# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **PAUL J. MANAFORT, Jr., and RICHARD W. GATES III,** | **Crim. No. 17-201 (ABJ/DAR)** |
| **Defendants** | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF
### CONDITIONS OF RELEASE, COMPLEX CASE DESIGNATION
### AND NOTICE OF INTENT TO USE CERTAIN BANK RECORDS

The United States of America, by and through Special Counsel Robert S. Mueller III, submits this memorandum to advise the Court of several issues in advance of the scheduled November 2, 2017, court appearance. First, we advise the Court of the current bail conditions and provide information pertinent to any requests to modify bail conditions for the defendants. Second, we request that this case be designated "complex" pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(8)(B)(ii). Third, we provide the defendants notice pursuant to 18 U.S.C. § 3505(b) that the government intends to admit foreign bank records in this matter.

As explained below and at the initial appearance in this matter on October 30, 2017, the defendants pose a risk of flight based on the serious nature of the charges, their history of deceptive and misleading conduct, the potentially significant sentences the defendants face, the strong evidence of guilt, their significant financial resources, and their foreign connections. The government recognizes that the defendants are United States citizens with no criminal history, and accordingly, the government did not oppose release on bonds in the amount of $10 million for the defendant Manafort and $5 million for the defendant Gates, subject to their house arrest and

electronic monitoring, among other conditions. The government agreed to revisit these conditions upon information from the defendants to substantiate their assets and if the defendants are able to present appropriate sureties.[1]

Due to the voluminous discovery from both here and abroad, the government moves to designate the case as "complex" under the Speedy Trial Act and thus exclude time. We understand that counsel for the defendant Manafort consents to this request. We understand that the defendant Gates is in the process of retaining counsel and thus have not been able to raise this issue with either the defendant or counsel.

## I.      The Indictment

The conduct charged in the Indictment arises from the defendants' acting as agents of the Government in Ukraine, the Party of Regions, and Ukrainian President Victor Yanukovych, without registering as required by the Foreign Agents Registration Act. From that work, the defendants profited substantially, laundered those profits, and hid both those profits and their conduct from United States authorities, including the Treasury Department and the Department of Justice. The defendants created a web of entities and corresponding bank accounts here and abroad to hide and facilitate the movement of funds. And they lied repeatedly to financial bookkeepers, tax accountants, legal counsel, and the government to further their scheme. For example, in September 2016, when the Department of Justice inquired of the defendants about their activity on behalf of Ukraine, the defendants responded with false and misleading statements to conceal their activities—first in November 2016 and again in February 2017. Of note, and as explained

---

[1] Both defendants were permitted to self-surrender on Monday to the Federal Bureau of Investigation (FBI) on the condition that, after each was notified of the existence of an arrest warrant, they were required to turn over any passports and to notify the FBI of their movements. Both complied.

further below, the Chief Judge recently found that the government made a *prima facie* showing that the defendants used their former attorney (who was not complicit) to convey this false and misleading information to the Department of Justice.

Manafort, with Gates's help, (i) filed tax returns that falsely reported his income, (ii) falsely denied controlling foreign bank accounts, and (iii) committed bank fraud. And both men failed to disclose their interests in foreign accounts to the Treasury Department as required by the Bank Secrecy Act, a federal law enacted in part to deter money laundering. *See United States v. Floyd*, 4 F. Supp. 3d 150, 153 n.2 (D.D.C. 2013). The defendants used their ill-gotten gains to purchase millions of dollars of goods and services, as detailed in the Indictment.

Based on this conduct, Manafort and Gates are charged with nine and eight counts, respectively, in a 12-count Indictment. The charges and the relevant counts are detailed below:

| Count | Charge | Defendant |
|---|---|---|
| 1 | Conspiracy Against the United States (18 U.S.C. § 371) | MANAFORT GATES |
| 2 | Conspiracy to Launder Money (18 U.S.C. § 1956(h)) | MANAFORT GATES |
| 3 | Failure To File Reports of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2) | MANAFORT |
| 4 | Failure To File Reports of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2) | MANAFORT |
| 5 | Failure To File Reports of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2) | MANAFORT |
| 6 | Failure To File Reports of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2) | MANAFORT |
| 7 | Failure To File Reports of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2) | GATES |
| 8 | Failure To File Reports of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2) | GATES |
| 9 | Failure To File Reports of Foreign Bank and Financial Accounts (31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2) | GATES |
| 10 | Failure to File as an Agent of A Foreign Principal (22 U.S.C. §§ 612(a) and 618(a)(1); 18 U.S.C. § 2) | MANAFORT GATES |
| 11 | False and Misleading FARA Statements (22 U.S.C. §§ 612, 618(a)(1); 18 U.S.C. § 2) | MANAFORT GATES |

| Count | Charge | Defendant |
|-------|--------|-----------|
| 12 | False Statements<br>(18 U.S.C. §§ 2, 1001(a)) | MANAFORT<br>GATES |

## II. Bail Issues

### A. Legal Framework

Absent a case falling into the categories delineated in the Bail Reform Act (the Act) in which a "rebuttable presumption" of detention arises, *see* 18 U.S.C. § 3142(e), the Act favors pre-trial release. *See United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014). Under the Act, defendants may be released on a bond with conditions if the government establishes by a preponderance of the evidence that the defendant constitutes a risk of flight but the court determines that some condition, or combination of conditions, will reasonably assure the defendant's appearance at trial and pre-trial proceedings. *Id.*; *see* 18 U.S.C. § 3142(c) and (f)(2)(A). In conducting the first (that is, the risk-of-flight) inquiry, courts consider the following factors: the nature and circumstances of the charged offenses; the weight of the evidence against the defendants; the history and characteristics of the defendants; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *see Bikundi*, 47 F. Supp. 3d at 133; *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013). Because the government does not contend here that the defendants pose a danger to the community, this last factor has "minimal relevance" and will not be addressed further. *Bikundi*, 47 F. Supp. 3d at 137.

### B. The Defendants Pose A Risk of Flight and Substantial Bail Conditions Are Warranted To Ensure Their Appearance

The nature and seriousness of the crimes with which the defendants are charged, their history of deception, the weight of the evidence against them, and their history and characteristics combine to establish, by at least a preponderance of the evidence, that they pose a serious risk of

flight.  The government addresses each of these statutory factors in Part 1 below, proceeding by proffer.  *See United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015).  The government then addresses in Part 2 the need for substantial bail conditions to ensure the defendants' continued appearances in light of their flight risk.

### 1.   The Court Should Find A Serious Risk of Flight

#### a.   Nature and Circumstances of the Offense

The charges in the indictment are properly characterized as serious due to the statutory penalties and the anticipated advisory Sentencing Guidelines ranges; the duration and complexity of the criminal conduct; and the fact that the charges include multiple crimes of deceit, which involve false and misleading statements to the United States Treasury Department and the Department of Justice, as well as to lawyers, accountants, and others.  *See United States v. Saani*, 557 F. Supp. 2d 97, 98-99 (D.D.C. 2008) (tax-perjury defendant's "alleged purposeful and illegal concealment of . . . access" to funds in foreign bank accounts was "directly relevant to [his] flight risk"); *United States v. Anderson*, 384 F. Supp. 2d 32, 39 (D.D.C. 2005) (defendant's "historical unwillingness to be forthright in his dealings with government officials" relevant to flight risk); *see also United States v. Khanu*, 370 F. App'x 121, 122 (D.C. Cir. 2010) (unpublished) (noting that defendant's "lack of candor regarding the proceeds from three real estate sales provides strong evidence supporting the presumption that he poses a risk of flight").

As an initial matter, the significant terms of imprisonment that the defendants would face upon conviction provide a strong incentive to flee.  *See, e.g.*, *Bikundi*, 47 F. Supp. 3d at 134 (considering the statutory penalties and advisory Guidelines range, and collecting cases doing the same).  The money laundering conspiracy and various Title 31 FBAR counts carry statutory

maximum sentences of 20 and 10 years, respectively.   Each of the remaining counts carries a statutory maximum sentence of five years.   Moreover, the government estimates that the defendants' offense levels under the Sentencing Guidelines, without considering relevant conduct with respect to related frauds, would be at least a level 32 for Gates and a level 34 for Manafort, which correspond to advisory guideline ranges of 121 to 151 months of imprisonment for Gates, and 151 to 188 months for Manafort.   The government arrived at this calculation under the money laundering guideline, U.S.S.G. § 2S1.1, as follows: a base level of 8 under § 2S1.1(a)(2), increased by 20 levels pursuant to § 2B1.1(b)(1)(K) because the value of the laundered funds exceeds $9,500,000; and with the following enhancements: plus 2 pursuant to § 2S1.1(b)(2) (if convicted under 18 U.S.C. § 1956), and plus 2 for sophisticated laundering (pursuant to § 2S1.1(b)(3)), for a total offense level of 32.   An additional two-level enhancement for a managerial role would apply for Manafort, pursuant to § 3B1.1(c).   Because neither defendant has a criminal history, Criminal History Category I applies.

The possibility of prison sentences in these ranges alone establishes a risk of flight as to both defendants.   Courts have repeatedly held that with serious charges and the possibility of considerable punishment comes "a substantial incentive to flee the United States." *Bikundi*, 47 F. Supp. 3d at 134 (finding advisory guidelines range of 161 to 210 months on money laundering counts to be relevant to detention decision); *Hong Vo*, 978 F. Supp. 2d at 43 (finding detention appropriate for defendant facing stiff penalties for bribery and visa fraud); *see also United States v. Dupree*, 833 F. Supp. 2d 241, 253-54 (E.D.N.Y. 2011) (finding bank fraud involving millions of dollars to be "serious charges" such that pretrial release not warranted).   And for a defendant such as Manafort, who is in his late 60s, that incentive is even stronger.   *See Anderson*, 384 F. Supp. 2d at 35 (explaining that incentive to flee for defendant facing combined statutory maximum

penalties of 23 years was great because, "[a]t 51 years old, Mr. Anderson potentially could spend most of the remainder of his life in prison if convicted").

Second, the schemes charged in the indictment involve a complex web of international financial transactions involving substantial sums of money, which also raise flight concerns. As set forth in the indictment, Manafort and Gates controlled numerous entities registered in multiple states and abroad. And they used those entities to transmit more than $18 million dollars from Ukraine through Cyprus and later Saint Vincent and the Grenadines to the United States, all while concealing those funds from both the United States Treasury and Justice Departments. Courts in this district have repeatedly held that a defendant's ability to conduct complex financial transactions, and the access to funds that this ability entails, increases the risk of flight.

The decisions in *Anderson* and *Saani*, *supra*, are instructive. In *Anderson*, the defendant was charged with a tax-evasion scheme conducted by creating offshore corporations in tax-haven countries. 384 F. Supp. 2d at 35. The court explained that the defendant's offenses "demonstrate substantial familiarity with the commercial and financial laws of other countries, sophistication in arranging international financial transactions and in moving money across borders, and a facility for concealing the existence and location of significant quantities of money and other assets." *Id.* "The behavior underlying these charged offenses," the court therefore concluded, "clearly suggests that [the defendant] is a flight risk." *Id.* at 35-36; *see also, e.g.*, *Bikundi,* 47 F. Supp. 3d at 133 (the defendant's sophistication in setting up several companies, navigating the regulatory process, and funneling monies to several bank accounts to conceal unlawful conduct created "a valid concern" that he would have an incentive and ability to flee).

Likewise, in *Saani*, the defendant was a dual citizen of the United States and Ghana charged with failing to report on his tax return his interest in foreign accounts. 557 F. Supp. 2d at 98. The

court explained that, while Saani's offense was neither violent nor a drug crime, "it is a crime of deception with direct relevance to [his] ability to support himself overseas." *Id.* That ability, along with Saani's "access to substantial sums of money in foreign bank accounts" and his lack of concrete ties to the United States, persuaded the court that Saani was a serious flight risk and that pre-trial detention was warranted. *Id.* at 99-100. The defendants here have more substantial ties to the country than did Saani, but their charged offenses similarly involve crimes of deception that evince an ability to earn and store money overseas, thus supporting the conclusion that they too pose a "flight risk." *Id.* at 99.

### b. Weight of the Evidence

Courts also consider the weight of the evidence in assessing the risk of flight. 18 U.S.C. § 3142(g)(2). The government briefly reviews the relevant evidence, keeping in mind that the evidence supporting guilt at this stage need not conclusively establish guilt and "is relevant . . . only in terms of the likelihood that [the defendants] will fail to appear at trial." *Hong Vo*, 978 F. Supp. 2d at 43-44.

The indictment sets forth in detail the charged crimes and certain supporting evidence, including references to documentary and other evidence obtained during the investigation. With respect to the FARA and related false and misleading statement charges, a recent ruling by the Chief Judge confirms the strength of the government's evidence that the defendants caused to be made false and misleading statements to the Justice Department. In granting the government's motion to compel the grand jury testimony of the former lawyer who submitted the November 2016 and February 2017 letters on the defendants' behalf, the Court concluded in relevant part that the government had made "a sufficient *prima facie* showing that the crime-fraud exception to the attorney-client and work-product privileges applies." Oct. 2, 2017 Mem. Op. at 2 (redacted copy

attached hereto as Exhibit A).[2]  Addressing the specific statements alleged to be false and for which the government sought to question the witness, the Court found, among other things, that the defendants "were intimately involved in significant outreach in the United States on behalf of the [European Centre for a Modern Ukraine or ECFMU], the Party of Regions and/or the Ukrainian government," *id.* at 17; that the defendants "had an informal agreement with the ECFMU to direct the government relations and public affairs activities of [Company A] and [Company B] and also to fund these activities," *id.* at 18; that the defendants "played far more significant and continuing roles" with respect to Company A and Company B than merely being "matchmakers," as their letters to the FARA Unit had indicated, *id.* at 20; and that given the "evidence confirming the level of regular contact by the [defendants] and [Company A and Company B] . . . the defendants' representation that "neither could recall 'being party to, arranging, or facilitating any such communication' with U.S. government officials or U.S. media outlets, strains credulity," *id.* at 22.

With respect to the remaining charges (money laundering, conspiracy against the United States and FBAR), the government will rely, among other evidence, on the defendants' tax filings and other bank records.  For example, bank records establish that Gates and Manafort were the beneficial owners of multiple foreign accounts in various countries and that these accounts were not reported to the Treasury Department or on the defendants' tax returns.  Further, transfers from these accounts totaling millions of dollars went directly to vendors to pay for expenses for Manafort and to accounts controlled by Gates.  Neither Manafort nor Gates identified these accounts on their tax returns or filed the required notifications with the Treasury Department.

---

[2] As noted above, the government does not allege that the lawyer in question was complicit in the defendants' submission, but rather was unwittingly conveying to the Department of Justice false and misleading information provided by Manafort and Gates.

### c. The History and Characteristics of the Defendants

As noted, the defendants are United States citizens with community ties and family here, and neither has a criminal record.  Manafort has residences in New York, Virginia, and Florida; Gates resides in Virginia.  Those connections distinguish these defendants from those ordered detained in cases such as *Anderson*, 384 F. Supp. 2d at 38-39, and *Saani*, 557 F. Supp. 2d at 99-100, and counsel in favor of release with conditions.  That said, both of the defendants have significant financial resources.  Both have had substantial overseas ties, including assets held abroad, significant foreign work connections, and significant travel abroad.  Those aspects of the defendants' history and characteristics evidence a risk of flight.[3]

### i. Financial Resources

A defendant's "financial resources" are a relevant aspect of his "history and characteristics."  18 U.S.C. § 3142(g)(3); *see United States v. Patriarca*, 948 F.2d 789, 795 (1st Cir. 1991) (explaining that the court should have considered the extent of defendant's assets and net worth before determining the amount of property to be posted as forfeiture condition).  The indictment sets forth and charges the defendants with engaging in a long running and complex scheme to funnel millions of dollars into the United States, through various entities and accounts in Cyprus, Grenadines, Seychelles and England, owned or controlled by the defendants worldwide, and passed through a series of foreign accounts.  Manafort, Gates, and a Russian national—who is a longstanding employee of Davis Manafort Partners, Inc. and DMP International LLC (collectively DMI)—served as the beneficial owners and signatories on these accounts.  The

---

[3]  The government has also learned that in March of this year, Manafort registered a phone and an email account using an alias.  Manafort traveled with this telephone to Mexico on June 2017; to China on May 23, 2017; and to Ecuador on May 9, 2017.

indictment also alleges that more than $75 million flowed through these overseas accounts, and the government has substantial documentary evidence to support that allegation.

Manafort's financial holdings are substantial, if difficult to quantify precisely because of his varying representations. Manafort has represented the value of his assets on loan applications and other financial documents in divergent amounts, which suggests considerable resources, the full extent of which is unclear. For example, in November 2016 and January 2017, he noted his assets to be worth approximately $25,000,000. In August 2016, he listed $63,000,000 as the value of his assets, and in a different application also in August 2016, he listed $28,000,000. Previously, in May 2016, Manafort listed the value of his assets at $136,000,000; in March 2016, Manafort represented his assets to be approximately $42,000,000; the prior month, in February 2016, Manafort represented his assets to be worth $48,000,000. In April 2015, Manafort noted the value of his assets to be approximately $35,000,000. In July 2014, he valued his assets at "$30,000,000 plus"; and in April 2012, he stated his assets were $19,000,000.

Gates's personal finances and other holdings also appear significant. Recently, in a February 2016 application for a line of credit, Gates listed his and his wife's net worth as $30,000,000 and his liquid net worth as $25,000,000. Other documents provide conflicting information. In March 2016, in a residential loan application, Gates listed his "total assets" (and that of his wife) to be valued at approximately $2.6 million. In connection with a loan in 2011, Gates estimated his "total assets" at approximately $2.2 million dollars.[4]

Further, since 2008, Gates has incorporated or registered almost two dozen entities, in a

---

[4] Gates has frequently changed banks and opened and closed bank accounts. From the period December 2004 to January 2017, Gates opened and was a signatory on 55 accounts with 13 financial institutions. The government believes at least 30 of those accounts remained open within the last six months.

variety of names in Delaware, Virginia, and Nevada (and others overseas).  Some of these entities are listed in the indictment and had corresponding foreign bank accounts.  Others had accounts in the United States and held significant funds.  And as alleged in the indictment, from the period of 2010 to 2013, Cypriot bank accounts for which Gates was the beneficial owner held substantial sums—*i.e.*, more than $10 million.  Gates also had accounts in England, in his name and in the name of a corporate entity for which he was the sole director.

### ii.     Ties Abroad and Frequent Travel

Both defendants have substantial ties abroad, including in Ukraine, where both have spent time and have served as agents of its government.  DMI, which Manafort owned and where Gates worked, had staff in Kiev and Moscow.  And both Manafort and Gates have connections to Ukrainian and Russian oligarchs, who have provided millions of dollars to Manafort and Gates.  Foreign connections of this kind indicate that the defendants would have access to funds and an ability "to live comfortably" abroad, *Hong Vo*, 978 F. Supp. 2d at 45, a consideration that strongly suggests risk of flight.  *See id.*; *Saani*, 557 F. Supp. 2d at 98-100; *Anderson*, 384 F. Supp. 2d at 36.

Manafort and Gates are frequent international travelers, consistent with the nature of their work for foreign entities.  Within the last year, Manafort has traveled to Dubai, Cancun, Panama City, Havana, Shanghai, Madrid, Tokyo, and Grand Cayman Island.[5]  Although we are unaware of any international travel by Gates in the last year, he has previously traveled abroad extensively, including trips to Paris, London, and Frankfurt before 2015.  The investigation has also revealed that Gates and Manafort traveled to Cyprus, the place where many of their foreign accounts are based.  Extensive travel of this nature further evidences a risk of flight.  *See, e.g.*, *Anderson*, 384

---

[5] In a little more than the last ten years, Manafort has submitted ten United States Passport applications on ten different occasions, indicative of his travel schedule.  He currently has three United States passports, with different numbers.

F. Supp. 2d at 36 (noting that defendant had made at least 35 trips outside of the U.S. in the two previous years); *Saani*, 557 F. Supp. 2d at 100 (noting, despite the apparent seizure of the defendant's passports, that he was "a sophisticated international traveler who ha[d] traveled throughout Europe, the Middle East, and Africa").

In sum, the seriousness of the charges and penalties that the defendants face, along with their extensive international connections and financial resources, establish that they pose a serious risk of flight.  Although the defendants will surely argue that this risk is minimal given that they did not flee despite being under grand jury investigation, "a pre-indictment investigation and a post-indictment trial are two very different things."  *Anderson*, 384 F. Supp. 2d at 40 (rejecting defendant's argument that the fact that he did not flee prior to charges being filed despite being aware of the investigation is proof the he was not a risk of flight).  This argument, in short, does not undermine the conclusion that the defendants pose a serious risk of flight.

### 2. The Defendants May Appropriately Be Released on Substantial Conditions That Reasonably Assure Their Future Appearances

Because the defendants pose a serious risk of flight, the remaining question is "whether any condition or combination of conditions" authorized under the Act "will reasonably assure the appearance of [the defendants] as required."  18 U.S.C. § 3142(f).  The government believes that a package of conditions that suffices to reasonably assure the defendants' presence should include substantial financial conditions and travel restrictions, among others, to mitigate the risk of flight established above.

Courts have recognized that setting bail conditions and bond amounts is "[not] an exact science" and that the determination of those issues "calls for an exercise of experience-based judgment that often turns on very circumstance-specific and defendant-specific considerations."  *United States v. Famiglietti*, 548 F. Supp. 2d 398, 414–15 (S.D. Tex. 2008); *see*

*generally* 3B Wright & Leipold, Fed. Practice & Proc. Crim. § 776 (4th ed. 2017 update) (explaining that framing adequate conditions largely "must be left to the discretion of the judicial officer who makes the initial determination").   As to bail conditions in particular, however, Congress has provided significant guidance.  *See* 18 U.S.C. § 3142(c)(1)(B) (setting forth possible conditions that may be used to assure the defendant's appearance).   Among the statutorily authorized conditions are third-party custody; restrictions on a defendant's associations and travel (including association with potential witnesses); periodic reporting; curfews; a bail bond with solvent sureties; and "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community."  *Id.* § 3142(c)(1)(B)(i)-(xiv).

In authorizing the Court to release a defendant on conditions, the Act contemplates a focus on the defendant's finances as a relevant consideration.  18 U.S.C. § 3142(g)(3)(A) (person's history and characteristics include "financial resources"); *id.* § 3142(c)(1)(B)(xi) and (xii) (authorizing release subject to financial conditions).  With that consideration in mind, courts have routinely determined that bail conditions in white collar cases should require the posting of substantial cash or other assets, to be accompanied by a range of other restrictions (such as the surrender of passports and travel limitations).  *See, e.g.*, *United States v. Brooks*, 872 F.3d 78, 83-84 (2d Cir. Sept. 20, 2017) (bond secured by cash and family sureties, paired with home detention and bar on maintaining assets overseas); *United States v. Dreier*, 596 F. Supp. 2d 831, 833-34 (S.D.N.Y. 2009) ($10 million bond co-signed by defendant's family members and paired with home detention).[6]

---

[6] The Bail Reform Act codified a district court's authority to conduct an inquiry—often called a *Nebbia* hearing—to determine the "the source of funds deposited as bail bond . . . to ensure that the funds provided are adequate to compel the defendant to return," *United States v.*

The financial conditions in some of the above cases have included bonds secured through family sureties. Any such sureties allowed here should satisfy certain criteria. First, they "would need to possess enough assets so that they would collectively be able to pay the full amount of the bond if necessary." *United States v. Batista*, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *see* 18 U.S.C. § 3142(c)(1)(B)(xii) (requiring that sureties be "solvent," with "a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond"). Second, sureties must also exercise "moral suasion" sufficient "to ensure the defendant's presence at trial." *Batista*, 163 F. Supp. 2d at 224. Appropriate factors to consider when weighing whether a proposed surety exercises moral suasion vary from case to case, but may include the strength of the ties between the surety and defendant (*i.e.*, family or close friend, close or estranged), the defendant's roots in the community, and the regularity of contact between the surety and the defendant. *Id.*

### III.    Complex Case Designation

The Speedy Trial Act (STA) requires a defendant's trial to begin within 70 days of his indictment or appearance before a judicial officer, whichever occurs later. *See* 18 U.S.C. § 3161(c)(1). In addition to certain periods of delay that are automatically excluded from the 70-day period, *see id.* § 3161(h), "[a] district court can, on its own motion or at the request of a party, grant an excludable continuance if 'the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.'" *United States v. Rice*, 746 F.3d 1074, 1078 (D.C. Cir. 2014) (quoting 18 U.S.C. § 3161(h)(7)(A)). An ends-of-justice continuance has both procedural and substantive components. Procedurally, the STA requires the court to "set[] forth, in the record of the case, either orally or in writing, its reasons for finding that the ends

---

*Eschweiler*, 782 F.2d 1385, 1386 n.2 (7th Cir. 1986). *See* 18 U.S.C. § 3142(g)(4). If the Court orders the defendants released on financial conditions, the government reserves its ability to request such an inquiry.

of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A); *see Zedner v. United States*, 547 U.S. 489, 506-07 (2006). The court's "substantive judgment," in turn, is informed by "several factors" set forth in the STA, "including the complexity of the case." *Rice*, 746 F.3d at 1078; *see* 18 U.S.C. § 3161(h)(8)(B)(ii) (court should consider whether the case is "so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by" the STA).

This case warrants designation as a complex case and a corresponding ends-of-justice continuance under the STA.[7] The indictment charges two defendants in 12 counts that are based on conduct stretching over a more than a decade-long period and involving numerous financial transactions, many of which are cross-border. As a result, the government will be producing substantial documentary evidence involving hundreds of thousands of documents from the United States and abroad. That makes it unreasonable to expect adequate preparation for trial or pretrial proceedings within the time limits proscribed by the STA. For these reasons, and as other courts in this circuit have regularly done in cases involving cross-border events and voluminous discovery, this Court should designate the case as complex under the STA. *See, e.g.*, *Rice*, 746 F.3d at 1078-79 (upholding continuance based on determination that international drug-trafficking prosecution "was sufficiently complex"); *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 204 (D.C. Cir. 2013) (same, in case involving foreign defendants and witnesses); *United States v. Salahmand*, No. 08-cr-192 (CKK), 2008 WL 11356766, at *1-*3 (D.D.C. 2008) (need for counsel

---

[7] Counsel for defendant Manafort has informed the government that he supports this request for a complex-case designation under the Act.

and defendant to review "voluminous discovery"); *cf. United States v. Cooper*, 947 F. Supp. 2d 108, 118 (D.D.C. 2013) (granting additional ends-of-justice continuance in "complex case" involving "voluminous discovery materials" and "foreign depositions").

**IV.     Notice Pursuant to 18 U.S.C. § 3505**

Finally, pursuant to 18 U.S.C. § 3505, the government hereby gives notice to the defendants that the government intends to offer in evidence "a foreign record of regularly conducted activity."

**V.     Conclusion**

The government has explained above its position that the defendants pose a risk of flight but that release subject to significant financial and other conditions will reasonably assure the defendants' appearance as required by law.  Second, the government asks that the Court designate this case as a complex case warranting an ends-of-justice continuance under the Speedy Trial Act.

Respectfully submitted,

ROBERT S. MUELLER III
Special Counsel

Dated: October 31, 2017              By:      /s/
                                              Andrew Weissmann
                                              Greg D. Andres
                                              Kyle R. Freeny
                                              (202) 514-1746

17

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| *In Re* GRAND JURY INVESTIGATION | Misc. Action No. 17-2336 (BAH) |
| | Chief Judge Beryl A. Howell |
| | **FILED UNDER SEAL** |
| | **FILED TEMPORARILY EX PARTE, PENDING REVIEW BY THE SPECIAL COUNSEL'S OFFICE** |

**MEMORANDUM OPINION**

This is a matter of national importance.  The United States, through the Special Counsel's

Office ("SCO"), is investigating foreign interference in the 2016 presidential election and

potential collusion in those efforts by American citizens.  The SCO has uncovered evidence that

Target 1, who was associated with the campaign of one presidential candidate—now the

President—and Target 2, who was Target 1's employee (collectively, "the Targets") at Target

Company, may have concealed from the government the extent of their lobbying actions on

behalf of a foreign government and foreign officials, in violation of federal criminal laws, by

submitting two letters through their former counsel, the Witness, containing false and misleading

information to the U.S. Department of Justice ("DOJ").[1]  The SCO seeks to compel the Witness

to testify before a grand jury regarding limited aspects of her legal representation of the Targets,

which testimony the SCO believes will reveal whether the Targets intentionally misled DOJ

---

[1]	For the purposes of this opinion, "Target 1" refers to Paul J. Manafort, Jr., "Target 2" refers to Richard W. Gates, "Target Company" is DMP International, LLC, and "the Witness" is ▮▮▮▮▮▮▮▮▮▮▮, an attorney at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SCO's Motion to Compel ("SCO Mot.") at 1, ECF No. 1.

1

about their work on behalf of a foreign government and foreign officials.  The Witness has refused to testify unless directed by a court order, due to professional ethical obligations, because the Targets have invoked their attorney-client and work-product privileges.  The SCO posits that the crime-fraud exception to both privileges applies and, alternatively, that the Targets have waived the attorney-client privilege to the extent of disclosures made in the submissions to DOJ, and that the work-product privilege is here overcome by a showing of adequate reasons to compel the Witness's testimony.

The attorney-client and work-product privileges play vital roles in the American legal system, by encouraging persons to consult freely and candidly with counsel, and counsel to advocate vigorously on their clients' behalves, without fear that doing so may expose a client to embarrassment or further legal jeopardy.  The grand jury, however, is an essential bedrock of democracy, ensuring the peoples' direct and active participation in determining who must stand trial for criminal offenses.  "Nowhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena." *In re Sealed Case*, 676 F.2d 793, 806 (D.C. Cir. 1982) (citing *Branzburg v. Hayes*, 408 U.S. 665, 688 & n.26 (1972)).  When a person uses the attorney-client relationship to further a criminal scheme, the law is well established that a claim of attorney-client or work-product privilege must yield to the grand jury's investigatory needs.

Based on consideration of the factual proffers made by the SCO, as well as the arguments articulated by the SCO, the privilege holders and the Witness over multiple filings and three hearings held during the past two weeks, the Court finds that the SCO has made a sufficient *prima facie* showing that the crime-fraud exception to the attorney-client and work-product privileges applies.  Additionally, the Targets have impliedly waived the attorney-client privilege

concerning their communications with the Witness to the extent those communications formed

the basis of the disclosed text of the Witness's letters to DOJ.  Finally, the SCO overcomes any

work-product privilege by showing that the testimony sought from the Witness is necessary to

uncover criminal conduct and cannot be obtained through other means.  Thus, the SCO may

compel the Witness to testify as to the specific matters delineated more fully below.

## I.      BACKGROUND

On May 17, 2017, Acting Attorney General Rod Rosenstein appointed Robert S. Mueller

III to serve as Special Counsel for the United States Department of Justice.[2]  U.S. Dep't of

Justice, Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian*

*Interference with the 2016 Presidential Election and Related Matters* (May 17, 2017), *available*

*at* https://www.justice.gov/opa/press-release/file/967231/download.  The Special Counsel was

authorized to conduct an investigation into "(i) any links and/or coordination between the

Russian government and individuals with the campaign of President Donald Trump; and (ii) any

matters that arose or may arise directly from the investigation; and (iii) any other matters within

the scope of 28 C.F.R. § 600.4(a)."  *Id.*

As part of its investigation, the Special Counsel's Office ("SCO") is scrutinizing

representations made by the Witness in two letters submitted in November 2016 and February

2017 respectively, on behalf of her clients, the Targets, to the Foreign Agent Registration Act's

("FARA") Registration Unit of DOJ's National Security Division.  SCO's Motion to Compel

---

[2]      Deputy Attorney General Rod Rosenstein served as Acting Attorney General for the purposes of the
Special Counsel appointment due to Attorney General Jeff Sessions' recusal "from any existing or future
investigations of any matters related in any way to the campaigns for President of the United States" in 2016.  Press
Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017), *available at*
https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal.

(Sept. 19, 2017) ("SCO Mot.") at 1, ECF No. 1.  The factual background pertinent to this matter

is summarized first before turning to the relevant procedural history.

### A.      Factual Background

#### 1.      The Targets' Work on Behalf of Ukraine's Party of Regions

On September 13, 2016, Heather H. Hunt, the Chief of the FARA Registration Unit,

wrote separately to Target Company and Target 1, noting that "[n]umerous published sources

raise questions" that Target Company and Target 1 may have engaged in activities on behalf of

the European Centre for a Modern Ukraine ("ECFMU"), the Ukrainian government, the

Ukrainian Party of Regions, or other foreign entities, thus requiring registration under FARA.

*See* Target 1's Opp'n to SCO Mot. (Sept. 25, 2017) ("Target 1 Opp'n"), Ex. A, DOJ Requests to

Target 1 (Sept. 13, 2016), ECF No. 9.  Ms. Hunt requested that Target 1 and Target Company

provide documents and information for review and, shortly thereafter, Target 1 retained the

Witness as counsel for the purposes of responding to these requests.  Target 1 Opp'n at 2.

#### 2.      The 2016 and 2017 FARA Submissions to DOJ

The SCO has advised that the information sought from the Witness focuses on two

letters, dated November 23, 2016 and February 10, 2017, respectively, that the Witness sent to

the FARA Registration Unit on behalf of her clients, Target Company, Target 1, and Target 2.

SCO Mot. at 1.  The November 23, 2016 letter explained that Target Company is a "single-

member, wholly-owned, limited liability company . . . controlled by [Target 1]," that engaged in

political consulting, for both foreign and domestic clients, and provided "strategic guidance on

democratic election processes, campaign management, and electoral integrity."  Target 2's

Opp'n to SCO Mot. (Sept. 20, 2017) ("Target 2 Opp'n"), Ex. C, Letter from Witness to Heather

H. Hunt, Chief, FARA Registration Unit, Nat'l Security Div., U.S. Dep't of Justice (Nov. 23,

2016) ("2016 FARA Submission") at 1, ECF No. 3.  As to ECFMU, the submission stated that Target Company, Target 1, and Target 2 "did not have an agreement to provide services to the ECFMU," and "[f]urthermore, my Clients were not counterparties to any service agreement(s) between [two government relations companies ("GR Company 1" and "GR Company 2")] and the ECFMU."  *Id.*  According to the submission, a "search ha[d] been conducted for correspondence containing additional information related to the matters described in" the FARA Registration Unit's inquiries, but "as a result of [Target Company's] Email Retention Policy, which does not retain communications beyond thirty days, the search . . . returned no responsive communications."  *Id.*[3]  A copy of that written policy was enclosed in the November 2016 letter. *Id*.

The Witness wrote a more fulsome explanation of her clients' work on behalf of the Party of Regions in the second FARA submission on February 10, 2017.  According to that submission, Target Company, along with Target 1 and Target 2, were "engaged by the Party of Regions to provide strategic advice and services in connection with certain of the Party's Ukrainian and European-facing political activities."  SCO Mot., Ex. A, Letter from Witness to Heather H. Hunt, Chief, FARA Registration Unit, Nat'l Security Div., U.S. Dep't of Justice (Feb. 10, 2017) ("2017 FARA Submission") at 1, ECF No. 1.  The submission continued by describing the "scope of this work" as consisting "of two principal components: (1) [Target Company] provided assistance in managing the Party of Regions' party building activities and

---

[3]      The Targets rely on Target Company's Email Retention Policy to advance an argument that, to the extent the Witness's letters to DOJ on their behalves materially omit or misstate facts, these failings occurred due to imperfect memory, unaided by contemporaneous emails which could have refreshed their recollection.  *See* Nov. 23 Ltr. at 1–2 ("we are seeking to determine whether there are alternative sources of such information that would assist in ensuring that any responses are complete and accurate.").  As discussed more fully, *infra*, this argument is belied by evidence gathered by the SCO.

assisted in the development of its overall party strategy and political agenda, including election planning and implementation of the Party's political plan; and (2) [Target Company] provided counsel and advice on a number of policy areas that were relevant to the integration of Ukraine as a modern state into the European community." *Id.*

Despite this scope of work, the 2017 FARA Submission downplayed Target Company's U.S. activities for the Party of Regions. In particular, the 2017 FARA Submission stated that Target Company's "efforts on behalf of the Party of Regions and Opposition bloc did not include meetings or outreach within the U.S." *Id.* at 2. Further, the 2017 FARA Submission minimized any relationship between the Targets and the ECFMU, stating that "neither [Target Company] nor [Target 1 or Target 2] had any agreement with the ECFMU to provide services." *Id.* While Target Company provided the ECFMU "with a list of potential U.S.-based consultants," the 2017 FARA Submission states that ECFMU "contracted directly with" GR Company 1 and GR Company 2. *Id.* Further, the 2017 FARA Submission indicates that Target 2 "recall[ed]" interacting with ECFMU's consultants "regarding efforts in the Ukraine and Europe," but neither Target 1 nor Target 2 "recall[ed] meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the ECFMU, nor do they recall being party to, arranging, or facilitating any such communications." *Id.* Instead, the 2017 FARA Submission explained that Target 1 and Target 2 recalled that any "such communications would have been facilitated and conducted by the ECFMU's U.S. consultants, as directed by the ECFMU, pursuant to the agreement reached between those parties (to which [Target Company] was not a party)." *Id.* at 2–3.

### 3.   The Targets Register Under FARA

On June 27, 2017, the Witness made another submission to DOJ on behalf of her clients, the Targets, in response to "guidance and assistance offered by the FARA Registration Unit in this matter." Target 2 Opp'n, Ex. E, Letter from Witness to Heather H. Hunt, Chief, FARA Registration Unit, Nat'l Security Div., U.S. Dep't of Justice (June 27, 2017) at 1, ECF No. 3. While stating that the "Clients' primary focus was directed at domestic Ukrainian political work, consistent with our discussions, we understand that the FARA Registration Unit has taken the position that certain of the activities conducted and/or contacts made by my Clients between 2012 and 2014 constituted registerable activity under FARA." *Id.* Accordingly, the submission states that the Targets "submitted the registration and supplemental statements with respect to their activities on behalf of the Party of Regions." *Id.*

### 4.   The Grand Jury Subpoenas to the Witness

On August 18, 2017, a subpoena was issued, as part of the SCO's investigation, for the Witness's testimony before the grand jury. *See* Target 2 Opp'n at 2; Hr'g Tr. (Sept. 20, 2017) ("Sept. 20 Tr.") at 12:24–25, ECF No. 8. In the discussions that ensued, the Targets, through counsel, asserted to the Witness's counsel and the SCO "the protections of attorney-client privilege, attorney work product doctrine, the Rules of Professional Conduct," including "those addressing client-lawyer confidentiality and duty of loyalty." Target 2 Opp'n at 2.

The SCO responded to the objections raised by Target 2's counsel in a letter, dated September 11, 2017, outlining both the scope of the questions to be posed to the Witness and the bases for the government's position that the information sought by those questions is not shielded by the attorney-client privilege or the work product doctrine. Target 2 Opp'n, Ex. B, SCO Letter to Target 2 (Sept. 11, 2017) at 1, ECF No. 3. Further, the SCO argued that even if

7

the communications at issue were initially protected, those privileges "would be overcome by the crime-fraud exception." *Id.*

With respect to the planned questions to the Witness before the grand jury, the SCO stated that the witness would be asked "narrow questions to confirm the source of the facts she submitted to the government, including whether her clients gave her the information represented in the letter as coming from them and/or reviewed a draft of the letter for accuracy." *Id.*

With respect to the Targets' invocation of attorney-client privilege, the SCO set out several bases for why the Targets' communications with the Witness underlying the 2017 FARA Submission were not protected. First, the SCO expressed the view that the communications were not privileged to begin with because the submission "expressly and repeatedly attributed the information to her clients" and "[t]hat sourcing makes clear that the [submission was] intended to convey information from her clients," such that "the underlying communications were intended to be revealed to the government." *Id.* at 1–2. Second, "[e]ven if the privilege initially attached, the [Witness's] letter waived it" because the submission's contents did "more than simply present facts that were likely learned from clients; it attributes many of these facts to the 'recollections' and 'understandings' of named clients," "[a]nd because the letter did so to benefit the clients in their interactions with the FARA Unit, waiver would be implied based on objective considerations of fairness." *Id.* at 2. Third, the SCO dismissed the applicability of the work-product doctrine, stating that the doctrine did "not apply at all to the issue of whether [the Witness] showed her clients the [2017 FARA Submission] before submitting it to DOJ." *Id.* at 3. "Just as asking a lawyer whether she provided her client a document given to her by the government does not seek protected work product," the SCO continued, "neither does asking the lawyer whether she showed the client a document that the lawyer had drafted for submission to

the government." *Id.* (internal citation omitted).  Additionally, the SCO asserted that "[t]he same is true for the source of factual representations in the [2017 FARA Submission] about the recollections and understandings of named individual clients," because "[t]he work product doctrine does not shield 'factual confirmation concerning events the attorney personally witnessed,' including 'as the receiver . . . of information.'"  *Id.* (citing *In re Grand jury Proceedings*, 616 F.3d 1172, 1185 (10th Cir. 2010) and 8 Charles Alan Wright & Mary Kay Kane, *Federal Practice and Procedure* § 2023 (3d ed. 2017)).  The SCO emphasized that it was not seeking the Witness's "witness interview notes or to probe which witnesses she believed." *Id.* at 4.  Rather, the SCO was "just seeking to confirm that the source of the factual representations is what it purports to be: the clients' recollections."  *Id.*

Finally, the SCO stated that the crime-fraud exception to attorney-client privilege applied to the testimony sought from the Witness since "[t]he information known to the government establishes a prima facie showing that [the Targets] violated federal law by making materially false statements and misleading omissions to the FARA Unit," including violations of 18 U.S.C. § 1001(a) (false statements to the federal government); 22 U.S.C. § 618(a)(2) (false or misleading statements and omissions "in any . . . document filed with or furnished to the Attorney General under" FARA), and 18 U.S.C. § 2(b) (willfully causing another to commit a criminal act).  *Id.* at 5–6.  In particular, the SCO pointed to specific text in the 2017 FARA Submission that contained either "false statements or misleading omissions," *id.,* bolstering this assertion with general information about the nature of the contradictory evidence gathered.  In particular, the 2017 FARA Submission contained: (1) a statement that "misrepresented the relationship among [the Targets], the Ukrainian government, the European Centre for a Modern Ukraine (ECFMU), and two U.S. lobbying firms [('GR Company 1 and GR Company 2')]," *id.*

at 6, as shown by "[d]ocumentary evidence and witness testimony [] that both [Target 1 and Target 2] played a materially different role than these representations describe and that they knew so at the time they conveyed their alleged recollections to counsel," *id.*; (2) a statement that neither Target 2 nor Target 1 "recall[ed] meeting with or conducting outreach to U.S. government officials or U.S. media outlets on ECFMU, nor do they recall being party to, arranging, or facilitating any such communications," *id.* (quoting Feb. 10 Letter at 2), which was demonstrably contrary to "evidence establish[ing] that [Target 2], on his own and on behalf of [Target 1], engaged in weekly and at times daily calls and emails with [GR Company 1 and GR Company 2] to provide them directions as to specific lobbying steps that should be taken and to receive reports back as to the results of such lobbying," *id.*; (3) statements regarding the Targets' relationship with the GR Companies, which "convey[ed] to the FARA Unit that [Target 1] and [Target 2] had merely played matchmaker between the U.S. consultants ([GR Company 1 and GR Company 2]) and ECFMU," which was contrary to "evidence show[ing] that [Target 1 and Target 2] solicited [GR Company 2 and GR Company 1] to represent the Ukraine and directed their work," *id.* (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 135 S. Ct. 1318, 1329 (2015) (an omission can make a statement misleading under securities laws)), and "the FARA violations were part of a sustained scheme to hide funds in violation of the applicable money laundering and tax statutes, among others," *id.*; and (4) the statement "represent[ing] that there were no documents to refresh recollections because of an alleged [Target Company] corporate policy on document retention," was not consistent with the government's "evidence to prove otherwise," *id.* at 6–7 (internal citation omitted).

**B.      Procedural History**

In a letter, dated September 19, 2017, the Witness's counsel stated that the Witness was "committed to complying with the grand jury subpoena directed to her for testimony" but only to the extent such compliance was "within the bounds of her ethical obligations to her former clients, [Target 2 and Target 1]."  Letter from Witness's Counsel to SCO (Sept. 19, 2017) at 1, Ex. B, SCO Mot., ECF No. 1.  Relying on American Bar Association Formal Opinion #473, counsel for the Witness stated that the Witness was "ethically bound not to disclose any attorney-client communications, even after receiving a grand jury subpoena, based on any reasonable grounds articulated by the client, absent a Court Order," and that, in this matter, her clients had directed the Witness "not to respond to those questions by invoking the privilege."  *Id.*

That same day, the SCO moved to compel the Witness's testimony, relying on three theories.  SCO Mot. at 1.  First, the SCO asserts a so-called "conduit theory," under which the communications at issue are not covered by the attorney-client privilege because the clients provided information to the Witness with the expectation and understanding that the Witness would convey that information to the government.  SCO Mot. at 2 (citing *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir. 1984); *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958).  Second, the SCO argues that even if attorney-client privilege attached, the FARA Submissions impliedly waived the privilege when information was voluntarily disclosed to the government, and that the work product privilege is overcome by a showing of substantial need. *Id.* at 2–3.  Finally, the SCO asserts that the crime-fraud exception applies to the Targets' assertion of attorney-client privilege, because the communications at issue "were made with an 'intent' to 'further a crime, fraud or other misconduct.'"  *Id.* at 3 (citing *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989)).

That same day, the Court held a hearing with counsel from the SCO and for the Witness. *See* Minute Entry (Sept. 19, 2017).[4]  A second hearing was held on September 20, 2017 for the purpose of hearing from Target 1 and Target 2, as the privilege holders, in opposition to the SCO's motion.  At the second hearing, the SCO summarized the scope of questions to be posed to the Witness before the grand jury:

> The gist is, basically, we're trying to tie the statements in [the Witness's] letters, one in February of 2017, one in November of 2016 to her various clients.  The letters are written on behalf of [Target Company, Target 1, and Target 2].  We're trying to understand who the source of those statements were. . . . [I]n some instances, statements are attributed to [Target 2] [him or herself]; but, certainly, we'd also want to ask if all the clients reviewed letters for the purposes of accuracy before it was submitted.  So that's the gist.

Sept. 20 Tr. at 12:7–17.  At the conclusion of this hearing, the government was directed to submit any written proffer supporting application of the crime-fraud exception to the attorney-client privilege as well as to address the scope of questions to be posed to the Witness.  *Id.* at 29:18–25.  Counsels for Target 1 and Target 2 were also given an opportunity to supplement their prior submissions.  *Id.* at 30:4–5.

The Targets subsequently "engaged in discussions" with the SCO regarding the Witness's testimony.  Target 2's Suppl. Opp'n to SCO Mot. (Sept. 25, 2017) ("Suppl. Target 2

---

[4]      At the September 19, 2017 hearing, the Witness's counsel asserted that the SCO had taken the position that the privilege holders lacked standing to move to quash a subpoena "unless and until a motion to compel is filed." Hr'g Tr. (Sept. 19, 2017) ("Sept. 19 Tr.") at 11:8–10.  The SCO responded by making clear that the SCO had no objection to the privilege holders' counsel "being heard on behalf of their clients, given the fact that the privilege is theirs.  The Special Counsel's office doesn't object to that." *Id.* at 14:15–19.  Here, the Targets seek to assert their personal right to attorney-client and work-product privilege, and neither the SCO nor the Witness's counsel objected to the Targets' right to be heard.  Accordingly, the Court concludes that the Targets have standing to assert their claim of privilege in this proceeding.  *See, e.g.*, *United States v. Idema*, 118 F. App'x 740 (4th Cir. 2005) ("Ordinarily, a party does not have standing to challenge a subpoena issued to a nonparty unless the party claims some personal right or privilege in the information sought by the subpoena."); *Langford v. Chrysler Motor Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975) ("In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness."); 9A Wright & Miller, Federal Practice & Procedure § 2459 (2017) ("Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought." (internal quotation marks omitted)).

Opp'n") at 1, ECF No. 7.  While not conceding, as a matter of law, that the government is
entitled to elicit from the Witness any information about her representation of the Targets,
including  (1) "the source of the representations in the November 23, 2016 and February 10,
2017 letters" to DOJ, or (2) whether the Witness's "clients saw the final letters before they were
sent to DOJ," the Targets informed SCO that, "in order to avoid further litigation regarding these
issues," the Targets consented to the government asking the Witness those questions in
connection with the two letters (*i.e.*, (1) "Who gave you *x* information?" and (2) "Did [Target 1
or Target 2] see the final letter before it was sent to the FARA unit?").  *Id.*  According to Target
2's counsel, the SCO declined this offer.[5]  *Id.*

On September 26, 2017, the SCO supplemented its *ex parte* proffer of evidence
supporting application of the crime-fraud exception, and a third and final hearing was held, as
requested by the counsel to the Targets.  At this hearing, the SCO confirmed eight topics to be
posed to the Witness about portions of the 2017 and 2016 FARA submissions that the SCO
alleges are fraudulent or misleading:

1) "[W]ho are the sources of the specific factual representations in the November 2016 and
   the February 2017 letters that [the Witness] sent to the FARA Registration Unit at DOJ?"
   Hr'g Tr. (Sept. 26, 2017) ("Sept. 26 Tr.") at 23:8–11, ECF No. 13-1
2) "Who are the sources of [Target Company's] e-mail retention policy that was attached to
   the November 2016 letter to the FARA Registration unit at DOJ?"  *Id.* at 23:13–16;
3) "Whether --or if, [Target 2], [Target 1] or anyone else within [Target Company]
   approved the [November 2016 or February 2017] letters before [the Witness] sent the two
   letters to the FARA Registration Unit at DOJ?"  *Id.* at 23:7–23;

---

[5]      The SCO explained the reason for declining to limit questions to those stipulated by the privilege holders,
stating that "[t]here was, in our view, an effort to narrow the questions."  Hr'g Tr. (Sept. 26, 2017) ("Sept. 26 Tr.")
at 22:1-2, ECF No. 13-1.  Further "unlike the privilege holders, we don't know what [the Witness] is going to say"
and SCO "wanted to . . . have the latitude to be able to ask the right questions."  *Id.* at 22:6-9.  Moreover, although
the SCO explained that generally "the same information" was sought under any of its theories, the SCO would likely
have "more latitude if there was a ruling with respect to the crime fraud" exception, *id.* at 22:10-13, since the kinds
of questions permissible to pose under the crime-fraud exception were "slightly broader" than under a waiver theory,
*id.* at 22:15-18.  In short, the SCO expressed its interest in being "prepared for any follow-ups based on what [the
Witness] answers" to questions.  *Id.* at 22:18-21.

4) "For each of the sources that are identified in response to th[e] prior three questions, what did the source say "to [the Witness] about the specific statement in the letter?" *Id*. at 23:24–25, 24:1–3;[6]

5) "When" and "how" the Witness received communications from her clients, including whether the conversations were by "phone, telephone, [or] e-mail[?]" *Id*. at 25:14–25, 26:1;

6) "[D]id anyone raise any questions or corrections with respect to the letter[?]" *Id*. at 26:13–15;

7) "[D]id [the Witness] memorialize [the conversations with her clients] in any way?" *Id*. at 26:15–16;

8) Whether [the Witness] "was careful with submitting these representations to the Department of Justice? And if that was her practice, to review the submissions with her clients before she did so[?]" *Id*. at 26:12–20.[7]

The arguments by the SCO, Witness and privilege holders were taken under advisement and the Court reserved decision.

## II.   ANALYSIS

The SCO is correct that a limited set of questions about the Witness's representation of Targets 1 and 2 and Target Company may be posed to the Witness in the grand jury because the attorney-client and work product privileges have been vitiated by operation of both the crime-fraud exception and implied waiver. Each of those exceptions are addressed *seriatim* below.

### A.   Crime-Fraud Exception

Following review of the legal principles governing the crime-fraud exception and the SCO's *ex parte* submission, analysis of this basis for compelling the testimony of the Witness before the grand jury is reviewed.

---

[6]   When the Court inquired as to whether the SCO intended to ask this fourth question, the SCO responded by saying that SCO was not "planning on asking about those specific communications from the client" but confirmed that they want to be "authorized to do that should [SCO] decide [to] want to pursue a follow up with that question." Sept. 26 Tr. at 24:4–14.

[7]   The SCO stated that it was not "presently" intending to ask the Witness for any of her notes, but assured the Court that "[w]ithout any additional application to the Court, we wouldn't ask [for] the notes from" the Witness. *See* Sept. 26 Tr. at 27:14–21. The SCO disclaimed any plan to ask what the Witness "thought about what her clients told her," "what advice she gave to her clients," or anything "about any of the clients' communications to [the Witness] about matters outside specific statements in the two letters[.]" *Id.* at 29:10–21.

### *1. Overview of Crime-Fraud Exception*

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law,'" aiming "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  The privilege "applies to a confidential communication between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014).

The doctrine of the crime-fraud "[e]xception comes into play when a privileged relationship is used to further a crime, fraud, or other fundamental misconduct." *In re Sealed Case*, 676 F.2d at 807.  "Attorney-client communications are not privileged if they 'are made in furtherance of a crime, fraud, or other misconduct.'" *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)).  "To establish the exception . . . the court must consider whether the client 'made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act,' and establish that the client actually 'carried out the crime or fraud.'" *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000) (quoting *In re Sealed Case,* 107 F.3d 46, 49 (D.C. Cir. 1997)).

To satisfy its burden of proof as to the crime-fraud exception, the government may offer "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *In re Grand Jury*, 475 F.3d at 1305 (internal quotation marks omitted).  It "need not prove the existence of a crime or fraud beyond a reasonable doubt." *In re Sealed Case*, 754 F.2d at 399.  "The determination that a prima facie showing has been made lies

15

within the sound discretion of the district court," *id.* at 400, which must "independently explain

what facts would support th[e] conclusion" that the crime-fraud exception applies.  *Chevron*

*Corp. v. Weinberg Grp.*, 682 F.3d 96, 97 (D.C. Cir. 2012).  The D.C. Circuit has "approved the

use of '*in camera, ex parte* proceedings to determine the propriety of a grand jury subpoena or

the existence of a crime-fraud exception to the attorney-client privilege when such proceedings

are necessary to ensure the secrecy of ongoing grand jury proceedings.'"  *In re Grand Jury*

*Subpoena, Judith Miller*, 438 F.3d 1141, 1179 (D.C. Cir. 2006) (quoting *In re Sealed Case No.*

*98–3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998)).  "[I]*n camera, ex parte* submissions generally

deprive one party to a proceeding of a full opportunity to be heard on an issue, and thus should

only be used where a compelling interest exists."  *In re Sealed Case No. 98-3077*, 151 F.3d at

1075 (internal citation and quotation marks omitted).

### 2. SCO's **Ex Parte** *Proffer*

The SCO intends to ask the Witness about five distinct portions of the 2017 FARA

Submission, two of which portions are also reflected in the 2016 FARA Submission.  *See* Hr'g

Tr. (*ex parte*)(Sept. 26, 2017) at 15:1–14.  In its two declarations, submitted *ex parte*, the SCO

offers witness testimony and documentary evidence to show that these statements are false,

contain half-truths, or are misleading by omission.  The veracity of these five portions of the

2017 FARA Submission are assessed before turning to the applicability of the crime-fraud

exception to the underlying communications that may have served as a basis for these five

statements contained in the Witness's 2017 FARA Submission.  The underlined portion of each

set of statements indicates the text that the SCO believes is "either false or constitutes a half-

truth."  Gov't Ex Parte Suppl. Decl. of Brock W. Domin, Special Agent, Federal Bureau of

16

Investigation, in Supp. of Gov't Showing of Crime Fraud ("Gov't Ex Parte Suppl. Decl.") ¶ 6, ECF No. 12-1.

a)   **"[Target Company's] efforts on behalf of the Party of Regions and Opposition Bloc did not include meetings or outreach within the U.S."**   2017 FARA Subm'n at 2.

████████████████████████████████ establish that the above statement is false, a half-truth, or at least misleading because evidence shows that Target 1 and Target 2 were intimately involved in significant outreach in the United States on behalf of the ECFMU, the Party of Regions and/or the Ukrainian government. ████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

      **b)**      **"[N]either [Target Company] nor [Target 1 or Target 2] had any agreement with the ECFMU to provide services." 2017 FARA Subm'n at 2.**

Although no evidence presented reflects any formal written contract between the Targets and ECFMU, Target 1 and Target 2 clearly had an informal agreement with ECFMU to direct the government relations and public affairs activities of GR Company 1 and GR Company 2, and also to fund these activities. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

     **c)**    **"[Target Company] did provide the ECFMU, at the request of members of the Party of Regions, <u>with a list of potential U.S.-based consultants</u>—including [GR Company 2 and GR Company 1]—<u>for the ECFMU's reference and further consideration</u>.  ECFMU then contracted directly with [GR Company 2] and [GR Company 1] to provide services within the United States for which these entities registered under the Lobbying Disclosure Act."  2017 FARA Subm'n at 2.**

As the SCO puts it, the phrasing in this portion of the 2017 FARA Submission suggests that the Targets "were little more than matchmakers" between ECFMU, GR Company 1, and GR Company 2, ███████████████████████ when, in fact, both Target 1 and Target 2 played far more significant and continuing roles.[8] ███████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████

         ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[8]     The 2016 FARA Submission also portrays the Targets' involvement with ECFMU as limited, stating the following: "With respect to the [ECFMU], [Target Company] did not have an agreement to provide services to the ECFMU.  Likewise, [Target 1 and Target 2] did not have an agreement to provide services to the ECFMU.  Furthermore, my Clients were not counterparties to any service agreement(s) between [GR Company 2], [GR Company 1] and the ECFMU."  2016 FARA Subm'n at 1.



The 2017 FARA Submission attempts to paint the Targets as mere spectators in a game when they actually were integral players.  Far from mere matchmakers, the Targets were significantly involved in U.S.-based advocacy efforts on behalf of ECFMU and the Ukrainian government.

21

d)      "To [Target 2's] recollection, these efforts included providing policy briefings to the ECFMU and its consultants on key initiatives and political developments in Ukraine, including participation in and/or coordination of related conference calls and meetings. Although [Target 2] recalls interacting with ECFMU's consultants regarding efforts in the Ukraine and Europe, neither [Target 2] nor [Target 1] recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the ECFMU, nor do they recall being party to arranging, or facilitating any such communications. Rather, it is the recollection and understanding of [Targets 1 and 2] that such communications would have been facilitated and conducted by the ECFMU's U.S. consultants, as directed by the ECFMU, pursuant to the agreement reached between those parties (to which [Target Company] was not a party)." 2017 FARA Subm'n 2–3.

Based on the evidence already discussed, ██████████████████████

evidence confirming the level of regular contact by the Targets with the GR Companies, the

representation above that neither Target 1 nor Target 2 could recall "being party to, arranging, or

facilitating any such communications" with U.S. government officials or U.S. media outlets,

strains credulity. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

      e)     **"With respect to other specific matters on which [Target 2] interfaced with the ECFMU and its consultants, . . . [Target Company's] Email Retention Policy does not retain communications beyond thirty days, and the information that would be contained in such correspondence is vital to refreshing recollections regarding these matters."** 2017 FARA Subm'n at 3. [9]

Both the 2016 and 2017 FARA Submissions refer to the Target Company's undated

Email Retention Policy, which states that Target Company "does not retain communications

beyond thirty days." 2016 FARA Subm'n at 1; 2017 FARA Subm'n at 3. ██████████

████████████████████████████████████████████████████

_____

[9] The 2016 FARA Submission included a similar claim. *See* 2016 FARA Subm'n ("[A] search has been conducted for correspondence containing additional information related to the matters described in your letters. However, as a result of DMP's Email Retention Policy, which does not retain communications beyond thirty days, the search has returned no responsive communications.").

23

[REDACTED]

### 3.    *Conclusion*

Through its *ex parte* production of evidence, the SCO has clearly met its burden of

making a *prima facie* showing that the crime-fraud exception applies by showing that the Targets

were "engaged in or planning a criminal or fraudulent scheme when [they] sought the advice of

counsel to further the scheme."  *In re Grand Jury*, 475 F.3d at 1305 (quoting *In re Sealed Case*,

754 F.2d at 399); *see also In re Sealed Case*, 107 F.3d at 49 (same).  This evidence establishes

that Target 1 and Target 2 likely violated federal law by making, or conspiring to make,

materially false statements and misleading omissions in their FARA Submissions, which may

constitute violations of, *inter alia*, 22 U.S.C. § 618(a)(2) (false or misleading statements and

omissions "in any . . . document filed with or furnished to the Attorney General" under FARA);

18 U.S.C. § 1001(a) (false statements to the executive branch); and 18 U.S.C. § 371 (conspiracy

to commit any offense against the United States or to defraud the United States).[10]

"Communications otherwise protected by the attorney-client privilege are not protected if

the communications are made in furtherance of a crime, fraud, or other misconduct."  *In re*

*Sealed Case*, 754 F.2d at 399.  Generally, the crime-fraud exception reaches communications or

work product with a "relationship," *In re Sealed Case*, 676 F.2d at 814–15 (opinion of Wright,

J.), to the crime or fraud.  *See In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985) (requiring

"some relationship between the communication at issue and the prima facie violation").  With

respect to work product protection, the crime-fraud exception applies where "some valid

relationship between the work product under subpoena and the prima facie violation" is present.

*In re Sealed Case*, 676 F.2d at 814–15 (opinion of Wright, J.).  The inquiry focuses on the

"client's intent in consulting the lawyer or in using the materials the lawyer prepared."  *In re*

*Sealed Case*, 107 F.3d at 51.  "The question is: Did the client consult the lawyer or use the

material for the purpose of committing a crime or fraud."  *Id.*

---

[10]     The list provided by the SCO of federal criminal statutes that would be violated by submission of false and
fraudulent or misleading representations to DOJ's FARA unit in the course of its investigation whether a FARA
registration was required, is not exhaustive. *See, e.g.,* 18 U.S.C. § 1519(criminalizing knowing conduct that
"conceals, covers up, falsifies, or makes a false entry in any record, document …with the intent to impede, obstruct,
or influence the investigation or proper administration of any matter within the jurisdiction of any department or
agency of the United States").

Given the *prima facie* showing of crime, fraud, or misconduct with respect to the five areas of false or misleading statements in the 2017 FARA Submission, the Witness may be compelled to answer the following seven questions with respect to these statements:

1. Who were the sources for each of the specific factual representations alleged to be false or misleading in the submissions, dated November 23, 2016 and February 10, 2017, made by the Witness on behalf of her clients, Targets 1 and 2 and Target Company, to the Foreign Agent Registration Act's ("FARA") Registration Unit of the National Security Division of the U.S. Department of Justice?

2. Who were the sources of information regarding the Target Company's email retention policy that the Witness attached to the November 23, 2016 FARA Submission?

3. Did Target 1, Target 2, or anyone else within the Target Company, if anyone, approve the November 23, 2016 and February 10, 2017 FARA Submissions before the Witness sent each such submission to the FARA Registration Unit at the U.S. Department of Justice?

4. For each source of information identified in response to the prior three questions, what did that source tell the Witness about the specific factual representations alleged to be false or misleading in the November 23, 2016 and February 10, 2017 FARA Submissions?

5. When and how did the Witness receive communications from Target 1, Target 2, or anyone else within Target Company regarding the specific factual representations alleged to be false or misleading in the November 23, 2016 and February 10, 2017 FARA Submissions?

6. Did Target 1 or Target 2, or anyone else within Target Company, raise any questions or corrections with the Witness regarding the specific factual representations alleged to be false or misleading in the November 23, 2016 and February 10, 2017 FARA Submissions before the Witness sent those submissions to the FARA Registration Unit at the U.S. Department of Justice?

7. Was it the Witness's practice to review with her clients written submissions prior to sending such submissions to the FARA Registration Unit at the U.S. Department?

The first six questions call for answers regarding communications that have, at the very least, "some relationship" with the "prima facie violation" of law. *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985); *see also In re Sealed Case*, 676 F.2d at 814–15 (opinion of Wright, J.)

26

(explaining that for the crime-fraud exception to apply to the work-product doctrine, there must

be "some valid relationship between the work product under subpoena and the prima facie

violation").[11]  The final question calls for general information—not specific to the Witness's

representation of any particular client—that does not fall within the scope of any privilege.

### B.       Implied Waiver of the Attorney-Client Privilege

The SCO also contends that the Targets impliedly waived the attorney-client privilege as

to the testimony sought from the Witness by disclosing the 2016 and 2017 FARA Submissions to

DOJ.  The waiver extends to the Targets' specific conversations with the Witness that were

released in substance to DOJ in these FARA Submissions.

### 1. Implied Waiver Generally

The scope of the implied waiver comports with the D.C. Circuit's "adhere[nce] to a strict

rule on waiver of [the attorney-client] privilege[,]" requiring a privilege-holder to "zealously

protect the privileged materials" and "tak[e] all reasonable steps to prevent their disclosure."

*SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (quoting *In re Sealed Case*, 877 F.3d 976, 980

(D.C. Cir. 1989)).  As such, "disclosure will waive the privilege."  *In re Sealed Case*, 877 F.3d at

980.  A client waives the privilege by disclosing privileged information's "substance . . . before

an investigative body at the pretrial stage."  *White*, 887 F.2d at 271; *see also In re Subpoenas*

*Duces Tecum*, 738 F.2d 1367, 1370 (D.C. Cir. 1984) (a client waives the privilege entirely as to

all "material that has been disclosed to [a] federal agency"); *Permian Corp. v. United States*, 665

F.2d 1214, 1219 (D.C. Cir. 1981) (a client "destroy[s] the confidential status of . . .

communications by permitting their disclosure to the SEC staff").  Waiver of the privilege

---

[11]       As discussed above, the SCO also seeks to also ask the Witness whether she "memorialized" any of her
communications with the Targets.  The propriety of asking this question is addressed *infra* Part II.C.

"extends to all other communications relating to the same subject matter." *In re Sealed Case*, 29

F.3d 715, 719 (D.C. Cir. 1994); *see also Williams & Connolly v. SEC*, 662 F.3d 1240, 1244

(D.C. Cir. 2011) ("[One who] voluntarily discloses part of an attorney-client conversation . . .

may have waived confidentiality—and thus the attorney client privilege—for the rest of that

conversation *and* for any conversations related to the same subject matter."); *In re Sealed Case*,

877 F.2d at 980–81 ("[W]aiver of the privilege in an attorney-client communication extends 'to

all other communications relating to the same subject matter.'" (quoting *In re Sealed Case*, 676

F.2d at 809)).

### 2. Analysis

Upon sending the FARA Submissions to DOJ, the Targets waived, through voluntary

disclosure, any attorney-client privilege in their contents.[12] *White*, 887 F.2d at 271; *In re

Subpoenas Duces Tecum*, 738 F.2d at 1370; *Permian Corp.*, 665 F.2d at 1219.  In fact, the

FARA Submissions made specific factual representations to DOJ that are unlikely to have

originated from sources other than the Targets, and, in large part, were explicitly attributed to

one or both Targets' recollections.[13] *See* 2017 FARA Subm'n at 1–3; 2016 FARA Subm'n at 1–

2.  Additionally, the Targets impliedly waived the privilege as to their communications with the

---

[12]    The government also argues that the attorney-client privilege never attached to the communications with the Witness reflected in the FARA Submissions in the first place because the Targets intended to disclose the information to DOJ from the outset.  SCO Mot. at 1–2; SCO Suppl. Mem. in Supp. of Mot. ("SCO Suppl. Mem.") at 4, ECF No. 11; *see In re Sealed Case*, 877 F.2d at 979 & n.4 ("[D]ata that [a client] intends to report [to the IRS] is never privileged in the first place" so long as it does not "reveal directly the attorney's confidential advice."); *(Under Seal)*, 748 F.2d at 875; *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984); *Naegele*, 468 F. Supp. 2d 165, 170 (D.D.C. 2007).  This "conduit theory" need not be addressed, as the SCO's motion to compel is granted on alternative grounds.

[13]    Target 1 argues that the SCO has not shown that the 2016 FARA Submission contained representations sourced to the Targets themselves rather than to publicly-available sources such as "media reports, or a corporate registry or similar database," Target 1 Opp'n at 5, but even a cursory review of this letter shows otherwise.  The 2016 FARA Submission contained representations the Witness could not plausibly have gathered solely from publicly-available sources, such as that the Targets had no agreement to provide the ECFMU services or were counterparties to any service agreements between ECFMU and the GR Companies.  *See* 2016 FARA Subm'n at 1. The Targets repeated these representations in the 2017 FARA Submission.  *See* 2017 FARA Subm'n at 2.

Witness to the extent that these communications related to the FARA Submissions' contents. *Williams & Connolly*, 662 F.3d at 1244; *In re Sealed Case*, 29 F.3d at 719; *In re Sealed Case*, 877 F.2d at 980–81; *In re Sealed Case*, 676 F.2d at 809.

    *In re Sealed Case* (1994) is instructive.  There, the target, who was subject to a grand jury investigation of his financial transactions with a foreign government, disclosed to the government details about his conversations with a lawyer "in connection with" the transactions, thereby waiving the privilege as to the disclosed conversations.  29 F.3d at 716–17.  The government "subpoenaed the [l]awyer to appear before the grand jury to testify and to produce any and all documents relating to and/or generated as a result of discussions and/or consultation with the" target, the target's business partner, "and/or any representative or agent of" a company the target had created to accept payments from the foreign government.  *Id.* at 717 (alterations and internal quotation marks omitted).  The D.C. Circuit determined that the target's waiver "extended to all conversations between the [l]awyer and him relating to the same subject matter, specifically including documents in the case files," as "the material sought has an obvious relationship to the subject matter of [the target's] admissions."  *Id.* at 719–20 (internal quotation marks omitted).  Here, the testimony sought from the Witness has a similarly "obvious relationship" to the subject matter of the disclosures to DOJ.  *Id.*; *see also In re Martin Marietta Corp.*, 856 F.2d 619, 623–24 (4th Cir. 1988) (holding that submission of a Position Paper by counsel on behalf of the client urging the U.S. Attorney not to indict waived the privilege as to "audit papers" and "witness statements" from which factual statements in the Position Paper "were derived").  For these reasons, the attorney-client privilege does not prevent the SCO from compelling the Witness's testimony about the limited subjects already disclosed in the 2016 and 2017 FARA Submissions.

## C.      The Work-Product Privilege

Even if the Targets impliedly waived the attorney-client privilege with respect to the communications as to which the SCO seeks to compel the Witness's testimony, the Targets are partially correct that the work-product privilege would still apply.  *See* Target 1 Opp'n at 5; Target 2 Opp'n at 5–10.  In the Targets' view, the work-product privilege operates to block SCO from compelling testimony from the Witness on all questions that the SCO seeks to pose.  The SCO's proposed questions, however, with one exception, seek production only of fact work product, which may be compelled upon a showing of adequate reasons.

### *1.  The Work-Product Privilege Generally*

The work-product privilege protects "material 'obtained or prepared by an adversary's counsel' in the course of his legal duties, provided that the work was done 'with an eye toward litigation.'"  *In re Sealed Case*, 676 F.2d at 809 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).  This material includes the attorney's "interviews, statements, memoranda, correspondence, briefs, mental impressions," and "personal beliefs."  *Hickman*, 329 U.S. at 511. The work-product privilege affords greater protection to "*opinion* work product, which reveals 'the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation,'" than to "*fact* work product, which does not."  *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 151 (D.C. Cir. 2015) (quoting FED. R. CIV. P. 26(b)(3)(B)).  Fact work product is discoverable "upon showing a substantial need for the materials and an undue hardship in acquiring the information any other way," *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997), a test we equate with a requirement "to show 'adequate reasons' why the work product should be subject to discovery," *Boehringer*, 778 F.3d at 153 (quoting *In re Sealed Case*, 676 F.2d at 809).

Opinion work product, in contrast, "is virtually undiscoverable."[14]  *Vinson & Elkins*, 124 F.3d at 1307.

Where information "contains both opinion and fact work product, the court must examine whether the factual matter may be disclosed without revealing the attorney's opinions." *Boehringer*, 778 F.3d at 152.  The D.C. Circuit has rejected "a virtually omnivorous view" of opinion work product, cautioning that "not every item which may reveal some inkling of a lawyer's mental impressions . . . is protected as opinion work product." *Id.* at 151–52 (quoting *In re Sealed Case*, 124 F.3d 230, 237 (D.C. Cir. 1997), *rev'd on other grounds sub nom. Swidler & Berlin v. United States*, 524 U.S. 399 (1998); *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1015 (1st Cir. 1988)).  Rather, information constitutes opinion work product only if it "reflects the attorney's focus in a meaningful way." *Id.* at 151.  "[T]o convert [a] fact into opinion work product . . . . there must be some indication that the lawyer 'sharply focused or weeded the materials.'" *Id.* (quoting *In re Sealed Case*, 124 F.3d at 236).

### 2. *Analysis*

The Targets argue that the Witness's testimony sought by the SCO calls for production of opinion work product, and that the SCO has made no sufficient showing of necessity and burden to overcome the privilege regardless of whether fact or opinion work product is to be disclosed. In the Targets' view, the work-product privilege attached to the information sought by the eight questions the SCO proposes to pose to the Witness because those questions will elicit testimony as to her communications with the Targets, including "statements" made during and her "mental

---

[14]   The SCO acknowledges that opinion work product withstands even the force of the crime fraud exception to remain privileged unless the attorney knows of or participates in the crime or fraud.  SCO Suppl. Mem. at 1 n.* (citing *In re Grand Jury Subpoena*, No. 16-4096, 2017 WL 3567824, at *3 (4th Cir. Aug. 18, 2017)).  Here, the Witness was an unwitting participant in the crime alleged.  *See* Sept. 26 Tr. at 20:13–23.

impressions" of them. *Hickman*, 329 U.S. at 511. With one exception, discussed below, the testimony the SCO seeks is fact work product only, not opinion work product, as the SCO's proposed inquiry would not require the Attorney do disclose her "personal beliefs," *id.*, "opinions," or information that "reflects [her] focus in a meaningful way." *Boehringer*, 778 F.3d at 151.

The Targets rely on a recent Fourth Circuit decision holding that the question "What did [the Witness] tell you?" sought opinion work product. *In re Grand Jury Subpoena*, No. 16-4096, 2017 WL 3567824, at *3 (4th Cir. Aug. 18, 2017). There, the government, after securing a criminal defendant's conviction, observed that an exhibit the defendant had introduced appeared to be a forgery. *Id.* at *1. The defendant's attorney gave the government a higher-quality copy of the exhibit, which confirmed that the exhibit was in fact forged. *Id.* The government sought to interview the attorney and her investigator, both of whom declined to be interviewed, and then issued grand jury subpoenas compelling their testimony. *Id.* The attorney and investigator invoked the work-product privilege and moved to quash. *Id.* The Fourth Circuit determined that the government could ask two questions—"(1) Who gave you the fraudulent documents?" and "(2) How did they give them to you, specifically?"—as these sought only fact work product, but that a third question—"(3) What did [a specific party under investigation] tell you?"—required production of opinion work product. *Id.* at *1, **3–4 (alterations in original). "To answer this question," the Fourth Circuit reasoned, would require lawyers "to disclose their recollections of witness statements and reveal what they deemed sufficiently important to remember from those discussions." *Id.* at *3. This information "contain[s] the fruit of the attorney's mental processes," the Fourth Circuit held, and thus "falls squarely within the category of . . . opinion work product." *Id.* (alterations and internal quotation marks omitted). In making this

determination, the Fourth Circuit relied on *Hickman*, where the Supreme Court had deemed improper under the work-product privilege a "functionally equivalent . . . interrogatory . . . which asked the attorney to 'set forth in detail the exact provisions of any such oral statements or reports [from witnesses].'"  *Id.* (quoting *Hickman*, 329 U.S. at 499).

Judge Niemeyer, dissenting, described the panel's assumption "regarding the nature of memory" as "shaky," noting the myriad factors at play in why an attorney might recall a conversation with a client, including "[p]erhaps the attorney remembers what the Witness told her about the document because she found it significant to her client's defense . . . . [or] because the Witness made a joke or was wearing an interesting shirt or used a strange turn of phrase[;] [o]r maybe the attorney simply has a good memory and is able to relate accurately what was told to her." *Id*. at *7 (Niemeyer, J., concurring in part and dissenting in part).  Whatever the reason, "[t]he grand jury will never know," even though "[t]here thus remains an important difference between an attorney's present memory of a witness's statement and her contemporaneous notes and memoranda of a witness's statement, which are written specifically *to document the portions* of the statement that she considered relevant to her client's case—*i.e.*, what she 'saw fit to write down.'  Only the latter provides a window into the attorney's thought process." *Id.*

Judge Neimeyer's analysis both is more persuasive and better comports with D.C. Circuit work-product privilege jurisprudence, which rejects "a virtually omnivorous view" of opinion work product, *Boehringer*, 778 F.3d at 152 (quoting *In re Sealed Case*, 124 F.3d at 237), than that of the majority of the Fourth Circuit panel.  The Fourth Circuit panel majority appears to conflate as the same question asking "What did the client tell you?" and "What of importance did the client tell you?"  These are different questions, and only the latter implicates opinion work product.

33

*Boehringer* is on point.  The D.C. Circuit held there that documentary materials "contain[ing] only factual information . . . . produced by non-lawyers . . . d[id] not reveal any insight into counsel's legal impressions or their views of the case" and thus was not opinion work product, even though the information was "requested or selected by counsel."  778 F.3d at 152.  Here, the SCO seeks to compel the Witness to testify only as to "factual information"—that the Witness may have selected which of the Targets' disclosures to include in or omit from the FARA Submissions does not bring the proposed testimony within the scope of opinion work product protection.  *Id.*

In any event, *Hickman* is inapposite, as the Supreme Court did not characterize the information sought as opinion work product—indeed, no such distinction between fact and opinion work product was then recognized, as that doctrinal development occurred later.  *See generally Hickman*, 329 U.S. 495; *see also In re Grand Jury Subpoena*, No. 16-4096, 2017 WL 3567824, at *6 (Niemeyer, J., concurring in part and dissenting in part) ("In the years since *Hickman*, courts have distinguished between 'opinion work product' and 'fact work product' when assessing the nature of the showing necessary to justify production of attorney work product.").  *Hickman*, if anything, suggested that the material sought to be produced more properly was characterized as fact than opinion work product by determining that the petitioner had not made the requisite showing of necessity and undue hardship for discovery of fact work product, but which showing is more or less irrelevant to discovery of opinion work product. *Hickman*, 329 U.S. at 508–09; *see also Vinson & Elkins*, 124 F.3d at 1307.

Thus, the first six questions amount, if anything, to only fact work product.  They each seek only factual information—testimony as to the Witness's mere "present memory of a [client's] statement," *id.*—and thus do not require the Witness to reveal her "mental processes,"

*id.* at \*3.  The mere fact that the Witness can recall things the Targets told her provides, by itself,

no "indication that [she] 'sharply focused or weeded the materials.'"  *Boehringer*, 778 F.3d at

152 (quoting *In re Sealed Case*, 124 F.3d at 236).  At most, it reveals "some inkling of [the

Witness's] mental impressions," which itself is not "protected as opinion work product."  *Id.* at

151 (quoting *San Juan*, 859 F.2d at 1015); *see also id.* at 152 ("[T]he mere fact that an attorney

had chosen to write a fact down [i]s not sufficient to convert that fact into opinion work

product.").  The eighth question does not seek work product at all, for reasons discussed *supra*

Part II.A.6.

Without additional foundation, however, the SCO's proposed seventh question—whether

the Witness "memorialize[d]" her conversations with the Targets regarding the FARA

Submissions, Sept. 26 Tr. at 26:15–16—seeks opinion work product.  While the mere fact that an

attorney can recall something her client told her does not necessarily "reveal what [she] deemed

sufficiently important to remember from those discussions," *In re Grand Jury Subpoena*, No. 16-

4096, 2017 WL 3567824, at \*3, as Judge Nieyemer ably explained, the fact that an attorney

memorialized, in writing or another form, particular client communications reveals her "thought

processes," *id.* at \*7 (Niemeyer, J., concurring in part and dissenting in part), by showing her

"focus in a meaningful way," *Boehringer*, 778 F.3d at 151, particularly if the attorney only

recorded a client's communication that she considered significant in some way.  In that

circumstance, an attorney's "contemporaneous notes and memoranda of a [client's] statement . . .

provides a window into [her] thought process" precisely because they show "that she

considered" the statement "relevant to her client's case" and "saw fit to write [them] down."  *In*

*re Grand Jury Subpoena*, No. 16-4096, 2017 WL 3567824, at \*7 (Nieyemer, concurring in part

and dissenting in part) (internal quotation marks omitted).

Thus, with the exception of the seventh question, the SCO seeks to compel production of fact work product only, and thus must show "a substantial need for the materials and an undue hardship in acquiring the information any other way." *Vinson & Elkins*, 124 F.3d at 1307. This, in turn, requires a showing only that "adequate reasons" exist to compel the Witness's testimony. *Boehringer*, 778 F.3d at 153 (quoting *In re Sealed Case*, 676 F.2d at 809). The SCO has satisfied this burden here by showing that any protected material is relevant to establishing criminal activity, as already explained *supra* Part II.A, and that the only other persons who plausibly could describe the Witness's communications with the Targets are the Targets themselves, who likely would be unwilling to testify before the grand jury, for obvious reasons.

Target 2 disputes whether the SCO can demonstrate substantial need for the Witness's testimony, asserting that the SCO already has the FARA Submissions, which purported to be written on the Targets' behalves, as well as evidence of inconsistencies between the FARA Submissions' representations and the Targets' behavior, *see* Gov't Ex Parte Decl.; Gov't Ex Parte Suppl. Decl., and thus that the SCO seeks merely "corroborative evidence." Suppl. Target 2 Opp'n at 7–8. The Court disagrees. The Witness's testimony would not be merely corroborative because the SCO does not possess direct evidence that the Targets knew of or approved the FARA Submissions' contents before the Witness disclosed them to DOJ, nor can the SCO plausibly obtain such evidence from sources other than the Witness or the Targets themselves. For these reasons, the work-product privilege does not prevent the SCO from compelling the Witness's testimony.

*     *     *

To summarize, the SCO may pose to the Witness the first six and eighth proposed questions. The first six questions seek testimony that (1) falls within the scope of the crime-

36

fraud exception, (2) is unprotected by the attorney-client privilege, which the Targets have

impliedly waived as to the information targeted by those questions, and (3) constitutes fact work

product, which the SCO overcomes by showing adequate reasons.  The eighth question seeks

testimony that neither the attorney-client nor work-product privileges shield from disclosure at

all.  The seventh question seeks opinion work product, and the SCO has not made the

extraordinary showing necessary to justify posing it, nor shown (or even alleged, see SCO Suppl.

Mem. at 1 n.*) that the Witness knew of or participated in the Targets' crimes, a precondition to

compelling production of opinion work product under the crime-fraud exception.

### III.    CONCLUSION

The SCO's motion to compel the Witness's testimony is granted.  The SCO may compel

the Witness to answer seven of the eight questions enumerated at the September 26, 2017

hearing.  The SCO is directed, by October 3, 2017, to review this Memorandum Opinion and

propose to the Court any redactions that should be made prior to making the opinion available

under seal to the Witness and privilege holders.  The order will be stayed until October 4, 2017,

on which date, if not earlier, the Witness and privilege holders will be provided a copy of this

Memorandum Opinion, with any necessary redactions, under seal.  The Witness or the privilege-

holders may seek a further stay of this Order pending any appeal.

An appropriate Order, which is filed under seal, accompanies this Memorandum Opinion.

Date:  October 2, 2017

_____
BERYL A. HOWELL
Chief Judge