1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA      :
                                   :
5                      Plaintiff  :
                                   :
6           versus                 : Criminal Action Number
                                   :
7    PAUL J. MANAFORT              : 1:18-CR-83
                                   :
8                     Defendant. :
     ------------------------------x
9
                                        March 8, 2018
10
              The above-entitled Arraignment Hearing was
11   continued before the Honorable T.S. Ellis, III, United States
     District Judge.
12
              THIS TRANSCRIPT REPRESENTS THE PRODUCT
13            OF AN OFFICIAL REPORTER, ENGAGED BY THE
              COURT, WHO HAS PERSONALLY CERTIFIED THAT
14            IT REPRESENTS TESTIMONY AND PROCEEDINGS OF
              THE CASE AS RECORDED.
15

16

17

18

19

20

21

22

23

24

25

2

A P P E A R A N C E S

FOR THE PLAINTIFF:

        ANDREW A. WEISSMANN, ESQ.
        GREG D. ANDRES, ESQ.
        US Attorney's Office
        2100 Jamieson Avenue
        Alexandria, VA 22314

FOR THE DEFENDANT:

        KEVIN DOWNING, ESQ.
        Law Offices of Kevin Downing
        601 New Jersey Avenue NW, Suite 620
        Washington, DC 20001

        DAVID G. BARGER, ESQ.
        1750 Tysons Boulevard, Suite 1000
        McLean, VA 22102

      OFFICIAL UNITED STATES COURT REPORTER:

        MS. TONIA M. HARRIS, RPR
        United States District Court
        Eastern District of Virginia
        401 Courthouse Square
        Ninth Floor
        Alexandria, VA 22314
        703-646-1438

3

1              **P R O C E E D I N G S**

2

3              THE DEPUTY CLERK:  United States versus Paul J.

4    Manafort.  Criminal Case Number 1:18-CR-83.

5              THE COURT:  All right.  Who's here for the special

6    prosecutor?

7              MR. WEISSMANN:  Andrew Weissmann and Greg Andres.

8              THE COURT:  All right.  Now -- and who's here on

9    behalf of the defendant?

10             MR. DOWNING:  Your Honor, Kevin Downing for Paul

11   Manafort.

12             THE COURT:  All right.  And Mr. Manafort is to your

13   right?  Good afternoon, Mr. Manafort.

14             All right.  You may be seated.  Preliminarily let me

15   ask, you do have local counsel?

16             MR. WEISSMANN:  We have been in communication with

17   the prosecutors in the Eastern District of Virginia and

18   they've been of great assistance.  We had not anticipated for

19   the purpose of the trial having counsel from the Eastern

20   District of Virginia.

21             THE COURT:  Yes, I don't think that's necessary.

22   But I do think it is helpful to the Court and it would be

23   helpful to you.  Have you ever tried a case in this court?

24             MR. WEISSMANN:  I have not.

25             THE COURT:  How about your partner?

4

1          MR. WEISSMANN:  I don't think he has either.  But

2   we -- I can assure you we have had --

3          THE COURT:  You've been in private practice?

4          MR. WEISSMANN:  I've been in private practice --

5          THE COURT:  And did you ever try a case in a

6   jurisdiction that you weren't familiar with where you didn't

7   have local counsel?

8          MR. WEISSMANN:  Yes, I have.

9          THE COURT:  That was a mistake, wasn't it?

10          MR. WEISSMANN:  It may very well have been.  I've

11   done that both in private practice and in the Government.

12          THE COURT:  Well, I seem to recall.  I worked many,

13   many years ago for someone I knew as Mr. Powell, you knew him

14   as Justice Powell.  And he was very clear that only a fool

15   will try a case in the jurisdiction that he's unfamiliar with

16   without local counsel.  There's a great deal to know about

17   that.

18          Now on the defense side, do you have local counsel?

19          Yes, I see him right behind you.

20          MR. DOWNING:  Well, for today Mr. Barger has agreed

21   to come and sponsor me pro hac vice.

22          THE COURT:  That's good.

23          MR. DOWNING:  We have two lawyers that are Virginia

24   barred lawyers that will enter notice of appearance next week.

25          THE COURT:  All right.  That's fine.  Mr. Barger has

5

1    the advantage of having tried cases here.  And in fact, he's

2    even seen me on one or two occasions.

3            MR. BARGER:  To my great fortune, Your Honor, yes.

4            THE COURT:  Mr. Barger was a former or is a former

5    assistant U.S. Attorney.

6            MR. BARGER:  It's good to see you again, Your Honor.

7            THE COURT:  But he has answered the siren call of

8    money.  He did public service, now he's doing personal

9    service.

10           MR. BARGER:  I'd like to think of it as children and

11   money, Your Honor.

12           THE COURT:  Let's get to this matter.  Just a

13   moment.

14           (A brief interruption in the proceedings.)

15           THE COURT:  All right.  Let's begin.  Let me ask Mr.

16   Weissmann, you helpfully provided a status report about a week

17   ago or two weeks ago.

18           Is there anything in that status report that needs

19   to be updated before we begin?

20           MR. WEISSMANN:  There probably is.  I think the most

21   salient thing is that Judge Amy Berman Jackson has set a trial

22   date of September 17th for the case that is before her.  And I

23   think that may be the only thing that I think is pertinent.

24           THE COURT:  All right.  Thank you.  Now Mr. Downing,

25   does your client waive formal reading of this indictment?

6

1        MR. DOWNING:  He does, Your Honor.

2        THE COURT:  And it is a 32-count indictment

3   involving everything from tax to failure to register foreign

4   bank accounts and failing to register -- just foreign bank

5   accounts, bank fraud, bank fraud conspiracy.

6        And how does he wish to plead to these counts?

7        MR. DOWNING:  Not guilty, Your Honor.

8        THE COURT:  And does he wish a jury trial?

9        MR. DOWNING:  He does, Your Honor.

10       THE COURT:  All right.  Thank you, Mr. Downing.

11       Now Mr. Weissmann, how long do you think it would

12   take the Government to try this case?

13       MR. WEISSMANN:  I believe it would take between 8

14   and 10 trial dates.  The reason for not being sure is that we

15   will work with the defense to work out stipulations to try to

16   streamline certain issues.

17       THE COURT:  All right.  Typically I would set now

18   some motions dates, which I will after fixing a trial date.

19   But let me ask, how many witnesses do you anticipate you would

20   present?

21       MR. WEISSMANN:  Judge, with the same admonition that

22   we will try to work things out so we don't need to call all

23   those witnesses, I think between 20 and 25.

24       THE COURT:  To what extent does a trial of this

25   matter duplicate what's going on in the District of Columbia?

1            MR. WEISSMANN:  That's an excellent question.  I

2    think there are essentially two types of charges as the Court

3    alluded to.  One is substantive tax charges and the other is

4    bank fraud.  With respect to the substantive tax charges,

5    those are the subject of a conspiracy count in D.C.  And we,

6    as we noted in the status report, had offered to bring the

7    substantive tax charges in D.C. precisely because of the

8    duplication and the defendant, as he has a right to do,

9    insisted that those charges be brought in the district where

10   there is proper venue.  We did not believe and do not believe

11   there's proper venue for the substantive tax charges in D.C.

12            The bank fraud charges are not charged at all --

13            THE COURT:  Is there a conspiracy charge in this

14   indictment that duplicates the one in the District of

15   Columbia?

16            MR. WEISSMANN:  No, there is not.

17            THE COURT:  Well, I take it it follows though, from

18   what you've said, that the conspiracy charge that currently

19   exists in the District of Columbia could have been brought

20   here?

21            MR. WEISSMANN:  It could have been brought here.

22            THE COURT:  Of course.  Why should we try that

23   charge twice?

24            MR. WEISSMANN:  So depending on which case goes

25   first, we raised that exact issue with -- because there are

8

1   other charges that are in the case before it, the D.C. judge,

2   that are properly venued and we think maybe exclusively venued

3   in that district.  So there are charges in that case, what are

4   called FARA charges, the failure of registering as a foreign

5   agent that are brought in that case that are not here.  But is

6   also here that is not in D.C. are all the bank fraud charges,

7   but substantive and conspiracy.  Those are exclusively here

8   and need to be brought here.

9        THE COURT:  Have you all met to discuss a sensible,

10  efficient way of separating these without having the defendant

11  waive his venue rights?

12       MR. WEISSMANN:  We offered that.  We had brought the

13  case in D.C.  We told the defense exactly what charges we

14  propose to bring, the bank fraud charges.  Walked the defense

15  through the nature of the evidence, both with respect to the

16  substantive tax fraud and the bank fraud, and gave the

17  defendant the choice of whether to bring those here or whether

18  to bring those in the case before Judge Amy Berman Jackson.

19       What we would propose is because these charges are

20  now brought here, at the defendant's election, is that a trial

21  be set and these cases go forward.  And it's the -- if this

22  case were to go first, which is what we would like to see, and

23  within the speedy trial clock, then the issue would be for

24  Judge Amy Berman Jackson to decide what the ramifications

25  would be in that case.  And she is quite aware of that issue

9

1  and raised that issue with the defense.

2          THE COURT:  Thirty-two counts.  At my stage in life

3  I spend a lot of time reminiscing.  Looking forward isn't

4  productive.  And the 32 counts that you brought remind me of

5  that gentleman over there on the wall behind you.  All of you

6  were too young to have known him.  I am not.  I suffered under

7  him.  He had -- he was very strong about counts in criminal

8  cases.  In a case of this sort he would say, "No.  Give me

9  your three best counts.  That's all you're going to get."

10          I always thought that was, as he was criticized,

11  autocratic, dictatorial, mean-spirited, all of that.  He was

12  sharply criticized.  I don't think there's anybody in the

13  courtroom old enough to have known that.  But I am and I was.

14  And I joined in some of that criticism as I was on that side

15  of the bench.

16          How ironic and somewhat fitting, I suppose, that I

17  sit here now 40, 50 years later and I look up at his portrait

18  and hear myself being criticized by the bar in exactly the

19  same terms I used to use:  autocratic, dictatorial,

20  mean-spirited.  It's ironic that I now look at him and I'm in

21  that position.

22          But in any event, 32 counts -- I don't do what he

23  does.  I don't say just give me your three best counts, even

24  though I see some sense in that.  And fairness as well.

25          But in any event, what is the speedy trial date?

1       MR. WEISSMANN:  To answer your immediate question I

2   believe the speedy trial date is May 17th.  I may be off by

3   one day.  It may be May 16th.  And then the other thing I'd

4   just like to point out, Your Honor, although the superseding

5   indictment before you is 32 counts, that was with respect to

6   two defendants.  We had made a motion, that the Court granted,

7   to dismiss the counts with respect to Mr. Gates.  So I can

8   already apprise the Court that we have slimmed down the case

9   so there are not 32 counts, there are only 18 with respect to

10  Mr. Manafort that would go to trial.

11      THE COURT:  All right.  And that, you said May 17th?

12      MR. WEISSMANN:  I believe that's right.

13      THE COURT:  Now Mr. Downing, any problem with

14  setting a trial date within the speedy trial deadline?

15      MR. DOWNING:  I believe the Government has already

16  agreed under the proceeding that this is a complex case, so we

17  don't really think --

18      THE COURT:  So your answer is, yes.  There is a

19  problem, you need more time.

20      MR. DOWNING:  I do.  We do.

21      THE COURT:  All right.  Say it directly.

22      MR. DOWNING:  Your Honor --

23      THE COURT:  There's been no discovery thus far?

24      MR. DOWNING:  Well, there has been some discovery.

25      THE COURT:  Oh, in D.C.

1           MR. DOWNING:  In D.C. that overlaps with this, I

2     think.

3           THE COURT:  But I take it, Mr. Weissmann, you have

4     much more to produce?

5           MR. WEISSMANN:  No, that's incorrect.  We have

6     produced we think all of the tax discovery as well as the bank

7     fraud discovery.  The tax discovery was produced in the fall

8     through December and the bank fraud discovery was made

9     available in the first week of January to the defense.

10          THE COURT:  All right.  But that doesn't mean it's

11    not complicated.  Do you agree that it is?

12          MR. WEISSMANN:  With respect to the case before Your

13    Honor, with all due respect, I don't think it's complicated.

14          THE COURT:  All right.  I think you're wrong.  I

15    think you're wrong.  It is.  Come on.  Sometimes I have

16    prosecutors in front of me who take that position and I

17    wondered to myself how would he like it if three or four weeks

18    after that he had to try a case like that.  No, but I don't

19    think it should be very long, Mr. Downing.  I think it can be

20    done fairly promptly.

21          Any reason why you couldn't be ready to try this

22    case beginning June 12 or June 19th?  He says it's now just a

23    tax case and what else did you say, Mr. Weissmann?

24          MR. WEISSMANN:  Bank fraud.

25          THE COURT:  Bank fraud and taxes and essentially all

1   the documents you've had for a while.

2          MR. DOWNING:  Well, I guess having the benefit of

3   having tried criminal tax cases for 15 years, I can tell you

4   this is a very complicated case.

5          THE COURT:  And you're still alive.  You didn't die

6   of boredom.

7          MR. DOWNING:  So I disagree.  I actually think there

8   are a lot of complex issues in this case.  I don't think it's

9   going to be such a straight run that the Government is talking

10  about.  It involves offshore activities, it involves

11  international income, it involves offshore corporate accounts.

12  So it is not cut and dry.  It is not anything other than a

13  complex case.

14         The FBAR issues in this case are pretty complicated

15  too.  I would say the bank fraud charges in the case --

16         THE COURT:  You've just talked me into a little

17  extension.  How about July 10th?

18         MR. DOWNING:  I guess what I'm trying to figure out,

19  if I keep talking, do I get more of an extension or do I get

20  moved back.

21         THE COURT:  Well, you see, it sometimes then begins

22  to go back the other way.  If you really can't try the case by

23  the 11th of July, I need to know that.  But then you'll have

24  to tell me why.  I don't see any reason why you couldn't be

25  ready to try the case by then, but I don't know it as well as

13

1    you do and you need to -- if you really can't, you need to

2    tell me and tell me why.

3          MR. DOWNING:  The case in the District is again it's

4    a very broad conspiracy that's been alleged by the Government

5    tracking activity from 2006 to 2017.  This is a massive

6    indictment that involves a lot of international activity --

7          THE COURT:  Let me be quick to point out, it doesn't

8    have anything to do with the Russians or Russians interfering

9    in the election.

10         MR. DOWNING:  Your Honor, you made the point.  I

11   don't have to make it again.

12         THE COURT:  That's all right.  I'm going to ask you

13   in a minute.  You can think about it.

14         Do you intend to file a motion attacking the special

15   prosecutor's authority to bring such a wide ranging --

16         MR. DOWNING:  We do, Your Honor.  And we have --

17         THE COURT:  Now, that I want to set a special

18   schedule for.  So I'll come to that.  But let's deal first

19   with this issue of a trial date.

20         MR. DOWNING:  Your Honor, if I may.  We have a

21   deadline set in D.C. for March 14th and we think within days

22   of this deadline we would have the motion for you.

23         THE COURT:  March 14th of this year?

24         MR. DOWNING:  Yes.

25         THE COURT:  You're going to try the case?

14

1          MR. DOWNING:  No, no, no.  The motion to dismiss

2     based on the unlawful appointment of the special counsel's

3     office.

4          THE COURT:  You brought that as a civil matter as I

5     understand --

6          MR. DOWNING:  We have it as a civil matter, but it's

7     also going to be filed as a motion to dismiss both in D.C. and

8     here.  So that's scheduled --

9          THE COURT:  It's only going to be decided by one

10    judge.  You filed a civil case on this issue, you filed a

11    motion in the criminal case in D.C. on this issue and you --

12         MR. DOWNING:  Not yet.  The motion is due on March

13    14th.

14         THE COURT:  All right.  You intend to?

15         MR. DOWNING:  Correct.

16         THE COURT:  And you intend to file one here?

17         MR. DOWNING:  Correct, Your Honor.

18         Now quite frankly, Your Honor, we are in an unusual

19    situation.  We have a client conspiracy, a tax conspiracy in

20    one district.  And when the case was brought here for the

21    substantive counts, it's kind of an odd situation not to have

22    that married up.  So that's one of the issues that we've been

23    looking at, but quite frankly the way the Government tried --

24         THE COURT:  No one has asked you to do it.  You'd

25    have to waive a venue situation, but you can put them all in

15

1   D.C. if you give up the venue.

2           That's what you proposed, is that it?

3           MR. WEISSMANN:  Yes, Your Honor.

4           MR. DOWNING:  We're actually thinking trying to get

5   the conspiracy to come here.  We're happy to be here.

6           THE COURT:  That's something, I'm sure, Mr.

7   Weissmann you don't want to try these things twice.  You don't

8   want to have to -- and you're not going to have three judges

9   decide the authority issue.  It's just not going to happen.

10          MR. DOWNING:  Your Honor, Judge Amy Berman Jackson

11  has both the civil case and obviously the criminal case.

12          THE COURT:  It's not -- it's not going to be two

13  different judges just because the things were filed.  Only one

14  judge is going to address that.  And -- well, unlike the

15  gentleman behind up there on the wall, I don't try to coerce

16  people into giving up rights at all.  And I'm not going to

17  here.  It would make sense to try it all in one district.  But

18  I leave it to you all whether you wish to continue down this

19  road or not.  And there are significant issues.  One is an

20  appeal to the Fourth Circuit, the other is an appeal to the

21  D.C. Circuit.  So there are significant issues to be sure.

22          MR. DOWNING:  Your Honor, if I might return to the

23  trial date issue.

24          THE COURT:  Yes.

25          MR. DOWNING:  In this perfect world where I have my

16

1   rosy glasses on, we were envisioning that we would be trying

2   this case in November following the case in D.C.

3            THE COURT:  You need to go back to the optometrist,

4   because that isn't going to happen.

5            MR. DOWNING:  Okay.

6            THE COURT:  You've got a trial date in September in

7   the District?  Mr. Weissmann, this case seems -- maybe I'm not

8   familiar with the indictment in D.C., but this case seems less

9   complex than the one in D.C.

10            MR. WEISSMANN:  That's our view as well.  The tax

11   charges, as we mentioned, do largely overlap.  But unlike the

12   D.C. case, there are no Foreign Agents Registration Act

13   charges before this Court.  And those involve quite an

14   extensive array of evidence and different theories of

15   liability.  Here we have what I think are five bank frauds and

16   they are discrete over a two-year period and the discovery has

17   been produced.

18            THE COURT:  All right.  Mr. Downing, I'm going to

19   set this matter in July.  Now, if in the course of your

20   preparation something comes up that suggests to you that you

21   now have a more persuasive basis for me to consider on a later

22   trial date, I'll consider it.  But for now, 12th of -- or not

23   12th -- 10th of July at 10 a.m. with a jury.

24            Also having that earlier deadline is an important --

25   it will focus your minds, everyone's minds on it and get this

17

1   matter done.

2           All right.  I'm going to set a date for the filing

3   of motions -- I'm going to set the date of April 30th.  And

4   the local rules will govern the filing of responses and other

5   briefs.  And I'll set a hearing date for those will be on the

6   25th of May and I think I have set all the dates that I need

7   to set.  The local rules will take care of any responses.

8           Now proposed jury instructions, proposed voir dire,

9   and any motions in limine will have to be filed by the 22nd of

10  June, and a hearing will be the 29th of June on any of those

11  motions.  So I'll issue an order that reflects these dates and

12  it will shorten the time -- motions in limine, you'll get much

13  less time.  They don't really need it.  You all, I'm sure,

14  know your case quite well and you know what the other side is

15  likely to seek to limit or what you want to seek to limit

16  they're aware of.

17          So I'll put these dates in the order setting the

18  trial date of July the 10th.

19          All right.  Is there anything else that needs to be

20  accomplished in this matter today?

21          Yes, is this his initial appearance?

22          MR. ANDRES:  Excuse me, Judge?

23          THE COURT:  Is this his initial appearance?

24          MR. ANDRES:  It is, Judge.

25          THE COURT:  What is the Government's -- you aren't

1    the Government necessarily -- but what's a special prosecutor

2    position with respect to conditions of release pending trial?

3          MR. ANDRES:  Judge, it's the Government's view that

4    Mr. Manafort constitutes a risk of flight in light of the

5    charges, in light of the evidence, and in light of his

6    individual characteristics.  And the Government's view is that

7    --

8          THE COURT:  Well, the only individual characteristic

9    I'm familiar with from the probation office is that he has a

10   lot of money, property.  And so he's a risk of flight because

11   someone with that wealth can easily disappear.

12         So what are you suggesting?

13         MR. ANDRES:  Judge, the Government's view is that

14   Mr. Manafort, if he were to be released, should be released on

15   a substantial bond of $10 million to include home detention

16   and electronic monitoring.

17         Just so Your Honor is aware, again -- not that it's

18   controlling in any way, but Mr. Manafort is currently on bond,

19   the same bond in the District of Columbia.  The Judge there

20   has offered to allow him to be released from those conditions

21   were he to proffer sufficient property or suretors and he has

22   not yet done that.

23         So in effect he would be on the same bond that he

24   was on in the District of Columbia.  I'm not aware that

25   defense has a specific bail package today.

1          Further, Your Honor, Mr. Manafort clearly has not,

2    since October, has not violated the terms of his release in

3    any way.  However, he has, since that time been on electronic

4    monitoring and home detention --

5          THE COURT:  He's what?

6          MR. ANDRES:  He has been on electronic monitoring

7    and home detention.

8          I would just add, Judge, in addition to having a

9    significant amount of wealth, Mr. Manafort also has

10   significant ties abroad and travels frequently abroad and

11   that's an additional characteristic in terms of the bail

12   analysis.

13         THE COURT:  All right.  Thank you.

14         Mr. Downing, what's your view on this subject?

15         MR. DOWNING:  When we started the process for bail

16   in D.C., the Government agreed with us on a package that was a

17   $10 million surety that did not have any monitoring.  The

18   court in D.C. layered monitoring on top of the $10 million.

19   And quite frankly that combination seems more onerous than the

20   bail packages for Jeff Skilling in the Enron case or for

21   Bernie Madoff.

22         So while we do not object to the dollar amount of

23   the bond and we're about to finalize that in D.C., we think

24   the combination of a ten million dollar bond and the

25   monitoring far exceeds what the requirements are under the

1  bail act in terms of to reasonably ensure that Mr. Manafort

2  appears for trial.

3         Now we have trial dates that are set close in time.

4  Mr. Manafort has not violated any of the conditions of his

5  release.  He's lived here for over 35 years right here in

6  Virginia.  He's got his family here.

7         So we're dealing with the bond with the Court in

8  D.C., but I can tell you in a white collar case like this, the

9  bond package that has been proposed in D.C. by the Court is

10  incredibly onerous.  And we don't think it should apply here.

11         And, Your Honor, may we approach on just two issues

12  from the pretrial services report?

13         THE COURT:  What is the subject?

14         MR. DOWNING:  The two personal items in here that I

15  think need to be corrected.

16         THE COURT:  All right.  Mr. Manafort, you have the

17  right to be present at all proceedings against you including

18  bench conferences.  So you may come as well.  You don't have

19  to but you may.

20         MR. DOWNING:  He'll waive, Your Honor.

21         THE COURT:  All right.

22         (Bench Conference.)

23         THE COURT REPORTER:  Is this under seal?

24         THE COURT:  This is under seal for now.

25         MR. DOWNING:  On page 6 there's a reference to

21

1   driving under the influence.  He's never had an arrest or a

2   conviction for driving under the influence.  This was a

3   speeding infraction.  And he was never ordered --

4           THE COURT:  Why is this under seal?

5           MR. DOWNING:  I didn't think this was something we

6   wanted to put out in the public.  This seems pretty personal.

7   It's not true.

8           THE COURT:  Well, this does not warrant being under

9   seal.  That's not going to be material to my bond decision.

10          MR. DOWNING:  Okay.  The only other one is that this

11  was picked up from D.C. about alcohol abuse problem.  It's

12  not -- it was not ever reported as an alcohol abuse problem.

13  It's incorrect.  And we're going to go back and have D.C.

14  correct it and deal with pretrial services.  He never said he

15  had an alcohol abuse problem.

16          THE COURT:  All right.  This is not under seal.

17          None of this deserves to be under seal from my view.

18  But I understand why you thought it will be better if it were,

19  but it does not deserve to be under seal.  So this will be

20  transcribed, but it will be in the public record.  Neither of

21  those are really material to my decision.

22          The most important factor -- and I'll repeat this --

23  is the risk of flight.  And I think there is a risk of flight.

24  And I'll say this much whenever someone has a great deal of

25  money, it's quite easy to slip away.  You can buy your own

22

1    airplane and have it ready to pick you up and take you

2    somewhere where they don't have an extradition treaty.  So I

3    need to have conditions that satisfy me.  And we'll talk about

4    that in open court.

5              (Bench conference ended.)

6              THE COURT:  All right.  Let's proceed now.

7              The issue is whether Mr. Manafort should be remanded

8    today or whether there are conditions.  Of course he's

9    entitled to bail, a bond.  But he is, I think, quite

10   manifestly a risk of flight.  He has substantial personal

11   assets.  And he faces a very substantial period of

12   incarceration if he is convicted.  So there is substantial

13   incentive for someone to flee.

14             On the other hand, he has been compliant with his

15   conditions thus far.  He has considerable ties to this

16   country.  He is, after all, an American citizen.

17             But I think what I need is -- and it has to be

18   separate and distinct from Judge --

19             MR. WEISSMANN:  Jackson.

20             THE COURT:  -- Judge Jackson's bond requirements,

21   because those could be lifted at any time without even my

22   knowledge of it.  I have to make sure that there are

23   conditions that satisfy me that he will appear at trial.  So I

24   need to set them separately.  And I don't have any opinion on

25   whether her conditions were, as you put it, onerous or not.

1   But I think he is a risk of flight.

2          I think what I'm inclined to do -- let me tell you

3   what I'm inclined to do so that you can address it.  And I'll

4   change it if you persuade me.

5          I'm inclined to put him on home incarceration with

6   monitoring.  Now home incarceration is distinct from home

7   confinement.  Home confinement, there are usually

8   circumstances under which a defendant can leave the home with

9   probation officer's permission or something of that sort.

10         Home incarceration means that the defendant doesn't

11  go anywhere without my permission.  Unless, of course, he has

12  a heart attack or something and an ambulance takes him away.

13  The issue of a bond seems to me to be less significant.  He's

14  getting together a bond package, as I understand it, Mr.

15  Downing, that would satisfy the District of Columbia judge --

16  or District of Columbia -- she isn't a District of Columbia

17  judge, she's a federal judge.  But it will satisfy her.  And I

18  would be inclined then to review what I do because maybe the

19  same bond could suffice and same conditions.  I think it's

20  always important to remember that Mr. Manafort is presumed

21  innocent and remains so unless and until a jury finds

22  otherwise.

23         And the only reason I am limiting his freedom is the

24  risk of flight.  And the only way I can be reasonably assured

25  that there is reasonable assurance that he will appear is the

24

1    GPS or the -- I guess it's home incarceration with electronic

2    monitoring.  Because that means that I would have nearly, not

3    I, but the probation office, would have nearly instantaneous

4    knowledge if he violated that.  And we would then be in a

5    position to take remedial action.  I don't anticipate, of

6    course, that that's at all necessary.  But I don't know.  So I

7    have to set those conditions.  That's what I think is

8    appropriate at this time.

9            Let me say it clearly for you, Mr. Downing.  I would

10   release, Mr. Downing, on a bond, I'll set the bond.  But it

11   could be unsecured at this time.  But he would be subject to

12   home incarceration.  That is, he can't leave the house without

13   my permission unless he -- there is an exigent or an emergency

14   situation.  And I would be prepared to modify that in some way

15   if you make this package that satisfies -- I'm sorry --

16           MR. DOWNING:  Judge Jackson.

17           THE COURT:  -- Judge Jackson, I think that might

18   have some persuasive effect on me.  And I would think about

19   it.  I think what she has is a $10 million bond with home

20   confinement.  I don't know what the conditions of the

21   confinement are, but I understood that she wasn't, at this

22   point, willing to give up the home confinement even with the

23   bond.  But I'm not sure.  I know that the only way I can have

24   reasonable assurance that he will appear is by using the home

25   incarceration until I'm presented with a bond situation that I

1   think satisfies and gives reasonable assurance that he will

2   appear.

3           Go ahead, Mr. Downing.

4           MR. DOWNING:  Well, I have no problem getting the

5   Court the details of the bond package, but the restrictions on

6   Mr. Manafort would be -- many of them would be lifted under

7   the bond package that we're trying to complete with the Court

8   there.

9           THE COURT:  All right.

10          MR. DOWNING:  So I'm prepared to file that with you.

11  In terms of confinement of incarceration, I would say, given

12  our trial schedules and our prep for this, Mr. Manafort does

13  come into D.C. on a regular basis in terms of preparing his

14  defense for trial.

15          THE COURT:  Yes, I think that's reasonable.

16          MR. DOWNING:  Okay, and then the other issue that's

17  been out there is just for doctor's appointments.

18          THE COURT:  Yes.  That's also quite reasonable and

19  sensible.

20          MR. DOWNING:  So we'd be happy to get the bond

21  package together in D.C. and submit that to the Court for its

22  review.

23          THE COURT:  Well, he's now been indicted.  He has

24  not fled.  It will take time to impose these conditions.  He

25  currently is subject to electronic monitoring, is that

26

1  correct?

2          MR. DOWNING:  That's correct, Your Honor.

3          THE COURT:  Just a moment.

4          (A brief interruption in the proceedings.)

5          THE COURT:  Mr. Downing, I take it you've reviewed

6  or you've had access to the pretrial services report.

7          MR. DOWNING:  Correct, Your Honor.

8          THE COURT:  And do you know of any reason why the

9  finances that are reflected there are not accurate?

10         MR. DOWNING:  No, Your Honor.  I believe they are

11 accurate.  And, Your Honor, if it helps the Court --

12         THE COURT:  Tell me this, on the home confinement,

13 which he's currently on, is that right?

14         MR. DOWNING:  Correct.  Which is anticipated to be

15 lifted.

16         THE COURT:  It's a bracelet or anklet or whatever it

17 is?

18         MR. DOWNING:  Yes.

19         THE COURT:  What did he do to get permission to come

20 here today?  In other words, what process did he follow?

21         MR. DOWNING:  The general process is that when Mr.

22 Manafort is planning on leaving his residence, he contacts his

23 pretrial services in the District of Columbia to report the

24 reason for him leaving his residence.

25         THE COURT:  Is that what he did in this instance?

27

1      MR. DOWNING:  It is, Your Honor.  And also I would

2  like to add when there has been occasions when Mr. Manafort

3  needed to travel up to New York and pretrial services was able

4  to accommodate the monitoring of him during that period of

5  time while he traveled from Virginia to New York.

6      THE COURT:  Well, I'm less likely to approve that.

7      MR. DOWNING:  Your Honor, I would like to make one

8  point about this, which is --

9      THE COURT:  Yes, go ahead.

10      MR. DOWNING:  -- it's been a little confusing in

11 dealing with this matter, because the GPS monitoring is

12 supposed to be foolproof.  It's there, you know where he is,

13 you know where he's located.

14      THE COURT:  Let me tell you a little history about

15 that.  I put somebody on GPS monitoring.  It takes as much as

16 an hour or two before the word finally gets back.  I've had

17 defendants make it to the Baltimore Friendship Airport in that

18 period of time.  So it isn't foolproof.  It isn't -- it's

19 getting better all the time.

20      MR. DOWNING:  I would say the technology has

21 improved drastically in the last decade.  I actually thought

22 you were going to talk about someone going for a swim in the

23 Potomac.

24      THE COURT:  No.  That person, I think, I would

25 remand for a mental health evaluation.

1          MR. DOWNING:  Your Honor, if I may, the $10 million

2     package that we're putting together we can do the complete

3     reporting to this Court.  But you can see it's a substantial

4     amount of the real property that's owned by Mr. Manafort.  And

5     it's supported by approved appraisals.  And it's all been

6     scheduled out.  So we can provide that with the Court.  But

7     $10 million is a substantial part of his wealth.  And I will

8     tell you that if he was to flee that would leave his family in

9     ruin, because a lot of the rest of the assets in the package

10    is really highly leveraged.  So this is a substantial portion

11    of his wealth that's being put up.  And one of the prob- --

12    well, we substituted out that.  Forget it.  Withdrawn.

13         THE COURT:  Is the probation officer present in the

14    courtroom?

15         THE PROBATION:  Yes, Your Honor.

16         THE COURT:  Come forward, if you would, please.  I

17    meant to cover this with you, but I forgot it.

18         How long would it take for the probation office to

19    set up a home confinement electronic monitoring situation at

20    his home?  He already has one there?

21         THE PROBATION:  The issue with the monitoring that

22    he already has is I would not have access to those tracks from

23    the District of Columbia because they could not transfer the

24    monitoring to me.  I do have a unit available here today so he

25    could be placed on the GPS unit this afternoon.  So

1    immediately, Your Honor.

2              THE COURT:  Is that a bracelet or an anklet?

3              THE PROBATION:  It's a bracelet, Your Honor.

4              THE COURT:  So he wears two bracelets now?

5              THE PROBATION:  Yes, Your Honor.

6              THE COURT:  So it could be put on him today.

7              THE PROBATION:  Correct, Your Honor.

8              THE COURT:  And then if I set conditions of

9    release -- and this GPS monitoring would also, you would be

10   able to monitor not just if he leaves, but where he goes.

11   Unless he saws it off or something.

12             THE PROBATION:  Correct, Your Honor.  What we would

13   do is I would sit down with Mr. Manafort.  We would create

14   what's called a home zone.  So we would know that that's his

15   primary residence.  So we would always know when he's at home.

16   Anytime he needs to leave his home, he would need to give me

17   the time he's leaving, the address of where he's going and his

18   anticipated arrival back home and we would set up a zone so

19   that we would know whether or not that's where he actually

20   went.  And we're able to follow his tracks during the day to

21   see if he strayed or deviated from his course of travel that

22   was approved by the probation office.

23             THE COURT:  What would happen if at 2:00 in the

24   morning he left?

25             THE PROBATION:  I would contact the defendant, Your

30

1    Honor, to see where he was.  The software is not perfect.

2    Sometimes we get what are called "drift points."  But that's

3    why we contact the defendant to obtain his whereabouts.

4            THE COURT:  And, of course, a bracelet can always be

5    cut off.

6            THE PROBATION:  Yes, Your Honor, but we would know

7    as soon as it went into a tamper state.  And we would contact

8    the defendant.  If he did not answer, we have an after-hours

9    warrants protocol that we would then activate.

10           THE COURT:  All right.  Thank you.

11           When do you anticipate being able to post the bond?

12   My thought is that if Mr. Manafort flees, that bond would be

13   gone.  In other words, he would forfeit that bond once you get

14   it.

15           MR. DOWNING:  Your Honor, in terms of that bond

16   package, we had one outstanding item that had to be resolved

17   with the financial institution that we resolved.  So once that

18   gets filed with the Court in D.C., I think that will put

19   everything that needs to be in front of the court in D.C. for

20   final determination on a bond.

21           THE COURT:  All right.  I'm going to order that he

22   be placed on home confinement with electronic monitoring.  And

23   the same bond.  The same bond.  And in terms of his leaving,

24   the only approved ones are to consult with counsel or medical

25   emergencies.  Those are the two.

31

1          MR. DOWNING:  And religious observance, Your Honor?

2          THE COURT:  How often are those?

3          MR. DOWNING:  Either Saturday evening or Sunday

4   morning mass.

5          THE COURT:  Once a week.

6          MR. DOWNING:  Yes, unless, of course, for Holy days

7   of obligation, Your Honor.  The church is right here in

8   Alexandria.

9          THE COURT:  All right.  And let me ask the probation

10  officer.  If I authorize -- if I authorize leaving the home to

11  consult with attorney -- his attorneys, or going to a

12  religious service and you know where the attorneys are and you

13  know where the religious services are, can you ascertain from

14  the equipment whether he has in fact gone to those places?

15         THE PROBATION:  Yes, Your Honor, we can.

16         THE COURT:  And obviously for Mr. Manafort if he

17  needs to go to a doctor for some exigent purpose, he should do

18  so.  And if he's got a doctor's appointment already set up,

19  I'll probably approve that as well.

20         THE PROBATION:  He would just need to give our

21  office, specifically me, all of the information so that we

22  could set the proper time out for him in our system.

23         THE COURT:  And I've got to know it too.

24         THE PROBATION:  I'll let you know, Your Honor.

25         THE COURT:  All right.  Mr. Weissmann, any objection

32

1   to that?

2           MR. ANDRES:  No, Your Honor.

3           THE COURT:  All right.  That was -- Mr. Andres, any

4   objection to that?

5           MR. ANDRES:  No, Judge, thank you.

6           THE COURT:  We'll proceed on that.  I don't

7   foreclose, Mr. Downing, that you might return to Court if you

8   can propose some more appropriate, maybe even more lenient,

9   but right now I think that that's what we'll have to do.

10          MR. DOWNING:  Thank you, Your Honor.

11          THE COURT:  And the reason for that is purely on the

12  facts presented to me, he is a risk of flight, and I need to

13  take steps so that I have reasonable assurance that he will

14  appear.  And this, I think, gives me reasonable assurance.  If

15  something arises where you need outings for some other reason,

16  other than what I've listed, don't hesitate to ask.

17          Anything further in the arraignment today, Mr.

18  Weissmann, on behalf of the Government or not the Government,

19  the special prosecutor?

20          MR. WEISSMANN:  Yes, Judge.  In light of the Court

21  setting a date for the trial that is outside of the 70 days

22  for the --

23          THE COURT:  Yes, I will indicate that it's a complex

24  matter and I will indicate that the parties have advised the

25  Court and I think Mr. -- Mr. Downing, you would also urge it's

33

1    a complex matter and you need the time to prepare.

2          MR. DOWNING:  Yes, I urge the Court.

3          THE COURT:  I'll indicate that as well.  And you're

4    fortunate, my trial docket is pretty crowded right now.

5          Anything else today?  I'll issue an order setting

6    these dates.

7          MR. WEISSMANN:  No, Your Honor.

8          THE COURT:  Mr. Barger?

9          MR. BARGER:  Yes, Your Honor.  The only other

10   housekeeping is I filed the pro hac vice motion for Mr.

11   Downing.  And if the Court would permit him to pay the clerk's

12   office by check, they normally only take, I think, by credit

13   card, but since he's here today --

14         THE COURT:  Yes, I will.

15         MR. BARGER:  And do what the Court tells him.

16         THE COURT:  Yes, I will grant on the assurance that

17   you will file the fee.

18         MR. BARGER:  Yes, Your Honor.  I'll make sure that

19   Mr. Downing pays it.

20         THE COURT:  And I'm glad to see you again.

21         MR. BARGER:  It was very nice to see you, Your

22   Honor.  Thank you.

23         THE COURT:  Well, you can submit a speedy trial

24   waiver form, but in fact it's not only his right, it's the

25   public's right to a speedy trial.  And my rulings on the

34

1   Speedy Trial Act accommodate the public's interest.  But he

2   should also file a standard waiver, which you can supply him

3   or ask -- well, I don't see a prosecutor.  Is that Mr. Richman

4   back there?

5           MR. RICHMAN:  Yes, Your Honor.

6           THE COURT:  He's a public defender.  He'll give you

7   a form.  He's got a few forms, haven't you, Mr. Richman?

8           MR. RICHMAN:  I do, Your Honor.

9           THE COURT:  Thank you.

10

11          **(Proceedings adjourned at 2:36 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

35

<u>CERTIFICATE OF REPORTER</u>

1

2

3       I, Tonia Harris, an Official Court Reporter for the

4   Eastern District of Virginia, do hereby certify that I

5   reported by machine shorthand, in my official capacity, the

6   proceedings had and testimony adduced upon the Arraignment in

7   the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8   **MANAFORT,** Criminal Action Number 1:18-CR-83, in said court on

9   the 8th day of March, 2018.

10      I further certify that the foregoing 35 pages

11  constitute the official transcript of said proceedings, as

12  taken from my machine shorthand notes, my computer realtime

13  display, together with the backup tape recording of said

14  proceedings to the best of my ability.

15      In witness whereof, I have hereto subscribed my

16  name, this the 13th day of March, 2018.

17

18

19

20

21  _____

22  Tonia M. Harris, RPR
    Official Court Reporter

23

24

25