IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> ) Criminal No. 1:18-cr-00083-TSE <br> ) <br> v. ) Judge T. S. Ellis, III <br> ) <br> ) **ORAL ARGUMENT REQUESTED** <br> PAUL J. MANAFORT, JR., ) May 25, 2018 @ 9:00 a.m. <br> ) <br> ) <br> *Defendant.* ) <br> ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REQUIRE A HEARING REGARDING IMPROPER DISCLOSURES RELATING TO CONFIDENTIAL GRAND JURY INFORMATION AND POTENTIALLY CLASSIFIED MATERIALS

I.    INTRODUCTION

In the fall of 2016, the former chairman to Donald J. Trump's presidential campaign, Paul J. Manafort, Jr., became the target of an apparent "leaks" campaign conducted by numerous unidentified government officials. Over the following sixteen months, current and former government officials—including law enforcement agents—disclosed confidential and ostensibly classified information to multiple media sources in an effort to substantially prejudice and adversely impact Mr. Manafort. These actions were in violation of the defendant's Fifth Amendment right to due process, his Sixth Amendment right to trial before an impartial jury, and Rule 6(e) of the Federal Rule of Criminal Procedure. The government leaks may have also disclosed classified information, a felony, in violation of 18 U.S.C. § 798. Moreover, it appears that government officials or agents intentionally provided false information to media outlets,

knowing that the information would be widely reported and that the disclosures would unfairly prejudice Mr. Manafort in his efforts to defend himself.

Without question, unauthorized government leaks during criminal investigations and prosecutions create enormous challenges for both the target/defendant and the Court. Such leaks impugn the character of the individual under investigation and substantially undermine a fundamental principle of our judicial system; *i.e.*, the right of the defendant to have the case determined by an impartial jury on the facts.

The case at bar involves a matter of intense national and international attention. From the outset, Mr. Manafort has been on the receiving end of a torrent of negative and apparently false press generated by numerous unlawful disclosures made by individuals within the government. There have been important details reported regarding these sources, and the basis for their inside knowledge. As discussed *infra*, the leakers in these articles are often identified as current and former government officials who have requested anonymity, who admit that they were not authorized to speak, and who were—astoundingly—providing information that was seemingly classified. Although the exact persons are not yet known, they must be identified. At bottom, these government-sourced disclosures have violated the Federal Rules of Criminal Procedure, internal government policies and procedures, federal statutes, and Mr. Manafort's constitutional rights.

Here, an investigation could be done expeditiously. It has been widely reported that Congressional Committees and the Department of Justice have been investigating government leaks related to the investigation of whether there was contact or coordination between the Trump campaign and Russian government officials. Importantly, former FBI Director James Comey, and former FBI Deputy Director Andrew McCabe, have admitted to leaking information to the press

during their tenures at the FBI. Both individuals had direct involvement in the investigation of the Trump campaign. There should be a manageable number of individuals that had access to the leaked information, as the information was confidential and/or classified and, by definition, not widely disseminated. A small sampling of unlawful disclosures made about Mr. Manafort follows.

## II. UNAUTHORIZED DISCLOSURES OF PROTECTED INFORMATION

From October 2016 through February 2018, countless press articles were published and disseminated regarding the government's investigation and prosecution of Mr. Manafort. Numerous reports contained information from government sources that was clearly subject to grand jury secrecy, was potentially classified intelligence information, or was simply false. For example:

**On October 31, 2016, NBC News reported that**:

- The FBI has been conducting a preliminary inquiry into Donald Trump's former campaign manager Paul Manafort's foreign business connections.

- The article cited law enforcement and intelligence sources.

    Ken Dilanian, Robert Windrem, William M. Arkin and Tom Winter, *FBI Making Inquiry Into Ex-Trump Campaign Manager's Foreign Ties,* NBC News, Oct. 31, 2016. (Exhibit 1).

**On February 14, 2017, The New York Times reported that:**

- Phone records and intercepted calls show that members of the Trump campaign and other Trump associates had repeated contact with senior Russian intelligence officials in the year before the election, according to four current and former American officials.

- All of the current and former officials spoke on the condition of anonymity because the continuing investigation is classified.

- The officials stated that one of the advisors picked up on a recorded call was Paul Manafort who was Trump's campaign chairman for several months last year.

- The National Security Agency, which monitors the communications of foreign intelligence services, initially captured calls between Trump's associates and the Russians as part of routine foreign surveillance. After that, the FBI asked the NSA to collect as much information as possible about Russian operatives on the phone calls and to search through troves of previously intercepted communications that had not been analyzed.

- The agency's investigation of Mr. Manafort began last spring as an outgrowth of a criminal investigation into his work for a pro-Russian political party in Ukraine and for the country's former president, Victor Yanukovych. It has focused on why he was in such close contact with Russian and Ukrainian intelligence officials.

- The Bureau did not have enough evidence to obtain a warrant for a wiretap of Mr. Manafort's communications, but it had the NSA scrutinize the communications of Ukrainian officials he had met.

  Michael S. Schmidt, Mark Mazzetti and Matt Apuzzo, *Trump Campaign Aides Had Repeated Contacts with Russian Intelligence*, The New York Times, Feb. 14, 2017. (Exhibit 2).

**On March 22, 2017, the Associated Press reported that:**

- People familiar with the relationship between Paul Manafort and Russian oligarch Oleg Deripaska said money transfers to Mr. Manafort amounted to tens of millions of dollars and continued through 2009. They spoke on the condition of anonymity because they were not authorized to discuss secret payments publicly.

- Paul Manafort had been a leading focus of the U.S. intelligence investigation of Trump's associates and Russia, according to a U.S. official. The person spoke on the condition of

4

anonymity because details of the investigation are confidential. Meanwhile, federal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukrainian assets.

Jeff Horwitz & Chad Day, *Before Trump Job Manafort Worked to Aid Putin*, Associated Press, Mar. 22, 2017. (Exhibit 3).

**On March 23, 2017, the Associated Press reported that:**

- Treasury agents in recent months obtained information connected to Paul Manafort's transactions from Cypriot authorities according to a person familiar with the matter who was not authorized to speak publicly.

- The time period covered under the request for Mr. Manafort's transactions from the Treasury Department's Financial Crimes Enforcement Network was not immediately clear.

Jack Gillum, Menelaos Hadjicostis & Eric Tucker, *US Probe of Ex-Trump Aide Extends To Cyprus*, Associated Press, Mar. 23, 2017. (Exhibit 4).

**On April 12, 2017, the Associated Press reported that:**

- Now, financial records newly obtained by the AP confirm that Paul Manafort's firm received at least some money listed in the so called "black ledger."

- Federal prosecutors in the U.S. have been investigating Mr. Manafort's work in Eastern Europe as part of a larger anti-corruption probe.

Jack Gillum, Chad Day and Jeff Horwitz, *Manafort Firm Received Ukraine Ledger Payout*, Associated Press, Apr. 12, 2017. (Exhibit 5).

**On June 3, 2017, the Associated Press reported that:**

- The Special Counsel investigating possible ties between Trump's campaign and the Russian government has taken over a separate criminal probe involving former Trump campaign chairman Paul Manafort.

- The expansiveness of Mueller's investigation was described to the AP. No one familiar with the matter has been willing to discuss the scope of his investigation on the record because it is just getting underway and because revealing details could complicate its progress.

- Sadie Gurman, Eric Tucker, and Jeff Horwitz, *Special Counsel's Trump Investigation Includes Manafort Case,* Associated Press, Jun. 3, 2017. (Exhibit 6).

**On August 4, 2017, CNN reported that:**

- In the summer of 2016, U.S. intelligence agencies noticed a spate of curious contacts between Trump campaign associates and suspected Russian intelligence, according to current and former U.S. officials briefed on the investigation.

- In the months that followed, investigators turned up intercepted communications appearing to show efforts by Russian operatives to coordinate with Trump associates on damaging Hillary Clinton's election prospects, officials said. CNN has learned those communications included references to campaign chairman Paul Manafort.

- The suspect operatives relayed what they claimed were conversations with Mr. Manafort, encouraging help from the Russians.

    Evan Perez, Pamela Brown, and Shimon Prokupecz, *One Year Into the FBI's Russia Investigation, Mueller Is On the Trump Money Trail,* CNN, Aug. 4, 2017. (Exhibit 7).

Again, this is but a small sampling of the improper disclosures made by government officials regarding the defendant. Indeed, in the days before the Special Counsel presented superseding indictments in the Eastern District of Virginia and the District of Columbia, numerous news stories—again fueled by government sources—appeared in the media which violated Mr. Manafort's constitutional rights to due process and trial by an impartial jury. *See, e.g.*, Jason Leopold, Anthony Cormier and Tanya Kozyreva, *Manafort Under Scrutiny for $40 Million in "Suspicious" Transactions*, BuzzFeed News, Feb. 19, 2018[1] (discussing the Special Counsel's investigation and noting that "three current and former law enforcement officials said that Mueller's team is poring over [documents] as it considers leveling new charges against Manafort"); David Willman, *Former Trump Aide Richard Gates to Plead Guilty; Agrees to Testify Against Manafort, Sources Say*, L.A. Times, Feb. 18, 2018[2] (discussing Gates' anticipated plea "within the next few days" and stating that these individuals "spoke on condition of anonymity, citing a judge's gag order restricting comments about the case to the news media or public"); Katelyn Polantz and Sara Murray, *Exclusive: A Top Trump Campaign Adviser Close to Plea Deal with Mueller*, CNN, Feb. 17, 2018[3] (anonymous sources stating that "investigators with the special counsel's office are preparing to file new charges against him, according to people familiar with the probe").

---

[1] Available at: https://www.buzzfeed.com/jasonleopold/manafort-under-scrutiny-for-40-million-in-suspicious?utm_term=.yqR2lEVed#.mj3ym2Yv3 (last accessed Apr. 30, 2018).

[2] Available at: http://www.latimes.com/politics/la-na-pol-rick-gates-plea-deal-20180218-story.html (last accessed Apr. 30, 2018).

[3] Available at: https://www.cnn.com/2018/02/15/politics/rick-gates-plea-deal-mueller-russia-investigation/index.html (last accessed Apr. 20, 2018).

As is evident, the government sources are specifically identified as such in the news articles, and even when they are not, it is abundantly clear that the leakers are current or former government officials with personal knowledge of the matters reported. For example, in the CNN article noted immediately above, the reporters point out that Mr. Gates' lawyers did not respond to requests for comments and Mr. Manafort, of course, was certainly not privy to plea negotiations between Mr. Gates and the Special Counsel or his Office's inner workings. The only reasonable inference is that the source of the disclosure was from government officials who had knowledge about the status of the investigation.

### III. ARGUMENT

#### A. INTERFERENCE WITH CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A TRIAL BEFORE AN IMPARTIAL JURY

The government-sourced leaks concerning surveillance of Mr. Manafort with foreign individuals is particularly troubling. Despite multiple discovery and *Brady* requests in this regard, the Special Counsel has not produced any materials to the defense—no tapes, notes, transcripts or any other material evidencing surveillance or intercepts of communications between Mr. Manafort and Russian intelligence officials, Russian government officials (or any other foreign officials). The Office of Special Counsel has advised that there are no materials responsive to Mr. Manafort's requests. Of course, the natural implication of this is that these government leaks were intentionally designed to create a false narrative in order to garner support for the appointment of a Special Counsel to investigate Mr. Manafort for purportedly coordinating with Russian intelligence/government officials despite the lack of any such evidence. If this proves this to be true, then Mr. Manafort should not have been referred to the Special Counsel for investigation of coordination with the Russian government, nor for any other matters. Simply put, without original jurisdiction to investigate Mr. Manafort for alleged coordination with the Russian government

during the presidential campaign of Donald J. Trump, the Special Counsel had – and has – no lawful authority or jurisdiction to investigate and prosecute Mr. Manafort for the matters that he has brought in this Court and in the District of Columbia. *See United States v. Providence Journal Co.*, 485 U.S. 693 (1988); *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).

Moreover, the false government leaks started long before the government returned the first indictment against Mr. Manafort in October 2017 and continued until the eve of the Special Counsel's superseding indictments in February 2018. These leaks were clearly intended to unfairly prejudice the jury pool, both grand jury and petit, against Mr. Manafort and deprive Mr. Manafort of due process and an impartial jury. Here, the unfair prejudice suffered by Mr. Manafort is indisputable. *See Irvin v. Dowd*, 366 U.S. 717 (1961). The press articles state that multiple government officials confirmed **repeated contact** between the Trump campaign (including Mr. Manafort), Trump associates and Russian intelligence officials in the year before the election. The false impressions created by this baseless narrative would reasonably cause grand jurors or future potential trial jurors to speculate that, if Mr. Manafort was communicating with Russian intelligence officials during the campaign, then he may have been involved in some other nefarious conduct. Accordingly, if the representations of the Special Counsel are accurate, and there is not, in fact, any evidence of communications between Mr. Manafort and foreign officials, then the perpetrators of this elaborate hoax must be identified and punished and the substantial unfair prejudice to Mr. Manafort must be remedied.

B. VIOLATIONS OF GRAND JURY SECRECY

Rule 6(e) of the Federal Rules of Criminal Procedure prohibits government attorneys and agents from disclosing "a matter occurring before the grand jury...." Fed. R. Crim. P. 6(e)(2)(B).

As the Supreme Court has stated, "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," which encourages voluntary participation in investigations, enables witnesses to testify fully and frankly, safeguards the investigative process from undue outside influence, and spares uncharged investigatory targets from public ridicule. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218-19 (1979). As a result, courts have an obligation to look into alleged Rule 6(e) violations. In *Finn v. Schiller*, 72 F.3d 1182 (4th Cir. 1996), the Fourth Circuit held "—that upon a *prima facie* showing to the district court of an alleged Rule 6(e) violation, the court must take appropriate steps to determine whether a violation has occurred. If the court finds that a violation has, in fact, occurred, the court should take appropriate action to prevent further violations and to sanction the violator as provided by the Rule." *Id.* at 1189-90.

In this matter, there is *prima facie* evidence that government officials and agents with access to or information about the Special Counsel's investigation and prosecution have violated longstanding rules protecting grand jury information. Press reports sufficiently demonstrate reliance on government sources when the nature of the information provided by the source reveals a connection to the government. *See Barry v. United States*, 865 F.2d 1317, 1325 (D.C. Cir. 1989); *see also In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 218 ( 5th Cir. 1980). By their actions, it is self-evident that the objective of these government sources was to create unfair prejudice against Mr. Manafort and thereby deprive him of his Fifth and Sixth Amendment rights. The government's investigation, and the criminal charges that ultimately resulted from it, are the epitome of a party seeking to decide a case in the press and not the courtroom.

As noted in the sampling of articles published in the major media outlets identified above, the evidence of these Rule 6(e) violations is clear and substantial. Mr. Manafort was identified to media outlets as a target of a criminal investigation as early as the fall of 2016. With respect to

the scope of the investigation and the law enforcement techniques that were being employed, the reporting indicates, among other things, that the National Security Agency was asked to scrutinize classified intercepts of phone calls with Russian intelligence officials with whom Mr. Manafort had communicated with because the FBI could not obtain a court-ordered wiretap. The government's theories of wrongdoing abound, but clearly disclose a focus upon Mr. Manafort's Ukrainian consulting activities. Indeed, discovery materials produced by the government in this case substantiate the existence of federal grand jury investigation(s) of Mr. Manafort prior to the appointment of the Special Counsel in May 2017. Therefore, the government leaks disclosing the nature of the investigation, its time frame, and the potential dollar amounts of the purported criminal violations are clear violations of Rule 6(e) and also violated the Justice Department's own policies and procedures. "[A] *prima facie* case of a violation of Rule 6(e)(2) is made when . . . media reports disclose[] information about matters occurring before the grand jury and indicate that the sources of the information include[] attorneys and agents of the Government." *Barry*, 865 F.2d at 1321 (citations and internal quotation marks omitted).

In fact, the most compelling evidence that government officials or agents have knowingly violated Rule 6(e)'s secrecy requirement is the way in which the media reports describe the sources. Apparently, there was no fear of potential legal repercussions by these sources. In many instances, no effort whatsoever is made to hide the fact that the leakers are government officials or agents with direct knowledge of the investigation. In other cases, the reports state that the sources "are not authorized to discuss" the matter, or that anonymity is required because the "continuing investigation is classified." There is thus a strong inference that these individuals knew that they were subject to the requirements of Rule 6(e), but nevertheless chose to disclose the information. Any other interpretation is implausible. *See, e.g., In re Motions of Dow Jones &*

*Co.*, 142 F.3d 496, 500 (D.C. Cir. 1998). The totality of the facts demonstrate that Mr. Manafort is entitled to a hearing requiring the Office of Special Counsel to address the unauthorized leaks to the press.

WHEREFORE, Defendant Manafort respectfully requests the relief sought in the instant motion including requiring the Office of Special Counsel to address the unauthorized leaks to the press at a hearing and other such relief needed to allow Mr. Manafort an opportunity to seek legal redress for all violations of his constitutional rights.

Dated: April 30, 2018                      Respectfully submitted,

                                               s/ Kevin M. Downing
                                               Kevin M. Downing (*pro hac vice*)
                                               Law Office of Kevin M. Downing
                                               601 New Jersey Avenue NW
                                               Suite 620
                                               Washington, DC 20001
                                               (202) 754-1992
                                               kevindowning@kdowninglaw.com

                                               s/ Thomas E. Zehnle
                                               Thomas E. Zehnle (VSB No. 27755)
                                               Law Office of Thomas E. Zehnle
                                               601 New Jersey Avenue NW
                                               Suite 620
                                               Washington, DC 20001
                                               (202) 368-4668
                                               tezehnle@gmail.com

                                               *Counsel for Defendant Paul J. Manafort, Jr.*