1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,   )  Case 1:18-cr-00083
                                )
 4              Plaintiff,      )
                                )
 5        v.                    )  Alexandria, Virginia
                                )  May 4, 2018
 6  PAUL J. MANAFORT, JR.,      )  9:55 a.m.
                                )
 7              Defendant.      )
                                )  Pages 1 - 48
 8

 9              TRANSCRIPT OF MOTIONS

10        BEFORE THE HONORABLE T.S. ELLIS, III

11         UNITED STATES DISTRICT COURT JUDGE

12
    APPEARANCES:
13
    FOR THE PLAINTIFF:
14
        ANDREW A. WEISSMANN, ESQUIRE
15      GREG D. ANDRES, ESQUIRE
        MICHAEL R. DREEBEN, ESQUIRE
16      UZO E. ASONYE, ESQUIRE
        OFFICE OF THE UNITED STATES ATTORNEY
17      2100 Jamieson Avenue
        Alexandria, Virginia  22314
18      (703) 299-3700

19  FOR THE DEFENDANT:

20      THOMAS E. ZEHNLE, ESQUIRE
        KEVIN M. DOWNING, ESQUIRE
21      MILLER & CHEVALIER, CHARTERED
        900 Sixteenth Street, N.W.
22      Washington, D.C.  20006
        (202) 626-6062
23
    THE DEFENDANT, PAUL J. MANAFORT, JR., IN PERSON
24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1          THE COURT:  All right.  Call the next case,

2  please.

3          THE CLERK:  *United States v. Paul J.*

4  *Manafort, Jr.*, Criminal Case 1:18-cr-83.

5          THE COURT:  All right.  Who is here on behalf

6  of the special prosecutor?

7          MR. WEISSMANN:  Good morning, Your Honor.

8  Andrew Weissmann for the special counsel's office.

9  With me today are Michael Dreeben, who will be arguing

10  the motion, Greg Andres, and Uzo Asonye.

11          THE COURT:  Yes.  Good morning to all of you.

12          Who will argue today, Mr. Weissmann?

13          MR. DREEBEN:  Good morning, Your Honor,

14  Michael Dreeben.

15          THE COURT:  All right.  Spell that for us,

16  please.

17          MR. DREEBEN:  D as in David, R, E as in echo,

18  E as in echo, B as in boy, E as in echo, N as in

19  November.

20          THE COURT:  Okay.  And, Mr. Asonye, I'm glad

21  to see you here.  I indicated that the special counsel

22  should have local counsel, and that's you.

23          MR. ASONYE:  Yes, Your Honor.  Thank you.

24          THE COURT:  Good morning.

25          MR. ASONYE:  Good morning.

1          THE COURT:  All right.  For the defendant,

2  who is here?

3          MR. ZEHNLE:  Good morning, Your Honor.

4  Thomas Zehnle on behalf of Mr. Manafort, and with me is

5  Kevin Downing.

6          THE COURT:  All right.  And also with you is?

7          MR. ZEHNLE:  The defendant, Mr. Manafort.

8  I'm sorry.

9          THE COURT:  All right.  Good morning to all

10  of you.

11          Who will argue today?

12          MR. DOWNING:  Mr. Downing will argue today,

13  Your Honor.

14          THE COURT:  All right.  Spell that for me,

15  please.

16          MR. DOWNING:  Mr. Downing's name?

17  D-O-W-N-I-N-G.

18          THE COURT:  All right.  Thank you.

19          The matter is before the Court today on your

20  motion, Mr. Downing.  So you may begin.  I have some

21  knowledge.

22          Let me ask a few facts so that I can be

23  clear.  Let me ask the government -- or not the

24  government -- the special counsel a few questions,

25  Mr. Dreeben.

1          MR. DREEBEN:  Yes, Your Honor.

2          THE COURT:  All right.  The indictment

3   against Mr. Manafort was filed in February, but it

4   actually was antedated by a filing in the District of

5   Columbia.  These allegations of bank fraud, of false

6   income tax returns, of failure to register or report

7   rather, failure to file reports of foreign bank

8   accounts, and bank fraud, these go back to 2005, 2007,

9   and so forth.  Clearly, this investigation of

10  Mr. Manafort's bank loans and so forth antedated the

11  appointment of any special prosecutor and, therefore,

12  must've been underway in the Department of Justice for

13  some considerable period before the letter of

14  appointment, which is dated the 17th of May in 2017.

15  Am I correct?

16         MR. DREEBEN:  That is correct, Your Honor.

17         THE COURT:  All right.  So when the special

18  prosecutor was appointed -- and I have the letter of

19  appointment in front of me -- what did they do?  Turn

20  over their file on their investigation of Mr. Manafort

21  to you all?

22         MR. DREEBEN:  Essentially, Your Honor,

23  special counsel was appointed to conduct an

24  investigation --

25         THE COURT:  I'm sorry.  Answer my question.

1  Did you remember what my question was?

2           MR. DREEBEN:  Yes, Your Honor, and I was

3  attempting to answer your question.  We did acquire the

4  various investigatory threads that related to

5  Mr. Manafort upon the appointment of the special

6  counsel.

7           THE COURT:  Apparently, if I look at the

8  indictment, none of that information has anything to do

9  with links or coordination between the Russian

10 government and individuals associated with the campaign

11 of Donald Trump.  That seems to me to be obvious

12 because they all long predate any contact or any

13 affiliation of this defendant with the campaign.  So I

14 don't see what relation this indictment has with

15 anything the special prosecutor is authorized to

16 investigate.

17          It looks to me instead that what is happening

18 is that this investigation was underway.  It had

19 something.  The special prosecutor took it, got

20 indictments, and then in a time-honored practice which

21 I'm fully familiar with -- it exists largely in the

22 drug area.  If you get somebody in a conspiracy and get

23 something against them, you can then tighten the

24 screws, and they will begin to provide information in

25 what you're really interested in.  That seems to me to

1  be what is happening here.  I'm not saying it's

2  illegitimate, but I think we ought to be very clear

3  about these facts and what is happening.

4         Now, I think you've already conceded

5  appropriately that this investigation that has led to

6  this indictment long antedated the appointment of a

7  special prosecutor; that it doesn't have anything to do

8  with Russia or the campaign; and that he's indicted;

9  and it's useful, as in many cases by prosecutors, to

10 exert leverage on a defendant so that the defendant

11 will turn and provide information on what is really the

12 focus of the special prosecutor.

13        Where am I wrong in that regard?

14        MR. DREEBEN:  The issue, I think, before you

15 is whether Mr. Manafort can dismiss the indictment

16 based on his claim.

17        THE COURT:  Yes.  Now I asked you:  Where am

18 I wrong about that?

19        MR. DREEBEN:  Your Honor, our investigatory

20 scope does cover the activities that led to the

21 indictment in this case.

22        THE COURT:  It covers bank fraud in 2005 and

23 2007?

24        MR. DREEBEN:  Yes, because --

25        THE COURT:  Tell me how.

1           MR. DREEBEN:  Your Honor, the authorization

2 for the special counsel to investigate matters is

3 described generally in the appointment order on May --

4           THE COURT:  I have it right in front of me,

5 and it won't surprise you to learn that I'm fully

6 familiar with it.  My question to you was, how does

7 bank fraud and these other things that go back to 2005,

8 2007, how does that have anything to do with links

9 and/or coordination between the Russian government and

10 individuals associated with the campaign of Trump?

11           MR. DREEBEN:  So the authorization order

12 permits investigation of two different things that are

13 described in separate clauses.  The first are links and

14 coordination between individuals associated with the

15 Trump campaign and the Russian government's effort to

16 influence the election.  Mr. Manafort was a campaign

17 official.

18           THE COURT:  You're running away from my

19 question again.  You know, I'm focused on the

20 indictment that is here.

21           MR. DREEBEN:  Correct.

22           THE COURT:  It involves facts and

23 circumstances that go back as far as 2005 and come

24 forward, Mr. Manafort's loans from several banks that

25 you all claim he submitted fraudulent statements -- I'm

1   asking you, and I've already established this

2   investigation long predated the special prosecutor.

3   And so what is really going on, it seems to me, is that

4   this indictment is used as a means of exerting pressure

5   on the defendant to give you information that really is

6   in your appointment, but it itself has nothing whatever

7   to do with it.

8           MR. DREEBEN:  Well, Your Honor, I understand

9   the question.  I'm trying to explain why I think that

10  it does have to do with our investigatory scope, and I

11  think there are a couple of premises that may help

12  illuminate what that investigatory scope is.

13          The first one is that in examining an

14  individual who was associated with the Trump campaign

15  and did have Russian-affiliated connections, which

16  Mr. Manafort did --

17          THE COURT:  Are they Russian or Ukrainian?

18          MR. DREEBEN:  Both.  Mr. Manafort worked

19  extensively in Ukraine, and he also has business

20  connections and other connections to individuals

21  associated with Russia.

22          In following the leads from those things,

23  investigators want to understand the full scope of his

24  relationship, how he was paid, with whom he associated,

25  what happened to the money, and that leads to the

1  activities that are at issue in this indictment.

2           THE COURT:  Well, it didn't lead to that.

3  This was given to you by the Department of Justice.

4  The investigation was already well underway going back

5  to 2005.  Am I correct?

6           MR. DREEBEN:  Well, I think, Your Honor, the

7  investigation has developed considerably with the

8  special counsel.

9           THE COURT:  Wasn't it already in existence in

10 the Department of Justice, and they gave it to you when

11 you all were appointed?

12          MR. DREEBEN:  There were investigations that

13 were in existence, yes, but those investigations were

14 folded together with our overall examination of

15 Mr. Manafort's conduct that fits within (b)(i).

16          THE COURT:  All right.  Do you have it in

17 front of you?

18          MR. DREEBEN:  Yes.

19          THE COURT:  All right.  I think you would

20 agree that the indictment that we have before the Court

21 is not triggered by (i), which says, "any links and/or

22 coordination between the Russian government and

23 individuals associated with the campaign of President

24 Donald Trump."  Bank fraud in 2005 and other things had

25 nothing whatever to do with that.

1           So then you go to number two.  It says, "any

2    matters that arose or may arise directly from the

3    investigation."  Well, this indictment didn't arise

4    from your investigation; it arose from a preexisting

5    investigation even assuming that that (ii) is a valid

6    delegation because it's open-ended.

7           Go ahead, sir.

8           MR. DREEBEN:  So I would take a different

9    look at the way this order works than Your Honor's

10   description for a couple of reasons.

11          THE COURT:  All right.

12          MR. DREEBEN:  The first is that in provision

13   (c) which is in the order, the special counsel is

14   authorized to prosecute matters that arose from the

15   investigation that is described earlier in the preamble

16   and in (b)(i) and (b)(ii).  So we are not limited in

17   our prosecution authority to crimes that would fit

18   within the precise description that was issued in this

19   public order.  If the investigation is valid, the

20   crimes that arose from that investigation are within

21   the special counsel's authority to prosecute.

22          THE COURT:  Even though it didn't arise from

23   your investigation.  It arose from a preexisting

24   investigation.

25          MR. DREEBEN:  Well, the investigation was

1    inherited by the special counsel.

2            THE COURT:   That's right, but your argument

3    says, Even though the investigation was really done by

4    the Justice Department, handed to you, and then you're

5    now using it, as I indicated before, as a means of

6    persuading Mr. Manafort to provide information.

7            It's vernacular by the way.  I've been here a

8    long time.  The vernacular is to sing.  That's what

9    prosecutors use, but what you've got to be careful of

10   is they may not just sing.  They may also compose.  I

11   can see a few veteran defense counsel here, and they

12   have spent a good deal of time in this courtroom trying

13   to persuade a jury that there wasn't singing, there was

14   composing going on.

15           But in any event, finish up this point, and

16   then I'll come back to the defendant.

17           MR. DREEBEN:   Well, Your Honor, we are the

18   Justice Department.  We are not separate from the

19   Justice Department.  The acting attorney general

20   appointed us to complete investigations and to conduct

21   the investigation that's described in this order.

22           In addition, the acting attorney general has

23   made clear in testimony before Congress that this order

24   does not reflect the details of the matters that were

25   assigned to us for investigation.  And the word "arose"

1   from that's contained in (b) is not a full and complete

2   description that's meant to be judicially enforceable

3   of the matters that were entrusted --

4           THE COURT:  So it's written by lawyers but

5   not intended to be judicially enforceable?

6           MR. DREEBEN:  It's certainly not intended to

7   be judicially --

8           THE COURT:  I think you are better off

9   arguing that it's very broad and that the matters that

10  are here are well within it.  But to say that you can

11  write a letter delegating a job to somebody but don't

12  pay any attention to the scope of it is not very

13  persuasive to say the least.

14          MR. DREEBEN:  Well --

15          THE COURT:  What we don't want in this

16  country is we don't want anyone with unfettered power.

17  We don't want federal judges with unfettered power.  We

18  don't want elected officials with unfettered power.  We

19  don't want anybody, including the president of the

20  United States, nobody to have unfettered power.  So

21  it's unlikely you're going to persuade me that the

22  special prosecutor has unlimited powers to do anything

23  he or she wants.

24          By the way, your office was appointed, you

25  say, in May 2017.  Is there any requirement that you

1   make reports periodically to the attorney general?

2              MR. DREEBEN:  Yes.

3              THE COURT:  Does that include financial?  I

4   think you were given $10 million to begin with.

5              MR. DREEBEN:  We have proposed a budget and

6   had a budget approved.

7              THE COURT:  Of $10 million?

8              MR. DREEBEN:  I believe that's correct.

9              THE COURT:  Have you spent that yet?

10             MR. DREEBEN:  I am not in a position to talk

11  about what our budget is.

12             THE COURT:  Are you in a position to tell me

13  when the investigation will be over?

14             MR. DREEBEN:  I am not, Your Honor.

15             THE COURT:  All right.  Well, I understand

16  that, and it isn't pertinent to what I have to decide

17  today.  And I understand your not being in a position

18  to tell me, but I'm sure you're sensitive to the fact

19  that the American people feel pretty strongly about no

20  one having unfettered power.

21             We had an interesting judicial conference in

22  the early '90s, I think, on the special prosecutor, and

23  they all appeared.  I think it was at The Greenbrier.

24  I was the chair of that judicial conference.  It was a

25  very interesting time.  There were many special

1   prosecutors who appeared, including my former

2   constitutional law professor, Archie Cox, and others.

3   So I had a wonderful opportunity to meet and speak to

4   them and hear their variety of views.

5            All right.  I think you answered my

6   questions, Mr. Dreeben.  If you want to say anything

7   else -- now, of course, you're going to have a full

8   opportunity to respond to the defendant's arguments,

9   but I had some preliminary questions, which I think

10  you've answered.

11           MR. DREEBEN:  I think I should clarify one

12  thing, Your Honor.  We are not operating with

13  unfettered power.  We're operating within a framework

14  of regulations that contemplate regular reporting to

15  the acting attorney general, who is supervising the

16  work of our office within the framework of --

17           THE COURT:  Is that Rosenstein?

18           MR. DREEBEN:  Yes.

19           THE COURT:  Is he not recused?

20           MR. DREEBEN:  No.  He is the acting attorney

21  general who appointed the special counsel and who is

22  operating in the framework of internal Department of

23  Justice regulations.  This is not the Independent

24  Counsel Act that Your Honor was referring to in the

25  conference that you spoke of.  This is not a separate

1    court-appointed prosecutor who's operating under

2    statutory independence.

3            We are within the Department of Justice.

4    We're being supervised by an acting attorney general

5    who has conferred upon us specific jurisdiction and who

6    regularly is in a position to describe to us the metes

7    and bounds of that.  There is in this record a

8    memorandum that he has issued on August 2 that explains

9    that crimes that arose from Mr. Manafort's receipt of

10   payments from Ukraine is within our jurisdiction and

11   was at --

12           THE COURT:  Yes.  I have that right here, and

13   I'm glad you raised it because 75 percent of it is

14   blocked out, redacted.  Why don't I have a full copy of

15   it?

16           MR. DREEBEN:  The only paragraphs that are

17   pertinent to Mr. Manafort are the ones that are

18   contained in this record.

19           THE COURT:  Well, let me use a phrase that

20   I'm fond of that I used to use with my children.  I

21   can't use it with my wife, but I'll be the judge of

22   whether it relates to the others.  I think you should

23   give me under seal to be sure -- and you can do it

24   *ex parte* if you wish -- under seal, *ex parte* a complete

25   copy of the August 2, and I'll be the judge of whether

1   it has anything to do with Mr. Manafort.

2          MR. DREEBEN:  Your Honor, if I could ask

3   leave to consult with the relevant components of the

4   intelligence community because that is a classified

5   document.

6          THE COURT:  Yes, of course, you may do that.

7   If any part of it is classified, it won't surprise you

8   to know that a district judge is fully cleared.  In

9   fact, I have several espionage trials underway.  If

10  CIPA is needed, we will invoke it and use it.  But I

11  don't think it will be necessary.  I just want to be

12  sure I understand it fully.

13         What you're telling me is that the redacted

14  portions don't have anything to do with Manafort or the

15  issue he's raised.  I don't have any reason to doubt,

16  especially because you're making in effect a

17  representation, but I'm not bound by that.  I need to

18  satisfy myself.  That's why I want to know.

19          I think it's perfectly appropriate for you to

20  consult with other parts of the government,

21  particularly intelligence agencies.  If they feel some

22  of it is classified, I'm prepared to look at it

23  *ex parte* under seal.  We've got a SCIF downstairs where

24  we put those things.  So I'm fully familiar with that.

25  You may take some time to -- you can have two weeks to

1  explore that.

2          Now thank you.  Do you have anything else at

3  this time?

4          MR. DREEBEN:  I just wanted to connect the

5  dots with my reference to the August 2 scope

6  memorandum.  Even if Your Honor is not satisfied that

7  on the face of the May 17 order the charges in this

8  indictment are within the scope of the special counsel,

9  the August 2 memorandum confirms the acting attorney

10  general's understanding both at the time of our

11  appointment and as of the time of that memo that these

12  crimes are within the scope of our authority.  And the

13  explanation for the greater detail in the August 2 memo

14  is that the public order was not the place or occasion

15  to provide details about the matters that the special

16  counsel was to investigate.

17          So we are not operating off the range of what

18  the acting attorney general has authorized us to do.  I

19  would respectfully submit that under Fourth Circuit

20  law, the regulation that Mr. Manafort is relying is not

21  a judicially enforceable matter.  I understand Your

22  Honor's view on that.  I think we have provided case

23  law on why we don't think it's a matter for judicial

24  enforcement.  Even if the Court does, we do have

25  written confirmation that the matters in the indictment

1  are within our scope.

2            Thank you, Your Honor.

3            THE COURT:  Thank you.

4            All right.  I have actually heard probably

5  most of their argument, and I haven't heard all of

6  yours.  You may now tell me what you think.

7            MR. DOWNING:  Well, first of all, Your Honor,

8  good afternoon -- or good late morning.

9            I didn't know if you had any questions you

10  would like me to start off with answering as opposed to

11  just reiterating what's in the brief, but I will say --

12            THE COURT:  Well, I don't want you to

13  reiterate what's in the brief.  I've read that.

14            MR. DOWNING:  Okay.

15            THE COURT:  It's now your opportunity to

16  bring out what really you think is dispositive in some

17  arresting, interesting way.

18            MR. DOWNING:  That's setting the bar high.

19            THE COURT:  I reminisce a lot.  The world has

20  changed.  I was a student in England in the late '60s,

21  and I went to many oral arguments.  They didn't use

22  briefs at all in the cases I went to.  In the House of

23  Lords, the judges appeared in suits, and the lawyers

24  appeared and the barristers appeared in wigs and robes.

25  They together bent down, pulled books off the shelf,

1  and read cases together and argued about them.   I

2  thought that was a charming but ineffective way to do

3  things.   Writing briefs is much more effective, but

4  then it kind of renders oral argument a little more

5  uninteresting.

6        Tell me why -- you've heard him say -- I mean

7  their argument is fairly straightforward.   They say you

8  look at the May 17 letter.   It says any links and/or

9  coordination between the Russian government and

10 individuals associated with the campaign of President

11 Donald Trump; secondly, any matters that arose or may

12 arise directly from the investigation.   Which I focused

13 on their investigation rather than the Department of

14 Justice's, but that's a fair point.   And then the third

15 one is any other matters within the scope of 600.4 of

16 Title 28, Code of Federal Regulations.

17       Then counsel appropriately called my

18 attention to the August 2 memorandum from Rosenstein

19 which amplifies that a bit.   Of course, most of the

20 letter is redacted, but I'm advised that that doesn't

21 have anything to do with Mr. Manafort.   I'm going to

22 look at that myself.

23       But that goes on to say whether crimes were

24 committed by colluding with Russian government

25 officials with respect to the Russian government

1  efforts to interfere with the 2016 election for

2  president.  That was pretty clear from the May letter.

3  But then they go on to say committed a crime or crimes

4  arising out of payments he received from the Ukrainian

5  government before or during the tenure of President

6  Viktor Yanukovych.

7          Well, we could argue all day here and not get

8  very much clarity on whether there's a difference

9  between the Ukraine and Russia.  Of course, I wasn't

10  there any later than about 40 years ago, but if you ask

11  the average Ukrainian, they will tell you there's a

12  huge difference.

13          On the other hand, the government makes a

14  very powerful point.  Yankovych's operation was

15  supported by the Russian government.  He did

16  essentially what they wanted him to do, but he's not

17  there anymore.  People are killing each other in the

18  eastern Ukraine.  My hunch is that it's Ukrainians and

19  Russians that are mostly fighting.

20          MR. DOWNING:  Actually, Your Honor, we've

21  spent a lot of time on this issue.  For the work that

22  Mr. Manafort was involved with with Mr. Yankovych, they

23  were very --

24          THE COURT:  They were very what?

25          MR. DOWNING:  They were leaning towards

1  getting into the European union.  They were actually

2  trying to get further away from Russia.  Those were the

3  efforts of Mr. Manafort.

4          For today, I will say that the first comment

5  that you had has to do with the record.  You asking for

6  an unredacted document so you can confirm what has been

7  represented to you by the government is, in fact, true

8  and correct, verify.

9          So the biggest problem we've seen in the

10 opposition to our motion is that this August 2 memo --

11 I'm not sure what we would refer to it as -- is the

12 only document that's been provided by the government to

13 verify that, in fact, they did not violate the special

14 counsel's statute or the regulation.  It seems very

15 irregular for --

16          THE COURT:  There isn't any guidance in the

17 statute; is it?

18          MR. DOWNING:  No.  The statute says

19 specifically directed.

20          Special counsel -- as you know, the regs came

21 about in a response to Congress, and a bipartisan

22 commission decided that having a continuation of the

23 independent counsel statute was a bad idea.  They were

24 really bad results.  So the regs as adopted basically

25 said to Congress, to the courts, and to the American

1  public:  This won't happen again.  We have a

2  politically accountable officer of the government, the

3  attorney general, and we have specific factual mandate

4  if a special counsel --

5          THE COURT:  By politically accountable, what

6  do you mean?

7          MR. DOWNING:  I mean someone who is senate

8  confirmed and appointed by the president of the United

9  States.

10         THE COURT:  Serves at the pleasure of the

11  president?

12         MR. DOWNING:  Correct, Your Honor.

13         THE COURT:  So could be fired?

14         MR. DOWNING:  Correct.

15         THE COURT:  Go on.

16         MR. DOWNING:  That politically accountable

17  officer now is the acting attorney general because of a

18  conflict or a recusal that occurred with the attorney

19  general.  That conflict was necessary for the acting

20  attorney general to look to the special counsel statute

21  and say, Okay, I need to appoint a special counsel.

22         Now, what happens next, under the regs, it

23  says a specific factual description, which you have in

24  .1 we would agree.  And then for any additional

25  jurisdiction, for any additional matters to be

1  investigated, the acting attorney general, the

2  politically accountable government official, has to

3  grant additional jurisdiction.  It doesn't say, Sure,

4  go ahead and do something else.  It says jurisdiction

5  because unless the acting attorney general conveys

6  jurisdiction on the special counsel, the special

7  counsel has no authority to act.  The special counsel

8  is very limited.  He has the authority of a U.S.

9  Attorney to the extent he's been given specific

10  jurisdiction and additional jurisdiction.

11        That second part of the appointment order

12  completely eviscerates the special counsel regulations

13  that require that the special counsel come back to the

14  acting attorney general, confer if he wants to expand

15  his investigation, and then there has to be a

16  determination made by the acting attorney general to

17  grant additional jurisdiction.

18        On the record we have in front of us right

19  here, that did not happen.  What we've asked for is for

20  the government to produce the record.  The

21  investigation that ends up here was an investigation

22  that was being conducted by the U.S. Attorney's Office

23  in the Eastern District of Virginia for quite some

24  time.  We have no record of how that investigation got

25  transferred to the special counsel.  We have no record

1   how an investigation involving banking issues made its

2   way to the special counsel.  We only have --

3           THE COURT:  Well, let me ask you:  So what?

4   In other words, is what you're arguing that the use of

5   that investigation in this case is contrary to the

6   regulation that requires the acting attorney general

7   here, Rosenstein, to be specific about what areas he

8   wants investigated, and you're saying he was too

9   general.  In this supplemental, doesn't he remedy that

10  in the August 2 letter?

11          MR. DOWNING:  He can't retroactively remedy

12  it.  The question is as of that date, what he did, does

13  it give jurisdiction to the special counsel, or is it

14  still so unrelated to the specific mandate as to be in

15  violation of the regulations and the underlying

16  statute?  That's the question.  You, I think, early on

17  got right to the point, which is this doesn't really

18  make any sense.  This doesn't look like it's related.

19          Prior cases -- and there are cases that

20  involved the special counsel -- always look to is it

21  demonstrably related.  The idea here is to keep a

22  narrow jurisdiction on the special counsel to not end

23  up with another independent counsel.  When you see

24  (b)(ii), it looks like another independent counsel.  It

25  didn't even require for Mr. Mueller to go back to

1  Mr. Rosenstein if he wanted to expand under (b)(ii).

2  It just says anything that arises or may arise.

3  That --

4          THE COURT:  Let's assume for a moment your

5  argument that this delegation is in some way illegal.

6  Why isn't the right result simply to give to the

7  Eastern District of Virginia's U.S. Attorney's

8  Office -- give it back to them and let them prosecute

9  this indictment?  Why isn't that the right result?

10          MR. DOWNING:  Well, the right result may be

11  for the Department of Justice to finish the

12  investigation they had started and make a determination

13  as to whether or not to charge Mr. Manafort.  But if,

14  in fact, this order is defective, then Mr. Mueller did

15  not have the authority of the U.S. Attorney to conduct

16  a grand jury investigation, to get search warrants, or

17  to return and sign an indictment.

18          THE COURT:  All right.  I think I understand.

19  Is there anything else you want me to --

20          MR. DOWNING:  We make, I think, one point for

21  the Court, and I think it's an important point.  The

22  government had argued initially that these matters

23  arose during their investigation.  I think the

24  government is now admitting, no, they didn't.  That's a

25  big admission, and it wasn't in their papers.  All the

1    way up to being in court here today, I have not heard

2    the government admit to the Court that that's exactly

3    what happened.  It looked like --

4           THE COURT:  What's exactly what happened?

5           MR. DOWNING:  That they grabbed these

6    investigations from other components of the Department

7    of Justice in the U.S. --

8           THE COURT:  You say these investigations.

9    Are you saying this indictment against Mr. Manafort?

10          MR. DOWNING:  Yes, Your Honor.

11          THE COURT:  All right.  Go on.

12          MR. DOWNING:  So in their papers, they've

13    been arguing, oh, they came upon this during their

14    investigation.  That's not the facts.  So I'd like to

15    make that record clear, that their arguments in their

16    brief are absolutely erroneous.  It didn't arise during

17    it, and I think that matters because their other

18    argument was, well, this whole thing falls into the

19    first specific description, which I think you've

20    pointed out:  In no way does it make any sense that it

21    falls into the first description.

22          Then finally, when you go and look at

23    Mr. Rosenstein's memo, it's very odd for when it

24    occurs, but the most obvious omission from it is it

25    does not say "as we agreed" or "as we discussed."  It

1  just puts something in a point in time with no relation

2  back to what happened on or before May 17.

3           And just one other issue.  The government

4  continues to refer to these regulations as no different

5  than something that would be in the U.S. Attorney's

6  manual or a written policy.  Obviously, the Department

7  of Justice for some time and the attorney general

8  decided to make these special counsel regulations.

9  They didn't make it a policy.  They didn't make it a

10  procedure.  They didn't put it in the U.S. Attorney's

11  manual.  They made it a regulation, and they did it

12  publicly to say to the country, to Congress, and to the

13  courts and the land that this is how we're going to

14  conduct ourselves.

15           The attorney general certainly at points in

16  time could have taken that right back, but he never

17  did.  He left it on the books.  They promulgate that

18  these regs are controlling the office of this special

19  counsel in a public notice, their appointment order.

20  So they tell the world:  Don't worry about it.  We're

21  not going to end up with this runaway special counsel

22  like we've seen with the independent counsel.  When

23  they come to court, they say, By the way, these are not

24  judicially enforceable.  It's as if they hoodwinked the

25  entire United States into thinking that this was going

1  to be different than the independent counsel.

2         I think it's very important for the

3  government to be held accountable just like the

4  government was and the Department of Justice was in

5  *U.S. v. Nixon*.  You put these regulations out there.

6  You're telling the world.  You're telling the

7  government.  You're telling the United States citizens:

8  You can rely upon us conducting ourselves in this

9  manner.  Then when they don't and they don't produce a

10 record, they say to this Court, they say to Manafort,

11 they say to the country:  Guess what?  It's not

12 enforceable.  And I don't think that can stand, Your

13 Honor.

14        THE COURT:  All right.  Let me hear your

15 response.  You've already made most of it, but repeat

16 what you feel is necessary.

17        MR. DREEBEN:  Thank you, Your Honor.

18        Let me try to make four quick points and

19 answer any questions that the Court may have.

20        First, Mr. Manafort's counsel treats the

21 May 17 order as if it is the specific factual statement

22 that's contemplated by the special counsel regulations.

23 It is not.  The regulations nowhere say that a specific

24 factual statement needs to be provided publicly, and in

25 the context of a confidential, sensitive

1  counterintelligence investigation that involves

2  classified information, it would not make any sense for

3  that information to be conveyed publicly.  Mr. Manafort

4  actually acknowledged that in argument on this issue

5  before the district court in the District of Columbia.

6  The specific factual statement, as Attorney General

7  Rosenstein described in his Congressional testimony,

8  was conveyed to the special counsel upon his

9  appointment in ongoing discussions that defined the

10  parameters of the investigation that he wanted the

11  special counsel to conduct.  So it is not really

12  appropriate to assume that the (b)(i) description is

13  the factual statement that the regulations contemplate.

14         THE COURT:  Well, I understand your argument,

15  but let me characterize it and see if you find it as

16  satisfying as you appear to indicate that you think it

17  is:  We said this is what the investigation was about.

18  But we're not going to be bound by it, and we weren't

19  really telling the truth in that May 17 letter.

20         I don't watch pro football, but I used to

21  enjoy the program that came beforehand where a bunch of

22  players would get on and essentially make fun of

23  everybody.  But they would put on some ridiculous

24  thing, and then they would all say in a chorus, Come

25  on, man.

1           I loved that.  I thought that was great.

2           So your argument that we said this was the

3    scope of the investigation but we really didn't mean it

4    because we weren't required by any law or regulation to

5    say what the scope was, I understand that argument, but

6    it kind of invites, Come on, man.  You said that was

7    it.

8           But I think your argument goes on, and you

9    say, Look, the May 17 letter isn't the end of it.

10   There is the August 2 letter, and in the August 2

11   letter, it's expanded considerably because it then

12   says -- Russian government is number one, and then it

13   goes on to the Ukrainian government which is never

14   mentioned beforehand.  Who knows what else, of course,

15   went on?

16           In any event, I wanted you to be clear how I

17   understand that particular argument.

18           MR. DREEBEN:  Can I take a shot at explaining

19   why I don't think that's the accurate way to look at

20   it?

21           THE COURT:  Of course you may.

22           MR. DREEBEN:  So we're dealing here with a

23   national security counterintelligence investigation

24   that had been conducted by the FBI that had numerous

25   different aspects to it that were --

1          THE COURT:  Are you telling me that in this

2   indictment that's before the Court on Mr. Manafort,

3   that I'm going to have to go through CIPA, that there's

4   going to be a Section 4 filing, that there will be

5   classified documents, they'll have an opportunity to

6   say what they need to say, etc., etc.?

7          MR. DREEBEN:  I hope not, Your Honor.  I was

8   trying to describe the overall --

9          THE COURT:  Well, you're making a big deal

10  out of it being a classified kind of thing.  If that's

11  in any way relevant to his defense, there we go with

12  another CIPA.  I have been through CIPA cases going way

13  back to John Walker Lindh and other matters.  If that's

14  what's going to happen, I'd like to have notice of it.

15  You all could drag this out.  I'm an old man.  You

16  could actually outlive me.

17         MR. DREEBEN:  I'm not trying to do that, Your

18  Honor.

19         THE COURT:  This proceeding could outlive me.

20  In fact, if a lot of lawyers around here had their way

21  about it, they would take steps to ensure that almost

22  everything outlived me.

23         MR. DREEBEN:  Let me try to be brief.

24         THE COURT:  All right, sir.  That's welcome.

25         MR. DREEBEN:  The May 17 order could not

1  fully describe the matters that the acting attorney

2  general wanted the special counsel to investigate

3  because they implicated people who were under

4  investigation but who may never be charged and

5  sensitive national security matters.  As a result, the

6  specifics of the investigation were conveyed to us not

7  on the face of the May 17 order but in interaction with

8  the acting attorney general.  He explained this in his

9  testimony in just these terms, simply could not be made

10  public.

11          I think Your Honor would agree that it's not

12  appropriate for the government to disclose specific

13  subjects of an investigation when those matters may

14  never result in a charge and when they could jeopardize

15  ongoing criminal investigations, as well as reveal

16  national security matters.  That was the only point

17  that I was trying to make one.  (b)(i) is not the

18  factual statement.

19          THE COURT:  All right.

20          MR. DREEBEN:  The second point here is that

21  we are within the Department of Justice.  To the extent

22  that Mr. Manafort is suggesting that we're analogous to

23  the independent counsels that operated under the old

24  statute, that's not right.  Our indictment was reviewed

25  and approved by the Tax Division, by the National

1   Security Division.  We operate within a framework of

2   the Department of Justice.  We're not different from

3   the U.S. Attorney's Office in that respect.  We're all

4   part of the same Department of Justice.

5            THE COURT:  You resisted my suggestion to

6   have someone here, and Mr. Asonye showed up.  When did

7   you ask Mr. Asonye to join you?

8            By the way, don't nod or shake your head out

9   here because it interrupts the speaker.  It's rude, and

10  it has often the opposite effect you may -- I was never

11  able to do that by the way.  When I was sitting where

12  you are, I nodded and shook my head all the time.

13  Despite the fact that it aggravated judges, I did it,

14  and I regret that.  My perspective is a little

15  different now.  I expect you to do what I was unable to

16  do.  Don't worry about it.  It's not a big deal.

17           Go ahead.

18           MR. DREEBEN:  Thank you, Your Honor.

19           We took your admonition to heart, and we are

20  very happy to have Mr. Asonye join us.

21           THE COURT:  Good.  I think that's important

22  for communications as well.  Plus, you never know.  If

23  you have to try this case, you will have to try it

24  before me.  Mr. Asonye has some experience here.

25           Is that right, Mr. Asonye?

1          MR. ASONYE:  Yes, Your Honor.

2          THE COURT:  And before me as well.

3          MR. ASONYE:  Yes, Your Honor.

4          THE COURT:  So he can tell you some

5     interesting things.

6          MR. DREEBEN:  Two more quick points with

7     leave, Your Honor.

8          THE COURT:  Yes.

9          MR. DREEBEN:  First, Your Honor referred to

10    the fact that there were ongoing investigatory matters

11    that concerned Mr. Manafort before the appointment of

12    the special counsel, but the investigation that the

13    special counsel has conducted has considerably advanced

14    and deepened our understanding of the matters that have

15    been previously identified.  So it is not entirely fair

16    to say that the matters in the indictment did not arise

17    from the investigation or could not have arisen from it

18    because our investigation --

19         THE COURT:  It factually did not arise from

20    the investigation.  Now, saying it could have arised

21    under it is another matter, but factually, it's very

22    clear.  This was an ongoing investigation.  You all got

23    it from the Department of Justice.  You're pursuing it.

24    Now I had speculated about why you're really interested

25    in it in this case.  You don't really care about

1   Mr. Manafort's bank fraud.  Well, the government does.

2   You really care about what information Mr. Manafort can

3   give you that would reflect on Mr. Trump or lead to his

4   prosecution or impeachment or whatever.  That's what

5   you're really interested in.

6           You know, when a prosecutor is appointed,

7   he's appointed to get an indictment.  He's appointed to

8   go after somebody.  Somebody mentioned to me not long

9   ago that this is a different scheme, that it's not the

10  scheme that was in effect in the '60s and '70s.  That's

11  true, but I suspect the change in this process is not

12  significant.  It's still the same.  It's still the

13  same.  You appoint a prosecutor, and that prosecutor

14  goes after with the intent -- whether it was Clinton or

15  whoever else it was, Reagan or whoever, they go after

16  him with the idea they've got to get an indictment.  If

17  they don't, they're very unhappy.  I remember speaking

18  to one special prosecutor, the Iran-Contra thing, and

19  he was terribly disappointed.  That's what prosecutors

20  do.  I understand that.

21          The Brits use a different system.  They don't

22  use special prosecutors.  They use a commission to go

23  out and investigate it and write a report, and then

24  people sort of accept that.  In this country, I don't

25  think a commission could do the job you all are doing.

1   It doesn't have the power to subpoena.  It doesn't have

2   the power to impanel a grand jury, etc., etc.  I

3   understand that, but it sure is less disruptive.

4          In any event, your point, if I can distill it

5   to its essence, is that this indictment can be traced

6   to the authority the special prosecutor was given in

7   the May and August letters.  That, as far as you're

8   concerned, is the beginning and end of the matter.

9          MR. DREEBEN:  Yes, Your Honor, it is the

10  beginning and almost the end.

11         And this is my last point, I promise.

12         THE COURT:  All right.

13         MR. DREEBEN:  The special counsel regulations

14  that my friend is relying on are internal DOJ

15  regulations.  He referred to them as if they're a

16  statute.  I want to be clear.  They are not enacted by

17  Congress.  They are internal regulations of the

18  Department of Justice.

19         THE COURT:  Most regulations aren't enacted

20  by Congress.  They're promulgated by agencies pursuant

21  to rule-making authority.

22         MR. DREEBEN:  Correct.

23         THE COURT:  Congress doesn't do it.

24         MR. DREEBEN:  Correct.  But he referred to

25  them as a statute.  I just wanted to be clear we're --

1          THE COURT:  Yes, I'm clear about that.  I've

2    learned a few things.

3          MR. DREEBEN:  The fourth, they conclude in a

4    provision that's applicable here, 600.10, by describing

5    that these rules and regulations are not intended to

6    create any rights that can be enforced by individuals

7    in any proceedings, civil or criminal.

8          THE COURT:  Yes, I have that in front of me.

9          MR. DREEBEN:  The reason for that is that

10   this is a way for the Department of Justice to organize

11   its investigatory and prosecutorial actions.  It's no

12   different than the acting attorney general assigned a

13   matter to the Eastern District of Virginia or assigned

14   it to a component of the Department of Justice.  It's

15   not there for the benefit of individual --

16         THE COURT:  Of course, the difference is that

17   if you did assign it to the Eastern District of

18   Virginia, it wouldn't come, Mr. Asonye, with a

19   $10 million budget; would it?

20         MR. DREEBEN:  Your Honor --

21         THE COURT:  Look, I take your point on

22   600.10, that it doesn't create any rights, but that's a

23   little bit like arguing, look, we issued these internal

24   things but don't expect us to be bound by them.  I

25   think your stronger argument is you complied with them.

 1          MR. DREEBEN:  I agree that is a strong

 2   argument.

 3          THE COURT:  It's not a very strong argument

 4   to say, Don't hold us to it because we didn't mean it.

 5   We said it, but we didn't mean it.

 6          MR. DREEBEN:  Can I refer the Court to a

 7   Fourth Circuit case that interpreted very similar

 8   language and concluded that it was not enforceable in a

 9   court?

10          THE COURT:  Yes, of course.

11          MR. DREEBEN:  We cited this case in our

12   brief.  It is *In re Shain*.  It's 978 F.2d 850.  It's a

13   1992 decision of the Fourth Circuit, and it concerned

14   the media subpoena regulation that the department has,

15   which it has established in order to put a buffer zone

16   around subpoenas that may go to the media.  It's not

17   required by the First Amendment but reflects the

18   Department of Justice's internal sensitivity to seeking

19   information from the media.  The litigant in that case

20   claimed that the department had violated that

21   regulation, issued a subpoena that wasn't authorized by

22   it, and the Fourth Circuit concluded that this was an

23   internal DOJ regulation.  It contained language very

24   similar to 600.10, and the Fourth Circuit held, This is

25   not a matter for courts to enforce.  It's an internal

1   DOJ matter.  Respectfully, Your Honor, although we

2   fully agree that we are authorized to conduct this

3   investigation and there's no basis for dismissing the

4   indictment, I would also refer you to this case.

5            THE COURT:  Wasn't there a matter in New York

6   recently that the special counsel returned to the

7   Southern District of New York?

8            MR. DREEBEN:  The special counsel's office

9   did refer certainly allegations concerning an

10  individual to the Southern District.

11           THE COURT:  Why did it do it?

12           MR. DREEBEN:  With respect, Your Honor, I'm

13  not at liberty to go into the internal prosecutorial

14  matters within the Department of Justice.

15           THE COURT:  Let me ask you this:  Did it do

16  it because it concluded that it had uncovered materials

17  that really weren't within the scope of what it was

18  authorized to look into, or did it do it because, well,

19  we're not interested in it because we can't use this to

20  further our core effort, which is to get --

21           MR. DREEBEN:  Let me try to answer Your

22  Honor's question this way --

23           THE COURT:  -- to Trump?

24           MR. DREEBEN:  -- because I want to be

25  responsive and at the same time respect internal

1  investigatory equities.

2          THE COURT:   I'm not asking you to disclose

3  anything that you can't disclose.

4          MR. DREEBEN:   We take very seriously the

5  primary mission that was assigned to us by the acting

6  attorney general in the May 17 order, which is to

7  investigate, not prosecute necessarily unless there's a

8  prosecutable crime, but to investigate Russia's

9  interference with the 2016 presidential election and

10  links or coordination that may have occurred with

11  individuals associated with the campaign of President

12  Trump.

13          We are focused on that mission.   We may

14  uncover other criminal activity in the course of that

15  that is necessary for us to investigate in order to

16  complete that mission.   We may uncover criminal

17  activity that is not necessary for us to investigate

18  but is still appropriately investigated by a different

19  component of the department.   We have sought to respect

20  that line.   We have consulted with the acting attorney

21  general in order to make sure that we are operating

22  within --

23          THE COURT:   All right.   That's helpful.   But

24  it brings me back to a point that I don't know that we

25  adequately plumbed, and that is why in New York did you

1   feel that it wasn't necessary for you to keep that but

2   it is necessary for you to keep this which involves

3   bank fraud and registration and other things dating

4   back to 2005, 2007, which I think manifestly don't have

5   anything to do with the campaign or with Russian

6   collusion?  You're keeping one and giving up the other.

7   I don't see the difference.

8           I think one answer you could tell me, and I

9   want to say it because I think you would properly be a

10  little reluctant to do it.  It is this:  It's none of

11  your business, Judge, why we did that.  We're going to

12  proceed on that.

13          Well, I think that's a fair point to make.

14  I'm not sure it's none of my business because I don't

15  have yet a full understanding of everything, but why is

16  New York different?  And if you can't tell me, I accept

17  that.

18          MR. DREEBEN:  Well, Your Honor, I think I can

19  be helpful to you about this case.  In this case,

20  Mr. Manafort clearly is within the area of

21  investigation because of his affiliation with the

22  campaign of President Trump and because of his

23  affiliations in Ukraine with Russia-associated

24  individuals.  Once a prosecutor --

25          THE COURT:  Suppose you found a crime that he

1  committed -- let's say the statute of limitations was

2  20 years ago.  Would that permit you to go after him

3  and use it to coerce him or put pressure on him to turn

4  on others or Trump himself?

5      MR. DREEBEN:  If it's not factually linked to

6  the subject of the investigation, then we would go back

7  under the regulations if we thought it was appropriate

8  for us to investigate and have the acting attorney

9  general decide that, but here the crimes --

10     THE COURT:  Can you tell me how these things

11 in the indictment are factually linked to Russian

12 influence over the 2016 election?

13     MR. DREEBEN:  They're factually linked to the

14 areas of our investigation because in trying to

15 understand the activities of Mr. Manafort in Ukraine

16 and associations that he may have had with Russian

17 individuals and the depth of those, we needed to

18 understand and explore financial relationships and to

19 follow the money where it led.  So the logic of the

20 investigation has factual connections to the

21 indictment.  I think in Your Honor's hypothetical, that

22 would not have been so, and that's the fundamental

23 difference.

24     THE COURT:  All right.  I might mention to

25 you that I've gone through the indictment, as you would

1  expect me to do.  There's no mention in the indictment

2  that I know of that refers to any Russian individual or

3  any Russian bank or any Russian money or any payments

4  by Russians to Mr. Manafort.  Correct?

5          MR. DREEBEN:  I think that is correct, but

6  the money that forms the basis for the criminal charges

7  here, the tax charges, the bank fraud charges comes

8  from his Ukraine activities.  That's what we were

9  focused on.  So we followed the money into the

10 transactions that led to the criminal charges here, and

11 it's that factual link that connects the subject of the

12 investigation in --

13         THE COURT:  You can't be talking about bank

14 fraud because that's not where money came from.  That's

15 getting money from a bank without telling the truth,

16 but it could be in the false income tax.  Is that what

17 you're suggesting?

18         MR. DREEBEN:  It's both, Your Honor, because

19 the Ukraine money was used to purchase and improve real

20 estate.  The transactions that are charged as bank

21 fraud extracted that money and made it --

22         THE COURT:  Purchases of his homes.

23         MR. DREEBEN:  With money that he derived from

24 the Ukraine activities we've alleged.  That's the

25 factual connection, Your Honor.  I'm just trying to

1  explain why we regard this as connected to our

2  investigation.

3           THE COURT:  All right.  Thank you.

4           MR. DREEBEN:   Thank you.

5           THE COURT:  Do you have anything else to add?

6           MR. DOWNING:  Just briefly, Your Honor.  The

7  one thing we would ask this Court to do before deciding

8  the motion before the Court is to ask the government

9  for what anybody who has had any experience with the

10  Department of Justice knows exists, which is the

11  written record.  Where is the written record before

12  Mr. Mueller was appointed?  Where is the written record

13  about the decision --

14           THE COURT:  What do you mean by the written

15  record?

16           MR. DOWNING:  Mr. Rosenstein had a process he

17  had to go through in order to determine that there was

18  a conflict that gave rise to the appointment of special

19  counsel, the specific matter that the special counsel

20  was going to investigate in any additional jurisdiction

21  he granted.  It would all be written down somewhere.

22  That's how the Department of Justice works.

23           Mr. Rosenstein even conceded when he was

24  testifying up on the Hill and he was confronted with

25  the question of, When did you expand the jurisdiction

1  to the special counsel?  He couldn't or wouldn't answer

2  the question, but he did say very tellingly, I will go

3  back and check my records, and I will get back to you.

4           So we would ask that this Court order the

5  government to turn over those records so that the Court

6  doesn't have to guess what happened.

7           THE COURT:  What records is what I'm asking

8  you.

9           MR. DOWNING:  Well, Mr. Rosenstein referred

10  to records.

11           THE COURT:  In his testimony?

12           MR. DOWNING:  Correct.

13           THE COURT:  What records are you referring

14  to?  That is, what kinds of records?

15           MR. DOWNING:  Well, Your Honor, generally --

16           THE COURT:  Are you suggesting that

17  Rosenstein had to go through some process to conclude

18  that there was some conflict before the Department of

19  Justice could proceed?

20           MR. DOWNING:  Which he also testified to.

21           THE COURT:  All right.  Is that what

22  you're -- the record of identifying the conflict?

23           MR. DOWNING:  I believe identification of the

24  conflict, the matter that needed to be referred to a

25  special counsel in order to -- because of the conflict

1   and the scope of the special counsel's investigation,

2   including any additional jurisdiction.

3           THE COURT:   The May and August letters are

4   the scope.

5           MR. DOWNING:   That's after the fact.   You

6   would expect that the Department of Justice, especially

7   Mr. Rosenstein, would have had a memo before.

8           THE COURT:   Why do you say that?

9           MR. DOWNING:   Because in the Department of

10  Justice generally, just in any situation --

11          THE COURT:   Did you serve in the department?

12          MR. DOWNING:   Fifteen years, five of which

13  was under Mr. Rosenstein's management.   Mr. Rosenstein

14  is a stickler for memos being written, for there to be

15  a written record for the actions of the Department of

16  Justice.

17          THE COURT:   What good would that do me if I

18  had all of that in front of me?

19          MR. DOWNING:   It might show you exactly

20  whether or not Mr. Rosenstein violated the regs or

21  whether he complied with them.

22          THE COURT:   I don't know about regulations,

23  but let's suppose he violated.   Of course, counsel has

24  already pointed out that that's, in his view,

25  irrelevant.   But let's suppose it shows that, that

1  Rosenstein didn't do a good job.  So what?

2  MR. DOWNING:  So our position is that to the

3  extent that Mr. Rosenstein exceeded his authority to

4  appoint a special counsel, the special counsel does not

5  have the authority of a U.S. Attorney.

6  THE COURT:  Thank you.

7  MR. DOWNING:  Thank you.

8  THE COURT:  All right.  I'll take the matter

9  under advisement.

10  Did you wish to respond to this last point?

11  MR. DREEBEN:  No thank you, Your Honor,

12  unless you have any questions.

13  THE COURT:  Good choice on your part.

14  I must tell you that I'm exercising

15  uncharacteristic restraint on my part not to require

16  you to tell me about those things, but I think I have

17  an adequate record now.  You're going to let me know in

18  two weeks the rest of this letter.

19  I'm going to be interested if CIPA really is

20  invoked.  That creates a whole new regime for the

21  treatment of discovery and so forth, as you all well

22  know.

23  Thank you for your arguments.  They were

24  entertaining.  I think I found the right adjective.

25  Thank you.

1            Mr. Asonye, I'm glad to see you here.

2            MR. ASONYE:  I'm glad to see you as well,

3    Your Honor.

4                  -----------------------------------
                        Time:  10:57 a.m.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22        I certify that the foregoing is a true and

23    accurate transcription of my stenographic notes.

24
                                        /s/
25                        Rhonda F. Montgomery, CCR, RPR