UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PAUL J. MANAFORT, JR.,<br><br>Defendant | Crim. No. 1:18-cr-83 (TSE) |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT PAUL J. MANAFORT, JR.'S "MOTION TO REQUIRE A HEARING REGARDING IMPROPER DISCLOSURES RELATING TO CONFIDENTIAL GRAND JURY INFORMATION AND POTENTIALLY CLASSIFIED MATERIALS"**

The United States of America, by and through Special Counsel Robert S. Mueller, III, files this memorandum in opposition to defendant Paul J. Manafort, Jr.'s motion (Doc. 43) for a hearing to explore alleged disclosures of grand jury and other confidential information by former or present government officials, both before and after the appointment of the Special Counsel. A defendant seeking a hearing on alleged violations of Federal Rule of Criminal Procedure 6(e) must first establish a *prima facie* violation of that rule, which requires a showing that press reports revealed not simply information about a law enforcement investigation, but information specific to a grand jury investigation. The "sampling" of press reports identified by Manafort does not make that showing; indeed, the reports do not mention the role or activities of a grand jury at all. As it did in similar circumstances in *United States v. Rosen*, 471 F. Supp. 2d 651 (E.D. Va. 2007), this Court should therefore reject Manafort's claim of a Rule 6(e) violation without a hearing. The government attorneys and agents involved in this case understand and respect their duty to preserve grand-jury secrecy as required by Rule 6(e) and to avoid public disclosures that could jeopardize a defendant's right to a fair trial. *Cf.* 28 C.F.R. § 50.2 (Department of Justice guidelines for release

1

of information related to criminal investigation). Manafort's speculative claim of improper conduct falls far short of the showing necessary to warrant a hearing on potential violations of Rule 6(e) or of his constitutional rights.

Finally, the Court can address any concerns about pretrial publicity through *voir dire* and other procedures that can ensure Manafort a fair trial before an impartial jury. A pretrial hearing on alleged government leaks, which would itself generate publicity on the very matters that Manafort finds prejudicial, is unwarranted.

## BACKGROUND

In March 2016, Manafort joined the presidential campaign of then-candidate Donald J. Trump as convention manager and served as campaign chairman from May 2016 until he resigned in August 2016, after reports surfaced of his financial activities in Ukraine. Doc. 32 at 13. He has since been indicted in neighboring districts on two sets of federal charges arising from his Ukraine work. In October 2017, a grand jury in the District of Columbia returned an indictment that, as since superseded, charges Manafort with conspiring to defraud and commit offenses against the United States, money laundering conspiracy, violating the Foreign Agents Registration Act, and making false statements to the government. Superseding Indictment, *United States v. Manafort*, No. 17-cr-201 (D.D.C. Feb. 23, 2018) (Doc. 202). In February 2018, a grand jury in this district returned an indictment that, as since superseded, charges Manafort with five counts of subscribing false tax returns, four counts of failing to file reports of foreign bank and financial accounts, bank fraud conspiracy, and multiple counts of bank fraud. *See* Doc. 9. Trial in this Court is scheduled for July 10, 2018, while trial in the District of Columbia case is scheduled for September 17, 2018.

The investigation resulting in the above charges has been the subject of extensive media coverage. *Cf. Skilling v. United States*, 561 U.S. 358, 379 (2010) ("[M]ost cases of consequence

garner at least some pretrial publicity."). Manafort claims (Doc. 44 at 3) that "[n]umerous" media "reports have contained information from government sources that was clearly subject to grand jury secrecy, was potentially classified intelligence information, or was simply false." He cites ten articles, none of which purports to disclose grand jury information.[1]

The first was an NBC News article dated October 31, 2016. That article states that "[t]he FBI has been conducting a preliminary inquiry into . . . Manafort's foreign business connections," and attributes that information to "law enforcement and intelligence sources." Doc. 44-1 (Def. Exh. 1) at 2. The article also states that the FBI's "inquiry . . . has not blossomed into a full-blown criminal investigation," notes that "[t]he FBI did not comment," and contains a denial by Manafort that he was being investigated. *Id.* at 3. It does not mention the convening of, or proceedings before, any grand jury.

The second article is a February 14, 2017 article in *The New York Times*. It states that, "according to four current and former American officials," "[p]hone records and intercepted calls show that members of" then-candidate Trump's "campaign and other Trump associates had repeated contacts with senior Russian intelligence officials in the year before the election." Doc. 44-2 (Def. Exh. 2) at 1. The unnamed "officials" listed as sources reportedly asserted that Manafort was "one of the advisers picked up on the calls." *Id.* at 2. The article elsewhere states that the FBI's "investigation of Mr. Manafort began last spring as an outgrowth of a criminal investigation into his work for a pro-Russian political party" and politician in Ukraine and that, although the FBI "did not have enough evidence to obtain a warrant for a wiretap of Mr. Manafort's communications, . . . it had the [National Security Agency] scrutinize the communications of Ukranian officials he had met." *Id.* at 4. The FBI's investigation, the article further states, was

---

[1] An *ex parte* filing provides the Court additional information concerning one article.

"proceeding at the same time that separate investigations into Russian interference in the election" were being conducted "by the House and Senate Intelligence Committees." *Id.* at 4. The article does not mention the grand jury.

Three Associated Press pieces published in March and April 2017 describe Manafort's pre-campaign work in Ukraine and for Russian oligarch Oleg Deripaska, as well as investigators' interest in those activities. The first of the three articles, which concerns Deripaska, was based on "interviews with several people familiar with payments" Deripaska made "to Manafort and business records obtained by the AP." Doc. 44-3 (Def. Exh. 3) at 2. The article states that its revelations came "as Trump campaign advisers are the subject of an FBI probe and two congressional investigations" and that "Manafort has been a leading focus of the U.S. intelligence investigation of Trump's associates and Russia, according to a U.S. official." *Id.* at 3-4. A second article, published the next day, states that "[t]he U.S. government investigation" of Manafort included financial transactions conducted through accounts in Cyprus and that, "according to a person familiar with the matter who was not authorized to speak publicly," Treasury agents had "in recent months" obtained information related to those transactions. Doc. 44-4 (Def. Exh. 4) at 1. The article references "records of international wire transfers obtained by the AP and public court documents filed in a 2014 legal dispute" between Manafort and Deripaska. *Id.* at 2. It also states that federal prosecutors had "bec[o]me interested in Manafort's activities" as early as 2014 "as part of a broad investigation to recover stolen Ukranian assets" but that no criminal charges had been filed in that case. *Id.* The third AP article, published the following month, similarly states that federal prosecutors "have been looking into Manafort's [Ukraine] work" since 2014 and that Manafort was "also under scrutiny as part of congressional and FBI investigations into

4

possible contacts between Trump associates and Russia's government." Doc. 44-5 (Def. Exh. 5) at 1. None of the articles mentions the grand jury.

The remaining five articles postdate the Special Counsel's May 2017 appointment. One news story—a June 2017 AP article—reports that "[t]he Justice Department's criminal investigation into Manafort . . . predated the 2016 election and the counterintelligence probe that in July began investigating possible collusion between Moscow and associates of Trump" and that the Special Counsel had "taken over" that "separate" criminal investigation. Doc. 44-6 (Def. Exh. 6) at 1. The article states that "[n]o one familiar with the matter has been willing to discuss the scope of [the Special Counsel's] investigation on the record because it is just getting underway and because revealing details could complicate its progress." *Id.* at 2. It does not mention the grand jury.

An August 2017 CNN story on the Special Counsel's investigation discusses Manafort in two ways. It states that federal investigators pursuing contacts between the Trump campaign and Russia had "turned up intercepted communications appearing to show efforts by Russian operatives to coordinate with Trump associates on damaging Hillary Clinton's election prospects" and that "CNN has learned those communications included references to . . . Manafort." Doc. 44-7 (Def. Exh. 7) at 2. The report separately states that FBI investigators had "focused on" Manafort and three other individuals even before the Special Counsel "was appointed" and that, "according to current and former officials," investigators were examining "whether Manafort was involved in money laundering or tax violations in his business dealings with pro-Russia parties in Ukraine." *Id.* at 5-6. The report does not reference the grand jury.

The final three reports were published between February 17 and 19, 2018—after the grand jury in this district had already indicted Manafort but the indictment was still under seal.

*See* Doc. 1 (sealed indictment returned on Feb. 13, 2018).  One addresses suspicious banking activity that federal investigators had reportedly discovered in 2014-2015 as part of an international kleptocracy probe.  It states that "an FBI special agent questioned Manafort at his attorney's office" in the course of that probe and that, according to "current and former law enforcement officials," the Special Counsel's Office was "poring over" files from the earlier investigation "as it considers leveling new charges against Manafort."[2]

The last two articles primarily concern Richard Gates, Manafort's co-defendant in this case and the District of Columbia prosecution, stating that he had reached a plea deal with the government in the D.C. case.[3]  The reports represent that "sources" (or "people") "familiar with the investigation" (or "the case") provided the information.  The CNN report additionally states that "investigators with the Special Counsel's Office are preparing to file new charges against" Manafort and Gates.[4]  That same article states that Thomas Green, Gates's attorney in connection with a plea, had declined to comment and that "[t]wo other attorneys for Gates [also] declined to comment."[5]  The other report, an article in the *Los Angeles Times*, states that a spokesman for the Special Counsel's Office "declined . . . to comment."[6]

---

[2] Jason Leopold, et al., *Manafort Under Scrutiny For $40 Million In "Suspicious" Transactions*, BuzzFeed News, Feb. 19, 2018, at https://www.buzzfeed.com/jasonleopold/manafort-under-scrutiny-for-40-million-in-suspicious.

[3] David Willman, *Former Trump Aide Richard Gates to Plead Guilty; Agrees to Testify Against Manafort, Sources Say*, L.A. Times, Feb. 18, 2018, at http://www.latimes.com/politics/la-na-pol-rick-gates-plea-deal-20180218-story.html; Katelyn Polantz & Sara Murray, *Exclusive: A Top Trump Campaign Adviser Close to Plea Deal with Mueller*, CNN, Feb. 17, 2018, at https://www.cnn.com/2018/02/15/politics/rick-gates-plea-deal-mueller-russia-investigation/index.html.

[4] Polantz & Murray, *supra* n.2.

[5] *Id.*

[6] Willman, *supra* n.2.

6

**ARGUMENT**

Manafort contends (Doc. 44 at 1-3, 12) that the Court should hold a hearing to inquire into allegedly "unauthorized leaks to the press" by unnamed current and former government officials, some of which predate the indictment in this case by more than a year and none of which is alleged to have emanated from the government attorneys and agents involved in this prosecution or from the Special Counsel's Office. Indeed, many of the matters reported, if accurate, would have been known to the defense, to witnesses who were interviewed or subpoenaed for documents, or to other investigators examining overlapping issues. The cited articles, in short, do not establish any factual basis for the inquiry that Manafort asks the Court to undertake.

Nor has Manafort established any legal basis for that inquiry. His cited cases instead recognize that the authority of courts to inquire into asserted violations of Federal Rule of Criminal Procedure 6(e) and to consider potential remedies for claims of prejudicial pretrial publicity is highly circumscribed. As explained below, however, Manafort has not satisfied the prerequisites for obtaining a hearing under Rule 6(e) and has not sought—much less demonstrated entitlement to—any of the remedies designed to address pretrial publicity.

**A. Manafort Has Not Established A *Prima Facie* Violation Of Rule 6(e)**

Federal Rule of Criminal Procedure 6(e) prohibits "an attorney for the government" and other government personnel assisting in enforcing federal criminal law from "disclos[ing] a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B)(vi)-(vii) & (e)(3)(A)(ii). A court faced with an alleged Rule 6(e) violation first determines whether "a prima facie case of a violation" exists. *Finn v. Schiller*, 72 F.3d 1182, 1189 (4th Cir. 1996). To establish a prima facie case, the complaining party must show that (1) the information disclosed concerned "a matter occurring before the grand jury" and (2) the source of the information was a person subject to Rule

7

6(e)'s secrecy requirements. *Id.* at 1189 n.7; *United States v. Rosen*, 471 F. Supp. 2d 651, 654 (E.D. Va. 2007). "If evidence establishes a *prima facie* Rule 6(e) violation, a hearing must be held to determine whether a violation occurred." *Rosen*, 471 F. Supp. 2d at 656. But "[i]f no *prima facie* case is shown, no hearing is warranted, and *a fortiori* the claim fails." *Id.* As explained below, Manafort has not established a *prima facie* violation because none of his cited reports reveals, or even purports to be based on, matters occurring before a grand jury.

### 1. The Reports Do Not Reveal Matters Occurring Before A Grand Jury

a. The threshold question—and the dispositive one here—is whether the information disclosed in press reports involved "a matter occurring before the grand jury." That phrase is not defined in the Rules, but courts have interpreted it to reach "disclosures that reveal the identity of grand jurors or expected witnesses, reveal witness' expected testimony or questions they would be asked, reveal transcripts or the substance of testimony, reveal the strategy or direction of a grand jury investigation, or report when the grand jury will return an indictment." *Rosen*, 471 F. Supp. 2d at 655. At the same time, courts have emphasized that "Rule 6(e) should not be read to require [that] a 'veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.'" *Id.* at 655 n.3 (quoting *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1001-02 (D.C. Cir. 1999)). As the D.C. Circuit has put it, "the disclosure of information coincidentally before the grand jury which can be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury is not prohibited" by Rule 6(e). *In re Sealed Case No. 99-3091*, 192 F.3d at 1002 (brackets and internal quotation marks omitted).

That proposition is of particular importance in the context of law enforcement inquiries that may involve both grand juries and other investigative activities. As the Court recognized in *Rosen*, "law enforcement investigations typically precede, or occur simultaneously with but

independently of, grand jury investigations." 471 F. Supp. 2d at 655. And Rule 6(e) treats government disclosures about the two types of investigations differently. *See Matter of Search of 2122 21 Road North Arlington, Virginia*, No 1:17-cr-236, 2018 WL 534161, at *2 (E.D. Va. Jan. 23, 2018) (explaining that "statements by the government about a law enforcement investigation are not the same as statements about a grand jury investigation": while the latter may violate Rule 6(e), the former do not); *see also In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 217 (5th Cir. 1980) ("[T]he disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e)."). The upshot, this Court stated in *Rosen*, is that "[l]eaks of information from law enforcement investigations that relate to matters under grand jury investigation do not concern 'matters before the grand jury,' unless . . . they disclose secret details about proceedings inside the grand jury room." *Rosen*, 471 F. Supp. 2d at 655.

    b. The Court in *Rosen* applied the above principles to factual circumstances directly analogous to those of this case. The defendants in *Rosen* were two men accused of conspiring to disclose national defense information to persons not authorized to receive it. 471 F. Supp. 2d at 652. They moved for an evidentiary hearing, and eventually sanctions that included dismissal of the indictment, based on alleged violations of Rule 6(e). *Id.* at 654. In support of their motion, the defendants cited 18 media reports published in the year preceding their indictment. *Id.* at 653. In broad strokes, those reports described the progress of the FBI's investigation into the scheme to provide classified information to Israel—including specific surveillance techniques, searches, and witness interviews—and the eventual charges brought against the two defendants. *Id.* "The various media reports," the Court stated, "quote unnamed 'senior administration officials,' 'U.S. officials,' 'U.S. government officials,' 'officials,' 'investigators,' 'law enforcement sources,'

9

'sources familiar with the investigation,' 'people who have been officially briefed on the case,' and in one instance, simply 'sources' without any further description." *Id.* at 654.

This Court held that the defendants' cited media reports did not establish a *prima facie* violation of Rule 6(e). 471 F. Supp. 2d at 656-57. "[T]he media reports," the Court explained, "identify no grand jury witnesses, disclose no questions that were asked or would be asked of witnesses in the grand jury, nor do the reports even describe or summarize any grand jury witness' testimony." *Id.* at 656. The Court stressed that the reports "never even mention a grand jury investigation" and that, while they did reference "a 'government investigation,'" such an investigation "can, and in this case did, take many forms independent of a grand jury inquiry." *Id.* The Court also acknowledged that one story published just before the indictment had reported "that prosecutors planned to announce charges against [the] defendants," but explained that the story did not "state that defendants would be indicted by a grand jury" rather than charged by criminal complaint and did "not identify the specific charges to be brought" or "describe any evidence presented to the grand jury." *Id.* Finally, the Court contrasted the facts before it with those of cases in which media reports had established a *prima face* violation, noting that the reports in those cases made "explicit reference to grand jury proceedings" and contained sufficient "specificity and detail [to] warrant an inference that the disclosures related to 'matters occurring before the grand jury.'" *Id.* at 657 (citing, among others, *Lance*, 610 F.2d at 218 nn.8-10).

c. Under the analysis in *Rosen*, the information disclosed in Manafort's cited media reports does not reveal matters occurring before a grand jury. Indeed, this Court's summary of the media accounts in *Rosen* applies with even more force to the articles herein:

> [T]he media reports rely on unnamed government sources to reveal some details of law enforcement's efforts in this extensive investigation involving the FBI, [other federal agencies], and a grand jury. Importantly, the reports cite no grand jury transcripts, reveal no grand jury testimony, name no grand jury witnesses, and (with

10

> [two] arguable exception[s] . . . ) do not reveal the expected course of future grand jury investigation or deliberation.

471 F. Supp. 2d at 654. The "arguable exception[s]" in this case are two February 2018 reports that state, without disclosing the source of the information, that prosecutors were considering (or preparing to file) new charges against Manafort and co-defendant Richard Gates. *See* Doc. 44 at 7. But as *Rosen* itself makes clear, revealing that a prosecutor plans to bring charges—without linking that plan to an indictment returned by a grand jury—does not reveal a "matter occurring before the grand jury." 471 F. Supp. 2d at 656. That is particularly true where, as here, information about such prospective charges was revealed in court proceedings attended by defense counsel and interactions with counsel, all outside the confines of the grand jury.[7]

Manafort identifies (Doc. 44 at 10-11) only three examples of supposedly confidential grand jury information in the reports, but none of them "concern[s] the details of the grand jury's past or future proceedings." *Rosen*, 471 F. Supp. 2d at 656. The first—an October 2016 report that the FBI was conducting a "preliminary inquiry" into Manafort (Doc. 44-1 at 2), not a grand jury investigation. Manafort also references a February 2017 story reporting that the FBI, which purportedly lacked sufficient evidence to obtain a wiretap of Manafort's communications, asked the National Security Agency "to scrutinize the communications of Ukrainian officials he had met." Doc. 44-2 at 4. But that story discussed investigative methods other than the grand jury and did not in any way imply that those methods had yielded evidence presented to a grand jury. *See United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996) (no Rule 6(e) violation where media reports

---

[7] *See* Doc. 20 (Gov't Status Report) at 4 (explaining that, before bringing certain charges in this District for venue reasons, the government alerted Manafort's counsel and gave Manafort the chance to waive venue and face a single trial on all charges in the District of Columbia); 2/14/2018 Tr. 14, *United States v. Manafort*, No. 1:17-cr-201 (D.D.C.) (Doc. 280) (court addresses with defense counsel at a bench conference "that there are charges contemplated in the Eastern District of Virginia and that there are superseding charges contemplated" in D.C.).

"discussed federal 'investigations,' without actually discussing matters before the grand jury").[8] Finally, Manafort alludes to "the potential dollar amounts" involved in his criminal violations, ostensibly a reference to a February 2018 article linking him to millions of dollars in suspicious transactions. *See* Leopold, *Manafort Under Scrutiny For $40 Million In "Suspicious" Transactions*, *supra* n.1. The article, however, appears to base its estimates on "suspicious activity reports" filed by "[e]ight banks," and it nowhere states that those reports or the information in them were presented to a grand jury. *Id.* None of these reports, in short, "contain[s] the details necessary to reflect that a disclosure of the grand jury's inner workings occurred." *Rosen*, 471 F. Supp. 2d at 656.[9]

### 2. The articles do not support an inference that information was provided by persons subject to Rule 6(e)

Manafort fails to establish a *prima facie* violation for a second reason—*viz.*, the reports do not indicate that the disclosed information came from "a person subject to Rule 6(e)'s secrecy requirements." *Rosen*, 471 F. Supp. 2d at 654; *see Finn*, 72 F.3d at 1189 n.7. For example, several of the AP articles base their information on financial, business, and public court records reviewed by the reporters, not just interviews with individuals. Doc. 44-3 at 2-4 ("business records" and "detailed documents obtained by the AP"); Doc. 44-4 at 2 ("records of international wire transfers

---

[8] *See also Rosen*, 471 F. Supp. 2d at 653 (no Rule 6(e) violation where cited reports included a story stating that the FBI "investigation involved 'wiretaps, undercover surveillance, and photography'" that documented passing of classified information); *United States v. Skelos*, No. 15-cr-31, 2015 WL 6159326, at *10 (S.D.N.Y. Oct. 20, 2015) (no Rule 6(e) violation where government was separately investigating defendants "through wiretaps, search warrants, and interviews with witnesses not expected to appear before the grand jury").

[9] The decision in *Barry v. United States*, 865 F.2d 1317 (D.C. Cir. 1989) (cited by the Manafort at Doc. 44 at 10-11), does not support a contrary result. *Barry* involved media reports that expressly identified "law-enforcement officials familiar with" a mayor's grand-jury testimony as the individuals who disclosed to the media "details about the Mayor's statements to the grand jury about his alleged cocaine use." 865 F.2d at 1320, 1325.

obtained by the AP and public court documents"); Doc. 44-5 at 1 ("financial records newly obtained by" the AP). And when they do refer to information provided by individuals, the context strongly suggests that those individuals are persons outside of the U.S. government—either that they may be foreign government officials, *see* Doc. 44-4 at 2 (citing comments by "Cypriot officials" while noting that "[a] Treasury Department spokesman" declined to comment); Doc. 44-5 at 2 (citing remarks by Ukrainian officials); or individuals "familiar" with Manafort's business dealings through means other than a government (much less a grand jury) investigation, *see* Doc. 44-3 at 2 ("Manafort and Deripaska maintained a business relationship until at least 2009, according to a person familiar with the work.").

In addition, multiple accounts note that Manafort was also the subject of ongoing congressional investigations. Doc. 44-2 at 4; Doc. 44-3 at 3; Doc. 44-5 at 1. References to "officials" or "American officials" in the reports, Doc. 44-2 at 2, could thus be to people who are not subject to Rule 6(e)'s restrictions. *See* Fed. R. Crim. P. 6(e)(2)(B)(vi)-(vii) & (e)(3)(A)(ii) (restrictions apply in relevant part to "attorney[s] for the government" and other "government personnel" who "assist in performing that attorney's duty to enforce federal criminal law"). That the same article elsewhere mentions "law enforcement officials" (Doc. 44-2 at 2, 4) does not mean that the particular passages that Manafort alleges to contain Rule 6(e) material are attributable to such officials. *See Lance*, 610 F.2d at 218 & n.10.

Manafort's only effort at connecting particular disclosures to government officials concerns CNN and *Los Angeles Times* articles on the then-anticipated guilty plea of co-defendant Gates, information that is not covered by Rule 6(e) in the first place, *see Lance*, 610 F.2d at 217 n.5; p. 11, *supra*. According to Manafort, "[t]he only reasonable inference is that the source of that information" was a government official, because one of the articles states "that Mr. Gates'

13

lawyers did not respond to requests for comments" and Manafort himself was "not privy to [the] plea negotiations." Doc. 44 at 8. Manafort's inference, however, is anything but reasonable. As an initial matter, neither of the two articles identifies its sources as a law enforcement or other government official. They instead link the information to "people familiar with the probe" (or "the case"), *see* Willman, *supra* n.2; Polantz & Murray, *supra* n.2, a phrase that is broad enough to include individuals outside of the government. Further, even if a reported refusal to comment is taken as facially valid, the cited CNN article states only that three of Gates's lawyers had "declined to comment," at a time when Gates had four counsel of record and his representation was in flux.[10] Even if information about Gates's anticipated guilty plea were protected by Rule 6(e), therefore, nothing in the articles supports an inference that "the source of th[at] information is a person subject to Rule 6(e)," *Finn*, 72 F.3d at 1189 n.7.

### B. Manafort's Constitutional Claims Provide No Basis For A Hearing And Can Best Be Addressed At Jury Selection

Manafort asserts (Doc. 44 at 1, 9, 10) that the media accounts based on alleged government leaks have undermined his ability to obtain a fair trial by an impartial jury, in violation of his constitutional rights.[11] The legal propositions on which Manafort relies are uncontroversial: "[t]he Sixth Amendment secures to criminal defendants the right to trial by an impartial jury," *Skilling v. United States*, 561 U.S. 358, 377 (2010), and "[a] fair trial in a fair tribunal is a basic requirement

---

[10] Gates had retained three lawyers of record, other than Mr. Green, in the D.C. case. *See* Doc. 20 (notice of appearance for Shanlon Wu), Docs. 42 & 43 (*pro hac vice* motions for Walter Mack and Annemarie McAvoy), *United States v. Gates*, No. 1:17-cr-201-2 (D.D.C.); *see also* 2/14/2018 Tr. 9, *United States v. Manafort*, No. 1:17-cr-201 (D.D.C.) (Doc. 280) (colloquy during which district court states, in the presence of counsel for all parties, its "plan to discuss Mr. Gates' representation issues" at a sealed hearing later that day).

[11] Manafort focuses some of his brief constitutional discussion (Doc. 44 at 8-9) on the Special Counsel's authority to prosecute him, the subject of a motion that is separately pending before the Court (*see* Docs. 30, 32, 40) and that the government does not address further here.

of due process" protected by the Fifth Amendment, *In re Murchison*, 349 U.S. 133, 136 (1955). In high-profile prosecutions that generate extensive media coverage, those rights are normally safeguarded through careful *voir dire* and other measures in selecting and instructing the petit jury. *See Skilling*, 561 U.S. at 388 n.21; *United States v. Lindh*, 212 F. Supp. 2d 541, 548 (E.D. Va. 2002). If a defendant believes that such measures are insufficient to protect his rights, he can seek a change of venue, *see* Fed. R. Crim. P. 21(a), or a continuance so that the passage of time can help "soothe" any "community prejudice," *Skilling*, 561 U.S. at 381 n.13 (brackets and internal quotation marks omitted). *See also Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (recognizing continuance and transfer as remedies for prejudicial pretrial publicity).

Manafort, however, has not sought such relief in this case. Nor does he argue that pretrial publicity warrants dismissal of the indictment, an argument that would lack merit even if the prosecutors and agents involved in this case were complicit in the disclosures that Manafort alleges (which they were not). *See United States v. Curcio*, 712 F.2d 1532, 1544 (2d Cir. 1983) ("[E]ven publicity partly engendered by the Government would not warrant the extreme remedy of dismissal of an indictment before a voir dire."); *see also United States v. Washington*, 705 F.2d 489, 499 (D.C. Cir. 1983) ("Since the concern over adverse publicity is its effect on the fairness of the ensuing trial, it was not error to fail to hold an evidentiary hearing concerning the effect of pre-indictment publicity on the grand jury.") (internal citation omitted).

Rather than requesting the foregoing forms of relief, Manafort appears to ask (Doc. 44 at 1-2, 9) that the Court itself conduct an inquiry to "identif[y] and punish[]" government officials who allegedly disclosed information—including unspecified classified information—about him to the media. That would place the Court in an inquisitorial role that is, to say the least, unusual: while federal courts "undoubtedly" have "some authority to investigate misconduct as to . . . grand

jury proceedings," they "generally do not have the power to act as investigators or prosecutors of misconduct." *In re United States*, 441 F.3d 44, 58 (1st Cir.), *cert. denied*, 549 U.S. 888 (2006); *cf. In re United States*, 398 F.3d 615, 619 (7th Cir. 2005) ("Our legal system does not contemplate an inquisitorial role for federal judges.").

Beyond that, the hearing that Manafort seeks risks derailing this case on satellite issues, distinct from the issues of bank fraud, tax filings, and foreign-account reporting that the jury will be asked to decide at trial. That risk is only enhanced by Manafort's failure to specify the nature of the hearing he seeks. While Manafort claims that his proposed inquiry "could be done expeditiously" and would involve "a manageable number of individuals," Doc. 44 at 2-3, he does not grapple with the universe of individuals who may have been privy to the information disclosed in his cited articles and who would potentially have to be called at a hearing. Apart from the reporters who wrote each of the articles that Manafort cites, such individuals include not only current and former prosecutors and law enforcement agents, but numerous others who were aware of investigative activity, such as witnesses who were interviewed, third parties who produced documents in response to grand jury subpoenas, and investigators from agencies outside of the Department of Justice who investigated related matters.[12] Nor does Manafort indicate whether he would offer testimony from members of Gates's defense team or his own, such as the spokesman who has regularly accompanied Manafort to court and has often been quoted, including in some of Manafort's cited articles, *see* Doc. 44-5 (Def. Exh. 5) at 1-2; Doc. 44-7 (Def. Exh. 7) at 6.

---

[12] To the extent Manafort contemplates testimony by Department of Justice attorneys, he would have to overcome the rule that testimony from prosecutors trying criminal cases is "disfavored," *United States v. Ziesman*, 409 F.3d 941, 950 (8th Cir.), *cert. denied*, 546 U.S. 990 (2005), a rule that applies even when the testimony would be at a pre-trial hearing, *see United States v. Johnston*, 690 F.2d 638, 643-44 (7th Cir. 1982) (en banc) (stating that "it is a situation to be avoided if possible" and that counsel's testimony is permitted only "in extraordinary circumstances and for compelling reasons").

For these reasons, the Court should not address the publicity that inevitably accompanies a case of this nature through a hearing of uncertain scope that risks putting allegedly prejudicial stories back on the front page. The Court should instead address pretrial publicity as it has done in the past—*i.e.*, through a thorough jury-selection process that includes "careful" *voir dire*. *See Lindh*, 212 F. Supp. 2d at 549-50 (explaining that "only those prospective jurors found to be capable of fair and impartial jury service after careful voir dire will be declared eligible to serve as jurors," and that the Court's "[p]ast experience provide[d] reasonable assurance that more than a sufficient number of qualified, impartial jurors [would] be identified" even in a terrorism case that "ha[d] understandably occasioned considerable nationwide publicity"); *see also, e.g.*, *Skilling*, 561 U.S. at 426 (Alito, J., concurring in part and concurring in the judgment) ("Careful *voir dire* can often ensure the selection of impartial jurors even where pretrial media coverage has generated much hostile community sentiment.").

## CONCLUSION

For the foregoing reasons, Manafort's motion to require a hearing on allegedly improper disclosures relating to grand jury information and classified materials (Doc. 43) should be denied.

                                                                                                         Respectfully submitted,

                                                                                                         ROBERT S. MUELLER, III
                                                                                                         Special Counsel

Dated: May 14, 2018                                             */s/ Andrew Weissmann*
                                                                                                         Andrew Weissmann

Uzo Asonye                                                            Greg D. Andres
Assistant United States Attorney                   Scott A.C. Meisler
Eastern District of Virginia                        Special Assistant United States Attorneys
                                                                                        Special Counsel's Office

                                                                                        U.S. Department of Justice
                                                                                        950 Pennsylvania Avenue NW
                                                                                        Washington, D.C. 20530
                                                                                        Telephone: (202) 616-0800

                                                                                        *Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of May, 2018, I will cause to be filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Thomas E. Zehnle (VA Bar No. 27755)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue, N.W., Suite 620
Washington, D.C. 20001
tezehnle@gmail.com

Jay R. Nanavati (VA Bar No. 44391)
Kostelanetz & Fink LLP
601 New Jersey Avenue, N.W., Suite 620
Washington, D.C. 20001
jnanavati@kflaw.com

                                                /s/  *Andrew Weissmann*
                                                Andrew Weissmann
                                                Special Assistant United States Attorney
                                                Senior Assistant Special Counsel
                                                U.S. Department of Justice
                                                Special Counsel's Office
                                                950 Pennsylvania Avenue N.W.
                                                Washington, D.C. 20530
                                                Telephone: (202) 616-0800
                                                Fax: None
                                                E-mail: AAW@usdoj.gov

                                                *Attorney for the United States of America*