**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**PAUL J. MANAFORT, JR.,**<br><br>**Defendant** | **Crim. No. 1:18-cr-83 (TSE)** |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANT PAUL J. MANAFORT, JR.'S MOTION TO SUPPRESS EVIDENCE
AND ALL FRUITS THEREOF RELATING TO THE SEARCH OF THE
STORAGE UNIT LOCATED IN ALEXANDRIA, VIRGINIA**

The United States of America, by and through Special Counsel Robert S. Mueller, III, files

this memorandum in opposition to defendant Paul J. Manafort, Jr.'s motion (Doc. 45) to suppress

evidence that the government obtained pursuant to a warrant authorizing the search of a storage

unit located in Alexandria, Virginia. Manafort argues principally that a previous consent search

of the storage unit violated the Fourth Amendment and tainted the subsequently issued warrant,

that the warrant was an overbroad general warrant, and that execution of the warrant was

unreasonable and violated Federal Rule of Criminal Procedure 41(f). These arguments lack merit.

As was fully disclosed to the magistrate judge who signed the warrant for the storage unit,

the initial entry into the storage unit was done with the permission of the unit's lease holder, who

had a key to the unit. Specifically, Special Agents of the Federal Bureau of Investigation (FBI)—

who were working with the United States Attorney's Office for the Eastern District of Virginia

and the Money Laundering and Asset Recovery Section of the Department of Justice's Criminal

Division—entered the storage unit after obtaining written consent from an employee of a

Manafort-affiliated business who had a key to the unit, was listed as its occupant on the lease, and

1

had personally moved the contents of the unit into the unit.   The employee thus had common authority to consent or, at a minimum, apparent authority to do so.   Regardless, any infirmity in this initial entry would not undermine the lawfulness of the subsequently obtained search warrant. Even excising the description of what the agent saw in the storage unit during the initial entry, the warrant application established probable cause to believe that evidence of the listed offenses would be found at that location.   And, given that the pertinent facts were disclosed to the magistrate who signed the warrant, and that the entry was at the very least closely aligned with pertinent legal authority, suppression is not warranted under the good-faith exception to the exclusionary rule.

Manafort's challenges to the breadth and execution of the warrant are equally unavailing. The warrant satisfies the Fourth Amendment's particularity requirement because the categories of documents to be seized, especially when read alongside the subject crimes, sufficiently guided officer discretion and do not amount to a prohibited general warrant.   Nor does the absence of a specific temporal limitation render the warrant overbroad in light of the extensive scope of the financial criminal activities described in the warrant affidavit.   And even assuming otherwise, the warrant was not so obviously overbroad that it precluded a reasonable officer from relying on a neutral magistrate's decision to issue it.   In any event, the remedy for any overbreadth would be exclusion of evidence predating the period relevant to this case, not the blanket suppression that Manafort seeks.   Finally, Manafort's complaints about execution of the warrant lack merit and do not support suppression.   For these and other reasons explained further below, Manafort's motion to suppress should be denied.

## BACKGROUND

On May 26, 2017, a Special Agent then assigned to the FBI's International Corruption Squad in Washington, D.C. ("the Agent") met with a salaried employee ("the Employee") of a

business affiliated with Manafort, Steam Mountain, LLC.  Aff. ¶ 28.[1]  The Employee, who had

previously worked at another Manafort business (Davis Manafort Partners, or DMP), informed the

Agent that "he perform[ed] a variety of functions for Manafort and his companies[,] as directed by

Manafort."  *Id.*  As relevant here, the Employee stated that, in approximately 2015, he had moved

a series of office files from Manafort's business contained in boxes in a smaller storage unit to the

larger unit at the same storage facility ("Unit 3013") that became the subject of the search.  *Id.*

The Employee had personally moved the items, which were still in the unit and which consisted

of several boxes of office files from Manafort's business, as well as a metal filing cabinet that

contained additional, more recent business files.  *Id.* ¶¶ 28, 30.

    Later that day, the Employee led the Agent to the storage facility.  Aff. ¶ 29.  Once there,

the Agent obtained a copy of the lease for Unit 3013 from the facility manager.  *Id.*  The lease

identified the Employee as the "occupant" of the unit, *id.*, and also named Manafort as one of the

"occupant's authorized access persons."  Doc. 46-3.  Richard Gates, another Manafort employee,

was listed as an alternate point of contact.  *Id.*; Aff. ¶ 29.

    The Employee confirmed to the Agent that he had a key to the unit's lock.  Aff. ¶ 30.  He

also signed a written consent-to-search form stating that he had "been advised of [his] right to

refuse consent," that he voluntarily gave permission to search Unit 3013, and that he authorized

the investigating agents "to take any items which they determine may be related to their

---

[1] Manafort's opening assertion that the agents who executed the warrant "acted pursuant
to Acting Attorney General Rosenstein's invalid grant of authority to the Special Counsel," Doc.
46 at 2 n.2, overlooks the information in the warrant application making clear that the agent who
sought the warrant was assigned at the time to the FBI's International Corruption Squad, Aff. ¶ 2,
and that the warrant application was reviewed by an Assistant U.S. Attorney in this District,
Doc. 46-2 at 3.  In any event, Manafort's assertion would not support suppression because the
warrant itself satisfies the Fourth Amendment, and any defect in the affiant's statutory or
regulatory authority does not trigger application of the exclusionary rule.  *See Sanchez-Llamas v.
Oregon*, 548 U.S. 331, 348 (2006).

investigation." Exh. B, *infra*; Aff. ¶ 31.  The Employee then used the key in his possession to open Unit 3013.  Aff. ¶ 31.  The Agent entered the unit and observed approximately 21 bankers' boxes that could contain documents, as well as a five-drawer metal filing cabinet.  *Id.*  None of the file drawers was marked as to their contexts, but some of the boxes did have markings.  *Id.*  Two were labeled "MPI," initials that the Agent determined to stand for an international film-production company in which Manafort was believed to be an investor.  *Id.*  Another was marked "Ukraine binders," making it reasonable to believe that the storage unit was "a collection point for Manafort's and Gates's business records from their work in Ukraine."  *Id.* ¶ 35.

The Agent did not open any of the boxes or file-cabinet drawers during his entry into Unit 3013.  Aff. ¶ 31.  Rather, the Agent prepared an application for a warrant to search the unit and submitted it to a magistrate judge in this District the next day.  The affidavit in support of the warrant explained at the outset that, since 2014, law enforcement agents had been conducting an investigation into, among other things, Manafort's financial dealings.  Aff. ¶ 5.  The affidavit then set forth at length facts establishing probable cause to believe that violations of three federal laws had been committed—*viz.*, failure to report bank accounts, in violation of 31 U.S.C. §§ 5314 and 5322(a); acting as an unregistered agent of a foreign principal, in violation of 22 U.S.C. §§ 612 and 618; and filing a false tax return, in violation of 26 U.S.C. § 7206(a)—and that evidence and fruits of those crimes would be found in the storage unit.  Aff. ¶ 4.  In reciting those facts, the affidavit described how the Agent had obtained the Employee's consent to enter the unit a day earlier, what the Agent had observed when he entered the unit, and additional details about the filing cabinet in the unit provided by the Employee.  Aff. ¶¶ 28-37.[2]  The affidavit also explained

---

[2] In particular, the affidavit explained that the Employee had moved the filing cabinet from Manafort's former residence—which Manafort was using as an office at the time—in the spring of 2015; that the cabinet was extremely heavy when he moved it, indicating that it contained a

that the unit had been locked with a key when the Agent exited and had been under surveillance since that time to ensure that no one entered or took items from the unit.  *Id.* ¶ 38.

On May 27, 2017, the magistrate judge issued a warrant authorizing the search of Unit 3013, "as well as any locked drawers, locked containers, safes, computers, electronic devices, and storage media . . . found therein."  Doc. 46-2, Attach. A.  Attachment B to the warrant identified as the "[p]roperty to be seized" "[r]ecords relating to" the three federal offenses listed in the Agent's affidavit:  failure to file a report of a foreign bank account, in violation of 31 U.S.C. §§ 5314 and 5322; acting as an unregistered act of a foreign principal, in violation of 22 U.S.C. § 618; and filing a false tax return, in violation of 26 U.S.C. § 7206(a).  Doc. 46-2, Attach. B ¶ 1. The warrant listed the following eight categories of records as subject to seizure:

  a. Any and all financial records for Paul Manafort, Richard Gates or companies associated with Paul Manafort or Richard Gates, including but not limited to records relating to any foreign financial accounts;

  b. Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Richard Gates, or companies associated with Paul Manafort or Richard Gates;

  b. Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

  c. Any and all correspondence, communication, memorandum, or record of any kind relating to the Party of Regions, Viktor Yanukovych, the European Centre for a Modem Ukraine, or any other foreign principal of Paul Manafort or Richard Gates, or any company associated with Paul Manafort or Richard Gates;

  d. Any and all correspondence, memorandum, press release, or documentation of any kind regarding any lobbying or advocacy performed by Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates, on behalf of the Party of Regions, Viktor Yanukovych, the European Centre for

---

large amount of records; and that although the Employee could not describe the contents of the filing cabinet in more detail, he told the Agent that Manafort occasionally sent emails directing the Employee to put certain records ("brown, legal-sized files") into the filing cabinet.  Aff. ¶ 30.  The Employee recalled having last added such records to the filing cabinet in the spring of 2016.  *Id.*

a Modern Ukraine, or any other foreign principal of Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates[;]

e. Records related to, discussing, or documenting Neocom Systems, Antes Management, Yiakora Ventures, Global Highway Ltd., Global Endeavor, Leviathan Advisors, Peranova Holdings, Bletilla Ventures, Lucicle Consultants, and/or Telmar Investments, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records[;]

f. Records related to, discussing, or documenting the Podesta Group[;]

g. Any and all daily planners, logs, calendars, schedule books relating to Paul Manafort or Richard Gates.

*Id.*, Attach. B ¶ 1.

FBI agents entered the storage unit to execute the warrant at approximately 5:20 p.m. that afternoon. Doc. 46-1 at 3 (reporting time as 17:20). Over the course of the next two hours, they seized nine sets of documents that were within the scope of the warrant, a subset of what was in the unit. *See* Exh. A, *infra* (FBI Collected Item Log lists time of seizure as 7:09 p.m.). Five of the groups of documents (and some binders) were taken from a file cabinet, while the remaining four sets were gathered from boxes located on the left-hand side and rear wall of the storage unit. *Id.* On June 5, 2017, nine days after the search, the Agent submitted to the magistrate an inventory that described one set of the seized items as "documents and binders" and the other eight sets as "documents." Doc. 46-1 at 3.

## ARGUMENT

### I. The Preliminary Consent Search Was Valid And, Even If Not, Would Not Require Suppression Of Evidence Later Obtained Pursuant To The Warrant

Manafort argues (Doc. 46 at 3-13) that the Agent's consent entry into Unit 3013 was unconstitutional because the Employee lacked authority to consent and that all evidence obtained

from the subsequent search pursuant to a warrant should be suppressed.  As explained below, those contentions lack merit.

### A.  The Employee Had Authority To Consent To The Search of Unit 3013

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  A search within the meaning of this Amendment occurs when the government violates a person's reasonable expectation of privacy or obtains information by physically intruding into a constitutionally protected area.  *Florida v. Jardines*, 569 U.S. 1, 5 (2013).  Such a "search" occurred in this case when the Agent entered Unit 3013 and observed its contents, and the government accepts for purposes of this motion that Manafort is entitled to challenge that search under the Fourth Amendment.  *See United States v. Karo*, 468 U.S. 705, 720 n.6 (1984) (noting individuals' "reasonable expectation of privacy in their own storage locker"); *see also, e.g., United States v. Johnson*, 584 F.3d 995, 1001 (10th Cir. 2009) (similar, even when the individual "is not the lessee of the unit").

The Agent's entry into Unit 3013 was a "[c]onsent search[]," one of the "categories of permissible warrantless searches" that are constitutionally "reasonable" and thus lawful under the Fourth Amendment.  *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014).  Although the government must show, "by a preponderance of the evidence, that it obtained valid consent to search," *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir.), *cert. denied*, 550 U.S. 913 (2007), such consent need not come from the target of the search.  It may instead be provided by "a third party who possessed common authority over or [had] other sufficient relationship to the premises

or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). This authority to consent rests not solely on "the law of property" but on indicia of "joint access or control" that make it "reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

Even when the third party ultimately lacks the authority to consent, a search based on that party's consent is reasonable (and constitutional) if the agents "act[ed] under a reasonable belief that" the third party "had granted valid consent." *United States v. Kinney*, 953 F.2d 863, 866 (4th Cir. 1992). This "apparent authority" is sufficient to sustain a search because the Fourth Amendment requires only that officers' factual determinations in such situations "always be reasonable," "not that they always be correct." *Illinois v. Rodriguez*, 497 U.S. 177, 185, 187 (1990). As explained below, the warrantless entry into Unit 3013 was reasonable because the Employee had common authority or, at a minimum, apparent authority to consent to the search.

### 1. The Employee had common authority to consent

As an initial matter, the Employee had common authority to consent to a search of Unit 3013. The Employee was listed as the occupant on the unit's lease. Aff. ¶ 29; Doc. 46-3. He had a key to the unit. Aff. ¶ 30. And he had accessed the unit multiple times as part of his job responsibilities, both when first moving the files and boxes into the unit in 2015 and on the more recent occasions when, at Manafort's direction, he placed files in the filing cabinet stored in the unit. *Id.* ¶¶ 28, 30. Under those circumstances, Manafort "assumed the risk that [the Employee] would" use the key he possessed to "permit outsiders (including the police) into the" unit. *United States v. Peyton*, 745 F.3d 546, 555 (D.C. Cir. 2014); *see Matlock*, 415 U.S. at 171 & n.7.

Two courts of appeals have held that materially indistinguishable facts establish a storage unit lessee's authority to consent to a search of the unit.  In *United States v. Kim*, 105 F.3d 1579 (9th Cir.), *cert. denied*, 522 U.S. 940 (1997), an associate of Kim's (Wee) had rented storage units that officers believed to contain stolen goods.  *Id.* at 1580.  The officers reviewed lease agreements showing that Wee had rented the units and that others, including Kim, also had access to them. Wee did not have the keys to the units but told the officers that Kim had hired him to rent the storage units and inventory merchandise in them.  Officers "also learned that Wee had been the only individual present during the unloading of some of the allegedly stolen goods and that Wee had temporarily kept the keys to the storage units afterwards."  *Id.*  Based on those facts, the Ninth Circuit held "that Wee possessed common authority to consent to the search."  *Id.* at 1582.  The court explained that Kim had "allowed Wee to keep possession of the leases, supervise unloading of the goods and retain the keys on occasion."  *Id.*  By "ced[ing] partial control" of the units "to Wee at all times, and allow[ing] him total control on occasion," the court reasoned," Kim "assumed the risk that Wee would allow a search of the units."  *Id.*

The Tenth Circuit followed *Kim* in *United States v. Trotter*, 483 F.3d 694 (10th Cir. 2007), *vacated on other grounds*, 552 U.S. 1090 (2008).  The defendants there, two brothers, participated in a drug-distribution conspiracy with King, who rented a storage unit in his own name at the direction of one of the brothers.  *Id.* at 697.  The brothers kept the three keys to the unit, "but on numerous occasions Mr. King was temporarily given a key so that he could retrieve drugs and drug paraphernalia from unit."  *Id.*  After surreptitiously copying or stealing one of the keys, King cooperated with the police and consented to searches of the unit using the key.  *Id.*  The brothers moved to suppress the resulting evidence on the ground that King lacked actual authority to consent to the search, but the Tenth Circuit rejected that argument.  The court pointed out both that

9

King's status as lessee of the unit gave him the right to have the facility open the unit at any time without the brothers' knowledge and that the brothers had allowed "King to access the storage unit when they sent [him] to the unit to retrieve or drop off items." *Id.* at 699. The court concluded that "King's position as lessee of the unit and his active participation in renting and using the facility gave him a 'sufficient relationship to the premises' to justify the searches based upon his consent." *Id.* (quoting *Matlock*, 415 U.S. at 171); *see also United States v. Atiyeh*, No. 00-cr-682, 2001 WL 66409, at *9 (E.D. Pa. 2001) (party who rented storage locker in his own name at the behest of, and was partially reimbursed by, the defendant had authority to consent to search).

The same result is warranted in this case. As in *Kim* and *Trotter*, the Employee was the lessee of the storage unit and thus had the right and capability to gain access to the unit at any time "without [Manafort's] knowledge or permission." *Kim*, 105 F.3d at 1582. As in those cases, the other person listed on the lease (Manafort) "allowed" the Employee access to the storage unit by sending the Employee to the unit to "drop off items." *Trotter*, 483 F.3d at 699; *see* Aff. ¶¶ 28, 30 (in addition to having the Employee move materials into the larger storage unit at the outset, Manafort occasionally sent the Employee emails "directing [him] to put certain records into the filing cabinet" in the unit). And as in those cases, the Employee had a key to the storage unit. Indeed, the Employee's access to a key is more probative of his authority here than in *Kim* and *Trotter*. Unlike in *Kim*, 105 F.3d at 1580, the Employee possessed the key at the time that he consented to the search. Aff. ¶¶ 30-31. And he did not have to steal or "surreptitiously" make a copy of the key to obtain access to it, as in *Trotter*, 483 F.3d at 697. The undisputed facts, in short, overwhelmingly support the conclusion that the Employee "possessed common authority to

consent to the search." *Kim*, 105 F.3d at 1582.[3]

### 2. *The Agent reasonably believed that the Employee had authority to consent*

At a minimum, the search is valid based on the Employee's apparent authority to consent. The relevant question in deciding apparent authority is whether "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (internal quotation marks and ellipses omitted); *see Buckner*, 473 F.3d at 555. Here the answer to that question is "yes."

As noted above, the Agent had verified that the Employee was listed as the occupant of the unit on the lease, Aff. ¶ 29, a factor that courts have considered significant in determining the existence of common authority. *Compare Rodriguez*, 497 U.S. at 181 (rejecting common-authority argument in part because the consenting party's "name was not on the lease"), *with Buckner*, 473 F.3d at 555 (officers reasonably believed that wife had authority to consent to search of her husband's password-protected files in part because the computer "was leased solely in [her] name"). The Employee also had a key to the unit, another fact that signals authority to consent. *See United States v. Murphy*, 506 F.2d 529, 530 (9th Cir. 1974) (even where employee "was given the key to the warehouse" only on occasions when he performed work there, his "custody of the key gave him sufficient dominion over the premises to enable him to grant the necessary consent");

---

[3] In the D.C. case (Doc. 287 at 2-3), Manafort has argued that *Kim* and *Trotter* rely on an assumption-of-risk rationale that is at odds with the law of other circuits. But the Supreme Court's most recent third-party decisions continue to analyze consent in terms of "assumption of risk." *See Georgia v. Randolph*, 547 U.S. 103, 110-11 (2006). Case law in this circuit—including two of Manafort's cited authorities, *see Buckner*, 473 F.3d at 554; *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978)—has long been to the same effect. *See also Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001). And that is true in the D.C. Circuit as well. *See, e.g.*, *Peyton*, 745 F.3d at 555; *United States v. Patrick*, 959 F.2d 991, 998 (D.C. Cir. 1992) (agreeing with the Seventh Circuit's statement that "[t]he underpinning of third-party consent is assumption of risk"), *abrogation on other grounds recognized by United States v. Webb*, 255 F.3d 890 (D.C. Cir. 2001).

*United States v. Piet*, 498 F.2d 178, 181 (7th Cir. 1974) (acting warehouse foreman who had one of two keys to storage area where goods were kept had "access and control over" that area).  In addition, the Agent understood that the Employee "current[ly]" worked for Manafort, received a salary from one of his affiliated companies, and that the "functions" the Employee performed "for Manafort and his companies" included moving files into the storage unit.  Aff. ¶ 28.  Even if those circumstances did not definitively establish the Employee's common authority to consent, they made it reasonable for the Agent to believe that the Employee had sufficient authority "over the premises" to give consent, *Rodriguez*, 497 U.S. at 188.  *See Kinney*, 953 F.2d at 866-67 (officers reasonably believed that apartment inhabitant who "had a key to the closet in her possession, and actually opened the [closet] door" in their presence had authority to consent, even after learning that she had "surreptitiously obtained the keys from [her boyfriend] while he slept").

### 3.  *Manafort's contrary arguments lack merit*

Manafort makes a series of factual and legal arguments against the Employee's authority to consent, but none undermines the lawfulness of the Agent's entry.

a.  Factually, Manafort bases much of his argument on the assertion that the Agent knew the Employee who gave consent to be merely a "former employee" of one of Manafort's companies, DMP.  That assertion is inaccurate.  What the Agent actually knew is that the consenting party was "a former employee of [DMP], *and a current employee of Steam Mountain, LLC, which is a business currently operated by Paul Manafort*."  Aff. ¶ 28 (emphasis added).[4] The Agent further understood the Employee to be "a salaried employee" of one Manafort company

---

[4] Although the information does not alter what the Agent understood at the time, the government has learned since the search that DMP appears to have been folded into Steam Mountain, such that the benefits of DMP employees (*e.g.*, health insurance) were carried over to Steam Mountain.  Steam Mountain's expenses, in turn, reflected the same ones previously paid by DMP, including the Employee's salary and payments to Manafort's lawyers and accountants.

who "perform[ed] a variety of functions for Manafort *and his companies* as directed by Manafort." *Id.* (emphasis added).   Accordingly, this is not like a situation in which an employee quits his job, keeps a copy of the key to the job site, and then invites the police to enter.  *Cf.* 4 Wayne R. LaFave, *Search And Seizure: A Treatise On The Fourth Amendment* § 8.6(c) at n.49 (5th ed. 2012).  Rather, it involves at most a formal change in the identity of the business entity (from DMP to Steam Mountain) used to pay a worker's salary, where the principal remains the same.  Nothing about that change would have signaled to a reasonable officer (or even the Employee himself) that the Employee's access to and authority over the storage unit had suddenly ceased; indeed, it did not change anything about the Employee's services to Manafort or access to the unit.

   b.  Legally, Manafort argues (Doc. 46 at 6-7) that "[m]utual use *and* joint access are *both* required to validate a searched based on the common authority of a third party consenter," and that the government has not shown "mutual use" here.  As an initial matter, Manafort's position is difficult to square with the Fourth Circuit's articulation of the governing standard.  *See Kinney*, 953 F.2d at 866 ("mutual use, general access or common authority"); *United States v. Block*, 590 F.2d 535, 539 (4th Cir. 1978) (consent "may be based simply upon the fact that the third person shares with the absent target of the search a common authority over, general access to, or mutual use of the place or object sought to be inspected").  The court's disjunctive phrasing would make little sense if "mutual use" were always a prerequisite to establishing "common authority."

   More to the point, Manafort's understanding of "mutual use"—derived exclusively from decisions involving residential searches—is a poor fit for cases involving premises or effects that the consenting employee jointly accesses because of his job.[5]  In particular, Manafort would ask

---

[5] Given their exclusive focus on residential searches, none of Manafort's cited district court cases dictate the result here.  Doc. 46 at 11-12.  The consenting party in *United States v. Corral*, 339 F. Supp. 2d 781 (W.D. Tex. 2004), was a part-time housekeeper who did not even have a key

(Doc. 46 at 7) whether the Employee here "shared use of the storage unit with Mr. Manafort" in the sense that the Employee placed his own "item[s] of property" in Unit 3013.  But that is not the inquiry that courts have conducted in employee-consent cases analogous to this one.  In that setting, "mutual use" is established when the employee "is authorized to enter" a location "to perform his [job] duties" and in fact performs those duties there.  *See United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir. 1981) (research assistant with keys to university laboratory and permission to enter had common authority); *see also Murphy*, 506 F.2d at 530 (warehouse employee who was given key to facility "only on occasions when [he] was to perform work on the premises" had authority to consent); *United States v. Jenkins*, 46 F.3d 447, 455-56 (5th Cir. 1995) (employee who was authorized to open and remove videotapes from packages sent to him had authority to consent to search of box containing videotapes).  The facts here satisfy this understanding of mutual use; indeed, it is undisputed that the Employee performed his job duties by moving items into the storage unit outside the presence of, and without supervision from, Manafort or other DMP principals.  Aff. ¶¶ 28, 30.

c. On the question of apparent authority, Manafort argues at length (Doc. 46 at 8-11) that the Employee's authority to consent was "uncertain" and that the Agent thus "had a duty to take reasonable investigative steps to confirm [the Employee's] authority."  It is true that, in some circumstances, even an agent faced with "an explicit assertion" of authority to consent cannot reasonably rely on that assertion "without further inquiry."  *Rodriguez*, 497 U.S. at 188.  But as

---

to the house.  *Id.* at 792.  In *Boyer v. Peterson*, 221 F. Supp. 3d 943 (W.D. Mich. 2016), the police knew that the woman who gave consent had not resided at the house for months and had to make an "appointment" with her estranged husband to enter.  *Id.* at 957-58.  And *United States v. Toan Phuong Nghe*, 925 F. Supp. 2d 1142, 1145-47 (W.D. Wash. 2013), involved consent from a motel manager, which the Supreme Court has generally deemed insufficient to justify entry into a guest's room since *Stoner v. California*, 376 U.S. 483 (1964).

this Court has explained, that caveat does not mean "that government officials must contest every claim of authority." *United States v. Potter*, 71 F. Supp. 2d 543, 550 (E.D. Va. 1999) (explaining that when a landlord tells officers that her tenant has been evicted, they are not required "to file a quiet title suit" to figure out if the tenant still has an interest in the premises); *cf. Georgia v. Randolph*, 547 U.S. 103, 122 (2006) (noting the impracticalities of requiring police "to take affirmative steps" before relying on a third party's consent).   Here, the Agent was dealing directly with a storage unit occupant who was listed on the lease, was in possession of the key, and had moved the contents of the unit to their current location.  Aff. ¶¶ 28-29.  Those circumstances did not present "an ambiguous situation" that required "further inquiry" before the Agent could enter. *See United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991).[6]

Nothing in *Whitfield*, on which Manafort principally relies, dictates a contrary result. *Whitfield* involved a mother's consent to search the bedroom (including the closet) of her adult son.  *See* 939 F.2d at 1074-75.  In holding that the officers lacked sufficient information about the mother's use of the room to rely on her consent without further inquiry, the court emphasized the significance of the relationship at issue there—between a parent and her "adult offspring"—and the different results that would obtain for other family relationships.  *Id.*  The same "shared social expectations" that drove the result in *Whitfield*, *see Randolph*, 547 U.S. at 111, point in the other direction in this case, which involves entry into a non-residential space leased in the name of the consenting employee.  *See* 4 LaFave, *supra*, § 8.6(c) (explaining that courts analyzing consent by

---

[6] In any event, it is hard to see how the Fourth Amendment's "flexible" reasonableness standard, *see Wilson v. Arkansas*, 514 U.S. 927, 934 (1995), would demand the precise set of questions that Manafort proposes (Doc. 46 at 10)—including whether the Employee "was authorized to store his own property in the unit" or "let others into the unit"—in order for the Agent's reliance to be reasonable.  *Cf. Jenkins*, 46 F.3d at 456 (fact that company never gave employee "permission to allow the FBI to copy or view the videotapes" did not affect the employee's "actual or apparent authority to consent").

employees recognize "that the private nature of the place searched counts for something" and that employee consent "is more likely to be found sufficient for the search of a warehouse than it is for the search of a private office or residential premises").

d.   Finally, Manafort speculates (Doc. 46 at 11) that the Agent himself must not have believed the Employee's consent to be valid because he got a warrant before seizing and opening the containers that he had seen in the storage unit.  But the Agent can hardly be faulted for honoring "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  In any event, Manafort's speculation is unfounded. As Manafort elsewhere notes (Doc. 46 at 8), the Agent described in the warrant affidavit the details of his consent entry into the storage unit and what he observed in the unit.  That disclosure confirms not that the Agent believed that the consent was insufficient to justify a full search, but that the added assurance of a warrant could help eliminate later disputes over the authorization for and bounds of the search.  Officers should not be penalized for taking such precautions.

**B.  Suppression Would Not Be Warranted Even If The Entry Was Not Supported By Valid Consent**

Even assuming the Agent's entry into Unit 3013 was unlawful, Manafort errs in arguing (Doc. 46 at 11-12) that "[t]he appropriate remedy" would be "suppression of all evidence seized from the premises and the fruits thereof."  That is so for two reasons.

First, even without the information obtained from the initial warrantless entry, the warrant affidavit establishes probable cause that evidence of the three listed offenses would be found in the storage unit.  *See United States v. Karo*, 468 U.S. 705, 719 (1984) (where information from an earlier unconstitutional search was included in a warrant affidavit, "the warrant was nevertheless valid" because "sufficient untainted evidence was presented in the warrant affidavit"); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) ("The inclusion of tainted evidence does not

invalidate a search warrant if enough untainted evidence supports it[.]").  Based on the Agent's interview with the Employee, the affidavit established that the storage unit housed "office files of Manafort's business contained in boxes," as well as a metal filing cabinet that was heavy enough to "contain[] a large amount of records" and into which the Employee had more recently placed other records at Manafort's request.  Aff. ¶¶ 28, 30.  The affidavit also explained that Manafort was authorized to access the unit and that Richard Gates—the Manafort associate alleged to be involved in the offenses set forth in the warrant—was an alternate point of contact on the lease.  *Id.* ¶ 29.  And the affidavit gave specific reasons, apart from the box labeled "Ukraine" in the unit, to believe that the storage unit was a repository for business records relevant to the tax, FBAR, and FARA offenses at issue.  *Id.* ¶ 35 (reasonable to believe that financial records would be found in light of IRS guidelines recommending that business records be retained for three to seven years); *id.* ¶ 37 (noting that people often retain records "in anticipation of litigation" and that Manafort had been "sued by his former client, Oleg Deripaska, sometime in or about 2008").  Taken together, this information met the legal standard for probable cause—*i.e.*, it "demonstrate[d] cause to believe that 'evidence'" relevant to proving the listed offenses "'[wa]s likely to be found at the place to be searched.'"  *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004)).

Second, suppression is unwarranted under the good-faith exception to the exclusionary rule.  *See generally United States v. Leon*, 468 U.S. 897 (1984).  In particular, and as several courts of appeals have held, the good-faith exception applies when a warrant affidavit cites information obtained in violation of the Fourth Amendment but the police conduct that violated the Fourth Amendment was "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable."  *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir.)

(internal quotation marks omitted), *cert. denied*, 569 U.S. 987 (2013); *see also, e.g.*, *United States v. Massi*, 761 F.3d 512, 527-28 (5th Cir. 2014) (adopting that rule but noting that a minority of circuits have rejected it), *cert. denied*, 135 S. Ct. 2377 (2015).  That standard is readily satisfied here.  Given that two courts of appeals have validated a third party's authority to consent on almost identical facts, *see* Part I.A.1, *supra*, the Agent's entry into Unit 3013 based on the Employee's consent was at least "close . . . to the line of validity."  *See Cannon*, 703 F.3d at 413; *see also United States v. Thornton*, 746 F.2d 39, 49 (D.C. Cir. 1984) ("eminently reasonable" for officers to rely on warrant where "the overwhelming weight of authority" had upheld the type of warrantless search that preceded the warrant).  As a result, it was objectively reasonable for the Agent to believe in the lawfulness of the warrant, and suppressing the fruits of the subsequent search would not further the deterrent purpose "of the exclusionary rule in any appreciable way." *Leon*, 468 U.S. at 920 (internal quotation marks omitted).  For that reason too, the storage-locker evidence should not be suppressed even if the initial warrantless entry was unlawful.

## II.  Manafort's Challenges To The Breadth Of The Search Warrant Are Unavailing And Do Not Support Blanket Suppression

Manafort argues (Doc. 46 at 14-21) that the warrant issued by the magistrate judge was "unconstitutionally overbroad" and that the government executed it unreasonably by seizing materials beyond the warrant's scope and providing a search inventory that allegedly violated Federal Rule of Criminal Procedure 41(f).  These arguments lack merit and would not, in any event, support the remedy of blanket suppression that Manafort seeks.

### A.  The Warrant Satisfies The Particularity Requirement

As stated above, p. 7, *supra*, the Fourth Amendment's warrants clause requires that warrants "particularly describ[e]" the "things to be seized.''  U.S. Const. amend. IV.  Manafort contends that the warrant here runs afoul of that requirement "because it allowed the searching

agents to indiscriminately seize everything from the storage unit." Doc. 46 at 13.  In so doing, he claims, the warrant authorized the kind of "general, exploratory rummaging in a person's belongings" that the Fourth Amendment was designed to avoid.  *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

Manafort's contention blurs two related but distinct types of specificity relevant under the Fourth Amendment: "particularity and breadth."  *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006) (internal quotation marks omitted), *cert. denied*, 549 U.S. 1299 (2007); *see United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017) ("[B]readth and particularity are related but distinct concepts."), *pet. for cert. filed*, No. 17-950 (Jan. 4, 2018).  As one court of appeals has explained, "[p]articularity is the requirement that the warrant must clearly state what is sought," while "[b]readth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."  *Hill*, 459 F.3d at 973 (internal quotation marks omitted).

The warrant here poses no particularity problem.  Attachment B, which is expressly incorporated on the face of the warrant, identifies by name and citation three federal offenses for which the accompanying affidavit establishes probable cause—failure to report foreign bank accounts (FBAR), acting as an unregistered agent of a foreign principal (FARA), and filing a false tax return.  Doc. 46-2 at 4.  It then lists eight categories of records "to be seized."  *Id.*; pp. 5-6, *supra* (quoting categories in full).  Two of the listed categories (¶¶ 1c and 1d) seek specific types of records reflecting the work of Manafort and Richard Gates on behalf of named individuals and entities.  *Id.* ("the Party of Regions, Viktor Yanukovych, the European Centre for a Modern Ukraine").  One category (¶ 1f) covers a single lobbying firm involved in the FARA scheme. Another category (¶ 1e) authorizes seizure of records relating to ten specific Manafort-affiliated companies.  Still another (¶ 1g) refers to "daily planners, logs, calendars, [and] schedule books"

of two named individuals (Manafort and Gates).  And two other categories (both listed as ¶ 1b) seek, respectively, "federal and state tax documentation" and correspondence "with any foreign financial institution" or individual signatory on a foreign bank account.

All of those descriptions fully satisfied the particularity requirement.  Each "confine[d] the executing [agents'] discretion by allowing them to seize only evidence of . . .  particular crime[s]." *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994); *see also United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986) (a warrant generally satisfies the particularity requirement when it allows officers "to seize only evidence of a particular crime"); *United States v. Young*, 260 F. Supp. 3d 530, 549 (E.D. Va. 2017) (rejecting particularity challenge to warrant that sought "all records and documents" falling within eight enumerated categories).  And by so doing, they ensured that the agents who executed the warrant would not have "unbridled discretion to rummage at will" among the "effects" found in the storage locker.  *See* Doc. 46 at 14 (quoting *Arizona v. Gant*, 556 U.S. 332, 345 (2009)).

Manafort bases his contrary argument (Doc. 46 at 15, 16) largely on the first category in Attachment B (¶ 1a), which authorized the seizure of "[a]ny and all financial records" for Manafort, Gates, and their associated companies, "including but not limited to records relating to any foreign financial accounts."  But this language does not transform the warrant into an "'all documents' warrant," Doc. 46 at 13, as Manafort suggests.  The clause is limited by its terms to "*financial*" records of two individuals and their companies.  It therefore would not authorize agents to seize and retain, for example, family letters or analogous personal documents.  Moreover, as courts have repeatedly held, the clause must be read in light of the specific categories that surround it and the three criminal offenses that are listed in the warrant immediately before it.  *See Andresen v. Maryland*, 427 U.S. 463, 479-81 (1976) (the phrase "together with other fruits, instrumentalities,

20

and evidence of crime at this (time unknown)," had to be read in context and together with the warrant's "lengthy list of specified and particular items to be seized"). When it is so read, the warrant's reference to "all financial records" of Manafort and Gates serves to focus the agents on those financial records that relate to three specific criminal offenses. *See Jones*, 31 F.3d at 1313.

But even if this category had the sweep that Manafort ascribes to it, the warrant would still not violate the particularity requirement. The Fourth Circuit has long recognized that the particularity inquiry "is a pragmatic one" and that "[t]he degree of specificity required" varies "according to the circumstances and type of items involved." *In re Grand Jury Subpoena*, 920 F.2d 235, 239 (4th Cir. 1990) (internal citation omitted); *see also United States v. Phillips*, 588 F.3d 218, 225 (4th Cir. 2009) ("A warrant need not—and in most cases, cannot—scrupulously list and delineate each and every item to be seized."). And in cases of financial malfeasance that require investigators to piece together "a 'paper puzzle,'" *United States v. Srivastrava*, 540 F.3d 277, 291 (4th Cir. 2008), courts have long held that some broader or more generically described categories may satisfy the Fourth Amendment. *See In re Grand Jury Subpoena*, 920 F.2d at 239-40 (recognizing, in a case that included "tax evasion allegations," that "specificity is even more difficult because evidence of the crimes can be found in almost every type of business document conceivable"); *see also, e.g.*, *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) (cited in Doc. 46 at 17), *cert. denied*, 549 U.S. 1338 (2008). Here, given the warrant's focus on crimes that involved multi-million-dollar financial transactions, that arose from foreign connections, and that related to the tax code, the inclusion of a single more capacious category alongside the seven narrower ones did not violate the Fourth Amendment's particularity requirement. *See Andresen*, 427 U.S. at 479-81; *In re Grand Jury Subpoena*, 920 F.2d at 239-40.

**B. Any Temporal Overbreadth Does Not Justify Blanket Suppression**

Manafort also argues (Doc. 46 at 15-17) that the warrant is overbroad because it does not expressly limit the records subject to seizure to a specific time frame.  He points out that this warrant differs in that respect from other warrants executed in this case, which permitted the seizure of records relating to violations of several statutes that occurred on or after January 1, 2006.  And he argues that the absence of date limits invalidates the warrant, because "[f]or a search warrant to be valid, it must provide the executing agents with guidance as to the time frame for which the agents are to seize evidence." *Id.* at 15.  But as explained below, Manafort's challenge fails whether understood as contesting particularity or breadth, and blanket suppression would be inappropriate in any event.

1.  Construed as the type of particularity challenge addressed in Part II.A, Manafort's contention fails.  The omission of a specific time frame does not detract from the clarity with which Attachment B described the various categories of records to be seized.  And while the absence of date limits authorized the seizure of a wider swath of records, "a search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100.

2.  Manafort's objection is equally unavailing if it is understood as focusing on the issue of "breadth" discussed above (p. 19, *supra*).  Although the absence of date limits can contribute to a mismatch between the scope of the seizures authorized by a warrant and the probable cause supporting that warrant, Manafort's own cases confirm that a specific time frame is not an indispensable requirement.  *See United States v. Blake*, 868 F.3d 960, 973-74 n.7 (11th Cir. 2017) (concluding that "the lack of a time limitation did not render the warrant unconstitutional" where other aspects of the warrant ensured that it was "appropriately limited in scope") (cited in Doc. 46 at 16-17); *United States v. Abboud*, 438 F.3d 554, 576 n.7 (6th Cir.) (cited in Doc. 46 at 17;

recognizing that some temporal "flexibility" must be afforded the warrant drafter, "because evidence that date[s] from outside of the time period" described in a warrant affidavit "may be relevant to the activity within the time period."), *cert. denied*, 549 U.S. 976 (2006).  Indeed, courts in this District have repeatedly held that "a search warrant does not fail the particularity requirement by not explicitly articulating a time frame."  *Young*, 260 F. Supp. 3d at 550 (quoting *United States v. Moore*, 775 F. Supp. 2d 882, 898 (E.D. Va. 2011), *aff'd*, 498 Fed. Appx. 195 (4th Cir. 2012)); *see also United States v. Shilling*, 826 F.2d 1365, 1369 (4th Cir. 1987) (warrants need not be limited by "specific time periods" when, among other things, "[t]he dates of specific documents" relevant to the offenses at issue "could not have been known to the Government").

Several aspects of the warrant and accompanying affidavit here support the seizure of records that predate Manafort's Ukraine work, which the affidavit describes as starting in 2005. Aff. ¶ 6.[7]  As an initial matter, the subject offenses in the warrant include tax violations, *id.* ¶ 4, a context in which the Fourth Circuit has recognized that earlier conduct can inform the assessment of violations alleged to have occurred later.  *See Shilling*, 826 F.2d at 1359 ("as for income tax violations, documents from an earlier time may have bearing on the tax violations alleged in a later year").  Further, both of the other named offenses (FBAR and FARA) are specific-intent crimes that involve international connections—one the failure to report foreign bank accounts, and the other acting as an unregistered agent of a foreign principal.  *See* 31 U.S.C. § 5322(a) and (b) (penalties for willful FBAR violation); 22 U.S.C. § 618(a) (penalty for "willfully violat[ing]" FARA).  Evidence that predated the specific course of conduct described in the affidavit could

---

[7] Manafort suggests (Doc. 46 at 17-18) that the supporting affidavit cannot be consulted because the issuing magistrate did not expressly incorporate it into the warrant.  But when the alleged defect inheres in the breadth of a warrant (*i.e.*, probable cause) and not the specificity of the descriptions in it, a reviewing court may consult the affidavit "regardless of whether it is incorporated or attached."  *United States v. Cohan*, 628 F. Supp. 2d 355, 364 n.4 (E.D.N.Y. 2009).

shed light on Manafort's (or Gates's) past use of or access to foreign accounts, as well as prior representation of foreign clients, both of which may be relevant to establishing the mental state needed to prove the FBAR and FARA violations. *See United States v. Cohan*, 628 F. Supp. 2d 355, 365 (E.D.N.Y. 2009) (explaining, where warrant lacked a date limit, how prior instances of conduct predating criminal scheme by as much as 14 years "would be potentially admissible under Federal Rule of Evidence 404(b) to demonstrate intent or absence of mistake"); *cf. Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) ("[P]robable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular . . . conviction."). This is therefore not an instance in which the scope of the search authorized by the warrant outstrips the probable cause established by the affidavit.

3. The Court, however, need not definitively resolve whether the absence of a specific time frame renders the warrant overbroad. That is because, even if the warrant were overbroad, suppression is inappropriate under the good-faith exception to the exclusionary rule. *See Leon*, 468 U.S. at 925 (authorizing courts to "turn[] immediately to a consideration of the officers' good faith" without resolving validity of the warrant).

As the Supreme Court has explained, the exclusionary rule "does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." *Davis v. United States*, 564 U.S. 229, 238-39 (2011) (quoting *Leon*, 468 U.S. at 922). "The error in such a case rests with the issuing magistrate, not the police officer, and 'punish[ing] the errors of judges' is not the office of the exclusionary rule." *Id.* at 239 (quoting *Leon*, 468 U.S. at 916). Of relevance here, the Court has applied that reasoning both where the warrant was allegedly unsupported by probable cause (as in *Leon*, 468 U.S. at 903), and where it was found to be overbroad (as in the companion case of *Massachusetts v. Sheppard*, 468 U.S. 981, 988-91 (1984)).

Lower courts, in turn, have applied *Leon* and *Sheppard* to the specific type of defect that Manafort emphasizes here—*viz.*, temporal overbreadth. *See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002) ("Evidence seized pursuant to an overly broad warrant need not be suppressed if the good faith exception applies."). In an opinion by then-Judge Alito, for example, the Third Circuit assumed that a warrant was overly broad because it authorized the seizure of a decade's worth of records that predated the food-stamp-fraud scheme under investigation. *Id.* at 151. But the court held that "[t]he absence of limiting dates" did not preclude officers who had fully presented the facts gathered in their investigation "to a neutral and detached [m]agistrate [j]udge" from relying on that judge's conclusion that the officers were entitled to conduct the search that they had requested. *Id.* at 152. The same conclusion follows in this case, where the Agent prepared a detailed affidavit that undisputedly established probable cause, that affidavit was reviewed by an Assistant U.S. Attorney, and a magistrate judge issued a warrant that authorized the seizure of the enumerated categories of records that the Agent had listed in Attachment B. *See id.*; *see also, e.g.*, *United States v. Diaz*, 841 F.2d 1, 4-6 (1st Cir. 1988) (applying good-faith exception where the warrant allowed officers to seize records that predated by months "the first instance of wrongdoing mentioned in the affidavit"); *Cohan*, 628 F. Supp. 2d at 367 (applying good-faith exception where warrant had no date limits).[8]

Neither of the two exceptions to *Leon*'s rule conceivably relevant to this case are

---

[8] Courts have also applied *Leon* to warrants found overbroad because they reached "virtually all of [a party's] business records," *United States v. Maxwell*, 920 F.2d 1028, 1033-34 (D.C. Cir. 1990), or were similarly expansive in scope, *see, e.g.*, *United States v. Gros*, 824 F.2d 1487, 1497 (6th Cir. 1987) (executing officers reasonably presumed validity of warrant permitting "seizure of 'books, documents and other papers tending to show motive and intent'"). Under those precedents, the good-faith exception would equally foreclose suppression if the Court found merit in the particularity challenge addressed in Part II.A above.

applicable.  This is not the rare case in which the affidavit was so lacking in probable cause that the executing agents could not rely on the warrant issued based on that affidavit.  *See Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (Supreme Court "precedents make clear . . . that the threshold for establishing this exception is a high one, and it should be").  Nor does "the absence from the warrant of a provision limiting the search and seizure to documents pertaining to the time period" described in the affidavit "make the warrant so facially deficient as to render official belief in its legality entirely unreasonable." *$92,422.57*, 307 F.3d at 151 (internal quotation marks and brackets omitted).  To the contrary, Manafort's own cases make clear that date limits are not indispensable, *see* pp. 22-23, *supra*, and courts in this District have repeatedly rejected particularity challenges to warrants seeking "categories of information . . . unbound by date restrictions," *Young*, 260 F. Supp. 3d at 550.  Against that legal backdrop, "a reasonably well trained officer would [not] have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23.

4.  Even if any overbreadth required suppression, it would not support exclusion of "[a]ll evidence seized from the storage unit," as Manafort claims (Doc. 46 at 20).  Rather, under the doctrine of severance, any suppression remedy would be limited to evidence seized under the portion of the warrant that is overbroad, which would at most be records that predate 2005.

The courts of appeals have uniformly applied the doctrine of severance (also sometimes referred to as "partial suppression" or "redaction") when a warrant only partly satisfies either the particularity or probable cause requirements. *United States v. Sells*, 463 F.3d 1148, 1150 n.1 (10th Cir. 2006) (citing cases from every circuit), *cert. denied*, 549 U.S. 1229 (2007); *see also United States v. Jones*, No. 3:17-cr-71, 2018 WL 935396, at *16 (E.D. Va. Feb. 16, 2018) (recognizing doctrine).  The doctrine reflects a judgment that "it would be harsh medicine indeed if a warrant

issued on probable cause and particularly describing certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well." 2 LaFave, *supra*, § 4.6(f).

Notably, courts—including in Manafort's cited cases—have applied the severance doctrine in the particular circumstances at issue here, in which a warrant is allegedly overbroad because it authorizes the seizure of items without a sufficient (or any) limitation on timeframe. The warrant in *Abboud*, *supra*, for example, was overbroad because "law enforcement knew that the evidence in support of probable cause in the affidavit revolved only around a three-month period in 1999," yet the "warrant authorized search for records from January 1996 to May of 2002." 438 F.3d at 576. The Sixth Circuit concluded that the warrant's overbreadth did "not require suppression of all of the items seized pursuant to the warrant," and instead that the proper result was that "all evidence seized irrelevant to the three-month period in 1999 should have been suppressed, while evidence relevant to this period should be upheld." *Id.* The Third Circuit reached a similar conclusion in *$92,422.57*, explaining that even if a warrant is temporally overbroad insofar as it covers time periods for which probable cause may not have existed, "the proper remedy . . . [i]s simply to excise the years for which there was no probable cause." 307 F.3d at 151; *accord United States v. Flores*, 802 F.3d 1028, 1045 (9th Cir. 2015) (applying severance to a warrant with "no temporal limit" under which investigators "[s]eiz[ed] five or six years' worth of data"), *cert. denied*, 137 S. Ct. 36 (2016).

Under these decisions, the severance doctrine applies to any overbreadth resulting from the absence of date limits in the warrant here. Manafort does not dispute that the affidavit established probable cause to seize the enumerated categories of materials for the period of conduct described in the affidavit—that is, 2005 to the date of the warrant. Aff. ¶ 6 (Manafort's Ukraine work

extended from 2005 through "at least 2014"); *see* Doc. 46 at 16 (raising no objection to similar temporal limitation in other warrants). The proper remedy under the severance doctrine would therefore be to suppress evidence dating from the pre-2005 time period for which probable cause was ostensibly lacking.[9]

### C.   The Execution Of The Warrant Violated Neither The Constitution Nor Rule 41

Manafort's final contentions concern the execution of the search warrant. He asserts that the executing agents exceeded the scope of the warrant by "seiz[ing] virtually everything from the premises" and that they violated both the Fourth Amendment and Federal Rule of Criminal Procedure 41(f) by preparing an inventory of seized items that was, Manafort asserts, "devoid of description." Doc. 46 at 19. These contentions lack merit.

As an initial matter, Manafort is simply incorrect about the scope of the materials seized from the storage unit. He infers from the listing of "nine categories of unidentified documents" in the inventory returned to the magistrate judge that the searching agents "seized far in excess of what they were authorized to seize." Doc. 46 at 19. But that inference is unfounded. Before the search, the Agent observed in the unit "approximately 21 bankers' boxes that could contain documents, as well as a five-drawer metal filing cabinet." Aff. ¶ 31. The agents seized from those

---

[9] Manafort suggests (Doc. 46 at 2 & n.3) that suppressing the fruits of the storage-locker search would require invalidating the subsequent warrant to search his residence because that warrant affidavit incorporates information obtained from the storage locker. That is incorrect. If the Court suppressed the storage-locker evidence, it would next consider "which portions of [the other] affidavit are tainted by" the unlawful search and ask whether the untainted portions are sufficient "to establish probable cause." *United States v. Hoang Anh Thi Duong*, 156 F. Supp. 2d 564, 574 (E.D. Va. 2001). The answer to that question is "yes" because, although the residential warrant affidavit incorporates by reference the storage-locker affidavit, it relies on information obtained from the storage-locker search at only two points. And neither of those points is essential to establishing probable cause:  one (¶ 16) mentions records from the storage locker that echo information from other sources about Manafort's work abroad, and the other (¶¶ 63-65) describes the information that the Employee—who also provided information in connection with the residential search—had previously provided about the storage locker.

containers the nine sets of documents listed in the inventory returned to the magistrate—five sets of documents (including binders) from the filing cabinet, two sets from bankers' boxes on the left-hand side of the unit, and two sets from boxes on the rear wall.  Exh. A, *infra* (Collected Item Log).  The documents taken amount to a subset of the storage unit's contents, and do not demonstrate a seizure beyond the scope authorized by the warrant.[10]

Manafort's criticisms of the inventory itself are equally misguided.  Abandoning the constitutional argument he made in the D.C. case, he argues only that the description in the inventory violated the Federal Rules of Criminal Procedure.  But while Rule 41(f)(1)(B) requires that executing agents "prepare and verify an inventory of any property seized," the Rule "do[es] not dictate a requisite level of specificity for inventories."  *Matter of Searches of Semtex Indus. Corp.*, 876 F. Supp. 426, 430 (E.D.N.Y. 1995).  And of relevance here, "[i]n circumstances where filing cabinets of documents are seized, routine practice is to list the storage devices, i.e., the cabinets, on the inventory, as opposed to making a document by document list of the contents."  Fed. R. Crim. P. 41 adv. comm. note (2009 amendment).  The inventory in this case did not violate Rule 41(f) when, rather than providing such "a document by document list" of the materials seized from the filing cabinet and bankers boxes, it described the seized items more generically as consisting of nine sets of documents (and binders).  *See, e.g.*, *United States v. Rollack*, 90 F. Supp. 2d 263, 271 (S.D.N.Y. 1999) (no Rule 41 violation when inventory prepared after jail cell search "refer[red] only to 'miscellaneous papers' and the like without listing specific items seized").

In any event, any Rule 41(f) violation would not justify suppression.  Manafort makes no

---

[10] The inventory and Collected Items Log, when read together, refute Manafort's suggestion (Doc. 46 at 17) that the agents executed the warrant with particular "swiftness."  Those documents show that the agents entered the unit to execute the warrant at approximately 5:20 p.m. and completed their seizure of items from the cabinet and boxes just under two hours later, at 7:09 p.m.  *See* Doc. 46-1 at 3 (inventory); Exh. A, *infra* (log).

effort to establish prejudice from the asserted violation, which is the showing that the Fourth Circuit has generally required for a defendant to obtain suppression based on "ministerial" violations of Rule 41. *United States v. Smith*, 914 F.2d 565, 568 (4th Cir. 1990), *cert. denied*, 498 U.S. 1101 (1991). And while the court of appeals has suggested that "evidence of intentional and deliberate disregard of" Rule 41's strictures might support suppression, *United States v. Simons*, 206 F.3d 393, 403 (4th Cir. 2000) (remanding on the intent issue), Manafort does not explain how an inventory description that mirrors the "routine practice" in cases where entire cabinets are seized, *see* Fed. R. Crim. P. 41 adv. comm. note (2009 amendment), could satisfy that exacting standard when police seized less than that.[11]

## CONCLUSION

For the foregoing reasons, Manafort's motion to suppress evidence derived from the search of the storage unit (Doc. 45) should be denied.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: May 14, 2018

Uzo Asonye
Assistant United States Attorney
Eastern District of Virginia

*/s/ Andrew Weissmann*
Andrew Weissmann
Greg D. Andres
Scott A.C. Meisler
Special Assistant United States Attorneys
Special Counsel's Office

U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-0800

*Attorneys for United States of America*

---

[11] On remand in Simons, the district court found that the officers had not intentionally or deliberately disregarded Rule 41's requirements, a finding that the Fourth Circuit affirmed on appeal. *United States v. Simons*, 107 F. Supp. 2d 703, 705-06 (E.D. Va. 2000), *aff'd*, 5 Fed. App'x 332 (4th Cir.), *cert. denied*, 534 U.S. 930 (2001).

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of May, 2018, I will cause to be filed electronically the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification

of such filing (NEF) to the following:

Thomas E. Zehnle (VA Bar No. 27755)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue, N.W., Suite 620
Washington, D.C. 20001
tezehnle@gmail.com

Jay R. Nanavati (VA Bar No. 44391)
Kostelanetz & Fink LLP
601 New Jersey Avenue, N.W., Suite 620
Washington, D.C. 20001
jnanavati@kflaw.com

                                         _/s/    *Andrew Weissmann*_____
                                         Andrew Weissmann
                                         Special Assistant United States Attorney
                                         Senior Assistant Special Counsel
                                         U.S. Department of Justice
                                         Special Counsel's Office
                                         950 Pennsylvania Avenue N.W.
                                         Washington, D.C. 20530
                                         Telephone: (202) 616-0800
                                         Fax: None
                                         E-mail: AAW@usdoj.gov

                                         *Attorney for the United States of America*