**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | Criminal No. 1:18-cr-00083-TSE |
| v. | ) ) ) | Judge T. S. Ellis, III |
| PAUL J. MANAFORT, JR., | ) ) ) ) | |
| *Defendant.* | ) ) | |

**DEFENDANT PAUL J. MANAFORT JR.'S REPLY TO THE OFFICE OF SPECIAL
COUNSEL'S OPPOSITION TO THE MOTION TO REQUIRE A HEARING
REGARDING IMPROPER DISCLOSURES RELATING TO CONFIDENTIAL GRAND
JURY INFORMATION AND POTENTIALLY CLASSIFIED MATERIALS**

Defendant Paul J. Manafort, Jr., by and through counsel, files this reply to the opposition memorandum submitted by the Office of Special Counsel (Dkt. # 61) to his motion to require a hearing regarding improper disclosures relating to confidential grand jury information and potentially classified materials. The Special Counsel may view the requested hearing as a risk to "derail[] this case on satellite issues" (Dkt. # 61 at 16), but the defendant most certainly does not view unauthorized and intentional government leaks of confidential and classified information in violation of federal law and his Fifth and Sixth Amendment rights as "satellite issues."

The Special Counsel focuses his attention on violations of Federal Rule of Criminal Procedure 6(e) and all but ignores that certain press reports by *The New York Times* and CNN cite to current and former government officials as sources for classified information included in the articles. Not only is leaking classified information a felony, but it was also apparently intended to

create the false public narrative that Mr. Manafort was colluding with Russian intelligence officials during the Trump presidential campaign. This smear campaign may have in fact irreparably prejudiced the jury pool in violation of the defendant's Constitutional rights.

Moreover, the Special Counsel so narrowly construes *United States v. Rosen*, 471 F. Supp.2d 651 (E.D. Va. 2007), as to suggest that if the media accounts disclose confidential grand jury information provided by government sources, but such reports do not specifically mention "the grand jury," then the defendant cannot have made the *prima facie* showing necessary for a hearing with respect to those Rule 6(e) violations.[1]  But the Special Counsel has entirely ignored the factual context and unusual circumstances under which the Special Counsel took over the prior investigation(s) of the defendant.  In essence, the Special Counsel invites the Court to view this matter in a vacuum; however, more transparency—not less—is what is needed to get to the bottom of these violations in this highly unusual investigation and prosecution.[2]  At a minimum, information should be provided to this Court with respect to the activities of the lead attorney for the Special Counsel in the government investigations related to Mr. Manafort prior to the appointment of Special Counsel, including the details of the lead attorney's communications with the Associated Press regarding ongoing grand jury investigations.

## BACKGROUND

### The Substantial Harm from the Government Leaks Is Obvious

In the memorandum in support of the defendant's instant motion (Dkt. # 44), a number of media accounts were specifically identified to demonstrate that the information reported in the press articles (1) came from government sources, and (2) that such information was subject to

---

[1] *See* Dkt. # 61 at 3-5.
[2] Regarding the issue of transparency, in its memorandum in opposition, the Office of Special Counsel continues to submit matters *ex parte* to keep them from the defendant, and no general explanation is proffered as to why the matter must be addressed *ex parte*.  (*See* Dkt. # 61 at 3, n.1).

grand jury secrecy, was potentially classified intelligence information, or was simply false.  (Dkt. # 44 at 3-7).  Given the enormous amount of negative press coverage that the defendant has endured since the Special Counsel took over the prior investigations, it hardly seemed controversial to limit the review of such deleterious media accounts in his *own* court filings— especially where the threshold for making a *prima facie* showing for a hearing is not difficult.[3]  A simple Google search of "Mr. Manafort and Special Counsel" yields hundreds of articles almost uniformly negative to Mr. Manafort and often disclosing confidential and classified information. These articles routinely disclose the grand jury investigations of former Ukrainian President Yanukovych, Mr. Manafort and his political campaign activities in Ukraine, and purported counterintelligence surveillance of the defendant.   Adding reams of newspaper cites to such repetitive reporting seemed unnecessary.  Indeed, the extraordinary public reach of CNN, *The New York Times* and the Associated Press (among others) is more than sufficient to reasonably show the magnitude of harm to Mr. Manafort by these reports based on government leaks.

**The Counterintelligence Leaks Investigation is Narrow in Scope**

Recently, the House Permanent Select Committee on Intelligence released the results of its investigation into the FBI counterintelligence investigation of the Trump campaign which began in July 2016.[4]  The report confirms that Mr. Manafort was part of investigation from its early stages. The investigation was conducted by a small group at the FBI.[5]  Information collected during the investigation was only shared with a small group including officials from the Department of

---

[3] "A *prima facie* case is one which has proceeded upon sufficient proof to that stage where it will support finding if evidence to the contrary is disregarded."  *United States v. Rosen*, 471 F. Supp.2d 651, 656 (E.D. Va. 2007) (internal quotations and citations omitted).
[4] House Permanent Select Committee on Intelligence, Report on Russian Active Measures, March 22, 2018, at page 47, 114.
[5]  Andrew C. McCarthy, *The Strzok-Page Texts and the Origins of the Trump-Russia Investigation,* Nationalreview.com, May 14, 2018 (Exhibit 1).

Justice, White House, State Department and CIA.[6]   Recent reporting puts the number of DOJ officials briefed at "a hand full" according to government officials.[7]   Despite protestations from the Office of Special Counsel, it appears that an investigation into government leaks surrounding the counterintelligence investigation of the Trump campaign—as it pertains to Mr. Manafort— would involve a small number of current and former government officials.

**The Grand Jury Leaks Investigation Is Narrow in Scope**

The focus on grand jury leaks is likewise limited, primarily concerning communications between the Special Counsel's lead attorney and four reporters from the Associated Press.   It appears that this investigation would involve approximately nine DOJ employees, including attorneys and FBI agents.   The primary basis for having this inquiry comes from the questions raised by the House Permanent Select Committee on Intelligence, and the reporting of freelance journalist, Sara Carter.

**On January 5, 2018, freelance journalist Sara Carter reported that**:

- The senior attorney for Special Counsel Robert Mueller, described as his righthand man, has a significant role in the investigation which appears to be expanding from its original edict to investigate alleged collusion between members of the Trump campaign with Russia, to a broader financial investigation of Trump, members of his family and campaign officials.

  Sara Carter, *Mueller's "Pit Bull" Andrew Weissmann under scrutiny as Rosenstein agrees to turn over documents to Nunes,* saraacarter.com, Jan. 5, 2018 (Exhibit 3); Letter from D. Nunes to R. Rosenstein, dated January 4, 2018 (Exhibit 4).

---

[6] *Id.*
[7] Matt Apuzzo, Adam Goldman and Nicholas Fandos, *Code Name Crossfire Hurricane: The Secret Origins of the Trump Investigation,* The New York Times, May 16, 2018 (Exhibit 2).

**On January 21, 2018, freelance journalist Sara Carter reported that**:

- A senior Justice Department prosecutor in Robert Mueller's Special Counsel Office held a meeting with Associated Press[8] (AP) journalists last spring to discuss an investigation into Paul Manafort's financial records, a day before the wire service published a major exposé disclosing alleged money laundering made by the former and now embattled Trump campaign chairman.

---

[8] Associated Press articles that were published in the spring of 2017 were previously identified in the defendant's memorandum in support of the instant motion (Dkt. # 44 at 4-6):

**On March 22, 2017, the Associated Press reported that:**
- People familiar with the relationship between Paul Manafort and Russian oligarch Oleg Deripaska said money transfers to Mr. Manafort amounted to tens of millions of dollars and continued through 2009.  They spoke on the condition of anonymity because they were not authorized to discuss secret payments publicly.
- Paul Manafort had been a leading focus of the U.S. intelligence investigation of Trump's associates and Russia, according to a U.S. official.  The person spoke on the condition of anonymity because details of the investigation are confidential.  Meanwhile, federal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukrainian assets.
  Jeff Horwitz & Chad Day, *Before Trump Job Manafort Worked to Aid Putin*, Associated Press, Mar. 22, 2017.

**On March 23, 2017, the Associated Press reported that:**
- Treasury agents in recent months obtained information connected to Paul Manafort's transactions from Cypriot authorities according to a person familiar with the matter who was not authorized to speak publicly.
- The time period covered under the request for Mr. Manafort's transactions from the Treasury Department's Financial Crimes Enforcement Network was not immediately clear.
  Jack Gillum, Menelaos Hadjicostis & Eric Tucker, *US Probe of Ex-Trump Aide Extends To Cyprus*, Associated Press, Mar. 23, 2017.

**On April 12, 2017, the Associated Press reported that:**
- Now, financial records newly obtained by the AP confirm that Paul Manafort's firm received at least some money listed in the so called "black ledger."
- Federal prosecutors in the U.S. have been investigating Mr. Manafort's work in Eastern Europe as part of a larger anti-corruption probe.
  Jack Gillum, Chad Day and Jeff Horwitz, *Manafort Firm Received Ukraine Ledger Payout*, Associated Press, Apr. 12, 2017.

**On June 3, 2017, the Associated Press reported that:**
- The Special Counsel investigating possible ties between Trump's campaign and the Russian government has taken over a separate criminal probe involving former Trump campaign chairman Paul Manafort.
- The expansiveness of Mueller's investigation was described to the AP.  No one familiar with the matter has been willing to discuss the scope of his investigation on the record because it is just getting underway and because revealing details could complicate its progress.
  Sadie Gurman, Eric Tucker, and Jeff Horwitz, *Special Counsel's Trump Investigation Includes Manafort Case,* Associated Press, Jun. 3, 2017.

- The meeting with the Associated Press was also attended by other employees and agents of the U.S. Department of Justice, U.S. Attorney's Office and FBI.

- The senior DOJ attorney's role in arranging the meeting did not go over well with FBI officials, who issued a complaint to the Justice Department suggesting that the attorney did not follow normal procedures for dealing with journalists.

Sara Carter, *Weissmann met with AP to discuss Manafort case before joining special counsel,* saraacarter.com, Jan. 21, 2018 (Exhibit 5).

Just recently, on May 16, 2018, *The Washington Times* confirmed that the chairman of the House Permanent Select Committee on Intelligence asked the Department of Justice for information on a meeting that a senior attorney with the Special Counsel's Office conducted with news reporters last year when he headed the Fraud Section on the Criminal Division.[9]

## ARGUMENT

For months, Mr. Manafort has sought information from the Special Counsel regarding unauthorized leaks by government officials. Despite multiple discovery and *Brady* requests, the Special Counsel has not produced any materials in this regard. When finally compelled to ask for the Court's intervention and to require a hearing on these violations, the Special Counsel's Office responds that "Manafort's speculative claim of improper conduct fall far short" of what is necessary to warrant a hearing on potential violations of Rule 6(e) or his Constitutional rights. (Dkt. # 61 at 2).

As an initial matter, the Special Counsel's resistance to finding out who has been responsible for these unauthorized and unlawful government leaks was perplexing. As a general proposition, prosecutors are interested in investigating potential wrongdoing. However, the

---

[9] Rowan Scarborough, *Mueller moves to muscle out Manafort's lawyers from grilling prosecutors,* The Washington Times, May 16, 2018. (Exhibit 6)

Special Counsel's memorandum in opposition contained a footnote that may explain the reluctance. (Dkt. # 16 at 16, n.12). Apparently, the Special Counsel's Office is concerned that prosecutors on the trial team could be called to provide testimony. *Id.* Based upon the congressional inquiry and reporting noted above that concern may well be justified, but that decision is for the Court to make, not the defendant.

**Government Leaks Regarding Grand Jury Investigations of Mr. Manafort**

A *prima facie* case is a case in which sufficient proof has been presented where it will support the finding if evidence to the contrary is disregarded. *Rosen*, 471 F. Supp.2d at 656. Far from being "speculative," the media reports identified in the motion and this reply clearly demonstrate that unauthorized disclosures of Rule 6(e) information and potentially classified materials have occurred. Indeed, it is hard to fathom how the Special Counsel contends Mr. Manafort's claim is speculative when the chairman of the House Permanent Select Committee on Intelligence has asked the Department of Justice for information on the meeting that the lead prosecutor in this case conducted with news reporters last year. How can it be that the legislative branch, in exercising its oversight responsibilities regarding the Russian collusion investigation, has demanded (and is to receive) this relevant information, and the Court and the defendant in this criminal prosecution cannot?

As noted *supra*, it has been reported that a complaint was made to the Justice Department by the FBI with respect to the meeting with the AP reporters, which suggests that normal procedures were not followed in this case.[10] (*See* Exhibit 5). The thrust of this motion requests

---

[10] Again, the Special Counsel attempts to preempt any inquiry into this matter. (Dkt. # 61 at 16, n.12). As a *general* principle, the defense would agree that the taking of testimony of any lawyer who is trying a case should ordinarily be avoided. But this is by no means an ordinary case. Indeed, it is troubling that in discussing the AP stories, the Special Counsel first points out that the disclosed information must come from a person subject to Rule 6(e) secrecy, for which there is no argument from the defendant, but then attempts to convince the Court that "when [the AP stories] do refer to information provided by individuals, the context strongly suggests that those individuals are persons outside of the U.S. government. . . ." (*Id*. at 12-13). This suggestion is made without any mention or disclosure that the

that the Court hold a hearing on these unauthorized government leaks, and if there has been an internal investigation (or investigations) regarding such leaks, or if emails, notes or memoranda exist regarding the same, the Court and the defendant—whose Constitutional rights are actually at issue—are entitled to review the same. The Special Counsel may view the requested hearing as a risk to "derail this case on satellite issues" (Dkt. # 61 at 16), but the defendant most certainly does not view unauthorized and intentional violations of Rule 6(e) and his Fifth and Sixth Amendment rights as "satellite issues."

Sensing the weakness in his argument, the Special Counsel seeks to narrowly construe the Court's decision in *Rosen* to avoid having a hearing on the unauthorized Rule 6(e) disclosures.[11] In *Rosen*, however, the Court was dealing with an Espionage Act prosecution that involved national defense information. *Rosen*, 471 F. Supp. 2d at 652. The Court explained that law enforcement investigations and grand jury investigations differ and there was nothing in the media articles cited by the defendants that related to a "matter occurring before the grand jury." *Id*. at 654-56. Given the sensitivity of the national defense information involved in *Rosen*, it is reasonable to infer that classified information may not have been presented *in toto* to the grand jury and, without more, the defendants were not able to meet their burden. It is also clear from the Court's analysis that if there were evidence that (a) a grand jury was empaneled and (b) matters occurring before that grand jury were disclosed by government sources to the media, then a *prima facie* showing would have been made.

In this highly unusual case, where a Special Counsel was appointed and thereafter wandered far from his core mandate to investigate Russian collusion in the 2016 presidential

subject meeting with the AP reporters by the lead attorney in this case (and other government attorneys and FBI agents) is under scrutiny by the House Permanent Select Committee on Intelligence.
[11] The Special Counsel ignores the potential leaks of classified material and false information, which the defendant also contends requires exploration in a hearing.

election, the facts are quite different.  Based on their own admission during the May 4 motions hearing, the Special Counsel's Office took over investigations regarding the defendant that antedated by years the Special Counsel's appointment.  (*See* Transcript of Motions Before the Honorable T.S. Ellis, III, dated May 4, 2018, at p. 4).  Based upon information provided by Special Counsel, it appears that there have been two grand jury investigations and, as such, any matters occurring before those grand juries were protected under Rule 6(e).

Indeed, in a recent filing, the Special Counsel acknowledges the existence of one of the grand jury investigations.  (Dkt. # 66).  To oppose the defendant's motion to dismiss Count Eleven of the Superseding Indictment (*see* Dkt. ## 41 and 42), the Special Counsel advises that his Office sought and obtained an *ex parte* order[12] in June 2017 suspending the running of the statute of limitations.  (Dkt. # 66 at 2-3).  To secure such a tolling order, however, the Special Counsel was required by statute to apply to the court where *the grand jury* was investigating the offense.  18 U.S.C. Section 3292(a)(1).  There is no question that the Special Counsel obtained financial information based upon the investigative powers of the grand jury.

Importantly, for purposes of the case at bar, violations of Rule 6(e) concern "matters occurring before the grand jury" that, among other things, disclose or "reveal the strategy or direction of a grand jury investigation, or report when the grand jury will return an indictment." *Rosen*, 471 F. Supp.2d at 655 (citations omitted).  The articles referenced in the subject motion and this reply clearly implicate Rule 6(e).

**Government Leaks Regarding the Counterintelligence Investigation**

---

[12] The Special Counsel only recently produced this order to the defense after the filing of the response to the motion to dismiss Count Eleven (Dkt. # 66 at 4), and the issue will be addressed in the defendant's reply to that memorandum in opposition.

The Special Counsel has avoided addressing the counterintelligence leaks to *The New York Times* and CNN regarding the surveillance of Mr. Manafort.  There is strong evidence that the highest-level FBI and intelligence officials authorized leaks to the press and, in fact, leaked themselves.  The identified officials include former FBI Director James Comey, and former FBI Deputy Director Andrew McCabe.[13]  Recently, it has also been confirmed that James Clapper, then the Director of National Intelligence, leaked details of what is known as the "Steele dossier" to CNN in January 2017.[14]  The Steele dossier was relied on by DOJ in applying for FISA surveillance of individuals associated with the Trump campaign.  James Comey has confirmed that the information in the dossier could not be confirmed.  The public has only recently learned that the dossier was part of political opposition to Trump that was compiled and paid for by the Hillary Clinton campaign for president.

The Special Counsel's assertion of national security and classified information concerns to withhold information from the defendant and this court strains credulity.   The highest-level counterintelligence officials at the FBI and National Intelligence Agency leaked the very same information to the press when it served their purposes to disclose details of counterintelligence investigations and the results of the investigations.

Just last week, government officials leaked more classified information about the FBI counterintelligence investigation of the Trump campaign to *The New York Times*.[15]  The leakers confirmed that only a small group was privy to information about the investigation.[16]  Therefore,

---

[13] Jonathan Turley, *McCabe just made life tough for Comey and the special counsel,* TheHill.com, March 17, 2018 (Exhibit 7).

[14] Sean Davis, *Declassified Congressional Report: James Clapper Lied About Dossier Leaks to CNN,* thefederalist.com, April 27, 2018 (Exhibit 8).

[15] Matt Apuzzo, Adam Goldman and Nicholas Fandos, *Code Name Crossfire Hurricane: The Secret Origins of the Trump Investigation,* The New York Times, May 16, 2018 (Exhibit 2).

[16] Andrew C. McCarthy, *The Strzok-Page Texts and the Origins of the Trump-Russia Investigation,* Nationalreview.com, May 14, 2018 (Exhibit 1).

a leaks investigation in this regard would be limited in scope and manageable. The House Intelligence Committee's report also disclosed documents that contain the redacted names of individuals at the White House, State Department, DOJ and CIA who were privy to this information. Therefore, the individuals that would be the focus of a leaks investigation are readily identifiable.

Moreover, *The New York Times* and CNN articles cited in defendant's motion clearly identify government officials as the source of counterintelligence information, including the details of the investigation and the surveillance of Mr. Manafort. If the media reports of these leaks of classified information are accurate, they constitute felonies. And if the leaks were/are false, they constitute an inexcusable public smear campaign.[17] Either way, the leaks constitute outrageous government conduct intended to deprive Mr. Manafort of his Fifth and Sixth Amendment Constitutional rights to due process and a trial by an unbiased jury of his peers. In light of the mass media coverage of these leaks in print, on television, radio and the internet, it seems unlikely that there is a jury questionnaire, instruction or change of venue that could cure the irreparable harm to Mr. Manafort's Constitutional rights resulting from leaks by the highest-level government officials.

WHEREFORE, Defendant Manafort respectfully requests a hearing with respect to the government's unauthorized leaks in this case and any other such relief needed to allow Mr. Manafort an opportunity to seek legal redress for all violations of his Constitutional rights.

---

[17] *See, e.g.,* Martin London, *Spiro Agnew's Lawyer: How the Russia Leaks Could Backfire in Court,* Time.com, June 7, 2017 (Exhibit 9).

Dated: May 21, 2018                     Respectfully submitted,


                                        s/ Kevin M. Downing
                                        Kevin M. Downing (*pro hac vice*)
                                        Law Office of Kevin M. Downing
                                        601 New Jersey Avenue NW
                                        Suite 620
                                        Washington, DC 20001
                                        (202) 754-1992
                                        kevindowning@kdowninglaw.com

                                        s/ Thomas E. Zehnle
                                        Thomas E. Zehnle (VSB No. 27755)
                                        Law Office of Thomas E. Zehnle
                                        601 New Jersey Avenue NW
                                        Suite 620
                                        Washington, DC 20001
                                        (202) 368-4668
                                        tezehnle@gmail.com

                                        s/ Jay R. Nanavati
                                        Jay R. Nanavati (VSB No. 44391)
                                        Kostelanetz & Fink LLP
                                        601 New Jersey Avenue NW
                                        Suite 620
                                        Washington, DC 20001
                                        (202) 875-8000
                                        jnanavati@kflaw.com

                                        *Counsel for Defendant Paul J. Manafort, Jr.*