# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| PAUL J. MANAFORT, JR., | Crim. No. 17-201-1 (ABJ) |
| Defendant. | |

## GOVERNMENT'S MOTION TO REVOKE OR REVISE DEFENDANT PAUL J. MANAFORT, JR.'S CURRENT ORDER OF PRETRIAL RELEASE

Pursuant to 18 U.S.C. § 3148, the United States of America, by and through Special Counsel Robert S. Mueller, III, hereby moves the Court to revoke or revise the current Order authorizing the release of defendant Paul J. Manafort, Jr. (Manafort) to the Pretrial Services Agency's high-intensity supervision program. The evidence set forth below and in the attached declaration of Federal Bureau of Investigation (FBI) Special Agent Brock W. Domin establishes probable cause to believe that Manafort has violated 18 U.S.C. § 1512(b)(1) by attempting to tamper with potential witnesses while on pretrial release and, accordingly, has violated the conditions of his release. That violation triggers a statutory presumption that no conditions or combination of release conditions will assure the safety of the community and of others. *See* 18 U.S.C. § 3148(a)-(c). The government therefore requests that the Court promptly schedule the hearing called for by the statute to determine Manafort's release status. *See id.* § 3148(b).[1]

---

[1] By minute order entered on May 31, 2018, the Court granted the government leave to file a supplemental response to Manafort's motion to reconsider the conditions of his release (Doc. 291). The government submits this motion as its supplemental response to avoid any question about the Court's authority to revoke the release Order under Section 3148. *Cf. United States v. Koumbairia*, No. 07-cr-61, 2007 WL 1307909, at *2 (D.D.C. May 3, 2007) (noting that the "question of whether a revocation proceeding could be initiated without . . . a written government motion remained unresolved").

### A. Factual Background

1.  *Manafort Was Released To Home Confinement Subject To The Standard Condition That He Not Commit Any Federal, State, Or Local Crime*

On October 27, 2017, Manafort was first indicted by a grand jury in this District on nine counts, including conspiracy to defraud and commit offenses against the United States, conspiracy to launder money, failure to file reports of foreign bank accounts, making false and misleading statements, and acting as an unregistered agent of a foreign principal.  The charges included allegations that Manafort lied to a wide array of people to carry out the charged crimes.  Doc. 13. On October 30, 2017, Manafort was permitted to surrender to the government after providing his passport to the FBI.  Following his arraignment, Manafort was, upon the parties' consent, ordered released to the Pretrial Service Agency's high-intensity supervision program and subject to the condition of home confinement and a $10 million bond.  *See* Doc. 9; 10/30/2017 Tr. 19.  The order releasing Manafort to home confinement, which Manafort signed, informed him that he was "not to commit any criminal offense nor violate any condition of this release order – a rearrest for any offense based upon probable cause may be grounds for revoking your release."  Doc. 9 at 2.

Since Manafort was released into the high-intensity supervision program, his conditions of release have been the subject of repeated motions concerning the security necessary to release him from home detention.  *See, e.g.*, Doc. 32, 66, 153, 182, and 229.  None of those motions has altered the basic requirement that Manafort not commit a federal, state, or local crime during the period of his release.  *Cf.* 18 U.S.C. § 3142(b) (providing that, even when a defendant is released "on personal recognizance," release is "subject to the condition that the person not commit a Federal, State, or local crime").

For instance, on November 4, 2017, Manafort moved this Court to modify his conditions of release to permit, among other things, travel within the District of Columbia and the states of

Florida, New York, and Virginia.  Doc. 32.  On November 6, the Court held a hearing on the

motion and found that release on Manafort's personal recognizance with an unsecured appearance

bond would not reasonably assure his appearance.  11/6/2017 Tr. 24:25-25:5.  On December 15,

2017, the Court further ordered that Manafort would, upon the satisfactory posting of a sufficient

bond and the fulfillment of various other conditions, be released from home confinement and

permitted to travel within a limited geographic area around his residence.  *See* Doc. 95; *see also*

12/11/17 Tr. 15:14-16:9 (noting that the Court was prepared to modify the condition of home

confinement but "required financial information that would satisfy . . . the two applicable

conditions under the Bail Reform Act").  Manafort's inability to satisfy the financial conditions

necessary to ensure his release have, to date, prevented him from securing the modification he

seeks.   Like the October 30 Order, the Court's December 15 Order provided that Manafort's

pretrial release must, in accordance with the Bail Reform Act, be "subject to the condition that

[he] not commit a Federal, State, or local crime."  Doc. 95 at 1 (quoting 18 U.S.C. § 3142(c)); *see*

*also* Doc. 95 at 2 (determining, as a necessary condition of release, that "Defendant must not

commit any federal, state, or local crime").

     2.  *Manafort's Attempts to Influence Potential Witnesses*

On February 23, 2018, the grand jury returned the operative Superseding Indictment of

Manafort.  Doc. 202.  As relevant here, the Superseding Indictment included new allegations

concerning a part of Manafort's lobbying scheme that is alleged to have violated the Foreign

Agents Registration Act (FARA), 22 U.S.C. § 611 *et seq.*  Informally referred to by Manafort and

his co-conspirators as the "Hapsburg" group, this part of the charged illegal United States lobbying

scheme involved the secret retention of a group of former senior European politicians who would

act as third-party paid lobbyists for Ukraine.  Manafort was alleged to have funneled to the

Hapsburg group more than 2 million euros from overseas accounts he controlled.  *See* Superseding

Indictment ¶¶ 30–31.

Two individuals who were principals of a public-relations company (Company D) acted as

intermediaries between Manafort, Person A, co-defendant Richard Gates, and the Hapsburg group.

Those two individuals are described herein as Persons D1 and D2.  Manafort, with the assistance

of Person A and Gates, managed the work of Persons D1 and D2 on behalf of Ukraine (along with

the work of Companies A, B, and C, and others).[2]

Persons D1 and D2's work for Manafort, which included their work directing the Hapsburg

group, was—from its inception—directed at both the United States and Europe.  Manafort himself

wrote a June 25, 2011 memorandum to Person D1 describing the goals and deliverables of Persons

D1 and D2's work for Ukraine.  Manafort stated that a "goal of the program . . . is to educate

western media, expand the media awareness of what is really happening and establish mechanisms

to maintain a constant flow of information into Europe and the US," including "Washington."

Domin Decl. ¶ 6.  Similarly, Manafort noted in a "conference call agenda" that one deliverable of

Persons D1 and D2's work would be "Print/electronic media coverage in European [sic] and US,"

and that Ukraine's contract with Persons D1 and D2's company would "cover the EU and the US."

*Id.*

Pursuant to Persons D1 and D2's scope of work—and in coordination with Manafort,

Person A, Persons D1 and D2, and others—the Hapsburg group directly lobbied and conducted

public-relations work in the United States.  For example, in September 2012, Manafort and Gates,

---

[2] The references to anonymized companies and individuals in this motion mirror those used in the Superseding Indictment (*e.g.*, Doc. 202 ¶¶ 24, 29, 31) and in other pleadings in this and related cases.  *See, e.g.*, Gov't Sent. Mem. at 2, *United States v. van der Zwaan*, No. 1:18-cr-31 (D.D.C. March 27, 2017) (Doc. 19).

with the assistance of Persons D1 and D2, arranged for members of the Hapsburg group to contact United States senators directly to lobby on behalf of Ukraine in connection with the Senate's potential condemnation of the imprisonment of Yulia Tymoshenko.  Domin Decl. ¶ 9.  In addition, in early 2013, Manafort and Gates arranged for members of the Hapsburg group to meet with members of Congress and their staffs.  Manafort and Gates further directed Persons D1 and D2 to draft an op-ed in the name of one of the members of the Hapsburg group, and arranged for its placement in *The Hill*—a newspaper published in Washington, D.C—at or around the time that the member of the Hapsburg group was in the United States.  *Id.* ¶ 10.  Persons D1 and D2 did the same with respect to another op-ed by a member of the Hapsburg group placed in *The New York Times* in January 2014.  *Id.* ¶ 12.

Following the public disclosure of the February 23 Superseding Indictment, Manafort and Person A—who is a longtime associate of Manafort's—repeatedly contacted Persons D1 and D2 in an effort to secure materially false testimony concerning the activities of the Hapsburg group. Neither Person D1 nor D2 had had any recent contact with Manafort or Person A.  But after the Superseding Indictment was publicly disclosed, Manafort called Person D1 on Persons D1's cellular phone.  Person D1 sought to avoid Manafort, so Person D1 ended the call.  Domin Decl. ¶¶ 14, 20.

The day after the Superseding Indictment was made public, Manafort also sent Person D1 a text message on an encrypted application, stating "This is paul."  Domin Decl. ¶ 14.[3]  Two days later, on February 26, 2018, Manafort used the same encrypted application to send Person D1 a news article describing the Superseding Indictment's allegations concerning the Hapsburg group,

---

[3] Persons D1 and D2 both preserved the messages they received from Manafort and Person A, which were sent on encrypted applications, and have provided them to the government. Domin Decl. ¶ 12 n.1

which included the statement that "two European politicians were secretly paid around €2 million by Manafort in order to 'take positions favorable to Ukraine, including by lobbying in the United States.'"[4]   One minute after sending the news article, Manafort wrote: "We should talk. I have made clear that they worked in Europe."   Domin Decl. ¶ 15.   Toll records for one of Manafort's phones indicate that Manafort had a short call with Person D1 on February 24, 2018, and that Manafort attempted to call Person D1 again on February 25 and 27, 2018.   *Id.* ¶ 14.

As noted in Special Agent Domin's declaration, Person D1 has told the government that he understood Manafort's outreach to be an effort to "suborn perjury," because Person D1 knew that the Hapsburg group worked in the United States—not just Europe.   Domin Decl. ¶ 19.

In an effort to connect Manafort with Person D1, Person A reached out to Person D2, a longtime partner of Person D1.   On February 28, five days after the Superseding Indictment, Person A attempted to contact Person D2 via an encrypted messaging application.   Person A wrote: "My friend P is trying to reach [Person D1] to brief him on what's going on."   Domin Decl. ¶ 17. Two minutes later, Person A added: "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU."   *Id.*   Approximately five hours later, Person A switched to another encrypted application and sent a similar series of messages to Person D2, including a message relaying Manafort's "summary" that the Hapsburg group never lobbied in the United States.   *Id.*

The February 2018 messages were not Person A's only efforts to put Manafort in contact with Persons D1 and D2.   In April 2018, Person A reached out to Person D1, relaying the message:

---

[4] Michael Kranz, *Former European leaders struggle to explain themselves after Mueller claims Paul Manafort paid them to lobby for Ukraine*, Business Insider (Feb. 25, 2018), available at    http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T

6

"My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that."  Domin Decl. ¶ 18.  Person A contacted Person D2 via two encrypted applications the same day, reiterating his need for help in connecting Person D1 with Manafort.  Person A added in his final text to Person D2: "I tried him [*i.e.*, Person D1] on all numbers."  *Id.*[5]

Like Person D1, Person D2 understood that Manafort and Person A were reaching out to him and Person D1 in an effort to influence the testimony of potential witnesses.  Domin Decl. ¶ 19, 20.  Person D2 explained that he and Person D1 had been responsible for interfacing with the Hapsburg group, and acted as "intermediaries" between Manafort and Ukraine government officials and the Hapsburg group.  *Id.* ¶ 20.  Person D2 further stated his opinion that Manafort and Person A's outreach to him and Person D1 was an effort to get them to relay a message to the Hapsburg group: if the members of the Hapsburg group were contacted by anyone, they should say that their lobbying and public relations work was exclusively in Europe—a representation that would be contrary to Person D's knowledge that the Hapsburg group worked in both Europe and the United States.  *Id.* ¶ 19, 20.

## B.  Legal Standard

"The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, permits the revocation of release and an order of detention for a person who has been released under 18 U.S.C. § 3142 and has violated a condition of that release."  *United States v. Addison*, 984 F. Supp. 1, 2 (D.D.C. 1997).  As relevant here, an "attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court."  18 U.S.C. § 3148(b).  Section 3148 further provides that the judicial officer hearing the motion:

> shall enter an order of revocation and detention if, after a hearing, the judicial

---

[5] A chart summarizing the contacts and attempted contacts discussed in this motion is attached to Special Agent Domin's Declaration as Exhibit N.

officer—

(1) finds that there is—

(A) *probable cause to believe that the person has committed a Federal, State, or local crime while on release*; or

(B) clear and convincing evidence that the person has violated any other condition of release;  and

(2) finds that--

(A) based on the factors set forth in [18 U.S.C. § 3142(g)], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

(B) the person is unlikely to abide by any condition or combination of conditions of release.

*Id.* (emphasis added).

The government's motion here is based on Section 3148(b)(1)(A), which requires "probable cause to believe" that Manafort has committed (as pertinent here) a federal "crime while on release."  The probable-cause standard is not an onerous one.  As the Second Circuit explained in an analogous case, "[p]robable cause under § 3148(b)(1)(A) requires only a practical probability that the evidence supports a finding that the defendant has committed a crime while on bail." *United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000) (internal quotation marks, citation, and ellipses omitted); *accord, e.g.*, *United States v. Aron*, 904 F.2d 221, 224 (5th Cir. 1990) ("[T]o satisfy the probable cause requirement of § 3148(b)(1)(A), the facts available to the judicial officer must warrant a man of reasonable caution in the belief that the defendant has committed a crime while on bail.") (internal quotation marks omitted).

Notably, once a court finds probable cause to believe that the defendant committed a crime while on release, "a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the

community."  18 U.S.C. § 3148(b).  If the defendant rebuts that presumption and a court finds "that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions," then the court "shall treat the person in accordance with the provisions of [18 U.S.C. § 3142] and may amend the conditions of release accordingly."  *Id.*; *see United States v. McKethan*, 602 F. Supp. 719, 722 (D.D.C. 1985) (explaining that, where the government seeks detention "based upon a charge that a defendant has committed a felony while on release, § 3142 does not come into play unless and until the judicial officer finds under § 3148(b)(2)(B) that the defendant has overcome the statutory rebuttable presumption").  Nonetheless, the statutory "presumption does not disappear once the defendant has produced some rebuttal evidence, but continues to be weighed along with other factors."  *LaFontaine*, 210 F.3d at 130 (quotation marks omitted).

## C. The Defendant Has Violated The Release Condition That He Not Commit Any Federal Crime

The facts set forth above and in Special Agent Domin's Declaration establish probable cause to believe that Manafort has violated his conditions of release by attempting to tamper with witnesses, in violation of 18 U.S.C. § 1512(b)(1).  A violation based on commission of a federal crime triggers the statutory presumption in favor of detention.

1. Section 1512(b)(1) proscribes "knowingly . . . corruptly persuad[ing]" or "attempt[ing] to" corruptly persuade another person "with intent to . . . influence . . . the testimony of any person in an official proceeding."  18 U.S.C. § 1512(b)(1).[6]  As relevant here, the statute's plain language

---

[6] Section 1512(b)(1) provides in full:

(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

reaches "non-coercive attempts to tamper with witnesses," *United States v. Khatami*, 280 F.3d 907, 912 (9th Cir. 2002), including attempts "to persuade a witness to give false testimony," *United States v. Cruzado-Laureano*, 404 F.3d 470, 487 (1st Cir. 2005).  *See also United States v. Baldridge*, 559 F.3d 1126, 1142 (10th Cir.) ("All circuits that have considered the issue have" held "that a non-coercive attempt to persuade a witness to lie to investigators constitutes a violation of § 1512(b)."), *cert. denied*, 556 U.S. 1226 (2009).

That straightforward construction of the statute—that Section 1512(b)(1) reaches non-coercive witness tampering—is borne out by the D.C. Circuit's decisions applying the statute.  In *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), for example, the court affirmed the conviction of a defendant who had tried to corrupt a witness "by exhorting her to violate her legal duty to testify truthfully in court," an effort that the witness understood as a request that she "'perjure' herself." *Id.* at 630.  More recently, the defendant in *United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006), was charged with conspiracy and other offenses arising from his role in financial malfeasance at a credit union.  After his arrest, the defendant and another credit-union employee attempted to persuade a witness to sign an affidavit falsely stating that the witness had authorized money to be transferred from her account. *Id.* at 154.  The D.C. Circuit upheld Gurr's conviction under Section 1512(b)(1), rejecting his argument that the evidence was insufficient "because there was no evidence of cooperation between Gurr and the other credit union employee and no evidence that the witness was intimidated or threatened." *Id.*  The court explained that Gurr

---

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

* * *

shall be fined under this title or imprisoned not more than 20 years, or both.

"was not charged with intimidating or threatening [the witness], and the jury could reasonably find that Gurr, with the assistance of [the other employee], attempted to 'corruptly persuade [ ]' [the witness] in order to influence her testimony by having her sign a false affidavit." *Id.*

In support of its conclusion, the court in *Gurr* cited with approval several out-of-circuit decisions involving non-coercive efforts to influence witness testimony that are similar to Manafort's conduct here.  For example, *United States v. LaShay*, 417 F.3d 715 (7th Cir. 2005), involved a gas station employee's efforts to convince a co-worker to lie for him about a $2,000 check that the defendant had received from the gas station's owner.  The court in *LaShay* followed decisions of the Second Circuit holding that "corrupt" persuasion occurs (1) "where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it," and (2) where a "defendant trie[s] to persuade a witness to give a false account that tracked the defendant's position."  *Id.* at 718 (quoting, respectively, *United States v. Gabriel*, 125 F.3d 89, 102 (2d Cir. 1997), and *LaFontaine*, *supra*, 210 F.3d at 132).  Applying those principles to the facts before it, the Seventh Circuit affirmed the employee's Section 1512 conviction, concluding that "[a] jury could properly view LaShay's remarks [to his co-worker] as an unstated invitation to lie." *Id.* at 719.

In *LaFontaine*, one of the Second Circuit decisions discussed in *LaShay*, the district court revoked the bail of a defendant who had tampered with a witness after her indictment.  *See* 210 F.3d at 128-33.  The defendant there participated in a fraudulent-billing scheme in which her health clinic performed cosmetic surgeries for patients but billed them out as necessary procedures to obtain insurance payments.  After her arrest in the scheme, the defendant was recorded on a jail call "reminding" a relative and former employee (Reyes) that Reyes' mother had undergone the procedures listed on the clinics' false bills.  When she was released from custody, the defendant

11

then met with Reyes several times, including one occasion on which the defendant played for Reyes a recording of the jail call "reminder" about her mother's surgeries.  The Second Circuit upheld the decision revoking the defendant's bail, concluding that her "attempt to review the 'facts' that would likely become part of Reyes['s] trial testimony . . . satisf[ies] the requirements of the witness tampering statute and, consequently, of the bail revocation statute."  *Id.* at 133.  In so concluding, the court rejected the defendant's argument that the jail call did "not show any threats or intimidation of Reyes," explaining that Section 1512(b)(1) "plainly does not require 'physical force' or 'threats' to support a tampering charge; corrupt influence is sufficient."  *Id.*

Finally, the First Circuit's decision in *Cruzado*, *supra*, involved a corrupt mayor who extorted money and kickbacks from local businesses and, after learning of the investigation, pressured various individuals to conform their stories to his.  The First Circuit characterized Cruzado's challenge to the sufficiency of the evidence as "simple: all he did was urge witnesses to tell the truth, which is not a crime."  404 F.3d at 487.  But the court rejected that challenge. While "Cruzado did ask that [witnesses] tell the truth," the court explained, "his version of 'the truth' that he urged upon them was anything but the truth."  *Id.*  The jury could therefore find that Cruzado was trying to persuade witnesses to testify to something other than their true beliefs, which was sufficient to support his Section 1512(b)(1) convictions.  *Id.*

2.   Under these decisions, the evidence recited above and in Special Agent Domin's Declaration establishes probable cause to believe that Manafort violated Section 1512(b)(1) by attempting to persuade Persons D1 and D2—both directly and through an intermediary—to support a materially false narrative in connection with the charges in the Superseding Indictment.

The string of communications with Persons D1 and D2 establishes a violation of Section 1512(b)(1) under the probable-cause standard.  Manafort sent Person D1 a news article

that reported on allegations in the recent Superseding Indictment that members of the Hapsburg group performed lobbying and public-relations work in the United States, not just in Europe, which is a key difference for purposes of liability under FARA. *See* 22 U.S.C. § 611(c)(1) (defining "agent of a foreign principal" as a person who, as relevant here, engages in various acts "within the United States"). Manafort then messaged Person D1 that he had "made clear that" the Hapsburg group "worked in Europe," a message that Person D1 reasonably understood to embody one form of corrupt persuasion criminalized by Section 1512(b)(1)—*viz.*, an attempt "to persuade a witness to give a false account that track[s] the defendant's position." *LaShay*, 417 F.3d at 718. Indeed, Person D1's understanding of the message as an effort to "suborn perjury" is itself a strong indication that Manafort acted both "corruptly" and with the intent to "influence" a third party's testimony, as required by Section 1512(b)(1). *See, e.g.*, *Morrison*, 98 F.3d at 629–30 (affirming Section 1512 conviction where witness understood defendant's request to provide false testimony as asking her "to 'perjure' herself").

Person A's outreach to Person D2 on behalf of Manafort is equally probative of a Section 1512(b)(1) violation. As described in Special Agent Domin's Declaration, Person D2 perceived Person A's series of messages as an effort by Manafort to influence the accounts of potential witnesses in his case about the nature of the work performed behalf of Ukraine. At the very least, Person A's statements and Person D2's description of them establish "a practical probability that the evidence supports a finding that the defendant has committed a crime while on bail." *LaFontaine*, 210 F.3d at 133.

As an initial matter, the content and context of Person A's messages indicate that Person A was reaching out to Person D2 at Manafort's request. That much is evident from Person A's initial message to Person D2 that Manafort was "trying to reach [Person D1] to brief him on what's going

on."  It would strain credulity to suggest that Person A—a close confidant of Manafort for years—undertook that outreach without Manafort's knowledge and approval, especially given the timing of the messages (they followed closely on the heels of Manafort's own outreach to Person D1, after a lengthy hiatus with no communications with Persons D1 or D2), their content (they sought to arrange a communication with Manafort), and the person with an overriding legal interest in the communication (Manafort).   The inference that Person A acted on Manafort's behalf is all the more reasonable in light of evidence already before this Court demonstrating that Manafort and Person A coordinated in connection with an op-ed that appeared in the *Kyiv Post* during Manafort's home confinement.  *See* Decl. of Special Agent Brock W. Domin, Doc. 123, Exs. A & B (Dec. 8, 2017).

Furthermore, the story that Person A conveyed to Person D2 was, like the message Manafort conveyed to Person D1, false.  Person A wrote: "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU."  Domin Decl. ¶ 17.  As explained above, that description of the geographic reach of the Hapsburg group's activities is both false and central to the applicability of FARA to Manafort's "Hapsburg group" scheme.  Person A's message is thus a "false story" conveyed "as if the story were true," *LaShay*, 417 F.3d at 718, and an attempt "to persuade a witness to give a false account that tracked the defendant's position," *id.*  *See also Cruzado*, 404 F.3d at 487 (affirming Section 1512(b) conviction where, although the defendant asked witnesses to "tell the truth," the "version of 'the truth' that he urged upon them was anything but the truth").  Person A's message consequently amounts to an attempt to corruptly persuade a witness proscribed by Section 1512(b)(1).

It is no defense that Manafort conveyed messages to Person D2 through an intermediary. Section 1512(b)(1)'s language is sufficiently expansive to reach acts designed "to influence testimony at a proceeding by corruptly persuading [one] person *through another*." *United States v. Norris*, 753 F. Supp. 2d 492, 505 (E.D. Pa. 2010) (emphasis added); *see also United States v. Amato*, 86 F. App'x 447, 450 (2d Cir. 2004) (unpublished) (upholding Section 1512 conviction where the defendant believed a third party was cooperating against him, the defendant was concerned the third party would testify against him at trial, and the "defendant directed intermediaries" to reach out to the third party and deliver a message).  And even if Section 1512 alone did not reach corrupt persuasion accomplished through intermediaries, 18 U.S.C. § 2 makes it a crime both to cause an unwitting third party to corruptly persuade a potential witness and to aid and abet a complicit party in committing corrupt persuasion.

In sum, the government's evidence establishes probable cause that Manafort violated the witness-tampering statute both through his direct outreach to Person D1 and his intermediary's outreaches to Persons D1 and D2.  As a result, Manafort violated the condition of release requiring that he not commit any federal, state, or local crime.  *See LaFontaine*, 210 F.3d at 133.

3.  A finding of probable cause to believe that Manafort violated his conditions of release by committing the federal crime of witness tampering triggers the statutory presumption that no condition or combination of conditions can assure that Manafort "will not pose a danger to the safety of any other person or the community."  18 U.S.C. § 3148(b); *see United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989) (explaining that "[o]nce the presumption arises, the ball is in the defendant's court, and it is incumbent on the defendant to come forward with some evidence to rebut the presumption.") (internal citation omitted).  And with respect to "danger to . . . the community," courts have recognized that a defendant's "attempts to influence the testimony of"

potential witnesses "constitute the type of danger to the community that [can] support detention." *LaFontaine*, 210 F.3d at 135; *see, e.g.*, *United States v. Gilley*, 771 F. Supp. 2d 1301, 1308 (M.D. Ala. 2011) (explaining that a probable-cause finding that a defendant engaged in witness tampering goes to "the very integrity of [the court's] own processes and the fair administration of justice," and implicates "not only the singular concern of keeping a defendant from engaging in illegal conduct, but also the public concern of encouraging all witnesses and all potential witnesses to come forward and provide information helpful to the implementation of justice") (internal brackets and quotation marks omitted).

The Second Circuit's decision in *LaFontaine*, *supra*, is instructive.  The fraud defendant there argued that she posed no danger to the community because, unlike in other witness-tampering cases, she was "a white-collar criminal with no connection to the mob . . . or to narcotics," and the evidence showed at most that she "persistently 'fed' [a witness] false testimony with the expectation that [the witness] would adopt it."  210 F.3d at 134.  The Second Circuit rejected that argument.  It explained that "obstruction of justice ha[d] been a traditional ground for pretrial detention by the courts, even" before the Bail Reform Act of 1984 made "dangerousness" a basis for detention.  *Id.*; *see id.* (stating that "pretrial trial detention [i]s even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness").  And although the court acknowledged that "witness tampering that is accomplished by means of violence may seem more egregious," it concluded that "the harm to the integrity of the trial is the same no matter which form the tampering takes."  *Id.* at 135.  The court therefore affirmed the district court's conclusion that the defendant "posed a danger to the community," *id.* at 134, and that revocation was warranted under Section 3148(b), *id.* at 135.

16

Revocation of the terms of the current Order is appropriate here for many of the same reasons.  Manafort's efforts to influence the testimony of potential witnesses, both directly and through an intermediary, threaten "the integrity of the trial" even though those efforts have not been violent in nature and the underlying prosecution involves "white-collar" offenses rather than "narcotics" or violent crimes.  *See LaFontaine*, 210 F.3d at 134.  At the same time, Manafort's obstructive conduct—carried out at a time when he was seeking relief from his current conditions of release—instills little confidence that restrictions short of detention will assure Manafort's compliance with the Court's orders and prevent him from committing further crimes.  To the contrary, that conduct is strong evidence that Manafort is conscious of his guilt of the FARA allegations added in the Superseding Indictment and that he has a greater incentive to flee than this Court (and another) already found him to possess in connection with the earlier indictments. *See* 11/6/2017 Tr. 24-25 (citing Manafort's "risk of flight" as one factor weighing against release on personal recognizance); Doc. 25 at 2, *United States v. Manafort*, No. 1:18-cr-63 (E.D. Va. March 9, 2018) (finding that Manafort "poses a substantial risk of flight").

## CONCLUSION

For the foregoing reasons, the government moves the Court to conduct a hearing pursuant to 18 U.S.C. § 3148(b) and to revoke or revise its current Order authorizing Manafort's release to the Pretrial Services Agency's high-intensity supervision program.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: June 4, 2018      By:      */s/ Andrew Weissmann*  _____
Andrew Weissmann
Greg D. Andres (D.D.C. Bar No. 459221)
Scott A.C. Meisler
Brian M. Richardson
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 616-0800

*Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **PAUL J. MANAFORT, JR.,** | **Crim. No. 17-201-1 (ABJ)** |
| **Defendant.** | |

## <u>ORDER</u>

This matter having come before the Court pursuant to the government's motion to revoke or revise the Court's Order releasing defendant Paul J. Manafort, Jr., to the Pretrial Services Agency's high-intensity supervision program, it is hereby

ORDERED that a hearing on the government's motion shall be held on [DATE] at [TIME]; and it is further

ORDERED that the parties shall be prepared to address at the hearing whether probable cause exists to believe that Manafort has violated a condition of his release by committing a federal crime and, if so, whether the Court's release order should be revoked or revised.

_____                    _____
Date                                                             HON. AMY BERMAN JACKSON
                                                                      UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PAUL J. MANAFORT, JR.,<br><br>Defendant. | Crim. No. 17-201-1 (ABJ) |

DECLARATION IN SUPPORT OF THE GOVERNMENT'S
MOTION TO REVOKE OR REVISE DEFENDANT PAUL J. MANAFORT, JR.'S
CURRENT ORDER OF PRETRIAL RELEASE

I, Brock W. Domin, hereby state as follows:

A. **Affiant**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") working directly with the Special Counsel's Office.  I have been a Special Agent with the FBI since 2015.  I have training and experience related to national security investigations, as well as federal financial crimes.  Prior to my employment with the FBI, I spent seven years in the software industry and have extensive experience working with computer technology.

2.      I make this declaration in support of the government's motion to revoke or revise the release order of defendant Paul J. Manafort, Jr., pursuant to 18 U.S.C. § 3148.  This declaration is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement personnel, and my training and experience.  Where the contents of documents or the statements and conversations of others are reported herein, they are reported in substance and in pertinent part, except where otherwise indicated.

B. **The "Hapsburg" Group**

3.     As part of its ongoing investigation, the government identified a public-relations firm—called, along with its successor, "Company D" in what follows—and two principals at that firm (Persons "D1" and "D2") who communicated with Manafort, Gates, and Person A regarding the lobbying scheme described in the Superseding Indictment.  Persons D1 and D2's work with Manafort, Gates, and Person A encompassed lobbying work on behalf of the Ukrainian government, which included the lobbying work by the Hapsburg group members.  Persons D1 and D2 also communicated with individual(s) at Law Firm A, Company A, and Company B, and Ukrainian government personnel, among others, regarding Manafort's scheme to lobby on behalf of Ukraine in the United States.

4.     As referenced in the Superseding Indictment, in late 2011, Manafort, with Person D1, developed what became the "Hapsburg group."  Manafort proposed the project to the Ukrainian government in the "Eyes Only" memorandum excerpted in the Superseding Indictment. *See, e.g.*, Superseding Indictment of February 23, 2018 (Doc. 202), ¶ 31.

5.     Person D1 told the government that Manafort wanted the Hapsburg group to remain "under the radar," and that the Hapsburg group would speak as ostensible third-party endorsers on behalf of Ukraine, but the fact that they were paid millions of euros would be kept secret.  Manafort and Person D1 selected individuals who could be discreet.

6.     In or about June 2011, Manafort arranged a conference call with Person D1 to discuss the goals and deliverables of Company D's work.  Manafort then sent Person D1 a memorandum describing a "framework" for Company D's work: the "goal of the program . . . is to educate the western media, expand the media awareness of what is really happening and establish mechanisms to maintain a constant flow of information into Europe and the US,"

2

including "Washington."   Manafort's agenda for the conference call proposed a contract that would "cover the EU and the US."   And, indeed, a contract sent by Person A to Person D1 regarding Company D's work described a "campaign . . . aimed at media, decision-makers, think[] tanks and business and political leaders in Europe and the United States."  The contract included, as "agreed deliverables," work on "Print/electronic media coverage in Europe and US."  A copy of Manafort's e-mail regarding the June 2011 conference call is attached hereto as Exhibit A, and a copy of the contract is attached hereto as Exhibit B.

7.      In or about June 2012, Person D1 wrote a memorandum to Manafort describing a group of "Third-Party Champions on Ukraine," which Person D1 described as a "small chorus of high-level European third-party endorsers and politically credible friends who can act informally and without a formal government relationship . . . ."  In this memorandum, Person D1 described a phone call with a former senior politician who would eventually become the head of the Hapsburg group, during which the former politician embraced the "idea of what he called 'underground commenting.'"  Person D1's memorandum to Manafort is attached hereto as Exhibit C.

8.      As alleged, the government has developed substantial evidence showing that the Hapsburg group performed a variety of lobbying tasks in the United States.  That work included, among other things, the dissemination of ghostwritten articles in the American press and the arrangement of meetings with politicians in the legislative branch and members of the Executive Branch (in coordination with Companies A and B).

9.      As one example of the Hapsburg group's lobbying directed towards the United States, in September 2012, members of the Senate Foreign Relations Committee were considering a resolution condemning as "politically motivated" the prosecution of Yulia Tymoshenko. Manafort and Gates, with the assistance of Persons D1 and D2, arranged for members of the

Hapsburg group to lobby United States senators on behalf of Ukraine.  Manafort emphasized that one of the senators should be made aware that one member of the Hapsburg group was a "representative of the President of the [European Parliament]," but did not disclose that that member was a paid lobbyist for Ukraine.  A copy of the correspondence memorializing the Ministry of Foreign Affairs's instructions, Manafort's guidance, and outreach to senators is attached hereto as Exhibit D.

10.    As another example, in early 2013, Manafort, Gates, and Persons D1 and D2 arranged for members of the Hapsburg group to meet with politicians and others in Washington, D.C.  In connection with one member's visit to Washington, D.C., Gates and others arranged for the member of the Hapsburg group to submit an op-ed to *The Hill*.  *See* Ex. E.  Persons D1 and D2 drafted the op-ed, and redrafted it after receiving Manafort's direction that it not appear "too partisan" for the Hapsburg group member.  Once satisfied with the piece, Manafort noted that it was "[a]lmost a waste not to use this on the FT, NYT, WSJ, WP, caliber newspapers."  *See* Ex. F. The article was placed in *The Hill*, a newspaper and website published in Washington, D.C., on March 4, 2013.

11.    In connection with another member of the Hapsburg group's trip to Washington in early 2013, Gates and Manafort communicated with Persons D1 and D2 regarding the trip.  Gates sent Manafort an agenda memorializing the member's scheduled meetings with senators, congressmen, and members of their staffs.  That agenda is attached hereto as Exhibit G.  As explained by an employee of Company B to an embassy employee making border entry arrangements, the Hapsburg group member would "be traveling to Washington, DC next week" and would "be meeting with US Government officials and Members of Congress."  *See* Ex. H. Person D2 told the government that he attended the meetings in Washington, D.C. with the member

of the Hapsburg group and members of Congress, among others.  Person D2 further stated that after the meetings with United States government officials, the member of the Hapsburg group, Person D2, and Manafort met at the Willard Hotel for drinks.  After the member of the Hapsburg group left, Person D2 and Manafort remained at the hotel and discussed how the meetings had gone.  Manafort reported that he had received positive feedback regarding the meetings from a "backchannel" source, and, in Person D2's view, Manafort was happy with the results.

12.     As a final example, when an editorial regarding Ukraine appeared in *The New York Times* in January 2014, Gates forwarded the article to Persons D1 and D2 with instructions that a member of the Hapsburg group should write a "response."  *See* Ex. I.  Persons D1 and D2 drafted an op-ed on behalf of one of the members of the Hapsburg group, *see* Ex. J, Gates offered comments, *see* Ex. K, and the op-ed ran in *The New York Times* in or around February 2014, *see* Ex. L.

### C.  Efforts to Contact Persons D1 and D2

13.     Documents produced by Persons D1 and D2, statements made by Persons D1 and D2 to the government, telephone records obtained by the government, and documents recovered pursuant to a court-authorized search of Manafort's iCloud account evidence that Manafort, while on bail from this Court, and with the assistance of Person A, contacted and attempted to contact Persons D1 and D2 in an effort to influence their testimony and to otherwise conceal evidence. The investigation into this matter is ongoing.[1]

14.     On February 24, 2018—the day after Gates pleaded guilty—Manafort sent Person D1 the message "This is paul."  Manafort's toll records for his cell phone indicate that he called a number associated with Person D1 the same day, and that the two had a call lasting 1 minute and

---

[1] Persons D1 and D2 provided the content of the text messages described below in May 2018.

24 seconds.  On February 25 and 27, 2018, Manafort attempted to call another phone number associated with Person D1, but did not connect.  Person D1 told the government that in or around this period, Manafort called Person D1, and that the two had not spoken since July of the previous year.  Person D1 stated that after answering the call and after the caller identified himself as Manafort, Manafort stated that he wanted to give Person D1 a heads-up about Hapsburg.  Person D1 immediately ended the call because he was concerned about the outreach.

15.    On February 26, 2018, Manafort sent Person D1 a series of messages using an encrypted application on his phone.  The messages read as follows:

- **23:56:** http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T
- **23:57:** We should talk. I have made clear that they worked in Europe.

The government confirmed that these messages were sent by Manafort, upon review of Manafort's iCloud account pursuant to a court-authorized search.  Information contained in Manafort's iCloud account further indicates that Manafort attempted to call Person D1 from the same encrypted application on February 27, 2018.

16.    The web address included in Manafort's "23:56" message contains an article describing the Superseding Indictment and its inclusion of allegations concerning the Hapsburg group and its work in the United States.  *See* Michael Kranz, *Former European leaders struggle to explain themselves after Mueller claims Paul Manafort paid them to lobby for Ukraine*, Business Insider (Feb. 25, 2018), *available at* http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T (attached hereto as Exhibit M) ("According to Mueller's indictment, two European politicians were secretly paid around €2 million by Manafort in order to 'take positions favorable to Ukraine, including by lobbying in the United States.'").

17.    On February 28, 2018, Person A separately contacted Person D2 via an encrypted messaging application.  Person D2 worked for years with Person D1, and was known to Manafort

and Person A as a key associate of Person D1.  Person D2 told the government that he worked on

press strategy for the Hapsburg group, and did work on behalf of Ukraine in the United States and

Europe.  Person A's texts to Person D2 read as follows:

- 01:49: [Person D2], hi! How are you? Hope you are doing fine. ;))
- 01:51: My friend P is trying to reach [Person D1] to brief him on what's going on.
- 01:51: If you have a chance to mention this to [Person D1] - would be great.
- 01:53: Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU

Approximately four hours later, Person A switched to another encrypted application and sent a

similar series of messages to Person D2.

18.     Approximately one month later, Person A reached out to Person D1 directly as well.

On April 4, 2018, Person A sent a message to Person D1: "Hi. This is [Person A's first initial]. My

friend P is looking for ways to connect to you to pass you several messages. Can we arrange that."

Person A reached out to Person D2 the same day, and reiterated his need for help in connecting

Person D1 with Manafort.  Person A added in his text to Person D2: "I tried him [*i.e.*, Person D1]

on all numbers."  A timeline summarizing the above-described communications is attached hereto

as Exhibit N.

19.     Person D1 told the government that Person D1 understood Manafort's messages to

be an effort to "suborn perjury" by influencing Person D1's potential statements.  Person D1 well

knew and believed from frequent interactions with its members that the Hapsburg group in fact

lobbied in the United States, and that Manafort and Person A knew that fact.

20.     Person D2 told the government that Person D1 had also told him that Manafort had

called Person D1 to discuss the new indictment, but that Person D1 abruptly ended the call.  Person

D2 further stated that he received the messages from Person A "out of the blue," but did not open

them at the time for fear of alerting Person A that he had read them.  (Person D2 could, however,

read the first few lines of each message in the preview screen of the electronic application.) Person D2 stated that, in his opinion, Manafort and Person A were reaching out to him and Person D1 because Company D "owned" the Hapsburg group and served as intermediaries between Manafort, Gates, and Person A, on the one hand, and the Hapsburg group on the other. Person D2 further stated that he understood Manafort and Person A's outreach to him and Person D1 to be an effort to get at least Person D1 to relay a message to the members of the Hapsburg group: if the members of the Hapsburg group were contacted by anyone, they should say their lobbying and public-relations work was exclusively in Europe. Person D2 stated to the government that the Hapsburg group worked in Europe and in the United States, and that he understood that one of the goals of the Hapsburg group was to lobby in the United States.

Respectfully submitted,

_6/4/2018_
Date

Brock W. Domin
Special Agent
Federal Bureau of Investigation

# EXHIBIT A

From: Person D1
Sent: Sunday, June 26, 2011, 7:47 AM
To: ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ D2
Person D2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; Paul Manafort
<pmanafort@▮▮▮▮▮ >
Subject: Fwd: Conf Call
Attachments: ▮▮▮ Conf Call Agenda 6-25-11.docx

Begin forwarded message:

**From:** "Paul Manafort" <pmanafort@▮▮▮▮▮▮ >
**Date:** June 26, 2011 1:11:51 PM GMT+02:00
**To:** Person D1
**Subject: Conf Call**

D1

These times can work for me. You can reach me on 631 ▮▮▮▮ at 9:00am.
You should set the conference call up for 9"30am. These are both NY times.
The parties on my side would be Person A ▮▮▮ and Rick Gates. You
can co-ordinate with Person A who will provide you with the details in
order that you might add them to the conference call that you are setting
up. Use the same 631 number for me on the conference call.
I am attaching the memo that comments on the revised goals, deliverables
and terms of reference. On the conference call we should focus on the
Goals and Deliverables. Once we  have those worked out, you and I can
finalize the contract terms.
Look forward to speaking with you tomorrow.
Best
Paul

On 6/26/11 3:44 AM, Person D1 ▮▮▮▮▮▮ wrote:

>Dear Paul,
>
>1. Were you able to open the link and see the broadcast?
>
>2. Best time for me on Monday is about  830 or 9 am your time for you and
>me to chat and about 9 or 930am your time for the conference call.
>
>Best
>
>D1

To:       Person D1
From:    Paul Manafort
Re:      Ukraine Communications Program – Conference Call Agenda
Date:    June 25, 2011

The purpose of this memorandum is to lay out a framework for our conference call that can result in a revised proposal by ▇

My objective would be to have a revised product from ▇ by June 30. This would then be the basis for a contract to be signed the week of July 4, assuming scope of work and budget are approved.

The ▇ proposal contains many services that might be desirable in a later contract. The initial contract needs to be more focused and specific in goals and deliverables.

Ukraine is looking for media coverage that focuses on what is happening in the country today. To date, most daily news media coverage is more "editorial" than objective in presentation. Reporters come to Ukraine with a bias that is not accurate and this bias is reflected in the subjects they pursue and the stories they file. Instead of reporting the changes occurring under Yanukovich, the western media usually focuses on what is not occurring or on negative stories promoted by former PM Tymoshenko.

The last 6 months of 2011 will see the implementation of reforms and the beginning of western investment of a serious nature. The EU DCFTA negotiations should be nearly complete during this same time. I expect that the IMF agreement will continue to be successfully implemented and important macro and fiscal reforms will be in place and ready to help modernize Ukraine's economy.

These are the stories that need to be told.

The goal of the program with ▇ is to educate the western media, expand the media awareness of what is really happening and establish mechanisms to maintain a constant flow of information into Europe and the US. Thus, the key objectives for the initial program center on building a new cadre of educated and knowledgeable reporters in western Europe, organizing a flow of information to Brussels and Washington, building a blog network that will be balanced in its commentary and interacting with current Ukrainian blogs to inject accurate information.

The first six months will be the foundation from which we will build a longer term communications strategy that will incorporate the other tools of the ▇ proposal. However, our initial focus should be on the print/electronic media and blogs that cover important current events. This coverage can be managed consistent with a strategy that I will provide to you that is the basis for the agenda of President Yanukovich.

As I indicated to you, the concept envisions that ▇ be an invisible participant in the early phase. We can discuss how to organize and manage this image, as well as we will cooperate practically on a day-to-day basis, in our conference call.

**CONFERENCE CALL AGENDA**

Goals
1. Promote the image of VY as a reformer and successful President
2. Promote reforms being implemented in Ukraine with focus on economic reforms, anti-corruption reforms and democratic reforms (new election law, Public documents law, etc). Compare Ukraine initiatives with western governments/NGO requirements.
3. Re-position Tymoshenko image in Europe from European democrat to populist, failed politician with little domestic support (squandered opportunities for reforms and democratic values), and someone that needs to be held accountable for her actions (in this context the criminal trial needs to be carefully explained)
4. Position VY vis-a-vis Russia (holding firm against Russian imperial aims for Ukraine) and Europe (committed to finalizing the agreements with EU to bring Ukraine into the European sphere)
5. Focus in on activity related to Ukraine's Independence Day – build media components around this day, which has profound meaning to Ukrainians.

Deliverables
1. Print/electronic media coverage in European and US. Establish system to provide information, educate reporters and generate more accurate news stories.
2. On-line media strategy – 24/7 focus (all goals and themes) - build and manage; interact with Ukrainian blogs;
3. World Business editorial news features (reforms/Ukraine and Europe/Russia)
4. Airline Distribution  (internal and external) - at least twice a month
5. Implementation plan with timeline (how it will work practically and logistically)

Contract
1. Role of ▮▮▮ as independent contractor.
2. Term - Six (6) month contract to roll-over to an additional twelve (12) month contract if not terminated by December 15, 2011
3. Contract to cover the EU and the US
4. Budget - It should be a fee-based contract, not project based. Initial budget should focus on the scope above and be much less expensive than presented in your full proposal.

# EXHIBIT B

From: Person D1 ████████████████
Sent: Thursday, July 21, 2011, 9:24 AM
To: ████████████████████████████; ████████
████████████████████████████ ██████████████
Cc: Person D2 ████████████████
████████████████████

Subject: Fwd: contract
Attachments: contract ███ 21 07 2011.doc; ATT660183.htm

---

THIS IS THE URGENT 30 MINUTE DEADLINE MOMENT WE DEAMED OF
NOW REPRINT ON EMAIL AND CORRET INSIDE CONTRACT THE BANK DETAILS
AND SEND BACK TO ME WITH SOME ████████ NAME INSERTED AND
SIGNATURE ANY NAME ████ CAN HELP PDF AND SCAN BEFORE 3 PM UK TIME
Person A ██████ SAID IF WE GET OT BACK SIGNED BY THEN WITH CORECT BANK
DETAILS IT WILL BE WIED IN ONE HOUR

URGENT

URGENT

Begin forwarded message:

**From:** Person A ████████████ @dmpint.com>
**Date:** July 21, 2011 3:16:38 PM GMT+02:00
**To:** Person D1 ████████████████████
**Subject: contract**

Please print off, sign, scan and email back to me. As soon as possible.

Many thanks

Person A

**CONTRACT FOR THE PROVISION OF A STRATEGIC COMMUNICATIONS CAMPAIGN FOR**

**8 JULY 2011 – 7 JANUARY 2011**

BETWEEN



British Virgin Islands

AND

Seychelles

## 1   EXECUTIVE SUMMARY

1.1   The Contractor and the Client agree that they will begin a long-term collaboration with an initial 6-month Agreement for the Contractor to provide strategic communications services.

1.2   The campaign will be aimed at media, decision-makers, thinks tanks and business and political leaders in Europe and the United States.

## 2   TERM

2.1   This agreement runs for six months, from 8 July 2011 to 7 January 2012.

2.2   The agreement will be automatically renewed for a further twelve months as from 8 January 2012 subject to two key conditions: First, that the Client is pleased with the Contractor's work, and agrees and formalizes in a meeting within 30 days before expiry of the first 6 months the set of objectives for the next 12 months covering calendar year 2012, and second, that the new budget and financial conditions for the 2012 calendar period are agreed and signed by December 15, 2011.

**3    SCOPE OF WORK**

- To generate US and European online, TV and print media coverage that focuses on what is happening in the country today.  Currently, instead of reporting the changes occurring under VY, the western media usually focuses on what is not occurring or on negative stories promoted by former PM Tymoshenko.  We will try to begin, in the coming months, to provide more balanced coverage and counter negative perceptions.

- In substantive terms, we will focus during the last 6 months of 2011 on the implementation of reforms and the beginning of western investment of a serious nature. The EU DCFTA negotiations will be a key theme, as will be the IMF agreement that will continue to be successfully implemented and the important macro and fiscal reforms that are being put in place in order to help modernize Ukraine's economy.

- Our most urgent priority will be to launch online coverage that can be bounced back into the Ukraine that tells the true story of Tymoshenko, as opposed to negative coverage as at present. This can be termed "deconstruction" activity. In this context we will organize a daily news summary of activity in the Tymoshenko trial that will be blast e-mailed to targeted audiences in Europe and the US.

- Our other top priority will be to focus on the VY's drive for closer ties to the EU, including the Council of Europe activities, and the economy. This can be termed "positive projection" activity.

- The goal of the programme with is to educate the western media, expand the media awareness of what is really happening and establish mechanisms to maintain a constant flow of information into Europe and the US.  Thus, the key objectives for the initial programme center on building a new cadre of educated and knowledgeable reporters in western Europe, organizing a flow of information to Brussels and Washington. This will include building a blog network that will be balanced in its commentary and interacting with current Ukrainian blogs to inject accurate information.

- We do not expect to achieve all of the above goals in the scope of work in just 6 months. We do expect to begin to change perceptions, but we are facing strong and negative headwinds, so we wish to agree that the first six months will be the foundation from which we will build a longer term communications strategy that will incorporate the other tools of the proposal. However, our initial focus should be on the print/electronic media and blogs that cover important current events. This coverage can be managed consistent with a strategy that is the basis for the agenda of VY.

**4    GOALS**

2

4.1     Promote the image of VY as a reformer and successful President.

4.2     Promote reforms being implemented in Ukraine with focus on economic reforms, anti-corruption reforms and democratic reforms (new election law, Public documents law, etc) and compare Ukraine initiatives with western governments/NGO requirements.

4.3     Re-position Tymoshenko's image in Europe from European democrat to populist, failed politician with little domestic support (squandered opportunities for reforms and democratic values), and someone that needs to be held accountable for her actions (in this context the criminal trial needs to be carefully explained).

4.4     Position VY vis-a-vis Russia (holding firm against Russian imperial aims for Ukraine) and Europe (committed to finalizing the agreements with EU to bring Ukraine into the European sphere).

4.5     Focus on activity related to Ukraine's Independence Day – build media components around this day, which has profound meaning to Ukrainians.

**5      AGREED DELIVERABLES**

5.1     Strategic Media Advisory and PR and editorial monthly retainer work: Print/electronic media coverage in Europe and US. Establish system to provide information, educate reporters and generate more accurate news stories, pitch stories for TV and print. Creation and generation of a daily news summary of key activity in Ukraine, centered on the Tymoshenko trial.

5.2     Digital monthly retainer work: On-line media strategy – 24/7 focus (all goals and themes) - build and manage; interact with Ukrainian blogs.

5.3     Specific guaranteed TV reports: World Business editorial news features (reforms/Ukraine and Europe/Russia)

5.4     Guaranteed Airline Distribution  – to reflect and mirror TV news reports, on 30 USA, European, Middle Eastern and Asian Airlines and also on Ukraine International Airlines.

**6      FEES, EXPENSES AND PAYMENT TERMS**

6.1     The Contractor shall charge the Client a total fee of €1,300,000 (one million, three hundred thousand euro), which allowing for a one-time

introductory discount of 10%, comes to a net fee to be paid of €1,170,000 (one million, one hundred and seventy thousand euro).

6.2    Fees charged shall be exclusive of all travel costs and accommodation expenses incurred by staff in performing the work under this agreement. The Client shall pay the fee described over the 6 month periods in 6.1 as follows:

- 50% (EUR 585,000) within 7 days of signing this agreement,
- 25% (EUR 292,500) by 15 October 2011
- 25% (EUR 292,500) by 15 December 2011
- Travel-related expenses within 30 days of receipt of invoices.

6.3    A breakdown of the fees is set out in the Budget Breakdown in Appendix A.

6.4    Payments shall be made by bank transfer to:



ACCOUNT NAME:              ███████████(BVI) LTD

BANK:                  ████████████████ZURICH

ADDRESS:

SWIFT:

ACCOUNT NO:

IBAN:              ███████████████(EUR)

## 7    COPYRIGHT AND FORMAT RIGHTS

7.1    The parties agree that all copyright and other rights in and to the format the televisual production and all other constituent elements thereof are owned by the Contractor to meet U.K. regulatory obligations and to meet the terms and conditions of our contract obligations with its broadcast partners.

## 8    WARRANTIES

8.1    The Contractor hereby warrants to the Client that it has full power and authority to enter into this Agreement.

8.2    The Client hereby warrants to the Contractor that it has full power and authority to enter into this Agreement.

4

**9     TERMINATION**

9.1     Either party may terminate this Agreement by written notice to the other if the other party is in breach of a material obligation under this Agreement and fails to remedy such breach within 120 days of notice requiring it to do so.

9.2     Any termination pursuant to paragraph 6.1 shall be without prejudice to any obligations or rights hereunder which have accrued to either party at the date of termination, and for the avoidance of doubt, the Client shall be obliged to pay to the Contractor all costs and expenses which have accrued, incurred or committed to at the date of any such notice to cease. The Contractor shall provide documentation supporting all expenditures for review and agreement by the Client prior to any such payment. If the amount paid by the Client exceeds The Contractor's costs and expenses,the Contractor shall within twenty-one days of the Client's notification about termination of this Agreement pay the Client the specified difference.

**10     FORCE MAJEURE**

10.1     Neither party shall not be in breach of this Agreement or otherwise liable for any delay in performance or any failure to perform any of its obligations under this Agreement if and to the extent that the delay or failure is due to circumstances beyond its reasonable control including, without limitation, flood, fire, earthquake, failure or non-delivery of sub-contractors or programme suppliers, riots, industrial disputes, legal enactment, government order or regulation.

**11     CONFIDENTIALITY**

11.1     Each party shall keep the existence and terms of this Agreement and any other confidential information relating to the other party strictly confidential.

**12     VAT / WITHHOLDINGS**

12.1     In the event that the Client is required, pursuant to any applicable present or future law, rule or regulation of any competent governmental or other administrative body, to make any deduction or withholding in respect of tax for any amount or amounts payable to The Contractor under this Agreement, the Client shall pay to the Contractor an additional amount as will, after the deduction or withholding has been made, leave the Contractor with the same amount as it would have been entitled to receive in the absence of any such requirement to make a deduction or withholding; promptly pay to the relevant taxation authority within the period permitted by law the amount of such withholding or deduction; and provide the Contractor with written evidence (including certification where appropriate) that it has made the payment to the relevant taxation authority.

**13    GENERAL AND OTHER**

13.1    The Contractor shall be entitled to assign its rights and obligations under this Agreement at any time to any other company controlled by the Contractor

13.2    The Contractor shall be entitled to assign its rights and obligations under this Agreement at any time to any other company controlling or controlled by the Contractor (of which the company is a part).

13.3    This Agreement shall be governed by English law and the parties shall submit to the exclusive jurisdiction of the English courts in respect of any dispute relating to this Agreement.

**IN WITNESS WHEREOF** the parties have executed this Agreement on the date below.

Signed this 8th day of July 2011

On behalf of the Contractor                    On behalf of the Client

BY                                             BY


_____          _____
Signature                                      Signature


_____          _____
Name                                           Name


_____          _____
Position                                       Position

6

**Appendix A:**

**DETAILED BUDGET BREAKDOWN**

**8 July 2011 – 7 January 2012**

|   |   | EUR |
|---|---|---|
| 1 | Strategic Media Advisory retainer<br>€50,000 per month for 6 months | 300,000 |
| 2 | Online Media Strategy<br>€120,000 retainer per month for 6 months | 720,000 |
| 3 | TV Editorial News Channel Reports<br>2 at €90,000 each | 180,000 |
| 4 | Airline Distribution of World Business<br>2 at €50,000 each | 100,000 |
|   | **Total value** | **€1,300,000** |
|   | Minus one-time-only 10% introductory discount (for 6 months only) |   |
|   | **Contract total\*** | **€1,170,000** |

\*Staff travel and lodging expenses are billed extra. Costs will be fully documented and reimbursed within 30 days of submission.

7

**Appendix B: Airlines currently screening World Business Special Edition**

**World Business Special Edition: 33 airlines**

1. Aer Lingus
2. Air Canada
3. Air China
4. Air India
5. Bangkok Airlines
6. China Airlines
7. Emirates
8. Ethiopian
9. Etihad Airways
10. Eva Air
11. Finnair
12. Garuda Indonesia
13. Hong Kong Airlines
14. Kingfisher Airlines
15. KLM
16. Kuwait Airlines
17. LOT Polish Airlines
18. Middle Eastern Airlines
19. Malaysia Airlines
20. Oman Air
21. Philippine Airlines
22. Qatar
23. Royal Brunei Airlines
24. Royal Jet
25. Royal Jordonian
26. SAS Scandinavian
27. Saudi Arabian Airlines
28. Singapore Airlines
29. South African Airlines
30. Sri Lankan
31. Strategic Aviation
32. Thai Airways International
33. TAP Air Portugal

**Appendix C: Timeline**

| July - September 2011 | | | |
| --- | --- | --- | --- |
| Objective: Counter negative media perceptions | | | |
| DELIVERABLE CATEGORY | JULY | AUGUST | SEPTEMBER |
| Strategic Media Advisory and PR | ■ Strategic Media Advisory and PR and editorial monthly retainer work: Print/broadcast media coverage in Europe and US.<br><br>■ Establish system to provide information, educate reporters and generate more accurate news stories, pitch stories for TV and print.<br><br>■ Creation and generation of a daily news summary of key activity in Ukraine, centered on the Tymoshenko trial. | | |
| Online Strategy | ■ Build English and Ukrainian blog teams<br><br>■ Start engagement with blogosphere centered on the Tymoshenko trial and EU | ■ Monitor, assess and respond to media reports, blogs and other commentary<br><br>■ Produce and disseminate online content based on VY's agenda including EU priorities plus successful implementation of reforms and IMF agreement | |
| Media Production | | | Pre-production for October broadcast |
| Airline distribution | | | Advance booking of slot |

9

| (October 2011 - January 2012) | | | |
|---|---|---|---|
| **Objective: Counter negative media perceptions** | | | |
| **DELIVERABLE CATEGORY** | **OCTOBER** | **NOVEMBER** | **DECEMBER-JANUARY** |
| Strategic Media Advisory and PR | ▪ Strategic Media Advisory and PR and editorial monthly retainer work: Print/broadcast media coverage in Europe and US. ▪ Establish system to provide information, educate reporters and generate more accurate news stories, pitch stories for TV and print. ▪ Generation of a daily news summary of key activity in Ukraine, centered on the Tymoshenko trial, IMF and EU. | | |
| Online Strategy | ▪ Monitor, assess and respond to media reports, blogs and other commentary ▪ Produce and disseminate online content based on VY's agenda including EU priorities plus successful implementation of reforms and IMF agreement | | |
| Media Production | ▪ 1st "World business" report | Pre-production for December broadcast | ▪ 2nd "World Business" report |
| Airline distribution | | Reversioning for airlines | ▪ Airline Distribution of 1st and 2nd "World business" reports |

# EXHIBIT C

**C O N F I D E N T I A L**

10 June 20112

**Memo for Paul Manafort**

**From:** D1

**Subject:  Revised Network Idea for 2012 Involving Third-Party Champions on Ukraine Electoral and Economic Reforms**

1. **Purpose**

    To begin to assemble a small chorus of high-level European third-party endorsers and politically credible friends who can act informally and without a formal government relationship between now and the end of the year.  These persons could then become a more formal International Advisory Board starting in January 2013. Their value would be as much after the October election as before.

2. **Structure and Fees**

    Led by former Chancellor Hapsburg Member               , the other former leaders from
    would have a private sector or NGO relationship, even disbursed via the Chancellor himself for us so as to be quite indirect.
    Hapsburg member is willing to be discreet.  In a just concluded telephone conversation today, he understood completely and embraced the idea of what he called "underground commenting" and said he would do it on a monthly budget that is pro-rated from or similar to his annual fees (that would amount to €30k a month).  Even if we pushed him down a bit to €25k a month, that would mean that if we engaged him from July through December it would be €150k.  My view is that this is a very good investment.

    For others, they could be taken on in different ways via Speaker's Fees and Election Observer or other consulting fees and such in the September-December period, and that would cost for that period €50k to €100k each depending on how much we use them. Again, depending on the stature and nationality of the people we engage, if they were willing these would represent modest costs. A hypothetical total would be
    plus 2 others = €150,000 (6 mos) + €100,000 (4 mos)  x 2 = Total potential of €350,000

1

### 3. Key Participants

They have not been spoken to but represent the initial talent pool█████and I would canvass informally if you approve.



### 4. Work To Be Undertaken

Mission Statement: To take direction from us informally and via█████to speak out in the European media and to write and publish occasional op-eds and to appear at select conferences we stage in Rome, Berlin or Brussels before and after the election of October, and if desired, to serve as a prestige international observer during the election. To essentially promote the idea of a Ukraine that is closer to Europe than to Russia and to recognise its path toward electoral and economic

reforms. Perhaps to write and announce a report examining the Electoral Law in terms of transparency, to emerge before or after the election this autumn.

# EXHIBIT D

**Subject:** Re: an urgent request ON IT
**From:** Person D1 ███████████████
**Date:** 9/19/12, 9:29 AM
**To:** Rick Gates <rgates@ ███████████
**CC:** Paul Manafort <pmanafort@ ██████████ Person D2 ██████████████

And Hapsburg Member ALSO happy to speak to Senator ██████████ and ask hm to delay or tone down or stop the resolution

Sent from my iPad

On Sep 19, 2012, at 15:25, Rick Gates <rgates@ ██████████ wrote:

> On it. Thank you.
>
> **From:** Person D1 ███████████
> **To:** Paul Manafort <pmanafort@ ██████████
> **Cc:** Rick Gates <rgates@ ██████████ Person D2 ██████████ —
> **Subject:** Re: an urgent request ON IT
>
> Am with Hapsburg Membe now, who is speaking to Hapsburg Member who is getting ready for the wedding of his only daughter...BUT....he will talk to Senator yes. He is delighted to speak to Senator and try to calm things down and ask them to wait and tust him..Need rick to call me in three minutes so we can set this up, make it happen....
>
> Hapsburg Member ██████████ says yes here is his personal and private mobile and Senator shd call him
>
> + ██████████
>
> The Senator can dial him directly or ████ can put him on
>
> He will keep he phone open until midnight CET or six pm DC time
>
> He is very keen to delay and calm things down
>
> READY....
>
> Sent from my iPad
>
> On Sep 19, 2012, at 15:12, Paul Manafort <pmanafort@ ██████████ wrote:
>
> > Keep me posted on █ call to Senator status
> >
> > **From:** Rick Gates <rgates@ ██████████
> > **Date:** Wed, 19 Sep 2012 08:07:57 –0500

██████████

**To:** Paul Manafort <pmanafort@███████████████>
**Subject:** Re: an urgent request ON IT

He was supposed to talk with ████████ yesterday but I have not heard back. Trying to reach him. I will brief him on the other items and see if he can call ██████ as well.

---

**From:** Paul Manafort <pmanafort@█████████████>
**To:** Rick Gates <rgates@███████████>
**Subject:** Re: an urgent request ON IT

Is ███ calling ██████

---

**From:** Rick Gates <rgates@███████████>
**Date:** Wed, 19 Sep 2012 07:51:49 –0500
**To:** Paul Manafort <pmanafort@████████████████████████>
**Subject:** FW: an urgent request ON IT

██████

Message was delivered to ███████'s CoS and he is now aware. Do we have a sense of what time ██ will call ███████'s office? I am working on ███████'s office now. Please let me know.

Rick

---

**From:** Paul Manafort <pmanafort@█████████>
**To:** Rick Gates <rgates@████████████  Person D1>
**Cc:** Person A ████████████████████████, Person D2██████████████████
**Subject:** Re: an urgent request ON IT

Rick
I would recommend that ███████ be made aware of these facts and ██ role as a designated representative of the President of the EP. We ought to try to make the connection from both ends. Have Senator CoS aware of ██ and the importance of ███████ talking to ██ who has been tasked with the intermediary role. ███████ should also be made aware of the fact that the US would be getting out front in a political way even further than the EP has gotten by passing this resolution.

Finally the points of my last email to you are relevant re ███████ understanding the acceptability of holding the hearing but not passing any resolution at this time. ██ should make this point to ███████ as well.
P

---

**From:** Rick Gates <rgates@███████████>
**Date:** Wed, 19 Sep 2012 05:39:08 –0500
**To:** Person D1
**Cc:** Paul Manafort <pmanafort@████████████>
**Subject:** Re: an urgent request ON IT

██████ –

The number for Senator is (202) ███████ .  You can also ask for his Chief of Staff ████ ████ . If your guy is going to call Senator I suggest you have him call Senator too. This just as important since Senator is driving the legislation. Senator's number is (202) ███████ . Keep me posted.

---

**From:** Person D1 █████████████████████
**To:** Dmytro Kuleba ████████████████    Oleg Voloshyn ████████████████
**Cc:** Paul Manafort <pmanafort@ ██████████    Rick Gates <rgates@ ████████████
Person A ████████████████    Person D2
█████████████████████████
**Subject:** Re: an urgent request ON IT

Ok i am on it.
Will see Chancellor and place the call to ███ in 90 minutes
Rick is gettng me a direct line to Senator's office.

D1

Sent from my iPad


> **From:** Dmytro Kuleba ████████████████████████
> **Date:** September 19, 2012 11:44:31 GMT+02:00
> **To:** Person D1 █████████████████
> **Cc:** Person A ████████████████ @dmpint.com>
> **Subject:** an urgent request
>
> Dear D1
>
> We have an idea with regard to the draft res under consideration by Senate's foreign relations committe. Would it be possible to reach out to Hapsburg Member ████████ and ask him to make an early morning call to Senator ████ with the following messages (more details in the attached files):
>
> - After having exerted substantial pressure on Ukraine, the European Union is now pursuing the policy of engagement with Ukraine on the Tymoshenko case. In particular, the recent apsburg Member mission to Ukraine proved to be helpful and efficient leading to quite a number of very substantial and unprecedented achievements. The policy of engagement with Ukraine is far more efficient that the policy of the alienation of Ukraine.
>
> - Yulia Tymoshenko exhausted national remedies and her application is now under consideration by the European Court for Human Rights (ECHR). Therefore, **proper assessment of the Tymoshenko case can only be done after ECHR delivers its highly authoritative judgment.**
>
> **-** the discussion about situation in Ukraine can take place today but it is obvious that resolution calling for the relase of Ms Tymoshenko can be helpful if adopted **after the October elections,**

█████████

not prior to them.

Paul works through his channels and is sending the same messages. He also supports the above initiative. The issue is under Big Guy's personal control.

As you understand, the matter is very urgent and we understand the time pressure but it would be fantastic if such a call could take place.

Best regards,

Dmytro

&lt;senate.doc&gt;

&lt;res part 1.pdf&gt;

&lt;res part 2.pdf&gt;

# EXHIBIT E

**Subject:** Re: DC Updates
**From:** █████Person D2███████████████████
**Date:** 3/1/13, 6:31 AM
**To:** Rick Gates <rgates@████████████ ████Person D1████████████████
**CC:** Paul Manafort <pmanafort@████████████████

Working on it now.

---

**From:** Rick Gates <rgates@████████████
**Date:** Friday, 1 March 2013 05:01
**To:** ████Person D1████████████████ ████Person D2████████████████
**Cc:** Paul Manafort <pmanafort@████████████████
**Subject:** DC Updates

█Persons D1/D2██ –
A few notes from my meeting with the principal this afternoon.
1. We have been offered the op/ed slot for the Hill on Monday. I spoke with █ and he is interested. Can one or both of you take a run at a first draft. I need this by 300pm DC time to get to █ He will review it.
2. He liked the idea of an apology letter to the members for the meetings he missed. I will draft that for his review.
3. Attached is the final agenda for his meetings tomorrow.

Let me know when you are free to discuss the op/ed draft.

# EXHIBIT F

**Subject:** Re: Draft Op Ed for Hill VERSION 2
**From:** Person D1
**Date:** 3/1/13, 10:35 AM
**To:** Paul Manafort <pmanafort@████████████
**CC:** Rick Gates <rgates@████████████ Person D2 ████████████ ████
Person A ████████ @dmpint.com>

Thanks

Sent from my iPad

On Mar 1, 2013, at 15:05, Paul Manafort <pmanafort@████████ wrote:

> This is precisely what we need. Almost a waste not to use this on the FT, NYT, WSJ, WP,
> caliber newspapers….
> P

**From:** Person D1
████████████
**Date:** Friday, March 1, 2013 8:30 AM
**To:** Paul manafort <pmanafort@████████ Rick Gates <rgates@████████ D2
████████, Person A ████████████
**Subject:** Draft Op Ed for Hill VERSION 2

Here we go. Hope this does the trick a  bit better.

**From:** Paul Manafort <pmanafort@████████
**To:** Person D1 Rick Gates <rgates@████████ Person D2 ████████ Person A
████ @dmpint.com>
**Sent:** Friday, 1 March 2013, 13:14
**Subject:** Re: Draft Op Ed for Hill

Person D1

I don't like the tone of this op ed.
The message is the right message but at this time it is too partisan for ████ It will damage his
"non-partisan" image.
The problem with the op ed is that it contains all of our core messages. It could be given by VY of the
Foreign MInister.
This op ed should be more focused and narrow.
I recommend that you re-write it from the standpoint of Europe with the theme of Ukraine's
importance to Europe as a part of the security umbrella provided by NATO. The messages can include
energy security as well as continental defense.
The piece should be more macro focusing on the big themes and the importance of Ukraine in those
themes.
P

**From:** Person D1 ████████████

**Reply-To:** ████████████████

**Date:** Friday, March 1, 2013 7:03 AM

**To:** Rick Gates <rgates@███████████   Paul manafort <pmanafort@████████
Person D2 ████████████████, Person A ████████████████

**Subject:** Draft Op Ed for Hill

Dear Rick

Here is the draft op ed for ████ you requested. Please make sure he reads the final version and approves before it is sent.  So far I have not contacted him, because you asked for a draft op ed by 3 pm.

Best

█

# EXHIBIT G

**Subject:** ▮ Visit to US
**From:** Rick Gates <rgates@d▮▮▮▮▮▮▮▮
**Date:** 3/8/13, 11:32 PM
**To:** Paul Manafort <pmanafort@▮▮▮▮▮▮▮▮
**CC:** Person D2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ >, Person D1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

P–
This email contains the following documents in regards to the ▮'s visit to the US.

1. Current agenda (as of 1100pm 3/8) – there are still some meetings to confirm but this will provide an overview on the meetings thus far. In addition, there is a point of contact for each of the meetings (either Company B ▮▮▮ or Company A ▮▮▮ )
2. Logistics Sheet – this document is just for our internal use. It has all of the logistical information and POCs for the trip.
3. ▮ Draft Carnegie Speech Points – need to be reviewed and modified

There are 3 additional items which will be coming over the weekend.
4. Congressional TPs
5. Briefing books for meetings
6. Draft Oped

—Attachments:————————————————————————————

| | | |
|---|---|---|
| ▮ | Agenda – as of 1100pm 3.8.13.docx | 16.5 KB |
| ▮ | Visit POCs.docx | 61.8 KB |
| ▮ | Carnegie Speech [1].doc | 40.0 KB |

**Meeting Agenda**
**Washington, DC – March 13<sup>th</sup> – 14<sup>th</sup>**

---

**Wednesday, March 13<sup>th</sup>**

1455            ██ **Arrival to Washington, DC**
                Transfer to Hotel (if time permits)
                VIP Transfer – ████ Embassy (will provide transportation during visit)

                HOTEL:    Willard Intercontinental
                          1401 Pennsylvania Avenue
                          Washington, DC 20004
                          (202) ██████

1630 – 1715     **Senator** ████████ **(D██)**
                Chairman, ████████████████████
                Location:  Dirksen Senate Office Building ████
                POC: ██Company B Employee██

1700 – 1730     **Senate Foreign Relations Staff Briefing**
                Location: Dirksen Senate Office Building, Room: TBD
                POC: ██Co. A Employee██

1930            **TENTATIVE   Dinner with** ████ **Ambassador**
                Location:  Villa Frienze

**Thursday, March 14<sup>th</sup>**

900 – 930       ████████
                Senior Policy Advisor, House ████████
                Location: U.S. Capitol – Room: H ████
                POC: ██Co. A Employee██

1000 – 1045     **Congressman** ████ **(R██)**
                Chairman, ████████████
                Location: ████ Rayburn House Office Building
                POC: ██Co. A Employee██

1215 – 1245     **Congressman** ████ **(D██)**
                Ranking Member, ████████████████
                ████
                Location: ██ Cannon House Office Building
                POC: ██Company B Employee██

████

| TBC | **Congressman** ███████████ **(R-██)**<br>Chairman, House ████████████████████<br>██████████ |
|---|---|

| TBC | **Senator** ██████████████<br>Ranking Member, Senate ████████████████ |
|---|---|

| TBC | **Bloomberg Interview** |
|---|---|

| TBC | ██████████ **or** ████████████<br>White House ████████████████████ |
|---|---|

| TBC | ████████████████<br>US Department of State |
|---|---|

1545 – 1600     **Carnegie Endowment for International Peace**
Meeting with CEIP Board and Leadership
Location:     Carnegie Endowment for International Peace
              1779 Massachusetts Ave., NW
              Washington, DC 20036

████████████████████████████████████████████

1600 – 1730     **Carnegie Endowment for International Peace**
Speech – ███Hapsburg Member███

████████████████████████████████████████████

Brief Q&A following Speech

1730 – 1800     Carnegie Reception in Honor of ███Hapsburg Member███

1800            Depart for Dulles Airport
                ████████ Embassy to Provide Transportation

2020            Depart to ████████ via Paris

# EXHIBIT H

**Subject:** Re: R: Expedited Port Courtesis for ▆Hapsburg member▆
**From:** ▆Person D2▆
**Date:** 3/13/13, 11:25 AM
**To:** ▆
**CC:** ▆Company B▆                                    ▆Company B▆
▆

Hi ▆

I just had a meeting with ▆Comp. B▆ and the team and that's what we will do. At every point there will
be the relevant contact person to meet President ▆Haps. member▆ and facilitate access.

However, like everyone else, he will have to go through security/metal detectors etc.

We can discuss further details when I see you at 12:30pm.

Best, ▆D2▆

---

**From:** ▆
**Date:** Wednesday, 13 March 2013 14:26
**To:** ▆Person D2▆
**Cc:** ▆Company B▆                          , ▆Company B▆
**Subject:** RE: R: Expedited Port Courtesis for ▆Hapsburg member▆

Hy ▆D2▆

It was a pleasure to talk to you.

Just a very last detail...we suggest you to agree with the counterparts of each meeting which
will be the access point/address on the occasion of each meeting, in order to avoid any
problem/delay to President ▆
Ideally, for each meeting you should be in contact with someone of the organizers who should
possibly wait for President ▆'s car at an agreed access point/address at a certain time.
Our drivers know Washington very well and will be able to bring you anywhere, but the access
to some institutional locations (like the Congress) could be tricky if no agreement has been
taken in advance with someone coming and waiting from inside and it is not clear what is
going to be the access point.
This is obviously just and advice from our side.

All the Best and see you in a couple of hours,

▆

---

**From:** ▆Person D2▆
**Sent:** Wednesday, March 13, 2013 9:34 AM

▆

**To:** Company B ███████████
**Cc:** Company B ███████
**Subject:** Re: R: Expedited Port Courtesis for ███Hapsburg member███

Thanks for the introduction, ███Comp. B███

I just spoke to ███████ All in good hands.

See you shortly.

Best, ███D2███

---

**From:** Company B ███████████████
**Date:** Wednesday, 13 March 2013 13:00
**To:** ███████████████
**Cc:** ███Person D2███████████     ███Company B███████████
**Subject:** FW: R: Expedited Port Courtesis for ███Hapsburg member███

Hi ████████

Per the emails below, we are coordinating Prime Minister ██████'s visit to Washington.  I am copying ███Person D2███ who works for the Prime Minister. ███D2███ will be with the Prime Minister throughout his stay.  He needs to accompany you to the airport today to meet the Prime Minister so I am connecting you.

███D2███'s cell number is ███████████.

Please let me know if I can be off assistance on this matter.

Thank you so much.

███Comp B███

---

**From:** ███Company B███
**Sent:** Tuesday, March 12, 2013 6:02 PM
**To:** ███████████████
**Cc:** ███████████████     ███Company B███
**Subject:** Re: R: Expedited Port Courtesis for ███Hapsburg member███

Grazie mille
I am learning diplomacy
Are you or anyone coming to his talk?
███Comp B███

███Company B███
███████████████

Company B ██████████

**From:** ████████████████████
**Sent:** Tuesday, March 12, 2013 05:48 PM
**To:** Company B ████
**Cc:** ███████████████████████████████
**Subject:** R: Expedited Port Courtesis for Hapsburg member

Dear Comp B
thanks to your contact infos, we are now in touch with Hapsburg member 's staff. Mi colleague ██████████ (reading in cc) will be at the airport and he will inform President ███ that the Ambassador is pleased to put a car at his for the whole stay in Washington.
Best. ███



**Da:** Company B ████████████
**Inviato:** martedì 12 marzo 2013 15.28
**A:** █████████
**Oggetto:** RE: Expedited Port Courtesis for Hapsburg member

████  –

Great to see you the other night.
Thank you for your assistance with Hapsburg member 's arrival and departure from Dulles airport. Additionally his office has reached out for transportation assistance during his time in DC.
I don't know if the Embassy has the capacity or desire to assist.
We are happy to figure something else out if you are unable to help.
His current schedule is below.

████████

Hope to see you again tomorrow evening at Villa Firenze.

Best,


## Wednesday, March 13<sup>th</sup>

1455            █ **Arrival to Washington, DC**
                Transfer to Hotel (if time permits)
                VIP Transfer – █████ Embassy (will provide transportation during visit)

                HOTEL:        ██████████████
                              ██████████████
                              ██████████████

1700 – 1730     **Senate Foreign Relations Committee**
                Staff Briefing (Minority – Republicans)
                Location: Dirksen Senate Office Building - Room: TBD
                POC: Company A

1730 – 1800     **Senate Foreign Relations Committee**
                Staff Briefing (Majority – Democrats)
                Staff Director ████████
                Location:  Dirksen Senate Office Building – Room TBD
                POC: Company B

1815            **Meeting with Paul and** D2 █████
                Willard Intercontinental Hotel

1900            **Dinner with** █████ **Ambassador**
                Location:  Villa Firenze

## Thursday, March 14<sup>th</sup>

900 – 930       ████████████
                Senior Policy Advisor, House Representative ████████
                Location: U.S. Capitol – Room: ██████
                POC: Company A

1000 – 1045     **Congressman** ████████ **(R** ██ **)**
                Chairman, House ████████
                Location: ████ Rayburn House Office Building
                POC: Company A

██████

1215 – 1245      **Congressman** ███████ **(D-**██**)**
                 Ranking Member,
                 ████████████████████████████████

                 Location:  ██  Cannon House Office Building
                 POC: Company B ████████

1330 – 1430      **Bloomberg Interview**
                 1399 New York Ave NW
                 Washington, DC 20005
                 POC: Company B ████

1500 – 1530      **Congressman** ████████ **(R-**██**)**
                 Member, House Foreign ██████████████████████
                 ██

                 Location: ██  Cannon House Office Building
                 POC: Company B ████

1545 – 1600      **Carnegie Endowment for International Peace**
                 Meeting with CEIP Board and Leadership
                 Location:      Carnegie Endowment for International Peace
                                1779 Massachusetts Ave., NW
                                Washington, DC 20036
                                (202) 483-7600
                 POC: ████████████████████████

1600 – 1730      **Carnegie Endowment for International Peace**
                 Speech – Hapsburg member ████████
                 ████████████████████████████████

                 Brief Q&A following Speech

1730 – 1815      Carnegie Reception in Honor of Hapsburg member ████████

1815             Depart for Dulles Airport
                 ████  Embassy to Provide Transportation

2020             Depart to ██████ via Paris


Company B ████
████████████████
████████████
████████████
█████████████████
████████████

---

**From:** ██████████████████████
**Sent:** Thursday, March 07, 2013 4:04 PM

████████

**To:** `Company B`
**Subject:** R: Expedited Port Courtesis for `Hapsburg member`

Actually, it seems that we shall meet tonight at Villa Firenze…





---

**Da:** `Company B`
**Inviato:** giovedì 7 marzo 2013 15.47
**A:**
**Cc:**
**Oggetto:** RE: Expedited Port Courtesis for `Hapsburg member`

Millie grazie
Soon
`Comp B`

---

**From:**
**Sent:** Thursday, March 07, 2013 9:53 AM
**To:** `Company B`
**Cc:**
**Subject:** R: Expedited Port Courtesis for `Hapsburg member`

Thanks a lot. My colleagues reading in cc will contact her today.
Look forward to see you soon.





---

**Da:** ██Company B██████████████████
**Inviato:** giovedì 7 marzo 2013 9.47
**A:** ████████████████
**Oggetto:** RE: Expedited Port Courtesis for ██Hapsburg member██

His NY office is not coordinating the visit. He is doing it through his foundation. ████████████████ is the point of contact.
**E-mail:** █████████████████████
**Mobile:** ████████████

---

**From:** ███████████████████████
**Sent:** Wednesday, March 06, 2013 2:33 PM
**To:** ██Company B██
**Subject:** R: Expedited Port Courtesis for ██Hapsburg member██

Dear ██Comp B██

with all great pleasure we shall provide all the necessary airport assistance to ██Hapsburg member██ ████. I only kindly ask you to provide me with the contacts of the person who got in touch with you  in order to get all the necessary details (and to avoid possible duplications with his staff in New York).

Best, ████



```
-----Messaggio originale-----
```
Da: ██Company B██████████████████

Inviato: mercoledì 6 marzo 2013 11.30
A: ██████████████████
Oggetto: Expedited Port Courtesis for ██Hapsburg member██

██████ -

Former Prime Minister ██Hapsburg member██ will be traveling to Washington, DC next week.
During his trip he will be meeting with US Government officials and Members of
Congress to discuss his work ████████████████████████████████████████
██████ and to offer insights about EU-US relations and Russia.
██Hapsburg member██ is scheduled to arrive Dulles at 2:55p on Wednesday, March 13 and will
depart on Thursday, March 14 at 8:20p.
Could the Embassy assist with his trip by requesting expedited port courtesis
through the e-gov system for ██Hapsburg member██?

Best,
██Comp B██

Sent from my iPad

─ image001.jpg ──────────────────────────────────────────



─Attachments:──────────────────────────────────────────

image001.jpg                                        4.6 KB

# EXHIBIT I

From: Rick Gates <rgates@ ███████████ ██
Sent: Wednesday, January 29, 2014, 10:44 AM
To: Person D2
Cc: Person D1
Subject: Re: Items

---

Excellent. Thank you.

On Jan 29, 2014, at 7:44 AM, Person D2 ███████████ wrote:

> ███ said yes.
>
> Working on piece today and should have draft by tomorrow.
>
> .....................................................................................
>
> **From:** Person D1
> **Date:** Wednesday, 29 January 2014 14:41
> **To:** Rick Gates <rgates@ ██████
> **Cc:** Person D2 ██████████
> **Subject:** Re: Items
>
> Sure
> But they will ask if that means they are renewed for the next 6 months or not….
>
>
> On Jan 29, 2014, at 1:31 PM, Rick Gates <rgates@ ███████████ wrote:
>
> D1/D2 ███████
> We have an assignment in regards to an oped that was published in the NYT yesterday which I am placing below. We need to have one of our friends write an oped that focuses on two things. A partial response to the NYT piece, and focus on the differences between a legitimate opposition and violent thugs such as:
>
> 1. There is a great difference between legitimate political protest which is non-violent and violent attacks on police officers and public buildings.
> 2. The former is an essential component of democracy. The latter has no place in the political dialogue of democracy.
> 3. The leaders of the Ukrainian opposition and the peaceful protestors in the Maidan need to distance themselves from violent extremists and completely repudiate their actions.
> 4. These leaders cannot allow violent rightwing extremists to exercise a veto over their political decisions and the future of Ukraine.
>
>
> Let me know a time that you can Skype today to discuss. Thanks.

# EXHIBIT J

From:  Person D1 ████████████████
Sent: Tuesday, February 04, 2014, 4:35 AM
To: Person D2 ███████████████████████
Bcc: Person D1 ████████
Subject: Fwd: Op ed for ████████
Attachments: Hapsburg member ██ op ed for New York Times on ███████████ doc

Please make the change and send on to rick and make sure they put ████ contact details
I am in a train

Sent from my iPad

Begin forwarded message:

> **From:** Person D1 ████████████████
> **Date:** February 4, 2014 10:16:07 GMT+01:00
> **To:** Person D2 ███████████████████
> **Cc:** Rick Gates <rgates@███████████████>
> **Subject: Fwd: Op ed for** ███
>
> Haps. member has signed off with ony one change
> In the very last sentence he wants to strike the last few words on europe's future
> and end the piece wth the words GRASP IT.
> Who sends to NYT? Please advise
> D1
>
> Sent from my iPad
>
> Begin forwarded message:
>
> > Person D1 ██████████████████
> > **Date:** February 4, 2014 9:30:10 GMT+01:00
> >
> > Person D2 ████████████████████████████
> >
> > **Subject: Op ed for** ███
> >
> > Dear Haps. member ,
> >
> > Please review this, as discussed, and then ask ████████ to call
> > me or D2 ████ today so we can tell her where to send it by 4 pm
> > ████ time to the New York Times.
> >
> > Thanks
> >
> > Un'abbraccio.
> >
> > D1

**For The New York Times**

By Hapsburg member



*The author,* ██████████████████████████████████████ *is a former*
██████████████ *Prime Minister* ████████

# EXHIBIT K

From: Rick Gates <rgates@███████████>
Sent: Tuesday, February 18, 2014, 10:13 PM
To: █Person D1██████████████    █Person D2██████████████
Subject: Oped
Attachments: ██OpEdv4.doc

Guys-

Below is the email from the NYT oped editor we received. Attached are the changes that I made to the oped
based on these comments. Usual password. But please review it carefully and make any changes you deem
necessary based on the points from the NYT. No pride of authorship here. Please make any changes and send
back to me  by 800am NY time if possible.

_____

███████ we're close to a decision and want to run it but some of this seems quite boilerplate frankly. what is
the evidence that right-winters have truly infiltrated the ukraine democracy movement? and is the
significant violence and disorder we've seen today in kiev and other cities changing/affecting ██Hapsburg member██
POV? please let us know soonest. thanks.

--
███████████████████
Deputy Editor, Op-Ed
The New York Times

# EXHIBIT L

From: Rick Gates <rgates@ ███████ >
Sent: Thursday, February 20, 2014, 8:16 AM
To: Paul Manafort <pmanafort@dmpint.com>; Person D1 ████████████ Person A
Person A ████ Person D2 ████████████
Subject: NYT Oped - ██

The NYT has run the ██ oped.

http://www.nytimes.com/2014/ █████████████████
███████████████

███████████████████████

**By** Hapsburg member

- 







# EXHIBIT M

# Former European leaders struggle to explain themselves after Mueller claims Paul Manafort paid them to lobby for Ukraine



Michal Kranz
Feb. 25, 2018, 5:49 PM



Paul Manafort. Drew Angerer/Getty

- **President Donald Trump's former campaign manager Paul Manafort was charged on Friday with paying European leaders to lobby of behalf of Ukraine, special counsel Robert Mueller alleged.**
- **The leaders in question, who include former leaders of Austria and Italy, have denied any wrongdoing.**
- **The leaders were allegedly part of a lobbying group called the Hapsburg Group.**

---

*Sign up for the latest Russia investigation updates here.*

Following special counsel Robert Mueller's newest indictment on Friday of President Donald Trump's former campaign manager Paul Manafort, two former European leaders were shocked to find their names mentioned in the indictment documents, claiming they'd done nothing wrong, according to the New York Times.

According to Mueller's indictment, two European politicians were secretly paid around €2 million by Manafort in order to "take positions favorable to Ukraine, including by lobbying in the United States," the Times reported. This money was paid during a period when former Ukrainian President Viktor Yanukovych was inching closer to Europe on several issues. He eventually changed course however, and was ousted in a pro-Western revolution in Ukraine in 2014.

The group of politicians who were allegedly paid by Manafort were known as the Hapsburg Group, a reference to the famous Austrian imperial dynasty.

Although the indictment documents did not name the leaders, the former Prime Minister of Italy Romano Prodi stated in an interview on Saturday that he and former Austrian Chancellor Alfred Gusenbauer were the leaders mentioned.

But Prodi said he was not aware that the funds Gusenbauer had paid him had come from Manafort, and were part of "normal private relations I had with him," and was "not any money from external sources."

"I tell you I have never been paid from any lobby group in America," Prodi added.

According to the Times, Prodi and Gusenbauer had both long believed that closer ties between Ukraine and the European Union were a good thing.

"I always had the point of view that it was important to move Ukraine closer to Europe," Gusenbauer told the BBC in a statement. "It would have been extremely positive if Ukraine could have agreed" to closer ties, he said. "I was talking to E.U. and U.S. politicians to make that point clear... I stopped this activity when I had the impression that Ukraine was moving in the wrong direction."

## A trans-Atlantic charade

Mueller's documents claim that the group had strategized to "appear to be providing their independent assessments of Government of Ukraine actions, when in fact they were paid lobbyists for Ukraine," according to the Times.



Ukrainian President Viktor Yanukovych (L) gives a wink to his Russian counterpart Vladimir Putin during a signing ceremony after a meeting of the Russian-Ukrainian Interstate Commission at the Kremlin in Moscow, December 17, 2013. REUTERS/Sergei Karpukhin

Gusenbauer did admit that he had been paid for working on behalf of Ukraine, but did not divulge by whom. According to filings made by Mercury Public Affairs, a political strategy group contracted by Manafort, the former chancellor had met with several members of Congress in 2013 to lobby for Ukraine.

The Podesta Group, a Washington lobbying firm formerly run by the brother of the former chairman of the 2016 Democratic presidential campaign John Podesta, also reportedly "arranged meetings and media opportunities" for a group of visiting European leaders working on the Ukraine issue that included Prodi and Gusenbauer. Prodi however has denied membership in this group, and stated that Gusenbauer headed it.

Last year, Manafort and his former deputy Rick Gates had been indicted on 12 charges related to money laundering, tax fraud, failure to register as foreign agents, and conspiracy against the United States.

But on Thursday, Gates and Manafort were handed a superseding indictment that replaced the original 12 charges with a fresh set of 35 charges related to tax and bank fraud. Mueller's indictment document alleges that Gates and Manafort set up offshore bank accounts that they then failed to disclose to the proper authorities, and laundered over $75 million through these accounts. Friday's indictment was placed on top of these existing charges.

# EXHIBIT N

| Date/Time* | From | To | Method | Type | Content | Source |
|---|---|---|---|---|---|---|
| 2/24/2018;<br>15:51 (UTC) | Paul Manafort | Person D1 | Telephone | Phone Call | Attempted phone call - No duration | Manafort Toll Records |
| 2/24/2018;<br>15:51 (UTC) | Paul Manafort | Person D1 | Telephone | Phone Call | 1 min, 24 second call | Manafort Toll Records |
| 2/24/2018;<br>15:53 (UTC) | Paul Manafort | Person D1 | WhatsApp | Chat | This is paul | Person D1 Production;<br>Manafort iCloud<br>Production |
| 2/25/2018;<br>18:41 (UTC) | Paul Manafort | Person D1 | Telephone | Phone Call | Attempted phone call - No duration | Manafort Toll Records |
| 2/26/2018;<br>23:56 (UTC) | Paul Manafort | Person D1 | WhatsApp | Chat | http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T | Person D1 Production;<br>Manafort iCloud<br>Production |
| 2/26/2018;<br>23:57 (UTC) | Paul Manafort | Person D1 | WhatsApp | Chat | We should talk. I have made clear that they worked in Europe. | Person D1 Production;<br>Manafort iCloud<br>Production |
| 2/27/2018;<br>11:03 (UTC) | Paul Manafort | Person D1 | WhatsApp | Phone Call | Attempted phone call - No duration | Manafort iCloud<br>Production |
| 2/27/2018;<br>11:31 (UTC) | Paul Manafort | Person D1 | Telephone | Phone Call | Attempted phone call - No duration | Manafort Toll Records |
| 2/28/2018;<br>01:49 (CEST) | Person A | Person D2 | WhatsApp | Chat | [Person D2], hi! How are you? Hope you are doing fine. :) | Person D2<br>Production |
| 2/28/2018;<br>01:51 (CEST) | Person A | Person D2 | WhatsApp | Chat | My friend P is trying to reach [Person D1] to brief him on what's going on. | Person D2<br>Production |
| 2/28/2018;<br>01:51 (CEST) | Person A | Person D2 | WhatsApp | Chat | If you have a chance to mention this to [Person D1] - would be great | Person D2<br>Production |

| Date/Time* | From | To | Method | Type | Content | Source |
|---|---|---|---|---|---|---|
| 2/28/2018; 01:53 (CEST) | Person A | Person D2 | WhatsApp | Chat | Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU | Person D2 Production |
| 2/28/2018; 06:01 (CEST) | Person A | Person D2 | Telegram | Chat | Hey, how are you? This is [Person A]. | Person D2 Production |
| 2/28/2018; 06:01(CEST) | Person A | Person D2 | Telegram | Chat | Hope you are doing fine. | Person D2 Production |
| 2/28/2018; 06:01 (CEST) | Person A | Person D2 | Telegram | Chat | My friend P is trying to reach [D1] to brief him on what's going on | Person D2 Production |
| 2/28/2018; 06:02 (CEST) | Person A | Person D2 | Telegram | Chat | Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU | Person D2 Production |
| 2/28/2018; 06:03 (CEST) | Person A | Person D2 | Telegram | Chat | If you have a chance to mention this to [Person D1] - it would be great. It would be good to get them connected to discuss in person. P is his friend. | Person D2 Production |
| 4/4/2018; 13:00 (UTC) | Person A | Person D1 | WhatsApp | Chat | Hi. This is [Person A's first initial]. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that. | Person D1 Production |
| 4/4/2018; 08:53 (CEST) | Person A | Person D2 | WhatsApp | Chat | Hey. This is [Person A]. My friend P asked me again to help connect him with [Person D1]. Can you help? | Person D2 Production |
| 4/4/2018; 08:54 (CEST) | Person A | Person D2 | Telegram | Chat | Hey. My friend P has asked me again if there is any way to help connect him through [Person D1] | Person D2 Production |
| 4/4/2018; 08:54 (CEST) | Person A | Person D2 | Telegram | Chat | I tried him on all numbers. | Person D2 Production |

*UTC and CEST refer to Coordinated Universal Time and Central European Summer Time, respectively.