## THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 1:18-cr-83** |
| | ) | |
| **PAUL J. MANAFORT,** | ) | |
| **Defendant.** | ) | |

### <u>MEMORANDUM OPINION</u>

This multi-count indictment charging defendant with various bank fraud and tax charges was brought by a Special Counsel appointed by the Acting Attorney General to investigate collusion between President Trump's campaign for the presidency and the Russian government in connection with the 2016 Presidential election.  At issue is defendant's threshold challenge to the authority of the Special Counsel to pursue the charges in the Superseding Indictment which, on their face, appear unrelated to the 2016 Presidential election.

### I.

### A.

As a preface to the analysis of defendant's contentions attacking the Superseding Indictment, it is useful to begin with a brief recitation of the recent history of special prosecutors, and then to describe the current provisions governing the appointment of special prosecutors and their investigations.  Special prosecutors are not an unfamiliar feature of the American legal landscape; indeed special prosecutors were ubiquitous in the 1980s and 1990s, albeit under a different statutory regime.  In the wake of Watergate and the so-called Saturday Night Massacre, Congress enacted the first iteration of the independent counsel statute, the Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824 (codified at 28 U.S.C. §§ 591-598) (the 1978

Act).  The intended purpose of the 1978 Act was to create a mechanism for the investigation and

prosecution of high-ranking government officials.  Although originally enacted with a five-year

sunset provision, Congress revised and reauthorized the 1978 Act in 1983 and again in 1987.  In

1988, the Supreme Court upheld the constitutionality of the 1978 Act despite substantial

separation-of-powers challenges.  *See Morrison v. Olson*, 487 U.S. 654 (1988).[1]

Congress reauthorized the 1978 Act for the final time in 1994.  *See* Independent Counsel

Reauthorization Act of 1994, Pub. L. No. 103-270, 108 Stat. 732 (codified in 28 U.S.C. §§ 591-

599) (the 1994 Reauthorization Act).  By its terms, the 1994 Reauthorization Act required the

Attorney General to conduct a "preliminary investigation" to determine whether appointment of

an independent counsel was necessary if the Attorney General received "information sufficient to

constitute grounds to investigate whether" a covered person[2] has violated federal criminal law.

---

[1] It is important to note that despite the fact that *Morrison* was decided 7-1, Justice Scalia's dissent presented a compelling and powerful argument against the constitutionality of the 1978 Act.  Beginning with an eloquent description of the Founders' motivations in enshrining separation of powers principles in the Constitution, Justice Scalia's dissent went on to describe the ways in which the 1978 Act infringed upon Executive power:

> the [independent counsel's] investigation . . . was commenced, not necessarily because the President or his authorized subordinates believe it is in the interest of the United States, in the sense that it warrants the diversion of resources from other efforts, and is worth the cost in money and in possible damage to other governmental interests; and not even, leaving aside those normally considered factors, because the President or his authorized subordinates necessarily believe that an investigation is likely to unearth a violation worth prosecuting; but only because the Attorney General cannot affirm, as Congress demands, that there are no reasonable grounds to believe that further investigation is warranted. The decisions regarding the scope of that further investigation, its duration, and, finally, whether or not prosecution should ensue, are likewise beyond the control of the President and his subordinates.

*See Morrison*, 487 U.S. at 703 (Scalia, J., dissenting). According to Justice Scalia, "[i]f to describe this case is not to decide it, the concept of a government of separate and coordinate powers no longer has meaning" because "it is ultimately irrelevant how much the statute reduces Presidential control"; any impingement on Presidential control over the Executive Branch was unconstitutional.  Justice Scalia also noted significant Appointments Clause problems with the 1978 Act, arguing that the independent counsel was not an inferior officer because neither the President nor the Attorney General could remove the independent counsel.  Ultimately, however, Chief Justice Rehnquist and the other Justices involved in the case were not of the same mind as Justice Scalia, and the Court ruled 7-1 that the 1978 Act passed constitutional muster, including the Appointments Clause.

[2] Covered persons under the 1994 Reauthorization Act included the President, Vice President, Attorney General, any Assistant Attorney General, the Director of the CIA, the Deputy Director of the CIA, the Commissioner of Internal Revenue, the heads of the cabinet departments, and the chairman and treasurers of the principal national campaign committees seeking election or reelection of the President.  28 U.S.C. § 591(b).  Previous iterations of the 1978 Act

*Id.* § 591.   Once a preliminary investigation was initiated, the statute required the Attorney General to decide within ninety days whether "there are reasonable grounds to believe that further investigation is warranted."  *Id.* §§ 592(c)(1), (a)(1).   Finally, in the event the Attorney General concluded that "there are reasonable grounds to believe that further investigation is warranted," then the Attorney General was required by the 1994 Reauthorization Act to apply to the D.C. Circuit for the appointment of an independent counsel.  *Id.* § 592(c)(1).   Once that court appointed an independent counsel, the independent counsel would have "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice."  *Id.* § 594(a).   After appointment, the independent counsel could be removed by the Attorney General "only for good cause, physical or mental disability, or any other condition that substantially impairs the performance" of his or her duties.  *Id.* § 596(a)(1).

In 1999, through a bipartisan consensus, Congress agreed to allow the 1994 Reauthorization Act to expire.   The lawmakers at that time concluded that the 1994 Reauthorization Act was seriously flawed in several important respects as experience had shown. Indeed, in her testimony before the Senate Committee on Governmental Affairs, then-Attorney General Janet Reno testified that the statute was "structurally flawed" because the independent counsel was unaccountable, "not . . . confirmed by the Senate, and . . . not typically subject to the same sort of oversight or budget constraints that the Department [of Justice (DOJ)] faces[.]" *The Future of the Independent Counsel Act: Hearings Before the S. Comm. on Gov't Affairs*, 106th Cong. 249 (1999) (statement of Janet Reno, Attorney General).   Significantly, former independent counsel Kenneth Starr expressed a similar view, stating that the statute was both "structurally unsound" and "constitutionally dubious."  *Id.* at 425, 433 (statement of Kenneth

included different individuals as covered persons.

3

Starr, former independent counsel).  Both Republicans and Democrats had come to the conclusion that in practice the 1994 Reauthorization Act and its predecessors had become more often a political weapon to be unleashed in the ongoing, indeed escalating culture wars, than a tool for ferreting out and prosecuting crimes ostensibly committed by high-ranking government officials.

## B.

But the expiration of the 1978 Act did not end the appointment of "independent" counsel to investigate and prosecute crimes allegedly committed by high-level members of the Executive Branch.  Later in 1999, the DOJ, acting pursuant to distinct statutory authority,[3] promulgated regulations "to replace the procedures set out in the Independent Counsel Reauthorization Act of 1994."  *Office of Special Counsel*, 64 Fed. Reg. 37038, 37038 (July 9, 1999).  These regulations were an effort to address criticisms of the 1978 Act by "strik[ing] a balance between independence and accountability" and empowering the Special Counsel to "structure the investigation as he or she wishes and to exercise independent prosecutorial discretion" while maintaining "ultimate responsibility for the matter and how it is handled . . . with the Attorney General."  *Id.*

These regulations begin by outlining the grounds for appointing a Special Counsel. Specifically, 28 C.F.R. § 600.1 provides that the Attorney General, or where the Attorney

---

[3] The statutory authority under which current Special Counsel are appointed by the Attorney General pre-dates the 1978 Act.  The statutory provisions applicable to the Special Counsel were codified in 1966 at Sections 501 through 530D of Title 28 of the United States Code.  *See* An Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 612 (codified at 28 U.S.C. §§ 501-530D).  As relevant here, these provisions vest all functions of the DOJ, including conducting criminal litigation on behalf of the United States, in the Attorney General, *see* 28 U.S.C. § 509, and authorize the Attorney General to delegate these functions to "any other officer, employee, or agency of the Department of Justice," *see id.* § 510.  Although the Attorney General can delegate these functions to an existing officer of the DOJ, the Attorney General may also retain outside attorneys and commission these attorneys as special assistants to the Attorney General or special attorneys.  *See id.* § 515.  Once a special attorney is retained, that assistant "may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct."  *Id.* § 515(a).

General is recused, the Acting Attorney General, may appoint a Special Counsel when he or she determines (i) that "criminal investigation of a person or matter is warranted", (ii) that investigation of that person or matter by existing DOJ components "would present a conflict of interest," and (iii) that it would be "in the public interest to appoint an outside Special Counsel to assume responsibility for the matter."  28 C.F.R. § 600.1.  The regulations further require the Attorney General to establish the jurisdiction of the Special Counsel.  *See id.* § 600.4(a).  In this regard, the Attorney General must provide the Special Counsel "with a specific factual statement of the matter to be investigated."  *Id.*  In addition to this specific factual statement of the matter to be investigated, the regulations make clear that the Special Counsel's jurisdiction also automatically encompasses "the authority to investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation" as well as "appeals arising out of the matter being investigated and/or prosecuted."  *Id.*

The regulations also establish a mechanism by which a Special Counsel can acquire additional jurisdiction beyond the jurisdiction originally conferred by the Attorney General in the factual statement.  Specifically, a Special Counsel in the current scheme can consult with the Attorney General in the event the Special Counsel believes that additional jurisdiction is necessary to investigate fully the matters assigned in the original factual statement or to investigate new matters that come to light.  In this event, the Attorney General must then determine whether to include the additional matters within the Special Counsel's jurisdiction.  *See id.* § 600.4(b).

Once the Attorney General appoints a Special Counsel, the regulations provide that "the Special Counsel shall exercise, within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United

States Attorney." *Id.* § 600.6.   At the same time, however, the regulations require the Special

Counsel to "comply with rules, regulations, procedures, practices, and policies of the [DOJ]." *Id.*

And although it does not appear that the Special Counsel is subject to day-to-day supervision by

the Attorney General, the regulations do provide that the Special Counsel is obligated to "notify

the Attorney General of events in the course of his or her investigation in conformity with the

Departmental guidelines with respect to Urgent Reports,"  *id.* § 600.8(b), and the Attorney

General "may request that the Special Counsel provide an explanation for any investigative or

prosecutorial step," *id.* § 600.7(b).  If the Attorney General concludes that any action the Special

Counsel has taken is "inappropriate or unwarranted under established Departmental practices,"

the Attorney General can conclude that action "should not be pursued[.]" *Id.* § 600.7(b). And

in the event of the Special Counsel's "misconduct, dereliction of duty, incapacity, conflict of

interest, or for other good cause, including violation of Departmental policies[,]" the Attorney

General may remove the Special Counsel.  *Id.* § 600.7(d).  Finally, the regulations specify that

"[t]he regulations . . . are not intended to, do not, and may not be relied upon to create any rights,

substantive or procedural, enforceable at law or equity, by any person or entity, in any matter,

civil, criminal, or administrative." *Id.* § 600.10.

Some of the criticisms leveled at the provisions of the 1978 Act seem equally applicable

to the current Special Counsel scheme.[4]  To be sure, the separation of powers concerns that

---

[4] Criticisms of the 1978 Act and 1994 Reauthorization Act were legion.  Commentators from academia, Congress, and the judiciary all leveled significant criticism at the independent counsel scheme.  *See, e.g.*, Panel Program, *The Independent Counsel Process: Is it Broken and How Should it be Fixed?*, 54 Wash. & Lee L. Rev. 1515, 1546 (1997) (distinguishing an independent counsel from a U.S. Attorney because "the independent counsel, once appointed, has all the authority of the Attorney General and the independent counsel doesn't have to seek authority from anybody to anything") (Fiske, Robert B., Partner at Davis Polk & Wardwell); *id.* at 1549 ("My experience is that I had unlimited authority as an independent counsel") (Stein, Jacob A., former independent counsel); *see also* Steven G. Calabresi, *Some Normative Arguments for the Unitary Executive*, 48 Ark. L. Rev. 23, 90-95 (1995) (arguing that the costs of the 1978 Act outweighed the benefits); Julie O'Sullivan, *The Independent Counsel Statute: Bad Law, Bad Policy*, 33 Am. Crim. L. Rev. 463 (1996) (arguing that the 1978 Act created significant accountability and other problems).

plagued the 1978 Act and provoked Justice Scalia's now-famous dissent in *Morrison v. Olson* are largely cured by the present appointment structure.[5]  But the regulations do not require the Special Counsel's investigation to be limited as to time[6] or budget.  Thus, to provide a Special Counsel with a large budget and to tell him or her to find crimes allows a Special Counsel to pursue his or her targets without the usual time and budget constraints facing ordinary prosecutors, encouraging substantial elements of the public to conclude that the Special Counsel is being deployed as a political weapon.[7]  Furthermore, although the regulations require the Attorney General to provide a Special Counsel with a factual statement of the matters to be investigated, notably missing from the regulation is any requirement that the Attorney General specify any particular crime or statutes that are believed to have been violated.  The failure to specify to the Special Counsel the types of crimes and statutes involved contributes to the public

---

[5] Yet, even the current Special Counsel regulations are not entirely free from constitutional attack.  Indeed, Professor Steven Calabresi has argued that the appointment of the Special Counsel may run afoul of the Appointments Clause of the Constitution because the Special Counsel is a principal, not an inferior officer, and therefore must be appointed by the President with the advice and consent of the Senate.  *See* Steven G. Calabresi, *Mueller's Investigation Crosses the Legal Line*, Wall Street J. (May 13, 2018) https://www.wsj.com/articles/muellers-investigation-crosses-the-legal-line-1526233750; *see also* Steven G. Calabresi, *Opinion on the Constitutionality of Robert Mueller's Appointment* (May 22, 2018) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3183324. Defendant does not argue that the appointment of the Special Counsel violates the Appointments Clause of the Constitution, so that particular objection need not be addressed in detail here, but it is worth noting that such an objection would likely fail.  The Special Counsel appears quite plainly to be an inferior officer.  He is required to report to and is directed by the Deputy Attorney General.  *See Morrison*, 487 U.S. at 671-72 (holding that the independent counsel was an inferior officer); *see also Myers v. United States*, 272 U.S. 52, 159 (1926) (referring to "a United States attorney" as "an inferior officer"); *Edmond v. United States*, 520 U.S. 651, 663 (1997) ("[W]e think it evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.").  Congress may vest appointment of inferior officers in the "heads of departments" and so the congressionally authorized appointment of the Special Counsel by the Deputy Attorney General, acting as the Attorney General, is valid pursuant to the Appointments Clause.  *See* U.S. Const. art. II, § 2, cl. 2.

[6] Neither the current Special Counsel regulations, nor the order in this case places any limit on the duration of the Special Counsel's investigation.  *See infra* at 9-10.

[7] In a December 5, 2017 report, the Special Counsel's Office reported spending $3.2 million on the Special Counsel's salaries, travel, rent, and equipment between May 17, 2017 and September 30, 2017.  *See* Special Counsel's Office Statement of Expenditures May 17, 2017 to September 30, 2017 (2017).  The most recent budget proposal from the White House projects that the Special Counsel will spend about $10 million in the new fiscal year, which starts in October of this year.  *See* Josh Gerstein & Daren Samuelsohn, *Trump budget anticipates Mueller investigation will stretch into fiscal year 2019*, Politico (Feb. 12, 2018) ("The budget projects that Mueller's team will keep spending at its current rate of about $10 million per year in the next fiscal year, which starts in October.").

perception that appointment of a Special Counsel is wielded as a political weapon, not as a tool for prosecuting specific crimes believed to have been committed by high-ranking officials as to which the DOJ has a conflict.

Furthermore, the Special Counsel regulations' failure to require identification of specific crimes creates strong incentives for Special Counsel to allege that those individuals have committed criminal acts, even if the criminal acts the Special Counsel ultimately prosecutes are unrelated to the original reasons for appointing the Special Counsel.[8]  If a Special Counsel discovers no criminal activity then the investigation is likely to be perceived as a waste of time and resources, and thus a Special Counsel has a strong incentive to find criminality and to prosecute criminal conduct by the people he has been charged with investigating — here persons connected with the Trump campaign.  *See* Cass R. Sunstein, *Bad Incentives and Bad Institutions*, 86 Geo. L.J. 2267, 2279-80 (1998).[9]

The current Special Counsel is also in some ways *less accountable* than the independent counsel of the past.  The 1994 Reauthorization Act included a number of provisions requiring

---

[8] Independent Counsel Kenneth Starr's investigation is illustrative.  What began as an investigation of a real estate deal in Arkansas became an investigation of allegations that President Clinton had lied under oath and attempted to obstruct justice.  *See 'Clinton v. Starr': A 'Definitive' Account*, NPR (Feb. 16, 2010) https://www.npr.org/templates/story/story.php?storyId=123653000.

[9] The Special Counsel must also hire others to assist in the investigative process, and those applying to join the investigation may have their own biases and incentives to prosecute the target of the investigation, or their self-selection into the investigation may create an appearance of bias.  *See* Akhil Amar, *On Impeaching Presidents*, 28 Hofstra L. Rev. 291, 296 (1999) ("An ad hoc independent counsel must build an organization from scratch, and those who volunteer may have an ax to grind, since the target is known in advance.").  In this case, many of the individuals working for the Special Counsel have donated to or worked for Democrats in the past, creating a public appearance of possible bias.  *See* Alex Hosenball *et al.*, *Meet special counsel Robert Mueller's prosecution team*, ABC News (Mar. 17, 2018) https://abcnews.go.com/Politics/meet-special-counsel-robert-muellers-prosecution-team/story?id=55219043.  Similar accusations of bias were made against Kenneth Starr during the Whitewater investigation, with a number of Democrats criticizing the appointment of Kenneth Starr because of his connections to the Republican Party.  *See* David Johnston, *Appointment in Whitewater Turns into a Partisan Battle*, N.Y. Times (Aug. 13, 1994) https://www.nytimes.com/1994/08/13/us/appointment-in-whitewater-turns-into-a-partisan-battle.html.  Both cases highlight the fact that even the selection of the Special Counsel and his or her subordinates can provide grist for the media mill, heightening partisan tension and increasing the likelihood that substantial portions of the public will perceive work of the Special Counsel as partisan warfare.

progress reports to Congress,[10] and requiring that the independent counsel adhere to DOJ policies.[11]   None of these *statutory* limitations or oversight mechanisms exists for the current Special Counsel regime.

In sum, there appears to be little operational difference between the current Special Counsel appointment scheme and the scheme found wanting under the 1978 Act and its reauthorizations.   Both schemes are subject to many of the same objections.   Like the independent counsel under the 1978 Act, the current Special Counsel has broad authority to investigate and prosecute crimes unburdened by traditional limits placed on an ordinary prosecutor.   Many of the same problems that plagued investigations pursued under the 1978 Act — from Kenneth Starr's investigation of Whitewater to Lawrence Walsh's investigation of Iran-Contra — seem equally applicable to the current process.[12]   In the end, Congress and members of both political parties reached the sound conclusion that the 1978 Act and its reauthorizations should be allowed to expire, as the Act had come to be a tool for pursuing partisan agendas rather than a means of assuring accountability in government by prosecuting crimes committed by high-ranking government officials.   That lesson, it seems, has been forgotten.

## C.

The facts surrounding the appointment of the Special Counsel in this case are widely known, but bear repetition in some detail here.   On March 20, 2017, then-Federal Bureau of Investigation ("FBI") Director James Comey disclosed that the FBI was in the process of

---

[10] 28 U.S.C. § 595(a)(2) ("An independent counsel . . . shall submit to the Congress annually a report on the activities of the independent counsel, including a description of the progress of any investigation or prosecution . . .").

[11] *Id.* § 594(f)(1) (requiring the independent counsel to "comply with the written or other established policies of the Department of Justice respecting enforcement of the criminal laws"); *id.* § 594(*l*)(l)(C) (requiring the independent counsel to "comply with the established policies of the Department of Justice respecting expenditures of funds").

[12] *See supra* note 4.

investigating Russian interference in the 2016 Presidential election and any potential links or coordination between the Russian government and President Trump's campaign organization. *See* Statement of FBI Director James B. Comey, House Permanent Select Committee on Intelligence, Hearing on Russian Active Measures Investigation (Mar. 20, 2017), https://www.fbi.gov/news.  Shortly thereafter, on May 17, 2017, Acting Attorney General Rod J. Rosenstein (Rosenstein)[13] appointed Robert S. Mueller, III (Mueller) as Special Counsel pursuant to 28 U.S.C. §§ 509, 510, and 515 and authorized Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017," including as stated in ¶ (b):

> (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

> (ii) any matters that arose or may arise directly from the investigation; and

> (iii) any other matters within the scope of 28 C.F.R. § 600.4(a).

Dep't of Justice, Office of Deputy Attorney General, Order No. 3915-2017, *Appointment of Special Counsel To Investigate Russian Interference with the 2016 Presidential Election and Related Matters*, ¶ (b) (May 17, 2017) (May 17 Appointment Order).  The May 17 Appointment Order further authorized the Special Counsel "to prosecute federal crimes arising from the investigation of these matters" should the Special Counsel believe prosecution necessary and appropriate, and subject to the applicable regulations.  *Id.* ¶ (c).  Finally, the Acting Attorney General made "[s]ections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations [] applicable to the Special Counsel" in this matter.  *Id.* ¶ (d).  In sum, ¶ (b), including ¶¶ (b)(i),

---

[13] On March 2, 2017, the Attorney General recused himself "from any existing or future investigations of any matters related in any way to the campaigns for President of the United States."  Press Release, U.S. Dep't of Justice, Attorney General Sessions Statement on Recusal (Mar. 2, 2017), https://www.justice.gov/opa/pr/attorney -general-sessions-statement-recusal.  Accordingly, the Deputy Attorney General became Acting Attorney General with respect to these investigations.  *See* 28 C.F.R. § 600.1 (providing that where the Attorney General is recused, the Deputy Attorney General serves as Acting Attorney General).

(b)(ii), and (b)(iii), defines the scope of the Special Counsel's investigatory authority, ¶ (c) grants the Special Counsel authority to prosecute federal crimes "arising" from his investigation, and ¶ (d) subjects the Special Counsel to the applicable internal DOJ regulations.

Subsequently, on August 2, 2017, the Acting Attorney General issued a non-public memorandum concerning "[t]he Scope of Investigation and Definition of Authority" conferred on the Special Counsel. Memorandum from Rod Rosenstein to Robert S. Mueller, III 1 (Aug. 2, 2017) (August 2 Scope Memorandum).[14] The August 2 Scope Memorandum made clear that the May 17 Appointment Order "was worded categorically in order to permit its public release" and that the August 2 Scope Memorandum "provide[d] a more specific description" of the Special Counsel's authority. *Id.* With respect to the defendant, the August 2 Scope Memorandum identified several allegations, including allegations that the defendant:

> [c]ommitted a crime or crimes by colluding with Russian government officials with respect to the Russian government's efforts to interfere with the 2016 election for President of the United States, in violation of United States law;
>
> [c]ommitted a crime or crimes arising out of payments he received from the Ukrainian government before and during the tenure of President Viktor Yanukovych[.]

*Id.* at 2. The August 2 Scope Memorandum noted that these allegations against the defendant "were within the scope of [the Special Counsel's] investigation at the time of [his] appointment and are within the scope of the [Appointment] Order." *Id.* at 1.

Several months later, on February 22, 2018, the Special Counsel charged defendant[15]

---

[14] Prior to the hearing, the Special Counsel submitted the August 2 Scope Memorandum in this record, albeit with significant redactions. In the course of the hearing on defendant's motion to dismiss the Superseding Indictment, the Special Counsel was ordered to produce an un-redacted copy of the August 2 Scope Memorandum. The Special Counsel complied with this directive, and a review of the un-redacted memorandum confirms that the only portions pertinent to the issues in this case are those already available in this public record and excerpted above.

[15] Given the investigation's focus on President Trump's campaign, even a blind person can see that the true target of the Special Counsel's investigation is President Trump, not defendant, and that defendant's prosecution is part of that larger plan. Specifically, the charges against defendant are intended to induce defendant to cooperate with the Special Counsel by providing evidence against the President or other members of the campaign. Although these

with, and a grand jury indicted defendant on (i) five counts of subscribing to false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 1-5); (ii) four counts of failing to file reports of foreign bank accounts, in violation of 31 U.S.C. §§ 5314, 5322(a) (Counts 11-14); and (iii) nine counts bank fraud and conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344, 1349 (Counts 24-32).[16]   Specifically, the Superseding Indictment[17] alleges that defendant received millions of dollars in payments from his political consulting and lobbying work on behalf of Ukraine, the pro-Russia political party in Ukraine, and then-President Yanukovych and that defendant fraudulently hid those funds from U.S. authorities.

Defendant has now subsequently moved to dismiss the Superseding Indictment.  The questions presented in defendant's motion, and addressed in this memorandum opinion are as follows:

(1) whether ¶ (b)(i) of the May 17 Appointment Order is a valid grant of jurisdiction pursuant to the Special Counsel regulations and whether the Special Counsel's investigation falls within that grant of jurisdiction;

(2) whether ¶ (b)(ii) of the May 17 Appointment Order is a valid grant of jurisdiction pursuant to the Special Counsel regulations and whether the Special Counsel's investigation falls within that grant of jurisdiction; and

(3) whether a violation of the Special Counsel regulations would require dismissal of the Superseding Indictment.

These questions have been fully briefed and argued, and are separately addressed below.

## II.

The first question is whether ¶ (b)(i) of the May 17 Appointment Order is a valid grant of

---

kinds of high-pressure prosecutorial tactics are neither uncommon nor illegal, they are distasteful.

[16] The Special Counsel also sought and obtained an indictment in the District of Columbia charging defendant with a number of similar charges.  That indictment is still pending and that trial is set for September 17, 2018.  The Superseding Indictment here at issue was apparently sought in this district to accommodate venue requirements.

[17] Defendant was initially charged with a co-defendant.  On March 1, 2018, the government's motion to dismiss the charges against the co-defendant was granted without prejudice. Accordingly, the government subsequently filed the Superseding Indictment at issue here, including charges solely against defendant.

jurisdiction pursuant to the Special Counsel regulations and whether the Special Counsel's investigation of defendant falls within that grant.[18] To begin with, defendant concedes that ¶ (b)(i) is a valid grant of jurisdiction. Specifically, defendant acknowledges that the Acting Attorney General acted consistently with the Special Counsel regulations when the Acting Attorney General authorized the Special Counsel to investigate the matters included in ¶ (b)(i) of the May 17 Appointment Order, namely "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump." May 17 Appointment Order ¶ (b)(i). Thus, the only issue is whether the Special Counsel's investigation and prosecution of the matters contained in the Superseding Indictment falls within the valid grant of jurisdiction contained in ¶ b(i) of the May 17 Appointment Order.

It does; the Special Counsel's investigation of defendant falls squarely within the jurisdiction outlined in ¶ b(i) of the May 17 Appointment Order, and because ¶ b(i) was an appropriate grant of authority, there is no basis for dismissal of the Superseding Indictment on this ground. Specifically, in the May 17 Appointment Order, the Acting Attorney General authorized the Special Counsel to investigate, among other things, "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump … ." May 17 Appointment Order ¶ (b)(i). It is undisputed that defendant is an "individual[] associated with the campaign of President Donald Trump[;]" indeed, defendant served as the chairman of President Donald Trump's campaign from March 2016 until August 2016. Moreover, the Special Counsel's investigation focused on potential links between defendant and the Russian government. In particular, the Special Counsel investigated

---

[18] Defendant's principal argument relies on the assumption that the Special Counsel's jurisdiction to investigate and prosecute the crimes alleged against defendant in the Superseding Indictment must arise from ¶ (b)(ii) of the May 17 Appointment Order. But analysis properly begins with a determination as to whether the Special Counsel's investigation and prosecution of defendant falls within the grant of jurisdiction outlined in ¶ (b)(i) because that issue is dispositive.

defendant's political consulting work on behalf of, and receipt of substantial payments from, then-President Victor Yanukovych of the Ukraine and the Party of Regions, Yanukovych's pro-Russian political party in the Ukraine. *See* Superseding Indictment ¶¶ 10-11. To be sure, history is replete with evidence of the existing and longstanding antagonism between the Ukraine and Russia. Indeed, armed conflict in the eastern Ukraine is still underway.[19] Nonetheless, the fact that the Yanukovych was a strongly pro-Russian President warranted the investigation here. The fact that the Russian government did not make payments to defendant directly is not determinative because the text of the May 17 Appointment Order authorizes investigation of "*any* links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump." May 17 Appointment Order ¶ (b)(i) (emphasis added).[20] Given that, as the Supreme Court has recognized, the term "any" "has an expansive meaning, that is, 'one or some indiscriminately of whatever kind[,]'"[21] the May 17 Appointment Order plainly authorizes the investigation of indirect links between Trump campaign officials and the Russian government in addition to more direct connections. In this regard, the May 17 Appointment Order authorizes the Special Counsel to investigate defendant's ties with individuals financially and politically supported by the Russian government, even where, as here, those individuals are not themselves members of the Russian government.

Defendant argues that the Special Counsel's investigation cannot possibly fall within ¶ b(i) of the May 17 Appointment Order because the crimes for which defendant was ultimately

---

[19] *See* Michael Nienaber, *Ukraine, Russia fail to agree on U.N. peacekeeping mission*, Reuters (June 11, 2018) ("A ceasefire agreement that was signed in February 2015 in Minsk has failed to end the violence, with fighters from both sides violating the peace plan on a nearly daily basis.").

[20] The wisdom of allowing all links between individuals associated with President Trump's campaign and the Russian government to be subject to investigation, irrespective of how stale those connections might be, is seriously in doubt. Nevertheless, the grant of investigatory authority is written broadly, and does capture the connections at issue in this case.

[21] *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002).

prosecuted, namely bank fraud and failure to file tax returns, do not involve election interference. At first glance, this argument appears to have some force.  After all, defendant argues that the stated reason for the appointment of a Special Counsel was to investigate Russian interference with the 2016 Presidential election.  But, upon further review, it becomes clear that this argument misunderstands the structure of the May 17 Appointment Order and the difference between the Special Counsel's investigative and prosecutorial authority.  Paragraph b(i) describes the subject of the Special Counsel's *investigative* authority, namely "any links" between President Trump campaign officials and the Russian government.  May 17 Appointment Order ¶ b(i).  Paragraph (c) of the May 17 Appointment Order then describes the Special Counsel's *prosecutorial* authority, authorizing the Special Counsel "to prosecute federal crimes arising from these matters" if the Special Counsel "believes [prosecution] is necessary and appropriate."  *Id.* ¶ (c). The May 17 Appointment Order does not limit the Special Counsel's prosecution authority to federal crimes concerning election interference or collusion; rather, the Special Counsel is authorized to prosecute federal crimes that arise out of his authorized investigation.  And the crimes charged in the Superseding Indictment clearly arise out of the Special Counsel's investigation into the payments defendant allegedly received from Russian-backed leaders and pro-Russian political officials.  Specifically, the Special Counsel "followed the money" paid by pro-Russian officials to defendant, and as a result, claimed to have found evidence that defendant was deliberately hiding these payments from U.S. authorities by disguising the payments as loans from offshore corporate entities and by depositing the payments in offshore accounts and using those accounts to make payments to purchase and to make improvements to U.S. real estate.  *See* Superseding Indictment ¶ 2.  Based on this, the Special Counsel charged defendant with subscribing to false tax returns, failing to report foreign bank accounts, bank fraud, and

conspiracy to commit bank fraud.

In sum, ¶ (b)(i) of the May 17 Appointment Order makes clear that the Special Counsel's investigation into the payments defendant received from Russian-backed Ukrainian officials was authorized because the investigation involved potential links between a Trump campaign official — the defendant — and the Russian government via the Russian-backed Ukrainian President. The May 17 Appointment Order also confirms that the Special Counsel was authorized to prosecute the crimes alleged in the Superseding Indictment because evidence of these alleged crimes was uncovered as part of the Special Counsel's aforementioned investigation. Given that defendant concedes that the Acting Attorney General appropriately exercised his authority in authorizing this jurisdiction in the May 17 Appointment Order, defendant's argument for dismissal of the Superseding Indictment is unpersuasive.

Even assuming, *arguendo*, that the Special Counsel's investigation and the subsequent prosecution of defendant were not authorized by the plain text of ¶ (b)(i) of the May 17 Appointment Order, the August 2 Scope Memorandum reflects that the Special Counsel was acting within his authority when he sought and obtained the Superseding Indictment against defendant in February 2018. The August 2 Scope Memorandum explains that the May 17 Appointment Order's description of the Special Counsel's authority was "worded categorically in order to permit its public release." August 2 Scope Memorandum at 1. The August 2 Scope Memorandum then goes on to provide additional detail regarding the Special Counsel's authority, explaining that allegations that defendant "[c]ommitted a crime or crimes arising out of payments he received from the Ukrainian government before and during the tenure of President Viktor Yanukovych" "are within the scope of the [Appointment] Order[.]" *Id.* at 2.

No interpretive gymnastics are necessary to determine that the investigation at issue here

falls within this category of allegations described in the August 2 Scope Memorandum.  Indeed, the Superseding Indictment alleges that defendant "generated tens of millions of dollars income as a result of [his] Ukraine work" and that from approximately 2006 through the present, defendant "engaged in a scheme to hide [that] income from United States authorities[.]" Superseding Indictment ¶ 2.  Thus, the Superseding Indictment alleges that defendant committed a crime by engaging in a scheme to hide the payments he received from the Ukrainian government beginning in 2006, before the election of President Yanukovych, and continuing during President Yaunkovych's tenure and through the present.  Accordingly, the plain text of the August 2 Scope Memorandum makes clear that the Special Counsel was authorized to conduct the investigation and to seek the Superseding Indictment at issue here.

In sum, the parties agree that the Acting Attorney General properly delegated to the Special Counsel the authority to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump … ." May 17 Appointment Order ¶ b(i).  And it is clear from the text of the May 17 Appointment Order that the Special Counsel's investigation into defendant, the former chairman of the Trump campaign, and in particular defendant's receipt of payments from Russian-backed officials in the Ukrainian government falls within this appropriately-delegated prosecutorial authority.  To the extent the broadly-worded May 17 Appointment Order is lacking in clarity, the August 2 Scope Memorandum seeks to remedy this by stating explicitly that the Special Counsel is authorized to investigate defendant's payments from the Ukrainian government before and during the tenure of President Yanukovych.  *See* August 2 Scope Memorandum at 1-2.  Given that the Special Counsel was authorized to conduct the investigation and to prosecute the violations in the Superseding Indictment, dismissal of the Superseding Indictment is not warranted and

defendant's motion must be denied on this ground alone.

### III.

Given that the Special Counsel was authorized to investigate and to prosecute this matter pursuant to ¶ (b)(i) of the May 17 Appointment Order and the August 2 Scope Memorandum, that conclusion is dispositive and defendant's arguments with respect to ¶ (b)(ii) of the May 17 Appointment Order need not be addressed. But they are addressed for purposes of completeness.

Assuming, *arguendo*, that ¶ b(ii) of the May 17 Appointment Order is implicated, this question is a closer one. Paragraph (b)(ii) authorizes the Special Counsel to investigate "any matters that arose or may arise directly from the investigation." May 17 Appointment Order ¶ b(ii). Defendant contends this paragraph exceeds the Acting Attorney General's authority to establish the Special Counsel's jurisdiction pursuant to 28 C.F.R. § 600.4 because ¶ (b)(ii) confers unlimited additional, not original, jurisdiction without the required oversight of the Acting Attorney General. The Special Counsel opposes this argument, contending (i) that the line between original and additional jurisdiction is not as distinct as defendant suggests and (ii) that ¶ (b)(ii) cabins the Special Counsel's authority in a manner consistent with the Special Counsel regulations.

The question whether the Acting Attorney General complied with 28 C.F.R. § 600.4 when he granted the Special Counsel the authority described in ¶ b(ii) of the May 17 Appointment Order is close. On the one hand, as defendant correctly notes, the Special Counsel regulations distinguish between the Special Counsel's original and additional jurisdiction. With respect to the Special Counsel's original jurisdiction, § 600.4(a) requires that the Special Counsel "be provided with a specific factual statement of the matter to be investigated." 28 C.F.R. § 600.4(a). Pursuant to § 600.4(a), the Special Counsel's original jurisdiction "shall also include

the authority to investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation . . . and to conduct appeals arising out of the matter being investigated and/or prosecuted." *Id.*

Section 600.4(b) establishes procedures by which the Special Counsel can gain additional jurisdiction beyond the original jurisdiction described in § 600.4(a). Specifically, if the Special Counsel concludes that he or she needs additional jurisdiction "to fully investigate and resolve the matters assigned, or to investigate new matters that come to light in the course of his or her investigation," the Special Counsel can consult with the Attorney General, and the Attorney General "will determine whether to include the additional matters within the Special Counsel's jurisdiction … ." *Id.* § 600.4(b).

These provisions, taken together, suggest that a Special Counsel's original jurisdiction must be limited to (i) a specific factual statement of the matter to be investigated, (ii) federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, and (iii) appeals arising out of the matter to be investigated. *Cf. Chevron U.S.A. Inc. v. Echazabl*, 536 U.S. 73, 80 (2002) ("[E]xpressing one item of [an] associated group or series excludes another left unmentioned" (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)). Accordingly, in defendant's view, any matter not falling within one of these three categories, including the matters described in ¶ (b)(ii) of the May 17 Appointment Order, necessarily constitutes additional jurisdiction and can only be assigned to the Special Counsel after consultation with, and approval by, the Attorney General.

On the other hand, the Special Counsel correctly notes that the text of § 600.4 neither expressly limits the scope of the Special Counsel's original jurisdiction, nor does it establish a strict boundary line between original and additional jurisdiction. And the Special Counsel

contends that such sharp limitations and divisions would require the Special Counsel to consult the Attorney General with respect to every incremental action the Special Counsel anticipated taking as the facts developed in his or her investigation. In this regard, defendant's interpretation of § 600.4 would lead to results inconsistent with other sections of the Special Counsel's regulations, which make clear that the Special Counsel "shall not be subject to the day-to-day supervision of any official of the [DOJ]." *Id.* § 600.7(b). [22]

The government also argues that ¶ (b)(ii) of the May 17 Appointment Order is not, as defendant suggests, a "blank check" granting the Special Counsel unlimited and unreviewable authority. Def't. Mot. at 14. Indeed, the text of ¶ (b)(ii) circumscribes the Special Counsel's authority in two key ways: (i) by requiring that the matter at issue "arise from" the Special Counsel's investigation and (ii) by requiring that the matter arise "directly" from this investigation. May 17 Appointment Order ¶ (b)(ii). In this regard, the Special Counsel is not entitled to investigate and prosecute criminal conduct that is entirely incidental to, or disconnected from, the specific factual statement of matters to be investigated; rather, the Special Counsel is entitled to investigate only those matters that arise "in the usual or regular course or order" of investigating the matters included in the specific factual statement. *Black's Law Dictionary* 557 (10th ed. 2014). [23]

The Special Counsel regulations also make clear that the Special Counsel remains subject to the Attorney General's oversight following the Special Counsel's appointment, notwithstanding the specific grant of original jurisdiction. For example, the regulations require

---

[22] Such limitations, divisions, and requirements for frequent consultation might ultimately be desirable, as they would ensure that the Special Counsel's work is carefully reviewed by democratically accountable leaders within the DOJ.

[23] Although Special Counsel may be correct that the May 17 Appointment Order does not grant a blank check, it does grant the Special Counsel broad authority at which some observers might blanch. But whether a grant of broad authority to the Special Counsel is desirable is a different question from whether it is legal.

the Special Counsel (i) to "comply with the rules, regulations, procedures, practices, and policies of the [DOJ,]" 28 C.F.R. § 600.7(a), and (ii) to "notify the Attorney General of events in the course of his or her investigation in conformity with the Departmental guidelines with respect to Urgent Reports[,]" *id.* § 600.8.  And importantly, the Attorney General "may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued."  *Id.* § 600.7(b).  Should the Special Counsel violate any of these Departmental policies, the Attorney General is empowered to remove the special counsel.  *See id.* § 600.7(d).  In sum, because ¶ (b)(ii) itself and the regulations cabin the Special Counsel's authority, the Special Counsel argues that defendant's concern that ¶ (b)(ii) grants unlimited and unreviewable discretion to the Special Counsel is unfounded.

In the end, it is unnecessary to resolve the question whether ¶ (b)(ii) of the May 17 Appointment Order, which authorizes the Special Counsel to investigate "any matters that arose or may arise directly from the investigation," is an improper grant of original jurisdiction for two reasons.  First, as described *supra*, the Special Counsel's investigation and prosecution of defendant is supported by ¶ (b)(i) of the May 17 Appointment Order.  Second, the record makes clear that the Acting Attorney General has required the Special Counsel to consult with the Acting Attorney General before investigating matters that might fall under ¶ (b)(ii) of the May 17 Appointment Order.  Specifically, the August 2 Scope Memorandum, consistent with 28 C.F.R. § 600.4, identifies specific factual matters to be investigated by the Special Counsel, including allegations that defendant "[c]ommitted a crime or crimes by colluding with Russian government officials with respect to the Russian government's efforts to interfere with the 2016

election for President of the United States, in violation of United States law[.]"  August 2 Scope Memorandum at 2.  And notably, the August 2 Scope Memorandum limits the Special Counsel's ability to investigate "additional matters that otherwise may have arisen or may arise directly from the Investigation" by requiring the Special Counsel to "consult [the Acting Attorney General] for a determination of whether such matters should be within the scope of [the Special Counsel's] authority."  *Id.* at 3.  Thus, for the matters encompassed in ¶ (b)(ii) of the May 17 Appointment Order, namely "matters that arose or may arise directly from the investigation," the Acting Attorney General has required the Special Counsel to follow precisely the procedures the Special Counsel must follow should he wish to request additional jurisdiction.  Put differently, it is immaterial whether ¶ (b)(ii) of the May 17 Appointment Order was actually a grant of additional jurisdiction because the Acting Attorney General has required the Special Counsel to follow the procedures for gaining additional jurisdiction should the Special Counsel wish to exercise the authority set out in ¶ (b)(ii).

In sum, whether ¶ (b)(ii) of the May 17 Appointment Order is a valid grant of original jurisdiction pursuant to 28 C.F.R. § 600.4(a) is a close question; defendant's argument that ¶ (b)(ii) grants overbroad original jurisdiction is not without some merit.  In the end, however, it is unnecessary to resolve this question because the Acting Attorney General incorporated the regulations which required the Special Counsel to consult with the Acting Attorney General, in compliance with 28 C.F.R. § 600.4(b), in the event the Special Counsel sought to exercise the authority described in ¶ (b)(ii) of the May 17 Appointment Order.

## IV.

Even assuming, *arguendo*, that the Acting Attorney General violated the Special Counsel regulations by appointing the Special Counsel, this fact would nonetheless fail to support the

remedy defendant seeks, namely dismissal of the Superseding Indictment, because (i) defendant is not entitled to enforce these regulations and (ii) the Special Counsel had the requisite constitutional and statutory authority to investigate and prosecute this matter.

To begin with, the plain text of the Special Counsel regulations makes pellucid that the regulations do not create any enforceable rights and as such, defendant's attempt to enforce the regulations must fail.  Specifically, § 600.10, provides that the regulations "are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law or equity, by any person or entity, in any matter, civil, criminal, or administrative."  28 C.F.R. § 600.10.  The Fourth Circuit has routinely declined to enforce provisions governing DOJ procedures where those provisions use language similar to the language at issue here.  *See, e.g.*, *In re Grand Jury Proceedings*, 42 F.3d 876, 880 (4th Cir. 1994) (policy governing attorney subpoenas); *In re Shain*, 978 F.2d 850, 853 (4th Cir. 1992) (regulations governing journalist subpoenas); *United States v. Howard*, 590 F.2d 564, 567-68 (4th Cir. 1979) (Petite policy limiting dual prosecution).[24]  Defendant is attempting to do precisely that which § 600.10 of the Special Counsel regulations and Fourth Circuit precedent proscribe, namely to enforce the Special Counsel regulations in a criminal proceeding.  Because the plain text of the regulations prevents this, it is not appropriate to do so here.

In an attempt to avoid this conclusion, defendant characterizes his argument not as an effort to enforce rights under the regulations but rather as a challenge to the Special Counsel's legal authority.  Specifically, defendant argues that a Special Counsel, appointed in a manner that violates the Special Counsel regulations, does not have the requisite legal authority to represent

---

[24] Other circuits have similarly declined to enforce provisions of this nature.  *See, e.g.*, *In re Grand Jury Subpoena (Miller)*, 438 F.3d 1141, 1152-53 (D.C. Cir.) (press subpoena regulations and related USAM provision), *cert. denied*, 545 U.S. 1150 (2005); *United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005) (Petite policy limiting dual prosecution); *United States v. Lee*, 274 F.3d 485, 492-93 (8th Cir.) (death penalty protocol), *cert. denied*, 537 U.S. 1000 (2002).

23

the United States in investigating and prosecuting this case.  But this argument misidentifies the source of the Special Counsel's legal authority.  The Special Counsel's legal authority is not grounded in the procedural regulations at issue here, but in the Constitution and in the statutes that vest the authority to conduct criminal litigation in the Attorney General and authorize the Attorney General to delegate these functions when necessary.  And because the Special Counsel was appointed in a manner consistent with both these sources of legal authority, there is no basis for dismissal of the Superseding Indictment.

To begin with, the parties do not dispute that the Special Counsel's appointment was consistent with the Appointments Clause of the Constitution, which empowers Congress to vest appointment of "inferior officers," in the "president alone" or in "heads of departments."  U.S. Const. art. II, § 2, cl. 2.  In *Morrison v. Olson*, the Supreme Court concluded that the independent counsel there was an "inferior officer," not subject to appointment by the President and advice and consent of the Senate, because (i) the independent counsel was removable by the Attorney General and (ii) the independent counsel was "empowered . . . to perform only certain, limited duties."  487 U.S. at 663, 671.  These same factors apply here—(i) the Special Counsel is removable by the Acting Attorney General, *see* 28 C.F.R. § 600.7(d), and (ii) the Special Counsel's authority is limited to that which the Acting Attorney General has authorized generally in the May 17 Appointment Order, and more specifically in the August 2 Scope Memorandum.  In sum, the parties do not dispute, and *Morrison* makes clear, that the Special Counsel is an "inferior officer" and as such, can be appointed by a department head, in this case the Acting Attorney General, pursuant to Article II of the Constitution.[25]

The Acting Attorney General appointed the Special Counsel and authorized him to

---

[25] *See supra* note 5.

conduct the investigation at issue here in a manner consistent with statutory authority.  Congress has vested in the Attorney General the power to conduct criminal litigation on behalf of the U.S. government.  *See* 28 U.S.C. § 516.   At the same time, Congress has authorized the Attorney General to appoint subordinates to assist in discharging these duties when necessary.  *See id.* §§ 509, 510, 515, 533.  In this regard, Congress enabled the Attorney General to "specially retain[]" attorneys "commissioned as special assistant to the Attorney General or special attorney" and to authorize these special assistants to "conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings." *Id.* § 515.  Precisely this occurred here.  The Acting Attorney General decided that it was necessary to delegate the criminal investigation at issue here to a "specially retained" attorney and as such, commissioned the Special Counsel and directed him to investigate generally "any links  . . . between the Russian government and individuals associated with the campaign of President Donald Trump" and more specifically "any allegations that [defendant] committed a crime or crimes arising out of payments [defendant] received from the Ukrainian government before and during the tenure of President Viktor Yanukovych[.]"  August 2 Scope Memorandum at 1-2.  Accordingly, the Acting Attorney General acted within his statutory authority when he appointed the Special Counsel and as such, the Special Counsel had legal authority to investigate and prosecute this case.

In sum, because the Special Counsel's appointment was consistent with both constitutional requirements regarding appointment of officers and statutory requirements governing the authority to conduct criminal litigation on behalf of the United States, the Special Counsel had legal authority to investigate and to prosecute this matter and dismissal of the Superseding Indictment is not warranted.

This conclusion is consistent with Supreme Court precedent, which has made clear in the

criminal context that a court need not enforce an agency's internal rules when the agency was "not required by the Constitution or by statute to adopt any particular procedures or rules[.]" *United States v. Caceres*, 440 U.S. 741, 749 (1979). As described above, the constitutional and statutory provisions at issue here empower the Attorney General to appoint a special assistant and to authorize that special assistant to conduct criminal litigation on behalf of the U.S. government; these provisions do not require the Attorney General to follow specific procedures when delegating this power. *See, e.g.*, *In re Persico*, 522 F.2d 41, 66 (2d Cir. 1975) (noting that, to satisfy 28 U.S.C. § 515, the Attorney General's authorization of a specially retained attorney "need not be embodied in a single written authorization, but may be implied from other writings, guidelines, practices, and oral directions transmitted through a chain of command within the department"); *Infelice v. United States*, 528 F.2d 204, 206 (7th Cir. 1975) (holding that a commission's failure to specify (i) the statute under which the special attorney was appointed, (ii) the names of the persons to be investigated, and (iii) the reason for the appointment was not fatal to a specially retained attorney's appointment). Thus, as in *Caceres*, the DOJ was "not required by the Constitution or by statute to adopt any particular procedures or rules [before appointing a Special Counsel]" and as such, the court is not required to enforce the internal procedures that the DOJ elected to establish. 440 U.S. at 749.

The cases defendant relies on do not compel a contrary conclusion. Specifically, defendant relies chiefly on *United States v. Providence Journal*, 485 U.S. 693 (1988), *United States v. Nixon*, 418 U.S. 683 (1974), and their progeny, but these lines of cases do not require a result different from that reached here. In *Providence Journal*, a court-appointed prosecutor sought certiorari in the Supreme Court without the authorization of the Solicitor General. *Providence Journal*, 485 U.S. at 695-99. The Supreme Court ultimately dismissed the writ of

certiorari because 28 U.S.C. § 518(a) makes clear that unless the Attorney General specifically directs otherwise, only the Attorney General and the Solicitor General may "conduct and argue suits and appeals in the Supreme Court . . . in which the United States is interested." *Id.* at 699. Because the court-appointed prosecutor was not the Attorney General or the Solicitor General, the Supreme Court held that the court-appointed prosecutor was not a party entitled to petition for certiorari and dismissed the writ for want of jurisdiction. *Id.*

Defendant argues that the special prosecutor in *Providence Journal* lacked authority because the special prosecutor was not appointed consistent with a DOJ regulation delegating to the Solicitor General the authority to represent the United States in the Supreme Court. But, contrary to defendant's assertions, the Supreme Court made clear in *Providence Journal* that it dismissed the writ of certiorari because "a federal *statute*[,]" namely 28 U.S.C. § 518(a), "deprive[d] the special prosecutor of the authority to pursue the litigation in this Court on behalf of the United States … ." *Id.* at 699 n.5 (emphasis added). In this regard, *Providence Journal* is distinguishable from this case. Here, as described above, the Acting Attorney General's delegation of authority to the Special Counsel to investigate and to prosecute the crimes alleged in the Superseding Indictment is fully consistent with both pertinent constitutional and statutory authority. Because there is no federal statute depriving the Special Counsel here of the power to pursue litigation of this matter, *Providence Journal* does not demand dismissal of the Superseding Indictment.[26]

---

[26] Defendant also cites to several cases arising under *Providence Journal.* Importantly, as in *Providence Journal,* the courts in these cases relied on the fact that a statute, not an internal DOJ regulation, deprived the prosecutor at issue of authority. For example, in *Federal Election Commission v. NRA Political Victory Fund,* 513 U.S. 88 (1994), the Court considered whether the FEC could petition for a writ of certiorari. Again, the Court dismissed the writ of certiorari, this time because the Solicitor General authorized the filing of the petition outside the "mandatory and jurisdictional" 90-day time limit established by statute in 28 U.S.C. § 2101(c). Similarly, in *United States v. Fernandez,* the Fourth Circuit considered whether the Attorney General could take an interlocutory appeal of a matter prosecuted by an independent counsel. The Fourth Circuit held that the Attorney General was not authorized to take an interlocutory appeal because when an independent counsel is prosecutor, "the [1978] Act removes from

Next, defendant cites to *United States v. Nixon* in support of his argument that special prosecutors, appointed inconsistently with internal DOJ regulations, lack authority to represent the United States in criminal litigation.  Specifically, defendant relies on one line of dicta in *Nixon* in which the Supreme Court states that "[s]o long as this regulation is extant it has the force of law."  *Nixon*, 418 U.S. at 695.  But *Nixon* is distinguishable for two reasons.  First, the *Nixon* Court considered an issue different from the issue in this case; instead of deciding whether the special prosecutor there had legal authority to conduct criminal litigation, the *Nixon* Court considered whether the political question doctrine barred judicial review of conflicts between the special prosecutor and the President.  Specifically, the *Nixon* Court had to determine whether the President's attempt to quash a special prosecutor's subpoena was an intrabranch conflict concerning delegation of authority or a case or controversy capable of resolution by the judiciary.  As such, *Nixon* is inapposite inasmuch as the holding there did not adjudicate the legal authority of a special prosecutor.

Even assuming *Nixon*'s discussion of the political question doctrine was to govern here, *Nixon* is distinguishable because the regulation at issue there appointed a special prosecutor and specifically defined that special prosecutor's authority.  *See id.* at 694-96.  In particular, the regulation at issue in *Nixon* vested the special prosecutor there with authority to control the course of investigations relating to:

> all offenses arising out of the 1972 Presidential Election for which the Special Prosecutor deems it necessary and appropriate to assume responsibility,

---

[the Attorney General's] purview [the considerations inherent to the interlocutory appeal]."  *United States v. Fernandez*, 887 F.2d 465, 470 (4th Cir. 1989).  Thus, dismissal of the appeal in that case was required because the 1078 Act, a statute, transferred the authority in question to the independent counsel.  In sum, given that those cases focus on statutory, not regulatory authority, the remedies in those cases are not warranted here.

Neither does *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), also cited by defendant, require a result different from the result reached here.  The *Larson* Court found that where "the officer's powers are limited by statute," the officer's "actions beyond those limitations are considered individual and not sovereign."  *Id.* at 689.  In this regard, the Court again emphasized the statutory, and not regulatory limit, to the officer's authority, and as such, *Larson* supports the conclusion reached here.

allegations involving the President, members of the White House staff, or Presidential appointees, and any other matters which he consents to have assigned to him by the Attorney General.

*Id.* at 694 n.8 (quoting Fed. Reg. 30739, *as amended by* 38 Fed. Reg. 32805). Indeed, the regulation itself expressly delegated to the special prosecutor full authority with respect to "determining whether or not to contest the assertion of 'Executive Privilege' or any other testimonial privilege … ." 38 Fed. Reg. 30739, *as amended by* 38 Fed.Reg. 32805. The *Nixon* Court reasoned that because the Attorney General specifically delegated to the special prosecutor the authority to determine whether to contest the President's assertion of Executive Privilege, the Attorney General could not now reclaim that same authority without "amend[ing] or revok[ing] the regulation." *Nixon*, 418 U.S. at 696. By contrast, defendant here is not attempting to enforce a regulation delegating specific authority to the Special Counsel; rather, defendant is attempting to enforce a more general regulation governing the process by which the DOJ allocates authority and divides responsibility internally. Given that the regulation at issue in this case is not a grant of specific authority to the Special Counsel, *Nixon*'s dicta requiring the Attorney General to revoke a specific grant of authority before reclaiming precisely that authority, is inapposite here.

In sum, even assuming defendant is correct that the Acting Attorney General violated the Special Counsel regulations when he appointed the Special Counsel here, that fact does not warrant dismissal of the Superseding Indictment. The Special Counsel regulations themselves make clear that the regulations do not "create any rights, substantive or procedural," and as such, the regulations are unenforceable "at law or equity, by any person or entity, in any matter, civil, criminal, or administrative." 28 C.F.R. § 600.10. Moreover, a violation of the Special Counsel regulations would not deprive the Special Counsel of the requisite legal authority to investigate and prosecute this matter because the Special Counsel's appointment was consistent with both

the Constitution and relevant federal statutes, and the Constitution and federal statutes do not mandate that the Attorney General adopt any particular procedures prior to appointing a Special Counsel. Accordingly, dismissal of the Superseding Indictment is not appropriate here, and for this reason, as well as those described *supra*, defendant's motion must be denied.

## V.

In sum, dismissal of the Superseding Indictment on the grounds urged by defendant is not warranted here. But that conclusion should not be read as approval of the practice of appointing Special Counsel to prosecute cases of alleged high-level misconduct. Here, we have a prosecution of a campaign official, not a government official, for acts that occurred well before the Presidential election. To be sure, it is plausible, indeed ultimately persuasive here, to argue that the investigation and prosecution has some relevance to the election which occurred months if not years after the alleged misconduct. But in the end, that fact does not warrant dismissal of the Superseding Indictment. The Constitution's system of checks and balances, reflected to some extent in the regulations at issue, are designed to ensure that no single individual or branch of government has plenary or absolute power. The appointment of special prosecutors has the potential to disrupt these checks and balances, and to inject a level of toxic partisanship into investigation of matters of public importance.[27] This case is a reminder that ultimately, our system of checks and balances and limitations on each branch's powers, although exquisitely designed, ultimately works only if people of virtue, sensitivity, and courage, not affected by the winds of public opinion, choose to work within the confines of the law. Let us hope that the people in charge of this prosecution, including the Special Counsel and the Assistant Attorney

---

[27] A better mechanism for addressing concerns about election interference would be the creation of a bipartisan commission with subpoena power and the authority to investigate all issues related to alleged interference in the 2016 Presidential election. If crimes were uncovered during the course of the commission's investigation, those crimes could be referred to appropriate existing authorities within the DOJ.

General, are such people.  Although this case will continue, those involved should be sensitive to

the danger unleashed when political disagreements are transformed into partisan prosecutions.

T. S. Ellis, III
United States District Judge