**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>)<br>v. )<br>)<br>)<br>)<br>PAUL J. MANAFORT, JR., )<br>)<br>)<br>*Defendant.* )<br>) | Criminal No. 1:18-cr-00083-TSE<br><br>Judge T. S. Ellis, III |

**DEFENDANT PAUL J. MANAFORT JR.'S MEMORANDUM**
**IN SUPPORT OF HIS MOTION FOR A CHANGE OF VENUE**
**AND FOR OTHER RELIEF RELATING TO JURY SELECTION**

Defendant Paul J. Manafort, Jr., by and through counsel, files this memorandum in support of his motion for a change of venue and for other relief relating to jury selection.  Mr. Manafort makes his motion based upon his Sixth Amendment right to trial by an impartial jury and pursuant to Rule 21of the Federal Rules of Criminal Procedure.

**1.  Procedural Background**

On June 29, the Court addressed Mr. Manafort's motion for a hearing inquiring into improper government leaks to the media. (Dkt. 43).  The Court stated that any hearing to assess any alleged leaks would take place following the trial.  The Court further noted that if defendant was seeking a change of venue, he should file a motion by July 6, 2018.

At the June 29 hearing, the Court also explained how jury selection would be conducted.  First, the Court informed counsel that it would not use the proposed jury questionnaire.  Second, the Court described the jury selection process itself. Specifically, the Court noted that it would ask

approximately 60 potential jurors about exposure to media coverage, but that it would not inquire into who anyone voted for or whether they subscribe to certain publications.  Upon defendant's request, the Court granted permission to file supplemental briefing by July 6, 2018.

### 2.  Pretrial Publicity

The investigation into "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump" and "any matters that arose or may arise directly from the investigation" has dominated the news cycle in the United States at least since the moment of Mr. Mueller's appointment as Special Counsel on May 17, 2017.  *See* May 17, 2017 Appointment Order.  From the outset, a significant portion of the media coverage has focused on Mr. Manafort – the first individual indicted by the Special Counsel and the first individual to face a trial arising from the probe.

While federal courts often address issues of pretrial publicity in high-profile cases, it is difficult to conceive of a matter that has received media attention of the same magnitude as the prosecution of Mr. Manafort.  There are several reasons for this unrelenting news coverage.

First, the Special Counsel investigation focuses on issues relating to a sitting United States President.  While Mr. Manfort's indictment and upcoming trial before this Court have little to do with President Trump, as the Court noted, in a much-reported statement:

> Given the investigation's focus on President Trump's campaign, even a blind person can see that the true target of the Special Counsel's investigation is President Trump, not [Manafort], and that [Manafort's] prosecution is part of that larger plan.

Court's Order on Motion to Dismiss, Doc. 97, at 11, n.15.[1]

Unsurprisingly, then, the nation's attention remains fixed on Mr. Manafort's trial.

---

[1] *See, e.g., 'Even a blind person' can see Mueller using Manafort to 'target' Trump: judge,* The Washington Times, June 28, 2018.    Available at: https://www.washingtontimes.com/news/2018/jun/28/even-blind-person-can-see-mueller-using-manafort-t/

Second, the subject matter of the Special Counsel's investigation has a direct relationship to the political process. This prosecution involves the President's former campaign manager. As a result, for many Americans, Mr. Manafort's legal issues and the attendant daily media coverage have become theatre in the continuing controversy surrounding President Trump and his election. This controversy continues to engender strong partisans on both sides of every issue. As a result, it is difficult, if not impossible, to divorce the issues in this case from the political views of potential jurors.

Third, the high profile of the Special Counsel himself, a former FBI Director, has turned the Special Counsel's investigation into something the media has portrayed as a showdown between Mr. Mueller on one hand and the President on the other.

Fourth, the reporting on this prosecution has often been sensationalized and untethered from the facts in the case. For example, while the recent indictment of Konstantin Kilimnik, a defendant in the D.C. prosecution, involved little more than an effort to make contact with a former associate, the reporting about Mr. Kilimnik has focused primarily on his alleged background in Russian intelligence.[2]

Fifth, on June 15, 2018, the U.S. District Court for the District of Columbia revoked Mr. Manafort's release and remanded him into custody. This event, less than 45 days before the trial scheduled before this Court, unleashed a spate of intensely negative news coverage suggesting that Mr. Manafort violated the law.[3] Indeed, even the President's response on Twitter; observed that

---

[2] *See, e.g., Russian charged with Trump's ex-campaign chief is key figure*, The Washington Post, July 2, 2018. Available at: https://www.washingtonpost.com/politics/russian-charged-with-trumps-ex-campaign-chief-is-key-figure/2018/07/02/c34bfc74-7e1c-11e8-a63f-7b5d2aba7ac5_story.html?utm_term=.3d9d016fd126

[3] Notably, this coverage included televised video of the van carrying Mr. Manafort arriving at the Northern Neck Regional Jail. Available at: https://www.cnn.com/videos/politics/2018/06/16/paul-manafort-arrives-to-jail-ctn.cnn

Case 1:18-cr-00083-TSE   Document 107   Filed 07/06/18   Page 4 of 10 PageID# 1871

Mr. Manafort received a "tough sentence," incorrectly suggesting that Mr. Manafort had been sentenced for committing a crime.[4]

Finally, while this matter has received national media attention, the coverage, and the degree to which the public has followed that coverage, has been most intense in and around Washington, D.C.  The Alexandria Division[5] of the Eastern District of Virginia is part of the greater Washington, D.C. metropolitan area and lies, at least in part, inside-the-Beltway.

### 3.  Applicable Law and Argument

Under the Sixth Amendment, all criminal defendants have the right to trial by "indifferent" jurors "free from outside influences," who will "base their decision solely on the evidence," undisturbed by personal prejudice or public passion. *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court reviewed the denial of a change of venue motion in a high-profile white-collar crime prosecution.  The government charged Skilling, the former CEO of Enron Corporation, with more than 25 counts of securities fraud, wire fraud, and making false statements in relation to Enron's financial strength. *Id.* at 369. The trial took place in Houston, the site of the company's headquarters.  Skilling filed a motion seeking a change of venue, which the district court denied.  *Id.* at 369-70.  Following his conviction, Skilling appealed, first to the Fifth Circuit and then to the Supreme Court, complaining

---

[4] *See 'Very unfair!': Trump complains about Manafort's jailing on witness tampering allegations,* The Washington Post, June 15, 2018.  Available at: https://www.washingtonpost.com/politics/nothing-to-do-with-our-campaign-trump-seeks-to-distance-himself-from-manafort-before-hes-jailed/2018/06/15/79267402-70b7-11e8-bf86-a2351b5ece99_story.html?utm_term=.1fcf5272051b

[5] The Alexandria Division consists of the City of Alexandria and the counties of Arlington, Fairfax, Fauquier, Loudoun, Prince William and Stafford, as well as any other city or town within the geographical boundaries of those counties.

4

that the district court's failure to order a change of venue deprived him of a fair trial.  *Id.* at 375-377.

The Supreme Court noted the extensive pre-trial publicity surrounding the Enron collapse, which included not only hard-news stories but also special interest pieces mocking the Enron executives and inciting sympathy for Enron investors. *Id.* at 375, n. 8.  However, the Supreme Court rejected Skilling's claim holding that the record did not support a finding of presumed prejudice and, as a result, "declining to order a venue change, did not exceed constitutional limitations." *Id.* at 383-85.

In reaching this conclusion, the Court focused on the following factors and differentiated Skilling from defendants in prior cases requiring a venue change.  Specifically, the Court pointed to: (1) the size and characteristics of the community; (2) whether the news stories contained blatantly prejudicial information; (3) the time between the reported events and the trial; and (4) evidence that the jury verdict undermined possible juror bias. *Id.* at 382-84.

While the Court used these standards to evaluate error in the district court's decision to deny a change of venue, several of the factors support the requested change of venue in Mr. Manafort's case.  First, as to the size and characteristics of the community, the Alexandria Division of the Eastern District of Virginia is far less populous than Houston.  Perhaps more importantly, while having a substantial population, the individuals residing in the division are far more likely to have closely followed the developments and news coverage in the Manafort case in light of the division's close connection with the nation's capital.  This may be the rare case where a juror's predisposition may directly tie to their vote in the last presidential election.  It is not a stretch to expect that voters who supported Secretary Clinton would be predisposed against Mr. Manafort or that voters who supported President Trump would be less inclined toward the Special Counsel.

Notably, however, voters in the Alexandria Division voted 2-to-1 in favor of Secretary Clinton (66% Clinton; 34% Trump).[6]  This split is more balanced in other places in Roanoke, Virginia, located in the Western District of Virginia.

A simple Google search for articles about Russian collusion shows 2,900,000 results.  As the Court has pointed out, public interest in this case is far beyond what the Court would expect. In fact, the amount of media coverage of the Special Counsel's investigations is astounding.  A Google search for articles relating to Paul Manafort reveals 1,390,00 results. Reviewing these articles, one is hard pressed to find any that are not unfavorable to Mr. Manafort.  The news coverage here has contained prejudicial information, including, but not limited to the false news coverage as detailed in Mr. Manafort's prior "leaks" motion (Dkt. 43), coverage of Mr. Manafort's recent jailing,[7] and allegations regarding connections with Russian intelligence.[8]

Nowhere in the country is the bias against Mr. Manafort more apparent than here in the Washington, D.C. metropolitan area.  The phrase "inside-the-beltway" was coined to capture the area's preoccupation with all things political.  The Washington media market, including Maryland and Virginia suburbs, is the sixth largest TV market in the United States with over 2,321,610 TV

---

[6] *See* https://results.elections.virginia.gov/vaelections/2016%20November%20General/Site/Presidential.html

[7] *See, e.g., Judge sends Paul Manafort to jail, pending trial*, CNN, June 15, 2018.  Available at: https://www.cnn.com/2018/06/15/politics/judge-sends-paul-manafort-to-jail-pending-trial/index.html;

*Judge Orders Paul Manafort Jailed Before Trial, Citing New Obstruction Charges*, The New York Times, June 15, 2018.  Available at: https://www.nytimes.com/2018/06/15/us/politics/manafort-bail-revoked-jail.html; and

*Paul Manafort ordered to jail after witness-tampering charges,* The Washington Post, June 15, 2018. Available at: https://www.washingtonpost.com/local/public-safety/manafort-ordered-to-jail-after-witness-tampering-charges/2018/06/15/ccc526cc-6e68-11e8-afd5-778aca903bbe_story.html?utm_term=.95bcb30d02c6

[8] *See, e.g., Special counsel: Manafort, Gates worked with Russian intelligence agent*, CBS News, March 28, 2018. Available at: https://www.cbsnews.com/news/special-counsel-manafort-gates-worked-with-russian-intelligence-agent/; and

*Manafort and ally with Russian intel ties face new obstruction charges*, CNN, June 8, 2018. Available at: https://www.cnn.com/2018/06/08/politics/paul-manafort-indictment-robert-mueller/index.html

homes. *See Top 100 Media Markets*, News Generation.[9]  The Washington, D.C. metropolitan area has over 60 online news outlets in addition to websites run by major print and broadcast media companies. Gloria & Hadge, *An Information Case Study, Washington, D.C.*, New America Foundation, Aug. 5, 2010.[10]  It ranks first in the nation in households with computers (82.9%) and internet access (80% of adults receiving information online).  For news consumption, the city's major mainstream print and broadcast outlets command the most online page views in the United States. In comparison, Roanoke is the 70th largest media outlet in the United States and 38% of households in Roanoke lack broadband compared to 3% in Northern Virginia. *See* John Edwards, *Bringing broadband to rural Virginia*, The Roanoke Times, February 28, 2018.[11]  Roanoke represents a venue where the media coverage is substantially less than in the D.C. metropolitan area.

The time between the reported events and the trial has been very short.  Unlike in *Skilling*, where the news coverage of the Enron bankruptcy more than four years before the trial had diminished, the news coverage in Mr. Manafort case continues apace. Indeed, the news coverage of the Special Counsel's investigation (starting in May 2017); Mr. Manfort's indictment in the District of Columbia (October 2017); Mr. Manafort's indictment in the Eastern District of Virginia (February 2018); and Mr. Manafort's remand (June 2018), has all taken place in the year leading up to the scheduled July 25 trial.  Moreover, some of the most prejudicial coverage has been in the

---

[9] Available at: https://www.newsgeneration.com/broadcast-resources/top-100-radio-markets/ (last visited July 6, 2018).

[10] Available at:
https://web.archive.org/web/20130909224854/http://mediapolicy.newamerica.net/publications/policy/an_informatio
n_community_case_study_washington_dc

[11] Available at:
https://www.roanoke.com/opinion/commentary/edwards-bringing-broadband-to-rural-virginia/article_b50ec107-
7b88-515d-ab44-e8d133c7a62b.html

last month.  Based upon all of these factors and the intense, unfavorable pretrial publicity, Mr. Manafort asks the Court to transfer this matter to Roanoke Virginia, well outside of the Washington metropolitan area.

Mr. Manafort also asks the Court to adopt the voir dire practices approved by the Supreme Court in *Skilling*.  These include: (1) the use of a jury questionnaire; (2) voir dire by the Court designed to address the topics included in Mr. Manafort's proposed voir dire questions (Dkt. 102); and (3) a substantial increase in the number of jurors in the venire that will be summoned to Court for the trial.  561 U.S. at 370-75.

In reviewing the *Skilling* trial for actual prejudice, and finding none, the Supreme Court carefully reviewed and generally approved of the jury selection process used by the district court. *Id.* at 386-98.  The Supreme Court described the detailed questionnaire, which included 77-questions over 14 pages that were generally open-ended allowing the jurors to provide meaningful information. *Id.* at 371.  The questionnaire was sent out to 400 prospective jurors. *Id.* at 372.  The Supreme Court demonstrated the importance of the questionnaires by finding they "confirmed that, whatever community prejudice existed in Houston generally, Skilling's juror were not under its sway."  *Id.* at 391. In addition to the questionnaire, the Supreme Court favorably noted that the district court in *Skillin*g asked questions related to pretrial publicity to each juror individually. Id. at 389. This approach is similar to the practice the Court has indicated it would apply in Mr. Manafort's case.

Mr. Manafort submits that a fair trial will impossible without a change of venue to Roanoke, Virginia.  Mr. Manafort also respectfully asks the Court to adopt the additional steps discussed above when summoning the venire and conducting voir dire.

WHEREFORE, Defendant Manafort respectfully requests that the Court transfer this case to Roanoke, Virginia for trial and asks the Court to adopt the procedures described above in its jury selection process.

Dated: July 6, 2018                        Respectfully submitted,


s/ Kevin M. Downing
Kevin M. Downing (*pro hac vice*)
Law Office of Kevin M. Downing
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 754-1992
kevindowning@kdowninglaw.com


s/ Thomas E. Zehnle
Thomas E. Zehnle (VSB No. 27755)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 368-4668
tezehnle@gmail.com

s/ Jay R. Nanavati
Jay R. Nanavati (VSB No. 44391)
Kostelanetz & Fink LLP
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 875-8000
jnanavati@kflaw.com

*Counsel for Defendant Paul J. Manafort, Jr.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of July, 2018, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Andrew A. Weissman
Greg D. Andres
Uzo Asonye
U.S. Department of Justice
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 616-0800
Email: AAW@usdoj.gov
      GDA@usdoj.gov
      UEA@usdoj.gov

            s/ Jay R. Nanavati
           Jay R. Nanavati (VSB No. 44391)
           Kostelanetz & Fink LLP
           601 New Jersey Avenue NW
           Suite 620
           Washington, DC 20001
           (202) 875-8000
           jnanavati@kflaw.com

           *Counsel for Defendant Paul J. Manafort, Jr.*