**THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 1:18-cr-83** |
| | ) | |
| **PAUL J. MANAFORT,** | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION**</u>

At issue in this multi-count bank and tax fraud prosecution is defendant's motion to suppress evidence recovered from a May 27, 2017 search of a storage unit. Defendant argues that suppression is warranted

(i) because the search warrant application was based on an earlier warrantless search of the storage unit conducted without valid consent,

(ii) because the search warrant was unconstitutionally overbroad as the warrant failed to identify with adequate particularity the items to be seized, and

(iii) because the executing agents exceeded the search warrant's scope.

The government opposes these arguments, contending

(i) that the individual who authorized the initial search of the storage unit had both actual and apparent authority to consent to the search,

(ii) that the search warrant specified the matters to be seized with the particularity required to satisfy Fourth Amendment requirements, and

(iii) that executing agents seized only evidence within the scope of the warrant.

These issues have been fully briefed and argued and are now ripe for disposition.

1

**I.**[1]

On May 26, 2017, Special Agent Pfeiffer interviewed Alex Trusko ("Trusko"), an individual who, in his own words, served as defendant's "personal assistant". June 29, 2018 Hr'g Tr. 15:14-20.   Specifically, Trusko had formerly worked for defendant through two different companies operated by defendant, namely Davis Manafort Partners ("DMP"), and Steam Mountain LLC ("Steam Mountain").   *Id.* at 16:3-20.   Trusko was employed by Steam Mountain at the time of the interview.   *Id.* at 16:16-18.   During the interview with Special Agent Pfeiffer, Trusko told Special Agent Pfeiffer that defendant used a storage unit at Public Storage to store business records.   *Id.* at 17:2-8.   Trusko explained that at defendant's direction Trusko had moved business records from defendant's residence into the unit on prior occasions and that Trusko believed the records would still be contained within the storage unit.   *Id.* at 17:9-14; 18:21-19:2.   Trusko also informed Special Agent Pfeiffer that Trusko (i) had access to the storage unit, (ii) had a key to the unit, and (iii) was willing to take Special Agent Pfeiffer to the unit.   *Id.* at 19:3-20.   Although Trusko believed that defendant also had a key to the unit, Trusko doubted that defendant had ever visited the storage unit himself.   *Id.* at 27:2-8.

Special Agent Pfeiffer and Trusko subsequently traveled from Trusko's home to the storage unit.   There, Special Agent Pfeiffer spoke with the property manager of the storage facility and asked the property manager for a copy of the lease for the unit to verify Trusko's level of access to the unit.   *Id.* at 19:21-20:7.   The lease agreement listed Trusko as the "Occupant" of the unit, listed Trusko's phone number under contact information, and bore Trusko's signature as the occupant.   The lease also listed defendant as a person with "Authorized

---

[1] The facts recited here are derived from the testimony of Special Agent Jeffrey Pfeiffer ("Special Agent Pfeiffer") and the evidence introduced at the June 29, 2018 hearing on defendant's motion to suppress, including the warrant, the attached affidavit, the storage unit's lease, the storage unit's insurance addendum, the storage unit's occupant information, and the storage unit's customer transaction journal.  Importantly, defense counsel indicated no desire or intention to elicit any further testimony.  *See* June 29, 2018 Hr'g Tr. at 8:3-6.

Access" to the unit.  Special Agent Pfeiffer also received from the property manager a copy of the occupant information, insurance addendum, and customer transaction journal for the unit. The occupant information listed Trusko as the "Occupant" and Trusko's e-mail address for contact information.  Like the lease, the occupant information also listed defendant as an "Authorized User."  The insurance addendum produced by the property manager bore Trusko's signature, and the customer transaction journal, which recorded lease payments for the unit, was addressed to Trusko.

After interviewing Trusko and reviewing the documents associated with the storage unit, Special Agent Pfeiffer then asked for Trusko's consent to search the unit.  In doing so, Special Agent Pfeiffer presented Trusko with the FBI's standard consent-to-search form, and asked Trusko to read the form and sign it if appropriate.  June 29, 2018 Hearing Tr. at 27:9-19.  Trusko did so and signed the form without hesitation.  Then Trusko unlocked and opened the door to the storage unit.  *Id.* at 27:20-28:16.  Special Agent Pfeiffer then entered the storage unit where he observed, but did not open, several bankers' boxes and a filing cabinet, which later were found to contain documents.

After observing the contents of the storage unit, Special Agent Pfeiffer contacted lawyers at the Department of Justice ("DOJ").  Out of an abundance of caution, DOJ lawyers decided to seek a search warrant before continuing further with a search of the contents of the bankers' boxes and filing cabinet.  *Id.* at 29:8-17.  Accordingly, Special Agent Pfeiffer prepared a warrant application with an attached affidavit, setting out Special Agent Pfeiffer's reasons for believing that probable cause existed to support a more comprehensive search of the storage unit. Specifically, Special Agent Pfeiffer explained that he had met with Trusko and that Trusko had advised Special Agent Pfeiffer that "in approximately 2015, at the direction of [defendant],

3

Trusko moved a series of office files of [defendant's business] contained in boxes from one smaller storage unit . . . to [the storage unit to be searched]." Aff. ¶ 28.  In his affidavit, Special Agent Pfeiffer further described how Trusko informed Special Agent Pfeiffer that the storage unit "contained several boxes of office files from [defendant's] business, as well as a metal filing cabinet" which was "extremely heavy" suggesting that the filing cabinet "contained a large amount of records." *Id.* ¶ 30.  Special Agent Pfeiffer also indicated in the affidavit that Trusko advised Special Agent Pfeiffer that Trusko, at defendant's direction, had moved "brown, legal-sized files" into the cabinet as recently as spring 2016.  *Id.*

Special Agent Pfeiffer also included in his affidavit some of the information he observed from his initial viewing of the unit on May 26, 2017.  Specifically, Special Agent Pfeiffer described that he observed approximately "21 bankers' boxes that could contain documents, as well as a five-drawer metal filing cabinet" in the storage unit.  Aff. ¶ 31.  Special Agent Pfeiffer, in his affidavit, added that some of the bankers' boxes bore markings on the exterior, such as "MPI" which Special Agent Pfeiffer believed referred to "Manhattan Products International" a company in which defendant was believed to have invested.  *Id.* ¶¶ 32-33.  Another box bore the marking "Ukraine Binders" on the exterior.

Special Agent Pfeiffer further explained in his affidavit that he believed that the storage unit contained defendant's business records given (i) the information he learned from Trusko, (ii) his observations of the contents of the storage unit on May 26, 2017, and (iii) the information Special Agent Pfeiffer observed on the lease and other rental agreements.  *Id.* ¶ 35.  Special Agent Pfeiffer also believed that the storage unit contained financial records because IRS guidelines recommend that persons and corporations retain business records for several years

after filing returns and individuals and corporations often retain copies of records in anticipation for litigation. *Id.* ¶¶ 35, 37.

On May 27, 2017, a magistrate judge issued the warrant on the basis of Special Agent Pfeiffer's application and affidavit. The warrant contained two attachments: Attachment A and Attachment B. Attachment A described the property to be searched, namely the storage unit and "any locked drawers, locked containers, safes, computers, electronic devices, and storage media . . . , found therein." Warrant Attach. A. Attachment B described the property to be seized during the search of the storage unit. Specifically, Attachment B directed executing agents to seize:

1. Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to File a Report of Foreign Bank and Financial Accounts), 22 U.S.C. § 618 (Foreign Agent Registration Act), and 26 U.S.C. § 7206(a) (Filing a False Tax Return), including:

a. Any and all financial records for Paul Manafort, Richard Gates or companies associated with Paul Manafort or Richard Gates, including but not limited to records relating to any foreign financial accounts;

b. Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Richard Gates, or companies associated with Paul Manafort or Richard Gates;

b. Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

c. Any and all correspondence, communication, memorandum, or record of any kind relating to the Party of Regions, Viktor Yanukovych, the European Centre for a Modem Ukraine, or any other foreign principal of Paul Manafort or Richard Gates, or any company associated with Paul Manafort or Richard Gates;

d. Any and all correspondence, memorandum, press release, or documentation of any kind regarding any lobbying or advocacy performed by Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates, on behalf of the Party of Regions, Viktor Yanukovych, the European Centre for a Modern  Ukraine, or any other foreign principal of Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates[;]

e. Records related to, discussing, or documenting Neocom Systems, Antes Management, Yiakora Ventures, Global Highway Ltd., Global Endeavor,

5

> Leviathan Advisors, Peranova Holdings, Bletilla Ventures, Lucicle Consultants, and/or Telmar Investments, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records[;]
>
> f. Records related to, discussing, or documenting the Podesta Group[;]
>
> g. Any and all daily planners, logs, calendars, schedule books relating to Paul Manafort or Richard Gates.

*Id.* ¶ 1.

That same day, following issuance of the warrant, Special Agent Pfeiffer and a team of FBI agents executed a search on the storage unit. The team of executing agents referenced Attachment B of the warrant as they searched the unit and seized only those documents referred to in the attachment. *See* June 29, 2018 Hr'g Tr. at 31:12-32:3. Special Agent Pfeiffer prepared an inventory of the documents seized following the search, listing nine categories of documents without describing the categories.

On February 22, 2018, a grand jury returned a multi-count indictment, charging defendant with subscribing to false income tax returns, in violation of 26 U.S.C. § 7206(1), failure to file reports of foreign bank and financial accounts, in violation of 31 U.S.C. §§ 5314, 5322(a), and bank fraud and conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344, 1349. Subsequently, on April 30, 2018, defendant filed the motion to suppress at issue here, contending that suppression of the evidence recovered from May 27, 2017 search of the storage unit is warranted (i) because Trusko did not have the authority to consent to the initial search of the storage unit (ii) because the search warrant failed to identify particularly the items to be seized, and (iii) because the executing agents exceeded the search warrant's scope.

## II.

Analysis of defendant's motion to suppress the evidence seized during the May 27, 2017 search of the storage unit presents the following questions:

(i) whether Special Agent Pfeiffer obtained valid consent to search the storage unit on May 26, 2017, and if not, whether this lack of consent requires suppression of the evidence seized in the May 27, 2017 search of the storage unit.

(ii) whether the May 27, 2017 FBI search warrant was valid under the Fourth Amendment, and if not, whether suppression of the evidence recovered from the May 27, 2017 search is warranted.

(iii) whether the execution of the search was consistent with the strictures of the Fourth Amendment.

Each of these questions is addressed in turn.

### A.

### 1.

The first question focuses on Special Agent Pfeiffer's May 26, 2017 warrantless search or viewing[2] of the storage unit: the question is whether the warrantless search violated defendant's Fourth Amendment rights or whether the search was legal because Special Agent Pfeiffer obtained valid consent to search or view the unit. This question is easily resolved on the basis of the ample and undisputed factual record.

The Fourth Amendment provides that "[t]he right of the people . . . against unreasonable searches and seizures, shall not be violated … ." U.S. Const. Amend. IV. And it is axiomatic that a warrantless search is "'per se unreasonable' unless it falls within one of the 'specifically

---

[2] Special Agent Pfeiffer's cursory observation of the storage unit on May 26, 2017 does not seem to rise to the level of a "search" in the general sense of the term given that Special Agent Pfeiffer did not examine the contents of the banker boxes or of the filing cabinet. But the law is clear, and the parties do not dispute that Special Agent Pfeiffer's intrusion into, and observation of, the storage unit nonetheless constitutes a "search" within the meaning of the Fourth Amendment. *See Garcia v. Dykstra*, 260 F. App'x 887, 897 (6th Cir. 2008) (holding that law enforcement intrusion into a locked storage unit was a "search" because individuals "maintain a legitimate expectation of privacy" in the "contents of a closed, locked storage unit within a gated storage complex").

established and well-delineated exceptions' to the warrant requirement." *United States v. Simons*, 206 F.3d 392, 399-400 (4th Cir. 2000) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One such exception occurs when there is valid consent to the search.  *Fernandez v. California*, 571 U.S. 292, 298 (2014).  Fourth Circuit and Supreme Court precedent make clear that consent to search is valid for Fourth Amendment purposes if it is (1) "knowing and voluntary,"[3] and (2) given by one with authority to consent.[4]

Given that the parties do not contest that Trusko's consent to the search of the storage unit was knowing and voluntary, the only question is whether Trusko had the requisite authority to consent to the search.  In this regard, the Supreme Court has made clear that a third party, who is not the target of a search, has authority to consent to a search where the third party "posses[es] *common authority* over or [has] other sufficient relationship to the premises or effects sought to be inspected."  *United States v. Matlock*, 415 U.S. 164, 171 (1974) (emphasis added).  And the question of common authority "is not merely a question of property interest.  Rather, it requires evidence of 'mutual use' by one generally having 'joint access or control for most purposes.'" *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (quoting *Matlock*, 415 U.S. at 171 n.7).  In this regard, common authority makes it "reasonable" for a user of the premises "to recognize that any of the co-[users] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7.

Importantly, the fact that a third party who consents to a search may not have common authority over the premises to be searched does not end the constitutional inquiry because

---

[3] *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001) (citing *United States v. Mendenhall*, 446 U.S. 544, 557 (1980)).

[4] *Id.* at 402–03 (citing *Stoner v. California*, 376 U.S. 483 (1964)).

consent is still valid for Fourth Amendment purposes if the investigating officers "act[ed] under a reasonable belief that [the person who consented to their entry] . . . granted valid consent to the search." *United States v. Kinney*, 953 F.2d 863, 866 (4th Cir. 1992) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990)).

These principles, applied here, point persuasively to the conclusion that Special Agent Pfeiffer obtained valid consent to the May 26, 2017 search or viewing of the storage unit and thus that this warrantless search of the storage unit satisfied Fourth Amendment requirements. To begin with, the record reflects that Trusko had the requisite common authority to consent to the search of the storage unit.  In this respect, the record reflects that Trusko had joint access to the storage unit given that the storage unit's lease, occupant information form, and insurance addendum listed Trusko as the "Occupant" of the storage unit, included Trusko's email address and phone number for contact information, and included Trusko's signature and initials as the customer.  Defendant, by contrast, is listed as an "Authorized Access Person[]" on the lease and did not sign or initial the lease.  Importantly, although Trusko was not certain that defendant had retained a copy of the key, Trusko had his own key to the storage unit, which Trusko used to allow Special Agent Pfeiffer to view the unit.  These factors make clear that Trusko had 'joint access or control for most purposes [over the storage unit].'" *Buckner*, 473 F.3d at 554 (quoting *Matlock*, 415 U.S. at 171 n.7).

There is also evidence of Trusko's use of the storage unit.  Trusko explained to Special Agent Pfeiffer that Trusko had accessed the storage unit on several occasions as part of his job responsibilities.  Specifically, in 2015, Trusko, at defendant's direction, moved defendant's files and boxes into the unit from a larger storage unit, and more recently, in 2016, Trusko placed defendant's files in the filing cabinets in the unit.  And notably, although Trusko told Special

Agent Pfeiffer that Trusko had accessed the storage unit on several occasions, Trusko also indicated that he was not certain that defendant himself had ever personally entered the unit. In sum, this evidence of Trusko's access to, and use of, the storage unit makes clear that defendant "assumed the risk that one of [his] number might permit the common effects to be searched" and that Trusko had common authority over the storage unit sufficient to render valid his consent to the search. *Buckner*, 473 F.3d at 554.

This conclusion is consistent with *United States v. Kim*, 105 F.3d 1579 (9th Cir. 1997) and *United States v. Trotter*, 483 F.3d 694 (10th Cir. 2007), *judgment vacated on other grounds in light of Kimbrough v. United States*, 552 U.S. 85 (2007), the most factually apposite circuit authority. As here, *Kim* and *Trotter* involved consent searches of storage units. Specifically, in both *Kim* and *Trotter*, the defendants there directed associates to rent storage units in the associates' names. The associates there, as Trusko did here, periodically accessed the storage units to unpack goods, and the associates either temporarily retained or made copies of the storage unit keys. On these facts, both courts, the Ninth and the Tenth Circuits, determined that the associates in those cases had common authority to consent to searches of the units because the associates in both cases had rented the units in their own names and the defendants in both cases had allowed the associates' access to the units to drop off goods. *See Trotter*, 483 F.3d at 699; *Kim*, 105 F.3d at 1582.

The facts are almost identical here. As in *Kim* and *Trotter*, Trusko here leased the storage unit at defendant's direction and regularly accessed the unit to store or to move files. Significantly, the evidence of common authority in this case is, if anything, stronger than the evidence of common authority in *Kim* or *Trotter* because here, Trusko had his own key to the storage unit and doubted whether defendant had ever even personally accessed the storage unit.

Accordingly, the conclusion reached here that Trusko had common authority to consent to the search of the storage unit is consistent with, and indeed compelled by, the most factually apposite circuit authority.[5]

In an effort to avoid this conclusion, defendant contends that there could be no evidence of Trusko's common authority over the storage unit because Trusko was no longer employed by DMP. This argument fails; it ignores the fact that although Trusko was no longer employed by DMP at the time of the search, Trusko was a current employee of Steam Mountain, a different business operated by defendant. June 29, 2018 Hr'g Tr. at 15:17-16:20. Defendant's argument also overlooks that as part of both his roles for DMP and for Steam Mountain, Trusko "ran various errands" for defendant, including moving records from defendant's various businesses into the storage unit. *Id.* at 16:24-17:14. Thus, the fact that Trusko was no longer employed by one specific business entity associated with defendant does not suggest that Trusko no longer had access to, or common authority over, the storage unit.

Defendant also contends that the government has not demonstrated that Trusko had common authority over the storage unit because there is no evidence that Trusko stored any of

---

[5] Defendant attempts to distinguish *Kim* and *Trotter* by arguing that these cases rely on an "assumption-of-risk" analysis that was rejected both in a later Tenth Circuit opinion, *United States v. Cos*, 498 F.3d 1115 (10th Cir. 2007), and in other circuits. But *Trotter* does not rely on an "assumption-of-risk" analysis and *Cos* did not repudiate the holding in *Trotter*. Instead of focusing on the fact that the defendant there assumed the risk that his associate would enter the unit, the *Trotter* court reasoned that the associate's "position as lessee of the unit and his active participation in renting and using the facility gave him a 'sufficient relationship to the premises' to justify the searches based upon his consent." *Trotter*, 483 F.3d at 699. And the Tenth Circuit in *Cos*, far from repudiating *Trotter*'s holding, distinguished *Trotter* based on the fact that the *Cos* case involved a search of a home, not a storage unit. 498 F.3d at 1127. Because this case involves the search of a storage unit, not a home, *Trotter*, not *Cos*, is the most apposite here.

And importantly, other courts to consider consent searches of storage units have adopted reasoning similar to that of *Kim* and *Trotter*. For example, in *United States v. Camp*, 157 F. App'x 121 (11th Cir. 2005), the Eleventh Circuit found that the defendant's girlfriend had common authority over a storage unit within the meaning of *Matlock* based on the facts that the girlfriend had moved weapons into the storage facility with the defendant, that the defendant had asked the girlfriend to rent a storage unit in her name, and that the defendant had given the girlfriend a key to the unit. *Id.* at 122; *cf. United States v. Burcham*, 2009 WL 425006, at *3 (W.D. Tenn. Feb. 19, 2009) (finding that third party had apparent authority to consent to search where she had been in the storage locker before and had the access code and key thereto).

his own property in the storage unit.   But this argument also fails, as courts have routinely

concluded that in employer-employee contexts such as exists here, an employee has common

authority where he or she "is authorized to enter" a location "to perform his [job duties]" there.

*United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir. 1981) (holding that an employee

with keys to a lab and permission to enter to conduct his lab duties had common authority to

consent to a search of the lab).[6]   None of these cases holds that common authority requires the

employee to include his own property in the storage unit.   And notably, even the case on which

defendant chiefly relies—*United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991)—

does not stand for the proposition that a third party must store his or her own property in a

location to meet the requirements of common authority.   In *Whitfield*, the D.C. Circuit,

considering the validity of a mother's consent to a search of her adult son's bedroom, concluded

that the evidence there did not establish common authority.   *Whitfield*, 939 F.2d at 246.

Importantly, in reaching this conclusion, the D.C. Circuit reasoned that because there was no

evidence in the record reflecting that the defendant's mother "made use of the room at any time

for any purpose[,]" the mother could not have common authority to consent to a search of the

room.   *Id.*   By contrast, the record here clearly reflects that Trusko made use of the storage unit

on multiple occasions when he moved filing cabinets and files into the unit as part of his job

duties.   As such, *Whitfield* is inapposite and does not demand a result contrary to that reached

here.

In sum, the facts that Trusko rented the storage unit in his name, retained the key to the

storage unit, and used the storage unit to move and to store defendant's files are sufficient to

---

[6] *See also United States v. Jenkins*, 46 F.3d 447, 455-56 (5th Cir. 1995) (holding that an employee had common authority over a box of videotapes where he was authorized to receive, extract, and view the videotapes as part of his job duties); *United States v. Murphy*, 506 F.2d 529, 530 (9th Cir. 1974) (holding that an employee who was given a key to a warehouse "only on occasions when [he] was to perform work on the premises" had authority to consent to a search thereof).

establish Trusko's common authority over the storage unit.  Accordingly, Trursko's consent to Special Agent Pfeiffer's May 26, 2017 search of the storage unit was valid, and there is no basis on this ground to suppress the evidence recovered from the later search.

Even assuming, *arguendo*, that Trusko did not have common authority to consent to the search of the storage unit, it is nonetheless clear that Special Agent Pfeiffer "act[ed] under a reasonable belief that [Trusko] . . . granted valid consent to the search." *Kinney*, 953 F.2d at 866 (citing *Rodriguez*, 497 U.S. 177).  Special Agent Pfeiffer's interview of Trusko makes this point clear.  Specifically, in the course of Special Agent Pfeiffer's interview of Trusko, and Trusko explained that Trusko had rented a storage unit for defendant, that Trusko had moved defendant's business records into that unit, and that Trusko had a key to the unit.  Special Agent Pfeiffer then accompanied Trusko to the facility where Special Agent Pfeiffer confirmed that Trusko had the requisite access to the unit by securing a copy of the unit's lease, occupant information form, and insurance addendum from the property manager.  Each of these documents confirmed Trusko's description of his authority over the storage unit.  After receiving these documents, Special Agent Pfeiffer presented Trusko with an FBI consent-to-search form and asked Trusko if he would consent to a search of the unit.  Trusko, without hesitation, signed the form, unlocked the storage unit, and opened the door for Special Agent Pfeiffer to look inside the unit.  Special Agent Pfeiffer's interaction with Trusko clearly demonstrates that Special Agent Pfeiffer acted under a reasonable belief that Trusko had common authority over the unit and thus granted valid consent to a search of the unit.

Defendant argues that Special Agent Pfeiffer could not have believed that Trusko validly consented to a search of the storage unit because Special Agent Pfeiffer knew that Trusko could only enter the storage unit with defendant's permission and at defendant's direction.  To be sure,

13

the record reflects that Trusko accessed the unit on several occasions at defendant's direction, but Trusko never advised Special Agent Pfeiffer that Trusko could *only* enter or use the unit with defendant's permission.  Nor does Special Agent Pfeiffer's affidavit indicate that Trusko's access was limited in this respect.  Thus, although the affidavit makes clear that defendant on occasion directed Trusko to move files and cabinets into the unit, nowhere does the record reflect that defendant was not permitted to access the unit without defendant's authorization.

Nor does the fact that Special Agent Pfeiffer ultimately sought a warrant to search the contents of the storage unit suggest that Special Agent Pfeiffer did not have a reasonable belief that Trusko validly consented to the initial search.  Fourth Circuit precedent reflects that although a third party may validly consent to the search of a room, the same third party might not have the authority to consent to a search of the locked contents of a room.  *See United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) (finding that the defendant's mother had authority to permit inspection of room but that her authority did not extend to the interior of the footlocker within the room).  Although Special Agent Pfeiffer reasonably concluded that Trusko had the authority to consent to a search of the storage unit, Special Agent Pfeiffer likely did not have sufficient information to conclude that Trukso had authority to consent to a search of all the locked or sealed contents of the unit.  As such, DOJ lawyers prudently elected to seek a search warrant on the basis of information reflected in Special Agent Pfeiffer's affidavit.  Nothing in the affidavit suggests that Special Agent Pfeiffer did not reasonably believe that Trusko's consent to search the storage unit was valid.

Finally, defendant faults Special Agent Pfeiffer's failure, in defendant's view, to take steps to investigate further the nature of Trusko's authority over the storage unit.  In support of this argument, defendant relies again on *United States v. Whitfield*, but that case is inapposite in

14

this context, as well.  In *Whitfield*, the agents knew only that the defendant's mother owned the

house and that the defendant's room was not locked.  *Whitfield*, 939 F.2d at 1075.  The agents

knew nothing concerning whether the mother used her son's room, or indeed whether the mother

had ever even entered her son's room.  *Id.*  Here, by contrast, Special Agent Pfeiffer not only

understood that Trusko had leased the storage unit as the "Occupant" and had a key to the

storage unit, but Special Agent Pfeiffer also understood that Trusko regularly accessed the unit to

carry out his job functions, namely moving filing cabinets and storing files.  As such, in sharp

contrast to *Whitfield*, Special Agent Pfeiffer had a sufficient factual basis on which to conclude

that Trusko had authority to consent to a search of the storage unit without additional inquiry.[7]

In sum, Special Agent Pfeiffer's May 26, 2017 search or viewing of the storage unit was

a valid consent search because Trusko had actual, or at the very least, apparent authority to

consent to the search of the unit.  As such, suppression of the evidence ultimately seized from the

storage unit is not warranted as the evidence is not fruit of the poisonous tree.

---

[7] Defendant cites also to *United States v. Corral*, 339 F. Supp. 2d 781 (W.D. Tex. 2004), *Boyer v. Peterson*, 221 F. Supp. 3d 943 (W.D. Mich. 2016), and *United States v. Toan Phuong Nghe*, 925 F. Supp. 2d 1142 (W.D. Wash. 2013).  These cases are similarly inapposite.  In *Corral*, the court faulted the agents for ascertaining minimal information about the third party who consented to the search.  Specifically, the agents knew only that the third party was a housekeeper, that she cleaned the whole house, that she was the only adult present with defendant's minor son, and that she did not own or live on the premise.  *Corral*, 339 F. Supp. 2d at 796.  The court emphasized that the agents there "never inquired into [the defendant's] whereabouts" and received only "vague answers to broad questions" concerning the third party's authority and duties.  *Id.*  Here, by contrast, there was no vagueness or ambiguity in Special Agent Pfeiffer's questioning or in Trusko's responses—Trusko explained that he rented the unit, that he had a key to the unit, and that he accessed the unit as part of his job responsibilities, which specifically included moving files into the unit.  Trusko also ultimately signed a consent-to-search form without hesitation.

*Boyer* is similarly distinguishable.  In *Boyer*, the officer relied on the fact that the consenting third party was the "owner" of the house being searched even though the officer knew that the third party did not live in the house and that the third party was not permitted to be in the house without the defendant present.  *Boyer*, 221 F. Supp. 3d at 956-57.  Here, by contrast, there were no such limitations on Trusko's access to the storage unit; Trusko had a key to the unit and accessed the unit regularly for his job duties without defendant present.

Nor is *Toan Phuong Nghe* persuasive here.  That case involved a motel manager who allowed law enforcement agents to access the defendant's rented room in order to eject unauthorized guests.  *Toan Phuong Nghe*, 925 F. Supp. 2d at 1145-46.  The court there found the motel manager did not have apparent authority because the officers knew that the defendant was not on notice of the motel manager's authority to eject unauthorized guests.  *Id.*  Here, by contrast, defendant was clearly on notice regarding Trusko's ability to access the storage unit because Trusko rented the unit in his own name and had the key to the unit.

**2.**

Even assuming that Special Agent Pfeiffer's warrantless May 26, 2017 search or viewing of the unit was not a valid consent search, this does not end the analysis.  Suppression of the evidence ultimately recovered from the May 27, 2017 search would nonetheless be unwarranted if the affidavit submitted in support of the warrant application contained sufficient untainted information to establish probable cause to search the unit.  In this regard, the Supreme Court has made clear that where a warrant affidavit relies on information from an earlier unconstitutional search, the warrant is "nevertheless valid" where "sufficient untainted evidence [is] presented in the warrant affidavit."  *United States v. Karo*, 468 U.S. 705, 719 (1984).[8]  This principle applies here, as the record reflects that Special Agent Pfeiffer's affidavit contained ample untainted information to support probable cause to search the unit.  Specifically, the affidavit reflected that Special Agent Pfeiffer had interviewed defendant's current employee Trusko, who revealed that the storage unit housed boxes of "office files of [defendant's] business," and a metal filing cabinet that was large enough to "contain[] a large amount of records."  Aff. ¶ 30.  The affidavit also described that Trusko had personally placed defendant's business records in the filing cabinet as recently as spring 2016 at defendant's request.  *See id.* ¶¶ 28, 30.  This untainted evidence from Special Agent Pfeiffer's interview with Trusko thus established probable cause to believe the storage unit contained defendant's business records.  The affidavit further reflected untainted facts to establish probable cause to believe the business records contained in the storage unit would include records relevant to the bank and tax fraud offenses described in the affidavit.  Specifically, the affidavit explained that IRS guidelines recommend that individuals and corporations retain business and tax records for three years after filing returns.  *Id.* ¶ 35.

---

[8] *See also United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) ("The inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it … .").

And the affidavit also described how defendant was recently engaged in litigation with a former Ukrainian client and how individuals often retain copies of contracts in anticipation of litigation. *Id.* ¶ 37. Taken together, these facts demonstrate that "sufficient untainted evidence" from Special Agent Pfeiffer's interview with Trusko was presented in the warrant to justify issuance of the search warrant for the storage unit. *Karo*, 468 U.S. at 719. Accordingly, even assuming that Trusko did not validly consent to the May 26, 2017 warrantless search, the warrant was "nevertheless valid" and there is no basis for suppression of evidence on this ground. *Id.*

**B.**

**1.**

Given that suppression is not required on the basis of the May 26, 2017 search or viewing, it is next necessary to consider whether there is an independent basis for attacking the validity of the warrant that requires suppression of the evidence recovered from the May 27, 2017 search. The relevant governing principles are not disputed. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. With respect to the particularity of the warrant, the Fourth Circuit has made clear that a warrant generally satisfies the Fourth Amendment's requirements where "the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013) (quoting *United States v. Williams*, 592 F.3d 511, 519 (4th Cir.2010)). At the same time, the Fourth Circuit has emphasized that "a warrant is not intended to impose a

'constitutional strait jacket' on investigating officers." *Id.* (quoting *United States v.* Dornhofer, 859 F.2d 1195, 1198 (4th Cir. 1988)).  In this regard, "[c]ourts must refrain from interpreting warrant terms in a 'hypertechnical' manner, and should instead employ a 'commonsense and realistic' approach." *Id.* (quoting *Williams*, 592 F.3d at 519)).

This common sense approach, applied here, points persuasively to the conclusion that the May 27, 2017 warrant satisfies Fourth Amendment requirements because the warrant identifies the items to be seized by their relation to designated crimes and limits the executing officers' discretion.  To begin with, the warrant identifies items to be seized by their relation to designated crimes.  Specifically, paragraph 1 of Attachment B to the warrant identifies the property to be seized as "[r]ecords relating to violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to File a Report of Foreign Bank and Financial Accounts), 22 U.S.C. § 618 (Foreign Agent Registration Act), and 26 U.S.C. § 7206(a) (Filing a False Tax Return)."  Warrant Attach. B ¶ 1.  Subparagraphs a through g of paragraph 1 then proceed to list examples of the aforementioned records, including, for example, "financial records," "federal and state tax documentation," "[l]etters, correspondence, emails, or other forms of communications" and "correspondence, memorandum, or record[s]."  Warrant Attach. B ¶¶ 1(a), 1(b), 1(b)[9], 1(c).  This requirement—that the records seized be related to specific alleged offenses—"confines the executing [agents'] discretion by allowing them to seize only evidence of . . . particular crime[s]." *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994).

The warrant also limits the discretion of the executing agents by specifying the types of records to be seized.  Each of the subparagraphs not only contains a broad description of the type of records subject to seizure, such as financial records, federal and state tax documentation,

---

[9] The Attachment lists two paragraphs 1(b).

correspondence, communication and letters, but each subparagraph also describes the relevant set of those records. For example, paragraph 1(c), which authorizes the seizure of "[a]ny and all correspondence, communication, memorandum, or record of any kind" specifies that the aforementioned records must "relat[e] to the Party of Regions, Viktor Yanukovych, the European Centre for a Modern Ukraine, or any other foreign principal of [defendant] or Richard Gates, or any company associated with [defendant] or Richard Gates." Warrant Attach. B ¶ 1(c). In this regard, the warrant cabins the executing agents' discretion in a second way by permitting the agents to seize only a particular set of documents within each of the more general types of records.

Defendant contends that the fact that the warrant did not confine the agents' search and seizure of evidence to particular time periods renders the warrant unconstitutionally overbroad. On the one hand, as defendant correctly notes, several courts have held warrants to be unconstitutionally overbroad in part because those warrants failed to limit law enforcement's search to evidence associated with a particular time period.[10] At the same time, the Fourth Circuit has recognized that "[t]he degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." *In re Grand Jury Subpoena*, 920 F.2d 235, 239 (4th Cir. 1990) (quoting *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979)). In this respect, the Fourth Circuit and other courts of appeals have recognized that in certain circumstances, warrants need not contain specific time limits, including when "dates of specific documents" relevant to the offenses at issue "could not have

---

[10] *See, e.g.*, *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017); *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 84 (2d Cir. 2016); *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *United States v. Leary*, 846 F.2d 592, 604 (10th Cir. 1988); *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980). Notably, each of these cases involved other reasons, not present here, for invalidating the warrant, and as such, they are not persuasive here.

been known to the Government,"[11] or when "evidence that date[s] from outside of the time period" described in a warrant affidavit "may be relevant to the activity within the time period."[12]

Circumstances justifying a warrant for seizure of documents without precise time limits clearly exist here. Specifically, although defendant is alleged to have committed crimes from approximately 2006 through the present, where, as here, the alleged crimes involve tax and bank fraud violations, "documents from an earlier time may have bearing on the tax violations alleged in a later year." *Shilling*, 826 F.2d at 1369. Similarly, evidence from outside the time period of relevant criminal activity here, namely defendant's past use of foreign accounts or representation of foreign clients, could be relevant to establishing defendant's state of mind during the relevant times alleged in the indictment. These facts suggest that less temporal specificity is required here than in other contexts where evidence can more readily be confined to a particular time period.

## 2.

In the end, even assuming that the absence of a time limit in the warrant would render this warrant unconstitutionally overbroad, the good-faith exception to the exclusionary rule applies here, and as such, suppression of the evidence recovered from the May 27, 2017 search of the storage unit is unwarranted. The Supreme Court has made clear that the exclusionary rule "does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." *Davis v. United States*, 564 U.S. 229, 238-39 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). And lower courts have specifically applied this

---

[11] *United States v. Shilling*, 826 F.2d 1365, 1369 (4th Cir. 1987) (per curiam), *overruled on other grounds as recognized in United States v. Ruhe*, 191 F.3d 376 (4th Cir. 1999).

[12] *United States v. Abboud*, 438 F.3d 554, 576 n.7 (6th Cir. 2006).

exception where, as alleged here, a warrant suffers from a lack of temporal specificity.  *See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002) (noting that "the absence from the warrant of a provision limiting the search and seizure to documents pertaining to the time period of the scheme did not make the warrant so facially deficient as to render official belief in its legality entirely unreasonable" (internal quotation marks and citations omitted)).[13]  Accordingly, even assuming the warrant in issue here was overbroad, the executing agents nonetheless acted in reasonable reliance on the warrant issued by the magistrate judge and hence suppression is not warranted.

## C.

Given that both the initial warrantless search and the warrant were valid under the Fourth Amendment, the final step in the suppression analysis is to consider whether the search was executed in a constitutionally permissible manner.  It is well-settled that "a search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization."  *United States v. Kimble*, 855 F.3d 604, 610 (4th Cir. 2017) (quoting *United States v. Phillips*, 588 F.3d 218, 223 (4th Cir. 2009)).  In this regard, the Fourth Circuit has made clear that "the seizure of items not described in the warrant violates the Fourth Amendment—and the items should be suppressed—unless an exception to the warrant requirement applies."  *United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994).

Defendant contends that the fact that the executing agent's inventory of seized items lists nine categories of documents without describing the categories demonstrates that the executing agents seized virtually all the documents in the storage unit, including documents outside the

---

[13] *See also, e.g.*, *United States v. Diaz*, 841 F.2d 1, 4-6 (1st Cir. 1988) (applying good-faith exception where the "warrant included permission to seize records . . . [before] the first instance of wrongdoing mentioned in the affidavit occurred").

scope of the warrant.  But that inference is not supported by the executing agents' log of seized items, which reveals that although the storage unit contained approximately 21 bankers' boxes of documents and a five-drawer metal filing cabinet containing documents, executing agents seized only five sets of documents from the filing cabinet and four sets of documents from the bankers' boxes.  Far from revealing a search that exceeded the scope of the warrant, this log demonstrates that the executing agents were careful to select and seize only items responsive to the warrant's terms.

In an effort to avoid this conclusion, defendant further argues that the search return prepared by the executing agents did not satisfy the requirements of Rule 41, Fed. R. Crim. P. Rule 41 provides that following the execution of a search warrant, "[a]n officer present during the execution of the warrant must prepare and verify an inventory of any property seized." Rule 41(f), Fed. R. Crim. P.  Importantly, however, courts have recognized that Rule 41(f) "do[es] not dictate a requisite level of specificity for inventories." *Matter of Searches of Semtex Indus. Corp.*, 876 F. Supp. 426, 430 (E.D.N.Y. 1995).  And significantly, "[i]n circumstances where filing cabinets of documents are seized, routine practice is to list the storage devices, *i.e.*, the cabinets, on the inventory, as opposed to making a document by document list of the contents." Fed. R. Crim. P. 41 adv. comm. note (2009 amendment).  The executing agents here did just that: instead of "making a document by document list of contents," the agents listed the storage devices—*i.e.*, the bankers' boxes and the cabinets—in the collection log.  *Id.*  Accordingly, there is no basis to conclude that the executing agents violated Rule 41, Fed. R. Crim. P.

### III.

In sum, suppression of the evidence recovered from the May 27, 2017 search of the storage unit is not required.  Trusko, defendant's employee, leased the storage unit, regularly

accessed the unit to unpack defendant's business records, and retained a key to the unit.  Thus, Trusko had common authority over the storage unit and validly consented to Special Agent Pfeiffer's May 26, 2017 search of the storage unit.  The May 27, 2017 warrant was also sufficiently particular given the nature of the alleged crimes to satisfy Fourth Amendment requirements.  And even assuming Special Agent Pfeiffer's warrant was overbroad, the executing agents reasonably relied on the magistrate judge's issuance of the warrant to conduct the search and executed the search in a manner consistent with the terms of the warrant as informed by Attachment B.  As such, there are no grounds for suppression of the evidence recovered from the May 27, 2017 search of the storage unit, and defendant's motion to suppress must be denied.

Alexandria, Virginia
July 9, 2018

/s/

T. S. Ellis, III
United States District Judge