1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

. . . . . . . . . . . .
                            .
UNITED STATES OF AMERICA     .   Criminal Action No.
                            .   1:18-CR-83
                            .
     vs.                     .   Alexandria, Virginia
                            .   June 29, 2018
PAUL J. MANAFORT, JR         .
                            .
            Defendant.       .
                            .
. . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE T.S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | UZO ASONYE, ESQ. |
| | GREG ANDRES, ESQ. |
| | SCOTT MEISLER, ESQ. |
| | US Attorney's Office |
| | 2100 Jamieson Avenue |
| | Alexandria, VA 22314 |
| | |
| FOR THE DEFENDANT: | JAY ROHIT NANAVATI, ESQ. |
| | Kostelanetz & Fink LLP |
| | 601 New Jersey Avenue NW |
| | Suite 620 |
| | Washington, DC 20001 |
| | and |
| | THOMAS ZEHNLE, ESQ. |
| | Miller & Chevalier, Chartered |
| | 900 Sixteenth St NW |
| | Washington, DC 20006 |
| | |
| ALSO PRESENT: | KEVIN DOWNING, ESQ. |
| | |
| OFFICIAL COURT REPORTER: | TONIA M. HARRIS, RPR |
| | U.S. District Court, Ninth Floor |
| | 401 Courthouse Square |
| | Alexandria, VA 22314 |
| | (703)646-1438 |

```
1                       TABLE OF CONTENTS
                            TRIAL
2                          WITNESSES

3    On behalf of the Government:

4    Jeff Pfeiffer

5         Direct examination by Mr. Asonye................ 09
          Cross-examination by Mr. Zehnle................. 33
6
                            EXHIBITS
7
     On behalf of the Government:
8
                                               Admitted
9
     Number JP1......................................... 11
10   Number JP2......................................... 21
     Number JP3......................................... 23
11   Number JP4......................................... 25
     Number JP5......................................... 26
12   Number JP6......................................... 28

13                         MISCELLANY

14   Preliminary matters................................ 03
     Argument........................................... 53
15   Certificate of Court Reporter...................... 72

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(Court proceedings commenced at 11:01 a.m.)

THE COURT:  You may call the next matter, please.

THE DEPUTY CLERK:  The Court calls Case Number 1:18-CR-83, United States versus Paul J. Manafort, Jr., for a motion hearing.

May I have the appearances, please, first for the Government.

MR. ANDRES:  Good morning, Your Honor.  For the Government, it's Greg Andres, Uzo Asonye, and Scott Meisler.

THE COURT:  All right.  Good morning to all.  And I'm glad to see Mr. Asonye sitting there.  He can give you valuable advice because he's been here.

All right.  And for the defendant?

MR. ZEHNLE:  Good morning, Your Honor.  Thomas Zehnle on behalf of Mr. Manafort.  With me is Jay Nanavati and Kevin Downing.

THE COURT:  All right.  Who will be heard today?

MR. ZEHNLE:  Your Honor, dependent upon the motion and with the Court's permission, each of us will be heard today.

THE COURT:  All right.  Let's begin -- let me give you an understanding of how I wish to proceed.  If you think that my intentions are in error in some way, by all means tell me.

US v. Manafort

4

1           But what I first want to do is to be clear for the

2     record and in my own mind that the effort to dismiss Count 11

3     has either been withdrawn or is no longer an issue.  I've got

4     to do something on the record that reflects that.

5           MR. ZEHNLE:  Your Honor, Tom Zehnle on behalf of the

6     defendant.

7           Yes, we have withdrawn that motion based upon

8     information that was provided by the Special Counsel's office

9     with respect to the tolling of the statute.

10          THE COURT:  All right.  Thank you.  I will enter an

11    order then that reflects that that has been withdrawn and is

12    not an issue.

13          The next issue that I want to go into are the motions

14    to suppress both the search of the -- I don't know what you

15    call it, but the --

16          MR. ANDRES:  The storage locker, Your Honor.

17          THE COURT:  -- storage locker and then the search of

18    the home.  I'll say a little more about that in a minute.

19    We'll do that argument next.

20          I want then to address the Special Counsel's -- I'm

21    going to refer to you as the Government -- the Government's

22    request for a juror questionnaire.  And I will also in that

23    vein, I won't hear argument but I'll tell you how I'm going to

24    proceed.  And I will also tell you a bit about how we do -- how

25    I will do the voir dire.

1          And then there will be -- I'll address and hear from

2     you on the motion for a hearing regarding putative leaks of

3     grand jury information.

4          And those are all, I think, that's on the agenda.  Do

5     I have that right?

6          MR. ANDRES:  Judge, for the Government, there's just

7     a few other housekeeping items that I'd like to address at some

8     point.  Obviously, we can do it at the end.  There's a pending

9     discovery order that we've filed --

10          THE COURT:  Yes.

11          MR. ANDRES:  -- with the Court.

12          THE COURT:  Yes.  We'll do that at the end.

13          MR. ANDRES:  Okay.  Great.  Thank you, Your Honor.

14          THE COURT:  All right.  Let's begin, then, and let me

15     focus -- there are, of course, two motions -- two searches that

16     are sought to be suppressed, the storage locker and the house.

17          The argument on the storage locker focuses to some

18     extent, maybe solely, on whether the individual who gave

19     permission had the authority to do so; and the search of the

20     house focuses chiefly on the scope of the search and whether

21     the search warrant was adequately specific.

22          Let's begin with the search of the storage locker.

23          Now, before I hear what you have to tell me on that,

24     let me say that I was somewhat surprised that we don't have a

25     factual basis or predicate that we can proceed on, because

1    that's not only typical of these hearings, it's required.

2            Mr. Asonye, you probably should have told them that

3    or you did?

4            MR. ANDRES:  Judge, we do have a witness for the

5    storage locker.

6            THE COURT:  All right.  But you were called -- you

7    see the problem is I had -- I had the deputy clerk call you-all

8    to say do you plan to offer any evidence, any testimony,

9    because I have other hearings and I have to make plans.

10           MR. ASONYE:  Your Honor, just to be clear, we did

11   notify the clerk that the Government had witnesses available to

12   testify on --

13           THE COURT:  That was yesterday.

14           MR. ASONYE:  Yes, Your Honor.

15           THE COURT:  All right.  In the future, do it before

16   yesterday.  Do it in a much more timely way.

17           All right.  But I don't know if there's any real

18   factual dispute.  But I do have to have a factual basis, a

19   predicate for considering what the -- how to resolve the

20   matter.  For example, I have to know what the Government

21   contends is the basis for this person having the authority to

22   consent to a search of this locker.

23           For example, is there an employment agreement, how

24   does this person, you know -- and I thought all this was done.

25   I thought I'd see a stipulation of fact, because I sort of

1    assumed that this same issue would be raised in the District of

2    Columbia case, as it may well have been.  I'm not bound by that

3    decision or anything of that sort, but I thought that you-all

4    would have covered this ground.

5            Now -- so you have a witness that you can offer

6    today?

7            MR. ASONYE:  Yes, Your Honor.

8            THE COURT:  How long do you anticipate that witness

9    will take?

10           MR. ASONYE:  Fifteen minutes, Your Honor, from the

11   Government.

12           THE COURT:  All right.  And are you aware of who that

13   witness is?

14           MR. ZEHNLE:  No, Your Honor, I'm not aware.

15           MR. ASONYE:  It's the witness -- the agent who

16   obtained the search warrant, Your Honor, Jeff Pfeiffer (ph).

17           THE COURT:  All right.  Now, is there some factual

18   dispute by the defendant that I should know about and focus my

19   attention on?

20           MR. ZEHNLE:  Your Honor, in terms of the motion to

21   suppress with respect to the storage unit, obviously that's

22   dealing with a warrantless search and the Government's

23   contention is that a valid consent was obtained.

24           The defense -- and I can tell the Court that --

25           THE COURT:  I'm sorry, you said it's the Government's

1    view that a valid --

2            MR. ZEHNLE:  That a valid consent was obtained --

3            THE COURT:  Right.  And you factually oppose that?

4            MR. ZEHNLE:  Based on the -- we're willing to proceed

5    based on the affidavit that the Government provided from

6    Special Agent Pfeiffer.

7            THE COURT:  All right.  Who is your first witness?

8            MR. ASONYE:  Special Agent Jeffrey Pfeiffer, Your

9    Honor.

10           THE COURT:  Come forward and take the oath, please,

11   sir.

12           THE CSO:  Face the deputy clerk.

13           Thereupon,

14                        **JEFFREY PFEIFFER,**

15   having been called as a witness on behalf of the Government and

16   having been first duly sworn by the Deputy Clerk, was examined

17   and testified as follows:

18           (Witness seated.)

19           THE DEPUTY CLERK:  Thank you.  Please be seated.

20           THE COURT:  All right.  Mr. Asonye, you may proceed,

21   sir.  I'm glad to see you're earning your fee.

22           For those persons in the courtroom who aren't aware,

23   Mr. Asonye is an assistant United States Attorney in the

24   Eastern District of Virginia.  The other gentlemen here are

25   members of the Special Counsel's team.

1          But you-all -- tell me where you-all came from.  I'm

2     not sure.  You didn't come from other U.S. Attorney's offices.

3          MR. ANDRES:  Not most recently, Judge.  But I was an

4     assistant U.S. Attorney in the U.S. Attorney's Office in the

5     Eastern District of New York for most of my career at the

6     criminal division.

7          Mr. Meisler is from the Department of Justice's

8     criminal division appellate section.

9          THE COURT:  All right.  Thank you.  All right,

10    Mr. Asonye.

11                         **DIRECT EXAMINATION**

12    BY MR. ASONYE:

13    Q.   Could you please state your name for the record.

14    A.   Jeff Pfeiffer.

15    Q.   Are you currently employed?

16    A.   Yes.

17    Q.   Where do you work?

18    A.   The FBI.

19    Q.   What's your title?

20    A.   Special Agent.

21    Q.   How long have you been a Special Agent with the FBI?

22    A.   Since February 2002.

23    Q.   And prior to becoming a Special Agent, did you receive any

24    training?

25    A.   I did.  I -- new agent academy training.

US v. Manafort

10

1   Q.    And do you receive periodic training?

2   A.    Yes.

3   Q.    Could you describe what your periodic training is that you

4   received?

5   A.    I have various trainings depending on the violations I

6   would prosecute -- or the violations I would investigate as

7   well as annual CPA training.

8   Q.    Let me direct your attention to the spring of 2017.

9         Were you assigned to a particular FBI squad at the

10  time?

11  A.    Yes.

12  Q.    Which one?

13  A.    International Corruption Squad.

14  Q.    And are you currently assigned to that squad?

15  A.    Yes.

16  Q.    How long have you been assigned to that squad?

17  A.    Since approximately August of 2015.

18  Q.    And have you served on that squad continuously?

19  A.    No.

20  Q.    Please describe to the Court where else you served in the

21  FBI.

22  A.    I served for a time on the Special Counsel.

23  Q.    From approximately when were you on the Special Counsel's

24  team?

25  A.    Approximately May of 2017.

11

1   Q.   Are you still at the Special Counsel's office now?

2   A.   No.

3   Q.   Where are you?

4   A.   I'm back on the International Corruption Squad.

5   Q.   During your tenure at the International Corruption Squad,

6   were you involved in an investigation related to Paul Manafort?

7   A.   Yes.

8   Q.   And in May of 2017, did you obtain a search warrant

9   related to a storage unit in Alexandria, Virginia?

10  A.   I did.

11  Q.   Let me show you what's been marked as JP No. 1.

12       What is it?

13  A.   It's the search warrant for the storage unit.

14  Q.   And what's attached to it?

15  A.   Attachment A, Attachment B, as well as the application and

16  the affidavit.

17       MR. ASONYE:  Your honor, Government moves JP1 into

18  evidence.

19       MR. ZEHNLE:  No objection, Your Honor.

20       THE COURT:  Without objection, it's admitted.

21            (Government's Exhibit No. JP1

22            admitted into evidence.)

23       THE COURT:  Next question.

24  BY MR. ASONYE:

25  Q.   What location is cited in the warrant?

12

1    A.   370 Holland Lane, Unit 3013, Alexandria, Virginia.

2    Q.   And what is that exactly?

3    A.   That's the storage unit in question.

4    Q.   What judicial district was the warrant sought in?

5    A.   The Eastern District of Virginia.

6    Q.   And did you sign the application?

7    A.   I did.

8    Q.   And did you sign the affidavit?

9    A.   Yes.

10   Q.   Was the warrant -- search warrant authorized?

11   A.   It was.

12   Q.   By what judge?

13   A.   By the Honorable Theresa Carroll Buchanan.

14   Q.   Now, you testified earlier that you searched the storage

15   unit.  How did you come to understand that Mr. Manafort used a

16   storage unit?

17   A.   I don't recall exactly.  It was either through my

18   investigative efforts or through a meeting that occurred with

19   reporters of the Associated Press.

20   Q.   Have you -- how long had you been investigating

21   Mr. Manafort prior to this occasion?

22   A.   Approximately nine months.

23   Q.   Is that in mid-2016?

24   A.   Roughly, yes.

25   Q.   Okay.  And you mentioned a meeting with --

1          THE COURT:  Are you aware of any FBI investigation of

2    Mr. Manafort prior to then?

3          THE WITNESS:  I don't believe so, sir.

4          THE COURT:  Next question.

5    BY MR. ASONYE:

6    Q.   You mentioned a meeting with reporters.  Did that occur on

7    April 11, 2017?

8    A.   Yes, it did.

9    Q.   And where did that meeting take place?

10   A.   In the Bond Building of the Department of Justice.

11   Q.   And who was present generally?

12   A.   Generally speaking, there were members of the FBI,

13   Department of Justice, and the Associated Press.

14   Q.   And what did you understand the purpose of that meeting to

15   be?

16   A.   To receive information from the reporters.

17   Q.   Can you explain to the Court generally what happened?

18   A.   The reporters offered information in regards to an

19   investigation they had been conducting on Mr. Manafort.

20   Q.   And how did the Government representatives respond?

21   A.   Generally, no comment as far as questions involving any

22   sort of investigation.

23   Q.   And based on the meeting, did it appear as though the

24   reporters had conducted a substantial investigation with

25   respect to Mr. Manafort?

14

1   A.   They had.

2   Q.   During that meeting, did one of the reporters mention a

3   storage unit in Alexandria, Virginia, associated with

4   Mr. Manafort?

5   A.   He did.

6   Q.   Did you subsequently issue a grand jury subpoena to a

7   facility named -- a facility named "Public Storage"?

8   A.   I did.

9   Q.   And did you serve that subpoena personally on April 18,

10  2017?

11  A.   Yes.

12  Q.   At that time did you meet with the manager on duty of the

13  Public Storage?

14  A.   I did.

15  Q.   And did you learn information about a storage locker

16  associated with Mr. Manafort?

17  A.   I did.

18  Q.   What did you learn about how a locker -- how one of the

19  lockers was associated with Mr. Manafort?

20  A.   The storage unit was opened by one of his employees and

21  also had several other employees associated with the unit.

22  Q.   Now, this storage unit that you learned about at the time,

23  was this the unit you end up searching?

24  A.   No.

25  Q.   What did you do with the information that you learned

1   about Mr. Manafort and the storage unit and the individuals

2   associated with it?

3   A.    I used that as a list of potential interviewees.

4   Q.    Was an individual named Alex Trusko one of the people

5   identified as related to a storage unit associated with

6   Mr. Manafort?

7   A.    He was.

8   Q.    And as part of your investigation, did you interview Alex

9   Trusko?

10  A.    I did.

11  Q.    Did you interview him on May 26, 2017?

12  A.    I did.

13  Q.    And where did you interview him?

14  A.    At his residence.

15  Q.    Did you learn that Mr. Trusko had a relationship with

16  Mr. Manafort?

17  A.    I did.

18  Q.    Please explain to the Court what you understood their

19  relationship to be?

20  A.    I would describe it as sort of a personal assistant.  He

21  did various jobs for Mr. Manafort.

22  Q.    Was it in --

23              THE COURT:  How did you learn this information?

24              THE WITNESS:  Mr. Trusko told me.

25              THE COURT:  Next question.

1    BY MR. ASONYE:

2    Q.   Was it an employment relationship?

3    A.   It was.

4    Q.   And please describe the entity or entities that you

5    understood Mr. Trusko worked for that were related to

6    Mr. Manafort?

7    A.   Two companies were DMP and Steam Mountain.

8    Q.   Does DMP stand for Davis Manafort Partners?

9    A.   It does.

10   Q.   Did you have an understanding at the time as to what Steam

11   Mountain was?

12   A.   I did not.

13   Q.   Was it a business that Mr. Manafort operated?

14   A.   It was.

15   Q.   Okay.  And how did you know that?

16   A.   Mr. Trusko told me.

17   Q.   And did he -- did Mr. Trusko currently work for Steam

18   Mountain?

19   A.   He did.

20   Q.   And how do you know that?

21   A.   Mr. Trusko told me.

22   Q.   Did you learn about the responsibilities of Mr. Trusko

23   that Mr. Trusko had working for Mr. Manafort?

24   A.   I did.

25   Q.   Okay.  Could you tell the Court generally what he told you

US v. Manafort

17

1    about his responsibilities working for Mr. Manafort.

2    A.    He ran various errands and also drove Mr. Manafort around.

3    Q.    Did you ask Mr. Trusko if he was aware of any storage

4    units that Mr. Manafort used?

5    A.    I did.

6    Q.    And what did he say?

7    A.    He said that there was one.

8    Q.    What did he tell you about what was stored in the unit?

9    A.    Business records.

10   Q.    How did he know that Mr. Manafort stored business records

11   at the -- in the unit?

12   A.    Because he had moved them in there.

13   Q.    And did he tell you, Mr. Trusko, where he moved those

14   records from?

15   A.    From Mr. Manafort's residence.

16   Q.    Well, what did you -- what did he tell you --

17             THE COURT:  Now, who told you that he moved records

18   from where they were located to this storage locker?

19             THE WITNESS:  Mr. Trusko told me, sir.

20             THE COURT:  And tell me again what he told you.

21             THE WITNESS:  That he had moved these business

22   records from Mr. Manafort's residence into the storage unit in

23   question, sir.

24             THE COURT:  Next question.

25   BY MR. ASONYE:

18

1  Q.   And did Mr. Trusko tell you if Mr. Manafort had previously

2  used that residence to conduct business?

3  A.   He did.

4  Q.   And what did he say?

5  A.   He said that Mr. Manafort -- Mr. Manafort had used that

6  residence to conduct business.

7  Q.   Did Mr. Trusko tell you that the storage facility was a

8  Public -- at the Public Storage?

9  A.   It was.

10  Q.   And did you include information from Mr. Trusko in the

11  search warrant affidavit for the unit?

12  A.   I did.

13  Q.   After Mr. Trusko told you that he had moved business

14  records into the storage unit, did you ask whether he knew if

15  the records were still in that facility?

16          THE COURT:  You're leading.  Why don't you say:

17  What, if anything, did you ask him?

18          MR. ASONYE:  Your Honor, I simply didn't because the

19  Federal Rules don't apply in this type of hearing, but I can

20  ask it in a more open-question if you'd prefer.

21          THE COURT:  Yes, I would prefer you did that.  Go.

22          After he told you what he thought was in there, did

23  you ask him anything further?

24          THE WITNESS:  I did, sir.

25          THE COURT:  What did you ask him?

US v. Manafort

19

```
 1              THE WITNESS:  I asked him if I thought -- if he

 2   thought that the records were still in there.  And he said

 3   that they -- he believed that they were.

 4              THE COURT:  And did you ask him whether he had access

 5   to it?

 6              THE WITNESS:  I did, sir.

 7              THE COURT:  And what did he tell you?

 8              THE WITNESS:  He said that he did.

 9              THE COURT:  And what access did he say he had?

10              THE WITNESS:  He had the key to the storage unit,

11   sir.

12              THE COURT:  Next question.

13   BY MR. ASONYE:

14   Q.   Did Mr. -- what did Mr. Trusko tell you about when he was

15   last at the facility?

16   A.   He said it was approximately a year before we had spoken

17   that day.

18   Q.   During the interview, did Mr. Trusko agree to take you to

19   the storage facility that he referenced in connection with

20   Mr. Manafort?

21   A.   He did.

22   Q.   Did you guys travel there?

23   A.   We did.

24   Q.   And when you arrived at the storage facility, what did you

25   do?
```

1    A.    I spoke with the property manager and asked for a copy of

2    the lease for the unit.

3    Q.    And did you ask for a copy of the lease pursuant to the

4    prior subpoena?

5    A.    I did.

6    Q.    Why did you ask for a copy of the lease?

7    A.    I just wanted to verify what Mr. Trusko had told me in

8    regards to his access to the unit.

9    Q.    And did you review the lease?

10   A.    Yes.

11   Q.    Did it confirm Mr. Trusko's oral representations to you?

12   A.    It did.

13          THE COURT:  And how did it do so?

14          MR. ASONYE:  Your Honor, I'd be happy to, but I'm

15   about to walk him through the actual lease.

16          THE COURT:  All right.  But I just asked that

17   question.  Go ahead, sir.

18          THE WITNESS:  The lease listed Mr. Trusko as the

19   occupant of the unit, sir.

20          THE COURT:  Next question.

21   BY MR. ASONYE:

22   Q.    Let me show you what's been marked as JP2.

23          What is JP2?

24   A.    JP2 is the lease agreement for the unit in question.

25          MR. ASONYE:  Your Honor, Government moves JP2 into

1   evidence.

2          THE COURT:  All right.  Without objection it's

3   admitted.

4          MR. ZEHNLE:  Without objection, Your Honor.

5          THE COURT:  Thank you.  Next question.

6                  (Government's Exhibit No. JP2

7                  admitted into evidence.)

8   BY MR. ASONYE:

9   Q.   Where did you get this document from?

10  A.   I got this from the property manager of the storage unit

11  facility.

12         MR. ASONYE:  And, Your Honor, may the Government

13  publish the exhibit?

14         THE COURT:  Well, it's several pages.  How do you

15  intend to publish it?

16         MR. ASONYE:  We have the electronic set up, Your

17  Honor.

18         THE COURT:  All right.  Go ahead.

19  BY MR. ASONYE:

20  Q.   All right.  Who is listed as the occupant of the lease?

21  A.   Alexander Trusko.

22  Q.   And what number -- well, the number that's actually

23  blacked out there, is that number associated with Mr. Trusko?

24  A.   Yes.

25  Q.   And whose address is listed on the -- under the occupant

1    section?

2    A.    That's Mr. Manafort's prior residence.

3    Q.    And who is listed as an occupant with authorized access?

4    A.    Paul Manafort.

5    Q.    Who is listed under the alternate contact name?

6    A.    Richard Gates.

7    Q.    So is the -- on the last page of this document is it

8    signed?

9    A.    Yes, it is.

10   Q.    And who signed it?

11   A.    The property manager and Mr. Trusko.

12   Q.    What was your understanding --

13               THE COURT:  In what capacity did Mr. Trusko sign it?

14               THE WITNESS:  As the occupant, sir.

15               THE COURT:  Next question.

16   BY MR. ASONYE:

17   Q.    Let me show you what's been marked as JP3.

18               Can you tell me what this document is.

19   A.    It's the occupant information for the unit in question.

20               MR. ASONYE:  Your Honor, the Government moves JP3 in

21   evidence.

22               MR. ZEHNLE:  Your Honor, may I have a moment to

23   review this?

24               THE COURT:  Yes, you may.

25               MR. ZEHNLE:  Thank you.

```
 1              (A pause in the proceedings.)

 2              MR. ZEHNLE:  No objection, Your Honor.

 3              THE COURT:  All right.  It's admitted.  Proceed.

 4   Next question.

 5                          (Government's Exhibit No. JP3

 6                          admitted into evidence.)

 7   BY MR. ASONYE:

 8   Q.   Did you, again, get the document from the manager of the

 9   Public Storage?

10   A.   Yes.

11   Q.   Who is listed under the occupant information?  Whose name?

12   A.   Mr. Trusko.

13   Q.   Whose e-mail address is listed?

14   A.   Mr. Trusko.

15   Q.   Who is listed as the emergency contact?

16   A.   Richard Gates.

17   Q.   And did you understand Richard Gates to work with

18   Mr. Manafort?

19   A.   I did.

20   Q.   At the bottom, does it list an authorized user?

21   A.   Yes.

22   Q.   And who is listed?

23   A.   Paul Manafort.

24   Q.   If you turn to the second page of this document, whose

25   name is listed under customer information?
```

1   A.   Alexander Trusko.

2   Q.   And is Mr. Manafort's prior residence listed under

3   Mr. Trusko's name?

4   A.   It is.

5   Q.   Let me show you what's been marked as JP4.

6           What is this document?

7   A.   This is the insurance addendum to the lease for the unit

8   in question.

9           MR. ASONYE:  Your Honor, Government moves JP4 into

10  evidence.

11          MR. ZEHNLE:  May I ask for a moment, Your Honor?

12          THE COURT:  Yes, you may.

13          MR. ZEHNLE:  Thank you.

14          THE COURT:  While he's doing that, Mr. Asonye, while

15  you're correct that the Rules of Evidence do not apply,

16  strictly speaking, as you'll know from looking at the law, they

17  often are referred to and imposed because they help ensure the

18  reliability of the evidence that is presented.  And that

19  includes whether leading questions should be asked.

20          Because it's well known that individuals with a gift,

21  as you have it, in engaging in verbal atomic footwork, you get

22  a rhythm going, and who knows what the witness will agree to.

23  So I prefer to have direct, open questions asked.

24          MR. ASONYE:  Fair enough, Your Honor.

25          THE COURT:  You'd be surprised what answers you get.

US v. Manafort

25

1              I worked for one lawyer at a law firm when I first

2     arrived.  He never asked leading questions, and he had a very

3     successful litigation life and experience.  He's in the great

4     litigation land in the sky now.  But he did well while he was

5     here.

6              Next question.

7              MR. ZEHNLE:  No -- I'm sorry, Your Honor.  No

8     objection.

9              THE COURT:  All right.  It's admitted.

10                        (Government's Exhibit No. JP4

11                        admitted into evidence.)

12    BY MR. ASONYE:

13    Q.    What is that JP4?

14    A.    JP4 is the insurance addendum to the lease for the unit in

15    question.

16    Q.    And whose name is listed next to "print name"?

17    A.    Alex Trusko.

18    Q.    And is it signed three times by Alex Trusko?

19    A.    It is.

20    Q.    Let me show you JP5.

21              What is JP5?

22    A.    This is the customer transaction journal for the unit.

23              MR. ASONYE:  Your Honor, Government moves JP5 into

24    evidence.

25              MR. ZEHNLE:  Again, Your Honor, may I have a moment?

1              THE COURT:  Yes, you may.

2              MR. ZEHNLE:  Thank you.

3              (A pause in the proceedings.)

4              MR. ZEHNLE:  No objection, Your Honor.

5              THE COURT:  All right.  It's admitted.  You may

6    proceed.

7                        (Government's Exhibit No. JP5

8                        admitted into evidence.)

9              MR. ASONYE:  Your Honor, may we publish this document

10   as well?

11             THE COURT:  Yes.

12   BY MR. ASONYE:

13   Q.   Who gave you this document?

14   A.   The property manager of the Public Storage facility.

15   Q.   And who is listed in the "To" line?

16   A.   Alexander Trusko.

17   Q.   Now, are there a number of payments listed in this

18   document?

19   A.   There are.

20   Q.   Have you been able to subsequently confirm who paid for

21   the unit?

22   A.   Yes.

23   Q.   Who?

24   A.   Mr. Manafort.

25   Q.   Now, during your interview with Mr. Trusko, did you learn

1  whether Mr. Trusko had a key to the unit?

2  A.   I did.

3  Q.   And what, if anything, did Mr. Trusko tell you about

4  whether Mr. Manafort or anyone else had a key?

5  A.   He believed Mr. Manafort had a key.

6  Q.   What, if anything, did Mr. Trusko tell you about whether

7  Manafort himself had ever visited the storage unit?

8  A.   He doubted Mr. Manafort ever -- had ever visited the

9  storage unit.

10  Q.   After you reviewed the lease and other documentation, did

11  you seek Mr. Trusko's consent to search the storage unit?

12  A.   I did.

13  Q.   Did you present him with a form?

14  A.   I did.

15  Q.   Did you discuss the form with him?

16  A.   I did.

17  Q.   What did you tell him?

18  A.   I told him this is a -- it's a FBI form, consent to

19  search.  I asked him -- I read it to him first and I asked him

20  to read it and, if he was comfortable with it, to sign it.

21  Q.   And did he sign the form?

22  A.   He did.

23  Q.   Let me show you what is marked as JP6.

24        What is JP6?

25  A.   JP6 is the form, consent to search.

US v. Manafort

28

1          MR. ASONYE:  Your Honor, Government moves JP6 into

2    evidence.

3          THE COURT:  All right.

4          MR. ZEHNLE:  No objection, Your Honor.

5          THE COURT:  It's admitted.  Next question.

6                      (Government's Exhibit No. JP6

7                      admitted into evidence.)

8    BY MR. ASONYE:

9    Q.   If you could read line number 4 into the record.

10   A.   Line number 4 reads, "I authorize these agents to take any

11   items which they determine may be related to their

12   investigation."

13   Q.   Did Mr. Trusko exhibit any hesitancy when he signed the

14   form?

15   A.   No, he didn't.

16   Q.   After he signed the form, what happened next?

17   A.   He -- he unlocked the storage unit and opened the door.

18   Q.   And did you enter the storage unit?

19   A.   I did.

20   Q.   What did you do when you entered the storage unit?

21   A.   I made observations of what I had seen inside.

22   Q.   Did you take any photographs?

23   A.   I did.

24   Q.   What did you see inside?

25   A.   Several Bankers Boxes and a filing cabinet.

1    Q.   Were your observations documented in the search warrant

2    affidavit in paragraphs 31 through 34?

3    A.   Yes.

4    Q.   Now, when you opened the storage unit did you actually

5    open any of the boxes or containers?

6    A.   No.

7    Q.   Did you open the file cabinet?

8    A.   No.

9    Q.   During this timeframe, were you in contact with lawyers

10   from the Justice Department's Criminal Division in the U.S.

11   Attorneys Office in the Eastern District of Virginia?

12   A.   I was.

13   Q.   And did you have a discussion about how to proceed?

14   A.   I did.

15   Q.   What -- what was the determination about how to proceed?

16   A.   The determination was to, out of abundance of caution,

17   obtain a search warrant and continue with the search after the

18   search warrant.

19   Q.   Not withstanding that determination, did you believe you

20   had valid authorization and consent from the leaseholder to

21   enter and search the unit?

22   A.   Yes, I did.

23   Q.   As the search warrant was being drafted, did you have

24   additional conversations with Mr. Trusko?

25   A.   I did.

1  Q.    And if you could turn back to Government -- JP1.

2        Did you document that conversation?

3  A.    Yes, I did.

4  Q.    Turn to the affidavit, paragraph 30, on page 11.  Was your

5  additional conversation with Mr. Trusko at that time documented

6  in paragraph 30 of the search warrant affidavit?

7  A.    Yes.

8  Q.    Did there come a time when you secured the facility?

9  A.    Yes, I did.

10 Q.    Why did you secure the facility?

11 A.    To make sure that no one entered the facility to do

12 anything with the evidence inside.

13 Q.    Did you lock the unit?

14 A.    I did.

15 Q.    And what did you do after you locked it?

16 A.    I situated myself outside the storage facility and just

17 kept an eye on any people coming and going that may have

18 entered the -- the unit.

19 Q.    And how long did you surveil the unit?

20 A.    Until the physical -- until the -- the facility was

21 physically locked to all customers.

22 Q.    You testified that you first visited the storage unit on

23 May 26, 2017.  What day did Judge Buchanan sign the search

24 warrant?

25 A.    The next day, on May 27th.

31

1    Q.    Was that a Saturday?

2    A.    It was.

3    Q.    Was that Memorial Day weekend?

4    A.    Yes.

5    Q.    Now, were you present for the actual execution of the

6    search warrant?

7    A.    I was.

8    Q.    And were there other members of your team?

9    A.    Yes.

10   Q.    Can you explain what happened?

11   A.    As soon as we obtained the search warrant we executed the

12   search on the storage unit.

13   Q.    Was there a document or a list that you followed to

14   understand what you could and what you could not search?

15   A.    Yes, there was.

16   Q.    What document was that?

17   A.    The attachment via the search warrant.

18   Q.    And did you have a copy of the search warrant affidavit

19   with you when you executed the search warrant?

20   A.    I did.

21   Q.    Did other members of your search team also review the

22   search warrant and the affidavit?

23   A.    They did.

24   Q.    Now, when you executed the search warrant did you seize

25   every document in the storage unit?

US v. Manafort

32

1   A.   No.

2   Q.   How did you know what documents to seize and what

3   documents not to seize?

4   A.   We referred to Attachment B as to what we could seize.

5          MR. ASONYE:  Your Honor, the Government has no

6   further questions.

7          THE COURT:  All right.  Any cross-examination?

8          MR. ZEHNLE:  Yes, Your Honor.  May I ask the Court's

9   indulgence?  I was just handed the Rule 3500 material by the

10  Government just before the examination began.  I haven't had a

11  chance, or my team hasn't had a chance, to look through it

12  looks like 23 separate items relating to Rule 3500 material

13  relating to the subject of the testimony.

14         THE COURT:  All right.  I'll make it easy for you.

15         MR. ZEHNLE:  Yes, sir.

16         THE COURT:  You may step down.  You may not discuss

17  your testimony with anyone during this recess in this case.

18  And I'm going to hear the Wikimedia matter while you review

19  this material.  If there's any further material you can

20  anticipate that the defense may want to review, let's use this

21  time.

22         All right.  The Manafort matter is recessed.  Let's

23  call the Wikimedia matter.

24         (Recess.)

25         THE COURT:  All right.  Have you now had an adequate

33

1    opportunity to review that material?

2            MR. ZEHNLE:  Your Honor, I've been able to go through

3    it as quickly as possible.  This isn't my first rodeo, so we

4    can proceed.

5            THE COURT:  All right.  Let's proceed.  You'll

6    recall, sir, that you remain under oath?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  All right.  You may complete your

9    cross-examination of the witness.

10            MR. ZEHNLE:  Thank you, Your Honor.

11                        **CROSS-EXAMINATION**

12   BY MR. ZEHNLE:

13   Q.   So, Agent Pfeiffer, my name is Tom Zehnle, and I represent

14   Mr. Manafort in this matter.

15            I want to go back and ask a couple of questions or

16   develop a couple of questions in certain areas that Mr. Asonye

17   was asking you about.

18            The first area of inquiry, as I recall, was dealing

19   with an AP meeting that the Justice Department had with the AP

20   reporters.  Do you recall that testimony?

21   A.   Yes.

22   Q.   Okay.  Who was present at that meeting?

23   A.   Specifically?

24   Q.   Yes.

25   A.   On the DOJ side was Andrew Weissman, Ann Brickley (ph).  I

1    don't recall the name of the -- there was a New York Assistant

2    U.S. Attorney, I believe.  I can't remember his name.

3            On the FBI side, it was myself, Karen Greenaway (ph),

4    George McCekrin (ph).

5            And then there were, I believe, four AP reporters.

6    Q.   And do you --

7    A.   And I can't recall their names.

8    Q.   Do you recall any of the names of the AP reporters?

9    A.   I don't.

10   Q.   Okay.  And that meeting occurred in April of 2017; is that

11   correct?

12   A.   Yes, it did.

13   Q.   Okay.  And I recall that Mr. Asonye was asking you on

14   direct examination whether or not the Government provided any

15   information to the AP reporters at that meeting.  Do you recall

16   that?

17   A.   Yes.

18   Q.   And I believe your answer -- and we can look at it if we

19   need to, but I believe your answer was generally "no comment,"

20   was the Government's response?

21   A.   Correct.

22   Q.   So in reviewing some of the Jencks material that I was

23   just provided, I wanted to ask you about a specific section,

24   which is at the end of one of the memos that was written with

25   respect to that meeting, and I want your comment on it.

1          It says, "at the conclusion of the meeting, the AP

2    reporters asked if we would be willing to tell them if they

3    were off base or on the wrong track, and they were advised that

4    they appear to have a good understanding of Manafort's business

5    dealings."

6          Now, you would agree that's not "no comment,"

7    correct?

8    A.   Correct.

9    Q.   Okay.  And when it says, "they were advised," who on the

10   Government's side was advising these AP reporters with respect

11   to the nature of Mr. Manafort's business dealings?

12   A.   I don't recall that being said, so I don't -- I wouldn't

13   be able to tell you who said it.

14   Q.   Did you have a chance to review these FBI 302's and these

15   notes that were just handed to me a little while ago?

16   A.   Yes.

17   Q.   And did you actually pay attention to that particular

18   paragraph?

19   A.   I remember reading it, yes.

20   Q.   And your recollection now as you stand -- as you sit on

21   the stand is that you don't remember exactly who said that

22   particular statement?

23   A.   Correct.

24   Q.   Okay.

25          THE COURT:  Well, he said more than that.  He said he

36

1    doesn't remember that statement.

2           THE WITNESS:  Yeah, I just -- I don't remember the

3    statement at all.

4           THE COURT:  Next question.

5    BY MR. ZEHNLE:

6    Q.   Okay.  So let me turn now to what I think is much more the

7    focus of this motion and this hearing before the Court, and

8    that is the circumstances of the warrantless search that

9    occurred on May 26th.

10          So there was very brief discussion on direct

11   examination about the circumstances of your meeting with

12   Mr. Trusko, but I kind of want to get a little bit more

13   information on that.  So where did you meet Mr. Trusko the

14   first time?

15   A.   At his residence.

16   Q.   Okay.  And where is that residence located generally, not

17   address or anything?

18   A.   It's west of D.C. and Virginia.  I don't recall the exact

19   city.  He happened to be -- there was a list of potential

20   interviewees, like I had said, and he just happened to be the

21   furthest from D.C. so he was the first just based on how

22   much -- D.C. traffic is terrible, so --

23   Q.   So kind of the exurbs, a more rural part of Virginia?

24   A.   Yes.

25   Q.   Is that fair to say?

1  A.   Yes.

2  Q.   Okay.  And --

3            THE COURT:  Still within the Eastern District of

4  Virginia?

5            THE WITNESS:  Yes.  Yes, sir.

6            THE COURT:  Next question.

7  BY MR. ZEHNLE:

8  Q.   So when you went to meet Mr. Trusko for the first time,

9  did you call in advance?

10 A.   No.

11 Q.   So you arrived -- were you alone when you arrived?

12 A.   No.

13 Q.   Who else was with you?

14 A.   I had a contractor, a retired FBI agent.

15 Q.   Pardon me?

16 A.   He was a retired FBI agent, a contractor working for DOJ.

17 Q.   Okay.  And how did you -- did you just go up and knock on

18 the door and say I'd like to speak to Mr. Trusko?

19 A.   Yes.

20 Q.   Okay.  And how did that proceed?  What did -- did

21 Mr. Trusko answer the door?

22           THE COURT:  The question is now compound.

23           MR. ZEHNLE:  Correct, Your Honor.

24           THE COURT:  How did that proceed, and then you went

25 on to ask a question.  So one question at a time.

1   BY MR. ZEHNLE:

2   Q.   How did that proceed?

3   A.   So I knocked on his door and Mr. Trusko answered.

4   Q.   Okay.  And did you identify yourself as an FBI agent?

5   A.   I did.

6   Q.   Okay.  Did you show him your credentials?

7   A.   I did.

8   Q.   Okay.  Did Mr. Trusko invite you into the house?

9   A.   He did.

10  Q.   Okay.  You went into the house and you had a brief

11  discussion with Mr. Trusko?

12  A.   I wouldn't call it brief.  It was -- it was a pretty long

13  discussion.

14  Q.   Okay.  So I want to -- and that discussion, by the way, is

15  the subject of the 302 that details the information that you

16  received from Mr. Trusko, correct?

17  A.   Yes.

18  Q.   At that meeting?  There wasn't a second --

19  A.   There were -- I wrote, I believe, two 302's in different

20  conversations with Mr. Trusko.  But the original meeting I had

21  with him is the very first 302 related to Mr. Trusko.

22  Q.   Would it be fair for me to say that's the primary 302 that

23  deals with Mr. Trusko's statements to you?

24  A.   Yes.

25  Q.   Okay.  Now -- and we'll get to the substance of that in a

39

1    minute because that's really the heart of what I want to talk

2    about.

3              But in terms of after that meeting concluded, how did

4    you get from Mr. Trusko's rural Virginia residence back to

5    Alexandria?

6    A.   Well, we drove in separate cars.  So Mr. Trusko drove his

7    car and I drove mine.

8    Q.   Okay.  And I assume that the contract FBI agent was with

9    you as well?

10   A.   He was with me, yes.

11   Q.   Okay.  By the way, do you -- how old is Mr. Trusko?  Do

12   you have an idea?

13   A.   I did.  I'm trying to remember.  I want to say early,

14   mid 30's, if I recall correctly.

15   Q.   Okay.  So this is all occurring on May 26, 2017, correct?

16   A.   Yes.

17   Q.   Okay.  Mr. Trusko then describes his job and his

18   responsibilities for Mr. Manafort and Mr. Manafort's companies

19   to you, correct?

20   A.   Yes.

21   Q.   And what's your recollection of how he described that?

22   A.   To me, it seemed like he was Mr. Manafort's personal

23   assistant, conducting various errands for him.  I know he drove

24   Mr. Manafort around quite a bit.

25   Q.   So would you characterize him as a driver?

US v. Manafort

40

1           THE COURT:  He characterized him as a personal

2    assistant who did some driving; is that correct?

3           THE WITNESS:  That's how we classified him, yes, sir.

4           THE COURT:  Next question.

5    BY MR. ZEHNLE:

6    Q.   Okay.  Did Mr. Trusko describe himself as being an intern

7    for Mr. Manafort?

8    A.   I think at one time he was an intern, but not when I spoke

9    with him.

10   Q.   Did Mr. Trusko advise himself as a, "Manafort family

11   helper."?

12   A.   I don't recall the exact quote, but he did do errands for

13   the family.

14   Q.   And did he also advise you that he once picked up

15   furniture from a condo for Mr. Manafort?

16   A.   That sounds familiar, yes.

17   Q.   Okay.  Was there anything else about Mr. Trusko's job

18   description or his responsibilities outside of what we've just

19   discussed?

20   A.   I would say that's the bulk of what he had told me.

21   Q.   Okay.  Now, in terms of the actual consent, let's get to

22   the heart of the matter.  In terms of the consent, this was, of

23   course, a warrantless search of the storage unit, correct?

24   A.   Initially, yes.

25   Q.   Okay.  And we're talking on May 26, 2017, right now?

1  A.   Yes.

2  Q.   Okay.  And you were -- were you advised that Mr. Manafort

3  had Mr. Trusko move the contents of the small unit at that

4  storage facility into the larger unit at the same storage

5  facility?

6  A.   I believe he had told me that's part of the contents of

7  the storage unit in question.

8           THE COURT:  Who told you?

9           THE WITNESS:  Mr. Trusko, sir.

10          THE COURT:  Next question.

11 BY MR. ZEHNLE:

12 Q.   And did Mr. Trusko also tell you that because Mr. Manafort

13 was not there to sign the lease papers, that Mr. Trusko signed

14 those lease papers?

15 A.   I don't remember the exact wording, but, I mean,

16 Mr. Trusko had ultimately signed the lease papers.

17          THE COURT:  That wasn't his question.

18          THE WITNESS:  I mean, I don't -- I don't recall the

19 exact wording of why Mr. Trusko had signed the lease papers.

20          THE COURT:  Next question.

21          MR. ZEHNLE:  Court's indulgence.

22          (A pause in the proceedings.)

23 BY MR. ZEHNLE:

24 Q.   Agent Pfeiffer, would it refresh your recollection if I

25 showed you what you had written in your 302?

1   A.   Yes.

2            MR. ZEHNLE:  Your Honor, may I approach the witness?

3            THE COURT:  No, but you may hand it to the court

4   security officer and he will show it.  Show it to counsel --

5   show it to Mr. Asonye first.

6            MR. ZEHNLE:  Your Honor, I'm advised that the

7   Government has provided Agent Pfeiffer with his own copy and

8   that it's over there with him.

9            THE COURT:  All right.  Is this a 302?

10           THE WITNESS:  Yes, it is.

11           THE COURT:  All right.  You may read it silently to

12  yourself and then you may ask the question whether that

13  refreshes your recollection as you sit here today, Agent -- as

14  to whether -- as to what Mr. Trusko said.

15           All right.  Proceed.

16  BY MR. ZEHNLE:

17  Q.   Agent Pfeiffer, have you had a chance to -- I know it's

18  four pages.  I'll give you a moment.

19           (A pause in the proceedings.)

20  BY MR. ZEHNLE:

21  Q.   I would direct you -- Agent Pfeiffer, if it helps, I would

22  direct you to page 3 of 4 of the FBI 302.  The date is May 26,

23  2017.

24           (A pause in the proceedings.)

25           THE WITNESS:  Okay.

US v. Manafort

43

1  BY MR. ZEHNLE:

2  Q.   Sir, have you had a chance to review the affidavit?

3  A.   Yes, the --

4  Q.   Or, excuse me, 302?

5  A.   Yes.

6  Q.   Okay.  Does that refresh your recollection as we sit here?

7          THE COURT:  Well --

8          MR. ZEHNLE:  Yes, Your Honor.

9          THE COURT:  -- that's an appropriate question.  But

10  it is often asked in a way that no witness really understands

11  what you're asking.

12          What he wants to know is:  Does it give you a present

13  recollection as you sit here today?  That is, reading that,

14  does it give you a present recollection, as you sit here today,

15  as to that's what Trusko said to you?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  And what is your present recollection?

18          THE WITNESS:  That he had said something about

19  Mr. Manafort was not present to sign.

20          THE COURT:  Next question.

21  BY MR. ZEHNLE:

22  Q.   Did he say anything else about that is why he opened up

23  the storage locker in his name?

24  A.   I don't -- I don't recall him saying anything else.

25          THE COURT:  Let me be clear.  That's the way to ask

1    past recollection or whether it refreshes, because most

2    witnesses don't understand that that means do you now have a

3    recollection that that's what was said.

4            Otherwise, it's not past recollection.  Refreshed,

5    it's past recollection recorded, and that requires a different

6    procedure.

7            MR. ZEHNLE:  Thank you, Your Honor.

8            THE COURT:  Next question.

9            MR. ZEHNLE:  Thank you, Your Honor.

10   BY MR. ZEHNLE:

11   Q.   So during the discussion -- and I want to -- I want you to

12   continue to refer to this FBI 302 that you prepared in order,

13   as the Court just explained, to refresh your present

14   recollection of what occurred that day.

15           If you would take a moment just to read through the

16   last paragraph on page 4 of your 302 report?

17           THE COURT:  Well, he hasn't said he doesn't remember

18   anything.  The predicate for reading something to refresh your

19   recollection is a witness saying I don't remember.

20           So ask the question.  If he says he doesn't recall,

21   then you may direct his attention to something in the 302, and

22   we'll determine whether it refreshes his recollection or

23   whether it simply records his recollection.

24   BY MR. ZEHNLE:

25   Q.   With respect to the documents that were contained in the

1    storage unit, did Mr. Trusko identify specific records that

2    were in the Bankers Boxes or in the file cabinets?

3    A.   I don't recall exactly what he said in regards to what

4    documents were located in the -- in the storage unit.

5    Q.   Would it help you refresh your recollection if you would

6    look at your 302 and --

7    A.   Yes, and you said this is the last paragraph?

8    Q.   Well, yes, just read the last paragraph and see if that

9    refreshes --

10            THE COURT:  Read it to yourself and see if it gives

11   you a present recollection, as you sit here this afternoon, as

12   to what he said on that subject.

13            (A pause in the proceedings.)

14            THE WITNESS:  So according to what I had written to

15   give you a general idea --

16            THE COURT:  No, not a -- it doesn't --

17            THE WITNESS:  Well, from my recollection, sir.

18            THE COURT:  Now refreshed?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  You do have that recollection?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  What is it?

23            THE WITNESS:  That he had a general understanding of

24   what documents were located in the storage unit.

25   BY MR. ZEHNLE:

US v. Manafort

46

1    Q.    Did he pack any of those documents?

2    A.    No.

3    Q.    Did he open the boxes and look through specific records

4    that were contained in those boxes?

5    A.    No.

6    Q.    Did he open the file cabinet and look through the file

7    cabinet and identify specific records?

8    A.    I don't believe he said he did, no.

9    Q.    Okay.  Now, Mr. Trusko, as we were discussing a moment

10   ago, ended up signing as the occupant on the lease that's the

11   subject of this search, correct?

12   A.    Yes.

13   Q.    Okay.  With respect to the affidavit that was prepared and

14   presented to Magistrate Judge Buchanan the following day, you

15   reviewed that document, of course, correct?

16   A.    Yes.

17   Q.    That document was sworn, correct?

18   A.    Yes.

19   Q.    So on cross --

20         MR. ZEHNLE:  One moment, Your Honor.

21         (A pause in the proceedings.)

22   BY MR. ZEHNLE:

23   Q.    Do you recall in that affidavit that was presented to the

24   Magistrate Judge, that in describing the functions that

25   Mr. Trusko performed for Mr. Manafort, that he advised you he

US v. Manafort

47

1   did so only at the direction of Mr. Manafort?

2   A.    I don't recall that directly.

3   Q.    Would something help you refresh your recollection if you

4   took a moment to look at the affidavit, particularly paragraphs

5   28 and 30 of the affidavit?

6   A.    Yes.

7            THE COURT:  I think I've already admitted the

8   affidavit.

9            MR. ZEHNLE:  You have, Your Honor.

10           THE COURT:  So it's in the record.  You can read from

11   it if you wish.

12           It's already in evidence.  You may ask him whatever

13   question you wish.

14           MR. ZEHNLE:  Yes, Your Honor.  I was just giving him

15   a chance to actually look at it.

16           Just those two paragraphs, 28 and 30.

17           (A pause in the proceedings.)

18           THE WITNESS:  Okay.

19   BY MR. ZEHNLE:

20   Q.    So as the Court just advised, this affidavit is actually

21   in the record, but I wanted to ask you, you know, give you a

22   chance, does that help your recollection in terms of what --

23   the information you provided to the Magistrate Judge through

24   your affidavit?

25   A.    Yes.

1   Q.   So in response to my earlier question, did Mr. Trusko

2   advise you that he performed a variety of functions for

3   Mr. Manafort and his companies as directed by Mr. Manafort?

4   A.   Yes.

5   Q.   And did he tell you that on a number of occasions during

6   the interview?

7   A.   I don't recall how many times he had told me that.

8   Q.   So the next -- let me read to you from page 11 on what has

9   been admitted as JP-1, paragraph 28.

10          "On May 26, 2017, your affiant met with" -- and I'm

11   assuming that's Mr. Trusko, I have a redacted version -- "a

12   former employee of Davis Manafort Partners and a current

13   employee of Steam Mountain, LLC, which is a business currently

14   operated by Mr. Manafort.  Mr." -- I'm again assuming that all

15   redactions here -- Agent Pfeiffer, I'm assuming all of these

16   redactions are Mr. Trusko.  "Mr. Trusko advised that he's a

17   salaried employee of Manafort's company and that he performs a

18   variety of functions for Manafort and his company as directed

19   by Manafort."

20          You do recall that?

21   A.   Yes.

22   Q.   Okay.  And then the next sentence, "Mr. Trusko advised

23   that in approximately 2015" -- and that would be two years

24   prior to this discussion, correct?

25   A.   Correct.

49

1    Q.   --  "... in 2015 at the direction of Manafort, Mr. Trusko

2    moved a series of office files of Mr. Manafort's business

3    contained in boxes from one small storage -- smaller storage

4    unit at the address in Alexandria, Virginia, to a larger

5    storage unit at the same storage facility."

6            Do you see that?

7    A.   Yes.

8    Q.   Is that correct?

9    A.   Yes.

10   Q.   Did Mr. Trusko also advise that he personally moved the

11   office files into the particular unit, 3013, at that location?

12   A.   Yes.

13   Q.   Did he advise you of that?

14   A.   Yes.

15   Q.   Okay.

16           THE COURT:  That's all in the affidavit.

17           MR. ZEHNLE:  It is, Your Honor.

18           THE COURT:  So why are we taking this time?

19           MR. ZEHNLE:  Because I wanted to confirm the witness

20   actually recollected this and, in fact, stood by those

21   statements.

22           THE COURT:  All right.  How much more do you have?

23           MR. ZEHNLE:  Not that much more, Your Honor.

24           THE COURT:  How much more do you have?  I asked and

25   it calls for --

50

1          MR. ZEHNLE:  In terms of time?

2          THE COURT:  -- a quantitative answer.

3          MR. ZEHNLE:  I would probably say about 10 minutes,

4    Your Honor.

5          THE COURT:  All right.  Let's finish up.

6    BY MR. ZEHNLE:

7    Q.   Paragraph 30 of that same affidavit, the last sentence on

8    the page, 11.  Do you see it?

9    A.   Yes.

10   Q.   "Although Trusko could not describe the contents of the

11   filing cabinet in detail, he advised that Manafort occasionally

12   sent e-mails to Trusko directing Trusko to put certain records

13   into the filing cabinet on Mr. Manafort's behalf."

14          Is that your recollection?

15   A.   Yes.

16   Q.   Okay.  And you stand by that?

17   A.   Yes.

18          (A pause in the proceedings.)

19          THE COURT:  Next question.

20          MR. ZEHNLE:  Yes, Your Honor.  I'm sorry, I'm trying

21   to get through the Jencks.

22          THE COURT:  All right.

23          (A pause in the proceedings.)

24   BY MR. ZEHNLE:

25   Q.   So, Agent Pfeiffer, is it -- is it fair to say -- and I

1    believe -- is it fair to say that Mr. Trusko, as you put it,

2    was his personal assistant?

3    A.   Yes.

4    Q.   Is it fair to say that Mr. Trusko did not have an idea of

5    the specific records that were contained in either the Bankers

6    Boxes or the binders or the file cabinet that were contained in

7    the storage unit?

8    A.   Yes.

9    Q.   Is it fair to say that Mr. Trusko was on the lease as the

10   occupant because Mr. Manafort was not there present to sign as

11   the lease -- the lessee?

12   A.   I mean, I couldn't tell you what the reason was --

13   Q.   Is that what you were told?

14   A.   -- whether he signed -- I mean, he was -- so Mr. Trusko

15   was the occupant who signed it in the absence of Manafort.

16   Q.   And the address for the occupant was actually

17   Mr. Manafort's address?

18   A.   It was a former residence, yes.

19   Q.   Yes.  And the e-mail address that was provided on that

20   particular document was Mr. Manafort's business address,

21   correct?

22   A.   Yes.

23   Q.   Okay.

24          THE COURT:  Anything further?

25          MR. ZEHNLE:  If I may refer to my notes for a moment,

1    Your Honor.

2                 THE COURT:  Yes.  Mr. Asonye, do you have any

3    redirect?

4                 MR. ASONYE:  No, Your Honor.

5                 THE COURT:  All right.

6                 MR. ZEHNLE:  May I consult with my counsel?

7                 THE COURT:  Yes, you may.

8                 MR. ZEHNLE:  Thank you.

9                 (A pause in the proceedings.)

10                MR. ZEHNLE:  Thank you, Your Honor.  No further

11   questions.

12                THE COURT:  Any redirect?

13                MR. ASONYE:  No, Your Honor.

14                THE COURT:  Thank you.  You may step down.

15                All right.  Is there any further -- any further

16   testimony to be presented either with respect to the storage

17   unit search or the house search?

18                           (Witness excused.)

19                MR. ANDRES:  Judge, for the storage locker, no

20   additional testimony.

21                For the house search, we have witnesses available.

22   All they are going to testify to are the facts in the

23   affidavit.  There's not a consent search aspect of the house --

24   the house search.  So we're happy to proceed, but I'm not sure

25   it's entirely necessary.

US v. Manafort

53

1          THE COURT:  All right.  Yes?

2          MR. NANAVATI:  Your Honor, we don't see any

3  additional evidence for the house search.

4          THE COURT:  So in other words, in assessing the

5  legality of the house search, I can rely on the facts that are

6  set forth in the affidavit as the facts on which to base that

7  assessment?

8          MR. NANAVATI:  That's our position, Your Honor.

9          MR. ANDRES:  The Government --

10          THE COURT:  Because your real claim on the house

11  search is that the search warrant was worded in a way that it

12  was excessively broad?

13          MR. NANAVATI:  Yes, Your Honor.

14          THE COURT:  Is that the only claim or the central

15  claim?

16          MR. NANAVATI:  That's one.  The other is that there

17  was an insufficient demonstration of the connection between the

18  electronic devices and their existence -- the fact that they

19  would be found in the home.  Those are the two core claims.

20          THE COURT:  All right.

21          MR. ANDRES:  We don't think there's a need to put on

22  any evidence either, Judge.

23          THE COURT:  All right.  So now we -- I can hear your

24  legal arguments on both searches.  You both submitted briefs on

25  those, so I have your legal arguments.

US v. Manafort

54

1          So let me ask you briefly, on behalf of the

2    Government, do you want to add to that or what you already have

3    in your briefs?  Do you have anything further you want to say

4    about that?

5          MR. MEISLER:  Good morning, Your Honor.  It was the

6    defense motion that --

7          THE COURT:  It's afternoon.  And that's the point

8    that I want you to have --

9          MR. MEISLER:  Time flies when you're having fun.

10         THE COURT:  And even when you're not.

11         MR. MEISLER:  It's the defense motion, Your Honor, as

12    an affirmative argument, I don't have an affirmative argument

13    if the defense wishes their motion --

14         THE COURT:  Well, you know what arguments they have

15    made and you have responded to them in writing.  And I want to

16    know whether there's anything else you want to say other than

17    what you've submitted in your response.

18         MR. MEISLER:  I don't have anything else specific to

19    add beyond the response, Your Honor.

20         THE COURT:  Does the defendant wish to say anything

21    further on the house search or on the storage other than what's

22    in the briefs?  Otherwise, I'm going to take the matter under

23    advisement and decide it.

24         MR. ZEHNLE:  Nothing on the storage unit, Your Honor.

25         THE COURT:  How about the house?

1            MR. NANAVATI:  Your Honor, at the small risk of

2    gilding the lily, just a couple of potentially eloquent things

3    to say.

4            THE COURT:  All right.  Gild it.

5            MR. NANAVATI:  Your Honor, I think -- I just want to

6    highlight a couple of points on the home.  You know, we make in

7    the papers very clear that essentially saying all financial

8    records is too broad.  And one of the arguments from the

9    Government is, well, it's not as broad as it seems because it's

10   being limited by offenses listed, it can't be just any

11   financial records, it has to be financial records related to

12   the offenses.

13           But, Your Honor, I think it's a -- we have to ask

14   ourselves would a search warrant affidavit be enough if it

15   said, Your Honor, I want permission to search for all evidence

16   of burglary.  That's all evidence and it's limited by the

17   offenses.  It's not what we have here, but I think the answer

18   is no.

19           But another way that the Government argues it's

20   limited further is that we're also seeking evidence of state of

21   mind.

22           Well, I think that's a bit of a totality, Your Honor,

23   because if you say to a judge, "I want all evidence of

24   burglary," and the judge says specifically, "What evidence," I

25   understand burglary to be breaking and entering in the night in

1    an occupied dwelling and, you know, with intent to get in there

2    or what have you.

3              And if you say, well, I want evidence if there's

4    intent to get in there, it's just sort of circular argument.

5    It's I want evidence of burglary again.  And our position is

6    saying that if I want evidence of state of mind, there's no

7    meaningful narrowing of sort of the universe that you would get

8    if you just said, "I want evidence of burglary" or in this case

9    other types of crimes.

10             THE COURT:  What case would you chiefly rely on that

11   tells me that I need to pay attention to state of mind of

12   anybody?

13             MR. NANAVATI:  Well, Your Honor, I think at risk of

14   making part of the Government's point for them, is, you know,

15   they cite a handful of cases that say state of mind is relevant

16   and it's okay to search for evidence that bears on state of

17   mind.  And I agree with that, state of mind is an element of

18   the offense.  If there's evidence that shows that, it is

19   relevant.  But I don't think it narrows things at all to say

20   state of mind any more than it does to say I want evidence of a

21   tax due and owing in tax year 2015 on a tax evasion charge.

22             THE COURT:  All right.  Anything further?

23             MR. NANAVATI:  Just the one other point, you know, on

24   the connection between the electronic devices and the home.

25             Your Honor, I think there's a lot in the affidavit

1    connecting paper to the home, essentially, mail covers and the

2    like.

3            The connections to -- of the electronic devices to

4    the home are frankly -- they're wafer thin, Your Honor.  I'd

5    just direct Your Honor's attention, as the Government did, to

6    paragraph 65 through 71 of the affidavit.  And essentially 65

7    deals with paper; 66, paper; 68, papers related to FERA; 70,

8    papers related to bank statements; 71, bank statements; 72,

9    clothing; 73, furnishings.  That's not --

10           THE COURT:  Does the affidavit in paragraph 75 point

11   out that records, relevant records, might be found in data

12   stored on a computer's hard drive and other storage media?

13           MR. NANAVATI:  Yes, Your Honor.  And that's part of

14   what we uncharitably call an "assortment of truisms" in our

15   motion, that the Government didn't care for calling it that.

16   But those truisms are one form in which records might be found

17   is on a hard drive or a flash drive.

18           THE COURT:  Any storage medium?

19           MR. NANAVATI:  Yeah, that's right.

20           THE COURT:  Why isn't that adequate?

21           MR. NANAVATI:  Because it does nothing to separate

22   this home from every home to say we know for a fact that

23   records are often kept on magnetic media.  That's not -- that's

24   not -- we have reason to believe that, you know, we've talked

25   to Alex Trusko and he says that, you know, Mr. Manafort's

1    common way of doing business was storing things on a certain

2    type of electronic media and he would have to take it with him

3    home to work at night.

4           We're not saying that's necessarily required in every

5    case, but it's often that you see when you hit somebody's house

6    looking for business records, you often have a witness who

7    says, "Oh, yeah, and he takes a briefcase full of stuff home

8    every night, I know he does work in his home office."

9           THE COURT:  All right.  I understand your argument.

10          MR. NANAVATI:  Okay.  Okay.  And just one other

11   point, the home office point here, yes, there's a home office

12   in the house that was searched.  But all of the points about

13   business being run out of a home office in the affidavit, if

14   you look closely, are about his previous residence.

15          All of that business run out of the previous

16   residence, Trusko says all of that stuff was moved into a

17   storage unit.  But we then search his current residence where

18   he -- there's no indication he continues to do business,

19   looking for business records.  That's the end of our argument.

20          THE COURT:  Let me cover some other points very

21   quickly.  I'll take these matters under advisement.  And I'll

22   examine the briefs.  You -- you've addressed those points in

23   the brief.

24          MR. MEISLER:  I believe we have, Your Honor, but --

25          THE COURT:  I know you have.

1          MR. MEISLER:  Yes, sir, thank you.

2          THE COURT:  Now, whether it's adequate or not is your

3    problem.

4          Now, let me cover some other items.  First of all, I

5    want to cover the Government's request for a juror

6    questionnaire.  I understand the Government's views in that

7    regard and I think there's force to them.

8          However, I'm not going to do it.

9          And I'm not going to do it, because I've had 30-plus

10   years of experience in this regard.  And I do find juror

11   questionnaires to be necessary and immensely important in

12   capital cases.

13         I have not, in 30-plus years, 31-plus years, found

14   them to be particularly significant or helpful.  All they do is

15   extend the voir dire process.

16         It is important, because this case has stimulated

17   public interest far beyond what I would have expected, because,

18   as I noted in a recent opinion that I wrote, I noted that even

19   a blind man can see that this was not about Manafort, at least

20   on the part of the Special Prosecutor.

21         So it excites a lot of public interest and there has

22   been a great deal written about it.  And I will have to explore

23   at the time of juror voir dire, for every juror I will ask

24   those jurors who have seen or read or heard or know anything

25   about this case from any source to come forward.  And they will

1    all come forward, as probably all 60 or however many are here.

2    And I'll spend a day.  And I will ask them, "What is it that

3    you've seen or read or heard?  What source?  And have you

4    formed any opinions?  And are you able to be fair and

5    impartial?"

6              And then looking at them, without some form, without

7    some questionnaire, looking at them, I can tell whether -- or I

8    can make a judgment, put it that way, I can make a judgment as

9    to whether they can be fair and impartial.

10             Many of the jurors will say, "Yeah, I've read about

11   it."

12             What did it say?

13             And they'll tell me what they thought it said.

14             "Have you formed any opinion?"  And I'll listen very

15   carefully and I'll ask further questions.

16             So that's how I intend to deal with that.

17             All of the other requests in the questionnaire I will

18   deal with orally, because it's my experience that it is

19   preferable, more effective, and even shorter to do it that way.

20             So the request is denied, although I've recognized

21   that the Government's request for it is a sensible request.  I

22   just don't do it in this case.

23             I have done it in some cases.  Now, and I've told you

24   a little bit.  Let me tell you more about voir dire.

25             In this court, all voir dire, that is, all questions

1    of jurors, are asked by the Court.  I ask all the questions.

2            Now, you may, however, both sides, participate in the

3    voir dire process in three ways.  First, you may submit

4    proposed voir dire in advance of the trial.  I'll probably set

5    a date for that, and I will review that.

6            Next, the second way in which you may participate is

7    that when I have asked a question of a juror at the bench, and

8    you think a subject should be pursued further, you think more

9    questions should be asked in order for me to ferret out or in

10   order for the Court to ferret out an impermissible bias, then

11   after that person has left the bench to return to his or her

12   seat in the courtroom, you may ask, request that further

13   questions be asked of that juror on a subject and what those

14   questions are.

15           And if I find that your suggestion is narrowly

16   tailored to ferret out an impermissible bias and not unduly

17   intrusive, we're not going to ask jurors who they voted for or

18   anything of that sort, then I will have the person return to

19   the bench and I will ask the question.

20           Now, the third way in which you may participate is

21   after I have completed all of the voir dire and -- are you with

22   me, Mr. Asonye?  You two look like you were deep in

23   conversation.

24           You've been through this process before.

25           MR. ASONYE:  I have, Your Honor.

US v. Manafort

62

1          THE COURT:  They haven't.  So they need to listen to

2     me, not to you.

3          The third way in which you may participate is that

4     after I have completed the voir dire, you may then consult your

5     list or your wits, whatever you wish, and suggest additional

6     voir dire that may have occurred to you in the course of

7     process.  And, again, if it's narrowly tailored to ferret out

8     some impermissible bias and not unduly intrusive, I will ask

9     it.

10          We are not going to determine whether people

11     subscribe to some magazine called "Progressive" or "National

12     Review" or anything of that sort.

13          We're not going to go down that road.  But I do want

14     to find out if they are going to be fair-minded and not -- and

15     have not made up their mind and are able to reach an unbiased

16     conclusion, reasonably unbiased.

17          So that's how the Court will conduct the voir dire.

18     And I'll issue an order as to when the proposed voir dire

19     should be submitted.

20          MR. ASONYE: Your Honor your order or Your Honor's

21     previous order --

22          THE COURT:  Does that.

23          MR. ASONYE:  -- voir dire was due when -- at the

24     motion in limine, which was a week or two ago.

25          THE COURT:  All right .  So there you have it.

63

1   You've done it.

2          MR. ASONYE:  When the Government filed its jury

3   questionnaire, we noted a footnote that if the Court denied the

4   motion that it used the questionnaire as voir dire.  However --

5          THE COURT:  So you decided to disobey the Court order

6   based on a request by the Government?

7          MR. ASONYE:  Your Honor, we are happy to reformulate

8   it and --

9          THE COURT:  Yes, do it by 5 o'clock on Monday.

10          MR. ASONYE:  Yes, Your Honor.

11          THE COURT:  Did the defendant do it in a timely

12   manner?

13          MR. NANAVATI:  We just said what he said.

14          THE COURT:  All right.  Then you say it on Monday at

15   5 o'clock.

16          All right.  That leaves only one item for the Court

17   to discuss.

18          And that is the motion relating to leaks of grand

19   jury material.  And the defendant has requested a hearing on

20   that.  I'm looking at what you've -- why the basis for

21   requesting it.  You know, the -- we're getting close to a trial

22   date and there's only one thing that could change that trial

23   date, and that one thing is a personal thing.  It has nothing

24   to do with you-all.  But I don't think the trial date is going

25   to move.

1          So a hearing on whether there were leaks, given what

2     the remedies are for a leak, there's only one remedy that would

3     affect the trial.  And that is if the leaks were such as to

4     poison the whole venire and you asked -- someone asked for a

5     change of venue, that would change things.  But I don't see

6     that, and nobody has made that, that request.

7          What happens is that there are remedies, there are

8     sanctions for leaks of grand jury materials.  And I'm prepared

9     to impose those sanctions if the facts reflect that there was a

10    leak by anybody, especially the Government.  I would certainly

11    impose an appropriate sanction, but it doesn't affect the trial

12    that I can see.

13         So I don't want to take any more time right now.  I

14    want to focus on the motion to suppress, and I'll think about

15    how we deal with this motion for a hearing on leaks.  I do

16    regard leaks as serious breaches of grand jury secrecy.  They

17    need to be addressed to see if they occurred and sanctions

18    imposed.  But, of course, the person seeking a hearing has a

19    threshold burden to meet before I take the trouble of having a

20    hearing.  And I haven't decided that yet.

21         I'm still at the point of deciding whether what I

22    have had disclosed to me by the defendant compels the

23    Court or -- "compels" is the wrong word -- warrants the Court

24    in having a hearing and determining whether leaks of grand jury

25    material occurred.

US v. Manafort

65

1              Yes, sir.

2              MR. DOWNING:  May I be heard, Your Honor, briefly?

3              THE COURT:  Yes.  The magic word is "briefly."

4              MR. DOWNING:  You talked a bit earlier about, for

5     voir dire, what we were going to do.  You were going to inquire

6     about what people know about the case, the manner in which

7     they've heard about it, and whether or not they can be fair and

8     impartial.  We'd like to do -- we don't have to take too much

9     time, we'd like to do some supplemental briefing with you about

10    the nature of the leaks that occurred here.

11             I mean, we have highest level government officials

12    that have said to the press that Mr. Manafort --

13             THE COURT:  Well, have you filed -- let's assume for

14    a moment that you're right.  What is the remedy that you would

15    seek?

16             MR. DOWNING:  Well, the question becomes:  How can he

17    have a fair trial when the press and media has been so

18    associated with false statements about the evidence --

19             THE COURT:  All right.  So what is the remedy,

20    assuming you're right?

21             MR. DOWNING:  Well, given the pattern of conduct, one

22    remedy is certainly dismissal --

23             THE COURT:  No.  Putting that one aside.

24             MR. DOWNING:  I'd like to stick with that one

25    briefly.

1          THE COURT:  No.  Go on.

2          MR. DOWNING:  The next -- Your Honor, what I'm trying

3   to deal with is I think you have kind of glossed over this

4   issue in terms of you talking to somebody and asking them some

5   questions in voir dire.  I think we can do some supplemental

6   briefing to just show this Court how satiated the populace --

7          THE COURT:  Will you listen to what I'm saying to

8   you?

9          What remedy would you've asked for if you're right

10  that it has been satiated, as you put it?

11         MR. DOWNING:  It would have to be a change of venue.

12         THE COURT:  Ah, finally.  Finally.

13         MR. DOWNING:  I was brief.

14         THE COURT:  Have you made a motion?

15         MR. DOWNING:  Well, I was waiting to hear back from

16  the Court on the motion on the leaks.  We haven't made a motion

17  on that, but we did say that -- and the Government has said

18  that may be one of the remedies.

19         THE COURT:  Of course it's a remedy, but I have to

20  determine whether the remedy is warranted.  You better marshal

21  all your evidence of that before we determine whether you go to

22  Roanoke or Richmond or some place to try this case.

23         MR. DOWNING:  That's correct, Your Honor.  We'd ask

24  leave of court to file a supplemental briefing on that issue.

25         THE COURT:  Well, do it right now.  Do it quickly.  I

1    expect to see it by the close of business Friday, a week from

2    Friday.

3              MR. DOWNING:  Thank you, Your Honor.

4              THE COURT:  That was obvious for the first time I saw

5    the motion.

6              I mean, not obvious that change of venue is required,

7    but that's really the only remedy.  The other remedies are

8    sanctions for people who made the leaks.  That doesn't affect

9    this trial.

10             No, just tell me in a sentence.  It's lunchtime.

11             MR. DOWNING:  I think in the Spiro Agnew case the

12   Court realized how damaging this type of leaks were to the

13   defendant, and that had a very --

14             THE COURT:  You weren't alive then and I was actually

15   in the court when that happened with Judge Hoffman.  I know a

16   little bit about that.

17             So what is it you want to say Spiro Agnew case has to

18   do with this?

19             MR. DOWNING:  Well, I think you could say this is in

20   the briefing too, but I think -- I wasn't in the courtroom

21   but --

22             THE COURT:  No, you were a gleam in your daddy's eye.

23             MR. DOWNING:  What this had to do with how unfair

24   that process turned out to be and how justice could not be done

25   until they could --

1          THE COURT:  Where was Agnew tried?

2          MR. DOWNING:  In Maryland.  He wasn't tried.

3          THE COURT:  He pled.

4          MR. DOWNING:  The Government reached a nolo

5    contendere and the judge basically said, "Thank you for

6    coming."

7          THE COURT:  I don't see Judge Hoffman -- you had to

8    know Judge Hoffman as I did.  "Beef" Hoffman would not -- and

9    by the way, for your -- for your general -- Mr. Asonye knows

10   these -- I don't accept nolo pleas.  If there is to be a nolo

11   plea, I do respect the right of a defendant to try to assert a

12   nolo plea.  I simply tell you go ask one of my colleagues here

13   and she or he will accept a nolo plea.

14         In this court when I accept a guilty plea you have to

15   admit what you did under oath.  Nobody pleads guilty unless

16   they actually did what they are pleading guilty to.

17         All right.  I think I've -- I've listened to your

18   point, but I'm not going to have a hearing on the leaks.

19   You've got enough information to determine whether you think

20   leaks don't determine a transfer.  You used the word "satiated"

21   many times .

22         Well, prove it.  Show me.  And I will consider it.

23         Mr. Asonye?

24         MR. ASONYE:  Your Honor, we have two brief

25   housekeeping matters we had mentioned.

1      THE COURT:  You better make them brief.

2      MR. ASONYE:  First of all, Your Honor, we want to

3  advise the Court I think at arraignment that Government had

4  estimated approximately a two-week trial.  And as we've

5  prepared for trial, we believe that it's more likely three

6  weeks, three weeks to present the Government's evidence in this

7  case.  We are working --

8      THE COURT:  It's bank fraud and tax, false statements

9  and tax, right?

10      MR. ASONYE:  That's correct, Your Honor.

11      THE COURT:  Do you have any idea how many bank frauds

12  and income tax false statements I've heard?

13      MR. ASONYE:  Many, because I've tried at least one in

14  front of you, Your Honor.  So --

15      THE COURT:  None of them last three weeks.  None.

16      MR. ASONYE:  We are working --

17      THE COURT:  In fact, I can't remember a case in the

18  past few years that has lasted that long.  You better think

19  about ways of streamlining your case.  It's a document case.

20      MR. ASONYE:  It's a document case, Your Honor, but

21  it's -- there are witnesses -- international case, and we are

22  working with defense counsel.  We have offered a number of

23  stipulations to try to streamline the Government's case.  And

24  we are going to continue to do that, but we did want to advise

25  the Court --

70

1        THE COURT:  Well, I thank you for the -- for the

2   notice.  My response is -- I like your estimate, your original

3   estimate, even though I thought that was excessive.

4        MR. ASONYE:  And then, finally, Your Honor, again, we

5   note that the Government has filed a request for a discovery

6   order in this case.  Again, we think this will help --

7        THE COURT:  Request for?

8        MR. ASONYE:  A discovery order in this case.

9   Otherwise, we'll revert to the Federal Rules, which we, quite

10  frankly, think are less generous for the defendant but it would

11  be helpful to have --

12       THE COURT:  All right.  Well, defense hasn't agreed

13  to the discover order, is that what you're saying?

14       MR. ASONYE:  They haven't, but, Your Honor, we

15  haven't received a response and there hasn't been a filing --

16  we filed a motion for discovery order and we heard nothing,

17  even though the deadlines have past.

18       THE COURT:  All right.  You-all, I take it, have the

19  discovery order.  And I'm not going to require that you tell me

20  now, but let me hear -- did you submit the draft order in your

21  motion?

22       MR. ASONYE:  We did list the standard discovery order

23  that is utilized in this district.

24       THE COURT:  All right.  You-all need to look at it

25  carefully and tell me what you think in writing by the close of

1  business on Friday, a week from today, and I'll act on it after

2  that.

3          I thank counsel for your cooperation.

4          Now, what remains?  May I see what remains for today?

5              (Discussion off the record.)

6          **(Proceedings adjourned at 1:31 p.m.)**

1                    CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motions

7    Hearing in the case of the **UNITED STATES OF AMERICA versus**

8    **PAUL J. MANAFORT, JR**, Criminal Action No. 1:18-CR-83, in

9    said court on the 29th day of June, 2018.

10           I further certify that the foregoing 72 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this July 18, 2018.

17

18

19

20

21                    _____

22                    Tonia M. Harris, RPR
                      Official Court Reporter

23

24

25