UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
UNITED STATES OF AMERICA,      .   Criminal Action No.
                               .   1:18-CR-83
        versus                 .
                               .
PAUL J. MANAFORT, JR.,         .
                               .   August 1, 2018
            Defendant.         .   Volume II-A.M.
------------------------------x

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            UZO ASONYE, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              GREG D. ANDRES, SAUSA
                              BRANDON L. VAN GRACK, SAUSA
                              Special Counsel's Office
                              U.S. Department of Justice
                              950 Pennsylvania Avenue, N.W.
                              Washington, D.C. 20530

FOR THE DEFENDANT:            JAY ROHIT NANAVATI, ESQ.
                              BRIAN P. KETCHAM, ESQ.
                              Kostelanetz & Fink LLP
                              601 New Jersey Avenue, N.W.
                              Suite 620
                              Washington, D.C. 20001
                                and
                              THOMAS E. ZEHNLE, ESQ.
                              Law Office of Thomas E. Zehnle
                              601 New Jersey Avenue, N.W.
                              Suite 620
                              Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 133 - 274)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

134

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANT:              KEVIN M. DOWNING, ESQ.
                                     Law Office of Kevin M. Downing
3                                    601 New Jersey Avenue, N.W.
                                     Washington, D.C. 20001
4                                      and
                                     RICHARD W. WESTLING, ESQ.
5                                    Epstein, Becker & Green, P.C.
                                     1227 25th Street, N.W.
6                                    Washington, D.C. 20037

7    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
8                                    401 Courthouse Square
                                     Alexandria, VA 22314
9                                    (703)299-8595

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

INDEX

WITNESS                          EXAMINATION      PAGE


DANIEL RABIN

                                 DIRECT           144
                                 CROSS            166

SA MATTHEW MIKUSKA

                                 DIRECT           171
                                 CROSS            261




                        E X H I B I T S

Government Exhibit No. 33A was received              156
Government Exhibit Nos. 23-24 were received          162
Government Exhibit Nos. 30-32 were received          163
Government Exhibit No. 1D was received              174
Government Exhibit No. 35 was received              184

Government Exhibit No. 36 was received              186
Government Exhibit No. 37 was received              188
Government Exhibit No. 38 was received              189
Government Exhibit No. 39 was received              190
Government Exhibit No. 48 was received              192

Government Exhibit No. 49 was received              194
Government Exhibit No. 50 was received              195
Government Exhibit No. 51 was received              196
Government Exhibit No. 52 was received              197
Government Exhibit No. 53 was received              198

Government Exhibit No. 55 was received              218
Government Exhibit No. 58 was received              220
Government Exhibit No. 59C was received             223
Government Exhibit No. 329 was received             224
Government Exhibit No. 70C was received             225

Government Exhibit No. 152 was received             227
Government Exhibit No. 40 was received              229
Government Exhibit No. 41 was received              231
Government Exhibit No. 43 was received              240
Government Exhibit No. 44 was received              242

```
1    Government Exhibit No. 59 was received        242
     Government Exhibit No. 59A was received       243
2    Government Exhibit No. 59B was received       244
     Government Exhibit No. 59D was received       245
3    Government Exhibit No. 97B was received       246

4    Government Exhibit No. 359 was received       250
     Government Exhibit No. 372 was received       251
5    Government Exhibit No. 444 was received       254
     Government Exhibit No. 445 was received       255
6    Government Exhibit No. 446 was received       256

7    Government Exhibit No. 412A was received      258
     Government Exhibit No. 412B was received      260
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(Defendant present, Jury out.)

THE COURT:  Good morning.  The record will reflect that counsel and the parties and the defendant are present and prepared to proceed.  I didn't convene sharply at 9:30 because the given vagaries of Northern Virginia traffic are such that some of the jurors were not here sharply at 9:30.  They're all here now.

I have, at my request, been given to me by the Government the list of the exhibits you intend to offer through these witnesses.  Thank you.  That's very helpful.

With respect to Mr. Rabin -- is that how he pronounces his name?

MR. ANDRES:  Yes, Judge.

THE COURT:  All right.

-- Mr. Rabin's testimony, is there any objection to those memos?

MR. WESTLING:  No.  We don't have any objection to those documents, Your Honor.

THE COURT:  All right.  Then so be it.

Just as a matter of notice to you, I have some concern, as I indicated at the bench, about whether every element of business record is met.  I also have some concern about whether or not they really -- they aren't submitted for the truth of the matter asserted.

```
 1              I think, Mr. Andres, what you're doing is you're

 2    trying to show that Mr. Manafort did indeed do a lot of work in

 3    the Ukraine.  Am I right?

 4              MR. ANDRES:  Yes, Judge.

 5              THE COURT:  I doubt you're going to get any argument

 6    from the defendant on that.

 7              MR. WESTLING:  None, Your Honor.

 8              MR. ANDRES:  I understand that, Judge, but the

 9    defense also hasn't stipulated to that and we obviously --

10              THE COURT:  That's right.  No, I haven't stopped you

11    from doing that, but at the same time I'm not sure you want

12    Mr. Rabin to talk about some memo about what they were doing.

13    Just ask him the question if he's on the stand.  You don't need

14    a bunch of paper, have them leafing through memos at the end of

15    the case.

16              MR. ANDRES:  Understood, Judge.

17              THE COURT:  Now, one other very minor matter.  I

18    think at least both sides have mentioned the term "oligarch."

19    Of course, an oligarchy is just despotic power exercised by a

20    privileged few, autocratic control of any government.  And so

21    people involved in that are commonly referred to as oligarchs.

22    Principals of high schools are oligarchs in that sense.

23              Now, what I want to avoid, because I think the

24    Government is entitled to a fair trial and the defendant is

25    entitled to a fair trial, is somehow to use the term "oligarch"
```

1   to mean that he was consorting and being paid by people who are

2   criminals, and of course there will be no evidence about that.

3   There will be no evidence about those people, about their

4   activities.  The only thing we really will know about them is

5   if they had a lot of money.

6        Well, Mr. Soros would then be an oligarch by that

7   definition and so would Mr. Koch.  I picked two people on both

8   sides of the spectrum.  But we wouldn't call them oligarchs.

9   So I would suggest to you that you avoid the term.  You can

10  use "Where the money came from," financier, people who financed

11  a campaign, and refer to it that way.

12       The word "oligarch" has come to have a pejorative

13  meaning about which there will be no evidence in this trial, so

14  I don't think it has a role to play in this trial.

15       Mr. Andres?

16       MR. ANDRES:  Thank you, Judge.  We don't refer to

17  American businessmen as oligarchs.  Ukraine businessmen are

18  referred to as oligarchs by the witnesses.  Those are the facts

19  of this case, and that's how they refer to them because --

20       THE COURT:  No, they're not the facts of this case.

21  That's an opinion by a witness, an opinion by a witness, and I

22  don't expect witnesses to offer opinions about that.  Find

23  another term to use.

24       MR. ANDRES:  Judge, if I might, the -- when I say --

25       THE COURT:  Let's do it this way:  You can submit a

1   brief.

2           MR. ANDRES:   Okay.

3           THE COURT:   Tell me in detail why you want to call

4   them oligarchs, and you understand that what I'm saying is I

5   think the Government is surely entitled to a fair trial, as is

6   the defendant.   So I'm going to allow you to put on evidence

7   that is fair and goes to prove the elements of the offense,

8   which is that he falsely subscribed to an income tax return and

9   that he defrauded banks.

10          Those are the two groups of allegations, but we're

11  not going to have this case tried that he associated with

12  despicable people and therefore he's despicable.   That's not

13  the American way.

14          MR. ANDRES:   Judge, I'm in complete agreement, and

15  when I said fact versus opinion, all I meant to say was those

16  were the -- it's not the opinion of a witness that these people

17  are oligarchs.   It's a fact that they were referred to that way

18  among the people who discussed the payments.   So we're happy to

19  brief the issue, and I don't want to take any more of the

20  Court's time.

21          THE COURT:   Is the term "oligarch" used in some

22  document that you intend to use?

23          MR. ANDRES:   I'll have to look, Judge.

24          THE COURT:   All right.   I don't think we need to

25  spend much time on this.   You don't need the term "oligarch."

1   You can use the term "he financed it."

2          MR. ANDRES:  Understood, Judge.  Thank you.

3          THE COURT:  Language has a dynamic aspect to it.  It

4   changes, and I can't control the changes.  Oligarch had a

5   different meaning to those who wrote about the Greek states,

6   not different but a little bit, and nobody would think to refer

7   to the principal of a high school as an oligarch, but the

8   definition could encompass it.

9          No, I don't control language, and -- at all.  One

10  evidence of that is that I grew up not splitting infinitives.

11  I still don't split infinitives.  My wife's an English teacher.

12  She says, give it up, splitting infinitives is okay.  I'm too

13  old to give some things up.  So I still don't split

14  infinitives, but I don't -- I don't judge people adversely for

15  splitting them.  I accept it.  I just don't do it myself.

16         All right.  Let's bring the jury in.

17                    (Jury present.)

18         THE COURT:  No assigned seats, but I can see some --

19  some proprietary interest in particular seats being

20  demonstrated, which is fine.

21         You may be seated.

22         All right.  Ladies and gentlemen, we begin, as we do

23  every morning, with the calling of the roll.  We'll do it by

24  number again.

25         Ms. Pham, you may proceed.

1              THE CLERK:  Ladies and gentlemen, as I call your

2     number, please answer "present" or "here."

3              Juror 0008?

4              JUROR 0008:  Present.

5              THE CLERK:  Juror 00037?

6              JUROR 00037:  Present.

7              THE CLERK:  Juror 0276?

8              JUROR 0276:  Present.

9              THE CLERK:  Juror 0017?

10              JUROR 0017:  Present.

11              THE CLERK:  Juror 0145?

12              JUROR 0145:  Present.

13              THE CLERK:  Juror 0115?

14              JUROR 0115:  Present.

15              THE CLERK:  Juror 0082?

16              JUROR 0082:  Present.

17              THE CLERK:  Juror 0009?

18              JUROR 0009:  Present.

19              THE CLERK:  Juror 0299?

20              JUROR 0299:  Present.

21              THE CLERK:  Juror 0091?

22              JUROR 0091:  Present.

23              THE CLERK:  Juror 0302?

24              JUROR 0302:  Present.

25              THE CLERK:  Juror 0060?

1          JUROR 0060:  Present.

2          THE CLERK:  Juror 0296?

3          JUROR 0296:  Present.

4          THE CLERK:  Juror 0054?

5          JUROR 0054:  Present.

6          THE CLERK:  Juror 127?

7          JUROR 127:  Present.

8          THE CLERK:  And Juror 133?

9          JUROR 133:  Present.

10          THE CLERK:  Thank you.

11          THE COURT:  All right.  Ladies and gentlemen, we'll

12   continue with the taking of the evidence today, and we will

13   take one mid-morning recess and one mid-afternoon recess.

14   However, if at any point during the proceedings any of you need

15   a brief recess for some truly exigent purpose, you need only

16   raise your hand or give me the sports time signal and I will

17   call a recess, and I will not inquire of you of the reason for

18   it.

19          I ask you not to avail yourself of that opportunity

20   unless it's really necessary, but don't -- if it is, don't

21   worry about it.  I'm not going to ask about it.  I'll do it.

22          THE COURT:  All right.  Mr. Andres, you may call your

23   next witness.

24          MR. ANDRES:  Thank you, Judge.  The Government calls

25   Daniel Rabin.

D. Rabin - Direct                                                    144

1          THE COURT:  And, again, Mr. Andres, it's helpful that

2   you provided that list.  Thank you.

3          Come forward, take the oath, please, sir.

4          DANIEL RABIN, GOVERNMENT'S WITNESS, AFFIRMED

5          THE COURT:  All right.  Mr. Andres, you may proceed.

6          MR. WESTLING:  Your Honor, if I could have a moment

7   just before we start.  I may have been too quick to answer the

8   Court's questions about exhibits.  There are three on that list

9   that I do have an issue with, and I apologize for that.  I just

10  missed them when I was looking at the list quickly.  They are

11  33A, B, and C.

12         THE COURT:  All right.  Before you offer those, we'll

13  have a brief bench conference.

14         MR. ANDRES:  Very well, Judge.

15         THE COURT:  Proceed, Mr. Andres.

16                         DIRECT EXAMINATION

17  BY MR. ANDRES:

18  Q.   Please state your name for the record.

19  A.   My name is Daniel Rabin.

20  Q.   Can you briefly describe your educational background?

21  A.   Yes.  I have a bachelor's degree from the University of

22  Maryland.

23  Q.   And what year did you receive that degree?

24  A.   In 1992.

25  Q.   And in what area or discipline?

1   A.    In communications.

2   Q.    And what field do you work in, Mr. Rabin?

3   A.    I work in political media.

4   Q.    As a media consultant, what do you specialize in?

5   A.    In making television and radio ads.

6   Q.    And how long have you worked as a media consultant?

7   A.    Since 1997.

8   Q.    Have you worked or been associated with various media

9   companies in your career?

10  A.    I have, yes.

11  Q.    Can you tell us what companies and over what time periods?

12  A.    Yeah.  So I started as -- always as a vendor, but I began

13  from 1997 to roughly 2002 with a firm called Shrum, Devine and

14  Donilon and then as a vendor again, working with a firm called

15  D&D Media and then I started my own firm, Rabin Strasberg LLC.

16  Q.    With respect to those first two firms that you mentioned

17  and D&D, did you work for the man named Tad Devine?

18  A.    I did.

19  Q.    Strasberg Rabin, what position did you hold at that firm?

20  A.    Partner.

21  Q.    And at -- where are you currently employed?

22  A.    Again, I'm a partner at a firm called RSH Campaigns.

23  Q.    Do you know Mr. Manafort, Paul Manafort?

24  A.    I do.

25  Q.    How do you know Mr. Manafort?

D. Rabin - Direct                                                146

1  A.    I worked with Mr. Manafort.

2  Q.    Over what period of time did you work with Mr. Manafort?

3  A.    From roughly 2006 to 2014.

4  Q.    And during that time period, what did you do with

5  Mr. Manafort?

6  A.    I made television ads.

7  Q.    Were you working in a particular country?

8  A.    I was.

9  Q.    What country?

10  A.    In Ukraine.

11  Q.    You testified that you worked until 2014.  What happened

12  in 2014 that you stopped working in the Ukraine?

13  A.    The project ended.

14  Q.    Okay.  Was there a change in political party?

15  A.    There was.

16  Q.    Okay.  And with respect to the television ads and work in

17  Ukraine, what specifically did you do in the Ukraine?

18  A.    So we would write scripts and then turn those scripts into

19  30-second ads, which would run then on air.

20  Q.    And were those scripts related to an election?

21  A.    They were.

22  Q.    And did you work for a particular party?

23  A.    We did.

24  Q.    What party?

25  A.    So we began working for the Party of Regions.

1    Q.   Okay.  And did you work for a particular presidential

2    candidate?

3    A.   We did.

4    Q.   Who?

5    A.   Viktor Yanukovych.

6    Q.   And what was your role in those elections?

7    A.   Media consultant.

8    Q.   Okay.  And who did you report to?

9    A.   I reported to Paul.

10   Q.   Okay.  And do you know who he reported to?

11   A.   I don't.

12   Q.   Okay.  Now, prior to your testimony, did you receive a

13   subpoena?

14   A.   I did.

15   Q.   And did you provide certain materials to the Government?

16   A.   I did.

17   Q.   What materials?

18   A.   Photographs, e-mails, and documents.

19   Q.   And did you meet with the Government prior to your

20   testimony to review those materials?

21   A.   I did.

22   Q.   You testified that you first began working in the Ukraine

23   in 2006.  Did you work on other elections?

24   A.   In Ukraine?

25   Q.   Yes.

D. Rabin - Direct                                                     148

1    A.    Yes.

2    Q.    What elections?

3    A.    Elections for the Rada, which is their parliament, and the

4    presidential election.

5            THE COURT:  Mr. Rabin, may I ask you, please, to

6    speak up?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  My hearing is not what it once was.

9            THE WITNESS:  I understand.  Mine too.

10           THE COURT:  Nothing is what it once was.

11           Go ahead, Mr. Andres.

12           MR. ANDRES:  Thank you, Judge.

13   BY MR. ANDRES:

14   Q.    Did you work on local elections in the Ukraine?

15   A.    We never made ads in local elections that I can remember.

16   Q.    Okay.  How about in mayoral elections?

17   A.    Yes, we did work on one mayoral election.

18   Q.    And for that election, who hired you?

19   A.    I worked for Paul.

20   Q.    Okay.  You testified that Mr. Manafort was involved in

21   these various elections.  Can you explain to the jury what

22   Mr. Manafort did and what his role was?

23   A.    He was the general consultant on the election.  He ran the

24   strategy, he ran the team, and made political decisions for the

25   client.

1   Q.   Okay.  And can you describe what Mr. Manafort's management

2   style was?

3   A.   He demanded a lot of the people that worked for him.  He

4   was thorough, he was strict, and he -- you know, he always

5   worked for the best of the campaign.  You know, he ran a very

6   good campaign.

7   Q.   And was he successful in those campaigns?

8   A.   Yes.

9   Q.   Did he win elections?

10  A.   He did.

11  Q.   You testified that you helped make TV ads and commercials

12  for the elections.  Can you explain the process by which you

13  made those?

14  A.   Yeah.  We would start by getting research from -- usually

15  from a pollster, and then we would talk about what a message

16  would be in the campaign and create a narrative arc for the

17  message, then write 30-second scripts, a whole series of them

18  that could potentially be turned into television commercials.

19  Then we'd acquire the footage, either through filming it or

20  tapping into footage that already existed, edit that down into

21  30 seconds, record a voiceover, get it approved and then send

22  it to air.

23  Q.   Okay.  Who had the final approval with respect to those

24  commercials?

25  A.   Well, on our team, Paul would approve ads, and then the

1   client would approve ads as well.

2   Q.    Okay.  And when you say Paul, who are you referring to?

3   A.    Paul Manafort.

4   Q.    During the time that you worked for Mr. Manafort,

5   approximately how many commercials did you make?

6   A.    Well over 50.

7   Q.    You testified that Viktor Yanukovych was the leader of the

8   Party of Regions.  Have you met Mr. Yanukovych?

9   A.    I did.

10  Q.    On how many occasions?

11  A.    Two occasions that I remember.

12  Q.    And what were the circumstances that led you to meet

13  Mr. Yanukovych?

14  A.    We were filming him for TV ads.  He was reading scripts.

15          MR. ANDRES:  Judge, I was going to introduce those

16  exhibits now.

17          THE COURT:  You mean 30 and so forth?

18          MR. ANDRES:  30 -- I'm just going to admit 30A and --

19  33A and 33C.

20          THE COURT:  All right.  Come to the podium -- or to

21  the bench, rather.

22          (Bench conference on the record.)

23          MR. WESTLING:  Your Honor, again, I apologize for

24  missing this, but just to raise the issue, these are two

25  photographs of Mr. Yanukovych at a photo shoot.  We've heard

D. Rabin - Direct                                                    151

1    testimony about that.  I don't understand the benefit of

2    putting on photos --

3              THE COURT:  Your objection is to relevance?

4              MR. WESTLING:  Relevance and prejudice.

5              THE COURT:  What's the prejudice?

6              MR. WESTLING:  Well, we think that the continuing

7    association of Mr. Yanukovych showing him in this space is just

8    sort of piling on, if you will.

9              THE COURT:  What's the relevance of this?

10             MR. ANDRES:  Judge, I can't understand how this is

11   possibly prejudicial.

12             THE COURT:  I can't understand why it's possibly

13   relevant.  Why don't we start with that?

14             MR. ANDRES:  Okay.  It's relevant because there's

15   been testimony about the work that Mr. Manafort did in the

16   Ukraine.  This is a picture of Mr. Yanukovych.  The defense

17   certainly mentioned repeatedly in opening --

18             THE COURT:  I don't see why that's relevant.  You

19   have asked him what he's done work for.  He's testified to

20   that.  What does the picture add to that?

21             MR. ANDRES:  It corroborates his testimony --

22             THE COURT:  It isn't going to be denied.

23             MR. ANDRES:  But we still have a burden.  When you

24   say it isn't going to be denied --

25             THE COURT:  This picture does not satisfy any burden

D. Rabin - Direct                                                    152

1    the Government has.

2              MR. ANDRES:   This picture shows the work that

3    Mr. Rabin is doing in the Ukraine for Mr. Manafort.   That is

4    central to the case.

5              THE COURT:   I will sustain the objection.   You have

6    asked the question whether he met Mr., he met Mr. Yanukovych.

7    He says he did.   He's described the work that he did.   He's

8    described the fact that he did it for Mr. Manafort.

9              A picture, I don't see adds anything to it.

10             I also don't see any particular prejudice, but

11   clearly, it isn't relevant.

12             I don't know.   Frankly, Mr. -- well, let's leave it

13   at that.   I've ruled.   The -- this picture that I've seen now

14   doesn't go to prove any fact in issue.   The fact in issue, I

15   think, is whether he received payment or revenues or money from

16   people that he didn't report on his income tax return.

17             There's no doubt that it's appropriate for the

18   Government to prove that he did work for which he got paid.

19   This picture doesn't help at all.   What this picture does is to

20   continue to associate this defendant with individuals in Russia

21   who may or may not, in the press, have received favorable

22   coverage, I don't know, because I don't read the press.

23             MR. ANDRES:   Judge, this has nothing to do with

24   Russia.

25             THE COURT:   Good.   I'm glad.

D. Rabin - Direct                                                    153

1            MR. ANDRES:  I just referred to individuals in

2      Russia.  This is what the defense is alleging --

3            THE COURT:  This is in Ukraine.

4            MR. ANDRES:  Right.  This is what the defense keeps

5      saying that they're admitting to and they're admitting to and

6      they're admitting to every time.

7            THE COURT:  No, they haven't said anything.  I made

8      the mistake by referring to Russia.

9            MR. ANDRES:  No, I'm sorry, what I'm saying was is

10     that every objection that defense has, we stipulated that

11     Mr. Manafort worked for or we're not opposing that, and yet

12     when we try to prove it, they object to it.  So I'm just

13     confused by it.

14           THE COURT:  No, he has just testified that he worked

15     for Manafort, and he's testified as to the nature that he did.

16     A photograph showing them has essentially no probative value.

17           MR. ASONYE:  Your Honor, may I speak?

18           THE COURT:  No.  One lawyer from now on, but you may

19     confer.

20           MR. ASONYE:  Thank you.

21           MR. ANDRES:  Judge, I don't want to belabor this, but

22     it is a photograph of a man who's paying him, which is exactly

23     what the issue is, the man who's facilitating payments to

24     Mr. Manafort.  So --

25           THE COURT:  He didn't pay him.

D. Rabin - Direct                                                    154

1        MR. ANDRES:  He, he -- the payments were made on

2  behalf of Mr. Yanukovych by the -- I would say oligarchs, but

3  by the oligarchs, by the wealthy businessmen.

4        THE COURT:  Right.  Now, how are you going to -- what

5  is your evidence going to be about how that money -- it went to

6  some offshore bank, and you're going to show somehow that

7  Mr. Manafort had signatory power over those accounts.  All

8  right.  But you're not going to have evidence about precise

9  person or entity that sent that money.

10       MR. ANDRES:  Yes, we are.

11       THE COURT:  Oh, you are?

12       MR. ANDRES:  Those are the oligarchs.

13       THE COURT:  All right.  Those are the individuals who

14 financed it.  Don't use the term.

15       MR. ANDRES:  Understand.

16       THE COURT:  It has a pejorative thing, and you don't

17 want to try somebody by smearing them, do you?

18       MR. ANDRES:  I do not.

19       THE COURT:  All right.  Well, then don't use the

20 term.  It's that simple.

21       All right.  Now, let's come back to this picture.

22 On -- how many of these pictures did you want to use to show?

23       MR. ANDRES:  Two.

24       THE COURT:  No, you can use one.  Pick the best one,

25 and that's it.

D. Rabin - Direct                                                        155

1              MR. ANDRES:  Thank you, Judge.

2              THE COURT:  Let's proceed.

3              (End of bench conference.)

4              THE COURT:  All right, Mr. Andres, you may proceed in

5    accordance with the results of the bench conference.

6              MR. ANDRES:  Thank you, Judge.

7    BY MR. ANDRES:

8    Q.   Now, Mr. Rabin, can I ask you, do you have a binder in

9    front of you?

10   A.   I do now.

11   Q.   Can I ask you to take a look at Government Exhibit 33A?

12   A.   My eyes aren't what they used to be either.

13        33A, yes.

14   Q.   Got it?  Can you tell me what that is?

15   A.   It's a photograph.

16   Q.   And what is that a photograph of?

17   A.   That's a photograph that was taken on the set where we

18   were reading scripts.

19   Q.   Okay.  And does this relate to a commercial or a TV ad?

20   A.   It does.  This was right before we filmed.

21   Q.   And was this work that you were doing for Mr. Manafort?

22   A.   It was, yes.

23   Q.   And does the photograph in 33A fairly and accurately

24   depict what was happening at that time?

25   A.   It does.

D. Rabin - Direct                                                    156

1              MR. ANDRES:  Judge, I ask --

2              THE COURT:  Well, what was happening at that time was

3    that people were together?

4              THE WITNESS:  Yes, it was --

5              THE COURT:  Does that show an actual ad?

6              THE WITNESS:  It doesn't.  It shows the introduction

7    of the candidate to us before the ad was filmed.

8              THE COURT:  Next question.

9              MR. ANDRES:  Judge, I'd like to admit Government

10   Exhibit 33A.

11             THE COURT:  All right.  I'll admit it without -- or

12   over the objection.

13             MR. WESTLING:  Thank you, Your Honor.

14             THE COURT:  But I sustain the objection as to any

15   other photographs of that group.

16             MR. ANDRES:  Thank you, Judge.

17             (Government Exhibit No. 33A was received in

18   evidence.)

19             MR. ANDRES:  I'd like to publish the photograph,

20   Judge.

21             THE COURT:  No, let's go on.

22             MR. ANDRES:  Okay.

23   BY MR. ANDRES:

24   Q.   Can you describe the individuals in the photograph?

25   A.   I can.  The woman on the right is Anna German, the

D. Rabin - Direct                                                    157

1    gentleman next to her is Viktor Yanukovych.  The man to his

2    left is Phillip Griffin, next to him is me and then next to him

3    is Vladimir Stepanov.

4    Q.   And you identified Viktor Yanukovych in the photograph.

5    Who is that?

6    A.   He was -- I don't remember when this photo was taken, but

7    he was either the president or the prime minister.

8    Q.   And the woman next to him, you identified as Anna Gorman,

9    who is that?

10   A.   She worked for the president.

11   Q.   And Phil Griffin, who's that?

12   A.   He worked for Paul Manafort.

13   Q.   At the time that you worked for Mr. Manafort, do you know

14   what firm or company he worked for?

15   A.   He worked for Davis Manafort and then Davis Manafort

16   International.

17   Q.   And did you meet any individuals associated with Davis

18   Manafort or DMP International?

19   A.   Over the years, I did, yes.

20   Q.   Who did you meet?

21   A.   I met a gentleman named Christian Ferry and then a

22   gentleman named Rick Gates.

23   Q.   Who did you understand Rick Gates to be?

24   A.   An employee or somebody who worked with or for Paul.

25   Q.   And do you know what his status was relative to

1   Mr. Manafort?

2   A.   He worked under him, but I don't know what his job title

3   was.

4   Q.   Okay.  And would you deal with Mr. Gates on issues

5   relating to the Ukraine?

6   A.   Yes, I would.

7   Q.   What types of issues?

8   A.   Mostly financial issues.  Rick was -- Rick was a

9   gatekeeper, so we didn't want to bother Paul with stuff like

10  invoices and schedules.  So Rick was who we would send our

11  invoices to.  Rick was who we would coordinate with.  Rick got

12  our flights approved.  And Rick would help -- Rick would help

13  us get information to Paul if we couldn't get in touch with

14  him.

15  Q.   During the time that you worked in the Ukraine, did you

16  meet an individual named Konstantin Kilimnik?

17  A.   I did.

18  Q.   Who is that?

19  A.   Konstantin worked for Paul as well.

20  Q.   And what did he do specifically?

21  A.   I don't know what his relationship was with Paul, but I

22  could tell you what he did with us.

23  Q.   Okay.

24  A.   Konstantin spoke English, so he would help to translate

25  scripts into Ukrainian in a way that sort of captured what the

D. Rabin - Direct                                                          159

1    original English intent was of scripts.  And Konstantin would

2    help us set up meetings with the party and the right people

3    there to get ads approved, and to get -- to get the right

4    people to see the work that we were doing so we could move

5    forward.

6    Q.   During the time that you worked in the Ukraine, did you

7    travel there?

8    A.   I did.

9    Q.   How often did you travel there?

10   A.   It really depended on the election.  Sometimes every other

11   week, sometimes only a couple of times.  It depended on what

12   was happening at the time.

13   Q.   Over the period from 2006 to 2014, do you know

14   approximately how many times you've been to the Ukraine?

15   A.   Over 40 times.

16   Q.   Okay.  Do you know if Mr. Manafort -- and who would pay

17   for those expenses?

18   A.   So Mr. Manafort would pay for the flights, then we would

19   pay for hotels and food and phone, and then we would get

20   reimbursed.

21   Q.   Do you know if Mr. Manafort had an office in the Ukraine?

22   A.   There was an office there.  I don't know whose office it

23   was, but there was an office that we used.

24   Q.   And would you meet there with individuals associated with

25   the campaign?

D. Rabin - Direct                                                          160

1    A.    On occasion.

2    Q.    Okay.  And --

3    A.    Only the U.S. team.  We never met with Ukrainians.

4    Q.    And where was that office located?

5    A.    In the center of the city.

6    Q.    During the time that you worked in the Ukraine, were there

7    other U.S. advisors who worked for Mr. Manafort?

8    A.    There were.

9    Q.    Who were they?

10   A.    On my team over the years, I worked with Mike Donilon, Tad

11   Devine, Adam Strasberg, and Julian Mulvey.

12   Q.    Did you ever work with a man named Dave Sackett?

13   A.    Yes.

14   Q.    Who was he?

15   A.    He was a pollster.

16   Q.    How about Tony Fabrizio?

17   A.    I did.

18   Q.    What did he do?

19   A.    He was a pollster as well.

20   Q.    And what was the purpose of the pollsters?

21   A.    So the pollsters would, just like a U.S. election, they

22   would -- they would do a questionnaire or a poll to figure out

23   what the -- what the message was that we would need to run in

24   the campaign.  They would get a feel for the electorate and how

25   we needed to position ourselves and create a strategy that

D. Rabin - Direct                                                    161

1   would ultimately win a political campaign.

2   Q.   Were you paid for your work in the Ukraine?

3   A.   Yes.

4   Q.   How were you paid?

5   A.   By either a check or bank wire.

6   Q.   And who paid you?

7   A.   Mr. Manafort.

8   Q.   Were you required to open any foreign accounts to get

9   paid?

10  A.   I wasn't.

11  Q.   Did you open an account in Cyprus?

12  A.   I didn't.

13  Q.   Do you know if Mr. Manafort had overseas accounts?

14  A.   I don't know.

15  Q.   Did you talk to Mr. Manafort about how he was paid?

16  A.   I never did.

17  Q.   Can I ask you to turn to Exhibit -- if I could -- if I

18  could ask you to turn to Exhibit 23 in your binder?

19  A.   Okay.

20  Q.   If you could look at Exhibit 23 and 24?  Can you tell me

21  what those are?

22  A.   Yes.  These are invoices from my firm at the time to

23  Mr. Manafort for expense reimbursement.  They're both for

24  expense reimbursement for the work that we did in Ukraine.

25  Q.   And they relate to the work that you did for Mr. Manafort?

D. Rabin - Direct                                                    162

1    A.   They do.

2              MR. ANDRES:   Your Honor, the Government moves to

3    admit Government Exhibit 23 and 24.

4              MR. WESTLING:   Without objection, Your Honor.

5              THE COURT:   All right.   It's admitted.   They are

6    admitted.

7              (Government Exhibit Nos. 23 and 24 were received in

8    evidence.)

9    BY MR. ANDRES:

10   Q.   Mr. Rabin, with respect to Exhibit 23, can you just tell

11   me who the billing party is on that?

12   A.   Yes.   This was sent to Davis Manafort to the attention of

13   Amanda Van Sickle.

14   Q.   And what's the date of the bill?

15   A.   The date of the bill is September 28, 2010.

16   Q.   And does the bill list the project name?

17   A.   The bill lists the project name as Ukraine 2010.

18   Q.   Okay.   And with respect to Exhibit 24, can you tell me

19   what the date on Exhibit 24 is?

20   A.   October 15, 2010.

21   Q.   And what's the project listed for that bill?

22   A.   Ukraine 2010.

23   Q.   Okay.   Can I ask you now to look at Exhibits 30, 31, and

24   32?

25             THE COURT:   Do you intend to offer these?

D. Rabin - Direct                                                      163

1          MR. ANDRES:  Yes, Judge.

2          THE COURT:  These are all invoices.  Any objection?

3          MR. WESTLING:  No, Your Honor.

4          THE COURT:  All right.  Exhibits 30, 31, and 32 are

5    admitted.

6          (Government Exhibit Nos. 30 thru 32 were received in

7    evidence.)

8          THE COURT:  Next question.

9    BY MR. ANDRES:

10   Q.   What are the exhibits in 30, 31, and 32?

11   A.   These are invoices from my firm to Davis Manafort

12   International.

13   Q.   Okay.  With respect to the Exhibit 30, can you just tell

14   me the date on that invoice?

15   A.   On 30?  October 23, 2012.

16   Q.   And does this -- does this relate to work that you did in

17   the Ukraine?

18   A.    It does.  Again, this is expense reimbursement for travel

19   and a retainer for the month of October.

20         MR. ANDRES:  Your Honor, could I just publish one of

21   these exhibits, No. 31?

22         THE COURT:  Yes, you may.

23         MR. ANDRES:  Exhibit 31, please.

24   BY MR. ANDRES:

25   Q.   With respect to Exhibit 31, can you just take us through

D. Rabin - Direct                                                    164

1   the document, starting with the heading at the top?

2   A.    31.  So the heading on the top is April 18, 2014, to Davis

3   Manafort International, DMI, LLC, 211 North Union Street,

4   Suite 250, Alexandria, Virginia, 22314.  Project Title:

5   "Ukraine."  No project description or PO number.  The invoice

6   number is UK001-14.  Terms:  Due on receipt.

7   Q.    And this is sent to DMI.  What is DMI?

8              THE COURT:  We've had testimony about that already, I

9   think.  In fact, from this witness.  So let's see if we can

10  expedite things.  Go ahead and remind us about DMI.

11             THE WITNESS:  Davis Manafort International.

12  BY MR. ANDRES:

13  Q.    Mr. Rabin, you testified that you were paid by Davis

14  Manafort.  At the time of your work for Davis Manafort, did you

15  have any outstanding bills?

16  A.    At the end of this election or the end of --

17  Q.    At the end of all your work.

18  A.    I did.

19  Q.    Approximately when was that?

20  A.    Sometime around 2014.

21  Q.    And how much was that outstanding bill?

22  A.    Approximately $31,000.

23  Q.    During the time that you worked for Mr. Manafort, did you

24  write memos from time to time?

25  A.    We did.

D. Rabin - Direct                                                      165

1    Q.   What did those memos pertain to?

2    A.   The memos would pertain to anything from how we thought a

3    media campaign would proceed and what the -- we called them

4    flights, that's how long an ad is on the air -- what a flight

5    schedule would look like to what messaging could look like in a

6    political campaign to how production would unfold, how we might

7    acquire film footage in order to make television ads.

8    Q.   Mr. Rabin, during the time that you worked in Ukraine, did

9    you learn about an individual named Rinat Akhmetov?

10   A.   A little bit, yes.

11   Q.   Who is he?

12   A.   He was somebody of wealth who -- I think he was out of

13   Donetsk.

14   Q.   Okay.  And how did you learn about him?

15   A.   He was running, I believe, for parliament and I was asked

16   to go and observe a speech that he was giving.

17   Q.   And who asked you to go there?

18   A.   Paul Manafort.

19   Q.   And during the time that you worked in the Ukraine, did

20   you learn about an individual named Sergei Levochkin?

21   A.   I heard his name, but that's it.

22   Q.   When you say you "heard his name," who did you hear his

23   name from?

24   A.   I can't remember, but it was a name that was used fairly

25   often.

1   Q.    Okay.

2             MR. ANDRES:  Judge, may I have one moment?

3             THE COURT:  Yes, you may.

4             MR. ANDRES:  I have no further questions, Judge.

5   Thank you.

6             THE COURT:  Any cross-examination?

7             MR. WESTLING:  Yes, Your Honor.

8                          CROSS-EXAMINATION

9   BY MR. WESTLING:

10  Q.    Good morning, Mr. Rabin.

11  A.    Good morning.

12  Q.    My name is Richard Westling.  I represent Mr. Manafort.

13  How are you?

14  A.    Good.

15  Q.    I don't think I have too many questions for you but let's

16  just start.

17            You talked about the work that you do and you've been

18  involved in media consulting for quite a while; is that right?

19  A.    It is.

20  Q.    All right.  And you know Mr. Manafort through your

21  professional relationships of that sort, correct?

22  A.    I do.

23  Q.    All right.  And you know him to be a talented political

24  consultant, correct?

25  A.    I do.

D. Rabin - Cross                                                        167

1    Q.   And you witnessed that yourself in the work you did

2    together in the Ukraine, correct?

3    A.   I have.

4    Q.   All right.

5             THE COURT:  I'm sorry, I didn't hear your answer.

6             THE WITNESS:  I have.

7             THE COURT:  Next question.

8             MR. WESTLING:  Thank you, Your Honor.

9    BY MR. WESTLING:

10   Q.   And so you obviously worked together for a number of years

11   over there, correct?

12   A.   Correct.

13   Q.   All right.  On a number of campaigns?

14   A.   Correct.

15   Q.   And you did more than, I think you said, 50 ads for

16   Mr. Manafort?

17   A.   Over the years, yes.

18   Q.   Okay.  And so it sounds like it was a productive

19   partnership that you-all had?

20   A.   It was.

21   Q.   Okay.  And you were paid well for your work?

22   A.   Depends who you ask.

23             (Laughter.)

24             MR. WESTLING:  I shouldn't have asked for an opinion

25   on that, I guess.

D. Rabin - Cross                                                      168

1  BY MR. WESTLING:

2  Q.   But you were paid for your work with the exception of that

3  one invoice you mentioned?

4  A.   Yes.

5  Q.   All right.  And I assume you were paid more than $100,000?

6  A.   Over the years, yes.

7  Q.   More than $500,000?

8  A.   I'd have to go back and check.

9  Q.   All right.  A substantial amount of money?

10 A.   Yes.

11 Q.   Okay.  Now, I'm curious, some of the testimony we've heard

12 in the trial, obviously you do work in the United States as

13 well, correct?

14 A.   I do.

15 Q.   All right.  And do you work for any particular side in the

16 United States?  Don't tell me which one.

17           MR. ANDRES:  Objection.  Outside the scope, Judge.

18           THE COURT:  It is outside the scope, but I'll permit

19 it.  Is this the only question on that?

20           MR. WESTLING:  It is, Your Honor.

21           THE COURT:  All right.  That doesn't mean,

22 Mr. Andres, that you should refrain from asserting the

23 objection if he proceeds.  I think you're correct, it is

24 outside the scope.  Proceed.

25 BY MR. WESTLING:

D. Rabin - Cross                                                      169

1  Q.   So, again, without telling us which side, do you typically

2  in the U.S. work for any particular side?

3  A.   Typically I do, yes.

4  Q.   Okay.  But in cases of international consulting, it sounds

5  like those sides get melded because we're not in the U.S.; is

6  that right?

7  A.   Well, there's no Democrats and Republicans anywhere but in

8  the U.S.  So --

9  Q.   And that may be good in some countries, right?

10 A.   Yes.

11 Q.   Okay.  So just to kind of go over some of this, you submit

12 invoices on a regular basis for your work?

13 A.   Yes.

14 Q.   And it looks like you generally sent those to someone in

15 Mr. Manafort's office, correct?

16 A.   Correct.

17 Q.   And was that typically Mr. Gates?

18 A.   Well, it began I think with Ms. Van Sickle.

19 Q.   Okay.

20 A.   And then to Mr. Gates next, yes.

21 Q.   All right.  And you described Mr. Gates' role in working

22 with you in the Ukraine, and it sounds like he handled a lot of

23 the logistics and business issues that came up; is that right?

24 A.   That is correct.

25 Q.   All right.  And you obviously said he worked for

1  Mr. Manafort?

2  A.   Yes.

3  Q.   All right.  Mr. Rabin, I'm curious about one other thing.

4  I know that Mr. Andres asked you that you had been interviewed

5  by his office before this.  When were you first contacted in

6  this case?

7  A.   Oh, I don't know the exact date.

8  Q.   In the last month?  In the last year?

9  A.   I'd say sometime in the last -- within the last two

10  months.

11         MR. WESTLING:  Okay.  Thank you very much.  I have no

12  further questions.

13         THE COURT:  Redirect?

14         MR. ANDRES:  I don't have any questions, Judge.

15  Thank you.

16         THE COURT:  All right.  You may step down.  Thank

17  you, sir.

18         THE WITNESS:  Thank you.

19                      (Witness excused.)

20         THE COURT:  This witness may be excused?

21         MR. ANDRES:  Yes, Judge.

22         THE COURT:  All right.  Call your next witness,

23  please.

24         MR. ASONYE:  Your Honor, the Government calls

25  Matthew Mikuska.

1          THE COURT:  Come forward, sir.  Take the oath,

2   please.

3       SA MATTHEW MIKUSKA, GOVERNMENT'S WITNESS, AFFIRMED

4          THE COURT:  All right.  Mr. Asonye, you may proceed.

5          MR. ASONYE:  Thank you, Your Honor.

6                        DIRECT EXAMINATION

7   BY MR. ASONYE:

8   Q.   Could you please state and spell your name for the record?

9   A.   Yes.  It's Special Agent Matthew Mikuska.  It's

10  M-i-k-u-s-k-a.

11  Q.   Mr. Mikuska, how far did you go in school?

12  A.   I have a law degree.

13  Q.   And what did you earn your college degree in?

14  A.   Political science.

15  Q.   After you went to law school, what was your next major

16  job?

17  A.   I worked for a commercial real estate firm in Chicago.

18  Q.   And then what did you do?

19  A.   I became a prosecutor at the Will County State's

20  Attorney's Office just south of Chicago.

21  Q.   For how long?

22  A.   Approximately four years.

23  Q.   And after you left the Will County's Prosecutor's Office,

24  where did you work?

25  A.   I entered on duty with the Federal Bureau of

M. Mikuska - Direct                                                          172

1    Investigation.

2    Q.   Do you currently work at the FBI?

3    A.   I do.

4    Q.   And how long have you worked there?

5    A.   Eleven years, sir.

6    Q.   What is your title?

7    A.   I'm a special agent.

8    Q.   Did you receive training as a special agent?

9    A.   I did.

10   Q.   Generally what type of training did you receive?

11   A.   Sure.  To become a special agent, you have to complete

12   approximately six months of training at Quantico.

13   Q.   Now, generally, without stating the particular name, are

14   you part of a squad at the FBI?

15   A.   Yes, I am.

16   Q.   And, generally, what does that squad do?

17   A.   We do counterintelligence.

18   Q.   And how long have you worked in that area?

19   A.   Eleven years.

20   Q.   Now, as part of your duties as a special agent, do you

21   participate in the execution of search warrants?

22   A.   I do.

23   Q.   Approximately how many times have you participated in the

24   execution of a federal search warrant?

25   A.   Approximately 100.

M. Mikuska - Direct                                                      173

1    Q.   Did you participate in the search of Paul Manafort's

2    condominium at 601 North Fairfax Street in Alexandria,

3    Virginia?

4    A.   I did.

5    Q.   And was that search executed on August 14, 2017?

6    A.   Yes, it was.

7    Q.   Now, prior to executing the search warrant, what, if any,

8    documents did you review?

9    A.   I reviewed the search warrant and attached affidavits.

10   Q.   And why did you review those documents?

11   A.   Just to ensure that during the search we complied with the

12   court's order.

13   Q.   And was that search warrant approved by a federal

14   magistrate judge --

15   A.   Yes, sir.

16   Q.   -- here in the Eastern District of Virginia?

17   A.   Yes, sir.

18   Q.   Were there other members of a search team with you?

19   A.   Yes, there were.

20   Q.   Now, do you know if every member of that team was required

21   to review the search warrant and the affidavits?

22   A.   Yes, I do; and, yes, they did.

23   Q.   And were those materials available to you at the actual

24   search?

25   A.   Yes, sir.

M. Mikuska - Direct                                                      174

1    Q.   Now, let me show you what's been marked as Government

2    Exhibit 1D in your binder.  What is it?

3    A.   It is a picture of an apartment complex.

4    Q.   Which -- what apartment complex?

5    A.   Sure.  It's the apartment complex that holds the apartment

6    we searched of Mr. Manafort.

7    Q.   And is it a fair and accurate representation of the

8    exterior of Mr. Manafort's building?

9    A.   Yes, it is.

10             MR. ASONYE:  Your Honor, Government moves Exhibit 1D

11   into evidence.

12             MR. WESTLING:  No objection.

13             THE COURT:  Admitted.

14             (Government Exhibit No. 1D was received in evidence.)

15             MR. ASONYE:  May we publish?

16             THE COURT:  Yes, but come to the bench, please.

17             (Bench conference on the record.)

18             THE COURT:  I take it, Mr. Asonye, that you intend to

19   introduce documents that were found in the search?

20             MR. ASONYE:  Correct, Your Honor.

21             THE COURT:  I appreciate and understand your

22   thoroughness in the attempt to show the picture of this

23   location.  I don't see why.  And I'm doing this because I want

24   to encourage you-all to focus sharply and get this case done.

25   It is a tax evasion or a fraud case or a bank fraud case.

1           Do you have any objection to the search?

2           MR. WESTLING:  Well, we do.

3           THE COURT:  You didn't file one, did you?

4           MR. WESTLING:  Yeah, we --

5           THE COURT:  Oh, did I issue an opinion?

6           MR. WESTLING:  You did, Your Honor.

7           THE COURT:  All right.

8           MR. WESTLING:  Unfortunately, we didn't prevail.

9           THE COURT:  No.

10          MR. WESTLING:  But the one thing we do have with this

11  witness that I refer the prosecution to is there's a number of

12  exhibits that they're going to put in through this witness in

13  order to establish foundation that they came from the place,

14  and I have no trouble with that.

15          My objection to anything, Your Honor, is simply I

16  don't think it's appropriate for this agent to work through

17  those exhibits from a content point of view.  If he doesn't

18  have any personal knowledge, he simply can say, "I found them,

19  here they are."  But other than that, he becomes sort of a

20  summary witness, and we're concerned about that.  There's other

21  summary witnesses we've been noticed about.

22          MR. ASONYE:  Well, Your Honor, it's absolutely

23  relevant for the agent to walk through the documents that were

24  located in the defendant's home during the search warrant.  We

25  are looking for relevant materials, and we found them.  We

1  found bank records.  We found bank loan applications.  We found

2  memos related to the work that he did do.

3          THE COURT:  Well, you don't have any objection to his

4  eliciting that there were bank records found?

5          MR. WESTLING:  The type of document, no.  It's the

6  content of the document.

7          MR. ASONYE:  But, Your Honor, we have to go through

8  the content.  He's the only person who can talk about the

9  content, that they're showing payments, showing bank accounts,

10  and where they came from.

11          THE COURT:  Is he an accountant?

12          MR. ASONYE:  No, Your Honor, but he's going to be

13  able to read this is the document that was located.  Can you

14  read through highly relevant portions of the document that were

15  found and why they were seized?

16          THE COURT:  Let's see if we can be a little more

17  concrete about this.  There will be bank records that show

18  what, Mr. Asonye?

19          MR. ASONYE:  Well, Your Honor, a number of things on

20  the bank records.  There will be bank records that show

21  payments from overseas accounts, the shell companies that we

22  referred to in our opening that were found in Mr. Manafort's

23  home.  There will -- there are records about his work in the

24  Ukraine that were found in his home.

25          We want to go through those and highlight some of

1   those.  We're not going to read the whole documents, probably a

2   paragraph on each document, but it's important that the jury

3   sees these records, what was found.

4           THE COURT:  Well, there's no objection to their

5   admissibility.  I don't see the problem with the -- his reading

6   the --

7           MR. WESTLING:  Well, I think, Your Honor --

8           THE COURT:  Just a moment.

9           MR. WESTLING:  I apologize.

10          THE COURT:  His reading the facts.  If I admit the

11  documents, they're admitted for the truth of the matters they

12  contain.

13          MR. WESTLING:  That's correct, Your Honor, and I

14  think our concern is simply to have someone who can say, "I

15  found them," has no knowledge of their content, what's been

16  prepared for trial, and he becomes sort of a mouthpiece talking

17  about that, which I cannot effectively cross-examine him on.

18          THE COURT:  Yes, you can.  You can ask him, "Do you

19  know anything about those documents" -- don't nod your head.

20          MR. ASONYE:  Sorry, Your Honor.

21          THE COURT:  Do you know anything about those

22  documents apart from what you see on their face?"  And what

23  will be his answer?

24          MR. ASONYE:  I think in some cases, he will know.  In

25  some cases, he will not know.

1            THE COURT:  All right.  I'll let you decide whether

2    you can cross-examine him or not, and I'll allow you to ask him

3    to read certain portions of it, but let's see if we can -- I

4    mean, a picture of the apartment complex?  Come on.  Let's use

5    some judgment to focus this matter sharply.

6            MR. ASONYE:  And, Your Honor, just to your point on

7    focusing sharply, we've culled down our witnesses.  We are way

8    ahead of schedule on this trial.

9            THE COURT:  Good.  Let's keep it up.  That's good.

10   I'm proud of you.

11           MR. ASONYE:  We're trying to focus on the things that

12   actually matter.  This does matter to us.

13           THE COURT:  All right.  And I hope this conference is

14   helpful to both sides.

15           MR. ANDRES:  Thank you, Judge.

16           THE COURT:  Thank you.

17           (End of bench conference.)

18           THE COURT:  All right.  Mr. Asonye, you may proceed,

19   sir.

20           MR. ASONYE:  Thank you, Your Honor.  And I believe

21   Your Honor said we could publish 1D?

22           THE COURT:  Yes.  But I also noted that I don't think

23   it has much to do with this case.

24   BY MR. ASONYE:

25   Q.   All right, could you just describe, just briefly describe

M. Mikuska - Direct                                                    179

1   the building that you --

2              THE COURT:  They can see the building.  Is this -- is

3   somewhere in this building what you searched, a condo you

4   searched?

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  All right.  Let's go on.

7              MR. ASONYE:  All right.  Go ahead.  Take it down.

8   BY MR. ASONYE:

9   Q.    What floor was Mr. Manafort's unit on in this building?

10  A.    The fourth floor, sir.

11  Q.    And approximately what time did you execute the search

12  warrant?

13  A.    Slightly after 6:00 a.m.

14  Q.    And where did your search team go when you arrived?

15  A.    When we arrived at the complex, we entered into the

16  underground parking area.

17  Q.    And then where did you go?

18  A.    We proceeded to elevators and took the elevators to the

19  lobby of the apartment complex.

20  Q.    And after the lobby, where did you head next?

21  A.    From the lobby we took a second set of elevators to the

22  fourth floor.

23  Q.    And that was Mr. Manafort's floor?

24  A.    Yes, it was.

25  Q.    Now, what did you do once you were on his floor?

M. Mikuska - Direct                                                  180

1    A.    We gathered at his door and prepared to enter and execute

2    the search warrant.

3    Q.    Did you knock before you entered?

4    A.    A special agent did knock at his -- on his door and

5    announce that it was the FBI and that we were there to serve a

6    search warrant.

7    Q.    Okay.  Did anyone immediately answer the door?

8    A.    No, sir.

9    Q.    What did you do after no one answered?

10   A.    We proceeded to knock and announce that we were the FBI

11   and we were there to serve a search warrant two more times.

12   Q.    And how many -- between each knock, how long did you wait?

13   A.    Approximately, 30 seconds.

14   Q.    How many times did you -- separate occasions, did you have

15   to knock?

16   A.    Three times in total.

17   Q.    Now, are you familiar with something called a no-knock

18   warrant?

19   A.    Yes, sir.

20   Q.    Was this a no-knock warrant?

21   A.    No.

22   Q.    Eventually, did the FBI enter the unit?

23   A.    Yes, we did.  We had a key to the unit.

24   Q.    All right.  And what -- when you opened the door, what

25   happened next?

M. Mikuska - Direct                                                    181

1    A.    The knock-and-announcing agent again advised that we were

2    the FBI and that we were there to serve a search warrant, and

3    we opened the door.

4    Q.    And who was inside the unit when you arrived?

5    A.    Immediately upon opening the door, to our left we saw

6    Mr. Manafort.

7    Q.    And you mentioned that you had a key for the unit?

8    A.    Yes, sir.

9    Q.    Okay.  Where did you get the key from?

10   A.    I'm not familiar with that.

11   Q.    Now --

12            THE COURT:  What is your answer?

13            THE WITNESS:  That I was not familiar with where

14   precisely we obtained the key.

15            THE COURT:  All right.  Next question.

16   BY MR. ASONYE:

17   Q.    What did you do once you were inside?

18   A.    The first thing that we do when we get inside a unit like

19   this, and on this particular case, is we ensured that the unit

20   was secure of any danger.

21   Q.    Okay.  And was Mr. Manafort advised of what was going on?

22   A.    He was.

23   Q.    And could you just briefly describe for the jury the

24   layout of the condominium?

25   A.    Sure.  It's a large unit, luxury.  It is three bedrooms

1    with a large office, a large closet space, at approximately

2    somewhere -- I'd approximate it's somewhere over 2,000 square

3    feet.  It had an open kitchen, an open dining room, and open

4    living or entertainment room.

5    Q.   Now, what was your role in executing the search warrant?

6    A.   I was the seizing agent.

7    Q.   What does it mean to be the seizing agent?

8    A.   The seizing agent is someone who takes custody of the

9    seized evidence and ensures that it gets properly stored.

10   Q.   And as the seizing agent, are you generally aware of the

11   items that were seized?

12   A.   Yes.

13   Q.   What, if any, documents did you use to -- well, and did

14   you help determine what would be seized?

15   A.   Yes, sir.

16   Q.   And what helped guide your determinations of what could be

17   seized and what could not be seized?

18   A.   The search warrant and affidavit that we had.

19   Q.   And could you briefly explain to the jury the process of

20   seizing evidence?

21   A.   Sure.  So we put multiple agents into -- the first thing

22   that we do is mark every room inside the residence or location

23   that we're going to search with a letter.  After that, a number

24   of agents, always more than one, search a room and document

25   what we find.

1              We also have members who are part of the FBI's

2    evidence response team that are there to take appropriate

3    pictures, make sketches of the areas that are seized, and we

4    also have members of the FBI's CART team, which is the computer

5    analysis response team, that are there to ensure that any

6    digital or electronic items that we find are seized and stored

7    appropriately.

8              THE COURT:  Mr. Asonye, I take it what you are

9    seeking to do is introduce a number of documents that were

10   found in the search.

11             MR. ASONYE:  Yes, Your Honor.

12             THE COURT:  Let's do it.

13   BY MR. ASONYE:

14   Q.   Agent Mikuska, did the search warrant authorize the

15   seizure of records?

16   A.   Yes, sir.

17   Q.   And what about electronic media?

18   A.   Yes, sir.

19   Q.   All right.  Let me -- and were both types of items seized?

20   A.   Yes.

21   Q.   All right.  Let me show you what's been marked as

22   Government Exhibit 35.

23             Okay.  Was this a document that was seized during the

24   search?

25   A.   Yes, it was.

M. Mikuska - Direct                                          184

1              MR. ASONYE:  Your Honor, the Government moves 35 into

2      evidence.

3              MR. WESTLING:  No objection.

4              THE COURT:  Admitted.

5              (Government Exhibit No. 35 was received in evidence.)

6              MR. ASONYE:  And may we publish?

7              THE COURT:  Yes, you may.

8      BY MR. ASONYE:

9      Q.   All right.  Agent Mikuska, could you just go through

10     briefly this document?

11             On the top right, what is the name of the company

12     that's listed?

13     A.   Peranova Holdings Limited.

14     Q.   And then the letter is written to another company.  What

15     company is listed there on the left side?

16     A.   DMP International LLC.

17     Q.   Okay.  What is the date of the letter?

18     A.   It's dated June 23, 2015.

19     Q.   And could you go ahead and read the first sentence of the

20     letter?

21     A.   Yes.  "The purpose of this letter is to confirm that

22     Peranova Holdings Limited has stricken off from its register

23     the debt owed by DMP International LLC."

24     Q.   Go ahead and read the rest of that paragraph.

25     A.   The --

M. Mikuska - Direct                                              185

1              THE COURT:  The jury can read it if they choose to do

2    so.

3    BY MR. ASONYE:

4    Q.   And who was the letter signed by?

5              THE COURT:  Do you have any personal knowledge about

6    the contents of this letter other than what appears in the

7    letter itself?

8              THE WITNESS:  No, Your Honor.

9              THE COURT:  Next question.

10   BY MR. ASONYE:

11   Q.   Who was this letter -- what's the title above the

12   signature?

13   A.   The title above the signature is Ms. Georgia -- and pardon

14   me if I mispronounce the last name -- Chrysostomides.

15   Q.   Okay.  Go ahead and turn to the next page.

16   A.   Yes.

17   Q.   What is the title of this document?

18   A.   This is a loan agreement.

19   Q.   All right.  And what is the date of this loan agreement?

20   A.   6 March 2014.

21   Q.   And do you see it's between two parties?  Could you read

22   the name of the party on the first line?

23   A.   Telmar Limited.

24   Q.   And where does it say this company is registered under?

25   A.   The Laws of Cyprus.

M. Mikuska - Direct                                                186

1    Q.    And the second company that's listed, what company is

2    listed there?

3    A.    DMP International LLC.

4    Q.    And if you can go ahead and just read the whereas clause

5    in this loan agreement?

6    A.    "Whereas, the borrower requires funds of an aggregate

7    amount of $900,000 for its business operations."

8    Q.    And, Agent Mikuska, how many pages is this loan agreement?

9    A.    Two.

10   Q.    All right.  Let me show you what's been marked as

11   Government Exhibit 36.  Do you have that?

12   A.    I do.

13   Q.    All right.  What is it?

14   A.    It's a personal financial statement and loan application.

15   Q.    And was this also seized at the search?

16   A.    Yes, it is.

17          MR. ASONYE:  Your Honor, the Government moves 36 into

18   evidence.

19          MR. WESTLING:  No objection.

20          THE COURT:  It's admitted.

21          (Government Exhibit No. 36 was received in evidence.)

22          THE COURT:  It's admitted.  Next question.

23          MR. ASONYE:  May we publish?

24          THE COURT:  Yes, you may.

25   BY MR. ASONYE:

1    Q.    Okay.  What financial institution is listed in the top

2    left?

3    A.    It's the Banc of California.

4    Q.    And can you tell the jury who the applicant is in this

5    loan agreement?

6    A.    The applicant --

7    Q.    I'm sorry, loan application?

8    A.    Sure.  The applicant is listed as Paul J. Manafort.

9    Q.    And if you could turn to the second page.

10   A.    Yes.

11   Q.    And if we could blow up the middle of the document.

12         Is there handwriting on this loan application?

13   A.    Yes, there is.

14   Q.    And if we could turn to -- it's three pages -- two pages,

15   the next two pages, Mr. Binder.

16         And, Agent Mikuska, the Bates range ending in 4.

17   A.    Yes.

18   Q.    Okay.  Is this document signed?

19   A.    It is.

20   Q.    What is the date next to the signature?

21   A.    March 8, 2016.

22   Q.    Okay.  Let me show you what's been marked as Government

23   Exhibit 37.  Was this also seized during the search?

24   A.    Yes, it was.

25   Q.    And does it also reference the defendant?

M. Mikuska - Direct                                                        188

1    A.   Yes, it does.

2         MR. ASONYE:   Your Honor, the Government moves 37 into

3    evidence.

4         MR. WESTLING:   No objection.

5         THE COURT:   It's admitted.

6         (Government Exhibit No. 37 was received in evidence.)

7         MR. ASONYE:   May we publish?

8         THE COURT:   Yes, you may.

9         MR. ASONYE:   If we could blow up the top of the

10   document.

11   BY MR. ASONYE:

12   Q.   What financial institution is listed at the top of this

13   document?

14   A.   First Nationwide Title.

15   Q.   And below the phone number, what does it say?

16   A.   It's --

17   Q.   In the fax?

18   A.   The disbursement statement.

19   Q.   Who is listed as the borrower?

20   A.   Oh, I'm sorry.  Mr. Paul Manafort and Kathy Manafort.

21   Q.   And what is the lender?

22   A.   The lender is the Federal -- the Federal Savings Bank.

23   Q.   What property is listed?

24   A.   377 Union Street, Brooklyn, New York.

25   Q.   And what is the closing date that's listed?

1    A.    January 13, 2017.

2    Q.    And if you could turn to the second page?

3    A.    Yes, sir.

4    Q.    Do you see where there's a line for Paul Manafort?

5    A.    I do.

6    Q.    Is there a signature there?

7    A.    There is.

8    Q.    Let me show you what's been marked as Government

9    Exhibit 38.  Was this also seized during the search?

10   A.    Yes, it was.

11             MR. ASONYE:  Your Honor, the Government moves 38 into

12   evidence.

13             MR. WESTLING:  No objection.

14             THE COURT:  Admitted.

15             (Government Exhibit No. 38 was received in evidence.)

16             THE COURT:  Proceed.

17             MR. ASONYE:  May we publish?

18             THE COURT:  Yes.

19   BY MR. ASONYE:

20   Q.    What does it say in handwriting on the front page of this

21   document?

22   A.    "Copy of Genesis Docs."

23   Q.    And if you could turn to the second page, whose names are

24   listed in the first full sentence?

25   A.    Paul J. Manafort and Kathleen B. Manafort.

M. Mikuska - Direct                                                190

1   Q.   And if you could turn to your Bates page 55.  And,

2   Mr. Binder, I think that should be page 8.

3            Are you there?

4   A.   Yes.

5   Q.   Okay.  What is the title of this document?

6   A.   It's a guarantee.

7   Q.   And in the second paragraph, which names are listed as the

8   guarantors -- I'm sorry -- the borrowers?

9   A.   Yeah.  Paul J. Manafort and Kathleen B. Manafort.

10  Q.   All right.  Let me show you what's been marked as

11  Government Exhibit 39.

12           Was this document also located during the search?

13  A.   Yes, it was.

14           MR. ASONYE:  Your Honor, the Government moves 39 into

15  evidence.

16           MR. WESTLING:  No objection.

17           THE COURT:  It's admitted.

18           (Government Exhibit No. 39 was received in evidence.)

19           THE COURT:  Proceed.

20           MR. ASONYE:  May we publish?

21           THE COURT:  Yes.

22           MR. ASONYE:  If we could highlight the top of this

23  document, the top third.

24  BY MR. ASONYE:

25  Q.   The name, what's listed next to the name, handwritten?

1    A.    MC Brooklyn Holdings, LLC.

2    Q.    And next to address, what name is written?

3    A.    Paul Manafort.

4    Q.    Okay.  And if you could read the first three lines that we

5    have blown up and tell the jury what that says.

6    A.    Sure.  Wire into our account November 29, 2012, WT Actinet

7    Trading, Ltd.  Credits in the amount of $1,800,000.

8    Q.    And what's on the second line?

9    A.    Underneath that is an arrow from Wire into our account to

10   also November 29, 2012, WT Actinet Trading, Ltd., the amount of

11   $1,200,000.

12   Q.    What does it show for the balance?

13   A.    The balance is totaled at $3 million.

14   Q.    And if you could turn to the next page.  If you could read

15   to the jury what is listed on the last line of this document.

16   A.    Sure.  It says under Date, January 17, 2013, WT to

17   Manafort.

18   Q.    And what's the amount that's listed?

19   A.    The amount?  The debit or balance?

20   Q.    You can tell both.  What's the number of the debits?

21   A.    The debits of the amount of $220,614.78, with a final

22   balance of zero dollars.

23   Q.    And then if you could turn to the next page.  If you could

24   just blow up the very top of this document.

25        What's listed as the purchaser?

1   A.   The purchaser is listed as MC Brooklyn Holdings.

2   Q.   And what's listed under the property?

3   A.   The property is 377 Union Street.

4   Q.   All right.  Let me show you what's been marked as

5   Government Exhibit 48.  Was this located during the search?

6   A.   Yes, it was.

7   Q.   And does it reference Paul Manafort?

8   A.   Yes.

9        MR. ASONYE:  Your Honor, Government moves 48 into

10  evidence.

11       MR. WESTLING:  No objection.

12       THE COURT:  It's admitted.

13       MR. ASONYE:  May we publish?

14       THE COURT:  Yes.

15       (Government Exhibit No. 48 was received in evidence.)

16  BY MR. ASONYE:

17  Q.   And does 48 consist of a series of invoices?

18  A.   Yes, sir.

19  Q.   Okay.  And what company are the invoices from?

20  A.   Sensorphile, Incorporated -- Sensoryphile, Incorporated.

21  I'm sorry.

22  Q.   And on this first page, what date is listed?

23  A.   The date is listed -- the handwritten date?

24  Q.   No, the date in the box.

25  A.   I'm sorry.  March 1, 2010.

1    Q.    And what is the location that's listed?

2    A.    Location is 194 Jobs Lane, in Bridgehampton, New York.

3    Q.    And is there something written in handwriting on the top?

4    A.    Yes.

5    Q.    What does it say?

6    A.    It says Paid March 8, and I believe that's two

7    thousand- -- or I believe it's a 10 for 2010.

8    Q.    And if you turn to the second page, what is the total of

9    this invoice?

10   A.    The total for this invoice is $20,338.96.  Sorry.

11   Q.    Can you turn to the next page?

12   A.    Yes.

13   Q.    I'm sorry, actually, you know, before you turn to the next

14   page -- the Court's indulgence?

15           Are you on -- right.  If you could turn to Bates

16   page 20.

17   A.    Yes, sir.

18   Q.    And what is the total of this invoice?

19   A.    The total for this invoice is $8,141.44.

20   Q.    And if you could move two pages forward?  What is the

21   total of the last invoice?

22   A.    $16,501.78.

23   Q.    All right.  If we could scroll out and highlight the

24   description for this invoice.

25           If you could just read one of the lines of what was

M. Mikuska - Direct                                                      194

1    invoiced.

2    A.    Sure.   "Crestron touchscreen."

3    Q.    And what location -- for the first line, what room was --

4    is indicated there?

5    A.    Paul's office.

6    Q.    Let me show you what's been marked as Government

7    Exhibit 49.

8    A.    Yes, sir.

9    Q.    What is it?

10   A.    It's a draft invoice.

11   Q.    Was it seized during the search?

12   A.    It was.

13          MR. ASONYE:   Your Honor, Government moves 49 in

14   evidence.

15          MR. WESTLING:   No objection.

16          THE COURT:   It's admitted.

17          (Government Exhibit No. 49 was received in evidence.)

18          MR. ASONYE:   May we publish?

19          THE COURT:   You may.

20   BY MR. ASONYE:

21   Q.    What is -- if you can focus on the top of the document,

22   the letterhead for the invoicing entity, what does it say?

23   A.    Big Pictures Solutions, Inc.

24   Q.    Under Draft Invoice, whose name is listed?

25   A.    Paul Manafort.

1    Q.    Under the name -- title reference, what's listed there?

2    A.    Upgrade for Florida.

3    Q.    And to the right of Upgrade for Florida, what address is

4    listed?

5    A.    8123 159th Court North, Palm Beach Gardens, Florida.

6    Q.    Okay.  If you could turn to the second page.  What's the

7    total of this invoice?

8    A.    Total U.S. dollars, $115,550.80 (sic).

9    Q.    Let me show you what's been marked as Government

10   Exhibit 50.  Was this seized during the search?

11   A.    Yes, it was.

12           MR. ASONYE:  Your Honor, Government moves 50 into

13   evidence.

14           MR. WESTLING:  No objection.

15           THE COURT:  All right.  It's admitted.  Proceed.

16           MR. ASONYE:  If we could publish, Your Honor?

17           THE COURT:  Yes.

18           (Government Exhibit No. 50 was received in evidence.)

19   BY MR. ASONYE:

20   Q.    Agent Mikuska, at the very bottom left corner of this

21   document, if you go ahead and read what that -- well, does it

22   reference a name?

23   A.    Yes.  It references Manafort.

24   Q.    And if you turn to the second page?

25   A.    Yes, sir.

M. Mikuska - Direct                                                      196

1    Q.   What is the total of this invoice?

2    A.   The total of this invoice is $32,369.90.

3    Q.   All right.  Let me show you Government Exhibit 51.  Was

4    this document located during the search?

5    A.   Yes, it was.

6               MR. ASONYE:  Your Honor, Government moves 51 into

7    evidence.

8               MR. WESTLING:  No objection.

9               THE COURT:  It's admitted.  Proceed.

10              (Government Exhibit No. 51 was received in evidence.)

11              MR. ASONYE:  May we publish?

12              THE COURT:  Yes.

13   BY MR. ASONYE:

14   Q.   What company is listed at the top left of this document?

15   A.   SP&C Home Improvements, Inc. -- Home Improvement, Inc.

16   I'm sorry.

17   Q.   And what is listed under the -- next to the job name?

18   A.   Paul Manafort.

19   Q.   What about the job location?

20   A.   174 Jobs Lane, Bridgehampton, New York.

21   Q.   And what is the date?

22   A.   November 8, 2011.

23   Q.   If we could turn to the third page.

24              Do you see where it says "Estimated Cost Labor &

25   Materials"?

M. Mikuska - Direct                                                    197

1   A.   Yes.

2   Q.   I'm sorry, "Total Cost for Both Bathrooms."

3   A.   I see that as well.

4   Q.   What is -- what was listed as the total cost?

5   A.   $49,520.

6   Q.   And is there a signature above owner's signature?

7   A.   Yes, there is.

8   Q.   Let me show you what's been marked as Government

9   Exhibit 52.  Was this also seized during the search?

10  A.   Yes, it was.

11              MR. ASONYE:  The Government moves 52 into evidence.

12              MR. WESTLING:  No objection.

13              THE COURT:  Admitted.

14              (Government Exhibit No. 52 was received in evidence.)

15              MR. ASONYE:  And may we publish?

16              THE COURT:  Yes, you may.

17  BY MR. ASONYE:

18  Q.   Okay.  What -- who was this bill from?

19  A.   SP&C Home Improvement, Inc.

20  Q.   Whose name is listed next to job name for this job?

21  A.   Jessica Manafort.

22  Q.   And what is listed next to job location?

23  A.   29 Howard Street, New York, New York.

24  Q.   And the date?

25  A.   February 16, 2012.

M. Mikuska - Direct                                                    198

1    Q.   And if we could turn to Bates page 281.

2    A.   Yes, sir.

3    Q.   What's listed as the estimated cost of labor and materials

4    here?

5    A.   $150,000.

6    Q.   And is there a signature above owner's signature?

7    A.   Yes, there is.

8    Q.   Let me show you Government Exhibit 53.  Was this also

9    seized during the search?

10   A.   Yes, it was.

11            MR. ASONYE:  Your Honor, Government moves 53 into

12   evidence.

13            THE COURT:  All right.

14            MR. WESTLING:  No objection.

15            THE COURT:  Without objection, it's admitted.

16            (Government Exhibit No. 53 was received in evidence.)

17            MR. ASONYE:  And may we publish?

18            THE COURT:  Yes, you may publish.

19   BY MR. ASONYE:

20   Q.   Is this another bill from SP&C Home Improvement?

21   A.   Yes.

22   Q.   And this time what is the job name?

23   A.   "Bond Residence."

24   Q.   What is the job location?

25   A.   83 Whooping Hollow Road, East Hampton, New York.

M. Mikuska - Direct                                                    199

1    Q.   And what's the date?

2    A.   March 1, 2013.

3    Q.   And if you could turn to the page for -- that is Bates

4    labeled 12.  And, Mr. Binder, I believe it's page 6.

5           What is listed next to the estimated cost of labor

6    and materials for this job?

7    A.   $750,000.

8    Q.   And -- all right.  Let me show you what's been marked as

9    Government Exhibit 54.

10          THE COURT:  That's not an invoice, is it?  It's a

11   proposal to do work, isn't it?

12          THE WITNESS:  Yes.  It's labeled "Proposal," Judge.

13   I don't know what the company considers it.

14          THE COURT:  So the 750,000 was an estimated cost of

15   labor and materials.

16          THE WITNESS:  That's what it says, Your Honor, yes.

17          THE COURT:  Next question.

18   BY MR. ASONYE:

19   Q.   Let me show you Government Exhibit 54.  Was this also

20   seized during the search?

21   A.   Yes, it was.

22          MR. ASONYE:  Your Honor, Government moves 54 into

23   evidence.

24          MR. WESTLING:  Your Honor, we object.  If we could be

25   heard?

1             THE COURT:  Yes.  Mr. -- or, Agent Mikuska, you may

2      step down.

3             THE WITNESS:  Thank you, Your Honor.

4             THE COURT:  We'll take a recess.  Now, during the

5      recess, you may not discuss your testimony with anyone at all.

6             THE WITNESS:  Yes, Judge.

7             THE COURT:  You may step down.

8             THE WITNESS:  Thank you.

9             THE COURT:  Pass your books to the right, ladies and

10     gentlemen.  I'm going to take the mid-morning recess at this

11     time.

12            Mr. Flood will collect your books, maintain their

13     security during the recess.  There will be soft drinks

14     available for you, I think.

15            Mr. Flood, am I right?

16            THE COURT SECURITY OFFICER:  Right.

17            THE COURT:  And then we'll proceed after the recess.

18     When we reconvene, we'll go until about 12:30, at which time I

19     hope your pheasant under glass will have been delivered.

20            (Laughter.)

21            All right.  Remember not to discuss the matter with

22     anyone or among yourselves and put the matter out of your mind.

23     Don't undertake any investigation.  You may follow Mr. Flood

24     out, and we will reconvene at 11:15.

25                           (Jury out.)

M. Mikuska - Direct                                                  201

1           THE COURT:  All right.  Mr. Zehnle -- as soon as the
2    door closes.  Mr. Zehnle?
3           MR. WESTLING:  Mr. Westling, Your Honor, I apologize.
4           THE COURT:  Westling, I'm sorry.  I'm sorry.
5           MR. ZEHNLE:  He's got more hair, Your Honor.
6           THE COURT:  No, it's -- I need to update my numbers
7    up here.  I apologize to you.
8           MR. WESTLING:  Oh.
9           THE COURT:  Mr. Westling, what's the nature of your
10   objection?  Just tell me --
11          MR. WESTLING:  Well, Your Honor --
12          THE COURT:  Just tell me what it is.
13          MR. WESTLING:  It's really just that we're now
14   spending time --
15          THE COURT:  I'm sorry, what is the objection?
16          MR. WESTLING:  I object because I don't think the
17   next item is relevant.  It's a proposal.  The Government --
18          THE COURT:  54 is the item, and you say 54 is not
19   relevant?
20          MR. WESTLING:  That's correct, Your Honor.
21          THE COURT:  All right.  Mr. Asonye, what is the
22   Government's position on whether this is relevant?
23          MR. ASONYE:  It's evidence of the work done on the
24   Bridgehampton home that was used -- that was paid for by funds
25   from the Cypriote accounts, and it was found in Mr. Manafort's

M. Mikuska - Direct                                          202

1    home.

2            THE COURT:  All right.  Let's go back to the

3    beginning.  I think it might be useful to everybody.  This is a

4    case in which the Government has alleged that the defendant

5    falsely signed the income tax returns, that those income tax

6    returns are false for two reasons:

7            One, that they did not indicate the ownership or

8    control of foreign accounts.

9            And secondly, that it omitted income.  Am I correct?

10           MR. ASONYE:  That's correct, Your Honor.

11           THE COURT:  Now, I understand that you have the

12   obligation, as the Government, to prove beyond a reasonable

13   doubt that he received certain monies for work that would be

14   properly called income.  So you put on evidence that shows that

15   he did work for these folks in the Ukraine.  And I'm sure

16   you're going to put on some evidence that they sent him some

17   money to these bank accounts in Cyprus that you've referred to.

18   But I'm unclear how you're going to tie 54 to those monies

19   other than just -- is it just that Mr. Manafort's awash in

20   money?

21           MR. ASONYE:  Absolutely not, Your Honor.  There's --

22           THE COURT:  All right.  Then how do you tie 54 to

23   funds that Mr. Manafort received from his work in the Ukraine,

24   which he, in your -- in the Government's view, should have

25   reported on his returns?

1            MR. ASONYE:  So the Government has to prove not only

2    that he earned income, but that he didn't report it on his

3    taxes, right?  And --

4            THE COURT:  Is that different from anything I just

5    said?  No.  The answer is no.  I've said that.

6            So tell me how this Exhibit 54 goes to show that he

7    received income that he failed to report, knowingly failed to

8    report.

9            MR. ASONYE:  The things that Mr. Manafort failed to

10   report are payments that were paid directly from these

11   vendors -- from the Cypriote accounts and the St. Grenadine's

12   accounts to these vendors by bypassing his company's books.

13           THE COURT:  All right.  Let's go to page --

14   Exhibit 54 specifically.  As I look at Exhibit 54, the first is

15   a picture of a house.

16           The second page is -- appears to be some kind of

17   contractor picture or seems to show something on the property.

18           Then you have a certificate of electrical compliance

19   from the town of Southampton for a particular address relating

20   to Kathleen Manafort.

21           Then you have another certificate of electrical

22   compliance, and then you have a number of pictures.

23   Presumably, I don't know, but presumably the pictures are of

24   the interior -- maybe they're exterior, I don't know.  yes,

25   it's apparently exterior that's being built.  In other words,

1    amenities for the house.

2              What is going to be your proof that this has

3    relevance?

4              MR. ASONYE:  So, Your Honor, in addition to proving

5    that these were the funds that were used, this is the work that

6    was -- these are the -- this is -- the money that was paid to

7    these vendors, which was not reported to the IRS, this is the

8    work that they --

9              THE COURT:  They don't have to report money paid to a

10   vendor.  They have to report money -- he has to report money

11   that he received as income.

12             MR. ASONYE:  It's -- there are two theories, Your

13   Honor, actually.  There is, yes, that he has to report the

14   money when it hits the Cypriote accounts.  There's a second

15   theory, which the Government will show what the tax preparers

16   and what the accountants were doing, they were booking income

17   when it was onshore, when it came to the United States.

18             So they will testify that had they known about this

19   work and known about these payments, they would have treated it

20   as income, regardless of whether they knew about the Cypriote

21   accounts.  So there are actually two different ways that one

22   could argue you could calculate the income.  This is evidence

23   of his income, that he diverted it from his business directly

24   to U.S. vendors.

25             THE COURT:  All right.

1              MR. ASONYE:  That's part of why it's relevant.  It's

2    also relevant, this goes to -- this house is and some of the

3    work that was done here is also relevant to the bank fraud as

4    well.

5              And thirdly, Your Honor, it's, again, that this --

6              THE COURT:  Tell me about that.  I understand your

7    argument on the -- well, actually, that's enough.  Let me hear

8    from the defendant.

9              Why isn't that relevant?

10             MR. ASONYE:  Your Honor, if I -- may I add one other

11   point?  I just --

12             THE COURT:  No, let's hear -- it may not be

13   necessary.  You know, the more I can do to shorten this thing,

14   the better.  You get to go home and I get to go home.

15             MR. WESTLING:  Your Honor, we object to this document

16   in particular and documents like it because it doesn't evidence

17   any money being paid to anyone.  And so it seems to me the fact

18   that work is being done, in and of itself, proves nothing

19   related to this case.  It's --

20             THE COURT:  All right.  Let's go back to Mr. Asonye.

21   He says, look, this doesn't show money was paid.  It only shows

22   that this was a proposal for work to be done or something of

23   that sort.

24             MR. ASONYE:  It's evidence that money was -- the

25   money that was transferred to these vendors was for this work,

1    these proposals.

2              THE COURT:  All right.  And you do have -- you are

3    going to introduce evidence that there was money paid to these

4    vendors?

5              MR. ASONYE:  Yes, Your Honor.  I mean, that's what we

6    expect to hear the rest of today.  And, Your Honor, the

7    other --

8              THE COURT:  How are you going to show that money was

9    paid to these vendors?

10             MR. ASONYE:  They're going to testify and say they

11   were paid.

12             THE COURT:  All right.  Then why do we need pictures

13   of everything else?

14             MR. ASONYE:  I mean, Your Honor, we've got the

15   burden to -- the other thing I would add --

16             THE COURT:  You're gilding the lily.

17             MR. ASONYE:  We also -- no, Your Honor, we also have

18   to prove that these are not potentially deductible business

19   expenses.

20             THE COURT:  All right.

21             MR. ASONYE:  That Mr. Manafort could -- we have to

22   show that these are personal expenses, he could not have

23   deducted them on his business taxes, and therefore, he falsely

24   stated his income.

25             THE COURT:  All right.  Let me -- what's your

M. Mikuska - Direct                                                   207

1    response to that?

2              MR. WESTLING:  Well, Your Honor, I think that we've

3    worked with the Government to stipulate to a number of vendors

4    because there really is not an issue about this money being

5    spent for Mr. Manafort's benefit.  I mean, that's not what we

6    see the issue in the case.

7              I understand the Government has the burden of proof,

8    but we're now sitting here with an FBI agent who has no

9    personal knowledge of any of these documents.  Well, now we're

10   learning the vendors are going to come forward.

11             So if they are, are we going to hear about all of

12   these documents twice?  I mean, it doesn't seem to me that gets

13   us to where we're trying to get here.  And so I'm sort of

14   renewing my objection to this witness being a source for these

15   things.

16             Again, no problem with the idea that he can

17   authenticate and say he found them, but there's another witness

18   coming that's the appropriate person to talk to if the

19   Government is going to put on that kind of evidence.

20             THE COURT:  All right, Mr. Asonye, I'll give you the

21   last word.

22             MR. ASONYE:  They say in their opening statement that

23   this was all about Rick Gates, that Rick Gates did --

24             THE COURT:  I'm sorry.  I know what they said in

25   their opening statement.

 1              MR. ASONYE:  So, Your --

 2              THE COURT:  I don't think that has any bearing on

 3    what I have to decide here.

 4              MR. ASONYE:  It does, Your Honor --

 5              THE COURT:  So tell me -- tell me why you think,

 6    given the fact that you are going to have the people who did

 7    the work appear and say, we billed and got paid for this, why

 8    you need this -- these pictures and all the rest.

 9              MR. ASONYE:  It's evidence that Paul Manafort

10    orchestrated the payments and directed the payments because the

11    document for the work was found in his home, not -- it wasn't

12    found in Rick Gates's home.  It was found in Paul Manafort's

13    home.

14              THE COURT:  Well, aren't they going to testify that

15    they billed Mr. Manafort and got paid by him?

16              MR. ASONYE:  They -- well, yes, they will, but

17    it's --

18              THE COURT:  All right.

19              MR. ASONYE:  But its -- Your Honor, but it's

20    corroborative --

21              THE COURT:  So then you're gilding the lily.

22              MR. ASONYE:  No, Your Honor.  We're simply saying

23    that this document related to this work was found in

24    Mr. Manafort's home, and that it was -- corroborates that he is

25    the one that directed these payments, not someone else.

M. Mikuska - Direct                                                     209

 1              THE COURT:  This document doesn't have anything to do

 2      with where payments were directed to.  If you're going to have

 3      a witness appear and say, we billed Mr. Manafort for work done

 4      at this location in certain sum and he paid it, fine.  Let's

 5      get there and do that.  This document doesn't advance the ball

 6      at all on that.  What it does is, again, to show that he has a

 7      lavish lifestyle.

 8              All right.  I'll think about it.  Thank you.  I'll

 9      rule when I return.

10              MR. WESTLING:  Thank you, Your Honor.

11              THE COURT:  Court stands in recess.

12              (Recess from 11:01 a.m., until 11:15 a.m.)

13                              (Defendant present, Jury out.)

14              THE COURT:  All right.  The matter is before the

15      Court on an objection of relevancy by the defendant

16      to Exhibit 54 that's been offered by the Government.  As a

17      preparatory comment, let's be clear.  These are documents

18      seized from the residence of the defendant, and that's really

19      all.

20              You may be seated.  I'll tell you where we are.

21              That's really all this witness knows about it, is

22      where they came from.  I don't think there's any dispute about

23      where they came from.

24              This document is offered by the Government, in part,

25      to accommodate the burden the Government has to prove beyond a

1    reasonable doubt that this defendant signed tax returns that

2    understated his income.  Actually, the allegation is twofold:

3            One, that he didn't reveal foreign bank accounts.

4            And, two, that he underreported his income knowingly.

5            And so what the Government introduces this for is to

6    show that he underreported his income.

7            Well, this particular document doesn't show or make

8    that more likely true than not true, which is the standard

9    under 402.  All this document shows is that Mr. Manafort had a

10   lavish lifestyle.  He had a nice home with a swimming pool and

11   a gazebo and what have you, and so it isn't relevant.

12           I'm also buttressed in my conclusion by the fact that

13   the Government has represented that they intend to call people

14   who did work on this property, did bill for it, and did get

15   paid for it.  So this is really unnecessary as well as

16   irrelevant, and I think there's some unfair prejudice in the

17   sense that the effort to show that somebody's rich, has a

18   lavish lifestyle may have some relevance here, as it does in

19   other cases, but enough is enough.  We don't convict people

20   because they have a lot of money and throw it around.

21           Now, let me cover two more subjects.  As I look

22   ahead, I now see that there are lots of pictures in here of

23   clothing.  Was Mr. Manafort's clothing seized during this

24   search?

25           MR. ASONYE:  No, Your Honor.  There were

1    photographs -- instead of seizing the actual items, the

2    photographs were taken of them.

3            THE COURT:  All right.  So these are photographs of

4    his clothing.  Now, in this instance, there are a number of

5    suits and so forth in here.  What's the probative value of

6    these?  I see that you've also photographed one label,

7    something, is it Bijan?

8            MR. ASONYE:  Bijan.  And these are the clothing

9    vendors that, again, the Government will show that the offshore

10   funds were used to purchase these specific items found in

11   Mr. Manafort's homes.

12           THE COURT:  All right.  Now, what evidence do you

13   have that these items, the purchase of these items, came from

14   funds that you say were from Cyprus; is that right?

15           MR. ASONYE:  Yes.

16           THE COURT:  Now, what evidence do you have of that?

17           MR. ASONYE:  So there are invoices for these specific

18   items.

19           THE COURT:  All right.  And invoices to Mr. Manafort?

20           MR. ASONYE:  They are invoices to Mr. Manafort for

21   these specific items.  The invoices don't -- well, they're just

22   invoices, Your Honor.

23           THE COURT:  All right.  And is there evidence that

24   they were paid?

25           MR. ASONYE:  Yes.

 1            THE COURT:  And what evidence does the Government

 2   has -- have as to where the money came from that paid for them?

 3            MR. ASONYE:  Your Honor, there will be -- there's

 4   bank evidence of the foreign wire transfers.  However, we

 5   cannot rely on those alone --

 6            THE COURT:  Well, you have the -- the foreign

 7   transfers come from the Ukraine to the bank account, right, and

 8   then you have wire transfers from Cyprus to the U.S.?

 9            MR. ASONYE:  To the -- directly to the U.S. vendor.

10            THE COURT:  All right.  And so what is the probative

11   value of -- I think it's significant -- I've never heard of any

12   of these people.  Dugan or Bijan?  I can't recognize these

13   names.  If it doesn't say Men's Wearhouse, I don't know it.

14            (Laughter.)

15            MR. ASONYE:  These are the specific vendors that

16   Mr. Manafort contracted with to make the clothing for him.

17            THE COURT:  I see.  Well, won't they appear?

18            MR. ASONYE:  Some of them will, some of them may not,

19   Your Honor.  We've tried to cull it -- we've tried to cull it

20   down.

21            THE COURT:  All right.  Well --

22            MR. ASONYE:  The Court's indulgence?

23            THE COURT:  You may confer.

24            MR. ANDRES:  Sorry, Judge.

25            I'm reminded that the vendors won't be able to

1   authenticate these exact suits because they're in

2   Mr. Manafort's house.  What they can do is they can

3   authenticate the invoices that reference seven or six suits or

4   a tie or a watch, and then we can place those --

5          THE COURT:  Isn't that the real evidence?  I mean,

6   who knows whether he bought some suit somewhere else or bought

7   some watch somewhere else to parade all of this?  Again, it

8   seems to me unnecessary, irrelevant, and maybe unfairly

9   prejudicial.

10         MR. ASONYE:  Again, Your Honor, these items were

11  located in Mr. Manafort's house.  The invoices were not in

12  Mr. Manafort's house.  They evidence his involvement in, in

13  directing those wire transfers.  The fact that they're --

14         THE COURT:  But you're not going to have any evidence

15  that this, this particular suit, as to which I don't have --

16  this suit, is it Bijan?

17         MR. ASONYE:  It's Bijan.

18         THE COURT:  Bijan.

19         MR. ASONYE:  It's a very specific clothes-maker who

20  will -- who he will testify, we make clothing, this is what it

21  looks like, it has our specific insignia on it, here's what I

22  billed Mr. Manafort for.  And this witness shows that suits

23  from that company were found in his home.

24         THE COURT:  All right.  Let's do it this way to save

25  time.  The clothing, do you have any objection to the clothing?

1          MR. WESTLING:  Well, Your Honor, we don't understand

2     why there needs to be photos of all of this stuff.  I mean,

3     seems to me that's irrelevant.

4          THE COURT:  Well, obviously, I'm not entirely attuned

5     to that, either, but you don't have any objection to them.

6          Well, let's go back to what I did have.  I'm going to

7     sustain the objection to this Home Improvement, Inc., exhibit

8     that's 54 because that's an estimate.  There isn't -- it

9     doesn't show anything other than the extent of the work.  The

10    bill, the invoice that you're going to submit from the person

11    or entity that did the work is the real proof.  They're going

12    to testify and they're going to say we did -- you can ask them,

13    what was that for?

14         Well, it was for a swimming pool or for this or that.

15         You can ask.  This witness doesn't know anything

16    about it other than where the document came from, and I think

17    the defendant is willing to stipulate that the document came

18    from his home.

19         MR. WESTLING:  We're willing to stipulate that all of

20    these documents and items were found in the home on the day of

21    the search, Your Honor.

22         THE COURT:  So the, the objection to 54 is sustained

23    on relevancy grounds for the reasons I stated, and we'll deal

24    with all these pictures of clothing and suits and everything

25    else coming up, but, again, there are invoices in here, you

M. Mikuska - Direct                                                        215

1    have invoices from a rug gallery.

2              Do you have any objection to those?

3              MR. WESTLING:  Your Honor, we've actually entered a

4    stipulation on the rug gallery that I'm sure the Government

5    will offer at some point about the money that was spent and all

6    of that.

7              THE COURT:  Maybe that can be shortened.

8              Now, the next thing I want to mention, and the last

9    thing before we have the jury back, it's been reported to me --

10   I have not seen it myself because I don't look for it, because

11   I don't see things as well as I did 30-some years ago, 50-some

12   years ago, 60-some years ago -- that the lawyers on both sides

13   need to rein in their facial expressions.  It's been reported

14   that lawyers upon leaving the bench roll their eyes,

15   communicating to those who are watching them, essentially, why

16   do we have to put up with this idiot judge?

17             Don't do that.  Obviously, if I were to see it, I

18   might be a little upset, and it's inappropriate.  You can't

19   express your personal views about that.  You can't also, when

20   you get an answer from a witness, say, "Thank you very much,"

21   because that communicates to the jury that you like the answer.

22   You can't comment on the evidence.

23             So rein in your facial expressions.  I'm sure when I

24   tried cases as a lawyer I was never fully successful in doing

25   that.  I received rulings and events happened that disappointed

1    me greatly, and I'm sure I was not successful in keeping my

2    facial features from revealing that, but I expect you to do

3    better than I did.  Rein in your facial expressions and

4    proceed.

5              All right.  I'm going to have the jury brought in.

6    I've sustained the objection to 54, and, however, I've admitted

7    54.  I've admitted the exhibit so that you can use it,

8    Mr. Asonye, when you have the person on the stand who actually

9    sent it if you need it to show the extent of the work, but I

10   don't think you do because all that does is -- again,

11   Mr. Manafort is not on trial for having a lavish lifestyle.

12   He's on trial for not revealing on his income tax, not

13   disclosing on his income tax return that he actually received

14   more money than he reported, and the Government has to prove

15   that.  I take your point in that regard, and I'm going to give

16   you as much latitude as you need to prove that beyond a

17   reasonable doubt.

18             All right.  Let's bring the jury in, please.

19                           (Jury present.)

20             THE COURT:  All right.  You may be seated.

21             Thank you, ladies and gentlemen, for your patience.

22             Yes, the interest in a particular seat has now become

23   clear.

24             A JUROR:  Yes, sir.

25             THE COURT:  You're entitled to that.  I have no

1    reserved seats in the courtroom, in the body of the room.

2    People may sit wherever they please, and if you need to get

3    here early just to get the seat you want in a particular seat,

4    but I have not reserved seats for people in the courthouse.  I

5    have not reserved seats for journalists.  I have not reserved

6    seats for anyone.  People may sit wherever they please, and

7    they need to get here early enough to sit where they please.

8              All right.  All right, let's have Agent Mikuska

9    return to the stand, please.

10             All right.  Agent Mikuska, you'll recall, sir, that

11   you remain under oath.

12             THE WITNESS:  Yes, sir.  Yes, Your Honor.

13             THE COURT:  All right.  Mr. Asonye, you may proceed.

14   BY MR. ASONYE:

15   Q.   Agent Mikuska, during the search, did agents identify a

16   number of suits?

17   A.   Yes, we did.

18   Q.   Roughly how many?

19   A.   It's hard to quantify but easily closets full.

20   Q.   Let me show you Government Exhibit 55.  Is this entire

21   exhibit photographs of some of the suits that were photographed

22   during the search?

23   A.   Yes, sir.

24             MR. ASONYE:  Your Honor, the Government moves 55 into

25   evidence.

1          MR. WESTLING:  Objection, Your Honor.

2          THE COURT:  On relevance?

3          MR. WESTLING:  On relevance.

4          THE COURT:  All right.  Provisionally, I'm going to

5    admit it for now, but it's on the assumption that you're going

6    to have proof that shows that these suits were bought by money

7    that he received from his Ukrainian work.

8          MR. ASONYE:  Yes, Your Honor.

9          THE COURT:  Is that clear?

10          MR. ASONYE:  Yes.

11          (Government Exhibit No. 55 was received in evidence.)

12          THE COURT:  You may not exhibit it now.  Let's move

13    on.  There are a number of suits that are listed here.  If you

14    could turn to the second page, the name on the interior of this

15    suit, what does it say?

16          THE WITNESS:  It's an Alan New York label.

17          THE COURT:  Are you going to have any evidence about

18    the significance of the label?

19          MR. ASONYE:  Yes, sir.

20          THE COURT:  All right.  At that time, you can do it.

21          Let's move.  He doesn't know anything about that.

22          What you won't have to do, Mr. Asonye, is to persuade

23    me that this material was found in Mr. Manafort's home.  What

24    you now need to do to make it relevant is to complete the proof

25    otherwise, and then I'll make a final determination as to the

1    admissibility of particular pictures.

2              MR. ASONYE:  Thank you, Your Honor.

3    BY MR. ASONYE:

4    Q.   If you could turn to Government Exhibit 56.

5    A.   Yes, sir.

6    Q.   And are these photographs of other clothing that was

7    photographed during the search?

8    A.   Yes, again.

9              MR. ASONYE:  And, again, Your Honor, we'd move to

10   admit those pursuant to the same Court's provisional adoption

11   of this --

12             THE COURT:  All right.  And you have the same

13   objection?

14             MR. WESTLING:  I do, Your Honor.

15             THE COURT:  But, of course, you can't really make the

16   objection until we have the further evidence, so we'll see.  I

17   haven't ruled on it.

18             Let's move on.

19   BY MR. ASONYE:

20   Q.   And if you could turn to just the second page of this

21   exhibit, and tell the jury the name of the company on the

22   interior of this suit.

23   A.   It's a label from the House of Bijan.

24   Q.   All right.  Let's turn to Government Exhibit 58.

25             Is this a series of invoices that was seized during

M. Mikuska - Direct                                                  220

1    your search of Mr. Manafort's residence?

2    A.   I'm sorry, you said 58?

3    Q.   Yes, 58.

4    A.   Yes.

5              MR. ASONYE:  All right.  Government moves 58 into

6    evidence.

7              MR. WESTLING:  No objection.

8              THE COURT:  All right.  It's admitted.

9              (Government Exhibit No. 58 was received in evidence.)

10             MR. ASONYE:  May we publish?

11             THE COURT:  Yes -- don't you have a stipulation on

12   this?

13             MR. WESTLING:  I think we do, Your Honor.

14             MR. ASONYE:  We do, but I think we're going to enter

15   it before the person testifies, Your Honor.

16             THE COURT:  I beg your pardon?

17             MR. ASONYE:  I think we're intending to enter it

18   before the witness actually testifies on this issue.

19             THE COURT:  May I see the stipulation?

20             THE CLERK:  Counsel, what stipulation?

21             MR. ASONYE:  One moment, Your Honor, please.

22             THE COURT:  All right.

23             MR. ASONYE:  Your Honor, I believe it's Government

24   Exhibit 329.

25             THE COURT:  All right.  Now, what do we need other

M. Mikuska - Direct                                          221

1    than the stipulation?

2           MR. ASONYE:  Your Honor, I was literally trying to

3    put in the exhibit that it has been --

4           THE COURT:  Well, ladies and gentlemen, I'm going to

5    read the stipulation to you.  Remember, now, a stipulation is

6    an agreement by the parties that certain facts are true and you

7    may accept them as true.

8           The parties stipulate to the following facts:

9           1.  Joshua Nabatkhorian is an owner of J&J Oriental

10   Rug Gallery, which sells and repairs oriental rugs located in

11   Alexandria, Virginia.

12          On March 19, 2010, J&J Oriental Rug Gallery submitted

13   to Paul J. Manafort invoice No. 25819 in the amount of $160,000

14   for two silk rugs.

15          On March 31, 2010, a wire transfer from Yiakora

16   Ventures Limited in the amount of $140,000 drawn on a bank

17   account at the Bank of Cyprus in Nicosia, Cyprus, was sent to

18   J&J Oriental Rug Gallery.

19          On June 10, 2010, J&J Oriental Rug Gallery and Jesand

20   Investment Corporation, through Mr. Manafort, entered into a

21   loan agreement.  Jesand Investment Corporation agreed to loan

22   J&J Oriental Rug Gallery $250,000 for investment in oriental

23   rugs in exchange for 40 percent of the profit on any sale of

24   rugs and $500,000 of oriental rugs as collateral.

25          On June 16, 2010, a wire transfer from Global Highway

M. Mikuska - Direct                                                222

1  Limited in the amount of $250,000 was drawn on a bank account

2  at Marfin Laiki Bank in Nicosia, Cyprus, and sent to J&J

3  Oriental Rug Gallery.

4          In and around February 2012, Nabatkhorian called

5  Mr. Manafort to request that Mr. Manafort pay all of his

6  outstanding invoices with J&J Oriental Rug Gallery.

7  Mr. Manafort offered $100,000 as payment in full for all

8  outstanding invoices, which Nabatkhorian accepted.

9          On February 28, 2012, a wire transfer from Global

10  Highway Limited in the amount of $100,000 was drawn on a bank

11  account at Marfin Laiki Bank in Nicosia, Cyprus, and sent to

12  Natalie Nabatkhorian, who is Nabatkhorian's wife.

13          And the records that are admitted and attached to the

14  stipulation as Exhibits A through B are records of J&J Oriental

15  Rug Gallery and constitute the records of a regularly conducted

16  business activity under the Federal Rules of Evidence, without

17  requiring any further authentication, certification, witness

18  testimony, or the testimony of a custodian of records.

19          The exhibits are Exhibit A is a copy of an invoice in

20  the amount of $160,000 for two silk rugs; and Exhibit B is a

21  copy of the loan agreement dated June 10, 2010.

22          Now, in view of that, why do we need anymore

23  documentation?

24          MR. ASONYE:  It's in, but I don't need to go over it,

25  Your Honor.  That's fine.

M. Mikuska - Direct                                                    223

 1              THE COURT:  Next question.

 2   BY MR. ASONYE:

 3   Q.   All right.  Let me show you what's been marked as

 4   Government Exhibit 59C.  Was this record seized during the

 5   search?

 6   A.   Yes, sir.

 7   Q.   And does it reference the defendant?

 8   A.   Yes, it does.

 9              MR. ASONYE:  Your Honor, Government moves 59C into

10   evidence.

11              MR. WESTLING:  No objection.

12              THE COURT:  Admitted.

13              (Government Exhibit No. 59C was received in

14   evidence.)

15              MR. ASONYE:  May we publish?

16              THE COURT:  Yes.

17   BY MR. ASONYE:

18   Q.   Okay.  I want you to focus on two items.  First, could you

19   just tell the title of this document, the first three words?

20   A.   Yes.  "Virginia Chubb Policy."

21   Q.   And the second item, what's the second item, the name of

22   the vehicle listed?

23   A.   No. 2, sir?

24   Q.   Yes, No. 2.

25   A.   Land Rover 2012 tan.

 1   Q.   And who is it registered to?

 2   A.   Registered to Paul and Kathleen Manafort.

 3   Q.   Okay.  And on the second page --

 4   A.   Yes, sir.

 5   Q.   -- the reference the first vehicle, what is the name of

 6   the first vehicle?

 7   A.   It's a Mercedes SI 550, red.

 8   Q.   And who is it registered to?

 9   A.   Kathleen Manafort.

10          MR. ASONYE:  Your Honor, I believe I neglected to

11   actually move in the stipulation into evidence.

12          THE COURT:  Yes, it will be admitted.  Let's proceed.

13          MR. ASONYE:  And the attached exhibits.

14          THE COURT:  That's right.

15          MR. ASONYE:  Thank you, Your Honor.

16          (Government Exhibit No. 329 was received in

17   evidence.)

18   BY MR. ASONYE:

19   Q.   All right.  Let me show you what's been marked as

20   Government Exhibit 70C, as in Charlie.  Again, was this

21   document found during the search?

22   A.   Yes, it was.

23          MR. ASONYE:  Your Honor, Government moves 70C into

24   evidence.

25          MR. WESTLING:  No objection, Your Honor.

M. Mikuska - Direct                                                      225

1            THE COURT:  Admitted.

2            (Government Exhibit No. 70C was received in

3    evidence.)

4            MR. ASONYE:  May we publish?

5            THE COURT:  Yes, you may.

6    BY MR. ASONYE:

7    Q.   Okay.  What is this?

8    A.   It is a bank statement.

9    Q.   Okay.  What is the -- blow up the top.  The bank statement

10   is in what name?

11   A.   DM -- I'm sorry -- DMP International LLC.

12   Q.   And what is the statement period?

13   A.   From February 1, 2012, through February 29, 2012.

14   Q.   And if you move down to the bottom third of the document,

15   there are two items under "Description" on February 1 and

16   February 29.

17           Can you read to the jury what it states there?

18   A.   Sure.  Date February 1, deposit wire funds Peranova

19   Holdings Limited in the amount of $1,500,000.  On February 29,

20   deposit wire funds Global Highway Limited in the amount of

21   $450,000.

22   Q.   And what does it show as the total of those two items?

23   A.   The total -- the total -- sorry -- is shown as $1,950,000.

24           THE COURT:  Next question.

25   BY MR. ASONYE:

1    Q.   Let me show you what's been marked -- I'm sorry -- if you

2    turn to the last page of this exhibit, which should be page 5

3    for you, Mr. Binder?  And if you could zoom in on the last

4    page, page 5.

5             All right.  Agent Mikuska, could you tell the jury

6    what it says for the amount of this wire?

7    A.   Sure.  The amount of the wire is $1,500,000.

8    Q.   And who's the beneficiary?

9    A.   The beneficiary is DMP International, LLC.

10   Q.   And what is the country code?

11   A.   The country code is CY.

12   Q.   And if you see originator, who is -- what's listed next to

13   the originator?

14   A.   The originator is Peranova Holdings Limited.

15   Q.   And the address for the originator?  The address, one

16   right below it.

17   A.   I see it.  Thank you.  001 Lampousas, 1095 Nicosia.

18   Q.   Thank you.

19            Let me show you what's been marked as Government

20   Exhibit 152.  Was this document found during the search?

21   A.   Yes, it was.

22            MR. ASONYE:  Your Honor, the Government moves 152

23   into evidence.

24            MR. WESTLING:  No objection.

25            THE COURT:  Admitted.

M. Mikuska - Direct                                                227

1                (Government Exhibit No. 152 was received in

2       evidence.)

3                MR. ASONYE:  May we publish, Your Honor?

4                THE COURT:  Yes.

5       BY MR. ASONYE:

6       Q.   If you could read to the jury -- if you could highlight

7       the top of this document.

8                What is the title of this document?

9       A.   "2012 Tax Organizer."

10      Q.   And what is the company name that's listed?

11      A.   Kositzka, Wicks and Company.

12      Q.   And where are they -- what city are they located in?

13      A.   Alexandria, Virginia.

14      Q.   Who is the document to?

15      A.   It's to Paul J. Manafort, Jr., and Kathleen B. Manafort.

16      Q.   Okay.  If you could look at the first paragraph and read

17      that to the jury.

18      A.   "The enclosed" --

19               THE COURT:  He doesn't know anything more than what's

20      on this document.  Are you going to have any other witness

21      testify to this?

22               MR. ASONYE:  We --

23               THE COURT:  Is that "yes" or "no"?

24               Are you going to have any other witness testify to

25      what's in this document?

1           MR. ASONYE:  Your Honor, I -- I believe somebody can

2    testify about a similar type of document that was sent out, not

3    necessarily this document.

4           THE COURT:  All right.  Go on.  You may read the

5    first paragraph.

6           THE WITNESS:  "The enclosed tax organizer was

7    prepared specifically for you and is designed to assist you in

8    the acclimation (sic) of your tax data" --

9           THE COURT:  Accumulation.

10          THE WITNESS:  Accumulation, thanks, Your Honor.

11          "Included is an engagement letter, which sets forth

12   the nature of our mutual responsibilities concerning the

13   preparation of your return.  Please sign the letter and return

14   it with your completed organizer."

15   BY MR. ASONYE:

16   Q.   All right.  And if you could turn to Bates page 20.

17   A.   Yes, sir.

18   Q.   What is the title of this document?

19   A.   "Foreign Assets."

20   Q.   And what does it say under "Foreign Bank" -- at the bottom

21   "Foreign Bank Accounts and Trusts"?

22   A.   "At any time during 2012, did you have any interest in or

23   a signature or other authority over a financial account in a

24   foreign country, such as a bank account, securities account, or

25   other financial account?  If yes, enter name of foreign

M. Mikuska - Direct                                                    229

1    country."

2    Q.   Okay.  That's fine.

3            All right.  Let me show you what's been --

4            THE COURT:  Just to be clear, that's not a page from

5    the organizer.  It's actually a page from the return.

6            MR. ASONYE:  No, Your Honor, it's from the organizer.

7            THE COURT:  It's from the organizer?

8            MR. ASONYE:  Yes.

9            THE COURT:  So they took it from the return.

10           MR. ASONYE:  It's the --

11           THE COURT:  It's the same language?

12           MR. ASONYE:  It's the exact same language that goes

13   into a tax return, but it's the organizer.

14           THE COURT:  All right.  Let's proceed.

15   BY MR. ASONYE:

16   Q.   All right.  Let me show you Government Exhibit 40 -- I'm

17   sorry -- yes, 40.

18           Okay.  Was this document seized during the search?

19   A.   Yes, sir.

20           MR. ASONYE:  Your Honor, the Government moves 40 into

21   evidence.

22           MR. WESTLING:  No objection.

23           THE COURT:  Admitted.

24           (Government Exhibit No. 40 was received in evidence.)

25           MR. ASONYE:  May we publish?

1            THE COURT:  Yes, you may.

2    BY MR. ASONYE:

3    Q.   What is the -- what's the first two -- the title of this

4    document?

5    A.   "VY Agenda."

6    Q.   And below on Section 3, do you see 3.d?  What's it say

7    there?

8    A.   "3.d, US update.  Consultants:  Podesta/Devine/Weber/Barry

9    Jackson.

10   Q.   Now, what does it say under 4.i, 4.a.i?

11   A.   "4.a.i, Europe, First quarter" --

12   Q.   Just the (i) section.

13   A.   Sure.  "PJM Goals."

14   Q.   All right.  Let me show you Government Exhibit 41.  Was

15   this document found in your search?

16   A.   Yes, it was.

17           MR. ASONYE:  Your Honor, Government moves 41 into

18   evidence.

19           MR. WESTLING:  Your Honor, we just lodge an objection

20   around this witness being the one to testify about this

21   information.  I understand that he found it in the apartment,

22   but I don't think he has any other information about it and

23   we're going to go through a lot of content here that I don't

24   think is appropriate through this witness unless the Government

25   has someone else to call.

1          MR. ASONYE:  We're not intending to call anyone else

2   and we're only offering it to show that these records were

3   found during the search of his house.

4          THE COURT:  All right.  He's already stated that this

5   is a record that was found.  Do you have any objection to its

6   admissibility?

7          MR. WESTLING:  I don't, Your Honor.

8          THE COURT:  All right.  It's admitted.

9          (Government Exhibit No. 41 was received in evidence.)

10          THE COURT:  Let's move on.

11          MR. ASONYE:  I'm sorry, so we're on 41, Your Honor?

12          THE COURT:  Yes.

13          MR. ASONYE:  May we publish?

14          THE COURT:  Yes.

15   BY MR. ASONYE:

16   Q.   Let's look at the top of the document, please.

17          THE COURT:  Well, the jury can look at it at the

18   appropriate time.  It's admitted for the truth of the matters

19   asserted.  Let's move on.  All he can do is read what the jury

20   can read.  He's not a knowledgeable witness other than the fact

21   that he was the seizing and searching agent.

22   BY MR. ASONYE:

23   Q.   Let me show you what's been marked as Government

24   Exhibit 42.

25   A.   Yes, sir.

1   Q.   Was this document found during the search?

2   A.    Indeed, yes.

3            MR. ASONYE:  Your Honor, the Government moves 42 into

4   evidence.

5            MR. WESTLING:  We'd object on relevance grounds, Your

6   Honor.

7            THE COURT:  All right.  You-all can come to the

8   bench.  I want you now to go back to this document that was

9   helpfully provided about the exhibits that were going to be

10  shown and tell me now, once and for all, how many more of these

11  are going to be objected to so I can resolve it and we can get

12  on with this.

13           MR. WESTLING:  I will, Your Honor.

14           THE COURT:  All right.  Come to the bench.

15           (Bench conference on the record.)

16           MR. ASONYE:  May I bring the binder, Your Honor?  If

17  we're going to talk about multiple exhibits, may I bring my

18  binder.

19           THE COURT:  Oh, yes, you may, of course.

20           MR. ASONYE:  Thank you.

21           THE COURT:  Mr. Asonye, this appears to be an exhibit

22  that outlines -- it's from Mr. Manafort.  There's no objection

23  from that point of view.

24           MR. WESTLING:  No, it's his document.

25           THE COURT:  So what is the objection?

1           MR. WESTLING:  Well, the objection is relevance to

2    this case, Your Honor.  This deals with U.S. consulting

3    activities, which is an issue in the case in D.C., and I don't

4    understand, it doesn't have anything to do with revenue or

5    income or reporting income or bank fraud, and so there's a

6    number of them that fit into that category.  There are,

7    however, things like summary of overdue accounts that seem

8    appropriate.  So --

9           THE COURT:  You're going on now.  Which one are we

10   focused on?

11          MR. WESTLING:  Right now we're focused on No. 42,

12   Your Honor.  That's the first one that I objected to.

13          THE COURT:  All right.  And your contention is that

14   it's irrelevant because it relates to consulting work that has

15   nothing to do with the Ukraine.

16          MR. WESTLING:  It has to do with the Ukraine.  It's a

17   question of whether that was going on in the United States or

18   not, and I don't think that's an issue in this trial.

19          THE COURT:  Why not?

20          MR. WESTLING:  It's an issue in the other case as to

21   whether there's a separate legal violation that relates to his

22   failure to register as an agent.

23          THE COURT:  But here the allegation is that he did

24   not report fully his income.

25          MR. WESTLING:  Correct.

M. Mikuska - Direct                                                    234

1        THE COURT:  So the Government is trying to show that

2   he did work for this group and that they paid him.

3        Is that what you're trying to show?

4        MR. ANDRES:  Yes.

5        THE COURT:  Only Mr. Asonye.

6        MR. ANDRES:  I'm sorry.

7        MR. ASONYE:  I defer to him because this was his

8   issue, Your Honor, more than mine.

9        THE COURT:  All right.  But in the future --

10       MR. ANDRES:  I understand.

11       THE COURT:  -- it's the lawyer who conducts the

12  examination who must respond to the -- but tell me what the

13  relevance is, briefly.

14       MR. ANDRES:  Sure, Judge.  Exactly what you said,

15  which is there are overlapping issues, but this project, this

16  U.S. consultant project, Mr. Manafort is paid $8 million over a

17  two-year period of time.  That $8 million was transferred from

18  the Ukraine to Cyprus.

19       MR. WESTLING:  I don't think there's anything in this

20  document that evidences that payment.  Is the amount in the

21  document?  I may have missed it.

22       MR. ANDRES:  I'm sorry, I'm not here to answer the

23  questions --

24       THE COURT:  No, you're not, but I ask the questions.

25  So you are here to answer my question.

1              MR. ANDRES:  No, I --

2              THE COURT:  Don't worry about it.  But does the

3    document say anything about the amount?

4              MR. ANDRES:  I'd have to go through it, Judge.  What

5    it talks about is the actual work, and the person that's going

6    to testify about this is Rick Gates.

7              THE COURT:  All right.

8              MR. ANDRES:  And this will corroborate his testimony.

9              THE COURT:  All right.  I'll overrule the objection.

10   Let's proceed.

11             MR. WESTLING:  Thank you.  And, Your Honor, how did

12   you want me to handle further --

13             THE COURT:  Oh, I asked you about the others.  Let's

14   do it.

15             MR. WESTLING:  And so I think it's all the same

16   grounds, Your Honor.  So it will be as to 42 --

17             THE COURT:  Just a minute.

18             MR. ASONYE:  I think we just did 42.

19             THE COURT:  Go ahead, sir.

20             MR. WESTLING:  So it would be as to 42, 44, 45, 46,

21   59, and 47, and then there are several that appear to relate to

22   financial issues, 43, 59A, 59B, that we do not have an

23   objection to because we believe they are relevant.

24             THE COURT:  Let's take them one at a time.  What's

25   the first one you have an objection to?

1          MR. WESTLING:  You've ruled on the 42, so it would be

2    43, Your Honor -- I'm sorry, we don't object to 43.  44, I

3    apologize.

4          THE COURT:  Doesn't that have to with Ukraine work?

5          MR. WESTLING:  It has to do with campaign strategy in

6    the Ukraine, yes.

7          THE COURT:  All right.  So what's the objection?

8          MR. WESTLING:  The objection is at some point, it

9    doesn't have anything to do with the money --

10          THE COURT:  You're saying it's cumulative that he's

11    doing work?

12          MR. WESTLING:  Exactly.

13          THE COURT:  All right, I'll overrule that.  If there

14    comes a time --

15          MR. ASONYE:  We're not going to go over it.

16          THE COURT:  All right.  Next.  What do you --

17          MR. WESTLING:  And, Your Honor, just so I'm clear, to

18    the extent that the only thing the Government is planning to do

19    with this witness is put the document in and not have him refer

20    to it, I have no objection to any of this.

21          THE COURT:  But they want him to read certain things

22    from the document.

23          MR. WESTLING:  Understood.

24          THE COURT:  I am going to permit that to a very

25    limited extent.  Go ahead.

1            MR. WESTLING:  So as to 44, 45, 46, and 47, it's all

2    the same objection.  I suspect it falls under the same ruling,

3    frankly.

4            THE COURT:  What are those documents?

5            MR. ANDRES:  It reflects the work.

6            THE COURT:  Work in the Ukraine?

7            MR. ANDRES:  Yes.

8            THE COURT:  All right.  I'll permit those.  I'll

9    admit them, over relevance.  They may be cumulative.  You know,

10   enough is enough.  I don't think there is going to be -- there

11   might be some dispute about how much he received, so I'm going

12   to admit those provisionally now.  But at some point, it's

13   cumulative.

14           Next.

15           MR. WESTLING:  And 59.  And that's the last one, Your

16   Honor.

17           THE COURT:  What is 59?

18           MR. ASONYE:  It's showing him traveling to Cyprus.

19           THE COURT:  All right.  Any objection -- what's the

20   objection to that?

21           MR. WESTLING:  I have no objection to that, Your

22   Honor.

23           THE COURT:  All right.  It's admitted.

24           MR. ASONYE:  Thank you.

25           MR. ANDRES:  Thank you.

1              THE COURT:  All right.  Again, please control

2    facial -- no, you weren't actually the culprit.

3              MR. ANDRES:  You make it sound as though you thought

4    maybe I was.

5              THE COURT:  No.

6              MR. ASONYE:  And, Your Honor, to the extent --

7              THE COURT:  You're innocent.

8              MR. ASONYE:  Your Honor, to the extent it was me, I

9    always in every trial, and I think I've been admonished by the

10   Court before in previous trials, that I -- that I do express

11   myself.  I apologize if in any way it shows any disrespect.

12             THE COURT:  Your apology is -- don't worry about it.

13             MR. ASONYE:  I apologize.

14             THE COURT:  But do curb it.  It's -- you know, it's

15   not good, and it often has the exact opposite effect that you

16   might think it will have.

17             I think one of the most effective lawyers I had was a

18   lawyer from California in a very big patent case, and he

19   understated everything, sat like an absolute Buddha throughout

20   the entire trial, didn't argue very much at all.

21             In closing, he said, in effect, look, that's my

22   patent.  That's my client's patent.  These people infringed it.

23   Sat down.  They got $138 million.

24             Understatement is always better.  I never knew that

25   when I practiced.  Thank you.

1            MR. WESTLING:  Thank you, Your Honor.

2            (End of bench conference.)

3            THE COURT:  All right.  Mr. Asonye, you may proceed

4    in accordance with the results of the bench conference.

5            The bench conference may have gone a little longer.

6    There's already been some reference to it, but I'm, at my age,

7    disposed to tell stories.  So they had to listen to a couple of

8    my stories.  It had nothing to do with this case.

9            Proceed.

10           (Laughter.)

11           MR. ASONYE:  Your Honor, the Government moves

12   Government Exhibit 42 into evidence.

13           THE COURT:  Yes, I think what I said is I would admit

14   that.  There's a provision to it, and once you tie that up,

15   remind me, and I'll make it final.

16           Go ahead, Mr. Asonye.

17           MR. ASONYE:  All right.

18           THE COURT:  Although it's entirely up to you,

19   Mr. Westling, to remind me what the problem was and to tell me

20   that it hadn't been remedied.

21           MR. WESTLING:  I'll do that at the appropriate time,

22   Your Honor.

23           THE COURT:  Next question.

24   BY MR. ASONYE:

25   Q.   Let me show you Government Exhibit 43.

1          Was this document found during the search?

2    A.   Yes, sir.

3          MR. ASONYE:  The Government moves 43 into evidence.

4          MR. WESTLING:  No objection, Your Honor.

5          THE COURT:  Admitted.

6          (Government Exhibit No. 43 was received in evidence.)

7          MR. ASONYE:  May we publish, Your Honor?

8          THE COURT:  Yes.

9    BY MR. ASONYE:

10   Q.   All right.  If we could highlight the top of the document?

11        And who is it from?

12   A.   PJM.

13   Q.   Who is it to?

14   A.   SL.

15   Q.   What is the subject line?

16   A.   Summary of Accounts Overdue.

17   Q.   And the date?

18   A.   April 25, 2013.

19   Q.   And if you could read the first two paragraphs of this

20   document?

21   A.   "I have attached the updated ledger of accounts that

22   relate to the projects I am managing.

23        "The ledger sets out the annual fees, what has been

24   paid, what is overdue, and remainder that is due in the second

25   half of 2013."

1   Q.   All right.  And if we could then look at the bottom of the

2   document, the paragraph that says, "This means," can you read

3   that to the jury?

4   A.   Yes, sir.  "This means the wire needs to cover the

5   following (as set out on the ledger).  I have converted the

6   euros to dollars so you can do the entire wire in dollars.

7        "KK has the contract information and wire

8   instructions."

9   Q.   And if we can just highlight the next paragraph and -- but

10  if you could only read the final line of starting with "Total"?

11  A.   "Total to be wired"?

12  Q.   Yes.

13  A.   "Total to be wired in May:  $4,446,125."

14  Q.   And then the final paragraph, can you read that to the

15  jury?

16  A.   "Please don't disappoint me and please don't do a partial

17  payment.  I need all of this now.  I promise, I won't bother

18  you for a while if you get me this amount in May."

19  Q.   All right.  Let me show you Government Exhibit 44.

20       Was this found during the search?

21  A.   Yes, it was.

22       MR. ASONYE:  The Government moves 44 into evidence.

23       MR. WESTLING:  Just subject to the same objection,

24  Your Honor.

25       THE COURT:  I think that this just shows -- this is

M. Mikuska - Direct                                                242

 1   just one more document showing the work that was done in the

 2   Ukraine?

 3            MR. ASONYE:  Yes, Your Honor.

 4            THE COURT:  All right.  I'll admit it.  That's the

 5   last one.

 6            (Government Exhibit No. 44 was received in evidence.)

 7            THE COURT:  Am I clear?

 8            MR. ASONYE:  Yes, Your Honor.

 9            THE COURT:  Next question.  Next question.

10   BY MR. ASONYE:

11   Q.   Let me show you Government Exhibit 59.

12            What is -- was this located during the search?

13   A.   Yes, it was.

14            MR. ASONYE:  The Government moves 59 into evidence.

15            MR. WESTLING:  No objection, Your Honor.

16            THE COURT:  Admitted.

17            (Government Exhibit No. 59 was received in evidence.)

18            MR. ASONYE:  May we publish?

19            THE COURT:  Yes, you may.

20   BY MR. ASONYE:

21   Q.   All right.  If we could focus on the top of this document?

22            Go ahead and please read the first three lines to the

23   jury.

24   A.   "PJM, Trip to Cyprus, Berlin, and Kiev, Wednesday,

25   February 14 - Friday, February 23."

M. Mikuska - Direct                                               243

1   Q.   All right.  Let me show you Government Exhibit 59A.

2            MR. ASONYE:  The Government moves 59A into evidence.

3            MR. WESTLING:  No objection.

4            THE COURT:  Admitted.

5            (Government Exhibit No. 59A was received in

6   evidence.)

7            MR. ASONYE:  May we publish?

8            THE COURT:  Yes.

9   BY MR. ASONYE:

10  Q.   And if we could focus on the top of this document, who is

11  it from?

12  A.   PJM.

13  Q.   And who is it to?

14  A.   VFY.

15  Q.   What is the subject?

16  A.   Professional Team - Bonuses.

17  Q.   And what is the date?

18  A.   February 16, 2010.

19  Q.   And if you could just look to the third paragraph and read

20  that to the jury?

21  A.   "I am providing you with a list of all of the professional

22  people who I am giving bonuses for work beyond what I paid

23  them.  I am not suggesting that you do the same.  There is no

24  expectation by any of them that there will be additional

25  bonuses."

1    Q.   Let me show you Government Exhibit 59B, as in "beta."

2              Was this seized during the search?

3    A.   Yes, it was.

4              MR. ASONYE:   Your Honor, the Government moves 59B

5    into evidence.

6              MR. WESTLING:   No objection.

7              THE COURT:   Admitted.

8              (Government Exhibit No. 59B was received in

9    evidence.)

10             MR. ASONYE:   May we publish?

11             THE COURT:   Yes.

12   BY MR. ASONYE:

13   Q.   If you could blow up the top of this document.

14             Who is it from?

15   A.   PJM.

16   Q.   And who is it to?

17   A.   VFY.

18   Q.   And what is the subject line?

19   A.   Wire Transfer Details for Personal Bonuses.

20   Q.   What is the date?

21   A.   February 22, 2010.

22   Q.   Okay.  If we could blow up the middle of this document,

23   the next section.

24             Okay.  What does it say below the date?

25   A.   "Paul Manafort."

M. Mikuska - Direct                                                    245

1    Q.   And what's listed as the beneficiary?

2    A.   The beneficiary is Leviathan Advisors Limited.

3    Q.   And is there an account number that's listed there?

4    A.   There is.

5    Q.   Do you see a bank name?  Could you read that to the jury?

6    A.   The bank name is Marfin Popular Bank Public Co., Ltd.

7    Q.   And what country is listed for the address for the bank?

8    A.   Cyprus.

9    Q.   Let me show you Government Exhibit 59D, as in "delta."

10        Was this found during the search?

11   A.   Yes, it was.

12        MR. ASONYE:  Your Honor, the Government moves 59D,

13   delta, into evidence.

14        MR. WESTLING:  No objection.

15        THE COURT:  Admitted.

16        (Government Exhibit No. 59D was received in

17   evidence.)

18        MR. ASONYE:  May we publish?

19        THE COURT:  Yes.

20   BY MR. ASONYE:

21   Q.   Looking at the top of this document, what are the names

22   listed?

23   A.   Ayliff, NAJI, and RG.

24   Q.   And if you could read 3.a, Section 3.a to the jury?

25   A.   3.a is, "2.7 in taxes from the 18 gain."

M. Mikuska - Direct                                              246

1    Q.   Let me show you Government Exhibit 97B, as in "beta."

2              Was this found during the search?

3    A.   Yes, it was.

4              MR. ASONYE:  Your Honor, the Government moves 97B

5    into evidence.

6              MR. WESTLING:  No objection.

7              THE COURT:  Admitted.

8              (Government Exhibit No. 97B was received in

9    evidence.)

10             MR. ASONYE:  May we publish?

11             THE COURT:  Yes, you may.

12   BY MR. ASONYE:

13   Q.   Which company is -- what name is listed at the top of this

14   document?

15   A.   Alan Custom Tailoring.

16   Q.   And who is it addressed to?

17   A.   Mr. Paul Manafort.

18   Q.   And what is the total of this invoice?

19   A.   The total is $38,950.

20   Q.   If you could turn to the third page?  Well, actually, does

21   this document contain a number of invoices from the same

22   company?

23   A.   Yes, it does.

24             THE COURT:  Next question.

25             MR. ASONYE:  Yes, Your Honor.  If I could have just

1   one moment to make sure I'm adhering to the Court's order?

2            THE COURT:  I've admitted all of them.  All of that

3   exhibit has been admitted.

4            MR. ASONYE:  Oh, yes, Your Honor.  I'm -- yes, Your

5   Honor.

6   BY MR. ASONYE:

7   Q.   Let me show you what has been marked as Government

8   Exhibit 355.

9            Was this found during the search?

10  A.   Yes, it was.

11           MR. ASONYE:  The Government moves 355 into evidence.

12           MR. WESTLING:  We'd object, Your Honor.  I think this

13  is more work in Ukraine.  I'm not sure.

14           MR. ASONYE:  Your Honor -- Your Honor, there's a

15  specific --

16           THE COURT:  This is what?

17           MR. ASONYE:  There's a specific location that's

18  listed at the top of this document that's relevant, in the

19  subject line.

20           THE COURT:  All right.  Just a moment.  So this does

21  not have to do with work in the Ukraine?

22           MR. ASONYE:  It's related -- well, Court's indulgence

23  one moment?  I just want to -- may I confer?

24           THE COURT:  Yes.

25           MR. ASONYE:  Your Honor, it's -- this is work in a

M. Mikuska - Direct                                                   248

1   different country.

2            THE COURT:  Not in the Ukraine?

3            MR. ASONYE:  Not in the Ukraine, but work -- Your

4   Honor, work that he was paid for in a different country.

5            THE COURT:  In what?

6            MR. ASONYE:  Work that he was paid for in a different

7   country.

8            THE COURT:  Do you have anything further you want to

9   say by way of -- at the bench, by way of relevance?

10           MR. WESTLING:  May I have just one moment, Your

11  Honor?

12           THE COURT:  Well, let me short-circuit this:

13  Mr. Asonye, does this have to do with work that you're going to

14  put in evidence about him having been paid for this work and

15  you're going to contend that he didn't report this money on his

16  return?

17           MR. ASONYE:  Your Honor, I believe what we're

18  putting this in --

19           THE COURT:  I'm sorry, my question takes a yes or a

20  no.

21           MR. ASONYE:  No.  No.

22           THE COURT:  All right.  Then why are we bothering

23  with it?

24           MR. ASONYE:  We are showing it to his connection for

25  this location, Your Honor.

1           THE COURT:  Connection with the location.

2           MR. ASONYE:  And his -- and his knowledge that he's

3    aware those accounts were located, Your Honor.

4           THE COURT:  All right.  Let's pass this.  I'll

5    consider it.  He can only say that it was recovered in the

6    search.

7           MR. ASONYE:  Correct.

8           THE COURT:  The relevance, I'll consider.  Let's move

9    it along.  I'll take it under advisement.

10          MR. ASONYE:  All right, Your Honor.

11          THE COURT:  I think what you've told me is you only

12   want to use it to show that he knows about Cyprus.

13          MR. ASONYE:  Correct, Your Honor.

14          THE COURT:  All right.  I'll think about that.

15          Next question.

16          MR. ASONYE:  The Court's indulgence, please?

17          THE COURT:  All right.  I plan on recessing about

18   12:30 for lunch.

19   BY MR. ASONYE:

20   Q.   Let me show you what's been marked as Government

21   Exhibit 359.

22   A.   Yes, sir.

23   Q.   Was this document located during the search?

24   A.   Yes, it was.

25          MR. ASONYE:  Your Honor, the Government moves 359

M. Mikuska - Direct                                                    250

 1   into evidence.

 2              MR. WESTLING:  No objection.

 3              THE COURT:  Admitted.

 4              (Government Exhibit No. 359 was received in

 5   evidence.)

 6              MR. ASONYE:  And may we publish?

 7              THE COURT:  Yes.

 8   BY MR. ASONYE:

 9   Q.    Okay.  Let's go up to the top of this document.

10              Who is it from?

11   A.    It's from PJM.

12   Q.    And who is it to?

13   A.    SL/YN.

14   Q.    What is the subject?

15   A.    Consulting Payments.

16   Q.    And the date?

17   A.    October 11, 2011.

18   Q.    Go ahead and please read the first two paragraphs of this

19   document.

20   A.    "This document outlines the total fees owed and the fees

21   that have been paid in relation to the consulting agreement

22   between Telmar Investments and Leviathan Advisors for March

23   2011 through 2012.

24              "The contract terms call for a fee of € 4 million due

25   to the consultant per annum for consulting services plus

M. Mikuska - Direct                                               251

1   expenses.  The chart below summarizes the payment

2   activity related to the contract based on a quarterly payment

3   of € 1 million."

4   Q.   All right.  Let me show you what's been marked as

5   Government Exhibit 372.

6            MR. ASONYE:  Your Honor, may I have one moment?

7            THE COURT:  Yes.

8   BY MR. ASONYE:

9   Q.   All right.  Was 372 found during the search?

10  A.   I do not have a 372.

11           MR. ASONYE:  If the court security officer could --

12           THE COURT:  Show it to counsel first.

13           All right.  The witness has it.

14  BY MR. ASONYE:

15  Q.   Was this document found during the search?

16  A.   Yes, it was.

17  Q.   All right.

18           MR. ASONYE:  Your Honor, the Government moves 372

19  into evidence.

20           MR. WESTLING:  No objection.

21           THE COURT:  Admitted.

22           (Government Exhibit No. 372 was received in

23  evidence.)

24           MR. ASONYE:  And may we publish?

25           THE COURT:  Yes.

1    BY MR. ASONYE:

2    Q.   What is the title of this document?

3    A.   "Gates, Agenda, March 21, 2013."

4    Q.   And what does it say below the -- in the next section?

5    A.   "Ayliff."

6    Q.   Yeah, go ahead and read Sections 1 through 5, please.

7    A.   "K1s - Global and L done.  2, do payment.  3, tax plan for

8    April 15 done.  4, taxes - asset allocations (Review Doc with

9    PJM) done.  5, Eagle.  5.a, 300 savings.  5.b, 200 in checking.

10   And 5.c, Action:  Move another 750,000 to Eagle checking."

11            THE COURT:  Why are we -- are you going to -- you're

12   going to offer Mr. Gates, aren't you?

13            MR. ASONYE:  Your Honor, that's -- we're not sure

14   if we're -- he may testify in this case, Your Honor.  He may

15   not.

16            THE COURT:  All right.  Because this appears to be a

17   document that he did.

18            MR. ASONYE:  But this document was located in

19   Mr. Manafort's home, Your Honor.

20            THE COURT:  All right.  Go on.

21   BY MR. ASONYE:

22   Q.   The section under "Admin," Section 6, could you go ahead

23   and read that to the jury?

24   A.   "Admin" --

25            THE COURT:  That was news to me, by the way, and

M. Mikuska - Direct                                                     253

1   obviously to about 25 other people who scurried out of here

2   like rats leaving a sinking ship.

3           (Laughter.)

4           MR. ASONYE:  Your Honor, all -- let me be clear.

5           All I meant to say is:  As we -- as the evidence

6   comes in, we constantly reevaluate whether we need to call

7   certain witnesses.  It's not to suggest we're not calling him,

8   but obviously if we can shorten the trial, we will do so.

9           And that applies to every witness that we put on the

10  list, not just Mr. Gates.

11          THE COURT:  Well, the fact of the matter is you know

12  who you're going to call by and large.  If you're going to call

13  Mr. Gates, this is a waste of time.

14          Go ahead.  Remember I said that.

15          MR. ASONYE:  Yes, Your Honor.

16  BY MR. ASONYE:

17  Q.   6?

18  A.   Sure.  Under "Admin," correct?

19  Q.   Yes, in Section 6, please?

20  A.   "Set up UK HSBC account, Action:  RG.  6.a, Alex to create

21  company and bank account.  6.a.i, two accounts - Symthson and

22  DMPINT."

23  Q.   That's fair enough.  And are there two references on the

24  bottom to Nats and Yanks?

25  A.   Yes, there are.

M. Mikuska - Direct                                                      254

1    Q.   Let me show you what's been marked as Government

2    Exhibit 444.

3              Was this document seized during the search?

4    A.   Yes, it was.

5              MR. ASONYE:   The Government moves 444 into evidence.

6              MR. WESTLING:   No objection.

7              THE COURT:   Admitted.

8              (Government Exhibit No. 444 was received in

9    evidence.)

10             MR. ASONYE:   May we publish?

11             THE COURT:   You may.

12   BY MR. ASONYE:

13   Q.   What is the title of this document?

14   A.   "Agenda, Conference call RJ, Saturday, December 11."

15   Q.   And what's listed under Section 8 and 8.1?

16   A.   8 says, "finance report," and 8.1 says, "2014 taxes."

17   Q.   And then could you go ahead and read the action items

18   between Sections 5 through 8?

19   A.   Yes.  "8.1.5, Action:  RG and Heather working on books.

20   6, Action:  RG to transfer 800,000 to UBS investment portfolio.

21   7, Action:  RG to find out PJM 2014 income number.  8, Action:

22   How to treat 1m."

23   Q.   And I don't need you to read the sub-numbers, but what

24   does it say under Section 9?

25   A.   Use of 1M.

1    Q.    And let me show you Government Exhibit 445.  Was this also

2    found during the search?

3    A.    Yes, it was.

4              MR. ASONYE:  Your Honor, the Government moves 445

5    into evidence.

6              MR. WESTLING:  No objection.

7              THE COURT:  Admitted.

8              (Government Exhibit No. 445 was received in

9    evidence.)

10             MR. ASONYE:  May we publish?

11             THE COURT:  Yes.

12   BY MR. ASONYE:

13   Q.    If you could focus on -- first of all, what's the title of

14   this document?

15   A.    "Rick Agenda Business."

16   Q.    And if you could focus on Section 5.

17   A.    Yes.

18   Q.    What does that say?

19   A.    "KWC Engagement Letter."

20   Q.    And turn to the second page.

21   A.    Yes, sir.

22   Q.    There's a bold and underlined section.  What does that

23   say?

24   A.    "Follow-up items from 1/3 Conversation."

25   Q.    What is section -- go ahead and read.  What are those

1    follow-up items?

2            THE COURT:  Let's not read all of them.  Come on.

3    Let's move it along.  He doesn't have any idea.  The jury can

4    read them.  We can give them two seconds, they can read it.

5            MR. ASONYE:  Fair enough, Your Honor.  May he read

6    one section, Your Honor?

7            THE COURT:  Yes, he may.

8    BY MR. ASONYE:

9    Q.    Section 3?

10   A.    "Ayliff - finalize taxes."

11   Q.    Let me show you Government Exhibit 446.  Was this record

12   found during the search?

13   A.    Yes, it was.

14           MR. ASONYE:  Your Honor, the Government moves 446

15   into evidence.

16           MR. WESTLING:  No objection.

17           THE COURT:  Admitted.

18           (Government Exhibit No. 446 was received in

19   evidence.)

20           MR. ASONYE:  May we publish?

21           THE COURT:  You may.

22   BY MR. ASONYE:

23   Q.    What is the title of this document?

24   A.    "Gates - payments."

25   Q.    And what does the first paragraph say?

M. Mikuska - Direct                                        257

1    A.    It's, "II of the payments have been processed.  Below is

2    the vendor and the date the payment was made.  For the ones

3    coming out of StV, it will take about 7-8 days from the date it

4    was processed."

5    Q.    And could you read the -- not -- just the vendors that are

6    listed?

7    A.    Sure.

8              THE COURT:  All those?

9              MR. ASONYE:  Well, the bottom four, Your Honor.

10             THE COURT:  You can read that.

11             MR. ASONYE:  Your Honor, I was just trying to put it

12   in for the record, but I'm happy to move on.

13             THE COURT:  It's in the record.  This document is in.

14             MR. ASONYE:  For the transcript, but I'm happy to

15   move on, Your Honor.

16             THE COURT:  Let's move on.

17             MR. ASONYE:  Okay.

18   BY MR. ASONYE:

19   Q.    Let me show you Government Exhibit 412A.  What is 412A?

20   A.    It's a United States of America passport.

21   Q.    And was this --

22             THE COURT:  It's not actually a passport.  It's a

23   Xerox of the face page, right?

24             THE WITNESS:  Yes, Your Honor.

25             THE COURT:  Of the cover page?

M. Mikuska - Direct                                                    258

1           THE WITNESS:  Correct.

2           THE COURT:  Next question.

3           MR. ASONYE:  Your Honor, on this exhibit we actually

4   do have the physical item, which we're going to swap in, but

5   for now we're going to use just the photographs.

6           THE COURT:  All right.  And this shows all the pages

7   of it; is that right?

8           MR. ASONYE:  Yes, Your Honor.

9           THE COURT:  All right.  Next question.

10          MR. ASONYE:  Was this located during the search?

11          THE WITNESS:  Yes, it was.

12          MR. ASONYE:  Your Honor, the Government moves 412A

13  into evidence.

14          MR. WESTLING:  No objection.

15          THE COURT:  It's admitted.

16          (Government Exhibit No. 412A was received in

17  evidence.)

18  BY MR. ASONYE:

19  Q.   Agent Mikuska, are you familiar with a Ukrainian passport

20  stamp?

21  A.   Yes, I am.

22  Q.   And how are you familiar with that?

23  A.   Just general background, slight familiarization with

24  Cyrillic, and also there are some number codes on passports I'm

25  familiar with.

M. Mikuska - Direct                                         259

1    Q.   If you could turn to the third page from the last page.

2         Your Honor, may we publish?

3         THE COURT:  Yes, you may do so.

4    BY MR. ASONYE:

5    Q.   And if we could turn to the third from the last page of

6    this document.  And could you tell the jury what you see?

7    A.   Yes.  I see photocopies of a passport book of Page 26 and

8    27.

9    Q.   And what is -- what are -- what do you see on Page 26 and

10   27 of the passport?

11   A.   Approximately two full pages of what I recognize as copies

12   of Ukrainian passport stamps.

13   Q.   And we don't have to show this, but on the prior pages --

14        THE COURT:  I agree.

15   BY MR. ASONYE:

16   Q.   The next page beforehand --

17        THE COURT:  What's that?

18        MR. ASONYE:  On the prior pages, the next page

19   beforehand and the page before that, that would be passport

20   Pages 22 through 25.

21   BY MR. ASONYE:

22   Q.   Do those all also contain Ukrainian passport stamps?

23   A.   Yes.  The pages are full of Ukrainian passport stamps.

24   Q.   And on the beginning -- on Page 3 of this passport, could

25   you tell the jury the dates that this passport was valid?

1   A.   Yeah.  This passport was valid from 9 May 2008 until

2   8 May 2018.

3   Q.   All right.  Let me show you Government Exhibit 412B.  Was

4   this a different passport that was photographed during the

5   seizure?

6   A.   Yes, it was.

7            MR. ASONYE:  Your Honor, the Government moves 412B

8   into evidence.

9            MR. WESTLING:  No objection.

10           THE COURT:  Admitted.

11           (Government Exhibit No. 412B was received in

12   evidence.)

13           MR. ASONYE:  May we publish?

14           THE COURT:  I take it you want to show he went to the

15   Ukraine?

16           MR. ASONYE:  Yes, Your Honor.

17           THE COURT:  I don't believe anybody in this courtroom

18   has any doubt about that.  Let's move along.

19           MR. ASONYE:  May I just -- I think I can finish up,

20   Your Honor, in two to three questions.

21           THE COURT:  All right.

22   BY MR. ASONYE:

23   Q.   On Page 3 of the passport, what period is this passport

24   valid from?

25   A.   This passport was valid from 9 February 2012 through

1    8 February of 2014.

2    Q.   And, again, on the last three pages of this exhibit, is it

3    full of Ukrainian passport stamps?

4    A.   Photos of stamps from Ukraine, yes.

5              MR. ASONYE:   Thank you.   No further questions, Your

6    Honor.

7              THE COURT:   All right.   Any cross-examination of this

8    witness?

9              MR. WESTLING:   Yes, Your Honor.

10             THE COURT:   All right.   Proceed.

11                          CROSS-EXAMINATION

12   BY MR. WESTLING:

13   Q.   Special Agent Mikuska -- is that correct?

14   A.   Yes.   That's a good pronunciation.   Thank you.

15   Q.   And so -- I'm Richard Westling.   I represent Mr. Manafort.

16   If I say anything that's not clear, you can't understand me,

17   just let me know, okay?

18   A.   No problem.   Yes, sir.

19   Q.   So as I understand it, you were, as you testified, the

20   seizing agent in connection with the search of Mr. Manafort's

21   residence in the condominium building, correct?

22   A.   That's correct, yes, sir.

23   Q.   All right.   And prior to that, being involved in that

24   search, had -- were you involved in the investigation the

25   Government was conducting?

1    A.    No, sir.

2    Q.    Okay.  So your entire involvement has been in connection

3    with that search; is that correct?

4    A.    Yes, sir.

5    Q.    Okay.  And that's not atypical, correct?

6    A.    Can you clarify that?

7    Q.    Well, I mean, it's very typical to bring additional agents

8    in before a search is done of that sort who aren't already

9    involved in the case?

10   A.    I wouldn't call it typical or atypical.  It's a

11   case-by-case decision.

12            THE COURT:  All he's saying is that it happens a good

13   deal.

14            THE WITNESS:  Absolutely, Your Honor.

15            THE COURT:  That's what he meant.

16            MR. WESTLING:  Thank you, Your Honor.

17            THE COURT:  Proceed.

18   BY MR. WESTLING:

19   Q.    And so just so we're clear, you've read a number of

20   documents here for the jury today, but you didn't have any real

21   background in this case other than reading the search warrant

22   affidavit that led you to be involved, correct?

23   A.    Yes.

24   Q.    All right.  Let's talk a little bit about the search

25   itself.  Counsel for the Government asked you about that.

M. Mikuska - Cross                                                   263

1           First, let's just clarify, what date did the search

2   take place?

3   A.   You'd have to refresh my recollection on that.

4   Q.   Well, I think your testimony may have been in August, but

5   it was actually in July; is that correct?

6   A.   It was July or August.

7   Q.   And so it was July 26?  Does that sound right?

8   A.   You'd have to show me the search warrant, and I'll look at

9   the dates.

10  Q.   I've got a report that you wrote from an encounter that

11  occurred that day.  Would the date of that report be the

12  correct date?

13  A.   Yes.

14  Q.   All right.  So that was July 26, 2017?

15          THE COURT:  Well, you could show him something to

16  refresh his recollection.

17          MR. WESTLING:  I'm happy to move on, Your Honor.

18          THE COURT:  All right.  Let's move on.

19  BY MR. WESTLING:

20  Q.   So let's talk a little bit about preparing for that

21  search.  I think you said you read the application, the

22  affidavit; is that right?

23  A.   Yes.

24  Q.   And how many people were involved in the search?

25  A.   In what part of the search?

 1  Q.   Well, I guess let's start -- I mean, typically --

 2            MR. ASONYE:  Objection, Your Honor, relevance.

 3            THE COURT:  What is the relevance?

 4            MR. WESTLING:  Well, I think, Your Honor, Mr. Asonye

 5  brought the agent through all the steps they used to enter the

 6  apartment.  I'm simply inquiring into those areas of his

 7  examination.

 8            THE COURT:  How long?  I'll give you some leeway.

 9            MR. WESTLING:  I'll try to move it along, Your Honor.

10            THE COURT:  I'll overrule the objection for now, but,

11  Mr. Asonye, you may remove -- you may renew it if it looks like

12  it's turning to matters that are really irrelevant or beyond

13  the scope.  Proceed.

14            THE WITNESS:  I'm sorry, go ahead.

15  BY MR. WESTLING:

16  Q.   Go ahead.

17  A.   There's different parts of a search and so different

18  people are partaking at different times.

19  Q.   Right.  And so there's typically a search team, correct?

20  A.   Yes, sir.

21  Q.   And how many people were on that team?

22  A.   Probably between -- I'd say approximately 14 or so.

23  Q.   Okay.  And so the 14 individuals were all those people

24  that entered Mr. Manafort's condominium that day?

25  A.   Yes, sir.

1   Q.   All right.  And they were all FBI agents?

2   A.   No.

3   Q.   Okay.  There were other law enforcement agencies?

4   A.   They were all FBI personnel.

5   Q.   Okay.  Right.  Because you had folks from the CART team

6   and from the ERT and other things?

7   A.   Yeah.  CART and ERT.  ERT specifically has personnel that

8   aren't agents.  All the CART team members, I believe, were

9   agents, but I can't be sure on that.

10  Q.   And not to get too deep into the jargon, but CART and ERT

11  are just acronyms you-all use for people that are involved in

12  evidence gathering, correct?

13  A.   Yes, sir.  Yes, sir.

14  Q.   All right.  And so you indicated you got to the -- the

15  apartment and it was a few minutes after 6:00 a.m.; is that

16  right?

17  A.   Yes, sir.

18  Q.   And Mr. Asonye asked you whether you had entered without

19  knocking.  You said that you actually had knocked, correct?

20  A.   Yes, we did.

21  Q.   And eventually, though, you let yourself into the

22  apartment, correct?

23  A.   Yes, that's correct.

24  Q.   All right.  Nobody answered the door?

25  A.   Yes, that's correct.

M. Mikuska - Cross                                                266

1    Q.   And you said that you had a key, correct?

2    A.   Yes, sir.

3    Q.   And I think you also testified you didn't know where the

4    key came from?

5    A.   That's correct.

6    Q.   How did you get into the locked garage in the building?

7    A.   We also had a fob for that.

8    Q.   Okay.  And you don't know where that came from either?

9    A.   That's correct.

10   Q.   All right.  So you entered the building through the

11   garage, you were able to come up, and obviously this is a

12   covert operation, correct?  You don't want people to find out?

13   A.   No, that -- that's actually not correct.

14   Q.   Well, was there a sealed search warrant?

15   A.   Yes, there was.

16   Q.   All right.  And so you didn't want people to know what was

17   in the search warrant?

18   A.   Sorry, I just have a very specific usage of the word

19   "covert."

20   Q.   Understood.  I didn't mean to mix my metaphor.

21   A.   And I just wanted to be clear, Counsel, I'm sorry.

22   Q.   But it was designed to be secret, correct?

23   A.   Yes.

24   Q.   All right.

25   A.   It was designed to be quiet and non-interruptive.

M. Mikuska - Cross                                                    267

1    Q.   All right.  So you knock on the door?

2    A.   Correct.

3    Q.   And eventually you let yourself in?

4    A.   Yes.

5    Q.   All right.  And then you said that you encountered

6    Mr. Manafort?

7    A.   That's correct.

8    Q.   And, again, this is a few minutes after 6:00; is that

9    correct?

10   A.   Yes.

11   Q.   All right.  So were you surprised that no one answered the

12   door at 6:00 a.m.?

13   A.   No.

14   Q.   Okay.  So you entered the apartment, and who is present in

15   the residence at the time?

16   A.   At the time there were two, Mr. Manafort and his wife.

17   Q.   Okay.  And just so I'm clear, how are you-all dressed for

18   this occasion?

19   A.   We were dressed in -- some people were -- some people wear

20   jeans, some people wore regular like khaki-type pants, a

21   comfortable undergarment, and at the time, we had on

22   FBI-labeled coats or vests.

23   Q.   All right.  And so were you wearing bulletproof vests?

24             MR. ASONYE:  Objection, Your Honor, to relevance.

25             THE COURT:  It does seem to me to be far afield.

1          MR. WESTLING:  Well, Your Honor, the Government

2     gratuitously elicited whether it was a knock or no-knock

3     warrant and got into these procedures.  I think we're entitled

4     to investigate them.

5          THE COURT:  Well, I'll sustain the objection.  I

6     don't think it matters whether they wore bulletproof vests or

7     not.

8          MR. WESTLING:  I'll move on, Your Honor.

9     BY MR. WESTLING:

10    Q.   Were you armed?

11    A.   Yes.

12    Q.   All right.  And that's standard, correct?

13    A.   Yes.

14    Q.   All right.  So just in terms of the gathering of this

15    information, did you keep a catalog of where it was all

16    located?

17    A.   Yes.

18    Q.   All right.

19    A.   I'm sorry, when you say, "you," do you mean me, myself, or

20    did somebody?

21    Q.   Well, why don't we clarify that?

22         Tell me if somebody did.

23    A.   Yes.

24    Q.   All right.  And in some cases, that was you but not

25    always?

1    A.    I was not a cataloging agent.  That would have been a

2    member of our ERT team.

3    Q.    All right.  But you're the one who took possession of all

4    the material?

5    A.    That's correct.

6    Q.    All right.  So in terms of figuring out where it came from

7    around the house, do you know where any of these documents were

8    found that you testified about today?

9    A.    Yes.

10   Q.    Okay.  So you have personal knowledge of that or --

11   A.    Yes.

12   Q.    I guess I'm confused, because I thought you said you

13   didn't catalog everything or didn't search every room?

14   A.    When you said "catalog," I meant that to be the actual

15   writing of the -- of where they were located.

16   Q.    All right.  Did you seize every item that was seized?

17   A.    No.

18   Q.    Okay.  So in some cases someone else went to a room and

19   seized it?

20   A.    Yes, sir.

21   Q.    And you went to other rooms and seized other things?

22   A.    That's correct.

23   Q.    All right.  And so the documents that we're talking about

24   here, did you find them -- well, where did you find them,

25   generally?

1  A.   Again, in most -- in every case today, I was not the one

2  that found the document.

3  Q.   All right.  To the extent that you know, do you know where

4  those documents were found?

5  A.   Yes.

6  Q.   Can you tell me?

7  A.   You'd have to -- there are a lot of documents.  You'd have

8  to refer to a specific document and --

9  Q.   Okay.  I don't think we need to belabor that point.

10         I guess what I'm asking, though, is that these were

11  found in various areas of his home?

12  A.   That's correct.

13  Q.   All right.  And they were in cabinets or boxes or

14  something?

15  A.   Correct.

16  Q.   All right.  They weren't hidden anywhere, were they?

17  A.   I don't know.

18  Q.   I mean, they were just found -- you didn't have trouble

19  finding them --

20  A.   Again, I was not the one that found them.

21  Q.   Okay.  Do you -- did you have any indication from the

22  search that anyone had any trouble locating anything?

23  A.   I'm not trying to be difficult, but that's a very

24  difficult question to answer.  I don't -- I can't speak to

25  other agents.

 1            THE COURT:  No, the question is:  Do you know?

 2            THE WITNESS:  I don't know.  I can't speak for other

 3   agents.

 4            THE COURT:  All right.  Next question.

 5   BY MR. WESTLING:

 6   Q.   And to the extent that you came into the apartment

 7   unannounced -- well, announced but as a surprise -- is that a

 8   fair way to put it?

 9   A.   No.

10   Q.   Okay.  You don't think Mr. Manafort was surprised by your

11   presence?

12   A.   I can't tell you what Mr. Manafort was thinking that day.

13   Q.   All right.  But you didn't tell him you were coming before

14   you arrived?

15   A.   I did not, no.

16            MR. ASONYE:  Objection.

17   BY MR. WESTLING:

18   Q.   Okay.  And no one did?

19   A.   I have no idea.

20            MR. ASONYE:  Relevance, Your Honor.

21            THE COURT:  I beg your pardon?

22            MR. ASONYE:  Objection, relevance, as to --

23            THE COURT:  I'll overrule it.  I gave you some

24   latitude on --

25            THE WITNESS:  I did not.  I can't tell you whether

1    anybody else did.

2    BY MR. WESTLING:

3    Q.   All right.  Did you believe he knew the team was coming?

4    A.   No.

5    Q.   Okay.  And so you arrive.  He comes to meet you somewhere

6    on the way in from the door; is that right?

7    A.   Yes, that's correct.

8    Q.   All right.  And so he's not running around the apartment

9    trying to hide anything?

10   A.   I don't know that.

11   Q.   Well, you saw him, didn't you?  You said you saw him.

12   A.   At the door, yes.

13   Q.   Right.  So what was he doing at the door?

14   A.   Walking towards us.

15   Q.   Did he have documents in his hands?

16   A.   No, he did not.

17   Q.   Did he look like he was doing anything else to try to

18   secrete or hide anything?

19   A.   No.

20   Q.   All right.  Did anything in your interaction you had with

21   him that day, which you documented in your 302, indicate he was

22   trying to hide anything?

23   A.   No.

24        MR. WESTLING:  All right.  Thank you.  I have no

25   further questions.

1          THE COURT:  Any redirect?

2          MR. ASONYE:  No, Your Honor.

3          THE COURT:  All right.  Thank you.  You may step

4     down, Agent.

5          THE WITNESS:  Thanks, Judge.

6          THE COURT:  May this witness be excused?

7          MR. ASONYE:  From the Government, yes, Your Honor.

8          THE COURT:  And the agent may be excused.

9                    (Witness excused.)

10         THE COURT:  Ladies and gentlemen, we'll take the

11    luncheon recess at this time.  Pass your books to the right.

12    The court security officer will collect them, maintain their

13    security during the lunch hour, and we will recess for exactly

14    one hour.  We will reconvene at 1:30.  I hope your lunches will

15    be there, but they may be a bit late.  And there will be soft

16    drinks as well available.

17         Remember during the recess not to discuss the matter

18    with anyone or undertake any investigation on your own.  Put it

19    out of your mind for at least the next hour and I'll see you

20    then.  You may follow Mr. Flood into the jury room.

21                    (Jury out.)

22         THE COURT:  Court is still in session.  Thank you.

23         All right.  You may be seated.

24         I think we have exhausted this very heavy document

25    you provided, Mr. Andres.  Do you have one for the afternoon?

1          MR. ANDRES:  Yes, Judge.  We have several.  We're

2   intending to call Mr. Katzman and Mr. Wall, and then after that

3   I think we're going to have time for several witnesses,

4   frankly, Mr. Opsut, I'm probably not pronouncing that

5   correctly, but it's spelled O-p-s-u-t.  We have several, but --

6          THE COURT:  All right.  Well, that's helpful, but do

7   you have this, which was quite helpful?

8          MR. ANDRES:  What?  The exhibits, Judge?

9          THE COURT:  The -- I asked you-all to prepare the --

10  tell me who was going to testify and what exhibits, and you

11  gave me Rabin and Mikuska.

12         THE CLERK:  I have it.

13         THE COURT:  Oh, you have it?  Thank you.

14         MR. ANDRES:  Thank you.

15         THE COURT:  You're ahead of me.

16         All right.  We will recess for lunch until 1:30.

17         MR. ANDRES:  Thank you.

18         THE COURT:  Court stands in recess.

19           (Recess from 12:29 p.m., until 1:30 p.m.)

20

21                 CERTIFICATE OF THE REPORTER

22      I certify that the foregoing is a correct transcript of

23  the record of proceedings in the above-entitled matter.

24

25                                   _____/s/_____
                                     Anneliese J. Thomson