UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
------------------------------x
UNITED STATES OF AMERICA,       .  Criminal Action No.
                                .  1:18-CR-83
        versus                  .
                                .
PAUL J. MANAFORT, JR.,          .
                                .  August 2, 2018
            Defendant.          .  Volume III-P.M.
------------------------------x
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:               UZO ASONYE, AUSA
                                  United States Attorney's Office
                                  2100 Jamieson Avenue
                                  Alexandria, VA 22314
                                    and
                                  GREG D. ANDRES, SAUSA
                                  BRANDON L. VAN GRACK, SAUSA
                                  Special Counsel's Office
                                  U.S. Department of Justice
                                  950 Pennsylvania Avenue, N.W.
                                  Washington, D.C. 20530

FOR THE DEFENDANT:                JAY ROHIT NANAVATI, ESQ.
                                  BRIAN P. KETCHAM, ESQ.
                                  Kostelanetz & Fink LLP
                                  601 New Jersey Avenue, N.W.
                                  Suite 620
                                  Washington, D.C. 20001
                                    and
                                  THOMAS E. ZEHNLE, ESQ.
                                  Law Office of Thomas E. Zehnle
                                  601 New Jersey Avenue, N.W.
                                  Suite 620
                                  Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 548 - 706)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANT:              KEVIN M. DOWNING, ESQ.
                                     Law Office of Kevin M. Downing
3                                    601 New Jersey Avenue, N.W.
                                     Washington, D.C. 20001
4                                      and
                                     RICHARD W. WESTLING, ESQ.
5                                    Epstein, Becker & Green, P.C.
                                     1227 25th Street, N.W.
6                                    Washington, D.C. 20037

7    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
8                                    401 Courthouse Square
                                     Alexandria, VA 22314
9                                    (703)299-8595

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

550

1                                INDEX

2

WITNESS                         EXAMINATION      PAGE

3

4    HEATHER WASHKUHN

                                 DIRECT           552
5                                CROSS            635
                                 REDIRECT         656
6                                RECROSS          659

7    JAMES PHILIP AYLIFF

                                 DIRECT           666
8

9

10                          E X H I B I T S

11   Government Exhibit No. 122A was received        553
     Government Exhibit No. 123A was received        558
12   Government Exhibit No. 124A was received        561
     Government Exhibit No. 124B was received        565
13   Government Exhibit No. 125A was received        568

14   Government Exhibit No. 125B was received        571
     Government Exhibit No. 126A was received        572
15   Government Exhibit No. 126B was received        573
     Government Exhibit No. 126C was received        574
16   Government Exhibit No. 126D was received        575

17   Government Exhibit No. 128 was received         578
     Government Exhibit No. 133 was received         581
18   Government Exhibit No. 147 was received         587
     Government Exhibit No. 127 was received         590
19   Government Exhibit No. 131 was received         594

20   Government Exhibit No. 149A was received        595
     Government Exhibit No. 136 was received         598
21   Government Exhibit No. 137 was received         600
     Government Exhibit No. 140 was received         602
22   Government Exhibit No. 138 was received         609

23   Government Exhibit No. 139 was received         610
     Government Exhibit No. 298 was received         615
24   Government Exhibit No. 145 was received         620
     Government Exhibit No. 146 was received         622
25   Government Exhibit No. 149 was received         624

551

```
 1    Government Exhibit No. 282 was received          626
      Government Exhibit No. 257 was received          631
 2    Government Exhibit No. 153 was received          671
      Government Exhibit No. 204 was received          679
 3    Government Exhibit Nos. 337A through 337U were    682
      received
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          P R O C E E D I N G S

2                     (Defendant present, Jury out.)

3          THE COURT:  All right.  You may bring in the jury.

4          All right.  You may be seated, and let's have

5   Ms. Washkuhn return to the podium.

6          MR. ANDRES:  Yes, sir.

7     HEATHER WASHKUHN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

8          THE COURT:  Ms. Washkuhn, you'll recall that you

9   remain under oath.  You may resume the stand.

10         All right.  Mr. Andres, you may proceed.

11         MR. ANDRES:  Thank you, Your Honor.

12                   DIRECT EXAMINATION (Cont'd.)

13  BY MR. ANDRES:

14  Q.   Ms. Washkuhn, I just remind you to try to keep your voice

15  up so that everyone can hear.

16  A.   Okay.

17  Q.   Can I ask you to look in your binder at Government

18  Exhibit 122A?

19  A.   Okay.

20  Q.   Can you tell me what that document is?

21  A.   This is the DMP International general ledger from 2012.

22         MR. ANDRES:  Your Honor, the Government moves 122A

23  into evidence.

24         MR. ZEHNLE:  No objection, Your Honor.

25         THE COURT:  Admitted.  Next question.

1           (Government Exhibit No. 122A was received in

2    evidence.)

3    BY MR. ANDRES:

4    Q.   Ms. Washkuhn, can I ask you to turn to Page 14 of the 2002

5    ledger?

6           May I publish the document, Judge?

7           THE COURT:  Yes, you may.  This is one I've admitted,

8    right, just admitted?

9           MR. ANDRES:  Yes, Judge.

10          THE COURT:  All right.  Proceed.

11   BY MR. ANDRES:

12   Q.   Ms. Washkuhn, the code 1337-002, do you see that entry?

13   A.   Yes.

14   Q.   Can you explain what that entry is?

15   A.   Sure.  That code indicates a loan, and that's a loan to

16   Peranova Holdings Limited.

17   Q.   Okay.  And how much is that loan?

18   A.   1.5 million.

19   Q.   Okay.  And we previously saw entries for income for

20   Peranova; is that correct?

21   A.   Correct.

22   Q.   Okay.  And with respect to this loan, do you know if you

23   ever received any underlying documentation?

24   A.   I don't recall.

25   Q.   Okay.  If this loan was actually income, would that change

1   the booking in your -- in your general ledger?

2   A.   Yes.

3   Q.   And would that have an effect on Mr. Manafort's income for

4   the year 2012?

5   A.   Yes, it would.

6   Q.   Can you turn to Page 25?

7   A.   Okay.

8   Q.   On Page 25 there's a code 2301-003, Member Distribution -

9   Paul Manafort.  Do you see that?

10  A.   Yes.

11  Q.   Can you explain to the jury what that means?

12  A.   That means funds distributed out of DMP International,

13  LLC, to its member, Paul.

14  Q.   And would that be income to Mr. Manafort?

15  A.   No.  It would be shown through a K-1 document.

16  Q.   With respect to the entry at 3/6/12, can you read that

17  entry?

18  A.   "To record incoming wire into Paul and Kathleen Manafort

19  master checking account from Lucicle Consultants Limited."

20  Q.   And do you have an understanding of what Lucicle

21  Consultants Limited was?

22  A.   No.

23  Q.   And how much -- and what's recorded with respect to that

24  entry?

25  A.   $100,000.

1   Q.    Can I ask you to turn to Page 28?  Do you see the entry

2   halfway down that says, "Other Income, Global Highway Limited"?

3   A.    Yes.

4   Q.    Can you explain to the jury what that means?

5   A.    That's income for the year of 2012 from Global Highway

6   Limited which totaled 675,000.

7   Q.    And do you know what Global Highway Limited is?

8   A.    No.

9   Q.    And what's the total amount of income from Global Highway

10  Limited?

11  A.    $675,000.

12  Q.    And the reference below to Lucicle Consultants Limited,

13  what does that refer to?

14  A.    That refers to income for 2012 from Lucicle Consultants

15  Limited.

16  Q.    And what's the total amount of income from Lucicle in

17  2012?

18  A.    1,750,000.

19  Q.    Do you know what Lucicle is?

20  A.    No.

21  Q.    Can you turn to the next page, Page 29?

22        There's a reference to Bletilla Ventures, Ltd.  Can

23  you tell me what that is?

24  A.    That shows income from Bletilla Ventures throughout 2012.

25  Q.    Do you know what Bletilla Ventures is?

1  A.   No.

2  Q.   And what's the total amount of income from Bletilla

3  Ventures in 2012?

4  A.   4,780,000.

5  Q.   Do you see the reference below that to Actinet Trading?

6  A.   Yes.

7  Q.   Can you tell me what that is?

8  A.   Income for the year of 2012 from Actinet Trading.

9  Q.   How would you know that that was income?

10  A.   The code starting with the 3000 indicates that it's coded

11  in the income section.

12  Q.   Is there anything in that entry that suggests that

13  Mr. Manafort controls Actinet Trading?

14  A.   No.

15  Q.   Did you understand Mr. Manafort to have a bank account

16  related to Actinet Trading?

17  A.   No.

18  Q.   Do you know if Mr. Manafort paid any -- paid for any

19  vendors directly from Actinet Trading?

20  A.   No.

21  Q.   What's the total amount of income for that year for

22  Actinet Trading?

23  A.   105,000.

24  Q.   Can I ask you to turn to Page 92?

25       There's a reference to the code 4841-001.  What does

1  that reflect?

2  A.   That's a code for salary.

3  Q.   And whose salary is recorded here?

4  A.   Mr. Gates.

5  Q.   Okay.  And what's the total -- what was Mr. Gates' total

6  salary for this year?

7  A.   240,000.

8  Q.   Is there an entry some place for salary, Mr. Manafort's

9  salary?

10  A.   Yes.

11  Q.   Was Mr. Manafort paid a salary from DMP?

12  A.   Yes, he was.

13  Q.   Okay.  And what was his salary?

14  A.   1,986,500.

15  Q.   Can I ask you to turn to Page 98?

16       There's a code 4949-001.  Can you explain that code

17  to the jury?

18  A.   That code is for foreign taxes.

19  Q.   And what -- what foreign entity is being paid taxes?

20  A.   Its funds going to Davis Manafort, LLC, or Davis Manafort

21  International, LLC.

22  Q.   And does it relate -- in terms of the foreign taxes, are

23  foreign taxes being paid in another country?

24  A.   It's related to Ukraine.

25  Q.   Okay.  Does this general ledger record any taxes paid in

1    Cyprus?

2    A.    No.

3    Q.    In the 2012 general ledger, do you also record travel

4    expenses?

5    A.    Yes.

6    Q.    Okay.  Can I ask you to turn to Government Exhibit 123A?

7          Can you tell me what that is?

8    A.    I think that's a different binder.  123A is a DMP

9    International general ledger for 2013.

10   Q.    And what time period does that ledger cover?

11   A.    1/1/13 through 12/31/13.

12          MR. ANDRES:  Your Honor, the Government moves to

13   admit Government Exhibit 123A.

14          MR. ZEHNLE:  No objection.

15          THE COURT:  Admitted.

16          (Government Exhibit No. 123A was received in

17   evidence.)

18   BY MR. ANDRES:

19   Q.    Ms. Washkuhn, can I ask you to turn to Page 30?

20          At the top of the page, there's a reference to

21   Smythson, LLC.  Do you know what that reflects?

22   A.    That's reflecting income from Smythson, LLC, during 2013.

23   Q.    Do you know what Smythson, LLC, is?

24   A.    No.

25   Q.    If you -- how did you learn that there was income from

1  Smythson?

2  A.    We would have seen it on the bank statement or an incoming

3  wire notification.

4  Q.    And how would you know how to characterize or classify

5  those -- that income -- sorry -- those wires?

6  A.    When they first started coming in, we would usually ask

7  Mr. Manafort or Mr. Gates and then we would just follow the

8  pattern after that.

9  Q.    Okay.  Did you ever learn that Mr. Manafort or Mr. Gates

10 controlled Smythson?

11 A.    No.

12 Q.    What's the total amount of income from Smythson in this

13 year?

14 A.    3,375,000.

15 Q.    Would it have been relevant to your books and records if

16 Mr. Manafort controlled Smythson?

17 A.    Yes.

18 Q.    Why?

19 A.    We would have recorded it a bit differently here, and then

20 we would have also recorded it on Mr. Manafort's personal

21 ledger.

22 Q.    In the year 2013 -- sorry -- in the year 2013, did DMP

23 earn any income aside from this Smythson income?

24 A.    No.

25 Q.    Are there any foreign wires recorded in 2013?

1   A.    I can't tell from this if Smythson was a foreign wire.

2   Q.    Okay.  But in terms of other income, are there any other

3   foreign wires that are recorded?

4   A.    I don't see any other income, no.

5   Q.    And in 2013, did you understand that Mr. Manafort was

6   working in the Ukraine?

7   A.    I don't recall.

8   Q.    Can I ask you to turn to Page 88?

9         At the top of the page, do you see a reference to

10  Konstatin Kilimnik?

11  A.    Yes.

12  Q.    And what's recorded in that entry?

13  A.    At the top of the page, it's a payment for $73,000.

14  Q.    And does it identify what that payment is?

15  A.    For professional services.

16  Q.    Did you know who Konstatin Kilimnik was?

17  A.    No.

18  Q.    Are there other references to Konstatin Kilimnik on this

19  page?

20  A.    Yes.

21  Q.    And what are those?

22        For example, the one at 8/30/13, what does that

23  reflect?

24  A.    There's two payments to him on 8/30/13, one for 15,000 and

25  one for 65,000.

1   Q.    And what's the description of those payments?

2   A.    One says, "Private transfer"; one says, "Professional

3   services."

4   Q.    And on Page 93, there's a reference to salaries office.

5   What does that relate to?

6   A.    That's salaries paid to Mr. Gates.

7   Q.    And what was Mr. Gates' salary in -- in 2013?

8   A.    240,000.

9   Q.    Can I ask that you turn to Government Exhibit 124A?

10          Please -- do you have that?

11  A.    Yes.

12  Q.    Okay.  What is Government Exhibit 124A?

13  A.    It's the DMP International ledger for 2014.

14          MR. ANDRES:  Your Honor, the Government moves to

15  admit Government Exhibit 124A.

16          MR. ZEHNLE:  No objection.

17          THE COURT:  Admitted.

18          (Government Exhibit No. 124A was received in

19  evidence.)

20  BY MR. ANDRES:

21  Q.    Can you turn to Page 3?

22          On the top of Page 3, there are two -- the top two

23  entries at January 23, 2014, can you tell me what those refer

24  to?

25  A.    Those refer to payments to Kilimnik Konstantin.

Washkuhn - Direct                                                        562

1   Q.   And how much were those payments for?

2   A.   One is for 39,500 and the other is for 15,000.

3   Q.   Can you turn to Page 16?

4   A.   Okay.

5   Q.   What's reflected on Page 16 of the 2014 DMP International

6   general ledger?

7   A.   That is bank account activity for an HSBC checking

8   account.

9   Q.   Okay.  At 1/22/14 there's a reference to Alan Couture.

10  Can you tell me what that is?

11  A.   That's a payment to Alan Couture for $42,000.

12  Q.   On February 7 -- I'm sorry, on March 17, 2014, there's a

13  reference to Global Endeavor.

14          Do you know what that is?

15  A.   That's income received from Global Endeavor for $27,126.

16  Q.   Do you know what Global Endeavor is?

17  A.   No.

18  Q.   At -- on April 2, 2014, there's a reference to Telmar.

19          Can you tell me what that is?

20  A.   That's a million dollars of income from Telmar

21  Investments, Inc., with a description, first installment for

22  services rendered under the consultancy agreement dated 1/3/14.

23          MR. ANDRES:  Your Honor, can I publish this document?

24          THE COURT:  Yes, you may.

25  BY MR. ANDRES:

1    Q.   Just referring to that entry at April 3, 2014, you said

2    that there was a services rendered under consultancy.

3              What does that mean?

4    A.   It means there was a consulting agreement in place and

5    this payment was listed in that agreement.

6    Q.   And what's the payment?

7    A.   $1 million.

8    Q.   And who do you understand made the $1 million payment to

9    DMP International?

10   A.   Telmar Investments.

11   Q.   And do you know what Telmar Investments is?

12   A.   No, I don't.

13   Q.   Can you turn to Page 45?

14             On page 45, there's a reference to Peranova Holdings

15   Limited.  Do you see that?

16   A.   Yes.

17   Q.   Can you explain to the jury what that reference relates

18   to?

19   A.   That's a loan code.  So that references a loan to Peranova

20   for $1.5 million.

21   Q.   And who's the loan to?

22   A.   Peranova Holdings Limited.

23   Q.   It's a loan to Peranova or a loan to DMP?

24   A.   A loan to DMP International from Peranova Holdings.

25   Q.   Okay.  And what -- how much is the loan for?

1    A.    1.5 million.

2    Q.    Do you know if you saw any underlying documentation for

3    that loan?

4    A.    I don't recall.

5    Q.    Can you turn to Page 65?  I'm sorry, 64.

6          Now, there's a code 3101-007.  Do you see that?

7    A.    Yes.

8    Q.    And what's recorded under that code?

9    A.    Income from Telmar Investments, Ltd.

10   Q.    Do you know what Telmar Investments is?

11   A.    No.

12   Q.    There are -- on the reference on April 29, 2014, can you

13   read that?

14   A.    "Telmar Investments Ltd. for services rendered under the

15   consultancy agreement dated 4/15/14."

16   Q.    Would you have had access to that consultancy agreement?

17   A.    I don't recall if we had access to that or not.

18   Q.    Can you turn to Page 65?

19         Can you tell me what's reflected on the top of

20   Page 65?

21   A.    Income from Global Endeavor, Inc.

22   Q.    What's the total amount of income from Global

23   Endeavor, Inc.?

24   A.    $1,215,398.07.

25   Q.    Did Mr. Manafort ever tell you what Global Endeavor, Inc.,

1   is?

2   A.    No.

3   Q.    Can you turn to Page 194?

4         Can you tell me what's reflected on Government --

5   Page 194?

6   A.    Salaries to Mr. Gates.

7   Q.    And what was Mr. Gates' salary in 2014?

8   A.    240,000.

9   Q.    Let me ask you to turn to Government Exhibit 124B.  I

10   think it might be in a different --

11   A.    It's here.

12   Q.    -- binder.

13         124B, what's included in Government Exhibit 124B?

14   A.    This is a financial statement for DMP International for

15   2014.

16         MR. ANDRES:  Your Honor, the Government moves to

17   admit Government Exhibit 124B.

18         MR. ZEHNLE:  No objection, Your Honor.

19         THE COURT:  It's admitted.

20         (Government Exhibit No. 124B was received in

21   evidence.)

22   BY MR. ANDRES:

23   Q.    Ms. Washkuhn, can you explain to the jury what's included

24   in Government Exhibit 124B?

25   A.    This is the financial statements, so it includes the

Washkuhn - Direct                                                          566

1    balance sheet and an income statement and then supporting

2    schedules.

3    Q.   And how is the -- how is the financial statement

4    generated?

5    A.   Through our accounting software.

6    Q.   Okay.  And where does the information in the financial

7    statement, where does it come from?

8    A.   From the general ledger.

9              MR. ANDRES:  Your Honor, can I publish this exhibit?

10             THE COURT:  Yes, just that first -- you're going to

11   publish one page?

12             MR. ANDRES:  I'd like to turn to Page 9.

13             THE COURT:  All right.  You may do so.

14   BY MR. ANDRES:

15   Q.   Can you turn to Page 9, Ms. Washkuhn?

16   A.   Yes.

17   Q.   Now, what's reflected on page 9?

18   A.   That is the income statement for DMP International for

19   2014.

20   Q.   And does Page 9 reflect the net income for

21   DMP International in the year 2014?

22   A.   Yes.

23   Q.   What is it?

24   A.   $3,481,993.

25   Q.   In 2014, do you know if DMP International kept its books

1    on a cash or accrual basis?

2    A.    Cash.

3    Q.    And what does it mean to keep your books on a cash basis?

4    A.    It means activity is recorded as cash comes in or out.  So

5    it's recorded in the -- in a ledger when cash is received or

6    spent.

7    Q.    And is an accrual basis, is that different from a cash

8    basis?

9    A.    Yes.

10   Q.    What does it mean to keep your books on an accrual basis?

11   A.    Accrual basis would be maybe you had earned income, but

12   not received it yet or you're accruing different expenses.

13   It's just a different method of keeping your books.

14   Q.    Is it possible to commingle cash and accrual basis in one

15   general ledger?

16   A.    No, not that I'm aware of.

17            THE COURT:  He asked you if it was possible.

18            THE WITNESS:  I don't believe so, no.

19            THE COURT:  Virtually anything is possible.

20            (Laughter.)

21            THE WITNESS:  That's true.

22            THE COURT:  Now, what did you mean when you said no?

23            THE WITNESS:  I'm not aware of any way that you can

24   do it.

25            THE COURT:  Brute force and awkwardness?  In other

 1   words, in ignorance?  It can be done.  What you're saying is

 2   it's inappropriate to do.

 3              THE WITNESS:  That's true.

 4              THE COURT:  Next question.

 5   BY MR. ANDRES:

 6   Q.   Can I ask that you turn to Government Exhibit 125A?

 7              Can you tell me what's included in Government

 8   Exhibit 125A?

 9   A.   This is the general ledger for DMP International for 2015.

10              MR. ANDRES:  The Government moves to admit Government

11   Exhibit 125A.

12              MR. ZEHNLE:  No objection.

13              THE COURT:  It's admitted.

14              (Government Exhibit No. 125A was received in

15   evidence.)

16              THE COURT:  Next question.

17              MR. ANDRES:  May I publish, Judge?

18              THE COURT:  Yes.

19   BY MR. ANDRES:

20   Q.   Can you turn to Page 20?

21   A.   Okay.

22   Q.   With respect to the code 1337-002, can you tell me what's

23   reflected there?

24   A.   That is a loan code for Peranova Holdings Limited.

25   Q.   And did something happen with respect to that loan?

Washkuhn - Direct                                                      569

1   A.    Yes, it was reclassified as income on 12/31/15.

2   Q.    And what does the note indicate as to who you spoke to

3   about that?

4   A.    The note says, "Per Rick Gates, loan to Peranova Holdings

5   to be forgiven and treated as income in 2015."

6   Q.    And what does it mean to have a loan forgiven?

7   A.    Just reclassified on our books.

8   Q.    Does it mean it was paid back?

9   A.    No.

10  Q.    Did you ever see any documentation as to the loan

11  forgiveness for Peranova?

12  A.    I did not.

13  Q.    Okay.  And beneath that, there's a reference to Telmar

14  Investments Ltd.  Can you tell me what that is?

15  A.    Yes.  That's also a loan code for Telmar Investments

16  referencing two $500,000 loans.

17  Q.    Can you turn to Page 34?

18         There's a reference there to other income.  Can you

19  explain what that means?

20  A.    The reference is other income to Peranova Holdings Limited

21  for 1.5 million.

22  Q.    Okay.  Does that relate to the prior entry with respect to

23  the loan?

24  A.    Yes, that's the other side of the same entry.

25  Q.    And so can you explain what's happened now from it turning

1  from a due to affiliates to income?

2  A.   You're wiping out the loan or zeroing it out and then

3  you're crediting your income.  So you're realizing it as

4  income.

5  Q.   So in this year, in 2015, would the -- would this income

6  be reported to Mr. Manafort's tax preparers?

7  A.   Yes.

8  Q.   Can you turn to Page 106?

9         What's reflected on Page 106 on the bottom?

10  A.   That is salaries for Mr. Gates.

11  Q.   Can you turn to Page 113?

12         Do you see the reference to operating expenses,

13  foreign taxes?

14  A.   Yes.

15  Q.   What is that a reference to?

16  A.   That's a reference to wires made to Davis Manafort for

17  foreign taxes.

18  Q.   Is there any reference here for foreign taxes in the

19  Cyprus?

20  A.   No.

21  Q.   Can you turn to Government Exhibit 125B?

22         Can you tell me what's reflected in Government

23  Exhibit 125B?

24  A.   This is a financial statement for DMP International for

25  2015.

1    Q.   And is this a document you would have created?

2    A.   Yes.

3    Q.   Where is it generated from?

4    A.   From our accounting software.

5         MR. ANDRES:  The Government moves to admit Government

6    Exhibit 125B.

7         MR. ZEHNLE:  No objection.

8         THE COURT:  All right.  125B is admitted.

9         (Government Exhibit No. 125B was received in

10   evidence.)

11        THE COURT:  Next question.

12        MR. ANDRES:  May I publish it?

13        THE COURT:  Yes, you may.

14   BY MR. ANDRES:

15   Q.   Can you turn to Page 9, Ms. Washkuhn?

16   A.   Okay.

17   Q.   Can you tell the jury what's reflected on Page 9?

18   A.   This is the income statement for DMP International for

19   2015.

20   Q.   And as of what month in 2015?

21   A.   For the entire year as of December 31, 2015.

22   Q.   And what was the net income for DMP International as to

23   year-end 2015?

24   A.   $388,542.

25   Q.   And in 2015, did DMP International keep its books on a

1   cash or an accrual basis?

2   A.   Cash.

3   Q.   Can I ask you to turn to Government Exhibit 126A?

4   A.   Yes.

5   Q.   Do you recognize Government Exhibit 126A?

6   A.   Yes.

7   Q.   Can you tell me what's reflected in that document?

8   A.   The DMP International LLC ledger from 2016.

9            MR. ANDRES:   The Government moves to admit 126A.

10           MR. ZEHNLE:   No objection.

11           THE COURT:   It's admitted.

12           (Government Exhibit No. 126A was received in

13  evidence.)

14           THE COURT:   Next question.

15  BY MR. ANDRES:

16  Q.   Can you turn to Page 13?

17           There's a code 1337-003.  Can you explain that entry

18  to the jury?

19  A.   That's a liability code to Telmar Investments with a

20  balance of 1.9 million.

21  Q.   Is that a loan?

22  A.   Yes.

23  Q.   And how much is the loan for?

24  A.   The balance is 1.9 million.

25  Q.   Can I ask that you turn to Government Exhibit 126B?

Washkuhn - Direct                                                    573

1              What is Government Exhibit 126B?

2   A.   That is an income statement for DMP International LLC for

3   the seven months ending July 31, 2016.

4   Q.   What's the net income for Davis -- DMP International as of

5   July 31, 2016 --

6              MR. ANDRES:  Judge, I'm sorry, can I publish this

7   document?

8              THE COURT:  I beg your pardon?

9              MR. ANDRES:  May I publish it?

10             THE COURT:  Yes, you've -- I've admitted it.

11             MR. ANDRES:  Actually, I have to ask -- I need to ask

12  to admit it and then ask to publish it.

13             THE COURT:  All right.  Then do that.

14             MR. ANDRES:  May I admit Government Exhibit 126B?

15             THE COURT:  Yes.  There's no objection?

16             MR. ZEHNLE:  No objection, Your Honor.

17             THE COURT:  It's admitted.

18             (Government Exhibit No. 126B was received in

19  evidence.)

20             THE COURT:  You may now publish.

21             MR. ANDRES:  Thank you, Judge.

22  BY MR. ANDRES:

23  Q.   With respect to the July 31, 2016 statement of revenue and

24  expenses, what is the net income for that period?

25  A.   It shows a loss of $638,048.

1   Q.    And the number you're referring to is in parentheses.

2   What does that mean?

3   A.    That means it's a loss versus a positive income.

4   Q.    Can I ask that you look at Government Exhibit 126C?

5         What is Government Exhibit 126C?

6   A.    That's a financial statement for DMP International as of

7   November 30, 2016.

8         MR. ANDRES:  Your Honor, the Government moves to

9   admit 126C.

10        MR. ZEHNLE:  No objection.

11        THE COURT:  All right.  It's admitted.

12        (Government Exhibit No. 126C was received in

13  evidence.)

14  BY MR. ANDRES:

15  Q.    With respect to Government Exhibit 126C, is the net income

16  for November 2016 reflected in this document?

17  A.    It would be on the income statement.

18  Q.    It's on Page 9.

19  A.    Okay.  Yes, it's a loss of $1,116,497.

20        MR. ANDRES:  May I publish this, Your Honor?

21        THE COURT:  Yes.

22  BY MR. ANDRES:

23  Q.    Again, the number that you're referring to is on the

24  right-hand side?

25  A.    Yes.

1   Q.   And that's also in parentheses?

2   A.   Yes.

3   Q.   And what does that mean?

4   A.   That means that it's a loss versus a net income.

5   Q.   And what's the net loss for Davis -- DMP International as

6   of November 2016?

7   A.   The net loss is $1,116,497.

8   Q.   Can you turn to Government Exhibit 126D?

9        Can you tell me what that is?

10  A.   Financial statements for DMP International as of

11  December 31, 2016.

12            MR. ANDRES:  The Government moves to admit 126D.

13            THE COURT:  Are you saying B, as in "boy"?

14            MR. ANDRES:  I just said D, as in "dog."

15            THE COURT:  All right.

16            MR. ZEHNLE:  No objection.

17            THE COURT:  Without any objection?  All right.

18  It's -- without objection, it's admitted.

19            (Government Exhibit No. 126D was received in

20  evidence.)

21            THE COURT:  Proceed.

22            MR. ANDRES:  May I publish, Your Honor?

23            THE COURT:  Again, not the whole thing, right?

24            MR. ANDRES:  Just one page.

25            THE COURT:  All right.  Do so.

Washkuhn - Direct                                                          576

1   BY MR. ANDRES:

2   Q.   Please turn to Page 9, Ms. Washkuhn.

3   A.   Okay.

4   Q.   Can you tell me what's reflected in Page 9?

5   A.   The income statement for DMP International for the

6   12 months ending December 31, 2016.

7   Q.   And what was the net income or loss of -- for that time

8   period?

9   A.   The net loss of $1,193,325.

10           THE COURT:  Is this -- are you looking at 126D, as in

11   "David" or "Douglas"?

12           THE WITNESS:  I am, on page --

13           THE COURT:  At the bottom of the page, do you see at

14   the bottom?  What does it say?

15           THE WITNESS:  It says -- on the first page?  126D?

16           THE COURT:  On any of the pages.

17           THE WITNESS:  Oh, it says, "FOR DISCUSSION PURPOSES

18   ONLY, SUBJECT TO FINAL REVIEW - D R A F T."

19           THE COURT:  Right.  What does that mean?

20           THE WITNESS:  That's our disclaimer that goes on all

21   financial statements.

22           THE COURT:  Well, what does "draft" mean?

23           THE WITNESS:  It means it could change.  So after it

24   goes to the CPA, sometimes they make adjusting journal entries

25   and change it.

1              THE COURT:  Next question.

2    BY MR. ANDRES:

3    Q.   Ms. Washkuhn, if DMP pays personal expenses, how do you

4    treat that?

5    A.   We would treat that as a distribution to Mr. Manafort.

6    Q.   Is that income?

7    A.   No.

8    Q.   If -- if income came into accounts that you didn't have

9    access to, would that affect your general ledger?

10   A.   Yes.

11   Q.   If Mr. Manafort was paying personal expenses from his

12   business accounts, how would that be treated?

13   A.   That would be recorded as a distribution to Mr. Manafort.

14   Q.   And if business income was paid into Mr. Manafort's

15   personal accounts, how would that be categorized?

16   A.   That would be categorized as a distribution from DMP

17   International.

18   Q.   Okay.  You testified earlier that you would provide --

19              THE COURT:  When you say that would be characterized,

20   that's how you -- you or your company would characterize it?

21              THE WITNESS:  Yes.  That's how we would categorize it

22   in the ledger.

23              THE COURT:  For bookkeeping reasons?

24              THE WITNESS:  Yes.

25              THE COURT:  Next question.

1   BY MR. ANDRES:

2   Q.   You testified that as part of your responsibilities, you

3   were involved with Mr. Manafort's tax preparers; is that

4   correct?

5   A.   Yes.

6   Q.   And what specifically would you do?

7   A.   We would provide them copies of the ledger for the entire

8   year along with financial statements and trial balances.

9   Q.   Okay.  Can I ask you to turn to Government Exhibit 128?

10  Can you tell me what that is?

11  A.   That's an e-mail chain from myself to Conor O'Brien at

12  KWC.

13          MR. ANDRES:  Your Honor, the Government moves to

14  admit Government Exhibit 128.

15          MR. ZEHNLE:  May I have a moment, Your Honor?

16          THE COURT:  Yes, you may.

17          MR. ZEHNLE:  No objection.

18          THE COURT:  All right.  It's admitted.

19          (Government Exhibit No. 128 was received in

20  evidence.)

21          MR. ANDRES:  May I publish, Your Honor?

22          THE COURT:  Yes.  While you're doing it, let me ask a

23  question.

24          When you have answered questions saying would that be

25  characterized as income or not as income, do you recall those

1   questions?

2           THE WITNESS:  Yes.

3           THE COURT:  That's an opinion, isn't it?

4           THE WITNESS:  Yes.

5           THE COURT:  It's your opinion.

6           THE WITNESS:  Yes.

7           THE COURT:  So a tax preparer could reach a different

8   conclusion?

9           THE WITNESS:  That's correct.

10          THE COURT:  Next question.

11  BY MR. ANDRES:

12  Q.   With respect to the e-mail in Government Exhibit 128, can

13  you tell me at the top of the e-mail what the date of the

14  e-mail is?

15  A.   February 24, 2015.

16  Q.   And who's the author?

17  A.   I am.

18  Q.   And who is the e-mail written to?

19  A.   To Conor O'Brien.

20  Q.   Who is Conor O'Brien?

21  A.   Conor works at the CPA firm that handled Mr. Manafort's

22  taxes, KWC.

23  Q.   And who's cc'd on the e-mail?

24  A.   Philip Ayliff from KWC and Lauren Tanner from my office.

25  Q.   And what's the subject?

1    A.    It's regarding DMP International.

2    Q.    And are there attachments to the e-mail?

3    A.    Yes.

4    Q.    Can you read the e-mail?

5    A.    "Philip and Conor, Please find attached the 12/31/14

6    financial statements, trial balance, and general ledger.

7    Please review and let us know if you have questions."

8    Q.    Why are you forwarding the financial statements, trial

9    balance, and general ledger to Mr. Manafort's tax preparers?

10   A.    So that they can prepare the tax returns.

11   Q.    And is that a practice that you would follow every year?

12   A.    Yes.

13   Q.    Is it something you did in 2011?

14   A.    Every year.

15   Q.    Okay.  Ms. Washkuhn, you testified about various losses to

16   DMP in 2016.  Did there come a time when Mr. Manafort had

17   trouble paying his bills?

18   A.    Yes.

19   Q.    How did you know that?

20   A.    I knew that I had asked multiple times for bills to be

21   paid and there wasn't enough funds to pay them.

22   Q.    Okay.  Did that include bills -- your own bills for your

23   own work?

24   A.    Yes.

25   Q.    Can I ask you to turn to Government Exhibit 133?

Washkuhn - Direct                                                        581

1              Can you tell me what Government Exhibit 133 is?

2    A.   It's an e-mail chain between myself and Mr. Manafort,

3    giving him a list of bills that need to be approved and asking

4    for funding.

5    Q.   Okay.  And with respect to the top e-mail, what's the date

6    of the top e-mail?

7    A.   January 6, 2016.

8              MR. ANDRES:  The Government moves to admit

9    Exhibit 133.

10             MR. ZEHNLE:  No objection.

11             THE COURT:  Admitted.

12             (Government Exhibit No. 133 was received in

13   evidence.)

14             MR. ANDRES:  May I publish, Your Honor?

15             THE COURT:  Yes, you may.

16   BY MR. ANDRES:

17   Q.   Ms. Washkuhn, if you could turn to the back page, actually

18   the fifth page of the e-mail, about a third of the way down,

19   there's an e-mail at 4:52 p.m.

20             Do you see that?

21   A.   Yes.

22   Q.   Who is that -- who's the author of that e-mail?

23   A.   I am.

24   Q.   And who did you write it to?

25   A.   To Mr. Manafort.

1    Q.    And what's the subject?

2    A.    "Bills Through 1/15/16."

3    Q.    And can you read the e-mail?

4    A.    "Paul, Please find attached a list by entity of all open

5    bills due through 1/15/16.  Please go through the list and let

6    me know which ones are approved for payment and also arrange

7    funding."

8    Q.    What are you doing in this e-mail?

9    A.    I'm asking for his approval to pay this list of bills, and

10   I'm asking him to provide money to cover all of them.

11   Q.    Okay.  If you -- if you turn two pages to page 7, there's

12   a list.  Can you explain what that list is?

13   A.    That's an itemized list of all the bills that are due

14   through the 15th of January of that year --

15   Q.    Okay.  I'd like to --

16   A.    -- and they're -- sorry.

17          MR. ANDRES:  Mr. Binder, if I could focus on the

18   top --

19          THE COURT:  Have you finished your answer?

20          THE WITNESS:  No.

21          THE COURT:  Finish your answer.

22          THE WITNESS:  And they're separated by entity.

23   BY MR. ANDRES:

24   Q.    And with respect to the top list, what do those relate to?

25   A.    Those are Mr. and Mrs. Manafort's personal bills.

Washkuhn - Direct                                                         583

1   Q.   Okay.  There's a reference to Big Pictures Solution, what

2   is that?

3   A.   It was a bill due for $8,099.44.

4   Q.   And that's a personal bill?

5   A.   Yes.

6   Q.   This list of bills, how often would you send that to

7   Mr. Manafort?

8   A.   Usually about twice a month.

9   Q.   Okay.  And if I could ask you to turn back to the e-mail

10  on December 29, 4:52, did you include Mr. Gates on this e-mail?

11  A.   No, I did not.

12  Q.   Why not?

13  A.   I didn't deal with Mr. Gates on personal affairs.

14  Q.   If you turn one page forward, there's an e-mail on

15  January 4, 2016, at 8:43 a.m.

16          Do you see that?

17  A.   Yes.

18  Q.   And when you write these e-mails, what time zone are you

19  in?

20  A.   Pacific.

21  Q.   Okay.  Who is the author of the e-mail on January 4, 2016?

22  A.   I am.

23  Q.   And who did you write it to?

24  A.   To Mr. Manafort.

25  Q.   And can you read the e-mail?

1  A.   "Paul, Please advise which bills are ok to pay and the

2  status of funding."

3  Q.   Okay.  And are you writing that because you haven't heard

4  back from Mr. Manafort?

5  A.   Correct.

6  Q.   Can you turn to the next page, 9:40 a.m.?

7       Do you see an e-mail at that time?

8  A.   Yes.

9  Q.   And who's the author of that e-mail?

10 A.   I am.

11 Q.   And who did you write it to?

12 A.   To Mr. Manafort.

13 Q.   Can you read that e-mail?

14 A.   "As a reminder, the NYC property tax payments are due

15 today before accruing penalties."

16 Q.   What are you trying to communicate to Mr. Manafort?

17      THE COURT:  Other than the plain words?  Let's move

18 on.

19      (Laughter.)

20      MR. ANDRES:  The top e-mail --

21      THE COURT:  That's merely a device to repeat what's

22 there, and we don't need to do that.

23      MR. ANDRES:  Thanks, Judge.

24 BY MR. ANDRES:

25 Q.   There's an e-mail at 12:23 p.m.  Do you see that?

1    A.    Yes.

2    Q.    You use the word "urgently needed."  What does that

3    reference?

4    A.    I must not have heard back, so I'm responding to the same

5    e-mail chain, saying that I need to pay these bills that are

6    due.

7    Q.    Can you turn to the first page, the top e-mail?  On any of

8    the e-mails in Government Exhibit 133, is Mr. Gates included?

9    A.    No.

10   Q.    Can I ask you to turn to Government Exhibit 135?

11         Can you -- can you tell me what Government 135 is?

12   A.    That's an e-mail between myself and Mr. Gates.

13   Q.    And what's the -- what's the date of the bottom e-mail?

14   A.    The bottom e-mail is dated January 29, 2016.

15         MR. ANDRES:  The Government moves to admit Government

16   Exhibit 135.

17         MR. ZEHNLE:  May I have a moment, Your Honor?

18         THE COURT:  Yes, you may.

19         MR. ZEHNLE:  Thank you.

20         Your Honor, I'd like to at least continue our

21   objection that we made prior to this afternoon's session.

22         THE COURT:  Is that the hearsay within hearsay?

23         MR. ZEHNLE:  Yes, it is, Your Honor.

24         THE COURT:  That would be remedied, would it not, if

25   the Government satisfies its burden under 801(d)(2)(E)?

1           MR. ZEHNLE:  It is, Your Honor.  I just wanted to

2    make it for the record.

3           THE COURT:  All right.  You've preserved that, but

4    I've admitted it anyway because it's a stipulation under

5    803(6), which I think covers the whole thing.

6           All right.  Proceed.

7    BY MR. ANDRES:

8    Q.   Ms. Washkuhn, with respect to the bottom e-mail, can you

9    summarize that for the jury?

10   A.   Rick is asking myself and Nadine, who works at UBS, to

11   draw on a line of credit.

12   Q.   Whose line of credit?

13   A.   Mr. Manafort's.

14   Q.   And who's Nadine?

15   A.   Nadine Azzam works at UBS.

16   Q.   Okay.  And do you respond at 11:36?

17   A.   Yes.

18   Q.   And what's your response?

19   A.   In summary, it's that there's nothing available on the

20   line to draw.

21   Q.   And what is the -- what are the -- what's the line of

22   credit that you're referring to?

23   A.   There was a line of credit at UBS, which is called an SBL

24   or a securities-backed line, so it's essentially a loan against

25   your securities portfolio.

1  Q.   And at the time of the e-mail, what was the status of the

2  line of credit?

3  A.   It was fully drawn, so there was zero available.

4  Q.   And whose line of credit was it?

5  A.   Mr. Manafort's.

6  Q.   Can I ask you to turn to Government Exhibit 147?

7           Can you tell me what's included in Government

8  Exhibit 147?

9  A.   It's an e-mail chain between myself, Mr. Manafort, and

10 Mr. Gates about bills pending for DMP International.

11 Q.   Okay.  Can you turn to the third page --

12          MR. ANDRES:  Your Honor, the Government moves to

13 admit 147.

14          MR. ZEHNLE:  No objection.

15          THE COURT:  I beg your pardon?

16          MR. ZEHNLE:  I'm sorry, no objection, Your Honor.

17          THE COURT:  Thank you.  Admitted.

18          (Government Exhibit No. 147 was received in

19 evidence.)

20          THE COURT:  Next question.

21          MR. ANDRES:  May I publish it?

22          THE COURT:  Yes.

23 BY MR. ANDRES:

24 Q.   If you could turn to the third page, can you tell me

25 what's included in the third page?

1    A.    The third page is a notice from Kelly Insurance that they

2    have not received a premium and that coverage will be canceled

3    if they don't.

4    Q.    I'm sorry, I think it's one page before that?

5    A.    I'm sorry.  Okay.  That's a list of open invoices for DMP

6    International.

7    Q.    Okay.  Why are you sending that to Mr. Manafort?

8    A.    So that he can approve them.

9    Q.    Okay.  And was that your regular practice?

10   A.    Yes.

11   Q.    Can you look on the first page?  There's an e-mail at 3:11

12   p.m.

13         Do you see that?

14   A.    Yes.

15   Q.    Who wrote that e-mail?

16   A.    I did.

17   Q.    And who did you write it to?

18   A.    To Mr. Manafort.

19   Q.    And did you copy someone?

20   A.    Rick Gates.

21   Q.    Can you summarize that e-mail for the jury?

22   A.    I'm asking for funding for DMP so that we can pay bills,

23   and then I'm also asking him to pay our bill.

24   Q.    When you say your bills, that's for Nigro Karlin?

25   A.    Yes.

1    Q.    During this time period, was Mr. Manafort paying his bills

2    to Nigro Karlin?

3    A.    He was behind on those.

4    Q.    Okay.  And was that a reoccurring issue?

5    A.    It happened a couple times, yes.

6    Q.    With respect to the top e-mail at --

7              THE COURT:  He asked you whether it was a re -- what

8    did -- what was your question?

9              MR. ANDRES:  I asked if that was a reoccurring issue.

10             THE WITNESS:  Yes.

11             THE COURT:  What was your answer?

12             THE WITNESS:  Yes.  That happened a couple of times.

13             THE COURT:  All right.  Next question.

14   BY MR. ANDRES:

15   Q.    With respect to the top e-mail, can you summarize that

16   e-mail to the jury?

17   A.    That's me asking for the same thing, just more urgently,

18   that we need to pay the items attached, mainly the medical

19   insurance, otherwise the medical policy would have been

20   canceled.

21   Q.    Let me direct your attention to late 2015 and early 2016.

22             Did you become aware that Mr. Manafort started

23   applying for bank loans?

24   A.    Yes.

25   Q.    How did you know that?

1    A.    Mr. Manafort would send an e-mail if he needed assistance

2    with applying for a bank loan.

3    Q.    Okay.  And did you assist him in that process in some

4    regard?

5    A.    Yes.  We would gather documents.

6    Q.    What types of documents?

7    A.    Bank statements, brokerage statements, financial

8    statements.

9    Q.    Can I ask that you look at Government Exhibit 127?

10          Can you tell me what's included as Government

11   Exhibit 127?

12   A.    This is an e-mail chain regarding MC Soho.

13   Q.    Okay.  Are you included in the e-mail chain?

14   A.    Yes, I am.

15   Q.    What's the date of the e-mail chain?

16   A.    February 5, 2015.

17          MR. ANDRES:  The Government moves to admit 127.

18          THE COURT:  127?

19          MR. ANDRES:  Yes.

20          MR. ZEHNLE:  No objection.

21          THE COURT:  They're admitted -- or it's admitted.

22          (Government Exhibit No. 127 was received in

23   evidence.)

24          MR. ANDRES:  May I publish it?

25          THE COURT:  Yes, you may.

1          Just a moment.  There's a gentleman and lady in the

2    back.  If there isn't room, there's another courtroom where

3    this is piped to.  On the other hand, if you can't find a seat

4    here, otherwise, perhaps people will move to give you a seat.

5          A WOMAN:  Thank you.

6          THE COURT:  All right.  Mr. Andres, you may proceed.

7          MR. ANDRES:  Thank you.

8    BY MR. ANDRES:

9    Q.   Ms. Washkuhn, can you take a look at this e-mail?  It's

10   several pages.  With respect to the e-mail, the subject line

11   says "MC Soho."

12          Do you know what MC Soho was?

13   A.   Yes.

14   Q.   What was it?

15   A.   It's an LLC that owned a condominium in New York City on

16   Howard Street.

17   Q.   Okay.  And did it -- did it own a particular property?

18   A.   Yes.

19   Q.   What property?

20   A.   A condo in New York City on Howard Street.

21   Q.   And do you know who the members or who was associated with

22   MC Soho?

23   A.   I believe it was Mr. and Mrs. Manafort and their daughter,

24   Jessica.

25   Q.   Okay.  If you -- if you turn to the second page, there's

1    an e-mail at 11:12 a.m.  Do you see that?

2    A.   Yes.

3    Q.   Who did you write that e-mail to?

4    A.   To Mr. Manafort.

5    Q.   Can you summarize that e-mail for the jury?

6    A.   I'm sending him the monthly activity for January 2015 for

7    MC Soho, showing the income and expenses for the property.

8    Q.   And when you say "monthly activity," what does that mean?

9    A.   All of the income and expenses that happened in January

10   2015.

11   Q.   In January 2015, was there -- what -- what was the basis

12   for the income for MC Soho?

13   A.   It was rental income from Airbnb.

14   Q.   If you'd look at the e-mail before that -- I'm sorry --

15   the top e-mail, can you tell me what the date -- the date and

16   time in the top e-mail is?

17   A.   On the first page?

18   Q.   Yes.

19   A.   On February 5, 2015, at 7:38 a.m.

20   Q.   And who's that -- who's the author of that e-mail?

21   A.   Mr. Manafort.

22   Q.   And who is it sent to?

23   A.   To Jeff Yohai.

24   Q.   Who's Jeff Yohai?

25   A.   He was married to Mr. Manafort's daughter, Jessica.

1   Q.    Okay.  Are you also cc'd on the e-mail?

2   A.    Yes.

3   Q.    And how about Phil Ayliff?

4   A.    Yes.

5   Q.    Who is that?

6   A.    Ayliff was -- worked for KWC, the CPA firm.

7   Q.    With respect to the first sentence of the e-mail -- first

8   of all, who does Mr. Manafort write the e-mail to?

9   A.    To Jeff Yohai.

10  Q.    And what does it say in the first paragraph that starts

11  as "As we enter"?

12  A.    "As we enter the second month of the Howard Street rental,

13  I think we need to clarify the framework and finalize the

14  structure in a way that reflects our deal and our accounting

15  and tax needs."

16  Q.    And what did you understand that to relate to?

17  A.    Laying out the framework for how we were to handle the

18  monthly income and expenses now that the condo was being rented

19  out.

20  Q.    Can I ask you to turn to Government Exhibit 131?

21        Can you tell me what that is?

22  A.    That's an e-mail chain between myself and Mr. Yohai.

23        MR. ANDRES:  The Government moves to admit Government

24  Exhibit 131.

25        MR. ZEHNLE:  No objection.

1          THE COURT:  All right.  It's admitted.

2          (Government Exhibit No. 131 was received in

3    evidence.)

4          THE COURT:  You may publish a page or so.  Is this

5    131, did you say?

6          MR. ANDRES:  Yes, Judge.

7          THE COURT:  All right.  Proceed.

8    BY MR. ANDRES:

9    Q.   Can I ask you to turn to the e-mail at 11:37 p.m.?

10   A.   Okay.

11   Q.   Who did you write that -- did you write that e-mail?

12   A.   Yes.

13   Q.   Who did you write it to?

14   A.   To Jeff Yohai.

15   Q.   And what are you asking him in that e-mail?

16   A.   I'm asking him if there's a tenant at the Howard Street

17   property and what he projects the rent will be.

18   Q.   And why do you need to know that?

19   A.   Because we have expenses to cover, so I'd want to know

20   what kind of money we have coming in.

21   Q.   And did he reply?

22   A.   Yes, he did.

23   Q.   Can you summarize his reply?

24   A.   He said, there's not a tenant, but they had reservations

25   coming up for December and into January.

1   Q.   And that would have been January of what year?

2   A.   2016.

3   Q.   And when you say "reservations," what did you understand

4   that to mean?

5   A.   Through Airbnb.

6   Q.   Okay.  Can I ask that you turn to Government Exhibit 149A?

7        What's included in Government Exhibit 149A?

8   A.   This is the general ledger for MC Soho Holdings for 2015.

9        MR. ANDRES:  The Government moves to admit Government

10  Exhibit 149A.

11       MR. ZEHNLE:  One moment, Your Honor?

12       THE COURT:  Yes.

13       MR. ZEHNLE:  Thank you.

14       No objection.

15       THE COURT:  All right.  149A is admitted.

16       (Government Exhibit No. 149A was received in

17  evidence.)

18       MR. ANDRES:  May I publish one page?

19       THE COURT:  Yes, you may.

20  BY MR. ANDRES:

21  Q.   Ms. Washkuhn, can I ask you to turn to Page 9?

22  A.   Okay.

23  Q.   On the top of Page 9, can you tell me what's reflected in

24  the top entry on Page 9?

25  A.   That shows the total rental income for the Howard Street

Washkuhn - Direct                                                    596

1    condo for 2015.

2    Q.   And what was the total rental income for the Howard Street

3    property in 2015?

4    A.   $115,987.

5    Q.   Can I ask that you turn to Government Exhibit 136?

6    A.   Okay.

7    Q.   Can you tell me what's included in Government Exhibit 136?

8    A.   This is an e-mail chain and insurance documents regarding

9    the property at 377 Union Street.

10   Q.   Do you know where the property at 377 Union Street was

11   located?

12   A.   Yes.

13   Q.   Where?

14   A.   Brooklyn, New York.

15   Q.   I'm sorry?

16   A.   Brooklyn, New York.

17   Q.   And do you know what type of structure that was?

18   A.   I don't.

19   Q.   Okay.  And as part of your responsibilities for

20   Mr. Manafort, did you pay bills for that property?

21   A.   Yes.

22   Q.   Was there an entity that owned that property?

23   A.   Yes.

24   Q.   What was it called?

25   A.   MC Brooklyn.

1    Q.   With respect to the top e-mail, can you tell us who that

2    e-mail is from?

3    A.   It's from Donna Duggan at Moody Insurance.

4    Q.   Do you know Donna Duggan?

5    A.   Yes.

6    Q.   Have you dealt with her before?

7    A.   Yes.

8    Q.   What did you understand Donna Duggan's job to be?

9    A.   We went to Duggan -- Donna with any insurance questions.

10   So I understood that she worked for the insurance agent.

11   Q.   Okay.  And when you say "she worked for the insurance

12   agent," who was her client?

13   A.   Her client would be Mr. Manafort.

14   Q.   Okay.  And the top e-mail, can you tell me what the date

15   and time of that e-mail is?

16   A.   February 22, 2016, at 12:59 p.m.

17   Q.   And what is the subject of that?

18   A.   "Evidence of Insurance; Declarations Page; Invoice

19   attached - 377 Union Street."

20   Q.   And what did you understand Ms. Duggan to be saying in the

21   top e-mail?

22   A.   To be saying that the annual premium for that property was

23   paid.

24   Q.   And is there something attached to this e-mail?

25   A.   Yes.

1    Q.    What's attached?

2    A.    There's an evidence of property insurance.

3    Q.    And how about after that?

4    A.    And then actual pages from the Chubb policy and a Moody

5    invoice, invoice for the premium.

6              MR. ANDRES:  The Government moves to admit Government

7    Exhibit 136.

8              MR. ZEHNLE:  No objection.

9              THE COURT:  All right.  Exhibit 136 is admitted.

10   Proceed.

11             (Government Exhibit No. 136 was received in

12   evidence.)

13             MR. ANDRES:  May I publish one page?

14             THE COURT:  Yes, you may.

15   BY MR. ANDRES:

16   Q.    Can I ask you to look at the third page?  It's the Bates

17   No. 3471.

18   A.    Okay.

19   Q.    Can you tell me what that document is?

20   A.    That is a declaration page from the insurance policy.

21   Q.    Okay.  Can I focus on the top half of that document?

22             What is the name and address of the insured?

23   A.    MC Brooklyn Holdings, care of our company, P.O. Box 54086,

24   Irvine, California 92619.

25   Q.    And is there an effective date of that policy?

1   A.   February 1, 2016.

2   Q.   Okay.  If you look at the bottom half of that page, can

3   you explain what's referenced in the bottom half?

4   A.   It's showing a mortgage on the property of Genesis

5   Capital.

6   Q.   Do you know if Mr. Manafort had a loan from Genesis

7   Capital?

8   A.   Yes.

9   Q.   Okay.  And based on this document, is it your

10  understanding that there was a mortgage on the property at 377

11  Union Street?

12  A.   Yes.

13  Q.   Okay.  And that was true as of the date of the e-mail on

14  February 22, 2016?

15  A.   Yes.

16  Q.   Can I ask you to turn to Government Exhibit 137?

17       Can you tell me what Government Exhibit 137 is?

18  A.   That's an e-mail from Mr. Gates to Melinda Francis.

19  Q.   Okay.  And what's the date of that e-mail?

20  A.   February 24, 2016.

21  Q.   Two days after the e-mail on Government Exhibit 135 --

22  136?

23  A.   Yes.

24       MR. ANDRES:  Your Honor, the Government moves to

25  admit Government Exhibit 137.

Washkuhn - Direct                                                    600

1          MR. ZEHNLE:  No objection.

2          THE COURT:  It's admitted, 137.

3          (Government Exhibit No. 137 was received in

4     evidence.)

5          THE COURT:  Next question.

6          MR. ANDRES:  May I publish one page?

7          THE COURT:  Yes, you may.

8     BY MR. ANDRES:

9     Q.   With respect to the e-mail in 137, Ms. Washkuhn, who wrote

10    that e-mail?

11    A.   Mr. Gates.

12    Q.   And who is it written to?

13    A.   To Melinda Francis.

14    Q.   Who is that?

15    A.   I don't know.

16    Q.   And who's cc'd?

17    A.   Myself and Mr. Manafort.

18    Q.   Okay.  And what is -- can you summarize the e-mail that

19    Mr. Gates wrote to Ms. Francis?

20    A.   He's attaching two insurance policies for Baxter Street

21    and the MC Brooklyn property.

22    Q.   Okay.  And can you turn -- can you turn to the attachment

23    and explain to the jury what's attached?

24    A.   First is the policy for the MC Brooklyn Holdings house at

25    377 Union Street and then the policy for the condo at 123

1    Baxter Street.

2    Q.   Okay.   If I could focus your attention on the document,

3    the second page, 371.

4    A.   Okay.

5    Q.   With respect to the first page, what property does this

6    relate to?

7    A.   377 Union Street.

8    Q.   Okay.  And what's the effective date listed?

9    A.   12/28/15.

10   Q.   And does this document list a mortgage on the property at

11   377 Union Street?

12   A.   No, not that I can see.

13   Q.   Okay.  Based on the document that you saw in Government

14   Exhibit 136, did you know that as of February 24, 2016, there

15   was a mortgage on that property?

16   A.   Yes, based on that e-mail.

17   Q.   And who was that -- who was the lending -- who was the

18   financial institution that extended that mortgage?

19   A.   Genesis Capital.

20   Q.   Okay.  So based on the information from Government Exhibit

21   136, is the information in Government Exhibit 137 accurate as

22   to the mortgage on the Union Street property?

23   A.   No, I don't believe it is.

24   Q.   Can I ask you to turn to Government Exhibit 140?

25             Can you tell me what's included in Government Exhibit

1  140?

2  A.   A series of e-mails between myself and Mr. Gates.

3  Q.   Okay.  And on the top e-mail, what's the date of the top

4  e-mail?

5  A.   March 16, 2016.

6          MR. ANDRES:  The Government moves to admit Government

7  Exhibit 140.

8          MR. ZEHNLE:  No objection.

9          THE COURT:  It's admitted.

10         (Government Exhibit No. 140 was received in

11  evidence.)

12         MR. ANDRES:  May I publish it, Judge?

13         THE COURT:  You may.

14  BY MR. ANDRES:

15  Q.   Ms. Washkuhn, if I could ask you to look at the last

16  e-mail on the second page of Government Exhibit 140.

17         Do you see that?

18  A.   Yes.

19  Q.   At what time is that e-mail sent at?

20  A.   7:18 a.m.

21  Q.   Okay.  And do you know if Mr. Gates -- do you know what

22  part of the country he lives in?

23  A.   The East Coast.

24  Q.   Okay.  And -- and, generally, you worked on the West

25  Coast?

1   A.   Correct.

2   Q.   With respect to the e-mail at 7:18 a.m., can you read that

3   e-mail to the jury?

4   A.   "Can you send me the Word Document version of the 2015 P&L

5   for DMP International before 11:00 a.m. EST?  Paul wants me to

6   add the accrual revenue, which we have not received yet, in

7   order to send to Bank of California.  I have the PDF version

8   you sent, but it is slanted and not completely clear.  Thanks."

9   Q.   When Mr. Gates references a "Word document," what did you

10  understand that to mean?

11  A.   He's looking for a document in the version of Word, the

12  program from Microsoft Office.

13  Q.   It's a word processing application?

14  A.   Yes.

15  Q.   And that allows you to do editing?

16  A.   Yes.

17  Q.   Okay.  And with respect to the P&L documents that are

18  produced at Nigro Karlin, what format are they produced in?

19  A.   They either print out usually in hard copy and we can scan

20  to PDF and attach it.

21  Q.   Are they available in a Word document?

22  A.   No.

23  Q.   Mr. Gates wrote that he wanted a copy of the 2015 P&L.

24  What is that a reference to?

25  A.   The income statement.

1  Q.    And there's a reference to sending that document to the

2  Banc of California.  Do you know why Mr. Manafort or Mr. Gates

3  wanted to send that document to the Banc of California?

4  A.    No.

5  Q.    Can you look at the first page?

6  A.    Yes.

7  Q.    The bottom e-mail?  Did you respond to Mr. Gates?

8  A.    Yes.

9  Q.    Can you read that e-mail?

10 A.    "Hi, Rick.  I can resend the PDF but there is no Word

11 version.  These are generated directly from our accounting

12 software."

13 Q.    Okay.  And does Mr. Gates respond?

14 A.    Yes.

15 Q.    What does he say?

16 A.    "The version I have looks to be scanned and then sent,

17 which is why it's not clear.  If you can send me the original

18 PDF version generated by the system, that would be great and

19 work.  Thanks."

20 Q.    And do you respond to that e-mail at 10:26?

21 A.    Yes.

22 Q.    And can you summarize that e-mail?

23 A.    I'm just telling him we can scan it again and we'll send

24 it again to him in about an hour.

25 Q.    And does Mr. Gates respond to that e-mail?

1   A.    Yes.

2   Q.    And at what time does he respond?

3   A.    7:30 a.m.

4   Q.    And can you read his response?

5   A.    "I am confused.  Why can't you e-mail me the version

6   generated by your system?  Scanning does not work.  Your

7   scanner does not work well.  You should be able to send the

8   electronic version by e-mail.  There should be" -- I believe he

9   means "no need to scan.  Please try and send as close to

10  11:30 a.m. as possible.  Thanks."

11  Q.    Okay.  Were you able to e-mail the P&L's directly from

12  your system?

13  A.    No.

14  Q.    And then --

15              THE COURT:  Do you know whether these times that are

16  listed here are Eastern? Western? Mountain?

17              THE WITNESS:  I believe Mr. Gates' e-mails are

18  Eastern and mine are Pacific.

19              THE COURT:  His are Eastern?

20              THE WITNESS:  Yes.

21              THE COURT:  And yours are Western?

22              THE WITNESS:  Yes.

23              THE COURT:  Pacific time?

24              THE WITNESS:  Yes.

25              THE COURT:  Next question.

1    BY MR. ANDRES:

2    Q.   Mr. Gates says at 7:30 that he doesn't understand why you

3    can't e-mail it to him.  Do you respond to that e-mail?

4    A.   Yes, I do.

5    Q.   Can you read your response at 10:33 a.m.?

6    A.   I say, "The system prints financial statements.  From

7    there, the only way to e-mail them to you is to scan them and

8    e-mail them.  That is our only option unless you want a hard

9    copy in the mail.  Thanks."

10   Q.   And then does Mr. Gates respond to that?

11   A.   Yes.

12   Q.   Does he seem unsatisfied by your answer?

13   A.   Yes.

14   Q.   Can you read his response at 7:47 a.m.?

15   A.   "Poor system.  If it creates electronic documents, it

16   should be able to e-mail them.  Sounds like old technology.  In

17   any case, let's do this.  We have $2.6 million in accrued

18   revenue that he wants added to DMP 2015 income.  Can you make

19   the adjustments on your end and then send me a new scanned

20   version?  Thanks."

21   Q.   Based on that e-mail, do you have an understanding --

22   Mr. Gates says "he -- he wants to add," do you know who

23   the "he" is?

24   A.   I would assume Paul.

25   Q.   Okay.  And there's a reference to 2.6 million in accrued

Washkuhn - Direct                                                    607

1   revenue.  Do you see that?

2   A.   Yes.

3   Q.   In March of 2016, did DMP International -- how did DMP

4   International keep its books?

5   A.   Cash basis.

6   Q.   And as a result of that, would you have been able to add

7   2.6 million in accrued revenue to your financial statement?

8   A.   No.

9   Q.   Why not?

10  A.   Because we keep it on cash basis.

11            THE COURT:  If you added it, put an asterisk or mark

12  and said it was approved, that would be all right, wouldn't it?

13            THE WITNESS:  No.  You need to be consistent

14  throughout the financial statement, either on accrual

15  completely or on cash basis completely.

16            THE COURT:  All right.  Next question.

17  BY MR. ANDRES:

18  Q.   Do you respond at 11:47?

19  A.   Yes, I do.

20  Q.   What did you say?

21  A.   I said, "Can't make that change on my end.  Books are on

22  cash basis, not accrual."

23  Q.   Did Mr. Gates seem satisfied by that response?

24  A.   No.

25  Q.   And how does he respond at -- on -- at 3:56 p.m. -- I'm

Washkuhn - Direct                                                    608

1    sorry -- yeah, does Mr. Gates respond at 3:56?

2    A.    Yes.

3    Q.    What does he say?

4    A.    He says, "What?  So none of your corporate clients have

5    accrued income?  Does not make sense."

6    Q.    Can I ask you to turn to Government Exhibit 138?

7    A.    Okay.

8    Q.    If you look on the -- can you explain to the jury what's

9    included in Government 138?

10   A.    So this is based on the prior e-mail chain, and I'm

11   forwarding it to Lauren in my office and asking her to scan a

12   new set of financials to Mr. Gates.

13   Q.    Okay.  And is this response -- is this related to the

14   e-mail or the request we just saw in the prior e-mail?

15   A.    Yes.

16   Q.    Okay.  And who's Lauren Tanner?

17   A.    Lauren is a supervisor on my team.

18   Q.    Okay.  And if you look at the e-mail at the top, what time

19   is that e-mail at?

20   A.    11:25.

21   Q.    On what day?

22   A.    March 16, 2016.

23   Q.    That's the same day that Mr. Gates is asking you to send a

24   Word version?

25   A.    Yes.

1    Q.    Okay.   And at the top, does Ms. Tanner send an e-mail to

2    Mr. Gates?

3    A.    Yes.

4    Q.    And does she attach something?

5    A.    Yes.

6    Q.    What's attached?

7    A.    The 12/31/15 financial statements.

8              MR. ANDRES:   Your Honor, the Government moves to

9    admit Government Exhibit 138.

10             MR. ZEHNLE:   No objection.

11             THE COURT:   It's admitted.

12             (Government Exhibit No. 138 was received in

13   evidence.)

14             MR. ANDRES:   Can I publish one page?

15             THE COURT:   Yes, you may.

16   BY MR. ANDRES:

17   Q.    With respect to the attachment, Ms. Washkuhn, what's

18   attached?

19   A.    The financial statements for DMP International for 2015.

20   Q.    And can you turn to Page 4 of the financial statement?

21             Tell me what's reflected.

22             Can you highlight that?   I think Page 4.   Oh, sorry,

23   Page 11.   Can you highlight that?

24             THE COURT:   Do you need time?

25             MR. ANDRES:   Just one second, Judge.

1          THE COURT:  All right.

2    BY MR. ANDRES:

3    Q.   Ms. Washkuhn, with respect to the net income for DMP,

4    December 31, 2015, what's reflected on this document?

5    A.   A net income of $400,744.

6    Q.   Okay.  Can you take a look at Government Exhibit 139?

7          THE COURT:  That page that you had didn't show that

8    figure, but the exhibit does.  Let's go on.

9    BY MR. ANDRES:

10   Q.   Okay.  Can I ask you to turn to Government Exhibit 139?

11   A.   Okay.

12   Q.   Can you tell me what's included in Government Exhibit 139?

13   A.   This is part of the same e-mail chain that we just went

14   through on March 16, 2016, between Mr. Gates, myself, and

15   Ms. Tanner.

16   Q.   And who wrote the e-mail at the top?

17   A.   Mr. Gates.

18         MR. ANDRES:  The Government moves to admit Government

19   Exhibit 139.

20         MR. ZEHNLE:  No objection.

21         THE COURT:  It's admitted.

22         (Government Exhibit No. 139 was received in

23   evidence.)

24   BY MR. ANDRES:

25   Q.   What's the date of the e-mail in Government Exhibit 139?

1    A.    March 16, 2016.

2    Q.    Okay.  Is this the same date as the prior e-mails?

3    A.    Yes.

4    Q.    And Mr. Gates writes an e-mail to Lauren Tanner?

5    A.    Yes.

6    Q.    And what does he say?

7    A.    He says, "Lauren, this is not updated per my e-mail with

8    Heather.  The revised 2015 P&L needs to reflect 2.6 million in

9    accrued income.  Please make the changes and resend as soon as

10   possible.  Thank you."

11   Q.    Is that the same request that Mr. Gates made of you?

12   A.    Yes.

13   Q.    Can I ask you to turn to Government Exhibit 298?

14   A.    Okay.

15   Q.    With respect to Government Exhibit 298, are you included

16   on this e-mail?

17   A.    No.

18   Q.    Okay.  Who is this e-mail written by?

19   A.    Mr. Gates.

20   Q.    And who is it written to?

21   A.    Perris Kaufman at Banc of California.

22   Q.    Do you know who Mr. Kaufman is?

23   A.    No, I do not.

24         MR. ANDRES:  Your Honor, the Government moves to

25   admit Government Exhibit 298, subject to connection.

1            MR. ZEHNLE:  Your Honor, may I have a moment?

2            THE COURT:  Yes.

3            How much more do you have?

4            MR. ANDRES:  I'd say roughly a half-hour, Judge.

5            THE COURT:  All right.

6            MR. ZEHNLE:  Your Honor, we would object on the basis

7    that the witness doesn't have personal knowledge of this

8    exhibit.

9            THE COURT:  All right.  Come to the bench.

10            (Bench conference on the record.)

11            THE COURT:  All right, sir, tell me what the exhibit

12    is first of all and then your objection.

13            MR. ZEHNLE:  Your Honor, I'm just looking over the

14    exhibit now.  It's Exhibit 298, and it appears to be an e-mail

15    chain with respect to a number of people, including, it looks

16    like, from Mr. Gates to a person named Perris Kaufman.

17    Mr. Manafort is copied on it, it looks like it might be

18    Mr. Yohai, but there's nothing here that tells me that

19    Ms. Washkuhn was a recipient of this or has any knowledge of

20    this, and I don't believe this exhibit has been admitted into

21    evidence yet.

22            THE COURT:  What's the number?

23            MR. ZEHNLE:  298, Your Honor.

24            THE COURT:  298.

25            All right, sir, what's the Government's view?

1              MR. ANDRES:  Your Honor, the defense has stipulated

2     this is a bank document from the Banc of California relating to

3     a loan.

4              THE COURT:  Which stipulation covers this document?

5              MR. ANDRES:  The one we talked about earlier.  I'll

6     find the number, but it's the one where they stipulate to --

7              THE COURT:  Let me see it.  Tell me just the number.

8     I don't need --

9              MR. ASONYE:  I don't have it offhand, but we can get

10    it, Your Honor.

11             THE COURT:  I have it here.  Just a moment.

12             MR. ASONYE:  It's the financial institution records.

13    Thank you.

14             THE COURT:  Which one?

15             MR. ASONYE:  It should be towards the back.  It's

16    this one, Your Honor, 450.

17             THE COURT:  All right.  Do you agree that that's --

18    this stipulation covers that?  You can take it and look at it.

19             MR. ZEHNLE:  Thank you, Your Honor.

20             THE COURT:  And if you need to consult with one of

21    your partners, he may come up here.

22             MR. ZEHNLE:  Mr. Andres, may I see that again?

23             MR. ANDRES:  Sure.

24             MR. ZEHNLE:  Thank you.

25             Thank you, Your Honor.  I would agree that this

1    stipulation does talk to authenticity in 803(6), but I'm not

2    sure that this witness has any personal knowledge of this

3    document or could add anything to it other than what's, just

4    reading it.

5            THE COURT:  That may be so, but if the stipulation

6    covers it, the stipulation is a stipulation that it is a

7    business record -- you-all have to avoid nodding your heads.

8            MR. ANDRES:  Sorry.

9            THE COURT:  That it's a business record, and as such,

10   of course, that ends any hearsay problem.  Your objection is a

11   little different.  It says, look, what can this witness say

12   about a document that doesn't have her as an addressee or

13   signatory or anything?  And the short answer to that, sir, is

14   we don't know.  We'll have to wait until she's asked a

15   question.

16           Now, in terms of its admissibility, it is admissible

17   because of the stipulation.  Why do you think this witness will

18   have something to say of note on this?

19           MR. ANDRES:  Judge, what's attached to this e-mail is

20   the financial statement that Ms. Washkuhn generates for Davis

21   Manafort, so this is fundamentally her document.  It's been

22   altered, and she's in the unique position to --

23           THE COURT:  Oh, you're going to ask her about how

24   it's been altered?

25           MR. ANDRES:  Correct.

1           THE COURT:  All right.  You don't have any objection

2   to that, do you?

3           MR. ZEHNLE:  No, I guess I don't, Your Honor.

4           THE COURT:  All right.  Let's proceed.

5           MR. ANDRES:  Thank you, Judge.

6           (End of bench conference.)

7           THE COURT:  All right.  Mr. Andres, you may proceed.

8   BY MR. ANDRES:

9   Q.   Ms. Washkuhn, can I ask you to take a look at Government

10  Exhibit 298?

11  A.   Yes.

12  Q.   What's the date of that e-mail?

13  A.   March 16 --

14          THE COURT:  Well, first you need to --

15          MR. ANDRES:  About -- I understand.

16          THE COURT:  All right.  I will admit -- you've

17  already offered it.  I'll admit it.  I overruled the objection.

18  You may proceed.

19          (Government Exhibit No. 298 was received in

20  evidence.)

21          MR. ANDRES:  May I publish it, Your Honor?

22          THE COURT:  Yes, you may.  And I admitted it pursuant

23  to the stipulation.  It's been stipulated.

24          MR. ANDRES:  Can I get the first page of the e-mail?

25  Can you highlight the top there, Mr. Binder?

Washkuhn - Direct                                                    616

BY MR. ANDRES:

1

2  Q.   With respect to the e-mail, can you identify who the

3  author of the e-mail is?

4  A.   Mr. Gates.

5  Q.   And who's cc'd?

6  A.   Mr. Manafort and Jeff Yohai.

7  Q.   And who is it sent to?

8  A.   Perris Kaufman at Banc of California.

9  Q.   Okay.  And what's the date of the e-mail?

10 A.   March 16, 2016.

11 Q.   Is that the same date that Mr. Gates asked you for a Word

12 version of the P&L?

13 A.   Yes.

14 Q.   Okay.  And can you read the e-mail from Mr. Gates?

15 A.   "Perris, please see the 2015 P&L attached.  Thanks."

16 Q.   Okay.  Is there an attachment?

17 A.   It looks like there was an attachment, yes.

18 Q.   And what's attached?

19 A.   Pages from a financial statement.

20 Q.   Okay.  Can I ask you to turn to Page 9?

21      Is this a document that you saw during your

22 preparation for your testimony?

23 A.   Yes.

24 Q.   Okay.  Is this a document that you created?

25 A.   No.

1    Q.    When you looked at the financial statement, does it

2    provide -- on Page 9, does it provide a net income?

3    A.    Yes, it does.

4    Q.    Is this document similar in some regards to the financial

5    statements that you produced?

6    A.    It has similarities.

7    Q.    Okay.  How about differences?  What's different about it?

8    A.    The font is different.  The headings are different.  The

9    numbers are different.

10   Q.    If I ask you to look at the bottom of the page, what do

11   you notice about the bottom of the page?

12   A.    The disclaimer is missing.

13   Q.    Have you ever printed a document or a P&L document from

14   your system that doesn't have a disclaimer?

15   A.    No.

16   Q.    With respect to the net income that's included for

17   December 31, 2015, what number is that?

18   A.    $4,450,744.

19   Q.    Is that correct?

20   A.    Not to my knowledge.

21   Q.    Okay.  Can I ask you now to turn to Government

22   Exhibit 138?

23           MR. ANDRES:  This is already in evidence, Your Honor.

24           THE COURT:  All right.

25   BY MR. ANDRES:

1    Q.    What's included in Government Exhibit 138?

2    A.    This is an e-mail to Mr. Gates, and the 2015 financial

3    statements for DMP International are attached.

4    Q.    And who sent that to Mr. Gates?

5    A.    Ms. Tanner from my office.

6    Q.    She works for you?

7    A.    Yes.

8    Q.    And can you read the attachment, the -- what it says for

9    the attachment?  What's attached?

10   A.    12-31-15 financial statements.

11   Q.    Okay.  And if you look at Page -- I believe it's Page 11.

12         If you look at the page that reflects the statement

13   of revenue and expenses, do you see that?

14   A.    Yes.

15   Q.    What is that -- is this a document that you recognize?

16   A.    Yes.

17   Q.    And is this a document that came from Nigro Karlin?

18   A.    Yes.

19   Q.    Does it include the footer?

20   A.    Yes.

21   Q.    And what do you notice about the font?

22   A.    It's consistent with our financial statements.

23   Q.    And what's listed as the net income?

24   A.    $400,744.

25   Q.    And when you compare that to the net income in Government

1    Exhibit 298, what do you find?

2    A.   It's about a $4 million difference.

3    Q.   Okay.  It's an increase of approximately $4 million?

4    A.   Correct.

5            MR. ANDRES:  Your Honor, is now a good time to take a

6    break?

7            THE COURT:  No, now is the time for you to finish.

8            MR. ANDRES:  Okay.

9            (Laughter.)

10   BY MR. ANDRES:

11   Q.   Can I ask you to look at Government Exhibit 145?

12   A.   Yes.

13   Q.   Can you tell me what's included in Government Exhibit 145?

14   A.   This is an e-mail chain with Anna Ivakhnik at the Federal

15   Savings Bank, asking for me to send the 2016 P&L for DMP

16   International and an attachment.

17   Q.   What does Ms. Ivakhnik say is attached?

18   A.   She's attaching the 2015 P&L that she has on file.

19   Q.   And who's cc'd on the e-mail?

20   A.   Mr. Manafort.

21   Q.   Did you come to understand, at some point, that

22   Mr. Manafort was applying --

23           THE COURT:  You're leading now.

24   BY MR. ANDRES:

25   Q.   Do you know --

1              THE COURT:  What, if anything, and so forth.

2    BY MR. ANDRES:

3    Q.   Do you know if Mr. Manafort applied for a loan from the

4    Federal Savings Bank?

5    A.   Yes.

6    Q.   Okay.  And do you know if this e-mail relates to that loan

7    application?

8    A.   Yes, it does.

9    Q.   Okay.  Can I ask you look at the attachment to the e-mail

10   in 145?

11             MR. ANDRES:  Your Honor, the Government moves to

12   admit Government Exhibit 145.

13             MR. ZEHNLE:  No objection.

14             THE COURT:  Admitted.  Proceed.

15             (Government Exhibit No. 145 was received in

16   evidence.)

17   BY MR. ANDRES:

18   Q.   Can I ask you to look at the attachment to Government

19   Exhibit 145, and specifically Page 9?

20             This is a document that you received; is that

21   correct?

22   A.   This was attached to the e-mail, yes.

23   Q.   Okay.  Did you produce this document?

24   A.   No, I did not.

25   Q.   Is this document similar, in some respect --

1                MR. ANDRES:  May I publish this, Your Honor?

2                THE COURT:  Yes, I admitted it.  You may publish it.

3                MR. ANDRES:  Okay.

4    BY MR. ANDRES:

5    Q.   With respect to this document, is it similar, in some

6    respect, to the documents that are produced by Nigro Karlin?

7    A.   It is similar in some respects.

8    Q.   And how is it different?

9    A.   The font is different, the spacing is different, the

10   wording on the lines is different, the numbers are different,

11   and the footer or the disclaimer is not there.

12   Q.   Okay.  And how about the net income that's reported?

13   A.   That's approximately 4 million more than what was reported

14   on the document that we created.

15   Q.   Okay.  Can I ask you, again, to look at Government

16   Exhibit 138?

17                What's included in Government Exhibit 138?

18   A.   That's the e-mail that Lauren sent to Rick with the 2015

19   financial statements.

20   Q.   And based on your view of the financial statement in 138,

21   does that appear to be an accurate financial statement from

22   Nigro Karlin?

23   A.   Yes.

24   Q.   And when you compare the financial statement in 138 to the

25   financial statement attached from the Federal Savings Bank,

1    what do you find?

2    A.    The income statement is different.  It's -- the fonts are

3    different, the numbers are different.  There's a lot of

4    changes.

5    Q.    And what about the income?  What's the difference in the

6    income?

7    A.    There's about a $4 million difference.

8    Q.    Okay.  Can I ask that you turn to Government Exhibit 146?

9          What's included in Government Exhibit 146?

10   A.    That's the e-mail of me replying to Anna Ivakhnik with the

11   2016 P&L that she requested.

12   Q.    Okay.  And is there an attachment?

13   A.    Yes.

14         MR. ANDRES:  The Government moves to admit Government

15   Exhibit 146.

16         MR. ZEHNLE:  No objection.

17         THE COURT:  It's admitted.  Proceed.

18         (Government Exhibit No. 146 was received in

19   evidence.)

20   BY MR. ANDRES:

21   Q.    What's attached to the e-mail in Government Exhibit 146?

22   A.    The 2016 year-to-date P&L for DMP through July 31, 2016.

23   Q.    Okay.  And if you turn to Page 5, what is listed or

24   recorded as the net income for DMP International as of July 31,

25   2016?

1  A.   A net loss of $638,048.

2          MR. ANDRES:  May I publish this, Your Honor?

3          THE COURT:  Yes, you may.

4  BY MR. ANDRES:

5  Q.   With respect to the -- you said that there was a loss.  Is

6  that -- is that number included in parentheses?

7  A.   Yes.

8  Q.   And what is the loss?

9  A.   $638,048.

10 Q.   Okay.  With respect to this document that you sent to

11 Ms. Ivakhnik at the Federal Savings Bank, did anyone from the

12 Federal Savings Bank ever call you about this?

13 A.   No.

14 Q.   Can I ask you to turn to Government Exhibit 149?

15      Can you tell me what Government Exhibit 149 is?

16 A.   That's an e-mail between myself, Dennis Raico at the

17 Federal Savings Bank, and Cindy Laporta at KWC.

18 Q.   Okay.  And who wrote this e-mail?

19 A.   I did.

20 Q.   What's the date and time of the e-mail?

21 A.   January 4, 2017, at 3:43.

22          MR. ANDRES:  The Government moves to admit 149, Your

23 Honor.

24          MR. ZEHNLE:  No objection.

25          THE COURT:  It's admitted.

1          (Government Exhibit No. 149 was received in

2  evidence.)

3          THE COURT:  Next question.

4          MR. ANDRES:  May I publish it?

5          THE COURT:  Yes.

6  BY MR. ANDRES:

7  Q.   With respect to the top e-mail, who is that e-mail from?

8  A.   From me.

9  Q.   And who did you send it to?

10  A.   Dennis Raico.

11  Q.   Do you know who Dennis Raico is?

12  A.   He works for the Federal Savings bank.

13  Q.   And what did you write in the e-mail to Mr. Raico?

14  A.   "Draft financials for DMP as of 11/30/16 are attached."

15  Q.   And is there an attachment?

16  A.   Yes.

17  Q.   May I ask you to look at page 13?

18          THE COURT:  Ladies and gentlemen, we'll take the

19  recess as soon as Mr. Andres finishes his direct testimony.

20          MR. ANDRES:  Thank you, Judge.

21          THE COURT:  It gives us all something to look forward

22  to.

23          (Laughter.)

24          MR. ANDRES:  Ms. Washkuhn's direct testimony, Judge.

25  I'm only asking the questions.

1          THE COURT:  Yes.

2   BY MR. ANDRES:

3   Q.   With respect to page 13, can you tell me what's reflected

4   in that document?

5   A.   That's the income statement for DMP International through

6   November 30, 2016.

7   Q.   And this is a document produced by you to the bank?

8   A.   Yes.

9   Q.   And what does it reflect that the net income is?

10  A.   A net loss of $1,116,497.

11  Q.   Okay.  Can I ask you to turn to Government Exhibit 282?

12          Can you tell me what's included in Government

13  Exhibit 282?

14  A.   It's an e-mail and an attachment from Mr. Manafort to

15  Dennis Raico at the Federal Savings Bank.

16  Q.   Can you read that e-mail?

17  A.   "Dennis, I have attached the last item requested by you,

18  the DMP P&L as of September 2016.  Please confirm that you now

19  have everything.  Paul."

20          MR. ANDRES:  The Government moves to admit Government

21  Exhibit 282.

22          MR. ZEHNLE:  Your Honor, may I have a moment?

23          THE COURT:  All right.

24          MR. ZEHNLE:  Thank you.

25          No objection, Your Honor.

1          THE COURT:  It's admitted.

2          (Government Exhibit No. 282 was received in

3    evidence.)

4          MR. ANDRES:  May I publish it?

5          THE COURT:  Yes, you may.

6    BY MR. ANDRES:

7    Q.   With respect to the e-mail at the top, who's it from?

8    A.   Mr. Manafort.

9    Q.   And who is it to?

10   A.   Dennis Raico at the Federal Savings Bank.

11   Q.   And can you read the e-mail?

12   A.   "Dennis, I have attached the last item requested by you,

13   the DMP P&L as of September 2016.  Please confirm that you now

14   have everything.  Paul."

15   Q.   And is it -- does the cover e-mail list an attachment?

16   A.   Yes.

17   Q.   And can I ask you to look at the attachment?

18   A.   Okay.

19   Q.   Starting with the heading -- first of all, is this a

20   document that you produced from Nigro Karlin?

21   A.   No.

22   Q.   How do you know that?

23   A.   There's numerous things different from what we normally

24   would produce to this document.

25   Q.   Okay.  Can you look at the heading?  Can you identify

1   anything about the heading?

2   A.    "September" is misspelled.

3   Q.    Okay.  And with respect to that document, when Nigro

4   Karlin produces financial statements, how is the date

5   generated?

6   A.    It's automatically generated by the system.

7   Q.    Okay.  And then when you look at the body of the document,

8   what do you find that's different?

9   A.    It only has one column.  Usually we have a month-to-date

10  and a year-to-date, so we have two columns.  It's missing

11  different rows that we would normally have.  The font is

12  different.  It's missing a final net income, which would be

13  your bottom number.

14  Q.    And with respect to the footer, is there anything about

15  the footer that's different?

16  A.    "Review" is spelled wrong and --

17  Q.    And with respect to the net income that's listed or the

18  income loss before federal income taxes, what's listed?

19  A.    $3,011,952.

20          THE COURT:  Next question.

21  BY MR. ANDRES:

22  Q.    With respect to the top of the heading that says "Income

23  Tax Basis," what does that mean?

24  A.    It means on a cash basis.

25  Q.    Okay.  And can I ask you now to take a look at Government

1    Exhibit 147?

2              MR. ANDRES:  I'm sorry, Judge, not 147.  Just give me

3    one moment, please.

4    BY MR. ANDRES:

5    Q.   Can you look at Government Exhibit 149?

6    A.   Yes.

7    Q.   Can you tell me what's attached?  It's a previously

8    admitted document at Government Exhibit 149?

9    A.   DMP financial statements from 11/30/16.

10   Q.   And did you produce that?

11   A.   Yes.

12   Q.   Okay.  And I'm going to ask you to turn to page -- the

13   page with the income.  I think it's page 13.

14   A.   Okay.

15   Q.   And what's recorded there?

16   A.   The -- it shows a net loss through 11/30/16 of $1,116,497.

17   Q.   And when you compare this document to the document in

18   Government Exhibit 128 --

19             MR. ANDRES:  Can I publish this, Your Honor?

20             THE COURT:  Just ask the question and get the

21   comparison.  Is this your last question or --

22             MR. ANDRES:  I have two other documents after this.

23             THE COURT:  All right.  Let's go ahead.

24             MR. ANDRES:  Okay.

25             THE COURT:  Go ahead.

1  BY MR. ANDRES:

2  Q.   First of all, the dates of these two documents, are they

3  the same?

4  A.   I'm sorry, what was the other --

5  Q.   The one document is Document 149, and the second document

6  is Document 282.

7  A.   282.

8          THE COURT:  She's already testified she didn't

9  produce -- or she did produce 149.  She didn't produce 282,

10  right?

11         MR. ANDRES:  Correct, but --

12         THE COURT:  And the documents reflect the

13  differences, don't they, the figures?

14         MR. ANDRES:  They're just -- they're just something

15  different about the document, if I could just elicit that,

16  Judge.

17         THE COURT:  All right.  Go ahead.

18  BY MR. ANDRES:

19  Q.   Are these documents in the same month?

20  A.   No.

21  Q.   Okay.  What's the difference in the month?

22  A.   One is November and one is September.

23  Q.   Okay.  And with respect to the first document in

24  September, what's the income listed?

25  A.   Income is listed as 3,650,000.

1   Q.    Okay.  And during the period from September 2016 to

2   November 2016, are you aware of whether or not DMP lost $4

3   million?

4   A.    No.

5   Q.    Okay.  After -- in the year 2016, did DMP have any income

6   at the end of the year?

7   A.    I would have to look at the 12/31 financials, but as of

8   11/30, no.

9   Q.    Okay.  Can I ask you to look at Government Exhibit 257?

10  A.    Okay.

11  Q.    Can you tell me what that is?

12  A.    It's a chain of e-mails between people at Citizens Bank.

13  Q.    You're not included on these e-mails, are you?

14  A.    No, I'm not.

15  Q.    Okay.  The -- who is the top -- who is the top e-mail

16  from?

17  A.    Taryn Rodriguez.

18  Q.    And who is it to?

19  A.    David Salley and David Fallarino.

20  Q.    And is there something attached?

21  A.    There is an attachment of a 7/31/16 P&L.

22          MR. ANDRES:  The Government moves to admit Government

23  Exhibit 257.

24          MR. ZEHNLE:  One moment, Your Honor.

25          THE COURT:  Yes.  You may take a moment.  I take it

1  your position is it's covered by the stipulation?

2          MR. ANDRES:  Yes, Judge.

3          MR. ZEHNLE:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5          (Government Exhibit No. 257 was received in

6  evidence.)

7  BY MR. ANDRES:

8  Q.   Can you look at the attachment to Government Exhibit 257?

9  A.   Yes.

10 Q.   And what is represented in Government Exhibit 257 on

11 page 333?

12         MR. ANDRES:  May I publish this, Your Honor?

13         THE COURT:  Yes, you may.

14         THE WITNESS:  An income statement for DMP

15 International through July 31, 2016.

16 BY MR. ANDRES:

17 Q.   And is this a document that you produced from Nigro

18 Karlin?

19 A.   No, it is not.

20 Q.   How do you know that?

21 A.   The font is different, the spacing, the numbers.

22 Q.   How about the top row?

23         THE COURT:  Well, are the numbers different?

24         THE WITNESS:  Yes.

25         THE COURT:  Let's go on.

1  BY MR. ANDRES:

2  Q.   How about the net income?

3  A.   It's different.

4            THE COURT:  She's already said she didn't produce it.

5  What difference does it make whether the fonts are the same or

6  different?

7  BY MR. ANDRES:

8  Q.   Can you compare that document --

9            THE COURT:  Are you going to present any evidence

10 that people at the bank were familiar with the two fonts?  The

11 answer is no.  Let's move along.

12 BY MR. ANDRES:

13 Q.   Okay.  With respect to the income, what's listed as the

14 income?

15 A.   Zero.

16 Q.   Can you look at the document in 126A?

17 A.   Okay.

18           THE COURT:  Is this already admitted?

19           MR. ANDRES:  Yes.

20           THE COURT:  All right.

21 BY MR. ANDRES:

22 Q.   What is the document in 126A?

23           THE COURT:  All right, sir.  You may display it, if

24 you wish.

25           MR. ANDRES:  126B, I'm sorry, 126B.

1           THE WITNESS:  The financial statement for DMP

2    International as of July 31, 2016.

3    BY MR. ANDRES:

4    Q.   And what is listed as the net income?

5    A.   Net loss of $638,048.

6    Q.   And when you compare that to the document in Government

7    Exhibit 257, what do you find?

8    A.   It's completely different.

9    Q.   Okay.  Which number is higher?

10           THE COURT:  Well, you're talking about losses.

11           THE WITNESS:  The one that shows the net income of

12    1.7 million and one shows a net loss of 600,000.

13           THE COURT:  There you go.

14           MR. ANDRES:  And, Judge, may I just have a minute --

15    a moment?  I believe I'm done.

16           THE COURT:  Yes, you may.  And just so that we're

17    clear, which one is the loss and which one is the --

18           THE WITNESS:  The loss would be in parentheses.

19           THE COURT:  Say again.

20           THE WITNESS:  The loss would be in parentheses.

21           THE COURT:  Yes, I know that.  But which of the

22    exhibits?

23           THE WITNESS:  Oh, sorry.  The Exhibit 126B is the

24    loss.

25    BY MR. ANDRES:

1   Q.   Ms. Washkuhn, just three to four additional questions.

2        You testified earlier about the GLs from DMP

3   International.  Do you remember that?

4   A.   Yes.

5   Q.   Okay.  When something comes -- when a -- when a payment

6   comes in or you identify an incoming wire, how do you know how

7   to characterize that?

8   A.   We would ask Mr. Manafort or Mr. Gates.

9   Q.   And if it was income, who would tell you whether or not it

10  was income?

11  A.   Mr. Manafort or Mr. Gates.

12  Q.   And if it was a loan, who would tell you whether or not it

13  was a loan?

14  A.   Mr. Manafort or Mr. Gates.

15       MR. ANDRES:  I have no further questions, Your Honor.

16       THE COURT:  All right.  Now, Ms. Washkuhn, we're

17  going to take a recess.  Again, during the recess, do not

18  discuss the matter with anyone.

19       And you may step down.

20            (Witness stood down.)

21       THE COURT:  Ladies and gentlemen, pass your books to

22  the right.  Mr. Flood will collect them, maintain their

23  security during the recess, and as always, you must refrain

24  from discussing the matter among yourselves or with anyone or

25  undertaking any investigation.  You'll find soft drinks, I

1    think, available to you.

2              All right.  And we will reconvene at 20 minutes to

3    4:00.  You may follow Mr. Flood out.

4                              (Jury out.)

5              THE COURT:  You may be seated.  Mr. Zehnle, for

6    planning purposes, how long do you anticipate your

7    cross-examination will take?

8              MR. ZEHNLE:  Your Honor, I believe half an hour or

9    so.

10             THE COURT:  All right.  Court stands in recess until

11   20 minutes to 4:00.

12             (Recess from 3:21 p.m., until 3:42 p.m.)

13                         (Defendant present, Jury out.)

14             THE COURT:  All right.  Mr. Flood, you may bring the

15   jury back in, please.

16                              (Jury present.)

17             THE COURT:  All right.  You may be seated.

18             All right.  Ms. Washkuhn, let's have Ms. Washkuhn

19   back.

20             Ms. Washkuhn, you recall that you remain under oath?

21             THE WITNESS:  Yes.

22             THE COURT:  And you may resume the stand.

23             All right.  Mr. Zehnle, you may proceed, sir.

24             MR. ZEHNLE:  Thank you, Your Honor.

25                         CROSS-EXAMINATION

1  BY MR. ZEHNLE:

2  Q.   Good afternoon, Ms. Washkuhn.  I'm Tom Zehnle, and I

3  represent Mr. Manafort in this case.

4           I want to pick up where we just left off.  May I ask,

5  Mr. Binder, could you put Exhibit 256 back up?

6           257, I'm sorry.

7           THE COURT:  You may ask to have anything displayed

8  you wish if it's been already displayed.

9           MR. ZEHNLE:  It has, Your Honor.

10           THE COURT:  What are we --

11           MR. ZEHNLE:  This -- could you display that, please?

12  Thank you.

13  BY MR. ZEHNLE:

14  Q.   I just wanted to clarify, with respect to this e-mail and

15  the attachment, Ms. Washkuhn, this is an e-mail between two

16  Citizens Bank employees, correct?  This doesn't have anything

17  to do with you?

18  A.   Correct.

19  Q.   All right.  And I think when you read the body of it, this

20  is the bankers dealing with the CPA for Mr. Manafort, correct?

21  If you read the first paragraph.

22  A.   No, this is the bankers dealing internally, I believe.

23  Q.   I'm sorry, if you read the second sentence.

24  A.   Oh.

25           "We have been working him and his CPA in regards to

1   the 2015 P&L and 2016 year-to-date figures."

2   Q.   Okay.  I just wanted to make sure that you weren't

3   involved with this e-mail or the attachments or anything like

4   that?

5   A.   No, I was not.

6   Q.   Okay.  Thank you.

7           So, Ms. Washkuhn, I just kind of wanted to just go

8   through some of the testimony that you had on direct

9   examination.

10          First of all, as I understand it, your primary

11  responsibilities were to pay Mr. Manafort's personal bills,

12  correct?

13  A.   Correct.

14  Q.   And you would transfer funds between accounts?  That was

15  one of the things that you did?

16  A.   Yes.

17  Q.   Okay.  And you would prepare the general ledgers and the

18  financial statements, as you've testified?

19  A.   Yes.

20  Q.   And these general ledgers and then, of course, the

21  financial statements that flowed from them, you would use bank

22  statements to prepare those as one part of it?

23  A.   Yes.

24  Q.   And you would use credit card statements, correct?

25  A.   Yes.

1    Q.    And invoices?

2    A.    Yes.

3    Q.    Wire devices showing wire transfers back and forth?

4    A.    Yes.

5    Q.    And, also, e-mails sometimes with respect to information

6    that you gathered either from Mr. Manafort or Mr. Gates or

7    someone who -- one of his professionals, like his CPAs?

8    A.    Correct.

9    Q.    Okay.  Now, I want to talk to you about early on I think

10   you were discussing with Mr. Andres foreign bank accounts and

11   your knowledge of any foreign bank accounts that Mr. Manafort

12   may have had.

13            Do you recall that testimony?

14   A.    I do.

15   Q.    And you don't recall yourself having any conversations

16   with Mr. Manafort about any foreign bank accounts, correct?

17   A.    That's correct.

18   Q.    And so it's fair to assume that you also didn't discuss

19   foreign bank account reports or any of the regulations that

20   surround foreign bank account reports.

21            You didn't have any of those discussions with

22   Mr. Manafort, did you?

23   A.    No, I did not.

24   Q.    Okay.  Now, with respect to the deposits that were coming

25   in and that you were keeping track of in the general ledgers,

Washkuhn - Cross                                                    639

1    there would be many deposits coming into both DMP's accounts as

2    well as Mr. Manafort's personal accounts, correct?

3    A.   Correct.

4    Q.   Okay.  And many of these would be from overseas, right?

5    A.   Yes.

6    Q.   And I think Mr. Andres went through a number of the names

7    on these entities that held certain accounts.  Do you recall

8    that?

9    A.   Yes.

10   Q.   Okay.  So did you have a chance, I assume, to review your

11   general ledgers in your discussions with the Special Counsel's

12   office in preparation for today's testimony?

13   A.   Yes, I did.

14   Q.   So you've seen a number of those names on the accounts

15   or -- that show who it's coming from, correct?

16   A.   Correct.

17   Q.   So is it fair to say that you, having looked at those

18   general ledgers that you prepared in the past, you've seen the

19   sources of the income deposits as being Yiakora or "Yiakora"?

20   You've seen that name?

21   A.   I've seen that name, yes.

22   Q.   And Global Highway, you've seen that?

23   A.   Yes.

24   Q.   And Peranova?

25   A.   Yes.

1  Q.   LOAV, L-O-A-V, Limited, you've seen that one?

2  A.   Yes, uh-huh.

3  Q.   Leviathan Advisors, correct?

4  A.   Yes.

5  Q.   Telmar?

6  A.   Yes.

7  Q.   Bletilla?

8  A.   Yes.

9  Q.   Actinet?

10  A.   Yes.

11  Q.   Lucicle?

12  A.   Yes.

13  Q.   Smythson or Smythson?

14  A.   Yes.

15  Q.   Okay.  You've seen all those, and those were in your

16  actual ledgers at the time that you were preparing them,

17  correct?

18  A.   Correct.

19  Q.   Okay.  And you assumed that when that money was coming in,

20  that was income from Mr. Manafort's consulting business in

21  Ukraine, correct?

22  A.   Consulting business in general.

23  Q.   Consulting business in general.  Well, you knew that most

24  of his consulting business during this time period was

25  conducted in the Ukraine.

1    A.    I believe for a portion of the time, it was Ukraine, yes.

2    Q.    Okay.  A significant portion or you're just not aware?

3    A.    I'm not aware of how much.

4    Q.    Okay.  That's fair.

5          Now, is -- let me ask you:  Did Davis Manafort

6    Partners also have an account in Ukraine?

7    A.    Yes, I believe it did.

8    Q.    And did Mr. Gates ask you, at times, to send money to a

9    Ukrainian account in order -- you know, for DMP?

10   A.    Yes.

11   Q.    Okay.  Do you know who had signature authority on that

12   account over there?

13   A.    I have no idea.

14   Q.    Okay.  Did you ask?

15   A.    No.

16   Q.    Okay.  Is it fair to say -- and I don't want to simplify

17   it too much.  But is it fair to say in terms of like the

18   ledgers, you're -- I know a lot of accountants -- I'm not an

19   accountant, but I know a lot of accountants talk about the left

20   side and the right side of the balance sheet.

21   A.    Uh-huh.

22   Q.    Is that a fair characterization of what your real focus

23   was in terms of handling this part of the business, making sure

24   the -- you know, the left sides and the right sides were

25   correct?

1    A.    Yes, that's a fair thing to say, yes.

2    Q.    Okay.  Now, you talked about Mr. Gates and -- do you

3    recall that?

4    A.    Yes, I do.

5    Q.    And you met Mr. Gates at the beginning of your engagement

6    with Mr. Manafort, right?

7    A.    Correct.

8    Q.    That was out in California, I believe?

9    A.    Yes, it was.

10   Q.    Okay.  And I think you also talked about Mr. Gates was the

11   one, he would -- he would often communicate with respect to

12   First Republic Bank, which is where you were first, correct?

13   A.    Correct.

14   Q.    Or when you moved over, when the Personal Services

15   Group -- is that what it was called?

16   A.    It was called the Personal Financial Services.

17   Q.    Personal Financial Services Group, then they moved over to

18   Nigro Karlin, correct?

19   A.    Correct.

20   Q.    Okay.  And it's fair to say that Mr. Gates was

21   communicating often with both First Republic and with Nigro

22   Karlin?

23   A.    Yes.

24   Q.    Okay.  Now, when the tax accountants, who I believe you

25   identified as KWC, when they had questions preparing

1   Mr. Manafort's tax returns, whether they were business returns

2   or whether they were personal returns, they would often contact

3   you, correct?

4   A.   Correct.

5   Q.   And they would often contact Mr. Gates; is that correct?

6   A.   Yes, I believe they did.

7   Q.   I mean, you saw -- during the course of these number of

8   years that you worked on behalf of Mr. Manafort, you would see

9   e-mail back and forth with questions from the accountants

10  asking about specific items that they needed to know?

11  A.   Yes.

12  Q.   All right.  And oftentimes they would be directed to

13  Mr. Gates, correct?

14  A.   Yes.

15  Q.   And you would oftentimes be on those very same e-mails?

16  A.   Yes, I'd be copied on them.

17  Q.   And so would it be fair to say that if information came in

18  that you didn't have at your fingertips, you would often defer

19  to Mr. Gates; is that correct?

20  A.   Correct.

21  Q.   And, in fact, you would sometimes just say, "defer to

22  Rick," right?

23  A.   I would, yes.

24  Q.   Okay.  Now, during this time, you knew that Mr. Manafort

25  was a political consultant, correct?

1    A.    Correct.

2    Q.    And he was traveling extensively, correct?

3    A.    Yes, that's correct.

4    Q.    Because you saw the expenses coming in from DMP, right?

5    A.    Yes.

6    Q.    You could tell that even if you didn't know what his

7    travel itinerary was, you could just see the expenses on when

8    they were submitted?

9    A.    Yes.

10   Q.    Okay.  Now, is it fair to say that when you were dealing

11   with the accountants, providing them the information that they

12   needed for the tax returns, that oftentimes it was being done

13   at the last minute for the tax accountants, that they were in a

14   hurry because a deadline was approaching?

15   A.    No, I don't think it was often last minute.

16   Q.    You don't think, oftentimes, they didn't have any

17   questions about, you know, things were being done in terms of

18   getting the filings done?

19   A.    I think that happens in the normal course of business for

20   every CPA, but I don't recall it always being a rush.

21   Q.    Okay.  But, again, Mr. Gates was the one who would handle

22   a lot of the -- would handle the business things for

23   Mr. Manafort, correct?

24   A.    He handled a lot of the business affairs, yes.

25   Q.    Okay.  I think you said earlier in your testimony that

1  you -- he was kind of viewed as Mr. Manafort's right hand?

2  A.    Yes.

3  Q.    Okay.  Mr. -- excuse me, Mr. Gates also had the authority

4  to direct wires, right?  He was a signature authority on DMP's

5  accounts; is that correct?

6  A.    Yes, he was.

7  Q.    Okay.  And you often would review the general ledgers with

8  Mr. Gates, right, because he was essentially Mr. Manafort's

9  proxy, if you will?

10 A.    I don't recall reviewing general ledgers with him often.

11 The only time would be if the CPA had questions on the general

12 ledger.

13 Q.    Okay.  But Mr. Gates would -- he would assist if there was

14 anything that needed to be potentially reclassified, correct,

15 like if there was a question?

16 A.    Yes.

17 Q.    Fair enough?

18 A.    Yes.  He would assist, yes.

19 Q.    Okay.  Now, let's talk a little bit about the First

20 Republic Bank accounts.  Did there come a time when those

21 accounts were closed, do you recall?

22 A.    Yes.

23 Q.    Do you know when that was?

24 A.    It was in the summer of 2014.

25 Q.    And do you know where those accounts moved to?

1   A.    They moved to UBS.

2   Q.    And you assisted in actually helping Mr. Manafort move

3   those accounts to UBS, right?

4   A.    I did.

5   Q.    All right.  And you'll recall that Mr. Manafort wasn't

6   particularly pleased because he'd been a client of First

7   Republic Bank for a number of years, right?

8   A.    I do recall that.

9   Q.    Okay.  But Mr. Manafort had, in 2014, also moved the

10  personal financial services with you over to Nigro Karlin,

11  correct?

12  A.    That's correct.

13  Q.    Okay.  Did you see that there were problems sometimes,

14  given the number of transfers that were coming in from overseas

15  from Mr. Manafort's business, that the banks in the U.S.

16  sometimes had issues with them?

17  A.    Yes.

18  Q.    And could you explain that maybe a little bit for the

19  jury?

20  A.    Any money coming in from overseas usually triggers a flag

21  from a bank.  So they will -- their AML unit or their

22  anti-money laundering unit will usually reach out and ask

23  what's it for or want you to provide a little background on it.

24  Q.    But that's normal course, right?

25  A.    Yes.

1   Q.    I mean, you've worked at -- you worked at Federal -- or

2   First Republic for a number of years, over a decade, right?

3   A.    I worked there for ten years.

4   Q.    Yeah.  So, I mean, that's -- actually, almost all domestic

5   banks do that, right, when they have wires coming in of

6   substantial amounts from overseas?

7   A.    Yes.

8   Q.    Okay.  And so that created an issue sometimes, right, with

9   money coming in, that some of the banks would raise issues and

10  it would create problems in terms of, you know, the banking

11  ability of Davis Manafort?

12  A.    That's correct.

13  Q.    Is that fair to say?

14  A.    That's fair.

15  Q.    Okay.  Now, you were talking a little bit about incoming

16  wires from overseas, and I think Mr. Andres was asking you how

17  those were treated.  And I think your testimony was that the

18  funds would go into DMP's account and that would be treated as

19  income, correct?

20  A.    It would be classified as income or a loan, depending on

21  what we were told to classify it as, yes.

22  Q.    That's right, because sometimes it was a loan, right?

23  A.    Correct.

24  Q.    And you were advised of that?

25  A.    Correct.

Washkuhn - Cross                                                648

1  Q.   Okay.  Or sometimes you said that funds would go into

2  Mr. Manafort's account, correct, personal account?

3  A.   Yes.

4  Q.   Right?  And then you would -- you would treat that as a

5  distribution to Mr. Manafort?

6  A.   If it had been a business income that he received

7  personally, then it is treated as a distribution.

8  Q.   So was being -- my point is, not being an accountant, it

9  was being picked up in the ledgers.  You were treating it, if

10  it went into DMP, we're going to call it income and if it's

11  going to Mr. Manafort's accounts, we're going to make sure it's

12  a distribution; is that fair?

13  A.   Yes.

14  Q.   Okay.  I did want to ask you one question, and I'm not

15  going to go through this binder.  So you don't -- you don't

16  have to look at the binder.  I can't even pick it up.

17         But in the general ledgers, I think that there was a

18  term used in there, "due to affiliate."  Now, what -- in a

19  business sense, what is an affiliate generally defined as?

20  A.   It's just a general term, an affiliated party.

21  Q.   Right, a related --

22  A.   So due to another company, due to another person, just a

23  general term.

24  Q.   Okay.  Okay.  That's fair enough.  I didn't want to

25  interrupt you.  I'm sorry.

1   A.   I'm sorry.

2   Q.   Now, in the course of handling both DMP's, you know, the

3   accounts for DMP and also Mr. Manafort's personal accounts, I

4   think you were testifying that you don't recall reviewing any

5   of Mr. Manafort's consulting agreements or DMP's consulting

6   agreements with its counterparties; is that correct?

7   A.   That's correct.

8   Q.   Okay.  And I think you also testified on direct

9   examination that you didn't review any of the loan documents

10  with -- that you would see coming in.

11  A.   We would ask for them.  If we received them, I would

12  review them.  If not, then I wouldn't have had a chance to

13  review them.

14  Q.   Okay.  But I'm asking:  Do you recall if you ever -- right

15  now, as we're talking today, do you recall reviewing any of the

16  loan documents?

17  A.   I don't recall.

18  Q.   Okay.  So you wouldn't know exactly what the terms of

19  those loans were because you didn't review the documents,

20  correct?

21  A.   That's correct.

22  Q.   Okay.  And if you were told to reclassify any items, that

23  would generally be by the CPAs that you were dealing with at

24  KWC; is that correct?

25  A.   Yes, that's correct.

1   Q.   Although, I think sometimes, Mr. Gates would also advise

2   you that items needed to be reclassified; is that fair to say?

3   A.   On occasion, yes.

4   Q.   Okay.  I want to talk a little bit about the P&L

5   statements or the profit-and-loss statements that you were

6   mentioning earlier.  And you said that, I believe, Nigro Karlin

7   did those financial statements on a cash basis; is that

8   correct?

9   A.   That's correct.

10  Q.   Okay.  But I just want to make sure that there's nothing

11  incorrect or wrong about having a PL -- a P&L done on accrual

12  basis either, right?

13  A.   No, there's not.

14  Q.   As a matter of fact, lots of companies do their accounting

15  on an accrual basis, correct?

16  A.   That's correct.

17  Q.   Right?  I think your problem was when we -- when

18  Mr. Andres was talking to you about it, it was an issue of it

19  was on a cash basis, but it was injecting an accrual item into

20  it, right?

21  A.   That's correct.

22  Q.   But I just want to make sure there's nothing wrong, if

23  Mr. Manafort said, "I want to do it on an accrual basis," that

24  could have been done, right?

25  A.   It could be done, yes.

1    Q.    And that's not an unusual request.  Other companies, I'm

2    sure, have done that before, too?

3    A.    That's correct.

4    Q.    Okay.  Now, Ms. Washkuhn, I also -- I think it probably

5    goes without saying, but it seems like there are literally

6    maybe hundreds of thousands of entries on those general ledgers

7    over the course of the years that we're talking about.  Is that

8    fair to say?

9    A.    Yes, there's a lot.

10   Q.    And, again, it dealt with the business side and it also

11   dealt with personal side, correct?

12   A.    Correct.

13   Q.    So this was a fairly complicated set of accounts to

14   manage; is that fair to say?

15   A.    Yes, that's fair.

16   Q.    And Nigro Karlin was paid a reasonable amount of funds for

17   it.  I believe you testified over 100,000 generally a year?

18   A.    Per year, yes.

19   Q.    Okay.  Now, there was some discussion towards the last

20   half of Mr. Andres's direct examination that I wanted to talk

21   about that dealt with the mortgage loans.  And I believe your

22   testimony was that you collected or assisted in collecting a

23   lot of the documentation for those loans, right?

24   A.    Yes.

25   Q.    Mr. Manafort brought you into the process to help assist

1    in the mortgage loans for that purpose?

2    A.   Yes.

3    Q.   But others were brought into it, too, right?

4    A.   Yes.

5    Q.   Right?  For example, Mr. Gates was heavily involved in, as

6    we saw, the e-mail, right?  Mr. Gates was involved in this

7    process, correct?

8    A.   Yes, he was.

9    Q.   And KWC, the accounting firm, they were involved in this

10   process, correct?

11   A.   Yes.

12   Q.   Mr. Manafort had brought them into it as well, right?

13   A.   Yes, I believe so.

14   Q.   Okay.  And I believe you said, primarily, that was Cindy

15   Laporta, if I recall?

16   A.   Yes, yes, Cindy Laporta from KWC.

17   Q.   Okay.  But there were a lot of people involved, actually

18   including the people at the banks that were going to -- or that

19   were being asked to do the loans, right?

20   A.   That's correct.

21   Q.   So a lot of people involved?

22   A.   Uh-huh.

23          MR. ZEHNLE:  Okay.  One moment, Your Honor.

24          THE COURT:  I beg your pardon?

25          MR. ZEHNLE:  Just a moment, Your Honor.

1            THE COURT:  Yes.

2            MR. ZEHNLE:  I'm looking through my notes.

3    BY MR. ZEHNLE:

4    Q.   Those mortgage loans, Ms. Washkuhn, those were for

5    Mr. Manafort's personal residence, right?

6    A.   Yes.

7    Q.   Right?  So Mr. Gates was assisting in that respect, even

8    though it was personal matters, right?

9    A.   I believe he was, yes.

10   Q.   Okay.  So I just wanted -- it wasn't like a complete wall

11   between business and personal, because Rick Gates would

12   essentially assist when -- as Mr. Manafort's right hand when he

13   needed assistance; is that fair to say?

14   A.   That's fair.

15   Q.   And he was handling a lot of the financial side of things,

16   if you will, being his proxy in that sense?

17   A.   Yeah, when he was asked by Mr. Manafort, he was.

18   Q.   Now, in terms of the communications, and I do believe that

19   you talked about -- you primarily communicated with

20   Mr. Manafort via e-mail?

21   A.   That's correct.

22   Q.   Is that fair to say?

23   A.   Yes.

24   Q.   Okay.  And you said that he would approve payment for

25   expenses, correct?

1    A.    He approved all payments.

2    Q.    And so when you're talking about those payments, I just

3    want to get a little bit better understanding.  Were those

4    payments like for personal bills, such as telephone services?

5    A.    Yes.

6    Q.    Right?  Gas bills?

7    A.    Yes.

8    Q.    Right?  Utilities, things like that?

9    A.    Yes.

10   Q.    Right?  Smaller amounts, but the kind of expenses that all

11   of us have, in that we have to pay every month, right?

12   A.    Correct.

13   Q.    That's what Mr. Manafort was primarily involved in saying,

14   you're approved, go ahead, pay that kind of stuff?

15   A.    He approved every expenditure.

16   Q.    On the personal side, those kind of things that we just

17   talked about?

18   A.    Personal and business side.

19   Q.    Well, sometimes I think you just said that Mr. Gates would

20   stand in and also be the approving source?

21   A.    Mr. Gates would deal with DMP items, but mainly

22   Mr. Manafort was the approval source.

23   Q.    Okay.  Now, I believe you testified with respect to the

24   Peranova loan forgiveness.  Do you recall that?

25   A.    Yes, I do.

1  Q.   Okay.  So I just want to make sure I understand from a tax

2  perspective -- by the way, are you -- are you a CPA?

3  A.   No, I am not.

4  Q.   Okay.  Do you have some accounting background?

5  A.   Accounting, yes, but not tax.

6  Q.   Okay.

7          THE COURT:  Sorry, but not what?

8          THE WITNESS:  Not tax.

9          THE COURT:  Next question.

10 BY MR. ZEHNLE:

11 Q.   Okay.  So could you explain when a loan is forgiven, what

12 happens to that in terms of the balance sheet, in terms of what

13 you do?

14 A.   For what I do, it's taken off of the balance sheet and

15 it's moved to the income statement and classified as income.

16 Q.   So it is income now, correct?

17 A.   Yes.

18 Q.   And that would have to be reported, correct?

19 A.   Yes, I believe so.

20 Q.   And --

21 A.   I can't testify to the tax implication.

22 Q.   Okay.  Do you know whether or not that was reported on

23 Mr. Manafort's tax returns?

24 A.   I do not know.

25 Q.   Okay.  But there was a $1.5 million increase, correct,

1   when the loan was forgiven for Peranova?

2   A.    That's correct.  It was reclassified income.

3   Q.    Okay.  Now, there was some discussion briefly about a

4   property in New York that was being rented out as part of

5   Airbnb?

6   A.    Yes.

7   Q.    Do you recall that?

8   A.    I do.

9   Q.    Okay.  And you were aware of that, correct?

10  A.    I was.

11  Q.    Right.  Mr. Manafort -- you were on the e-mails with

12  Mr. Manafort, correct?

13  A.    That's correct.

14  Q.    He wasn't -- I mean, it wasn't hidden or anything, right?

15  A.    Not to me, no.

16  Q.    Okay.  That was -- was that the Howard Street property?

17  A.    Yes.

18          MR. ZEHNLE:  One moment, Your Honor.

19          THE COURT:  All right.

20          MR. ZEHNLE:  Nothing further, Your Honor.

21          THE COURT:  All right.  Any redirect?

22          MR. ANDRES:  Briefly, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MR. ANDRES:

25  Q.    Ms. Washkuhn, can I ask you to turn to Government

1    Exhibit 257?

2              THE COURT:  Was there any testimony on cross about

3    257?

4              MR. ANDRES:  Yes, the first question, Your Honor.

5              THE COURT:  All right.  Go ahead.

6    BY MR. ANDRES:

7    Q.   Do you see document 257?

8    A.   Yes, I do.

9    Q.   Mr. Zehnle asked you about the -- whether this were an

10   internal discussion.  Do you remember that?

11   A.   Yes.

12   Q.   Okay.  If you'd turn to the attached P&L, do you see that?

13   A.   Yes, I do.

14   Q.   And the number there, the net income, is inconsistent with

15   your records; is that correct?

16   A.   That's correct.

17   Q.   And the heading on the P&L, what does it say?

18   A.   The heading?

19   Q.   What company is listed?

20   A.   Oh.  DMP International, LLC.

21   Q.   And whose company is that?

22   A.   Mr. Manafort's.

23   Q.   And if you look at the top e-mail, do you see the e-mail

24   at 11:45 a.m.?

25   A.   I do.

1    Q.    What is the subject of that?

2    A.    Manafort file.

3    Q.    And do you know if Mr. Manafort applied for any loans at

4    Citizens Bank?

5    A.    Yes.

6    Q.    Mr. Zehnle asked you if you were aware of the Howard

7    Street rental income.  Do you remember that?

8    A.    Yes, I do.

9    Q.    Do you know if Mr. Manafort disclosed to any banks that he

10   was renting that property?

11   A.    I do not know.

12   Q.    Did you have access to any overseas accounts that were

13   owned or controlled by Mr. Manafort?

14   A.    No.

15   Q.    Were you aware of any payments from overseas accounts to

16   pay for his personal expenditures?

17   A.    No.

18   Q.    You testified that income -- incoming wires to DMP were

19   treated as income or loans.  Is that correct?

20   A.    Yes.

21   Q.    Who gave you the information about how to treat those?

22   A.    Mr. Manafort or Mr. Gates.

23   Q.    If books were kept on an accrual basis, when would the --

24   when would they be added to the financial statement?

25              When would income be added to the financial

Washkuhn - Recross                                                    659

1  statement?

2  A.   As it had been earned but not yet received.

3          MR. ANDRES:  Can I have a minute, Your Honor?

4          Nothing further, Your Honor.

5          THE COURT:  Any recross based only on that?

6          MR. ZEHNLE:  Yes, Your Honor, just one question.

7          THE COURT:  All right.

8          MR. ZEHNLE:  Can we bring up 257 again, and the

9  financial statement?

10                      RECROSS EXAMINATION

11 BY MR. ZEHNLE:

12 Q.   Ms. Washkuhn, are you looking -- can you see that

13 financial statement that's on your screen?

14 A.   Yes, I can.

15 Q.   Are those numbers correct when you go down them?

16 A.   No.  They don't add.

17 Q.   They don't add, do they?

18 A.   No.

19 Q.   Right.  It says operating expenses of $2.4 million, right?

20 A.   Yes.

21 Q.   And then it has income (loss) from operations, negative

22 $638,048, correct?

23 A.   Correct.

24 Q.   So when you go down to the bottom, this math is not right,

25 is it?

1    A.   No, it's not.

2    Q.   Right?  This should actually be -- instead of showing a

3    net income of $1.76 million, it should be almost -- it should

4    be a little over $3 million in loss, shouldn't it, when you

5    take the operating expenses and the loss from the operations?

6    A.   It would technically be a loss of 2.4 million because you

7    have no income, but you have 2.4 million in expenses.

8    Q.   Understood.  And that's why I'm not the accountant.

9             MR. ZEHNLE:  No further questions, Your Honor.

10            THE COURT:  All right, thank you.  You may step down.

11            And this witness may be excused?

12            MR. ANDRES:  Yes, Your Honor.

13            THE COURT:  All right.  Hope it's not raining in

14   California.

15            THE WITNESS:  Thank you.

16            THE COURT:  Well, no, I hope it is, rain for the

17   fires.

18            THE WITNESS:  Oh, that's true.  Thank you.

19                          (Witness excused.)

20            THE COURT:  Call your next witness, Mr. Andres or

21   Mr. Asonye.

22            MR. ASONYE:  Your Honor, the next witness is Philip

23   Ayliff.  However, at this time, the Government would like to

24   move a stipulation into evidence.

25            THE COURT:  All right.  What is the stipulation?

1          MR. ASONYE:  It's Government Exhibit 337 regarding

2 tax returns.

3          THE COURT:  Is it a long -- a lengthy one?

4          MR. ASONYE:  Your Honor, it's about a page and a

5 half.

6          THE COURT:  You may read it, but the witness need not

7 come in yet.

8          MR. ASONYE:  Stipulation regarding tax returns.  The

9 parties stipulate to the following:  The federal tax returns

10 listed below were each filed with the Internal Revenue Service:

11          Form 1040 tax returns for Paul and Kathleen Manafort

12 for years 2010 through 2014.

13          Form 1120S tax returns for Davis Manafort Partners,

14 Inc., for years 2010 through 2011.

15          Form 1065 tax returns for DMP International, LLC, for

16 years 2011 through 2014.

17          Form 1065 tax returns for John Hannah for years 2010

18 through 2014.

19          Form 1065 tax returns for MC Soho Holdings, LLC, for

20 years 2015 and 2016.

21          There were no tax returns filed with the Internal

22 Revenue Service for MC Brooklyn Holdings, LLC, or Smythson.

23          There were no tax returns filed with the Internal

24 Revenue Service for Davis Manafort Partners, Inc., for years

25 2012 through 2014.

662

1          There were no tax returns filed with the Internal

2   Revenue Service for DMP International, LLC, for year 2010, and

3   there were no tax returns filed with the Internal Revenue

4   Service for MC Soho Holdings, LLC, for years 2013 through 2014.

5          And, Your Honor, the remainder of the stip simply

6   indicates that all the tax returns are admissible under 803(6),

7   803(8), 803(10), and 902, and are self-authenticating.

8          THE COURT:  All right.  Is there anything further to

9   be said on that?

10         MR. DOWNING:  Not on the stipulation.  But we were

11  notified that the next witness up was going to be Ms. Laporta,

12  not Mr. Ayliff, so...

13         THE COURT:  That was my understanding as well.

14         MR. ASONYE:  I'm sorry, Your Honor, we didn't -- I

15  don't know if that was the precise order, but --

16         THE COURT:  That's what was conveyed to me.

17         MR. DOWNING:  And that's what we prepared for, Your

18  Honor.

19         MR. ASONYE:  Your Honor, the next -- Ms. Laporta is

20  not even here.  The next witness is Mr. Ayliff.  They're both

21  tax preparers for the same firm.

22         THE COURT:  Well, there's a big difference between

23  the two.  Do you-all need a moment or a few minutes?

24         MR. DOWNING:  Yes, Your Honor.

25         THE COURT:  All right.  I'll give you 15 minutes.

663

 1              MR. DOWNING:  Okay.

 2              THE COURT:  I don't think you -- anyone intended to

 3    mislead --

 4              MR. DOWNING:  No.

 5              THE COURT:  -- and certainly to mislead me, but I

 6    share with you the firm impression that Laporta was next.

 7              MR. DOWNING:  Thank you, Your Honor.

 8              THE COURT:  But it is who now, Mr. Asonye?

 9              MR. ASONYE:  It's Philip Ayliff.  And just to be

10    clear, Your Honor, again, chronologically in terms of this

11    witness, he's the first person with the relationship with the

12    firm.

13              THE COURT:  Well, that may be a good reason why you

14    want him first, but that doesn't explain why we didn't know

15    that.  I don't quarrel with that.  I'm going to let you put him

16    on when you want to put him on.  I'm just going to, as a matter

17    of fairness, give them a few minutes.

18              Pass your books to the right, ladies and gentlemen.

19    Mr. Flood will collect them.  Remember to refrain from

20    discussing the matter among yourselves or undertaking any

21    investigation and we will reconvene at 25 to 5:00.

22              Now, let me ask you, Mr. Asonye:  How long do you

23    think his direct testimony will take?

24              MR. ASONYE:  He's a substantial witness.  Probably --

25    approximately as long as Ms. Washkuhn was.

664

1          THE COURT:  All right.  Well, I'm not sure we really

2     need that much time, then, because you're not going to get to

3     cross-examination today.

4          MR. DOWNING:  Well, I wouldn't mind ten minutes so I

5     can just get my files together.

6          THE COURT:  All right.  We'll take this recess.

7          Thank you.  Remember to refrain from discussing the

8     matter among yourselves or with anyone or undertaking any

9     investigation.

10                         (Jury out.)

11          THE COURT:  Court stands in recess until 25 of 5:00.

12          MR. DOWNING:  Thank you, Your Honor.

13           (Recess from 4:18 p.m., until 4:39 p.m.)

14                         (Defendant present, Jury out.)

15          THE COURT:  All set?

16          MR. DOWNING:  Thank you, Your Honor.

17          THE COURT:  Yes, Mr. Asonye?

18          MR. ASONYE:  The Government would call Philip Ayliff,

19     Your Honor.

20          THE COURT:  All right.

21          MR. ASONYE:  Although I guess we need the jury.

22          THE COURT:  You need the jury.

23          (Laughter.)

24          MR. ZEHNLE:  Really speeding things up.

25          THE COURT:  Oh, that's all right.  He can come in

1    while the jury is coming in.

2              Bring the jury in, please.  If you'll wait there at

3    the gate.  Thank you.

4                        (Jury in.)

5              THE COURT:  Yes, there's no doubt about it, there's

6    a -- there may be a trespass action filed.

7              (Laughter.)

8              THE COURT:  All right.  We'll continue now, ladies

9    and gentlemen, and we'll go for possibly until 5:30 or

10   thereabouts.

11             All right.  You may be seated in the courtroom.

12   Thank you.

13             And, Mr. Asonye, you're calling now Mr. --

14             MR. ASONYE:  Philip Ayliff.

15             THE COURT:  Mr. Ayliff, come forward and take the

16   oath, please, sir.

17        JAMES PHILIP AYLIFF, GOVERNMENT'S WITNESS, AFFIRMED

18             THE COURT:  All right.  Mr. Asonye, you may proceed.

19   And for -- to give the jury a heads-up, this -- I doubt we'll

20   finish the witness today on direct.  I think you're estimating

21   how long?

22             MR. ASONYE:  Your Honor, about two-and-a-half hours

23   on direct.

24             THE COURT:  All right.  Now, I'm sure Mr. Asonye will

25   work hard this evening to try to focus things more sharply and

Ayliff - Direct                                                    666

1    expedite it.

2              MR. ASONYE:  Every evening, Your Honor.  Late into

3    the evening.

4              THE COURT:  All right.  Proceed, Mr. Asonye.

5                           DIRECT EXAMINATION

6    BY MR. ASONYE:

7    Q.   Could you please state and spell your name for the record?

8    A.   My name is James Philip Ayliff, J-a-m-e-s P-h-i-l-i-p

9    A-y-l-i-f-f.

10   Q.   And, Mr. Ayliff, where were you born?

11   A.   Where was I born?

12   Q.   Yes.

13   A.   I was born in Swaziland, in Africa.

14   Q.   And where do you live now?

15   A.   I live in Falls Church, Virginia.

16   Q.   How far did you go in school?

17   A.   I got a bachelor's degree in South Africa.

18   Q.   And in what subject?

19   A.   A bachelor of commerce, majoring in accounting.

20   Q.   When did you move to the United States?

21   A.   In 1983.

22   Q.   Do you know what a certified public accountant is?

23   A.   Yes.

24   Q.   What does a CPA do?

25   A.   What does a CPA do?  They provide accounting services to

Ayliff - Direct                                                    667

1   the general public, prepare tax returns, prepare financial

2   statements, can do audits.

3   Q.   Did you become a CPA?

4   A.   Yes, I did.

5   Q.   When?

6   A.   In -- I wrote the exam in 1983, and then was certified in

7   1986, '85-'86.

8   Q.   And what was your first job after you became a CPA?

9   A.   I was an entry level accountant.

10  Q.   At what firm?

11  A.   At a CPA firm, and that was Renner, Kositzka & Wicks.

12  Q.   And are you familiar with a company named Kositzka Wicks &

13  Company?

14  A.   Yes.  That was the -- Renner, Kositzka & Wicks changed to

15  Kositzka, Wicks & Company.

16  Q.   And is that also known as KWC?

17  A.   Yes.

18  Q.   And what type of firm is KWC?

19  A.   A CPA firm.

20  Q.   Did you work there?

21  A.   Yes.

22  Q.   When did you join?

23  A.   December 1, 1983.

24  Q.   And how long did you work there?

25  A.   I worked until -- until I retired in nineteen- -- I mean,

Ayliff - Direct                                                      668

1   2014 and then I worked three more years on a contract basis.

2   Q.    And where is KWC located?

3   A.    In Alexandria, Virginia.

4   Q.    When you first began working at KWC, what position did you

5   hold?

6   A.    An entry level accountant.

7   Q.    And have you held various levels, positions at KWC?

8   A.    Yes.

9   Q.    What was the highest position that you held there?

10  A.    I was -- I was a shareholder.

11  Q.    And is that -- is that as high as you can go?

12  A.    Well, I was the managing shareholder.

13  Q.    And when did you become a shareholder?

14  A.    In 1989.

15  Q.    Did you eventually sell -- well, as a shareholder, did you

16  have an ownership interest in the firm?

17  A.    Yes.

18  Q.    Did you eventually sell it?

19  A.    Yes.

20  Q.    When was that?

21  A.    May the 31st, 2014.

22  Q.    And then you mentioned that you at some point became a

23  contract employee with the firm?

24  A.    Yes, for the last three -- for the three years after that.

25  Q.    So that was between 2014 and '17?

Ayliff - Direct                                                      669

1    A.    Yes.

2    Q.    And in -- what did you do in that role?

3    A.    So what I did was I acted more in a support role on the --

4    a lot of the clients that I had that -- that were my -- that

5    were assigned to me before I retired.  So it was more helping

6    the -- the new shareholders that assumed the responsibility for

7    those clients, and -- but my -- the whole idea of the

8    transition was that the interaction with the -- I had no more

9    leadership role, no more -- try to minimal interaction with the

10   client and didn't take responsibility for the clients.  That

11   was the responsibility of the new shareholders.

12   Q.    And can you describe, as a principal or shareholder of

13   KWC, what was your -- what were your duties and

14   responsibilities?

15   A.    So you had -- you're assigned different internal functions

16   within the firm.  It could be running the -- be in charge of

17   the, the IT, the -- it could be tax, it could be accounting, it

18   could be personnel, and then -- then you also were responsible

19   for managing the book or business or a client base.

20   Q.    You mentioned that you became the managing principal?

21   A.    Yes.

22   Q.    And is that the highest role in the company?

23   A.    Yes.

24   Q.    And when did you become the managing principal?

25   A.    Oh, probably in the early 2000s.  I don't remember the

Ayliff - Direct                                                          670

1   date.

2   Q.   And how long did you hold that position?

3   A.   I think for about eight years.

4   Q.   And then are you now fully retired?

5   A.   Yes.

6   Q.   I'm going to ask you some questions about how you prepared

7   tax returns while you worked at KWC.

8            Approximately, in total, how many tax returns did you

9   prepare while you worked at the firm?

10  A.   Over the -- over the 30-odd years, it was thousands.

11  Q.   And did you prepare -- did KWC prepare both individual and

12  business returns?

13  A.   Yes.

14  Q.   Did you prepare both federal and state returns?

15  A.   Yes.

16  Q.   Now, is there any document that memorialized the terms of

17  the agreement between KWC and its clients?

18  A.   Yes.

19  Q.   What is that called?

20  A.   It's an engagement letter.

21  Q.   What is the purpose of that document?

22  A.   It spells out the -- the terms of the engagement that --

23  or the project that we're going to do --

24  Q.   All right.  Let me show the --

25  A.   -- the responsibilities.

Ayliff - Direct                                                             671

1   Q.   Let me show you what's been marked as Government

2   Exhibit 153 in your binder.

3             Do you recognize what these documents are in 153?

4   A.   Yes.

5   Q.   What are they?

6   A.   Engagement letters.

7   Q.   And who are they addressed to?

8   A.   To Mr. Paul Manafort.

9             MR. ASONYE:  Your Honor, the Government moves 153

10  into evidence.

11            MR. DOWNING:  No objection.

12            THE COURT:  Admitted.  Proceed.

13            (Government Exhibit No. 153 was received in

14  evidence.)

15            MR. ASONYE:  And, Your Honor, may I publish a page --

16  two pages of this document?

17            THE COURT:  Yes, you may.  Yes.

18  BY MR. ASONYE:

19  Q.   Yes.  If you could turn to the engagement letter dated

20  January 2, 2015, which is on -- it's 11 pages in, Bates

21  No. 6131.

22  A.   Okay.

23  Q.   Are you there?

24  A.   Yes.

25  Q.   Okay.  Could you please read the first sentence of the

1  engagement letter?

2  A.   "We are writing this letter to confirm our understanding

3  of the terms and objectives of our engagement and the nature

4  and limitations of the service we will provide."

5  Q.   And then if you could go to the second sentence in the

6  second paragraph, what does that say?

7  A.   "We will not audit or verify the data you submit, although

8  we may ask you for clarification as needed."

9  Q.   Okay.  Are you familiar with what an audit is?

10 A.   Yes.

11 Q.   What is an audit?

12 A.   An audit is -- it's where we get engaged to do a

13 certain -- we get engaged to do an audit.  It's -- we then --

14 we obtain additional support.  A lot of it is third-party

15 verification for transactions and balances.  And the whole idea

16 of it is, is you end up issuing -- it's normally -- it normally

17 comes with a financial statement, and you issue a report that

18 goes -- an audit report that goes with the financial statements

19 to say that they're fairly stated.  And also you're not trying

20 to -- you're trying, at that point, also to -- part of it is

21 looking for fraud and things like that, too.

22 Q.   Now, are you familiar with -- the KWC also just prepared

23 tax returns; is that correct?

24 A.   Yes.  Well, KWC prepared tax returns and did audits.

25 Q.   Right.  And they're two different services?

1    A.    Yes.

2    Q.    Which one is more rigorous?

3    A.    The audit, significantly, sir.

4    Q.    Now, if you look at this document, there are a number of

5    entities that are listed.  Do you see them in the middle of the

6    first page?

7    A.    Yes.

8    Q.    Okay.  Why are there a number of business entities listed

9    in this document?

10   A.    Because this engagement letter is covering the preparation

11   of the tax returns for all of those entities.  Instead of

12   issuing individual letters for each one, we can just use one

13   letter that combines and, you know, is for all those entities.

14   Q.    Now, if you look at the second paragraph, could you read

15   the last sentence?

16   A.    "We may furnish you with questionnaires and worksheets to

17   help you gather the necessary information."

18   Q.    What document is referred to there?

19   A.    This -- there's an organizer that we provide when

20   preparing individual returns.

21   Q.    And can you briefly explain to the jury, what's a tax

22   organizer?

23   A.    A tax organizer is -- it's a set of forms that are sent

24   out to the client at the beginning of the year.  And what it

25   does is it lists -- it takes all the information from the prior

Ayliff - Direct                                                    674

1    year tax return and then lists it in this report that we send

2    them, and it helps them to gather all the information to

3    prepare the tax return for the current year.

4    Q.    All right.  If you look at the last paragraph, the first

5    sentence, just go ahead and read that.

6    A.    "You are responsible for management decisions and

7    functions and for designating an individual with suitable

8    skill, knowledge, or experience to oversee any bookkeeping

9    services, tax services, or other services we provide."

10   Q.    Now, do some clients use bookkeepers to track their

11   finances?

12   A.    Yes.

13   Q.    Or other individuals?

14   A.    Yes.

15   Q.    And what information do you collect from those third

16   parties?

17   A.    We collect the information we need to prepare tax returns.

18   Q.    And do you rely on the information provided to you from

19   third-party agents of your clients?

20   A.    Yes.

21   Q.    How important is it that information KWC receives from

22   third parties is accurate?

23   A.    Well, we rely on that information to prepare the tax

24   returns.

25   Q.    And did you explain that to your clients?

Ayliff - Direct                                                          675

1   A.    Yes.

2   Q.    And then if you could read the last sentence of the last

3   paragraph on Page 1 of the engagement letter?

4   A.    "Our engagement for the above-referenced tax work does not

5   include any procedures designed to detect material errors,

6   irregularities or illegal acts, including fraud or

7   defalcations, should any exist."

8   Q.    So when you're preparing a tax return as proposed -- as

9   opposed to an audit, does your firm typically look behind or

10  investigate the information provided to you by clients?

11  A.    No.

12  Q.    Now, are there times that you would ask for supporting

13  documentation?

14  A.    Yes.

15  Q.    And when would you ask for that?

16  A.    Oh, as part of our preparation, we would -- if there's

17  anything that looks -- that we have any questions on, that we

18  need clarification on, then we would -- we would then ask the

19  client.

20  Q.    All right.  If you could turn to Page --

21              THE COURT:  Let me ask the operator -- it's

22  distracting -- once the question is finished, you can remove

23  the exhibit.  Thank you.

24              Next question.

25  BY MR. ASONYE:

Ayliff - Direct                                                        676

1   Q.   And if you could turn to Page 2 of the document?

2           And if you could read the first sentence to the jury?

3   A.   "You represent that the information you are supplying to

4   us is accurate and complete to the best of your knowledge and

5   that the expenses for meals, entertainment, travel, business

6   gifts, charitable contributions, dues and memberships, and

7   vehicle use are supported by records as required by law."

8   Q.   And, again, do you rely on representations directly from

9   your clients?

10  A.   Yes.

11          THE COURT:  Eliminate it entirely if it isn't being

12  asked about.

13          Next question.

14  BY MR. ASONYE:

15  Q.   And then on this portion again, now, the

16  second-to-the-last sentence of this paragraph?

17          THE COURT:  All right.  Now you can put up that.

18  BY MR. ASONYE:

19  Q.   What does it say there?

20  A.   It says -- okay, "We will not verify the information you

21  give us."

22  Q.   Now --

23          THE COURT:  All right.  Don't need to do it now.

24  It's already happened.  Let's move along.

25  BY MR. ASONYE:

Ayliff - Direct                                                      677

1   Q.   Now, Mr. Ayliff, if KWC receives false information from a

2   client, how does that affect their tax return?

3   A.   Then the tax return will be incorrect.

4   Q.   If you turn two pages further on this document, is it

5   signed?

6   A.   Yes.

7           MR. ASONYE:  Your Honor, may we publish this page?

8           THE COURT:  No.  You know that's signed, they're

9   going to be able to see a signature.  Move on.

10          (Laughter.)

11          MR. ASONYE:  Okay.

12  BY MR. ASONYE:

13  Q.   Okay.  Who is this -- do you -- who is it signed by?

14  A.   It's Mr. Manafort.

15  Q.   All right.  Does -- when are federal business tax returns,

16  business returns due?

17  A.   They are due either March 15 or April 15.

18  Q.   And what about individual returns?

19  A.   April 15.

20  Q.   Can you get an extension on both returns?

21  A.   Yes.

22  Q.   How long can you get an extension for both returns?

23  A.   Six months.

24  Q.   Now, before filing a return, does KWC send a draft tax

25  return to its clients?

Ayliff - Direct                                                      678

1    A.    Yeah, normally we do, yes.

2    Q.    And why do you do that?

3    A.    Oh, to give the client a chance to review the return to

4    make sure that they -- that it's accurate and they feel

5    comfortable with it.

6    Q.    And do clients have to approve of their returns?

7    A.    Yes.

8    Q.    And how do they do that?

9    A.    Well, once the return is -- once we get the go-ahead from

10   the client to finalize the return, then an eFile form and then

11   the actual final return is sent to them.  And then they'll sign

12   the eFile form and send it back, and that's the final approval

13   from the client.

14   Q.    Who decides whether to file a tax return electronically or

15   by paper?

16   A.    The taxpayer.

17   Q.    Okay.  Now, if it's filed by paper, how does that work?

18   A.    If it's filed by paper, then a hard copy of the return,

19   together with the materials, will be sent back to them by mail

20   or courier, and then they have to sign it and then mail it.

21   Q.    And, Mr. Ayliff, you testified earlier that Government

22   Exhibit 153, the 2015 engagement letter, was signed by

23   Mr. Manafort.  In that exhibit, are all other engagement

24   letters signed except for 2016?

25   A.    Yes.

1    Q.   Now, can KWC -- well, let me show you what's been marked

2    as Government Exhibit 204.  And what are -- what's contained in

3    204, the whole exhibit?

4    A.   These are eFile forms.

5    Q.   For who?

6    A.   For Mr. and Mrs. Manafort.

7             MR. ASONYE:  Your Honor, the Government moves 204

8    into evidence.

9             MR. DOWNING:  No objection.

10            THE COURT:  It's admitted.

11            (Government Exhibit No. 204 was received in

12   evidence.)

13            MR. ASONYE:  Your Honor, may we publish the first

14   page?

15            THE COURT:  Do you need to publish it?

16            MR. ASONYE:  Yes, Your Honor.

17            THE COURT:  All right.  You may publish it.  I don't

18   think you need to publish it.  There's not any objection, is

19   there, as to who signed these returns?

20            MR. DOWNING:  No, Your Honor, in fact, it's

21   certified --

22            THE COURT:  All right.  Move it along.

23            MR. ASONYE:  Your Honor, if I could --

24            THE COURT:  No, move it along.  I've let you do this,

25   but you have in mind that I don't want to waste time.

Ayliff - Direct                                                          680

1            MR. ASONYE:  I don't, Your Honor.  I simply want to

2    point out the jurat on the document, not the signature.

3            THE COURT:  All right.  You may do so.

4    BY MR. ASONYE:

5    Q.   Okay.  If we could focus on Part 2 of the document, where

6    it says Taxpayer Declaration and Signature Authorization?

7    A.   Uh-huh.

8    Q.   Could you please read to the jury the first two sentences

9    of that declaration?

10   A.   "Under penalties of perjury, I declare that I have

11   examined a copy of my electronic individual income tax return

12   and accompanying schedules and statements for the tax year

13   ending December 31" -- this is 2011 that I'm reading -- "and to

14   the best of my knowledge and belief, it is true, correct, and

15   complete."

16   Q.   All right.  And for each of the authorizations in this

17   exhibit, are they all signed by Mr. Manafort for 2011 through

18   2015?

19   A.   Yes.

20   Q.   Who retains the -- you can take that down.

21            Who retains the eFile authorization form?

22   A.   The eFile forms are -- it's KWC does, the firm, the

23   accounting firm does.

24   Q.   And what other documentation does KWC retain regarding tax

25   returns that you prepare?

1   A.   A copy of the tax return and a copy of the supporting work

2   papers.

3   Q.   With respect to Mr. Manafort, did he ever complain to you

4   that you filed a tax return on his behalf without his

5   authorization?

6   A.   No.

7   Q.   Now, when preparing an individual tax return, does the IRS

8   ask any questions on the return or the form about whether the

9   filer has any foreign bank accounts?

10   A.   Yes.

11   Q.   On what schedule of an individual tax return is this

12   question asked?

13   A.   Schedule B.

14          MR. ASONYE:  Your Honor, at this time, the Government

15   would, I believe, we'll move all the tax returns into evidence.

16          THE COURT:  All right.  You may do so.

17          MR. ASONYE:  It is -- it's a series, Your Honor, a

18   337 series.  It is essentially 337A through U, Your Honor.

19          THE COURT:  337A through U.

20          Any objection to those?

21          By the way, Mr. Asonye, the Government, you provided

22   me with a list of exhibits for a particular witness and those

23   exhibits are not on the list.

24          MR. ASONYE:  Are not on there?  My apologies, Your

25   Honor.

1              THE COURT:  That's all right.  Don't worry about it.

2    It's not a big deal.  Just tell me again what they are because

3    I'm going to admit them if there's no objections.

4              MR. ASONYE:  They're 337A through U, and we think

5    they come under the stipulation, Your Honor.

6              THE COURT:  Yes.

7              Any objection?

8              MR. DOWNING:  No objection, Your Honor.

9              THE COURT:  They're admitted.  Proceed.

10             (Government Exhibit Nos. 337A through 337U were

11   received in evidence.)

12             MR. ASONYE:  Your Honor, I'm told that at the bench,

13   there is this tax return binder.

14             THE COURT:  Yes, but not in this list.

15             MR. ASONYE:  Okay.  Fair enough.

16   BY MR. ASONYE:

17   Q.   All right.  Let me show you what's been marked as

18   Government Exhibit 337E, as in "echo."

19             Do you have that in your -- do you have the tax

20   return binder?

21   A.   Not that I'm aware of.

22             Oh, yes, I do.  Thank you.

23   Q.   And if you turn to Bates -- if you're at 337E and you turn

24   to Bates Page 557?

25   A.   Okay.

1    Q.    Is this the Schedule B for Mr. Manafort's 2014 individual

2    return?

3    A.    Yes.

4    Q.    Okay.  Could you -- read to the jury the Question 7a?

5    A.    "At any time during 2014, did you have a financial

6    interest in or significant (sic) authority over a financial" --

7    Q.    I'm sorry, you said "significant."  Can you make sure you

8    read that correctly?

9    A.    Okay.  "At any time during 2014, did you have a financial

10   interest in or signature authority over a financial account

11   (such as a bank account, a securities account, or brokerage

12   account) located in a foreign country?  See instructions."

13   Q.    All right.  Now, what are the criteria that would cause

14   KWC to check "Yes" or "No"?

15   A.    We would -- in the organizer and in -- when we're

16   preparing the tax return, we'll ask the taxpayer as to whether

17   they have any foreign bank accounts or not or how to answer

18   this question.  And then in this case, we said no because we

19   had asked the question and we never -- the response was no.

20   Q.    All right.  And in this return, is the response no?

21   A.    Yes.

22   Q.    Now, what --

23   A.    No -- correct.

24   Q.    What is your understanding of the term "financial

25   interest"?

1  A.   Financial interest in an account is if you own the

2  account, if you have a --

3          THE COURT:  Are you offering him as an expert?

4          MR. ASONYE:  No, Your Honor, I'm just -- on the basis

5  of him preparing tax returns for that number of years, his

6  understanding of what the term means.

7          MR. DOWNING:  Your Honor, I would object.  I believe

8  the law on this --

9          THE COURT:  Well, you're a little slow, aren't you?

10          MR. DOWNING:  Very slow, I apologize.

11          I believe the law of what --

12          THE COURT:  No, he can't testify as an expert

13  because, well, first of all, he's not noticed as an expert.

14  But tell me why you think I should allow you to have him answer

15  that question.

16          MR. ASONYE:  Your Honor, may we approach?

17          THE COURT:  Yes, you may.

18          (Bench conference on the record.)

19          THE COURT:  All right, let's be clear.  The pending

20  question is to this witness what does he understand what to

21  mean, Mr. Asonye?

22          MR. ASONYE:  "Financial interest" to mean.

23          THE COURT:  "Financial interest" as stated in the tax

24  return.  What does he understand that to mean.

25          Do you object to that?

1             MR. DOWNING:   I object to that.

2             THE COURT:   And what's the basis for your objection?

3             MR. DOWNING:   I believe what the meaning of

4    "financial interest" is with respect to that question on the

5    returns is a matter of law for the judge, for the Court to

6    instruct the jury, and his understanding of that issue is not

7    relevant to the intent issue in proving up whether or not

8    Mr. Manafort knowingly and intentionally filed a false return.

9             THE COURT:   Well, they could certainly present expert

10   testimony to the jury, so the jury could do it.   I don't think

11   I necessarily agree with you that it's only for the Court --

12            MR. DOWNING:   Well, I would say the --

13            THE COURT:   -- but let's wait to see what Mr. Asonye

14   says.

15            MR. ASONYE:   I think, Your Honor, it's relevant to

16   how he prepared the tax returns.

17            THE COURT:   Oh, I don't doubt it that it's relevant.

18   I think what we're asking about is why do you think this

19   witness is the appropriate witness to answer a question that

20   seems to call for expert testimony when you-all haven't noticed

21   an expert -- that this person is an expert, so there's no, what

22   is it, Rule 12 notice?

23            MR. ASONYE:   Your Honor, I don't believe we're asking

24   him to define "financial interest" in terms of the legal

25   meaning.   It's just what he understood it to be, so that in

1   terms of him preparing the tax return and marking "yes" or "no"

2   communicating to the client that he -- just whatever his

3   understanding is.  He's free to cross on if you don't

4   understand the term correctly, but it's not that this is the

5   law of "financial interest."  It's just what his understanding

6   is.

7            THE COURT:  I don't see how his understanding,

8   frankly, is relevant unless there was a dispute about what was

9   there, because as he's already testified, he doesn't look

10  behind these questions and answers.  So I don't know what

11  difference it would make what he thinks.  Since they don't look

12  behind anything, what difference does it make?

13           And I'm not sure I agree with you that it's only for

14  the Court.  I think there could be testimony about what is

15  meant by that.

16           Do you anticipate down the line that Mr. Manafort is

17  going to take the position that he didn't put whatever was down

18  there because he didn't think that it fit under there because

19  of this financial interest requirement?

20           MR. DOWNING:  I believe, Your Honor, there will come

21  a point in the trial where we will ask this Court to instruct

22  the jury on what "financial interest" means under the

23  requirements of filing a foreign bank account report.  We

24  believe that will be an issue that we're going to ask the Court

25  to instruct the jury on.

Ayliff - Direct                                                        687

1            THE COURT:  Do you have any authority that it's for

2      the Court only?

3            MR. DOWNING:  Yes, we do.  We will brief it for you.

4      We have it briefed already, and it would be improper --

5            THE COURT:  Do you mean I already have a brief?

6            MR. DOWNING:  No, we have the brief.

7            THE COURT:  I think this is probably, I don't know

8      that it's important enough to you-all, but it's probably

9      important for you-all to have an opportunity to tell me why

10     this witness should be entitled to give his personal view given

11     the fact that I don't think his personal view is relevant.  He

12     doesn't look behind it.  He doesn't make a judgment.  He just

13     reports whether -- what the client tells him, yes or no.  So

14     what difference does it make what he thinks?

15           MR. ASONYE:  Well, Your Honor, what he will actually

16     testify to is they don't audit, but they do ask follow-up

17     questions.  They do try to help clients understand whether they

18     have reporting obligations.

19           THE COURT:  Well, why -- then it may be relevant for

20     you to ask whether on any of these questions, did he have a

21     conversation.

22           MR. DOWNING:  And we would not object to that, Your

23     Honor.

24           MR. ASONYE:  And, Your Honor --

25           THE COURT:  But just to give his, his opinion, given

1   the fact that you've established quite clearly that they don't

2   look behind anything, I don't see what his personal view has to

3   do with the case, but I'm going to give you a chance to brief

4   that.  I don't think it has anything to do with it, even if it

5   would be admissible, and take into account that you -- it may

6   be a matter for expert testimony on which you didn't give the

7   required notice.

8           MR. ASONYE:  Two things, Your Honor:  We actually did

9   provide them notice on a different witness, on the summary

10  expert --

11          THE COURT:  Well, that witness you can do it for.

12          MR. ASONYE:  And number two, just to Mr. Downing's

13  point about briefing this issue, we've submitted joint jury

14  instructions with the definition of "financial interest" and

15  "signature authority."

16          THE COURT:  All right.  Don't ask this witness to

17  contradict it.  If you, if you two have, that is, both sides

18  have agreed to a definition of "financial interest," why muddy

19  the waters when I'm going to give it to them?

20          I'm not sure you-all have thought enough about this,

21  and if it's going to be an issue that you fight about -- I'll

22  tell you what.  I'm going to reserve judgment on this.  I will

23  give you a chance to say, both of you to say anything you want

24  to, and we're going to have to do it quickly because this

25  witness is going to testify and be gone tomorrow.

1          Let me be clear:  I don't have any doubt that a

2   knowing -- or a knowledgeable witness, expert could testify

3   about what something under the law means, because "financial

4   interest" is in the statute, and therefore, you're asking for

5   an opinion, and I don't think his opinion makes any difference

6   for two reasons:  One, he's not an expert that's been provided

7   notice about, and number two, he's already said he doesn't look

8   into these things, doesn't look behind them.  He doesn't

9   exercise any judgment about that.

10          Now, you've told me that, well, he does help people

11  and talk about it.  Okay.  I don't have any evidence about that

12  now, and I've already heard from the defendant that they don't

13  object to any evidence if he discussed with someone that, if

14  he's going to say he discussed.

15          So that's my current thinking.  If you can change my

16  mind on any of that with authority, I will consider it.

17          You'll have the same opportunity.  But I need to hear

18  about it forthwith, that is, before tomorrow, before we finish

19  this witness.  Otherwise -- oh, the other thing that I'll

20  mention, it seems to me there's no dispute about what

21  "financial interest" is.  Since you have agreed, there's a

22  proposed jury instruction as to which --

23          MR. DOWNING:  That's correct.

24          THE COURT:  -- the government and the defendant

25  agree, and one of those is what is a financial interest.

 1          Well, as I've said, I don't want to muddy the water.

 2   I'm not going to let someone else throw out some other opinion

 3   there if you've already agreed to what it is.  So address all

 4   of that, if you would, in your briefs, and I'm prepared to

 5   change my mind about all of it if you point that out, but for

 6   now, let's go on.

 7          I'll go on for maybe another 20 minutes.  Do you have

 8   enough to keep you going for 20 minutes by skipping over this?

 9          MR. ASONYE:  Yes, I think so.  Absolutely, Your

10   Honor.

11          THE COURT:  All right.  I will simply tell the jury

12   that I've taken an issue under advisement and we're going to go

13   on.  I'll leave it at that.  Any objection to that?

14          MR. DOWNING:  No objection.

15          THE COURT:  Let's proceed.

16          MR. DOWNING:  Thank you, Your Honor.

17          MR. ASONYE:  Thank you.

18          (End of bench conference.)

19          THE COURT:  All right.  Ladies and gentlemen, I've

20   heard some argument.  I'm going to defer the matter.  We're

21   going to go on.  We may or may not need to come back to it.

22          Next question, Mr. Asonye.

23   BY MR. ASONYE:

24   Q.   I think we're on, Mr. Ayliff, the tax return on Bates

25   page 557.

1            Does each -- each tax return in each year between

2   2010 and 2014, did it ask on the individual return whether the

3   individual had a foreign bank account?

4   A.   Yes.

5   Q.   And then could you please read the next sentence below 7a,

6   starting, "If 'Yes'"?

7   A.   If "Yes," you are required to file a FinCen Form 114, a

8   report to a foreign bank and foreign -- and financial accounts,

9   FBAR, to report that the financial interest or signature

10  authority, and then --

11  Q.   And are you familiar with an FBAR filing?

12  A.   Yes.

13  Q.   Have you filed FBARs before?

14  A.   Yes.

15  Q.   Is it -- how frequently do you file FBARs for your

16  clients?

17  A.   Oh, every year there's some that have to be filed.

18  Q.   Now --

19            THE COURT:  Remind me once again what FBAR stands

20  for?  Foreign Bank Account Report, FBAR?

21            THE WITNESS:  Yes.  It's foreign bank and financial

22  accounts.

23            THE COURT:  But FBAR really is Foreign Bank Account

24  Report?

25            THE WITNESS:  Yes, it's report of foreign bank and

Ayliff - Direct                                                              692

1   financial accounts.

2            (Laughter.)

3            THE COURT:  All right.  Let's go on, Mr. Asonye.

4            MR. ASONYE:  All right.

5   BY MR. ASONYE:

6   Q.   In addition to this question in writing, did KWC ask

7   clients if they had foreign accounts in writing each year?

8   A.   Yes.

9   Q.   All right.  If we could turn back to the engagement

10  letter, which is Government Exhibit 153?

11           THE COURT:  I'm just standing for the comfort of my

12  back.

13  BY MR. ASONYE:

14  Q.   This is the second page of the engagement letter, which is

15  6132.

16           MR. ASONYE:  And, Your Honor, if we could just

17  publish this part of the page?

18           THE COURT:  Yes, you may.

19           MR. ASONYE:  It should be page 12 for you,

20  Mr. Binder.

21  BY MR. ASONYE:

22  Q.   Are you there, Mr. Ayliff?

23  A.   Yes.

24  Q.   Do you see a bolded section of the engagement letter?

25  A.   Yes.

Ayliff - Direct                                                          693

1    Q.    Okay.  What does that say?

2    A.    "Foreign Related Reporting Requirements."

3    Q.    Go ahead and read the two paragraphs below it for the

4    jury.

5    A.    The introduction paragraph or just the other --

6    Q.    "There are several..."

7    A.    Okay.  "There are several different reporting requirements

8    related to foreign matters.  Failure to timely and adequately

9    disclose the required information to the U.S. Department of the

10   Treasury may result in substantial civil and/or criminal

11   penalties."

12          Then the Foreign Bank and Financial Accounts Report,

13   which is the FBAR, "Any entity subject to the jurisdiction of

14   the U.S. having a financial interest in, or signature or other

15   authority over, a bank, securities, or other financial

16   account(s) in a foreign country having an aggregate value

17   exceeding $10,000 on any day of the year shall report such

18   relationship."

19   Q.    That's -- that's fine.

20          Was this -- and this is in the engagement letter,

21   correct?

22   A.    Correct.

23   Q.    Now, was information about a client's foreign accounts

24   important to KWC?

25   A.    Yes.

1    Q.    Why?

2    A.    Because we wanted to make sure that the clients were

3    complying with this rule.  If they -- the penalties are very

4    severe, and we also wanted to make sure that if there is any

5    income in -- related to these accounts, that they -- it was

6    also reported.

7    Q.    Okay.  And are you familiar with a 1099-INT?

8    A.    Yes.

9    Q.    Okay.  What is that?

10   A.    It's a -- Form 1099-INT reports income -- interest income

11   that's been earned on financial -- or on accounts typically at

12   banks or investment houses in the U.S., and that is sent out to

13   the recipients, and also a copy is sent to the IRS each year.

14   Q.    Now, with respect to foreign bank accounts, what is your

15   understanding of whether interest earned in a foreign account

16   is typically reported to the individual -- to the IRS?

17   A.    Typically it is not.

18   Q.    And does KWC get reports directly from international banks

19   about your clients' accounts?

20   A.    No.

21   Q.    So is KWC alerted to the existence of a foreign account if

22   the client doesn't tell you?

23   A.    No.

24   Q.    Now, the question that you just went through, 7a on

25   Schedule B for the individual return, does the same question

Ayliff - Direct                                                    695

1    appear on a business tax return for, say, a company like DMP

2    International?

3    A.   Yes.

4    Q.   And did KWC also ask clients whether any of their

5    corporate or their business entities maintain foreign accounts?

6    A.   Yes, we did.

7    Q.   Was there any time period where you understood the IRS was

8    placing a greater emphasis on the recording of foreign bank

9    accounts?

10   A.   Yes.

11   Q.   When did that occur?

12   A.   That was in -- probably in the early 2010 time.

13   Q.   Two thousand when?

14   A.   2010.

15   Q.   And what, if any, impact did that have on KWC's

16   communications with its clients about foreign bank accounts?

17   A.   We placed more emphasis on it.

18   Q.   If a client tells you that they have a foreign bank

19   account, what other questions would you ask?

20   A.   We would want to know what the balances were, what are the

21   account numbers, what accounts was income that was earned, that

22   was the highest balance during the year, information like that,

23   what was the exchange rate.

24   Q.   And as a tax preparer, if you don't know about all your

25   clients' foreign bank accounts, can you accurately report

1    income to the IRS?

2    A.    No.

3    Q.    All right.  Are you familiar with what an S Corporation

4    is?

5    A.    Yes.

6    Q.    Okay.  In general, do S Corporations pay federal income

7    tax at the business level?

8    A.    No.

9    Q.    And are you familiar with a partnership?

10   A.    Yes.

11   Q.    In general, do partnerships pay income tax at the business

12   level, federal income tax?

13   A.    No.

14   Q.    Are you familiar with something called a Schedule K-1?

15   A.    Yes.

16   Q.    Okay.  What is a Schedule K-1?

17   A.    So when you prepare an S Corporation or a partnership

18   return, you calculate what the taxable income is on the tax

19   return, and then it is then allocated to the shareholders or

20   the partners on the Form K-1, which is a byproduct of the tax

21   returns.

22   Q.    Now, can you explain to the jury what partnership income

23   is?

24   A.    Partnership income is the income -- the gross revenue or

25   income that's generated by the partnership less the allowed

Ayliff - Direct                                                     697

1   business expenses to come up with what the taxable income is.

2   Q.   Is that something different than a partnership

3   distribution?

4   A.   Yes.  A distribution is -- is an amount of cash that's

5   actually paid out to the -- to the partners of the partnership.

6   Q.   Can businesses deduct expenses?

7   A.   Yes.  They can deduct ordinary and necessary business

8   expenses.

9   Q.   And what do you mean by "ordinary and necessary business

10  expenses"?

11  A.   They have to relate to the business.  It's in the

12  production of income.

13  Q.   What type of expenses are not deductible for business?

14  A.   Personal expenses, penalties, things like that.

15            THE COURT:  I think we will recess a bit early.

16            You may step down, sir, and, Mr. Ayliff, you must not

17  discuss your testimony with anyone during the time that you're

18  on the stand.  So this evening, don't talk to any lawyers or

19  anybody else about your testimony.

20            THE WITNESS:  Yes, sir.

21            THE COURT:  And we will begin tomorrow morning at

22  9:30.  Thank you, sir.

23            THE WITNESS:  Thank you.  May I leave?

24            THE COURT:  Yes.

25            THE WITNESS:  Thank you.

698

1                    (Witness stood down.)

2          THE COURT:  All right.  Ladies and gentlemen, pass

3  your books to the right.  Remember to refrain from discussing

4  this matter with anyone, and refrain from -- resist the

5  temptation to answer the questions that you'll be asked,

6  although we're reaching the point where they won't believe

7  they've been missed anyway, and don't conduct any electronic --

8  or I don't even -- don't look up anything in books or anything

9  else about this case at all.  We'll begin tomorrow morning at

10 9:30.

11         I have something else at 8:30 again tomorrow, but, as

12 happened today, I'm confident I will finish before 9:30,

13 although everybody else was here at 8:30.  I don't know whether

14 they wanted to hear my mellifluous voice or whether the seats

15 they are occupying are so valuable that they're not going to

16 give them up.  I suspect it's the latter.

17         All right.  Thank you.  You may follow -- oh, did you

18 fill out your menus?

19         A JUROR:  Yes.

20         THE COURT:  Thank you.  You may follow Mr. Flood out.

21                    (Jury out.)

22         THE COURT:  All right.  You may be seated.

23         Let me briefly explain why I recessed a little early,

24 and say something about what went on at the bench conference so

25 the public has some idea.  It wasn't very complicated or, in my

1    view, in the end very significant.

2           But the question was asked -- help me out,

3    Mr. Asonye.  What was your question?  It was about financial

4    interest.

5           MR. ASONYE:  Yes.  What was his understanding of the

6    term "financial interest"?

7           THE COURT:  Now, the reason this began to tread on

8    more sensitive ground is that I took that question possibly as

9    a question you would put to an expert on a question of law,

10   because the term "financial interest" in this context is a term

11   in the statute.

12          I don't know whether these parties have a different

13   view about what financial interest is and whether there's going

14   to be a dispute about it.  If there is and if it's a matter of

15   expert testimony, then this witness couldn't do it because

16   there was no notice from the Government that he was an expert

17   in this area, and that's required by the Rules.

18          There's another reason for it.  Well, there was also

19   an objection that it was only for the Court to do.  I don't

20   think so.  I think a witness could testify to that, but then

21   I'm advised here at the bench that both the Government and the

22   defendant have agreed to a jury instruction on what "financial

23   interest" in this context means.

24          So I'm concerned that if this witness, who is on the

25   stand, were to testify to something that contradicted an

1    instruction I'm going to give, that's hardly productive.

2         This case, I don't think, turns on financial

3    interest, but if it does, I'm going to have the parties submit

4    briefs to the Court, and I'll learn more about it, but I think

5    on the whole, it doesn't matter what this particular witness'

6    view on what "financial interest" is.

7         But if I read something tomorrow morning that is

8    submitted that shows that I haven't thought about it as

9    carefully as I should and I don't understand it as well as I

10   should, I'll change my mind, but that's where we are at the

11   moment.

12        I don't think in the end it makes a significant

13   difference.

14        Now -- and now he's back in that area because he's

15   being asked other -- the other point I -- I made at the bench

16   is it doesn't really matter what he thinks a financial interest

17   is, because Mr. Asonye has already carefully established that

18   he relies entirely on what the client says.  If the client

19   says "none" or "zero," that's it.  He doesn't inquire behind

20   it.  So what difference does it make what he thinks?

21        I don't know the answer to that question from the

22   Government or the defendant yet either.  But I think this is

23   really much ado about very little, and we're going to proceed,

24   I'm going to consider anything, and, of course, you may decide

25   you really don't need it, you don't want to submit anything.

1   That's fine with me too.  We'll just go on.  But then you don't

2   go through the tax return and ask him what that means.

3           There's one other thing.  I think, Mr. Asonye, you

4   told me at the bench that there was actually -- you thought

5   there might be some discussion between this witness and

6   somebody, either Mr. Manafort or somebody on his behalf, asking

7   a question about financial interest.

8           If that's true, then you can present that evidence,

9   and as I understand it, the Government has -- or the defendant

10  has no objection to that.

11          MR. DOWNING:  That's correct.

12          THE COURT:  All right.  Let's see if that's true.

13  But I'll read what you submit, and, of course, what you submit

14  will be a public document, and all of you-all can read it.  I

15  want to share my pain.

16          (Laughter.)

17          THE COURT:  And that's how we'll proceed.  But

18  it's -- it's not an unimportant thing, because the indictment

19  charges Mr. Manafort with not being truthful on those -- is it

20  four returns or three returns?

21          MR. ASONYE:  Five returns.

22          THE COURT:  Five returns in which there was a

23  statement in the return marked "none," that is, no financial

24  interest or control over a foreign bank account, and we've

25  heard evidence, you would say, Mr. Asonye and Mr. -- well, all

1    three of you would say that we've heard evidence to the

2    contrary.  I don't make decisions about the facts.

3           So it isn't an unimportant point.  It's a central

4    point to certain allegations in the indictment, and we need to

5    be careful and thorough about addressing them.

6           Anything else this evening, Mr. Asonye, on this?

7    Remember, if you don't want to pursue that matter with this

8    lawyer, let everyone know and we won't worry about it.  If you

9    do, let me have something very brief, and you may do the same,

10   but it seems to me that if Mr. Asonye is going to raise with

11   this or other witnesses some discussion between Mr. Manafort

12   and persons associated with him concerning that or other parts

13   of the form, then, as you've already indicated, you have no

14   objection to that, and we'll hear it.

15          The overriding thing, Mr. Asonye, is that you and the

16   defendant have already agreed on what "financial interest" is

17   and put it in the instructions.  I don't want that confused or

18   clouded up by what some witness might say, and I don't even

19   know whether there's a dispute about it.  It doesn't seem to me

20   that there is.

21          Perhaps -- and I -- I refrain from asking you,

22   because you don't have to tell me at this time, what your

23   position is, although you do have to tell me what your position

24   is on this objection you've raised that I've deferred.

25          MR. DOWNING:  Your Honor, and we will try to work

1    with the Government to see if we don't have to file anything

2    with the Court.  We'll do that.

3            THE COURT:  All right.  That would be helpful.  They

4    don't have to write anything, you won't have to write anything,

5    and whatever you've agreed to, we'll do.

6            MR. DOWNING:  Thank you, Your Honor.

7            THE COURT:  All right.  I thank you for your

8    cooperation this evening.

9            I still think we will finish before the end of next

10   week.  Is that your view, Mr. Andres?

11           MR. ANDRES:  I hope so, Judge.  I'm not sure that

12   we'll finish -- when I say "finish," I think the Government's

13   case-in-chief would be finished before the end of next week.  I

14   don't -- obviously, and defense has no obligation, I'm not sure

15   we'll be finished with all the evidence.

16           THE COURT:  Oh, of course not.  You don't know what

17   they're going to do, do you?

18           MR. ANDRES:  Exactly, yeah.

19           THE COURT:  Do you?

20           MR. ANDRES:  No.

21               (Laughter.)

22           MR. ANDRES:  I'm working on what I have to do, Judge,

23   concentrating on that.

24           THE COURT:  Of course you don't.  That will -- we

25   will see.  I don't know either.

```
 1              They don't know yet.  They don't know until you
 2      finish your case, and then they will have to make their
 3      decision.
 4              All right.  Thank you for your cooperation this
 5      evening, and I'm not unmindful -- I'm not much for the press.
 6      I never speak to any member of the press, but I am sensitive to
 7      the fact that the public should understand what happens in
 8      these proceedings and should have an understanding of it, and I
 9      know there are many members of the press who work hard to bring
10      that about, and, of course, we see -- I see situations where it
11      isn't reported accurately, not the facts, but they don't
12      understand things quite, some members, and so it's -- and I've
13      contributed to some extent to that in some comments I've made.
14              But, anyway, you-all do your job, and I'll do mine.
15              MR. ASONYE:  Your Honor, could I raise one issue?
16              THE COURT:  Yes.
17              MR. ASONYE:  Just because I've dealt with this in
18      other trials.  Mr. Ayliff is represented by counsel.  I know
19      the Court's order --
20              THE COURT:  Yes.
21              MR. ASONYE:  May he --
22              THE COURT:  He wanted -- that's another thing.  I was
23      met with a request to have his counsel appear at the witness
24      stand with him.  I said, no, his counsel can sit back here.
25              Is he here, by the way?
```

1                    (No response.)

2          THE COURT:  No.  But you can't have -- I don't

3    typically allow a witness' lawyer to appear with the witness

4    while the witness is on the witness stand.  I don't think it's

5    good for the Government to have that happen, and I don't think

6    it's good for the Court system to have it happen.

7          MR. ASONYE:  Certainly, Your Honor.  That's not our

8    question.  The only question is while he's off the stand this

9    evening, if he's allowed to discuss his testimony with his

10   attorney.  Obviously, and we're not anticipating discussion --

11         THE COURT:  The answer to that is I wasn't asked.  I

12   don't know.  And you're asking me so that you can answer his

13   question?

14         MR. ASONYE:  Correct, Your Honor.

15         THE COURT:  Well, I usually don't cross bridges

16   unless I have to.  That's a bridge I don't think I need to

17   cross.  For defendants now, it's clear defendants can, if they

18   testify or don't, they can always talk to their lawyers.  Civil

19   matters are different.  If -- I told him he couldn't talk to

20   anybody.  If you want to, you can ask him tomorrow morning,

21   "Did you follow the Court's instruction?"

22         I won't.  I'll assume he did.

23         Anything further?

24                    (No response.)

25         THE COURT:  So to be clear, I didn't answer your

1    question.

2              (Laughter.)

3              THE COURT:  Yes, anything further?

4              MR. ASONYE:  Nothing, Your Honor.

5              MR. ANDRES:  Thank you, Judge.

6              THE COURT:  I do thank counsel.  You-all are, I know,

7    working hard to bring this matter as expeditiously as possible

8    to a conclusion, and rest assured I appreciate that.

9              Court stands in recess.

10      (Recess from 5:30 p.m., until 9:30 a.m., August 3, 2018.)

11

12                   CERTIFICATE OF THE REPORTER

13        I certify that the foregoing is a correct transcript of

14    the record of proceedings in the above-entitled matter.

15

16

17    _____  /s/

18                              Anneliese J. Thomson

19

20

21

22

23

24

25