─────────────────────U.S. v. Manafort─────────────────────

1

```
 1                 UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   ------------------------------x
                                   :
 4   UNITED STATES OF AMERICA,      : Criminal Action No.
                                   : 1:18-CR-83
 5             versus               :
                                   :
 6   PAUL J. MANAFORT, JR.,         :
                                   : July 31, 2018
 7                  Defendant. : Volume I - AM/PM
     ------------------------------x

 8
                     TRANSCRIPT OF JURY TRIAL
 9          BEFORE THE HONORABLE T.S. ELLIS, III
                  UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     FOR THE GOVERNMENT:        UZO ASONYE, AUSA
12                              United States Attorney's Office
                                2100 Jamieson Avenue
13                              Alexandria, VA 22314
                                     and
14                              GREG ANDRES, SAUSA
                                BRANDON LANG VAN GRACK, SAUSA
15                              Special Counsel's Office
                                U.S. Department of Justice
16                              950 Pennsylvania Avenue NW
                                Washington, D.C. 20530
17
     FOR THE DEFENDANT:         JAY ROHIT NANAVATI, ESQ.
18                              Kostelanetz & Fink LLP
                                601 New Jersey Avenue NW
19                              Suite 620
                                Washington, DC 20001
20                                 and
                                THOMAS E. ZEHNLE, ESQ.
21                              Law Office of Thomas E. Zehnle
                                601 New Jersey Avenue NW
22                              Suite 620
                                Washington, DC 20001
23                                 and
                                KEVIN DOWNING, ESQ.
24                              Law Office of Kevin Downing
                                601 New Jersey Avenue NW
25                              Suite 620
                                Washington, DC 20001
```

─────────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────────

 1                                  and
                         RICHARD WILLIAM WESTLING, ESQ.
 2                       Epstein, Becker, & Green, PC
                         1227 25th Street NW
 3                       Washington, DC 20037

 4   OFFICIAL COURT REPORTER:    TONIA M. HARRIS, RPR
                         U.S. District Court, Ninth Floor
 5                       401 Courthouse Square
                         Alexandria, VA 22314

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────────────────────────U.S. v. Manafort─────────

3

1                           TABLE OF CONTENTS
                                   TRIAL
2                               WITNESSES

3      On behalf of the Government:

4      Thomas Devine

5              Direct examination by Mr. Andres.............. 69
               Cross-examination by Mr. Westling............ 118
6              Redirect examination by Mr. Andres........... 125

7                               EXHIBITS

8      On behalf of the Government:
                                                       Admitted
9
       Number 448.......................................... 69
10     Number 4............................................ 78
       Number 7............................................ 86
11     Number 8............................................ 88
       Number 9............................................ 90
12     Number 10........................................... 93
       Number 11........................................... 100
13     Number 12........................................... 101
       Number 20........................................... 102
14     Number 14........................................... 106
       Number 15........................................... 107
15     Number 16........................................... 112
       Number 18........................................... 113
16     Number 19........................................... 115
       Number 6............................................ 116

17                              MISCELLANY

18
       Preliminary matters................................. 04
19     Motions............................................. 04
       Opening statements of Mr. Asonye.................... 22
20     Opening statements of Mr. Zehnle.................... 39
       Certificate of Court Reporter...................... 132

21

22

23

24

25

U.S. v. Manafort

4

1                 **P R O C E E D I N G S**

2            (Court proceedings commenced at 9:05 a.m.)

3            THE COURT:  Good morning.  This is United States

4    against Paul Manafort, Jr.  It's 1:18-CR-83.

5            And the record will reflect that all parties of the

6    defendant -- or all counsel and the defendant are present.

7            But let's have briefly for the Government who will

8    be heard this morning.

9            MR. ANDRES:  I will go, Your Honor, with respect to

10   the motion, Greg Andres.

11           THE COURT:  All right.  That's Mr. Andres?

12           MR. ANDRES:  Yes, Judge.

13           THE COURT:  All right.  And for the defendant?

14           MR. DOWNING:  Good morning, Your Honor.  Brian

15   Ketcham will be taking the argument this morning.

16           THE COURT:  All right.  Good morning to all of you.

17           Now, let me tell you what I anticipate doing between

18   now and the voir dire.

19           We have outstanding a motion in limine brought on by

20   a motion -s- well, it was brought on this past -- not this

21   past weekend, but I think the weekend before that.  It

22   involves 50 exhibits, roughly 400 pages.

23           I do not intend to take the time at this point to

24   resolve the issues with respect to each of the motions -- or

25   each of the documents.  Instead, what I will do is tell you

─────────── U.S. v. Manafort ───────────

5

1   what principles will be used to resolve that.  And I would

2   expect counsel to consider those principles, apply them, and

3   perhaps reduce the number of exhibits to be offered.

4          All right.  First, there was an issue of relevancy.

5   And in that regard, I think the Government is correct that

6   documents which tend to show the nature of funds that

7   Mr. Manafort received as income that had to be reported, those

8   documents are relevant.

9          Obviously, I am now not at this time going through

10  each of the documents to make that determination and hear

11  argument about each of the documents.  That would be too time

12  consuming at this point.  If it becomes necessary to do so, I

13  will do so.  So that's the first principle.

14         But, of course, the fact that documents may be

15  relevant is not the end of the inquiry.  Instead, the Court

16  will have to consider in addition whether the documents are

17  perhaps inadmissible because they are cumulative, because they

18  are unfairly prejudicial or confusing or for some other reason

19  not admissible.

20         And, again, I have not made that determination with

21  respect to each of the 50 exhibits and 400 pages that are in

22  issue.  I will do so if I have to, but I hope you will take

23  those principles back, apply them rigorously, and perhaps

24  reduce the number.

25         Now, there's one other principle that's not as

U.S. v. Manafort

6

1   familiar to most lawyers, and that is I do not want a data

2   dump into the record on the assumption that when the jury

3   retires to deliberate on its verdict, it's going look at this

4   data dump without any previous testimony or description of it

5   except perhaps by way of argument.

6        So I don't expect these 400 pages of documents

7   simply to be dumped into the record.  I would expect that the

8   offering party, which in this case would be the Government,

9   will elicit some testimony about them and that there will be

10  some relevance pointed out to the jury.

11       I think Mr. Asonye is familiar with that requirement

12  that I have.

13       MR. ASONYE:  Yes, Your Honor.

14       THE COURT:  So I will delay the disposition of the

15  motion in limine until after jury selection, and we'll deal

16  with it again either document by document or in some other

17  fashion.  For example, I will be asking you at this time not

18  to include any specific document in that category that I

19  haven't ruled on in your opening statements.

20       You may, however, refer to those class of documents,

21  which means you may tell the jury that they can expect to hear

22  evidence, testimony, and documentary evidence describing the

23  nature of the monies received, what they were received for.

24  That's one of your burdens.

25       Am I correct, Mr. Andres?

U.S. v. Manafort

7

1        MR. ANDRES:  Yes, Judge.

2        THE COURT:  All right.  Now, so that's the first

3   point I wanted to cover.

4        The second point I wanted to cover is, of course, we

5   have two groups of jurors, because we had to summon a --

6   another -- a second group.  So I will greet all the jurors at

7   ten o'clock, as I typically do, including the new ones.

8        In the greeting, I will use only numbers when we

9   call the roll.  We will not use names.  We will use numbers.

10  And the names and the numbers will be -- remain under seal for

11  the time being, that is, the association of a number with a

12  particular name.

13       I'll swear the jury, of course.  I'll summarize

14  certain portions of the indictment.  Of course, I will not

15  read the entire indictment.  Rather, I will try to summarize

16  or encapsulate the principal claims and allegations by the

17  Government, of course, telling the jury repeatedly that the

18  indictment is not proof or evidence of guilt of any kind

19  whatsoever and that the defendant has pled not guilty to those

20  charges and therefore must be presumed by the jury to be

21  innocent of those charges unless and until the jury find

22  otherwise.

23       The jury will be sworn, and I will then proceed to

24  conduct the voir dire.  Now, when you-all asked the Court to

25  use the device of a preliminary questionnaire, I think at

U.S. v. Manafort

8

1    least the Government, I recall vividly, but I'm sure the

2    defendant did as well, assured me that it would shorten the

3    voir dire process.

4         I've had some experience in the last 30 years with

5    that, that in some instances it has been true but in many it

6    has not.  I expect it will be, however, in this case.

7         Now, specifically, I expect to begin the voir dire,

8    of course, by introducing parties and counsels to ensure there

9    are no affiliations that would prevent a juror from sitting as

10   a fair and impartial juror.

11        I will also -- there were some jurors that the

12   Government wished to be recalled.  I think those jurors --

13   there were three of them, as I recall.  I have those, and I

14   will ask them further questions.  I think it had to do with

15   whether they could put aside any preliminary opinion they

16   might have.

17        Then I will ask a number of questions relating to

18   the responses on the -- on the questionnaire about childcare

19   responsibilities and plans for August.  I even had requests by

20   the jury, of course -- under childcare, I even had others

21   about pet care.  And that doesn't surprise me.  I have pets.

22   And it only took a moment's reflection for me to recognize I,

23   too, pay close attention to that.  And it's very clear to my

24   wife and to me who has the duty to be there to feed them and

25   make sure they get out.  We live in the country so they don't

─────U.S. v. Manafort─────
9

1   have trouble getting out.

2          But in any event, I will ask those questions.  And

3   then we will begin.

4          Now, I will ask those of you in the courtroom who

5   are in this center area to leave the center area.  You could

6   sit on the sides if there's room; if not, there's an overflow

7   courtroom on the sixth floor, I believe.  And you may go down

8   there until after we have selected a jury.  Afterwards you may

9   return.

10         As you know, because I have made that clear, there

11  are no reserved -- or assigned -- you don't need to move right

12  now.  We're not going to do it until ten o'clock.  So relax.

13  We'll do it at ten o'clock.  And the deputy -- or the court

14  security officer will do that.  But that's the reason for it

15  and, of course, you may return as soon as the jury selection

16  process is over.

17         There is, as I said, an overflow courtroom on the

18  sixth floor.

19         There are no assigned seats.  You may sit wherever

20  you please in the courtroom.  First come, first served.

21         All right.  Are there any other preliminary matters,

22  Mr. Andres, that we should cover at this time?

23         MR. ANDRES:  No, Judge.

24         THE COURT:  All right.  Then let me ask the same of

25  Mr. Ketcham?

U.S. v. Manafort

10

1          MR. KETCHAM:  No, Your Honor.

2          THE COURT:  All right.  Yes, I'm advised that the

3    courtroom will be closed at five o'clock this afternoon.  In

4    other words, you can't get back in.  You can get out, but you

5    can't get -- oh, yes, courthouse.  What did I say?

6          Oh, yes.  The courthouse will be closed at five

7    o'clock.  So if you depart, and you're out at five o'clock,

8    you will -- cannot get back in.  I'll look into that.  It's

9    not a usual problem, but I'll look into that.

10          In any event, I don't know how late today we will

11    go.  I won't know that until I inquire of the jury whether any

12    of them have any responsibilities that they have to tend to so

13    that they need to be released sharply at five o'clock.  If

14    they don't, we'll go a little bit further, limited, of course,

15    by the stamina of counsel and the witnesses.

16          All right.  Anything further?

17          MR. ANDRES:  Not from the Government, Judge.

18          MR. DOWNING:  No, Your Honor.

19          THE COURT:  Yes, let me review that.  We are going

20    to seat 16 jurors.  There are, not coincidentally, 16 chairs

21    in the jury box.  But that will be 12 jurors and 4 alternates.

22          Now, the 12 will have to be chosen first.  And then

23    after the 12 are chosen and all strikes have been exercised

24    against the 12, Ms. Pham, the court -- or the deputy clerk

25    will call four additional names and they will be alternate

─────U.S. v. Manafort─────

11

1  jurors and they will serve in the order in which they were

2  called.

3          Now, you'll have -- because there are four

4  additional jurors, four alternates, you will each have two

5  additional strikes.  That means the defendant will have ten --

6  12 strikes, and the Government will have eight.  Eight strikes

7  for the Government, 12 strikes for the defendant.

8          And you may exercise those strikes entirely on the

9  first 12, if you wish, or you may reserve some for the

10  alternates.  Now, of course, any juror that passes a round is

11  thereafter cannot be stricken.  You can't go back and strike a

12  juror who has passed through a round.

13          When you indicate your strikes, the deputy -- or no,

14  the -- yes, the deputy clerk will hand the court security

15  officer, Mr. Flood, the board.

16          Do you have the board there, Margaret?

17          This is the board.  The names will be on the board.

18  And you'll put your strikes, for a particular round, at the

19  bottom under P and D.  Mark for each strike the number.

20          So, in other words, let's assume that the Government

21  decides to strike four jurors in the first round, they'll be

22  P-1, 2, 3, and 4; and for the defendant similarly D-1, 2, 3,

23  and 4.

24          That will ensure that we have an accurate count of

25  the strikes as they're exercised and importantly that you as

U.S. v. Manafort

12

1    well have an accurate count of the strikes.

2         Then at the close of the -- all of the strikes, we

3    will then swear the jury and proceed.  Now, prior to that, of

4    course, after all of the jury -- jurors are -- the voir dire

5    is completed, I will be asking whether you have any motions to

6    strike for cause.  Those will be done typically at the bench

7    because jurors will still be here.

8         Now, for those of you in the public, which includes

9    the press, things that are done at the bench will typically

10   remain under seal until the end of the case.  Some may be

11   unsealed before that.  So you will have access to it.

12        Some of the matters may remain under seal.  For

13   example, some jurors may come to the bench to tell the Court

14   about their -- any disabilities that may prevent them from

15   paying close and careful attention to the evidence as it's

16   being offered.  And those statements will typically remain

17   under seal, because they'll tell me about their medical

18   situation.  Some jurors will come to talk about their vacation

19   plans.  That will not remain under seal after the end of the

20   case.

21        All right.  We'll recess now until ten o'clock.  And

22   it's only then, or prior to 10:00, that I will ask those of

23   you in the center portion to vacate that area so that we can

24   put the jury there.

25        Mr. Flood, can we sit all 45 or 50 or more in the

─────────U.S. v. Manafort─────────

13

1    center section?

2            THE CSO:  45 to 50, yes, sir.

3            THE COURT:  All right.  And no one else -- I want no

4    one else in the center section.  I want the jurors to remain

5    separate and apart from other members of the panel.

6            And, of course, you should all -- those of you who

7    are in here, you should understand and recognize that you may

8    not talk to the jurors.  In other words, don't strike up a

9    conversation with them and ask them things during this period

10   of time.  Anything further?

11           All right.  Court stands in recess.

12           (Recess.)

13           (Voir dire held, but not included herein.)

14           (Jury not present.)

15           THE COURT:  All right.  We'll -- let me ask -- you

16   may be seated.  Let me ask, first of all, how long do you

17   think -- who will make the opening statement?

18           MR. ASONYE:  I will, Your Honor.

19           THE COURT:  Mr. Asonye, how long do you think you

20   need for opening statement?

21           MR. ASONYE:  No longer than 30 minutes, Your Honor.

22           THE COURT:  All right.  That's sensible.  Who will

23   make the opening statement for the defendant?

24           MR. ZEHNLE:  I will, Your Honor.

25           THE COURT:  All right.  And how long do you think

U.S. v. Manafort

14

1   you need for that?

2           MR. ZEHNLE:  Thirty minutes.

3           THE COURT:  All right.  And you're Mr. Westling?

4           MR. ZEHNLE:  No, I'm Mr. Zehnle.

5           MR. WESTLING:  We've been shuffling around.  We

6   apologize for that.

7           THE COURT:  So she's innocent.

8           All right.  How long did you say you needed?

9           MR. ZEHNLE:  Thirty minutes.

10          THE COURT:  All right.  I think that's appropriate

11  and sensible and be prepared to go on.  I'm not going to

12  address the 40 pages that are still in dispute.  Do you

13  anticipate those coming up in the first witness or so?

14          MR. ANDRES:  Several of them, but not any of the

15  ones that really are the longer ones that are really of

16  concern, but we can let defense know who we are going to call

17  and what exhibit --

18          THE COURT:  Which ones -- yes, advise chambers and

19  the defendants which ones you intend to use in these first few

20  witnesses so that I can pay attention to those.

21          MR. ANDRES:  Okay.

22          THE COURT:  Thank you.

23          MR. ASONYE:  Judge, I'm sorry, we also -- the

24  Government would move to exclude any witnesses once the

25  opening statements start with the exception of our expert and

U.S. v. Manafort

15

1    our case agent.

2           THE COURT:  All right.  Any objection to the case

3    agent and the expert?

4           MR. WESTLING:  No, Your Honor.

5           THE COURT:  Who is the expert?

6           MR. ASONYE:  Special Agent Michael Welch, Your

7    Honor.

8           THE COURT:  And in what discipline is he an expert?

9           MR. ASONYE:  In tax, Your Honor, tax computation,

10   Your Honor.  He's the IRS revenue agent.

11          THE COURT:  All right.  I will grant the motion to

12   exclude witnesses.  And other than the defendant, does the

13   defendant wish to have anyone else present.

14          MR. WESTLING:  No, Your Honor.

15          THE COURT:  Anything else before I recess?

16          MR. ANDRES:  No, Judge.  Thank you.

17          MR. WESTLING:  Nothing from the defense, Your Honor.

18          THE COURT:  All right.  I thank counsel for your

19   cooperation.  Court stands in recess until 2:45.

20          (Lunch Recess 2:00 p.m.)

21                **P R O C E E D I N G S**

22             **A F T E R N O O N   S E S S I O N**

23

24          THE COURT:  All right.  Mr. Flood, you may bring the

25   jury in, please.

1          (Jury in.)

2          THE COURT:  Everyone stands for the jury, so you-all

3   may be seated when you come in.  And all of you in the

4   courtroom may now be seated.

5          There are no assigned seats, ladies and gentlemen.

6   You may sit wherever you please.  However, I've learned over

7   the years, many years, that in a trial of any length, jurors

8   come to feel a property interest in a particular chair or

9   seat.  And that's all right, but it isn't required.

10         You can sit wherever you please.

11         All right.  Ladies and gentlemen, now that you have

12  been sworn, I'm going to give you some preliminary

13  instructions to guide you in your participation in the trial.

14         First, it will be your duty to find what the facts

15  are.  You and you alone are the sole judges of the facts of

16  this case, and you will then have to apply to the facts as you

17  find them from the evidence in the case the law that the Court

18  will give to you in the form of instructions at the end of the

19  case and you must follow that law whether you agree with it or

20  not.

21         Nothing the Court may say or do during the course of

22  the trial is intended to indicate, nor should it be taken by

23  you as indicating, what your verdict should be.  What your

24  verdict is is your sole and exclusive duty and responsibility.

25         Now, the evidence in which you will find the facts

U.S. v. Manafort

17

1   of the case will consist of the testimony of the witnesses who

2   will testify from the witness stand immediately across from

3   you, and there will be somewhere in the neighborhood of 20 to

4   30 witnesses, maybe one or two more, I'm not sure.  I didn't

5   count.  So you may want, as you listen to them, to make notes

6   about your impressions.  Remember, no one is going to look at

7   your notes to see whether you've made any or not; and if so,

8   what they are.  No one will look at the books but you.  And

9   you may take as many or as few notes as you wish.

10          Now, as I said, the testimony from which you will

11  find the facts of the case will consist of the testimony of

12  the witnesses from the witness stand and documents and other

13  things received into the record as exhibits and any facts that

14  the lawyers may agree or stipulate to or that the Court may

15  instruct you that you may find.

16          Now, there are, however, certain matters that are

17  not evidence and it must not be considered by you.  And let me

18  list those for you now.

19          First, the lawyers' statements, the lawyers'

20  arguments, and the lawyers' questions are not evidence and

21  must not be considered by you.

22          Of course, when the lawyers ask a question, you have

23  to consider the question and the answer, because you can't

24  understand an answer unless you understand the question.  I

25  hope the lawyers will keep that in mind.

U.S. v. Manafort

18

1    In any event, the lawyers' arguments, statements,

2   and questions are not by themselves evidence.  It is the

3   answer of the witness that is evidence.

4    Next, objections to questions are not evidence.  The

5   lawyers have an obligation to their client to make objections

6   when they believe evidence is being offered that's contrary to

7   the Rules of Evidence.

8    The essence of a fair trial is that it be conducted

9   to the Rules of Evidence and that your verdict be based solely

10  on legally admissible evidence.  So you should not be

11  influenced by the objection or by the Court's ruling on it.

12    If the objection is sustained, ignore the question

13  completely.  If the objection is overruled, then you may treat

14  the answer to that question just as you would treat the answer

15  to any other question.

16    Now, if you're instructed that some item of evidence

17  is received for a limited purpose, you must follow that

18  instruction and consider that evidence only for that limited

19  purpose.

20    Next, any testimony that the Court excludes or tells

21  you to disregard is not evidence and must not be considered by

22  you.

23    Next, anything you may have seen or read or heard

24  outside the courtroom is not evidence and must be disregarded

25  because you're to decide this case solely on the basis of the

U.S. v. Manafort

19

1    evidence presented here in the courtroom.

2             Now, in that regard, there are two types of evidence

3    from which you may find the facts of the case.  There is

4    direct evidence and there is circumstantial evidence.

5             Direct evidence is direct proof of a fact such as

6    the testimony of an eyewitness to an event.  Circumstantial

7    evidence is evidence that is proof -- evidence of facts from

8    which you may infer or conclude that other facts exist.  And

9    I'll give you further instructions on these as well as other

10   matters at the end of the case, but for now you may consider

11   both kinds of evidence.  You may consider both circumstantial

12   and direct evidence.

13            Now, it will be up to you to decide which witnesses

14   to believe, which witnesses not to believe, and how much of

15   each witness' testimony to accept or reject.

16            You and you alone will be the sole judges of the

17   testimony of the witness and of the weight and effect of their

18   testimony.

19            I'll give you some instructions at the end of the

20   case on determining the credibility of witnesses.  This is a

21   civil case -- I beg your pardon -- this is a criminal case.

22   And in this case, there are certain rules you must keep in

23   mind.

24            First, the defendant has pled not guilty to all of

25   the charges.  And as I've previously instructed you, that

U.S. v. Manafort

20

1    means that the defendant is entitled to the presumption of

2    innocence; that is, you must presume the defendant innocent of

3    the charges unless and until the jury find otherwise.

4          Next, the Government has to prove the defendant's

5    guilt of each element of the offense charged against him

6    beyond a reasonable doubt.  Of course, I'll have further

7    instructions for you in that regard at the end of the case.

8          Next, the -- there may be references to the

9    indictment in the course of the trial.  Remember, the

10   indictment is itself not proof or evidence of any kind.  It's

11   not proof of guilt or evidence of guilt of any kind

12   whatsoever.

13         Next, ladies and gentlemen, I will instruct you at

14   the end of every day that you may not discuss the matter with

15   anyone or undertake any investigation using any electronic

16   device at all.  Put the matter out of your mind.  Don't

17   discuss it with anyone.

18         I'll tell you at the end of the day that your

19   spouses, your partners, your friends, your children will be

20   intensely interested in what you've been doing and they will

21   ask you questions.  You'll be tempted to answer those

22   questions.  Resist that temptation.  Do not answer the

23   question.

24         Tell them that the Court, the judge, has told you

25   that you may not discuss the matter with anyone.  There will

1    come a time when you can, but that's a ways off.

2            Now, you've been provided with books.  I hope all of

3    you have writing tools or implements.

4            All right.  We'll begin first with the opening

5    statements.  Now, an opening statement is neither evidence nor

6    argument.  It is simply a means the lawyers have of outlining

7    what the evidence is that they intend to offer or that they

8    expect will be offered.  And it's offered for you to follow

9    that evidence as it is presented.

10           It is not argument.  And I will caution jurors

11   gently, I hope, if they attempt to argue the case in opening

12   statement.

13           And, remember, the lawyers' statements are not

14   evidence at all.  But these opening statements will be no more

15   than 30 minutes in length.  The Government will go first and

16   the defendant may do so if he wishes.  He's not required to

17   offer an opening statement, but he's permitted to do so if he

18   wishes to.  And then we will begin to hear the witnesses in

19   the case.

20           All right.  Mr. Asonye, are you prepared to give

21   your opening statement?

22           MR. ASONYE:  I am, Your Honor.

23           THE COURT:  All right.  I'll ask Mr. Flood to move

24   the podium.

25

U.S. v. Manafort

1                        **OPENING STATEMENT**

2              THE COURT:  All right.  Mr. Asonye, you may proceed.

3              MR. ASONYE:  A man in this courtroom believed the

4    law did not apply to him.  Not tax law.  Not banking laws.

5    This man collected over $60 million for his work in a European

6    country called Ukraine.  But this man didn't want to report

7    all of his income, so he used shell companies and foreign bank

8    accounts to funnel --

9              THE COURT:  The evidence, you contend, will show

10   this?

11             MR. ASONYE:  Yes, Your Honor.

12             THE COURT:  Well, that's the way I would put it,

13   Mr. Asonye.

14             MR. ASONYE:  -- to funnel millions of dollars --

15             THE COURT:  Did you hear what I said?

16             MR. ASONYE:  Yes, Your Honor.

17             THE COURT:  All right.  Do it that way, please.

18             MR. ASONYE:  The evidence will show that he used

19   shell companies and foreign bank accounts to funnel millions

20   of dollars of untaxed income into the United States concealing

21   it from U.S. authorities and bankrolling his extravagant

22   lifestyle.

23             The evidence will show that from 2010 to 2014 he

24   spent this secret income on luxury items.  He purchased over

25   $6 million of real estate in cash, an apartment in Manhattan,

1  a townhouse in Brooklyn, a $2 million house just a stone's

2  throw away from this very courthouse in Arlington, Virginia.

3          The evidence will show he spent millions of dollars

4  renovating his house in Florida, a ten-bedroom/12-bath house

5  in the Hamptons.  And with those funds, he bought himself more

6  than a half million dollars in fancy clothes, a half million

7  dollars in rugs.  He drove high-end vehicles.  He got whatever

8  he wanted.

9          THE COURT:  Mr. Asonye, you might focus on elements

10  of the offense.  It isn't a crime to have a lot of money and

11  be profligate in your spending, so focus on the allegations in

12  the indictment and the evidence the Government intends to

13  offer to prove those elements.

14          MR. ASONYE:  We do, Your Honor.

15          But there's one thing this man did not do with those

16  millions of dollars.  It's what Americans do every year.  Pay

17  the taxes he owed.

18          Instead, the evidence will show this man hid

19  millions of his Ukraine earnings in foreign bank accounts,

20  mainly in Cyprus, an island country off the coast of Turkey.

21  And when those accounts were closed, the evidence will show he

22  moved them not to the United States but to another island

23  country, St. Vincent and the Grenadines in the Caribbean.

24          Now, ladies and gentlemen, as the judge just noted,

25  there's nothing wrong with being successful or rich in this

Opening statement - Asonye

24

1   country.  We actually celebrate it.  But when you sign a

2   federal tax return, you swear that you reported all of your

3   income.

4           You swear that you've identified if you have any

5   foreign bank accounts and the evidence will show that if you

6   have any of those foreign bank accounts containing more than

7   $10,000, you have to declare all of those accounts to the U.S.

8   Treasury Department.

9           Ladies and gentlemen, this man did none of those

10  things.  The evidence will show that he knowingly filed false

11  tax returns.

12          Sitting in this courtroom today is the man who the

13  evidence will show hid tens of millions in overseas income,

14  the man who on his tax returns concealed his many foreign bank

15  accounts, the man who evaded the report to the Treasury

16  Department, the man who the evidence will show lied to the IRS

17  about his total income.

18          That man is the defendant, Paul Manafort.

19          Now, Paul Manafort didn't just slight U.S. tax laws.

20  The evidence will show that he committed bank fraud and he did

21  it more than once.

22          In 2015, the defendant's work in Ukraine had dried

23  up.  He was no longer making millions and he couldn't support

24  his lifestyle.  Mr. Manafort was running out of cash, and to

25  maintain the life that he had become accustomed to, he needed

1   more of it.

2          So he approached multiple banks for loans, loans on

3   the homes that he purchased or improved with the untaxed

4   income from his foreign bank accounts.  And once again, ladies

5   and gentlemen, the evidence will show that Paul Manafort broke

6   the law in multiple loan applications to three different

7   banks.

8          The evidence will show Paul Manafort lied.  He lied

9   about important matters and he lied over again.  He lied about

10  the properties he owned.  He lied about the amount of debt he

11  had.  He lied about his net worth.  He lied about his income.

12  He even lied about where he was living.

13         Paul Manafort, the evidence will show, lied despite

14  promising the banks, under penalty of perjury, that everything

15  he submitted in his loan applications was true and accurate.

16  He made false statements to the banks starting in 2006, just

17  like he had lied to the IRS in 2010, '11, '12, '13, and 2014.

18         Now, to make sure he got these loans, the evidence

19  will show that Paul Manafort submitted fake documents or he

20  ordered others to do it for him.  You will see doctored

21  financial statements, backdated business records, a fake

22  insurance binder.  You will see Paul Manafort discussing over

23  e-mail how he needs these documents and you will see many

24  around him and those who worked for him spring into action on

25  his behalf.  You will see them altering reports and submitting

U.S. v. Manafort

26

1    information that they all know is false.  The evidence will

2    show that they all understood they were breaking the law.

3          Ladies and gentlemen, all of these actions

4    culminated in a federal grand jury's indictment of Paul

5    Manafort.  The indictment charges the following crimes:

6          Counts 1 through 5 charged the defendant with filing

7    false tax returns between 2010 and 2014.

8          Counts 11 through 14 charged the defendant with

9    failure to report foreign bank accounts.

10         Counts 24 through 32 of the indictment charged Paul

11   Manafort with bank fraud and conspiracies to commit bank

12   fraud.  All of these charges boil down to one simple issue:

13   Did Paul Manafort lie?

14         We, the Government, we bear the burden of proof in

15   this case and we embrace it.  Let me tell you what this case

16   will look like after you've heard all the testimony and you've

17   received all the exhibits in this trial.

18         I'm going to begin by telling you about the

19   defendant and how he accumulated so much money, then I'll

20   outline his scheme to avoid reporting his foreign bank

21   accounts.

22         Next, I'm going to tell you about how he filed false

23   tax returns, returns that underreported his foreign income and

24   concealed his foreign accounts.

25         And finally, I'm going to explain how he committed

Opening statement - Asonye

1  bank fraud by lying to the banks about his income and his

2  debts.

3          In each of these crimes, ladies and gentlemen, the

4  evidence will show that Paul Manafort placed himself and his

5  money over the law.

6          Now, Paul Manafort was a political consultant and a

7  lobbyist.  The evidence will show he was very skilled at his

8  job.  He's a lawyer who became -- who opened a successful

9  international political consulting firm called Davis Manafort

10  Partners, which later became DMP International.  The business

11  was Mr. Manafort's primary source of income.

12          Now, beginning in 2005, Paul Manafort worked for

13  politicians in Ukraine.  He represented the government of

14  Ukraine, Viktor Yanukovych, who would become the president of

15  Ukraine, and two Ukrainian political parties.  He spent lots

16  of time in the Ukraine and he traveled there frequently.  And

17  for that work for these foreign officials, Paul Manafort was

18  paid handsomely.

19          During this trial, you will learn that for his

20  political work in Ukraine, Manafort was paid by Ukrainian

21  oligarchs, some of the country's most powerful and wealthy

22  men.  Men who, as oligarchs, controlled entire industries with

23  the aid and comfort of the Ukraine government.

24          Now, these payments weren't in the names of the

25  oligarchs either.  It came from their shell companies.  So in

U.S. v. Manafort

1  order for Paul Manafort to receive his consulting fees, he set

2  up his own shell companies, too.  So ultimately, the payments

3  went from the oligarchs' foreign shell companies to Manafort's

4  foreign shell companies.

5        In total, the evidence will show, Paul Manafort

6  opened over 30 bank accounts in three foreign countries.  And

7  the evidence will show that Paul Manafort's foreign shell

8  companies and his foreign bank accounts served no business

9  purpose other than to receive and to hide the defendant's

10  substantial foreign income.

11        Now, ladies and gentlemen, you're going to hear

12  testimony from U.S. Treasury Department officials about the

13  importance of disclosing your foreign bank accounts.  They're

14  going to explain that there are two separate obligations.

15        First, every federal tax return asks a very

16  important, but a very simple yes-or-no question:  Do you have

17  a financial interest or signature authority over a foreign

18  bank account?

19        The judge will instruct you that if you control the

20  money in that foreign bank account, even if it's not in your

21  name, you have to declare it.

22        Second, and independently, if there's more than

23  $10,000 cumulatively in any of those accounts, you have to

24  file a separate report with the Treasury Department, except if

25  you're Paul Manafort.  He answered no to that question every

U.S. v. Manafort

1   year.  However, you will see overwhelming evidence that these

2   foreign accounts belong to Paul Manafort.

3          Ladies and gentlemen, we brought documents all the

4   way from Cyprus and the St. Vincent in the Grenadines.  They

5   show that Paul Manafort's name or one of his underlings was

6   always listed on these foreign bank accounts.

7          You will see how Paul Manafort controlled these

8   foreign accounts and used them to pay for his houses, his

9   renovations, his jewelry, his clothing.  And you don't have to

10  take anybody's word for it.  You will read Manafort, in his

11  own words, authorizing transactions from these foreign

12  accounts.  You will see an exhibit where Paul Manafort, in his

13  own words, refers to a foreign account as "my account."

14         The evidence will show that all of this was willful.

15  Paul Manafort knew about the laws requiring him to report

16  foreign bank accounts.  The evidence will show it was simply

17  another law he chose not comply with.  And Paul Manafort

18  didn't just forget about one account with a few thousand

19  dollars in it.  He had millions in these accounts every single

20  year.

21         You will also learn that Paul Manafort paid tax

22  preparers more than $10,000 a year to compile his taxes.  And

23  the evidence will show that each year these tax preparers sent

24  him letters, which he signed, explaining his obligation to

25  identify any foreign bank accounts.

1    In addition, every single year, these tax preparers

2 asked Manafort in writing, or somebody authorized to speak on

3 his behalf, whether Mr. Manafort had any foreign accounts.

4 You're going see these documents in this trial.  And every

5 single year, Paul Manafort and his associates lied to the tax

6 preparers by answering, no.

7    Then Paul Manafort repeated that same exact lie to

8 the IRS about not having any foreign accounts, making his tax

9 return false and violating the law to disclose those accounts.

10    Now, Paul Manafort's tax returns weren't simply

11 false because he failed to disclose foreign bank accounts.  He

12 also significantly underreported his income.  As I mentioned,

13 between 2010 and '14, Paul Manafort was paid over $60 million

14 from the oligarchs in Ukraine and the evidence will show he

15 didn't want to pay income tax on all of that money.  He didn't

16 want to report all of that income, so he didn't.  And by doing

17 so, he filed false tax returns.

18    The evidence will show that the first way

19 Mr. Manafort avoided reporting millions in income was to

20 bypass depositing the money into his personal and business

21 accounts that were located in the United States.

22    You will see bank records showing how Manafort

23 funneled millions of dollars from his foreign accounts

24 directly to U.S. vendors, people he owed money to for personal

25 goods and services, merchandise like a $21,000 watch and a

U.S. v. Manafort

1    custom $15,000 jacket made from an ostrich.

2            You will hear from the vendors themselves.  They

3    will tell you about his spending habits and the personal work

4    that they did for him.  And it will be clear from the evidence

5    that the money Paul Manafort spent were for purely personal

6    expenses.  Some of these vendors will tell you, they noticed

7    Paul Manafort paid their invoices with large overseas wire

8    transfers.  Others will tell you that they told him that he

9    told them to expect payment from a particular company.  The

10   evidence will show that these were Manafort's foreign shell

11   companies and Manafort's unreported foreign income, which he

12   used to divert millions of dollars to these vendors and keep

13   his money off the books.

14           Now, speaking of off book, another critical party

15   that Manafort deceived during his scheme was his bookkeeper.

16   At a cost of over $100,000 a year, Paul Manafort hired a

17   bookkeeping service.  It was hired supposedly to track all of

18   his financial transactions, to pay all of his bills, and to

19   prepare his financial statements each year.  This service was

20   supposed to trace every penny that flowed in and out of Paul

21   Manafort's personal and business accounts or so they thought.

22           You will hear testimony that just like he lied to

23   the IRS, and his tax preparers about his foreign bank

24   accounts, Paul Manafort also misled his bookkeeper.  Paul

25   Manafort's bookkeeper will tell you that in order for her to

1  do her job, she needed a complete picture of Paul Manafort's

2  finances.  She needed to know about all of his bank accounts,

3  personal and business.  But the evidence will show Paul

4  Manafort never told his bookkeeper about his foreign accounts.

5  He never told her that he wired money directly to U.S. vendors

6  from these foreign accounts.

7         Paul Manafort hired a bookkeeper to track his bills

8  and all of his transactions, but then he proceeded to hide

9  millions of dollars in bills and transactions from the exact

10  same bookkeeper.  Why?  Because the evidence will show that at

11  the end of the year, the bookkeeper provided a summary of all

12  of those transactions to the tax preparers so that he could

13  prepare -- they could prepare his tax returns each year.  If

14  either party knew about Manafort's foreign accounts or his

15  foreign transactions, the funds would have been booked as

16  income and the ruse would be over.

17         Now, ladies and gentlemen, the evidence will show

18  that Paul Manafort was shrewd.  His wealth was obvious, after

19  all, he owned seven homes.  If he didn't report a plausible

20  amount of income each year, the authorities might ask

21  questions.  So Paul Manafort transferred some, but not all, of

22  the funds in his foreign accounts into his U.S. business

23  accounts, leaving millions of dollars sitting in those foreign

24  accounts, which he never transferred and those monies remained

25  hidden and untaxed.

1           You will learn that Manafort's tax preparers drafted

2   his tax returns based on the information that he provided.

3   But the evidence will show that he omitted important

4   information and that he lied about other information.  And if

5   you lie to your bookkeeper and you lie to your tax preparer

6   and you conceal your income sources, then your tax returns are

7   going to be false.  Garbage in, garbage out.

8           Now, another way that Paul Manafort hid his income

9   from the United States government was to disguise it as a

10  loan.  You will hear testimony that a loan does not count as

11  income on your taxes because you don't have to pay it back --

12  because you do have to pay it back.

13          Now, Manafort and his associates created sham loans

14  that significantly reduced Manafort's taxable income.  You

15  will see funds coming into his accounts that are initially

16  booked as income by his bookkeeper.  But then you will see

17  how, at Manafort's direction, the income is falsely called a

18  loan.  But the evidence will show these were bogus loans and

19  Paul Manafort knew it.

20          First, the lender on these loans were Manafort's

21  foreign shell companies in Cyprus.  These loans were for

22  millions and millions of dollars, but they had no collateral.

23  They didn't even have a real due date.  The loan agreements

24  for millions of dollars were a page, or maximum, two pages

25  long.

1          What's more, the loans didn't require a single

2    principal or interest payment until the entire note was due.

3    In other words, on these loans, the evidence will show, Paul

4    Manafort never made a single loan payment on loans worth

5    millions of dollars.

6          Ladies and gentlemen, the evidence will show that

7    over the course of five years, Paul Manafort never reported

8    over $15 million of income to the IRS and he lied about the

9    existence of his foreign accounts.  And as a result of these

10   misrepresentations, his tax returns were false every year from

11   2010, '11, '12, '13, and 2014.

12         Now, up until 2014, Paul Manafort was flushed with

13   cash and hiding a lot of it from the IRS.  But in 2014, the

14   evidence will show President Viktor Yanukovych, Manafort's

15   golden goose in the Ukraine, he lost power.  The cash spigot

16   suddenly closed and Manafort was on the hunt for a new source

17   of money to fund his huge lifestyle.

18         The evidence will show that Manafort then applied

19   for tens of millions of dollars in bank loans from a series of

20   different banks.  However, in order to obtain those loans, he

21   had to lie in violation of the banks rules and federal law.

22         Now, why did he have to lie to get bank loans?  The

23   evidence will show that your income and your debt are two of

24   the most important factors that a bank considers when they're

25   evaluating a loan application.  They want to see high income

U.S. v. Manafort

1   and they want to see low debt, which was a huge problem for

2   Paul Manafort in 2014.

3          In 2015 after the loss of his Ukraine income, Paul

4   Manafort didn't have enough income.  He didn't have enough

5   cash flow to qualify for the massive loans that he wanted.

6   And he had fake loans on his balance sheet, that debt which he

7   had used to conceal some of his income.  So what did he do?

8   He had to reverse course.  Whereas, in order to cheat the IRS,

9   he had previously reported less income and more loans, fake

10  loans, now he needed to show the banks the exact opposite.

11         So, for example, in 2016, you will see his company,

12  DMP International, made no profits whatsoever, zero.  No

13  income, no problem.  In loan applications to two separate

14  banks, Paul Manafort falsified and he instructed other people

15  to falsify his profit-and-loss statements, adding millions of

16  dollars of income that he never received.  He literally

17  created cash out of thin air and debt.

18         Remember how he created those fake loans to reduce

19  his income and avoid paying income taxes?  Well, now he's in a

20  predicament because those loans were still on the books.  So

21  in order to get rid of that debt, Paul Manafort retroactively

22  forgave a loan that never existed in the first place.  He used

23  his tax preparer to generate a backdated loan forgiveness

24  letter.  Magically, the debt was gone.  But without this

25  manufactured letter, the evidence will show the bank would

U.S. v. Manafort

1   have denied the loan to Paul Manafort.  Instead, he got

2   $3.4 million.

3          Now, the evidence will show that Paul Manafort was

4   aware it is a crime to lie to a bank.  You will see numerous

5   documents that Paul Manafort, where he signs, swearing that

6   his representations to the bank were complete, true, and

7   accurate.  He signed documents promising not to submit altered

8   or falsified records.  He signed documents acknowledging to

9   the bank that the bank relied on his representations.

10          And notably, Paul Manafort signed documents, and

11   you're going see them, that warned him if he lied, he could be

12   criminally prosecuted.  Now, despite those warnings, Paul

13   Manafort submitted multiple false loan applications to three

14   different banks.  The evidence will show that in order to keep

15   his hands clean, Paul Manafort used his associates, his

16   employees, his agents to help him commit the fraud.

17          For example, in one loan application, Paul Manafort

18   instructed one of his associates to manipulate a document, to

19   conceal that he owed $5.3 million on one of his properties.

20   The fake document was later sent, of course, by one of his

21   underlings to the bank who was none the wiser.

22          Now, to be clear, Paul Manafort was an active

23   participant in the tax and fraud schemes.  Was he too busy to

24   pay attention to the details?  The evidence will show quite

25   the opposite.  Paul Manafort constantly issued orders and he

U.S. v. Manafort

1    received reports back, nor was he duped.

2          Many of the witnesses will testify that they dealt

3    directly with Paul Manafort.  And where Manafort did use an

4    intermediary, you will see and you will hear how he directed

5    their activities.  After all, the evidence will show that Paul

6    Manafort was the primary beneficiary of these frauds.  He got

7    the bank loans.  He got the money.  He got to use the untaxed

8    income.  As the old adage goes:  Just follow the money.

9          Now, you may hear evidence in this case attacking

10   the credibility of certain witnesses, in particular,

11   Paul Manafort's associates, like Rick Gates, who helped him

12   commit his crimes, or other individuals who looked the other

13   way while he did.  But the evidence will show that

14   Paul Manafort chose to associate himself with these people,

15   not the Government.

16         The evidence will show that these people have

17   acknowledged and accepted responsibility for their role in

18   these crimes.  In any event, the Government's case is not

19   going to be dependent on any single witness or any single

20   associate or any single victim.  You will hear from over two

21   dozen witnesses, people from different backgrounds, from

22   different walks of life.  Most of the witnesses don't even

23   know each other.  You will receive in evidence hundreds of

24   documents that corroborate the witness testimony you're going

25   to hear during this trial.  Together, these witnesses and all

U.S. v. Manafort

1  of these documents will establish that Paul Manafort lied to

2  his bookkeeper, he lied to his tax preparer, he lied to the

3  IRS, and he lied to multiple financial institutions all in

4  order to get and to keep money.

5          Ladies and gentlemen, none of this happened by

6  accident.  Shell companies don't create themselves.  Neither

7  do fake loans.  Bank records don't falsify themselves.  The

8  evidence will show that Paul Manafort orchestrated these

9  crimes.  He submitted the false tax returns.  He willfully

10  failed to declare his foreign bank accounts.  He committed

11  bank fraud.

12          So at the conclusion of this trial, the United

13  States with Mr. Andres; Mr. Van Grack; FBI Special

14  Agent Ebadi; IRS Special Agent Valdini; our paralegal, Mr.

15  Binder; and I, we have the high privilege and honor to

16  represent.  We will come back to you and we will ask you to

17  hold this defendant accountable for his actions to make clear

18  that he is not above the law and that the rules apply equally

19  to him.  We will ask you to find Paul Manafort guilty on each

20  count of the indictment.  Thank you.

21          THE COURT:  All right.  Mr. -- is it Mr. Zehnle?

22  All right.  Sir, are you ready to make your opening statement?

23          MR. ZEHNLE:  I am, Your Honor.

24          THE COURT:  All right.  You may proceed.

25          MR. ZEHNLE:  Thank you.

U.S. v. Manafort

1                           **OPENING STATEMENT**

2              MR. ZEHNLE:  May I please the Court?  Counsel,

3    members of the jury, good afternoon.

4              This cases -- this case is about taxes and trust.

5    It's about taxes because, as the prosecutor just explained to

6    you, my client, Paul Manafort, has been charged willfully and

7    intentionally signing false tax returns because he failed to

8    check a box on a schedule that was attached to his returns and

9    because they say he didn't report his income.  They also say

10   that he failed to file this foreign bank account report or

11   FBAR, as you'll hear it described.

12             Now, they talk about his failure to report these

13   accounts and his failure to report the income, but what the

14   evidence will show you is from the years 2005 to 2015

15   Mr. Manafort reported $30 million in adjusted gross income.

16   The evidence will show you that his company reported

17   $92 million in gross revenues over that same period.

18             This case is also about trust.  Because the evidence

19   is going to show you that in his business affairs, in his tax

20   affairs, and that dealing with these mortgage lenders that the

21   prosecutor was just talking about, that Mr. Manafort consulted

22   and involved his employees, his bookkeepers, and his tax

23   accountants.  And he trusted them to speak with one another

24   and to make sure that these things were done right.

25             At its core, this case is about trust because it's

Opening statement - Zehnle

1    about Mr. Manafort placing his trust in the wrong person.  And

2    you just heard the prosecutor mention his name a moment ago,

3    Rick Gates.  Rick Gates, you'll find out, was Mr. Manafort's

4    business associate and essentially the man in charge of the

5    day-to-day operations of Mr. Manafort's business.

6           Mr. Gates pled guilty not more than a couple of

7    months ago to actually lying to the Government, among other

8    crimes.  And this is the person that you will find the

9    Government now wants you to trust.  There are two sides to

10   every story.  It's an old adage, but it's true.  The

11   Government's story you've just heard:  Mr. Manafort is a

12   criminal.  But that is simply not the case.

13          Members of the jury, I'm proud to be here

14   representing Paul Manafort today.

15          Paul, would you please stand for the jury?  Thank

16   you.

17          Paul Manafort is a talented political consultant and

18   a good man.  He's a second-generation immigrant to this

19   country and he's the first one in his family to go to college.

20   Paul Manafort has been involved at the pinnacle of U.S.

21   politics for almost 40 years.  He has been a driving force in

22   the candidacies of not just one U.S. president but multiple

23   U.S. presidents.  He has been a strategic advisor and

24   consultant to numerous U.S. senators and members of Congress.

25          And so doing, Paul Manafort has rendered a valuable

1   service to our system of government.  And along the way,

2   Mr. Manafort was successful.

3          THE COURT:  I take it you intend to offer evidence

4   to this?

5          MR. ZEHNLE:  We do, Your Honor.

6          THE COURT:  All right.  Couch it -- it's preferable

7   if you couch it in terms of, "You will hear evidence that."

8          MR. ZEHNLE:  Yes, Your Honor.  Thank you.

9          THE COURT:  All right, sir.  You may proceed.

10         MR. ZEHNLE:  You're going to hear evidence that he

11  was successful in creating one of the most successful

12  political consulting and government relation shops in

13  Washington.

14         You're also going to hear evidence that

15  Paul Manafort worked as a consultant and a strategist on a

16  global stage as well.

17         He advised the foreign heads of state and members of

18  parliament in other countries.  And you will learn during this

19  case that such international consulting is not a partisan

20  endeavor.  Political consultants like Mr. Manafort, who are

21  often on the opposite side in our U.S. elections, work

22  together in international campaigns.

23         You'll hear the testimony from Tad Devine, who the

24  Government has identified as one of their witnesses.

25  Mr. Devine most recently worked on the campaign of

1   Senator Bernie Sanders.  And he has worked in the past for

2   Vice President Gore and for Senator John Kerry.  Mr. Manafort,

3   along with Mr. Devine and others, worked on the election of

4   Viktor Yanukovych in Ukraine.  Viktor Yanukovych is the

5   president, or the "golden goose," as the prosecutor just

6   referred to him, was the president of Ukraine.

7          The focus of their efforts, you will hear, was to

8   bring the country closer to western democracies after decades

9   of Soviet rule.

10         Paul's efforts in particular were aimed to getting

11  Ukraine into the European Union and away from the Russian

12  influences.  Mr. Manafort could not have possibly anticipated

13  that his work in Ukraine those years ago would ultimately

14  bring him here today to this courtroom in Alexandria.  Yet

15  here we are.

16         Paul Manafort shouldn't be here, though.  The

17  evidence will show that Mr. Manafort did not willfully or

18  intentionally deceive or mislead the IRS about his income or

19  about any foreign bank accounts to which his company was paid.

20  Nor was there any secret conspiracy to intentionally mislead

21  domestic mortgage lenders in giving him loans.

22         The bankers were aware of who Mr. Manafort was and

23  his prominence.  They were aware of his substantial assets,

24  which the prosecutor has just told you about.  And they wanted

25  to make loans, you will learn.

1    Now, with respect to those bank accounts, first and

2  foremost, you will learn that Mr. Manafort was not the one who

3  was responsible for how or why these accounts were set up in

4  Cyprus, which, as many of you might know, is an island in the

5  eastern Mediterranean.

6    The people who were paying the bills for

7  Mr. Manafort's services, that is, the financial supporters of

8  the party of regions in the Ukraine, they require this.  If

9  Mr. Manafort was going to get paid for his services, you will

10  learn, and he wanted to get paid for those services because

11  these were multimillion-dollar contracts, this was the way

12  that they required it to be done.

13    In the post Soviet rule of Ukrainian politics, many

14  of these financial backers for the party of regions did not

15  want others in Ukraine knowing which party they were

16  supporting, knowing which candidate they were supporting,

17  knowing how much they were giving to a particular party,

18  knowing how much they were giving to a particular candidate.

19  You will learn that these supporters were the ones who told

20  Mr. Manafort to use accounts in Cyprus and to use those

21  accounts in the names of offshore companies.  And that is what

22  they wanted.  They did not want to transfer funds within

23  Ukraine.

24    The evidence will show Paul Manafort did not create

25  this arrangement.  And he certainly was not trying to mislead

U.S. v. Manafort

1    or deceive the Internal Revenue Service.

2           This is not a case where someone flies to

3    Switzerland after making a lot of money here and tried to

4    stash it in a numbered account.

5           The people that were paying his invoices for his

6    legal services as a political consultant advisor, they are the

7    ones who told him to do this.  Paul Manafort did not come up

8    with this.

9           Now, I spoke a moment ago about willfulness.  Did

10   Mr. Manafort willfully or intentionally mislead the IRS?  And

11   as you consider the evidence, that is an important concept.

12   Because the tax code and the FBAR regulations are complicated.

13   And so the law requires that an individual must know what the

14   law is and then intentionally and purposely violate that law.

15   That is what willfulness is.  If a person has a good faith

16   belief that they are not violating the law, even if that

17   belief is incorrect, then he or she is not guilty of a willful

18   crime.

19          U.S. citizens are not prosecuted for mistakes on

20   their tax returns or failing to file a form that they didn't

21   believe they had to file.  The IRS audits those people.  It

22   doesn't criminally prosecute them.  But in the Government's

23   rush to judgment in this case you're going to learn that

24   Mr. Manafort was never audited by the IRS, nor were any of his

25   companies.

U.S. v. Manafort

1      So as you consider this, as you hear all the

2  evidence come in, the documents and the testimony, you might

3  ask yourself whether the Government knew enough to initiate

4  the audit.  Did they have enough evidence?  I mean, the

5  government knows a lot about us, but did they have enough

6  evidence to even think about initiating an audit of

7  Paul Manafort?

8      Here is what you'll hear.  FBI Agent Staci Sullivan

9  interviewed Paul Manafort almost four years ago to the day,

10  2014.  At the time, the FBI was looking at the potential

11  misuse of Ukrainian government funds and working with the

12  government of Ukraine.  What you're going to learn is that

13  Paul Manafort voluntarily agreed to go talk to these FBI

14  agents and to Department of Justice attorneys.  Not only to

15  discuss his consulting work over in Ukraine, but to provide

16  information about individuals that they were interested in.

17      And here is the key things that you will hear as the

18  evidence comes in.  Here is what he told the government in

19  that meeting.  He told them that he had received $27 million

20  in income for his services during the years they were asking

21  him about in the interview.  He explained why the funds were

22  being sent to these offshore entity accounts in Cyprus, and he

23  explained why the backers of the party of regions wanted it

24  this way.  And he even identified these accounts by the names

25  of the entities that they were held in.

1          And he told the FBI agents and the Department of

2  Justice attorneys that he didn't have signature authority on

3  these accounts because he believed he did not have any

4  signature authority on these accounts.  They were set up for

5  the convenience of the backers of the party of regions.  They

6  weren't convenient to him.  He's working in Ukraine.

7          In fact, if you remember one thing from my opening

8  statement, as you consider the evidence, please ask yourself

9  how someone who reports to the government that I earn

10  $27 million the years you're asking me and I'm telling you how

11  the money is coming in through bank accounts held in Cyprus in

12  the name of offshore companies, ask yourself how that person

13  was willfully and intentionally trying to mislead the

14  government when he's telling them that.

15          So why are we here then?

16          Well, the evidence will show that we're primarily

17  here because of one man, and he got short-mentioned during the

18  prosecution's opening argument.  That man is Rick Gates.

19          The foundation of the Special Counsel's case against

20  Mr. Manafort rests squarely on the shoulders of this star

21  witness.  You're going to hear evidence that Rick Gates was

22  the point person on DMP -- that's Davis Manafort Partners --

23  on DMP's business operations and on its financial and tax

24  affairs.  A number of the witnesses, including the company's

25  bookkeepers, Hesham Ali and Heather Washkuhn; and its tax

U.S. v. Manafort

1    accountants, Phil Ayliff and Cindy Laporta, they're going to

2    confirm for you that Rick Gates was their main contact in this

3    case.

4            Remember, Mr. Manafort was often seven or eight time

5    zones away, depending on the time of the season, and he's

6    working on the existing contract that he has in Ukraine and

7    he's trying to bring in new business.

8            Paul Manafort could not be everywhere at once, and

9    the evidence will establish that it was Rick Gates who filled

10   that operational role and that finance role.

11           Now, unfortunately for Mr. Manafort, his trust in

12   Rick Gates was misplaced.

13           You're going to see evidence of how Mr. Gates' story

14   has evolved over time and how the Government was eager to

15   believe his evolving stories about Paul Manafort.  You're

16   going to learn that Mr. Gates will tell untruths about

17   Mr. Manafort and about anyone and anything in order to save

18   himself from prison time, from huge criminal fines, to save

19   himself from having to pay his back taxes, and all the

20   penalties that are associated with those taxes that he owes

21   because of his own personal misdeeds.

22           You see, Rick Gates got himself in trouble not

23   because of some grand conspiracy with my client, as the

24   Special Counsel contends, but because he embezzled millions of

25   dollars from his long-time employer.

U.S. v. Manafort

1    He abused his position of trust, you will learn.

2  And he did not report that money that he embezzled on his tax

3  returns.  And then he compounded the issue by filing amended

4  tax returns, which were also false, even while he was under

5  investigation by the government.  And if that wasn't enough,

6  what you will learn, is that he continued to make false

7  statements even up to the time he pled guilty.

8    That's right.  Even as he's trying to cut a deal

9  with the Government he was still making false statements and

10 he had to plead guilty to that too.

11    This is the same person that the Government is now

12 going to ask you to trust.  Rick Gates, you will learn,

13 violated one of life's most basic rules.  When you're in a

14 hole, stop digging.

15    Now, as jurors, you and you alone, as Judge Ellis

16 said, will be the ones who determine whether or not Mr. Gates

17 is to be believed.  But as you consider his testimony and the

18 testimony of all the Government's witnesses in this case, you

19 need to ask yourself, does the witness have a motivation to

20 testify falsely?  Including whether they cut a plea deal or

21 have potential jail time on the horizon.

22    You should consider whether or not they received a

23 grant of immunity so that they don't feel like they have any

24 exposure.

25    You can consider whether or not there are

U.S. v. Manafort

1  discrepancies in their testimony now versus what they said

2  when they were first asked about things.

3          You can consider whether the witness' testimony has

4  discrepancies with what all the other witness' testimony is.

5          And you should carefully consider their demeanor as

6  you watch them testify.  Do they fidget?  Do they make eye

7  contact?  Things like that.  Draw upon your own life

8  experiences in determining what is fact and fiction in this

9  case.

10          So what are the charges?  Well, Judge Ellis has

11  given you, I think, a succinct outline of the groups of

12  charges here, and the prosecution has also went through them.

13  So I'm not going to spend too much time repeating them.

14          But basically the allegations can be viewed in three

15  groups.  The first group relate to allegations that

16  Mr. Manafort signed false tax returns for each of the years

17  2010 through 2014.  So it's '10, '11, '12, '13, and '14.  Five

18  years.

19          Now, as you listen to the evidence about the tax

20  counts, you should keep in mind how Mr. Manafort has been

21  charged and what the Government is claiming, because they say

22  they are false in two and two ways only:  No. 1, he didn't

23  identify the foreign bank accounts; and No. 2, the report --

24  the returns did not report all of his income.

25          The second group of charges, as Judge Ellis told

1  you, deal with this failing to file a Foreign Bank Account

2  Report.  Those charges, however, relate to 2011 through '14.

3  So there's only four of those charges.  2010 is not charged as

4  a failure to file.

5          And you're going to hear, as the prosecutor

6  mentioned to you, that this form is required if a U.S. person

7  has signature authority or financial interest over a bank

8  account in another country and it has more than $10,000 in it.

9          So, essentially, with the first five charges and

10  then the four FBAR charges that follow, they are essentially

11  looking at very similar conduct, that is, the whole issue of

12  these foreign bank accounts.

13          The third group of charges, as you heard, were the

14  allegations of bank fraud and bank fraud conspiracy.  That

15  there was some secret agreement to keep material information

16  from these mortgage bankers when Mr. Manafort was applying for

17  those loans.

18          Now, let's talk about the evidence for each of those

19  groups.  The evidence will show that while Mr. Manafort was

20  working on those campaigns in Ukraine and generating business

21  overseas, he hired others to run DMP's operations and to keep

22  track of the money that was coming in and that was going out

23  and to take care of the taxes for not only the company but

24  also on his personal side.

25          So early in the process, up until 2011, you will

1   hear evidence that Amanda Metzler was the in-house bookkeeper

2   for DMP.  She had started as an assistant.  Mr. Manafort had

3   hired her just after college, and she had worked her way up

4   the ladder.

5          She was using QuickBooks to control the firm's

6   financial information, and she gave that financial information

7   to the accountants, a firm which we'll abbreviate the firm's

8   name as KWC.  KWC are the outside tax accountants, and they

9   handled the tax returns and the forms that are associated with

10  the tax returns.

11         Mr. Manafort's company was generating millions of

12  dollars at this time.  And you'll learn that Ms. Metzler had

13  full access to the accounts and she paid the company's bills

14  from the accounts here in the U.S.

15         Now, you will learn that during her time as a

16  bookkeeper, she was aware of the offshore accounts because the

17  funds, when they would come into the U.S., would be deposited

18  into the company's U.S. accounts and she would, of course, see

19  on the bank statements where the money is coming from.

20         So some of the names you'll hear, Ms. Metzler saw

21  deposits from Yiakora, from Evo Holdings, from Global Highway.

22  These are some of the names of the accounts in which the money

23  was held.  She knew about offshore companies like LOAV

24  Advisors, L-O-A-V, and Pericles.

25         None of this was hidden from her.  It was in the

1    open and it was transparent and she could see it on the

2    statements.

3            You'll also hear from Ms. Metzler that Rick Gates

4    had to be advised about all the bills and invoices coming in.

5    And you'll also hear Ms. Metzler tell you that it was Rick

6    Gates who was the one who would transfer money and amounts

7    into the company's accounts to pay the bills.

8            Now, in 2011, Ms. Metzler is gone and Mr. Manafort

9    hires a professional accounting firm to handle DMP bookkeeping

10   and payment processing and as well handle his personal

11   finances.

12           Heather Washkuhn was the person.  She was first at

13   First Republic Bank in their personal financial services

14   group, and later she went to an accounting and bookkeeping

15   firm, which we will refer to as NKSFB.  That's the name for

16   all the partners.

17           But essentially First Republic Bank had a group, you

18   will learn, that handled the personal finances, was a personal

19   finances group, and then they moved that group over to NKSFB.

20   And Heather Washkuhn was there during both periods.

21           Ms. Washkuhn provided the bill paying services to

22   Mr. Manafort, you will learn, and she would transfer funds and

23   she would maintain ledgers and she would provide this

24   accounting information to KWC, which are the outside tax

25   accountants.  And it was those tax accountants who then

Opening statement - Zehnle

53

1    prepared Mr. Manafort's business returns and his personal

2    returns.

3          Ms. Washkuhn also had a supervisor at First Republic

4    Bank, and his name was Hesham Ali.  And he supervised her work

5    and he also provided accounting and bookkeeping services for

6    Mr. Manafort's entities and for his personal finances.

7          The evidence is going to show you that Mr. Ali and

8    Ms. Washkuhn, they were signatories on those DMP bank accounts

9    along with Rick Gates so that all the bills could get paid

10   that were coming in.

11         Now, these individuals will also tell you that the

12   accounting and bookkeeping for these entities was complicated.

13   It's not surprising because you will learn that this was a

14   very small staff but generating large revenues.

15         Importantly, as I said, Ms. Washkuhn and Mr. Ali

16   will confirm what I previewed, that they contacted Rick Gates

17   regarding any issues that were related to income, to expenses,

18   to loans and the like.

19         They only met Mr. Manafort on rare occasion one or

20   two times, and they didn't speak to him on the phone very much

21   at all.

22         Again, Rick Gates was the contact point for all the

23   day-to-day operations and the financial matters of the

24   company.

25         You're going to hear the tax accountants who were

U.S. v. Manafort

1    responsible for preparing those returns.  And because of

2    Paul's travel schedule, you're going to hear that when they

3    had questions about the tax returns, whether it be for the

4    business returns or whether it be for Mr. Manafort's personal

5    returns, that it was Rick Gates who was the point person for

6    the financial information they needed.  And the documents are

7    going to show that when there were questions to be asked and

8    answered, they sent them to Rick Gates.

9         Phil Ayliff and Cindy Laporta are the two partners

10   at KWC, the tax accounting firm.  And they worked on these

11   returns.  They will tell you this.  The problem was Rick Gates

12   was not giving these professionals the full story.  The

13   problem was, and you will learn this, Rick Gates had his hand

14   in the cookie jar and he couldn't take a chance that his boss

15   might find out.  So if he told the accountants and bookkeepers

16   the truth, his embezzlement would be discovered and the jig

17   would be up.

18        So let's talk about how he did it.  Well, with

19   respect to those FBAR accounts, those foreign bank accounts,

20   remember what I said earlier, that the evidence will show you

21   that these accounts were set up not at Paul's initiative but

22   at the initiative of the people who were paying for his

23   services on behalf of the Ukrainian Party of Regions.

24        And so for each separate campaign that he worked on,

25   the evidence will show, for example, if it was a presidential

1  campaign, they would set it up in a company name, Company A,

2  and then if two years later there was a parliamentary campaign

3  and they were dealing with different candidates, that would be

4  set up in Company B so that they could keep track for each

5  contract what the money is coming in for and what the money is

6  going out for in terms of expenses.

7       Paul Manafort instructed that neither he nor Rick

8  Gates should be on these accounts.  Paul agreed to use those

9  bank accounts in Cyprus and put them up in these offshore

10  entities, because that is the way the client wanted it to be

11  done.

12       What the evidence will show you, however, is that

13  Rick Gates kept his name on these accounts so that he could

14  keep control.  He could then contact the people in Cyprus who

15  had charge of these accounts and he could have them send money

16  where he wanted it to be sent.  And because he was on the

17  corporate documentation and because he was on the bank's

18  signature cards, he could do it.

19       Since things were getting paid and because Paul was

20  very busy working on multiple campaigns in Ukraine and the

21  money was coming in, everything seemed fine.

22       Rick was handling the financial operations and he

23  was communicating directly with the company's bookkeepers and

24  the company's tax accountants.  But little did Paul know that

25  Rick Gates was lining his own pockets and the evidence will

U.S. v. Manafort

1   show he was claiming fake bonuses and business expenditures in

2   order to pay himself.

3          Now, there is no dispute that Rick Gates also sent

4   money from these accounts to pay for Paul's personal expenses,

5   so let me speak to that just for a moment.

6          You've heard a great deal about it during the

7   prosecutor's opening remarks, and I suspect you're going to

8   hear a lot more about it during the trial.  But there's really

9   no dispute.

10         Members of the Jury, Paul Manafort travels in

11  circles that most people will never know and he has gotten

12  handsomely rewarded for it.

13         We do not dispute that.  Paul Manafort, you will

14  see, made millions of dollars as a political consultant, and a

15  good deal of that money was made on those Ukrainian campaigns

16  for the Party of Regions.  We don't contest that.

17         We don't contest that Paul Manafort spent a lot of

18  money and lived a lifestyle that most people can only dream

19  of.  These facts are not in dispute.  Nevertheless, you're

20  going to hear a lot about what Paul spent his money on.

21         The prosecutors, as you've heard, will present

22  evidence about Paul's expensive tailored suits, or his

23  Mercedes-Benz cars or Range Rovers.  They'll talk about season

24  tickets to sporting events.  And they're going to show you

25  pictures of all of this as if you've never seen luxury cars or

U.S. v. Manafort

1  nice homes before.

2          But as you listen to the evidence, you need to

3  consider how those expenditures actually prove the case that

4  the Government has brought before you or whether those

5  pictures and those documents and that evidence is being put in

6  for some other reason.

7          Money is coming in fast and it's a lot.  And Paul

8  Manafort trusted that Rick Gates was keeping track of it and

9  that he was communicating with the company's bookkeepers and

10  its tax accountants, the professionals that Paul Manafort

11  hired to keep it all straight.

12          That's what Rick Gates was getting paid for, by the

13  way.  But, again, the evidence is going to show you Paul --

14  Paul's trust was misplaced.

15          Finally, the third group that Judge Ellis talked to

16  you about were the bank fraud counts and the related

17  conspiracy charges that went with them.

18          Now, conspiracy involves a secret agreement among

19  the participants.  But the evidence will show that nothing was

20  being hidden here.  Paul Manafort was open with his outside

21  professionals, those bookkeepers and tax accountants, about

22  why he was seeking the mortgages and what he wanted to do with

23  the money if the loans were approved.  Nothing was being

24  hidden by him.

25          The Government alleges that -- in its indictment,

U.S. v. Manafort

1  that Paul Manafort intended to violate the conditions of one

2  loan agreement that required 1.4 million to be used to

3  renovate a property.  But you're going to hear evidence in

4  form of witness testimony and e-mails that completely refute

5  that allegation.

6         You're also going to hear evidence that most of the

7  banks ultimately did receive the information that the

8  Government contends was kept from them, and they received it

9  before they made the mortgage loans.

10        For another bank you're going to hear evidence from

11 witnesses that it was going to give Paul the mortgage loan

12 regardless of his income because of his substantial assets so

13 that the income information that Rick Gates forwarded to them

14 was not even material to their decision.

15        You see, it's not as the prosecutor said, that it's

16 just about income and debt.  Loans can also be based on a

17 person's net worth and how substantial their assets are to

18 provide collateral.

19        What will be shown is that Paul had legitimate

20 reasons for applying for these loans.  And, in fact, before

21 the Government brought the case and seized the funds, these

22 loans were all being repaid by -- at the banks.  No one was

23 out a dime.

24        At the end of the day, Members of the Jury, you're

25 going to find evidence that Paul Manafort trusted Rick Gates

U.S. v. Manafort

1  to handle the day-to-day operations of his company and his own

2  finances, his personal finances.  And he expected Rick Gates

3  and trusted Rick Gates to coordinate with the professionals,

4  the outside professionals, that he, Paul Manafort, hired.

5          Rick Gates had worked for Paul for more than a

6  decade, and Paul trusted him.  Paul was working on lucrative

7  consulting contracts halfway around the globe, and Rick Gates,

8  you will find, took advantage of Paul's trust.

9          Now, this is the same person upon whom the

10  Government has built its entire case.  Rick Gates is their

11  foundation.  It will be your job to assess his credibility,

12  whether to believe him, and whether to determine whether that

13  testimony is credible beyond a reasonable doubt, the highest

14  standard of proof that our law knows.

15          Finally, if I might, I'm going to ask you that you

16  please don't make up your mind on any of this until you've

17  heard all the evidence.  It's natural to start forming

18  impressions as the information comes in.  But as Judge Ellis

19  told you, one of the most important principles of our American

20  justice system is the presumption of innocence.

21          So Mr. Manafort is presumed innocent as he sits here

22  today and he's going to be presumed innocent and should be

23  presumed innocent to you throughout the presentation of all

24  this evidence.  And that's why we ask you not to form early

25  judgments.

U.S. v. Manafort

1        Now, at the conclusion of this -- the presentation

2   of evidence, we'll have a chance to come up and review the

3   documents to review the testimony with you.

4        And at that time we're going to ask you to return a

5   verdict of not guilty.  Thank you for listening.

6        THE COURT:  All right.  Call your first witness on

7   behalf of the Government, please.

8        MR. ANDRES:  Judge, I'm not sure if the Court was

9   intending on taking an afternoon break, but if we could just

10  take a quick break, we can move the exhibits and the binders

11  to get ready for the witness.

12       THE COURT:  All right.  I will do that.

13       Ladies and gentlemen, we will take a brief recess.

14  Remember during the recess not to discuss the matter among

15  yourselves or with anyone and not to undertake any research at

16  all.  And don't allow anyone to speak to you about it.

17       Now, I intend to go until about 5:30 or 6 o'clock at

18  the very latest.  If any of you have any childcare or other

19  responsibilities that you must attend to that would preclude

20  that, tell Mr. Flood during this recess and I will accommodate

21  them.  I'll release you promptly at 5:00 if you really need to

22  be released then.  But I want to get the matter going and

23  done, and the way to do that is to start with the evidence

24  today.

25       Pass your books to the right.  The court security

1  officer will collect them, maintain their security during the

2  recess.  There will be soft drinks, I think, available to you

3  back there.  Help yourself to them.  Make sure you fill out

4  your menu.  Have you seen it yet?  Did you find the baked

5  Alaska?  Oh, I'm sorry.  But I think you'll find something on

6  there that you can eat.  You may follow Mr. Flood out now.

7  Reconvene in 15 minutes, which I have to be 4:20.

8            (Jury excused.)

9            THE COURT:  You may be seated.  I'm going to take a

10  15-minute recess now.  Anything further at this time?

11           The Court stands in recess for 15 minutes.  Don't

12  bother standing.

13           (Recess.)

14           THE COURT:  All right.  You may call the

15  Government's first case -- or first witness.  I beg your

16  pardon, Mr. Andres.

17           MR. ANDRES:  I just wanted to alert Your Honor to

18  the first thing I'm going to ask the Court to do is read a

19  stipulation.  So since I'm going to task you with that

20  request --

21           THE COURT:  All right.

22           MR. ANDRES:  -- it's Stipulation 448.  And I know

23  it's Your Honor's intention to read that himself.

24           THE COURT:  That's right.

25           MR. ANDRES:  I think we have a copy up on your

U.S. v. Manafort

1   chambers.  If not, I can give you this one.  No?

2          THE COURT:  I don't see a copy up here.

3          MR. ASONYE:  It's behind Your Honor, I believe, all

4   the exhibits.

5          THE DEPUTY CLERK:  What number?

6          MR. ANDRES:  It's 448.  I can get -- yeah.

7          THE COURT:  Hand me -- what I have behind me are --

8          MR. ANDRES:  Understood, Judge.

9          THE COURT:  -- loose-leaf binders.  I'm not going to

10  go through them.

11         MR. ANDRES:  Judge, the second issue I wanted to

12  just raise with Your Honor is that many of the documents for

13  this witness will be admitted pursuant to a 902(11) business

14  records stipulation, which I don't intend to admit into

15  evidence.  But we've provided them to the defense and we have

16  copies if Your Honor wants to see them.

17         THE COURT:  All right.

18         MR. ANDRES:  Okay.

19         THE COURT:  Any problem with those?

20         MR. WESTLING:  We have no challenge foundation on

21  these documents, Your Honor.

22         THE COURT:  All right.

23         MR. WESTLING:  Only issue may be relevancy.

24         THE COURT:  Well, is this one of the documents in

25  the motion in limine?

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

63

1          MR. WESTLING:  Some of these documents will be, Your

2   Honor.

3          THE COURT:  All right.  I think there were what, how

4   many documents that were involved in the motion in limine?

5          MR. WESTLING:  A total of about 60, 50 or so.  And I

6   think 20 of them relate to this witness or something in that

7   neighborhood.  And, Your Honor, I think given, frankly, what

8   was said in opening, we may let this proceed.  I don't know

9   that we're going to have objections to as many, as things

10  develop.  So it may be better to --

11         THE COURT:  Which documents?  I want to be able to

12  do it quickly.

13         MR. WESTLING:  Yes, sir.

14         THE COURT:  Which documents do you intend to offer?

15  Have you told counsel about those?

16         MR. ANDRES:  I did.  We notified the Court and

17  counsel that we'd be admitting through Mr. Devine, he'll be

18  the next witness, Exhibits 3 through 22.

19         THE COURT:  All right.  Are there any objections to

20  3 through 22?

21         MR. WESTLING:  We do not have objections to 3

22  through 22, Your Honor.

23         THE COURT:  Any other through this witness?

24         MR. ANDRES:  No, Judge.

25         THE COURT:  So how long do you expect this witness

U.S. v. Manafort

64

1    to take?

2            MR. ANDRES:  I think about an hour.

3            THE COURT:  All right.  So he'll be the only witness

4    we'll do today.  There aren't any problems with the exhibits,

5    so let's get on with it.

6            MR. ANDRES:  Thank you, Judge.  You want to put the

7    witness on the stand before the jury comes in?

8            THE COURT:  Say again.

9            MR. ANDRES:  Do you want the witness on the stand

10   before the jury comes in?

11           THE COURT:  No.

12           MR. ANDRES:  Okay.

13           THE COURT:  The other way around.  Let me -- when

14   the jury comes in, I'm going to read to them the stipulation

15   regarding the e-mail, then you may have your -- you may call

16   your witness.

17           All right.  You may bring the jury in, please.

18           Oh, just a moment.  Mr. Flood, just a moment.

19           I have had word that some of the witnesses, maybe

20   not this particular witness, have lawyers accompanying them

21   and they wish to have their lawyers present.  I understood

22   that they wish to have their lawyers present with them at the

23   witness stand rather than in the courtroom.  If they have that

24   request, they can make it in open court.

25           Otherwise, the lawyer can just sit in the body of

65

1   the court.  If that's not acceptable to the party or to the

2   witness or the lawyer, they can make their request in open

3   court and I'll consider it.

4           There's no authority that I know of that requires

5   any witness who wants to have a lawyer present, to have the

6   lawyer next to him or her at the witness stand.  And I have

7   never so -- done so as a matter of course.  Now, if someone

8   wants to make a special request and give me a reason or

9   authority that I should consider, I'll consider it.

10  Otherwise, they can sit in the courtroom.

11          MR. ANDRES:  Understood, Judge.

12          Just with respect to that stipulation, the

13  Government is going to move to enter the stipulation into

14  evidence and I'd just note from our private discussions with

15  defense counsel, that they at least intended to object to the

16  admission of those stipulations.  So I just wanted to

17  highlight that issue.

18          MR. WESTLING:  Your Honor, we would prefer that the

19  Court read the stipulation, but not enter the document into

20  evidence only because we believe it overemphasizes the

21  stipulation as should be heard as oral testimony is throughout

22  this case.

23          MR. ANDRES:  Judge, there are more than 15

24  stipulations in this case.  There's absolutely no reason that

25  we should be hiding these from the jury if they're being --

U.S. v. Manafort

66

1          THE COURT:  I usually send stipulations back to the

2     jury.  So I understand your view to the contrary, your

3     objection, I'll overrule it.  It's what I do.  I think it's

4     important for the jury to hear it and then see it when they

5     want to consider the evidence.  I don't think it has the

6     effect of emphasizing specific elements.  These are formal

7     matters largely.  So the request is denied.

8          Bring the jury in, please.

9          (Jury in.)

10          THE COURT:  I see the beginning of a trend.  There

11    is -- I saw the claim of a seat here and I see some others as

12    well.  All right.  You may be all seated now.

13          Ladies and gentlemen, as I said, I'll go until about

14    5:30.  I think the next witness will take approximately an

15    hour and I did not receive any concern from any juror as to

16    going another hour.  Am I correct?  Good.

17          All right.  Now, first, I'm going to read to you a

18    stipulation, which is something the lawyers can do.  They can

19    stipulate to the admissibility of certain facts or matters.

20    And you're entitled to accept that jurisdiction and treat the

21    facts as having been proved or the matters having been agreed

22    to.

23          In this case, the parties stipulate that the

24    defendant, Paul Manafort, was the person who was the assigned

25    subscriber of the following e-mail accounts and then there are

U.S. v. Manafort

67

1    a number of those:  PManafort@DMPINT.com and

2    PM223114@gmail.com and PMManafort@DavisManafort.com.  That's

3    the first paragraph.

4            Second paragraph is with respect to all e-mails

5    introduced at trial, which had previously been produced by the

6    United States to the defense, as part of the discovery

7    process, the stipulation is that the e-mails are authentic and

8    no further testimony is necessary to establish their

9    authenticity.  Authenticity is a judgment, is a criterion of

10   admissibility.  And the judge makes that typical determination

11   if there's an objection.  It simply means that the document is

12   authentic.  It is what it purports to be.  If there is a

13   concern about whether it isn't what it purports to be, it

14   isn't an e-mail from X to Y on such and such a date, even

15   though it purports to be that, then I have to consider that.

16   But the stipulation here is that the e-mails that are going to

17   be introduced with this witness?

18           MR. ANDRES:  During the entire trial, Judge.

19           THE COURT:  All right.  During the trial are e-mails

20   that were authored and sent from the e-mail account listed on

21   the particular e-mails, that the e-mails were received by the

22   recipient on the particular e-mails, and that the e-mails were

23   sent on the date listed on the e-mails.

24           Now, let me ask one other question.  It says in the

25   stipulation that the defendant was the person who was assigned

─────U.S. v. Manafort─────

68

1  subscriber of the following e-mail accounts.  I'm not sure,

2  since I'm not a person of this century, maybe not even the

3  last century, what does assigned subscriber mean?

4       MR. ANDRES:  It means that the defendant was the

5  owner of those accounts.  Those were his e-mail accounts.

6       THE COURT:  All right.  Is the inference then that

7  the e-mails that you introduced from those accounts were

8  authored by him, authorized by him, or what?

9       MR. ANDRES:  Certainly, Judge.  It was his e-mail

10 account, so that's certainly the inference.

11      THE COURT:  Well, I don't have an e-mail account.  I

12 never have and never will.  I don't know.  I have a telephone

13 and some people can use my telephone with my authorization,

14 so --

15      MR. ANDRES:  This stipulation doesn't preclude that

16 though, Judge.  But there will be testimony about particular

17 individuals who received those e-mails and will testify they

18 responded to the defendant and the like.  So we understand

19 that.  The stipulation governs the fact that those were his

20 e-mail accounts.

21      THE COURT:  My wife has several e-mail accounts.  My

22 wife has multiple computers and lots of other things.  And if

23 I were to fiddle with any of them, my life would be in danger.

24 I would have to resort to the witness protection program.

25      All right.  Call your first witness, please.

─────────────────U.S. v. Manafort─────────────────

1          MR. ANDRES:  Judge, the Government would like to

2    move into evidence the stipulation you just read.

3          THE COURT:  Yes, it'll be -- every stipulation will

4    be part of the exhibits admitted into evidence, in this case,

5    448.

6          MR. ANDRES:  Thank you, Judge.

7          The Government calls Thomas A. Devine.

8                         (Government's Exhibit No. 448

9                          admitted into evidence.)

10          THE COURT:  Come forward.  Take the oath, please,

11    sir.

12          Thereupon,

13                    **THOMAS A. DEVINE,**

14    having been called as a witness on behalf of the Government

15    and having been first duly sworn by the Deputy Clerk, was

16    examined and testified as follows:

17          (Witness seated.)

18          THE COURT:  All right.  You may proceed.

19                    **DIRECT EXAMINATION**

20    BY MR. ANDRES:

21    Q.   Please state your name for the record.

22    A.   My name is Thomas Arthur Devine.  I go by Tad Devine.

23    Q.   How old are you, Mr. Devine?

24    A.   63.

25    Q.   Can you briefly describe your educational background?

U.S. v. Manafort

1  A.   Yes.  I'm a graduate of Brown University, a graduate of

2  Suffolk University school of law.

3  Q.   And what field do you work?

4  A.   I'm a political consultant.

5  Q.   How long have you worked as a political consultant?

6  A.   For 25 years.

7  Q.   Can you tell the jury what types of things you do,

8  what -- the specifics of your profession as a political

9  consultant?

10  A.   Yes, I -- mostly, I make television ads.  I write,

11  direct, and produce television ads.  I also do strategy,

12  media, communications for campaigns.

13  Q.   Are you involved in speech writing from time to time?

14  A.   Yes, I am.

15  Q.   Have you worked in -- as a political consultant outside

16  of the United States?

17  A.   Yes.

18  Q.   Approximately, how many countries have you worked as a

19  political consultant?

20  A.   I think nine countries.

21  Q.   And can you explain to the jury how, as an American,

22  American citizen, you're able to go to other countries and

23  work on their political campaigns?

24  A.   Yeah.  Most of my work in foreign countries is producing

25  television ads and it relies on polling and research that we

U.S. v. Manafort

1  do in those countries.  So even though I'm not very familiar

2  with the culture or other aspects of that country, I am very

3  familiar with campaigns and particularly familiar with the

4  production of television advertising and the context of

5  campaigns.

6  Q.   Have you worked in Ukraine?

7  A.   Yes, I have.

8  Q.   Who hired you to work in Ukraine?

9  A.   Paul Manafort.

10  Q.   What did Mr. Manafort hire you to do in Ukraine?

11  A.   To work on the media team, to really head up the media

12  time, to make television advertisements, to work also with

13  speeches and communication for the campaigns.

14  Q.   And over what period of time did you work for

15  Mr. Manafort in the Ukraine?

16  A.   I began work in 2005 and continued to work through 2010,

17  I believe.

18  Q.   Okay.  At some point after 2010, did you go back and work

19  again later?

20  A.   I did.  Yes, I worked on a project in 2014 as well.

21  Q.   Okay.  Who did you report to on these projects that you

22  worked on in the Ukraine?

23  A.   To Paul Manafort.

24  Q.   And what did you understand Mr. Manafort's role to be on

25  various elections in the Ukraine?

T. Devine - Direct

1   A.   He was in charge of the campaign.  He was the person who

2   ran it.

3   Q.   And do you know who he reported to?

4   A.   To the Party of Regions and its leader, Viktor

5   Yanukovych.

6   Q.   Okay.  Who is Viktor Yanukovych?

7   A.   He was the leader of the Party of Regions.  He was

8   elected prime minister in the first campaign we worked on

9   together.  He was elected president in 2010 on the final

10  campaign we worked on together.

11  Q.   And what is the Party of Regions?

12  A.   The Party of Regions is a major political party in

13  Ukraine.  It's -- regions are kind of like our states.  So it

14  would be the party of different states or regions of the

15  country.

16  Q.   Have you maintained a relationship with Mr. Manafort

17  since you first worked with him?

18  A.   Yes.

19  Q.   How would you describe that relationship?

20  A.   As a friendly relationship.

21  Q.   Can I ask you to look around the courtroom today and tell

22  me if you see Mr. Manafort in the courtroom?

23  A.   Yes, I do.

24  Q.   Can I ask you to point out something he's wearing?

25  A.   He's wearing a --

U.S. v. Manafort

1    THE COURT:  I'll let the record reflect that the --

2  he has identified Mr. Manafort.  Next question.

3  BY MR. ANDRES:

4  Q.   Mr. Devine, did you produce documents to the Government

5  pursuant to a subpoena in this matter?

6  A.   Yes, I did.

7  Q.   What types of materials did you produce?

8  A.   Contracts between my firms and Paul's firm.  Memorandum

9  that we prepared for the campaign.  Television advertising

10  scripts and advertisements themselves.  Speeches that we

11  worked on, talking points.

12  Q.   And did you meet with the Government to review those

13  materials prior to your testimony?

14  A.   Yes, I did.

15  Q.   Let me ask you about your employment history.  Have you

16  been a principal or a partner in any political consulting

17  firms?

18  A.   Yes.

19  Q.   Can you briefly tell the jury where you worked and over

20  what time period?

21  A.   Well, I've worked as a political consultant since 1993.

22  I was a partner in a firm in Washington, D.C.  It was called

23  Doak, Shrum, Harris, Carrier, Devine.  I then worked in

24  another firm called Shrum, Devine, Donilon.  I then worked in

25  a firm called DMV Media, then Devine, Mulvey and now I work in

U.S. v. Manafort

1    a firm called Devine, Mulvey, Longabaugh.  So I've had

2    different partners through the years.

3    Q.   All right.  You testified that you worked in the Ukraine.

4    Can you explain how you first came to work in the Ukraine?

5    A.   Yes.  My former partner, Mike Donilon, was contacted by

6    Rick Davis who was Paul's partner.  They knew one another.

7    And they asked if we would be interested in working on the

8    project in Ukraine.  We were busy with a domestic campaign at

9    the time.  This was the fall of 2005.  Mike was mostly working

10   on that.

11          I had just finished a campaign outside the country

12   and done a lot of work, foreign work.  So it was decided that

13   I would handle the Ukrainian project.  I spoke to Paul on the

14   phone.  He told me that he thought I should travel to Ukraine,

15   meet the people there, meet the team.

16          THE COURT:  All right.  You've answered the

17   question.  Next question.

18   BY MR. ANDRES:

19   Q.   Mr. Devine, when you reference Paul --

20   A.   Yes.

21   Q.   -- who are you referring to?

22   A.   Paul Manafort.

23   Q.   Okay.  So you had an invitation to work on a project.

24   Can you tell us what happened next?

25   A.   Yes, I traveled to Kiev.  I met with people from the

1    Party of Regions.  I met with people who worked for the

2    campaign, policy people and others who were working on the

3    election campaign, making sure that it was, you know, a free

4    and fair election.  And after that, I decided that I would

5    work for him.

6    Q.   What was your impression of the operation that

7    Mr. Manafort had in the Ukraine?

8    A.   My impression was that it was a really incredible

9    operation.  He had a lot of really good people in place, very

10   well organized.  And I was deeply impressed by him and the

11   people around him.

12   Q.   And what about the resources that Mr. Manafort had?

13   A.   I thought there was substantial resources for the

14   campaign.  There were a lot of people working there and he

15   seemed to be well resourced.

16   Q.   And was that significant to you?

17   A.   Yes, it was significant because if you don't have a lot

18   of resources, how do you win campaigns.

19   Q.   At that time when you first went to the Ukraine, did you

20   have an understanding of what political party or candidate

21   Mr. Manafort was representing?

22   A.   A little bit of an understanding, but most of it was

23   developed in my trip there and, you know, reading about it --

24   Q.   And what did you learn?

25   A.   I learned that, you know, there'd been a lot of

─────U.S. v. Manafort─────

1  controversy in Ukraine.  There was a revolution there that the

2  previous election was disputed.  I learnt that -- from people

3  I met in my trip there, that -- and these were Ukrainian

4  people that I met -- that they believed that Yanukovych had

5  moved on, had lost a lot of the bad people with him, that they

6  were going to support him.  So, you know, I learned that, you

7  know, while there were issues from past elections that, you

8  know, well, this was a new election and a new time.

9  Q.   Do you know at the time that Mr. Manafort first started

10  working for Mr. Yanukovych what his political fortunes were or

11  whether he was considered a viable candidate?

12          THE COURT:  The question is now compound.

13          MR. ANDRES:  Sorry, Judge.

14  BY MR. ANDRES:

15  Q.   When you first began working or when Mr. Manafort first

16  started working for Mr. Yanukovych, what was Mr. Yanukovych's

17  political standing?

18  A.   His standing was very low.  He had, you know, lost a

19  previous election.  He -- his, you know, standing in politics

20  was that this was a guy who was part of the past and really

21  had no political future.

22  Q.   So you testified that he ultimately became the president.

23  What do you attribute that success to?

24  A.   I attribute it to excellent campaigns that Paul ran, to a

25  good team, a good message that connected with voter.

U.S. v. Manafort

1  Q.   In addition to the -- in addition to the first engagement

2  that you had, did you work on other elections in the Ukraine?

3  A.   Yes, I did.

4  Q.   What other elections do you remember?

5  A.   I worked -- there was a special parliamentary-called Rada

6  election that I think was sometime around 2007.  We had some

7  local elections in that period, 2007 to 2008.  I worked on the

8  presidential election, 2009 to 2010.  I think we had some

9  local elections thereafter in 2010, and that's when I stopped

10  working.

11  Q.   You testified that you worked on a 2010 presidential

12  election.  Who did -- who did Mr. Manafort represent in that

13  election?

14  A.   Viktor Yanukovych in the Party of Regions.

15  Q.   Do you know what Mr. Manafort's relationship was with

16  Mr. Yanukovych?

17  A.   Yes, I believed it was a very close relationship.  They

18  spent time together.  He dealt with him directly and

19  frequently.

20  Q.   And how did you know that?

21  A.   I know that because he told me that and others told me

22  that as well who were involved in the campaign.

23  Q.   Okay.  There's an exhibit binder.  Let me ask you to take

24  a look at Exhibit No. 4.

25  A.   Yes.

T. Devine - Direct

1  Q.    Do you see that?

2  A.    Yes.

3  Q.    Is that something you've seen before?

4  A.    Yes.

5  Q.    Is that document relevant to your work with Mr. Manafort?

6  A.    Yes, it is.

7  Q.    And can you tell -- can you tell the Court what -- what

8  document is included in Government Exhibit 4?

9  A.    Yes.  This is a consulting agreement between Paul's

10  company, Davis Manafort International, and my firm, and

11  another firm who was working with us on this project.

12          MR. ANDRES:  The Government moves to admit

13  Government Exhibit 4.

14          MR. WESTLING:  No objection.

15          THE COURT:  Admitted.  Next question.

16                      (Government's Exhibit No. 4

17                      admitted into evidence.)

18          MR. ANDRES:  Let me direct your attention -- can I

19  publish that, Judge?

20          THE COURT:  Yes, but we don't need to prolong it.  I

21  mean, if it's going to play some significant role you may

22  highlight something, but let's move on --

23          MR. ANDRES:  Thanks, Judge.

24          THE COURT:  -- as expeditiously as you can.  The

25  answer to your question is yes, but --

─────────────────── U.S. v. Manafort ───────────────────

1          MR. ANDRES:  Yes, but quickly.

2          THE COURT:  Yes.

3          MR. ANDRES:  Understood, Judge.  Thank you.

4    BY MR. ANDRES:

5    Q.    Mr. Devine, can you tell what this document is?

6    A.    This is a contract between my firm and another firm that

7    worked with us and Paul's firm, Paul Manafort's firm.

8    Q.    Okay.  So in the first paragraph does it identify the

9    parties?

10   A.    Yes, it does.

11   Q.    And who are the parties?

12   A.    The parties are Davis Manafort International, and my

13   firm, Devine Mulvey, and another firm, Rabin Strasberg, who is

14   working with us.

15   Q.    Okay.  And does the contract identify what the specific

16   election or term you're going to work on is?

17   A.    Yes.  It's for the presidential election in Ukraine.

18   Q.    Of what year?

19   A.    In -- the election will be held in 2010 but the work

20   began in 2009.

21   Q.    Does the contract cover what your compensation would be?

22   A.    Yes, it does.

23   Q.    And can you explain that to the jury?

24   A.    Yes.  The compensation that we agreed to in this contract

25   was -- for a total sum of $500,000, was payable on a monthly

U.S. v. Manafort

1    basis.  And in addition to that, if we were successful in this

2    campaign and Yanukovych was elected president, we would

3    receive a success fee of $100,000.

4    Q.   Okay.  And did President Yanukovych win this election?

5    A.   Yes, he did.

6    Q.   And did you receive a success fee?

7    A.   Yes.

8    Q.   Can you turn to the last page of the contract and tell me

9    whether it's signed?

10   A.   Yes, it is.

11   Q.   Who signed the contract?

12   A.   Paul Manafort signed it, I signed it, and Dan Rabin,

13   Daniel Rabin, signed it for his firm.

14   Q.   And then just one additional question.  If you turn back

15   to the first page, it says, "Scope of services."

16          Can you explain to the jury what services you were

17   being contracted for here?

18   A.   Yes.  We were contracted to render media services.  And

19   we would provide media services, including the production of

20   all television radio advertisements.  That meant involvement

21   in the planning of those advertisements, the editing, the

22   finalization of television and radio ads, scripts for them.

23   You know, that we would participate in strategy and planning

24   for media for the presidential campaign and travel to Ukraine

25   in order to do that.

T. Devine - Direct

1   Q.   The -- the contract is signed by -- or there's a heading

2   for Davis Manafort International.  What did you understand

3   that to be?

4   A.   I understood that to be Paul Manafort's firm.

5   Q.   Do you know if other individuals, either who were working

6   for or associated with his firm, worked with you on the

7   elections in the Ukraine?

8   A.   Yes.

9   Q.   Did you meet an individual named Rick Gates?

10  A.   Yes, I did.

11  Q.   Who else did you identify with Mr. Manafort or his firm?

12  A.   Working in Ukraine?

13  Q.   Yes.

14  A.   Yes.  Phil Griffin was another person that we worked with

15  frequently there.  And there was Konstantin Kilimnik, who

16  worked there as a translator.  And there were -- there were

17  others, Ukrainians' names I really don't remember right now.

18  Those are the major people we worked with.

19  Q.   With respect to Konstantin Kilimnik, did he have a

20  nickname?

21  A.   Yes, we called him "KK."

22  Q.   Did you find it common that people referred to the

23  Ukrainians by their initials?

24  A.   Well, him for sure.

25  Q.   Okay.

─────U.S. v. Manafort─────
T. Devine - Direct

82

1  A.   You know, and I think perhaps for others as well, yes.

2  Q.   On documents and memoranda?

3  A.   Yes, absolutely.  Yeah, documents.

4  Q.   With respect to Mr. Gates, what did you understand

5  Mr. Gates' role to be at Mr. Manafort's firm?

6  A.   I understood Rick to be -- I would call him Paul's

7  business guy.  The one who handled the contracts, our travel.

8  You know, those kinds of matters he would deal with.

9  Q.   And did you interact with him?

10 A.   Yes.

11 Q.   And vis-à-vis Mr. Manafort, what was his role?  Were they

12 peers?  Were they --

13 A.   No.  You know --

14        THE COURT:  The question is now compound and

15 leading.

16 BY MR. ANDRES:

17 Q.   Could you describe Mr. Gates' role in connection with

18 Mr. Manafort?

19 A.   Yes.  Paul was in charge.  Rick worked for Paul.

20 Q.   And what about Mr. Kilimnik?  What was his role?

21 A.   His role was to work as a translator with us and, you

22 know, he also worked for Paul under -- you know, he was in

23 charge of the campaign.

24 Q.   How about Phil Griffin?

25 A.   Phil Griffin worked on a lot of political things with us.

T. Devine - Direct

1  He would be available to facilitate our work, you know, going

2  to studios.  He would give us direction as to what we were

3  supposed to be working on at that time.

4  Q.  Do you know if Mr. Manafort had an office in the Ukraine?

5  A.  Yes, he did.

6  Q.  Do you know where it was located?

7  A.  Yes.

8  Q.  Where?

9  A.  It was located next to the main square in Kiev called the

10  Maidan.

11  Q.  During the time that you worked in the Ukraine, did you

12  travel there?

13  A.  Yes, I did.

14  Q.  How often?

15  A.  In the period of those five years, I probably went there

16  15 or more times.

17  Q.  And where did you stay when you went to the Ukraine?

18  A.  Towards the end we stayed at the Hyatt hotel mostly.

19  Before that we stayed at other hotels, like the Radisson and

20  one other hotel as well.

21  Q.  And would you see Mr. Manafort when you were there?

22  A.  Yes, sometimes I would.

23  Q.  How often would you see him?

24  A.  Most of the time I was there.  You know, during the

25  election campaigns he would be around.

1   Q.   And would you communicate with him about the work, the TV

2   ads, and other work you were doing?

3   A.   Yes.

4   Q.   How would you communicate with him?

5   A.   Through e-mail, in person, or by telephone.

6   Q.   You testified that you worked as an advisor to

7   Mr. Manafort on these elections.  Do you know if Mr. Manafort

8   hired other U.S. advisors?

9   A.   Yes.

10  Q.   Who were the other advisors?

11  A.   There was The Tarrance Group, which is a polling firm.

12  Dave Sackett was an advisor.  There were -- you know, Rabin

13  Strasberg who worked with us.  There was -- there were a lot

14  of people who did advance -- and I don't really know all their

15  names, but there were many of them particularly in that first

16  campaign.

17         So, you know, U.S. people who would come over there

18  and do events.  There were a team of people who did sort of,

19  you know, elections to try to ensure that the elections were

20  going to be free and fair.  There was a large team of people

21  who did that as well.

22  Q.   Do you know an individual named Tony Fabrizio?

23  A.   Yes.  Tony Fabrizio was also -- was a pollster who began

24  working later on this project.

25  Q.   And you testified earlier about an individual named

T. Devine - Direct

85

1    Dan Rabin?

2    A.    Yes.

3    Q.    What did Dan Rabin do in the Ukraine?

4    A.    Dan Rabin worked with me, you know, as part of our team.

5    So on producing television advertising.

6    Q.    And he -- do you know who he reported to?

7    A.    He reported -- when he was there he reported to

8    Paul Manafort.

9    Q.    You testified about the 2010 -- 2010 presidential

10   election.  Were you involved in writing any speeches for that

11   election?

12   A.    Yes, I was.

13   Q.    What speeches?

14   A.    I wrote a -- I know I wrote a speech -- I sent a draft of

15   the speech to Paul on election night for Yanukovych after he

16   won.  I believe I wrote an earlier speech about the economic

17   policy of the Party of Regions.

18   Q.    Let me direct your attention to Government Exhibit 7.

19   Have you seen that document before?

20   A.    Yes.

21   Q.    Does it relate to your work in the Ukraine for

22   Mr. Manafort?

23   A.    Yes, it does.

24         MR. ANDRES:  Your Honor, the Government moves to

25   admit Government Exhibit 7.

U.S. v. Manafort

1            MR. WESTLING:  No objection.

2            THE COURT:  Admitted.

3                         (Government's Exhibit No. 7

4                         admitted into evidence.)

5            THE COURT:  Next question.

6            MR. ANDRES:  May I publish it, Your Honor?

7            THE COURT:  Yes, you may.  Subject to the same point

8  I made to you earlier.  Don't ask to publish something that

9  you're not going to ask much about.

10            MR. ANDRES:  Understood.

11            THE COURT:  But go ahead.  You may publish.

12  BY MR. ANDRES:

13  Q.   Mr. Devine, starting with the e-mail at the bottom, who

14  is the author of that e-mail?

15  A.   I'm the author of the e-mail.

16  Q.   And who did you write the e-mail to?

17  A.   I wrote it to Paul Manafort.

18  Q.   Can you read the subject line?

19  A.   The subject is "Election Night Speech."

20  Q.   And what's the date of the e-mail?

21  A.   February 3, 2010.

22  Q.   When you referred to "election night speech," what was --

23  what were you referring to?

24  A.   I was referring to the speech that Yanukovych would give

25  after the presidential election.

U.S. v. Manafort

1  Q.  Okay.  Can you just summarize for the jury what --

2  what -- summarize that e-mail for the jury, the bottom one.

3  A.  I had just flown back from Kiev to New York.  Paul had

4  asked me to write a speech.  I told him I had just landed

5  there and I sent him the speech.

6  Q.  And is there an attachment to the speech, an attachment

7  to the e-mail?

8  A.  Yes, there is.

9  Q.  And what is the attachment?

10  A.  The attachment is the text of the speech.

11  Q.  Okay.  Do you know if that speech was ever delivered?

12  A.  I'm not sure if it was delivered in Ukrainian -- you

13  know, translated, but I just don't know the answer to that.

14  Q.  Can you turn to Government Exhibit 8?

15       Is that a -- is that a document you've seen before?

16  A.  Yes, it is.

17  Q.  Did it relate to your work in the Ukraine for

18  Mr. Manafort?

19  A.  Yes.

20       MR. ANDRES:  Your Honor, the Government moves to

21  admit Government Exhibit 8.

22       MR. WESTLING:  No objection.

23       THE COURT:  Admitted.

24                 (Government's Exhibit No. 8

25                 admitted into evidence.)

U.S. v. Manafort

1              MR. ANDRES:  May I publish it, Your Honor?

2              THE COURT:  Yes.

3    BY MR. ANDRES:

4    Q.   Mr. Devine, starting with the e-mail about two-thirds of

5    the way down that says, "To the team," do you see that e-mail?

6    A.   Yes.

7    Q.   Who is the author of that e-mail?

8    A.   Paul Manafort.

9    Q.   And can you explain to the jury who the e-mail was sent

10   to?

11   A.   It was sent to the sort of key people on the consulting

12   people.

13   Q.   Was it sent to you?

14   A.   Yes, it was.

15   Q.   And Mr. Strasberg?

16   A.   Yes.

17   Q.   What did Mr. Strasberg do?

18   A.   He worked with Dan Rabin as part of our media consulting

19   team.

20   Q.   And also Julian Mulvey?

21   A.   Yes, he's my business partner.

22   Q.   Okay.  And who is CC'd on the e-mail?

23   A.   Rick Gates, Phil Griffin, and Konstantin Kilimnik.

24   Q.   Can you read the first line of the e-mail?

25   A.   "To the team.  The CEC certified Viktor Yanukovych as the

U.S. v. Manafort

1   winner of the presidential election last night."

2   Q.   And what did you understand the CH -- I think the C --

3   A.   I believe that's the election authority in Ukraine.

4   Q.   Okay.  And then down in the next paragraph, starting with

5   "everyone," can you read those three sentences?

6   A.   "Everyone from Yanukovych to Demeko know that but for the

7   efforts of this team, there will be no celebration.  I spent

8   five hours with Yanukovych on election night, and he made the

9   point continuously to thank the team.  This is not something

10  that he has done in the past.  This time he definitely gets

11  it."

12  Q.   Okay.  Did you reply to Mr. Manafort's e-mail?

13  A.   Yes, I did.

14  Q.   Okay.  And rather than reading it, can you just summarize

15  what you said in your e-mail?

16  A.   I congratulated Paul for running a great campaign and

17  told him he deserved enormous credit for putting the team

18  together and for running the -- the campaign.

19  Q.   Your e-mail references "tremendous discipline in the

20  campaign."  What did you mean by that?

21  A.   I meant tremendous discipline in the execution and

22  delivery of message.  Frequently, in campaigns that's one of

23  the biggest problems, is that they get off-message and they

24  don't deliver the message to the voters.  This was not one of

25  those campaigns.  This campaign delivered the message with

─────────U.S. v. Manafort─────────

1   numbing reputation and got through.

2   Q.   And who did you -- who did you attribute with having that

3   discipline?

4   A.   I attributed Paul and the leadership that he provided to

5   the campaign.

6   Q.   Okay.  Can you look at Government Exhibit No. 9?

7        Can you tell me that what that is?

8   A.   This is an e-mail.  Well, the bottom is an e-mail from

9   Paul to me regarding the win bonus after the election.

10  Q.   And this relates to your work with Mr. Manafort in the

11  Ukraine?

12  A.   Yes.

13       MR. ANDRES:  The Government moves to admit

14  Government Exhibit 9.

15       MR. WESTLING:  No objection.

16       THE COURT:  Admitted.

17                    (Government's Exhibit No. 9

18                    admitted into evidence.)

19       MR. ANDRES:  May I publish it, Your Honor?

20       THE COURT:  You may.

21  BY MR. ANDRES:

22  Q.   Mr. Devine, the bottom e-mail, who is that e-mail from?

23  A.   It's from Paul Manafort.

24  Q.   And who is it to?

25  A.   To me.

T. Devine - Direct

1  Q.   And what's the date?

2  A.   The date is February 16, 2010.

3  Q.   And what does that e-mail relate?

4  A.   It relates to the win bonus that we were going to get

5  under the contract.

6  Q.   And was that -- how was that referred to?  What was the

7  term that was used --

8  A.   Success fee.

9  Q.   And how much was the success fee?

10  A.   $100,000.

11  Q.   And were you paid that success fee?

12  A.   Yes, we were.

13  Q.   In the e-mail there's a reference to when Mr. Manafort is

14  going to pay you.  Do you see that?

15  A.   Yes.

16  Q.   What does it say?

17  A.   It says, "I get my last payment right after the

18  inauguration, which is scheduled for February 25th.  I'll be

19  making your payment from it.  If there's any delay, I will dip

20  into other sources.  Is that okay for you?"

21  Q.   Did you understand that Mr. Manafort was being paid for

22  his work in the Ukraine?

23  A.   Yes.

24  Q.   Did you know who was paying him?

25  A.   The Party of Regions.

─────U.S. v. Manafort─────
T. Devine - Direct
92

1   Q.   Okay.  And do you know any -- who in the Party of Regions

2   was responsible?

3   A.   Well, I knew that Rinat Akhmetov was someone who

4   contributed a lot of money to the campaign and to the Party of

5   Regions.

6   Q.   And how did you know that?

7   A.   I know that because I was told that by Paul and by other

8   people who worked on the campaign.

9   Q.   And who is Rinat Akhmetov?

10  A.   He's a wealthy Ukrainian.  They would call him an

11  oligarch, someone who is, you know, a wealthy person.  He was

12  involved in politics with the Party of Regions.

13  Q.   And when you say that term "oligarch," what does that

14  mean to you?

15  A.   That means someone of enormous wealth in -- in Ukraine.

16  Q.   Did you have an idea of what Mr. Akhmetov's wealth was?

17  A.   I believe it was in the billions of dollars.

18  Q.   And you had discussions with Mr. Manafort about

19  Rinat Akhmetov?

20  A.   Yes.

21  Q.   Do you know what Mr. Manafort's relationship was with

22  Mr. Akhmetov?

23  A.   I believe, you know, they, you know, knew each other well

24  and spoke to one another.

25  Q.   Okay.  Let me ask you to look at Government Exhibit

┌─────────────── U.S. v. Manafort ───────────────┐

1   No. 10.  Can you tell me what that is?

2   A.   Yes.  This is a media strategy memo about message and

3   advertising.

4   Q.   And is there a cover e-mail?

5   A.   Yes.

6   Q.   Okay.  And what's the date on the cover e-mail?

7   A.   The date is August 31, 2010.

8   Q.   And the attached memo, is that something you've seen

9   before?

10  A.   Yes.

11  Q.   Can you explain what it is?

12  A.   This is a memo to President Yanukovych and others

13  identified by initials -- I'm not sure who they are -- from

14  PJM, who is Paul Manafort.

15  Q.   Okay.

16       Your Honor, the Government would move to admit

17  Government Exhibit 10.

18       MR. WESTLING:  No objection.

19       THE COURT:  All right.  It's admitted.

20              (Government's Exhibit No. 10

21               admitted into evidence.)

22       MR. ANDRES:  May I publish it, Your Honor?

23       THE COURT:  Yes.  This memo is from you, that is,

24  the memo of August 31?

25       THE WITNESS:  No, Your Honor.  The memo that I'm

U.S. v. Manafort

1   looking at is for PJM, Paul J. Manafort.

2          THE COURT:  No.  Exhibit 10 is a memo from

3   Tad Devine dated August 31.  Is that you?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  And you attached to that another memo?

6          THE WITNESS:  Yes.  I think I would have written a

7   memo to Paul.  And this memo that I'm looking at right now is

8   from Paul to President Yanukovych and others.

9          THE COURT:  All right.  Did you author any part of

10  that?

11         THE WITNESS:  This memo?  Yes, it looks -- very much

12  looks like something I would have written, yes, Your Honor.

13         THE COURT:  So as I understand it, this is a memo,

14  August 31, from you to Manafort, and the attachment appears to

15  be a memo intended to be sent to Yanukovych that you

16  essentially authored, am I correct?

17         THE WITNESS:  Well, this -- the Yanukovych memo is

18  dated August 12th.  The e-mail from me is dated August 31st.

19         THE COURT:  All right.  What did you attach?

20         THE WITNESS:  I assumed that I attached the memo

21  which probably looked a lot like this memo.

22         THE COURT:  Oh, there -- no.  Look a little bit --

23  look at the end.  I think I see it.

24         THE WITNESS:  At the end of the memo?

25         THE COURT:  Yes.  There's an August 31 memo from you

T. Devine - Direct

1   to --

2          MR. ANDRES:  That's a different document, Your

3   Honor.  If I might, I don't want to interrupt, but if I

4   could --

5          THE COURT:  Well, it's in the book that you prepared

6   for the Court under Exhibit 10.

7          MR. ANDRES:  I understand, Judge.  But the issue

8   really is that the first document is an e-mail and the e-mail

9   attaches the memo --

10         THE COURT:  All right.  That's all right.  I --

11  let's hear from the witness.

12         The e-mail is from you and there's an attachment; is

13  that right?

14         THE WITNESS:  Yes.  Yes, Your Honor.

15         THE COURT:  And we don't have the attachment here,

16  do we?

17         THE WITNESS:  Not here, no.

18         THE COURT:  What was the attachment, as you recall?

19         THE WITNESS:  You know, I believe I may have seen

20  the attachment, and I think it looked a lot like the memo that

21  Paul later sent.

22         THE COURT:  So --

23         MR. ANDRES:  Your Honor --

24         THE COURT:  Just a moment.  When I'm -- just a

25  moment.  When I'm done, I will let you know.

U.S. v. Manafort

1          MR. ANDRES:  Understood.

2          THE COURT:  The August 31 memo is from you to Anne.

3  Who is Anne?

4          THE WITNESS:  Anne was my assistant in my firm.

5          THE COURT:  All right.  You sent her a memo and the

6  subject was, quote, another memo, close quote.  And the

7  attachment is a media presentation, right?

8          THE WITNESS:  Yes.

9          THE COURT:  Now, the next thing in Exhibit 10 is

10 this memorandum from PJM, which I assume is Mr. Manafort, to

11 Yanukovych.

12         THE WITNESS:  Yes.

13         THE COURT:  That really isn't part of your August 31

14 memo, is it?

15         THE WITNESS:  No.  But, Your Honor, I think I wrote

16 a memo that looks a lot like Paul's memo and sent it to him.

17         THE COURT:  I see.  So this would have been Manafort

18 sending on to Yanukovych something that you had worked on and

19 prepared and sent to Manafort?

20         THE WITNESS:  I believe so, yes.

21         THE COURT:  All right.  And then we get to the last

22 part of Exhibit 10, and that's from you to Anne, your

23 assistant, and that attaches the memorandum from Mr.

24 Manafort to --

25         THE WITNESS:  Actually, I'm sorry, Your Honor, this

1    is to Anna.

2              THE COURT:  Anna.

3              THE WITNESS:  Okay.  Who is also at my firm at the

4    time.  So not Anne with an E.

5              THE COURT:  So there was an Anne and a Anna?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  Who is Anna?

8              THE WITNESS:  She is my daughter and she was

9    interning at my firm.

10             THE COURT:  All right.  And then there's an

11   attachment to that; is that correct?

12             THE WITNESS:  Yes.

13             THE COURT:  All right.  What's the purpose of

14   Exhibit 10.

15             MR. ANDRES:  Judge, Exhibit 10 reflects the work

16   that Mr. Devine was doing for Mr. Manafort in the Ukraine in

17   2010.  And I was going to inquire about the memo that's

18   attached to his e-mail.

19             THE COURT:  All right.  You may do so.

20   BY MR. ANDRES:

21   Q.   Okay.  If you could look at the top of the -- of the

22   memo.

23             And if you could scan in on that, please?

24             The memo is to President -- well, you tell me, who

25   is the memo to?

─────U.S. v. Manafort─────

1   A.    To President Viktor Yanukovych.

2   Q.    And then there's CCs and some initials?

3   A.    Yes.

4   Q.    Do you know who any -- do you know who NA is?

5   A.    I don't.

6   Q.    How about AK?

7   A.    No.

8   Q.    How about BVK?

9   A.    I can't remember right now all these.

10  Q.    During the time that you worked in the Ukraine, were you

11  aware of an individual named Boris Kolesnikov?

12  A.    Yes.

13  Q.    Who is that?

14  A.    I think he was -- I believe he worked for the Party of

15  Regions.

16  Q.    Okay.  How about an individual named Sergei Levochkin?

17  A.    Again, that was someone involved in the Party of Regions,

18  but not someone I dealt with.

19  Q.    Okay.  In this memo, can you tell me what subject matter

20  this relates to?

21  A.    Yes.  This is about strategic assumptions for the

22  campaign, key messages, advertising themes.

23  Q.    And does this memo reflect your work in the Ukraine after

24  the election of Mr. Yanukovych?

25  A.    Yeah, I believe so.  Well, I wouldn't call it work.  I

─────────────U.S. v. Manafort─────────────

1    wasn't being paid for it, but it certainly would reflect, you

2    know, my thinking, yeah.

3    Q.   Okay.  And when you say it wasn't work, who are you --

4    who asked you to write that memo or who was asking for your

5    help?

6            THE COURT:  The question is compound.  One question.

7    BY MR. ANDRES:

8    Q.   Who was asking for your help?

9    A.   Paul Manafort.

10   Q.   Okay.  Can I ask you to take a look at Government

11   Exhibit 11?

12           Can you tell what that is?

13   A.   This is -- these are talking points produced, you know,

14   for communication purposes.

15   Q.   And talking points as they related to what campaign or

16   party?

17   A.   This is -- these are talking points for some of the

18   leaders of the Party of Regions, including Yanukovych.  You

19   know, probably for some event like what we would call

20   conventions here.  Party conference.

21           MR. ANDRES:  Your Honor, the Government moves to

22   admit Government's Exhibit 11.

23           MR. WESTLING:  No objection.

24           THE COURT:  It's admitted.

25                         (Government's Exhibit No. 11

─U.S. v. Manafort─

1                          admitted into evidence.)

2    BY MR. ANDRES:

3    Q.   And what's the date on the cover e-mail?

4    A.   The date is September 1, 2010.

5    Q.   And who does the e-mail -- who did you send the e-mail

6    to?

7    A.   To Paul Manafort.

8    Q.   And who's CC'd?

9    A.   Dan Rabin, Julian Mulvey, Rick Gates, Adam Strasberg, and

10   Phil Griffin.

11   Q.   And can I ask you to take a look at Government Exhibit

12   No. 12.  The bottom e-mail.

13   A.   Uh-huh.

14   Q.   Do you see that e-mail?

15   A.   Yes.

16   Q.   Are you included on that e-mail?

17   A.   Yes, I am.

18   Q.   Is that an e-mail you've seen before?

19   A.   Yes.

20   Q.   Okay.  And did it relate to your work for Mr. Manafort in

21   the Ukraine?

22   A.   Yes.

23             MR. ANDRES:  The Government moves to admit

24   Government Exhibit 12.

25             MR. WESTLING:  No objection.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1          THE COURT:  Admitted.

2                        (Government's Exhibit No. 12

3                        admitted into evidence.)

4    BY MR. ANDRES:

5    Q.   With respect to Government Exhibit 12, can you explain to

6    the jury what -- can you summarize that exhibit?

7    A.   Yes.  This is a memo which talks about a draft of a poll

8    that was being prepared, soliciting comments from people who

9    would be involved in the process of preparing the polling

10   instrument.

11   Q.   And were polls important to you during the time you

12   worked in the Ukraine?

13   A.   Yes, critically important.

14   Q.   Can you look at Government Exhibit No. 20?

15   A.   20?

16   Q.   20.  Can you tell what that is?

17   A.   This is a memo to Davis Manafort from July 2010 about a

18   draft message for the elections, a recommended draft TV and

19   radio media plan as well.

20   Q.   And did that also reflect the work you were doing in the

21   Ukraine for Mr. Manafort?

22   A.   Yes.

23          MR. ANDRES:  The Government moves to admit

24   Government's Exhibit 20.

25          MR. WESTLING:  No objection.

─────U.S. v. Manafort─────

1      THE COURT:  Admitted.

2                  (Government's Exhibit No. 20

3                  admitted into evidence.)

4      MR. ANDRES:  May I publish it, Your Honor.

5      THE COURT:  Yes, you may.  How much more do you have

6  of this witness?

7      MR. ANDRES:  I would say about 20 minutes, Judge.

8      THE COURT:  All right.  Let's move it along.

9  BY MR. ANDRES:

10  Q.   With respect to the top of the e-mail, can you explain

11  the letterhead on the e-mail -- on the -- I'm sorry -- on the

12  memoranda of Government's Exhibit 20?

13  A.   Yes.  There were two letterhead on here.  One is Rabin

14  Strasberg, which is Dan Rabin and Adam Strasberg.  The other

15  is Devine Mulvey, which is myself and my business partner,

16  Julian Mulvey.

17  Q.   And who is the -- who is the memo to?

18  A.   It's to Davis Manafort.

19  Q.   And what's the date?

20  A.   The date is July 12, 2010.

21  Q.   And can you summarize what the purpose of the memo was?

22  A.   To talk about a draft message for the upcoming elections

23  and recommend a TV and radio media plan.

24  Q.   Okay.  And did you create a radio and media plan?

25  A.   Yes.  I'm sure we did.

T. Devine - Direct

1    Q.   Did you -- you testified earlier that you created TV and

2    radio ads.  Are you familiar with the term "script"?

3    A.   Yes, I am.

4    Q.   What is a script?

5    A.   A script is a written version of the ad where we would

6    write out what the narrator or a candidate was going to say

7    and then -- and then we would have a column which we would

8    attach visuals which would go along with the written script.

9    Q.   During the time that you worked for Mr. Manafort,

10   approximately how many TV ads or commercials did you propose?

11   A.   During all of that time and all of those campaigns,

12   probably hundreds.

13   Q.   Can I ask you to take a look at Government's Exhibit 22?

14          Can you tell me what that is?

15   A.   This is a script for a television ad.

16   Q.   Okay.  And does this relate to the work that you did for

17   Mr. Manafort?

18   A.   Yes, it does.

19   Q.   Okay.

20          MR. ANDRES:  The Government moves to admit

21   Government's Exhibit No. 22.

22          MR. WESTLING:  No objection.

23          MR. ANDRES:  May I publish it, Your Honor?

24          THE COURT:  You may.

25   BY MR. ANDRES:

U.S. v. Manafort

1   Q.   Mr. Devine, if you could look at the top half of the --

2   well, can you explain to the jury what Government Exhibit 22

3   is?

4   A.   This is a script for an ad that we produced in Ukraine

5   during the presidential election.

6   Q.   And can I highlight the top end of that?

7        Can you just explain the top part of that?

8   A.   The audio side of the top --

9   Q.   Yeah, where it says "client."

10  A.   Oh, client.  The client is the Party of Regions.

11  Q.   Okay.  And is this an ad that you remember?

12  A.   Yes, I do.

13  Q.   Was this an ad that was ultimately run?

14  A.   I'm not sure that -- whether or not it was run, but I

15  remember the ad.

16  Q.   Can you explain the ad?

17  A.   Yes.  The ad was inspired by the television show "Mad

18  Men" when a character was falling down through tall buildings.

19  And, you know, the ad was meant to show that the predecessors

20  in government, when they held power, things did not work out

21  well.  Then it would change from orange to blue and the

22  character would be introduced into a scene -- a vibrant scene

23  of economic growth.

24  Q.   And can you explain the process of how you would propose

25  ads for Ukraine elections?

─────U.S. v. Manafort─────
T. Devine - Direct
                                                                    105

1   A.   Yes.  We would draft scripts like this, and we would send

2   them to Paul Manafort and he would, you know, approve the

3   scripts.  He may have had a separate process that I was not

4   involved in with the Party of Regions.  But our process was to

5   give them to Paul.

6   Q.   Okay.  Can you look at Government Exhibit 14?

7        Can you tell me what that is?

8   A.   Yes.  This is a memo from me to Paul Manafort.

9   Q.   Okay.  And is there a cover e-mail?

10  A.   Yes.  This is in -- Paul sent me a memo and, you know,

11  asked me to review some information about what was happening

12  in the -- in the campaign over there.

13  Q.   At the time did you understand Mr. Manafort to be working

14  in the Ukraine as of the time of the e-mail?

15  A.   Yes.

16  Q.   And this e-mail, your response relates to Mr. Manafort's

17  work in the Ukraine?

18  A.   Yes.

19  Q.   Okay.

20        MR. ANDRES:  The Government moves to admit

21  Government Exhibit 14.

22        MR. WESTLING:  No objection.

23        THE COURT:  It's admitted.

24                        (Government's Exhibit No. 14

25                        admitted into evidence.)

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────── U.S. v. Manafort ───────

106

1   BY MR. ANDRES

2   Q.   Can you explain what the context of the e-mail is?

3   A.   Yes.  The context of the e-mail is that Paul got in touch

4   with me and wanted to know what I thought about what they

5   should be doing in the campaign.

6        At that point in time, I was no longer working for

7   them, but he wanted my input and opinion, shared the research

8   data with me.  I reviewed it.  And I sent, you know, this memo

9   back to Paul on the basis of my review.

10  Q.   You testified that you were no longer working in the

11  Ukraine.  As of the time of this e-mail, was Mr. Manafort

12  working in the Ukraine?

13  A.   Yes.

14  Q.   And over what period of time did you understand

15  Mr. Manafort to work in the Ukraine?

16  A.   Well, from -- when I got there in 2005 through -- you

17  know, the last time I was there was in 2014, and he was still

18  involved there.

19  Q.   And what did you do in the Ukraine in 2014?

20  A.   In 2014, I traveled to Ukraine.  This is after Yanukovych

21  left the presidency.  And Rick Gates had gotten in touch with

22  me and asked me to meet with a group of people formerly

23  involved with the Party of Regions who wanted to form a new

24  political party.

25  Q.   Do you know what the name of that political party was?

1    A.    I believe they were calling it the Party of Development.

2    Q.    Okay.  Can you take a look at Government Exhibit 15?

3          Can you tell me what that is?

4    A.    Yes.  This is a memo from me to Rick Gates, and it was

5    about an inquiry they made about whether or not my firm would

6    work for another candidate, this was after Yanukovych left,

7    Petro Poroshenko, who was a candidate for president of

8    Ukraine.

9    Q.    And when Mr. Gates sent you an e-mail, who did you

10   understand him to be speaking for?

11   A.    I understood him to be speaking for Paul Manafort.

12   Q.    And this e-mail in Government Exhibit 15 relates to your

13   work -- relates to the work of the Mr. Manafort in Ukraine?

14   A.    Yes.

15         MR. ANDRES:  The Government moves to admit

16   Government Exhibit 15.

17         MR. WESTLING:  No objection.

18         THE COURT:  Admitted.

19                        (Government's Exhibit No. 15

20                        admitted into evidence.)

21   BY MR. ANDRES:

22   Q.    Can you explain what Mr. Gates is proposing here?

23   A.    He's proposing that we -- you know, that we work on a

24   campaign for another presidential candidate.

25   Q.    And did you ultimately work on that campaign?

U.S. v. Manafort

1    A.    No, we did not.

2    Q.    Okay.  Take a look at Government Exhibit 16.

3              Can you tell me what that is?

4    A.    Yes.  This is a draft proposal for us to work in -- on a

5    campaign in Ukraine.

6    Q.    Okay.  And do you know what this related to?

7    A.    I think it was -- I think -- let's see -- March 31,

8    2014 -- I think it related to the same campaign which would

9    have been for Poroshenko.

10   Q.    Okay.  And you understood that Mr. Manafort was working

11   for Poroshenko?

12   A.    Well, I think they were -- it was coming together.  I'm

13   not sure that it all came together, but there was -- they were

14   trying to put it together and --

15   Q.    And did you have --

16   A.    -- asked us if we'd do it.

17   Q.    And did you have discussions about working on that

18   campaign?

19   A.    Yes.

20   Q.    Who did you have discussions with?

21   A.    Rick Gates.

22   Q.    With respect to Government Exhibit 16, does this document

23   reflect your discussions?

24   A.    Yes, it does.

25              MR. ANDRES:  The Government moves to admit

U.S. v. Manafort

1   Government Exhibit 16.

2            MR. WESTLING:  No objection.

3            THE COURT:  All right.  It's admitted.  But let me

4   have counsel quickly at the bench.

5            (Bench Conference.)

6            THE COURT:  Mr. Andres, I'm sure you have a clear,

7   lucid idea about why this is important.  But when you asked to

8   have admitted a memo by -- what's his name -- Gates, why is

9   that not hearsay?

10           MR. ANDRES:  It's not hearsay for a few reasons,

11  Judge.  First of all, these documents are business records and

12  there's a business --

13           THE COURT:  There's no evidence that they are

14  business records.

15           MR. ANDRES:  They have been certified by this

16  company that produced them as business records.  The 90211

17  stipulation.  That -- that would be our first basis.

18  Secondly, as the defense --

19           THE COURT:  I don't think they are business records.

20           MR. ANDRES: Well, Your Honor --

21           THE COURT:  Come on man.

22           MR. ANDRES:  Option two.

23           THE COURT:  Yes, option tow.

24           MR. ANDRES:  Option one is the defense mentioned

25  rather prominently in Mr. Gates as the co-conspirator.

─────U.S. v. Manafort─────
T. Devine - Direct
110

1          THE COURT:  No he's not a co-conspirator on this.

2     He's a co-conspirator on the other counts.

3          MR. ANDRES:  No, Judge this is the count.  This is

4     the count.

5          THE COURT:  Well, I see.  Well, I misunderstood

6     this.

7          MR. ANDRES:  I understood --

8          THE COURT:  I thought the counts of the

9     co-conspirator were for bank loans.

10          MR. ANDRES:  Mr. Manafort has -- I'm sorry, Mr.

11     Gates has pled guilty.  But obviously he's an admitted

12     co-conspirator.  You don't have to be charged with that crime.

13     Mr. Gates was charged with conspiring with Mr. Manafort with

14     respect to hiding the income from these contracts.

15          THE COURT:  Well, let me clear about that.  I don't

16     have any evidence yet and that was --

17          MR. ANDRES:  Understood.

18          THE COURT:  -- what this conspiracy was.  At the

19     moment it seems completely foreign.  As a matter of fact, what

20     I've heard so far doesn't advance the Government's ball at all

21     under 402.

22          But I just wanted to call that to your attention.

23     You've clarified for me that you want to introduce this as a

24     co-conspirator's statement in furtherance of -- and I

25     understood or I understand now that you do mean it to be the

U.S. v. Manafort

T. Devine - Direct

111

1   conspiracy to -- for the -- for the ugh --

2          MR. ANDRES: Tax fraud.

3          THE COURT:  Tax fraud.  That is the hide the income.

4          MR. ANDRES: Correct.

5          THE COURT:  All right.  I take it we will hear from

6   Mr. Gates.

7          MR. ANDRES:  That's our expectation.

8          THE COURT:  I think the conspiracy is a much

9   narrower conspiracy.  It's a conspiracy about hiding income.

10  It's far from easy for me to see how this goes to hiding

11  income.

12         MR. ANDRES: I understand that, Judge.

13         THE COURT:  But what I am acutely sensitive to is

14  how much time we're taking in this sort of thing.

15         All right.  There's no objection anyway.  It's

16  admitted.  Let's proceed.

17         MR. ANDRES:  Thank you, Your Honor.

18         (Open court.)

19         THE COURT:  All right.  Mr. Andres, what was the

20  exhibit you were on?

21         MR. ANDRES:  17, Judge.

22         THE COURT:  All right.  You may continue.

23         MR. ANDRES:  Has that been admitted, Judge.  16.

24  I'm sorry, Judge, being told that I was on 16.

25         THE COURT:  You were on 16?

─────────────────U.S. v. Manafort─────────────────
                                                                    112

1             MR. ANDRES:  Yes.

2             THE COURT:  You may continue.

3             MR. ANDRES:  The Government moves to admit

4    Government Exhibit 16.

5             MR. WESTLING:  No objection, Your Honor.

6             THE COURT:  Admitted.  Next question.

7                          (Government's Exhibit No. 16

8                          admitted into evidence.)

9    BY MR. ANDRES:

10   Q.   Mr. Devine, can you look at Government Exhibit 18.

11        Can you tell me what that is?

12   A.   This is a memo from me to Konstantin Kilimnik about my

13   travel to Ukraine in June of 2014.

14   Q.   Okay.  And this is additional work that you're going to

15   do in Ukraine?

16   A.   Yes, this is the work I --

17             THE COURT:  You're leading.  You had that -- the

18   correct question is:  What was the additional work?

19   BY MR. ANDRES:

20   Q.   What was the additional work?

21   A.   The additional work was for me to work with a group of

22   individuals who were forming a new political party.

23   Q.   And who did you understand Mr. Kilimnik to be?

24   A.   He was someone who worked as a translator for Paul's

25   operation.

1  Q.   Okay.  And did you go to the Ukraine?

2  A.   Yes, I did.

3  Q.   And what did you do when you got there?

4  A.   I met for a week with a group of individuals who were

5  preparing to form a new political party.

6  Q.   And who was responsible for the details of your travel?

7  A.   Rick Gates and Konstantin Kilimnik.

8  Q.   With respect to the Government Exhibit -- the exhibit

9  in -- with respect to Government Exhibit 18, can you explain

10  what that is?

11  A.   18?  The one we're on now?

12  Q.   Yeah, 18.

13  A.   Yeah, this is a memo from me to Konstantin Kilimnik about

14  my travels to Ukraine and the work that I would be doing there

15  that week.

16          MR. ANDRES  the Government moves to admit Government

17  Exhibit 18.

18          MR. WESTLING:  No objection.

19          THE COURT:  It's admitted.  Next question.

20                    (Government's Exhibit No. 18

21                    admitted into evidence.)

22  BY MR. ANDRES

23  Q.   Can you turn to Government Exhibit 19?

24  A.   Yes.

25  Q.   I'm sorry.  One question, Mr. Devine, with respect to 18.

U.S. v. Manafort

T. Devine - Direct

114

1   A.    Uh-huh.

2   Q.    Do you remember where you stayed when you went to the

3   Ukraine?

4   A.    Yes.  I stayed at Hyatt Hotel in Kiev.

5   Q.    And with respect to the e-mail from Mr. Kilimnik, does it

6   identify where you're staying?  On the first page of

7   Government Exhibit 18.

8   A.    On 18 there's a memo from me to --

9   Q.    I'm sorry.  The e-mail at the top -- the top document of

10  Government Exhibit 18.

11  A.    Yes.  Let's see.  We're talking about the June 16 memo?

12  Q.    The e-mail.

13  A.    June 16 e-mail from me to Kilimnik?

14  Q.    Right.  Does it identify --

15  A.    Yes, it says -- it says you are staying at the Hyatt.

16  Q.    Okay.  Thank you.

17        With respect to the Government Exhibit 19, can you

18  tell me what that is?

19  A.    Yes.  This is a note memorandum from me to Konstantin

20  Kilimnik regarding messages and talking points for that new

21  party that was being formed.

22  Q.    And what's the date of this e-mail?

23  A.    The date is June 19, 2014.

24  Q.    Does it relate to work you were doing in the Ukraine?

25  A.    Yes.

──────U.S. v. Manafort──────

1  Q.   Who were you doing that work for?

2  A.   For Paul Manafort.

3         MR. ANDRES  the Government moves to admit Government

4  Exhibit 19.

5         MR. WESTLING:  No objection, Your Honor.

6         THE COURT:  Admitted.

7                           (Government's Exhibit No. 19

8                           admitted into evidence.)

9  BY MR. ANDRES:

10 Q.   You testified that you were paid for your work in the

11 Ukraine; is that correct?

12 A.   Yes.

13 Q.   Can you explain to the jury what your invoicing process

14 was?

15 A.   Well, our process would be that my office would send an

16 invoice to Davis Manafort for whatever the agreed terms of

17 that contract was and then they would, you know, pay the

18 invoice.

19 Q.   And how were you paid?

20 A.   By wire transfers.

21 Q.   Were any of the payments you received foreign wires?

22 A.   I don't know the details of that.

23 Q.   Okay.  Can I ask you to look at Government Exhibit 6?

24        Can you tell me what Government Exhibit 6 is?

25 A.   Yes.  These are invoices from my firm to Davis Manafort

U.S. v. Manafort

1    for various amounts.

2    Q.   Okay.  And did these -- have you seen all of these

3    invoices before?

4    A.   Yes.  Yes, I have.

5    Q.   Do they all relate to Davis Manafort?

6    A.   Yes.

7    Q.   And did all the work that you did for Davis Manafort

8    relate to a certain country?

9    A.   Yes.

10   Q.   What country?

11   A.   Ukraine.

12   Q.   Okay.

13            MR. ANDRES:  The Government moves to admit

14   Government Exhibit 6.

15            MR. WESTLING:  No objection.

16            THE COURT:  Admitted.

17                           (Government's Exhibit No. 6

18                           admitted into evidence.)

19   BY MR. ANDRES:

20   Q.   Okay.  If I could just show --

21            MR. ANDRES:  May I publish these, Judge?  This is

22   the last exhibit I'm going to ask about.

23            THE COURT:  They're just invoices.

24            MR. ANDRES:  Correct.

25            THE COURT:  But you may publish one of them.

U.S. v. Manafort

1          MR. ANDRES:  Fair enough.  Thank you, Judge.

2          THE COURT:  You don't want to publish all of them,

3    do you?

4          MR. ANDRES:  No, Judge, just the first one.

5          THE COURT:  Go ahead.

6    BY MR. ANDRES:

7    Q.   Can you explain, Mr. Devine, what that is?

8    A.   This is an invoice from my firm to Davis Manafort for a

9    bill.

10   Q.   Okay.  And what does it relate to?

11   A.   It relates to the payment of consulting fees to my firm.

12   Q.   And what's the date of the invoice?

13   A.   The date -- the date of the invoice is February 1, 2010.

14   Q.   Okay.  And how much is the invoice for?

15   A.   The invoice is for $62,500.

16   Q.   Okay.  And can you take a look at the next invoice?

17        Can you tell me what the date of that invoice is?

18   A.   That is February 25, 2010.

19   Q.   And how much is that invoice for?

20   A.   That's for $100,000.

21   Q.   And who would -- who would -- who did you bill on that

22   invoice?

23   A.   Davis Manafort.

24   Q.   Is it fair to say that all of the documents contained in

25   Government Exhibit 6 are additional invoices?

T. Devine - Direct/Cross

1   A.   Yes.

2   Q.   Okay.  And those reflect bills for your work in the

3   Ukraine?

4   A.   Yes.

5           MR. ANDRES:  Judge, may I have just one moment?

6           THE COURT:  Yes, you may.

7           MR. ANDRES:  I have no further questions.  Thank

8   you, Judge.

9           THE COURT:  Cross-examination, if any?

10          MR. WESTLING:  Yes, Your Honor.

11          THE COURT:  For planning purposes, how long do you

12  anticipate?

13          MR. WESTLING:  Probably about 15 or 20 minutes.

14          THE COURT:  All right.

15          Ladies and gentlemen, I said 5:30, but we can finish

16  this witness if you're able to do so.  Is anyone in dire

17  straits and needs to be excused before 6:00?

18          All right.  Let's proceed.

19          MR. WESTLING:  Thank you, Your Honor.

20                       **CROSS-EXAMINATION**

21  BY MR. WESTLING:

22  Q.   Good afternoon, Mr. Devine.  My name is Richard Westling,

23  and I represent Paul Manafort.  How are you this afternoon?

24  A.   Good.  Thank you.

25  Q.   I appreciate you being here.  I just have a few questions

————U.S. v. Manafort————

1    for you.

2            You started out by explaining your relationship with

3    Mr. Manafort.  How long have you known him?

4    A.    I met him in 2005.

5    Q.    Okay.  And so before that, were you familiar with his

6    reputation?

7    A.    Yes, I was.

8    Q.    What did you know about him as a political consultant?

9    A.    That he was a prominent political consultant.

10   Q.    Do you have any sense of how long he's been involved in

11   this business?

12   A.    Yes, for, I'd say, 40 years.

13   Q.    All right.  And he's worked on a number of domestic

14   campaigns; is that right?

15   A.    Yes, he has.

16           MR. ANDRES:  Objection.

17           THE COURT:  I beg your pardon?

18           MR. ANDRES:  Objection, relevance.

19           THE COURT:  Overruled.

20   BY MR. WESTLING:

21   Q.    He's worked on a number of domestic campaigns?

22   A.    Yes, he has.

23   Q.    And going back in time, my sense is that you-all have not

24   always been on the same side of the aisle.  Is that fair to

25   say?

U.S. v. Manafort

T. Devine - Cross

120

1   A.   No, that's fair to say.

2            MR. ANDRES:  Objection, relevance.

3            THE COURT:  I'm going to overrule it.

4            Next question.

5   BY MR. WESTLING:

6   Q.   And so obviously when it came to your work in the

7   Ukraine, you were working for the same candidate, correct?

8   A.   Yes.

9   Q.   All right.  And so in terms of the work that you did over

10  there, you've had some e-mails and things shown to you.  My

11  sense is that you thought pretty highly of the work

12  Mr. Manafort was doing?

13  A.   Yes, I did.

14  Q.   He's a well-qualified professional in the consulting

15  space?

16  A.   Yes.

17  Q.   You felt happy to be working with him on this project?

18  A.   Yes.

19  Q.   And you felt you were doing good work over there; is that

20  right?

21  A.   Yes.

22  Q.   You were very successful together, correct?

23  A.   Yes.

24  Q.   And in this case, part of what was going on with

25  Mr. Yanukovych, as I understand it, and correct me if I'm

─────────────────── U.S. v. Manafort ───────────────────
T. Devine - Cross

1  wrong, is that there was an effort to work with him in order

2  to open up Western alliances for the Ukraine; is that right?

3  A.   Yes.

4  Q.   All right.  And that was a part of the strategy behind

5  all of this, correct?

6  A.   Yes, it was.

7  Q.   Because the thought was making him more Europe-facing

8  would make him a better president and candidate in the

9  Ukraine?

10 A.   Yes.

11 Q.   And it would be good for the country, correct?

12 A.   Yes.

13 Q.   All right.  And so you were happy to be part of that

14 project?

15 A.   I was.

16 Q.   Now, you've also indicated that you worked with

17 Mr. Manafort on the Ukrainian projects for five or six years;

18 is that right?

19 A.   Yes.

20 Q.   And during that time, were you always left with a

21 positive impression about his hard work and effort?

22 A.   Yes.

23 Q.   All right.  Let's talk a little bit about his team.

24 You've testified about that.  You talked about Mr. Kilimnik

25 who was over in Kiev, correct?

─U.S. v. Manafort─

1   A.   Yes.

2   Q.   And he was largely doing translation and other logistic

3   work?

4   A.   Yes.

5   Q.   All right.  And then Mr. Gates, you said you got to know

6   him as well?

7   A.   Yes.

8   Q.   Did he spend much time in the Ukraine?

9   A.   I'd see him not all the time, but sometimes.

10  Q.   All right.

11  A.   Yeah.

12  Q.   Did you understand he also sort of had a role holding

13  down the office here in the U.S.?

14  A.   Yeah, and elsewhere, he seemed to be traveling as well.

15  Q.   Okay.  And you described him, I think, earlier -- and I

16  don't want to put words in your mouth, so please correct me if

17  I get it wrong.  He was sort of Paul's business person; is

18  that right?

19  A.   Yes.

20  Q.   And he worked on a lot of logistics and made sure you got

21  paid and other things; is that right?

22  A.   Yes.

23  Q.   And worked on travel arrangements and all those sorts of

24  things that, again, correct me if I'm wrong, but that Paul was

25  too busy to do himself?

1    A.    Yes.

2    Q.    All right.  And so generally you saw him handling a lot

3    of the day-to-day stuff, but Paul was the strategy guy?

4    A.    Yes.

5    Q.    All right.  And as far as someone who ran the campaigns

6    that you worked on, was this a full-time job for Mr. Manafort?

7              What was his work effort like?

8              THE COURT:  Your question is compound.

9              MR. WESTLING:  I apologize, Your Honor.  I'll

10   rephrase.

11   BY MR. WESTLING:

12   Q.    As far as your job for Mr. Manafort, it was in connection

13   with these campaigns, correct?

14   A.    In Ukraine, yes.

15   Q.    Yes.  And so give me a sense of how many hours a day

16   people were putting in to make this project work.

17   A.    It was a tremendous amount of work.  And I would have to

18   say I think Paul worked harder than anybody.  He was always

19   available.  There would be e-mails through the night sometimes

20   that went on.

21   Q.    If you can -- you're in this space, I obviously do

22   something different for a living.

23              Can you give the jury a sense of kind of the

24   intensity of the political campaign world?

25   A.    Well, it -- yes, it can be very intense and heated in

1  elections.  That was certainly true in Ukraine.  And I think

2  compounded by the fact that, you know, people speaking a

3  different language, it's a different culture.  So that added

4  to the complexity of it as well.

5  Q.  And then I assume there was also a challenge just dealing

6  with -- you had operations here in the U.S., correct?

7  A.  Yes, yes.

8  Q.  And you're in a different time zone.  How many hours

9  apart are we?

10  A.  I think it was seven.

11  Q.  Okay.  And does that make your work life challenging at

12  all?

13  A.  Yes, it did.

14  Q.  All right.  And so that would be true for anyone who was

15  involved in the campaign; is that right?

16  A.  Yes, that's correct.

17  Q.  Okay.  And then, just so we're clear, you make your

18  living as a political consultant, correct?

19  A.  Yes, I do.

20  Q.  And you get paid well for that?

21  A.  Yes.

22  Q.  Right?  I mean, it's --

23  A.  Sometimes.

24  Q.  When you're paid?

25  A.  Yes.

1   Q.   But it can be a lucrative undertaking, correct?

2   A.   It can be, yes.

3   Q.   And that's because there are often people who want to

4   spend a lot of money in the furtherance of certain political

5   purposes and -- correct?

6   A.   People and causes, yes.

7   Q.   Okay.  All right.

8        MR. WESTLING:  One moment, Your Honor.

9        I have no further questions, Your Honor.

10       THE COURT:  All right.  Any redirect?

11       MR. ANDRES:  Just briefly, Judge.

12       THE COURT:  All right.

13                     **REDIRECT EXAMINATION**

14   BY MR. ANDRES:

15   Q.   Mr. Devine, you were asked questions about how you got

16   paid for your political campaigns.  Do you remember that?

17   A.   Yes.

18   Q.   Did you ever set up an account in Cyprus to get paid for

19   political --

20       MR. WESTLING:  Objection, Your Honor, outside the

21   scope of cross.

22       MR. ANDRES:  Excuse me.  Can I finish the question,

23   Judge?

24       THE COURT:  No, you let him object, and then I hear

25   the objection.

────────────── U.S. v. Manafort ──────────────

1              MR. ANDRES:  Understood.

2              THE COURT:  If I need to hear from you, I will ask

3      it.  I understand your objection to be, Mr. Andres, that it's

4      beyond the scope of the examination; is that right?  Or is

5      that your objection?

6              MR. ANDRES:  That's my objection to Mr. Westling,

7      Your Honor.

8              MR. WESTLING:  Yes.

9              THE COURT:  And the question is -- you asked him

10     about -- what was it?  What was the question?

11             MR. ANDRES:  Whether -- in response to a question on

12     cross --

13             THE COURT:  What was your question?

14             MR. ANDRES:  Whether he's been -- whether Mr. Devine

15     has set up any accounts in Cyprus to be paid --

16             THE COURT:  Personally?

17             MR. ANDRES:  For his business.

18             THE COURT:  All right.  I'll permit him to answer

19     that.  I don't see the relevancy of it.

20             What's the answer?

21             THE WITNESS:  No.

22             THE COURT:  Next question.

23             MR. ANDRES:  I have no -- I have no further

24     questions, Your Honor.

25             THE COURT:  All right.  Do you?

U.S. v. Manafort

127

1          MR. WESTLING:  Nothing further, Your Honor.

2          THE COURT:  All right.  You may step down.  Thank

3    you.

4          THE WITNESS:  Thank you.

5          (Witness excused.)

6          THE COURT:  All right.

7          Ladies and gentlemen, pass your books to the right.

8    The court security officer will collect them, maintain their

9    security overnight.

10          Now, when you get home this evening, as I've told

11    you, there will be intense curiosity about what you've been

12    doing today and your family and your children and your spouses

13    will ask you questions, partners, everybody.  They'll want to

14    know what you've been doing today.  Resist the temptation to

15    answer those questions.  Don't answer them, don't conduct any

16    investigation on your own.

17          You're not to discuss the case with anyone or permit

18    anyone to discuss it with you.  And, in fact, until you retire

19    to deliberate on your verdict, you're not to talk to anyone

20    about this case, including among yourselves.

21          And as I should have mentioned to you, of course,

22    you may not read or listen to anything touching on the case.

23    That's a fairly easy requirement to adhere to, except today,

24    in this matter because I am told, although I am not a watcher

25    of TV or radio, that it is often a subject.  Simply go out of

─────────U.S. v. Manafort─────────

128

1    the room or turn it off.  Don't listen to it at all.

2            That might even be more pleasant.  And I also want

3    you not to form any opinion on this case until all the

4    evidence is in.  Keep an open mind until you -- until you

5    start your deliberations at the end of the case.

6            Thank you for your careful and close attention to

7    the evidence today.  And we will begin tomorrow.  I'll give

8    you some leeway here.  I usually give juries an opportunity to

9    appear at 8:30 or 9:00 or 9:30.  I can't recall in 31 years

10   any jury selecting 8:30, and I'm comfortable that you-all will

11   stick to that tradition.

12           But between 9:00 and 9:30.  I know you-all come from

13   different distances and you face different obstacles in your

14   attempt to get here.  It's very difficult in Northern Virginia

15   to get around during periods of traffic.  That's why some of

16   us don't live here anymore.

17           What time would you like to convene in the morning?

18   9:30?  9:30.

19           All right.  I will see you tomorrow morning at 9:30.

20   You may follow the court security officer out.

21           (Jury dismissed.)

22           THE COURT:  All right.  You may be seated.

23           All right.  Mr. Andres, you gave me some information

24   that I wasn't aware of in terms of that one objection that I

25   ruled on.  But tell me something, I'm curious, what difference

129

1  does it make what hotel they stayed in in the Ukraine?

2      MR. ANDRES:  Sure, Judge.

3      There's evidence that Mr. Manafort spent a

4  substantial time in the Ukraine and he generally stayed at the

5  Hyatt.  I think in one year, he stayed there somewhere in the

6  neighborhood of 150 days or so.

7      And all of these witnesses are going to testify, not

8  a lot of them, but they all stayed in the same hotel.  So

9  we're just trying to corroborate that all the witnesses are

10 telling the same story, that Mr. Manafort was in the Ukraine

11 and the like.  So that was the purpose.

12     And for what it's worth, Judge, my objection to the

13 questions about whether Mr. Devine was working for a Democrat

14 or a Republican, seems to me, those are the very issues that

15 you had asked us to keep out of the case as with issues with

16 respect to Russia and the like.  And those are all issues that

17 the defense has now raised.

18     I think they may have actually referred to the

19 Soviet Union as opposed to Russia, but I assume they think

20 it's about the same thing.  So that was the purpose of that

21 objection.

22     THE COURT:  Perhaps you heard that.  I didn't.

23     MR. ANDRES:  In the opening statement.

24     THE COURT:  Oh, the opening statement.  Could have

25 been, I don't know.  I should have paid closer attention

─────U.S. v. Manafort─────

130

1    to your opening -- or Mr. Asonye's and his, but I didn't,

2    except for the very beginning.  I have the -- well, never

3    mind.

4          All right.  We will convene tomorrow morning at

5    9:30.  Who is the witness that we begin with tomorrow?

6          MR. ANDRES:  Mr. Rabin.

7          THE COURT:  And what exhibits do you plan to

8    introduce through him?

9          MR. ANDRES:  Judge, we're going to try to cull them

10   down tonight.  But those were among the group of exhibits that

11   we provided to chambers and defense.  We're also --

12         THE COURT:  All right.  Do this for me:  Give to

13   chambers or submit to the court security officer, he'll be

14   around, a list of those exhibits so that I can be prepared if

15   there are objections to them.  If there aren't, then I really

16   don't care.

17         MR. WESTLING:  Your Honor, it would also be helpful

18   if we can get more than the first witness, just in terms of

19   knowing what material to have in the Court tomorrow.  There's

20   obviously a long list, so any help would be appreciated.

21         MR. ANDRES:  We've agreed to do that for the defense

22   and we'll do that.

23         THE COURT:  All right.

24         MR. ANDRES:  The next witness after that is an FBI

25   agent whose name I almost routinely mispronounce, so I will

1    send an e-mail to the defense to let them know that.  But

2    we're happy to do that.

3              THE COURT:  That's fine.  That's appreciated.

4              It's -- it's a useful thing to do.  It helps to

5    expedite matters.

6              All right.  Anything further in this matter this

7    evening, Mr. Andres.

8              MR. ANDRES:  Not tonight, Judge.

9              MR. WESTLING:  Nothing from the defense, Your Honor.

10             THE COURT:  Thank you.  All right.  Court stands in

11   recess until 9:30 tomorrow morning.

12                **(Proceedings adjourned at 5:44 p.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3              I, Tonia Harris, an Official Court Reporter for

4     the Eastern District of Virginia, do hereby certify that I

5     reported by machine shorthand, in my official capacity, the

6     proceedings had and testimony adduced upon the Jury trial

7     in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8     **MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in said

9     court on the 31st day of July, 2018.

10             I further certify that the foregoing 132 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, my computer realtime

13    display, together with the backup tape recording of said

14    proceedings to the best of my ability.

15             In witness whereof, I have hereto subscribed my

16    name, this August 6, 2018.

17

18

19

20

21    _____
      Tonia M. Harris, RPR
22    Official Court Reporter

23

24

25

                                                              132