—U.S. v. Manafort—

275

1 UNITED STATES DISTRICT COURT
 FOR THE EASTERN DISTRICT OF VIRGINIA
2 ALEXANDRIA DIVISION

3 ------------------------------x
             :
4 UNITED STATES OF AMERICA, : Criminal Action No.
            : 1:18-CR-83
5     versus    :
            :
6 PAUL J. MANAFORT, JR.,  :
            : August 1, 2018
7       Defendant. : Volume II - P.M.
 ------------------------------x

8

      TRANSCRIPT OF JURY TRIAL
9   BEFORE THE HONORABLE T.S. ELLIS, III
    UNITED STATES DISTRICT JUDGE
10

 APPEARANCES:
11

 FOR THE GOVERNMENT:   UZO ASONYE, AUSA
12          United States Attorney's Office
          2100 Jamieson Avenue
13          Alexandria, VA 22314
           and
14          GREG ANDRES, SAUSA
          BRANDON LANG VAN GRACK, SAUSA
15          Special Counsel's Office
          U.S. Department of Justice
16          950 Pennsylvania Avenue NW
          Washington, D.C. 20530
17

 FOR THE DEFENDANT:    JAY ROHIT NANAVATI, ESQ.
18          BRIAN KETCHAM, ESQ.
          Kostelanetz & Fink LLP
19          601 New Jersey Avenue NW
          Suite 620
20          Washington, DC 20001
           and
21          THOMAS E. ZEHNLE, ESQ.
          Law Office of Thomas E. Zehnle
22          601 New Jersey Avenue NW
          Suite 620
23          Washington, DC 20001
           and
24          KEVIN DOWNING, ESQ.
          Law Office of Kevin Downing
25          601 New Jersey Avenue NW
          Suite 620

U.S. v. Manafort

276

Washington, DC 20001
   and
RICHARD WILLIAM WESTLING, ESQ.
Epstein, Becker, & Green, PC
1227 25th Street NW
Washington, DC 20037

OFFICIAL COURT REPORTER:      TONIA M. HARRIS, RPR
                              U.S. District Court, Ninth Floor
                              401 Courthouse Square
                              Alexandria, VA 22314

─U.S. v. Manafort─

277

TABLE OF CONTENTS
TRIAL
WITNESSES

On behalf of the Government:

Maximillian Katzman

        Direct examination by Mr. Andres.................. 285
        Cross-examination by Mr. Nanavati................ 308

Ronald Wall

        Direct examination by Mr. Andres.................. 312
        Cross-examination by Mr. Nanavati................ 328

Daniel Opsut

        Direct examination by Mr. Asonye, ................ 339
        Cross-examination by Mr. Nanavati................ 348

Wayne Holland

        Direct examination by Mr. Asonye.................. 350
        Cross-examination by Mr. Nanavati................ 358

Stephen Jacobson

        Direct examination by Mr. Andres.................. 361
        Cross-examination by Mr. Nanavati................ 385
        Redirect examination by Mr. Andres............... 389

Doug DeLuca

        Direct examination by Mr. Van Grack.............. 393
        Cross-examination by Mr. Nanavati................ 409

EXHIBITS

On behalf of the Government:

Admitted

Number 450......................................... 282
Number 55.......................................... 291
Number 97A......................................... 293
Number 98.......................................... 298
Number 99.......................................... 301
Number 100......................................... 302
Number 101......................................... 303
Number 67A......................................... 304

———U.S. v. Manafort———

1   Number 111A........................................... 318
    Number 112............................................ 324
2   Number 103A........................................... 341
    Number 105............................................ 344
3   Number 106............................................ 345
    Number 91............................................. 356
4   Number 94A............................................ 368
    Number 95A............................................ 377
5   Number 81............................................. 398
    Number 86............................................. 405
6   Number 87............................................. 407

7                          MISCELLANY

8   Certificate of Court Reporter......................... 416

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. v. Manafort

279

1                    **P R O C E E D I N G S**

2          (Court proceedings commenced at 1:32 P.M.)

3          THE COURT:  The record will reflect that counsel and

4  the defendant are presently prepared to proceed.  You may

5  bring the jury in.

6          MR. ANDRES:  Judge, can I just preview two issues

7  for this afternoon -- actually, three?

8          THE COURT:  Yes, you may.

9          MR. ANDRES:  So, one, when the jury comes in and

10  before the next witness, Mr. Van Grack, is going to offer some

11  foreign records pursuant to 3505.  3505?  3505.  So that's

12  issue one.

13          Second, we're going to ask the Court to read a

14  stipulation, which will provide the number relating to bank

15  records.

16          And then thirdly, with respect to the next witness,

17  Alan Katzman, he's one of the tailors and is familiar with the

18  suits.  And so here is the only thing that we're going to ask

19  to admit pursuant to the Court's prior rulings, which is a

20  photograph of the label, which is specific to this tailor.

21  They're the only ones that make this suit.  And so I simply

22  like to show them a copy, a photograph of the label so he can

23  identify it and the accompanying suit, which the label goes

24  with.  And that's it.  We're not going to show any other

25  pictures.  The same is true for the following witness.

─────U.S. v. Manafort─────

1          So it's a label that's specific to them.  They're

2   the only ones that sell those suits, and that's our only

3   request.  I just wanted to preview that in case there were

4   issues.

5          MR. NANAVATI:  No issues, Your Honor.  No objection.

6          THE COURT:  I take it you're going to have evidence

7   the money he paid for these suits came from his Ukraine

8   income?

9          MR. ANDRES:  There's going to be testimony today

10  that the -- that this witness will testify that he was paid

11  from Cyprus accounts and later we'll link that up.

12          I just want to be clear about one issue, Judge, in

13  case there's any misunderstanding.  We're not contending, and

14  I don't think we really could, that the exact suits that were

15  seized from Mr. Manafort's house were the exact suits in

16  the -- in the invoices.  There's really no way to tell that

17  because the invoices don't have serial numbers or anything

18  like that.  It's just that the suits in Mr. Manafort's house

19  are from these tailors, and there are as many as 40 or 50

20  invoices.  So we're just making the inference that we want to

21  show the label.

22          THE COURT:  Well, we ought to tell the jury that.

23  That's why submitting pictures of suits is sort of misleading,

24  because you can't show that the specific suit was paid for by

25  money coming from a Cyprus account.

281

1          MR. ANDRES:  We're going to show that through the

2   invoices.  And, again, all I wanted to show was the -- was the

3   label, and I think it's a fair inference the Government can

4   make that Mr. Manafort is a customer of that tailor.

5          THE COURT:  All right.  But you don't need pictures

6   of all the suits.

7          MR. ANDRES:  I didn't ask to put in pictures of all

8   the suits, Judge.

9          THE COURT:  All right.

10         MR. ANDRES:  And to the extent that anybody wants to

11  tell the jury, the defense is more than welcome to do all of

12  that in their closing arguments.  I'm not sure it's something

13  that warrants him separate or in their cross.

14         THE COURT:  What is it that you're saying they can

15  tell them?

16         MR. ANDRES:  I was just suggesting that there's --

17  I'm not asking that the defense be precluded from questioning

18  this witness in any way about that.

19         THE COURT:  All right.  And who will be doing it for

20  the defendant, Mr. Nanavati?

21         MR. NANAVATI:  Yes, Your Honor.

22         THE COURT:  All right.  You may bring the jury in.

23         (Jury in.)

24         THE COURT:  You may be seated.

25         All right.  Ladies and gentlemen, we'll continue.

U.S. v. Manafort

282

1  Let me confirm that I answered one of -- your one question

2  affirmatively.  You may indeed bring in a birthday cake for

3  Friday.

4           It's not my birthday.  I quit having those some

5  years ago.  My wife is younger and I'm waiting for her to

6  catch up.  She's not doing a good job.

7           All right.  Yes, Mr. Van Grack.

8           MR. VAN GRACK:  Your Honor, at this time the

9  Government would move to admit the stipulation regarding

10 business records of financial institutions.

11          THE COURT:  All right.  Hand that to the court

12 security officer and I will read it.  You'll have the

13 stipulations with you in the jury room.

14          MR. VAN GRACK:  And, Your Honor, for the record,

15 it's Government Exhibit 450.

16          THE COURT:  All right.  It's admitted.

17                      (Government's Exhibit No. 450

18                      admitted into evidence.)

19          THE COURT:  What else do you have, Mr. Van Grack?

20          MR. VAN GRACK:  And, Your Honor, if we can read it

21 to the jury at this time, it pertains to some of the evidence

22 that the Government intends to introduce subsequent to this.

23          THE COURT:  Yes, I'm going to read it at this time.

24 Do you have anything else?

25          MR. GRACK:  Yes, Your Honor.  The Government would

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

283

1    also move to admit Government Exhibit 67A pursuant to Title 18

2    United States Code 3505.  It concerns foreign business records

3    from St. Vincent and the Grenadines.

4              THE COURT:  All right.  Any objection to that?

5              MR. NANAVATI:  No, Your Honor.  We've seen the

6    certifications.

7              THE COURT:  All right.  It's admitted.

8              MR. VAN GRACK:  Your Honor -- okay.  That's all,

9    Your Honor.  Thank you.

10             THE COURT:  All right.  Ladies and gentlemen, the

11   stipulation which covers -- well, it covers a page and a half.

12   It's really a stipulation about the authenticity of the

13   categories of records listed in these paragraphs.  The

14   stipulation notes that they've previously been produced in

15   discovery.

16             And they -- the two categories are:  Records of

17   American Express; Anchor Commercial Bank; Bank of America;

18   Barclays; Banc of California; BB&T; Bridgehamptom National

19   Bank; Burke & Herbert Bank; Capital One; Charles Schwab;

20   Citibank; Citigroup; Citizens Bank; City National Bank;

21   Clearing House Interbank Payments [sic]; Colony Northstar;

22   Deutsche Bank; Eagle Bank; Fedwire; First Republic Bank;

23   Republic Investment Management [sic]; Genesis Capital; Goldman

24   Sachs Bank; Hudson City Savings Bank; JPMorgan Chase Bank; M&T

25   Bank; Metropolitan Commercial Bank; Morgan Stanley;

U.S. v. Manafort

284

1   Northwestern Mutual.

2           And two more lines.

3           But, in essence, the parties are stipulating that

4   these bank records, to the extent that you're going to offer

5   them, Mr. Van Grack, they're stipulating this is a stipulation

6   that they are authentic and admissible.

7           MR. VAN GRACK:  Yes.  Yes, Your Honor.

8           THE COURT:  So what specific records are you

9   referring to?

10          MR. VAN GRACK:  Your Honor, for the witnesses that

11  the Government is intending to call, there are various bank

12  records that refers to banks that the Court just read.

13          THE COURT:  All right.  So what this does is it says

14  that the defendant doesn't object on the basis of authenticity

15  to any of these documents.  If you have other objections, I

16  will hear it at the appropriate time.

17          Anything else?

18          MR. VAN GRACK:  Your Honor, just wanted to point out

19  the last paragraph in this stipulation, which concerns that

20  the entirety of the business records from these --

21          THE COURT:  Yes, all right.  The records are not

22  limited to e-mails, account statements, checks, wire

23  transfers, loan files, credit files, credit reports, and it

24  goes on and on.  Oh, it includes but aren't limited to.

25  Essentially, it's all of the documents that the bank had.

U.S. v. Manafort

1          MR. VAN GRACK:  Yes, Your Honor.  And it's pursuant

2   to Federal Evidence 803(6).  Business records.

3          THE COURT:  All right.  And there's no objection on

4   those grounds to it?

5          MR. NANAVATI:  On those grounds, that's correct.

6          THE COURT:  All right.  Call your next witness,

7   Mr. Andres.

8          MR. ANDRES:  Your Honor, the Government calls

9   Maximillian Katzman.

10         THE COURT:  Come forward.  Take the oath, please,

11  sir.

12         Thereupon,

13                    **MAXIMILLIAN KATZMAN,**

14  having been called as a witness on behalf of the Government

15  and having been first duly affirmed by the Deputy Clerk, was

16  examined and testified as follows:

17                    (Witness seated.)

18         THE COURT:  All right.  You may proceed.

19                    **DIRECT EXAMINATION**

20  BY MR. ANDRES:

21  Q.   Please state your name for the record.

22  A.   Maximillian Katzman.

23  Q.   How old are you, sir?

24  A.   29 years old.

25  Q.   Where do you live?

M. Katzman - Direct

286

1   A.   Jersey City, New Jersey.

2   Q.   Can I direct your attention to 2010?  Were you working at

3   the time?

4   A.   Yes.

5   Q.   Where?

6   A.   Alan Couture.

7   Q.   What is --

8         THE COURT:  I'm sorry, sir.  Could I ask you to

9   speak up?

10        THE WITNESS:  Yes, sir.

11        THE COURT:  It's difficult for me to hear what

12  you're saying.  Next question.

13  BY MR. ANDRES:

14  Q.   I'm sorry, I asked where you were working.

15  A.   Alan Couture.

16  Q.   And what is Alan Couture?

17  A.   A luxury menswear boutique.

18  Q.   Where is it located?

19  A.   It's located in New York on 57th Street.

20  Q.   Over what period of time did you work at Alan Couture?

21  A.   From 2008 through 2017.

22  Q.   And who owned Alan Couture?

23  A.   Alan Katzman.

24  Q.   Who is Alan Katzman?

25  A.   That's my father.

M. Katzman - Direct

287

1   Q.   Did Alan Couture specialize in a particular type of

2   clothing?

3   A.   Yes, luxury custom clothing.

4   Q.   During the period from 2010 to 2015, approximately how

5   many regular customers did Alan Couture have?

6   A.   Approximately 40 customers.

7   Q.   Do you know an individual named Paul Manafort?

8   A.   Yes.

9   Q.   How do you know Mr. Manafort?

10  A.   He was a client of ours at Alan Couture.

11  Q.   Do you know over what period of time Mr. Manafort was a

12  customer?

13  A.   As long as I worked there, so it was about ten years.

14  Q.   Is Mr. Manafort an important client of Alan Couture?

15  A.   Absolutely.

16          THE COURT:  Are all clients important?

17          THE WITNESS:  I don't want to answer that.

18          (Laughter from audience.)

19          THE COURT:  All right.  Don't ask for a job from me

20  if you're going to sell things.

21          Next question.

22  BY MR. ANDRES:

23  Q.   In terms of volume, how would you rate Mr. Manafort as a

24  client of Alan Couture?

25  A.   He's one of our top five clients.

M. Katzman - Direct

288

1   Q.   And what types of clothing would Mr. Manafort purchase?

2   A.   Primarily suits, sport coats, outerwear, neckwear.

3   Q.   And do you know how Mr. Manafort first became associated

4   with Alan Couture?

5   A.   Yes, he met my father at Bijan.

6   Q.   And what is Bijan?

7   A.   Bijan is also a luxury menswear store.  It used to be on

8   Fifth Avenue in New York.  It's now on Rodeo Drive in

9   California.

10  Q.   During the time --

11           THE COURT:  Did you hear that, ladies and gentlemen?

12           All right.  Proceed.  Keep your voice up, please,

13  sir.

14  BY MR. ANDRES:

15  Q.   During the time that Mr. Manafort was a client, how would

16  you communicate with him?

17  A.   Via e-mail.

18  Q.   Okay.  Would you meet him in person?

19  A.   Yes.

20  Q.   Why?

21  A.   For fittings.

22  Q.   Do you know an individual named Rick Gates?

23  A.   Yes.

24  Q.   How do you know Rick Gates -- how do you know who Rick

25  Gates is?

U.S. v. Manafort

1   A.   I also communicated with him through e-mail.

2   Q.   Okay.  And was Rick Gates a customer of Alan Couture?

3   A.   No, he was not.

4   Q.   You testified that you would communicate with Mr. Gates.

5   On what occasions would you reach -- would you communicate

6   with Mr. Gates?

7   A.   Primarily for, you know, invoices.

8   Q.   Okay.  And would you reach out to him initially or

9   directly?  What occasions would you contact --

10            THE COURT:  Your question is now compound.

11            MR. ANDRES:  Understood.

12  BY MR. ANDRES:

13  Q.   When you reached out to Mr. Gates, was there a reason you

14  were reaching out to him?

15  A.   Yes.  I couldn't get in contact with Mr. Manafort.

16  Q.   Did Mr. Gates ever order any clothing from Alan Couture?

17  A.   No.

18  Q.   Do you know an individual named Heather Washkuhn?

19  A.   No.

20  Q.   Did you ever deal with anyone else on behalf of

21  Mr. Manafort?

22  A.   No, I did not.

23  Q.   Prior to your testimony here today, did you receive a

24  subpoena from the Government?

25  A.   Yes, I did.

M. Katzman - Direct

290

1   Q.   Did you produce certain materials?

2   A.   Yes.

3   Q.   What types of materials did you produce?

4   A.   Our bank records, invoices to Mr. Manafort, and my

5   e-mails between myself and Mr. Manafort.

6   Q.   You testified earlier that you worked at Alan Couture.

7   What were your responsibilities there?

8   A.   I was the manager there.

9   Q.   And as the manager, what would you do?

10  A.   I would -- responsible for the buying of the clothing.  I

11  was responsible for the fittings.  I was responsible for the

12  invoicing.

13  Q.   Does the clothing at Alan Couture carry a particular

14  label or marking?

15  A.   Yes.

16  Q.   Can you describe it?

17  A.   It's my father's signature, Alan.  It's on a black label

18  with red pick stitching.

19  Q.   Can I ask you to look in the binder next to you at

20  Exhibit -- at Exhibit 55 and turn to the second page?

21  A.   Yes.

22  Q.   Do you know what that is?

23  A.   That's our logo.

24  Q.   Okay.  When you say, "that's our logo," what are you

25  referring to?

─────────────────── U.S. v. Manafort ───────────────────

M. Katzman - Direct

291

1    A.    The Alan, New York.

2    Q.    Okay.  And the preceding photo in 55, do you know if

3    that -- can you describe what that is?

4    A.    Yes, this is also a suit bearing our label.

5    Q.    Okay.

6            MR. ANDRES:  Your Honor, at this point, the

7    Government moves to admit Government Exhibit 55.

8            MR. NANAVATI:  Without objection, Your Honor.

9            THE COURT:  Without?

10            MR. NANAVATI:  That's right, in this -- in light of

11    this witness, without, Your Honor.

12            THE COURT:  All right.  It's admitted.

13                            (Government's Exhibit No. 55

14                             admitted into evidence.)

15            MR. ANDRES:  Okay.  So, Judge, I'd like to just

16    publish the second page in Government Exhibit 55.

17            THE COURT:  Really, it takes publication?  No, let's

18    move on.

19    BY MR. ANDRES:

20    Q.    Mr. Katzman, can you explain the billing practices at

21    Alan Couture?

22    A.    Yes, we would e-mail the invoices.

23    Q.    Okay.  How would you send your invoices to Mr. Manafort?

24    A.    Via e-mail.

25    Q.    And how would customers generally pay for their clothing?

U.S. v. Manafort

1  A.   Primarily by check.

2  Q.   How did Mr. Manafort pay for his clothing?

3  A.   Primarily wire transfer.

4  Q.   Do you know what type of wire transfer?

5  A.   International.

6  Q.   Did you have other clients who paid by international

7  wire?

8  A.   No, I did not.

9  Q.   During the time that you worked at Alan Couture, where

10 did -- where did Alan Couture do its banking?

11 A.   HSBC.

12 Q.   During the time that Mr. Manafort was a client, did you

13 have problems with payments?

14 A.   Occasionally.

15 Q.   Can you explain those problems?

16 A.   Just delinquency.

17        THE COURT:  I'm sorry.  What was that?

18        THE WITNESS:  Delinquency in paying bills.

19        THE COURT:  Meaning he was late?

20        THE WITNESS:  Yes.

21 BY MR. ANDRES:

22 Q.   And would Mr. Manafort --

23        THE COURT:  Did he ultimately pay them?

24        THE WITNESS:  Yes, he did.

25        THE COURT:  Next question.

M. Katzman - Direct

293

1    BY MR. ANDRES:

2    Q.   Let me ask you to look at Government Exhibit 97A in the

3    binder.

4              Can you look through those documents and tell me

5    when you've had a chance to review them?

6    A.   Okay.

7    Q.   Okay.  Have you seen those documents before?

8    A.   Yes.

9    Q.   What are they?

10   A.   These are invoices that I produced.

11   Q.   Okay.  And from what entity are the invoices from?

12   A.   This is from Alan Couture.

13   Q.   Okay.  And who -- is the customer on these invoices in

14   Government Exhibit 97A, are they -- is it all the same

15   customer?

16   A.   Yes, yes, Mr. Paul Manafort.

17              MR. ANDRES:  Your Honor, the Government would move

18   to admit Government Exhibit 97A.

19              MR. NANAVATI:  No objection, Your Honor.

20              THE COURT:  Admitted.

21                        (Government's Exhibit No. 97A

22                        admitted into evidence.)

23   BY MR. ANDRES:

24   Q.   Can I ask you to turn to the first invoice dated

25   March 16, 2010?

———————U.S. v. Manafort———————
294

1   A.   Yes.

2          MR. ANDRES:  Your Honor, may I publish this?

3          THE COURT:  Yes, I'll let you publish one.

4   BY MR. ANDRES:

5   Q.   Starting at the top with the letterhead, can you take us

6   through the invoice and explain the details?

7   A.   Yes.  Our invoices have a simple letterhead with my

8   father's signature, Alan, a date, the client's address, the

9   word "statement," and an itemized description of the invoice.

10  Q.   And what's itemized in this invoice?

11  A.   Right here, we have two suits and four trousers.

12  Q.   And what's the total amount of the invoice?

13  A.   The total amount is 15,195.

14  Q.   And can you look at the bottom line?  What's that?

15  A.   The bottom line is our address, our phone number, and

16  website.

17  Q.   Can I ask you now to look at Government Exhibit 97B?

18          Can you tell me what those are?

19  A.   This is another invoice to Mr. Paul Manafort.

20          MR. ANDRES:  Your Honor, Government 97B is already

21  in evidence.

22          THE COURT:  All right.  Let's move on then.

23  BY MR. ANDRES:

24  Q.   With respect to -- let me ask you now to take a look at

25  Government Exhibit 97.

1    A.    Okay.

2    Q.    Can you tell me what that is?

3    A.    This is an itemized invoice activity.

4    Q.    Okay.  And the chart in Government 97, did you create

5    that yourself?

6    A.    No, I did not.

7    Q.    Okay.  Did you take the chart in Government 97 and

8    compare it to something?

9    A.    Yes.

10   Q.    What did you compare it to?

11   A.    To our invoices issued to Mr. Manafort.

12   Q.    Okay.

13              THE COURT:  Who prepared the chart?

14              THE WITNESS:  The FBI.

15   BY MR. ANDRES:

16   Q.    And with respect to the --

17              THE COURT:  Just a moment.

18              (A pause in the proceedings.)

19              THE COURT:  Did they give you the chart and ask you

20   to verify it?

21              THE WITNESS:  Yes.

22              THE COURT:  He didn't do this chart.  You all ought

23   to make your own chart, put your own person up there.

24              Any objection to 97?

25              MR. NANAVATI:  Your Honor, perhaps, at some point,

M. Katzman - Direct

1   it's appropriate as a demonstrative aid, but I don't think --

2          THE COURT:  It's not appropriate as an exhibit as

3   such.  But you may use it as a demonstrative aid and you may

4   refer to it in your argument.  Let's proceed.

5          But you can also elicit, from this witness,

6   testimony that he checked what the -- he checked all of his

7   invoices and if you want to ask him what the total amount was,

8   you can do that.

9          MR. ANDRES:  Thank you, Judge.

10  BY MR. ANDRES:

11  Q.   With respect to the chart in Government 97, what did you

12  do to verify the accuracy of that information?

13  A.   We checked this against both our invoices and our HSBC

14  bank records.

15  Q.   Okay.  And did you also check the total amounts that were

16  listed in the chart?

17  A.   Yes.

18  Q.   With respect to 2010, what was the total amount of money

19  invoiced to Mr. Manafort from Alan Couture?

20  A.   The amount of $103,845.

21  Q.   And with respect to 2011, what was the total amount

22  invoiced to Mr. Manafort from Alan Couture?

23  A.   It was $83,025.

24  Q.   And with respect to 2012, what was the total amount

25  invoiced to Mr. Manafort from Alan Couture?

M. Katzman - Direct

1    A.    $138,125.

2    Q.    And with respect to 2013, what was the total amount

3    invoiced to Mr. Manafort from Alan Couture?

4    A.    $444,160.

5    Q.    And for 2014, what was the total amount invoiced to

6    Mr. Manafort from Alan Couture?

7    A.    $159,865.

8    Q.    Over the period from 2010 --

9            THE COURT:  I take it you're now going to present

10   evidence at some point that ties this, as the Government sees

11   it, to income that he earned from his work in the Ukraine and

12   did not report on his income tax; is that right?

13           MR. ANDRES:  Yes, Judge.

14           THE COURT:  Because the Government doesn't want to

15   prosecute somebody because they wear nice clothes, do they?

16           MR. ANDRES:  No, Judge.

17           THE COURT:  All right.  Let's move on.  Enough is

18   enough of that.

19   BY MR. ANDRES:

20   Q.    With respect to the total amount of money paid from --

21           THE COURT:  I said that's enough.  They can make --

22   they can add.

23   BY MR. ANDRES:

24   Q.    Can I ask you to turn to Government Exhibit 98?

25           Can you tell me what that is?

U.S. v. Manafort

M. Katzman - Direct

298

1   A.   This is an HSBC record.

2   Q.   And what are these records for?

3   A.   This was for our monthly statements from HSBC.

4   Q.   And do these records reflect payments from Mr. Manafort?

5   A.   They are in there, yes.

6   Q.   And where are those payments from?

7   A.   They are from multiple overseas banks.

8          MR. ANDRES:  Your Honor, the Government moves to

9   admit Government Exhibit 98.

10         THE COURT:  Any objection?

11         MR. NANAVATI:  No, Your Honor.

12         THE COURT:  Admitted.

13                      (Government's Exhibit No. 98

14                      admitted into evidence.)

15  BY MR. ANDRES:

16  Q.   Can I ask you to turn to the second page on Government

17  Exhibit 98.

18         Do you see an entry at 3/30/10?

19  A.   Yes.

20  Q.   And what is the -- that entry?

21  A.   This is a JPMorgan Chase Yiakora Ventures.  This is from

22  Cyprus to Alan Couture in New York.

23  Q.   And how much is the payment for?

24  A.   This is for $15,000.

25  Q.   Okay.  When you compare the payment in the bank records

─────U.S. v. Manafort─────
M. Katzman - Direct
299

1  at 98 to the first invoice in Government Exhibit 97A, what do

2  you find?

3  A.   I find that it's accurate less $195.

4  Q.   And what does the $195 relate to?

5  A.   This was most likely the shipping.

6  Q.   Okay.  Can I ask you to turn back to Government

7  Exhibit 98 and ask you to look at --

8         MR. ANDRES:  May I have a moment, Judge?

9         THE COURT:  Yes.

10 BY MR. ANDRES:

11 Q.   If you could turn to the page -- the next page with the

12 Bates Number 3712.

13         MR. ANDRES:  Can I publish this, Your Honor?

14         THE COURT:  Yes.  It's already been admitted.

15 What's the Bates number?

16         MR. ANDRES:  3712.

17         THE COURT:  All right.

18 BY MR. ANDRES:

19 Q.   Can you highlight the section at the bottom?

20         Do you see an entry at 5/11/10?

21 A.   Yes.

22 Q.   Can you tell me what that is?

23 A.   It's an incoming wire transfer.

24 Q.   Okay.  And who's the incoming wire transfer from?

25 A.   This is from Deutsche Bank Trust, Global Highway Limited,

U.S. v. Manafort

M. Katzman - Direct

300

1  Marfin Popular Bank to Alan Couture in New York.  This is from

2  Mr. Manafort.

3  Q.   How do you know this is from Mr. Manafort?

4  A.   This is the only client that paid us in international

5  wire transfers.

6  Q.   Can I ask you to turn to the page 3724?

7          Can you tell me what that is?

8  A.   This is, again, an incoming wire transfer from overseas.

9  Q.   Okay.  And what's the date?

10 A.   The date is August 12, 2010.

11 Q.   And how much money is related to that entry?

12 A.   $32,500.

13 Q.   And is that an incoming wire or an outgoing wire?

14 A.   That is an incoming wire.

15 Q.   And who is that wire from?

16 A.   This is from Mr. Paul Manafort.

17          MR. ANDRES:  Can I have one minute, sir?

18          THE COURT:  Yes.

19          (A pause in the proceedings.)

20 BY MR. ANDRES:

21 Q.   Just with respect to that entry on Bates 3724, does it

22 list -- do you see a reference to Leviathan Advisors Limited?

23 A.   Yes, I do.

24 Q.   Okay.  Do you know what that was?

25 A.   I do not.

─────────────U.S. v. Manafort─────────────

M. Katzman - Direct

301

1   Q.   Can I ask you to take a look at Government Exhibit 99?

2        Can you tell me what that is, Government Exhibit 99?

3   A.   This is an e-mail from Paul Manafort to myself.

4   Q.   Okay.  And if you look at the top e-mail at one --

5   8:41 p.m., does this relate to work that you did for

6   Mr. Manafort at Alan Couture?

7   A.   Yes.

8        MR. ANDRES:  The Government moves to admit

9   Government Exhibit 99.

10        MR. NANAVATI:  No objection, Your Honor.

11        THE COURT:  It's admitted.

12                    (Government's Exhibit No. 99

13                    admitted into evidence.)

14   BY MR. ANDRES:

15   Q.   With respect to the first e-mail at the top, who's that

16   e-mail from?

17   A.   That's from Mr. Paul Manafort.

18   Q.   And who is it to?

19   A.   To myself.

20   Q.   Can you read that first line of the e-mail?

21   A.   "You will be receiving a wire for the amount due from

22   Leviathan Company.  Please confirm when you have received it."

23   Q.   And what did you understand Leviathan Company to be?

24   A.   This is one of Mr. Manafort's companies.

25   Q.   Okay.  And how did you come to understand that that was

M. Katzman - Direct

1   one of Mr. Manafort's companies?

2   A.    Because I often received wire transfers from that

3   company.

4   Q.    Okay.  Can I ask you to look at Government Exhibit 100?

5         Can you tell me what that is?

6   A.    This is an e-mail from myself to Mr. Paul Manafort.

7   Q.    Okay.  And what's the date at the top e-mail?

8   A.    August 27, 2013.

9   Q.    Okay.  Are there also e-mails contained in this chain

10  from Mr. Manafort?

11  A.    Yes.

12  Q.    Can you turn to the second page, the top of the second

13  page?

14  A.    Yes.

15  Q.    Does that e-mail relate to work that you did for

16  Mr. Manafort?

17  A.    Yes, it does.

18        MR. ANDRES:  Your Honor, the Government moves to

19  admit Government Exhibit 100.

20        MR. NANAVATI:  No objection, Your Honor.

21        THE COURT:  Admitted.  Next question.

22                 (Government's Exhibit No. 100

23                 admitted into evidence.)

24  BY MR. ANDRES:

25  Q.    With respect to the top e-mail at 6:42 a.m., can you read

M. Katzman - Direct

1    the first line of that e-mail?

2    A.   "The wire has left my account as of Tuesday, Global

3    Endeavor LTD."

4    Q.   What did you understand Global Endeavor to be?

5    A.   This was one of Mr. Manafort's companies.

6    Q.   And, lastly, can I ask you to take a look at Government

7    Exhibit 101.

8            Can you tell me what that is?

9    A.   This is an e-mail from myself to Mr. Rick Gates.

10   Q.   Okay.  And who is Rick Gates?

11   A.   From my understanding, that was Mr. Manafort's assistant.

12   Q.   Okay.  And can you tell me what the substance of this

13   e-mail chain is?

14   A.   I am trying to estimate when I would receive a wire

15   transfer from Mr. Manafort and Rick was informing me.

16           MR. ANDRES:  Your Honor, the Government moves to

17   admit Government Exhibit 101.

18           MR. NANAVATI:  No objection, Your Honor.

19           THE COURT:  Admitted.  Next question.

20                     (Government's Exhibit No. 101

21                     admitted into evidence.)

22   BY MR. ANDRES:

23   Q.   Can I ask you now to look at Government Exhibit 67A and

24   look at the second page?

25           MR. ANDRES:  Your Honor, this exhibit has been

─────────────U.S. v. Manafort─────────────

M. Katzman - Direct

304

1   admitted previously by Mr. Van Grack.

2           THE COURT:  All right.  Proceed.

3   BY MR. ANDRES:

4   Q.   With respect -- with respect to the second page --

5           MR. ANDRES:  Can I ask to have this published, Your

6   Honor?

7           THE COURT:  Yes.  When you say previously been

8   admitted, you're talking about pursuant to a stipulation?

9           MR. ANDRES:  Pursuant to Rule 3505 of Foreign

10  Records.

11          THE COURT:  All right.  So this specific exhibit

12  wasn't addressed, it was just the stipulation addressed

13  generally that group, a group.

14          MR. ANDRES:  So there was a stipulation that related

15  to the admission of bank records.  That was one stipulation.

16          THE COURT:  All right.

17          MR. ANDRES:  This was the admission of the foreign

18  bank records pursuant to the statute.

19          THE COURT:  All right.  You may proceed.

20          Any objection?

21          MR. NANAVATI:  No, Your Honor.

22          THE COURT:  All right.  It's -- 67A has been

23  admitted.  Proceed.

24                          (Government's Exhibit No. 67A

25                           admitted into evidence.)

┌─────────────── U.S. v. Manafort ───────────────┐

M. Katzman - Direct

305

1   BY MR. ASONYE:

2   Q.   Is this a document that you've seen before?

3   A.   No, I have not.

4   Q.   Okay.  When you look at the top of the document --

5           THE COURT:  Well, if he hadn't seen it before, why

6   are we having him testify about it?

7           MR. ANDRES:  I can explain that if I'm just able to

8   ask him a few questions, Your Honor.

9           THE COURT:  All right.  Proceed.

10  BY MR. ANDRES:

11  Q.   With respect to the top -- if we could focus on the top,

12  can you read that?  What it says?

13          THE COURT:  Am I looking at 67A?

14          MR. ANDRES:  The next page, Judge.  The second page

15  in.

16          THE COURT:  All right.  Because the first page is in

17  another language.

18          MR. ANDRES:  Correct.

19          THE COURT:  All right.  The second page.  Yes, I see

20  it now.

21  BY MR. ANDRES:

22  Q.   At the top, can you read that?

23          THE COURT:  Go ahead.

24          THE WITNESS:  Okay.  The top is Alan "Corture"

25  [sic], LLC, 47 West 57th Street, 601, New York, New York

M. Katzman - Direct

306

1    10025.

2    BY MR. ANDRES:

3    Q.   Is that the name of your business?

4    A.   No, it is not.

5    Q.   Off by a letter?

6    A.   Yes.

7    Q.   How about the address; is that correct?

8    A.   The zip code is incorrect.

9    Q.   Did you ever have a client named Global Endeavor?

10   A.   No, I did not.

11          THE COURT:  Have you ever seen this document before?

12          THE WITNESS:  No, I have not.

13          THE COURT:  All right.  Proceed.

14   BY MR. ANDRES:

15   Q.   And the zip code, that is correct?

16   A.   That is incorrect.  It should be 10019.

17   Q.   Can you look at the next document in Government's

18   Exhibit 67?

19          Can you tell me what that is?  Have you seen that

20   before?

21   A.   I have not.

22   Q.   Are there --

23   A.   There it is again with our company name and ZIP code.

24   Q.   Okay.  And with respect to the client, Global Endeavor,

25   did you ever have a client named Global Endeavor?

U.S. v. Manafort

1   A.   No, we've never billed a Global Endeavor nor had a client

2   named Global Endeavor.

3   Q.   During the time that you worked with Mr. Manafort, did

4   you know an individual named Konstantin Kilimnik?

5   A.   I did not.

6   Q.   Okay.

7           MR. ANDRES:  Judge, could I just have one moment.

8           THE COURT:  Yes.

9           MR. ANDRES:  Judge, could we approach for one

10   moment?

11           THE COURT:  Yes.

12           (Bench Conference.)

13           THE COURT:  Yes.

14           MR. ANDRES:  Judge, I just wanted to understand your

15   ruling with respect to the chart, because I think you said we

16   could use it as a demonstrative exhibit.

17           THE COURT:  Yes.

18           MR. ANDRES:  And so I'd like to prepare that and

19   just publish it briefly for the purpose of the chart.

20           THE COURT:  No.  You may do it in argument.  That's

21   what "demonstrative" means.

22           MR. ANDRES:  I understand, but Rule 106 allows for

23   charts to be used to summarize a witness --

24           THE COURT:  Yes, but we're not at that point.

25           MR. ANDRES:  We are with this witness.  He's our

M. Katzman - Direct/Cross

1   witness who -- what -- if I could cut to the chase --

2          THE COURT:  And you've already got the final

3   figures.  You elicited them.

4          MR. ANDRES: I understand.  I just want to show it to

5   jury for a moment.  The reason is we're trying to expedite the

6   case.  We, obviously, don't want to go through every single

7   invoice.

8          THE COURT:  You're not going to.  This is the only

9   witness you can do that with.  And you've elicited that he

10  didn't prepare the document.  But he did review it to

11  determine its accuracy.  You've asked him about the final

12  figures and he's testified to the final figures.  And so you

13  want to do it all over again with a demonstrative.  You can do

14  it in your closing argument.

15         MR. ANDRES:  Thanks, Judge.

16         (Bench conference ends.)

17         THE COURT:  All right.  You may proceed.

18         MR. ANDRES:  I have no further questions, Your

19  Honor.

20         THE COURT:  Any cross-examination?

21         MR. NANAVATI:  Just briefly, Your Honor.

22         THE COURT:  All right.  Proceed.

23                        **CROSS-EXAMINATION**

24  BY MR. NANAVATI:

25  Q.   Mr. Katzman, first, I'd like to apologize for the suit

────────── U.S. v. Manafort ──────────

1    I'm wearing.

2              My name is Jay Nanavati.  I represent Mr. Manafort

3    and it's good to meet you.

4    A.    Pleasure.

5    Q.    I just have a few questions.

6              One is, you said that Mr. Manafort was your only

7    client that paid via international wire transfers?

8    A.    That's true.

9    Q.    Is it fair to say that Mr. Manafort was one of your more

10   international clients?

11   A.    Absolutely.

12   Q.    Okay.  And you said there were a number of times where he

13   was difficult to reach for whatever reason, right?

14   A.    Absolutely.

15   Q.    And you don't know whether when he was difficult to reach

16   he was many times zones away, do you?

17   A.    I have no idea where he was.  He was just hard to reach.

18   Q.    And that includes -- that difficulty in reaching him

19   includes reaching him by e-mail, too, doesn't it?

20   A.    Or contacting Rick Gates.

21   Q.    I'm sorry?

22   A.    Or contacting Rick Gates.

23   Q.    Just so that I understand, are you saying that when it

24   was difficult to reach him by e-mail you would contact

25   Rick Gates?

─────U.S. v. Manafort─────

1  A.    I would also -- yes, I would copy Rick Gates.

2  Q.    I see.

3          Have you ever met Rick Gates?

4  A.    I haven't.

5  Q.    Okay.  And the Government showed you an invoice that had

6  an unfortunate spelling of the word "couture" in it.

7  A.    Uh-huh.

8  Q.    You saw that?

9  A.    Yes.

10  Q.    And have you ever spoken with Rick Gates?

11  A.    No.

12  Q.    Okay.  Have you exchanged e-mails with him?

13  A.    E-mails, yes.

14  Q.    Okay.  Are you at all familiar with his level of

15  education or spelling ability?

16  A.    Not at all.

17  Q.    And you said also that Leviathan was a company that you

18  were not familiar with, correct?

19  A.    Not familiar with.

20  Q.    But you're at least familiar with the name?

21  A.    Yes, because it was on the wire transfers.

22  Q.    And your --

23          THE COURT:  I didn't hear you, sir.  What was your

24  answer?

25          THE WITNESS:  Yes, because it was on the wire

──────U.S. v. Manafort──────
M. Katzman - Cross
311

1   transfers.

2          THE COURT:  Next question.

3   BY MR. NANAVATI:

4   Q.   And the other way you're familiar with it is because

5   Mr. Manafort would tell you you're going to be getting a wire

6   transfer from Leviathan, right?

7   A.   That's correct.

8   Q.   And one of the e-mails you were shown was at 6:42 in the

9   morning.  Again, do you have any idea where in the world

10  Mr. Manafort was when he sent you that?

11  A.   No.

12  Q.   Do you know whether the -- it was 6:42 in the morning

13  where he was?

14  A.   No idea.

15  Q.   And when you did have trouble reaching Mr. Manafort, you

16  said Mr. Gates was the person you would try to go to?

17  A.   Yes.

18  Q.   Okay.  And you said, I believe, that specifically that --

19  that was especially when you were dealing with financial

20  matters, correct?

21  A.   Only when I was dealing with financial matters, yes.

22          MR. NANAVATI:  Court's indulgence.

23          THE COURT:  All right.

24          MR. NANAVATI:  That's all I have, Your Honor.

25          THE COURT:  All right.  Any redirect?

U.S. v. Manafort

1          MR. ANDRES:  No, Judge.

2          THE COURT:  Thank you.  You may step down.  This

3   witness may be excused.

4          MR. ANDRES:  Yes, Your Honor.

5          THE COURT:  Call your next witness.

6          MR. ANDRES:  Ron Wall.

7          Come forward and take the oath, please, sir.

8          Thereupon,

9                         **RON WALL,**

10   having been called as a witness on behalf of the Government

11   and having been first duly affirmed by the Deputy Clerk, was

12   examined and testified as follows:

13          (Witness seated.)

14          THE COURT:  All right.  You may proceed.

15                    **DIRECT EXAMINATION**

16   BY MR. ANDRES:

17   Q.   Please state your name for the record.

18   A.   Ronald W. Wall.

19   Q.   Can you describe for the jury your educational

20   background?

21   A.   Yes.

22   Q.   What is it?

23   A.   I'm a graduate of Syracuse University, 1971.  Went on and

24   became a certified public accountant in New York several years

25   later.  After that, I was certified as a CPA also in Arizona

─────────U.S. v. Manafort─────────

R. Wall - Direct

313

1   and a couple years after that in California.

2   Q.   Are you familiar with an entity known as House of Bijan?

3   A.   Yes.

4   Q.   What is the House of Bijan?

5   A.   It is the DBA, the doing business as name for a company

6   that is a venerable mens apparel retailer and luxury provider

7   in Beverly Hills, California.

8   Q.   Do you have an association with the House of Bijan?

9   A.   Yes.

10  Q.   Can you explain that association?

11  A.   Yes.  I've been the CFO since 1985.

12  Q.   Okay.  And have you served in acting capacities?

13  A.   I have.

14  Q.   Can you explain that?

15  A.   Among my functions are the -- I'm in charge of

16  accounting, our financial reporting, lender relations, banking

17  relations, tax compliance, business legal affairs, HR, and

18  among others things.

19  Q.   Are you employed directly by the House of Bijan?

20  A.   No.

21  Q.   Okay.  So can you explain the relationship between your

22  employer and the House of Bijan?

23  A.   Since October 2014, I am under contract with the House of

24  Bijan.  Prior to that, I was CFO of a company that had Bijan

25  as a primary client.

U.S. v. Manafort

314

1  Q.   Okay.  From the period of 2010 to 2014, what were your

2  responsibilities as they related to the House of Bijan?

3  A.   Again, I was in charge of financial reporting, accounting

4  functions, finance, tax compliance, HR, et cetera, and I

5  oversaw the financial and accounting activities.

6  Q.   Did you serve as a records custodian for the House of

7  Bijan?

8  A.   Yes, I did.

9  Q.   Does the House of Bijan have a particular corporate name

10 or doing business as name?

11 A.   It has a corporate name, Fashion World, Inc.

12 Q.   Okay.  Do you know of an individual named Paul Manafort?

13 A.   I know of him.

14 Q.   How do you know of Mr. Manafort?

15 A.   I know he was a very good customer.

16 Q.   A customer of where?

17 A.   House of Bijan.

18 Q.   And how did you know that?

19 A.   I know that from seeing invoices written to him and his

20 purchase of merchandise.

21 Q.   Have you ever met Mr. Manafort?

22 A.   No.

23 Q.   Do you know if the House of Bijan received a subpoena

24 from the Government in this matter?

25 A.   It did.

U.S. v. Manafort

R. Wall - Direct

315

1  Q.    What role did you play in responding to that subpoena?

2  A.    As the custodian of records, I gathered all of the

3  documentation that was relevant to the subpoena.

4  Q.    And are you appearing today pursuant to a federal

5  subpoena?

6  A.    I am.

7  Q.    Prior to your testimony, did you meet with the Government

8  to review certain materials?

9  A.    Yes.

10  Q.    Mr. Wall, can you explain to the jury the billing

11  practices of the House of Bijan?

12  A.    Sure.  Generally, being a retail establishment, people

13  come in and they often use charge cards to make purchases

14  because of the sums of money involved.  Sometimes they give a

15  check, other times they might pay by cash, be unusual.

16  Occasionally, we have customers who pay by wire transfer, so

17  they are entitled to credit, generally, on 30-day terms.

18  Q.    Do you know what bank the House of Bijan used for its

19  wires?

20  A.    Yes.

21  Q.    What bank?

22  A.    City National Bank.

23  Q.    Does the clothing from the House of Bijan carry a

24  particular label or marking?

25  A.    Yes.

U.S. v. Manafort

R. Wall - Direct

316

1   Q.   Can you describe it?

2   A.   Yes.  It's -- there are labels in the lining, at least

3   one or two in all apparel pieces, jacket, suits, sport

4   jackets, shirts.  All Bijan merchandise is labeled by the

5   House of Bijan or Bijan Designer or Bijan.

6   Q.   Can I ask you to take a look at Government Exhibit 56?

7   And turn to page 2.

8            Your Honor, this exhibit is already in evidence

9   provisionally pursuant to Your Honor's ruling.

10           MR. NANAVATI:  Again, in light of this witness, we

11  don't object to it, Your Honor.

12           THE COURT:  All right.  But I thought what I did was

13  admit this on the basis that you were going to tie it up.  I

14  mean, the whole point is that you have to prove, beyond a

15  reasonable doubt, that he signed tax returns knowing that he

16  had more income than he revealed.  And I understand this

17  effort to show that he lived lavishly, but at some point

18  that's not really relevant.

19           MR. ANDRES:  Judge, this is not an effort to prove

20  that Mr. Manafort lived lavishly.  It's evidence of his

21  income.

22           THE COURT:  All right.  Go on.

23  BY MR. ANDRES:

24  Q.   With respect to Government Exhibit 56, the second page,

25  can you tell me what that is?

────U.S. v. Manafort────

R. Wall - Direct
317

1  A.   Yes.

2  Q.   What is it?

3  A.   This is a -- an insert label in a -- looks like a sport

4  jacket.  The House of Bijan.

5  Q.   Does the House of Bijan make custom clothing?

6  A.   It makes special orders for customers when need be.

7  Q.   And where is the merchandise from the House of Bijan

8  sold?

9  A.   All of the Bijan merchandise is manufactured in Italy by

10 a -- maybe 20 factories that we do business with quite a long

11 time.

12 Q.   Has any of the House of Bijan merchandise sold at

13 stores -- at other stores or stores not associated with the

14 House of Bijan?

15 A.   No, sir.

16 Q.   Okay.  Does the House of Bijan sell products from other

17 companies?

18 A.   No, it doesn't.

19 Q.   Can I ask you to take a look at Government Exhibit 111A?

20       Can you tell -- can you look through the documents

21 in 111A?  Let me know when you've had a chance to review them.

22 A.   I've reviewed.

23 Q.   What are the Government -- what are the exhibits in

24 Government Exhibit 11A [sic]?

25 A.   These are invoices that were written to Mr. Paul Manafort

─────────U.S. v. Manafort─────────
318

1    over a period of time.

2    Q.    Okay.  And the customer on each of the invoices is who?

3    A.    Is Mr. Paul Manafort.

4          MR. ANDRES:  And, Your Honor, at this point the

5    Government moves to admit Government's Exhibit 111A.

6          MR. NANAVATI:  No objection, Your Honor.

7          THE COURT:  Admitted.

8                         (Government's Exhibit No. 111A

9                         admitted into evidence.)

10   BY MR. ANDRES:

11   Q.    Can I ask you to turn to the first invoice, Government

12   Exhibit 111A?  Do you see that?

13   A.    Yes, sir.

14   Q.    What's the date on that invoice?

15   A.    April 22, 2010.

16   Q.    And does it relate to a particular customer?

17   A.    Yes.

18   Q.    Who?

19   A.    Mr. Paul Manafort.

20   Q.    Can you identify for the jury what's identified as the --

21   what's listed as the description on the invoice?

22   A.    Yeah, I can.

23   Q.    What is it?

24   A.    One limited edition Bijan black titanium Royal Way with

25   crystal.

U.S. v. Manafort

1   Q.   Okay.  And how much was --

2            THE COURT:  Is that a watch?

3            THE WITNESS:  Yes, sir.  Yes, Your Honor.

4            THE COURT:  Next question.

5   BY MR. ANDRES:

6   Q.   And are you familiar with that product?

7   A.   I am.

8   Q.   With respect to the document in 111A, is the method of

9   payment identified somewhere?

10  A.   Yes.

11  Q.   Where?

12  A.   In the last line of the -- of the information on the

13  right-hand side it says, "Wire transfer," above payment.

14           MR. ANDRES:  Your Honor, may I publish 111A?

15           THE COURT:  Yes.

16           MR. ANDRES:  Can you focus on the top?

17  BY MR. ANDRES:

18  Q.   Can you identify where specifically it identifies the

19  payment method?

20  A.   On the last line it says, "Payment:  Wire transfer," as

21  highlighted.

22           THE COURT:  That would be something that your

23  company would fill in?

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  Next question.

─────U.S. v. Manafort─────

R. Wall - Direct

320

1   BY MR. ANDRES:

2   Q.   And can you go to the invoice two pages later, the

3   invoice from November 5, 2010?  Can you tell me what that is?

4   A.   Invoice No. 28460 to Mr. Paul Manafort dated November 5,

5   2010.

6   Q.   Okay.  And does it indicate -- first of all, can you

7   generally describe what the merchandise is that's listed on

8   this invoice?

9   A.   Yes.

10  Q.   What is it?

11  A.   It's an assortment of clothing, including jackets, suits,

12  some assorted shirts, and then in one special item at the end.

13  Q.   Does it list the total amount of the invoice?

14  A.   Yes.

15  Q.   What is the total amount of the invoice?

16  A.   Before insurance and shipping, it's $128,000.

17  Q.   And who does this invoice relate to?  What customer?

18  A.   Mr. Paul Manafort.

19  Q.   On the front page does it list how the -- how the

20  transfer was paid for?

21       I'm sorry, how the invoice was paid for?

22  A.   It does on the top of the page.

23  Q.   Okay.  Can I ask you now -- and what does it say in terms

24  of how it was paid for?

25  A.   Paid wire transfer November 17, 2010.

U.S. v. Manafort

1   Q.   Can I ask you to turn to Government's Exhibit 111?

2        Have you seen that document before?

3   A.   Yes.

4   Q.   Is that something you, yourself, prepared?

5   A.   No.

6   Q.   Were you shown that chart by the Government?

7   A.   Yes.

8        THE COURT:  Are you referring now to Exhibit 111?

9        MR. ANDRES:  Yes, Judge.

10       THE COURT:  I thought that's what we've been talking

11  about.

12       MR. ANDRES:  I'm not seeking to admit it, Judge.

13  I'm seeking only to ask questions pursuant to your ruling.

14       THE COURT:  All right.  Proceed -- no, what I'm

15  asking is I thought that's where we were, is 111.

16       MR. ANDRES:  We were at 111A, Judge, where the

17  invoices are.

18       THE COURT:  I see.

19       MR. ANDRES:  Sorry if I wasn't clear.

20       THE COURT:  No, you were.  I -- I wasn't.  Yes, go

21  ahead.

22  BY MR. ANDRES:

23  Q.   With respect to the chart in Government Exhibit 111A --

24  I'm sorry -- now you have me confused, Judge -- the chart in

25  Government Exhibit 111, do you see that?

─────U.S. v. Manafort─────
R. Wall - Direct
322

1    A.    I do.

2    Q.    What did you do to verify that information?

3    A.    I verified the invoice number, the amount and the date to

4    the -- to the particular invoice.  This is written on two

5    invoices because of the length of the descriptions, so it's

6    28460 and 28461, the total being on the latter page --

7    Q.    Okay.

8    A.    -- verified to our books of accounting.

9    Q.    I'm asking you now to look at Government Exhibit 111.  Do

10   you see that?

11   A.    Yeah.

12   Q.    It's a chart?

13   A.    Yes.

14   Q.    Did you verify the information on that chart?

15   A.    I did.

16   Q.    How did you do that?

17   A.    I vouched all of the underlying invoices to the chart by

18   date, by invoice number, and by amount.  Added up the

19   subtotals and the total.  And I agree with the major --

20   Q.    With respect to the year 2010, what was the total amount

21   of -- the total amount in dollars of the invoices sent to

22   Mr. Manafort?

23   A.    $213,280.

24   Q.    And with respect to the year 2011, what was the total

25   amount in dollars of the House of Bijan invoice to

─────U.S. v. Manafort─────

1    Mr. Manafort?

2    A.    $113,450.

3    Q.    And with respect to 2012, what was to total amount

4    invoiced from the House of Bijan to Mr. Manafort?

5    A.    $7,595.

6    Q.    Over the period from 2010 to 2012, what was the total

7    amount of dollars invoiced to Mr. Manafort from the House of

8    Bijan?

9    A.    $334,325.

10   Q.    I ask that -- now to turn to Government's Exhibit 112.

11         Can you tell me what's contained -- have you had a

12   chance to look at all of those documents.

13   A.    Yes, I have.

14   Q.    Okay.  And can you tell me what's included in Government

15   Exhibit 112?

16   A.    Yes.  For the most part, these are advices of credit

17   faxed to Bijan by City National Bank in connection with

18   payments that apply to the invoices that we've just discussed.

19   Q.    Do they relate to payments for Mr. Manafort?

20   A.    They do.

21   Q.    Okay.  And have you reviewed these previously?

22   A.    I have.

23   Q.    Do the payments on these wire transfers come from a

24   particular country?

25   A.    Yes.

R. Wall - Direct

324

1   Q.   What country?

2   A.   Cyprus.

3         MR. ANDRES:  Your Honor, the Government would move

4   to admit Government's Exhibit 112, 112.

5         MR. NANAVATI:  Without objection, Your Honor.

6         THE COURT:  Admitted.

7                         (Government's Exhibit No. 112

8                         admitted into evidence.)

9   BY MR. ANDRES:

10  Q.   With respect to the --

11        MR. ANDRES:  Your Honor, may I publish this to the

12  jury?

13        THE COURT:  One page of it, yes, you may.

14        MR. ANDRES:  Thank you.  Can you publish the second

15  page?

16  BY MR. ANDRES:

17  Q.   Mr. Wall, if you could turn to the page that ends in

18  Bates No. 698.

19  A.   I see it.

20  Q.   Can you explain this document first in terms of the date?

21  A.   Yes.  On the fax encryption line, it's November 17, 2010.

22  This is an advice of credit from City National Bank.

23  Q.   And what amount is at issue in this wire?

24  A.   $128,280.

25  Q.   And who is the -- what's the account name at City

─────U.S. v. Manafort─────

1   National Bank?

2   A.   Fashion World, Inc.

3   Q.   And in terms of the originating bank, what's the

4   originating bank?

5   A.   Marfin Popular Bank, PCL.

6   Q.   And who is the originator of the wire?

7   A.   Global Highway Limited.

8   Q.   And can you read the address for Global Highway Limited?

9   A.   001 Lampousas, Nicosia.

10  Q.   Do you know where Nicosia is?

11  A.   Yes.

12  Q.   Where?

13  A.   Cyprus.

14  Q.   And who is the receiver of the funds?

15  A.   Fashion World, Inc., DBA Bijan.

16  Q.   Based on your response to the subpoena in this matter,

17  did you determine who this wire came from?

18  A.   Yes.

19  Q.   Who did it come from?

20  A.   It was applied to the invoice that was written to

21  Mr. Paul Manafort.

22  Q.   And that's the invoice that's included in Government

23  Exhibit 111A?

24  A.   Yeah, refer to 24860 and 28461.

25  Q.   Okay.  And can you turn to the next page in Government's

─────────── U.S. v. Manafort ───────────

R. Wall - Direct

326

1   Exhibit 112.

2           Can you explain to the jury what that is?

3   A.   An advice of credit from City National Bank dated

4   5/31/11, May 31, '11.  $64,000 even.

5   Q.   And who is the -- who is the originator of this wire?

6   A.   Leviathan Advisors Limited.

7   Q.   And what's the address for Leviathan Advisors Limited?

8   A.   001 Lampousas, 1095 Nicosia.

9   Q.   And what bank?

10  A.   Marfin Popular, PCL.

11  Q.   And did you have an understanding based on your subpoena

12  response what this payment was for?

13  A.   It matched to an invoice that was outstanding more or

14  less from -- I'll give you the date -- April 11, 2011.

15  Q.   And who is the customer?

16  A.   Mr. Paul Manafort.

17  Q.   And, finally -- or almost finally, second to last, can

18  you look at the -- in Government Exhibit 112, can you look at

19  the document that ends 9693?

20  A.   Yes.

21  Q.   Can you tell me what that is?

22  A.   Advice of credit from City National Bank dated

23  November 15, '11, $48,000 even.

24  Q.   And where does that -- what's the originating bank there?

25  A.   Marfin Popular Bank, Public Co Limited?

─────U.S. v. Manafort─────

1    Q.    What's the amount of transfer?

2    A.    $48,000.

3    Q.    And in terms of the originator?

4    A.    Global Highway Limited.

5    Q.    And who did you understand this payment to relate to,

6    what client?

7    A.    Mr. Paul Manafort.

8    Q.    Now, lastly, if you can look at the last document in

9    Government Exhibit 112, Government's No. 9691.

10            Can you tell me what that is?

11   A.    Yes.  It's an advice of credit from City National Bank

12   dated December 17, 2012, for 7,500.

13   Q.    And where did that -- what's the originating bank?

14   A.    Cyprus Popular Bank, Public Co Limited.

15   Q.    And what's the originating entity?

16   A.    Lucicle Consultants Limited.

17   Q.    Did you have an understanding of Lucicle Consultants was?

18   A.    No.

19   Q.    Okay.  And did you apply this payment to a particular

20   client?

21   A.    Yes.

22   Q.    Who?

23   A.    Mr. Paul Manafort.

24   Q.    Are you familiar with an -- with an individual named Rick

25   Gates?

U.S. v. Manafort

1    A.    No.

2    Q.    Do you know if he was a client of the House of Bijan?

3    A.    I don't know.

4    Q.    How about an individual named Konstantin Kilimnik, did

5    you know that individual?

6    A.    No.

7            MR. ANDRES:  Your Honor, could I just have one

8    moment?

9            THE COURT:  Yes.

10           (A pause in the proceedings.)

11           MR. ANDRES:  I have no further questions.  Thank

12   you.

13           THE COURT:  Any cross-examination?

14           MR. NANAVATI:  Very briefly, Your Honor.

15           THE COURT:  All right.

16                    **CROSS-EXAMINATION**

17   BY MR. NANAVATI:

18   Q.    Mr. Wall, my name is Jay Nanavati.  I represent Paul

19   Manafort.  How are you doing today?

20   A.    I'm fine, sir.  How are you?

21   Q.    Good.  Thank you.

22   A.    Good.

23   Q.    You mentioned that Mr. Manafort paid for his clothing via

24   wire transfer?

25   A.    Yes.

U.S. v. Manafort

329

1   Q.   And -- but House of Bijan had other customers that also

2   paid via wire transfer, correct?

3   A.   Indeed.

4   Q.   And during your time at House of Bijan, whether as an

5   employee or a contractor, you've not been a salesperson, have

6   you?

7   A.   No.

8   Q.   You're not customer-facing.  Is that fair to say?

9   A.   Correct.

10  Q.   And you didn't interact with Paul Manafort?

11  A.   I did not.

12  Q.   And today you're essentially here to explain the records

13  that have been put before you, correct?

14  A.   In my role of custodian of records, that's correct.

15          MR. NANAVATI:  Okay.  I don't have any other

16  questions, Your Honor.

17          THE COURT:  All right.  Any redirect?

18          MR. ANDRES:  No, Judge.

19          THE COURT:  Thank you.  You may step down.  Any

20  reason why this witness may not be excused?

21          MR. ANDRES:  No, Judge.

22          THE COURT:  You're excused.  Thank you.

23          (Witness excused.)

24          THE COURT:  Who is your next witness.

25          MR. ASONYE:  Your Honor, would it be appropriate to

U.S. v. Manafort

330

1   take our afternoon break?

2          THE COURT:  Yes.

3          MR. ANDRES:  I think that's an objection.

4          (Laughter.)

5          THE COURT:  All right.  Ladies and gentlemen, pass

6   your books to the right.  Court security officer will collect

7   and maintain their security.  Remember not to discuss the

8   matter with anyone or undertaking any investigation on your

9   own.  And there will be soft drinks available to you.

10          I omitted to ask you:  Were the lunches

11  satisfactory, even though it wasn't high cuisine?

12          THE JURY:  Yes, Your Honor, they were delicious.

13          THE COURT:  High cuisine.  Good.  Thank you.

14          All right.  You may follow Mr. Flood into the jury

15  room.

16          (Jury dismissed.)

17          THE COURT:  And we'll reconvene at five minutes to

18  3:00 -- or let's make it 3:00, at three o'clock.

19          Court stands in recess until three o'clock.

20          MR. ANDRES:  Thank you, Judge.

21          (Recess.)

22          THE COURT:  All right.  Let's bring the jury in and

23  we'll continue.

24          Who is the next witness?

25          MR. ANDRES:  Your Honor, Mr. Van Grack is going to

U.S. v. Manafort

331

1    offer a few stipulations that we're going to ask the Court to

2    read and admit, and then we have Daniel Opsut.

3                THE COURT:  All right.  What stipulations are they?

4                MR. VAN GRACK:  Your Honor, it's Government

5    Exhibit 332 and 333, and each of those stipulations have an

6    attachment that's 332A and 333A.  And I believe the Court

7    should have a binder that says "Stipulations" in front of him.

8                THE COURT:  Yes, I do.  And 330 what again?

9                MR. VAN GRACK:  332.

10               THE COURT:  A and B?

11               MR. VAN GRACK:  Just A for 332 and then 333, there's

12   also an attachment that's labeled 333A.

13               THE COURT:  Well, 330 -- oh, I'm looking at 328.

14               Three -- I'm sorry, the two numbers again, sir?

15               MR. VAN GRACK:  Of course, Your Honor, 332 and 333.

16               (A pause in the proceedings.)

17               THE COURT:  I wonder why you have a stipulation and

18   then the documents as well.  The whole point of your offering

19   these documents is to show that they spent this money in a

20   certain way.

21               MR. VAN GRACK:  Your Honor, two things:  First of

22   all, in terms of reading the stipulation, we have -- we would

23   not be requesting Your Honor read the attachments to the

24   stipulations.

25               THE COURT:  Well, I know that.

U.S. v. Manafort

332

1          MR. VAN GRACK:  And the second, some of these

2    stipulations will be referred to -- the documents will be

3    referred to by other witnesses.

4          THE COURT:  All right.  But I'm still unclear why if

5    the stipulation says, for example, this is about a 2012 Land

6    Rover purchase and lease, once the stipulation says how much,

7    where the money came from, why do you need documents attached

8    to it?

9          MR. VAN GRACK:  Your Honor, at this point, again, I

10   believe at least for one of the attachments that will be

11   referred to, some of the exhibits may be referred to by other

12   witnesses.

13         If you look at Exhibit 333, it actually doesn't

14   refer to any specific numbers or documents.  It just

15   authenticates the documents behind it.

16         THE COURT:  I take it what you want to show is that

17   the defendant and his wife leased or purchased these vehicles.

18         MR. VAN GRACK:  Yes, Your Honor, and that they

19   are --

20         THE COURT:  And how much they spent to do that for

21   what period of time, right?  That's what you want to show.

22         MR. VAN GRACK:  Your Honor, and what these

23   stipulations indicate is that the payments for those personal

24   automobiles were paid for by Cypriote entities.

25         THE COURT:  All right.  That could all be done in a

─────────U.S. v. Manafort─────────

333

1    stipulation in two paragraphs.

2           MR. VAN GRACK:  I think we did it, it looks like, in

3    seven paragraphs, Your Honor.

4           THE COURT:  Plus attached documents.

5           MR. VAN GRACK:  Plus some attachments, that's

6    correct, Your Honor.

7           THE COURT:  You don't need to do both.

8           MR. VAN GRACK:  Your Honor, I believe at this time,

9    the stipulations, themselves, at least for 332, would be

10   sufficient.  But for 332 -- for 333, again, to direct your

11   attention --

12          THE COURT:  Yeah, that's just the business records

13   of Mercedes-Benz.

14          MR. VAN GRACK:  Your Honor, and my understanding is

15   that it was actually a request by defense counsel that we

16   include the underlying documentation.

17          THE COURT:  I don't care whether they request that

18   or not.  It's my job to see if we can get this thing done with

19   the least amount of wasted time.  And to submit more documents

20   that are necessary is not appropriate, but if they want to add

21   something, they can add it.  All right.  It's 332 and 333?

22          MR. VAN GRACK:  Yes, Your Honor.

23          THE COURT:  All right.  I will read those to the

24   jury.  And, of course, as you recognize, I won't read the

25   package of documents that comes with it.  Although, I will say

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

─────────U.S. v. Manafort─────────

334

1   something about them.

2          You will then offer the stipulation.  I'll admit it.

3   Do you have any problem with all these documents?

4          MR. NANAVATI:  I don't, Your Honor.  I think -- I

5   think our point was that before we enter into the stipulations

6   we wanted to see the underlying documents supporting it, but I

7   don't think we're pushing to have the underlying documents --

8          THE COURT:  You didn't ask to have them included,

9   you just wanted to see them?

10          MR. NANAVATI:  I can't speak for the Royal Way, but

11   I don't think so.  I think that's right.

12          THE COURT:  For the royal weed?  And, of course,

13   there were other attorneys involved at some point.

14          MR. NANAVATI:  Yes, Your Honor.  I will take

15   responsibility that we were the attorneys on base.  We can't

16   put this on any other law firm.  But my recollection is that

17   we just wanted to be sure we saw the underlying documents

18   before we agreed to the stipulation, not that the underlying

19   documents actually be part of what goes to the jury.  But I

20   could be wrong about that.

21          THE COURT:  All right.  Mr. Van Grack, anything

22   other than 332 and 333?

23          MR. VAN GRACK:  Not at this time, Your Honor.

24          THE COURT:  And who is the next witness?

25          MR. VAN GRACK:  I'm going to mispronounce the last

U.S. v. Manafort

335

1  name, so I'm going to have Mr. Asonye do so.

2  MR. ASONYE:  His name is Daniel Opsut.

3  THE COURT:  Is there a list of exhibits that goes

4  with your witness, Mr. Asonye?  I don't have it if --

5  MR. ASONYE:  Yes, I can tell you, Your Honor, for

6  Mr. Opsut it should be 103A, 105, 106, 106A, and 104.  And I

7  believe there should be -- Your Honor, should have a binder

8  with these exhibits.

9  THE COURT:  I do have that, but you typically, by

10  request, furnished me -- I have it here for the other

11  witnesses.

12  MR. ASONYE:  Okay.  We didn't -- Your Honor,

13  we didn't -- we -- now I think I further understand what

14  you're asking.  But we understood that Your Honor had some

15  concerns about the memorandum, memoranda that we introduced

16  through Mr. Rabin and Mr. Devine and wanted to preclear those

17  exhibits.  We're now beyond that, but if Your Honor requests

18  that we submit to Chambers a list of the exhibits per witness,

19  we do have the binders.

20  THE COURT:  It would be helpful, because it focuses

21  the attention of the defendant on whether they want to make

22  a specific objection.  I can know about it in advance and we

23  can rule on it in advance and, therefore, save time.

24  So, yes, it would be helpful and I would like to

25  have it.  All right.

———————U.S. v. Manafort———————

336

1          MR. ASONYE:  And, Your Honor --

2          THE COURT:  Yes.

3          MR. ASONYE: -- just as you mentioned time, just

4    wanted to advise the Court that we're moving ahead of schedule

5    in light of the Government's case and we fully anticipate

6    resting our case in chief next week.

7          THE COURT:  All right.  I'm glad to hear that.

8    Bring the jury in, please.

9          (Jury in.)

10          THE COURT:  All right.  You may be seated.

11          All right.  Ladies and gentlemen, we're going to

12   begin with a couple of stipulations that I will read to you.

13   You will have all of the stipulations in the jury room with

14   you at the end of the case.

15          The first stipulation is that the parties stipulate

16   to the following:  On April 11, 2012, Paul and Andrea Manafort

17   purchased a 2012 Land Rover -- Land Rover Range Rover from Don

18   Beyer Motors, Inc., also known as Land Rover of Alexandria.

19   As part of the payment for that vehicle on April 12th, the

20   wire transfer from Lucicle Consultants, Limited, in the amount

21   of $83,525 drawn on a bank account at Marfin Laiki Bank in

22   Nicosia, Cyprus, was sent to Don Beyer Motors, Inc.

23          On April 25, 2012, Paul and Kathleen Manafort leased

24   a 2012 Land Rover Range Rover.  As down payment for that

25   vehicle, on May 2, 2012, a wire transfer from Lucicle

U.S. v. Manafort

337

1    Consultants, Limited, in the amount of $12,500 drawn on a bank

2    account at Marfin Laiki Bank in Nicosia, Cyprus sent to Don

3    Beyer Motors, Inc.

4            On June 28, 2012, Paul and Kathleen Manafort, using

5    company John Hannah, LLC, purchased a 2012 Land Rover Range

6    Rover.  As part of the payment for that vehicle, on June 29,

7    2012, a wire transfer from Lucicle Consultants, Limited, to

8    the amount -- in the amount of $67,655 drawn on a bank account

9    at Marfin Laiki Bank in Nicosia, Cyprus was sent to Don Beyer

10   Motors, Inc.  And then the stipulation notes that the records

11   attached are records of Don Beyer Motors, Inc., that

12   constitute the records of regularly consulted -- conducted

13   business activity pursuant to the Rules of Evidence.

14           And, again, I point out, Mr. Van Grack, I don't see

15   the point of more documents being submitted if the parties

16   have stipulated to the essential facts that you wish to be

17   presented.  Namely, that these amounts were paid from these

18   sources for the rental or sale of these vehicles.  Attaching

19   documents doesn't add anything because this is stipulated.

20   The defendants don't deny it.  Attaching documents, this

21   clutters up the record.

22           MR. VAN GRACK:  We understand, Your Honor.

23           THE COURT:  All right.  So I'm going to admit the

24   stipulation, and I don't plan to add the attached documents

25   unless I hear from you later or from the defendant later.  I

U.S. v. Manafort

338

1    understand the defendant wanted to see those documents, and

2    that's probably why they're here.

3              The second stipulation, ladies and gentlemen, is the

4    following:  This is simply a stipulation that certain records

5    are records of the American Service Center Associates, LLC,

6    also known as Mercedes-Benz of Alexandria, a car dealership,

7    and they constitute the records of regularly conducted

8    business activity and don't require any further

9    authentication.  And these are records -- is this the 333A?

10             MR. ASONYE:  Your Honor, actually, they are -- they

11   are the witnesses -- the exhibit that will be introduced

12   through this witness, Your Honor.

13             THE COURT:  This witness that you're now going to

14   present?

15             MR. ASONYE:  Yes, Your Honor.  But we're not moving

16   333A.  That was, again, for the defense.

17             THE COURT:  And I take it, again, what you want to

18   show is that the defendant and his wife or other family

19   members spent this money, maybe where it came from, that's

20   what you want to show.

21             MR. ASONYE:  Yes, Your Honor.

22             THE COURT:  All right.  Well, you can elicit that

23   from these witnesses if they have that knowledge and let's be

24   done with it, rather than burdening the record with yet more

25   documentation that nobody really needs to look at because the

─────U.S. v. Manafort─────

D. Opsut - Direct

339

1   facts are not disputed.

2          All right.  Call your next witness, please.

3          MR. ASONYE:  The Government calls Daniel Opsut.

4          THE COURT:  All right.  Mr. Opsut, come forward,

5   sir, and take the oath, please.

6          Thereupon,

7                          **DANIEL OPSUT,**

8   having been called as a witness on behalf of the Government

9   and having been first duly affirmed by the Deputy Clerk, was

10  examined and testified as follows:

11         (Witness seated.)

12         THE COURT:  All right.  You may proceed.

13                     **DIRECT EXAMINATION**

14  BY MR. ASONYE:

15  Q.   Good afternoon.  Could you please state and spell your

16  last name for the record?

17  A.   Daniel Opsut, O-p-s-u-t.

18  Q.   What city and state do you live in?

19  A.   Burke, Virginia.

20  Q.   And how far did you go in school?

21  A.   Bachelor's degree.

22  Q.   And if you could speak up into the microphone so that the

23  jury and the Court can hear you.

24         What subject did you earn your degree in?

25  A.   Accounting.

U.S. v. Manafort

1   Q.   Are you employed?

2   A.   Yes.

3   Q.   Where do you work?

4   A.   Mercedes-Benz of Alexandria.

5   Q.   Is that located in Alexandria, Virginia?

6   A.   Yes.

7   Q.   How long have you worked there?

8   A.   Ten years.

9   Q.   What's your title?

10  A.   Controller.

11  Q.   And what do you do as a controller?

12  A.   Responsible for all financial transactions and fiduciary

13  responsibilities.

14  Q.   Okay.  Are you familiar with the process by which your

15  company creates and maintains records?

16  A.   Yes.

17  Q.   And did your company produce records in response to a

18  Government subpoena?

19  A.   Yes.

20  Q.   And did you meet with the Government in anticipation of

21  your testimony to review those documents?

22  A.   Yes.

23  Q.   Has your dealership sold a vehicle to Kathleen Manafort?

24  A.   Yes.

25  Q.   All right.  Let me show you what's marked as Government

D. Opsut - Cross

1  Exhibit 103A in your binder.

2          Are these records that were produced in response to

3  the subpoena?

4  A.  Yes.

5          MR. ASONYE:  Your Honor, the Government moves 103A

6  into evidence.

7          MR. NANAVATI:  No objection, Your Honor.

8          THE COURT:  Admitted.

9                      (Government's Exhibit No. 103A

10                      admitted into evidence.)

11  BY MR. ASONYE:

12  Q.  If you could turn to Page 3?

13          MR. ASONYE:  Your Honor, may we publish?

14          THE COURT:  Page 3?  Yes, you may do so.

15  BY MR. ASONYE:

16  Q.  What is this document?

17  A.  It's a buyer's order for the purchase of an SL550.

18          THE COURT:  Speak up if you would, please.  I can't

19  hear you.

20          THE WITNESS:  It's a buyer's order for the purchase

21  of a SL550.

22  BY MR. ASONYE:

23  Q.  And what's the purpose of the document?

24  A.  It's the finalized pricing of the vehicle signed by the

25  customer and our company.

─────────U.S. v. Manafort─────────

 1   Q.   If you look at the top right of this document, if we

 2   could blow it up, what's the date?

 3   A.   October 1, 2012.

 4   Q.   And what name is listed below that date?

 5   A.   Kathleen Manafort.

 6   Q.   What is the e-mail address that's listed to the right of

 7   the date?

 8   A.   PMAManafort@DavisManafort.com.

 9   Q.   And on the top left-side of the document, there's a

10   vehicle listed.  Could you -- what does it say?

11   A.   It's a 2013 Mercedes-Benz SL550.

12   Q.   Is this the vehicle that was purchased by Ms. Manafort?

13   A.   Yes.

14   Q.   According to this document, was it new or used?

15   A.   It was a new vehicle.

16   Q.   And if you look towards the bottom-third of the document,

17   what was listed as the cash price of the -- cash-delivered

18   price of the vehicle?

19   A.   $123,733.70.

20   Q.   And if you could turn to Page 4, is the document signed?

21   A.   Yes.

22   Q.   Please take a look at Page 1.  What is Page 1?

23   A.   Page 1 is our internal invoice.

24   Q.   And do you see a left column on the bottom where it says,

25   "Used car traded"?

U.S. v. Manafort

1   A.   Yes.

2   Q.   What's listed there?

3   A.   During this purchase they traded in two vehicles, a E350

4   Convertible and an SL500.

5   Q.   Those are Mercedes-Benz vehicles?

6   A.   Yes.

7   Q.   And how much value was Ms. Manafort given for each

8   trade-in for the vehicles?

9   A.   For the E350 Convertible she was given 30,000, and for

10  the SL500 she was given 26,000 in value.

11  Q.   So was this amount applied to the purchase price?

12  A.   Yes.

13  Q.   Then if you could turn to the second page.  What's the

14  purpose of this document?

15  A.   This is just another internal form for the deal recap

16  breaking it down further.

17  Q.   Do you see a box for "Other" that's checked?

18  A.   Yes.

19  Q.   What does it say next to "Other"?

20  A.   "Cash Deal."

21  Q.   What does Cash Deal mean?

22  A.   It means the purchaser was bringing in their own funds.

23  Q.   Now, according to these records, did Ms. Manafort pay for

24  the vehicle at the time of purchase or later?

25  A.   She paid at a later date.

─────U.S. v. Manafort─────

1    Q.   And if you look on the right side, top right, there's a

2    column listed, a number of payments/payment?

3    A.   Yes.

4    Q.   What does it list next to that line?

5    A.   One payment for $62,733.70.

6    Q.   What does that mean?

7    A.   That was the remaining balance due after the two

8    trade-ins that was to be paid by Ms. Manafort.

9    Q.   All right.  Let me show you what's been marked as

10   Government Exhibit 105.  And do you recognize this document?

11   A.   Yes.

12   Q.   What is it?

13   A.   This is a promissory note.

14   Q.   Does it relate to this transaction?

15   A.   Yes.

16           MR. ASONYE:  Your Honor, Government moves 105 into

17   evidence.

18           MR. NANAVATI:  No objection, Your Honor.

19           THE COURT:  Admitted.

20                       (Government's Exhibit No. 105

21                        admitted into evidence.)

22   BY MR. ASONYE:

23   Q.   What's the date of the document?

24   A.   October 1, 2012.

25   Q.   And the amount of the promissory note?

┌─────────────── U.S. v. Manafort ───────────────

D. Opsut - Direct

1   A.   $62,733.70.

2   Q.   And who -- what name is it, this promissory note in?

3   A.   Kathleen Manafort.

4   Q.   And is it signed?

5   A.   Yes.

6   Q.   Now, was this vehicle, in fact, paid for?

7   A.   Yes, it was.

8   Q.   Do you know how?

9   A.   By wire transfer.

10  Q.   Let me show you what's been marked as Government

11  Exhibit 106.

12            Do you have that?

13  A.   Yes.

14  Q.   Is -- does this record relate to this transaction you've

15  been testifying about?

16  A.   Yes.

17            MR. ASONYE:  Your Honor, Government moves 106 into

18  evidence.

19            MR. NANAVATI:  No objection, Your Honor.

20            THE COURT:  All right.  It's admitted.  Is this 106

21  your company's record?

22            THE WITNESS:  Yes, it's our wire transfer.

23            THE COURT:  Next question.

24                      (Government's Exhibit No. 106

25                       admitted into evidence.)

U.S. v. Manafort

1            MR. ASONYE:  Your Honor, may we publish?

2            THE COURT:  Yes, you may.

3   BY MR. ASONYE:

4   Q.   All right.  If we could just walk through this document.

5   Again, explain as the Court asked, what is it?

6   A.   This is the transaction that's given to us by SunTrust

7   stating the location of the funds and when it's been

8   transferred into our bank account.

9   Q.   Right.  And what is the -- listed under "Amount"?

10  A.   This wire transfer is for $62,750.

11  Q.   And does that -- does that relate to the promissory note,

12  is that approximately the amount of the promissory note?

13  A.   Yes.

14  Q.   Who is the money sent to?

15  A.   The money was sent to Mercedes-Benz of Alexandria.

16  Q.   And about ten lines from the bottom, if we could

17  highlight from "Sender" all the way down.

18  A.   Okay.

19  Q.   Under "Ordering Bank," can you read that line to the

20  jury?  What does it say?

21  A.   Underneath it is, "Cyprus Popular Bank Public Co, LTD."

22  Q.   And then two lines below that, the location of that bank?

23  A.   Nicosia, Cyprus.

24  Q.   And then below that there's two lines, there's another

25  name of a company.  What does it say?

─────────U.S. v. Manafort─────────

1    A.    It is Lucicle Consultants, Limited.

2    Q.    Lucicle?

3    A.    Lucicle.

4    Q.    Okay.  And then what does it say below those two lines?

5    The next two lines, I'm sorry.

6    A.    The next two lines?  1095 --

7    Q.    I'm sorry, above that line?

8    A.    Oh.  "001 LAMPOUSAS."

9    Q.    And then what's right below?

10   A.    "1095 NICOSIA."

11   Q.    Now, this wire transfer, was it applied to the balance of

12   the -- to the balance of the promissory note?

13   A.    Yes.

14   Q.    How did your company know to associate this wire transfer

15   with the purchase of the Mercedes-Benz by Ms. Manafort?

16   A.    We were informed at the time of purchase that the wire

17   transfer should be coming a few days later.

18   Q.    And how often does your company receive foreign wire

19   transfers for a purchase of a vehicle?

20   A.    It's not common, but it's not unheard of.

21   Q.    Now, are you familiar with a person named Rick Gates?

22   A.    No.

23   Q.    As far as you can tell from the records you reviewed and

24   produced in connection with this transaction the Government

25   subpoenaed, was there any reference to a Mr. Rick Gates?

─────────────U.S. v. Manafort─────────────

D. Opsut - Cross

348

1    A.   No.

2          MR. ASONYE:  Your Honor, the Government has no

3    further questions for this witness.

4          THE COURT:  Any cross-examination?

5          MR. NANAVATI:  Just briefly.

6                 **CROSS-EXAMINATION**

7    BY MR. NANAVATI:

8    Q.   Mr. Opsut, my name is Jay Nanavati.  I represent

9    Paul Manafort.  Nice to meet you.

10          You said that this was a cash deal?

11    A.   Yes.

12    Q.   The cash deal doesn't mean like currency greenbacks, does

13    it?

14    A.   No.

15    Q.   Okay.  What does a cash deal mean?

16    A.   Cash deal means that the -- the vehicle being purchased

17    is not being financed or leased.  So the funds, whichever way

18    they come into the dealership, is not given to us by a bank

19    based on a contract.

20    Q.   Okay.  And so -- and just to clarify, there was a very

21    short-term loan involved, though, correct?

22    A.   No.

23    Q.   This promissory note?

24    A.   Promissory note, yes.  We give generally seven days based

25    on the client to bring in the funds.

U.S. v. Manafort

D. Opsut - Cross

349

1  Q.   So when you say "Cash Deal," you mean no traditional like

2  36-month or 48-month financing, that sort of thing?

3  A.   Correct.

4  Q.   Okay.

5       MR. NANAVATI:  All right.  No further questions,

6  Your Honor.

7       THE COURT:  All right.  Any redirect?

8       MR. ASONYE:  No, Your Honor.

9       THE COURT:  Thank you.  You may step down.

10      May this witness be excused?

11      MR. ASONYE:  From the Government, yes, Your Honor.

12      THE COURT:  All right.  You may be excused.

13      (Witness excused.)

14      THE COURT:  Call your next witness.

15      MR. ASONYE:  The Government calls Wayne Holland.

16      I believe we have a stipulation to introduce, Your

17  Honor.

18      THE COURT:  Come forward and take the oath, please,

19  sir.

20      Thereupon,

21           **WAYNE RICHARD HOLLAND,**

22  having been called as a witness on behalf of the Government

23  and having been first duly affirmed by the Deputy Clerk, was

24  examined and testified as follows:

25      (Witness seated.)

U.S. v. Manafort

W. Holland - Direct

350

1      THE COURT:  All right.  You may proceed.

2                    **DIRECT EXAMINATION**

3    BY MR. ASONYE:

4    Q.   Could you please state and spell your name for the

5    record?

6    A.   Wayne Richard Holland, excuse me, Lieutenant Colonel,

7    U.S. Army retired, H-o-l-l-a-n-d.

8    Q.   And, sir, what city and state do you live in?

9    A.   Alexandria, Virginia.

10   Q.   How far did you go in school?

11   A.   Say again.

12   Q.   How far did you go in school, education?

13   A.   Master's degree.

14   Q.   You already mentioned you -- you're Army retired?

15   A.   Yes.

16   Q.   How long were you in the Army?

17   A.   23 years.

18   Q.   And did you do any work after you retired?

19   A.   Yes.

20   Q.   What did you do?

21   A.   I was a licensed contractor in the State of Virginia and

22   I also hold a realtor's license in Virginia.

23   Q.   And with your real estate license, were you affiliated

24   with any particular real estate company?

25   A.   Yes, McEnearney Associates in Alexandria.

U.S. v. Manafort

1    Q.    And where was your office?

2    A.    109 South Pitt Street.

3    Q.    In what city?

4    A.    In Alexandria.

5    Q.    Okay.  And how long were you with McEnearney Associates?

6    A.    Since 1996.

7    Q.    Are you still with them?

8    A.    Yes.

9    Q.    Do you know Paul Manafort?

10   A.    Yes, I do.

11   Q.    When did you first meet Paul Manafort?

12   A.    Paul has been a neighbor of mine -- I don't know what

13   year I first met him, but he's been a neighbor for about 30

14   years from across the street.

15   Q.    And is that how you met him?

16   A.    I think the first time I met Paul was we were visiting

17   another family in Paul's neighborhood.  This is before I moved

18   there.  And we were out on the -- on the rear deck, looking

19   towards Paul's house.  And for the first time in my life, I

20   just happened to be looking towards his house when a bolt of

21   lightening came down out of the sky, hit the chimney, knocked

22   bricks all over the place and we got in touch with him.

23   Q.    Great.  Are you friends?

24   A.    We're very close friends.

25   Q.    And how long have you been friends?

───────U.S. v. Manafort───────
W. Holland - Direct
352

1   A.   About 30 years.

2   Q.   Do you know his wife, Kathleen Manafort?

3   A.   Yes, I do.

4   Q.   And do you know if they have any children?

5   A.   Yes, they do.

6   Q.   How many?

7   A.   They have two wonderful children, two daughters.

8   Q.   And do you know their names?

9   A.   Andrea and Jessica.

10  Q.   Okay.  And have you met any of his children?

11  A.   Oh, yes I have.  I've seen them grow up.

12  Q.   Both of them?

13  A.   Both of them.

14  Q.   Okay.  When you -- while you knew Mr. Manafort, did you

15  know how he was employed?

16  A.   I'm sorry, how he was?

17  Q.   Employed?

18  A.   Employed, yes.  He was a very successful lobbyist in

19  Washington.

20  Q.   Are you familiar with property located at 1046 North

21  Edgewood Street in Arlington, Virginia?

22  A.   Yes, I am.

23  Q.   Were you involved in a real estate transaction for this

24  property?

25  A.   Yes.  I helped Andrea Manafort buy that house.

1  Q.   And what was your role in that transaction?

2  A.   I was -- I was her agent, her Realtor.

3  Q.   And who did you represent?

4  A.   Andrea Manafort.

5  Q.   And do you recall the year that this property was

6  purchased in?

7  A.   2012.

8  Q.   Who first contacted you about this property?

9  A.   Paul Manafort, I believe, called and said that Andrea was

10 interested in looking at a house near where she was renting at

11 the -- at the -- at that time.

12 Q.   And was ultimately a decision made to put an offer on it?

13 A.   Well, first, I showed the house to Andrea.  And as I

14 recall, a few days later, Paul and I believe Kathy also looked

15 at the house.

16 Q.   And then who took --

17 A.   And then it was decided that after analyzing the value

18 and, you know, looking the house over, they would put an

19 offer.

20          THE COURT:  Would you speak up just a little bit

21 more, sir?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Thank you.

24 BY MR. ASONYE:

25 Q.   What was the -- was -- the house was listed for sale,

─────────U.S. v. Manafort─────────

1   what was the list price?

2   A.   List price, I believe, was 1,899,000.

3   Q.   And what, if anything, did Paul Manafort tell you about

4   putting an -- putting an offer on this house?

5   A.   He was -- he said go for it.

6   Q.   And what, if anything, did he tell you in terms of the

7   offer price that you would put on the one hundred- --

8   A.   That we would -- we would offer the full price.

9   Q.   And with respect to the financial issues for this

10  purchase, who did you primarily receive instructions from?

11  A.   From -- well, I -- the earnest money deposit was written

12  by Andrea and then the balance, I believe, was paid by Paul.

13  Q.   And was this a cash offer or was a loan involved in the

14  purchase of this --

15  A.   It was a cash -- it was all cash.

16  Q.   Okay.  I'm sorry, if I could just finish the question and

17  then -- just for the record.

18  A.   Okay.

19  Q.   So was this a cash offer or was a loan involved?

20  A.   There was no loan involved.

21          THE COURT:  Well, the question -- he gave you a

22  chance to finish it and it's improper because it's compound.

23  The simple question is:  What was the arrangement with respect

24  to payment?

25  BY MR. ASONYE:

U.S. v. Manafort

W. Holland - Direct

355

1   Q.   What was the arrangement with respect to payment?

2   A.   It was a cash -- a cash offer.

3        THE COURT:  Otherwise, it's leading, Mr. Asonye.

4        MR. ASONYE:  Yes, Your Honor.

5        THE COURT:  Gives him two choices, neither one which

6   may apply.

7   BY MR. ASONYE:

8   Q.   Let me show you what's been marked as Government

9   Exhibit 89.  If you could look at -- it should be a tab for 89

10  for you in that binder.

11       Do you recognize it?

12  A.   I haven't gotten to it yet.  89?

13       THE COURT:  Mr. Asonye, maybe I can suggest how we

14  can expedite this matter.

15       Was the house purchase consummated?

16       THE WITNESS:  Yes, it was, sir.

17       THE COURT:  I think what you want to know is:  Where

18  did the payment come from?

19       Where did the payment come from?

20       THE WITNESS:  Well, sir, I don't know where the

21  payment came from.  It was -- the closing was done at an

22  attorney's office in Alexandria and the money was wired to

23  that attorney.  So I don't know where it originated.

24       THE COURT:  All right.

25  BY MR. ASONYE:

U.S. v. Manafort

```
 1   Q.   If I could --

 2              MR. ASONYE:  May I?

 3              THE COURT:  Yes, go ahead, Mr. Asonye.

 4   BY MR. ASONYE:

 5   Q.   Let me show you what's been marked as Government

 6   Exhibit 91.

 7              Do you see that?

 8   A.   Okay.

 9   Q.   Is that an e-mail chain between -- involving you and

10   Mr. Manafort?

11   A.   Yes, it is.

12   Q.   Does it discuss the purchase of this property?

13   A.   Say again, sir.

14   Q.   Does it discuss the purpose -- purchase of the property

15   at Edgewood Street?

16   A.   Yes, yes, it does.

17              MR. ASONYE:  Your Honor, Government moves 91 into

18   evidence.

19              MR. NANAVATI:  No objection.

20              THE COURT:  All right.  It's admitted.

21                        (Government's Exhibit No. 91

22                        admitted into evidence.)

23              THE COURT:  But get to the heart of the matter.

24              What information do you have as to who paid what

25   money?
```

1              MR. ASONYE:  Your Honor, I would -- if I may, it's

2    in this e-mail if I could point to it.

3              THE COURT:  All right.  Then let's do it and get

4    done with it.  Probably didn't need the e-mail.  Go ahead.

5    BY MR. ASONYE:

6    Q.   If we could turn to the second page of this exhibit?

7              THE COURT:  Of the e-mail.

8              MR. ASONYE:  Of the e-mail.

9              THE COURT:  Yes.

10             MR. ASONYE:  And, Your Honor, may we publish?

11             THE COURT:  Yes, you may do so.

12   BY MR. ASONYE:

13   Q.   And if you could look at the bottom of this e-mail.

14             Do you see the e-mail from Paul Manafort to -- it

15   says Wayne, is that you?

16   A.   Yes, yes, it is.

17   Q.   At 2:33 p.m.?

18   A.   Yes.

19   Q.   What is the subject, next to the subject in the subject

20   line?

21   A.   It's just:  "$1.9 million should be in your escrow

22   account tomorrow morning.  It is coming from Lucicle LLC.

23   Please confirm to me when it arrives."

24             THE COURT:  All right.  So that's the relevant part

25   of the e-mail.

U.S. v. Manafort

1          MR. ASONYE:  That is, Your Honor.

2          THE COURT:  All right.  I'll admit the e-mail that

3    much.  The rest of it, no one has to pay any attention to it.

4          Let's proceed.

5    BY MR. ASONYE:

6    Q.   Now, Mr. --

7          THE COURT:  Now you can ask him:  Do you know what

8    Lucicle is?

9          THE WITNESS:  No, sir.

10          THE COURT:  Next question.

11    BY MR. ASONYE:

12    Q.   Did Mr. Manafort tell you anything about where the wire

13    was coming from?

14    A.   No.

15    Q.   During this transaction -- well, first of all, are you

16    familiar with a man named Rick Gates?

17    A.   I've never met him.  I'm very familiar with his

18    appearance in the news recently.

19    Q.   Has -- was he involved at all in this transaction?

20    A.   Not to my knowledge.

21          MR. ASONYE:  No further questions, Your Honor.

22          THE COURT:  All right.

23          Any cross-examination?

24          MR. NANAVATI:  Yes, please, Your Honor.

25                         **CROSS-EXAMINATION**

W. Holland - Cross

1   BY MR. NANAVATI:

2   Q.   Mr. Holland, I represent Paul Manafort.  My name is Jay

3   Nanavati.  Nice to meet you.

4           I wanted to ask you:  You had -- on direct

5   examination, you had said you don't know what Lucicle is,

6   correct?

7   A.   That's correct.

8   Q.   And you also -- there was no need for Mr. Manafort to

9   even mention Lucicle to you, was there?

10  A.   No.

11  Q.   And -- because the only person that needed to know about

12  funds was the settlement attorney's office, correct?

13  A.   Yes, that's correct.

14  Q.   And when you first became neighbors with the Manaforts,

15  they were one of the nicest neighbors you had, weren't they?

16  A.   I would say yes.

17          MR. NANAVATI:  That's all the questions I have, Your

18  Honor.

19          THE COURT:  Any redirect?

20          MR. ASONYE:  No, Your Honor.

21          THE COURT:  Thank you.  You may step down, sir, and

22  you may be excused.

23                    (Witness excused.)

24          THE COURT:  Next witness.

25          MR. ANDRES:  Your Honor, the Government calls Steve

1   Jacobson.

2            THE COURT:  There are no exhibits for this witness;

3   is that correct?

4            MR. ANDRES:  Excuse me, Judge?  There are exhibits.

5            THE COURT:  There are exhibits?

6            MR. ANDRES:  Yes.

7            THE COURT:  We don't have a list of those.  Do you

8   have it?

9            MR. ANDRES:  Oh, well, as Mr. Asonye just told you

10  earlier, we provided the exhibit numbers for the ones where we

11  thought there were problems.  But we can do that tomorrow to

12  produce exhibits.  The ones that relate to this witness are

13  principally -- I can tell Your Honor the exhibits.

14           THE COURT:  Is it a lengthy list?

15           MR. ANDRES:  It's not a -- well, it's about ten to

16  15.

17           THE COURT:  Yes, let's -- but let's have this

18  gentlemen sit down anyway, and take the oath, please, sir.

19           THE WITNESS:  Thank you, Your Honor.

20           Thereupon,

21                       **STEPHEN JACOBSON,**

22  having been called as a witness on behalf of the Government

23  and having been first duly sworn by the Deputy Clerk, was

24  examined and testified as follows:

25           (Witness seated.)

─────────U.S. v. Manafort─────────

1      THE COURT:  All right.  Mr. Andres, you can run down

2   your list, if you would, please, sir.

3      MR. ANDRES:  Government Exhibit 67A, Government

4   Exhibit 94, Government Exhibit 94A, Government Exhibit 95A.

5      I think that's it, Judge.

6      THE COURT:  All right.  Thank you.

7      MR. ANDRES:  May I inquire, Judge?

8      THE COURT:  Oh, I thought you were done.

9      MR. ANDRES:  I asked -- I asked if I could inquire

10  of the witness.

11      THE COURT:  Yes, you may do so.

12      MR. ANDRES:  Okay.  Thank you.

13                  **DIRECT EXAMINATION**

14  BY MR. ANDRES:

15  Q.   Sir, please state your name for the record.

16  A.   Stephen Jacobson.

17  Q.   Are you currently employed?

18  A.   No, I'm retired.

19  Q.   When did you retire?

20  A.   2016.

21  Q.   Prior to your -- prior to your retirement, where did you

22  work?

23  A.   I owned my own business.

24  Q.   What was the name of that business?

25  A.   SP&C Home Improvement Incorporated.

U.S. v. Manafort

S. Jacobson - Direct

362

1   Q.   And what is --

2           THE COURT:  I'm sorry, sir.  Could I ask you to

3   speak up?  I didn't hear that very well.

4           THE WITNESS:  Yes, SP&C Home Improvement

5   Incorporated.

6           THE COURT:  All right.  Next question.

7   BY MR. ANDRES:

8   Q.   What did -- what did SP&C stand for?

9   A.   Originally, Steve's painting and carpentry.

10  Q.   And who's Steve?

11  A.   That would be me.

12  Q.   What type of work did SP&C do?

13  A.   Home improvements, building, construction.

14  Q.   And were you the owner of the company?

15  A.   I am or was.

16  Q.   Over what period of time did you operate SP&C home --

17  SP&C Home Improvements?

18  A.   Over 20 years.

19  Q.   And where was that business located?

20  A.   In the Hamptons.  Our primary office was in Southampton.

21  Q.   And when you say, "the Hamptons," where are the Hamptons

22  located?

23  A.   The Hamptons are on the east end of Long Island, New

24  York.

25  Q.   Can you describe the geography in that area?

U.S. v. Manafort

S. Jacobson - Direct

363

1   A.   Yes, it's largely a summertime community, a lot of

2   beaches.

3   Q.   Is it seasonal?

4   A.   Yes, largely seasonal.

5   Q.   Mr. Jacobson, have you provided documents and other

6   materials to the Government pursuant to a subpoena?

7   A.   Yes, I have.

8   Q.   What materials were you provided -- what materials did

9   you provide to the Government?

10  A.   Bank records, invoices, pictures, photographs.

11  Q.   Have you reviewed those materials with the Government

12  prior to your testimony here today?

13  A.   Yes, I have.

14  Q.   Are you appearing today pursuant to a -- are you

15  appearing today pursuant to a subpoena?

16  A.   Yes, I am.

17  Q.   Mr. Jacobson, do you know an individual named Paul

18  Manafort?

19  A.   I do.

20  Q.   How do you know Mr. Manafort?

21  A.   Mr. Manafort was a longtime customer of mine.

22  Q.   How did you first meet Mr. Manafort?

23  A.   I first met Mr. Manafort actually through his wife,

24  Kathy, a very nice lady who had called me up for an estimate

25  for some backsplash repair in their kitchen.

S. Jacobson - Direct

1  Q.   Okay.  What's a backsplash?

2  A.   Backsplash would be what is behind the kitchen

3  countertop.

4  Q.   And approximately when was that?

5  A.   About 2001.  Yeah, about 15, 16 years ago.

6  Q.   And did you -- did you do that work?

7  A.   Yes, I did.

8  Q.   Over time, were you hired for other projects?

9  A.   Yes.

10  Q.   Did you consider -- did you work for Mr. Manafort

11  directly?

12  A.   Yes.

13  Q.   Did you consider him an important client?

14  A.   Absolutely.

15  Q.   Why?

16  A.   He provided more and more work, larger projects and he

17  paid his bills.

18  Q.   Do you -- with respect to the work that you did for

19  Mr. Manafort, was it at one location or more than one

20  location?

21  A.   Over time it became other locations, primarily the

22  Bridgehampton home.  But there were other locations in --

23  Q.   Well, let me ask you -- so let me ask you:  You said that

24  primarily it was the Bridgehampton home.  What was the address

25  of that home?

U.S. v. Manafort

1  A.    174 Jobs, J-o-b-s, Lane.  That's in Bridgehampton, New

2  York.

3  Q.    And over time, what other properties did you work at?

4  A.    There were two properties in Manhattan at -- one at

5  Howard Street and the other one was at Baxter Street.  And

6  there was a residence in the Trump Tower building.  And we

7  built a new house -- Paul had me build a house for his wife's

8  younger brother, a new house in East Hampton, Whooping Hollow,

9  Whooping Hollow Lane, I believe.

10  Q.    Did you do any work for Mr. Manafort in Brooklyn, New

11  York?

12  A.    Yes, we did start a project on a -- it's Union Street,

13  377 Union Street, I believe, in -- it's in Brooklyn.

14  Q.    Over the course of the time from 2010 to 2014, do you

15  know approximately how much money you charged Mr. Manafort for

16  these various projects?

17  A.    2010 to 2014, it was a little over $3 million.

18  Q.    And can you explain the process by which you engaged in

19  work for Mr. Manafort, that is, did you submit proposals?

20  A.    Correct.  So we would look at a job that Mr. Manafort

21  would like done.  We would give him a written estimate and

22  then we would meet and negotiate over it and come to an

23  agreement.

24  Q.    Okay.  And how would you describe those negotiations?

25  A.    Paul's a tough negotiator, but -- he's tough, but he's

U.S. v. Manafort

1    fair.

2    Q.    Okay.  Was Mr. Manafort very involved in the construction

3    work that you did?

4    A.    Yeah, Paul liked to oversee and make sure things were

5    being done correctly.

6    Q.    Okay.  And would he communicate to you about the progress

7    or the status of the work?

8    A.    Well, we would meet in person to review work.  If, for

9    instance, it was at the Bridgehampton home, we would go over

10   it in person.  If it was in a place where he was not at that

11   moment, we would do it by e-mail and I would try to take as

12   many pictures to document the progress of a project.

13   Q.    Did you find him to be detail-oriented?

14   A.    Yeah.

15   Q.    Okay.  With respect to your billing practices, can you

16   explain to the jury what the billing practices were at SP&C?

17   A.    So typically on a large project, you would take half the

18   money down, so a 50 percent deposit is typical.  And then

19   halfway through the job, your next payment would be 25

20   percent.  And when the job is completed, you've reviewed

21   everything to the customer's satisfaction, that last 25

22   percent would be due.

23   Q.    And how would you send -- how would you provide the

24   e-mail -- the -- excuse me -- how would you provide the

25   invoices to Mr. Manafort?

─────U.S. v. Manafort─────
S. Jacobson - Direct
                                                                  367

1   A.   Generally by e-mail.  On occasion we were able to be in

2   the same place at the same time.  And if I saw him in person,

3   I would give him a physical copy, but also send an e-mail copy

4   of the invoice also.

5   Q.   Can I ask you to look in the binder to take a look at

6   Government Exhibit 94A.

7           Can you tell me -- can you take a look in the

8   documents in 49A?  Have you seen these before?

9   A.   Yes, I have.

10  Q.   Did you review them prior to your testimony?

11  A.   Yes, I have.

12  Q.   Okay.  Can you describe to the jury what documents are

13  included in Government Exhibit 94A?

14  A.   Yes.  So this is the beginning of a proposal for a dining

15  room renovation --

16  Q.   Sir, I'm sorry, I didn't mean to interrupt you.  Just the

17  entire document that is in 94A, what are all of these

18  documents together?

19  A.   I'm sorry, I'm not understanding exactly what you're

20  asking.

21  Q.   In 94A do you see there's a series of documents?  What is

22  the whole set of these documents together?

23  A.   These are invoices.

24  Q.   Okay.  And where are the invoices coming from?

25  A.   They are coming from me .

S. Jacobson - Direct
368

1   Q.   And who is the customer on these invoices?

2   A.   Mr. Manafort.

3   Q.   So you were referring to the first invoice.

4   Can you take a look at the first invoice and tell me what the

5   date is there?

6   A.   Certainly.  That would be March 5th of 2010.

7        MR. ANDRES:  Okay.  Your Honor, at this point the

8   Government moves to admit Government Exhibit 94A.

9        MR. NANAVATI:  No objection, Your Honor.

10       THE COURT:  Admitted.

11                        (Government's Exhibit No. 94A

12                        admitted into evidence.)

13  BY MR. ANDRES:

14  Q.   With respect to the first invoice, who's the customer?

15  A.   The customer is Mr. Manafort.

16  Q.   And what's the location of the work?

17  A.   This is for his home at Jones Lane in Bridgehampton.

18  Q.   Okay.  And with respect to the first invoice, can you

19  explain what work was covered in that invoice?

20  A.   Right.  So the first page, we start with the dining room

21  renovation, and along with that is an extension.  So to make

22  the dining room larger, we not only demolitioned the original

23  dining room, but we broke out a back wall of the house and

24  basically reframed everything, put everything back together

25  with the upgrades that were requested.

┌─────────────────── U.S. v. Manafort ───────────────────┐

1          This also leads into the next area, which is a

2   kitchen renovation.  Again, a similar process, as many of you

3   may be aware of, in a kitchen you're taking off cabinets,

4   granite countertops, then we're putting in all new materials,

5   new wiring, new electric, new lighting, and appliances to go

6   with it.

7   Q.   And with respect to the work that you did in the first

8   invoice, what was the total price that was billed to

9   Mr. Manafort?

10  A.   Let me check.  I believe it was 123,000.  Let me get you

11  the exact number on that.

12          (A pause in the proceedings.)

13  BY MR. ANDRES:

14  Q.   It's on page 10.

15  A.   $123,765.

16          MR. ANDRES:  Your Honor, may I just publish the

17  first page of Government Exhibit 94A?

18          THE COURT:  Any objection?

19          MR. NANAVATI:  No, Your Honor.

20          THE COURT:  All right.  You may do so.  I've already

21  admitted this document.

22          MR. ANDRES:  Yes, Judge.

23          THE COURT:  All right.  Go ahead.

24          MR. ANDRES:  If you could just zoom in on the top

25  half.

1    BY MR. ANDRES:

2    Q.   Could you just explain to us the top half of the invoice,

3    starting from the left?

4    A.   Right.  So on the top half of the invoice, you have the

5    box for "billed to," and under that it would be the customer's

6    name and address.  So I have billed to Paul Manafort at his

7    Alexandria, Virginia, home.

8              And on the second box on the right-hand side, you'll

9    see the job location of where the actual work was done.  And

10   that is at the Bridgehampton home in New York.

11   Q.   With respect to the logo above the "billed to" area, do

12   you recognize that?

13   A.   Yes.  That is my company logo, SP&C Home Improvement,

14   Incorporated.

15   Q.   Can I ask you now to take a look at Government

16   Exhibit 94?

17             (A pause in the proceedings.)

18   BY MR. ANDRES:

19   Q.   Do you see Government Exhibit 94?

20   A.   I do.

21   Q.   Is there a chart there?

22   A.   There is.

23   Q.   Did you create that chart?

24   A.   No, I did not.

25   Q.   Okay.  Was it shown to you by the FBI?

─────────U.S. v. Manafort─────────

1    A.   Yes, it was.

2    Q.   And did you do something to verify the information in the

3    chart?

4    A.   Yes.  I -- it was for several hours with a very pleasant

5    young lady from the FBI who went step by step, invoice by

6    invoice over every detail of each invoice matching it with

7    each payment.

8    Q.   Okay.

9    A.   So we end up with three columns, the date, the number of

10   the invoice, and then the amount billed.

11   Q.   So the information that comes -- that's included in

12   Government Exhibit 94, does that come from the invoices

13   attached in Government 94A?

14   A.   I'm sorry, could you say that again, please?

15   Q.   So you testified that the information in Government

16   Exhibit 94, you reviewed invoices; is that correct?

17   A.   Yes.

18   Q.   And are those invoices included in Government

19   Exhibit 94A?

20   A.   Yes.

21   Q.   Okay.  With respect to the chart in Government's

22   Exhibit 94, does it state the total amount of invoices that

23   were issued to Mr. Manafort or his family members from SP&C in

24   the year 2010?

25   A.   Yes, it does.

┌─────────────── U.S. v. Manafort ───────────────
S. Jacobson - Direct

1  Q.    And how much is that?

2  A.    So 2010 the total gross for that year was $553,921.34.

3  Q.    And with respect to the year 2011, does the chart in

4  Government's Exhibit 94 -- does it list the total amount

5  invoiced to Mr. Manafort from SP&C Home Improvements?

6  A.    Yes, it does.

7  Q.    And what's that amount?

8  A.    The 2011 gross total is $516,025.60.

9  Q.    And if you could turn the page.  With respect to the year

10 2012, what's the total amount of money invoiced to

11 Mr. Manafort in 2012 from SP&C?

12 A.    That total is $782,060.

13 Q.    And for 2013 what's the total amount invoiced to

14 Mr. Manafort from SP&C Home Improvement?

15 A.    The 2013 total is $1,128,183.

16 Q.    And, finally, for 2014, what's the total amount of money

17 invoiced to Mr. Manafort from SP&C Home Improvements?

18 A.    Total for year the 2014, $309,087.50.

19 Q.    And what's the total amount of money over the period 2010

20 to 2014 that was invoiced to Mr. Manafort from SP&C Home

21 Improvement?

22 A.    So over the course of those five years, the gross amount

23 billed is $3,289,277.44.

24 Q.    Mr. Jacobson, you've testified that you did some work at

25 Mr. Manafort's Bridgehampton's house.

U.S. v. Manafort

1   A.    Yes.

2   Q.    Aside from the work that you described, did you do other

3   work there?

4   A.    Other than?

5   Q.    Other than the kitchen and the other --

6   A.    Yes, quite a bit, yes.

7   Q.    Okay.  Were you involved in constructing a pool house?

8   A.    Yes, I was.

9   Q.    And can you explain what you did with respect to that

10  pool house?

11          THE COURT:  Is that something you've already

12  testified to that has been billed?

13          THE WITNESS:  No.  This is literally hundreds and

14  hundreds of pages of billing over the course of the years that

15  I've worked for Mr. Manafort.

16          THE COURT:  Yes, but what I'm asking is:  Is the

17  work that Mr. --

18          MR. ANDRES:  Andres.

19          THE COURT:  -- that Mr. Andres has asked you about,

20  was that included in your answers that you just gave about the

21  monies that you billed?

22          THE WITNESS:  Yes.

23          THE COURT:  Let's go on.  No one contests that he

24  did the work, am I correct?

25          MR. NANAVATI:  Yes, Your Honor.

———U.S. v. Manafort———

S. Jacobson - Direct

374

```
 1              THE COURT:  Let's go on.

 2              THE WITNESS:  Thank you, Your Honor.

 3   BY MR. ANDRES:

 4   Q.   Mr. Jacobson, let me ask you to look at -- look at

 5   Government Exhibit --

 6              MR. ANDRES:  Oh, excuse me, Judge.  May I just have

 7   one moment?

 8              THE COURT:  Yes, you may.

 9   BY MR. ANDRES:

10   Q.   At some point did you work on a property management

11   contract for Mr. Manafort?

12   A.   Yes, I did.

13   Q.   Okay.  Over what period of time did you do that?

14   A.   That involved from, I guess, approximately 2010 to 2015.

15   Over time I ended up coordinating vendors, managing the

16   property when he was not there, making sure the home was ready

17   as a vacation home.

18   Q.   And over what period of time did you serve as a property

19   management?

20   A.   Approximately those five years.

21   Q.   With respect to the bills that were issued to

22   Mr. Manafort, do you know how he paid?

23   A.   Mostly by wire transfer.

24   Q.   Okay.  And what type of wire transfer?

25   A.   I'm not sure what types.  I don't -- are there different
```

U.S. v. Manafort

1   types of wire transfers?

2   Q.   Did they involve international wires?

3   A.   Oh, yes, yes.

4   Q.   Okay.  And did Mr. Manafort ask you for certain

5   information with respect to your bank?

6   A.   Yes.  In order to do a wire transfer, I would have to, on

7   the e-mail invoice, also provide my banking information, so

8   the routing number, the bank account number, full money to be

9   sent to and a SWIFT number.

10  Q.   Did you ever have any issues with respect to payment by

11  Mr. Manafort?

12  A.   He always paid his bills.  I never think I get paid fast

13  enough, but...

14  Q.   Okay.  And with respect to the full amount, would he pay

15  the full amount of the bills?

16  A.   Yes, he did.

17  Q.   Okay.  At the same time, would they come in different

18  tranches or different --

19  A.   Right.  That would be an expression that I was unfamiliar

20  that Mr. Manafort explained to me.  They would -- so if a bill

21  had an odd number to it, I would get an even number and then

22  carry that small balance or whatever it is to the next bill.

23       So sometimes I'd get paid in full if it was a round

24  number, but if it was an odd number, not usually to the penny

25  would I get that wire transfer.

─────U.S. v. Manafort─────
S. Jacobson - Direct
376

1   Q.   During the time that you worked for Mr. Manafort, did you

2   have bank accounts for SP&C?

3   A.   Yes.

4   Q.   And at what banks did you have bank accounts?

5   A.   Originally with Chase and HSBC.

6   Q.   Okay.  And did you have problems with those accounts at

7   some point?

8   A.   Yeah.  Eventually, after many years with the bank, I was

9   informed by the Chase manager first that they were closing out

10  small business accounts.  And I did not ask for any further

11  reasons since they weren't --

12              THE COURT:  All right.  This is now hearsay.

13  BY MR. ANDRES:

14  Q.   With respect -- did you have more than one bank account

15  that closed?

16  A.   Yes.

17  Q.   Were those your bank -- were those your personal bank

18  accounts or your business bank accounts?

19  A.   Only my business account.

20  Q.   Did you ever discuss that issue with Mr. Manafort?

21  A.   I asked him if it had anything to do with the wire

22  transfers, and he told me don't worry about it.

23  Q.   And did he tell you anything else in terms of any changes

24  in his banking practices?

25  A.   Yeah.  At that time he said his banking would be coming

U.S. v. Manafort

S. Jacobson - Direct

377

1    from HSBC London Bank and I had an HSBC account in New York,

2    so theoretically there should be no problem.

3    Q.   He said he was going to make a change to HSBC in London?

4    A.   Correct.

5    Q.   Can I ask you to take a look at Government Exhibit 95A.

6         Can you tell me what's included in Government

7    Exhibit 95A?

8    A.   Yes, it is a bank statement.  Very small print.

9    Q.   A bank statement for what entity?

10   A.   For HSBC bank.  This would be my corporate account for

11   HSBC bank.  My branch was in Hampton Bays, New York.

12   Q.   Okay.  And are there records of the wires that

13   Mr. Manafort paid you within these bank accounts?

14   A.   Yes.  So on this first page, I see one wire transfer.

15        MR. ANDRES:  Okay.  Your Honor, at this point the

16   Government would move to admit Government Exhibit 95A.

17        MR. NANAVATI:  No objection, Your Honor.

18        THE COURT:  Admitted.

19                         (Government's Exhibit No. 95A

20                         admitted into evidence.)

21   BY MR. ANDRES:

22   Q.   Can I direct your attention --

23        MR. ANDRES:  May I publish it, Your Honor?

24        THE COURT:  Yes, but, you know, if I admit it, it's

25   admitted for the truth of the matter asserted and we don't

U.S. v. Manafort

1  need to go into it in detail.  But you may exhibit one page of

2  it.  Let's get it done and move on.

3          MR. ANDRES:  Thank you, Judge.

4  BY MR. ANDRES:

5  Q.   Can I direct your attention to the -- to the entry at

6  March 8, 2010?

7  A.   Certainly.  Let me try reading it off the paper because

8  this is illegible for me.

9          The -- so the March 8, 2010?

10 Q.   Yes.

11 A.   You want me to read that?

12 Q.   Can you just identify -- is that an incoming wire or an

13 outgoing wire?

14 A.   That's an incoming wire that's being -- that's an invoice

15 being paid for $124,000 to my company, SP&C Home Improvement.

16 Q.   Okay.  There's a reference there to Global Highway

17 Limited.  Do you know what that is?

18 A.   I have no idea.

19 Q.   And there's a reference to Nicosia?

20         THE COURT:  A reference to Nicosia.

21         MR. ANDRES:  Nicosia.  Looking for the bank, Judge.

22 BY MR. ANDRES:

23 Q.   Do you know what's that a reference to?

24 A.   I do now.  Apparently that's a place in Cyprus.

25 Q.   Okay.  So do you know who that -- do you know who that

─────U.S. v. Manafort─────

 1  payment came from?

 2  A.   The payment --

 3          THE COURT:  Other than having been told by somebody?

 4  BY MR. ANDRES:

 5  Q.   Do you know which client of yours --

 6          THE COURT:  Just a minute.  I asked a question.  Be

 7  patient.

 8          MR. ANDRES:  I'm sorry.

 9          THE COURT:  I'm never patient, but you need to be.

10          MR. ANDRES:  No comment, Judge.

11          THE COURT:  Yes, there was a comment.  You just made

12  it.  I have a long memory.

13          All right, sir.  Do you know anything about what

14  that reference is to Nicosia?

15          THE WITNESS:  I do not.

16          THE COURT:  Next question.

17  BY MR. ANDRES:

18  Q.   Do you know where that came -- who the -- which of your

19  clients that payment is related to?

20  A.   Yes.

21  Q.   Who?

22  A.   Mr. Manafort.

23  Q.   How do you know that?

24  A.   This matches up with an invoice that I had sent to him.

25  Q.   Can I ask you to turn to page -- the Bates number at the

─────U.S. v. Manafort─────

1    bottom 16280.  Do you see that document?

2    A.   Let me just move forward here.

3           Right.  So we have another -- God bless you.  We

4    have another bank statement, it looks like.  Is that what

5    you're referring to?

6    Q.   Yeah.  Do you see the entry at 5/11/2010?

7    A.   Yes, I do.

8    Q.   Okay.  And what's that a payment -- that's -- can you

9    explain that payment?

10   A.   Again, this is a wire transfer for an invoice for $25,000

11   through Deutsche Bank.

12   Q.   Okay.  And this is an incoming wire to your company --

13   A.   Yes.

14   Q.   -- to your bank account?

15   A.   Right.

16   Q.   Okay.  And there's a reference there to Global Highway

17   Limited.  Are you familiar with that entity?

18   A.   I am not.

19   Q.   How about the Marfin Popular Bank in Cyprus?

20   A.   No.

21   Q.   Can you turn to the Bates number at the bottom 16296?

22   A.   Bear with me one moment.  296?

23   Q.   Yes.

24   A.   Yes.

25   Q.   There's a reference at 7/8/2010.  Can you tell how much

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

—U.S. v. Manafort—

1    that is for?

2    A.   Let's see.  July 8, 2010.  So that's an invoice that was

3    paid for $28,000.

4    Q.   Okay.  And who do you associate that payment with?

5    A.   That was a payment for Mr. Manafort.

6    Q.   How did you know that?

7    A.   It was that amount is due, it matches with the invoice

8    that I would have sent to Mr. Manafort.

9    Q.   Okay.  And that -- that's from Global Highway Limited in

10   Marfin Popular Bank.  Are you familiar with either of those

11   entities?

12   A.   No.  All I know -- I guess Deutsche Bank is the only

13   thing there I would -- I think that's German.

14   Q.   Okay.  And just two more, Mr. Jacobson.  If I could have

15   you to turn to page 16312 at the bottom number.

16   A.   36 or 63?

17   Q.   I'm sorry, 16312.

18   A.   16312.

19   Q.   Do you see that?  Can I ask you to look at the reference

20   at 9/2/2010?

21   A.   Yes.  September 2, 2010, is --

22   Q.   Can you describe that transaction?

23   A.   Certainly.  So that is a deposit for $31,000 -- $31,500.

24   Q.   And there's a reference there to Yiakora Ventures

25   Limited.  Are you familiar with that?

U.S. v. Manafort

S. Jacobson - Direct

382

1   A.   I am not.

2   Q.   And how about this Bank of Cyprus, are you familiar with

3   that?

4   A.   No, I am not.

5   Q.   Who did you associate this payment with?

6   A.   This is a payment that Mr. Manafort paid.  It matches up

7   with an invoice I had sent to him.

8   Q.   Mr. Jacobson, do you know an individual or have you ever

9   met an individual named Rick Gates?

10  A.   No.

11  Q.   Have you ever dealt with Mr. Gates in the context of

12  Mr. Manafort's construction issues?

13  A.   No.

14  Q.   When you had construction issues for the various

15  properties, who did you deal with?

16  A.   I dealt with Paul directly.

17  Q.   Okay.  And how about an individual named

18  Konstantin Kilimnik?  Do you know him?

19  A.   No.

20  Q.   Okay.  And did you ever deal with any bill payers or

21  anyone else on behalf of Mr. Manafort?

22  A.   I think he had a bill paying service of some sort.  It

23  was a young lady named Heather -- I don't remember her last

24  name.  And some times she had -- at a point in time he asked

25  me to CC bills when I complained that bills weren't getting

S. Jacobson - Direct

383

1  paid fast enough.

2  Q.   Okay.

3  A.   Then I would CC the e-mailed invoice to this other

4  person, Heather.

5  Q.   Do you know approximately when that was?

6  A.   I can only give you a guess of 2012, 2013, and that's my

7  best guess.  I don't know exactly.

8  Q.   Okay.  And so at some point in your relationship with

9  Mr. Manafort he asked you to start e-mailing --

10         THE COURT:  The question is now leading and it's

11  repetitive.

12  BY MR. ANDRES:

13  Q.   At some point you started e-mailing Heather?

14  A.   Yes.

15  Q.   Okay.  If I could just ask you to look at -- Judge, can I

16  have one second?

17         THE COURT:  Yes, you may.

18         MR. ANDRES:  Thanks, Judge.

19  BY MR. ANDRES:

20  Q.   Mr. Jacobson, I just have a few more questions.

21         THE COURT:  All right.  You may proceed.

22  BY MR. ANDRES:

23  Q.   Mr. Jacobson, did Mr. Manafort ever invest in your

24  company?

25  A.   No.

─────────────U.S. v. Manafort─────────────
S. Jacobson - Direct
384

1  Q.   Let me ask you to take a look at Government Exhibit 67A

2  in your binder.

3            These have previously been admitted, Your Honor.

4            THE COURT:  All right.

5  BY MR. ANDRES:

6  Q.   Can you look at the second page, 67A?

7            May I publish this, Your Honor?

8            THE COURT:  Yes, if it's been admitted you may do

9  so.

10           THE WITNESS:  67A.

11 BY MR. ANDRES:

12 Q.   Do you see the invoice in 67A?  Is that an invoice that

13 came from your company?

14 A.   67A is in a foreign language.

15 Q.   The next -- the second page.

16 A.   Page 2.

17 Q.   Yes.

18 A.   No, that's not a bill from my company.

19 Q.   Do you see a letterhead at the top?

20 A.   Yes, I see a faint imprint of my company logo it looks

21 like.

22 Q.   Okay.  And how about the address; is that accurate?

23 A.   There's no project address.  There's a bill to address

24 which says, "C/O Global Endeavor, Inc."

25 Q.   Was Global Endeavor ever a client of yours?

─U.S. v. Manafort─

1  A.   No, it was not.

2  Q.   How about the address at the top, 1601 Country Road 39

3  Suite 4; is that right?

4  A.   Yeah, that's -- yeah, that was my office address at the

5  time.

6  Q.   Okay.  And in the bill it says, "Per the work conducted

7  during October 2013, architecture and design planning for

8  allocated spaces designed by client."

9       Did you ever work in the architecture space?

10  A.   No.

11  Q.   How about in the design space?

12  A.   No.  But for that money I would like to.

13  Q.   I'm sorry?

14  A.   I said:  For that kind of money I would like to.

15       MR. ANDRES:  I think I'm done, Your Honor.  Just one

16  second.

17       I have no further questions.  Thank you, Your Honor.

18       THE COURT:  Any cross-examination?

19       MR. NANAVATI:  Thank you, Your Honor.

20                    **CROSS-EXAMINATION**

21  BY MR. NANAVATI:

22  Q.   Mr. Jacobson, you said that -- well, first, I should

23  introduce myself.  I'm Jay Nanavati.  I represent

24  Paul Manafort.  Nice to meet you.

25       Can I first take you back?  You said that

U.S. v. Manafort
S. Jacobson - Cross
386

1   Mr. Manafort was tough but fair, right?

2   A.   That is correct.

3   Q.   And detail oriented; is that right?

4   A.   Yes.

5   Q.   And fairly involved in the projects you did?

6   A.   Yes.

7   Q.   And when it came to financial matters, namely invoices

8   and payment, was he as detailed oriented?

9   A.   As much as he could be.  He's a very busy man.

10  Q.   Is it fair to say that his detailed orientation suffered

11  in the -- in the -- how about I speak English?

12       Is it fair to say that his timeliness was not so

13  good with financial matters with you?

14  A.   That would be fair to say.

15  Q.   Okay.  Is it fair to say that the timeliness improved

16  when he turned those matters over to Heather, last name

17  unknown, of bill paying company?

18  A.   Yes.

19  Q.   Is it also fair to say that when Chase Bank closed your

20  account it made doing business more difficult?

21  A.   Temporarily, absolutely, yeah.

22  Q.   And is it also fair to say that your account closing made

23  it more difficult for Mr. Manafort to do business with you?

24  A.   That's true.

25  Q.   Okay.  And I want to show -- if you could turn again to

───────U.S. v. Manafort───────

1  Exhibit 67A.

2  A.    The English version?

3  Q.    Page 2, please.

4  A.    Okay.

5  Q.    So, yes.  Invoice No. 743.

6  A.    Yes.

7  Q.    And you had said on direct examination that that was not

8  your invoice, right?

9  A.    That is exactly right.

10  Q.    Okay.  And you never got the $130,000 listed there?

11  A.    No.

12  Q.    Okay.  And do you see sort of a faint, circular stamp at

13  the top of the page?  It says, "Loyal Bank of St. Vincent in

14  the Grenadines."

15  A.    I'll take your word for it.  I can see a faint -- it's

16  like a watermark of some kind.

17  Q.    It could be.  Are you able to make out any of it?

18  A.    Something bank -- it's written over also.  You have some

19  notations here.  There's an "A" or something written over.

20  Anyway, something -- it looks like Loyal Bank, Limited, St. --

21  I think that's Vincent's.

22  Q.    I'll rescue you.

23  A.    I didn't drive here just so I -- it's very hard to read.

24  Q.    I think that's good enough.

25         Is it fair to say you don't have any idea who has

U.S. v. Manafort

S. Jacobson - Cross

388

1   signature authority over a bank account at Loyal Bank in

2   St. Vincent and the Grenadines?

3   A.   I have no idea.

4   Q.   And it's also fair to say that you don't know who

5   Rick Gates is, correct?

6   A.   No, not before today.

7   Q.   Okay.  And if you can turn to Invoice No. 832.  I think

8   it should be the next one.

9   A.   I have a -- a blank page.

10  Q.   Are there any pages behind the invoices I just went over

11  with you?

12  A.   No.  I have this --

13  Q.   Okay.  Well, then, let me ask this way:  Are you aware of

14  having received sums in 2014 of $57,000 from St. Vincent and

15  the Grenadines?

16  A.   No.

17  Q.   Okay.  And then also in 2014 are you aware of having

18  received $34,666 from St. Vincent and the Grenadines?

19  A.   No, I don't know.

20  Q.   I'm sorry?

21  A.   No, I do not.

22          MR. NANAVATI:  Your Honor, that's all the questions

23  I have.

24          THE COURT:  Any redirect?

25          MR. ANDRES:  Just briefly, Judge.

─────── U.S. v. Manafort ───────

1    **REDIRECT EXAMINATION**

2    BY MR. ANDRES:

3    Q.   Mr. Jacobson, you were asked by counsel whether or not

4    you received payments from Loyal Bank; is that correct?

5    A.   Correct.

6    Q.   And you weren't aware of any?

7    A.   From this Loyal Bank, I have no idea.

8    Q.   Can I ask you to take a look at Government Exhibit 95A?

9    Can you tell the jury what those -- what those Exhibits are?

10   A.   95A is a bank statement.  Is that what you're referring

11   to?

12   Q.   Is that -- are those your bank statements?

13   A.   Yes.

14   Q.   Can I ask you to look at the Bates No. 16411?

15   A.   Is this on the first -- 16 -- I'm sorry, 16267?

16   Q.   No, 16411.  Do you see that?

17   A.   00016411?

18   Q.   Right.  Let me direct your attention of payment at

19   11/13/13?

20   A.   11/13/13.

21   Q.   Is there a payment at that time?

22   A.   Right.  So we do have a payment at that time.  It looks

23   like $75,000 deposit.

24   Q.   Okay.  And it says, "Global Endeavor"?

25   A.   Correct.

─────U.S. v. Manafort─────

S. Jacobson - Redirect

390

1   Q.    When you compare that -- and, by the way, who do you

2   associate that payment with?

3   A.    That's from Mr. Manafort.

4   Q.    Okay.  Can you go back to Government Exhibit 60 -- I'm

5   sorry -- Government Exhibit 67A?

6         Can I publish that, Judge?  It's already in

7   evidence.

8         THE COURT:  All right.  You may do so.

9   BY MR. ANDRES:

10  Q.    Do you see at the top of 67A you said this was your

11  invoice -- the invoice you hadn't seen.  What's the billed to?

12  Who is it billed to?

13  A.    This is in another language.

14  Q.    No, Page 2.

15  A.    I'm looking at the screen.  Okay.  So Page 2.

16  Q.    Yeah.

17  A.    Okay.  So you want to know who this is billed to.

18  Q.    Correct.

19  A.    Okay.  This is billed to C/O Global Endeavor,

20  Incorporated.

21  Q.    And when you look back at 16411, what -- what company is

22  listed in that bank transaction?

23  A.    On Page 16411, there is $75,000.  The bank is Chip

24  Barclays Bank PLC*ORG:Global Endeavor, Inc. --

25  Q.    Right.  So the Global Endeavor there --

─────U.S. v. Manafort─────
S. Jacobson - Redirect
391

1              THE COURT:  Let him finish his answer.

2              MR. ANDRES:  Sorry, Judge.

3              THE WITNESS:  Global Endeavor, Inc. C -- excuse

4    me -- CEDAR HILL AND THE GRENADINES OGB*:LOYAL BANK, LIMITED,

5    KINGSTOWN*BNF:S P & C HOME IMPROVEMENT, INC.,

6    SOUTHAMPTON*OBI:INVESTMENT INVOICE 188 DD

7    09/15/2013*BBI:/INS/BARCGB22.

8              I mean, I can go on.  I have no idea what I'm

9    talking about here.

10             (Laughter.)

11   BY MR. ANDRES:

12   Q.   Yeah.  So one last question.  That payment that relates

13   to Loyal Bank, who did that come from?

14   A.   That is a payment from Mr. Manafort.

15             MR. ANDRES:  I have no further questions, Judge.

16             THE COURT:  Any recross based on that?

17             MR. NANAVATI:  No, thank you, Your Honor.

18             THE COURT:  Thank you.  You may step down.  This

19   witness may be excused.  Call your next witness.

20             MR. ASONYE:  Your Honor, may we approach?

21             THE COURT:  How long do you think this will take?

22             MR. ASONYE:  I think just fairly brief, Your Honor.

23             THE COURT:  All right.  Who is your next witness?

24             MR. ASONYE:  Doug DeLuca, Your Honor.

25             THE COURT:  I beg your pardon?

U.S. v. Manafort

392

1              MR. ASONYE:  Doug DeLuca.

2              THE COURT:  All right.  Come to the bench.

3              (Bench Conference.)

4              THE COURT:  Yes, Mr. Asonye.

5              MR. ASONYE:  Thank you, Your Honor.  There are two

6    issues that we wanted to raise.  One is we wanted to enter a

7    stipulation.  Although I don't think the Court will

8    necessarily need to read the whole thing.  It relates to Mr.

9    Wane Holland's purchase of the home.

10             THE COURT:  Yes.

11             MR. ASONYE:  As Your Honor knows he simply read the

12   e-mail where the payment came from Lucille.  It didn't say

13   where.

14             The stipulation finishes the rest of that story.

15             THE COURT:  Does that have anything to do with this

16   next witness?

17             MR. ASONYE: No, it doesn't.

18             THE COURT:  So let's not keep these folks sitting.

19   We can do that at the end of the day.

20             MR. ASONYE:  Sure.  Your Honor, we just wanted to

21   raise another issue.  What we wanted to raise is that this is

22   our final witness that we have for today, Mr. Doug DeLuca.

23   Our plan is we believe he's about 30 minutes.  We want to ask

24   permission of the Court to end at 5:00.  The remainder of our

25   witnesses -- as we said, we are way ahead of schedule.  We're

D. Deluca - Direct

393

1    flying them in --

2              THE COURT:  You don't have a problem with that?

3              MR. NANAVATI:  No.

4              THE COURT:  All right.  Thank you.

5              (Bench Conference ends.)

6              THE COURT:  Who is your next witness?

7              MR. VAN GRACK:  Doug DeLuca, Your Honor.

8              THE COURT:  All right.  What is it you need to do?

9              The button has to be pressed on the witness.

10             THE DEPUTY CLERK:  I did it.

11             THE COURT:  All right.  Is Mr. DeLuca in the

12   courtroom?  Come forward and take the oath, please, sir.

13             Thereupon,

14                          **DOUG DELUCA,**

15   having been called as a witness on behalf of the Government

16   and having been first duly sworn by the Deputy Clerk, was

17   examined and testified as follows:

18             (Witness seated.)

19             THE COURT:  All right.  You may proceed.

20                     **DIRECT EXAMINATION**

21   BY MR. VAN GRACK:

22   Q.   Could you please state and spell your name for the

23   record?

24   A.   Doug DeLuca, D-o-u-g D-e-l-u-c-a.

25   Q.   And how old are you?

U.S. v. Manafort

1   A.   47.

2   Q.   Mr. DeLuca, where do you live?

3   A.   McLean, Virginia.

4   Q.   Are you employed?

5   A.   Yes, I am.

6   Q.   Where?

7   A.   My firm, Federal Construction Company, LLC.

8   Q.   And what is Federal Construction Company, LLC?

9   A.   Federal Construction Company is a design build firm

10  focusing on residential homes and exterior and interior

11  design.

12  Q.   And what is your title at Federal Construction?

13  A.   I'm the founder and operating member.

14  Q.   And who is the owner?

15  A.   Myself.

16  Q.   Do you own any other businesses?

17  A.   I do not at the time.  I do, but they are not

18  operational.

19  Q.   What are the nonoperational businesses that you own?

20  A.   Federal Home, LLC, and Federal Stone and Brick, LLC.

21  Q.   And what is Federal Stone and Brick, LLC?

22  A.   Federal Stone and Brick, LLC, is a exterior design firm

23  focusing on gardens and outdoor living spaces.

24  Q.   And why is it no longer in operation?

25  A.   I've merged the companies all under one, general parent

U.S. v. Manafort

1  company, which is Federal Construction Company, LLC.

2  Q.   And what was your title at Federal Stone and Brick?

3  A.   Member.

4  Q.   And who was the owner?

5  A.   It was a co-ownership.  We had a partnership at the time,

6  and it was myself and John Browning.

7  Q.   And when it was in operation, where was Federal Stone and

8  Brick located?

9  A.   It had an office address of Sterling, Virginia.

10  Q.   Now, Mr. DeLuca, I'd like to ask you some questions by an

11  individual named Paul Manafort.  Do you know Mr. Manafort?

12  A.   Yes, I do.

13  Q.   How do you know Mr. Manafort?

14  A.   I performed -- I designed exteriors and performed work

15  for him.

16  Q.   And where did you perform that work?

17  A.   In Arlington, Virginia.

18  Q.   And, in general, what type of work did you perform?

19  A.   Exterior garden designs with some different features,

20  including an outdoor kitchen, an outdoor pergola, as well as

21  seating and landscape.

22  Q.   And approximately how long did that project take?

23  A.   I would say approximately seven months.

24  Q.   And who owned that property?

25  A.   I believe Mr. Manafort did.

D. Deluca - Direct

396

1   Q.   And who lived in that property?

2   A.   I believe Mr. Manafort's daughter.

3   Q.   Did you work on any other property for Mr. Manafort?

4   A.   No, sir.

5   Q.   Did you perform any other work for Mr. Manafort?

6   A.   No, sir.

7   Q.   Prior to your testimony today, did you receive a subpoena

8   from the Government for documents?

9   A.   Yes, I did.

10  Q.   Did you provide documents to the Government pursuant to

11  that subpoena?

12  A.   Yes, I did.

13  Q.   What types of document did you provide?

14  A.   Various e-mails.  I do constant sketches throughout a

15  project in regards to design.  Photographs of progress.

16  Photographs of completion, as well as e-mails and bank

17  statements.

18  Q.   And have you reviewed those documents with the Government

19  prior to your appearance today?

20  A.   I have.

21  Q.   How did you communicate with Mr. Manafort about this

22  project?

23  A.   I met with him once at his house in Mt. Vernon, and the

24  majority of the time, e-mails.

25  Q.   And did you have a contract for this project?

——————U.S. v. Manafort——————
D. Deluca - Direct
397

1   A.   Yes, I did.

2   Q.   And who did you communicate with about the contract?

3   A.   Mr. Manafort.

4   Q.   And how did you communicate with Mr. Manafort about the

5   contract?

6   A.   Through e-mails and the meeting.

7   Q.   Mr. DeLuca, I'd like to show you what's been marked as

8   Government Exhibit 81.

9        Do you have a binder in front of you?

10  A.   No, sir, I don't.

11       MR. VAN GRACK:  One moment, Your Honor.

12       THE COURT:  Look, let's cut to the chase.  We don't

13  need to look at pictures of property.  He did work.  He can

14  describe the work ^ audio cut out.  He can describe that he

15  billed for it, that he got paid for it.  If you have any

16  information on how it was paid, you can elicit that, but we

17  don't need to look at pictures of work.

18       MR. VAN GRACK:  Your Honor, the Government wasn't

19  intending to elicit -- to show any photos to Mr. DeLuca.

20       THE COURT:  Oh, I thought you were referring to

21  Exhibit 1A.

22       MR. VAN GRACK:  Oh, no, Your Honor, Exhibit 81.  I

23  may have misspoken.

24       THE COURT:  All right.  No, it's my hearing.  Just a

25  moment.  You said 81?

U.S. v. Manafort

1        MR. VAN GRACK:  Yes, Your Honor.

2        THE COURT:  All right.  Go on.

3   BY MR. VAN GRACK:

4   Q.   Mr. DeLuca, do you recognize this document?

5   A.   Yes, I do.

6   Q.   And what is it?

7   A.   It's an e-mail.

8   Q.   And is there anything attached to that e-mail?

9   A.   I believe it's the contract.

10  Q.   A contract with whom?

11  A.   Mr. Manafort.

12  Q.   And was it created near the time of your project with

13  Mr. Manafort?

14  A.   Yes, it was.

15  Q.   And was it the regular practice of Federal Stone and

16  Brick to maintain such records?

17  A.   Yes, it was.

18        MR. VAN GRACK:  Your Honor, at this time, the

19  Government would move to admit Government Exhibit 81 into

20  evidence.

21        MR. NANAVATI:  No objection, Your Honor.

22        THE COURT:  Admitted.  Next question.

23                      (Government's Exhibit No. 81

24                      admitted into evidence.)

25        MR. VAN GRACK:  May we publish, Your Honor?

U.S. v. Manafort

1            THE COURT:  What do you want to publish?

2            MR. VAN GRACK:  Simply the contract, who it was

3  with, and the amount of the contract.

4            THE COURT:  He's already testified it was with him.

5  What more do you want to know?

6            MR. VAN GRACK:  The amount of the contract, Your

7  Honor.

8            THE COURT:  All right.

9            What was the amount of the contract?

10            THE WITNESS:  I don't remember, Your Honor.

11            THE COURT:  Look at the exhibit and tell me.

12  BY MR. VAN GRACK:

13  Q.   Mr. DeLuca, if I could direct your attention to --

14            THE COURT:  I have the floor for the moment.

15            MR. VAN GRACK:  My apologies, Your Honor.

16            MR. NANAVATI:  Your Honor --

17            THE COURT:  Look at the -- at the contract.  Do you

18  see it, $104,000?

19            THE WITNESS:  Yes, sir, $104,424.

20            THE COURT:  Next question.

21            MR. VAN GRACK:  And, Your Honor, if I --

22            THE COURT:  Did you do the work?

23            THE WITNESS:  My firm did, yes, sir.

24            THE COURT:  And did the firm get paid?

25            THE WITNESS:  Yes, we did.

─────U.S. v. Manafort─────

1              THE COURT:  Who paid the firm?

2              THE WITNESS:  I believe -- I believe Mr. Manafort

3    did.

4              THE COURT:  Next question.

5              MR. VAN GRACK:  And, Your Honor, if I may direct

6    Mr. DeLuca to the first page of that contract, just to

7    establish the address where the work was performed.

8              THE COURT:  All right.  You may do so.

9    BY MR. VAN GRACK:

10   Q.   Mr. DeLuca, if I could direct your attention to the top

11   of the contract.  On what address did you perform this work?

12   A.   1049 North Edgewood Street, Arlington, Virginia.

13   Q.   And, Mr. DeLuca, if I could now direct your attention to

14   Government Exhibit 82.

15             Do you recognize this document?

16   A.   Yes, sir.

17   Q.   And what is it?

18   A.   It's an e-mail.

19   Q.   And who is the e-mail with?

20   A.   Mr. Manafort to Doug DeLuca.

21             MR. VAN GRACK:  Your Honor, at this time, the

22   Government would move to admit Government Exhibit 82.

23             MR. NANAVATI:  Without objection, Your Honor.

24             THE COURT:  All right.  It's admitted.

25   BY MR. VAN GRACK:

─────── U.S. v. Manafort ───────

D. Deluca - Direct

401

1   Q.   And, Mr. DeLuca, who received this e-mail?

2   A.   I did.

3   Q.   And what is the subject?

4   A.   The subject is Manafort project, Edgewood Street,

5   Arlington, Virginia.

6   Q.   And if you could read the first two lines in that e-mail?

7   A.   "Doug, this design -- the design looks exciting and I

8   know Andrea is pleased with the interaction with you.  As we

9   move to the next phase, you will be interacting with me and a

10  person who oversees my construction projects."

11  Q.   And, Mr. DeLuca, if you could read under breakout of

12  responsibilities, who Mr. Manafort directed you to interact

13  with?

14  A.   "One, on matters of design, you will deal with Andrea.

15  Two, on matters of contract and budget, you will deal with me.

16  Three, on matters of construction, my general contractor,

17  Steve Jacobson."

18  Q.   And on this project, who did you deal with on matters of

19  design?

20  A.   Mr. Manafort and Andrea.

21  Q.   And who did you deal with on matters of contract and

22  budget?

23  A.   Mr. Manafort.

24  Q.   And, Mr. DeLuca, if I could now direct your attention

25  just to the next two lines in that e-mail?

D. Deluca - Direct

402

1   A.   Yes, sir.

2   Q.   And if you could read those two lines?

3   A.   "I have reviewed your contract.  Assuming this is best

4   you have been able to negotiate, I will most likely want to

5   bid out a number of subs as every one of the bids in your

6   proposal is high."

7   Q.   Now, Mr. DeLuca, could you describe the work that you

8   performed at the -- at this Arlington home?

9   A.   It was an outdoor garden concept that we came up with.

10  It was a demolition of an existing concrete slab that looked

11  original to the home.  We designed an outdoor kitchen area

12  that was an outdoor grill with various equipment with a

13  soapstone countertop on face stone.  We designed an outdoor

14  living room, which was underneath an American cedar pergola,

15  which was in a rough state to emulate a pergola that I've seen

16  in Central Park.  There was an outdoor dining area that we did

17  an antique brick rug pattern underneath of it.

18  Q.   And, Mr. DeLuca, forgive me, what is a pergola?

19  A.   A pergola is a garden structure consisting of wood as

20  well as vine and twigging.  Typically, what we would do is we

21  would emulate four points that would be supporting a suspended

22  roof.  We -- there was an art approach to it because we wanted

23  them to look like natural trees.  So there were natural growth

24  twigs that intertwined within it.  We added four points of

25  wisteria and climbing hydrangea, and the ultimate goal of the

D. Deluca - Direct

403

1  pergola is to create a complete green roof that creates shade

2  and protection as it grows in.

3  Q.   And --

4           THE COURT:  Is there any dispute that this work is

5  done?

6           MR. NANAVATI:  No, Your Honor.

7           THE COURT:  What is the virtue of describing it?

8           MR. VAN GRACK:  Your Honor, just the --

9           THE COURT:  The answer is:  None.  You want to show

10  that work was done, that Mr. Manafort paid for it.  You may

11  want to show something about how he paid, but to have a

12  witness come and describe in exquisite detail what was done is

13  hardly a good expenditure of time.

14           MR. VAN GRACK:  Your Honor, the Government is simply

15  seeking to establish that these expenditures were personal in

16  nature.

17           THE COURT:  All right.  You're done.  Let's move on.

18           MR. VAN GRACK:  Yes, Your Honor.

19  BY MR. VAN GRACK:

20  Q.   Mr. DeLuca, if I could direct your attention again to

21  Government Exhibit 81, and this time, the first page of that

22  exhibit.

23           MR. VAN GRACK:  Your Honor, may we publish?

24           THE COURT:  Just a moment.  Which one?

25           MR. VAN GRACK:  Government Exhibit 81.  It was

─────────────U.S. v. Manafort─────────────

D. Deluca - Direct
                                                                        404

1  previously admitted into evidence.

2             THE COURT:  Yes, you may do so.

3             What is it you want to show?

4             MR. VAN GRACK:  Just the first -- the top part of

5  that e-mail, Your Honor.  It deals with payment.

6             THE COURT:  All right.  Go ahead.

7  BY MR. VAN GRACK:

8  Q.   Mr. DeLuca, did you, in fact, complete your work on this

9  project?

10  A.   Yes, sir.

11  Q.   And with respect to Government Exhibit 81, what is the

12  date on that e-mail?

13  A.   November 19, 2012.

14  Q.   And who was the e-mail from?

15  A.   Paul Manafort.

16  Q.   And can you read the first two lines of that e-mail?

17  A.   "Here -- Doug, here is the signed contract.  You will be

18  receiving a wire from Lucicle LLC in the next two days for

19  $45,000."

20  Q.   And did you, in fact, receive $45,000 from Lucicle in

21  November of 2012?

22  A.   I believe we did.

23  Q.   Mr. DeLuca, in 2012, where did Federal Stone and Brick

24  bank?

25  A.   Virginia Heritage Bank.

─────────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────────

─────U.S. v. Manafort─────

D. Deluca - Direct

405

1   Q.   And does that bank still exist?

2   A.   No, they were acquired.

3   Q.   By whom?

4   A.   Eagle Bank.

5   Q.   I'd like to direct your attention now to Government

6   Exhibit 86.

7          Mr. DeLuca, do you recognize that document?

8   A.   Yes.

9   Q.   And what is it?

10  A.   It's a bank statement that I gave you.

11         MR. VAN GRACK:  Your Honor, at this time, the

12  Government would move to admit Government Exhibit 86.

13         THE COURT:  The bank statement that you gave whom?

14         THE WITNESS:  The Government, sir.

15         THE COURT:  And any objection to it?

16         MR. NANAVATI:  No, Your Honor.

17         THE COURT:  All right.  It's admitted.  Proceed.

18                      (Government's Exhibit No. 86

19                      admitted into evidence.)

20         MR. VAN GRACK:  And, Your Honor, may we publish?

21         THE COURT:  All right.  There are a lot of

22  redactions.

23         MR. VAN GRACK:  Yes, Your Honor.  I believe I can

24  establish with the witness who made those redactions.

25         THE COURT:  We don't need to establish.  What is it

1   that you want to offer the document for?

2            MR. VAN GRACK:  To demonstrate what individual or

3   entity paid Mr. DeLuca for the work.

4            THE COURT:  All right.

5            MR. VAN GRACK:  We're just seeking to publish the

6   first page, Your Honor.

7            THE COURT:  All right.  You may do so.

8            Who paid for the work, Mr. DeLuca?

9            THE WITNESS:  In regards to this, sir, Lucicle

10  Consultants Limited vendor payment.

11           THE COURT:  And you understood that to be

12  Mr. Manafort?

13           THE WITNESS:  To the best of my ability, sir.

14           THE COURT:  All right.  Next question.

15  BY MR. VAN GRACK:

16  Q.   And, Mr. DeLuca, did you receive multiple payments from

17  Lucicle Consultants?

18  A.   I believe we did.

19  Q.   Mr. DeLuca, I'd like to show you what's been marked as

20  Government Exhibit 87 in your binder.

21           And do you recognize that document?

22  A.   Yes, sir.

23  Q.   And what is it?

24  A.   It's an e-mail.

25  Q.   E-mail with -- between whom?

┌─────────────────────────────────────────────────────┐
U.S. v. Manafort

D. Deluca - Direct

407

1   A.   An e-mail from Mr. Manafort to our CFO or our controller.

2   Q.   And who is CC'd on that e-mail?

3   A.   Myself.

4   Q.   And what is it in regards to?

5   A.   It's in regards to you should be receiving a wire from --

6   Q.   I apologize, Mr. DeLuca --

7   A.   Yes, sir, I'm sorry.

8   Q.   -- for cutting you off, but just generally, what is --

9   what project is this in regards to?

10  A.   The project on North Edgewood.

11          MR. VAN GRACK:  Your Honor, at this time, the

12  Government would move to admit Government Exhibit 87.

13          MR. NANAVATI:  No objection.

14          THE COURT:  Admitted.

15                         (Government's Exhibit No. 87

16                         admitted into evidence.)

17          MR. VAN GRACK:  May we publish, Your Honor?

18          THE COURT:  Just ask the question.

19          MR. VAN GRACK:  Your Honor, I simply want to

20  direct --

21          THE COURT:  I said:  Ask the question.

22          MR. VAN GRACK:  Yes, Your Honor.

23  BY MR. VAN GRACK:

24  Q.   If I could direct your attention to the bottom e-mail.

25          Who was the e-mail -- that's dated May 28, who was

U.S. v. Manafort

1  that e-mail between?

2  A.   Our controller and Mr. Manafort.

3  Q.   And what is the controller asking Mr. Manafort?

4  A.   "Paul, attached is your invoice for the remaining items

5  under the change order.  Please let me know if you have any

6  questions."

7  Q.   And did Mr. Manafort respond to that e-mail?

8  A.   Yes, sir.

9  Q.   And what was his response?

10  A.   "You should be receiving a wire from Pompolo Ltd. for

11  $4,000."

12  Q.   And do you know what Pompolo Ltd. was?

13  A.   No, sir.

14  Q.   Do you know if Mr. Manafort ever sent you a wire from

15  Pompolo Ltd.?

16  A.   Only in what I see here.

17  Q.   And I -- just to direct you to the question:  Do you know

18  whether you received a payment one way or the other from

19  Pompolo Ltd.?

20  A.   I believe we may have received a payment, yes, sir.

21  Q.   Mr. DeLuca, during your work for Mr. Manafort, did you

22  ever interact with an individual named Konstantin Kilimnik?

23  A.   No, sir.

24  Q.   Did you ever receive a payment from an individual named

25  Konstantin Kilimnik?

U.S. v. Manafort

1  A.  No, sir.

2  Q.  And during your work for Mr. Manafort, did you ever meet

3  an individual named Rick Gates?

4  A.  No, sir.

5  Q.  Did you ever speak with an individual named Rick Gates?

6  A.  No, sir.

7  Q.  Did you ever send an invoice to an individual named Rick

8  Gates?

9  A.  Not that I believe.

10  Q.  Did you ever receive a payment from an individual named

11  Rick Gates?

12  A.  Not that I know of.

13          MR. VAN GRACK:  No further questions, Your Honor.

14          THE COURT:  Cross-examination.

15                    **CROSS-EXAMINATION**

16  BY MR. NANAVATI:

17  Q.  Mr. DeLuca -- well, I'm Jay Nanavati.  I represent Paul

18  Manafort.  Nice to meet you.

19          During the course of this work that you did in this

20  backyard, Mr. Manafort -- at no point did Mr. Manafort try to

21  tell you this was a business project, did he?

22  A.  No, sir.

23  Q.  Okay.  And at no point did he lead you to believe that

24  the house was being used for anyone other than his daughter,

25  Andrea, right?

D. Deluca - Cross

1  A.   No, sir.

2  Q.   Okay.  And the first time you heard of Lucicle or

3  Lucicle, that was directly from the mouth or the electronic

4  mail of Mr. Manafort, wasn't it?

5  A.   Yes, sir.

6  Q.   Okay.  And that's true of Pompolo or Pompolo, too,

7  correct?

8  A.   I've never heard of that besides that e-mail.

9  Q.   Right.  And that e-mail was from Mr. Manafort?

10  A.   I believe so.

11        MR. NANAVATI:  That's all the questions, I have,

12  Your Honor.

13        THE COURT:  All right.  Any redirect?

14        MR. VAN GRACK:  No, Your Honor.

15        THE COURT:  All right.  Thank you.

16        You may step down, sir, and you may be excused.

17        Now, I understand you want to cease at this time,

18  Mr. Asonye?

19        MR. ASONYE:  After the -- yes, Your Honor, after the

20  stipulation that we referred to.

21        THE COURT:  All right.  Mr. Asonye, what number is

22  it?

23        MR. ASONYE:  It's Government Exhibit 331, Your

24  Honor.  And I believe all we need is for the Court to read to

25  the jury, whatever the Court prefers, the first four

─────U.S. v. Manafort─────

411

1    paragraphs or even 2 through 4 is sufficient.

2              THE COURT:  All right.  Just a moment.

3              Is this the stipulation regarding the purchase of

4    1046 North Edgewood Street?

5              MR. ASONYE:  Yes, Your Honor.

6              THE COURT:  All right.

7              The -- ladies and gentlemen, the parties have

8    stipulated to the following facts:  Land, Carroll & Blair PC

9    is a law firm specializing in, among other things, real estate

10   and land use.  On August 21, 2012, Andrea Manafort entered

11   into a sales contract for the purchase of real property -- a

12   typographical error -- known as Edgewood.  The purchase price

13   was 1,899,000.

14             The same day Anna Manafort wrote a $50,000 check to

15   her Realtor as earnest money deposit for Edgewood.  On

16   September 10, 2012, Andrea Manafort purchased Edgewood.  To

17   pay for Edgewood on August 31, 2012, a wire transfer in the

18   amount of 1,900,000 was sent from Lucicle Consultants Limited

19   bank account at Marfin Laiki Bank in Nicosia, Cyprus, to an

20   account of Land, Carroll & Blair PC.

21             According to instructions from Paul J. Manafort,

22   Junior, at closing, the settlement company issued a $23,000 --

23   $23,001.36 check to Andrea Manafort representing excess funds

24   from the $1,900,000 wire transfer.

25             The records -- I think that's all we need.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────────── U.S. v. Manafort ───────────

412

1        MR. ASONYE:  That's all, Your Honor.  Yes, Your

2   Honor.

3        THE COURT:  All right.  And you'll have these

4   stipulations with you in the jury room.

5        All right.  Pass your books to the right, ladies and

6   gentlemen.  The court security officer will collect them and

7   you get a bonus.  We quit 15 minutes -- well, more like

8   45 minutes early tonight.  I would say to you that this gives

9   you an opportunity to beat the traffic, but you'd have to

10  leave at around 11 a.m. to beat the traffic.

11       (Laughter.)

12       All right.  Remember this evening, you'll still be

13  accosted by your family, your friends, your children, your

14  spouses and partners.  They will all ask you questions.

15  You'll be tempted to answer and you should not.  You may not

16  answer.

17       But that's all right.  By the third or fourth or

18  fifth day, they will cease asking you questions because they

19  will no longer believe you've been doing what you say you've

20  been doing.

21       But you must resist talking to anybody about this

22  case, resist television, radio or whatever else, reports about

23  this case and don't listen to any of it.  They don't know what

24  you know.  You were here.  Although I must say, I'm curious to

25  know what all these people fled out of here to do today.

U.S. v. Manafort

413

1    Someone will tell me, I'm sure.

2           All right.  Do not undertake any research or

3    investigation on your own.  Put it out of your mind.  I'll see

4    you tomorrow morning at 9:30.  Have you filled out your menus?

5    Good.  Thank you for your close attention to the evidence

6    today.  You may follow Mr. Flood out.

7           (Jury dismissed.)

8           THE COURT:  All right.  You may be seated.

9           Now, tomorrow, when we begin, Mr. Andres or

10   Mr. Asonye or Mr. Van Grack, who's going to be the first

11   witness?

12          MR. ANDRES:  Judge, we have two vendors and then

13   we'll be done with the vendors tomorrow.

14          Joel Maxwell, we're just waiting for him to travel

15   in tonight, and then there's an individual named Mike -- I'm

16   going to mispronounce his last name, I think it's Regolizio,

17   Regolizio or something like -- along -- Mike R.

18          THE COURT:  All right.

19          MR. ANDRES:  And then we'll start with the

20   bookkeepers and the accountants after that.  So Heather

21   Washkuhn and the series of tax preparers, Mr. Manafort's tax

22   preparers.

23          THE COURT:  All right.  Pass that -- a list of that

24   sort on to the defendants.

25          The material you gave me before was quite helpful,

─────────────────── U.S. v. Manafort ───────────────────

414

1    so I'd like it again.  That's the mixed blessing of having

2    done well on this request.  It's this -- you know what I'm

3    talking about?

4              MR. ANDRES:  I do, Judge.

5              THE COURT:  If you could provide that, it's very

6    helpful on objections to exhibits and the like.  We move along

7    as quickly as we can.  I'm hoping that we can finish this case

8    much, much sooner than anyone predicted.

9              MR. ANDRES:  We're on track to do that, Judge.

10             THE COURT:  Yes, I think you're on track to do

11   better than anybody expected, but we'll see.  There are many a

12   slip between the cup and the lip between now and then.

13             (Laughter.)

14             All right.  Anything further in this matter this

15   evening, Mr. Asonye?

16             MR. ASONYE:  Court's indulgence.  Your Honor, in

17   terms of that list --

18             THE COURT:  And I'm an expert on slips of the lip.

19   Go ahead.

20             MR. ASONYE:  In terms of list, as Your Honor knows,

21   we are trying to cull some of these exhibits down.  So would

22   you -- would the Court prefer the list first thing in the

23   morning when we know which exhibits we're using?

24             THE COURT:  Yes.  I don't need it tonight.

25             MR. ASONYE:  All right.  Thank you, Your Honor.

U.S. v. Manafort

415

1          THE COURT:  Anything else?  On behalf of the

2    defendant?

3          MR. NANAVATI:  No, Your Honor.

4          THE COURT:  All right.  I thank counsel for your

5    cooperation.  Court stands in recess in this matter until

6    9:30.  Do I have another matter in the courtroom?

7          I have a hearing at 8:30 in another matter, but I

8    fully expect that to be done by 9:30 for sure, but I will have

9    another matter ongoing.

10         Now, that doesn't mean you -- the members of the

11   public can't come in at 8:30.  You're perfectly welcome to

12   come in and be entertained or edified or bored or you may wait

13   until 9:30 and you may sit wherever you wish.  I don't have

14   any assigned or reserved seating in the courtroom.

15         Court stands in recess until 8:30 tomorrow morning.

16         **(Proceedings adjourned at 4:49 p.m.)**

17

18

19

20

21

22

23

24

25

1                       CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury trial

7    in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8    **MANAFORT, JR.,** Criminal Action No. 1:18-CR-83, in said

9    court on the 1st day of August, 2018.

10          I further certify that the foregoing 142 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this August 6, 2018.

17

18

19

20

21          _____
            Tonia M. Harris, RPR
22          Official Court Reporter

23

24

25

                                                            416