```
                      ─U.S. v. Manafort─
                                                        417
```

1             UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA,      : Criminal Action No.
                                   : 1:18-CR-83
5             versus               :
                                   :
6    PAUL J. MANAFORT, JR.,         :
                                   : August 2, 2018
7                   Defendant. : Volume III - A.M.
     ------------------------------x

8
                  TRANSCRIPT OF JURY TRIAL
9         BEFORE THE HONORABLE T.S. ELLIS, III
              UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     FOR THE GOVERNMENT:        UZO ASONYE, AUSA
12                              United States Attorney's Office
                                2100 Jamieson Avenue
13                              Alexandria, VA 22314
                                     and
14                              GREG ANDRES, SAUSA
                                BRANDON LANG VAN GRACK, SAUSA
15                              Special Counsel's Office
                                U.S. Department of Justice
16                              950 Pennsylvania Avenue NW
                                Washington, D.C. 20530
17
     FOR THE DEFENDANT:         JAY ROHIT NANAVATI, ESQ.
18                              BRIAN KETCHAM, ESQ.
                                Kostelanetz & Fink LLP
19                              601 New Jersey Avenue NW
                                Suite 620
20                              Washington, DC 20001
                                     and
21                              THOMAS E. ZEHNLE, ESQ.
                                Law Office of Thomas E. Zehnle
22                              601 New Jersey Avenue NW
                                Suite 620
23                              Washington, DC 20001
                                     and
24                              KEVIN DOWNING, ESQ.
                                Law Office of Kevin Downing
25                              601 New Jersey Avenue NW
                                Suite 620

U.S. v. Manafort

418

1        Washington, DC 20001
         and
2        RICHARD WILLIAM WESTLING, ESQ.
        Epstein, Becker, & Green, PC
3        1227 25th Street NW
        Washington, DC
4
 OFFICIAL COURT REPORTER:  TONIA M. HARRIS, RPR
5        U.S. District Court, Ninth Floor
        401 Courthouse Square
6        Alexandria, VA 22314

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. v. Manafort

419

TABLE OF CONTENTS
TRIAL
WITNESSES

On behalf of the Government:

Joel Maxwell

        Direct examination by Mr. Andres................. 435
        Cross-examination by Mr. Nanavati............... 457
        Redirect examination by Mr. Andres.............. 459

Michael Regolizio

        Direct examination by Mr. Andres................. 469
        Cross-examination by Mr. Nanavati............... 489
        Redirect examination by Mr. Andres.............. 491

Heather Washkuhn

        Direct examination by Mr. Andres................. 513

EXHIBITS

On behalf of the Government:

                                              Admitted

Number 102A............................................ 442
Number 102B............................................ 447
Number 102C............................................ 452
Number 107A............................................ 477
Number 109............................................. 483
Number 121A............................................ 534
Number 121B............................................ 544

MISCELLANY

Preliminary matters.................................... 420
Certificate of Court Reporter.......................... 547

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

420

1                    **P R O C E E D I N G S**

2            (Court proceedings commenced at 9:29 a.m.)

3            THE COURT:  This is U.S. against Paul Manafort,

4   CR-83.

5            And the record will reflect that the -- that counsel

6   and the defendant are present, prepared to proceed.

7            Let me first deal with a couple of preliminary

8   matters that I have.  First, the Government has submitted a

9   brief regarding items and services purchased by the defendant.

10           I'm well aware that the evidence is relevant,

11  evidence of how much money he had.  And that's why I have

12  permitted the Government to introduce the amounts of money

13  that he spent.  What I have not permitted is to gild the lily,

14  that is, if he spent a lot of money on fancy clothes or

15  watches or cars or -- I guess you'd call them designer

16  clothes.  They're not Men's Wearhouse clothes, but it wouldn't

17  matter if he'd spent money on Men's Wearhouse clothes.

18           The amount of money would be relevant.  And I have

19  permitted the Government to show that.  What I haven't

20  permitted the Government to do or what I had discouraged you

21  from doing, when I looked at the book, is you want to

22  introduce pictures of these suits and rows of them.  You want

23  to introduce pictures of drawings of a pagoda or whatever it

24  is in the back yard of this home he bought for his daughter,

25  et cetera, et cetera.

1          That isn't relevant at this point.  It could become

2   relevant, but it isn't relevant at this point.  It could

3   become relevant if there was a dispute as to whether -- what

4   the money was spent for and that sort of thing.

5          And if that occurs, then, of course, the Government

6   has the right to present rebuttal testimony.  And then we can

7   do it.  It isn't going to happen.  You know that and I know

8   that.

9          So all the evidence of the fancy suits or the

10  pagodas or whatever it is and all of that stuff really goes --

11  is irrelevant and kind of besmirches the defendant.  Most of

12  us don't have pagodas.  We don't have closets full of suits

13  and that sort of thing.  It kind of engenders some resentment

14  against rich people, generally.

15         But the fact of the matter is, this is a case in

16  which the Government has alleged that he underreported his

17  income.  And I say all of this not really for Mr. Andres, he

18  knows all this, but I'm responding to what he submitted.  I

19  really say it because the public needs to understand this.

20         The Government has alleged that he underreported his

21  income.  Now, I understand -- and I may be wrong, but I

22  understand that the Government's proof of that is that he had

23  a lot more money in the way he spent it and had it than he

24  reported it.

25         To put it in concrete terms, let's say he bought a

U.S. v. Manafort

422

1   $10 million house and reported $100,000 in annual income.

2   That would raise an inference.

3          Now, the Government wants to show that he spent and

4   had a lot of money and that he didn't report.  Well, we don't

5   have what he reported yet, but the Government is going to get

6   there.  I might have started there had I been the Government,

7   but that's your choice.  That's your choice.

8          And you'll get to it.  And that's essentially what

9   the Government wants to prove on underreported income.  If

10  there is a dispute about whether the money was spent on that

11  or -- because these things, like suits and other things, I

12  don't know whether the defendant intends to argue that they

13  were business expenses or deductible, but we'll come to that.

14         Right now we don't need to worry about that.  It's

15  the money and if it -- if on the Government -- or the

16  defendant's case they raise some defense of that sort, then

17  you can do it.

18         Now, the Government has also submitted a motion in

19  limine to preclude the reference by the defendant's counsel

20  to -- either in argument or in evidence concerning the absence

21  of a IRS civil audit of Manafort or his companies.

22         And the Government cites -- I think there is good

23  deal of authority for the fact, but the fact that there's a

24  civil audit doesn't mean that the Government has to do that

25  before it can proceed criminally.  It does not preclude a

1   criminal -- a criminal conviction for that.

2          Now, I don't know what the defendant wants to say

3   about that.  I'm not going to ask you today, because this just

4   came in, but you have an opportunity to respond.

5          I will say this so that the Government has this --

6   and you may want to -- you may want to address this particular

7   matter if you disagree with it, because if you disagree with

8   it I want to know because I may be wrong.

9          If the defendant testifies, which, of course, we

10  don't know -- and for the public who's present in the

11  courtroom, the defendant doesn't have to make that decision

12  until the defendant's case begins.  And judges should not ask

13  defense counsel to commit to anything.  It's just not the

14  proper thing to do.

15         He has the right to testify.  He has the absolute

16  right under the Constitution to remain silent and he may not

17  be penalized for exercising the right to remain silent.  So I

18  don't penalize him by asking him in advance, look, tell me

19  what you're going to do.

20         So we don't know whether he will testify.  And we

21  don't know what he wants to say.  And the defense now has this

22  motion in limine, and you may respond to it.

23         It seems to me that the way we're progressing -- and

24  I do want to compliment you, chiefly the Government, for

25  moving it along, paying attention to when I say, "Let's move

U.S. v. Manafort

424

1  it along.  Don't show me a closet full of clothing and a

2  house, a condo.  Just move it along."

3         You have been.  And I think, Mr. Andres, you're

4  ahead of schedule.  Am I right?

5         MR. ANDRES:  Yes, Judge.

6         THE COURT:  Good.  Now, I will point out that, as I

7  said, if the defendant testifies, I'm likely to permit.  You

8  know, if he were to say -- I don't know this to be what you

9  intend to offer, but it's -- what you've addressed,

10  Mr. Andres, in your brief doesn't reach the point of suppose

11  the defendant wants to say, "I offered to have all my books

12  brought in.  I offered to have a -- an audit of me and my

13  companies and it was ignored or declined."

14        I'm thinking I'm likely to allow that testimony

15  because it goes to a number of mental matters as well as other

16  things.  And that's not really addressed in your, very good

17  brief, but doesn't cover that point and I wanted to alert you

18  and you, both sides, to that.

19        Now, there was one other matter I meant to cover.

20  Again, Mr. Andres, you or Mr. Asonye or Mr. Van Grack, whoever

21  is responsible, this is helpful, that is, the list.  It's

22  helpful to the Court and to the defendant.  You've given the

23  next three witnesses and -- four witnesses -- five

24  witnesses and the documents that you intend to introduce

25  through those witnesses.  That's very helpful and I appreciate

U.S. v. Manafort

425

1    it.

2            Now, I can see an issue arising, and I don't like to

3    interrupt testimony to do it if we can deal with it in

4    advance.  I'll tell you what one issue is.  There are a number

5    of exhibits, e-mails and the like, that refer to a lot of

6    people and I can't tell whether -- what, if any, involvement

7    the defendant had.  For example, if you look at 154 or 157,

8    you have those as well, Mr. Nanavati.

9            MR. NANAVATI:  Yes, Your Honor.

10           THE COURT:  All right.  I don't know if those are

11   offered by Mr. Manafort, but I assume they are not or they'd

12   say so.  Of course, there shouldn't be any dispute about --

13   about any e-mail authored by Mr. Manafort.  But if it isn't,

14   then, of course, we get to 801(d)(2)(E) issue, which is what I

15   think I think -- I think the Government also relies on

16   business records, and I'll say something about that.  Well,

17   let me say about that.

18           The business records exception has a long history.

19   And like everything else in my life things have changed over

20   time.

21           The original -- the original justification for the

22   business records exception was the assurance of reliability.

23   Even though they were hearsay documents, there was reliability

24   because it was a regularly conducted activity.  Over time it's

25   come to be viewed as anything a business keeps is a business

Case 1:18-cr-00083-TSE   Document 208   Filed 08/06/18   Page 10 of 131 PageID# 3735

1  record.  I don't think that's exactly right.

2          There has to be some assurance of reliability as a

3  result of the regularly conducted activity.  But let's put

4  that to one side because I thought the major -- the major

5  position of the Government on these memos was 801(d)(2)(E),

6  that is, memoranda in furtherance of the conspiracy.  If I'm

7  wrong about that, you can tell me.  Am I wrong?

8          MR. ASONYE:  Your Honor, we have multiple bases,

9  particularly the series --

10          THE COURT:  Are you relying on 801(d)(2)(E) in part?

11          MR. ASONYE:  In part, yes, Your Honor.

12          THE COURT:  All right.  Thank you.  Lawyers will

13  never answer questions.  They always get upset at witnesses

14  who don't answer questions directly.  But you answered it,

15  Mr. Asonye.  That's not a criticism of you.

16          All right.  801(d)(2)(E) requires the Court to make

17  a preliminary determination as to whether there is an

18  existence of a conspiracy just for purposes of admissibility.

19  It's the jury that decides in the end whether there was any

20  conspiracy about anything, but I make a preliminary

21  determination.  I don't have any evidence.

22          If I admit it, it will be conditional, provided I am

23  persuaded ultimately that it is a co-conspirator statement

24  made in furtherance of a conspiracy as to which there has been

25  some persuasive evidence, by a preponderance of the evidence,

─────U.S. v. Manafort─────

427

1   I think, is the -- just -- and most of this is unnecessary.

2         Mr. Nanavati, you've seen this list.  I don't know

3   whether you're the designated victim for that particular

4   witness.  Are you?

5         MR. NANAVATI:  I'm not, Your Honor.

6         THE COURT:  Who is?

7         MR. WESTLING:  I would say that I'm not sure I'm

8   going to handle the witness, but I did talk with the Judge and

9   the counsel about this issue on a prior witness, because of

10  the concern about co-conspirator statements with some other

11  documents.

12        THE COURT:  All right.  Well, put -- all I'm going

13  to ask is something broader.  I want to know whether there's

14  any objection to these documents.  I'm not going to waste my

15  time if there's no objection to them.

16        MR. WESTLING:  Well, I think if he says -- mentioned

17  in a prior conference, Your Honor, our understanding had been

18  that Mr. Gates was going to be a witness and that the

19  Government would establish a conspiracy through his testimony.

20  We've learned, in the last 24 hours, that may not be the case.

21        THE COURT:  Well, I think Mr. Asonye walked that

22  back pretty quickly.

23        MR. ANDRES:  Well, Judge, just to be clear about

24  that, that's not something we really think is appropriate to

25  be discussed in front of the jury, so who the Government --

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

428

1      THE COURT:  They're not here.  That's the public.

2      MR. ANDRES:  They were here -- they were here when

3  the issue came up about Mr. Gates.  They were absolutely here

4  when the Court said that it was your -- a surprise to the

5  Court that he was going to be testifying.  So we absolutely

6  have put him on the witness list.  It's absolutely --

7      THE COURT:  I'm not the one who said that he might

8  not testify.

9      MR. ANDRES:  I understand.  But the issue came up

10  about whether or not he would testify, and my concern was

11  that -- it was my view that those issues aren't appropriately

12  addressed in front of the jury while they're here.  So, look,

13  Judge --

14      THE COURT:  Well, my impression is that Mr. Asonye

15  walked it back pretty quickly after that.

16      MR. ANDRES:  Yes, but there's sort of the -- I'm not

17  sure what -- the horse or the cow or the animal was out of the

18  barn, whichever one the analogy is at that point, because the

19  question had come up about whether he was going to testify.

20      But, Judge, we've put him on the witness list.

21  It's -- we have every intention to call him as a witness.

22      THE COURT:  Of course.

23      MR. ANDRES:  And so --

24      THE COURT:  You can't prove the conspiracy probably

25  without that.

—————————U.S. v. Manafort—————————

429

1          MR. ANDRES:  Well, I don't know if that's true

2    entirely, but it's our intention to call.

3          THE COURT:  All right.  I don't think most people

4    were -- except the 30 or 40 people that rushed out of here.

5    My wife wasn't fooled.  My wife is an English teacher, but she

6    is -- she did practice law for 20 years.  She wasn't happy.

7    She's very happy now, not having to do with me.

8          Yes, sir?

9          MR. WESTLING:  Your Honor, I think on this issue,

10   what I would say is that to the extent that there are e-mails

11   being offered that includes statements from Mr. Gates, and he

12   were not going to be a witness, we would have an objection.

13         THE COURT:  Of course.  I understand that.

14         MR. WESTLING:  But we do realize --

15         THE COURT:  Because if there's an objection made,

16   Mr. Andres, then, of course, I would ask the Government

17   whether it intends to do that and whether the Government

18   intends to have evidence from which I could find by a

19   preponderance of that evidence that there's a conspiracy

20   sufficient to admit the questions or challenged document.  And

21   I would then admit it, conditionally, on the assumption that

22   you would meet that assurance.

23         What other -- now, let's come back.  Who is the

24   attorney who's going to -- going to deal with Cindy Laporta

25   and Heather Washkuhn?

─────────────────────U.S. v. Manafort─────────────────────
430

1           MR. WESTLING:  Your Honor, I think as to

2   Ms. Laporta, it's Mr. Downing, and as to Ms. Washkuhn, it's

3   Mr. Zehnle.

4           THE COURT:  All right.  Now, I need to know from the

5   two of you so we don't take up time in the midst of

6   examination, which if you could give me a list of the

7   documents you intend to object to and give those to the

8   Government as well, so that they can be prepared to address

9   it.  And then I'll address it before we begin the witness,

10  I'll do that out of hearing of the jury, and we will get it

11  done.  And it has -- yes?

12          MR. WESTLING:  We'll get that to you, Your Honor.

13          THE COURT:  All right.

14          MR. NANAVATI:  And to the Government.

15          THE COURT:  And how long do you think Maxwell and

16  Regolizio will take?

17          MR. ANDRES:  Those are both very short witnesses,

18  Judge.  They're two additional vendors.  Our third witness is

19  actually going to be Ms. Washkuhn.  So while we provided Cindy

20  Laporta, we've provided several witnesses because we weren't

21  entirely sure of the order.

22          THE COURT:  All right.

23          MR. ANDRES:  So Ms. Washkuhn is after that, and

24  she's the bookkeeper for Mr. Manafort.

25          THE COURT:  All right.

U.S. v. Manafort

431

1          MR. ANDRES:  But the same issue will come up with

2     respect to --

3          THE COURT:  Right.

4          MR. ANDRES:  -- e-mails in which Mr. Gates --

5     neither Mr. Gates nor Mr. Manafort are on their bank, their

6     e-mails between the bookkeeper and the banks.  The defense has

7     stipulated to the authenticity and admissibility of those

8     documents, so --

9          THE COURT:  All right.  So for most of these

10    exhibits, there won't be an issue.

11         MR. ANDRES:  Correct.

12         THE COURT:  All right.  Yes?

13         MR. ANDRES:  I'm sorry, I didn't mean to interrupt.

14    One other issue that we were inclined to brief, but maybe I

15    could just preview it for Your Honor, which I completely

16    understand.  Yesterday we had some charts that we showed to

17    the vendor witnesses in an effort --

18         THE COURT:  Yes, and I told you, you could use it as

19    a demonstrative evidence.  And you wanted it admitted as

20    evidence for the truth of the matters asserted; is that right?

21         MR. ANDRES:  Yes, and we don't -- we understand Your

22    Honor's concern that these witnesses didn't create the charts.

23    Tomorrow we intend to call the FBI agent who did create the

24    charts.

25         THE COURT:  All right.  Well, that's a different

1  matter.

2          MR. ANDRES:  Exactly.  So I just wanted --

3          THE COURT:  And you can renew your offer at that

4  time and I will consider it, and there may or may not be an

5  objection.

6          MR. ANDRES:  Thank you, Judge.

7          THE COURT:  All right.  Are we prepared now to

8  proceed?

9          Mr. Flood, bring the jury in, please.

10                    (Jury in.)

11         THE CSO:  Still waiting on one.

12         THE COURT:  You may be seated.

13         (A pause in the proceedings.)

14         THE COURT:  Good morning, ladies and gentlemen.  Let

15  me first confirm that all of you were successful in following

16  the Court's instructions to refuse -- or to refrain from

17  discussing the matter with anyone or undertaking any

18  investigation.  Good.  I see unanimous affirmative responses

19  there.

20         Now, we'll begin as usual with the calling of the

21  roll by numbers.  Ms. Pham?

22         THE DEPUTY CLERK:  Ladies and gentlemen, as I call

23  your number, please answer "present" or "here."

24         Juror 0008.

25         THE JUROR:  Present.

1         THE DEPUTY CLERK:  Juror 0037.

2         THE JUROR:  Present.

3         THE DEPUTY CLERK:  Juror 0276.

4         THE JUROR:  Here.

5         THE DEPUTY CLERK:  Juror 0017.

6         THE JUROR:  Present.

7         THE DEPUTY CLERK:  Juror 0145.

8         THE JUROR:  Present.

9         THE DEPUTY CLERK:  Juror 0115.

10        THE JUROR:  Present.

11        THE DEPUTY CLERK:  Juror 0082.

12        THE JUROR:  Present.

13        THE DEPUTY CLERK:  Juror 0009.

14        THE JUROR:  Present.

15        THE DEPUTY CLERK:  Juror 0299.

16        THE JUROR:  Present.

17        THE DEPUTY CLERK:  Juror 0091.

18        THE JUROR:  Present.

19        THE DEPUTY CLERK:  Juror 0302.

20        THE JUROR:  Present.

21        THE DEPUTY CLERK:  Juror 0060.

22        THE JUROR:  Present.

23        THE DEPUTY CLERK:  Juror 0296.

24        THE JUROR:  Present.

25        THE DEPUTY CLERK:  Juror 0054.

U.S. v. Manafort

434

1                THE JUROR:  Present.

2                THE DEPUTY CLERK:  Juror 0127.

3                THE JUROR:  Present.

4                THE DEPUTY CLERK:  And Juror 0133.

5                THE JUROR:  Present.

6                THE DEPUTY CLERK:  Thank you.

7                THE COURT:  All right.

8                Again, good morning, and we'll proceed today with

9        the taking of the testimony in this case.

10               Mr. Andres, the Government may call its first

11       witness this morning.

12               MR. ANDRES:  Thank you, Your Honor.  The Government

13       calls Joel Maxwell.

14               THE COURT:  Come forward and take the oath, please,

15       sir.

16               Thereupon,

17                              **JOEL MAXWELL,**

18       having been called as a witness on behalf of the Government

19       and having been first duly sworn by the Deputy Clerk, was

20       examined and testified as follows:

21                         (Witness seated.)

22               THE COURT:  All right.  While the witness is being

23       seated, I'm sure you've recognized that some witnesses take

24       the oath with the Bible, some don't.  That's perfectly

25       appropriate.  There's no requirement that they use the Bible.

1    There's no requirement that they not use the Bible.

2              But the oath is a little bit different of whether

3    they do or they don't.  But it makes no difference.  They're

4    under oath.  But I wanted you to be aware of that.  You may

5    have wondered.

6              All right.  Mr. Andres, you may proceed.

7              MR. ANDRES:  Thank you, Judge.

8                         **DIRECT** EXAMINATION

9    BY MR. ANDRES:

10   Q.   Please state your name for the record.

11   A.   Joel Maxwell.

12   Q.   Are you currently employed?

13   A.   Yes.

14   Q.   Where?

15   A.   Big Picture Solutions.

16             THE COURT:  Mr. Maxwell, could you speak up a bit,

17   please?

18             THE WITNESS:  Sure.

19             THE COURT:  Next question, please.

20   BY MR. ANDRES:

21   Q.   Can you explain to the jury what Big Picture Solutions

22   is?

23   A.   We do home automation and commercial automation and

24   lighting building control.

25   Q.   You say home automation, what does that involve?

─────────────────U.S. v. Manafort─────────────────
J. Maxwell - Direct
436

1   A.   That involves everything from just controlling your TV

2   all the way through to lighting control, video distribution

3   and that kind of stuff, networks.

4   Q.   And what is your position at Big Picture Solutions?

5   A.   COO.

6   Q.   And who owns Big Picture Solutions?

7   A.   My wife.

8   Q.   How long have you worked there?

9   A.   Since 2004.

10  Q.   And where is your business located?

11  A.   In Jupiter, Florida.

12  Q.   What geographic area does your -- does Big Picture

13  Solutions cover?

14  A.   Pretty much the United States.

15  Q.   Prior to your testimony here today, did you provide

16  certain materials to the Government pursuant to a subpoena?

17  A.   I did.

18  Q.   What types of materials did you provide?

19  A.   Invoices, bank statements.

20  Q.   Have you reviewed those materials with the Government

21  prior to your testimony?

22  A.   I have.

23  Q.   And are you appearing today pursuant to a subpoena?

24  A.   Yes.

25  Q.   Sir, do you know a man named Paul Manafort?

J. Maxwell - Direct

437

1   A.    I do.

2   Q.    How do you know Mr. Manafort?

3   A.    He's a client.

4   Q.    When did Mr. Manafort become a client of Big Picture

5   Solutions?

6   A.    2011, 2012.

7   Q.    And over what period of time was he a client of your

8   firm?

9   A.    Current.

10  Q.    In terms of account --

11            THE COURT:  I'm sorry, what was your answer?

12            THE WITNESS:  Current, still.

13            THE COURT:  Current?

14            THE WITNESS:  I mean -- well, yeah.

15            THE COURT:  Beginning when?

16            THE WITNESS:  2011 until as of last year when this

17  started.

18            THE COURT:  Next question.

19  BY MR. ANDRES:

20  Q.    In terms of account revenue, how would you rank

21  Mr. Manafort among your clients?

22  A.    Top five.

23  Q.    Did Mr. Manafort ever invest in Big Picture Solutions?

24  A.    No.

25  Q.    Do you know an individual named Rick Gates?

┌─────────────── U.S. v. Manafort ───────────────
J. Maxwell - Direct
                                                                    438

1    A.    I do.

2    Q.    How do you know Rick Gates?

3    A.    He handled wire transfer, billings, that kind of stuff.

4    Q.    For who?

5    A.    For Mr. Manafort.

6    Q.    Did you deal with Mr. Gates?

7    A.    Just e-mail and maybe a couple of conversations on the

8    phone.

9    Q.    Have you ever met him?

10   A.    No.

11   Q.    And how did you come to understand that you could deal

12   with Mr. Gates relating to Mr. Manafort's account?

13   A.    I was told by Mr. Manafort via e-mail.

14   Q.    And you testified that you've dealt with Mr. Manafort

15   from 2011 until recently.  When did you start dealing with

16   Mr. Gates?

17   A.    2013, 2014 time frame.

18   Q.    You testified that you did work for Mr. Manafort.  Did

19   you work in one of his houses or residences or more than one?

20   A.    More than one.

21   Q.    What different locations or residences did you do work

22   for Mr. Manafort?

23   A.    Bridgehampton, his New York and Arlington, Mt. Vernon,

24   and Florida.

25   Q.    With respect to Mr. Manafort's house in Bridgehampton,

─────U.S. v. Manafort─────

1   have you been there?

2   A.   Yes.

3   Q.   Okay.  Now, what types of work have you done at that

4   location?

5   A.   Networks, TV distribution, audio throughout, normal

6   stuff.

7   Q.   When you say "networks," what does that refer to?

8   A.   The wireless connection throughout the property, hard

9   wire connections for the TVs, Apple TVs, that kind of stuff.

10  Q.   And does it relate to internet access?

11  A.   Yes.

12  Q.   And when you were dealing with the proposals for the work

13  in Bridgehampton, who did you deal with?

14  A.   Mr. Manafort.

15  Q.   Did you ever deal with Mr. Gates on any issues relating

16  to Bridgehampton?

17  A.   Payments at some point.

18  Q.   With respect to the property at Mt. Vernon, what work did

19  you do there?

20  A.   Same kind of stuff, Apple TVs, network.

21  Q.   And how about the property in Arlington?

22  A.   Same, video TVs, network.

23  Q.   And with respect to the video TVs, what services do you

24  provide?

25  A.   We provide everything from the TV to the Apple TVs to,

──────U.S. v. Manafort──────

J. Maxwell - Direct

440

1   you know, anything that's required to keep everything

2   centrally located.

3   Q.   And when you -- when you're involved in centrally

4   locating the TV systems, can you explain how that works?

5   A.   Fiber or coppers ran between displays and the central

6   location.

7   Q.   And with respect to the Arlington property, do you know

8   who lived there?

9   A.   Andrea.

10  Q.   And who's Andrea?

11  A.   His daughter.

12  Q.   And who paid for that work?

13  A.   Mr. Manafort.

14  Q.   You testified about a property in New York.  What work

15  did you do in Mr. Manafort's New York property?

16  A.   TV control and networks.

17  Q.   How about the Palm Beach house?

18  A.   Same.

19  Q.   Mr. Maxwell, can you explain to the jury what your

20  billing practices are at Big Picture Solutions?

21  A.   We grant a proposal, client approves proposal, and then

22  depending on the size of the -- and the scope of the project,

23  then there's -- it's divided in percentages for payment.

24  Q.   Did you file this practice with respect to Mr. Manafort?

25  A.   We did.

┌─────────────────────────────────────────────────────────
──────── U.S. v. Manafort ────────

1   Q.   And how did you send your bills or invoices to

2   Mr. Manafort?

3   A.   They're e-mailed.

4   Q.   And how did Mr. Manafort pay for your services?

5   A.   Wire transfer.

6   Q.   Was it a domestic wire or an international wire?

7   A.   A mixture.

8   Q.   And do you have other clients who pay by international

9   wire?

10  A.   We have a few.

11  Q.   When you say, "a few," how many do you mean?

12  A.   Two or three.

13  Q.   Let me show you an exhibit marked Government Exhibit 102A

14  and ask that you take a look at those.

15       Have you had a chance to review those?

16  A.   Uh-huh.

17  Q.   What are the documents that are included in Government

18  Exhibit 102A?

19  A.   Invoices.

20  Q.   Invoices from where?

21  A.   From us.

22  Q.   All right.  When you say, "us," you mean Big Picture

23  Solutions?

24  A.   Yes, correct.

25  Q.   And who are -- who are the clients that are -- who are

─────U.S. v. Manafort─────

442

1  the clients listed on these invoices?

2  A.   Mr. Manafort, Andrea.

3  Q.   You say Andrea, that's his daughter?

4  A.   Correct.

5  Q.   So the invoices relate to Mr. Manafort and his family?

6  A.   Correct.

7  Q.   Okay.  And are these part of the documents that you

8  related -- that you provided to the Government?

9  A.   Yes.

10  Q.   And these relate to services that you provided to

11  Mr. Manafort?

12  A.   Correct.

13          MR. ANDRES:  Your Honor, the Government would move

14  to admit Government Exhibit 102A.

15          MR. NANAVATI:  No objection, Your Honor.

16          THE COURT:  Admitted.

17                              (Government's Exhibit No. 102A

18                               admitted into evidence.)

19          MR. ANDRES:  May I publish the first invoice to the

20  jury, Judge?

21          THE COURT:  Yes, you may.

22  BY MR. ANDRES:

23  Q.   Mr. Maxwell, can you look the invoice at Government

24  Exhibit 102A, the first one?

25          Can you tell me what the date of that invoice is?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

┌─────────── U.S. v. Manafort ───────────┐

1  A.   It's 10/27/11.

2  Q.   And who's the client?

3  A.   Mr. Manafort.

4  Q.   Can you explain the services that are described in this

5  invoice?

6  A.   There's network, wireless network, Apple TVs, battery

7  backup and labor.

8  Q.   The second item on the invoice that's at --

9        (Reporter clarification.)

10        THE WITNESS:  Battery backup and labor.

11  BY MR. ANDRES:

12  Q.   The second item on the invoice, SSV-1000, what's that?

13  A.   It's a Savant brand video distribution.

14  Q.   And how about the item that says "Unity 4RN-G," what's

15  that?

16  A.   That's the network.

17  Q.   And what's the total price of the invoice?

18  A.   34,000.

19  Q.   Can I ask you to look at the exhibit on Government

20  Exhibit 102.

21        THE COURT:  What did you ask?

22        MR. ANDRES:  To look at Government Exhibit 102.

23        THE COURT:  All right.  Go on.

24  BY MR. ANDRES:

25  Q.   Do you see that exhibit, Mr. Maxwell?

─U.S. v. Manafort─

1  A.    I do.

2  Q.    Have you seen that before?

3  A.    I have.

4  Q.    Okay.  The chart that's included in Government

5  Exhibit 102, did you create that?

6  A.    I did not.

7  Q.    Did someone provide it to you?

8  A.    The FBI.

9  Q.    And did you have an opportunity to review the facts and

10  figures in that chart?

11  A.    Yes.

12  Q.    Can you describe what information is conveyed in that

13  chart?

14  A.    A summary of the invoices that are in 102A.

15  Q.    And are the amounts of those invoices included?

16  A.    Yes.

17  Q.    Can you explain how you verified the information in that

18  chart?

19  A.    Went one by one, looking at the invoice, comparing it to

20  what's in here.

21  Q.    Okay.  With respect to the chart in Government

22  Exhibit 102, can you tell the jury the total amount of money

23  that was invoiced for Big Picture Solutions services to

24  Mr. Manafort in 2011?

25  A.    66,000.

─────U.S. v. Manafort─────
J. Maxwell - Direct
445

1   Q.   And in the year 2012, what was the total amount invoiced

2   to Mr. Manafort with respect to services from Big Picture

3   Solutions?

4   A.   A little over 455,000.

5   Q.   And with respect to 2013, what was the total amount in

6   dollars of the services invoiced to Mr. Manafort from Big

7   Picture Solutions?

8   A.   A little over 1.4 million.

9   Q.   And with respect to the year 2014, what was the total

10  amount invoiced to Mr. Manafort?

11  A.   291,000.

12  Q.   And then for that entire period from 2011 to 2014, what

13  were the total of the invoices sent to Mr. Manafort?

14  A.   A little over 2.2 million.

15  Q.   Can I ask you, Mr. Maxwell, to tell the jury during this

16  time period where Big Picture Solutions did its banking?

17  A.   We banked at Chase and Wells Fargo.

18  Q.   And did you have issues with respect to your accounts at

19  Chase?

20  A.   Yeah, the accounts were closed.

21  Q.   And after they closed, did you move to a different bank?

22  A.   It moved to Wells Fargo.

23  Q.   Can I ask you to take a look at Government Exhibit

24  102C -- actually, 102B.

25          Have you seen those?

U.S. v. Manafort

1    A.    You say 102B?

2    Q.    B, as in "boy"?

3    A.    I have.

4    Q.    Have you seen these documents before?

5    A.    Yes.

6    Q.    Do they relate to payments from Mr. Manafort?

7    A.    They do.

8                MR. ANDRES:  Your Honor, the Government moves to

9    admit 102B.

10               MR. NANAVATI:  No objection, Your Honor.

11               THE COURT:  All right.  The Exhibit 102B that I have

12   is marked up.

13               MR. ANDRES:  Oh, Judge, sorry.  We will have to

14   switch copies.

15               THE COURT:  All right.  Let me return this to you

16   then.  Show it to Mr. Nanavati, at least that one page.

17   That's all you have to show, Mr. Andres, and give me the --

18   the clean book that doesn't have your props.

19               MR. ANDRES:  Give you some idea where we're going,

20   Judge.

21               THE COURT:  I was quite clear I didn't need to have

22   that.  At least not as much as you did.

23               All right.  Go ahead, sir.

24               MR. ANDRES:  The Government moves to admit 102B.

25               MR. NANAVATI:  Without objection, Your Honor.

─────────────────────U.S. v. Manafort─────────

1              THE COURT:  All right.  It's admitted.

2                              (Government's Exhibit No. 102B

3                              admitted into evidence.)

4              MR. ANDRES:  Mr. Maxwell -- Judge, may I publish

5    that, the first page?

6              THE COURT:  Yes, you may.

7    BY MR. ANDRES:

8    Q.   With respect to Government Exhibit 102B, can you look at

9    the first document and explain to the jury what that is?

10   A.   That's a transaction for a wire transfer.

11   Q.   Okay.  And what's the date of the wire transfer?

12   A.   3/21/2011.

13   Q.   And what's the amount of the wire transfer?

14   A.   12,000.

15   Q.   How about the order party?

16   A.   Leviathan Advisors.

17   Q.   Okay.  And is there an address for Leviathan?

18   A.   Nicosia.

19   Q.   Do you know where Nicosia is?

20   A.   Uh-uh.

21   Q.   Do you know what Leviathan is?

22   A.   No.

23   Q.   And what's the bank that's --

24   A.   Marfin.

25   Q.   Excuse me?

U.S. v. Manafort

1   A.   Marfin.

2   Q.   And who is this payment made to?

3   A.   Big Picture Solutions.

4   Q.   And with respect to -- with respect to the Marfin Bank,

5   where is that located?  Does it indicate on the record?

6        THE COURT:  Your question is compound.

7   BY MR. ANDRES:

8   Q.   You referenced the order bank, Marfin Popular Bank.  Does

9   it list what country that bank is located in?

10  A.   Cyprus.

11  Q.   And who received this payment?

12  A.   Big Picture Solutions did.

13  Q.   And do you have an understanding of who made this

14  payment?

15  A.   Mr. Manafort.

16  Q.   And how did you know that?

17  A.   It matched invoices.

18  Q.   What matched invoices?

19  A.   The amount.

20  Q.   Okay.  Can I ask you to skip a few pages to the document

21  in Government Exhibit 102B at 0006?

22        Can you tell me what that is?

23  A.   It's a transaction for 25,000.

24  Q.   Okay.  And what's the date on the transaction?

25  A.   3/21 -- I'm sorry -- 5/16.

J. Maxwell - Direct

1  Q.   And what's the amount of the transaction?

2  A.   25,000.

3  Q.   And what's the order party?

4  A.   Leviathan.

5  Q.   And how about the bank?

6  A.   Marfin.

7  Q.   And who did that payment come to?

8  A.   Big Picture Solutions.

9  Q.   Did you have an understanding of who that payment came

10 from?

11 A.   Mr. Manafort.

12 Q.   And how did you know that?

13 A.   It was, again, part of our invoices.

14 Q.   Can I ask you to take a look at the next page, 009?

15      Can you tell me the transaction date on that

16 document?

17 A.   11/15/11.

18 Q.   And the amount of the transaction?

19 A.   $17,006.

20 Q.   What's the order party?

21 A.   Global Highway.

22 Q.   And does it list an address for Global Highway?

23 A.   Nicosia.

24 Q.   And where is the order bank?

25 A.   Marfin.

J. Maxwell - Direct

450

1    Q.   And who did you understand that this payment came from?

2    A.   Mr. Manafort.

3    Q.   Can I ask you to skip ahead to the document that ends in

4    00022?

5         Can you tell me the date of this transaction?

6    A.   10/31/2012.

7    Q.   And who is the order party?

8    A.   I don't know how to say it.

9    Q.   Can you spell it?

10   A.   L-u-c-i-c-l-e.

11   Q.   Lucicle Consultants?

12   A.   Yeah, that one.

13   Q.   And what's the order bank?

14   A.   Cyprus.

15   Q.   And who did you understand this payment to come from?

16   A.   Mr. Manafort.

17   Q.   Can I ask you to turn to the document, the last one,

18   0036?

19        Can you tell me the date of that transaction?

20   A.   4/25/2013.

21   Q.   And what's the amount paid in this transaction?

22   A.   200,000.

23   Q.   And who is the -- the order party?

24   A.   Mr. Manafort.

25   Q.   And what bank did he use?

─────U.S. v. Manafort─────
J. Maxwell - Direct
451

1   A.   First Republic Bank.

2   Q.   And what's the address in that bank?

3   A.   San Francisco.

4   Q.   And who did you understand this payment to come from?

5   A.   Mr. Manafort.

6   Q.   Sorry, just one more, the next one at 0037.

7        Can you explain the date of this transaction?

8   A.   5/6/2013.

9   Q.   And the amount?

10  A.   124,000.

11  Q.   Who is the order party?

12  A.   DMP International.

13  Q.   Who did you understand DMP International to be?

14  A.   Mr. Manafort's company.

15  Q.   And -- and what bank was used for that?

16  A.   HSBC.

17  Q.   Okay.  And can I ask you now to turn to Government

18  Exhibit 10 -- 102C?

19       Can you tell me what these are?

20  A.   Bank statements.

21  Q.   From what bank?

22  A.   Wells Fargo.

23  Q.   Who is -- who is the customer?

24  A.   Big Picture Solutions.

25       MR. ANDRES:  Your Honor, the Government moves to

─────U.S. v. Manafort─────

452

1  admit 102C.

2            MR. NANAVATI:  Without objection, Your Honor.

3            THE COURT:  Admitted.  Next question.

4                              (Government's Exhibit No. 102C

5                              admitted into evidence.)

6            MR. ANDRES:  May I publish the first page, Your

7  Honor?

8            THE COURT:  You may.

9  BY MR. ANDRES:

10  Q.   Mr. Maxwell, if I could ask you to look on Government

11  Exhibit 102C.  Can you call up the entry of 8/29?

12            Can I ask you to call your attention to the entry on

13  the bank statement at 8/29/2013?

14  A.   That's a wire transfer for Loyal Bank from Global

15  Endeavour.

16  Q.   Okay.  And what's the amount?

17  A.   179,000.

18  Q.   And who did you understand this payment to be from?

19  A.   Mr. Manafort.

20  Q.   Can you turn to the next page ending in 0074?

21            Can you turn to the entry at 11/5?  Tell me what

22  that is.

23  A.   A wire transfer.  Loyal Bank, Global Endeavour, 73,000.

24  Q.   And who did you understand that to be?

25  A.   Mr. Manafort.

────────────U.S. v. Manafort────────────
J. Maxwell - Direct
453

1    Q.   And the last transaction on 42, the next page, 0096.

2         4/2/2014, do you see an entry there?

3    A.   I do.

4    Q.   Can you explain that entry?

5    A.   Wire transfer, HSBC Bank, DMP.

6    Q.   And who did you understand that to be?

7    A.   Mr. Manafort.

8    Q.   Mr. Maxwell, can I ask you to turn to Government Exhibit

9    67A?

10        Your Honor, this document is already admitted into

11   evidence.

12        THE COURT:  All right.

13   BY MR. ANDRES:

14   Q.   Can I ask you to turn to the second page?

15        Can I ask to publish this document, Your Honor?

16        THE COURT:  Yes, you may, if it's been admitted.

17        MR. ANDRES:  Yes.

18   BY MR. ANDRES:

19   Q.   This document, sir, have you seen it prior to today?

20   A.   I have.

21   Q.   You have.  Did you see it in preparation for your

22   testimony?

23   A.   Yes.

24   Q.   Is the document that's included in 67A, is that an

25   invoice from your company?

─────U.S. v. Manafort─────

1   A.   It is not.

2   Q.   Okay.  Is the name of your company listed on that

3   invoice?

4   A.   Kind of.

5   Q.   Okay.  When you say "kind of," what do you mean by that?

6   A.   We're not an LLC.

7   Q.   And can you point to where you're talking about?  It

8   says, "Big Picture Solutions, LLC."

9   A.   We're a S Corp so we're --

10  Q.   Okay.  How about the address listed; is that correct?

11  A.   No.

12  Q.   And the -- it says to Global Endeavour, Inc.  Do you have

13  a client in Nicosia named Global Endeavour, Inc.?

14  A.   No.

15  Q.   And the services listed?

16  A.   They are not detailed like ours would be.

17  Q.   Okay.  Can I direct your attention back to Government

18  Exhibit 102B?

19          Could I have a moment, Your Honor?

20          THE COURT:  Yes, you may.

21          (A pause in the proceedings.)

22          THE COURT:  I've been to Greece, not to Cyprus, and

23  I'm not a Greek speaker, but I believe -- or a Turkish

24  speaker, but I think they pronounce it Nicosia.

25          MR. ANDRES:  Okay.  Thank you, Judge.

U.S. v. Manafort

1          THE COURT:  I could be wrong about that.

2  BY MR. ANDRES:

3  Q.   Actually, could you turn to Government Exhibit 102C on

4  the first page?

5          The entry at 8/29.

6  A.   Uh-huh.

7  Q.   What entity is referenced in that payment?

8  A.   Global Endeavour.

9  Q.   Okay.  And what bank is located?

10  A.   Loyal Bank.

11  Q.   And when you compare that to the exhibit -- and that

12  entry at 8/29, who did you understand that to come from?

13  A.   Mr. Manafort.

14  Q.   And then when you compare that to the client listed in

15  Government Exhibit 67A, can you tell me what you find?

16  A.   Global Endeavour.

17  Q.   And then with respect to -- can you see the stamp?  Can

18  you read what that says?

19  A.   Loyal Bank.

20  Q.   Okay.  Lastly, Mr. Maxwell, can I ask you to turn to

21  Government Exhibit 436 -- 102D?

22          Can you take a look at those documents and let me

23  know when you've had a chance to review them?

24  A.   I'm assuming 436G.

25  Q.   102D.

U.S. v. Manafort

1   A.   Okay.  I don't have a D.

2   Q.   You don't have a 102D?

3   A.   It does not appear.

4   Q.   Okay.

5          THE COURT:  Show it to Mr. --

6          MR. ANDRES:  He has a copy, Judge.  Thank you.

7          THE COURT:  All right.

8   BY MR. ANDRES:

9   Q.   What are the documents included in 102D?

10  A.   E-mails.

11  Q.   And who are those e-mails between?

12  A.   Between myself and Mr. Gates.

13  Q.   And if you look at the top e-mail, what's the date of

14  that e-mail?

15  A.   March 23, 2014.

16  Q.   Okay.

17         Your Honor, the Government -- and did these e-mails

18  relate to the payment, payments related to Mr. Manafort's

19  account?

20  A.   Yes.

21         MR. ANDRES:  The Government moves to admit 102D.

22         MR. NANAVATI:  We don't object, Your Honor.

23         THE COURT:  All right.  It's admitted.

24  BY MR. ANDRES:

25  Q.   Okay.  Can you explain to the jury, there's a series of

—————U.S. v. Manafort—————

1   e-mails here, what these e-mails relate to?

2   A.    They relate to payment from wire transfers.

3   Q.    Okay.  And who are you discussing the payments with?

4   A.    Mr. Gates.

5   Q.    And as they relate to whose account?

6   A.    Mr. Manafort.

7   Q.    Okay.

8          May I have a moment, Your Honor?

9          THE COURT:  Yes.

10         MR. ANDRES:  Just one final question, Your Honor.

11  BY MR. ANDRES:

12  Q.    Mr. Maxwell, was Mr. Gates ever a client of Big Picture

13  Solutions?

14  A.    No.

15  Q.    Okay.

16         Thank you, Judge.

17         THE COURT:  Any cross-examination?

18         MR. NANAVATI:  Thank you, Your Honor.  Yes, please.

19                    **CROSS-EXAMINATION**

20  BY MR. NANAVATI:

21  Q.    Good morning, Mr. Maxwell.  My name is Jay Nanavati, and

22  I represent Paul Manafort.

23         Just wanted to ask you a few questions.  Regarding

24  Government Exhibit 102D, the stack of e-mails that you were

25  just looking at, you'd mentioned that -- that they related to

─U.S. v. Manafort─

458

1  Mr. Manafort's account, right?

2  A.    Uh-huh, correct.

3  Q.    Just to clarify, you mean his account with you, right?

4  A.    Correct.

5  Q.    Not his bank account?

6  A.    Correct.

7  Q.    Okay.  And these e-mails that we're talking about, is it

8  fair to say that they describe a series of frustrating

9  interactions between you and Mr. Gates regarding payment?

10  A.    That's true.

11  Q.    Okay.  And is it also fair to say that in the e-mails

12  Mr. Gates is trying to explain why it's so hard to move money

13  from their accounts to your account?

14  A.    Correct.

15  Q.    Okay.  And then I also want to take you back to

16  Government Exhibit 67A.  It's the LLC invoice, the one that --

17  A.    Yes.

18  Q.    That's for $163,000?

19  A.    Correct.

20  Q.    But that's an amount that you were not paid, correct?

21  A.    That's correct.

22  Q.    And it's for services you did not provide, right?

23  A.    Correct.

24  Q.    You don't provide -- you don't describe your services as

25  goods and services provided pursuant during the month of

1   April, right?

2   A.   We do not.

3   Q.   Okay.  And you -- and you also -- when you took a look at

4   this exhibit, you saw that it came from an account at Loyal

5   Bank in St. Vincent in the Grenadines?

6   A.   Correct.

7   Q.   In the name of Global Endeavour?

8   A.   Correct.

9   Q.   But you don't know who has or had signature authority

10  over that account, do you?

11  A.   That's correct.

12  Q.   Okay.  And when you were dealing with -- we'll call it

13  the Manafort Big Picture Solutions account -- when it came to

14  money, you dealt with Rick Gates, correct?

15  A.   Correct.

16          MR. NANAVATI:  Your Honor, I don't have any other

17  questions.

18          THE COURT:  All right.  Any redirect?

19          MR. ANDRES:  Just briefly, Your Honor.

20                    **REDIRECT EXAMINATION**

21  BY MR. ANDRES:

22  Q.   Mr. Maxwell, you were asked a question about whether you

23  dealt with Mr. Gates on money issues.  When did that start?

24  A.   That started in 2013, I would say.  2012.

25  Q.   Okay.  So when Mr. Manafort was a client in 2011, did you

────────U.S. v. Manafort────────

460

1    deal with Mr. Gates?

2    A.    Not to my knowledge.

3    Q.    How about 2012?

4    A.    Not to my knowledge.

5    Q.    Okay.  And Mr. Nanavati asked you if you had done

6    services for Global Endeavour.

7          Do you remember him asking you that?

8    A.    Correct.

9    Q.    Your bank records show that you did receive payments from

10   Global Endeavour; isn't that right?

11   A.    Yes.

12   Q.    And those -- those payments you relate to a particular

13   client?

14   A.    They match transactions to Mr. Manafort.

15   Q.    Mr. Nanavati asked about the movement of money from their

16   accounts to your accounts.  When he said "their accounts,"

17   what did you understand that to mean?

18   A.    The whole group, Manafort and his companies, whatever.

19   Q.    Not any accounts controlled by Mr. Gates?

20   A.    I don't have that information.

21         MR. NANAVATI:  Objection, calls for speculation.

22         THE COURT:  Well, the objection is overruled.  He's

23   already answered.  You don't know, do you?

24         THE WITNESS:  No, I do not.

25         THE COURT:  Next question.

1          MR. ANDRES:  No other questions, Your Honor.

2          THE COURT:  Any recross based on that redirect?

3          MR. NANAVATI:  No, thank you, Your Honor.

4          THE COURT:  All right.

5          Do you know from whom you received the document that

6    has the name on the top of it -- I forgot what exhibit number

7    it is -- that isn't the name of your company?  What exhibit

8    number was that?

9          MR. ANDRES:  67A, Judge.

10          THE COURT:  67A, would you look at that again?  You

11   have that?

12          THE WITNESS:  I have it, yes.

13          THE COURT:  Do you know from whom you received that?

14          THE WITNESS:  I received it from the FBI.

15          MR. ANDRES:  Judge, he didn't receive a copy of

16   that.  He just was testifying --

17          THE COURT:  Well, I think that ought to be clear.

18   And I just clarified it because I thought he had received it

19   from somebody else.

20          All right.  So you didn't receive that in the course

21   of business; is that correct?

22          THE WITNESS:  No, sir.

23          THE COURT:  All right.  Thank you.  You may step

24   down.

25                    (Witness excused.)

U.S. v. Manafort

1          THE COURT:  And this witness may be excused.

2          MR. ANDRES:  Yes, Your Honor.

3          THE COURT:  Mr. Asonye, are you the next person?

4          MR. ASONYE:  For this brief -- well, this portion,

5    Your Honor.  The Government at this time --

6          THE COURT:  I was hoping you would stick with that.

7          MR. ASONYE:  The Government would like to enter in a

8    number of stipulations into the record, Your Honor.

9          THE COURT:  All right.

10          MR. ASONYE:  The first being Government Exhibit 327.

11          THE COURT:  I have 327A.  I don't think I have 327.

12          MR. ASONYE:  We'll hand it up, Your Honor.

13          THE COURT:  Maybe I do.  Just a minute.  Let me --

14    yes, I do have it.  I'm sorry.  I do have it.

15          All right.  This is the stipulation, ladies and

16    gentlemen, between the parties, and they stipulate to the

17    following facts:

18          First, Mark Baldinger previously owned Aegis,

19    A-E-G-I-S, Aegis Holdings, LLC, which provided investment

20    advice.  In 2013, Paul J. Manafort, Jr., through an entity he

21    controlled, named LilRed, LLC, made various investments

22    through Aegis Holdings, LLC, totaling approximately

23    $1,500,000.

24          On September 4, 2013, at 10:43 a.m., Mark Baldinger

25    sent an e-mail to Mr. Manafort inquiring about a $500,000

1    payment noting, "Please let me know when you've attempted to

2    wire the funds and I will look out for it."

3            Mr. Manafort sent an e-mail in response on September

4    4, 2013, at 10:44 a.m. and noted, "They should be in your

5    account today coming from Global Endeavour, Ltd."

6            On September 4, 2013, $500,000 was transferred from

7    Global Endeavour, Inc.'s bank account to Loyal Bank in

8    Kingstown, St. Vincent, and the Grenadines to an account at

9    Aegis Holdings, LLC.

10           MR. ASONYE:  And we don't need that last paragraph,

11   Your Honor.

12           THE COURT:  All right.

13           Now, the purpose of that stipulation, of course, is

14   to obviate the necessity to hear testimony.

15           MR. ASONYE:  Yes, Your Honor.

16           THE COURT:  All right.  What's the next one,

17   Mr. Asonye?

18           MR. ASONYE:  The next one, Your Honor, is Government

19   Exhibit 334.  That one is quite a bit longer, Your Honor.

20           THE COURT:  All right.  I have it.  Is this a

21   stipulation regarding renovations of Palm Beach Gardens,

22   Florida, residence?

23           MR. ASONYE:  Yes, Your Honor.

24           THE COURT:  All right.  Ladies and gentlemen, the

25   parties stipulate to the following facts.  And, again, you'll

U.S. v. Manafort

1    have these stipulations in the jury room with you.

2          First, Carl Sabatello is the president of Sabatello

3    Construction of Florida, Inc., which is a construction company

4    that operates in the Palm Beach, Florida, area.  On

5    November 14, 2011, Sabatello Construction of Florida entered

6    into a contract with Paul J. Manafort, Jr., and Kathleen

7    Manafort with respect to the renovation of their master

8    bathroom at their home on 10 St. James Drive in Palm Beach

9    Gardens, Florida.

10          The contract price for the work was $38,475.  And as

11   part of the payment for that renovation on November 15, 2011,

12   a wire transfer was made from Global Highway Limited in the

13   amount of $8,000 from a bank account at Marfin Laiki Bank in

14   Nicosia, Cyprus to an account of Sabatello Construction of

15   Florida, Inc.

16          This is a long one, Mr. Asonye.

17          MR. ASONYE:  It is, Your Honor.  I'm happy to read

18   it, Your Honor, if the Court prefers or. . .

19          THE COURT:  Yes, you go ahead and read the rest of

20   it.  I don't know why we can't simply submit it, but I'll let

21   you read the rest of it.

22          MR. ASONYE:  As further part of the payment for that

23   renovation on December 5, 2011, a wire transfer was made from

24   Leviathan Advisors Limited in the amount of $11,237 from a

25   bank account at Marfin Laiki Bank in Nicosia, Cyprus, to an

M. Regolizio - Direct

465

1  account of Sabatello Construction of Florida, Inc.

2          As further part of the payment for that renovation,

3  on December 21, 2011, a wire transfer was made from Black Sea

4  View Limited in the amount of $20,000 from a bank account at

5  Marfin Laiki Bank in the Nicosia, Cyprus, to Sabatello

6  Construction of Florida, Inc.

7          On February 4, 2012, Sabatello Construction of

8  Florida, Inc., entered into an additional contract with Paul

9  and Kathleen Manafort with respect to remodeling the master

10 bathroom and construction of an addition to the guesthouse at

11 their home on 10 St. James Drive in Palm Beach Gardens,

12 Florida.  The contract price for the work was $259,300.

13         With respect to the February 4, 2012, contract,

14 there were nine changed orders reflecting additional work

15 agreed to and signed by Sabatello Construction of Florida and

16 Mr. Manafort.  The total cost associated with these change

17 orders was $133,941.

18         As part of payment of the February -- as part of the

19 payment for the February 4, 2012 contract, and the nine change

20 orders, the following payments were made:

21         On February 9, 2012, a wire transfer was made from

22 Global Highway Limited in the amount of $51,000 from a bank

23 account at Marfin Laiki Bank in Nicosia, Cyprus, to Sabatello

24 Construction of Florida.

25         On May 17, 2012, a wire transfer was made from

U.S. v. Manafort

1   Lucicle Consultants Limited in the amount of $68,000 from a

2   bank account at Marfin Laiki Bank in Nicosia, Cyprus, to

3   Sabatello Construction.

4          On June 19, 2012, a wire transfer was made from

5   Lucicle Consultants Limited in the amount of $60,000 from a

6   bank account at Marfin Laiki Bank in Nicosia, Cyprus, to

7   Sabatello Construction.

8          On July 11, 2012, a wire transfer was made from

9   Lucicle Consultants Limited in the amount of $32,250 from a

10  bank account at Marfin Laiki Bank in Nicosia, Cyprus, to

11  Sabatello Construction of Florida.

12         On September 19, 2012, a wire transfer was made from

13  Lucicle Consultants Limited in the amount of $112,000 from a

14  bank account at Marfin Laiki Bank in Nicosia, Cyprus, to

15  Sabatello Construction of Florida.

16         On November 30, 2012, a wire transfer was made from

17  Lucicle Consultants in the amount of $39,700 from a bank

18  account at Marfin Laiki Bank in Nicosia, Cyprus, to Sabatello

19  Construction.

20         And on January 9, 2013, a wire transfer was made

21  from Lucicle Consultants Limited in the amount of $25,600 from

22  a bank account at Laiki Bank in Nicosia, Cyprus, to Sabatello

23  Construction of Florida.

24         And, finally:  On February 28, 2013, a wire transfer

25  was made from Lucicle Consultants Limited in the amount of

───────U.S. v. Manafort───────

M. Regolizio - Direct

467

1   $4,700 from a bank account at Hellenic Bank in Nicosia,

2   Cyprus, to Sabatello Construction of Florida, Inc.

3              THE COURT:  All right.  Any other --

4              MR. ASONYE:  At this time there is one additional

5   stipulation, Your Honor, we introduce.  It's Government's

6   Exhibit 336.

7              This one is a page and a half long.  I'm happy to

8   read it, Your Honor, or defer to the Court.

9              THE COURT:  Go ahead.  You may read it.

10             MR. ASONYE:  This is a stipulation --

11             THE COURT:  I understand that.  The defendant has

12  agreed to this and entered into these stipulations and you

13  have been on behalf of the Government.  So we don't have to

14  hear evidence about this.

15             MR. ASONYE:  Yes, Your Honor, we're not calling any

16  witnesses on these invoices.

17             THE COURT:  All right.  Let's proceed.

18             MR. ASONYE:  Stipulation regarding purchase of audio

19  video system and service.  The parties stipulate to the

20  following facts:

21             Greg Garland was the co-owner of Sensoryphile, Inc.,

22  which operates in the Hamptons, New York, area.  Paul J.

23  Manafort, Jr., had been a client of Sensoryphile, Inc., since

24  approximately 1994.

25             Sensoryphile, Inc., installed the original

U.S. v. Manafort

468

1    audiovisual/video system and karaoke system at Manafort's

2    residence at 174 Jobs Lane, Bridgehampton, New York.

3            On March 1, 2010, Sensoryphile, Inc., submitted

4    invoice No. 76381 in the amount of $20,339 for Creston design

5    and installation.  As payment of that invoice, on March 8,

6    2010, Global Highway Limited transferred $20,300 from its bank

7    account at Marfin Laiki Bank in Nicosia, Cyprus, to

8    Sensoryphile, Inc.

9            On April 15, 2010, Sensoryphile submitted invoice

10   No. 76526REV2 in the amount of $8,147 for a deposit on a

11   karaoke machine and audio visual design and installation.

12           As payment for that invoice, on April 23, 2010,

13   Yiakora Ventures Limited transferred $8,500 from its bank

14   account at Bank of Cyprus in Nicosia, Cyprus, to Sensoryphile,

15   Inc.

16           On July 13, 2010, Sensoryphile submitted invoice

17   76836 in the amount of $10,395 for a karaoke machine and an

18   audio visual design and installation.

19           On July 15, 2010, Sensoryphile submitted an invoice

20   No. 76838 in the amount of $7,574 for Creston design and

21   installation and televisions.  As payment of both invoices, on

22   July 29, 2010, Leviathan Advisors Limited transferred $17,650

23   from its bank account at Marfin Laiki Bank in Nicosia, Cyprus,

24   to Sensoryphile Inc.

25           Thank you, Your Honor.

U.S. v. Manafort

1          THE COURT:  Who is your next witness?

2          MR. VAN GRACK:  Your Honor, at this time the

3   Government calls Michael Regolizio.

4          THE COURT:  Come forward, take the oath, please,

5   sir.

6          How long do you think this witness will take,

7   Mr. Van Grack?

8          MR. VAN GRACK:  15 to 20 minutes, Your Honor.

9          THE COURT:  All right.  I think we'll probably

10  recess after this witness.

11         Come forward and take the oath, please, sir.

12         Thereupon,

13                          **MICHAEL REGOLIZIO,**

14  having been called as a witness on behalf of the Government

15  and having been first duly sworn by the Deputy Clerk, was

16  examined and testified as follows:

17                      (Witness seated.)

18         THE COURT:  You may proceed.

19                      **DIRECT EXAMINATION**

20  BY MR. VAN GRACK:

21  Q.   Could you please state your name and spell it for the

22  record?

23  A.   Michael Regolizio, M-i-c-h-a-e-l R-e-g-o-l-i-z-i-o.

24  Q.   And how old are you?

25  A.   47.

M. Regolizio - Direct

470

```
 1   Q.    Where do you live?

 2   A.    Flanders, New York.

 3   Q.    Are you employed?

 4   A.    Yes.

 5   Q.    Where?

 6   A.    New Leaf Landscape Maintenance.

 7   Q.    And where is New Leaf Landscape located?

 8   A.    Southhampton, New York.

 9   Q.    And what is New Leaf Landscape?

10   A.    It's a full service landscape design, install, and

11   maintenance company.

12   Q.    How long have you worked there?

13   A.    Since September of 2003.

14   Q.    And what is your position at New Leaf?

15   A.    I am the owner.

16   Q.    Are there any other owners?

17   A.    No.

18   Q.    And what are some of your duties as owner of New Leaf

19   Landscape?

20   A.    I supervise managers.  I handle all accounts payable,

21   accounts receivable, all banking.

22   Q.    And as the owner, are you familiar with the process by

23   which New Leaf Landscape creates and maintains records?

24   A.    Yes.

25   Q.    And for approximately how long have you been in the
```

1   landscaping business?

2   A.   Thirty years.

3   Q.   Now, I'd like to ask you some questions specifically

4   about an individual named "Paul Manafort."

5          Do you know Paul Manafort?

6   A.   Yes.

7   Q.   How do you know Mr. Manafort?

8   A.   He's a client.

9   Q.   Have you communicated with Mr. Manafort before?

10  A.   Yes.

11  Q.   And have you met him in person?

12  A.   Yes.

13  Q.   Who introduced you to Mr. Manafort?

14  A.   Steve Jacobson.

15  Q.   And why did Mr. Jacobson make that introduction?

16  A.   He was a --

17          THE COURT:  If you know.

18          THE WITNESS:  -- home improvement --

19          THE COURT:  Did you hear what I said?  I said if you

20  know.  Keep in mind you're being asked questions that you need

21  to answer of your own knowledge.  If you don't know, say so.

22  He's asked you whether you know what this person introduced

23  you -- what reason he had.

24          THE WITNESS:  I know the reason.

25          THE COURT:  If you know, you may say, but you don't

U.S. v. Manafort

1  speculate.

2  THE WITNESS:  Okay.  We were referring business back

3  and forth.  That's the reason why he referred multiple

4  clients.

5  BY MR. VAN GRACK:

6  Q.  And did that referral lead to New Leaf Landscape doing

7  work for Mr. Manafort?

8  A.  Yes.

9  Q.  And when did that work begin?

10  A.  2010.

11  Q.  And in 2010 what was the scope of that work?

12  A.  We were brought in just to do tree care.

13  Q.  And at which property did you perform the work for

14  Mr. Manafort?

15  A.  Jobs Lane in Bridgehampton.

16  Q.  And did there come a time when the scope of your work

17  changed for Mr. Manafort?

18  A.  Yes.

19  Q.  And approximately when was that?

20  A.  2012.

21  Q.  And what changed about the scope of your work?

22  A.  We took over the entire landscape maintenance and install

23  on the property.

24  Q.  And do you still landscape that property at Bridgehampton

25  for Mr. Manafort?

─────U.S. v. Manafort─────

473

1   A.    Not today, no.

2   Q.    When did that work cease?

3   A.    December 2017.

4   Q.    Is there any other property that you landscape for

5   Mr. Manafort?

6   A.    No.

7   Q.    So in total, for how long have you landscaped

8   Mr. Manafort's property at Bridgehampton?

9   A.    Seven years.

10  Q.    And can you generally describe the landscaping work that

11  you performed at that Bridgehampton property?

12  A.    Yes.  I mean, the property is acre, acre and a half

13  estate.  We -- you know, surrounded by 14-foot hedges that we

14  pruned multiple times a year.  The lawn throughout the whole

15  property was mowed twice a week and we fertilized.  And

16  hundreds and hundreds of flowers, you know, were planted.

17        As you pull in the driveway, to the left there was a

18  huge flower bed that was all white flowers with red flowers

19  and it's shaped like a M.  To the right there was a very large

20  pond, one of the bigger ponds in the Hamptons, manmade pond

21  that had a waterfall feature.  We would clean that a few times

22  a year.

23        We would plant all the annuals around the pond.

24  Fertilize them weekly.  I mean, there was -- there was a crew

25  on that property, you know, easily four or five times a week.

1   Next to the pond was a tennis court.  Around the tennis court,

2   there was hundreds and hundreds of flowers planted, that we

3   would fertilize weekly, deadhead, clean up.  Weed the beds,

4   edge them.

5          In the back yard there were flowerpots, large

6   flowerpots that we would --

7   Q.   Mr. Regolizio, that's -- I think that's sufficient

8   detail.

9   A.   Okay.  I like to talk about my work.

10          THE COURT:  I'm glad you recognized it.  I might

11   have recognized it earlier.

12          MR. VAN GRACK:  Understood, Your Honor.

13   BY MR. VAN GRACK:

14   Q.   And over the course of your seven years landscaping for

15   Mr. Manafort, who directed you on what to landscape?

16   A.   Paul Manafort.

17   Q.   Did anyone else provide that direction?

18   A.   No.

19   Q.   And over those seven years, who did you talk to about

20   payments for your work?

21   A.   Paul Manafort.

22   Q.   Did you talk to anyone else about those payments?

23   A.   No.

24   Q.   Mr. Regolizio, did you provide documents and other

25   materials to the Government pursuant to a subpoena?

1  A.   Yes.

2  Q.   And can you describe generally what types of materials

3  you provided?

4  A.   Invoices, contracts, bank statements.

5  Q.   Photographs?

6  A.   Photographs.

7  Q.   And have you reviewed those materials with the Government

8  prior to appearing in court today?

9  A.   Yes.

10 Q.   When you began your work for Mr. Manafort in 2010, did

11 you issue invoices to your clients?

12 A.   Yes.

13 Q.   And did you send invoices to Mr. Manafort?

14 A.   Yes.

15 Q.   How did you send those invoice to Mr. Manafort?

16 A.   E-mail.

17 Q.   And in 2010 when you began working for Mr. Manafort, did

18 you e-mail those invoices to anyone other than Mr. Manafort?

19 A.   No.

20 Q.   At some point did that practice change?

21 A.   Yes.

22 Q.   What changed?

23 A.   At somewhere along the line, we were told to e-mail

24 somebody else, which happens a lot with our clients.

25 Q.   Do you know approximately when that was?

M. Regolizio - Direct

1  A.   I don't know.  It was later years.  I don't remember

2  exactly.

3  Q.   And did you continue to e-mail invoices to Mr. Manafort

4  as well?

5  A.   The client -- our clients always get the e-mail.  If they

6  request we CC somebody else on it, we will add them, but we

7  never take the client's name off.

8  Q.   And so after that point in time when someone else was

9  CC'd --

10  A.   CC'd, yeah.

11  Q.   -- on those e-mails --

12  A.   Yeah.

13  Q.   -- who did you talk to about payments with respect to

14  your landscaping work?

15  A.   I would usually speak to only Paul Manafort.

16  Q.   Was there anyone else that you spoke with about payments?

17  A.   No.

18  Q.   Mr. Regolizio, if you could please turn to Government's

19  Exhibit 107A, which should be in your binder.

20         Do you recognize those documents?

21  A.   Yes.

22  Q.   And what are they?

23  A.   These are invoices, New Leaf Landscape invoices.

24  Q.   And who is the client for those invoices?

25  A.   Paul Manafort.

1  Q.   And what are the years those invoices are for?

2  A.   2010 through 2014.

3  Q.   Were those invoices created near the time of the work by

4  someone with knowledge?

5  A.   Yes.

6  Q.   And was it the regular practice of New Leaf Landscape to

7  make such records?

8  A.   Yes.

9  Q.   And were these records kept in the ordinary course of

10  business for New Leaf Landscape?

11  A.   Yes.

12          MR. VAN GRACK:  Your Honor, at this time the

13  Government would move to admit Government Exhibit 107A.

14          MR. NANAVATI:  No objection, Your Honor.

15          THE COURT:  All right.  They're admitted.  You can

16  eliminate some of that by knowing that they weren't going to

17  object.

18          MR. VAN GRACK:  Yes, Your Honor.

19          Let's proceed.

20                              (Government's Exhibit No. 107A

21                              admitted into evidence.)

22          MR. VAN GRACK:  Your Honor, may the Government

23  publish a single document from that invoice?

24          THE COURT:  Yes, you may.

25  BY MR. VAN GRACK:

U.S. v. Manafort

1   Q.   If you could please take a look at page 18 of Government

2   Exhibit 107A, the invoice dated February 7, 2012.  Do you see

3   that invoice?

4   A.   Yes.

5   Q.   If you could look at the writing on the top left corner

6   of the invoice and describe what that -- what's on that --

7   A.   That's our New Leaf logo, the name of our company, New

8   Leaf Landscape Maintenance, our address, our phone number.

9   Q.   And who are the services for on this invoice?

10  A.   Paul Manafort, Jobs Lane in Bridgehampton.

11  Q.   And this particular invoice, how did you transmit it to

12  Mr. Manafort?

13  A.   I'm sorry?

14  Q.   And how did you transmit this invoice to Mr. Manafort?

15  A.   E-mail.  E-mail.

16  Q.   And what is the description of the work in that invoice?

17  A.   This was the 2012 landscape maintenance contract

18  installment.  We bill clients in installments.

19  Q.   And why, with respect to this invoice, does it say that

20  it was an installment?

21  A.   This was when I met with Paul Manafort and we were taking

22  over the entire property.  And he -- he requested to pay half

23  up front, which sometimes clients do, they'll say, I'll pay

24  you half now and I'll pay you half midseason.

25  Q.   And was this bill paid?

U.S. v. Manafort

M. Regolizio - Direct

479

```
 1   A.   Yes.

 2   Q.   And who paid it?

 3   A.   Paul Manafort.

 4   Q.   Mr. Regolizio, I would like to now direct your attention

 5   to what's been marked as Government Exhibit 107.

 6            Have you seen this chart before?

 7   A.   Yes.

 8   Q.   And what is contained on this chart?

 9   A.   This is every invoice New Leaf Landscape sent to Paul

10   Manafort from 2010 to 2014.

11   Q.   And were those the invoices we were just looking at at

12   Government Exhibit 107A?

13   A.   Yes.

14   Q.   Prior to your testimony, did you review the information

15   on this chart?

16   A.   Yes.

17   Q.   And what did you determine -- or how did you review that

18   information?

19   A.   All the -- all the dates and invoice numbers

20   cross-tracked with our computer system back at the office.

21   Q.   And who cross-checked them?

22   A.   Me.

23   Q.   And what did you determine as to the accuracy of this

24   chart?

25   A.   It's accurate.
```

1  Q.   If I could direct your attention to the year 2010, how

2  much money did New Leaf Landscape invoice Mr. Manafort?

3  A.   $4,426.

4  Q.   And for 2011, how much money did New Leaf Landscape

5  invoice Mr. Manafort?

6  A.   $13,035.

7  Q.   And for 2012?

8  A.   $134,365.

9  Q.   And why was there an increase from 2011 to 2012?

10 A.   That's when we went from just doing tree care on the

11 property.  We took over the entire property and that number

12 reflects that.

13 Q.   And for 2013, how much did New Leaf Landscape charge

14 Mr. Manafort?

15 A.   155,799.

16 Q.   And finally for 2014?

17 A.   $144,071.

18 Q.   Now, Mr. Regolizio, I'd like to ask about payments.

19        How did customers generally pay New Leaf Landscape

20 for your work?

21 A.   Generally, credit cards.

22 Q.   And how did Mr. Manafort pay for his invoices?

23 A.   Check or a wire transfer.

24 Q.   With respect to wire transfer, did you ever communicate

25 with Mr. Manafort about how he would wire money?

─────U.S. v. Manafort─────
M. Regolizio - Direct
481

1  A.   Most of the time, he would either e-mail or call the

2  office and tell us that money was coming by wire and where to

3  expect it from.

4  Q.   And in those -- in those communications, did he ever

5  describe from where those wires were coming?

6  A.   Yes.

7  Q.   And what do you recall him saying about from where those

8  wires were coming?

9  A.   They were coming from Cyprus.

10 Q.   Mr. Regolizio, do you have any other customers who pay by

11 wire?

12 A.   Yes.

13 Q.   How many others?

14 A.   During that time period, there was only one other

15 customer.

16 Q.   And did those wires come from -- from that other

17 customer, did those wires come from a domestic or foreign

18 bank, if you know?

19 A.   It was domestic.

20 Q.   Between 2010 and 2014, where did New Leaf Landscape bank?

21 A.   Where did we?

22 Q.   Bank?  What was your financial institution?

23 A.   For Paul Manafort, what we billed him?

24 Q.   Excuse me.  I'll just rephrase.

25        In the period of time between 2010 and 2014, what

1   bank --

2   A.   Oh, what bank did I use?

3   Q.   Yes.

4   A.   Capital One bank, yeah.

5   Q.   I'd like to direct your attention now to Government

6   Exhibit 109.

7   A.   Okay.

8   Q.   Do you recognize those documents?

9   A.   Yes.

10   Q.   What are they?

11   A.   They're the New Leaf Capital One bank statements.

12   Q.   And have you reviewed those bank statements prior to your

13   testimony today?

14   A.   Yes.

15

16          MR. VAN GRACK:  Your Honor, the Government would

17   move to admit Government Exhibit 109.

18          MR. NANAVATI:  No objection, Your Honor.

19          THE COURT:  Admitted.

20                              (Government's Exhibit No. 109

21                               admitted into evidence.)

22          MR. VAN GRACK:  Your Honor, may we publish?

23          THE COURT:  Yes.

24   BY MR. VAN GRACK:

25   Q.   Mr. Regolizio, I'd like to direct your attention to the

─────────U.S. v. Manafort─────────

1  December 2011 bank statement, and page 5 of that bank

2  statement.

3          And, specifically, the third transaction on two

4  thousand- -- excuse me, December 5, 2011?

5  A.   Yes.

6  Q.   What type of transaction is that?

7  A.   That's a wire transfer.

8  Q.   What was the amount?

9  A.   $4,115.

10  Q.   And where did that money come from?

11  A.   It says Leviathan Advisors Limited.

12  Q.   And do you know what customer that wire transfer came

13  from?

14  A.   That came from Paul Manafort.

15  Q.   And how do you know that?

16  A.   Because he would have contacted us ahead of time and told

17  us that that was coming, and process of elimination, the other

18  client was -- I only had one other client that did a wire

19  transfer and that one came across with the client's name on

20  it.  So I knew that this was his.

21  Q.   And was that other client's company Leviathan Advisors

22  Limited?

23  A.   No.

24  Q.   If I could now direct your attention to page 17 of this

25  exhibit.  It's the first transaction for March of 2012.

┌─────────────────U.S. v. Manafort─────────────────┐
M. Regolizio - Direct
484

1  A.   Yes.

2  Q.   What type of transaction is that?

3  A.   It's a wire transfer.

4  Q.   And the amount?

5  A.   $50,000.

6  Q.   And where did that money come from?

7  A.   Global Highway Limited.

8  Q.   And who -- which customer was that wire transfer for?

9  A.   Paul Manafort.

10 Q.   And if I could now direct your attention to page 27,

11 which, specifically, the first transaction on June 6, 2012?

12 A.   Okay.

13 Q.   What type of transaction is that?

14 A.   It's a wire transfer.

15 Q.   And the amount?

16 A.   47,800.

17 Q.   And where did that money come from?

18 A.   Lucicle Consulting [sic].

19 Q.   And who is that wire transfer from?

20 A.   Paul Manafort.

21 Q.   And if I could direct your attention to Page 50 of this

22 exhibit.  And the first transaction on July 15, 2013?

23 A.   Yes.

24 Q.   What type of transaction?

25 A.   Wire transfer.

M. Regolizio - Direct

485

1   Q.   And the amount?

2   A.   $13,325.

3   Q.   And where did the money come from?

4   A.   Pompolo Limited.

5   Q.   And who was the client that this money came from?

6   A.   Paul Manafort.

7   Q.   And finally, if I could direct your attention to Page 63

8   of this exhibit, and the first transaction on November 26,

9   2013.

10   A.   Yes.

11   Q.   What type of transaction?

12   A.   Wire transfer.

13   Q.   The amount?

14   A.   9,400.

15   Q.   And where did the money come from?

16   A.   Global Endeavour.

17   Q.   And who is this wire transfer from?

18   A.   Paul Manafort.

19   Q.   Mr. Regolizio, I'd like to now direct your attention to

20   what's marked as Government Exhibit 67A, which has previously

21   been admitted into evidence.

22        And if you could turn to the second page, I believe,

23   in your binder.  Do you recognize that document?

24   A.   Yes.

25   Q.   And how do you recognize it?

1   A.   You showed it to me a few weeks ago.

2

3            MR. ANDRES:  Your Honor, may we publish?

4            THE COURT:  Yes.

5   BY MR. VAN GRACK:

6   Q.   If you could look at the right side of the document, what

7   does this document purport to be?

8            THE COURT:  Well, this is the same document we've

9   seen.

10           MR. VAN GRACK:  Your Honor, this is a -- this is a

11  different invoice.

12           THE COURT:  Oh, all right.  Proceed.

13  BY MR. VAN GRACK:

14  Q.   If you could look on the right side, what does this

15  document purport to be?

16  A.   Am I looking at these?

17           THE COURT:  Well, just ask him the final question.

18  The jury can determine what it is.  Is this a document from

19  your business?

20           THE WITNESS:  No.

21           THE COURT:  All right.  Next question.

22  BY MR. VAN GRACK:

23  Q.   If you could actually turn to the next page in your

24  binder as well?

25  A.   Yes.

U.S. v. Manafort

1  Q.   And what does this document purport to be?

2  A.   It's another invoice.

3  Q.   And is this invoice created by New Leaf Landscape?

4  A.   No.

5  Q.   And how do you know it's not a document created by New

6  Leaf Landscape?

7  A.   It doesn't have our full name in the top left, it doesn't

8  have our logo, it doesn't have our address and --

9          THE COURT:  And I assume you can recognize your own

10  document.

11          THE WITNESS:  Yeah.

12          THE COURT:  All right.  Next question.

13          MR. VAN GRACK:Mr. Regolizio --

14          THE COURT:  And before today, you haven't seen any

15  of these documents; is that right?

16          THE WITNESS:  Well, I have seen these.

17          THE COURT:  Oh, I mean, he showed them to you.

18          THE WITNESS:  He showed them to me, yes.

19          THE COURT:  Right.  But prior to that, you hadn't

20  seen them?

21          THE WITNESS:  I had never seen them before that.

22          THE COURT:  Nobody sent these to you.

23          THE WITNESS:  No.

24          THE COURT:  Next question.

25  BY MR. VAN GRACK:

U.S. v. Manafort

1   Q.   Mr. Regolizio, did Mr. Manafort ever invest in your

2   company?

3   A.   No.

4   Q.   Were you ever involved in a loan with Mr. Manafort?

5   A.   No.

6   Q.   During your work for Mr. Manafort, did you ever speak

7   with an individual named Konstantin Kilimnik?

8   A.   No.

9   Q.   Did you ever send an invoice to an individual named

10  Konstantin Kilimnik?

11  A.   No.

12  Q.   Did you ever receive a payment from someone called

13  Konstantin Kilimnik?

14  A.   No.

15  Q.   And during your work for Mr. Manafort, did you ever meet

16  an individual named Rick Gates?

17  A.   No.

18  Q.   Did you ever speak with an individual named Rick Gates?

19  A.   No.

20  Q.   Did you ever send an invoice to Rick Gates?

21  A.   No.

22  Q.   Did you ever receive a payment from Rick Gates?

23  A.   No.

24          MR. VAN GRACK:  No more questions, Your Honor.

25          THE COURT:  All right.  Mr. Nanavati?

1          MR. NANAVATI:  Thank you, Your Honor.

2          THE COURT:  Cross-examination.

3          MR. NANAVATI:  Yes, please.

4                    **CROSS-EXAMINATION**

5    BY MR. NANAVATI:

6    Q.   Mr. Regolizio, I'm Jay Nanavati.  I represent

7    Mr. Manafort.  It's nice to meet you.  I just want to ask you

8    a very few questions.

9          You had said on direct examination that the person

10   you dealt with for payment was Mr. Manafort, correct?

11   A.   Yes.

12   Q.   And -- but there was a point of time when your main

13   contact became a bookkeeping service, correct?

14   A.   We were -- we were told by Paul Manafort to CC someone --

15   I had no idea who it was.  I don't know if it was an assistant

16   or a bookkeeper.

17   Q.   Got it.

18   A.   But he would still -- our policy is that the client

19   always gets e-mailed regardless.  So he was still on those

20   e-mails.

21   Q.   Sure.  And it -- obviously, tell me if you don't

22   recognize it, but does the name Heather Washkuhn sound

23   familiar at all?

24   A.   No.

25   Q.   Okay.  Is it fair to say that after you were told to

─U.S. v. Manafort─

M. Regolizio - Redirect

490

1   start CC'ing this other person --

2   A.   Uh-huh.

3   Q.   -- payment became more timely?

4   A.   Yeah.  I would say, yeah, payment was timely.

5   Q.   Okay.  And I want to take you to Government Exhibit 67A.

6        The -- is it -- is it -- or do you agree with me,

7   can I call it a fake invoice?

8   A.   Yeah, is that the one we were just talking about?

9   Q.   Yes.

10  A.   Yes.

11  Q.   Okay.  And you -- just to make clear, you did not issue

12  that invoice, correct?

13  A.   No.

14  Q.   And you did not receive payment on that invoice, correct?

15  A.   No.

16  Q.   And you don't know who had signature authority on the

17  bank account that's in the sort of ghost -- ghostly seal at

18  the top of it, right?

19  A.   I have no idea.

20  Q.   And when you were going to be getting wires from Cyprus,

21  the -- your source of information that those would be coming

22  was Mr. Manafort, right?

23  A.   Yes.

24        MR. NANAVATI:  No further questions, Your Honor.

25        THE COURT:  All right.  Any redirect?

U.S. v. Manafort

491

1        MR. VAN GRACK:  Just briefly, Your Honor.

2                    **REDIRECT EXAMINATION**

3    BY MR. VAN GRACK:

4    Q.   All right.  Do you recall the question about -- that you

5    were just asked in terms of CC'ing or including someone else

6    on your communications about invoices?

7    A.   Yes.

8    Q.   Approximately, when did you believe that occurred?

9    A.   I believe that to be the later years, 2014, '15.

10        MR. VAN GRACK:  No more questions, Your Honor.

11        THE COURT:  All right.  Thank you.

12        You may step down, sir, and you may be excused.

13        (Witness excused.)

14        THE COURT:  All right.  Ladies and gentlemen, we'll

15   take the morning recess at this time.

16        Who is your next witness?

17        MR. ANDRES:  Heather Washkuhn, Judge.

18        THE COURT:  Just a moment.

19        (A pause in the proceedings.)

20        THE COURT:  All right.  I need a list, Mr. Nanavati,

21   from you or from somebody as to any objections so that I can

22   deal with them.

23        MR. NANAVATI:  Yes, sir.

24        THE COURT:  Who is going to do that?

25        MR. ZEHNLE:  I will, Your Honor.

U.S. v. Manafort

H. Washkuhn - Direct

492

1          THE COURT:  All right.  Can you do that in the next

2  20 minutes?

3          MR. ZEHNLE:  Certainly, Your Honor.

4          THE COURT:  Good.  All right.  And tell me this

5  witness's name again.

6          MR. ANDRES:  Judge, it's not my strong suit, but

7  Heather Washkuhn is how it's pronounced.  It's Mr. Manafort's

8  bookkeeper.

9          THE COURT:  All right.  Thank you.

10          Ladies and gentlemen, pass your books to the right.

11  The court security officer will collect them, maintain their

12  security during the recess.  Remember, as always, do not

13  discuss the case among yourselves or with anyone or undertake

14  any investigation on your own.  We will recess now until --

15  until quarter after.  Gives you 20 minutes and gives you an

16  opportunity to -- well, let's make it 20 after.  That will

17  give you an opportunity to enjoy a soft drink and then we'll

18  resume.  You may follow the court security officer out.

19          (Jury dismissed.)

20          THE COURT:  If there are objections to exhibits,

21  share that with government counsel and give it to the court

22  security officer so that I may see it.  Thank you very much.

23          Court stands in recess.

24          (Recess.)

25          THE COURT:  Let me just mention briefly in an effort

U.S. v. Manafort

1  to accommodate the public's knowledge of these exhibits, the

2  arrangements, I think, that we've made are that the Government

3  will -- and the defendant when it's their case -- but the

4  Government will make available to the clerk's office at the

5  close of the day the exhibits that have been admitted, then

6  they'll be placed by the clerk's office in a binder, which

7  people can come and look at if they want to, and -- but they

8  can't remove the binders or the documents in the binders.

9         I would say to the parties or to the press, really,

10 if you really want to see a document, ask the lawyer who

11 proffered, who offered the document.  I'm sure they'll be

12 eager to give you a copy.  But this is a public proceeding.  I

13 do want to ensure that the public, which, of course, includes

14 the press, gets access to these documents, but that's the way

15 we're going to do it.

16        At the end of the day, Mr. Andres, if you would -- I

17 hope this isn't the first you're hearing of this.

18        MR. ANDRES:  Judge, if I might -- and I just don't

19 know the date, but at some point members of the press wrote to

20 Your Honor and Your Honor issued a letter and asked us to make

21 sure that at the end of the day we facilitate that.

22        THE COURT:  That's right.

23        MR. ANDRES:  Which is what's been happening.

24        THE COURT:  All right.

25        MR. ANDRES:  So it's slightly different than the

─────────────U.S. v. Manafort─────────────

1   process you've outlined --

2          THE COURT:  No, I think it's exactly what I

3   outlined.

4          MR. ANDRES:  I meant the process that we're

5   following is slightly different, which is --

6          THE COURT:  What I outlined in the letter and I

7   agreed to do in response to a request.

8          MR. ANDRES:  Right.  So we've been providing copies

9   to the -- to the press.  We haven't been making a copy --

10          THE COURT:  Oh, I see.

11          MR. ANDRES: -- available in the clerk's office,

12   which we're happy to do, but what we've been doing is taking

13   requests from the press and responding with the exhibits from

14   the day.

15          (A pause in the proceedings.)

16          THE COURT:  I think that's a good way to keep doing

17   it, Mr. Andres.  But the reason I'm raising this is calls have

18   been received at the clerk's office and I thought somewhere I

19   had represented that it would be a practice to put them in a

20   book so the public can come and look at them after the

21   Government produced copies of them.  But I think what you're

22   doing, frankly, is perfectly all right and acceptable.

23          If there are particular -- if we have to switch to

24   some -- see, the clerk's office, I don't want to impose on

25   them the burden of copying everything and putting it into a --

H. Washkuhn - Direct

1   a book.  Now, any member of the public can come to the clerk's

2   office and say, "We want a copy of Exhibit 135," and if we

3   have it and if we're able to do it, given all the other

4   obligations, the copy will be made and a charge will be

5   imposed.

6          So my advice to all of you out there, if you want to

7   see a particular document, ask one of the lawyers for the side

8   that offered it.  I'm sure they'll be delighted to give it to

9   you, together with a speech.

10         All right.  The next thing I wanted to note was the

11  objections to exhibits.  I notice there's an objection to an

12  exhibit here that isn't on the list for Ms. Washkuhn.  On the

13  list that was provided to me 139 was listed, but I don't see

14  139 on the Government's list.

15         Am I wrong?  It goes from 138 to 140.

16         MR. ANDRES:  May I just confer with counsel, Judge?

17         (A pause in the proceedings.)

18         MR. ANDRES:  We'll provide you with a copy.  We're

19  intending to admit Government 139.  I think that might have

20  inadvertently --

21         THE COURT:  It's not on here.

22         MR. ANDRES:  Yeah.  I think there was -- it wasn't

23  in the binder.

24         THE COURT:  All right.  That's all right.

25         MR. ANDRES:  If it's not in the binder it doesn't

─────U.S. v. Manafort─────
H. Washkuhn - Direct
496

1    get on the list and --

2              THE COURT:  Don't worry about it.  It's not a

3    problem.

4              MR. ANDRES:  Okay.

5              THE COURT:  Now, there are -- one, two, three, four,

6    five -- six documents that are objected to.  Let me begin.

7    Mr. Westling is going to do this?

8              MR. ZEHNLE:  Mr. Zehnle, Your Honor.

9              THE COURT:  Oh, I'm sorry, Mr. Zehnle.  Yes, let's

10   go down very quickly each one.

11             135, which I -- I take to be the e-mail chain

12   involving Gates and Washkuhn regarding transfer, and you've

13   objected.  What's the ground of objection or grounds of

14   objection?

15             MR. ZEHNLE:  Your Honor, I can state for all six of

16   these objections, the same grounds.

17             THE COURT:  Good.

18             MR. ZEHNLE:  So as the Court will learn in just a

19   moment, stipulation has been entered as to authenticity and,

20   in fact, business records exception as well.

21             The defense is maintaining an objection, subject to

22   the Government's burden, to tie this in via 801(d)(2)(E).

23             THE COURT:  All right.  But let me --

24             MR. ZEHNLE:  Hearsay within hearsay, Your Honor.

25             THE COURT:  You have stipulated that they are

———————U.S. v. Manafort———————

1   business records.  It's over.  That takes care of hearsay.

2   It's over.

3       MR. ZEHNLE:  We -- Your Honor, if I may.  We

4   stipulated to the authenticity in 803(6) exception, but this

5   is a hearsay within hearsay exception.  We maintained our

6   objections, our ability to object with respect to relevancy

7   and other -- other objections.  It was just, are these the

8   records of the bookkeeper?

9       THE COURT:  So, really, what you're ultimately

10  saying is that you don't object to these except on hearsay

11  grounds -- on a hearsay ground because there is not yet

12  evidence satisfactory to say it's a 801(d)(2)(E) document,

13  that is, a document that is admissible as in furtherance of

14  the conspiracy by one of the conspirators.

15      MR. ZEHNLE:  That's correct, Your Honor.

16      THE COURT:  All right.  And I take it the Government

17  surely intends to offer that testimony.

18      MR. ANDRES:  We do, Judge.  I would just say, and

19  respectfully to my colleague, that he's absolutely wrong about

20  the business records stipulation.  They -- you'll notice that

21  in some of the stipulations there's a stipulation --

22      THE COURT:  You forgot to say, and that you were

23  right.

24      MR. ANDRES:  I didn't go -- we'll see if I'm right.

25      THE COURT:  It's true.  If they stipulated 803(6),

U.S. v. Manafort

498

1    that takes care of hearsay.

2            MR. ANDRES:  That's our position.  And some of the

3    stipulations only stipulate as to authenticity so they could

4    reserve these very objections.  And we understand that and

5    that was negotiated.  With these they stipulated all the way.

6            THE COURT:  All right.  So which ones are -- am I

7    going to admit conditionally on the condition that you do

8    submit evidence of conspiracy so that I can find whether or

9    not the document fits under 801(d)(2)(E).

10           MR. ANDRES:  None, because they are all business

11   records and they've all been stipulated by the defense to be

12   business records.

13           THE COURT:  Well, I thought you said they didn't

14   stipulate as to some of them.  They only stipulated

15   authenticity.

16           MR. ANDRES:  What I said -- I misspoke.  Some of the

17   stipulations that Your Honor has entered relate to other

18   documents, and in those document the defense has said, "We

19   only stipulate as to authenticity."

20           With respect to all of these documents, they've

21   stipulated that they're business records.  And, accordingly,

22   there can't really be a hearsay objection for the very reason

23   Your Honor stated.

24           THE COURT:  All right.

25           MR. ZEHNLE:  Your Honor, may I have Mr. Westling

1 address this?

2          THE COURT:  Yes, you may.

3          MR. WESTLING:  Your Honor, as the person who had the

4 conversations about the stipulations, I just wanted to raise

5 the fact that we specifically noted that there could be times

6 when a business record contains hearsay that was beyond the

7 business record itself, and then you have a hearsay within

8 hearsay problem.  Well, the business record exception

9 establishes the admissibility of the document.  In our view,

10 it does not accept admissibility of Mr. Gates' statement to

11 the extent these are not records of Mr. Gates' business.

12          And so we did raise that issue, and I can do my best

13 to go back through our communication.

14          THE COURT:  Well, come to the podium for just a

15 minute.

16          Let's look.  For example, I have -- one, two, three

17 four, five -- six documents.  Let's take 137.

18          Now, 137 is an e-mail involving Gates, from Gates to

19 Francis, Mr. Manafort, and others, right?

20          MR. WESTLING:  That's correct.

21          THE COURT:  Involving some insurance matter; is that

22 correct?

23          MR. WESTLING:  That's correct.

24          THE COURT:  Now, do you have any objection to that

25 given that its been stipulated to be a business record?

U.S. v. Manafort

1      MR. WESTLING:  Well, I guess what I don't know from

2  looking at this document, Your Honor, is whether this is a

3  document of Mr. Gates' business or of the bank.  I think it's

4  a document of the bank involved.  And from our point of view,

5  while this is a business record --

6      THE COURT:  It's not.  It's a document by Mr. Gates.

7  He was the author.

8      MR. WESTLING:  But it was recovered from the files

9  of the bank and so it is being offered as a business record of

10  the bank.

11      THE COURT:  All right.  What do you think follows

12  from that?

13      MR. WESTLING:  Well, I think what follows, while

14  this area comes in from business records perspective, this

15  statement of Mr. Gates is not in and of itself -- it's a

16  hearsay statement that's not part of the business record that

17  the bank retains.  This is in their files, but it's his

18  statement and the Government, in essence, is offering him as a

19  co-conspirator.  And we simply want to preserve that

20  objection.

21      THE COURT:  Well, I don't think I agree with you.

22      MR. WESTLING:  Understood.

23      THE COURT:  I think once you have stipulated under

24  803(6) that it's a business record the -- the show is over as

25  to hearsay because 803(6) is designed to deal with hearsay.  I

────────U.S. v. Manafort────────
H. Washkuhn - Direct

1   don't see the hearsay within a hearsay point that you're

2   making.  But I will point out to you that you have leave to

3   renew your objection under 801(d)(2)(E) if there isn't

4   evidence of a conspiracy, and I'll consider it again then.

5   But it seems to me it's over once you stipulate that it's a

6   business record.

7          Whatever views I may have about what's happened to

8   the business records rule over the past 50 years are

9   irrelevant.

10         MR. WESTLING:  Understood, Your Honor, thank you.

11         THE COURT:  The world has passed me by in many ways.

12         All right.  So I understand that the defendant's

13  objections to 135, 137, 138, 139, 140, and 148 are hearsay

14  objections.  So I overrule the hearsay objection on the basis

15  of an existing stipulation that they are business records.

16  Whosever business records they are, and I don't need to

17  concern myself with.

18         And I don't -- I don't at this time countenance the

19  hearsay within hearsay argument.  However, I would also take

20  it that these -- the Government also asserts that these

21  documents could be admissible under 801(d)(2)(E) even if they

22  weren't business records.  And the Government has forecasted,

23  represented, indeed, not withstanding Mr. Asonye's statement,

24  represented that they're going to show these are part of a

25  conspiracy.  And then they would be admissible under

1   801(d)(2)(E) in addition to the 803(6) hearsay stipulation.

2          Do I have that right, Mr. Andres.

3          MR. ANDRES:  Yes, Judge.

4          THE COURT:  Counsel, see what I've said.  Now that's

5   the court's ruling.

6          MR. WESTLING:  I understand, Your Honor.  Thank you.

7          THE COURT:  So proceed.  You may call your next

8   witness.

9          MR. ANDRES:  Judge, Mr. Asonye is going to enter

10  several additional stipulations and then we'll call

11  Ms. Washkuhn.

12         THE COURT:  How many, Mr. Asonye?

13         MR. ASONYE:  There are three, Your Honor.  And,

14  again, happy to --

15         THE COURT:  Of some length?

16         MR. ASONYE:  Some of them are lengthy, so I'm happy

17  to read -- read them, Your Honor.

18         One of them, Your Honor, I believe we have agreed to

19  enter, without reading the stipulation we've been discussing.

20  It's of a legal matter, 803(6).

21         THE COURT:  All right.  Let me hear or let me see

22  what number that is.

23         MR. ASONYE:  That is Government Exhibit 451, Your

24  Honor.

25         It should be the last one in your binder, Your

─────U.S. v. Manafort─────
H. Washkuhn - Direct
503

1    Honor.

2              THE COURT:  All right.  I don't see any -- yes, it

3    is.  Thank you.  I don't see any reason -- I don't see any

4    reason at all, Mr. Westling or Mr. Zehnle, to read that.

5              MR. WESTLING:  We agree, Your Honor.  We've told the

6    Government we have no problem with that not being read to the

7    jury.

8              THE COURT:  So what are the ones that are being

9    offered now?

10             MR. ASONYE:  The first one would be Government's

11   Exhibit 335 regarding landscaping services.

12             THE COURT:  And what's the next one?

13             MR. ASONYE:  The next one is --

14             THE COURT:  Didn't we just hear testimony?

15             MR. ASONYE:  It's a different landscaper, Your

16   Honor.

17             THE COURT:  All right.  Go on.  You should have

18   stipulated all of them.

19             MR. ASONYE:  Government Exhibit 328.

20             THE COURT:  Yes.

21             MR. ASONYE:  Which regards a property on 377 Union

22   Street.

23             THE COURT:  All right.

24             MR. ASONYE:  And then, finally, for this portion,

25   they stipulate 330 regarding the Howard Street property.

1    THE COURT:  All right.  So what we'll do is have the

2    jury brought in.  You may read them, because they're lengthy.

3    But I'll remind them these are stipulations by and between the

4    parties.  They may regard the facts stipulated as having been

5    proved, they don't have to, but they may do so.

6         And then you will call, Mr. Andres, your next

7    witness.  Is that you doing it?

8         MR. ANDRES:  Yes, Judge.

9         THE COURT:  All right.  Bring the jury, in, please.

10   How long do you think that witness will take?

11        MR. ANDRES:  This witness is going to be rather

12   lengthy.  She may take substantial part of the rest of the

13   day.

14        THE COURT:  All right.  Can I have a quantitative

15   estimate?

16        MR. ANDRES:  I would say roughly two and a half to

17   three hours on direct.  Ms. Washkuhn bridges both the tax

18   fraud and the bank fraud, and she was bookkeeper for a number

19   of years.

20        THE COURT:  All right.  Bring the jury in, please.

21                      (Jury in.)

22        THE COURT:  All right.  You may be seated.

23        Ladies and gentlemen, we're going to go ahead now

24   with the testimony.  I anticipate, for planning purposes, that

25   we will continue until 12:30 or shortly thereafter and then

H. Washkuhn - Direct

505

1    we'll recess for lunch.

2           All right.  To begin with, Mr. Asonye is going to

3    read to you stipulations that the parties have agreed to.  The

4    purpose is to obviate taking the time in the trial to go

5    through all of this because the parties agree.  So you may

6    consider the facts that have been stipulated to that have been

7    proven.  However, the extent to which you do that is a matter

8    entirely left up to you.

9           Typically, I read the stipulation, but the length of

10   these is such that I'm ceding that privilege to Mr. Asonye.

11   Go ahead, Mr. Asonye.

12          MR. ASONYE:  Thank you, Your Honor.

13          This is Government Exhibit 335, stipulation

14   regarding purchase of landscaping services.

15          The parties stipulate to the following facts:  Scott

16   L. Wilson Landscaping and Tree Specialists, Inc., operates in

17   the Hamptons, New York, area.  Scott Wilson is the owner of

18   Scott L. Wilson Landscaping and Tree Specialists, Inc., and

19   performed landscaping design and maintenance.  He performed

20   landscaping services for Paul J. Manafort, Jr.'s, residence

21   located at 174 Jobs Lane, Bridgehampton, New York.

22          Scott Wilson Landscaping and Tree Specialists

23   received a total of $503,500 from Global Highway, Limited;

24   Leviathan Advisors, Limited; and Yiakora Ventures, Limited,

25   between 2010 and 2011.

U.S. v. Manafort

H. Washkuhn - Direct

506

1          On May 11, 2010, $44,000 was transferred from Global

2    Highway, Limited's, bank account at Marfin Laiki Bank in

3    Nicosia, Cyprus, to Scott Wilson Landscape and Tree

4    Specialists.

5          On June 21, 2010, Scott L. Wilson Landscape and Tree

6    Specialists submitted to Mr. Manafort's Invoice No. 2852 in

7    the amount of $50,842 for landscaping services.

8          On June 28, 2010, $50,000 was transferred from

9    Leviathan Advisors, Limited, bank account at Marfin Bank in

10   Nicosia, Cyprus, to Scott Wilson Landscape and Tree

11   Specialist.

12         THE COURT:  So I was wrong, it isn't Nicosia?

13         MR. ASONYE:  Your Honor, I don't know how to

14   pronounce it so I will probably jump between both.

15         THE COURT:  Default to Nicosia.

16         MR. ASONYE:  Nicosia.

17         On July 16, 2010, Scott Wilson Landscape and Tree

18   Specialists, Inc., submitted Invoice No. 2861 in the amount of

19   $19,069 for landscaping services.

20         On July 23, 2010, $19,000 was transferred from

21   Leviathan Advisors, Limited, bank account at Marfin Laiki Bank

22   in Nicosia --

23         THE COURT:  You got it right.

24         MR. ASONYE: -- Nicosia, Cyprus, to Scott Wilson

25   Landscape and Tree Specialists.

H. Washkuhn - Direct

1          On August 17, 2010, Scott Wilson Landscape and Tree

2     Specialists submitted Invoice No. 2883 in the amount of

3     $26,418 for landscaping services.

4          On September 2, 2010, $21,000 was transferred from

5     Yiakora Ventures, Limited, bank account at Bank of Cyprus in

6     Nicosia, Cyprus, to Scott Wilson Landscape and Tree

7     Specialists.

8          On September 23, 2010, Scott Wilson's company

9     submitted an invoice, No. 2898, in the amount of $7,740 for

10    landscape services.

11         On October 6, 2010, $57,700 was transferred from

12    Global Highway's, Limited, bank account at Marfin Laiki Bank

13    in Nicosia, Cyprus, to Scott L. Wilson Landscape and Tree

14    Specialists.

15         On October 27, 2010, Scott Wilson Landscape and Tree

16    Specialists submitted Invoice No. 2906 in the amount of

17    $20,000 -- $20,568 for landscaping services.

18         On October 18, 2010, $26,000 was transferred from

19    Leviathan Advisors, Limited, bank account at Marfin Laiki Bank

20    in Nicosia, Cyprus, to Scott Wilson Landscape and Tree

21    Specialists.

22         On November 30, 2010, Scott Wilson Landscape and

23    Tree Specialists submitted Invoice No. 299 -- 2922 in the

24    amount of $8,532 for landscaping services.

25         On December 16, 2010, $20,000 was transferred from

1  Global Highway Limited's bank account Marfin Laiki Bank in

2  Nicosia, Cyprus, to Scott Wilson Landscape & Tree Specialists.

3          On March 8, 2011, Scott Wilson's company submitted

4  invoice No. 2962 in the amount of $44,857 for landscaping

5  services.

6          On March 22, 2011, $50,000 was transferred from

7  Leviathan Advisors Limited's bank account Marfin Laiki

U.S. v. Manafort

H. Washkuhn - Direct

509

1   Nicosia, Cyprus, to Scott Wilson's company.

2          On May 3, 2011, $40,000 was transferred from Global

3   Highway Limited's bank account at Marfin Laiki Bank in

4   Nicosia, Cyprus, to Scott Wilson's company.

5          On June 1, 2011, $44,000 was transferred from

6   Leviathan Advisors Limited's bank account at Marfin Laiki Bank

7   in Nicosia, Cyprus, to Scott Wilson's company.

8          On July 27, 2011, $27,000 was transferred from

9   Leviathan Advisors Limited bank account at Marfin Laiki Bank

10  in Nicosia, Cyprus, to Scott Wilson's company.

11         On August 16, 2011, $13,450 was transferred from

12  Leviathan Advisors' bank account at Marfin Laiki Bank in

13  Nicosia, Cyprus, to Scott Wilson's company.

14         On August 24, 2011, Scott Wilson submitted invoice

15  No. 2997 in the amounts of $19,634 for landscaping services.

16         On September 19, 2011, $12,000 was transferred from

17  Leviathan Advisors Limited bank account at Marfin Laiki Bank

18  in Nicosia, Cyprus, to Scott Wilson's company.

19         And on September 30, 2011, Scott Wilson's company

20  submitted invoice No. 3019 in the amount of $20,555 for

21  landscaping services.

22         On October 20 -- 24, 2011, $42,000 was transferred

23  from Global Highway Limited's bank account at Marfin Laiki

24  Bank in Nicosia, Cyprus, to Scott Wilson's company.

25         And, finally, on November 2, 2011, $37,350 was

U.S. v. Manafort

1  transferred from Global Highway Limited's bank account at

2  Marfin Laiki Bank in Nicosia, Cyprus, to Scott Wilson

3  Landscape & Tree Specialists.

4         Your Honor, may I -- and the Government moves that

5  stipulation into evidence and the prior ones.

6         THE COURT:  It's admitted.  Next.

7         MR. ASONYE:  The second stipulation is titled

8  "Stipulation regarding purchase of the property located 377

9  Union Street, Brooklyn, New York."

10        The parties stipulate to the following facts:

11        First Nationwide Title Agency settled the purchase

12  of 377 Union Street on December 28, 2012.

13        On November 24, 2012, MC Brooklyn Holdings, LLC,

14  entered into a residential contract of sale for the purchase

15  of real property at 377 Union Street, Brooklyn, New York.

16        The purchase price was $2,995,000.

17        The down payment was $299,500.

18        As payment for the down -- as payment for the down

19  payment of $299,500, on November 20, 2012, a wire transfer

20  from Lucicle Consultants Limited in the amount of $299,500

21  drawn on a bank account at Marfin Laiki Bank in Nicosia,

22  Cyprus, was sent to the attorney trust account of Michele

23  Scotto, esquire, in her capacity as the attorney for the

24  seller.

25        On December 27, 2012, Jessica Manafort, as member of

H. Washkuhn - Direct

1   MC Brooklyn Holdings, LLC, designated Bruce Baldinger,

2   esquire, as an agent of MC Brooklyn Holdings, LLC.

3          As payment for the remainder due for the purchase of

4   377 Union Street on December 27, 2012, Bruce Baldinger on

5   behalf of MC Brooklyn Holdings, LLC, transferred $2.8 million

6   from his law firm's bank account at TD Bank to First

7   Nationwide Title Agency, LLC.

8          On December 28, 2012, First Nationwide Title Agency,

9   LLC, conducted the settlement, that is, the sale of MC

10  Brooklyn Holdings' purchase of 377 Union Street.

11         And, Your Honor, we move that into evidence.

12         THE COURT:  All right.  Call your witness, Mr. --

13         MR. ASONYE:  There's one stipulation, Your Honor.

14         THE COURT:  All right.  Go ahead.

15         MR. ASONYE:  This one regards the purchase of 29

16  Howard Street No. 4, New York, New York.

17         The parties stipulate to the following facts:

18         On January 26, 2012, Jessica Manafort, Kathleen

19  Manafort, and Paul J. Manafort, Jr., entered into a contract

20  of sale for the purchase of real property known as 29 Howard

21  Street.  The purchase price was $2,850,000.

22         On January 24, 2012, a wire transfer in the amount

23  of $285,000, representing the down payment for 29 Howard

24  Street, was sent from Paul and Kathleen Manafort's account at

25  First Republic Bank to the seller's attorney.

────────U.S. v. Manafort────────
H. Washkuhn - Direct
512

1              On February 14, 2012, Kensington Vanguard National

2    Land Services of New York, Kensington Vanguard, conducted the

3    settlement, that is, the sale of Howard Street to MC Soho

4    Holdings LLC.

5              As payment for the purchase of Howard Street on

6    February 10, 2012, MC Soho Holdings, LLC, transferred

7    $2,650,000 to Kensington Vanguard.

8              MC Soho Holdings, LLC, was a Florida limited

9    liability company formed on January 15, 2012.  The registered

10   agent and managing member of MC Soho Holdings, LLC, was Paul

11   Manafort.

12             The Government moves 330 into evidence, Your Honor.

13             THE COURT:  All right.  Mr. Andres, call your next

14   witness.

15             MR. ANDRES:  The Government calls Heather Washkuhn,

16   Judge.

17             THE COURT:  Come forward and take the oath, please,

18   ma'am.

19             Thereupon,

20                      **HEATHER WASHKUHN,**

21   having been called as a witness on behalf of the Government

22   and having been first duly sworn by the Deputy Clerk, was

23   examined and testified as follows:

24                         (Witness seated.)

25             THE COURT:  All right.  You may proceed.

U.S. v. Manafort

1          **DIRECT EXAMINATION**

2     BY MR. ANDRES:

3     Q.   Please state your full name for the record.

4     A.   Heather Washkuhn.

5     Q.   Ms. Washkuhn, can you just try to keep your voice up.

6     The microphone is in front of you, the bar.

7     A.   Sure.

8     Q.   Can you please state your name for the record?

9     A.   Heather Washkuhn.

10    Q.   Did you attend college?

11    A.   I did.

12    Q.   Where?

13    A.   Pepperdine University.

14    Q.   Did you receive your degree?

15    A.   Yes, I did.

16    Q.   And what discipline and in what year?

17    A.   International business, 2001.

18    Q.   Where are you currently employed?

19    A.   I'm employed at NKSFB, Nigro Karlin Segal Feldstein &

20    Bolno.

21    Q.   Okay.  Is that firm also -- is it also referred as Nigro?

22    A.   Yes.

23    Q.   Okay.  How long have you worked at NKSFB?

24    A.   Since 2014.

25    Q.   And what's your title there?

┌─────────────────── U.S. v. Manafort ───────────────────┐

H. Washkuhn - Direct

514

1    A.    Managing director.

2    Q.    What services do you provide in your capacity?

3    A.    We do accounting and bookkeeping services for high net

4    worth individuals.

5    Q.    Approximately how many clients do you have?

6    A.    Approximately 35 clients.

7    Q.    Where is your office located?

8    A.    In Newport Beach, California.

9    Q.    Do you know Paul Manafort?

10   A.    I do.

11   Q.    How do you know Mr. Manafort?

12   A.    Mr. Manafort was a client since 2011.

13   Q.    And over what period of time was he your client?

14   A.    2011 to 2018.

15   Q.    And how did you first -- how did Mr. Manafort first come

16   to be your client?

17   A.    He became my client when I worked at First Republic Bank.

18   Q.    And when you were at First Republic Bank, what role did

19   you play on Mr. Manafort's account?

20   A.    At that time I was a more junior person.  I was maybe a

21   director or manager.  I don't recall my title.

22   Q.    And who was the lead on the account for Mr. Manafort when

23   you were at First Republic Bank?

24   A.    Hesham Ali.

25   Q.    And during that time that Mr. Ali was the lead, what role

1  did you play on Mr. Manafort's account?

2  A.   I was working under him on the team, so I was a director

3  or manager at that time.

4  Q.   And did you have a lot of contact with Mr. Manafort?

5  A.   Through e-mails at that time.

6  Q.   At some point did you leave the First Republic Bank?

7  A.   Yes.

8  Q.   And where did you go?

9  A.   To Nigro Karlin, where I'm at currently.

10  Q.   And that's where you're currently employed?

11  A.   Yes.

12  Q.   And why did you move from First Republic to Nigro Karlin?

13  A.   At the end of 2013, First Republic bought like 25 percent

14  of our firm, so our two groups merged together.

15  Q.   And when you switched over to Nigro Karlin, did

16  Mr. Manafort continue to be your client?

17  A.   Yes, he did.

18  Q.   Did your role change?

19  A.   It did.

20  Q.   Can you explain how your role changed with respect to

21  Mr. Manafort's account?

22  A.   Sure.  So I became a managing director, so I became the

23  lead on Mr. Manafort's account.

24  Q.   Since you've moved to Nigro Karlin, how often do you

25  communicate with Mr. Manafort?

H. Washkuhn - Direct

516

1  A.   We communicated maybe several times a week to at least

2  weekly.

3  Q.   Okay.  And by what means did you communicate?

4  A.   Mainly e-mail.

5  Q.   And have you met Mr. Manafort in person?

6  A.   Yes, I have.

7  Q.   On how many occasions?

8  A.   On three occasions.

9  Q.   How much money does your firm charge Mr. Manafort for

10  your services?

11  A.   It's varied over the years.  It was approximately

12  $100,000 a year.

13  Q.   Do you know what Mr. Manafort does professionally?

14  A.   Yes.

15  Q.   How do you know that?

16  A.   When he first became a client, he was introduced to us as

17  a political consultant.

18  Q.   Do you know if Mr. Manafort owns a political consulting

19  firm?

20  A.   Yes.

21  Q.   What's the name of that firm?

22  A.   DMP International.

23  Q.   And do you know if Mr. Manafort works abroad?

24  A.   Yes, I believe he did.

25  Q.   How did you know that?

U.S. v. Manafort

1   A.   We would have travel records.  We would see expenses, so

2   there was expenses from working internationally and there was

3   income that came in from international.

4   Q.   Okay.  And do you know where he worked abroad?

5   A.   I know he worked in Ukraine for a time.

6   Q.   You mentioned travel expenses as part of your work for

7   Mr. Manafort.  Did you track his bills relating to his travel

8   expenses?

9   A.   Yes, we did.

10  Q.   And did they reflect frequent travel?

11  A.   Yes.

12  Q.   Are you aware whether or not Mr. Manafort earned income

13  from the Ukraine?

14  A.   Yes, I believe he did.

15  Q.   How did you know that?

16  A.   We had wires that came in, so we would track all of the

17  income.

18  Q.   As part of your work for Mr. Manafort, did you work on

19  his business invoices and bills?

20  A.   Yes.

21  Q.   Did you also work on his personal bills and invoices?

22  A.   Yes.

23  Q.   In the course of working on his business bills, did you

24  meet an individual named "Rick Gates"?

25  A.   Yes, I did.

U.S. v. Manafort

H. Washkuhn - Direct

518

1   Q.   Who did you understand Mr. Gates to be?

2   A.   Mr. Gates worked on the business affairs with

3   Mr. Manafort and he was, I would say, his right-hand man.

4   Q.   And have you -- do you know who Mr. Gates reported to?

5   A.   I understood that he reported to Mr. Manafort.

6   Q.   And have you met with Mr. Gates?

7   A.   I have met him.

8   Q.   In person?

9   A.   Yes.

10  Q.   Can you explain the circumstances that you met him in

11  person?

12  A.   I met him when we first started working on Mr. Manafort's

13  account back in 2011.

14  Q.   At some point did you have a discussion with Mr. Manafort

15  about what role Mr. Gates was to play vis-à-vis at Nigro

16  Karlin?

17  A.   I didn't, no.

18  Q.   Okay.  Did you have an understanding over time of what

19  role Mr. Gates was to play?

20  A.   Yes, I did.

21  Q.   What was that?

22  A.   That we were to go to Rick with business questions if we

23  couldn't get ahold of Paul.

24  Q.   And did you interact with Mr. Gates?

25  A.   Yes, I do.

U.S. v. Manafort

H. Washkuhn - Direct

519

1    Q.   How frequently?

2    A.   Maybe every couple of weeks.

3    Q.   Okay.  And over what types of issues would you deal with

4    Mr. Gates?

5    A.   With issues relating to funding the account, monies

6    coming in, monies coming out, payroll.

7    Q.   Let me ask questions now about Mr. Manafort's personal

8    account.

9         With respect to his personal account, did you deal

10   with Mr. Gates?

11   A.   No.

12   Q.   Why not?

13   A.   I dealt with Mr. Manafort on the personal issues.

14        THE COURT:  When he -- when you're asked about a

15   personal account, did he actually have an account where he put

16   money and took money out with your firm?

17        THE WITNESS:  He did have bank accounts personally,

18   yes.

19        THE COURT:  With you, with your firm?

20        THE WITNESS:  Our firm doesn't have bank accounts.

21        THE COURT:  Right.  So you used the term "his

22   personal account."  What are you referring to?

23        THE WITNESS:  I thought it meant just his personal

24   engagements.

25        THE COURT:  All right.  Let's be more precise about

H. Washkuhn - Direct

520

1   that, Mr. Andres.

2   BY MR. ANDRES:

3   Q.   As part of your engagement for Mr. Manafort, did you

4   manage his personal bank accounts?

5   A.   Yes, I did.

6   Q.   And with respect to his personal bank accounts, can you

7   explain to the jury what you did?

8   A.    Sure.  So with the personal bank accounts, again, we

9   tracked any income coming in and then we also paid all of his

10  expenses out of his personal bank accounts as they related to

11  personal expenses.

12  Q.   And with respect to his -- the payment of bills on his

13  personal accounts, did you ever deal with Mr. Gates?

14  A.   No.

15  Q.   Why not?

16  A.   We only dealt with Mr. Gates on business affairs.

17  Q.   And with respect to the personal accounts and the

18  movement of money, who did you deal with?

19  A.   With Mr. Manafort.

20  Q.   And how often would you communicate with Mr. Manafort

21  about his personal account?

22  A.   Pretty consistently, weekly to biweekly.

23  Q.   And when you communicated to him, was he responsive?

24  A.   Usually, yes.

25  Q.   Did he usually get back to you?

U.S. v. Manafort

1  A.   Usually, unless he was traveling.

2  Q.   And did you have an understanding of how knowledgeable

3  Mr. Manafort was about his individual personal accounts?

4  A.   Yes.

5  Q.   Can you explain that?

6  A.   I would say he was very knowledgeable.  He was very

7  detail-oriented.  He approved every penny of anything that we

8  paid.

9  Q.   Okay.  When you say he approved every penny of everything

10 you paid, what are you referring to?

11 A.   If there were any bills to pay or transfers to make, we

12 would send Mr. Manafort a very detailed list for his approval

13 and then he would have to approve before anything would be

14 released.

15 Q.   Okay.  You testified about some of the bill-keeping

16 activities that you performed.

17        Can you explain the full range of activities that

18 you performed for Mr. Manafort?

19 A.   Sure.  So accounting and bookkeeping, we -- again, we

20 track all income coming in, track every expense going out.

21 Your goal is to keep a complete general ledger of all

22 activity, and then every year we provide that activity to the

23 CPA so that they can file the tax returns.

24 Q.   You testified that you provide information to the CPAs or

25 the tax preparers.  Why do you do that?

U.S. v. Manafort

1   A.   So they can file the tax return.

2   Q.   And can you explain that process, how you transfer the

3   information at Nigro Karlin to the tax preparers?

4   A.   Sure.  So at the end of every year, we usually do a

5   general ledger and a trial balance and financial statements.

6   And we send it to the CPAs via e-mail so that they can use the

7   information for tax projections.  And then we do that again in

8   the spring so that they have a complete set of records for the

9   prior year.

10  Q.   During the time that you worked on Mr. Manafort's

11  account, were you involved in his real estate properties?

12  A.   Yes.

13  Q.   What role did you play with respect to his real estate

14  properties?

15  A.   We would pay all the bills relating to all of the

16  properties, pay any payroll that needed to happen, and then we

17  would track the basis of the properties on our books, too, so

18  that we would know if a property was bought or sold, if there

19  was a loan on it, things like that.

20  Q.   Would you also record rental property or rental income?

21  A.   Yes.

22  Q.   With respect to those properties, can you explain to the

23  jury what properties you help managed for Mr. Manafort?

24  A.   Sure.  So we managed the property in Palm Beach.

25        In Virginia, there was a condo and a horse farm.

─────────────── U.S. v. Manafort ───────────────

1          In Connecticut, there was a small house.

2          In New York, there was a property in the Hamptons.

3          And then in New York City, there was a property on

4  Fifth Avenue, Baxter Street, Howard Street, Union Street.  I

5  think that's all of them.

6  Q.   Okay.  And you testified that you would record rental

7  income.  Where would you do that on your books?

8  A.   In the ledger for that specific property.  So if a

9  property was owned by an LLC, the LLC would have its own set

10  of books and then we would record income in there.

11  Q.   And with respect to the properties generally, what would

12  you do -- what responsibilities did you have?

13  A.   I'm sorry, could you state that again?

14  Q.   With respect -- you mentioned various properties that you

15  helped managed.

16          What specifically did you do in terms of those

17  properties.

18  A.   We would pay all the bills related to all the properties,

19  make sure they had insurance, pay the property taxes, just

20  keep them running.

21  Q.   As part of your work for Mr. Manafort, did you have

22  access to certain financial records and accounts?

23  A.   Yes.

24  Q.   And how did you gain access to those bank records, bank

25  accounts, or other financial records?

U.S. v. Manafort

H. Washkuhn - Direct

524

1   A.   We would -- some of the accounts we had authority on, so

2   we would be able to get statements or online access to them.

3   And if we didn't have signing authority, we would ask for

4   online access or duplicate statements.

5   Q.   And who determined what accounts you had access to?

6   A.   Mr. Manafort.

7   Q.   And you testified about bank records.  Did that also

8   include credit card records?

9   A.   Yes, we had access to credit card records.

10  Q.   How about investment accounts?

11  A.   Yes.

12  Q.   Was it important to your job to have access to all of

13  Mr. Manafort's accounts?

14  A.   Yes.

15  Q.   Why?

16  A.   Because we would track everything on the general ledger

17  that I referenced before, and we would want to provide a

18  complete financial picture to the CPA.

19  Q.   And when you say, "the CPA," are you referring to the tax

20  preparers?

21  A.   Yes.

22  Q.   With respect to Mr. Manafort, do you know who his tax

23  preparers were?

24  A.   He used KWC.

25  Q.   Okay.  Is that an accounting firm?

U.S. v. Manafort

525

1   A.   Yes.

2   Q.   And do you know who specifically at KWC Mr. -- handled

3   Mr. Manafort's tax returns?

4   A.   Mr. Ayliff, I believe, was the lead.  And I also worked

5   with Conor and Cindy and Naji (ph) at one time.

6   Q.   Okay.  You testified that it was important that you had

7   access to all of Mr. Manafort's accounts.  Did you have access

8   to all of his accounts?

9   A.   I believe we did.

10  Q.   Okay.  Did you ever see any movement in the accounts that

11  you were not aware of?

12  A.   Yes, occasionally.

13  Q.   And when that happened, what, if anything, would you do?

14  A.   When that happened, we would ask for the records for the

15  other side of the transaction that we were missing.

16  Q.   And would you get them?

17  A.   Sometimes.

18  Q.   Did you ask for access to these additional accounts?

19  A.   Yes.

20  Q.   During the course of the time that you worked for

21  Mr. Manafort, were you aware -- were you aware that he had any

22  holdings outside of the United States?

23  A.   No, I was not.

24  Q.   Did you ever record on Mr. Manafort's books and records

25  any foreign bank accounts?

EASTERN DISTRICT OF VIRGINIA

1   A.   No.

2   Q.   If Mr. Manafort had any foreign bank accounts, would that

3   have been important to your work?

4   A.   Yes.

5   Q.   Why?

6   A.   Again, we would want to keep a complete set of records,

7   so we tried to have the full financial picture.  So all

8   accounts, we would want to see.

9   Q.   Okay.  You testified that there was no -- that you didn't

10  record any foreign bank accounts.  Did you see foreign wires

11  incoming to Mr. Manafort's accounts?

12  A.   Yes.

13  Q.   And what did you understand those wires to be?

14  A.   Funds from political consulting, so income.

15  Q.   Okay.  And you understood that those wires came from who?

16  A.   From whoever Mr. Manafort was working for.

17  Q.   Some other third party?

18  A.   Correct.

19  Q.   It wasn't your understanding that Mr. Manafort --

20           THE COURT:  You're leading now.

21           MR. ANDRES:  I'm sorry, Judge.

22  BY MR. ANDRES:

23  Q.   Do you know if Mr. Manafort had any bank accounts in

24  Cyprus?

25  A.   No.

─────U.S. v. Manafort─────

H. Washkuhn - Direct

527

1   Q.   Do you know if Mr. Manafort had any bank accounts in

2   St. Vincent and the Grenadines?

3   A.   No.

4   Q.   Do you know if Mr. Manafort had any accounts in the

5   Ukraine?

6   A.   No.

7   Q.   During the time that you worked for Mr. Manafort, do you

8   know if he owned or controlled any bank accounts under the

9   name Actinet Trading limited?

10  A.   No.

11  Q.   During the time that you worked for Mr. Manafort, do you

12  know if he owned or controlled any bank accounts under the

13  name of Black Sea View Limited?

14  A.   No.

15  Q.   Do you know if Mr. Manafort had any bank accounts under

16  the name Bletilla Ventures Limited?

17  A.   No.

18  Q.   Do you know if Mr. Manafort had any bank accounts under

19  the name Global Highway Limited?

20  A.   No.

21  Q.   Do you know if Mr. Manafort had any bank accounts under

22  the name Leviathan Advisors Limited?

23  A.   No.

24  Q.   Do you know if Mr. Manafort had any bank accounts under

25  the name Lucicle Consultants Limited?

┌─────────────────────────────────────────────┐
U.S. v. Manafort

1    A.    No.

2    Q.    Do you know if Mr. Manafort had any bank accounts under

3    the name Olivenia Trading Limited?

4    A.    No.

5    Q.    Olivenia.   I'm sorry, Olivenia Trading Limited?

6    A.    No.

7    Q.    How about Peranova Holdings Limited?

8    A.    No.

9    Q.    How about Serangon Holdings Limited?

10   A.    No.

11   Q.    Do you know if Mr. Manafort had any bank accounts under

12   the name Yiakora Ventures Limited?

13   A.    No.

14   Q.    Do you know if Mr. Manafort had any bank accounts under

15   the name Global Endeavour Inc.?

16   A.    No.

17   Q.    Do you know if Mr. Manafort had any bank accounts under

18   the name Jeunet Limited?

19   A.    No.

20   Q.    Do you know if Mr. Manafort had any bank accounts under

21   the name Marziola?

22   A.    No.

23   Q.    Do you know if Mr. Manafort had any bank accounts under

24   the name Pompolo Limited?

25   A.    No.

H. Washkuhn - Direct

1  Q.   You testified that as part of your work for Mr. Manafort,

2  you paid his bills.  Can you explain that process?

3  A.   Sure.  We would receive all of the mail for all of the

4  bills.  We would scan them in electronically and then we would

5  process payments via checks, wire transfers, ACH, whatever was

6  necessary.

7  Q.   And so what types of bills did you pay?

8  A.   All bills.  So all bills relating to the home, personal

9  bills, credit cards, any payments that needed to be paid.

10  Q.   Did you pay any bills for Mr. Manafort to a company named

11  Alan Couture?

12  A.   Yes.

13  Q.   And did you have an understanding what Alan Couture was?

14  A.   Clothing.

15  Q.   Did you pay any bills for Mr. Manafort to a company named

16  House of Bijan?

17  A.   Yes.

18  Q.   Do you know what House of Bijan was?

19  A.   Clothing.

20  Q.   Did you pay any bills for Mr. Manafort to a company named

21  SP&C?

22  A.   Yes.

23  Q.   And what was SP&C?

24  A.   Home improvement.

25  Q.   Did you pay any bills for Mr. Manafort to a company named

─────U.S. v. Manafort─────
H. Washkuhn - Direct
530

1   New Leaf Landscaping?

2   A.   Yes.

3   Q.   And what was New Leaf Landscaping?

4   A.   Landscaping.

5   Q.   Do you know where that landscaping service worked?

6   A.   I believe it was the Hamptons.

7   Q.   Are you familiar with a company named Big Picture

8   Solutions?

9   A.   Yes.

10  Q.   Did you pay any bills for Mr. Manafort to Big Picture

11  Solutions?

12  A.   Yes.

13  Q.   Do you know if Mr. Manafort paid any of these vendors

14  from overseas accounts?

15  A.   Not that I'm aware of.

16  Q.   And if Mr. Manafort was paying those vendors separately,

17  would that be something you'd need to know?

18  A.   Yes, we'd like to track that.

19  Q.   Why?

20  A.   Again, to have a full set of financial records.

21  Q.   During the time that you paid Mr. Manafort's bills, were

22  you aware of any expenses related to the New York Yankees?

23  A.   Yes.

24  Q.   What types of expenses?

25  A.   Ticket expenses.

U.S. v. Manafort

531

Q.    And was that a reoccurring expense?

A.    Yes, I believe it was annual.

Q.    During the time that you worked for Mr. Manafort, did you record loans on his ledgers?

A.    Yes.

Q.    And how would you know when something was a -- how would you know to classify something as a loan?

A.    Mr. Manafort or Mr. Gates would let us know.

Q.    And when you were told about a loan, would you receive any loan documentation?

A.    We would ask for it, but not always receive it.

Q.    And why was it important to you to have the underlying loan documentation?

A.    We would want to track the loan, so to see if there was any payments due, to see the terms of the loan, interest rates, when it came due, things like that.

Q.    And were there loans on Mr. Manafort's books where you were unaware of this information?

A.    Yes.

Q.    You testified about a variety of information that you gathered.  Once you got that information, what did you do with it?

A.    I'm sorry.  Could you repeat the question?

Q.    When you had bank records and credit card records, how did you track that information?

─────── U.S. v. Manafort ───────

1  A.   We tracked it all on a general ledger.

2  Q.   And can you explain to the jury what a general ledger is?

3  A.   Sure.  It's just a record of all transactions, in and

4  out, for a period of time.  And then on a general ledger,

5  everything is classified into different accounts.  And then

6  you use that information to prepare financial statements or

7  trial balances or different documents.

8  Q.   And how is the information physically inputted into the

9  general ledger?

10 A.   Through our accounting software.

11 Q.   Is there an automated system?

12 A.   It's not automated.  It's manual entry.

13 Q.   And can you explain what types of information

14 specifically you categorize in the GL?

15 A.   Sure.  We categorize assets, liabilities, so any loans,

16 and then all income and all expenses get categorized out.  So

17 a credit card bill would get categorized out via travel,

18 clothing, things like that.

19 Q.   And you mentioned income.  How would you learn about any

20 income to Mr. Manafort or his firm?

21 A.   We would check the bank and see incoming wires or have

22 checks to deposit.

23 Q.   And with respect to expenses, how would you learn about

24 the expenses?

25 A.   We would -- again, paying all the bills, so we would have

U.S. v. Manafort

H. Washkuhn - Direct

533

1   access to expenses that way or we would get requests via

2   e-mail to pay certain things, and then those were the

3   expenses.

4   Q.   Were there codes included on the general ledger?

5   A.   Yes.

6   Q.   What was the purpose of the codes?

7   A.   You code things out so that you know exactly -- you could

8   say over a period of time, this is what was spent on

9   landscaping or -- it all rolls into the financial statements

10  then when you print them so that it's all organized.

11  Q.   Okay.  You mentioned a financial statement.  What is a

12  financial statement?

13  A.   A financial statement consists of a balance sheet and an

14  income statement.  So it shows a full financial picture as of

15  a certain period of time.

16  Q.   Does it include the net income?

17  A.   Yes.

18  Q.   And how often would you generate financial statements for

19  Mr. Manafort?

20  A.   Usually annually.

21  Q.   Okay.  Were you able to do it at different times of the

22  year if you were requested to?

23  A.   Yes.

24  Q.   I'm going to ask you to turn to the binder of documents.

25  Do you have a binder of documents?

U.S. v. Manafort

1        MR. ANDRES:Excuse me, Your Honor.

2   BY MR. ANDRES:

3   Q.   Yeah, the one that says 121.

4        Do you have that binder in front of you,

5   Ms. Washkuhn?

6   A.   Yes, I do.

7   Q.   Can you turn to Government Exhibit 121A?

8   A.   Yes.

9   Q.   Do you recognize that document?

10  A.   Yes, I do.

11  Q.   Can you tell me what it is?

12  A.   That is a general ledger for Davis Manafort

13  Partners, Inc. from 2011.

14  Q.   Okay.

15       MR. ANDRES:  Your Honor, at this point, the

16  Government would move to admit Government Exhibit 121A.

17       MR. ZEHNLE:  No objection, Your Honor.

18       THE COURT:  Admitted.

19                            (Government's Exhibit No. 121A

20                            admitted into evidence.)

21       MR. ANDRES:  And may I publish it?

22       THE COURT:  Yes.  I take it you only want

23  published --

24       MR. ANDRES:  Not the whole thing, Judge.

25       THE COURT:  Of course not, a small amount.

─────────── U.S. v. Manafort ───────────

1          MR. ANDRES:  Yeah, just a few references throughout

2    the general ledger.

3          THE COURT:  All right.  You may do so.

4    BY MR. ANDRES:

5    Q.   I'd like to start with the first page.

6          Ms. Washkuhn, can you look at the heading of this

7    document and read it?

8    A.   Sure.  It's Davis Manafort Partners, Inc., ledger report

9    from 1/1/11 through 12/31/11.

10   Q.   Okay.  And so what time period does this cover?

11   A.   It covers the entire year for 2011.

12   Q.   Okay.  And if you look on the left, there's a code

13   001-001 [sic].

14          Can you tell us what's happening on this first page

15   and explain the various columns?

16   A.   Sure.  That's a general ledger code.  So that indicates

17   that it's an asset account and it's a cash account.  And then

18   you customize underneath that.  So they would all start

19   0001, dash, and then another number.

20          G- -- oh, I'm sorry.

21   Q.   Yes, keep going.  Can you just take us across the

22   document so we understand the different columns?

23   A.   Sure.  GJ-Reference, that's the general journal number.

24   So you would just pull up that journal number if you needed to

25   make a change to it.

─────U.S. v. Manafort─────
H. Washkuhn - Direct
536

1           The date is the date of the transaction.

2           Payee/Payor would be who you paid or who the money

3    was from if it was income.

4           Description is self-explanatory.

5           Contra.  Contra account means how it's coded on the

6    other side.  So every entry has a debit and a credit.  So if

7    it was a debit, this tells you where the credit goes to.  If

8    it was a credit, this tells you what account the debit is in.

9           And then you have a debit and credit columns for

10   your amounts.

11   Q.   Okay.  Let me -- can I call your attention to an entry at

12   1/31/11?

13          Can you explain that entry?

14   A.   Yes.  So that shows income from Global Highway Limited of

15   $375,000.

16   Q.   And do you know what Global Highway Limited is?

17   A.   No, I don't.

18   Q.   Do you know where that payment came from?

19   A.   No, I do not.

20   Q.   And the code there for Global Highway, is it 3101-003,

21   what does that reference?

22   A.   So that's an income code.  Anything in the 3,000's

23   indicates that it's income.

24   Q.   Okay.  Can I ask you to turn to Page 6 on the 2011

25   general ledger?

1      Halfway down, there's a reference to "due from

2  affiliates, Paul Manafort."  Can you explain what that section

3  of the general ledger is?

4  A.   Sure.  So things would be in this section of the ledger

5  if they were paid out of the Davis Manafort Partners, Inc.

6  account, but they were personal expenses.  So they would get

7  classified there as if they were due from Paul.

8  Q.   Okay.  There's a reference at 5/27/11 to American

9  Express.  Can you explain what that entry is?

10  A.   Yes.  That's a charge to SP&C Home Improvement for

11  $4,000.

12  Q.   Okay.  Can I ask you to turn to Page 10?

13      There's a reference on Page 10 to -- at the bottom

14  that says, "due to affiliates, Yiakora Ventures."

15      Can you explain what "due to affiliate" means?

16  A.   Sure.  So that's a loan category.  That's a liability.

17  Q.   Okay.  And so with respect to the entry here, can you

18  explain the entry at 3/11 -- sorry, can you explain the entry

19  on March 8, '11?

20  A.   Money came in from Yiakora Ventures for $275,000, and

21  it's classified as a loan to them.

22  Q.   And above that, it says there's a balance of -- there's a

23  balance 12/31/10.  What does that refer to?

24  A.   So that was just the opening balance in the account of

25  approximately 1.7 million.

────────── U.S. v. Manafort ──────────
H. Washkuhn - Direct
538

1   Q.   And with respect to the closing balance, what's the total

2   loan from Yiakora Ventures?

3   A.   1,989,651.

4   Q.   With respect to the Yiakora loan, did you ever receive

5   any underlying documentation?

6   A.   I don't recall.

7   Q.   Would you have requested it?

8   A.   Yes.

9   Q.   Can I ask that you turn to Page 11?

10          At the bottom of the page, there's a reference to

11   "deferred income, Ukraine contract."

12          Can you explain what that is?

13   A.   That -- again, that's a liability code.  But beyond that,

14   that was an opening balance given to us from 2010, before

15   Mr. Manafort worked with us.

16   Q.   Okay.  So you said it was given to you.  Who was it given

17   to you by?

18   A.   That would have been provided by either his CPAs or a

19   former accountant would have given us opening balances.

20   Q.   So is it fair to say you weren't aware of the details of

21   that deferred --

22          THE COURT:  You're leading now.

23   BY MR. ANDRES:

24   Q.   Were you aware of the details of that deferred income?

25   A.   No.

U.S. v. Manafort

1  Q.   Okay.  And under that, there's a reference to "deferred

2  income, Cyprus."

3           Can you tell me what that is?

4  A.   No.

5  Q.   Based on that entry, did you have an understanding that

6  Mr. Manafort had any assets or bank accounts in Cyprus?

7  A.   No.

8  Q.   Can you turn to Page 12?

9           At the bottom of the page, there's a reference to

10 "distributions, Paul and Kathleen Manafort."

11          Can you explain what that category is?

12 A.   So that would have been money coming in from Leviathan

13 Advisors.  That would have gone directly to Mr. and

14 Mrs. Manafort instead of going directly into a Davis Manafort

15 Partners, Inc. account.

16 Q.   What's Leviathan Advisors?

17 A.   I don't know.

18 Q.   Can you turn to Page 13?  Under the reference to "other

19 income"?

20 A.   Yes.

21 Q.   There's another reference to Leviathan Advisors and then

22 can you read what it says in parentheses?

23 A.   Ukraine.

24 Q.   And what's included in this category under the -- under

25 the code 3101-001?

─────U.S. v. Manafort─────
H. Washkuhn - Direct
540

1   A.   That's all of the income for the year received from

2   Leviathan Advisors.

3   Q.   And at the bottom, does it list the total amount of

4   income from Leviathan Advisors?

5   A.   Yes.

6   Q.   What is it?

7   A.   2,157,300.

8   Q.   Can you turn to Page 14?

9        Do you see a reference at the top to Peranova

10  Holdings?

11  A.   Yes.

12  Q.   What did you understand Peranova Holdings to be?

13  A.   It's classified as income.

14  Q.   And what's the total income from Peranova Holdings?

15  A.   $875,000.

16  Q.   Do you know what Peranova Holdings was?

17  A.   No.

18  Q.   Did you know if Mr. Manafort controlled Peranova

19  Holdings?

20  A.   No.

21  Q.   There's a reference below to Global Highway.  Can you

22  tell me what that is?

23  A.   That's classified as income as well.

24  Q.   And do you know what Global Highway is?

25  A.   No.

1  Q.   Do you know if Mr. Manafort controlled Global Highway?

2  A.   No.

3  Q.   Can I ask that you turn to Page 36?

4  A.   Okay.

5  Q.   What's recorded on Page 36?

6  A.   Sorry, I have to flip back to reference.

7       So Page 36 is part of the entertainment category.

8  Q.   Okay.  And at 7/28/11, can you explain the entry relating

9  to the New York Yankees?

10 A.   There's multiple ones.  7/28/11.

11 Q.   Okay.  The one for $2,575?

12 A.   So that's a charge to the New York Yankees --

13 Q.   Okay.

14 A.   -- on the American Express card.

15 Q.   So with respect to the -- this is the 2011 G&L.

16      Is it fair to say that in the ensuing years, there

17 are a number of --

18      THE COURT:  You're leading again.

19      MR. ANDRES:  I'm just trying to move along, Judge.

20 Sorry, I'll rephrase the question.

21      THE COURT:  Yes, just rephrase it, because I do -- I

22 do appreciate your moving it along.

23 BY MR. ANDRES:

24 Q.   With respect to the general ledgers in 2012, are there

25 references to the New York Yankees?

─────────────── U.S. v. Manafort ───────────────

1  A.   In 2012?

2  Q.   Yes.

3  A.   I'd have to look at the 2012 ledger.

4  Q.   Okay.  Is it fair to say that there are more than one

5  reference to the New York Yankees in the various general

6  ledgers that you've reviewed?

7  A.   Yes.

8  Q.   Okay.  Can I ask you to turn to Page 47?

9       There's a category listed as "Professional

10  Services."  Can you tell me what that is?

11  A.   Sure.  So that would be any professional outside

12  consultants that we paid for their services.

13  Q.   Okay.  At the bottom on 11/14/11 there's a reference to

14  the Tarrance Group.  Can you explain what the purpose of that

15  payment was?

16  A.   It says, "For the survey of voter added to in Ukraine,

17  conducted October 1 to 16, 2011."

18  Q.   And what's the amount of that payment?

19  A.   27,200.

20  Q.   Can you turn to Page 55?

21       The heading for "Travel Expenses," can you explain

22  what you're tracking there?

23  A.   Sure.  So that's all travel airfare expenses, most paid

24  on the American Express card.

25  Q.   Okay.  And over the course of the time that you worked

U.S. v. Manafort
H. Washkuhn - Direct

543

1   for Mr. Manafort, did you record entries relating to travel to

2   the Ukraine?

3   A.   Yes.

4   Q.   Can I ask that you turn to Page 92?  There's a reference

5   to travel to hotels.  Can you tell me what that is?

6   A.   That would be tracking all travel hotel expenses.

7   Q.   Okay.  And is it fair to say that you also recorded

8   travel or stay in hotels in the Ukraine?

9   A.   Yes.

10  Q.   Can I ask that you turn to Government Exhibit 121B?

11        Can you tell me what that is?

12  A.   That is a financial statement for Davis Manafort

13  Partners, Inc., for 2011.

14  Q.   And so this is a document that relates to Mr. Manafort's

15  business?

16  A.   Yes.

17  Q.   And what does this document record?

18  A.   So this -- the first page is the balance sheet, and then

19  it should have supporting schedules and then there's an income

20  statement in there as well.

21  Q.   And how is the -- how are the financial statements

22  generated?

23  A.   They are generated through our accounting system using

24  all the information in the general ledger.

25  Q.   Okay.

U.S. v. Manafort

1      MR. ANDRES:  Your Honor, the Government would move

2  to admit Government Exhibit 121B.

3      MR. ZEHNLE:  No objection, Your Honor.

4      THE COURT:  All right.  It's admitted.

5                              (Government's Exhibit No. 121B

6                              admitted into evidence.)

7      THE COURT:  We're going to take the lunch recess.

8      How much more do you anticipate with this witness?

9      MR. ANDRES:  Judge, this witness is going to be --

10      THE COURT:  Yes.  How much more time?

11      MR. ANDRES:  I would say two hours.

12      THE COURT:  All right.  Two hours.  You've already

13  been at it for a while.  During the luncheon period, see if

14  you can focus sharply what you want to elicit and do it a

15  little more expeditiously.

16      MR. ANDRES:  Thank you, Judge.

17      THE COURT:  All right.  Ms. Washkuhn, did I

18  pronounce your name correctly?

19      THE WITNESS:  You did.

20      THE COURT:  You may step down.  We'll take a

21  luncheon recess.

22      Now, during the luncheon recess, you may not discuss

23  your testimony with anyone at all, not with any of the lawyers

24  or any of the members of the public.

25      And we will recess until -- until 1:30 and then

─────U.S. v. Manafort─────

545

1   we'll resume.

2           THE WITNESS:  Okay.

3           THE COURT:  You may step down.

4                    (Witness excused.)

5           THE COURT:  Ladies and gentlemen, pass your books to

6   the right.  The court security officer will collect them,

7   maintain their security during the lunch period.  I hope your

8   lunches will be there.  By the time -- they are.  I just had

9   that confirmed.  Have a nice lunch.  We will reconvene at

10  1:30.  You may follow the court security officer out.

11           (Jury dismissed.)

12           MR. ANDRES:  Your Honor, I promise to do my best to

13  move this along.  I just wanted Your Honor to be aware --

14           THE COURT:  You may be seated.  Go ahead,

15  Mr. Andres.

16           MR. ANDRES:  I just wanted the Court to be aware the

17  number of categories that are relevant to the prosecution.  So

18  in addition to all --

19           THE COURT:  Well, I'm aware that you can't shorten

20  it to 15 or 20 minutes.  I understand you have to go through

21  it.

22           MR. ANDRES:  Okay.  It's just that Ms. Washkuhn also

23  plays a substantial role with respect to the bank frauds as

24  well.  Not to say she's involved, she's not, but she has

25  relevant evidence.  I just -- I promise to do my best to push

U.S. v. Manafort

546

1    it along, but there is a lot of detail.

2            THE COURT:  Your best is all I expect.

3            MR. ANDRES:  Thank you.

4            THE COURT:  And I wanted to emphasize, however, that

5    you not stint in giving me your best.

6            MR. ANDRES:  Always.

7            THE COURT:  Court stands in recess.

8            (Lunch Recess 12:29 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF REPORTER</u>

2

3              I, Tonia Harris, an Official Court Reporter for

4     the Eastern District of Virginia, do hereby certify that I

5     reported by machine shorthand, in my official capacity, the

6     proceedings had and testimony adduced upon the Jury Trial -

7     AM in the case of the **UNITED STATES OF AMERICA versus PAUL**

8     **J. MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in said

9     court on the 2nd day of August, 2018.

10             I further certify that the foregoing 131 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, my computer realtime

13    display, together with the backup tape recording of said

14    proceedings to the best of my ability.

15             In witness whereof, I have hereto subscribed my

16    name, this August 6, 2018.

17

18

19

20

21    _____

22    Tonia M. Harris, RPR
      Official Court Reporter

23

24

25

547