─────────────────U.S. v. Manafort─────────────────

707

1                     UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
2                          ALEXANDRIA DIVISION

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA,      : Criminal Action No.
                                   : 1:18-CR-83
5              versus               :
                                   :
6    PAUL J. MANAFORT, JR.,         :
                                   : August 3, 2018
7                     Defendant. : Volume IV - A.M.
     ------------------------------x
8
                        TRANSCRIPT OF JURY TRIAL
9            BEFORE THE HONORABLE T.S. ELLIS, III
                    UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     FOR THE GOVERNMENT:          UZO ASONYE, AUSA
12                                United States Attorney's Office
                                  2100 Jamieson Avenue
13                                Alexandria, VA 22314
                                       and
14                                GREG ANDRES, SAUSA
                                  BRANDON LANG VAN GRACK, SAUSA
15                                Special Counsel's Office
                                  U.S. Department of Justice
16                                950 Pennsylvania Avenue NW
                                  Washington, D.C. 20530
17
     FOR THE DEFENDANT:           JAY ROHIT NANAVATI, ESQ.
18                                BRIAN KETCHAM, ESQ.
                                  Kostelanetz & Fink LLP
19                                601 New Jersey Avenue NW
                                  Suite 620
20                                Washington, DC 20001
                                       and
21                                THOMAS ZEHNLE, ESQ.
                                  Law Office of Thomas E. Zehnle
22                                601 New Jersey Avenue, NW
                                  Suite 620
23                                Washington, DC 20001
                                       and
24                                KEVIN DOWNING, ESQ.
                                  Law Office of Kevin Downing
25                                601 New Jersey Avenue NW
                                  Suite 620

```
                              ─U.S. v. Manafort─
                                                                    708
 1                                Washington, DC 20001
                                     and
 2                                RICHARD WILLIAM WESTLING, ESQ.
                                  Epstein, Becker, & Green, PC
 3                                1227 25th Street NW
                                  Washington, DC 20037
 4
     OFFICIAL COURT REPORTER:     TONIA M. HARRIS, RPR
 5                                U.S. District Court, Ninth Floor
                                  401 Courthouse Square
 6                                Alexandria, VA 22314
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

─────────U.S. v. Manafort─────────

709

1                          TABLE OF CONTENTS
                                TRIAL
2                              WITNESSES

3    On behalf of the Government:

4    James Philip Ayliff (continued from 8/2/18)

5            Direct examination by Mr. Asonye................ 715

6                               EXHIBITS

7    On behalf of the Government:
                                                        Admitted
8
Number 217............................................ 724
9    Number 205............................................ 727
     Number 198............................................ 756
10   Number 199............................................ 758
     Number 196............................................ 759
11   Number 206............................................ 761
     Number 201............................................ 764
12   Number 202............................................ 766
     Number 207............................................ 774
13   Number 209............................................ 775
     Number 190............................................ 796
14   Number 212............................................ 801
     Number 150............................................ 807
15   Number 214............................................ 810
     Number 210............................................ 814
16
                             MISCELLANY
17
     Preliminary matters...................................... 710
18   Certificate of Court Reporter........................... 820
19

20

21

22

23

24

25

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
                EASTERN DISTRICT OF VIRGINIA

710

**P R O C E E D I N G S**

(Court proceedings commenced at 9:41 a.m.)

THE COURT:  All right.  Good morning the record will reflect that counsel and the defendant are present, prepared to proceed in CR-18-83, 18-83.

Outstanding is one motion, that is the Government's motion to exclude evidence or argument on civil tax audits. Counsel presented very brief, happily brief, memoranda on it, which I reviewed.  It's difficult to resolve it, because I don't know precisely how the issue is going to come up.

I think you understand that if the defendant were to testify about something, I'm going to permit that.

I think, however, it's equally so that the mere existence of a civil alternative to criminal enforcement does not erase or eliminate criminal liability.

Let me put it more directly.  The fact that the Government has a choice either to pursue someone civilly or prosecute someone criminally does not mean they have to do it civilly and it's not a defense to a criminal prosecution.

However, if a defendant in a particular case offered and is in some way attempting or involved in a -- in an offering to submit to an audit and books and everything, that could be admissible because it goes to the willfulness requirement of these tax offenses, which require that a defendant know what the legal requirement is and willfully,

711

1   knowingly violated it.

2           And there is some evidence that that doesn't happen

3   if he's willing to submit voluntarily to an audit.

4           So we'll do it this way: before you elicit, either

5   side elicits any testimony in that regard, you come to the

6   bench and I'll resolve it for that.  But I've given you

7   guidance and the guidance is pretty clear, I think.  And

8   depending on how the evidence comes in, counsel -- what is

9   that?

10          All right.  What that was was our sending to

11  probation the results of the previous hearing, so the noise is

12  my fault.

13          Now, if evidence does come in for some reason, it's,

14  of course, open to the parties to request that I give some

15  instruction on the issue.  For example, an instruction could

16  be you heard evidence about X, you may take that evidence into

17  account in determining whether the Government has proved

18  beyond a reasonable doubt X or Y or Z and you may not consider

19  it for any other purpose, something like that, or an

20  instruction that says the availability of a civil remedy does

21  not preclude the Government from seeking a criminal remedy.

22          Any questions, Mr. Asonye?

23          MR. ASONYE:  No, Your Honor.

24          THE COURT:  All right.  And this is Mr. Zehnle.

25          MR. DOWNING:  I'm going to be Mr. Downing today.  We

712

1    switched again.

2              THE COURT:  All right.  Ms. Pham is having a hard

3    time keeping up with you-all.  Actually I'm having a hard

4    time.

5              All right.  Yes, sir.  All right.  We're prepared to

6    proceed.

7              MR. ASONYE:  Your Honor, can we clarify one issue.

8    Just to be clear, defense counsel won't be able to elicit

9    any -- on cross any information about civil tax audit without

10   approaching the bench first.  That's --

11             THE COURT:  Do you intend to?  We'll do it now.  Do

12   you intend to bring anything out about civil tax audit from

13   this witness?

14             MR. DOWNING:  We'll wait on that, Your Honor.  If I

15   do, I understand the instruction of the Court that I'll have

16   to notify the Court before asking that question.

17             THE COURT:  All right.  Let's bring the jury in and

18   let's get started.

19             (Jury in.)

20             THE COURT:  All right.  You all may be seated now.

21   Well, it's apparent to the Court that there is still a strong

22   view about your proprietary interest in a particular seat.

23   That's all right.  But the point is, I want you to have in

24   mind, if you can't see anything, because I think there are

25   screens in front of some of the -- the seats here in the

─U.S. v. Manafort─

713

1   front.  But persons in the back either have to look over the

2   shoulder to see a screen or have to look at this big screen

3   right here.

4           If at any time you -- something is shown that you

5   want to see, raise your hand, and I'll see that you have an

6   opportunity to see it.  But I think with these two sets of

7   screens, you ought to be able to make do.  If not, let me know

8   and I'll take steps to ensure that it is made available.

9           All right.  Let's proceed with calling the roll as

10  we always do by number.

11          THE DEPUTY CLERK:  Ladies and gentlemen, as I call

12  your number, please answer "present" or "here."

13          Juror 0008?

14          THE JUROR:  Present.

15          THE DEPUTY CLERK:  Juror 0037?

16          THE JUROR:  Present.

17          THE DEPUTY CLERK:  Juror 0276?

18          THE JUROR:  Here.

19          THE DEPUTY CLERK:  Juror 0017?

20          THE JUROR:  Present.

21          THE DEPUTY CLERK:  Juror 0145?

22          THE JUROR:  Present.

23          THE DEPUTY CLERK:  Juror 0115?

24          THE JUROR:  Present.

25          THE DEPUTY CLERK:  Juror 0082?

U.S. v. Manafort

714

```
 1              THE JUROR:  Present.

 2              THE DEPUTY CLERK:  Juror 0009?

 3              THE JUROR:  Present.

 4              THE DEPUTY CLERK:  Juror 0299?

 5              THE JUROR:  Present.

 6              THE DEPUTY CLERK:  Juror 0091?

 7              THE JUROR:  Present.

 8              THE DEPUTY CLERK:  Juror 0302?

 9              THE JUROR:  Present.

10              THE DEPUTY CLERK:  Juror 0060?

11              THE JUROR:  Present.

12              THE DEPUTY CLERK:  Juror 0296?

13              THE JUROR:  Present.

14              THE DEPUTY CLERK:  Juror 0054?

15              THE JUROR:  Present.

16              THE DEPUTY CLERK:  Juror 0127?

17              THE JUROR:  Present.

18              THE DEPUTY CLERK:  And Juror 0133?

19              THE JUROR:  Present.

20              THE DEPUTY CLERK:  Thank you.

21              THE COURT:  All right.  Ladies and gentlemen, good

22   morning.

23              Let me ask -- ask that you confirm to me that you

24   had no difficulty in following the Court's instructions to

25   refrain from discussing the matter with anyone or undertaking
```

U.S. v. Manafort

1   any investigation?  Good.  I see unanimity there.

2           But I take it we're getting closer to the time where

3   they no longer believe you've been doing what you say you've

4   been doing.  That's a good sign.  Disinterest.

5           All right.  You may call Mr. Ayliff.  I think we're

6   in the process of the direct examination of Mr. Ayliff.

7           Come forward, Mr. Ayliff.  And you'll recall, sir,

8   that you remain under oath.

9           You may resume the stand.

10          (Witness seated.)

11          THE COURT:  All right.  Mr. Asonye, you may proceed

12  and I assume you've been working diligently overnight to focus

13  sharply what you want to elicit and get it done expeditiously.

14          MR. ASONYE:  Try my best, Your Honor.

15          THE COURT:  All right.  Proceed.

16  (James Philip Ayliff was previously affirmed 8/2/18.)

17              **DIRECT EXAMINATION (cont'd)**

18  BY MR. ASONYE:

19  Q.   Mr. Ayliff, on what accounting basis can income tax

20  returns be prepared?

21  A.   What accounting basis?  A cash basis --

22          THE COURT:  Isn't that a question you're asking him

23  that goes to a legal conclusion?  Why don't you ask him what

24  basis does he prepare them on?

25          MR. ASONYE:  Fair enough, Your Honor.

J. Ayliff - Direct (cont.)

1          THE COURT:  Actual question.

2    BY MR. ASONYE:

3    Q.   What basis did you prepare -- well, could you prepare

4    income tax returns?

5    A.   On cash basis or accrual basis, typically.

6    Q.   And what was your understanding -- and what's a cash

7    basis?

8    A.   Cash basis is based purely on cash flow.  So cash coming

9    in to -- it's based on a cash being collected and then it gets

10   reported as income, if it's income, and then cash payments

11   made on business expenses, then those are deducted when paid.

12   Q.   What about the accrual basis?

13   A.   The accrual basis is based on when -- rather when the

14   cash is collected, it's when the work is actually performed

15   and where the income is earned and the expenses is when the

16   expenses are actually incurred rather than necessarily paid.

17   Q.   Who decides whether to use the cash basis or the accrual

18   basis for the purpose of preparing a tax return?

19   A.   This is done by the taxpayer at the beginning of the --

20   when the entity is performed.

21   Q.   When you talk about income and how you -- when you

22   prepared income tax returns, how did you know the amount of

23   income to report on business tax returns?

24   A.   It's based on the information that's provided by the

25   client.

─U.S. v. Manafort─

1   Q.   And in those cases, could a business direct its income

2   such as payment for goods and services to a third party?

3   A.   Yes.

4   Q.   And so, in other words, when a -- instead of accepting

5   payment, can it be directed to like a vendor, a payment to a

6   vendor?

7   A.   Yes.

8   Q.   And in those circumstances, how did you treat that

9   payment?

10  A.   Well, that payment would still be picked up as -- it

11  would still be reported within the entity's tax return as

12  income.

13  Q.   Now, if -- do some of your clients pay foreign taxes?

14  A.   Yes.

15  Q.   Is that information that you would want to know?

16  A.   Yes.

17  Q.   Why would you want to know that information?

18  A.   Because if they pay foreign taxes, they are able -- they

19  will probably be able to take a foreign tax credit on the tax

20  return and reduce the amount of taxes that they have to pay to

21  the U.S.

22  Q.   And what about rental income?  When you would prepare

23  taxes, did you have to report rental income on a tax return?

24  A.   Yes.

25  Q.   And what about rental expenses?

─────U.S. v. Manafort─────

1    A.    Rental expenses would also be deductible.

2    Q.    And what did -- when you're preparing a tax return, what

3    do rental expenses -- what is the effect on that person's tax

4    due and owing when they submit rental expenses?

5    A.    Reduce the amount of taxable income.

6    Q.    Did you encounter situations with loans when you were

7    preparing taxes?

8    A.    Yes.

9    Q.    And did you treat loans as income?

10   A.    No.

11   Q.    Why not?

12   A.    Because if it's a loan, then it's not -- it's not income.

13   It's a liability to the entity.

14   Q.    And how did you determine, when you were reviewing the

15   books, whether a transaction was income or proceeds of a loan?

16   A.    Client representation.

17   Q.    And would you ever characterize something as a loan when

18   it was actually income?

19   A.    No.

20   Q.    Why not?

21   A.    Because that's incorrect.

22   Q.    What's the effect of calling something a loan when it's

23   actually income?

24   A.    It understates the income.

25   Q.    Now, if a loan is forgiven -- did you ever have a

────────U.S. v. Manafort────────
J. Ayliff - Direct (cont.)                                          719

1   circumstance where you dealt with where a loan is forgiven?

2   A.   Yes.

3   Q.   And what's the effect of that on -- for tax purposes?

4   A.   When a loan is forgiven, it is income.

5   Q.   And when does it become actually recorded as income?

6   A.   When the loan is forgiven.

7   Q.   Can a taxpayer backdate a loan document to pick the best

8   year to recognize the income?

9   A.   No.

10  Q.   Why not?

11  A.   Because it's when the -- when the loan is actually

12  forgiven, that's when the transaction is to be recorded.

13  Q.   I'm going to ask you about some of your clients, then

14  specifically Mr. Manafort.

15       At your peak, how many clients did you personally

16  have at KWC?

17  A.   Around 350.

18  Q.   And what was your total compensation when you retired as

19  a principal?

20  A.   My last year, my W2 was 435,000.

21  Q.   Was your compensation determined based on how much your

22  clients paid in taxes or how much they saved on taxes?

23  A.   No.

24  Q.   How was your pay determined?

25  A.   There were multiple factors.  There was a compensation

U.S. v. Manafort

1   committee, they determined what -- how the -- how much pay I

2   would get.

3   Q.   How much did one individual client affect your

4   compensation?

5   A.   Very minimal.

6   Q.   Do you know Paul Manafort?

7   A.   Yes.

8   Q.   Was he one of your clients at KWC?

9   A.   Yes.

10  Q.   How many times -- well, have you met him in person?

11  A.   Yes.

12  Q.   How many times?

13  A.   Over the 20 years, probably about 30 times.

14  Q.   And have you communicated with him repeatedly over e-mail

15  and by phone?

16  A.   Yes.

17  Q.   When did -- well, how did Mr. Manafort become a client of

18  your firm?

19  A.   We -- in the mid 90's, Davis Manafort became a client

20  initially when they formed.  And then a couple of years later,

21  Mr. Manafort engaged us to help him with his taxes.

22  Q.   And when did you begin working on Mr. Manafort's returns?

23  A.   I think 1997.

24  Q.   Did you -- did KWC prepare both business and personal

25  returns for Mr. Manafort?

J. Ayliff - Direct (cont.)

721

1   A.   Yes.

2   Q.   And the -- and did those returns include returns for

3   Mr. Manafort's family?

4   A.   Yes.

5   Q.   Which family members?

6   A.   His daughters.

7   Q.   What about his wife?

8   A.   His wife was a joint return with Mr. Manafort.

9   Q.   How much -- in terms of your client base, what percentage

10  of your client base approximately was Mr. Manafort's total

11  business, him and his entire family?

12  A.   When I retired --

13          THE COURT:  Wait just a moment.  I don't understand

14  your question.

15          MR. ASONYE:  I'll rephrase it, Your Honor.

16          THE COURT:  All right.

17  BY MR. ASONYE:

18  Q.   What portion of your entire client total base was

19  Mr. Manafort's business?

20          THE COURT:  Just a moment.  Why is that relevant?

21          MR. ASONYE:  Well, I'm happy to -- I'm happy to

22  withdraw it, Your Honor.  I'm sorry.

23          THE COURT:  All right.  Let's do that.

24  BY MR. ASONYE:

25  Q.   Who else at KWC worked on Mr. Manafort's tax returns with

─────U.S. v. Manafort─────

J. Ayliff - Direct (cont.)

722

1    you?

2    A.   There were a number of staff people over the years.

3    Cindy Laporta, Conor O'Brien, Naji Lakkis, Dan Walters --

4              THE REPORTER:  Excuse me.  I lost you.  Cindy

5    Laporta and. . .

6              THE WITNESS:  Uh-huh.

7              THE REPORTER:  And who else?

8              THE WITNESS:  Conor O'Brien, Naji Lakkis, Dan

9    Walters, and there were a number of others.

10   BY MR. ASONYE:

11   Q.   Now, you testified yesterday that, at some point, you --

12   I believe in 2014, you transitioned from a principal at KWC to

13   a contract employee; is that correct?

14   A.   Yes.

15   Q.   And did your role in Mr. Manafort's preparation of his

16   tax returns change at that point as well?

17   A.   Yes.

18   Q.   How did it change?

19   A.   Well, once I had transitioned the client base over to

20   the -- to the shareholders that received the clients, then my

21   position changed where I was just providing more of a support

22   role.  So in Mr. Manafort's case, I was then helping making

23   sure that the tax returns were getting prepared and getting

24   the data ran, and just moving things along.

25   Q.   Now, do you know an individual named Rick Gates?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

J. Ayliff - Direct (cont.)

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   How do you know him? |
| 3 | A.   I met him through Mr. Manafort. |
| 4 | Q.   What was your understanding of his relationship to |
| 5 | Mr. Manafort? |
| 6 | A.   My understanding was that he was working closely with |
| 7 | Mr. Manafort and he was his right-hand person. |
| 8 | Q.   And what was your understanding of who was in charge |
| 9 | between the two of them? |
| 10 | A.   Mr. Manafort. |
| 11 | Q.   Did you communicate with Rick Gates regarding Paul |
| 12 | Manafort's tax returns? |
| 13 | A.   Yes. |
| 14 | Q.   Why did you do that? |
| 15 | A.   Because Mr. Manafort authorized it. |
| 16 | Q.   Did Mr. Manafort ever complain to you about how you |
| 17 | prepared his tax returns? |
| 18 | A.   No. |
| 19 | Q.   Did he ever complain to you about your communications |
| 20 | with Rick Gates? |
| 21 | A.   No. |
| 22 | Q.   Did Rick Gates ever contradict Paul Manafort? |
| 23 | A.   No. |
| 24 | Q.   And did Mr. Manafort ever contradict Rick Gates? |
| 25 | A.   No. |

EASTERN DISTRICT OF VIRGINIA

─U.S. v. Manafort─

J. Ayliff - Direct (cont.)

724

1   Q.   Did Rick Gates ever tell you to hide information from

2   Paul Manafort?

3   A.   No.

4   Q.   Did you participate on e-mails and phone calls regarding

5   Paul Manafort's taxes where both Rick Gates and Paul Manafort

6   were present?

7   A.   Yes.

8   Q.   All right.  Let me show you what's been marked as

9   Government Exhibit 217.

10           Do you recognize this entire exhibit?

11  A.   Yes.

12  Q.   Okay.  What is it?

13  A.   It's invoices that are prepared by the firm to different

14  Davis Manafort related entities.

15           MR. ASONYE:  Your Honor, Government moves 217 into

16  evidence.

17           MR. DOWNING:  No objection.

18           THE COURT:  It's admitted.

19                      (Government's Exhibit No. 217

20                      admitted into evidence.)

21           MR. ASONYE:  And, Your Honor, may we publish it?  I

22  think it's a couple of pages.

23           THE COURT:  What are these?  These are the bills?

24           MR. ASONYE:  Yes, Your Honor.

25           THE COURT:  For the accountants?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

J. Ayliff - Direct (cont.)

725

1           MR. ASONYE:  For the tax preparer, yes.

2           THE COURT:  All right.  Let's do it quickly.

3           MR. ASONYE:  Yes, Your Honor.

4    BY MR. ASONYE:

5    Q.   Now, are there highlights contained on this document?

6    A.   Yes.

7    Q.   Now, let's turn to the second to the last page.

8           And, Mr. Binder, I believe that's Page 53.

9           THE COURT:  Well, as long as you're referring to

10   highlights, who did the highlights?

11          I'm asking you, Mr. Ayliff.  Who did the highlights?

12          THE WITNESS:  I don't know.

13          THE COURT:  Who did the highlights?

14          THE GOVERNMENT:  The Government highlighted it, Your

15   Honor.

16          THE COURT:  All right.  Well, you can't -- I don't

17   want any -- that lets the Government testify about this.

18          MR. ASONYE:  We'll take it down.  We'll submit an

19   unhighlighted version, Your Honor.

20          THE COURT:  Yes.

21          MR. ASONYE:  On this --

22          THE COURT:  Don't display anymore where you-all have

23   highlighted it because that is an argument to the jury.

24          MR. ASONYE:  Thank you, Your Honor.

25   BY MR. ASONYE:

U.S. v. Manafort

726

1   Q.   Mr. --

2              THE COURT:  That doesn't mean you can't ask about

3   the highlighted areas.

4              MR. ASONYE:  I will.  Thank you, Your Honor.

5              THE COURT:  Proceed.

6   BY MR. ASONYE:

7   Q.   Does this -- do these invoices reflect conference calls,

8   e-mails, and meetings with Paul Manafort?

9   A.   Yes.

10  Q.   Okay.  And roughly how many in all of these invoices?

11  A.   I don't -- I don't know.  I'd say probably maybe 15.  But

12  I'd have to go through and count them.

13  Q.   Did you frequently discuss Mr. Manafort's tax returns

14  with him?

15  A.   When he -- when he had any questions, yes.

16  Q.   All right.  Initially, how did the firm -- let me show

17  you actually Government Exhibit 205.

18              Do you recognize these documents?

19  A.   Yes.

20  Q.   Okay.  What are they?

21  A.   The first one is a FedEx shipping receipt and the second

22  one is a courier receipt.

23  Q.   And are they to Mr. Manafort's addresses?

24  A.   Yes.

25              MR. ASONYE:  Your Honor, Government moves 205 into

U.S. v. Manafort

J. Ayliff - Direct (cont.)

727

1  evidence.

2          MR. DOWNING:  No objection.

3          THE COURT:  Admitted.  Next question.

4                    (Government's Exhibit No. 205

5                    admitted into evidence.)

6  BY MR. ASONYE:

7  Q.   And what types of materials would your firm ship to

8  Mr. Manafort?

9  A.   It could be -- we would ship like some returns that could

10 not be paper -- could not be electronically filed, for

11 example, like a gift tax return.  It could be a Florida

12 personal property tax return, that type of thing is what would

13 be --

14         MR. DOWNING:  Your Honor, I object to the "would"

15 question.  It's just calling for speculation.  What did he

16 send to Mr. Manafort, I understand, but not what he said.

17         THE COURT:  I don't know what probative value it

18 would have, Mr. Asonye.

19         MR. ASONYE:  Your Honor, I believe that he actually

20 received the returns and reviewed them.

21         THE COURT:  I beg your pardon?

22         MR. ASONYE:  That he received the returns and

23 reviewed them.

24         MR. DOWNING:  Your Honor, there's nothing attached

25 to this shipping label.  It's just a shipping label.

U.S. v. Manafort

J. Ayliff - Direct (cont.)

728

1          THE COURT:  Well, what is it that you want to -- you

2   think this establishes, Mr. Asonye?

3          MR. ASONYE:  Your Honor, I asked him what they would

4   ship to Mr. Manafort, and I believe he was saying he would --

5   they would ship tax returns to Mr. Manafort.

6          THE COURT:  All right.

7          MR. ASONYE:  That's all -- that's all we want to

8   establish.

9          THE COURT:  All right.  I think you asked him what

10  sorts of things and then he went off about Florida this and

11  something else, all of which has no relevance to this case.

12         Did you ship tax returns, federal tax returns back

13  to Mr. Manafort?

14         THE WITNESS:  Shipped back gift tax returns.

15         THE COURT:  Gift tax returns?

16         THE WITNESS:  Yes.

17         THE COURT:  How about annual income tax returns?

18         THE WITNESS:  If they were electronically filed,

19  which I believe most of them were, then, no, we did not ship

20  federal tax returns.

21         THE COURT:  All right.  Then let's move it along.  I

22  don't see how this is particularly probative of anything.

23  BY MR. ASONYE:

24  Q.  Now, you talked about your transition in 2014.  Which

25  partner took over the relationship with Mr. Manafort after you

U.S. v. Manafort

729

1   transitioned off?

2   A.   Cindy Laporta.

3   Q.   And, again, what year did she take over?

4   A.   She took over May the 31, 2014, when I -- when I retired,

5   that's when she took it over.

6   Q.   All right.  I want to walk you through the tax returns

7   that you signed with Mr. -- for Mr. Manafort.  If you could

8   look in the tax return binder, which should be Government

9   Exhibit 337N.

10              MR. ASONYE:  It should be in evidence, Your Honor.

11              THE COURT:  Already admitted into evidence?

12              MR. ASONYE:  It is, Your Honor.

13              THE COURT:  All right.  I'll rely on you,

14   Mr. Asonye, to -- not to use any that are highlighted by the

15   Government.

16              MR. ASONYE:  None of these are, Your Honor.

17              THE COURT:  All right.

18              MR. ASONYE:  That was the only document.

19              THE COURT:  All right.  Go ahead.

20   BY MR. ASONYE:

21   Q.   Okay.  What is 337N?

22   A.   337N is Davis Manafort Partners Inc., Form 1120S.

23              MR. ASONYE:  And, Your Honor, may we publish?

24              THE WITNESS:  For 2010.

25              MR. ASONYE:  I'm sorry, may we publish?

U.S. v. Manafort

1          THE COURT:  Yes, you may --  well, a page or two.

2   You're -- I don't know how many pages it is.

3          MR. ASONYE:  We're going to go -- we're not going

4   to -- definitely not going to go through the whole tax return.

5          THE COURT:  All right.

6   BY MR. ASONYE:

7   Q.   The second page, please.

8          THE COURT:  You'll have the tax returns in the jury

9   room, ladies and gentlemen.

10          Next question.

11   BY MR. ASONYE:

12   Q.   And what is the entity that's listed?

13   A.   This was Davis Manafort Partners Inc.

14   Q.   Okay.  And what was Mr. Manafort's ownership percentage

15   in Davis Manafort Partners Inc.?

16   A.   He had 100 percent ownership.

17   Q.   And for tax purposes, what type of entity was Davis

18   Manafort Partners Inc.?

19   A.   An S Corporation.

20   Q.   And on what accounting method did Davis Manafort

21   Partners Inc. file its tax returns in 2010 and 2011?

22   A.   Accrual basis.

23          MR. DOWNING:  Your Honor, I'm sorry to interrupt,

24   but I don't see an exhibit sticker on this item.  Is this an

25   exhibit?

U.S. v. Manafort

1              MR. ASONYE:  Yeah, it's on the first page.  We're on

2    the second page now.

3              THE COURT:  What exhibit number, Mr. Asonye?

4              MR. ASONYE:  We're at 337N, I believe.

5              MR. DOWNING:  Thank you.

6              THE COURT:  All right.  And 337 has been admitted, I

7    believe.

8              MR. ASONYE:  All of 337 has been admitted, all of

9    the set of exhibits.

10             THE COURT:  All right.  Proceed, Mr. Asonye.

11   BY MR. ASONYE:

12   Q.   All right.  If we could turn to Bates Page 00971?

13   A.   00971.

14   Q.   It should be in your bottom right corner?

15   A.   Oh, yes.  Okay.

16   Q.   Oh, I'm sorry.  What is -- if you look at Line 1C, what

17   does it indicate was the gross receipts for Davis Manafort

18   Partners in 2010?

19   A.   It indicates the sales of 5,844,590.

20   Q.   And then if you see Line -- do you see a Line 21 for

21   ordinary business income?

22   A.   Yes.

23   Q.   Okay.  What is the ordinary business income that was

24   reported in 2010 for Davis Manafort Partners?

25   A.   It's a loss of $149,399.

U.S. v. Manafort

J. Ayliff - Direct (cont.)

732

1    Q.   Why was it a loss after they reported gross receipts of

2    $5.8 million?

3    A.   Because there were related expenses that were deducted

4    against the revenue.

5    Q.   Okay.  And after you calculated the ordinary business

6    income, did you produce a form K-1?

7    A.   Yes.

8    Q.   And what's the form K-1?

9    A.   It's part of this tax return.

10   Q.   And what's the purpose of the form K-1?

11   A.   It allocates the taxable items from the -- from the tax

12   return to the -- to the shareholder.

13   Q.   All right.  Let's turn to that, which should be Bates

14   Page 998.

15          And, Mr. Binder, Page 29.

16          Is this the K-1 for 2010 from Mr. Manafort?

17   A.   Yes.

18   Q.   And what does the K-1 report as Mr. Manafort's share of

19   profits for 2010 for Davis Manafort Partners?

20   A.   On Line 1, it's got a loss of 149,399.

21   Q.   Okay.  And what is -- what does this information flow

22   next to when you're preparing Mr. Manafort's tax return?

23   A.   It flows through to Schedule E on his tax return.

24   Q.   All right.  Let's take a look at his individual tax

25   return.

┌─────────────────U.S. v. Manafort─────────────────┐

J. Ayliff - Direct (cont.)

733

1          MR. ASONYE:  Which, Your Honor, is Government

2   Exhibit 337A, which is already in evidence.

3          Your Honor, may we publish his individual tax

4   return?

5          THE COURT:  Yes, you may.

6   BY MR. ASONYE:

7   Q.   If you turn to Page 184.

8          Mr. Binder, this is Page 23.

9   A.   Okay.

10  Q.   Okay.  What does this show?

11  A.   This shows -- this is a summary of the K-1 from Davis

12  Manafort Partners Inc.

13  Q.   And was Mr. Manafort able to take the loss that we

14  reported earlier of $149,000 here?

15  A.   No, he was not.

16  Q.   Why not?

17  A.   Because he had a -- there was a basis limitation.

18  Q.   Okay.  And then if you could turn to Page 4 --

19          I'm sorry.  Mr. Binder, it's Page 4 for you.

20          It's 165.

21  A.   Okay.

22  Q.   This is the front of the tax return for Mr. Manafort and

23  his wife?

24  A.   Okay.

25  Q.   Are you there?

U.S. v. Manafort

J. Ayliff - Direct (cont.)

734

1   A.   Yes.

2   Q.   Okay.  And is this the front of the tax return?  Is this

3   where the income would flow down to?

4   A.   Yes.

5   Q.   Where does this -- the -- look at Line 17.

6        What's reported there?

7   A.   Negative 35,927.

8   Q.   And what does that represent?

9   A.   That's the loss that's coming through from all the

10  different Schedule E items.

11  Q.   And then does this ultimately flow down to Line 22 of

12  Mr. Manafort's tax return?

13  A.   Yes.

14  Q.   What's reported in Line 22 of Mr. Manafort's personal tax

15  return for 2010?

16  A.   504,744.

17  Q.   And did that $500,000 come from sources other than Davis

18  Manafort Partners?

19  A.   Yes.

20  Q.   And then does Mr. -- on the second page, does

21  Mr. Manafort sign this return?

22  A.   Yes.

23  Q.   If we can turn to that page.  If we zoom in on

24  Mr. Manafort's signature, what does he say next to his

25  occupation?  What is listed as his occupation?

U.S. v. Manafort

J. Ayliff - Direct (cont.)

735

1    A.    Attorney/consultant.

2    Q.    And, again, is there a -- if you could read above his

3    signature, what does it say?

4    A.    "Under penalties of perjury, I declare that I have

5    examined this return and accompanying schedules and

6    statements, and to the best of my knowledge and belief, they

7    are true, correct, and complete."

8    Q.    And now was this electronically filed or was this tax

9    return filed in paper?

10   A.    This was a paper filed return.

11   Q.    So do you -- in order to submit a paper file return, does

12   KWC have any involvement in that?

13   A.    No.  What we do is when the return is finished, then

14   we'll deliver the return to the client and then the client

15   submits the return.

16          THE COURT:  But he had put the question to you

17   generally, do you have any involvement.  Of course, you had

18   involvement, you prepared it.  And you sent it to him, he

19   signed it, and then he mailed it.

20          THE WITNESS:  Yes, he submitted it.

21          THE COURT:  So the correct question would be:  Did

22   you have any role in mailing it in?

23   BY MR. ASONYE:

24   Q.    Did you have any role in mailing in --

25          THE COURT:  And the answer to that is what?  Did you

J. Ayliff - Direct (cont.)

736

1  have any role in mailing it in?

2          THE WITNESS:  Probably not.

3          THE COURT:  Next question.

4  BY MR. ASONYE:

5  Q.  All right.  Let's move on to 2011, the tax return for

6  Davis Manafort Partners, which is 337O.

7          If you would turn to the second page.

8          MR. ASONYE:  Your Honor, may we publish?

9          THE COURT:  Yes.

10  BY MR. ASONYE:

11  Q.  Second page, please.

12          Is this the 2011 tax return for Davis Manafort

13  Partners?

14  A.  Yes.

15  Q.  Okay.  Direct your attention to Line 1E.

16          What does Paul Manafort report as the gross receipts

17  in 2011 for Davis Manafort Partners?

18  A.  The gross income was $5,354,298.

19  Q.  And then let me direct your attention to Line 21.

20          What did Paul Manafort report as the ordinary

21  business income or profits for Davis Manafort Partners in

22  2011?

23  A.  $660,193.

24  Q.  Okay.  And what -- what causes that -- that significant

25  difference?

U.S. v. Manafort

737

1  A.   The income is offset by business expenses.

2  Q.   And was this income reported on a K-1 for Mr. Manafort?

3  A.   Yes.

4  Q.   All right.  If we could turn to -- for you it will be

5  Bates range 1023.  Mr. Binder, it would be Page 21.

6        You there?

7  A.   Yes.

8  Q.   Okay.  Let me direct your attention to Line 1 of the K-1.

9        What was Mr. Manafort's share of business income for

10 Davis Manafort Partners in 2011?

11 A.   660,193.

12 Q.   And does that income flow down to Mr. Manafort's

13 individual return?

14 A.   Yes.

15 Q.   Let's take a look at that.  That's Government

16 Exhibit 337B, as in "beta."

17        Your Honor, may we publish 337B?

18        THE COURT:  You may.

19 BY MR. ASONYE:

20 Q.   Let's turn to Bates Page 365, 337B, which is Page 53.

21 A.   Okay.

22 Q.   Okay.  What is page, Bates Page 365 of the individual

23 return?

24 A.   This is a Schedule E, Part II, Line 28 details.

25 Q.   And directing your attention to Lines G, as "golf," and

─────U.S. v. Manafort─────
J. Ayliff - Direct (cont.)
738

1   H, "helo," what's listed there?

2   A.   G is Davis Manafort Partners, Inc., and H is the basis

3   carryover.

4   Q.   What does that mean?

5   A.   Basis carryover is the amount of the loss from the

6   previous year, from 2010, that had been disallowed.

7   Q.   And how much is reflected on these lines?

8   A.   On the -- first, on G, Davis Manafort Partners, Inc., its

9   got 660,193 is a nonpassive income coming from schedule K-1.

10  And then on H its got the nonpassive loss of the 149,399 of

11  the basis carryover.

12  Q.   Does this information flow down to Mr. -- Mr. Manafort's

13  individual return?

14  A.   Yes.

15  Q.   All right.  If you could turn to page -- for you it would

16  be Bates 314.  Mr. Binder, it's Page 2.

17         Let me direct your attention to Line 17.  What's

18  reported in Line 17?

19  A.   486,946.

20  Q.   Does that flow down to Line 17 -- I'm sorry -- does that

21  flown down to Line 22?

22  A.   Yes.

23  Q.   What does Paul Manafort report in 2011 as his total

24  income?

25  A.   His total income is 3,071,409.

—————U.S. v. Manafort—————
J. Ayliff - Direct (cont.)
739

1   Q.   And, again, in the 2011 return was Davis Manafort

2   Partners still filing as an S Corp?

3   A.   Yes.

4   Q.   Did Davis Manafort Partners continue forever as an S

5   Corp?

6   A.   No.  2011 was a final return.

7   Q.   What happened to -- what was the company's status at the

8   end of 2011?

9   A.   It was liquidated.

10  Q.   And was a new company formed?

11  A.   Yes.

12  Q.   What was the name of the new company?

13  A.   DMP International, LLC.

14  Q.   What was your understanding of the business activity?

15  What business DMP International, LLC --

16          THE COURT:  The question is compound now.

17  BY MR. ASONYE:

18  Q.   What did DMP International, LLC, do?

19  A.   It was -- our understanding was that Mr. Manafort was

20  doing the Ukraine-related activities within that entity.

21  Q.   All right.  Let me show you the 2012 tax return for DMP

22  International, which is 337G, as in "golf."

23          Your Honor, may we publish?

24          THE COURT:  You may.

25          MR. ASONYE:  Go to Page 2, Mr. Binder, and blow up

U.S. v. Manafort

J. Ayliff - Direct (cont.)

740

1    the top.

2    BY MR. ASONYE:

3    Q.    What type of entity was DMP International, LLC?

4    A.    It was a partnership.

5    Q.    Okay.  Is that different than what Davis Manafort

6    Partners was?

7    A.    Yes.

8    Q.    What percentage of DMP International did Paul Manafort

9    own between 2012 and 2014?

10   A.    50 percent.

11   Q.    And were there other partners who were part of DMP

12   International?

13   A.    Yes.

14   Q.    How many other partners?

15   A.    One.

16   Q.    And who was the other partner?

17   A.    Mrs. Manafort.

18   Q.    Did she own the other 50 percent?

19   A.    Yes.

20   Q.    So together did Mr. and Mrs. Manafort own 100 percent of

21   DMP International, LLC?

22   A.    Yes.

23   Q.    Now, between 2012 and 2014, on what accounting method did

24   KWC prepare DMP International's tax returns?

25   A.    On a cash basis.

—U.S. v. Manafort—
J. Ayliff - Direct (cont.)

1   Q.   Now, even though you prepared their returns on a cash

2   basis, what box was checked on the tax return?

3   A.   Accrual.

4   Q.   Why was the accrual box checked?

5   A.   This was an oversight.

6   Q.   Was that a mistake?

7   A.   Yes.

8   Q.   How can you be sure that the tax return was actually

9   prepared on the cash basis rather than the accrual basis?

10  A.   Because we prepared the tax return.

11  Q.   And the -- did you receive the general ledgers from the

12  bookkeepers?

13  A.   Yes.

14  Q.   And what basis were they prepared on?

15  A.   Cash basis.

16  Q.   Now, if you could turn to -- let me direct your

17  attention to Line 1 of --

18          THE COURT:  I take it that was a mistake that you

19  all collectively made?  People didn't notice it?

20          THE WITNESS:  Correct.

21          THE COURT:  Next question.

22  BY MR. ASONYE:

23  Q.   Let me direct your attention to Line 1 of DMP

24  International's 2012 tax return.

25          What's reported as the gross receipts?

U.S. v. Manafort

J. Ayliff - Direct (cont.)

742

1   A.    7,310,000.

2   Q.    And then directing your attention to Line 22, what's

3   reported as the -- the profits of DMP International for 2012?

4   A.    948,657.

5   Q.    All right.  Let me direct your attention to Bates

6   Page 595.

7             Which is Page 7, Mr. Binder.

8             Are you there, Mr. Ayliff?

9   A.    Yes.

10  Q.    Okay.  What is this page?

11  A.    This is the balance sheet.

12  Q.    And what is listed generally?  What information goes on

13  this page?

14  A.    This lists all the assets and the liabilities for the

15  partnership.

16  Q.    And if we could zoom in on Line 20.  Directing your

17  attention to Line 20 of the liabilities, what amount is listed

18  there?

19  A.    1,500,000.

20  Q.    Do you know what that liability is?

21  A.    I could -- I think it's Peranova, but let me double-

22  check.

23             Due to Peranova Holdings Limited.

24  Q.    Okay.  And was there a K-1 produced as a result of the

25  income?

U.S. v. Manafort

1   A.   Yes.

2   Q.   Let me ask you to turn to Page 605.

3        And directing your attention to Line 1, what was

4   Mr. Manafort's share of the business income for DMP

5   International in 2012?

6   A.   474,329.

7   Q.   And was Kathleen Manafort's share of the profits a

8   similar share?

9   A.   Yes.

10  Q.   And does all that income flow down to Mr. Manafort's and

11  his wife's personal individual return?

12  A.   Yes.

13  Q.   All right.  Let me show you Government Exhibit 337C,

14  which is the individual return for 2012.

15       Your Honor, may we publish?

16       THE COURT:  Yes, you may.

17  BY MR. ASONYE:

18  Q.   If you could turn to Page 428, which is, Mr. Binder,

19  Page 53.

20  A.   Okay.

21  Q.   What's on this page?

22  A.   This is the Schedule E, Part II, Line 28, income and loss

23  from partnerships and S Corporations.  It's a supporting

24  schedule.

25  Q.   Let me direct your attention to Lines X and Y, what are

—U.S. v. Manafort—

J. Ayliff - Direct (cont.)

744

1  those?

2  A.    DMP International.

3  Q.    And if you turn -- if you turn to the next page, are the

4  amounts listed for DMP International there?

5  A.    Yes.

6  Q.    Let me direct your attention to Page 377 for you, Page 2

7  on the return.  This is the front of the return.

8           Did the K-1 information flow down to Line 17?

9  A.    Yes.

10  Q.    What amount is listed -- is reported for Line 17 of the

11  individual return?

12  A.    230,292.

13  Q.    And does that flow down to Line 22?

14  A.    Yes.

15  Q.    What did Paul Manafort report as total income in 2012?

16  A.    5,361,007.

17  Q.    Let me direct your attention to Line 7 of this return.

18  What's listed there?

19  A.    Wages, salaries, tips, et cetera.

20  Q.    And how much is listed for wages, salaries, and tips?

21  A.    1,986,500.

22  Q.    Now, is it proper for a partnership to give a W-2 to a

23  partner?

24  A.    No.

25  Q.    Why did then -- and, Mr. Manafort, was he a partner of

J. Ayliff - Direct (cont.)

745

1   DMP International?

2   A.   Yes.

3   Q.   Okay.  Why did he receive a W-2?

4   A.   Because when this entity was set up they established a

5   payroll through the bookkeeping service and Mr. Manafort was

6   added to the payroll.  When we found out that he had -- he had

7   been paid through the payroll company, we decided -- we had

8   them stop doing it going forward, but we left -- left the

9   wages as they were as it wouldn't have any direct impact on

10  his -- on his tax return.

11  Q.   And did it have an impact on what was reported on

12  Line 22, the total income?

13  A.   No.

14  Q.   All right.  Let's move on to the 2013 tax returns.  Let

15  me show you DMP International's tax return, 337H, as in

16  "helo."

17          Your Honor, may we publish?

18          THE COURT:  You may.

19  BY MR. ASONYE:

20  Q.   On Page 2.  For you, Mr. Ayliff, it's Page 16.  Let me

21  direct your attention to Line 1.

22          What did Paul Manafort report as DMP's -- DMP

23  International's gross receipts in 2013?

24  A.   4,540,040.

25  Q.   And then what were the profits that were reported on

U.S. v. Manafort

J. Ayliff - Direct (cont.)

746

1    Line 22?

2    A.    1,506,761.

3    Q.    Did that flow down to K-1?

4    A.    Yes.

5    Q.    All right.  Please turn to Page 632.

6          And directing your attention to Line 1, what was

7    Mr. Manafort's share of the profits of DMP International in

8    2013?

9    A.    753,381.

10   Q.    And did Kathleen Manafort have a similar share of

11   profits?

12   A.    Yes.

13   Q.    And did this flow down to their individual return?

14   A.    Yes.

15   Q.    Let me show you the individual return, 337D, as in "dog."

16         Your Honor, may we publish?

17         THE COURT:  You may.

18   BY MR. ASONYE:

19   Q.    If you could turn to Bates Page 499, which is Page 62,

20   Mr. Binder.

21   A.    Okay.

22   Q.    And I'm going to direct your attention to Lines P and Q.

23   And if you turn to the next page, what's reported on Lines P

24   and Q?

25   A.    769,925 and 753,380.

U.S. v. Manafort

1   Q.   And if you turn to the front of Mr. Manafort's personal

2   returns as Page 2, second page.

3            That information flow down to Line 17 of his

4   individual return?

5   A.   Yes.

6   Q.   And did that ultimately flow down to his total income for

7   Line 22?

8   A.   Yes.

9   Q.   What did Mr. Manafort report as his total income in 2013?

10  A.   1,910,928.

11  Q.   All right.  Now, let's move on to the 2014 tax return.

12  Were you involved in the preparation of the 2014 tax return?

13  A.   Yes.

14  Q.   But did you actually sign it?

15  A.   I don't believe so, no.

16  Q.   All right.  Let me show you 337, I believe it's I --

17  yes -- 337I.

18            Your Honor, may we publish?

19            THE COURT:  You may.

20  BY MR. ASONYE:

21  Q.   And on the second page, direct your attention to Line 1.

22  What did Paul Manafort report as DMP International's gross

23  receipts in 2014?

24  A.   7,465,398.

25  Q.   And if you look at Line 22, what did Paul Manafort report

U.S. v. Manafort

J. Ayliff - Direct (cont.)

748

1  as the profits for DMP International in 2014?

2  A.    2,037,597.

3  Q.    Was there a K-1 that was produced?

4  A.    Yes.

5  Q.    Let me direct your attention to Bates Page 659.  Is this

6  the K-1 for Paul Manafort?

7  A.    Yes.

8  Q.    Direct your attention to Line 1.  What was Mr. Manafort's

9  share of profits from DMP International in 2014?

10  A.    1,018,799.

11  Q.    And did Kathleen Manafort receive a similar share?

12  A.    Yes.

13  Q.    And did this income flow down to individual return?

14  A.    Yes.

15  Q.    Let me show you that Government Exhibit 337E, as in

16  "echo."

17            Your Honor, may we publish?

18            THE COURT:  Yes, you may.

19  BY MR. ASONYE:

20  Q.    If you could turn to Bates Page 566.

21  A.    Okay.

22  Q.    And what's -- directing your attention to Lines G and H,

23  what was reported -- what's the amount that's listed for

24  Lines G and H?

25  A.    1,039,333 and 1,018,798.

U.S. v. Manafort
J. Ayliff - Direct (cont.)

749

1   Q.   Did that flow down to the personal return on the front?

2   A.   Yes.

3   Q.   Turn to Page 2 of the return.  What was reported on

4   Line 17?

5   A.   2,025,398.

6   Q.   And then ultimately what did Paul Manafort report as his

7   total income in 2014?

8   A.   2,984,210.

9   Q.   I'm going to ask you some questions about whether

10  Mr. Manafort reported having any financial interest or

11  signature authority over foreign bank accounts.  You've

12  already testified about the tax return itself.

13       Does it contain a question about foreign bank

14  accounts?

15  A.   Yes.

16  Q.   And did KWC ask Mr. Manafort whether he had a foreign

17  bank account each year?

18  A.   Yes.

19  Q.   What did Mr. Manafort report?

20  A.   No.

21  Q.   And did -- did you send Mr. Manafort a copy of his tax

22  return before you filed it each year?

23  A.   Yes.

24       MR. ASONYE:  Court's indulgence, I'm trying to see

25  what I can excise, Your Honor.

J. Ayliff - Direct (cont.)

1              THE COURT:  All right.

2              (A pause in the proceedings.)

3    BY MR. ASONYE:

4    Q.   Let me show you Government Exhibit 337A, which is the

5    individual return for 2010.  And if you could turn to Bates

6    Page 169.

7              Your Honor, may we publish?

8              THE COURT:  You may.

9    BY MR. ASONYE:

10   Q.   Page 8.  If you could scroll in on question, at the

11   bottom, 7A.  What did Mr. Manafort report here for whether he

12   has any foreign bank accounts?

13   A.   He had none.

14   Q.   Let me show you 337B, which is the return for 2011.  And

15   if you could turn to Bates Page 358.  Are you there?

16   A.   Yes.

17   Q.   And what does Mr. Manafort report about whether he had

18   any foreign bank accounts in 2011?

19   A.   None.

20   Q.   Let me show you Government Exhibit 337C.  If you could

21   turn to Bates Page 420.

22             Your Honor, may we publish?

23             THE COURT:  You may.

24   BY MR. ASONYE:

25   Q.   What does Mr. Manafort report in 2012 about whether he

──U.S. v. Manafort──
J. Ayliff - Direct (cont.)
751

1   has any foreign bank accounts?

2   A.    None.

3   Q.    Let me show you 337D.  And if you could turn to Bates

4   Page 490.

5   A.    Okay.

6   Q.    What does Mr. Manafort report about whether he has any

7   financial interest or signature authority over a foreign

8   account?

9   A.    None.

10   Q.    And then, finally, let me show you 337E.

11          Your Honor, may we publish 337E?

12          THE COURT:  You may.

13   BY MR. ASONYE:

14   Q.    This is going to be Bates Page 557.  What does

15   Mr. Manafort report about whether they have any foreign bank

16   accounts?

17   A.    None.

18   Q.    I believe you already testified about the engagement

19   letter asking about foreign bank accounts?

20   A.    Yes.

21   Q.    And the tax organizer; is that correct?

22   A.    That's correct.

23   Q.    Let me show you what's been marked as Government

24   Exhibit 198.

25          Okay.  What is 198?

─────U.S. v. Manafort─────

1   A.   It's blank.  I don't have anything.

2   Q.   You don't have anything for 198?

3            THE COURT:  Show it to counsel first.

4            MR. DOWNING:  Thank you.

5   BY MR. ASONYE:

6   Q.   What is this exhibit?

7   A.   This is a letter from Mr. Manafort to me.

8            MR. ASONYE:  Your Honor, Government moves 198 into

9   evidence.

10           THE COURT:  All right.  But in the list submitted to

11  the Court, that's not what 198 is.

12           THE WITNESS:  It's 197.

13           MR. ASONYE:  Your Honor I have it as 198.  I don't

14  know what it says on the exhibit list.

15           MR. DOWNING:  And I'm sorry, Your Honor, did he say

16  this was a memo?

17           THE COURT:  Yes.  That is what 198 is.  Here,

18  Mr. Flood, show this to counsel at the podium.  Both counsel

19  can look at it.

20           Look at what 198 is described as and what was

21  submitted to the Court.

22           MR. ASONYE:  Your Honor, I --

23           THE COURT:  Just look at it, first.

24           MR. ASONYE:  I have it, Your Honor.

25           THE COURT:  All right.  Do you see what 198 is

─────U.S. v. Manafort─────
J. Ayliff - Direct (cont.)
753

1   referred to?

2            MR. ASONYE:  Yes, Your Honor.

3            THE COURT:  All right.  It's not what you just said.

4            MR. ASONYE:  Yes, Your Honor.  I'm happy to approach

5   and explain.

6            THE COURT:  Well, this was just submitted to me this

7   morning.

8            MR. ASONYE:  May we approach?

9            THE COURT:  Is it a mistake?  All right.  Yes, you

10  can.

11           (Bench Conference.)

12           THE COURT:  Yes, Mr. Asonye?

13           MR. ASONYE:  Your Honor, the Government works hard

14  to prepare exhibit lists.  I just don't want to do it in front

15  of the jury, Your Honor.  We can fix it.  I believe it's

16  actually a work paper.  It's a memorandum they put in their

17  work papers.  So I don't believe the description of being an

18  e-mail is necessarily accurate.

19           THE COURT:  Well, is it or isn't it an e-mail?

20           MR. ASONYE:  We don't believe it's an e-mail.  We

21  believe it's memoranda.

22           THE COURT:  All right.  Then it is a mistake and

23  it's not a big deal.

24           You know what it is, don't you, Mr. Downing?

25           MR. DOWNING:  Yes, I have it.

U.S. v. Manafort

1        THE COURT:  So let's proceed.  But there's --

2        MR. ANDRES:  I know one lawyer is supposed to speak,

3  and I don't want to break this rule but --

4        THE COURT:  You are breaking it.

5        MR. ANDRES:  Well, the notion that we have to

6  continue to have the Court suggest that the Government is

7  making mistakes --

8        THE COURT:  Well, then get it right.  Get it right.

9        MR. ANDRES:  Well, I understand that.

10        THE COURT:  Get it right.

11        MR. ANDRES:  I understand.

12        THE COURT:  All right.  I don't want to hear

13  anything more from you.

14        MR. ANDRES:  Well, Judge --

15        THE COURT:  No.  It's a simple mistake.  All you had

16  to do is tell me that it was a mistake in what you submitted.

17  You have to take responsibility for mistakes.

18        MR. ANDRES:  I understand, but we don't have to be

19  chastised in front of the jury for our every mistake.

20        THE COURT:  You haven't been chastised for every

21  mistake.

22        MR. ANDRES:  Judge --

23        THE COURT:  Enough.

24        MR. ASONYE:  The point we are making --

25        THE COURT:  You don't need to make a point.  All you

───────U.S. v. Manafort───────

J. Ayliff - Direct (cont.)                                             755

1   need to say is, look, we made a mistake.  It should have been

2   called an e-mail or something and then it's done.  You-all

3   have managed to turn it into a big deal.  It is not a big

4   deal.

5              All right.  Return to your seats.

6              (Bench conference ends.)

7              THE COURT:  Ladies and gentlemen, the Government

8   submitted to me at my request a list, and these are lengthy

9   things.  And I -- it is described as one thing.  It's probably

10  the same document.  It's not a big deal.  It's no big mistake.

11  You shouldn't be concerned about it at all and having a bench

12  conference about it was unnecessary.

13             It's just not a big deal.

14             All right.  Now, Mr. Asonye, is -- what exhibit were

15  we talking about?

16             MR. ASONYE:  198.

17             THE COURT:  All right.  198.  And I take it the --

18  the document that's referred to is the same document that you

19  referred to.  There may be an error in the description.

20             MR. ASONYE:  Sure.  But, yes, the description that's

21  provided to the Court, at the Court's request that we did late

22  last night, yes, Your Honor.

23             THE COURT:  All right.  And those things happen and

24  it's not a big deal.

25             Mr. Downing, you know what document it is referring

J. Ayliff - Direct (cont.)

1    to?

2              MR. DOWNING:  I do, Your Honor.

3              THE COURT:  All right.  Let's proceed.  We don't

4    need a bench conference.

5              MR. ASONYE:  Your Honor, may we publish.  Well,

6    first of all, we will move it into evidence.  I'm not sure

7    it's been admitted.

8              THE COURT:  All right.  Any objection?

9              MR. DOWNING:  No objection, Your Honor.

10             THE COURT:  It's admitted.  You may display it.

11                            (Government's Exhibit No. 198

12                            admitted into evidence.)

13   BY MR. ASONYE:

14   Q.   Could you -- if we'd scroll at the top of this document.

15             By the way, do you see the P's that are in circles?

16   What are -- do you know -- is that a familiar symbol to you?

17   A.   Yes.

18   Q.   What are -- what do they stand for?

19   A.   That's -- within our software and during the preparation

20   of the return, when I review the document, I will put a P on

21   there.

22   Q.   All right.  Does that P stand for your name?

23   A.   It's just my way of indicating that I had -- I had

24   addressed this document.

25   Q.   And who is this from?

─────────────U.S. v. Manafort─────────────
J. Ayliff - Direct (cont.)
757

1   A.    This is from Mr. Manafort.

2   Q.    And is it -- it's to you?

3   A.    Yes.

4   Q.    What's the subject line?

5   A.    2010 taxes.

6   Q.    And when -- what was the date?

7   A.    August 21, 2011.

8   Q.    Okay.  And if you'd go ahead and read that -- just the

9   first sentence?

10  A.    (As read): "In addition to the Tax Organizer for Kathy

11  and me, I am enclosing my 2010 tax records for the taxpayers

12  listed below."

13  Q.    And did the tax organizer that you would send to your

14  clients contain the advisory about disclosing foreign bank

15  accounts?

16  A.    Yes.

17  Q.    And if you could turn to the second page.

18        What does Mr. Manafort say on the last sentence.

19  A.    (As read):  "In the meantime, if you have any questions

20  on what I have enclosed, feel free to contact me as you always

21  do."

22  Q.    All right.  Let me show you Government's Exhibit 199.

23        Is this an e-mail where you're discussing

24  Mr. Manafort's taxes?

25  A.    Yes.

U.S. v. Manafort

J. Ayliff - Direct (cont.)

758

1  Q.   Is Mr. Manafort included on this e-mail chain?

2  A.   Yes.

3          MR. ASONYE:  Your Honor, Government moves 199 into

4  evidence.

5          MR. DOWNING:  No objection.

6          THE COURT:  It's admitted, and you may display it.

7          MR. ASONYE:  Thank you, Your Honor.

8                          (Government's Exhibit No. 199

9                           admitted into evidence.)

10  BY MR. ASONYE:

11  Q.   In the middle e-mail, do you see the e-mail on August 4,

12  2011 -- 2010 tax filing?

13          MR. ASONYE:  Court's indulgence.

14          THE COURT:  All right.

15          (A pause in the proceedings.)

16  BY MR. ASONYE:

17  Q.   Okay.  Mr. Ayliff, do you see your e-mail on the bottom,

18  No. 2 -- No. 1, I'm sorry?

19  A.   Yes.

20  Q.   Can you go ahead and read what you write to Mr. Manafort?

21  A.   "At any time during 2010, did you, Kathy, Andrea, or

22  Jessica have an interest in or a signature or other authority

23  over a financial account in a foreign country such as a bank

24  account, securities account, or other financial account.  If

25  yes, please provide the following details."

J. Ayliff - Direct (cont.)

759

1  Q.   Does Mr. Manafort respond?

2  A.   Yes.

3  Q.   What does he say?

4  A.   No.

5  Q.   All right.  Let me show you Government Exhibit 196.

6        Is this another e-mail where you're discussing Mr.

7  Manafort's tax returns?

8  A.   Yes.

9        MR. ASONYE:  Your Honor, Government moves 196 into

10  evidence.

11       MR. DOWNING:  No objection.

12       THE COURT:  It's admitted.

13                  (Government's Exhibit No. 196

14                  admitted into evidence.)

15       MR. ASONYE:  Your Honor, may we display?

16       THE COURT:  Yes, you may.

17  BY MR. ASONYE:

18  Q.   If we could turn to the third page, Mr. Ayliff, there's

19  an e-mail at 6:29.  Can you just tell the jury what you're

20  asking about here?

21  A.   When we were preparing this one particular return, there

22  was a transaction that we didn't know what it was.  So we were

23  trying to get more information about it.  It was a million-

24  dollar transaction.

25  Q.   And the million dollars, where does it say -- where does

—U.S. v. Manafort—

J. Ayliff - Direct (cont.)

760

1   it say it came from?

2   A.   It came -- it came from Deutsche Bank through Marfin

3   Popular B and then it's got LOAV Advisors Limited.

4   Q.   And did you know what that entity was?

5   A.   No.

6   Q.   What do you say on the last line of that e-mail?

7   A.   "Any idea of the source of this money?"

8   Q.   Why do you want to know the source of the money?

9   A.   I wanted to see if it was -- it was taxable income or --

10  the LOAV -- the entity that we were preparing the tax return

11  for is LOAV Limited and this one was LOAV Advisors Limited.

12  And I am trying to figure out what was going on here.

13  Q.   In addition to asking Mr. Manafort questions about

14  foreign bank accounts, did you ask Rick Gates about whether

15  Mr. Manafort had foreign bank accounts?

16  A.   Yes.

17  Q.   Why did you go to Rick Gates in those circumstances?

18  A.   Well, because Rick Gates was helping us with getting all

19  of these tax returns prepared.

20  Q.   All right.  Let me show you Government Exhibit 206.

21       And what's the subject of this -- what's the subject

22  line of this e-mail?

23  A.   Foreign account report due 6/30/13.

24  Q.   And the top e-mail, who sent it?

25  A.   Rick Gates.

─────────U.S. v. Manafort─────────
J. Ayliff - Direct (cont.)
761

1          MR. ASONYE:  Your Honor, the Government moves 602

2  into evidence.

3          MR. DOWNING:  No objection.

4          THE COURT:  It's admitted.

5                         (Government's Exhibit No. 206

6                         admitted into evidence.)

7          MR. ASONYE:  And may we publish, Your Honor?

8          THE COURT:  Yes, you may.

9  BY MR. ASONYE:

10  Q.   If you'd look at the e-mail at 7:21.  Could you go ahead

11  and read -- first of all, who Naji Lakkis?

12  A.   He as an employee of KWC.

13  Q.   Okay.  And go ahead and read -- I'll tell you when to

14  stop.  If you'll start, "We have to."  Read that to the jury.

15  A.   Okay.  (As read):  "We have to submit the report in

16  regards to foreign accounts to the Treasury by June the 30th,

17  '13.  Please note that the report must be received by June

18  30th and not postmarked.  For the 6/30 report, we need to know

19  if the following were applicable to Paul and Kathy in regards

20  to both business and personal foreign accounts:

21          "They had a financial interest (see below for

22  explanation) in or signature authority (see below for

23  explanation) over accounts outside the United States and the

24  aggregate value of all foreign financial accounts exceeded

25  $10,000 at any time during 2012."

─────U.S. v. Manafort─────
J. Ayliff - Direct (cont.)
                                                                762

1   Q.   That's good enough.

2           Now, sir, did -- attached to this -- well, at the

3   bottom of this e-mail, did the definitions -- did Mr. Lakkis

4   provide the definitions of these terms?

5   A.   Yes.

6   Q.   All right.  Let's turn to that.  Do you see where its

7   bolded "Financial Interest"?

8   A.   Yes.

9   Q.   Go ahead and read Sections 1 and 2.

10  A.   (As read):  "The United States person is the owner of

11  record or holder of legal title regardless of whether the

12  account is maintained for the benefit of the U.S. person,

13  United States person, or for the benefit of another person; or

14  the owner of record or legal holder -- or holder of legal

15  title is one of following."

16  Q.   All right.  And if you could just skip down to Section C,

17  what does it say there about a partnership?

18  A.   (As read):  "A partnership in which the United States

19  person earns directly or indirectly: (i) an interest in more

20  than 50 percent of the partnership's profits."  Example --

21  Q.   That's good enough.

22          And in 2010 and 2011, what personal jurisdiction of

23  Davis Manafort Partners did Mr. Manafort control?

24  A.   50 percent.

25  Q.   Of Davis -- 2010 and 2011?

J. Ayliff - Direct (cont.)

763

1    A.   Oh, I'm sorry.  100 percent.

2    Q.   Now, if you could turn to the next page, do you see where

3    it says "Signature Authority"?

4    A.   Yes.

5    Q.   Could you read what is defined for signature authority?

6    A.   (As read):  "Signature authority is the authority of an

7    individual (alone or in conjunction with another individual)

8    to control the disposition of assets held in a foreign

9    financial account by direct communication (whether in writing

10   or otherwise) to the bank or other financial institution that

11   maintains the financial account."

12   Q.   And does -- if you turn to the front -- the first page,

13   does Mr. Gates respond?

14   A.   As -- his response was (as read):  "As discussed, to my

15   knowledge, nothing has changed.  Please file the form as you

16   did last year.  Let me know if you need anything else."

17   Q.   And as a result, what did KWC do?  Did you file a report?

18   A.   No.

19   Q.   All right.  Let me show you Government Exhibit 201.

20        And what is Government Exhibit 201?

21   A.   It's an e-mail from Rick Gates to Naji Lakkis, and it's

22   dated June the 29th, 2012.

23   Q.   And what is the subject of this e-mail?

24   A.   Foreign accounts.

25        MR. ASONYE:  Your Honor, Government moves 201 into

────────U.S. v. Manafort────────

1    evidence.

2              MR. DOWNING:  No objection.

3              THE COURT:  It's admitted.

4                        (Government's Exhibit No. 201

5                        admitted into evidence.)

6              MR. ASONYE:  May we publish?

7              THE COURT:  You may.

8    BY MR. ASONYE:

9    Q.   Could you read Mr. Gates' e-mail at the top, that

10   sentence?

11   A.   (As read):  "Naji, I will call you tomorrow but based on

12   the structure as I learned today we do not need to file for

13   Paul."

14   Q.   Okay.  Are you familiar with an entity named "EVO" or

15   "EVO Holdings"?

16   A.   Yes.

17   Q.   Okay.  What was your understanding of -- well, what was

18   it?

19   A.   It was a -- it's -- it's -- I believe it was a Cyprus

20   entity that Mr. Manafort had an ownership interest in.

21   Q.   And what was KWC trying to determine with respect to EVO

22   Holdings?

23   A.   We were trying to determine whether he had a financial

24   interest and control in that entity.

25   Q.   And what did you ultimately determine?

1   A.   We determined that -- that he did not have a controlling

2   interest because it was -- it was multiple -- it was three

3   entities and you had to do a calculation to see if he had more

4   than 50 percent ownership.  And he did not.

5   Q.   And whose representations did you rely on when -- in

6   determining that EVO Holdings was not reportable?

7   A.   Rick Gates.

8   Q.   And in connection with determining whether to file an

9   FBAR for EVO Holdings, did Mr. Gates or Mr. Manafort mention

10  any other potential reportable entities?

11  A.   No.

12  Q.   Now, if you could turn to the second page.  There's an

13  e-mail at 4:20.  And do you see where it says number paragraph

14  2, there's a paragraph starting "Also"?  Could you just read

15  that to the jury?

16  A.   (As read):  "Also, you stated that the entities that Paul

17  owns do not have any foreign financial accounts but the

18  telecommunications does have an operational account but Paul

19  does not have signature authority over."

20  Q.   Okay.  And did you rely on representations like this?

21  A.   Yes.

22  Q.   If you turn to the next page, we won't have you read it

23  again, but did you -- KWC provide the definition of financial

24  interest?

25  A.   Yes.

─────U.S. v. Manafort─────

J. Ayliff - Direct (cont.)

766

1              THE COURT:  The highlighting here.

2              MR. ASONYE:  That's in the document, Your Honor.

3              THE COURT:  All right.  Let's proceed.

4    BY MR. ASONYE:

5    Q.   Let me show you Government Exhibit 202.

6              Okay.  What is Government's Exhibit 202?

7    A.   This is a -- an e-mail from Rick Gates to Naji.

8    Q.   And does it relate to Mr. Manafort's tax returns?

9    A.   The subject is DMP International, LLC, tax return, which

10   then does impact Mr. Manafort's tax return.

11             MR. ASONYE:  Your Honor, Government moves 202 into

12   evidence.

13             MR. DOWNING:  No objection.

14             THE COURT:  It's admitted.

15                         (Government's Exhibit No. 202

16                         admitted into evidence.)

17             MR. ASONYE:  May we publish?

18             THE COURT:  Yes, you may.

19   BY MR. ASONYE:

20   Q.   Do you see in the middle e-mail, about sort of three

21   paragraphs down, "what is"?  Go ahead and read that.

22   A.   "What is the $1,550 of foreign taxes for?"

23   Q.   Okay.  And how does Rick Gates respond?

24   A.   "We have to pay a regulatory tax from the US company to

25   the rep office in Ukraine."

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

————————U.S. v. Manafort————————

J. Ayliff - Direct (cont.)

767

Q.   And what does it say in red writing in the block?

A.   "Another foreign income tax."

Q.   Why are you asking this question?

A.   To determine whether there is -- they've been paying any foreign income taxes, to see if they would be eligible for a foreign tax credit.

Q.   Now, did you have other clients at KWC whose circumstances required you to file a FBAR?

A.   Yes.

Q.   Have you filed an FBAR for a client before?

A.   Yes.

Q.   How many times?

A.   Each year we file -- it's a number of times.

Q.   Is it -- is it a big deal for KWC to do it?

A.   No.

Q.   Did Mr. Manafort or Mr. Gates ever tell you that they had accountants or tax preparers in Cyprus?

A.   No.

Q.   Did they -- either of them ever tell you that they filed tax returns in Cyprus?

A.   No.

Q.   Would you want to know that information if it happened?

A.   Yes.

Q.   Why?

A.   Because we want to make sure that we reported all the

────U.S. v. Manafort────

J. Ayliff - Direct (cont.)                                                768

1   income and any tax credits or anything.  We just wanted to

2   make sure.  It's worldwide income, but they have to report on.

3   So that's why we do that.

4   Q.   I'm going to show you what's been marked as -- and we're

5   not going to move this exhibit in, but let me just show you

6   Government Exhibit 191.

7            Does this appear to be a client list for KWC related

8   to Mr. Manafort?

9   A.   Yes.

10  Q.   Okay.  To your knowledge, any of the entities that are

11  listed there, were any of them, other than EVO Holdings,

12  foreign entities?

13  A.   None of these were foreign entities.

14  Q.   Okay.  Did you understand that any of the entities that

15  you prepared tax returns for Mr. Manafort to have foreign bank

16  accounts?

17  A.   No.

18  Q.   Did you -- do you know if DMP International received

19  foreign payments?

20  A.   Yes, they did.

21  Q.   What was your understanding of who was paying DMP

22  International from overseas?

23  A.   Their clients.

24  Q.   Why did you believe they were clients?

25  A.   Because the general ledger had all of that -- all of

J. Ayliff - Direct (cont.)

769

1  those payments coded into income.

2  Q.   And did anyone tell you they were clients?

3  A.   We used the representation of what was in the general

4  ledger and so it -- so that's how we determined that it was --

5  that they were clients.

6  Q.   Did you have any understanding, whatsoever, that any of

7  these overseas entities were controlled by Paul Manafort?

8  A.   No.

9  Q.   Did you have any understanding that Mr. Manafort had any

10  ownership interests in these overseas entities that paid DMP

11  International?

12  A.   No.

13  Q.   Did you have any understanding they had any affiliation

14  with Mr. Manafort beyond being clients?

15  A.   No.

16  Q.   All right.  I'm going to ask you about a number of

17  entities by name.  And could you indicate what your

18  understanding of the nature of their relationship with

19  Mr. Manafort was, if you have any understanding?

20            Actinet Trading Limited?

21  A.   The -- they showed up in the DMP International general

22  ledger.

23  Q.   And so what did you understand it to be?

24  A.   Presumed it -- that it was a client of theirs.

25  Q.   Black Sea View Limited?

J. Ayliff - Direct (cont.)

770

```
 1   A.    I don't recall.

 2   Q.    Have you ever heard of that, to your knowledge?

 3   A.    No.

 4   Q.    Bletilla Ventures Limited?

 5   A.    Could you say that again?

 6   Q.    Sure.  Bletilla, B-l-e-t-i-l-l-a.

 7   A.    Yeah, I recall seeing that.  I think that's a client as

 8   well.

 9   Q.    Okay.  Global Highway Limited?

10   A.    Yes, that's a client.

11   Q.    Leviathan Advisors Limited?

12   A.    Yep, same.

13   Q.    LOAV, L-o-a-v, Advisors Limited?

14   A.    Yes, a client.

15   Q.    Lucicle Consultants Limited?

16   A.    A client.

17   Q.    Marziola Holdings Limited?

18   A.    I don't recall.

19   Q.    Have you ever heard of that, to your knowledge?

20   A.    No.  It may -- it may well have been in the general

21   ledger, but I don't recall.

22   Q.    Olivenia Trading Limited?

23   A.    I don't recall either.

24   Q.    Have you ever heard of that, to your knowledge?

25         THE COURT:  He said he didn't recall, but ask again
```

J. Ayliff - Direct (cont.)

1   if you wish.

2   BY MR. ASONYE:

3   Q.   Have you -- to your knowledge, have you ever heard of

4   that entity?

5   A.   No.

6   Q.   Peranova Holdings Limited?

7   A.   Yes, that's another client.

8   Q.   Serangon, S-e-r-a-n-g-o-n, Holdings Limited?

9   A.   I think that's a client, too.

10  Q.   Yiakora, Y-i-a-k-o-r-a, Ventures Limited?

11  A.   Yes, I have heard of that one.  That was a client as

12  well.

13  Q.   Global Endeavor Inc.?

14  A.   I'm not familiar with that one.

15  Q.   And Jeunet, J-e-u-n-e-t, Limited?

16  A.   I don't recall that one either.

17  Q.   And then finally Pompolo Limited?

18  A.   I'm not -- I don't recall that either.

19  Q.   Did Mr. Manafort or Mr. Gates ever show you documentation

20  as to who controlled accounts for any of those entities I

21  named?

22  A.   No.

23  Q.   Did they -- did Mr. Manafort or Mr. Gates ever tell you

24  either of them had signature authority over any of those

25  entities?

J. Ayliff - Direct (cont.)

772

1  A.    No.

2  Q.    Did Mr. Manafort or Gates ever tell you Mr. Manafort had

3  an ownership interest in any of those entities?

4  A.    No.

5  Q.    Did Mr. Manafort or Gates ever tell you that Paul

6  Manafort was the beneficial owner of accounts for those

7  entities?

8  A.    No.

9  Q.    Did Manafort or Gates ever tell you that Mr. Manafort

10 could control payments out of accounts for those entities?

11 A.    No.

12 Q.    Would you want to know that?

13 A.    Yes.

14 Q.    Why would you want to know if Mr. Manafort could control

15 payments out of accounts for those entities that I named?

16 A.    Because then they would -- we would have to do the FBAR

17 reporting requirements.

18 Q.    And did Mr. Manafort or Gates ever ask you whether any of

19 those entities were reportable on the FBAR?

20 A.    No, they were never discussed.

21 Q.    Would you want to know if income to Paul Manafort was

22 deposited in foreign accounts?

23 A.    Yes.

24 Q.    Why would you want to know that?

25 A.    Because I want to make sure that all the income is being

J. Ayliff - Direct (cont.)

773

1   picked up on his tax return.

2   Q.   And did he or Mr. Gates ever tell you that?

3   A.   They never told us about any income that was deposited in

4   other accounts.

5   Q.   If income to Paul Manafort was deposited in foreign

6   accounts and then directed to you as vendors, would you want

7   to know about that?

8   A.   Yeah, if it's -- if it's deposited in foreign accounts,

9   yes.

10  Q.   Okay.  Why would you want to know about income that's

11  deposited in foreign accounts and then directed to U.S.

12  vendors on Mr. Manafort's behalf?

13  A.   Because I want to make sure that that income is actually

14  being picked up and reported correctly.

15  Q.   Now, when -- were there times that Mr. Manafort or Gates

16  provided information to you that was -- that had to be cleared

17  up?

18  A.   That had to be cleared up?

19  Q.   Yeah, that was confused?

20  A.   Yes.  Yeah, if there was -- we would always -- when we

21  get the information, we would develop a list of questions.

22  Q.   Okay.  Let me show you Government Exhibit 207.

23         This is an e-mail between you and Rick Gates?

24  A.   Yes.

25  Q.   In preparation for Mr. Manafort's tax returns?

─────────────U.S. v. Manafort─────────────

J. Ayliff - Direct (cont.)

774

1    A.    Yes.

2             MR. ASONYE:  Your Honor, the Government moves 207

3    into evidence.

4             THE COURT:  Without objection?

5             MR. DOWNING:  Without objection.

6             THE COURT:  It's admitted.

7                         (Government's Exhibit No. 207

8                          admitted into evidence.)

9             MR. ASONYE:  Your Honor, may we publish?

10            THE COURT:  You may display it.

11            MR. ASONYE:  Thank you.

12   BY MR. ASONYE:

13   Q.    Okay.  What do you ask in the first paragraph?

14   A.    We were trying to figure out why there was a negative

15   balance in the -- in the book -- the general ledger that was

16   maintained by the bookkeeper, and why there was a negative

17   balance in an account for Chase Bank for $1,414,000.

18   Q.    And what was concerning about that?

19   A.    Well, why would there be a negative balance in there?

20   And then from Heather, she -- we had asked her and she said

21   the negative balance comes from the deposit of two attached

22   cashier's checks, so --

23   Q.    Okay.  And could that be an indicator of another source

24   of income?

25   A.    Well, it could mean that something is not being recorded.

U.S. v. Manafort

J. Ayliff - Direct (cont.)

775

Q.   And did you rely on Mr. Manafort's and Mr. Gates's

representations about where the -- these funds came from?

A.   Yes.

Q.   Would you have wanted to know if the actual source of

these funds was an overseas bank account?

A.   Yes.

Q.   And why would you want to know that?

A.   Because we want to make sure we're complying with the

law.

Q.   Let me show you Government Exhibit 209.

Is this an e-mail between you and -- you and Rick

Gates and others?

A.   Yes.

Q.   Does it relate to the preparation of Mr. Manafort's tax

returns?

A.   Yes.

MR. ASONYE:  Your Honor, Government moves in 209.

MR. DOWNING:  No objection.

THE COURT:  It's admitted.

(Government's Exhibit No. 209

admitted into evidence.)

MR. ASONYE:  May we publish?

THE COURT:  Yes.

BY MR. ASONYE:

Q.   Let me show you the e-mail at 4/14 [sic].

─────U.S. v. Manafort─────
J. Ayliff - Direct (cont.)
776

1          Go ahead and read what you wrote at -- starting, "I

2   went."

3   A.   Oh, "I went through the detailed reports from Heather for

4   2013 and have the following questions/comments that are not on

5   that prior list you responded to yesterday.  Please provide a

6   response for each comment."

7   Q.   Okay.  And what does Mr. -- what do you ask about the

8   Union Street purchase, which is the third bullet?

9   A.   The Union Street purchase, "Where did the funds come from

10  for the purchase?"

11  Q.   And how does Mr. Gates respond?

12  A.   "This came from a savings account of Kathy's according to

13  PJM."

14  Q.   And who did you understand PJM to be?

15  A.   Mr. Manafort.

16  Q.   Would you want to know if -- well, first of all, did you

17  rely on their representation about the source of these funds?

18  A.   Yes.

19  Q.   Would you want to know if the source of these funds was

20  actually a foreign bank account?

21  A.   Yes.

22  Q.   Why?

23  A.   Again, to comply with the -- with the law and make sure

24  the income was all reported.

25  Q.   Now, and in this same e-mail, are you asking about the

U.S. v. Manafort

J. Ayliff - Direct (cont.)

777

1   source of funds --

2           If you can actually pull that -- just go back up.

3           Those other two bullet points, are you asking about

4   the source of funds for other accounts?

5   A.   Yes.

6   Q.   Can you prepare -- well, let me rephrase it.

7           Can you properly advise -- let me say it again.

8           Can you provide proper tax advice to Mr. Manafort if

9   you're not aware of all of his financial accounts?

10  A.   No.

11  Q.   Did you see, on the general ledger, expenses related to

12  Mr. Manafort on DMP's general ledger?

13  A.   Yes.

14  Q.   Okay.  Did you have to classify those expenses as

15  business or personal?

16  A.   Yes, we had --

17  Q.   And why did you have to do that?

18  A.   Because if they're personal, they are not a business

19  expense and they're not deductible.

20  Q.   And how did you determine whether they were personal or

21  business?

22  A.   Well, we would get the general ledger and I -- and go

23  through it and then send the questions to the client for

24  review to see if there were -- and they came back and told us

25  whether they were business or personal.

U.S. v. Manafort

J. Ayliff - Direct (cont.)

778

1   Q.   So did you rely on their representations?

2   A.   Yes.

3   Q.   And if a expense is deemed personal, is it deductible?

4   A.   No.

5   Q.   And if you determined that DMP International did pay for

6   Mr. Manafort's personal expenses, how did you treat that on

7   his tax returns or on -- at least on DMP's tax returns?

8   A.   They were nondeductible.

9   Q.   And if Mr. Manafort used personal funds to pay for a

10  business expense, how did you treat that on his tax return?

11  A.   If there were -- on his tax return or?

12  Q.   Yes.

13  A.   On the -- on the DMP International's tax return, they

14  would have been deducted if they were valid business expenses.

15          THE COURT:  How much more do you anticipate,

16  Mr. Asonye?

17          MR. ASONYE:  I would say about 30 minutes, Your

18  Honor.

19          THE COURT:  All right.  This might be a good time

20  then to take the morning recess.

21          Mr. Ayliff, you may step down, sir.  During recess,

22  you may not discuss the case with anyone and your testimony

23  with anyone.

24          Pass your books to the right, ladies and gentlemen.

25  We will recess until 11:25 and then we'll go to just beyond

─────U.S. v. Manafort─────
J. Ayliff - Direct (cont.)                                      779

1    12:30.

2             Remember to refrain from discussing the matter among

3    yourselves or with anyone or undertaking any investigation on

4    your own.

5             Mr. Downing, how long, based on what you've heard

6    thus far, do you think your cross-examination will take?

7             MR. DOWNING:  I think about 45 minutes, Your Honor.

8             THE COURT:  All right.  You may follow Mr. Flood

9    out.

10            All right.  The Court stands in recess.

11            (Recess.)

12            MR. DOWNING:  Your Honor, before you bring the jury

13   in, I would like to revisit the issue that we were talking

14   about earlier today before the jury comes in.  It will only

15   take a couple of minutes.

16            THE COURT:  All right.  You may be seated, ladies

17   and gentlemen.

18            MR. DOWNING:  May we approach?

19            THE COURT:  Which issue is this?

20            MR. DOWNING:  This is about questioning the question

21   about audits.

22            THE COURT:  All right.  Come to the podium or bench

23   quickly.

24            Since the jury is not in here, does it need to be at

25   the bench?

────────U.S. v. Manafort────────

1          MR. ASONYE:  Yeah, we don't.

2          MR. DOWNING:  No, Your Honor.

3          THE COURT:  He asked for it at the bench so let him

4    respond.

5          Does it need to be at the bench?

6          MR. DOWNING:  No, don't think so, but you said

7    earlier you told me that --

8          THE COURT:  All right.  That assumed the jury would

9    be present.

10         All right.  What is the problem?

11         MR. DOWNING:  I anticipate -- I don't know that

12   there is a problem.  I anticipate asking this witness about

13   their work papers, the documents they keep, the records they

14   retain, why they retain them.  I believe he would say, "In

15   case we're audited."

16         And then I was going to ask, "Well, what type of

17   information does the IRS ask for, from you, during an audit?"

18   And that's it.

19         THE COURT:  Who -- it will be Mr. Asonye?

20         MR. ASONYE:  Mr. Van Grack, Your Honor.

21         THE COURT:  All right.

22         MR. VAN GRACK:  Your Honor, I'm not quite sure what

23   the relevance is in terms of the -- what information in a

24   hypothetical situation that his firm would keep in terms of

25   preparing for an audit that did not occur in this instance.

U.S. v. Manafort

J. Ayliff - Direct (cont.)

781

1          THE COURT:  Well, I think it's a predicate, but let

2   me ask.  Mr. Downing, what is the relevance of that?

3          MR. DOWNING:  Well, I think the relevance ties back

4   to Mr. Manafort knowing that these records were being utilized

5   and retained by the accountant.  And if, in fact, it has all

6   this information about offshore accounts on it, I think it

7   would definitely be evidence that would go against the

8   Government's claim that it was knowingly and intentionally

9   trying to conceal these accounts from the United States

10  Government.

11         THE COURT:  No, just a minute, Mr. Downing.  So your

12  argument is that -- little circuitous -- but your argument is

13  that they keep all of these records that include references to

14  foreign accounts and they reported no.  Apparently, I think

15  Mr. Asonye has elicited answers that says that they put down

16  "no" because they asked and they were told no.  And you want

17  to ask whether they keep all their papers in case they're

18  audited because these papers, you say, or you would want to

19  argue, reflect these entities that Mr. Asonye asked about, and

20  so that would be a trail to a foreign bank account?

21         MR. DOWNING:  That's correct, Your Honor.

22         THE COURT:  And, therefore, what ?

23         MR. DOWNING:  Therefore, only a fool would give that

24  kind of information to his accountant if he was trying to

25  conceal the information from the IRS.

U.S. v. Manafort

782

1          THE COURT:  All right.  Mr. Van Grack.

2          MR. VAN GRACK:  Your Honor, there are no records of

3   these foreign accounts in the paperwork, and that is the

4   entirety of the point, which is that Mr. Manafort did not

5   disclose this information to his tax preparers --

6          THE COURT:  Well, wouldn't he say that?

7          MR. VAN GRACK:  Well, Your Honor --

8          THE COURT:  What he's saying is not that there were

9   records of these foreign bank accounts.  He's saying the

10  existence or what -- or some evidence of a foreign bank

11  account is there.  He's not saying the records are kept.

12         MR. VAN GRACK:  Your Honor, and it's not that the

13  question as to whether he has records of these foreign bank

14  accounts would be inappropriate.  That would be a very

15  appropriate line of inquiry for defense counsel.  It's asking

16  the question in a context of an audit that would be

17  inappropriate.  And it's also in the context of defense

18  counsel's opening statements with respect to audit and

19  connecting the lack of an audit to the Government's rush to

20  judgment and --

21         THE COURT:  I've told you at the outset this morning

22  about that issue, that you can prepare and submit an

23  instruction that says the mere existence of a civil remedy

24  through an audit does not foreclose the Government from

25  seeking criminal penalties.  And I told you you can prepare

U.S. v. Manafort

J. Ayliff - Direct (cont.)

783

1   that, submit it to the other side, and I'll think about it.

2           Now, the real question -- and I've also told you

3   that if he testifies and talks about it I'm probably going to

4   permit that.  If he offered to submit to an auditor and the

5   like.  I don't know the answer to that and I don't know if

6   he's going to testify.

7           But then the question comes up, as Mr. Downing has

8   raised, he wants to ask the question of this witness whether

9   they retained records for purposes of an audit.  And he argues

10  that that's relevant to the issue of willfulness because it

11  would -- it would be evidence that the -- presumably that some

12  evidence of a foreign bank account was reflected in these

13  documents, which is presumably why Mr. Ayliff asks the

14  question.  He saw evidence that there might be; is that right?

15          I'm sorry, I can't hear you.

16          MR. DOWNING:  That's correct, Your Honor.

17          THE COURT:  All right.  So what he wants to ask is:

18  Do you keep records that would be available for an audit?

19          He says, yes, they want to be able to argue that

20  nobody, meaning Mr. Manafort, would answer as he did if he

21  thought that was -- that it would be found out just by an

22  audit.  I don't know that's very probative, Mr. Downing, but

23  what's the problem with that?

24          MR. VAN GRACK:  And, Your Honor, even if there's

25  minimal probative value, it's incredibility prejudicial.  Not

U.S. v. Manafort

1    just --

2         THE COURT: Well, I'm not worried about prejudice.

3    Come on.

4         Look, the Government has to prove beyond a

5    reasonable doubt that he knew what the requirement was in the

6    law for FBAR and that he deliberately violated it. Am I right

7    about that?

8         MR. VAN GRACK: Yes, Your Honor.

9         THE COURT: All right. A defense to that is that

10   he's going to say that he didn't deliberately violate the law

11   because nobody intending to violate the law would leave that

12   evidence around and his accountant to find it. And I -- I can

13   see that argument for relevance.

14        The argument that it's unfairly prejudicial to the

15   Government because it would lead jurors to nullify is not

16   moving to me.

17        MR. VAN GRACK: And, Your Honor, even in its reply

18   this morning, the Government acknowledged the point the Court

19   had raised previously in terms of if the defendant chooses to

20   testify and indicate what he relied on.

21        THE COURT: I saw that. I read it. Of course you

22   agreed with it, because it's right.

23        MR. VAN GRACK: Yes, Your Honor. And what we want

24   to clarify in this instance is whatever the purposes were in

25   which this witness and this firm maintained these records,

U.S. v. Manafort

J. Ayliff - Direct (cont.)                                              785

1   asking the question as to whether an audit occurred one way or

2   another, that point would not be probative.

3          THE COURT:  Well, I agree he's not going to ask

4   whether an audit would have found anything.  He's just going

5   to ask whether they keep the records for possible audit

6   purposes; is that right?

7          MR. DOWNING:  That's correct, Your Honor.

8          THE COURT:  Now, tell me once -- and I think he's

9   explained, with a little help --

10         MR. DOWNING:  Thank you.

11         THE COURT: -- that he's explained what the relevance

12  is, that the Government has to prove willfulness on this FBAR.

13  The Government has certainly proved that he said "no," and the

14  Government certainly has deduced evidence that it appears he

15  did have control over foreign bank accounts.

16         All right.  So he now wants to provide evidence for

17  the jury that says, look, there is a trail in these documents

18  that could lead to the truth in that.  And somebody who

19  intended to violate the law, which you have to prove, would

20  not have done that.  It's just inconsistent with someone who

21  wanted to violate the law.

22         What's your response to that.

23         MR. VAN GRACK:  Again, Your Honor, as long as the

24  question isn't -- the follow-up question isn't asked in terms

25  of whether, in fact, an audit occurred with respect to this

————U.S. v. Manafort————
J. Ayliff - Direct (cont.)
786

1    particular company or witness.

2            THE COURT:  All right.  You don't intend to ask any

3    such questions, do you?

4            MR. DOWNING:  I do not.

5            THE COURT:  But I take it what you do intend to do,

6    if the evidence -- if I allow you to ask this question, is you

7    intend to argue to the jury, look, you can't find willfulness

8    on Mr. Manafort's part with respect to the Foreign Bank

9    Account Report, the FBAR report, because all that information

10   that would have led the Government to find that was in these

11   documents that is -- that is available.  Of course, what's in

12   the documents is -- they ask the question and he said "no,"

13   but the names are there.  And so --

14           MR. DOWNING:  And account information, Your Honor.

15           MR. VAN GRACK:  Your Honor, I just want to clarify

16   the point --

17           THE COURT:  Yes.

18           MR. VAN GRACK:  -- there is no information in these

19   documents on those foreign accounts.

20           THE COURT:  Where -- there's an identification of

21   entities.

22           MR. VAN GRACK:  No, Your Honor.  The list that

23   Mr. Asonye was reading from was actually the list that

24   Mr. Asonye prepared for this direct examination.  There is no

25   list in these records of these multiple foreign entities that

U.S. v. Manafort

J. Ayliff - Direct (cont.)

787

1   he was required to disclose.

2           THE COURT:  All right.  What's the answer to that?

3           MR. DOWNING:  That's incorrect is the answer to

4   that.  The general ledger has the name of all of these

5   entities.  The bookkeeper had all the bank accounts that had

6   the wire transfer information with the name of the entity and

7   the Cyprus account number on the bank statement.

8           MR. VAN GRACK:  I withdraw my claim, Your Honor.

9           THE COURT:  All right.  Thank you.

10          And you're not, Mr. Downing, going to ask anything

11  other than:  Do you keep all of these records and -- for audit

12  purposes?

13          MR. DOWNING:  Yes.

14          THE COURT:  That's it?

15          MR. DOWNING:  What records do you keep, how long do

16  you keep them, and why do you keep them?  That's it.

17          THE COURT:  Anything further, Mr. Van Grack?

18          MR. VAN GRACK:  No, Your Honor.

19          THE COURT:  I'm going to take about a five-minute

20  recess to consider this and then I'll give you my answer.

21  Court stands in recess.

22          (Recess.)

23          THE COURT:  All right.

24          MR. ASONYE:  Your Honor, the Government wanted to

25  clarify one point.  And maybe it's putting the cart before the

———U.S. v. Manafort———
J. Ayliff - Direct (cont.)                                            788

 1   horse.

 2            It's just that the Government wants to be clear, we

 3   are not seeking a jury instruction on this issue.  In fact, in

 4   our brief I think we cited cases where -- where it would be

 5   improper to provide a jury instruction on this civil audit

 6   issue.  That's the only thing we wanted to make it clear to

 7   the Court.

 8            THE COURT:  Well, I don't know that I agree with

 9   that, but I'm not requiring you to submit any instructions.

10   You suit yourself on that.  But I'm saying it's a possibility

11   if you're really concerned about it.

12            I'm not familiar with any authority that says you

13   can't do it, because I, in fact, do it in every case.  In

14   every case.  I tell the jury, "Here are my instructions, and

15   you must follow them whether you agree with them or not."

16            You're not going to tell me that's improper.

17            MR. ASONYE:  Oh, no, Your Honor.

18            THE COURT:  Of course not.  I've been doing it for

19   31 years.

20            (Laughter.)

21            MR. ASONYE:  I've simply just -- Your Honor, I'm

22   citing *United States v. Merrick*, which found no relevance in a

23   jury instruction that a civil case might be brought against

24   the defendant and the *United States v. Muse* where --

25            THE COURT:  That has nothing to do with this.

———————U.S. v. Manafort———————
J. Ayliff - Direct (cont.)
789

1          Look, you-all decide whether you want any

2    instruction or not.

3          All I'm deciding right now is that Mr. Downing is

4    responding to the Court's instructions.  He says, "Look, I

5    want to ask this witness a question that may trespass on what

6    I have said."

7          And he asked the question.  I'm going to permit him

8    to ask a couple of questions, and I'm going to be precise

9    about it, and I'm going to circumscribe it.

10          All you may ask, Mr. Downing, if you wish --

11    certainly not required to -- is whether the ledger books that

12    this company was provided lists these names that are -- have

13    some connection to a foreign bank.

14          There's no foreign bank account, I think, actually

15    stated in the ledger, but there is these names.  And then you

16    can say, "Do you keep the ledger for audit purposes?"

17          Yes, That's it.  No reference to IRS audits or

18    anything else.  It could be an audit by somebody whose buying

19    the company but they keep the record.  And the record does

20    mention those entities.  I've forgotten the names of them.

21    You can be specific about those.  And that's it .  Two

22    questions.  Am I clear?  No questions about audit.  That,

23    Mr. Van Grack, takes care of your concern.  No question about

24    IRS or possible audits.

25          MR. VAN GRACK:  Yes, Your Honor.

J. Ayliff - Direct (cont.)

1          THE COURT:  All right.

2          MR. DOWNING:  Understood.

3          THE COURT:  Do you have a continuing objection to

4    just those two questions that I'm permitting?

5          MR. VAN GRACK:  No, Your Honor.

6          THE COURT:  All right.  Let's bring the jury in and

7    get started.  You indicated, Mr. Asonye, you had about

8    40 minutes.

9          MR. ASONYE:  30.

10         THE COURT:  30?

11         MR. ASONYE:  Yeah.

12         THE COURT:  Well, you're not limited.

13         MR. ASONYE:  Thank you, Your Honor.

14         THE COURT:  If you feel you have to go beyond that

15   you may do so.  Bring the jury in.

16         (Jury in.)

17         THE COURT:  I will tell you that we're not going to

18   have brass plates with your names on them affixed to any

19   seats.

20         I don't even have one of those.

21         All right.  You may bring Mr. Ayliff in again,

22   please.

23         Mr. Ayliff, you'll recall, sir, that you remain

24   under oath.

25         I think you nodded assent to that, but I'll have the

1    record reflect that.  you may resume the stand and,

2    Mr. Asonye, you may proceed with your examination.

3    BY MR. ASONYE:

4    Q.   Mr. Ayliff, if you could turn back to Government

5    Exhibit 196, which is already admitted but we don't need to

6    display it.

7            If you turn to Page 3.  Do you recall this is

8    the exhibit you testified for LOAV Advisors and you were

9    inquiring where the $1 million came from?

10   A.   Yes, sir.

11   Q.   Okay.  I didn't -- let me ask you:  Would you want to

12   know if the source of these funds was an overseas bank

13   account?

14   A.   Yes, I would -- if it was an overseas bank account I

15   would want to know that.

16   Q.   And why would you want to know that?

17   A.   Well, I -- let me change that.  It's more -- I -- if it

18   was from overseas, I don't know that I really would need to

19   know it if it was unrelated to Mr. Manafort.

20   Q.   And if it was related to Mr. Manafort?

21   A.   Then I would need to know that.

22   Q.   Let me ask you about how you would classify certain

23   items, whether you would classify them as business or personal

24   items.

25           If you saw payments on DMP's general ledger to a

U.S. v. Manafort
J. Ayliff - Direct (cont.)
792

1  home improvement company for work on a personal residence,

2  would you classify that as personal or business expense?

3  A.    Personal.

4  Q.    And what about audiovisual equipment in a personal

5  residence?

6  A.    Personal.

7  Q.    And what about landscaping for a second home?

8  A.    Personal.

9  Q.    And what about suits?

10  A.    Personal.

11  Q.    Did you have any occasion to learn about any foreign

12  loans to Mr. Manafort or his businesses?

13  A.    Yes.

14  Q.    For these loans, what did you understand was the

15  relationship between the entities?

16  A.    They were unrelated.

17  Q.    Did you understand that Mr. Manafort controlled any of

18  those entities that loaned him money?

19  A.    No.

20  Q.    In your experience preparing tax returns, do clients

21  have -- let me withdraw that.

22        Now, did you see any loan documentation for these

23  loans?

24  A.    No.

25  Q.    Did you ask for it?

J. Ayliff - Direct (cont.)

793

A.   Yes.

Q.   When you were asked, generally, what was the response?

A.   There normally wasn't --

        THE COURT:  I think you said, "When you were asked."
You mean when he asked?

        MR. ASONYE:  Sorry.

BY MR. ASONYE:

Q.   When you asked.

A.   There normally wasn't a response.  They just said it was
a loan.

Q.   With these loans, did you ever see evidence of interest
payments on the loan?

A.   No.

Q.   What about principal payments?

A.   No.

Q.   Did you ever tell Paul Manafort or Rick Gates that they
could create fake loans to reduce Mr. Manafort's income?

A.   No.

Q.   Did you ever tell Paul Manafort or Rick Gates that they
could classify income as a loan?

A.   No.

Q.   Did you ever tell Rick Gates or Paul Manafort that they
could backdate loan documents?

A.   No.

Q.   Now, you testified earlier about a $1.5 million loan on

─────U.S. v. Manafort─────

J. Ayliff - Direct (cont.)

794

1   the balance sheet due to Peranova Holdings; is that correct?

2   A.   Yes.

3           THE COURT:  I'm not sure you said balance sheet, did

4   you?

5           THE WITNESS:  Yeah, it was --

6           THE COURT:  Isn't it a ledger?

7           THE WITNESS:  It was on the -- it was on the

8   schedule on the tax return, which is the balance sheet.

9           THE COURT:  All right.  Next question.

10  BY MR. ASONYE:

11  Q.   Let me direct your attention to Government Exhibit 190.

12          What is Government Exhibit 190?

13  A.   This is the general ledger that was prepared by the

14  bookkeeper for DMP International.

15  Q.   And then is this a document that you-all would retain and

16  then make markings on?

17  A.   Yes.  We would get this from the bookkeeper and use it

18  for our tax return preparation.

19          MR. ASONYE:  Your Honor, Government moves 190 into

20  evidence.

21          THE COURT:  Is there any objection to 190?

22          MR. DOWNING:  I'm looking at it, Your Honor.

23          THE COURT:  All right.

24          (A pause in the proceedings.)

25  BY MR. ASONYE:

──────── U.S. v. Manafort ────────
J. Ayliff - Direct (cont.)
795

1   Q.   Is this just -- this is not the entire general ledger, is

2   it?

3   A.   No.  This is just one of the pages.

4   Q.   The rest of the exhibit?  The rest of the exhibit, does

5   it contain pages from the general ledger?

6   A.   They have -- it's for different years, so for this

7   particular page that you're referring to is page 14 of the

8   2012 general ledger, just one page.

9           MR. ASONYE:  Your Honor, the Government moves

10  Government Exhibit 190 into evidence.

11          THE COURT:  You want to start with just that one

12  page, Mr. Asonye?

13          MR. ASONYE:  Your Honor, I can walk him through the

14  whole -- I'll walk him through this exhibit --

15          MR. DOWNING:  I'm sorry, just to make this clear,

16  it's a page from a general ledger from a year, the next page

17  is a page from a general ledger from a different year.

18          MR. ASONYE:  Correct.

19          MR. DOWNING:  So if he could clarify what it is he's

20  offering this as --

21          THE COURT:  All right.  Why don't we do it this way.

22  Take a look at 190, then tell us if you can summarize the

23  contents as being pages from the general ledger for what

24  years.

25          THE WITNESS:  Okay.

———U.S. v. Manafort———
J. Ayliff - Direct (cont.)
796

1          THE COURT:  And the general ledger of what.

2          THE WITNESS:  So this is -- this is the general

3   ledger for DMP International.  So there's one page from 2012.

4   There's one page from -- oh, there is -- the next page is

5   Mirror Cube Films and that is a general ledger from 2013,

6   Page 12.  And then the next one is DMP International, which is

7   the general ledger, one page.

8          And then the next year is 2015 DMP International

9   general ledger, one page -- or there are two pages there.  And

10  that's it.

11         THE COURT:  All right.  So in other words, there are

12  pages from a general ledger relating to some of the same or

13  different entities?

14         THE WITNESS:  Yes.

15         THE COURT:  All right.  Any objection to their

16  admissibility?

17         MR. DOWNING:  No, Your Honor.

18         THE COURT:  They're admitted.  Proceed.

19                              (Government's Exhibit No. 190

20                              admitted into evidence.)

21         MR. ASONYE:  May we publish, Your Honor?

22         THE COURT:  Yes, you may.

23  BY MR. ASONYE:

24  Q.   All right.  If you look on the first page and you see a

25  transaction in -- that's in a square --

―――――U.S. v. Manafort―――――

J. Ayliff - Direct (cont.)

797

1    A.    Yes.

2    Q.    -- the date of it, what's the date of that transaction?

3    A.    February the 1st, 2012.

4    Q.    And what's the entity?

5    A.    Peranova Holdings Limited.

6    Q.    Okay.  What does it say to the right of that name?

7    A.    Loan document 137736.

8    Q.    And what is the amount?

9    A.    $1.5 million.

10   Q.    Okay.  And so how was this $1.5 million originally booked

11   according to your work papers?

12   A.    As a loan.

13   Q.    And so since it's booked as a loan, would -- this is

14   counted as income on DMP International's tax returns?

15   A.    No.

16   Q.    What was your understanding of the relationship between

17   DMP International and Peranova Holdings?

18   A.    Had never heard of Peranova Holdings and we thought it

19   was independent third party.

20   Q.    Would you want to know if this $1.5 million --

21             THE COURT:  You may ask that question, but I just

22   wanted to be clear, the box that says "This is a loan, not

23   income, per Rick Gates conference call," that's something who

24   did?

25             THE WITNESS:  We did.

─────U.S. v. Manafort─────
J. Ayliff - Direct (cont.)
798

1          THE COURT:  You did?

2          THE WITNESS:  Yes.

3          THE COURT:  That's not part of the real ledger.

4          THE WITNESS:  No.

5          THE COURT:  Next question.

6    BY MR. ASONYE:

7    Q.   Would you have wanted to know if this $1.5 million was

8    actually payment for services rendered?

9    A.   Yes.

10   Q.   Okay.  Why would you want to know that?

11   A.   Because then it would have been income.

12   Q.   And would you want to know if Mr. Manafort or DMP

13   International controlled the bank account for Peranova

14   Holdings?

15   A.   Yes.

16   Q.   Why would you want to know that?

17   A.   Well, because then -- if they had control over it, then

18   this is a related party.

19   Q.   And whose representation did KWC rely on that this $1.5

20   million was a loan?

21   A.   Rick Gates.

22   Q.   Did you know personally what this loan was extended for?

23   A.   No.

24   Q.   Now, according to this work paper, this loan you said was

25   made on December 1, 2012.  Was there any interest or principal

──────U.S. v. Manafort──────

1   payments made on this loan in 2012?

2   A.   No.

3         THE COURT:  I'm sorry, you referred to it as a work

4   paper?

5         MR. ASONYE:  Yes.

6         THE COURT:  I thought it was a page from a general

7   ledger --

8   BY MR. ASONYE:

9   Q.   Mr. -- do you want to clarify Mr. --

10        THE COURT:  -- which -- just a minute.

11        THE WITNESS:  Just -- sorry.

12        THE COURT:  Just a moment.  Which is it, Mr. Ayliff?

13        THE WITNESS:  Well, it's an extract from the general

14  ledger that we used as a work paper to support the balance on

15  the balance sheet.

16        THE COURT:  All right.  But it's really --

17        THE WITNESS:  It's a work paper.

18        THE COURT:  -- it's really something from the

19  general ledger and you took a page from the general ledger and

20  made it part of your work papers?

21        THE WITNESS:  Correct.

22        THE COURT:  Next question.

23  BY MR. ASONYE:

24  Q.   And if you could turn to the third page, which is the

25  general ledger, does it -- what does it indicate in the box

——————U.S. v. Manafort——————
J. Ayliff - Direct (cont.)
800

1   happened for activity for 2014 on this loan?

2   A.   No 2014 activity.

3   Q.   And what is the balance of the loan?

4   A.   $1.5 million.

5   Q.   So was there any -- as far as you can tell, in 2013 and

6   '14, were there any interest or principal payments made on the

7   loan?

8   A.   No.

9   Q.   Is that unusual?

10  A.   It depends on the term of the loan.

11        THE COURT:  Again, no activity would be something

12  you-all put on?

13        THE WITNESS:  Correct.

14        THE COURT:  Next question.

15  BY MR. ASONYE:

16  Q.   What, if any, discussions did you have with Paul Manafort

17  or Rick Gates about the fact that this loan received -- had no

18  payments for years?

19  A.   What we would ask from them is, is the -- you know,

20  what's the status of the loan.  They said it's still

21  outstanding.

22  Q.   Did you -- let me move on to another topic about

23  Mr. Manafort's income.

24        After the 2014 tax year, what, if anything, did you

25  notice about the amount of income Mr. Manafort earned?

─U.S. v. Manafort─

J. Ayliff - Direct (cont.)

801

1   A.   After 2014, in 2015 the income dropped.

2   Q.   Do you have any knowledge of Paul Manafort applying for

3   mortgage loans in -- beginning in 2015?

4   A.   Yes.

5   Q.   Okay.  And how did you learn about these loans, the

6   mortgage loans?

7   A.   Via e-mail.

8   Q.   From who?

9   A.   From Paul Manafort.

10  Q.   Okay.  Let me show you Government's Exhibit 212.

11          Is this an e-mail from Paul Manafort to you?

12  A.   Yes.

13  Q.   Regarding a mortgage loan?

14  A.   Yes.

15          MR. ASONYE:  Your Honor, Government moves 212 into

16  evidence.

17          THE COURT:  Without objection?  I haven't heard one.

18  Mr. Downing?

19          MR. DOWNING:  No objection, Your Honor.

20          THE COURT:  It's admitted.  You may display it.

21                      (Government's Exhibit No. 212

22                       admitted into evidence.)

23          MR. ASONYE:  Thank you, Your Honor.

24  BY MR. ASONYE:

25  Q.   Turn to the last page of the e-mail from Mr. Manafort,

U.S. v. Manafort

J. Ayliff - Direct (cont.)

802

1   January 5, 2015, at 8:12.  Could you go ahead and read that?

2   A.   (As read): "Philip UBS has some questions based on the

3   2000 tax filing for John Hannah.  They thought it was a rental

4   property.  I explained that it has never been a rental

5   property and that Kathy and I use it for our personal

6   residence in New York City.  You will be receiving a call

7   tomorrow from Tom Berry and possible -- possibly someone from

8   the U.S. -- UBS underwriting division to clarify the tax

9   filing references.  Thanks, Paul."

10  Q.   What was your understanding of what Mr. Manafort wanted

11  you to say?

12  A.   My understanding was he wanted me to discuss it with an

13  onset of questions that UBS has.

14  Q.   About what?

15  A.   About the -- the -- this -- how this -- about this --

16  this property and how -- how it had been recorded on the tax

17  returns.

18  Q.   And was it your understanding as Mr. Manafort -- well,

19  was it understanding that the Fifth Avenue apartment was

20  a rental?

21  A.   It was my understanding it was a rental.  It had always

22  been a rental.

23  Q.   Did you understand the Fifth Avenue apartment to be used

24  as a personal residence for Paul Manafort and Kathleen

25  Manafort?

J. Ayliff - Direct (cont.)
803

A.    Yes.

Q.    If it was a personal residence for Paul Manafort and

Kathleen Manafort in 2014, would Mr. Manafort have been able

to deduct expenses on it on John Hannah's tax returns?

A.    Yes.

Q.    And did he, in fact, do that?

A.    Yes.

Q.    Could you read your response above at 9:14 p.m., the

next --

A.    (As read):  "We have always treated it as a self-rental

by DMP from JH and not as a residence for you.  Not sure --

not sure where that leaves us."

Q.    Were you willing to tell UBS that the Fifth Avenue

apartment was a personal residence for Mr. Manafort?

A.    No.

Q.    Why not?

A.    Because it was -- it was always treated as a rental.

Q.    And, in fact, did you tell them?

A.    No, I did not tell them that it was a personal residence.

Q.    All right.  Let me move onto a different topic.  Are you

aware of whether DMP International deducted a portion of the

cost of New York Yankees tickets on its tax returns?

A.    Yes.

Q.    And what did it -- what did it do?  Did it?

A.    Yes, it did.

───U.S. v. Manafort───
J. Ayliff - Direct (cont.)
804

1   Q.   All right.

2   A.   I'm sorry, yes.

3          THE COURT:  Let me go back for a moment.  You

4   learned from Mr. Gates and Mr. Manafort that they treated this

5   as a self-rental?

6          THE WITNESS:  Yes.  It's a self-rental.  It's

7   because you had a related party that was renting -- so DMP was

8   renting from John Hannah.  And Mr. Manafort owned both of

9   those, so therefore it's treated as a self-rental.

10          THE COURT:  All right.  So Mr. Manafort or Mr. Gates

11   were thinking that it was a rental so that they could deduct

12   expenses; is that right?

13          THE WITNESS:  Yes.

14          THE COURT:  And you told them no?

15          THE WITNESS:  No.  What I -- what the question was,

16   was this Mr. -- based on this Mr. Manafort had made a

17   representation that it was his personal residence in New York,

18   nothing to do with the business.

19          And the way that all the tax filings had been done

20   is that the -- that it was treated as a rental between DMP and

21   John Hannah.  And the reason for that -- the reason why it was

22   originally set up like that is when they bought the property,

23   was that they were having to travel to New York City, and then

24   instead of paying for hotel reservations, they would just --

25   own -- you know, purchase a unit that they would use instead.

U.S. v. Manafort

805

1    THE COURT:  Well, were you, in fact, called by the

2  bank and asked about it?

3    THE WITNESS:  I -- I -- yes, I did discuss it with

4  the bank.

5    THE COURT:  And what did you tell the bank?

6    THE WITNESS:  I told them that it was -- I told them

7  exactly the way that it had been presented, that it was a

8  rental.  It was not a personal residence.

9    THE COURT:  Next question.

10 BY MR. ASONYE:

11 Q.   And just to be clear, you answered in response to the

12 Court's question about Manafort or Gates.  Was Mr. Gates

13 involved at all in this discussion?

14 A.   No.

15 Q.   All right.  Let me show you what's been marked as

16 Government Exhibit 150, 150.

17    What is -- it's a one-page document.  What is it?

18    THE COURT:  Is this 150?

19    MR. ASONYE:  Yes, Your Honor.

20    THE WITNESS:  This --

21    THE COURT:  Just a moment.

22    MR. ASONYE:  Do you not have it, Your Honor?

23    THE COURT:  It's not on my list.  I'm sure in one of

24 these books I have it.  Go ahead.

25    MR. ASONYE:  Apologies, Your Honor.  It must have

—U.S. v. Manafort—

J. Ayliff - Direct (cont.)

806

1   been --

2           THE COURT:  It goes from 132 to 153.

3   BY MR. ASONYE:

4   Q.   All right.  What is Government Exhibit 150?

5           MR. ASONYE:  Court's indulgence.  We want to get a

6   copy for the Court, Your Honor.

7           THE COURT:  All right.  Thank you.

8           (A pause in the proceedings.)

9           THE COURT:  All right.  You may proceed.

10  BY MR. ASONYE:

11  Q.   What is this document?

12  A.   This is a -- a ledger report, a page out of general

13  ledger from -- for Davis Manafort Partners, Inc., for 2011.

14  And it is used as -- I think this was part of the work papers.

15  I mean -- and --

16          THE COURT:  Part of your work papers?

17          THE WITNESS:  Yes.  It's definitely part of our work

18  papers.

19          THE COURT:  All right.  Go on.  Next question.

20  BY MR. ASONYE:

21  Q.   Was this used to prepare Mr. Manafort's for Davis

22  Manafort Partners, Inc.?

23  A.   Yes.

24          MR. ASONYE:  Your Honor, Government moves 150 into

25  evidence.

─────U.S. v. Manafort─────

J. Ayliff - Direct (cont.)

807

1        MR. DOWNING:  No objection.

2        THE COURT:  Admitted.

3                        (Government's Exhibit No. 150

4                        admitted into evidence.)

5   BY MR. ASONYE:

6   Q.   This -- a reference -- do you see the reference to two

7   companies, Global Sites and Global Technology, LLC?

8   A.   Uh-huh.

9   Q.   What did KWC determine about whether Global Sites and

10  Global Technology were business expenses for Davis Manafort

11  Partners, Inc.?

12  A.   They were not business expenses for Davis Manafort, Inc.,

13  so this had been -- this is the way it had been coded by --

14  within the general ledger.  And so they were reclassified and

15  not deducted on this particular return because they related to

16  another entity.

17  Q.   All right.

18  A.   It was owned by Daisy Manafort.

19  Q.   Are you aware of Mr. Manafort applying for a mortgage on

20  a Howard Street property with Citizens Bank in 2015 and '16?

21  A.   Yes.

22  Q.   And were you aware of how 29 Howard Street was used

23  beginning in 2015?

24  A.   Yes.

25  Q.   And how was it used?

─────U.S. v. Manafort─────
J. Ayliff - Direct (cont.)
808

1   A.   As a rental.

2   Q.   And how did you know it was a rental?

3   A.   There were two e-mails.  Mr. Manafort had sent out an

4   e-mail when the first report came in for January.  I think it

5   was a report to Heather, but I'm not 100 percent on that.  I

6   think it may be in here, but each specifically saying it was a

7   rental.  And then there was another e-mail from Mr. Gates

8   where he indicated that in 2014 it was personal and then in

9   2015 it was a rental.

10  Q.   All right.  Let me show you Government Exhibit 127, which

11  I believe is already in evidence.

12           MR. ASONYE:  And, Your Honor, may we publish?

13           THE COURT:  Yes.  If it's in evidence, you may do

14  so.  127?  All right.

15           MR. ASONYE:  If we could focus on the -- just the

16  top e-mail.

17  BY MR. ASONYE:

18  Q.   Mr. Ayliff, is this the e-mail that you were referring to

19  where Mr. Manafort told you that 29 Howard Street was being

20  used as a rental in 2015?

21  A.   Yes.  And I thought it was to Heather, but it's to Jeff;

22  and I was copied on the e-mail.

23  Q.   All right.  And I want to talk about the expenses.  If we

24  can highlight the numbered paragraphs -- well, not highlight,

25  but blow them up.

────────── U.S. v. Manafort ──────────

J. Ayliff - Direct (cont.)

809

1          Could you read -- this says "Terms of the

2    agreement."  And read paragraphs 1, 2, and 6.

3    A.   1, 2, and 6.  Okay.

4          (As read):  "Kathy and I and Jessica and you share

5    in all expenses and revenues.  There is no third party between

6    the renter and you and me.  If the fees are owed to anyone, we

7    both need to approve, for example Airbnb.  Our idea" -- this

8    is No. 2.  "Our idea is no commissions on renting Howard

9    Street."

10          And what was the last number?

11   Q.   Number 6, please.

12   A.   Number 6 (as read): "All revenues need to go to MC Soho

13   for distribution.  If there is a rental -- if there is a

14   rental agreement with Airbnb, both Heather, Ayliff, and I need

15   copy.  This agreement should be" --

16   Q.   That's good enough.  That's fair enough.

17   A.   Okay.

18   Q.   All right.  Let me show you Government Exhibit 214.

19          Is this an e-mail between you and Rick Gates?

20   A.   Between Rick Gates and Conor, yes.

21   Q.   And are you copied?

22   A.   Yes.

23   Q.   Does it discuss Howard Street and how its treated for tax

24   purposes?

25   A.   Yes.

────────────────U.S. v. Manafort────────────────

J. Ayliff - Direct (cont.)

810

1    MR. ASONYE:  Your Honor, the Government moves 214

2  into evidence.

3    MR. DOWNING:  No objection.

4    MR. ASONYE:  May we publish?

5    THE COURT:  Yes.

6                           (Government's Exhibit No. 214

7                           admitted into evidence.)

8    MR. ASONYE:  Okay.  If we could focus on the middle

9  e-mail, paragraph --

10    THE COURT:  Again, whose highlighting?

11    MR. ASONYE:  That's in the document, Your Honor.

12    THE COURT:  All right.  Go ahead.  The yellow is in

13  the document.

14    MR. ASONYE:  Yes, Your Honor.

15    THE COURT:  All right.  Thank you.  Go ahead.

16  BY MR. ASONYE:

17  Q.   Go ahead and read the first -- the intro paragraph where

18  it says, "Hello Rick."

19  A.   (As read):  "We are trying to determine if any of the

20  NYC, New York City, properties (other than John Hannah) have a

21  filing requirement for 2014.  Please confirm the following."

22  Q.   And what does that -- what does that mean?

23  A.   Well, if any of these properties are rental properties,

24  then you're going to have file a tax return.  If it's

25  personal, you don't have to file a tax return for them.

─────── U.S. v. Manafort ───────

J. Ayliff - Direct (cont.)
811

1   Q.   All right.  And then -- what is it -- go ahead and read

2   just paragraph No. 2.

3   A.   (As read):  "MC Soho Holdings, LLC (Howard Street

4   property) - we believe this was turned into a rental property

5   in January 2015.  Per FRB reports" -- that's the bookkeeper --

6   "there seem to be just condo fees, mortgage payments, taxes

7   and utilities in 2014.  Please confirm no business/rental

8   activity in 2014."  And then --

9   Q.   So what's the response?

10  A.   (As read):  "Correct - personal 2014 and rental 2015."

11  Q.   Let me show you -- and, in fact, did KWC prepare a tax

12  return for MC Soho for the Howard Street property in 2015?

13  A.   Yes.

14  Q.   All right.  Let me --

15          MR. ASONYE:  This is already in evidence, Your

16  Honor, as Government Exhibit 337L, as in "Lima."

17          THE COURT:  All right.

18          MR. ASONYE:  May we publish?

19          THE COURT:  Yes.

20  BY MR. ASONYE:

21  Q.   Mr. Ayliff, if you could turn to Bates Page 700.

22          Okay.  What is this document?

23  A.   This is Form 8825, which is a rental real estate income

24  and expense of a partnership.  So it's one of the forms that

25  flows through and summarizes all the rental activity and flows

—U.S. v. Manafort—

J. Ayliff - Direct (cont.)

812

1   through into a partnership return.

2   Q.   And is this for the property -- I know it says 27 Howard

3   Street, but is this for 29 Howard Street?

4   A.   It's -- yeah, it -- yes, I guess so.

5   Q.   And if we could -- let me direct your attention to the

6   top portion of the tax return.

7            And how many fair rental days were indicated for

8   this -- for this property in 2015?

9   A.   365.

10  Q.   How many personal days were indicated?

11  A.   Zero.

12  Q.   How many -- how much in gross rent were generated

13  according to the tax return on Line 2?

14  A.   $115,987.

15  Q.   Okay.  Now, was depreciation taken?

16  A.   Yes.

17  Q.   And does depreciating a property reduce -- did it reduce

18  Mr. Manafort's ultimate tax obligations?

19  A.   Yes.

20  Q.   And then let me show you 337M, as in "Mary," which is

21  also in evidence.

22           MR. ASONYE:  Your Honor, may we publish this

23  document?

24           THE COURT:  Yes, you may.

25  BY MR. ASONYE:

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─────U.S. v. Manafort─────

J. Ayliff - Direct (cont.)

813

1   Q.   If you turn to Page 2, the second page, Mr. Ayliff?

2        Is this a 2016 tax return for MC Soho Holdings,

3   which held the Howard Street property?

4   A.   Yes.

5   Q.   And if you turn to Page 727?

6        Which, Mr. Binder, should be -- I don't know.

7   You're going to have to find that on your own.

8        How many days does it indicate in 2016 that the

9   Howard Street property was rented?

10  A.   It was 365.

11  Q.   And how many -- is there anything indicated for personal

12  days?

13  A.   No.  We did not prepare this return.

14  Q.   Okay.

15  A.   Just as a side.

16  Q.   Now, let me --

17       MR. DOWNING:  Excuse me, Your Honor, I didn't hear

18  the last statement from the witness.

19       THE COURT:  He said, "We did not prepare this

20  return."

21       MR. DOWNING:  Thank you.

22       THE COURT:  Next question.

23  BY MR. ASONYE:

24  Q.   Let me show you Government Exhibit 210.

25       Okay.  Is this an e-mail relating to, again, the

─────U.S. v. Manafort─────

1  29 Street -- 29 Howard Street property?

2  A.   Yes.

3         MR. ASONYE:  Your Honor, Government moves 210 into

4  evidence.

5         MR. DOWNING:  No objection.

6         THE COURT:  Admitted.

7                        (Government's Exhibit No. 210

8                        admitted into evidence.)

9  BY MR. ASONYE:

10  Q.   If you look at the bottom of this e-mail chain, what does

11  Heather Washkuhn tell you at the 4:08 e-mail.

12         MR. ASONYE:  May we publish, Your Honor?

13         THE COURT:  Yes.

14  BY MR. ASONYE:

15  Q.   You can go ahead and just read that, her bottom e-mail.

16  A.   (As read): "That entry was against rental income for a

17  return of a security deposit to a tenant at Howard Street

18  rental.  Jeff wired it out of his own Yohai REI account so

19  that this transaction didn't hit cash on the MC Soho books."

20  Q.   And then if you look at the top e-mail, what does

21  Ms. Washkuhn say in the top e-mail to you and others?

22  A.   (As read):  "Yes, it is -- it is the rental income

23  account on the general ledger."

24  Q.   Was there any doubt in your mind that 29 Howard Street

25  was being used as a rental property in 2015 and 2016?

─────U.S. v. Manafort─────

1   A.   For 2015, I -- there was no doubt based on the

2   information that I had, and 2016, I don't know.

3   Q.   Now, you testified that you participated in preparing tax

4   returns for Mr. Manafort, I think you said since the late

5   '90s; is that correct?

6   A.   Yes.

7   Q.   Was Mr. Rick Gates involved during that entire time?

8   A.   No.

9   Q.   When was your first interaction with Mr. Rick Gates?

10  A.   I believe it was in the -- around 2009.

11  Q.   Okay.  Now, prior to 2009, when you were preparing

12  Mr. Manafort's tax returns for Davis Manafort Partners, did

13  that company receive foreign wire transfers?

14  A.   Yes.

15  Q.   And during that period, before 2009 --

16          THE COURT:  What relevance is 2000 -- before 2009

17  have in this case?

18          MR. ASONYE:  Your Honor, I think it goes to the

19  issue about whether this can all be placed on Mr. Gates about

20  the -- the lack of -- not disclosing the foreign bank

21  accounts.

22          THE COURT:  All right.  You may proceed.  There's no

23  objection, but nothing in this case, in the indictment,

24  predates 2010 -- when -- what -- don't I have that right?

25          MR. ASONYE:  Well, it -- there is evidence from --

—————U.S. v. Manafort—————
J. Ayliff - Direct (cont.)
816

1    in there from 2005, Your Honor.

2              THE COURT:  Oh, all right, then proceed.  I'm

3    incorrect.

4    BY MR. ASONYE:

5    Q.   Now, during the time prior to 2009, did Mr. Manafort or

6    his companies ever disclose the existence of a foreign bank

7    account to KWC?

8    A.   No, no.

9              MR. ASONYE:  Court's indulgence.

10             (A pause in the proceedings.)

11             THE COURT:  All right.

12             Mr. Flood, do we know if the lunches are here yet?

13             THE CSO:  I've got to check.

14   BY MR. ASONYE:

15   Q.   Were -- could you just -- the bookkeepers that you

16   obtained the general ledger from, could you just tell the jury

17   which -- who provided you with the general ledger, who are the

18   bookkeepers?

19   A.   So it was Heather -- over time or just --

20   Q.   Actually, from 2010, going forward?

21   A.   Okay.  2010, I believe it was pretty much all Heather at

22   that point and her company.  I think it was -- she was at

23   First Republic first and then they spun off from the bank.

24   Q.   All right.  Thank you.

25             MR. ASONYE:  No further questions, Your Honor.

U.S. v. Manafort

1          THE COURT:  All right.  Ladies and gentlemen --

2          Well, Mr. Ayliff, you may step down, sir.  Again,

3    you may not discuss your testimony with anyone during the

4    recess.

5          We will recess until 1:30.  We'll recess a little

6    early and then we will commence with cross-examination, which,

7    Mr. Downing, you forecasted would take you how long?

8          MR. DOWNING:  45 minutes, Your Honor.

9          THE COURT:  All right.  So that gives you,

10   Mr. Asonye, some clue about having your next witness ready.

11         Pass your books to the right.  Court security

12   officer will collect them, maintain their security.  Remember

13   not to undertake any investigation on your own.  You may

14   follow Mr. Flood out.

15         (Jury dismissed.)

16         THE COURT:  Court remains in session, please.

17         All right.  Court stands in recess until 1:30.

18         MR. ANDRES:  Your Honor, could I just preview two

19   issues very quickly?

20         THE COURT:  Yes, you may.

21         MR. ANDRES:  One witness that we anticipate will

22   likely not go on until Monday.  It's a witness that relates to

23   the 1006 charge that we briefed this morning.  I understand we

24   only just did it.  I'm not suggesting that we need an answer

25   immediately, I just wanted to highlight that for the Court.

U.S. v. Manafort

818

1          There's a second issue, which we're expecting to

2    resolve with defense counsel shortly, but I wanted to raise it

3    in the chance that it didn't get resolved because we've been

4    at it for some point, which is the following:

5          In -- as part of the investigation, the Government

6    issued a series of subpoenas to Mr. Manafort.  One of those

7    subpoenas was a Title 31 subpoena under the required records

8    statute.  Mr. Downing will tell you all about that.  He

9    basically is the first person who used it effectively.

10         But the gist of that statute was that it required

11   Mr. Manafort to turn over records, his own bank records,

12   relating to these Cyprian accounts.  He did so, and we

13   anticipate admitting those documents as part of our case in

14   chief.  And as I understand it, there's no -- there's no

15   question about the authenticity of those documents.

16         When those documents were provided to the

17   Government, Mr. Downing wrote a statement on behalf of his

18   client, which said, in effect, these are the records of DMP

19   International and they are not Rick Gates's records.  He --

20   Rick Gates wasn't responsible for them.

21         I'm not citing that verbatim, Judge, I'm just giving

22   you the gist.  That is also a statement on behalf of

23   Mr. Manafort, which we intend to admit.  We do not intend to

24   suggest that Mr. Downing had anything to do with that.  We're

25   going to anonymize his name so it's -- so there's no

─U.S. v. Manafort─

819

1  suggestion that it was him.  But we're going seek to admit

2  that.  And as I understand it, there's also no objection to

3  that -- the admission of that statement by counsel and these

4  are the details of the stipulation we've been trying to work

5  out.

6          What remains is the relation between that statement

7  and those documents in which subpoena they were in response

8  to, because there were several subpoenas.  And as I say, we're

9  hoping to work that out, but I just wanted Your Honor to be

10  aware of it, because obviously the fact that Mr. Downing, in

11  his statement, presents some possibility of a conflict since

12  he's counsel in this case.  But we're trying to work through

13  those issues.  That's all I wanted to say, Judge.

14          THE COURT:  All right.  Thank you.  I'm not sure I

15  see anything -- there isn't anything for the Court to decide

16  right now.  And I'll cross that bridge if and when it arrives.

17          MR. ANDRES:  Thank you, Judge.

18          THE COURT:  Anything, Mr. Downing?  I don't need to

19  hear anything from you.

20          MR. DOWNING:  No, Your Honor.

21          THE COURT:  The Court stands in recess until 1:30.

22          (Lunch Recess 12:23 p.m.)

23

24

25

1                    CERTIFICATE OF REPORTER

2

3              I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial -

7    A.M. in the case of the **UNITED STATES OF AMERICA versus**

8    **PAUL J. MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in

9    said court on the 3rd day of August, 2018.

10             I further certify that the foregoing 114 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15             In witness whereof, I have hereto subscribed my

16   name, this August 6, 2018.

17

18

19

20

21                            _____
                              Tonia M. Harris, RPR
22                            Official Court Reporter

23

24

25

                                                              820