821

                    UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION

------------------------------x
UNITED STATES OF AMERICA,        .  Criminal Action No.
                                 .  1:18-CR-83
        versus                   .
                                 .
PAUL J. MANAFORT, JR.,           .
                                 .  August 3, 2018
            Defendant.           .  Volume IV-P.M.
------------------------------x

                     TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE T. S. ELLIS, III
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              UZO ASONYE, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 GREG D. ANDRES, SAUSA
                                 BRANDON L. VAN GRACK, SAUSA
                                 Special Counsel's Office
                                 U.S. Department of Justice
                                 950 Pennsylvania Avenue, N.W.
                                 Washington, D.C. 20530

FOR THE DEFENDANT:               JAY ROHIT NANAVATI, ESQ.
                                 BRIAN P. KETCHAM, ESQ.
                                 Kostelanetz & Fink LLP
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001
                                   and
                                 THOMAS E. ZEHNLE, ESQ.
                                 Law Office of Thomas E. Zehnle
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001

              (APPEARANCES CONT'D. ON FOLLOWING PAGE)

                      (Pages 821 - 980)

          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

822

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANT:              KEVIN M. DOWNING, ESQ.
                                     Law Office of Kevin M. Downing
3                                    601 New Jersey Avenue, N.W.
                                     Suite 620
4                                    Washington, D.C. 20001
                                       and
5                                    RICHARD W. WESTLING, ESQ.
                                     Epstein, Becker & Green, P.C.
6                                    1227 25th Street, N.W.
                                     Washington, D.C. 20037

7

8    OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
                                     401 Courthouse Square
9                                    Alexandria, VA 22314
                                     (703)299-8595

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

823

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| JAMES PHILIP AYLIFF | | |
| | CROSS | 830 |
| | REDIRECT | 847 |
| | RECROSS | 853 |
| CYNTHIA LAPORTA | | |
| | DIRECT | 854 |

E X H I B I T S

Government Exhibit No. 195 was received       864
Government Exhibit No. 152A was received      868
Government Exhibit No. 154 was received       870
Government Exhibit No. 181 was received       871
Government Exhibit No. 157 was received       882

Government Exhibit No. 155 was received       887
Government Exhibit No. 221 was received       891
Government Exhibit No. 2E was received        897
Government Exhibit No. 189 was received       899
Government Exhibit No. 158 was received       902

Government Exhibit No. 193 was received       913
Government Exhibit No. 185 was received       916
Government Exhibit No. 160 was received       918
Government Exhibit No. 159 was received       922
Government Exhibit No. 171 was received       923

Government Exhibit No. 170 was received       926
Government Exhibit No. 194 was received       927
Government Exhibit No. 180 was received       928
Government Exhibit No. 172 was received       929
Government Exhibit No. 179 was received       930

Government Exhibit No. 182 was received       932
Government Exhibit No. 161 was received       934
Government Exhibit No. 162 was received       937
Government Exhibit No. 187 was received       942
Government Exhibit No. 163 was received       943

| | | |
|---|---|---|
| 1 | Government Exhibit No. 164 was received | 947 |
| | Government Exhibit No. 165 was received | 949 |
| 2 | Government Exhibit No. 166 was received | 953 |
| | Government Exhibit No. 167 was received | 954 |
| 3 | Government Exhibit No. 168 was received | 955 |
| 4 | Government Exhibit No. 169 was received | 959 |
| | Government Exhibit No. 173 was received | 961 |
| 5 | Government Exhibit No. 174 was received | 964 |
| | Government Exhibit No. 175 was received | 968 |
| 6 | Government Exhibit No. 176 was received | 971 |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

825

1          A F T E R N O O N   S E S S I O N

2                    (Defendant present, Jury out.)

3          THE COURT:  All right.  Yes, Mr. Asonye.

4          MR. ASONYE:  There was an issue, Your Honor, to raise

5    outside of the jury's presence.  The next witness after the

6    cross-examination of Mr. Ayliff is done will be Cindy Laporta.

7          THE COURT:  Yes.

8          MR. ASONYE:  She's one of the witnesses that the

9    Government moved to immunize and compel her testimony.

10         THE COURT:  All right.

11         MR. ASONYE:  And I wanted to go through the Court's

12   procedure presumably of immunizing her outside of the presence

13   of the jury.

14         THE COURT:  What's your view?

15         MR. ASONYE:  Well, Your Honor, we've been in contact

16   with her and her lawyer.  As long as the order is signed, she

17   is ready to testify.  The Court could do it now, you could do

18   it with her on the stand, whatever the Court's preference.

19         THE COURT:  What's the issue you want me to address?

20         MR. ASONYE:  When you would issue the order.  If you

21   want to actually ask her on the stand whether she would

22   testify -- do you want her on the record indicating that she

23   would refuse to testify absent immunization?

24         THE COURT:  What's your view, Mr. Downing?

25         MR. DOWNING:  We don't need that, Your Honor.

826

1          THE COURT:  I beg your pardon?

2          MR. DOWNING:  We do not need that.  If you have a

3    signed order, we're fine with that.

4          THE COURT:  All right.  You don't want to bring out

5    that she was reluctant to testify?

6          MR. DOWNING:  I may bring that out --

7          THE COURT:  All right.

8          MR. DOWNING:  -- but I don't need the first part.

9          THE COURT:  That's what I thought.

10         So you do as you wish, Mr. Asonye, and he'll do as he

11   wishes.  The circumstances under which she is testifying can be

12   raised by either party insofar as either party may make a

13   different judgment about how it affects the jury's evaluation

14   of her testimony.

15         It is a fact, that is, that she's been granted

16   immunity.  That can be brought out if either party wants to do

17   it.  And you do it simply by asking her whether she's

18   testifying pursuant to an agreement to, to provide her with

19   immunity.

20         MR. ASONYE:  Your Honor --

21         THE COURT:  She will say yes.

22         And if the other side wants to bring out:  Isn't it

23   true that you wouldn't testify without immunity?  If they want

24   to do that.

25         Anything else?

1          MR. ASONYE:  I don't believe Your Honor has signed

2     the order yet.

3          THE COURT:  All right.  Well, I think I, of course,

4     would sign the order.  She has been granted immunity, and

5     therefore, she has to testify.  All right, hand the order to

6     Mr. Flood.

7          Have you seen the order, Mr. Downing?

8          MR. DOWNING:  I have, Your Honor.

9          THE COURT:  All right.

10         MR. ASONYE:  And, Your Honor, we plan to mark that.

11         THE COURT:  I'm sorry, Mr. Asonye, I didn't hear you.

12         MR. ASONYE:  We plan to mark it as an exhibit, the

13    signed order.

14         THE COURT:  Do I plan to mark it?

15         MR. ASONYE:  No.  We would advise the Court we plan

16    to mark it as an exhibit.

17         THE COURT:  All right, you may certainly do so.  The

18    order, of course, reflects that it's under seal ex parte, and

19    that's not true.

20         MR. ASONYE:  It's been unsealed, Your Honor, yes.

21         THE COURT:  It was never sealed because I haven't

22    signed it yet.

23         But I think there may have been a reference previous

24    to it as being under seal, but in any event, I will ask the

25    clerk to mark this and also to white out the "Under Seal Ex

1  Parte" because it is not.  All right, we'll make it Government

2  Exhibit -- what number?

3          MR. ASONYE:  It should be 2E, as in "echo," Your

4  Honor.

5          THE COURT:  All right.  2E?

6          MR. ASONYE:  Yes.

7          THE COURT:  All right.  Do you have something else,

8  Mr. Andres?

9          MR. ANDRES:  Judge, just with respect to the issue of

10  releasing the exhibits to the public, one issue we wanted to

11  get guidance from the Court on is the tax returns for

12  Mr. Manafort have now been entered into evidence.  Obviously,

13  those documents are more sensitive than many of the others.

14          We've informed Mr. Downing and wanted to give him an

15  opportunity to address the issue and get guidance from the

16  Court basically whether or not we'd be required to or if the

17  Court would direct us to provide the tax returns to the public

18  as well.  So that's what I wanted to raise.

19          THE COURT:  Does the Government have a position on

20  that?

21          MR. ANDRES:  We don't have a position, Judge.  We're

22  certainly aware of the fact that they're more sensitive and

23  really wanted to more so let Mr. Downing address that.

24          THE COURT:  All right.  Do you have a view now, or do

25  you want to consider that?

829

1            MR. DOWNING:  I would like to address the Court later

2    today on that issue.

3            THE COURT:  All right, we'll do that.

4            MR. DOWNING:  And I thank the Government for raising

5    it.

6            THE COURT:  All right.  Bring the jury in now.

7            Mr. Downing, are you ready to go on with your

8    cross-examination?

9            MR. DOWNING:  I am, Your Honor.

10                        (Jury present.)

11           THE COURT:  All right, you may be seated.

12           Ladies and gentlemen, I trust that your lunches were

13   satisfactory today.

14           THE JURORS:  Yes, Your Honor.

15           THE COURT:  All right, good.  Now, we're going to

16   proceed as follows:  We're going to proceed with Mr. Downing's

17   cross-examination of this witness, and then I wanted to tell

18   you two things.  We will recess sharply -- well, not sharply,

19   but between 5:15 and 5:30 today, we will recess, and then we

20   will not commence on Monday until 1:00.  So Monday we will

21   commence at 1:00.  You may play or sleep until then.

22                        (Laughter.)

23           THE COURT:  All right, let's have Mr. Ayliff back.

24           JAMES PHILIP AYLIFF, GOVERNMENT'S WITNESS,

25                  PREVIOUSLY AFFIRMED, RESUMED

Ayliff - Cross                                                      830

1              THE COURT:  Mr. Ayliff, you'll recall you're still

2    under oath.

3              THE WITNESS:  Yes.

4              THE COURT:  You may resume the stand, sir.

5              All right.  Mr. Downing, you may proceed.

6              MR. DOWNING:  Thank you, Your Honor.

7                          CROSS-EXAMINATION

8    BY MR. DOWNING:

9    Q.   Good afternoon, Mr. Ayliff.  My name is Kevin Downing, and

10   I represent Paul Manafort.  I have a few follow-up questions

11   for you.  I want to try to go as slow as possible because I

12   find that we're talking about tax and accounting issues, and I

13   look over at the jury and they're --

14             MR. ASONYE:  Objection, Your Honor.  Where's the

15   question?

16             THE COURT:  All right.  Eliminate that reference.

17   BY MR. DOWNING:

18   Q.   So with my first question, I want to take you back to a

19   general ledger that we were talking about earlier.  The general

20   ledger is a starting point for you to prepare a tax return; is

21   that correct?

22   A.   Yes.

23   Q.   When the general ledger comes in the door, the first thing

24   you have to check is whether or not the bookkeeper has got it

25   right; is that correct?

1    A.    Yes.

2    Q.    So quite often, you need to do adjusting journal entries

3    to the work of the bookkeeper; is that correct?

4    A.    Correct.

5    Q.    And the types of things you would do is reclassify an

6    entry.  Maybe somebody put it in the wrong account, maybe they

7    characterized it the wrong way, and you have to reclassify; is

8    that correct?

9    A.    Yes.

10   Q.    And then you, yourself, the accountants, the tax folks,

11   have reoccurring tax entries that need to be made.  That's your

12   job.  That's what you do; is that correct?

13   A.    Yes.

14   Q.    And you make those adjusting journal entries to the

15   original general ledger?

16   A.    Yes.

17   Q.    And then you have other entries that need to get made to

18   properly account for compensation, distributions, loans, and

19   other matters; is that correct?

20   A.    Yes.

21   Q.    And as you went through preparing for trial, you went back

22   through some of those adjusting journal entries for the various

23   years that were involved?

24   A.    Yes.

25   Q.    And you saw that each year, there were 20 some-odd

1  adjusted journal entries, sometimes more, quite often not less,

2  to do all the things we just talked about?

3  A.   Yes.

4  Q.   In addition to doing the adjusting journal entries as part

5  of your job as the accountant, as a CPA, you have expertise in

6  the area of tax; is that correct?

7  A.   Yes.

8  Q.   And you're at a firm that has expertise in tax; is that

9  correct?

10  A.   Yes.

11  Q.   And you're affiliated with an international firm that has

12  further expertise in tax?

13  A.   Yes.

14  Q.   So in the process of preparing a return for Mr. Manafort

15  or for his entities, you come across some pretty complicated

16  issues; is that correct?

17  A.   Yes.

18  Q.   And you have various people that you consulted with, and

19  the folks that you referred to as helping with the tax

20  preparation consulted with people with expertise in various

21  areas of tax; is that correct?

22  A.   Yes.

23  Q.   And in terms of that expertise, in addition to the over 20

24  entities that you were handling for Mr. Manafort, there were

25  international tax issues that needed to be addressed; is that

Ayliff - Cross                                                      833

1   correct?  There were questions with respect to foreign tax?

2            THE COURT:  The question is now compound.  Do you

3   understand the question?

4            THE WITNESS:  So could you just repeat that?

5   BY MR. DOWNING:

6   Q.   Sure.  In the course of preparing the DMP International

7   returns, some of the issues that come up -- it's an

8   international company, correct?

9   A.   Yes.

10  Q.   Some of the issues are international tax issues; is that

11  correct?

12           THE COURT:  Mr. Downing, I'm not sure what you mean

13  by "international taxes" either.  There isn't some

14  international body that does taxes.  I take it what you're

15  asking -- well, try it again.

16           MR. DOWNING:  Sure.

17           THE COURT:  "International taxes" doesn't make any

18  sense.

19  BY MR. DOWNING:

20  Q.   When a company in the United States does business

21  throughout the world, does it raise issues of other countries'

22  tax systems?

23  A.   Yes.

24  Q.   And in what capacity would that come up?

25  A.   Well, if the income is earned in the -- in a foreign

Ayliff - Cross                                                         834

1    country.

2    Q.   And what would that mean to you?  What would you have to

3    know about the income earned in a foreign country?  Would you

4    have to know if it's been taxed, more or less?

5            THE COURT:  The question is now becoming compound.

6    It's unclear which question he's answering because you've gone

7    right on.  There needs to be clarity in that regard.

8            Go ahead.

9            THE WITNESS:  Yes.  And so we would ask whether they

10   have paid any foreign taxes.

11           THE COURT:  When you said "yes," what question were

12   you answering?

13                        (Laughter.)

14           THE COURT:  My point is --

15           MR. DOWNING:  I understand.

16           THE COURT:  -- made.

17           Let's re-ask the question to be clear about it.

18   BY MR. DOWNING:

19   Q.   Unlike a United States company that just does business in

20   the United States, are you faced with additional tax issues for

21   a U.S. company that's doing business abroad?

22   A.   Yes.  I guess so, yes.

23   Q.   Are you familiar with the term "transfer pricing"?

24   A.   No.

25   Q.   And when you come up with that issue in terms of something

Ayliff - Cross                                                    835

1    like transfer pricing or international tax issue, who would you

2    consult with at your firm?

3    A.    Probably Tom Lohr or some other tax expert.

4    Q.    And to back up for a minute, I probably should have asked

5    this initially:  What is your expertise as a CPA?  Do you have

6    a particular specialty?

7              THE COURT:  The question is now compound.  Just stop

8    after the first question.

9              What is your expertise as a CPA, he's asking you.

10             Is that your question?

11             MR. DOWNING:  That's correct, Your Honor.

12             THE COURT:  You may answer.

13             THE WITNESS:  I was a generalist.

14   BY MR. DOWNING:

15   Q.    So in the area of the filing of FBARs, do you have

16   expertise in that area?

17   A.    Just filing them.

18   Q.    Just filing them.

19             Determining whether or not they need to be filed, do

20   you consult with other people in your firm?

21   A.    Yes.  In this case, so when you look at some of the

22   e-mails there with Naji, that had been done through discussions

23   with other people in the firm.

24   Q.    Okay.  So why don't we do that?  Why don't we go to

25   Exhibit 201, if you would, please?

1      MR. DOWNING:  Your Honor, is it okay to publish this?

2  It's been up already.

3      THE COURT:  It's already been admitted?

4      MR. DOWNING:  Yes.

5      THE COURT:  Yes, you may publish.

6  BY MR. DOWNING:

7  Q.   And if you would turn to the second page, at the bottom of

8  the second page, is there a reference there to someone on your

9  team trying to get some expert advice on whether or not an FBAR

10 had to be filed?

11 A.   Yes.

12 Q.   And that FBAR issue arose with respect to a company that

13 Mr. Manafort had an interest in; is that correct?

14 A.   That's correct.

15 Q.   And it was a company in Cyprus; is that correct?

16 A.   Yes, yes.

17 Q.   And in trying to determine whether or not an FBAR had to

18 be filed, it was a lot more complicated than determining

19 whether or not there was a signature authority and control; is

20 that correct?

21 A.   Yes.

22 Q.   And in this particular instance, it was complicated enough

23 that someone on your team went to someone with expertise; is

24 that correct?

25 A.   Yes.

Ayliff - Cross                                                          837

1    Q.   And ultimately with respect to that FBAR, it was

2    determined it did not have to be filed; is that correct?

3    A.   Yes.

4    Q.   Now, I'd like you to turn to Exhibit 206.

5            MR. DOWNING:  Your Honor, that's also been entered

6    into evidence.  May we publish?

7            THE COURT:  All right, you may display it if you

8    wish.

9    BY MR. DOWNING:

10   Q.   And you testified about that e-mail a little bit earlier

11   today; is that correct?

12   A.   Yes.

13   Q.   And there was a question again about a filing of an FBAR,

14   and it finishes with a response from Mr. Gates.  And can you

15   read the response from Mr. Gates?

16   A.   "As discussed, to my knowledge, nothing has changed.

17   Please file the form as you did last year.  Let me know if you

18   need anything else."

19   Q.   And it says, "based on the structure"; is that correct?

20           I'm sorry, I think I -- I'll withdraw that question.

21           The e-mail states that because there was less than

22   57 percent ownership by Paul Manafort there was no filing

23   required; is that correct?

24   A.   Yes, comprising 89 percent of the ownership.

25   Q.   So there was an ownership test that had to be gone through

1  at several different levels of a structure of an investment

2  that involved many corporations; is that correct?

3  A.   Yes.

4  Q.   And if you could, could you go back to Exhibit 201?

5  That's an e-mail you testified about earlier.  That also deals

6  with the same issue of filing an FBAR; is that correct?

7  A.   Yes.

8  Q.   And at the top of that e-mail, Mr. Gates responds to it.

9  What does he say?

10  A.   It says, "Naji, I will call you tomorrow but based on the

11  structure, as I learned today, we do not need to file for

12  Paul."

13  Q.   And that, in fact, FBAR did not get filed; is that

14  correct?

15  A.   Yes.

16  Q.   I'd like to take a minute or two to go back to a topic

17  that we were talking about earlier today about rental

18  properties, personal versus rental, and I'd like to draw your

19  attention to Exhibit 156.

20          MR. DOWNING:  And, Your Honor, that's been entered

21  into evidence.  If we could publish that, I'd appreciate it.

22          THE COURT:  Yes, you may.

23          MR. DOWNING:  One moment, Your Honor.

24          THE COURT:  All right.

25          MR. DOWNING:  I'll continue.

Ayliff - Cross                                                    839

BY MR. DOWNING:

Q.   So maybe I'll just ask you a question.  You don't have to
look at a document.

         Mr. Ayliff, when you were dealing with Mr. Manafort
in the various real estate properties that he owned with
various family members, it seemed that there were facts that
changed over time with respect to how the properties were being
held; is that correct?

A.   Yes.

Q.   And a big issue that came up is whether or not property
was a rental property or it was a residence; is that correct?

A.   Yes.

Q.   And can you give the jury a little insight into why it
would matter whether or not you'd classify something as a
rental property or a residence?

A.   Well, if it's a rental property, then you've got a tax
filing, and then you've got to prepare the tax return, and it
impacts the actual 1040 itself.

Q.   And on that return, you would pick up the rents collected
and the expenses related to it; is that correct?

A.   Yes.

Q.   And you'd also get other deductions, like depreciation?

A.   Correct.

Q.   Now, what if you rent your personal residence?  What do
you do with that?  How do you report it on a return?

1    A.   Well, then, it's -- if you rent it, then it's also going

2    to appear on the 1040 under Schedule E.

3    Q.   And you're going to report income and expenses; is that

4    correct?

5    A.   Yes.  Yes.

6    Q.   But you may not have depreciation?

7    A.   Right.  And you may have to prorate some of the expenses,

8    depending on the amount of time that you've rented it out.

9    Q.   Now, with respect to the rental property, if you hold it

10   as a rental property, are there all kinds of limitations about

11   what kind of losses you can benefit from if, in fact, the

12   property is generating a loss?

13   A.   Yes.

14   Q.   And is that dependent upon the amount of income that you

15   make?

16   A.   Yes.

17   Q.   And Mr. Manafort's income was way beyond the range of

18   where those limitations would kick in; is that correct?

19   A.   Right.

20   Q.   I'd like to draw your attention back to the Peranova loan,

21   and I believe that was Exhibit 190.

22           MR. DOWNING:  Your Honor, that's been entered into

23   evidence.  Can we publish that?

24           THE COURT:  You may.

25   BY MR. DOWNING:

1    Q.   So can you read -- read the entry, the account entry where

2    the Peranova loan takes place as entered on the general ledger,

3    in the top left?

4    A.   Where it's entered in the general ledger, it says -- it's

5    got the date and the Peranova Holdings Limited and then a loan

6    document number.

7    Q.   And what do they call that account?  What's the name of

8    that account?

9    A.   That's Peranova Holdings Limited.

10   Q.   And it says Due from affiliates, correct?

11   A.   Oh, at the top.  It says Due from affiliates, yes.

12   Q.   And that's the name of the account --

13   A.   Yes.

14   Q.   -- the particular account, "Due from affiliates"?

15        From a tax perspective, can you explain what is an

16   affiliate?

17   A.   It's a -- an affiliate means that there's some sort of

18   relationship with the -- with the taxpayer.

19   Q.   Some type of common ownership or control; is that correct?

20   A.   Yes.

21   Q.   And can you explain from a tax -- from a tax standpoint

22   what's an unrelated party?

23   A.   Unrelated party is if there isn't a relationship.

24   Q.   And are there special rules for transactions with respect

25   to related parties?

1   A.    Yes.

2   Q.    There's a whole section of the code on that, is there not?

3   A.    Yes.

4   Q.    And there's tons of regulations on that, correct?

5   A.    Yes.

6   Q.    Now, if you have a transaction with the related party, for

7   tax purposes, you can have a transaction, correct?

8   A.    Yes.

9   Q.    But there are rules that apply to related-party

10  transactions as to how they're going to be treated; is that

11  correct?

12  A.    Yes.

13  Q.    So there's no prohibition from having a transaction with a

14  related party?

15  A.    No, there is not.

16  Q.    Now, with respect to the affiliate here, Peranova is being

17  listed as an affiliate.  When you were working with respect to

18  this loan, did you ask any questions with respect to what the

19  affiliation was?

20  A.    We had asked whether there was any other entities that

21  needed filing requirements.

22  Q.    Sure.  But with respect --

23  A.    I don't know that we asked specifically that was this --

24  because it was coded under affiliates, if that -- if there was

25  any relationship.

Ayliff - Cross                                                      843

1   Q.   Now, at the time that this loan was booked and it was

2   picked up on the balance sheet, you testified earlier, for the

3   tax return, you testified you didn't have a loan agreement at

4   the time; is that correct?

5   A.   I -- no.  I was thinking more about the earlier loans.  I

6   think there were a couple -- like this one here, I do recall

7   seeing a loan document on this one.

8   Q.   Okay.  And then you would have --

9          THE COURT:  Excuse me.  Mr. Ayliff, I just want to

10  clarify something.

11         On Exhibit 190, do you see the box there?

12         THE WITNESS:  Yes.

13         THE COURT:  It says, "This is a loan, not income, per

14  Rick Gates conference call."  Who would have made that

15  notation?

16         THE WITNESS:  We would have.

17         THE COURT:  So that's not something you got from the

18  ledger?

19         THE WITNESS:  That's correct.

20         THE COURT:  Next question.

21         MR. DOWNING:  Thank you, Your Honor.

22  BY MR. DOWNING:

23  Q.   Now, with respect to the recording of these type of loans,

24  again, when a shareholder borrows money from a corporation,

25  that's not prohibited, correct?

1    A.    No, it's not.  No, it's not prohibited.

2    Q.    But, again, there are a lot of issues you need to look at,

3    there are a lot of complicated tax rules on accruing interest

4    and terms and conditions and things like that; is that correct?

5    A.    Yes.

6    Q.    Now, earlier you were asked some questions about the

7    payment of interest on this loan, and you said, "Well, it

8    depends on the loan terms."

9            Are you familiar with the term "balloon loan"?

10   A.    Yes.

11   Q.    And what is balloon loan?

12   A.    Balloon loan, at a certain point in time, the whole

13   payment will be due.

14   Q.    And it's similar to like a demand loan?

15   A.    Yes.

16   Q.    Same thing, where you may not be paying interest or

17   principal, but at some point in time, it can be called?

18   A.    Yes.

19   Q.    And that's a legitimate -- legitimate loan provisions,

20   correct?

21   A.    That's correct.

22   Q.    Loan provisions that are respected under the code?

23   A.    Yes.

24   Q.    Now, as a larger question about working with Mr. Manafort

25   and his companies, Mr. Gates, it seemed like you were backed up

Ayliff - Cross                                                      845

1    year in and year out --

2              THE COURT:  You're now commenting.  Just ask your

3    question.

4    BY MR. DOWNING:

5    Q.   Were you backed up year in and year out against filing

6    deadlines?

7    A.   Yes.

8    Q.   Did you find it difficult to get information?

9    A.   Yes.

10   Q.   Did you find that the information was delayed to you until

11   generally the last minute?

12   A.   Yes.

13   Q.   And primarily that information was being provided by

14   Mr. Gates; is that correct?

15   A.   Towards the end it was, yes.

16   Q.   And with respect to the general ledger we talked about

17   early and your adjusting journal entries, you keep what's

18   called work papers; is that correct?

19   A.   Yes.

20   Q.   And what do you keep in your work papers?

21   A.   Any supporting documents for supporting the trial balance.

22   Q.   And documents that support what you're going to file

23   for -- on the tax return; is that correct?

24   A.   Yes.  Yes.

25   Q.   So you would have loan documents?

1    A.    If we had loan documents, yes.

2    Q.    You'd have depreciation schedules?

3    A.    Yes.

4    Q.    You'd have worksheets regarding affiliate transactions?

5    A.    Yes.

6    Q.    Intercompany transactions, I guess you would call them?

7    A.    Yes.

8    Q.    You would have entries for distributions?

9    A.    Yes.

10   Q.    You'd have work papers for the capital account for the

11   owners of the company?

12   A.    Yes.

13   Q.    You'd have payroll records in there?

14   A.    Yes.

15   Q.    You'd have capital contribution records?

16   A.    Yes.

17   Q.    And just basically to support everything you're going to

18   do on that return; is that correct?

19   A.    Yes.

20   Q.    And I think in your engagement letter, it said that you

21   retained those records for about eight years; is that correct?

22   A.    Yes.

23   Q.    And why do you retain them?

24   A.    If there's any question, then we've got the support for

25   all of it.

1   Q.   So any audit comes along, you'd have the documents ready

2   to provide; is that correct?

3   A.   Yes.

4   Q.   And you would do that?

5   A.   Yes.

6           MR. DOWNING:  No further questions.

7           THE COURT:  Any redirect?

8           MR. ASONYE:  Yes, Your Honor.

9                      REDIRECT EXAMINATION

10  BY MR. ASONYE:

11  Q.   If you could pull up Exhibit 201.

12          Mr. Ayliff, I believe Mr. Downing was asking you

13  about your filing for this entity; is that correct?  Do you

14  remember testifying about this?

15  A.   Filing for?

16  Q.   This entity.  During your testimony, did you say that you

17  believed this entity was in Cyprus?

18  A.   Yes.

19  Q.   Okay.

20  A.   I think this was EVO?

21  Q.   Well, actually, let me turn to Government Exhibit 337C.

22          THE COURT:  What was the exhibit you just showed?

23          MR. ASONYE:  The first one was 201, Your Honor.

24          THE COURT:  Can we go back to it for just a moment,

25  please?

1              MR. ASONYE:  Sure.

2              THE COURT:  Would you display it, please?

3              Mr. Ayliff, do you see the red and the little "A" and

4    a circle?

5              THE WITNESS:  Yes.

6              THE COURT:  Is that something your company did?

7              THE WITNESS:  Yes.

8              THE COURT:  That's not something that was in the

9    original work paper?

10             I used the wrong term.  It was not something that was

11   on the original ledger?

12             THE WITNESS:  No, this is an e-mail, so it wouldn't

13   have been in the ledger, and it was part of our work papers.

14             THE COURT:  All right.  And what does the box with

15   the "A" mean?

16             THE WITNESS:  The -- the "A" is something that we put

17   there, and I'm not sure, because sometimes what we would do is

18   there's a way that you can cross-reference work papers.  So you

19   can right-click on the A, and it will take you to another place

20   where there was an A so that you can -- so it tied together, or

21   this could be my initial for my last name.  Other places, I'd

22   use P, so I'm not sure.  I'd have to look at it in reference to

23   the -- to all the work papers.

24             THE COURT:  Next question.

25   BY MR. ASONYE:

Ayliff - Redirect                                                    849

1   Q.   All right.  But let's stay on this exhibit.  If you turn

2   to the second page, Mr. Downing was asking you about what you

3   recorded for this entity.  Do you see where the second "A"--

4   and if we can blow that paragraph up? -- do you see the

5   reference to your discussions about whether an FBAR is

6   necessary for this telecommunications entity?

7   A.   Um-hum.

8   Q.   What entity did you believe this was referencing?

9   A.   This whole calculation, my understanding, this was EVO

10  Holdings.

11  Q.   All right.  Did you testify -- did you tell Mr. Downing

12  that you believed EVO Holdings was in Cyprus?

13  A.   I thought EVO Holdings was in Cyprus.

14  Q.   All right.  Well, let me show you -- let me show you the

15  actual tax return.

16  A.   For EVO Holdings?

17  Q.   If you look at Government Exhibit 337C, is this the 2012

18  tax return for Mr. Manafort?

19  A.   Yes.

20  Q.   Okay.  And if you could turn to Bates page --

21          MR. ASONYE:  Your Honor, may we publish?

22          THE COURT:  Yes.  Has it already been admitted?

23          MR. ASONYE:  Yes, Your Honor.

24          THE COURT:  Of course.  You may publish.

25  BY MR. ASONYE:

Ayliff - Redirect                                                    850

1    Q.    And if you turn to Bates Page 407?

2    A.    Okay.

3    Q.    And if we could -- this is the Form 8938; is that correct?

4    A.    Yes.

5    Q.    Okay.  What is -- if we could highlight the top -- if we

6    could blow up the top, what is the title of this form?

7    A.    This is -- this is "Statement of Specified Foreign

8    Financial Assets."

9    Q.    Okay.  Is that something different than the FBAR?

10   A.    Yes.

11   Q.    Okay.  How is it different?

12   A.    This one is -- is required if you have these foreign

13   financial assets and your -- and the value is over $100,000 for

14   a joint filing return, and then you've got to report either

15   your -- all the same information as the FBAR for all of the

16   financial assets, and then also if you own anything, any

17   foreign holdings, then they're supposed to be reported on here.

18   Q.    So after your discussions, some of them we saw in

19   Government Exhibit 201, did KWC determine that this form had to

20   be filed in connection with EVO Holdings?

21   A.    Yes.

22   Q.    Okay.

23   A.    As a result of that discussion, yes.

24   Q.    All right.  And if you could turn to the second page, the

25   next page?

1   A.    Yes.

2   Q.    If we could blow up the top half or the top quarter?  Do

3   you report EVO Holdings in Line 7a as a result of those

4   discussions with Mr. Gates?

5   A.    Yes.

6   Q.    And Mr. Manafort?

7   A.    Yes.

8   Q.    And where does it say EVO Holdings is located in

9   Section 7d?

10  A.    It looks like it's Ukraine, but I was wrong.

11  Q.    Does that say "Cyprus"?

12  A.    No.

13  Q.    Okay.  Did you ever learn of any entity that was in any

14  way associated with Mr. Manafort in Cyprus?

15  A.    No.  I thought this was Cyprus, but it's not.

16  Q.    All right.  Let me show you Government Exhibit 190.

17          MR. ASONYE:  And, Your Honor, this is already

18  previously admitted, if we could -- if we could publish.

19          THE COURT:  Yes, you may.

20  BY MR. ASONYE:

21  Q.    And you testified -- again, what is -- just to be clear,

22  what is this document?

23  A.    This is -- this document is a copy of our work paper.

24  It's an -- and it's an extraction from the general ledger for

25  DMP International.

1   Q.   All right.  And at the top left, if we could blow it up,

2   Mr. Downing was asking you about this notation --

3              No, the top third of the document.  Just highlight

4   all the way down to the box.  Okay.

5              Mr. Downing was asking you in the top left above this

6   notation, "Due to affiliates, Paul and Kathleen Manafort,"

7   right?

8   A.   Yes.

9   Q.   Okay.  Now, did your company create that language, "Due to

10  affiliates, Paul and Kathleen Manafort"?

11  A.   No.

12  Q.   Who created that language?

13  A.   The -- that was within the general ledger, so the

14  bookkeeper.

15  Q.   Do you know what that means?

16  A.   I do know what "due to affiliates" means.

17  Q.   Okay.  Did you -- do you know what they understood it to

18  mean, the bookkeepers?

19  A.   No.

20  Q.   Did Mr. Manafort ever tell you that Peranova Holdings was

21  an affiliate of DMP International?

22  A.   No.

23  Q.   Would you have wanted to know that?

24  A.   Yes.

25  Q.   Did Mr. Manafort ever tell you that Peranova Holdings was

1   a related party of DMP International?

2   A.   No.

3        MR. ASONYE:  The Court's indulgence, Your Honor?

4        THE COURT:  All right.

5        MR. ASONYE:  No further questions, Your Honor.

6        THE COURT:  All right.  Any recross based on that

7   redirect?

8                    RECROSS EXAMINATION

9   BY MR. DOWNING:

10  Q.   And to be clear, the document --

11       THE COURT:  There is, I take it.

12            (Laughter.)

13       MR. DOWNING:  Ah, ruined the moment, Judge.

14       THE COURT:  All right.  Go ahead, sir.

15  BY MR. DOWNING:

16  Q.   To be clear, the document, the starting point for the

17  preparation of that tax return was the general ledger, correct?

18  A.   Yes.

19  Q.   And with the entry "due to affiliate," correct?

20  A.   Yes.

21       MR. DOWNING:  No further questions.

22       THE COURT:  All right.  Thank you.

23       You may step down, sir, and you -- this witness may

24  be excused?

25       All right, you may be excused.

Laporta - Direct                                                        854

1              (Witness excused.)

2              THE COURT:  All right.  Mr. Asonye or Mr. Andres, you

3    may call your next witness.

4              MR. ASONYE:  Your Honor, the Government calls Cindy

5    Laporta.

6              THE COURT:  All right.

7              MR. ASONYE:  Your Honor, if I could ask Ms. Pham for

8    a copy of the order?

9              THE COURT:  Yes.

10             Come forward, take the oath, please, ma'am.

11         CYNTHIA LAPORTA, GOVERNMENT'S WITNESS, SWORN

12             THE COURT:  All right, you may proceed.

13                     DIRECT EXAMINATION

14   BY MR. ASONYE:

15   Q.   Could you please state and spell your name for the record?

16   A.   Yes.  Cynthia --

17   Q.   Spell your last name, please.

18   A.   Laporta, L-a-p-o-r-t-a.

19   Q.   Ms. Laporta, how far did you go in school?

20   A.   Undergraduate.

21   Q.   And what did you earn your degree in?

22   A.   Accounting.

23   Q.   And when did you graduate college?

24   A.   1984.

25   Q.   Are you a certified public accountant?

Laporta - Direct                                                          855

1   A.    Yes, I am.

2   Q.    And when did you become a CPA?

3   A.    1987.

4   Q.    Have you worked in accounting since then?

5   A.    Yes.

6   Q.    Are you familiar with a company named KWC?

7   A.    Yes.

8   Q.    Do you work there?

9   A.    I do.

10  Q.    When were you first hired?

11  A.    October 1995.

12  Q.    And what positions have you held at KWC?

13  A.    Supervisor, manager, shareholder.

14  Q.    And how much do you typically earn from KWC?

15  A.    Recently, probably 400,000 annually.

16          THE COURT:  How much again?

17          THE WITNESS:  400,000.

18          THE COURT:  Next question.

19  BY MR. ASONYE:

20  Q.    Where is KWC located?

21  A.    We have an office in Alexandria, Virginia, and an --

22          MR. ASONYE:  Your Honor -- I'm sorry.

23          THE COURT:  Let her finish her answer.

24          Go ahead.

25          THE WITNESS:  An office in Richmond, Virginia.

1              MR. ASONYE:  Your Honor, I'd ask for -- take judicial

2    notice that Alexandria and Richmond are located within the

3    Eastern District of Virginia.

4              THE COURT:  Yes.  I don't think there's any objection

5    to that.

6                             (Laughter.)

7    BY MR. ASONYE:

8    Q.   Ms. Laporta, did you use e-mail for your work?

9    A.   Yes.

10   Q.   Okay.  And does your cell phone have your work e-mail on

11   it?

12   A.   Yes, it does.

13   Q.   Okay.  Do you have a signature line on your cell phone

14   when you send an e-mail?

15   A.   Yes.

16   Q.   What does it say?

17   A.   "Sent from my iPhone."

18   Q.   Okay.  If it doesn't say "Sent from my iPhone," where was

19   it sent from?

20   A.   From my office.

21   Q.   And when you were working in your office, what were your

22   typical work hours?

23   A.   In the office, probably 9:00 to 6:00, early morning and

24   evening e-mails from home.

25   Q.   All right.  In total, approximately how many tax returns

Laporta - Direct                                                   857

1  have you worked on while you were at KWC?

2  A.    Probably thousands.

3  Q.    And have you prepared both individual and business

4  returns?

5  A.    Yes.

6  Q.    Do you know Paul Manafort?

7  A.    Yes.

8  Q.    How do you know him?

9  A.    As a client of my firm.

10  Q.   And how did you end up working on his tax returns?

11  A.    One of our partners was retiring, and as part of our plan

12  at the firm, we transition clients from one partner to another

13  in that instance, and that's how I began working on the

14  returns.

15  Q.   What was the name of that partner?

16  A.    Philip Ayliff.

17  Q.   When did the transition occur?

18  A.    It started -- he started copying me on e-mails and having

19  me, you know, on calls with clients, with this particular

20  client, Mr. Manafort, probably during the preparation of the

21  2013 and certainly 2014 tax returns.

22  Q.   Now, did you actually sign the 2013 tax return?

23  A.    No, I did not.

24  Q.   Which tax return for Mr. Manafort have you signed as tax

25  preparer?

Laporta - Direct                                                      858

1    A.    2014 and 2015.

2    Q.    And by signing the tax return as the preparer, what are

3    you attesting to?

4    A.    That it's a -- it's a correct tax return.

5    Q.    Now, did Mr. Manafort have other business returns?

6    A.    Yes, he did.

7    Q.    And did you prepare all of Mr. Manafort's business

8    returns?

9    A.    I prepared most of them.  But for pass-through entities,

10   there were some that were prepared by other CPAs.

11   Q.    And do you know why you didn't prepare all of

12   Mr. Manafort's pass-through entities returns?

13   A.    No.

14   Q.    So roughly each year, how many returns were you preparing

15   for Mr. Manafort and his related entities?

16   A.    Probably 10 or 12.

17   Q.    What was Mr. Manafort's main business entity when you

18   began working on his tax returns?

19   A.    A company called DMP International.

20   Q.    Okay.  And what type of entity was it?

21   A.    It was -- what type?

22   Q.    Yes, for tax purposes?

23   A.    Tax purposes, it was a partnership.

24   Q.    Okay.  And are you familiar with the cash or accrual

25   basis?

Laporta - Direct                                                    859

1   A.    Yes.

2   Q.    And when you signed Mr. Manafort's tax returns in 2014 and

3   '15, what basis was -- were his tax returns prepared on?

4   A.    They were prepared on the cash basis.

5   Q.    So when did DMP International recognize taxable income?

6   A.    So DMP would have recognized income when it was received

7   and it would have recognized expenses when those expenses were

8   paid.

9   Q.    What was your understanding of the type of work that DMP

10  International engaged in?

11  A.    Consulting work.

12  Q.    And how did you get that understanding?

13  A.    From the client, from tax return previous.

14  Q.    And what was your understanding of where Mr. Manafort

15  conducted his business in order to earn his income?

16  A.    In the Ukraine.

17  Q.    And who told you that?

18  A.    The client.

19  Q.    And when you say "the client," who are you referring to?

20  A.    Mr. Manafort, Mr. Gates.

21  Q.    Now, are you familiar with KWC's engagement letters?

22  A.    Yes.

23  Q.    What is the purpose of the engagement letter?

24  A.    It's to communicate to the -- to the client that they have

25  responsibility for the information they're providing, and it

1    also provides a clear comment that we are not auditing or

2    verifying the information they provide.  And we also have a

3    section in there regarding foreign -- the requirement for

4    foreign bank reporting.

5    Q.   Now, you referenced auditing service -- auditing returns?

6    A.   Right.

7    Q.   Did KWC offer audit services?

8    A.   Audit of financial statements, yes.

9    Q.   Did you provide that service to Mr. Manafort?

10   A.   No, I did not.

11   Q.   What service did you provide to Mr. Manafort?

12   A.   Tax preparation services.

13   Q.   Are you familiar with something called a tax organizer?

14   A.   Yes.

15   Q.   Okay.  What is it?

16   A.   It's a workbook that's designed to help clients gather

17   their tax information for a certain year, and it includes

18   sources and amounts from the prior year.

19   Q.   And did KWC send tax organizers to Paul Manafort?

20   A.   Yes.

21   Q.   Now, in order to prepare Mr. Manafort's various tax

22   returns, where did KWC gather information from?

23   A.   From a couple of sources.  One would be his --

24   Mr. Manafort's bookkeeper, Heather Washkuhn.

25           Also, information would come from Mr. Manafort

1    directly and from Mr. Gates.

2    Q.   And who authorized KWC to obtain information from those

3    individuals you mentioned other than Paul Manafort?

4    A.   Mr. Manafort approved that.

5    Q.   And what was your understanding of what the bookkeepers

6    were doing for Mr. Manafort?

7    A.   So that firm would maintain the general ledgers for each

8    of the entities based on bank statements that they had, and

9    Heather also paid bills.

10   Q.   Did you rely on information provided to you by

11   Mr. Manafort's third-party agents?

12   A.   Yes.

13   Q.   Did you rely on information provided to you by Heather

14   Washkuhn?

15   A.   Yes.

16   Q.   And what about -- did you rely on information provided to

17   you by Mr. Manafort himself?

18   A.   Yes.

19   Q.   And what about Rick Gates?

20   A.   Yes.

21   Q.   Were there occasions when you requested documentation --

22   backup documentation from Mr. Manafort?

23   A.   Yes.

24   Q.   What type of backup documentation would you request?

25   A.   Loan documents, tax forms like 1099s, K-1s.

Laporta - Direct                                                    862

1   Q.   Did you always receive it?

2   A.   No.

3   Q.   And what did you do if you didn't receive the backup

4   documentation that you requested?

5   A.   Document conversations, calls, or anything like that in

6   the file.

7   Q.   Was it required to file a tax return to have the backup

8   documentation?

9   A.   I'm sorry?

10  Q.   Was it -- did you need -- were you required to have the

11  backup documentation in order to file the tax return?

12  A.   No.

13  Q.   Did KWC explain to its clients, including Mr. Manafort,

14  that the accuracy of their tax return depended on the accuracy

15  of the information provided to your firm?

16  A.   Yes.

17  Q.   And where did you do that?

18  A.   In the engagement letter.

19  Q.   And do you look behind or investigate the information

20  provided to you by your client?  Do you investigate?

21  A.   No.

22  Q.   Or verify?

23  A.   No.

24  Q.   Were your firm's tax preparation procedures designed to

25  detect fraud or misrepresentation --

Laporta - Direct                                                          863

1   A.    No, they're not.

2   Q.    -- by your client?

3   A.    No, they're not.

4   Q.    If you receive false information from a client, how does

5   that affect their tax return?

6   A.    It would make the tax return false.

7   Q.    Now, before you prepared Mr. Manafort's personal or

8   business returns, did you send Mr. Manafort a draft?

9   A.    Yes.

10  Q.    Did you ever file Mr. Manafort's tax return without his

11  approval?

12  A.    No.

13  Q.    Did Mr. Manafort ever complain to you that you filed his

14  tax returns without his approval?

15  A.    No.

16  Q.    What was your understanding of the relationship between

17  Mr. Manafort and Rick Gates?

18  A.    Rick Gates was Mr. Manafort's assistant.

19  Q.    His what?  I'm sorry.

20  A.    Assistant.

21  Q.    Okay.  Who was in charge?

22  A.    Mr. Manafort.

23  Q.    Did Paul Manafort authorize you to communicate with Rick

24  Gates regarding his tax returns?

25  A.    Yes.

Laporta - Direct                                                        864

1    Q.   All right.  Let me show you what's been marked as

2    Government Exhibit 195.

3              It should be -- there's a binder to your left.  Okay.

4    Who is --

5    A.   Okay.

6    Q.   Who was this e-mail from?

7    A.   It's from Rick Gates.

8    Q.   And are you discussing Mr. Manafort's tax returns?

9    A.   Yes.

10             MR. ASONYE:  Your Honor, Government moves 195 into

11   evidence.

12             MR. DOWNING:  No objection.

13             THE COURT:  It's admitted.

14             (Government Exhibit No. 195 was received in

15   evidence.)

16             MR. ASONYE:  May we publish?

17             THE COURT:  Yes.

18   BY MR. ASONYE:

19   Q.   Ms. -- I'm sorry, Ms. Laporta, the bottom e-mail, who is

20   it from?

21   A.   The very bottom, from Mr. Manafort.

22   Q.   Okay.  And who is it to?

23   A.   Rick Gates.

24   Q.   What's the date of the e-mail?

25   A.   September 15, 2015.

Laporta - Direct                                                     865

1    Q.   And what's the subject?

2    A.   "Forms."

3    Q.   Does -- what does Mr. Manafort say?

4    A.   (As read):  "Signed forms are attached."

5    Q.   All right.  And then how does Mr. Gates respond?

6    A.   He would forward them to me.

7    Q.   Okay.  If you turn to -- if you just look at the

8    attachment, we don't have to show it, what's attached to this

9    document?  If you'd look at Page -- I think it's about five

10   pages in.  Is there an e-File signed authorization?

11   A.   Yes, that's what these are.

12   Q.   Okay.  And is it signed?

13   A.   Yes, it is.

14   Q.   By Mr. Manafort?

15   A.   Yes.

16   Q.   Is this typical of how you would receive tax documents

17   related to Mr. Manafort?

18   A.   Yes.

19   Q.   Did Rick Gates ever, to your knowledge, contradict

20   Mr. Manafort?

21   A.   No.

22   Q.   Did Rick Gates ever tell you to hide information from Paul

23   Manafort?

24   A.   No.

25   Q.   Did you participate in e-mails and phone calls where both

1    Mr. Manafort and Rick Gates were present?

2    A.    Yes.

3    Q.    I'm going to ask you questions about foreign bank

4    accounts.   Does KWC get reports from international banks about

5    their clients' foreign bank accounts?

6    A.    No, we don't.

7    Q.    So how are you alerted to the existence of a foreign bank

8    account for one of your clients?

9    A.    When our clients provide us with the information.

10   Q.    And if you could speak up so everybody can hear you.

11   A.    Oh, I'm sorry.   We would get that information directly

12   from our clients.

13   Q.    And when preparing an individual return, does the IRS ask

14   questions on the tax return about whether your filer has any

15   foreign bank accounts?

16   A.    Yes, it does.

17   Q.    And is there a similar question on business returns, about

18   whether the business has a foreign bank account?

19   A.    Yes, there is.

20   Q.    And with respect to the 2014 return, individual return for

21   Mr. Manafort, what did KWC report for whether Mr. Manafort had

22   any foreign bank accounts?

23   A.    It was reported that there were no foreign bank accounts.

24   Q.    And what caused you to check "No"?

25   A.    The answers from Mr. Manafort that there were none.

Laporta - Direct                                                    867

1   Q.   Did KWC ask clients, including Mr. Manafort, if they had a

2   foreign bank account in writing each year?

3   A.   Yes.

4   Q.   And when you were involved in Mr. Manafort's returns, did

5   he ever report that he had a foreign bank account?

6   A.   No.

7   Q.   Was information about foreign accounts important to you?

8   A.   Yes, very.

9   Q.   Okay.  Why is it important to you?

10  A.   Well, first of all, a foreign bank account may be

11  representative of a revenue-generating investment.

12          The second would be the disclosure requirement on

13  both individual and business tax returns.

14          And the third reason is there is a filing requirement

15  called an FBAR for foreign bank account reporting.

16  Q.   Now, you testified earlier that you sent tax organizers to

17  Mr. Manafort?

18  A.   Yes.

19  Q.   All right.  Let me direct your attention to Government

20  Exhibit 152A, which I don't believe is in evidence.  Which is

21  not in evidence.

22          Do you have 152A?

23  A.   I'm there.

24  Q.   Do you recognize this entire exhibit?

25  A.   Yes.

Laporta - Direct                                                      868

1   Q.   Does it contain a tax organizer for 2013 and 2014?

2   A.   Yes, it does.

3             MR. ASONYE:  Your Honor, Government moves 152A into

4   evidence.

5             MR. DOWNING:  No objection.

6             THE COURT:  Admitted.

7             (Government Exhibit No. 152A was received in

8   evidence.)

9             MR. ASONYE:  May we publish, Your Honor?

10            THE COURT:  Yes.  A portion of it, not -- I don't

11  know how long it is.  How long is it?

12            MR. ASONYE:  Oh, we're not going to go through the

13  whole document.  We're going to go through a couple pages, Your

14  Honor.

15            THE COURT:  All right.  Go ahead.

16  BY MR. ASONYE:

17  Q.   All right.  Well, while this loads, could you go ahead and

18  read the first paragraph of this tax organizer that was sent to

19  Mr. Manafort for 2013?

20  A.   The first paragraph.  I can read it here.

21            "The enclosed tax organizer was prepared specifically

22  for you and is designed to assist you in the accumulation of

23  your tax data.  Included is an engagement letter, which sets

24  forth the nature of our mutual responsibilities concerning the

25  preparation of your return.  Please sign the letter and return

Laporta - Direct                                                      869

1    it with your completed organizer."

2    Q.   And if you'd turn to the fourth page in your binder, this

3    document.   I'm not going to ask you to read it, but does the

4    second paragraph of this letter contain information about

5    obligations of U.S. persons to report foreign bank accounts?

6    A.   Yes.

7    Q.   And then if you could turn to Bates page 2275, which would

8    be at the bottom of your --

9               And, Mr. Binder, I believe that's page 20.

10              Are you on page 22 -- right, 75.   What's the title of

11   this document?

12   A.   "Foreign Assets."

13   Q.   Okay.   And what does it say at the very bottom of the

14   document under the bolded "Foreign Bank Accounts and Trusts"?

15   A.   "Foreign Bank Accounts:   At any time during 2013, did you

16   have an interest in or a signature . . . authority over a

17   financial account in a foreign country, such as a bank account,

18   securities account, or other financial account?"

19   Q.   And you testified that the 2014 tax organizer is also in

20   this document, correct?

21   A.   Yes.

22   Q.   And does it also contain a similar question about foreign

23   bank accounts for 2014?

24   A.   Yes, it does.

25   Q.   In addition to the tax organizer and the engagement

Laporta - Direct                                                    870

1   letter, did you specifically ask in writing Mr. Manafort or

2   Mr. Gates about whether he had any foreign bank accounts each

3   year?

4   A.   Yes.

5   Q.   All right.  Let me show you Government Exhibit 154.

6            Is this an e-mail regarding -- that you're on

7   regarding Mr. Manafort's tax returns?

8            I'm sorry, did you hear the question?

9   A.   Oh, no, I'm sorry.

10  Q.   Okay.  Is this -- is this an e-mail regarding

11  Mr. Manafort's tax returns?

12  A.   Yes, it is.

13           MR. ASONYE:  Your Honor, Government moves 154 into

14  evidence.

15           MR. DOWNING:  No objection.

16           THE COURT:  Admitted.

17           (Government Exhibit No. 154 was received in

18  evidence.)

19           MR. ASONYE:  May we publish?

20           THE COURT:  You may.

21  BY MR. ASONYE:

22  Q.   Okay.  If you look at the bottom e-mail at 9:08, it's

23  about four or five lines up, do you see where it says "Foreign

24  asset disclosures"?

25  A.   Yes.

1    Q.   Okay.  Could you go ahead and read that sentence and the

2    next sentence?

3    A.   "Foreign asset disclosures -- need to make sure nothing

4    has changed -- see attached."

5    Q.   What does it say next?

6    A.   "No change from 2012 -- use the same as last year.  Note

7    that the EVO investment was valued at $6 million -- no change

8    from 2012?"

9    Q.   And what did you understand the response to mean with

10   respect to foreign bank accounts?

11   A.   That there were none.

12   Q.   All right.  Let me show you Government Exhibit 181.

13            Is this an e-mail regarding Mr. Manafort's tax

14   returns?

15   A.   Yes, it is.

16            MR. ASONYE:  Your Honor, Government moves 181 into

17   evidence.

18            MR. DOWNING:  No objection.

19            THE COURT:  Admitted.

20            (Government Exhibit No. 181 was received in

21   evidence.)

22            MR. ASONYE:  May we publish?

23            THE COURT:  Yes.

24   BY MR. ASONYE:

25   Q.   Now, do you see -- if we could highlight the -- zoom into

Laporta - Direct                                                        872

1   the second e-mail from the bottom.

2           Who is that e-mail from on October 4, 2016, at 11:26

3   a.m.?

4   A.   It's from Mr. Manafort.

5   Q.   Okay.  And what does Mr. Manafort tell you in that e-mail,

6   the e-mail at 11:26 a.m.?

7   A.   Right.

8   Q.   Just what does he say in the e-mail, if you could read it?

9   A.   "See below for my answers in blue."

10  Q.   And then if you turn to the next page, what does he say at

11  the e-mail at 2:50 p.m.?

12  A.   "See answers below."

13  Q.   And then if you look below in the e-mail at 9:54 a.m.,

14  could you please start reading at where it says "Foreign bank

15  accounts"?

16  A.   "Foreign bank accounts, etc.?  Value of EVO Holdings?"

17  Q.   And what is the response?

18  A.   "None."

19  Q.   And then go ahead and read the rest of the line.

20  A.   "Please confirm I understand correctly -- value of EVO

21  Holdings is zero?"

22          His answer:  "Yes."

23  Q.   What did you understand Mr. Manafort's response to mean

24  here with respect to foreign bank accounts?

25  A.   That there were no foreign bank accounts.

1    Q.   While you participated in the preparation of Paul

2    Manafort's returns, did he or Rick Gates ever tell you that

3    Manafort had control or signature authority --

4              THE COURT:  I'm sorry, let's go back to the previous

5    exhibit for just a moment so that I'm clear.

6              Yes, enlarge where we were, please.

7              No -- oh, yes, that's it.  I beg your pardon.

8              Do you see where it says, "Please confirm I

9    understand correctly -- value of EVO Holdings is zero?"

10             The statement "Yes," is that from you or from the

11   client?

12             THE WITNESS:  It's from the client.

13             THE COURT:  Next question.

14   BY MR. ASONYE:

15   Q.   While you participated in the preparation of

16   Mr. Manafort's personal and business returns, did he or Rick

17   Gates ever tell you that Manafort had control or signature

18   authority over a foreign bank account?

19   A.   No.

20   Q.   If you knew that Mr. Manafort had a foreign bank account,

21   what other questions would you ask?

22   A.   What was the account for?  For example, was there an

23   income-producing investment?  What is the name and address and

24   dollar, U.S. dollar amount, of that account?  And then, of

25   course, we'd disclose that on the business or a personal tax

Laporta - Direct                                                      874

1   return.

2   Q.   Would you want to know if Mr. Manafort had control over a

3   foreign bank account?

4   A.   Yes.  Signature authority or control.

5   Q.   And why would you want to know that?

6   A.   Because of the reporting requirements and potential

7   income.

8   Q.   Would you want to know if Mr. Manafort had control over an

9   account even if he didn't have -- even if he wasn't listed on

10  the actual account for an account?

11  A.   Yes.

12  Q.   Why would you want to know that?

13  A.   Again, for purposes of any income that might be -- that he

14  would have control over.

15  Q.   And would that in any way impact your determination of

16  whether he had to file an FBAR?

17  A.   Yes.

18  Q.   Was there a time period where you understood as a tax

19  preparer that the IRS was placing a greater emphasis on

20  disclosure of foreign bank accounts?

21  A.   Yes.

22  Q.   And when was that?

23  A.   Maybe 2012.

24  Q.   And what impact, if any, did that have on your

25  communications with clients regarding disclosure of foreign

Laporta - Direct                                                     875

1    bank accounts?

2    A.   Well, two things:  We expanded the -- the information

3    provided in the engagement letter, and we also had a policy to

4    always ask every year the question rather than just rely on the

5    prior year, and this was mostly because the penalties and fines

6    were just huge for noncompliance.

7    Q.   And did you have other clients at KWC that required you to

8    file an FBAR?

9    A.   Yes.

10   Q.   And how many times have you filed an FBAR for your

11   clients?

12   A.   Maybe a dozen times.

13   Q.   I'm going to show you what's been marked, but not

14   admitted, as Government Exhibit 191.  And what is Government

15   Exhibit 191?

16   A.   191 is -- is an internal document that we prepare to

17   identify the clients and whether -- where -- in this particular

18   case, Mr. Manafort and his businesses, and which years we have

19   in which of our software programs.

20   Q.   And did you understand that any of the entities that you

21   prepare tax returns for for Mr. Manafort were foreign entities?

22   A.   No.

23   Q.   Do you -- did you understand any of the entities you

24   prepared tax returns for Mr. Manafort to have foreign bank

25   accounts?

1   A.    No.

2   Q.    Are you familiar with this entity called "EVO" or "EVO

3   Holdings"?

4   A.    Yes.

5   Q.    What was your understanding of -- of that entity?

6   A.    Simply that it was an investment and we just had to report

7   the fair market value of that investment on the tax return.

8   Q.    And when you learned about it, did you report it?

9   A.    Yes.

10  Q.    Do you know where EVO Holdings was located?

11  A.    I don't think I remember that.

12  Q.    What was your understanding of whether DMP International

13  received foreign payments?

14  A.    It did receive foreign payments.

15  Q.    Okay.  Did it receive foreign payments from entities or

16  individuals?

17  A.    From entities.

18  Q.    And those entities, what was your understanding of their

19  relationship, if any, with DMP International?

20  A.    They were clients of DMP International.

21  Q.    Why did you believe that those entities sending foreign --

22  those foreign entities were clients?

23  A.    Because Heather Washkuhn maintained the general ledgers

24  for DMP International, and listed in the income section by

25  customer what I -- would be where I would know the companies,

1    that they were customers.

2    Q.    Did you have any understanding that these entities were

3    controlled by Mr. Manafort?

4    A.    No.

5    Q.    Did you have any understanding that these -- Mr. Manafort

6    had an ownership interest in any of these entities?

7    A.    No.

8    Q.    Did you have any understanding that these entities were

9    affiliated with Mr. Manafort or DMP International in any way?

10   A.    No.

11   Q.    Now, I want to ask you specifically about particular

12   entities, and if you could tell me whether you had any

13   understanding whether Mr. Manafort controlled these entities or

14   their bank accounts.

15   A.    Okay.

16   Q.    Actinet Trading Limited?

17   A.    No.

18   Q.    Black Sea View Limited?

19   A.    No.

20   Q.    Bletilla Ventures Limited?

21   A.    No.

22   Q.    Global Highway Limited?

23   A.    No.

24   Q.    Leviathan Advisors Limited?

25   A.    No.

Laporta - Direct                                                          878

```
 1   Q.   LOAV, L-O-A-V, Advisors Limited?

 2   A.   Can you name that one again for me, please?

 3   Q.   LOAV, L-O-A-V, Advisors Limited?

 4   A.   No.

 5   Q.   Lucicle Consultants Limited?

 6   A.   No.

 7   Q.   Marziola Holdings Limited?

 8   A.   No.

 9   Q.   If you could keep your voice up?

10   A.   No.

11   Q.   Olivenia Trading Limited?

12   A.   No.

13   Q.   Peranova Holdings Limited?

14   A.   No.

15   Q.   Serangon Holdings Limited?

16   A.   No.

17   Q.   Yiakora Ventures Limited?

18   A.   No.

19   Q.   Global Endeavor, Inc.?

20   A.   No.

21   Q.   Jeunet Limited?

22   A.   No.

23   Q.   And Pompolo Limited?

24   A.   No.

25   Q.   Now, have you heard or seen any of these entities prior to
```

1    these proceedings beginning?

2    A.   Have I heard --

3    Q.   Let me rephrase that.

4         During your work preparing Mr. Manafort's tax returns

5    prior to 2017, those entities that I just named, had you ever

6    seen them in documents that were provided to you?

7    A.   I may have.  Can I see that on the screen or no?

8         MR. ASONYE:  Could we have one moment?  Can we have

9    Government Exhibit 61?

10        If the court security officer could hand her

11   Government Exhibit 61?

12        THE WITNESS:  And you're asking if this -- no, I'm

13   sorry.

14   BY MR. ASONYE:

15   Q.   I'll ask the question.  Just let me get you the exhibit.

16        The entities listed on that exhibit, my question is:

17   When you were preparing Mr. Manafort's tax returns prior to

18   2017, had you ever seen those -- any of those entities

19   referenced?

20   A.   I saw Peranova Holdings.

21   Q.   Okay.  And what was your understanding of what Peranova

22   Holdings was?

23   A.   A customer of DMP International.

24   Q.   And do any of those entities on that list seem totally

25   unfamiliar to you?

1    A.    Yes.

2    Q.    Did Mr. Manafort or Mr. Gates ever show you documentation

3    as to who controlled accounts for those entities?

4    A.    No.

5    Q.    Did Mr. Manafort or Mr. Gates ever tell you that Manafort

6    had signature authority over accounts for those entities?

7    A.    No.

8    Q.    Did Mr. Manafort or Gates ever tell you that Manafort was

9    the beneficial owner of accounts for those entities, for any of

10   those entities?

11   A.    No.

12   Q.    Did Manafort or Gates ever tell you that Mr. Manafort

13   could control payments out of accounts for those entities?

14   A.    No.

15   Q.    Did Manafort or Gates ever ask you whether any of those

16   accounts for those entities needed to be reported?

17   A.    No.

18   Q.    Would you want to know if Mr. Manafort controlled payments

19   out of the accounts for those entities on that list, Government

20   Exhibit 61?

21   A.    Yes.

22   Q.    Why?

23   A.    That would require disclosure and reporting, and there

24   could be income from those accounts.

25   Q.    Did you ever discuss -- did Mr. Manafort or Gates ever

1    tell you that they had accountants and tax preparers in Cyprus?

2    A.    No.

3    Q.    Did Manafort or Gates ever tell you that they filed tax

4    returns in Cyprus?

5    A.    No.

6    Q.    If they did file tax returns in Cyprus, would you want to

7    know that?

8    A.    Yes.

9    Q.    Why?

10   A.    We always want to know the full picture.

11              THE COURT:  There also might be deductions that he

12   would be entitled to here if he paid taxes over there.

13              THE WITNESS:  That's correct.

14              THE COURT:  Next question.

15   BY MR. ASONYE:

16   Q.    When -- did you ever receive information from Mr. Manafort

17   or Gates that required follow-up?

18   A.    Do you mind repeating that, please?

19   Q.    Sure.  When you were preparing tax returns for

20   Mr. Manafort, did you ever receive information that required

21   follow-up with the client?

22   A.    Yes.

23   Q.    All right.  Let me show you Government Exhibit 157.  Is

24   this an e-mail -- are you discussing Mr. Manafort's tax returns

25   in this e-mail?

Laporta - Direct                                                    882

1    A.   Yes.

2              MR. ASONYE:   Your Honor, Government moves 157 into

3    evidence.

4              MR. DOWNING:   No objection.

5              THE COURT:   It's admitted.

6              (Government Exhibit No. 157 was received in

7    evidence.)

8              MR. ASONYE:   May we publish?

9              THE COURT:   Yes.

10   BY MR. ASONYE:

11   Q.   If you look at the middle e-mail at 5:19 p.m., from -- it

12   says Conor O'Brien.   Who's Conor O'Brien?

13   A.   He's a former staff member of KWC's.

14   Q.   He's one of your tax preparers?

15   A.   Yes.

16   Q.   And was he junior or senior to you?

17   A.   Junior.

18   Q.   And did he assist on Mr. Manafort's tax returns?

19   A.   Yes.

20   Q.   Now, if you -- I don't need you to read this whole thing,

21   but if you could just review Section 1a of that middle e-mail

22   and then tell the jury what KWC was trying to determine.

23   A.   In 1a?

24   Q.   Yes.

25   A.   We're wanting to know how certain expenses were paid and

1   when they were paid.

2   Q.   And why did you want to know that?

3   A.   To determine when they were deductible.

4              MR. ASONYE:  All right.  Let me show you Government

5   Exhibit --

6              THE COURT:  Just a moment before you go on.  Let me

7   clarify.

8              Ms. Laporta, you see on 1a there appears to be darker

9   print and then lighter print; is that right?

10             THE WITNESS:  Yes, that is.

11             THE COURT:  Am I correct that the darker print is

12  what you were asking and the lighter print is the response you

13  got?

14             THE WITNESS:  Yes.

15             THE COURT:  So the lighter print would be something

16  that someone at your firm, presumably you, wrote in?

17             MR. ASONYE:  I think it's the opposite of what you

18  just said, Judge.

19             THE COURT:  All right.  I think you may be right.

20  Let her tell me that.  You're not on the stand.

21                         (Laughter.)

22             THE WITNESS:  The bold -- the bold letter is from us,

23  KWC, to the client, and the answers are in the un-bolded.

24             THE COURT:  And the answers in this case would have

25  been from whom?

1             THE WITNESS:  Either Rick Gates or Paul Manafort.  I

2    have to see.

3             THE COURT:  Well, you know who, don't you?

4             THE WITNESS:  I just was going to look at it.

5             They're from Rick Gates.

6             THE COURT:  Next question.

7    BY MR. ASONYE:

8    Q.   All right, let me show you Government Exhibit 156.

9             MR. ASONYE:  The Court's indulgence, Your Honor?  I

10   think we have a duplicate exhibit.

11            THE COURT:  All right.

12   BY MR. ASONYE:

13   Q.   Okay.  If I could show you 214, which is in evidence.

14            THE COURT:  All right.  You may display it if you

15   wish.

16            MR. ASONYE:  Yes, Your Honor.  And just to be clear,

17   it's the same exhibit as 156.  It looks like there's a

18   duplicate in Your Honor's binder.

19            THE COURT:  All right.  Well, why are we looking at a

20   duplicate?

21            MR. ASONYE:  Because it made it into the exhibit list

22   and we'll --

23            THE COURT:  Well, that doesn't mean it's going to be

24   produced.

25            MR. ASONYE:  Yeah, we're not going to move it in.

1              THE COURT:  All right.

2              MR. ASONYE:  We're going to look at the prior version

3     that's admitted.

4              THE COURT:  Let's not waste any time asking questions

5     about a duplicate.

6     BY MR. ASONYE:

7     Q.   All right.  Let's look at Government Exhibit 214.

8     Ms. Laporta, it will be on your screen.  And what's the subject

9     line of this e-mail?

10    A.   "NYC Property LLCs."

11    Q.   Okay.  And did Mr. Manafort have an interest in a number

12    of properties owned through LLCs?

13    A.   Yes.

14    Q.   And did you rely on representations from he and Mr. Gates

15    regarding whether these properties were used as homes or rental

16    properties?

17    A.   Yes.

18              THE COURT:  Well, whose representations did you rely

19    on is the right way to ask the question.  Whose representations

20    did you rely on in connection with this issue?

21              THE WITNESS:  Rick Gates.

22              THE COURT:  Next question.

23    BY MR. ASONYE:

24    Q.   With respect to rental properties, all of Mr. Manafort's

25    properties, whose representations did you rely on of whether

Laporta - Direct                                                           886

1    they were rental properties or second homes?

2    A.    Rick Gates and Mr. Manafort.

3    Q.    All right, let me show you what's been marked as --

4              THE COURT:  Meaning you relied on some

5    representations for some properties from Manafort and some

6    representations from -- for some properties from Mr. Manafort

7    (sic)?

8              THE WITNESS:  That's correct.

9              THE COURT:  Next question.

10   BY MR. ASONYE:

11   Q.    All right, let me show you Government Exhibit 155.

12             THE COURT:  Is that an admitted exhibit?

13             MR. ASONYE:  No, Your Honor.

14             THE COURT:  All right.

15             MR. ASONYE:  And are you --

16             THE COURT:  I might note it's not on my list, but

17   that's all right.  You go ahead.

18   BY MR. ASONYE:

19   Q.    And is this an e-mail where you're discussing an issue

20   regarding Mr. Manafort's preparation of his tax returns?

21   A.    Did you say Exhibit 155?

22   Q.    Yes.

23   A.    Oh, I'm sorry.  I'm copied on this e-mail, and it is

24   talking about the properties, yes.

25             MR. ASONYE:  Your Honor, Government moves 155 into

Laporta - Direct                                                      887

1   evidence.

2            THE COURT:  All right.

3            MR. DOWNING:  No objection.

4            THE COURT:  It's admitted.

5            (Government Exhibit No. 155 was received in

6   evidence.)

7            THE COURT:  The reason I asked, Mr. Asonye, is it

8   wasn't on the list for that witness, but you may proceed.  Not

9   a problem.

10  BY MR. ASONYE:

11  Q.   If we could focus on the bottom e-mail first?  And who is

12  the e-mail from?

13  A.   Rick Gates.

14           MR. ASONYE:  May we publish, Your Honor?

15           THE COURT:  Yes.

16  BY MR. ASONYE:

17  Q.   What's the subject of the e-mail?

18  A.   "Union Street."

19  Q.   And what is -- go ahead and read that e-mail.

20  A.   (As read):  "Philip, here is the settlement sheet for the

21  Union Street property.  Also, the ownership structure is 50-50

22  (Paul and Kathy) and 50 percent Jessica (see the attached

23  operating agreement)."

24  Q.   And then if you could read the e-mail above?

25  A.   "Hi, Rick.  Do you know where the 3 million came from that

Laporta - Direct                                                      888

1    was wired into the account to buy this property?  Per FRB

2    notes, it was funded by an account outside of FRB."

3    Q.    And what are you trying to determine?  What is your

4    company trying to determine in this e-mail?

5    A.    Where the money came from.  It may be -- to make sure it

6    was included in taxes or if it came from an account we'd need

7    to know about.

8    Q.    Were you aware of whether Mr. Manafort purchased other

9    properties in 2012?

10   A.    I think so.  I wasn't really involved in 2012, but I seem

11   to recall a couple of properties being purchased.

12   Q.    And would you want to know if Manafort purchased

13   properties with cash from overseas?

14   A.    Yes.

15   Q.    And why would you want to know that?

16   A.    Because we'd need to know for -- for compliance with rules

17   about reporting foreign bank accounts.  We'd need to know if

18   there were income or deductions available as a result of the

19   foreign investment, or foreign account.

20   Q.    Now, I'm going to ask you some questions about the general

21   ledger for DMP International.

22         Did you see personal expenses related to Mr. Manafort

23   on the DMP International general ledger?

24   A.    Yes.

25   Q.    And how did KWC determine how to classify those

Laporta - Direct                                                                889

1    transactions?

2    A.    Conversations with either Paul or Rick.

3    Q.    And how did you determine whether the purchase -- the

4    transactions were personal or business related?

5    A.    Again, conversations with -- well, first -- first level of

6    reliance would be on how they were already categorized, and the

7    second, any questions would be run by either Mr. Manafort or

8    Mr. Gates.

9    Q.    And were there tax consequences if an item is deemed

10   personal versus business?

11   A.    Yes.

12   Q.    If you determined that DMP International paid for

13   Mr. Manafort's personal expenses, how did you treat that on the

14   tax returns?

15   A.    Either as a distribution or a nondeductible.

16   Q.    And when you say "nondeductible," can you just explain to

17   the jury what you mean?

18   A.    Certainly.  When an expense is nondeductible, it's

19   still -- the company still paid for it, but it's not a -- an

20   expense item on the tax return.

21   Q.    And does that essentially increase someone's taxable

22   income?

23   A.    Yes.

24   Q.    Now, do you know if --

25              THE COURT:  It wouldn't increase it.  It would just

Laporta - Direct                                                890

1    not decrease it.

2              THE WITNESS:  Right.

3              MR. ASONYE:  Fair enough, Your Honor.

4    BY MR. ASONYE:

5    Q.   Do you know --

6              THE COURT:  Surprise me.

7    BY MR. ASONYE:

8    Q.   Do you know if --

9              THE COURT:  And I think I succeed, Mr. Asonye.

10             MR. ANDRES:  No objection.

11             THE COURT:  Next question.

12   BY MR. ASONYE:

13   Q.   Do you know if DMP International owned New York Yankees

14   season tickets?

15   A.   Yes.

16   Q.   And how do you know that?

17   A.   Well, the reason is that there's attention, special

18   attention to season tickets in terms of how the IRS will let

19   you deduct a portion of them.  So it gets a little special

20   treatment, that's all.

21   Q.   And so, in fact, did DMP International deduct expenses

22   related to New York Yankees tickets?

23   A.   Yes.

24   Q.   Let me show you Government Exhibit 221.  Is this an e-mail

25   with Mr. Gates discussing preparation of Mr. Manafort's tax

Laporta - Direct                                                              891

1    returns?

2    A.   Yes, it is.  DMP International.

3              MR. ASONYE:  Your Honor, Government moves 221 into

4    evidence.

5              MR. DOWNING:  No objection.

6              THE COURT:  Admitted.

7              (Government Exhibit No. 221 was received in

8    evidence.)

9              THE COURT:  Proceed.

10             MR. ASONYE:  May we publish?

11             THE COURT:  Yes.

12   BY MR. ASONYE:

13   Q.   Do you see the -- the top e-mail -- blow it up --

14   Mr. Gates writes, "Please see the responses in RED"?

15             Do you see that?

16   A.   Yes.

17   Q.   Okay.  And then can you read the first sentence from

18   Mr. O'Brien below that?

19   A.   "Hello, Rick, I have e-mailed Heather with some questions

20   regarding DMP International."

21   Q.   All right.  And if you could turn to the next page?  Do

22   you see Paragraph 14?

23   A.   Yes.

24   Q.   Go ahead and read the first sentence.

25   A.   "There are some large expenses for the Yankees, Knicks,

Laporta - Direct                                                        892

1    and Nationals (see attached)."

2    Q.    And then below that in red is there a reference to the New

3    York Yankees?

4    A.    Yes.

5    Q.    And how many tickets does it indicate DMP International

6    has?

7    A.    Just for the Yankees?

8    Q.    Just for the Yankees?

9    A.    Four seat tickets to New York Yankees.

10   Q.    And is there a reference to a split?

11   A.    Yes.

12   Q.    Above it?

13   A.    Yes.

14         "Split is 80/20 again for business/personal."

15   Q.    And so what did you understand the 80/20 split to mean?

16   A.    80 percent business, 20 percent personal.

17   Q.    Would it matter to you if someone else claimed to purchase

18   the New York Yankees tickets that were deducted on DMP

19   International's tax returns?

20   A.    Yes.

21   Q.    Okay.  Why would that matter?

22   A.    Because if DMP didn't pay for them, they're not

23   deductible.

24   Q.    Sorry, could you speak up?  I didn't hear you.

25   A.    If DMP didn't pay for them they would not be deductible.

Laporta - Direct                                                    893

1   Q.   Were you aware of payments being made from foreign

2   accounts directly to U.S. vendors who had performed personal

3   services for Mr. Manafort?

4   A.   No.

5   Q.   Would you want to know if that occurred?

6   A.   Yes.

7   Q.   Are there potential tax consequences for those payments?

8   A.   There are.

9   Q.   What are the potential tax consequences?

10  A.   Well, the source of the income is -- lends itself to a

11  number of reasons that it could be a tax consequence.

12  Q.   All right.  I'm going to ask you some questions about

13  loans.

14  A.   Okay.

15  Q.   Are loans -- when you prepared Mr. Manafort's tax returns,

16  did you treat -- how did you treat loan proceeds with respect

17  to income?

18  A.   Loan proceeds are not included in income.

19  Q.   Now, would you, nevertheless, want to know about any loans

20  to DMP International?

21  A.   Would --

22  Q.   Would you want to know whether DMP International had any

23  loans?

24  A.   Yes.

25  Q.   Okay.  Why would you want to know that?

Laporta - Direct                                                      894

1    A.    Well, one, we like to keep track of the loans to make sure

2    that they're following any -- the loan terms or when are they

3    going to be due, how much interest, what kind of payments, that

4    sort of thing.

5    Q.    And when you saw -- when you looked at the general ledger

6    and you saw funds coming in, how did you determine whether it

7    was income and taxable versus a loan?

8    A.    The general ledger is divided into sections that reflect

9    the balance sheet where a loan would be posted and a section

10   for income and expenses.  So the loan would be on the balance

11   sheet section of that.

12   Q.    Are you allowed to characterize something as a loan when

13   it's actually income?

14   A.    No.

15   Q.    And what's the effect of calling something a loan when

16   it's actually income?

17   A.    It reduces income.

18   Q.    Did you ask for loan documentation in connection with

19   loans that you saw for DMP International?

20   A.    Yes.

21   Q.    And what happens if you didn't get it?  What did you do?

22   A.    Relied on conversations with the client.

23   Q.    And if a loan is forgiven, are there tax consequences?

24   A.    If a loan is forgiven, it is taxable.

25   Q.    And when would it be recorded as income?

Laporta - Direct                                                      895

1    A.    The year that it was forgiven.

2    Q.    Now, can a taxpayer backdate a loan forgiveness document

3    to select a year they want to apply income?

4    A.    No.

5    Q.    Now, Ms. Laporta, did you learn of any loans Mr. Manafort

6    or his business had from foreign sources?

7    A.    Yes.

8    Q.    Who or what entities did you learn those loans were from?

9    A.    Telmar and Peranova.

10   Q.    And for those loans for Telmar and Peranova, what do you

11   understand the relationship between DMP International and those

12   entities to be?

13   A.    They were customers of DMP's.

14   Q.    And where did you get that understanding from?

15   A.    I got that understanding from the general ledger that

16   identifies customers under the income section.

17   Q.    Now, was it at all concerning to you that customers who

18   were paying Mr. Manafort's company were also loaning him funds?

19   A.    I had not seen that before.  Yes, it was a concern.

20   Q.    And how large were those loans?

21   A.    One was 900,000, one was a million-five.

22   Q.    Did you ever see loan documentation for the loans?

23   A.    Not all.

24   Q.    Did you see it for at least one?

25   A.    Yes.

Laporta - Direct                                                          896

1    Q.    And, in general, how many pages were the loan documents?

2    A.    Maybe one, two most.

3    Q.    Did that strike you as unusual?

4    A.    Yeah.  Yes.  Excuse me.

5    Q.    Was any collateral required?

6    A.    No.

7    Q.    And did you ever see any evidence of interest or principal

8    payments on the loans?

9    A.    No.

10   Q.    Did you have concerns about the representations you

11   received about these foreign loans?

12   A.    Yes.

13   Q.    Did you at the time believe all the representations about

14   the foreign loans?

15   A.    No.

16   Q.    Did you nevertheless file tax returns that relied on those

17   representations about foreign loans you didn't believe?

18   A.    I did.

19   Q.    Ms. Laporta, are you testifying today under a grant of

20   immunity?

21   A.    I am.

22   Q.    All right.  Let me show you what's been marked as

23   Government Exhibit 2E.

24         Is this your immunity agreement?

25   A.    It is.

1            THE COURT:  Well, it isn't her immunity agreement.

2    It's my order.

3    BY MR. ASONYE:

4    Q.   It's the judge's order granting you immunity?

5    A.   (Nodding head.)

6            THE COURT:  What he wants to know:  Is that the

7    reason you're testifying?

8            THE WITNESS:  Yes.

9            THE COURT:  Next question.

10           MR. ASONYE:  Your Honor, may we move Government

11   Exhibit 2E into evidence?

12           THE COURT:  Yes.  You may do so if you wish.

13   BY MR. ASONYE:

14   Q.   Ms. Laporta, why do you need immunity?

15           MR. ASONYE:  Did you admit 2E, Your Honor?

16           THE COURT:  Yes, I did.

17           (Government Exhibit No. 2E was received in evidence.)

18   BY MR. ASONYE:

19   Q.   Why do you need immunity?

20   A.   Because I prepared tax returns and communicated with banks

21   based on information that Mr. Manafort and Mr. Gates provided

22   to me that I didn't believe --

23           THE COURT:  Well, wait a minute now.  She can't give

24   her opinion about things.

25           MR. ASONYE:  She's giving a --

Laporta - Direct                                                    898

1            THE COURT:  No, I'm not going to permit that.

2            I take it you're testifying on immunity because

3   you're concerned that if you didn't have immunity, you might be

4   prosecuted?

5            THE WITNESS:  Correct.

6            THE COURT:  Next question.  That's the simple reason.

7   BY MR. ASONYE:

8   Q.   Does your immunity order require you to testify truthfully

9   today?

10  A.   Yes, it does.

11  Q.   Do you understand what could happen if you don't testify

12  truthfully today?

13  A.   Yes.

14  Q.   What could happen?

15  A.   I could be charged.

16  Q.   Let me -- let's talk about these loans.

17           Have you heard of a company named Telmar Investments

18  Limited?

19  A.   Yes.

20  Q.   And what was your understanding of what Telmar was?

21  A.   Telmar was a customer of DMP International.

22  Q.   And, Ms. Laporta, you said you understand you could be

23  charged if you didn't testify truthfully today?

24  A.   Yes.

25  Q.   Do you understand what you could be charged with?

1    A.   Perjury.

2    Q.   Now, let me show you Government Exhibit 188.  I'm sorry,

3    it should be 189.  Do you have that?

4    A.   Yes.

5    Q.   Okay.  What is it?

6    A.   This is a general ledger report for 2014.

7    Q.   For what company?

8    A.   DMP International.

9    Q.   And who did you receive -- what company did you receive

10   this from?

11   A.   Heather Washkuhn.  I can't remember the name of the

12   company.

13   Q.   Did you use it to prepare Mr. Manafort's tax returns?

14   A.   Yes.

15          MR. ASONYE:  Your Honor, Government moves 189 into

16   evidence.

17          MR. DOWNING:  No objection.

18          THE COURT:  It's admitted.

19          (Government Exhibit No. 189 was received in

20   evidence.)

21          MR. ASONYE:  May we publish?

22          THE COURT:  Yes.  And while that's being done, tell

23   me how much longer do you anticipate your direct testimony?

24          MR. ASONYE:  She has at least another hour, Your

25   Honor.

1           THE COURT:  All right.  We'll continue for another

2    ten minutes or so, and then I'll take an afternoon recess.

3    Proceed.

4    BY MR. ASONYE:

5    Q.   Okay.  In the -- first of all, what year, tax return year

6    is this for, this general ledger for?

7    A.   2014.

8    Q.   And on the left-hand column, do you see a notation for

9    3101-007?

10   A.   Yes.

11   Q.   Okay.  What does that mean?

12   A.   That's an account number for this particular income

13   account.

14   Q.   Right.  And what does it say next to the number?

15   A.   "Other income."

16   Q.   Okay.  And what does it indicate occurred on April 3,

17   2014?

18   A.   That there was a $1 million payment for services rendered

19   per a consultancy agreement.

20   Q.   And what does it say occurred on September 30, 2014?

21   A.   Another $1 million payment.

22   Q.   For what?

23   A.   Related to the same customer, fees as per contract.

24   Q.   And according to this ledger for the entire year of 2014,

25   what was the total amount of income DMP International earned

1   from Telmar?

2   A.    $5,150,000.

3   Q.    And how did KWC, your firm, initially classify these

4   funds?

5   A.    As income.

6   Q.    And based on your review of this document, what was your

7   understanding of why Telmar paid these funds to DMP?

8   A.    For consultant services.

9   Q.    Now, did -- what was your understanding of whether Heather

10  Washkuhn prepared DMP International's general ledger on a cash

11  or accrual basis?

12  A.    These are prepared on a cash basis.

13  Q.    So did you understand these funds to -- this 5.15 million

14  in funds to have been received in 2014?

15  A.    Yes.

16  Q.    And do you see the top of -- the top of this document?  It

17  says as of September 15, 2015?

18  A.    Yes.

19  Q.    Does that date have any significance?

20  A.    Just that that's when we received it, a final version of

21  this to prepare the tax return.

22        THE COURT:  I'm sorry, I didn't hear you.

23        THE WITNESS:  Just that it was received on the due

24  date of the tax return.

25        THE COURT:  Next question.

1   BY MR. ASONYE:

2   Q.   And which -- the due date of what tax return?

3   A.   I'm sorry, DMP International's tax return extended due

4   date.

5   Q.   All right.  Let me show you what's been marked as

6   Government Exhibit 158.

7           Is this an e-mail that you're copied on discussing

8   the preparation of Mr. Manafort's DMP International tax return?

9   A.   Yes.

10          MR. ASONYE:  Your Honor, Government moves 158 into

11  evidence.

12          MR. DOWNING:  No objection.

13          THE COURT:  Admitted.

14          (Government Exhibit No. 158 was received in

15  evidence.)

16  BY MR. ASONYE:

17  Q.   Now, around this date, September 15, 2015, what, if

18  anything, did KWC present to Mr. Gates and Mr. Manafort?

19  A.   We would have provided either a draft of the tax return or

20  at least a summary of the tax return.

21  Q.   And would that have included an estimate of the tax due

22  and owing?

23  A.   Yes.

24  Q.   And around this time, did you have a conference call?

25  A.   Yes.

Laporta - Direct                                                              903

1    Q.    Who participated on the conference call?

2    A.    I remember Conor O'Brien and myself.  Rick was on the

3    call, possibly Philip, but I'm sorry, I don't remember.

4    Q.    And during this call, was an estimate of the tax due and

5    owing provided?

6    A.    Yes.

7    Q.    What, if any, reaction did you receive?

8    A.    Rick said it was too high, he didn't have that money.

9    Q.    When you say, "he didn't have that money," who are you --

10   A.    He was referring to Mr. Manafort.

11   Q.    Where were you located during this phone conversation?

12   A.    In my office in Alexandria.

13   Q.    What, if anything, was proposed during the call?

14   A.    Changing the amount of the loan.

15   Q.    And when you say, "changing the amount of the loan," what

16   loan are you referring to?

17   A.    In -- there was a loan that Conor had discussed with Rick

18   Gates.

19   Q.    And what was your understanding of what Mr. Gates was

20   trying to achieve?

21   A.    He was trying to reduce income, and therefore, reduce

22   income taxes.

23   Q.    For who?

24   A.    For Mr. Manafort.

25   Q.    What was your understanding at the time of whether that

Laporta - Direct                                                          904

1    was appropriate?

2    A.    It's not appropriate.

3    Q.    Why not?

4    A.    Because a loan would have had to be -- we did not -- it

5    came in as income.  We had no -- you can't pick and choose

6    what's a loan and what's income.

7    Q.    Now, what discussion, if any, was there about the amount

8    of the loan?

9    A.    In this e-mail, I think it went between maybe 750,000 or

10   900,000.

11   Q.    So was there a discussion about different amounts?

12   A.    Yes.

13   Q.    All right.  If you could turn to the second page of

14   Government Exhibit 158?

15             THE COURT:  Is this a new exhibit?

16             MR. ASONYE:  No, it's the same exhibit.  I haven't --

17   may we publish?  Is it in?  Yeah.

18             THE COURT:  All right, I thought you were on 157.  Go

19   ahead.

20             MR. ASONYE:  158, Your Honor, which is --

21             THE COURT:  All right.  Go on.

22             MR. ASONYE:  If we could publish it?

23   BY MR. ASONYE:

24   Q.    Turn to the second page.  And this e-mail is from Rick

25   Gates, the top e-mail on the second page; is that correct?

Laporta - Direct                                                       905

1   A.   Oh, yes.

2   Q.   If we could blow up -- blow up -- what does Mr. Gates say,

3   the third-to-the-last sentence, starting "If we"?

4   A.   "We can take it back further if needed."

5   Q.   Go ahead.  Keep going.

6   A.   Oh, I'm sorry.  (As read):  "If we need to schedule a

7   call, let's do it now because I will have to change -- I will

8   have to change the amount in the loan agreement."

9   Q.   And did Mr. O'Brien respond?

10          Go to the first page.  Do you see his response?

11  A.   Is -- this said on September 15 at 11:19 a.m.?

12  Q.   Yes.  Do you -- do you see him responding?

13  A.   Yes, "We did" -- oh, I'm sorry, I thought --

14  Q.   I don't need you to read it, but if you could just read

15  the last line of Mr. O'Brien's response?

16  A.   "The loan amount may need to be changed."

17          THE COURT:  Show the whole response only.

18          MR. BINDER:  That is the entire response, Your Honor.

19          THE COURT:  Oh, I'm sorry.

20          All right, proceed.  Go ahead, Mr. Asonye.

21  BY MR. ASONYE:

22  Q.   Go ahead, just read the last -- I'm sorry, that last

23  sentence.

24  A.   "The loan amount may need to be changed."

25  Q.   And do you recall what the determination about --

Laporta - Direct                                                906

1              THE COURT:  Who is the person who sent that?  Is that

2     Conor O'Brien?

3              THE WITNESS:  Yes, it is.

4              THE COURT:  All right.  So that's your person.

5              THE WITNESS:  Right.

6              THE COURT:  Next question.

7     BY MR. ASONYE:

8     Q.   And was there a determination about the final amount of

9     the loan?

10    A.   Yes.

11    Q.   And how much was the final amount of the loan determined

12    to be?

13    A.   $900,000.

14    Q.   And why was that amount selected?

15    A.   It resulted in a tax amount due that Rick said could be

16    paid.

17    Q.   Could be paid by who?

18    A.   By Mr. Manafort.

19    Q.   Did this calculation have anything to do with Mr. Gates'

20    personal tax return?

21    A.   No.

22             THE COURT:  I'm sorry, what was that question?

23             MR. ASONYE:  Did this calculation of the loan amount

24    have anything to do with Mr. Gates' personal tax return?

25             THE COURT:  All right.

1          And the answer was?

2          THE WITNESS:  No.

3          THE COURT:  All right, let's take the afternoon

4    recess.  Are you done with this line?

5          MR. ASONYE:  No, Your Honor.

6          THE COURT:  All right, let's finish it.

7          MR. ASONYE:  Oh, we could -- but we could -- I have

8    no problem taking a break, Your Honor.  This is a good place.

9          THE COURT:  Well, I know you don't, but I don't want

10   to cut things up.  How long do you think it'll take you to

11   finish this line of questioning?

12         MR. ASONYE:  I could finish this portion of it

13   probably in five minutes.

14         THE COURT:  All right.  Let's -- these exhibits.

15         All right.  Let's take -- pass your books to the

16   right.

17                    (Laughter.)

18         THE COURT:  And, Ms. Laporta, you may step down.  You

19   may not discuss your testimony with anyone during this recess.

20         THE COURT SECURITY OFFICER:  Quiet.

21         THE COURT:  Thank you, Mr. Flood.

22         All right, during -- you may step down.

23         During the recess, remember you may not discuss this

24   matter with anyone or undertake any investigation on your own.

25   There should be soft drinks.  We will reconvene at 3:30.

Laporta - Direct                                                        908

1                        (Jury out.)

2              THE COURT:  I had a brief matter, Mr. Asonye.

3              All right, you may be seated.

4              Mr. Asonye, I didn't understand one question that you

5     asked much earlier, but I didn't want to --

6              MR. ASONYE:  Oh, I'm sorry, Your Honor.  The witness

7     is still here.

8              THE COURT:  Oh, yes.  Thank you.

9                             (Witness stood down.)

10             THE COURT:  I didn't understand one question you

11    asked, and it doesn't matter probably, but I just was curious:

12    I think you asked a question about who paid for Yankee tickets.

13             MR. ASONYE:  Yes.

14             THE COURT:  And I thought the implication was that

15    the taxpayer didn't pay for the tickets.

16             MR. ASONYE:  I think she, she testified that the DMP

17    International, her understanding was that they had paid for the

18    Yankees tickets and deducted it.

19             THE COURT:  Right.  Then you asked a question

20    implying that someone else paid for them.

21             MR. ASONYE:  Then I asked if somebody else paid for

22    the tickets, would it be proper for DMP International to deduct

23    the cost of those tickets on his tax return, and then she said

24    no.

25             THE COURT:  That's right, I do recall that.  And I

Laporta - Direct                                                     909

1    assume you're going to have evidence that someone else did pay

2    for the tickets.

3              MR. ASONYE:  Yes, Your Honor -- no -- well, we're not

4    going to have evidence that says that, but it is a relevant

5    question to the bank fraud charges, Your Honor.

6              THE COURT:  Well, you -- in the question, you imply

7    that it wasn't truthful, that these persons -- or whether the

8    taxpayer was, I think it was DMP International, didn't pay for

9    the tickets.

10             MR. ASONYE:  I think that --

11             THE COURT:  And I was just curious whether you had

12   evidence who did pay for them.

13             MR. ASONYE:  I think, Your Honor, there's -- I

14   believe the Government will present evidence that there's a

15   representation to a bank that someone else purchased these New

16   York Yankees tickets, not DMP International.

17             THE COURT:  All right.  And will you have evidence

18   that who paid for them is going to be material to the bank?

19             MR. ASONYE:  Yes.

20             THE COURT:  Anything, Mr. Downing?

21             MR. DOWNING:  No, Your Honor.

22             THE COURT:  Court stands in recess until 3:30.

23          (Recess from 3:10 p.m. until 3:36 p.m.)

24                      (Defendant present, Jury out.)

25             THE COURT:  All right.  You may be seated.

Laporta - Direct                                                   910

1              Ladies and gentlemen, when I take a recess, when the

2     Court goes into recess, there tends to be a certain amount of

3     disorder, entropy, but please, when you do disperse, I do

4     not -- it's not allowed for people to come beyond the bar

5     unless you're an attorney who's been involved in the case; that

6     is, don't come beyond these gates.  That's an important rule

7     that we follow.

8              All right, you may bring the jury.

9              How much more did you say you had, Mr. Asonye?

10             MR. ASONYE:  About an hour, Your Honor.

11             THE COURT:  Less the time that you took the last time

12    I asked you that.

13             MR. ASONYE:  I worked on it last night to slim it

14    down.

15                         (Jury present.)

16             THE COURT:  All right, you may be seated, ladies and

17    gentlemen.

18             All right, bring in Ms. Laporta, please.

19             All right, Ms. Laporta, you'll recall you're still

20    under oath.

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  And you may resume the stand.

23             All right, you may proceed, Mr. Asonye.

24    BY MR. ASONYE:

25    Q.   All right.  Before the break, we were talking about the

1    Telmar loan; is that correct?

2    A.    Yes, that's correct.

3    Q.    And when you were having discussions with Mr. Gates

4    regarding this purported loan, what year -- what date were you

5    having these discussions?

6    A.    September 15, 2015.

7    Q.    And what tax return year were -- did the loan relate to?

8    A.    The 2014 tax return.

9    Q.    Now, is it appropriate for -- as a -- in order to be

10   appropriate as a loan in 2014, in what year would the loan have

11   actually have had to be extended?

12   A.    In 2014.

13   Q.    Now, based on the discussions and e-mails that you were

14   having with Mr. Gates, what was your understanding of whether a

15   loan actually existed at that time in September of 2015?

16   A.    It did not.

17   Q.    And if you could keep your voice up?

18   A.    Oh, I'm sorry.  It did not.

19   Q.    So when Gates told you that he would get a loan document,

20   at that time, did you believe he would supply you with

21   legitimate loan documents?

22   A.    No.

23   Q.    Why didn't you believe he would provide you with

24   legitimate loan documents?

25   A.    It was already September of 2015.

1  Q.   Did Mr. Gates tell you what the loan from Telmar to DMP

2  International was for?

3  A.   No.

4  Q.   What's the effect of changing funds originally booked as

5  income into a loan?

6  A.   It reduces your income.

7  Q.   And whose income here did it reduce?

8  A.   DMP International and ultimately Mr. Manafort's.

9  Q.   Did you accept the plan to book some of the income from

10 Telmar as a loan rather than entirely as income?

11 A.   I did.

12 Q.   And at the time, did you believe it was wrong or right --

13 A.   Wrong.

14 Q.   -- to, to characterize it as a loan?

15 A.   Wrong.

16 Q.   If you knew it was wrong, why did you go along with the

17 plan?

18 A.   I had a couple of choices at that point.  One was I could

19 have refused to file the tax return.  That would potentially

20 expose my firm to risk of litigation.

21        I could have called them, Mr. Manafort and Mr. Gates,

22 liars, and they were a longtime -- Mr. Manafort was a longtime

23 client of the firm, and I didn't think I should do that either.

24 Q.   Do you regret it?

25 A.   I very much regret it.

Laporta - Direct                                                      913

1    Q.   Are you taking responsibility today for your actions?

2    A.   Absolutely.

3    Q.   Let me show you Government Exhibit 193.

4         Okay.  What is Government Exhibit 193?  Do you have

5    it in front of you, 193?

6    A.   I do, yes.

7    Q.   What is it?

8    A.   It's a -- the trial balance for DMP International for the

9    year 2014.

10   Q.   And is this something you would have used at KWC to

11   prepare his -- DMP's tax returns?

12   A.   Yes, it is.

13        MR. ASONYE:  Your Honor, Government moves 193 into

14   evidence.

15        THE COURT:  Just a moment.

16        All right, proceed.

17        MR. ASONYE:  193.

18        MR. DOWNING:  No objection.

19        THE COURT:  It's admitted.

20        (Government Exhibit No. 193 was received in

21   evidence.)

22        MR. ASONYE:  May we publish, Your Honor?

23        THE COURT:  Yes, you may.

24   BY MR. ASONYE:

25   Q.   Okay.  Could you -- Ms. Laporta, could you explain to the

1   jury what this document is?

2   A.   Yes.  It's a trial balance for DMP International as of

3   December 31, 2014.

4   Q.   Let's go through the columns.  Could you just highlight

5   the top half?  Just get a little bit more.

6           Okay.  What's the account column stand for?

7   A.   Oh, that's just the account number assigned to the

8   accounts and name.

9   Q.   Do those accounts mean something when they start with

10  zeros, ones or twos?

11  A.   They do.

12  Q.   What do they -- what do they mean?

13  A.   The -- everything through the -- oh, in this instance,

14  okay, everything through 0915 were assets, and everything

15  through the two -- I can't read the number on it -- 1355, it

16  looks like, are liabilities.

17  Q.   Okay.  And then do you see where it says "Adjusted"?

18  There's a -- there's a description, right?

19  A.   Yes.

20  Q.   And what does that describe?

21  A.   The unadjusted column?  Is that what you're asking?

22  Q.   No, the description.  What -- what is the description

23  column for?

24  A.   Oh, I'm sorry.  That's for the name of the accounts.

25  Q.   And then there's an unadjusted column.  What is the

Laporta - Direct                                                          915

1   unadjusted column for?

2   A.   The unadjusted column is the general ledger provided by

3   Heather Washkuhn.

4   Q.   So is that the information that Ms. Washkuhn provides?

5   A.   Correct.

6   Q.   Then there's an adjusted 1st PP -- well, sorry.  There's a

7   AJE column.  What does that mean?

8   A.   Those are for adjusting journal entries that KWC makes to

9   Heather's information to arrive at what's reported on the tax

10  return.

11  Q.   So if you change something that Ms. Washkuhn provided to

12  you, that would be reflected in AJE?

13  A.   Yes, that's right.

14  Q.   And then finally, what's that column ADJ?

15  A.   That's the adjusted balance.  That's the column that will

16  be reflected on the tax return.

17  Q.   That's the final column?

18  A.   Yes.

19  Q.   All right.  Now, do you see the row where it says it

20  states it's 1340-001?

21  A.   Yes.

22  Q.   If we could zoom in on that row?

23       Okay.  What is it -- walk us through that row.

24  A.   Okay.  So this is described as a loan, and there was a

25  zero balance on that in the general ledger, but in the AJE

Laporta - Direct                                                      916

1   column shows where KWC made an adjustment to create that loan,

2   arriving at a final balance of $900,000.

3   Q.   And then is there a reference to -- the row below that as

4   well?

5            Is there a reference to adjusting journal entry for

6   this loan?

7   A.   Yes, there is.

8   Q.   What number is referenced?

9   A.   18.

10  Q.   All right, let me show you Government Exhibit 185.  If you

11  can look in your binder, it may be easier.

12            Okay.  What is Government Exhibit 185?

13  A.   This is a listing of journal entries that were made for

14  DMP International for 2014.

15  Q.   Did you use this in preparing DMP's tax returns?

16  A.   Yes.

17            MR. ASONYE:  Your Honor, Government moves 185 into

18  evidence.

19            MR. DOWNING:  No objection.

20            THE COURT:  It's admitted.

21            (Government Exhibit No. 185 was received in

22  evidence.)

23            MR. ASONYE:  May we publish?

24            THE COURT:  Yes.

25  BY MR. ASONYE:

1    Q.   Let's turn to the last page.  And you testified earlier

2    that the $900,000 loan had an adjusting journal entry for

3    No. 18; is that correct?

4    A.   That's right.

5    Q.   Can you read what it says for the journal entry for No.

6    18?

7    A.   "To reclass as a loan," and it's reducing other income by

8    Telmar by $900,000 and it's increasing a loan amount to

9    900,000.

10   Q.   Okay.  What impact did this reclassification have on the

11   amount of income Mr. Manafort ultimately reported on his income

12   tax returns for 2014?

13   A.   It reduced it by $900,000.

14   Q.   And at the time that you signed off on the tax return, did

15   you believe that the amount of income earned from Telmar was

16   accurate?

17   A.   No.

18   Q.   Therefore, what, if anything, did you believe at the time

19   of the accuracy of Mr. Manafort's tax return for 2014?

20   A.   It would be inaccurate.

21   Q.   And roughly how much did this change of this $900,000 loan

22   reduce Mr. Manafort's income for the 2014 tax year?

23   A.   At his tax rate probably --

24   Q.   His income.

25   A.   It reduced his income by $900,000.

Laporta - Direct                                                      918

1   Q.   And roughly how much did this change the actual tax due

2   and owing that Mr. Manafort paid in 2014?

3   A.   At his rate, probably between 400- and 500,000 dollars.

4   Q.   So about half a million dollars?

5   A.   Yes.

6   Q.   Now, did you ultimately file the 2014 return for DMP

7   International on time?

8   A.   Yes.

9   Q.   Was that on September 15, 2014?

10  A.   Correct.

11  Q.   Before you filed DMP International's return, did you

12  receive any loan documentation for this purported $900,000

13  loan?

14  A.   No, I had not.

15  Q.   Let me show you Government Exhibit 160.  Is this an e-mail

16  from Rick Gates to you?

17  A.   Yes.

18  Q.   Regarding that loan?

19  A.   Yes.

20          MR. ASONYE:  Your Honor, Government moves 160 into

21  evidence.

22          MR. DOWNING:  No objection.

23          THE COURT:  It's admitted.

24          (Government Exhibit No. 160 was received in

25  evidence.)

Laporta - Direct                                                    919

1              MR. ASONYE:  May we publish?

2              THE COURT:  Yes.

3    BY MR. ASONYE:

4    Q.   What does Rick Gates tell you -- first of all, what is the

5    date of this e-mail?

6    A.   This is September 16.

7    Q.   Is that the day after the tax return was actually filed?

8    A.   Yes.

9    Q.   And what does he say?

10   A.   "Cindy, here you go.  Let me know if you need anything

11   else.  Thanks."

12   Q.   And is -- does it indicate that there's a document

13   attached?

14   A.   Yes, it does.

15   Q.   And is it a PDF?

16   A.   Yes.

17   Q.   Let's look at the attachment.  First of all, how many

18   pages is the attachment?

19   A.   Two pages.

20   Q.   Again, is this a loan agreement?

21   A.   Yes.

22   Q.   Who are the parties to this purported loan?

23   A.   Telmar and DMP International.

24   Q.   And let's just quickly walk through this loan.  What is

25   the date of the loan agreement?

Laporta - Direct                                                    920

1    A.   The 6th day of March, 2014.

2    Q.   Is that well before your conversation with Rick Gates

3    where you discussed the amount of the loan?

4    A.   Yes, it is.

5    Q.   Do you know how it's possible that you were discussing a

6    loan in 2015 and received a loan document with a date from

7    2014?

8    A.   How it was possible?

9    Q.   Yes.

10   A.   Just that it didn't exist prior to the conversation.

11   Q.   Is this loan backdated?

12   A.   Yes.

13   Q.   Now, the parties -- let's keep that up, please.

14        Do you see Telmar Limited?  Where is Telmar Limited

15   located?

16   A.   Cyprus.

17   Q.   And then do you see the Whereas clause below DMP

18   International?  How much was this loan, purported loan, for?

19   A.   $900,000.

20   Q.   Does the document indicate that any collateral was

21   provided?

22   A.   No.

23   Q.   Now, if we could turn to the second page?  If you could

24   blow up the bottom of the document?

25        Go ahead and read that to the jury?

Laporta - Direct                                                    921

1    A.    "In witness whereof, the parties hereto have set their

2    seals this 6th day of March 2014."

3    Q.    All right.  And let me ask you again:  Does that document

4    indicate that it was signed on March 6, 2014?

5    A.    Yes.

6    Q.    And did you believe that?

7    A.    No.

8    Q.    Now, on behalf -- on the left side, go ahead and read what

9    that says.

10   A.    "For and on behalf of the lender:  Telmar Limited."

11   Q.    Is there a signature?

12   A.    There is.

13   Q.    What does it say then below it?

14   A.    "Director."

15   Q.    All right.  And then the -- or what does it say above

16   "Director"?

17   A.    "Inter Jura CY (Directors) Limited."

18   Q.    Okay.  And then on the right side, what does it say?

19   A.    "For and on behalf of the borrower:  DMP International

20   LLC."

21   Q.    Do you recognize that signature?

22   A.    I do.

23   Q.    Whose signature do you recognize that to be?

24   A.    Mr. Manafort's.

25   Q.    All right.  Let me show you what's been marked as

Laporta - Direct                                                  922

1    Government Exhibit 159.

2              Is this an e-mail from you to -- from Rick Gates

3    to -- I'm sorry -- from you to Rick Gates regarding

4    Mr. Manafort's tax returns?

5    A.   I'm sorry, I'm falling --

6    Q.   Sorry, 159.

7    A.   Okay.  Yes, I'm here.  Yes, it's an e-mail from me to

8    Rick.

9              MR. ASONYE:  Your Honor, Government moves 159 into

10   evidence.

11             MR. DOWNING:  No objection.

12             THE COURT:  Admitted.

13             (Government Exhibit No. 159 was received in

14   evidence.)

15   BY MR. ASONYE:

16   Q.   And, Ms. Laporta, what do you ask at the end of this

17   e-mail?  Is it -- first of all, what is the date?

18   A.   The date of this e-mail is September 16, 2015.

19   Q.   And what do you ask at the end of this e-mail?

20   A.   "Were the funds wired to DMP in March 2015 miscoded to

21   fees when the funds were actually a loan from Telmar?"

22   Q.   Why did you ask that?

23   A.   I was still feeling pretty disturbed over the tax return

24   filed as it was.

25   Q.   To your knowledge, was this $900,000 loan from Telmar ever

1    repaid?

2    A.   No.

3    Q.   Did you ever see any evidence of an interest payment on

4    this loan?

5    A.   No.

6    Q.   Principal payment?

7    A.   No.

8    Q.   Let me show you Government Exhibit 171.  Is this an e-mail

9    where you're discussing Mr. Manafort's business tax return?

10   A.   Yes.

11          MR. ASONYE:  Your Honor, Government moves 171 into

12   evidence.

13          MR. DOWNING:  No objection.

14          THE COURT:  It's admitted.

15          (Government Exhibit No. 171 was received in

16   evidence.)

17          MR. ASONYE:  May we publish, Your Honor?

18          THE COURT:  Yes.

19   BY MR. ASONYE:

20   Q.   Focus at the top of this document.  Ms. Laporta, what's

21   the date of this e-mail?

22   A.   April 5, 2016.

23   Q.   And is that the following year from when you originally

24   discussed the Telmar loan?

25   A.   Yes.

Laporta - Direct                                                        924

1    Q.   And if we could look at the middle e-mail from

2    Mr. O'Brien, paragraph No. 5, just you go ahead and read that

3    to the jury.

4    A.   "Please confirm that the $900,000 loan from Telmar for

5    2014 was not repaid during 2015."

6    Q.   How does Mr. Gates respond?

7    A.   "Correct."

8    Q.   Why did you ask that?  Or why did KWC ask that?

9    A.   We don't like loans sitting on the books for too long

10   because it starts to look a lot like income, so we need to

11   follow up and make sure we understand correctly.

12   Q.   Was this the last time that DMP International claimed that

13   funds received from Telmar was a loan?

14   A.   No.

15   Q.   What happened the next year?

16   A.   In the next year, when we got the general ledger from

17   Heather Washkuhn, there had been loans during the year, I can't

18   remember when, that were classified as loans versus classified

19   as income.

20   Q.   So the following year, there were new loans?

21   A.   Correct.

22   Q.   If you could look at this exhibit and focus on paragraph

23   No. 6.  Can you read that to the jury?

24   A.   Yes.  "Should the $1 million received from Telmar in 2015

25   be picked up as income for 2015?"

Laporta - Direct                                                        925

1    Q.   And how does Mr. Gates respond?

2    A.   "No."

3    Q.   Why did you-all ask whether the million should come in --

4    should be picked up as income instead of a loan?

5    A.   It may have been misclassified.

6    Q.   How does -- go ahead and read the rest of the response.

7    A.   Well, he just says, "No."

8            And then our response, is that where you want me to

9    continue?

10   Q.   Yes.

11   A.   "Heather classified it as a loan, thus making the loan

12   from Telmar 1.9 million.  If it is a loan, is there an

13   amendment to the $900,000 loan agreement from 2014?"

14   Q.   How does Mr. Gates respond?

15   A.   "This is a separate loan."

16   Q.   Let me show you Government Exhibit 170.  What is 170?

17   A.   I'm sorry, I'm having trouble getting there.

18   Q.   Take your time.

19   A.   Okay.  What is document 170?

20   Q.   Yeah, what is it?

21   A.   It is a DMP International general ledger for the year

22   2015.

23   Q.   Is it used to prepare Mr. Manafort's DMP International tax

24   return?

25   A.   Yes.

Laporta - Direct                                                    926

1              MR. ASONYE:  Your Honor, Government moves 170 into

2    evidence.

3              MR. DOWNING:  No objection.

4              THE COURT:  Admitted.

5              (Government Exhibit No. 170 was received in

6    evidence.)

7              MR. ASONYE:  May we publish?

8              THE COURT:  Yes.

9    BY MR. ASONYE:

10   Q.   Do you see where it says Telmar Investments -- first of

11   all, actually, let's focus on the date.

12             For what tax year is this general ledger?

13   A.   For 2015.

14   Q.   And now if you look at Telmar, what does it indicate

15   occurred on August 28 and September 11, 2015?

16   A.   It shows on each of those dates loans to DMP International

17   for $500,000 each.

18   Q.   So how was this $1 million originally booked by Heather

19   Washkuhn?

20   A.   As loans.

21   Q.   And how did KWC treat it?

22   A.   As loans.

23   Q.   Let me show you Government Exhibit 194.  And what is 194?

24   A.   194 is the trial balance used to prepare the tax return

25   for DMP International.

1           MR. ASONYE:  Your Honor, Government moves 194 into

2    evidence.

3           MR. DOWNING:  No objection.

4           THE COURT:  Admitted.

5           (Government Exhibit No. 194 was received in

6    evidence.)

7    BY MR. ASONYE:

8    Q.   And, Ms. Laporta, if you could just look at line 1337-003?

9    A.   Yes.

10   Q.   Okay.  What -- what does the trial balance indicate

11   occurred?

12   A.   It shows that the general ledger balance was $1,900,000.

13   We made no adjustments to that, and the final number for the

14   tax return on the balance sheet would be 1,900,000.

15   Q.   So what does that mean about the total amount that was now

16   owed to Telmar?

17   A.   The amount owed to Telmar was $1,900,000.

18          Am I reading the wrong number?

19   Q.   And does this indicate that there's any principal or

20   interest that was paid on that original $900,000 loan from the

21   2014 tax year?

22   A.   No, it does not.

23   Q.   Let me show you Government Exhibit 180.  Is this an e-mail

24   between you and Rick Gates regarding Mr. Manafort's tax

25   returns?

Laporta - Direct                                                      928

1    A.    180?

2    Q.    Yes.

3    A.    Yes.

4              MR. ASONYE:  Your Honor, Government moves 180 into

5    evidence.

6              MR. DOWNING:  No objection.

7              THE COURT:  Admitted.

8              (Government Exhibit No. 180 was received in

9    evidence.)

10             MR. ASONYE:  And if we could turn to the second page

11   and publish the second page, Your Honor?

12             THE COURT:  Yes.

13   BY MR. ASONYE:

14   Q.    Ms. Laporta, did you -- do you see Section 5, numbered

15   paragraph 5?  Could you read that to the jury?

16   A.    "Documentation" -- this is pending items for the tax

17   return.  "Documentation for new loan from Telmar for

18   1,900,000."

19   Q.    What does it say?

20   A.    The response is, "It is three separate loan agreements.  I

21   am pulling together."

22   Q.    Now, did you ever see documentation for these two new

23   loans from Telmar for $1 million in 2015?

24   A.    No, I did not.

25   Q.    Let me show you Government Exhibit 172.

Laporta - Direct                                                    929

1          Are you, again, discussing Mr. Manafort's tax returns

2    with Rick Gates?

3    A.   Yes.

4          MR. ASONYE:  Your Honor, Government moves 172 into

5    evidence.

6          MR. DOWNING:  No objection.

7          THE COURT:  It's admitted.

8          (Government Exhibit No. 172 was received in

9    evidence.)

10         MR. ASONYE:  Your Honor, may we publish?

11         THE COURT:  Yes.

12   BY MR. ASONYE:

13   Q.   Turn to Page 2.  Could you read -- on the bottom, there's

14   a section for DMP International.  Could you read Section 1?

15   A.   I'm at 171?  Oh, Section 1, I'm sorry.

16         "Could you please send over the loan agreement for

17   the new $1 million Telmar loan?"

18   Q.   Go ahead and --

19   A.   The response?

20   Q.   Yes.

21   A.   "I will have to find it.  Do we need it for filing?"

22   Q.   And if you'd turn to the first page, what is the date of

23   this e-mail correspondence from Rick Gates?

24   A.   I'm not finding it.  Oh, April 12, 2016.

25   Q.   At that time, Mr. Gates, is he still looking for the loan

1   documents?

2   A.   Yes.

3   Q.   Now, were you ever told by Paul Manafort or Rick Gates why

4   one of DMP International's clients would lend them $1.9 million

5   in two years?

6   A.   No.

7   Q.   Now, if the additional $1 million from Telmar in 2015 was

8   not actually a loan but income, would Paul Manafort's tax

9   return have been accurate?

10  A.   If -- I'm sorry, if it had been income and not a loan --

11  Q.   Correct.

12  A.   -- would his tax return be accurate?  No.

13  Q.   Now, did you have e-mail communications directly with

14  Paul Manafort in which you referenced the purported Telmar

15  loans?

16  A.   Yes.

17  Q.   All right, let me show you a few examples.  Please turn to

18  Government Exhibit 179.  You discussed the Telmar loan in

19  Government Exhibit 179?

20  A.   Yes.

21          MR. ASONYE:  Your Honor, Government moves 179 into

22  evidence.

23          MR. DOWNING:  No objection.

24          THE COURT:  All right, it's admitted.

25          (Government Exhibit No. 179 was received in

Laporta - Direct                                                           931

1    evidence.)

2    BY MR. ASONYE:

3    Q.   Could you turn to the second page?

4            MR. ASONYE:  May we publish, Your Honor?

5            THE COURT:  Yes, you may.

6    BY MR. ASONYE:

7    Q.   Turn to the second page.  At the very bottom, is that an

8    e-mail from Rick Gates?

9    A.   Yes, it is.

10   Q.   Go ahead and read the e-mail to the jury.

11   A.   "What is outstanding for there entities following your

12   conversation with Paul?"

13   Q.   Based on this e-mail, did you have a conversation with

14   Paul Manafort?

15   A.   Yes.

16   Q.   And if you turn to the first page, do you see where it

17   says, "I'll send by entity," and your response?

18   A.   Yes.

19   Q.   Please, if you could, zoom in on Section d.  Could you

20   read your response?  Section d.

21   A.   "Documentation for new loan from Telmar for $1.9 million."

22   Q.   Now, if you could -- if we could blow up the top of this

23   e-mail?

24           Does this e-mail eventually get forwarded by

25   Rick Gates to Paul Manafort?

1   A.   Yes.

2   Q.   On what date did Rick Gates forward this e-mail to

3   Paul Manafort?  What's the date of the e-mail?

4   A.   September 13.

5   Q.   Paul Manafort ever call you and say, "What's going on with

6   this $1.9 million loan I've never heard of?"

7   A.   No.

8   Q.   All right, let me show you Government Exhibit 182.  Are

9   you discussing the Telmar loan in this document as well?

10  A.   Yes.

11          MR. ASONYE:  Your Honor, Government moves 182 into

12  evidence.

13          MR. DOWNING:  No objection.

14          THE COURT:  It's admitted.

15          (Government Exhibit No. 182 was received in

16  evidence.)

17          MR. ASONYE:  May we publish?

18          THE COURT:  Yes.

19          MR. ASONYE:  If we could scroll, highlight -- zoom in

20  the bottom document.

21  BY MR. ASONYE:

22  Q.   Okay.  What's the date of that bottom e-mail, Ms. Laporta?

23  A.   October 6.

24  Q.   Okay.  Who's copied on the e-mail?

25  A.   Rick Gates.

1   Q.   Who's the e-mail from?

2   A.   Paul Manafort.

3   Q.   Could you read what Paul Manafort writes to you in that

4   e-mail?

5   A.   "Cindy, have you got what you need from Rick?  If not, pls

6   call him to move this forward."

7   Q.   And then if we could focus on the response at the top.  Do

8   you write him back?

9   A.   Yes.

10  Q.   And go ahead and read the -- your response to the jury.

11  A.   (As read):  "Hi, Paul.  Yes, thank you.  Rick gave us the

12  information we needed to properly report the disposition of the

13  EVO investment.  He will be sending us the Telmar documents

14  soon.  We will send you a draft of the tax return for your

15  review and update when we receive basis information for the

16  Mount Vernon Circle home."

17  Q.   After this e-mail, did Paul Manafort ever express concerns

18  to you about some loans from Telmar?

19  A.   No.

20  Q.   Ms. Laporta, were you aware during -- of a drop in DMP

21  International's income beginning in 2015?

22  A.   Yes.

23  Q.   And do you have any knowledge of Paul Manafort applying

24  for loans, mortgage loans for his properties in 2016?

25  A.   Yes.

Laporta - Direct                                                      934

1   Q.    How did you know about these loans?

2   A.    Mr. Manafort sent out an e-mail to, to various people,

3   including me and Heather, about documentation that would be

4   needed for loans on two of his New York properties.

5   Q.    Do you remember where those properties were located?

6   A.    In New York City.

7   Q.    Do you remember what streets?

8   A.    One was with an entity -- an entity called MC Soho.  That

9   was -- there was one Union Street and then there was Howard

10  Street, excuse me.

11  Q.    All right.

12  A.    Howard Street was MC Soho.

13  Q.    And you said Howard Street was owned through which entity?

14  A.    MC Soho.

15  Q.    All right.  Let me show you Government Exhibit 161.  And

16  is this an e-mail where -- are you discussing with Mr. Manafort

17  the mortgage loans in 161?

18  A.    Yes.

19          MR. ASONYE:  Government moves 161 into evidence.

20          MR. DOWNING:  No objection.

21          THE COURT:  It's admitted.

22          (Government Exhibit No. 161 was received in

23  evidence.)

24          MR. ASONYE:  May we publish?

25          THE COURT:  Yes, you may.

Laporta - Direct                                                       935

1    BY MR. ASONYE:

2    Q.   If you could turn to Page 2, Ms. Laporta.  Do you see the

3    e-mail on December 22 from Paul Manafort?

4    A.   Yes.

5    Q.   What year is that?

6    A.   The year is 2015.

7    Q.   Okay.  What -- go ahead and read the first paragraph to

8    the jury, please.

9    A.   "I am applying for a mortgage using the Howard Street

10   property and a separate construction mortgage for the Union

11   Street project."

12   Q.   And about four paragraphs down, how many loans does

13   Mr. Manafort tell you there's going to be?

14   A.   Two separate loans.

15   Q.   Now, Ms. Laporta, in 2015, how was the Howard Street

16   property treated for tax purposes?

17   A.   For tax purposes, it was a rental property.

18   Q.   And let me show you Government Exhibit 3 -- in the tax

19   return binder, 337L, which is already in evidence.  It's

20   actually in your binder too.  337L, it's probably the last tab.

21        Do you have that?

22   A.   Got it.

23   Q.   Okay.  Is -- is that the tax return --

24        MR. ASONYE:  May we publish, Your Honor?

25        THE COURT:  Yes, you may.

Laporta - Direct                                                    936

1    BY MR. ASONYE:

2    Q.   Is that the tax return for MC Soho?

3    A.   It is.

4    Q.   And if you could turn to the Bates page ending at 700?

5         On the tax return for MC Soho for this 29 Howard

6    Street, according to the return, was, was the property rented

7    out in 2015?

8    A.   Yes.

9    Q.   And for how many days was it available for rent?

10   A.   365 days.

11   Q.   How much gross rent was generated?  Line 2.

12   A.   Okay.  Yeah.  I'm just not reading -- 115,987.

13   Q.   Was depreciation taken?

14   A.   Yes.

15   Q.   And does that -- would that reduce Mr. Manafort's tax

16   obligations by taking that depreciation?

17   A.   Yes.

18   Q.   All right, let me show you Government Exhibit 156.

19        MR. ASONYE:  Okay.  156 is already in evidence, Your

20   Honor.  May we publish?

21        THE COURT:  Yes, you may.

22        MR. ASONYE:  I'm sorry, not 156.  214.  214 is

23   already in evidence.

24        THE COURT:  All right.

25   BY MR. ASONYE:

1   Q.   Ms. Laporta, it's probably -- actually, it's on the screen

2   for you this time.

3   A.   Oh, okay.

4   Q.   And then according to this e-mail, Paragraph 2 in the

5   middle e-mail, what did Rick Gates tell you about whether

6   29 Howard Street was used -- how it was used in 2015?

7   A.   In this e-mail, he said it would be used as a rental in

8   2015.  It was used as a rental.  Yes.

9   Q.   Okay.  And is that well -- the date of this e-mail -- can

10  we focus on the top e-mail?  Top e-mail.

11          What's the date of that e-mail?

12  A.   March 19, 2015.

13  Q.   Is that well before Mr. Manafort told you he would be

14  applying for mortgage loans using the Howard Street property?

15  A.   Yes.

16  Q.   Okay.  Let me show you what's been marked as Government

17  Exhibit 162.  Is this an e-mail between you and the mortgage

18  company that Mr. Manafort was applying to?

19  A.   Yes.

20          MR. ASONYE:  Your Honor, Government moves 162 into

21  evidence.

22          MR. DOWNING:  No objection.

23          THE COURT:  It's admitted.

24          (Government Exhibit No. 162 was received in

25  evidence.)

1          MR. ASONYE:  May we publish?

2          THE COURT:  Yes, you may.

3          MR. ASONYE:  If we could zoom in on the picture and

4    the photograph and the name?

5    BY MR. ASONYE:

6    Q.   Ms. Laporta, who's David Fallarino?

7    A.   He is a representative for Citizens Bank.

8    Q.   And is that where Mr. Manafort was applying for the loan?

9    A.   Yes.

10   Q.   Now, if you turn to the next page of this exhibit, and if

11   we could scroll in -- zoom in on the January 7, 2016, e-mail

12   from Mr. Manafort.

13          Okay.  Who does Mr. Manafort write the e-mail to?

14   A.   To David Fallarino.

15   Q.   Are you copied?

16   A.   I am.

17   Q.   Okay.  Go ahead and read that e-mail, please.

18   A.   (As read):  "Below is the contact information for my CPA.

19   She was aware of the second home issue and the relevance of it

20   to the refinancing of Howard Street.  She has indicated to me

21   that the 2015 tax returns will be listing Howard Street as a

22   second residence for me, and I will be able to provide you with

23   a letter to that effect.  Feel free to call her to work out any

24   details and answer any questions."

25   Q.   What was your understanding of Mr. Manafort's reference to

1    the second home issue?

2    A.   Well, Mr. Manafort has multiple homes, and some are rented

3    and some are investment -- or maybe investment properties and a

4    primary residence and then a second home.  So in this instance,

5    a second home that he's trying to refinance is --

6    Q.   What was the issue?

7    A.   -- going to get a better rate at the -- as a second home

8    and needed to make that clear.

9    Q.   And what was your understanding of whether banks offer

10   better rates on a primary residence versus a second home?

11   A.   They offer a, a better rate on -- that's going to be real

12   close on a primary and a secondary.

13   Q.   Or on a rental.

14   A.   Okay.  Yeah.  The second home rate is typically better

15   than a rental property.

16   Q.   And if we turn to the first page, do you have

17   communications with Mr. Fallarino?  What do you guys -- what do

18   you talk about with him on the e-mail?

19   A.   I think we're trying to arrange to have a call to discuss

20   the property.

21   Q.   And did you eventually have that call?

22   A.   Yes.

23   Q.   Where were you when you had the phone call with

24   Mr. Fallarino?

25   A.   At my office.

Laporta - Direct                                                    940

1   Q.    In Alexandria?

2   A.    Yes.

3   Q.    And what did you -- what did you tell Mr. Fallarino when

4   you had that conversation?

5   A.    That the, the home -- that the Howard Street property

6   would be as a -- had been used as a second home and would,

7   therefore, be reflected on the tax return as such.

8   Q.    Why did you tell the bank that 29 Howard Street would be

9   treated as a second home on the tax return?

10  A.    So Rick Gates sent me a listing of the Manafort properties

11  and how each of them was used during 2015.

12  Q.    And did you -- and did you also rely on the prior e-mail

13  from Mr. Manafort?

14  A.    Yes.

15  Q.    Now, at the time, did you have the ability to determine

16  how -- whether 29 Howard Street was rented in 2015?

17  A.    I could have seen if Heather Washkuhn had prepared any

18  ledgers to that effect.

19  Q.    But did you?

20  A.    No.

21  Q.    And, in fact, did you actually treat 29 Howard Street as a

22  second home on the tax return for 2015?

23  A.    No.  When the tax return was filed, the information

24  provided was that it was, in fact, a rental property.

25  Q.    So was that consistent or inconsistent with what

1    Mr. Manafort told the bank in his first e-mail?

2    A.    Inconsistent.

3    Q.    Have you heard of a company named Peranova Holdings

4    Limited?

5    A.    Yes.

6    Q.    How did you come to hear about that company?

7    A.    Peranova is a customer of DMP International.

8    Q.    What gave you the understanding that Peranova was a

9    customer of DMP International?

10   A.    It's listed in the general ledger as -- as such.

11   Q.    Let me show you Government Exhibit 190, which --

12          MR. ASONYE:   May we publish, Your Honor?  It's

13   already in evidence.

14          THE COURT:   Yes, you may.

15   BY MR. ASONYE:

16   Q.    Do you recognize this document?

17   A.    I do.

18   Q.    Okay.  What does it indicate occurred -- occurred on

19   February 1, 2012?

20   A.    That there was a loan from Peranova Holdings for

21   $1.5 million.

22   Q.    And does it indicate who advised that it was a loan?

23   A.    Rick Gates.

24   Q.    So was it ultimately booked as a loan?

25   A.    It was initially booked as a loan.

1  Q.    But what is that -- what did that ultimately do to

2  Mr. Manafort's taxable income for 2012?

3  A.    It had no impact on his taxable income.

4  Q.    Let me show you Government Exhibit 187.  Do you recognize

5  what -- I think it's three pages -- what 187 is?

6  A.    Oh, yes.

7  Q.    Okay.  What is it?

8  A.    So this is just for internal purposes.  We track loan

9  balances and the interest rate because typically the interest,

10  if it's not paid, adds to the balance of the loan, and this --

11  that's what this is for.

12          MR. ASONYE:  Your Honor, Government moves 187 into

13  evidence.

14          MR. DOWNING:  No objection.

15          THE COURT:  It's admitted.

16          (Government Exhibit No. 187 was received in

17  evidence.)

18  BY MR. ASONYE:

19  Q.    Ms. Laporta, does this document indicate that there were

20  any principal or interest payments on the Peranova loan between

21  2012 and December 31, 2014?

22  A.    Let me get to '14.

23          Yes.  It shows there are no interest payments or

24  principal payments in those years.

25          THE COURT:  Do you need some time, Mr. Asonye?

Laporta - Direct                                                    943

1              MR. ASONYE:  No.  I just want to make sure I have the

2    right exhibit.

3    BY MR. ASONYE:

4    Q.   Let me show you what's been marked as Government

5    Exhibit 163.  Now, you testified earlier that Mr. Manafort was

6    applying for two loans; is that correct?

7    A.   Yes.

8    Q.   In 163, are you discussing the, the loan with the bank?

9    A.   Yes.

10             MR. ASONYE:  Your Honor, Government moves 163 into

11   evidence.

12             MR. DOWNING:  No objection.

13             THE COURT:  Admitted.

14             (Government Exhibit No. 163 was received in

15   evidence.)

16             MR. ASONYE:  May we publish?

17             THE COURT:  Yes.

18   BY MR. ASONYE:

19   Q.   Turn to the second page.  This e-mail on the second page,

20   who is it from?

21   A.   On the second page?

22   Q.   The very bottom e-mail.

23   A.   From David Fallarino.

24   Q.   And did you know who he is?

25   A.   He's the representative from Citizens Bank.

Laporta - Direct                                                    944

1    Q.   And who does he send this e-mail to?

2    A.   To Paul.

3    Q.   And you're copied?

4    A.   Yes.

5    Q.   Do you know who Melinda Francis is?

6    A.   Another member of the Citizens Bank group.

7    Q.   What is the subject of this e-mail?

8    A.   "DMP International Income question."

9    Q.   All right.  If you could turn to the second page, and if

10   you could just read starting from "We qualify," that -- the

11   whole area, there we go, to the end of that e-mail.

12   A.   Those two paragraphs?

13   Q.   Yeah?

14   A.   (As read):  "We qualify for everything here but fail the

15   liquidity test (using Schedule L on the tax returns.)  We fail

16   because of a liability in the amount of 1.5 million (which

17   looks like a debt owed to Peranova Holdings Limited).

18            "Cindy, can you possibly do a short write-up to

19   explain what the 1.5 million liability to Peranova is and also

20   address the paragraph highlighted above?  I will forward your

21   response to the underwriter."

22   Q.   Did you understand what the problem was?

23   A.   Yes.

24   Q.   What was the problem?

25   A.   The bank wanted to see more money available to pay back

Laporta - Direct                                                        945

1    the loan.

2    Q.    And what was causing -- what was causing that problem?

3    A.    There wasn't enough income on DMP International, and there

4    was a debt on the books.

5    Q.    And was the debt from Peranova Holdings?

6    A.    Yes.

7    Q.    And is this the debt that you've testified was -- there

8    was no interest or principal payments for two years?

9    A.    That's correct.

10   Q.    At the top e-mail, how did you -- would you read your

11   response?

12   A.    "Hi, David.  The loan from Peranova Holdings Limited to

13   DMP International of 1.5 million" --

14   Q.    I'm sorry, could you just slow down for the stenographer?

15   A.    Oh, I'm sorry.  I thought everyone was tired.

16          "Hi David, the loan from Peranova Holdings Limited to

17   DMP International of 1.5 million has been forgiven effective

18   2015.  As a result, the 1.5 million will be reported on the

19   2015 DMP International income tax return.  Please let me know

20   if you have any questions."

21   Q.    Now, first off, where were you when you sent this e-mail?

22   A.    At the office.

23   Q.    And did you copy Paul Manafort -- would you highlight the

24   top of this document?

25          Was Paul Manafort -- did he receive that e-mail where

1    you indicated the loan had been forgiven?

2    A.    Yes.

3    Q.    And you sent this e-mail to the bank?

4    A.    Yes.

5    Q.    Who directed you -- who, if anyone, directed you to send

6    this e-mail to the bank?

7    A.    Paul or -- Mr. Manafort or Mr. Gates.

8    Q.    And what information did you rely on in providing your

9    response?

10   A.    Their word.

11   Q.    Did you come up with the idea to send this e-mail?

12   A.    No.

13   Q.    At the time of your response on February 4, 2016, did you

14   have any documentation that the $1.5 million loan from Peranova

15   had been forgiven?

16   A.    No.

17   Q.    In light of your experience with the Telmar loan that you

18   had just testified about, which occurred five months earlier,

19   did you believe that the $1.5 million loan from Peranova had

20   actually been forgiven?

21   A.    No.

22   Q.    And was it your understanding that forgiving the $1.5

23   million loan solved the problem that Mr. Fallarino, from the

24   bank, had identified?

25   A.    Yes.

Laporta - Direct                                                    947

1    Q.   All right, let me show you Government Exhibit 164.   In

2    this e-mail, are you further discussing the Peranova loan?

3    A.   Yes.

4              MR. ASONYE:   Your Honor, Government moves 164 into

5    evidence.

6              MR. DOWNING:   No objection.

7              THE COURT:   Admitted.

8              (Government Exhibit No. 164 was received in

9    evidence.)

10             MR. ASONYE:   May we publish?

11             THE COURT:   Yes.

12   BY MR. ASONYE:

13   Q.   If we could focus on the second e-mail from the bottom

14   from Mr. Fallarino to you.  Could you go and read his e-mail to

15   you?

16   A.   "See below.  I won.  Can you write a letter for the 1.5

17   million loan has been forgiven and give any color possible?"

18   Q.   And does Mr. Gates respond to that e-mail?

19             Above it?

20   A.   Above.  Sorry.  So that's from David --

21   Q.   Oh, I'm sorry.  Do you respond above it?

22   A.   Right.  "Hi Rick, I will need documentation supporting the

23   1.5 million loan forgiveness effective 2015."

24   Q.   That's fine.  And then does Mr. Gates respond to you?

25   A.   Yes.

1    Q.    Okay.  Go ahead and read Mr. Gates' response to you.

2    A.    (As read):  "I will get you the letter and then you can do

3    a cover letter along with it.  I'll send a draft and then chase

4    down signatures."

5    Q.    What did you understand "chase down signatures" to mean?

6    A.    Find people to sign it.

7    Q.    What was your understanding of whether the documents

8    Mr. Gates referred to were actually signed at that point?

9    A.    Highly unlikely.

10   Q.    And then please read your response in the top e-mail?

11   A.    "Yes, that is what I will do.  Good plan to send draft

12   first."

13   Q.    Let me show you Government Exhibit 165.  Is this an e-mail

14   from Rick Gates to you regarding the loan?

15   A.    Yes, it is.

16             THE COURT:  Go back one e-mail, if you would.

17             MR. ASONYE:  That should be 164?

18             THE COURT:  The one you were just looking at.

19             MR. ASONYE:  Yes.

20             THE COURT:  This is the whole thing.  Which is the

21   one that --

22             MR. ASONYE:  The top e-mail.  If we could zoom in on

23   that, Mr. Binder?

24             THE COURT:  Yes.  What did you mean by "good plan"?

25             THE WITNESS:  To see what it looked like.

Laporta - Direct                                                    950

1   evidence.)

2           MR. ASONYE:  May we publish?

3           THE COURT:  Yes, you may.

4           MR. ASONYE:  Let's zoom in on that.

5   BY MR. ASONYE:

6   Q.   Could you please read what Mr. Gates tells you in this

7   e-mail?

8   A.   Yes.  "Please take a look and let me know if this works.

9   Thanks."

10  Q.   And does it indicate that there's an attachment?

11  A.   Yes, it does.

12  Q.   And go ahead and read the name of the attachment.

13  A.   "Peranova loan forgive.docx."

14  Q.   And what are the numbers before "Peranova loan forgive"?

15  A.   I don't know unless it's a loan number.

16  Q.   Well, actually just could you read the --

17  A.   Oh, I'm sorry.

18  Q.   Read the numbers.

19  A.   That's a date.  2016-02-08.

20  Q.   Okay.  What type of document is attached?

21  A.   This is a Word document.

22  Q.   Let's look at the attachment, the next page.

23           Whose letterhead is this document from?

24  A.   Peranova Holdings Limited.

25  Q.   What's the date?

Laporta - Direct                                                                951

1    A.    June 23, 2015.

2    Q.    Now, your e-mail from Mr. Gates, was that in 2016?

3    A.    Yes.

4    Q.    Is the date of this e-mail actually eight months -- the

5    date of this document actually eight months before you received

6    Mr. Gates' e-mail?

7    A.    Yes, it is.

8    Q.    To what entity is the letter addressed to?

9    A.    DMP International.

10   Q.    Go ahead and please read the letter to the jury.

11   A.    "The purpose of this letter is to confirm that Peranova

12   Holdings Limited has stricken off from its register the debt

13   owed by DMP International LLC.  The loan agreement was" --

14   Q.    Take your time, Ms. Laporta.  I'm sorry.

15   A.    Sorry.  (As read):  "The purpose of this letter is to

16   confirm that Peranova Holdings Limited has stricken off from

17   its register the debt owed by DMP International LLC.  The loan

18   agreement was entered into in February 2012 for a term of five

19   years, and the total amount of the debt forgiven is $1,500,000.

20          "The removal of the loan from Peranova Holdings is

21   effective June 2015 and constitutes a full and complete removal

22   of the indebted amount."

23   Q.    And then is there a signature line at the bottom?

24   A.    Yes.

25   Q.    Is there anything in there?

Laporta - Direct                                                        952

1    A.   No.

2    Q.   It's unsigned?

3    A.   Yes.

4    Q.   What, if anything, did you realize when you saw this

5    letter was e-mailed to you in Microsoft Word format without a

6    signature eight months prior to the date of the e-mail?

7    A.   That it was being created.

8    Q.   At the time, did you believe this document was true or

9    false?

10   A.   False.

11   Q.   Why did you believe it was false?

12   A.   Because of the dates.

13   Q.   Did you edit this document?

14   A.   No.

15   Q.   Why not?

16   A.   I did not want to -- I wanted it to be the client's

17   document.

18   Q.   Let me show you Government Exhibit 166.

19              THE COURT:  Did you believe it was false?

20              THE WITNESS:  Yes.

21              THE COURT:  But you still went ahead and used it?

22              THE WITNESS:  Yes.

23              THE COURT:  Next question.

24   BY MR. ASONYE:

25   Q.   Government Exhibit 166, is this an e-mail where you and

Laporta - Direct                                                          953

1    Rick Gates are discussing the -- that letter?

2    A.   Yes.

3              MR. ASONYE:  Your Honor, Government moves 166 into

4    evidence.

5              MR. DOWNING:  No objection.

6              THE COURT:  Admitted.

7              (Government Exhibit No. 166 was received in

8    evidence.)

9              MR. ASONYE:  May we publish?

10             THE COURT:  Yes, you may.

11   BY MR. ASONYE:

12   Q.   Would you read the top e-mail from Rick Gates to you?

13   A.   (As read):  "Can you do a brief cover letter to be

14   attached to the Peranova letter?  Basically whatever you

15   intended to put into the e-mail, just do it in a letter format

16   on KWC letterhead.  And then e-mail them both to David.  I will

17   send you the final letter as soon as I get it signed.  I need

18   your cover letter to give the Peranova group as proof we

19   submitted the letter.  Paperwork is awesome.  Thanks."

20             MR. ASONYE:  Your Honor, Government -- I'm sorry.

21   BY MR. ASONYE:

22   Q.   Ms. Laporta, if you could turn to Government Exhibit 167?

23             THE COURT:  How much more do you anticipate for this

24   witness?

25             MR. ASONYE:  Maybe 15-20 minutes, Your Honor.

1          THE COURT:  All right, proceed.

2    BY MR. ASONYE:

3    Q.   167, are you discussing this -- the Peranova loan

4    agreement again?

5    A.   Yes.

6          MR. ASONYE:  Your Honor, Government moves 167 into

7    evidence.

8          MR. DOWNING:  No objection.

9          THE COURT:  It's admitted.

10         (Government Exhibit No. 167 was received in

11   evidence.)

12   BY MR. ASONYE:

13   Q.   What is the date of this e-mail?

14         MR. ASONYE:  And may we publish, Your Honor?

15         THE COURT:  And you may, yes.

16   BY MR. ASONYE:

17   Q.   What is the date of this e-mail?

18   A.   February 9, 2016.

19   Q.   And does it indicate -- well, first of all, what -- go

20   ahead and read the e-mail.

21   A.   "Here is the letter.  Please call me when you have a

22   moment to discuss."

23   Q.   And does it indicate that there's an attachment?

24   A.   Yes.

25   Q.   And this time, what format is the document?

1    A.    In PDF.

2    Q.    All right.  Let's look at the attachment on the second

3    page.  In terms of the substance of the e-mail, the text -- I'm

4    sorry -- the text of the letter, is it the same text of the

5    prior Word document that Mr. Gates had e-mailed to you?

6    A.    Yes.

7    Q.    Is this one actually signed, though?

8    A.    It is.

9    Q.    And who is it claimed signed the letter?

10   A.    A director.

11   Q.    When you saw this letter and compared it to the previous

12   letter that was sent to you, what, if anything, did you

13   understand about whether it was backdated?

14   A.    The difference between this one and the previous one?

15   Q.    Let me rephrase it:  Did you understand this letter to be

16   backdated?

17   A.    Yes.

18   Q.    Let me show you Government Exhibit 168.  Are you again

19   discussing this letter?

20   A.    Yes.

21          MR. ASONYE:  Your Honor, Government moves 168 into

22   evidence.

23          MR. DOWNING:  No objection.

24          THE COURT:  It's admitted.

25          (Government Exhibit No. 168 was received in

Laporta - Direct                                                      956

1    evidence.)

2              MR. ASONYE:  May we publish?

3              THE COURT:  Yes, you may.

4    BY MR. ASONYE:

5    Q.   Okay.  Ms. Laporta, did you end up sending that letter to

6    Citizens Bank?

7    A.   Yes.

8    Q.   At whose direction did you send it to Citizens Bank?

9    A.   Oh, to Melinda Francis.

10   Q.   At whose direction?

11   A.   Oh, I'm sorry.

12   Q.   Who, if anyone, instructed you to send this letter to

13   Citizens Bank?

14   A.   Rick Gates.

15   Q.   Now, let's zoom in on the top of this, the whole top

16   e-mail.

17            You're the -- you sent this e-mail; is that correct?

18   A.   Yes.

19   Q.   Okay.  And who at the bank did you send it to?

20   A.   Melinda Francis and to David Fallarino.

21   Q.   And who did you copy on the e-mail?

22   A.   Mr. Gates, Mr. Manafort.

23   Q.   Did you believe that this was -- Mr. Gates was hiding

24   anything from Mr. Manafort in connection with preparing this

25   letter?

Laporta - Direct                                                          957

1    A.    No.

2    Q.    Now, this e-mail was sent at 5:53 on Wednesday, 24 2016;

3    is that correct?

4    A.    Yes.

5    Q.    So where were you when you sent this e-mail?

6    A.    At my office.

7    Q.    Can you go ahead and read the e-mail?

8    A.    "Attached is the memo regarding the forgiveness of debt

9    and related tax treatment."

10   Q.    And if you turn -- I believe it's the second-to-the-last

11   page -- actually, if you turn to the last page, what's

12   attached?

13   A.    The signed letter from Peranova Holdings.

14   Q.    And what did you attach to that signed letter?

15   A.    A memo from me.

16   Q.    And what's the date of this memo from you?

17   A.    February 24, 2016.

18   Q.    And who is the letter to?

19   A.    David Fallarino.

20   Q.    Can you go ahead and read the text of the letter?

21   A.    Yes.  (As read):  "KWC prepares the tax returns for DMP

22   International, LLC.  We have been informed by management that

23   the debt reported on the 2014 tax return balance sheet 'Due to

24   Peranova Holdings Limited' at 1.5 million has been forgiven.

25   The attached signed release was provided to us.  As a result,

1   the 1.5 million of debt forgiven will be reported as income on

2   the 2015 partnership tax return."

3   Q.   Okay.  Now, your cover letter indicated that the $1.5

4   million loan forgiveness would be counted on DMP's tax return

5   in 2015, right?

6   A.   Yes.

7   Q.   But if the loan forgiveness actually occurred in 2016,

8   when the e-mails were being sent between you and Rick Gates, in

9   what year should the income have been recognized?

10  A.   2016.

11  Q.   And you attached the loan forgiveness letter from

12  Peranova; is that correct?

13  A.   Yes.

14  Q.   And you understood that that letter was backdated?

15  A.   Yes.

16             THE COURT:  You're leading now.

17             MR. ASONYE:  I'm sorry, Your Honor.  I'm just trying

18  to move it along, but I'll rephrase it.

19             THE COURT:  No, that's losing sight of the fact that

20  you shouldn't lead.

21  BY MR. ASONYE:

22  Q.   Why did you -- why did you send the CPA letter to Citizens

23  Bank if you believed the loan forgiveness letter was backdated?

24  A.   I honestly believed that that -- the bank would have to

25  vet that document themselves, and I felt I was protected by

1   having them prepare that document and own that document.

2   Q.   When you sent the letter, did you understand that the bank

3   would consider it in connection with Mr. Manafort's loan

4   application?

5   A.   Yes.

6   Q.   All right, I want to move on to the second loan that

7   Mr. Manafort applied to with respect to the Union Street

8   property.

9            Let me show you Government Exhibit 169.

10           THE COURT:  Is it in evidence yet?

11           MR. ASONYE:  No, Your Honor.

12           THE COURT:  Will you offer it?

13           MR. ASONYE:  Yes, Your Honor.

14           THE COURT:  Any objection?

15           MR. DOWNING:  No, Your Honor.

16           THE COURT:  It's admitted.

17           (Government Exhibit No. 169 was received in

18   evidence.)

19           MR. ASONYE:  If we could turn to the second page, and

20   may we publish that, Your Honor?

21           THE COURT:  Yes, you may.

22   BY MR. ASONYE:

23   Q.   Do you see, Ms. Laporta, on the second page, is that an

24   e-mail from the loan officer, Mr. Fallarino, to you?

25   A.   Yes, it is.

1    Q.    And who's copied on that e-mail?

2    A.    Jeff Yohai and Paul Manafort.

3    Q.    Do you know who Jeff Yohai is?

4    A.    I do.

5    Q.    Who is he?

6    A.    Mr. Manafort's former son-in-law.

7    Q.    Okay.  And what does Mr. -- on the second page, would you

8    read the -- I'll tell you when to stop.  If you start the

9    paragraph "For the loan," just read that to the jury.

10   A.    (As read):  "For the loan, we will need equal or better

11   income than 2014.  Also, we have to verify that the K-1s for

12   did DMP have distribution income that matches ordinary business

13   income (which should be the case after the 1.5 million forgiven

14   loan -- but we need to confirm this)."

15   Q.    All right.  That's good.  What did you understand that to

16   mean?

17   A.    They wanted to make sure -- what this means is that K-1 is

18   the income from DMP International and they wanted to make sure

19   that there would be distributions that equaled that amount so

20   that they would have money to pay back the loan.

21   Q.    All right, let me show you Government Exhibit 173.  And

22   are you discussing this loan application with Rick Gates in

23   this e-mail?

24   A.    Yes.

25              MR. ASONYE:  Your Honor, Government moves 173 into

Laporta - Direct                                                        961

1    evidence.

2              MR. DOWNING:  No objection.

3              THE COURT:  It's admitted.

4              (Government Exhibit No. 173 was received in

5    evidence.)

6              THE COURT:  You may display it if you wish.

7              MR. ASONYE:  Yes, please.  Thank you, Your Honor.

8    BY MR. ASONYE:

9    Q.   What does Rick Gates tell you in the first sentence here?

10   A.   (As read):  "Can you please review this letter, make

11   changes and send it to David directly or back to me today?"

12   Q.   And then go ahead and read the rest of the e-mail.

13   A.   "Also, below is a text from David in terms of what they

14   were looking for."

15   Q.   And what does he -- what does David say?

16   A.   (As read):  "A letter from Cindy indicating that the

17   difference in ordinary income and distribution income on the

18   DMP K-1 in 2015 was due to a loan that was forgiven in 2015 and

19   that in 2015, the distribution income will match the ordinary

20   income as it has in years past."

21   Q.   And is there a Word document attached to this e-mail?

22   A.   There is.

23   Q.   And let's look at that.  Turn to the next page and look at

24   that document.  Who is the letter addressed to?

25   A.   David Fallarino.

Laporta - Direct                                                          962

1    Q.   At where?

2    A.   Oh, Citizens Bank.

3    Q.   Go ahead and read the letter.

4    A.   (As read):  "The purpose of this letter is to confirm that

5    Mr. Manafort had a difference in ordinary income from

6    distribution income on his DMP K-1 for 2014 and 2015.  The

7    difference is attributed to a loan that was forgiven in 2015,

8    and therefore allocated to Mr. Manafort's 2015 DMP K-1.  For

9    tax year 2015, it is anticipated that Mr. Manafort's

10   distribution income will match the ordinary income as in past

11   years."

12   Q.   And is there a Sincerely -- whose -- whose name is below

13   "Sincerely"?

14   A.   Rick created this with my signature.

15   Q.   Okay.  Did you -- did you draft this letter?

16   A.   No.

17             THE COURT:  Did you send it?

18             THE WITNESS:  No.

19             THE COURT:  Next question.

20   BY MR. ASONYE:

21   Q.   Now, at the time, did you have enough information to know

22   that Mr. Manafort's income would match ordinary income in past

23   years, as this letter indicates?

24   A.   No.

25   Q.   And why not?

Laporta - Direct                                                            963

A.   We had not completed the tax return for 2015.

          THE COURT:  I may have missed something.  You didn't

prepare this letter, and you didn't sign it.  Was it sent to

the -- to the Home Lending Solution, Citizens Bank?

          THE WITNESS:  No, not by me.

          THE COURT:  By anybody so far as you know?

          THE WITNESS:  Not as far as I know.

          THE COURT:  Was it ever sent to you as a draft?

          THE WITNESS:  This was sent to me as a draft.

          THE COURT:  All right.  So you -- what did you say

about it?

          THE WITNESS:  I dismissed it.

          THE COURT:  I'm sorry?

          THE WITNESS:  I dismissed this letter in its format

because I couldn't agree to any of that.  I created my own

letter based on what I knew.

          THE COURT:  All right, next question.

BY MR. ASONYE:

Q.   Let me show you Government Exhibit 174.  Is this a further

discussion of this letter?

A.   Yes.

          MR. ASONYE:  Your Honor, Government moves 174 into

evidence.

          MR. DOWNING:  No objection.

          THE COURT:  Admitted.

Laporta - Direct                                                       964

1              (Government Exhibit No. 174 was received in

2    evidence.)

3    BY MR. ASONYE:

4    Q.    Okay.  The date of this e-mail, is it May 16, 2016, at

5    4:54 p.m.?

6    A.    Yes.

7    Q.    And where were you when you sent this e-mail?

8    A.    In my office.

9    Q.    And who was it to?

10   A.    David Fallarino.

11   Q.    And what do you say in this e-mail?

12   A.    "Attached is the letter Rick requested I send to you."

13   Q.    And is there a letter that's attached?

14   A.    Yes.

15   Q.    All right, let's turn to page -- I think it's the fifth

16   page.

17              MR. ASONYE:  Oh, may we publish this, Your Honor?

18              THE COURT:  Yes, you may.

19   BY MR. ASONYE:

20   Q.    Okay.  Now, is this the letter that you drafted?

21   A.    That's correct.

22   Q.    Who is it to?

23   A.    David Fallarino at Citizens Bank.

24   Q.    And go ahead and read the first paragraph to the jury?

25   A.    (As read):  "Regarding the DMP International LLC 2014 tax

Laporta - Direct                                                    965

1   return, the Schedule K shows that there was $2,037,597 of

2   ordinary income and $1,168,504 of distributions.  Distributions

3   are only taken up to the point Paul and Kathy have basis.  Any

4   additional money distributed to Paul and Kathy is reflected in

5   loans to partners of $1,738,681, on Schedule L, balance sheet."

6   Q.   Now, this top paragraph that you just read, is it the same

7   language that Mr. Gates sent to you in the previous letter?

8   A.   No.

9   Q.   Why not?  Why did you use different language?

10  A.   I just had to write what I knew had happened.  I mean, I

11  can go back to his letter and compare it, but I just read his,

12  and it didn't make any sense to me.

13  Q.   Now, if you stick back on Government Exhibit 174, at your

14  letter, can you go ahead and read that second paragraph?

15  A.   "The 2015 DMP International LLC tax return has been

16  extended.  In 2015, the amount due to Peranova Holdings of

17  $1.5 million was forgiven and will be reported as income on the

18  2015 DMP International LLC tax return."

19  Q.   Now, are you repeating the same information to Citizens

20  Bank again, now on a different loan, that this $1.5 million had

21  been forgiven?

22  A.   Yes.

23  Q.   And again, when you sent this letter, to the extent there

24  ever really was a loan, did you believe it had actually been

25  forgiven in 2015?

Laporta - Direct                                                          966

1    A.    I did not.

2    Q.    All right.  Now, let's turn finally to the last bank loan

3    application.  Are you familiar with the financial institution

4    named The Federal Savings Bank?

5    A.    Yes.  Which tab am I looking at?

6    Q.    I'm sorry, I can't hear you?

7    A.    Which tab am I looking at?

8    Q.    No tab yet.

9    A.    Okay.

10   Q.    Are you familiar with the financial institution named The

11   Federal Savings Bank?

12   A.    Yes.

13   Q.    And in 2016, do you know if Paul Manafort applied for a

14   loan there as well?

15   A.    Yes.

16   Q.    How did you know that?

17   A.    He told me.

18   Q.    Okay.

19           MR. ASONYE:  And the Court's indulgence?

20   BY MR. ASONYE:

21   Q.    Okay.  Let me show you Government Exhibit 146, which is

22   already in evidence.

23           MR. ASONYE:  Your Honor, may we publish?

24           THE COURT:  Yes, you may.

25   BY MR. ASONYE:

1   Q.   The first page, top of this e-mail, did you receive this

2   e-mail from Heather Washkuhn?

3   A.   Yes.

4   Q.   And is Paul Manafort also copied on this e-mail?

5   A.   He is.

6   Q.   If you turn to the second-to-the-last page of the exhibit,

7   is there a profit and loss statement that's attached?

8   A.   Yes, there is.

9   Q.   And if we can zoom in on, on that?

10           And what's your understanding of what the income tax

11  at the top, the income tax basis means?

12  A.   It means it's prepared on the same accounting basis used

13  for the tax return, and the tax return happened to be a cash

14  basis tax return.

15  Q.   So what is income reported on the income tax basis?

16  A.   In this instance, when cash is received, it's considered

17  income.

18  Q.   And what does this document indicate about how much net

19  income DMP International earned year-to-date in 2016?

20  A.   It shows no income and expenses of 638,000, resulting in a

21  loss of 638,000.

22  Q.   Is that a significant drop in income from typical years

23  for Paul Manafort?

24  A.   Yes.

25  Q.   Around this time, who, if anyone, contacted you about DMP

Laporta - Direct                                                    968

1    International's year-to-date P&L?

2    A.   Who had contacted me about it?

3    Q.   Yes.

4    A.   Mr. Manafort.

5    Q.   And what, if anything, did Mr. Manafort tell you about

6    what he needed?

7    A.   He, he needed accrual basis financial statements.

8    Q.   And why did Mr. -- what did Mr. Manafort tell you why he

9    needed an accrual basis P&L?

10   A.   Because there had been -- he -- I guess the company had

11   earned 2.4 million in 2016 and it was supposed to be received,

12   I think he said, November of 2016.

13   Q.   For what purpose did he tell you he needed the P&L?

14   A.   Oh, for, for a bank.  I think it was another property

15   refi.

16   Q.   All right, let me show you Government Exhibit 175.

17        Is this an e-mail from Paul Manafort to you?  175.

18   A.   I'm sorry.  Yes, it is.

19        MR. ASONYE:  Your Honor, Government moves 175 into

20   evidence.

21        MR. DOWNING:  No objection.

22        THE COURT:  It's admitted.

23        (Government Exhibit No. 175 was received in

24   evidence.)

25        MR. ASONYE:  May we publish?

1        THE COURT:  Yes.

2    BY MR. ASONYE:

3    Q.   If you look at the August 10 e-mail at 8:38 p.m.,

4    Ms. Laporta, the middle e-mail --

5    A.   Yes.

6    Q.   -- what does Paul Manafort write you?

7        Starting, "The 2016."

8    A.   August 10 -- okay.  Sorry.

9        (As read):  "The 2016 P&L should reflect collection

10   of income earned in Ukraine of 2.4 million that is to be

11   collected in November.  The 1.5 million should be listed as

12   income.  Please correct the P&L."

13   Q.   And how do you respond?

14   A.   "Got it.  Thanks."

15   Q.   Now, did Paul Manafort ever provide you with a contract

16   that indicated anticipated collection of $2.4 million?

17   A.   No, he did not.

18   Q.   Did he provide you with an invoice?

19   A.   No.

20   Q.   Did he ever provide you with any evidence to substantiate

21   that he had earned $2.4 million in fees in 2016?

22   A.   No, nor any expenses that would need to be recorded on the

23   accrual basis, which I also requested.

24   Q.   And prior to this time, had Paul Manafort ever asked you

25   to prepare a P&L for him?

1    A.    No.

2    Q.    Who typically prepared the profit and loss statements for

3    Paul Manafort?

4    A.    Heather Washkuhn.

5    Q.    What was your understanding of why you were being asked to

6    prepare this profit and loss statement for Mr. Manafort rather

7    than Heather Washkuhn?

8    A.    Heather's firm had a policy of only preparing cash basis

9    financial statements.

10   Q.    And what would the cash basis P&L for 2016 year-to-date

11   show?

12   A.    Exactly what we just looked at.

13   Q.    Which was?

14   A.    Zero income and $800,000 loss.

15   Q.    What accounting basis would you use to prepare a 2016

16   year-to-date P&L adding $2.4 million?

17   A.    Accrual basis.

18   Q.    Now, did you believe Mr. Manafort expected to collect the

19   $2.4 million in 2016?

20   A.    I had no idea.  I just asked for evidence that would

21   support an accrual basis financial statement.

22   Q.    Did you agree to prepare the P&L?

23   A.    Yes.

24   Q.    Why?

25   A.    Because if I got all the information I requested, I could

Laporta - Direct                                                         971

1   do so.

2   Q.   Now, to whom did Paul Manafort want you to send the

3   accrual P&L?

4   A.   I think it was -- I can't remember the person's name, but

5   it was Federal Savings Bank.

6   Q.   Okay.  And, now, did you actually send the P&L?

7   A.   No.

8   Q.   Why not?

9   A.   I never received the information I requested regarding

10  backup for the accrued income or backup for any additional

11  expenses that should be recorded.

12  Q.   Let me show you Government Exhibit 176.

13          And is this an e-mail regarding that loan?

14  A.   Yes.

15          MR. ASONYE:  Your Honor, Government moves 176 into

16  evidence.

17          MR. DOWNING:  No objection.

18          THE COURT:  It's admitted.

19          (Government Exhibit No. 176 was received in

20  evidence.)

21  BY MR. ASONYE:

22  Q.   Okay.  The date of this e-mail --

23          MR. ASONYE:  May we publish?

24          THE COURT:  Yes.

25  BY MR. ASONYE:

Laporta - Direct                                                    972

1    Q.    If you can zoom in at the top e-mail.

2          The date of this e-mail, August 11, 2016, at

3    3:53 p.m., is that correct?

4    A.    Yes.

5    Q.    Where were you --

6          THE COURT:  Sorry, let me just inquire briefly,

7    Mr. Asonye, that P&L that you just had some testimony on, do

8    you intend to introduce evidence that it was submitted to the

9    bank?

10         MR. ASONYE:  The accrual P&L?

11         THE COURT:  Yes.

12         MR. ASONYE:  The Court's indulgence?

13         THE COURT:  All right.

14         MR. ASONYE:  Your Honor, that's -- it's already in

15   evidence.

16         THE COURT:  I understand that.  So the answer to my

17   question is, yes --

18         MR. ASONYE:  Yes.

19         THE COURT: -- it was submitted to the bank?

20         MR. ASONYE:  Yes, and it's already in evidence in

21   this case through Heather Washkuhn.

22         THE COURT:  That wasn't my question.

23         All right.  Well, in other words, your answer is,

24   yes, you've already introduced evidence that the P&L was

25   submitted to the bank?

Laporta - Direct                                                      973

1            MR. ASONYE:  Yes, Your Honor.  Yes, Your Honor.

2            THE COURT:  Thank you.  Continue.

3    BY MR. ASONYE:

4    Q.    Again, where were you when you sent this e-mail?

5    A.    At the office.

6    Q.    Could you -- and who is this e-mail to?

7    A.    Anna at Federal Savings Bank.

8    Q.    And who was copied on the e-mail?

9    A.    Paul and Heather.

10   Q.    Go ahead and read your e-mail, please.

11   A.    "Hi, Anna.  Please note, the profit loss draft provided by

12   Heather is on the cash basis.  Paul has indicated 2.4 million

13   in fees earned, but not yet received, by DMP are expected to be

14   deposited in November of 2016."

15   Q.    Who, if anyone, directed you to send this e-mail?

16   A.    Paul, Mr. Manafort.

17   Q.    Now, in order to legitimately place $2.4 million on DMP

18   International's 2016 year-to-date accrual basis P&L, when would

19   Mr. Manafort have had to perform the work?

20   A.    In 2016.

21   Q.    Now, if you learned that Mr. Manafort actually performed

22   this work for the $2.4 million in 2014, could you legitimately

23   place it on a 2016 P&L?

24   A.    If he had performed the work when?  I'm sorry.

25   Q.    In 2014.

1    A.    No.

2    Q.    Why not?

3    A.    Because under the accrual basis, it has to be when the

4    work is -- when the income is earned.

5    Q.    Does it matter -- I'm sorry.

6    A.    When it's performed.

7    Q.    Does it matter when Mr. Manafort expected to receive the

8    income?

9    A.    No.

10          MR. ASONYE:  No further questions, Your Honor.

11          THE COURT:  All right.  How long do you anticipate

12   your cross-examination will take?  I mean, I don't want to

13   begin it at 5:00 and you can't finish, and I don't want to rush

14   you.  And I -- there's one issue I want to see counsel on at

15   the bench.

16          MR. DOWNING:  I think I would be a lot more efficient

17   if I could do it on Monday, Your Honor.  And breaking it up

18   between now and Monday doesn't make a lot of sense.

19          THE COURT:  So you're going to need more than half an

20   hour or 45 minutes?

21          MR. DOWNING:  Correct, Your Honor.

22          THE COURT:  All right.  Ms. Laporta, you may step

23   down.  You may not discuss your testimony now with anyone.

24   Anyone.

25          THE WITNESS:  Okay.

975

1          THE COURT:  And we will reconvene Monday at 1:00,

2   Ms. Laporta, at 1:00 on Monday.

3          THE WITNESS:  Okay.

4          THE COURT:  Ladies and gentlemen, pass your books to

5   the right.  Mr. Flood will collect them, maintain their

6   security.

7          MR. ASONYE:  Your Honor, would you just admonish the

8   witness about discussions with any individuals over the

9   weekend?

10          THE COURT:  I did.

11          MR. ASONYE:  Oh, you did.  My apologies.

12          THE COURT:  I said she can't discuss her testimony

13   with anyone.

14          Ms. Laporta, did you understand that I meant that you

15   may not discuss your testimony with anyone while you're on the

16   stand?

17          THE WITNESS:  Yes.

18          THE COURT:  That includes over the weekend.

19          THE WITNESS:  Yes, Your Honor, I understood that.

20          MR. ASONYE:  Thank you, Your Honor.

21                    (Witness stood down.)

22          THE COURT:  All right, remember to refrain from

23   discussing the matter or undertaking any investigation.  I'm

24   sure there will be very little curiosity now.  All right, put

25   it out of your minds until we resume at 1:00 on Monday.

976

1          Thank you for your careful and close attention to the

2   evidence.  You may follow the court security officer out.

3          Oh, let me -- there's one other important matter I

4   have to deal with:  Did you do menus for Monday?

5          THE JURORS:  Yes, sir.

6          THE COURT:  Good.  Now, those meals will be here on

7   Monday if you come early.  Let's make it twelve.  Can we get

8   the meals here at twelve?

9          THE COURT SECURITY OFFICER:  Yes.

10         THE COURT:  We'll get them here at twelve.  So you'll

11  have meals and we'll start at one.

12         THE JURORS:  Thank you, Your Honor.

13                    (Jury out.)

14         THE COURT:  All right, you may be seated.

15         Mr. Asonye, I'm not sure that I understood.  I should

16  understand because I don't think you were lacking in clarity.

17  I asked you whether that -- you would have evidence that that

18  P&L statement that the witness said she never sent and it had

19  her signature on it, I asked you whether there would ever be

20  any evidence that it was submitted to the bank, and I think

21  your answer was, that I wasn't clear about, it's Exhibit

22  so-and-so.

23         So I take it the answer to my question is, yes,

24  evidence has already been submitted as to that.  Am I correct?

25         MR. ASONYE:  Yes, Your Honor.

1          THE COURT:  What is the exhibit you referred to?

2          MR. ASONYE:  I don't know it offhand.  We're going to

3    check on it, but I believe it's the P&L that shows there was no

4    draft on the bottom, had the funky numbers, and it showed a lot

5    of, like, $4 million of income that year.

6          THE COURT:  Oh, so it's a different P&L?

7          MR. ASONYE:  It's an accrual based -- it's a

8    different P&L.

9          THE COURT:  All right.  But my question to you was:

10   Was that P&L that you were asking questions about of this

11   witness ever submitted to the bank?  Will you have evidence of

12   that?

13         MR. ANDRES:  Could we just have one moment, Judge?

14         THE COURT:  Yes.

15         MR. ANDRES:  We'll try to clarify.

16         (Discussion among Government counsel off the record.)

17         MR. ASONYE:  So she -- he requests -- Ms. Laporta

18   never sends that P&L to the bank.

19         THE COURT:  I know that.  She testified to that.

20         MR. ASONYE:  Correct.

21         THE COURT:  So I wanted to know are you going to have

22   evidence that that P&L was submitted to the bank?  I think the

23   answer probably is, no, you're going to have evidence that

24   other P&Ls were submitted.

25         MR. ASONYE:  Correct.  Yes, Your Honor.

978

1          THE COURT:  All right.  Now, we don't need to cover

2    this in any detail, but I want to be clear because we've had

3    some discussion, I don't recall whether it was at the bench or

4    otherwise, about this immunity agreement and its effect and

5    that sort of thing.

6          I want to be clear, Mr. Downing.  There may -- there

7    may have been some statements made that could be construed as

8    my limiting you in some way, but you're not limited in

9    cross-examining her about the reasons for the immunity and what

10   effect it had on her.  This is just like any criminal

11   prosecution where immunity or cooperation is provided.  You're

12   entitled to go into that in any detail you want to.  You have

13   to make judgments about that, you know.

14         She said on the stand she took responsibility for it.

15   She didn't get prosecuted.  I don't know if there were any

16   professional consequences or anything of that sort.  So, in

17   essence, I don't know what she means when she said she took

18   responsibility.  Nothing happened.

19         But that's your problem.  You have to figure it out.

20   What I want you to understand is you're not limited in your

21   cross-examination of her with respect to the immunity that she

22   was provided by the Government.  Once the Government --

23         MR. DOWNING:  Understood, Your Honor.

24         THE COURT:  -- provides immunity, the Court is

25   obligated to require her to testify because she no longer has a

1    Fifth Amendment privilege, and I wanted the public to know that

2    as well.

3              That doesn't mean she's not credible.  She may be

4    credible.  That's their job.  Not mine, theirs.  And I, I have

5    witnesses testify in trials on numerous occasions, maybe

6    thousands in the past 31 years, who have cooperated and

7    gotten not immunity, but gotten cooperation and a reduction of

8    sentence, and sometimes the juries find that they're truthful;

9    sometimes they don't accept that.  It's their job.

10             And so you may cross-examine as you see fit or not at

11   all as you see fit.  That's your responsibility.

12             Anything further this evening, Mr. Asonye?

13             MR. ANDRES:  Judge, we're going to hold off on

14   releasing any of the tax return exhibits --

15             THE COURT:  Oh, yeah.

16             MR. ANDRES:  -- until hearing from Mr. Downing.

17             We're fine with that.  I just wanted some

18   direction --

19             THE COURT:  Yes.

20             MR. ANDRES:  -- or guidance.

21             THE COURT:  All right.  Well, let's wait and give

22   Mr. Downing an opportunity to address that.  But, ultimately,

23   these tax returns are going to be in the public record,

24   ultimately, in my view.  If I'm wrong about that, Mr. Downing,

25   you've got to tell me.  Now --

980

1          MR. DOWNING:  I will, Your Honor.

2          THE COURT:  -- tax returns aren't in the public

3  record, and maybe there are parts of it that shouldn't be, but

4  you-all should discuss that.

5          I think once it becomes an exhibit in a trial, I

6  think it has to be in the public.

7          MR. DOWNING:  We'll address that, Your Honor.

8          THE COURT:  All right.  Anything further this

9  evening?

10          MR. ANDRES:  No, Your Honor, thank you.

11          MR. DOWNING:  No, Your Honor.

12          THE COURT:  I thank counsel for your cooperation.  I

13  hope you will have an enjoyable, eventful weekend.  I hope mine

14  will not be eventful.  You'll get to that point, I promise you.

15     (Recess from 5:00 p.m., until 1:00 p.m., August 6, 2018.)

16

17                CERTIFICATE OF THE REPORTER

18     I certify that the foregoing is a correct transcript of

19  the record of proceedings in the above-entitled matter.

20

21

22              _____
                           /s/
23                   Anneliese J. Thomson

24

25