Rodriguez - Direct                                                    1906

1    BY MR. ASONYE:

2    Q.    Could you please state and spell your name for the record?

3    A.    Taryn Rodriguez, T-a-r-y-n R-o-d-r-i-g-u-e-z.

4    Q.    And where do you live?

5    A.    Bronx, New York.

6    Q.    How far did you go in school?

7    A.    I have a GED, sir.

8    Q.    And are you currently employed?

9    A.    Yes, I am.

10   Q.    Where do you work?

11   A.    Citizens Bank.

12   Q.    How long have you worked there?

13   A.    Two-and-a-half years, approximately.

14   Q.    And what's your title?

15   A.    Loan officer assistant.

16   Q.    And what do you do as a loan officer assistant?

17   A.    I speak to clients, collect their documents, review their

18   documents, such as tax returns, asset statements.

19   Q.    And what position do you report to?

20   A.    Loan officer.

21   Q.    Which loan officer do you report to?

22   A.    David Fallarino.

23   Q.    And how many years of experience do you have in the

24   mortgage industry?

25   A.    Approximately 13 years.

Rodriguez - Direct                                                      1907

1    Q.    Now, with respect to Citizens Bank, do you collect

2    information from the borrower for loans?

3    A.    Yes, I do.

4    Q.    And what type of information do you collect for

5    self-employed borrowers?

6    A.    Tax returns, profit and loss statements, balance sheets.

7    Q.    And does the borrower have to complete any other forms?

8    A.    As far as?  I'm sorry.

9    Q.    Do they have to complete a loan application?

10   A.    Yes, correct.

11   Q.    And all of those documents that are provided to the bank,

12   does the bank rely on the accuracy and completeness of those

13   records?

14   A.    Yes, we do.

15   Q.    In the loan application, does the borrower provide --

16   sorry -- promise that the information contained in the

17   application is complete and accurate?

18   A.    Yes.  On the third page.

19            THE COURT:  We're not going to cover anything that's

20   already been covered, are we?

21            MR. ASONYE:  No, Your Honor.  I'm not going to show

22   her any of those documents.

23            THE COURT:  Let's proceed.

24   BY MR. ASONYE:

25   Q.    Is -- I just want to go through the factors, make sure

Rodriguez - Direct                                                        1908

1    that they're -- they matter to the bank.

2            Does the debt-to-income ratio matter to the bank?

3    A.   Yes, it does.

4            THE COURT:  I think I've heard this before, and I

5    heard it from people -- from her bank senior to her.

6            MR. ASONYE:  Your Honor, as long as it's stipulated

7    on this loan that the same materiality factors exist from the

8    prior witness, I mean, I'm happy to skip through it.

9            THE COURT:  Is this a different loan?

10           MR. ASONYE:  It is a different loan.

11           THE COURT:  All right.  Go ahead.

12   BY MR. ASONYE:

13   Q.   Is the debt-to-income ratio an important factor in

14   determining whether to approve a loan at the bank?

15   A.   Yes, it is.

16   Q.   And would it matter to the bank if a borrower earned

17   income in a different year than he represented to the bank?

18   A.   Yes, it would.

19   Q.   The real estate owned -- the real estate owned, is that an

20   important factor the bank considers when trying to determine

21   whether to extend a loan?

22   A.   Yes, it is.

23   Q.   Does the borrower -- if the borrower is self-employed, do

24   they have to disclose all of the real estate owned by their

25   business as well?

Rodriguez - Direct                                                    1909

1    A.    I don't believe so, but I'm not sure.

2    Q.    With respect to a cash-out refinance, does the bank ask

3    whether the funds will be -- how the funds will be used?

4    A.    Yes, we do.

5    Q.    And if a borrower intends to use the funds from a cash-out

6    refinance to obtain new debt, would the bank want to know that?

7    A.    Absolutely.

8    Q.    Why?

9    A.    Because it affects how you qualify the loan.  If there's

10   going to be new debt, we want to ensure that we factor that

11   debt in and they can still pay back the loan that we're giving

12   them.

13   Q.    And does the Citizens Bank require borrowers to notify the

14   bank of any new debt obtained during the loan process?

15   A.    Yes, we do.

16   Q.    And how do you do that?

17   A.    We normally disclose it to the borrower and advise them

18   that they should let us know.

19   Q.    Is it important to the bank whether a property is a rental

20   property versus a primary residence or a secondary residence?

21   A.    Yes, it is.

22   Q.    And are they treated differently?

23   A.    Yes, they are.

24   Q.    How do you know whether, the bank know whether property is

25   a rental property?

Rodriguez - Direct                                                          1910

1    A.   Generally, there is rental income for that property listed

2    on a tax return.  So the borrower will claim the rental income

3    on their investment property.

4    Q.   And does the loan application also ask about rental

5    income?

6    A.   The loan application gives an area to list rental income,

7    yes, it does.

8    Q.   Okay.  Do -- does the bank use appraisers in connection

9    with loan applications?

10   A.   Yes, we do.

11   Q.   And what, if any, information about occupancy is contained

12   in the appraiser's report?

13   A.   On the first page of the report, there are three boxes

14   that the appraiser can check.  It's that the borrower is living

15   there, a tenant is living there, or the property is vacant.

16   Q.   According to the bank's rules, are processors and loan

17   officers allowed to communicate with the appraisers?

18   A.   No, we're not.

19   Q.   Why not?

20   A.   It could be a conflict of interest, so we go through a

21   third-party management system.  We place the order with them

22   and then they assign the appraiser.

23   Q.   Was Paul Manafort a customer of the bank?

24   A.   Yes, he was.

25   Q.   How many loans did he obtain from the bank?

Rodriguez - Direct                                                      1911

1   A.    I know of one that closed.

2   Q.    Okay.  Are you aware of any instance where he applied for

3   a loan but did not get it?

4   A.    Yes.

5   Q.    Do you recall having communications directly with

6   Paul Manafort regarding either of these loan applications?

7   A.    Via e-mail, yes.

8   Q.    Now, did you have access to documents related to

9   Paul Manafort's cash-out refinance loan on 29 Howard Street in

10  New York?

11  A.    Yes, I did.

12  Q.    And at what stage, if any, of that loan did you get

13  involved?

14  A.    Which loan, 29 Howard Street?

15  Q.    29 Howard Street.

16  A.    29 Howard Street, I had started working for the bank while

17  that loan was already approved.  So I got in at the end of that

18  loan, if I worked on it at all.

19  Q.    Okay.  And with respect to closing, is there any

20  requirement from the bank regarding a client's presence at

21  closing for a cash-out refinance?

22  A.    Yes, they must be present.  We don't allow power of

23  attorney.

24  Q.    Are you aware of a loan Paul Manafort applied for related

25  to a property at 377 Union Street in New York?

Rodriguez - Direct                                                    1912

1    A.    Yes, I am.

2    Q.    What type of loan was that?

3    A.    Construction to permanent.

4    Q.    And was -- unlike the prior loan, was this loan eventually

5    approved by Citizens Bank?

6    A.    No, it was not.

7    Q.    And did you work on the loan for 377 Union Street from the

8    very beginning?

9    A.    Yes, I did.

10   Q.    Now, was a loan application for Paul Manafort prepared for

11   Union Street?

12   A.    Yes, it was.

13   Q.    Okay.  Who input the information into that loan

14   application?

15   A.    I did.

16   Q.    And how did you populate the loan application for the

17   Union Street loan?

18   A.    I used the final application for 29 Howard Street that was

19   presented at closing, and I transferred that information for

20   377 Union Street.

21   Q.    And how -- like, how far apart were -- was that time

22   period from when the Howard Street loan closed to when you

23   populated the information for the Union Street loan?

24   A.    I don't know exactly.  I would say approximately 30 days,

25   45 days.

Rodriguez - Direct                                                          1913

1   Q.   Okay.  Did you make any changes from what Paul Manafort

2   submitted to the bank on the Howard Street loan application

3   when you populated the Union Street loan application?

4   A.   No, I did not.

5   Q.   And after you input the information for the Union Street

6   loan using the Howard Street loan application, was that Union

7   Street loan application forwarded to Paul Manafort?

8   A.   Yes, it was.

9   Q.   How do you know?

10  A.   It's sent electronically in our system, so we have receipt

11  that it went out electronically, and it also gets sent out via

12  hard copy.

13  Q.   And did Paul Manafort have the opportunity to make any

14  changes to his Union Street loan application?

15  A.   Yeah.

16  Q.   And how would he have done that?

17  A.   By sending an e-mail to us or calling us, letting us --

18  letting us know if something needed to be changed.

19  Q.   Do you know if the loan application for Union Street was

20  eventually submitted to underwriting for the bank?

21  A.   It was.

22  Q.   On the borrower's side for the Union Street loan, who, if

23  anyone, did you talk to regarding this loan -- or communicate

24  with, I should say?

25  A.   Paul Manafort, Jeff Yohai, I'm not sure who else.  I can't

Rodriguez - Direct                                                    1914

1   really remember.  I remember those two names specifically.

2   Q.   And did you know who Jeff Yohai -- do you know -- did you

3   know his relationship with Paul Manafort?

4   A.   Yes.  I understood him to be Paul Manafort's son-in-law.

5   Q.   Okay.  All right.  Let me show you what's been marked as

6   Government Exhibit 255.

7              What is it?

8   A.   255, you said, correct?

9   Q.   Yes.

10  A.   This is the loan application for 377 Union Street.

11             MR. ASONYE:  Your Honor, Government moves 255 into

12  evidence.

13             MR. NANAVATI:  No objection, Your Honor.

14             THE COURT:  Admitted.

15             (Government Exhibit No. 255 was received in

16  evidence.)

17             MR. ASONYE:  May we publish?

18             THE COURT:  You may if you need to.

19  BY MR. ASONYE:

20  Q.   All right.  So if we can zoom in on the top third of this

21  document?

22             Who's the borrower -- the borrowers on this loan

23  application?

24  A.   Paul Manafort and Kathleen Manafort.

25  Q.   Okay.  And if you look at the top left, what is the amount

Rodriguez - Direct                                                    1915

1  of this loan application?

2  A.   5.5 million.

3  Q.   And does it -- do you see what it says for purpose of the

4  loan?

5  A.   Yeah.

6  Q.   And what's the purpose of the loan?

7  A.   Construction to permanent.

8  Q.   Next to the right of that, what does it say the property

9  will be?  What box is checked?

10 A.   Primary residence.

11 Q.   And if you could turn to what I have as the second to the

12 last page, which is Page 6 of this document?

13        Do you see at the very bottom where it says, "real

14 estate owned"?

15 A.   Yes, I do.

16 Q.   Okay.  Does this section need to be accurate?

17 A.   Yes, it does.

18 Q.   If you turn to the final page of the loan application, do

19 you see where it says 377 Union Street?

20 A.   Yes.

21 Q.   Does Paul Manafort disclose the existence of any mortgages

22 on 377 Union Street?

23 A.   No.

24 Q.   Now, did Citizens Bank perform lien searches on every

25 property that's subject to a loan?

Rodriguez - Direct                                                    1916

1   A.   Yes, we do.

2   Q.   Okay.  And -- now, do you normally prepare those types of

3   searches for other properties that the borrower might own that

4   are not subject to the loan?

5   A.   No, we don't.

6   Q.   Okay.  Now, do you also conduct searches for property tax

7   information about a subject property for -- of a loan?

8   A.   Yes, I do.

9   Q.   Why do you do that?

10  A.   I do that to ensure that the loan is being qualified

11  properly and I'm accounting for all the proper taxes that the

12  borrower owes.

13  Q.   And what databases do you search?

14  A.   I search what's called ACRIS in New York City, A-C-R-I-S,

15  and I'll also search the public tax records.

16  Q.   What's ACRIS?

17  A.   It's a public records database that will tell you every

18  mortgage, lien, or deed that was done on a property.

19  Q.   And did you conduct those searches with respect to

20  377 Union Street for this loan?

21  A.   Yes, I did.

22  Q.   And when you conducted those searches, what, if anything,

23  did you learn?

24  A.   There was a mortgage on 377 Union Street.

25  Q.   Okay.  And did that conflict with the information we just

Rodriguez - Direct                                                  1917

1    looked at in the loan application?

2    A.   Yes, it did.

3    Q.   And when you conducted this search and found a lien on

4    377 Union Street, do you recall the amount of the lien?

5    A.   I don't know the exact amount, but I do know that it was

6    in the millions.

7    Q.   Now, does the bank want to know information about existing

8    liens on properties?

9    A.   Yes, yes.

10   Q.   Why do you want to know that?

11   A.   It affects the structure on the loan.  We need to know

12   what needs to be paid off.

13   Q.   And how important is existing lien information?

14   A.   Very important.

15   Q.   Had Mr. Manafort previously disclosed the existence of the

16   prior lien on 377 Union Street?

17   A.   Not that I'm aware of, no, not on this application.

18   Q.   In your experience, how unusual is it to not disclose a

19   loan on the subject property?

20   A.   Very unusual.

21   Q.   After you learned about the loan worth millions of dollars

22   on the Union Street property, what did you do?

23   A.   I had brought it to my loan officer, advised him that

24   there was a mortgage on the property, and that the loan would

25   need to be restructured.

Rodriguez - Direct                                                      1918

1   Q.    And again, who was your loan officer?

2   A.    David Fallarino.

3   Q.    What was Paul Manafort required to do as a result of your

4   finding?

5   A.    He needed to provide the information on the mortgage.

6   Q.    And how, if at all, did it affect the loan structure?

7   A.    We would have to pay that lien off.  In this particular

8   case, assuming the loan would have gone forward, it would have

9   potentially lowered the amount of cash that he would have

10  received towards the construction project.

11  Q.    Now, also on this loan application, does Mr. Manafort

12  disclose a $1 million business loan from the Banc of California

13  guaranteed by him personally?

14  A.    No, he does not.

15  Q.    How unusual is it, in your experience, to not disclose two

16  loans worth over a million dollars on a loan application?

17          MR. NANAVATI:  Objection.  Relevance, Your Honor.

18          THE COURT:  I can't hear you.

19          MR. NANAVATI:  Objection.  Relevance.

20          THE COURT:  What's the question again, Mr. Asonye?

21          MR. ASONYE:  In her experience, how unusual is it to

22  not -- for a borrower not to disclose two loans worth over a

23  million dollars on a loan application?

24          THE COURT:  I'll sustain the objection.  What

25  difference does it make whether it's common or not common or

Rodriguez - Direct                                                    1919

1    anything else?

2              MR. ASONYE:  I think it -- I think it goes to

3    intentionality, Your Honor.

4              THE COURT:  No.

5              MR. ASONYE:  Fair enough.  I'll move on.

6    BY MR. ASONYE:

7    Q.   Is it -- is that information the bank would want to know,

8    that there are two -- more than $1 million loans on -- that are

9    not disclosed?

10   A.   Yes, that's information the bank would want to know.

11   Q.   All right.  Let me show you Government Exhibit 252.

12             Does this relate to Mr. Manafort's loan on Union

13   Street?

14   A.   Yes, it does.

15             MR. ASONYE:  All right.  Your Honor, Government moves

16   252 into evidence.

17             MR. NANAVATI:  Without objection, Your Honor.

18             THE COURT:  Admitted.

19             (Government Exhibit No. 252 was received in

20   evidence.)

21             MR. ASONYE:  May we publish?

22             THE COURT:  Yes.

23   BY MR. ASONYE:

24   Q.   Who is this loan from -- I'm sorry, loan.  Who is this

25   e-mail from?

Rodriguez - Direct                                                      1920

1    A.    It's from me.

2    Q.    Okay.  If you turn to the fourth page, the e-mail on

3    March 11 at 10:02, do you see there's a starred paragraph?  It

4    starts, "We are."  Can you go ahead and read that to the jury?

5    A.    "We are now aware of the one loan on 377 Union.  We do

6    need the statement on this, please."

7    Q.    Okay.  And who sent that e-mail?

8    A.    David Fallarino.

9    Q.    Okay.  How did he -- what is that in reference to?

10   A.    He's referencing the loan that I found when I searched

11   ACRIS, so he's asking for the mortgage statement on it.

12   Q.    So you found that loan; is that correct?

13   A.    Yes.

14   Q.    Mr. Manafort didn't tell you about the loan; is it

15   correct?  You didn't learn about that loan from Mr. Manafort?

16   A.    Correct.

17   Q.    And just below --

18             THE COURT:  Where did you find out about the loan?

19             THE WITNESS:  On ACRIS, the database that I searched,

20   Your Honor.

21             THE COURT:  Next question.

22             MR. ASONYE:  The Court's indulgence.

23   BY MR. ASONYE:

24   Q.    Okay.  And then if you'd look at the -- there's a bullet

25   point for occupancy and then there's two stars below that.  Can

Rodriguez - Direct                                                    1921

1   you go ahead and read that sentence?

2   A.   "If they kick us to a second home, we will be max LTV at

3   60 percent."

4   Q.   What does that mean?

5   A.   It means that if we switch occupancy from primary to

6   second home, his loan-to-value will probably decrease.

7   Q.   So Mr. Manafort had represented that 377 Union was his

8   primary residence?

9   A.   Yes, that's correct.

10  Q.   And that -- did that allow him to get better terms?

11  A.   It would be probably be the same type of terms as a second

12  home.

13  Q.   Did it allow him --

14  A.   Maybe -- it may be a little less.

15  Q.   Did it allow him to have a better LTV, a more -- a looser

16  LTV?

17  A.   In this case, yes, it did.

18  Q.   Okay.  Now, could you read the next paragraph, below that,

19  "We are pushing"?

20  A.   "We are pushing the DTI on this.  We will need to see 2015

21  tax returns (of course we will need equal or better income than

22  2014).  Also, we will need to talk to Cindy to make sure the

23  K-1s for DMP have distribution income that matches Ordinary

24  Business Income (which should be the case after the 1.5 million

25  forgiven loan - but we need to confirm this.)  Also, the

Rodriguez - Direct                                                      1922

1   returns should be e-filed."

2   Q.   Okay.  I'm going to sort of break this down by issue.

3          If you could explain, if you know, to the jury what

4   this means.

5   A.   Sure.

6   Q.   The first sentence says, "We're pushing DTI on this."

7   What does that mean?

8   A.   It means we're very close to the maximum DTI allowed on

9   that loan.

10  Q.   And that's as a primary residence; is that correct?

11  A.   I believe so based on this e-mail.

12  Q.   The second issue:  Do you know why income needs to be

13  equal or better than 2014?

14  A.   Because when you're looking at income to qualify a loan,

15  you want to see a stable or increasing trends in order to use

16  that income to qualify.

17  Q.   Okay.  And what happens if you show a decreasing trend?

18  A.   You use the decreasing number for income or you may not be

19  able to use it at all.  It would depend on the situation.

20  Q.   And then there's some indication that -- why does

21  distribution income need to match ordinary business income?

22  What does that mean?

23  A.   Ordinary business income is the income that's filed on the

24  tax return that they made for their business.  Distribution

25  income is what they actually took from the business.  It's --

Rodriguez - Direct                                                    1923

1    that figure is not always the same.

2    Q.   And then finally, it says something about e-filed returns.

3    What does that mean?

4    A.   To e-file them, to send them electronically.

5    Q.   Why does that matter?

6    A.   They just get filed faster, that way, instead of via

7    regular snail mail, as we call it, where it would take weeks

8    for them to get with the IRS.

9    Q.   Okay.  Let me show you what's marked as Government

10   Exhibit 248.  Is that also an e-mail discussing this loan?

11   A.   Yes, it is.

12           MR. ASONYE:  Your Honor, Government moves 248 into

13   evidence.

14           MR. NANAVATI:  Without objection.

15           THE COURT:  Admitted.

16           (Government Exhibit No. 248 was received in

17   evidence.)

18   BY MR. ASONYE:

19   Q.   Okay.  And if you could turn --

20           MR. ASONYE:  May we publish?

21           THE COURT:  Yes.

22   BY MR. ASONYE:

23   Q.   If you could turn to the second page.

24           At the bottom e-mail, who is that e-mail from?

25   A.   Is that the e-mail Monday, April 18?

1    Q.    At -- yes, at 1:57 p.m.?

2    A.    That e-mail is from David Fallarino.

3    Q.    Okay.  And in the first paragraph, what does David

4    Fallarino say will be needed?

5    A.    Item No. 1?

6    Q.    Yes.

7    A.    (As read):  "A letter from Cindy indicating that the

8    difference in 'ordinary income' and 'distribution income' on

9    the DMP K-1 in 2015 was due to a loan that was forgiven in

10   2015.  And that the -- in 2015, the distribution income will

11   match the ordinary income as it has in the past."

12   Q.    And then what's the second issue that he says is

13   necessary?

14   A.    "An occupancy letter from Paul stating that this will be

15   his 'primary' home in New York City."

16   Q.    And if you could skip to just the last sentence of that

17   paragraph?

18   A.    "And the 29 Howard Street would be occupied full time by

19   Jeff and Jessica."

20   Q.    Okay.  Now, something I didn't ask you:  The bank, is

21   Mr. Fallarino an employee of the bank?

22   A.    Yes, he is.

23   Q.    Okay.  But who actually owns the bank?

24   A.    It's a publicly traded company.  In a bank, it's the

25   shareholders who own it.

Rodriguez - Direct                                                        1925

1    Q.   Okay.  Now, did the bank receive both of the documents

2    that are referenced in this e-mail?

3    A.   Yes, we did.

4    Q.   Did the bank rely --

5            THE COURT:  I think -- just to point out to you, I

6    think we have heard testimony about who owned the bank from

7    another witness.  And you took the risk of getting somewhat

8    different answers from a lower-ranking employee.

9            Let's see if we can't really sharply focus this.

10   BY MR. ASONYE:

11   Q.   Did the bank rely on both of those -- the documents that

12   were received?

13   A.   Yes, we did.

14   Q.   Why did the bank need an occupancy letter?

15   A.   We asked for the occupancy letter because we're doing the

16   home as a primary residence, but it's under construction.  So

17   we'd want something in the file attesting that the borrower

18   will be residing in it that way once the construction is

19   completed.

20   Q.   Now, if you turn to the front of this, first page of this

21   e-mail?  Now, if we can just focus at the top e-mail?  What

22   does the top e-mail say?  Just the -- if you -- it's to Rick

23   Gates.  What does it say?

24   A.   "Can we do these two things ASAP?"

25   Q.   Okay.  And what's the e-mail address that that's from?

Rodriguez - Direct                                                            1926

1   A.    Pm22314@gmail.com.

2   Q.    Okay.  Now, if I could show you Government Exhibit 230.

3             Is this also an e-mail relating to the occupancy of

4   this property?

5   A.    Yes, it is.

6             MR. ASONYE:  Your Honor, Government moves 230 into

7   evidence.

8             MR. NANAVATI:  No objection, Your Honor.

9             THE COURT:  Admitted.

10            (Government Exhibit No. 230 was received in

11  evidence.)

12            MR. ASONYE:  Okay.  And may we publish, Your Honor?

13            THE COURT:  Yes, you may.

14  BY MR. ASONYE:

15  Q.    The bottom e-mail is from Paul Manafort.  What is the

16  subject of the e-mail?

17  A.    "Primary residence letter - Union Street."

18  Q.    And what does he say in the e-mail?

19  A.    "David, I have attached the letter you requested.  Paul."

20  Q.    And if you turn to the next page, if we could just look at

21  this -- if we could blow up the letter.

22            Whose letterhead is on the top of this letter?

23  A.    Paul Manafort's.

24  Q.    Okay.  And who is it to?

25  A.    David Fallarino.

Rodriguez - Direct                                                    1927

1    Q.   What is the date?

2    A.   May 2, 2016.

3    Q.   And could you go ahead and read the letter?

4    A.   (As read):  "David, it is my intention to use the

5    brownstone on 277 Union Street, Brooklyn, New York, as my

6    primary residence once the construction is completed."

7    Q.   And now, with respect to -- there wasn't a loan for 277

8    Union Street, was there?

9    A.   No, I understood this to be a typo.

10   Q.   It should say 377?

11   A.   I believe so, yes.

12   Q.   Okay.  Now, this indicates that Mr. Manafort intended to

13   use 377 Union as his primary residence, but did he already

14   represent 29 Howard Street as his second residence on the

15   Howard Street loan application?

16   A.   From what I remember, yes.

17   Q.   All right.  Let me show you Government Exhibit 251.

18            Okay.  Is this another e-mail from Paul Manafort to

19   the bank relating to this property?

20   A.   Yes, it is.

21            MR. ASONYE:  Your Honor, Government moves 251 into

22   evidence.

23            MR. NANAVATI:  No objection, Your Honor.

24            THE COURT:  Admitted.

25            (Government Exhibit No. 251 was received in

Rodriguez - Direct                                                    1928

1    evidence.)

2              MR. ASONYE:   Okay.   May we publish?

3              THE COURT:   Yes.

4    BY MR. ASONYE:

5    Q.   Okay.   If you look at the second e-mail from the top, from

6    Mr. Fallarino, at 2:40, is -- who is that to?

7    A.   Paul Manafort.

8    Q.   Okay.   And are you also on the e-mail?

9    A.   Yes, I am.

10   Q.   And is Rick Gates on the e-mail?

11   A.   Yes, he is.

12   Q.   Okay.   Go ahead and read that e-mail, please.

13   A.   (As read):   "Hi, Paul, can you add to this letter that

14   Jeff and Jessica will occupy 27 Howard (and you will no longer

15   share that with them once the home is complete).

16              "We want the structure to be clear to the

17   underwriter - so any additional color is good.

18              "We had Jeff and Jessica and their kids at Howard.

19              "Your other daughter also in Manhattan.

20              "You and Kathleen will use Union Street once

21   complete.

22              "We also need a change to Cindy Laporta's letter.

23   Can I reach out to her directly?"

24   Q.   Okay.   And then does Mr. Manafort respond at the top

25   e-mail.

Rodriguez - Direct                                                    1929

1    A.    He does.

2    Q.    And what does he say?

3    A.    (As read):  "Rick, please deal with Fallarino regarding

4    the change he needs in Laporta letter.  Do this this morning.

5    Thanks, P."

6    Q.    And is Rick Gates on that e-mail as well?

7    A.    Yes, he is.

8    Q.    Okay.  Let me show you Government Exhibit 250.

9          Is this a document that the bank received?

10   A.    Yes, it is.

11   Q.    Does it relate to the Union Street loan application?

12   A.    Yes, it does.

13         MR. ASONYE:  Your Honor, Government moves 250 into

14   evidence.

15         MR. NANAVATI:  No objection, Your Honor.

16         THE COURT:  It's admitted.

17         (Government Exhibit No. 250 was received in

18   evidence.)

19         MR. ASONYE:  And may we publish?

20         THE COURT:  You may.

21   BY MR. ASONYE:

22   Q.    This -- is this a similar letter from the previous

23   occupancy letter that you testified about?

24   A.    Yes, it is.

25   Q.    Okay.  Is there a new paragraph in this letter?

Rodriguez - Direct                                                    1930

1    A.   Yes, there is.

2    Q.   Can you go ahead and read that second paragraph?

3    A.   "Once I move out of Howard Street, it is the intention of

4    my daughter, Jessica, and her family to move into the Howard

5    condo."

6    Q.   Now, do you know if Mr. Manafort had previously

7    represented that his daughter was already living in the Howard

8    Street condo?

9    A.   I don't know.

10   Q.   And is this letter signed by Paul Manafort?

11   A.   I believe it to be, yes.

12   Q.   Now, did the bank rely on Mr. Manafort's representations

13   in this letter about occupancy, both of himself and his

14   daughter?

15   A.   Yes, we did.

16   Q.   Okay.  Let me show you Government Exhibit 254.

17          Does this, again, also relate to the Union Street

18   loan?

19   A.   Yes, it does.

20          MR. ASONYE:  Your Honor, Government moves 254 into

21   evidence.

22          MR. NANAVATI:  No objection, Your Honor.

23          THE COURT:  All right.  It's admitted.

24          (Government Exhibit No. 254 was received in

25   evidence.)

```
Rodriguez - Direct                                              1931
```

1          MR. ASONYE:  May we publish?

2          THE COURT:  And you may publish.

3    BY MR. ASONYE:

4    Q.   And if we could zoom in on the top e-mail.

5         Who is it from?

6    A.   Rick Gates -- oh, I'm sorry, no, it's from Paul Manafort.

7    I'm sorry.

8    Q.   That's okay.  And who is it to?

9    A.   Rick Gates.

10   Q.   What's the subject?

11   A.   "Manafort items needed."

12   Q.   Okay.  And what does Mr. Manafort say in this e-mail?

13   A.   "I need this done by COB tomorrow.  Please confirm to me

14   when done."

15   Q.   Okay.  And then is the bottom e-mail from you?

16   A.   Yes, it is.

17   Q.   Okay.  And if you could turn to the second page.  What are

18   the items that you identify in paragraph 5 and in paragraph 7?

19   Could you read those two numbered paragraphs to the jury?

20   A.   Number 5 is, "Signed 2016 year-to-date profit and loss

21   statements for all businesses - not yet requested.  Updated CPA

22   letter without the additional sentence for 2015 K1 - requested

23   from Rick."

24   Q.   Okay.  Do you know why you needed the 2016 year-to-date

25   profit and loss statements for all businesses?

Rodriguez - Direct                                                    1932

1   A.   It would have been required at that time for where we were

2   in the year.

3   Q.   Okay.  And then for 7, you referenced the CPA letter?

4   A.   Correct.

5   Q.   Do you know why you indicated that you needed to request

6   it from Rick?  Why did you request it from Rick Gates?

7   A.   I don't remember.  I don't remember who told me to do

8   that.

9   Q.   Okay.  And did the bank ultimately get the profit and loss

10  statement?

11  A.   We did.

12  Q.   All right.  Let me show you Government Exhibit 257.

13          MR. ASONYE:  And, Your Honor, I believe 257 is in.

14  May we publish?

15          THE COURT:  You may.

16  BY MR. ASONYE:

17  Q.   And is this e-mail from you?

18  A.   Yes, it is.

19  Q.   Okay.  And can you go ahead and -- can you read the third

20  sentence, the 2015 figures?  Can you go ahead and read that

21  sentence?

22  A.   "The 2015 figures were light because the client received

23  payment in 2016 from one of his clients."

24  Q.   And go ahead and finish off that paragraph.

25  A.   (As read):  "Attached you will find the 2016 year-to-date

Rodriguez - Direct                                                      1933

1    P&L for DMP International reflecting $1,761,952 in income.

2    This combined with 2015 figures, which was 400,000, would

3    support the income used from 2013 and 2014."

4    Q.    Okay.  What did you mean when you said the 2015 figures

5    were light because the client received payment in 2016 from one

6    of his clients?

7    A.    We understood it to mean that there was work completed in

8    2015, but the client didn't receive payment until 2016.

9    Q.    And whose representation did you rely on when you made

10   that statement?

11   A.    The borrower's.

12   Q.    Would it matter to the banker if DMP International, Paul

13   Manafort's company, made no money, zero dollars, in 2016?

14   A.    Yes, it would.

15   Q.    Would it matter to the company if DMP's year-to-date

16   income for 2016 as of July 31, '16, was actually a loss of over

17   $600,000?

18   A.    Yes, it would.

19   Q.    And if you'd turn to page 3, the attached profit and loss

20   statement.

21          What does it indicate was the net income for DMP

22   International as of July 31, 2016?

23   A.    $1,761,952.

24   Q.    And did the bank rely on that statement?

25   A.    Yes, we did.

Rodriguez - Direct                                                              1934

1   Q.   What did you do with this document once you received it?

2   A.   It was forwarded to underwriting.

3   Q.   And what did -- why did you forward it to underwriting?

4   A.   Ultimately, they're the one who reviews the documentation

5   and either accepts it or asks for additional information.

6   Q.   Now, if this profit and loss statement was fabricated,

7   would the bank want to know that?

8   A.   Absolutely.

9   Q.   Why would you want to know if it was fabricated?

10  A.   Because it's a false document and we need an accurate

11  representation of the borrower's income.

12  Q.   What would you have done if you were -- if you found out

13  that this document was fabricated?

14  A.   I would have brought it to my upper management.

15  Q.   I'm sorry?

16  A.   I would have brought it to upper management.

17  Q.   Now, your previous -- one of the previous exhibits we

18  discussed referenced paragraph 7, a CPA letter; is that

19  correct?

20  A.   Yes, it is.

21  Q.   Okay.  Did you end up getting that CPA letter as well?

22  A.   Yes, we did.

23  Q.   All right.  Let me show you Government Exhibit 249.  Is

24  this an e-mail to you regarding this Union Street loan

25  application?

Rodriguez - Direct                                                    1935

1    A.   Yes, it is.

2            MR. ASONYE:  Your Honor, Government moves 249 into

3    evidence.

4            MR. NANAVATI:  No objection, Your Honor.

5            THE COURT:  Admitted.

6            (Government Exhibit No. 249 was received in

7    evidence.)

8            MR. ASONYE:  May we publish?

9            THE COURT:  Yes.

10   BY MR. ASONYE:

11   Q.   Okay.  If you could -- if you could highlight the e-mail.

12           And if you look at the bottom e-mail, who's the

13   bottom e-mail from?

14   A.   Paul Manafort.

15   Q.   And who's it to?

16   A.   David Fallarino.

17   Q.   What's the date of the e-mail?

18   A.   May 2, 2016.

19   Q.   And what is the subject?

20   A.   "KWC letter."

21   Q.   Okay.  Go ahead and read the e-mail.

22   A.   "David, here is the letter you requested.  Paul."

23   Q.   And is there a letter that's attached?

24   A.   Yes, there is.

25   Q.   Okay.  Turn to the next page, if you would.  Is this the

Rodriguez - Direct                                                      1936

1    CPA letter?

2    A.   Yes.

3    Q.   And who is it from?

4    A.   Cindy Laporta.

5    Q.   Is there a reference in this letter about a forgiven $1.5

6    million loan which would be income in 2015?

7    A.   Yes, there is.

8    Q.   Did the bank rely on that information?

9    A.   Yes, we did.

10   Q.   If you learned that this loan was not forgiven in 2015 but

11   was actually supposedly forgiven in 2016, could that have

12   affected the bank's lending decision?

13   A.   Yes.  Well, it would have affected how we calculated

14   income.

15   Q.   Okay.  And if you learned that this forgiveness letter was

16   backdated, could it affect the bank's lending decision?

17   A.   Yes.  Again, it would affect how we calculated income.

18   Q.   Also, let me ask you this, Ms. Rodriguez:  If Mr. Manafort

19   or his businesses had millions of dollars of overseas loans, is

20   that something that he would need to disclose to the bank?

21   A.   Yes.

22   Q.   And if his businesses internally had millions of dollars

23   of loans in between then, his own controlled entities, was that

24   something the bank would want to know too?

25   A.   Yes.  Generally speaking, that would be disclosed on the

Rodriguez - Cross                                                      1937

1    tax returns, most likely.

2    Q.   Was the Union Street loan ever funded?

3    A.   No, it was not.

4    Q.   Do you know why?

5    A.   No, I don't.  I was never given a specific reason for it,

6    me personally.  I was just told that we weren't moving forward

7    with the loan.

8               MR. ASONYE:  The Court's indulgence?

9               No further questions, Your Honor.

10              THE COURT:  All right.  Mr. Nanavati.

11              MR. NANAVATI:  Yes, Your Honor.  Thank you.

12              THE COURT:  You might want to spend time on a loan

13   that was granted.

14              MR. NANAVATI:  Thank you, Your Honor.

15              MR. ASONYE:  Your Honor, I just want to note that

16   this is a -- this is a charged count in the indictment.

17              THE COURT:  I know that.

18              MR. ASONYE:  Oh, okay.

19                         CROSS-EXAMINATION

20   BY MR. NANAVATI:

21   Q.   Ms. Rodriguez, my name is Jay Nanavati.  I represent Paul

22   Manafort.  How are you today?

23   A.   Good.  How are you?

24   Q.   Good.  Thank you.

25              Regarding the Union Street construction loan, is it