─────────────────U.S. v. Manafort─────────────

981

1                    UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                       ALEXANDRIA DIVISION

3  -----------------------------x
                                :
4  UNITED STATES OF AMERICA,    : Criminal Action No.
                                : 1:18-CR-83
5            versus             :
                                :
6  PAUL J. MANAFORT, JR.,       :
                                : August 6, 2018
7                   Defendant.  : Volume V
   -----------------------------x
8
                    TRANSCRIPT OF JURY TRIAL
9          BEFORE THE HONORABLE T.S. ELLIS, III
                UNITED STATES DISTRICT JUDGE
10
   APPEARANCES:
11
   FOR THE GOVERNMENT:        UZO ASONYE, AUSA
12                            United States Attorney's Office
                              2100 Jamieson Avenue
13                            Alexandria, VA 22314
                                  and
14                            GREG ANDRES, SAUSA
                              BRANDON LANG VAN GRACK, SAUSA
15                            Special Counsel's Office
                              U.S. Department of Justice
16                            950 Pennsylvania Avenue NW
                              Washington, D.C. 20530
17
   FOR THE DEFENDANT:         JAY ROHIT NANAVATI, ESQ.
18                            BRIAN KETCHAM, ESQ.
                              Kostelanetz & Fink LLP
19                            601 New Jersey Avenue NW
                              Suite 620
20                            Washington, DC 20001
                                  and
21                            THOMAS E. ZEHNLE, ESQ.
                              Law Office of Thomas E. Zehnle
22                            601 New Jersey Avenue NW
                              Suite 620
23                            Washington, DC 20001
                                  and
24                            KEVIN DOWNING, ESQ.
                              Law Office of Kevin Downing
25                            601 New Jersey Avenue NW
                              Suite 620

U.S. v. Manafort

982

```
 1                          Washington, DC 20001
                                 and
 2                          RICHARD WILLIAM WESTLING, ESQ.
                            Epstein, Becker, & Green, PC
 3                          1227 25th Street NW
                            Washington, DC 20037
 4
    OFFICIAL COURT REPORTER:    TONIA M. HARRIS, RPR
 5                              U.S. District Court, Ninth Floor
                                401 Courthouse Square
 6                              Alexandria, VA 22314

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

─U.S. v. Manafort─

983

TABLE OF CONTENTS
TRIAL
WITNESSES

On behalf of the Government:

Cindy Laporta (cont'd from 8/3/18)

Cross-examination by Mr. Downing................ 990
Redirect examination by Mr. Asonye.............. 1047
Recross-examination by Mr. Downing.............. 1065

Paula Liss

Direct examination by Mr. Asonye................ 1076
Cross-examination by Mr. Zehnle................. 1081
Redirect examination by Mr. Asonye............. 1089

Richard Gates

Direct examination by Mr. Andres................ 1090

EXHIBITS

On behalf of the Government:

Admitted

Number 2F............................................. 1101
Number 338A........................................... 1134
Number 338B........................................... 1137
Number 356............................................ 1140
Number 342............................................ 1152
Number 344............................................ 1153

On behalf of the Defendant:

Admitted

Number 3.............................................. 1010

MISCELLANY

Preliminary matters................................... 984
Certificate of Court Reporter......................... 1177

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

984

1           **P R O C E E D I N G S**

2     (Court proceedings commenced at 1:33 p.m.)

3           THE COURT:  Contrary to public opinion, Mr. Flood

4     was not previously a Marine Corps drill sergeant, but he does

5     a good job.

6           All right.  The record will reflect that the

7     defendant and counsel for the Government and counsel for the

8     defendant are present, prepared to proceed in this case, which

9     is U.S. against Manafort.  What's the number, Margaret?

10          (Discussion off the record.)

11          THE COURT:  83 -- 18-CR-83.

12          All right.  And as I recall -- before we get the

13    jury in, is there anything that needs to be done, Mr. Andres?

14          MR. ANDRES:  Very briefly, Judge.  Your Honor, I

15    don't know if it's the practice of the Court to give an

16    instruction to the jurors about whether they run into counsel

17    and other people outside the courtroom, but I know I was in

18    the elevator with a juror this morning.  Obviously I said

19    nothing.  But if Your Honor was inclined to just say to the

20    jury that we're not being rude, but that we're under --

21          THE COURT:  Yes, I'll do that.  I'll do that.

22          MR. ANDRES:  Okay.  Thank you, Judge.

23          THE COURT:  Anything else?

24          MR. ANDRES:  Just secondly, to the extent we've

25    identified previously the idea that -- the idea of any marital

─────U.S. v. Manafort─────

985

1    infidelity on the part of a witness is not necessarily

2    reflective of truthfulness and not necessarily a relevant

3    ground for cross-examination.

4            We've talked to the defense about that, and they've

5    agreed to the extent that that comes up during their

6    cross-examination we would approach the bench to understand

7    the circumstance of that so that Your Honor could rule on that

8    prior to any questions asked if that's okay with Your Honor.

9            THE COURT:  Yes, that's the way we do it.

10           MR. ANDRES:  Great.

11           THE COURT:  Anything else?

12           MR. ANDRES:  Just two other issues, which we briefed

13   and won't come up today necessarily, but one is the 1006

14   exhibits and --

15           THE COURT:  Yes, I've read that brief.  I haven't

16   had the opportunity to read the most recent submission, which

17   you-all made, but I will.

18           MR. ANDRES:  Okay.

19           THE COURT:  The 1006, I've read that, but it won't

20   come up in -- on this witness' testimony, it hasn't --

21           MR. ANDRES:  Correct.  And we've also talked to the

22   defense, and not clear to me, and they'll speak to themselves,

23   that they'll object to those.

24           And, lastly, the one we filed today, which won't

25   come up today either, is just to have a FBI agent read the

U.S. v. Manafort

986

1  e-mails from Mr. Manafort that are his own statements.  That,

2  again, won't come up today, but just to preview for Your

3  Honor.

4          THE COURT:  All right.

5          MR. ANDRES:  Thank you, Judge.

6          THE COURT:  As far as the exhibits, which I've

7  already told you you may use those summary exhibits as

8  demonstrative.  You want to introduce them as evidence in

9  chief.  And I understand that.

10         If you look at the rule carefully, the rule says

11  that if the data is voluminous, that it's sensible and

12  appropriate to do so as long as the exhibits are admitted and

13  so forth.

14         What you may not do is to use an exhibit, which is

15  really a demonstrative, to put that in.  It's an argument

16  disguised as an exhibit.  And so I won't allow that.  But I

17  think what you had originally shown me is something having to

18  do with voluminous financial figures and the like.  And

19  that's, of course -- but I'll hear the parties on that in

20  greater detail.

21         Again, keep in mind that if it is a summary of an

22  argument disguised to be a 1006, I won't allow it.  That

23  doesn't mean you can't use it, but it will be a demonstrative.

24         MR. ANDRES:  Understood.  Thank you, Judge.

25  Appreciate that.

─U.S. v. Manafort─

987

1          THE COURT:  All right.  Anything else before we

2    begin?

3          MR. DOWNING:  No, Your Honor.

4          MR. ASONYE:  We have one other issue, Your Honor.

5          We were handed a number of exhibits that defense

6    counsel plans to use in the cross of Ms. Laporta.  One of them

7    is --

8          THE COURT:  Well, how thoughtful of them.

9          MR. ASONYE:  One of them is --

10         THE COURT:  But they're not obligated to do that.

11         MR. ASONYE:  Your Honor, one of them is a tax return

12   from 2016, which is outside of the charged period and was not

13   prepared by Ms. Laporta or her firm.  The Government sees no

14   relevance whatsoever in this document; and, additionally, she

15   would have no personal knowledge of it either.  So we would

16   object to it being used to cross-examine her.

17         THE COURT:  Well, are you going to ask questions of

18   this witness to demonstrate the relevancy of this document.

19         MR. DOWNING:  Correct, Your Honor.

20         THE COURT:  All right.  Well, why don't I wait until

21   you ask those questions?  And when it's offered, then,

22   Mr. Asonye, you may state your objection.  I'll probably have

23   you come to the bench.  But I need to see it in context and

24   it's -- it's a waste of time to sit here and hear Mr. -- hear

25   one or both of you -- hear Mr. Downing or Mr. Zehnle tell me

U.S. v. Manafort

988

1    about this --

2              MR. DOWNING:  May I have one second to confer with

3    the Government?

4              THE COURT:  Yes, you may.

5              (Discussion off the record.)

6              THE COURT:  Mr. Downing, all set?

7              MR. DOWNING:  Yes.

8              THE COURT:  All right.  You may bring the jury in,

9    Mr. Flood.

10             (Jury in.)

11             THE COURT:  All right.  You may be seated.  Good

12   afternoon, ladies and gentlemen.  We'll begin as always with

13   the calling of the roll by the numbers.  Ms. Pham.

14             THE DEPUTY CLERK:  Ladies and gentlemen, as I call

15   your number, please answer "present" or "here."

16             Juror 0008.

17             THE JUROR:  Here.

18             THE DEPUTY CLERK:  Juror 0037.

19             THE JUROR:  Here.

20             THE DEPUTY CLERK:  Juror 0276.

21             THE JUROR:  Present.

22             THE DEPUTY CLERK:  Juror 0017.

23             THE JUROR:  Present.

24             THE DEPUTY CLERK:  Juror 0145.

25             THE JUROR:  Present.

U.S. v. Manafort

989

1          THE DEPUTY CLERK:  Juror 0115.

2          THE JUROR:  Present.

3          THE DEPUTY CLERK:  Juror 0082.

4          THE JUROR:  Present.

5          THE DEPUTY CLERK:  Juror 0009.

6          THE JUROR:  Present.

7          THE DEPUTY CLERK:  Juror 0299.

8          THE JUROR:  Present.

9          THE DEPUTY CLERK:  Juror 0091.

10          THE JUROR:  Present.

11          THE DEPUTY CLERK:  Juror 0302.

12          THE JUROR:  Present.

13          THE DEPUTY CLERK:  Juror 0060.

14          THE JUROR:  Present.

15          THE DEPUTY CLERK:  Juror 0296.

16          THE JUROR:  Present.

17          THE DEPUTY CLERK:  Juror 0054.

18          THE JUROR:  Present.

19          THE DEPUTY CLERK:  Juror 0127.

20          THE JUROR:  Present.

21          THE DEPUTY CLERK:  And Juror 0133.

22          THE JUROR:  Present.

23          THE DEPUTY CLERK:  Thank you.

24          THE COURT:  All right.  Good afternoon, ladies and

25  gentlemen.  Let me confirm, verify that you were able to do as

U.S. v. Manafort

C. Laporta - Redirect

990

1   you were instructed to refrain from discussing the matter with

2   anyone over the weekend.

3              THE JURORS:  Yes.

4              THE COURT:  Good.  Thank you.  And I hope you had a

5   pleasant and I had a pleasant and uneventful -- and to me that

6   always make it pleasant, I realize.  You'll get to the point

7   where uneventful is really good.

8              All right.  Ms. Laporta.  Let's have Ms. Laporta

9   back on the stand, please.

10             Ms. Laporta, you may recall you remain under oath.

11             THE WITNESS:  Yes.

12             THE COURT:  You may resume the stand.

13             (Witness seated.)

14             THE COURT:  Mr. Downing, you may proceed, sir.

15  (Witness previously sworn 8/3/18.)

16                **CROSS-EXAMINATION (cont'd)**

17  BY MR. DOWNING:

18  Q.   Good afternoon, Ms. Laporta.  My name is Kevin Downing,

19  and I represent Paul Manafort.  Thank you for coming back

20  today.

21             I want to follow up on some of your testimony from

22  last week.  There's a bit of testimony about services that you

23  provided through your accounting firm, KWC, to Mr. Manafort

24  and his entities.

25             Can you explain to the jury how big of an accounting

U.S. v. Manafort

C. Laporta - Redirect

991

1   firm KWC is?

2   A.   Yes, certainly.

3        KWC has about --

4        THE COURT:  I'm sorry, Ms. Laporta, I can't hear

5   you.  Ask you just to speak up.  I'm sure your voice is fine;

6   my ears aren't.

7        THE WITNESS:  I'm happy to speak up.

8        KWC has about -- I think we've got around 80 people

9   on staff, including partners, CPAs, administrative staff.

10  BY MR. DOWNING:

11  Q.   And you're affiliated with an international accounting

12  firm; is that correct?

13  A.   That's correct.

14  Q.   And what firm is that?

15  A.   BDO.

16  Q.   How big of a firm is that?

17  A.   They're an international firm.

18  Q.   Hundreds of accountants?

19  A.   I would -- yes.

20  Q.   With respect to both KWC and BDO, do you have -- did you

21  have available to you back in 2013, '14, '15, individual CPAs

22  that had expertise in tax?

23  A.   Yes, we did.

24  Q.   And that's not your particular area of expertise, is it?

25  A.   No.

─────────────────────U.S. v. Manafort─────────────────────
C. Laporta - Redirect

992

1   Q.   What is your particular area of expertise?

2   A.   Accounting and auditing.

3   Q.   And you didn't do any auditing for Mr. Manafort or for

4   his entities, did you?

5   A.   No, I did not.

6   Q.   And most of the work was tax work; is that correct?

7   A.   Yes.

8   Q.   And you did tax work for him individually?

9   A.   Yes.

10  Q.   For DMP and DMP International, his political consulting

11  firm?

12  A.   That's correct.

13  Q.   As well as a myriad of entities that were involved in

14  everything from real estate, horse farm, correct?

15  A.   That's before my time, but as a client of the firm --

16  Q.   You're familiar with that?  Movie production?

17  A.   That's right.

18            THE COURT:  You'll have to answer a little louder,

19  please.

20            THE WITNESS:  Yes.

21            THE COURT:  And you as well, Mr. Downing.  Just a

22  little louder, please.

23            MR. DOWNING:  I've never heard that, Your Honor.

24  BY MR. DOWNING:

25  Q.   How about international investing?

U.S. v. Manafort

1  A.   Yes.

2  Q.   And with respect to this engagement, how is it that you

3  as an audit and accounting partner got put in charge of a tax

4  engagement?

5  A.   Well, typically the profile of our clients is their

6  business taxes, their individual taxes, and then financial

7  statement work.  And what we do at our firm, is we have a tax

8  department that we work as a team on these engagements.

9       So while I may advise on an engagement that is

10 typically tax but then has an accounting and audit section, I

11 would help there the same way the tax department will step in

12 and help me on an engagement.  And when I took over -- well,

13 that's all.

14 Q.   So at that time, did -- KWC did not have someone of your

15 experience that had the expertise in tax to take over that

16 relationship?

17 A.   Uhm, the -- at the time I took over, it was still being

18 run by Philip Ayliff.

19 Q.   And you felt that Mr. Ayliff had considerable experience

20 in the area of tax?

21 A.   Yes, he did.

22 Q.   And with respect to your dealings with Mr. Manafort's

23 entities and his personal taxes, you had quite a few

24 interactions with Mr. Richard Gates; is that correct?

25 A.   Yes, that is correct.

U.S. v. Manafort

C. Laporta - Redirect

994

1   Q.   And if I -- if I got this correct from your testimony

2   last week, this was not a client that had everything organized

3   and for you -- and for -- available to you on a timely basis;

4   is that correct?

5   A.   That's correct.

6   Q.   And you ran up against a lot of deadlines; is that

7   correct?

8   A.   Yes, that is.

9   Q.   And it seemed like it was quite a chore to get this

10  information that you needed to get the returns filed year in

11  and year out; is that correct?

12  A.   That is correct.

13  Q.   And I could sense a level of frustration that you had, in

14  particular with Mr. Gates and others on your team, in terms of

15  that process being inefficient, difficult, a fact-finding

16  mission; is that correct?

17  A.   That's correct.

18  Q.   And I think you even stated last week there came a point

19  in time where you just didn't believe what Mr. Gates was

20  saying to you; is that correct?

21  A.   That is correct.

22  Q.   Now, in terms of the team that was involved, especially

23  let's talk about for tax years 2014 and '15, which would cover

24  years 2015; is that correct?

25  A.   That's correct.

U.S. v. Manafort

1  Q.   Because the tax returns come a year after?

2  A.   That's correct.

3  Q.   Now, your team consisted of you, that had the general

4  relationship?

5  A.   No, I had the general communication.

6  Q.   General communication.  Mr. Ayliff, what would you

7  describe his role?

8  A.   He would prepare and review the tax returns.

9  Q.   And Mr. Walters, was it?

10  A.   He was one person on the team at one point.

11  Q.   And did he have the tax expertise?

12  A.   Absolutely, yes.

13  Q.   And Mr. O'Brien, who is Mr. O'Brien?

14  A.   He was a staff member on the engagement.

15  Q.   Pretty young accountant at the time?

16  A.   Yes.

17  Q.   So when it came to the technical tax issues, was it

18  primarily Mr. Walters that would be relied upon?

19  A.   And Mr. Ayliff.

20  Q.   And Mr. Ayliff?

21  A.   Yes.

22  Q.   And others at KWC in the tax department?

23  A.   Yes.

24  Q.   So one of the issues that you testified about last week

25  had to do with real estate.  It was Howard Street, in

U.S. v. Manafort

996

1   particular, that came up.

2         Now, Mr. Manafort had invested in quite a few

3   residential properties; is that correct?

4   A.   That's correct.

5   Q.   And when I say "residential," I don't mean as a

6   residence, but they weren't commercial and big buildings.

7   They were actually individual properties; is that correct?

8   A.   That's correct.

9   Q.   And the ownership interest of these various properties in

10  New York involved Mr. Manafort, correct?

11  A.   Yes.

12  Q.   His wife?

13  A.   That's correct.

14  Q.   His daughters?

15  A.   Yes.

16  Q.   And there were several entities that were being used in

17  various forms, whether it was for personal occupancy?

18  A.   Correct.

19  Q.   Or rentals?

20  A.   That's correct.

21  Q.   And they were in various states of construction or

22  rehabilitation; is that correct?

23  A.   Yes, that is.

24  Q.   And during the 2015 and 2016 period, there were lots of

25  issues about trying to get financing for these various

─────────────U.S. v. Manafort─────────────
C. Laporta - Redirect
997

1   properties; is that correct?

2   A.   Yes, that is.

3   Q.   A lot of moving parts, would you say?

4   A.   Yes.

5   Q.   And we could see from the e-mail traffic that the

6   Government went through with you last week that it seemed to

7   be a lot of things were changing year by year; is that

8   correct?

9   A.   Yes, that is correct.

10  Q.   And that was one of the issues that it was tough for KWC

11  to deal with, was it not?

12  A.   Yes, it was difficult to follow.

13  Q.   And, in fact, at some time one of the issues that came

14  up, well, is it being used as a personal residence or is it

15  being rented; is that correct?

16  A.   That's correct.

17  Q.   And it was for more than one property?

18  A.   Yes, I believe so.

19  Q.   And involving more than Mr. Manafort, all the individuals

20  we talked about before, his daughters?

21  A.   Yes, that's correct.

22  Q.   And then some individual named Jeff Yohai, is it?

23  A.   I don't recall if Jeff Yohai was part of the -- who

24  was -- regarding those properties.

25  Q.   I think you said the other day that you -- you remember

C. Laporta - Redirect

998

1   Jessica had a husband and his name was Jeff?

2   A.   Yes, that's correct.

3   Q.   Is that Jeff Yohai?

4   A.   Yes.

5   Q.   And he was involved with one of Jessica's properties; is

6   that correct?

7   A.   So I just -- I guess I think of Jess, where she was

8   living, she was going to be living in New York.  I didn't put

9   it together about Jeff Yohai until just now.

10  Q.   But you do know that she was married to him at the time;

11  is that correct?

12  A.   Yes.

13  Q.   Now, with respect to the Howard Street property, there

14  was an issue that came up, I think Mr. Manafort had sent you

15  an e-mail that was covered last week, and he said, hey -- he

16  didn't say "hey."  That was me.

17        He said, Can you help me with something?  I'm

18  looking to borrow against one of the properties, Howard

19  Street.  And he said that it was a residence and that he

20  wanted you to communicate with the bank about that property

21  being not his primary but his secondary residence?

22        Do you recall that?

23  A.   Yes, I do.

24  Q.   And I believe you stated that you did convey that to

25  Mr. Fallarino at Citizens Bank; is that correct?

U.S. v. Manafort

C. Laporta - Redirect

999

1    A.    Yes.

2    Q.    And you also indicated that you made a mistake, that it

3    actually wasn't a second residence, it had been picked up as a

4    rental property; is that correct?

5    A.    I relied on Rick Gates' facts as to how each of those

6    properties was being used -- or had been used for 2015.

7    Q.    Right.  And I think just part of the explanation for

8    dealing with an issue like this for the jury, you're not

9    spending day and night on these questions, are you?

10   A.    No.

11   Q.    So if Mr. Manafort calls you up as a client, with a

12   question, how many clients call you with a question any given

13   day?

14   A.    All day, every day.

15   Q.    All day, every day.  And you try to do your best to get

16   accurate information back out for the client; is that correct?

17   A.    That's correct.

18   Q.    And you have files that you can go check or have others

19   check to make sure that you're providing accurate information?

20   A.    That's correct.

21   Q.    And I think, in this instance, you said that you didn't

22   have an opportunity to go check the tax returns or your work

23   papers when you conveyed the information; is that correct?

24   A.    I believe what I said was that I didn't rely on anything

25   else or didn't do any more work on determining how that house

C. Laporta - Redirect

1  had been used, how those properties had been used.

2  Q.   And one way you could have done that is to go to your --

3  the tax return that had been filed for the prior year; is that

4  correct?

5  A.   I don't believe so, because I don't think the timing

6  would have been right for that.

7  Q.   So you wouldn't know from the prior years return what was

8  going on, whether it was a rental or a residence for the

9  current year; is that correct?

10 A.   That's correct.

11 Q.   And that's because you hadn't prepared the tax returns

12 yet?

13 A.   That's correct.

14 Q.   And that's because you didn't have any other information

15 from Mr. Gates regarding how the property was being used?

16 A.   The only information I had was his representation,

17 correct.

18 Q.   And other than taking Mr. Gates' representation, you

19 didn't do any other procedures or inquiries to determine if

20 they were accurate; is that correct?

21 A.   That's correct.

22 Q.   Okay.  So at the end of the day, it ends up that it was

23 not accurate; is that correct?

24 A.   That's correct.

25 Q.   Now, on your part, you wouldn't say that you conveyed

C. Laporta - Redirect                                              1001

1   something intentionally false to the bank, did you?

2   A.   No, I did not believe so.

3   Q.   And, if anything, a mistake was made on your part; is

4   that correct?

5   A.   That's correct.

6   Q.   And you would have no reason to believe whether

7   Mr. Manafort was mistaken either, do you?

8   A.   No, I have no reason to believe that.

9   Q.   So one of the -- one of the overriding issues, I think,

10  last week during your direct had to do with foreign bank

11  accounts and whether FBARs had to be filed.  And over the

12  years, it seemed there were a lot of questions about whether

13  or not FBARs had to be filed for Mr. Manafort or for his

14  entities; is that correct?

15  A.   That's correct.

16  Q.   Now, the FBAR area is not an area of expertise for you,

17  is it?

18  A.   No.

19  Q.   And who on your team did you go to in terms of relying

20  upon the analysis as to whether or not Mr. Manafort or his

21  entities had any FBAR filing requirements?

22  A.   Philip Ayliff was very well informed about these

23  international filing requirements, and he had established this

24  in a routine of being certain that we addressed it each and

25  every year, for each and every entity.

U.S. v. Manafort

C. Laporta - Redirect

1002

1   Q.   And did you think that Mr. Ayliff had expertise with

2   respect to determining if an FBAR had to filed?

3   A.   Yes, or he would have gone to another member of the firm

4   that did.

5   Q.   Why do you say yes?  You said, yes, you thought he had

6   experience with respect to determining whether or not an FBAR

7   had to be filed.

8   A.   Because he had a lot of large clients that had FBAR

9   requirements.

10  Q.   Would you be surprised to learn last week he testified

11  that he did not have expertise with respect to determining

12  whether or not an FBAR had to be filed?

13  A.   Well, as I said, he may have spoken to other members of

14  the KWC team that did have expertise.

15  Q.   But I asked if you would be surprised if he said he did

16  not have the expertise with respect to determining if an FBAR

17  had to be filed?

18  A.   No, I guess I could see him relying on other people.

19  Q.   As you did; is that correct?

20  A.   Yes.

21  Q.   And in terms of the determination to file FBARs, there

22  came a point in time, I believe, the -- you had some

23  discussions with Mr. Gates, in particular, about some accounts

24  that were in Ukraine; is that correct?

25  A.   That is correct.

U.S. v. Manafort

C. Laporta - Redirect

1003

1  Q.   And it has been represented to us that you had said that

2  Mr. Gates told you that things were set up, the bank accounts,

3  so that they did not have an FBAR filing requirement with

4  regards to a foreign account; is that correct?

5  A.   That is correct.

6  Q.   And other than Mr. Gates' representation to you on that

7  issue, did you have any other information from Mr. Gates about

8  what that meant about how things were set up?

9  A.   No, I did not.

10  Q.   And do you know if KWC or Mr. Ayliff made any further

11  inquiries about what that meant, how they were set up?

12  A.   I don't believe so, or I'm not aware of any others.

13  Q.   And another issue last week that I think you spent

14  considerable time on was talking about loans, and loans

15  between DMP and foreign entities or loans between affiliates

16  and DMP or Mr. Manafort.

17        Do you recall that?

18  A.   I do recall those.

19  Q.   And in particular, you were brought -- you were asked

20  some questions about the 2015, '16 time frame, and most of it

21  came out of questions -- is that correct?

22  A.   That's correct.

23  Q.   Sorry.  I need to slow down.

24        And was that -- did that come about because of some

25  of the questions about Mr. Manafort trying to get lending on

C. Laporta - Redirect

1004

1    the real estate?

2    A.    Do you mind repeating your question?

3    Q.    Sure.  I'll break it down in a smaller piece.

4          Last week when you were asked questions about

5    Telmar?

6    A.    Okay.

7    Q.    Telmar questions came up because Mr. Manafort was trying

8    to borrow some money and they were trying to get financial

9    statements out to the lenders; is that correct?

10   A.    That is not how I recall the Telmar note.

11   Q.    Do you recall Telmar being part of tax return

12   preparation?

13   A.    Yes.

14   Q.    Do you recall it being on a deadline date --

15   A.    Yes.

16   Q.    -- when you were dealing with that issue?

17         Now, when you talked about Telmar, some issues came

18   up about how you're dealing with income that was coming into

19   DMP International; is that correct?

20   A.    That is correct.

21   Q.    And DMP International, you understood to be earning

22   income overseas by providing political consulting; is that

23   correct?

24   A.    Yes, that is correct.

25   Q.    And you understood the money that was coming in from

─────U.S. v. Manafort─────

C. Laporta - Redirect

1005

1  these overseas companies was for the political consulting

2  fees?

3  A.   That is correct.

4  Q.   But there was another issue that you -- KWC was dealing

5  with every year.  It was a question of how much money would be

6  reported as loans to Mr. Manafort or loans from an affiliate;

7  is that correct?

8  A.   The first experience I had with that was filing the 2014

9  tax return.

10 Q.   And Mr. Ayliff was involved with that issue, correct?

11 A.   Yes.

12 Q.   And Mr. Ayliff had been doing the work -- tax work for

13 Mr. Manafort and his entities, going back to 1997, did you

14 know that?

15 A.   Yes, I did.

16 Q.   And Mr. Ayliff is familiar with this income loan issue;

17 is that correct?

18 A.   That's my understanding, yes.

19 Q.   So before I get into the nitty-gritty detail, which I

20 apologize, I need to do, are you familiar that when you're

21 dealing with a partnership and its partners, that every year

22 you have to reconcile issues in terms of personal expenditures

23 that may have been made on behalf of a partner by the

24 partnership?

25 A.   Yes.

C. Laporta - Redirect

1006

1   Q.   Distributions that may have been made that may not have

2   been taxed?

3   A.   That's correct.

4   Q.   And then finally, what is the income of the partner; is

5   that correct?

6   A.   That's correct.

7   Q.   Now, in the course of doing accounting and doing tax work

8   in a given year, a partnership may pay out personal expenses

9   for an individual partner; is that correct?

10  A.   That's correct.

11  Q.   And the question is, at the end of the day, how do you

12  account for it; is that correct?

13  A.   That's correct.

14  Q.   Because you're not going to account for it as a

15  deduction, a business deduction for the partnership, correct?

16  A.   That's correct.

17  Q.   And that's because it's personal?

18  A.   Correct.

19  Q.   But the next thing to figure out is, okay, what do we do

20  with it?  Is it going to be compensation to a partner?

21  A.   No.

22  Q.   It's not, because you're not going to have compensation

23  to a partner; is that correct?

24  A.   That's correct.

25  Q.   So the next question is:  Is it a distribution?  Has the

U.S. v. Manafort

C. Laporta - Redirect

1007

1  partnership taken its own money for the personal benefit of a

2  partner and distributed it out?

3  A.   That's --

4  Q.   So it could be a distribution?

5  A.   Yes, it could be a distribution.

6  Q.   And then the other item, the only other item that you're

7  generally going to deal with:  If a particular partner got a

8  personal benefit, whether or not it's a loan to that partner;

9  is that correct?

10 A.   I'm sorry.  Can you repeat that question for me?

11 Q.   The third way you can categorize the partnership's

12 payment of a personal expense for a partner would be as a loan

13 to a partner?

14 A.   That's correct.

15 Q.   Okay.  Now, in terms of this issue, as an accountant, you

16 deal with this issue every day with closely held partnerships;

17 is that correct?

18 A.   That's correct.

19 Q.   Because quite often, the partners in these closely held

20 partnerships are having personal expenses paid by the

21 partnership, correct?

22 A.   That is correct.

23 Q.   But they're also going out of their own pockets to pay

24 business expenses?

25 A.   That is correct.

C. Laporta - Redirect

1008

1   Q.   And you had that -- you had that second issue with

2   Mr. Manafort also with respect to DMP; is that correct?

3   A.   That is correct.

4   Q.   Do you need something, ma'am?

5   A.   I need water badly.  Sorry.

6          (A pause in the proceedings.)

7   BY MR. DOWNING:

8   Q.   Now, in the -- in the course of doing work for

9   Mr. Manafort and for DMP International, did you have occasion

10  for yourself or your staff to put together work papers?

11  A.   Yes, we did.

12  Q.   And can you explain to the jury what's a work paper?

13  What's the purpose of it?

14  A.   Work paper is to support items that are reported on the

15  balance sheet or certain income and expense accounts that need

16  to have a little more detail, so that we can follow the next

17  year in preparation.  There might be anticipated activity that

18  we'd want to include in that work paper.  It's just really a

19  guide to help as a -- if there are any questions on the

20  current year, but also for any assistance in the following

21  year.

22  Q.   And part of your work every year for an accountant, let's

23  just talk about DMP and DMP International, there are certain

24  schedules you need to keep, because every year the issue is

25  going to come up again on a tax return like schedules for

C. Laporta - Redirect

1   depreciation?

2   A.   That's correct.

3   Q.   That would be an example.  But anything you would

4   consider reoccurring on a tax return, you'd want to have a

5   schedule for?

6   A.   Yes.

7   Q.   And as part of your work with DMP International with

8   Mr. Manafort, there also comes occasion when clients ask you

9   for information; is that correct?

10   A.   That's correct.

11   Q.   And you have occasion, in your capacity as an accountant

12   at a CPA firm, to put together schedules for clients; is that

13   correct?

14   A.   Yes, that is.

15   Q.   So I'm going to ask you to take a look at what's been

16   marked Defendant's Exhibit 3.

17         And take a minute and take a look at it.

18   A.   Exhibit 3?

19   Q.   3, yes.

20         And, Ms. Laporta, is this a work paper, would you

21   call it, spreadsheet?  What would you call it?

22   A.   A spreadsheet.

23   Q.   And is this something that you -- the client had asked

24   you to put together?

25   A.   Yes, it is.

C. Laporta - Redirect

1   Q.   And is this something you were involved with putting

2   together and oversaw the completion of it?

3   A.   Yes.

4   Q.   And at the time you were putting this together, was this

5   put together from the tax filings of DMP, DMP International,

6   and Mr. Manafort?

7   A.   Yes, that's correct.

8   Q.   And as you were putting the document together, did you

9   have other people help you out and check that it's fair and

10  accurate?

11  A.   Yes, I did.

12  Q.   Okay.  And as you sit here today, do you know this to be

13  a fair and accurate record that you put together?

14  A.   Yes.

15          MR. DOWNING:  Your Honor, I move Defense Exhibits 3

16  into evidence as business record of KWC.

17          MR. ASONYE:  No objection.

18          THE COURT:  Admitted.

19                      (Defendant's Exhibit No. 3

20                      admitted into evidence.)

21          MR. DOWNING:  May we publish, Your Honor?

22          THE COURT:  You may.

23          MR. DOWNING:  Maybe not.

24          THE COURT:  You can use the ELMO.

25          MR. DOWNING:  With a little help, I think so.

C. Laporta - Redirect

```
1              THE COURT:  That, I can't help you with.

2              There we are.

3              MR. DOWNING:  Thank you.

4              Well, it's small enough that no one can read it, so

5     I'm not sure that's going to be helpful.

6              THE COURT:  Well, you can.  You can magnify.  You

7     can focus it down.

8              Let me ask the court security officer, can you

9     manipulate this thing or do we need to get Lance up here?

10             THE CSO:  Probably Lance.

11             MR. DOWNING:  I have a volunteer.

12             THE COURT:  Oh, all right.

13             MR. DOWNING:  Thank you, sir.

14             MR. NANAVATI:  Sure.

15             MR. DOWNING:  We're having technical difficulty.

16             THE COURT:  Mr. Nanavati.

17             MR. NANAVATI:  I'm going to do my best, Your Honor.

18             Yes, Your Honor.

19             THE COURT:  All right.  Go ahead.  He knows how to

20    do it.

21    MR. DOWNING:

22    Q.   Very good.  So on that -- the top left corner of this

23    document, it says it's loans from wire transfers.

24             And do you recall you going back in time and trying

25    to find out through the records, what kind of monies were
```

U.S. v. Manafort

1   flowing into DMP International, where it was coming from, and

2   how it was categorized; is that correct?

3   A.   That is correct.

4   Q.   And this particular spreadsheet shows wires that came in

5   from various foreign entities that had been recorded as loans;

6   is that correct?

7   A.   That is correct.

8   Q.   And going back as far as 2006, you -- the first loan you

9   have recorded there is about $10 million; is that correct?

10  A.   Yes, that's correct.

11  Q.   And then as you go down that column, there's 3.5 million

12  in 2007, correct?

13  A.   Yes.

14  Q.   And in 2007, there's another -- that's from LOAV.

15  There's another one, 2.8 million that came in, do you see

16  that?

17  A.   That's correct.

18  Q.   And then for 2008, you have four entries; is that

19  correct?

20  A.   That's correct.

21  Q.   For 225,507, 8 million, 120,000.  That one totaled

22  8,120,000, correct?

23  A.   Correct.

24  Q.   You have another 105,000, and then if we go down a little

25  further on 2008, there's a series of transfers in from

─────U.S. v. Manafort─────

1  Yiakora, correct?

2  A.   Yes.

3  Q.   To the tune of 1.9 million, do you see that?

4  A.   Yes, I do.

5  Q.   Okay.  And then 2012, there's Peranova, right?

6  A.   Right.

7  Q.   1.5, and next up for 2014, '15 is Telmar, which Peranova

8  and Telmar are what you were familiar with, correct?

9  A.   Yes, that's correct.

10  Q.   Okay.  So over that period of time, from 2006 to 2015,

11  there was over $30 million in loans that had been reported on

12  the tax returns, correct?

13  A.   That's correct.

14  Q.   Of DMP International?

15        And during that same period of time, if we can go

16  down a little further --

17  A.   Excuse me, not all on DMP International.  I don't think.

18  I'm looking at the responsible party.  I'm sorry, I'm not --

19  Q.   Go ahead.  Take your time.

20  A.   Okay.  That's all I was going to point out, that there

21  were other entities.

22  Q.   Go ahead.  One more time, I'm sorry?

23  A.   That there were other entities here besides DMP.

24  Q.   There were other entities involved, too.

25        But this -- all of this information came from tax

C. Laporta - Redirect

1    returns that had been filed by KWC, correct?

2    A.    That's correct.

3    Q.    Okay.  And we go to the bottom, you have a total number

4    for the total loans and it shows $30 million, correct?

5    A.    That's correct.

6    Q.    Okay.  What's the next line, "recognized revenues," what

7    does that mean?

8    A.    Those are loans that had been over time.  I guess -- I

9    have to guess, the only one I'm familiar with is the

10   1.5 million from Peranova, but -- so that's the only time I

11   remember recognizing revenue for what had previously been a

12   loan.

13   Q.    And let's just go back to that testimony you gave.

14         The recognition of income from a loan is when you

15   say the loan has been forgiven?

16   A.    That's correct.

17   Q.    And then the amount of the loan in the case of Peranova,

18   you would report that 1.5 million Peranova loan as income on

19   Mr. Manafort's tax return, correct?

20   A.    That's correct.

21   Q.    And even though he didn't receive anymore money, you

22   reported as income because he's not paying it back, correct?

23   A.    That's correct.

24   Q.    So in addition to Peranova, there must have been another,

25   what is that, almost 6 million, just shy of 6 million in loan

──────── U.S. v. Manafort ────────

1   forgiveness that you were not involved with?

2   A.   That's correct.

3   Q.   But KWC was?

4   A.   Yes.

5   Q.   How about the next line, "Distributed to Paul Manafort,"

6   is that what we were talking about earlier, the distributions

7   from the partnership?

8   A.   Yes.

9   Q.   And that totals $15.7 million, correct?

10  A.   Correct.

11  Q.   The next line is, "Distributed to others, other

12  partners."  Do you see that?

13  A.   Yes.

14  Q.   2.3?  And then "Worthless Investment," what does that

15  mean?

16  A.   I would think that that would -- that would be an

17  investment that had been reported on the tax return that had

18  no further value.

19  Q.   And then the final balance on there says 1.9 million,

20  correct?

21  A.   That's correct.

22  Q.   And that would be Telmar, correct?

23  A.   Yes.

24  Q.   Okay.  Now, let's go to the bottom right-hand side of the

25  document.

C. Laporta - Redirect

1016

1    You have some notes on this side of the document,

2  and the particular note I want to point your attention to is

3  the three-star note.  Can you read that?

4  A.    "To be recognized as income in 2016 by Paul Manafort, no

5  longer expected to receive connected anticipated proceeds in

6  order to repay this debt."

7  Q.    So that was the outstanding amount as of 2015?

8  A.    That's correct.

9  Q.    And you were expecting that in 2016, that would be picked

10  up in income?

11  A.    Yes.

12  Q.    Now, you didn't prepare the 2016 tax return for Mr.

13  Manafort, did you?

14  A.    No, I did not.

15  Q.    But you did talk to a Mr. Gittelman, a CPA, about the

16  preparation of that return?

17  A.    Yes, I tried to --

18  Q.    And you provided some records with respect to the

19  preparation of that return, correct?

20  A.    Yes, that's correct.

21  Q.    And you have to provide records, right?  It's like

22  anything else, a new accountant can't start from scratch, they

23  need to know what happened before, correct?

24  A.    That's correct.

25  Q.    And they need some books and records and prior year's tax

C. Laporta - Redirect

1  returns, and those are the kind of things that you provided,

2  correct?

3  A.    That's correct.

4  Q.    Now, I'm going to ask you to take a look at what's been

5  marked Government's Exhibit 4 -- Defendant's Exhibit 4.  Sorry

6  about that.

7         I would like you to take a look at Line 1.  And what

8  is line -- well, first of all, what is this?

9  A.    This is a tax return for DMP International for 2016, and

10  it was prepared by Gittelman CPA.

11  Q.    And that's the Gittelman CPA that you were dealing with

12  in providing information --

13         THE COURT:  Mr. Downing, I want to know what magic

14  you have.  Mr. Asonye started to get up and he went like this

15  and he sat right back down.

16         MR. ASONYE:  Give him a little more leeway, Your

17  Honor.

18         MR. DOWNING:  A little more rope you've given me, I

19  believe.

20         THE COURT:  I see.  Are you offering the Exhibit 4?

21         MR. DOWNING:  Not yet, Your Honor.

22         THE COURT:  All right.

23         MR. DOWNING:  Not yet.

24         THE COURT:  Proceed.

25  MR. DOWNING:

U.S. v. Manafort

C. Laporta - Redirect

1018

1  Q.    So you see the Line 1, gross receipts?

2  A.    I do.

3  Q.    And how much is that?

4         MR. ASONYE:  Well, objection, relevance, Your Honor.

5         MR. DOWNING:  I'm about to explain why it's

6  relevant.

7         MR. ASONYE:  Now, getting the information out of the

8  document.  It's not admitted.

9         THE COURT:  Go ahead, Mr. Downing, and elicit why

10  it's relevant from this witness, if you can do so.

11  MR. DOWNING:

12  Q.    In terms of your note on the work sheet we just talked

13  about, you had $1.9 million that was supposed to be picked up

14  in 2016; is that correct?

15  A.    That's correct.

16  Q.    And in your dealings with Mr. Gittelman, did you provide

17  him with information regarding picking up that income?

18  A.    I don't recall.  It would -- I just don't recall that for

19  sure.  I gave him everything I could or that he asked for, but

20  I can't tell you exactly what I gave him besides tax returns.

21  Q.    Okay.  So can you turn to the back of this tax return in

22  the statement section marked Page 2, Statement 6?

23  A.    I'm here.

24  Q.    Do you see that entry?

25  A.    Yes.

U.S. v. Manafort

C. Laporta - Redirect

1019

1  Q.   Now, does that refresh your recollection as to whether

2  KWC provided the Telmar information to Mr. Gittelman?

3  A.   It could have also come from the general ledger, the 2016

4  general ledger.

5  Q.   And do you know if the 2016 general ledger indicated that

6  the Telmar investment was picked up as income for

7  Mr. Manafort?

8  A.   I don't remember.  I don't believe I saw that 2016

9  general ledger.

10 Q.   And that's what's being indicated on this year's return,

11 correct?

12 A.   Yes, that's correct.

13       THE COURT:  What is it that's being reflected on

14 this 2016 return?

15       THE WITNESS:  That the -- the liability to Telmar

16 Investments is zero at the end of 2016.

17       THE COURT:  Meaning what?

18       THE WITNESS:  That it was included in income.

19       MR. DOWNING:  In 2016?

20       THE COURT:  For whom in 2016?

21       THE WITNESS:  DMP International.

22       THE COURT:  Next question.

23 MR. DOWNING:

24 Q.   And with respect to the partnership structure at DMP

25 International, the income of DMP International would directly

—U.S. v. Manafort—

1  flow down to its partners, correct?

2  A.   That's correct.

3  Q.   And that would be Mr. Manafort and Mrs. Manafort,

4  correct?

5  A.   Yes.

6  Q.   And that would flow through to their 1040 for that year?

7  A.   Yes, that's correct.

8  Q.   Now, in terms of your preparation of other documents and

9  work papers for Mr. Manafort at the request of the client,

10  would you take a look at Government's Exhibit No.  2 --

11  Defendant's Exhibit No. 2?

12          THE COURT:  I've already admitted 2, have I not?

13          MR. DOWNING:  It's Defendant's.  I'm sorry, Your

14  Honor.

15          THE COURT:  Yeah, but I've already admitted

16  Defendant's 2, have I not?

17          MR. DOWNING:  3.

18          THE COURT:  3 I've admitted.

19          MR. DOWNING:  I'm going out of order.

20          THE COURT:  All right.  You may do so.

21  MR. DOWNING:

22  Q.   Ms. Laporta, you've had a chance to look at that

23  document?

24  A.   Yes.

25  Q.   And, again, is this a schedule you prepared at the

U.S. v. Manafort

C. Laporta - Redirect

1021

1   request of a client?

2   A.   Yes, it is.

3   Q.   And your capacity as a CPA?

4   A.   Yes.

5   Q.   And did you have other individuals at KWC work with you

6   on this?

7   A.   Yes, I did.

8   Q.   And has it been checked for accuracy?

9   A.   Yes.

10  Q.   Against the tax records of KWC for DMP and Mr. Manafort?

11  A.   It was prepared from the tax returns.

12          MR. DOWNING:  Your Honor, I move Defendant's Exhibit

13  No. 2 into evidence as a record of KWC.

14          MR. ASONYE:  No objection.

15          THE COURT:  Admitted.

16          MR. DOWNING:  May I publish, Your Honor?

17          THE COURT:  Yes, you may.

18  MR. DOWNING:

19  Q.   Ms. Laporta, can you explain what this work sheet is?

20  A.   It's a summary of all of Mr. Manafort's companies and it

21  shows the gross receipts that came from those companies.

22          The second column shows what was reported on

23  Mr. Manafort's personal income tax returns as adjusted gross

24  income.  And then the next column shows what was reported on

25  these various tax years on Mr. Manafort's taxable income.

U.S. v. Manafort

C. Laporta - Redirect

1022

1   Q.   So can we -- go ahead.  I'm sorry.

2   A.   The final column is how much in federal taxes did

3   Mr. Manafort pay in each of those years.

4           MR. DOWNING:  So can we scroll down to the total,

5   please, Jay?

6   BY MR. DOWNING:

7   Q.   And, again, we have totals by year here, correct?

8   A.   Yes, that's correct.

9   Q.   So start -- going back to 2005, there was about

10  10.9 million in gross revenues, correct?

11          MR. ASONYE:  Your Honor, at this point we're going

12  to object to the relevance of years beyond the charge years

13  2010 to 2014.

14          MR. DOWNING:  I believe Mr. Asonye said the other

15  day this goes back to 2005.

16          MR. ASONYE:  Not the actual income.  Not the actual

17  income that's charged in the indictment, Your Honor.

18          THE COURT:  I'll overrule the objection.  You may

19  proceed.

20  MR. DOWNING:

21  Q.   So there's a year-by-year account from '05 to '15,

22  correct?

23  A.   Yes, that's correct.

24          MR. DOWNING:  And why don't we just scroll down year

25  by year?  We -- we'll go to the total, Jay.  To the next page,

U.S. v. Manafort

C. Laporta - Redirect

1023

1   please.

2   BY MR. DOWNING:

3   Q.   So in total for this period of time, you're reporting

4   that 92.5 million was reported as gross revenue on the tax

5   returns of DMP and DMP International, correct?

6   A.   That's correct.

7   Q.   And those are federal United States tax returns, correct?

8   A.   Yes, that's correct.

9   Q.   The next number that you list there, it says, "Entity

10  business expenses."  And those are the entity business

11  expenses that were deducted on those various federal tax

12  returns against the $92 million; is that correct?

13  A.   That is correct.

14  Q.   You also have other partner share.  What is that?

15  A.   I think in one of these years there was another partner

16  involved and so the income would have gone to their -- it

17  would have been reported on that partner's 1040, not

18  Mr. Manafort's.

19  Q.   And then you have other Paul Manafort 1040 items.  And

20  what does that encompass?  You have a note on that, I believe,

21  at the bottom.

22  A.   Would you like me to read that note?

23  Q.   Sure.

24  A.   So this 14 million that we're showing here is other

25  Manafort income, meaning not derived from these various

C. Laporta - Redirect                                                    1024

1   entities.  Includes W-2 wages, consulting income, and

2   investment portfolio income.

3   Q.   And that leaves $30,249,398 of adjusted gross income

4   reported on Mr. Manafort's personal federal income tax returns

5   over that period; is that correct?

6   A.   That's correct.

7   Q.   And the next total on there for 30 -- I'm sorry --

8   $23,924,619, what is that?

9   A.   That's the taxable income.

10  Q.   And how do you get to taxable income from gross to

11  taxable?  Can you explain that?

12  A.   There are a few adjustments, including health insurance,

13  but the biggest, of course, is the Schedule A deductions.

14  Q.   And on that amount of money you have that Mr. Manafort,

15  on his federal income taxes from 2005 to 2015, paid $8,383,179

16  in federal income tax; is that correct?

17  A.   That is correct.

18            (A pause in the proceedings.)

19  MR. DOWNING:

20  Q.   Ms. --

21            (A pause in the proceedings.)

22  MR. DOWNING:

23  Q.   Now, Ms. Laporta, last week you were asked some questions

24  about this Telmar loan, and I think you had said that if the

25  $1.9 million had been picked up as income in 2015 or -- 2015,

─────U.S. v. Manafort─────

1   I believe it was, that there could have been about $500,000 in

2   tax; is that correct?

3   A.   Yes, that's correct.

4   Q.   But it's a ballpark, you're giving a high-end number

5   saying --

6   A.   Yes.

7   Q.   -- tax bracket --

8   A.   Yes.

9   Q.   Now, in terms of -- in terms of that number, you saw the

10  tax return, it was picked up in 2016, as you indicated on your

11  work sheet; is that correct?  The tax return we just looked

12  at?

13  A.   Yes.  I don't know -- I mean, it seems like that's the

14  case.

15  Q.   Well, you saw the number on the income line, correct?

16  A.   Yes.

17  Q.   I'd like to ask you a question.  Do you know what the --

18  the penalty for late payment is, that's calculated by the IRS,

19  of tax?

20  A.   So there are -- there are different fines and

21  penalties --

22  Q.   Sure.

23  A.   -- including underpayment of taxes, and then if it's --

24  Q.   So let's talk about the underpayment of taxes.  Can you

25  go to -- take a look at Defendant's Exhibit 5?

C. Laporta - Redirect

1026

1    It's an IRS publication and it has a penalty for

2   late filing, and it says, "Penalty for late payment."  Do you

3   see that No. 3?

4   A.    Yes.

5   Q.    And that charges .5 percent per month; is that correct?

6   A.    Yes, that's correct.

7   Q.    And with respect to the Telmar, assuming what you've seen

8   as being correct, that Telmar was not reported in 2015 as

9   income but was reported in 2016; is that correct?

10  A.    That's correct.

11  Q.    And the IRS would say, "Okay, well, if we think it should

12  have been paid in 2015, we want .5 percent per month for the

13  late payment"; is that correct?

14  A.    Up to as much as 25 percent.

15  Q.    Depending upon how long you went out; is that correct?

16  A.    That's correct.

17  Q.    But in this case let's say we went out just one year.

18  That's about $30,000, isn't it?

19  A.    I can't do that in my head.

20  Q.    Well, you could do it by month, right?

21  A.    Yes.

22  Q.    Why don't you try?

23  A.    So, no, that's -- that's ballpark.

24  Q.    That's ballpark, about $30,000.  And that's what would

25  have been additionally owed to the IRS for a late payment if,

─────────U.S. v. Manafort─────────

1    in fact, they prevailed; is that correct?

2    A.    That's correct.

3    Q.    So one other issue I wanted to talk about before we leave

4    Telmar.  It seems to -- part of the conversation about Telmar

5    up against the September filing date in 2016 was a question

6    of, why was KWC so off on the estimated taxes?  Why would a

7    client be in a position this far into filing season to be --

8    not know what the tax would be?

9              So why don't we take a minute and talk about that?

10             Can you explain what estimated taxes are and what

11   you do as an accountant with respect to estimated taxes for a

12   client?

13   A.    So you really asked me two questions, right?  The first

14   is -- right.

15   Q.    Go ahead.

16   A.    Okay.  The first question was, how do we -- what are

17   estimated taxes and how are they calculated?

18   Q.    Yes.

19   A.    So typically estimated taxes are calculated at the same

20   time that an extension would be prepared in April.

21             And the information that we have available, as

22   provided by the client, we estimate what the tax hit on that

23   is and then we ask, will the following year be better or the

24   same?  If it's the same, we divide that -- we divide that

25   number by 4 and have the client pay in those estimated taxes

C. Laporta - Redirect

1    during the year.

2            And then the second question about when you get to

3    the -- when you -- based on what you've done in April for

4    extension purposes and then down to the final -- the filing of

5    the tax return, why is there a difference?  And that -- in

6    this instance you're asking how can we be so far off?

7    Q.   Well, I would ask you differently.  When you do your

8    estimates you're at, you know, April 15th, sometimes the

9    following year and you're setting up for the next year,

10   there's a lot of unknowns, correct?

11   A.   That's correct.

12   Q.   But you generally use last year's numbers, correct?

13   A.   Yes.

14   Q.   And then you see if the client has any insight into

15   whether or not you're going to have a lot more income or a lot

16   less; is that correct?

17   A.   That's correct.

18   Q.   And then as the year goes on, you check in with the

19   client, I would imagine?

20   A.   Yes.

21   Q.   And try to see if you can get some updates?

22   A.   That's correct.

23   Q.   And I don't know why, but for some reason for that tax

24   year, KWC didn't seem to note that there was going to be that

25   amount of income that had to be reported, and, therefore,

─────U.S. v. Manafort─────

C. Laporta - Redirect

1029

1 there was going to be additional tax that was going to have to

2 be paid that was not covered by the estimate; is that correct?

3 A.   That's correct.

4 Q.   Do you know how that happened?  Do you know why it

5 happened?

6 A.   Just lack of response to our questions.

7 Q.   And -- and the person that you were dealing with with

8 respect to these kinds of things was Mr. Gates; is that

9 correct?

10 A.   Typically.  But as I testified on Friday, often

11 Mr. Manafort was copied on those e-mails.  Or if I wasn't

12 getting Rick's attention then I'd copy Mr. Manafort on e-mails

13 for requesting information.

14 Q.   Sure.  You also had another source of information, that

15 is, the bookkeeper?

16 A.   Yes, that is correct.

17 Q.   And she's recording things, activity, as it occurs during

18 the year, correct?

19 A.   I don't know that for sure how frequently her recording

20 is, but we certainly relied on her information.

21 Q.   So if she was not up to date on the books and records and

22 you were using the books and records to determine if you

23 needed to pay an additional tax, the tax payments would be

24 short?

25 A.   Yes, that's correct.

C. Laporta - Redirect

1030

1 Q.   Okay.  So the tax payments were short that year, were

2 they not?

3 A.   That's correct.

4 Q.   And you have experience dealing with clients on filing

5 deadlines, don't you?

6 A.   Yes.

7 Q.   Do clients have a tendency to get very upset when all of

8 a sudden they're told they have to cut a check for a few

9 hundred thousand dollars?

10 A.   Yes, this is an usual --

11 Q.   Unusual filing.

12       Regardless of who may have caused the problem, it's

13 just one of those things that people are upset because they

14 usually want to plan for it, especially when it's a large

15 amount of money?

16 A.   That's correct.

17       (A pause in the proceeding.)

18 Q.   So now I'd like to go back and talk a little bit about

19 the Peranova loan and the write-off of the Peranova loan.

20       Again, the issue with the Peranova loan came up with

21 respect to an attempt by Mr. Manafort to borrow money from a

22 bank; is that correct?

23 A.   That's correct.

24 Q.   And had to do with some of his properties up in New York;

25 is that correct?

C. Laporta - Redirect

1   A.    Yes, that is.

2   Q.    And the bank had a bunch of questions about

3   Mr. Manafort's balance sheet, correct?

4   A.    Yes, that's true.

5   Q.    The bank had made a determination that they weren't going

6   to use Mr. Manafort's income or P&L, profit and lost

7   statement, to determine whether or not they were going to

8   lend; is that correct?

9   A.    That's correct.

10  Q.    And they were looking at his assets and his liabilities,

11  correct?

12  A.    Yes.

13  Q.    You'd call that a balance sheet?

14  A.    Yes.

15  Q.    An issue came up about --

16          THE COURT:  I'm sorry, did you answer that question?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.  Next question.

19  MR. DOWNING:

20  Q.    And an issue came up with respect to Peranova being a

21  liability, correct?

22  A.    Yes, that's correct.

23  Q.    Okay.  And what was being conveyed to the bank was that,

24  no, it's not a liability at this point in time; is that

25  correct?

—U.S. v. Manafort—

1032

1    A.   That's correct.

2    Q.   Now, much like the issue that you talked about with

3    Telmar, if you're making a call whether or not something is a

4    loan or it's income, you're making a call, correct?

5    A.   Yes.

6    Q.   And in this case, the call was made that they were no

7    longer going to carry this as a loan, correct?

8    A.   As I said to the bank, this is being represented to me as

9    forgiveness of debt.

10   Q.   And that's important because you wouldn't know otherwise?

11   A.   That's correct.

12   Q.   Correct?

13        And you were being told by Mr. Gates this is what

14   happened, correct?

15   A.   Yes, that's correct.

16   Q.   But more importantly at that point in time, if, in fact,

17   Peranova was no longer an outstanding loan, it would not be

18   appropriate to tell a bank it was a liability, correct?

19   A.   That's correct.

20   Q.   And let's go to another issue.  There was an issue about

21   monies that Mr. Manafort was owed, about $2.4 million from one

22   of his consulting contracts.  Do you remember that?

23   A.   Yes, I do.

24   Q.   And there was this question about, well, are we doing a

25   cash basis P&L or are we doing an accrual P&L?

C. Laporta - Redirect

1    A.    That's correct.

2    Q.    And the way you addressed it, you told the bank, well,

3    here is a cash basis P&L from the bookkeeper, correct?

4    A.    That's correct.

5    Q.    And I want you to know that my client also has an

6    accounts receivable that he believes he is going to collect by

7    November for $2.4 million, correct?

8    A.    Yes, that's correct.

9    Q.    So two separate issues.  Here is the P&L cash basis, and

10   you should know my client believes he's got another asset?

11   A.    That's correct.

12   Q.    Correct?

13         There's nothing inappropriate about telling the bank

14   that someone owes you money, correct?

15   A.    That is correct.

16   Q.    And it's called an accounts receivable, correct?

17   A.    That's what it's called, yes.

18   Q.    But it's not going to show up on a cash P&L, a cash basis

19   P&L, correct?

20   A.    That's correct.

21   Q.    Why is that?

22   A.    Because cash basis only records income that's been

23   received and not what's been earned but not received.

24   Q.    And you have no reason, as you sit here today, to believe

25   that the 2.4 million wasn't really owed as an accounts

U.S. v. Manafort

C. Laporta - Redirect

1034

1  receivable?

2  A.   I didn't have any evidence that -- to the contrary, I

3  asked for contracts or invoices, but I never saw that.

4  Q.   Well, it's interesting you should raise that issue.  It

5  seems like KWC asks for a lot of information, especially

6  contracts and loan documents that it never received; is that

7  correct?

8  A.   That's correct.

9  Q.   So this would be another instance of not getting what it

10 is you would like to have in your file?

11 A.   That's correct.

12 Q.   So one last thing I'd like to cover with you -- until, of

13 course, I convey with my colleagues and they tell me

14 everything I missed -- an issue came up, and we talked about

15 earlier, that you had reason to question the representations

16 of Mr. Gates, representations he made to you?

17 A.   Yes, that's correct.

18 Q.   About financial information that you were conveying to

19 other people, correct?

20 A.   Yes, that's correct.

21 Q.   About financial information that you would have to put on

22 tax returns?

23 A.   Yes, that's correct.

24 Q.   And you testified last week that you didn't want to rock

25 the boat, you didn't want to upset a client, I think, in sum

U.S. v. Manafort

C. Laporta - Redirect

1035

1   and substance is what you said about why you didn't raise an

2   issue; is that correct?

3   A.   I did raise issues.

4   Q.   I mean about Mr. Gates' credibility, about him giving you

5   false or misleading information, did you raise that issue?

6   A.   Yes, I did with him.

7   Q.   With Gates?

8   A.   Yes.

9   Q.   Okay.  And I'm sure he reacted well to that?

10  A.   That he didn't respond.

11  Q.   He didn't respond.  So you pointed out to him you thought

12  that you were getting misleading information or incomplete

13  information from him; is that correct?

14  A.   Yes.  I asked for clarification on that.

15  Q.   And you didn't get it?

16  A.   No, I did not.

17  Q.   And did you share that with Mr. Ayliff or other folks at

18  KWC?

19  A.   I don't recall whether they would be copied or whether we

20  talked about it.  We probably talked about it.

21  Q.   Do you know if Mr. Ayliff, in particular, had a similar

22  feeling about the representations he was getting from

23  Mr. Gates?

24  A.   I feel that Philip also felt -- had that --

25  Q.   And at the time of dealing with various banks, this --

─────U.S. v. Manafort─────

C. Laporta - Redirect

1036

1   this Telmar issue and Peranova, the e-mail was clear that you

2   were dealing with Mr. Gates.

3          Did you ever think about picking up the phone and

4   calling Mr. Manafort, either you personally or with

5   Mr. Ayliff, to let him know what your concerns were?

6   A.   I did not do that.  I think that in most instances it was

7   clear that Mr. Manafort was aware of what was going on.

8   Q.   But in this particular instance, you don't know?

9   A.   That's correct.

10  Q.   And were you surprised when Mr. Gates was telling you

11  that Mr. Manafort couldn't come up with the money to pay a

12  couple hundred thousand dollars in tax?  Did that surprise

13  you?

14  A.   Yes, but I had limited experience with the client, so I

15  didn't know if this -- if these were conversations --

16  Q.   Of course.

17  A.   -- that had happened in the past.

18  Q.   Of course.  Well, what if you picked up the phone and it

19  led to finding out that Mr. Gates was embezzling millions of

20  dollars from Mr. Manafort and his entities --

21         MR. ASONYE:  Objection, calls for -- objection, Your

22  Honor.

23         THE COURT:  Let him finish the question, and then

24  you may object.

25         THE WITNESS:  I didn't hear.

U.S. v. Manafort

C. Laporta - Redirect

1037

1    MR. ASONYE:  Your Honor --

2    THE COURT:  You don't have -- wait until he finishes

3    his question.  Re-ask your question starting at the beginning.

4    And don't answer -- I want to hear the objection and then I

5    may have you come to the bench if you need to, Mr. Asonye.

6    What's your question.

7    MR. DOWNING:

8    Q.  Ms. Laporta, if at the time you were dealing with

9    Mr. Gates you knew that he had embezzled millions of dollars

10   from Mr. Manafort unbeknownst to Mr. Manafort, would you have

11   picked up the phone and called Mr. Manafort?

12   MR. ASONYE:  Objection.

13   THE COURT:  What's your objection?

14   MR. ASONYE:  Assumes facts not in evidence, Your

15   Honor.

16   THE COURT:  I can't hear you.

17   MR. ASONYE:  There are no facts of that in evidence.

18   MR. DOWNING:  I have a good faith basis for asking

19   the question, and the Government knows facts will be coming

20   into evidence.  Mr. Gates is next up.

21   THE COURT:  I'll overrule the objection.  You may

22   answer.

23   THE WITNESS:  If I had known --

24   MR. DOWNING:  Could the court reporter ask the

25   question back, please?

U.S. v. Manafort

1        (Audience laughter.)

2        (Reporter read back into the record.)

3        THE COURT:  I don't think that was the question.

4   Try it again.

5        MR. DOWNING:  I'm sorry, Your Honor.  Did it quiet

6   down?

7   BY MR. DOWNING:

8   Q.   Ms. Laporta, if at the time you were dealing with the

9   Telmar issue and Peranova, if at the time you learned that

10  Mr. Gates was embezzling millions of dollars from

11  Mr. Manafort, would you have picked up the phone, you or

12  Mr. Ayliff to let Mr. Manafort know that?

13  A.   Yes.

14  Q.   Would that have caused you to not trust anything that

15  Mr. Gates was telling you?

16  A.   Yes.  I don't know how that would happen, that whole

17  scenario you've described, but, of course, if I knew there was

18  wrongdoing, then --

19  Q.   So you raised an interesting point.  You've been an

20  accountant for how many years now?

21  A.   Since '84.

22  Q.   Since '84.

23       You have a retainer agreement at KWC that says you

24  are not retained to conduct procedures to detect fraud,

25  illegalities, or defalcations; is that correct?

U.S. v. Manafort

C. Laporta - Redirect

1039

A.    That is correct.

Q.    And is that because generally the two last people to know

about it are the accountants and the business owner?

A.    Yes, that's correct.

Q.    And unless you're specifically called in to do procedures

to detect fraud, you really won't know?

A.    That's correct.

Q.    But there's one thing you probably do know, given your

experience, when you have somebody on the inside of an

accounting system, in the inside of a business that is in

control of financial information, if that person is embezzling

funds, is that person usually the one of the most difficult to

get information from?

          MR. ASONYE:   Objection, Your Honor, because this

calls for speculation.

          MR. DOWNING:   No, I'm asking her about a CPA -- as a

CPA, her experience.

          MR. ASONYE:   Your Honor, there's no foundation that

she's ever dealt with that type of scenario before.  It calls

for speculation.

          THE COURT:   I'll overrule it.  She can answer.  If

you don't know, simply say you don't know.

          THE WITNESS:   That scenario you've just described is

what is taught in fraud related CP -- that's continuing

professional education.

U.S. v. Manafort

1    MR. DOWNING:

2    Q.   And then continuing professional education for CPAs, they

3    train you for these red flags, would you call them?

4    A.   Yes, that's correct.

5    Q.   And some of the red flags are difficulty in getting

6    information from that individual?

7    A.   Yes.  That's normally on the audit side; on the tax side,

8    not so much.

9    Q.   Well, explain it on the audit side?

10   A.   Well, on the audit side, it's a whole different world and

11   you're doing a risk assessment before you even see a number.

12   Q.   I'm talking about the behavior that you're looking for,

13   not the procedures.  But somebody who is difficult to get

14   information from that should have the information for you; is

15   that correct?

16   A.   Yes.

17   Q.   And you have reason to call into question what

18   information was given to you; is that correct?

19   A.   That is correct.

20   Q.   So these are some of the telltale sides of someone who

21   can be involved as an insider in an embezzlement; is that

22   correct?

23   A.   That is correct.

24          MR. DOWNING:  No further questions.

25          THE COURT:  Let me have counsel quickly at the

U.S. v. Manafort

1    bench, please.

2              (Bench Conference.)

3              THE COURT:  Mr. Downing, I didn't understand what

4    you meant by "there would be evidence of embezzlement."

5              MR. DOWNING:  The Government has produced statements

6    of Mr. Gates regarding embezzlement.  We have accounting

7    records from various accounts which Mr. Gates was unauthorized

8    to take monies out of and embezzled funds, and that's

9    something that that's been given to us by the Government and

10   have put us on notice of the embezzlement.

11             THE COURT:  So is that what you meant when you said

12   you had a good faith basis to believe that he had embezzled

13   money from Mr. Manafort?

14             MR. DOWNING:  That's correct, Your Honor.

15             THE COURT:  Now, on another subject, you didn't ask

16   this witness -- she testified in her direct examination what

17   she took responsibility for.  You didn't go into that at all,

18   about what she took responsibility for, or what consequences

19   she faced, or anything of that sort.

20             Is that right?

21             MR. DOWNING:  That is correct.

22             THE COURT:  And that's a judgment that you-all made?

23             MR. DOWNING:  Correct, Your Honor.

24             THE COURT:  Is she still an accountant?  Is she

25   still a CPA?

U.S. v. Manafort

C. Laporta - Redirect

1042

```
 1              MR. DOWNING:  I believe she is.  I believe that -- I
 2    think the Government knows better.  I think over the weekend
 3    she was suspended from her firm.  I don't know in what terms.
 4              THE COURT:  But you're not going into that?  And you
 5    don't plan to go into it for sure?
 6              MR. ASONYE:  No, Your Honor.
 7              THE COURT:  And he didn't ask whether you-all had
 8    made any deal with her about that.
 9              MR. ASONYE:  About her --
10              THE COURT:  Consequences.  Typically when a
11    cooperating witness cooperates, typically, they cooperate, but
12    there are consequences.  They plead guilty and so forth.  And
13    they get a reduction in their sentence.  It seems odd in this
14    case that there are no consequences.  And, indeed, her lawyer
15    wanted to sit with her to assert objections to questions,
16    which, of course, I didn't permit.
17              MR. DOWNING:  And, Your Honor, I guess we believe
18    that we can use that immunity in our closing.
19              THE COURT:  Yes, you can.  But it's a judgment you
20    made.  I'm not going to ask the question.
21              Did you want to say something?
22              MR. ANDRES:  May I, Judge?
23              THE COURT:  You may.
24              MR. ANDRES:  It's not right to assume there were no
25    consequences.  Whether they get brought out on direct or not
```

U.S. v. Manafort

1    is a different issue.  Mr. Downing wants the jury to believe

2    that Ms. Laporta is telling the truth.  So, obviously, there's

3    no -- I just -- it doesn't mean that we didn't -- there

4    weren't consequences and with her own employment --

5          THE COURT:  What did I miss?  What are the

6    consequences?

7          MR. ANDRES:  Well, she has licensing issues, I'm

8    sure.  She just testified in public that she's lied about

9    things.  That doesn't mean that the accounting board or these

10   other entities, which have now been alerted to, may take

11   action.  We don't know.  We don't control that within the

12   Department of Justice.

13         THE COURT:  And, of course, there's no Government

14   agreement to help her avoid that?

15         MR. ANDRES:  No, no.  The only agreement that we

16   have --

17         THE COURT:  Is in the --

18         MR. ANDRES:  Immunity order.

19         THE COURT:  It's not in the order, it's in the

20   agreement you have with her.  I just signed --

21         MR. ANDRES:  We don't have an agreement with her.

22         THE COURT:  All right.  I signed an order requiring

23   her to testify.  There is no agreement?

24         MR. ANDRES:  The agreement was to get her immunity

25   from the Court, to apply to the Court for --

U.S. v. Manafort

1044

1      THE COURT:  That's the only agreement?

2      MR. DOWNING:  Yes.

3      THE COURT:  I did not give her immunity.  You did.

4      MR. ASONYE:  That is correct.

5      THE COURT:  I required her to testify.

6      MR. ASONYE:  That is correct, Your Honor.

7      MR. ANDRES:  Yes.  Absolutely.

8      MR. DOWNING:  Thank you, Your Honor.

9      THE COURT:  Let's be very clear about it.  All

10  right.  Thank you.  Mr. Downing --

11      MR. ASONYE:  Your Honor, I was going to ask if it's

12  time for -- an appropriate time for a bathroom break.

13      THE COURT:  Oh, okay.  Yes, I'll do that.

14      MR. ASONYE:  Thank you, Your Honor.

15      (End of bench conference.)

16      THE COURT:  All right.  Is there any redirect, Mr.

17  Asonye?

18      MR. ASONYE:  Yes, there is, Your Honor.

19      THE COURT:  How long?

20      MR. ASONYE:  You know, it could be about 15, 20

21  minutes.  15 minutes.

22      THE COURT:  All right.  I take it you would

23  appreciate a break now.

24      MR. ASONYE:  That would be helpful, Your Honor.

25      THE COURT:  Pass your books to the right.  The court

U.S. v. Manafort

C. Laporta - Redirect

1045

1   security officer will collect them, maintain their security.

2            Ms. Laporta, you may step down.  Remember, you may

3   not discuss your testimony with anyone at all.  You understand

4   that includes attorneys?

5            THE WITNESS:  Yes, I understand.  Thank you.

6            THE COURT:  All right.  We will reconvene at 5

7   minutes after 3:00.

8            I hope -- you got your lunches today, those of you

9   who wanted them.  Good.

10            And there will be soft drinks, Mr. Flood?

11            THE CSO:  Yes, sir.

12            THE COURT:  Good.  Remember to refrain from

13   discussing the matter with anyone or among yourselves and also

14   undertaking any kind of investigation at all.

15            THE CSO:  Quiet.

16            THE COURT:  You may follow Mr. Flood out.

17            (Recess.)

18            THE COURT:  All right.  Before we begin -- ladies

19   and gentlemen, you may be seated for just a moment.

20            Before we begin, in the last session, for the second

21   time in this case, because of something that was said, at

22   least a half a dozen to a dozen or more people jumped up and

23   ran out of here.

24            (Audience laughter.)

25            THE COURT:  Making noises as they did.  It happened

U.S. v. Manafort

C. Laporta - Redirect

1046

1 once before.  The first time it happened, it was disruptive

2 and mildly amusing, especially since there was no reason at

3 all for it, and this time it was not as amusing and equally or

4 more disruptive.

5           You may not do that.  If you cause a disruption, I'm

6 going to have you excluded.  It's that simple.  If you want to

7 leave the courtroom, yes, of course, you may do so.  But do so

8 in a quiet, orderly way, not in the way in which we've seen it

9 done twice.  Let's not have that again.

10          All right.  Let's have the jury brought in.  We'll

11 continue with the redirect examination of the witness.

12          Did you have something, Mr. Asonye?

13          MR. ASONYE:  Just if Your Honor could remind -- we,

14 again, ran into some of the jurors in the elevator at the

15 break.

16          THE COURT:  Oh, yes, you're quite right.  I will do

17 that, Mr. Asonye.  Thank you for the reminder.

18          (Jury in.)

19          THE COURT:  All right.  You may be seated.

20          Ladies and gentlemen, you will, on occasion, see

21 lawyers on behalf of the Government or the defendant, either

22 in the hallways, here, or on the street or walking across to

23 the hotel or whatever.  And they will typically not

24 acknowledge you or say hello, and that's entirely appropriate.

25          They are told by the Court not to discuss or not to

1  have any conversations or contact with any of the jurors.

2  And, indeed, everyone should avoid that, but the lawyers, in

3  particular.  So if that happened, don't think of the lawyers

4  as being rude.  Think of them, instead, as having adhered or

5  abiding my instructions.

6          All right.  Let's have Ms. Laporta return and,

7  Mr. Asonye, you may do your redirect examination, which you

8  say should be about 30 minutes?

9          MR. ASONYE:  And hopefully I can do it in less, Your

10 Honor.

11         THE COURT:  Good.

12         (Witness seated.)

13         THE COURT:  Ms. Laporta, you'll recall you're still

14 under oath.

15         THE WITNESS:  Yes, I do, Your Honor.

16         THE COURT:  And you may resume the stand.

17                    **REDIRECT EXAMINATION**

18 BY MR. ASONYE:

19 Q.   Good afternoon.  Ms. Laporta, Mr. Downing, do you

20 remember him asking you some questions about 29 Howard Street

21 and whether there was some confusion about whether it was a

22 rental?

23         Do you remember those questions?

24 A.   Yes, I do.

25 Q.   Okay.  Were you confused as to whether 29 Howard Street

C. Laporta - Redirect

1048

1   was a rental?

2   A.   Was I confused that it was?

3   Q.   Were you confused?

4   A.   No, I think the only confusion was whether or -- who was

5   living there when another name was thrown out there.

6   Q.   In fact, let me show you Government Exhibit 156, which

7   has already been admitted.

8          MR. ASONYE:  Your Honor, may we publish?

9          THE COURT:  Yes, you may.

10  BY MR. ASONYE:

11  Q.   And you received -- if you look at the middle e-mail?

12          You received this e-mail from Rick Gates, and did

13  Rick Gates ever express any confusion about the 29 Howard

14  Street, whether it was a rental in 2015?

15  A.   No.

16  Q.   In fact, in Paragraph 2, what does he say about how it's

17  used in 2015?

18  A.   He said rental clearly.

19  Q.   All right.  And if we can pull up Government Exhibit

20  337L, which is the tax return for MC Soho, 29 Howard Street in

21  2015.  And if we could turn to Page 14, if we could zoom in on

22  the top.

23          Was there any confusion about the number of days

24  this property was rented out for when the tax return was

25  filed?

C. Laporta - Redirect

1049

1   A.    No, there was not.

2   Q.    Is the -- how many days was it rented for?

3   A.    It was available 365 days.

4   Q.    Okay.  In fact, if you read Line 1, you said it was

5   available for 365 days.  Could you actually read Line 1 to the

6   jury, what does it say?

7   A.    (As read):  "Show the type and address of each property.

8   For each rental property -- real estate property listed,

9   report the number of days rented at fair rental value and days

10  with personal use."

11  Q.    All right.  So that says days rented at fair rental

12  value; is that correct?

13  A.    Yes.

14  Q.    And how many days was it rented?

15  A.    365.

16  Q.    How many days was it personal?

17  A.    None.

18  Q.    If we can take that down.  Thank you.

19          Now, Mr. Downing also asked you some questions about

20  your expertise in preparing tax returns; is that correct?

21  A.    That's correct.

22  Q.    And what is your expertise?

23  A.    Expertise is accounting and auditing, but experience

24  includes business and personal tax returns.

25  Q.    Now, did it take you an -- did you need to be an expert

U.S. v. Manafort

C. Laporta - Redirect

1050

1   in order to determine that the Peranova letter -- forgiveness

2   letter for $1.5 million was backdated?  Did you need to be an

3   expert to figure that out?

4   A.   No.

5   Q.   Did you need to be an expert to know that you can't

6   disguise income as a loan?

7   A.   No.

8   Q.   Was that complicated?

9   A.   No.

10  Q.   Did you need to be an expert to know that calling

11  $900,000 from Telmar was wrong and not right?

12  A.   The $900,000?

13  Q.   Calling that a loan instead of income?

14  A.   Correct.

15  Q.   Did you need to be an expert to know that that was wrong?

16  A.   No.

17  Q.   Now, Mr. Downing asked you about some tax returns from

18  KWC going all the way back to 2005; is that correct?

19  A.   That is correct.

20  Q.   Now, you testified that you signed the 2014 and the 2015

21  return for DMP International; is that correct?

22  A.   That is correct.

23  Q.   Did you sign the 2010, '11, '12, or '13 returns?

24  A.   No, I did not sign those returns.

25  Q.   Did you even work on the 2010, '11, or '12 returns?

U.S. v. Manafort

1   A.   No, I did not.

2           THE COURT:  Did you work on the 2013 return?

3           THE WITNESS:  I did not work on them.  There's --

4   it's possible I was copied on e-mails in that transition

5   period, but I don't recall.

6           THE COURT:  So you when you say you didn't work on

7   them, what do you mean?

8           THE WITNESS:  I don't -- I don't recall working on

9   anything but '14 or '15.

10          THE COURT:  Next question.

11  BY MR. ASONYE:

12  Q.   In effect, with respect to 2013, did you review or

13  approve the 2013 tax return for Mr. Manafort?

14  A.   No, I did not.

15  Q.   So with respect to the tax returns that are at issue in

16  this case, that are charged in this case, what is the one year

17  that you worked on?

18  A.   2014 and 2015.

19  Q.   Now, Mr. Downing asked you about DMP International's 2016

20  return.  Did you work on that return?

21  A.   No, I did not.

22  Q.   Did your firm work on that tax return?

23  A.   No, we did not.

24  Q.   Okay.  Have you ever seen that tax return before today?

25  A.   No, I have not.

—U.S. v. Manafort—

C. Laporta - Redirect

1052

1  Q.   And you indicated during your cross-examination that

2  $1.9 million from Telmar was apparently picked up as income in

3  that 2016 tax return, correct?

4  A.   That's correct.

5  Q.   Okay.  And did you recall when that 2016 tax return was

6  actually filed?

7  A.   I don't recall when it was actually filed.

8  Q.   If you could take a look at Defendant's two thousand- --

9  I'm sorry, Defendant's 4?

10 A.   Oh, sorry.  October 16, 2017.

11 Q.   Okay.  Now, when were you interviewed for the first time

12 in this investigation?

13 A.   I don't remember.  Maybe a year ago.

14 Q.   Was it -- was it prior to October 2017?

15 A.   I don't believe so.  I honestly don't remember.

16 Q.   Now, let me show you -- Mr. Downing asked you about

17 Defendant's Exhibit 2, and if we could actually put that up on

18 the ELMO.

19       And did you testify that you prepared this document?

20 A.   Yes.

21 Q.   Okay.  How did you prepare this document?

22 A.   It's just based on tax returns that are in the files for

23 those years for those entities.

24 Q.   And did those tax returns rely on the GL's that were

25 provided by Heather Washkuhn and her firm?

U.S. v. Manafort

1   A.   Presumably.

2           MR. DOWNING:  Objection, Your Honor.  How can a tax

3   return rely on a general ledger?

4           THE COURT:  I'll overrule the objection.  But you

5   may, of course, in a recross-examination, clarify that.  She's

6   answered the question.

7           MR. ASONYE:  Oh, I'm sorry.  I didn't -- I didn't

8   hear her response, Your Honor.

9           THE COURT:  Well, maybe I missed it as well.

10          You may re-ask it.

11  BY MR. ASONYE:

12  Q.   Okay.  Ms. Laporta, the tax returns that you -- that KWC

13  prepared, did they rely on the information on the GL's

14  provided by Heather Washkuhn and her firm?

15  A.   That's the initial representation of the activity for the

16  entities, the general ledger.

17  Q.   And if --

18          THE COURT:  Does that mean that everything is

19  accepted without question?

20          THE WITNESS:  No, it does not.

21          THE COURT:  Next question.

22  BY MR. ASONYE:

23  Q.   Now, if income wasn't included on the GL and the client

24  didn't tell you about it, was it reflected in the client's tax

25  return?

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

C. Laporta - Redirect

1054

1   A.   And which tax year are we talking about?  I'm sorry to be

2   confused.

3   Q.   The -- let's just take 2014, the year that you signed for

4   Mr. Manafort.

5   A.   Okay.  Okay.

6   Q.   If you -- if you didn't see a payment or income on the GL

7   and -- or -- and Mr. Manafort didn't tell you about it, was it

8   reflected on his tax return?

9   A.   No, I don't think so, if I'm following correctly.

10  Q.   And, in fact, were you aware of any foreign accounts that

11  were under the control of Mr. Manafort?

12  A.   No, I was not ever aware of those foreign accounts.

13  Q.   So did your tax returns that you prepared reflect any

14  payments into those foreign accounts?

15  A.   No.

16  Q.   And if payments were made out of those foreign accounts

17  on behalf of Mr. Manafort to U.S. vendors, would that have

18  been reflected in your tax returns?

19  A.   If payments had been made from foreign accounts to

20  vendors?

21  Q.   If a payment was made from a foreign account that you

22  didn't know about to a U.S. vendor on Mr. Manafort's behalf,

23  would that have been reflected as income on the tax return

24  that you prepared?

25  A.   Well, I'm not completely following, but I think

─────U.S. v. Manafort─────

1   if overseas accounts were used to pay vendors of the

2   company --

3   Q.   Vendors of Mr. Manafort, personal vendors for

4   Mr. Manafort?

5   A.   Oh, I didn't know of any.  And if they were, I don't know

6   if they'd be expenses on his behalf or --

7   Q.   So --

8   A.   -- it'd be -- it would be income.  What your -- I think

9   what the -- ultimately, if there was payments made from

10  another account, that income would need to be picked up

11  somewhere.

12  Q.   And you're not aware of any such payments, are you?

13  A.   No, I'm not.

14  Q.   So any such payments are not reflected on Defendant's

15  Exhibit 2, are they?

16  A.   That's correct.

17  Q.   And, in fact, let's look a little closer at Defendant's

18  Exhibit 2.

19        Now, if you -- Mr. Downing asked you about the total

20  amount of gross receipts between 2005 and 2015, and you said

21  92 million on the second page; is that right?

22  A.   Yes, that's correct.

23  Q.   Okay.  But I want you to actually focus on five

24  particular years, if we can do a little bit of addition

25  together.  If you could add the gross receipts for 2010

U.S. v. Manafort

1   through 2014 that was reported that you-all picked up, I'd

2   like you to tell the jury what the total of that is, okay?

3           So we're going to start for 2010.  And how much was

4   reported as gross receipts by Davis Manafort in 2010?

5   A.   Approximately $6.5 million dollars.

6   Q.   Okay.  Let me just keep track of that.

7           THE COURT:  What is this?

8           MR. ASONYE:  Your Honor, I'm just -- I'm just trying

9   to --

10          (Audience laughter.)

11          THE COURT:  You don't -- no, take it off of there.

12  You don't testify.

13  BY MR. ASONYE:

14  Q.   All right.  6.5 --

15          THE COURT:  Yes, all right is correct.

16          Go head, Mr. Asonye.

17  BY MR. ASONYE:

18  Q.   In 2011, how much is reported as gross receipts for Davis

19  Manafort Partners?

20  A.   5.3 million.

21  Q.   Okay.  So are we now at 11.8 million?

22  A.   Yes.

23  Q.   For 2012, how much is reported in gross receipts for DMP

24  International?

25  A.   Seven million-three.

U.S. v. Manafort

C. Laporta - Redirect

1057

1  Q.   Okay.  So are we now at 19.1 million?  11.8 plus 7.3?

2  A.   That sounds right.

3  Q.   Okay.  And how much is reported for 2014 -- 2013?

4  A.   4.5 million.

5  Q.   Does that take you to 23.6 million approximately?

6  A.   Approximately.

7  Q.   And then the final year, how much is reported for DMP

8  International in 2014?

9  A.   7.4 million.

10 Q.   Does that get you to around 31 million?

11 A.   Right.

12 Q.   Okay.  Is that less than 60 million?

13 A.   Excuse me?

14 Q.   Is that less than $60 million --

15 A.   Yes.

16 Q.   -- for the one million that's reported?

17 A.   Yes.

18 Q.   Now, let me show you Defense Exhibit 3.  You were asked

19 about this as well.

20      And can you explain to the jury again what this

21 exhibit is?

22 A.   Yes.  This exhibit is a summary of loans that were made

23 from wire transfers during 2005 and 2015.  And we show the

24 dates and the amounts and which entities received those

25 monies -- that money.  And -- and then we show of those loans

─────────── U.S. v. Manafort ───────────

1  how much was recognized in revenue, how much was distributed

2  to the patterns, how much was written off as a worthless

3  investment, and the year of -- the loans were repaid or

4  converted.

5  Q.   Okay.  So --

6           THE COURT:  Did you do this?

7           THE WITNESS:  Yes.

8           THE COURT:  Did you do this as what, in order to

9  help you get the return accurate?

10           THE WITNESS:  No, this was a request of the clients.

11           THE COURT:  From Mr. Gates?

12           THE WITNESS:  No, from Mr. Manafort.

13           THE COURT:  What was -- you may proceed.

14           MR. ASONYE:  Thank you, Your Honor.

15  BY MR. ASONYE:

16  Q.   I want to ask you first about some of the entities that

17  are listed on this exhibit.

18           THE COURT:  But is it accurate based on what you

19  saw?

20           THE WITNESS:  This was developed from tax returns

21  that were already filed.  So there were no judgments made here

22  in the preparation of this schedule.

23           THE COURT:  Next question.

24  BY MR. ASONYE:

25  Q.   Now, Yiakora Ventures Limited, do you see that, Yiakora

U.S. v. Manafort

1  Ventures Limited, in the middle?

2  A.   Yes.

3  Q.   Okay.  What was your understanding of what that entity's

4  relationship with Davis Manafort Partners was?

5  A.   I believe -- and I wasn't familiar back in those years,

6  but I believe they were all -- they were all -- I didn't know

7  the relationship between them.  I'd be guessing.

8           I know the two I dealt with, Peranova and Telmar,

9  were customers of DMP International.

10 Q.   And you didn't understand Peranova to be controlled by

11 Mr. Manafort?

12          THE COURT:  You're leading.

13 BY MR. ASONYE:

14 Q.   Did you understand -- did you understand --

15          THE COURT:  What, if anything.

16 BY MR. ASONYE:

17 Q.   What, if anything, did you understand about whether

18 Peranova was controlled by Mr. Manafort?

19 A.   No -- no knowledge of that.

20 Q.   And what about for Yiakora?

21 A.   I don't -- I wasn't involved with Yiakora, I don't think.

22 Q.   And --

23 A.   I mean, I know I wasn't.

24 Q.   Now, there's a name at the top, Deripaska.  What, if

25 anything, did Mr. Manafort tell you about $10 million in loans

─────────U.S. v. Manafort─────────

1   from Mr. Deripaska?

2   A.   Nothing.  We were just using numbers and maybe he came in

3   with some explanations or maybe they came from the general

4   ledger.  I don't remember where the client or customer listing

5   or entity where that was coming from.

6   Q.   What did Mr. Manafort tell you about a Russian NGO?

7   A.   Nothing.

8   Q.   Now, this -- the title of this document is called "Loans

9   From Wire Transfers."

10         Why did -- why did you label this document "Loans

11  From Wire Transfers"?

12  A.   We were going from what was reported on tax returns, the

13  balance sheets, as loans for each of these years.  So it was

14  simply every Schedule L for all the entities that are listed

15  here.

16  Q.   Now, the loans I asked you about from Deripaska, the

17  10 million and the 8 million from Yiakora, do you see that --

18  those loans ever being picked up as income in any subsequent

19  year?

20  A.   All I know are when Telmar was picked up as income.

21  Q.   But do you know of any time that the $10 million in loans

22  from Deripaska was picked up as income?

23  A.   I don't know that.  It would be in the recognized income

24  of 7 million.  And I don't have the details of that.  Oh,

25  wait.  That's not true.  7 million -- recognizes income.

─────────U.S. v. Manafort─────────

C. Laporta - Redirect

1061

1    And which two are you asking about?

2  Q.   Well, let's first start with Deripaska.

3  A.   Yes.

4  Q.   Do you see the $10 million purportedly loaned from

5  Deripaska ever being picked up as income?

6          THE COURT:  What do you mean by "ever"?

7          MR. ASONYE:  Ever.

8          THE COURT:  Well, have you seen any returns after

9  2016?

10          THE WITNESS:  No, I have not.

11          THE COURT:  All right.  So that's all she can say.

12  BY MR. ASONYE:

13  Q.   For any return that you've ever seen these loans

14  were made -- supposedly made in 2006?

15          THE COURT:  Well, if she hasn't seen a return, of

16  course, it isn't there.

17          MR. ASONYE:  For any return that she's worked on or

18  seen.

19          THE COURT:  All right.  That's an appropriate

20  question.  You may ask that.

21  BY MR. ASONYE:

22  Q.   Since 2006, have you seen the $10 million in supposed

23  loans from Deripaska being picked up as income?

24  A.   I'm sorry, I'm reading the disposition of those loans

25  over here in the columns to the right.  And it looks like the

1   loans were distributed, reported as distributions, and to

2   another partner, and there was a write-off of a worthless

3   security.

4           So I don't see it here where its been paid off, no.

5   Q.   And, in fact, if you look at your other -- the other

6   chart that you prepared, which was Mr. Manafort's income that

7   year -- if we could flash that up quickly -- Defendant's

8   Exhibit 2.

9           Do you see any income that is reported from

10  Deripaska?

11  A.   No, I don't see any.

12  Q.   And then let's take a look at Yiakora.  Is there

13  supposedly $1.969 million in loans from Yiakora on Defendant's

14  Exhibit 3; isn't that right?

15  A.   Yes.

16  Q.   And do you see that on Defendant's Exhibit 2 ever being

17  picked up as income?

18  A.   Well, if we can stick with the loan document, the

19  schedule I prepared on loans --

20  Q.   Sure.

21  A.   -- the 1.9, if you go to recognized income, it appears to

22  have happened and it says, "Year 2016 to be recognized in

23  income in 2016."

24  Q.   And when Mr. Downing showed you that 2016 tax return, did

25  you see that being picked up as income?

U.S. v. Manafort

1   A.    I did not.

2   Q.    Now, Ms. Laporta, in order to call something a loan, do

3   you have to have an intent to actually repay it?

4   A.    Yes.

5   Q.    Can you call something a loan when it's actually income?

6   A.    No.

7   Q.    If you do that, if you call something a loan when its

8   income, is that fraud?

9   A.    It could be considered fraud.

10  Q.    Now, let me ask you, Mr. Downing asked you about the

11  Telmar loan, isn't that right, or supposed loan?

12  A.    That's correct.

13  Q.    Was Mr. Manafort's 2014 tax return accurate when he

14  called the $900,000 a loan and not income?

15  A.    No, it was not.

16  Q.    And so is -- was Mr. Manafort's 2014 tax return still

17  false for 2014 even if he picked it up as income two years

18  later?

19  A.    Yes, that's correct.

20          THE COURT:  Anything further?

21          MR. ASONYE:  Just a little bit, Your Honor.

22          THE COURT:  All right.

23  BY MR. ASONYE:

24  Q.    Mr. Downing -- do you recall when Mr. Downing asked you

25  about your representations to the bank about $2.4 million in

C. Laporta - Redirect

1064

1   accrual income for Mr. Manafort?

2   A.    Yes, I do.

3   Q.    Okay.  And I think you said there's nothing inappropriate

4   about using an accrual P&L; is that correct?

5   A.    That's correct.

6   Q.    Now, to show as income on an accrual P&L --

7           THE COURT:  Go ahead and finish your question.

8           MR. ASONYE:  I haven't even finished my thought,

9   but, yes.

10  BY MR. ASONYE:

11  Q.    When is income recognized on an accrual basis P&L?

12          MR. DOWNING:  Objection, Your Honor.  The question

13  to Ms. Laporta earlier had to do with the cash basis P&L and

14  then accounts receivable.  I did not ask her a question about

15  an accrual based P&L.

16          THE COURT:  Well, I'll overrule the objection.  But

17  you might use those words.  It might be better, more accurate.

18  Go ahead, Mr. Asonye.

19  BY MR. ASONYE:

20  Q.    For an accrual based P&L, when is income recognized?

21  A.    In the year.

22          THE COURT:  Haven't we been over this?

23          Let's not --

24          (A pause in the proceedings.)

25          THE COURT:  Let us not cover ground that has already

1  been covered.

2  BY MR. ASONYE:

3  Q.   Did you receive any evidence that the $2.4 million was an

4  accounts receivable for Mr. Manafort?

5  A.   No, I did not.

6  Q.   Did you ask for it?

7  A.   Yes, I did.

8  Q.   And in that case were you dealing with Mr. Manafort

9  directly?

10  A.   Yes, I was.

11  Q.   And did you ever get it from him?

12  A.   No, I did not.

13  Q.   Did he tell you why?

14  A.   No.

15        MR. ASONYE:  Nothing further, Your Honor.

16        THE COURT:  Mr. Downing, any recross based on that?

17        MR. DOWNING:  Brief.

18        THE COURT:  All right, sir.  That's the magic word.

19                    **RECROSS-EXAMINATION**

20  MR. DOWNING:

21  Q.   Ms. Laporta, with respect to the questions that you were

22  just asked, the Schedule L is the balance sheet on a tax

23  return; is that correct?

24  A.   That is correct.

25  Q.   And the schedule you put together that you were just

U.S. v. Manafort

1  talking about when it looked at the Schedule L's for the tax

2  returns for DMP and DMP International from '05 to '15,

3  correct?

4  A.    That is correct.

5  Q.    And can you explain from year to year on those

6  Schedule L's, do they have a beginning balance for the items

7  on the balance sheet?

8  A.    Yes, they do.

9  Q.    And do they have an ending balance?

10  A.    Yes, they do.

11  Q.    And as part of your preparation of the tax returns, a

12  balance sheet, in fact, has to balance, correct?

13  A.    That is correct.

14  Q.    And what does that mean?

15  A.    That the assets have to equal the liabilities and equity.

16  Q.    And with respect to a loan account, from a year-to-year

17  basis, for a loan to go off of the balance sheet, either

18  somebody had to repay it, correct?

19  A.    Yes.

20  Q.    Or it had to be reclassified; is that correct?

21  A.    That is correct.

22  Q.    They don't magically disappear, do they?

23  A.    No, they don't.

24         MR. DOWNING:  No further questions.

25         THE COURT:  All right.  Thank you.  You may step

C. Laporta - Redirect

1067

1    down.  You may be excused.

2            Call your next witness.

3            (Witness excused.)

4            MR. ASONYE:  The Government calls Paula Liss.

5            MR. ZEHNLE:  Your Honor, may I be heard?

6            THE COURT:  Yes.  At the bench?

7            MR. ZEHNLE:  Yes.

8            THE COURT:  All right.  Keep Ms. Liss outside for

9    just a few minutes.

10           (Bench Conference.)

11           THE COURT:  Yes, Mr. Zehnle?

12           MR. ZEHNLE:  Good afternoon, Your Honor.

13           It is my understanding that through Special

14   Agent Liss that the Government intends to introduce Government

15   Exhibit 117.  That's what we were advised of.

16           And the defense has an objection to Government

17   Exhibit 117 both for relevancy under 401 and 403 analysis and

18   under -- you know, basically stating that it's irrelevant for

19   many, many purposes.

20           It's a composite exhibit.  It deals with more than a

21   dozen separate individuals and entities and purports to state

22   that no FBAR reports were filed for any of these individuals

23   or entities.

24           The defendant's objection --

25           THE COURT:  Let me get the report.

U.S. v. Manafort

1           (A pause in the proceedings.)

2           THE COURT:  Tell me what you think these purport to

3    be, Mr. Zehnle.

4           MR. ZEHNLE:  These are essentially certifications

5    from the FinCEN, Financial Crimes Enforcement Network, stating

6    that a search was done for records relating to the filing of

7    foreign bank reports.  And it purports to do so for the period

8    of January 1, 2001 through May 25th of this year, 2018.

9           The defense's objection, Your Honor, is that in

10   Counts 11 through 14 of the superseding indictment, the

11   Government has charged Mr. Manafort, and Mr. Manafort alone,

12   for failing to file a foreign bank account report for each of

13   the years 2011, '12, '13, and '14.

14          So the basis for the objection are multiple.

15          Number one, out of these -- and I counted them, I

16   believe there's 14, Your Honor.  There's more than a dozen.

17   Out of more of a dozen of these records, the only ones that

18   relate to Mr. Manafort appears to be the first page of the

19   exhibit, Government 117.

20          In addition, the search purports to state that it

21   was done for a period going all the way back to 2001 and

22   continuing all the way up to May 25th of this year, 2018.

23   None of these things have relevance to the four charges

24   related solely to Mr. Manafort with respect to the failure to

25   file the FBARs.

─────U.S. v. Manafort─────
P. Liss - Direct                                           1069

1          And, in fact, under 401 and 403 analysis, it seems

2    that the Government was trying to suggest that he had a duty

3    or a responsibility or an obligation to file these things

4    going back all these years when, in fact, no evidence has been

5    adduced to that whatsoever.

6          THE COURT:  What's your response?

7          MR. ASONYE:  Well, Your Honor, these are all --

8    these not only Mr. Manafort, but all his related entities.  We

9    just saw a chart where he's talking about, I guess, loans from

10   foreign sources for an account that is an affiliate of his.

11   We, of course, to check, A, to show that there was no absence

12   of mistake to show that:  Well, maybe his wife, another 50

13   percent partner, filed the FBAR.  We, of course, had to go and

14   check.  And in addition to --

15         THE COURT:  Well, maybe you had to check, but I'm

16   not sure it's admissible.  Because that -- these people are

17   not the ones accused of it.  And it has -- it has the effect

18   of -- a bit of a smear.  But you have already evidence in the

19   record that he checked "no" on his tax returns; is that right?

20         MR. ASONYE:  Yeah, but this is an independent and

21   different requirement.  The tax return is one requirement.

22   There's a separate statute of a partner that actually filed

23   the FBAR with a different agent.

24         Secondly, Your Honor --

25         THE COURT:  But it only accuses him of failing to do

U.S. v. Manafort

P. Liss - Direct

1070

1    it.

2              MR. ASONYE:  Well, the --

3              THE COURT:  Do you intend to argue that the

4    Government has not proven that because they didn't do it

5    on evidence -- that -- that John Hannah, LLC, did not file

6    a -- an FBAR?

7              MR. ZEHNLE:  Yes, Your Honor.  That's my point.

8    There's no evidence that's been adduced.

9              THE COURT:  No.  Do you intend to argue to the jury

10   that they failed because they didn't show that John Hannah,

11   LLC, did not file an FBAR?

12             MR. ASONYE:  Your Honor.

13             MR. ANDRES:  No, Your Honor.

14             (Court reporter interruption.)

15             THE COURT:  Yes, she can only get one of us at a

16   time.

17             MR. ASONYE:  Your Honor, the other thing that's

18   incredibly important here, the defense -- the parties just

19   agreed to a stipulation where we're going to get into the fact

20   that Mr. Manafort and one of his entities responded to the 31

21   subpoenas and these are Mr. Manafort's -- DMPs foreign

22   accounts.

23             And there's no FBAR filing for DMP as well.

24             THE COURT:  Well, let me see if I can get my

25   fingers -- or my arms around this.

U.S. v. Manafort

P. Liss - Direct

1071

1     Who is John Hannah, LLC?  It's a name I've never

2  even heard in the case so far.

3     MR. ASONYE:  It is, Your Honor.  It's one of

4  Mr. Manafort's entities.  In fact, if I can grab that chart, a

5  number of entities received these foreign loans, supposed

6  foreign loans.

7     THE COURT:  Jesand Investments.

8     MR. ASONYE:  These are Manaforts.  And he is a

9  member of these entities or his children are a member of these

10  entities.  But most of them -- I believe all of them are.  But

11  there may be a way.  This is the first time we're hearing

12  about it.  I can tell you about the ones we care about, Your

13  Honor.

14     THE COURT:  All right.

15     MR. ASONYE:  We care about Paul Manafort, Kathleen

16  Manafort.  That's on their tax return.  They probably care

17  more about Rick Gates than we do, but -- Davis Manafort

18  matters and DMP International.  Davis Manafort Partners.

19  Those are the most important ones that are critical to this

20  case.  The evidence about all of those parties actually having

21  foreign accounts and controlling those accounts and that he

22  never filed a FBAR for any of those.  That's highly relevant.

23  The rest we can --

24     THE COURT:  Just a minute.  I want to get a copy of

25  the indictment.

U.S. v. Manafort

P. Liss - Direct

1072

1      MR. ZEHNLE:  Your Honor, if you want to just look at

2  mine.

3      THE COURT:  No.

4      (A pause in the proceedings.)

5      THE COURT:  All right.  Mr. Zehnle --

6      MR. NANAVATI:  Yes, Your Honor.

7      THE COURT:  -- do you intend to argue that the

8  Government fails in its allegations on the FBAR, because they

9  didn't cover all of these various other entities?

10      MR. NANAVATI:  No, Your Honor.  My focus is really

11  if we had -- if they had produced a document that simply said

12  Mr. Manafort did not file -- there's no record of filing FBARs

13  for the years 2011 through 2014, we wouldn't be standing here.

14      THE COURT:  Well, you have that, don't you?

15      MR. ASONYE:  We have it for those -- no, we don't.

16  What we have, Your Honor, is each entity and they do one

17  search.  They cover an entire period.

18      THE COURT:  I don't care how they do it.  Do you

19  have evidence that Mr. Manafort didn't file FBARs on these

20  four years, which is the crime he's accused of committing?

21      MR. ASONYE:  Yes.  I mean, we have --

22      THE COURT:  All right.  Then let's offer that and

23  we'll end with that.

24      MR. ASONYE:  Your Honor, it's also absolutely

25  relevant that the company, DMP International did not --

P. Liss - Direct

1073

1         THE COURT:  He's not accused of that.

2         MR. ANDRES:  He would be required on his tax return.

3    I believe this witness is going to testify it would have

4    been --

5         THE COURT:  All right.  I said that I'm only going

6    to allow one lawyer, but go ahead, Mr. Andres.  Go ahead.

7         MR. ANDRES:  I think the requirement would be that

8    because of his position at DMP, he would have had to file

9    those either himself or for his company.  So his -- he has an

10   obligation to file not just for himself but for his companies.

11   And so --

12        THE COURT:  Well, that's not alleged in the

13   indictment is the problem.  And do you intend to argue

14   anything about his entities having filed FBARs?

15        MR. ZEHNLE:  No, Your Honor.

16        THE COURT:  All right.  That's the way it's going

17   the stand.

18        MR. ANDRES:  Understood.

19        THE COURT:  I'm going to sustain the objection.  You

20   are limited to these four years and the failure of him and his

21   wife, I think -- doesn't she jointly file with him?

22        MR. ASONYE:  Yes.

23        THE COURT:  It's a joint return.

24        MR. ZEHNLE:  The only point I would make in that

25   regard, Your Honor, is that these are done on -- excuse me --

U.S. v. Manafort

P. Liss - Direct

1074

1    the FinCENs are done on an individual basis.  And they didn't

2    charge anything in there with respect to Mrs. Manafort.  Or --

3    I mean, there's individuals in here and there's also entities

4    that they are doing this for and they are doing it for a long

5    period of time.

6              THE COURT:  Yes.  I think you've made your point

7    clear and I've accepted it.  I'm not going to allow them to

8    put on evidence that they've not done it for 15 years.

9              I'm going to allow them to show that he didn't file

10   the FBAR on 2011, 2012, 2013, and 2014, because that's what's

11   alleged in the indictment.  And if -- if you want to show

12   that, you may do it.  How you do it is entirely up to you.

13             MR. ASONYE:  I think -- well, I obviously can't do

14   it from the exhibit, Your Honor.  It's becomes the longer

15   periods --

16             THE COURT:  Yes, but you could maybe ask the person

17   to look -- I'm not going to tell you how to try your case, but

18   I think you have evidence.  You just need to present it.  And

19   you're not required to go ahead with this witness.

20             MR. ASONYE:  Well, Your Honor, may I -- I can either

21   lead her or just have one minute with her to make her clear of

22   the Court's ruling on where we can go.  That will probably

23   solve the issue.

24             THE COURT:  All right.  Well, I'll let you lead --

25   well, did -- did he file -- does the record show that he filed

U.S. v. Manafort

P. Liss - Direct

1075

1  an FBAR for the years 2012, '13, '14, '15?  Yes or no?

2          MR. ASONYE:  Yes, I just -- she's --

3          THE COURT:  And she can rely on this record to make

4  that statement.  Don't you agree?

5          MR. ZEHNLE:  I'm fine with that, Your Honor.

6          THE COURT:  Let's do it.

7          MR. ASONYE:  I just -- she's prepped a number of

8  times for the whole thing, so it may not --

9          THE COURT:  That's her problem.  Don't let her

10  answer.  I don't want to take a recess at this time.

11          MR. ANDRES:  I agree.

12          THE COURT:  Because then we have a long witness,

13  right?  We do, don't we?

14          MR. ANDRES:  Yes.

15          THE COURT:  That's your witness?

16          MR. ANDRES:  Yes.

17          THE COURT:  All right.  Let's proceed.

18          MR. ZEHNLE:  Thank you, Your Honor.

19          THE COURT:  For the record -- just a moment.

20          For the record, the objection is sustained, but the

21  Government is permitted to offer evidence based on the search

22  that relates to the matters that were listed in the

23  indictment.

24          MR. ZEHNLE:  Understood.

25          THE COURT:  And the sustained -- and it's not

┌─────────────────── U.S. v. Manafort ───────────────────┐

P. Liss - Direct

1076

1   relevant, all of those other things.  And there is a 403

2   problem with doing it that way.  They can convict him for

3   years that he's not alleged to have violated in the

4   indictment.  So that is why I'm doing it.  Let's proceed.

5           (End of bench conference.)

6           THE COURT:  All right.  Mr. Asonye, you may proceed

7   in accordance with the Court's ruling, which focuses sharply

8   on what is in the indictment.

9           MR. ASONYE:  The Government calls Paula Liss.

10          THE COURT:  All right.

11          Come forward and take the oath, please, ma'am.

12          Thereupon,

13                          **PAULA LISS,**

14  having been called as a witness on behalf of the Government

15  and having been first duly sworn by the Deputy Clerk, was

16  examined and testified as follows:

17          (Witness seated.)

18          THE COURT:  All right.  You may proceed, Mr. Asonye.

19                      **DIRECT EXAMINATION**

20  BY MR. ASONYE:

21  Q.   Good afternoon.  Could you please state and spell your

22  last name for the record?

23  A.   My name is Paula Liss, L-i-s-s.

24  Q.   And how far did you go in school?

25  A.   I have a bachelor's degree in accounting.

─────────U.S. v. Manafort─────────
P. Liss - Direct/Cross                                    1077

1   Q.   Do you have any certifications?

2   A.   Yes.  I'm a certified fraud examiner and a certified

3   anti-money laundering specialist.

4   Q.   And, Ms. Liss, if you could scoot up and just speak a

5   little bit closer into the microphone, that will -- that will

6   help some of us who are getting up in age, myself.

7            So do you -- where do you work?

8   A.   I work at the Financial Crimes Enforcement Network,

9   commonly known as FinCEN.

10  Q.   And what Government agency is FinCEN part of?

11  A.   FinCEN is a Bureau of the Treasury Department.

12  Q.   What does FinCEN do?

13  A.   FinCEN's mission is to protect the U.S. financial system

14  from money laundering, terrorist financing, and other illicit

15  use through the collection --

16           THE COURT:  Can we get immediately to the

17  straightforward question?  There's no money laundering in this

18  case alleged.

19  BY MR. ASONYE:

20  Q.   Where do you -- what's your position at FinCEN?

21  A.   I'm a senior special agent.

22  Q.   And what are your duties?

23  A.   Part of my duties are to search records maintained in

24  FinCEN's database, testify as custodian of record.

25  Q.   And are you familiar with a report of foreign bank

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────
EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1078

1   account -- bank and financial accounts?

2   A.   Yes.

3   Q.   Is that also called the FBAR?

4   A.   Yes.

5   Q.   Okay.  What is that?

6   A.   An FBAR is required when a U.S. person has a financial

7   interest in or signature or other authority over one or more

8   foreign financial accounts when aggregated exceed $10,000 at

9   any time during a calendar year.

10  Q.   And is the FBAR reporting requirement separate from the

11  requirement to disclose a foreign bank account on an

12  individual tax return?

13  A.   Yes.

14  Q.   When during the year is the deadline to file an FBAR if

15  you are required to do so?

16  A.   It's April 15th of the year following the activity.

17  Q.   Now, when was the deadline to file an FBAR in tax years

18  2011 through 2014?

19  A.   It was June 30 of the following year.

20  Q.   Now, if a person has an obligation to file a FBAR, how is

21  it actually filed?

22  A.   Electronically.

23  Q.   Was there a time that it could be mailed?

24  A.   Yes.

25  Q.   When was that?

U.S. v. Manafort

1    A.   It could be mailed prior to June 30, 2013.

2    Q.   And if it was mailed, who was the FBAR mailed to?

3    A.   It was mailed to the IRS.

4    Q.   Are you familiar with the way that FinCEN keeps records

5    of FBARs?

6    A.   Yes.

7    Q.   And generally how does FinCEN keep those records?

8    A.   They are maintained electronically.

9    Q.   And do you have access to those electronic records?

10   A.   Yes, I do.

11   Q.   Were you asked to conduct a search for FBAR filings in

12   this case?

13   A.   Yes.

14   Q.   And did you conduct a FBAR filing search for Paul

15   Manafort, the defendant?

16   A.   Yes.

17   Q.   Let me show you what's marked as Government Exhibit 117

18   in your binder.

19            THE COURT:  I thought we discussed that at the

20   bench.

21            MR. ASONYE:  I just want her to see it.

22            THE COURT:  Just ask her the question as we

23   discussed at the bench.  Let's get it done.

24            MR. ASONYE:  Trying, Your Honor.

25            THE COURT:  Well --

U.S. v. Manafort

P. Liss - Direct

1080

BY MR. ASONYE:

Q.    Did you -- did you conduct a search of whether Paul
Manafort filed an FBAR for the tax years 2011, 2012, 2013, and
2014?

A.    Yes.

Q.    And who conduct -- who asked you to conduct that search?

A.    The U.S. government.

Q.    And what were the results -- what did you find for those
tax years?

A.    There were no FBARs in FinCEN's system of record.

              MR. ASONYE:  Thank you.

              THE COURT:  Any cross-examination?

              MR. ASONYE:  Actually, Your Honor, may I have one
moment, Your Honor.

              THE COURT:  Yes, you may.

              (A pause in the proceedings.)

              MR. ASONYE:  Your Honor, may we approach?  There's a
question about the Court's ruling.

              THE COURT:  All right.  Yes, you may.

              (Bench Conference.)

              THE COURT:  What's the question?

              MR. ASONYE:  The question is whether we're allowed
to ask about any FBAR filings for Kathleen Manafort during the
same period?  We understood that we were allowed to do so,
Your Honor.

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1081

 1          THE COURT:  Any objection to that?

 2          MR. ZEHNLE:  Your Honor, I was just asking for

 3   clarification.  I thought initially it was just the husband.

 4          THE COURT:  I did, but as long -- they filed joint

 5   returns --

 6          MR. ZEHNLE:  I'm okay with it, Your Honor.

 7          THE COURT:  Let's return.

 8          (End of bench conference.)

 9          THE COURT:  All right.  You may proceed.

10   BY MR. ASONYE:

11   Q.   And, Ms. Liss, for the same period, 2011, 2012, 2013, and

12   2014, did your search yield any results for FBAR filings for

13   Kathleen Manafort, the defendant's wife?

14   A.   There were no FBARs in FinCEN's system of record.

15          THE COURT:  I didn't hear you.

16          THE WITNESS:  There were no FBARs in FinCEN's system

17   of record.

18          THE COURT:  Thank you.  Cross-examination.

19          MR. NANAVATI:  Yes, briefly, Your Honor.

20                        **CROSS-EXAMINATION**

21   BY MR. ZEHNLE:

22   Q.   Good afternoon, Agent Liss.  My name is Thomas Zehnle,

23   and I represent Paul Manafort in this case.

24   A.   Good afternoon.

25   Q.   I just wanted to go over a little bit of your testimony a

─────U.S. v. Manafort─────

P. Liss - Redirect

1082

1   moment ago.  You are familiar with the FBAR, correct?

2   A.   Yes.

3   Q.   Okay.  And I think you testified that in the past it used

4   to be filed on June 30th of the following year; is that

5   correct?

6   A.   That's correct.

7   Q.   And that was not the same time obviously as income tax

8   returns were generally due, correct?

9   A.   That's true.

10  Q.   And then it's also now changed to a system whereby it's

11  done electronically; is that correct?

12  A.   Yes.

13  Q.   And in the past it could have been mailed in by paper,

14  right?

15  A.   True.

16  Q.   And that was sent to the Detroit center; wasn't that

17  correct?

18  A.   Yes.

19  Q.   Okay.  Now, just in terms of the FBAR so we can clarify

20  this, there are a number of elements that need to be satisfied

21  before a person, a U.S. person, is required to file an FBAR;

22  is that correct?

23  A.   Yes.

24  Q.   And so one of those elements would be that it has to be a

25  United States person, correct?

─U.S. v. Manafort─

1   A.    Yes.

2   Q.    And a person can be more than just an individual, right?

3   A.    That's correct.

4   Q.    It can be a corporation, correct?

5   A.    Yes.

6   Q.    A U.S. domestic corporation has to file.

7         And the U.S. person has to have a financial interest

8   in the account; is that correct?

9   A.    That's one of the ways.

10  Q.    And another way is that they have signature authority

11  over the account?

12  A.    Yes.

13  Q.    Okay.  And then there's a definition of what is a foreign

14  financial account, correct?

15  A.    Yes.

16  Q.    And a financial account can mean more than just a bank

17  account, right?

18  A.    That's correct.

19  Q.    It can be a securities account, right?

20  A.    Yes.

21  Q.    It could be an insurance policy with a cash or

22  undervalue, right?

23  A.    Yes.

24  Q.    There are a number of definitions that deal with what a

25  foreign financial institution is, correct?

U.S. v. Manafort

1   A.    That's correct.

2   Q.    Okay.  And then you also said something about aggregating

3   the amounts.  And how amounts are aggravated in order to meet

4   the $10,000 threshold, there are regulations on that as well,

5   correct?

6   A.    Yes, there's guidance on that as well.

7   Q.    And there are practical issues because if it's a foreign

8   financial account, it might be in currency that's different

9   than U.S. dollars, of course?

10  A.    Yes.

11  Q.    Okay.  So in terms of a corporation's filing

12  requirements, and an individual who owns a corporation, what

13  is the rule in terms of ownership of the corporation in order

14  to require the filing of an FBAR?

15  A.    I'm not sure I understand your question.

16  Q.    Okay.  That was probably my inartful question.

17          How much ownership does a person have to have in a

18  corporation in order to be required to file an FBAR on behalf

19  of that corporation?

20  A.    The corporation may have its own filing requirement, and

21  then an individual may have their own filing requirement if

22  they own, directly or indirectly, more than 50 percent of the

23  company.

24  Q.    That is, it's more than 50 percent, correct?

25  A.    That's correct.

─────────────── U.S. v. Manafort ───────────────

1   Q.   So if it's 50 percent ownership or less, they have no

2   filing requirement?

3   A.   Well, you have to take into consideration if they may

4   indirectly own some of that as well.

5   Q.   Okay.  So if you take that into account and they don't

6   have indirect ownership of it, if it's 50 percent or less,

7   there is no FBAR filing requirements?

8   A.   For the individual who owned something in the company,

9   that's correct.  Others may have a filing requirement because

10  multiple people can have a filing requirement on one account.

11  Q.   Okay.

12          MR. ZEHNLE:  Nothing further, Your Honor.

13          MR. ASONYE:  Your Honor, I believe he's opened the

14  door on some of the --

15          THE COURT:  I'm sorry?

16          MR. ASONYE:  May we -- I can -- we can approach on

17  this, but we believe his cross opened the door on at least one

18  or two additional filings.

19          THE COURT:  I don't agree.  I can see that.  It's

20  done.  But come to the bench anyway.

21          (Bench Conference.)

22          THE COURT:  Mr. Zehnle, do you intend to argue that

23  any entities -- well, that Paul Manafort or his wife did not

24  file FBARs because they didn't have 50 percent of a company?

25          MR. ZEHNLE:  No, Your Honor.

U.S. v. Manafort

P. Liss - Redirect

1086

1        MR. ASONYE:  Your Honor, he just basically made the

2    argument.  Because their evidence in this case is if a person

3    who doesn't necessarily own 50 percent of DMP, therefore

4    implying that he has no filing responsibility.  He also went

5    deeply into personal --

6        THE COURT:  But they're not accused of failing to

7    file.  We're only focused on his obligation to file.  You

8    could have indicted him for more, but you didn't.

9        MR. ASONYE:  Then, Your Honor, then he expanded in

10   the area and went into this --

11       THE COURT:  Yes, but he's entitled -- he's entitled

12   to -- what he did in cross-examination is to make clear that

13   if he doesn't own 50 percent of a company, he doesn't have to

14   file.  If he does own more than 50 percent, then he and the

15   company have to file, but the company hasn't been indicted.

16   Only he has been indicted.

17       So he's entitled to argue that for any company that

18   he only owned 50 percent of, there was no FBAR requirement.

19   Well, that's what he wants to argue.  Am I correct?

20       MR. ZEHNLE:  Correct, Your Honor.

21       MR. ASONYE:  And to be clear, Your Honor, in 2010

22   and in 2011, Mr. Manafort owned 100 percent of Davis Manafort

23   Partners.

24       THE COURT:  Well, do you have evidence to that?

25       MR. ASONYE:  It's already in evidence.

U.S. v. Manafort

P. Liss - Redirect

1087

1    THE COURT:  Well, then don't worry about it.

2    MR. ASONYE:  Well, Your Honor, that's what we were

3  going to ask her now.  That opened the door on that issue.  If

4  Mr. Manafort had 100 percent ownership in Davis Manafort

5  Partners, did he have an FBAR requirement and so did Davis

6  Manafort.

7    THE COURT:  Yes, but you don't have to -- his

8  failure to file is all you can prosecute because of your

9  indictment.  You cannot prosecute that Davis Manafort

10  Partnership didn't file.

11    Do you understand what I'm saying?

12    MR. ASONYE:  I understand what you're saying, Your

13  Honor.  I just vigorously disagree that he has now opened that

14  issue now by --

15    THE COURT:  Well, then you lose the argument.  I'm

16  going to permit you to offer as much evidence as you would

17  like that he had an obligation to file and that he didn't

18  file.  That is what's in exhibits -- or in the counts 11

19  through 14.  The fact that some partnership or some company

20  didn't file, no.  But if you have shown that he owns more than

21  50 percent of the company, then he had an obligation to file.

22  Not for the company, but on his own.

23    MR. ASONYE:  And, Your Honor, we're going to do that

24  now.  I'm going to ask her that on redirect then.

25    THE COURT:  All right.  You can do that on redirect,

┌─────────────────────────────────────────────────────────┐
U.S. v. Manafort

P. Liss - Redirect

1088

1   but it can only focus on him.  Do you understand that?

2          MR. ASONYE:  On Mr. Manafort, understood.

3          MR. ZEHNLE:  Your Honor, if I might just be heard on

4   this.  I was -- I was very careful in the way I asked the

5   questions, simply talking about the element of what's required

6   for the filing of an FBAR.  Mr. Asonye seems like he wants to

7   bring this into a direct discussion of Mr. Manafort's

8   obligations.  I was only asking:  What are the elements that

9   are necessary because the jury needs to know that this is a

10  complicated process.  This isn't just something where it's

11  like, oh, gee, I've got a foreign account and I have to file.

12         THE COURT:  Well, the other --

13         Mr. Flood, let's have the noise in the courtroom

14  kept down, please.

15         THE CSO:  Stop talking.  Court is in session.

16         THE COURT:  Again, I want to emphasize that

17  Mr. Manafort has been indicted for failing to file FBARs for

18  four years, and that is the sharp focus.  Now, it's come out

19  that he does have an obligation to file an FBAR if he owns

20  more than 50 percent of a company that had that obligation.

21  The company would have to file it and the individual would

22  have to file it.  I think that's right.

23         MR. ASONYE:  That's correct.

24         THE COURT:  And so what is it, Mr. Zehnle, that you

25  would object to if he emphasizes that point he asks on

─────────────────── U.S. v. Manafort ───────────────────
P. Liss - Redirect
                                                            1089

1  redirect.  All he would ask is if Mr. Manafort owns more than

2  50 percent, he has to file an FBAR.

3          MR. ASONYE:  I mean, Your Honor, the question I

4  would ask is:  For 2010 and 2011, Mr. Manafort owned 100

5  percent of Davis Manafort Partners and DMP foreign bank, did

6  he have an obligation to file a FBAR?

7          THE COURT:  Any objection to that?

8          MR. ZEHNLE:  Well, only to the extent, Your Honor --

9  not on that particular point, but only to the extent that it

10 assumes that all the other elements that I just discussed with

11 this witness --

12         THE COURT:  That's a matter of argument.  I'll

13 permit you to ask that question and then we're done.

14         Let's proceed.

15         MR. NANAVATI:  Thank you, Your Honor.

16         (End of bench conference.)

17         THE COURT:  All right.  You may proceed in

18 accordance with the ruling at the bench.

19         MR. ASONYE:  Okay.  One moment, Your Honor.

20                   **REDIRECT EXAMINATION**

21 BY MR. ASONYE:

22 Q.   Ms. Liss, if in 2010 and 2011 Davis Manafort Partners had

23 a foreign bank account with more than $10,000 in it and

24 Mr. Manafort owned 100 percent of that company, would he have

25 an FBAR filing requirement in 2010 and 2011?

U.S. v. Manafort

1090

1   A.   It sounds like it, yes.

2   Q.   I'm sorry?

3   A.   Yes, yes.

4        MR. ASONYE:  No further questions.

5        THE COURT:  Any cross?

6        MR. ZEHNLE:  No, Your Honor.

7        THE COURT:  Thank you.  You may step down.  You may

8   be excused.

9        (Witness excused.)

10        THE COURT:  All right.  Call your next witness,

11   please.

12        MR. ANDRES:  The Government calls Richard Gates.

13        THE COURT:  Come forward and take the oath, please,

14   sir.

15        Thereupon,

16                    **RICHARD GATES,**

17   having been called as a witness on behalf of the Government

18   and having been first duly sworn by the Deputy Clerk, was

19   examined and testified as follows:

20        (Witness seated.)

21        MR. ANDRES:  May I inquire, Judge?

22        THE COURT:  Just a moment, please.

23        MR. ANDRES:  Sure.

24        THE COURT:  Thank you.  Proceed, Mr. Andres.

25                    **DIRECT EXAMINATION**

R. Gates - Direct

1091

BY MR. ANDRES:

Q.   Please state your name and spell your last name for the record.

A.   Yes, Rick Gates, G-a-t-e-s.

Q.   How old are you, Mr. Gates?

A.   46 years old.

Q.   Where do you live?

A.   Richmond, Virginia.

Q.   Are you married?

A.   I am.

Q.   Do you have children?

A.   I do.

Q.   How many children?

A.   I have four children.

Q.   Can you describe your educational background, starting with college?

A.   Yes.  I received my bachelor of arts from the College of William and Mary in 1994, and then I received a masters in arts and public policy in 2001.

Q.   Have you served in the military?

A.   I did.

Q.   In what capacity?

A.   I was in the Virginia Army National Guard.

Q.   Were you discharged?

A.   I was.

U.S. v. Manafort

R. Gates - Direct

1092

1   Q.   What was the nature of your discharge?

2   A.   Honorable.

3   Q.   Since graduating from college, what field have you worked

4   in?

5   A.   Primarily political affairs.

6   Q.   And can you tell us -- briefly describe what jobs you've

7   held?

8   A.   Yes.  Since graduating from university, I first served

9   with a lobbying firm called Black, Manafort Stone and Kelly.

10  I then went to work for a company called GTECH Corporation.

11  That was followed by a company called Business Strategies and

12  Insight, then went to work for Scientific Games followed by my

13  employment at Davis Manafort Partners, and then I worked for

14  one of the presidential campaigns most recently.

15  Q.   Do you know Paul Manafort?

16  A.   I do.

17  Q.   How do you know Mr. Manafort?

18  A.   I worked for Mr. Manafort from 2006 to 2016.

19  Q.   When did you first meet Mr. Manafort?

20  A.   I first met Mr. Manafort when I was an intern at his

21  firm, Black, Manafort, Stone and Kelly in 1995.

22  Q.   Can you explain the circumstances under which you met

23  Mr. Manafort?

24  A.   Yes.  I was an intern at the time.  Mr. Manafort was

25  hosting a Christmas party at his house.

1  Q.   And you testified that you worked at Black, Manafort,

2  Stone and Kelly.  What is that?

3  A.   That is a bipartisan political lobbying firm that was

4  based in Alexandria, Virginia.

5  Q.   And when you worked there, who did you principally work

6  for?

7  A.   At that time, it was one of the named partners, Charlie

8  Black and Rick Davis.

9  Q.   Was Mr. Manafort a named partner?

10  A.   He was.

11  Q.   Did you work with him during that time period?

12  A.   No, I did not.

13  Q.   And over what period of time did you work at Black,

14  Manafort, Stone and Kelly?

15  A.   From 1995 to 1997.

16  Q.   Let me direct your attention to 2006.

17        Did you start a new job in that year?

18  A.   I did.

19  Q.   What month of that year did you start the job?

20  A.   October of 2006.

21  Q.   And where did you go to work?

22  A.   Davis Manafort Partners.

23  Q.   And what is Davis Manafort Partners?

24  A.   It is a -- it was a political lobbying company that also

25  did work in electoral campaigns.

U.S. v. Manafort

R. Gates - Direct

1094

Q.   Did you work with Mr. Manafort at Davis Manafort

Partners?

A.   I did.

Q.   Okay.  At some point, did the name of the firm change?

A.   It did.

Q.   Can you explain why it changed and when?

A.   Yes.  The two named partners went their separate ways.  I

believe the name changed in 2012.

Q.   And what was it changed to?

A.   DMP International LLC.

Q.   And who owned, as far as you knew, DMP International?

A.   Mr. Manafort.

Q.   During this time period, from 2006 to 2016, who did you

report to?

A.   Mr. Manafort.

Q.   And what type of work did you do?

A.   I did primarily work on political electoral campaigns and

then the firm also, at that time, had a private equity fund

that it was working on.

Q.   Did you work internationally?

A.   I did.

Q.   Where specifically?

A.   Primarily in Ukraine.

Q.   Anywhere else?

A.   In Cyprus as well.

R. Gates - Direct

1    Q.    While you were working for Mr. Manafort, from 2006 to

2    2016, did your responsibility change over time?

3    A.    It did.  Over the years, my responsibilities increased.

4    As well, we had a number of employees that left the firm over

5    time.  So with less employees, I acquired more of the work.

6    Q.    What was the process or protocol during that time by

7    which you kept Mr. Manafort up to date on your activities?

8    A.    Yes, we typically had calls, e-mail exchanges throughout

9    the week.  But that usually culminated in kind of an agenda

10   process where either Mr. Manafort or I would prepare an

11   agenda, and then the other would add items to the agenda to go

12   through kind of on a weekly or biweekly basis.

13   Q.    During the course of the time that you worked for

14   Mr. Manafort, did you learn about his educational background?

15   A.    I did.

16   Q.    Was that -- did you learn about that as part of your work

17   for Mr. Manafort?

18   A.    Yes.

19   Q.    How?

20   A.    In -- as part of my job, I had to put together

21   presentations to describe the firm, and as part of that, I

22   would take and put the bios into the experience that the

23   principals had at the time.

24   Q.    And what did you learn about where Mr. Manafort went to

25   school?

─────U.S. v. Manafort─────
R. Gates - Direct

1096

1    A.    He went to Georgetown University.

2    Q.    And did he have any additional education?

3    A.    And then he went to Georgetown University of law school

4    following that.

5    Q.    Do you know if Mr. Manafort practiced as a lawyer?

6    A.    I don't know.  I don't know.

7    Q.    Do you know if he had any -- took any continuing legal

8    education courses?

9    A.    I believe he took continuing legal education courses.

10   Q.    How did you know that?

11   A.    I recall, at one point, Mr. Manafort describing that he

12   had to take some classes in continuing legal education.

13   Q.    During the time that you worked for Mr. Manafort, how

14   often would you communicate with him?

15   A.    Very frequently.  I wouldn't say daily, but I mean,

16   sometimes more than a few times a day and then other times

17   throughout the week.

18   Q.    How did you communicate with him?

19   A.    By e-mail, phone, and text.

20   Q.    Did you meet with him in person?

21   A.    I did.

22   Q.    Where would you meet with him?

23   A.    Initially, we met at our Alexandria office until we no

24   longer had the office.

25         And then I would also meet with him at his house in

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1    Alexandria, Virginia.

2              And then later, his condo in Alexandria, Virginia.

3              And then we also had a office temporarily in New

4    York, and also in his New York apartment.

5    Q.   In addition to having a professional relationship with

6    Mr. Manafort, did you socialize with him?

7    A.   No, outside of business, we didn't, you know, socialize.

8    I was an employee of the firm.  And I kind of, you know -- I

9    believe Mr. Manafort viewed me as an employee of the firm, but

10   our work was mainly professional.

11   Q.   During the time that you worked for Mr. Manafort, were

12   you involved in criminal activity?

13   A.   Yes.

14   Q.   Did you commit crimes with Mr. Manafort?

15   A.   Yes.

16   Q.   Were you indicted for some of those crimes?

17   A.   I was.

18   Q.   Were you arrested?

19   A.   I was.

20   Q.   When were you arrested?

21   A.   In October of 2017.

22   Q.   Did you make a decision about how you wanted to resolve

23   those charges?

24   A.   I did.

25   Q.   What decision did you make?

─U.S. v. Manafort─

R. Gates - Direct

1098

1    A.    I made the decision to plead.

2    Q.    And when did you plead guilty?

3    A.    In February of 2018.

4    Q.    As part of your guilty plea, did you enter into a written

5    agreement with the Government?

6    A.    I did.

7    Q.    Does that agreement contain all the terms of your

8    agreement with the Government?

9    A.    Yes.

10   Q.    Do you have a binder in front of you?  Two binders.  The

11   binder that starts with Tabs 2F to 326.

12         Can I ask you to look at Government Exhibit 2F?

13         Can you tell me what that is?

14   A.    This is a copy of my plea agreement.

15         MR. ANDRES:  Your Honor, I'd like to admit that.

16         THE COURT:  2F, did you say?

17         MR. ANDRES:  Yes, Judge.

18         THE COURT:  Come quickly to the bench, please.

19         (Bench Conference.)

20         THE COURT:  I want to be clear.  I'm not sure I am

21   clear.  He didn't plead guilty in this case, did he?

22         MR. ANDRES:  No.

23         THE COURT:  This plea agreement isn't in the form

24   I'm accustomed to.  That doesn't mean anything, but he pled

25   guilty to a criminal information?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────────── U.S. v. Manafort ───────────

R. Gates - Direct

1099

```
 1              MR. ANDRES:  Yes.

 2              THE COURT:  And the criminal information was in the

 3   D.C. case?

 4              MR. ANDRES:  Correct.

 5              THE COURT:  And so am I correct that when the time

 6   comes for an assessment of whether he has provided substantial

 7   assistance and whether he's been truthful, that's not a

 8   judgment I will make.  It's a judgment that the judge in the

 9   District of Columbia will make?

10              MR. ANDRES:  Correct.

11              THE COURT:  All right.

12              Yes?

13              MR. DOWNING:  Well, I've been in multi-district

14   prosecutions before, and I think, generally, the judge in D.C.

15   will pay deference to your thoughts on the testimony.

16              THE COURT:  Perhaps.

17              MR. DOWNING:  I mean, I've seen it before, Your

18   Honor.

19              THE COURT:  Well, it isn't something that really is

20   of immediate concern.  It does bother me a bit, but that's the

21   way it's happened and we'll deal with it.

22              Ultimately, it's her judgment as to whether he has

23   provided substantial assistance.  And it's her judgment, as to

24   how much that should count and how that should reduce his

25   sentence.  I assume you're going to ask him whether he's been
```

─────U.S. v. Manafort─────

R. Gates - Direct

1100

1   sentenced yet.  And I don't see that she's obligated at all to

2   communicate with me or ask me my views.

3           So I'm not sure it works that way.

4           MR. DOWNING:  Okay.

5           THE COURT:  If she calls me, I'll give her my views.

6           MR. ANDRES:  And, Judge --

7           THE COURT:  The problem with that is that it isn't

8   out in the open.  She has to explain or give some speculation

9   of why she thinks there's been substantial assistance and why

10  she thinks that quantum of substantial assistance warrants the

11  required reduction that she orders that's required.

12          Your brow is furrowed.

13          MR. ASONYE:  I'm sorry, Your Honor, I'm just

14  listening.

15          MR. ANDRES:  You're pleasantly listening.

16          THE COURT:  Yes, your brow wasn't furrowed, his was.

17          But anyway, I just wanted to be clear.  He didn't

18  plead here.

19          MR. ANDRES:  Judge, just here is the full scale of

20  the record.  And to the extent that -- I know you're not

21  implying this.  It's not like we chose to let him plea in one

22  place or the other.

23          THE COURT:  Oh, of course not.  I'm not implying

24  that.

25          MR. ANDRES:  The case is much more developed.  It

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────────U.S. v. Manafort─────────────
R. Gates - Direct
                                                                    1101

1   went -- the only reason we came here, the defendant, as he's

2   entitled to, decided not to waive in that other court.

3            Your Honor, Mr. Gates wasn't indicted in the Eastern

4   District of Virginia and Your Honor dismissed the indictment

5   against him at the Government's request, and that's a term of

6   his plea agreement, which I will elicit.

7            THE COURT:  All right.  Any objection to any of

8   that?

9            MR. DOWNING:  No.

10           THE COURT:  Let's go.

11           (End of bench conference.)

12           THE COURT:  All right.  Mr. Andres, you may proceed.

13           MR. ANDRES:  Your Honor, the Government moves to

14  admit Government Exhibit 2F.

15           THE COURT:  All right.  Without objection?

16           MR. DOWNING:  Without objection.

17           THE COURT:  It's admitted.

18                        (Government's Exhibit No. 2F

19                        admitted into evidence.)

20           MR. ANDRES:  May I publish that, Judge?

21           THE COURT:  Yes, you may.

22  BY MR. ANDRES:

23  Q.   Mr. Gates, can I ask you, again, to look at Government

24  Exhibit 2F and tell me what that is?

25  A.   Yes, this is a copy of my plea agreement.

─────────────────────────

─────U.S. v. Manafort─────

R. Gates - Direct

1102

1    Q.    Okay.  And can I ask you, first, to look at the last

2    page?

3              Did you sign that agreement?

4    A.    I did.

5    Q.    And did your lawyer sign it?

6    A.    He did.

7    Q.    And if I could ask you to look at the preceding page, is

8    it also signed by the Government?

9    A.    It is.

10   Q.    Do you see in the bottom corner, there's writing on each

11   page?

12   A.    Yes.

13   Q.    What is that?

14   A.    Those are my initials with the date.

15   Q.    And why did you initial and date each page?

16   A.    I was requested by the judge to do so in order to make

17   sure that I read every page.

18   Q.    Okay.  Let me ask you to turn, again, to the first page

19   of the --

20              THE COURT:  Let me ask one further question.

21              MR. ANDRES:  Sure.

22              THE COURT:  If you'd come up quickly, please.  It's

23   very minor, but I want to be sure.

24              (Bench Conference.)

25              THE COURT:  I haven't had the opportunity to read it

U.S. v. Manafort

R. Gates - Direct

1103

1  thoroughly.  In virtually every plea agreement in this

2  district, there is an obligation to submit to a polygraph.

3          Is there any reference to a polygraph?  Because we

4  strike that routinely when it's admitted in this Court.

5          MR. ANDRES:  There is not, Judge.  And just so

6  you're clear, these agreements -- this isn't my home district

7  either.  So this is the Washington, D.C. district's plea

8  channel that we follow.  It was slightly foreign to me, but

9  there is no polygraph.  Well, actually --

10          MR. ASONYE:  Well actually --

11          MR. ANDRES:  -- a forfeiture --

12          THE COURT:  If there is, it needs to be stricken.

13          MR. ASONYE:  Yes.

14          MR. ANDRES:  I'm not going to refer to it.

15          MR. ASONYE:  We'll take a look at it and we'll

16  redact it and let the court know.

17          THE COURT:  All right.  Let's proceed.

18          (End of bench conference.)

19  BY MR. ANDRES:

20  Q.   Can you turn now to the first page of the plea agreement?

21          Can I direct your attention to Paragraph 1 where it

22  says, "Charges and statutory penalties"?  Do you see that?

23  A.   I do.

24  Q.   And were you required to plead guilty to one count or two

25  counts?

─────U.S. v. Manafort─────

R. Gates - Direct

1104

1    A.    Two counts.

2    Q.    And are those listed in Paragraph 1A and 1B?

3    A.    Yes.

4    Q.    And with respect to Paragraph 1A, what were you charged

5    with?

6    A.    One count of conspiracy.

7    Q.    Conspiracy against the United States?

8    A.    Yes.

9    Q.    And with respect to the second count, what were you

10   charged with?

11   A.    Making a false statement to the Government.

12   Q.    With respect to the Count 1 conspiracy against the United

13   States charge, as part of those -- as part of that crime, who

14   did you conspire with?

15   A.    Mr. Manafort.

16   Q.    And over what period of time did that conspiracy cover?

17   A.    It was 2008 to 2015.

18   Q.    Does that conspiracy cover a series of crimes?

19   A.    It does.

20   Q.    What crimes?

21   A.    There was three components to it.  I assisted

22   Mr. Manafort in filing his tax returns falsely.

23          Mr. Manafort, with my assistance, did not file a

24   report indicating he had control over foreign banks.

25          And the third was Mr. Manafort did not register as a

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────────────────U.S. v. Manafort─────────
R. Gates - Direct
1105

1   foreign agent, which I was aware.

2   Q.   You testified that you pled guilty to conspiring with

3   Mr. Manafort to file false tax returns.  How are those returns

4   false?

5   A.   There are two aspects.  One is that the income was

6   underreported.

7          And, two, there was a schedule in the IRS -- IRS tax

8   report that was not checked.

9          THE COURT:  That was not what, sir?

10         THE WITNESS:  Checked, regarding the foreign bank

11  accounts.

12         THE COURT:  Next question.

13  BY MR. ANDRES:

14  Q.   With respect to the tax charges that you're talking

15  about, whose tax returns were involved?

16  A.   Mr. Manafort's.

17  Q.   Can you explain to the jury what you did to conspire with

18  Mr. Manafort to file those false tax returns?

19  A.   Yes.  Mr. Manafort over the years had requested that I

20  make wire transfers from the offshore accounts.  That

21  information was not reported to the accountants.  The income

22  was not reported as well.

23         In addition, we did not report the foreign bank

24  accounts.  And, then again, we also failed to check the box on

25  the tax returns indicating we had foreign accounts.

U.S. v. Manafort

1    Q.   With respect to those foreign accounts, where were those

2    foreign accounts housed?

3    A.   They were primarily in Cyprus and then the Grenadines,

4    and one in the United Kingdom.

5    Q.   And during the time that you were conspiring with

6    Mr. Manafort to file the false tax returns, did you deal with

7    his accountants?

8    A.   I did.

9    Q.   Did you lie to them?

10   A.   Yes.

11   Q.   Why?

12   A.   We didn't report the income or the fact that the accounts

13   existed.

14   Q.   At the time did you understand that it was illegal to

15   file --

16           MR. DOWNING:  Objection, Your Honor, nonresponsive.

17   The question was:  Why?  Why did he lie?

18           THE COURT:  Was that your question, Mr. Andres?

19           MR. ANDRES:  It was a question or two again, but I

20   don't -- I did ask why.  I asked why Mr. Gates lied to the tax

21   accountants.

22           THE COURT:  Well, the objection is overruled, but

23   you should clarify it.

24           MR. ANDRES:  Sure.

25   BY MR. ANDRES:

U.S. v. Manafort

R. Gates - Direct

1107

1   Q.   You testified that you lied to Mr. -- lied to

2   Mr. Manafort's accountants.  Why did you do that?

3   A.   Yes.  Mr. Manafort requested at different points in the

4   year that we do not disclose the foreign bank accounts.

5   Q.   Okay.  At the time that you conspired with Mr. Manafort,

6   did you understand that it was illegal to file false U.S. tax

7   returns as to income?

8   A.   Yes.

9   Q.   And did you understand that it was a crime to fail to

10  identify foreign bank accounts on a tax return?

11  A.   Yes.

12  Q.   As part of the tax fraud conspiracy, did you provide

13  information to Mr. Manafort's accountants about alleged loans?

14  A.   Yes.

15  Q.   And can you explain what information you provided?

16  A.   Yes.  When income came into the company, Mr. Manafort

17  directed whether the income would be treated as income or, in

18  some cases, whether it would be treated as loans.

19       However, the entity that loaned the money was not

20  one of the companies that actually paid for the work that was

21  done.  It was actually a company offshore controlled by

22  Mr. Manafort.

23  Q.   And were there times that you characterized income as

24  loans?

25  A.   Yes.

U.S. v. Manafort

R. Gates - Direct

1108

1    Q.    And why did you do that?

2    A.    That was in order to reduce the taxable income on the tax

3    returns.

4    Q.    Whose tax returns?

5    A.    Mr. Manafort's.

6    Q.    And who directed you to characterize the income as a

7    loan?

8    A.    Mr. Manafort.

9    Q.    Did you have an understanding of how that benefitted

10   Mr. Manafort?

11   A.    Yes.

12   Q.    How?

13   A.    By not including the income and treating it as a loan he

14   was able to defer the ability to pay the increased tax on his

15   tax returns.

16   Q.    In the context of the income that was characterized as

17   loans, did you deal with Mr. Manafort's bookkeeper?

18   A.    Yes.

19   Q.    Who is that?

20   A.    Heather Washkuhn.

21   Q.    And were you truthful to her about the nature of the

22   income?

23   A.    No.

24   Q.    And in the course of dealing with these loan issues, did

25   you deal with Mr. Manafort's tax preparers?

─U.S. v. Manafort─

1   A.   Yes.

2   Q.   And who were they?

3   A.   It was primarily Philip Ayliff and Cindy Laporta.

4   Q.   And were you truthful to them as to -- were you truthful

5   with them with respect to the nature of the loans and the

6   income?

7   A.   No.

8   Q.   You testified that you conspired with Mr. Manafort to

9   fail to file foreign bank accounts reports with the Treasury

10  Department.  Do you remember that?

11  A.   Yes.

12  Q.   What did you do that made you guilty of failing to file

13  foreign bank account reports with the Treasury Department?

14  A.   We did not submit the required form designating that we

15  had control over a offshore account that was in Mr. Manafort's

16  control.

17  Q.   With respect those accounts, did you have discussions

18  with -- with Mr. Manafort's accountants about the FBAR

19  requirements?

20  A.   Yes.

21  Q.   Okay.  And what, if anything, did you tell them about

22  whether Mr. Manafort had false -- had foreign bank accounts?

23  A.   We told them that he did not have foreign bank accounts.

24  Q.   And when you say "we," who do you mean by "we"?

25  A.   Meaning the company or Mr. Manafort.

1   Q.   And when you spoke to the accountants and told them there

2   were no foreign bank accounts, why did you tell them that?

3   A.   Mr. Manafort's direction.

4   Q.   With respect to those foreign bank accounts, do you know

5   how much money flowed through those accounts?

6   A.   Over the years, it was several million dollars.

7   Q.   And with respect to those overseas bank accounts that

8   Mr. Manafort controlled, do you know what countries they were

9   in?

10   A.   Yes.  They were primarily in Cyprus, the Grenadines, and

11   the United Kingdom.

12   Q.   And at the time that you conspired with Mr. Manafort to

13   fail to file FBARs, did you know it was illegal to fail to

14   file those FBARs?

15   A.   Yes.

16   Q.   How did you know it was illegal?

17   A.   We were notified by the accounting firm in regards to

18   e-mails that were sent both to myself and Mr. Manafort along

19   with the regulation outlining the definitions of foreign bank

20   accounts.

21   Q.   Mr. Gates, you've testified about a variety of foreign

22   bank accounts under Mr. Manafort's control.  Can you tell me

23   the names of those accounts and their locations?

24   A.   Yes.

25   Q.   Slowly.

U.S. v. Manafort

R. Gates - Direct

1111

1    A.    Actinet was in Cyprus.  Black Sea View Limited was in

2    Cyprus.  Bletilla was in Cyprus.  Yiakora was in Cyprus.

3    Peranova was in Cyprus.  Olivenia was in Cyprus.  Marziola,

4    Cyprus.  Serangon, Cyprus.  Lucicle, Cyprus.

5              Let me see how many more in Cyprus.

6              And then there were two in the Grenadines, Global

7    Endeavor and Jeaunet.

8              And one in the United Kingdom called Pompolo.

9    Q.    Okay.  How about a company named -- or an entity known as

10   Leviathan Advisors?

11   A.    Yes.  Leviathan Advisors was Cyprus, and Global Highway

12   Limited was also Cyprus.

13   Q.    How about LOAV?

14   A.    LOAV was Cyprus.

15   Q.    Do you know if Mr. Manafort's name was listed on any of

16   these accounts?

17   A.    Yes, some of them.

18   Q.    And was your name listed on any of these accounts?

19   A.    It was.

20   Q.    Was there anyone else who was listed on the accounts?

21   A.    Yes.  One other colleague, Mr. Konstantin Kilimnik.

22   Q.    Who is Konstantin Kilimnik?

23   A.    He's a consultant that worked for Mr. Manafort.

24   Q.    Okay.  Were there other signatories on these accounts?

25   A.    There were.

─U.S. v. Manafort─

R. Gates - Direct

1112

1  Q.    Who?

2  A.    The way that the accounts were set up in Cyprus is that

3  there were two directors from a legal firm that set up the

4  entities so they were the signature panels on the accounts.

5  Q.    With respect to the money that was in those accounts,

6  whose money was that?

7  A.    Mr. Manafort's.

8  Q.    And where did it come from?

9  A.    It came from income related to political campaigns that

10  he worked on in Ukraine.

11  Q.    Was that income to Mr. Manafort?

12  A.    It was.

13  Q.    You testified that you also pled guilty to making a false

14  statement to the FBI.  Can you explain that charge?

15  A.    Yes.  It was in regards to a meeting that Mr. Manafort

16  had with a member of the United States Congress.

17  Q.    And what false statement did you tell?

18  A.    It was a meeting that was, you know, over five years ago.

19  I was not at the meeting.  I was given information after the

20  meeting when I was presented with a memo from the government.

21  I had made a mistake and I lied on the -- on the basis of the

22  memo that the meeting had not occurred and it did.

23  Q.    When you made the false statement to the government, when

24  did you make that false statement to the government?

25  A.    During the interview sessions.

─────────────── U.S. v. Manafort ───────────────

R. Gates - Direct

1113

1  Q.   Okay.  Was that before or after you pled guilty?

2  A.   That was before I pled guilty.

3  Q.   As a result of making those false statements to the

4  government, was -- were there consequences?

5  A.   There were.

6  Q.   What were the consequences?

7  A.   The Government added a second charge of making a false

8  statement.

9  Q.   And did you plead guilty to that charge as well?

10  A.   I did.

11  Q.   Can you explain to the jury what effect that second

12  charge had on the amount of time you're facing in jail?

13  A.   Yes, it increased it from potentially five years to ten

14  years.

15  Q.   Okay.  You testified that you pled guilty.  When you pled

16  guilty did you appear in front of a federal judge?

17  A.   I did.

18  Q.   Did the judge explain to you what penalties you're

19  facing?

20  A.   She did.

21  Q.   For the Count 1 conspiracy against the United States

22  charge, what are the statutory penalties?

23  A.   It's up to five years imprisonment, up to a fine of

24  $250,000, and up to three years of supervised release.

25  Q.   With respect to the Count 2 false statement charge, what

─────────────── U.S. v. Manafort ───────────────

R. Gates - Direct                                          1114

1  penalties are you facing?

2  A.    Again, it was up to five years imprisonment, up to

3  $250,000 in fines, and up to three years of supervised

4  release.

5  Q.    And with respect to the total amount of time, jail time

6  you're facing, what is that?

7  A.    Up to ten years.

8  Q.    Does --

9         THE COURT:  What, if anything, were you told about

10 whether the two five-year maximums could run concurrently as

11 well as consecutively?

12        THE WITNESS:  I was advised by my attorney that

13 could happen but it was totally up to the judge, as I

14 understood.

15        THE COURT:  Next question.

16 BY MR. ANDRES:

17 Q.    Does your plea agreement estimate the amount of time you

18 may be facing in jail in terms of something called the

19 sentencing guidelines?

20 A.    It does.

21 Q.    What does it say?

22 A.    It indicates that I could serve up to -- from 57 to 71

23 months.

24 Q.    As part of your written agreement with the Government,

25 did you make -- did you make certain promises to the

─────U.S. v. Manafort─────
R. Gates - Direct                                                    1115

1  Government?

2  A.    I did.

3  Q.    What did you promise to do?

4  A.    I promised to tell the truth, I promised to plea, I

5  promised to provide evidence, and I promised to testify if

6  required.

7  Q.    Okay.  Have you turned over evidence to the Government?

8  A.    I have.

9  Q.    What evidence have you turned over to the Government?

10  A.    Documents, e-mails, computers, and phones.

11  Q.    Okay.  As part of the written plea agreement, what

12  promises did the Government make to you?

13  A.    The Government promised to write a 5K1 letter.  It

14  promised not to bring any additional charges.

15          It also promised to drop the charges in regards to a

16  second indictment.

17          And then it also agreed not to oppose my attorney

18  filing a recommendation of probation at sentencing.

19  Q.    You testified that the Government agreed to dismiss a

20  second indictment.  Where was that indictment brought?

21  A.    Here in the Eastern District of Virginia.

22  Q.    And what crimes were you charged with in that indictment?

23  A.    Related to, primarily, tax fraud, bank fraud, and foreign

24  banks.

25  Q.    And were you indicted alone in that case?

1   A.   No.

2   Q.   Who else was charged?

3   A.   Mr. Manafort.

4   Q.   Were you charged with any crimes relating to your own

5   taxes?

6   A.   Yes.

7   Q.   Can you explain what charges were included in that

8   indictment as they related to your personal tax returns?

9   A.   Yes.  I was charged with underreporting income on my

10   personal account and then also not disclosing a foreign bank

11   account.

12   Q.   Were you also charged with FBAR charges?

13   A.   Yes.

14   Q.   Okay.  And bank fraud?

15   A.   Yes.

16   Q.   Were you guilty of those charges?

17   A.   Yes.

18   Q.   With respect to the income on your tax return that you

19   failed to disclose or your false filing, can you explain to

20   the jury what you did to make you guilty?

21   A.   Yes.  In regards to some of the payments that I received

22   for my compensation, I transferred those from a Cyprus bank

23   account to a UK bank account then transferred them to my U.S.

24   bank account.  And I did not report the additional income from

25   the UK account to the U.S. account.

U.S. v. Manafort

R. Gates - Direct

1117

1    Q.    During that time period, did you have a tax preparer?

2    A.    I did.

3    Q.    Did you use the same tax preparer as Mr. Manafort?

4    A.    No.

5    Q.    Okay.  Were you truthful with your tax preparer about

6    your other income?

7    A.    No.

8    Q.    Okay.  You also testified that you were charged with

9    filing tax returns as it related to overseas accounts.  Did

10   you have overseas accounts?

11   A.    I did.

12   Q.    Okay.  Where were they?

13   A.    They were based in the United Kingdom.

14   Q.    And did you report those on your tax return?

15   A.    I did not.

16   Q.    With respect to the bank fraud charges, what conduct did

17   that involve?

18   A.    That related to a series of loans that Mr. Manafort was

19   attempting to receive.

20   Q.    And did you help him with those loans?

21   A.    I did.

22   Q.    Did you provide fraudulent documents to banks?

23   A.    Yes.

24   Q.    Did you alter documents?

25   A.    Yes.

─────U.S. v. Manafort─────
R. Gates - Direct
1118

1  Q.   At the time you did that, did you know it was illegal to

2  send those documents to banks?

3  A.   Yes.

4  Q.   And did you benefit in any way from those loan

5  applications that Mr. Manafort made?

6  A.   No, I did not.

7  Q.   You testified that the Government agreed to dismiss the

8  second indictment in the Eastern District of Virginia.  Has

9  the Government done that?

10  A.   It has.

11  Q.   Are there circumstances where those charges could be

12  brought again?

13  A.   There is.

14  Q.   Under what circumstances could they be re-filed?

15  A.   If they -- there's a violation of the plea agreement or I

16  breach the plea agreement then those charges can be brought

17  against me.

18  Q.   If you lied during your testimony today, would that

19  violate your agreement?

20  A.   It would.

21  Q.   You testified that the Government also agreed not to

22  bring additional charges with respect to certain conduct.

23  What were you referring to?

24  A.   Yes.  I omitted information in a deposition.  I added

25  payments to expenses.  I also increased my income on a credit

U.S. v. Manafort

R. Gates - Direct

1119

1  card and mortgage application and then also created an

2  inaccurate letter for a colleague.

3  Q.   As far as you're aware, how did the Government become

4  aware of these additional crimes?

5  A.   I presented those to the Government at my accord during

6  my interview sessions.

7  Q.   Okay.  Did you also tell the Government about additional

8  money that you took from Mr. Manafort that wasn't authorized?

9  A.   I did.

10  Q.   Okay.  Let me start with the mortgage fraud.  You

11  testified that you lied on a mortgage application.  Can you

12  explain to the jury what you did?

13  A.   Yes.  I increased my income level in regards to

14  submitting the application for the mortgage.

15  Q.   How about credit card applications?  Have you filed false

16  credit card applications?

17  A.   Yes.

18  Q.   What did you do?

19  A.   Increased the amount of income.

20  Q.   Have you filed false expense reports to your employers?

21  A.   Yes.

22  Q.   Okay.  You testified that you were not truthful during a

23  deposition.  Can you explain when that was and what happened?

24          THE COURT:  You said -- just a moment.  You said you

25  filed false expense reports to your employer?

U.S. v. Manafort

1           THE WITNESS:  Yes.

2           THE COURT:  Is that Mr. Manafort?

3           THE WITNESS:  Yes.

4           THE COURT:  Did he know they were false.

5           THE WITNESS:  No.

6           THE COURT:  Next question.

7     BY MR. ANDRES:

8     Q.    Was it Mr. Manafort and other employers?

9     A.    Yes.

10    Q.    Okay.  You testified that you weren't truthful during

11    deposition.  Can you explain what happened and when that was?

12    A.    Yes.  It was in regards to a private equity fund that the

13    company had set up.  We -- the principals of the firm had been

14    deposed in separate settings.  During the course of that and

15    in preparation for that Mr. Manafort and I met on several

16    occasions and Mr. Manafort had asked me not to include certain

17    things in the deposition.

18    Q.    You testified about a colleague that you worked with,

19    Steve Brown.  Do you remember that?

20    A.    Yes.

21    Q.    Were you involved in a business with him?

22    A.    I was.

23    Q.    And were you involved in fraudulent conduct with respect

24    to that business?

25    A.    Yes.

R. Gates - Direct

1121

Q.   How so?

A.   Mr. Brown had asked me, as a favor, to write him a letter

in regards to an investment offer that he was making.  I

represented that the company that we are using had income

level that was not accurate.

Q.   You testified that you took money from Mr. Manafort that

wasn't authorized.  Can you explain specifically what you did?

A.   Yes.  In essence, I added money to expense reports and

created expense reports to receive the additional money.

Q.   And where did that money come from?

A.   Primarily from Cyprus.

Q.   Okay.  And approximately how much money did you take from

Mr. Manafort that wasn't authorized?

A.   I don't have an exact number, but approximately, I'd say,

several hundred thousand.

Q.   Okay.  And how were you able to take that money from

Mr. Manafort and not -- and he not notice?

A.   I had authority on some of the offshore accounts to move

that money.

Q.   Okay.  And were you paid money from those accounts that

Mr. Manafort authorized?

A.   Yes.

Q.   And how would you make those payments?

A.   Same basis, through wire transfers.

Q.   Okay.  And Mr. Manafort was aware of those?

─────────U.S. v. Manafort─────────

1   A.    Yes.

2   Q.    With respect to the money that was unauthorized, how

3   would you charge those?

4   A.    How do I charge?

5   Q.    What -- what was the process by which you would be able

6   to take that money that wasn't authorized?

7   A.    Yes.  So the way that the wire transfers worked is

8   typically Mr. Manafort would request, you know, me to make

9   wire transfers or he would do it himself.  Those transfer

10  requests would be sent to the law firm in Cyprus.  They had a

11  separate group that dealt with financial and accounting

12  matters.  They would then process the wire transfers that were

13  requested.

14  Q.    Okay.  And with respect to that money, you identified

15  them as expenses?

16  A.    Uh-huh, yes.

17  Q.    Okay.  And as you identified them expenses, do you know

18  if those charges were passed onto anybody else?

19  A.    Yes.  Typically, the firm took the expenses from any of

20  the employees that were working on the Ukrainian campaigns,

21  and we submitted those expenses back to the client in Ukraine.

22  Q.    Were you ever charged criminally for taking this money

23  from Mr. Manafort in your first indictment?

24  A.    No.

25  Q.    Were you ever charged with taking this money from

┌─ U.S. v. Manafort ─┐

R. Gates - Direct

1123

1   Mr. Manafort in your second indictment?

2   A.   No.

3   Q.   As far as you know, how does the Gov -- how did the

4   Government find out about these unauthorized monies?

5   A.   I made the Government aware of them in our interviews.

6   Q.   You testified that the Government promised that if your

7   cooperation was substantial, the Government would not oppose

8   your application for a sentence of probation.

9            Can you explain what that means?

10  A.   Yes.  It means that on the basis of the Government

11  writing a 5K1 letter, that if I provide substantial

12  cooperation, then my attorney can file a request for probation

13  that the Government would not oppose.

14  Q.   And has that recommendation --

15           THE COURT:  What's your understanding of who would

16  make the decision?

17           THE WITNESS:  The judge makes the decision.

18           THE COURT:  Which judge?

19           THE WITNESS:  The judge in D.C.

20           THE COURT:  Next question.

21  BY MR. ANDRES:

22  Q.   You testified about a 5K letter.  What is a 5K letter?

23  A.   A 5K1 letter is something that the Government writes.  It

24  is a summary of everything I've done to cooperate

25  substantially, and it also includes everything I've done wrong

U.S. v. Manafort

R. Gates - Direct

1124

1 and then that letter is presented to the judge.

2 Q.   And who writes the letter?

3 A.   The Government.

4 Q.   And who does the Government write the letter to?

5 A.   It writes it to the judge.

6 Q.   Is that letter important to you?

7 A.   It is.

8 Q.   Why?

9        THE COURT:  So we're clear, the judge in D.C.?

10       THE WITNESS:  The judge in D.C. yes, Your Honor.

11       THE COURT:  Next question.  Go ahead, Mr. Andres.

12 BY MR. ANDRES:

13 Q.   Who does the prosecutor write the letter to?  The judge

14 in D.C., you testified.

15       Is that letter important to you?

16 A.   Yes.

17 Q.   Why?

18 A.   It potentially reduces the amount of time that I can be

19 potentially incarcerated.

20 Q.   If the Government writes the letter, is the judge

21 obligated to give you a lower sentence?

22 A.   She is not.

23 Q.   Okay.  Do you understand what will happen to you if you

24 breach this agreement in some way?

25 A.   Yes.

U.S. v. Manafort

R. Gates - Direct

1125

1  Q.   What?

2  A.   I lose all the benefits associated with the plea

3  agreement.

4  Q.   And what happens to your guilty plea?

5  A.   The guilty plea would stand.

6  Q.   Would you be entitled to a sentencing reduction for your

7  cooperation?

8  A.   No.

9  Q.   Okay.  After your arrest, Mr. Gates, were you released on

10  bail?

11  A.   Yes.

12  Q.   Are there conditions with respect to your travel?

13  A.   There are.

14  Q.   Have you always complied with all those conditions?

15  A.   No.

16  Q.   In what respect did you not comply?

17  A.   In one instance I violated the curfew, it was set for

18  11:00, by about 15 minutes.  And then I notified the probation

19  office of that violation.

20  Q.   Okay.  Prior to your testimony here today, did you meet

21  with the Government to prepare?

22  A.   I did.

23  Q.   And during that time, did you review documents and other

24  materials?

25  A.   Yes.

1   Q.   Approximately how many times did you meet with the

2   Government?

3   A.   Approximately 20 times.

4   Q.   Okay.  You testified that in 2006 you began working for

5   Mr. Manafort.  Can you explain to the jury what your

6   responsibilities were?

7   A.   Yes.  When I first started, my first role was to help the

8   firm finalize a private equity fund that it was starting.

9   Following that, I became more involved in the political

10  activities of the firm and the international elections it was

11  working on.

12  Q.   Okay.  Did Mr. Man -- did Davis Manafort have offices in

13  the United States at the time?

14  A.   It did.

15  Q.   Where?

16  A.   In Alexandria, Virginia.

17  Q.   How about offices in the Ukraine?

18  A.   It did.

19  Q.   Where was that located?

20  A.   In Kyiv, Ukraine.

21  Q.   Did you work from both offices?

22  A.   Yes.

23  Q.   With respect to the Alexandria office, how many -- how

24  many employees worked there?

25  A.   It ranged over time over the years, but when I first

U.S. v. Manafort

R. Gates - Direct

1127

1  joined, there were approximately eight employees at the

2  company.

3  Q.   And how about the office in Kyiv, how many employees were

4  employed there -- how many -- let me rephrase that.  Sorry.

5       With respect to the Kyiv office, how many people

6  worked there?

7  A.   It, again, ranged over time depending on the amount of

8  work that was happening.  It ranged anywhere from, you know, 5

9  to 12 employees.

10  Q.   And who were some of the people that worked in the Kyiv

11  office?

12  A.   Some of the original people were Konstantin Kilimnik,

13  Phillip Griffin, Vlad Sivkovych, and then several other local

14  employees that we had hired.

15  Q.   And what were Mr. Kilimnik's responsibilities in the Kyiv

16  office?

17  A.   He was primarily Mr. Manafort's translator and one of the

18  principal people that interacted with the political people in

19  Ukraine.

20  Q.   And you said that he was a translator.  Did he speak

21  Ukrainian?

22  A.   He spoke Ukrainian and Russian and English.

23  Q.   Okay.  Did Mr. Kilimnik have a nickname?

24  A.   Yes.

25  Q.   What was it?

┌─ U.S. v. Manafort ─┐

R. Gates - Direct

1128

1   A.    KK.

2   Q.    Were individuals in the Ukraine often referred to by

3   their initials?

4   A.    Yes.

5   Q.    Why?

6   A.    Because sometimes their names were a little difficult to

7   pronounce or long and it was easier to abbreviate in e-mails.

8   Q.    Okay.   During the time that you were in the United States

9   and Mr. Kilimnik was in the Ukraine, were you able to

10  communicate with him?

11  A.    Yes.

12  Q.    Were there any problems with respect to the time

13  difference?

14  A.    No.

15  Q.    Any problems with respect to the phones?

16  A.    No.

17  Q.    How about e-mail?

18  A.    No.

19  Q.    How about Mr. Manafort, did he communicate with

20  Mr. Kilimnik from the United States?

21  A.    Yes.

22  Q.    How do you know that?

23  A.    Because in some instances I was with him when he was

24  communicating with Mr. Kilimnik.

25  Q.    Were you able to help direct the efforts in the Ukraine

—U.S. v. Manafort—

R. Gates - Direct

1129

1   from the United States?

2   A.   Yes.

3   Q.   You testified that your first assignment at Davis

4   Manafort Partners related to a private equity fund.  Can you

5   explain what you did?

6   A.   Yes.  The firm was -- at the beginning of starting a

7   private equity fund, we were putting together the documents,

8   that constituted the fund and seeking investment at that time.

9   Q.   Okay.  When did you first start working on elections in

10  the Ukraine?

11  A.   The first election I worked on was the parliamentary

12  election in 2007.

13  Q.   And over what period of time did you work on the

14  elections?

15  A.   From 2007 to 2014.

16  Q.   Who did you report to with respect to your election work

17  in the Ukraine?

18  A.   Mr. Manafort.

19  Q.   Did you ever learn how Mr. Manafort first started working

20  on elections in the Ukraine?

21  A.   I did.

22  Q.   Okay.  First of all, when did he first start working

23  there?

24  A.   It was, I believe, 2005.

25  Q.   And what did you understand about how he first started

U.S. v. Manafort

R. Gates - Direct

1130

1    working there?

2    A.   He was introduced to a Ukrainian businessmen that he was

3    helping with a business project, which then later translated

4    to a political project because of the role of the businessmen.

5    Q.   And who was that businessman?

6    A.   His name was Rinat Akhmetov.

7    Q.   Who did you understand Mr. Akhmetov to be?

8    A.   He was one of the founders of the party that Mr. Manafort

9    worked for over the years and he was also a very wealthy

10   businessman in Ukraine.

11   Q.   Did you refer or people within your company refer to him

12   by his initials?

13   A.   Yes.

14   Q.   And what were they?

15   A.   RA.

16   Q.   Okay.  You said that he was a wealthy man.  Do you know

17   approximately what his net wealth was?

18   A.   I mean, in the papers it fluctuated over time, but it was

19   anywhere from --

20           THE COURT:  Do you know for any -- on any basis

21   other than what was in the newspapers.

22           THE WITNESS:  No.

23   BY MR. ANDRES:

24   Q.   Okay.

25           THE COURT:  All right.  Let's not venture on --

U.S. v. Manafort

R. Gates - Direct

1131

1        MR. ANDRES:  I understand.

2        THE COURT:  You don't need it.  It's not relevant.

3   Next question.

4        MR. ANDRES:  Understood.

5   BY MR. ANDRES:

6   Q.   Do you know what business Mr. Akhmetov was in?

7   A.   Yes.

8   Q.   What business?

9   A.   Energy and steel.

10  Q.   And did he hold a position in politics in the Ukraine?

11  A.   He did.

12  Q.   What position?

13  A.   He was a member of parliament for a number of years.

14  Q.   Was Mr. Akhmetov responsible for paying Davis Manafort --

15  Davis Manafort and DMP International for certain work?

16  A.   Yes, he was.

17  Q.   What work?

18  A.   Largely political work from the time that I started.

19  Q.   And how did he make those payments?

20  A.   Through wire transfers.

21  Q.   Okay.  Wire transfers from where to where?

22  A.   Generally it was from Cyprus to Cyprus.

23  Q.   Okay.  And did Mr. Akhmetov make those payments through

24  associates?

25  A.   Yes, in some cases he did.

┌─ U.S. v. Manafort ─┐

1132

1    Q.   And did they have shelf companies?

2    A.   They did.

3    Q.   Where were those shelf companies located?

4    A.   In Cyprus.

5    Q.   I'm sorry, what?

6    A.   In Cyprus.

7    Q.   And in terms of those contracts or those issues, who

8    negotiated the payments for Mr. Akhmetov?

9    A.   Mr. Manafort.

10   Q.   And do you know how Mr. Manafort received those payments?

11   A.   Through a wire transfer.

12   Q.   You testified that Mr. Akhmetov asked Mr. Manafort to set

13   up the Party of Regions.  Can you explain to the jury what the

14   Party of Regions is?

15   A.   Yes.  The Party of Regions was a new political party.  At

16   the time, the purpose of it was to create a stable party in

17   Ukraine that brought together many of the different regions in

18   the country.

19   Q.   Did Mr. Manafort agree to do this work?

20   A.   Yes.

21   Q.   And at the start of the Party of Regions, what was the

22   initial work that Mr. Manafort did?

23   A.   It was primarily building the party.  So it started out

24   party structuring, party platform, creating party leadership,

25   and a party congress.  It was kind of, you know, building a

─────────U.S. v. Manafort─────────
R. Gates - Direct                                    1133

1   party 101.

2   Q.   Who was the leader of the Party of Regions at the time?

3   A.   Mr. Viktor Yanukovych.

4   Q.   Do you know if Mr. Manafort had a relationship with

5   Mr. Yanukovych?

6   A.   Yes.

7   Q.   What did you understand that to be?

8   A.   The relationship was such that Mr. Manafort, in essence,

9   brought him back from the proverbial political dead.

10   Mr. Yanukovych ran for the presidential election in 2004 and

11   ultimately lost.  And Mr. Manafort was successful in bringing

12   him back.

13   Q.   When you say "bringing him back," what does that mean?

14   A.   Bringing him back, back into the political spectrum.

15   Later on Mr. Yanukovych became prime minister with

16   Mr. Manafort's help and then later he won the presidency in

17   2010 in Ukraine.

18   Q.   And what role did Mr. Manafort have in those election

19   successes?

20   A.   Mr. Manafort ran the elections, you know, kind of from

21   start to finish.

22   Q.   And during the time that you worked for him, how did you

23   assess his political skills or his ability to work in the

24   Ukraine?

25   A.   He's probably one of the most, you know, politically

─────U.S. v. Manafort─────

R. Gates - Direct

1134

1    brilliant strategists I've ever worked with.

2    Q.    Did Mr. Manafort ever meet with President Yanukovych?

3    A.    Yes.

4    Q.    Frequently?

5    A.    I mean, I think, you know, most of the times that he was

6    in Ukraine, he would meet with him.

7    Q.    When you say "he was in Ukraine," who are you talking

8    about?

9    A.    Mr. Manafort.

10   Q.    Would you attend those meetings?

11   A.    No.

12   Q.    Why not?

13   A.    Those meetings were designed more for kind of the

14   principals to meet.  I was not at that level.

15   Q.    And with respect to President Yanukovych, was he referred

16   to in the company memos by a certain way?

17   A.    He was.

18   Q.    How?

19   A.    It was either VFY for his initials or sometimes BG or Big

20   Guy.

21   Q.    During the course of your work in the Ukraine, did you

22   travel there?

23   A.    Yes.

24   Q.    How often?

25   A.    It was frequently during the elections.  And then I did

─────────────── U.S. v. Manafort ───────────────

R. Gates - Direct

1135

1 some work for the private equity fund there as well.

2 Q.   Okay.  Was there a period of time when you weren't

3 traveling?

4 A.   Yes.  I traveled primarily from 2007 to 2010 and then

5 2012 to 2014.

6 Q.   Can I ask you to take a look at Government Exhibit 338A.

7           Do you see that?

8 A.   I do.

9 Q.   Can you tell me what's included in Government

10 Exhibit 338A?

11 A.   It's a copy of my U.S. passport.

12 Q.   Did you provide this passport to the Government as part

13 of your cooperation?

14 A.   I did.

15           MR. ANDRES:  Your Honor, the Government moves to

16 admit Government Exhibit 338A.

17           MR. DOWNING:  Without objection.

18           THE COURT:  Admitted.

19                     (Government's Exhibit No. 338A

20                     admitted into evidence.)

21           MR. ANDRES:  May we publish it?

22           THE COURT:  Yes, but I -- let's get to the heart of

23 the matter.  I doubt a passport --

24           MR. ANDRES:  Judge, we've been at the heart of

25 the --

U.S. v. Manafort

R. Gates - Direct

1136

1    THE COURT:  Just listen to me.  For goodness sakes.

2    Don't speak when I speak.

3    My point was, I don't see clearly why a passport

4    makes a hill of beans.  And I'm going to admit it and allow

5    you to use it, but I want you to focus sharply on what matters

6    in this case so we can get this case done.

7    MR. ANDRES:  Your Honor, we have gone through the

8    relevant payments with this witness.  When he travels on his

9    passport is relevant, and that's why we're seeking to admit

10   it.

11   THE COURT:  All right.  You may use it.

12   MR. ANDRES:  Thank you.

13   THE COURT:  But I don't think there is any dispute

14   about when he was there.  Just ask him.

15   MR. ANDRES:  Well, this evidence has not been

16   entered yet.

17   THE COURT:  Just get on with it, please.

18   MR. ANDRES:  Thank you, Judge.

19   BY MR. ANDRES:

20   Q.   Can you turn to the first page?

21   A.   Yes.

22   Q.   And what's the period of time that's covered in this

23   passport?

24   A.   It's from April 2009 to April 2011.

25   Q.   Okay.  And are there passports stamps in here that relate

—U.S. v. Manafort—

R. Gates - Direct

1137

1  to the Ukraine?

2  A.   There are.

3  Q.   Okay.  And can I ask you to turn to page Bates No. 00020.

4  A.   Mine stops at 0017.

5  Q.   Do you see it on the screen?

6  A.   Yes.

7  Q.   What is that?

8  A.   That is entry and exit stamps into Ukraine.

9  Q.   Okay.  Can I ask you to take a look at Government's

10  Exhibit --

11        THE COURT:  Let me ask:  Mr. Downing, do you have

12  any dispute about when he was in the Ukraine?

13        THE WITNESS:  No, we don't, Your Honor.

14        THE COURT:  Why not have just a list of the dates he

15  was there that are undisputed.  We can get it into the record

16  and move on.

17        MR. ANDRES:  Well, for one, no one has asked for

18  that before and, two, the defense --

19        THE COURT:  I am.

20        MR. ANDRES:  -- the defense has never raised that

21  before and we're happy to do that, Judge.

22        THE COURT:  Good.  Do it.

23  BY MR. ANDRES:

24  Q.   Can you take a look at Government Exhibit 338B?

25        THE COURT:  I'd like to find ways, Mr. Andres, to

─────────U.S. v. Manafort─────────

R. Gates - Direct                                          1138

1    expedite the trial of this matter, and that's one way we can

2    do it rather than go through pages of a passport.

3          MR. ANDRES:  Judge, I appreciate that.  And as you

4    know, each night you've asked us for copies of the exhibits,

5    which we've done.  So we've done everything we can to move the

6    trial along, and I think we've succeeded in doing that.

7          THE COURT:  All right.  Well, you have, and I

8    appreciate what you've given me.  But I have no idea just by

9    looking at something that says "passport."

10          In other words, find a way to expedite.  You want to

11    show when he was in the Ukraine, fine.  Mr. Downing says he

12    doesn't have an objection, so you can show him some summary

13    and get it done in one question.

14          MR. ANDRES:  Thank you, Judge.

15          This next passport relates to travel in Cyprus,

16    which has not been admitted yet, so if it's okay --

17          THE COURT:  I'll admit it.  No objection, is there?

18          MR. DOWNING:  No objection, Your Honor.

19                          (Government's Exhibit No. 338B

20                          admitted into evidence.)

21    BY MR. ANDRES:

22    Q.   Can you take a look at Government Exhibit 338B?

23    A.   Yes.

24    Q.   What is that?

25    A.   It's a copy of my passport.

─────────U.S. v. Manafort─────────
R. Gates - Direct
1139

1   Q.   Over what time period?

2   A.   From April 2011 to April 2013.

3   Q.   Okay.  Can I ask you to turn to page, at the bottom,

4   00025?

5   A.   Okay.

6        MR. ANDRES:  Can I publish that, Your Honor?

7        THE COURT:  Yes, you may.  Let me be specific,

8   Mr. Andres, if you will submit to Mr. Downing what you want to

9   show as to when this witness was in the Ukraine or Cyprus, let

10  them look at it, see if they have any objection to it.  If

11  they don't, I'll admit that.  We'll be done with it.  We'll

12  move on.

13       MR. ANDRES:  Thank you, Judge.  It's just going to

14  take a minute.

15       THE COURT:  Well, you see, it creates -- all right.

16  Go on.

17  BY MR. ANDRES:

18  Q.   With respect to Government Exhibit 338 and the -- on the

19  screen there are number of -- or at least there's one passport

20  stamp from Laranka [sic].  Is that -- am I pronouncing that

21  right?

22  A.   Larnaka.

23  Q.   What is that?  What is Larnaka?

24  A.   Larnaka is the capitol of Cyprus.

25  Q.   Okay.  And did you travel to Cyprus --

U.S. v. Manafort

R. Gates - Direct

1140

1    A.    I did.

2    Q.    -- during the course of your work at DMP?

3    A.    Yes.

4    Q.    Okay.  And why did you travel to Cyprus?

5    A.    Primarily two reasons:  the first was that we worked on

6    some political election work for a candidate, and that

7    individual was also our attorney in Cyprus for our business

8    matters.

9    Q.    Okay.  What was the name of that individual?

10   A.    Kypros Chrysostomides.

11   Q.    Okay.  Did he have a nickname?

12   A.    He did.

13   Q.    What was it?

14   A.    Dr. K.

15   Q.    Okay.  With respect to Dr. K, you testified that you

16   worked on some political campaigns for him?

17   A.    Yes.

18   Q.    Can you explain what you did?

19   A.    Yes.  In 2008, Cyprus was having a presidential election.

20   Mr. Manafort had been contacted by a business associate and

21   asked us to meet with them and assess whether or not he had a

22   prospect of not only running in the race but potentially

23   winning.

24   Q.    Okay.  And did you meet with Dr. K?

25   A.    We did.

R. Gates - Direct

1   Q.   Okay.  And you testified that Dr. K also performed

2   certain services with respect to your Cyprus accounts?

3   A.   Yes.

4   Q.   Can you explain what that was?

5   A.   Yes.  Dr. K's law firm opened up all of the Cyprus

6   accounts that were under Mr. Manafort's control.

7   Q.   Okay.  And how did you first meet Mr. -- Dr. K?

8   A.   Mr. Manafort invited me to a meeting with Dr. K in

9   Cyprus.

10  Q.   Okay.  Can I ask you to take a look at Government

11  Exhibit 356.

12          Can you tell me what that is?

13  A.   Yes.  This is a memo to a businessmen Mr. Manafort knew

14  from Mr. Manafort and Dr. K.

15  Q.   And does this relate to the work that you did for Dr. K

16  in Cyprus?

17  A.   It does.

18          MR. ANDRES:  The Government moves to admit 356.

19          MR. DOWNING:  No objection.

20          THE COURT:  Admitted.

21                  (Government's Exhibit No. 356

22                  admitted into evidence.)

23          MR. ANDRES:  May I publish it, Your Honor?

24          THE COURT:  Yes.

25  BY MR. ANDRES:

R. Gates - Direct

1  Q.   Starting from the top of the memo -- can you highlight

2  the top, please -- can you just explain who it's to, from, the

3  subject matter, and the date?

4  A.   Yes.  The "to" is to Oleg Deripaska.  The "from" is from

5  Mr. Manafort, and KC is also Kypros Chrysotomides.

6  Q.   And what does it say for the subject?

7  A.   The subject is Cyprus.

8  Q.   How about the date?

9  A.   The date is April 20, 2009.

10  Q.   And can you read the first paragraph?

11  A.   "Following several conversations in relation to the next

12  steps for KC in Cyprus, presented below is an interim report

13  that summarizes the strategy and the next steps pending your

14  agreement and approval."

15  Q.   Okay.  You testified earlier about your work with

16  Mr. Manafort in the Ukraine.  During the periods of time that

17  he was traveling, were you able to contact him?

18  A.   Yes.

19  Q.   Okay.  And how would you speak with him?

20  A.   Either usually by phone or e-mail.

21  Q.   And do you know if during the time that Mr. Manafort was

22  traveling, he was able to be in touch with his bill payer?

23  A.   Yes.

24  Q.   How do you know that?

25  A.   Because in some cases I had the e-mails forwarded to me

U.S. v. Manafort

R. Gates - Direct

1143

1    by Mr. Manafort, you know, seeking action on a document or

2    other matter that he had received from the accountant or

3    bookkeeper.

4    Q.    Was there anything about Mr. Manafort's travel that

5    prevented him from speaking to his tax preparers?

6    A.    Not to my knowledge.

7    Q.    How did you know whether or not he was in contact with

8    his tax preparers?

9    A.    Again, I would get e-mails either forwarded by

10   Mr. Manafort or, in some cases, the accountants would reach

11   out to me and say they had talked to Paul and were trying to

12   follow up on certain actions.

13   Q.    You testified that you worked on elections in the

14   Ukraine.  What was the first election you worked on?

15   A.    The parliamentary election in 2007.

16   Q.    And can you describe how -- what work you did on that

17   election?

18   A.    Yes.  That was my first election.  I had primarily helped

19   by coordinating a number of the outside consultants that the

20   company used for that election, then also helping writing the

21   messaging and talking points for the Party of Regions.

22   Q.    Okay.  And can you describe how the parliamentary

23   elections work in the Ukraine?

24   A.    Yes.  Politics in Ukraine is a little different than the

25   United States.  They do not have elections by direct members.

┌─────────────────────────────────────────────────
U.S. v. Manafort
R. Gates - Direct                                    1144

1   It's done by proportional representation --

2          THE COURT:  Do you have an objection?

3          MR. DOWNING:  I do.  Objection, Your Honor,

4   irrelevant.

5          MR. ANDRES:  I'm not sure how this is irrelevant.

6   This is what Mr. Manafort is paid for, for his work in the

7   Ukraine.

8          THE COURT:  Well, you don't deny that he was paid.

9   You just deny that -- or the Government takes the position

10  that he didn't report everything he was paid for.  Nobody

11  denies that he did work over there.

12         MR. ANDRES:  Judge, there has not been a single

13  admission, not a single admission by the defense as to any

14  facts in this case.  The fact that they opened on it doesn't

15  mean that they made an admission.  It doesn't mean that the

16  Court's not going to instruct the jury they have to find it.

17  It doesn't mean we don't have the burden to do so.

18         THE COURT:  I don't see anything in any instruction,

19  that either side has submitted, that calls for an instruction

20  on this.

21         Let me -- go ahead and move on, Mr. Andres, and

22  we'll talk about it after we let the jury go home.

23         But we need to focus sharply.  What's in the

24  indictment, what the allegations are, and what each witness

25  can contribute to that.

U.S. v. Manafort

R. Gates - Direct

1145

1  I certainly hope you don't mean to offer a history

2  of Ukrainian politics or anything of that sort, do you?

3  (Audience laughter.)

4  MR. ANDRES:  No.  Judge, to be clear, what --

5  THE COURT:  Do you?  Answer my question.

6  MR. ANDRES:  No.

7  THE COURT:  All right.  Well, keep that in mind.

8  Next question.

9  MR. ANDRES:  The Government intends to --

10  THE COURT:  Next question, sir.

11 BY MR. ANDRES:

12 Q.  With respect to the number of elections that you worked

13 on in the Ukraine, how many elections did you work on?

14 A.  I think over the period of time from 2007 to 2014, it was

15 eight to ten.

16 Q.  And what type of work did you do?

17 A.  Primarily, again, worked in pulling a series of

18 consultants together that we used externally.  Also, working

19 with our local staff to pull together messaging, talking

20 points, election integrity efforts, and media and political

21 matters and polling.

22 Q.  You testified that you -- did you work on the 2010

23 election of President Yanukovych?

24 A.  Yes.

25 Q.  Okay.  And who won that election?

U.S. v. Manafort

R. Gates - Direct

1146

1   A.    Mr. Yanukovych.

2   Q.    Can I show you what's been marked as Government

3   Exhibit 346?

4         Can you tell me what that is?

5   A.    Yes.  This is a memo from Mr. Manafort to our campaign

6   team and it's in regards to kind of a status of the campaign

7   three weeks out from the election date.

8   Q.    And what campaign does that refer to?

9   A.    This is in reference to -- let me check real quick -- the

10  presidential campaign in 2010.

11  Q.    Okay.  And did you work on that campaign?

12  A.    I did.

13  Q.    Okay.  And after that, can -- did you --

14  A.    Sorry, I apologize.  The date, this is the parliamentary

15  election in 2012.

16  Q.    And did DMP and Mr. Manafort work on that campaign?

17  A.    It did, yes.

18        MR. ANDRES:  Your Honor, the Government moves to

19  admit Government Exhibit 346.

20        MR. DOWNING:  No objection.

21        THE COURT:  It's admitted.  But let me give you an

22  opportunity, Mr. Andres, to tell me a bit more about why you

23  think it's relevant.  Come to the bench.

24        (Bench Conference.)

25        THE COURT:  All right.  Why is it relevant?

U.S. v. Manafort

R. Gates - Direct

1147

1          THE CSO:  Quiet.

2          MR. ANDRES:  Is there an objection, Judge?

3          THE COURT:  I want to know why it is relevant.  Yes,

4    I have an objection to the time this is taking.  This witness

5    has testified that he committed crimes, pointed them out.  You

6    have evidence that you've -- but you're asking him about what

7    he did in an election and it just doesn't seem relevant.  And

8    so I'm giving you an opportunity to tell me why.

9          MR. ANDRES:  I'm asking these questions because

10   these are the facts that are alleged in the indictment and

11   this is the money that he'll be paid for.  What he's going to

12   testify about shortly about who specifically paid for those

13   elections, for what accounts they used, how they did it.

14   There are a number of individuals --

15         THE COURT:  Ask him that directly.

16         MR. ANDRES:  Judge, you --

17         THE COURT:  You can ask the question directly.

18         MR. ANDRES:  And there's also no reason why I can't

19   ask the questions.

20         THE COURT:  There is, because we don't have

21   interminable time.  Don't look so puzzled (directing comment

22   to Mr. Asonye.)

23         You've tried cases in this Court before.

24         MR. ANDRES:  Judge, I disagree that speed is more

25   important than the substance.

U.S. v. Manafort

1    THE COURT:  I agree that speed isn't more important

2  than substance, but a delay is unnecessary.

3    MR. ANDRES:  The suggestion that the Government is

4  somehow delaying the record does not reflect that.

5    THE COURT:  You're going into areas that don't seem

6  to be relevant.

7    MR. ANDRES:  I understand.  But Your Honor -- as

8  Your Honor now knows, I haven't previewed my entire case for

9  you.  So I don't know how exactly I'm supposed to explain to

10  the Court before I ever admit any of the evidence what's

11  coming next.  And so Your Honor has questions about what's

12  coming next --

13    THE COURT:  Look at me when you're talking to me.

14    MR. ANDRES:  I'm sorry, Judge, I was.

15    THE COURT:  No, you weren't.  You were looking at

16  down.

17    MR. ANDRES:  Because I don't want to get in trouble

18  for some facial expression.  I don't want to get yelled at

19  again by the Court for having some facial expression when I'm

20  not doing anything wrong, but trying my case.

21    So every instance the Court interrupts every single

22  one of the Government's directs, every single one.  On the

23  defense direct, they get to bring in documents that aren't

24  even in the relevant time frame.

25    THE COURT:  Well, why didn't you object?

U.S. v. Manafort

R. Gates - Direct

1149

1      MR. ANDRES:  We did.

2      THE COURT:  Then I ruled on it.  You must be quiet.

3  One lawyer at a time.  You knew that.

4      (Directing comment to Mr. Asonye.)

5      MR. ANDRES:  I'm sorry, Judge.

6      THE COURT:  Well, I understand how frustrated you

7  are.  In fact, there's tears in your eyes right now.

8      MR. ANDRES:  There are not tears in my eyes, Judge.

9      THE COURT:  Well, they're watery.

10     Look, I want you to focus sharply on what you need

11 to prove -- to prove the crime.  And I don't understand what a

12 lot of these questions have to do with it.

13     Now, let me be clear about the trips to the Ukraine.

14 I'm going to permit you to show those, but I'd like you to

15 expedite things and I don't fault you for not doing this in

16 advance.  You could have, but you're not required to.  Give

17 him a list of when he was in the Ukraine, and ask them to do

18 that, then we don't have to spend time going page by page

19 through a passport.

20     Now, what is it you want to elicit from him about

21 the work on the campaigns?

22     MR. ANDRES:  The memos list the individuals who are

23 paying for the campaigns.  They are being updated repeatedly.

24 Their names have not been entered into evidence.

25     The last time we tried to go through the memos, with

┌─────────────────────────────────────────────────────┐

U.S. v. Manafort

R. Gates - Direct

1150

1    the search warrant witness, the Court prevented us from doing

2    that.  These are memos that Mr. Gates wrote for Mr. Manafort

3    or was copied on.

4               THE COURT:  And what do they show?

5               MR. ANDRES:  They show who the -- who's being

6    updated about the campaign.  And the people with the initials,

7    the businessmen here, the oligarchs.  We're not calling them

8    that obviously, but businessmen who are paying them for

9    the campaign.  This is the money trail Your Honor has been

10   asking for for some time and here we are, and yet, we're still

11   having problems submitting our case.

12              THE COURT:  How were they paid?  They were paid by

13   wire transfers through the Cyprus accounts.

14              MR. ANDRES:  Through shell companies.  So we have to

15   elicit the name of people who control the accounts.  Who the

16   pay masters were, the businessmen, what accounts they held.

17   There's documentary evidence which support that.  Your Honor

18   knows very well that Mr. Gates' credibility will be tested

19   severely on cross-examination.  And we're simply submitting

20   documents that are going to help how it is he knows what he

21   does.

22              MR. DOWNING:  Your Honor, I'm -- I get your point,

23   too.  I don't mind working with the Government.  If they give

24   us some kind of summary of the contracts for the consulting

25   services and the payments that go into the accounts, we'd be

─────U.S. v. Manafort─────

R. Gates - Direct

1151

1     more than happy to work on this.

2              And by the way, to be clear, this was something I

3     talked to Mr. Andres about before this trial, about getting

4     some of this stuff summarized, getting an agreement on it, and

5     moving through this case.

6              So I definitely did raise it with him and I did not

7     appreciate him saying that earlier.  That is not what

8     happened.

9              MR. ANDRES:  Okay.  So maybe Mr. Downing can send up

10    an e-mail that it doesn't exist.  And by the way, Judge,

11    you'll remember not long ago, I tried to show a witness a

12    summary chart and Your Honor wouldn't let it in.

13             THE COURT:  That's a different matter.

14             MR. ANDRES:  It's not a different matter.

15             THE COURT:  I say it's different.

16             Now, you're going to get a chance to introduce those

17    later, but the right way.

18             MR. ASONYE:  Can I say something on this point?

19             THE COURT:  No, you may not.

20             MR. DOWNING:  But I will -- I'll work with

21    Mr. Andres this evening, do my work.

22             THE COURT:  Look -- yes, and I want you-all to work

23    to see if you can expedite getting the evidence in this case.

24    You may continue with your examination now.

25             MR. ANDRES:  Okay.  Thank you, Judge.

─────U.S. v. Manafort─────

R. Gates - Direct

1152

1    (End of bench conference.)

2    THE COURT:  All right.  Mr. Andres, you may proceed.

3    MR. ANDRES:  Thank you, Your Honor.

4    THE COURT:  And I didn't exclude anything, so you

5    may proceed as you were doing.

6    MR. ANDRES:  Thank you, Judge.

7    BY MR. ANDRES:

8    Q.  Can you look at Government Exhibit 342?

9    A.  Yes.

10   Q.  Can you tell me what that is?

11   A.  This is an e-mail chain involving Mr. Kilimnik and

12   Mr. Manafort.

13   Q.  Okay.  And the attached -- the subject, can you read the

14   subject?

15   A.  The subject is ST documents.

16   Q.  And the reference to ST, is that an individual?

17   A.  It is.

18   Q.  Who is ST?

19   A.  His name is Serhiy Tihipko.

20   Q.  Okay.  And was he -- who is Serhiy Tihipko?

21   A.  Serhiy Tihipko is -- had his own political party and also

22   supported the Party of Regions that we were working for.  And

23   at the point of this e-mail, he was helping as a surrogate on

24   economic matters.

25   Q.  In the course of your work in the Ukraine, did

U.S. v. Manafort

R. Gates - Direct

1153

1    Mr. Tihipko make payments to Davis Manafort and DMP

2    International?

3    A.    Yes.

4    Q.    For what?

5    A.    For a lobbying project involving the EU in the U.S.

6    Q.    Okay.

7            MR. ANDRES:  Your Honor, the Government moves to

8    admit Government Exhibit 342.

9            MR. DOWNING:  No objection, Your Honor.

10           THE COURT:  Admitted.

11                        (Government's Exhibit No. 342

12                        admitted into evidence.)

13   BY MR. ANDRES:

14   Q.    With respect to the payments that ST made, or Serhiy

15   Tihipko, how were those payments made?

16   A.    By wire transfer.

17   Q.    Okay.  Wire transfer from where to where?

18   A.    From his company in Cyprus to Mr. Manafort's company in

19   Cyprus.

20   Q.    And did Mr. Tihipko, did he control certain shell

21   companies in Cyprus?

22   A.    Yes.

23   Q.    Do you know what the names of those were?

24   A.    Yes.  The one that was used by Mr. Tihipko was Dresler

25   Holdings, I believe, Dresler Holdings.

U.S. v. Manafort

R. Gates - Direct

1154

1   Q.   Okay.  And did they make payments to Mr. Manafort's

2   Cypriote holdings?

3   A.   Yes.

4   Q.   How do you know that?

5   A.   Because I was the one that helped organized the paperwork

6   to -- and initiate the wire transfer from their side.

7   Q.   Can you take a look at Government Exhibit 344?

8        Can you tell me what that is?

9   A.   Yes.  This is a memo drafted by Mr. Manafort in regards

10  to an election integrity program that we were working on for

11  the upcoming parliamentary elections in 2012.  And this was to

12  basically outline the strategy for how the Party of Regions

13  members would work with embassies, the media, and MGO's prior

14  to the campaign.

15        MR. ANDRES:  The Government moves to admit

16  Government Exhibit 344.

17        MR. DOWNING:  No objection.

18        THE COURT:  Admitted.

19                    (Government's Exhibit No. 344

20                    admitted into evidence.)

21        MR. ANDRES:  May I publish it?

22        THE COURT:  Yes.

23  BY MR. ANDRES:

24  Q.   Okay.  You testified, Mr. Gates, about the e-mail, the

25  top e-mail.  And I'd just ask you to look at the top e-mail

U.S. v. Manafort

R. Gates - Direct

1155

1  and tell me who the e-mail is to?

2  A.   The top e-mail is to Mr. Manafort.

3  Q.   And who's it from?

4  A.   Mr. Kilimnik.

5  Q.   And are you CC'd?

6  A.   I am.

7  Q.   What's the date?

8  A.   Date is July 12, 2012.

9  Q.   Okay.  Can you tell me what the subject of the e-mail is?

10 A.   The subject is EI, which means Election Integrity

11 Outreach International Plan.

12 Q.   Okay.  And in the e-mail, can you just read the first

13 sentence of the e-mail?  Who's it -- after it says, "Paul,"

14 can you just read that first sentence?

15 A.   Yeah.  "Attached is the final version of the memo.  It

16 was given to SL, Levenets, MFA, AK."

17 Q.   Okay.  The reference to SL, who is that?

18 A.   Serhiy Lovochkin.

19 Q.   Okay.  During the course of the time that you worked in

20 the Ukraine, did Mr. Lovochkin pay for certain services?

21 A.   He did.

22 Q.   Davis Manafort?

23 A.   Yes.

24 Q.   What did he pay for?

25 A.   He paid for political work and some policy work on behalf

U.S. v. Manafort

R. Gates - Direct

1156

1  of the Party of Regions.

2  Q.   And without giving us a particular number, were those

3  payments in the millions of dollars?

4  A.   Yes.

5  Q.   Okay.  And did DMP International enter into series of

6  work contracts with them?

7  A.   Yes.

8  Q.   How did Mr. Lovochkin pay for the work to DMP?

9  A.   Mr. Lovochkin wired money from his Cyprus account to

10  Mr. Manafort's account in Cyprus.

11  Q.   And was his Cyprus account in the name of a shell

12  company?

13  A.   Yes.

14  Q.   What were the names?

15  A.   The two that Mr. Lovochkin primarily used were Taunton

16  Limited and Telmar Investments.

17  Q.   And with respect to the way that Mr. Manafort received

18  those payments, where did he receive those payments?

19  A.   He received them in Cyprus.

20  Q.   Okay.  And did he -- when the money got to Cyprus, did he

21  move it to the United States immediately?

22  A.   In some cases, he moved some, but he left some in Cyprus

23  as well.

24  Q.   Did Mr. Manafort maintain those Cyprus accounts over a

25  period of time?

────────────────U.S. v. Manafort────────────────
R. Gates - Direct

1157

1  A.   Yes.

2  Q.   And was there money in those accounts?

3  A.   Yes.

4  Q.   Was it millions of dollars?

5  A.   Yes.

6  Q.   Can I ask you to turn to the memorandum attached to

7  Government Exhibit 344?

8       Can you tell me what that is?

9  A.   Yes.  This is the memo that Mr. Manafort drafted to

10 several people in the party of leadership, outlining what

11 needed to be done in terms of the election integrity efforts.

12 Q.   Okay.  Can you tell me who's on the "to" line?

13 A.   Yes.  SL is Mr. Serhiy Lovochkin.

14      AK is Andriy Klyuyev.

15      ST is Serhiy Tihipko.

16      BVK is Borys Kolesnikov.

17      And KG is Kostyantyn Gryshchenko.

18 Q.   And who is KG?

19 A.   KG is Kostyantyn Gryshchenko.

20 Q.   And what was his position?

21 A.   At that time, I believe he was the Minister of Foreign

22 Affairs.

23 Q.   Okay.  With respect to the four other individuals, SL,

24 AK, ST, and BVK, were they businessmen in the Ukraine?

25 A.   They were.

U.S. v. Manafort

R. Gates - Direct

1158

1    Q.   Were they all involved in making payments to

2    Mr. Manafort?

3    A.   Yes.

4    Q.   Okay.  Did they make those payments through shell

5    companies?

6    A.   I should say the only one, Mr. Gryshchenko did not make

7    any payments.

8    Q.   Correct.  So all the people before KG?

9    A.   Correct.  That's -- yes.

10   Q.   Okay.  You've testified previously about SL.  Who is AK?

11   A.   AK is Andriy Klyuyev.  He was the first deputy prime

12   minister in the government.

13   Q.   Is he also a businessmen in the Ukraine?

14   A.   Yes.

15   Q.   And did he make payments to Mr. Manafort?

16   A.   Yes.  Not that many, though.

17   Q.   Okay.  What entities did he use?

18   A.   I think the primary one he used was Novirex Limited.

19   Q.   Okay.  And --

20        THE COURT:  What -- do you know what these payments

21   were for?

22        THE WITNESS:  Yes.

23        THE COURT:  What?

24        THE WITNESS:  Primarily political campaigns with

25   Mr. Klyuyev specifically, since he didn't make that many, and

1   this one was for polling work that was done.

2             THE COURT:  In other words, services?

3             THE WITNESS:  Services, yes.

4             THE COURT:  Services done in support of these

5   people's political campaigns?

6             THE WITNESS:  That's correct.

7             THE COURT:  So the people they supported.

8             THE WITNESS:  Yes.

9             THE COURT:  And you said payments were made by these

10  people or their entities, because you said --

11            THE WITNESS:  Their Cyprus entities, yes, Your

12  Honor.

13            THE COURT:  I beg your pardon?

14            THE WITNESS:  Their Cyprus entities.

15            THE COURT:  Yes, to Mr. Manafort.

16            THE WITNESS:  Correct.

17            THE COURT:  Or his entity?

18            THE WITNESS:  His Cyprus entity, yes.

19            THE COURT:  Next question.

20  BY MR. ANDRES:

21  Q.   The person with -- that's identified as BVK?

22  A.   Yes.

23  Q.   Can you tell me who that is?

24  A.   Yes.  That's Borys Kolesnikov.  He was in the party

25  leadership.  He's very closely associated with Rinat Akhmetov.

1   And then Mr. Kolesnikov is also the minister of transportation

2   in the government.

3   Q.   Okay.  And with respect BVK, was he a wealthy

4   businessmen?

5   A.   Yes, I think so.

6   Q.   Did he make payments to Mr. Manafort?

7   A.   He did.

8   Q.   And what were those payments for?

9   A.   Political work.

10  Q.   And did he make those payments through a series of shell

11  companies?

12  A.   He did.

13  Q.   Do you know what the names of those shell companies are?

14  A.   Some that I recall are Mistaro, Inlord Sales -- let's

15  see, Firemax.  I think there are some others as well.

16  Q.   Okay.  Do you have an understanding why these

17  businessmen --

18          THE COURT:  Go ahead.  Go ahead.

19  BY MR. ANDRES:

20  Q.   Do you have an understanding why these businessmen were

21  making payments for political campaigns in the Ukraine?

22  A.   Yes.  In Ukraine, there's no party structure like there

23  is in the U.S.  So you don't really have a Republican National

24  Committee or a Democratic National Committee, so there are no

25  political contributions in Ukraine.  And what typically

R. Gates - Direct

1   happens is those people supporting a particular party come

2   together, a budget is created, and then the budget is divided

3   among those people who can contribute to those campaigns.

4           THE COURT:  So it is a political contribution.

5           THE WITNESS:  A very high one, yes, Your Honor.

6           THE COURT:  You've said they did it shelf -- through

7   shelf companies.

8           THE WITNESS:  Yes.

9           THE COURT:  What did you mean by that?

10          THE WITNESS:  Shelf companies are basically

11  companies in Cyprus that have already been set up and remain

12  on the corporate registry in Cyprus and that you're allowed to

13  use.  And it's cheaper than to set up a company that you

14  actually create a name for.

15          THE COURT:  Well, what does the term "shell" mean?

16          THE WITNESS:  I think it's shelf company.  You said

17  shell?  Yeah, it should be shelf, not shell.  Shelf, like

18  meaning they are already on the shelf.

19          THE COURT:  Oh, I see.

20          THE WITNESS:  Right.

21          THE COURT:  Are you saying s-h-e-l-f?

22          THE WITNESS:  Correct.

23          THE COURT:  I see.  All right.  Go ahead,

24  Mr. Andres.

25  BY MR. ANDRES:

U.S. v. Manafort

R. Gates - Direct

1162

1  Q.   You testified about the manner in which the -- well, let

2  me ask you this:  Did the businessmen in the Ukraine, did they

3  benefit in some way from supporting these elections?

4  A.   If the party was successful and that party came to power,

5  then yes.  Often they benefitted financially through contracts

6  or ownership of certain companies or percentages of companies.

7  Q.   You testified about this manner in which these payments

8  were made from the businessmen in the Ukraine to Mr. Manafort.

9  How did you first learn about that process?

10 A.   Mr. Manafort told me, and then later Mr. Kilimnik also

11 confirmed that information.

12 Q.   Anything to you about whether or not he was required to

13 open accounts in Cyprus?

14 A.   Yes.  He indicated that the Ukrainian businessmen and the

15 people that were working on the political parties had directed

16 him to set up Cyprus accounts because the payments would be

17 coming from Cyprus.  So it was easier for the Ukrainian

18 businessmen to make those payments.

19           THE COURT:  When you come to a good stopping point,

20 I take it you have more that we can't finish today.

21           MR. ANDRES:  I can stop now if you'd like, Your

22 Honor.

23           THE COURT:  Let's do that.

24           Mr. Gates, you may step down.

25           We will reconvene tomorrow at 9:30.  And in the

U.S. v. Manafort

1163

1  interim, you may not discuss your testimony with anyone at

2  all, whether lawyer or other.

3          THE WITNESS:  Okay.  Thank you.

4          (Witness excused.)

5          THE COURT:  Ladies and gentlemen, pass your books to

6  the right.  Mr. Flood will collect them, maintain their

7  security.

8          Remember, as always, to refrain from discussing the

9  matter with your family or anyone or undertaking any

10 investigation on your own.

11         And avoid, as I find it easy to do, the news or

12 anything, any discussions.

13         Let me ask Mr. Andres:  How much more do you

14 anticipate with this witness?

15         MR. ANDRES:  Approximately three hours.

16         THE COURT:  All right.  Gives you a forecast.  We'll

17 try, of course, to focus it sharply and ensure that -- that

18 time is spent well.

19         You may follow the court security officer out.  I'll

20 see you tomorrow morning at 9:30.  You filled out your menus,

21 I hope.

22         Good.  See you tomorrow morning.

23         (Jury dismissed.)

24         THE COURT:  All right.  You may be seated.

25         Mr. Andres, let me give you an opportunity to

1164

1    educate me.  I understand that the -- Mr. Andres?

2            MR. ANDRES:  I'm listening, Judge.  I'm sorry.  I

3    was listening.

4            THE COURT:  It's customary, as Mr. Asonye will tell

5    you, when I address you to come to the podium and stand, but

6    you can be forgiven.

7            MR. ANDRES:  No, no.

8            THE COURT:  You can be forgiven that.

9            Anyway, Mr. Andres, I want to give you an

10   opportunity to explain to me why some of this is relevant.  I

11   understand that the Government has alleged in the indictment

12   that he received payments from these people in -- and from

13   these organizations and companies that he report on his

14   return.  And so I'm not sure that I see clearly what this has

15   to do -- for example, you asked a question:  Do these people

16   have something to gain from giving -- giving this money?

17           I don't see any earthly relevance to that.

18           I mean, I don't ask Mr. Koch or Mr. Soros whether

19   they have anything to gain from contributions they make.

20   These are people that are backing political parties and

21   political factions.

22           So maybe I'm not seeing something and maybe you can

23   explain that to me.

24           MR. ANDRES:  These people are not making political

25   contributions in the way that you suggest.  They're not

U.S. v. Manafort

1165

1   anything like any Americans.  I don't know why you keep

2   singling out these individuals.  I don't know anything about

3   their political connections or who they give money to.

4            These people are oligarchs.  They are oligarchs.

5   And that means they control a segment of the economy based on

6   the Government's allowing them to do that.  The Government,

7   who they support, then provides them with political cover so

8   that they can have a monopoly over certain areas of the

9   economy.

10           Now, Your Honor, and I've done my best --

11           THE COURT:  I'm glad you've explained that to me --

12           MR. ANDRES:  Yes.

13           THE COURT:  -- because that makes it even clearer to

14   me that it doesn't have anything to do with the allegations in

15   this case.

16           I think -- you know, I'm not here to debate with you

17   whether these are good people or bad people.  I raised early

18   on about the use of the term "oligarch."  I didn't -- it

19   throws dirt on these people.  They may deserve it.  I don't

20   know and I don't care.

21           What matters is whether he received money and he

22   didn't report it on his income tax.  It doesn't matter whether

23   these are good people, bad people, oligarchs, crooks, Mafia,

24   or whatever.  It doesn't matter.  What matters is that your

25   allegations that he received money that he didn't report on

U.S. v. Manafort

1166

1   his income tax, that's what matters.

2           MR. ANDRES:  Respectfully, Judge, that is not what

3   the law is.

4           The law is that what he earned as income matters,

5   not if these people gave it as a gift, I want to make sure

6   that's not clear, not if these people gave it for some other

7   reason and that Mr. Manafort earned it, that he earned

8   income --

9           THE COURT:  All right.  I see that.  I see that.

10  But you don't need to throw mud at these people or the cause

11  they supported or the reasons.  In fact, some early -- early

12  witnesses said Mr. Manafort was brilliant and so forth and

13  that it was an important aspect in -- I'm here, Mr. Andres.

14          MR. ANDRES:  I'm sorry, Judge, I'm listening.

15          THE COURT:  I know.  But when you look down, it's as

16  if to say, you know, that's BS.  I don't want to listen any

17  more from you.

18          MR. ANDRES:  Judge, you continue to interpret our

19  reactions in some way.  We don't do that to you and we're not

20  being disrespectful in any way.

21          THE COURT:  All right.  Well, then look at me.

22          MR. ANDRES:  Fine.

23          THE COURT:  Don't look down.  Don't roll your eyes.

24  Don't --

25          MR. ANDRES:  I'm not rolling -- I don't understand

─U.S. v. Manafort─

1167

1    how --

2         THE COURT:  You may not have rolled your eyes, but

3    you're not the only person sitting on that side.

4         MR. ANDRES:  I would find it interesting to see that

5    I was both looking down and you notice that I was rolling my

6    eyes, but I --

7         THE COURT:  I told you, Mr. Andres, I wasn't saying

8    you rolled your eyes.  I did make a comment about your eyes up

9    here, and I stand by that comment.

10        But, anyway, explain to me why it makes a difference

11   whether the payments came from people you think are immoral

12   and oligarchs or whatever other than that he earned the money.

13   I don't think anyone denies that he did work over there, that

14   he was successful, and they paid him millions of dollars.

15        And I think you have shown that it was paid through

16   these companies in Cyprus.  And you need to show, as I think

17   you have evidence, that he didn't report that money on his

18   income tax.

19        But I don't see any need to cast aspersions on

20   whether he was doing the Lord's work or some evil work over

21   there, do you?

22        MR. ANDRES:  I wasn't suggesting that in any way.  I

23   didn't say a word about oligarchs.  I didn't say a word about

24   anything.  But, Your Honor -- Your Honor --

25        THE COURT:  I stopped that early on.

U.S. v. Manafort

1168

1    MR. ANDRES:  -- Your Honor then injected that these

2  were political contributions, and they're not really political

3  contributions.

4    THE COURT:  Why not?

5    MR. ANDRES:  Only with respect to Your Honor

6  injecting a question to the witness about -- because they're

7  not just political contributions, they are these self-serving

8  payments with respect to what the oligarchs are giving to

9  these politicians.

10    THE COURT:  You don't think people in the United

11  States when they give --

12    MR. ANDRES:  I'm not here to talk about what

13  political people do in a campaign.  I'm here to prove a fact.

14    THE COURT:  It is political contribution, but it

15  doesn't matter.

16    MR. ANDRES:  Fine.

17    THE COURT:  What matters is that he received

18  payments and it was for work and, therefore, it's income and

19  he didn't report it.  That's what matters.

20    MR. ANDRES:  Right.  And at every instance when we

21  try to describe the work, that he worked on elections, what he

22  did, Your Honor stops us and tell us to move on.  Judge, look

23  at --

24    THE COURT:  Oh, the record will reflect I have

25  rarely stopped you in this case.

1    MR. ANDRES:  I will stand by the record as well.

2    THE COURT:  All right.  Then you will lose.

3    All right.  I want to see this matter tried

4    expeditiously.  So I am requiring you and Mr. -- well, Downing

5    and anyone else -- for example, on these passports, I want you

6    to get together.  There's no dispute about when this fellow --

7    when this witness was in the Ukraine, and it ought to be a

8    simple piece of paper that you can agree to, a stipulation.

9    Going through the thing page by page is unnecessary.

10   And there are other things that I think -- if you want to show

11   that certain payments were made, and certainly you can do so.

12   What I don't think is necessary -- I haven't been

13   through these hundred-plus exhibits that you plan to go

14   through.  There were a couple of these e-mails trails that --

15   chains that you admitted that I don't think have much to do

16   with this.

17   All I'm asking is that you look at what you intend

18   to present and see if you can focus it very sharply.

19   MR. ANDRES:  Your Honor, it would be helpful for me

20   to do that if you could identify an e-mail chain that you've

21   admitted as relevant evidence, which is not relevant or how

22   it's not relevant --

23   THE COURT:  Well, I've admitted a lot of e-mail.

24   I'm not going to go through those.

25   MR. ANDRES:  Just asking for one example of a

U.S. v. Manafort

1170

1  document that you've admitted --

2        THE COURT:  I don't have to give you an example.  I

3  want you to shorten it.

4        MR. ANDRES:  Your Honor, I don't understand how

5  I'm -- this is a trial.  We're going to call witnesses.  We're

6  going to try to admit evidence.  I don't understand how I'm

7  supposed to combine with Mr. Downing so that he can approve

8  the Government's evidence before it's admitted.

9        I'm not casting any aspersions on Mr. Downing.  He

10  has his own work to do.

11        THE COURT:  He says he offered to do it.  You said

12  he didn't; is that right, Mr. Downing?

13        MR. ANDRES:  To do what?  To do what?

14        THE COURT:  What was it that you said you offered to

15  do and they said you didn't?

16        MR. DOWNING:  Your Honor, earlier in the case,

17  before all these witnesses were called to the vendors to talk

18  about the personal expenses, we said to the extent you have a

19  chart and you break it down by vendor, give us the detail.

20  We'll look at it.  If we don't have any objection to it, you

21  can put it in evidence.  So we feel no differently about the

22  issues that are coming up now.

23        He's got a chart that summarizes the payments that

24  came in, who made the payments, and the purpose of it.  We

25  will look at it.  And if we have no objections --

1171

1    THE COURT:  Well, didn't you object to a chart that

2    Mr. Asonye offered?

3    MR. DOWNING:  I think it was an objection to the

4    timing of a summary coming in.

5    THE COURT:  Well, in any event, this case has now

6    gone on -- is this the sixth day, I believe?

7    MR. ANDRES:  I think -- I think --

8    THE COURT:  I beg your pardon.

9    MR. ANDRES:  It might be the fifth.

10    THE COURT:  All right.  It's -- I think you're

11    right.  It is the fifth.

12    But we need to move the matter along.

13    And any way that you can think to do it, Mr. Andres,

14    would be appreciated by the Court, would be appreciated by the

15    jury.  And you should cooperate, Mr. Downing.

16    MR. DOWNING:  Understood.

17    THE COURT:  No reason to -- to extend this.  I still

18    am not sure, Mr. Andres, give me another try, tell me why it

19    matters, apart from the fact that whether it's income or a

20    gift, and nobody is going to contend any of this money was a

21    gift, but why it matters for us to go into detail about who

22    these contributors were and so forth.

23    MR. ANDRES:  That it prove -- it proves the flow of

24    money.  We have to prove where the money came from.  And,

25    again, Your Honor, we're all tired.  So I don't mean to be

U.S. v. Manafort

1172

1    disrespectful, but this seems to me the very type of evidence

2    that Your Honor was saying we should move on to, and here we

3    are.  So we're just trying to prove this.  We're trying to

4    prove that these men in the Ukraine, Rinat Akhmetov, Serhiy

5    Lovochkin, Borys Kolesnikov are the payers.  They pay the

6    money to the DMP.

7           Now, the way they do it are through companies, not

8    in their name, Cyprus companies, and Mr. Manafort's companies

9    that are in Cyprus, not in his name, and that's where the

10   money sits.  So there you have the foreign bank accounts which

11   form the basis of the false tax filing.

12          Okay.  That money is then moved to the United

13   States.  It's income.  It's not reported to his accountants.

14   It's used to pay a whole host of different things, and that's

15   the income that's not reported.

16          THE COURT:  Well, I agree with everything you've

17   said.

18          Now, tomorrow if you ask a question about who is

19   this guy and what does he do and how does he benefit from

20   giving this money, you will see why I am confused about why

21   that makes any difference.

22          MR. ANDRES:  Again, Your Honor, I was just trying to

23   make the record clear -- Mr. Gates never described these as

24   necessarily or simply as political contributions.  So I wanted

25   to complete his answer with respect to that.

1173

1          I'm not -- I'm certainly not going to ask any

2   questions I've already asked.  It is not going to happen.

3   That's not my goal.  I share your interest in moving it along.

4          I will say that I am -- I -- you know --

5          THE COURT:  Tell me why these are not political

6   contributions if they're trying to help get a candidate

7   elected and why it makes any difference.

8          The only thing that matters is that they paid

9   Mr. Manafort money that he didn't report.  That's what the

10  case is about.

11         MR. ANDRES:  I don't fundamentally disagree with

12  that except for the fact that I don't think it's appropriate

13  to not explain to the jury why they are making these payments,

14  right?

15         So why exactly these people are paying millions and

16  millions of dollars, more than $60 million over time to

17  Mr. Manafort.

18         It's not -- it's not extraneous or irrelevant to

19  explain that these people control industry and have the money

20  to make the payments.  That's all.  It's not ten questions.

21  It's one.  So --

22         THE COURT:  All right.  Well, it occurs to me that I

23  am unnecessarily -- I am unnecessarily extending this by

24  continuing this conversation.

25         But you are both under my firm desire that you

U.S. v. Manafort

1174

1    should do what you can to expedite this matter and not spend

2    time on matters that aren't relevant.

3              MR. ANDRES:  I will do that, Judge, but the notion

4    that we're going to meet with Mr. Downing tonight to help him

5    understand what Mr. Gates' testimony is so we can

6    expedite it --

7              THE COURT:  I'm not requiring you to meet with

8    Mr. Downing.  I am requiring -- the only thing I've said is

9    give him the chart on the things and -- I'm up here.

10             MR. ANDRES:  Sorry.

11             THE COURT:  Give him a chart that says when he was

12   in the Ukraine.  We'll at least get rid of some of those

13   questions.  We don't have to have passports in the record.

14             MR. ANDRES:  Got it.  Past that.

15             THE COURT:  Good.  See, and if you can see other

16   areas where you can do it, do it.  But you're not required to

17   meet with him.

18             I do want you to make every effort to expedite this

19   matter.  And if meeting with Mr. Downing and getting him to

20   stipulate something will expedite it, wonderful.

21             MR. ANDRES:  We will do that, Judge.  You'll

22   remember from the opening statements that's central to the

23   defense case was that this whole -- whole conspiracy was

24   Mr. Gates doing so.  I would just ask the Court for a slight

25   bit of leniency in being able to introduce documents which

─────────U.S. v. Manafort─────────

1175

1   corroborate Mr. Gates' testimony, because, obviously, in every

2   case, I'm sure most that you've had, the credibility of a

3   cooperating witness is central.

4           We want to be able to corroborate that with

5   documentary evidence which he had, which we seized from

6   Mr. Manafort's house and the like.  So that's why with this

7   witness these documents are critical.  I will cut them down --

8           THE COURT:  All right.  That's a good explanation

9   and I will have that in mind.  Anything else you think I

10  should have in mind?

11          MR. ANDRES:  That's about it, Judge.  We're hoping

12  to finish tomorrow morning and with your instruction, we'll

13  get to moving it along.  For sure.  And I didn't mean to be

14  disrespectful.

15          THE COURT:  Don't worry about it.  I'm not concerned

16  about that at all.

17          I remember trying cases.  I don't think I ever

18  had -- I had big cases that I thought were important.  They

19  were important to me, important to my career.  And I remember

20  the stress and I remember the pressure.  And so I know that's

21  true for both of you -- I mean all of you.

22          This is a stressful time.  So I understand that.

23  But I'm trying to minimize the stress time is all I'm trying

24  to do.  And I think we can do it.

25          I don't think this case is as complex as it could be

1176

1  made to be.  I think it's simpler than that.

2          And you do what you think you have to do.  And you

3  object if you think he's getting to this irrelevant stuff.

4          And I'll rule on it.

5          MR. ANDRES:  Thank you, Judge.  Have a good night.

6          THE COURT:  All right.  We're in recess until 9:30.

7          **(Proceedings adjourned at 5:50 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8    **MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in said

9    court on the 6th day of August, 2018.

10          I further certify that the foregoing 197 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this August 8, 2018.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25

                                                            1177