U.S. v. Manafort

1178

1        UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF VIRGINIA
2            ALEXANDRIA DIVISION

3  ------------------------------x
                                 :
4  UNITED STATES OF AMERICA,     : Criminal Action No.
                                 : 1:18-CR-83
5            versus              :
                                 :
6  PAUL J. MANAFORT, JR.,        :
                                 : August 7, 2018
7                  Defendant. : Volume VI - A.M.
   ------------------------------x

8

9            TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE T.S. ELLIS, III
            UNITED STATES DISTRICT JUDGE

10

   APPEARANCES:

11

   FOR THE GOVERNMENT:        UZO ASONYE, AUSA
12                            United States Attorney's Office
                              2100 Jamieson Avenue
13                            Alexandria, VA 22314
                                   and
14                            GREG ANDRES, SAUSA
                              BRANDON LANG VAN GRACK, SAUSA
15                            Special Counsel's Office
                              U.S. Department of Justice
16                            950 Pennsylvania Avenue NW
                              Washington, D.C. 20530

17

   FOR THE DEFENDANT:         JAY ROHIT NANAVATI, ESQ.
18                            BRIAN KETCHAM, ESQ.
                              Kostelanetz & Fink LLP
19                            601 New Jersey Avenue NW
                              Suite 620
20                            Washington, DC 20001
                                   and
21                            THOMAS E. ZEHNLE, ESQ.
                              Law Office of Thomas E. Zehnle
22                            601 New Jersey Avenue NW
                              Suite 620
23                            Washington, DC 20001
                                   and
24                            KEVIN DOWNING, ESQ.
                              Law Office of Kevin Downing
25                            601 New Jersey Avenue NW
                              Suite 620

U.S. v. Manafort

1179

```
 1                              Washington, DC 20001
                                   and
 2                              RICHARD WILLIAM WESTLING, ESQ.
                                Epstein, Becker, & Green, PC
 3                              1227 25th Street NW
                                Washington, DC 20037
 4
     OFFICIAL COURT REPORTER:    TONIA M. HARRIS, RPR
 5                               U.S. District Court, Ninth Floor
                                 401 Courthouse Square
 6                               Alexandria, VA 22314
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

U.S. v. Manafort

1180

1 TABLE OF CONTENTS
TRIAL
2 WITNESSES

3 On behalf of the Government:

4 Richard Gates (cont'd from 8/6/18)

5        Direct examination by Mr. Andres................. 1185

6                            EXHIBITS

7 On behalf of the Government:

                                                        Admitted
8

Number 66F............................................. 1190
9 Number 66B............................................. 1198
Number 350............................................. 1209
10 Number 352............................................. 1213
Number 364............................................. 1216
11 Number 370............................................. 1228
Number 427.  .......................................... 1232
12 Number 373............................................. 1258
Number 219............................................. 1260
13 Number 375............................................. 1261
Number 375............................................. 1263
14 Number 376............................................. 1264
Number 220............................................. 1268
15 Number 380............................................. 1280
Number 235............................................. 1284
16 Number 237............................................. 1289
Number 240............................................. 1291
17 Number 263............................................. 1291
Number 384............................................. 1293
18 Number 262............................................. 1295
Number 137............................................. 1296
19 Number 389............................................. 1303
Number 388............................................. 1304
20 Number 424............................................. 1306

21                            MISCELLANY

22 Preliminary matters...................................... 1181
Certificate of Court Reporter........................... 1310
23

24

25

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1181

1        **P R O C E E D I N G S**

2    (Court proceedings commenced at 9:33 a.m.)

3           THE COURT:  All right.  The record will reflect that

4    counsel and the defendant are present, prepared to proceed.

5           Anything we need to deal with at the outset,

6    Mr. Andres?

7           MR. ANDRES:  Just briefly, Judge.  We have had a

8    chance to work with the defense, and we appreciate their

9    cooperation.  I understand that they are going to stipulate to

10   any venue issues, so we'll be able to avoid any evidence --

11          THE COURT:  Good.

12          MR. ANDRES:  -- with exhibits or witnesses.  And

13   maybe we can just get that on the record from the defendant.

14          THE COURT:  All right.  Well, you're both to be

15   complimented for that.

16          Now, there are other things.  I've received the

17   Government's briefs on the summaries.  The rules are pretty

18   clear on that, as are the cases.  The line that sometimes is

19   difficult to discern is an indistinct line is between the

20   presentation of voluminous data by way of charts and advocacy.

21          In other words, it is appropriate for the Government

22   to prepare summary charts.  It's not appropriate for the

23   Government to present charts that do that and advocate at the

24   same time by the way the matter is presented.  I'm not going

25   to look at all of it.  That's your problem.

U.S. v. Manafort

1182

1    MR. DOWNING:  Understood.

2    THE COURT:  So if there's no objection, you need to

3 let me know and counsel for the Government so we can proceed

4 expeditiously.

5    Anything else this morning?

6    MR. ANDRES:  If we could just have our colleagues

7 from the defense side put on the record that they have no

8 objection to venue, that would be -- I think complete that

9 issue.

10    THE COURT:  I'm sorry, I didn't hear you,

11 Mr. Andres?

12    MR. ANDRES:  I just was asking Mr. Downing to

13 confirm that he's not going to object or consent to the venue

14 issue and I think the best way --

15    THE COURT:  All right.  Well, your representation

16 was sufficient for me.

17    MR. DOWNING:  We consent, Your Honor.

18    THE COURT:  Yes.  Okay.  I'm sure he would have

19 popped up if you had said something he didn't agree with.  And

20 if you represented to me that it was done that way, I accept

21 the representation of counsel.

22    All right.  You may bring the jury in, please.

23    (Jury in.)

24    THE COURT:  You may be seated.  Of course I can see

25 all of you are present and prepared to proceed.  For purposes

U.S. v. Manafort

1183

1   of the record, I will have Ms. Pham call the roll by the

2   numbers and we will proceed.

3           THE DEPUTY CLERK:  Ladies and gentlemen, as I call

4   your name, please answer "present" or "here."

5           Juror 0008.

6           THE JUROR:  Present.

7           THE DEPUTY CLERK:  Juror 0037.

8           THE JUROR:  Here.

9           THE DEPUTY CLERK:  Juror 0276.

10          THE JUROR:  Present.

11          THE DEPUTY CLERK:  Juror 0017.

12          THE JUROR:  Present.

13          THE DEPUTY CLERK:  Juror 0145.

14          THE JUROR:  Present.

15          THE DEPUTY CLERK:  Juror 0115.

16          THE JUROR:  Present.

17          THE DEPUTY CLERK:  Juror 0082.

18          THE JUROR:  Present.

19          THE DEPUTY CLERK:  Juror 0009.

20          THE JUROR:  Present.

21          THE DEPUTY CLERK:  Juror 0299.

22          THE JUROR:  Present.

23          THE DEPUTY CLERK:  Juror 0091.

24          THE JUROR:  Present.

25          THE DEPUTY CLERK:  Juror 0302.

U.S. v. Manafort

1184

1       THE JUROR:  Present.

2       THE DEPUTY CLERK:  Juror 0060.

3       THE JUROR:  Present.

4       THE DEPUTY CLERK:  Juror 0296.

5       THE JUROR:  Present.

6       THE DEPUTY CLERK:  Juror 0054.

7       THE JUROR:  Present.

8       THE DEPUTY CLERK:  Juror 0127.

9       THE JUROR:  Present.

10      THE DEPUTY CLERK:  And Juror 0133.

11      THE JUROR:  Present.

12      THE DEPUTY CLERK:  Thank you.

13      THE COURT:  Once again, good morning, ladies and

14  gentlemen.

15      And I can understand your haziness on the number.

16  It brings to mind when I forgot my service number when I was

17  first a young member of the United States Navy.  And that was

18  a painful experience.  And to this day, some 60-some years

19  later, 647251.

20      (Audience laughter.)

21      Now, we'll proceed today.  Let me confirm that all

22  of you were able to adhere to the Court's instructions to

23  refrain from discussing the case with anyone or undertaking

24  any investigation.

25      THE JURORS:  Yes, Your Honor.

R. Gates - Direct

1185

1           THE COURT:  Good.  Thank you.

2           All right.  Let's have Mr. Gates return.  And,

3   Mr. Andres, you may complete your examination, which I think

4   you indicated would be another --

5           MR. ANDRES:  Three to four hours, Judge.

6           THE COURT:  All right.

7           Good morning, sir.  You'll recall you're still under

8   oath, and you may resume the stand.

9           THE WITNESS:  Thank you.

10          (Witness seated.)

11          THE COURT:  All right.  Mr. Andres, you may proceed.

12          MR. ANDRES:  Thank you, Your Honor.

13  (Witness previously sworn 8/6/2018.)

14                       **DIRECT EXAMINATION**

15  BY MR. ANDRES:

16  Q.   Mr. Gates, yesterday you testified about a payment

17  structure from businessmen in Ukraine to Mr. Manafort's shelf

18  companies in the -- in Cyprus.  Do you remember that?

19  A.   Yes.

20  Q.   Okay.  With respect to the structure of those payments,

21  did Mr. Manafort tell you why he was paid through Cypriote

22  entities?

23  A.   Yes.  He indicated that the Ukrainian businessmen wanted

24  to set up Cyprus bank accounts in order to make transfers to

25  Mr. Manafort through entities that he needed to set up in

U.S. v. Manafort

1186

1   Cyprus as well.

2   Q.   During the course of that process, were you involved in

3   obtaining those payments from the Ukrainian businessmen?

4   A.   Yes.

5   Q.   Okay.  And did you learn the names of the Cypriote

6   entities that were controlled by the Ukraine businessmen?

7   A.   Yes.

8   Q.   Are you familiar with the name Bedel Ventures Limited?

9   A.   Yes.

10  Q.   Who controlled Bedel Ventures Limited?

11  A.   It was controlled by a businessman named Mr. Kolesnikov.

12  Q.   And where is he from?

13  A.   I believe he's from Ukraine.

14  Q.   And did he hold a position in the -- in the government in

15  Ukraine?

16  A.   He did.  In the time that they were in power, he held the

17  position of minister of transportation.  That was also a

18  leader in the party.

19  Q.   Are you aware of whether there were payments from Bedel

20  Ventures Limited to Mr. Manafort's Cypriote accounts?

21  A.   There were.

22  Q.   And what were those payments for?

23  A.   It was for political work for political campaigns.

24  Q.   During the course of your work for Mr. Manafort, did you

25  become familiar with an entity named Dresler Holdings Limited?

─────U.S. v. Manafort─────
R. Gates - Direct
1187

1    A.    Yes.

2    Q.    What was Dresler Holdings Limited?

3    A.    Dresler Holdings was an entity held by another Ukrainian

4    businessman, Serhiy Tihipko, who helped finance the lobbying

5    campaign in the United States and the European Union.

6    Q.    And those payments were made to Mr. Manafort?

7    A.    Yes.

8    Q.    Are you familiar with an entity called Firemax

9    Corporation?

10   A.    Yes.

11   Q.    What is Firemax Corporation?

12   A.    Firemax Corporation is an entity, again, that was held by

13   Mr. Kolesnikov.  It was used for political work.

14   Q.    Inlord Sales, LLP, can you tell me what that was?

15   A.    Yes.  That was an entity, again, held by Mr. Kolesnikov

16   for payments regarding political work.

17   Q.    Payments to Mr. Manafort?

18   A.    Yes.

19   Q.    How about Mistaro Ventures Limited?

20   A.    Mistaro Ventures was also Mr. Kolesnikov and, again,

21   payments for political work for Mr. Manafort.

22   Q.    Novirex Sales, LLP, are you familiar with that entity?

23   A.    Yes.

24   Q.    What is?

25   A.    Novirex was held by another businessman named Andriy

1  Klyuyev, and it was a payment for political work.

2  Q.   You said Andriy Klyuyev.

3  A.   Yes.

4  Q.   Was he identified by certain initials on memorandum and

5  otherwise at your company?

6  A.   He was.

7  Q.   What initials?

8  A.   AK.

9  Q.   How about Plymouth Consultants Limited, what was that?

10  A.   Plymouths Consultants Limited was an entity held by

11  Ukrainian businessman named Victor Pinchuk, and that was in

12  relation to a legal project.

13  Q.   How about Sea Chaika Corp., what did you understand that

14  to be?

15  A.   Sea Chaika Corp. was related to a non-Ukrainian

16  businessman, and it was in regards to expenses for a different

17  campaign.

18  Q.   And those payments were made into Mr. Manafort's Cypriote

19  bank accounts?

20  A.   Yes.

21  Q.   How about Taunton Business Limited, what was that?

22  A.   Taunton Business Limited is a company that was held by

23  Serhiy Lovochkin, and it was used for payments for political

24  work and for policy contract later on.

25  Q.   And how is Serhiy Lovochkin referenced in the various

1  memos from DMP International?

2  A.   SL.

3  Q.   How about Telmar Investments Limited?

4  A.   Telmar was also held by Mr. Lovochkin, and it was

5  primarily used for political and policy work.

6  Q.   And who did he make payments to?

7  A.   Mr. Manafort.

8  Q.   Viewpoint Trade, LLP?

9  A.   Viewpoint Trade was a entity by Mr. Kolesnikov, and that

10  was used for political work.

11  Q.   Okay.  You testified about the various bank accounts and

12  entities used for the payments from the Ukrainian businessmen

13  to Mr. Manafort.

14       Was there a process in place to initiate payment?

15  A.   There was.

16  Q.   Did that involve the execution of consultancy agreements?

17  A.   It did.

18  Q.   Did you play a role with respect to the drafting of those

19  consultancy agreements?

20  A.   Yes.

21  Q.   Can you explain what the process was?

22  A.   Yes.  Early on Mr. Manafort would sit with the relevant

23  leaders of the party.  They would craft a budget for the

24  political campaign for any given year.  They would agree to an

25  amount and typically agree to a payment structure.

R. Gates - Direct                                                    1190

1           Once that payment structure was agreed to, I would

2    either be contacted by Mr. Manafort or Mr. Kilimnik to put

3    together a draft agreement, which outlined the terms of the

4    contract.

5           And then what they would typically do is we would be

6    given an amount.  I would put the amount into the contract.

7    Then we would have our Cypriote agent execute that contract,

8    send it back to Mr. Kilimnik, who would handle the contract on

9    the Ukrainian side.

10   Q.  Can I ask you to take a look at Government Exhibit 60 --

11   66F.

12          MR. ANDRES:  Your Honor, the Government moves to

13   admit 66F pursuant to 18 U.S.C. 3505.  They're international

14   business records that have been certified?

15          THE COURT:  Any objection?

16          MR. DOWNING:  No, Your Honor.

17          THE COURT:  Admitted.

18                         (Government's Exhibit No. 66F

19                          admitted into evidence.)

20   BY MR. ANDRES:

21   Q.  Mr. Gates, can I ask you to take a look at Government

22   Exhibit 66F?  Can you tell me, have you seen those documents

23   before?

24   A.  Yes.

25   Q.  Do they include some of the consultancy agreements that

R. Gates - Direct

1    you were referring to?

2    A.    They do.

3    Q.    Do they also include loan agreements?

4    A.    Yes.

5    Q.    Let me start with Government Exhibit 66F at Page 11 at

6    the bottom.

7              MR. ANDRES:  Your Honor, may I publish this exhibit?

8              THE COURT:  You may.

9    BY MR. ANDRES:

10   Q.    Mr. Gates, can you tell me what's contained in Government

11   Exhibit 66F at Page 11?

12   A.    Yes.  This is an example of the consultancy agreement

13   that was a template given to us by our Cypriote attorney.  We

14   would typically fill in the details regarding the agreement

15   and the parties between which the payment was made and then it

16   would also contain the amount of that specific payment that

17   was going to be made.

18   Q.    Okay.  If you look at the agreement, can you tell me what

19   the date of the agreement is?

20   A.    The date of this agreement is 5 June 2012.

21   Q.    And can you identify who the parties are?

22   A.    Parties are Black Sea View Limited and Dresler Holdings

23   Limited.

24   Q.    What was Black Sea View Limited?

25   A.    Black Sea View Limited was an entity held by Mr. Manafort

─────U.S. v. Manafort─────

R. Gates - Direct

1192

1 in Cyprus.

2 Q.   And how about Dresler Holdings Limited?

3 A.   Dresler Holdings Limited was an entity held by Serhiy

4 Tihipko.

5 Q.   Can I ask you to turn to paragraph 4, which is on

6 Page 13?

7         What's contained in paragraph 4 of this consultancy

8 agreement?

9 A.   The amount that was actually paid in the contract.  So

10 this did not represent the total contract value, but just

11 actually how much money was being wired from the Ukrainian

12 businessmen.

13 Q.   Okay.  And how much is listed in this contract?

14 A.   In this contract it's $1.1 million.

15 Q.   Can I ask you to turn to the page at 66F, Page 15?

16         What was that, Mr. Gates?

17 A.   This is another consultancy agreement that was prepared

18 in regards to a payment for a different project.

19 Q.   Okay.  Do you know what project this is for?

20 A.   Since it was Telmar Investments, it was likely either

21 related to the parliamentary election in 2012 or it could have

22 been the policy work that was done as well.

23 Q.   Can you tell us what the date of this agreement is?

24 A.   1 June 2012.

25 Q.   And who are the parties?

U.S. v. Manafort

1    A.    Black Sea View Limited and Telmar Investments Limited.

2    Q.    And you previously testified about Black Sea View

3    Limited.  What's Telmar Investments?

4    A.    Telmar Investments, again, is an entity held by Mr.

5    Lovochkin, a Ukrainian businessmen.

6    Q.    And Mr. Lovochkin is referred to as "SL" throughout the

7    company documents?

8    A.    Yes.

9    Q.    Can you turn to -- at paragraph 4, and tell us what the

10   amount agreed upon for some portion of this contract was?

11   A.    In this particular contract, the fee is for 1 million

12   euros.

13   Q.    Okay.  And does that constitute the full payment of the

14   contract?

15   A.    It does not.

16   Q.    Can you turn to Page 12 of the agreement?  I think

17   it's -- scratch that.  It's at the bottom of Page 21.  66F,

18   Page 21.

19          Do you see the reference there to Chrysostomides &

20   Company?

21   A.    Yes.

22   Q.    What is that?

23   A.    Chrysostomides is the company with the law firm that

24   Mr. Manafort employed to set up the various Cypriote entities

25   and which all Cypriote paperwork went to.

R. Gates - Direct

1    Q.    And is that -- was that firm associated with Dr. K?

2    A.    Yes.

3    Q.    Can I ask you to turn to Page 25?

4          Can you tell me what this is?

5    A.    Again, it's another consultancy agreement for a specific

6    project.

7    Q.    And who is this agreement between?

8    A.    This agreement is between Black Sea View Limited and

9    Dresler Holdings Limited.

10   Q.    And what is Dresler Holdings?

11   A.    Dresler Holdings is an entity that was held by Serhiy

12   Tihipko.

13   Q.    Okay.  And what are his initials?

14   A.    ST.

15   Q.    Can I ask you to turn to Page 37?

16         Do you see that?

17   A.    Yes.

18   Q.    What's -- is there a consultancy agreement included on

19   Page 37?

20   A.    There is.

21   Q.    And who are the entities?

22   A.    Peranova Holdings Limited and Telmar Investments Limited.

23   Q.    And what's the date of the agreement?

24   A.    1 November 2011.

25   Q.    And you previously testified that Telmar related to

R. Gates - Direct

1   Serhiy Lovochkin.

2           What is Peranova Holdings Limited?

3   A.   Peranova Holdings Limited is a company that Mr. Manafort

4   set up in Cyprus.

5   Q.   And did Peranova Holdings Limited receive income from the

6   Ukraine business -- Ukrainian businessmen?

7   A.   It did.

8   Q.   Okay.  That's the same entity that you -- that you

9   represented -- or was that income ever represented as

10  something else to either Ms. Washkuhn or to the tax preparers?

11  A.   It was.

12  Q.   What was it classified as?

13  A.   It was classified as a loan.

14  Q.   Okay.  And who classified it as a loan?

15  A.   Mr. Manafort.

16  Q.   Okay.  Why did he do that?

17  A.   At the time, I believe that he was trying to decrease the

18  amount of taxable income for that particular tax year.

19  Q.   As far as you're aware, was there ever a loan extended

20  from Peranova Holdings?

21  A.   No.

22  Q.   Okay.  And who controlled Peranova Holdings?

23  A.   Mr. Manafort.

24  Q.   And was there consistently income to Peranova Holdings?

25  A.   There was.

1   Q.   And where did that come from?

2   A.   It came from the electoral work that we did in Cyprus.

3   Q.   Can I ask you to turn to Page --

4   A.   Excuse me, in Ukraine.

5   Q.   Can I ask you to turn to Page 64 of Government Exhibit

6   66F?

7        Can you tell me what that is?

8   A.   Another consultancy agreement.

9   Q.   And who's this between?

10  A.   Leviathan Advisors and Telmar Investments.

11  Q.   Okay.  You testified about Telmar.  What's Leviathan

12  Advisors?

13  A.   Leviathan Advisors is another entity that was set up by

14  Mr. Manafort in Cyprus.

15  Q.   Okay.  For what purpose?

16  A.   It was to receive payments.  In this case, it looks like

17  it was related to the policy contract.

18  Q.   And what was the purpose of these payments?

19  A.   The purpose of these payments was for policy work.

20  Q.   Can you turn to Paragraph 4 in the agreement, which is on

21  Page 41?

22        Can you identify for the jury what the terms of this

23  agreement were in terms of payment?

24  A.   Yes.  It was a fee of 3 million euros.

25  Q.   Okay.  Why is this contract in euros and not dollars?

1    A.   At a point in time, the Ukrainian businessmen started

2    using the euro currency as opposed to U.S. dollar currency

3    because, in some instances, it was easier to make payments,

4    and in other instances, the currency exchange rate was better

5    using the euro.

6    Q.   Can I ask you to turn to Page 75?

7         Do you see the signature page for this consultancy

8    agreement?

9    A.   Yes.

10   Q.   Who signed on behalf of the parties?

11   A.   So these are both the Cypriote directors of the companies

12   that represented each of the Cyprus entities.

13   Q.   Do you see a reference at the bottom of the page to

14   "Inter Jura CY"?

15   A.   Yes.

16   Q.   What is that?

17   A.   Inter Jura CY was a subsidiary company of

18   Mr. Chrysostomides.  In Cyprus, you have what they call

19   director companies and they just act as directors for the

20   various companies that are set up.  So in this case, Inter

21   Jura pertained to the Leviathan entity.

22   Q.   And the entities that were set up on behalf of

23   Mr. Manafort, Leviathan, for example, did they sell any

24   products?

25   A.   No.

┌─────────────────────────────────────────────────────────┐
─────────────────────────U.S. v. Manafort─────────────────
R. Gates - Direct                                      1198

1   Q.   Did they have any employees?

2   A.   No.

3   Q.   What was the purpose of those entities?

4   A.   The purpose of the entities was to accept payments and

5   make payments in and out of the companies.

6   Q.   Can I ask you to turn to Government Exhibit 66B?

7           MR. ANDRES:  Your Honor, the Government admits 66B

8   also pursuant to 18 U.S.C. 3505 international bank records

9   that have been certified.

10          MR. DOWNING:  No objection.

11          THE COURT:  Admitted.

12                      (Government's Exhibit No. 66B

13                      admitted into evidence.)

14  BY MR. ANDRES:

15  Q.   With respect to Government Exhibit 66B, Mr. Gates, can

16  you turn to Page -- at the bottom, it says Page 006?

17          MR. ANDRES:  May I publish that, Your Honor?

18          THE COURT:  Yes.

19  BY MR. ANDRES:

20  Q.   Can you tell me what that is, Mr. Gates?

21  A.   This is a -- again, a consultancy agreement between DMP

22  International and Telmar Investments Limited.

23  Q.   Okay.  And these agreements identified DMP International

24  directly?

25  A.   Yes.

─────────────── U.S. v. Manafort ───────────────
R. Gates - Direct
1199

1  Q.   And why have these changed that there's no reference to

2  the Cypriote entity?

3  A.   At a point in time, Mr. Manafort had worked with a

4  specific bank, and because of the difficulty in many cases of

5  getting payments from Cyprus to the United States, he

6  approached the bank directly and outlined for them the type of

7  work that he did.  As a result, they were willing to take on

8  the risk, if you will, of accepting payments from Cyprus.  So

9  then we were able to get the payments directly from the

10 Ukrainian businessmen into the business account in the United

11 States?

12         MR. DOWNING:  Your Honor, can I have a moment just

13 to ask a question of the Government?

14         (A pause in the proceedings.)

15         THE COURT:  Mr. Downing, I didn't quite hear you.

16         MR. DOWNING:  I'm sorry.  I just wanted to confer

17 with Government as to where we were in the exhibit.  Thank

18 you.

19         THE COURT:  All right.  You've done so.  Proceed.

20 BY MR. ANDRES:

21 Q.   And can you turn to Paragraph 4 of this document?

22         And can you identify what the terms of this document

23 were?

24 A.   Yes, this is for a payment of $1 million.

25 Q.   Okay.  And do you -- do you remember which project this

1  document -- this contract relates to?

2  A.   Yes, this would be in relation to a new political project

3  that Mr. Manafort began working on called the Opposition BLOC.

4  Q.   Okay.  At the point that the Opposition BLOC began, was

5  President Yanukovych, was he still in power?

6  A.   He was not.

7  Q.   And what had happened to the Party of Regions?

8  A.   The Party of Regions had dissolved for the most part.

9  Q.   Okay.  And with respect to this document -- let me show

10 you first, there's another one at Page 019 -- yeah, I'm

11 sorry -- yeah, 019.

12       Can you tell me what that is?

13 A.   Yes.  This is a consultancy agreement between DMP

14 International and Telmar Investments.

15 Q.   Okay.  And what does this project relate to?

16 A.   Again, this is related to the Opposition BLOC political

17 work.

18 Q.   Okay.  If you look at the last page of that contract,

19 031, you testified that the contract is in the name of DMP.

20 Who signs for DMP?

21 A.   In this case, because the transfer was occurring from

22 Cyprus, we had our Cypriote director sign it.

23 Q.   So even though the agreement is between DMP and Telmar,

24 the payment still goes to Cyprus?

25 A.   No, the payment went directly to DMP.

U.S. v. Manafort

1   Q.   Okay.  And so why is Inter Jura signing on behalf of DMP?

2   A.   I have -- I don't know.

3   Q.   Okay.  But Inter Jura, who controls that entity?

4   A.   Inter Jura is controlled by Chrysostomides and company.

5   Q.   Okay.  I've shown you a series of consultancy agreements.

6   Is it fair to say there are more of these or these are

7   examples of the types of documents you used to get payment?

8   A.   Yes, they are.

9   Q.   Okay.  Let me ask you to turn back to Government Exhibit

10  66F and look at the first page.

11       Can you tell me what that is?

12  A.   Yes, this is a loan agreement that was constructed in

13  regards to the financial transfer between the two entities in

14  Cyprus.

15  Q.   Okay.  And what was the purpose of this loan document?

16  A.   So in Cyprus you also had to file what were called

17  audits.  And in order to ensure that all transactions were

18  recorded, there needed to be some sort of agreements between

19  the various entities that received payments and had outgoing

20  payments.  So it was, in essence, a way to make sure that

21  every financial transaction in Cyprus was tracked.

22  Q.   So as part of this Cyprus audit, did you track all of the

23  payments from the Ukraine businessmen to Mr. Manafort?

24  A.   Our law firm did, yes.

25  Q.   Okay.  And were you involved in that process?

R. Gates - Direct

1202

1    A.    Yes.

2    Q.    And was Mr. Manafort?

3    A.    He was aware of the process.  He wasn't involved from a

4    day-to-day basis.

5    Q.    Okay.  And in terms of those loan agreements, were there

6    actually loans between the Ukrainian businesses and the --

7    Mr. Manafort's Cypriote account?

8    A.    In Cyprus, they were documented as loans.  In reality, it

9    was basically money moving among the accounts.

10   Q.    Okay.  And for the --

11            THE COURT:  By that, do you mean they were

12   compensation?

13            THE WITNESS:  Yeah, so --

14            THE COURT:  For work done?

15            THE WITNESS:  Yes, correct, Your Honor.

16            THE COURT:  Compensation for work done.

17            THE WITNESS:  Yes.

18            THE COURT:  By the Manafort group.

19            THE WITNESS:  Yes.

20            THE COURT:  Next question.

21   BY MR. ANDRES:

22   Q.    Were you involved -- were those documents, were they

23   dated correctly, the loan agreements?

24   A.    They were -- the dates of the agreements are based on the

25   dates of the transactions.

U.S. v. Manafort

R. Gates - Direct

1203

1  Q.    Okay.

2  A.    But these -- a lot of the loan agreements are backdated

3  simply because in Cyprus, you have the ability to file your

4  audits two years after the calendar year in which the work was

5  done.  So they give you a little bit of time.

6  Q.    You testified earlier about payments from Ukrainian

7  businessmen to Mr. Manafort.  Did that include payments for

8  policy work?

9  A.    It did.

10  Q.    Okay.  What type of policy work did Mr. Manafort do in

11  the Ukraine?

12  A.    When Viktor Yanukovych was elected president and the

13  Party of Regions took control, Mr. Manafort entered into a

14  policy contract.  And we describe it as policy advisory in the

15  sense of once Mr. Yanukovych was elected, he was elected on a

16  platform of issues.  So Mr. Manafort worked with the local

17  political officials there to help implement those policy

18  initiatives based on those campaign promises.

19  Q.    And was there an agreement for a two-year policy contract

20  or payments over a two-year period of time?

21  A.    Well, it was -- it started out as potentially once the

22  president was elected, it was on an annual basis.  But the

23  belief was, is that it would be for the duration of the

24  president's tenure.

25  Q.    And in terms of the two years, at least, what were --

U.S. v. Manafort

R. Gates - Direct

1204

1   what were the terms or the payments?  What was the total

2   amount and what were the installment payments?

3   A.   Uh-huh.  So the total amount was $4 million a year.  And

4   I think one year, it was actually changed again from a

5   denomination point of view to 4 million euros, and then the

6   payments were broken up into $1 million quarterly payments.

7   Q.   Can I ask you to turn to Government Exhibit 359?

8            Can you tell me what that is when you get there?

9   Excuse me.

10  A.   Yes.  This is a memo that I prepared for Mr. Manafort in

11  regards to the payments that were outstanding and the payments

12  that had been made related to the policy contract work in

13  2011.

14  Q.   Let me just stop you there.

15           MR. ANDRES:  Your Honor, the Government moves to

16  admit Government Exhibit 359.  Oh, it's in evidence already,

17  Judge.  I'm sorry.  Excuse me.  May I publish it?

18           THE COURT:  Yes, you may.

19  BY MR. ANDRES:

20  Q.   Can we start with the top, Mr. Gates?

21           Can you explain who the document is to, from, the

22  subject, and the date?

23  A.   Yes.  The document is to SL and YN from Mr. Manafort.

24  The subject is consulting payments.  The date is October 11,

25  2011.

1  Q.   You've testified previously about SL.  How about YN, who

2  is that?

3  A.   YN was Mr. Lovochkin's sister.  Her name was Yulia (ph).

4  Q.   Do you know what her last name was?

5  A.   Nemovskiy (ph), I think, Nemovskiy.

6  Q.   Okay.  And who's the -- who's the memorandum from?

7  A.   Mr. Manafort.

8  Q.   And the subject is consulting payments.  What does that

9  refer to?

10  A.   This refers to the policy contract work that Mr. Manafort

11  had at this time.

12  Q.   Can you read the first paragraph and explain it to the

13  jury?

14  A.   (As read):  "This document outlines the total fees owed

15  and the fees that have been paid in relation to the consulting

16  agreement between Telmar Investments and Leviathan Advisors

17  for March 2011 to 2012."

18  Q.   And what does that mean that the fees that have been paid

19  from Telmar to Leviathan?

20  A.   Again, Telmar is an entity that was held by Mr. Lovochkin

21  who was paying the policy contract.  So the terms, again, were

22  the four million, in this case, euros a year.  And if you look

23  at the document, you can see it's broken down by quarter.  So

24  it tracks the actual quarterly payment made.

25  Q.   And once the money gets to Leviathan, do you know what

R. Gates - Direct

1206

1 Mr. Manafort does with it then?

2 A.   I don't.  I mean, he moved money from Leviathan in some

3 case to the United States.  In some cases, he left it in

4 Leviathan.

5 Q.   With respect to the Leviathan account in Cyprus, did you

6 ever report that to Heather Washkuhn, Mr. Manafort's

7 bookkeeper?

8 A.   No.

9 Q.   Did you ever report it to any of his tax preparers at

10 KWC?

11 A.   No.

12 Q.   There's a chart on the memo in Government Exhibit 359.

13        Can you explain what that is?

14        MR. ANDRES:  Your Honor, is that me with the

15 feedback?

16        THE WITNESS:  The chart indicates, again, the --

17 both the expenses and the quarterly payments that have both

18 been made and the outstanding balance that is still due.

19 BY MR. ANDRES:

20 Q.   And at the bottom where it says, "total contract," what

21 does that refer to?

22 A.   That's the total contract value for that year included in

23 the expenses.

24 Q.   And in what denomination is that listed?

25 A.   This contract is in euros.

1   Q.   Okay.  For the last -- can you just read the last line of

2   the memorandum?

3   A.   "I am requesting that this outstanding balance be paid as

4   soon as possible."

5   Q.   And what did you understand that to mean?

6   A.   That Mr. Manafort was looking for the remaining balance

7   that was due on the contract.

8   Q.   With respect to the policy work that Mr. Manafort is

9   being paid for in Government Exhibit 359, did you write memos

10  on behalf of Mr. Manafort to outline that work?

11  A.   Yes, in some cases, I did as well as the staff in

12  Ukraine.

13  Q.   Okay.  And who did those memos go to, for example?

14  A.   They would typically go to various members of the party

15  leadership, including Mr. Lovochkin, who, at this time, was

16  the chief of staff to the president, and in some cases, to the

17  president himself.

18  Q.   Can I ask you to turn to Government Exhibit 350?

19         Can you tell me what that is?

20  A.   This is a memo that was drafted by our two lobbying firms

21  that were hired in the United States, and they put together a

22  memo that went from Mr. Manafort to the president of the

23  Ukraine to describe the activity.

24  Q.   And what were those lobbying firms?

25  A.   It was Mercury Public Affairs and the Podesta Group.

R. Gates - Direct

1  Q.   And this is part of the work that you were doing for the

2  overall policy project?

3  A.   It was labeled as a different project called Engage

4  Ukraine, but it was related to policy, yes.

5  Q.   Okay.  And in terms of the payment for Mr. Manafort,

6  those were the payments that we just saw in the prior exhibit

7  from Serhiy Lovochkin?

8  A.   Some of those payments were, but there was a separate

9  payment specifically for the lobbying work from Mr. Tihipko.

10 Q.   I'm referring to the payments to Mr. Manafort, not the

11 payments that were --

12 A.   Oh, yes.

13 Q.   Okay.

14 A.   Payments to Mr. Manafort, correct.

15 Q.   And then just in terms -- you mentioned Engage Ukraine.

16 What was that?

17 A.   Engage Ukraine became the strategy for helping Ukraine

18 enter into the European Union, and as a result, a public

19 affairs effort was put together both in the EU and the U.S.

20 for that work.

21 Q.   Was there also a project referred to as the Hapsburg

22 Project?

23 A.   Yes.

24      MR. ANDRES:  Your Honor, the Government moves to

25 admit Government Exhibit 350.

U.S. v. Manafort

R. Gates - Direct

1209

1   MR. DOWNING:  No objection.

2   THE COURT:  Admitted.

3                   (Government's Exhibit No. 350

4                   admitted into evidence.)

5   MR. ANDRES:  May I publish it?

6   THE COURT:  Yes.

7  MR. DOWNING:

8  Q.   All right.  Zoom in on the top.

9       Just with respect to Government Exhibit 350 that you

10 testified about, can you identify the heading of the memo?

11 A.   Yes, it was to the president, Mr. Yanukovych, from

12 Mr. Manafort.

13 Q.   Okay.  And there's a reference to U.S. consultants

14 quarterly report.  What does that refer to?

15 A.   This refers to the report that was drafted by the two

16 U.S. consulting firms identified.

17 Q.   Okay.  I was asking you whether you were familiar with a

18 project called the Hapsburg Project.  What was that?

19 A.   The Hapsburg Project was a separate initiative that was

20 kind of tied into the overall effort to have Ukraine align

21 with the European Union.

22      The Hapsburg Group used former European politicians

23 to help interface with European politicians to work on that

24 effort.

25 Q.   Was there also work that you did together with

R. Gates - Direct

1   Mr. Manafort that involved hiring of an international law

2   firm?

3   A.   Yes.

4   Q.   Okay.  What law firm was that?

5   A.   Skadden Arps.

6   Q.   And work did that relate to?

7   A.   Skadden Arps related to a independent legal report that

8   was done in conjunction with a former political official that

9   had a trial in Ukraine.

10  Q.   You testified that, at some point, Mr. Manafort's work

11  for President Yanukovych and the Party of Regions came to an

12  end?

13  A.   It did.

14  Q.   Approximately, when was that?

15  A.   The last project we did for the Party of Regions was at

16  the beginning of 2014, and then we picked up with another

17  political project that also went to the end of 2014 in

18  October.

19  Q.   With respect to the time frame when President Yanukovych

20  lost power, what effect, if any, did that have on

21  Mr. Manafort's income stream?

22  A.   I would say that it decreased the income stream.

23  Q.   How?

24  A.   Because there was a change in the -- in the power

25  structure and a new political party needed to be created,

U.S. v. Manafort

1   which meant that we had to go through and work to build a new

2   contract.

3   Q.   Did you work with the Opposition BLOC?

4   A.   I did.

5   Q.   And did the Opposition BLOC ever come to power within

6   Ukraine?

7   A.   It didn't come to power.  It won seats in Parliament.

8   Q.   Okay.  As a result of work that you and Mr. Manafort did

9   for the Opposition BLOC?

10  A.   Yes.

11  Q.   As a result of it being the minority party, were you able

12  to do additional work for Opposition BLOC?

13  A.   The hope was to do additional work for the Opposition

14  BLOC, but because most of the Opposition BLOC or a good

15  portion of it had been aligned with the Party of Regions, they

16  were, in essence, out of power.  So the income streams were

17  more difficult to come by.

18  Q.   Okay.  And did you continue to obtain additional work for

19  Mr. Manafort or obtain additional work for the Opposition

20  BLOC?

21  A.   No.

22  Q.   At some point, in addition to working for the Opposition

23  BLOC, did you also work on local elections?

24  A.   We worked on local elections in the prior year.

25  Q.   Okay.  And what election did that relate to?

─────────── U.S. v. Manafort ───────────

1   A.   That related to the -- well, there was the presidential

2   election in 2014 that Mr. Manafort worked on very briefly.

3   And then the parliamentary election in 2014, which was at the

4   end of the year.

5   Q.   Okay.  For the presidential election, who did

6   Mr. Manafort work for?

7   A.   He was assisting the current president, Mr. Poroshenko.

8   Q.   And was he paid for that work?

9   A.   I don't believe he was.

10  Q.   Was that work substantial with -- did he have the same

11  position with respect to that campaign that he had for

12  president --

13  A.   No, he did not.

14  Q.   At some point did your work in the Ukraine come to an

15  end?

16  A.   Yes.

17  Q.   Approximately, when was that?

18  A.   The last election we worked on was the parliamentary

19  election of 2014.  And there was no other political campaign

20  work after that time.

21  Q.   And with respect to that work for the Opposition BLOC,

22  was Mr. Manafort paid in full?

23  A.   He was not.

24  Q.   Was he paid -- was part of his bill paid?

25  A.   Yes, I believe part of the bill was paid.

1    Q.   If you can turn to Government Exhibit 352.  Can you tell

2    me what that is?

3    A.   Yes.  This is a memo that Mr. Manafort drafted to the

4    leadership of the Opposition BLOC party following the

5    parliamentary election in 2014.

6            MR. ANDRES:  Your Honor, the Government moves to

7    admit Government Exhibit 352.

8            MR. DOWNING:  No objection.

9            THE COURT:  It's admitted.

10                        (Government's Exhibit No. 352

11                         admitted into evidence.)

12           MR. ANDRES:  May I publish it?

13           THE COURT:  You may.

14   BY MR. ANDRES:

15   Q.   With respect to the cover e-mail, can you explain what

16   that is?

17   A.   Yes.  It's an e-mail from Mr. Manafort to Mr. Kilimnik

18   and myself indicating that he has attached the final version

19   of the memo, which outlines the priorities of the Opposition

20   BLOC strategy moving forward.

21   Q.   And this is the work you were describing that was sort of

22   the last work you were doing in the Ukraine?

23   A.   Yes.  The hope was that this effort would lead to an

24   additional contract.

25   Q.   Mr. Manafort writes, "Your opinions on when we should

R. Gates - Direct

1   circulate the memo, the options are next week for when I

2   arrive in Kyiv on approximately November 10th."

3          Did you have an understanding from this e-mail where

4   Mr. Manafort was when he wrote it?

5   A.   I do not.

6   Q.   Okay.  Is it fair to understand it wasn't in Kyiv?

7   A.   Correct.

8   Q.   And was Mr. Manafort often able to manage his work in

9   Kyiv when he wasn't there?

10  A.   Yes.

11  Q.   And did you -- when you were not in Kyiv, were you able

12  to communicate with people there?

13  A.   Yes.

14  Q.   With respect to the memo that's attached to Government

15  Exhibit 352, can I just ask you to look at the top of that

16  memo?

17          And identify who it's to, who's CC'd, and who it's

18  from.

19  A.   Yes.  It's to Mr. Levochkin and Mr. Akhmetov who are

20  pretty much leading the new Opposition BLOC that's been

21  formed.  And CC'd OB leadership, included a series of other

22  Ukrainian businessmen that were part of the Opposition BLOC

23  party.

24  Q.   What role did Serhiy Lovochkin or what role did SL and RA

25  play with respect to the Opposition BLOC?

1    A.    They were principally the financiers of the new political

2    party.

3    Q.    You testified earlier that Mr. Manafort had difficulty

4    receiving payment for his work for the Opposition BLOC.  Can

5    you explain what efforts were made to obtain that payment?

6    A.    Yes.  There were a series of memos that Mr. Manafort had

7    sent to Mr. Kilimnik to translate and deliver.  In addition,

8    Mr. Manafort used Mr. Kilimnik to work with the Opposition

9    BLOC leadership to secure the payments.

10   Q.    And earlier you had testified about a process involving

11   consultancy agreements to initiate payment from the Ukraine

12   businessmen.  Did you follow that same procedure here?

13   A.    We did when the payments were made, yes.

14   Q.    Okay.  And with respect to that process to obtain the

15   payments from the Opposition BLOC, what role, if any, did you

16   play?

17   A.    Again, once Mr. Kilimnik or Mr. Manafort confirmed that a

18   payment was going to be made, I worked with the Cypriote law

19   firm to draft the consultancy agreement and then returned it

20   to Ukraine for execution.

21   Q.    Can I ask you to turn to Government's Exhibit 364?

22         Do you recognize that?

23   A.    Yes.

24   Q.    Are you listed on that e-mail?

25   A.    I am.

U.S. v. Manafort

R. Gates - Direct

1216

1   Q.   And is there attached documents?

2   A.   There is.

3   Q.   Were you involved in preparing those?

4   A.   Yes.

5   Q.   And did these documents in the e-mail relate to the

6   efforts to obtain payment from the Opposition BLOC?

7   A.   They did.

8            MR. ANDRES:  The Government moves to admit 364, Your

9   Honor.

10           MR. DOWNING:  No objection.

11           THE COURT:  Admitted.

12                     (Government's Exhibit No. 364

13                      admitted into evidence.)

14           MR. ANDRES:  May I publish it?

15           THE COURT:  You may.

16  BY MR. ANDRES:

17  Q.   Starting with the top e-mail in Government Exhibit 364,

18  can you identify who it's "to" and "from" and the date?

19  A.   It's to me from Mr. Kilimnik, and it's dated August 25,

20  2015.

21  Q.   Okay.  How about the subject?

22  A.   Subject is "Contract for 1."

23  Q.   Okay.  Starting with the e-mail all the way at the

24  bottom, there's an e-mail from Mr. Kilimnik at 11:07 a.m.  Can

25  you explain or summarize that e-mail?

1  A.   Yes.  Mr. Manafort and Mr. Kilimnik had been in contact

2  regarding the payment that Mr. Manafort was seeking from the

3  Opposition BLOC.  Mr. Kilimnik asked me to send the initial

4  pro forma documents, including the details that he had given

5  me to execute the payment.

6  Q.   There's a reference at the bottom that says, "This is to

7  calm Paul down."

8       What did you understand that to mean?

9  A.   The payment was well overdue.  The campaign occurred in

10  October of 2014.  So payment was significantly, you know,

11  overdue and Mr. Manafort was quite upset that the money had

12  not been sent.  So Mr. Kilimnik wanted to start the paperwork

13  process in order to, you know, create the -- create the

14  scenario that we were making the effort to get the payment.

15  Q.   And what was Mr. Manafort's financial situation in July

16  of 2015?

17  A.   It was, I'd say, substantially decreased in terms of the

18  amount of income he had received from prior years.

19  Q.   Was he having issues paying his bills?

20  A.   He was.

21  Q.   And at this time in July of 2015, did Mr. Manafort have

22  any work in the Ukraine?

23  A.   No, not in the Ukraine.

24  Q.   Did DMP International have any clients?

25  A.   No.

──U.S. v. Manafort──

1   Q.   If you turn to the top portion of the e-mail there's a

2   reference that says, "I have no idea where this amount come

3   from, but this is SL's people's request anyway."

4           Can you explain that?

5   A.   Yes.  So, originally, Mr. Levochkin was going to send a

6   million per the agreement he and Mr. Manafort had entered

7   into.

8           Mr. Kilimnik then responded that the payment, in

9   essence, had been decreased and that they were going to be

10  sending a payment of 500,000 instead.

11  Q.   Okay.  Can you look at the attachment of Government

12  Exhibit 364?  Can you tell me what that is?

13  A.   Again, this is the pro forma contract which identifies

14  DMP International and Telmar Investments Limited, which was

15  Mr. Levochkin's entity.

16  Q.   And why you were attaching this to -- did you draft this?

17  A.   Yeah.  The Cypriote attorneys drafted the template.  I

18  entered the information in terms of the individual parties.

19  Q.   And the Telmar Investments, who controlled Telmar

20  Investments?

21  A.   Mr. Levochkin.

22  Q.   And if you look back at the e-mail, that's the reference

23  to "SL"?

24  A.   It is.

25  Q.   And do you know as of the time that you left DMP

1    International whether or not this contract was ever paid in

2    full?

3    A.    To my understanding, it was not paid in full.

4    Q.    You can take that down.

5          When you first began working for Mr. Manafort, did

6    you understand that he had Cypriote accounts?

7    A.    Yes.

8    Q.    And do you know who set those accounts up?

9    A.    I believe it was Mr. Manafort with the Cypriote attorney.

10   Q.    Okay.  And who is the Cypriote -- Cypriote -- Cypriotic

11   attorney?

12   A.    Kypros Chrysostomides.

13   Q.    Okay.  For efficiency --

14   A.    Dr. K.

15   Q.    -- did he have a nickname?

16   A.    Dr. K.

17   Q.    Okay.  Did there come a time when you met, yourself,

18   Dr. K?

19   A.    There was.

20   Q.    When?

21   A.    I met with Dr. K in 2007 with Mr. Manafort.

22   Q.    And where was -- where did that meeting take place?

23   A.    It occurred in Cyprus.

24   Q.    And why were you meeting with Dr. K?

25   A.    We were meeting with him for two purposes.  Mr. Manafort

R. Gates - Direct

1220

1    had just met with our investor for the private equity fund and

2    the investor wanted to have Mr. Manafort meet with him to

3    engage in potential political project, and then also to have

4    him coordinate some of the activity on our private equity

5    fund.

6    Q.   Did you also meet with Dr. K about opening bank accounts

7    and entities in Cyprus?

8    A.   We did.

9    Q.   Okay.  Did Dr. K explain to you the process involved with

10   opening up the shelf companies?

11   A.   He did.

12   Q.   What did he say to you?

13            THE COURT:  Isn't that hearsay?  If there's no

14   objection, I'll permit it.  But we ought to avoid just

15   importing hearsay, putting to one side whether it's relevant.

16            MR. DOWNING:  Objection, Your Honor, hearsay.

17            THE COURT:  You're a little late.

18            (Audience laughter.)

19            THE COURT:  Mr. Andres, do you really need it?

20            MR. ANDRES:  No, Your Honor.  I can work around it.

21            THE COURT:  Thank you.

22   BY MR. ANDRES:

23   Q.   Based on your meetings with Dr. K, did you come to

24   understand the process for opening the entities in Cyprus?

25   A.   Yes.

1   Q.   And did you understand that there were some level of

2   secrecy involved?

3   A.   Yes.

4   Q.   Okay.  Can you explain what you understood -- and at

5   these meetings with Dr. K, was Mr. Manafort there?

6   A.   He was.

7   Q.   Can you explain what you understood the process for

8   setting up these shelf companies?

9   A.   Yes.  When you set up a shelf company in Cyprus, the

10   individual that was setting it up wasn't necessarily on any of

11   the paper work.  You had two directors, which were usually

12   within the law firm that was setting up the entities, and then

13   above that you had what they call two board members.  So, in

14   essence, you had four people controlling a Cypriote entity,

15   but the actual individual setting up the company name did not

16   appear on any of the incorporation material.

17   Q.   With respect to the companies that were ultimately set

18   up, do you know who was listed as the directors, secretaries,

19   board members?

20   A.   Yes.  The directors and board members were members

21   generally of Mr. -- Dr. K's firm.

22   Q.   So with respect to the Cypriote entities that were set up

23   for Mr. Manafort, did his name appear on any of those

24   documents?

25   A.   No.

U.S. v. Manafort

R. Gates - Direct

1222

1   Q.   Did you come to understand, based on your meeting with

2   Dr. K and Mr. Manafort, what the process was for setting up

3   bank accounts in Cyprus?

4   A.   Yes.  Dr. K explained that to us as well.

5   Q.   Can you describe that for the jury?

6   A.   The law firm handled everything with respect to opening

7   the accounts.  Initially in the earlier years they designated

8   a point of contact with the bank, but neither Mr. Manafort nor

9   myself had any interaction with the bank.  Later on that point

10  of contact came to be known what was an ultimate beneficial

11  owner.  And none of the information on the banking forms was

12  publicly disclosed in any way.

13  Q.   Was that an issue that was discussed in detail?

14  A.   Yes, by Dr. K.

15  Q.   And was that important to Mr. Manafort to understand how

16  his name would be represented on those documents?

17  A.   I believe he understood that his name would not be

18  represented, nor was mine.

19  Q.   Okay.  You testified about a variety of different names,

20  Peranova, Leviathan, Global Endeavor.  How were those names

21  picked?

22  A.   So, again, with the exception of a few of the entities,

23  all of those entities' names were selected by Dr. K's law firm

24  as shelf companies.

25  Q.   And with respect to all of the Cypriote entities that

1  Dr. K set up, did those companies -- did they exist for some

2  purpose or did they sell any product or provide any services?

3  A.   No, but it was very common for them to set up.

4  Q.   And what was --

5  A.   To conduct various work.

6  Q.   What was the sole purpose of those companies?

7  A.   In terms of setting them up in general or with respect to

8  Mr. Manafort?

9  Q.   Just in terms of what they -- in setting them up for

10  Mr. Manafort, what function did those companies play?

11  A.   Oh, they serve to play the role of accepting the money

12  from the Ukrainian businessmen for the political contracts and

13  then for Mr. Manafort to, you know, determine what would be

14  done with that money.

15  Q.   And in terms of the bank accounts, were they set up in

16  different denominations?

17  A.   They were.

18  Q.   What denominations?

19  A.   Primarily U.S. dollars and euros.

20  Q.   Okay.  And do you know what banks in Cyprus those

21  entities were set up at?

22  A.   As I recall, there aren't many banks in Cyprus, but it

23  was the Bank of Cyprus, Laiki Bank, and I think Marfin Popular

24  Bank.

25  Q.   And the money that was -- that was deposited in those

U.S. v. Manafort

R. Gates - Direct

1224

1    accounts for Mr. Manafort, was that income?

2    A.    It was.

3    Q.    And how did he earn it?

4    A.    Through political campaign work in Ukraine.

5    Q.    You testified earlier about on one of the contracts there

6    was a reference to Inter Jura.  What was Inter Jura?

7    A.    An Inter Jura was a subsidiary company of Dr. K's that

8    represented the directors of the Cypriote entities that were

9    assigned to the companies that anybody set up.

10   Q.    You testified that Mr. Manafort's name was not on the

11   entity in corporation documents but that it was on some of the

12   Cypriote bank accounts.  At some point did he ask that his

13   name be removed from those?

14   A.    He did.

15   Q.    Do you know why?

16   A.    Yes.  Mr. Manafort described to me that he was engaged in

17   a lawsuit with somebody from the Ukraine and there was concern

18   that the individual might be able to find some of the

19   information on Mr. Manafort and, specifically, who some of the

20   other Ukrainian businessmen that paid some of those contracts

21   might be.

22   Q.    Did you -- was his name removed?

23   A.    It was.

24   Q.    And did you ask to have your name removed?

25   A.    No, not in all cases.

R. Gates - Direct

1225

1    Q.   At some point did you have your name removed?

2    A.   Yes.

3    Q.   Why did you want your name removed from the accounts?

4    A.   Well, at that time the number of accounts in Ukraine had

5    diminished in 2012 because of the banking collapse.  So it was

6    kind of a good time to make sure that most of the entities

7    were closed and our names were removed.

8    Q.   Okay.  And when there was a banking issue in Cyprus, were

9    the overseas accounts moved to another country?

10   A.   They were.

11   Q.   Where?

12   A.   They were moved to the Grenadines.

13   Q.   Is that the same country referred to as St. Vincent in

14   the Grenadines?

15   A.   It is, yes.

16   Q.   Do you know where that is?

17   A.   Somewhere in the Caribbean.

18   Q.   Okay.  And who -- who facilitated the movement of the

19   Cypriote accounts to St. Vincent in the Grenadines?

20   A.   Dr. K.

21   Q.   How was he able to do that?

22   A.   They have a relationship, apparently, between Cyprus and

23   the Grenadines, and so he was able to both open the entities,

24   which were actually designated in Cyprus, and then the actual

25   bank accounts as well.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA

R. Gates - Direct

1   Q.   And was the money moved to -- from the Cyprus accounts to

2   St. Vincent in the Grenadines?

3   A.   Yes.

4   Q.   Okay.  And when the accounts were opened there, do you

5   know the names of those accounts?

6   A.   Yes.  It was a very limited number.  There were only two

7   accounts, as I recall.

8   Q.   What were the names?

9   A.   Global Endeavor and Jeunet.

10  Q.   Do you know what bank or banks they were opened at?

11  A.   The name of the bank was Loyal Bank.

12  Q.   And whose name was the -- the St. Vincent in Grenadines

13  accounts opened in?

14  A.   At that time I believe we designated Mr. Kilimnik as the

15  point of contact for those.

16  Q.   Okay.  Is Mr. Kilimnik -- is he a U.S. citizen?

17  A.   He is not.

18  Q.   Were you able to move money from the Cypriote accounts

19  when they were in Cyprus?

20  A.   Yes.

21  Q.   And what was the process for moving money from the Cyprus

22  accounts to the United States or elsewhere?

23  A.   So, generally, it was all done again by the law firm.

24  The typical practice was that Mr. Manafort would send me a

25  list of wire requests or he would send the wires directly to a

R. Gates - Direct

1    point of contact that we had at Dr. K's firm.  That contact

2    then coordinated with the bank to make the wire distributions.

3    Q.   Okay.  And do you know who the people were that you

4    contacted at Dr. K's law firm?

5    A.   I know the primary person that we used, yes.

6    Q.   Who was that?

7    A.   Her name was Christina.

8    Q.   And would you receive directions from Mr. Manafort about

9    how to move money between the different accounts?

10   A.   Yes.

11   Q.   Would you receive instruction from Mr. Manafort about

12   directing payments from Cyprus to vendors in the United

13   States?

14   A.   Yes.

15   Q.   How would that happen?

16   A.   Mr. Manafort would prepare an e-mail.  There was a

17   template that the law firm had given him to use.  It was very

18   minimal information at that time.  And Mr. Manafort would put

19   in the name of the vendors that he wanted paid, the amount,

20   and then he would send that either again directly to the bank

21   in some cases or he would send it to me to send over to the

22   bank.

23   Q.   Can I ask you to take a look at Government Exhibit 370?

24        Have you had a chance to review that?

25   A.   Yes.

─────────── U.S. v. Manafort ───────────

1   Q.   Government Exhibit 370, is that an e-mail chain involving

2   you and Mr. Manafort?

3   A.   It is.

4   Q.   And does it involve the transfer of funds from Cypriote

5   accounts?

6   A.   It does.

7           MR. ANDRES:  The Government moves to admit

8   Government Exhibit 370, Your Honor.

9           MR. DOWNING:  No objection.

10          THE COURT:  Admitted.

11                      (Government's Exhibit No. 370

12                      admitted into evidence.)

13          MR. ANDRES:  May I publish it?

14          THE COURT:  Yes.

15  BY MR. ANDRES:

16  Q.   Starting with the top e-mail, Mr. Gates, can you tell me

17  who the e-mail is to and from?

18  A.   It's from Mr. Manafort to me.

19  Q.   Okay.  And what's the date?

20  A.   The date is November 29, 2011.

21  Q.   And what's the subject?

22  A.   Subject is "Payments."

23  Q.   Okay.  Can you start at the bottom e-mail at 22:38:24 and

24  describe to the jury what's -- what you're communicating to

25  Mr. Manafort there?

R. Gates - Direct

1229

1    A.   Yes.

2              (As read):  I write, "Mr. Manafort, for your review

3    and approval.  Let me know if you have any questions.  And

4    then I will transfer the money from the Leviathan account to

5    DMP International unless you direct otherwise."

6    Q.   It says, "Levi," L-e-v-i.  What's that a reference to?

7    A.   Levi is the abbreviation for Leviathan.

8    Q.   Okay.  And did Mr. Manafort explicitly approve that

9    payment?

10   A.   He did.

11   Q.   What did he say?

12   A.   "Yes, this is approved."

13   Q.   Okay.  And then there's a reference in the e-mail to

14   transferring money to P for the loan earlier this month.

15             What's the P reference?

16   A.   Yes.  So the reference to that is at some point we moved

17   money from Peranova to Leviathan and we were returning the

18   money, because, again, even within Mr. Manafort's Cyprus

19   entities, you could move money from one entity to the other,

20   but at the end of the day, it was going to be part of the

21   audit.  So it was just an exercise of moving the money back so

22   that we could account where it came from.

23   Q.   Okay.  Is this e-mail typical of communications between

24   you and Mr. Manafort with respect to the Cypriote accounts?

25   A.   Yes.  There were hundreds of these.

U.S. v. Manafort

R. Gates - Direct

1230

1   Q.   During the course of the time that you worked for

2   Mr. Manafort, do you know if he had any bill keepers?

3   A.   He did.

4   Q.   What bill keepers were you aware of?

5   A.   Initially, I was aware that he had been using KWC to do

6   the bills, but that he wanted to make a change.  He had hired

7   a gentlemen by the name of Hesham Ali, who at that time was

8   working with Heather Washkuhn; and then later on, Heather

9   Washkuhn directly took over the bill keeping.

10  Q.   Okay.  In terms of your interaction with Hesham Ali or

11  Heather Washkuhn, can you characterize what your relationship

12  was with the bill payers?

13  A.   Yes.  I would communicate frequently with them based on,

14  you know, various directions and instructions from

15  Mr. Manafort.  There were a number of instances where they

16  would reach out to me that they had received a request from

17  Paul and wanted some assistance in -- in fulfilling that

18  request.

19  Q.   Did you have the ability when you were dealing with the

20  bookkeepers to authorize payments?

21  A.   I did.

22  Q.   Okay.  And did you?

23  A.   I did.

24  Q.   At whose direction?

25  A.   Mr. Manafort's.

U.S. v. Manafort

R. Gates - Direct

1231

1  Q.   And did those payments relate to Mr. Manafort's business

2  accounts or for his personal accounts?

3  A.   Business accounts.

4  Q.   Okay.  And once you authorized those payments, was there

5  a process in place where the banks had to confirm payment?

6  A.   Yes.  The banks, actually in this case, required a verbal

7  confirmation from any type of money that Mr. Manafort was

8  moving between his accounts.  So the typical process is that

9  Heather would put the list of bills together.

10          I would add the DMP bills.  And then once the total

11  amount of that wire was calculated, Mr. Manafort would do a

12  verbal approval with his bank.

13  Q.   During this time period, did you have access to an

14  electronic signature for Mr. Manafort?

15  A.   I did.

16  Q.   What's an electronic signature?

17  A.   An electronic signature is Mr. Manafort's signature that

18  can be used on PDF documents.

19  Q.   And did you use it on PDF documents?

20  A.   I did on occasions, yes.

21  Q.   What types of documents would you use it on?

22  A.   Primarily documents that Mr. Manafort had asked me to

23  sign on his behalf.  If he was traveling or needed to get

24  something into a particular entity or organization, he would

25  often ask me to create the document, sign it on his behalf,

R. Gates - Direct

1232

1    and then send it to him.

2    Q.    Can I ask you to look at Government Exhibit 427?

3             Can you tell me what that is?

4    A.    Yes.  It's an e-mail from -- originally from Mr. Manafort

5    to me.

6             MR. ANDRES:  Okay.  Your Honor, the Government moves

7    to admit Government Exhibit 427.

8             MR. DOWNING:  No objection.

9             THE COURT:  Admitted.

10                          (Government's Exhibit No. 427

11                          admitted into evidence.)

12   BY MR. ANDRES:

13   Q.    With respect to the e-mail, can you -- looking at the top

14   e-mail, can you tell me who the e-mail is chain is between and

15   the date?

16   A.    Yes.  The top e-mail is from me to Mr. Manafort.  The

17   date is February 17, 2016.

18            MR. ANDRES:  May I publish it, Your Honor?

19            THE COURT:  Yes.

20   BY MR. ANDRES:

21   Q.    Focusing on the bottom e-mail where it says "R," can you

22   read that e-mail?

23   A.    "I need you to sign my name to another doc and return to

24   me.  I will be sending in 5 to 20 minutes.  It's on a quick

25   turnaround."

U.S. v. Manafort

R. Gates - Direct

1233

1   Q.   And who is that from?

2   A.   Mr. Manafort.

3   Q.   And what did you understand Mr. Manafort to ask you to be

4   doing?

5   A.   To take the document and attach his electronic signature

6   to it.

7   Q.   Did -- as you sit here today, do you have any idea what

8   that document was?

9   A.   I do not.

10  Q.   Okay.  And did you -- did you agree to sign it?

11  A.   I did.

12  Q.   And was it common for you to do that?

13  A.   Yes.

14  Q.   And would you always seek Mr. Manafort's approval?

15  A.   Yes.  Usually he reached out to me in order to sign the

16  document, but there were occasions where I reached out to him

17  on documents as well.

18  Q.   You testified earlier that Ms. Washkuhn was involved in

19  paying bills for Mr. Manafort.

20         Did you play a role in paying Mr. Manafort's bills?

21  A.   There were instances where I would pay some of the bills

22  from the DMP U.S. account.  Ms. Washkuhn and I both had access

23  to that account.

24  Q.   How about from the overseas accounts?

25  A.   Yes.

U.S. v. Manafort

R. Gates - Direct

1234

1  Q.   Would you frequently make payments for Mr. Manafort from

2  the Cypriote accounts?

3  A.   Probably more frequently from the Cypriote accounts, yes.

4  Q.   Okay.  And when you made those payments, did you alert

5  Ms. Washkuhn?

6  A.   I did not.

7  Q.   Why not?

8  A.   Mr. Manafort had basically requested that we not need to

9  inform Ms. Washkuhn on those payments.

10 Q.   And when you paid those bills, do you know the types of

11 bills they were; that is, who were you paying from the

12 Cypriote accounts?

13 A.   I just knew them by name because, again, Mr. Manafort

14 would prepare wiring instructions.  So it would all be in a

15 document or an e-mail that he provided.  So I wouldn't

16 necessarily know what the payment was for, but over time I

17 learned who some of the vendors were.

18 Q.   And do you know if Mr. Manafort also paid some of those

19 bills directly himself?

20 A.   He did.

21 Q.   How did you know that?

22 A.   Because in some instances when he had asked me to check

23 on the balances of the account, money had been wired out and

24 they were reflected wire transfers that he had requested in

25 addition.

R. Gates - Direct

1  Q.   And what accounts did he use to make those payments?

2  A.   Cyprus accounts.  And obviously he made requests for the

3  U.S. accounts as well.

4  Q.   Are you familiar with an individual in a business -- an

5  individual named "Steve Jacobson" and the business name

6  "SP&C"?

7  A.   Yes.

8  Q.   What is that?

9  A.   That was one of the Mr. Manafort's contractors that I had

10  come to learn about in the process of doing some wires for

11  Mr. Manafort.

12  Q.   Okay.  And where did that money come from?

13  A.   I believe it came from a combination of offshore and U.S.

14  accounts.

15  Q.   And do you know what work Mr. Jacobson did for

16  Mr. Manafort?

17  A.   I believe it was work related to his New York apartment

18  and Bridgehampton home.

19  Q.   Have you ever been to Mr. Manafort's home in

20  Bridgehampton?

21  A.   I have not.

22  Q.   Are you familiar with a individual named "Joel Maxwell"?

23  A.   Yes.

24  Q.   Who is that?

25  A.   Joel Maxwell provided audio and visual technical support

─────U.S. v. Manafort─────

R. Gates - Direct

1236

 1   for Mr. Manafort.

 2   Q.    Okay.  And was he paid from the overseas accounts?

 3   A.    I believe he was, yes.

 4   Q.    Have you ever sought services or has Mr. Maxwell done any

 5   services at any -- at your residence?

 6   A.    He has not.

 7   Q.    So you're familiar with an entity named "Alan Couture"?

 8   A.    Yes.

 9   Q.    What is Alan Couture?

10   A.    It's a clothing store that Mr. Manafort had directed me

11   and Ms. Washkuhn to make payments over the year.

12   Q.    When you made payments to Alan Couture, where did the

13   money come from?

14   A.    It was a combination both from the offshore accounts and

15   the U.S. accounts.

16   Q.    And do you know what Alan Couture -- what business

17   they're in?

18   A.    I learned over time that they were in the clothing

19   business.

20   Q.    Have you ever purchased any clothing from Alan Couture?

21   A.    No.

22   Q.    Are you familiar with an entity known as "New Leaf

23   Landscaping"?

24   A.    Yes.

25   Q.    Did you make payments to New Leaf Landscaping?

1  A.   Yes, I did at Mr. Manafort's request.

2  Q.   For what services?

3  A.   I believe that was landscaping services for his home in

4  Bridgehampton.

5  Q.   Have you ever contracted or gotten any services from New

6  Leaf Landscaping?

7  A.   No.

8  Q.   When you made payments to New Leaf Landscaping, where

9  would the money come from?

10  A.   I believe, again, it was a combination of the Cyprus

11  accounts and the U.S. accounts.

12  Q.   And would you report those to Ms. Washkuhn?

13  A.   The U.S. payments were reported to Ms. Washkuhn.  The

14  ones from overseas were not.

15  Q.   Are you familiar with an entity known as the House of

16  Bijan?

17  A.   Yes.

18  Q.   What is that?

19  A.   I believe, again, that was another clothier.

20  Q.   And who did -- was Mr. Manafort a customer of House of

21  Bijan?

22  A.   Yes.

23  Q.   Did you make payments to that entity?

24  A.   I did.

25  Q.   And where did that money come from?

R. Gates - Direct

1238

1   A.   Again, I believe that was a combination of offshore and

2   U.S. accounts.

3   Q.   Have you ever ordered any clothes from the House of

4   Bijan?

5   A.   No.

6   Q.   Okay.  You testified that both you and Mr. Manafort were

7   wiring money directly from Cyprus to the vendors.

8           Do you know what benefit if any -- how that

9   benefitted Mr. Manafort?

10  A.   Well, in not reporting the wires that were done, they

11  were not disclosed on Mr. Manafort's U.S. business records.

12  Therefore, it was, in essence, diminishing the amount of

13  income that should have been reported on the tax return.

14  Q.   You testified that at some point the accounts moved from

15  Cyprus to St. Vincent's and the Grenadines; is that correct?

16  A.   That's correct.

17  Q.   The process for moving money from St. Vincent and the

18  Grenadines, was it different than the process you used in

19  Cyprus?

20  A.   It was.

21  Q.   How?

22  A.   The process in the Grenadines was a little more document

23  complex, because it was a different bank.  And, again, at that

24  time there were banking issues that had transpired over from

25  Europe into kind of the Caribbean area.  So they requested

1   much more documentation as evidence to initiate that wire

2   transfer.

3   Q.   And the payments from the St. Vincent's and the

4   Grenadines that you made, were they on behalf of Mr. Manafort?

5   A.   Yes.

6   Q.   And did you also make payments to yourself from those

7   accounts?

8   A.   I did.

9   Q.   And those were the unauthorized payments?

10  A.   Some were; some were not.

11  Q.   You testified that there was additional documentation

12  required for moving money from the St. Vincent's and the

13  Grenadines?

14  A.   Yes.

15  Q.   Did you create some of those documents?

16  A.   I did.

17  Q.   Okay.  Can you explain to the jury what you did in terms

18  of creating documents and why you did it?

19  A.   So Mr. Manafort had sent -- you know, would typically

20  send me a list of wire transfers.  But when we started making

21  the transfers from the Grenadines, because they required

22  additional documentation, I had asked Mr. Manafort for a

23  copies of the invoices.

24        In most occasions he didn't have the original

25  invoices, so we used a template that basically was for the

R. Gates - Direct

1240

1  legitimate payment of that invoice.  But instead of being

2  addressed to Mr. Manafort, it needed to be addressed to the

3  company that the payment was actually coming from.  So I

4  edited the template and put the name of the company as opposed

5  to Mr. Manafort's name.

6  Q.   And because those payments were coming from St. Vincent's

7  and the Grenadines, what were the companies there that were

8  opened?

9  A.   The two companies, they were basically registered in

10 Cyprus but they were offshore.

11 Q.   And what were their names?

12 A.   Global Endeavour and Jeunet.

13 Q.   Okay.  Can I ask you to take a look at Government

14 Exhibit 67A.

15        MR. ANDRES:  These are already in evidence, Your

16 Honor.

17        THE COURT:  All right.

18        MR. ANDRES:  May I publish them?

19        THE COURT:  Yes.

20 BY MR. ANDRES:

21 Q.   Can I ask you to turn to page 2.  Do you recognize this

22 document, Mr. Gates?

23 A.   Yes.

24 Q.   Okay.  What is it?

25 A.   This is an invoice for amount -- a wire amount that

1   Mr. Manafort had sent to me.  And this is the invoice that

2   went to the actual Grenadines entity where the payment came

3   from.

4   Q.   Who created this invoice?

5   A.   I did.

6   Q.   And based on what information?

7   A.   Information that Mr. Manafort had given to me about the

8   wire transfer.

9   Q.   Is it fair to say that this is a fake invoice?

10  A.   It's a -- yes, it's a modified invoice.

11  Q.   Okay.  It's fake in terms of the document itself?

12  A.   Correct.

13  Q.   And how about the payment that's being made, what -- what

14  is -- how would you characterize the payment?

15  A.   The payment was legitimate.  I mean, again, the effort

16  here was to -- instead of having it billed to -- with the name

17  of Mr. Manafort, because the payment was coming from this

18  company at Mr. Manafort's request, it had to have the name of

19  the company itself.

20  Q.   And so where it says "billed to," who's listed?

21  A.   Global Endeavour.

22  Q.   And having reviewed this now, you realize that there are

23  typographical errors or other errors on these documents?

24  A.   Yes.

25  Q.   Okay.  And where it says "Alan Couture," who -- who added

R. Gates - Direct

 1   that information?

 2   A.   I took it off of the information that Mr. Manafort had

 3   sent me in the wire request.

 4   Q.   Okay.  Can I ask you to take a look -- and with respect

 5   to that -- I'm sorry -- with respect to that second document,

 6   what's the total amount of the payment that was made as a

 7   result of the invoice that you sent?

 8   A.   In this one the amount is 42,000.

 9   Q.   And that's a payment to who?

10   A.   Alan Couture.

11   Q.   And was there a wire initiated as a result of you

12   submitting this document?

13   A.   Yes.

14   Q.   Okay.  Can I ask you to turn to, in the same exhibit,

15   Government exhibit, ending in the Bates No. 552?

16        Can you explain what this document is?

17   A.   Yes.  Again, this is an invoice that Mr. Manafort had

18   requested a payment for.  I put in the name of the company

19   Global Endeavour to initiate the wire transfer.

20   Q.   And what's Big Picture Solutions?

21   A.   I believe that was Mr. Maxwell's company, the audio and

22   visual technician.

23   Q.   Okay.  And you created this document?

24   A.   I did.

25   Q.   There's a stamp on the top right-hand side of the

R. Gates - Direct

1   invoice.  What's that?

2   A.   That's from the bank.

3   Q.   Okay.  Now, when you were creating these invoices, would

4   it be one for -- one from an invoice from one of these vendors

5   or did you aggregate them from time to time?

6   A.   I don't recall.  I believe it was one to one.

7   Q.   Okay.  And who were you relying on for that information?

8   A.   Well, these are based on wire transactions that

9   Mr. Manafort had requested, so I was using the information he

10  provided.

11  Q.   And at the time, he didn't have the invoices?

12  A.   No.

13  Q.   So he provided you a total amount to make a payment?

14  A.   Well, yeah.  He would send it in the description of how

15  much needed to be paid and who it needed to be paid to.

16       I do believe on some occasions there were invoices

17  that he did provide, but, again, it didn't matter because the

18  invoice to him was in his name and the invoice for the payment

19  needed to be in the company's name.

20  Q.   Okay.  If you look down a little further in the Big

21  Picture Solutions invoice that you -- that you created, where

22  it says "Description of services," where did that information

23  come from?

24  A.   That was usually just generic language that was already

25  either filled in the template or maybe I modified it on some

R. Gates - Direct

1244

1    occasions.

2    Q.   Okay.  And, again, the payments for Mr. -- to Big Picture

3    Solutions were on behalf of who?

4    A.   Mr. Manafort.

5    Q.   And they were for services that were rendered?

6    A.   Yes, to my understanding.

7    Q.   Okay.  And did these invoices themselves -- did they ever

8    go to the vendors?

9    A.   No.

10   Q.   Who did they go to?

11   A.   They went to the bank.

12   Q.   Can you look at Government Exhibit -- at the page 636 in

13   the same exhibit?  What is that?

14   A.   Again, this is another invoice for work done by New Leaf

15   Landscape.

16   Q.   Okay.  And this is also an invoice that you created?

17   A.   It is.

18   Q.   Same process?

19   A.   Yes.

20   Q.   Okay.  And why did you create this invoice?

21   A.   Again, because Mr. Manafort wanted a wire transfer

22   initiated for this company.

23   Q.   And then, lastly, if you could turn to the last page in

24   the exhibit that ends in 452.

25            Can you tell me what that is?

U.S. v. Manafort

R. Gates - Direct

1245

1   A.   Again, finally, this is another invoice.  This time to

2   SP&C.

3   Q.   Same process?

4   A.   Same process.

5   Q.   You created this invoice?

6   A.   Yes.

7   Q.   And it was to initiate a payment?

8   A.   It was.

9   Q.   Mr. Gates, let me direct your attention to July of 2014.

10          Were you interviewed by the FBI at that time?

11  A.   Yes.

12  Q.   Okay.  Were you represented by counsel?

13  A.   I was.

14  Q.   At the time of the interview, did you understand why you

15  were being interviewed?

16  A.   Yes.

17  Q.   Why?

18  A.   We were asked to -- in the words of my attorney, to

19  voluntary help in regards to a forfeiture investigation the

20  Ukrainian Government was working on in conjunction with the

21  FBI.

22  Q.   Okay.  And at the time when you said "we," was somebody

23  else also interviewed?

24  A.   Yes.

25  Q.   Who?

1  A.   Mr. Manafort.

2  Q.   At the time did you understand whether you, yourself, was

3  under -- were under investigation?

4  A.   It was my understanding I was not.

5  Q.   And did you understand whether Mr. Manafort was under

6  investigation?

7  A.   It was my understanding he was not.

8  Q.   And how did you learn that Mr. Manafort was also being

9  interviewed?

10  A.   He told me.

11  Q.   Who was interviewed first?

12  A.   I was interviewed first.

13  Q.   During the interview were you asked questions about your

14  work in the Ukraine?

15  A.   Yes.

16  Q.   And were you asked questions about certain overseas

17  accounts?

18  A.   Yes.

19  Q.   At the time of that interview, what was the status of the

20  Cypriote accounts?

21  A.   The majority of the Cypriote accounts had been closed at

22  the time of the interview.

23  Q.   And in terms of the order of the interviews, who was

24  interviewed first, you or Mr. Manafort?

25  A.   I was interviewed first.

───────U.S. v. Manafort───────
R. Gates - Direct
1247

1  Q.   At some point, prior to Mr. Manafort's interview, did he

2  direct you to take certain action?

3  A.   He did.

4  Q.   What did he ask you to do?

5  A.   He asked me to travel to meet with one of the Ukrainian

6  businessmen to, one, notify him that we were going to be

7  interviewing with the FBI, and then to also determine the

8  status of the Ukrainian businessman's company because a lot of

9  the money came from the one particular company and we didn't

10  really have a lot of background on that company and wanted to

11  learn more.

12  Q.   Okay.  And who is the Ukrainian businessmen that you went

13  to see?

14  A.   Mr. Lovochkin.

15  Q.   And where did you go see him?

16  A.   In France.

17  Q.   And did he agree -- did he answer your questions?

18  A.   He did.

19  Q.   Okay.  Did -- at some point around this time, did you --

20  were you also aware of any negotiations with Mr. Lovochkin

21  about the payments that he was making to Mr. Manafort?

22  A.   Well, Mr. Manafort, in another exercise, was trying to

23  move all of his banking directly to one particular

24  institution.  So he was trying to have the payments -- the

25  contract payments for the Ukraine political work also sent to

R. Gates - Direct

1248

1   that bank as well.

2   Q.   And did Mr. Lovochkin agree to this arrangement?

3   A.   He did.

4   Q.   At that point, there was no longer a requirement to have

5   Cypriote or overseas accounts?

6   A.   At that time, no.

7   Q.   Excuse me?

8   A.   Yeah, at that time, no.

9   Q.   Mr. Gates, at some point during the course of the time

10  that you worked for Mr. Manafort, did you assist him in the

11  preparation of his tax returns?

12  A.   Yes.

13  Q.   Over what time period?

14  A.   I think my involvement specifically increased from 2010

15  forward.

16  Q.   And during that time period, did you work with

17  Mr. Manafort's tax preparers?

18  A.   I did.

19  Q.   Who did you understand them to be?

20  A.   At the time, it was Mr. Ayliff at KWC, who he later

21  brought on Ms. Cindy Laporta, and then there was some support

22  staff that worked with us as well.

23  Q.   How about Naji Lakkis?

24  A.   Yes.

25  Q.   Who is he?

R. Gates - Direct

1249

1  A.   Mr. Lakkis was primarily Mr. Ayliff's assistant that

2  worked on the tax efforts in the early years.

3  Q.   And during the time starting in 2009 that you helped with

4  the taxes, was there a process in place together with KWC with

5  respect to the preparation of Mr. Manafort's taxes?

6  A.   Yes.

7  Q.   Can you explain what that was?

8  A.   In the -- in the early years, the process started that

9  Mr. Manafort had asked me to sit in some of the meetings with

10  his accountants because the business entities were something

11  that I was involved in and followed.  Over time, I was tasked

12  with gathering a lot of the questions and answers that the

13  bookkeepers and the tax accountants had in regards to

14  Mr. Manafort's taxes.

15       So the process would be that they -- the bookkeeper

16  would send the balance sheet and ledger to the accountants.

17  The accountants would review that and then they would prepare

18  a series of questions.  Those questions were, in the initial

19  stages, e-mailed to both of us.  Later on, they were e-mailed

20  just to me.  I would answer the questions that I could answer

21  and then I would typically either speak or meet with

22  Mr. Manafort and ask him for the remaining answers.  The

23  answers were compiled and then returned to the accountants.

24       THE COURT:  All right.  Is this a good time to take

25  our morning break, Mr. Andres?

1    MR. ANDRES:  Yes, Your Honor.

2    THE COURT:  All right.  Mr. Gates, you may step

3  down, sir.  During the recess, which will be until about

4  11:20, you may not discuss your testimony with anyone.

5    THE WITNESS:  Okay.

6    THE COURT:  Ladies and gentlemen, pass your books to

7  the right.  Mr. Flood will collect them, maintain their

8  security as usual.

9    During the recess, remember to refrain from

10  discussing the matter with anyone or undertaking any

11  investigation on your own and we will reconvene at 11:20.  You

12  may follow Mr. Flood out.

13    (Jury dismissed.)

14    THE COURT:  All right.  You may be seated.

15    Mr. Andres, what's your estimate now of what remains

16  in Mr. Gates' direct testimony?

17    MR. ANDRES:  I'd say two hours, Judge.

18    THE COURT:  All right.  See if you can compress it.

19  I mean, this morning when I asked you, you said three hours.

20    MR. ANDRES:  I --

21    THE COURT:  Now you've been at it for almost two

22  hours.

23    MR. ANDRES:  I understand my math doesn't add up

24  entirely, Judge, but I will do everything I can to expedite

25  it.

R. Gates - Direct

1251

1            THE COURT:  Thank you.  Court stands in recess.

2            (Recess.)

3            THE COURT:  All right.  We're prepared to proceed.

4    Bring the jury in.

5            (Jury in.)

6            THE COURT:  All right.  You may be seated.

7            All right.  And let's have Mr. Gates return, please.

8            Mr. Gates, you'll recall that you're still under

9    oath, sir, and you may resume the stand.

10           THE WITNESS:  Thank you.

11           THE COURT:  All right.  Mr. Andres, you may proceed.

12           MR. ANDRES:  Thank you, Your Honor.

13   BY MR. ANDRES:

14   Q.   Mr. Gates, you were testifying about your role with

15   respect to Mr. Manafort's tax returns.

16           What role specifically did you play in interacting

17   with the tax preparers?

18   A.   Again, I worked with the tax preparers on answering

19   questions that they submitted based on a balance sheet and

20   ledger that they put together based on what the -- the work

21   that Ms. Washkuhn did.

22   Q.   Were there times that you interacted directly with the

23   tax preparers?

24   A.   Yes.

25   Q.   Cindy Laporta?

1  A.    Yes.

2  Q.    Philip Ayliff?

3  A.    Yes.

4  Q.    How about Mr. Manafort?  What did you know about his

5  interactions with his tax preparers?

6  A.    I knew he interacted with them.  He also reached out to

7  me in regards to requests that he wanted me to seek from the

8  accountants.

9  Q.    And with respect to your involvement, did you attend

10  meetings with Mr. Manafort and his tax preparers?

11  A.    I did.

12  Q.    Do you know what his relationship with Mr. Ayliff was?

13  A.    It was very longstanding.  It was preexisting before I

14  got there, but they seemed to have a longstanding

15  relationship.

16  Q.    Did you have an understanding, based on your discussions

17  with Mr. Manafort, that he understood the details of his tax

18  returns?

19  A.    Yes, it was my belief he did.

20  Q.    Did you make efforts to reduce the amount of income that

21  was reported on the tax returns?

22  A.    We did.

23  Q.    Okay.  What specifically did you do?

24  A.    I would say specifically the idea of exchanging income

25  for loans and putting those on the books enabled Mr. Manafort

U.S. v. Manafort

1   to reduce his overall tax liability.

2   Q.   Okay.  And did that relate to the Peranova loan?

3   A.   It did.

4   Q.   How about the Telmar loan?

5   A.   It did.

6   Q.   Okay.  And with respect to the income that was sent from

7   Cyprus to vendors or other locations, was that ever disclosed

8   to the tax preparers?

9   A.   It was not.

10  Q.   Did you have a discussion with Mr. Manafort about whether

11  those accounts should be disclosed?

12  A.   Yes.  Over the years, we had various discussions on them.

13  It was never an overt, you know, don't disclose the accounts,

14  but there were issues with the accounts, specifically such as

15  having signature authority, which because the Cyprus law firm

16  had the signature authority on the accounts, Mr. Manafort

17  would tend to use that as the reason for not informing the

18  accountants or the bookkeepers of those accounts.

19  Q.   And at any point during the time that those accounts in

20  Cyprus and St. Vincent and the Grenadines were opened, at any

21  time during that period, did Mr. Manafort not have control of

22  those accounts?

23  A.   No, he always had control.

24  Q.   And whose money was in those accounts?

25  A.   Mr. Manafort's.

R. Gates - Direct

1254

1  Q.   You testified yesterday that from time to time, either

2  you or Mr. Manafort would circulate an agenda for meetings

3  that you would attend?

4  A.   Yes.

5  Q.   Or phone calls?

6  A.   Yes.

7  Q.   Can you explain what those agendas were and what the

8  purpose was?

9  A.   Sure.  The agendas were a way for Mr. Manafort to catch

10 up or for me to provide updates on a variety of issues related

11 to work in Ukraine, work in the U.S.  It could be related to

12 the tax preparation, gathering material for various

13 investments that Mr. Manafort had.  It was a wide range of

14 issues.

15 Q.   Can I ask you to look at Government Exhibit 372?

16 A.   Okay.

17 Q.   Can you tell me what that is?

18 A.   In this instance, it's an agenda that was prepared by

19 Mr. Manafort and outlines a number of the issues that we were

20 talking about at that particular time.

21      MR. ANDRES:  The Government moves to admit

22 Government Exhibit 372 -- oh, I'm sorry, Your Honor, it's in

23 evidence.  May I publish it?

24      THE COURT:  Yes.

25      MR. ANDRES:  Excuse me, Your Honor.

U.S. v. Manafort

R. Gates - Direct

1255

1  BY MR. ANDRES:

2  Q.   Mr. Gates, can you zoom in on the top half, please?

3       Just read the heading of the document.

4  A.   Gates agenda, March 21, 2013.

5  Q.   Did you draft this or Mr. Manafort?

6  A.   Mr. Manafort did.

7  Q.   Okay.  And there is black writing and -- or typing and

8  red typing.  Do you know what the distinction is?

9  A.   Yes.  So typically, Mr. Manafort would take notes during

10 our calls and outline, in this case, once we had a discussion

11 about an issue, identifying an action item related to that

12 issue and who would carry it out and what the action item was.

13 Q.   And does this agenda reflect a meeting on or -- a meeting

14 or a communication with Mr. Manafort on or around March 21,

15 2013?

16 A.   Yes.

17 Q.   Okay.  If you look at the first category under Ayliff,

18 what's -- who's Ayliff?

19 A.   Mr. Ayliff is in reference to Philip Ayliff at KWC.

20 Q.   And there's a reference to k1's Global and L DONE.  What

21 is that?

22 A.   That's in reference to businesses that Mr. Manafort had.

23 Q.   And then if you look at Number 2, it says, "do payment."

24 Any idea what that is?

25 A.   I don't recall what that might be.

R. Gates - Direct

1256

1   Q.   What about 3, "tax plan for April 15 done"?

2   A.   Yes, that's in reference to the tax preparation for that

3   tax year.

4   Q.   And Number 4, "Taxes - Assets Allocations"?

5   A.   Yes.  I don't know if this is -- well, I don't know what

6   that specific reference is for, but related to the tax

7   preparation.

8   Q.   During the March 21, 2013 meeting, were you discussing

9   Mr. Manafort's taxes with him?

10  A.   Yes.

11  Q.   Was that routine for you to do?

12  A.   It was.

13  Q.   If you look at the second section under KC, who's -- who

14  is KC?

15  A.   KC is Kypros Chrysostomides.

16  Q.   Is that the individual we've referred to as "Dr. K"?

17  A.   Dr. K, it is.

18  Q.   And if you look at Number 2, it says, "update on

19  movements."  What's that a reference to?

20  A.   Sure.  At this time, there are still liquidity issues in

21  Cyprus, so moving money in and out is difficult.  So

22  Mr. Manafort wanted an update on what we were doing in order

23  to facilitate faster transfers.

24  Q.   At the meeting on March 21, 2013, were you and

25  Mr. Manafort discussing this overseas bank accounts?

U.S. v. Manafort

1   A.   Yes.

2   Q.   Okay.  If you look at the bottom, there's a reference to

3   Yanks.  What's that in reference to?

4   A.   That would be in regards to the Yankees season tickets

5   Mr. Manafort possessed.

6   Q.   Was Mr. Manafort a season ticket holder?

7   A.   He is.

8   Q.   With respect to the New York Yankees?

9   A.   Yes.

10  Q.   Okay.  Have you ever been a season ticket holder for the

11  New York Yankees?

12  A.   No.

13  Q.   Have you attended Yankee games using Mr. Manafort's

14  tickets?

15  A.   I have.

16  Q.   If you look on the next page, there's a reference to

17  Ukraine.  And can you tell me, for example, there's a

18  reference to the Gusenbauer trip.  What's that?

19  A.   Yes, that's in reference to Alfred Gusenbauer who was a

20  member of the project Hapsburg.  Mr. Gusenbauer used to be the

21  former chancellor of Austria.

22  Q.   I'm not going to go through anymore of this.  But having

23  reviewed this document, is it fair to say that in March 21,

24  2013, you're discussing issues relating to Ukraine with

25  Mr. Manafort?

R. Gates - Direct

1258

1    A.    Yes.

2    Q.    Okay.  Could I ask you to take a look at Government

3    Exhibit 373?

4            Can you tell me what that is, 373?

5    A.    Yes, it's an e-mail between Mr. Manafort and myself.

6    Q.    Okay.  And is this -- is -- are there attachments?

7    A.    Yes.  In this case, Mr. Manafort is attaching a copy of a

8    draft agenda, asking me to review it, and add items, which was

9    a typical process we used.

10   Q.    And that's reflected in the cover e-mail?

11   A.    Yes.

12           MR. ANDRES:  Your Honor, the Government moves to

13   admit 373.

14           MR. DOWNING:  No objection.

15           THE COURT:  Admitted.

16                          (Government's Exhibit No. 373

17                          admitted into evidence.)

18   Q.    At the bottom e-mail at 4:26 on December 13th, what does

19   Mr. Manafort say?

20   A.    (As read): "I would like to review the range of

21   outstanding items.  I have attached my agenda notes for the

22   call.  I am moving around all day, so best time to reach me is

23   8:00 a.m."

24   Q.    And is there an e-mail -- is there an agenda attached?

25   A.    There is.

U.S. v. Manafort

R. Gates - Direct

1259

1          MR. ANDRES:  May I publish, Your Honor?

2          THE COURT:  Yes.

3   BY MR. ANDRES:

4   Q.   If you look at the agenda for December 11th, there's a

5   reference to a No. 3, "Wires to send."

6          What is that a reference to?

7   A.   These are typically where Mr. Manafort would either say

8   he had some wires he would send me or he's already sent me and

9   he's looking for updates on the status.

10  Q.   Okay.  No. 8 refers to 2014 taxes.

11  A.   Yes.  That would be in reference to either looking at

12  something in preparation for the 2014 tax filing.

13  Q.   And No. 13 says, "Kyiv office - budget."

14         What is that a reference to?

15  A.   That is the office budget that we had in Kyiv still at

16  this time, indicating how many employees, our rent at the

17  local office, and other items.

18  Q.   Were these agendas typical?

19  A.   Yes.

20  Q.   How often would you receive or send an agenda to

21  Mr. Manafort?

22  A.   Oh, I mean, it could be, you know, as many as a couple a

23  week.  Sometimes they weren't as formal.  They were just

24  e-mails about catching up on certain items, but we typically

25  try to group items together, especially depending on travel

1  schedules.

2  Q.   I would ask you to take a look at Government Exhibit 219.

3       Can you tell me what that is?

4  A.   This is an e-mail from Conor O'Brien to myself, copying

5  Ms. Laporta and Mr. Ayliff.

6  Q.   Who is Conor O'Brien?

7  A.   Conor O'Brien works at KWC as well and works for

8  Ms. Laporta.

9  Q.   And does this e-mail relate to issues that you're

10 discussing with Mr. Manafort's tax preparers?

11 A.   It does.

12 Q.   Is Mr. Manafort included on this e-mail?

13 A.   He is not.

14 Q.   Okay.  The Government moves to admit 219.

15       MR. DOWNING:  Without objection.

16       THE COURT:  Admitted.

17                         (Government's Exhibit No. 219

18                          admitted into evidence.)

19 BY MR. ANDRES:

20 Q.   Mr. Gates --

21       MR. ANDRES:  May I publish, Your Honor?

22       THE COURT:  Yes.

23 BY MR. ANDRES:

24 Q.   Can you identify the -- who's on the e-mail and summarize

25 the e-mail for the jury?

R. Gates - Direct

1  A.   Yes.  The e-mail is from Conor O'Brien to myself and

2  Ms. Laporta -- I'm sorry -- copying Ms. Laporta and

3  Mr. Ayliff.  And this is in regards to a 2014 tax issue in

4  which Mr. Manafort believed his taxes were very high and we

5  needed to determine how we could lower the taxes, if at all

6  possible.

7         I was tasked by Mr. Manafort to go to Ms. Laporta

8  and ask her if there are ways in which we could do that, the

9  typical ways that we had been advised by KWC was, as always,

10 to convert income into loans and then also look at, you know,

11 other potential deductible expenses.

12 Q.   When you -- in the instances when you converted income to

13 loans, for example, in Peranova, what was that money?

14 A.   It was originally income.

15 Q.   Okay.  And can I ask you to take a look at Government

16 Exhibit 375?

17        Can you tell me what that is?

18 A.   Yes.  This is an e-mail exchange between me and

19 Mr. Manafort regarding his taxes.

20        MR. ANDRES:  The Government moves to admit

21 Government Exhibit 375.

22        MR. DOWNING:  No objection.

23        THE COURT:  Admitted.

24                       (Government's Exhibit No. 375

25                        admitted into evidence.)

R. Gates - Direct

1262

```
 1   BY MR. ANDRES:

 2   Q.   With respect to the bottom e-mail on April 15, 2005,

 3   can -- can you summarize that e-mail for the jury?

 4   A.   Yes.  So as is standard in our process of meeting with

 5   the accountants, they had provided an outline of

 6   Mr. Manafort's potential tax impact.  I met with them,

 7   gathered the information that they had prepared, and then put

 8   it in a report to Mr. Manafort.

 9   Q.   Okay.  And this is -- you're communicating those issues

10   to Mr. Manafort?

11   A.   Yes.

12   Q.   Again, you're discussing the tax returns with him?

13   A.   I am.

14   Q.   When he writes back at 4:20, what is his reaction?

15   A.   He's not happy.

16           "I just saw this.  WTF."

17           MR. ANDRES:  May I publish this, Your Honor?  I'm

18   sorry, excuse me.

19           THE COURT:  Let him finish his answer first.

20           Had you finished?

21           THE WITNESS:  I can continue reading, if you want.

22   BY MR. ANDRES:

23   Q.   I just asked you to summarize it.  Could you finish

24   summarizing it?

25   A.   Yes.
```

U.S. v. Manafort

R. Gates - Direct

1263

1    THE COURT:  All right.  You may publish if he's

2    finished.  Did you say you've finished?

3    THE WITNESS:  I did, Your Honor, yes.

4    THE COURT:  All right.  You may publish.

5    MR. ANDRES:  Judge, to the extent I hadn't, I move

6    to admit 375.

7    THE COURT:  I thought it was already admitted.

8    MR. ANDRES:  Okay.  Thank you, Judge.

9    THE COURT:  No objection, is there, Mr. Downing?

10   MR. DOWNING:  No objection.

11   THE COURT:  Admitted.

12                        (Government's Exhibit No. 375

13                        admitted into evidence.)

14   BY MR. ANDRES:

15   Q.   With respect to Mr. Manafort's reaction at 4:20, you

16   testified that he was upset.  Why was he upset?

17   A.   He was upset because a number of the items that had

18   originally been projected for his potential tax impact for

19   that year were off by the accountants.  And this is the first

20   time that, one, I was learning about it and then when I

21   communicated the information, obviously first time he was

22   learning about it as well.

23   Q.   And is it typical -- was this the typical process in

24   which you would discuss Mr. Manafort's taxes with him?

25   A.   Yes, in the latter years.

U.S. v. Manafort

1  Q.   May I ask you to turn to Government's Exhibit 376?

2        Can you tell me what that is?

3  A.   Yes.  This is an e-mail exchange between myself and

4  Ms. Washkuhn.

5  Q.   And does it relate to the -- to -- to an incoming wire

6  from Telmar?

7  A.   It does.

8  Q.   Who is Telmar associated with?

9  A.   Telmar is associated with Mr. Lovochkin.

10       MR. ANDRES:  The Government moves to admit

11  Government Exhibit 376.

12       MR. DOWNING:  No objection.

13       THE COURT:  Admitted.

14                     (Government's Exhibit No. 376

15                     admitted into evidence.)

16  BY MR. ANDRES:

17  Q.   With respect to this document, can you explain what's

18  happening in your discussion with Ms. Washkuhn?

19  A.   Yes.  As is typical the case when Mr. Manafort is

20  notified that a wire payment is being made from the Ukrainian

21  businessmen, and at this point the wires are being sent

22  directly to the U.S., we would typically track the payment.

23       So once the payment hits, Ms. Washkuhn had the role

24  of either recording it as income or loan based on, you know,

25  direction of Mr. Manafort.

R. Gates - Direct

1265

1   Q.   Okay.  And how is that -- how do you direct Ms. Washkuhn

2   to classify the Telmar payment?

3   A.   In this case, we disclosed it as a loan.

4   Q.   Okay.  And was it a loan?

5   A.   It was not.

6   Q.   During the time that you worked for Mr. Manafort and he

7   worked in the Ukraine, did Mr. Manafort ever receive a loan

8   from Serhiy Lovochkin?

9   A.   Not to my knowledge.

10  Q.   And the payments for Mr. Lovochkin to Mr. Manafort, what

11  were they?

12  A.   It was income for political work.

13  Q.   With respect -- when you identified the Telmar payment as

14  a loan for Ms. Washkuhn, was there an interest rate on that

15  loan?

16  A.   No.

17  Q.   Was there documentation?

18  A.   There wasn't at this point, but it was asked for later,

19  yes.

20  Q.   It was asked for because it didn't exist?

21  A.   Correct.

22  Q.   And did you create it?

23  A.   Ultimately, for this one, yes, we did.

24  Q.   You created a loan agreement for a loan that didn't

25  exist?

1    A.    Correct.

2    Q.    Why?

3    A.    At Mr. Manafort's direction.

4    Q.    Can you turn to Government Exhibit 160?

5              Can you tell me what that is?

6    A.    Yes.  This is an e-mail exchange between me and

7    Ms. Laporta.

8    Q.    Is there something attached?

9    A.    There is.

10             MR. ANDRES:  The Government moves to admit

11   Government Exhibit 160 -- oh, it's in evidence, Your Honor.

12             Thank you.  May I publish it?

13             THE COURT:  You may.

14   BY MR. ANDRES:

15   Q.    Mr. Gates, can you explain who this e-mail is from, who

16   it's to, and what it relates to?

17   A.    Yes.  It's to me -- excuse me -- to Ms. Laporta from me.

18   And it's in reference to me sending her a copy of the loan

19   agreement between Telmar and DMP, which she requested.

20   Q.    And what discussions are happening with the tax preparers

21   at this time?

22   A.    At this stage when the tax preparers saw that the loan

23   was on the books, they were more insistent on having loan

24   documentation to support that particular transaction.

25   Q.    Okay.  And you drafted this document on behalf of

1    Mr. Manafort?

2    A.    Yeah.  The document was provided by our Cypriote

3    attorneys and then I put in the relevant parties.

4    Q.    And in terms of the dates on the e-mail and the date of

5    the loan agreement, when you compare those, what do you find?

6    A.    So the loan agreement was executed on the 6th day

7    of March in 2014.

8    Q.    And was that, in fact, the day it was executed?

9    A.    The loan agreement?

10   Q.    Yeah.

11   A.    No, it was done at a later date.

12   Q.    Backdated it?

13   A.    Correct.

14   Q.    Because there was no loan?

15   A.    That is correct.

16   Q.    Can I ask you to turn to Government Exhibit 220?

17          Can you tell me what -- what's included in

18   Government Exhibit 220?

19   A.    Yes.  This is an e-mail regarding Mr. Manafort's taxes

20   for 2013.  Mr. O'Brien is seeking the engagement letter and

21   they are also seeking payment and then have a number of

22   questions regarding Mr. Manafort's tax return.

23          MR. ANDRES:  The Government moves to admit

24   Government Exhibit 220.

25          MR. DOWNING:  No objection.

U.S. v. Manafort

R. Gates - Direct

1268

1    THE COURT:  Admitted.

2                       (Government's Exhibit No. 220

3                       admitted into evidence.)

4  BY MR. ANDRES:

5  Q.   Can you tell us the date of this e-mail?

6  A.   October 7, 2015.

7  Q.   Okay.  And you said it was from Conor O'Brien.  Who is

8  that?

9  A.   I'm sorry, it's to Conor O'Brien from me.  Conor O'Brien

10 was Ms. Laporta's assistant at KWC.

11 Q.   Okay.  And was it -- did you from time to time pass on

12 the engagement letters to Mr. Manafort?

13 A.   I did.

14 Q.   Who signed those letters?

15 A.   In some cases, Mr. Manafort did, depending on where he

16 was.  In other cases, he had requested me to sign them and

17 submit them to KWC.

18 Q.   Okay.  And the engagement letters provide information

19 about certain foreign-related reporting requirements?

20 A.   I believe, yes, they do.

21 Q.   Okay.  At this time, had you previously had discussions

22 and interactions with the accountants about those

23 requirements?

24 A.   Yes, we had.

25 Q.   Can I ask you to turn to Government Exhibit 206?

U.S. v. Manafort

R. Gates - Direct

1269

1       It's already in evidence, Your Honor.

2       THE COURT:  All right.

3   BY MR. ANDRES:

4   Q.   Can you look at Government Exhibit 206 and tell me what

5   that is?

6   A.   Yes.  This is an e-mail from Mr. Lakkis to me copying

7   Mr. Ayliff, and it's in regards to Mr. Manafort's 2013 tax

8   return and asking for specific items, along with direction on

9   whether or not there's been a status change to any foreign

10  accounts Mr. Manafort might have.

11  Q.   And in the top e-mail, you write to Naji Lakkis.  Who is

12  that?

13  A.   Naji Lakkis worked for Mr. Ayliff at KWC.

14      MR. ANDRES:  May I publish this, Your Honor?

15      THE COURT:  You may.

16  BY MR. ANDRES:

17  Q.   With respect to the top, can you focus on the top?

18      You indicate, to your knowledge, nothing has

19  changed.  What do you mean by that?

20  A.   Yes.  After having a discussion with Mr. Manafort, I

21  relayed to Mr. Lakkis that nothing has changed with respect to

22  reporting of foreign bank accounts.

23  Q.   On June 24, 2013, did Mr. Manafort have foreign bank

24  accounts?

25  A.   He did.

─────U.S. v. Manafort─────

1  Q.   Was this representation accurate -- not as to whether

2  something changed, but accurate as to whether or not there

3  were foreign bank accounts?

4  A.   It is not accurate.

5  Q.   Okay.  And you previously testified that over time you

6  learned from the accountants about various FBAR requirements;

7  is that correct?

8  A.   Yes.

9  Q.   Can you look at the bottom e-mail on June 17, 2013?

10         Do you see that?

11 A.   I do.

12 Q.   You're having a discussion -- or an e-mail -- excuse

13 me -- with Mr. Lakkis.  Do you see that?

14 A.   Yes.

15 Q.   And who else is included on that e-mail?

16 A.   Mr. Ayliff and Mr. O'Brien.

17 Q.   And what's the title of the e-mail?

18 A.   "Foreign account report due 6/30/13."

19 Q.   And in sum and substance, what is Mr. Lakkis asking you

20 about in that bottom e-mail?

21 A.   He's summarizing the regulation with respect to reporting

22 foreign bank accounts and then attaches the IRS reg with it.

23 Q.   And then with respect to A, can you read A?  What does it

24 say?

25 A.   "They had a financial interest (see below for

─────U.S. v. Manafort─────

1   explanation) in or signature authority (see below for

2   explanation) over accounts outside of the United States."

3   Q.   And B?

4   A.   "The aggregate value of all foreign financial accounts

5   exceeds 10,000 at any time during 2012."

6   Q.   And as of June 2013, did Mr. Manafort have a financial

7   interest signature authority over accounts outside of the

8   United States?

9   A.   He did.

10  Q.   The aggregate value of those accounts, did it exceed

11  10,000?

12  A.   It did.

13  Q.   It far exceeded $10,000; isn't that true?

14  A.   Yes.

15  Q.   What was the amount of money in those accounts?

16  A.   I can't recall, but I venture to guess it's several

17  million dollars.

18  Q.   With respect to --

19          THE COURT:  Guesses are not admissible.

20          THE WITNESS:  Understood.

21          THE COURT:  So that's stricken, but you may ask

22  other questions if you think you can establish a value.  But

23  guesses not admissible.

24          MR. ANDRES:  Understood, Your Honor.

25  BY MR. ANDRES:

U.S. v. Manafort

R. Gates - Direct

1272

1  Q.   With respect to 2012, did DMP International,

2  Mr. Manafort, have a contract with the Ukraine?

3  A.   In 2012 it did.

4  Q.   Did that include a policy contract?

5  A.   Well, the policy contract had started earlier, but it was

6  continuing, yes.

7  Q.   Were there payments from the policy contract in 2012?

8  A.   Yes.

9  Q.   What was the total amount that was paid on the policy

10  contract in 2012?

11  A.   It would have been $4 million.

12  Q.   And where did that money go to?

13  A.   It went to a Cyprus bank account in Mr. Manafort's

14  control.

15  Q.   So in 2012, did Mr. Manafort have money in his Cyprus

16  accounts of at least $4 million?

17  A.   He did.

18  Q.   With respect to the document from Mr. Lakkis, it says,

19  "Last year we discussed the telecommunications company foreign

20  account as possible being reported."

21        What does that refer to?

22  A.   This refers to one of the investments from our private

23  equity fund that Mr. Manafort had.  And there was an

24  opportunity whereby Mr. Manafort wanted to exchange some of

25  the shares for loans that he had on his books over the years.

U.S. v. Manafort

R. Gates - Direct

1273

1    And we made this known to the accountants so that we could

2    figure out what type of tax impact it might have.

3    Q.   And in the course of that discussion about EVO Holdings,

4    was there a discussion about foreign bank accounts?

5    A.   There was.

6    Q.   And were there regulations explained?

7    A.   Yes, I believe they were.

8    Q.   Okay.  If you'd turn to the next page, Government

9    Exhibit 2585.

10             And if I could ask you to zoom in on the top.

11             What do you understand this to be?

12   A.   Based on Mr. Lakkis' e-mail, this was the attachment of

13   the financial regulation regarding ownership of foreign bank

14   accounts.

15   Q.   Okay.  And during this time period, were you having

16   discussions with Mr. Manafort about the disclosure of any

17   foreign bank accounts?

18   A.   Yes.

19   Q.   And did you have a discussion with him and pass on the

20   information from Mr. Lakkis?

21   A.   Yes, we did.

22   Q.   Okay.  I want to ask you to turn to Government

23   Exhibit 195.

24             Can you tell me what that is?

25             MR. ANDRES:  It's already in evidence, Your Honor.

─────U.S. v. Manafort─────
R. Gates - Direct
1274

1          THE COURT:  All right.

2          THE WITNESS:  Yes.  This is an e-mail chain from

3    Paul to me and then from me to Cindy.

4          MR. ANDRES:  May I publish it, Your Honor?

5          THE COURT:  You may.

6    BY MR. ANDRES:

7    Q.   Starting with the bottom e-mail on September 15, 2015,

8    can you explain what's happening and summarize this e-mail for

9    the jury?

10   A.   Yes.  It appears that KWC had sent Mr. Manafort the tax

11   forms to sign.  He signed the forms and then sent them to me

12   to forward to KWC.

13   Q.   Okay.  So these tax returns with respect to the year --

14   what year tax returns are these?

15   A.   It's 2014.

16   Q.   Okay.  It came from Mr. Manafort to you; is that right?

17   A.   Correct.

18   Q.   And then you sent them on to KWC?

19   A.   I did.

20   Q.   Do you know why Mr. Manafort didn't just send them

21   directly?

22   A.   I don't, but it wasn't unusual for him to just, from a

23   delegation point of view, send me documents to disburse among

24   other individuals.

25   Q.   And did you send those along to KWC?

U.S. v. Manafort

1  A.   I did.

2  Q.   Did you make any changes to them?

3  A.   No.

4  Q.   Mr. Gates, let me direct your attention to late 2015.

5        Where were you working in 2015?

6  A.   At DMP International.

7  Q.   Did DMP International have any active clients?

8  A.   No.  We were attempting to secure a new contract with the

9  Opposition BLOC party in Ukraine, but at that time no new

10  contracts.

11  Q.   How about 2016?  Did you continue to work at DMP?

12  A.   I did.

13  Q.   Up until when?

14  A.   Approximately, March of 2016.

15  Q.   And what did you do in March of 2016?

16  A.   I went to work on -- for one of the presidential

17  campaigns.

18  Q.   And who hired you for that presidential campaign?

19  A.   Mr. Manafort.

20  Q.   And was he also working on the presidential campaign at

21  the time?

22  A.   He was.

23  Q.   With respect to the income that DMP was earning prior to

24  that, was he -- was DMP earning any income in 2016?

25  A.   Not to my knowledge.

─────U.S. v. Manafort─────
R. Gates - Direct
                                                          1276

1   Q.   How did you know?

2   A.   Ms. Washkuhn would typically prepare monthly

3   reconciliation pages with respect to both Mr. Manafort's

4   business and personal accounts so we'll have a snapshot of the

5   amount due in bills and then Ms. Washkuhn would request

6   funding for those payments.

7   Q.   In late 2015 and early 2016, how many people were

8   employed at DMP?

9   A.   Two.

10  Q.   Who were they?

11  A.   Myself and Alex Trusko.

12  Q.   And what was Mr. Kilimnik's status?

13  A.   He was still working with Mr. Manafort, but, to my

14  knowledge, he was being paid locally from Ukraine.

15  Q.   During the time that you worked for Mr. Manafort from

16  2006 to 2016, was Mr. Kilimnik always associated with the firm

17  in some way?

18  A.   Yes.

19  Q.   In 2016, do you -- if DMP wasn't making any money, do you

20  know how Mr. Manafort was paying your salary?

21  A.   Yes.  The salary and the bills of the company were being

22  paid by savings and investment accounts that Mr. Manafort had

23  at the time.

24  Q.   How did you know that?

25  A.   Based on information that Ms. Washkuhn had circulated.

R. Gates - Direct

1   Q.   During this time period, were you also -- did you have

2   other businesses that you were involved in?

3   A.   I did.

4   Q.   Were you involved in a company called Map Global

5   Holdings?

6   A.   Yes.

7   Q.   What was the name of that company?

8   A.   Map Global Holdings.

9   Q.   And what did that involve?

10  A.   It was PR and a movie production company.

11  Q.   Okay.  And did you make any money from that --

12  A.   I did.

13  Q.   -- company?

14  A.   I did.

15  Q.   Steve Brown involved in that company?

16  A.   He was.

17  Q.   Okay.  And that's the instance where you were involved in

18  backdating documents?

19  A.   Yes.

20  Q.   How about ID Watchdog, what was that?

21  A.   That was a company that I served as a board of directors

22  for.

23  Q.   During this time period in 2015 and 2016, was

24  Mr. Manafort having issues with his expenses?

25  A.   Yes.

R. Gates - Direct

1278

1    Q.   What were the issues?

2    A.   There were a number of vendors that had reached out to

3    both myself and Ms. Washkuhn, indicating that the bills had

4    not been paid and asking when payment might be received.

5    Q.   During this time period, did Mr. Manafort begin applying

6    for bank loans?

7    A.   He did.

8    Q.   How did you know that?

9    A.   He had requested a team of people to begin pulling

10   together an assortment of documents in order for him to apply

11   for the bank loans.

12   Q.   Did he apply for one loan or more than one loan?

13   A.   It was more than one loan.

14   Q.   And what role did you play with respect to those loans?

15   A.   It varied depending on the loan.  But in large respect, I

16   was the point person for collecting all of the documents from

17   the various individuals and then submitting those to the

18   members of the various banks that Mr. Manafort directed.

19   Q.   In the process of doing that, did you provide false

20   information to any of the banks where Mr. Manafort applied for

21   a bank [sic]?

22   A.   Yes.

23   Q.   Did Mr. Manafort know that you were doing that?

24   A.   Yes.

25   Q.   How did he know?

EASTERN DISTRICT OF VIRGINIA

┌─ U.S. v. Manafort ─┐

R. Gates - Direct

1279

1  A.   Because he had requested certain things be changed in

2  some of the documents.

3  Q.   And did you, in fact, alter those documents?

4  A.   Yes, we did.

5  Q.   Did you alter profit and loss documents?

6  A.   Yes.

7  Q.   How were you able to do that?

8  A.   At one point, I was tasked with -- by Mr. Manafort,

9  speaking with Ms. Laporta, to determine whether or not there

10 could be any other sources of income.

11      At the time Ms. Laporta indicated to us that the

12 only way that you can find more income is if you have loans on

13 the books, but in doing so you have to forgive a loan and if

14 you do that, there's a tax consequence with that as well.

15 Q.   Okay.  But when you altered the P&L documents, physically

16 you changed them from PDF documents to other types of

17 documents?

18 A.   Yes, to Word documents.

19 Q.   Okay.  Let me ask you to turn to Government Exhibit 380.

20 Can you tell me what this is?

21 A.   This is an e-mail to me from Mr. Manafort.

22 Q.   And does this relate to some of the loan applications

23 Mr. Manafort was making?

24 A.   It does.

25      MR. ANDRES:  The Government moves to admit

R. Gates - Direct

1280

1    Government Exhibit 380.

2                MR. DOWNING:  No objection.

3                THE COURT:  Admitted.

4                          (Government's Exhibit No. 380

5                           admitted into evidence.)

6    BY MR. ANDRES:

7    Q.   Starting at the top, can you tell us who the e-mail is

8    from and to and the date?

9    A.   Yes.  It's to me from Mr. Manafort on January 6, 2016.

10   Subject is VIP time sensitive.

11               MR. ANDRES:  Your Honor, may I publish this

12   document?

13               THE COURT:  You may.

14   BY MR. ANDRES:

15   Q.   Okay.  And with respect to the document, what's the

16   title?

17   A.    VIP time sensitive.

18   Q.   Can you summarize the e-mail for the jury?

19   A.    Yes.  Mr. Manafort had requested me to reach out to

20   Mr. Ayliff in regards to a question that he wanted additional

21   information and was hoping for a specific answer in regards to

22   some of his properties that he was using to apply for the

23   loan.

24   Q.   Mr. Manafort said he wants to cash out refinance on the

25   Howard Street property.  What did you understand that to mean?

R. Gates - Direct

1    A.   That a cash-out refinance is, if successfully you obtain

2    the mortgage, then part of what you get back is cash.

3    Q.   Mr. Manafort says, "For the maximum benefit I'm claiming

4    Howard Street as a second loan."

5              Do you know if Mr. Manafort has ever -- as a second

6    home, excuse me.

7              Has Mr. Manafort ever lived at Howard Street?

8    A.   To my knowledge, no.

9    Q.   Do you know what his primary residence was?

10   A.   At that time it was his house in Florida.

11   Q.   And how did you know his house in Florida was his primary

12   residence?

13   A.   Because I, along with one of our legal advisors and real

14   estate attorneys, changed the incorporation documentation to

15   have the company listed as a Florida-based company and then

16   Mr. Manafort changed his state of residence to Florida.

17   Q.   And the Howard Street property, what city and state was

18   that in?

19   A.   That was in New York City, New York.

20   Q.   When Mr. Manafort was in New York City, where did he

21   stay?

22   A.   He had an apartment on Fifth Avenue.

23   Q.   When Mr. Manafort said he -- in order to have a maximum

24   benefit that he's claiming Howard Street as a second home, do

25   you have an understanding what that referred to?

1   A.   Yes.  Just that he was looking for the most favorable

2   terms in the mortgage interest rate.

3   Q.   And do you know if there are different terms if the

4   property is a home or an investment property?

5   A.   Based on my conversation with Ms. Laporta, yeah, she

6   described that there were.

7   Q.   Okay.  And then he -- he says he needs to be in touch

8   with David Fallarino.  Who is that?

9   A.   David Fallarino was the banking representative at

10  Citizens Bank.

11  Q.   Okay.  And he asked you to get in touch with Mr. Ayliff.

12       Did you ever get in touch with Mr. Ayliff?

13  A.   I was not able to get in touch with Mr. Ayliff, but I was

14  able to speak with Ms. Laporta.

15  Q.   And what, if anything, did Ms. Laporta -- what did you

16  understand about what actions Ms. Laporta had taken as a

17  result of that conversation?

18  A.   Ms. Laporta had given some background information on the

19  various options and then she, I believe, had designated

20  Mr. Manafort to use this as a second home.

21  Q.   Can I ask you to take a look at Government Exhibit 235.

22       Can you tell me what that is?

23  A.   Originally this is an e-mail from Linda Francis in

24  regards to outstanding items she needed to process Paul's bank

25  loan application.

U.S. v. Manafort

R. Gates - Direct

1283

1    Q.    Who is Melinda Francis?

2    A.    She was a banking representative at Citizens Bank that

3    worked with Mr. Fallarino.

4    Q.    And do you know where Mr. Manafort was applying for -- or

5    the property -- excuse me.

6          Do you know what property he was seeking a loan with

7    respect to at Citizens Bank?

8    A.    Yes.  At Citizens I believe it was a property called

9    Union Street and also Baxter Street.

10   Q.    Okay.  Well, those were the mortgages.  With respect to

11   the actual loan, did it relate to Howard Street?

12   A.    Oh, yes, Howard Street.

13   Q.    So if you look at number -- the e-mail from Mr. Manafort

14   to Ms. Francis on February 21st, can you tell me what that

15   says?

16   A.    (As read): "Melinda, I have provided answers to the

17   questions that you posed in your e-mail.  My answers are in

18   red.  I will provide the requested documentation in the next

19   48 hours."

20         MR. ANDRES:  The Government moves to admit

21   Government Exhibit 235.

22         THE COURT:  Well, that portion of it I will admit.

23   Any objection to portion of it?

24         (A pause in the proceedings.)

25         MR. DOWNING:  No, Your Honor.

R. Gates - Direct

1284

1    THE COURT:  Admitted.

2                    (Government's Exhibit No. 235

3                    admitted into evidence.)

4    THE COURT:  Next question.  And that's an e-mail

5   from Mr. Manafort, so it's clearly admissible.  I'm -- I'm not

6   sure you either need or want to have the hearsay testimony

7   from a person who isn't here and testifying.

8        MR. ANDRES:  Thank you, Your Honor.

9   BY MR. ANDRES:

10  Q.   With respect to the request for information, was there a

11  request for information about certain mortgages on properties

12  that Mr. Manafort owned?

13  A.   There was.

14  Q.   Okay.  Was there a request for information with respect

15  to the Union Street property?

16  A.   Yes.

17  Q.   Okay.  And how about the Baxter Street property?

18  A.   Yes.

19  Q.   Do you know when Mr. Manafort applied for the loan how he

20  represented the Union Street property?

21  A.   He represented that it had no mortgage on the property.

22  Q.   And did you understand that it did?

23  A.   I later came to learn that it did, yes.

24  Q.   Okay.  How did you learn that fact?

25  A.   From some documentation Mr. Manafort had requested me to

U.S. v. Manafort

R. Gates - Direct

1285

1  gather from his insurance representative.

2  Q.   Who is that?

3  A.   Donna Duggan.

4  Q.   And when you called Donna Duggan, what did you ask for?

5  A.   I asked her for the current insurance policies that

6  Mr. Manafort had asked me to obtain for him from her.

7  Q.   When you spoke to Ms. Duggan, did you ask for the current

8  policy or did you ask for a different copy?

9  A.   At the time I asked --

10        THE COURT:  The correct question is what did you ask

11  for, because otherwise you're only giving him two choices and

12  it's leading.  What did you ask for is the question.

13        THE WITNESS:  I asked for the current year policy.

14  BY MR. ANDRES:

15  Q.   Okay.  And did you later have a discussion with Ms. --

16  did you have a second discussion or interaction with

17  Ms. Duggan?

18  A.   Yes.

19  Q.   And what did you ask for then?

20  A.   At that point Mr. Manafort had asked me to get the prior

21  year policy.

22  Q.   Okay.  And did you?

23  A.   I did.

24  Q.   And what did you do with that document?

25  A.   I sent it to Melinda Francis at the bank.

┌─────────────────────────────────────────────────────┐
U.S. v. Manafort
R. Gates - Direct
1286

1  Q.    And what did you represent that to be?

2  A.    These were two of the insurance policies Mr. Manafort had

3  asked me to obtain for him, and both of them showed that they

4  were free and clear of any mortgages.

5  Q.    And when you sent that document to Citizens Bank, was it

6  accurate?

7  A.    It was not.

8  Q.    How was it inaccurate?

9  A.    Because there was a mortgage listed on the Union Street

10 property.

11 Q.    Can I ask you to turn to Government Exhibit 237?

12          When you sent that inaccurate mortgage document to

13 the bank, did you know it was false?

14 A.    Yes.

15 Q.    And was Mr. Manafort involved in those e-mails?

16 A.    He was.

17 Q.    Can I ask you -- when you look at Government Exhibit 237,

18 can you tell me what that is?

19 A.    This is an e-mail from me to Ms. Francis.  I copied

20 Mr. Manafort and Ms. Washkuhn.  And this is in regard to the

21 some of the outstanding documents that the bank had required.

22 Q.    Okay.  And you were sending documents back and forth to

23 Ms. -- to Ms. Francis on behalf of Mr. Manafort?

24 A.    Yes.

25 Q.    And is there attachment to this document?

U.S. v. Manafort

R. Gates - Direct

1287

1  A.   There is.

2  Q.   And does that -- the attachment, is that the current

3  version of the insurance or is it the older version?

4       THE COURT:  Again, you're giving him two choices.

5       MR. ANDRES:  Understood, Your Honor.  I'm sorry.

6  BY MR. ANDRES:

7  Q.   With respect to the attachment, can you describe that to

8  the jury?

9  A.   Yes.  The effective date on the attachment is 10/12/2015,

10 which would have been the prior year policy.

11 Q.   Okay.  That document that you sent, what's the date of

12 that?  The e-mail, I'm sorry.

13 A.   The date of the e-mail is February 23, 2016.

14 Q.   Okay.  And the policy with respect to the Union Street

15 property, is that included in the document?

16 A.   Yes.

17 Q.   Okay.  And with respect to the Union Street property,

18 what's the effective date of that policy?

19 A.   The effective date is 10/12/2015.

20      MR. ANDRES:  Can I have one moment, Your Honor?

21      THE COURT:  Yes, you may.

22      (A pause in the proceedings.)

23      MR. ANDRES:  I'll move on and come back to this

24 document, Your Honor.

25      THE COURT:  I beg your pardon?

─────U.S. v. Manafort─────

R. Gates - Direct

1288

1       MR. ANDRES:  I said I was going to move on and come

2  back to this document, if that's okay.

3       THE COURT:  All right.

4       MR. ANDRES:  To move things along.

5  BY MR. ANDRES:

6  Q.   Can I ask you to take a look at Government Exhibit 240.

7       Actually, I'm sorry, Mr. Gates, can you turn back to

8  the prior exhibit, 235 -- 237.

9       Can you look at the document marked "7526," the last

10  four Bates numbers?

11  A.   Yes.

12  Q.   Do you see that?

13  A.   I do.

14  Q.   What's the property listed there?

15  A.   Property listed is 377 Union Street.

16  Q.   What's the effective date of that policy?

17  A.   2/1/2016.

18  Q.   And this is the document that's attached -- the -- the

19  insurance folders that's attached to Government's Exhibit 237;

20  is that right?

21  A.   Yes.

22  Q.   As far as you understood, how would you describe that

23  version of the policy?

24  A.   This was the most current policy that had been submitted

25  by the insurance brokers.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

┌─────────────────────────────────────────────────────────────┐
U.S. v. Manafort
R. Gates - Direct
1289

1   Q.   Can I ask you now to turn to Government's Exhibit 240?

2             MR. ANDRES:   Your Honor, I just want to make sure I

3   admit or I move to admit Government Exhibit 237 -- or 240.

4   I'm sorry.  240.

5             THE COURT:   Not admitted yet.

6             MR. ANDRES:   Move to admit it, Judge.

7             THE COURT:   Any objection to 240, which is a -- just

8   a moment -- e-mail chain that includes Mr. Manafort?   Any

9   objection.

10             MR. DOWNING:   One moment, Your Honor.

11             MR. ANDRES:   It's 237, Your Honor.

12             THE COURT:   Oh, it was 237?

13             MR. ANDRES:   Yes.

14             MR. DOWNING:   I thought you said 240.

15             THE COURT:   That's an e-mail chain Mr. --

16             MR. DOWNING:   No objection.

17             THE COURT:   No objection.  All right.  It's

18   admitted.

19                          (Government's Exhibit No. 237

20                          admitted into evidence.)

21   BY MR. ANDRES:

22   Q.   Can I ask you to turn to Government Exhibit 240 now?

23   A.   Yes.

24   Q.   Can you tell me what that is?

25   A.   This is an e-mail chain involving myself, Mr. Manafort,

U.S. v. Manafort

R. Gates - Direct

1290

1   Ms. Washkuhn, and Ms. Francis.

2   Q.   Okay.  And is Ms. Francis asking a question in this -- in

3   this e-mail?

4   A.   She is.

5   Q.   Is Mr. Manafort included in these e-mails?

6   A.   He is.

7   Q.   Okay.  And what is she asking?

8   A.   She's asking about the properties in question, Union

9   Street and Baxter Street, as being owned free and clear.

10  Their records indicate that one of the properties was not.

11  Q.   Has she received conflicting information, as you

12  understood at this time?

13  A.   She did.

14  Q.   Okay.  And what was the conflicting information?

15  A.   The conflicting information that she was given the

16  current year policy, which in the case of the one property

17  showed the mortgagee listed on it.

18  Q.   Okay.  Who had sent her the current policy?

19  A.   I'm sorry.

20  Q.   Who had sent her the current policy?

21  A.   I sent her the current policy.

22  Q.   Okay.  And is that consistent with what Mr. Manafort

23  listed on his application?

24  A.   The current policy was not accurate.

25  Q.   Okay.

─────────U.S. v. Manafort─────────

R. Gates - Direct

1291

1    A.   Excuse me.  The current policy was accurate.

2    Mr. Manafort had asked me to submit the prior year policies.

3              MR. ANDRES:  Your Honor, the Government moves to

4    admit Government Exhibit 240.

5              MR. DOWNING:  No objection.

6              THE COURT:  Admitted.

7                        (Government's Exhibit No. 240

8                        admitted into evidence.)

9    BY MR. ANDRES:

10   Q.   Can I ask you now to look at Government Exhibit 263?

11            Can you tell me what that is?

12   A.   This is an e-mail from me to Donna Duggan.  Mr. Manafort

13   had requested that I reach out to Ms. Duggan to get some

14   information that he had already spoken to her about.

15   Q.   At the -- at the e-mail -- at the bottom e-mail, who is

16   that between?

17   A.   At the bottom e-mail is between myself and Ms. Duggan.

18            MR. ANDRES:  Your Honor, the Government moves to

19   admit 263.

20            MR. DOWNING:  Without objection.

21            THE COURT:  Admitted.

22                        (Government's Exhibit No. 263

23                        admitted into evidence.)

24   BY MR. ANDRES:

25   Q.   And can you summarize for the jury what's happening in

┌─ U.S. v. Manafort ─┐

R. Gates - Direct

1292

1    this e-mail?

2              MR. ANDRES:  May I publish it, Your Honor.

3              THE COURT:  You may.

4              THE WITNESS:  Yes.  Mr. Manafort asked that I reach

5    out to Ms. Duggan in order to get the prior year policy after

6    Ms. Francis had indicated that there was a discrepancy in the

7    current year policy.

8    BY MR. ANDRES:

9    Q.   And did you e-mail back and forth with Ms. Duggan?

10   A.   I did.

11   Q.   Did you eventually speak with her?

12   A.   I did.

13   Q.   And what specifically did you request?

14   A.   I requested the copy of the prior year policy per

15   Mr. Manafort.

16   Q.   And did she -- why did you do that?

17   A.   Because at the time Mr. Manafort had asked me to.

18   Q.   And did she provide that?

19   A.   She did.

20   Q.   I'm going to show you Government Exhibit 384.

21              Can you tell me what that is?

22   A.   It's an e-mail between me and Mr. Manafort.

23   Q.   Okay.  And does it relate to this issue that you've been

24   testifying about with Donna Duggan?

25   A.   It does.

1  Q.   And the Citizens Bank loan?

2  A.   Yes.

3        MR. ANDRES:  The Government moves to admit

4  Government Exhibit 384.

5        MR. DOWNING:  No objection.

6        THE COURT:  Admitted.

7                    (Government's Exhibit No. 384

8                    admitted into evidence.)

9        MR. ANDRES:  May I publish it?

10       THE COURT:  You may.

11 BY MR. ANDRES:

12 Q.   Can I focus on the e-mail at the bottom at 2:45?

13       Mr. Gates, can you explain that e-mail?

14 A.   Yes.  It is a follow-up for Mr. Manafort, indicating to

15 him that I was successful in reaching Ms. Duggan and told him

16 that we would have the amended policies very soon.

17 Q.   Okay.  So there were two insurance policies that you got

18 from Ms. Duggan; is that correct?

19 A.   Correct.

20 Q.   So with respect to the Baxter Street insurance policy,

21 the policy that was originally sent to the bank, how would you

22 describe that?

23 A.   That was accurate.

24 Q.   Okay.  How?

25 A.   In the sense that there was no mortgagee listed on that

R. Gates - Direct

1  insurance policy.

2  Q.   And did you get the right one?

3  A.   We did.

4  Q.   And what did you do with it?

5  A.   Submitted it to her.

6  Q.   With respect to the Union Street property, the one that

7  was originally submitted to the bank, was that the -- was that

8  correct?

9  A.   It was not correct.

10  Q.   Okay.  The one that was originally sent to the bank?

11  A.   The one that was -- the original policy was accurate.  It

12  reflected the mortgagee.

13  Q.   And what did you get from Ms. Duggan?

14  A.   Ms. Duggan sent us the prior year policy, which we then

15  forwarded to the bank.

16  Q.   And was that accurate?

17  A.   That was not accurate.

18  Q.   Okay.  And your e-mail here on February 24, 2016 with

19  Mr. Manafort, what are you discussing?

20  A.   Again, I'm updating Mr. Manafort on the status of his

21  request regarding the insurance policies.  He then asked me

22  who we're sending these to at Citizens, or if I had sent them

23  to anybody at Citizens, and I said that I would be sending

24  them to Melinda.

25  Q.   Okay.  Can I show you Government Exhibit 262?

U.S. v. Manafort

R. Gates - Direct

1295

1    Can you tell me what that is?

2    A.   Yes.  These are the declaration pages for both Union

3    Street property and Baxter Street, forwarded to Mrs. Duggan to

4    myself and Ms. Azzam at UBS Bank.

5    MR. ANDRES:  The Government moves to admit 262.

6    MR. DOWNING:  No objection.

7    THE COURT:  Admitted.

8    (Government's Exhibit No. 262

9    admitted into evidence.)

10   BY MR. ANDRES:

11   Q.   Is this the document that Ms. Duggan sent you after you

12   spoke to her?

13   A.   It is.

14   Q.   And how would you characterize this policy that she sent

15   to you after you spoke to her?

16   A.   This was the prior year policy to the earlier one she had

17   sent.

18   Q.   Okay.  Can I show you now Government Exhibit 137?

19   What is Government Exhibit 137?

20   A.   This is an e-mail from me to Ms. Francis, copying

21   Mr. Manafort and Ms. Washkuhn.

22   Q.   Okay.

23   A.   In regards to the two properties.

24   Q.   And who is Melinda Francis?

25   A.   She's the representative at Citizens Bank.

U.S. v. Manafort

R. Gates - Direct

1296

1  Q.   Okay.  And what did you send her?

2  A.   I sent her the two previous year policies on the two

3  properties.

4  Q.   Where it says, "MC Brooklyn (Carol Gardens)," what's that

5  in reference to?

6  A.   That is Union Street.

7          MR. ANDRES:  The Government moves to admit

8  Government Exhibit 137.

9          MR. DOWNING:  No objection.

10          THE COURT:  It's admitted.

11                        (Government's Exhibit No. 137

12                        admitted into evidence.)

13  BY MR. ANDRES:

14  Q.   With respect to the --

15          MR. ANDRES:  Thank you, Your Honor.

16  BY MR. ANDRES:

17  Q.   With respect to MC Brooklyn, Carol Gardens, what property

18  is that?

19  A.   The Union Street property.

20  Q.   Okay.  And what -- how would you characterize the

21  insurance policy that you sent to Melinda Francis on this date

22  with respect to that property?

23  A.   So this e-mail attaches the two older policies, which

24  reflect no mortgagees on the properties.

25  Q.   Okay.  And with respect to Baxter Street, was there a

R. Gates - Direct

1297

1 | mortgage there?

2 | A.    There was not.

3 | Q.    Okay.  And with respect to Union Street, was there a

4 | mortgage there?

5 | A.    There was.

6 | Q.    Okay.  During the course of the dealings with Citizens

7 | Bank, did an issue arise with respect to Peranova?

8 | A.    Yes.

9 | Q.    Okay.  And what issue arose with respect to Peranova?

10 | A.    The issue that arose was regarding the effort of

11 | Mr. Manafort to find additional income for the mortgage

12 | application.  This is when one of the loans that was on the

13 | books at DMP had been forgiven and then was treated as income.

14 | Q.    Okay.  So -- and that loan related to what entity?

15 | A.    Peranova Holdings.

16 | Q.    And during the course of the time that you worked for

17 | Mr. -- what was Peranova?

18 | A.    Peranova was a Cypriote entity and the controller was

19 | Mr. Manafort.

20 | Q.    During the time that you worked for Mr. Manafort, did

21 | Peranova, the Cypriote entity, ever make a loan to

22 | Mr. Manafort?

23 | A.    It did not.

24 | Q.    Were there payments from Peranova to Mr. Manafort?

25 | A.    There were.

─────U.S. v. Manafort─────

R. Gates - Direct                                          1298

1   Q.   What were they?

2   A.   Income.

3   Q.   Were they always income?

4   A.   To my knowledge, yes.

5   Q.   Can I ask you to look at Government Exhibit 163?

6        MR. ANDRES:  It's already admitted into evidence,

7   Your Honor.

8   BY MR. ANDRES:

9   Q.   Can you tell me what Government Exhibit 163 is?

10  A.   Yes.  It's an e-mail exchange initially between David

11  Fallarino and Cindy Laporta, and then later -- yes, and copies

12  Ms. Francis.

13  Q.   And with respect -- and you're on the top e-mail?

14  A.   I'm on the top and Mr. Manafort is as well.

15  Q.   And what's the -- what's the date of the e-mail, the top

16  one?

17  A.   February 4, 2016.

18  Q.   Okay.  Can you look at the e-mail on February 4 at four

19  o'clock where it says, "we qualify for everything," do you see

20  that?

21  A.   Yes.

22  Q.   Can you describe what's -- what's being conveyed to

23  Mr. Manafort there?

24  A.   Yes.  So after submitting a series of documents, the bank

25  came back and indicated areas that we were still lacking in

R. Gates - Direct

U.S. v. Manafort

1299

1   documentation.  One of the areas that they described is based

2   on the information they received in terms of the

3   differentiating tax years, is there was a liquidity issue with

4   respect to Mr. Manafort's current year income.

5   Q.   Okay.  And did you solve that problem or was that problem

6   solved in some regard?

7   A.   I believe it was, yeah, solved partially.

8   Q.   Okay.  How?

9   A.   By converting the Peranova loan to income, we were able

10  then to treat that as income on the books for 2015.

11  Q.   And when you say, "converted," how did you convert that?

12  A.   We did a loan forgiveness letter between Peranova and DMP

13  International.

14  Q.   And who is Peranova?

15  A.   A company controlled by Mr. Manafort.

16  Q.   Did a loan forgiveness letter between Mr. Manafort and

17  Mr. Manafort?

18  A.   Yes.

19  Q.   And was the -- were the details of that loan forgiveness,

20  the dates, were they accurate?

21  A.   They were not.

22  Q.   And did Ms. Laporta help you with that process?

23  A.   She did.

24  Q.   Can I ask you to turn to Government Exhibit 164?

25          MR. ANDRES:  This is already in evidence, Your

─U.S. v. Manafort─

R. Gates - Direct

1300

1  Honor.

2  BY MR. ANDRES:

3  Q.   Can you take a look at Government Exhibit 164 and let me

4  know when you've had a chance to read it?

5  A.   Okay.

6  Q.   Can you look at the e-mail at 3:28 on the first page and

7  explain, summarize that for the jury?

8  A.   Yes.  Ms. Laporta is reaching out to me and she's says

9  that she will need documentation supporting the 1.5 million

10  loan forgiveness.  This is in order so that she can report it

11  to the banker.  So this is the letter that I had mentioned

12  earlier that she's requesting to demonstrate the loan.

13  Q.   Okay.  And how did you respond?

14  A.   I responded that I will get her the letter and then she

15  could do the cover letter that Mr. Manafort had requested.

16  Q.   At the time that you're discussing writing this letter,

17  had the loan, in fact, been forgiven?

18  A.   No.

19  Q.   It never existed in the first place?

20  A.   Correct.

21  Q.   Can I ask you to turn to Government Exhibit 165?

22          THE COURT:  But the money represented, was that

23  actual money paid to Mr. Manafort for services?

24          THE WITNESS:  It was.

25          THE COURT:  Next question.

U.S. v. Manafort

R. Gates - Direct

1301

1    BY MR. ANDRES:

2    Q.   Can I ask you to turn to Government 165?

3            MR. ANDRES:  Which is already in evidence, Your

4    Honor.

5            THE COURT:  All right.

6            We're going recess at 12:30, ladies and gentlemen.

7    BY MR. ANDRES:

8    Q.   When you look at Government Exhibit 165, can you describe

9    that for the jury, Mr. Gates?

10   A.   Yes.  This is the draft loan forgiveness letter that I

11   had sent to Ms. Laporta so that she could review and make sure

12   that nothing else needed to be included with it before I got

13   the signatures.

14   Q.   And what is the date on the e-mail that you send to

15   Ms. Laporta?

16   A.   It is February 8, 2016.

17           MR. ANDRES:  May I publish this, Your Honor?

18           THE COURT:  Yes.

19   BY MR. ANDRES:

20   Q.   Just highlight the date.

21           Where do you see the date on that e-mail?

22   A.   Where it says, "sent, Monday, 2/8/2016."

23   Q.   And who is the e-mail to?

24   A.   To Cindy Laporta from me.

25   Q.   And if you look now at the attachment, what is that?

———————U.S. v. Manafort———————

R. Gates - Direct

1302

1   A.   Peranova loan forgive.

2   Q.   Okay.  And what's the date on the letter?

3   A.   June 23, 2015.

4   Q.   When you wrote the letter, did you put the right date?

5   A.   No.  The income needed to be associated with 2015, so we

6   had to secure a date in that year.

7   Q.   And, again, the purpose for this document is to do what?

8   A.   To forgive a loan in order to treat loan as income in

9   2015.

10  Q.   And that was in relation to Mr. Manafort's bank loan

11  application?

12  A.   Bank loan application, that's correct.

13           THE COURT:  Was the money involved always income?

14           THE WITNESS:  It was.

15           THE COURT:  Next question.

16  BY MR. ANDRES:

17  Q.   Can I ask you to turn to Government Exhibit 166?

18  A.   Okay.

19           MR. ANDRES:  This is already in evidence, Your

20  Honor.

21           THE COURT:  All right.

22  BY MR. ANDRES:

23  Q.   Can I ask you to take a look at Government Exhibit 166

24  and explain who that e-mail is to and from and summarize it

25  for the jury?

U.S. v. Manafort

R. Gates - Direct

1303

1   A.   Yes.  It's to Ms. Laporta from me and it's in regards to

2   the loan letter that she, in essence, approved.  And then she

3   was going to originally do a cover e-mail of -- Mr. Manafort

4   had requested actually a cover letter with the KWC letterhead

5   on it because it was being submitted to the bank.  So I'm

6   asking her basically to do a letter instead of an e-mail.

7   Q.   Okay.  And this, again, relates to the Peranova loan

8   forgiveness issue?

9   A.   It does.

10  Q.   Okay.  Can I ask you to turn to Government Exhibit 389?

11          Can you describe Government Exhibit 389?

12  A.   This is an e-mail to Mr. Manafort from me.

13  Q.   Okay.

14          MR. ANDRES:  Your Honor, the Government moves to

15  admit Government Exhibit 389.

16          MR. DOWNING:  No objection.

17          THE COURT:  Admitted.

18                          (Government's Exhibit No. 389

19                          admitted into evidence.)

20  BY MR. ANDRES:

21  Q.   And can you describe what's happening here in the e-mail

22  from you to Mr. Manafort?

23  A.   Yes.  After Ms. Laporta approved the letter, I sent it to

24  Mr. Manafort to get his approval and sign off as well in case

25  he wanted to add anything.

R. Gates - Direct

1  Q.   And did he ultimately approve?

2  A.   Yes, he did.

3  Q.   Okay.  Can you turn to Government Exhibit 388?

4       Can you tell me what that is?

5  A.   Yes.  This is a continuation of the previous e-mail.

6  This shows that Mr. Manafort is fine with the letter and it

7  can go forward and he requests that it be on KWC's stationary,

8  and then I indicate that the cover note from Ms. Laporta will

9  be, but that the forgiveness letter would be on Peranova

10 letterhead since Peranova was forgiving the loan.

11       MR. ANDRES:  Government moves to admit Government

12 Exhibit 388.

13       MR. DOWNING:  No objection.

14       THE COURT:  Admitted.

15                      (Government's Exhibit No. 388

16                      admitted into evidence.)

17 BY MR. ANDRES:

18 Q.   Mr. Gates, with respect to the income that was at issue

19 in Peranova, there's -- do you know what year that was

20 actually earned?

21 A.   I believe it was 2012.

22 Q.   Okay.  It wasn't 2015; is that correct?

23 A.   That's correct.

24 Q.   Can I ask you to turn to Government Exhibit 167?

25       Can you tell me what that is?

1   A.   Yes.   This is the final letter that I send to Ms. Laporta

2   with the director of the signature from the Cypriote company.

3   Q.   Okay.  And who is the director from the Cypriote company?

4   A.   In this case, it was a woman by the name of

5   Ms. Chrysostomides.

6   Q.   Okay.  And is that an individual that's associated with

7   Dr. K?

8   A.   Dr. K's firm, that's correct.

9   Q.   Okay.  With respect to the e-mail in 167, what's the date

10   of that e-mail?

11   A.   February 9, 2016.

12   Q.   Okay.  And the -- and the letter that was signed?

13   A.   June 23, 2015.

14          MR. ANDRES:  The Government moves to admit 167.

15          MR. DOWNING:  No objection.

16          THE COURT:  Admitted.

17          Is this an appropriate time?  It's now virtually

18   12:30.

19          MR. ANDRES:  I have two documents left of this loan,

20   Judge.  Could I finish those?

21          THE COURT:  All right.  Go ahead.  You may do it.

22   BY MR. ANDRES:

23   Q.   Take a look at Government Exhibit 424.

24          Can you tell me what that is?

25   A.   Let's see.  Yes, this is in reference to the loan.

1   Mr. Manafort is on an e-mail exchange with other individuals

2   from Citizens Bank, and this is where the requirement from the

3   bank saying that the letter from Ms. Laporta will need to be

4   on KWC letterhead.  So this is where Mr. Manafort is

5   requesting me to make sure that we get that on KWC letterhead.

6   Q.   Just to clarify, you said this relates to a loan.  It

7   relates to the loan application at Citizens Bank?

8   A.   Yes.

9   Q.   And also the --

10  A.   The Peranova loan, correct.

11          MR. ANDRES:  And the Government moves to admit 424,

12  Your Honor.

13          MR. DOWNING:  No objection.

14          THE COURT:  Admitted.

15                      (Government's Exhibit No. 424

16                       admitted into evidence.)

17  BY MR. ANDRES:

18  Q.   During the process of crafting the letter for the bank

19  and interacting with Ms. Laporta, was Mr. Manafort fully

20  informed of what was happening with respect to the Peranova

21  letter?

22  A.   Yes.

23  Q.   And did you include him on e-mails?

24  A.   Yes.

25  Q.   And the the e-mail in 424, Mr. Manafort is included in

─────────── U.S. v. Manafort ───────────

R. Gates - Direct

1307

1     that e-mail chain; is that right?

2   A.   He is.

3   Q.   And if you look at the top e-mail on 424, does it

4   reference a conversation between Mr. Manafort and Ms. Laporta?

5   A.   Well, it's a reference to me talking to Ms. Laporta and

6   updating Mr. Manafort.

7   Q.   I'm sorry, so that's -- that top e-mail is for you?

8   A.   Yes.

9   Q.   Okay.  And you were informing Mr. Manafort of what?

10  A.   That Cindy would put the letter on the letterhead.

11  Q.   Okay.  Let me show you Government Exhibit 168, the last

12  document, as it relates to this issue.

13          MR. ANDRES:  This is already in evidence, Your

14  Honor.

15          THE COURT:  All right.

16  BY MR. ANDRES:

17  Q.   Can you take a look at the exhibit at 168?  Tell me what

18  that is.

19  A.   Yes, this is in regard to another issue Mr. Fallarino

20  highlighted for Mr. Manafort and had asked Ms. Laporta to

21  become involved in terms of the ordinary income versus the

22  dividend income in regards to Mr. Manafort's income.

23  Q.   Okay.  But attached to this string of e-mails, if you

24  look at the last page, it's the forgiveness letter?

25  A.   It is.

─────U.S. v. Manafort─────

R. Gates - Direct

1308

1  Q.   Okay.  And in this -- is that forgiveness letter now

2  being sent to Citizens Bank?

3  A.   Yes, Ms. Laporta sent it with her cover note on the page

4  prior.

5  Q.   Okay.  And who was CC'd on that cover note?

6  A.   Let's see.

7  Q.   On the first page at 168?

8  A.   Oh, 168.  So it was myself and Mr. Manafort.

9       MR. ANDRES:  Your Honor, I can stop now if that's

10  appropriate.

11       THE COURT:  Yes.

12       All right.  You may step down, Mr. Gates.  And

13  remember, you may not discuss your testimony with anyone

14  during the luncheon recess.

15       THE WITNESS:  Understood.

16       THE COURT:  We'll reconvene at 1:35.

17       Mr. Andres, how much more do you anticipate with

18  this witness?

19       MR. ANDRES:  Less than an hour, Your Honor.

20       THE COURT:  Now, you've listed on your witness list

21  a number of witnesses.  We've heard thus far from 15.  This is

22  the fifteenth witness and we're not yet finished, and there

23  are twice that number on your list.  I assume not all of those

24  you expect to call?

25       MR. ANDRES:  That's absolutely true, Your Honor.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

R. Gates - Direct

1309

1      THE COURT:  All right.  And when do you think you'll

2  finish your case in chief?

3      MR. ANDRES:  Your Honor, we're hoping by the end of

4  this week.  That's our intention.

5      THE COURT:  All right.  Pass your books to the

6  right, ladies and gentlemen.  You've done that.

7      Remember, during the luncheon recess not to discuss

8  the case with anyone or undertake any investigation on your

9  own.  I hope you enjoy your pheasant under glass or whatever

10 else you were able to see on the menu.  I've looked pretty

11 hard at Panera's menu, but I've never seen that.  So maybe if

12 you do get something engaging, you can tell me about it and

13 I'll take steps to get it.

14     Thank you.  We'll resume at -- well, let's resume at

15 1:35.

16     You may follow Mr. Flood out.

17     (Jury dismissed.)

18     (Lunch Recess 12:32 p.m.)

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8    **MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in said

9    court on the 7th day of August, 2018.

10           I further certify that the foregoing 133 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this August 7, 2018.

17

18

19

20                       _____

                         Tonia M. Harris, RPR
21                       Official Court Reporter

22

23

24

25

                                                            1310