─────────────────────U.S. v. Manafort─────────────────────

1567

```
 1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3   -----------------------------x
                                  :
 4   UNITED STATES OF AMERICA,     : Criminal Action No.
                                  : 1:18-CR-83
 5            versus              :
                                  :
 6   PAUL J. MANAFORT, JR.,        :
                                  : August 8, 2018
 7                  Defendant. : Volume VII - P.M.
     -----------------------------x
 8
                  TRANSCRIPT OF JURY TRIAL
 9        BEFORE THE HONORABLE T.S. ELLIS, III
                UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     FOR THE GOVERNMENT:          UZO ASONYE, AUSA
12                                United States Attorney's Office
                                  2100 Jamieson Avenue
13                                Alexandria, VA 22314
                                       and
14                                GREG ANDRES, SAUSA
                                  BRANDON LANG VAN GRACK, SAUSA
15                                Special Counsel's Office
                                  U.S. Department of Justice
16                                950 Pennsylvania Avenue NW
                                  Washington, D.C. 20530
17
     FOR THE DEFENDANT:           JAY ROHIT NANAVATI, ESQ.
18                                BRIAN KETCHAM, ESQ.
                                  Kostelanetz & Fink LLP
19                                601 New Jersey Avenue NW
                                  Suite 620
20                                Washington, DC 20001
                                       and
21                                THOMAS E. ZEHNLE, ESQ.
                                  Law Office of Thomas E. Zehnle
22                                601 New Jersey Avenue NW
                                  Suite 620
23                                Washington, DC 20001
                                       and
24                                KEVIN DOWNING, ESQ.
                                  Law Office of Kevin Downing
25                                601 New Jersey Avenue NW
                                  Suite 620
```

U.S. v. Manafort

1568

1   (Appearances continued)

2                                    Washington, DC 20001
                                          and
3                                    RICHARD WILLIAM WESTLING, ESQ.
                                     Epstein, Becker, & Green, PC
4                                    1227 25th Street NW
                                     Washington, DC 20037
5
     OFFICIAL COURT REPORTER:        TONIA M. HARRIS, RPR
6                                    U.S. District Court, Ninth Floor
                                     401 Courthouse Square
7                                    Alexandria, VA 22314

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EASTERN DISTRICT OF VIRGINIA

─────U.S. v. Manafort─────

1569

1          TABLE OF CONTENTS
                 TRIAL
2               WITNESSES

3    On behalf of the Government:

4    Morgan Margionis

5          Direct examination by Mr. Andres................. 1570
           Cross-examination by Mr. Westling............... 1633
6          Redirect examination by Mr. Andres.............. 1647

7    Michael Welch

8          Direct examination by Mr. Asonye................ 1653
           Cross-examination by Mr. Downing................ 1696
9          Redirect examination by Mr. Asonye............. 1710

10                   EXHIBITS

11   On behalf of the Government:
                                              Admitted
12
     Number 61............................................. 1575
13   Number 65A1.......................................... 1581
     Number 327A.......................................... 1582
14   Number 65B........................................... 1584
     Number 65B-1......................................... 1586
15   Number 65C........................................... 1590
     Number 65C-1......................................... 1591
16   Number 65I........................................... 1600
     Number 65K-2......................................... 1605
17   Number 65L........................................... 1606
     Number 65M........................................... 1608
18   Number 65M-1......................................... 1610
     Number 69A........................................... 1612
19   Number 72............................................ 1617
     Number 73A - E....................................... 1620
20   Number 74............................................ 1624
     Number 34............................................ 1632
21   Number 75............................................ 1664
     Number 66............................................ 1677
22   Number 77............................................ 1681
     Number 78............................................ 1684
23   Number 78B........................................... 1694

24   On behalf of the Defendant:
                                              Admitted
25
     Number 23 - 26....................................... 1640

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

───────U.S. v. Manafort───────

```
                                              1570
```

1  Number 23 - 26......................................... 1650

2                    MISCELLANY

3  Preliminary matters................................... 1571
   Certificate of Court Reporter......................... 1721

```
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  **P R O C E E D I N G S**

2  **A F T E R N O O N   S E S S I O N**

3  (Court proceedings commenced at 1:37 p.m.)

4          THE COURT:  All right.  Let's bring in the jury.

5          You're prepared to proceed, Mr. Andres?

6          MR. ANDRES:  Yes, Your Honor.

7          THE COURT:  All right.  Let's do so.  Bring the jury

8  in, please.

9          (Jury in.)

10          THE COURT:  You may be seated.  Ladies and

11  gentlemen, let me confirm your lunches were acceptable and

12  you've had enough time.

13          THE JURORS:  Yes.

14          THE COURT:  All right.  Bring Mr. -- not Mr. --

15  Ms. Magionos back, please.  There she is.

16          You'll recall, ma'am, that you remain under oath.

17  You may resume the stand.

18          All right.  Mr. Andres, you may proceed.

19  (Witness previously sworn in A.M. session.)

20          **DIRECT EXAMINATION (Cont'd)**

21  BY MR. ANDRES:

22  Q.  Ms. Magionos, we're going to look at the ELMO on the

23  screen, but to the extent you're not able to locate an

24  exhibit, we'll publish it for you.

25          I'm going to start with Government Exhibit 66D,

1    which is in evidence, page 4480.

2            MR. ANDRES:  May I publish that, Your Honor?

3            THE COURT:  Yes, you may.

4    BY MR. ANDRES:

5    Q.    Do you see the document on 66D --

6    A.    Yes.

7    Q.    -- that's on the screen.  Can you tell me what that is?

8    A.    Yes.  This is a page from the account opening doc for

9    Bletilla Ventures Limited and it shows the beneficial owner of

10   the account.

11   Q.    And who is that?

12   A.    Mr. Manafort.

13   Q.    Can you highlight -- where it's being pointed to, is that

14   where it's located, the name?

15   A.    Yes.

16   Q.    And what's the date of this document?

17   A.    February 1, 2012.

18   Q.    Okay.  Can I ask you to turn to the second page of this

19   document?

20            Can I ask you to look at the bottom of the document?

21            Okay.  I'll move on.  We don't have a copy of the

22   second page.

23            Can I ask you to turn to Government Exhibit 66D and

24   Bates number 5105.

25            MR. ANDRES:  May I publish this, Your Honor.

─────U.S. v. Manafort─────

1              THE COURT:  You may.

2    BY MR. ANDRES:

3    Q.   Can you tell me what this document is?

4    A.   Again, a page from an account opening doc for LOAV

5    Advisors Limited.

6    Q.   Okay.  And if you look at the top, who's listed -- when

7    it says, "We the undersigned," who's listed there?

8              THE COURT:  All right.  Let's not have any pointing.

9    You're not on the stand.

10             THE PARALEGAL:  Yes, Your Honor.  My apologies.

11             THE COURT:  All right.  Proceed.

12   BY MR. ANDRES:

13   Q.   Do you see on the top of the document A it says, "We the

14   undersigned"?  What does it say there?

15   A.    Intra Jura CY Limited.

16   Q.   In the course of the investigation, did you learn what

17   Intra Jura CY is?

18   A.    Yes.

19   Q.   What is it?

20   A.   It's an entity associated with Dr. Kypros Chrysostomides'

21   law firm.

22   Q.   Okay.  If you look further down, it says the name of the

23   beneficial owners.  Can you tell me who is listed in those

24   documents?

25   A.    Mr. Gates and Mr. Manafort.

U.S. v. Manafort

M. Magionos - Direct

1574

1   Q.   And if you can turn to the last page, Page 4 of the last

2   page.  Let me ask you to turn to Government Exhibit 66D, Bates

3   No. 4248.

4           Can you tell me what that is?

5   A.   This is a signature card for Lucicle Consultants Limited.

6   Q.   Okay.  And who's listed on the signature card?

7   A.   Mr. Gates and Mr. Manafort.

8   Q.   Okay.  Can I ask you to turn to 4239?

9           What is that?

10  A.   This is the copy of Mr. Manafort's passport.

11  Q.   And what does it say below there, that it's certified?

12  A.   Yes.  A certified true copy, Dr. K. Chrysostomides &

13  Company.

14  Q.   Can I ask you to look at Government Exhibit 66D and

15  page 3958.

16          THE COURT:  Is that a copy of the entire passport,

17  if you know?

18          THE WITNESS:  No, I don't know.  I believe it was

19  just the first page.

20          THE COURT:  All right.  Well, we'll be clear about

21  that in the future.  Next question.

22  BY MR. ANDRES:

23  Q.   Can you take a look at 66D, 3958?

24  A.   Yes.

25  Q.   What is that?

1    A.    This is account opening documents for Yiakora Ventures

2    Limited.

3    Q.    And what does it reflect?

4    A.    It shows Mr. Manafort as the beneficial owner.

5    Q.    Can I ask you to turn also to Government Exhibit 66D,

6    3965.

7             Can you tell me what that is?

8    A.    Yes.  It's a copy from the front page of Mr. Manafort's

9    passport.

10   Q.    Okay.  And I'm going to ask you to -- ask you to turn to

11   3965 -- 60 -- oops.

12            With respect to the accounts in your chart in

13   Government 63, as of July 2014, were any of the accounts --

14   did they remain open?

15   A.    Yes.

16   Q.    What accounts remained open?

17   A.    The accounts in St. Vincent and the Grenadines, Global

18   Endeavour, they had two bank accounts listed in the chart, and

19   then Jeunet Limited.

20   Q.    How about the accounts in Cyprus?

21   A.    They were all closed by that time.

22   Q.    And with respect to the -- with respect to the entities

23   in St. Vincent and the Grenadines, who is listed on those

24   accounts?

25   A.    Mr. Kilimnik was listed as the beneficial owner.

U.S. v. Manafort

M. Magionos - Direct

1576

1    Q.    Okay.  And who was listed as the authorized signatory?

2    A.    Individuals from Dr. Chrysostomides' law firm, so

3    Myrianthi Christou, Chrystalla Dekatris, Eleni Chrysostomides,

4    Georgoula Mavrides, and Evelina Georgiades.

5    Q.    During the course of your investigation, did you identify

6    documents relating to the entities related to the bank

7    accounts in Government Exhibit 63?

8    A.    Incorporation documents.

9    Q.    Okay.  Can I ask you to turn to Government Exhibit 61.

10            Do you have that?

11            Can you tell me what that is?

12   A.    Yes.  This chart lists the foreign entities.  It lists

13   their name, their -- the date they were incorporated as well

14   as the incorporation location.

15            MR. ANDRES:  The Government moves to admit

16   Government's Exhibit 61.

17            MR. WESTLING:  No objection, Your Honor.

18            THE COURT:  Admitted.

19                          (Government's Exhibit No. 61

20                          admitted into evidence.)

21            MR. ANDRES:  May I publish it?

22            THE COURT:  You may, if you need to.

23   BY MR. ANDRES:

24   Q.    Can you describe what's listed in this chart?

25   A.    Yes.  It lists the -- the entity name, the date the

U.S. v. Manafort

1577

1   entity was created or incorporated, and the country that the

2   entity was incorporated in.

3   Q.   When you compare the entities listed in Government

4   Exhibit 61, did the entities in Government Exhibit 63, the

5   bank accounts, what do you find?

6   A.   They're the same.

7   Q.   And with respect to the underlying incorporation

8   documents related to the entities in Government Exhibit 61,

9   was Mr. Manafort's name listed on any of those incorporation

10  documents?

11  A.   No.

12  Q.   Was Mr. Gates?

13  A.   No.

14  Q.   Was Mr. Kilimnik?

15  A.   No.

16  Q.   Were there individuals who were identified as the

17  directors of those entities?

18  A.   Yes.

19  Q.   And how about the secretaries?

20  A.   Yes.

21  Q.   And who was listed on the accounts for the various

22  secretaries and board directors?

23  A.   And this is only for the Cypriote entities.

24  Q.   Yes.

25  A.   Intra Jura was listed as the director or secretary for

U.S. v. Manafort

M. Magionos - Direct

1578

```
 1   many of the entities in this chart.
 2   Q.   Can I ask you to turn to Government Exhibit 66A, 3280.
 3            MR. ANDRES:  May I publish that, Your Honor?
 4            THE COURT:  Yes.
 5   BY MR. ANDRES:
 6   Q.   What is that document that you're looking at?
 7   A.   It's a certificate of incorporation for Actinet Trading
 8   Limited.
 9   Q.   And does the -- does that document list any names
10   associated with Actinet Trading?
11   A.   Not on this page.  This page lists the date of
12   incorporation as May 29, 2009.
13   Q.   Can I ask you to turn to 3282?
14            What is that document?
15   A.   This document lists the director and the secretary for
16   Actinet Trading Limited.
17   Q.   And who is list -- is that the same party listed for the
18   director and secretary?
19   A.   Yes, it is.
20   Q.   And who is listed?
21   A.   Intra Jura CY Limited.
22   Q.   And is there an address listed with Intra Jura?
23   A.   Yes.
24   Q.   What is it?
25   A.   It's Lampousas 1, 1095 Nicosia, Cyprus.
```

1  Q.   And is that -- did you learn that there's another entity

2  associated with that address?

3  A.   Yes.

4  Q.   What entity?

5  A.   Dr. K. Chrysostomides' law firm.

6  Q.   Okay.  And, lastly, can I ask you to take a look at 3283?

7       What's that document?

8  A.   This shows the shareholder for Actinet Trading Limited.

9  Q.   Okay.  And who's the shareholder?

10  A.   Intra Jura CY Limited.

11  Q.   You testified about various overseas bank accounts.

12       During the course of your investigation, did you

13  trace incoming and outgoing funds from those accounts?

14  A.   Yes.

15  Q.   Did you trace payments to the United States?

16  A.   I did.

17  Q.   And what did you find?

18  A.   I found that payments made from the foreign bank accounts

19  went to vendors, went to purchase real estate, were

20  transferred to DMP International or Davis Manafort Partners,

21  Mr. Manafort, his family, and related entities.

22  Q.   Based on that review, did you identify all of the vendors

23  and real estate entities in the United States?

24  A.   I did.

25  Q.   And of that group, did you concentrate on some subset of

U.S. v. Manafort

1  the vendors and real estate entities?

2  A.   Yes.

3  Q.   How did you decide which vendors to include in your

4  analysis?

5  A.   I looked at the volume of transactions that were involved

6  as well as the dollar volume of transactions.

7  Q.   Did you obtain information from the vendors in real

8  estate companies?

9  A.   Yes.

10  Q.   What information?

11  A.   The vendors provided copies of invoices, contracts and

12  agreements as well as their bank account information.  The

13  real -- for the real estate transactions, I reviewed title

14  records.

15  Q.   And with respect to the vendors and the real estate

16  entities, was the client or customer generally the same

17  person?

18  A.   Yes.

19  Q.   Who did you find were the clients or customers?

20  A.   Mr. Manafort.

21  Q.   Okay.  Let me ask you:  In the course of your

22  investigation, did you obtain information with respect to

23  Aegis Holdings?

24  A.   Yes.

25  Q.   Okay.  And do you know what Aegis Holdings is?

U.S. v. Manafort

1   A.   Yes.  It's -- it provides investment advice and

2   facilitated investment for Mr. Manafort.

3   Q.   And do you know who owned or ran Aegis Holdings?

4   A.   Marc Baldinger.

5   Q.   Can I ask you to take a look at Government Exhibit 67A,

6   Bates No. 354 to 355?

7             Can you tell me what that is?

8             MR. ANDRES:  May I publish, Your Honor?

9             THE COURT:  Yes.

10  BY MR. ANDRES:

11  Q.   What is that?

12  A.   This is wire remittance advice for Global Endeavour and a

13  transaction in the amount of $500,000 dated September 3, 2013.

14  Q.   Okay.  And during the course of the investigation, did

15  you trace this -- trace different aspects of this transaction?

16  A.   I did.

17  Q.   Okay.  Let me show you Government Exhibit 65A1.

18            Can you tell me what that is?

19  A.   Yes.  This is Aegis Holdings LLC's bank account dated

20  September 30, 2013.

21            MR. ANDRES:  Your Honor, the Government moves to

22  admit 65A1 pursuant to our bank records stipulation.

23            MR. WESTLING:  No objection, Your Honor.

24            THE COURT:  Admitted.

25                        (Government's Exhibit No. 65A1

1           admitted into evidence.)

2  BY MR. ANDRES:

3  Q.   And is there a payment on that -- on those records that

4  you determined related to Mr. Manafort?

5  A.   Yes.

6           MR. ANDRES:  May I publish that, Your Honor?

7           THE COURT:  Yes.

8  BY MR. ANDRES:

9  Q.   Let me direct your attention to the payment September 3,

10 2013.  Can you explain what that is?

11 A.   Yes.  This is an incoming wire from Global Endeavour,

12 Inc., in the amount of $500,000 and the transaction occurred

13 on September 3, 2013.

14 Q.   Okay.  During the course of your investigation, did you

15 identify e-mail correspondence relating to this transaction?

16 A.   Yes.

17 Q.   Can I ask you to take a look at Government Exhibit 327A.

18           Can you tell me what that is?

19 A.   This is an e-mail string between Marc Baldinger and Paul

20 Manafort.

21           MR. ANDRES:  Your Honor, the Government moves to

22 admit Government Exhibit 327A.

23           MR. WESTLING:  No objection.

24           THE COURT:  Admitted.

25                    (Government's Exhibit No. 327A

1                          admitted into evidence.)

2           MR. ANDRES:  Can I publish that, please?

3           THE COURT:  Yes.

4    BY MR. ANDRES:

5    Q.   Ms. Magionos, can you -- can you summarize the e-mail in

6    327A, beginning with the top e-mail, the date, the "to" and

7    "from" and the subject?

8    A.   Yes.  It's from Marc Baldinger to Paul Manafort, and it

9    says -- it references wire instructions and says "Paul,

10   Received.  Wire funds to Halen today."

11   Q.   Can I ask you to look at the e-mail at 10:44 a.m. and

12   summarize that for the jury?

13   A.   Yes.  Mr. Manafort is e-mailing Mr. Baldinger and says

14   that the funds should be in the account today coming from

15   Global Endeavour Limited.

16   Q.   During the course of the investigation, did you learn and

17   trace certain payments to an entity known as Alan Couture?

18   A.   I did.

19   Q.   Did you trace those payments?

20   A.   Yes.

21   Q.   And where did those payments come from?

22   A.   The payments came from Cyprus and St. Vincent and the

23   Grenadines as well as domestic accounts.

24   Q.   Can I ask you to take a look at Government Exhibit 65B?

25   Can you tell me what that is?

┌─ U.S. v. Manafort ─┐
M. Magionos - Direct

1584

1    A.   This is a chart that summarizes the invoices that were

2    submitted to Mr. Manafort from Alan Couture as well as the

3    payments made from both foreign and domestic bank accounts to

4    Alan Couture.

5    Q.   What documents did you rely on in creating that chart?

6    A.   I relied on invoices provided by Alan Couture and foreign

7    and domestic bank account statements and wire remittance

8    advice.

9    Q.   Did you also rely on documents seized from Mr. Manafort's

10   condominium during a search warrant?

11   A.   Yes.

12   Q.   And were those records that you used to make this chart,

13   were they voluminous?

14   A.   Yes, they were.

15   Q.   And prior to finalizing this chart, did you check your

16   work for its accuracy?

17   A.   Yes.

18          MR. ANDRES:  Your Honor, the Government moves to

19   admit Government Exhibit 65B.

20          MR. WESTLING:  Your Honor, just renewing our

21   cumulative objection, but other than that, that's all we have.

22          THE COURT:  All right.  You mean because we've

23   already heard evidence about this payment.

24          MR. WESTLING:  That's correct, Your Honor.

25          THE COURT:  All right.  I'll overrule it.  It does

1  seem cumulative.  Let's see if you can keep it down to a dull

2  roar, Mr. Andres.

3                      (Government's Exhibit No. 65B

4                      admitted into evidence.)

5          MR. ANDRES:  Thank you, Your Honor.  May I publish

6  that, Your Honor.

7          THE COURT:  Not a good first step on dull roar, but

8  go ahead.  You may do so.

9  BY MR. ANDRES:

10  Q.   Ms. Magionos, can you describe the information in the

11  chart in Government Exhibit 65B?

12  A.   Yes.  On the left side I have summarizes -- summarized

13  the invoices submitted by Alan Couture to Mr. Manafort.  And

14  then on the right side of the chart, I have listed all of the

15  payments made either from foreign or domestic bank accounts to

16  Alan Couture.  And I have tried to match up the payments to

17  the specific invoices, but they are pretty much matched up by

18  date and transaction amount.

19  Q.   Okay.  With respect to the first entry in the chart, can

20  you explain that entry?

21  A.   Yes.  On March 16, 2010, Alan Couture submitted an

22  invoice in the amount of $15,195.  On March 30, 2010,

23  Yiakora Ventures Limited transferred $15,000 to Alan Couture.

24  Q.   Can I ask you to take a look at Government Exhibit 66D,

25  specifically Bates No. 4151?

─U.S. v. Manafort─

M. Magionos - Direct

1586

1    Can you tell me what that is?

2    A.   This is a wire remittance advice for Yiakora Ventures

3    Limited.  It's dated March 30, 2010, in the amount of $15,000

4    to Alan Couture.

5    Q.   And where did you obtain that document from?

6    A.   From the Cyprus MLAT.

7    Q.   During the course of your investigation, did you

8    determine who the beneficial owner of Yiakora Ventures Limited

9    was?

10   A.   Yes.

11   Q.   Let me ask you to turn back to the chart in Government

12   Exhibit 65B.

13          Can you explain the entry at August 3, 2010?

14   A.   Yes.  On August 3, 2010, Alan Couture submitted an

15   invoice in the amount of $32,500 to Mr. Manafort.  And on

16   August 12, 2010, Leviathan Advisors Limited transferred

17   $32,500 to Alan Couture.

18   Q.   Let me show you what's been marked as Government's

19   Exhibit 66D.  Turn to Bates No. 4986.

20          Can you tell me what that document is?

21   A.   Yes.  This is wire remittance advice for Leviathan

22   Advisors Limited, and it's dated August 12, 2010, and it shows

23   a wire transfer of $32,500 to Alan Couture.

24   Q.   And that's the information documented in your chart?

25   A.   Yes.

U.S. v. Manafort

1   Q.   Let me ask you:  During the course of the investigation,

2   did you obtain e-mails or review e-mails that related to

3   certain purchases at Alan Couture?

4   A.   I did.

5   Q.   Can you turn to Government Exhibit 65B1, and specifically

6   Bates No. 1435?

7   A.   Yes.

8   Q.   Can you explain to the jury what that is?

9   A.   This is an e-mail from Mr. Manafort to Myria at

10  accounts.management@chrysostomides.com.cy, and he's asking --

11  Mr. Manafort is asking that five transfers listed below be

12  made from Leviathan account and to confirm to him when the

13  transfers had been made.

14          MR. ANDRES:  Your Honor, the Government moves to

15  admit 65B1 and ask to publish it.

16          MR. WESTLING:  No objection.

17          THE COURT:  Admitted.  You may do so.

18                          (Government's Exhibit No. 65B1

19                          admitted into evidence.)

20  BY MR. ANDRES:

21  Q.   Starting at the top of the e-mail, Ms. Magionos, can you

22  explain what's indicated?

23  A.   Yes.  On August 12, 2010, Mr. Manafort sent an e-mail

24  requesting the transfers that are below.

25  Q.   With respect to the "to" line, can you read that?

1   A.   Yes.  It's accounts.management@chrysostomides.com.cy.

2   Q.   And where do you understand that e-mail address to be

3   associated with?

4   A.   Dr. K. Chrysostomides' law firm.

5   Q.   Can you read the subject line?

6   A.   "Wire transfers from Leviathan account."

7   Q.   And is there, in the body of that e-mail, a transfer that

8   relates to Alan Couture?

9   A.   Yes.

10  Q.   Can you explain that?

11  A.   Yes.  Mr. Manafort is requesting that a wire transfer in

12  the amount of $32,500 be made to Alan Couture.

13  Q.   Can I ask you to turn back to the chart in Government's

14  Exhibit 65B?

15          Does that chart include all of the invoices to Alan

16  Couture from 2010 to 2014?

17  A.   All of the invoices that were provided by them, correct.

18  Q.   And who is the client or customer on all of those

19  invoices?

20  A.   Mr. Manafort.

21  Q.   Does your chart identify all the payments to Alan Couture

22  from overseas accounts?

23  A.   Yes.

24  Q.   Does the chart list the total amount of payments for the

25  period from 2010 to 2014 from the overseas accounts?

─────U.S. v. Manafort─────

M. Magionos - Direct

1589

1   A.   Yes.

2   Q.   How much is that?

3   A.   The total payments from foreign accounts were $748,000 --

4   or pardon me -- $748,464.59.

5   Q.   Okay.  That's the total of the overseas payments?

6   A.   Correct.

7   Q.   What's the total of payments for that period?

8   A.   $1,032,589.59.

9   Q.   And how do you -- how do you account for the discrepancy

10  between the overseas payments and the total number of payments

11  to Alan Couture?

12  A.   There were payments made from Mr. Manafort's domestic

13  accounts.

14  Q.   During the course of your investigation did you --

15          THE COURT:  Would you call that a discrepancy?

16          THE WITNESS:  A difference between --

17          THE COURT:  A difference, not a discrepancy; is that

18  correct.

19          THE WITNESS:  That's correct, Your Honor.

20          THE COURT:  Next question.

21  BY MR. ANDRES:

22  Q.   During the course of your investigation, did you learn of

23  payments to an entity known as American Service Center

24  Associates of Alexandria?

25  A.   Yes.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

M. Magionos - Direct

1590

1  Q.   Is that entity also known as Mercedes-Benz of Alexandria?

2  A.   Yes.

3  Q.   During the course of the investigation, were you able to

4  trace transactions with that entity?

5  A.   Yes.

6  Q.   And can I ask you to look at Government Exhibit 66D,

7  Bates No. 4355?

8  A.   Yes.

9  Q.   What is that?

10  A.   This is wire remittance advice for Lucicle Consultants

11  dated October 5, 2012, in the amount of $62,750 and transfer

12  to American Service Center Associates.

13  Q.   And from what account?

14  A.   From Lucicle Consultants Limited.

15  Q.   Okay.  Let me ask you:  During the course of your

16  investigation, did you trace payments to an entity known as

17  Big Picture Solutions?

18  A.   I did.

19  Q.   And let me ask you to look at Government Exhibit 65C.

20  Can you tell me what that is?

21  A.   This is a chart that summarizes vendor invoices from Big

22  Picture Solutions and then both foreign and domestic payments

23  made to Big Picture Solutions.

24  Q.   And what documents did you rely on in creating the

25  summary chart?

U.S. v. Manafort

1591

1   A.   I relied on invoices provided by Big Picture Solutions as

2   well as both foreign and domestic bank account statements and

3   wire remittance advice.

4         MR. ANDRES:  Government moves to admit Government

5   Exhibit 65C, and ask to publish a copy to the jury.

6         MR. WESTLING:  No objection, Your Honor.

7         THE COURT:  Admitted.  You may do so.

8                       (Government's Exhibit No. 65C

9                       admitted into evidence.)

10  BY MR. ANDRES:

11  Q.   With respect to the chart in Government Exhibit 65C, can

12  you describe what you've indicated in this chart?

13  A.   Yes.  The left side of the chart shows the vendor invoice

14  detail, the date of the invoice, the invoice number, and the

15  amount of the invoice.  The right side of the chart lists the

16  account the payment was made from, the date of the wire

17  transfer, and the amount of the wire transfer.

18  Q.   For the period from 2011 to 2014, what was the total

19  number of payments made to Big Picture Solutions?

20  A.   $2,249,262.91.

21  Q.   How much of the total payment came from international

22  wires?

23  A.   $1,661,201.

24  Q.   What countries did those payments come from?

25  A.   They came from Cyprus, St. Vincent in the Grenadines, and

U.S. v. Manafort

M. Magionos - Direct

1592

1  the United Kingdom.

2  Q.   And what overseas entities did those payments come from?

3  A.   Leviathan Advisors Limited; Global Highway Limited;

4  Lucicle Consultants Limited; Pompolo Limited; and Global

5  Endeavour, Inc.

6  Q.   During the course of the investigation, did you review

7  e-mails related to the payment to Big Picture Solutions?

8  A.   Yes.

9  Q.   Let me show you what's been marked as Government's

10  Exhibit 65C1.  Direct your attention to the Bates No. 2470.

11          Do you have that?

12  A.   Yes.

13  Q.   What is that?

14  A.   This is an e-mail from Mr. Manafort to Christina at

15  accounts.management@chrysostomides.com.cy.

16          MR. ANDRES:  Government moves to admit Government

17  Exhibit 65C1 and seeks to publish it, Your Honor.

18          MR. WESTLING:  No objection, Your Honor.

19          THE COURT:  All right.  Admitted.  You may do so.

20                      (Government's Exhibit No. 65C1

21                      admitted into evidence.)

22  BY MR. ANDRES:

23  Q.   Starting with the top of the e-mail, can you tell the

24  jury who the e-mail is from, who it's to, the date, and the

25  subject matter?

1  A.   Sure.  The e-mail is from Mr. Manafort to Christina.

2  It's dated November 22, 2011, and the subject is "Transfers

3  from Peranova Holdings Limited and Global Highway."

4  Q.   And Peranova Holdings Limited, were you familiar with the

5  bank account related to that entity?

6  A.   Yes.

7  Q.   Where was that located?

8  A.   In Cyprus.

9  Q.   How about Global Highways?

10 A.   Also located in Cyprus.

11 Q.   And what does Mr. Manafort ask Christina to do in this

12 e-mail?

13 A.   Mr. Manafort is asking Christina to transfer $400,000

14 from Peranova Holdings Limited to Global Highway Limited and

15 then to make the six transfers that are listed below.

16 Q.   Is there a transfer there related to Joel Maxwell?

17 A.   Yes.

18 Q.   And do you know what company Joel Maxwell worked at?

19 A.   Big Picture Solutions.

20 Q.   And how much is that transfer for and what's the date?

21 A.   The transfer is for $11,000, and the date of the transfer

22 is around November 22, 2011.

23 Q.   Okay.  During the course of your investigation, did you

24 learn about the purchase of vehicles from Land Rover of

25 Alexandria?

─────────U.S. v. Manafort─────────

 1   A.   Yes.

 2   Q.   Were you able to trace those payments?

 3   A.   Yes.

 4   Q.   And Land Rover of Alexandria, does that also go by the

 5   name of Don Beyer Motor?

 6   A.   Yes, it does.

 7   Q.   Okay.  Did you create a chart documenting those

 8   transfers?

 9   A.   Yes.

10   Q.   What did you rely on?

11   A.   I relied on invoices provided by Don Beyer Motors and

12   foreign bank accounts statements and wire remittance advice.

13   Q.   And were those records voluminous?

14   A.   Yes.

15   Q.   And prior to creating -- or after creating the chart, did

16   you check it for its accuracy?

17   A.   Yes.

18            MR. ANDRES:  The Government moves to admit

19   Government Exhibit 65G, and seeks to publish it to the jury.

20            MR. WESTLING:  Your Honor, we object.  There's three

21   transactions.  I don't think this is voluminous.

22            THE COURT:  Well, the choice is we go over it.  Go

23   ahead, Mr. Andres.

24            MR. ANDRES:  Okay.

25            THE COURT:  You may go over it.

BY MR. ANDRES:

Q.   Can you describe the information in Government

Exhibit 65G?

A.   Yes.  On the left side, I list the vendor invoices, the

invoice date, the invoice number, and the amounts.  And on the

right side I summarize the payments made to Don Beyer Motors

from foreign bank accounts.

Q.   And what was the total amount of the invoice to -- the

invoices for Mr. Manafort to Land Rover in 2012?

A.   $163,705.16.

Q.   And what was the total of foreign payments made to the

vendor?

A.   $163,705.

Q.   During the course of your investigation, did you trace

payments to Federal Stone and Brick?

A.   I did.

        THE COURT:  Before you go on, let me make clear that

I sustained the objection because the documentation on which

the chart was based was not voluminous.  But I allowed you to

go through it and put the admissible facts before the jury.

        Let's proceed.  You're moving on to another vendor.

        MR. ANDRES:  Yes.  Thank you, Your Honor.

        THE COURT:  All right.

BY MR. ANDRES:

Q.   You testified that you had traced payments with respect

U.S. v. Manafort

M. Magionos - Direct

1596

1    to Federal Stone.  With respect to those transactions, what

2    documents did you rely on?

3    A.   I relied on a contract that was provided by Federal Stone

4    and Brick and foreign and domestic bank account statements and

5    wires.

6    Q.   Okay.  Did you create a chart relating to those

7    transactions?

8    A.   Yes.

9         MR. ANDRES:  The Government moves to admit

10   Government Exhibit 65D.  Seeks to publish it to the jury.

11        MR. WESTLING:  Same objection, Your Honor.  We're

12   talking about six or seven transactions.

13        THE COURT:  Well, if I sustain the objection, it's

14   going to go through the six or seven.  If I overrule the

15   objection, he'll probably do the same thing.

16        MR. WESTLING:  Well, Your Honor, I think our issue

17   is only whether the document comes into evidence.  I have no

18   problem with it being used as a demonstrative for the purpose

19   of the jury.

20        THE COURT:  Well, I wouldn't -- I wouldn't sanction

21   an objection on that basis.  I think it's on the borderline.

22   I'll sustain it, but you can go through the transactions, if

23   you wish.

24        MR. ANDRES:  May I publish it as a demonstrative

25   piece of evidence, Your Honor?

U.S. v. Manafort

M. Magionos - Direct

1597

1   THE COURT:  Yes, you may do that.

2   MR. ANDRES:  Okay.

3   THE COURT:  That means, ladies and gentlemen, you

4   won't have this in the jury room.  They can use it for

5   argument and that sort of thing, but you won't have it in the

6   jury room.  Go on.

7   BY MR. ANDRES:

8   Q.   Can you explain the chart in Government's Exhibit 65D for

9   identification?

10  A.   Yes.  The left side lists the contract date and amount.

11  The right side lists the payments made from foreign and

12  domestic bank accounts.

13  Q.   Okay.  Can you provide the total number of invoices

14  charged?

15  A.   Yes.  The contract value was $104,424.

16  Q.   What was the total amount from foreign overseas wires?

17  A.   So foreign payments totalled $125,650.

18  Q.   During the course of the investigation, did you learn

19  about payment to an entity --

20  THE COURT:  Let me -- the operator shouldn't focus

21  anything.  Just put it up there, because that has the operator

22  testifying.  Thank you.  Go on.

23  BY MR. ANDRES:

24  Q.   During the course of the investigation, did you learn

25  about payment to an entity known as House of Bijan?

U.S. v. Manafort

1  A.   Yes.

2  Q.   What documents did you review in tracing your work?

3  A.   I reviewed invoices provided by House of Bijan and

4  foreign bank accounts statements and wire remittance advice.

5  Q.   Okay.  And were those documents voluminous?

6  A.   Yes.

7  Q.   Okay.  And did you create a chart?

8  A.   I did.

9         MR. ANDRES:  Your Honor, I'm just going to ask to

10 show the chart as a demonstrative piece of evidence and not

11 admit it.

12        THE COURT:  All right.

13        MR. WESTLING:  No objection.

14        THE COURT:  Proceed.

15 BY MR. ANDRES:

16 Q.   Can you explain your chart in Government's Exhibit 65E

17 for identification?

18 A.   Yes.  On the left side I summarize the vendor invoices

19 and provide the vendor date -- or vendor invoice date, number,

20 and amount.

21 Q.   What was the total dollar amount of the invoices from the

22 year 2010 to 2012?

23 A.   $334,325.

24 Q.   And what was the total amount of payments to the House of

25 Bijan from foreign accounts?

M. Magionos - Direct

1599

1   A.    $332,780.

2   Q.    And where -- where did those -- where did that money come

3   from?

4   A.    Global Highway Limited, Leviathan Advisors Limited, and

5   Lucicle Consultants Limited.

6   Q.    And what country?

7   A.    Cyprus.

8   Q.    During the course of your investigation, did you learn of

9   purchases from an entity known as J&J Oriental Rug Gallery?

10  A.    Yes.

11  Q.    Were you able to trace those payments?

12  A.    I was.

13  Q.    What documents did you review in tracing your work?

14  A.    I reviewed invoices and investment agreement and foreign

15  bank account records.

16  Q.    And did you create a chart summarizing the payments?

17  A.    I did.

18        MR. ANDRES:  Your Honor, the Government seeks to

19  publish that chart but not admit it as an exhibit.

20        THE COURT:  You may do so.

21  BY MR. ANDRES:

22  Q.    Can I ask you to look at the chart in Government Exhibit

23  65F and explain it to the jury?

24  A.    Yes.  The left side lists a vendor invoice and loan

25  agreement, and the right side lists payments made to J&J.

U.S. v. Manafort

M. Magionos - Direct

1600

1  Q.   What was the total amount of dollars in terms of the

2  invoices to Mr. Manafort in 2010?

3  A.   So the total invoice was $160,000 and he also invested

4  $250,000.

5  Q.   And in terms of the overseas payments?

6  A.   The total payments were $490,000.

7  Q.   And where did the payments come from?

8  A.   Yiakora Ventures Limited and Global Highway Limited.

9  Q.   During the course of the investigation, did you learn of

10  payments to an entity known as New Leaf Landscape Maintenance?

11  A.   Yes.

12  Q.   What documents did you review in tracing your work?

13  A.   I reviewed invoices provided by New Leaf Landscape and

14  foreign and domestic bank account statements, wires, and

15  checks.

16  Q.   Were those documents voluminous?

17  A.   Yes, they were.

18  Q.   Did you -- did you create a chart summarizing your work?

19  A.   I did.

20  Q.   Can I show you what's been marked as Government

21  Exhibit 65I?

22          What is that?

23  A.   This is a chart that summarizes the invoices submitted to

24  Mr. Manafort from New Leaf Landscape Maintenance LLC and

25  payments that were made from foreign and domestic bank

M. Magionos - Direct

1601

1  accounts.

2         MR. ANDRES:  The Government moves to admit as an

3  exhibit 65I and publish it for the jury.

4         MR. WESTLING:  No objection.

5         THE COURT:  All right.  It's admitted.

6                     (Government's Exhibit No. 65I

7                      admitted into evidence.)

8         MR. ANDRES:  May I publish it, Your Honor?

9         THE COURT:  You may.

10 BY MR. ANDRES:

11 Q.  Ms. Magionos, can you summarize for the jury the chart in

12 Government Exhibit 65I?

13 A.  Yes.  On the left side I list the vendor invoices

14 submitted to Mr. Manafort from New Leaf Landscape Maintenance.

15 It lists the invoice date, invoice number, and invoice amount.

16 On --

17 Q.  Is -- sorry.  Excuse me.

18 A.  Pardon me.

19         And then on the right side of the chart I list

20 payments made from foreign and domestic bank accounts.

21 Q.  What was the total dollar amount of invoices from New

22 Leaf Landscaping to Mr. Manafort?

23 A.  $451,697.68.

24 Q.  And what was the total amount of payments made to New

25 Leaf Landscaping?

U.S. v. Manafort

M. Magionos - Direct

1602

1   A.   $440,467.38.

2   Q.   How much of that money came from foreign wires?

3   A.   $255,684.79.

4   Q.   And where did the remainder of the payments come from?

5   A.   The remainder came from domestic bank accounts.

6   Q.   And which domestic bank accounts -- or who controlled

7   those accounts?

8        THE COURT:   The question is compound, which is -- go

9   ahead.  You may re-ask it.

10  BY MR. ANDRES:

11  Q.   Who controlled those domestic accounts?

12  A.   Mr. Manafort.

13  Q.   What was the source of the domestic payments?

14  A.   DMP International, LLC, and Paul and Kathleen Manafort.

15  Q.   During the course of the investigation, did you learn of

16  payments to Sabatello Construction?

17  A.   Yes.

18  Q.   Did you trace those payments?

19  A.   I did.

20  Q.   Did you create a chart detailing those payments?

21  A.   Yes.

22  Q.   What documents did you rely on?

23  A.   I relied on contracts provided by Sabatello Construction

24  and foreign bank accounts.

25       MR. ANDRES:   Your Honor, the Government asks to show

U.S. v. Manafort

1    the chart in 65J as a demonstrative exhibit.

2              THE COURT:  All right.  You may do so.

3              MR. ANDRES:  May I publish it to the jury?

4              THE COURT:  You may.

5    BY MR. ANDRES:

6    Q.   Ms. Magionos, can you explain to the jury what's detailed

7    in Government Exhibit 65J?

8    A.   Yes.  This lists contracts with Sabatello Construction,

9    and on the right side, it lists payments made from foreign

10   bank accounts.

11   Q.   And what foreign bank accounts?

12   A.   Global Highway Limited; Leviathan Advisors Limited; Black

13   Sea View Limited; and Lucicle Consultants Limited.

14   Q.   During the course of your investigation, did you learn of

15   payment to Scott Wilson Landscaping & Tree Specialists?

16   A.   Yes.

17   Q.   Did you trace those payments?

18   A.   I did.

19   Q.   What documents did you rely on?

20   A.   I relied on foreign and domestic bank account statements

21   and wire remittance advice.

22   Q.   And were those records voluminous?

23   A.   Yes.

24   Q.   Can I show you Government Exhibit 65K?

25   A.   Yes.

U.S. v. Manafort

1604

1  Q.   Do you see that?

2  A.   Yes.

3  Q.   What is -- what's included in Government Exhibit 65K?

4  A.   It summarizes vendor invoices provided by Scott Wilson

5  Landscape and then summarizes vendor payments made to Scott

6  Wilson Landscape from both foreign and domestic bank accounts.

7  Q.   Did you check that chart for its accuracy?

8  A.   Yes.

9  Q.   Is it fair to say that all of the charts that you're

10  testifying about today, you checked for accuracy?

11  A.   Yes.

12         MR. ANDRES:  The Government moves to admit

13  Government Exhibit 65K and seeks to publish it to the jury.

14         MR. WESTLING:  No objection, Your Honor.

15         THE COURT:  You may do so.  It's admitted.

16                    (Government's Exhibit No. 65K

17                     admitted into evidence.)

18  BY MR. ANDRES:

19  Q.   Ms. Magionos, can you describe to the jury the

20  information contained in Government Exhibit 65K?

21  A.   The left side shows the vendor invoices provided by Scott

22  Wilson Landscape.  The first column lists the date of the

23  invoice, the second column lists the invoice number, and then

24  the third column lists the invoice amount.

25  Q.   The --

1   A.   The right hand of the chart lists the vendor payments

2   made to Scott Wilson Landscape from foreign and domestic bank

3   accounts.

4   Q.   What was the total amount billed to Mr. Manafort by Scott

5   Wilson Landscape & Tree Specialists?

6   A.   $218,214.12.

7   Q.   What was the total payment to Scott Wilson Landscaping

8   [sic] & Tree Specialists from overseas accounts?

9   A.   $503,500.

10  Q.   Do you have an understanding of why there's a difference

11  between the amount invoiced and the amount paid?

12  A.   I -- yes, the invoices that are listed on this chart are

13  the invoices that were provided.

14  Q.   With respect to the payment to Scott Wilson Landscaping &

15  Tree Specialists, where do they come from?

16  A.   Could you please ask that question again?

17  Q.   The payments to Scott Wilson, where did they come from?

18  A.   They came from accounts in Cyprus.  Global Highway

19  Limited, Leviathan Advisors Limited, Yiakora Ventures Limited,

20  and that -- those accounts.

21  Q.   Were there any payments from the domestic accounts?

22  A.   Yes.

23  Q.   Who controlled those accounts?

24  A.   Mr. Manafort.

25  Q.   During the course of your investigation, did you identify

U.S. v. Manafort

M. Magionos - Direct

1606

1    e-mails relating to payments to Scott Wilson?

2    A.   Yes.

3    Q.   Can I show you Government Exhibit 65K-2?

4         Can you tell me what that is?

5    A.   This is an e-mail from Mr. Manafort to Maria.  It's dated

6    October 5, 2010.

7    Q.   Okay.

8         MR. ANDRES:  The Government moves to admit

9    Government Exhibit 65K-2 and seeks to publish it to the jury.

10        MR. WESTLING:  No objection.

11        THE COURT:  Admitted.

12                        (Government's Exhibit No. 65K-2

13                        admitted into evidence.)

14   BY MR. ANDRES:

15   Q.   Can I ask you to summarize that e-mail for the jury,

16   Ms. Magionos?

17   A.   Yes.  Mr. Manafort e-mails Maria, requesting that three

18   wires be made out of my Global Highway Limited account and

19   then to inform him when the wires had been completed.

20   Q.   And is there a wire transfer -- wire transfer information

21   to Scott Wilson?

22   A.   Yes.

23   Q.   And which of the numbers is that, wire number what?

24   A.   Wire transfer No. 2.

25   Q.   And what's the total amount of that payment?

U.S. v. Manafort

1607

1   A.    57,700.

2   Q.    During the course of the investigation, did you learn

3   about payments to Century -- Sensoryphile?

4   A.    I did.

5   Q.    And did you trace those payments?

6   A.    Yes.

7   Q.    Did you create a chart documenting your work?

8   A.    Yes.

9   Q.    What did you rely on in tracing that information?

10  A.    I relied on invoices provided by Sensoryphile as well as

11  foreign and domestic bank account records.

12  Q.    Were those records voluminous?

13  A.    Yes.

14  Q.    Can you take a look at Government Exhibit 65L?

15        What is that?

16  A.    This is a summary of vendor invoices from Sensoryphile

17  and payments made to Sensoryphile from foreign and domestic

18  bank accounts.

19        MR. ANDRES:   The Government moves to admit 65L and

20  seeks to publish it to the jury.

21        MR. WESTLING:   No objection.

22        THE COURT:   Admitted.

23                        (Government's Exhibit No. 65L

24                        admitted into evidence.)

25  BY MR. ANDRES:

M. Magionos - Direct

1  Q.   Ms. Magionos, can you explain to the jury the information

2  contained in the chart, Government Exhibit 65L?

3  A.   Yes.  On the left side, I summarize vendor invoices by

4  invoice date, then the invoice number and the invoice amount.

5         On the right side lists payments made to

6  Sensoryphile from -- and includes the account the payment was

7  made as well as the date of transfer and the amount of

8  transfer.

9  Q.   What was the total dollar amount of the invoices from

10  Sensoryphile to Mr. Manafort?

11  A.   $65,126.42.

12  Q.   What was the total amount of payments from overseas

13  accounts?

14  A.   $46,450.

15  Q.   And what entities did those payments come from?

16  A.   The payments came from Global Highway Limited, Yiakora

17  Ventures Limited, and Leviathan Advisors Limited.

18  Q.   During the course of your investigation, did you learn

19  about payments to SP&C Home Improvement?

20  A.   Yes.

21  Q.   Did you create a chart summarizing your work?

22  A.   I did.

23  Q.   Can I ask you to take a look at Government Exhibit 65M?

24  A.   Okay.

25  Q.   Can you tell me what that is?

M. Magionos - Direct

1609

1  A.   This is a chart that summarizes vendor invoices provided

2  by SP&C Home Improvement, and then foreign and domestic bank

3  payments to SP&C Home Improvement.

4  Q.   What documents did you rely on in creating that chart?

5  A.   I relied on invoices provided by SP&C as well as foreign

6  and domestic bank account information.

7  Q.   And were those records voluminous?

8  A.   Yes.

9       MR. ANDRES:  The Government moves to admit

10  Government Exhibit 65M and seeks to publish it to the jury.

11       MR. WESTLING:  No objection.

12       THE COURT:  All right.  It's admitted.  You may do

13  so.

14                        (Government's Exhibit No. 65M

15                         admitted into evidence.)

16  BY MR. ANDRES:

17  Q.   And, Ms. Magionos, can you describe to the jury the

18  information contained in Government Exhibit 65M?

19  A.   Yes.  The left side lists the vendor invoices provided by

20  SP&C Home Improvement.

21       The first column is the invoice date, the second

22  column is the invoice number, and then the third column is the

23  invoice amount.  On the right side, I list payments to SP&C

24  Home Improvement by account and then date of transfer and

25  amount of transfer.

M. Magionos - Direct
1610

1  Q.   And what was the total amount of invoices from SP&C to

2  Mr. Manafort from 2010 to 2014?

3  A.   The total amount was $3,289,277.44.

4  Q.   And what's the total amount of payments from invoices to

5  Mr. Manafort -- what was the total amount of invoices from

6  Mr. Manafort and his family from overseas accounts, total

7  amount of payments from overseas accounts?

8  A.   $3,548,872.84.

9  Q.   And where did these payments come from?

10 A.   They come from bank accounts in Cyprus and St. Vincent

11 and the Grenadines.

12 Q.   During the course of your investigation, did you review

13 e-mails relating to payments from SP&C?

14 A.   I did.

15 Q.   Can I show you Government Exhibit 65M-1?

16         Can you tell me what that is?

17 A.   This is an e-mail from Mr. Manafort to Myria on

18 September 1, 2010.

19 Q.   And what's the subject of the e-mail?

20 A.   Yiakora Ventures.

21         MR. ANDRES:  The Government moves to admit 65M-1 and

22 seeks to publish it to the jury.

23         MR. WESTLING:  No objection, Your Honor.

24         THE COURT:  Admitted.  You may do so.

25                     (Government's Exhibit No. 65M-1

┌─────────────────────U.S. v. Manafort─────────────────────┐

1          admitted into evidence.)

2    BY MR. ANDRES:

3    Q.   Starting with the top of the e-mail, Ms. Magionos, can

4    you explain that portion of the e-mail to the jury?

5    A.   Yes.  Mr. Manafort is requesting seven wire transfers

6    today from my Yiakora Ventures account, and then to have her

7    confirm back to him once those have been sent.

8    Q.   And with respect to the Yiakora account in the e-mail,

9    how does Mr. Manafort describe that?

10   A.   Mr. Manafort says it's my account.

11   Q.   And with respect to the wire transfers requested, are

12   there any included in this e-mail to SP&C?

13   A.   Yes.

14   Q.   Which wire number?

15   A.   Wire No. 3.

16   Q.   Okay.  And what's the amount of that wire transfer?

17   A.   $31,500.

18   Q.   Okay.  Do you also have before you, as part of that

19   exhibit, Government Exhibit 20 -- also in 65M-1, Bates

20   No. 2435?

21   A.   I do.

22   Q.   And what's that?

23   A.   This is an e-mail from Paul Manafort to Maria, it's --

24   Q.   Okay.  Go ahead.

25   A.   It's requesting three wires out of my Global Highway

U.S. v. Manafort

1 Limited account.

2 Q.   Okay.  And is there a wire transfer there to SP&C?

3 A.   Yes.

4 Q.   Can you describe that transfer?

5 A.   It's Wire No. 3 and it's in the amount of $67,600.

6 Q.   During the course of your investigation, did you learn

7 that Mr. Manafort purchased certain real estate properties

8 from funds overseas?

9 A.   Yes.

10 Q.   How did you obtain this information?

11 A.   I reviewed the foreign bank account and saw payments made

12 to title companies or attorneys, and I traced the payment to

13 those entities and then requested title records to learn more

14 about the real estate transaction.

15 Q.   And with respect to those properties, what properties did

16 you determine were purchased with overseas accounts?

17 A.   A property in New York City, 29 Howard Street, a property

18 in Brooklyn, 377 Union Street, and then a property in

19 Arlington.

20 Q.   And did you create flowcharts, which described the money

21 that was used to pay those -- for those real estate holdings?

22 A.   Yes.

23 Q.   And are those included in Government Exhibit 69A, 69B,

24 and 69C?

25 A.   Yes.

M. Magionos - Direct

1613

1    MR. ANDRES:  The Government moves to admit

2  Government Exhibit 69A, B, and C as demonstrative exhibits

3  only, Your Honor.

4    MR. WESTLING:  No objection, Your Honor.

5    THE COURT:  All right.  You may use them as such.

6    MR. ANDRES:  May I publish them, Your Honor?

7    THE COURT:  Yes.

8  BY MR. ANDRES:

9  Q.   Starting with Government Exhibit 69A?

10    (Government's Exhibit No. 69A

11    admitted into evidence.)

12  BY MR. ANDRES:

13  Q.   Ms. Magionos, can you describe what's depicted in

14  Government Exhibit 69A?

15  A.   Yes.  This is a flow of funds from Cyprus to the title

16  company for purchase of 29 Howard Street in New York, New

17  York.

18  Q.   And starting, I guess, with the green boxes, there's two

19  of them.  Can you describe the flow of money?

20  A.   Sure.  On June 4, 2008, Yiakora Ventures Limited

21  transferred $8 million to Jesand Investment Corporation's

22  First Republic bank account ending 6573.  On the same day

23  Jesand Investment Corporation transfers $7,650,000 to another

24  Jesand Corporation account ending 7373.

25    And then on June 10, 2008, Jesand Investment

U.S. v. Manafort

M. Magionos - Direct

1614

1  Corporation transfers $3 million to Jessica Anne Manafort's

2  First Republic Securities Company account ending 5358.

3        And then on February 10, 2012, Jessica Anne Manafort

4  transfers $1,534,500 to Paul and Kathleen Manafort's First

5  Republic account ending 9730.

6        On February 1, 2012, Peranova Holdings Limited

7  transfers $1,500,000 to DMP International LLC's First Republic

8  account at -- ending 6524.

9        And then on February 9, 2012, DMP International LLC

10  transfers $1,500,000 to Paul and Kathleen Manafort's First

11  Republic bank account ending 9730.

12        The next day, on February 10, 2012, Paul and

13  Kathleen Manafort transfer $3,045,500 to MC Soho Holdings LLC,

14  and then the same day, MC Soho Holdings LLC transfers

15  $2,650,000 to Kensington Vanguard National Land Services.

16        THE COURT:  Just so we're clear about this,

17  Mr. Andres, you are offering this evidence as part of your --

18  of the Government's burden to prove, beyond a reasonable

19  doubt, that Mr. Manafort did not report all of his income on

20  specific tax returns; is that right?

21        THE WITNESS:  Yes, Your Honor.

22        THE COURT:  You're not offering any of this evidence

23  to show that any of these transactions, themselves, are

24  illegal.

25        MR. ANDRES:  No, Your Honor.

U.S. v. Manafort

M. Magionos - Direct

1615

1    THE COURT:  You mean, yes, sir?

2    MR. ANDRES:  I mean --

3    THE COURT:  You're not offering to show that these

4  transactions are illegal other than to show that you're trying

5  to prove that he had income that he didn't report?

6    MR. ANDRES:  Yes, Your Honor.  That's correct.

7    THE COURT:  All right.  One can get lost with all of

8  these movements of monies, and sometimes it seems that that's

9  what the Government is aiming at.  But you confirmed that it

10  isn't, so let's proceed.

11    MR. ANDRES:  Thank you, Your Honor.

12  BY MR. ANDRES:

13  Q.   Ms. Magionos, you testified about the flow of money in

14  this chart and you've referred to a series of different bank

15  accounts.  Have you reviewed each of those accounts?

16  A.   Yes.

17  Q.   And have you also reviewed real estate documents?

18  A.   I have.

19  Q.   What real estate documents?

20  A.   I reviewed title records provided by Kensington Vanguard.

21  So it would have been the sales agreement and the transfer of

22  deed and closing statements.

23  Q.   Can I ask you to turn to Government Exhibit 69B?

24    MR. ANDRES:  May I publish that for Your -- for the

25  jury, Your Honor?

1    THE COURT:  Yes.  Is it already admitted?

2    MR. ANDRES:  Yes, as a demonstrative exhibit only,

3    Your Honor.

4    THE COURT:  All right.  Go ahead.

5    BY MR. ANDRES:

6    Q.   This one is a little simpler, Ms. Magionos.  Can you

7    describe the payments for the purchase of the property of

8    1046 North Edgewood Street in Arlington, Virginia?

9    A.   Yes.  On August 31st for -- August 31st, 2012, $1,900,000

10   is transferred from Lucicle Consultants Limited to Land,

11   Carroll & Blair real estate trust.

12   Q.   And for this chart, what types of documents are this --

13   what did you rely on?

14   A.   I relied on the foreign bank account records for Lucicle

15   Consultants Limited and title records provided by Land,

16   Carroll & Blair.

17   Q.   Okay.  Lastly, can I ask you to take a look at Government

18   Exhibit 69C?

19   MR. ANDRES:  And I seek to publish that to the jury,

20   Your Honor.

21   THE COURT:  Any objection?

22   MR. WESTLING:  Not as a demonstrative, Your Honor.

23   THE COURT:  All right.  You may do so.

24   BY MR. ANDRES:

25   Q.   Ms. Magionos, can you describe the flow of money in this

─────U.S. v. Manafort─────
M. Magionos - Direct

1617

1   chart, Government Exhibit 69C?

2   A.   Yes.  On November 14, 2012, MC Brooklyn Holdings enters

3   into a contract to purchase the property known as 377 Union

4   Street, and on November 20, 2012, $299,500 is transferred from

5   Lucicle Consultants Limited to the trust account for the

6   seller, so the seller's attorney.

7          And then on November 29, 2012, in two transactions,

8   $3 million is transferred from Actinet Trading Limited to the

9   law offices of Bruce Baldinger LLC, his trust account.

10          And then on November 27, 2012, $2.8 million is

11  transferred to First Nationwide Title Agency.

12  Q.   And with respect to the various transfers in the real

13  estate property, what documents did you review?

14  A.   I reviewed foreign bank accounts for Lucicle Consultants

15  and Actinet Trading, as well as Mr. Baldinger's trust account,

16  and then title records provided by First Nationwide Title

17  Agency.

18  Q.   Can I ask you to turn to Government Exhibit 72?

19          Can you tell me what that is?

20  A.   This is a summary chart showing all vendor and property

21  payments from foreign bank accounts that we've just discussed.

22  Q.   And these are the -- these are the -- does this document

23  reflect your tracing work?

24  A.   It does.

25  Q.   And what documents did you rely on for this chart?

M. Magionos - Direct

1618

1    A.   I relied on foreign bank account statements and wire

2    remittance advice, invoices provided by the vendors, as well

3    as their bank account information, and then title records in

4    the case of the property purchases.

5            MR. ANDRES:  The Government moves to admit

6    Government Exhibit 72 and seeks to -- I'm sorry, excuse me.

7    Can I withdraw that, Judge?  I have one additional question.

8            THE COURT:  All right.  You may.

9    BY MR. ANDRES:

10   Q.   Were the records that you reviewed in creating this

11   chart, were they voluminous?

12   A.   Yes, they were.

13           MR. ANDRES:  The Government moves to admit

14   Government Exhibit 72 and seeks to publish it to the jury.

15           MR. WESTLING:  No objection, Your Honor.

16           THE COURT:  Admitted.  You may do so.

17                       (Government's Exhibit No. 72

18                       admitted into evidence.)

19   BY MR. ANDRES:

20   Q.   With respect to the chart in Government Exhibit 72, can

21   you explain to the jury what that is?

22   A.   Yes.  This summarizes payments made to the vendors and

23   for the purchase of property in the years 2010 through 2014,

24   and it summarizes the payments made to the vendor by year.  So

25   that would be the total amount per calendar year paid to the

U.S. v. Manafort

1  vendor or for the property purchase, and then it totals the

2  total amount paid to the vendor in -- by year.

3  Q.   Okay.  Just by way of example, the first entry is for

4  SP&C Home Improvements.  Can you walk the jury through the

5  entries from left to right for SP&C Home Improvement?

6  A.   Sure.  In 2010, SP&C receives $626,700 from foreign bank

7  accounts.

8           In 2011, SP&C received $716,200.

9           In 2012, SP&C received $1,015,960.

10          In 2013, SP&C received $1,099,000.

11          And then in 2014, they received $90,953?

12 Q.   Then under the vendors, there's a total.  Do you see

13 that?

14 A.   Yes.

15 Q.   And then a grand total at the bottom.

16          What's the difference between the total and the

17 grand total?

18 A.   The total lists the total payments by year for just the

19 vendors, whereas the grand total also includes the property

20 purchases.  And there's only a difference in 2012, as that's

21 when all the real estate was purchased.

22 Q.   With respect to the grand total, can you walk the jury

23 through those numbers from left to right?

24 A.   In 2010, the grand total of payments made from overseas

25 to vendors was $1,617,190.

U.S. v. Manafort

1           In 2011, it was $1,431,158.

2           In 2012, it was $9,228,615.

3           In 2013, it was $2,864,150.

4           And then in 2014, it was $429,933.

5  Q.   Can I ask you to turn to Government Exhibit 73A?

6           Can you tell me what that is?

7  A.   This is a chart that lists bank accounts in 2010 that

8  have account balances.

9  Q.   And did you do the similar chart for 2011, '12, '13, and

10  '14?

11  A.   Yes.

12  Q.   And those are Government Exhibits 73B, C, D, and E?

13  A.   Correct.

14           MR. ANDRES:  The Government moves to admit

15  Government --

16  Q.   And with respect to those charts, can you tell the jury

17  what you relied on, what information is included in that chart

18  and what documents you relied on?

19  A.   Yes.  I relied on foreign bank account statements and

20  account opening documents to determine the maximum value of

21  the bank account in the years 2010 through 2014.

22           MR. ANDRES:  The Government moves to admit

23  Government Exhibits 73A, B, C, D, and E; seeks to publish them

24  to the jury.

25           MR. WESTLING:  No objection, Your Honor.

U.S. v. Manafort

1        THE COURT:  All right.  They're admitted.  You may

2   do so.

3                              (Government's Exhibit Nos. 73A,

4                                B, C, D, and E admitted into

5                                evidence.)

6   BY MR. ANDRES:

7   Q.   Starting with Government Exhibit 73A, can you describe

8   that information in the chart to the jury?

9   A.   Yes.  This is the summary of the aggregate maximum value

10  of the foreign bank accounts with balances in 2010.  Column 2

11  lists the account name, financial institution, and account

12  number.

13       Column 3 lists the maximum account value throughout

14  the year.

15       Column 4 lists the beneficial owner listed on the

16  bank account information.

17       And the last column lists the authorized signers on

18  the bank account applications.

19  Q.   What's the aggregate maximum value of the foreign bank

20  accounts associated with Mr. Manafort in 2010?

21  A.   $5,416,029.04.

22  Q.   Can I ask you to take a look at Government Exhibit 73B?

23       THE COURT:  What was that last question you asked,

24  Mr. Andres?

25       MR. ANDRES:  I asked for the aggregate maximum value

U.S. v. Manafort

1622

1    of the foreign bank accounts associated with Mr. Manafort in

2    2010.

3              THE COURT:  You said associated with him?

4              MR. ANDRES:  Yes.

5              THE COURT:  What did you mean by that?

6              MR. ANDRES:  Well, I can ask the witness, Your

7    Honor, but I --

8              THE COURT:  All right.  You may do so.

9    BY MR. ANDRES:

10   Q.   These bank accounts that are listed here, how did you

11   determine what bank accounts to use?

12   A.   These were foreign bank accounts that we -- that I had

13   analyzed financially and determined had bank account balances

14   in 2010.

15   Q.   In terms of these bank accounts, were substantial

16   payments made to Mr. Manafort?

17   A.   Yes, they were.

18   Q.   And in some cases, was he listed or his associates listed

19   as the beneficial owners?

20   A.   Yes.

21             THE COURT:  All right.  Proceed.

22             MR. ANDRES:  Thank you, Your Honor.

23   BY MR. ANDRES:

24   Q.   73B, can you describe that chart to the jury?

25   A.   Yes.  This was the aggregate maximum value of foreign

U.S. v. Manafort

1   bank accounts in 2011 and, again, it shows the account name,

2   financial institution, and account number, the maximum value

3   throughout the year, and the beneficial owner listed on the

4   bank account application and the authorized signers.

5   Q.   And what was the aggregate maximum value for 2011?

6   A.   $8,381,798.75.

7   Q.   Can you take a look at Government Exhibit 73C?  Explain

8   that to the jury.

9   A.   This lists the aggregate maximum value of foreign bank

10  accounts in 2012.

11  Q.   Okay.  And which accounts were listed in this chart?

12  A.   Actinet Trading Limited.

13  Q.   I'm sorry, you don't have to go through each one.  But

14  the lists where you have account name, how did you determine

15  which accounts to include in this chart?

16  A.   I included accounts that were included in my financial

17  analysis of payments made to vendors and for real estate

18  purchased and transfers made to DMP International,

19  Mr. Manafort, his family, and associated entities.

20  Q.   And what's the aggregate maximum value in 2012?

21  A.   $25,704,669.72.

22  Q.   Can you take a look at Government Exhibit 73D.

23            Can I -- can I try to cut to the chase, the exhibit

24  in 73D is the same as the prior exhibit in 73C, B, and A but

25  for a different year; is that right?

┌─ U.S. v. Manafort ─┐

M. Magionos - Direct

1624

1    A.    That's correct.

2    Q.    Okay.  So can you tell me if you calculated the aggregate

3    maximum value for the year 2013?

4    A.    Yes, it's $18,788,808.57.

5    Q.    Can I ask you to take a look at Government Exhibit 73E?

6          Is it fair to say that this chart is also -- it does

7    the same analysis but for the year 2014?

8    A.    Yes.

9    Q.    And what is the aggregate maximum value of the accounts

10   in 2014?

11   A.    $2,743,303.56.

12   Q.    During the course of your investigation, did you do a

13   deposit analysis?

14   A.    I did.

15   Q.    And what is a deposit analysis?

16   A.    I looked at all incoming funds into the foreign bank

17   accounts and determined the source of those funds and which

18   bank accounts they were deposited into.

19   Q.    And what documents did you rely on for this analysis?

20   A.    I relied on foreign bank accounts provided by the Cyprus

21   and St. Vincent and the Grenadines MLAT productions as well as

22   records from HSBC UK.

23   Q.    And were these documents voluminous?

24   A.    Yes, they were.

25   Q.    Can I ask you to take a look at the chart in Government

─────────────U.S. v. Manafort─────────────
M. Magionos - Direct                                          1625

1   Exhibit 74.

2             Can you tell me what that is?

3   A.   Yes.  This summarizes all incoming funds into the foreign

4   bank accounts and provides the source of funds, as well as the

5   wire memo description on the wire remittance advice transfers

6   and it's for the years 2010 through 2013.

7             MR. ANDRES:  The Government moves to admit

8   Government Exhibit 74, and seeks to publish it to the jury.

9             MR. WESTLING:  No objection.

10             THE COURT:  It's admitted.  You may do so.

11                          (Government's Exhibit No. 74

12                          admitted into evidence.)

13   BY MR. ANDRES:

14   Q.   Ms. Magionos, can you describe to the jury what's

15   included in Government Exhibit 74?

16   A.   Yes.  In the first column, I list the foreign source of

17   funds.

18             The second column lists the foreign bank account

19   receiving those funds.

20             The third column lists the wire memo description, so

21   showing whether -- what the service was that the payment was

22   made for.  And then I totaled those amounts by calendar year,

23   So from 2010 through 2013.

24   Q.   Based on the investigation, the entities listed in the

25   first column, those relate to Ukrainian entities?

─────────── U.S. v. Manafort ───────────
M. Magionos - Direct                                    1626

1   A.   Yes, they do.

2   Q.   And in the second column, what's listed in the second

3   column?

4   A.   These are the foreign bank --

5        MR. WESTLING:  Your Honor, I know the horse may be

6   out of the barn.  I'm not entirely clear about "related to

7   Ukrainian entities."  If he could clarify that, it would help.

8        THE COURT:  Do you have something other than this

9   chart to go on to before you finish?

10       MR. ANDRES:  If I could just ask the witness that

11  question, Your Honor, and clarify her answer.

12       THE COURT:  All right.  You may do so.

13  BY MR. ANDRES:

14  Q.   With respect to the entities in the first column, what do

15  you understand them to be?

16  A.    I understand them to be foreign entities that --

17       THE COURT:  I'm sorry, I can't hear you.  And you

18  have to tell me what it is.  If your basis and understanding

19  is what you were told by other agents, you need to tell me

20  that.

21       THE WITNESS:  I understand that, Your Honor.

22       THE COURT:  All right.

23       THE WITNESS:  By reviewing e-mails and other

24  correspondence, I determined most of the, what I would say,

25  beneficial owners of these entities providing funds for

U.S. v. Manafort

M. Magionos - Direct

1627

1    services that were provided by DMP International.

2              THE COURT:  All right.  Give me an example.  Take

3    the first one.

4              THE WITNESS:  Well, I can tell you Telmar

5    Investments Limited is related to Lovochkin.

6              THE COURT:  And that you determined from e-mails in

7    this case?

8              THE WITNESS:  Correct.

9              THE COURT:  Do you know whether they've been

10   admitted?

11             MR. ANDRES:  Your Honor, I don't mean to answer,

12   but, as you know, Ms. Magionos has been excluded from the

13   trial as a witness.  So I'm not sure that she would know

14   exactly what -- but we can proffer that information --

15             THE COURT:  All right.  She would know if you

16   intended to offer, I assume.

17             But in any event, do you have any objection,

18   Mr. Westling?

19             MR. WESTLING:  No, Your Honor.  I just want to

20   clarify that these are Cypriote entities, but they relate to

21   Ukraine.  It's just a distinction.

22             THE COURT:  All right.  Do you agree with that?  Do

23   you agree that they are Cypriote entities related to the work

24   being done in the Ukraine, if you know?

25             THE WITNESS:  I do know in the case of Telmar that

U.S. v. Manafort

1628

1   it's registered in Seychelles, but it does have to do with

2   banking in Cyprus.

3         THE COURT:  All right.  Next question.

4   BY MR. ANDRES:

5   Q.   With respect to the entities listed in the second column,

6   what did you understand those to be?

7   A.   These are the foreign bank accounts receiving funds from

8   foreign sources.

9   Q.   Okay.  And the third column where it says "Wire Memo

10  Description," where did you get that information from?

11  A.   This information was provided in a wire remittance

12  advice, which --

13  Q.   So you don't know if those services were actually

14  performed, you just -- that came from the actual documents?

15  A.   That's correct.

16  Q.   Okay.  With respect to the final, at the bottom, the

17  total funds received by foreign accounts, starting in 2010,

18  going left to right, can you identify those for the jury?

19  A.   Yes.  In 2010, $9,430,899 were received.

20         In 2011, $11,004,861 was received.

21         In 2012, $31,559,379.50 was received.

22         And then in 2013, $13,865,363 was received.

23  Q.   Can I ask you to turn to Government Exhibit 80.

24         (A pause in the proceedings.)

25         THE COURT:  What exhibit number, again, Mr. Andres?

U.S. v. Manafort

1    MR. ANDRES:  80, Your Honor.  This is the last

2  exhibit.

3    Your Honor, may I hand it --

4    THE COURT:  Yes, you may do so.  Show it to

5  Mr. Westling first.

6    MR. WESTLING:  Yeah, I have a copy, Your Honor.

7  Thank you.

8    THE COURT:  All right.  She has it.

9  BY MR. ANDRES:

10  Q.   With respect to Government Exhibit 80, can you tell me

11  what that is?

12  A.   Yes.  This is a comparison of receipts reported in the

13  FARA filing as compared to receipts reported in Davis Manafort

14  Partners and DMP International LLC's financial records, so

15  bank statements, general ledgers, and tax returns.

16    MR. ANDRES:  Your Honor, Government moves to admit

17  Exhibit 80 solely as a demonstrative to the jury.

18    MR. WESTLING:  No objection, Your Honor.

19    THE COURT:  All right.  You may do so.

20    Mr. Andres, I should tell you, and Mr. Westling and

21  other counsel, demonstratives are useful, you can use them in

22  closing statements, if you wish.  But as you surely know, all

23  of you, you're not going to be given an unlimited amount of

24  time for your closing statement.  You're going to have to be

25  selective, but I'm sure you knew that.

U.S. v. Manafort

1          Proceed, Mr. Andres.

2          MR. ANDRES:   Thank you, Your Honor.

3     BY MR. ANDRES:

4     Q.   You mentioned, Ms. Magionos, a FARA filing.  What is a

5     FARA filing?

6     A.   If one acts as an agent of a foreign principal in a

7     political capacity, they are required to make a filing

8     regarding that activity.

9     Q.   And with respect to the FARA filing that you reviewed for

10    this exhibit, what was that date of that filing?

11    A.   I don't have it in front of me, but I believe it was in

12    June of 2017.

13    Q.   And was it signed by somebody?

14    A.   Yes.

15    Q.   Who?

16    A.   Mr. Manafort.

17    Q.   And who was the registrant?

18    A.   The registrant was DMP International, LLC.

19    Q.   And does that form -- does it list Mr. Manafort's

20    ownership stake?

21    A.   Yes.

22    Q.   And what was it?

23    A.   He was listed as wholly owning DMP International, LLC.

24    Q.   100 percent?

25    A.   100 percent.

─────────────── U.S. v. Manafort ───────────────

1  Q.   On the left side of the chart, can you explain to the

2  jury what's on the left side of the chart?

3  A.   Yes.  This shows the receipts that were recorded in the

4  FARA filing, so it lists it by month.  It shows the foreign

5  principal, the purpose of the funds being received, which was

6  for services rendered, and then the total amount of receipts

7  received by month and then in total.

8  Q.   Okay.  And how about on the right side?

9  A.   The right side shows the receipts that were received per

10  review of DMP International's bank statements, the general

11  ledger, and then their tax filing for 2012.

12  Q.   Okay.  Ms. Magionos, I'm going to ask that you take a

13  look at Government Exhibit 34.

14          MR. ANDRES:  May I hand it up, Your Honor?  This is

15  the FARA filing.

16          THE COURT:  Yes, you may give it to the court

17  security officer.

18          MR. ANDRES:  Thank you, Your Honor.

19          THE COURT:  What do you want her to do now?

20          MR. ANDRES:  I just want her to look at it, and I

21  want to admit it, Your Honor.

22          THE COURT:  It's pretty voluminous, isn't it?

23          MR. ANDRES:  It's just the underlying documentation,

24  Judge, and it's relevant.

25          THE COURT:  You've seen it all?

U.S. v. Manafort

1        MR. WESTLING:  I have, Your Honor, and we have no

2   objection.

3        THE COURT:  All right.

4   BY MR. ANDRES:

5   Q.   With respect to February 2012, can you explain to the

6   jury what's reflected in February 2012?

7   A.   Yes.  In February 2012, $1,950,000 was reported as being

8   received in the FARA filing.  When I reviewed the bank

9   statements in general ledger, $450,000 was recorded as income

10  and then there was a loan in the amount of $1.5 million.

11  Q.   Okay.  And how about November 2012, can you look at

12  Government Exhibit 80 and explain the entries on the left side

13  and the right side?

14  A.   Yes.  In November 2012, $4,399,500 was recorded in the

15  FARA filing as being received for services rendered.  When I

16  reviewed the bank accounts in general ledger, $1.1 million was

17  recorded as being received as income in November of 2012.

18        MR. ANDRES:  Your Honor, may I have one moment?

19        THE COURT:  Yes.

20        (A pause in the proceedings.)

21        MR. ANDRES:  Your Honor, I'm told that I didn't move

22  to admit the FARA filing at 34.  The Government moves to admit

23  Government Exhibit 34.  Maybe I did.

24        MR. WESTLING:  I have no objection.

25        THE COURT:  It's admitted.

┌─── U.S. v. Manafort ───

M. Magionos - Direct                                              1633

1              MR. ANDRES:  I got bad information from my

2     colleagues.

3                              (Government's Exhibit No. 34

4                              admitted into evidence.)

5              MR. ANDRES:  Thank you.  I have no further

6     questions.  Thank you, Your Honor.

7              THE COURT:  All right.  Pass your books to the

8     right, ladies and gentlemen.  We'll take the afternoon recess.

9     We will reconvene at 3:20.  Remember to refrain from

10    discussing the matter among yourselves or undertaking any

11    investigation.  I'll try to reconvene at 3:20, but I may be

12    five or ten minutes late on another matter.

13             Thank you for your patience.

14             Remember, as always, don't discuss the matter with

15    anyone or allow anyone to discuss it with you and don't

16    undertake any investigation on your own.

17             Mr. Flood, do we have soft drinks and everything

18    back there?

19             THE COURT SECURITY OFFICER:  Yes, sir.

20             THE COURT:  All right.  You may follow Mr. Flood

21    out.

22             Oh, I'm sorry.  You may step down and you'll have to

23    remember not to discuss your testimony with anyone.

24             THE WITNESS:  Of course.  Thank you.

25             THE COURT:  Mr. Flood, in about five minutes I'll

U.S. v. Manafort

1   need to see you on another matter and Ms. Pham as well.

2          You may take a rest.

3          Court stands in recess until at least 3:20.  It may

4   take a few minutes longer.

5          (Recess.)

6          THE COURT:  All right.  You may bring the jury in.

7          All right.  You may be seated.  Ladies and

8   gentlemen, as you've requested, we will cease sharply at or

9   before 5:30.

10          All right.  Ms. Magionos, if you'd return to the

11   stand, please.

12          And you'll recall that you remain under oath.

13          Mr. Westling, how long do you think?

14          MR. WESTLING:  I would think less than half an hour,

15   Your Honor.

16          THE COURT:  All right.  You may proceed.

17          MR. WESTLING:  Thank you, Your Honor.

18                    **CROSS-EXAMINATION**

19   BY MR. WESTLING:

20   Q.   Ms. Magionos, my name -- did I get that right?  I want to

21   make sure I say your name right.  Magionos?

22   A.   Yes, thank you.

23   Q.   Okay.  My name is Richard Westling and I represent

24   Mr. Manafort.  If there is anything that I say that isn't

25   clear or you don't understand it, please just let me know.

1    Okay?

2    A.   Okay.

3    Q.   All right.  Now, you gave some testimony on direct and

4    explained basically your background as a forensic accountant;

5    is that correct?

6    A.   Correct.

7    Q.   Right.  And if I understand correctly, the work that you

8    did as a person tracing transactions was really to work

9    through series of records to match from one place to the next

10   to the next.  It's pretty much taking paper records, or

11   electronic records, and just finding the connections between

12   them; is that correct?

13   A.   In part, yes.

14   Q.   All right.  And I imagine there's some amount of judgment

15   because you need to know the difference between a debit and a

16   credit and that sort of thing, but basically your testimony is

17   based on the documents; is that correct?

18   A.   Correct.

19   Q.   All right.  Now, in doing this work, I take it that you

20   spent a lot of time looking through --

21           THE COURT:  I think what he was asking -- in your

22   work, you weren't required to make any judgments about whether

23   a payment was one -- a loan, other than if it said so, or

24   income, other than if it said so?

25           THE WITNESS:  I relied on the documentation

U.S. v. Manafort

1    provided.

2            THE COURT:  So the answer to my question is, yes,

3    you didn't have to make any judgements?

4            THE WITNESS:  No, I did not have to make any

5    judgments.

6            THE COURT:  Thank you.

7            MR. WESTLING:  Thank you, Your Honor.

8            THE COURT:  I always chastise lawyers for asking

9    leading questions because the answer you get almost never is

10   clear, and you just used my question to make that point to me.

11   I'll remember.  Go ahead, Mr. Westling.

12           MR. WESTLING:  Thank you, Your Honor.

13   BY MR. WESTLING:

14   Q.   And so, as I was saying, you basically go through the

15   records, looking at what's there, reading what's there, and

16   then try to map them out.  Is that a fair statement?

17   A.   Yes.

18   Q.   Okay.  And in doing that, you obviously produced a number

19   of charts and a number of things we've seen here today,

20   correct?

21   A.   Correct.

22   Q.   All right.  And as far as the way you got the records, so

23   you -- you mentioned a Mutual Legal Assistance Treaty.  What

24   is that?

25   A.    It's an agreement between two countries to gather and

────────── U.S. v. Manafort ──────────

1    share information.

2    Q.   All right.  And so you used that to get the bank records

3    from Cyprus and St. Vincent and the Grenadines, correct?

4    A.   Yes.

5    Q.   All right.  And -- and based on that evaluation of those

6    records, again, you sort of put the bricks together to put the

7    charts in front of a jury that they've seen, correct?

8    A.   Yes.

9    Q.   All right.  And so I assume that a big part of what you

10   do is based on the validity or accuracy of the records; is

11   that fair?

12   A.   Correct.

13   Q.   And so if the information that you're reading is not

14   accurate in some way, your product may not be accurate.  Fair

15   statement?

16   A.   That could be, yes.

17   Q.   Okay.  And so in terms of working through the various

18   documents, I want to start kind of where we finished, which

19   is, you gave some testimony about a FARA filing, which is a

20   filing that was made in 2017, correct?

21   A.   Yes.

22   Q.   And do you still have that document in front of you?  I

23   think it was 34.

24   A.   Yes, I do have that.

25   Q.   Now, if you look at this document, Ms. Magionos, this

─────U.S. v. Manafort─────

M. Magionos - Cross

1638

1   covers several years, doesn't it?

2   A.    Yes, it does.

3   Q.    All right.  And you had a chart that projected only a

4   single year, correct?

5   A.    Correct.

6   Q.    All right.  And that chart showed that there was a

7   discrepancy between the work you did looking at bank deposits

8   and all kinds of other records and what the FARA report said;

9   is that right?

10  A.    Correct.

11  Q.    And was that true in the other years as well, the two

12  that you didn't testify about?

13  A.    I did not summarize 2013 and 2014, but in 2013 there was

14  also some differences.

15  Q.    All right.  But as a practical matter, did you -- you

16  didn't do the analysis for all those years?

17  A.    I reviewed the information.  I did not summarize it like

18  I did for 2012.

19  Q.    Okay.

20  A.    If I recall, 2014 had no discrepancy but 2013 did.

21  Q.    All right.  Thank you.

22          And I think you also testified that you were looking

23  at an attachment that was submitted along with the FARA

24  document, which is a part of the exhibit that's in evidence,

25  No. 34, and it's entitled "Operating Agreement of DMP

─────────────U.S. v. Manafort─────────────
M. Magionos - Cross
                                                              1639

1    International."

2              Are you familiar with that document?

3    A.   I have seen it, yes.

4    Q.   Okay.  And, in fact, it was that document that you based

5    your last answer about 100 percent on, correct?

6    A.   No.  I based it on what was in -- I can -- let's see.

7    It's actually Page 3 of the FARA filing.

8    Q.   Okay.

9    A.   And it's -- let's see.  It's Section 5, Letter J.

10   Q.   All right.  So it says, "Wholly owned by Mr. Manafort"?

11   A.   Yes.

12   Q.   Right.  And then you get back to the supporting

13   documentation that's here, correct?

14             And it's got a management agreement -- operating

15   agreement, excuse me.  I'll rephrase.

16   A.   Okay.  I see that.

17   Q.   Okay.  If you go to the back page, the attachment,

18   Page 13 of that document, does that indicate that Mr. Manafort

19   is 100 percent interest holder of -- as a Class A member?

20   A.   Yes, it does.

21   Q.   And do you know what that means?

22   A.   I would assume that he -- his interest is in -- well, it

23   looks like he had a capital contribution and he's 100 percent

24   owned as far as that membership class.

25   Q.   Okay.  And there could be other membership classes,

M. Magionos - Cross

1    correct?

2    A.    That is correct.

3    Q.    All right.  And as a fact of the matter, do you know who

4    prepared the FARA filing?

5    A.    I don't.

6    Q.    But you do know it was signed by Mr. Manafort?

7    A.    That's correct.

8    Q.    All right.  So if he had someone else prepare it, that's

9    surely possible, isn't it?

10   A.    Sure.

11   Q.    Okay.  Now, going back to our discussion about records,

12   you had a chart that you used -- and I think -- let me see if

13   I can find the exhibit number quickly.

14         But it was the chart that showed the various

15   interests or connections to the foreign banks.  Do you

16   remember that chart?  I think it's 63.  I found it.  Sorry

17   about that.

18         Do you have that there?

19   A.    I do.  Let me just locate it.

20         (A pause in the proceedings.)

21         THE WITNESS:  I'm there.

22   BY MR. WESTLING:

23   Q.    Do you have it?

24   A.    Yes.

25   Q.    Now, this is the chart that had a listing of 31 different

U.S. v. Manafort

1    accounts, correct?

2    A.   Correct.

3    Q.   And in each case I think you described the process as you

4    looked at the foreign bank records that you got from various

5    sources and you simply mapped out what you saw on the face of

6    those records, correct?

7    A.   That's correct.  I summarized the information that was

8    contained in the bank account application and account opening

9    documents.

10   Q.   All right.  And in doing that, you'll also see up there

11   on the podium with you what I premarked as Defendant's 23, 24,

12   25, and 26.  Do you have those?

13   A.   I do.

14   Q.   All right.

15          MR. WESTLING:  Your Honor, 23 through 26 are

16   defendant's exhibits that are excerpts from an admitted

17   Government exhibit, and I would like to offer them at this

18   time.

19          THE COURT:  Any objection?

20          MR. ANDRES:  No, Your Honor.

21          THE COURT:  All right.  They're admitted.

22                  (Defendant's Exhibit Nos. 23-26

23                   admitted into evidence.)

24          MR. WESTLING:  All right.  And I'm going to see if I

25   can make this camera work, if that's okay with Your Honor.

U.S. v. Manafort

1    May I publish them, Your Honor?

2    THE COURT:  You may.

3    (A pause in the proceedings.)

4    MR. WESTLING:  My colleague just said it's not

5  rocket science so he thinks I may be able to do it.  We'll

6  see.  I apologize, Your Honor.  I'll move along.

7  BY MR. WESTLING:

8  Q.  So I just put a document on the screen, and I think it is

9  one of several.  I know you've reviewed all of these.  But

10  this is a document that relates to one of the accounts,

11  Actinet Trading; is that correct?

12  A.  Yes.

13  Q.  All right.  And it shows that there are signatories,

14  Richard William Gates, III, and Paul Manafort, correct?

15  A.  Correct.

16  Q.  And it has signatures of those individuals?

17  A.  Yes.

18  Q.  All right.  Did you do anything to determine whether or

19  not that's, in fact, Mr. Manafort's signature?

20  A.  No, I did not.

21  Q.  All right.  And so you relied on the document because of

22  what it says on the face of the document, correct?

23  A.  Yes.  These were provided as bank account applications

24  and account opening docs from Bank of Cyprus.

25  Q.  And then I'm going to ask you to take a look at 24,

M. Magionos - Cross

1643

1 Page 2.  We just looked at 23.  And you'll see another line

2 here where it says "Paul Manafort," and this, again, is a

3 signature document.

4           Do you see that?

5 A.   Yes.

6 Q.   And does that signature on 24 appear to be the same as

7 the one on 23?

8 A.   It looks different -- a little bit different, but I'm

9 also not a handwriting expert.

10 Q.   I'm asking for your lay opinion.

11 A.   Sure.  The -- I guess, the ending portion of the

12 signature looks a little different.

13 Q.   Okay.  Well, let's see if we can just lay these out in a

14 way that is helpful.

15           So the one, if you have it on the screen in front of

16 you, above, Paul Manafort, the second block down.  And then

17 the one below, the second line is Mr. Manafort, allegedly; is

18 that right?

19 A.   Yes.

20 Q.   All right.  And you can see there's some substantial

21 differences between those two signatures; isn't that fair to

22 say?

23 A.   Yes.

24 Q.   All right.  And so what we have here is documents that

25 bear a signature, and you don't know whether these were signed

M. Magionos - Cross

1   by Mr. Manafort or not, correct?

2   A.   No, I don't know.

3   Q.   Okay.  And you said you haven't made a comparison with

4   other signatures.  Are you familiar with other exhibits that

5   have been offered by the Government in this case that relate

6   to various banking transactions?

7   A.   I mean, I know that there are exhibits, but I don't know

8   the particulars of them.

9   Q.   Exhibit No. 36, Government Exhibit 36 is already in

10  evidence, and I can hand you a copy if that's quicker than --

11          If that's all right, Mr. Flood.  I appreciate your

12  help.

13          THE COURT:  Show it to Mr. Andres first.

14          MR. WESTLING:  I will, Your Honor.

15          THE WITNESS:  Thank you.

16  BY MR. WESTLING:

17  Q.   Now, you're looking at what's in evidence as Government's

18  Exhibit 36.

19          Do you have that in front of you?

20  A.   Yes, I do.

21  Q.   All right.  And then on the page -- let's see if I can

22  count here.  I think the fourth page at the bottom, you'll see

23  a signature block?

24  A.   Yes.

25  Q.   And that is a signature of Mr. Manafort's?

─────U.S. v. Manafort─────
M. Magionos - Cross

1645

```
 1   A.   Yes, it is.

 2   Q.   And this is a document that, I believe, was found during

 3   the search of Mr. Manafort's home, if I'm not mistaken.

 4   Counsel can correct me if I have that wrong, but it's in

 5   evidence.

 6   A.   Okay.

 7   Q.   All right.  So you don't have any reason to dispute that

 8   that's Mr. Manafort's signature?

 9   A.   No.

10   Q.   Okay.  So let's just take a second, if we could, and

11   compare these to the ones on the bank documents we just looked

12   at.

13            So we have the second box there with Mr. Manafort's

14   signature from the bank documents, and then below that, we

15   have his actual signature from the Banc of California loan

16   application.  Do you see that?

17   A.   Yes, I do.

18   Q.   And those appear to be substantially different, don't

19   they?

20   A.   Yes.

21   Q.   All right.  And that, I think, is going to be true, but

22   I'll go through the exercise with the other one I showed you a

23   moment ago.

24            Again, at the top, we'll have the foreign bank

25   document and below that, you'll have the U.S. bank --
```

U.S. v. Manafort

M. Magionos - Cross

1646

1   THE COURT:  Do you think you can get someone to help

2   you, because when you turn your back --

3   MR. WESTLING:  I apologize, Your Honor.  I will get

4   someone to help me.  I could always use help.

5   THE COURT:  All right.

6   MR. WESTLING:  Proving that it actually is rocket

7   science, Your Honor.  I apologize.

8   (Laughter.)

9   BY MR. WESTLING:

10  Q.  So if you look at those again, they look substantially

11  different, don't they?

12  A.  Yes, I do see differences.

13  Q.  Okay.  And so we can't say, sitting here today, who

14  signed Mr. Manafort's name to the Cyprus bank documents, can

15  we?

16  A.  Again, I can only go off of what is in the bank account

17  opening document.

18  Q.  Understood.  And to my earlier point, to the extent that

19  you rely on certain documents, you're relying on what's there;

20  and if what's there isn't what it purports to be, it's going

21  to affect your analysis; is that fair?

22  A.  Correct.  Although, when I look at the disposition of

23  funds from, in particular, Actinet Trading Limited, I do see

24  who benefited the most from the disposition of funds from that

25  account.

M. Magionos - Cross                                            1647

1  Q.    I'm not here to quibble about that.

2  A.    Okay.

3  Q.    I'm just saying when we look at 63 --

4  A.    Sure.

5  Q.    -- which is the summary of bank records, and we use that

6  to assign various individuals' roles with connection to those

7  accounts, you have to rely on the accuracy of the underlying

8  documents?

9  A.    I do have to rely on documents provided by financial

10 institutions, that's correct.

11 Q.    And in -- I'm sorry to cut you off.  I didn't mean to do

12 that.

13 A.    No, that's okay.

14 Q.    And in this case, we know that at least a couple of

15 examples suggest that someone else was signing Mr. Manafort's

16 name?

17 A.    Perhaps, yes.

18 Q.    And you don't have any way to know who that might have

19 been?

20 A.    No, I don't.

21 Q.    All right.  And similarly, do you know whether Mr. Gates

22 had access to Mr. Manafort's passport?

23 A.    I don't.

24 Q.    And you don't know how the passports got into the Cypriot

25 records, do you?

─────U.S. v. Manafort─────
M. Magionos - Cross/Redirect

1648

1   A.   No, I was not able to go and interview anyone in Cyprus.

2   Q.   Okay.  And so as a practical matter, what we know is

3   there's a copy in the records, but that's all we have,

4   correct?

5   A.   That is correct.

6          MR. WESTLING:  All right.  I don't have any further

7   questions, Your Honor.

8          THE COURT:  Any redirect?

9          MR. ANDRES:  Very briefly, Your Honor, very briefly.

10          THE COURT:  All right.

11                       **REDIRECT EXAMINATION**

12   BY MR. ANDRES:

13   Q.   Ms. Magionos, do you still have Government Exhibit -- I'm

14   sorry, Defense Exhibit 63 in front of you?

15   A.   I do.

16   Q.   And that's the document that was seized from

17   Mr. Manafort's house?

18   A.   Yes.

19   Q.   Can you look on Page -- at the bottom, there's the Bates

20   number that says 400696068.  Do you see that?

21   A.   Yes.

22   Q.   And there's a signature that looks like Mr. Manafort's

23   there?

24   A.   Yes.

25   Q.   And then the page after that --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

1    THE COURT:  Well, you don't know whether it looks

2  like his, but it's a signature that says Paul Manafort; is

3  that right?

4    THE WITNESS:  That is correct.

5    THE COURT:  And it came from his house as far as you

6  know?

7    THE WITNESS:  Yes.

8    THE COURT:  Next question.

9  BY MR. ANDRES:

10  Q.  And this is the document that defense counsel pointed you

11  to; is that right?

12  A.  Yes.

13  Q.  If you turn to the next page, is there also a signature?

14  A.  Yes.

15  Q.  And the signature, the first one on 004 is the date,

16  what's the date after that?

17  A.  Sorry.  It is March 8, 2016.

18  Q.  And how about the next one on the next page?

19  A.  March 9, 2016.

20  Q.  And when you turn to the front page of this application,

21  whose name is listed as applicant?

22  A.  Paul Manafort.

23  Q.  Okay.

24    MR. ANDRES:  So can I -- Your Honor, can I just show

25  these on the ELMO for two seconds?

U.S. v. Manafort

M. Magionos - Redirect

1650

1      THE COURT:  Yes, you may.  They're admitted, aren't

2  they?

3      MR. ANDRES:  Yeah.

4      MR. WESTLING:  Yeah, they're admitted.

5      MR. ANDRES:  They're admitted.

6      THE COURT:  And while we're at it, Mr. Westling, you

7  offered 23 and 24 or how many did you offer?

8      MR. WESTLING:  I think it was 23 through 26, Your

9  Honor.

10      THE COURT:  All right.  Let me check.

11      Margaret, did I admit all of those?

12      You've offered those.

13      Any objection to 23 through 26?

14      MR. ANDRES:  No -- Your Honor, no, but -- and for

15  the record, they're admitted as separate Government exhibits

16  as well.  So we don't have any objection.

17      THE COURT:  All right.

18      MR. WESTLING:  This is just an excerpt, Your Honor,

19  for speed.

20      THE COURT:  All right.  I'll admit 23 through 26,

21  defendant's exhibits.

22      Go ahead, Mr. Andres, you may finish.

23                      (Defendant's Exhibit No. 23 - 26

24                       admitted into evidence.)

25  BY MR. ANDRES:

─────────U.S. v. Manafort─────────
M. Magionos - Redirect                                    1651

1   Q.   Those two signatures on the bank application in the

2   United States to Mr. Manafort, do those look the same?

3   A.   No, the beginning looks different.

4   Q.   Okay.  And those are on the same document?

5   A.   Yes.

6   Q.   And for the record, can you turn to the first page --

7          THE COURT:  I'm sorry.  You're saying these don't

8   look the same, is that what you're saying?

9          THE WITNESS:  Yes, Your Honor, I am.

10          THE COURT:  All right.  It's up to the jury whether

11   they look the same or not.

12          (Laughter.)

13          THE COURT:  Let's proceed.

14   BY MR. ANDRES:

15   Q.   Mr. Westling asked you about a document,

16   Government Exhibit -- Defense Exhibit 23 from Actinet Trading

17   Limited.  Did you identify payments from Actinet Limited to

18   Mr. Manafort?

19   A.   I did.

20   Q.   Substantial number of payments?

21   A.   Yes.

22   Q.   And you relied on that information as well, didn't you?

23   A.   I did.

24   Q.   In Government Exhibit -- or Defense Exhibit 25 relates to

25   Lucicle Consultants Limited; is that correct?

┌─────────────────────────────────────────────────┐
U.S. v. Manafort
M. Magionos - Redirect                          1652

1   A.    That's correct.

2   Q.    During the course of your tracing, did you identify

3   substantial payments from Lucicle to the benefit of

4   Mr. Manafort?

5   A.    Yes.

6   Q.    And then lastly -- or the last one is Lucicle as well.

7               MR. ANDRES:  I don't have anything further, Judge.

8   Thank you, Your Honor.

9               THE COURT:  All right.  Any recross based only on

10  that?

11              MR. WESTLING:  No, Your Honor.

12              THE COURT:  Thank you.  You may step down.  You may

13  be excused.  Call your next witness, please.

14              (Witness excused.)

15              MR. ASONYE:  Your Honor, the Government calls

16  Michael Welch.

17              THE COURT:  Come forward and take the oath, please,

18  sir.

19              Thereupon,

20                        **MICHAEL WELCH,**

21  having been called as a witness on behalf of the Government

22  and having been first duly sworn by the Deputy Clerk, was

23  examined and testified as follows:

24              (Witness seated.)

25              THE COURT:  You may proceed.

1653

1          If you all need to confer, you may do so, because I

2     encourage it if it's going to have the effect of shortening

3     this proceeding.

4          (Laughter.)

5          MR. DOWNING:  Could we have a moment, Your Honor?

6          THE COURT:  You can have a day.

7          (Laughter.)

8          MR. ASONYE:  Your Honor, may we step outside for one

9     minute?

10          THE COURT:  Yes, you may.  So this is what -- all

11     right.  Yes, you may.  But I was only kidding about a day.

12          (Laughter.)

13          (A brief interruption in the proceedings.)

14          THE COURT:  Ladies and gentlemen, tomorrow -- this

15     is really for everybody here.  Tomorrow morning at 8:30, and

16     you-all are welcome to come that early if you wish, at 8:30

17     I'm going to have another proceeding.

18          During that other proceeding, I'm going to have some

19     people, with your permission, use your seats in the jury box.

20     These will be prosecutors and judges from Burma or Myanmar,

21     whichever, I don't know, I'll call the country whatever it

22     wants to be called.  I just remember it as being Burma, but if

23     they prefer Myanmar, so be it.

24          But they'll be here, about a dozen of them, and I

25     have a plea to -- a guilty plea to hear in a case.  I had

U.S. v. Manafort

1  other matters scheduled, but I'm going to defer those until

2  five o'clock or 5:30 tomorrow afternoon.

3          So I take it this means, Mr. Asonye, we can all go

4  home now.

5          MR. ASONYE:  I wish.  But it does mean, Your Honor,

6  I think we have an understanding on how the charts will be --

7  will come in.

8          THE COURT:  All right.

9          MR. ASONYE:  May I proceed?

10          THE COURT:  You may.

11                    **DIRECT EXAMINATION**

12  BY MR. ASONYE:

13  Q.   Could you please state and spell your last name for the

14  record?

15  A.   Michael Welch, W-e-l-c-h.

16  Q.   Did you attend college?

17  A.   Yes.

18  Q.   And did you earn your undergraduate degree?

19  A.   Yes.

20  Q.   In what area?

21  A.   I have a bachelor's in accounting from Southern Illinois

22  University.

23  Q.   Do you hold any graduate degrees?

24  A.   Yes.  I have a master's degree in accounting-taxation

25  from Southern Illinois University.

1   Q.   Are you currently employed?

2   A.   Yes, I am.

3   Q.   Where do you work?

4   A.   I work for the Internal Revenue Service.

5   Q.   How long have you worked for the IRS?

6   A.   For 34 years.

7   Q.   What is your position at the IRS?

8   A.   I'm a revenue agent with the Internal Revenue Service.

9   Q.   And how long have you been a revenue agent?

10  A.   For 34 years.

11  Q.   So have you been a revenue agent for your entire career?

12  A.   Yes, I have.

13  Q.   What are the duties and responsibilities of a revenue

14  agent with the IRS?

15  A.   The basic duties of a revenue agent are to audit tax

16  returns to determine if they're substantially correct.

17  Q.   And are you assigned to any particular group?

18  A.   Yes.  Currently, I'm assigned to the grand jury group.

19  Q.   What are the duties of a revenue agent with the grand

20  jury group?

21  A.   A grand jury agent basically assists the criminal

22  division of the IRS in investigations and subsequent criminal

23  trials.

24  Q.   And how long have you been with the grand jury group?

25  A.   For over 25 years.

1  Q.   How many criminal investigations have you assisted in

2  over your career?

3  A.   Approximately 500.

4  Q.   Before you joined the grand jury group, what other groups

5  did you work in?

6  A.   I was a revenue agent reviewer and I was a revenue agent

7  in the special enforcement program.

8  Q.   What did the special enforcement program focus on?

9  A.   They focused on unreported income, both legal and illegal

10  income.

11  Q.   When you were hired as a revenue agent, did you receive

12  any training?

13  A.   Yes, I did.

14  Q.   What type of training did you receive?

15  A.   I received a series of five training classes, each one

16  several weeks long.  The first one dealt with individual

17  income taxes.

18       The second one dealt with individual income tax,

19  more advanced topics, including self-employment tax.

20       The third class dealt with corporations.

21       The fourth class dealt with partnerships.

22       And the fifth class dealt with more advanced

23  corporate topics.

24  Q.   Can you explain to the jury what type of additional

25  training you received?

U.S. v. Manafort

M. Welch - Direct

1657

1   A.   I've received basic instructor training, special

2   enforcement program training, expert witness training, and

3   foreign trust training.

4   Q.   And in addition to this training, do you receive annual

5   training?

6   A.   Yes, each year we receive 40 hours of continuing

7   professional education that focus on the duties of a revenue

8   agent.

9   Q.   As part of your duties as a revenue agent, have you

10  taught any courses?

11  A.   Yes.  I taught the first two revenue agent classes that

12  new hires or newly hired revenue agents have to take.

13  Q.   And what about as your duties as a member of the grand

14  jury group, do you teach any courses?

15  A.   Yes.  I've taught the special enforcement program

16  training that we teach agents who come into the special

17  enforcement program.

18  Q.   Okay.  Now, as a revenue agent in the grand jury group,

19  do you have additional responsibilities?

20  A.   Yes, I do.

21  Q.   What are they?

22  A.   I have responsibilities, I am a FinCEN SAR gatekeeper,

23  SAR meaning suspicious activity report.  I'm a gatekeeper for

24  that information.  I have whistle-blower debriefing duties.

25  I'm also an FBAR coordinator and I have some other duties.

1   Q.   And you said you're the FBAR coordinator.  What's the

2   FBAR again?

3   A.   It's the foreign bank account report.

4   Q.   And what do you do in that role as FBAR coordinator for

5   the IRS?

6   A.   I provide guidance to other revenue agents and assist in

7   interviews of individuals regarding foreign accounts and FBAR

8   issues.

9   Q.   Now, there -- are there multiple FBAR coordinators across

10  the country for the IRS?

11  A.   Yes.  I'm one of several in the Midwest area that covers

12  ten states.

13  Q.   Do you know what an IRS special agent is?

14  A.   Yes.  An IRS Special Agent investigates potential

15  violations of the criminal law.

16  Q.   But are you a Special Agent?

17  A.   I'm not a Special Agent.  I'm a revenue agent.  And as I

18  stated before, our duties are to basically audit tax returns

19  to see if they're substantially correct.

20  Q.   Now, Agent Welch, what was your role in this case?

21  A.   In April of this year, I was assigned to participate in

22  this trial and help the trial team.

23  Q.   And what, if anything, were you asked to do?

24  A.   I was asked to review a lot of documents, e-mails,

25  financial records, bank statements, tax returns, general

M. Welch - Direct

1  ledgers, and then to provide some summary charts and do some

2  analysis of some of the accounts.

3  Q.   Do you have specialized knowledge in the fields of

4  taxation and accounting?

5  A.   Yes.

6  Q.   And as part of your job duties as a revenue agent, have

7  you testified in state court?

8  A.   Yes, I have.

9  Q.   Have you testified in federal court?

10  A.   Yes, I have.

11  Q.   Have you testified in federal district court?

12  A.   Yes, I have.

13  Q.   And have you testified in any other federal courts?

14  A.   Yes, in the United States tax court.

15  Q.   How many times have you testified in federal court?

16  A.   I testified approximately 29 times in 20 different cases.

17  Q.   And have you ever testified in federal court as an expert

18  witness?

19  A.   Yes, I have.

20  Q.   Is your testimony today intended to assist the jury in

21  determining facts at issue in this case?

22  A.   Yes.

23        MR. ASONYE:  Your Honor, at this time, the

24  Government tenders Michael Welch as an expert in the fields of

25  accounting and taxation.

1    THE COURT:  That last question is really asking him

2  what you-all are offering his testimony for, not him.  You-all

3  make that determination, you, the lawyers.

4    Any objection to his testifying to give expert

5  opinions in the area of -- what specific area?

6    MR. ASONYE:  Taxation and accounting, Your Honor.

7    THE COURT:  That's pretty broad.  You got something

8  narrower?

9    MR. DOWNING:  I thought we did.

10    MR. ASONYE:  No, I think that's what we -- well, we

11  know what area -- he's going to testify about income.

12    MR. DOWNING:  Yes.  Yeah, we agreed to limited scope

13  for inquiry with respect to the experts.

14    THE COURT:  All right.  Proceed.  Yes, I'll permit

15  you to ask him questions in that area that you-all have agreed

16  to, Mr. Downing.

17    MR. DOWNING:  Thank you.

18  BY MR. ASONYE:

19  Q.   Agent Welch, have you been present --

20    THE COURT:  Let me tell the jury that ordinarily

21  witnesses cannot offer their opinions.  Witnesses who by

22  reason of experience or training have special expertise or

23  knowledge in certain areas, if they're admitted to testify as

24  experts, can give their opinions on matters.

25    However, the extent to which you accept a witness is

U.S. v. Manafort

M. Welch - Direct

1661

1    an expert in an area and the extent to which you accept that

2    witness' testimony as expert testimony are matters left

3    entirely to you, the jury.  And I'll give you further

4    instructions on this as well as other matters at the end of

5    the case.

6              Mr. Asonye, you may proceed.

7    BY MR. ASONYE:

8    Q.   Agent Welch, have you been present each day in this

9    courtroom so far in this trial?

10   A.   Yes, I have.

11   Q.   Have you heard all of the testimony --

12             THE COURT:  I thought we excluded witnesses.

13             MR. ASONYE:  Except for -- Your Honor, except for

14   expert witnesses, Your Honor --

15             THE COURT:  Is that right?

16             MR. ASONYE:  -- and case agents.

17             THE COURT:  The case agents I did admit.  But the

18   next time we do this, it's my clear recollection, Mr. Asonye,

19   that I wasn't admitting experts.  You need to ask

20   specifically.  You're going to go ahead now, I'm going to

21   permit that, but I want you to remember that.  I typically

22   allow the case agents to remain.  I don't typically allow

23   experts for either side to remain.

24             MR. ASONYE:  Appreciate it, Your Honor.  We'll check

25   the transcript, but we believe that we said case agent

1    and expert witness.

2            THE COURT:  Well, let me be clear:  I don't care

3    what the transcript says.  Maybe I made a mistake.  But I want

4    you to remember don't do that again.  When I exclude

5    witnesses, I mean everybody.  Now, it may be that I didn't

6    make that clear.  It may be that I did allow this, but don't

7    do it in the future.

8            MR. ASONYE:  Fair enough, Your Honor.

9            THE COURT:  I beg your pardon?

10           MR. ASONYE:  I said fair enough, Your Honor.

11           THE COURT:  Well, it's right.  Fair enough.

12           All right.  I just want you to have that in mind,

13   Mr. Asonye, because you appear here again.  And when I exclude

14   witnesses, I mean everybody unless I make a specific

15   exception, and I do for case agents.

16           Proceed.  It's not a big deal, but I want you to be

17   clear about that.

18           MR. ASONYE:  May I proceed, Your Honor?

19           THE COURT:  You may.

20   BY MR. ASONYE:

21   Q.   Have you heard all of the testimony of the witnesses who

22   have testified thus far in this case?

23   A.   Yes, I have.

24   Q.   And have you reviewed all the exhibits that have been

25   admitted thus far in this trial?

U.S. v. Manafort

M. Welch - Direct

1663

1   A.   Yes.

2   Q.   And in preparation for your testimony, have you reviewed

3   the exhibits thus far?

4   A.   Yes.

5   Q.   Did you review all the stipulations that were entered

6   into evidence thus far?

7   A.   Yes, I did.

8   Q.   Did you also review all the records from the U.S. vendors

9   in this case?

10  A.   Yes.

11  Q.   What other records have you reviewed?

12  A.   I reviewed general ledgers, working trial balances,

13  adjusting journal entries, tax returns, vendor bank records;

14          Vendor statements, vendor invoices, vendor

15  contracts, domestic and foreign bank records, wire transfer

16  records from the foreign bank accounts;

17          And financial statements and other financial

18  documents.

19  Q.   Did you review all the tax returns that were entered into

20  evidence in this case?

21  A.   Yes.  Tax returns, if I didn't say that.

22  Q.   Now, as part of your duties, were you asked to prepare

23  summary charts in connection with this trial?

24  A.   Yes, I was.

25  Q.   And did you review the same documents you just testified

M. Welch - Direct

1664

1    about to prepare those charts?

2    A.    Yes, also e-mails.

3    Q.    Were those records associated with a number of entities

4    and individuals?

5    A.    Yes, they were.

6    Q.    And for those accounts that you reviewed, how many

7    financial institutions were the records from?

8    A.    They were from numerous financial institutions.

9    Q.    And from what time period did you review the records?

10   A.    The records I reviewed went from 2008 into 2017.

11   Q.    And do your charts summarize voluminous information?

12   A.    Yes, they do.

13   Q.    Can you explain to the jury generally how you prepared

14   summary charts?

15   A.    I reviewed the documents, the ledgers, the entries, the

16   bank statements, the wire transfers.  And then I recorded

17   certain information from all those records and put them on

18   summary charts, made some additions, and put them on charts.

19   And that's how I made them.

20   Q.    Did you use any software to assist your preparation of

21   the charts?

22   A.    Yes, I used --

23   Q.    I'm sorry, go ahead.

24   A.    I used basically Microsoft Excel and Microsoft

25   PowerPoint.

U.S. v. Manafort

M. Welch - Direct

1665

1    Q.   And did you review your charts for accuracy?

2    A.   Yes, I did.

3    Q.   All right.  Let me show you what is marked as Government

4    Exhibit 75.

5            What is Government's Exhibit 75?

6    A.   It's a chart I prepared that has a summary of filed tax

7    returns.

8    Q.   Filed by who?

9    A.   Filed by Davis Manafort Partners, Inc., DMP

10   International, LLC, and the individual return of Mr. and

11   Mrs. Manafort.

12   Q.   And is it accurate, to the best of your knowledge?

13   A.   Yes, it is.

14           MR. ASONYE:  Your Honor, the Government moves to

15   admit Government Exhibit 75.

16           MR. DOWNING:  No objection.

17           THE COURT:  Admitted.

18                       (Government's Exhibit No. 75

19                       admitted into evidence.)

20           MR. ASONYE:  May we publish, Your Honor?

21           THE COURT:  You may.

22   BY MR. ASONYE:

23   Q.   All right.  Could you -- we're not going to go through

24   all of this, but if you could explain to the jury what happens

25   in the first row for the 2010 tax year, working from left to

U.S. v. Manafort

M. Welch - Direct

1666

1  right.

2  A.    The year is 2010.  The entity name is Davis Manafort

3  Partners, Inc., and they are an S Corporation and file a

4  Form 1120S.  The gross receipts are $5.8 million.

5        They had an ordinary loss of $149,000.  That amount

6  of loss was attributed the Mr. Manafort since he owned 100

7  percent of the corporation, and none was allocated to

8  Mrs. Manafort.

9        And then on their personal return on line 17 for

10  their Schedule E, a loss of 35,000 was reported and their

11  total income, line 22, reflected $504,000.

12  Q.    All right.  And then did Davis Manafort Partners file the

13  return in 2011?

14  A.    Yes, they did.

15  Q.    And then if you could look at 2012, is there a different

16  entity?

17  A.    Yes.

18  Q.    Okay.  What entity filed for 2012?

19  A.    In 2012, DMP International, LLC, is a partnership and

20  filed a Form 1065.  The gross receipts were 7.3 million.  The

21  business income was 948,000 of which 474,000 was allocated to

22  Mr. Manafort and 474,000 was allocated to Mrs. Manafort.

23        On their personal return, line 17, Schedule E, the

24  amount reported was 230,000.  And their total income, line 22,

25  for 2012 was $5.3 million.

U.S. v. Manafort

M. Welch - Direct

1667

1  Q.   All right.  And if we could -- let me show you what's

2  been marked as Government Exhibit 79.  And if you could

3  explain, what is Government's Exhibit -- the entire collection

4  of 79?

5  A.   It's in an exhibit that demonstrates the flow of money

6  from the foreign sources into the foreign bank accounts and

7  then the disposition thereof to where it went domestically for

8  certain transactions.

9  Q.   And is it accurate to the best of your knowledge?

10 A.   Yes.

11        MR. ASONYE:  Your Honor, at this point the

12 Government moves, for demonstrative purposes, to publish

13 Government Exhibit 79.

14        THE COURT:  All right.

15        MR. DOWNING:  No objection.

16        THE COURT:  You may do so.

17 BY MR. ASONYE:

18 Q.   All right.  Let's go through these charts with you.

19        What -- first of all, what year does this first

20 chart cover -- what years?

21 A.   It covers the years 2010 through 2013.

22 Q.   Okay.  And if you could explain from left to right what's

23 occurring according to this chart.

24 A.   The first item is the foreign sources, the political

25 funds, political work funds, are being transferred into the

U.S. v. Manafort

M. Welch - Direct

1668

1  foreign bank accounts at the countries of Cyprus and

2  St. Vincent in the Grenadines.  And then the ultimate wire

3  transfer out of those accounts to the business entity or

4  Mr. Manafort personally or to the U.S. vendors.

5  Q.   Now, the top box on the right side, it says, "Manafort's

6  Domestic Business Entities."  Is that correct?

7  A.   Yes.

8  Q.   What entities would be covered by that box?

9  A.   That would be the Davis Manafort Partners, Inc., and the

10 DMP International, LLC, entities.

11 Q.   In the blue box, it appears there's a legend on the

12 bottom left-hand corner.  What does it mean that it's blue?

13 A.   I was basically able to trace those wire transfers into

14 the domestic business accounts and then trace them into the

15 general ledger and trace them ultimately that they were

16 reported on the tax return.

17 Q.   So blue means it's reported on a tax return --

18 A.   Yes.

19 Q.   -- on this chart?

20       And then what does the gray mean for Paul Manafort?

21 A.   The gray means sometimes I was able to trace the wire

22 transfer into the general ledger.  And when I was able to

23 trace it into the business general ledger, it was ultimately

24 reported on the tax return.  And other times I was not able to

25 trace it into the general ledger, so it was not reported on a

1  tax return.

2  Q.   And to be clear, when that gray arrow goes to Paul

3  Manafort, what does that mean?

4  A.   It was a foreign wire transfer to Mr. Manafort.

5  Q.   A personal account for Mr. Manafort?

6  A.   Personal bank account, yes.

7  Q.   And then the bottom box in -- I guess that's mango or

8  orange -- what does that stand for?

9  A.   Those are -- those are foreign wire transfers to these

10 U.S. vendors for personal expenses we've heard so much about,

11 and that's what that color represents.  And I was unable to

12 trace those into general ledger of the business entities and I

13 was unable trace them to the business return, nor was I able

14 to trace them to see if they were reported on the personal tax

15 return for Mr. and Mrs. Manafort.

16 Q.   All right.  If you could turn to the next page of

17 Government Exhibit 79, I believe.

18       What happen does -- first of all, what time period

19 does that represent?

20 A.   This is the month of October, 2010.

21 Q.   And if you could walk the jury from left to right, again,

22 in this chart, what do you depict?

23 A.   There's a deposit from Telmar Investments of

24 approximately $1 million to -- I'm going to butcher this

25 name -- Livation [sic], Livathan.

U.S. v. Manafort

M. Welch - Direct

1670

1  Q.   Is it Leviathan?  Is it Leviathan?

2  A.   Leviathan Advisors, thank you.  And then the colors are

3  the same except for the yellow.

4          The orange color is to the U.S. vendors.

5          The blue color is to the domestic business entity

6  bank account.

7          And then the yellow one is a payment to Paul

8  Manafort where I was unable to find it in the general ledger

9  or report it on the business or personal tax returns.

10  Q.   That initial transfer from Telmar to Leviathan of almost

11  a million dollars, on what date did it occur?

12  A.   On October 4, 2010.

13  Q.   Okay.  And then does this chart -- the arrows from

14  Leviathan to the final column, do you depict every transaction

15  out of the Leviathan account?

16  A.   No, I don't.

17  Q.   Okay.  How did you select these transactions?

18  A.   I select these because they were related to items at

19  issue, the U.S. vendors, the business payments, and

20  Mr. Manafort personally.  And they were at -- they were near

21  the time of the deposit, so I could see and show what was

22  happening to the million dollars that came in.

23  Q.   And is there a transaction on the right side of the chart

24  for all of those boxes?  Do they all occur on October 18,

25  2010?

─────────────── U.S. v. Manafort ───────────────

M. Welch - Direct

1671

1  A.   One for each box occurred on October 18, and there was a

2  second blue amount on October 29, 2010.

3  Q.   Okay.  And what -- of those October 18 transactions,

4  which transactions were reported on a tax return and which

5  ones were not?

6  A.   The blue was reported on the tax return and the mango and

7  yellow was not.

8  Q.   And were you able to discern any pattern by which foreign

9  source monies were ultimately reported as income on the tax

10  return?

11  A.   I could not discern a pattern.

12  Q.   All right.  If we could move on to the next chart, on

13  page 3.  And what's the time period for this chart?

14  A.   This is the next month, November 2010.

15  Q.   And explain what happen from left to right on this chart.

16  A.   Again, monies coming in from Novirex Sales into the

17  Global Highway bank account at the Bank of Cyprus, $1.1

18  million.

19       And then we have two different U.S. vendors coming

20  out on November 17.  We have a Davis Manafort Partners, Inc.,

21  money coming out and then we have another payment to Paul

22  Manafort.

23       Again, the mango or orange color, I was unable to

24  trace that into the general ledger and unable to trace it to a

25  tax return.

U.S. v. Manafort

1    And the blue I was able to follow that into the

2  general ledger and show that it was ultimately reported on the

3  tax return.

4    And the last payment to Mr. Manafort, I was unable

5  to find that on either a business or personal tax return, nor

6  in the general ledger.

7  Q.   And if you could turn to the next chart on Page 4, what

8  time period does this chart cover?

9  A.   This is the next year, May 2011.

10  Q.   And explain what happens from left to right on this

11  chart.

12  A.   Telmar money comes into the company account at the Bank

13  of Cyprus.  And in this particular section of transactions, we

14  have reported for the business entity as usual and we also

15  have a payment that was recorded in the general ledger that

16  ended up on the business tax return to Mr. Manafort.

17  Q.   And do you know why this payment to Mr. Manafort was

18  reported on the business return -- or on the tax return

19  whereas the prior payment the month before for $150,000 was

20  not reported on the tax return?

21    MR. DOWNING:  Objection, Your Honor, calls for

22  speculation.  How would this person know why it was on a

23  return or wasn't?

24    THE COURT:  All right.  Let's come to the bench.

25    Presumably if I listen to the arguments, then there

U.S. v. Manafort

1    would be no point neither admitting or excluding it because it

2    would be out there.  Come to the bench, please.

3              (Bench Conference.)

4              THE COURT:  All right.  The question to the witness

5    is:  Does he know why the -- some things were reported and

6    other things were not?

7              MR. ASONYE:  I think it's on this specific payment,

8    Your Honor, for directly to Paul Manafort contrasting why the

9    prior payment was not reported but this one was reported.  And

10   I believe, Your Honor, his answer is going to be "I don't

11   know, based on my analysis, why it was reported."

12             THE COURT:  So --

13             MR. DOWNING:  Okay.

14             THE COURT:  All right.  Let's go back.

15             (End of bench conference.)

16             THE COURT:  Is the -- I said -- when you hear the

17   answer, you will know why I'm smiling.

18             What was the question?

19             (The court reporter reads back into the record.)

20             THE COURT:  All right.  "Was not" I think what was

21   going to be asked.  She's pretty good.

22             All right.  What's your answer, sir?

23             THE WITNESS:  I don't know specifically.  I only

24   know it was posted in the general ledger, and that's how it

25   made it to the tax return.

─────U.S. v. Manafort─────

M. Welch - Direct

1674

1    THE COURT:  All right.  Next question.  So your

2  answer was you don't know?

3    THE WITNESS:  Correct, Your Honor.

4    THE COURT:  Next question.

5  BY MR. DOWNING:

6  Q.   And, again --

7    THE COURT:  That's why I was smiling.  Much ado

8  about nothing.

9    All right.  Go on, sir.

10  BY MR. DOWNING:

11  Q.   Were the orange payments to the vendors reported on a tax

12  return?

13  A.   No, they were not.

14  Q.   All right.  Let's look at the next chart on Page 5.  What

15  time period does Page 5 cover?

16  A.   It covers July 2011.

17  Q.   And explain, if you could, to the jury what's happening

18  here from left to right.

19  A.   The deposit from Telmar for the political work into the

20  bank account at the Bank of Cyprus.  Two vendor payments and

21  one payment to the business entity.

22    And the blue means I was able to trace it to the

23  general ledger and that it ultimately made it to the tax

24  return.

25    And the mango has the same meaning, where I was

─────────────────────────

1  unable to trace it to the general ledger of the tax return or

2  Mr. and Mr. Manafort's personal tax return.

3  Q.    And finally on this exhibit, the last page, Page 6, do

4  you essentially -- is it the same pattern as the last chart,

5  which is were you able to trace the vendor payments to tax

6  return?

7  A.    It looks almost like the last chart, but it's for a month

8  in 2012 and it is for Lucicle Consultants.

9  Q.    Now, in summary, Agent Welch, did you identify any

10  payments directly from foreign accounts to U.S. vendors on

11  Paul Manafort's behalf that were reported as income on Paul

12  Manafort's business and personal tax returns?

13  A.    I did not.

14  Q.    Now, based on the evidence in this case, what method of

15  accounting did the bookkeepers use to prepare the general

16  ledger?

17  A.    They used the cash method to prepare the general ledger,

18  the cash method of accounting.

19  Q.    And based on your analysis, were -- were vendor payments

20  from foreign bank accounts ever reported on any general ledger

21  or tax returns?

22  A.    They were not.

23  Q.    Now, Agent Welch, can DMP International direct its

24  business income to be paid to a vendor rather than being

25  deposited into DMP International's bank account?

U.S. v. Manafort

M. Welch - Direct

1676

1   A.   It can.

2   Q.   Do those payments need to be reported as business gross

3   receipts by DMP International?

4   A.   Yes, they must be reported.  They are business gross

5   receipts.

6   Q.   And does directing those funds to a vendor change the

7   fact that it is still business income?

8   A.   No, it does not.

9   Q.   And would that business income flow through to line 22 of

10  Paul Manafort's tax return?

11  A.   Yes, it would.

12  Q.   Now, were you asked to prepare a chart based on the

13  testimony exhibits in this trial depicting how the bookkeeper

14  and tax preparer would have recorded these vendor payments if

15  they saw the payment in the -- in the records?

16  A.   Yes.

17  Q.   And how did you complete this analysis?

18  A.   I took the summaries of the vendor payments and totaled

19  those up after verifying back to the foreign bank account

20  statements and foreign wire transfer statements.

21       I also recorded the money that went to purchase the

22  three properties, the Howard Street, the Union Street, and the

23  Arlington house.  And I put those on the chart and added those

24  up, and those were all the items that were not found on a tax

25  return, as well as one additional item that dealt with the

U.S. v. Manafort

M. Welch - Direct

1677

1    reclassification of the loan.

2    Q.   Is this analysis based on the way Paul Manafort regularly

3    reported income in the general ledger?

4    A.   Yes, this is based on -- based on his method of

5    accounting.

6    Q.   And how -- what was his method of accounting in terms of

7    timing of when things were reported?

8    A.   Things were reported when they left the foreign bank

9    accounts and came over to the U.S. and were deposited into the

10   business bank account.  That's how he reported his income.

11   Q.   Is that when the money was onshored into the United

12   States?

13   A.   Yes, when the money was onshored.

14   Q.   And for the purposes of your analysis, does the tax code

15   require tax returns to be prepared on the accounting method

16   used by the tax -- used by the tax payer to keep their books?

17   A.   Yes.

18   Q.   And is that how you prepared this chart?

19   A.   Yes, I did.

20   Q.   All right.  Let me show you what's been marked as

21   Government Exhibit 76.  Is this the chart you prepared?

22   A.   Yes.

23   Q.   Is it accurate, to the best of your knowledge?

24   A.   Yes.

25               MR. ASONYE:  Your Honor, Government moves Government

─────U.S. v. Manafort─────

M. Welch - Direct

1678

1    Exhibit 76 into evidence.

2              MR. DOWNING:  No objection.

3              THE COURT:  Admitted.

4                        (Government's Exhibit No. 76

5                        admitted into evidence.)

6              MR. ASONYE:  And may we publish?

7              THE COURT:  You may.

8    MR. ASONYE:

9    Q.   Agent Welch, the information for this chart, where did

10   you get it from generally?

11   A.   Generally, from the prior witness did this work, as well

12   as I went and verified it through the foreign bank statements

13   and the foreign wire transfer statements, and then the general

14   ledger would be the entry at the bottom and the third section

15   of this chart.

16   Q.   And what -- can you just walk through the three

17   categories of payments that are reported in this -- that are

18   listed in this chart?

19   A.   The first section are the foreign wire transfer payments

20   to U.S. vendors for personal expenses.

21             The second is the wire transfers that were used to

22   purchase property.

23             And the third one is the reclassification from

24   income to loan in the year 2014.

25   Q.   And are any of these payments reflected in

U.S. v. Manafort

M. Welch - Direct

1679

1   Paul Manafort's tax returns?

2   A.   Not as income.

3   Q.   And so is every dollar on this chart unreported taxable

4   income?

5   A.   Yes.

6   Q.   And what years is covered -- does this chart cover?

7   A.   It covers the years 2010 to 2014.

8   Q.   All right.  If you could just give us the totals for each

9   year.  What -- for the year 2010 with respect to vendor

10  payments, what is the total amount of unreported business

11  income to vendors?

12  A.   1,617,000.

13  Q.   You said 100 -- what's the number again?  I'm sorry, say

14  that again, please.

15  A.   2010.

16  Q.   2010.

17  A.   $1,617,000.  I rounded.

18  Q.   Oh, you rounded.  Could you give me the exact number just

19  for the record?

20  A.   Okay.  $1,617,190.

21  Q.   Is that the total amount recorded unreported income for

22  2010?

23  A.   Yes.

24  Q.   And what's the total amount of unreported business income

25  to vendors in 2011?

─────U.S. v. Manafort─────

M. Welch - Direct

1680

1  A.    $1,431,158.

2  Q.    Was that also the total of unreported income in 2011?

3  A.    Yes.

4  Q.    Okay.  And what's the total amount of unreported business

5  income to vendors in 2012?

6  A.    $2,529,115.

7  Q.    Did Paul Manafort purchase real estate with unreported

8  wire transfers from the foreign bank accounts in 2012?

9  A.    Yes, he did.

10  Q.    How many different properties did he purchase?

11  A.    He purchased three.

12  Q.    What was the total amount of unreported business income

13  used to purchase real property in 2012?

14  A.    $6,699,500.

15  Q.    Now, I see that there's 1.5 million listed for the Howard

16  Street property.

17  A.    Yes.

18  Q.    Okay.  Why is that included in this chart?

19  A.    That's the Peranova loan that was reported in the general

20  ledger as a -- as a loan rather than income.  But the money

21  that came into the account was income, so I put it on the

22  chart as money coming from a foreign source that wasn't

23  recorded as income.

24  Q.    As a result, what is the total amount of unreported

25  business income in 2012?

┌─────────────────────U.S. v. Manafort─────────────────────┐

M. Welch - Direct

1681

1   A.    $9,228,615.

2   Q.    Okay.  And what is the total amount of unreported

3   business income to vendors in 2013?

4   A.    $2,864,150.

5   Q.    Is that the total amount of unreported business income

6   for that year?

7   A.    Yes, it is.

8   Q.    And then finally for 2014, what is the total amount of

9   unreported business income to vendors?

10  A.    $429,933.

11  Q.    Now, for that year I see that there's a reclassification

12  from income to a loan in the amount of $900,000; is that

13  correct?

14  A.    Yes.

15  Q.    Okay.  What does that come from?

16  A.    That comes from the general ledger for 2014.  It was --

17  there was money that came from Telmar that was posted as

18  income.  I believe it was like $5.1 million.  And then there

19  was an adjusted journal entry, No. 18, reclassified part of

20  that income as a loan to reduce Mr. Manafort's tax burden, and

21  that amount was 900,000.

22  Q.    So did you treat it as income?

23  A.    I treated it as income because it wasn't reported on a

24  tax return as income.

25  Q.    So what was the total amount of unreported income in

─────U.S. v. Manafort─────
M. Welch - Direct                                    1682

1    2014?

2    A.    $1,329,933.

3    Q.    And what was the grand total of all business income that

4    Paul Manafort did not report on income tax returns between

5    2010 and 2014?

6    A.    $16,471,046.

7    Q.    Agent Welch, based on this analysis, were you asked to

8    prepare a chart that compared what Paul Manafort reported on

9    his personal tax return to the amount of additional unreported

10   income?

11   A.    Yes, I was.

12            MR. ASONYE:  Your Honor, Government, at this point

13   in time, moves in Government Exhibit 77.

14            MR. DOWNING:  Without objection.

15                     (Government's Exhibit No. 77

16                      admitted into evidence.)

17            THE COURT:  All right.

18            MR. ASONYE:  And may we publish?

19            THE WITNESS:  Yes, you may.

20   MR. ASONYE:

21   Q.    And if could you just briefly, Agent Welch, explain what

22   this chart is?

23   A.    The first column -- the chart is a summary of personal

24   tax return items and the unreported income from the prior

25   schedule.

─────U.S. v. Manafort─────
M. Welch - Direct                                                    1683

1   Q.   And then what's the third column?

2   A.   The third column is a -- was the foreign account reported

3   on Schedule B, Line 7A.  And per the tax return, it was marked

4   "no" and so there were none, no foreign bank accounts

5   identified.

6   Q.   All right.  We'll come back to that.

7            Now, Agent Welch, is unreported income material to

8   the IRS?

9   A.   Yes.

10  Q.   Why?

11  A.   The IRS would want to know that because it would

12  determine the amount of tax that should be collected from the

13  taxpayer.

14  Q.   Now, we've just reviewed Mr. Manafort's unreported income

15  based on the way that he -- his bookkeeper and tax preparers

16  prepared his tax returns.

17           I'm going to ask you:  Did you calculate how the

18  income would look at the point when it was deposited into the

19  foreign accounts?

20  A.   Yes, I was.

21  Q.   And under this analysis, when should the income have been

22  reported?

23  A.   The income should have been reported when it was

24  deposited into the foreign bank accounts in the Country of

25  Cyprus, UK, or St. Vincent and the Grenadines.

─U.S. v. Manafort─

M. Welch - Direct

1684

1    Q.   And why is that?

2    A.   Because under a cash basis of accounting that's when the

3    income is received from the client, like such as Telmar.

4    Q.   Is that, in fact, what occurred?

5    A.   That did not occur in this case.

6    Q.   Were you asked to prepare a chart summarizing the amount,

7    if any, of income that was not reported on Paul Manafort's

8    personal and business tax returns under this analysis?

9    A.   Yes, I was.

10   Q.   And, again, how was this analysis different than the

11   large vendor chart we just looked at before?

12   A.   There's a timing issue where under the first method I was

13   using Mr. Manafort's accounting method where the money was

14   coming on shore and that's when it was taxable.  And under

15   this method I'm recording the income as taxable when it hits

16   the first foreign bank account.  So when Telmar sends money

17   over per the contract, that's when I record it as income.

18   Q.   Did you review the foreign bank accounts to conduct this

19   analysis?

20   A.   Yes, I did.

21   Q.   How many accounts did you review?

22   A.   I reviewed 32 foreign bank accounts.

23   Q.   And is Government Exhibit 78 accurate to the best of your

24   knowledge?

25   A.   Yes.

┌─────────────────────────────────────────────────┐

U.S. v. Manafort

M. Welch - Direct

1685

1        MR. ASONYE:  Your Honor, Government moves 78 into

2   evidence and moves to -- seeks to publish.

3        MR. DOWNING:  No objection.

4        THE COURT:  All right.  It's admitted.  You may do

5   so.

6                        (Government's Exhibit No. 78

7                        admitted into evidence.)

8   BY MR. ASONYE:

9   Q.   What -- what tax years does this chart cover?

10  A.   It covers the years 2010 to 2014.

11  Q.   And could you just walk the jury through and explain this

12  chart?

13  A.   Yes.  There's going to be three line items.  The first --

14  Q.   I'm sorry, I'm going to withdraw that question.

15       Can you first explain how you prepared the chart?

16  A.   Oh, yes.  I had to go through 32 different foreign bank

17  accounts and review all the underlying documents, such as wire

18  transfer forms, deposits, or wire transfers into the account,

19  and record the information in -- for each of the 32 accounts.

20  And then I looked line by line item and categorized them into

21  the three different line items below.

22  Q.   Okay.  And I want to focus --

23       THE COURT:  Can you go back to 77, please?

24       THE WITNESS:  Yes, Your Honor.

25       THE COURT:  What's the difference between that

U.S. v. Manafort

1    analysis and what you did on 78?

2         THE WITNESS:  It's a timing issue where I was

3    recording the vendor payment as income when they hit on shore.

4    And now I'm taking a step back and I'm going overseas and

5    going to calculate the profit that didn't hit a tax return

6    based on when the money came from in the political consulting

7    work at the point when it hit the foreign bank.

8         So the money could have hit the foreign bank account

9    in one year and the vendor could have been paid in the next

10   year.  So it's a timing as to when the income would be

11   reported under the two analyses.

12        THE COURT:  But when you have on 77 "total

13   unreported income," doesn't that mean that it is the

14   Government's view that that's the income that -- additional

15   income that should have been reported that year?

16        THE WITNESS:  Yes.  Under Mr. Manafort's method of

17   accounting, the way he accounted for money coming in from

18   offshore.  Under that analysis, that would be the money.

19        THE COURT:  All right.  Next question.

20   BY MR. ASONYE:

21   Q.   Now we're back to Government Exhibit 78.

22   A.   Okay.  Let me get there.

23   Q.   And then let 's just walk through the rows.  What is the

24   first row?

25   A.   The first row are the deposits from clients.

M. Welch - Direct

1687

1    Q.   So is that essentially every payment from the Ukrainian

2    businessmen?

3    A.   Yes.

4    Q.   And then what is the second row?

5    A.   There were other deposits and credits that weren't from

6    that source, and so mainly there were wire transfers that went

7    out, which I will allow as a deduction, and some of them came

8    back as a credit or they bounced.

9         And so I had to record that on -- somehow because

10   I'm going to allow them as a deduction, and when they come

11   back I've got to account for them.  But they weren't

12   necessarily from the Ukrainian work.  It's just a banking

13   thing where money went out and money bounced back in.  So I

14   recorded those on the second line.

15   Q.   And what's the third line?

16   A.   Then on the third line, I'm attempting to give credit

17   against that business income for any item that went out of the

18   account except for the U.S. vendor payment.

19   Q.   So are these essentially what you allowed as potential

20   business expenses?

21   A.   Yes.

22   Q.   Now, did you account for funds that were transferred into

23   DMP or Davis Manafort Partners bank account and, therefore,

24   reported?

25   A.   Yes, I did.  I included those on the third line, except

U.S. v. Manafort

M. Welch - Direct

1688

1   for the $1.5 million Peranova loan which was not recorded as a

2   income item on the books of DMP.  But every other payment that

3   went to DMP is included on the third line as a reduction of

4   the business income to -- in this analysis.

5   Q.   So under this analysis, did you include on the third line

6   as a potential business expense payments that went directly

7   from foreign accounts to Paul Manafort?

8   A.   Yes, I did.

9   Q.   And why did you do that?

10  A.   Well, I don't have any testimony or evidence that they

11  weren't potentially used for business expenses.  So in my

12  conservative analysis I allow those as a reduction against the

13  income to try to determine if there's income that should have

14  been reported under this analysis.

15  Q.   And what about to Kathleen Manafort?  Did you see

16  payments directly from the Cypriote accounts to

17  Kathleen Manafort?

18  A.   There were several directly to Kathleen Manafort, and I

19  treated them in the same way.  I don't know if they were

20  ultimately used for business expenses and I didn't have a

21  witness that testified that they were for personal expenses.

22  So being conservative in my analysis, I allowed those against

23  the business income.

24  Q.   All right.  I want to go through a couple of -- a few

25  examples of things that you allowed as potential business

M. Welch - Direct

1  examples -- sorry -- business expenses.

2          Can you turn to Government Exhibit 78A, as in alpha?

3  A.   Yes.

4          MR. ASONYE:  Your Honor, at this time the Government

5  moves to admit Government's Exhibit 78A pursuant -- these are

6  documents that were produced pursuant to the MLAT.

7          THE COURT:  Any objection?

8          MR. DOWNING:  No, Your Honor.

9          THE COURT:  All right.  Submitted.  Next question.

10          MR. ASONYE:  May we publish, Your Honor.

11          THE COURT:  You may.

12  BY MR. ASONYE:

13  Q.   All right.  If we -- if I can direct your attention to

14  Page 2, what is this document?

15  A.   This document represented an outgoing wire transfer.

16  Q.   And where is it from?

17  A.   It's from the Cyprus Popular Bank in the Lucicle

18  Consultants account.

19  Q.   On what date?

20  A.   Approximately, July 26, 2012.

21  Q.   And what is the amount of the transfer?

22  A.   It's for 132,000 euro.

23  Q.   And who is the beneficiary that's listed?

24  A.   International Yacht Collection, LLC.

25  Q.   All right.  Now, this $132,000 -- I'm sorry -- 132,000

─────────────── U.S. v. Manafort ───────────────

M. Welch - Direct

1690

1   euro transferred to International Yacht Collection, did you

2   allow that as a potential business expense for DMP

3   International?

4   A.   I did because I don't know what it's for and I don't know

5   that it could not be a possible business expense.  So I

6   allowed that as a reduction of the business income in my

7   analysis to be conservative.

8   Q.   Okay.  And if you -- let me direct your attention to

9   Page 6, which is Bates Range 5047.  What is this document?

10  A.   This is an outgoing wire transfer document from the

11  Marfin L-a-i-k-i Bank.

12  Q.   Laiki?

13  A.   Yes.

14  Q.   Okay.  From what entity?  The top left.

15  A.   Leviathan Advisors.

16  Q.   In what amount?

17  A.   49,425 U.S. Dollar.

18  Q.   And on what date?

19  A.   On the July 13th, 2011.

20  Q.   And on the bottom left, what does this wire transfer

21  indicate its -- the beneficiary is?

22  A.   Via Villas -- Via Villas of Italy, Inc.

23  Q.   And did you allow this payment, this $49,000 payment to

24  Via Villas of Italy as a potential business expense of DMP

25  International?

M. Welch - Direct

1691

1  A.   Yes.  For the reasons I told you on the last one, I

2  allowed that one to be conservative because I don't know what

3  it's for.

4  Q.   And if we can turn to Page 17 of this document, which is

5  Bates Page 4999.

6  A.   Yes.

7  Q.   Do you see this $18,900 payment to Ravenwood Riding

8  Academy?

9  A.   I'm sorry, I wasn't there.  Let me get there.

10         (A pause in the proceedings.)

11         THE WITNESS:  Yes, I do.

12  BY MR. ASONYE:

13  Q.   And is it from Leviathan Advisors?

14  A.   Yes, it is.

15  Q.   Did you allow this as a potential business expense in

16  your calculation?

17  A.   Yes, I did.

18  Q.   And then finally, if you could turn to Page 25, which is

19  Bates Range 0504.

20  A.   Yes.

21  Q.   And just explain to the jury what this document is.

22  A.   This is a wire transfer document from Global Endeavour,

23  and it went to a Michael J. Scherb, D.M.D., located in

24  Jupiter, Florida, on approximately May 2, 2014, and it came

25  from the Loyal Bank.

─────────── U.S. v. Manafort ───────────

M. Welch - Direct

1692

1   Q.   And what's the amount of the wire transfer?

2   A.   The amount is $45,000.

3   Q.   And if you turn to the two pages from that.

4   A.   Yes.

5   Q.   If you could read the first line of the document and the

6   last paragraph of the document.

7   A.   "Cosmetic Reconstructive and Sedation Dentistry,

8   Michael J. Scherb, D.M.D., Jupiter Smiles, Page 1 of 3.  We

9   provide the highest quality care and safe, comfortable

10  environment while helping you make informed decisions for

11  comprehensive dental treatment."

12  Q.   All right.  Now, did you allow this expense for

13  comprehensive dental treatment as a potential business expense

14  for DMP International?

15  A.   Yes, I did.

16  Q.   And, again, why did you do it?

17  A.   There was no witness to say that this was a personal

18  expense and I don't know really what it's for and I don't know

19  that it wasn't a business expense.  So in order to be

20  conservative, I allowed this against the business income in my

21  analysis.

22  Q.   So if we turn back to Government Exhibit --

23         THE COURT:  Mr. Asonye, refresh my recollection.

24  The allegation in the indictment is that Mr. Manafort didn't

25  report all of his income.  But we are not here to audit what

─────U.S. v. Manafort─────

M. Welch - Direct                                              1693

1    he did report.  You're here to prove that he didn't report his

2    income fully.

3           MR. ASONYE:  Those are things, Your Honor, that my

4    understanding is were not reported because they came from the

5    foreign wire transfers.

6           THE COURT:  All right.  But we're not here, are we,

7    to dispute whether certain deductions were correctly taken?

8           MR. ASONYE:  No, Your Honor.  I don't believe that's

9    what he's doing.  He's explaining how he got to the bottom

10   line income on Government Exhibit 78.

11          THE COURT:  All right.  You may proceed.  I'm glad

12   you confirmed that we're not here to do that.

13   BY MR. ASONYE:

14   Q.   If we could turn back to Government Exhibit 78 and

15   publish that.

16          So under your conservative analysis of taxing funds

17   when they were received in the foreign accounts, what is your

18   opinion, based on the evidence, of whether additional amounts

19   of income should have been reflected on Line 22 of Paul

20   Manafort's personal tax return in any year under this

21   analysis?

22   A.   Yes, additional income should have been reported in 2011,

23   2012, and 2013 under this analysis.

24   Q.   Now, I noticed that -- I want to talk about 2014, and I

25   noticed that on this chart, there are no deposits for 2014;

─────────────U.S. v. Manafort─────────────

M. Welch - Direct

1694

1  is that correct, from foreign sources?

2  A.   That's correct.

3  Q.   According to your review, where was the money being

4  deposited that year?

5  A.   The money was being wire transferred directly into the

6  DMP International bank account and entered into the general

7  ledger, and ultimately reported on the tax return, unless it

8  was booked as a loan.

9  Q.   But this analysis looks like, according to your Line 3,

10 still shows funds being spent out of the foreign accounts; is

11 that correct?

12 A.   Yes.

13 Q.   So under this method, is there any unreported income from

14 the foreign bank accounts?

15 A.   Yes.

16 Q.   Notwithstanding the foreign deposits, was Paul Manafort's

17 2014 tax return false?

18 A.   Yes.

19 Q.   And taking the file, the 2014 tax return at face value,

20 why is it false?

21 A.   It's false because of the $900,000 Telmar loan that was

22 income on the general ledger, and then the adjusting journal

23 entry changed 900,000 from income to loan, thus reducing the

24 business income that would flow down to Mr. and

25 Mrs. Manafort's personal tax returns, and ultimately, should

U.S. v. Manafort

M. Welch - Direct

1695

1   have been on Line 22 of their tax return.

2   Q.   And did you prepare a chart that shows that?

3   A.   Yes, I did.

4          MR. ASONYE:  Your Honor, the Government moves in

5   Government Exhibit 78B.

6          MR. DOWNING:  Okay.  No objection.

7          THE COURT:  Admitted.

8                          (Government's Exhibit No. 78B

9                          admitted into evidence.)

10          MR. ASONYE:  May we publish?

11          THE COURT:  You may.

12   BY MR. ASONYE:

13   Q.   And does this chart essentially show what you just

14   testified about?

15   A.   Yes.

16   Q.   And finally, Agent Welch, does the superseding indictment

17   allege that Paul Manafort's tax returns were false in each

18   year for reasons beyond income?

19   A.   Yes.

20   Q.   And what was that reason?

21   A.   Because they failed to check the box that Mr. Manafort

22   had a foreign bank account on the Schedule B, Line 7A.

23   Q.   And where does an individual -- well, sorry, you just

24   answered the question, Schedule B.

25          Why would the IRS want to know whether a person has

U.S. v. Manafort

M. Welch - Direct

1696

1    a foreign bank account?

2    A.   Well, we would like to --

3              THE COURT:  Didn't we have an answer to this already

4    from witnesses?

5              MR. ASONYE:  I believe actually, Your Honor, that

6    came from the -- on the FBAR question from the FinCEN witness.

7    This is a different issue.  This is on the actual tax return,

8    not the -- not the FBAR report.  There has not been testimony

9    on this issue.

10             THE COURT:  All right.  You may proceed.

11             Any objection?

12             MR. DOWNING:  No, Your Honor.

13             THE WITNESS:  The IRS would like to know about

14   foreign bank accounts because they could have potential

15   foreign investment income or they could have potential

16   business income being deposited there.  Foreign bank accounts

17   don't file 1099 Interest forms or they don't file 1099

18   Miscellaneous forms.

19             So, in general, there's no reporting to the IRS

20   about what happens in a foreign account.  So they would be

21   interested for those reasons.

22   BY MR. ASONYE:

23   Q.   Now, you've already testified that Mr. Manafort checked

24   the box "no" for two thousand- -- years 2010 through 2014 of

25   whether he had a financial interest or signature authority

─U.S. v. Manafort─

1   over a foreign bank account; is that correct?

2   A.   Yes.

3   Q.   Do you have an opinion based on the evidence as to

4   whether Paul Manafort should have answered the question on

5   Schedule B, Line 7A, from years 2010 to 2014?

6   A.   Yes.

7   Q.   Okay.  And what is your opinion?

8   A.   He should have marked the box "yes."

9   Q.   What is your opinion based on?

10  A.   It's based on several things.  He was beneficial owner of

11  certain accounts.  He had signing authority on certain

12  accounts.  He controlled the money coming out of the accounts.

13         And so he had a financial interest, in my opinion,

14  in those accounts and so he should have marked the box "yes."

15         He also had a signatory authority over those

16  accounts because he could control where the money went to.

17  And it was his money and so that's why I based my answer on

18  that.

19         MR. ASONYE:  No further questions, Your Honor.

20         THE COURT:  Any cross-examination?

21         MR. DOWNING:  Yes, Your Honor.

22                      **CROSS-EXAMINATION**

23  BY MR. DOWNING:

24  Q.   Good afternoon, Mr. Welch.

25  A.   Good afternoon.

M. Welch - Cross

1698

1   Q.   My name is Kevin Downing, I represent Mr. Manafort.  How

2   are you today?

3   A.   Okay.

4   Q.   I wanted to ask you some questions.  I think earlier you

5   were asked some questions about individuals and the method of

6   accounting that they used for tax returns?

7   A.   Okay.

8   Q.   What is the method of accounting used by individuals for

9   tax returns?

10  A.   Most individuals use a cash method of accounting for

11  their tax returns, although the accrual method is also a

12  proper method of accounting.

13  Q.   It would be highly unusual, though, wouldn't it?

14  A.   If you have a business, you could certainly use the

15  accrual method.  But in general, most taxpayers use the cash

16  method.

17  Q.   And if you had a business, let's say it would be a

18  Schedule C business or a 1065 business, is that what you're

19  talking about?

20  A.   Sure.  Any type of business if --

21  Q.   Well, a 1065 wouldn't file on a 1040, correct?

22  A.   The 1065 partnership return is a flow-through return.  So

23  all the business income, whether or not provided to the

24  partners, is reported on the partners' tax return.

25  Q.   And a partnership can be accrual or cash basis, correct?

M. Welch - Cross

1  A.   They could.

2  Q.   And they do that for various reasons, correct?

3  A.   Yes.

4  Q.   But the partnership's method of accounting for tax

5  purposes in no way has to relate to the individual's 1040

6  method of accounting, correct?

7  A.   Correct.

8  Q.   Now, if you're a cash basis taxpayer and you receive

9  money under a contract to provide services, and the contract

10 provides that you're getting paid two dollars, one dollar for

11 services being provided in the current year and one dollar for

12 services to be provided in the future.  As a cash basis

13 taxpayer, could that cash basis taxpayer look at the situation

14 and say, well, I'm making a dollar this year and I haven't

15 earned the other dollar yet.  So I'll report Dollar 1 this

16 year and Dollar 2 next year?

17 A.   No.  Both dollars would be taxable upon receipt.

18 Q.   So if someone was using a completed contracts method with

19 respect to these type of payments, are you saying they

20 couldn't spread the income over more than one year?

21 A.   Under the completed contract method, they could.

22 Q.   And quite often people do that, don't they, when they're

23 getting paid large amounts of money for a multi-year contract?

24 A.   Yes.

25 Q.   And the IRS would prefer if everybody reported it in year

M. Welch - Cross

1700

1   one, correct?

2   A.    I'm not sure what the IRS would prefer.

3   Q.    Well, the IRS prefers to get their tax up front, correct?

4   A.    The IRS just collects the tax.

5   Q.    Well, they -- actually, the IRS assesses tax, too,

6   doesn't it?

7   A.    They asses the tax, they take in the tax returns, they

8   collect the tax.

9   Q.    So under the proper facts and circumstances, depending

10  upon a contract, a cash basis taxpayer could take income and

11  then spread it over a few years; is that correct?

12  A.    If the contract is spread over -- if the contract is over

13  the same time period, then it would be appropriate to match

14  your income with your expenses and how you earned it over

15  time.

16  Q.    Now, you had some questions earlier about transfers that

17  came out of these offshore accounts.

18          Did you sit here through the testimony of Mr. Gates?

19  A.    Yes.

20  Q.    And did you hear testimony that he embezzled funds from

21  the offshore accounts of DMP International?

22  A.    I heard the testimony, and I think it was different

23  depending on which seat was talking about it.

24  Q.    Well, if, in fact, he did embezzle money from DMP's

25  accounts offshore, was DMP, the partnership, entitled to an

┌─────────────────── U.S. v. Manafort ───────────────────┐

M. Welch - Cross

1701

1  embezzlement deduction?

2  A.   In my analysis, I allowed that.  I allowed all money

3  leaving the account against the business income.

4  Q.   Okay.  So it is allowable?  It's a business deduction for

5  a business?

6  A.   I allowed it in my analysis when I was --

7  Q.   I asked you a different question.

8       THE COURT:  He's asking you whether it is allowable.

9  Answer his question.

10       THE WITNESS:  Yes, it's allowable.

11       THE COURT:  Next question.

12  BY MR. DOWNING:

13  Q.   A business is allowed to take a dollar-for-dollar

14  deduction for an embezzlement?

15  A.   And there --

16  Q.   There's a bunch of other rules, too, we understand.

17  A.   There's the loss rules and you'd have to follow those,

18  but embezzlement would come under that, yes.

19  Q.   Okay.  And with respect to your analysis of the deposits

20  from the clients, I think it's on -- it was on 78, your chart?

21  A.   Yes.

22  Q.   So on that chart, when you did your analysis, there's

23  actually -- would be a substantial loss for 2010, correct?

24  A.   Under this analysis, yes.

25  Q.   1.5 million, correct?

U.S. v. Manafort

M. Welch - Cross

1702

1    A.    Yes.

2    Q.    And also for the year 2014, there would be about $974,000

3    loss, correct?

4    A.    Yes.

5              THE COURT:  How much, Mr. --

6              MR. DOWNING:  $974,415.

7              THE COURT:  All right.

8              Is that right, sir?

9              THE WITNESS:  Yes.

10             THE COURT:  Next question.

11   BY MR. DOWNING:

12   Q.    Now, in this chart, under your analysis, you went through

13   and you assumed that all of the deposits into the account were

14   for contracts, payment for political consultancy contracts,

15   correct?

16   A.    I didn't assume that, no.

17   Q.    Well, how did you determine what the deposits were?

18   A.    I went line by line item and recorded Telmar, Novirex,

19   Firemax.

20   Q.    Sure.

21   A.    The contracts that were discussed and talked about and I

22   recorded those.  If I didn't know the source of the deposit, I

23   didn't include it in here.

24   Q.    Did you have a contract for each of the deposits?

25   A.    Do I have a contract for each of the deposits?

┌─────────────────────────────────────────────────────────────────┐
U.S. v. Manafort
M. Welch - Cross                                               1703

1  Q.   Did you have a contract that you reviewed for each of the

2  deposits?

3  A.   No.  I don't know that they're not in evidence, but I --

4  Q.   You didn't review them?

5  A.   I didn't review them all and match them up with the

6  deposits.  I was basically on the testimony that Telmar was

7  business income and FireMax was business income.

8  Q.   So you did not review contracts to substantiate that each

9  of the deposits, in fact, were payments for consultancy

10 services?

11 A.   On some of them, I did, and I didn't -- I don't recall

12 seeing them on every deposit.

13 Q.   You did for some?

14 A.   Yes.

15 Q.   Now, if we could go back to -- look forward to, I think

16 it's Exhibit 79, and we can go to the -- I'm sorry -- the

17 third chart, the Novirex?

18 A.   Yes.

19 Q.   Do you see that?

20 A.   Yes.

21 Q.   And so you have a -- I believe a wire coming in to Global

22 Highway for 1.15 million, correct?

23 A.   Yes.

24 Q.   And then you list a series of transactions on the

25 right-hand side, correct?

─────────────── U.S. v. Manafort ───────────────

1   A.   Yes.

2   Q.   But the transactions on the right-hand side, they don't

3   total up to the wire transfer that came in, correct?

4   A.   That's correct.

5   Q.   What happened with the rest of the funds?  Did you

6   account for them?

7            THE COURT:  The question is now compound.

8            MR. DOWNING:  I'm sorry, I thought he said yes.

9            THE COURT:  He did.  But then you said, "what

10  happened to the rest of the funds," and then you said, "did

11  you account for that?"  Which question do you want him to

12  answer?

13           MR. DOWNING:  The second one is a better version of

14  the first.

15           THE COURT:  All right.

16  BY MR. DOWNING:

17  Q.   So I'll go with:  How did you account for that?

18  A.   Could you just please repeat it?

19  Q.   What I'm -- what I'd like to know is the amount coming in

20  is 1.15 million?

21  A.   Yes.

22  Q.   The amount going out does not approximate 1.15 million?

23  A.   Correct.

24  Q.   So did you account for the rest of the money that related

25  to the 1.15 million?

───────U.S. v. Manafort───────

1   A.   I have the bank statements and the bank statements show a

2   couple of other outflows during this time period, and then the

3   balance at the end of the month was pretty large because the

4   money didn't leave.

5   Q.   Okay.  And with respect to -- with respect to your

6   deposits method and the -- your assumption that all the money

7   that came in was to pay DMP International for their services,

8   did you -- you had occasion to sit through Mr. Gates'

9   testimony, didn't you?

10  A.   Yes.

11  Q.   And during his testimony, he indicated that, I believe

12  when asked about were there considerable amounts of money that

13  came in, that was supposed to be paid out to other

14  consultants?

15  A.   Yes.

16  Q.   Do you remember that?

17  A.   Yes.

18  Q.   And you remember he said millions and millions of

19  dollars -- I asked millions and millions of dollars, and he

20  said "correct"?

21  A.   I don't recall specifically, but fair enough.

22  Q.   Did you -- that's kind of an important fact for your

23  review, isn't it?

24  A.   Yes and no.

25  Q.   Well, were you able to determine what amounts that came

─────U.S. v. Manafort─────

M. Welch - Cross

1706

1  into these offshore accounts were actually for other

2  consultants and not for DMP International?

3  A.   I included in the first line payments from clients, the

4  names of the contracts he testified about.

5  Q.   The names of the companies?

6  A.   The names of the company.

7  Q.   Not necessarily the contracts?

8  A.   Correct.

9  Q.   Because you only reviewed some of the contracts?

10  A.   Correct.

11  Q.   Okay.  So now I'm asking a different question, which is:

12  What did you do with the -- how did you account for the

13  millions and millions of dollars that were coming in that

14  weren't for DMP International services, but were for other

15  consultants?

16  A.   I allowed them as an outflow on the third line as they

17  went out.

18  Q.   So --

19  A.   And the only thing I didn't allow as an outflow on the

20  third line were payments to the U.S. vendors for the personal

21  expenses and the real estate.

22  Q.   And that's your other chart?

23  A.   No, no, that same chart we're talking about.

24  Q.   No, I mean, the other chart totals up what went to the

25  vendors in the United States?

U.S. v. Manafort

M. Welch - Cross

1707

1  A.   Under his accounting method, the other chart totals up

2  the vendor payments that went to the United States in the year

3  they went there.

4  Q.   Yes.  Now, one other question that I had for you has to

5  do with the Peranova loan.

6         In one chart, it looks like you're treating it like

7  a loan; in the other chart, it looks like you're not.

8  A.   Could you walk me through that?

9  Q.   Well, I'm asking you the question.  Did you treat it as a

10  loan throughout or did you add it into income?

11         THE COURT:  Now you're asking two questions.  Pick a

12  question.

13  BY MR. DOWNING:

14  Q.   Did you treat the Peranova loan as a loan throughout

15  these charts or did you -- I'll stop there?

16         (Laughter.)

17  BY MR. DOWNING:

18  Q.   And end soon.

19         THE COURT:  That doesn't mean that you can't ask

20  both questions.

21         MR. DOWNING:  I understand.

22         THE COURT:  One at a time.

23         MR. DOWNING:  Yes, sir.

24         THE COURT:  If you give it -- did you do this and

25  this, it excludes other possibilities.

M. Welch - Cross

1      MR. DOWNING:  I'll try it again.

2      THE WITNESS:  Maybe I should give an answer and then

3   we'll follow up.

4   BY MR. DOWNING:

5   Q.   Okay.  Sounds good?

6   A.   Okay.  On Exhibit 76 where I'm recording money that came

7   onshore that wasn't reported as income on a tax return, I

8   shammed [sic] the Peranova loan because all that money came in

9   as income.  So I treated it -- that as income in 2012 under

10  Exhibit 76 and then --

11  Q.   And under that exhibit, you did not treat it as a loan?

12  A.   Correct.

13  Q.   Okay.

14  A.   I retreated -- I treated it as income that should have

15  been on the tax return.

16  Q.   Got it.

17  A.   Okay.  And in the next chart, Chart No. 78, I did not

18  allow that payment from Peranova to DMP as a reduction of the

19  income, because like the other payments from DMP that were

20  recorded in the general ledger and recorded as income, that

21  payment wasn't recorded as income.  So I didn't allow it as a

22  reduction of the business income.  So I didn't treat that as a

23  loan on that one either.

24  Q.   So it's -- Peranova is not treated as a loan?

25  A.   Correct.

U.S. v. Manafort

1   Q.   It's treated as income?

2   A.   Yes.

3   Q.   Okay.  Now, let me ask you a question:  Can you explain

4   to the jury, what is a deferral?  What does that refer to when

5   you say a deferral for tax purposes?

6   A.   It's when the statute or the law allows you to report

7   something at a -- at a later time period or expense something

8   at a later time period.

9   Q.   So when it comes to partnerships, the partnerships have

10  certain tax advantages.  Is that why businesses choose to be

11  partnership formation?

12  A.   They have certain advantages, some of them tax.

13  Q.   Some of them tax, right?

14  A.   Such as you can change your capital percent.  You can

15  take distributions in unequal shares.

16  Q.   You could take distributions.  Why don't we talk about

17  that?  Will you explain to the jury what a distribution is?

18  A.   Okay.  When a partnership sends money to a partner, in

19  general, that's a distribution.  Under the partnership

20  taxation, whatever business income there is, you have to pay

21  tax on that money whether the partnership gives you that money

22  or not.

23          So if the partnership had a million-dollar profit

24  and there's two partners, each partner has to pay tax on half

25  a million dollars.

U.S. v. Manafort

M. Welch - Cross

1710

1    Now, you have this like credit of half a million

2    dollars of money you pay tax on that you didn't get yet.  A

3    distribution is a -- giving you the money that represents

4    that, and I'll just call it like previously taxed money that

5    you didn't get yet.  That, in general, what a distribution is

6    from a partnership or from an S Corporation.

7    Q.    And there can be distributions from partnerships or

8    S Corporations in years where the partnership or the

9    S Corporation has losses, correct?

10   A.    There can always be distributions from the partnership,

11   regardless of income.  It could be cash, it could be property.

12   Yes, there could be a distribution at any point in time.

13   Q.    And can there be loans between partners and partnerships?

14   A.    Yes.

15   Q.    And questions often arise during IRS audits as to whether

16   or not something would be -- let's say money put into a

17   partnership would be an investment or a loan to a partnership,

18   correct?

19   A.    Right.  It's either additional paid in capital to the

20   partnership or it could be a loan to the business.

21   Q.    And there are also instances where the partnership can

22   lend money out to the partner?

23   A.    Sure .  The partnership could lend money out to the

24   partner.

25   Q.    And there are lots of rules about those loans, too,

M. Welch - Cross/Redirect

1711

1    correct?

2    A.    Yeah.  Loans need to be documented, have a structure to

3    them, have a interest rate, have a payment schedule of some

4    type.

5    Q.    And it's a common audit issue when you're looking at

6    closely held partnerships or S Corps. that the IRS would look

7    closely at what's on the books as loans to or from

8    shareholders; is that correct?

9    A.    Certainly.

10   Q.    And it's a bit of a item you get right to early in a

11   audit when you see on the Schedule L for a partnership "due to

12   shareholder"?

13   A.    In my experience, income comes first and --

14   Q.    And those come second?

15   A.    -- and distributions and loans and things of that nature

16   come after that.

17            MR. DOWNING:  Thank you very much.

18            THE COURT:  Any redirect?

19            MR. ASONYE:  Briefly, Your Honor.

20                     **REDIRECT EXAMINATION**

21   BY MR. ASONYE:

22   Q.    Mr. Downing asked you about, I guess, the embezzlement

23   deduction.

24   A.    Yes.

25   Q.    Can you take a deduction for an embezzlement loss if you

U.S. v. Manafort

M. Welch - Redirect

1712

1    didn't report the income from which the embezzlement was taken

2    in the first place?

3    A.    Under the tax benefit rule, if money is stolen from money

4    that's untaxed, then there would be no deduction.

5    Q.    And then you would have to report that income, right?

6    A.    You would have to report the income that was stolen from

7    you that you didn't report.

8    Q.    And, finally, did any of Mr. Downing's questions change

9    any of the opinions you testified on direct examination about?

10   A.    No.  No, they did not.

11             MR. ASONYE:  No further question, Your Honor.

12             THE COURT:  Any re-cross based only on that?

13             MR. DOWNING:  No, Your Honor.

14             THE COURT:  Thank you, sir.  You may -- you may step

15   down.

16             (Witness excused.)

17             THE COURT:  Who is your next witness?

18             MR. ASONYE:  Your Honor, we have a bank witness that

19   is here who is considerably longer than the Court's schedule.

20             She's probably 45 minutes to 50 minutes long of a

21   witness.

22             THE COURT:  Do you have a shorter witness?

23             MR. ASONYE:  It's --

24             (A pause in the proceedings.)

25             MR. ASONYE:  May I consult with my colleagues?

———————U.S. v. Manafort———————

1      THE COURT:  Yes, you may.  Now, if you can assure me

2  that what you-all are discussing is going to have a

3  substantial effect of shortening this proceeding, I'll recess

4  now.

5      I am going to ask you, Mr. Asonye, so that you can

6  prepare, and I'll give you a minute, I want to know how many

7  witnesses you have left.  And yesterday I think Mr. Andres

8  said he thought it would go to the end of the week.  But I'm

9  hopeful that you now have a better estimate.

10      MR. ASONYE:  May I have a moment, Your Honor?

11      THE COURT:  Of course.

12      MR. ASONYE:  I think I can have a brief witness.

13  We'd have to go get them, but it'll take probably five minutes

14  and he's probably a ten minute witness.

15      THE COURT:  And who is this witness?

16      MR. ASONYE:  His name is Darin Evenson, and I

17  believe he has three exhibits.  I'm not sure if he was on

18  today's -- he was on today's list, Your Honor.

19      THE COURT:  All right.  You think you can finish him

20  in how long?

21      MR. ASONYE:  I think on direct he's 10 to 15

22  minutes, and then we have a couple of stipulations that we can

23  read into the record as well.

24      THE COURT:  All right.  Do you agree to about ten

25  minutes?  You've got ten minutes of cross?

U.S. v. Manafort

1714

1        MR. NANAVATI:  Yes, Your Honor.

2        THE COURT:  All right.  Let me see the stipulations.

3        I hope you've got somebody scurrying around to get

4   this witness.

5        Good.  I see Mr. Welch is back in the courtroom in a

6   prime seat.  I don't reserve any seats in the courtroom.  It's

7   a first come, first serve.  I received requests from other

8   judges to have their law clerks here.  No.  First come, first

9   serve to the public.

10       Now, it doesn't escape my attention that certain

11  people are always in the first couple of rows.  I don't know

12  how that happens, and I don't think I want to know.

13       Certainly the artists are always in the front row.

14  They probably have surrogates who stand in line at 8:30.

15       In any event, ladies and gentlemen, I have some

16  stipulations.

17       The parties stipulate that at all times relevant to

18  the superseding indictment, Citizens Bank, Banc of California,

19  and Federal Savings Bank were all financial institutions as

20  defined by Title 18 U.S. Code Section 20 these accounts were

21  insured by the FDIC.  Citizens Bank and Banc of California and

22  Federal Savings Bank are referred to -- when I read the

23  indictment, they were lender C and lender D.  There are two

24  for lender C, but that's for another time.

25       All right.  The second stipulation is fairly

1715

1    lengthy.

2              Is your witness here?

3              MR. ASONYE:  No.  No, Your Honor.

4              (A pause in the proceedings.)

5              THE COURT:  Mr. Asonye, this is a lengthy

6    stipulation.

7              MR. ASONYE:  I'm happy to read it, Your Honor.

8              THE COURT:  You can read it.

9              MR. ASONYE:  Stipulation regarding Genesis Capital.

10             The parties stipulate to the following facts:  MC

11   Brooklyn Holdings, LLC, was a company created to hold real

12   property at 377 Union Street, Brooklyn, New York.  The sole

13   shareholders of MC Brooklyn Holdings, LLC, were Paul Manafort,

14   Kathleen Manafort, and Jessica Manafort.

15             Bruce Baldinger was the special secretary of MC

16   Brooklyn Holdings, LLC, and was authorized to execute mortgage

17   documents on its behalf.

18             On February 9, 2016, MC Brooklyn Holdings, LLC,

19   executed and delivered the following loan documents to Genesis

20   Capital Master Fund 2, LLC, for the purpose of securing a

21   mortgage in the amount of $3,897,468 and a construction loan

22   in the amount of $1,402,532 against real property located at

23   377 Union Street, Brooklyn, New York, secured promissory note

24   mortgage, assignment of leases and rents and security

25   agreement, building loan agreement, and borrower's affidavit.

U.S. v. Manafort

1716

1       On or about February 9, 2016, Paul Manafort,

2    Kathleen Manafort, Jessica Manafort, and Jeffrey Yohai

3    executed guaranties in favor of Genesis Capital Master Fund 2,

4    LLC, wherein they individually and personally guaranteed,

5    among other things, payment of the $3,897,468 mortgage and the

6    $1,402,532 construction loan.

7       On or about August 31, 2016, Paul Manafort met with

8    representatives from Genesis Capital Master Fund 2, LLC, to

9    discuss the fact that payments had not been made on the MC

10   Brooklyn Holdings, LLC, loans and as a result the loans were

11   in default and Genesis Capital Master Fund 2, LLC, was

12   pursuing foreclosure.

13      On or about September 20, 2016, Genesis Capital

14   Master Fund 2, LLC, filed a summons and verified complaint in

15   the Supreme Court of the State of New York, County of Kings,

16   against MC Brooklyn Holdings, Paul Manafort, Kathleen

17   Manafort, Jessica Manafort, and Jeffrey Yohai.

18      Judicial proceedings were initiated as a result of a

19   lack of payment on the $3,897,468 mortgage beginning on or

20   about April 1, 2016.

21      Notice of the filed summons and verified complaint

22   was served on the registered agent for MC Brooklyn Holdings,

23   LLC, corporation service company, on September 26, 2016.

24      Notice was also served at 377 Union Street,

25   Brooklyn, New York, on October 5, 2016, and on Paul Manafort

─────────U.S. v. Manafort─────────

1717

1    at 10 -- at his location in Palm Beach Gardens, Florida, on

2    October 17, 2016.

3         Kathleen Manafort was served on October 17, 2016.

4    Jessica Manafort was served on October 5, 2016, and

5    October 19, 2016.  And Jeffrey Yohai was served on October 21,

6    2016.

7         In January 2017, Paul Manafort repaid Genesis

8    Capital Master Fund 2, LLC, in full for the outstanding

9    principal on the 377 Union Street loan from funds received

10   from a separate loan from the Federal Savings Bank.

11        At the time of that repayment, Paul and Kathleen

12   Manafort signed a $300,000 promissory note to repay Genesis

13   for default interest under its loan contract.

14        This loan was secured by a second position lien on

15   the property.

16        THE COURT:  All right.  Now, you don't have your

17   witness here.  It's a little late.  Oh, you do have him?  It's

18   a little late because we won't be able now to finish by 5:30.

19        Tell me, Mr. Asonye or Mr. Andres, how many

20   witnesses you have remaining and what your estimate is.

21        You originally listed a lot of witnesses, many, many

22   more than have already testified.

23        MR. ANDRES:  Putting that issue aside, Judge, I'm

24   not sure I agree with that.  But in either case, there are

25   approximately eight witnesses left.  I don't think any of them

1718

1   last more than an hour or around an hour, several of them

2   significantly less than a hour.  So we're still on pace to end

3   early, which would be by Friday.

4           THE COURT:  Good.  Well, to be clear about what I

5   said, you've had 17 witnesses, you listed 35.  And now you're

6   telling me you're going to have about eight remaining and you

7   think you can finish before the end of the day Friday.

8           MR. ANDRES:  Certainly by the end of the day on

9   Friday.

10          THE COURT:  All right.  Good.  Well, I think you --

11  you've answered the question.

12          Thank you.

13          MR. ANDRES:  Thank you, Your Honor.

14          THE COURT:  Now, when we begin tomorrow, you may

15  begin, Mr. Asonye, either with the one you were rushing to get

16  here or with the one you'd planned.

17          But whichever you begin with, tell Mr. Nanavati so

18  that they have notice of -- to prepare.  And, indeed, if

19  you -- if you-all have objections to the exhibits that you

20  know are going to be offered, because they'll give you that

21  information, air that with them.  And let's see if we can

22  avoid -- avoid the problem of taking more time.

23          Ladies and gentlemen, pass your books to the right.

24  And, again, Mr. Flood will collect them, maintain their

25  security, and prevent anybody from looking at them.

1           Nobody will look at those books.

2           Now, this evening when you get home, there will be

3    very little curiosity, but you may be accosted, you may be

4    asked questions.  Remember to resist the temptation to answer

5    the questions.  We're going to make good progress and finish

6    this matter as promptly as we can.

7           Now, of course, as you've noticed, I haven't asked

8    the defendant how many witnesses they have or if they have

9    any, because the defendant is not required to present any

10   evidence or to prove his innocence, because he has the

11   presumption of innocence.

12          But he does have the right to prepare -- or to

13   present witnesses.  And -- but it isn't appropriate to ask

14   him, his counsel, what witnesses they intend or how many

15   witnesses they intend, because sort of like poker, you don't

16   have to show your hand until you're called, something like

17   that.  I'm not a poker player.

18          But you have to wait until all of the Government's

19   evidence is in, and then the defense can be asked, "Do you

20   have any witnesses you wish to present or any evidence you

21   wish to present?"

22          That's why I haven't asked so far.

23          Thank you for your careful attention today to the

24   evidence.  You may follow Mr. Flood out.

25          I'll see you tomorrow morning at 9:30.  There will

U.S. v. Manafort

1720

1  be a proceeding going on, but I fully expect it to be

2  completed by 9:30.

3          (Jury dismissed.)

4          THE COURT:  Court stands in recess until tomorrow

5  morning at 9:30.

6

7          **(Proceedings adjourned at 5:11 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8    **MANAFORT, JR.,** Criminal Action No. 1:18-CR-83, in said

9    court on the 8th day of August, 2018.

10            I further certify that the foregoing 155 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15            In witness whereof, I have hereto subscribed my

16   name, this August 8, 2018.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25

                                                              1721