———————U.S. v. Manafort———————

1722

```
 1                UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3   -----------------------------x
                                  :
 4   UNITED STATES OF AMERICA,    : Criminal Action No.
                                  : 1:18-CR-83
 5           versus               :
                                  :
 6   PAUL J. MANAFORT, JR.,       :
                                  : August 9, 2018
 7                   Defendant.   : Volume VIII - A.M.
     -----------------------------x
 8
                     TRANSCRIPT OF JURY TRIAL
 9          BEFORE THE HONORABLE T.S. ELLIS, III
                 UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     FOR THE GOVERNMENT:      UZO ASONYE, AUSA
12                            United States Attorney's Office
                              2100 Jamieson Avenue
13                            Alexandria, VA 22314
                                   and
14                            GREG ANDRES, SAUSA
                              BRANDON LANG VAN GRACK, SAUSA
15                            Special Counsel's Office
                              U.S. Department of Justice
16                            950 Pennsylvania Avenue NW
                              Washington, D.C. 20530
17
     FOR THE DEFENDANT:       JAY ROHIT NANAVATI, ESQ.
18                            BRIAN KETCHAM, ESQ.
                              Kostelanetz & Fink LLP
19                            601 New Jersey Avenue NW
                              Suite 620
20                            Washington, DC 20001
                                   and
21                            THOMAS E. ZEHNLE, ESQ.
                              Law Office of Thomas E. Zehnle
22                            601 New Jersey Avenue NW
                              Suite 620
23                            Washington, DC 20001
                                   and
24                            KEVIN DOWNING, ESQ.
                              Law Office of Kevin Downing
25                            601 New Jersey Avenue NW
                              Suite 620
```

─U.S. v. Manafort─

1723

1   Appearances continued:

                                Washington, DC 20001
2                                  and
                                RICHARD WILLIAM WESTLING, ESQ.
3                               Epstein, Becker, & Green, PC
                                1227 25th Street NW
4                               Washington, DC 20037

5   OFFICIAL COURT REPORTER:    TONIA M. HARRIS, RPR
                                U.S. District Court, Ninth Floor
6                               401 Courthouse Square
                                Alexandria, VA 22314

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. v. Manafort

1724

1

TABLE OF CONTENTS
TRIAL
WITNESSES

2

3  On behalf of the Government:

4  Melinda James

5       Direct examination by Mr. Asonye................. 1729
        Cross-examination by Mr. Nanavati................ 1780
6       Redirect examination by Mr. Asonye............... 1811
        Recross-examination by Mr. Nanavati............. 1817

7

Darin Evenson

8

       Direct examination by Mr. Asonye................. 1819

9

EXHIBITS

10

On behalf of the Government:

11                                                    Admitted

12 Number 224............................................. 1737
   Number 228............................................. 1738
13 Number 227............................................. 1744
   Number 245............................................. 1749
14 Number 246............................................. 1752
   Number 225............................................. 1758
15 Number 229............................................. 1762
   Number 235............................................. 1764
16 Number 239............................................. 1768
   Number 241............................................. 1769
17 Number 242............................................. 1772
   Number 231............................................. 1776
18 Number 422............................................. 1813
   Number 118............................................. 1823

19

On behalf of the Defendant:

20                                                    Admitted

21 Number 32.............................................. 1811

22

MISCELLANY

23 Preliminary matters.................................... 1725
   Certificate of Court Reporter.......................... 1841

24

25

1725

**P R O C E E D I N G S**

1    (Court proceedings commenced at 9:32 a.m.)

2

3

4            THE LAW CLERK:  This honorable court is in session.

5    Please be seated and come to order.

6            THE COURT:  All right.  The record will reflect that

7    counsel and the parties are present and prepared to proceed in

8    the case of United States against Manafort, CR83 -- 18-CR-83.

9            Mr. Asonye, you were about to call a witness.  Are

10   you ready to call that witness?

11           MR. ASONYE:  Yes, we are.  I believe the witness

12   will be Melinda James.  I think the Court -- we may have had

13   one item to raise for the Court before we start.

14           THE COURT:  Well, you submitted a pleading.

15           MR. ASONYE:  Yes, Your Honor.

16           THE COURT:  All right.  And we'll take care of that.

17           You ready to proceed otherwise?

18           MR. ANDRES:  Yes, Your Honor.

19           MR. ASONYE:  We are.

20           THE COURT:  All right.  Who is the first witness?

21           MR. ASONYE:  The first witness is Melinda James,

22   Your Honor.

23           THE COURT:  All right.  And is that you,

24   Mr. Nanavati?

25           MR. NANAVATI:  Yes, Your Honor.

U.S. v. Manafort

1726

```
 1          THE COURT:  All right.  Bring the jury in.

 2          (Jury in.)

 3          THE COURT:  All right.  You may be seated.

 4          Good morning, ladies and gentlemen.  As always,

 5    we'll begin with the calling of the roll by number.

 6          Ms. Pham, you may proceed.

 7          THE DEPUTY CLERK:  Ladies and gentlemen, as I call

 8    your number, please answer "present" or "here."

 9          Juror 0008.

10          THE JUROR:  Present.

11          THE DEPUTY CLERK:  Juror 0037.

12          THE JUROR:  Present.

13          THE DEPUTY CLERK:  Juror 0276.

14          THE JUROR:  Present.

15          THE DEPUTY CLERK:  Juror 0017.

16          THE JUROR:  Present.

17          THE DEPUTY CLERK:  Juror 0145.

18          THE JUROR:  Present.

19          THE DEPUTY CLERK:  Juror 0115.

20          THE JUROR:  Present.

21          THE DEPUTY CLERK:  Juror 0082.

22          THE JUROR:  Present.

23          THE DEPUTY CLERK:  Juror 0009.

24          THE JUROR:  Present.

25          THE DEPUTY CLERK:  Juror 0299.
```

U.S. v. Manafort

1727

1        THE JUROR:  Present.

2        THE DEPUTY CLERK:  Juror 0091.

3        THE JUROR:  Present.

4        THE DEPUTY CLERK:  Juror 0302.

5        THE JUROR:  Present.

6        THE DEPUTY CLERK:  Juror 0060.

7        THE JUROR:  Present.

8        THE DEPUTY CLERK:  Juror 0296.

9        THE JUROR:  Present.

10       THE DEPUTY CLERK:  Juror 0054.

11       THE JUROR:  Present.

12       THE DEPUTY CLERK:  Juror 0127.

13       THE JUROR:  Present.

14       THE DEPUTY CLERK:  And Juror 0133.

15       THE JUROR:  Present.

16       THE COURT:  All right.  Once again, ladies and

17  gentlemen, good morning.  And as usual, I want first to ask

18  that you confirm to me whether or not you were able to adhere

19  to the Court's instructions to refrain from discussing the

20  matter with anyone or undertaking any investigation, if you'd

21  give me some indication.  Was anybody unable to do that?

22       All right.  No one was.  Now, to begin with, we're

23  going to have a witness, but before that, you'll recall

24  yesterday I was critical of counsel for counsel's allowing a

25  witness, Mr. Welch, to remain in the courtroom.  You're to put

U.S. v. Manafort

M. James - Direct

1728

1   that aside.

2            To begin with, it appears I may well have been

3   wrong.  I may have permitted that without -- I haven't gone

4   back to read the transcript, but I'm satisfied I could well

5   have been wrong about that.

6            I typically don't allow people to do that, but I may

7   well have done so in this case.  And so put aside any

8   criticism.  I may -- I was probably wrong in that.  But like

9   any human, and this robe doesn't make me anything other than

10  human, I sometimes make mistakes.  And I may have made a

11  mistake there and any criticism to counsel should be put

12  entirely aside.  It has nothing to do with your consideration

13  in this case.

14           All right.  Now, Mr. Asonye, who is your next

15  witness?

16           MR. ASONYE:  Melinda James, Your Honor.

17           THE COURT:  All right.  Call Ms. James.

18           Come forward.  Take the oath, please, ma'am.

19           Thereupon,

20                     **MELINDA JAMES,**

21  having been called as a witness on behalf of the Government

22  and having been first duly sworn by the Deputy Clerk, was

23  examined and testified as follows:

24           (Witness seated.)

25           MR. ASONYE:  May I proceed, Your Honor?

M. James - Direct

1729

1        THE COURT:  You may proceed, yes.

2        MR. ASONYE:  Thank you.

3                    **DIRECT EXAMINATION**

4    BY MR. ASONYE:

5    Q.   Could you please state your name for the record?

6    A.   Melinda James.

7    Q.   And did you have a prior name?

8    A.   Melinda Francis.

9    Q.   And with respect to your work e-mail and the exhibits

10   that we're going to cover today, what name is listed on those

11   e-mails?

12   A.   Melinda Francis.

13   Q.   What city and state do you live in?

14   A.   Brooklyn, New York.

15   Q.   And how far did you go in school?

16   A.   High school.

17   Q.   Are you currently employed?

18   A.   I am.

19   Q.   Where do you work?

20   A.   Citizens Bank.

21   Q.   And just before you began working at Citizens Bank, how

22   were you employed?

23   A.   I was employed as a nanny.

24   Q.   And how long were you a nanny before that?

25   A.   For five years.

─────────────── U.S. v. Manafort ───────────────

M. James - Direct

1730

1   Q.   Before babysitting, how were you employed?

2   A.   I worked in the mortgage business.  I was a processor for

3   a couple of years and I was an underwriter for a couple of

4   years.

5   Q.   And when did you begin working at Citizens Bank?

6   A.   November of 2015.

7   Q.   Is Citizens Bank a mortgage lender?

8   A.   It is.

9   Q.   Okay.  And what's your title there?

10  A.   I'm a mortgage loan assistant.

11  Q.   What does a mortgage loan assistant do?

12  A.   We're responsible for gathering the initial documents

13  from the clients and preparing them and getting them ready for

14  review for the processor.

15  Q.   And does Citizens Bank -- well, first of all, what type

16  of loans does Citizens Bank offer?

17  A.   We offer residential loans, cash-out refinances, and

18  purchases.

19  Q.   And what is a cash-out refinance?

20  A.   A cash-out refinance is when you're taking the equity out

21  of your house as cash.

22  Q.   And are you familiar with something called a home equity

23  line of credit or HELOC?

24  A.   Yes.

25  Q.   What is -- what is that?

U.S. v. Manafort

M. James - Direct

1731

1  A.   It's commonly referred to in mortgages as a second

2  mortgage.   It's where you use your property as collateral to

3  take out a line of credit.

4  Q.   Now, in 2016, who did you report to?

5  A.   David Fallarino.

6  Q.   And what was David Fallarino's title?

7  A.   He was a manager and also a loan officer.

8  Q.   And as a loan officer, what were his responsibilities?

9  A.   His responsibilities were making initial contact with

10  clients and making sure that their deal was good for

11  processing and bringing them in to us.

12  Q.   Did any other loan officer assistants or loan assistants

13  report to Mr. Fallarino?

14  A.   Yes.

15  Q.   Who?

16  A.   There was Taryn Rodriguez, there was John Henry, and

17  Jared -- I can't remember his last name.

18  Q.   Okay.   And do you still report to Mr. Fallarino?

19  A.   I do not.

20  Q.   All right.   I'm going to ask you some questions about the

21  loan application and approval process at Citizens Bank.

22        What type of information does the bank collect from

23  potential borrowers?

24  A.   We collect their income information, their asset

25  information, their monthly debts, and any relevant information

─U.S. v. Manafort─

1732

1    in regards to properties that they owned.

2    Q.    Okay.  Do you collect their tax returns?

3    A.    We do.

4    Q.    What if the borrower is self-employed or owns a business,

5    what information do you collect then?

6    A.    We require the income statement that shows the income

7    that they reported for the particular business that they're

8    self-employed in.

9    Q.    Do you collect that business's tax returns?

10   A.    I do.

11   Q.    And what forms do -- does a borrower have to complete?

12   A.    A mortgage loan application.

13   Q.    And is there another name for that document?

14   A.    A 1003.

15   Q.    And who typically collects the 1003 or the loan

16   application?

17   A.    It's initially done by the loan officer.

18   Q.    All right.  I want to just cover the loan process at a

19   very high level.

20          After you collect the loan paperwork, what do you do

21   next?

22   A.    There's a system that I upload all the documents to.  I

23   input it into the system as well and I send it over to our DQC

24   center, that's the data control processing center.

25   Q.    And are you familiar with Citizens Bank's quality control

M. James - Direct

1733

1   department?

2   A.    I am.

3   Q.    Is that what that DQ center was?

4   A.    Correct.

5   Q.    What do they do?

6   A.    They review the documents and make sure that you have all

7   the initial documents required for the particular loan that

8   you're submitting.

9   Q.    And do you have any particular rating with that

10  department?

11  A.    I do.

12  Q.    What's your rating?

13  A.    It's 100 percent.

14  Q.    And what does it mean that you have 100 percent rating

15  with the quality control department?

16  A.    It means that I'm -- I usually collect all the documents

17  that is required for the particular loan program that we're

18  submitting.

19  Q.    And after quality control, what happens next in the

20  process?

21  A.    It's sent to the processor.

22  Q.    What does a processer do?

23  A.    The processer's job is to review the documents a second

24  time to make sure that there's enough information to pass it

25  over to the underwriter who has to make the final decision on

M. James - Direct

1734

1    the file.

2    Q.    Now, I'm going to ask you some questions about some

3    terms.  Do you know what a loan-to-value is?

4    A.    A loan-to-value, it's a lender term for the value that

5    you're taking out of your house.  It's the loan amount.  So

6    it's the loan amount versus the value of the property.

7    Q.    And then are you -- have you heard of debt-to-income

8    ratio?

9    A.    Yes.  It's your income versus your monthly debt.

10   Q.    And as part of determining debt, does the bank want to

11   know about other properties that the borrower owns?

12   A.    Yes.

13   Q.    And if their business owns any properties, does the bank

14   want to know about -- know about that as well?

15   A.    Yes.

16   Q.    Are there different rules that apply when your loan

17   involves a rental property?

18   A.    Yes, there is.

19   Q.    And then, finally, closing, what's a closing?

20   A.    A closing is the final stage of the loan process where

21   the client sits and reviews all the documents, signs them, and

22   is provided with the money from the loan process.

23   Q.    And during this entire process, does the bank rely on the

24   accuracy and completion -- completeness of information

25   provided during -- from the borrower during this process?

┌─U.S. v. Manafort─
M. James - Direct                                             1735

```
1   A.   Yes.

2   Q.   Now, I'm going to ask you some questions about Paul

3   Manafort.  Was Paul Manafort a customer of Citizens Bank?

4   A.   Yes.

5   Q.   To your knowledge, how many loans did he obtain from the

6   bank?

7   A.   One.

8   Q.   Now, are you aware of any instances where he applied for

9   a loan, but did not obtain one from Citizens Bank?

10  A.   Yes.

11  Q.   Were you involved in a $3.4 million cash-out refinance

12  loan to Paul Manafort on 29 Howard Street in New York in 2016?

13  A.   Yes.

14  Q.   And what was the purpose of the loan?

15  A.   It was a cash-out refinance.

16  Q.   What was your role in the transaction?

17  A.   Gathering the initial documents required for the loan

18  program and getting it over to our document control center for

19  review.

20  Q.   Do you recall having conversations or e-mails directly

21  with Paul Manafort regarding this loan application?

22  A.   Yes.

23  Q.   And how did you primarily communicate with him during

24  that period?

25  A.   E-mail.
```

┌─────────────────────────────────────────────────┐
U.S. v. Manafort

1  Q.    How frequently, would you say, you communicated with

2  Mr. Manafort via e-mail?

3  A.    Frequently in the beginning of the loan process.

4  Q.    Did you communicate with someone else named Rick --

5  Richard Gates?

6  A.    Yes.

7  Q.    What, if anything, did Mr. Manafort tell you about Rick

8  Gates regarding this loan process?

9  A.    He would be the person to reach out to if he was

10  unreachable at the time.

11  Q.    And just -- when you say "he," who are you referring to?

12  A.    Mr. Gates would be the person to reach out if

13  Mr. Manafort was unreachable.

14  Q.    And who told you that?

15  A.    Mr. Manafort.

16  Q.    And what was your understanding of whether Rick Gates was

17  authorized to speak on Mr. Manafort's behalf?

18  A.    I mean, based on that, I -- that was my understanding,

19  that he was able to speak on Mr. Manafort's behalf.

20  Q.    And when you e-mailed Rick Gates, who, if anyone else,

21  did you copy on those e-mail communications?

22  A.    I copied Mr. Manafort and Mr. Fallarino.

23  Q.    And why did you copy Paul Manafort on those e-mails?

24  A.    Because it was essentially his mortgage loan that he was

25  obtaining.

─────U.S. v. Manafort─────

M. James - Direct                                                  1737

 1              MR. ASONYE:  Court's indulgence.

 2              THE COURT:  All right.

 3    BY MR. ASONYE:

 4    Q.   All right.  Let me show you in your binder, to your left,

 5    what's been marked as Government Exhibit 224.

 6              Okay.  Do you have it?

 7    A.   Yes.

 8    Q.   Is this an e-mail -- the entire exhibit, is this an

 9    e-mail chain between bank officials discussing Mr. Manafort's

10    loan?

11    A.   Yes.

12              MR. ASONYE:  Your Honor, Government moves 224 into

13    evidence.

14              MR. NANAVATI:  Without objection, Your Honor.

15              THE COURT:  All right.  It's admitted.

16                        (Government's Exhibit No. 224

17                        admitted into evidence.)

18              MR. ASONYE:  May we publish?

19              THE COURT:  Yes.

20    BY MR. ASONYE:

21    Q.   If we could turn to the second page.

22              If you -- do you see the e-mail at 12:25 on the

23    second page, Ms. James?

24    A.   Yes.

25    Q.   What is -- what does Paul Manafort say in the -- in that

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

U.S. v. Manafort

M. James - Direct

1738

1   e-mail?

2   A.   (As read): "David, I received the -- these disclosure

3   documents today, read and signed them and sent them forward."

4   Q.   Okay.  That's good enough.

5        And, again, was Mr. Fallarino the loan officer on

6   this?

7   A.   Yes, he was.

8   Q.   All right.  Let me show you what's been marked as

9   Government Exhibit 228.

10       Is this an e-mail from Paul Manafort to you

11  regarding the 29 Howard Street loan application?

12  A.   Yes.

13       MR. ASONYE:  Your Honor, Government moves 228 into

14  evidence.

15       MR. NANAVATI:  Without objection, Your Honor.

16       THE COURT:  Admitted.

17                      (Government's Exhibit No. 228

18                      admitted into evidence.)

19       MR. ASONYE:  Again, may we publish?

20       THE COURT:  Yes, you may.

21  BY MR. ASONYE:

22  Q.   What does Mr. Manafort indicate on the first e-mail that

23  he's attaching?

24  A.   (As read): "I am also attaching the documents that you

25  sent for signature.  The social security verification form,

1  the 4506-T form, and the borrower and authorization form."

2  Q.   All right.  And if you could turn to the last page of

3  this exhibit.

4        What is this document?

5  A.   It's an affidavit of borrower and authorization form.

6  Q.   All right.  And in the top paragraph, if you could read

7  that first paragraph for the jury.

8  A.   "By signing this document, you are stating that all

9  information you have provided to this lender is accurate and

10  verifiable.  The lender is authorized to verify or reverify

11  any of the information you have provided in your application."

12  Q.   And whose names are handwritten in the blank line in this

13  loan application?

14  A.   Paul Manafort and Kathleen Manafort.

15  Q.   Okay.  And then if you could go ahead and read

16  Paragraphs 1 through 3 of the authorization form?

17  A.   "The Borrower has applied for a mortgage loan from RBS

18  Citizens, N.A.  In applying for the loan, the Borrower has

19  completed, executed, and submitted a residential loan

20  application (the 'Application') to the Lender containing

21  various information regarding, without limitation, the purpose

22  of the loan, the source, and amount of any down payment being

23  paid by the Borrower for the purchase of the property, the

24  Borrower's income, employment and credit references, and the

25  Borrower's assets and liabilities.  The Borrower hereby

M. James - Direct

1740

1  certifies that all information contained in such application

2  is complete, accurate, true, and correct.

3         "The Borrower hereby certifies that the documents

4  submitted to the Lender in support of the application are true

5  and correct copies of the original documents with no

6  additions, deletions, alterations, or modifications from the

7  original documents, and that the information contained therein

8  is accurate and complete."

9  Q.   And then could you read the fifth -- Paragraph No. 5?

10 A.   "The Borrower hereby acknowledges that the Lender has

11 relied on the statements contained in the application and this

12 affidavit in making the loan."

13 Q.   Now, do you see at the very bottom of the page, the word

14 in bold, "advisory notice"?

15 A.   Yes.

16 Q.   Okay.  What does it say under the advisory notice?

17 A.   "If any statement in the foregoing Affidavit is knowingly

18 false, the Borrower shall be subject to civil and criminal

19 penalties under applicable state and federal laws."

20 Q.   And then does this document appear to be signed by both

21 Paul Manafort and Kathleen Manafort?

22 A.   Yes.

23 Q.   Now, if we could turn back to Government Exhibit 224, on

24 the first page.

25         Do you see where in the top e-mail -- actually, if

U.S. v. Manafort

1   you could go ahead and read Mr. Fallarino's e-mail to you?

2   I'll tell you when to stop.

3   A.   (As read): "Melinda, we have ALL the tax returns and

4   K-1's, et cetera...

5        "So we need EVERYTHING else included proof of

6   insurance and HOA fees on all properties (we have the taxes on

7   all properties).  His REO is attached.  He filled this out so

8   you can just reattach it and ask for that.  Assets, et

9   cetera...  Also use this for occupancy on all properties with

10  underwriting."

11  Q.   Okay.  Now, Mr. Fallarino states that the bank has all

12  the tax returns and K-1's.  If a borrower has an interest in a

13  business, what tax documents is he required to provide to the

14  bank?

15  A.   If he owns 25 percent or more of the business, he's

16  required to provide K-1's and the applicable tax returns for

17  that particular business.

18  Q.   Now, Mr. Fallarino makes a reference to proof of

19  insurance?

20  A.   Yes.

21  Q.   What is that?

22  A.   It's the insurance binder for the property in question.

23  Q.   And why does the bank collect proof of insurance

24  information?

25  A.   It's used for two purposes.  One, to be added to your

U.S. v. Manafort

1    monthly debts, and two, it can also be used to confirm if

2    there's a mortgage attached to the property.

3    Q.   And then also there's a reference in the last sentence of

4    the first paragraph for Mr. Fallarino, "also use this for

5    occupancy on all properties with underwriting."

6         What did you understand Mr. Fallarino to mean when

7    he said "use this for occupancy"?

8    A.   The document in question, they -- there was a section for

9    the occupancy of each property listed.  So he was telling me

10   that those were the occupancies for the particular properties.

11   Q.   And what are the different types of occupancy that you

12   can have for a property?

13   A.   Owner occupied, second home, or investment property.

14   Q.   Okay.  And in the second -- I'm sorry, is an investment

15   property a rental?

16   A.   Yes.

17   Q.   Now, Mr. Fallarino references "REO" in his e-mail.  What

18   does REO stand for?

19   A.   Real estate owned.

20   Q.   Okay.  Why does the bank collect information about real

21   estate owned?

22   A.   It goes with your DTI because we need all your monthly

23   debts to be included.

24   Q.   And you used this term again, "DTI."  What did you mean

25   when you said DTI?

U.S. v. Manafort

1    A.    Debt-to-income ratios.

2    Q.    Now, is there a document that's attached to this e-mail?

3    A.    Yes.

4    Q.    And in the e-mail, what does it say next to attachments

5    if you -- if you look at the --

6    A.    Real estate taxes, insurance, mortgage schedule.

7    Q.    All right.  And if you could turn to the last page.

8          What's your understanding of the document that was

9    -- is attached, what is it?

10   A.    The last page of this exhibit?

11   Q.    Yes.

12   A.    It's a list of all the properties that's owned, the

13   occupancy, and if there's a mortgage on the property or not.

14   Q.    And what was your understanding of who prepared the

15   document?

16   A.    Based on Mr. Fallarino's e-mail, it was Mr. Manafort.

17   Q.    Now, if you -- do you see at the second line from the

18   bottom, a property named 377 Union Street?

19   A.    Yes.

20   Q.    Okay.  And under entity for that property, what does it

21   indicate is the entity for 377 Union Street?

22   A.    MC Brooklyn LLC.

23   Q.    What's your understanding of what MC Brooklyn LLC is?

24   A.    That's the entity that the property was titled in.

25   Q.    Okay.  And what does this document indicate about whether

M. James - Direct

1744

1   there is a mortgage on 377 Union Street?

2   A.   It says, no, there's no mortgage.

3   Q.   And what, if anything, did you do with this information?

4   A.   I inputted it into my software system.

5   Q.   Now, based upon these representations, was a loan

6   application for the cash-out refinance prepared for

7   Mr. Manafort?

8   A.   Yes.

9   Q.   All right.  Let me show you what's been marked as

10  Government Exhibit 227.

11          What is Government Exhibit 227?

12  A.   It's the initial disclosure package.

13  Q.   Okay.  And who is this sent to?

14  A.   Mr. Manafort.

15  Q.   And how is this document sent to him?

16  A.   It's sent electronically.

17          MR. ASONYE:  Your Honor, Government moves 227 into

18  evidence.

19          MR. NANAVATI:  No objection, Your Honor.

20          THE COURT:  Admitted.

21                      (Government's Exhibit No. 227

22                      admitted into evidence.)

23          MR. ASONYE:  And we -- may we publish certain pages

24  of this, Your Honor?

25          THE COURT:  Yes.

1   BY MR. ASONYE:

2   Q.   All right.  If we can turn to Bates Page 388.

3           And if you can just go through some of the

4   information, look at the top first, what is the title of this

5   document?

6   A.   Borrower's certification and authorization.

7   Q.   And who is listed as the mortgage loan originator on the

8   top left?

9   A.   Citizens Bank.

10  Q.   That's your bank?

11  A.   Correct.

12  Q.   Okay.  Who is -- who are listed as the borrowers?

13  A.   Paul Manafort and Kathleen Manafort.

14  Q.   And what about the date?

15  A.   January 26, 2016.

16  Q.   And what property is this for?

17  A.   29 Howard Street.

18  Q.   Now, do you see Paragraph 1?  In Paragraph 1, the last

19  line, does it say, "I/we made no misrepresentations in the

20  loan application or other documents, nor did we -- or I/we

21  admit any pertinent information"?

22  A.   Yes.

23  Q.   And then what does it say in Paragraph 3?

24  A.   "I/we fully understand that it is a Federal crime

25  punishable by fine or imprisonment, or both, to knowingly make

─────────U.S. v. Manafort─────────
M. James - Direct
                                                    1746

1   any false statements when applying for this mortgage, as

2   applicable under the provisions of Title 18, United States

3   Code, Section 1014."

4   Q.   Is Paul Manafort's name typed in at the bottom?

5   A.   Yes.

6   Q.   Now, there's -- there's nothing signed there, correct?

7   A.   No, this is all electronically signed.

8   Q.   Do you see at the top half of the document there are some

9   words, a watermark going diagonal?

10  A.   Yes.

11  Q.   Okay.  What -- first of all, what does it say?

12  A.   It says, "SDX signed."

13  Q.   And then what -- if you look a little closer, what does

14  it say below that?

15  A.   On Wednesday, January 27th, at 10:55 by Paul Manafort.

16  Q.   Okay.  And what does that mean?

17  A.   It means that he accessed the documents via our system

18  and there's a button where you can electronically sign the

19  documents.

20  Q.   Now, if we can turn to page -- for you it's going to be

21  Bates Page 407.

22       What is the top of this document?  What's the title

23  of this document?

24  A.   "Disclosure Notices."

25  Q.   And is it for the same property, 29 Howard Street, in New

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
                EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

1747

1   York?

2   A.   Yes.

3   Q.   Could you please read below where it says, "Below

4   occupancy"?

5   A.   (As read):  "Affidavits of Occupancy.  The Applicant(s)

6   hereby certify and acknowledge that, upon taking title to the

7   real property described above, their occupant status -- their

8   occupancy status would be as follows:"

9   Q.   And then what box is checked?

10  A.   "Secondary residence."

11  Q.   And what does it say for secondary residence?

12  A.   (As read):  "A secondary residence is a single family

13  property that either is currently or will be occupied by at

14  least one of the borrowers in addition to their primary

15  residence.  It will not be producing."

16  Q.   It would not be what?

17  A.   "It will not be income producing."

18       Sorry.

19  Q.   And is there a box for investment property?

20  A.   Yes.

21  Q.   Is it checked?

22  A.   No.

23  Q.   What does it say next to "investment property"?

24  A.   "Not owner occupied.  Purchased as an investment to be

25  held or rented."

M. James - Direct                                                    1748

1    Q.   And, again, is there a -- below that, a warning that

2    acknowledges any false statement in this application is

3    punishable under Title 18, United States Code, Section 1014?

4    A.   Yes.

5    Q.   And, once again, was this document electronically signed

6    by Mr. Manafort?

7    A.   Yes.

8    Q.   And then finally on this document, if you could turn to

9    Page 423.  For you, Bates Page 423.  What's the rest of this

10   exhibit?  What's -- what's the remainder?

11   A.   The uniform residential loan application.

12   Q.   Okay.  And who completed this document?

13   A.   I completed this based on the initial application I

14   received from Mr. Manafort.

15   Q.   And then you populated that information in this document?

16   A.   Correct.

17   Q.   And did Paul Manafort electronically sign this loan

18   application?

19   A.   Yes.

20   Q.   Can you -- I just want to look at a couple of things in

21   this document if we zoom in on the top half.

22        What is listed as the loan amount in this document?

23   A.   $3,180,000.

24   Q.   And is Paul Manafort and Kathleen Manafort listed as the

25   borrowers?

M. James - Direct

1749

1   A.   Yes.

2   Q.   And if you turn to the next page, do you see an income,

3   monthly income and combined housing expense information?

4   A.   Yes.

5   Q.   And do you see a line for net rental income?

6   A.   Yes.

7   Q.   What does Mr. Manafort list for net rental income?

8   A.   Zero.

9   Q.   All right.  Let me show you what's been marked as

10  Government Exhibit 245, 245.

11          What is this document?

12  A.   It's a uniform residential loan application.

13  Q.   And is it signed?

14  A.   Yes.

15  Q.   By Paul Manafort?

16  A.   Yes.

17          MR. ASONYE:  Your Honor, Government moves 245 into

18  evidence.

19          MR. NANAVATI:  Without objection, Your Honor.

20          THE COURT:  Admitted.

21                      (Government's Exhibit No. 245

22                      admitted into evidence.)

23          MR. ASONYE:  May we publish?

24          THE COURT:  Yes.

25  BY MR. ASONYE:

M. James - Direct

1  Q.   All right.  And, again, who are listed as the borrowers

2  here?

3  A.   Paul Manafort and Kathleen Manafort.

4  Q.   And is it for 29 Howard Street once again?

5  A.   Yes.

6  Q.   What's listed as the purpose of the loan?

7  A.   Refinance.

8  Q.   And then to the box to the right of where its --

9  indicates a refinance, it says, "Property will be used,"

10  what's checked there?

11  A.   Secondary residence.

12  Q.   And if we can turn to Page 3.  Well, actually, let's turn

13  to the next page.  Is the net rental information still listed

14  as zero on this loan application?

15  A.   Yes.

16  Q.   And then if we can turn to the third page, is it signed?

17  A.   Yes.

18  Q.   I'm not going to ask you to read the super tiny print

19  there, but I'm going to read it and will you tell me if

20  this -- by the way, have you reviewed this document before?

21  A.   Yes.

22  Q.   All right.  Is there a -- above the signature an

23  acknowledgment and agreement section?

24  A.   Yes.

25  Q.   Does it say in there in part, (As read):  "The

─────────U.S. v. Manafort─────────

M. James - Direct                                              1751

1    information provided in the application is true and accurate,

2    true and correct as of the date set forth, opposite my

3    signature, and that any intentional or negligent

4    misrepresentation of information contained in the application

5    may result in civil" -- and then I'm skipping forward --

6    "and/or criminal penalties, including, but not limited to,

7    fine or imprisonment"?

8            Does it say that in that section?

9    A.   Yes.

10   Q.   And does the bank rely on the information that

11   Mr. Manafort provided in this document?

12   A.   Yes.

13   Q.   What's the date next to Mr. Manafort's -- the date next

14   to the signatures on this document?

15   A.   March 4, 2016.

16   Q.   Okay.  And, actually, if you turn to the first page again

17   of 245, do you see there's a loan amount listed in the top

18   left?

19   A.   Yes.

20   Q.   Okay.  What's the loan amount?

21   A.   It's $2,730,000.

22   Q.   All right.  Now, let me show you what's been marked as

23   Government Exhibit 246.

24           Is this another loan application regarding the same

25   property?

M. James - Direct

1752

1    A.   Yes.

2    Q.   Is it signed by Mr. Manafort?

3    A.   Yes.

4              MR. ASONYE:   The Government moves 246 into evidence.

5              MR. NANAVATI:   No objection, Your Honor.

6              THE COURT:   Admitted.

7                            (Government's Exhibit No. 246

8                            admitted into evidence.)

9              MR. ASONYE:   May we publish?

10             THE COURT:   Yes.

11   BY MR. ASONYE:

12   Q.   Now, if you look at the loan amount in the top left for

13   this document, what does it say there?

14   A.   $682,500.

15   Q.   Can you explain to the jury why there are two loan

16   applications for this same property?

17   A.   So this is the HELOC that was referenced earlier.  It's a

18   second mortgage.

19   Q.   Okay.  When you said "HELOC," is that a home equity line

20   of credit?

21   A.   Correct.

22   Q.   Does this 246 contain substantially the same information

23   that was in the prior exhibit, 245?

24   A.   Yes.

25   Q.   Does it, if you turn to the second page, again, zero

─────────U.S. v. Manafort─────────

M. James - Direct

1753

1    rental income, net rental income?

2    A.   Yes.

3    Q.   Now, if we can turn back to Government Exhibit 246 -- I'm

4    sorry -- 245.

5         Mr. Manafort checked this property will be used as a

6    secondary residence, right?

7    A.   Yes.

8    Q.   Would the bank want to know if this property was actually

9    being used as a rental property?

10   A.   Yes.

11   Q.   If the bank learned that this property was actually being

12   used as a rental property, would it affect the terms of the

13   loan?

14   A.   Yes, it would.

15   Q.   If you turn to the second page, is it important to the

16   bank that income information is accurate?

17   A.   Yes.

18   Q.   And can income information affect the terms of the loan?

19   A.   Yes.

20   Q.   Do you see the assets and liability section on this page

21   as well?

22   A.   Yes.

23   Q.   Do all liabilities have to be disclosed in this loan

24   application?

25   A.   They do.

1  Q.   And if a borrower has business debt or has personal debt

2  overseas, does it have to be disclosed?

3  A.   It does.

4  Q.   And if they have business debt overseas, would that have

5  to be disclosed to the bank in this section?

6  A.   Not in this section but it would have to be disclosed.

7  Q.   And if you turn to the -- is there also a section for

8  schedule of real estate owned under the assets and liability

9  section?

10  A.   Yes.

11  Q.   Okay.  What information is supposed to be listed there?

12  A.   Any properties that are owned, the value of the

13  properties, the amount of the mortgages and the liens, if

14  there's any rental income, the mortgage payment, and the

15  insurance and taxes.

16  Q.   And does it say, "See attached to this," on that part of

17  the application?

18  A.   Yes.

19  Q.   All right.  Let's turn to the attachment.  I don't have a

20  page number for you, but on my exhibit it is the second to

21  last page of the exhibit.

22       You there?

23  A.   Yes.

24  Q.   Now, if we could zoom in on the bottom portion.  Do you

25  see information for a property listed at 377 Union Street?

U.S. v. Manafort

M. James - Direct

1755

1   A.   Yes.

2   Q.   Okay.  Does this document value that property at

3   $3,000,000?

4   A.   Yes, it does.

5   Q.   Now, do you see a column it says, "Mort," and, "Liens"?

6   A.   Yes.

7   Q.   What does that mean?

8   A.   You would list whatever mortgages and liens that was

9   attached to that particular property there.

10   Q.   And what does Mr. Manafort represent about whether a

11   mortgage exists on 377 Union Street?

12   A.   There's none listed there.

13   Q.   Would the bank want to know if there was actually a

14   $5.3 million loan on 377 Union Street?

15   A.   Yes.

16   Q.   Now, is the actual subject property of this loan,

17   29 Howard Street, listed in the schedule of real estate owned?

18   A.   Yes, it is.

19   Q.   Okay.  And if you follow next to that property, is there

20   a T listed?

21   A.   There is.

22   Q.   What does the T stand for?

23   A.   T stands for second home.

24   Q.   And if you look at that column there's some other letters

25   there.  There's an H and R.  What do the H and R stand for?

M. James - Direct

1756

1   A.   H stands for home, R stands for rental.

2   Q.   So on this application, what is Mr. Manafort representing

3   about how 29 Howard Street is being used?

4   A.   Second home.

5   Q.   Okay.  He didn't say it is being used as a rental there,

6   did he?

7   A.   No.

8   Q.   Now, do you conduct research to verify the -- the address

9   of this property, 29 Howard Street?

10   A.   I did.

11   Q.   What did you do?

12   A.   I went onto a local website that we have that's called

13   StreetEasy for New York City, and it just confirms the address

14   of the property.

15   Q.   And when you did that research, what did you find out

16   about 29 Howard Street?

17   A.   I found out two things.  It had two -- it was an address

18   that had two addresses with it.  So it was 2927 Howard Street,

19   and it was listed for rent.

20   Q.   It was listed for rent on that website?

21   A.   Yes.

22   Q.   And when you learned that 29 Howard Street was being

23   listed as a rental, what did you do with that information?

24   A.   I relayed that information to Mr. Fallarino.

25   Q.   That's your boss?

U.S. v. Manafort

1   A.   Yes.

2   Q.   Do you know what he did?

3   A.   No, I do not.

4   Q.   Okay.  Are you familiar with a company called Airbnb?

5   A.   I am.

6   Q.   What's -- what's your understanding of what Airbnb is?

7   A.   I believe it's a rental share website where you can list

8   your property for rent.

9   Q.   Okay.  Did you search whether 29 Howard Street was listed

10   on the Airbnb website?

11   A.   No.

12   Q.   Would you have wanted to know if 29 Howard Street was

13   listed on Airbnb as available to rent at this time?

14   A.   I'm sorry, can you repeat?

15   Q.   Would you want to know if it was -- 29 Howard Street was

16   being listed as a rental on Airbnb?

17   A.   The bank would, yes.

18   Q.   Okay.  Now, does Citizens Bank use appraisers?

19   A.   We do.

20   Q.   And are they independent third parties?

21   A.   Yes.

22   Q.   What do they do?

23   A.   They go out to the property and they take pictures and

24   make an evaluation of the value.

25   Q.   And what, if anything, does the appraiser disclose to the

U.S. v. Manafort

M. James - Direct

1758

1  bank about whether a property is being used as a rental?

2  A.   There's a box to check if the property is being used as

3  an owner-occupied, second home, or investment property or

4  rental.

5  Q.   All right.  Let me show you Government Exhibit 225.

6        Is this an e-mail from Paul Manafort to you?

7  A.   225.  Yes.  I'm here.

8  Q.   And does it relate to 29 Howard Street application?

9  A.   It does.

10        MR. ASONYE:  Your Honor, the Government moves 225

11  into evidence.

12        MR. NANAVATI:  No objection, Your Honor.

13        THE COURT:  Admitted.

14                    (Government's Exhibit No. 225

15                    admitted into evidence.)

16        MR. ASONYE:  May we publish?

17        THE COURT:  Yes.

18  BY MR. ASONYE:

19  Q.   If you turn to the third page, there's an e-mail at 10:05

20  we can zoom in on on January 21st.

21        What does Paul Manafort ask David Fallarino?

22  A.   "Has the appraisal been ordered?  Is there anything I

23  need to do?  Procedurally, what are the next steps?"

24  Q.   And then if you look above in the -- if you stay on that

25  page, on the first line, what does Mr. Fallarino say?  Go

1  ahead and read that first line.

2  A.    (As read):  "Melinda, do you have all the docs from Paul

3  that you need?  Who are the appraisers contacting to set the

4  appointments?  Paul, once we get all docs plus appraisal (will

5  take seven to ten days once seen to turn around) we submit to

6  underwriting and have a two-week turnaround time to get the

7  commitment."

8  Q.    And then if you could turn to the prior e-mail on the

9  earlier page, can you go ahead and read the rest of that

10  response?  The bottom.

11  A.    (As read):  "Hi, Paul.  These appraisals are being

12  ordered today.  We had a two-day delay.  Our research showed

13  that the property was listed for rent (which it cannot be.)

14  We reached out to Jeff and he solved the issue as of late

15  yesterday afternoon.  Important that the appraiser - when he

16  visits the property - is not under the impression that this is

17  a rental but knows the facts that this is your second home

18  (shared with Jeff and Jessica)."

19  Q.    All right.  Ms. James, do you know who Jeff is that's

20  referred to in Mr. Fallarino's e-mail?

21  A.    Mr. Manafort's son-in-law.

22  Q.    Okay.  Is that Jeff Yohai?

23  A.    Yes.

24  Q.    And who, if you know, contacted Jeff and solved the

25  issue?

U.S. v. Manafort

M. James - Direct

1760

1    A.    Based on this e-mail, it would be Mr. Fallarino.

2    Q.    And what was your understanding of how the fact that

3    29 Howard Street was listed as a rental was resolved?  How

4    this issue was resolved?

5    A.    I have no idea.

6              (A pause in the proceedings.)

7    BY MR. ASONYE:

8    Q.    And if you turn back to the first page at the top e-mail,

9    what does Mr. Manafort say in the first sentence of this

10   e-mail?

11   A.    "The docs you were looking for are the ones listed below,

12   correct?"

13   Q.    And in the bullet points under No. 1, does he identify a

14   copy of the insurance bill as one of the documents?

15   A.    Yes.

16   Q.    And what is listed as the last bullet point?

17   A.    "Copy of lease agreement with tenant if you own

18   investment property."

19   Q.    Do you know who put this -- did you put that information

20   in here of what you were looking for?

21   A.    I did.

22   Q.    Now, Ms. James, do you know if it would matter to the

23   bank if it learned that in 2015 Mr. Manafort claimed on a tax

24   return that 29 Howard Street was rented for the entire year?

25   A.    Yes, it would.

U.S. v. Manafort

M. James - Direct

1761

1   Q.   Would it matter to the bank if it learned that he

2   reported on a tax return for 29 Howard Street that it was used

3   as a rental for the entire year?

4   A.   Yes, it would.

5   Q.   Would it matter if he claimed on a tax return that it

6   generated over $100,000 in income?

7   A.   Yes.

8   Q.   Would it matter that he depreciated the property on his

9   tax return?

10   A.   Yes.

11   Q.   Why would all of these issues matter to the bank?

12   A.   Because it goes to the underwriter in making her final

13   decision on whether this is a second home or investment

14   property.

15   Q.   Now, are you the underwriter on this?

16   A.   No, I'm not.

17   Q.   Did you have any determination about whether the loan

18   could be approved or not?

19   A.   No, I do not.

20   Q.   All right.  Let me show you what's been marked as

21   Government Exhibit 229.

22        Is this another e-mail from Paul Manafort to you?

23   A.   Yes.

24   Q.   And does it relate to the 29 Howard Street loan?

25   A.   Yes.

U.S. v. Manafort

M. James - Direct

1762

1    MR. ASONYE:  Your Honor, the Government moves 229

2  into evidence.

3    MR. NANAVATI:  No objection, Your Honor.

4    THE COURT:  Admitted.

5    (Government's Exhibit No. 229

6    admitted into evidence.)

7    MR. ASONYE:  May we publish?

8    THE COURT:  Yes.

9  BY MR. ASONYE:

10  Q.  Can you go ahead and read that e-mail from Mr. Manafort?

11  A.  "Melinda, I have attached a copy of the letter to you

12  regarding the use of proceeds from the refinance.  Please

13  confirm to me that this letter is what you need.  You now have

14  all the additional four items requested on Friday.  Let me

15  know if you need anything else from me.  Thanks."

16  Q.  And then is there a document that he attaches the e-mail

17  to you?

18  A.  Yes.

19  Q.  All right.  If you could turn to that next page, the

20  attached document.  Is Mr. Paul Manafort's letterhead

21  attached?

22  A.  Yes.

23  Q.  And who is this letter from?

24  A.  Mr. Manafort.

25  Q.  To who?

U.S. v. Manafort

M. James - Direct

1763

A.    David Fallarino.

Q.    And what is the "Re," the subject line?

A.    Explanation of use of funds from refinancing of Howard Street property.

Q.    And what is the date?

A.    February 2, 2016.

Q.    Okay.  Could you read the first two paragraphs of the letter?

A.    (As read): "The property at 29 Howard Street is owned by MC Soho LLC.  This LLC is owned by Kathleen Manafort, 25 percent, Paul Manafort, 25 percent, and Jessica Manafort, 50 percent.  It is used as a second home for us."

Q.    And then what -- could you read the last paragraph?

A.    (As read): "The purpose of the refinancing is to consolidate all these cash-outlays and to realign the debt so that this is properly balanced."

Q.    Would it matter to the bank if this home was actually not being used as a second home for Mr. Manafort?

A.    Yes.

Q.    And would it matter to the bank that rather than paying off old debts Mr. Manafort used it as a down payment to acquire new debt?

A.    Yes.

Q.    Now, do you recall in your prior testimony that in Mr. Manafort's loan application on 377 Union Street he

U.S. v. Manafort

1  disclosed that there were no mortgages on that property?

2  A.   Yes.

3  Q.   Did Paul Manafort continue to make a number of

4  representations to you and the bank that 377 Union Street was

5  free and clear of any mortgages?

6  A.   Yes.

7  Q.   All right.  Let me show you two- -- Government

8  Exhibit 235.

9        Is this another e-mail from Paul Manafort to you

10  regarding the 29 Howard Street loan application?

11  A.   Yes, it is.

12        MR. ASONYE:  Your Honor, the Government moves 235

13  into evidence.

14        MR. NANAVATI:  Without objection, Your Honor.

15        THE COURT:  It's admitted.

16                    (Government's Exhibit No. 235

17                    admitted into evidence.)

18        MR. ASONYE:  May we publish?

19        THE COURT:  You may.

20  BY MR. ASONYE:

21  Q.   On the bottom e-mail at 6:48, is that an e-mail from you

22  to Paul Manafort?

23  A.   Yes, it is.

24  Q.   Could you read paragraph No. 3?

25  A.   (As read): "Documentation properties are owned free and

─────────────── U.S. v. Manafort ───────────────

M. James - Direct

1765

1  clear.  Please provide most current insurance declaration

2  pages evidencing no mortgage listed for the following

3  properties: 174 Jobs Lane, 10800 Belmont Boulevard, 10 James

4  Drive, 123 Baxter Street, 377 Union Street (the documentation

5  previously provided were not the most current policies)."

6  Q.   Why did you need an insurance declaration for 377 Union

7  Street?

8  A.   To confirm that there was no mortgage attached to the

9  property.

10  Q.   And why do you want to know that?

11  A.   Because if there was, we would need to include the

12  mortgage payment into the monthly debts.

13  Q.   Okay.  And did you receive some insurance declarations

14  following this e-mail request?

15  A.   I did.

16  Q.   Let me show you Government Exhibit 237.

17        MR. ASONYE:  And, Your Honor, I believe this has

18  already been admitted.

19        THE COURT:  All right.

20        MR. ASONYE:  May we publish?

21        THE COURT:  Yes.  What's the number?

22        MR. ASONYE:  237.

23        THE COURT:  You may do so.

24  BY MR. ASONYE:

25  Q.   By the way, first of all, who is this e-mail from?

M. James - Direct

1766

```
1    A.   Mr. Gates.

2    Q.   And it's to you?

3    A.   Yes.

4    Q.   Okay.  Who is copied on the e-mail?

5    A.   Mr. Manafort and Heather Washkuhn.

6    Q.   And then if you could read the first sentence.

7    A.   (As read): "Melinda, please find below documents for the

8    following numbers."

9    Q.   And what is listed for No. 3?

10   A.   "Insurance documentation for requested properties as

11   attached."

12   Q.   And did you review the attached documents to this e-mail?

13   A.   I did.

14   Q.   Okay.  Let me ask you to turn to Bates range -- and it's

15   going to end in 6146 -- I'm sorry -- 7526.  7526.

16             Okay.  And what is this document?

17   A.   It's a mortgage insurance binder.

18   Q.   What's the name of the insured that's listed at the top

19   left?

20   A.   MC Brooklyn Holdings LLC.

21   Q.   And is that what owned 29 Howard Street?

22   A.   Yes.

23   Q.   Paul Manafort had an ownership interest in this?

24   A.   Yes.

25   Q.   If you look to the right, what's listed as the effective
```

1   date?

2   A.   February 1, 2016.

3   Q.   Okay.  And the policy period?

4   A.   December 28, '15, to December 28, '16.

5   Q.   Now, do you see where mortgages are listed?

6   A.   Yes.

7   Q.   Do you see where it says "mortgagee"?

8   A.   Yes.

9   Q.   Okay.  What does it say next to "added"?

10  A.   Genesis Capital Master Fund II LLC.

11  Q.   What did you understand that to mean when you received

12  this insurance binder?

13  A.   That there was a mortgage attached to the property.

14  Q.   Now, was that consistent -- was that consistent with

15  information that Mr. Manafort had previously provided to the

16  bank that Union Street was free and clear of any mortgages?

17  A.   No.

18  Q.   And when you saw this information, what did you do?

19  A.   I reached out to Mr. Manafort, just for clarification.

20  Q.   Now, were you aware of any other conversations happening

21  between Mr. Manafort and Mr. Fallarino?

22  A.   No.

23  Q.   Now, during this time, who, if anyone, at the insurance

24  company were you in communication with?

25  A.   Ms. Duggan, I think I'm saying that correctly.

─────────U.S. v. Manafort─────────
M. James - Direct                                          1768

1   Q.   And why were you in communication with Ms. Duggan?

2   A.   Because there was several policies that that insurance

3   company was providing for the other properties owned as well.

4   Q.   And did you communicate with her via e-mail?

5   A.   Yes, I did.

6   Q.   Let me show you Government Exhibit 239.

7        Is this an e-mail communication regarding 29 Howard

8   Street with Ms. -- between you and Ms. Duggan?

9   A.   Yes.

10       MR. ASONYE:  Your Honor, Government moves 239 into

11  evidence.

12       MR. NANAVATI:  No objection, Your Honor.

13       THE COURT:  Admitted.

14                      (Government's Exhibit No. 239

15                      admitted into evidence.)

16       MR. ASONYE:  May we publish?

17       THE COURT:  You may.

18  BY MR. ASONYE:

19  Q.   All right.  What is the subject of this e-mail chain?

20  A.   "Manafort mortgagee clause update."

21  Q.   If you see at February 24, the next e-mail down, what do

22  you write to Ms. Duggan?

23  A.   (As read):  "Can you please let me know when you have a

24  moment for a quick call?  I just wanted to go over a couple of

25  questions about the policies that I received in regards to the

U.S. v. Manafort

1   other properties owned by this borrower."

2   Q.   Did she write you -- what did you -- did she write you

3   back?

4   A.   She did.

5   Q.   And did she attach a document?

6   A.   She did.

7   Q.   Now, does -- if you look at the attachment -- sorry -- if

8   you look at the attachment, I think it's on the next page,

9   does the document indicate that there's a mortgage on 377

10   Union Street?

11   A.   It does.

12   Q.   And what time did you send the e-mail -- what time did

13   Donna send the e-mail to you indicating that there was a

14   mortgage on 377 Union Street?

15   A.   At 10:40 a.m.

16   Q.   All right.  Let me show you Government Exhibit 241.

17          Is this an e-mail communication between you and

18   Mr. Manafort regarding this issue?

19   A.   Yes.

20          MR. ASONYE:  Your Honor, the Government moves 241

21   into evidence.

22          MR. NANAVATI:  No objection, Your Honor.

23          THE COURT:  Admitted.

24                          (Government's Exhibit No. 241

25                          admitted into evidence.)

U.S. v. Manafort

1          MR. ASONYE:  May we publish?

2          THE COURT:  Yes, you may.

3   BY MR. ASONYE:

4   Q.   Now, if you turn to the second page, do you see at the

5   top there's an e-mail from you to Rick Gates?

6   A.   Yes.

7   Q.   And who's copied on this e-mail?

8   A.   Mr. Manafort and Ms. Washkuhn.

9   Q.   At what time is this e-mail sent at?

10  A.   10:41.

11  Q.   Go ahead and could you please read the e-mail for the

12  jury?

13  A.   (As read):  "Good morning all.  Our application currently

14  has the following properties as being owned free and clear:

15  377 Union Street, 123 Baxter Street.  Based on the insurance

16  binders that we received last night, we are showing that there

17  are mortgages listed on these properties.  Can you please

18  clarify?  Are they paid off?  If so, how do we confirm/prove?

19  If not, can we have the mortgage statements to add them to the

20  application?"

21  Q.   Okay.  That's fine.  Thank you.

22          Why is this issue so important to the bank, that you

23  keep repeatedly asking about it?

24  A.   Because the -- the underwriter needs a clear picture of

25  all the debts, the monthly debts, for the borrower in order to

U.S. v. Manafort

M. James - Direct

1771

1   make an accurate decision on the loan.

2   Q.   Now, if you turn back to the first page, the bottom

3   e-mail from Paul Manafort, does Paul Manafort write you?

4   A.   Yes.

5   Q.   And who does he copy?

6   A.   Mr. Gates.

7   Q.   Okay.  What does Paul Manafort say?  You can just read

8   the last sentence?

9   A.   "Union Street just had a mortgage approved this month."

10  Q.   Now, did you understand that when Mr. Manafort said

11  "approved this month," did you understand that to mean that a

12  closing had occurred and a mortgage was actually on Union

13  Street at the time?

14  A.   No, I did not.

15  Q.   Why didn't you -- why didn't you have -- why did you not

16  have that understanding?

17  A.   Because in this business, clients usually shop around for

18  mortgages.  So sometimes they have three or four different

19  applications approved at a time, but they would take the best

20  deal that works for them.

21  Q.   So you can apply for a loan, but -- be approved for a

22  loan, but not necessarily get a loan?

23  A.   Correct.

24  Q.   Let me show you Government Exhibit 242.

25          This is an e-mail from Rick Gates to you regarding

U.S. v. Manafort

1    this issue, the mortgage issue?

2    A.   Yes.

3           MR. ASONYE:   Your Honor, Government moves 242 into

4    evidence.

5           MR. NANAVATI:   No objection, Your Honor.

6           THE COURT:   Admitted.

7                        (Government's Exhibit No. 242

8                        admitted into evidence.)

9           MR. ASONYE:   May we publish?

10          THE COURT:   You may.

11   BY MR. ASONYE:

12   Q.   If you'll focus on the top of this document.   What --

13   what's the date of it?

14   A.   February 24, 2016.

15   Q.   At what time?

16   A.   5:37 p.m.

17   Q.   And then who's also copied on this e-mail?

18   A.   Mr. Manafort and Ms. Washkuhn.

19   Q.   And if you could read the subject line, what does it say?

20   A.   "Manafort Chubb Insurance Properties - 377 Union Street

21   and 123 Baxter -  Declarations - NO mortgagee listed both."

22   Q.   What did you understand that subject line to mean, "no

23   mortgagees listed both"?

24   A.   That there were no mortgages for the two properties in

25   question.

U.S. v. Manafort

M. James - Direct

1773

1 Q.   And, in fact, around the time of this e-mail, did you

2 talk to Rick Gates before this e-mail?

3 A.   I did.

4 Q.   And what, if anything, did he tell you?

5 A.   He indicated that they decided not to move forward with

6 the mortgage anymore and --

7 Q.   Which mortgage?

8 A.   The mortgage on 377 Union Street.

9 Q.   Okay.

10 A.   And on these -- the documents being provided was proof of

11 it.

12 Q.   And is this the -- did you receive this e-mail after that

13 conversation?

14 A.   Yes.

15 Q.   And did Paul Manafort receive this e-mail?

16 A.   He's copied on that e-mail, yes.

17 Q.   All right.  Let's turn to the attachment, if you could

18 turn to the last page.

19       What is on the last page of this document?  What is

20 this?

21 A.   An insurance policy.

22 Q.   And is 377 Union Street listed in this portion of the

23 insurance binder?

24 A.   It is.

25 Q.   And is there a place to list the mortgage information for

U.S. v. Manafort

M. James - Direct

1774

1   377 Union?  Is there a section where you would list the

2   mortgage?

3   A.   There is.

4   Q.   And is there any mortgage listed?

5   A.   I'm not seeing the section, that's why I'm -- is it on

6   this first page?

7   Q.   Yes, if you look at -- I'm sorry -- the last page.

8   A.   I may be on the wrong page.  Okay.  Yes.

9   Q.   And is there any mortgage listed?

10  A.   No.

11  Q.   What did you conclude after receiving this document?

12  A.   That there was no mortgage attached to the property.

13  Q.   And now let me direct your attention to the effective

14  date of the policy.  If you could -- it's on the top left, if

15  you could zoom in.

16  A.   It's October 18, 2015.

17  Q.   And we looked at a prior insurance binder that actually

18  listed a mortgage on Union Street; is that correct?

19  A.   Correct.

20  Q.   And did that -- is the date of that one February of 2016?

21  A.   Correct.

22  Q.   So which one was more current, the insurance binder that

23  you're looking at now or the prior exhibit?

24  A.   The prior exhibit.

25  Q.   Did you actually recognize that at the time?

1    A.   I did not.

2    Q.   What did you believe when you received this document?

3    A.   That there was no mortgage attached to the property.

4    Q.   Let me show you Government Exhibit -- back to 245, which

5    is the signed loan application for Mr. Manafort.

6          And is March 4, 2006, the final loan application

7    that Mr. Manafort signed?

8    A.   Yes.

9    Q.   If we could turn to that third page.

10          And when Mr. Manafort signed the final loan

11   application, did he continue to represent that there was no

12   mortgage on 377 Union Street?

13   A.   Correct.

14   Q.   And would it matter to the bank if there was a mortgage

15   at that time that he signed the loan application?

16   A.   It would.

17   Q.   Would it matter to the bank if the documents received in

18   correspondence with Paul Manafort, Rick Gates, and Donna

19   Duggan were altered or fabricated?

20   A.   It would.

21   Q.   During the bank's consideration of this loan, do you know

22   if underwriting raised concerns about Mr. Manafort's business

23   income or liquidity?

24   A.   I believe they did, yes.

25   Q.   All right.  Let me show you what's been marked as

┌─────────────────────U.S. v. Manafort─────────────────────┐

M. James - Direct

1776

1   Government's Exhibit 231.  231.

2           Is this an e-mail from Paul -- I'm sorry -- from

3   Mr. Fallarino to Paul Manafort and you regarding the 29 Howard

4   Street loan application?

5   A.   Yes, it is.

6           MR. ASONYE:  Your Honor, Government moves 231 into

7   evidence.

8           MR. NANAVATI:  No objection, Your Honor.

9           THE COURT:  Admitted.

10                      (Government's Exhibit No. 231

11                       admitted into evidence.)

12          MR. ASONYE:  And may we publish?

13          THE COURT:  Yes.

14  BY MR. ASONYE:

15  Q.   If you could turn to the second page.  I don't need you

16  to read it.  But above Mr. Fallarino's picture, do you see --

17  does he raise issues about liquidity and $1.5 million

18  liability to Peranova?

19  A.   Yes.

20  Q.   And does he, in this e-mail, raise an issue about

21  obtaining a CPA letter?

22  A.   Yes.

23  Q.   If you'd turn to the first page.  And read -- zoom in on

24  the second e-mail from the bottom from Cindy Laporta at 5:36

25  p.m.

─────U.S. v. Manafort─────
M. James - Direct                                                    1777

1              Did you receive this e-mail?

2    A.   I'm copied on this e-mail, yes.

3    Q.   Okay.  Is Rick Gates copied on the e-mail?

4    A.   Yes.

5    Q.   Is Paul Manafort copied on the e-mail?

6    A.   Yes.

7    Q.   And is the subject line "DMP International income

8    question"?

9    A.   Yes.

10   Q.   Okay.  Go ahead and please read Ms. Laporta's e-mail.

11   A.   (As read):  "Hi David, the loan from Peranova Holdings

12   Limited to DMP International of 1.5 million has been forgiven

13   effective 2015.  As a result the 1.5 million will be reported

14   on the 2015 DMP International income tax return.  Please let

15   me know if you have any questions."

16   Q.   Is that a statement that the bank relies on?

17   A.   Yes.

18   Q.   Let me ask you to look at Government Exhibit 168.

19            MR. ASONYE:  Which is already in evidence, Your

20   Honor.

21            THE COURT:  All right.

22   BY MR. ASONYE:

23   Q.   And so, in fact, Ms. James, did the bank actually

24   receive -- are you copied on this e-mail?

25   A.   Yes.

M. James - Direct

1778

1   Q.   And is Paul Manafort copied on this e-mail?

2   A.   Yes.

3   Q.   And did the bank actually receive a letter from

4   Ms. Laporta regarding the issue you just discussed, the $1.5

5   million liability?

6   A.   Yes.

7   Q.   If you could turn to the last page -- I'm sorry -- the

8   second to the last page.

9   A.   Okay.

10  Q.   And if you could just read Ms. Laporta's letter.

11  A.   "The purpose of this letter is to confirm" --

12  Q.   I'm sorry, the page before that, the cover letter.  Go

13  ahead.

14  A.   The memorandum?

15  Q.   Yes.  It should be Bates No. 800.

16  A.   Yes.  (As read):  "KWC prepares the tax returns for DMP

17  International LLC.  We have been informed by the management

18  that the debt reported on the 2014 tax return balance sheet

19  due to Peranova Holdings Limited at 1.5 million has been

20  forgiven.  The attached signed release was provided to us.  As

21  a result the 1.5 million of debt forgiven will be reported as

22  income on the 2015 partnership tax returns."

23  Q.   Is this a document the bank would have relied on in its

24  determination about this loan?

25  A.   Yes.

─────U.S. v. Manafort─────

1  Q.   And the attachment, would the bank have relied on the

2  next page as well?

3  A.   Yes.

4  Q.   Would it matter to the bank if the attachment, the last

5  page from Peranova Holdings, that letter was backdated?

6  A.   Yes.

7  Q.   Would it matter to the bank if Ms. Laporta had no

8  confidence in the letter that she wrote to the bank?

9  A.   Yes.

10 Q.   Ultimately, did the bank approve the cash-out refinance

11 for Mr. Manafort on 29 Howard Street for $3.4 million?

12 A.   Yes.

13 Q.   And did Mr. Manafort get those funds?

14 A.   Yes.

15 Q.   What if, any, policies does Citizens Bank have about a

16 customer's presence at a closing for a cash-out refi in New

17 York?

18 A.   It's required.

19 Q.   So was Paul Manafort required to attend this closing in

20 person?

21 A.   Yes.

22 Q.   And was he at the closing, required to sign the loan

23 application that we reviewed that was dated March 4, 2016?

24 A.   Yes.

25 Q.   And why is he required to sign that loan application

U.S. v. Manafort

1  again?

2  A.   To confirm that all the information listed on it --

3  listed in the application is correct.

4  Q.   And was he required to disclose any significant changes

5  in his loan application that occurred between that initial

6  application and the day of the closing?

7  A.   Yes.

8        MR. ASONYE:  Your Honor, I have no further questions

9  of this witness.

10       THE COURT:  All right.  Cross-examination.

11       MR. NANAVATI:  Thank you, Your Honor.

12                    **CROSS-EXAMINATION**

13  BY MR. NANAVATI:

14  Q.   Ms. James, if I accidentally call you Ms. Francis at any

15  point, it's just because --

16  A.   It's perfectly fine.

17  Q.   Yeah.  So my name is Jay Nanavati.  I represent Paul

18  Manafort and welcome to Alexandria.

19  A.   Thank you.

20  Q.   You had said that Mr. Manafort was present in person at

21  the closing, correct?

22  A.   Correct.

23  Q.   And that closing took place on March 4, 2016?

24  A.   I believe so, yes.

25  Q.   Okay.  And the documents you were shown indicate that the

─────U.S. v. Manafort─────

1   closing happened on March 4, 2016, right?

2   A.   Correct.

3   Q.   Okay.  And when a person applies for a loan, is it a --

4   fair to say that the application process is just that, a

5   process?

6   A.   Yes.

7   Q.   Okay.  And that process can drag out several months,

8   right?

9   A.   Correct.

10  Q.   And things are final on the date of closing, right?

11  A.   Yes.

12  Q.   That's when the deal is done?

13  A.   Yes.

14  Q.   And that's when the information that's in the bank's

15  possession --

16           MR. NANAVATI:  Strike that, Your Honor.

17  BY MR. NANAVATI:

18  Q.   That's -- the deal that's done on the day of closing is

19  based on the information that the bank has as of the day of

20  closing, correct?

21  A.   Correct.

22  Q.   March 4, 2016?

23  A.   Yes.

24  Q.   Okay.

25           MR. NANAVATI:  Your Honor, at that -- this time, I

─────────────────────────────────────────────

U.S. v. Manafort

M. James - Cross

1782

1  would ask permission to read a portion of the Genesis Holdings

2  stipulation?

3         THE COURT:  Yes, you may do so.

4  BY MR. NANAVATI:

5  Q.   On or about February 9 --

6         THE COURT:  Or tell Mr. Asonye what it is you're

7  going to read.

8         (Discussion off the record.)

9         THE COURT:  All right.  Go ahead.  You may do so.

10        MR. NANAVATI:  Thank you, Your Honor.

11 BY MR. NANAVATI:

12 Q.   On or about February 9, 2016, MC Brooklyn Holdings LLC

13 executed and delivered the following loan documents to Genesis

14 Capital Master Fund II LLC for the purposes of securing a

15 mortgage in the amount of $3.8 million and a construction loan

16 in the amount of $1.4 million against real property located at

17 377 Union Street, Brooklyn, New York.

18        And there's some other verbiage after that.

19        And so I want to take you back then, Ms. James, to

20 December the 24th of 2015, if I could.

21        Do you -- first, can I ask you -- oh, it is.  Okay.

22        MR. NANAVATI:  Your Honor, Exhibit -- Government 224

23 is in evidence.  I wonder if we could display it.

24        THE COURT:  Yes, you may.  I believe it is in

25 evidence.

M. James - Cross

1          MR. ASONYE:  Yes, Your Honor.

2          THE COURT:  Yes, you may display it.

3          MR. NANAVATI:  Thank you.

4    BY MR. NANAVATI:

5    Q.   And if you could go to that second page, please.

6          And, Ms. James, if you could go down to the second

7    page.  It's on your screen to an e-mail from Paul Manafort to

8    David Fallarino sent January 15 of 2016.  Do you see that?

9    A.   Yes.

10   Q.   And does it say, "David, I received these disclosure

11   documents today, read and signed them and sent them forward.

12   There was no application in the package of documents.  I

13   assume that is correct and it will be forthcoming.  Am I

14   correct?  Paul."

15          Do you see that?

16   A.   Yes, I do.

17   Q.   Okay.  And in -- on January 15th of 2016, pardon me for

18   saying the wrong date earlier, this was early in the

19   application process, correct?

20   A.   Correct.

21   Q.   And, again, to keep us straight, closing was March 4,

22   2016, correct?

23   A.   Yes.

24          MR. NANAVATI:  And, Your Honor, could I hand

25   something up to the witness, please, and one for the Court?

U.S. v. Manafort

M. James - Cross

1784

```
 1            THE COURT:  Show it to Mr. Asonye first.

 2            MR. NANAVATI:  Yes, Your Honor.  I gave him a copy.

 3            THE COURT:  All right.

 4            MR. NANAVATI:  This is -- this was marked for

 5   identification as Government 223, but it's not in evidence.

 6   So it's now marked for identification as Defendant's 32.

 7            THE COURT:  All right.  Do you wish to offer?

 8            MR. NANAVATI:  I do, Your Honor.

 9            THE COURT:  Objections?

10            MR. ASONYE:  Your Honor -- yeah, we do object, Your

11   Honor.  It's hearsay, defendant's own statement.  I'm happy to

12   approach the bench if Your Honor would like to discuss it

13   further.

14            THE COURT:  This was originally marked as a

15   government exhibit; is that correct?

16            MR. ASONYE:  Yes.  But we haven't offered it, Your

17   Honor.

18            THE COURT:  All right.  But your objection now is

19   that it is hearsay?

20            MR. ASONYE:  It's self-serving hearsay.

21            THE COURT:  I beg your pardon?

22            MR. ASONYE:  Hearsay, Your Honor.

23            THE COURT:  All right.  May I see the document,

24   please?

25            What part do you wish to offer, Mr. Nanavati?
```

U.S. v. Manafort

1           MR. NANAVATI:  Your Honor, the date of the e-mail

2    combined with the very top, the first e-mail that's at the

3    very top of the first page.

4           THE COURT:  So that's an e-mail from Mr. Manafort

5    to --

6           MR. NANAVATI:  A person at the bank.

7           THE COURT:  All right.  How much more do you have

8    with this witness?

9           MR. NANAVATI:  A fair amount -- I shouldn't -- I

10   apologize.  I would say 20 to 25 minutes.

11          THE COURT:  All right.  This seems like an

12   appropriate time then to take the morning recess.

13          Hand your books to the right, ladies and gentlemen.

14   Mr. Flood will collect them, keep them secure.  And, again, as

15   usual, I ask that you not discuss the case with anyone or

16   undertake any investigation on your own.

17          Ms. James?

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  You may step down and relax for a bit.

20   It'll be about -- let's say 11:20.

21          THE WITNESS:  Okay.

22          THE COURT:  And you may not discuss your testimony,

23   of course, with anyone.  You may step down.  Thank you.

24          (Witness excused.)

25          THE COURT:  All right.  You may follow the court

U.S. v. Manafort

1  security officer out.

2          (Jury dismissed.)

3          THE COURT:  All right.  You may be seated.

4          So as I understand it, Mr. Asonye, Defense

5  Exhibits 32, which was previously marked as a Government

6  exhibit, but never offered by the Government, the top part

7  that Mr. Nanavati is interested in says it's from Paul

8  Manafort to Fallarino.

9          And it says, "David, I have attached the short form

10 application that you sent me yesterday for the Howard refi.

11 Please confirm receipt and let me know what the next steps

12 are.  Thanks, Paul."

13         Did I read that correctly, Mr. Nanavati?

14         MR. NANAVATI:  Yes, Your Honor.

15         THE COURT:  And you want to introduce it.  Can you

16 tell me why?  I don't think there's an objection as to

17 relevance, but I need to know the relevance.

18         MR. NANAVATI:  Yes, Your Honor.

19         The relevance would be to show that the first part

20 of the application process started in December of 2015, and to

21 contrast that with the supposedly concealed mortgage that

22 wasn't closed until February of 2016, a couple of months

23 later.  Just there -- just to show that information is flowing

24 into the bank before there's a mortgage.

25         THE COURT:  Why do you need a document to do --

U.S. v. Manafort

M. James - Cross

1787

1       Sit down, Mr. Asonye.  I'll get to you, I promise.
2  But you see it interrupts the speaker, it interrupts me.  You
3  need to be patient.  So do I. (Laughter.)
4       Mr. Nanavati, why do you need a document for that?
5  Why can't you just ask her the question directly: Weren't
6  there communications over a period of time and materials
7  submitted and all the rest?
8       MR. NANAVATI:  Your Honor, if I'm being completely
9  open, it's probably due to a law school exam-type anxiety
10  about not having paper and putting everything in that I
11  possibly know, so I agree with you, I probably could do it
12  that way.
13       THE COURT:  And Mr. -- now, Mr. Asonye.
14       MR. ASONYE:  I was just actually going to say, Your
15  Honor, if we could have a moment with defense counsel, I think
16  we actually can resolve this issue.
17       THE COURT:  All right.  I can do that.
18       Court stands in recess until 11:20.
19       MR. ASONYE:  Thank you.
20       MR. NANAVATI:  Thank you, Your Honor.
21       THE COURT:  Make it 11:25.
22       (Recess.)
23       THE COURT:  All right.  You-all resolved it?
24       MR. ASONYE:  Yes, Your Honor.  The Government will
25  withdraw its objection in light of the fact that there's a

U.S. v. Manafort

1    stipulation over financial institution records, which includes

2    e-mails.  So this would come in under 8036 as a business

3    record of Citizens Bank.

4            So on that basis, we withdraw our objection.

5            THE COURT:  All right.  I'm simply going to tell the

6    jury you withdraw the objection.

7            All right.  Bring the jury in, please.

8            (Jury in.)

9            THE COURT:  All right.  You may be seated.

10           All right.  We'll continue now.  The Government has

11   withdrawn its objection, so we're going to proceed.

12           All right.  Bring in Ms. James.

13           Ms. James, you'll recall that you remain under oath.

14           THE WITNESS:  Yes, Your Honor.

15           THE COURT:  You may resume the stand.

16           All right.  Mr. Nanavati, you may proceed.

17           MR. NANAVATI:  Thank you, Your Honor.

18   BY MR. NANAVATI:

19   Q.   Ms. James, the -- do you still have the paper that has a

20   sticker that says Defendant's Exhibit 32 on it in front of

21   you?

22   A.   Yes, I do.

23   Q.   Okay.  And at the very top, is that an e-mail dated

24   December 24th of 2015?

25   A.   Yes.

─────U.S. v. Manafort─────

M. James - Cross

1789

Q.   And is it from Paul Manafort to David Fallarino?

A.   Yes.

Q.   And, again, you mentioned him earlier, but he was a loan

officer at your bank?

A.   Correct.

Q.   Is he still a loan officer at your bank?

A.   He is.

Q.   And is it -- is it correct that this is an e-mail from

Paul Manafort to David Fallarino just saying, "I've attached

the short form application that you sent to me yesterday for

the Howard refi," is that what it says?

A.   Yes.

Q.   Okay.  And it -- and the closing date, again, for -- to

remind me was March 4, 2016?

A.   Correct.

Q.   And regarding the March 4, 2016 closing, were there a lot

of documents there?

A.   Yes, there was.

Q.   Okay.  And is it fair to say that the documents were all

filled out by the bank and not Mr. Manafort?

A.   Correct.

Q.   Okay.  And is it fair to say that at the closing, there

are "sign here" stickers on lots and lots of pages?

A.   I believe so.  I've never been to a closing.

Q.   Okay.  Fair enough.

1    And is it also fair to say that the filling out of

2    the documents to be signed at closing is based on information

3    the bank has received throughout that monthslong application

4    process?

5    A.    Correct.

6    Q.    And I wonder if you could get in front of you

7    Government's Exhibit 241 again.  And if you could -- just

8    directing your attention -- you don't need to read it, but

9    directing your attention to the e-mail at the bottom of the

10   page, that's February 24, 2016, at 10:55 in the morning?

11   A.    Yes.

12   Q.    Okay.  And so that's about ten days before the closing

13   date?

14   A.    Yes.

15   Q.    Okay.  And it's Mr. Manafort clarifying for you that

16   Union Street just had a mortgage approved this month, correct?

17   A.    Correct, that's --

18   Q.    And you're, of course, now aware from the stipulation I

19   read that the Union Street mortgage was indeed closed on

20   February 9 of 2016, the same month, correct?

21   A.    Yes.

22   Q.    But you said that by Mr. Manafort using the term

23   "approved" instead of "closed" he was making a

24   misrepresentation to you; is that right?

25   A.    I said that I did not understand that to mean that he had

─────────────U.S. v. Manafort─────────────

1    a mortgage closed.

2    Q.   Okay.  So -- but it sounds like -- is it fair to say the

3    difference -- the difference we're talking about here is

4    between using the word "approved" and using the word "closed"?

5    A.   Correct.

6    Q.   Because, as we discussed earlier, there's no loan until

7    it's closed, right?

8    A.   Correct.

9    Q.   And that goes for the Howard Street loan that we're

10   talking about here too, right?

11   A.   Correct.

12   Q.   There's no loan until it's closed, correct?

13   A.   Correct.

14   Q.   And if you -- if a bank gets information before the loan

15   is closed, the bank has that information to use at closing,

16   correct?

17   A.   Correct.

18   Q.   Now, I want to turn your attention to the day before

19   this.  I'm not going to put an exhibit in front of you yet,

20   but -- so this e-mail we've just talked about, Exhibit 241,

21   it's from February 24, correct?

22   A.   Correct.

23   Q.   Isn't it true that on February the 23rd -- I'm sorry --

24   on February the 20th, you e-mailed Paul Manafort asking him

25   for the most recent insurance declaration pages evidencing no

─────U.S. v. Manafort─────

1  mortgages, correct?

2  A.   Correct.

3  Q.   Okay.  And is it fair to say that you asked him for that

4  to confirm the information you had been getting during the

5  application process?

6  A.   Yes.

7  Q.   Okay.  And the information you had been getting during

8  the application process was that there, indeed, was no

9  mortgage on his Union Street property, right?

10  A.   Yes.

11  Q.   Or I should say on the Union Street property, correct?

12  A.   Yes.

13  Q.   And the information you had been getting saying that

14  there was no mortgage on the Union Street property started

15  flowing to the bank back on December 24, 2015, correct?

16  A.   Correct.

17  Q.   Now, I want to turn your attention from February the 20th

18  to February the 21st.  Isn't it true that in response to your

19  request for the most recent insurance declaration pages,

20  Mr. Manafort replied to you, "I will provide the requested

21  documentation in the next 48 hours"?

22  A.   Correct.

23  Q.   And isn't it also true that -- and you can tell me if you

24  need to see something -- that 48 hours and 14 minutes later

25  you received an e-mail from Rick Gates in closing the very

M. James - Cross

1  insurance documentation you had requested, correct?

2  A.   I believe so, yes, correct.

3  Q.   Okay.  And the insurance documentation you had requested

4  was, of course, the current insurance documentation?

5  A.   I believe so, yes, correct.

6       THE COURT:  I'm sorry, Ms. James.  Are you having

7  any trouble at all hearing her?

8       THE JUROR:  Yes, sir.

9       THE COURT:  Would you speak up, please?

10      THE WITNESS:  Yes, Your Honor.

11      THE COURT:  It would be helpful.

12      THE WITNESS:  Okay.  Yes, Your Honor.

13      THE COURT:  You have a very gentle voice, but I'd

14  ask you to speak up just a bit, if you would, please.

15      THE WITNESS:  Yes, Your Honor.

16  BY MR. NANAVATI:

17  Q.   And so after the promise to get you the insurance

18  declaration pages within 48 hours, about 48 hours and 14

19  minutes later you got the current insurance declaration page,

20  correct?

21  A.   I believe so, correct.

22  Q.   And if at any time you don't remember and you'd like your

23  recollection refreshed, please tell me.

24      So when you got the insurance declaration pages that

25  were current, they revealed this new mortgage on the Union

M. James - Cross

1  Street property, correct?

2  A.   Correct.

3  Q.   And the lender on that mortgage was a placed called

4  Genesis Capital, correct?

5  A.   Correct.

6  Q.   But at this point you now have information you've gotten

7  through this application process that conflicts with these

8  current insurance documents you just received, correct?

9  A.   Correct.

10 Q.   So on the one hand you've learned through the process

11 there's no mortgage on Union Street, but on the other hand

12 you've learned, hey, there is a mortgage that just happened on

13 Union Street?

14 A.   Based on the e-mail, yes.

15 Q.   Okay.  And you needed clarification on that, correct?

16 A.   Yes.

17 Q.   And, in fact, the very next morning, February 24 at

18 10:41 a.m., you e-mailed Rick Gates and Paul Manafort laying

19 out just that conflict, didn't you?

20 A.   Yes.

21 Q.   And you said, "Please clarify"?

22 A.   Correct.

23 Q.   And 14 minutes later Mr. Manafort responds to you,

24 "123 Baxter is free and clear.  There was never a mortgage.  I

25 don't know what you are showing.  The UBS loan is a loan

U.S. v. Manafort

1  against the portfolio line.  Union Street just had a mortgage

2  approved this month."

3          Isn't that what it said?

4  A.  Yes.

5  Q.  And that's the e-mail I showed you a moment ago, right?

6  A.  Correct.

7  Q.  And then ten minutes later at 11:55 a.m. you responded to

8  Mr. Manafort, "Thank you, Paul, for the clarification," right?

9  A.  Right.

10  Q.  So as of 11:55 a.m. on February the 24th, you knew that

11  there was a mortgage on Union Street, correct?

12  A.  Correct.

13  Q.  And at some point later that day, you got a telephone

14  call from Rick Gates, correct?

15  A.  Yes.

16  Q.  Not e-mail?

17  A.  No.

18  Q.  And Rick Gates called you or you called him?

19  A.  I believe he called me.

20  Q.  And Rick Gates called you and told you, hey, those

21  insurance policies we sent you that show a mortgage on Union

22  Street, those were wrong, right?

23  A.  Yes.

24  Q.  And Rick Gates told you that they were wrong because the

25  Genesis mortgage on Union Street had actually been paid off,

U.S. v. Manafort

1  correct?

2  A.   No, I believe he said they were not moving forward with

3  that mortgage.

4          MR. NANAVATI:  Court's indulgence one moment.

5          THE COURT:  Yes.

6  BY MR. NANAVATI:

7  Q.   And, Ms. Francis, you sat down to be interviewed by the

8  Government on May 3 of 2018, correct?

9  A.   I believe that's the date, yes.

10 Q.   Okay.  And you were -- you were in Washington, D.C., for

11 that interview?

12 A.   Yes.

13 Q.   And you told the Government about that telephone call,

14 correct?

15 A.   Yes.

16 Q.   And at that time you told the Government that Mr. Gates

17 told you on that call that the mortgage had been paid off but

18 not yet removed from the insurance document.  Isn't that how

19 you said it at the time?

20 A.   I don't have recollection of that.

21 Q.   Do you -- do you have any reason to doubt FBI Special

22 Agent Sherine Ebadi --

23         MR. ASONYE:  Objection.  Objection.

24         THE COURT:  Yes, I'll sustain the objection.  You

25 can refresh your recollection by showing her anything.

U.S. v. Manafort

1           MR. NANAVATI:  Okay.

2           THE COURT:  Otherwise, you're seeking to introduce

3    it.  But show her the document.  See if it refreshes -- she's

4    just said she doesn't recollect that.  See if it refreshes her

5    recollection.

6           MR. NANAVATI:  Thank you, Your Honor.

7           Your Honor, I don't have a clean version of this

8    document handy so I might have to come back to that.

9           THE COURT:  Well, Mr. -- let's do it now.

10          MR. NANAVATI:  Okay.

11          (A pause in the proceedings.)

12          THE COURT:  If we can.

13          MR. NANAVATI:  Yes, Your Honor.

14          (A pause in the proceedings.)

15          MR. NANAVATI:  Is it acceptable if it has

16   highlighting and no writing?

17          THE COURT:  Do you have a problem with that,

18   Mr. Asonye?

19          MR. ASONYE:  No, Your Honor.

20          THE COURT:  All right.  Ladies and gentlemen, this

21   process may seem a little arcane.  But if a witness does not

22   recall something, it is appropriate for a lawyer to present

23   the witness with anything that might refresh his or her

24   recollection.

25          And then the lawyer will ask:  Does seeing this,

M. James - Cross

1   whatever it is -- now, he can't then read from the document

2   because the document itself is not admitted.  He's -- he'll

3   direct her to read something.  And he says:  Does seeing that

4   refresh your recollection?  Meaning, does it give you a

5   present recollection, as you sit here today, that you did say

6   that.

7           And if she says, yes, then we can go on.  If she

8   says, no, we'll see.

9   BY MR. NANAVATI:

10  Q.   So, Ms. James, if you could just take a look at that

11  without reading it out loud just to yourself.  I've turned you

12  to Page 7 of 9, but obviously feel free to orient yourself.

13  And if you could take a look, I believe it's the -- I can tell

14  you -- it is the -- it is the third full paragraph on the

15  page.

16          Do you see that, that paragraph?

17  A.   Yes.

18  Q.   Could you read that to yourself?  When you're done, set

19  it down and let me know if it refreshes your recollection from

20  that day.

21          (A pause in the proceedings.)

22          THE WITNESS:  It does not.

23  BY MR. NANAVATI:

24  Q.   It does not refresh your recollection?

25  A.   It does not.

U.S. v. Manafort

M. James - Cross

1799

1  Q.    Okay.  Thank you.  We can be done with that document.

2          So that telephone call in which Rick Gates calls

3  you, at some point after that later in the day Rick Gates

4  e-mails you some follow-up information, correct?

5  A.    Correct.

6  Q.    Okay.  And -- and is it fair to say around 5:37 p.m.,

7  that same day, Rick Gates e-mails you what are now old

8  insurance policies, correct?

9  A.    Correct.

10  Q.    And the old insurance policies that predate the

11  February 9, 2016, closing of the Genesis mortgage don't show

12  the genesis mortgage, correct?

13  A.    Correct.

14  Q.    Again, because there is no Genesis mortgage until

15  February 9, 2016, correct?

16  A.    That is correct.

17  Q.    And if you're aware, do you know whether Mr. Manafort was

18  also applying for a different type of loan on a different

19  property at this time with Citizens Bank?

20  A.    No, I did not.

21  Q.    Okay.  And if we could bring up Government Exhibit 237,

22  please?

23          THE COURT:  All right.  It's already admitted I take

24  it?

25          MR. NANAVATI:  Yes, Your Honor.

─────U.S. v. Manafort─────

M. James - Cross

1800

1    THE COURT:  All right.  You may do so.

2    BY MR. NANAVATI:

3    Q.   And if I could have you turn to the page that the last

4    four digits of its page number are 7526.  And could we put

5    that page up?

6    Is it fair to say that that's the part of the

7    insurance policy that properly discloses the Genesis mortgage

8    on the Union Street property?

9    A.   Yes.

10   Q.   I'm sorry?

11   A.   Yes.

12   Q.   Okay.  And that you received that on February the 23rd of

13   2016 at 6:17 p.m.?

14   A.   I believe so.

15   Q.   Okay.  If -- if you'd like to check I believe you can

16   turn to the first page of the exhibit.

17   A.   Yes.

18   Q.   Yes, that is when you received it?

19   A.   Yes.

20   Q.   You had mentioned earlier that -- that -- that you were

21   sort of shown a document that suggested that Mr. Manafort or

22   that showed, frankly, that Mr. Manafort reported on his 2015

23   tax return that Howard Street property was a rental, correct?

24   A.   I was not.

25   Q.   Okay.  Maybe you were asked:  Would it have been

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────U.S. v. Manafort─────
M. James - Cross                                          1801

1    something material to you to know that he had reported that

2    way?

3    A.   That's correct.

4    Q.   Okay.  And it would have been, right?

5    A.   It would have been, yes.

6    Q.   Okay.  And you don't know whether as of the March 4,

7    2016, closing date he had even filed his 2015 tax return, do

8    you?

9    A.   No, I do not.

10   Q.   And you don't know how Mr. Manafort reported that

11   property on his 2016 tax return, do you?

12   A.   No, I do not.

13   Q.   And, again, the year -- we're working with this 2016,

14   correct?

15   A.   Correct.

16   Q.   And you also don't know whether you're allowed to change

17   on one year tax return to the next whether you treat --

18   treating it -- ugh, scratch that.

19         You also don't know whether you can change your

20   designation of a property from residential to investment from

21   one year to the next on a tax return, do you?

22   A.   No, I do not.

23   Q.   You'd also mentioned that you interacted at least some

24   with a gentleman named Jeff Yohai, correct?

25   A.   I've never interacted with Jeff Yohai.

U.S. v. Manafort

M. James - Cross

1802

1   Q.   Okay.  Did you see his name on a document?

2   A.   On an e-mail.

3   Q.   On an e-mail.  Yes.

4        And do you know who Jeff Yohai is?

5   A.   I know that he's Mr. Manafort's son-in-law.

6   Q.   Son-in-law.

7        And is it fair to say you don't know whether

8   Mr. Manafort knew that Jeff Yohai had listed the apartment for

9   rental, do you?

10  A.   That's correct.

11  Q.   And if you could turn, but not display, Exhibit 225,

12  please.

13       And is it fair to say this is an e-mail from

14  Mr. Fallarino?

15  A.   Yes.

16  Q.   And your -- your coworker, correct?

17  A.   My manager at the time.

18  Q.   Yes.  And is it fair to say that Mr. Fallarino writes,

19  "It is important that the appraiser, when he visits the

20  property, is not under the impression that this is a rental

21  but knows the facts that this is your second home (shared with

22  Jeff and Jessica)"?

23       It does say that, right?

24  A.   It does.

25  Q.   And you're not aware of any reason why Mr. -- what the

─────U.S. v. Manafort─────

M. James - Cross

1803

1  things that Mr. Fallarino knows would not be shared with

2  people at the bank, do you?

3  A.   I do not.

4  Q.   In fact, Mr. Fallarino, as an -- was an employee of the

5  bank, correct?

6  A.   Correct.

7       MR. NANAVATI:  Court's indulgence, please.

8       THE COURT:  All right.

9  BY MR. NANAVATI:

10  Q.   And if I could turn you to Exhibit 246, please.

11       And if you could turn to the second to last page.

12  Do you have that in front of you?

13  A.   I do.

14  Q.   Do you remember being asked about that page on direct

15  examination?

16  A.   The second to last page?

17  Q.   Yes.

18  A.   That list the borrowers liabilities?  No.

19  Q.   I believe there should be a real estate owned section

20  there?

21  A.   That's the last page.

22  Q.   I apologize, the last page.

23       And does that have the real estate owned section

24  there?

25  A.   It does.

────────── U.S. v. Manafort ──────────

1  Q.   And when you were asked, you said that it shows zero

2  dollars for mortgages on Union Street, correct?

3  A.   Correct.

4  Q.   And because this is a March 4, 2016 document, that's

5  incorrect, right?

6  A.   I believe that would be the case -- yeah.

7  Q.   And is --

8          MR. NANAVATI:  Can I publish that page, Your Honor?

9          THE COURT:  Yes.  Is it -- it's already admitted,

10 isn't it?

11         MR. NANAVATI:  It is, Your Honor.

12         THE COURT:  Yes, you may do so.

13 BY MR. NANAVATI:

14 Q.   And in that list of documents -- I mean, in that list of

15 properties where it says here on the property address, we just

16 talked about Union Street.  Do you see Howard Street on there?

17 A.   I do.

18 Q.   And what does it show for mortgages on Howard Street?

19 A.   No mortgages as well.

20 Q.   Okay.  But isn't today, March 4, 2016, the day a mortgage

21 is closing on Howard Street?

22 A.   But this is filled out with the prior information.  So

23 the mortgage is going to be listed in the first page of the

24 1003.

25 Q.   Because there is no mortgage until a mortgage closes,

─────U.S. v. Manafort─────

1  correct?

2  A.    Correct.

3  Q.    And you were also asked about the fact that this

4  document, I won't point you to a page unless you need it,

5  shows zero dollars of net rental income; is that correct?

6  A.    Yes.

7  Q.    And is it fair to say you filled that out, correct?

8  A.    I filled that out based on the documentation I received.

9  Q.    And it was based on the documentation or representation

10  that it was not a rental property, correct?

11  A.    Correct.

12  Q.    And because it was represented as not being a rental

13  property, the net rental income had to be zero, correct?

14  A.    That's correct.

15  Q.    So if it was represented as a second residence,

16  necessarily, the net rental income is zero, correct?

17  A.    That's correct.

18  Q.    Now, isn't it true that a secondary residence can, in

19  fact, be rented out?

20  A.    That's true.

21  Q.    And can generate rental income, correct?

22  A.    It can.

23  Q.    And it's still a secondary residence, correct?

24  A.    That's correct.

25  Q.    And Fannie Mae is sort of the -- we'll call it maybe the

U.S. v. Manafort

1  governor, the -- I'll ask it a different way.

2          Fannie Mae is the government agency that imposes

3  many of the rules that Citizens Bank has to follow; is that

4  correct?

5  A.   If we're using that particular program, yes.

6  Q.   Yes.  And is it fair to say that as long as a property is

7  occupied by the borrower for at least some portion of the

8  year, it can be treated as a second residence, correct?

9  A.   Correct.  There's a certain period, time frame.

10  Q.   You're saying that under Fannie Mae's rules, there's a

11  certain time frame?

12  A.   I believe so, yes.

13  Q.   Okay.  Are you familiar enough with Fannie Mae's rules

14  that seeing them would refresh your recollection, or is this

15  just based on your understanding?

16  A.   This is just based on my understanding.

17  Q.   Fair enough.  And are you aware that the IRS has its own

18  rules on whether something is a residence or an investment

19  property?

20  A.   No, I do not.

21  Q.   Okay.  And you don't know how many days a person has to

22  be in the property to be a resident for IRS purposes, correct?

23  A.   No, that would be an underwriter's decision.

24  Q.   That would be?

25  A.   That would be an underwriter's decision.

1    Q.    Thank you.  And you're aware that the same person can

2    have more than one second home, correct?

3    A.    As long as it's in separate states, correct.

4    Q.    So second really means second or subsequent, correct?

5    A.    Correct.

6              MR. NANAVATI:  Court's indulgence.

7              THE COURT:  All right.

8              (A pause in the proceedings.)

9    BY MR. NANAVATI:

10   Q.    Could you turn to Government Exhibit 227, please?

11             And let me know, if you would, when you get there.

12   A.    I'm here.

13   Q.    Okay.  And that mortgage -- I mean, not mortgage, that

14   document has sort of an electronic signature, signifying that

15   it was signed January 27, 2016?

16   A.    Correct.

17   Q.    Okay.  And it shows that there's no mortgage on Union

18   Street, correct?

19   A.    Correct.

20   Q.    As of January 27, 2016, correct?

21   A.    That's correct.

22   Q.    And you filled out that document, correct?

23   A.    Based on the application provided by the client, yes.

24   Q.    Yes.  Thank you.

25             THE COURT:  Ms. James, could I ask you, once again,

U.S. v. Manafort

1   please, speak up just a little bit, please.

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  Thank you.  Next question.

4           MR. NANAVATI:  Thank you, Your Honor.

5   BY MR. NANAVATI:

6   Q.   Could I have you turn, Ms. James, to Government

7   Exhibit 224, please?

8           And if you could just let me know when you're there.

9   A.   I'm here.

10  Q.   Okay.  And in that document, that's dated January 15 of

11  2016, correct?

12  A.   Yes.

13  Q.   And, again, as of January 15, 2016, there's no mortgage

14  according to that document on the Union Street property,

15  correct?

16  A.   Based on the application I received, correct.

17  Q.   And in that same document, there's an e-mail from Paul

18  Manafort to David Fallarino, correct?

19  A.   On the first page?

20  Q.   Yes, I believe.

21  A.   I just see two e-mails from Mr. Fallarino to

22  Mr. Manafort.

23          THE COURT:  I couldn't hear that.

24          THE WITNESS:  I just see two e-mails from

25  Mr. Fallarino to Mr. Manafort.  I believe it's on the second

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

M. James - Cross

1809

1    page.

2    BY MR. NANAVATI:

3    Q.   Oh, thank you.

4    A.   Yes.

5    Q.   Okay.  And do you see Mr. Manafort telling Mr. Fallarino,

6    "There was no application in the package of documents.  I

7    assume that is correct and it will be forthcoming, am I

8    correct?"

9            Do you see that?

10   A.   I do, yes.

11   Q.   And that e-mail is from January the 15 of 2016, correct?

12   A.   Correct.

13           (A pause in the proceedings.)

14           MR. NANAVATI:  Court's indulgence, please.

15           THE COURT:  All right.

16           (A pause in the proceedings.)

17   BY MR. NANAVATI:

18   Q.   And on direct, you had said that Mr. Manafort told you

19   that when he's unreachable, Rick Gates is the person to deal

20   with, correct?

21   A.   Yes.

22   Q.   And is it fair to say that as of February the 24 at

23   11:55 a.m., when you thanked Mr. Manafort for the

24   clarification about the mortgage, you were under the

25   impression that there was, indeed, a mortgage on Union Street?

U.S. v. Manafort

1    A.   Can I see that e-mail again, please?

2    Q.   Sure.  Could you please turn to Government's Exhibit 241?

3            THE COURT:  Would you put it on the screen for her?

4    It's admitted, isn't it?

5            MR. NANAVATI:  Yes, Your Honor.

6            THE COURT:  Put it on the screen for her, please.

7            Ms. James, you can also look at the screen.  But you

8    can do either one or both, if you wish.

9            THE WITNESS:  Thank you, Your Honor.

10   BY MR. NANAVATI:

11   Q.   And do you see the 10:55 a.m. e-mail from Mr. Manafort at

12   the bottom of the page?

13   A.   Yes.

14   Q.   And is it fair to say that -- and then do you see your

15   11:56 a.m. response at the top of the page?

16   A.   I do.

17   Q.   And is it fair to say that as of your response, thanking

18   Mr. Manafort for the clarification, things for you were

19   clarified?

20   A.   Correct.

21   Q.   And they were clarified that there was a mortgage on

22   377 Union Street, correct?

23   A.   I believe so, yes.

24   Q.   And it wasn't until you got a telephone call from

25   Mr. Gates later that day that things went off the rails,

1  correct?

2  A.   I guess if you call it "off the rails," yes.

3       MR. NANAVATI:  Court's indulgence.

4       THE COURT:  All right.

5       (A pause in the proceedings.)

6       MR. NANAVATI:  No further questions, Your Honor.

7       THE COURT:  All right.  Any redirect?

8       MR. ASONYE:  Yes, Your Honor.

9       MR. NANAVATI:  Your Honor, just for housekeeping,

10 could we move to admit Defense Exhibit 32, the one that we had

11 initially tussled over, but then kind of came together.

12      THE COURT:  All right.  Any objection to that?

13      MR. ASONYE:  No objection, Your Honor.

14      THE COURT:  Admitted.

15                      (Defendant's Exhibit No. 32

16                       admitted into evidence.)

17      THE COURT:  Proceed.

18                  **REDIRECT EXAMINATION**

19 BY MR. ASONYE:

20 Q.   Ms. James, Mr. Nanavati asked you about Fannie Mae loan

21 rules and how long something had to be rented for it to be

22 called a rental property; is that correct?

23 A.   Yes, that's correct.

24 Q.   Do you know, in fact, how many days this 29 Howard Street

25 was rented?

─────U.S. v. Manafort─────

M. James - Redirect                                                    1812

1   A.   I do not.

2   Q.   Let me show you Government Exhibits 337L and M, if we

3   could put them side by side.

4          MR. ASONYE:  Your Honor, these are previously

5   admitted.

6          THE COURT:  All right.

7   BY MR. ASONYE:

8   Q.   Pages 13 and 14.  And you can -- you'll see it on your

9   screen.  This is the 2015 and 2016 tax returns for MC Soho

10  Holdings for the 29 Howard Street property.

11         And if you could look closely, does it say how many

12  days this property was rented for in 2015 and 2016?

13  A.   365.

14  Q.   For both years?

15  A.   Yes.

16  Q.   Under Fannie Mae rules, would it be called anything else

17  other than a rental?

18  A.   No, it would not.

19  Q.   And Mr. -- defense counsel asked you some questions about

20  Mr. Manafort's communications with Mr. Yohai, right?

21  A.   I believe so.

22  Q.   Jeff Yohai.

23         MR. ASONYE:  Your Honor, at this time, the

24  Government would move to admit Government Exhibit 422, which

25  is an e-mail between Paul Manafort and Jeff Yohai.

U.S. v. Manafort

1           THE COURT:  Any objection?

2           MR. NANAVATI:  No, Your Honor.

3           THE COURT:  Admitted.

4                        (Government's Exhibit No. 422

5                         admitted into evidence.)

6           MR. ASONYE:  May we display it, Your Honor?

7           THE COURT:  You may.

8    BY MR. ASONYE:

9    Q.   If we could zoom in on the top e-mail.

10          Could you -- could you just read that e-mail?

11   A.   (As read): "Jeff, the appraiser for Howard Street is

12   calling to make an appointment to view the condo.  Can you

13   please call Justin to arrange a time for him to access the

14   apartment.  Remember, he believes that you and Jessica are

15   living there.  Let me know when you have arranged it.

16   Thanks."

17   Q.   Now, at Citizens Bank, is the bank allowed to have

18   communication with the appraisers?

19   A.   No.

20   Q.   Why not?

21   A.   Because we can't influence any decision that the

22   appraiser makes.

23   Q.   So they're supposed to be independent?

24   A.   Correct.

25   Q.   All right.  And then let me -- I want to make sure we

─────U.S. v. Manafort─────

M. James - Redirect                                                    1814

1  understand the timeline with respect to the 377 Union Street

2  mortgage.

3  A.   Okay.

4  Q.   Okay.  Defense counsel asked you what your understanding

5  was as of February 24 and he said something about going off

6  the rails.  What was your final understanding the night of

7  February 24, 2016, about whether there was a mortgage on Union

8  Street?

9  A.   I believe that there was no mortgage on Union Street.

10 Q.   And, in fact, if we could turn to Government Exhibit 242.

11 If we could publish that, which is already admitted, and we

12 can zoom in on the top of that e-mail.

13        After you had that call with Rick Gates, did you

14 receive this e-mail?

15 A.   Yes, I did.

16 Q.   Okay.  And that's the night of February 24, 2016?

17 A.   Yes.

18 Q.   That's after Mr. Manafort said that the mortgage had been

19 approved on the Union Street?

20 A.   Correct.

21 Q.   Okay.  And is Mr. Manafort copied on this e-mail?

22 A.   He is.

23 Q.   And does the subject line indicate that there are no

24 mortgages listed on both the Baxter Street property and the

25 Union Street property?

┌─────────────────────U.S. v. Manafort─────────────────────┐

1815

1    A.    Correct.

2    Q.    And was that your final understanding?

3    A.    Yes.

4    Q.    So let me also show you Government Exhibit 235.

5          And if we could zoom in on the bottom e-mail, is

6    this an e-mail from you to Paul Manafort?

7    A.    Yes, it is.

8    Q.    Okay.  And what's the date of that e-mail?

9    A.    February 20, 2016.

10   Q.    Now, Mr. Nanavati, I think he asked you some questions.

11   He read a stipulation to you about a Genesis mortgage on Union

12   Street, do you recall that?

13   A.    Yes.

14   Q.    Do you recall him telling you that the mortgage on the

15   Union Street property from Genesis was added on February 9,

16   2016?

17   A.    Yes.

18   Q.    Okay.  Now, your e-mail to Mr. Manafort, is that after

19   February 9, 2016?

20   A.    No, it's February 20, 2016.

21   Q.    Yes, and is that after February 9?

22   A.    Yes, it is.

23   Q.    Okay.  And you ask -- what do you say in No. 3, at the

24   very bottom of that e-mail?  What are you asking for?

25   A.    The most current policies.

M. James - Redirect

1816

1  Q.   Okay.  So at that time on February 20, after the Genesis

2  mortgage is on there, would you have expected Paul Manafort to

3  tell you there's a $5.3 million mortgage on Union Street?

4  A.   Yes.

5  Q.   Is that why you asked?

6  A.   Yes.

7  Q.   And then if we could turn on the loan application, which

8  was dated March 4, 2016, was that yet another opportunity for

9  Mr. Manafort to disclose that he had a $5.3 million mortgage

10  on the Union Street property?

11  A.   Yes.

12  Q.   What's the purpose of having people sign their documents

13  at the closing?

14  A.   To confirm that all the information is correct.

15  Q.   Now, Mr. -- defense counsel asked you a lot of questions

16  about your communications with Richard Gates, do you remember

17  those?

18  A.   Yes.

19  Q.   As far as you know, did Mr. Gates receive one penny from

20  this cash-out refinance mortgage?

21  A.   Not that I know of.

22  Q.   Who got all the money from this mortgage?

23  A.   Mr. Manafort.

24       MR. ASONYE:  No further questions, Your Honor.

25       THE COURT:  Any recross based on that?

1          MR. NANAVATI:  Yes, please, Your Honor.

2                    **RECROSS-EXAMINATION**

3   BY MR. NANAVATI:

4   Q.   Ms. James, the e-mails from Mr. Gates conveying the --

5   we'll call them outdated insurance policy to you, that was

6   on -- late in the day, February 24, correct?

7   A.   Correct.

8   Q.   And, in fact, you had received from Mr. Gates the day

9   before, the correct insurance policy, correct?

10  A.   Correct.

11  Q.   And Mr. Manafort had been copied on that, too, correct?

12  A.   Yes.

13  Q.   And you also received them from a representative of an

14  insurance company, didn't you?

15  A.   Yes.

16  Q.   Also on February 23?

17  A.   Yes.

18  Q.   And to clarify your -- the conflict, is when you asked

19  for clarification, correct?

20  A.   Yes.

21  Q.   And you don't have any idea whether that e-mail late in

22  the day on the 24, on which Mr. Manafort is copied, you don't

23  have any idea whether he scrolled down to the -- to see the

24  dates on the insurance policies, do you?

25  A.   I do not.

┌─────────────────────────────────────────────────────────────┐

U.S. v. Manafort
M. James - Recross
                                                          1818

1   Q.   And you were also asked about an e-mail where you asked

2   Mr. Manafort on February the 20 for documentation that all

3   those properties, including Union Street, were held free and

4   clear, correct?

5   A.   Yes.

6   Q.   And "free and clear" means no mortgage, right?

7   A.   Yes.

8   Q.   And, in fact, it was in response to that request that you

9   got the documentation showing the mortgage, correct?

10  A.   Correct.

11  Q.   And, in fact, it was Mr. Manafort who responded saying, I

12  will get you that documentation within 48 hours, correct?

13  A.   Yes.

14  Q.   And 48 hours and 14 minutes later, you had confirmation

15  of the mortgage, correct?

16  A.   I did.

17  Q.   And you had a confirmation of the confirmation by

18  Mr. Manafort the next morning, correct?

19  A.   Correct.

20  Q.   And you thanked him for the confirmation of the

21  confirmation, correct?

22  A.   I did.

23          MR. NANAVATI:  No further questions, Your Honor.

24          THE COURT:  All right.  Thank you.

25          You may step down and you may be excused.

└─────────────────────────────────────────────────────────────┘

D. Evenson - Direct

1819

1           (Witness excused.)

2           THE COURT:  Who is your next witness, Mr. Asonye?

3           MR. ASONYE:  Darin Evenson, Your Honor.

4           THE COURT:  And how long will this witness take?

5   MR. ASONYE:  On direct 15 minutes.

6           THE COURT:  All right.  Let's see if we can do it.

7   Let's call him.

8           Come forward and take the oath, please, sir.

9           Thereupon,

10                          **DARIN EVENSON,**

11  having been called as a witness on behalf of the Government

12  and having been first duly sworn by the Deputy Clerk, was

13  examined and testified as follows:

14          (Witness seated.)

15          THE COURT:  All right.  Mr. Asonye, you may proceed.

16          MR. ASONYE:  Thank you, Your Honor.

17                       **DIRECT EXAMINATION**

18  BY MR. ASONYE:

19  Q.   Could you please state and spell your name for the

20  record?

21  A.   My name is Darin Evenson, D-a-r-i-n E-v-e-n-s-o-n.

22  Q.   And what city and state do you live in?

23  A.   I live in Lake Oswego, Oregon.

24  Q.   How far did you go in school?

25  A.   I graduated from the U.S. Naval Academy.  I earned two

D. Evenson - Direct

1820

1  master's degrees from the naval postgraduate school; one in

2  space systems operation and one in information technology

3  management.  And I have a MBA from the Wharton School at the

4  University of Pennsylvania.

5          THE COURT:  Mr. Evenson, I'll ask you to speak up if

6  you would, please.

7          THE WITNESS:  Okay.

8          THE COURT:  Thank you.

9          THE WITNESS:  Yes, Your Honor.

10 BY MR. ASONYE:

11 Q.   And, sir, after your graduation, could you briefly

12 describe your employment history?

13 A.   After I graduated from the U.S. Naval Academy, I was a

14 Navy Seal for 22 years, a Navy Seal officer.  I served in

15 Operation Iraqi Freedom, Operation Enduring Freedom, and other

16 countries around the world.  And my final assignment was the

17 seal team commander in Hawaii.

18 Q.   And are you currently employed?

19 A.   I am employed.

20 Q.   Where do you work?

21 A.   I work at Airbnb.

22 Q.   What is Airbnb?

23 A.   Airbnb is a internet website that allows you to book a

24 stay at a property for a night or longer.  The website allows

25 for a host to list their property on the website, and it

D. Evenson - Direct

1821

1   allows guests to search for that property and book a place to

2   stay in accordance with their preference.

3   Q.   And how long have you worked at Airbnb?

4   A.   I've worked at Airbnb for almost two and a half years.

5   Q.   What's your title?

6   A.   My title is the director of customer experience for North

7   America.

8   Q.   And what are your duties, generally?

9   A.   My duties are to oversee the operational teams that

10  handle all inbound customer contacts from social media,

11  payments, and normal customer issues they might have.

12  Q.   Sir, there's a binder next to you, if you could take

13  that.

14          Did Airbnb receive a subpoena from the Federal

15  Government?

16  A.   That's correct, they did.

17  Q.   And was that subpoena related to a property located at

18  29 Howard Street in New York?

19  A.   That's correct.

20  Q.   Did your company produce records in response to that

21  subpoena?

22  A.   That's correct, we did.

23  Q.   And are some of those records contained in Government

24  Exhibits 118, 119, and 120?

25  A.   That's correct.  These are some of the records.

─────────U.S. v. Manafort─────────

D. Evenson - Direct

1822

1   Q.   And have you previously reviewed these records in your

2   preparation for your testimony?

3   A.   Yes, I have.

4   Q.   Were all of those records created by a person with

5   knowledge at or near the time of the event?

6   A.   Yes, that's correct.

7   Q.   Is it the regular practice of Airbnb to make such

8   records?

9   A.   Yes, it is the regular practice of business to keep these

10  records.

11  Q.   And is it -- were these records created and maintained in

12  the ordinary course of business?

13  A.   Yes.

14  Q.   Are they your business records?

15  A.   That's correct, they are business records.

16  Q.   And do they all relate to 29 Howard Street?

17  A.   That's correct.

18          MR. ASONYE:  Your Honor, the Government moves 118,

19  119, and 120 into evidence.

20          MR. NANAVATI:  Without objection, Your Honor.

21          THE COURT:  All right.  It's admitted.  You really

22  do need all these pages?

23          MR. ASONYE:  Actually, for 118 we really don't need

24  all the pages, but it is the complete exhibit.  So I'm

25  happy -- we're happy to reduce it.

U.S. v. Manafort

D. Evenson - Direct

1823

1    THE COURT:  Yes, do reduce it.  I mean, sending back

2  a lot of documents that aren't really pertinent, aren't really

3  relevant, don't play any role.  There may be some kind soul on

4  the jury who thinks they need to leaf through all this stuff,

5  and it isn't true.

6    MR. ASONYE:  So with respect, Your Honor, Government

7  Exhibit 118, which is the bulky exhibit, the Government only

8  needs the first 11 pages.

9    THE COURT:  All right.  That's fine.  Do you have

10  any problem with that?

11    MR. NANAVATI:  No, Your Honor.

12    THE COURT:  All right.  First 11 pages of 118 are

13  admitted.  And you may display as many or as few of them as

14  you need to.

15                    (Government's Exhibit No. 118

16                    admitted into evidence.)

17    MR. ASONYE:  It will be few, Your Honor.

18  BY MR. ASONYE:

19  Q.  Let's turn to Government Exhibit 120.

20    MR. ASONYE:  May we publish, Your Honor?

21    THE COURT:  Yes.

22  BY MR. ASONYE:

23  Q.  Can you explain -- let's just look at the first page.

24  Can you explain what is -- what is this document?

25  A.  This document is a printout from our systems that

─────U.S. v. Manafort─────

D. Evenson - Direct

1824

1     describes the reservation.

2     Q.    And is this a one reservation for 29 Howard Street?

3     A.    This first page is just one reservation, that's correct.

4     Q.    And are there multiple reservations contained within

5     Government Exhibit 120?

6     A.    That's correct.

7     Q.    Do those reservations span between 2015 and 2016?

8     A.    That is correct.

9     Q.    And so, for example, if we can turn to the second to the

10    last page of the exhibit.

11          Okay.  Is that a reservation in 2016, in April of

12    2016?

13    A.    Yes, that's correct.  April 9, 2016.

14    Q.    Okay.  Now, if we could turn back to the first page, I

15    just want you to walk through this reservation and explain

16    what happened --

17          THE COURT:  You already offered this particular

18    exhibit?

19          MR. ASONYE:  Yeah, we offered all three, Your Honor.

20          THE COURT:  I see.  All right.  Proceed.

21          MR. ASONYE:  And if -- I apologize, I should have

22    said, "Yes, Your Honor."

23    BY MR. ASONYE:

24    Q.    Let me turn back to the first page.  And do you see where

25    it says, "Host ID"?

U.S. v. Manafort

1           What is host ID?

2   A.    Host ID is a unique identifier for the host that lists a

3   property on Airbnb.

4   Q.    And then what does the start date mean?

5   A.    The start date means the start of the reservation in this

6   instance.

7   Q.    And in this instance, what is the start date of the

8   reservation?

9   A.    The start date is January 18, 2015.

10  Q.    The next line says, "Nights."

11          What does that mean?

12  A.    The nights field represents the number of nights that --

13  of the reservation.  So this was a four-night stay.

14  Q.    And the guest charge amount, what does that mean?

15  A.    The guest charge amount was -- it means the amounts

16  that -- in U.S. dollars in this instance, that the guest was

17  charged to stay at the property.

18  Q.    Okay.  And so in this case was the guest charged $1,978?

19  A.    That's correct.

20  Q.    And then if you could skip down to payout amount, what is

21  that?

22  A.    The payout amount field in this record indicates the

23  amount that was sent to the host as a payout for the execution

24  of this reservation.

25  Q.    And is it sort of lower than the charge amount because of

D. Evenson - Direct

1826

1   Airbnb's fees?

2   A.   That is correct.

3   Q.   And then, finally, if you -- well, is there payout

4   address?  What's listed on this document as the payout

5   address?

6   A.   This document indicates that the payout address was

7   29 Howard Street, Apartment No. 4.

8   Q.   And then finally at the very bottom there's an account,

9   ACH account name.

10          What goes in that field?

11  A.   The host sets the name for the account to be paid out,

12  and in this case it's Jeff Yohai.

13  Q.   And I assume you don't know who Jeff Yohai is?

14  A.   I do not.

15  Q.   Okay.  If we could look quickly at one other reservation

16  on Page 8.

17          What is the start date of this reservation?

18  A.   This record indicates that the start date of the

19  reservation was June 3, 2015.

20  Q.   And how many nights was it reserved for?

21  A.   This was for 21 nights.

22  Q.   And is that -- and for Airbnb is that sort of a long-term

23  rental or longer rental?

24  A.   This is a -- this is longer than a normal stay on Airbnb,

25  but --

┌─────────────── U.S. v. Manafort ───────────────┐

D. Evenson - Direct                                      1827

1   Q.   Okay.  And then if you see --

2              THE COURT:  But what?  I didn't hear.

3              THE WITNESS:  This is longer than a normal stay on

4   Airbnb.

5              THE COURT:  You then went on to say "but."

6              Did you finish your answer?

7              THE WITNESS:  I did, Your Honor.

8              THE COURT:  All right.  Next question.

9   BY MR. ASONYE:

10  Q.   And do you see payout amount here?  Is it in dollars, the

11  payout amount?

12  A.   That's correct.

13  Q.   What was the payout amount for this reservation?

14  A.   The payout amount for this reservation was $11,640 U.S.

15  Q.   All right.  Now, let me show you Government Exhibit 118.

16  Oh, I'm sorry, it should be 119.

17             MR. ASONYE:  And may we publish the first page, Your

18  Honor?

19             THE COURT:  Yes, you may.

20  BY MR. ASONYE:

21  Q.   What is Government Exhibit 119?

22  A.   119 is a printout from our system that has a description

23  of the listing on Airbnb.

24  Q.   Okay.  And here again is the property location 29 Howard

25  Street?

─────U.S. v. Manafort─────

D. Evenson - Direct

1828

1    A.    That's correct.

2    Q.    What is the listing name?

3    A.    The listing name, as indicated on this record, is Amazing

4    Full Floor Loft in Soho.

5    Q.    Okay.  And what's the date that this listing was created

6    and then updated?

7    A.    This record indicates the listing was created on May 7,

8    2015, at 5:22 p.m. local time.

9    Q.    And then was it updated November 7, 2015, as well?

10   A.    That's correct, at 4:13 a.m. local time.

11   Q.    Now, next to room type there's an entry.  What does it

12   say?

13   A.    This record indicates that the room type is the entire

14   home or, slash, apartment.

15   Q.    So what does that mean?

16   A.    So this means that the classification of the property on

17   Airbnb would be that the guest staying in this place would

18   have complete access to the entire home or apartment for this

19   stay.

20   Q.    And then, finally, there's a section called -- well,

21   would that mean all two bedrooms of this apartment, if you

22   look at the -- one, two three -- fifth row from the bottom

23   that the guest would have access to the entire unit?

24   A.    Yes, that's correct.

25   Q.    Okay.  And then above the beds there's a field for max

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

D. Evenson - Direct

1829

1    nights.  What does it say there?

2    A.    The max night field here indicates 1,125.

3    Q.    What does that setting mean?  Can you explain to the jury

4    what that means?

5    A.    So this setting on Airbnb is a default setting.  If it is

6    not changed by the host, the default is 1,125 nights.  But the

7    host can change that, can modify that.

8    Q.    So does that mean there was no restriction on how long

9    somebody could have potentially rented this unit?

10   A.    That's correct.  This has to also -- you know, in

11   reference to the calendar that the host sets for the property

12   itself.  But there is no restriction listed here on the

13   listing description for the max number of nights.

14   Q.    And for Government's Exhibit 119, is it fair to say there

15   are a number of different listings for 29 Howard Street in

16   this exhibit?

17   A.    That's correct, there are a number of listings.

18   Q.    And do they span into 2015 and 2016?

19   A.    That's correct.

20   Q.    And then, finally, if I can have you look at Government

21   Exhibit 118.

22         MR. ASONYE:  May we publish, Your Honor?

23         THE COURT:  Yes.

24   BY MR. ASONYE:

25   Q.    Could you explain what Government's Exhibit 118 is?

─────────────── U.S. v. Manafort ───────────────

D. Evenson - Direct

1830

```
 1              THE COURT:  Or the 11 pages of it.
 2              MR. ASONYE:  Yes, Your Honor.  We're not going to
 3   look at all 11.
 4   BY MR. ASONYE:
 5   Q.   Can you explain what that is?
 6   A.   Exhibit 118 is a printout from our system that shows
 7   whether or not this listing was active on the Airbnb platform.
 8   Q.   And if you -- and does this listing relate exclusively to
 9   29 Howard Street in New York?
10   A.   That's correct.
11   Q.   Now, if you look at Pages 1 through 11, what does this
12   exhibit show about whether 29 Howard Street was listed on the
13   Airbnb website and available to be searched between
14   January 2015 and April 28, 2016?
15   A.   There's a specific column on this record, which is dim as
16   active, and that is a binary field.  It's either a 1 or a 0.
17   If that field indicates a 1, that means that it is active and
18   available for search on the Airbnb.com platform.
19   Q.   Okay.  I want to point -- if we could move to Page 8.
20   Well, actually, let's first jump to Page 11.  And except for a
21   brief break that we're going to talk about, was this listing
22   active all the way from January 1, 2015, to on Page 11,
23   February 28, 2016?
24   A.   That is correct.  In my review of these records there are
25   actually two breaks.
```

─────────U.S. v. Manafort─────────
D. Evenson - Direct

1831

1  Q.   Okay.  When was the -- so let's talk about the first

2  break.

3  A.   Okay.

4  Q.   Okay.  If you could turn to page -- well, at least the

5  first break that I'm aware of -- Page 10.  And if we could

6  zoom in on the time period around the end of February '16 and

7  beginning March of '16 of Page 10.

8         Okay.  When does the first break occur?

9  A.   The first break occurs on February 26th of 2016 to

10  March 26th of 2016.

11  Q.   So what happened, according to Airbnb's records, on

12  February 26, 2016, between that and March 26, 2016?

13  A.   The listing, with the listing ID No. 9550696, was no

14  longer active for search on Airbnb.com platform.

15         And then a listing with a different listing ID for

16  the same property was -- or for the same listing came on with

17  a listing ID of 12055738.

18  Q.   So the -- I'm sorry.  Go ahead.

19  A.   Starting on March 27th of 2016.

20  Q.   So the property was delisted at the end of February of

21  2016 and then relisted again in -- on March 27, 2016?

22  A.   That's correct.

23  Q.   And that -- March 27, 2016, is after March 4, 2016,

24  correct?

25  A.   That is correct.

─────U.S. v. Manafort─────

D. Evenson - Direct                                                    1832

1   Q.   And then you said there's one other break?

2   A.   There is.  On Page 8, if you look at Page 8, I believe.

3   Q.   And where does that break occur?

4   A.   That break occurs near the top at Row 3.  You can see on

5   October 27, 2015, there's a break between that listing at that

6   address being active on the Airbnb.com platform through

7   November 20th of 2015.

8   Q.   And does -- finally, does Airbnb tie the hosts to

9   particulars of individuals host -- do you have to identify

10  yourself as a host within your system?

11              THE COURT:  Do you understand the question?

12              THE WITNESS:  That's correct.

13              THE COURT:  I'm sorry, I asked you if you understood

14  the question.

15              THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

16              THE COURT:  I'm not sure I do.

17              MR. ASONYE:  Sure.

18              THE COURT:  Re-ask.

19  BY MR. ASONYE:

20  Q.   Does a host have to identify themselves to Airbnb in

21  their database?

22  A.   That's correct.  Each host has a unique host ID.

23  Q.   Okay.  Was Paul Manafort a host on Airbnb, as far as you

24  know?

25  A.   I'm not aware -- I'm not aware that Paul Manafort was a

─────────────────────────────

─────U.S. v. Manafort─────

1833

1    host on Airbnb.

2          MR. ASONYE:  All right.  No further questions.

3          THE COURT:  How long do you think your

4    cross-examination will take, Mr. Nanavati?

5          MR. NANAVATI:  20 minutes, Your Honor.  Or less.

6          THE COURT:  Good answer.

7          But it's lunchtime.  I don't know how much of your

8    lunch is hot so we're not going to postpone it.  We'll do it

9    after lunch.

10          Mr. Evenson, you may step down, sir.  During the

11   luncheon recess you may not discuss your testimony with

12   anyone.  We're going to reconvene at 1:30.  And if what I

13   heard is accurate, we'll be done with you in 15 or 20 minutes.

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  All right.  Pass your books to the

16   right.  Mr. Flood, as always, will collect them, lock them up,

17   and maintain their security.  Remember to refrain from

18   discussing the matter.

19          You may go ahead and file out, sir.  Thank you.

20          Remember not to undertake any investigation or

21   discuss the matter with anyone.  You may follow Mr. Flood out.

22          (Jury dismissed.)

23          THE COURT:  All right.  Court stands in recess until

24   1:30.

25          MR. ANDRES:  Your Honor, may I just inquire about

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

U.S. v. Manafort

1834

1 one matter before we recess?

2          THE COURT:  Yes, you may.

3          MR. ANDRES:  I just wanted to make sure I was

4 keeping my promise about finishing up.  Do you have a sense of

5 what time we'll end today?

6          THE COURT:  5:30.

7          MR. ANDRES:  5:30.  Okay.  And then -- okay.  So and

8 then to the extent we don't -- I don't anticipate we'll rest

9 today, but I think we are still on track for resting tomorrow.

10 Okay.  Thank you, Judge.

11          THE COURT:  Glad to hear that.

12          MR. ANDRES:  Thank you.

13          THE COURT:  Now, but that raises the question that

14 you need to be prepared, Mr. Nanavati, and others.  I'm going

15 to ask you whether you have evidence you wish to offer, and

16 you can give me some sense of how much time it will take so I

17 can make judgments about when it should be done.  There will

18 also be an opportunity for you -- for which one of you, I

19 don't know, to offer any motions that you may have and I'll

20 consider those.  And then we'll move on.

21          MR. ANDRES:  Judge, would we also have a charge

22 conference on Friday or would that be on -- I'm not sure what

23 the Court's practices are, but with respect to the jury

24 instructions.

25

U.S. v. Manafort

1    THE COURT:  I think it's likely we will have it.

2  And before we have that, I will distribute to you a package of

3  instructions consisting of a sort of sandwich.  Opening

4  instructions, I have a standard group of that that I'll give

5  you; and closing instructions are pretty standard.  And then

6  sandwiched in between will be the substantive instructions.

7    The fact that I have standard opening and closing

8  instructions does not foreclose you from suggesting additional

9  or changes or whatever.  I'll consider those.

10    But you have a sort of uphill battle.  As I have --

11  those are fairly standard instructions.  So you will have that

12  in advance of an instructions conference.  You will also be

13  required to disclose to opposing counsel whether you have any

14  objections to the package.

15    And if so, what is the nature and grounds for the

16  objection.  And the party to whom an objection is addressed

17  has the responsibility to tell the objecting party why you

18  disagree with him.  The purpose, of course, is for me to hear

19  focused argument so that one side or the other doesn't hear

20  for the first time what the objection is and what the response

21  is.

22    Do you have any other questions about the charged

23  conference?  I don't know now when it would be.  It certainly

24  won't be today.

25    MR. ANDRES:  Just wanted to get -- just understand

U.S. v. Manafort

1836

1  the scheduling, and we'll speak with our colleagues as well to

2  make sure they understand when we think tomorrow we'll rest

3  whether we -- if there's a need to make other witnesses

4  available and the like.

5       But I don't have any other questions at this moment,

6  Judge.  Just one last thing.  There is, before we close, one

7  outstanding motion that we filed with respect to the admission

8  of the FBAR.  We can deal with that later, but I just wanted

9  to put Your Honor --

10      THE COURT:  Yes, we can deal with that later.

11      MR. ANDRES:  Thank you, Judge.

12      THE COURT:  I recall in this case there was a -- an

13  issue that came up pretrial involving discovery -- or not a

14  discovery order, sort of a discovery order.  And I -- I signed

15  an order, but I don't see it entered.  I'll check with

16  Ms. Pham, and see, because it is not even on the docket.

17      But that order -- because it's a standard order that

18  I use, and that order included a requirement about 404(b) that

19  is part of the motion you're suggesting.  Right?

20      MR. ANDRES:  Not entirely, Judge.  Well, so there's

21  a couple of issues.  I'm not suggesting a 404(b) issue.  I'm

22  suggesting an issue that came up during the testimony of Paul

23  Liss from FinCEN and Your Honor's ruling as to what could be

24  admitted, which FBAR lack of records certifications.  Your

25  Honor allowed for it to come in for Mr. Manafort and

U.S. v. Manafort

1837

1  Mrs. Manafort and not for DMP on the -- on the caveat that

2  defense counsel not argue that the -- that the accounts for

3  DMP and the like and we filed the motion subsequently --

4          THE COURT:  All right.  So the issue, then, that you

5  want me to decide is whether you should now be permitted to

6  add that entity to the evidence.

7          MR. ANDRES:  Correct.

8          THE COURT:  Do you have any objection to that?

9          MR. ZEHNLE:  Your Honor, I'm the one who handled

10  that particular motion, and I do object to it and I stand by

11  my objections that I made.

12          THE COURT:  I can't hear you.

13          MR. ZEHNLE:  I'm sorry.

14          Your Honor, I'm sorry.  Yes, I do stand by those

15  objections that we had at the -- at the sidebar.

16          THE COURT:  Yes.  What he wants to do now is to add

17  to the husband and wife this entity for that same four-year

18  period that's in the indictment.

19          Do you have a problem with that.

20          MR. ZEHNLE:  I do, Your Honor, because the

21  Government charged that it was Mr. Manafort, and Mr. Manafort

22  alone, that failed to file those FBARs for four years.  And

23  they're consistently trying to get this Court to put in all of

24  this additional evidence of certifications of entities and

25  people that aren't related to Mr. Manafort or referenced in

U.S. v. Manafort

1838

1  the superseding indictment.

2          THE COURT:  Well, the Government has submitted a

3  brief, which I'm sure you received, on this issue.  Am I

4  right, Mr. Andres?

5          MR. ANDRES:  Yes, Your Honor.

6          THE COURT:  So you need to respond to it.  Tell me

7  in writing why you think the Government is wrong about that.

8          MR. ZEHNLE:  Your Honor, we'll be more than happy to

9  do so.  The reason we didn't file anything sooner is that it

10  was a brief.  It wasn't a motion for reconsideration by this

11  Court and under this Court's --

12          THE COURT:  Well, that's what this is, in effect.

13          MR. ZEHNLE:  Okay.  That's fine.

14          THE COURT:  It is, in effect, a motion for

15  reconsideration.  Am I correct, Mr. Andres?

16          MR. ANDRES:  Yes, Your Honor.

17          THE COURT:  All right.  And so you need to respond.

18          MR. ZEHNLE:  Okay.  Very well.

19          THE COURT:  Anything further at this time?

20          MR. ANDRES:  Not important, Judge, but there is not,

21  as I understand it, a discovery order in this case.  There was

22  some litigation about that.  The Government moved for one.

23  Defense counsel critically didn't respond, and didn't agree to

24  sign one.  And so I'm not sure it's relevant at this point,

25  but there is not -- as I understand it, the standard discovery

U.S. v. Manafort

1839

1   order was not entered.

2          THE COURT:  Well, I think the record supports what

3   you say.  But I have a recollection of saying something at the

4   time that I'm going to enter this order and I recall signing

5   it.  And I think I recall giving it to the deputy clerk.  And

6   it may have been my error that it didn't get entered.  But I

7   don't typically try cases, especially extended cases, where I

8   don't enter a discovery order.  And Mr. Asonye knows that.

9   But if it isn't entered, it isn't entered.

10          MR. ANDRES:  Generally follow the guidelines in the

11  order notwithstanding that, that is, we did provide 404(b) and

12  expert notice and the like subject to the -- to the standard

13  practice.  So I'm not sure it matters.

14          THE COURT:  All right.  But just to get back to

15  where we were, you're going to give me something about why --

16  what's the name of this entity again?

17          MR. ANDRES:  DMP International and Davis Manafort

18  Partners.

19          THE COURT:  All right.  Whether I should allow the

20  Government to introduce evidence that there was nothing filed

21  on behalf of this entity regarding FBARs.  Is that what you

22  wish?

23          MR. ANDRES:  Yes, Your Honor.

24          THE COURT:  All right.  Court stands in recess, and

25  we'll stand in recess until 1:30.

U.S. v. Manafort

1840

1    (Lunch Recess 12:35 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8    **MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in said

9    court on the 9th day of August, 2018.

10         I further certify that the foregoing 120 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this August 9, 2018.

17

18

19

20

21   _____
     Tonia M. Harris, RPR
22   Official Court Reporter

23

24

25

                                                           1841