UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
UNITED STATES OF AMERICA,      .  Criminal Action No.
                               .  1:18-CR-83
        versus                 .
                               .
PAUL J. MANAFORT, JR.,         .
                               .  August 7, 2018
            Defendant.         .  Volume VI-P.M.
------------------------------x

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              UZO ASONYE, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 GREG D. ANDRES, SAUSA
                                 BRANDON L. VAN GRACK, SAUSA
                                 Special Counsel's Office
                                 U.S. Department of Justice
                                 950 Pennsylvania Avenue, N.W.
                                 Washington, D.C. 20530

FOR THE DEFENDANT:               JAY ROHIT NANAVATI, ESQ.
                                 BRIAN P. KETCHAM, ESQ.
                                 Kostelanetz & Fink LLP
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001
                                   and
                                 THOMAS E. ZEHNLE, ESQ.
                                 Law Office of Thomas E. Zehnle
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1311 - 1446)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1312

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANT:              KEVIN M. DOWNING, ESQ.
                                    Law Office of Kevin M. Downing
3                                   601 New Jersey Avenue, N.W.
                                    Suite 620
4                                   Washington, D.C. 20001
                                      and
5                                   RICHARD W. WESTLING, ESQ.
                                    Epstein, Becker & Green, P.C.
6                                   1227 25th Street, N.W.
                                    Washington, D.C. 20037

7    OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
8                                   U.S. District Court, Fifth Floor
                                    401 Courthouse Square
9                                   Alexandria, VA 22314
                                    (703)299-8595

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1313

1                                    INDEX

2

   WITNESS                          EXAMINATION        PAGE
3

4  RICHARD GATES (Resumed)
                                    DIRECT             1314
5                                   CROSS              1361

6

7
                            E X H I B I T S
8
   Government Exhibit No. 391 was received            1315
9  Government Exhibit No. 392 was received            1316
   Government Exhibit No. 398 was received            1328
10 Government Exhibit No. 377 was received            1329
   Government Exhibit No. 400 was received            1331
11
   Government Exhibit No. 403 was received            1334
12 Government Exhibit No. 405 was received            1336
   Government Exhibit No. 407 was received            1338
13 Government Exhibit No. 408 was received            1340
   Government Exhibit No. 409 was received            1341
14
   Government Exhibit No. 406 was received            1342
15 Government Exhibit No. 411 was received            1343
   Government Exhibit No. 399 was received            1348
16 Government Exhibit No. 402 was received            1350
   Government Exhibit No. 393 was received            1353
17
   Defendant's Exhibit No. 14 was received            1411
18 Defendant's Exhibit No. 15 was received            1415

19

20

21

22

23

24

25

 1                    A F T E R N O O N   S E S S I O N

 2                         (Defendant present, Jury out.)

 3              THE COURT:  All right.  You may call the jury,

 4    please.

 5                         (Jury present.)

 6              THE COURT:  All right.  You may be seated.

 7              Ladies and gentlemen, I hope your lunches were

 8    adequate, satisfactory.  Good.

 9              All right.  We'll proceed.  Let's bring Mr. Gates

10    back, please.

11    RICHARD GATES, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, RESUMED

12              THE COURT:  You'll recall, sir, you remain under

13    oath.

14              THE WITNESS:  I understand, Your Honor.

15              THE COURT:  You may resume the stand.

16              And, Mr. Andres, you may complete your direct

17    examination.

18              MR. ANDRES:  Thank you, Your Honor.

19                   DIRECT EXAMINATION (Cont'd.)

20    BY MR. ANDRES:

21    Q.   Mr. Gates, did you know whether or not Mr. Manafort was

22    involved in applying for a loan from the Banc of California?

23    A.   Yes, he was.

24    Q.   Were you involved in providing information to the bank for

25    that loan?

1   A.    I was.

2   Q.    Why were you involved?

3   A.    Mr. Manafort asked me to get a team of individuals,

4   including the accountants and bookkeeper, to pull together the

5   relevant documents for the loan application.

6   Q.    Can I ask you to take a look at Government Exhibit 391?

7   Do you have that document?  What is included in Government

8   Exhibit 391?

9   A.    This is an e-mail among myself, Mr. Manafort, and

10  Mr. Yohai in regards to the bank loan and the required

11  documents from the bankers.

12  Q.    What bank loan?

13  A.    This is for Banc of California.

14  Q.    And who's Mr. Yohai?

15  A.    Mr. Yohai is Mr. Manafort's son-in-law.

16          MR. ANDRES:  The Government moves to admit Government

17  Exhibit 391.

18          MR. DOWNING:  No objection.

19          THE COURT:  Admitted.

20          (Government Exhibit No. 391 was received in

21  evidence.)

22  BY MR. ANDRES:

23  Q.    If you can look at the bottom of the first page with

24  respect to that e-mail, there's an e-mail at 8:24 a.m.  Do you

25  see that?

1   A.   I do.

2   Q.   Okay.  Mr. Manafort writes:  "Rick, you are the

3   quarterback.  All information needs to go to you."

4        What did you understand that to mean?

5   A.   That means I was the point person designated with pulling

6   together all of the documents from the various individuals.

7   Q.   And with respect to this loan from the Banc of California,

8   who's the loan for?

9   A.   I understood it to be for Mr. Manafort.

10  Q.   Did you -- were you expecting or intending to get any of

11  the funds extended by the bank?

12  A.   No.

13  Q.   Can you look at Government Exhibit 392?  Can you tell me

14  what that is?

15  A.   Yes.  As part of the document package that needed to be

16  put together, the banks required a response to specific

17  questions about Mr. Manafort's properties.  Mr. Yohai, I

18  believe, and myself put this together and sent it to

19  Mr. Manafort for review.

20        MR. ANDRES:  The Government moves to admit 392, Your

21  Honor.

22        MR. DOWNING:  No objection.

23        THE COURT:  Yes, it's admitted.

24        (Government Exhibit No. 392 was received in

25  evidence.)

1           MR. ANDRES:  May I publish it?

2           THE COURT:  Yes, you may.

3    BY MR. ANDRES:

4    Q.   This e-mail in 392, it relates to the Banc of California

5    loan, Mr. Gates?

6    A.   It does.

7    Q.   And the e-mail from Mr. Manafort makes a reference-- the

8    top e-mail, can you tell me who that's from and who it's to?

9    A.   Yes.  It's to me from Mr. Manafort.

10   Q.   At what time?

11   A.   3:55 p.m.

12   Q.   And after Mr. Manafort writes, "Rick," can you read the

13   last sentence?

14   A.   Yes.

15           "I need to see the P&L and then we are fine."

16   Q.   And what did you understand that to mean?

17   A.   This is in reference to the profit and loss statement that

18   was required by the bank as one of the documents.

19   Q.   And based on your time at -- working for Mr. Manafort, who

20   created those documents?

21   A.   Ms. Washkuhn.

22   Q.   May I ask you to take a look at Government Exhibit 140?

23           MR. ANDRES:  This is in evidence, Your Honor.

24           THE COURT:  All right.

25           MR. ANDRES:  May I publish it?

1            THE COURT:  Yes, you may.

2    BY MR. ANDRES:

3    Q.   I ask you to take a look at the Government's Exhibit 140.

4    Can you tell me what this is?

5    A.   Yes.  This is an e-mail exchange between myself and

6    Ms. Washkuhn in terms of obtaining the profit and loss

7    statement for 2015.

8    Q.   And why are you asking Ms. Washkuhn for the P&L?

9    A.   I'm asking Ms. Washkuhn for the P&L because we need to add

10   additional income into the P&L in order to obtain an income

11   level that was equal to or close to prior years.

12   Q.   Did you need to alter the document?

13   A.   Yes.

14   Q.   And who directed you to get the P&L?

15   A.   Mr. Manafort did.

16   Q.   Who directed you to alter it?

17   A.   Mr. Manafort.

18   Q.   Can you look at the last e-mail in the chain from

19   Ms. Washkuhn at March 16th, 7:18 a.m.?

20            Can you read that e-mail?

21   A.   Yes.

22            (As read):  "Can you send me the Word document

23   version of the 2015 P&L for DMP International before

24   11:00 a.m.?  Paul wants me to add the accrual revenue, which we

25   have not received yet, in order to send it to the Banc of

Gates - Direct                                                          1319

1   California.   I have the PDF version you sent but it is slanted

2   and not completely clear."

3   Q.   When you say a Word version, what does that mean?

4   A.   A Word version is a Word document version that can be

5   edited more easily than a PDF document.

6   Q.   Okay.   And you said accrual revenue.   Did DMP have accrual

7   revenue?

8   A.   It was accrued revenue from 2014, not 2015.   This related

9   to the Opposition Bloc contract that had not been fully paid.

10  Q.   And the P&L that you're asking for is in what year?

11  A.   The P&L is for 2015.

12  Q.   And at that time, did DMP keep its books on a cash basis

13  or accrual basis?

14  A.   A cash basis.

15  Q.   And what's the difference?

16  A.   The difference is that cash basis records revenue the year

17  that you receive it.

18  Q.   And if you're keeping your books on a cash basis, can

19  you -- has it ever been your experience that you can add

20  accrual revenue?

21  A.   No.

22  Q.   Okay.   Look at Mrs. -- Ms. Washkuhn's response at 10:21.

23  When you're sending these e-mails, do you know where she is and

24  where you are?

25  A.   I believe I'm in Virginia and she's in California.

1    Q.    Okay.  Does -- how does she respond?

2    A.    "Hi, Rick.  I can resend the PDF, but there is no Word

3    version.  These are generated directly from our accounting

4    software."

5    Q.    Okay.  And do you write back?

6    A.    I do.

7    Q.    What did you write?

8    A.    I said:  "The version I have looks to be scanned and then

9    sent which is why it is not clear.  If you can send me the

10   original PDF version generated by the system that would be

11   great and work."

12   Q.    Okay.  And Ms. Washkuhn says that she can send it in about

13   an hour.  What's your response to that?

14   A.    I say:  "I am confused.  Why can't you e-mail the version

15   generated by your system?  Scanning does not work.  Your

16   scanner does not work well.  You should be able to send the

17   electronic version by e-mail."

18   Q.    And what time are you asking her to send it to you by?

19   A.    I had asked her to send it to me by 11:00 a.m. East Coast

20   time.

21   Q.    Okay.  Were you in a hurry to get these documents?

22   A.    Yes.

23   Q.    Why?

24   A.    Because Mr. Manafort in the earlier e-mail had indicated

25   that we needed to have all the documents to the bank by

Gates - Direct                                                    1321

1    9:00 a.m. Pacific time.

2    Q.   Okay.  And how does Ms. Washkuhn respond?  She says --

3    where it says, "The system prints," can you read that?

4    A.   "The system prints financial statements.  From there the

5    only way to e-mail them to you is to scan them and e-mail them.

6    That is our only option unless you want a hard copy in the

7    mail."

8    Q.   Okay.  And with respect to the -- your response to her,

9    what do you say about the accrued revenue?

10   A.   I ask her in any case, if she can't send a PDF version, if

11   she can add the amount of the accrued revenue on her end.

12   Q.   And what did she say?

13   A.   She says:  "Can't make that change on my end.  Books are

14   on cash basis, not accrual."

15   Q.   And what did you understand that to mean?

16   A.   Meaning that she couldn't take income from either prior

17   year or successive year and actually attribute it to the

18   current year.

19   Q.   And did you ultimately get a copy of this P&L?

20   A.   Not one that I could use.

21   Q.   Okay.  When you say "not one that you can use," what do

22   you mean by that?

23   A.   Meaning that she had sent the scanned version that I had

24   but that was in no position to be able to be edited.  So I

25   created a separate page for this document.

Gates - Direct                                                    1322

1  Q.   You ultimately altered the document?

2  A.   Yes.

3  Q.   Let me ask you to take a look first at Government

4  Exhibit 138.

5           MR. ANDRES:  This is in evidence, Your Honor.

6           THE COURT:  All right.

7           MR. ANDRES:  May I publish it to the jury?

8           THE COURT:  You may.

9  BY MR. ANDRES:

10  Q.   What is Government Exhibit 138?

11  A.   This is an e-mail from Ms. Lauren Tanner, who worked for

12  Ms. Washkuhn at her firm.

13  Q.   Okay.  And what does she attach?

14  A.   She attaches a copy of the DMP P&L.

15  Q.   And this is what you were requesting from Ms. Washkuhn?

16  A.   Yes.

17  Q.   Can you look on the 12th page -- is there an attachment?

18  A.   There is.

19  Q.   What is the attachment?

20  A.   The attachment is the statement of assets and liabilities

21  and balance sheet and P&L for DMP.

22  Q.   Okay.  Can you turn to the 12th page, which records the

23  net income?

24  A.   Okay.

25  Q.   What is recorded as the net income as of December 31,

Gates - Direct                                                          1323

1  2015?

2  A.   Net income is recorded as $400,744.

3  Q.   Okay.  Can you turn to --

4           MR. ANDRES:  The Government moves -- oh, it's in.

5  BY MR. ANDRES:

6  Q.   Can you turn to Government Exhibit 139?

7           MR. ANDRES:  And this is also in evidence, Your

8  Honor.

9           THE COURT:  All right.

10 BY MR. ANDRES:

11 Q.   139.  Do you see that document, Mr. Gates?

12 A.   I do.

13          MR. ANDRES:  May I publish it, Your Honor?  May I

14 publish it, Your Honor?

15          THE COURT:  You may.

16 BY MR. ANDRES:

17 Q.   Okay.  Can you look at the top e-mail here?

18 A.   Yes.

19 Q.   What is -- what is the document -- can you tell us who

20 it's from and summarize the document for the jury?

21 A.   Sure.  It's from me to Lauren Tanner, copying Heather

22 Washkuhn.

23 Q.   Okay.

24 A.   And then I indicate to her that, based on my previous call

25 with Ms. Washkuhn, the revised P&L had not been updated to

Gates - Direct                                                      1324

1   reflect the accrued income.

2   Q.   Okay.  And why were you trying to add the accrued income?

3   A.   To help bolster Mr. Manafort's income number in that year

4   for the bank application.

5   Q.   Okay.  And let me ask you to turn to Government

6   Exhibit 298.

7           MR. ANDRES:  That's admitted already, Your Honor.

8           THE COURT:  All right.

9   BY MR. ANDRES:

10  Q.   What's included in Government Exhibit 298?

11          MR. ANDRES:  May I publish it, Your Honor?

12          THE COURT:  You may.

13          THE WITNESS:  This is an e-mail on Mr. Manafort's

14  bankers at Banc of California that ultimately includes me,

15  copying Mr. Manafort and Mr. Yohai, and it attaches the 2015

16  P&L statement.

17  Q.   Does it attach the copy of the P&L statement that you

18  received from Lauren Tanner?

19  A.   It does not.

20  Q.   Can you take a look at the exhibit at 111, the Bates --

21  Government Exhibit 298, Bates stamp 111.

22  A.   Okay.

23  Q.   And can I ask you to zoom in on the net income?

24          What is the net income that's listed in this

25  document?

1   A.   The net income is $4.45 million.

2   Q.   And is that the same net income that -- or is that the

3   same document that you got from Ms. Washkuhn's firm?

4   A.   No, it is not.

5   Q.   And how is it different?

6   A.   It's a -- it adds approximately $6 million of income.

7   Q.   Who added that?

8   A.   I did.

9   Q.   And how did you come up with that figure?

10  A.   That figure included the loan forgiveness of 1.5 million

11  from the Peranova loan, and then it included the accrued

12  revenue of 2.6 million as well.

13  Q.   And with respect to the Peranova loan, when was that

14  earned?

15  A.   It was actually earned around 2012.

16  Q.   So did it belong in the 2015 P&L?

17  A.   No.

18  Q.   And with respect to the accrued interest, when did that

19  occur?

20  A.   The accrued income occurred in 2014.

21  Q.   And was it appropriate to add accrued interest into this

22  P&L?

23  A.   No.

24  Q.   Why not?

25  A.   Because the books were on a cashier basis according to

Gates - Direct                                                      1326

1    Ms. Washkuhn.

2    Q.   Was the document that you submitted attached to the e-mail

3    on March 16, 2016, to the Banc of California, was it accurate?

4    A.   It was not.

5    Q.   Was it false?

6    A.   Yes.

7    Q.   With respect to how much in income was it false?

8    A.   Yes.  Oh, how much?  Approximately $6 million.

9    Q.   Okay.  Let me ask you, with respect to Citizens Bank, did

10   there come a time that Mr. Manafort applied for another loan at

11   Citizens Bank?

12   A.   Yes, he did.

13   Q.   Did that relate to the Union Street property?

14   A.   It did.

15   Q.   And was there an issue again with respect to the Peranova

16   loan?

17   A.   Yes.

18   Q.   Can I ask you to turn to Government Exhibit 169?

19              MR. ANDRES:  This is already in evidence, Your Honor.

20              THE COURT:  All right.

21              MR. ANDRES:  May I publish it?

22              THE COURT:  You may.

23   BY MR. ANDRES:

24   Q.   What is included in Government Exhibit 169?

25   A.   This is an e-mail string among David Fallarino, Cindy

1  Laporta, Mr. Yohai, and Mr. Manafort in regards to information

2  that is needed for that second loan.

3  Q.   Okay.  And are you included in the e-mail as well?

4  A.   Yes.  Later I'm added to the e-mail.

5  Q.   And what did you understand the issue to be now as to the

6  second loan in Peranova?

7  A.   There are two issues.  The first, as I understood, was

8  that the -- there was an issue with ordinary business income

9  and distribution income, and then also, again, there was an

10 issue with the amount of income that Mr. Manafort had for that

11 given year.

12 Q.   And what did the income have to equal?

13 A.   Either kind of equal to or around the prior year.

14 Q.   And why is that?

15 A.   Because that's what was required by the bank in order to

16 obtain the loan.

17 Q.   And in 2016, was DMP's income around or equal to what it

18 was in 2014?

19 A.   No.

20 Q.   Why not?

21 A.   Because DMP had no clients at that time.

22 Q.   Can I ask you to turn to Government Exhibit 398?

23      Can you tell me what that is?

24 A.   Yes.  This is an e-mail string including Ms. Laporta,

25 Mr. Manafort, and myself in regards to the income issue that

Gates - Direct                                                    1328

1   Mr. Fallarino raised, and Ms. Laporta is going to begin the tax

2   preparation for that year, which is required by the bank for

3   the loan application, but the question that arises is the

4   income level.  And I write an e-mail to Mr. Manafort indicating

5   that --

6   Q.   Let me just stop you there.

7           MR. ANDRES:  Your Honor, may I move in Government

8   Exhibit 398?

9           THE COURT:  Yes, but let him finish his answer.

10          MR. ANDRES:  Sorry.

11          THE WITNESS:  Okay.  And I indicated to Mr. Manafort

12  that we're not going to have anywhere near the 2014 income

13  level for 2016.

14          THE COURT:  All right.  Any objection to the

15  admissibility of that exhibit?

16          MR. DOWNING:  No, Your Honor.

17          THE COURT:  It's admitted.

18          (Government Exhibit No. 398 was received in

19  evidence.)

20          THE COURT:  Next question.

21          MR. ANDRES:  May I publish it?

22          THE COURT:  I beg your pardon?

23          MR. ANDRES:  May I publish it?

24          THE COURT:  You may.

25  BY MR. ANDRES:

Gates - Direct                                                            1329

1    Q.   You testified that Cindy Laporta and others are on this

2    e-mail string.

3         With respect to the top e-mail alone, who's on that

4    e-mail?

5    A.   On that e-mail, it's just myself and Mr. Manafort.

6    Q.   Okay.  And what are you informing Mr. Manafort in this

7    e-mail?

8    A.   I'm informing him that we're not even going to come close

9    to the income level of 2014.

10   Q.   And, again, why is that?

11   A.   Because DMP at that time has no clients.

12   Q.   Can I ask you to turn to Government Exhibit 377?

13        Can you tell me what that is?

14   A.   This is an e-mail chain between myself and Mr. Manafort.

15   Q.   Okay.  And it relates to the Citizens Union loan?

16   A.   It does.

17   Q.   Is there a response to the e-mail in the prior exhibit?

18   A.   Yes.

19        MR. ANDRES:  The Government moves to admit 377.

20        MR. DOWNING:  No objection.

21        THE COURT:  It's admitted.

22        (Government Exhibit No. 377 was received in

23   evidence.)

24        MR. ANDRES:  Can I publish it?

25        THE COURT:  You may.

Gates - Direct                                                          1330

1    BY MR. ANDRES:

2    Q.   With respect to the top e-mail, does Mr. Manafort respond

3    to your -- your concerns about the level of income?

4    A.   He does.

5    Q.   Okay.  Can you read that e-mail at the top?

6    A.   Yes.  (As read): "Let's talk around 9 a.m.  I sent him an

7    e-mail that there was no way that he would have the 2015 tax

8    filing before October.  We can count the account receivables

9    from Ukraine approximately 2.5 million.  Send me the P&L that

10   we used for the other refis before we speak."

11   Q.   Okay.  And, again, the reference to the accounts

12   receivable?

13   A.   That's the reference to the money that had been earned in

14   2014 that had not been paid for that contract.

15   Q.   And it didn't relate to the 2015 P&L?

16   A.   It did not.

17   Q.   Can I ask you to turn to Government Exhibit 400?

18        Can you tell me what this is?

19   A.   Yes.  This is an e-mail response from Mr. Manafort to

20   Mr. Fallarino with regards to a number of documents that need

21   to be pulled together for the loan.

22        MR. ANDRES:  The Government seeks to admit Government

23   Exhibit 400.

24        MR. DOWNING:  No objection.

25        THE COURT:  Admitted.

Gates - Direct                                                          1331

1              (Government Exhibit No. 400 was received in

2    evidence.)

3              MR. ANDRES:  May I publish it?

4              THE COURT:  Yes.

5    BY MR. ANDRES:

6    Q.   With respect to the top e-mail, Mr. Gates, what does

7    Mr. Manafort write to David Fallarino?

8    A.   (As read): "David, I have asked Rick Gates to call you.

9    Among other responsibilities Rick manages the company and my

10   personal assets.  He will work with you to get what you need."

11   Q.   Okay.  At this time were you managing Mr. Manafort's

12   company?

13   A.   I was doing a lot of the administrative day-to-day items.

14   Q.   How about his personal assets?

15   A.   No.

16   Q.   Did you ever have any control over his personal assets?

17   A.   No.

18   Q.   Okay.  With respect to this loan, do you continue to work

19   on gathering information for the bank?

20   A.   Yes.

21   Q.   If you look below, there's an e-mail from Mr. Fallarino to

22   Mr. Manafort.  Do you see that?

23   A.   I do.

24   Q.   Can you read the first paragraph?

25   A.   (As read): "Without using 2015 taxes, we will have to get

Gates - Direct                                                        1332

1    creative in terms of income (The K1 income versus distributed

2    income on the DMP returns knocks us down significantly)."

3    Q.   And who's writing that e-mail?

4    A.   Mr. Fallarino.

5    Q.   And where does he work?

6    A.   Citizens Bank.

7    Q.   Okay.  And then what does he say in the second paragraph

8    with respect to Cindy Laporta?

9    A.   (As read): "I will get a letter from Cindy stating that

10   the 2015 K-1 income will be equal to the distribution income."

11   Q.   Can I ask you to take a look at Government Exhibit 173?

12            Can you tell me what that is?

13   A.   Yes.  This is the letter that Mr. Manafort asked me to

14   draft and send to Cindy in regards to the ordinary versus

15   distribution income.

16   Q.   Okay.  And this, again, relates to the Peranova loan?

17   A.   It does.

18   Q.   And this is a different loan application now?

19   A.   Correct.

20   Q.   Okay.

21            MR. ANDRES:  And the Government -- this is in

22   evidence, Your Honor.

23            THE COURT:  All right.

24            MR. ANDRES:  Can I publish it?

25            THE COURT:  Yes.  Has it already been -- we're not

Gates - Direct                                                    1333

1  reviewing testimony you've already elicited from someone else,

2  are we?

3           MR. ANDRES:  I believe Ms. Laporta may have testified

4  to several facts that Mr. Gates has his own information about

5  the loan.

6           THE COURT:  All right.  Proceed.

7  BY MR. ANDRES:

8  Q.   Can you summarize this e-mail for the jury?

9  A.   Yes.  This is a draft letter that I sent to Ms. Laporta in

10 order to fulfill Mr. Fallarino's request.

11 Q.   Okay.  And what does the letter -- can I turn to the

12 letter?

13          What can you tell me about the letter?

14 A.   Yes.  The purpose of the letter is to attest that the loan

15 forgiveness can be counted in the income of DMP.

16 Q.   And did you send that letter to Ms. Laporta?

17 A.   I did.

18 Q.   And what did she do with it?

19 A.   She, in the end, actually rewrote the letter and then sent

20 it to Mr. Fallarino.

21          MR. ANDRES:  Can I focus on the second-to-last line?

22 Q.   With respect to the line for the tax year 2015, is that

23 the part of the letter which Ms. Laporta changed?

24 A.   She changed more than just that, but, yes, that's one area

25 she changed.

1  Q.   She revised the letter?

2  A.   She did.

3  Q.   Okay.  Can you take a look at Government Exhibit 403?

4       Can you tell me what that is?

5  A.   Again, it's an e-mail chain initially starting with

6  Mr. Fallarino and Mr. Manafort, indicating that the letter has

7  been attached.

8  Q.   Okay.  And it's now been changed?

9  A.   Yes.

10      MR. ANDRES:  The Government moves to admit Government

11  Exhibit 403.

12      MR. DOWNING:  No objection.

13      THE COURT:  Admitted.

14      (Government Exhibit No. 403 was received in

15  evidence.)

16  BY MR. ANDRES:

17  Q.   With respect to the top e-mail, who wrote the top e-mail?

18  A.   Mr. Fallarino.

19  Q.   The top e-mail at 5-6-2016?

20  A.   5-6-2016.

21  Q.   Do you have Exhibit 403?

22  A.   403, yes.  I have to Mr. Fallarino, copying Ms. Rodriguez,

23  from Mr. Manafort.

24  Q.   Okay.  And can you read that e-mail?

25      MR. ANDRES:  May I publish this, Your Honor?

Gates - Direct                                                          1335

1              THE COURT:  Yes.

2              MR. ANDRES:  Focus on the top e-mail.

3    BY MR. ANDRES:

4    Q.   Who's writing that e-mail?

5    A.   Mr. Manafort is.

6    Q.   And what does he say?

7    A.   (As read): "Rick, please deal with Fallarino regarding the

8    change he needs in Laporta letter due this morning."

9    Q.   Okay.  And Mr. Manafort is asking you to do what?

10   A.   Seek the change in the letter that he requested.

11   Q.   And does that letter provide accurate information to the

12   bank?

13   A.   No, it does not.

14   Q.   How is it inaccurate?

15   A.   It states that I think Mr. Manafort's primary address is

16   different than the one they used.

17   Q.   But in terms of the letter from Cindy Laporta, what -- was

18   that letter accurate?

19   A.   Yes.  She includes the Peranova income in the ordinary

20   income in the letter for that year.

21   Q.   Okay.  And can I ask you to turn to Government

22   Exhibit 174?

23              What is that?

24   A.   This is the letter that Ms. Laporta wrote and sent to

25   Mr. Fallarino.

1            MR. ANDRES:  This is already in evidence, Your Honor.

2            THE COURT:  All right.

3    BY MR. ANDRES:

4    Q.   So you've been through the process of revising the letter;

5    is that right?

6    A.   Yes.

7    Q.   Mr. -- was Mr. Manafort updated as to each and every

8    effort with respect to that letter?

9    A.   Yes.

10   Q.   And then it's sent to the bank?

11   A.   It is.

12   Q.   And when it's sent to the bank, who sends it to the bank?

13   A.   Ms. Laporta sends it to the bank.

14   Q.   Can I ask you now to turn to Government Exhibit 405?

15          Can you tell me what Government Exhibit 405 is?

16   A.   Yes.  It's an e-mail exchange among Mr. Manafort,

17   Ms. Laporta, Ms. Washkuhn, later copying me on the -- asking

18   for them to send Mr. Manafort the 2015 P&L.

19          MR. ANDRES:  Your Honor, the Government moves to

20   admit 405.

21          MR. DOWNING:  No objection.

22          THE COURT:  Admitted.

23          (Government Exhibit No. 405 was received in

24   evidence.)

25          MR. ANDRES:  May I publish it?

1              THE COURT:  Yes, you may.

2    BY MR. ANDRES:

3    Q.   And can I focus on the top e-mail?

4              With respect to the document, you said that

5    Mr. Manafort is seeking the P&L.  Do you see on the top e-mail

6    what -- what the date of the P&L is?

7    A.   Yes.  It's July 31, 2016.

8    Q.   And in the top e-mail, does Mr. Manafort make a request of

9    you?

10   A.   He does.

11   Q.   What does he say?

12   A.   He asked me:  How do I convert the PDF document into a

13   Word document?

14   Q.   And as you understand it, when the P&L comes from

15   Ms. Washkuhn's firm, what form does it come in?

16   A.   It comes in a PDF format.

17   Q.   When Mr. Manafort said, "How do I convert into non-PDF

18   Word document," what did you understand that to mean?

19   A.   That he wanted me to convert it from PDF to a Word format

20   for his use.

21   Q.   Can you take a look at Government Exhibit 407?

22             What is this e-mail?

23   A.   This is a follow-on e-mail to the previous one in which I

24   respond to Mr. Manafort's e-mail about the document conversion.

25             MR. ANDRES:  Okay.  The Government moves to admit

1   407, Your Honor.

2              MR. DOWNING:  No objection.

3              THE COURT:  Admitted.

4              (Government Exhibit No. 407 was received in

5   evidence.)

6              MR. ANDRES:  May I publish it?

7              THE COURT:  Yes, you may.

8   BY MR. ANDRES:

9   Q.   Can I focus on the middle e-mail?

10             When Mr. Manafort writes, "How do I convert into

11  non-PDF Word document," what do you respond?

12  A.   I respond that I can do it and will send to him.

13  Q.   Okay.  And what time did you respond to that?

14  A.   2:01 p.m.

15  Q.   And then did Mr. Manafort inquire again?

16  A.   Yes.

17  Q.   And what did you say?

18  A.   I said, "About 15 minutes.  Almost home."

19  Q.   Okay.  And when you say "almost home," where are you going

20  to at this point?

21  A.   In Richmond.

22  Q.   Did you ultimately convert this document into a non-PDF?

23  A.   I did.

24  Q.   And when Mr. Manafort says "non-PDF," what do you

25  understand that to mean?

1    A.    Understand that to mean that he is going to make some sort

2    of change to it.

3    Q.    Okay.  You're going to convert it into what form or what

4    type of document?

5    A.    Into a Word document.

6    Q.    Okay.  And that's a word processing-related application?

7    A.    Yes, correct.

8    Q.    Can I ask you to take a look at Government Exhibit 408?

9    A.    Okay.

10   Q.    What is contained in Government Exhibit 408?

11   A.    This is the 2016 P&L document that I convert from a PDF to

12   a Microsoft Word document and send to Mr. Manafort.

13   Q.    This is the original document Mr. Manafort sent to you?

14   A.    It is.

15   Q.    Okay.  And when you convert a document from a PDF to a

16   Word or a word processing document, what, if anything, happens

17   to it?

18   A.    In often cases, depending on the complexity of the various

19   fonts and graphics used, the alignments can be messed up when

20   you convert the document.  Also, some of the numbers can change

21   to symbols.

22          MR. ANDRES:  Your Honor, the Government moves to

23   admit Government Exhibit 408 and asks to publish it.

24          MR. DOWNING:  No objection.

25          THE COURT:  Admitted.  You may do so.

Gates - Direct                                                    1340

1              (Government Exhibit No. 408 was received in

2    evidence.)

3    BY MR. ANDRES:

4    Q.   Focusing on the first e-mail, who is the e-mail from?

5    A.   The e-mail is from me.

6    Q.   From who?

7    A.   From me to Mr. Manafort.

8    Q.   And what's attached?  Can I show you the first attachment?

9    A.   Yes.  The attachment is the July 31, 2016, P&L statement.

10   Q.   Okay.  And there are various parentheses and other letters

11   and numbers mixed together.  What's that a result of?

12   A.   That's a result of converting it from a PDF to a Word

13   document format.

14   Q.   When you look at the net -- have you changed the numbers

15   here at all?

16   A.   No.

17   Q.   So when you look at the net income or loss, what was the

18   net income or loss of the document when you sent it to

19   Mr. Manafort?

20   A.   The net loss was $638,000.

21   Q.   Okay.  And then this is the document sent to Mr. Manafort?

22   A.   Yes.

23   Q.   And in what version is it in?

24   A.   Word document.

25   Q.   Can I ask you to take a look at Government Exhibit 409?

Gates - Direct                                                          1341

1              What is that?

2    A.    This is an e-mail to me from Mr. Manafort in regards to a

3    revised P&L he has attached.

4    Q.    And when he says revised P&L, what do -- what do you think

5    he means by that?

6    A.    When I saw the document, I saw that he had changed the

7    income number.

8              MR. ANDRES:   The Government moves to admit 409.

9              MR. DOWNING:   No objection.

10             THE COURT:   Admitted.

11             (Government Exhibit No. 409 was received in

12   evidence.)

13             MR. ANDRES:   May I publish it?

14             THE COURT:   Yes, you may.

15   BY MR. ANDRES:

16   Q.    Okay.   In terms of the first document, when Mr. Manafort

17   writes in all caps, what is he conveying to you?

18   A.    That he's attached the revised P&L and to call him and

19   discuss this and other matters.

20   Q.    Okay.   And can you turn to the next page?

21             And can you focus on net income?

22             What is listed as the net income?

23   A.    Net income is $3 million.

24   Q.    Okay.   And is the format of the document different?

25   A.    It is.

Gates - Direct                                                    1342

1   Q.   Okay.  And as of September of 2016, did DMP International

2   have any clients?

3   A.   It did not.

4   Q.   Were they making any money?

5   A.   No.

6   Q.   Was the number that Mr. Manafort included there, was it

7   accurate?

8   A.   No.

9   Q.   Was it off by how much money approximately?

10  A.   About 4.2 million.

11  Q.   Okay.  Can I ask you to turn to Government Exhibit 406?

12       Can you tell me what's included in Government

13  Exhibit 406?

14  A.   Yes.  It's an e-mail from Mr. Manafort to me.

15  Q.   And --

16  A.   Asking to convert the document and send to him.

17       MR. ANDRES:  The Government moves to admit Government

18  Exhibit 406 and seeks to publish it.

19       MR. DOWNING:  No objection.

20       THE COURT:  You may -- yes, it's admitted.  You may

21  do so.

22       (Government Exhibit No. 406 was received in

23  evidence.)

24  BY MR. ANDRES:

25  Q.   With respect to the top e-mail, who's that from?

1    A.    Mr. Manafort.

2    Q.    What does he ask you to do?

3    A.    He's asking me to convert the PDF -- convert the document

4    to a PDF and send to him.

5    Q.    And what's attached?

6    A.    Attached is the 2016 P&L statement that he modified.

7    Q.    Okay.  And with respect to the net income, what's listed

8    in the attachment?

9    A.    Net income is 3 million.

10   Q.    Okay.  And is that an accurate statement of DMP

11   International's P&L as of September 2016?

12   A.    It is not.

13   Q.    I'm going to ask you to turn to page 411 -- Exhibit 411,

14   excuse me, Government Exhibit 411.

15         What is that?

16   A.    It's an e-mail to Mr. Manafort from me, reconverting the

17   document and sending to him.

18   Q.    Okay.  And this also contains the false P&L?

19   A.    Yes.

20         MR. ANDRES:  Your Honor, the Government moves to

21   admit Government Exhibit 40- -- sorry, Government Exhibit 411.

22         MR. DOWNING:  No objection.

23         THE COURT:  Admitted.

24         (Government Exhibit No. 411 was received in

25   evidence.)

Gates - Direct                                                    1344

1              MR. ANDRES:  Can I publish it?

2              THE COURT:  Yes.  You need to -- I assume you need to

3    do so.

4              MR. ANDRES:  Yes, Judge, I'm --

5              THE COURT:  All right.  Proceed.

6    BY MR. ANDRES:

7    Q.   With respect to the document, can you turn to the second

8    page and identify the net income?

9    A.   Net income is 3 million.

10   Q.   Okay.  You can take that down.

11             Mr. Gates, you testified that you were arrested in

12   October of what year?

13   A.   2017.

14   Q.   Okay.  Prior to the time that you were arrested, were you

15   aware of the fact that you were under investigation?

16   A.   Yes.

17   Q.   Had you received subpoenas and other requests for

18   documents?

19   A.   I did.

20   Q.   Did you receive a subpoena for your overseas bank records?

21   A.   Yes.

22   Q.   And did you make a production of those documents?

23   A.   I did.

24   Q.   Okay.  At some point, did you have a conversation with

25   Mr. Manafort about those -- about that production or the

Gates - Direct                                                    1345

1    overseas bank records?

2    A.    I did.

3    Q.    What, if anything, did he tell you?

4    A.    Mr. Manafort indicated to me that he wasn't sure why I was

5    being dragged into the investigation and indicated that he

6    would have a representative signify that I had no ownership or

7    control over those, that I was an employee of DMP and had no

8    ability to have control over those accounts.

9    Q.    During the time that you worked for Mr. Manafort, did you

10   delete your e-mails from time to time?

11   A.    Yes.

12   Q.    In what instances did you delete your e-mails?

13   A.    I mean, typically, I tried to do a purge of e-mails, you

14   know, throughout the year, just given the volume of e-mails I

15   typically received.

16   Q.    Were there instances where you deleted e-mails so that

17   they -- the Government or other entities wouldn't find out

18   about them?

19   A.    Yes, there was one instance.

20   Q.    Okay.  During the time that you communicated with

21   Mr. Manafort, did you ever use encrypted applications?

22   A.    We did.

23   Q.    What are encrypted applications?

24   A.    Well, encrypted applications are supposed to protect the

25   communications between two individuals.

Gates - Direct                                                    1346

1    Q.    Okay.  Did you frequently use those applications?

2    A.    I would say so in the later years, yes.

3    Q.    And what are some of the encrypted applications that you

4    used?

5    A.    Signal, Viber, I think were the primary two.  I think we

6    had used an application called Box at one point.

7    Q.    You testified that at some point, you began working for

8    the Trump campaign; is that correct?

9    A.    Yes.

10   Q.    Approximately, when was that?

11   A.    March of 2016.

12   Q.    And was Mr. Manafort also working for the Trump campaign?

13   A.    He was.

14   Q.    What was his position?

15   A.    At that moment, he was the convention manager.

16   Q.    And did he later have a different position?

17   A.    He did.

18   Q.    Okay.  What position?

19   A.    He ultimately became chairman of the campaign.

20   Q.    Do you know, did there come a point when Mr. Manafort left

21   the campaign?

22   A.    Yes.

23   Q.    Approximately, when was that?

24   A.    It was in late August.

25   Q.    And did you continue on?

1   A.   I did.

2   Q.   Okay.  After your work on the campaign, did you have

3   another job with respect to the administration?

4   A.   Yes.

5   Q.   What was it?

6   A.   Following the campaign, I went to work for the

7   inauguration.

8   Q.   Okay.  Let me ask you to look at Government Exhibit 397.

9   A.   Okay.

10  Q.   Can you tell me what Government Exhibit 397 is?

11  A.   Yes.  It's an e-mail exchange among a number of the staff

12  in regards to an economic advisory council that we're putting

13  together.

14  Q.   Okay.  And that's economic advisory council for the Trump

15  campaign?

16  A.   That's correct.

17  Q.   Okay.  Can I just focus you on the page, at the bottom it

18  says 3 of 66?

19  A.   Okay.

20  Q.   Is there an individual named Stephen Calk listed?

21  A.   Yes.

22  Q.   Okay.  And what is he being nominated to?

23  A.   To the economic advisory council for the campaign.

24  Q.   And do you know if he ultimately was on that?

25  A.   I believe he was.

1   Q.   Okay.  Can I ask you to turn to Government Exhibit 399?

2        Do you see that?

3   A.   I do.

4   Q.   What is Government Exhibit 399?

5   A.   It's an e-mail from Mr. Manafort to me in regards to

6   Mr. Calk.

7   Q.   Okay.

8        MR. ANDRES:  The Government moves to admit Government

9   Exhibit 399.

10       MR. DOWNING:  Your Honor, could I have a moment,

11  please?

12       THE COURT:  Yes.

13       MR. DOWNING:  I don't have that exhibit available to

14  me.  I think it was produced electronically this morning.  If I

15  could have a copy, I'll take a quick look at it.

16       THE COURT:  It was produced when?

17       MR. DOWNING:  This morning.

18       MR. ANDRES:  I don't think it -- I don't want to

19  respond, Your Honor, but I'm happy to -- Kevin?

20       MR. DOWNING:  Oh, do you have a copy?  Thank you.

21       No objection.

22       THE COURT:  All right.  It's admitted.

23       (Government Exhibit No. 399 was received in

24  evidence.)

25       MR. ANDRES:  May I publish it, Your Honor?

1           THE COURT:  Yes.

2           MR. ANDRES:  399.  I'm going to use the ELMO, Your

3    Honor.

4    BY MR. ANDRES:

5    Q.   Mr. Gates, who's this e-mail from?

6    A.   From Mr. Manafort.

7    Q.   And who is it to?

8    A.   To me.

9    Q.   And what's the date?

10   A.   November 24, 2016.

11   Q.   On November 24, 2016, where were you working?

12   A.   I was working for the presidential inaugural committee.

13   Q.   And where was Mr. Manafort working?

14   A.   I don't know.

15   Q.   And can you read that e-mail?

16   A.   "Rick, we need to discuss Steve Calk for Secretary of

17   Army.  I hear the list is being considered this weekend."

18   Q.   Is that the same Steve Calk who was previously identified

19   on the economic council?

20   A.   Yes.

21   Q.   Can I ask you to turn to Government Exhibit 402?

22           Do you see that?

23   A.   I do.

24   Q.   What is that?

25   A.   It's an e-mail from Mr. Manafort to me in regards to a

Gates - Direct                                                        1350

1    list.

2           MR. ANDRES:  And the Government moves to admit

3    Government Exhibit 402.

4           Can you pass that?

5           THE COURT:  How many more of these are there that he

6    may not have seen?

7           MR. ANDRES:  I think this is the last one, Judge.

8           THE COURT:  I take it all of this relates to a person

9    who had some contact with the bank these loans were being

10   applied for?

11          MR. ANDRES:  That's correct, Your Honor.

12          THE COURT:  All right.

13          MR. DOWNING:  No objection.

14          THE COURT:  All right.  It's admitted.

15          (Government Exhibit No. 402 was received in

16   evidence.)

17          MR. ANDRES:  May I publish it, Your Honor?

18          THE COURT:  Yes.

19   BY MR. ANDRES:

20   Q.   With respect to the e-mail in Government Exhibit 402,

21   what's the date of that e-mail?

22   A.   December 23, 2016.

23   Q.   And who's it from?

24   A.   Mr. Manafort.

25   Q.   And who is it to?

1   A.   To me.

2   Q.   And what does it pertain to?

3   A.   It pertains to individuals that Mr. Manafort would like to

4   invite to the inauguration.

5   Q.   And where were you working at the time?

6   A.   At the inaugural committee.

7   Q.   Okay.  And how about Mr. Manafort?

8   A.   I don't know.

9   Q.   If you turn to the last page of that, 15 of 26 --

10  actually, the second-to-last page, excuse me, 14 of 26.

11         Second from the bottom, can you read the name there?

12  A.   Yes.  Stephen Calk and Stephen Calk, Jr.

13  Q.   And was Mr. Manafort asking for tickets to the

14  inauguration for Stephen Calk?

15  A.   Yes.

16  Q.   Okay.  You can take that down.

17         Mr. Gates, you've testified at various times that

18  Mr. Manafort had season tickets to the New York Yankees; is

19  that correct?

20  A.   Yes.

21  Q.   Okay.  And over what period of time was Mr. Manafort a

22  season ticket holder?

23  A.   From at least the time I was there in 2006 to 2016.

24  Q.   Okay.  Did there come a time when he had difficulty paying

25  for those tickets?

Gates - Direct                                                            1352

1   A.   Yes.

2   Q.   Approximately, when was that?

3   A.   In 2016.

4   Q.   Did he task you with -- do you -- did he task you with --

5           THE COURT:  What, if anything, did he task you with,

6   with respect to the tickets?

7   BY MR. ANDRES:

8   Q.   What, if anything, did he --

9           THE COURT:  That means it's not leading.

10          MR. ANDRES:  I -- that's a great question, Judge.

11  Thanks.

12                          (Laughter.)

13          THE COURT:  Now, if they only paid me as much as they

14  pay you.

15                          (Laughter.)

16          THE COURT:  Next.  Go ahead.

17  BY MR. ANDRES:

18  Q.   What, if anything, did Mr. Manafort ask you to do with

19  respect to the tickets?

20  A.   He asked me to do him a favor.  I was still on the

21  campaign at the time, and it was very, you know, work

22  intensive.  So he asked me to sign a letter for him that

23  attributed the cost of the Yankees tickets to me instead of

24  him.

25  Q.   Okay.  And did it -- did the letter make a reference to

Gates - Direct                                                        1353

1   borrowing his credit card?

2   A.    It did, I believe, yes.

3   Q.    Okay.  Did you ever borrow Mr. Manafort's credit card to

4   buy Yankees tickets?

5   A.    No.

6   Q.    Did you ever purchase Yankees tickets, season Yankees

7   tickets for yourself?

8   A.    No.

9   Q.    Okay.  Were you previously involved in helping to resolve

10  the payment issue?

11  A.    Yes.

12  Q.    Okay.  I'm going to ask you to turn to Government

13  Exhibit 393.

14          Can you tell me what that is?

15  A.    Yes.  This is an e-mail that Mr. Manafort originally

16  received from the New York Yankees in regards to the payment

17  for his accounts.

18          MR. ANDRES:  Your Honor, the Government moves to

19  admit Government Exhibit 393.

20          MR. DOWNING:  No objection.

21          THE COURT:  All right.  It's admitted.

22          (Government Exhibit No. 393 was received in

23  evidence.)

24          MR. ANDRES:  May I publish it?

25          THE COURT:  Is it necessary?  We're going to get this

Gates - Direct                                                         1354

1    finished soon.

2            MR. ANDRES:  It's the last document, Your Honor.

3            THE COURT:  All right.  And what does this document

4    that you want to publish show that isn't already in evidence?

5            MR. ANDRES:  It shows the issue with respect to the

6    payment plan and the communications with the New York Yankees.

7            THE COURT:  Didn't he already testify to that?

8            MR. ANDRES:  Not to the specifics.

9            THE COURT:  All right.  Go ahead, publish it.

10           MR. ANDRES:  Thank you, Your Honor.

11   BY MR. ANDRES:

12   Q.   Mr. Gates, can you tell me what's described in Government

13   Exhibit 393?

14   A.   Yes.  It's an e-mail from the New York Yankees regarding

15   Mr. Manafort's payment for season tickets.

16   Q.   And do you know approximately what the debt was or what

17   the payment was that was owed?

18   A.   I believe at the time, the Yankees tickets usually ranged

19   in kind of the 210- to $225,000 range.

20   Q.   And was that -- was that money assessed to a particular

21   credit card for Mr. Manafort?

22   A.   It was.

23   Q.   And was that credit card paid on time?

24   A.   Not at that time.

25           MR. ANDRES:  Your Honor, may I have one moment?

Gates - Direct                                                          1355

1           THE COURT:  Yes.

2    BY MR. ANDRES:

3    Q.   Mr. Gates, you testified that in your plea agreement, the

4    Government promised to write you a 5K letter; is that correct?

5    A.   Yes.

6    Q.   Has that letter been written yet?

7    A.   No.

8    Q.   Have you been sentenced yet?

9    A.   No.

10   Q.   As you sit here today, do you know what your sentence is

11   going to be?

12   A.   I do not.

13          MR. ANDRES:  I have no further questions, Your Honor.

14          THE COURT:  But in addition, did the Government

15   promise to seek or not to object to a request for probation?

16          THE WITNESS:  It did.

17          THE COURT:  Anything else?

18          MR. ANDRES:  No, Judge.

19          THE COURT:  All right.  I'm going to take a recess so

20   you -- give you an opportunity, Mr. Downing.

21          Pass your books to the right, ladies and gentlemen.

22   The court security officer will collect them, maintain their

23   security during the recess, and we will recess until quarter --

24   quarter of three give you enough time, Mr. Downing?

25          MR. DOWNING:  Thank you, Your Honor.

```
 1              THE COURT:  All right.  Quarter of three.  If you
 2   need longer, tell Mr. Flood.
 3              MR. DOWNING:  I will.
 4              THE COURT:  And I expect you to use any extra time to
 5   focus sharply your cross-examination.
 6              MR. DOWNING:  Understood.
 7              THE COURT:  All right.  Remember to refrain from
 8   discussing the matter among yourselves or with anyone or
 9   undertaking any investigation.  Follow Mr. Flood out.  Soft
10   drinks are available back there.
11                          (Jury out.)
12              THE COURT:  Court stands in recess.
13                (Recess from 2:25 p.m., until 3:07 p.m.)
14                          (Defendant present, Jury out.)
15              THE COURT:  All right.  Mr. Downing, have you had
16   enough time?
17              MR. DOWNING:  I have, Your Honor.  Thank you.
18              THE COURT:  All right.  Let me ask something because
19   I want to see if I can forestall any objections or resolve them
20   first.  Do you intend to examine Mr. Gates on what benefits he
21   got from this deal with the Government, that is, what he
22   avoided?
23              MR. DOWNING:  Yes.
24              THE COURT:  So I take it you intend -- as I
25   understand it, he pled guilty to charges in Washington, not
```

1    here.

2              MR. DOWNING:  Correct.

3              THE COURT:  But the charges against him here were

4    dismissed as a result of that deal.

5              MR. DOWNING:  Correct.

6              THE COURT:  Do you intend to go over the charges here

7    that are no longer against him and what -- how many years he

8    faced for all those?

9              MR. DOWNING:  I do.

10             THE COURT:  And that's -- Mr. Andres, that's

11   perfectly appropriate, isn't it?

12             MR. ANDRES:  Perfectly.

13             THE COURT:  All right.

14                           (Laughter.)

15             THE COURT:  Because you've made judgments in other

16   parts of this case not to do that.

17             MR. DOWNING:  I did, Your Honor.  That's correct.  Or

18   we did.

19             One other issue I'd like to address with the Court

20   beforehand:  There was a motion -- oh, we need to do that

21   sidebar?

22             MR. ANDRES:  Yes.

23             MR. DOWNING:  The Government would like a sidebar to

24   talk about it.

25             THE COURT:  All right.  You may do that.

1358

1     (Bench conference on the record.)

2     THE COURT:  Yes, sir.

3     MR. DOWNING:  The government raised an issue about if

4  we were going to question --

5     THE COURT:  I'm sorry, if you-all could step back a

6  bit?

7     MR. DOWNING:  If we were to --

8     THE COURT:  My mother smoked when she was pregnant,

9  or I'd be as tall as you are.  My father was six-one.

10    Go ahead.

11    MR. DOWNING:  The government raised an issue whether

12 or not we were going to cross-examine Mr. Gates about specific

13 acts of marital infidelity.  We don't plan on doing that, but

14 we plan on questioning him about what we call his, you know,

15 separate secret life and how --

16    THE COURT:  Whose separate secret life?

17    MR. DOWNING:  Mr. Gates.

18    THE COURT:  Oh.

19    MR. DOWNING:  And how it relates to money he had

20 stolen, embezzled, and things that he was doing, but

21 specifically as to infidelity, we do not think we're going to

22 get into that.

23    THE COURT:  All right.  And is there anything for me

24 to consider and decide in that regard?

25    MR. ANDRES:  No.  I believe that the issue that we

1359

1  raised originally, Judge, was that the Fourth Circuit has held

2  that if somebody cheats on their wife or whatever, it's not

3  necessarily indicative of truthfulness.  Mr. Downing has

4  indicated he's not going to go there, and so we don't have any

5  issue.

6         MR. DOWNING:  Well, I want to be clear.

7         THE COURT:  Yeah, I --

8         MR. DOWNING:  We're not going to go into specific

9  acts of infidelity, but we are definitely implying that he was

10 leading a separate secret life from Mr. Manafort and from

11 others.

12        THE COURT:  Well, if that's -- am I right that what

13 you're thinking of doing is you're thinking of showing that he

14 needed money --

15        MR. DOWNING:  Yes.

16        THE COURT:  -- and therefore he took money that

17 wasn't his for another purpose?

18        MR. DOWNING:  Yes.

19        THE COURT:  I don't see anything wrong with that.  Do

20 you, Mr. Andres?

21        MR. ANDRES:  Yeah, just as long as there's not some

22 suggestion he's spending that money on things that are, that

23 are, you know, would somehow suggest marital infidelity.

24        MR. DOWNING:  Well, I think --

25        MR. ANDRES:  I mean, I don't know how that's

1  appropriate.  They can ask whatever they want about how he's

2  spending his money, but he's got to answer yes to those

3  questions in the first place.  I don't know that he will, but

4  putting that aside --

5           THE COURT:  You're not going to ask him directly

6  whether he was faithful to his wife?

7           MR. DOWNING:  Correct, but I will ask him about

8  keeping an apartment in London and going to fancy restaurants

9  and staying in fancy hotels, stuff like that, but no, I'm not

10 going to ask him about a specific act of infidelity.

11          THE COURT:  And so he needed money.

12          MR. DOWNING:  Correct.

13          THE COURT:  And you're going to establish or try to

14 establish that he stole money from Manafort for that purpose.

15          MR. DOWNING:  Yes, Your Honor.

16          THE COURT:  It seems to me perfectly appropriate.

17          MR. ANDRES:  Totally agree, Judge.

18          THE COURT:  All right.  Anything else we need to

19 discuss?

20          MR. ANDRES:  No, Judge.  Thank you.

21          MR. DOWNING:  Thank you.

22          THE COURT:  All right.  Let's go.

23          (End of bench conference.)

24          THE COURT:  All right.  Let's have Mr. Gates return,

25 please.

1          Oh, she's wonderful.  She's a jewel.  Without

2   Ms. Pham, I would fall on my face every day.  Bring the jury

3   in.

4                          (Laughter.)

5          THE COURT:  I just told her supervisor this morning

6   that she's a jewel.

7                          (Jury present.)

8          THE COURT:  All right.  You may be seated.  Thank you

9   for your patience, ladies and gentlemen, but I assure you it

10  was necessary.  Neither side objected and neither side was

11  responsible for this delay.  It's necessary to do it.

12         All right.  Now, I'll have Mr. Gates return.

13         Mr. Gates, you'll recall, sir, that you remain under

14  oath.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  You may resume the stand.

17         And, Mr. Downing, you may begin your

18  cross-examination.

19         MR. DOWNING:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21  BY MR. DOWNING:

22  Q.   Good afternoon, Mr. Gates.

23  A.   Good afternoon.

24  Q.   I think, as you know, I represent Mr. Manafort, and we're

25  here to ask you some questions about events leading up to your

Gates - Cross                                                          1362

1  testimony here today and your 20-some-odd interviews with the

2  Office of Special Counsel on the way here.

3           THE COURT:  You'll have to speak up just a bit,

4  Mr. Downing, for my benefit.

5  BY MR. DOWNING:

6  Q.   Mr. Gates, why don't we go back to the period of January

7  of this year?

8           You had occasion to sit down with your lawyer in the

9  Office of Special Counsel to discuss matters surrounding this

10  case?

11  A.   I did.

12  Q.   And did you meet on more than one occasion with the Office

13  of Special Counsel before entering into a plea agreement?

14  A.   We did.

15  Q.   Did you meet approximately three or four times before you

16  entered your plea?

17  A.   Yes, I'd say that's accurate.

18  Q.   And during the three or four times that you met with the

19  Office of Special Counsel, did you provide to them false and

20  misleading information?

21  A.   Not at that time, no.

22  Q.   Not at that time.

23  A.   No.

24  Q.   Do you recall when you first started giving false and

25  misleading information to the Office of Special Counsel?

1    A.   I was charged with a second count that was prior to the

2    plea agreement.

3    Q.   The second count was prior to the plea agreement?

4         THE COURT:   I don't think that was responsive to his

5    question.   Re-ask your question.

6         THE WITNESS:   Can you repeat the question, please?

7    BY MR. DOWNING:

8    Q.   When did you first start providing false and misleading

9    information to the Office of Special Counsel?

10   A.   I didn't provide false and misleading information to the

11   Special Counsel's office.

12   Q.   And then why did the Office of Special Counsel have you

13   plead guilty to providing false information to the Office of

14   Special Counsel?

15   A.   Under the one instance I did.

16        THE COURT:   I'm sorry, I didn't hear you.

17        THE WITNESS:   Under the one instance I did.

18        THE COURT:   Well, so previously, you said you didn't

19   provide false information.

20        THE WITNESS:   That's correct.   Your Honor, my

21   information leading up to the one count, up to that point, I

22   had not provided false and misleading information.

23        THE COURT:   Next question.

24   BY MR. DOWNING:

25   Q.   So just to get an idea of timeframe, you pled in February

1  of this year?

2  A.    Yes.

3  Q.    And you met with the Special Counsel starting in late

4  January of this year?

5  A.    I believe that's correct.

6  Q.    And prior to you entering your plea, when did you provide

7  false and misleading information to the Government?

8  A.    There were instances where I struggled with the

9  interviews, certainly recalling details and facts about various

10  questions that the Special Counsel asked.  So there's no

11  question that I struggled to -- to get all the information out.

12  Q.    So it sounds to me, as you sit here today, you're not

13  saying you knowingly, intentionally provided false and

14  misleading information.  You just had a bad recollection; is

15  that correct?

16  A.    To some extent, yes.

17          THE COURT:  But I thought you said you pled guilty to

18  providing false information?

19          THE WITNESS:  I did, Your Honor, to one count.

20          THE COURT:  All right.  You just said you just had a

21  bad memory.  Did you provide false information or did you have

22  just a bad memory?

23          THE WITNESS:  Your Honor, I provided false

24  information to the Special Counsel prior to my plea agreement.

25          THE COURT:  Next question.

Gates - Cross                                                                    1365

1   BY MR. DOWNING:

2   Q.   Prior to your plea agreement?

3   A.   Yes.

4   Q.   But not after your plea agreement?

5   A.   No.

6   Q.   And how many times did you meet with the Office of Special

7   Counsel after you entered into your plea agreement?

8   A.   Approximately 20 times.

9   Q.   Now, do you know how the Office of Special Counsel found

10  out that you had provided false and misleading information to

11  them?

12  A.   No, I do not.

13  Q.   Were you confronted by the Office of Special Counsel in an

14  interview about providing false and misleading information?

15  A.   I was.

16  Q.   And who confronted you?

17  A.   I believe it was Mr. Weissman.

18  Q.   And when he confronted you, did he indicate to you that

19  you had -- you had no chance of getting a plea agreement

20  because you had lied intentionally during a proffer session?

21  A.   He indicated that in order to move forward with the plea

22  agreement I would have to accept the second charge.

23  Q.   And did you have a plea agreement drafted for you at that

24  time?

25  A.   I don't recall if it was drafted at that time.

Gates - Cross                                                          1366

1   Q.   Did you know the terms and conditions of your plea

2   agreement at that time?

3   A.   I was aware of some of them, yes.

4   Q.   And when you met with the Office of Special Counsel at

5   each meeting, did they tell you you were required to provide

6   truthful information?

7   A.   Yes.

8   Q.   And after they discovered that you had intentionally

9   provided false and misleading information, did they tell you

10  they would not offer you a plea?

11  A.   They never made that indication.

12  Q.   But, instead, they told you they added a charge; is that

13  correct?

14  A.   That's correct.

15  Q.   Even though you knowingly and intentionally lied?

16  A.   Yes.

17  Q.   And subsequent to that, you did sign a plea agreement with

18  the Office of Special Counsel, correct?

19  A.   That is correct.

20  Q.   And that agreement, once again, requires you to provide

21  truthful information?

22  A.   That's correct.

23  Q.   Not to be intentionally false or misleading; is that

24  correct?

25  A.   Correct.

1  Q.   And in your plea agreement, despite the fact that you had

2  a plea to two counts with a total exposure to you of ten years

3  in jail, the Office of Special Counsel agreed that your lawyer

4  could file a recommendation with a judge in Washington, D.C.,

5  to say that even though you had committed these crimes and

6  admitted to it and lied during the process, that you should get

7  probation; is that correct?

8  A.   No, they were not responsible for indicating what the

9  sentence might be.  That's up to the judge.

10  Q.   So let me repeat the question.  The terms of your plea

11  agreement let your lawyer argue that you should have probation

12  and no jail time; is that correct?

13  A.   That is correct.

14  Q.   And it would be unopposed by the Office of Special

15  Counsel; is that correct?

16  A.   If I fulfilled the requirements in the plea agreement,

17  yes.

18  Q.   Even though before you got the plea agreement, you

19  violated the terms and conditions of your proffer with them?

20  A.   I don't know all the terms related prior to the proffer.

21  I knew when I signed the plea agreement what the terms were.

22  Q.   Well, you did know that the proffer agreement -- the most

23  important term was that you tell the truth?

24  A.   That's correct.

25  Q.   And you violated that before you even got a plea

1    agreement?

2              MR. ANDRES:  Objection, Judge.  That misstates both

3    the proffer agreement and the nature of it.

4              THE COURT:  I'll overrule the objection.  If he

5    misstates something in his mind, he can testify to it.

6              You may disagree with the accuracy of it, but your

7    mindset is not what's important; it's his.

8              MR. ANDRES:  Understood.

9    BY MR. DOWNING:

10   Q.   So is that correct?  That was one of the most important

11   things for you to do, tell the truth?

12   A.   Yes.

13   Q.   So let's talk about some of the information that you

14   provided during your proffers on the fraudulent activity that

15   you were involved in and let's start with Global Sites.

16             Do you want to explain what Global Sites is?

17   A.   Yes.  Global Sites is a company set up by Mr. Manafort and

18   a partner of his in New York in regards to a high-frequency

19   trading business.

20   Q.   And that was a gentleman named Arthur Cohen, correct?

21   A.   It was.

22   Q.   And "it was" because he's deceased, correct?

23   A.   Correct.

24   Q.   And he had expertise in the area of high-speed trading?

25   A.   He did not, but people affiliated with him did.

1   Q.   And Mr. Manafort made an investment with Mr. Cohen in

2   Global Sites; is that correct?

3   A.   That is correct.

4   Q.   And there came a time where you got involved with that

5   investment; is that correct?

6   A.   Yes.

7   Q.   And you had represented to Mr. Cohen that of the

8   $1.5 million that Mr. Manafort invested -- he invested 1.5, did

9   he not?

10  A.   I don't recall the exact amount.  I believe it was more,

11  though.

12  Q.   And you represented to Mr. Cohen of the amount of money

13  that Mr. Manafort invested, $250,000 of that was your money?

14  A.   That's correct.

15  Q.   And you represented that it was a bonus?

16  A.   That's correct.

17  Q.   And that's what you told the Office of Special Counsel?

18  A.   Yes.

19  Q.   Now, this is in 2012 when this investment took place?

20  A.   No, it was in 2011, I believe.

21  Q.   2011.  In 2011, what was your salary at DMP?

22  A.   I believe it was approximately 240,000.

23  Q.   And you, in 2011, received a bonus that year of about

24  $60,000; is that correct?

25  A.   I believe that was -- I don't know.  I don't have the --

1    Q.    About 60 to put you at $300,000?

2    A.    That would be correct.

3    Q.    And you sit here today, and you're telling this jury to

4    believe that on top of the 60,000 that Mr. Manafort allocated

5    another 250,000 to you for a bonus?

6    A.    Yes, that's correct.

7    Q.    That's correct?  And that that would be your investment

8    with Mr. Cohen?

9    A.    The investment with Mr. Cohen was actually through a

10   promissory note as well.

11   Q.    Oh, we're going to get to the promissory note.  That's

12   next up.

13          But so the first 250, you represented that

14   Mr. Manafort said it was a bonus for you; is that correct?

15   A.    Yes.

16   Q.    And have you seen any e-mails presented to you in any of

17   your meetings with the Office of Special Counsel that

18   Mr. Manafort communicated that you were going to be paid a

19   $250,000 bonus?

20   A.    I do not believe there are any e-mails.

21   Q.    So let's get to the promissory note, Part 2 of this

22   investment, correct?

23   A.    Yes.

24   Q.    And the second part of the investment is approximately a

25   $700,000 investment split between you and Mr. Cohen; is that

Gates - Cross                                                                     1371

1   correct?

2   A.   Correct.

3   Q.   And I think you represented to the Office of Special

4   Counsel that $350,000 that you provided to Mr. Cohen came out

5   of the Cypriot funds; is that correct?

6   A.   It came from the Cypriot funds to my accounts in the form

7   of bonuses and other payments, which, over time, I paid back

8   Mr. Cohen.

9   Q.   And in what year did you get the $350,000 bonus?

10  A.   It wasn't a singular year.  It was over, I think, a period

11  of four years.

12  Q.   Four years.  So in 2011, you got a $250,000 bonus for one

13  year, but then it took three years to accumulate the 350,000;

14  is that correct?

15  A.   Yes, in order for me to repay the promissory note.

16  Q.   And as you sit here today, do you want the jury to believe

17  that Mr. Manafort authorized you to take $350,000 out of the

18  Cypriot account?

19  A.   I've already admitted to the fact that I took unauthorized

20  funds from Mr. Manafort.

21  Q.   So they weren't bonuses?

22  A.   No, they were bonuses.

23  Q.   Well, how can it be unauthorized?

24  A.   I thought you were talking about additional funds that I

25  already admitted to.

Gates - Cross                                                         1372

1    Q.   Oh, okay.  I can see where the confusion comes from?

2              MR. DOWNING:  May I --

3              THE COURT:  Hand it to the court security officer.

4    There's a rule that you can't stray from the podium.  The court

5    security officer will hand the witness anything the witness

6    needs.

7    BY MR. DOWNING:

8    Q.   Now, please take a look at what's been marked Defendant's

9    Exhibit 17.

10             So, Mr. Gates, just take a minute to look over this

11   exhibit, kind of look at the -- the totals for years 2010 to

12   2014.  Give me a ballpark total number for all those items, if

13   you could.

14   A.   It looks like approximately 2.7, 2.8.

15   Q.   It's about $3 million, correct?

16   A.   Okay.

17   Q.   And about how many entries are contained on this -- this

18   document?

19   A.   I'd venture to guess somewhere around 40.

20   Q.   Somewhere around 40 entries?

21             And do you recall this document being a compilation

22   of unreported income that you had been initially indicted for

23   in this district?

24   A.   Yes.

25   Q.   And included on this -- on this -- in this document are

1  some very large dollar entries that are coming out of various

2  Cypriot entities; is that correct?

3  A.    That's correct.

4  Q.    And each and every one of the transactions that was --

5  that's contained on this document, as included in your original

6  indictment here, they were authorized by you; isn't that

7  correct?

8  A.    Yes.  Some were authorized by Mr. Manafort, but there were

9  unauthorized transfers as well.

10 Q.    So what I would imagine is -- can you -- do you recall

11 talking to the Office of Special Counsel about having some

12 unauthorized transfers out of the Cypriot accounts?

13 A.    I believe I indicated that to them, yes.

14 Q.    And do you recall saying that you thought there were about

15 six that were unauthorized?

16 A.    No, I don't have any recollection.

17 Q.    Totaling about $420,000, do you remember that?

18 A.    I do not.

19 Q.    Can you pick out the six that you represented to the

20 Office of Special Counsel were authorized?

21 A.    No, I cannot.

22 Q.    Can you pick out the 420,000 out of this list that you

23 represented were authorized?

24 A.    I cannot.

25 Q.    Now, as you sit here today, are you representing that

1    particular transactions on here were authorized by

2    Mr. Manafort?

3    A.   Yes.

4    Q.   But you can't recall if it was the six that you

5    represented to the Office of Special Counsel?

6    A.   It's actually not the amount.  It's for the purpose of

7    what it was for.  That's how I can tell.

8    Q.   Okay.  One moment.

9         Now, Mr. Gates, the transactions that I have in front

10   of you totaling $3 million, can you explain to me what these

11   transactions are for?

12   A.   Yes.  Some of them were unauthorized transactions, which I

13   admitted to.  Others were --

14   Q.   So let's slow down.  Which were the unauthorized

15   transactions?

16   A.   I don't know in general.  I'm saying I made that

17   statement.

18   Q.   And other than unauthorized transaction, do you have a

19   dollar amount that you can give to the jury were unauthorized

20   out of the 3 million?

21   A.   Out of this 3 million, no, I cannot.

22   Q.   And in addition to unauthorized ones, do you see

23   transactions that you -- you can identify as being some kind of

24   legitimate amount of money?

25   A.   Yes.

1   Q.   That you were duly owed?

2   A.   Correct.

3   Q.   Which ones are those?

4   A.   The series of transactions from Bletilla Ventures, while

5   not all of these were authorized, many of them were authorized

6   in the form of increased income from Mr. Manafort in regards to

7   the lobbying project that we took on between the years of 2012

8   and 2014, and that also included expenses as well.

9   Q.   What kind of expenses?

10  A.   In this case, some legitimate, some not.

11  Q.   What does that mean?  Can you explain that?

12  A.   Yes.  That means that some expenses had been approved by

13  Mr. Manafort and others had not been approved.

14  Q.   And why would they need to be approved by Mr. Manafort?

15  A.   Because all expenses at some point needed to be approved

16  by him.

17  Q.   And they were unrelated to the business of DMP

18  International; is that correct?

19  A.   These expenses?

20  Q.   Yes.

21  A.   Some were in relation to DMP, but others were not.

22  Q.   They were personal, correct?

23  A.   Some were personal, yes.

24  Q.   A substantial amount of them were personal, correct?

25  A.   That's possible, yes.

1    Q.    Why do you say it's possible?

2    A.    Because I don't know the exact breakdown based on this

3    sheet that you indicated -- or that you gave to me in terms of

4    what they exactly are.

5    Q.    Did you have a scheme that you developed to put personal

6    expenses as legitimate business expenses and have them paid

7    through these offshore accounts?

8          Was that a scheme you perpetrated?

9    A.    It wasn't a scheme.  I just added expense numbers to the

10   reports.

11   Q.    You added what?

12   A.    Numbers to the expense reports.

13   Q.    Or did you just submit your total AmEx bill and say, I'll

14   have the whole thing paid, thank you?

15   A.    I don't believe it was submitted overseas because we

16   didn't submit that type of documentation.

17   Q.    Did you have amounts paid to you in the full amount of

18   your AmEx bill?

19   A.    Yes.

20   Q.    That included substantial personal expenditures?

21   A.    Yes, that's possible.

22   Q.    What do you mean it's possible?

23          Is that part of your scheme?  Did you do that?

24   A.    I don't have the AmEx statements in front of me, so I

25   don't know what you're referring to.

1   Q.   Did you knowingly and intentionally have personal expenses

2   paid for through the Cypriot accounts of DMP International?

3   A.   Yes.  I've already stated that.

4   Q.   And it was part of the scheme that you perpetrated over

5   several years; is that correct?

6   A.   I submitted expense reports that were not authorized over

7   several years, that's correct.

8   Q.   And this is not something you disclosed to the Office of

9   Special Counsel, did you?

10   A.   Yes, it is.

11   Q.   Was this the seven times that you were talking about that

12   you had unauthorized transfers?

13   A.   No, I don't believe I indicated a number with the

14   Special --

15   Q.   Was this the 125,000 you stole out of SunTrust account

16   from Mr. Manafort?

17   A.   I don't know what you're referring to.

18   Q.   Did you not get questioned by the Office of Special

19   Counsel about closing a DMP SunTrust account?

20   A.   I don't recall.

21   Q.   You don't recall it having a balance of $125,000?

22   A.   No.

23   Q.   You don't recall telling the Office of Special Counsel

24   that 100 of it was a bonus for you?

25   A.   It's possible.

1   Q.    It's possible you said it or it's possible it's a bonus?

2   A.    It's possible that it's both.

3   Q.    And then when you told them the last 25,000 was used to

4   open a PNC bank account, were you confronted by Mr. Weissmann

5   that no such thing ever happened?

6   A.    I don't recall.

7   Q.    You know --

8           THE COURT:  I'm sorry, what was your answer?

9           THE WITNESS:  I said I don't recall.

10  BY MR. DOWNING:

11  Q.    Mr. Gates, you seem to have perfect recollection on direct

12  examination.  You have such a hard time now having recollection

13  about the same period of time.

14          Why is that?

15  A.    Well, I think you're referring to statements that I

16  haven't seen, so I don't know where you're getting the

17  information from.

18  Q.    You haven't seen the 302s?

19  A.    No, I have not.

20  Q.    Have you been confronted with information you provided by

21  the Office of Special Counsel?

22  A.    On the 302s?

23  Q.    Yes.

24  A.    Not to my knowledge.

25  Q.    Have they confronted you with so many lies that you can't

Gates - Cross                                                          1379

1   remember any of it?

2   A.    No.

3   Q.    No what?

4   A.    No, they presented me with -- in the interview sessions, I

5   answered the questions.  There was an agent in the room taking

6   notes, but I have never seen the notes in regards to those

7   conversations.

8   Q.    Okay.  We'll keep going on.

9          So the issue I talked to you about, a scheme where

10  you submit personal expenses to get reimbursed, like from DMP,

11  you did offshore, you did the same thing when you were at the

12  inaugural committee, didn't you?

13  A.    No, I did not.

14  Q.    You did not?  You did not tell the Office of Special

15  Counsel that you were submitting personal expenses to the

16  inaugural committee and getting reimbursed for it?

17  A.    Oh, I'm not sure if I told them that or not.  But to my

18  recollection, the inaugural expenses were reviewed very

19  closely.

20  Q.    Did you submit personal expenses to the inaugural

21  committee --

22  A.    I don't recall.

23  Q.    -- for reimbursement?

24  A.    It's possible.

25  Q.    Now, during your meetings with the Office of Special

Gates - Cross                                                          1380

1  Counsel, did you have occasion to talk about an entity called

2  Map Global Holdings?

3  A.   I did.

4  Q.   And -- well, let me go back for one second.  I'll just

5  finish on this other issue.

6           So after investing the 250,000 and 350,000 that came

7  from DMP International accounts, you were paid out in two

8  installments on that investment, were you not?

9  A.   I was.

10 Q.   And you were paid out 800,000 -- half of the first part of

11 the payout, correct?

12 A.   I believe that's correct.

13 Q.   And 1.7 million on the second payout, correct?

14 A.   Well, the 1.7 was split between the two partners.

15 Q.   That was the first payment.  The second one you got

16 another 1.7, did you not?

17 A.   Oh, okay.  I don't remember if it was 1.7.

18 Q.   So you got $2.5 million.  When you got to 2.5 million, did

19 you ever think about paying the money back to DMP or

20 Mr. Manafort?

21 A.   No, I did not.

22 Q.   No.  What did you do with it?

23 A.   We put it into investment accounts.

24 Q.   Who's "we"?

25 A.   My family.

1    Q.    And did you take any of that money to pay for anything

2    else?

3    A.    The 2.5?

4    Q.    Yeah.

5    A.    I don't understand the question.

6    Q.    Well, you just said you just did an investment.  Who is

7    "we"?

8    A.    Myself and my wife.

9    Q.    You and your wife?

10   A.    Yes.

11   Q.    But there's another Richard Gates, right?  Another Rick

12   Gates?  The secret life of Rick Gates, where you maintain a

13   separate life in London, in other places throughout the

14   country; isn't that true?

15   A.    There was a period of time, almost ten years ago, when I

16   had a relationship, yes.

17   Q.    And over that period of time, you used money from these

18   offshore accounts to pay for your lifestyle, your secret life,

19   did you not?

20   A.    No.  I believe those were payments that resulted in bonus

21   money that I used for that, and I used family money or money

22   from my family account as well.

23   Q.    So more bonus money.

24   A.    It was, yes.

25   Q.    To the tune of $3 million?

1  A.    No.

2  Q.    Do you have a number, as you sit here today, that you

3  would like to provide as a possible number?

4  A.    I don't have an exact number because of the figures, but

5  it was far less than 3 million.

6  Q.    And as part of your secret life, did you maintain a flat?

7  Is that what they call it in London, an apartment?

8  A.    There was a period of time when I was in a flat in London

9  for about two months.

10 Q.    And you spent a lot of time flying first class back and

11 forth to London and the United States; isn't that correct?

12 A.    Yes.  Usually on my transits to Ukraine, correct.

13 Q.    And usually those were expenses that went through the

14 offshore accounts for DMP International; isn't that correct?

15 A.    No.  Those probably went through the U.S. account because

16 Mr. Manafort's card was associated with the U.S. account.

17 Q.    Are you sure about that?

18 A.    I'm not, but I believe that to be the case.

19 Q.    And if we had records that indicated that you submitted

20 the expense reports to the Cypriot accounts and to the accounts

21 in St. Vincent's and the Grenadines, would you be surprised?

22 A.    I'd be happy to take a look.

23 Q.    Would you be surprised?

24 A.    Would I be surprised about the money coming from Cyprus?

25 Q.    That you went to the foreign banks, represented that you

1    had business expenses when they were not, and had them cut

2    checks or wire transfer money to you?

3    A.   No.  I've already admitted that I've taken unauthorized

4    expenses --

5    Q.   To fund your separate secret life?

6    A.   I -- yes, I acknowledge I had a period of time where I had

7    another relationship.

8    Q.   And did that also include spending money on fancy hotels

9    and fancy dinners and trips to Vegas?

10   A.   I don't believe to Vegas, but there were some trips in

11   Europe, yes.

12   Q.   You don't think you had to pay for her to go to Vegas?

13   A.   No.

14   Q.   How about buying sound equipment, audio equipment, do you

15   think the offshore accounts paid for that?

16   A.   No, I don't think so.

17   Q.   How about you going to Whole Foods down in Richmond, do

18   you think the offshore accounts paid for that?

19   A.   No.  That was out of my family --

20   Q.   As you sit here today, you're going to deny --

21             THE COURT:  You didn't give him a chance to finish

22   his answer.

23             MR. DOWNING:  Sorry.

24             THE COURT:  You may finish your answer.

25             THE WITNESS:  Thank you.  In Richmond, it was Whole

1    Foods, that's not offshore money.

2    BY MR. DOWNING:

3    Q.   And, and you said you wouldn't be -- the offshore accounts

4    wouldn't be -- you wouldn't have submitted false requests for

5    reimbursements for trips to Las Vegas?

6    A.   The business trips, there was business trips that I took

7    to Las Vegas to, I believe, meet Mr. Brown, and I don't

8    believe -- I don't know if I expensed those.  I believe I

9    expensed those to the U.S.

10   Q.   But Mr. Brown is not related to DMP International; isn't

11   that correct?

12   A.   That is correct.

13   Q.   You were conducting separate business and investment with

14   Mr. Brown; is that correct?

15   A.   Yes.

16   Q.   And so it would have been inappropriate -- it would have

17   actually been an embezzlement if you were trying to get

18   reimbursed for those trips through DMP's accounts; is that

19   correct?

20   A.   That would be correct.

21   Q.   And now let's get to Mr. Brown since you mentioned his

22   name.  During your meetings with the Office of Special Counsel,

23   did you have occasion to be confronted with your involvement

24   with Mr. Brown and Map Global Holdings?

25   A.   I did.

1  Q.   And what, if anything, did the Office of Special Counsel

2  confront you with?

3  A.   They confronted me first by asking about the relationship,

4  about how the company was structured, and about some of the

5  business deals that Mr. Brown was involved in, and then later

6  on, they confronted me in regards to a letter that I prepared

7  for Mr. Brown.

8  Q.   Was Map Global Holdings some type of Ponzi scheme?

9  A.   Map was not.

10 Q.   What was?

11 A.   I don't know what you're referring to.  Map was not a --

12 map was a PR and movie production company.

13 Q.   And what is it that you were doing for Map that the Office

14 of Special Counsel confronted you with?

15 A.   They were interested in two things.  One was a project

16 that we had worked on to create a Swiss documentary, and then

17 other questions arose not related to Map but specifically to

18 Mr. Brown about a Ponzi scheme.

19 Q.   Weren't there issues with you being involved with putting

20 together falsified financial statements?

21 A.   For Mr. Brown, yes.  I acknowledged that.

22 Q.   And what do you mean for Mr. Brown?  What does that mean?

23 A.   You're referring to?

24 Q.   Was it a personal financial statement?  A corporate

25 financial statement?

Gates - Cross                                                          1386

1   A.    No.  It was a letter that Mr. Brown asked me to prepare

2   for him in regards to an investment he was working on.

3   Q.    And what was false and misleading about the letter?

4   A.    The letter was a request from Mr. Brown to have a company

5   indicate that it might be interested investing in one of the

6   movies so that he could use it in another negotiation.

7   Q.    And it was not true?  It was just false?

8   A.    The amount of money listed in the letter was not true;

9   that's correct.

10  Q.    And how much was listed in the letter?

11  A.    I don't recall.

12  Q.    Millions?

13  A.    Yes.

14  Q.    And, in fact, did you know how much money was actually

15  involved?

16  A.    No.  Mr. Brown never indicated to me.

17  Q.    And you didn't ask him before you signed the letter?

18  A.    No, because I did it as a -- as a favor, similar as I did

19  the letter to Mr. Manafort.

20  Q.    So you committed fraud with Mr. Brown as a favor?

21  A.    I did.  I admitted to that.

22  Q.    And there's also another issue that went on with Mr. Brown

23  and his company that involved false entries on the general

24  ledgers.  And apparently do you recall --

25            THE COURT:  Is that a question?

1  BY MR. DOWNING:

2  Q.    Yeah, do you recall that?

3  A.    Which general ledger?  For Map?

4  Q.    Map Global Holdings.

5  A.    I'd have to look at it to see.

6  Q.    Do you recall receiving payments from Map Global Holdings?

7  A.    I did for PR work, yes.

8  Q.    What kind of amounts did you receive?

9  A.    200,000, roughly.

10  Q.    And do you recall that on the ledgers of Map Global

11  Holdings they were recorded as distributions for Steve Brown?

12  A.    Not in my -- not my entries.  I don't know about

13  Mr. Brown.  Mr. Brown had different entries.

14  Q.    You didn't make the general ledger entries for Map Global?

15  A.    I made the general ledger entries and reviewed with our

16  accountant.

17  Q.    And you did not make entries that were recording payments

18  to you as distributions to Steve Brown?

19  A.    I wasn't making recordings that gave money to Mr. Brown

20  and indicating that they were mine.

21  Q.    So there did not have a -- there was not an occasion when

22  you told the Office of Special Counsel that distributions

23  recorded as distributions to Steve Brown were actually received

24  by you in your bank account?

25  A.    The money in the Map, because it was a Map bank account,

Gates - Cross                                                        1388

1   and then the distributions were divided between myself and

2   Mr. Brown.

3   Q.    Okay.  One more time I have to ask the question, I'm

4   sorry.

5   A.    Sure.

6   Q.    You did not tell the Office of Special Counsel that

7   payments to you were being disguised on Map Global Holdings'

8   general ledger as distributions for Steve Brown?  You did not

9   say that?

10  A.    I don't recall saying that, no.

11  Q.    Do you recall being confronted with that?

12  A.    No, I don't.

13  Q.    Now, with respect to Map Global Holdings, was there any

14  discussions with the Office of Special Counsel as to what kind

15  of federal crimes you committed when you signed that letter and

16  provided it for Mr. Brown, the potential investments that he

17  had, I guess?

18         What would you call that type of letter?

19  A.    The letter was for a potential investment in a movie

20  project that he was working on.

21  Q.    So he was representing that he had certain backing, is

22  that what it was?

23  A.    Yes.

24  Q.    Okay.  So you're saying, "Hey, we have these investors.

25  You want to invest with us too," correct?

1    A.    That's what I understood.

2    Q.    Is that like a lulling letter?  Is that what you would

3    call it?

4    A.    He didn't call it that.

5    Q.    Would you?

6    A.    I don't know, because I wasn't privy to the negotiations.

7    Q.    Did the government indicate to you what kind of federal

8    crimes you committed when you did that?

9    A.    I think they indicated that it was fraud.

10   Q.    It was fraud?

11   A.    Yes.

12   Q.    Any securities fraud?

13   A.    I don't recall them indicating that.

14   Q.    Mail/wire fraud?

15   A.    I don't recall.

16   Q.    Any money received with respect to that letter by

17   Mr. Brown?

18   A.    Not to my knowledge.

19   Q.    But it wasn't discussed that crimes that would constitute;

20   is that correct?

21   A.    Other than fraud, I don't believe so, but I don't recall.

22   Q.    And was there any discussion about you pleaing to that

23   fraud?

24   A.    It was represented as an additional crime as part of my

25   plea agreement, yes.

1  Q.   But you didn't need to plea to it?

2  A.   No, because as part of the plea agreement, the government

3  agreed that it would not bring -- or would not prosecute for

4  additional charges, and I believe that was one that I raised in

5  addition with them.

6  Q.   You don't believe you were confronted with it.  You

7  believe you raised it?

8  A.   No, no.  I mean, the relationship with Mr. Brown I raised.

9  The letter itself, I was confronted with the letter.

10  Q.   Now, there's also an issue the Office of Special

11  Counsel -- Office of Special Counsel -- excuse me -- raised

12  with you regarding potential insider trading.  Is that --

13  insider trading, do you know what that is?

14  A.   That's correct.

15  Q.   Did they raise an issue with you about potential insider

16  trading?

17  A.   They did.

18  Q.   Can you explain to the jury what insider trading is?

19  A.   Yes.  To my understanding, it's when somebody that has a

20  position in a company is able to provide information that's not

21  available to the public.

22  Q.   And can that be considered fraud too?

23  A.   I don't know that.  I don't know the law in that regard.

24  Q.   Were you advised by the Office of Special Counsel that

25  there are federal statutes that criminalize insider trading?

Gates - Cross                                                      1391

1    A.   I believe they mentioned that there were statutes

2    regarding that, yes.

3    Q.   Did they mention that you would be prosecuted for that?

4    A.   No, they did not.

5    Q.   Now, when you were confronted about this insider

6    trading --

7              THE COURT:  Did you understand you could be

8    prosecuted for that?

9              THE WITNESS:  Oh, I understood that I could be

10   prosecuted, yes.

11             THE COURT:  Next question.

12   BY MR. DOWNING:

13   Q.   Well, in fact, you had received a letter from the SEC, did

14   you not, making an inquiry about this?

15   A.   I did.

16   Q.   And did you raise that issue with the Office of Special

17   Counsel or were you confronted with that letter?

18   A.   As I recall, I think I acknowledged that I had received a

19   letter.  I don't know if they asked it as a question or in the

20   context of talking about that entity, if I -- if I informed

21   them that I had received a letter.

22   Q.   And what entity did that involve?

23   A.   That was a company called ID Watchdog.

24   Q.   And what was the allegation about the insider trading?

25   A.   The allegation was in regards to a conversation and

1    whether or not it occurred with my brother, who I did not know

2    if he had invested in the company or not.

3    Q.   Was there also an issue about you receiving certain

4    warrants on the eve of an IPO for this company or a purchase?

5    A.   Yes.

6    Q.   And can you explain what that was?

7    A.   Yes.  So a number of board directors did not exercise

8    their warrants before the expiration date, but it was very

9    close to the expiration date.  And the CFO of the company

10   allowed the various board members, as I recall, to exercise

11   those warrants.

12   Q.   And what kind of -- what kind of warrants did you get to

13   exercise?

14   A.   I think it was a total of, I think, around 250,000

15   warrants.

16   Q.   And what year was that?

17   A.   The exercise of the warrants, I believe, was in 2017.

18   Q.   And did the Office of Special Counsel indicate whether or

19   not, at the time, there was an ongoing investigation against

20   you regarding insider trading?

21   A.   I don't recall if they had an investigation.

22   Q.   Did you retain a lawyer to represent you with respect to

23   an ongoing investigation by the SEC?

24   A.   No.

25   Q.   And did the Office of Special Counsel indicate that you

1   would have to plead guilty for your actions with respect to

2   that activity?

3   A.    No, they did not.

4   Q.    Now, in addition to these various fraud schemes, you also

5   had discussions with the Office of Special Counsel about your

6   failure to report income on your tax returns; is that correct?

7   A.    That is correct.

8   Q.    And one such occasion had to do with an investment you

9   made in a Facebook IPO; is that correct?

10  A.    I don't recall.

11  Q.    Do you recall what you disclosed to the Office of Special

12  Counsel about unreported income from various investments?

13  A.    I do not.

14  Q.    Did you disclose unreported income from various

15  investments?

16  A.    I believe I did.  It may have been generally, that I

17  indicated that I did not disclose all of my income.

18  Q.    Do you recall disclosing to the Office of Special Counsel

19  that you did not report the $2.5 million proceeds from your

20  activities with Mr. Cohen on your original tax returns?

21  A.    Well, that would have been on the 2017 tax return, which

22  has not been filed yet.

23  Q.    So you didn't represent that you failed to report it on

24  the original return, but you did report it on an amended tax

25  return; is that correct?

1   A.   I don't think it's been reported yet.  It's an action that

2   occurred in 2017.  That tax year has not been filed.  The

3   original has not been filed.

4   Q.   So you did not make any such representation to the Office

5   of Special Counsel?

6   A.   I don't believe I did.

7   Q.   Did you have occasion to talk to the Office of Special

8   Counsel or disclose that you had filed amended tax returns in

9   the summer of 2017?

10  A.   Yes.

11  Q.   And do you recall being confronted by the Office of

12  Special Counsel about falsities in the amended return?

13  A.   Yes.

14  Q.   And what were the falsities that you were confronted with?

15  A.   At the time, my attorney had indicated that I should put a

16  letter into the tax returns, because at subject was the foreign

17  bank accounts that were controlled by Mr. Manafort.  As was

18  stated earlier, Mr. Manafort had accepted that he had control

19  and signature authority over those accounts, but we were not in

20  the position, as I recall, with the Special Counsel to

21  determine whether or not they would accept that position or

22  not.

23          So my attorney had submitted, with the tax return, a

24  letter stating that we would have to investigate the --

25  further, the foreign bank accounts because of the situation

1    going on with the Special Counsel's office.

2    Q.    So, Mr. Gates, did the Office of Special Counsel state to

3    you they felt that you failed to report offshore bank accounts

4    on your amended tax return?

5    A.    They did.

6    Q.    And the amended tax returns, if I understand this

7    correctly, the timing of them was that the Office of Special

8    Counsel had been conducting an investigation for some time?

9    A.    Correct.

10   Q.    And you knew of it, correct?

11   A.    That's correct.

12   Q.    Did you also get confronted with leaving off well over

13   $1 million on your amended tax return?

14   A.    I don't recall if that was the number.

15   Q.    Do you recall that it was a large number?

16   A.    I don't recall what number that they allocated or

17   indicated that I had not paid in taxes.

18   Q.    Do you recall what it related to?

19   A.    I do not.

20   Q.    Do you recall if it related to income from offshore

21   accounts?

22   A.    Oh, I'm sorry, yes, it did relate to income from offshore

23   accounts.

24   Q.    So you do recall that?

25   A.    Now, with you recollecting my memory, yes.

1    Q.   So I want to go back to the EDVA indictment.  The original

2    indictment that I believe you testified, I'll ask the question

3    again, that the --

4            THE COURT:  Let me just say EDVA means Eastern

5    District of Virginia.

6            MR. DOWNING:  Oh, thank you, Your Honor.

7    BY MR. DOWNING:

8    Q.   As part of your plea agreement, the Office of Special

9    Counsel agreed to dismiss the charges against you here in the

10   Eastern District of Virginia; is that correct?

11   A.   That is correct.

12   Q.   And those charges included filing false tax returns for

13   several years; is that correct?

14   A.   Yes, that's correct.

15   Q.   And it included failure to file FBARs for several years?

16   A.   Yes.

17   Q.   And it included bank fraud charges?

18   A.   Yes.

19   Q.   And conspiracy to commit bank fraud, is that correct?

20   A.   Yes.

21   Q.   And did the Office of Special Counsel indicate to you that

22   you could be looking at as much as 290 months in jail?

23   A.   I don't think they ever indicated a number, but I don't

24   recall.

25   Q.   Oh, I stand corrected.  It's 290 years.

Gates - Cross                                                      1397

1        Did they indicate to you that you could go to jail

2   for 290 years?

3   A.   Same response, but I like your first answer better.

4                      (Laughter.)

5   Q.   What is the response?

6             THE COURT:  I'm sorry?

7             THE WITNESS:  Sorry, Your Honor.  I said that it's

8   the same answer.  I don't recall the Special Counsel indicating

9   to me the total number of maximum years that I could serve for

10  the second indictment.

11            THE COURT:  Well, what did you understand the maximum

12  years you could be sentenced to?

13            THE WITNESS:  It was -- I understood it to be quite

14  significant.

15            THE COURT:  All right.  Do you -- did you -- can you

16  quantify that?  Did you have, in your mind, a number?

17            THE WITNESS:  I knew it was in excess of 50 to 100

18  years, yes.

19            THE COURT:  Next question.

20            MR. DOWNING:  Thank you, Your Honor.

21  BY MR. DOWNING:

22  Q.   Now, in terms of your cooperation with the Office of

23  Special Counsel after you took your plea, did you have occasion

24  to be interviewed by other members of the Office of Special

25  Counsel about the Trump campaign?

Gates - Cross                                                              1398

1   A.   Yes.

2   Q.   And were you interviewed on several occasions about your

3   time at the Trump campaign?

4            MR. ANDRES:  Objection, Your Honor.

5            THE COURT:  All right.  Do you need to come to the

6   bench?

7            MR. ANDRES:  Please.

8            THE COURT:  All right.  You may do so.

9            (Pages 1399 through 1405 filed under seal.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gates - Cross                                                         1406

1          THE COURT:  Ladies and gentlemen -- ladies and

2   gentlemen, I want to thank you in advance for your patience,

3   because we're going to take another break now, and hope you'll

4   have a soft drink.

5          But it won't be a long break.  It will be -- well, it

6   will be -- we'll recess until 4:30 and then go at least until

7   5:30, and we'll see where we are.  Thank you for your patience.

8   I can assure you that this is necessary.

9          Pass your books to the right.  Mr. Flood will collect

10  them, maintain their security.  And remember to refrain from

11  discussing the matter amongst yourselves or with anyone or

12  undertaking any investigation.  You may follow Mr. Flood out.

13         All right.  Court stands in recess until -- I said

14  4:30.

15         Oh, Mr. Gates, you may step down, sir, but you must

16  remember that you may not discuss your testimony with anyone.

17         THE WITNESS:  Thank you.

18         MR. ANDRES:  Thank you, Your Honor.

19            (Recess from 4:04 p.m., until 4:28 p.m.)

20                        (Defendant present, Jury out.)

21         THE COURT:  Did you have something?

22         MR. DOWNING:  No.

23         THE COURT:  Mr. Nanavati?

24         MR. NANAVATI:  Yes.

25         THE COURT:  That's yours.  It was delivered to the

Gates - Cross                                                          1407

1    clerks.  The marshals opened it.  I have not looked at it.  I

2    have no idea what it is and don't care.

3              MR. NANAVATI:  Thank you, Your Honor.

4              THE COURT:  All right.  Bring in the jury, please.

5                         (Jury present.)

6              THE COURT:  All right.  You may be seated.  Thank you

7    again for your patience.

8              Let's have Mr. Gates return.  And we will recess

9    sharply at 5:30.

10             All right.  Mr. Gates, you'll recall you remain under

11   oath.  You may resume the stand.

12             THE WITNESS:  Thank you.

13             THE COURT:  All right.  Mr. Downing, you may proceed.

14             MR. DOWNING:  Thank you, Your Honor.

15   BY MR. DOWNING:

16   Q.   Mr. Gates, I'd like you to go back and take a look at what

17   was marked as Defendant's Exhibit 17, the compilation of

18   $3 million in wires from DMP's offshore accounts.  Do you have

19   that in front of you?

20   A.   I do.

21   Q.   And there's a section starting in 2010 -- 2011, I'm

22   sorry -- 9/9/2011, and it says -- the name on it is "Jemina" --

23   is it Jemina?  Is that correct?

24   A.   Jemina.

25   Q.   Jemina, J-e-m-i-n-a, LLC.

1       And do you see on 9/9/2011, there was a wire transfer

2  from Peranova for $48,500 to Jemina?  Do you see that?

3  A.   I do.

4  Q.   And then if you go to the next page, and for a series of

5  entries for July 8, 2013, do you see that?

6  A.   July 8?

7  Q.   Yeah.  Do you see that for Jemina LLC, 7/8/2013 from

8  Marziola?

9  A.   Yes, I do.

10  Q.   In the amount of $72,500?

11  A.   Yes.

12  Q.   And there's an entry for September 4, 2013, also from

13  Marziola to Jemina for $89,807?

14  A.   Yes.

15  Q.   There's another entry on 10/22/2013 from Cypriot agent to

16  Jemina for $119,844.  Do you see that?

17  A.   I do.

18  Q.   What is Cypriot agent?

19  A.   I don't know.

20  Q.   Did you have some side deal in Cyprus where you were

21  getting money funneled to you from a law firm or an accounting

22  firm?

23  A.   No, there was no side deal.

24  Q.   Well, what is Cypriot agent?

25  A.   Oh, Cypriot agent could be in reference to when the

Gates - Cross                                                          1409

1  Cypriot accounts were closed Dr. K had consolidated those

2  accounts into a -- what he called a client account.  So that

3  could be in reference to that.

4  Q.   And those Cypriot agent, the next three entries are 10/22,

5  11/12, and 12/22/13 -- excuse me -- December 20, 2013, all say

6  "Cypriot agent," correct?

7  A.   Yes.

8  Q.   119,844, 80,000, and $90,000; is that correct?

9  A.   That is.

10  Q.   And can we go down to 2014?

11       There's two more entries for Cypriot agent to Jemina,

12  correct?

13  A.   Yes.

14  Q.   February 2014 and April for $60,044 and $44,068, is that

15  correct?

16  A.   That is.

17  Q.   All to Jemina?

18  A.   Yes.

19  Q.   And then the last one is 10/6/2014 from Global Endeavour

20  to Jemina for $65,000, correct?

21  A.   Yes.

22  Q.   So that's several hundred thousand dollars that were going

23  to Jemina, correct?

24  A.   Yes, it is.

25  Q.   Now, I'd like you to take a look at what's been put in

1    front of you and marked as Defense Exhibit 14.  Do you see

2    that?

3    A.   I do.

4    Q.   And -- and what is that document?

5    A.   The first one appears to be the wiring instructions.

6    Q.   And these are wire instructions from?

7    A.   It appears to be from -- I'm sorry -- it's a confirmation

8    statement from Loyal Bank.

9    Q.   And for which account?

10   A.   This would be Global Endeavour.

11   Q.   And that's what it says on the bottom right-hand side,

12   correct?

13   A.   Yes.

14   Q.   And this is a wire transfer for $65,000?

15   A.   Yes.

16   Q.   And where is it headed?

17   A.   It appears to Jemina.

18   Q.   And what is the date of that?

19   A.   It's way at the bottom.  It looks like 8/9/2014.

20   Q.   And can you turn to the next page?  And what is that

21   document?

22   A.   This says, "Checklist for Confirmation of Wire Request."

23   Q.   And is that a corresponding document for the front page

24   for the wire transfer?

25   A.   Yes, it appears to be.

1  Q.   And it's the same bank, correct?

2  A.   It is.

3  Q.   And on the next page?

4  A.   This is a pro forma invoice that I -- that I drafted in

5  regards to the documentation needed from Global Endeavour.

6  Q.   And for the total of six- -- excuse me -- $65,000,

7  correct?

8  A.   That is correct.

9  Q.   And can you turn to the next page?  What is that document?

10         THE COURT:  Do you plan to offer this document?

11         MR. DOWNING:  I do.

12         THE COURT:  All right.  Any objections to it?

13         MR. ANDRES:  No, Your Honor.

14         THE COURT:  All right.  It's admitted.

15         (Defendant's Exhibit No. 14 was received in

16  evidence.)

17         THE COURT:  So let's see if we can move it along.

18         THE WITNESS:  It appears to be applicant check

19  details.

20         THE COURT:  What's the question to Mr. Gates?

21         MR. DOWNING:  I was just asking if he understood what

22  the next document was, if he knows what it is.

23         THE WITNESS:  No, I've never seen it.

24  BY MR. DOWNING:

25  Q.   And the next page?

1    A.   This is the consultancy agreement that was required by the

2    account of the bank in order to make a wire transfer.

3    Q.   Okay.  This says it's Global Endeavour, Inc., and Jemina;

4    is that correct?

5    A.   Yes.

6    Q.   Jemina.

7            And what is this supposed to be, a consultancy

8    agreement?

9    A.   Yes.  The bank required supporting documentation, so they

10   required both an agreement and a invoice.

11   Q.   So when you say the bank required it, what do you mean?

12   What does that mean?  I don't understand.

13   A.   It means that the bank, in order to make the wire transfer

14   effective, required the two pieces of supporting documentation.

15   Q.   And the supporting documentation is false and misleading,

16   is it not?

17   A.   The -- in order to do the wire, yes, it was.

18   Q.   There was no consultancy agreement between Global

19   Endeavour and Jemina?

20   A.   That's correct.  It was in order to get the wire

21   transacted out of the account.

22   Q.   And did you have occasion to discuss Jemina with the

23   Office of Special Counsel?

24   A.   I'm not -- I don't recall if they discussed that or not.

25            THE COURT:  Mr. Gates, is that your signature at the

1    end of this document?  At the end of the so-called consultancy

2    agreement?

3              THE WITNESS:  No, it is not.

4              THE COURT:  Do you recognize the signature?

5              THE WITNESS:  Yes.  These were the signatures for

6    Global Endeavour, and it appears some of that I had signed on

7    behalf of Jemina from the Cyprus law firm.

8              THE COURT:  So you did sign it?

9              THE WITNESS:  I personally didn't sign it, but I had

10   a representative sign it, yes.

11             THE COURT:  Next question.

12   BY MR. DOWNING:

13   Q.   So the invoice attached for $65,000, it says, "For

14   professional fees," is a false document, correct?

15   A.   Yes, it is.

16   Q.   And the consultancy agreement is a false document,

17   correct?

18   A.   Yes.  They were supporting documentation in order to get

19   the wire transaction.

20   Q.   And the account to which the wire went to for Jemina,

21   that's your account, is it not?

22   A.   It is.

23   Q.   And all the transfer we just talked about for Jemina were

24   similar to this, correct?

25   A.   I don't know which accounts they came from but --

1   Q.   Well, we went through that before but they're all under

2   the same consultancy agreement, correct?

3   A.   Yes.

4   Q.   A fake and phony consultancy agreement?

5   A.   Yes.

6   Q.   And the original -- the consultancy agreement itself is

7   something you drafted?

8   A.   No, that was drafted by the -- the template was drafted by

9   the Cyprus law firm and then that was the same one I've used to

10  edit other things.

11  Q.   So you've asked them to update it for this particular

12  false and misleading information?

13  A.   No, I updated it.  I used their template.

14  Q.   And you sent it to them?

15  A.   Correct.

16  Q.   Now, getting back to Exhibit 17, Defense Exhibit 17, I

17  draw your attention to the last page.  For November 25, 2014,

18  there's a transfer from Global Endeavour to Bade LLC for

19  $120,000.

20          Do you see that?

21  A.   I do.

22  Q.   Now, can you look at what's been marked Defense

23  Exhibit 15?  15.

24          MR. DOWNING:  And, Your Honor, we move Defendant's

25  Exhibit 15 into evidence.

Gates - Cross                                                          1415

1              MR. ANDRES:  None.  No objection.

2              THE COURT:  Admitted.

3              (Defendant's Exhibit No. 15 was received in

4    evidence.)

5              THE COURT:  Next question.

6    BY MR. DOWNING:

7    Q.   The first page, can you explain to the jury what the first

8    page is of Defendant's Exhibit 15?

9    A.   The first page is a wire confirmation request.

10   Q.   For $120,000?

11   A.   It is.

12   Q.   And it's set to go to Bade LLC; is that correct?

13   A.   Yes.

14   Q.   And the attached invoice from Bade LLC, do you see that?

15   A.   I do.

16   Q.   And it says it's for professional fees for $120,000?

17   A.   Yes.

18   Q.   And Bade LLC, is that an entity that you set up?

19   A.   It is.

20   Q.   And that's a bank account that you're the holder of?

21   A.   It is.

22   Q.   And this invoice is a false and phony invoice, correct?

23   A.   It is.

24   Q.   And there were no professional services provided with

25   respect to receiving 120,000, correct?

1  A.   Correct.  These were more expenses.

2  Q.   These are for what?

3           THE COURT:  Where did the money come from?

4           THE WITNESS:  The money came from Global Endeavour,

5  one of the offshore accounts.

6           THE COURT:  And -- but where did the money come from?

7           THE WITNESS:  Oh, the money came in conjunction to

8  expense reports that I created in order to get the money wired

9  out of the account.

10          THE COURT:  Yeah.  That tells me how you got the

11 money, you say by -- by using these false expense reports, but

12 I want to know whose money it was.

13          THE WITNESS:  Oh.  In this case it was Mr. Manafort's

14 money.

15          THE COURT:  Next question.

16 BY MR. DOWNING:

17 Q.   It's one of the -- the money -- the account that it came

18 out of, Global Endeavour, was one of DMP International's

19 offshore accounts, correct?

20 A.   Yes.  It's one of the accounts controlled by Mr. Manafort.

21 Q.   So I want to see if I can understand this.  You're saying

22 $120,000 are expenses?

23 A.   Well, it was a series of -- as I recall, there were two

24 different payments.  The invoice is broken down.  So the

25 description on the invoice was not necessarily consistent with

1  what the, you know, payment may have been for.

2  Q.   Are these payments for your secret life?

3  A.   No, they're not.

4        MR. ANDRES:  Your Honor, can the witness answer the

5  question?

6        THE COURT:  Yes, he can.

7        MR. DOWNING:  I thought he did.

8        THE COURT:  What's the answer to the question?

9        THE WITNESS:  The answer is:  No, they're not.

10 BY MR. DOWNING:

11 Q.   So what exactly are you telling us these expenses are to

12 the tune of $120,000?

13 A.   As I said, at least one of them -- I, you know, could go

14 back and try to refresh, but one of them is fabricated.  It's

15 not a true expense report.  For example, one of the entries, I

16 think you showed me, was a bonus from Mr. Manafort, and I

17 believe this one to be one as well.

18 Q.   Okay.  One more time.

19 A.   Yes.

20 Q.   First, you said it was reimbursement for expenses.

21 A.   For both, correct.

22 Q.   And now you're saying it's a bonus.

23 A.   Yes.  One -- there's -- you have two entries on here, on

24 the invoice.

25 Q.   And the entries say, "Professional fees"?

1   A.   That's correct.  That was the notation used to actually

2   transact the wire from the bank in the Grenadines.

3   Q.   So why exactly would it not say, "Reimbursement for

4   expenses," attach an invoice for DMP International-related

5   business expenses?

6   A.   As I said, I fabricated the invoice.

7   Q.   Why?

8   A.   Because I was -- in essence, I was living beyond my means.

9   I was -- it was a difficult time.  I was living, you know, more

10  than I should have.  I, you know, I regret it, clearly, and,

11  you know, I'm taking responsibility for it, but I made a

12  mistake.

13  Q.   So -- so this truly is not related to DMP International's

14  business.  This is related to your secret life.  That's what

15  this is about?

16  A.   It's not a secret life since this went to an account that

17  my wife is aware of but --

18  Q.   Was she aware of your secret life, too?

19  A.   She was.

20  Q.   So, Mr. Gates, just to be clear, because you've said it

21  several different things, but it is truly just an embezzlement,

22  correct?

23  A.   This is money that I've taken from Mr. Manafort that was

24  unauthorized.  I've already indicated that.  I've said that.

25  Q.   It's not authorized?

1    A.    I said it's unauthorized, that's correct.

2    Q.    It's an embezzlement, is it not?

3    A.    You can choose -- sure.   You can choose whatever word

4    you'd like.

5    Q.    Well, why don't you use the word?   It's an embezzlement?

6    A.    It is an unauthorized transaction that I took from

7    Mr. Manafort.

8    Q.    Why won't you say "embezzlement"?

9    A.    What difference does it make?

10   Q.    Why won't you say "embezzlement"?

11   A.    It was embezzlement from Mr. Manafort.

12           THE COURT:   I've admitted 15, 17 -- not 17.   I've

13   admitted 14 and 15; is that correct?

14           MR. DOWNING:   That's correct, Your Honor.

15           THE COURT:   All right.

16           MR. DOWNING:   Not 17.

17           THE COURT:   Not 17 as yet.

18   BY MR. DOWNING:

19   Q.    Mr. Gates, I'd like to ask you a few questions about your

20   activities with respect to DMP International and these -- you

21   know, DMP's offshore bank accounts.   You came -- I think you

22   indicated earlier that you left DMP for a few years and you

23   came back.

24           Do you recall when you came back to DMP?

25   A.    I'm not sure what you mean by leaving DMP.

1    Q.   You went off on some business venture, didn't you?

2    A.   You'd have to give me more information.  I'm not sure what

3    you mean.

4    Q.   Well, I thought you testified the other day that you

5    worked at Davis Manafort for a while and then you went off to

6    some tech company.

7           Didn't you testify to that?

8    A.   What's the name of the tech company?

9    Q.   I don't know.  G-something?

10          MR. ANDRES:  Judge, could we have questions and

11   answers as opposed to a discussion here?

12          THE COURT:  I don't see that as an objection.  I'll

13   overrule it.

14          Go ahead, Mr. Downing.

15   BY MR. DOWNING:

16   Q.   Was there a period of time when you left working for

17   Mr. Manafort and went off to some tech venture?

18   A.   I don't -- you have to give me more information.  I'm not

19   sure what you mean.

20          THE COURT:  Well, just with that information, can you

21   give an answer?

22          THE WITNESS:  Yeah.  I mean, I've never left the

23   employ of Mr. Manafort from 2006 to 2016.

24   BY MR. DOWNING:

25   Q.   No, I asked before that.  G-Tech?

Gates - Cross                                                          1421

1   A.   Oh, I'm sorry, yes.   Yes.   That was my second job after

2   going to Black, Manafort, Stone and Kelly.

3   Q.   And how many years did you spend at G-Tech?

4   A.   I believe it was about four years.

5   Q.   And then you came back in 2006 to Davis Manafort, correct?

6   A.   No.   Actually, I came back, I went to work for Business

7   Strategies & Insight, then Scientific Games.   And then from

8   Scientific Games, I came to Davis Manafort Partners.

9   Q.   In 2006?

10  A.   In 2006.

11  Q.   Okay.   Here we are in 2006.   I'm going to ask you some

12  questions about 2006.

13  A.   Yes.

14  Q.   When you came back in 2006, was Davis Manafort a smaller

15  operation than it had been before you left?

16  A.   It had approximately nine employees when I joined in 2006.

17  Q.   And before when you worked there?

18  A.   So I started with DMP --

19          MR. ANDRES:   Objection, Judge.   It misrepresents --

20          THE COURT:   Just a moment.

21          MR. DOWNING:   I'm just asking when --

22          THE WITNESS:   I started with Davis Manafort --

23          MR. ANDRES:   I'm objecting to the question.

24          THE COURT:   Wait just a moment.   What's your

25  question, Mr. Downing?

Gates - Cross                                                          1422

BY MR. DOWNING:

Q.   Before you left to go off with G-Tech, how big was Davis

Manafort?

          THE COURT:  All right.  Before you answer, what's the

objection?

          MR. ANDRES:  Yeah.  There was no Davis Manafort

before that time.  There was Davis Manafort --

          THE COURT:  Well, you can't testify.  What's your

objection?

          MR. ANDRES:  He's misrepresenting the entities that

existed.  They were two entirely different --

          THE COURT:  Well, he will have to answer the

question.  If something is wrong with the question, presumably

he'll know that, but you can't get up and tell the Court -- I'm

addressing you.

          MR. ANDRES:  I'm sorry.

          THE COURT:  You can't simply tell the Court in your

view what's right.  This is for the witness.

          MR. ANDRES:  Thank you, Judge.

          THE COURT:  All right.  Proceed.

          MR. DOWNING:  Thank you, Your Honor.

BY MR. DOWNING:

Q.   Before you went off to work for G-Tech, the entity that

you were working about with Mr. Manafort, what was it called?

A.   That was Black, Manafort, Stone and Kelly.

1    Q.    Okay.  So that company that you were working for back --

2    A.    Yes.

3    Q.    -- back in that day, was that a larger company than what

4    you had joined Manafort again in 2006?

5    A.    It was.

6    Q.    Okay.  How much smaller was it?

7    A.    How much smaller was Davis Manafort?

8    Q.    Yes.

9    A.    It was significantly smaller.  I mean, Davis Manafort was

10   a offshoot of Black, Manafort, Stone and Kelly by some of the

11   partners.

12   Q.    And when you returned in 2006, I think you indicated on

13   your direct you took on more responsibilities.

14   A.    Over the years, that's correct.

15   Q.    Over the years.  And can you give a little detail of the

16   types of responsibilities that you took on over the years?

17   A.    Yes.  It started out as being more engaged in the

18   political campaigns.  I was asked to help set up the private

19   equity fund, as I mentioned.  It also included a number of

20   administrative responsibilities.  I think, as I stated, as the

21   number of employees decreased over the years, more

22   responsibilities were split with the few staff that remained.

23   Q.    And in terms of the administrative responsibilities, can

24   you explain what types of administrative responsibilities you

25   took over?

1   A.   Yes.  It was a series of things such as managing the

2   company's healthcare, some of the information with the

3   accountants that I've stated, working with the bookkeeper as an

4   example, and also doing some of the other things that

5   Mr. Manafort assigned, including working with some of his real

6   estate attorneys.

7   Q.   And in addition to these -- these responsibilities that

8   you had, there was also some travel that came along with your

9   job?

10  A.   There was.

11  Q.   And can you explain what kind of travel you did?  Did you

12  do travel within the United States?

13  A.   I did travel within the United States as well as

14  international travel.

15  Q.   And where in the United States did you travel to?

16  A.   I know a lot in New York, because Mr. Manafort would meet

17  up there, and then also in kind of around the Washington, D.C.,

18  area.  And then depending on if there were various meetings

19  that Mr. Manafort wanted me to attend, in some cases I would

20  join him.

21  Q.   And how about international?

22  A.   Internationally, it was primarily Cyprus and Ukraine, and

23  then, again, there were a host of other countries that we had

24  meetings in that we would go to.

25  Q.   And when did you -- when you came back in 2006, when did

1   you start getting involved with the offshore -- Davis

2   Manafort's offshore accounts?

3   A.   I believe it was started in late 2007, when I met with

4   Mr. Chrysostomides, and then additional responsibilities were

5   assigned to me, you know, over the subsequent years.

6   Q.   And as you came up to speed and you were working on Davis

7   Manafort's international accounts, were you also working with

8   the accountants year in and year out in terms of getting tax

9   returns ready and prepared for Davis Man- -- DMP, DMP

10  International, and Mr. Manafort?

11  A.   Yes.  I was working with the accountants and the

12  bookkeeper.

13  Q.   And year in and year out, the questions seem to come out

14  about offshore bank accounts; is that correct?

15  A.   Yes.

16  Q.   And in 2013, or go ahead a little bit, there was an issue

17  that popped up about an EVO Holdings account.

18           Do you remember that?

19  A.   I do.

20  Q.   And the question was whether or not an FBAR had to be

21  filed by Mr. Manafort for his investment in EVO Holdings.

22           Do you remember that?

23  A.   I do.

24  Q.   And that particular inquiry you happened to be involved

25  with with accounts over at KWC?

1  A.   Yes.

2  Q.   And the issue that developed was a bit of a complicated

3  issue, was it not?

4  A.   I would say so, yes.

5  Q.   And the issue that came up had to do with whether or not

6  Mr. Manafort had the requisite control to be required to file

7  an FBAR; is that correct?

8  A.   Yeah.  Actually, that year it was about foreign shares,

9  not foreign bank account.

10  Q.   Foreign shares, ownership.

11  A.   Yes, yes.

12  Q.   And there was a question about how to determine if he had

13  control, correct?

14  A.   Yes.

15  Q.   And the question was difficult enough that the folks at

16  KWC had to get an expert involved, correct?

17  A.   I don't recall who the expert was.

18           MR. DOWNING:  Would you please bring up Exhibit 201?

19  It's already been in evidence.

20           May we publish, Your Honor?

21           THE COURT:  Which exhibit?

22           MR. DOWNING:  Yes, 201.

23           THE COURT:  And it's already in evidence?

24           MR. DOWNING:  It is.

25           THE COURT:  All right.  You may do so.

1  BY MR. DOWNING:

2  Q.   Mr. Gates, please take a look at Government Exhibit 201.

3  A.   Yes.

4  Q.   And if we can flip to the second page, please?  Thank you.

5  A.   Oh, so there's no additional expert.  This is KWC.

6  Q.   Right.  It's someone in their tax department, correct?

7  A.   Yes.  This is Naji Lakkis.

8  Q.   Okay.  And they got someone with some tax expertise in

9  this area involved to determine that, in fact, an FBAR did not

10  have to be filed; is that correct?

11  A.   Yes, it appears that's their recommendation.

12  Q.   And, Mr. Gates, you don't have any expertise in the area

13  of FBAR, do you?

14  A.   I do not.

15  Q.   Have you ever read any of the IRS regulations on them?

16  A.   I have not read them in full, but I've seen them, yes.

17  Q.   You've seen parts of them, correct?

18  A.   Correct.

19  Q.   And when you were presented with KWC's expert opinion on

20  this, they have asked you a question about whether or not this

21  would be the same for another year, correct?

22  A.   Yes.

23  Q.   And you respond, "I will call you tomorrow, but based on

24  the structure, as I've learned today, we do not need to file

25  for Paul."

1              Is that correct?

2    A.   Can you show me where that is?

3    Q.   It's in the top.  It's in the box.

4    A.   Yes, I see it.

5    Q.   On page 1.  Do you see that?

6    A.   Yes.

7    Q.   And what did you mean when you said, "I will call you

8    tomorrow, but based on the structure, as I learned today"?

9    What did you mean by that?

10   A.   Yes.  I believe that was initially the structure that had

11   been proposed to KWC in which they looked at the ownership

12   percentage of EVO Holdings.

13   Q.   But you weren't making any decisions on whether or not the

14   FBAR had to be filed.  KWC was, correct?

15   A.   With respect to the foreign taxes.  However, there was an

16   associated bank account with EVO Holdings that Mr. Manafort had

17   control of.

18   Q.   But the question here, you weren't making the decision as

19   to whether or not an FBAR had to be filed, correct?

20   A.   Not an FBAR on EVO Holdings.  This related to the shares.

21   Q.   Maybe I'll be clearer.  You weren't making the decision

22   here.  It was KWC that was making the decision; is that

23   correct?

24   A.   Yes.  Based on a previous e-mail, I believe, that's not

25   here, once KWC asked the questions about it, I contacted the

1    accountants in -- or the law firm in Cyprus to ask them the

2    complete structure of EVO Holdings.

3    Q.   Okay.  Can you turn to page 2 again?

4         And that's an e-mail from -- is it Lakkis?

5    A.   Naji Lakkis, yes.

6    Q.   Lakkis.  To you, correct, dated June 26, 2012?

7    A.   Correct, copying Mr. Ayliff and Mr. O'Conor (sic).

8    Q.   And they're both employees of KWC, correct?

9    A.   Yes.

10   Q.   Okay.  And it says, "Hello, Rick."  And can you read the

11   "Based on our conversation"?

12   A.   (As read): "Based on our conversation, the only foreign

13   financial account that Paul may need to report on the FBAR is

14   the telecommunications entity.  If this is incorrect, please

15   let me know."

16   Q.   And did you ever let him know if he thought it was

17   incorrect?

18   A.   No.  Because at Mr. Manafort's request, he asked me not to

19   disclose the other foreign bank accounts.

20   Q.   And do you have an e-mail in which Mr. Manafort told you

21   that?

22   A.   There is an e-mail where he is asked directly the same

23   question and he responds no.

24   Q.   I'm asking you:  Communication between you and

25   Mr. Manafort?

1   A.   No.  A lot of our communication occurred verbally,

2   especially on subjects like this.

3   Q.   Actually, it's interesting you raise that question.

4   Because in direct, every time you wanted to say something that

5   would make Mr. Manafort be involved with your activity, you

6   said, "We had discussions."  Every single time.

7   A.   Correct.

8   Q.   And there's no record of any such discussions, are there?

9   A.   I think there's a strong record that there are a number of

10  discussions that occurred, but for the most part, Mr. Manafort

11  would employ both phone and e-mail in those discussions.

12  Q.   So with respect to every time you said "discussions" on

13  direct, this jury is supposed to just believe you; is that

14  correct?

15  A.   Yes, they are.

16  Q.   Uncorroborated believe you?

17  A.   Yes.

18  Q.   After all the lies you told and fraud you've committed,

19  you expect this jury to believe you?

20  A.   Yes.

21  Q.   Uncorroborated?

22  A.   Yes.

23  Q.   Do you hope the Office of Special Counsel thinks the same

24  way?

25  A.   Yes.

1   Q.   Because they're the ones that are going to write you the

2   5K1 letter?

3   A.   They will.

4   Q.   They're the ones that are going to let your lawyer say you

5   get probation unopposed?

6   A.   Yes.

7   Q.   Even if you lie?

8   A.   But I haven't, and I'm here to --

9   Q.   And the jury is supposed to believe that?

10  A.   Yes.  Because I'm here to tell the truth.  I'm here

11  because I made a decision to take responsibility for my

12  actions.  Mr. Manafort had the same path.  I'm here.

13  Q.   Responsibility?  Probation is responsibility for your

14  conduct?

15  A.   I don't know the sentence.

16  Q.   That's your responsibility, probation?

17  A.   The sentence is decided by the judge.

18  Q.   It seems like the government agreed you can get probation?

19  A.   The government doesn't decide.

20  Q.   For all your crimes, for all your fraud, that's your

21  responsibility?

22  A.   I have accepted responsibility.  I'm taking it and I'm

23  trying to change, yes.

24  Q.   Have you returned any of the money you stole from

25  Mr. Manafort and his entities?

1    A.    I have not.

2    Q.    When you filed a financial disclosure form after you were

3    arrested, did you indicate on the form that you have money

4    stashed away in investments?

5    A.    I don't recall filing a financial form, but if I did, I

6    would accurately report that information.

7    Q.    Do you recall representing to the Court or Pretrial

8    Services that other than your home, you really have very few

9    assets?

10   A.    No.  We included all the assets that I have.

11   Q.    Did you include the assets that you invested from your

12   embezzlement?

13   A.    I'm not sure what you mean.

14   Q.    The monies we just talked about you were unauthorized to

15   take from DMP International's accounts or Mr. Manafort.

16   A.    Most of those went into my personal account.

17   Q.    And where are they now?

18   A.    Well, those were spent over the years.

19   Q.    Oh, so you can't return it to Mr. Manafort, can you?

20   A.    No, I cannot.

21   Q.    So you're really not taking responsibility, are you?

22   A.    On that subject, no.

23   Q.    What about on the insider trading?  What about the

24   ill-gotten gains you got in insider trading?  Did you return

25   those?

Gates - Cross                                                    1433

1   A.   First, they weren't ill-gotten gains, and I paid for those

2   out of bonuses and payments that I worked off a promissory note

3   over years.

4   Q.   The $2.5 million from the investment from stolen money

5   from Mr. Manafort, any intent to return that to Mr. Manafort?

6   A.   No, because it wasn't stolen.

7   Q.   Mr. Gates, are there other frauds that you've committed

8   for which you cannot reimburse or get restitution for their

9   victims as you sit here today?

10  A.   No.

11  Q.   Now, with respect to these offshore accounts and the

12  accountants, KWC, there was testimony from Ms. Laporta that she

13  had conversations with you about the offshore accounts, the

14  Davis Manafort offshore accounts.  Is that correct?

15       Do you recall having conversations?

16  A.   Yes.  Several people at KWC had discussions with me and

17  Mr. Manafort.

18  Q.   And she stated that when she had talked to you, that you

19  had stated that the accounts were set up in a manner to not

20  have to be reported in the United States.

21       Do you recall telling her that?

22  A.   I may have, but I don't recall.

23  Q.   You don't recall that, either?

24  A.   No.  Well, specifically what I recall telling KWC is the

25  information that Mr. Manafort and I discussed is that it was

1   unnecessary to report foreign accounts because, in his view, he

2   did not have signature authority over the account.

3   Q.   And do you recall telling the Office of Special Counsel

4   that same thing?

5   A.   Yes.  Initially in my discussions with them, I indicated

6   to them that is why Mr. Manafort did not file his foreign

7   accounts.

8   Q.   And how many times did you say you met with the Office of

9   Special Counsel to prep for trial?

10  A.   Approximately 20 times.

11  Q.   No, to prep the trial.  Was it 20 trial preps or was it

12  trial prep closer to this trial?

13  A.   I think it was about 20 hours.

14  Q.   Twenty hours.

15  A.   Yes.

16  Q.   And in the 20 hours, did the Office of Special Counsel

17  prep you at all with respect to your conversation with

18  Ms. Laporta?

19  A.   No.

20  Q.   Show you any documents?

21  A.   I was shown documents, yes.

22  Q.   About that conversation?

23  A.   I don't recall.  If you have a copy, I can look at it.

24  Q.   And is that why you don't recall a conversation?  You

25  weren't prepped?

1   A.   No.  If you'd just show me a copy, I'd be happy to tell

2   you.

3   Q.   I asked you a different question.

4   A.   Repeat the question.

5   Q.   If you weren't prepped by the Office of Special Counsel,

6   have you been prepped to say, "I don't recall"?

7   A.   No.

8   Q.   Mr. Gates, in -- you gave direct testimony that as an

9   initial matter, you learned that the Cyprus accounts were set

10  up for ease of transfers from the folks in the Ukraine that

11  were going to pay for consulting services; is that correct?

12  A.   That's what Mr. Manafort indicated, yes.

13  Q.   And over time, a lot of activity went on through those

14  accounts in Cyprus with respect to money being paid for

15  consulting services; is that correct?

16  A.   That is correct.

17  Q.   Now, you had testified on direct that all of the money

18  that came in was the income of Mr. Manafort or DMP or DMP

19  International; is that correct?

20  A.   Of the income that was asked, yes, that's correct.

21  Q.   I'm sorry, can you --

22  A.   Yes.  What I mean is when we went through the documents

23  indicating the values of the contracts, those contracts were

24  specifically for the majority of political work.

25  Q.   Majority of political work.

1    A.    Yes.

2    Q.    And do you know what other amounts were for?

3    A.    Well, yes.  For example, there was one amount that was for

4    the lobbying effort that the firm undertook for the European

5    Union and the U.S.

6    Q.    And there was also considerable amounts of money that came

7    in that were supposed to be paid out to other consultants,

8    correct?

9    A.    That's correct.

10   Q.    And -- and millions of dollars, not small amounts of

11   money, correct?

12   A.    Correct.

13   Q.    And so all the money that came in was not the income of

14   DMP International.  It actually was the income of a lot of

15   different consultants; isn't that correct?

16   A.    That is correct.

17   Q.    And there were transfers made through those accounts into

18   the United States to a lot of those consultants, correct?

19   A.    Yes.

20   Q.    And to other parts of the world to consultants, correct?

21   A.    That is correct.

22   Q.    And millions of dollars.

23         In addition to facilitating this flow of funds from

24   Cyprus, did there come a time where Mr. Manafort and DMP were

25   having difficulties banking in the United States?

1    A.   Yes.

2    Q.   And what do you know about that?

3    A.   As I understood, in some of the wire transfers from

4    Cyprus, over a period of time, some of the U.S. banking

5    institutions reached out to the firm, me and Mr. Manafort,

6    indicating that the accounts would be closed because of, I

7    think, what was -- they never really reported.  They just said

8    that they have the option of closing the account, but it was

9    quickly learned that the reason they did not keep the accounts

10   open was because the money was coming from Cyprus.

11   Q.   And it was a difficult issue, correct?

12   A.   Yes.

13   Q.   I mean, not knowing whether or not your bank is going to

14   honor a transaction or transfer money can make banking and

15   doing business very difficult, correct?

16   A.   Yes, it can.

17   Q.   Now, when it came to dealing with payments out of Cyprus

18   into the United States, were there any procedures that were put

19   in place to prevent amounts from being bounced back from U.S.

20   bank accounts?

21   A.   There were no protections that I'm aware of.  We followed

22   the wiring -- or the instructions by the Cypriot law firm that

23   requested specific information about a wire, and then either

24   Mr. Manafort or I would send those wire requests to the Cyprus

25   banks.  They would then make the subsequent wire transfer.

Gates - Cross                                                          1438

1   Q.   With respect to sending the request to the Cypriot banks,

2   did you have occasion to make up invoices that weren't the

3   invoice of, let's say, a contractor that was getting paid?

4   A.   Yes.  As I disclosed earlier, that's correct.

5   Q.   You did.  And can you explain why you did that?

6   A.   Yes, because in that instance, as I said, the invoice

7   couldn't be in the name of Mr. Manafort.  It had to be in the

8   name of the company.

9   Q.   But you didn't just -- if a $375,000 invoice came in the

10  door, you didn't just make up a $375,000 invoice, did you?

11  A.   If that was the wire request from Mr. Manafort, yes, we

12  did.

13  Q.   And would there be a reason to take a $375,000 invoice and

14  break it down into five separate invoices?

15  A.   Yes.  There was a period of time, I think, as I disclosed

16  earlier, beginning in 2012 through part of 2013, when Cyprus

17  had experienced a banking collapse.  So within the country,

18  internally, they put what were called liquidity restrictions.

19  So you were only allowed to withdraw a certain amount of money

20  from the country over a defined period of time.  So that's why

21  the invoices were broken up into various amounts.

22  Q.   And you testified on direct that you actually had a

23  template and you'd make it look like it was an outside vendor's

24  invoice, but you were doing it for that very reason?

25  A.   No, that was related to the Grenadines.  Cyprus was

1    different.  Cyprus had a much simpler process, for the most

2    part.  It was one that they had given to Mr. Manafort and I

3    regarding five lines of information that were required.

4    Q.   And what was the -- what was the procedure in the

5    Grenadines?  And that would be Global Endeavour, correct?

6    A.   Correct.  And Global, the process in the Grenadines, as I

7    explained earlier, you had to have more documentation

8    associated with the account.  I will say, though, in Cyprus,

9    after the banking collapse in 2012, there, as I recall, was a

10   more substantial requirement in terms of documentation.

11           So there could possibly be invoices that were

12   created, i.e., breaking down the payments for the banks in

13   Cyprus.

14   Q.   And with respect to your signature authority on accounts,

15   were you instructed by Mr. Manafort at the end of 2011 to no

16   longer be a signatory on the accounts in Cyprus?

17   A.   Mr. Manafort had requested me to remove him in 2012.

18   Q.   And yourself?

19   A.   Yes.

20   Q.   But you didn't?

21   A.   I removed myself from some of the accounts; that's

22   correct.

23   Q.   But not all?

24   A.   Not all of them.

25   Q.   And was that so you can continue to maintain authority to

1   be able to embezzle funds from DMP International's accounts

2   offshore?

3   A.    No.  And let me go back.  Mr. Manafort never requested I

4   take my name off.  It was his request to take his name off and

5   have his name expunged from the records.

6   Q.    So you did not tell the Office of Special Counsel in an

7   interview that in 2012 Mr. Manafort told you to remove yourself

8   as a signator, but you did not?

9   A.    I don't recall telling them that I was to remove myself.

10  The request was to remove Mr. Manafort, and then Mr. Kilimnik

11  and myself split the various accounts that were still open.

12  But at that point in 2012, a number of the accounts were

13  closed.

14  Q.    So on direct, you were -- excuse me one second.

15          On direct, you briefly talked about an account

16  called -- or an entity called "Pompolo"?

17  A.    Yes.

18  Q.    What is that entity?

19  A.    Pompolo was an entity that we created in the UK after

20  conversing with Mr. Manafort about the problems in Cyprus with

21  moving money from Cyprus to the United States and having some

22  of those banks close.  We conferred with our attorneys down in

23  Cyprus to see if there was a better way that we could get money

24  over to the United States without having the U.S. bank account

25  closed.

1          Because Cyprus has a relationship with the U.K., it

2   was recommended to us to set up an entity in the U.K. and then

3   transfer the money from Cyprus to the U.K. and then U.K. to the

4   U.S.

5   Q.   And did you, in fact -- was -- in fact, was a company set

6   up?

7   A.   Yes, it was.

8   Q.   Pompolo?

9   A.   Yes.

10  Q.   And what bank in the U.K. was that account set up with?

11  A.   That was set up at HSBC.

12  Q.   And at the same time an account was set up at HSBC in

13  London, was an account also opened in HSBC in New York?

14  A.   It was, yes.  Well, I take that back.  I think we already

15  had the HSBC account in New York opened.  The one in the UK was

16  an addition.

17  Q.   And was the idea that being interbank at HSBC might be

18  easier to get the money into the country?

19  A.   Yes, at that time.

20  Q.   And did you -- were attempts made to do that?

21  A.   As I recall, yes.

22  Q.   And were they successful?

23  A.   I believe so, yes.

24  Q.   Now, when I asked you earlier about what Cypriot agent

25  was, I think your explanation after saying, "I don't recall,"

1  was that it had something to do with Dr. K, we'll call him?

2  A.   Yes.

3  Q.   And him consolidating amounts that were from the offshore

4  accounts, DMP's offshore accounts that were closed, is that

5  correct?

6  A.   Yes.

7  Q.   And you mentioned that you think that -- those were the

8  amounts that were transferred to you, correct?

9  A.   Yes.

10 Q.   And can you -- can you explain -- or what did you explain

11 to Dr. K as to why you would be entitled to get these kind of

12 payments?  Did you talk to him?

13 A.   No.  Dr. K never requested any information about the

14 payments, Mr. Manafort or I had sent through the wire

15 transfers.  If any documentation was needed, somebody in his

16 accounts department would reach out to either me or

17 Mr. Manafort.  But Dr. K specifically never had any inquiries.

18 Q.   So with respect to Dr. K, you didn't really deal much with

19 him directly, did you?

20 A.   Over the years, it was less frequent.  He also had another

21 gentleman, another lawyer in his firm, that was working with

22 him.

23 Q.   And who was that?

24 A.   I believe his name was George Ioannou.

25 Q.   And with respect to initiating wire transfers, I think you

1    indicated you dealt with Dr. K's daughter?

2    A.    No, his -- he had an accounts department.  His daughter

3    was actually an attorney.

4    Q.    His accounts department.  Who did you deal with in the

5    accounts department?

6    A.    The woman I recall is Christina.  I don't -- she had a

7    long last name.

8    Q.    And with respect to initiating a wire transfer, you

9    clearly, with Dr. K's firm, had the complete authority to make

10   any transfer that you had requested?

11   A.    Yes.  Mr. Manafort had given me the authority at the

12   beginning with Dr. K, so that's correct.

13   Q.    And with respect to the transfers that you've made, and

14   especially from Defendant's Exhibit 17, the $3 million, you

15   were never questioned about making those transfers, were you?

16   A.    No.

17   Q.    Not until you came here?

18   A.    That's correct.

19           THE COURT:  Questioned by whom?

20   BY MR. DOWNING:

21   Q.    By anybody?

22   A.    Well, I mean, we were asked for supporting documentation,

23   but no specific inquiries into any of the amounts that were

24   wired.

25   Q.    And Mr. Manafort wasn't keeping after you on this stuff,

1  was he?

2  A.   Mr. Manafort, in my opinion, kept fairly frequent updates

3  on the information from the accounts.  Mr. Manafort was very

4  good about knowing where the money is and knowing where to

5  spend it.

6  Q.   So it's pretty --

7           THE COURT:  Well, he missed the amounts of money you

8  stole from him, though, didn't he?

9           THE WITNESS:  Yes, that's correct.

10          THE COURT:  So he didn't do it that closely.

11                        (Laughter.)

12          THE COURT:  How much more do you have with this

13  witness?

14          MR. DOWNING:  Quite a bit, Your Honor.

15          THE COURT:  All right.  I think, ladies and

16  gentlemen, I promised you we would cease sharply at 5:30

17  because one of you has child care responsibilities.  Pass your

18  books to the right.  We'll do it now.

19          Mr. Gates, you may step down, sir, and you will

20  recall you must refrain from discussing your testimony with

21  anyone, and we will convene tomorrow morning at 9:30.

22                    (Witness stood down.)

23          THE COURT:  And give me a quantitative estimate,

24  Mr. Downing.

25          MR. DOWNING:  One moment, please.

1         I was going to try to hedge my bet, but my colleagues

2  say if I tell you I should get done in an hour, it looks like

3  we can do it.

4         THE COURT:  All right.  Good.

5         Remember to refrain from discussing the matter with

6  anyone.  Don't look at TV or anything else on this case.  Put

7  it out of your mind.  Don't do any investigation.  I'll see you

8  tomorrow morning at 9:30.

9         Have you filled in your menus?

10         THE JURORS:  Yes, Your Honor.

11         THE COURT:  It doesn't get any more exciting, does

12  it?

13         (Laughter.)

14         MR. DOWNING:  You mean the menu?

15         THE COURT:  Yes, and -- that's right, the menu

16  doesn't.

17         (Laughter.)

18         THE COURT:  But if it's not suitable to you, you'll

19  have to stand behind me in lines at Panera.  You may follow

20  Mr. Flood out.

21         (Jury out.)

22         THE COURT:  All right.  Court will stand in recess

23  until 8:30 tomorrow in another matter, and I'll stand -- start

24  this matter at 9:30.  Court stands in recess.

25         MR. ANDRES:  Thank you, Your Honor.  Have a nice

1446

1   night.

2          THE COURT:  I beg your pardon?

3          MR. ANDRES:  I said have a nice night.  Thank you,

4   Your Honor.

5          THE COURT:  Oh, thank you.  You-all do the same.

6     (Recess from 5:20 p.m., until 9:30 a.m., August 8, 2018.)

7

8                  CERTIFICATE OF THE REPORTER

9      I certify that the foregoing is a correct transcript of

10  the record of proceedings in the above-entitled matter.

11

12

13          _____
                        /s/
14                 Anneliese J. Thomson

15

16

17

18

19

20

21

22

23

24

25