UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
UNITED STATES OF AMERICA,        .  Criminal Action No.
                                 .  1:18-CR-83
          versus                 .
                                 .
PAUL J. MANAFORT, JR.,           .
                                 .  August 8, 2018
               Defendant.        .  Volume VII-A.M.
------------------------------x

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              UZO ASONYE, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 GREG D. ANDRES, SAUSA
                                 BRANDON L. VAN GRACK, SAUSA
                                 Special Counsel's Office
                                 U.S. Department of Justice
                                 950 Pennsylvania Avenue, N.W.
                                 Washington, D.C. 20530

FOR THE DEFENDANT:               JAY ROHIT NANAVATI, ESQ.
                                 BRIAN P. KETCHAM, ESQ.
                                 Kostelanetz & Fink LLP
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001
                                   and
                                 THOMAS E. ZEHNLE, ESQ.
                                 Law Office of Thomas E. Zehnle
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1447 - 1566)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1448

```
1   APPEARANCES:   (Cont'd.)

2   FOR THE DEFENDANT:          KEVIN M. DOWNING, ESQ.
                                Law Office of Kevin M. Downing
3                               601 New Jersey Avenue, N.W.
                                Suite 620
4                               Washington, D.C. 20001
                                  and
5                               RICHARD W. WESTLING, ESQ.
                                Epstein, Becker & Green, P.C.
6                               1227 25th Street, N.W.
                                Washington, D.C. 20037
7
    OFFICIAL COURT REPORTER:    ANNELIESE J. THOMSON, RDR, CRR
8                               U.S. District Court, Fifth Floor
                                401 Courthouse Square
9                               Alexandria, VA 22314
                                (703)299-8595
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1449

1                                INDEX

2

    WITNESS                      EXAMINATION        PAGE
3

4   RICHARD GATES (Resumed)
                                 CROSS              1453
5                                REDIRECT           1459
                                 RECROSS            1502
6
    MORGAN MAGIONOS
7                                DIRECT             1537

8

9
                            E X H I B I T S
10
    Defendant's Exhibit No. 17 was received          1484
11  Government Exhibit Nos. 66A, 66C, 66D, 66E, 66G,  1542
    67B, and 67C were received
12  Government Exhibit No. 63 was received            1546
    Government Exhibit Nos. 447A thru 447Q and 456    1549
13  were received

14

15

16

17

18

19

20

21

22

23

24

25

1450

```
 1                   P R O C E E D I N G S

 2                        (Defendant present, Jury out.)

 3           THE COURT:  All right.  This is U.S. against Paul

 4   Manafort.  It's 18-CR-83.  The record will reflect that counsel

 5   and the defendant are present and prepared to proceed.

 6           Let's see.  We were in the midst of your

 7   cross-examination?

 8           MR. DOWNING:  We're almost done, Your Honor.

 9           THE COURT:  All right.  Let's bring the jury in.

10   I'll ask you in front of the jury how much more you have, and

11   then I'll ask you how much you have by way of redirect.

12           Can you give me the news now?

13                        (Laughter.)

14           THE COURT:  That will save -- that will save me from

15   grimacing or some other facial -- go ahead, sir.

16           MR. ANDRES:  I would say less than 30 minutes, Your

17   Honor.

18           THE COURT:  Ah.  Maybe you want that.

19                        (Laughter.)

20           THE COURT:  All right.  You may bring the jury in.

21           Thank you, Mr. Andres.

22           THE COURT SECURITY OFFICER:  One of them is

23   indisposed.

24                        (Jury present.)

25           THE COURT:  All right.  You may be seated.
```

1451

1          Good morning, ladies and gentlemen.  As always, we

2    will commence the day with the calling of the roll by numbers.

3          THE CLERK:  Ladies and gentlemen, as I call your

4    number, please answer "present" or "here."

5          Juror 0008.

6          THE JUROR:  Present.

7          THE CLERK:  Juror 0037.

8          THE JUROR:  Present.

9          THE CLERK:  Juror 0276.

10         THE JUROR:  Present.

11         THE CLERK:  Juror 0017.

12         THE JUROR:  Present.

13         THE CLERK:  Juror 0145.

14         THE JUROR:  Present.

15         THE CLERK:  Juror 0115.

16         THE JUROR:  Present.

17         THE CLERK:  Juror 0082.

18         THE JUROR:  Present.

19         THE CLERK:  Juror 0009.

20         THE JUROR:  Present.

21         THE CLERK:  Juror 0299.

22         THE JUROR:  Present.

23         THE CLERK:  Juror 0091.

24         THE JUROR:  Present.

25         THE CLERK:  Juror 0302.

1452

1      THE JUROR:  Present.

2      THE CLERK:  Juror 0060.

3      THE JUROR:  Present.

4      THE CLERK:  Juror 0296.

5      THE JUROR:  Present.

6      THE CLERK:  Juror 0054.

7      THE JUROR:  Present.

8      THE CLERK:  Juror 0127.

9      THE JUROR:  Present.

10      THE CLERK:  And 0133.

11      THE JUROR:  Present.

12      THE COURT:  All right.  Good morning, again, ladies

13  and gentlemen, and let me begin again by asking you to confirm

14  to me that you were successful in following the Court's

15  instructions to refrain from discussing the matter among

16  yourselves or with anyone or undertaking any investigation.

17      THE JURORS:  Yes, Your Honor.

18      THE COURT:  Thank you.

19      All right.  We're in the midst of the

20  cross-examination of Mr. Gates, and, Mr. Downing, your estimate

21  of how much more, I think, was about a half an hour or 45

22  minutes?

23      MR. DOWNING:  I think I might even get down to

24  15 minutes, Your Honor.

25      THE COURT:  All right.  And, Mr. Andres, your

Gates - Cross                                                        1453

1    prediction as to how much redirect you would have was?

2              MR. ANDRES:  Less than a half-hour, Your Honor.

3              THE COURT:  Less than a half-hour, good.

4              All right.  Bring Mr. Gates in, please.

5    RICHARD GATES, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN, RESUMED

6              THE COURT:  Mr. Gates, you'll recall, sir, you remain

7    under oath.  You may resume the stand.

8              THE WITNESS:  Thank you.

9                   CROSS-EXAMINATION (Cont'd.)

10   BY MR. DOWNING:

11   Q.   Good morning, Mr. Gates.

12             THE COURT:  All right.  Mr. Downing, you may proceed

13   and I'll give you some latitude for continuity purposes.

14             MR. DOWNING:  Thank you, Your Honor.

15   BY MR. DOWNING:

16   Q.   Mr. Gates, on direct examination from the Government, you

17   were asked some questions about an interview that you gave in

18   July of 2014.  Do you remember that?

19   A.   I do.

20   Q.   And it was an interview with FBI agents, correct?

21   A.   Yes.

22   Q.   And at that interview were also lawyers from the

23   Department of Justice, correct?

24   A.   That is correct.

25   Q.   And you were brought into that interview to discuss

1   payments that had come out of the Ukraine into DMP's offshore

2   accounts; is that correct?

3   A.   Yes, that was one of the topics.

4   Q.   And overall, the investigation you were told was about

5   monies that Mr. Yanukovych may have inappropriately taken out

6   of the Country of Ukraine; is that correct?

7   A.   That was what was described to us, yes.

8   Q.   And both you and Mr. Manafort met with the FBI; is that

9   correct?

10   A.   Yes.

11   Q.   And both you and Mr. Manafort disclosed to the FBI the

12   offshore accounts in Cyprus that we've been discussing,

13   correct?

14   A.   I don't know what was in Mr. Manafort's interview, but I

15   did disclose some of the accounts, yes.

16   Q.   And you also disclosed that there were also accounts in

17   St. Vincent's and the Grenadines, correct?

18   A.   I believe so, yes.

19   Q.   And this interview took place in July of 2014?

20   A.   Yes.

21   Q.   And when you met with Mr. Manafort, before having this

22   interview, did Mr. Manafort tell you that you should disclose

23   the activity in the Cypriot accounts?

24   A.   He indicated that we should be open and provide the

25   information about the questions that were asked of us.

1    Q.   So I'm going to ask you to take a look at what's been

2    marked Defendant's Exhibit 22.

3            And if you could turn in to Page 3?  And take a

4    minute and read through that.

5            THE COURT:  This is a number of pages.  Do you want

6    him to read the whole thing?

7            MR. DOWNING:  I asked him to pay attention to Page 3,

8    Your Honor.

9            THE COURT:  All right.

10   BY MR. DOWNING:

11   Q.   And the first two paragraphs on Page 4, please, Mr. Gates.

12   A.   Okay.  Okay.

13   Q.   So, Mr. Gates, as part of the FBI interview, you had

14   disclosed that DMP and Mr. Manafort had been hired as

15   consultants to assist in campaigns in the Ukraine, correct?

16   A.   That is correct.

17   Q.   And you also disclosed that payments that came into

18   accounts that were set up in Cyprus were for the offshore

19   consulting in the Ukraine; is that correct?

20   A.   Yes.

21   Q.   And you also disclosed to the FBI that you had been told

22   or Mr. Manafort had been told to open accounts in Cyprus for

23   the ease of payment from the Ukraine; is that correct?

24   A.   Yes, that was one of the reasons.

25   Q.   And you also indicated that invoices -- you had prepared

Gates - Cross                                                        1456

1    invoices for campaign assistance that were also paid into the

2    accounts that were held in Cyprus by DMP International,

3    correct?

4    A.    That is correct.

5    Q.    And you identified accounts such as Lucicle, correct?

6    A.    Yes.

7    Q.    You identified Bletilla Ventures?

8    A.    Yes.

9    Q.    You identified Leviathan Advisors?

10   A.    Yes.

11   Q.    Yiakora was also identified by you?

12   A.    Yes.

13   Q.    And LOAV, correct?

14   A.    Yes.

15   Q.    And all of these -- you also identified Global Endeavours

16   as something that was set up in St. Vincent's, correct?

17   A.    Yes.  The entity itself was set up in Cyprus.  The bank

18   account was in the Grenadines.

19   Q.    So you and Mr. Manafort agreed to be open and truthful

20   about the activities in Cyprus and in the Ukraine, correct?

21   A.    Yes.

22   Q.    And you felt that the interview you gave in 2014 was a

23   truthful interview about the operations of DMP in the Ukraine

24   and in Cyprus, didn't you?

25   A.    Yes.

1   Q.   Did you have occasion to talk to Mr. Manafort after your

2   interview?

3   A.   I did.

4   Q.   And after his interview?

5   A.   Yes.

6   Q.   And did he indicate to you that he was also truthful with

7   the FBI in his interview?

8   A.   To the extent of my recollection, yes.

9   Q.   Now, there were some questions of you about some loans and

10   the activities in acquiring loans in the 2015-2016 time frame?

11   A.   Yes.

12   Q.   Do you recall that?

13        And there were -- there were some questions of you

14   about decreasing income and DMP International's activities; is

15   that correct?

16   A.   Yes.

17   Q.   And that a lot of the campaigns had been done and were

18   finished; is that correct?

19   A.   Yes.  The last campaign was October of 2014.

20   Q.   Now, I believe you --

21        THE COURT:  I'm sorry.  I didn't hear that.

22        THE WITNESS:  Oh, sorry, Your Honor.  The last

23   campaign was in October of 2014.

24        THE COURT:  Next question.

25   BY MR. DOWNING:

Gates - Cross                                                      1458

1    Q.    I believe you also testified that there was some

2    outstanding monies that were due to DMP for one of the

3    campaigns that DMP ran?

4    A.    For the last campaign, correct.

5    Q.    And who was the gentleman, Porochkin?  Poroshenko, is that

6    right?

7    A.    The outstanding amount was related to the Opposition Bloc.

8    Q.    The Opposition Bloc?

9    A.    It was a parliamentary election.

10   Q.    Thank you.  And the outstanding amount was approximately

11   $2.4 million?

12   A.    That is correct.

13   Q.    And there were efforts by Mr. Manafort and others to try

14   to collect that money; is that correct?

15   A.    That is correct.

16   Q.    And those efforts continued through 2016; is that correct?

17   A.    Yes.

18   Q.    And with respect to Mr. Manafort's overall financial

19   picture, were you aware in the 2015-2016 time frame, that

20   Mr. Manafort had a net worth of around $20 million?

21   A.    No.  I was not privy to his personal assets.

22   Q.    Did you have any idea?

23   A.    I had some idea from some of the accounting statements

24   that Ms. Washkuhn had sent over, but that related more to the

25   business.

1  Q.   And where would you -- if at the time you were looking at

2  these accounting records, where -- in 2015 and '16, where did

3  you think his net worth was?

4  A.   Net worth, I don't know because of the value of the

5  properties.  I thought somewhere in the realm of 6 to 10

6  million.

7          MR. DOWNING:  No further questions.

8          THE COURT:  Any redirect?

9          MR. ANDRES:  Yes, Your Honor.

10         THE COURT:  All right.  You may proceed.

11                    REDIRECT EXAMINATION

12 BY MR. ANDRES:

13 Q.   Now, Mr. Gates, Mr. Downing asked you on cross-examination

14 about some -- about your interview with the FBI in July 2014.

15 Do you remember that?

16 A.   I do.

17 Q.   Okay.  And at the time of that interview, did you

18 understand that you were under investigation?

19 A.   I understood that we were not under investigation.

20 Q.   And did you understand that Mr. Manafort was under

21 investigation?

22 A.   I understood he was not under investigation either.

23 Q.   And you were interviewed by FBI agents; is that correct?

24 A.   We were.

25 Q.   Was anyone from the IRS there?

1    A.    No.  I believe it was DOJ.

2    Q.    Were you asked to produce your tax returns?

3    A.    No.

4    Q.    Was Mr. Manafort, if you know, asked to produce his tax

5    returns?

6    A.    I don't know.

7    Q.    Okay.  At the time of the interview, were the Cypriot

8    accounts closed?

9    A.    The majority of the Cypriot accounts were closed, yes.

10   Q.    Okay.  And at the time of the interview, had Mr. Manafort

11   asked you to take certain action?

12   A.    He did.

13   Q.    What did he ask you to do?

14   A.    He asked me to go meet with one of the Russian -- excuse

15   me, the Ukrainian businessman and to inform him of the FBI

16   interview.

17   Q.    And why did he ask you to do that?

18   A.    He asked me to do that because he wanted to know more

19   information about one of the entities that was paying

20   Mr. Manafort and to understand if that entity was viewed as a

21   clean entity, meaning that it had only been used to make

22   payments to Mr. Manafort.

23   Q.    And during that interview, there was a reference to

24   various of the Cypriot accounts; is that correct?

25   A.    Yes.

1    Q.   Do you remember the names of any of those accounts?

2    A.   I do.  It was similar to the names that I testified to on,

3    I guess, Monday.  It was Leviathan, Bletilla, Actinet,

4    Peranova, Global Highways, Serangon, Lucicle, and then there

5    was an additional list that I provided to the FBI that day of

6    accounts that they did not have.

7    Q.   Did you tell the FBI that there was hidden income in those

8    accounts?

9    A.   No, I did not.

10   Q.   Did you tell the FBI that you didn't -- or were you asked

11   by the FBI whether or not you identified those accounts on your

12   tax return?

13   A.   I don't recall if we were.

14   Q.   And do you know if Mr. Manafort was asked those questions?

15   A.   No, I don't.

16   Q.   And when you pled guilty in front of the judge in

17   Washington, D.C., did your guilty plea relate to those

18   accounts?

19   A.   No.

20   Q.   Your guilty plea to conspire --

21   A.   Oh, to the Cyprus accounts?

22   Q.   Yes?

23   A.   Yes, I did.  Sorry.

24   Q.   How did your guilty plea relate to the Cyprus accounts?

25   A.   The guilty plea related to the Cyprus accounts to the

Gates - Redirect                                                1462

1    extent that I was wiring money for Mr. Manafort from those

2    accounts and then not reporting the income in the United States

3    nor the foreign bank accounts.

4    Q.   Okay.  And after this FBI interview, was there any

5    follow-up?

6    A.   No, there was not.

7    Q.   Okay.  And you weren't present during Mr. Manafort's

8    interview, were you?

9    A.   I was not.

10   Q.   And you're not aware -- are you aware from the details of

11   which accounts he was asked about?

12   A.   I was not.

13   Q.   Okay.  Would you be surprised if he -- if you learned that

14   he said he only had a recollection about certain accounts?

15   A.   I don't know how many accounts Mr. Manafort recalls.

16   Q.   But to be clear, the subject matter of that interview was

17   the subject matter of your guilty plea in large respect?

18   A.   It was, yes.

19            THE COURT:  Well, what was the subject of his guilty

20   plea is recorded in the plea agreement.

21            Were you charged in the District of Columbia with --

22   how many counts?

23            THE WITNESS:  I believe it was 12 counts, Your Honor.

24            THE COURT:  And all of those counts with the

25   exception of the one or two that you pled guilty to, I think

Gates - Redirect                                                    1463

1    one, were dismissed as a result of your plea; is that right?

2              THE WITNESS:  I believe so.

3              THE COURT:  So you pled guilty to two counts, one of

4    which was in the indictment in the District of Columbia, and

5    the other one related to conduct outside of that.

6              THE WITNESS:  That is correct.

7              THE COURT:  Next question.

8    BY MR. ANDRES:

9    Q.   With respect to the Count 1 conspiracy against the United

10   States that you pled guilty to, did that relate to the foreign

11   Cypriot accounts?

12   A.   It did.

13   Q.   And did it relate to the filing of a false tax return for

14   Mr. Manafort?

15   A.   It did.

16   Q.   And did it relate to the filing of a false tax return as

17   it related to income?

18   A.   It did.

19   Q.   And was that income hidden in the accounts in Cyprus?

20   A.   It was.

21   Q.   And did it relate to a false filing as it related to the

22   failure to disclose foreign bank accounts?

23   A.   It did.

24   Q.   And did that relate to the Cypriot accounts?

25   A.   Yes.

1    Q.   And did you plead guilty to conspiring to fail to file

2    FBAR accounts for Mr. Manafort's foreign bank accounts?

3    A.   I did.

4    Q.   And did that relate to the overseas accounts in the

5    Cyprus?

6    A.   They did.

7    Q.   On cross-examination, Mr. Gates, you were asked about your

8    guilty plea and whether or not you made false statements to the

9    FBI.  Do you remember that?

10   A.   I do.

11   Q.   Mr. Gates, did you make false statements to the FBI?

12   A.   Only the one second count.

13   Q.   And that, that was a false statement that you made to the

14   FBI?

15             THE COURT:  You're leading now.

16             THE WITNESS:  Oh, to the FBI?  No, it was not to the

17   FBI.

18             THE COURT:  This jury is not going to know what

19   question you asked.  Re-ask your question.

20             MR. ANDRES:  Sure.  Certainly, Judge.

21   BY MR. ANDRES:

22   Q.   You pled guilty to making a false statement to the FBI; is

23   that correct?

24   A.   Yes.

25   Q.   You were asked about that on cross-examination by

Gates - Redirect                                                    1465

1   Mr. Downing?

2   A.    Correct.

3   Q.    What did you say to the FBI and the Government that was

4   false?

5   A.    I indicated to them that I had been aware of a meeting

6   that Mr. Manafort attended with a United States Congressman and

7   had met with Mr. Manafort in 2016 regarding that meeting.

8           When the FBI confronted me with a document that

9   showed that Mr. Manafort had, in fact, met with the Congressman

10  and discussed a specific issue, I had not informed the FBI of

11  that, and I was under oath, and I made a mistake, and I regret

12  it.

13  Q.    And that statement was false?

14  A.    It was.

15  Q.    You knowingly and intentionally made a false statement to

16  the FBI?

17  A.    That is correct.

18  Q.    As you sit here today, do you have any doubt in your mind

19  as to whether that was a false statement?

20  A.    No.

21  Q.    You were asked questions about your plea agreement on

22  cross-examination by Mr. Downing.  Do you remember that?

23  A.    Yes.

24  Q.    Do you remember that Mr. Downing asked you about the

25  possibility of getting probation?

Gates - Redirect                                                     1466

1    A.    Yes.

2    Q.    And do you remember that Mr. Downing asked if the terms of

3    your plea agreement let your lawyer argue that you should have

4    probation and no jail time?  Do you remember that?

5    A.    I do.

6    Q.    And Mr. Downing asked you if such a motion would be

7    unopposed by the Special Counsel's Office?  Do you remember

8    that?

9    A.    Yes.

10   Q.    With respect to the promises that have been made with your

11   plea agreement, are they all contained in your written plea

12   agreement?

13   A.    They are.

14   Q.    Okay.  And you testified about your written plea agreement

15   during your direct examination; is that right?

16   A.    I did.

17   Q.    I'd like to ask you to turn to Government Exhibit 2F,

18   which is already in evidence.

19             MR. ANDRES:  Can I publish that, Your Honor?

20             THE COURT:  Yes, you may.

21   BY MR. ANDRES:

22   Q.    Can you tell me what Government Exhibit 2F is?

23   A.    This is a copy of my plea agreement.

24   Q.    Okay.  And this contains all of the promises in it from

25   the Government; is that correct?

Gates - Redirect                                                        1467

1    A.    That is correct.

2    Q.    And all the promises that you made to the Government?

3    A.    Yes.

4    Q.    And this document was entered into the docket in the

5    District Court in Washington, D.C.; is that correct?

6    A.    Yes.

7    Q.    Can I ask you to turn to Paragraph 9 on Page 6?

8    A.    Okay.

9    Q.    On Paragraph 9, what is the title of Paragraph 9?

10   A.    "Government's Obligations."

11   Q.    Okay.  And -- okay.

12         And Paragraph 9 starts on Page 6; is that right?

13   A.    Yes, it does.

14   Q.    And it continues onto Page 7?

15   A.    Yes.

16   Q.    Okay.  With respect to the first full sentence on Page 7,

17   can you read that to the jury?

18   A.    Yes.  "The Government will bring to the Court's attention

19   at the time of sentencing the nature and extent of your

20   client's cooperation or lack of cooperation."

21   Q.    I'm sorry, Mr. Gates, on Page 7?

22   A.    Oh, sorry.

23   Q.    The first full sentence that starts with "Defendant."

24   A.    "Defendant will then be free to argue for any sentence

25   below the advisory Sentencing Guidelines range calculated by

Gates - Redirect                                                    1468

1   the Probation Office, including probation."

2   Q.   And read the next sentence.

3   A.   "Depending on the precise nature of the defendant's

4   substantial assistance, the Office may not oppose defendant's

5   application."

6   Q.   Did the, did the Government agree in this document to not

7   oppose a sentence of probation?

8   A.   No, it did not.

9   Q.   Okay.  When Mr. Downing was questioning you on

10  cross-examination, did he show you this document?

11  A.   No, he did not.

12  Q.   Has the Government made any promise to you about what your

13  sentence will be?

14  A.   No, it has not.

15  Q.   On cross-examination, you were asked questions about your

16  stealing money or embezzlement from Mr. Manafort.  Do you

17  remember that?

18  A.   I do.

19  Q.   Have you ever been charged with any crimes relating to

20  that money?

21  A.   I have not.

22  Q.   In your first indictment in Washington, were you charged

23  with any crimes?

24  A.   No.

25  Q.   How about here in the Eastern District of Virginia?

Gates - Redirect                                                    1469

1    A.    No.

2    Q.    Did Mr. Manafort ever confront you about that?

3    A.    He did not.

4    Q.    As far as you understand, your understanding, how did the

5    Government know that you embezzled money from Mr. Manafort?

6    A.    I told the Government that I did.

7    Q.    And how did Mr. Downing know, to the best of your

8    understanding, that you -- that you embezzled money from

9    Mr. Manafort?

10   A.    As I understood, Mr. Downing received the 302 reports from

11   the FBI during my interviews, so that he was able to gather the

12   information from that document.

13   Q.    With respect to --

14             MR. DOWNING:  Objection, Your Honor.  Speculation.

15             THE COURT:  That's not an objection.

16             MR. DOWNING:  How would he know how I learned of this

17   fraud?

18             THE COURT:  The proper way to have proceeded is when

19   he asked the question, you should have objected.  He's asked

20   and answered the question, and I'm going to overrule the

21   objection.

22             But you don't know, one way or the other, how he

23   learned of it, do you?

24             THE WITNESS:  I do not.

25             THE COURT:  All right.  That takes care of it.

Gates - Redirect                                                      1470

1    BY MR. ANDRES:

2    Q.   With respect to --

3              MR. ANDRES:  May I continue, Your Honor?  I'm sorry.

4              THE COURT:  Yes, you may.

5    BY MR. ANDRES:

6    Q.   With --

7              THE COURT:  But finish.

8    BY MR. ANDRES:

9    Q.   With respect to the funds that you took from Mr. Manafort,

10   how did you charge those?

11   A.   When you say "charge," what do you mean?

12   Q.   Did you charge them as expenses?

13   A.   Yes, the majority, yes.

14   Q.   Okay.  And with respect to expenses, how were those paid

15   for?

16   A.   The expenses, across the board for the company, for the

17   most part, were ultimately reimbursed to the Ukrainian clients.

18   Q.   So Mr. Manafort wouldn't have noticed any loss in his

19   money or income because the money was passed on to --

20             THE COURT:  The question is now leading.

21   BY MR. ANDRES:

22   Q.   With respect to those funds, who paid for them?

23   A.   The Ukrainian businessman.

24   Q.   During the cross-examination, you were asked questions

25   about the FBAR filings and KWC.  Do you remember that?

1  A.    I do.

2  Q.    And you pled guilty to -- to conspiring with Mr. Manafort

3  to fail to file FBARs; is that correct?

4  A.    That is correct.

5  Q.    And that related to overseas accounts?

6  A.    It did.

7  Q.    And what foreign countries were those accounts in?

8  A.    Cyprus, the Grenadines, and one in the United Kingdom.

9  Q.    And they involved bank accounts?

10 A.    They did.

11 Q.    Mr. Gates, did you need to -- did you need to consult with

12 an expert to know that Cyprus was a foreign country?

13 A.    No.

14 Q.    Did you need to consult with an expert to know that those

15 were bank accounts?

16 A.    No.

17 Q.    Did you need to consult with an expert to know that the

18 money Mr. Manafort earned from the income in foreign bank

19 accounts in Cyprus had to be disclosed on your tax returns?

20 A.    No.

21 Q.    With respect to your own conduct, you were charged with

22 respect to failing to file FBARs for your own accounts as well;

23 is that correct?

24 A.    That is correct.

25 Q.    And where were those accounts located?

1    A.    United Kingdom.

2    Q.    Did you consult with an expert to know that the United

3    Kingdom was a foreign country?

4    A.    No, I did not.

5    Q.    And did you consult with an expert --

6              THE COURT:  This is all irrelevant to this case.

7              MR. ANDRES:  He was asked -- I'm sorry.  Your Honor,

8    I'll move on.

9              THE COURT:  Yes, you will.

10   BY MR. ANDRES:

11   Q.    With respect to EVO Holdings, you were asked questions

12   about EVO Holdings on cross-examination.  Do you remember that?

13   A.    I do.

14   Q.    Can you explain to the jury what EVO Holdings is?

15   A.    EVO Holdings is a Cyprus-based company that was set up to

16   hold an asset that was purchased through Mr. Manafort's private

17   equity fund.

18   Q.    Okay.  Were there any bank accounts related to EVO

19   Holdings?

20   A.    There was.

21   Q.    What bank accounts?

22   A.    It was an EVO Holdings bank account in Cyprus.

23   Q.    Okay.  During the discussion about the EVO Holdings

24   issues, there were communications with Mr. Manafort's tax

25   accountants; is that right?

Gates - Redirect                                                    1473

1    A.    Correct.

2    Q.    The accountants at KWC?

3    A.    Yes.

4    Q.    And Mr. Downing asked you about that on cross-examination?

5    A.    He did.

6    Q.    Okay.  During the discussion about EVO Holdings, did

7    anyone disclose to the tax accountants or the tax preparers

8    that there was a foreign bank account related to EVO Holdings?

9    A.    No.  The only piece of information that was disclosed was

10   that there were foreign shares.

11   Q.    And at any time during the time that you worked on

12   Mr. Manafort's taxes, did either you or Mr. Manafort disclose

13   to the tax preparers that there were foreign accounts?

14   A.    No.

15   Q.    And if you give false information, Mr. Gates, to tax

16   preparers, can you expect appropriate advice?

17   A.    No.

18   Q.    You were asked questions on cross-examination about your

19   trial preparation.  Do you remember that?

20   A.    I do.

21   Q.    Mr. Downing asked you if anyone from the Special Counsel's

22   office told you how to answer any questions; is that right?

23   A.    Yes.

24   Q.    Were you told how to answer any questions?

25   A.    The only answer I was told is to tell the truth.

1   Q.   You were shown a series of exhibits by Mr. Manafort -- I'm

2   sorry -- by Mr. Downing.  Do you remember that?

3   A.   Yes.

4   Q.   You were shown Defense Exhibit 14.

5   A.   Yes.

6   Q.   Do you have that up there?

7   A.   I do.

8   Q.   What does that relate to, Defense Exhibit 14?

9   A.   It relates to a wire transfer request from one of the

10  offshore accounts.

11  Q.   And for what account?

12  A.   Global Endeavour.

13  Q.   Who set up Global Endeavour?

14  A.   Our lawyers in Cyprus.

15  Q.   Who specifically?

16  A.   At the direction of Mr. Manafort.

17  Q.   And what money was included in the Global Endeavor

18  account?

19  A.   Funds from the Ukrainian political elections.

20  Q.   And that's a foreign bank account; is that right?

21  A.   That's correct.

22  Q.   And Mr. Manafort had money in it?

23  A.   He did.

24  Q.   Did he disclose that on his taxes?

25  A.   To my knowledge, no.

Gates - Redirect                                                    1475

1    Q.   And that's what you pled guilty to as part of the Count 1

2    conspiracy; is that correct?

3    A.   That is correct.

4    Q.   Can you look at Government Exhibit -- I'm sorry -- Defense

5    Exhibit 15?

6             THE COURT:  And avoid leading.

7             MR. ANDRES:  Yes, sir.

8             THE WITNESS:  Okay.

9    BY MR. ANDRES:

10   Q.   What is Defense Exhibit 15?

11   A.   It's another wire request form for an offshore account.

12   Q.   What offshore account?

13   A.   Again, it's Global Endeavour.

14   Q.   And who set up Global Endeavour?

15   A.   It was at the direction of Mr. Manafort.

16            THE COURT:  He didn't ask you whose direction.  He

17   asked:  Who set it up?

18            THE WITNESS:  Okay.  The Cypriot attorneys set it up.

19            THE COURT:  Next question.

20   BY MR. ANDRES:

21   Q.   And what funds were included in that?

22   A.   Funds from the work from political campaigns.

23   Q.   Okay.  Do you have Defense Exhibit 17 there as well?

24   A.   No.

25   Q.   It's a chart.

Gates - Redirect                                                              1476

1    A.   No, I do not.

2              MR. ANDRES:  Do you have it, 17?  Oh, it's right

3    here.  Can I use that?

4              MR. DOWNING:  Yeah, sure.

5              MR. ANDRES:  Okay.  Mr. Flood, can I ask you --

6              MR. DOWNING:  Your Honor, we don't object to

7    Defendant's Exhibit 17 being admitted into evidence at this

8    time.

9              MR. ANDRES:  It's not admitted, Your Honor.  We're

10   not asking to admit it.

11             THE COURT:  You don't want to admit it?

12             MR. ANDRES:  No, I'm not asking to admit it.

13             MR. DOWNING:  Your Honor, we would move it in as a

14   1006 summary that's been authenticated as accurate by the

15   United States Government.

16             THE COURT:  All right.  I think I've heard a 1006

17   argument in another context.  Do you oppose its admission?

18             MR. ANDRES:  Your Honor --

19             THE COURT:  I'm just asking.  Yes or no?

20             MR. ANDRES:  Yes.  It's not complete.

21             THE COURT:  All right.

22             MR. DOWNING:  Your Honor, I believe that is an

23   inaccurate representation by the United States Government.

24   That came directly out of a charging instrument that this

25   Government returned in this district.  That's what this is.

Gates - Redirect                                                    1477

1    It's a copy of that.  It is definitely complete.

2           MR. ANDRES:  Your Honor, I'm happy to respond or come

3    to the sidebar, whatever Your Honor pleases.

4           THE COURT:  You do want to use this document?

5           MR. ANDRES:  I'm going to use it in the same way

6    defense did, by asking the defense -- the witness to look at

7    it.  But --

8           THE COURT:  All right.

9           MR. ANDRES:  -- this is a copy of the --

10          THE COURT:  But they're now offering -- they're going

11   to offer it, so I'll have to consider whether I admit it, and

12   the allegation -- I'll have you come to the bench, but the

13   allegation is that the document came from the Government, was

14   attached to a charging document.

15          Come to the bench.

16          (Bench conference on the record.)

17          THE COURT:  Mr. Downing, where do you think the

18   document came from?

19          MR. DOWNING:  This is a line-by-line copy of what was

20   contained in the indictment that was returned here in the

21   Eastern District of Virginia.

22          THE COURT:  This exact document --

23          MR. DOWNING:  Correct.

24          THE COURT:  -- or did somebody copy it?

25          MR. DOWNING:  Copy, an exact copy.

1    THE COURT:  She's got to get all of us --

2    MR. DOWNING:  Sorry.

3    THE COURT:  -- and if we're both talking, she can't

4  get us.

5    Is this a verbatim, exact copy of something that was

6  attached to the indictment?

7    MR. DOWNING:  Yes.  We represent it is.

8    THE COURT:  All right.  And you want to offer it?

9    MR. DOWNING:  Yes, as a summary.  This is the

10  $3 million that we questioned Mr. Gates about in his

11  embezzlement.

12    THE COURT:  And you also want to question this

13  witness about this?

14    MR. ANDRES:  Not if it's going to be admitted as an

15  exhibit, Your Honor.  I'm happy to wait, but I'd like to

16  address that.

17    THE COURT:  Yes, go ahead.

18    MR. ANDRES:  Okay.  First of all, I'm on questioning

19  now, and I'm not aware that defense is allowed to admit

20  exhibits while I'm there.  Putting that aside, I think the

21  indictment --

22    THE COURT:  I think you should put it aside because I

23  am going to get a request to have it admitted --

24    MR. ANDRES:  Fair enough.

25    THE COURT:  -- so I need to deal with it.

Gates - Redirect                                                        1479

1              But you're correct to point out that this isn't the

2     time to admit a piece of evidence on behalf of the defendant.

3     I understand that.

4              MR. ANDRES:  This is from the indictment, Judge.  If

5     you're going to send the indictment back to the jury --

6              THE COURT:  I'm not.

7              MR. ANDRES:  Well, this is the --

8              THE COURT:  At the moment, I'm not.  I'm going to

9     give you an opportunity and you an opportunity to address

10    whether I should.  I'm inclined not to.  I'll give you a

11    preview of what I'm thinking, and you can address it.  You may

12    want it; you may not want it.  I don't know.

13             There's a great deal in the indictment that's sort of

14    argument.  It's the government's argument about these sleazy

15    people, and I'm not inclined to admit anything other than the

16    exact counts and none of the previous paragraphs.  On the other

17    hand, I'm inclined to leave it all out.  I expect you've given

18    enough information.  But this isn't the time to decide whether

19    I'm going to send something back with the jury.  I will give

20    you an opportunity to tell me what you think about that, and I

21    will give you an opportunity to tell me as well.

22             Now, what -- Mr. Andres is correct, this isn't an

23    opportunity for you to offer because he's in the midst of his,

24    but if I'm going to admit it, if I were Mr. Andres, I'd like to

25    know that now before I am questioning a witness.

1           Wouldn't you?

2           MR. ANDRES:  Yes, Judge.

3           THE COURT:  All right.  So I'm going to consider it

4    now.

5           MR. ANDRES:  My argument, Judge, is this is part of

6    the indictment, and if Mr. Downing wants to include it, he

7    should have to include the entire indictment.  Snipping pieces

8    out of it are misleading.

9           I don't doubt at all --

10          THE COURT:  You mean what you attached makes the

11   indictment misleading?

12          MR. ANDRES:  No, it's not attached.

13          THE COURT:  I'm not moved by an argument that he

14   either has to swallow the whole pill or none of it.  All I'm

15   interested in is whether if he offers -- you're going to offer

16   it.

17          MR. DOWNING:  Yes, Your Honor.

18          THE COURT:  And if you're going to object to it,

19   let's resolve that now.

20          MR. ANDRES:  That was my argument, Judge.  If you're

21   going to -- if that's unpersuasive to you, then I'm ready to

22   proceed, and I don't have any objection to it being admitted,

23   and that's that.  I just don't think it's -- listen, I have

24   objected.  I don't doubt that Mr. Downing took this from the

25   indictment.  That's fine.  We can check it afterwards.

Gates - Redirect                                                           1481

1            THE COURT:  Well, I hope somebody from the government

2    checked it before they attached it to an indictment.

3            MR. ANDRES:  It's not attached, Judge.  It's in the

4    indictment.

5            THE COURT:  Oh.

6            MR. ANDRES:  It's not an attachment.  This is the

7    body of the indictment.  That's the problem.

8            THE COURT:  I see.  I see.

9            MR. ANDRES:  The indictment -- and the reason -- I'm

10   sorry, the reason why I raised the question of whether you're

11   going to admit the indictment is this is tantamount to

12   including the indictment and sending it back to the jury,

13   because it's part of the indictment.

14           THE COURT:  Well, I assume, though, that the

15   government would have checked something.  They wouldn't put

16   something false in an indictment.

17           MR. ANDRES:  That's not the issue.

18           THE COURT:  Well, it's an issue for me.

19           MR. ANDRES:  No, the question isn't whether there's

20   something inaccurate in the indictment.  I'm saying I didn't

21   take what Mr. Downing has marked as Government (sic) Exhibit

22   17, which we got for the first time last night, I haven't

23   checked that against the indictment to see if it matches up.

24   I'm not doubting that it --

25           THE COURT:  Well, I will give you that opportunity if

Gates - Redirect                                                    1482

1    I admit it.  You may certainly go and check it.

2              Go ahead.

3              MR. ANDRES:  That's it.  This is the indictment.

4    This is excerpts from the indictment, and that's what my

5    objection is, is it's only part of the indictment, and

6    that's -- unless Your Honor is going to send the whole

7    indictment back, I think it's misleading.

8              THE COURT:  All right.  What's your view?

9              MR. DOWNING:  The chart itself was in the indictment

10   as a --

11             THE COURT:  The chart.  You're referring to --

12             MR. DOWNING:  This is the chart.

13             THE COURT:  -- these three pages?

14             MR. DOWNING:  Correct.  Appear in the indictment as a

15   summary of the transfers that came from the offshore accounts

16   of DMP International that went to Mr. Gates and to Mr. Gates'

17   account for which he did not report on his tax return.  That's

18   exactly what I asked him about yesterday.

19             It also represents items that we believe are

20   embezzlement.  We also questioned about that.

21             That's the purpose of this, using this chart.  That's

22   it.

23             THE COURT:  I'll give you an opportunity to look and

24   ensure that it is complete and that they haven't omitted

25   something, but -- and, of course, you have an opportunity --

Gates - Redirect                                                  1483

1    your case isn't closed yet.  You may do as you wish.

2              MR. ANDRES:  Okay.

3              THE COURT:  But I don't have it in the record yet.

4    We'll have to do that on recross if you -- yes?

5              MR. ASONYE:  We were just consulting with each other.

6              THE COURT:  All right.  If you do that, please ask --

7    please say you need an opportunity to consult.  Then you can

8    consult with him.  And I'm talking, and it interrupts me.  You

9    understand that.  I think you would feel the same way.

10             Do you need an opportunity to consult?

11             MR. ASONYE:  No.  No, we don't.  I said my piece,

12   Your Honor.

13             THE COURT:  Anything further, Mr. Downing?

14             MR. DOWNING:  No, Your Honor.

15             THE COURT:  All right.  We had this bench conference.

16   I'm not clear that I have any issue in front of me.  If you

17   wish to offer this as an exhibit at the appropriate time, I'll

18   consider it.  You may state your objection then, and I will

19   rule on it.

20             As of this time, there's -- at this moment, I don't

21   think I have a question before me.

22             MR. ANDRES:  Your Honor, I don't object to its

23   admission since you're going to admit it, and we might as well

24   do it now because if he's going to get to admit it and show it,

25   I think to avoid a re-redirect examination, we might as well

1    get it over with.

2              So if Mr. Downing wants to admit it now, that's fine.

3    I'm going to ask to publish it, and I'll ask Mr. Gates about

4    it.

5              MR. DOWNING:  So, Your Honor, I move Defense Exhibit

6    17 into evidence.

7              THE COURT:  17, all right.  I'll overrule the

8    objection and admit it.

9              (Defendant's Exhibit No. 17 was received in

10   evidence.)

11             MR. ANDRES:  Thank you, sir.

12             THE COURT:  You'll be entitled to ask him questions

13   on re-redirect.

14             MR. ANDRES:  Oh, so not now?

15             THE COURT:  Yes.

16             MR. ANDRES:  Oh, yeah.  This is just the first

17   redirect.  I'm not -- the point was to avoid all the rest of

18   it.

19             THE COURT:  All right.  Well, that's right, because

20   you're in the midst of redirect.

21             MR. ANDRES:  Just the first one, Judge.  I know it

22   feels like the fifth one.

23             THE COURT:  I hope it's the last one.

24             MR. ANDRES:  I'm trying.

25             THE COURT:  Go ahead.

Gates - Redirect                                                   1485

1              MR. ANDRES:  Thank you.

2              (End of bench conference.)

3              THE COURT:  All right.  You may proceed.

4              MR. ANDRES:  Okay.

5              THE COURT:  For the record, I have admitted Defense

6    Exhibit 17 over the objection of the Government.  Proceed.

7              MR. ANDRES:  May I publish it, Your Honor?

8              THE COURT:  Yes, you may.

9    BY MR. ANDRES:

10   Q.   Mr. Gates, do you have document Defense Exhibit 17?

11   A.   Not yet.

12   Q.   You don't have it?

13   A.   No.

14             MR. ANDRES:  Do you have another copy?

15             THE COURT:  He has it in front of him on the screen.

16             MR. ANDRES:  Oh, fine.

17             THE COURT:  Or at least one screen of it.  It's three

18   pages.

19             MR. ANDRES:  Okay.

20   BY MR. ANDRES:

21   Q.   Mr. Gates, the -- the chart in Government's 17 includes

22   charges that were brought against you in the Eastern District

23   of Virginia; is that correct?

24   A.   It does.

25   Q.   And with respect to those charges, they relate to your

1    income taxes?

2    A.   They do.

3    Q.   And the failure for you to declare income?

4    A.   That is correct.

5    Q.   With respect to those charges, were you guilty of all

6    those charges?

7    A.   Yes.

8    Q.   And do they also relate to your failure to, to disclose

9    foreign bank accounts on your tax returns?

10   A.   They do.

11   Q.   And were you guilty of all those charges?

12   A.   Yes.

13   Q.   Mr. Downing asked you questions about these various

14   transfers.  Those were identified by the Government; isn't it

15   true?

16   A.   That is correct.

17   Q.   And they were included in your indictment?

18   A.   Yes.

19   Q.   Can I ask you to look at the chart, the first entries for

20   Serangon -- I may be mispronouncing it, so excuse me --

21   Serangon Holdings Limited?

22        Do you see that?

23   A.   I do.

24   Q.   And what does it say about the country of origin?

25   A.   Cyprus.

1    Q.    And what is Serangon Holdings Limited?

2    A.    It was an entity set up in Cyprus.

3    Q.    Okay.  By who?

4    A.    At the direction of Mr. Manafort.

5    Q.    And whose money was in it?

6              THE COURT:  Well, he didn't ask you that.  He asked

7    you:  Who set it up?

8              THE WITNESS:  The Cypriot attorneys set it up.

9              THE COURT:  Next question.

10   BY MR. ANDRES:

11   Q.    Who asked the Cypriot lawyers to set it up?

12   A.    In this account, I don't know specifically, but either

13   Mr. Manafort asked the Cypriot attorney or he asked me to ask

14   the Cypriot attorney.

15   Q.    During the time that you were dealing with Mr. Manafort's

16   tax preparers, did either you or Mr. Manafort disclose Serangon

17   Holdings?

18   A.    No, we did not.

19   Q.    There's another listing a few down before the shading for

20   Global Highway Limited.  What is Global Highway Limited?

21   A.    Global Highway Limited is another entity in Cyprus.

22   Q.    And who controlled that?

23   A.    Mr. Manafort.

24   Q.    And whose money was in that?

25   A.    Mr. Manafort's.

Gates - Redirect                                                           1488

1    Q.   Did you disclose that account to Mr. Manafort's tax

2    preparers?

3    A.   We did not.

4    Q.   And below that --

5             THE COURT:  I'm sorry, what was your answer?

6             THE WITNESS:  We did not, Your Honor.

7             THE COURT:  Are you saying "we" or "I"?

8             THE WITNESS:  I did not.

9             THE COURT:  Next question.

10   BY MR. ANDRES:

11   Q.   Do you know if Mr. Manafort disclosed that to your tax --

12   to his tax preparers?

13   A.   To my knowledge, no, he did not.

14   Q.   Below that is Peranova.

15   A.   Yes.

16   Q.   What is Peranova?

17   A.   Peranova is another Cyprus attorney that was used for

18   political work.

19   Q.   And who controlled that?

20   A.   Mr. Manafort.

21   Q.   Did you disclose that to Mr. Manafort's tax preparers?

22   A.   I did not.

23   Q.   Why not?

24   A.   Because Mr. Manafort had asked us not to -- said we did

25   not need to disclose the foreign accounts to the accountants.

Gates - Redirect                                                      1489

1    Q.   Okay.  And then for Peranova there are two entries.  One

2    is for $48,000.  Is that money you drew from that account?

3    A.   It is.

4    Q.   Okay.  And the other was for $100,000; is that right?

5    A.   That is correct.

6    Q.   And what year is that in?

7    A.   That is tax year 2011.

8    Q.   And that money was income to Mr. Manafort; is that

9    correct?

10   A.   This actually was income to me.

11   Q.   Income to you, but the money when it first went to

12   Peranova, what was that?

13   A.   That was income from the political work.

14   Q.   And that was never a loan, right?

15   A.   That's correct.

16   Q.   There was no loan from some businessman in the Ukraine to

17   Mr. Manafort --

18            THE COURT:  You're leading.

19   BY MR. ANDRES:

20   Q.   Was there ever a loan from a businessman in the Ukraine to

21   Mr. Manafort that you were aware of?

22   A.   No.

23   Q.   Okay.  Just one more.  At the bottom there it says,

24   "Bletilla Ventures."  What is that?

25   A.   Bletilla is another company that was incorporated in

1    Cyprus.

2    Q.   Okay.  And who controlled that?

3    A.   Mr. Manafort.

4    Q.   And did you disclose that to Mr. Manafort's tax preparers?

5    A.   I did not.

6    Q.   Why not?

7    A.   At the direction of Mr. Manafort.

8             MR. ANDRES:  Can I just have one moment to look at

9    the chart, Judge?

10            THE COURT:  Yes, you may.

11            MR. ANDRES:  I'm just trying to speed this along.

12            Just one or two more questions about the chart.

13   BY MR. ANDRES:

14   Q.   Do you see a reference to Pompolo Limited?

15   A.   Yes.

16   Q.   What is that?

17   A.   Pompolo Limited is an entity that was set up in the United

18   Kingdom.

19   Q.   Okay.  And who controlled that entity?

20   A.   That was controlled by me and Mr. Manafort.

21   Q.   Okay.  And did you disclose that to your tax preparer?

22   A.   I did not.

23   Q.   Under that is Lucicle.

24   A.   Yes.

25   Q.   What is Lucicle?

Gates - Redirect                                                    1491

1    A.    Lucicle is a company based in Cyprus.

2    Q.    Okay.  And who controlled that entity?

3    A.    Mr. Manafort.

4    Q.    Under that Mr. Downing asked some questions about Cypriot

5    Agent.  Do you see that?

6    A.    I do.

7    Q.    You didn't have your own lawyer in Cyprus, did you?

8    A.    I did not.

9    Q.    You didn't have your own accounts in Cyprus, did you?

10   A.    No.

11   Q.    At some point, the accounts moved from Cyprus to the

12   Grenadines, St. Vincent and the Grenadines?

13   A.    Correct.

14   Q.    And was there a transition period?

15   A.    There was.

16   Q.    What happened in that transition period?

17   A.    In terms of?

18   Q.    In terms of where the money was put, what accounts, where

19   was the money held?

20   A.    The money -- oh, the remaining money was held in the

21   Cypriot Agent account in Cyprus.

22   Q.    By Dr. K, is that right?

23   A.    That's correct.

24   Q.    The Cypriot Agent account is not yours, is it?

25   A.    No.  It was actually an internal account that actually

Gates - Redirect                                                    1492

1   designated by the company that the money remained in that

2   company, so it was simply a list of all the companies that we

3   had had prior to Cyprus and the remaining balance in those

4   companies.

5   Q.   Do you remember that Mr. Downing asked you questions about

6   Mr. Manafort having trouble moving the money from Cyprus to the

7   United States?

8            Do you remember that?

9   A.   Yes.

10  Q.   And he asked you if that caused difficulties?

11  A.   Yes.

12  Q.   And it caused problems for Mr. Manafort's business?

13  A.   Yes.

14  Q.   Do you know why banks in the United States wouldn't accept

15  Mr. Manafort's money from Cyprus?

16           THE COURT:  Wouldn't this be hearsay?

17           MR. ANDRES:  It's his understanding.

18           THE COURT:  His understanding isn't relevant.

19           MR. ANDRES:  Well, that's what he was asked about.

20           MR. DOWNING:  Actually, his answer was yes, he was --

21  the banks didn't tell him why.  That was his statement

22  yesterday, Your Honor, but objection.  Calls for hearsay.

23           MR. ANDRES:  But he asked the exact same question,

24  Your Honor.

25           THE COURT:  His understanding isn't really relevant,

Gates - Redirect                                                1493

 1   is it?

 2           MR. ANDRES:  It is.

 3           THE COURT:  Mr. Downing?

 4           MR. DOWNING:  Your Honor, I believe yesterday when I

 5   asked Mr. Gates if he knew why the accounts were closed, he

 6   said the banks did not indicate.  They just closed the

 7   accounts.

 8           So I don't think he's got a personal understanding of

 9   why the banks closed the accounts.  That was his testimony

10   yesterday.

11           MR. ANDRES:  We could ask him.

12           THE COURT:  All right.  I'll permit it, although it

13   leaves open the question of why he didn't answer it in the

14   first place when he was asked the question.

15   BY MR. ANDRES:

16   Q.   Mr. Gates, do you have an understanding as to why U.S.

17   banks wouldn't accept Mr. Manafort's money from Cyprus?

18   A.   It wasn't Mr. Manafort's --

19           THE COURT:  Do you have an understanding?

20           THE WITNESS:  I have a response from one of the banks

21   that we banked with, yes, Your Honor.

22           THE COURT:  I thought you answered Mr. Downing's

23   question that the banks didn't tell you.

24           THE WITNESS:  That's correct, that was the answer.

25           THE COURT:  Now, you're remembering that one bank

Gates - Redirect                                                    1494

1    told you.

2              THE WITNESS:  No, no.  The one bank had indicated to

3    us that they are able to --

4              THE COURT:  Just a moment.  Now you're telling that

5    the bank had indicated something to you?

6              THE WITNESS:  Yeah.  It follows with my answer

7    yesterday, Your Honor.

8              THE COURT:  All right.  That would be hearsay, so

9    I'll exclude that.  Continue.

10   BY MR. ANDRES:

11   Q.   Did anything about the fact that Mr. --

12             THE COURT:  By hearsay, ladies and gentlemen, I mean

13   that if I permitted a witness to testify as to what that

14   witness had been told by somebody else, that somebody else

15   couldn't be cross-examined here in court, so that's why it's

16   excluded.

17             Proceed, Mr. Andres.

18   BY MR. ANDRES:

19   Q.   Did anything about the fact that Mr. Manafort had a hard

20   time moving his money from Cyprus to the United States, did

21   anything about that prevent him, as you understand it, from

22   disclosing his overseas accounts to his tax payers?

23   A.   No.

24   Q.   Yesterday, Mr. Downing asked you some questions about a

25   relationship that you had.

Gates - Redirect                                                        1495

1          Do you remember that?

2   A.   I do.

3   Q.   How long did that last?

4   A.   Approximately five months.

5   Q.   And have you discussed that with your wife?

6   A.   I have.

7   Q.   How long ago was that?

8   A.   Almost ten years ago.

9   Q.   When it happened, did you -- did you tell Mr. Manafort?

10  A.   I did.

11  Q.   And was he supportive?

12  A.   He was.

13  Q.   Did he fire you?

14  A.   He did not.

15  Q.   Mr. Downing asked you some questions about bonuses that

16  you received.

17         Do you remember that?

18  A.   I do.

19  Q.   Where did those bonuses -- how were they made?

20  A.   They were paid from Cyprus.

21  Q.   Okay.  And those bonuses weren't disclosed to the tax

22  preparers, were they?

23  A.   No.  I failed to report those on my income tax.

24  Q.   Did Mr. Manafort report it to his tax payers?

25  A.   He did not.

1   Q.   That was his secret, right?

2   A.   As I understand, yes.

3   Q.   Did he report it to Ms. Washkuhn?

4   A.   He did not.

5            THE COURT:  Just a moment.

6            MR. DOWNING:  Objection, Your Honor.  There is no

7   evidence that Mr. Manafort knew that he was taking this money.

8   This is embezzlement.  This isn't a bonus.  How could he ask

9   him what --

10           THE COURT:  That's not the question that's being

11  asked.  The question that's being asked is whether Mr. Manafort

12  reported bonuses that were paid to him.

13           MR. DOWNING:  That's not what I understood the

14  question --

15           THE COURT:  Is that your question, Mr. Andres?

16           MR. ANDRES:  Yeah.

17           THE COURT:  I beg your pardon?

18           MR. ANDRES:  Yes, Judge.

19           THE COURT:  All right.  Be careful about that.  This

20  is not an informal proceeding.

21           MR. ANDRES:  Understood.  With --

22           THE COURT:  I'm not done yet.  There's an objection

23  pending.  So what's your objection?

24           MR. DOWNING:  My objection, I thought he was asking a

25  question about was the money he took out of these offshore

1   accounts that was unknown to Mr. Manafort that he calls

2   bonuses, that were reported by Mr. Manafort on tax returns.

3   That's what I understood the question.

4            THE COURT:  That was the question, wasn't it,

5   Mr. Andres?

6            MR. ANDRES:  Yes.

7            THE COURT:  I beg your pardon?

8            MR. ANDRES:  Yes, Judge.

9            THE COURT:  All right.  I'll overrule the objection.

10  He may answer.

11           THE WITNESS:  Sorry, can you repeat the question?

12  BY MR. ANDRES:

13  Q.   With respect to the --

14           THE COURT:  He wants to know whether the monies that

15  were paid to Mr. Manafort as bonuses were reported on his

16  income taxes, if you know.

17           THE WITNESS:  The money that was paid to Mr. Manafort

18  was not reported as income.

19           THE COURT:  Next question.

20  BY MR. ANDRES:

21  Q.   Mr. Downing asked you some questions about your indictment

22  here in the Eastern District of Virginia.  Do you remember

23  that?

24  A.   I do.

25  Q.   He said that you might be facing a substantial amount of

Gates - Redirect                                                    1498

1    jail time for that.

2              Do you remember that?

3    A.   Yes.

4    Q.   Somewhere in the neighborhood of 200 years in jail?

5    A.   Correct.

6    Q.   Is that your understanding that you were facing that

7    amount of time?

8    A.   No.  I thought it was a lower amount.

9    Q.   Are there --

10             THE COURT:  What was the lower amount that you

11   thought?

12             THE WITNESS:  I thought it was somewhere in the range

13   of a hundred years, Your Honor.

14             THE COURT:  A hundred years.  Next question.

15             MR. ANDRES:  Fair enough.

16             THE COURT:  Go ahead, Mr. Andres.

17             MR. ANDRES:  Fair enough.

18   BY MR. ANDRES:

19   Q.   That indictment has been dismissed?

20   A.   It has.

21   Q.   Are there circumstances under which that indictment can be

22   brought again?

23   A.   There are.

24   Q.   What are they?

25   A.   If I fail to tell the truth here today, the Special

Gates - Redirect                                                      1499

1    Counsel can claim a breach of the plea agreement, and they can

2    indict me on those charges.

3    Q.   And if you were indicted on that, how much time would you

4    be facing?

5    A.   A significant amount.

6    Q.   Hundred years by your account.

7    A.   Yes.

8    Q.   With respect --

9         THE COURT:   I'll strike that.   That's your testimony,

10   but you may ask him.

11   BY MR. ANDRES:

12   Q.   So how much time are you facing?

13   A.   To my knowledge, up to a hundred years.

14   Q.   Okay.   And with respect to the charges in the Eastern

15   District of Virginia indictment, you were guilty of all those

16   charges, right?

17   A.   Yes.

18   Q.   And if you had lied here today and those charges were

19   brought again, would you have any defense to those?

20   A.   No.

21   Q.   Mr. Downing asked you some questions --

22        THE COURT:   Just so we're clear -- no, go ahead,

23   Mr. Andres.

24   BY MR. ANDRES:

25   Q.   Mr. Downing asked you some questions about your

Gates - Redirect                                                1500

1   sentencing.  Do you remember that?

2   A.   I do.

3   Q.   And you're going to be sentenced by a federal judge in

4   Washington, D.C.; is that correct?

5   A.   That is correct.

6   Q.   With respect to all of the things that you've testified

7   today, will that judge know about all of the criminal activity

8   you're involved in?

9   A.   She will.

10  Q.   Okay.  With respect to the embezzlement from Mr. Manafort,

11  will that judge know about that?

12  A.   She will.

13  Q.   And with respect to your own failing to file tax returns,

14  will the judge know about that?

15  A.   Yes, she will.

16  Q.   How will she know about that?

17  A.   Because the government prepares a letter which indicates

18  all of the criminal activity conducted.

19  Q.   And will that judge have access to this transcript?

20  A.   I assume so, yes.

21  Q.   Okay.  And so at the time of sentencing, is it your

22  understanding that the judge will take into consideration the

23  totality of your conduct?

24  A.   Yes.  That's what is expressed to me.

25  Q.   That includes your criminal conduct?

Gates - Redirect                                                          1501

1    A.    It does.

2    Q.    And your cooperation?

3    A.    That's correct.

4    Q.    And as you sit here today, do you have any idea what your

5    sentence will be?

6    A.    None.

7    Q.    As you sit here today, Mr. Gates, do you have any doubt in

8    your mind, if you lied, that the Special Counsel's Office would

9    rip up your plea agreement?

10   A.    No doubt at all.

11             MR. ANDRES:  Judge, may I have a moment?

12             THE COURT:  Yes, you may.

13             MR. ANDRES:  Just one other quick area, Your Honor.

14             If I could go back to Defense Exhibit 17?

15             14.  Defense Exhibit 14.

16   BY MR. ANDRES:

17   Q.    Do you have that in front of you, Defense Exhibit 14?

18   A.    I do.

19             MR. ANDRES:  Okay.  May I just have one moment, Your

20   Honor?

21             THE COURT:  Yes.

22             MR. ANDRES:  I'm finished, Your Honor.  Thank you.

23             THE COURT:  I'm sorry?

24             MR. ANDRES:  I'm finished with my examination.  Thank

25   you.

1           THE COURT:  All right.  Mr. Downing?

2           MR. DOWNING:  Thank you, Your Honor.

3           Can I get a copy of the plea agreement?

4                        RECROSS EXAMINATION

5    BY MR. DOWNING:

6    Q.   Can we go back to Defense Exhibit 17?

7           Mr. Gates, you've had an opportunity to look at

8    what's been marked as Defense Exhibit 17, haven't you?

9    A.   Yes, I have.

10   Q.   Today and yesterday?

11   A.   Yes.

12   Q.   And I think you ballparked yesterday --

13          THE COURT:  Well, have you seen this chart before?

14          THE WITNESS:  Yesterday, yes, Your Honor.

15          THE COURT:  Before yesterday, have you seen it?

16          THE WITNESS:  Before yesterday?  Yes, I did see it in

17   the indictment, Your Honor.

18          THE COURT:  Next question.

19   BY MR. DOWNING:

20   Q.   The indictment here in EDVA, correct?

21   A.   That's correct.

22   Q.   And yesterday you ballparked that the total amount of

23   these wire transfers to your accounts was somewhere between 2.7

24   and 3 million dollars, correct?

25   A.   I believe that's correct, yes.

1  Q.   And this is all monies that you directed from DMP

2  International's offshore accounts to your personal accounts,

3  correct?

4  A.   That is correct.

5  Q.   And these monies are part of what we discussed yesterday,

6  your embezzlement from DMP and Mr. Manafort, correct?

7  A.   That is correct.

8  Q.   And they come from various entities in Cyprus as well as,

9  I believe, Global Endeavour is there for St. Vincent and the

10 Grenadines, correct?

11 A.   I don't see Global Endeavour here, but I think on that

12 previous page, yes, that's correct.

13 Q.   Okay.  And it spans from what years, 2010 to 2014?

14 A.   I don't have the last page, but I think that's correct.

15 Yes, November 2014.

16 Q.   Okay.  Not to rehash too much of yesterday, but I believe

17 Mr. Andres has made a big fact of the point that if you don't

18 tell the truth, that they can tear up your plea agreement?

19 A.   That's true.

20 Q.   Who prepped you for trial?

21 A.   My attorney.

22 Q.   And from the Government?

23 A.   I met with -- I met with Special Counsel.

24 Q.   Who?

25 A.   Mr. Andres and various FBI agents.

1  Q.   Any other lawyers from the Office of Special Counsel you

2  met with for trial prep?

3  A.   For trial prep?  I don't recall if there are any others.

4  Q.   And about on how many occasions did you meet with

5  Mr. Andres to prep for trial?

6  A.   Approximately 20.

7  Q.   How many?

8  A.   Approximately 20.

9  Q.   And in your trial preparation, this issue came up about an

10 extramarital affair that you may have had, correct?

11 A.   It did.

12 Q.   And when I asked you yesterday about your secret life, you

13 said you had made a mistake, correct?

14 A.   I did.

15 Q.   And that it was a short period of time and you rectified

16 it?

17 A.   Yes.

18 Q.   Do you recall telling the Office of Special Counsel that

19 you actually engaged in four extramarital affairs?

20          MR. ANDRES:  Objection, Your Honor.  Relevance.

21          MR. DOWNING:  It's going to go to you ripping up his

22 plea agreement for lying yesterday.

23          MR. ANDRES:  Your Honor, if we're going to testify,

24 maybe we could come to the sidebar?

25          THE COURT:  Yes, I think you're right, Mr. Andres.

1        (Bench conference on the record.)

2        THE COURT:  All right, there's an objection on the

3  basis of relevance.  Let me hear you, Mr. Andres.

4        MR. ANDRES:  Well, Judge, as a procedural matter,

5  Your Honor said that we weren't going to discuss any of this

6  stuff.  In fact, Your Honor ruled there would be no mention of

7  extramarital affairs without a bench conference.

8        Mr. Downing has violated that, obviously, but what is

9  the possible relevance of whether or not Mr. Gates had other

10 extramarital affairs?  What's the possible relevance of that?

11       MR. DOWNING:  I'm just throwing out the fact that

12 yesterday, first of all, Mr. Gates volunteered that he had the

13 affair.  I did not directly ask that, so I did not violate any

14 court order or agreement.

15       MR. ANDRES:  I would disagree with that.

16       MR. DOWNING:  Second of all --

17       THE COURT:  I'll be the judge of that.

18       MR. ANDRES:  I understand.  I'm just letting --

19       THE COURT:  That's not really what I need to pay

20 attention to now.  The question is whether this question is

21 relevant.  You said it isn't, and you've explained why you

22 think it isn't relevant, and I understand you want to make

23 clear that you think he's violated the Court's order.

24       That's not what I'm concerned with now.  What I'm

25 concerned with right now is whether this question is relevant.

1    Why do you think it's relevant?

2              MR. DOWNING:  Well, yesterday, he offered up that he

3    had an affair, one affair.  It was a short period of time.

4    We've, we've alleged and the basis for questioning about this,

5    we called it the secret life of the affair, that it stretched

6    over a period of time and it explained why he was embezzling

7    all of this money.

8              He, in fact, did not have one affair.  He told the

9    Office of Special Counsel he had multiple affairs, which goes

10   to the very issue of why we started questioning about this, his

11   lifestyle that he was leading, his secret life.  But, in fact,

12   it also goes to his credibility.  He lied on the stand

13   yesterday about it.

14             THE COURT:  Well, I think it is true that the

15   cross-examination referred to it as a secret life, and you did

16   not elicit that it was an affair.  It was pretty obvious that

17   it was.  Just now, you've raised it without coming to the

18   bench.  You should have come to the bench.

19             It's no secret.  The real question is whether -- the

20   multiple affairs question, and you contend that that's relevant

21   because there's been a great deal of testimony about whether

22   the -- if he's lied, he loses his immunity, and you want to

23   bring out that he's lied?  Is that what you want?

24             MR. DOWNING:  Correct.

25             THE COURT:  Where is it he's lied?

Gates - Recross                                                    1507

1           MR. DOWNING:  He said he had an affair, one affair.

2           THE COURT:  Who said that?

3           MR. DOWNING:  Yesterday, Mr. Gates said it.  He,

4    unsolicited by me, he blurted it out, and that it was over a

5    short period of time.

6           It was not one affair.  He told the Office of Special

7    Counsel it was multiple affairs and it took place over a period

8    of time, which goes to the motivation, his secret life, for

9    embezzling the money.  So it all ties into that.

10          THE COURT:  Yes, but that's not really -- the only

11   thing that's relevant is this whole thing is about whether or

12   not he's going to lose the benefit of his plea agreement if he

13   doesn't tell the truth.  That's what you've been asking.  And

14   did you want to establish that he didn't tell the truth in this

15   case?

16          MR. DOWNING:  Yes.

17          THE COURT:  Well, the problem with that is he wasn't

18   asked a question directly:  How many affairs did you have?  He,

19   I think you're correct, blurted out that he had an affair.

20   Consistent with my instructions to you, you didn't ask him,

21   because you weren't permitted to --

22          MR. DOWNING:  Correct.

23          THE COURT:  -- how many affairs did you have?

24          MR. DOWNING:  And, Your Honor, I apologize because I

25   thought since he opened the door to it by blurting it out

Gates - Recross                                                          1508

1    unsolicited, that it wasn't a violation of our agreement, so I

2    apologize.

3              THE COURT:  Well, that wasn't a violation.  That

4    wasn't a violation.  What Mr. Andres says is a violation is

5    what you said here in open court, but I'm not concerned with

6    that now.

7              I think the question about multiple affairs is not

8    relevant, and I'm not going to permit it.  It's not relevant

9    because I don't see how it bears on his credibility here.

10             In other words, well, you might argue, I suppose --

11   that's what interests me, is how does the multiple versus one

12   affair lead to this jury's consideration of whether he's been

13   truthful?

14             MR. DOWNING:  So I think overall what he was trying

15   to do was minimize the reason or the basis which caused him to

16   decide to embezzle the funds.  He made it sound like it was a

17   very short period of time and that it was over.

18             What I'm trying to say is he embezzled funds from

19   2010 to 2014, and those affairs span that period of time.  It

20   wasn't a short, five-month period.

21             THE COURT:  Well, I'll tell you what I think you can

22   do, but let me inquire of Mr. Andres.

23             I'm here.

24             MR. ANDRES:  I'm looking.

25             THE COURT:  He wants to show that this person is not

Gates - Recross                                                      1509

1    worthy of credibility, of course, and he did testify on direct

2    testimony that he had a secret life -- that's the term used --

3    he admitted that and he said -- I don't know whether he

4    admitted one affair, but it sort of sounded like that, and I

5    think what Mr. Downing wants to do is to point out that that

6    wasn't truthful.

7              The problem, Mr. Downing, is he wasn't asked:  Did

8    you only have one affair, because I wouldn't have permitted it.

9    What I will permit now is for you to establish that his secret

10   life spanned years.

11             MR. DOWNING:  Okay.

12             MR. ANDRES:  Your Honor, I object to that for the

13   following reason.

14             THE COURT:  All right.

15             MR. ANDRES:  I don't know the parlance of "affairs"

16   and "sexual encounters" --

17             THE COURT:  Good.

18             MR. ANDRES:  Thank you.  And the like.  I don't think

19   Mr. Gates would say that he had another affair, and I don't

20   think Mr. Downing can prove that, and he can bring up the 302

21   and the other document that said that.

22             THE COURT:  Well, the only thing I'm letting him,

23   letting him bring out is how long this secret life spanned.

24             MR. ANDRES:  Well, so if I could finish, Mr. Gates

25   had, I don't know what to call it, but he had sex with other

Gates - Recross                                                          1510

1    women aside from his wife more than once.  That is not

2    something that's relevant in any way.

3              Mr. Gates --

4              THE COURT:  It is relevant if it's inconsistent with

5    any other testimony he's given because this jury has to decide

6    whether or not to believe this witness.  So if he has been less

7    than candid, less than truthful in his testimony, they have an

8    opportunity to bring that out.

9              You have a wonderful brow furrowing --

10             MR. ASONYE:  I'm just, Your Honor --

11             MR. ANDRES:  Your Honor, the problem that Mr. Downing

12   is going to say is:  You had four affairs.

13             And he's going to say:  No, I didn't.

14             THE COURT:  No, I didn't permit him to ask that.

15   What I'm permitting him to ask is did his secret life span a

16   number of years, and that's all.

17             MR. DOWNING:  I got it.

18             THE COURT:  That's all.  Now, what's your objection

19   to that?

20             MR. ANDRES:  My objection is that Mr. Downing never

21   tied any of the payments that he alleges, and only him, have

22   anything to do with the, quote-unquote, secret life.  Mr. Gates

23   said that he didn't use any money from Mr. Manafort for that,

24   so what's --

25             THE COURT:  I don't care.  What I care about is

Gates - Recross                                                    1511

1   whether there is information from which a jury can make a

2   judgment about whether to believe this witness.  So I'm going

3   to permit that.

4           MR. ANDRES:  Can I just understand what specifically

5   you're going to permit?

6           THE COURT:  Yes.  I've said it; I'll say it again:

7   I'm going to permit Mr. Downing to inquire whether his secret

8   life, that's one question --

9           MR. DOWNING:  Yes.

10          THE COURT:  -- spanned whatever years it is.

11          MR. DOWNING:  Okay.

12          THE COURT:  And that's it.

13          MR. ANDRES:  And there's not going to be follow-up or

14  there's not going to be --

15          THE COURT:  Unless you do it.

16          MR. ANDRES:  Okay.  Thank you.

17          THE COURT:  I mean, you-all seem to be good at that.

18  He wanted an exhibit admitted.  I admitted it, and it turned

19  out that he used that.  Maybe -- be careful what you ask for.

20          MR. DOWNING:  I agree.  I'll make it brief.

21          MR. ANDRES:  Thank you, Judge.

22          (End of bench conference.)

23          THE COURT:  All right.  Mr. Downing, you may proceed

24  in accordance with the Court's ruling at the bench.

25  BY MR. DOWNING:

Gates - Recross                                                    1512

1   Q.   Mr. Gates, I asked you some questions about Defendant's

2   Exhibit 17 and the time frame over which it spanned.  It was

3   from 2010 to 2014.

4          Yesterday, I referred to your secret life, and I

5   believe you testified yesterday that you were spending beyond

6   your means, and there was a reason for your taking this

7   money --

8          THE COURT:  Well, never mind summarizing his

9   testimony.  Get to the question.

10  BY MR. DOWNING:

11  Q.   Well, the question is:  The secret life that we were

12  talking about spanned this period of time that's evidenced in

13  Exhibit 17?

14  A.   Mr. Downing, I'd say I've made many mistakes over many

15  years, and I regret them.

16         THE COURT:  This isn't the time for that.  Just

17  answer his question directly.

18         THE WITNESS:  I understand.  Yes, it did.

19  BY MR. DOWNING:

20  Q.   It is?

21  A.   Yes.

22         MR. DOWNING:  No further questions.

23         THE COURT:  Anything further?

24                (No response.)

25         THE COURT:  All right.  Thank you.

1513

1           Anything further, Mr. Andres?

2           MR. ANDRES:  No, Your Honor.

3           THE COURT:  Mr. Gates, you may step down.

4           THE WITNESS:  Thank you, Your Honor.

5                        (Witness excused.)

6           THE COURT:  All right.  Who is the next witness,

7    Mr. Andres?

8           MR. ANDRES:  Forensic Accountant Morgan Magionos,

9    from the FBI.

10          THE COURT:  All right.  Now, do I have something that

11   you submitted that I need to decide before that witness

12   testifies?

13          MR. ANDRES:  Yes, Judge.

14          THE COURT:  All right.  Pass your books to the right,

15   ladies and gentlemen.  The court security officer will collect

16   your books and maintain their security.

17          Remember to refrain from discussing the matter among

18   yourselves or with anyone or undertaking any investigation on

19   your own.  We will reconvene -- I have this issue to consider

20   and we will reconvene at -- how long is this next witness?

21          MR. ANDRES:  Two hours.

22          THE COURT:  All right.  We'll reconvene at 11:30 --

23   at, yes, let's make it 11:25 -- 11:30, and I'll resolve it.

24          Follow Mr. Flood out.

25                        (Jury out.)

1514

```
 1            THE COURT:  Mr. -- just a moment.

 2            Mr. Andres, would you give me a brief summary of this

 3   witness and this -- you submitted a memorandum relating to

 4   this.  I don't believe I received anything from the defendants

 5   in response.

 6            MR. WESTLING:  You did not, Your Honor.

 7            THE COURT:  All right.  But your -- is it your

 8   witness?

 9            MR. WESTLING:  It is, Your Honor.

10            THE COURT:  All right.  You can respond orally.

11            MR. WESTLING:  I'll be happy to.

12            THE COURT:  Do you have any objection to the

13   admissibility?

14            MR. WESTLING:  Well, I think that as a practical

15   matter, Your Honor, we don't have objections to the use of

16   summaries.  There's some issues in some of these charts

17   regarding information that's being put in related to domestic

18   expenditures that we're not entirely clear of the relevance of

19   that, because we understand those were actually captured and

20   put on the tax returns.

21            In addition, Your Honor, there are some exhibits the

22   Government has listed for this witness that relate to e-mails

23   and other things that I don't think fit under sort of the

24   general mantle of a summary witness.  It's one thing to say I'm

25   going to come and summarize transactions and other things.
```

1515

1    It's another to say I'm going to refer to other testimony or

2    the e-mails that have already been admitted into evidence, and

3    so that would be our concern with this witness.

4            THE COURT:  Well, let me go and read Mr. Andres'

5    brief that was submitted.

6            I think I mentioned earlier, Mr. Andres, that, of

7    course, summaries of voluminous data can be summarized if the

8    admissible evidence is submitted and available to the Court and

9    opposing counsel, but it isn't a device through which a party

10   can summarize its arguments; in other words, you can't use it

11   as a means of doing that.  But do you have the charts that you

12   want this witness to testify to as exhibits listed?

13           MR. ANDRES:  Yes, Judge.

14           THE COURT:  What are they so that I may look at

15   those?  Are they listed in your brief and attached to it?

16           MR. ANDRES:  I believe they are, Judge, but if it's

17   faster, we can just e-mail them as soon as we take a break.

18   That might be the most expeditious way to do it.

19           THE COURT:  All right.  All right.

20           MR. ANDRES:  Can I -- can I suggest just two other

21   things?

22           THE COURT:  Yes.

23           MR. ANDRES:  I'm happy to, if Your Honor is

24   interested, in giving a quick overview of the testimony.

25           THE COURT:  Yes.

1516

1        MR. ANDRES:  And then I think if I could work with

2   Mr. -- with defense counsel in terms of understanding their

3   objections, then we could try to work that out because we do

4   not intend to --

5        THE COURT:  Excellent idea.

6        MR. ANDRES:  -- admit other testimony or other, other

7   e-mails.

8        I'm not sure I understand that, but I'm happy to

9   clarify.  So Morgan Magionos is a forensic accountant with the

10  FBI, been involved in this investigation for some time.  She's

11  done tracing work to trace the payments from the Ukraine to

12  Cyprus to the United States to the vendors in a variety of

13  different ways, and that's principally what she'll testify

14  about is all of the movement of the money.  And those are the

15  charts that we provided.

16       There were a series of charts that related to the

17  purchase of real property.  Some of those had pictures of the

18  real property on them.  We now have two versions, one with

19  pictures and one without.  To the extent that there's an

20  objection, I don't think listing the photographs of the houses

21  is necessarily prejudicial, but in either case, we're not

22  arguing that.  So that's A, let's call that Part A of her

23  testimony.

24       Secondly, during the course of reviewing those

25  materials, which involve a substantial number of foreign bank

1517

1    accounts, as well as bank account information that Mr. Manafort

2    produced pursuant to a Title 31 subpoena, there are a handful

3    of e-mails that Mr. Manafort included that are his statements

4    that relate to the tracing exercise that she'll testify to, and

5    those, again, are his statements.  So all of that, again, I put

6    in Category A.

7           Category B are Mr. Manafort's e-mail statements that

8    are admissible as his statements, that is a different project,

9    if you will, than simply her tracing project.  But they involve

10   a range of issues in the case, whether it's the bank frauds or

11   other things, but they're defendant's statements.

12          That brief has more recently come to Your Honor, I

13   think, in the last day or two and is the issue that hasn't been

14   involved.  The 1006 issue has been resolved, and I certainly

15   appreciate the difference between a summary witness --

16          THE COURT:  I'm sorry, you say it has been resolved?

17   I don't recall ruling on the 1006 issue.

18          MR. ANDRES:  You did, Your Honor, and with the

19   admonition that we're not to use it as a summation.

20          THE COURT:  Oh, I see.

21          MR. ANDRES:  I understand the difference between a

22   summary witness.  I'm not going to give my closing witness

23   through this witness.

24          THE COURT:  All right.

25          MR. ANDRES:  The issue about whether to read her

1518

1    e-mails -- the e-mails that -- of Mr. Manafort as his

2    statements is something we briefed.  I'm not sure what the

3    defense position is, but our position are there's a stipulation

4    that they're authentic and these are the defendant's

5    statements.  So there's a handful that we seek to read through

6    Special Agent --

7            THE COURT:  Yes, that's, I think, the objection as I

8    understood it.  You can have the document admitted and it's

9    admitted, but you can't have a witness read it who doesn't know

10   anything about it other than that she's an FBI agent.

11           MR. WESTLING:  That's the objection, Your Honor.

12           MR. ANDRES:  Well, Judge, if I could address that,

13   agents take statements from witnesses all the time, and they

14   don't have to know all the background.  Drug agents seize drugs

15   all the time.  They don't have to have personal knowledge of

16   the drugs that they seize in order to testify.

17           THE COURT:  And that's quite true.

18           MR. ANDRES:  Right?  So --

19           THE COURT:  But this is merely a means of conveying

20   to the jury through the mouth of an agent -- these -- she had

21   nothing to do with -- is it a woman?

22           MR. ANDRES:  Yes, Judge.

23           THE COURT:  She had nothing to do with this.  In

24   other words, it isn't -- these aren't statements Mr. Manafort

25   made to her.  They're statements he made, and I'll think about

1519

1    that.  None of cases you've cited thus far is that, but if I've

2    missed it, I want you to call my attention to it.

3            MR. ANDRES:  I think we did cite a case in

4    particular, Judge, that allows for the reading of the e-mails.

5            The question is not -- we'll do it in any way that's

6    appropriate.  We're not trying to prejudice, but again, the

7    issue is to get the evidence in front of the jury.

8            THE COURT:  Well, the documents would be admitted

9    because they're statements of the defendant.  It's clearly

10   admissible.  But using an agent to make the case is not,

11   because these statements weren't made to an agent, and all the

12   agent is doing is testifying to the -- what it says.

13           Tell me what case you're relying on.

14           MR. ANDRES:  I'm obviously getting some help here,

15   Judge, but there's a Sixth Circuit case, *United States v.*

16   *Kilpatrick*, that says agents are free to read aloud from

17   admitted documents, and then there's another case, and this

18   one's in the Fifth --

19           THE COURT:  Well, I'll look at that, but, you know,

20   you're cherry-picking that statement.  Who knows whether that

21   agent could read aloud from it because that agent was involved

22   in some other part of the investigation where that statement,

23   that admission by a party was important.  I'll look at the

24   case.

25           Certainly, the exhibit is admissible.  It does become

1520

1    part of the record.  I'll just look at whether the appropriate

2    way to do it is simply to admit it.  You, in your argument, can

3    direct the jury:  You know, I think you ought to look

4    specifically at this, and so forth, rather than -- what she's

5    doing is simply repeating what you want her to do.  She's

6    reading those documents.

7              And I'm going to look at the -- what you say is the

8    Sixth Circuit case, but I'm not inclined to do it, but I may.

9    But as I said, you do get the documents to come into the

10   record.  They're perfectly admissible.  You do get to argue

11   them.  That's perfectly appropriate.

12             MR. ANDRES:  Thank you, Your Honor.

13             Just before you leave, Bucket 3 for Forensic

14   Accountant Magionos is just to admit some telephone records.

15   Again, as a custodian, they're business records that are coming

16   in, and she's going to identify certain of the telephone

17   records that are relevant to another part of the case.

18             Again, the telephone records themselves are

19   voluminous, and she has a chart that identifies.  I'm not going

20   to ask her as to what they relate to or anything else, but

21   rather just to identify those phone calls.

22             THE COURT:  All right.  Let's do this:  We're going

23   to take the recess.  I want you to look at all of the charts

24   that are being offered --

25             MR. WESTLING:  Yes, Your Honor.

1521

1    THE COURT:  -- as summaries of data under 1006,

2    because voluminous data can be presented to a jury by way of a

3    chart if the chart is not argumentative.

4    If it simply portrays in an organized fashion the

5    data that is admissible and if you're satisfied and don't have

6    an objection as to its accuracy, you get a chance to look at

7    it.

8    So number one, I want you to look at that and tell me

9    whether you have any objection to these charts that Mr. Andres

10   wants to introduce under 1006.  He has to introduce all of

11   the -- or make available all of the underlying data that would

12   be admissible, and then you can determine whether or not it's

13   an accurate summary.

14   MR. WESTLING:  Yes, Your Honor.

15   THE COURT:  But obviously, it's got to be neutral.

16   In other words, you can't offer a summary that has some numbers

17   in black and some numbers in red and some numbers with stars by

18   it, because that's an argument.  They can do that in closing

19   argument.  You can, you can do that, but it won't go back to

20   the jury room.  It'll be a demonstrative then.

21   Okay.  So that's the first thing I want you to do.  I

22   want to know whether there's any objection.

23   Second, do you know what exhibits Mr. Andres intends

24   to introduce through this witness because you provided that,

25   Mr. Andres?

1522

1      MR. ANDRES:  Yes, Judge.

2      THE COURT:  I want to know if there's any objection

3  to those.  I think, for the most part, they're all

4  Mr. Manafort's statements, are they not?

5      MR. ANDRES:  Yes, Your Honor.

6      THE COURT:  So there's no objection on the basis of

7  hearsay, but there may be some other objection, and I want to

8  know that.

9      MR. WESTLING:  Yes, Your Honor.

10      THE COURT:  And I want to resolve it.

11      There was a third -- oh, yes, and you were going to

12  get together with Mr. Andres to see if you could agree on if

13  you have an objection, give him notice of that, so I can hear

14  informed argument.

15      Now, tell me once again, what that Sixth Circuit case

16  was?

17      MR. ANDRES:  Your Honor, if I could hand up, I'm

18  happy to brief it, but I'm happy to provide you with a copy.

19  It does have highlighting, but it --

20      THE COURT:  No, I'll look it up.  Just give me the --

21      MR. ANDRES:  Okay.  Sure, here it is.  *United States*

22  *v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015).

23      THE COURT:  All right.  I'm sure somebody helpfully

24  wrote that down.

25      MR. ANDRES:  I'm happy to -- I'm happy to repeat it.

1523

1      (Laughter.)

2           THE COURT:  No, that's fine.  All right.  Anything --

3           MR. ANDRES:  It's not a -- it's not a secret.

4           THE COURT:  Now, Mr. Flood will have to tell the jury

5     that we'll probably be a little later.  Let's make it 11:45 we

6     will reconvene.

7           Anything further at this time?  Are we clear now?

8           MR. WESTLING:  Yes, Your Honor.

9           THE COURT:  Let's proceed.

10          MR. ANDRES:  Okay.  Thank you, Your Honor.

11          THE COURT:  Court stands in recess.

12          (Recess from 11:08 a.m., until 11:43 a.m.)

13                    (Jury out.)

14          THE COURT:  All right.  All right.  When we recessed,

15    I did not have any sense of the scope.  I now have it, and I

16    need some more clarification, but I want to give you some

17    guidance as well.

18          The focus, my focus was these charts that I received

19    a two- or three-page memorandum on, maybe it was two, no

20    specific charts were referred to, but you did give me an out --

21    not an outline but a -- as you've been doing, Mr. -- yes -- as

22    you've been doing, Mr. Andres, you've given me a chart of this

23    witness and the exhibits you want to offer through her.  She's

24    a forensic accountant.  So I've looked at some of those.

25          And, Mr. Wesley, I don't know what you're objecting

1524

1    to.  So you need -- just a moment -- what you're objecting to,

2    so that's what I expected you and Mr. Andres to review.  There

3    may be no objections; there may be a slew of them.  I just

4    don't know.

5            Now, let me give you some guidance that might resolve

6    it.  I told Mr. Andres that I would admit, of course, documents

7    under -- charts under 1006, if they are a way of conveying to

8    the jury in a neutral manner the content of voluminous

9    documents, but that they couldn't be disguised advocacy, that

10   is, as evidence.

11           So I began to look at some of these charts, and it

12   seemed to me, Mr. Westling, that they did that.  I didn't see

13   any problem with them.  For example, Exhibit 61, all it says is

14   the names of certain foreign entities, a date created, and a

15   corporation location, and these are names that I think all have

16   been mentioned in the record.  So I would assume this forensic

17   accountant determined, Mr. Andres, where these people were

18   created, when they were created, and then on the basis of

19   admissible records, and where they are incorporated.

20           Am I right about that?

21           MR. ANDRES:  Yes, Your Honor.

22           THE COURT:  So that seems to me that that would be

23   admissible under 1006, and I don't know if there's an

24   objection, but at some point --

25           MR. WESTLING:  There is not as to that one, Your

1525

1    Honor.

2             THE COURT:  Well, I'm not surprised.  But then I go

3    on and there's this much, and at some point I needed to have

4    some guidance on what's really at issue between the parties.

5    Now, that's one issue.  I'll come back to it.

6             The second issue is whether this witness could read

7    e-mails that are otherwise admissible into the record.  The

8    answer to that is, yes, in some instances, but not in all.  In

9    other words, you can't have someone who's an agent come in and

10   read e-mails that that agent has nothing to do with other than

11   to read, and if she -- he or she was involved in the

12   investigation, but if in preparing her testimony, this

13   witness -- and in making these charts she used this evidence,

14   assuming it's admissible, in other words, a statement by

15   Mr. Manafort which is admissible, she could certainly read

16   that, but, of course, nobody would doubt that I can't go in and

17   find one of these nice people off the street in the morning and

18   say, "Come in, I want you to read a bunch of e-mails for me,"

19   of course not.  Even though the e-mails may be admissible, they

20   have to have some context.  Remember, the defendant can't -- or

21   you can't cross-examine most of these anyway because maybe

22   there are other people on the e-mail and so forth.

23            But anyway, so those are the two questions.  One is

24   these charts, clearly charts that summarize voluminous

25   information in a neutral way to present to the jury that's

1526

1    appropriate under 1006.  It's up to you, Mr. Westling, whether

2    the predicates are met; namely, whether the documents have been

3    admitted in evidence, that is, the underlying data, and whether

4    the chart is accurate in its representation of that data.  I'm

5    not going to go through it; that's your problem.  And then I

6    need to know what the, what the objections are.

7            And for the second thing, you've got a list,

8    Mr. Westling, of all the documents Mr. Andres intends to

9    introduce through this witness.  If you have an objection to

10   those, I expected you and Mr. Andres to talk about it and see

11   if you could obviate the necessity for us to have yet another

12   bench conference, which I dearly wish to avoid.

13           MR. ANDRES:  Can I -- can I try first, Your Honor?

14           THE COURT:  Yes, of course.

15           MR. ANDRES:  So here's my understanding, and

16   Mr. Westling can correct me.  As to the 1006 charts, there's

17   a -- one issue was cumulative, which Mr. Westling will handle,

18   but, otherwise, there's not an objection to the admission.

19   There are --

20           THE COURT:  Except for cumulativeness?

21           MR. ANDRES:  Mr. Westling will handle that.  I'll

22   leave that.  I think -- and I don't want to speak for him, but

23   generally there's not an objection with respect to one

24   exception.  There are flow charts that cover the property that

25   was purchased.  So it shows the movement to the various

1527

1    accounts.  They're different than the charts.  We've agreed

2    that the -- we'd be allowed to show it so that Forensic

3    Accountant Magionos can describe her tracing activity, but

4    we're not going to admit those as exhibits.

5            THE COURT:  All right.  So it's a demonstrative in

6    effect?

7            MR. ANDRES:  For this witness.

8            MR. WESTLING:  That's correct, Your Honor.

9            MR. ANDRES:  Correct.  And then there's --

10           THE COURT:  Then you may use it in closing argument,

11   if you wish.

12           MR. ANDRES:  That would be wonderful.

13           THE COURT:  But the jury will be told you're not

14   going to have it in the jury room and it is not itself

15   evidence.

16           MR. ANDRES:  Understood.  And then there's a fourth

17   chart that also falls into that category with respect to

18   FARA -- the FARA filing, and it has -- it does summarize

19   voluminous evidence, but it also makes the comparison, which

20   there is some arguments that that could be argument, and we

21   don't want to fight about that, and we're going to put that

22   chart in as well as demonstrative evidence.  So --

23           THE COURT:  What chart is that?

24           MR. ANDRES:  It's called the FARA chart.  I don't

25   know offhand --

1528

1    MR. WESTLING:  I believe it's Exhibit 80, Your Honor.

2    THE COURT:  Just a moment.  Let's see if I -- all

3    right.  I do have Exhibit 80.  Go on.

4    MR. ANDRES:  So half of that chart summarizes

5    voluminous evidence.  I think it's the right side that goes

6    through all of the things that are in the general ledger, all

7    of the things that are in the bank account.  That is truly

8    voluminous evidence.

9    On the opposite side of that is a summary of what's

10   in Mr. Manafort's FARA filing, which is a document that is not

11   voluminous.  We don't contend it is, and to the extent that the

12   defense is arguing that this is some sort of argumentative

13   summation point, we're not going to seek to admit that as

14   evidence but rather have the accountant explain what she did

15   and the comparison that she made.  And like the other charts,

16   it will come in as a demonstrative exhibit but it won't be

17   admitted.

18   THE COURT:  All right.

19   MR. WESTLING:  And we have no problem with that, Your

20   Honor.

21   THE COURT:  All right.  That's a sensible resolution.

22   Now, your objection as to cumulativeness, of course,

23   we've heard testimony about how -- about the payment to the

24   clothiers, payment to the landscapers and other entities, and

25   we've heard these people who actually received payment testify

1   that, yes, I sent that bill, yes, I got that payment, and the

2   payment came to me from this entity.

3           And is it your argument that we don't need to hear

4   that evidence again?

5           MR. WESTLING:  That is my argument, Your Honor.

6           THE COURT:  Well, it was fairly clear.  What is it

7   that you intend to offer about that?  There were lots of

8   payments.  I mean, I just said clothiers and landscapers.

9   There were other payments, and I think the evidence showed they

10  came from Cyprus.  Am I correct?

11          MR. ANDRES:  Yes, Your Honor.  The point of Forensic

12  Accountant Magionos is to -- and we're not going to spend a lot

13  of time on this.  I'm really hoping it's not going to take two

14  hours.  I think we can get through it much quicker, but it is

15  to put together the whole picture.  So she -- they put it in

16  one part of the picture, which is the domestic half.  She's

17  going to put in the foreign half and she'll reference the

18  domestic half as well to show the connection between the

19  domestic payments and the foreign payments, and this is --

20          THE COURT:  Well, the domestic payments came from a

21  foreign bank.

22          MR. ANDRES:  Correct.  But what the, what the -- she

23  can trace the wire remittance from those foreign accounts, and

24  Your Honor will remember that when, when Your Honor asked that

25  we not admit the domestic chart payments through the, through

1530

1  the vendors, that you said through an appropriate FBI agent,

2  this is that appropriate FBI agent.

3         So it's not cumulative in the sense that it puts the

4  whole picture together.  And again, we are not -- we are

5  absolutely not going through every entry but rather to

6  summarize the charts so that the evidence is -- is in properly.

7         THE COURT:  All right.  What's your -- why is that

8  cumulative, Mr. Westling?

9         MR. WESTLING:  Well, Your Honor, I guess simply

10 because we've heard it all before, and so I don't think that

11 it's appropriate to have this witness get on the stand and

12 repeat for each vendor the specific transactions, sort of

13 transaction by transaction, which is at least what the charts

14 seem to suggest is going to happen and would have to happen for

15 the charts to be admitted.

16         THE COURT:  Well, do you intend to argue to the jury

17 that there was no evidence that the payments for his clothes

18 came from a Cyprus bank account?

19         MR. WESTLING:  We do not intend to argue that, Your

20 Honor.

21         THE COURT:  There was evidence of that, I think.

22         MR. WESTLING:  There was.

23         THE COURT:  Well, I'm looking for a way, Mr. Andres,

24 that you-all could shorten this matter.  You know, one way is

25 the accountant could be asked:  Did you examine the records to

```
1    see whether any payments were made to Clothier A from Cyprus

2    bank accounts between this time period?

3            Yes, I did.

4            And how much was that?

5            And then you're done, right?

6            MR. ANDRES:  Judge, I don't -- we're putting on a --

7    not an expert but a forensic accountant whose done a tremendous

8    amount of work.  I think it's important the jury understand her

9    work.  I'm not going through every transaction, even close.

10           THE COURT:  Look, it isn't relevant if she spent her

11   life doing it.  I'm not going to spend my life doing it,

12   neither is the jury.  So the amount of work she's done is not

13   really relevant to us.

14           What I'm looking for is a means -- and you can

15   express your gratitude to her, and so can the Department of

16   Justice.

17                         (Laughter.)

18           THE COURT:  But we need to find a way to focus

19   sharply.  I think your use of charts helps.

20           MR. ANDRES:  Your Honor, I think the compromise is to

21   not go through every transaction, which was never our intent,

22   but it's important to show that the transactions, the domestic

23   transactions match the foreign transactions.  And we're not

24   going to go through every one.  We're absolutely not intending

25   to do that.
```

1    THE COURT:  All right.  I do remember some testimony,

2  I don't remember all of it in detail, but I think you did

3  elicit testimony that the clothing bills, the landscaping

4  bills, the other bills were paid from wire transfers from an

5  account in Cyprus.  Was that elicited?

6    MR. ANDRES:  A substantial number of those witnesses

7  said that they didn't know whose accounts those were.

8    THE COURT:  Oh, I agree with you.  You can show that.

9  But one chart shows that.  In fact, that's 60 -- that's 61,

10  although, it doesn't say whose accounts that is, but that --

11  I'm sure you've got other charts that does that.

12    That was my goal, Mr. Andres, is not to repeat things

13  and not to -- and I think you share that view.

14    MR. ANDRES:  I do, Your Honor.  And I don't intend to

15  repeat things, but I don't think it's -- that means that the

16  subject matter itself won't come up, that is, where the

17  payments resulted.  I'm not going to ask these people about --

18  I'm not going to ask this -- this agent -- or this accountant

19  about all of the transactions or even close to all of them.

20  I'm just going to ask for a summary so that she can establish

21  the work that she did.

22    I wasn't suggesting that we all be thankful for the

23  work that she did.  I was suggesting that it's important that

24  the jury understand what she did so that the charts -- she can

25  explain her process with the charts.  That's really all.  And,

1533

1  again, I don't think this is going to be voluminous.  I

2  certainly don't think it's going to be cumulative.

3        THE COURT:  Mr. Westling, have you looked at all of

4  these charts?

5        MR. WESTLING:  I have, Your Honor, and I'll give the

6  Court an example.  If you look at No. 72, I think this is an

7  example of a proper summary.  It seems to include a summary of

8  all of the transactions that are foreign transactions that paid

9  vendors on one page as compared to the numerous charts that are

10  sort of vendor by vendor.

11       THE COURT:  I'm looking at 72.  All right.  It does

12  it by year, payments to vendors, how much.  What's missing,

13  however, Mr. Westling, is whether these vendors were paid by

14  wire transfers from Cyprus accounts.

15       MR. WESTLING:  Well, I suspect, Your Honor, that the

16  testimony of the witness would be that's what she gathered to

17  come up with these numbers.

18       THE COURT:  Well, another one-page chart could take

19  care of that.  I think the better way to put it, Mr. Andres, is

20  you want -- it's not a matter of gratitude for all the work the

21  witness has done, but you want to impress on the jury that

22  there's no doubt about the path of this money.

23       I agree that you may do that.  On the other hand, I

24  have to take into account the fact that they're not

25  disagreeing, they're not disputing it, and as a concession to

1534

1    the shortness of life, we need to get it done.  I take your

2    representation that you don't plan to go through it transaction

3    by transaction.  I'm glad to hear that.  I don't know that I'd

4    permit it, but in any event, I'm glad to hear that.

5            Have you gone through all these exhibits,

6    Mr. Westling?

7            MR. WESTLING:  I have, Your Honor.

8            THE COURT:  Now, which ones do you say are cumulative

9    and why?

10           MR. WESTLING:  Well, I guess I would say that all of

11   the charts that relate to vendors, which include 65A, 65B, 65C,

12   65D, 65E, 65F, 65G, 65H, 65I, 65J, 65K, 65L, and 65M, which are

13   summaries of all of the transactions on a per-vendor basis,

14   which we've heard about from many folks on the stand or through

15   stipulations, are cumulative, Your Honor.

16           I will say, to be fair to my conversation with

17   Mr. Andres in trying to work this out, that we also note that

18   some of those we believe are proper summaries.  I still think

19   they are cumulative, but there's a number that have five or

20   less than ten transactions, which I think Mr. Andres has said

21   he probably is not going to use in an effort to shorten the

22   witness.  So we have made an effort to kind of work through

23   this.

24           THE COURT:  Yes, and I appreciate that, but now we

25   need to bring it to a close and it's lunchtime.  I take it you

1   were -- the two of you were under way in your effort to see if

2   you could focus this sharply.

3         MR. ANDRES:   Judge, I wouldn't agree with that at

4   all.  We've been focused sharply for a long time.  These

5   exhibits have been with the defense for at least a month.

6   We're not delaying this trial.  We're not spending any more

7   time --

8         THE COURT:   I didn't say that you are delaying it.  I

9   asked whether you were in the process with Mr. Westling of --

10  of seeing if you could reach agreement on these many exhibits.

11        MR. ANDRES:   I think we're largely in agreement and

12  we're ready to proceed, with the exception, I don't -- we don't

13  agree that they're cumulative.  We're not going to spend a lot

14  of time on them.  But, again, it's important, and Your Honor

15  said previously that the charts that we tried to admit through

16  the vendors will more appropriately come through an FBI agent.

17  We've now done that, and we're now going to walk through this

18  in what I think would be an expeditious fashion.

19        And it's important to tie those specific receipts to

20  specific payments.  It's not enough to simply do a chart with

21  all of the payments.  You have to show the relationship between

22  the receipts and the payments.

23        The other thing, Your Honor, is --

24        THE COURT:   If there's a dispute, you do.  Otherwise,

25  you wouldn't.

1    MR. ANDRES:  Well, Judge, again -- again, I apologize

2 if this is argumentative, but if the defense has not stipulated

3 to anything, which they haven't, not a single thing in terms of

4 these charts --

5    THE COURT:  Do you want to stipulate to anything here

6 in these charts, Mr. Westling?

7    MR. WESTLING:  I think we're willing to stipulate to

8 the information in Chart No. 72, Your Honor.

9    MR. ANDRES:  Judge, I'm not -- I'm at a loss.  We've

10 prepared our case.  We're ready to go.  We're not taking any

11 more time.  You tell us constantly we need to focus sharply.

12 Here we are ready to go and the defense now wants to stipulate.

13 Who's going to write up a stipulation?  It would be quicker to

14 put the witness on and get started.

15    THE COURT:  He's stipulating to what -- the

16 information on 72; is that correct?

17    MR. WESTLING:  That's correct, Your Honor.

18    THE COURT:  All right.  What we're going to do is

19 we're going to get the jury in.  You can proceed.  Do it

20 quickly.  Every time an objection is made, I'm going to have

21 you at the bench, and neither side is going to profit from

22 that.  I generally -- judges should be patient.  They made a

23 mistake when they confirmed me.

24    (Laughter.)

25    THE COURT:  I'm not very patient, so don't try my

Magionos - Direct                                                        1537

1   patience either.

2              Bring the jury in.

3              And if the e-mail does not relate to the work that

4   she did, she's not going to read it.

5              MR. ANDRES:  Judge, I'd like to address that after,

6   after lunch.  I'm not going to -- in this session won't raise

7   that, but I'd like to address that at some point.

8              THE COURT:  You've already submitted a brief on it.

9              MR. ANDRES:  I understand, but I --

10             THE COURT:  And the brief was two pages, said a Sixth

11  Circuit case, which I've gone and read.  That's a throwaway

12  line.

13                          (Jury present.)

14             THE COURT:  All right.  You may be seated.

15             All right.  Call your next witness, Mr. Andres.

16             MR. ANDRES:  Your Honor, the Government calls

17  Morgan Magionos, a forensic accountant from the FBI.

18             THE COURT:  All right.  Come forward and take the

19  oath, please, ma'am.

20          MORGAN MAGIONOS, GOVERNMENT'S WITNESS, SWORN

21             THE COURT:  All right.  You may proceed, Mr. Andres.

22                       DIRECT EXAMINATION

23  BY MR. ANDRES:

24  Q.   Please state your name and spell it for the record.

25  A.   Morgan Magionos, M-a-g-i-o-n-o-s.

Magionos - Direct                                                    1538

1    Q.    Are you currently employed?

2    A.    Yes.

3    Q.    Where are you employed?

4    A.    The FBI.

5    Q.    And what's your title at the FBI?

6    A.    Forensic accountant.

7    Q.    Did you receive training from the FBI for this position?

8    A.    I did.

9    Q.    What training?

10   A.    I attended a six-week training session where we studied

11   forensic accounting investigative techniques and legal studies.

12   Q.    And how long have you been a forensic accountant at the

13   FBI?

14   A.    Eight years.

15   Q.    Have you been assigned to the investigation of

16   Paul Manafort?

17   A.    Yes.

18   Q.    And what was your role on that investigation?

19   A.    The financial analysis.

20   Q.    Did that involve tracing?

21   A.    Yes.

22   Q.    What is tracing?

23   A.    Tracing is following a transaction from origination to the

24   ultimate destination.

25   Q.    And over the course of your career in the FBI, how many

1  tracing and financial investigations have you been involved in?

2  A.   Over 25 investigations.

3  Q.   Can you briefly describe your educational background?

4  A.   Yes.  I have a Bachelor of Music in Cello Performance from

5  Manhattan School of Music, and I studied accounting at Portland

6  State University's postbaccalaureate program.

7  Q.   With respect to the program at Portland State University,

8  can you describe what that entailed?

9  A.   Yes.  It entailed taking 68 credit hours of accounting and

10  business-related courses, such as economics, statistics, and

11  finance.

12  Q.   And what was the purpose of that course?

13  A.   It allowed me to take the credit hours necessary to sit

14  for the CPA exam.

15  Q.   What is the CPA exam?

16  A.   It's a four-part exam that is one of the steps in becoming

17  licensed as a CPA.

18  Q.   During the time that you were in school at Portland State,

19  did you also work?

20  A.   I did.

21  Q.   Where did you work?

22  A.   I worked for a local architecture and engineering firm.

23  Q.   Okay.  And did you also work at an accounting firm at some

24  point?

25  A.   I did.

Magionos - Direct                                                      1540

1    Q.    What accounting firm?

2    A.    Deloitte & Touche.

3    Q.    What's Deloitte & Touche?

4    A.    It's an international audit, tax, and consulting firm.

5    Q.    And over what period of time did you work there?

6    A.    From 2007 to 2010.

7    Q.    And can you describe your responsibilities?

8    A.    Yes.  I audited the financial statements of for-profit and

9    not-for-profit entities.

10   Q.    Did you hold any professional licenses or certificates?

11   A.    I do.

12   Q.    What license or certificates do you hold?

13   A.    I'm a certified public accountant and a certified fraud

14   examiner.

15   Q.    And with respect to the certified public accountant

16   license, what did you have to do to earn that license?

17   A.    It requires educational experience, such as a bachelor's

18   degree and additional coursework in accounting.  It requires

19   passing a four-part examination, at least one year of practical

20   experience, and then continuing professional education.

21   Q.    And what year did you receive your CPA license?

22   A.    2009.

23   Q.    Are you required to complete annual training to maintain

24   that license?

25   A.    Yes.

1    Q.    What does that involve?

2    A.    It requires 40 hours of continuing professional education

3    every year.

4    Q.    And have you maintained that license in good standing

5    since 2009?

6    A.    Yes.

7    Q.    You also testified that you're a certified fraud examiner.

8    What does it mean to be a certified fraud examiner?

9    A.    The certification denotes experience in investigating and

10   preventing fraud.

11   Q.    What -- what are the requirements?

12   A.    It requires educational and professional experience as

13   well as taking a -- and passing a four-part examination.

14   Q.    And what year did you obtain your certified fraud

15   certificate?

16   A.    2011.

17   Q.    Are you required to complete annual training to maintain

18   that designation?

19   A.    Yes.

20   Q.    What -- what did that require?

21   A.    It requires 20 hours of continuing professional education.

22   Q.    And have you maintained that designation since 2011?

23   A.    Yes.

24   Q.    You testified that as part of the Manafort investigation

25   you did a financial analysis.  What was the purpose of that

Magionos - Direct                                                          1542

1   review?

2   A.   The purpose of the review was to determine sources of

3   funds into foreign bank accounts and then also determine the

4   ultimate destination of transfers from those foreign bank

5   accounts.

6   Q.   As part of that review, did you rely on particular

7   documents?

8   A.   Yes.

9   Q.   What documents?

10  A.   I relied on documents from foreign -- foreign accounts as

11  well as domestic bank accounts, title records, vendor records,

12  business records, tax records, and accounting records.

13          MR. ANDRES:  Your Honor, at this point, the

14  Government moves to admit Government Exhibit 66A, 66C, 66D,

15  66E, 66G, 67B, and 67C, all of which are foreign financial

16  records, and we move to admit them pursuant to Title 18, United

17  States Code, 3505.

18          MR. WESTLING:  No objection, Your Honor.

19          THE COURT:  Admitted.

20          (Government Exhibit Nos. 66A, 66C, 66D, 66E, 66G,

21  67B, and 67C were received in evidence.)

22          THE COURT:  Next question.

23  BY MR. ANDRES:

24  Q.   Let me ask you to take a look at Government Exhibit 63.

25  Can you tell me what that is?

Magionos - Direct                                                    1543

1   A.   This is a chart that lists foreign bank accounts.

2   Q.   Okay.  And what information did you rely on to create this

3   chart?

4   A.   I relied on bank account applications and account opening

5   documents from Cyprus, St. Vincent and the Grenadines, and from

6   HSBC U.K.

7   Q.   Okay.  And how did you obtain those documents?

8   A.   I obtained the records from Cyprus, St. Vincent and the

9   Grenadines through an MLAT, a mutual legal assistance treaty,

10  and the records from HSBC U.K. were provided via subpoena.

11  Q.   And were the documents that you relied on in creating the

12  chart in Government Exhibit 63, were they voluminous?

13  A.   Yes.

14  Q.   Okay.

15          MR. ANDRES:  Your Honor, the Government would -- let

16  me --

17  BY MR. ANDRES:

18  Q.   Before I do that, let me ask you to turn to Government

19  Exhibit 66, 66C.

20          What's included in Government Exhibit 66C?

21          MR. ANDRES:  Mr. Flood?

22          THE COURT SECURITY OFFICER:  We have five volumes

23  here.

24          MR. ANDRES:  Yeah.

25          THE COURT SECURITY OFFICER:  Do you know which one

1    it's in?

2              MR. ANDRES:  I believe it's in the first volume.

3              THE WITNESS:  They're the MLAT records.

4              MR. ANDRES:  66C?

5              THE COURT:  Is it a chart?

6              MR. ANDRES:  No, it's the underlying records.  Do you

7    have those?

8              THE WITNESS:  Not up here.

9              THE COURT:  Have they been admitted?

10             MR. ANDRES:  I just admitted them, Your Honor.

11             THE COURT:  All right.  And what --

12             MR. ANDRES:  Yes.

13             THE COURT:  -- is the question before this witness?

14             What is the question before this witness?

15             MR. ANDRES:  The question was to have her turn to the

16   exhibit that's been admitted.

17             THE COURT:  What is the question you're going to put

18   to her?

19             MR. ANDRES:  I'm going to ask her what the records --

20   what the document is.

21             THE COURT:  All right.  You may show that to the

22   witness.  And let me state so the record is clear:  There was

23   an objection as to cumulative.  I'll overrule that objection,

24   but you may reassert it as to a specific matter.

25             MR. WESTLING:  Thank you, Your Honor.

Magionos - Direct                                                    1545

1            THE COURT:  Proceed.

2            MR. ANDRES:  If I may, I just want to make sure I

3    have the right exhibit, Your Honor.  Can I have a moment?

4            THE COURT:  Yes, you may -- you may.

5            MR. ANDRES:  Your Honor, may Mr. Binder go and

6    facilitate looking for the exhibit in those boxes?

7            THE COURT:  Yes, you may.

8            MR. ANDRES:  Thank you.

9            THE COURT:  Can you go to something else while he

10   does that?

11           MR. ANDRES:  Sure.

12   BY MR. ANDRES:

13   Q.   Government Exhibit -- in the course of the -- creating the

14   chart in 66C, did you rely on bank records from abroad?

15   A.   I did.

16   Q.   What bank records?

17   A.   I relied on records provided by Cyprus, St. Vincent and

18   the Grenadines, and HSBC U.K.

19   Q.   And did that include bank account records?

20   A.   Yes.

21   Q.   Okay.  And did you also get records from the particular

22   banks?

23   A.   I did.

24   Q.   Okay.  And did you include that information in 66C?

25   A.   Yes, 63.  Yes, I did.

1    Q.   63, yes.  And --

2            THE COURT:  You were saying 66.  Which exhibit is it?

3            THE WITNESS:  63, sir.

4            THE COURT:  Is that the summary that you prepared?

5            THE WITNESS:  Yes.

6            THE COURT:  And is that based on these exhibits that

7    Mr. Andres has asked you about?

8            THE WITNESS:  Yes.

9            THE COURT:  I've admitted the 63, haven't I,

10   Mr. Andres?  I think I have.

11           MR. ANDRES:  I didn't move to admit it yet, but I'll

12   do that now, Your Honor.

13           MR. WESTLING:  No objection, Your Honor.

14           THE COURT:  It's admitted.

15           (Government Exhibit No. 63 was received in evidence.)

16           MR. ANDRES:  May I publish it, Your Honor?

17           THE COURT:  Yes, you may.

18           MR. ANDRES:  Okay.

19   BY MR. ANDRES:

20   Q.   Can I ask you to turn to Government Exhibit 63, the chart?

21           You testified that you relied on overseas bank

22   records.  Did that include records from HSBC?

23   A.   Yes, it did.

24   Q.   And what records came from HSBC?

25   A.   A bank account opening document and wires and bank

Magionos - Direct                                                    1547

1    statements for Pompolo Limited.

2    Q.   Okay.  Did you also rely on documents provided by

3    Mr. Manafort?

4    A.   Yes, I did.

5    Q.   And that was pursuant to a subpoena?

6    A.   Yes.

7    Q.   Okay.  With respect to those documents from Mr. Manafort,

8    Government Exhibit 447A through Q, what did -- what are those

9    documents?

10   A.   Those documents include account opening documents, bank

11   statements, and wires.

12           MR. ANDRES:  The Government moves to admit Government

13   Exhibit 447A through Q.

14           MR. WESTLING:  I think, assuming you're going to put

15   in the stipulation, no objection.

16           MR. ANDRES:  Thank you.

17           THE COURT:  I didn't hear that.

18           MR. WESTLING:  There's a -- there's a related

19   stipulation, Your Honor, that I wanted to be ensured the

20   Government was going to be offering, and with that proviso, we

21   have no objection to the records.

22           THE COURT:  What's the stipulation, Mr. Andres?

23           MR. ANDRES:  The stipulation relates to those

24   records, Your Honor.  I'm happy to offer it now, I just need to

25   find it.  I'm sorry, I apologize.

Magionos - Direct                                                      1548

1          It's Government Exhibit 456.

2          THE COURT:   What's the number of the stipulation?

3          MR. ANDRES:   456.   I'm going to hand up a copy to

4    Mr. Flood.

5          THE COURT:   No, I have it here.   I should have it

6    here.

7          No, I don't.   Mine goes to 451, so hand that to the

8    court security officer.

9          MR. ANDRES:   Thank you.

10         THE COURT:   Ladies and gentlemen, the parties

11   stipulate that in August and September of 2017, the United

12   States served several federal subpoenas for records, including

13   foreign bank records on Paul Manafort and DMP International.

14         In response, on October 20, 2017, the documents in

15   Government Exhibits 447A through Q were produced, and the

16   parties stipulate that the documents, Exhibits 447A through Q,

17   are admissible as trial exhibits.

18         On October 20, 2017, a duly-appointed agent also made

19   the following representation to the Government concerning the

20   documents described in Exhibit 2 with respect to the offshore

21   bank account information that we produced -- the "we" means

22   that these entities have produced the documents -- produced.

23   These are accounts of DMP International.

24         Mr. Rick Gates had no control over, no financial

25   interest, and ownership interest in these accounts.   He was not

1   a trustee as defined by U.S. law.  He was merely an employee of

2   DMP International and only had authority to act as an employee

3   with respect to these accounts.

4              Anything further?

5              MR. ANDRES:  Your Honor, the "we" references the

6   parties in No. 1, which is not just the entities.  It's also

7   Mr. Manafort.

8              THE COURT:  I see.  Yes, that's correct.

9              MR. ANDRES:  Thank you, Your Honor.

10             THE COURT:  You may proceed.  And 456 is admitted.

11             (Government Exhibit Nos. 447A thru 447Q and 456 were

12  received in evidence.)

13             MR. ANDRES:  Thank you, Your Honor.

14  BY MR. ANDRES:

15  Q.   Forensic Accountant Magionos, can you look at the chart in

16  Government Exhibit 63 and explain what that is?

17  A.   Yes.  This chart summarizes account opening documents as

18  provided by accounts in Cyprus, St. Vincent and the Grenadines,

19  and the United Kingdom.  The first column lists the account

20  name and account number as well as the financial institution

21  where the account is located.

22             The second column lists the account opening date or

23  the balance forward date.

24             The third column lists the account close date or the

25  final transaction date.

1              The next column lists the beneficial owner listed on

2      the bank account application.

3              And then the last column lists the authorized signers

4      listed on the bank account application.

5      Q.   And how many accounts are listed in this chart?

6      A.   Thirty-one.

7      Q.   Okay.  And those charts -- those accounts, you received

8      information about those accounts through your investigation?

9      A.   Yes.

10     Q.   Okay.  And listed on the accounts are the beneficial

11     owners.  Where did that information come from?

12     A.   That information came directly from the account opening

13     documents and bank account applications.

14     Q.   Okay.  And what denomination are the different accounts in

15     that you identify in your chart?

16     A.   They're either in U.S. dollar, euro, or British pound.

17     Q.   And how are you able to distinguish between those two

18     currencies?

19              THE COURT:  There were three currencies.

20              THE WITNESS:  It depended on the account number,

21     so --

22              THE COURT:  She said three currencies.

23              MR. ANDRES:  Yeah.

24              THE COURT:  But that's all right.

25              Go ahead, Mr. Andres.

1    BY MR. ANDRES:

2    Q.   How were you able to distinguish between those three

3    currencies?

4    A.   It depended on the account number.  The second digit for

5    the Cypriot accounts denoted either a 32 or an 11.  32 shows a

6    U.S. dollar account, the 11 shows a euro account.

7    Q.   And without going through each account, can you tell us

8    the names -- so, for example, when you look at the entry in

9    No. 1, it says "Actinet"; is that correct?

10   A.   Yes.

11   Q.   And there's more than one account for Actinet?

12   A.   Yes.

13   Q.   How do you -- how can you explain that?

14   A.   There were two accounts, a U.S. dollar account and a euro

15   account at Bank of Cyprus; and then there were two accounts at

16   Hellenic Bank, again, a U.S. dollar account and a euro account.

17   Q.   Okay.  And without going through each of the accounts in

18   terms of the banks and denomination, can you identify for the

19   jury the names of each of the entities that had bank accounts

20   that are in the chart in Government Exhibit 63?

21   A.   You want me to read the names?

22   Q.   Yes.

23   A.   Actinet Trading Limited; Black Sea View Limited; Bletilla

24   Ventures Limited; Global Highway Limited; Leviathan Advisors

25   Limited; LOAV Advisors Limited; Lucicle Consultants Limited;

1    Marziola Holdings Limited; Olivenia Trading Limited; Peranova

2    Holdings Limited; Serangon Holdings Limited; Yiakora Ventures

3    Limited; Pompolo Limited; Global Endeavour, Inc.; and Jeunet

4    Limited.

5    Q.   Okay.  And when you look at those -- the names in those

6    accounts, did you compare them to the documents produced by

7    Mr. Manafort?

8    A.   Yes.

9    Q.   And what did you find?

10   A.   I found that all of the accounts listed in this exhibit

11   were included in Mr. Manafort's production except for the

12   Peranova Holdings euro account and then the Pompolo Limited

13   account.

14   Q.   Okay.  And how were those different?

15   A.   They just were not provided by Mr. Manafort.

16   Q.   Okay.  But you received documentation from overseas

17   relating to those entities?

18   A.   I did.

19   Q.   And with respect to the accounts in the chart, what

20   countries are those accounts located?

21   A.   They're located in Cyprus, St. Vincent and the Grenadines,

22   and the United Kingdom.

23   Q.   Okay.  In Column No. 5, you have the beneficial owner

24   listed.  Without going through each of the accounts, who were

25   the individuals that are identified as the beneficial owners?

1    A.    It was either Mr. Manafort, Mr. Gates, or Mr. Kilimnik.

2    Q.    Okay.  And where did you determine that information from?

3    A.    By reviewing the account opening documentation.

4    Q.    Okay.  And then in the final column, it's listed

5    authorized signatures listed on the bank account application.

6    Where did that information come from?

7    A.    That information came from the bank account opening docs

8    that we received.

9    Q.    And again, without going through each and every account,

10   who are the names listed on those -- on those accounts?

11   A.    Either Mr. Manafort and Mr. Gates or a group of

12   individuals located in Cyprus:  Eleni Chrysostomides,

13   Chrystalla Pitsilli Dekatris, Myrianthi Christou, Evelina

14   Georgiades, or Georgoula Mavrides.

15   Q.    I'm not even going to try to pronounce those, but in the

16   course of your investigation, those individuals that you just

17   mentioned, did you understand that they were associated with a

18   particular entity?

19   A.    Yes.

20   Q.    What entity?

21   A.    They were associated with Dr. Kypros Chrysostomides' law

22   firm.

23   Q.    Is he also known as Dr. K?

24   A.    Yes.

25   Q.    Okay.  And how did you decide what accounts to include in

Magionos - Direct                                                1554

1    your chart in Government Exhibit 63?

2    A.   I included accounts that actually had transactional

3    activity or were relevant to the investigating --

4    investigation, meaning they had transfers into their accounts

5    from other foreign entities, and they made transfers to vendors

6    for real estate purchases to DMP International or Davis

7    Manafort Partners or Mr. Manafort, his family, and related

8    entities.

9    Q.   Okay.  And over what time period did you -- did that

10   relate to?

11   A.   2010 through 2014.

12   Q.   Okay.  You testified that you've gotten these records.

13   Can you identify now the banks that are listed in your chart?

14   A.   Yes.  The banks are Bank of Cyprus, Hellenic Bank, Loyal

15   Bank, and HSBC U.K.

16   Q.   Okay.  Can I ask you to look at the entry in No. 1 and 2

17   and identify who the beneficial owner is?

18   A.   Yes.  The beneficial owner is listed as Mr. Manafort, and

19   then as of January 21, 2013, Mr. Kilimnik.

20   Q.   Okay.  Can I ask you to take a look at Government

21   Exhibit 66D, which is in evidence, and tell me what that is?

22   A.   This is an account opening document and bank account

23   application.

24   Q.   Okay.  And can you take a look at Government Exhibit 4385

25   and tell me what that is?

1   A.   Yes.  This shows the beneficial owner for Actinet Trading

2   Limited, and it shows Mr. Manafort as the beneficial owner.

3   Q.   Okay.  I'm sorry, who's listed as the beneficial owners?

4   A.   Mr. Manafort.

5   Q.   Okay.  And can you turn to 4395 and tell me what that is?

6   A.   This is a signature card.

7   Q.   And who's listed on that document?

8   A.   Eleni Chrysostomides, Chrystalla Pitsilli Dekatris, and

9   Myrianthi Christou.

10  Q.   Can I ask you to turn to Government Exhibit -- to page

11  4401 of Government Exhibit 66D?

12  A.   Okay.

13          MR. ANDRES:  Your Honor, can I publish this document?

14          THE COURT:  Is it admitted?

15          MR. ANDRES:  Yes.

16          THE COURT:  You may.

17  BY MR. ANDRES:

18  Q.   Is there a page number listed on the bottom of there?  The

19  Bates number is 4401?

20  A.   Yes.

21  Q.   What's the page number listed?

22  A.   It's the last page.

23  Q.   Okay.  Okay.  Can you tell me what was included in the

24  bank records that you received in Government Exhibit 66D at

25  4401?

Magionos - Direct                                                1556

1    A.    Yes.  This is a copy of Mr. Manafort's passport.

2    Q.    And where did you find that document?

3    A.    In the account opening documents.

4    Q.    And where did those come from?

5    A.    From Cyprus.

6    Q.    Okay.  You testified that with respect to the banks,

7    Hellenic Bank was one of the banks that provided documents.

8          Was there a correlation between the dates of the

9    first transaction and those records and the relevant dates at

10   the Bank of Cyprus?

11   A.    Yes.

12   Q.    Can you explain what that was?

13   A.    So when the accounts at the Bank of Cyprus closed, soon

14   after, there were transfers from those accounts directly to

15   Hellenic Bank.

16   Q.    Okay.  And did you -- was there -- did you find that the

17   opening -- or the opening balance and the dates of the first

18   transaction or the opening dates of the records at Hellenic

19   Bank, that they matched up or there was some issue between

20   those?

21   A.    As far as Hellenic Bank goes, they did not provide the

22   account opening date or closing date, like the bank of Cyprus

23   did, and as a result, I used the balance forward date that was

24   listed on the statements as the account opening date, and then

25   I used the final transaction date as the date of the account

Magionos - Direct                                                    1557

1    closing.

2    Q.   Okay.

3         THE COURT:  When you say, "they did not provide,"

4    you're referring to the bank?

5         THE WITNESS:  That's correct.

6         THE COURT:  Next question.

7    BY MR. ANDRES:

8    Q.   With respect to Item 7 on Government Exhibit 63, can you

9    tell me what that is?

10   A.   This is a summary of the account opening documents for

11   Bletilla Ventures Limited.

12   Q.   Okay.  And with respect to those documents -- to that

13   account, can I ask you to look at Government Exhibit 66D and

14   turn to Page 4480?

15        Can you tell me what that is?

16   A.   This is a page that lists the beneficial owner for

17   Bletilla Ventures Limited.

18   Q.   Okay.

19        MR. ANDRES:  May I publish that, Your Honor?

20        THE COURT:  You may.  It's been admitted, hasn't it?

21        MR. ANDRES:  Yes.

22   BY MR. ANDRES:

23   Q.   Do you see in the middle of the page, at the bottom, what

24   the number is?

25   A.   It's 4480.

1    Q.   It's -- not the Bates number, I'm sorry.  The -- in the

2    middle of the bottom, there's a number that says 66D-page and

3    the page number.  Do you not see that?

4    A.   No.

5              MR. ANDRES:  Okay.  I'll move on, Your Honor.

6    BY MR. ANDRES:

7    Q.   What is that document that you have?

8    A.   This lists the beneficial owner for Bletilla Ventures

9    Limited.

10   Q.   And what's the date of that?

11   A.   It is February 1, 2012.

12   Q.   Okay.  Can I ask you to look at Entry 14 on your chart?

13             Can you tell me what that is?

14   A.   This summarizes the account opening docs for LOAV Advisors

15   Limited.

16   Q.   Okay.  Can I ask you to look at Government Exhibit 66D and

17   the Bates No. 5105?

18             Can you tell me what that is?

19   A.   Yes.  This lists the beneficial owner and comes from the

20   bank account opening docs.

21   Q.   Okay.  And who's listed as the beneficial owner?

22   A.   Mr. Gates and Mr. Manafort.

23   Q.   Okay.  And is that the information you relied on with

24   respect to creating the chart in Government Exhibit 63?

25   A.   Yes.

Magionos - Direct                                                          1559

1    Q.    And what's the date of the document 5105?

2    A.    The date is October 8, 2007.

3    Q.    Okay.  Can I ask you to look at the entries at 15 and 16?

4          Tell me what those are.

5    A.    Yes.  These summarize the account opening documents for

6    Lucicle Consultants Limited.

7    Q.    Okay.  And with respect to the signature cards for those

8    accounts, 15 and 16, can you take a look at Government

9    Exhibit 66D and Page 4248?

10         Tell me what that is.

11   A.    Yes.  This is a signature card for Lucicle Consultants

12   Limited.

13   Q.    Okay.  And can I ask you to turn to Page 4239?

14         What's included there?

15   A.    It's a copy of Mr. Manafort's passport.

16   Q.    Okay.  And where did you receive that document?

17   A.    From the account opening documents provided by Bank of

18   Cyprus.

19   Q.    And what account was that related to?

20   A.    Lucicle Consultants Limited.

21   Q.    Okay.  Can I ask you to take a look at the entry at

22   No. 20?

23         Can you tell me what that is?

24   A.    This summarizes the bank account opening docs for Marziola

25   Holdings Limited.

Magionos - Direct                                                  1560

1    Q.   And you testified earlier that the individuals listed on

2    the column on the far right were associated with Dr. K.  How

3    did you learn that?

4    A.   Through the investigation, reviewing e-mails.

5    Q.   Okay.  And with regard to entry No. 26, Serangon Holdings,

6    where did the information in the chart come from as it related

7    to Government Exhibit -- with respect to No. 26?

8    A.   It was from the bank account opening documents from Bank

9    of Cyprus.

10   Q.   Okay.  And is it fair to say that in the context of

11   reviewing these records, you found other instances where

12   Mr. Manafort's passport was included?

13   A.   Yes.

14   Q.   And that was produced as part of the account opening

15   documents?

16   A.   Yes.

17   Q.   Do you know generally when the date was that the -- that

18   the accounts in Cyprus was closed?

19   A.   They were closed in 2013.

20   Q.   Okay.  And during the course of the investigation, did you

21   learn that Mr. Manafort was interviewed at some point?

22   A.   Yes.

23   Q.   And when did that interview take place?

24   A.   In July of 2014.

25   Q.   And did you also learn that Mr. Gates was interviewed at

1    some point?

2    A.   Yes.

3    Q.   And when was that?

4    A.   In July of 2014.

5    Q.   That was after the accounts in Cyprus were closed?

6    A.   Yes.

7         THE COURT:  When we finish with this exhibit, we'll

8    recess for lunch.

9         MR. ANDRES:  Okay.  Thank you, Judge.  Just one other

10   question.

11   BY MR. ANDRES:

12   Q.   You testified that Mr. Manafort produced certain documents

13   pursuant to a Title 31 subpoena; is that correct?

14   A.   Yes.

15        MR. WESTLING:  Your Honor, I just want to object.  I

16   don't think that's what the stipulation says.  I think it says

17   they were produced by DMP International.

18        MR. ANDRES:  Your Honor, the stipulation, it

19   obviously stands for itself.  I'll rephrase the question.

20        THE COURT:  All right.

21   BY MR. ANDRES:

22   Q.   There were documents produced by Mr. Manafort and his

23   entities; is that correct?

24   A.   Yes.

25   Q.   And you relied on those at some point?

1    A.    Yes.

2    Q.    And that involved -- or that included bank records from

3    Cyprus; is that correct?

4    A.    That's correct.

5    Q.    Do you know when Mr. Manafort made that production?

6                MR. WESTLING:   Again, objection.   Same objection,

7    Your Honor.

8                THE COURT:   What's the objection?

9                MR. WESTLING:   It's misstating what's in the

10   stipulation, which clearly states these were produced by DMP

11   International.

12               THE COURT:   All right.   Go on.   I'll overrule the

13   objection.   Answer the question.

14   BY MR. ANDRES:

15   Q.    I'm just asking for the approximate date of the

16   production.

17   A.    The date of the production was October 20, 2017.

18               THE COURT:   And so far as you know from the

19   documents, was that production by DMP International?

20               THE WITNESS:   I don't know.

21               THE COURT:   All right.   Ladies and gentlemen --

22   you're done now?

23               MR. ANDRES:   Yes, Your Honor.

24               THE COURT:   All right.   Pass your books to the right.

25   The court security officer will collect them, maintain their

Magionos - Direct                                                    1563

1    security.  Remember to refrain from discussing the matter among

2    yourselves or with anyone or undertaking any investigation on

3    your own.

4             Your lunches should be there.  I hope they are

5    adequate.  You may follow the court security officer out.

6                          (Jury out.)

7             THE COURT:  All right.  You may be seated for a

8    moment.

9             Mr. Westling, I think you are aware of -- oh, I beg

10   your pardon.  Ms. Magionos, you -- did I pronounce your name

11   correctly?

12            THE WITNESS:  Yes.

13            THE COURT:  You may take the luncheon recess.

14            THE WITNESS:  Thank you.

15            THE COURT:  You may step down.  During your recess,

16   you may not discuss this -- your testimony with anyone,

17   including lawyers.

18            THE WITNESS:  Okay.  Thank you.

19            THE COURT:  You may depart.

20                          (Witness stood down.)

21            THE COURT:  Mr. Westling, you have the benefit of

22   receiving, I think, notice of what exhibits the Government

23   intends to offer through this witness.  Am I correct?

24            MR. WESTLING:  That's correct, Your Honor.

25            THE COURT:  If you have any objections to those

1564

1    exhibits, I want you to disclose to Mr. -- well, yes, I want

2    you to disclose to Mr. Andres what your objection is to a

3    specific exhibit, see if you can reach accommodation.  If not,

4    I'll rule on it, but we want to move along fairly expeditiously

5    if we can.

6              Is that clear?

7              MR. WESTLING:  Yes, Your Honor.

8              THE COURT:  And the other thing is I don't know,

9    Mr. Andres, whether you intend to have her read e-mails.  She

10   may read admissible e-mails if they pertain to her

11   investigation, but you may not read -- have her read e-mails

12   that she didn't use, if they weren't part of her -- that's not

13   the way to present evidence.  Am I clear?

14             MR. ANDRES:  You are, Your Honor.  I just -- just for

15   the record, I understand your ruling.  It's the Government's

16   position that agents can read evidence that's admitted, so our

17   basis for asking that the other --

18             THE COURT:  She's not even an agent.

19             MR. ANDRES:  If what Your Honor is suggesting is

20   that --

21             THE COURT:  I'm suggesting that if you want -- I told

22   you that it's admissible, and I don't know whether you've

23   already offered it, but it would be admitted, if it's an

24   admission and there's no other objection to it.

25             What I find problematic, troublesome is that you are

1   going to have a witness read it, a witness who didn't use it in

2   her investigation, and she's just reading something that's in

3   the record.  You do that in your closing, if you want to, after

4   I admit it.

5           MR. ANDRES:  Understood, Judge, but does that mean

6   that an agent who was involved in those aspects of the

7   investigation could read that or --

8           THE COURT:  Yes, it does.

9           MR. ANDRES:  Okay.  Thank you.  That's very helpful,

10  Judge.

11          THE COURT:  But you can't get somebody who has

12  nothing to do with it to sit there and read it.

13          MR. ANDRES:  I completely understand, Your Honor.

14          THE COURT:  And how in the world could a defendant

15  cross-examine this?  It's very difficult to anyone, but that

16  would make it impossible if the witness would simply say, "I

17  don't know.  I was just given this to read."

18          MR. ANDRES:  Thank you, Your Honor.

19          THE COURT:  All right.  We will, we will recess

20  until -- let's make it 1:35, and then we'll continue.

21          How much more do you anticipate, Mr. Andres?

22          MR. ANDRES:  At least another hour, Your Honor.

23          THE COURT:  I thought we were shortening it.

24          MR. ANDRES:  Well, we were.  We started -- I don't

25  think I've been speaking for much longer than 15 or 20 minutes,

1   but I'm sure there's a record of that somewhere.

2          THE COURT:  I'm not limiting it.  I'm merely asking

3   that you make an effort to shorten it even more if you can.

4          MR. ANDRES:  Enjoy your lunch, Judge.

5          THE COURT:  Court stands in recess.

6          (Recess from 12:40 p.m., until 1:35 p.m.)

7

8                   CERTIFICATE OF THE REPORTER

9       I certify that the foregoing is a correct transcript of

10  the record of proceedings in the above-entitled matter.

11

12

13                              _____
                                          /s/
14                                Anneliese J. Thomson

15

16

17

18

19

20

21

22

23

24

25