1842

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
------------------------------x
UNITED STATES OF AMERICA,      .  Criminal Action No.
                               .  1:18-CR-83
         versus                .
                               .
PAUL J. MANAFORT, JR.,         .
                               .  August 9, 2018
            Defendant.         .  Volume VIII-P.M.
------------------------------x
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:                UZO ASONYE, AUSA
                                   United States Attorney's Office
                                   2100 Jamieson Avenue
                                   Alexandria, VA 22314
                                     and
                                   GREG D. ANDRES, SAUSA
                                   BRANDON L. VAN GRACK, SAUSA
                                   Special Counsel's Office
                                   U.S. Department of Justice
                                   950 Pennsylvania Avenue, N.W.
                                   Washington, D.C. 20530

FOR THE DEFENDANT:                 JAY ROHIT NANAVATI, ESQ.
                                   BRIAN P. KETCHAM, ESQ.
                                   Kostelanetz & Fink LLP
                                   601 New Jersey Avenue, N.W.
                                   Suite 620
                                   Washington, D.C. 20001
                                     and
                                   THOMAS E. ZEHNLE, ESQ.
                                   Law Office of Thomas E. Zehnle
                                   601 New Jersey Avenue, N.W.
                                   Suite 620
                                   Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1842 - 2001)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1843

1  APPEARANCES:  (Cont'd.)

2  FOR THE DEFENDANT:              KEVIN M. DOWNING, ESQ.
                                   Law Office of Kevin M. Downing
3                                  601 New Jersey Avenue, N.W.
                                   Suite 620
4                                  Washington, D.C. 20001
                                     and
5                                  RICHARD W. WESTLING, ESQ.
                                   Epstein, Becker & Green, P.C.
6                                  1227 25th Street, N.W.
                                   Washington, D.C. 20037

7  OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
8                                  U.S. District Court, Fifth Floor
                                   401 Courthouse Square
9                                  Alexandria, VA 22314
                                   (703)299-8595

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1844

1

<u>INDEX</u>

2

3        <u>WITNESS</u>                      <u>EXAMINATION</u>        <u>PAGE</u>

4

5        DARIN EVENSON (Resumed)
                                        CROSS            1846
                                        REDIRECT         1853
6

7        PEGGY MICELI
                                        DIRECT           1855
                                        CROSS            1883
8                                       REDIRECT         1896
                                        RECROSS          1898
9

10       TARYN RODRIGUEZ
                                        DIRECT           1905
                                        CROSS            1937
11                                      REDIRECT         1946
                                        RECROSS          1948
12

13       ARAM GARY SEFERIAN
                                        DIRECT           1950
                                        CROSS            1988
14                                      REDIRECT         1997
                                        RECROSS          1998
15

16

17                      E X H I B I T S

18       Government Exhibit No. 232 was received       1869
         Government Exhibit No. 243 was received       1872
19       Defendant's Exhibit No. 27 was received       1896
         Government Exhibit No. 255 was received       1914
20       Government Exhibit No. 252 was received       1919

21       Government Exhibit No. 248 was received       1923
         Government Exhibit No. 230 was received       1926
22       Government Exhibit No. 251 was received       1927
         Government Exhibit No. 250 was received       1929
23       Government Exhibit No. 254 was received       1930

24       Government Exhibit No. 249 was received       1935
         Government Exhibit No. 296 was received       1961
25       Government Exhibit No. 297 was received       1963
         Government Exhibit No. 298 was received       1970

1845

1    Government Exhibit No. 302 was received          1975
     Government Exhibit No. 303 was received          1978
2    Government Exhibit No. 305 was received          1986
     Government Exhibit No. 306 was received          1987
3    Government Exhibit No. 299 was received          1995

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                              (Defendant present, Jury out.)

3              THE COURT:  All right.  You may bring the jury in.

4    You may bring the jury in.

5              Mr. Nanavati, you have some cross-examination for

6    Mr. Evenson?

7              MR. NANAVATI:  A scintilla.

8              THE COURT:  Good.

9                              (Jury present.)

10             THE COURT:  All right.  You may be seated.  Let me

11   confirm, ladies and gentlemen, that everything was all right

12   with lunch?

13             THE JURORS:  Yes.

14             THE COURT:  Good.  And we'll cease today again at

15   5:30 sharp, if that's what you wish.

16             All right.  Mr. Evenson, please.

17    DARIN EVENSON, DEFENDANT'S WITNESS, PREVIOUSLY SWORN, RESUMED

18             THE COURT:  Mr. Evenson, you'll recall, sir, that you

19   remain under oath.

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  You may resume the stand.

22             All right.  Mr. Nanavati, you may proceed with your

23   cross-examination.

24             MR. NANAVATI:  Thank you, Your Honor.

25                         CROSS-EXAMINATION

1   BY MR. NANAVATI:

2   Q.   Mr. Evenson, my name is Jay Nanavati, and I represent Paul

3   Manafort.  Nice to meet you.

4   A.   Nice to meet you.

5   Q.   Remember, you're under oath when you say that.  No, I'm

6   just kidding.

7                        (Laughter.)

8            THE COURT:  I hadn't heard that one before.

9                        (Laughter.)

10  BY MR. NANAVATI:

11  Q.   In any event, Airbnb, it's huge, correct?

12  A.   That's correct.

13  Q.   And do you have a sense of, at least in the U.S., how many

14  hosts you have, active hosts?

15  A.   I don't -- I don't have that information with me, no.

16  Q.   Okay.  Is it more than a hundred?

17  A.   That is correct.  It is more than a hundred.

18  Q.   Is it more than a million?

19  A.   I believe it is more than a million, yes.

20  Q.   Is it fair to say that Airbnb hosts or customers, often

21  the property that they're renting out is their own primary

22  residence, correct?

23  A.   That's correct.  In most cases, it is their primary

24  residence.

25  Q.   And people who have their homes listed on Airbnb even

1    actively, it's still their primary residence most of the time,

2    correct?

3    A.   For most hosts, I think the last time I saw the numbers it

4    was 73 percent, it was their primary residence.

5    Q.   And when a person rents out their entire apartment or

6    home, it means they can't be in there when it's being rented,

7    correct?

8    A.   That is correct.  I'm not aware of any instance where

9    somebody would rent out their entire home and remain in the --

10   remain in the home.

11   Q.   And when the listing says -- pardon me.

12        When the listing on Exhibit 119 says, "Me or a friend

13   will be available whenever you need help," that suggests

14   they're going to be nearby, correct?

15   A.   Can you clarify what --

16   Q.   Sure.  It's Exhibit 119.

17   A.   Okay.

18   Q.   And I wish I knew what page.

19        MR. ASONYE:  Your Honor.  I'd object and say calls

20   for speculation.

21        THE COURT:  What was the question?

22        MR. NANAVATI:  The question was when the listing

23   says, "Me or a friend will be available whenever you need help"

24   suggests that the owner will be nearby.

25        THE COURT:  If he knows.  If you don't know, simply

1    say so.

2              THE WITNESS:  I don't know.  The description is -- is

3    entered in by the host.

4    BY MR. NANAVATI:

5    Q.    Maybe the better question would be:  Does it say that?

6    A.    Can you point to specifically what page you're

7    referencing?

8    Q.    I wish I could.

9              On page 2, the Bates number ends 2384 in the bottom

10   right.

11   A.    Okay.  I'm on page 2384.

12   Q.    And if you go to the -- I won't go by sentence, because

13   it's unfortunately poorly punctuated, but if you go to the

14   third line from the last, starting "Me or a friend."

15   A.    Okay.  To your point, I think at the beginning, part of

16   that sentence goes all the way up to "Radiant heating floors."

17   Q.    Yes.  The punctuation is abominable, I agree.  But in

18   the -- in the third line from the bottom, with the capital M,

19   "Me," can you just read that?  I'm belaboring this point, but

20   can you just read starting at capital M, "Me"?

21   A.    This record indicates, starting at capital M, "Me or a

22   friend will be available whenever you need help during your

23   stay Luxury shopping and dining out your doorstep.  All subways

24   are one block away."

25   Q.    Okay.  And in this case, the person listed as the -- as

Evenson - Cross                                                          1850

1    the host is a person named Jeffrey Yohai, right?

2    A.   I would have to go back to the listing ID and confirm that

3    information.

4    Q.   Okay.

5    A.   It's not in this -- it's not in this exhibit.

6    Q.   Just to save time, do you have any reason to -- to doubt

7    that the documents you were shown on direct said Jeffrey Yohai

8    was the host?

9    A.   I don't have any reason to doubt that, but I can't confirm

10   that.

11   Q.   Good enough.  And I want to also ask you on that same

12   page, can you -- is there a line that says "house rules"?

13   A.   That's correct.  There is -- on page 2384, there is a

14   field in this record that indicates house rules.

15   Q.   What are the house rules?  What do they say?

16   A.   There's no entry in this record.  That is a field that is

17   entered in by the host.

18   Q.   Okay.  Can you turn to page 2368?  It should be maybe a

19   page or two further along.

20   A.   2368, I'm there.

21   Q.   Yes.  What are the house rules there?

22   A.   This record indicates that the house rules are "as you

23   would expect me to behave in your home."

24   Q.   And I want to take you to Exhibit 120, please.  And let

25   me -- are you there?

1    A.    I am, yes.

2    Q.    And that shows us the days that the property was actually

3    rented, right?

4    A.    This record is a printout from our system that shows some

5    of the reservations at this property.

6    Q.    Okay.  But the salient difference being reservations and

7    not just days it's available or listed, correct?

8    A.    That is correct.  These are reservations -- these are some

9    of the reservations that we were asked to provide.

10   Q.    Yes.  And is it -- is it fair to say -- and you can tell

11   me if you haven't done the math, is it fair to say that for

12   2016, it shows a total of five days reserved?

13   A.    I would have to go through this record to confirm that, so

14   I don't know.

15   Q.    Okay.  And for 2015, if you've done the math, is it fair

16   to say there were 77 days where it was rented?

17   A.    I can't confirm that.  I haven't -- I haven't done that

18   math.

19   Q.    And is it also fair to say that -- if you could turn to

20   Exhibit 118?

21   A.    I'm there.

22   Q.    And is it fair to say that if you look at the listing

23   days, the last listed day for 2016 is April 28?

24   A.    Correct.  On page 11 of this record, it indicates that

25   April 28 of 2016 was the last day that it was active for search

1    on the platform, according to this record.

2    Q.    And are you -- do you know how this property was -- was

3    owned, meaning who owned it?

4    A.    I don't have knowledge of that.

5    Q.    And earlier you talked a little bit about the amount, the

6    payout amount.  Do you remember that?

7    A.    Correct.

8    Q.    And the payout amount is essentially how much the host got

9    paid for the -- for the rental, correct?

10   A.    Correct.  The payout amount is the amount received from

11   Airbnb to the payout address on the reservation page.

12   Q.    And is it fair to say that a lot of your hosts hope to use

13   that -- those payout amount numbers as income so they can

14   qualify for mortgages sometimes?

15   A.    There are many reasons why a host might use their payout

16   amount.  I can't speak to all the reasons why they might use

17   that -- or how they might use that money.

18   Q.    Are you aware that Airbnb, the company, has publicly

19   talked about wanting to accommodate their hosts' desire to use

20   their Airbnb income as income to qualify for mortgages?

21   A.    I'm not aware of that.

22   Q.    Okay.  Are you aware that Airbnb is part of a partnership

23   with Fannie Mae and Citizens Bank, among others, specifically

24   to allow hosts to use their Airbnb income as qualifying income

25   to get mortgages?

1   A.   I'm not aware of it.  It's not an area of the business

2   that I'm in.

3   Q.   Okay.  And you were not privy to any conversations or

4   communications between the host and Mr. Manafort, correct?

5   A.   I'm not aware of any communications between the host and

6   Mr. Manafort.

7   Q.   And you also were shown a box that had 1,125 nights listed

8   in it.  Do you remember that?

9   A.   That's correct.

10  Q.   And you had said that that's a default setting, correct?

11  A.   That is correct.  It is a default setting in Airbnb.com.

12  Q.   So if the host does nothing in that field, 1,125 is going

13  to come up, correct?

14  A.   That's correct.  It is the default setting.

15            MR. NANAVATI:  Thank you, Your Honor.  No further

16  questions.

17            THE COURT:  Any redirect?

18            MR. ASONYE:  Briefly, Your Honor.

19                         REDIRECT EXAMINATION

20  BY MR. ASONYE:

21  Q.   Mr. Evenson, according to Airbnb's records, particularly

22  Government Exhibit 118, was 29 Howard Street available to be

23  searched on the Airbnb Web site for over 180 days in 2015?

24  A.   I would have to --

25            THE COURT:  Wasn't that already asked on direct?

Evenson - Redirect                                                    1854

1              MR. ASONYE:  No, I didn't ask the specific issue

2       about -- since they've raised this issue about the number of

3       days under Fannie Mae rules.

4              THE COURT:  All right.  I'm sure you'll be careful

5       not to re-ask questions that were asked on direct.  Proceed.

6       BY MR. ASONYE:

7       Q.   Was 29 Howard Street available to be searched on the

8       Airbnb Web site for over 180 days in 2015?

9       A.   I would have to confirm that.

10             MR. NANAVATI:  We'll stipulate to that, Your Honor.

11             MR. ASONYE:  Thank you.

12      BY MR. ASONYE:

13      Q.   And, finally, when a person rents their property on

14      Airbnb, can they rent it on other rental sites at the same time

15      as well?

16      A.   That's correct.  Some hosts list on multiple platforms.

17             MR. ASONYE:  Thank you.  No further questions.

18             THE COURT:  Mr. Evenson, thank you, sir.  You may

19      step down.  And you may be excused.

20                        (Witness excused.)

21             THE COURT:  Call your next witness.

22             MR. ASONYE:  The United States calls Peggy Miceli.

23             THE COURT:  What was name again?

24             MR. ASONYE:  Peggy Miceli, M-i-c-e-l-i.

25             THE COURT:  Oh, yes, I see it.  Thank you.

1              Come forward and take the oath, please, ma'am.

2                PEGGY MICELI, GOVERNMENT'S WITNESS, SWORN

3              THE COURT:  All right, you may proceed.

4                          DIRECT EXAMINATION

5   BY MR. ASONYE:

6   Q.   Could you please state and spell your last name for the

7   record?

8   A.   Peggy Miceli, M-i-c-e-l-i.

9   Q.   What city and state do you live in?

10  A.   Wading River, New York.

11  Q.   How far did you go in school?

12  A.   A bachelor's degree.

13  Q.   In what area?

14  A.   Accounting.

15  Q.   Are you currently employed?

16  A.   Yes.

17  Q.   Where do you work?

18  A.   Citizens Bank.

19  Q.   And how long have you worked at Citizens Bank?

20  A.   Five years.

21  Q.   Is Citizens Bank a publicly traded company?

22  A.   Yes, it is.

23  Q.   And as a publicly traded company, who owns the bank?

24  A.   The stockholders.

25  Q.   What's your title at Citizens Bank?

Miceli - Direct                                                    1856

1  A.    Vice president underwriting manager.

2  Q.    And what are your duties and responsibilities as an

3  underwriting manager at Citizens Bank?

4  A.    I supervise 24 underwriters.

5  Q.    And what do underwriters do?

6  A.    Underwriters analyze the income asset and liabilities of a

7  borrower to make sure they can pay the loan back.

8  Q.    How many years of experience do you have in the mortgage

9  industry?

10  A.    Thirty-plus.

11  Q.    And based on your training and experience, are you

12  familiar with the mortgage loan-making process at Citizens

13  Bank?

14  A.    Yes, I am.

15  Q.    What types of mortgages does Citizens Bank offer?

16  A.    One to four family residential loans.

17  Q.    And does it also offer cash-out refinances?

18  A.    Yes.

19  Q.    Does the bank also offer construction loans?

20  A.    Yes.

21  Q.    Okay.  What's a construction loan?

22  A.    We offer a construction to perm loan.  They borrow money

23  to build a house, and then once it's done, the loan is turned

24  into an end loan.

25  Q.    And if you can explain what type of information the bank

1    collects from borrowers when -- who are seeking loans from

2    Citizens Bank?

3    A.    Income docs, asset docs, and liability docs.

4    Q.    And does the bank rely on the accuracy and completeness of

5    information provided by the borrower?

6    A.    Absolutely.

7    Q.    What, if any, promises does the borrower make to the bank

8    during the loan process about the accuracy and completeness of

9    their information?

10   A.    That they're providing all information asked for.

11   Q.    And does the bank advise the borrower of potential

12   criminal penalties for false statements in connection with

13   their loan application?

14   A.    Yes, we do.

15   Q.    Ms. Miceli, what does the bank do if it concludes that a

16   borrower has purposely lied on an application or purposely

17   provided false materials to the bank?

18   A.    We will report it to our fraud department.

19   Q.    And have you actually had that happen to you before?

20   A.    In the past, yes.

21   Q.    Let me show you what's been marked in your binder as

22   Government Exhibit 228.  And if you could turn to the last

23   page.

24          First of all -- the first page, I'm sorry -- is this

25   an e-mail from Paul Manafort to the bank?

Miceli - Direct                                                        1858

1    A.    The first page?

2    Q.    Yes.

3    A.    Yes.

4    Q.    Okay.  And now if you could turn to the last page, what's

5    the title of this document?

6    A.    It's an affidavit of borrower and authorization form.

7    Q.    And does it give -- are there warnings to the borrower

8    about making false representations to the bank?

9    A.    Yes, there are.

10   Q.    Okay.  And why does the bank provide those warnings?

11   A.    Because we want all truthful information.

12   Q.    Now, what happens after the loan officer receives the

13   borrower's documentation and information?  What's the next step

14   in the process?

15   A.    The loan moves on to the processing department.

16   Q.    Okay.  And what does processing do?

17   A.    Processing accumulates all the documentation needed by the

18   underwriting department.

19   Q.    And what happens after processing?

20   A.    The loan is submitted to the underwriter.

21   Q.    Can you give the jury a sketch of sort of what the

22   underwriters do during this process to underwrite the loan?

23   A.    They review the income docs, the asset docs, the credit

24   report.  We also make sure that the loan is meeting the

25   guidelines of the bank.

Miceli - Direct                                                          1859

1    Q.    Okay.  And where do those bank guidelines come from?

2    A.    The bank.  They write the policy.

3    Q.    And is there any particular document that guides

4    underwriters?

5    A.    Yes.  There is a guidebook.

6    Q.    What are the potential internal consequences if an

7    underwriter or other bank employee helps to conceal material

8    information about a loan from the bank?

9    A.    They will be terminated.

10   Q.    Now, do underwriters typically communicate directly with

11   borrowers?

12   A.    No, they do not.

13   Q.    Why not?

14   A.    They're an independent department.

15   Q.    Okay.  And who do the borrowers -- I'm sorry -- who do the

16   underwriters typically communicate with?

17   A.    The processors and the loan officers.

18   Q.    Are you familiar with a term "a loan exception"?

19   A.    Yes.

20   Q.    What's a loan exception?

21   A.    At our bank, we have portfolio loans, and we set

22   guidelines, and if the loan doesn't meet the guideline, then we

23   will submit it to the portfolio exception desk to see if they

24   would approve the loan outside of the guideline.

25   Q.    All right.  Now, you said a few terms there.  You said

1  portfolio loans.

2  A.   Yes.

3  Q.   Can you explain to the jury what a portfolio loan is?

4  A.   A portfolio loan is a loan given by the bank that's kept

5  in their inventory, so to speak.

6  Q.   And how is a portfolio loan different than other loans

7  that the bank makes?

8  A.   The other loans that we make could be FHA or Fannie Mae,

9  and they are sold into the secondary market.

10  Q.   So if a loan doesn't meet the bank's normal guidelines,

11  you said it goes to a loan exception; is that correct?

12  A.   Correct.

13  Q.   And then there's a different group that makes a

14  determination on whether that exception will be granted?

15  A.   Yes.

16  Q.   And are you part of that exception group or is that

17  somebody above you?

18  A.   No, that's somebody actually parallel to me.  They're in a

19  different department.

20  Q.   All right.  So a different department from you?

21  A.   Yes.

22  Q.   Okay.  So let me ask you some -- about some criteria that

23  underwriters use to evaluate whether to approve the loan.  Are

24  you familiar with the term "loan to value"?

25  A.   Yes.

1   Q.    Is it better for the bank for that ratio to be higher or

2   lower?

3   A.    Lower.

4   Q.    Why?

5   A.    Less risk.

6   Q.    And are you familiar with the term "debt-to-income ratio"?

7   A.    Yes, I am.

8   Q.    When determining the debt to -- well, when determining the

9   borrower's debt, what does Citizens Bank look at?

10  A.    We look at all the debts that are disclosed on the

11  application.  We compare them to the credit report and to any

12  other disclosures made on the application.

13  Q.    How do you determine debt if the borrower is self-employed

14  or owns a business?

15  A.    If he owns a business, then we're going to look at the

16  business tax returns.

17  Q.    Okay.  And do you ever look at the business' profit and

18  loss statements?

19  A.    Yes, we do.

20  Q.    Do you always look at it?

21  A.    Yes.

22  Q.    How do you determine a self-employed borrower's income?

23  A.    We analyze the business tax returns.

24  Q.    And does the bank rely on the borrower's business tax

25  returns?

1    A.   Yes.

2    Q.   Does the bank rely on the business' -- or the borrower's

3    profit and loss statements?

4    A.   Yes.

5    Q.   What do you do -- how do you make that calculation when

6    you have -- once you've accumulated all the income and debt

7    information?

8    A.   We use a two-year average of the most recently filed two

9    years business tax returns, and then that average has to be

10   supported by the year-to-date on the profit and loss statement.

11   Q.   Does the bank care about the trend of a borrower's debt or

12   income?

13   A.   Yes.

14   Q.   Okay.  And why does the bank care about the trend?

15   A.   We want to receive an increasing trend, but if the trend

16   does decrease, we will use the most conservative figure and use

17   the most recent year where it decreased.

18   Q.   So in the end, is debt-to-income ratio an important factor

19   in determining whether a borrower can afford a mortgage

20   payment?

21   A.   Yes.

22   Q.   And are you familiar with the term "real estate owned"?

23   A.   Yes.

24   Q.   Are borrowers required to list a schedule of all the real

25   estate that they own to the bank?

1    A.    Yes, they are.

2    Q.    Why are they required to do that?

3    A.    Because we need to know what kind of debts they have

4    outstanding on that real estate owned.

5    Q.    And if a borrower owns a business, does he have to

6    disclose all the real estate owned by the business?

7    A.    Yes.

8    Q.    And is that debt also factored into their debt-to-income

9    ratio?

10   A.    Yes.

11   Q.    Does the bank request homeowner's insurance information

12   from borrowers?

13   A.    Yes, we do.

14   Q.    Why do you do that?

15   A.    Number one, for the subject property, to make sure it's

16   insured; and, number two, if we're trying to ascertain whether

17   there are any liens on a property, we'll look at the mortgagee

18   clause, and if there is none, we can pretty much ascertain

19   there are no liens.

20   Q.    And if a borrower misrepresents homeowner's insurance

21   information to the bank, would that matter to the bank?

22   A.    Yes.

23   Q.    With respect to cash-out refinances, in some cases is it

24   important for the bank to know how the funds will be used?

25   A.    Yes.

1    Q.    Why?

2    A.    To see if they're going to use it to incur any new debt.

3    Q.    And if a borrower was planning to use cash-out refinance

4    funds to incur new debt, are they supposed to disclose that to

5    the bank?

6    A.    Absolutely.

7    Q.    Now, do you -- does the bank typically obtain a borrower's

8    credit report?

9    A.    Yes.

10   Q.    Now, if a borrower obtains a loan shortly before applying

11   to your bank for a loan, would it necessarily appear on the

12   credit report?

13   A.    No.

14   Q.    Would you expect that borrower, nevertheless, to disclose

15   that new loan?

16   A.    Yes, we would.

17   Q.    And where would they disclose that information?

18   A.    If it was taken out prior to the closing of our loan?

19   Q.    Yes.

20   A.    We would -- they sign a final application at closing.

21   There's two applications; there's an initial and a final.  So

22   if they took out new debt before closing, we would expect them

23   to disclose that on the final application.

24   Q.    And what would you do with that new information if you

25   found out they obtained new debt between the initial loan

Miceli - Direct                                                    1865

1    application and the final loan application at closing?

2    A.    We would ask for the particulars on that loan.

3    Q.    And would a $5 million debt matter?

4    A.    Absolutely.

5    Q.    Is it important to the bank whether a property is a rental

6    property versus a primary or second residence?

7    A.    Yes.

8    Q.    Do underwriting rules treat rental and investment

9    properties differently than primary residences and secondary

10   residences?

11   A.    Yes, we do.

12   Q.    Can you explain to the jury how they're treated

13   differently?

14   A.    The loan-to-value is lower, and the loan amount, our

15   maximum loan amount is lower, and your rate would be higher.

16   Q.    Does it have an impact at all on the debt-to-income ratio?

17   Are those ratios any different?

18   A.    They could be, yes.

19   Q.    And are the rules with respect to the terms for an

20   investment property or rental property, are they more strict

21   than for primary and secondary residences?

22   A.    Yes.

23   Q.    Why -- can you explain to the jury why the bank places

24   more restrictions on rental properties and investment

25   properties than they do primary residences and secondary?

Miceli - Direct                                                          1866

1   A.    It's a higher risk loan.

2   Q.    I'm sorry?

3   A.    It's a higher risk loan.

4   Q.    Why is it a higher risk loan?

5   A.    Because they're not living there.  They're renting the

6   property.

7   Q.    What, if any, impact is there on the maximum loan amount

8   when a property is a rental property?

9   A.    The bank's policy, they limit that loan amount.

10  Q.    Do you recall what the limit is?

11  A.    Yeah, 1 million.

12  Q.    So if you're writing a property as an investment property,

13  the maximum loan you can get is a $1 million loan?

14  A.    Correct.

15  Q.    Not a $3 million loan?

16  A.    No.

17  Q.    At Citizens Bank, can a borrower obtain a cash-out

18  refinance on an investment property for a portfolio loan?

19  A.    Normally, it's not in policy, no, but there's always an

20  exception request.

21  Q.    Okay.  And why can't they do that?

22  A.    Why can't the --

23  Q.    Why can't they get a cash-out refinance on an investment

24  property?

25  A.    Because policy does not allow it.

1    Q.   Now, you said that there are guidelines that might permit

2    an exception; is that correct?

3    A.   Yes.

4    Q.   Do you ever recall seeing an exception to this rule?

5    A.   Far and few between.

6    Q.   What would Citizens Bank do if it learned a borrower

7    applied for a cash-out refinance loan on a rental property --

8    an investment property?

9    A.   They would have to change the terms of the loan.  It would

10   be counter offered to an investment property.

11   Q.   And does the bank do anything to try to check whether

12   property is being used as a rental?

13   A.   We rely on the tax returns.

14   Q.   Okay.  And do you rely on any representations from the

15   borrower?

16   A.   Yes.

17   Q.   And if the tax return hasn't been filed, what if the tax

18   return hasn't been filed for that year, let's say you're in

19   early 2016 and the tax return for 2015 hasn't been filed, what

20   does the bank rely on to determine whether if the property is

21   investment property?

22   A.   If they haven't filed '15, then we're going to rely on '13

23   and '14.

24   Q.   But do you, nevertheless, ask where the property is being

25   used as an investment property?

Miceli - Direct                                                        1868

1   A.    Yes.

2   Q.    And do you expect the borrower to be honest about how it's

3   being used?

4   A.    Yes.

5   Q.    Does the bank utilize services of appraisers?

6   A.    Yes.

7   Q.    Okay.  What's the role -- what do appraisers do?

8   A.    Appraisers go out and inspect a property and they compare

9   it to other comparable properties sold within the last

10  six months and they come up with a value.

11  Q.    And are the appraisers supposed to be independent?

12  A.    Yes.

13  Q.    What, if any, information do appraisers provide to the

14  bank about the occupancy of a property?

15  A.    They'll let us know whether it's tenant occupied or owner

16  occupied.

17  Q.    Now, did Paul Manafort obtain a loan from Citizens Bank?

18  A.    Yes.

19  Q.    On how many properties did he apply for loans?

20  A.    I believe he applied for two loans.

21  Q.    Do you recall the names of the properties?

22  A.    The loan from my site was Howard Street property.

23  Q.    Okay.  Now, do you recall having any conversations

24  directly with Paul Manafort regarding either of those loan

25  applications?

Miceli - Direct                                                          1869

1  A.   No, I do not.

2  Q.   But were you nevertheless involved in the review of a

3  cash-out refinance loan on 29 Howard Street for Mr. Manafort?

4  A.   Yes, I was.

5  Q.   Was that a portfolio loan?

6  A.   Yes, it was.

7  Q.   And, again, is that portfolio loan one of the loans that

8  the bank is going to hold on to?

9  A.   Yes.

10  Q.   All right.  Let me show you what's been marked as

11  Government Exhibit 232.

12         Is it an e-mail chain within the bank discussing

13  Mr. Manafort's loan application?

14  A.   Yes.

15         MR. ASONYE:  Your Honor, Government moves 232 into

16  evidence.

17         MR. NANAVATI:  No objection, Your Honor.

18         THE COURT:  Admitted.

19         (Government Exhibit No. 232 was received in

20  evidence.)

21         MR. ASONYE:  Your Honor, may I publish the last page?

22         THE COURT:  Yes.

23  BY MR. ASONYE:

24  Q.   If you could turn to the last page, Ms. Miceli?

25  A.   Okay.

Miceli - Direct                                                              1870

1    Q.   If you look at this e-mail, the first full e-mail, if you

2    could blow that up?

3         You see your name.  Who's Maria Guadron?

4    A.   Maria is the underwriter.

5    Q.   Okay.  And then copied on that e-mail is David Fallarino.

6    Do you know who he is?

7    A.   Yes.  He was the loan officer.

8    Q.   Okay.  Now, could you go ahead and just read your e-mail?

9    A.   Starting from Maria, "Here you go, Peggy."

10   Q.   Oh, no, at the top e-mail, I'm sorry.

11   A.   At the top.  From me to Maria?

12   Q.   Yes.

13   A.   "When you take the net income for 2014 and subtract the

14   total distributions you are left with $869,093.  The business

15   did not have the liquidity to disburse these dollars."

16   Q.   And then what do you have after the dollar sign?

17   A.   A sad face.

18                          (Laughter.)

19   Q.   Can you explain to the jury what you mean here in this

20   paragraph?

21   A.   When we're qualifying the borrower, we use the lower of

22   the ordinary income or the net income earned by that business

23   and what was distributed to that business.  If you want to use

24   all of the net income, because in this case, distributions were

25   lower, we would have to show liquidity.

Miceli - Direct                                                    1871

1   Q.   And did you -- what did you determine about Mr. Manafort's

2   liquidity?

3   A.   Liquidity according to the tax returns was negative, so he

4   did not have the liquidity to do that.

5   Q.   Okay.  And if you turn to now the prior page, so the prior

6   two pages, but I think most of the e-mail is on the prior page,

7   what was the loan officer, Mr. Fallarino, advocating that you

8   do?

9   A.   Part of the liquidity calculation was subtracting

10  mortgages notes payable due less than one year, which in this

11  case on the '14 tax return was 1.5 million.  That's what caused

12  it to be short to liquidity.  What he was advocating was that

13  this $1.5 million loan was forgiven, and if that's forgiven,

14  then if -- what we have left over for the liquidity is cash,

15  and he was proposing, can we use that much of the cash in

16  additional income?  Because it was never distributed.

17  Q.   And there's a reference, you see there, to a CPA letter.

18  A.   Yes.

19  Q.   What's the CPA letter?

20  A.   He was asking if we got a letter from a CPA confirming

21  that the 1.5 was forgiven, would you accept that?

22  Q.   And what's your response?

23  A.   I said, "Yes.  Go ahead and obtain the CPA letter."

24  Q.   Okay.  And why do you need a CPA letter?

25  A.   Because CPAs are licensed individuals and we believe them.

1    Q.   And what was your understanding of the effect of removing

2    that $1.5 million loan on Mr. Manafort's liquidity calculation?

3    A.   Once it was removed, then he would have the liquidity to

4    go ahead and disburse the cash that was left, which we could

5    count as net income.

6    Q.   Okay.  Let me show you what's been marked as Government

7    Exhibit 243 and which is not in evidence.

8             Is that an e-mail from you?

9    A.   Yes.

10   Q.   To the rest of your team?

11   A.   To the portfolio department.

12   Q.   Does this relate to Mr. Manafort's loan application?

13   A.   Yes, it does.

14           MR. ASONYE:  Your Honor, Government moves 243 into

15   evidence.

16           MR. NANAVATI:  Without objection, Your Honor.

17           THE COURT:  Admitted.

18           (Government Exhibit No. 243 was received in

19   evidence.)

20           MR. ASONYE:  May we publish?

21           THE COURT:  Yes.

22   BY MR. ASONYE:

23   Q.   Now, just to clear something up, Ms. Miceli, in the

24   subject line of this e-mail, the first word with some stars

25   around it says, "Secret."

Miceli - Direct                                                     1873

1        Can you explain to the jury why -- why it says that?

2   A.   That was a software glitch.  From the day I started at the

3   bank, everybody wondered, what does "Secret" mean?  And

4   somebody that programmed the software just happened to put that

5   in the subject line.

6   Q.   So is that automatically generated?

7   A.   It's automatically generated on every one.

8   Q.   There's nothing secret about this e-mail, is there?

9   A.   No, no.

10  Q.   All right.  In this e-mail, what do you recommend

11  regarding Mr. Manafort's loan?

12  A.   I recommended approval.

13  Q.   And when you recommended approval, did you rely on the

14  documents and the information that had thus been -- thus far

15  been provided to you by the borrower and others on his behalf?

16  A.   Yes.

17  Q.   Okay.  Let me show you what's been admitted as evidence,

18  Government Exhibit 168.  It should be the first tab.

19        And if we could turn to the second-to-the-last page.

20        MR. ASONYE:  May we publish, Your Honor?

21        THE COURT:  Yes, you may.

22  BY MR. ASONYE:

23  Q.   Is this the CPA letter that you had referred to in your

24  prior testimony?

25  A.   It looks like it, yes.

1  Q.   And then is attached on the next page a letter purporting

2  to forgive the $1.5 million debt?

3  A.   Yes.

4  Q.   Okay.  Would the bank have relied on both of these

5  documents in its determination about whether to approve this

6  loan?

7  A.   Yes.

8  Q.   Would you want to know if the perineal holdings letter,

9  the last page of this exhibit, was backdated?

10  A.   Yes.

11  Q.   And why would you want to know that?

12  A.   Because any letter signed should be signed -- dated the

13  date it's been signed.

14  Q.   And what does the bank do if it receives purposely

15  backdated documents?

16  A.   We would question it.

17  Q.   And would it matter to the bank if the CPA who wrote this

18  cover letter knew that the forgiveness letter was backdated?

19  A.   Yes.

20  Q.   Would it matter to the bank if the borrower purposely

21  supplied false documents?

22  A.   Yes.

23  Q.   Would you want to know -- if we turn on this last document

24  here, the Peranova Holdings letter that purports to forgive

25  this $1.5 million loan, would you want to know if Paul Manafort

1   controlled the entity that supposedly was lent $1.5 million to

2   his company?

3   A.    Absolutely.

4   Q.    Would that have been a relevant determination about

5   whether you would approve this loan?

6   A.    Yes.

7   Q.    And would it make it more likely that you would approve

8   the loan?

9   A.    No.  We would need more information.

10  Q.    Now, if I could show you Government Exhibit 245, which is

11  already in evidence.  It's Mr. Manafort's loan application.

12          Do you see where under property will be, what's

13  checked?  What's checked?

14  A.    I'm sorry?

15  Q.    I'm sorry, Government Exhibit 245.

16  A.    Yeah, page 1?

17  Q.    The first page.

18  A.    Yes.

19          MR. ASONYE:  And may we publish, Your Honor?

20          THE COURT:  Yes, you may.

21  BY MR. ASONYE:

22  Q.    And if we zoom in on the sort of top third of the

23  document, on the right, it says, "Property will be" used, and

24  do you see "Secondary Residence" is checked?

25  A.    Yes, I do.

1    Q.    Is there a box for investment?

2    A.    Yes, there is.

3    Q.    Is that box checked?

4    A.    No, it's not.

5    Q.    Okay.  Is that a statement that the bank relied on?

6    A.    Yes, it is.

7    Q.    All right.  Let me show you what's been marked as

8    Government Exhibit 229, which is in evidence.

9              MR. ASONYE:  May we publish, Your Honor?

10             THE COURT:  Yes, you may.

11   BY MR. ASONYE:

12   Q.    Okay.  This is an e-mail from Paul Manafort to the bank

13   regarding a use of cash letter.  Do you see that?

14   A.    Yes.

15   Q.    And if you could turn to the next page?  In the second

16   paragraph, what does Mr. Manafort tell the bank about how

17   29 Howard Street is currently being used?

18   A.    As a second home.

19   Q.    Would the bank have additional questions for the borrower

20   if it believed that this property was being used as a rental?

21   A.    Yes.

22   Q.    If this bank loan to this property was actually a rental

23   property, what impact could it have had on the terms of the

24   loan?

25   A.    A very big impact.

1  Q.   And when you say "a very big impact," what do you mean?

2  A.   The rate would be higher.  It would have to be approved by

3  the portfolio department because the loan amount was way over

4  the minimum.

5  Q.   The minimum?

6  A.   Of a million for an investment property.

7  Q.   Oh, do you mean the maximum?

8  A.   Oh, I'm sorry, the maximum, yes.

9  Q.   Okay.  Now, does it matter how long a property is used as

10 a rental?

11 A.   No.

12 Q.   So if it was used --

13 A.   Oh, you -- oh, I'm sorry, yes, it does.  You mean how many

14 number of days it's rented during the year?

15 Q.   Yes.

16 A.   Yes.

17 Q.   And how does the bank determine -- well, first of all, how

18 would you even know to ask how many days a property was being

19 rented?

20 A.   By looking at the tax returns.

21 Q.   Okay.  And is the borrower supposed to disclose to you

22 whether a property is being used as a rental?

23 A.   Yes.

24 Q.   Let me show you Government Exhibit 2- -- going back to the

25 loan application, 245.  And if we could turn to the schedule of

Miceli - Direct                                                    1878

1   real estate owned, which is the second-to-the-last page of the

2   exhibit?

3           Ma'am, how many days does it -- when you said it

4   matters how many days it's rented?

5   A.   Uh-huh.

6   Q.   What's the sort of magic number?

7   A.   If they're applying for a second home, it cannot be rented

8   for more than 180 days in any one year.

9   Q.   Okay.  So if you rent it for more than 180 days, then

10  you're an investment property?

11  A.   Correct.

12  Q.   And all of those restrictions triggered?

13  A.   Correct, correct.

14  Q.   Okay.  Now, let's take a look at the bottom of the

15  schedule "Real Estate Owned."  Do you see 29 Howard Street

16  listed?

17  A.   Yes, I do.

18  Q.   And do you see that there's a "T" next to it?

19  A.   Yes.

20  Q.   What does that mean?

21  A.   Second home.

22  Q.   And now above the "T," there's actually an "R" for a

23  different property, right?

24  A.   Correct.

25  Q.   And what does an "R" mean?

Miceli - Direct                                                    1879

1    A.    Rental.

2    Q.    So what did you understand Mr. Manafort was representing

3    was happening at 29 Howard -- 29 Howard Street was being used?

4    A.    As a second home.

5    Q.    And what was he representing that 123 Baxter Street was

6    being used as?

7    A.    It was an investment property.

8    Q.    So would the bank want to know if Howard Street was

9    actually being used as a rental?

10   A.    Yes.

11   Q.    Does this schedule indicate whether there are any

12   mortgages on the 377 Union Street?

13   A.    No, there is no mortgage.

14   Q.    And what's the date of this that Mr. Manafort signed this

15   application?

16   A.    March 4, 2016.

17   Q.    Would the bank want to know if there was actually a

18   $5.3 million loan on 377 Union Street?

19   A.    Yes.

20   Q.    Would that affect the potential terms of this loan?

21   A.    Yes.

22   Q.    What criteria would it affect?

23   A.    It would affect the loan to value, the rate.  It would

24   affect your debt-to-income ratio.

25   Q.    Ms. Miceli, if Paul Manafort or his business entities had

1   millions of dollars in loans from overseas individuals and

2   businesses, is that something the bank would want to know?

3   A.   Yes.

4   Q.   Why would you want to know that?

5   A.   Because it could be additional -- it's additional debt.

6   Q.   Was he required to disclose all of his debt, all of his

7   personal debt, and all of his business debt?

8   A.   Yes.

9   Q.   And what about if Paul Manafort had a number of business

10  entities and those business entities had all made loans to each

11  other?  Would you want to know that?

12  A.   Yes.

13  Q.   Why would you want to know that?

14  A.   Well, I would first want to know if there's any businesses

15  that we were unaware of that we would need the business tax

16  returns for.

17  Q.   Now, I asked you a number of questions about the bank

18  treating rental properties different than primary and secondary

19  residences, and you said that you look at the tax returns; is

20  that correct?

21  A.   Uh-huh.

22          MR. ASONYE:   If I could pull up Government Exhibits

23  337L and 337M, which are the tax returns for 29 Howard Street?

24          And we're going to have them -- may I publish, Your

25  Honor?

Miceli - Direct                                                      1881

1              THE COURT:  Yes, if you need to.  Haven't we already

2      published these?

3              MR. ASONYE:  Yes, we have.

4      BY MR. ASONYE:

5      Q.   And Ms. --

6              THE COURT:  I'm sure you'll take into account in the

7      future whether you really need to go back over the same thing.

8              MR. ASONYE:  And I don't -- I don't know --

9              THE COURT:  Proceed.

10     BY MR. ASONYE:

11     Q.   Ms. Miceli, do these -- both these tax returns indicate

12     that in 2015 and 2016, that 29 Howard Street was rented for the

13     entire year, 365 days in '15 and '16?

14     A.   Yes.

15     Q.   Is that something -- information that the bank would have

16     wanted to know?

17     A.   Absolutely.

18     Q.   And if the bank knew this information, how would it have

19     acted?

20     A.   We would have determined it was an investment property,

21     not a second home.

22     Q.   And he couldn't even qualify for this -- you can't even

23     get this kind of a loan without an exception, correct?

24     A.   Correct.

25             MR. ASONYE:  The Court's indulgence?

Miceli - Direct                                                        1882

1              THE COURT:  Yes.

2    BY MR. ASONYE:

3    Q.   Ms. Miceli, you testified that there's a -- you can get an

4    exception on a portfolio loan for a cash out refinance on an

5    investment property?

6    A.   You can ask for an exception.

7    Q.   You can ask for an exception, right?

8    A.   Yes, yes.

9    Q.   And then normally the limit is a million?

10   A.   For the loan amount.

11   Q.   For the loan amount.  What's the maximum loan amount

12   you've ever seen for a cash out refinance on an investment

13   property that went to exception?

14   A.   I would not -- I don't really recall that, but it's not a

15   lot.

16   Q.   Thank you.  Oh, I'm sorry, the other question is:  What is

17   the --

18              MR. ASONYE:  The Court's indulgence.  I'm sorry, Your

19   Honor.

20              THE COURT:  All right.

21   BY MR. ASONYE:

22   Q.   So I also asked you -- I asked you about the loan amount,

23   the maximum loan amount.

24   A.   Uh-huh.

25   Q.   But now I want to ask you:  What's the maximum cash that

Miceli - Cross                                                                    1883

1    you can get out on a portfolio loan that's an investment

2    property for a cash out refi?

3    A.   For an investment property?

4    Q.   Yes.

5    A.   They do not allow cash out.

6    Q.   At all?

7    A.   At all.  You would have to go for an exception.

8            MR. ASONYE:  Thank you.  No further questions, Your

9    Honor.

10           THE COURT:  Cross-examination.

11           MR. NANAVATI:  Thank you, Your Honor.

12                           CROSS-EXAMINATION

13   BY MR. NANAVATI:

14   Q.   Good afternoon, Ms. Miceli.

15   A.   Hi.

16   Q.   Hi.  I'm Jay Nanavati, I represent Paul Manafort.  I

17   wanted to just try to clarify a few things that came out on

18   direct examination.  You were shown a mortgage application from

19   March 4 of 2016.

20           Do you remember that?

21   A.   Not at the time, no.

22   Q.   Do you remember being shown it during direct examination?

23   A.   Yes.

24   Q.   Okay.  And that mortgage application was filled out by

25   Melinda Francis/Melinda James, not Mr. Manafort, correct?

Miceli - Cross                                                          1884

1   A.   Are you talking about the initial application?

2   Q.   I'm talking about the March 4 document that is

3   Exhibit 245, please.

4   A.   This is the final application.

5   Q.   Yes.

6   A.   So the initial application is completed by the LOA --

7   Q.   What's an LOA?

8   A.   -- which is loan officer assistant.

9   Q.   Okay.

10  A.   And then during the course of processing and underwriting,

11  figures are changed, information is changed based on verified

12  information, and this is the final application signed by him.

13          So is it solely Melinda?  No.

14  Q.   Okay.  That's a fair point.

15          The portions that are preprinted, those are filled in

16  by bank employees, correct?

17  A.   Correct.

18  Q.   And that signature would have happened on the closing day

19  of the loan, correct?

20  A.   Correct.

21  Q.   And you mentioned the sort of process from an initial

22  application to the final application, that sometimes can take

23  months, correct?

24  A.   Hopefully not.

25                          (Laughter.)

1              THE WITNESS:  30 to 45 days, we try.

2    BY MR. NANAVATI:

3    Q.    I'm sorry?

4    A.    30 to 45 days, we try.

5    Q.    Okay.  Okay.  And during that period, however long it is,

6    you said the bank is verifying information and collecting

7    information?

8    A.    Correct.

9    Q.    Okay.  And you were asked about a $5.3 million mortgage on

10   the Union Street property.  Do you remember being asked about

11   that?

12   A.    Yes.

13   Q.    And do you remember saying that that's something the bank

14   would definitely want to know about?

15   A.    Yes.

16   Q.    And are you aware that on February the 24, Mr. Manafort

17   told Ms. Francis/Ms. James that there was, indeed, a mortgage

18   on the Union Street property?

19   A.    There were --

20             MR. ASONYE:  Objection.  Misstates facts, Your Honor.

21   He says approved.

22             THE COURT:  Let her -- if it misstates facts, she can

23   answer that.

24             THE WITNESS:  Can you ask that again?

25             THE COURT:  I'll overrule the objection.

1              Re-ask the question.

2    BY MR. NANAVATI:

3    Q.   Okay.  Are you aware that on February the 24 of 2016,

4    Mr. Manafort sent to Ms. James an e-mail saying that a mortgage

5    had just been approved that month on Union Street?

6    A.   I was not aware of that.

7    Q.   Okay.

8              THE COURT:  Is there an objection to that question?

9              MR. ASONYE:  No, Your Honor.

10             THE COURT:  Next question.

11   BY MR. NANAVATI:

12   Q.   And, Ms. Miceli, if I could hand up a document to you,

13   please?

14             Do you have that in front of you?

15   A.   Yes.

16   Q.   Defendant's Exhibit 27?

17   A.   Okay.

18   Q.   And can I -- can I turn you to the second page, please?

19   A.   Okay.

20   Q.   And do you see where Mr. Fallarino says, "We are now aware

21   of the one loan on 377 Union"?

22   A.   Yes.

23   Q.   And that's dated March 11, 2016?

24   A.   Yes.

25   Q.   So do you -- or -- so for the -- for the construction

1  mortgage, the second of the two Citizens mortgages, it predates

2  the closing of that one, correct?  Or that that one never

3  closed, but it predates the finalization of the second

4  mortgage, correct?

5  A.   Of the construction to prolong?  Yes, March 11.

6  Q.   And it postdates by a week, the closing of the Howard

7  Street refinanced mortgage, correct?

8  A.   Correct.

9  Q.   Were you aware of this e-mail?

10 A.   No.

11 Q.   Okay.  And you also were not aware of the e-mail from

12 Mr. Manafort to Ms. James?

13 A.   No.

14 Q.   Were you aware that on February the 23 of 2016,

15 Mr. Manafort's assistant sent Ms. James insurance policies

16 reflecting that mortgage, too?

17 A.   I was not aware.

18 Q.   Okay.  Were you aware that on February 23, 2016, a

19 representative of the insurance company sent Ms. James

20 insurance policies reflecting that mortgage, too?

21 A.   I was not aware.

22 Q.   And you had said that your understanding was that if a --

23 if a property is rented out for 180 days or more in a year,

24 that makes it a rental or an investment property and not a

25 residence, correct?

1   A.   Correct.

2   Q.   And you -- I believe -- is it fair to say also that to

3   your understanding, in 2015 and 2016, Citizens Bank had no

4   guidelines regarding Airbnb rentals?

5   A.   I do not recall.

6   Q.   Would it refresh your recollection to see a summary of

7   your --

8            THE COURT:  You don't tell her what it is, just give

9   it to her.

10           MR. NANAVATI:  Okay.

11  BY MR. NANAVATI:

12  Q.   Is there anything --

13           THE COURT:  Otherwise, you're putting into evidence

14  what the document is.

15           MR. NANAVATI:  Yes, Your Honor.

16           THE COURT:  He's going to show you a document.  Read

17  it to yourself, whatever portion of it he directs your

18  attention to read, and then answer his question, which will be:

19  Does that refresh your recollection as to whatever fact it is

20  that he was talking about.

21           THE WITNESS:  Okay.

22           THE COURT:  And then you can say it either does or it

23  doesn't.  Does it give you a present recollection as you sit

24  here today as to that fact.  You answer yes or no.

25           THE WITNESS:  Okay.

 1              THE COURT:  Well, I suppose there's maybe, but I

 2   don't want to suggest that to you.

 3              MR. NANAVATI:  Sorry, Your Honor, I didn't --

 4              THE COURT:  All right.  Have you shown Mr. Asonye?

 5              MR. NANAVATI:  I haven't, but he excused me from

 6   that, if he's able to do that.

 7              THE COURT:  Well, he's looking for it now?

 8              MR. ASONYE:  Yes, Your Honor, it will take one

 9   minute.

10              THE COURT:  All right.

11              MR. NANAVATI:  He's looking for a copy for Your

12   Honor.

13              THE COURT:  I don't need a copy.

14              MR. NANAVATI:  Okay.

15              THE COURT:  I don't need a copy.

16              MR. ASONYE:  I need it.

17              THE COURT:  All right.

18              MR. NANAVATI:  Oh, I'm sorry.

19              THE COURT:  Then let Mr. Asonye have some time to

20   find it.

21              MR. NANAVATI:  Yes, Your Honor.

22              THE WITNESS:  What am I reading?

23              MR. NANAVATI:  We have to wait for --

24              THE WITNESS:  Oh, I'm sorry.

25              THE COURT:  He'll direct your attention to a specific

Miceli - Cross                                                              1890

 1   portion of it.

 2              THE WITNESS:  Okay.

 3              THE COURT:  Do you want to have it back, Mr. Asonye,

 4   so you can look at it?

 5              MR. ASONYE:  I think if she just tells me the date at

 6   the top right?

 7              MR. NANAVATI:  That's it.

 8              MR. ASONYE:  Okay.  I have it.

 9              MR. NANAVATI:  Page 9.

10   BY MR. NANAVATI:

11   Q.   And if you could turn to Page 9 of the document?

12   A.   Uh-huh.

13   Q.   And if you could look and see if there's any mention of

14   Airbnb and just review it to yourself, please?

15   A.   Okay.

16   Q.   So after reading that, the -- I'm asking a very specific

17   question:  Is it -- does that refresh your recollection as to

18   whether Citizens Bank had a policy on Airbnb rentals in the

19   2015 to 2016 time frame?

20   A.   We did, but it changed and I'm not sure when.

21   Q.   So that refreshes your recollection as to what the policy

22   was back then?

23   A.   Back then, right.  It's for portfolio --

24              THE COURT:  No, don't read the document.

25              THE WITNESS:  Okay.  Okay.

1              THE COURT:  Read it to yourself.

2              THE WITNESS:  Okay.

3              THE COURT:  But testify from your recollection as to

4    what he has asked.

5              THE WITNESS:  Could you ask that again, please?

6    BY MR. NANAVATI:

7    Q.   Sure.  Do you recall that Citizens did not have a policy

8    regarding Airbnb rentals in 2015 and 2016?

9    A.   At that time, I cannot say 100 percent sure.

10             MR. ASONYE:  Your Honor, can we take the document

11   away from her if she's going to testify from her memory?

12             THE COURT:  No, leave -- she's testifying without

13   reading it.

14             Yes, go ahead.  Without reading it, give us your

15   recollection.

16             THE WITNESS:  My recollection is I'm not sure what

17   the guideline was at that time.

18   BY MR. NANAVATI:

19   Q.   Thank you.

20             MR. NANAVATI:  The Court's indulgence one moment.

21             THE COURT:  All right.

22   BY MR. NANAVATI:

23   Q.   And you don't know how many days that property was rented

24   on Airbnb in 2016, do you?

25   A.   In 2016?  No.

Miceli - Cross                                                    1892

1    Q.    Yes, ma'am.

2              And you said that one of the ways you determine how

3    many days a property was rented is by looking at tax returns,

4    correct?

5    A.    Correct.

6    Q.    Okay.  And are you familiar with the Schedule E

7    instructions from the IRS forms?

8    A.    Yes.

9    Q.    Okay.  And are you aware then that it instructs taxpayers

10   not to count, as personal use, any days that you used the unit

11   as your main home before or after renting it or offering it for

12   rent, as long as you rented it or tried to rent it for at least

13   12 consecutive months?  Are you aware of that?

14   A.    I guess.

15   Q.    Yeah.  So the upshot being as long as during that year,

16   you tried to rent it for at least 12 consecutive months, you

17   don't have to say on your tax return that these were personal

18   use days, correct?

19   A.    Yeah, I'm not aware of -- I'm not quite sure what you're

20   asking me.

21   Q.    Okay.  Are you aware that the Schedule E instructions that

22   you're familiar with say that?

23   A.    They tell the taxpayer to put down how many days of the

24   year it was rented.

25   Q.    So you're not aware that the Schedule E instructions say

1    what I just read to you?

2    A.   I'm not -- yes, I'm not aware.  Okay.

3    Q.   And you said that you would want to know if -- scratch

4    that.

5             Do you remember the $1.5 million loan and loan

6    forgiveness issue that you were asked about?

7    A.   Correct.

8    Q.   And do you remember that the $1.5 million loan was a

9    problem for the borrower's creditworthiness?

10   A.   It had to do with liquidity.

11   Q.   Right.  Meaning it made it more difficult for them to

12   qualify for a loan, right?

13   A.   Correct.

14   Q.   Okay.  And you said that you would want to know if that

15   loan was owed to an entity was controlled by the borrower,

16   correct?

17   A.   Correct.

18   Q.   And if that entity, we'll call it the creditor entity, was

19   controlled by the borrower/debtor, that would actually make

20   things -- make it more likely they would qualify than if that

21   debt was owed to an independent party, wouldn't it?

22   A.   Not necessarily, because we would want to see the

23   business -- if we knew it was controlled by the borrower, we

24   would want to see the business tax returns, because how do we

25   know there's not a loss in that company after we analyze it?

1    Q.   Right.  Setting aside the profit and loss of the related

2    entity --

3    A.   Um-hum.

4    Q.   -- a loan to an independent party versus a loan to a

5    controlled entity, would the loan to the controlled entity be

6    less damaging to the borrower?

7    A.   I really wouldn't know how to answer that.

8    Q.   And regarding loan forgiveness, are you aware of how loan

9    forgiveness from a related entity is treated under the debt

10   equity regulations?

11   A.   No, I'm not.

12   Q.   And are you aware that it was Mr. Fallarino and the CPA

13   that initially raised the idea of forgiving this loan?

14   A.   Of actually forgiving it?  No, I'm not.

15   Q.   And you also said that when there's a cash out

16   refinancing, that cash out should not be used to incur new

17   debt, right?

18   A.   Correct.

19   Q.   And the way that cash might be used to incur new debt

20   would be by using it as the down payment to secure some other

21   loan, correct?

22   A.   Correct.

23   Q.   But there's nothing wrong with retiring existing debt with

24   the cash that you take out, correct?

25   A.   No.

1    Q.   You can pay off your car loan with it, correct?

2    A.   You could pay off a car loan.

3    Q.   Okay.  You just can't get new debt with it?

4    A.   Correct.

5    Q.   Okay.  And are you aware that Fannie Mae, for a residence

6    to be -- for a property to be treated as a residence, requires

7    only that the borrower live in the residence for some time

8    during that year?

9    A.   For a second home?

10   Q.   Yes.

11   A.   Yes.

12   Q.   And you don't know whether Mr. Manafort's daughter and her

13   husband lived in the property for some time during 2016, do

14   you?

15   A.   I was not aware of that, no.

16   Q.   And you had said -- pardon me.

17        MR. NANAVATI:  The Court's indulgence one moment?

18        THE COURT:  All right.

19   BY MR. NANAVATI:

20   Q.   And are you aware of a program that your bank and Fannie

21   Mae participate in that allows borrowers to use their Airbnb

22   income as qualifying income for new mortgage debt?

23   A.   Okay.  You're talking about Fannie Mae, but this was a

24   portfolio loan, and portfolio did not allow income from a

25   Airbnb.

1   Q.   Okay.  And are you aware of any communications explaining

2   to Mr. Manafort the intricacies of portfolio loans versus all

3   the other types?

4   A.   I'm not aware.

5          THE COURT:  You may confer.

6          MR. NANAVATI:  Oh, I apologize, Your Honor.  May I?

7   BY MR. NANAVATI:

8   Q.   And just leaving aside whether this was a portfolio loan,

9   are you aware of this program that your bank participates in?

10  A.   With Fannie Mae?

11  Q.   With Fannie Mae and Airbnb.

12  A.   I believe Fannie Mae guideline is that they allow income

13  to be used from an Airbnb, but I'd have to check the

14  guidelines, but I'm pretty sure they do.

15         MR. NANAVATI:  Okay.  That's all the questions I

16  have, Your Honor.

17         THE COURT:  So you're not offering 27?

18         MR. NANAVATI:  Oops.  I would like to, Your Honor,

19  please.

20         MR. ASONYE:  No objection.

21         THE COURT:  It's admitted.

22         (Defendant's Exhibit No. 27 was received in

23  evidence.)

24         THE COURT:  Redirect.  Yes, redirect.

25                        REDIRECT EXAMINATION

1   BY MR. ASONYE:

2   Q.   Speaking of Defendant's Exhibit 27, do you have that in

3   front of you still?

4   A.   Yes, the one he just gave me?

5   Q.   No.

6   A.   No.

7   Q.   The one with -- this one, Defendant's Exhibit 27.

8   A.   Yep.

9   Q.   Yes.  And you can turn to that first page.  And do you

10  recall Mr. -- defense counsel asking you -- telling you that

11  Mr. Manafort -- I'm sorry -- that on the second page, David

12  Fallarino had acknowledged that they were aware of the loan on

13  377 Union Street?

14  A.   Yes.

15  Q.   And what was the date of that?

16  A.   The date of the e-mail?

17  Q.   Yeah.

18  A.   March 11.

19  Q.   And that's after the loan on Howard Street closed, right?

20  A.   Correct.

21  Q.   All right.  So Mr. Manafort had already got the $3.4

22  million by the time the bank was aware of the loan, right?

23            THE COURT:  You're leading.

24  BY MR. ASONYE:

25  Q.   Was the bank -- did Mr. Manafort get the $3.4 million

Miceli - Recross                                                    1898

1    before he, Mr. Fallarino, sent this e-mail?

2    A.    Our loan closed before he got this e-mail.

3    Q.    And it wouldn't have helped the bank's determination about

4    whether to give Mr. Manafort the $3.4 million when it got this

5    e-mail, would it?

6    A.    If we had known at the time that there was a loan on 377

7    Union?  Yes, that would have mattered.

8    Q.    Right.  But you couldn't -- could you -- could the bank --

9    could this e-mail help the bank make its determination on

10   March 4, 2016?

11   A.    Yes.

12   Q.    Now, Mr. -- defense counsel asked you about whether you

13   knew if the CPA and Mr. Fallarino, whose idea it was to send

14   the $1.5 million loan forgiveness letter.

15         Do you remember that?

16   A.    Yes.

17   Q.    Mr. Fallarino, is he an employee of the bank?

18   A.    Yes.

19   Q.    Does he own the bank?

20   A.    No.

21         MR. ASONYE:  No further questions, Your Honor.

22         THE COURT:  All right.  Anything further?

23         MR. NANAVATI:  Just very briefly, Your Honor.

24                      RECROSS EXAMINATION

25   BY MR. NANAVATI:

Miceli - Recross                                                    1899

1   Q.   The March 11 e-mail from Mr. Fallarino, you had said, I

2   believe, that that postdates the March 4 closing on the Howard

3   Street loan, correct?

4   A.   This e-mail was after his closing, yes.

5   Q.   Correct.  And the February 24 e-mail from Mr. Manafort to

6   Ms. James was before the closing, correct?

7   A.   Did you give me the February 24 e-mail?

8   Q.   I didn't.  I'll leave that aside.  We can agree that

9   February 24 is before March 4?

10  A.   Yes.

11  Q.   And we can agree that this March 11 e-mail dealt with a

12  different loan, not the Howard Street loan, correct?

13  A.   Correct.

14  Q.   It dealt with the Union Street construction loan, correct?

15  A.   Correct.

16  Q.   Okay.  And can we also agree that Mr. Manafort -- there

17  was overlap between his applying for the Howard Street

18  refinance and the Union Street construction loan?

19  A.   I am not sure when he applied for the construction loan.

20  Q.   Okay.  But it was ongoing as of March 11, 2016, if this

21  e-mail is to be believed, correct?

22  A.   It looks like it, yes.

23  Q.   Yes.  And this e-mail is Mr. Fallarino saying he's aware

24  of the loan, correct?

25  A.   Correct.

1900

```
 1            MR. NANAVATI:  No further questions, Your Honor.

 2            THE COURT:  Anything further?

 3            MR. ASONYE:  (Shaking head.)

 4            THE COURT:  All right.  Thank you.  You may step

 5   down, and you may be excused.

 6                         (Witness excused.)

 7            THE COURT:  Call your next witness, please.

 8            MR. ASONYE:  Your Honor, this witness, I think, takes

 9   about just under an hour.  Is there any chance we could take a

10   bathroom break?

11            THE COURT:  Yes.  Pass your books to the right,

12   ladies and gentlemen.  Mr. Flood will collect them, keep them

13   safe and secure.

14            Do we have soft drinks available for the jury?

15            THE COURT SECURITY OFFICER:  We do.

16            THE COURT:  Good.  Remember not to discuss the matter

17   among yourselves or with anyone or undertake any investigation

18   on your own.  We will reconvene at -- I was going to go until

19   3:15.

20            Now, who is your next witness?

21            MR. ASONYE:  Taryn Rodriguez.

22            THE COURT:  And how long do you anticipate her direct

23   testimony will be?

24            MR. ASONYE:  Your Honor, she's about as long as the

25   last witness.  She's a little shorter.
```

1901

1          THE COURT:  And I'm sure you're not going to cover

2    the same area.

3          MR. ASONYE:  It's a different loan.

4          THE COURT:  All right.  And after Rodriguez, whom do

5    you plan to call?

6          MR. ASONYE:  Mr. Gary Seferian.

7          THE COURT:  Say the name again.  Oh, yes, I see it.

8    No, I don't.  What's the name again?

9          MR. ASONYE:  Gary Seferian, S-e-f-e-r-i-a-n.

10         THE COURT:  Yes, I see it.  And how long do you think

11   he'll be?

12         MR. ASONYE:  He's an hour.

13         THE COURT:  All right, thank you.

14         Thank you, ladies and gentlemen.  You may file out

15   and enjoy your recess.

16                         (Jury out.)

17         THE COURT:  Court stands in recess until 3:15.

18         MR. ASONYE:  Thank you, Your Honor.

19          (Recess from 2:42 p.m., until 3:19 p.m.)

20                         (Defendant present, Jury out.)

21         THE COURT:  All right.  You may bring the jury in.

22         MR. DOWNING:  Your Honor, might I just --

23         THE COURT:  Yes.  Come up to the podium so I can hear

24   you, please.

25         MR. DOWNING:  Your Honor, I was going to ask to

1   approach with the Government about just a brief matter that I

2   wanted to raise with you.

3           THE COURT:  All right.  Come to the bench.

4           (Bench conference on the record.)

5           THE COURT:  Yes, sir.

6           MR. DOWNING:  So I have two issues:  The government

7   has just filed a motion to seal the sidebar from the other day.

8           THE COURT:  Yes.  I asked for that, I think.

9           MR. DOWNING:  We have no opposition to it.

10          THE COURT:  All right.  I've already signed it and

11  given it to the deputy clerk.

12          MR. DOWNING:  But I did have another reason to come

13  up.

14          THE COURT:  All right.

15          MR. DOWNING:  I see we're progressing along to the

16  end of this trial.

17          THE COURT:  Well, I hope so.

18          MR. DOWNING:  Yeah, I think so, too, but we're going

19  to need some time to be able to sit in with our client after

20  the close of the government's case.

21          THE COURT:  That's understandable.

22          MR. DOWNING:  As we approach these deadlines

23  tomorrow, I just want to --

24          THE COURT:  Well, that might be a good time for us to

25  have our instructions conference, because I can appreciate you

1903

1    need more than 15 minutes.  So I'm pretty sure that we're going

2    to go on today until the end of today, and how far into

3    tomorrow?  I don't know which of the three of you is doing it.

4              MR. ANDRES:  I'll try, Judge.  We have two more

5    witnesses we'd like to get in today, do our best.  Then we have

6    four tomorrow.  So depending --

7              THE COURT:  It should take all day.

8              MR. ANDRES:  It may -- we'll get to the afternoon.

9              THE COURT:  Mr. Van Grack doesn't think so.

10             MR. ANDRES:  Well, I'll deal with that on my own.

11   That's what we call insubordination, but I'll deal with that.

12             We'll get close, but we may not fill up the whole day

13   tomorrow.

14             THE COURT:  All right.  I think what I'll do then

15   unless there's an objection is I'll -- it's Friday after all,

16   and I'll recess and we'll do instructions.  I'll give you a

17   package of instructions, tomorrow is the earliest I can do it,

18   and we'll see if we can't do the instructions conference

19   tomorrow.  That will have the virtue of giving you the time

20   that you reasonably require.

21             MR. DOWNING:  Okay.

22             THE COURT:  And then we'll go on.  But obviously, I'm

23   going to want to have some reasonably accurate -- if you intend

24   to offer evidence, I need to know how long you think it will be

25   and how many witnesses and so forth.

1     And if your client decides not to testify, I'm going
2  to have to voir dire him.

3          MR. DOWNING:  Understood.

4          THE COURT:  And I'll have to do that in open court.
5  All I'm going to do is ask him a few questions to ensure that
6  he knowingly and voluntarily waives his right to appear and
7  testify.

8          MR. DOWNING:  Thank you, Your Honor.

9          THE COURT:  All right.

10         MR. ANDRES:  And, Your Honor, will we then -- on
11 Monday, will we start at --

12         THE COURT:  At one o'clock.

13         MR. ANDRES:  Yeah, okay.

14         THE COURT:  And the reason for that is I don't live
15 here.

16         MR. ANDRES:  No, I'm all for it.

17         THE COURT:  I want to go home.

18         MR. ANDRES:  I think we all do.

19         THE COURT:  Where do you live?

20         MR. ANDRES:  New York.

21         THE COURT:  And where do you live?

22         MR. VAN GRACK:  In D.C.

23         THE COURT:  All right.  Well, you will fly home, and
24 Mr. Asonye is stuck here.

25         MR. ASONYE:  Yes, I am.

Rodriguez - Direct                                                    1905

1               THE COURT:  But aren't you-all glad that I insisted

2      that you have somebody from the Eastern District?

3               MR. ANDRES:  We are.  I'm not sure he is, but we are.

4               THE COURT:  I think he is, too, but there's a good --

5      that's why I always require that.

6               MR. ASONYE:  It's a good rule.

7               THE COURT:  And it is a good rule.

8               All right?

9               MR. ANDRES:  Thank you, Your Honor.

10              MR. DOWNING:  Thank you.

11              THE COURT:  But you've got what you need.

12              MR. DOWNING:  I appreciate that.

13              (End of bench conference.)

14              THE COURT:  All right.  You may bring the jury in,

15     Mr. Flood.

16                             (Jury present.)

17              THE COURT:  All right.  You may be seated.

18              Mr. Asonye, you may call your next witness.

19              MR. ASONYE:  The Government calls Taryn Rodriguez.

20              THE COURT:  All right.  Let's have Ms. Rodriguez.

21              Ms. Rodriguez, come forward and take the oath,

22     please, ma'am.

23              TARYN RODRIGUEZ, GOVERNMENT'S WITNESS, SWORN

24              THE COURT:  All right.  You may proceed.

25                          DIRECT EXAMINATION

Rodriguez - Direct                                                    1906

1   BY MR. ASONYE:

2   Q.   Could you please state and spell your name for the record?

3   A.   Taryn Rodriguez, T-a-r-y-n R-o-d-r-i-g-u-e-z.

4   Q.   And where do you live?

5   A.   Bronx, New York.

6   Q.   How far did you go in school?

7   A.   I have a GED, sir.

8   Q.   And are you currently employed?

9   A.   Yes, I am.

10  Q.   Where do you work?

11  A.   Citizens Bank.

12  Q.   How long have you worked there?

13  A.   Two-and-a-half years, approximately.

14  Q.   And what's your title?

15  A.   Loan officer assistant.

16  Q.   And what do you do as a loan officer assistant?

17  A.   I speak to clients, collect their documents, review their

18  documents, such as tax returns, asset statements.

19  Q.   And what position do you report to?

20  A.   Loan officer.

21  Q.   Which loan officer do you report to?

22  A.   David Fallarino.

23  Q.   And how many years of experience do you have in the

24  mortgage industry?

25  A.   Approximately 13 years.

1  Q.   Now, with respect to Citizens Bank, do you collect

2  information from the borrower for loans?

3  A.   Yes, I do.

4  Q.   And what type of information do you collect for

5  self-employed borrowers?

6  A.   Tax returns, profit and loss statements, balance sheets.

7  Q.   And does the borrower have to complete any other forms?

8  A.   As far as?  I'm sorry.

9  Q.   Do they have to complete a loan application?

10  A.   Yes, correct.

11  Q.   And all of those documents that are provided to the bank,

12  does the bank rely on the accuracy and completeness of those

13  records?

14  A.   Yes, we do.

15  Q.   In the loan application, does the borrower provide --

16  sorry -- promise that the information contained in the

17  application is complete and accurate?

18  A.   Yes.  On the third page.

19        THE COURT:  We're not going to cover anything that's

20  already been covered, are we?

21        MR. ASONYE:  No, Your Honor.  I'm not going to show

22  her any of those documents.

23        THE COURT:  Let's proceed.

24  BY MR. ASONYE:

25  Q.   Is -- I just want to go through the factors, make sure

Rodriguez - Direct                                                      1908

1    that they're -- they matter to the bank.

2              Does the debt-to-income ratio matter to the bank?

3    A.   Yes, it does.

4              THE COURT:  I think I've heard this before, and I

5    heard it from people -- from her bank senior to her.

6              MR. ASONYE:  Your Honor, as long as it's stipulated

7    on this loan that the same materiality factors exist from the

8    prior witness, I mean, I'm happy to skip through it.

9              THE COURT:  Is this a different loan?

10             MR. ASONYE:  It is a different loan.

11             THE COURT:  All right.  Go ahead.

12   BY MR. ASONYE:

13   Q.   Is the debt-to-income ratio an important factor in

14   determining whether to approve a loan at the bank?

15   A.   Yes, it is.

16   Q.   And would it matter to the bank if a borrower earned

17   income in a different year than he represented to the bank?

18   A.   Yes, it would.

19   Q.   The real estate owned -- the real estate owned, is that an

20   important factor the bank considers when trying to determine

21   whether to extend a loan?

22   A.   Yes, it is.

23   Q.   Does the borrower -- if the borrower is self-employed, do

24   they have to disclose all of the real estate owned by their

25   business as well?

Rodriguez - Direct                                              1909

1    A.    I don't believe so, but I'm not sure.

2    Q.    With respect to a cash-out refinance, does the bank ask

3    whether the funds will be -- how the funds will be used?

4    A.    Yes, we do.

5    Q.    And if a borrower intends to use the funds from a cash-out

6    refinance to obtain new debt, would the bank want to know that?

7    A.    Absolutely.

8    Q.    Why?

9    A.    Because it affects how you qualify the loan.  If there's

10   going to be new debt, we want to ensure that we factor that

11   debt in and they can still pay back the loan that we're giving

12   them.

13   Q.    And does the Citizens Bank require borrowers to notify the

14   bank of any new debt obtained during the loan process?

15   A.    Yes, we do.

16   Q.    And how do you do that?

17   A.    We normally disclose it to the borrower and advise them

18   that they should let us know.

19   Q.    Is it important to the bank whether a property is a rental

20   property versus a primary residence or a secondary residence?

21   A.    Yes, it is.

22   Q.    And are they treated differently?

23   A.    Yes, they are.

24   Q.    How do you know whether, the bank know whether property is

25   a rental property?

1    A.    Generally, there is rental income for that property listed

2    on a tax return.  So the borrower will claim the rental income

3    on their investment property.

4    Q.    And does the loan application also ask about rental

5    income?

6    A.    The loan application gives an area to list rental income,

7    yes, it does.

8    Q.    Okay.  Do -- does the bank use appraisers in connection

9    with loan applications?

10   A.    Yes, we do.

11   Q.    And what, if any, information about occupancy is contained

12   in the appraiser's report?

13   A.    On the first page of the report, there are three boxes

14   that the appraiser can check.  It's that the borrower is living

15   there, a tenant is living there, or the property is vacant.

16   Q.    According to the bank's rules, are processors and loan

17   officers allowed to communicate with the appraisers?

18   A.    No, we're not.

19   Q.    Why not?

20   A.    It could be a conflict of interest, so we go through a

21   third-party management system.  We place the order with them

22   and then they assign the appraiser.

23   Q.    Was Paul Manafort a customer of the bank?

24   A.    Yes, he was.

25   Q.    How many loans did he obtain from the bank?

Rodriguez - Direct                                                    1911

1    A.    I know of one that closed.

2    Q.    Okay.  Are you aware of any instance where he applied for

3    a loan but did not get it?

4    A.    Yes.

5    Q.    Do you recall having communications directly with

6    Paul Manafort regarding either of these loan applications?

7    A.    Via e-mail, yes.

8    Q.    Now, did you have access to documents related to

9    Paul Manafort's cash-out refinance loan on 29 Howard Street in

10   New York?

11   A.    Yes, I did.

12   Q.    And at what stage, if any, of that loan did you get

13   involved?

14   A.    Which loan, 29 Howard Street?

15   Q.    29 Howard Street.

16   A.    29 Howard Street, I had started working for the bank while

17   that loan was already approved.  So I got in at the end of that

18   loan, if I worked on it at all.

19   Q.    Okay.  And with respect to closing, is there any

20   requirement from the bank regarding a client's presence at

21   closing for a cash-out refinance?

22   A.    Yes, they must be present.  We don't allow power of

23   attorney.

24   Q.    Are you aware of a loan Paul Manafort applied for related

25   to a property at 377 Union Street in New York?

1    A.    Yes, I am.

2    Q.    What type of loan was that?

3    A.    Construction to permanent.

4    Q.    And was -- unlike the prior loan, was this loan eventually

5    approved by Citizens Bank?

6    A.    No, it was not.

7    Q.    And did you work on the loan for 377 Union Street from the

8    very beginning?

9    A.    Yes, I did.

10   Q.    Now, was a loan application for Paul Manafort prepared for

11   Union Street?

12   A.    Yes, it was.

13   Q.    Okay.  Who input the information into that loan

14   application?

15   A.    I did.

16   Q.    And how did you populate the loan application for the

17   Union Street loan?

18   A.    I used the final application for 29 Howard Street that was

19   presented at closing, and I transferred that information for

20   377 Union Street.

21   Q.    And how -- like, how far apart were -- was that time

22   period from when the Howard Street loan closed to when you

23   populated the information for the Union Street loan?

24   A.    I don't know exactly.  I would say approximately 30 days,

25   45 days.

Rodriguez - Direct                                                    1913

1   Q.   Okay.  Did you make any changes from what Paul Manafort

2   submitted to the bank on the Howard Street loan application

3   when you populated the Union Street loan application?

4   A.   No, I did not.

5   Q.   And after you input the information for the Union Street

6   loan using the Howard Street loan application, was that Union

7   Street loan application forwarded to Paul Manafort?

8   A.   Yes, it was.

9   Q.   How do you know?

10  A.   It's sent electronically in our system, so we have receipt

11  that it went out electronically, and it also gets sent out via

12  hard copy.

13  Q.   And did Paul Manafort have the opportunity to make any

14  changes to his Union Street loan application?

15  A.   Yeah.

16  Q.   And how would he have done that?

17  A.   By sending an e-mail to us or calling us, letting us --

18  letting us know if something needed to be changed.

19  Q.   Do you know if the loan application for Union Street was

20  eventually submitted to underwriting for the bank?

21  A.   It was.

22  Q.   On the borrower's side for the Union Street loan, who, if

23  anyone, did you talk to regarding this loan -- or communicate

24  with, I should say?

25  A.   Paul Manafort, Jeff Yohai, I'm not sure who else.  I can't

Rodriguez - Direct                                                    1914

1   really remember.  I remember those two names specifically.

2   Q.   And did you know who Jeff Yohai -- do you know -- did you

3   know his relationship with Paul Manafort?

4   A.   Yes.  I understood him to be Paul Manafort's son-in-law.

5   Q.   Okay.  All right.  Let me show you what's been marked as

6   Government Exhibit 255.

7            What is it?

8   A.   255, you said, correct?

9   Q.   Yes.

10  A.   This is the loan application for 377 Union Street.

11           MR. ASONYE:  Your Honor, Government moves 255 into

12  evidence.

13           MR. NANAVATI:  No objection, Your Honor.

14           THE COURT:  Admitted.

15           (Government Exhibit No. 255 was received in

16  evidence.)

17           MR. ASONYE:  May we publish?

18           THE COURT:  You may if you need to.

19  BY MR. ASONYE:

20  Q.   All right.  So if we can zoom in on the top third of this

21  document?

22           Who's the borrower -- the borrowers on this loan

23  application?

24  A.   Paul Manafort and Kathleen Manafort.

25  Q.   Okay.  And if you look at the top left, what is the amount

1    of this loan application?

2    A.    5.5 million.

3    Q.    And does it -- do you see what it says for purpose of the

4    loan?

5    A.    Yeah.

6    Q.    And what's the purpose of the loan?

7    A.    Construction to permanent.

8    Q.    Next to the right of that, what does it say the property

9    will be?  What box is checked?

10   A.    Primary residence.

11   Q.    And if you could turn to what I have as the second to the

12   last page, which is Page 6 of this document?

13          Do you see at the very bottom where it says, "real

14   estate owned"?

15   A.    Yes, I do.

16   Q.    Okay.  Does this section need to be accurate?

17   A.    Yes, it does.

18   Q.    If you turn to the final page of the loan application, do

19   you see where it says 377 Union Street?

20   A.    Yes.

21   Q.    Does Paul Manafort disclose the existence of any mortgages

22   on 377 Union Street?

23   A.    No.

24   Q.    Now, did Citizens Bank perform lien searches on every

25   property that's subject to a loan?

Rodriguez - Direct                                                    1916

1    A.    Yes, we do.

2    Q.    Okay.  And -- now, do you normally prepare those types of

3    searches for other properties that the borrower might own that

4    are not subject to the loan?

5    A.    No, we don't.

6    Q.    Okay.  Now, do you also conduct searches for property tax

7    information about a subject property for -- of a loan?

8    A.    Yes, I do.

9    Q.    Why do you do that?

10   A.    I do that to ensure that the loan is being qualified

11   properly and I'm accounting for all the proper taxes that the

12   borrower owes.

13   Q.    And what databases do you search?

14   A.    I search what's called ACRIS in New York City, A-C-R-I-S,

15   and I'll also search the public tax records.

16   Q.    What's ACRIS?

17   A.    It's a public records database that will tell you every

18   mortgage, lien, or deed that was done on a property.

19   Q.    And did you conduct those searches with respect to

20   377 Union Street for this loan?

21   A.    Yes, I did.

22   Q.    And when you conducted those searches, what, if anything,

23   did you learn?

24   A.    There was a mortgage on 377 Union Street.

25   Q.    Okay.  And did that conflict with the information we just

Rodriguez - Direct                                                          1917

1   looked at in the loan application?

2   A.   Yes, it did.

3   Q.   And when you conducted this search and found a lien on

4   377 Union Street, do you recall the amount of the lien?

5   A.   I don't know the exact amount, but I do know that it was

6   in the millions.

7   Q.   Now, does the bank want to know information about existing

8   liens on properties?

9   A.   Yes, yes.

10  Q.   Why do you want to know that?

11  A.   It affects the structure on the loan.  We need to know

12  what needs to be paid off.

13  Q.   And how important is existing lien information?

14  A.   Very important.

15  Q.   Had Mr. Manafort previously disclosed the existence of the

16  prior lien on 377 Union Street?

17  A.   Not that I'm aware of, no, not on this application.

18  Q.   In your experience, how unusual is it to not disclose a

19  loan on the subject property?

20  A.   Very unusual.

21  Q.   After you learned about the loan worth millions of dollars

22  on the Union Street property, what did you do?

23  A.   I had brought it to my loan officer, advised him that

24  there was a mortgage on the property, and that the loan would

25  need to be restructured.

1   Q.    And again, who was your loan officer?

2   A.    David Fallarino.

3   Q.    What was Paul Manafort required to do as a result of your

4   finding?

5   A.    He needed to provide the information on the mortgage.

6   Q.    And how, if at all, did it affect the loan structure?

7   A.    We would have to pay that lien off.  In this particular

8   case, assuming the loan would have gone forward, it would have

9   potentially lowered the amount of cash that he would have

10  received towards the construction project.

11  Q.    Now, also on this loan application, does Mr. Manafort

12  disclose a $1 million business loan from the Banc of California

13  guaranteed by him personally?

14  A.    No, he does not.

15  Q.    How unusual is it, in your experience, to not disclose two

16  loans worth over a million dollars on a loan application?

17          MR. NANAVATI:  Objection.  Relevance, Your Honor.

18          THE COURT:  I can't hear you.

19          MR. NANAVATI:  Objection.  Relevance.

20          THE COURT:  What's the question again, Mr. Asonye?

21          MR. ASONYE:  In her experience, how unusual is it to

22  not -- for a borrower not to disclose two loans worth over a

23  million dollars on a loan application?

24          THE COURT:  I'll sustain the objection.  What

25  difference does it make whether it's common or not common or

Rodriguez - Direct                                                    1919

 1   anything else?

 2          MR. ASONYE:  I think it -- I think it goes to

 3   intentionality, Your Honor.

 4          THE COURT:  No.

 5          MR. ASONYE:  Fair enough.  I'll move on.

 6   BY MR. ASONYE:

 7   Q.   Is it -- is that information the bank would want to know,

 8   that there are two -- more than $1 million loans on -- that are

 9   not disclosed?

10   A.   Yes, that's information the bank would want to know.

11   Q.   All right.  Let me show you Government Exhibit 252.

12          Does this relate to Mr. Manafort's loan on Union

13   Street?

14   A.   Yes, it does.

15          MR. ASONYE:  All right.  Your Honor, Government moves

16   252 into evidence.

17          MR. NANAVATI:  Without objection, Your Honor.

18          THE COURT:  Admitted.

19          (Government Exhibit No. 252 was received in

20   evidence.)

21          MR. ASONYE:  May we publish?

22          THE COURT:  Yes.

23   BY MR. ASONYE:

24   Q.   Who is this loan from -- I'm sorry, loan.  Who is this

25   e-mail from?

Rodriguez - Direct                                                    1920

1    A.    It's from me.

2    Q.    Okay.  If you turn to the fourth page, the e-mail on

3    March 11 at 10:02, do you see there's a starred paragraph?  It

4    starts, "We are."  Can you go ahead and read that to the jury?

5    A.    "We are now aware of the one loan on 377 Union.  We do

6    need the statement on this, please."

7    Q.    Okay.  And who sent that e-mail?

8    A.    David Fallarino.

9    Q.    Okay.  How did he -- what is that in reference to?

10   A.    He's referencing the loan that I found when I searched

11   ACRIS, so he's asking for the mortgage statement on it.

12   Q.    So you found that loan; is that correct?

13   A.    Yes.

14   Q.    Mr. Manafort didn't tell you about the loan; is it

15   correct?  You didn't learn about that loan from Mr. Manafort?

16   A.    Correct.

17   Q.    And just below --

18         THE COURT:  Where did you find out about the loan?

19         THE WITNESS:  On ACRIS, the database that I searched,

20   Your Honor.

21         THE COURT:  Next question.

22         MR. ASONYE:  The Court's indulgence.

23   BY MR. ASONYE:

24   Q.    Okay.  And then if you'd look at the -- there's a bullet

25   point for occupancy and then there's two stars below that.  Can

1   you go ahead and read that sentence?

2   A.   "If they kick us to a second home, we will be max LTV at

3   60 percent."

4   Q.   What does that mean?

5   A.   It means that if we switch occupancy from primary to

6   second home, his loan-to-value will probably decrease.

7   Q.   So Mr. Manafort had represented that 377 Union was his

8   primary residence?

9   A.   Yes, that's correct.

10  Q.   And that -- did that allow him to get better terms?

11  A.   It would be probably be the same type of terms as a second

12  home.

13  Q.   Did it allow him --

14  A.   Maybe -- it may be a little less.

15  Q.   Did it allow him to have a better LTV, a more -- a looser

16  LTV?

17  A.   In this case, yes, it did.

18  Q.   Okay.  Now, could you read the next paragraph, below that,

19  "We are pushing"?

20  A.   "We are pushing the DTI on this.  We will need to see 2015

21  tax returns (of course we will need equal or better income than

22  2014).  Also, we will need to talk to Cindy to make sure the

23  K-1s for DMP have distribution income that matches Ordinary

24  Business Income (which should be the case after the 1.5 million

25  forgiven loan - but we need to confirm this.)  Also, the

1    returns should be e-filed."

2    Q.    Okay.  I'm going to sort of break this down by issue.

3          If you could explain, if you know, to the jury what

4    this means.

5    A.    Sure.

6    Q.    The first sentence says, "We're pushing DTI on this."

7    What does that mean?

8    A.    It means we're very close to the maximum DTI allowed on

9    that loan.

10   Q.    And that's as a primary residence; is that correct?

11   A.    I believe so based on this e-mail.

12   Q.    The second issue:  Do you know why income needs to be

13   equal or better than 2014?

14   A.    Because when you're looking at income to qualify a loan,

15   you want to see a stable or increasing trends in order to use

16   that income to qualify.

17   Q.    Okay.  And what happens if you show a decreasing trend?

18   A.    You use the decreasing number for income or you may not be

19   able to use it at all.  It would depend on the situation.

20   Q.    And then there's some indication that -- why does

21   distribution income need to match ordinary business income?

22   What does that mean?

23   A.    Ordinary business income is the income that's filed on the

24   tax return that they made for their business.  Distribution

25   income is what they actually took from the business.  It's --

Rodriguez - Direct                                                        1923

1   that figure is not always the same.

2   Q.   And then finally, it says something about e-filed returns.

3   What does that mean?

4   A.   To e-file them, to send them electronically.

5   Q.   Why does that matter?

6   A.   They just get filed faster, that way, instead of via

7   regular snail mail, as we call it, where it would take weeks

8   for them to get with the IRS.

9   Q.   Okay.  Let me show you what's marked as Government

10  Exhibit 248.  Is that also an e-mail discussing this loan?

11  A.   Yes, it is.

12          MR. ASONYE:  Your Honor, Government moves 248 into

13  evidence.

14          MR. NANAVATI:  Without objection.

15          THE COURT:  Admitted.

16          (Government Exhibit No. 248 was received in

17  evidence.)

18  BY MR. ASONYE:

19  Q.   Okay.  And if you could turn --

20          MR. ASONYE:  May we publish?

21          THE COURT:  Yes.

22  BY MR. ASONYE:

23  Q.   If you could turn to the second page.

24          At the bottom e-mail, who is that e-mail from?

25  A.   Is that the e-mail Monday, April 18?

Rodriguez - Direct                                                    1924

1    Q.   At -- yes, at 1:57 p.m.?

2    A.   That e-mail is from David Fallarino.

3    Q.   Okay.  And in the first paragraph, what does David

4    Fallarino say will be needed?

5    A.   Item No. 1?

6    Q.   Yes.

7    A.   (As read):  "A letter from Cindy indicating that the

8    difference in 'ordinary income' and 'distribution income' on

9    the DMP K-1 in 2015 was due to a loan that was forgiven in

10   2015.  And that the -- in 2015, the distribution income will

11   match the ordinary income as it has in the past."

12   Q.   And then what's the second issue that he says is

13   necessary?

14   A.   "An occupancy letter from Paul stating that this will be

15   his 'primary' home in New York City."

16   Q.   And if you could skip to just the last sentence of that

17   paragraph?

18   A.   "And the 29 Howard Street would be occupied full time by

19   Jeff and Jessica."

20   Q.   Okay.  Now, something I didn't ask you:  The bank, is

21   Mr. Fallarino an employee of the bank?

22   A.   Yes, he is.

23   Q.   Okay.  But who actually owns the bank?

24   A.   It's a publicly traded company.  In a bank, it's the

25   shareholders who own it.

Rodriguez - Direct                                          1925

1    Q.   Okay.  Now, did the bank receive both of the documents

2    that are referenced in this e-mail?

3    A.   Yes, we did.

4    Q.   Did the bank rely --

5            THE COURT:  I think -- just to point out to you, I

6    think we have heard testimony about who owned the bank from

7    another witness.  And you took the risk of getting somewhat

8    different answers from a lower-ranking employee.

9            Let's see if we can't really sharply focus this.

10   BY MR. ASONYE:

11   Q.   Did the bank rely on both of those -- the documents that

12   were received?

13   A.   Yes, we did.

14   Q.   Why did the bank need an occupancy letter?

15   A.   We asked for the occupancy letter because we're doing the

16   home as a primary residence, but it's under construction.  So

17   we'd want something in the file attesting that the borrower

18   will be residing in it that way once the construction is

19   completed.

20   Q.   Now, if you turn to the front of this, first page of this

21   e-mail?  Now, if we can just focus at the top e-mail?  What

22   does the top e-mail say?  Just the -- if you -- it's to Rick

23   Gates.  What does it say?

24   A.   "Can we do these two things ASAP?"

25   Q.   Okay.  And what's the e-mail address that that's from?

Rodriguez - Direct                                                      1926

1    A.   Pm22314@gmail.com.

2    Q.   Okay.  Now, if I could show you Government Exhibit 230.

3              Is this also an e-mail relating to the occupancy of

4    this property?

5    A.   Yes, it is.

6              MR. ASONYE:  Your Honor, Government moves 230 into

7    evidence.

8              MR. NANAVATI:  No objection, Your Honor.

9              THE COURT:  Admitted.

10             (Government Exhibit No. 230 was received in

11   evidence.)

12             MR. ASONYE:  Okay.  And may we publish, Your Honor?

13             THE COURT:  Yes, you may.

14   BY MR. ASONYE:

15   Q.   The bottom e-mail is from Paul Manafort.  What is the

16   subject of the e-mail?

17   A.   "Primary residence letter - Union Street."

18   Q.   And what does he say in the e-mail?

19   A.   "David, I have attached the letter you requested.  Paul."

20   Q.   And if you turn to the next page, if we could just look at

21   this -- if we could blow up the letter.

22             Whose letterhead is on the top of this letter?

23   A.   Paul Manafort's.

24   Q.   Okay.  And who is it to?

25   A.   David Fallarino.

Rodriguez - Direct                                                    1927

1   Q.   What is the date?

2   A.   May 2, 2016.

3   Q.   And could you go ahead and read the letter?

4   A.   (As read):  "David, it is my intention to use the

5   brownstone on 277 Union Street, Brooklyn, New York, as my

6   primary residence once the construction is completed."

7   Q.   And now, with respect to -- there wasn't a loan for 277

8   Union Street, was there?

9   A.   No, I understood this to be a typo.

10  Q.   It should say 377?

11  A.   I believe so, yes.

12  Q.   Okay.  Now, this indicates that Mr. Manafort intended to

13  use 377 Union as his primary residence, but did he already

14  represent 29 Howard Street as his second residence on the

15  Howard Street loan application?

16  A.   From what I remember, yes.

17  Q.   All right.  Let me show you Government Exhibit 251.

18         Okay.  Is this another e-mail from Paul Manafort to

19  the bank relating to this property?

20  A.   Yes, it is.

21         MR. ASONYE:  Your Honor, Government moves 251 into

22  evidence.

23         MR. NANAVATI:  No objection, Your Honor.

24         THE COURT:  Admitted.

25         (Government Exhibit No. 251 was received in

Rodriguez - Direct                                                1928

1   evidence.)

2              MR. ASONYE:  Okay.  May we publish?

3              THE COURT:  Yes.

4   BY MR. ASONYE:

5   Q.   Okay.  If you look at the second e-mail from the top, from

6   Mr. Fallarino, at 2:40, is -- who is that to?

7   A.   Paul Manafort.

8   Q.   Okay.  And are you also on the e-mail?

9   A.   Yes, I am.

10  Q.   And is Rick Gates on the e-mail?

11  A.   Yes, he is.

12  Q.   Okay.  Go ahead and read that e-mail, please.

13  A.   (As read):  "Hi, Paul, can you add to this letter that

14  Jeff and Jessica will occupy 27 Howard (and you will no longer

15  share that with them once the home is complete).

16              "We want the structure to be clear to the

17  underwriter - so any additional color is good.

18              "We had Jeff and Jessica and their kids at Howard.

19              "Your other daughter also in Manhattan.

20              "You and Kathleen will use Union Street once

21  complete.

22              "We also need a change to Cindy Laporta's letter.

23  Can I reach out to her directly?"

24  Q.   Okay.  And then does Mr. Manafort respond at the top

25  e-mail.

1   A.   He does.

2   Q.   And what does he say?

3   A.   (As read):  "Rick, please deal with Fallarino regarding

4   the change he needs in Laporta letter.  Do this this morning.

5   Thanks, P."

6   Q.   And is Rick Gates on that e-mail as well?

7   A.   Yes, he is.

8   Q.   Okay.  Let me show you Government Exhibit 250.

9        Is this a document that the bank received?

10  A.   Yes, it is.

11  Q.   Does it relate to the Union Street loan application?

12  A.   Yes, it does.

13       MR. ASONYE:  Your Honor, Government moves 250 into

14  evidence.

15       MR. NANAVATI:  No objection, Your Honor.

16       THE COURT:  It's admitted.

17       (Government Exhibit No. 250 was received in

18  evidence.)

19       MR. ASONYE:  And may we publish?

20       THE COURT:  You may.

21  BY MR. ASONYE:

22  Q.   This -- is this a similar letter from the previous

23  occupancy letter that you testified about?

24  A.   Yes, it is.

25  Q.   Okay.  Is there a new paragraph in this letter?

Rodriguez - Direct                                                        1930

1   A.   Yes, there is.

2   Q.   Can you go ahead and read that second paragraph?

3   A.   "Once I move out of Howard Street, it is the intention of

4   my daughter, Jessica, and her family to move into the Howard

5   condo."

6   Q.   Now, do you know if Mr. Manafort had previously

7   represented that his daughter was already living in the Howard

8   Street condo?

9   A.   I don't know.

10  Q.   And is this letter signed by Paul Manafort?

11  A.   I believe it to be, yes.

12  Q.   Now, did the bank rely on Mr. Manafort's representations

13  in this letter about occupancy, both of himself and his

14  daughter?

15  A.   Yes, we did.

16  Q.   Okay.  Let me show you Government Exhibit 254.

17       Does this, again, also relate to the Union Street

18  loan?

19  A.   Yes, it does.

20       MR. ASONYE:  Your Honor, Government moves 254 into

21  evidence.

22       MR. NANAVATI:  No objection, Your Honor.

23       THE COURT:  All right.  It's admitted.

24       (Government Exhibit No. 254 was received in

25  evidence.)

1              MR. ASONYE:  May we publish?

2              THE COURT:  And you may publish.

3    BY MR. ASONYE:

4    Q.   And if we could zoom in on the top e-mail.

5              Who is it from?

6    A.   Rick Gates -- oh, I'm sorry, no, it's from Paul Manafort.

7    I'm sorry.

8    Q.   That's okay.  And who is it to?

9    A.   Rick Gates.

10   Q.   What's the subject?

11   A.   "Manafort items needed."

12   Q.   Okay.  And what does Mr. Manafort say in this e-mail?

13   A.   "I need this done by COB tomorrow.  Please confirm to me

14   when done."

15   Q.   Okay.  And then is the bottom e-mail from you?

16   A.   Yes, it is.

17   Q.   Okay.  And if you could turn to the second page.  What are

18   the items that you identify in paragraph 5 and in paragraph 7?

19   Could you read those two numbered paragraphs to the jury?

20   A.   Number 5 is, "Signed 2016 year-to-date profit and loss

21   statements for all businesses - not yet requested.  Updated CPA

22   letter without the additional sentence for 2015 K1 - requested

23   from Rick."

24   Q.   Okay.  Do you know why you needed the 2016 year-to-date

25   profit and loss statements for all businesses?

1   A.   It would have been required at that time for where we were

2   in the year.

3   Q.   Okay.  And then for 7, you referenced the CPA letter?

4   A.   Correct.

5   Q.   Do you know why you indicated that you needed to request

6   it from Rick?  Why did you request it from Rick Gates?

7   A.   I don't remember.  I don't remember who told me to do

8   that.

9   Q.   Okay.  And did the bank ultimately get the profit and loss

10  statement?

11  A.   We did.

12  Q.   All right.  Let me show you Government Exhibit 257.

13           MR. ASONYE:  And, Your Honor, I believe 257 is in.

14  May we publish?

15           THE COURT:  You may.

16  BY MR. ASONYE:

17  Q.   And is this e-mail from you?

18  A.   Yes, it is.

19  Q.   Okay.  And can you go ahead and -- can you read the third

20  sentence, the 2015 figures?  Can you go ahead and read that

21  sentence?

22  A.   "The 2015 figures were light because the client received

23  payment in 2016 from one of his clients."

24  Q.   And go ahead and finish off that paragraph.

25  A.   (As read):  "Attached you will find the 2016 year-to-date

Rodriguez - Direct                                                      1933

1    P&L for DMP International reflecting $1,761,952 in income.

2    This combined with 2015 figures, which was 400,000, would

3    support the income used from 2013 and 2014."

4    Q.   Okay.  What did you mean when you said the 2015 figures

5    were light because the client received payment in 2016 from one

6    of his clients?

7    A.   We understood it to mean that there was work completed in

8    2015, but the client didn't receive payment until 2016.

9    Q.   And whose representation did you rely on when you made

10   that statement?

11   A.   The borrower's.

12   Q.   Would it matter to the banker if DMP International, Paul

13   Manafort's company, made no money, zero dollars, in 2016?

14   A.   Yes, it would.

15   Q.   Would it matter to the company if DMP's year-to-date

16   income for 2016 as of July 31, '16, was actually a loss of over

17   $600,000?

18   A.   Yes, it would.

19   Q.   And if you'd turn to page 3, the attached profit and loss

20   statement.

21          What does it indicate was the net income for DMP

22   International as of July 31, 2016?

23   A.   $1,761,952.

24   Q.   And did the bank rely on that statement?

25   A.   Yes, we did.

Rodriguez - Direct                                                    1934

1    Q.   What did you do with this document once you received it?

2    A.   It was forwarded to underwriting.

3    Q.   And what did -- why did you forward it to underwriting?

4    A.   Ultimately, they're the one who reviews the documentation

5    and either accepts it or asks for additional information.

6    Q.   Now, if this profit and loss statement was fabricated,

7    would the bank want to know that?

8    A.   Absolutely.

9    Q.   Why would you want to know if it was fabricated?

10   A.   Because it's a false document and we need an accurate

11   representation of the borrower's income.

12   Q.   What would you have done if you were -- if you found out

13   that this document was fabricated?

14   A.   I would have brought it to my upper management.

15   Q.   I'm sorry?

16   A.   I would have brought it to upper management.

17   Q.   Now, your previous -- one of the previous exhibits we

18   discussed referenced paragraph 7, a CPA letter; is that

19   correct?

20   A.   Yes, it is.

21   Q.   Okay.  Did you end up getting that CPA letter as well?

22   A.   Yes, we did.

23   Q.   All right.  Let me show you Government Exhibit 249.  Is

24   this an e-mail to you regarding this Union Street loan

25   application?

Rodriguez - Direct                                                          1935

1    A.   Yes, it is.

2            MR. ASONYE:   Your Honor, Government moves 249 into

3    evidence.

4            MR. NANAVATI:   No objection, Your Honor.

5            THE COURT:   Admitted.

6            (Government Exhibit No. 249 was received in

7    evidence.)

8            MR. ASONYE:   May we publish?

9            THE COURT:   Yes.

10   BY MR. ASONYE:

11   Q.   Okay.  If you could -- if you could highlight the e-mail.

12           And if you look at the bottom e-mail, who's the

13   bottom e-mail from?

14   A.   Paul Manafort.

15   Q.   And who's it to?

16   A.   David Fallarino.

17   Q.   What's the date of the e-mail?

18   A.   May 2, 2016.

19   Q.   And what is the subject?

20   A.   "KWC letter."

21   Q.   Okay.  Go ahead and read the e-mail.

22   A.   "David, here is the letter you requested.  Paul."

23   Q.   And is there a letter that's attached?

24   A.   Yes, there is.

25   Q.   Okay.  Turn to the next page, if you would.  Is this the

1    CPA letter?

2    A.    Yes.

3    Q.    And who is it from?

4    A.    Cindy Laporta.

5    Q.    Is there a reference in this letter about a forgiven $1.5

6    million loan which would be income in 2015?

7    A.    Yes, there is.

8    Q.    Did the bank rely on that information?

9    A.    Yes, we did.

10   Q.    If you learned that this loan was not forgiven in 2015 but

11   was actually supposedly forgiven in 2016, could that have

12   affected the bank's lending decision?

13   A.    Yes.  Well, it would have affected how we calculated

14   income.

15   Q.    Okay.  And if you learned that this forgiveness letter was

16   backdated, could it affect the bank's lending decision?

17   A.    Yes.  Again, it would affect how we calculated income.

18   Q.    Also, let me ask you this, Ms. Rodriguez:  If Mr. Manafort

19   or his businesses had millions of dollars of overseas loans, is

20   that something that he would need to disclose to the bank?

21   A.    Yes.

22   Q.    And if his businesses internally had millions of dollars

23   of loans in between then, his own controlled entities, was that

24   something the bank would want to know too?

25   A.    Yes.  Generally speaking, that would be disclosed on the

Rodriguez - Cross                                                      1937

1   tax returns, most likely.

2   Q.   Was the Union Street loan ever funded?

3   A.   No, it was not.

4   Q.   Do you know why?

5   A.   No, I don't.  I was never given a specific reason for it,

6   me personally.  I was just told that we weren't moving forward

7   with the loan.

8              MR. ASONYE:  The Court's indulgence?

9              No further questions, Your Honor.

10             THE COURT:  All right.  Mr. Nanavati.

11             MR. NANAVATI:  Yes, Your Honor.  Thank you.

12             THE COURT:  You might want to spend time on a loan

13   that was granted.

14             MR. NANAVATI:  Thank you, Your Honor.

15             MR. ASONYE:  Your Honor, I just want to note that

16   this is a -- this is a charged count in the indictment.

17             THE COURT:  I know that.

18             MR. ASONYE:  Oh, okay.

19                          CROSS-EXAMINATION

20   BY MR. NANAVATI:

21   Q.   Ms. Rodriguez, my name is Jay Nanavati.  I represent Paul

22   Manafort.  How are you today?

23   A.   Good.  How are you?

24   Q.   Good.  Thank you.

25             Regarding the Union Street construction loan, is it

1    fair to say that this loan never closed?

2    A.   Yes, that's correct, sir.

3    Q.   Okay.  And no money ever changed hands; is that correct?

4    A.   On this loan, no, it did not.

5    Q.   And is it also fair to say that as of July 13 of 2016,

6    this loan was -- this loan was still moving toward closing?

7    A.   I don't know the exact date.

8    Q.   Can I have you pull up Government Exhibit 255, please?

9    A.   Sure.

10   Q.   Are you there yet?

11   A.   Yeah, I'm here.

12   Q.   Okay.  And can you tell me what that document is and what

13   it's dated?

14   A.   This is the loan application form for 377 Union, and it's

15   dated July 13, 2016.

16   Q.   Okay.  And as of July 13, things were still ongoing,

17   right?

18   A.   Yes, they were.

19   Q.   And that document was just a first draft of an

20   application, correct?

21   A.   The initial application, yes, that's correct.

22   Q.   Okay.  But you'd call it a first draft of an application?

23   A.   We actually call it the initial application.

24   Q.   Okay.  Do you know whether you've referred to it as a

25   first draft before?

Rodriguez - Cross                                                          1939

1    A.    I don't believe so.

2    Q.    Okay.  Do you remember whether you have?

3    A.    No.

4    Q.    Okay.  Would it refresh your recollection to look at the

5    notes of your interview with the FBI?

6    A.    Sure.

7              MR. NANAVATI:  It's July 3, '18, page 1.

8              THE COURT:  Do you need an opportunity to confer?

9              MR. NANAVATI:  Your Honor, I did, and I should have

10   asked for it, but I've done that now and would ask Your Honor

11   if I can show the witness something that has some underlining

12   on it.

13             THE COURT:  Mr. Asonye?

14             MR. ASONYE:  You know what?  I'll just give him mine

15   which is blank, Your Honor.

16             THE COURT:  All right.

17             MR. ASONYE:  We can use that.

18   BY MR. NANAVATI:

19   Q.    Ms. Rodriguez, if you could look at page 4 of -- of that

20   memorandum?

21   A.    Um-hum.

22   Q.    And do you see under the heading "Rodriguez" -- or, I'm

23   sorry -- "Uniform Residential Loan Application," do you see

24   that in bold?

25   A.    I do.

Rodriguez - Cross                                                      1940

1  Q.   And you don't -- don't read it out loud, but do you see

2  the line immediately under that?

3  A.   I do.

4  Q.   Okay.  Having looked at that, but not reading it out loud,

5  does it refresh your recollection as to whether you've referred

6  to that document as a first draft of the application?

7  A.   No.  I normally say initial loan application.

8  Q.   Okay.  And you also had said on -- on direct that you

9  filled out the loan application using information from the

10 Howard Street, earlier Howard Street loan application, correct?

11 A.   Yeah, that's correct.

12 Q.   Okay.  So the accuracy of this loan application we're

13 talking about depended in large part on the accuracy of the

14 Howard Street loan application, correct?

15 A.   The initial application did, yes.

16 Q.   And are you aware that before the date of the Howard

17 Street application, Mr. Manafort told the bank about the

18 mortgage on Union Street?

19 A.   No, I'm not.

20 Q.   But you are aware that on March 11 of 2016, Mr. Fallarino

21 indicated that he was aware of that mortgage on Union Street,

22 correct?

23 A.   No, I'm not.

24          MR. NANAVATI:  The Court's indulgence one moment?

25          THE COURT:  All right.

Rodriguez - Cross                                                    1941

1   BY MR. NANAVATI:

2   Q.   Do you have Defendant's Exhibit 27 up there anywhere?  It

3   has a large black box on the first page of it.  It should not

4   be in your binder.

5            That's already in evidence, but I wonder if you could

6   look at it and turn to the second page of it.

7   A.   Got it.

8   Q.   Okay.  And do you see an e-mail dated March 11, 2016?

9   A.   Yes.

10  Q.   Do you see yourself copied on it?

11  A.   Yes.

12  Q.   Do you see Mr. Fallarino as the author?

13  A.   Yes.

14  Q.   Do you see a line, heading toward the bottom of the page,

15  with an asterisk starting, "We are now"?

16  A.   Yes.  This is the same e-mail from earlier.

17  Q.   Right.  So that date is March 11, correct?

18  A.   Yes.

19  Q.   Where Mr. Fallarino says, "We are now aware of the loan on

20  377 Union"?

21  A.   Yes.

22  Q.   And as of July 13, a few months later, this loan was still

23  moving toward closing, correct?

24  A.   Yes, it was.

25            MR. NANAVATI:  Okay.  The Court's indulgence, one

Rodriguez - Cross                                                    1942

1    moment.

2    BY MR. NANAVATI:

3    Q.    And if I could have you turn, please, to Exhibit 248,

4    please.

5    A.    Got it.

6    Q.    Do you remember looking at that one on direct examination?

7    A.    Yes.

8    Q.    And I wonder, do you remember being asked to read the

9    paragraph that is called No. 2 on the second page?

10   A.    On the second page?  Yes.

11   Q.    And do you remember you were asked to skip over a line

12   when you read it?

13   A.    Yes.

14   Q.    Could you read paragraph No. 2 out loud without skipping

15   over the line?

16   A.    Yes.

17   Q.    Go ahead, please.

18   A.    (As read):  "An occupancy letter from Paul stating that

19   this will be his primary home in New York City, we know his

20   primary is in Florida but meaning this would be his main house

21   in New York, we would consider this the second home as far as

22   loan purposes."

23   Q.    And this is authored by Mr. Fallarino, correct?

24   A.    That is correct.

25   Q.    On behalf of Citizens Bank?

1   A.   Yes.

2   Q.   And as far as you know, Mr. Fallarino still works at

3   Citizens Bank?

4   A.   Yes.

5   Q.   And wouldn't he really be the person to talk about this

6   e-mail instead of you?

7            MR. ASONYE:   Objection, Your Honor.

8            THE COURT:   What's the nature of the objection?

9            MR. ASONYE:   First of all, it's argumentative.

10           THE COURT:   No, what's the --

11           MR. ASONYE:   It's argumentative.  He's arguing.

12           THE COURT:   Argumentative.  I'll overrule it.  It may

13   not be relevant what this witness' view is about who is the

14   appropriate person.

15           MR. ASONYE:   I'll object to relevance, then, Your

16   Honor.

17                         (Laughter.)

18           THE COURT:   All right.  Do you want the question?

19           MR. NANAVATI:   Did Your Honor -- I'd like it, yes,

20   depending on Your Honor's view of the matter.

21           THE COURT:   I'll sustain it.  It's pretty obvious

22   that the person who wrote it would be the best person, but

23   Mr. Asonye's objection doesn't mean that it has to be that

24   person.  This exhibit is in evidence, and they're not required

25   to produce this person.

1            MR. NANAVATI:  Thank you, Your Honor.

2    BY MR. NANAVATI:

3    Q.    And, Ms. Rodriguez, I want to take you to the Howard

4    Street home for a moment, not literally, and was going to ask

5    you:  You don't know who was living at Howard Street, do you?

6    A.    No.  I didn't really have any involvement in that loan.

7    Q.    And you don't know Jeff Yohai or Jessica Manafort, do you?

8    A.    Personally?  No.

9    Q.    Okay.  And you don't know whether that was their home?

10   A.    No, I don't.

11   Q.    Or whether they split their year in California?

12   A.    No idea.

13   Q.    Okay.  And, Ms. Rodriguez, regarding lending on a -- on a

14   property that has rental income, there was no prohibition at

15   the time we're talking about of lending on a property where the

16   borrower used Airbnb, is there -- was there at that time?

17   A.    No, not that I'm aware of.

18   Q.    Okay.  And as we stand here today, there's even a -- your

19   company has an agreement with Airbnb and Fannie Mae to allow

20   Airbnb income to be used to qualify for mortgages, correct?

21           MR. ASONYE:  Objection.  Relevance as to today's

22   policy.

23           THE COURT:  I'll sustain it.  Didn't this come up in

24   a previous witness?

25           MR. NANAVATI:  It did, Your Honor.

1          THE COURT:  And what happened there?  Didn't I

2   sustain the objection?

3          MR. NANAVATI:  I don't believe there was an

4   objection, but I'm not willing to stake my life on it.

5          THE COURT:  Well, there you have it.  And the jury

6   can consider that answer, but this answer they can't have.

7          MR. NANAVATI:  Thank you, Your Honor.

8          THE COURT:  Even though -- go ahead.

9          MR. NANAVATI:  Thank you, Your Honor.  The Court's

10  indulgence, one moment.

11         THE COURT:  Yes.

12  BY MR. NANAVATI:

13  Q.   And earlier you were talking about profit and loss

14  statements, correct?

15  A.   Yes, I was.

16  Q.   And are you aware that profit and loss statements can be

17  either cash method, cash basis or accrual basis?

18  A.   Yes.

19  Q.   And you're aware that a year-to-date profit and loss

20  statement can be cash basis or accrual basis, correct?

21  A.   Yes.

22  Q.   And do you know what an account receivable is?

23  A.   I have a vague understanding of it.

24         MR. NANAVATI:  Okay.  The Court's indulgence, please?

25  BY MR. NANAVATI:

1  Q.   And although this loan never closed, at some point, at

2  least the proposed structure of the loan took account of the

3  preexisting mortgage on Union Street, correct?

4  A.   Yes.  We did have to restructure the loan to account

5  paying that off.

6           MR. NANAVATI:  Thank you, Your Honor.  No further

7  questions.

8           THE COURT:  Any redirect?

9           MR. ASONYE:  Yes, Your Honor.

10           THE COURT:  Briefly, right?

11           MR. ASONYE:  I think I have two topics, Your Honor.

12           THE COURT:  All right.

13                        REDIRECT EXAMINATION

14  BY MR. ASONYE:

15  Q.   Do you remember defense counsel was asking you about

16  Government Exhibit 252, which is Defense Exhibit 27?

17           If we could pull that up.  I don't have to publish

18  it, but if you can pull up -- I believe it's the fourth page of

19  252, where Mr. Fallarino indicates that he's now aware of the

20  one loan on 377 Union Street?

21  A.   Yes.

22  Q.   Okay.  How did he become aware of the one loan on Union

23  Street?

24  A.   I brought it to him.

25  Q.   Okay.

1   A.   I believe that's how he became aware of it, from my

2   understanding.

3   Q.   All right.  And that was based on your research?

4   A.   Yeah, that's correct.

5   Q.   To your knowledge, did the borrower make him aware of this

6   loan?

7   A.   Not to me, no.

8   Q.   And then Mr. Nanavati asked you about cash-based P&Ls and

9   accrual-based P&Ls, right?

10  A.   Yes.

11  Q.   If we could we pull up Government Exhibit 257?

12        And what's your understanding of what an

13  accrual-based P&L is?

14  A.   Accrual means it's over time.  Cash basis means as soon as

15  it comes up.

16  Q.   So your understanding is cash basis means you receive the

17  funds?

18  A.   Accrual means you're due to receive the funds, yes,

19  correct.

20  Q.   And.  Did you understand this to suggest that this P&L was

21  perhaps based an accrual-based P&L?

22  A.   I don't remember.

23  Q.   Well, if you look at the first page of this e-mail,

24  your -- the third sentence that you wrote about the 2015

25  figures were light because the client received the payment, did

1    that indicate that this P&L was an accrual-based P&L if the

2    payment was received?

3    A.   Yes.

4    Q.   I'm sorry?

5    A.   Yes, it did.

6    Q.   It indicated it was what type of P&L?

7    A.   An accrual-based P&L.

8    Q.   When you're using a cash-based P&L, is that when funds

9    have been received?

10   A.   Yes.

11             MR. ASONYE:  No further questions, Your Honor.

12             THE COURT:  Yes, Mr. Nanavati?  You have a bit more?

13             MR. NANAVATI:  A tiny bit, Your Honor.

14             THE COURT:  All right.  Proceed.

15                        RECROSS EXAMINATION

16   BY MR. NANAVATI:

17   Q.   Ms. Rodriguez, you said your research is where you believe

18   Mr. Fallarino learned about the -- the Union Street mortgage,

19   correct?

20   A.   Yes.

21   Q.   Did your research, in addition to looking at this ACRIS

22   database, did it include talking to Ms. James?

23   A.   No.

24   Q.   Okay.  Or, Ms. Francis, whatever you know her as?

25   A.   You know, I really don't remember.  I don't remember.

1    Q.   Did it involve looking at the insurance documents that she

2    had in her files?

3    A.   Absolutely.  I would have transferred those documents

4    over.

5    Q.   Okay.  And that included the insurance documents that

6    revealed the existence of the mortgage?

7    A.   No.  Actually, we had an insurance document with no

8    mortgagee on it.

9    Q.   And -- and then -- but you did not go to the insurance

10   documents from the current time, correct?

11   A.   No.  I mean, I pulled the documents from 29 Howard Street

12   and transferred them over, correct.

13   Q.   I guess what I mean is you didn't go to the insurance

14   documents that covered the period at issue, did you?

15   A.   I pulled the documents from the 29 Howard Street, so

16   whatever documentation was there is what I used.

17        MR. NANAVATI:  Okay.  Thank you.  No further

18   questions.

19        THE COURT:  Thank you.  You may step down.

20                  (Witness excused.)

21        THE COURT:  Call your next witness.

22        MR. ASONYE:  The Government calls Gary Seferian.

23        THE COURT:  Come forward, sir, and take the oath,

24   please.

25        ARAM GARY SEFERIAN, GOVERNMENT'S WITNESS, SWORN

1          THE COURT:  All right.  You may proceed.

2                    DIRECT EXAMINATION

3  BY MR. ASONYE:

4  Q.   Could you please state and spell your name for the record?

5  A.   My name is Aram Gary Seferian.  Last name is spelled

6  S-e-f-e-r-i-a-n.

7  Q.   Mr. Seferian, how far did you go in school?

8  A.   I graduated from college.

9  Q.   And what degree?

10  A.   Bachelor's Degree in Finance.

11  Q.   And in what industry, since your graduation, have you

12  primarily worked in?

13  A.   Banking.

14  Q.   And so how many years have been in banking?

15  A.   Nearly 40.

16  Q.   Are you currently employed?

17  A.   I am.

18  Q.   Where do you work?

19  A.   Banc of California.

20  Q.   And what is your title at the Banc of California?

21  A.   Senior vice president of the managed assets group.

22  Q.   And prior to becoming the senior vice president of the

23  managed asset group, what was your prior title at Banc of

24  California?

25  A.   I was the portfolio group manager for the private bank.

1    Q.    And, Mr. Seferian, if you could speak up so that everybody

2    can hear you in the courtroom?

3    A.    Certainly.

4    Q.    Thank you.

5            And as a senior vice president of the portfolio group

6    manager, private bank, what were your duties?

7    A.    My duties were to supervise a group of portfolio managers

8    that underwrote letters and then to check and review their

9    work.

10   Q.    Now, is the Banc of California a publicly traded company?

11   A.    Yes, it is.

12   Q.    And as a publicly traded company, who owns the bank?

13   A.    The shareholders of the bank.

14   Q.    Does Banc of California offer commercial loans?

15   A.    Yes, they do.

16   Q.    What's a commercial loan?

17   A.    A commercial loan is one that's made for business

18   purposes.

19   Q.    Can you explain the process of how commercial loans are

20   originated at the Banc of California?

21   A.    Yes.  Typically a relationship manager or business

22   development officer will find a business opportunity and bring

23   it to the bank.  The process starts with the completion of an

24   application and submission of required financial information to

25   analyze the loan request.

Seferian - Direct                                                          1952

1  Q.   And then what happens?

2  A.   My staff would take a look at all this information and

3  synthesize it into a -- what we called a credit application.

4  Q.   And then walk us through the rest of the process to

5  closing.

6  A.   Okay.  They would analyze the loan and try to identify

7  several sources of repayment.  They would reduce that to the

8  written document.  Then they'd submit it to me for review and

9  recommendation on for approval.

10 Q.   Now, as portfolio group manager, did you have the

11 authority to recommend approving or denying a loan?

12 A.   Yes.  I had the authority to recommend approving or

13 denying a loan.

14 Q.   Okay.  And what financial information during this process

15 is the borrower expected to provide to the bank when applying

16 for a commercial loan?

17 A.   At the beginning, a personal financial statement and loan

18 application, several years of tax returns, business financial

19 statements, schedules of real estate, and anything else that

20 would help to identify the assets and income that are available

21 to repay a loan.

22 Q.   And what information is contained in the personal

23 financial statement?

24 A.   Assets owned by the applicant, as well as liabilities

25 against those assets, and then an outline of their income and

Seferian - Direct                                                    1953

1   their expenses.

2   Q.   Why does the bank need that information?

3   A.   To ascertain the ability to repay the loan that's

4   requested.

5   Q.   And is the borrower required to sign the personal

6   financial statement?

7   A.   Yes, they are.

8   Q.   What, if anything, is the borrower promising when they

9   sign the personal financial statement?

10  A.   That they have provided full and complete information

11  that's truthful.

12  Q.   You indicated that you collect tax returns?

13  A.   Yes.

14  Q.   Why do you collect tax returns?

15  A.   To verify the income that's been stated.

16  Q.   And who at the bank reviews the information that's

17  collected by the -- from the borrower?

18  A.   Our portfolio managers and credit analysts do the initial

19  review, and then I review on a less-specific basis their work.

20  Q.   What are the factors the bank considers when deciding

21  whether to extend a commercial loan?

22  A.   The bank looks at several factors:  primarily, cash flow

23  available to pay back the loan within a reasonable period of

24  time; secondarily, other sources of repayment, such as a

25  guarantor or other borrower income; and, thirdly, assets that

1    could be liquidated.

2    Q.   Are you familiar with the term "debt service coverage"?

3    A.   Yes, I am.

4    Q.   Okay.  What is global debt service coverage?

5    A.   Global debt service coverage is the analysis of all the

6    sources of income available to the borrower to repay a loan

7    divided by all the debt payment obligations that we've been

8    able to identify from the information provided.

9    Q.   And when the bank is calculating global debt service

10   coverage, do you factor in the loan payments for the new

11   commercial loan that you're considering extending?

12   A.   Yes, we do.

13   Q.   And what does the bank use to determine debt service

14   coverage for borrowers who are self-employed?

15   A.   We look at the debts that they have incurred and the

16   payments that are required for those debts.

17   Q.   Do you include their business debts?

18   A.   Yes, we do.

19   Q.   At Banc of California, was there a specific ratio that was

20   required for global debt service coverage?

21   A.   The bank standard is 1.25 times debt service coverage.

22   Q.   And were exceptions granted to the ratio from time to

23   time?

24   A.   Yes, there was.

25   Q.   What was the process of getting an exception?

1    A.    The process took place in the review, and if the debt

2    service coverage ratio was a little bit short, we looked for

3    other supporting or mitigating factors, such as an abundance of

4    the secondary or the tertiary source of repayment.

5    Q.    And is that an internal process within bank employees to

6    get an exception?

7    A.    Yes, it is.

8    Q.    Would you typically seek an exception if somebody was way

9    below the global debt service coverage?

10   A.    No, we would not.

11   Q.    Do you know what an unsecured loan is?

12   A.    Yes, it's one without collateral.

13   Q.    What's collateral?

14   A.    Collateral would be any assets that are assigned or deeded

15   to support the loan.

16   Q.    Which is more risky for the bank, a secured loan or an

17   unsecured loan?

18   A.    An unsecured loan.

19   Q.    Why?

20   A.    The unsecured loan does not have any collateral to act as

21   a backup source of repayment.

22   Q.    In an unsecured commercial loan, what is typically the

23   bank's primary source of repayment on the loan?

24   A.    The borrower's identified cash flow.

25   Q.    And what's typically the secondary source of repayment?

1  A.   Cash flow from the guarantors or other sources the

2  borrower may have.

3  Q.   And then what is the third source of repayment?

4  A.   Liquidation of assets, whether they are cash, real estate,

5  businesses, personal property.

6  Q.   In determining whether to extend an unsecured loan, is

7  income a relevant factor that the bank considers?

8  A.   Yes, it is.

9  Q.   And how does the bank determine a borrower's income,

10  particularly, if they're self-employed?

11  A.   We take a look at all of the information they provided.

12  That includes financial statements from the businesses, tax

13  returns, any other representations of potential asset

14  liquidation in the future.

15  Q.   Does it matter what year income is earned?

16  A.   Yes.

17  Q.   Why?

18  A.   Because we are looking for current income in the recent

19  past to portend what can be expected in the future.

20  Q.   Does the trend of income matter?

21  A.   Yes.

22  Q.   Why?

23  A.   An upward trend in income indicates that our loan is going

24  to be more safely covered.  A downward trend in income suggests

25  that they may dip below our debt service coverage standard.

1  Q.   Did the Banc of California obtain a borrower's credit

2  report?

3  A.   Yes, we did.

4  Q.   What do you look for in the credit report?

5  A.   We look for payment history on consumer-type items.

6  Q.   And with respect to recently obtained loans, who does the

7  bank rely on to disclose recently obtained loans?

8  A.   The borrower or the guarantors.

9  Q.   Why do you rely on them?

10  A.   Because information is not always complete or readily

11  available.

12  Q.   Are borrowers required to submit a schedule of real estate

13  owned?

14  A.   Yes, they are.

15  Q.   And is that an important factor the bank considers when

16  deciding whether to extend a commercial loan?

17  A.   Yes, it's important.

18  Q.   Why?

19  A.   It shows the equity that's available in real estate should

20  it be called upon to be liquidated to help repay our loan.

21  Q.   Does the bank rely on the accuracy and completeness of

22  information provided by the borrower?

23  A.   Yes, we do.

24  Q.   Now, if you learned that a borrower intentionally provided

25  false information to the bank, what would you do?

Seferian - Direct                                                1958

1    A.    I'd stop the loan application process and consult our

2    legal group.

3    Q.    And if you learned that a borrower fabricated a document,

4    what would you do?

5    A.    I'd stop the application and consult the bank's legal

6    group.

7    Q.    During your time at the Banc of California, were you

8    involved in a $1 million loan guaranteed by Paul Manafort?

9    A.    Yes, I was.

10   Q.    Have you met Paul Manafort?

11   A.    Yes, I have.

12   Q.    How many times have you met him?

13   A.    Once, I believe.

14   Q.    Prior to your testimony today, were you interviewed by

15   government agents and prosecutors?

16   A.    Yes, I was.

17   Q.    And during those sessions, did you review documents and

18   records?

19   A.    Yes, I did.

20   Q.    Were those produced pursuant to a subpoena?

21   A.    Yes, they were.

22   Q.    And are you testifying today under a subpoena?

23   A.    Yes, I am.

24   Q.    Do you know approximately when Paul Manafort first applied

25   for a commercial loan through the Banc of California?

1   A.    Approximately in the spring of 2016.

2   Q.    And was that loan through any particular entity?

3   A.    The loan request came for an entity called Baylor

4   Holdings, LLC.

5   Q.    What was your understanding of the purpose of Baylor

6   Holdings, LLC?

7   A.    Baylor Holdings was a partnership to purchase to

8   rehabilitate and then to resell at a profit single family homes

9   in the west Los Angeles area.

10  Q.    Is that essentially flipping homes in LA?

11  A.    Yes.

12  Q.    Who were the partners in Baylor Holdings?

13  A.    Paul Manafort and Jeffrey Yohai.

14  Q.    Do you know if Paul Manafort and Jeffrey Yohai were

15  related?

16  A.    I believe that Mr. Yohai was married to Mr. Manafort's

17  daughter.

18  Q.    Now, you mentioned relationship managers at the beginning

19  of this process that are associated with loans; is that

20  correct?

21  A.    Yes.

22  Q.    Who was the relationship manager that was assigned to

23  Paul Manafort's loan?

24  A.    Perris Kaufman.

25  Q.    Do you know how much Paul Manafort and Jeffrey Yohai

Seferian - Direct                                                    1960

1    initially sought from the Banc of California?

2    A.    I believe it was $5 million.

3    Q.    And what did you understand Paul Manafort's role to be in

4    this $5 million loan application?

5    A.    To supervise the business enterprise as well as to provide

6    significant financial support.

7    Q.    Was this $5 million loan supposed to be secured or

8    unsecured?

9    A.    Unsecured.

10   Q.    And did you meet with Paul Manafort and Jeff Yohai during

11   the loan process?

12   A.    I believe I did, yes.

13   Q.    Was it in person?

14   A.    Yes.

15   Q.    Where was the meeting?

16   A.    In the boardroom of the Banc of California office in

17   Century City.

18   Q.    Century City, California?

19   A.    Yes.

20   Q.    And who was present at that meeting?

21   A.    I believe Kevin LaPorte.

22   Q.    And who is Kevin LaPorte?

23   A.    Kevin LaPorte was the portfolio manager working on this

24   file.

25              Perris Kaufman, the aforementioned relationship

Seferian - Direct                                                    1961

1    manager.  I can't remember anybody else.

2    Q.    Was Paul Manafort there?

3    A.    Yes.

4    Q.    And Jeff Yohai?

5    A.    Mr. Yohai as well.

6    Q.    What was the purpose of the meeting?

7    A.    To discuss the loan.

8    Q.    All right.  Let me show you what's marked as Government

9    Exhibit 296 in your binder.

10   A.    Oh, okay.

11   Q.    Is this the -- what is -- is this the loan application for

12   the -- initially the $5 million loan?

13   A.    Yes.  It's a personal financial statement and loan

14   application.

15         MR. ASONYE:  Your Honor, Government moves 296 into

16   evidence and seeks to publish.

17         MR. NANAVATI:  No objection, Your Honor.

18         THE COURT:  Admitted.  And you may.

19         (Government Exhibit No. 296 was received in

20   evidence.)

21   BY MR. ASONYE:

22   Q.    Who's listed as the borrower on this loan?

23   A.    Paul J. Manafort.

24   Q.    And if we look at the top, scroll in the top third, what

25   type -- the applicant type, what box is checked?

1   A.   As an individual.

2   Q.   Okay.  And then do you see there's a notice to married

3   applicants?

4   A.   Yes.

5   Q.   What does it say?

6   A.   "If an individual, we intend to apply" --

7   Q.   No, I'm sorry, right next to --

8   A.   I'm sorry.

9        It says, "If you are married, you may apply for

10  credit in your name alone."

11  Q.   Okay.  And then what does it say?

12  A.   "If an individual, we intend to apply for joint credit."

13  Q.   And what does Mr. Manafort indicate about whether this is

14  a joint application with his wife or a sole application by

15  himself?

16  A.   The box marked "No" indicates that it's a sole application

17  by himself.

18  Q.   Now, if you could turn to Page 5, which is Bates

19  Page 1224.  Is the application signed?

20  A.   Yes, it is.

21  Q.   And what's the -- by Mr. Manafort, as far as you can tell?

22  A.   As far as I can tell, that's Mr. Manafort's signature.

23  Q.   And what is the date?

24  A.   March 8, 2016.

25  Q.   All right.  This version is pretty unclear, so I'm going

Seferian - Direct                                                      1963

1   to show you a clear version, Government Exhibit 297.  Is this

2   an e-mail from Paul Manafort to the Banc of California?

3   A.   From Paul Manafort to Perris Kaufman at the Banc of

4   California.

5           MR. ASONYE:  Your Honor, the Government moves 297

6   into evidence.

7           MR. NANAVATI:  No objection, Your Honor.

8           THE COURT:  Admitted.

9           (Government Exhibit No. 297 was received in

10  evidence.)

11          MR. ASONYE:  May we publish?

12          THE COURT:  Yes.

13  BY MR. ASONYE:

14  Q.   If we look at the top e-mail, what does Paul Manafort tell

15  Perris Kaufman in this e-mail?

16  A.   "I have attached the personal financial statement.  I

17  believe that you now have everything that you requested.

18  Please confirm that I am correct."

19  Q.   Okay.  Now, what is the date of this e-mail?

20  A.   March 10, 2016.

21  Q.   Okay.  That's after March 4, right?

22  A.   Yes.

23  Q.   All right.  Now, let's turn to the actual personal

24  financial statement on Page 4.  Is this the same document we

25  were looking at?  Is it clearer?

Seferian - Direct                                                    1964

1   A.   Yes.

2   Q.   If I can ask you to turn to the second page of the loan

3   application.   Is there a section for assets and liabilities?

4   A.   Yes, there is.

5   Q.   Is that a section important for the bank?

6   A.   Yes, it is.

7   Q.   And below, is there a schedule of expenses section?

8   A.   Yes, there are.

9   Q.   What -- what information is supposed to be provided from

10  the borrower in the section called "Schedule of Expenses"?

11  A.   All of the borrower's expenses, annual basis.

12  Q.   And next to that there's a section for "Contingent

13  Liabilities"?

14  A.   Yes.

15  Q.   What's supposed to go in the contingent liability section?

16  A.   Any obligations that are guaranteed or contingent to the

17  future.

18  Q.   So any -- any other loans that Mr. Manafort personally

19  guarantees?

20  A.   Yes.

21  Q.   Is that section important to the bank?

22  A.   Yes, it is.

23  Q.   If someone underreports the amounts in the schedule

24  expenses or the contingent liabilities, is that something the

25  bank would want to know?

Seferian - Direct                                                    1965

1   A.    Yes, it would be.

2   Q.    Now, if you could turn to the third page, the next page of

3   this loan application.

4         Do you see a Schedule F for real estate owned?

5   A.    Yes.

6   Q.    Okay.  What's supposed to go in that section?

7   A.    Real estate that's owned by the borrower.

8   Q.    Okay.  When you reviewed this loan application, what did

9   you understand Mr. Manafort was representing about the third

10  property listed on real estate owned regarding 174 Jobs Lane?

11  A.    That it was owned by Mr. Manafort.

12  Q.    And owned in what percentage, to your understanding?

13  A.    100 percent.

14  Q.    Now, below that, do you see a section for "Real Estate

15  Loans Payable," Schedule G?

16  A.    Yes.

17  Q.    What information is supposed to go in that category?

18  A.    Loans that are owed against the real estate noted in

19  Schedule F.

20  Q.    And is there an attachment or additional place where you

21  can identify additional properties for Schedule G?

22  A.    Yes, three pages further in the exhibit.

23  Q.    Again, is that Schedule G important to the bank?

24  A.    Yes.

25  Q.    Is it important to disclose all the real estate that you

Seferian - Direct                                                          1966

1    own?

2    A.   Yes, it is.

3    Q.   And all loans payable on such real estate?

4    A.   Yes, it is.

5    Q.   All right.  Let's turn to Page 5.  Well, it says Page --

6    on the bottom, it says Page 4 of 5, but it's the signature page

7    of the loan application?

8    A.   I see it.

9    Q.   Okay.  Is there a series of yes-or-no questions?

10   A.   Yes, there are.

11   Q.   Okay.  The third yes-or-no question from the bottom, "Are

12   you a co-borrower or guarantor on a loan," what does

13   Mr. Manafort indicate?

14   A.   That he is not the co-borrower or guarantor on a loan.

15   Q.   Why does the bank ask that question?

16   A.   In order to make sure that we are capturing all

17   obligations that might be a call on the cash flow that's also

18   being looked at to repay our loan.

19   Q.   Is that important information to the bank?

20   A.   Yes, it is.

21   Q.   In regards to this question, would the bank want to know

22   if Paul Manafort just became a co-borrower on a $3.4 million

23   loan on a property on Howard Street in New York?

24   A.   Yes.

25   Q.   And above Mr. Manafort's signature, is there a

Seferian - Direct                                                              1967

1    certification?

2    A.    Yes, there is.

3    Q.    Can you go ahead and read the first four sentences -- I'll

4    tell you when to stop -- of that certification?

5    A.    (As read):  "I/we hereby apply for the loan or credit

6    described in this application.  I/we certify that I/we made no

7    representations in this loan application or in any related

8    documents (including any tax returns submitted for the years

9    blank, blank, and blank in conjunction with this application),

10   that all information is true, correct, complete, and

11   continuing, and that I/we did not omit any important

12   information."

13   Q.    And the bank relies on that certification?

14   A.    Yes, we do.

15   Q.    Now, if we could turn to the next page.

16         What is this Schedule G?

17   A.    Schedule G is a schedule of real estate owned.

18   Q.    Okay.  And, again, what's supposed to be listed here?

19   A.    All real estate owned along with all liabilities against

20   the real estate and other information such as date of

21   acquisition, percentage of ownership, potential income from the

22   property.

23   Q.    Okay.  And does the first column contain property address

24   information?

25   A.    Yes, it does.

Seferian - Direct                                                    1968

1   Q.   Does the third column have the purchase price information?

2   A.   Yes, it does.

3   Q.   And I believe it's the eighth column, does that say the

4   current loan balance?

5   A.   Yes, it does.

6   Q.   Why does the bank want to know about the current loan

7   balance on these properties?

8   A.   Two reasons:  one, to understand payments that may be

9   associated with those loans and what impact they have on the

10  cash flow to repay our loan.

11  Q.   Is that important to the bank?

12  A.   Yes, it is.

13  Q.   And then the ninth column, does that list the current

14  lender?

15  A.   Yes.

16  Q.   Now, does Paul Manafort, that's the second property that's

17  listed, does he list 29 Howard Street?

18  A.   Yes, it does.

19  Q.   Okay.  What does Paul Manafort list as the current loan

20  balance on the 29 Howard Street loan?

21  A.   $1,370,000.

22  Q.   That doesn't say $3.4 million, does it?

23  A.   No, it does not.

24  Q.   Would the bank want to know if days earlier, Mr. Manafort

25  had actually closed on a $3.4 million cash-out refinance on the

Seferian - Direct                                              1969

1   29 Howard Street property?

2   A.   Yes.

3   Q.   The fifth property on that list, do you see 174 Jobs Lane?

4   A.   Yes.

5   Q.   Did you understand this to indicate that Mr. Manafort

6   owned 174 Jobs Lane?

7   A.   Yes.

8   Q.   Is this page signed by Mr. Manafort?

9   A.   Yes, it is.

10  Q.   What is the date of his signature?

11  A.   March 9, 2016.

12  Q.   And what does it say above his signature?

13  A.   (As read):  "I certify under penalty of perjury that the

14  above information is accurate as of March 9, 2016."

15  Q.   If you knew that Paul Manafort falsified information about

16  his assets and his liabilities, would you have recommended

17  moving forward with this loan?

18  A.   No.

19  Q.   Do you know, from the course of this loan, whether Paul

20  Manafort was required to submit a profit and loss statement for

21  DMP International for 2015?

22  A.   Yes.

23  Q.   And did you review that profit and loss statement for DMP

24  International for 2015?

25  A.   Yes, I did.

1   Q.   Why was Mr. Manafort required to submit a P&L for 2015 for

2   DMP International?

3   A.   To help us understand the sources of income available to

4   repay our loan.

5   Q.   Let me show you Government Exhibit 298.

6           Is this an e-mail regarding the loan application

7   for -- to the Banc of California for Mr. Manafort?

8   A.   Yes.

9           MR. ASONYE:  Your Honor, Government moves 298 into

10  evidence.

11          MR. NANAVATI:  No objection, Your Honor.

12          THE COURT:  Admitted.

13          (Government Exhibit No. 298 was received in

14  evidence.)

15          MR. ASONYE:  And may we publish, Your Honor?

16          THE COURT:  You may.

17  BY MR. ASONYE:

18  Q.   Okay.  If we can blow up the front.

19          Who is this e-mail from?

20  A.   From Rick Gates.

21  Q.   By the way, do you know who Rick Gates is?

22  A.   I do know who he is, yes.

23  Q.   Did you have communications with him regarding this loan?

24  A.   I did not.

25  Q.   And who is the e-mail to?

1    A.   Perris Kaufman.

2    Q.   Is that the relationship manager?

3    A.   Yes.

4    Q.   Is Paul Manafort copied on this e-mail?

5    A.   Yes, he is.

6    Q.   Okay.  Go ahead and read the e-mail.

7    A.   "Perris, please see the 2015 P&L attached.  Thanks, Rick."

8    Q.   And is a P&L attached to this e-mail?

9    A.   Yes, I believe it is.

10   Q.   Okay.  If you could -- Mr. Seferian, by the way, how do

11   you know who Rick Gates is?

12   A.   From reading about him in the newspaper.

13   Q.   Okay.  But you don't have any -- other than -- at the

14   time, did you know who Rick Gates was?

15   A.   No, I did not.

16   Q.   Okay.  If you could turn to page 9, Bates page 3111?

17           Is this a page of the P&L?

18   A.   Yes, it is.

19   Q.   Okay.  What is the title of it?

20   A.   "DMP International, LLC, Statement of Revenue and

21   Expenses."

22   Q.   And was this a document the bank used during its

23   underwriting process to evaluate the loan?

24   A.   Yes.

25   Q.   Under the statement of revenue and expenses, what does --

1    what does that say?

2    A.   Well, the income was $6.5 million.

3    Q.   Oh, no, I'm sorry.  Was it -- just statement of revenues,

4    what's the -- under the title?

5    A.   Oh, I'm sorry, it says "Income Tax Basis."

6    Q.   What's your understanding of what income tax basis means?

7    A.   That that was the amount that was reported for income tax

8    purposes.

9    Q.   Okay.  Was this document used during the bank's -- well,

10   was it used during the bank's underwriting process?

11   A.   Yes.

12   Q.   Was it important to you?

13   A.   Yes.

14   Q.   Did you rely on it?

15   A.   Yes.

16   Q.   Did you expect it to be accurate?

17   A.   Yes, I did.

18   Q.   Okay.  What does the document say was 2015 net income for

19   DMP International?

20   A.   $4,450,744.

21   Q.   Okay.  Did you understand -- did you understand that this

22   was an accrual-based P&L?

23   A.   No, I did not.

24   Q.   Why not?

25   A.   Because it stated an income tax basis and I did not see

1    any large receivables that would allow me to believe that the

2    income from operations was on an accrual basis.

3    Q.   And in your experience, when you're dealing with clients

4    and they send you an accrual-based P&L, do they usually

5    indicate to you that it's accrual-based?

6    A.   Yes.

7    Q.   Now, if we have could put up side by side what's already

8    been admitted, Government Exhibit 125B?

9              MR. ASONYE:  And, Your Honor, this has been

10   previously admitted.

11             THE COURT:  All right.

12   BY MR. ASONYE:

13   Q.   This is the actual P&L from 2015 for DMP International?

14             MR. NANAVATI:  Objection to the characterization,

15   Your Honor.

16             MR. ASONYE:  It's in evidence.

17             THE COURT:  It's already admitted?

18             MR. ASONYE:  Yes.

19             THE COURT:  All right.  Then he may -- he may repeat

20   what it says on the face.

21             Proceed.  Objection's overruled.

22   BY MR. ASONYE:

23   Q.   And if you learned -- if we could highlight the net income

24   for both?

25             If you learned that the net income in 2015 for DMP

Seferian - Direct                                                    1974

1    International was approximately $400,000 rather than the

2    $4.4 million that was represented by Mr. Manafort, how would --

3    would that have affected the bank's analysis of this loan?

4    A.   Yes, it would have.

5    Q.   How would it affected -- how would it have affected the

6    bank's debt, global debt service coverage?

7    A.   It would have significantly reduced it.

8    Q.   Would the bank want to know if Mr. Manafort had actually

9    earned only $400,000 in income in 2015 rather than 4.4 million?

10   A.   Yes.

11   Q.   Would Mr. Manafort have qualified for this loan if DMP

12   International's 2015 income was $400,000 instead of

13   $4.4 million?

14   A.   I don't think so.

15   Q.   If you knew that the P&L that the bank actually received

16   was falsified and fabricated, how would it have affected your

17   recommendation of -- on this loan?

18   A.   As I mentioned earlier, I would have stopped the

19   application and spoken to my legal department about it.

20   Q.   All right.  Let me show you what's been marked as

21   Government Exhibit 302.

22             Does this -- is this an e-mail chain that also

23   relates to consideration of this loan?

24   A.   Yes.

25             MR. ASONYE:  Your Honor, Government moves 302 into

1    evidence.

2              MR. NANAVATI:  Without objection, Your Honor.

3              THE COURT:  Admitted.

4              (Government Exhibit No. 302 was received in

5    evidence.)

6              THE COURT:  You may publish.

7              MR. ASONYE:  Thank you, Your Honor.

8    BY MR. ASONYE:

9    Q.   There's an e-mail at 6:22 from you; is that correct?

10   A.   Yes, that's correct.

11   Q.   And what do you say in that e-mail?

12   A.   That I have noted my thoughts to Perris Kaufman below in

13   response to his questioning.

14   Q.   And --

15   A.   My conclusion that the loan ought to be treated

16   differently.

17   Q.   Okay.  And if we could turn to the second page?

18             Do you see that there are -- on this e-mail, there

19   are bolded paragraphs and there's unbolded paragraphs.  Do you

20   see that?

21   A.   Yes.

22   Q.   Do you have any portion of this -- what portion of this

23   e-mail, if any, is yours?

24   A.   I authored the bolded portion.

25   Q.   Okay.  And so if you could -- I mean, you can read if

Seferian - Direct                                                1976

1   necessary, but if you could summarize what you are expressing

2   in paragraph b, the bolded portion?

3   A.   I was expressing the fact that not having Kathleen

4   Manafort's guarantee, which was backed up by the home in

5   Bridgehampton, which we discovered belonged to her solely, were

6   we not to have that guarantee, that the then $2 million loan

7   request would not be appropriate in my opinion.

8   Q.   All right.  So let's break that down.

9             The bank -- what did you say about the bank

10  determining that Bridgehampton was owned by Kathleen Manafort

11  solely?

12  A.   I believe that we had run a property profile, and it

13  determined that Kathleen Manafort was the sole owner of the

14  Bridgehampton property.

15  Q.   And what had Mr. Manafort represented in his personal

16  financial statement about the ownership of the Bridgehampton

17  home?

18  A.   That he was the 100 percent owner.

19  Q.   Okay.  And so did the bank make efforts then to include

20  Ms. Kathleen Manafort into this loan?

21  A.   Yes.  We suggested that we ought to have her guarantee to

22  support the loan, with those assets represented in support.

23  Q.   And was Mr. Manafort agreeable to including Ms. Kathleen

24  Manafort on -- as a guarantor to the bank account for any loan?

25  A.   I don't believe so, no.

Seferian - Direct                                              1977

1   Q.   Okay.  So did the bank move on without the inclusion of

2   the Bridgehampton property?

3   A.   We did.

4   Q.   Okay.  Now, without the Bridgehampton home being included

5   as support for this loan, did Paul Manafort have enough cash

6   flow, liquidity, or equity in real estate to support the loan?

7   A.   Based on the information that I had at that point, I

8   thought that the $2 million loan was too rich and that a lesser

9   amount might be appropriate.

10  Q.   And what was that lesser amount?

11  A.   $1 million.

12  Q.   Okay.  So if you walk the jury through this, this loan

13  started as a $5 million loan application; is that right?

14  A.   That's correct.

15          THE COURT:  Now, you're leading.  You're walking him

16  through it, and you can't do that, but you can ask him

17  questions that amount to the same thing.

18  BY MR. ASONYE:

19  Q.   What was the initial loan amount for this application?

20  A.   $5 million.

21  Q.   Okay.  How did it go from $5 million to $2 million?

22  A.   As we further examined the documentation here, we felt

23  that a lesser amount was appropriate, and $2 million was

24  suggested by the relationship manager, Perris Kaufman.

25  Q.   And then how did it get from 2 million to now 1 million?

Seferian - Direct                                                    1978

1   A.   As I expressed in the e-mail, without the guarantee

2   support that was backed by the free and clear $25 million

3   property in New York, I felt that $1 million was a safer loan

4   for the bank than $2 million.

5   Q.   And after these discussions, were you comfortable

6   recommending, based on these representations, a $1 million

7   loan?

8   A.   Based on the representations of income as I knew them, as

9   well as the lack of the Bridgehampton home, I was comfortable

10  at that point.

11  Q.   And did that recommendation of $1 million in terms of

12  moving forward, did that rely on the fact that you believed DMP

13  International earned $4.4 million in 2015?

14  A.   Yes, that's correct.

15  Q.   All right.  Let me show you Government Exhibit 303.

16          What is -- what is 303?

17  A.   303 is the bank's internal credit approval document.

18  Q.   And did you sign it?

19  A.   Yes, I did.

20          MR. ASONYE:  Your Honor, Government moves 303 into

21  evidence.

22          MR. NANAVATI:  No objection, Your Honor.

23          THE COURT:  Admitted.

24          (Government Exhibit No. 303 was received in

25  evidence.)

Seferian - Direct                                                    1979

1          MR. ASONYE:  Okay.  If we could publish, Your Honor?

2          THE COURT:  Yes.

3    BY MR. ASONYE:

4    Q.   And we zoom in on the top third of the document.

5          Do you see the summary?  If you could read the action

6    requested?

7    A.   "Action requested:  New $1 million unsecured revolving

8    line of credit for one year.  The line will be priced at a

9    start rate of Wall Street Journal Prime plus 1 percent (all-in

10   rate 4.5 percent).  Loan proceeds will be used for soft costs

11   related to renovation and construction of several high-end

12   single family residences on the west side of Los Angeles."

13   Q.   Now, you testified earlier that this was a business loan

14   that included Jeff Yohai as a partner; is that correct?

15   A.   Yes.

16   Q.   When the Bridgehampton home wasn't included, to keep this

17   loan at $2 million, did the bank consider whether there was any

18   financial backing from Jeff Yohai?

19   A.   Mr. Yohai exhibited very weak financial support.

20   Q.   So there -- was there anything that you could rely on from

21   Jeff Yohai to keep the loan at 2 million?

22   A.   No.

23   Q.   All right.  Now, if we could turn to the second page of

24   this credit approval memorandum?

25          There are some other signatures on the bottom.  Who

Seferian - Direct                                                    1980

1    are those -- who are those individuals?

2    A.   Toi Quick was a credit analyst that had worked with Kevin

3    LaPorte, the portfolio manager who had prepared the document.

4    He happened to be on vacation at the time we signed it, but I

5    had reviewed the document.

6         And Paul Alexander is our division senior credit

7    officer, who along with Richard Smith, the division managing

8    director, had the loan authority to approve the loan.

9    Q.   And what do all of those signatures indicate?

10   A.   That the loan was approved at $1 million.

11   Q.   Okay.  Now, if you could turn to the next page?

12        Do you see a section called "Sources of Repayment"?

13   A.   Yes.

14   Q.   What was the -- on this $1 million loan, what was the

15   primary source of repayment?

16   A.   Primary source of repayment was anticipated profits from

17   the flipping of the houses in west Los Angeles.

18   Q.   And then what was the secondary source of repayment?

19   A.   Cash flow outside of the sale proceeds from the houses,

20   primarily Mr. Manafort's income from political consulting.

21   Q.   And then what was the third source of repayment?

22   A.   Guarantor liquidity, meaning any liquidity possessed by

23   Mr. Manafort, Mr. Yohai, or any liquidity generated from sale

24   of their assets.

25   Q.   And I notice on the third -- for the third source,

1  guaranteed liquidity, is there any reference to Yohai there?

2  A.    No, there's not.

3  Q.    And why not?

4  A.    He had minimal liquidity.

5  Q.    Now, with respect to the secondary source of repayment,

6  could you just read that last sentence?

7  A.    "Global debt service coverage is 1.65 percent based on pro

8  forma 2015 income.

9  Q.    And when you say "pro forma 2015 income," what are you

10  referring to?

11  A.    I was referring to the income exhibited by DMP

12  International and the other sources from both Mr. Yohai and

13  Mr. Manafort.

14  Q.    And when you say DMP International, is that the -- are you

15  referring to the P&L from 2015 that we referred to?

16  A.    Yes, that's correct.

17  Q.    Okay.  Now, if you could turn to Page 11 -- I'm sorry, for

18  you, it's going to be Bates Page 121.

19        What is this page of the credit approval memorandum?

20  A.    This page is our cash flow analysis worksheet.

21  Q.    Okay.  And if we could -- the right column on the top

22  right, zoom in.  Well, actually, if you -- let's look at the

23  bottom right-hand corner.

24        What does it indicate after all your calculations for

25  2015 is the global debt service coverage number?

1  A.    1.65 times.

2  Q.    And is that within the acceptable guidelines for the bank?

3  A.    Yes, it is.

4  Q.    Okay.  Now, does that calculation, though, rely on the

5  2015 DMP International profit and loss statement indicating

6  $4.4 million of income?

7  A.    Yes, it does.

8  Q.    Now, if we could look at the top right of the credit

9  approval memorandum and go through the calculation?

10        Do you see where it says 1,100 in line -- it looks

11 like three lines down on the 2015 projected?

12 A.    Yes.

13 Q.    Okay.  What does that number signify?

14 A.    That was the estimated income for 2015 based on the

15 information that we held.

16 Q.    So where did that come -- what number did you start with

17 to get to 1,100?

18 A.    The footnote No. 1 indicates that we considered $2.2

19 million of Mr. Manafort's income from political consulting as

20 half of the income of DMP International, and the underwriter

21 attached a further 50 percent discount to that to be

22 conservative.

23 Q.    So did the bank start with $4.4 million from the 2015 P&L?

24 A.    Yes.

25 Q.    And then you said split them in half, they got to 2.2

Seferian - Direct                                                        1983

1    million?

2    A.   Split in half because Kathleen Manafort owned half the

3    company.

4    Q.   And then if -- why did it get split in half again to get

5    to 1100?

6    A.   Typically we like to be conservative in our underwriting

7    and make allowance for, on that particular statement, any kind

8    of discrepancy or slippage that may have occurred.

9    Q.   And does 1,100 there mean 1.1 million?

10   A.   Yes, it does.

11          THE COURT:  For planning purposes, how much more do

12   you anticipate?

13          MR. ASONYE:  Less than ten minutes.

14          THE COURT:  And how long do you anticipate the

15   cross-examination?

16          MR. NANAVATI:  Twenty-five minutes, Your Honor.

17          MR. ASONYE:  I'll try to speed it up.  Maybe I can

18   get it done in five, Your Honor.

19          THE COURT:  All right.

20          Mr. Richman, I'll get to you-all.  As soon as this

21   finishes, we'll take up that matter.

22          Is government counsel here?

23          MR. RICHMAN:  I don't see her.

24          THE COURT:  All right.  Let's proceed.  It's

25   Ms. Williamson, isn't it?

1            MR. RICHMAN:  Yes.

2            THE COURT:  Proceed, Mr. Asonye.

3            MR. ASONYE:  Okay.

4  BY MR. ASONYE:

5  Q.   Mr. Seferian, can you do the global debt service

6  calculation if DMP's income for 2015 was actually $400,000

7  versus $4 million?  How would that have affected the global

8  debt service calculation number?

9  A.   Well, if you apply a 90 percent discount to the number,

10 which is the difference between 4 million and 400,000, and

11 apply that same discount to the million-one on a flow-through

12 basis, then I would anticipate there was maybe $100,000 of

13 income from sole proprietorship, DMP International.

14            And if you bring that million-dollar discount down to

15 the bottom line in the last set of boxes that's entitled "Cash

16 Flow Available for Debt Service," or CFASD, you'll see that it,

17 after deducting living expenses, you have a negative number of

18 about 250,000 and debt service of 415,000, so there would not

19 have been adequate income to cover both debt service and

20 amended living expenses.

21 Q.   So would you have a negative global debt service coverage

22 number?

23 A.   Yes.

24 Q.   And could you qualify for a loan when you have a negative

25 global debt service coverage?

1    A.    We don't make loans with negative debt service coverage.

2    Q.    And even if you didn't apply that 50 percent discount, to

3    be safe, would he still have not qualified for this loan?

4    A.    I believe that he would not have qualified.

5    Q.    Also, if Mr. Manafort had disclosed a $3.4 million debt on

6    the Howard Street property instead of a $1.37 million debt,

7    would that also have negatively affected his global debt

8    service coverage ratio?

9    A.    Yes.  It probably would have increased the payment due on

10   that house.

11   Q.    Now, based on the representations in his personal

12   financial statement and also the 2015 DMP International P&L,

13   was this loan for $1 million to Baylor Holdings guaranteed by

14   Paul Manafort approved?

15   A.    Yes, it was.

16   Q.    Okay.  Let me show you Government Exhibit 305.

17         What is this document?

18   A.    This is our business loan agreement, which outlines the

19   terms of the loan.

20   Q.    And is it signed?  Go to the last page.

21   A.    Almost there.

22         Yes, it's signed.

23         MR. ASONYE:  Your Honor, Government moves 305 into

24   evidence and seeks to publish.

25         MR. NANAVATI:  No objection, Your Honor.

Seferian - Direct                                                    1986

1    THE COURT:  Admitted.  You may do so.

2    (Government Exhibit No. 305 was received in

3    evidence.)

4    BY MR. ASONYE:

5    Q.   Okay.  So does this show on the first page, this business

6    loan agreement, that it's for a million dollars?

7    A.   Yes, in the upper left-hand corner.

8    Q.   Okay.  Do you see a section for representations and

9    warranties?

10   A.   Yes.

11   Q.   And below that, do you see another section for financial

12   information?

13   A.   Yes, I do.

14   Q.   Can you read that to the jury?

15   A.   "Each of borrower's financial statements supplied to

16   lender truly and completely disclosed borrower's financial

17   condition as of the date of the statement, and there has been

18   no material adverse change in borrower's financial condition

19   subsequent to the date of the most recent financial statement

20   supplied to lender.  Borrower has no material contingent

21   obligations except as disclosed in such financial statements."

22   Q.   And then if you turn to the last page, again, is it signed

23   by Paul Manafort?

24   A.   Yes, it is.

25   Q.   All right.  And, finally, if I could turn you to

Seferian - Direct                                                        1987

1    Government Exhibit 306.

2              Is this the commercial guaranty?  Is it signed by

3    Paul Manafort?

4    A.   Yes, it is.

5              MR. ASONYE:  Your Honor, Government moves 306 into

6    evidence.

7              MR. NANAVATI:  Without objection.

8              THE COURT:  It's admitted.

9              (Government Exhibit No. 306 was received in

10   evidence.)

11             MR. ASONYE:  It's the last page we need to publish.

12   May we publish, Your Honor?

13             THE COURT:  Yes.

14   BY MR. ASONYE:

15   Q.   Okay.  What is a commercial guaranty?

16   A.   The commercial guaranty is a guaranty of a commercial loan

17   by either an individual or a company.

18   Q.   And is this one guaranteed by Paul Manafort?

19   A.   Yes, it is.

20   Q.   If you turn to the second page, do you see a section

21   called "Guarantor's Representations and Warranties"?  It's like

22   the second heading on the second page.

23   A.   Yes, I do.

24   Q.   Could you just read Section F, as in "Frank," to the jury?

25   A.   Section F reads:  "Upon lender's request, guarantor will

Seferian - Cross                                                    1988

1   provide to lender financial and credit information in form

2   acceptable to lender, and all such financial information which

3   currently has been, and all future financial information which

4   will be provided to lender is and will be true and correct in

5   all material respects and fairly present guarantor's financial

6   condition as of the dates the financial information is

7   provided."

8              MR. ASONYE:  No further questions, Your Honor.

9              THE COURT:  Cross-examination.

10             MR. NANAVATI:  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12  BY MR. NANAVATI:

13  Q.   Mr. Seferian, my name is Jay Nanavati, and I represent

14  Paul Manafort.  Good afternoon.

15  A.   Good afternoon.

16  Q.   And I want to take you back to this question about the

17  Bridgehampton property.  Do you remember being asked about

18  that?

19  A.   Yes.

20  Q.   And that the document showed that Mr. Manafort was the

21  owner of that property, correct?

22  A.   Yes.

23  Q.   But that it was Mrs. Manafort that was technically the

24  owner, correct?

25  A.   That's what we discovered through research, yes.

1   Q.   Okay.  And because Mrs. Manafort was the owner of the --

2   of the property, the proposed amount of the loan or the

3   acceptable amount of the loan fell from 5 million to 1 million?

4   A.   Yes.

5   Q.   So the loan being for $1 million took account of that,

6   correct?

7   A.   Yes.

8   Q.   And you don't have any reason to believe that Mr. and

9   Mrs. Manafort were estranged in any way at that time?

10  A.   I had no knowledge.

11  Q.   And regarding profit and loss statements, the bank would

12  want to know about all of DMP International, Mr. Manafort's

13  company's assets, correct?

14  A.   Yes.

15  Q.   And included under the rubric of assets is accounts

16  receivable, correct?

17  A.   Yes.

18  Q.   And the prosecution referred -- showed you Exhibit 125B

19  and referred to it as the actual P&L.  Do you remember that?

20  A.   Yes.

21  Q.   And you also saw another one that was an accrual-based

22  P&L, correct?

23  A.   I'm not sure which one you're referring to.

24  Q.   Okay.  Will you look at Government Exhibit 298, please?

25  A.   Okay.

1  Q.   And do you remember being asked -- I'm sorry, are you at

2  the document?

3  A.   Yes.

4  Q.   Do you remember being asked if that was a cash-basis P&L?

5  A.   Yes.

6  Q.   Okay.  And being asked if it was appropriate to have

7  accruals or accounts receivable on it?

8  A.   Yes.

9  Q.   Okay.  And an accrual-based P&L is still an actual P&L,

10 correct?

11 A.   Yes.

12 Q.   Now, I want to take you for a moment to Government

13 Exhibit 303, please.  And if you could let me know when you're

14 there.

15 A.   I'm there.

16 Q.   Okay.  Could you turn to the third page of it?  And the

17 number ends 114, is the page numbering system.

18 A.   Okay.

19 Q.   And do you see the heading "Financial Analysis:  Borrower

20 and Corporate Guarantor"?

21 A.   Yes.

22 Q.   And the fifth bullet point, the final bullet point, about

23 halfway through that paragraph, do you see where it says:

24 "Loans to date have been obtained from hard-money lender

25 Genesis Capital and future construction loans may also be

Seferian - Cross                                                         1991

1    obtained from Genesis"?

2            Do you see that?

3    A.   Yes.

4    Q.   Do you see after that where it says:   "Banc of

5    California's construction lending department has been consulted

6    on the business plan"?

7    A.   Yes.

8    Q.   And if you could turn to the next page, it says 115 at the

9    bottom.

10           Toward the top, do you see a bullet point that starts

11   "Liabilities are centered"?

12   A.   Yes.

13   Q.   And it says -- does it say:   "Liabilities are centered in

14   $19 million worth of real estate debt related to five

15   construction/remodel projects (three in California, one in New

16   York), and a $3 million mortgage on a New York residence"?

17   A.   Yes.

18   Q.   Okay.  And you don't know what that one mortgage related

19   to a construction remodel project in New York is, do you?

20   A.   No, I don't.

21   Q.   Okay.  So you don't know whether that's a Genesis Capital

22   mortgage or not?

23   A.   No, I don't.

24   Q.   But the source of information in this document is the

25   borrower, correct?

1    A.    I believe so.

2              MR. NANAVATI:  The Court's indulgence one moment?

3              THE COURT:  All right.

4              MR. NANAVATI:  If I might confer on one thing?

5              THE COURT:  Yes, you may.

6              While he's doing that, Mr. Richman and

7    Ms. Williamson -- I guess she's outside.

8              MR. RICHMAN:  I believe she went out.

9              THE COURT:  I'll start this -- I'll start that matter

10   when I finish here and excuse the jury.  We'll begin with that

11   case.

12             MR. RICHMAN:  Understood.  Thank you.

13             MR. NANAVATI:  Your Honor, if I could have the

14   witness refer to Government's Exhibit 392, which is already in

15   evidence?

16             THE COURT:  All right.

17             MR. NANAVATI:  And if I could hand a copy of it to --

18   to the witness, please?

19             THE COURT:  Yes.  You've already shown it to

20   Mr. Asonye?

21             MR. NANAVATI:  I have, Your Honor.

22             THE COURT:  All right.  He has it.

23             MR. NANAVATI:  Thank you.

24   BY MR. NANAVATI:

25   Q.   And, Mr. Seferian, if you could please turn to the fourth

1   page of that document, please?  Do you recognize this document,

2   first of all?

3   A.   No, I don't.  I don't believe I've seen this document.

4            MR. NANAVATI:  Okay.  And --

5            THE COURT:  I didn't hear your answer, sir.

6            THE WITNESS:  I'm sorry.  No, I don't believe I've

7   seen this document.

8            THE COURT:  Thank you.  Next question.

9            MR. NANAVATI:  Thank you, Your Honor.

10  BY MR. NANAVATI:

11  Q.   Can you please turn, then, back to the first page?  And

12  if -- could you please -- okay.

13           MR. NANAVATI:  Your Honor, may I have that exhibit

14  published, please?

15           THE COURT:  Yes, you may.  It's been admitted.

16  BY MR. NANAVATI:

17  Q.   If we could -- on the first page, could you look at -- and

18  on the first page, could you look at what the name of the

19  attachment is?  It's underlined.

20  A.   "160316 Responses - Banc of CaliforniaPJM REV.docx."

21           MR. NANAVATI:  One -- the Court's indulgence one

22  moment.

23           Your Honor, and separately, could I move what's been

24  marked for identification as Government Exhibit 299 into

25  evidence, if it's not?

1               THE COURT:  Any objection?

2               MR. ASONYE:  No.  We have to see it first, Your

3    Honor.

4               THE COURT:  I beg your pardon?

5               MR. ASONYE:  We have to see it first.  We don't have

6    it right now.

7               THE COURT:  All right.  You're not familiar with your

8    own Exhibit 299?  You've only got a few thousand of them here.

9               MR. ASONYE:  As the Court knows, there's a lot of

10   them, Your Honor, so I don't know it offhand.

11              THE COURT:  All right.  Yes, you may have a moment to

12   find it and look at it and let me know whether you have an

13   objection to it.

14              MR. NANAVATI:  It's my fault, Your Honor.  I thought

15   they were duplicate exhibits, and they're not.

16              THE COURT:  What exhibit is Mr. Asonye looking for?

17              MR. NANAVATI:  299.

18              THE COURT:  All right.

19              MR. NANAVATI:  And, Your Honor, I think before I can

20   ask the witness to read anything from the one he has in front

21   of him, I'll need 299 just to keep things clean.

22              THE COURT:  All right.  What exhibit does he have

23   before him?

24              MR. NANAVATI:  He has 392, Your Honor.

25              THE COURT:  And that's been admitted?

1          MR. NANAVATI:  Yes, it has.

2          THE COURT:  How much more do you think you have apart

3    from this?

4          MR. NANAVATI:  Apart from this, I would say three to

5    perhaps three-and-a-half minutes.

6                         (Laughter.)

7          THE COURT:  Well, I missed that joke.

8                         (Laughter.)

9          THE COURT:  But I've missed a lot.

10         How much do you have by way of redirect, Mr. Asonye?

11         MR. ASONYE:  Less than five minutes, Your Honor.

12         THE COURT:  All right.  Are you ready to tell me

13   whether you have an objection to this exhibit?

14         MR. ASONYE:  Yes.  No objection, Your Honor.

15         THE COURT:  It's admitted.

16         (Government Exhibit No. 299 was received in

17   evidence.)

18         MR. NANAVATI:  Okay.  Could we pull up 299?  And can

19   you scroll forward?

20         Sorry, Your Honor.  I apologize, this is not what I

21   thought it was, Your Honor.

22         THE COURT:  Let's finish.

23         MR. NANAVATI:  Yes, Your Honor.

24         THE COURT:  I'm sure this witness doesn't want to

25   return tomorrow.

Seferian - Cross                                                    1996

 1              MR. NANAVATI:  No, Your Honor.

 2              THE COURT:  Do you?

 3              THE WITNESS:  No, Your Honor.

 4              THE COURT:  We know the answer.  We know the answer.

 5              MR. NANAVATI:  Your Honor, with those two exhibits

 6    in, I'll just deal with my confusion later.

 7              THE COURT:  All right.

 8              MR. NANAVATI:  And I will -- and I will just move on

 9    to the next issue.

10    BY MR. NANAVATI:

11    Q.   I want to take you back to Government Exhibit 297, please.

12    If you could turn to that.

13    A.   Yes, I'm there.

14    Q.   And do you remember being shown Schedule G?

15    A.   Yes, I do.

16    Q.   And do you remember having pointed out to you that there's

17    no Howard Street property listed in Schedule G?

18              MR. ASONYE:  Objection, Your Honor.  Again --

19              THE WITNESS:  No, I don't remember that.

20              MR. NANAVATI:  Did I miss --

21              MR. ASONYE:  Yeah.

22              MR. NANAVATI:  I apologize.  My apologies again, Your

23    Honor.  Let me make sure I --

24    BY MR. NANAVATI:

25    Q.   And you remember that Schedule G is meant to disclose

1    properties that are listed in Schedule F, correct?

2    A.    Yes.

3    Q.    Okay.  And Schedule F is properties that the borrower is

4    relying on to establish their creditworthiness, correct?

5    A.    Yes.

6              MR. NANAVATI:  No further questions, Your Honor.

7              THE COURT:  Any redirect?

8              MR. ASONYE:  Yes, Your Honor.

9              THE COURT:  How long?

10             MR. ASONYE:  Less than five minutes, Your Honor.

11             THE COURT:  All right.

12                        REDIRECT EXAMINATION

13   BY MR. ASONYE:

14   Q.    If you could turn to Government Exhibit 303 and turn to

15   Bates page 115?

16             MR. ASONYE:  If we could publish that?

17   BY MR. ASONYE:

18   Q.    Defense counsel -- this should be the fourth -- the fifth

19   page.

20             Defense counsel asked you about this second bullet

21   point about a $3 million mortgage on a New York residence.  Do

22   you recall that?

23   A.    I remember him asking me about it.

24   Q.    And he asked you about whether this could be the mortgage

25   on 377 Union Street, correct?

1    A.    Yes.

2    Q.    And do you know the answer?

3    A.    I don't have a recollection of it.

4    Q.    All right.  Now, if you could actually look at Government

5    Exhibit 297?

6                MR. ASONYE:  If we could publish that?

7    BY MR. ASONYE:

8    Q.    Go to Page 6.  And if you look at Schedule G, is there a

9    property that's listed with a $3 million mortgage?

10   A.    I see a $3 million mortgage on 721 Fifth Avenue.

11   Q.    Right.  That's not that Union Street property, is it?

12   A.    No, it's not.

13   Q.    It's not the Howard Street property, is it?

14   A.    No, it's not.

15               MR. ASONYE:  No further questions, Your Honor.

16               MR. NANAVATI:  Just very brief clarification.

17               THE COURT:  Yes.

18                         RECROSS EXAMINATION

19   BY MR. NANAVATI:

20   Q.    Could you turn back to Exhibit 303, please?

21   A.    303?

22   Q.    303, yes, please.

23   A.    Okay.

24   Q.    And could you please turn back again to page -- the page

25   that says "115" in the bottom right corner?

1   A.    Yes.

2   Q.    Okay.  Do you agree that it refers to real estate debt

3   related to five construction remodel projects, in parens, one

4   in New York?

5   A.    Yes.

6   Q.    Okay.  And that, in fact, is the Union Street construction

7   remodel debt, isn't it?

8   A.    I don't know that.

9            MR. NANAVATI:  Okay.  No further questions, Your

10  Honor.

11           THE COURT:  All right.  Thank you.  You may step

12  down.  This witness may be excused.

13                         (Witness excused.)

14           THE COURT:  All right.  Ladies and gentlemen, pass

15  your books to the right.  Mr. Flood will collect them, maintain

16  their security overnight.

17           As always, remember to fill out your, your hope list,

18  that is, your menu.  Does it change, or is it the same?

19           A JUROR:  No, Your Honor.

20           THE COURT:  I'm sorry about that, but --

21           A JUROR:  It's always roasted pheasant under glass.

22           THE COURT:  Say it again?

23           A JUROR:  It's always roasted pheasant every day.

24           THE COURT:  Good.  Well, fill it out.  We'll see you

25  tomorrow at 9:30.  Remember not to discuss the matter with

1    anyone, and I'm sure that by now they don't believe you've been

2    doing what you say you've been doing, but put it out of your

3    mind.  Don't investigate it, discuss it with anyone or anything

4    of that sort, and I'll see you tomorrow morning at 9:30.

5              You may follow the court security officer out.

6                       (Jury out.)

7              THE COURT:  All right.  You may be seated.

8              Mr. Andres, is your hope and your schedule still for

9    finishing tomorrow?

10             MR. ANDRES:  Yes, Your Honor, subject to the ruling

11   about the FBAR issue.  We'll make that witness available

12   tomorrow, but if Your Honor were to rule in our favor, we'd

13   have to recall her.  She's probably a ten-minute witness at

14   most, but we should have time tomorrow to the extent that

15   that's right.  Our intention is to either rest tomorrow, that's

16   our intention, but if worse --

17             THE COURT:  How many witnesses do you have remaining?

18             MR. ANDRES:  I think we have four, Judge.

19             THE COURT:  All right.  And I think I have those.  Is

20   that the Brennan, Raico, Kirimca, and Chojnowski?

21             MR. ANDRES:  Yes, Judge.

22             THE COURT:  All right.  And maybe this other one.

23   Thank you.

24             MR. ANDRES:  Thank you, Judge.

25             THE COURT:  All right.  We'll recess in this matter

2001

1   until tomorrow, and you may -- we'll take about five minutes,

2   and then we will convene in the Haddock case.

3          And for those of you who heard the guilty plea this

4   morning and want to remain, this is a related case,

5   codefendant, but I would be surprised if any of you do.

6          Court stands in recess.

7     (Recess from 5:17 p.m., until 9:30 a.m., August 10, 2018.)

8

9               CERTIFICATE OF THE REPORTER

10     I certify that the foregoing is a correct transcript of

11   the record of proceedings in the above-entitled matter.

12                          /s/
                    Anneliese J. Thomson

13

14

15

16

17

18

19

20

21

22

23

24

25