2002

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
UNITED STATES OF AMERICA,      .  Criminal Action No.
                               .  1:18-CR-83
          versus               .
                               .
PAUL J. MANAFORT, JR.,         .
                               .  August 10, 2018
               Defendant.      .  Volume IX-P.M.
------------------------------x

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              UZO ASONYE, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 GREG D. ANDRES, SAUSA
                                 BRANDON L. VAN GRACK, SAUSA
                                 Special Counsel's Office
                                 U.S. Department of Justice
                                 950 Pennsylvania Avenue, N.W.
                                 Washington, D.C. 20530

FOR THE DEFENDANT:               JAY ROHIT NANAVATI, ESQ.
                                 BRIAN P. KETCHAM, ESQ.
                                 Kostelanetz & Fink LLP
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001
                                   and
                                 THOMAS E. ZEHNLE, ESQ.
                                 Law Office of Thomas E. Zehnle
                                 601 New Jersey Avenue, N.W.
                                 Suite 620
                                 Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 2002 - 2150)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2003

1    APPEARANCES:  (Cont'd.)

2    FOR THE DEFENDANT:            KEVIN M. DOWNING, ESQ.
                                   Law Office of Kevin M. Downing
3                                  601 New Jersey Avenue, N.W.
                                   Suite 620
4                                  Washington, D.C. 20001
                                     and
5                                  RICHARD W. WESTLING, ESQ.
                                   Epstein, Becker & Green, P.C.
6                                  1227 25th Street, N.W.
                                   Washington, D.C. 20037

7    OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
8                                  U.S. District Court, Fifth Floor
                                   401 Courthouse Square
9                                  Alexandria, VA 22314
                                   (703)299-8595

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2004

1                              INDEX

2

3     WITNESS                      EXAMINATION    PAGE

4     DENNIS RAICO
                                   DIRECT         2008
5                                  CROSS          2077
                                   REDIRECT       2097
6                                  RECROSS        2114
                                   FURTHER        2116
7                                  REDIRECT

8     IRFAN KIRIMCA
                                   DIRECT         2116
9                                  CROSS          2128

10    ANDREW CHOJNOWSKI
                                   DIRECT         2129
11

12

13

14                        E X H I B I T S

15    Government Exhibit No. 265 was received     2026
      Government Exhibit No. 268 was received     2029
16    Government Exhibit No. 274 was received     2031
      Government Exhibit No. 276 was received     2049
17    Government Exhibit No. 277 was received     2052

18    Government Exhibit No. 278 was received     2055
      Government Exhibit No. 280 was received     2058
19    Government Exhibit No. 279 was received     2061
      Government Exhibit No. 281 was received     2062
20    Government Exhibit No. 282 was received     2063

21    Government Exhibit No. 283 was received     2065
      Government Exhibit No. 284 was received     2066
22    Government Exhibit No. 287 was received     2069
      Government Exhibit No. 291 was received     2073
23    Government Exhibit No. 438 was received     2075

24
      Government Exhibit No. 149 was received     2075
25    Government Exhibit No. 289 was received     2111
      Government Exhibit No. 113A was received    2119

2005

```
 1    Government Exhibit No. 113 was received          2121
      Government Exhibit No. 115 was received          2124
 2    Government Exhibit No. 114 was received          2126
      Government Exhibit No. 288 was received          2132
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2006

```
 1                 A F T E R N O O N   S E S S I O N

 2                      (Defendant present, Jury out.)

 3           THE COURT:  Let me have one of you, please, for each

 4    side.

 5           (Bench conference on the record.)

 6           THE COURT:  Let's begin again.  The next witness is

 7    yours, Mr. Andres?

 8           MR. ANDRES:  Yes, Your Honor.

 9           THE COURT:  And he's testifying pursuant to a grant

10    of immunity by the government, which he now wants an order

11    entered requiring him to testify.

12           MR. ANDRES:  Correct.

13           THE COURT:  All right.  I'll sign that order.  Do you

14    have it here?

15           MR. ANDRES:  Yes.  There are -- two of the next three

16    witnesses are both going to be immunized.

17           THE COURT:  Now, all I have called you here for is

18    just to confirm that you understand that you can inquire into

19    the circumstances of their testimony, whether they've received

20    immunity, whether they declined to testify, and whether they're

21    testifying pursuant to a court order.  You can do all of that,

22    anything you want.  And he can also bring out in direct what he

23    wants to bring out.

24           MR. ANDRES:  Correct.

25           MR. WESTLING:  Understood, Your Honor.
```

2007

1              MR. ANDRES:  Thank you.

2              THE COURT:  All right.  I'll sign the orders.  I'll

3    give them to Ms. Pham, and you can proceed.

4              MR. ANDRES:  Thank you, Your Honor.

5              MR. WESTLING:  Thank you, Your Honor.

6              (End of bench conference.)

7              THE COURT:  All right.  Mr. Andres, you may call your

8    next witness, please, sir.

9              MR. ANDRES:  The jury, Your Honor?  Shall I wait for

10   the jury?

11             THE COURT:  Oh, I keep forgetting.

12                          (Laughter.)

13             THE COURT:  They probably wish I would.  Yes, bring

14   them in.  Thank you for reminding me.

15                          (Jury present.)

16             THE COURT:  All right.  You may be seated.

17             All right.  Ladies and gentlemen, let me inquire, as

18   I always do, I hope that you found your lunches adequate.

19             THE JURORS:  Yes, sir.

20             THE COURT:  All right.  Good.

21             We're prepared to proceed.  Mr. Andres, you may call

22   your next witness.

23             MR. ANDRES:  The Government calls Dennis Raico, Your

24   Honor.

25             THE COURT:  All right.  Come forward, take the oath,

```
Raico - Direct                                                    2008
```

1   please, sir.

2              DENNIS RAICO, GOVERNMENT'S WITNESS, SWORN

3              THE COURT:  You may proceed.

4                          DIRECT EXAMINATION

5   BY MR. ANDRES:

6   Q.   Please state your name and spell it for the record.

7   A.   Dennis Raico, D-e-n-n-i-s R-a-i-c-o.

8   Q.   Where do you live?

9   A.   Rockaway Beach, New York.

10  Q.   Can you briefly describe your educational background after

11  college?

12  A.   After college?

13  Q.   Including college.

14  A.   I have an undergraduate degree from Dickinson College in

15  Carlisle, Pennsylvania, and I attended NYU business school.

16  Q.   And what year did you receive your degree from Dickinson

17  College?

18  A.   1991.

19  Q.   And where did you attend graduate school?

20  A.   NYU.

21  Q.   Did you earn your -- did you earn a degree there?

22  A.   I did not.

23  Q.   Have you worked in the banking industry?

24  A.   Yes, sir.

25  Q.   Over what period of time have you worked in the banking

Raico - Direct                                                      2009

1   industry?

2   A.    From 1993 until present.

3   Q.    Did you specialize in a particular field?

4   A.    Yes.

5   Q.    What field?

6   A.    Mortgage banking.

7   Q.    Let me direct your attention to 2015.  Where were you

8   working at the time?

9   A.    The Federal Savings Bank.

10  Q.    And over what period of time did you work for The Federal

11  Savings Bank?

12  A.    Approximately three years.

13  Q.    What was your title there?

14  A.    Senior vice president.

15  Q.    And what were your responsibilities as a senior vice

16  president at The Federal Savings Bank?

17  A.    I was a salesman.

18  Q.    Did your job involve interacting with borrowers?

19  A.    Yes.

20  Q.    And during that period of time, what city was your office

21  in?

22  A.    Manhattan.

23  Q.    And where were the headquarters of The Federal Savings

24  Bank?

25  A.    120 Broadway.

Raico - Direct                                                        2010

1    Q.   Do you know if The Federal Savings Bank is insured by the

2    FDIC?

3    A.   Yes, they are.

4    Q.   Do you know --

5              THE COURT:   Would you speak up, please, sir?   I'm

6    having a little difficulty hearing you, but it's probably more

7    a function of my aged hearing than your voice, but it will help

8    if you speak up, please.

9              THE WITNESS:   Yes, Your Honor.

10             MR. ANDRES:   May I inquire, Judge?   May I continue,

11   Your Honor?

12             THE COURT:   Yes, you may.

13   BY MR. ANDRES:

14   Q.   Do you know an individual named Paul Manafort?

15   A.   Yes, sir.

16   Q.        How do you know Mr. Manafort?

17   A.   I was introduced to him through a woman by the name of

18   Ann DiCola from Bank of Internet.

19   Q.   Were you involved in funding loans for Mr. Manafort on

20   behalf of The Federal Savings Bank?

21   A.   Yes.

22   Q.   How many loans?

23   A.   Two.

24   Q.   What was the total value of those loans?

25   A.   16 million.   16 million.

Raico - Direct                                                                    2011

1   Q.    Did the -- did those loans relate to particular

2   properties?

3   A.    Yes.

4   Q.    What properties?

5   A.    One property in South Hampton, New York, and another

6   property in -- which was cross-collateralized by a property in

7   Virginia, and a third on 377 Union Street in Brooklyn, New

8   York.

9   Q.    Can you describe the structure of the first funded loan?

10  A.    The first funded loan was a cash-out refinance on the

11  South Hampton property, paying off the first mortgage with

12  additional cash-out and additional collateral that was

13  securitized was a Virginia property.

14  Q.    And how much was that loan for?

15  A.    9.5 million.

16  Q.    What does it mean to be a cash-out refinance?

17  A.    Whatever existing first mortgage is outstanding, that is

18  paid off, and then there is cash that's added up to the total

19  of the $9.5 million.

20  Q.    With respect to the loan that closed relating to the

21  Bridgehampton property, did that -- did the structure of that

22  loan change over time?

23  A.    Yes.

24  Q.    Okay.  Can you explain what the initial properties

25  involved and how the loan changed?

Raico - Direct                                                      2012

1   A.    Sure.   Initially, the -- the first project was supposed to

2   be a construction take-out loan of a California property, I

3   believe 2401 Nottingham, and at the closing table, Mr. Manafort

4   had suggested that instead of moving forward with the

5   construction take-out loan on the California property, since

6   the Bridgehampton property was going to be cross-collateralized

7   as well, that we just do a cash-out refinance on the

8   Bridgehampton property and cross the Virginia property, and not

9   the California property.

10  Q.    When the loan changed from the construction loan to the

11  Bridgehampton loan, did the risk profile of the loan change?

12  A.    Yes.

13  Q.    Can you explain how it changed?

14  A.    A construction loan and take-out is -- the risk for the

15  bank is alleviated once the loan -- once the loan is closed and

16  the construction is finished, the loan is paid off.  Property

17  is sold and the loan is paid off.

18            On a cash-out refinance, it's a typical mortgage

19  transaction with a much longer course of time.

20  Q.    So the duration of the two loans, can you explain the

21  difference of a duration of a construction loan and the

22  duration of the mortgage loan?

23  A.    Sure.  There's a short-term loan and a much longer term

24  loan.  A construction loan is essentially much shorter.  Once

25  the property is finished with construction, whether it be 6,

Raico - Direct                                                          2013

1    12, 18 months, the property is sold, and the loan is paid off.

2              A cash-out refinance is until the property is ever

3    sold or -- by the particular borrower.

4    Q.   And who do the loans differ in terms of what the bank

5    relies on for the source of repayment of the loan?

6    A.   The construction loan is essentially more so based on the

7    property value.  As the property value rises through the time

8    of construction, the loan is sold and the property is sold and

9    the loan is paid off.

10             On a cash-out refinance, it's more so based on the

11   economic profile of the borrower.

12   Q.   Okay.  Can you describe the structure of the second

13   loan -- I'm sorry -- excuse me.

14             Did you receive a commission on this first loan?

15   A.   Yes, sir.

16   Q.   How much was the commission?

17   A.   95,000.

18   Q.   Do you know the date that the loan closed?

19   A.   November 16, 2016.

20   Q.   And do you know whether that was relative to the time of

21   the 2016 presidential election?

22   A.   It was shortly thereafter.

23   Q.   You said there was a second loan.  Can you describe the

24   structure of the second loan?

25   A.   The second loan was a construction take-out loan on 377

Raico - Direct                                                          2014

1   Union Street in Brooklyn, New York.

2   Q.    Okay.  And what was the value of that loan?

3   A.    6.5 million.

4   Q.    And were there different payments in terms of that loan,

5   different -- was it broken up in some way?

6   A.    It was essentially two, two parts of the loan.  One was a

7   construction loan and one was -- one was the take-out loan and

8   one was the construction piece, the finished -- the property.

9   Q.    Do you know when that loan closed?

10  A.    January 4, 2017.

11  Q.    And do you know if it closed before or after the

12  presidential inauguration?

13  A.    I believe it was before the inauguration.

14  Q.    Did you receive a commission on that loan?

15  A.    I did.

16  Q.    What was the commission?

17  A.    57,000.

18  Q.    With respect to the first loan that was extended to

19  Mr. Manafort, was there someone at the bank who was pushing to

20  expedite the loan?

21  A.    Yes.

22  Q.    Who?

23  A.    Stephen Calk.

24  Q.    Who's Stephen Calk?

25  A.    The chairman and CEO.

Raico - Direct                                                        2015

1    Q.    During the time of the first loan, was Mr. Calk involved

2    in the loan process?

3    A.    Yes.

4    Q.    Was he directly involved in the negotiations?

5    A.    Yes.

6    Q.    With respect to the second loan, was Mr. Calk involved in

7    that?

8    A.    Yes.

9    Q.    And was he directly involved in the negotiations?

10   A.    Yes.

11   Q.    Over the course of the time that you've worked at The

12   Federal Savings Bank, has Mr. Calk ever been involved directly

13   in the negotiations of any of the loans that you've worked on?

14   A.    No, sir.

15          MR. WESTLING:  Objection.  Leading.

16          THE COURT:  Overruled.  He can answer.  Proceed.

17   BY MR. ANDRES:

18   Q.    Mr. Raico, let me direct your attention to June 27, 2017.

19   Were you interviewed by the FBI at that time?

20   A.    Yes, sir.

21   Q.    Where?

22   A.    At my home.

23   Q.    And what were you asked about?

24   A.    Mr. Manafort.

25   Q.    Okay.  And the loans from The Federal Savings Bank?

Raico - Direct                                                    2016

1    A.    Yes, sir.

2    Q.    Did you later agree to be interviewed by the Government?

3    A.    Yes.

4    Q.    Were those interviews conducted pursuant to a proffer

5    agreement?

6    A.    Yes.

7    Q.    Can you explain what a proffer agreement is?

8    A.    That anything I say cannot be used against me as long as

9    I'm truthful.

10   Q.    Do you know if The Federal Savings Bank produced documents

11   to the Government in this case?

12   A.    Yes.

13   Q.    Did you meet with the Government to review those

14   documents?

15   A.    Yes.

16   Q.    Did you receive a subpoena for your testimony here today?

17   A.    Yes.

18   Q.    And are you testifying pursuant to an immunity order?

19   A.    Yes, sir.

20         MR. ANDRES:  Your Honor, may I provide a copy of the

21   immunity order to Mr. Flood to show to the witness?

22         THE COURT:  Yes.

23         MR. ANDRES:  It's marked as Government Exhibit 2A.

24         THE COURT:  Do you intend to offer it?

25         MR. ANDRES:  Yes, Your Honor.

Raico - Direct                                                      2017

1          THE COURT:  All right.

2    BY MR. ANDRES:

3    Q.   Mr. Raico, I'm not sure you've seen this before because it

4    was just recently signed.

5          Do you see your name in that order?

6    A.   Yes, sir.

7    Q.   Okay.  I'm going to represent to you that that's a copy of

8    the immunity order.  Can you tell me what you -- have you seen

9    something similar to that in the past?

10   A.   Yes, sir.

11   Q.   Okay.  Can you explain to me what you understand that

12   order to involve?

13   A.   Again, that anything that I say today cannot be used

14   against --

15          THE COURT:  I can't hear you, sir.  Speak up, please.

16          THE WITNESS:  I'm sorry.

17          Anything that I say today cannot be used against me

18   as long as I am truthful.

19   BY MR. ANDRES:

20   Q.   Okay.  And as you understand it, who offered immunity to

21   you?

22   A.   The Department of Justice.

23   Q.   You testified that you were involved in the loan process

24   at The Federal Savings Bank.  Can you explain the types of

25   loans that you work on?

Raico - Direct                                                        2018

1    A.    There's two different types.   There's conventional loans,

2    which are traditional loans that are smaller in nature, sold

3    off in the secondary market to other investors, and then

4    there's the portfolio loans, which are generally much larger in

5    nature and they're not sold off.   They're held in the bank's

6    portfolio.

7    Q.    When you say that a loan is sold off in the secondary

8    market, what does that mean?

9    A.    It goes the Fannie and Freddie route.

10   Q.    With respect to the loans that were, that were extended to

11   Mr. Manafort, what type of loans were those?

12   A.    Portfolio loans.

13   Q.    With respect to the bank, The Federal Savings Bank's

14   process for approving the different loans, conventional or

15   portfolio, are those processes different?

16   A.    Yes.

17   Q.    Can you explain what the process is for approving a

18   conventional loan?

19   A.    Conventional loan is taken by a salesperson, like myself,

20   handed off to an assistant, it goes to processing,

21   underwriting, closing, post-closing, sold off in the secondary

22   market.   It's a very specific work flow.

23   Q.    And with respect to portfolio loans, how are those

24   approved within The Federal Savings Bank?

25   A.    A salesperson like myself would set up a sheet, what's

Raico - Direct                                                    2019

1   called a portfolio loan summary, and send it to Chicago, where

2   the headquarters are and where the credit committee sits.

3   Q.   What is the credit committee at The Federal Savings Bank?

4   A.   It's comprised of three voting members and two additional

5   members that make a credit decision.  It's Stephen Calk, the

6   chairman; Javier Ubarri, the president; Jim Norini, the CFO;

7   Jim Brennan, senior credit officer; and Tom Horn, one of the

8   underwriters.

9   Q.   You mentioned that James Brennan plays a role in the

10  credit committee.  What role does he play?

11  A.   He's a senior credit officer.

12  Q.   And why is it, as you understand it, that portfolio loans

13  need the approval of the credit committee?

14  A.   I'm sorry, can you say that again?

15  Q.   Why is it, as you understand it, that portfolio loans need

16  the approval of the credit committee?

17  A.   They're unique in nature.  It's a different type of

18  transaction.

19  Q.   Does it relate to the bank's risk?

20  A.   Yes.

21  Q.   With respect to portfolio loans, what -- what role do you

22  play in the process?

23  A.   I'm the front salesperson.

24  Q.   Okay.  And once the portfolio loan is approved by the

25  credit committee, are there additional steps or conditions that

Raico - Direct                                                         2020

1   are required?

2   A.   Yes.  After initial approval, it's approved subject to

3   underwriting.  So the back office does all of the underwriting

4   in Chicago and I help gather some of the documentation.

5   Q.   With respect to Mr. Manafort's loans, do you know who was

6   involved in the underwriting?

7   A.   I believe Jim Brennan and Tom Horn.

8   Q.   And do you play any role in the underwriting process?

9   A.   No.

10  Q.   Are you involved in gathering documents from the borrower?

11  A.   Yes.

12  Q.   And were you involved with respect to Mr. Manafort loans

13  in gathering documents?

14  A.   Yes.

15  Q.   Okay.  Did you play any role in actually reviewing those

16  documents?

17  A.   No.

18  Q.   Once you receive documents, what do you do with them?

19  A.   I either hand them off to my assistant or I simply send

20  them to Chicago.

21  Q.   Okay.  Do you know if the documents are put into a program

22  called Encompass?

23  A.   Yes.  That's our loan origination system.

24  Q.   And what's Encompass?

25  A.   Our loan origination system.

Raico - Direct                                                    2021

1  Q.   You testified that you worked with Mr. Manafort on certain

2  loans.   Approximately, when did you first start working with

3  him?

4  A.   April of 2016.

5  Q.   And at that time, was he partnering with another

6  individual?

7  A.   Yes.

8  Q.   Who was that?

9  A.   His son-in-law, Jeff Yohai.

10 Q.   Did you learn that Mr. Manafort, together with Mr. Yohai,

11 were working on projects as they related to certain properties?

12 A.   Yes.

13 Q.   Where were those properties located?

14 A.   Several in California and a couple in New York.

15 Q.   When you first started working with Mr. Manafort and

16 Mr. Yohai, how would you describe the process?

17 A.   A bit disorganized, unstructured, scattered.

18 Q.   And what do you mean by that?

19 A.   There were multiple discussions with various properties in

20 various stages of construction, just different phases of

21 properties looking for financing.

22 Q.   When you first got the referral to work with Mr. Manafort,

23 did you contact anyone else in the bank?

24 A.   Yes.

25 Q.   Who did you contact?

Raico - Direct                                                    2022

1    A.    Steve Calk.

2    Q.    Okay.   Why?

3    A.    Because he was the chairman of the bank.

4    Q.    And what about Mr. Manafort led you to call Mr. Calk?

5    A.    I came to learn that Mr. Manafort was involved in

6    politics, and I knew Steve was interested in politics, and on

7    the portfolio loan summary, at the bottom of the summary, you

8    generally tell and overview as much personal information as you

9    possibly can, and that was included in part of the portfolio

10   loan summary.

11   Q.    And do you remember what, what Mr. Calk's reaction was

12   when you told him that you'd gotten a referral relating to

13   Mr. Manafort?

14   A.    Yes.  He wanted to meet him.

15   Q.    Okay.  At some point in the process, did you meet with

16   Mr. Manafort?

17   A.    Yes.

18   Q.    Did you have dinner with him at some point?

19   A.    Yes.

20   Q.    When was that?

21   A.    May of 2016.

22   Q.    And where did that dinner take place?

23   A.    The Capital Grille, in the lobby of the 120 Broadway

24   office.

25   Q.    And what city is that in?

Raico - Direct                                                    2023

1    A.    Manhattan.

2    Q.    Who attended that dinner?

3    A.    Paul Manafort, Steve Calk, Robert Jones, myself,

4    Felix Katz, Jeff Yohai, and Greg Werd.

5    Q.    Okay.  With respect to Greg Werd, who is that?

6    A.    I believe he's an investment banker with Goldman Sachs.

7    Q.    And Robert Jones, who is that?

8    A.    He's my immediate supervisor.

9    Q.    You also mentioned Felix Katz.  Who's Felix Katz?

10   A.    Felix Katz was the mortgage broker that knew Bank of

11   Internet, which is how I got the referral.

12   Q.    What was discussed at the dinner?

13   A.    Politics, loans, anything that came to subject matter.

14   Q.    Do you know if Mr. Manafort and Mr. Calk got an

15   opportunity to speak privately?

16   A.    Yes.

17   Q.    How do you know about that?

18   A.    They were sitting close together.

19   Q.    At the time of the meeting, do you know where Mr. Manafort

20   was working?

21   A.    Yes.

22   Q.    Where?

23   A.    I understood he was involved in the Trump campaign.

24   Q.    Okay.  Did there come a time that you had an additional

25   meeting with Mr. Manafort, Mr. Yohai, and Steve Calk?

Raico - Direct                                                      2024

1    A.    Yes.

2    Q.    Do you know approximately when that was?

3    A.    July 27 of 2016.

4    Q.    And what was the nature of the meeting?  Was it in -- was

5    it in person?  Was everyone in the same place?  Can you explain

6    where everybody was?

7    A.    Sure.  Mr. Manafort, Mr. Yohai, and myself were in one of

8    the conference rooms of 120 Broadway, and Steve Calk was

9    video-conferenced in.

10   Q.    Okay.  What was discussed during the meeting?

11   A.    A number of properties that Mr. Manafort and Mr. Yohai

12   were looking for financing.

13   Q.    During this period, had you started to receive financial

14   information from Mr. Yohai?

15   A.    Yes.

16   Q.    And had you received financial information from

17   Mr. Manafort?

18   A.    Yes.

19   Q.    At the end of the videoconference, did Mr. Calk make a

20   request of Mr. Manafort?

21   A.    Yes, he did.

22   Q.    What did he -- what did he request?

23   A.    He indicated that he would be interested in helping serve

24   the Trump Organization.

25   Q.    Can I ask you to take a look at Government Exhibit 265?

Raico - Direct                                                        2025

1    A.   Yes.

2    Q.   Before I ask you to look at that, after the meeting, the

3    videoconference with Mr. Calk, Mr. Yohai, and Mr. Manafort, was

4    there -- was Mr. Manafort's loan submitted for approval?

5    A.   Yes.

6    Q.   How soon after the meeting with Mr. Calk was the loan

7    submitted for approval?

8    A.   That same day.

9    Q.   And how soon after you submitted the loan for approval was

10   it approved?

11   A.   The very next day.

12   Q.   Okay.  During the course of your time at The Federal

13   Savings Bank, have you ever been aware of a loan that's been

14   approved in that period of time?

15   A.   No.

16   Q.   Okay.  Now, can I ask you to take a look at Government

17   Exhibit 265?

18   A.   Yes.

19   Q.   Do you have that in front of you?

20   A.   I do.

21   Q.   Have you seen that before?

22   A.   I have.

23   Q.   Is that an e-mail that relates to your work at The Federal

24   Savings Bank?

25   A.   Yes.

Raico - Direct                                                       2026

1   Q.   And does it relate to the work you did for Mr. Manafort?

2   A.   Yes.

3           MR. ANDRES:   The Government moves to admit Government

4   Exhibit 265.

5           MR. WESTLING:   No objection, Your Honor.

6           THE COURT:   It's admitted.

7           (Government Exhibit No. 265 was received in

8   evidence.)

9           MR. ANDRES:   May I publish it, Your Honor?

10          THE COURT:   Yes.

11  BY MR. ANDRES:

12  Q.   Can I ask you to start, Mr. Raico, at the second-to-last

13  page, Bates No. 14256?  Do you see that?

14  A.   Yes.

15  Q.   And can I focus you specifically on the e-mail at the

16  bottom at 9:37 p.m.?

17  A.   Yes.

18  Q.   Can you tell me who are the people that are included in

19  that e-mail?

20  A.   It's an e-mail that I had sent to Steve Calk, Javier

21  Ubarri, Jim Brennan, and Jim Norini.

22  Q.   And what is the subject of the e-mail?

23  A.   "Revised Portfolio Summary - Paul Manafort and Jeff

24  Yohai."

25  Q.   Okay.  And can you -- without reading it word for word,

1  can you summarize what you're communicating in this e-mail?

2  A.   That I'm revising the structure of the loan for

3  Mr. Manafort and Mr. Yohai, that we are -- it was my

4  understanding that we were considering moving forward with the

5  property in California, with a transfer, asset transfer, from

6  UBS and cross-collateralizing three properties.

7  Q.   Okay.  And did Mr. Brennan reply to that e-mail at the top

8  of the last page?

9  A.   Yes, he did.

10  Q.   Okay.  Who is Mr. Brennan?

11  A.   He's a senior credit officer.

12  Q.   And what did Mr. Brennan -- what was -- again,

13  summarizing, what was his response?

14  A.   Has the construction started?  How far along are they?

15  What's the breakdown of the construction cost and land?  Is the

16  project completed?

17  Q.   Is it fair to say he had questions about the loan?

18  A.   Sure.

19  Q.   Okay.  Could you turn to the page now marked 255?

20       Do you answer the questions for Mr. Brennan?

21  A.   Yes, I do.

22  Q.   Okay.  And if you turn to the first page, what happens

23  next?  Do you receive an e-mail from Mr. Ubarri?

24       THE COURT:  The question is compound, what happens

25  next, and then you went on.  Which question do you wish him to

1    answer?

2              MR. ANDRES:   What happens next.

3              THE WITNESS:   Mr. Ubarri approves the loan.

4    BY MR. ANDRES:

5    Q.   Okay.  And who is Mr. Ubarri?

6    A.   Javier Ubarri is president of the bank.

7    Q.   Does he sit on the credit committee?

8    A.   Yes, he does.

9    Q.   Okay.  And that's the approval that you were talking about

10   earlier that happened after the meeting that you had with

11   Mr. Calk and Mr. Manafort and Mr. Yohai?

12   A.   Correct.

13   Q.   Okay.  After you received the e-mail from Mr. Ubarri, is

14   there another e-mail in the chain?

15   A.   Yes.

16   Q.   And who's that from?

17   A.   Steve Calk.

18   Q.   And what does Mr. Calk write?

19   A.   That this is the term sheet, and he provides the terms of

20   the term sheet.

21   Q.   And what does that mean, a term sheet?

22   A.   It's the approval.

23   Q.   Can I ask you turn to Government Exhibit 268?

24   A.   Yes.

25   Q.   Have you seen that e-mail before?

Raico - Direct                                                      2029

1    A.   Yes.

2    Q.   And are you included in the e-mail string?

3    A.   Yes, I am.

4    Q.   Okay.  And is it an e-mail that relates to your work at

5    The Federal Savings Bank as it -- as to Mr. Manafort's loans?

6    A.   Yes.

7            MR. ANDRES:  The Government moves to admit Government

8    Exhibit 268 and seeks to publish it.

9            MR. WESTLING:  No objection, Your Honor.

10           THE COURT:  It's admitted.  You may do so.

11           (Government Exhibit No. 268 was received in

12   evidence.)

13   BY MR. ANDRES:

14   Q.   I focus you, Mr. Raico, on the bottom e-mail in Government

15   Exhibit 268.

16           Can you tell me who the participants in the e-mail

17   are and the date?

18   A.   It's an e-mail from Paul Manafort on Wednesday, August 3,

19   2016, to myself.

20   Q.   And what's the subject matter?

21   A.   "Need Steve Calk Resume."

22   Q.   Okay.  And what does -- without reading it, what does the

23   body of the e-mail says?

24   A.   Mr. Manafort is asking me to send Steve's curriculum

25   vitae.

Raico - Direct                                                          2030

1    Q.    Do you know why Mr. Manafort was making this request?

2    A.    Yes.

3    Q.    Why?

4    A.    Because Mr. Calk asked if he could help serve the Trump

5    administration.

6    Q.    Okay.  And then at the top, do you reply to the e-mail?

7    A.    Yes.

8    Q.    And what was your response?

9    A.    That I should have it shortly and will send it on to you.

10   Q.    Did you communicate this request to Mr. Calk?

11   A.    I did.

12   Q.    Okay.  During the course of the time that you worked on

13   the loans for Mr. Manafort, did you get various requests to

14   pass messages between Mr. Calk and Mr. Manafort?

15   A.    Sometimes.

16   Q.    Okay.  Did you always pass on those messages?

17   A.    I believe so.

18   Q.    Okay.  Were there instances where you were uncomfortable

19   doing that?

20   A.    Yes.

21   Q.    Okay.  And what instances?  Can you explain that?

22   A.    I received a call from Steve Calk on November 11, and

23   Steve had said to me that he had not spoken with Mr. Manafort

24   in a day or two and thought that he would possibly be up for

25   some role in the Trump administration and had asked me if I

Raico - Direct                                                      2031

1    would call Paul and see if he was a potential candidate for

2    Secretary of the Treasury or Secretary of HUD.

3    Q.   Okay.  And did you make that call?

4    A.   No.

5    Q.   Why not?

6    A.   It made me very uncomfortable.

7    Q.   Okay.  Can I ask you to turn to Government Exhibit 274?

8           Looking at Government Exhibit 274, have you seen that

9    e-mail before?

10   A.   Yes.

11   Q.   Is that an e-mail that related to your work at The Federal

12   Savings Bank?

13   A.   Yes.

14   Q.   And did it relate to the loans extended to Mr. Manafort?

15   A.   Yes.

16          MR. ANDRES:  The Government moves to admit Government

17   Exhibit 274.

18          MR. WESTLING:  No objection.

19          THE COURT:  Admitted.

20          (Government Exhibit No. 274 was received in

21   evidence.)

22          MR. ANDRES:  May I publish it, Your Honor?

23          THE COURT:  Yes.

24   BY MR. ANDRES:

25   Q.   Mr. Raico, can you begin by telling us the participants in

Raico - Direct                                                    2032

1    the e-mail and the date?

2    A.    Sure.  This is from Anna Ivakhnik, who was my assistant at

3    the time, to Tom Horn and cc'ing myself on August 16, 2016.

4    Q.    And who is Tom Horn?

5    A.    One of the underwriters on the committee.

6    Q.    Okay.  In the first line of the e-mail, Ms. Ivakhnik says

7    she spoke to Paul on Thursday.

8          Do you know what the reference to Paul was?

9    A.    Mr. Manafort.

10   Q.    And she says -- she says that she's received documents

11   relating to the increase in income for DMP International and

12   the American Express account.

13         Do you understand that?

14   A.    Yes.

15   Q.    As it relates to the increase in DMP International income,

16   what did you understand that to mean?

17   A.    Exactly what she stated here, that he explained to her

18   that he is in the consulting business and his income

19   fluctuates, his income has been on the upswing for over the

20   past several years, and that she anticipates it will be able to

21   garner higher fees going forward.

22   Q.    The reference to his income has been on the upswing over

23   the past few years, what does that mean?

24   A.    Escalating.

25   Q.    Over the course of the time that you worked on the loans

Raico - Direct                                                          2033

1  for Mr. Manafort, were there issues that arose with respect to

2  his income?

3  A.   Yes.

4  Q.   What issues were those?

5  A.   It was my understanding that there were discrepancies in

6  his income.

7  Q.   Can you explain what that means, "discrepancies in his

8  income"?

9  A.   Some of the review from Chicago between tax returns and

10 profits and loss statements, it just -- it didn't -- A plus B

11 didn't equal C all the time.

12 Q.   Okay.  And when you say word from Chicago, when you say

13 "Chicago," what's that in reference to?

14 A.   The credit committee.

15 Q.   Is that where the underwriters at The Federal -- at The

16 Federal Savings Bank are located?

17 A.   Yes.

18 Q.   Okay.  There's a second issue that's listed that relates

19 to the American Express card?

20 A.   Yes.

21 Q.   And the fact that Mr. Manafort lent his card to a friend

22 to purchase season tickets?

23 A.   Yes.

24 Q.   What did you understand that to mean?

25 A.   That there was, I believe, a $300,000 outstanding balance,

1   and the explanation for that was that Mr. Manafort lent the

2   card to a friend who had purchased season tickets.

3   Q.   Did you later learn who that friend was?

4   A.   I did.

5   Q.   Who was it?

6   A.   I believe it was Rick Gates.

7   Q.   Can I ask you to turn to the page marked 400861294?

8        MR. ANDRES:  May I publish that, Your Honor?

9        THE COURT:  Yes.

10  BY MR. ANDRES:

11  Q.   Do you see the document on your screen or in front of you?

12  A.   Yes.

13  Q.   Was that document attached to Ms. Ivakhnik's e-mail?

14  A.   Yes, it is.

15  Q.   Okay.  And who's the heading -- is -- the letterhead,

16  who's listed at the top?

17  A.   Rick Gates.

18  Q.   Okay.  And can you describe for the jury or explain to the

19  jury who the memo is to, who it's from, the subject matter, and

20  the date?

21  A.   Sure.  This is to Mr. Manafort from Mr. Gates regarding

22  the loan to purchase season tickets for the New York Yankees on

23  April 3, 2016, and I believe Mr. Gates goes on to say that --

24  thanking Mr. Manafort for allowing him to use the AmEx card to

25  purchase the season tickets and that he expected to collect the

Raico - Direct                                                          2035

1    fees from various people who will be partnering with him to use

2    the tickets and will pay off the entire balance by May 30.

3    Q.   Okay.  Can I ask you to turn to the -- are Mr. Manafort's

4    American Express records also attached to this exhibit?

5    A.   Yes.

6    Q.   Can I ask you to turn to 1307?

7           MR. ANDRES:  Your Honor, the highlighting in this

8    document was included when it was produced to the Government.

9           THE COURT:  All right.  Proceed.

10   BY MR. ANDRES:

11   Q.   Can you look at the top of 1307?

12   A.   Yes.

13   Q.   Can you explain the first three charges and the amounts

14   for those charges?

15   A.   It states on February 15 of 2016, Major League Baseball

16   New York Yankees ticketing, $10,602; February 15, 2016, Major

17   League Baseball New York Yankees ticketing, $99,999;

18   February 15, 2016, Major League Baseball New York Yankees

19   ticketing, $99,999.

20   Q.   Okay.  Do you know why it was an issue that

21   Mr. Manafort -- what issue arose with respect to Mr. Manafort's

22   American Express card as it related to his application for

23   loans at The Federal Savings Bank?

24   A.   It was a large outstanding balance.

25   Q.   Okay.  And why is that relevant to the banks?

Raico - Direct                                                    2036

1    A.    It goes towards credit.

2    Q.    Okay.  Did it go --

3              THE COURT:  I didn't hear your answer.

4              THE WITNESS:  I'm sorry.  It goes toward credit.

5              THE COURT:  Next question.

6    BY MR. ANDRES:

7    Q.    Does it go to his ability to make payments on the loan?

8    A.    Yes.

9    Q.    How so?

10   A.    Well, there's a debt-to-income ratio, the debt that you're

11   currently carrying according to the income that you're making,

12   there's a multiple that's used to see what's reasonable for an

13   individual to have a lower debt-to-income ratio.

14   Q.    With respect to the business that's listed or the -- on

15   the top of the record at 3707, where it says American Express

16   Plum Card, who's listed under that?

17   A.    Davis Manafort Part, Paul Manafort.

18   Q.    Okay.  During the course of the time that you worked on

19   these loans for Mr. Manafort, do you know if Mr. Calk and

20   Mr. Manafort were meeting separately?

21   A.    Yes.

22   Q.    Did they attend lunches together?

23   A.    Yes.

24   Q.    How did you know about that?

25   A.    Mr. Calk would tell me.

Raico - Direct                                                      2037

1    Q.    Okay.  And during those lunches or meetings, would they

2    discuss the details of the loans extended to Mr. Manafort?

3    A.    I believe so.

4    Q.    Okay.  Did you learn about any terms that were agreed to

5    from Mr. Calk?

6    A.    Yes.

7              THE COURT:  Wouldn't this be hearsay?

8              MR. ANDRES:  No.  Your Honor, I can explain.

9              THE COURT:  All right.  Come to the bench and

10   explain.

11             Well, wait just a moment.  Is there an objection on

12   hearsay grounds?

13             MR. WESTLING:  Late, but objection, hearsay, Your

14   Honor.

15                       (Laughter.)

16        (Bench conference on the record.)

17             THE COURT:  All right.  Can you at least tell me what

18   you think the hearsay is?

19             MR. WESTLING:  I believe that this witness would be

20   saying what Mr. Calk told him.  Mr. Calk is not a witness in

21   this case and not available for cross-examination, and I don't

22   know that it fits with any exception of the rule.

23             MR. ANDRES:  Mr. Calk is a coconspirator, and he

24   participated in the conspiracy to defraud the bank.

25             THE COURT:  All right.  Now, what evidence -- what

Raico - Direct                                                          2038

1  evidence do I have that would permit me to make a determination

2  by a preponderance of the evidence that he's a coconspirator?

3  Because otherwise, 801(d)(2)(E) does not apply, and I have to

4  make such a determination.

5           MR. ANDRES:  Understood, Your Honor.  So the --

6  you've heard evidence from Mr. Gates that Mr. Manafort was

7  inquiring to propose Mr. Calk for a range of different

8  positions within the Trump campaign and the administration,

9  both to serve on the National Economic Committee and later to

10 serve as the Secretary of the Army, and Mr. Gates didn't know

11 the details of these loans, although he was involved in the

12 loans in some respects, and you've seen e-mails as well,

13 communications between Mr. Calk and, I believe, Mr. Manafort.

14          THE COURT:  I'm still not sure I see how you think

15 it's a conspiracy to commit some bank fraud.

16          MR. ANDRES:  Conspiracy is that Mr. Manafort -- you

17 will learn through this witness and the next that Mr. Manafort

18 was submitting both false documents and other material to the

19 bank, and notwithstanding the fact that he wouldn't have

20 otherwise qualified for those loans, Mr. Calk approved those

21 loans, and it's the government's theory that he did that

22 because he was trying to obtain a position within the Trump

23 administration.

24          THE COURT:  All right.  Well, that's understandable

25 as a theory, but I have to find in a conspiracy evidence

Raico - Direct                                                          2039

1   sufficient to the conspiracy that would permit the operation of

2   801(d)(2)(E).  Do you agree with that?

3           MR. ANDRES:  Yes, Your Honor.

4           THE COURT:  You just think there is evidence by a

5   preponderance of the evidence that I've heard thus far or that

6   you forecast I may hear that show that Mr. -- how do you

7   pronounce his name?

8           MR. WESTLING:  Mr. Calk.

9           THE COURT:  How do you spell it?

10          MR. WESTLING:  C-a-l-k.

11          THE COURT:  C-a-l-k.

12          Mr. Calk and Mr. Manafort were conspiring to defraud

13  the bank.

14          MR. ANDRES:  So here's the evidence you've seen so

15  far.  You've seen that the bank, Mr. Raico testified that the

16  bank extended the loans.  You've heard that Mr. Calk was

17  involved in those loans, that he generally wasn't involved in

18  those loans.

19          You've heard that Mr. Calk and Mr. Manafort were

20  meeting, and through the testimony of Mr. Gates, you've seen

21  that Mr. Manafort was proposing to Mr. Gates certain positions

22  within the administration for Mr. Calk.  That's the evidence to

23  date, Your Honor.

24          And the Government's --

25          THE COURT:  Why isn't that -- go ahead.

Raico - Direct                                                          2040

1           MR. ANDRES:  I'm sorry, I didn't mean to interrupt.

2    The Government's position is that it's a circumstantial basis

3    that certainly proves by a preponderance of the evidence that

4    there was a conspiracy.

5           THE COURT:  What's your view on whether that evidence

6    is adequate to justify the invocation of 801(d)(2)(E)?

7           MR. WESTLING:  Your Honor, I don't think it is.  I

8    think what it shows is that there were communications between

9    these two gentlemen about a possible position.  If you're

10   putting the evidence in the light most favorable to the

11   government, there is no connection that I've seen established

12   on the record, the evidence to suggest that was connected in

13   any way to the loans.  There's been no evidence to suggest it

14   influenced any decisions, and it seems to me there is no

15   evidence to show Mr. Calk was intending to defraud his own

16   bank, which is --

17          THE COURT:  Well, that's what I want to get back to,

18   Mr. Andres.  Mr. Calk is what at the bank?

19          MR. ANDRES:  He's not the sole owner of the bank.  He

20   owns a large percentage of the bank.  Together with his

21   brother, they own approximately 80 percent.

22          THE COURT:  All right.

23          MR. ANDRES:  Beyond that, there are other

24   shareholders in the bank.

25          And if I might, Your Honor, the, the Court has heard

Raico - Direct                                                    2041

1    that the loans were both approved, one around the time of the

2    presidential election, and the second one around the time of

3    the inauguration.  You've also heard that Mr. Calk sought a

4    position on the, on the campaign and got one, and Mr. Raico has

5    testified that he felt pressured throughout the process to

6    proceed with those loans even though they otherwise had

7    troubling issues.

8            THE COURT:  I think that's all true.  I'm still not

9    sure that I see evidence by a preponderance that there was a

10   conspiracy.  The trouble I'm having is that one of the

11   conspirators is an owner of the bank that you contend was

12   defrauded.

13           MR. ANDRES:  He's not the sole owner, Your Honor.

14   He's an owner.  He's part of the ownership.

15           THE COURT:  He's also an officer of the bank.

16           MR. ANDRES:  Correct.

17           THE COURT:  And how are you going to show materiality

18   with respect to any fraud in that regard?

19           MR. ANDRES:  We're going to show materiality because

20   there were -- the bank, the bank employees who relied on those

21   documents didn't know that they were false at the time, and

22   that Mr. Manafort submitted a series --

23           THE COURT:  But Mr. Coke did -- or Calk did?

24           MR. ANDRES:  It's not clear that he understood.

25   There's no testimony to that.  The underwriter will testify

```
Raico - Direct                                                    2042
```

 1    that they relied on a variety of documents that Mr. Manafort

 2    submitted that were false.

 3             MR. WESTLING:  I would suggest, Your Honor, that if

 4    Mr. Calk didn't know that Mr. Manafort was committing a fraud

 5    in the bank, it would be impossible for him to have been

 6    conspiring within that --

 7             THE COURT:  That's right; he would be.  He'd have to

 8    have knowledge of that.

 9             MR. ANDRES:  Your Honor, Mr. Calk is not the bank.

10    He is part of the bank.

11             THE COURT:  I understand that, but he is a part-owner

12    of the bank, and I assume he had knowledge that they were false

13    documents.

14             MR. ANDRES:  No one at the bank will say that they

15    were necessarily false documents.  There were a range of issues

16    and red flags that were raised with the bank that would

17    normally cause the bank to do additional due diligence and

18    identify those issues, and notwithstanding those issues,

19    Mr. Calk pushed forward and moved the loans forward.

20             So the point is he didn't follow the normal practice.

21    He was aware of the red flags, but he didn't look into them,

22    and he approved the loans.

23             THE COURT:  Well, I keep coming back to I don't see

24    the materiality, and I don't see a conspiracy to commit the

25    fraud, but I hear your arguments.

Raico - Direct                                                          2043

1              How much more do you have with this witness?

2              MR. ANDRES:  I would say I have a half-hour with this

3      witness, and then, and then the underwriter will testify either

4      next or soon after.  I think there's another short witness in

5      between.

6              THE COURT:  On this same loan?

7              MR. ANDRES:  Yeah.  There are two loans, and he'll

8      testify that the information provided by Mr. Manafort was

9      important to the bank and that they relied on it.

10             THE COURT:  All right.  And how many witnesses do you

11     have remaining total?

12             MR. ANDRES:  We have a total of four today.  This is

13     the first of the four.  This is one of the longer ones.  Two of

14     the four are approximately 15 minutes in length.

15             THE COURT:  And what are the two that are the short

16     ones?

17             MR. ANDRES:  So the short ones are one from the New

18     York Yankees.  You've just seen a letter that says that, you

19     know, Mr. Gates bought the Yankees tickets, and the custodian

20     of records from the Yankees will testify that there's no record

21     of Mr. Gates ever purchasing season tickets and that

22     Mr. Manafort did for years.

23             The other short witness is just a custodian --

24             THE COURT:  And what is that relevant to?  Just

25     remind me.  I'm sure it is; I just don't remember.

```
Raico - Direct                                                      2044
```

1           MR. ANDRES:  It's relevant because Mr. Manafort made

2   a representation to The Federal Savings Bank not that he wasn't

3   able to pay his own American Express records, but rather, that

4   he lent his card to Mr. Gates, and the problem was Mr. Gates --

5   obviously, Your Honor, if someone is not able to pay their

6   bills, that's not a factor that -- that's nothing that would

7   enamor a bank in terms of extending a loan.

8           THE COURT:  I don't recall whether Mr. Gates said

9   anything about this subject.  Remind me.

10           MR. ANDRES:  He did.  Mr. Gates testified about one

11   portion of this, which is that Mr. Gates testified that

12   Mr. Manafort, while Mr. Gates was on the campaign, asked him

13   for certain things on behalf of Mr. Calk.  So he asked him to

14   suggest his name as a Secretary -- different positions, I think

15   Secretary of the Treasury, Secretary of the Army.

16           He also made a request that he get inauguration

17   tickets for both Mr. Manafort and Mr. Calk.  So he testified

18   about the relationship between Calk and Manafort.

19           THE COURT:  All right.  Tell me -- yes, you can

20   confer.

21           MR. ANDRES:  Sorry.  And that he didn't buy the

22   tickets, that he's never done that, and that, in fact, he saw

23   this letter, Mr. Manafort asked him to sign it, he knew that it

24   was going to be used for some type of bank application, but he

25   didn't know specifically.

Raico - Direct                                                              2045

1          THE COURT:  All right.  Now, tell me one more time

2   what evidence do you expect me to hear that I haven't already

3   heard that goes to the question of whether Mr. Calk and

4   Mr. Manafort conspired to commit fraud against the bank of

5   which Mr. Calk owned a substantial amount of the stock, maybe

6   even as much as 80 percent with a family member?

7          MR. ANDRES:  So, Your Honor, it's not -- I'm not sure

8   that it's clear that Mr. Calk is involved necessarily.

9   Mr. Calk has other criminal liability aside from this bank

10  fraud.

11         THE COURT:  Yes, but all I'm interested in is this

12  hearsay statement --

13         MR. ANDRES:  I understand.

14         THE COURT:  -- and I want to figure out whether it

15  should come in under 801(d)(2)(E), and that's why I've asked

16  you what evidence have I not yet heard that I can expect to

17  hear that will persuade me by a preponderance of the evidence

18  that there is a conspiracy between Calk and -- or not between,

19  but including Manafort and Calk to defraud the bank?

20         MR. ANDRES:  The evidence from the underwriter is

21  that Mr. Manafort submitted a series of documents which they

22  relied on, but if they knew it was false, they would not have

23  approved the loan, and that the loan did not go through the

24  normal process because Mr. Calk was expediting the loan and

25  pushing it through, notwithstanding the red flags.

Raico - Direct                                                      2046

1             So there was agreement between Mr. Manafort and

2    Mr. Calk to have the loans approved, they were approved, and in

3    turn, Mr. Manafort proposed Mr. Calk for certain positions

4    within the administration.

5             THE COURT:  It's fairly simple, as I see what the

6    argument is, despite the number of words we've spilled on it.

7    The conspiracy alleged is that Mr. Manafort and Calk agreed

8    that they would submit false information to the bank in order

9    to get the bank to issue a loan that the bank would not

10   otherwise have issued.  It's really that simple.

11            And he says the evidence of that is that Mr. Calk

12   wanted a job with Mr. Trump and that that was his motivation

13   for doing it and that he expedited the loan, which reflects

14   that there was an agreement between him and Mr. Manafort to do

15   this.

16            Why isn't that enough to trigger 801(d)(2)(E)?

17            MR. WESTLING:  Well, Your Honor, I guess I would take

18   issue with the proffer, which I think is -- I don't believe

19   there will be any evidence nor am I aware of any evidence that

20   Mr. Calk knew anything that was being submitted to the bank

21   was, in fact, false.

22            I think what the government is saying is that

23   Mr. Manafort submitted what he did and it didn't get reviewed

24   because Mr. Calk had already decided to give the loan, and so I

25   don't think there's any reliance on any of the things

Raico - Direct                                                        2047

1   Mr. Manafort submitted.  I don't think there's any evidence of

2   a conspiracy to defraud this bank.

3              THE COURT:  All right.  I'm going to permit him to

4   ask him, get an answer.  However, I'm going to tell you I will

5   strike the testimony in its entirety if I'm persuaded that it

6   doesn't come in under 801(d)(2)(E).  I'll permit you to submit

7   a brief which attacks its admissibility.

8              Now, the bit about whether there was a fraud on the

9   bank because the bank knew everything and it wasn't material,

10  that's a separate issue.

11             MR. WESTLING:  Understood.

12             THE COURT:  That's not admissibility of this

13  particular piece of evidence.  That's on whether I should

14  strike that because there isn't a conspiracy to do that.

15             MR. WESTLING:  Understood.

16             THE COURT:  Is that one of the counts?

17             MR. ASONYE:  Yes, Your Honor.

18             THE COURT:  That's one of the counts.  So the count

19  would go.  If -- there can't be a conspiracy to commit a fraud

20  if the elements of the fraud are not met, and materiality is

21  one of the elements of the fraud, and you're now contending

22  that the government will not be able to show evidence of

23  materiality sufficient to warrant the jury to consider that

24  under Rule 29.

25             MR. WESTLING:  That's correct, Your Honor.

```
Raico - Direct                                                    2048
```

1           THE COURT:  That's when I'll consider it.

2           MR. WESTLING:  Yes, sir.

3           THE COURT:  But what I'll permit you to address if

4  you wish to, you're not required to, earlier is whether or not

5  I should have -- or should admit this statement under

6  801(d)(2)(E), in other words, is there evidence of a

7  conspiracy.

8           Now, I tell you, I'm not going to parse through this

9  record in the event that I find he's right and you're wrong.

10  If I strike it because of this, it all goes, this particular

11  testimony of the witness on this issue.  I'm not going to parse

12  through and figure out what happens if I eliminate -- I can't

13  expect a jury to understand eliminating the answer to this

14  question and what that does to everything.  Maybe you can

15  suggest to me how I can do that, but we're not there.  I

16  haven't determined.

17           I've permitted you to ask this question, to elicit

18  the answer.  I'm giving the defendant an opportunity to tell me

19  why, why on the basis of everything I've heard 801(d)(2)(A) is

20  not triggered -- 801(d)(2)(E).

21           MR. ANDRES:  I'm going to move on and ask a different

22  question, Your Honor.  Thank you for your time.  Which isn't to

23  say I meant to waste your time, but if the process is we have

24  to strike the whole, it's not worth it.

25           THE COURT:  No, I understand.  Let's go on.

Raico - Direct                                                          2049

1              MR. ANDRES:  Thank you, Your Honor.

2              (End of bench conference.)

3              THE COURT:  Next question, Mr. Andres.

4              MR. ANDRES:  Thank you, Your Honor.

5    BY MR. ANDRES:

6    Q.   Mr. Raico, if I could ask you to turn to Government

7    Exhibit 276.

8    A.   Yes.

9    Q.   Can you tell me what that is?

10   A.   That's an e-mail from myself to Javier Ubarri on

11   Wednesday, October 5.

12   Q.   Okay.  And does this document also relate to -- does this

13   also relate to the loans extended to Mr. Manafort?

14   A.   Yes.

15             MR. ANDRES:  The Government moves to admit Government

16   Exhibit 276.

17             MR. WESTLING:  No objection, Your Honor.

18             THE COURT:  Admitted.

19             (Government Exhibit No. 276 was received in

20   evidence.)

21   BY MR. ANDRES:

22   Q.   Mr. Raico, if we could start with the e-mail at the bottom

23   of 276?  Do you see that?

24   A.   Yes.

25   Q.   Can you tell me who that e-mail is between?

Raico - Direct                                                          2050

1    A.    From Javier Ubarri to myself.

2    Q.    Okay.  Sorry, the one at the bottom that starts with,

3    "Gentlemen," is that from Mr. Ubarri or from you where it

4    says --

5    A.    I'm sorry, that's mine.

6    Q.    Okay.  And in the beginning of the e-mail, it says, "I met

7    with Steve last night."

8              What is that a reference to?

9    A.    That was -- that's me.

10             (As read):  "I met with Steve last night to further

11   cement the terms in the above mentioned files.  He just

12   finished lunch with Paul Manafort and gave the following

13   specifications.  They're going to be two separate" --

14   Q.    Without -- sorry, Mr. Raico, without reading it.

15             You said that Mr. Steve, who is that a reference to?

16   A.    Steve Calk.

17   Q.    And he says he had lunch with Mr. Manafort and then

18   recites certain terms?

19   A.    Yes.

20   Q.    Okay.  And those terms, without going through each one,

21   what do they relate to?

22   A.    The financing transaction for Nottingham.

23   Q.    Those are the loans that Mr. Manafort has applied for?

24   A.    Yes, it is.

25   Q.    Okay.  And based on the e-mail, who has Mr. Manafort

Raico - Direct                                                          2051

1    spoken to about those terms?

2    A.    Steve Calk.

3    Q.    Okay.  And then at the top of the e-mail, there's a --

4    there's a -- top of the e-mail chain, there's an e-mail with

5    respect to -- from you to Mr. Ubarri.

6              Do you see that?

7    A.    Yes.

8    Q.    And what's represented in that e-mail?

9    A.    I'm indicating to Mr. Ubarri that I should be receiving

10   the 2015 draft tax returns for Jeff and Paul by the end of

11   business.

12             (As read):  "I'm told that the gross income for Jeff

13   will be almost 4 million and for Paul is in excess of

14   5 million.  One of the questions from Jim and Tom was did Paul

15   collect the 2.4 million in receivables, and he did.

16   Additionally, Paul had allowed an associate to purchase Yankee

17   season tickets some time ago on his AmEx for a charge of

18   $300,000, which has since been paid off and proof is

19   forthcoming.  Another question that has surfaced is that Jeff

20   started a luxury car business less than two months ago, and do

21   we have any returns or P&L?  There is no tax return or P&L as

22   the business is brand new, but I will be receiving a letter of

23   explanation on the business today."

24   Q.    Is it fair to say this e-mail relates to the process of

25   you obtaining financial information from Mr. Manafort?

Raico - Direct                                                          2052

1    A.    Yes.

2    Q.    And is there a reference to Mr. Manafort's gross income as

3    of October 5, 2016?

4    A.    Yeah.  It says, (as read):  "I'm told that the gross

5    income for Jeff is almost 4 and for Paul is in excess of 5

6    million."

7    Q.    Okay.  Is that a relevant factor for the bank?

8    A.    Yes.

9    Q.    Okay.  I'm going to ask you to turn to Government Exhibit

10   277.

11   A.    Yes.

12   Q.    And with respect to Government Exhibit 277, have you seen

13   that before?

14   A.    Yes.

15   Q.    And is that an e-mail that relates to your work with

16   Mr. Manafort's loans?

17   A.    Yes.

18         MR. ANDRES:  The Government moves to admit Government

19   Exhibit 277.

20         MR. WESTLING:  No objection.

21         THE COURT:  Admitted.

22         (Government Exhibit No. 277 was received in

23   evidence.)

24   BY MR. ANDRES:

25   Q.    The e-mail at the bottom of the chain, who is that

Raico - Direct                                                      2053

1   between?

2   A.   From Paul Manafort on October 7, 2016, to Steve Calk.

3   Q.   Okay.  And then on the top e-mail, who is that -- who's

4   involved in that e-mail?

5   A.   It's from Steve Calk back to Paul Manafort with myself

6   blind copied.

7           MR. ANDRES:  Your Honor, may I publish this exhibit?

8           THE COURT:  You may.

9   BY MR. ANDRES:

10  Q.   Okay.  Just a technical e-mail term that I want to

11  understand.  On the top e-mail, you're bcc'd.  What does that

12  mean?

13  A.   I'm blind copied.

14  Q.   What does it mean to be blind copied?

15  A.   So, for example, Steve sent the e-mail to Paul, and Paul

16  did not know that I was copied on it.

17  Q.   Okay.  So focusing first on the bottom e-mail between

18  Mr. Manafort and Mr. Calk, what does that e-mail relate to?

19  A.   It indicates, "Steve, we are getting close to closing the

20  loan but there is a major issue.  I don't know how to resolve

21  this problem" --

22  Q.   Again, without reading it, if you'd just summarize what

23  the e-mail relates to?

24  A.   Apparently at lunch, there was -- it was discovered that

25  there was -- instead of a $2.5 million payoff on the first

Raico - Direct                                                    2054

1  mortgage for the Bridgehampton property, it was $3.5 million

2  payoff.  It was a million dollars difference.

3  Q.   Mr. Manafort is telling that to Mr. Calk in the e-mail?

4  A.   Yes.

5  Q.   And at that time, had you been aware that the outstanding

6  mortgage on the Bridgehampton house was for 3.5 million?

7  A.   At that time, yes.

8  Q.   Before you got the e-mail, you knew?

9  A.   Right before I got the e-mail.

10 Q.   How did you find that out?

11 A.   When the -- Chicago was getting the payoff for the current

12 lender, we thought it was for 2.5 million.  It was actually for

13 3.5 million.

14 Q.   Okay.  And is that somebody that Mr. Manafort had

15 disclosed to The Federal Savings Bank?

16 A.   No.

17 Q.   Okay.  Mr. Manafort blames the million-dollar difference

18 on a blackout.  It says, "I must have had a blackout."

19      Did you have an understanding of what that meant?

20 A.   He forgot.

21 Q.   Okay.  And then in the top, later on in the e-mail,

22 Mr. Manafort says, Mr. Manafort writing to Mr. Calk says, "I

23 look to your cleverness on how to manage the underwriting."

24      Did you have an understanding of what that meant?

25 A.   Not specifically.

Raico - Direct                                                    2055

1   Q.   Have you ever been asked by a client to rely on your

2   cleverness to approve a loan?

3   A.   No.

4   Q.   Okay.  In the top e-mail where you're blind copied, can

5   you tell us who that e-mail is from, who it's to, and summarize

6   the e-mail without reading it?

7   A.   Yes.  It is from Steve Calk to Paul Manafort.  I'm blind

8   copied on the same day, Friday, October 7, 2016, and Steve is

9   telling Paul that he'll look into it and get back to him right

10  away.

11  Q.   Okay.  Let me ask you to turn to Government Exhibit 278.

12  Can you tell me what that is?

13  A.   Yes.

14  Q.   Is it an e-mail relating to your work at The Federal

15  Savings Bank?

16  A.   Yes, it is.

17  Q.   And does it relate to the work at -- for Mr. Manafort's

18  loans?

19  A.   Yes.

20          MR. ANDRES:  The Government moves to admit Government

21  Exhibit 278.

22          MR. WESTLING:  No objection.

23          THE COURT:  Admitted.

24          (Government Exhibit No. 278 was received in

25  evidence.)

Raico - Direct                                                              2056

1    BY MR. ANDRES:

2    Q.   Can you tell me, with respect to the e-mail in 278,

3    starting with the top e-mail, who's involved in that e-mail?

4    A.   Tom Horn is sending it to myself and Jim Brennan on

5    Tuesday, October 11th.

6    Q.   Okay.  And around this time, what's the status of

7    Mr. Manafort's loans?

8    A.   It's going through the approval process.

9    Q.   Okay.  And in the course of the -- the loan process, have

10   you received Mr. Manafort's tax returns?

11   A.   Yes.

12   Q.   Okay.  And for what purpose?

13   A.   For calculating income.

14   Q.   Excuse me?

15   A.   For calculating income.

16   Q.   Okay.  In the top e-mail from Mr. Horn to you, what's --

17   what is Mr. Horn conveying to you?

18   A.   That -- can I read it?

19   Q.   Just summarize it, if you can.

20   A.   That the -- we received the 2015 yearend financials for

21   DMP International and that they're considerably different than

22   his tax returns, that the -- they show 4.4 million net income,

23   yet the tax returns on the K-1s only show 344,000.

24   Q.   Okay.  Around this time in October of 2016, are there

25   problems with the loan?

Raico - Direct                                                        2057

1    A.    Yes.

2    Q.    Does Mr. Manafort decide not to proceed --

3    A.    Yes.

4    Q.    -- with the Nottingham loan?

5    A.    Yes.

6    Q.    Can you explain what happened?

7    A.    On October 19th, when we were -- it was essentially the

8    closing of the loan, I got a call from the closing table from

9    the attorneys and Mr. Manafort that instead of -- well, that

10   while we were looking to do a cross-collateralization of a

11   couple of properties, one of the properties that was being

12   crossed was the Southampton property; and mortgage tax is very

13   expensive in the State of New York, so Mr. Manafort had made

14   the suggestion that he did not want to include the California

15   property, he just wanted to do a cash-out refinance on the

16   Southampton property in New York, since he was already going to

17   be paying mortgage tax on it, and then continue to

18   cross-collateralize the Virginia property.

19   Q.    At some point, did Mr. Manafort propose additional terms?

20   A.    Yes.

21   Q.    Can you look at Government Exhibit 280?  Can you tell me

22   what that is?

23   A.    That is an e-mail from Mr. Manafort to myself, cc'ing his

24   attorney, Bruce Baldinger, and Jeff Yohai on Wednesday,

25   October 19.

Raico - Direct                                                      2058

1   Q.   Okay.  And is this after the closing did not proceed?

2   A.   Correct.

3   Q.   Okay.  And in this e-mail, is there an attachment?

4   A.   Yes.

5              MR. ANDRES:  The Government moves to admit Government

6   Exhibit 280.

7              MR. WESTLING:  No objection.

8              THE COURT:  Admitted.

9              (Government Exhibit No. 280 was received in

10  evidence.)

11             MR. ANDRES:  May I publish it?

12             THE COURT:  Yes.

13  BY MR. ANDRES:

14  Q.   Starting on the top e-mail, Mr. Manafort says, "I have

15  attached the framework of the deal that we discussed."

16             What does that relate to?

17  A.   Again, at the closing table, Mr. Manafort wanted to

18  restructure the transaction.

19  Q.   Okay.  And can you turn to the second page?

20  A.   Yes.

21  Q.   What's listed on the second page?

22  A.   A -- Mr. Manafort's request for new terms of the loan.

23  Q.   Okay.  Is this an official Federal Savings Bank document?

24  A.   No.

25  Q.   Where did it come from?

Raico - Direct                                                      2059

1    A.    Mr. Manafort.

2    Q.    Over the course of the time that you worked at The Federal

3    Savings Bank, did a customer or client ever write out or

4    propose the terms of a loan this way?

5    A.    No.

6    Q.    What is the normal process --

7           THE COURT:  Is there anything wrong with doing that,

8    as far as you know?

9           THE WITNESS:  I've never seen it done before, Your

10   Honor.

11          THE COURT:  All right.  Apart from you've never seen

12   it before, is it wrong for an applicant for a loan to suggest

13   the terms?

14          THE WITNESS:  No, Your Honor.

15          THE COURT:  Next question.

16   BY MR. ANDRES:

17   Q.    Is it consistent with the policies of the bank?

18   A.    No.

19          THE COURT:  I'm trying, Mr. Andres, to see if we can

20   focus the evidence.  I know you have other evidence you wish to

21   offer.  I'm trying to expedite things.

22          MR. ANDRES:  Thank you, Your Honor.

23   BY MR. ANDRES:

24   Q.    With respect to -- can I ask you to take a look at

25   Government Exhibit 279?  Can you tell me what that is?

Raico - Direct                                                         2060

1    A.    Yes.  This is an e-mail from Jim Brennan to Javier Ubarri

2    on Wednesday, October 19.

3    Q.    Okay.  And with respect to the terms that Mr. Manafort has

4    sent to you, have you forwarded those on to other people at the

5    bank?

6    A.    Yes.

7    Q.    Would you look at the second page?

8    A.    Yes.

9    Q.    And who did you forward them on to?

10   A.    Jim Brennan.

11   Q.    And when you sent them to Mr. Brennan, you said, "Take a

12   deep breath."

13              What were you referring to by that comment?

14   A.    Again, I haven't seen a loan get restructured at the

15   closing table, and I haven't seen Steve Calk approve the

16   restructuring of a loan.

17   Q.    As a result of the new terms, what happened to the

18   underwriting process?  Did the underwriting process begin

19   again?

20   A.    Yes.

21   Q.    Was there a new process that was started?

22   A.    Yes.

23   Q.    Why?

24   A.    Because now it was not based on a construction payoff loan

25   that would pay off the actual loan for the bank, but it was

```
Raico - Direct                                              2061
```

1    now -- had to look at a whole new economic profile for

2    Mr. Manafort.

3            MR. ANDRES:  Okay.  Can I ask you to -- I'm sorry,

4    did I admit that, Your Honor?  The Government moves to admit

5    Government Exhibit 279.

6            MR. WESTLING:  No objection.

7            MR. ANDRES:  I'm not seeking to publish that, Your

8    Honor.

9            THE COURT:  All right.  It's admitted, and you may

10   publish.

11           (Government Exhibit No. 279 was received in

12   evidence.)

13           MR. ANDRES:  I'm not seeking to publish it, Your

14   Honor.

15           THE COURT:  Oh, all right.  Proceed.

16   BY MR. ANDRES:

17   Q.   I'm going to move on to Government Exhibit 281.

18   A.   Yes, sir.

19   Q.   Can you tell me what that is?

20   A.   That is an e-mail from myself to Mr. Manafort on Thursday,

21   October 20.

22   Q.   Okay.  And does it relate to Mr. Manafort's loans?

23   A.   Yes.

24           MR. ANDRES:  The Government moves to admit Government

25   Exhibit 281.

Raico - Direct                                                    2062

1          MR. WESTLING:  No objection.

2          THE COURT:  Admitted.

3          (Government Exhibit No. 281 was received in

4    evidence.)

5          MR. ANDRES:  May I publish it?

6          THE COURT:  You may.

7          MR. ANDRES:  Okay.

8    BY MR. ANDRES:

9    Q.   I'm going to focus you on the top e-mail, Mr. Raico.

10         What's the date of that e-mail?

11   A.   Thursday, October 20, 2016.

12   Q.   Okay.  You suggest to Mr. -- or you write to Mr. Manafort

13   that his income, his P&L, and his tax returns are now relevant

14   because this loan is based on his economic profile.

15         What do you mean by that?

16   A.   Well, given that this is a cash-out refinance transaction

17   and no sale of another property to pay off the loan proceeds,

18   the file is based solely on his economic profile and it needs

19   to be underwritten as such.

20   Q.   Okay.  And what's the most important factor or what are

21   among the important factors in the bank determining whether

22   Mr. Manafort qualifies for this loan?

23   A.    Income.

24   Q.   Okay.  And did you later seek his profit and loss

25   statement?

Raico - Direct                                                          2063

1    A.    Yes.

2    Q.    Let me show you Government Exhibit 282.

3          Can you tell me what that is?

4    A.    It's an e-mail from Mr. Manafort to myself on October 21,

5    2016.

6          MR. ANDRES:  Okay.  And the Government moves to admit

7    Government Exhibit 282.

8          MR. WESTLING:  No objection.

9          THE COURT:  Admitted.

10         (Government Exhibit No. 282 was received in

11   evidence.)

12         MR. ANDRES:  May I publish it, Your Honor.

13         THE COURT:  You may display it, if you wish.

14         MR. ANDRES:  Thank you.

15   BY MR. ANDRES:

16   Q.    With respect to the top e-mail, can you tell me who it's

17   from, who it's to, and the date?

18   A.    It is from Mr. Manafort to myself on October 21, 2016.

19   Q.    Okay.  And what is attached?

20   A.    The DMP P&L as of September 2016.

21   Q.    Can I ask you to turn to that?

22   A.    Yes.

23   Q.    And with respect to the income that's listed at the

24   bottom, what is that?

25   A.    A little over 3 million.

Raico - Direct                                                      2064

1   Q.    Okay.  At the time you received this document, did you

2   play any role in reviewing it?

3   A.    No.

4   Q.    Did you play any role in checking it for its accuracy?

5   A.    No.

6   Q.    And subsequently in your preparation, have you noticed any

7   issues or inaccuracies with the document?

8           MR. WESTLING:  Objection, Your Honor.  Irrelevant.

9   His observations during preparation for trials don't have

10  anything to do with this.

11          THE COURT:  Well, you have other evidence, don't you,

12  as to any inaccuracies?

13          MR. ANDRES:  Yes, Your Honor.

14          THE COURT:  All right.  I'll sustain it.  Let's get

15  it that way.

16          MR. ANDRES:  Okay.

17  BY MR. ANDRES:

18  Q.    When you received this document, what did you do with it?

19  A.    Gave it to my assistant.

20  Q.    Okay.  For what purpose?

21  A.    To be put into Encompass and to be sent to Chicago.

22  Q.    Okay.  Take a look Government Exhibit 283.

23          Do you see that?

24  A.    Yes.

25  Q.    Does that document relate to your work with Mr. Manafort?

Raico - Direct                                                          2065

1    A.   Yes.

2            MR. ANDRES:   The Government moves to admit Government

3    Exhibit 283 and seeks to publish it.

4            MR. WESTLING:   No objection.

5            THE COURT:   Admitted.

6            (Government Exhibit No. 283 was received in

7    evidence.)

8            THE COURT:   You may do so.

9            MR. ANDRES:   Okay.

10   BY MR. ANDRES:

11   Q.   Can you describe to the jury this document, what it is and

12   what you're doing with it?

13   A.   Sure.   It's an e-mail from myself to Elizabeth Cholakis,

14   who was my assistant, on October 21, 2016, and it's the --

15   attached is the DMP P&L 9-31-16.

16   Q.   Can I ask you to look at 533?

17   A.   Yes.

18   Q.   That's the P&L we just reviewed?

19   A.   Yes.

20   Q.   And when you provide it to your assistant, what purpose

21   are you sending it to her for?

22   A.   To put into the credit file and to send out to Chicago.

23   Q.   And when it's sent out to Chicago, what does that mean?

24   A.   They review it.

25   Q.   By the underwriters?

Raico - Direct                                                    2066

1   A.   Yes.

2   Q.   Can I ask you to look at Government Exhibit 284?

3        Can you tell me what that is?

4   A.   That is an e-mail from myself to Javier Ubarri and Jim

5   Brennan.

6   Q.   Can I -- and what's the date of that?

7   A.   Thursday, October 20, 2016.

8        MR. ANDRES:   Okay.   The Government moves to admit

9   Government Exhibit 284 and seeks to publish it.

10        MR. WESTLING:   No objection.

11        THE COURT:   It's admitted.

12        (Government Exhibit No. 284 was received in

13   evidence.)

14        THE COURT:   You may do so.

15   BY MR. ANDRES:

16   Q.   Can I turn you to the second page?

17        Is there an e-mail on the second page?

18   A.   Yes.

19   Q.   Who is that between?

20   A.   That is from Javier Ubarri to myself and Jim Brennan.

21   Q.   Okay.   And does this relate to the -- does this relate to

22   the loans for Mr. Manafort?

23   A.   Yes.

24   Q.   And in this e-mail, is Mr. Ubarri making a decision about

25   whether to proceed with the loan?

Raico - Direct                                                          2067

1    A.    Yes.

2    Q.    What does he decide?

3    A.    He's deciding that we are not proceeding with the loan.

4    Q.    And what was his role at the bank?

5    A.    He was president at the bank.

6    Q.    He writes, "We are not changing the deal.  This should be

7    a short conversation.  Let's all stay friends, move on and go

8    our own way."

9              What did you understand that to mean when you

10   received that e-mail?

11   A.    That the transaction was no longer live and to amicably

12   move on.

13   Q.    And who was that transaction -- who was the client?

14   A.    Mr. Manafort.

15   Q.    Okay.  And what's the date and time of that e-mail?

16   A.    That was Thursday, October 20, at 9:21 a.m.

17   Q.    Okay.  Do you subsequently speak to Mr. Calk?

18   A.    Yes.

19   Q.    Okay.  Without telling the jury what he said, was there a

20   different decision made with respect to Mr. Manafort's loan?

21   A.    Yes.

22   Q.    What decision?

23   A.    Steve had called earlier that day, and Steve was moving

24   forward with the loan.

25   Q.    And when you say "moving forward," what does that mean?

Raico - Direct                                                    2068

1    A.    Steve was approving the loan.

2    Q.    Okay.  And then in the top e-mail, you write back to

3    Mr. Ubarri, who's the president, and what do you tell him?

4    A.    I said:  ". . . duly noted and much appreciated.  I'm not

5    sure if Jim mentioned, but I" -- in essence, I had spoken with

6    Steve earlier that day, and he seemed to be pleased that we

7    were moving the process forward, and we're setting a meeting

8    with Banc of California to see if they potentially wanted to

9    buy the loan and that everything was moving forward.

10   Q.    Are you conveying to Mr. Ubarri the decision that you

11   heard from Mr. Calk?

12   A.    Yes.

13   Q.    And was that decision different from the one that

14   Mr. Ubarri made?

15   A.    Yes.

16   Q.    Can I ask you to take a look at Government Exhibit 287?

17   A.    Yes.

18   Q.    Can you tell me what that is?

19   A.    That is a 1003 mortgage application.

20   Q.    What is a 1003 mortgage application?

21   A.    It's what the borrower fills out in order to apply for a

22   mortgage transaction.

23   Q.    And did this 1003 application --

24             MR. ANDRES:  Your Honor, the Government moves --

25   excuse me.

```
Raico - Direct                                                    2069
```

1    BY MR. ANDRES:

2    Q.    Who did this application relate to?

3    A.    Mr. Manafort.

4    Q.    Okay.  And Mrs. Manafort?

5    A.    Yes.

6    Q.    Okay.  And this relates to the loan that you've been

7    testifying about at Bridgehampton?

8    A.    Yes.

9             MR. ANDRES:  The Government moves to admit Government

10   Exhibit 287.

11            MR. WESTLING:  No objection.

12            THE COURT:  Admitted.

13            (Government Exhibit No. 287 was received in

14   evidence.)

15            MR. ANDRES:  Okay.  May I publish it, Your Honor?

16            THE COURT:  You may.

17   BY MR. ANDRES:

18   Q.    Okay.  At the top of the document, is there an electronic

19   signature?

20   A.    Yes.

21   Q.    Whose electronic signatures?

22   A.    Paul Manafort and Kathleen Manafort.

23   Q.    And does it list the amount of the loan?

24   A.    Yes, 9.5 million.

25   Q.    And how about the subject property?

Raico - Direct                                                          2070

1    A.    174 Jobs Lane, Bridgehampton, New York.

2    Q.    Okay.  And if you look on page 4 of 4, at the bottom, are

3    there additional electronic signatures?

4    A.    Yes.

5    Q.    Okay.  And is there a certification there of some sort?

6          Do you see where it says "I/we" on the bottom of 4

7    of 4?

8    A.    Yes.

9    Q.    First of all, what's the date that Mr. Manafort signed?

10   A.    October 28, 2016.

11   Q.    Okay.  And can you read the language, the sentence above

12   his signature?

13   A.    It says, "I/We fully understand that it is a federal crime

14   punishable by fine or imprisonment, or both, to knowingly make

15   any false statements concerning any of the above facts as

16   applicable under the provisions of Title 18, U.S. Code, Section

17   1001."

18   Q.    With respect to this loan, do you know when it closed?

19   A.    This loan closed on November 16, 2016.

20   Q.    Okay.  And that was with the approval of Mr. Calk?

21   A.    Yes.

22   Q.    And with respect to Mr. Calk's involvement, how would you

23   describe it?

24   A.    Very involved.

25   Q.    Okay.  Did he ultimately approve the loan?

Raico - Direct                                                    2071

1    A.   Yes.

2    Q.   You testified earlier that there was a second loan

3    extended to Mr. Manafort.  What loan did that relate -- what

4    property did that relate to?

5    A.   377 Union Street, Brooklyn, New York.

6    Q.   And what type of loan was that?

7    A.   That was a construction take-out loan.

8    Q.   And what was the amount of that loan?

9    A.   Total of 6.5 million.

10   Q.   Okay.  With respect to that loan, did you learn at some

11   point during the process that there was a prior loan on that

12   property?

13   A.   Yes.

14   Q.   And was that loan from a different financial institution?

15   A.   Yes.

16   Q.   Do you know what financial institution that was?

17   A.   I believe it was Genesis Capital.

18   Q.   Okay.  And when did you learn that there was an existing

19   or prior mortgage on that property?

20   A.   During the -- when we went to get the payoff loan.

21   Q.   Okay.  Is that a fact that was disclosed to you from -- by

22   Mr. Manafort?

23   A.   I believe so.

24   Q.   Mr. Manafort disclosed that there was a prior loan from

25   Genesis Capital?

Raico - Direct                                                    2072

1    A.    I don't remember.

2    Q.    And that related to the -- to the Union Street property?

3    A.    Yes.

4    Q.    With respect to the Union Street property, how soon did

5    that loan close after for the first loan?

6    A.    That loan closed on January 4, 2017.

7    Q.    And how would you describe the process for that loan in

8    terms of the timing?

9              THE COURT:  Mr. Raico, speak up, if you would,

10   please.  I'm having difficulty hearing you.

11             THE WITNESS:  Yes, Your Honor.

12             The loan was approved on, I believe, December 22.

13   BY MR. ANDRES:

14   Q.    Okay.

15   A.    And the loan closed on January 1.

16   Q.    Okay.  Is that -- would you consider that a quick process?

17   A.    Yes.

18   Q.    And would you consider the value of that loan a

19   significant exposure for the bank?

20   A.    Yes.

21   Q.    Okay.  And with respect to the second loan for the Union

22   Street property, what was Mr. Calk's involvement?

23   A.    He was directly involved.

24   Q.    Can I ask that you take a look at Government Exhibit 291?

25   A.    Yes.

Raico - Direct                                                          2073

1   Q.   Can you tell me what that is?

2   A.   That's an e-mail to myself -- from myself to Jim Brennan

3   on Wednesday, December 7.

4   Q.   And what -- can you -- what's the date of that e-mail?

5   A.   Wednesday, December 7, 2016.

6           MR. ANDRES:  The Government moves to admit Government

7   Exhibit 291.

8           MR. WESTLING:  No objection.

9           THE COURT:  It's admitted.

10          (Government Exhibit No. 291 was received in

11  evidence.)

12  BY MR. ANDRES:

13  Q.   And can you describe -- just summarize for the jury what's

14  included in this, in the summary of this e-mail.

15  A.   This is a portfolio loan summary, which is a setup for me

16  to send to Chicago that gives a picture of what the financing

17  is looking to be.

18  Q.   Can you --

19          MR. ANDRES:  Can I ask to publish this, Your Honor?

20          THE COURT:  You may.

21  BY MR. ANDRES:

22  Q.   And can I ask you to turn to the second page?

23          What is that?

24  A.   That is my portfolio loan scenario.

25  Q.   And is this document an official TFSB document?

Raico - Direct                                                      2074

1    A.    It's not necessarily.   I mean, it's what I put together to

2    send to Chicago for the first --

3              THE COURT:   Speak up, please, sir.   I can't hear you.

4              THE WITNESS:   This is the initial document, which

5    just gives a scenario of the setup for a loan that's

6    potentially going into portfolio.

7    BY MR. ANDRES:

8    Q.    But this is the typical type of format that you used to

9    propose those loans?

10   A.    Yes.

11   Q.    Okay.   And this proposal relates to what loan?

12   A.    This is the loan for 377 Union Street in Brooklyn.

13   Q.    Okay.   Can I ask you to turn to Government Exhibit 438?

14            Can you tell me what that is?

15   A.    Yes.   This is an e-mail from myself to Paul Manafort on

16   December 13, 2016, and I'm asking -- I'm letting Paul know that

17   the file is getting close to closing, looking to make sure all

18   income numbers are documented correctly, and I need his 2015

19   tax returns that are due, and that he would be receiving a note

20   receivable of 3.2 million as it's been received.

21   Q.    Okay.   And did you receive a reply to this e-mail?

22   A.    Yes.

23   Q.    Okay.   What was the reply?

24   A.    I was told that it was received.

25   Q.    Okay.   Finally, can I ask you to look at --

Raico - Direct                                                           2075

1          MR. ANDRES:  The Government moves to admit 438, Your

2    Honor.

3          MR. WESTLING:  No objection.

4          THE COURT:  Admitted.

5          (Government Exhibit No. 438 was received in

6    evidence.)

7    BY MR. ANDRES:

8    Q.   Finally, can I ask you to look at Government Exhibit 149?

9          Can you tell me what that is?

10   A.   This is an e-mail from Heather Washkuhn to myself, cc'ing

11   Cindy Laporta, on Wednesday, January 4.

12   Q.   And do you know who Heather Washkuhn was?

13   A.   She worked in one of the accounting firms, I think, for

14   Mr. Manafort.

15         MR. ANDRES:  Okay.  And the Government moves to admit

16   Government Exhibit 149.

17         MR. WESTLING:  No objection.

18         THE COURT:  Admitted.

19         (Government Exhibit No. 149 was received in

20   evidence.)

21   BY MR. ANDRES:

22   Q.   And what's attached to this e-mail?

23   A.   The financials, the DMP financials, as of November 30,

24   2016.

25   Q.   And what date did you receive this?

Raico - Direct                                                          2076

1    A.    On January 4, 2017.

2    Q.    And as of that time, had the Union Street loan closed?

3    A.    It -- this -- it was in the middle of closing.

4    Q.    It closed on the same day?

5    A.    Yes.

6    Q.    Did you review this document?

7    A.    No?

8    Q.    Okay.  Was it your job to review this document?

9    A.    No.

10            MR. ANDRES:  Your Honor, may I just have one moment?

11            THE COURT:  Yes, you may.

12            On the basis of what you've heard, how long do you

13   think your cross-examination will be?

14            MR. WESTLING:  I suspect about a half an hour, Your

15   Honor.

16            THE COURT:  Thank you.

17            MR. ANDRES:  Just a few more questions, Your Honor.

18   I'll be done shortly.

19            THE COURT:  All right.  You may proceed.

20   BY MR. ANDRES:

21   Q.   You testified that you extended the two loans to

22   Mr. Manafort for $16 million.

23            In terms of the first loan, did you ever e-mail with

24   Rick Gates?

25   A.    No.

Raico - Cross                                                      2077

1   Q.   Did you ever speak to him?

2   A.   No.

3   Q.   Have you ever met him?

4   A.   No.

5   Q.   How about with respect to the second loan, did you ever

6   speak or e-mail with Mr. Gates?

7   A.   No.

8   Q.   Do you know if -- aside from the reference of the American

9   Express records, if he had any involvement with these loans at

10  all?

11  A.   I don't know.

12          MR. ANDRES:  I have no further questions, Your Honor.

13          THE COURT:  All right.  You say you have about 30

14  minutes?

15          MR. WESTLING:  Yes, Your Honor.

16          THE COURT:  All right.  You may proceed.

17          MR. WESTLING:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19  BY MR. WESTLING:

20  Q.   Good afternoon, Mr. Raico.  My name is Richard Westling,

21  and I represent Paul Manafort.

22          How are you this afternoon?

23  A.   Good.  How are you?

24  Q.   All right.  Doing well, thank you.  I actually am, too,

25  having some trouble hearing you.  That bar in front of you is

Raico - Cross                                                      2078

1   the microphone, so I think if you're up a little closer to

2   that, it might help us all here.  Thank you.

3   A.    You're welcome.

4   Q.    If there are any questions that I ask you that aren't

5   clear in any way, just let me know, and I'll do my best to

6   clear them up.  All right?

7   A.    Yes.

8   Q.    All right.  Now, Mr. Raico, you said you worked for The

9   Federal Savings Bank.

10          Are you still employed there?

11  A.    No.

12  Q.    You're not?

13  A.    No.

14  Q.    Okay.  When did you leave the employment of the bank?

15  A.    January of this year.

16  Q.    Of this year.

17          And going back in time to when you were first

18  introduced to Mr. Manafort as a potential client of the bank,

19  when did you say that was?  April of 2016?

20          Do I have that right?

21  A.    Correct.

22  Q.    All right.  And that came through a mortgage broker,

23  correct?

24  A.    Correct.

25  Q.    That was Mr. Katz?

Raico - Cross                                                    2079

1    A.   Correct.

2    Q.   All right.  And then when you were introduced to

3    Mr. Manafort, I take it there was a particular loan that he had

4    in mind that he was looking for the bank to make; is that

5    right?

6    A.   Correct.

7    Q.   And what did that relate to, if you remember?

8    A.   The first property was 391 Broadway.

9    Q.   So 391 Broadway in New York was the first property?

10   A.   Yes.

11   Q.   And what kind of loan was that?

12   A.   A construction take-out loan.

13   Q.   Okay.  Construction take-out.  And do you remember the

14   amount of that loan?

15   A.   It was to be a total of 18 million.

16   Q.   18 million?

17   A.   Correct.

18   Q.   And so I take it that loan was never made; is that right?

19   A.   That is correct.

20   Q.   And why wasn't it made?

21   A.   The property was viewed by individuals at The Federal

22   Savings Bank, and we were told that the property was

23   approximately 75 percent complete as far as construction and

24   that there was to be a construction take-out, short-term

25   construction loan, property was complete, and it would be sold.

Raico - Cross                                                          2080

1              When the individuals at The Federal Savings Bank went

2    to take a look at the property, because it was close to our

3    office, it was less than 25 percent complete, and the

4    information seemed to be a little inaccurate.

5    Q.   And there was a co-borrower on that loan.  Was that

6    correct?

7    A.   Yes.

8    Q.   And that was Mr. Yohai; is that right?

9    A.   Yes.

10   Q.   And you understand him to be in charge of the construction

11   of that project; is that correct?

12   A.   Yes.

13   Q.   And he's the one who made the representation about the

14   percentage of completion; isn't that right?

15   A.   Yes.

16   Q.   And basically you said when folks from the Federal Savings

17   Bank went and toured the property, they were concerned because

18   Mr. Yohai had not represented the degree of completion

19   accurately; is that right?

20   A.   That is correct.

21   Q.   And the persons that toured the facility for the potential

22   loan to Mr. Manafort and Mr. Yohai were who?  Who were they

23   from the bank?

24   A.   Steve Calk and Robert Jones.

25   Q.   All right.  And so in this first interaction where

Raico - Cross                                                      2081

1    Mr. Calk is looking at this property, he says he doesn't want

2    to do a loan to Mr. Manafort; is that right?

3    A.    That is correct.

4    Q.    Okay.  So you move on, and there's another loan that comes

5    along as a possibility; is that right?

6    A.    Correct.

7    Q.    And when is that and what is it?

8    A.    That is shortly thereafter, and it was for the 2401

9    Nottingham property in California.

10   Q.    Okay.  So that's the California loan, correct?

11   A.    Correct.

12   Q.    And this is again with Mr. Yohai; is that right?

13   A.    That's correct.

14   Q.    And it has some kind of construction context to it.  Why

15   don't you tell us what it is?

16   A.    Very similar.  It was a construction take-out loan, taking

17   out the first lender and then having money to complete the

18   construction and then sell the property.

19   Q.    All right.

20           THE COURT:  Try pulling your chair up even closer to

21   the microphone, please.

22           Next question.

23           MR. WESTLING:  Thank you, Your Honor.

24   BY MR. WESTLING:

25   Q.    And so you moved along with that loan, and eventually that

Raico - Cross                                                      2082

1  didn't happen either; is that correct?

2  A.   Correct.

3  Q.   And what happened?  What went wrong with that loan, if you

4  know?

5  A.   From what I know, at the closing table, there was a --

6  there was a review of the closing settlement sheet, and

7  Mr. Manafort expressed disinterest because of the cost to close

8  the loan, one of those being the mortgage tax in New York; and

9  if we were cross-collateralizing properties, putting a mortgage

10 amount on them, the mortgage amount that we were putting on the

11 property was much higher than the actual outstanding mortgage

12 balance.

13        So therefore, he would be required to pay the

14 difference in mortgage tax, and Mr. Manafort wanted to

15 restructure at the closing table to take out the California

16 property and just to focus on the Bridgehampton property as

17 well as the cross on the Virginia property.

18 Q.   All right.  And so this Nottingham loan doesn't happen in

19 large part, if I understand you, and correct me if I'm wrong,

20 because Mr. Manafort doesn't like how much it's going to cost

21 him to get the deal done; is that right?

22 A.   Yes.

23 Q.   All right.  And so it sounds like it was a pretty

24 frustrating experience for you and others at the bank; is that

25 fair?

Raico - Cross                                                          2083

1    A.    I've seen it before.

2    Q.    All right.  You've seen people pull out at the closing

3    table before?

4    A.    No.

5    Q.    Maybe I'm not hearing you well, I apologize.

6    A.    No, I've been frustrated before.

7    Q.    You've been frustrated before.  I understand.  We all

8    have.  Thank you.

9          And so it was frustrating, and it was at that point,

10   am I correct, that Mr. Ubarri wrote you the e-mail that we saw

11   a few minutes ago expressing a sense that they should just walk

12   away rather than renegotiate?

13   A.    Yes.

14   Q.    All right.  And so when he was referencing the

15   renegotiation, he was talking about the Nottingham loan; is

16   that correct?

17   A.    Yes.

18   Q.    All right.  And so then things continue and more options

19   are considered.  Is that fair to say?

20   A.    That's fair to say.

21   Q.    All right.  And at this point, instead of seeking a loan

22   with Mr. Yohai, Mr. Manafort is deciding to go forward and to

23   seek a loan for himself; is that fair?

24   A.    Yes.

25   Q.    All right.  And this is in the fall of 2016, correct?

Raico - Cross                                                    2084

1    A.    Correct.

2    Q.    And I think you referenced an earlier -- an e-mail, it's

3    Government Exhibit 281 -- we don't need -- if you want to look

4    at it, you may -- where you sort of indicated to Mr. Manafort,

5    we need to start underwriting all over again if we're going to

6    do the $9.5 million loan on the Bridgehampton property; is that

7    correct?

8    A.    That is correct.

9    Q.    So we're going to sweep the deck clean and we're going to

10   start and look at you now as the borrower again.

11   A.    Yes.

12   Q.    Okay.  And from there, you worked with Mr. Manafort to

13   move that loan along; is that right?

14   A.    Yes.

15   Q.    And so when you were asked by the Government a few minutes

16   ago about Mr. Ubarri's e-mail in which he said (as read):  "We

17   will not move forward with changing the terms of the Nottingham

18   loan."

19          And you compared that with Mr. Calk's response to

20   Mr. Manafort, which I'm willing to go forward, they weren't

21   talking about the same loan, were they?

22   A.    No.

23   Q.    Okay.  So Mr. Calk was talking about the Bridgehampton

24   loan with Mr. Manafort only, correct?

25   A.    No, I believe Mr. Calk was talking about --

```
Raico - Cross                                                          2085
```

1    Q.    Well, I may be -- let me clarify because I think I'm being

2    confusing, and I don't want to be.

3              Mr. Calk was talking about not renegotiating the

4    Nottingham loan, which is where Mr. Ubarri was putting his foot

5    down, but, rather, continuing to pursue a new loan with

6    Mr. Manafort with different terms on a different property?

7    A.    May I look at that document again?

8    Q.    Yes, you may, if I can find it.

9              284.

10             THE COURT:  It was admitted?

11             MR. WESTLING:  Yes, Your Honor.

12             THE COURT:  All right.  You can put it on the screen

13   for him so it might help you find it.

14             MR. WESTLING:  Yeah, if you would put up Page 26?

15   BY MR. WESTLING:

16   Q.    So this is up on the screen now for you, Mr. Raico, if

17   that's helpful.

18             This is the second page of that document, which is

19   the document from Mr. Ubarri to you sort of saying:  We've had

20   enough, and we're moving on.

21             Is that a fair way to phrase what's being said there?

22   A.    May I finish reading it?

23   Q.    Oh, yeah, absolutely.

24             Have you had a chance to read it?

25   A.    I have.

Raico - Cross                                                    2086

1    Q.    And so Mr. Ubarri is talking about the proposal to

2    renegotiate the Nottingham loan; is that fair?

3    A.    Yes.

4    Q.    And we know that in part because he specifically

5    references whether Mr. Manafort wants to take a risk on his

6    son-in-law; is that right?

7    A.    Yes.

8    Q.    All right.  Now, if you turn to the next page of the

9    exhibit, the first page, there's an e-mail from you to

10   Mr. Ubarri, and you're talking about a proposal going forward,

11   but that's a different proposal for a different property,

12   correct?

13   A.    That is correct.

14   Q.    And so to the extent that you indicate that you have

15   spoken with Steve, who I think you said was Mr. Calk, what you

16   were referencing was his thoughts about a new loan, correct?

17   A.    Yes.

18   Q.    All right.  Now, let's talk about that new loan.  So now

19   we're moving on to an arrangement with Mr. and Mrs. Manafort,

20   correct?

21   A.    Correct.

22   Q.    And what is -- tell us the structure of that new loan.

23   A.    The new proposal was to be a $9.5 million cash-out

24   refinance on the Bridgehampton property, cross-collateralizing

25   the Virginia property.

Raico - Cross                                                        2087

1              THE COURT:  Are you hearing that, ladies and

2     gentlemen?

3              THE JURORS:  No.

4              THE COURT:  Neither am I.

5         You're going to have to speak up, please, Mr. Raico.

6     This is not a conversation strictly between you and the

7     attorneys.  The jury has to hear it.  Even I have to hear it,

8     maybe.

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  But I do have to hear it.  Let me hear it

11    from you a little louder.  I think if you're closer to the

12    microphone, that will help, and I'll remind you occasionally.

13             Go ahead.  Next question.

14    BY MR. WESTLING:

15    Q.   So the structure of this loan related to the Bridgehampton

16    property?

17    A.   This was to be a cash-out refinance, 9.5 million paying

18    off the existing first mortgage, providing additional cash,

19    while cross-collateralizing a Virginia property.

20             THE COURT:  That was good.  I heard all of it.

21    BY MR. WESTLING:

22    Q.   All right.  And so we have a sense, the bank is going to

23    be lending $9.5 million, correct?

24    A.   Correct.

25    Q.   And in exchange as collateral, you're going to get a first

Raico - Cross                                                      2088

1    mortgage free and clear.  You're going to pay off the existing

2    mortgage on the Bridgehampton property, correct?

3    A.    Yes.

4    Q.    And what was the appraised value of the Bridgehampton

5    property, if you know?

6    A.    There were two appraisals.  I don't recall offhand the

7    exact values.

8    Q.    Does it sound like $13 million is a fair number?

9    A.    That may have been the average.

10   Q.    Okay.  Because I know there was some averaging that went

11   on.

12   A.    That's correct.

13   Q.    So you had $13 million in collateral -- and I'll

14   double-check that number, I don't want to mislead you in any

15   way -- you had $13 million in collateral from the Bridgehampton

16   property, and in addition to that, you took a first position

17   mortgage on his Virginia residence; is that right?

18   A.    Yes.

19   Q.    And what was the value of that property?

20   A.    I believe it was around 2.5 million.

21   Q.    Okay.  2.5, 3 million dollars?

22   A.    Close enough.

23   Q.    Let's say 2.5.

24           So there was basically $15.5 million, give or take,

25   in collateral being put up for a $9.5 million loan; is that

Raico - Cross                                                      2089

1   correct?

2   A.    That's correct.

3   Q.    And that's a pretty good loan-to-value ratio as far as the

4   bank is concerned?

5   A.    Around 65 percent.

6   Q.    Now, to further secure your position on this property, you

7   also had a requirement that some portion of the proceeds of

8   that loan would actually be set aside to pay the loan; is that

9   right?

10  A.    Correct.

11  Q.    And that was $650,000 or so?

12  A.    The first year is principal, interest, taxes, and

13  insurance, yes.

14  Q.    Right.  And so basically you made a loan knowing that it

15  would pay the first mortgage, you'd get this collateral, and it

16  would clearly be paid for the first year?

17  A.    Correct.

18  Q.    And one of the reasons that you wanted to be sure the

19  money was there to pay for the first year was because you knew

20  Mr. Manafort was currently working or had just finished work on

21  a campaign and he'd be looking for new work in the future,

22  correct?

23  A.    Yes.

24  Q.    And so you knew that there was some need to be sure the

25  loan was covered while he got back on his feet after taking

Raico - Cross                                                    2090

1    time off with the presidential campaign, correct?

2    A.   Yes.

3    Q.   All right.  And so the bank knew all that and understood

4    it going in, correct?

5    A.   I believe so.

6    Q.   Okay.  Now, as far as this loan goes, I think you

7    indicated that there was a credit approval process at the bank

8    that involved a credit committee; is that correct?

9    A.   Yes.

10   Q.   And there are three members of the credit committee:

11   Mr. Norini, Mr. Ubarri, and Mr. Calk; is that right?

12   A.   Three voting members.

13   Q.   Three voting members.

14        In addition, there's also Mr. Brennan, who does not

15   have a vote, and Mr. Horn, who does not have a vote, correct?

16   A.   Correct.

17   Q.   And so they all basically discussed these loans before

18   they're approved, and then to some degree a vote is taken; is

19   that fair?

20   A.   I believe so.

21   Q.   And this was a loan that was unanimously approved by the

22   committee, correct?

23   A.   Yes.

24   Q.   All right.  And so the loan is then made, and you move

25   forward with another loan with Mr. Manafort, correct?

Raico - Cross                                                      2091

1    A.    Correct.

2    Q.    And that loan is the one you described in -- on the 377

3    Union Street property, correct?

4    A.    Correct.

5    Q.    And tell me again what kind of loan that was.

6    A.    A construction take-out loan.

7    Q.    Okay.  And so, again, I think what you told us was that

8    that would allow the payoff of existing mortgages so you'd have

9    a first position and provide money for there to be construction

10   to finish a project so it could be sold, correct?

11   A.    Correct.

12   Q.    And I think you said that that was typically something

13   that the bank felt was less risky because the goal was to get

14   it far along enough so that the property would be sold and at

15   sale you would be repaid, correct?

16   A.    Correct.

17   Q.    And so as a practical matter, that loan is really based

18   all on collateral because you know where the repayment is going

19   to come from eventually; is that right?

20   A.    Yes.

21   Q.    Okay.  And so with that loan, in order to secure its

22   position, do you remember what the value of the 377 Union

23   Street property was?

24   A.    I don't.

25   Q.    I don't remember the amount.  You testified the amount of

Raico - Cross                                                           2092

1    the loan, though, didn't you?

2    A.    6.5 million.

3    Q.    So 6.5.  Do you know if the property was worth that?

4    A.    If the appraisal came in at 6.5 million?

5    Q.    I'm sorry?

6    A.    You're asking me if the appraisal came in at 6.5 million?

7    Q.    Well, let me back up because I should be clear.

8          When you do a construction take-out loan, what does

9    the appraisal look to put a value on?

10   A.    The end value.

11   Q.    And what does that mean?

12   A.    Well, you generally get a value of the property as it is

13   currently and then an end value after the construction has been

14   complete.

15   Q.    All right.

16   A.    So there's an "as is" and an "as complete."

17   Q.    All right.  And do you remember at all what the

18   as-completed value was?

19   A.    I don't.

20   Q.    Let me see if I can find a piece of paper to refresh my

21   recollection.

22         MR. WESTLING:  The Court's indulgence for one moment,

23   Your Honor.

24         THE COURT:  Yes.

25   BY MR. WESTLING:

Raico - Cross                                                          2093

1   Q.   Does an as complete value of $6.3 million sound about

2   right?

3   A.   It could be.

4   Q.   Okay.  I'm looking at a loan memo.  Would that be a

5   document that I could rely on for that number?  It's a Federal

6   Savings Bank loan memorandum related to 377 Union.

7   A.   I haven't seen it.

8   Q.   Oh, you don't get to see that as part of your job?

9   A.   No.

10  Q.   Okay.  Well, but the documents of the bank, to the extent

11  they reflect the value of as completed, you would rely on that,

12  correct?

13  A.   Yes.

14  Q.   All right.  And you were involved in the appraisals,

15  arranging for them in some way?

16  A.   I visited the property, yes.

17  Q.   Okay.  And so if I were to tell you that the bank's record

18  showed that the value of the property as completed was

19  $6.3 million, would you argue with that?

20  A.   Are you going to show me?

21  Q.   Well, you said you haven't seen it before.  So I don't

22  want to show you a document that you haven't seen.  I'm happy

23  to do it.  Maybe it's best to do it by not admitting it but

24  just providing it so we're not in -- let me show you what's

25  been premarked by the Government as Exhibit 293.

Raico - Cross                                                      2094

1            MR. WESTLING:  And if I can hand that to the witness,

2       Your Honor?

3            THE COURT:  You may do so.  Just for planning

4       purposes, I'm not limiting you, how much more are you

5       anticipating?

6            MR. WESTLING:  Maybe another ten minutes, Your Honor.

7            THE COURT:  All right.  I think I will plan to take

8       the afternoon recess when we're finished with this witness.

9       BY MR. WESTLING:

10      Q.   Does that indicate an as completed value that helps you

11      refresh your recollection in some way?

12      A.   Can you --

13      Q.   That first paragraph at the bottom of the first page

14      there's a narrative that includes some numbers.

15      A.   Yes.  The as completed value appraisal is 6.3 million it

16      states.

17      Q.   All right.  So let me just make sure I understand this

18      loan.

19            At first you're going to loan $6.5 million, but the

20      property when sold is only going to provide potentially

21      $6.3 million, which sounds like a problem.  How did you-all

22      solve that problem?

23      A.   I'm sorry, can you say that again?

24      Q.   Sure.  My understanding is that you made a $6.5 million

25      loan construction take out on the 377 Union Street property.

Raico - Cross                                                      2095

1    As collateral, you took the property itself, free and clear

2    after the original mortgage was paid off, which had an as

3    completed value of about $6.3 million.

4              Are we together so far?

5    A.   Yes.

6    Q.   All right.  So what I'm saying is, that sounds like the

7    value of the loan being made is greater than the value of the

8    collateral, and I'm assuming there was an element of the loan

9    structure to deal with that.

10             Do you know what that was?

11   A.   I don't recall.

12   Q.   Okay.  If I were to remind you that the bank required

13   Mr. Manafort to deposit $2.5 million in cash to make up that

14   collateral difference, does that refresh your recollection?

15   A.   Yes.

16   Q.   That wasn't artful, I apologize, but it was expedient.

17             So the bank had $2.5 million in cash and a property

18   valued at $6.3 million, a total of 8.8?

19   A.   Yes.

20   Q.   For a loan of 6.5 million, correct?

21   A.   Correct.

22   Q.   And, again, that's a pretty good collateral position for

23   the bank?

24   A.   Yes.

25   Q.   In fact, this was a loan that was largely based on that

Raico - Cross                                                         2096

1   collateral, wasn't it?

2   A.   Yes.

3   Q.   And the bank allowed Mr. Manafort to take proceeds from

4   the Bridgehampton loan, $2.5 million, and use it as the

5   collateral for the Union Street loan, correct?

6   A.   I believe so.

7   Q.   And that was all something the bank was aware of, correct?

8   A.   Yes.

9   Q.   And the second loan, like the first, was approved

10  unanimously by the credit committee; is that right?

11  A.   Yes.

12  Q.   All right.  Now, Mr. Raico, is it fair to say that you

13  spent a lot of time working on the loans that Mr. Manafort

14  eventually got, the two at the end of the year given, all those

15  loans we talked about earlier?

16  A.   Yes.

17  Q.   All right.  And you were -- received commissions on them,

18  correct?

19  A.   Yes.

20  Q.   And as a practical matter, you were happy when they were

21  finished, correct?

22  A.   Yes.

23  Q.   I've noted in certain documents there's exclamation

24  points, we're finally done, something like that.  Does that

25  sound familiar?

Raico - Redirect                                                    2097

1    A.    Probably, yes.

2    Q.    Okay.  And so as a practical matter, the bank made the

3    loans and -- the bank made the loans, correct?

4    A.    Correct.

5    Q.    The credit committee approved them unanimously, correct?

6    A.    Correct.

7    Q.    And in both cases they were collateralized by an amount

8    substantially more than the bank lent; is that right?

9    A.    That is correct.

10            MR. WESTLING:  All right.  Thank you very much.  I

11   have no further questions.

12            THE COURT:  Redirect?

13            MR. ANDRES:  Very briefly, Your Honor.

14            Excuse me one second, Your Honor.

15                      REDIRECT EXAMINATION

16   BY MR. ANDRES:

17   Q.    Mr. Raico, Mr. Wesley asked you on -- on cross-examination

18   whether you were happy with the loans extended to Mr. Manafort;

19   is that correct?  Do you remember that?

20   A.    Yes.

21   Q.    Were you comfortable with the involvement of Mr. Calk

22   during that process?

23   A.    No.

24   Q.    And why were you uncomfortable?

25   A.    These were loans that Mr. Calk was more involved than any

Raico - Redirect                                                    2098

1   other loans that I've done at the bank.

2   Q.   I'm sorry, now I can't hear.

3            I'm sorry, Your Honor.

4   A.   These loans were -- Mr. Calk's involvement was much more

5   than any other loans I've had at the bank.

6   Q.   Why did that make you uncomfortable?

7   A.   He took a personal interest.  He met with the borrower on

8   his own accord without any of the other staff members.  It

9   wasn't the norm.

10  Q.   Okay.  And at the time, do you know if Mr. Calk was

11  seeking something from Mr. Manafort?

12           MR. WESTLING:  Objection, Your Honor.  I think it's

13  hearsay.  I don't know how he could possibly know that.

14           MR. ANDRES:  Well, I'm sorry --

15           THE COURT:  I'll overrule the objection, but let's

16  hear the answer.  The answer has to be what, sir?

17           THE WITNESS:  In November, Mr. Calk had asked me to

18  contact Mr. Manafort because he hadn't spoken with him in a

19  couple days and had --

20           THE COURT:  Well, let me go back to what your

21  question was.

22  BY MR. ANDRES:

23  Q.   Okay.  Without discussing the specific conversation with

24  Mr. Calk, over this time period, did you understand that

25  Mr. Calk was seeking something from Mr. Manafort?

Raico - Redirect                                                2099

1           MR. WESTLING:  It's still based on hearsay, Your

2    Honor.

3           THE COURT:  Well, we'll see.

4           MR. WESTLING:  He has no other personal knowledge.

5           THE COURT:  What was your -- did you have any

6    understanding?

7           THE WITNESS:  I had no concrete evidence, but my --

8           THE COURT:  Did you have any understanding?

9           MR. ANDRES:  You have to answer the judge's question.

10          THE WITNESS:  Can you say that again, Your Honor?

11          THE COURT:  Did you have any understanding as to what

12   was being asked by the prosecutor?

13          THE WITNESS:  That Mr. Calk was looking -- was

14   seeking something?

15          THE COURT:  Yes.

16          THE WITNESS:  Nothing concrete.

17          THE COURT:  Next question.

18   BY MR. ANDRES:

19   Q.   With respect to the dinner meeting that you had with

20   Mr. Calk and Mr. Manafort, do you know what they were

21   discussing at that meeting?

22   A.   They were by themselves for a fair amount of the time.

23   Q.   Do you know if they were discussing politics?

24   A.   I know politics came to the surface, yes.

25   Q.   Okay.  Mr. Westling asked you about whether there was

Raico - Redirect                                                    2100

1    unanimous approval on the credit committee for the loans to

2    Mr. Manafort.  Do you remember that?

3    A.    Yes.

4    Q.    Did you attend those meetings?

5    A.    No.

6    Q.    Have you ever attended a credit committee meeting?

7    A.    No.

8    Q.    Do you know what the power dynamic between the individuals

9    on that committee is?

10          MR. WESTLING:  Objection.  If he hasn't attended, he

11   can't know.

12          THE COURT:  I'll sustain that.  There's no basis for

13   him to have a view.

14   BY MR. ANDRES:

15   Q.    When Mr. Westling asked you about whether the -- whether

16   the vote was unanimous, did you respond to those questions?

17   A.    I did.

18   Q.    And when you responded to those questions, did you have

19   personal knowledge about what happened at those meetings?

20   A.    I don't.

21   Q.    So Mr. Westling's questions that you answered, did you

22   have any basis to know that they were unanimous?

23   A.    I don't.

24   Q.    Okay.  And --

25          THE COURT:  Why do you say that they were unanimous

1    then?

2              THE WITNESS:  Generally, Your Honor, it's a unanimous

3    decision.  It comes from all -- there's an e-mail that's sent

4    from all members of the committee.

5              THE COURT:  And they all sign it?

6              THE WITNESS:  Nobody really signs it.  It's just

7    everybody is included in the e-mail, Your Honor.

8              THE COURT:  If somebody dissents, do they note the

9    dissent?

10             THE WITNESS:  I -- I don't know.

11             THE COURT:  I beg your pardon?

12             THE WITNESS:  Did somebody what, Your Honor?

13             THE COURT:  If somebody dissents, some of the three

14   dissents from the decision, do they note that typically?

15             THE WITNESS:  I don't know.  I'm not there.

16             THE COURT:  Next question.

17   BY MR. ANDRES:

18   Q.   Mr. Westling asked you some questions about Government

19   Exhibit 284.  Do you remember that?

20   A.   Yes.

21   Q.   About whether the e-mail from Mr. Ubarri related to a

22   different project than the e-mail at the top in which you

23   discuss Mr. Calk.  Do you remember that?

24   A.   Yes.

25   Q.   Do you have Government Exhibit 284 in front of you?

Raico - Redirect                                                    2102

1   A.   I do.

2   Q.   Okay.  If you look in the back e-mail involving

3   Mr. Ubarri, what project does that involve?

4   A.   I believe this is the one that involves the California

5   property as well.

6   Q.   That's not --

7             THE COURT:  I'm sorry, excuse me, would you say that

8   again, please, sir?

9             THE WITNESS:  I believe this one involves the

10  California property as well.

11            THE COURT:  Next question.

12  BY MR. ANDRES:

13  Q.   That's the Nottingham property?

14  A.   Yes.

15  Q.   And then the property that you spoke to Steve about that's

16  referenced in the exhibit in the top e-mail?

17  A.   Yes.  This is on the Bridgehampton property.

18  Q.   So that's the new -- that's the second proposal; is that

19  correct?

20  A.   Yes.

21  Q.   And so from the period of time that you spoke to

22  Mr. Ubarri on October 20, 2016, at 9:21 a.m., to the time that

23  you spoke on the same day or you reference your discussion with

24  Mr. Calk, has Mr. Calk already approved the second loan?

25  A.   I believe so.

Raico - Redirect                                                    2103

1   Q.   Okay.  So that's a short period of time, isn't it?

2   A.   Yes.

3   Q.   And those loans were totally different?

4   A.   Yes.

5   Q.   Than the proposal that Mr. Manafort proposed himself

6   related to his Bridgehampton property; is that right?

7   A.   Correct.

8   Q.   And what were the relevant factors in deciding that loan?

9   A.   Just the Bridgehampton property?

10  Q.   Yeah.

11  A.   There was much more emphasis on his income.

12  Q.   Okay.  And you determined his income from reviewing his

13  P&L; is that correct?

14  A.   Yes.

15  Q.   Can I show you what's been marked as Government Exhibit --

16       MR. WESTLING:  Your Honor, objection.  I don't think

17  this witness indicated he had any ability to evaluate the P&L.

18  He simply received it, was his testimony on direct.  I don't

19  know why we would ask him about what it says.

20       MR. ANDRES:  I'm just asking about whether he

21  received it for purposes of the loan, Judge.  That's all, for

22  which loan.

23       THE COURT:  I'll permit that question.  You're not

24  going to ask him about his analysis of it or review of it?

25       MR. ANDRES:  He didn't do any review of it, Judge.

Raico - Redirect                                                    2104

1          THE COURT:  I understand that.  I said you are not

2  going to ask him questions about any analysis or his opinion of

3  it; is that correct?

4          MR. ANDRES:  That's correct.

5          THE COURT:  Next question.  So to the extent you

6  objected to what he's asking, I'll overrule that.  If it's that

7  question alone, you can pay attention and tell me.

8          MR. WESTLING:  Yes, Your Honor.  I'll try to do

9  better.

10          MR. ANDRES:  Let's have a minute, Your Honor.

11  BY MR. ANDRES:

12  Q.   Can I ask you to take a look at Government Exhibit 282?

13          Can you tell me what that is?

14          Can you tell me what that is?

15  A.   Yes, sir.  This is an e-mail from Paul Manafort to myself

16  on October 21, 2016.  It's the -- Mr. Manafort has attached the

17  DMP P&L of September 31, 2016.

18  Q.   And that -- that related to the new loan for

19  Bridgehampton?

20  A.   Yes.

21          MR. ANDRES:  Okay.  Your Honor, I'm sorry, I just

22  need another moment.

23          THE COURT:  All right.

24          MR. ANDRES:  Your Honor, I'd like to show Mr. Raico

25  another document that's not in this binder.  May I just put it

Raico - Redirect                                                           2105

1    on the screen?

2              THE COURT:  Is it admitted?

3              MR. ANDRES:  It's not admitted yet -- oh, sorry, it

4    is admitted.  I'm sorry, Your Honor.

5              THE COURT:  All right.  If it's admitted, you may do

6    it.  Otherwise, the answer would have been no.

7              MR. ANDRES:  Okay.

8              THE COURT:  Do you need some time?  I'll take the

9    afternoon recess.

10             MR. ANDRES:  That's fine.  That would be great,

11   Judge.  Thank you.

12             THE COURT:  I beg your pardon?

13             MR. ANDRES:  Yes, Your Honor.  That would be great.

14   I appreciate that.

15             THE COURT:  But during this recess, whatever decision

16   you make about using a document, let's be sure you tell

17   Mr. Westling about it.

18             MR. ANDRES:  I will, Your Honor.  Thank you.

19             THE COURT:  All right.  Ladies and gentlemen, pass

20   your books to the right.  And Mr. Flood will collect them.  He

21   will put them somewhere that they are secure from anyone's

22   view, and during this recess, you are not to discuss the matter

23   among yourselves.  Don't say anything to each other about

24   anything having to do with the case, that includes comments

25   about a witness' clothing.  I'm not suggesting there have been

Raico - Redirect                                                2106

1    any, but I want to make clear that you can't do anything of

2    that sort, or my clothing.

3                          (Laughter.)

4              THE COURT:  And undertake no investigation on your

5    own.

6              We have plenty of soft drinks, Mr. Flood?

7              THE COURT SECURITY OFFICER:  We do.

8              THE COURT:  All right.  You may follow Mr. Flood out.

9                          (Jury out.)

10             THE COURT:  We will reconvene at 4:30, but if you

11   need additional time, Mr. -- either of you, Mr. Andres or

12   Mr. Westling, tell Mr. Flood.

13             And, Mr. Raico, you may step down, sir.  Now, during

14   the recess, you may not discuss your testimony with anyone, no

15   lawyers or anyone else.  You may step down, sir.

16             Court stands in recess.

17             (Recess from 4:13 p.m., until 4:42 p.m.)

18                          (Defendant present, Jury out.)

19             THE COURT:  I received word you needed a little

20   longer.

21             MR. ANDRES:  Yeah.

22             THE COURT:  Did you have enough time?

23             MR. ANDRES:  Yes, Your Honor.  Can I just preview the

24   rest of the day so we have an understanding?

25             THE COURT:  Yes, sure.

Raico - Redirect                                                    2107

1            MR. ANDRES:  We have, as I mentioned, three

2    witnesses.  One's an hour.  I don't think we're going to make

3    it through that witness.  We have --

4            THE COURT:  No, you won't.

5            MR. ANDRES:  We're in agreement.

6            THE COURT:  We're going to -- no, you won't.

7            MR. ANDRES:  Yeah.  So we have two shorter witnesses

8    that are both 10 to 15 minutes.  We'll put both of them on, and

9    then on Monday, when we -- again, we have that one longer

10   witness, the hour witness, and then we have a witness that we

11   need to make sure the Court resolves the FBAR issue before we

12   put her on or not.  That's a short witness.  But that's the

13   issue that the defense filed a brief this morning and I think

14   we've just issued a reply.  So Monday we'll resolve that, and

15   then maybe once we finish today we can talk.

16           THE COURT:  All right.  I have all that paper.

17           MR. ANDRES:  Yes, Your Honor.

18           THE COURT:  I just received it.

19           MR. ANDRES:  Yes, Your Honor.

20           THE COURT:  And I just received yours as well,

21   Mr. Westling.

22           MR. ANDRES:  Yeah.

23           THE COURT:  So, all right.  Where are we with the

24   witness who's on the stand?

25           MR. ANDRES:  Less than ten minutes.

Raico - Redirect                                                    2108

1          THE COURT:  For redirect?

2          MR. ANDRES:  Correct.

3          THE COURT:  All right.  And have you resolved -- you

4    know what documents and Mr. Westling knows about them, too?

5          MR. WESTLING:  We'll make sure we do, Judge.

6          THE COURT:  All right.  And then -- then you'll have

7    recross, but it is focused -- it is focused sharply and limited

8    to his redirect.

9          MR. WESTLING:  Yes, Your Honor.

10         THE COURT:  We're not going to, either on his

11   redirect or on your recross, plow old ground.

12         MR. WESTLING:  Understood.

13         THE COURT:  All right.  And then we will have the two

14   15-minute witnesses?

15         MR. ANDRES:  Correct.  Mr. Van Grack is handling both

16   of those.

17         THE COURT:  All right.

18         MR. ANDRES:  I'm sorry, Your Honor.  Pardon me.

19         THE COURT:  All right.  Let's bring the jury in,

20   please.

21                         (Jury present.)

22         THE COURT:  All right.  You may be seated, ladies and

23   gentlemen.

24         Now, we're going to continue with the taking of the

25   evidence in the case, and let me forecast for you what I think

Raico - Redirect                                                    2109

1   remains.  I can't forecast with precision and I'll tell you

2   why:  We're going to finish the witness who's on the stand now.

3   He's in the midst of redirect examination.  Then I will be

4   asking Mr. Westling if he has any further cross-examination

5   based solely on the redirect.

6           Then we will go to two witnesses.  The Government has

7   forecasted that these two witnesses on direct will take about

8   15 minutes apiece, and that, I think, will take us essentially

9   to the end of the day, because the one clear remaining witness

10  for the Government is forecasted to take a bit more than an

11  hour.

12          MR. ANDRES:  Correct, Your Honor.

13          THE COURT:  We can't do that today, and we can't

14  finish the case today anyway because there are other aspects to

15  it.  I have not asked -- the defendant, as I reminded you

16  several times, is not required to present any evidence.  He has

17  no burden to prove his innocence, but he has an opportunity to

18  present evidence and to testify if he wishes.

19          He's not required to, and he has the presumption of

20  innocence, and it will be up to you to decide after all the

21  evidence is in -- including any, if he wishes, to offer

22  evidence, he's not required to -- whether the Government has

23  proved the elements of every offense, of each offense, beyond a

24  reasonable doubt.

25          I'll go over that in some detail with you in the

Raico - Redirect                                                2110

1    instructions, which will happen after the end of the case, and

2    just after -- or just before, rather, the -- well, just before

3    that, the lawyers will make their closing arguments.  Then I'll

4    give you final instructions.

5            So that means that we will begin again Monday, and we

6    will begin again Monday at 1:00, and I can't forecast with any

7    precision now how long the case will take beyond Monday because

8    I don't know whether there will be additional evidence offered

9    by the Government.  There's -- there is one witness that we

10   think will testify, Mr. Andres, and there may be another.

11           MR. ANDRES:  Correct.

12           THE COURT:  Or there may not be.  We'll see.

13           And then I'll ask Mr. Westling, Mr. Downing, counsel

14   for the defendant, does the defendant wish to offer evidence.

15   But only then, only after it's all over will I ask that.

16           So fill out your menus.  We'll be together again.  I

17   don't know how long for next week, but we're going to finish it

18   for certain probably early next week.

19           All right.  Let's have Mr. Raico return to the stand.

20           Come forward.  You'll recall, sir, that you remain

21   under oath.  You may resume the stand.

22           Mr. Andres, I didn't remember, did you tell me how

23   much longer you had on redirect?

24           MR. ANDRES:  Less than ten minutes, I hope, Your

25   Honor.

Raico - Redirect                                                    2111

1              THE COURT:  All right.  Let's proceed.

2    BY MR. ANDRES:

3    Q.   Mr. Raico, do you remember on cross-examination

4    Mr. Westling asked you some questions about the Union Street

5    loan?

6    A.   Yes.

7    Q.   Okay.  Can I ask you to take a look at Government Exhibit

8    289?  Can you tell me what that is?

9    A.   A 1003 mortgage application.

10   Q.   For the Union Street loan?

11   A.   Yes.

12             MR. ANDRES:  Your Honor, the Government moves to

13   admit 289.

14             MR. WESTLING:  No objection, Your Honor.

15             THE COURT:  Admitted.

16             (Government Exhibit No. 289 was received in

17   evidence.)

18   BY MR. ANDRES:

19   Q.   Okay.  I'm not going to publish this.  I'm just going to

20   ask a couple of questions.

21             What's the name of the borrower on this 1003

22   application?

23   A.   Paul Manafort and Kathleen Manafort.

24   Q.   Okay.  And what's the subject property listed?

25   A.   377 Union Street, Brooklyn, New York.

Raico - Redirect                                                              2112

1    Q.    What's the amount?

2    A.    $3.9 million.

3    Q.    Okay.  And this is part of the loan.  It's not the entire

4    loan; is that correct?

5    A.    Correct.

6    Q.    It's another -- another amount?

7    A.    Correct.

8    Q.    Okay.  And it adds up to a total of what?

9    A.    6.5 million.

10   Q.    Okay.  And then if you could just turn to Page 4, is

11   Mr. Manafort's signature there as well?

12   A.    Yes.

13   Q.    And above that, is there a reference to a declaration in

14   federal crimes?  Do you see that right above his -- on the

15   bottom of Page 4?

16            THE COURT:  Why wasn't this part of direct?

17            MR. ANDRES:  Your Honor, I didn't put it in.  I

18   should have, but I didn't.

19            THE COURT:  All right.  Confession is good for the

20   soul.

21            MR. ANDRES:  What?

22            THE COURT:  Confession is good for the soul.

23            MR. ANDRES:  I think my soul is in pretty good shape

24   or it should be after this process.

25            THE COURT:  I'll help.

Raico - Redirect                                                    2113

1                          (Laughter.)

2               THE WITNESS:  Yes.

3  BY MR. ANDRES:

4  Q.   Mr. Raico, can you read that?

5  A.   (As read):  "We fully understand that it is a federal

6  crime punishable by fine or imprisonment, or both, to knowingly

7  make any false statements concerning any of the above facts as

8  applicable under the provision of Title 18, U.S. Code, Section

9  1001."

10 Q.   Okay.  And that's the same, same declaration that's in the

11 prior 1003?

12 A.   Yes.

13 Q.   Okay.  Can you look at Government Exhibit 282 again?

14          And explain to the jury --

15          MR. ANDRES:  This is in evidence, Your Honor.

16 BY MR. ANDRES:

17 Q.   Can you explain what this e-mail is and what's attached?

18 A.   This is an e-mail from Paul Manafort to myself on Friday,

19 October 21, 2016, the DMP P&L as of 9/31/16.

20          MR. ANDRES:  May I publish this, Your Honor?

21          THE COURT:  Yes, you may.

22 BY MR. ANDRES:

23 Q.   Okay.  Just focus in on the second page.  Mr. Westling

24 asked you on cross-examination about whether the Bridgehampton

25 loan was over-collateralized.  Do you remember that?

Raico - Recross                                                          2114

1    A.   Yes.

2    Q.   When you were considering the Bridgehampton loan, it's a

3    cash-out refinance; is that right?

4    A.   Right.

5    Q.   Okay.  What is the most important factor for the repayment

6    of a cash-out refinance?

7    A.   Income.

8    Q.   And you asked Mr. Manafort for his income; is that

9    correct?

10   A.   Yes.

11   Q.   And that's why you received this document?

12   A.   Yes.

13   Q.   And this is the P&L from DMP International?

14   A.   Yes.

15          MR. ANDRES:  Okay.  I have no further questions, Your

16   Honor.  Thank you.

17          THE COURT:  Any recross based on the redirect?

18          MR. WESTLING:  Briefly, Your Honor.

19          THE COURT:  All right.

20                    RECROSS EXAMINATION

21   BY MR. WESTLING:

22   Q.   Mr. Raico, is it fair to say that but for the

23   over-collateralization of this loan, it would never have been

24   made?

25   A.   Correct.

Raico - Recross                                                    2115

1    Q.    So without all that collateral, no loan, correct?

2    A.    Correct.

3    Q.    And so while you said income is important, clearly

4    collateral is important, too, correct?

5    A.    It is.

6    Q.    And in this case, the bank actually exceeded normal

7    collateral loan to value from what it normally saw in its other

8    portfolio loans; is that right?

9    A.    No.

10   Q.    So there wasn't a greater amount of collateral on this

11   loan than you typically saw?

12   A.    About the same.

13   Q.    About the same.  Which was -- what was the ratio again, if

14   you remember?

15   A.    This was about 65 percent LTV.

16   Q.    Okay.  And that was your normal amount when a person was

17   mortgaging their home to get money out?

18   A.    Yes.

19              MR. WESTLING:  All right.  Thank you.

20              THE COURT:  All right.  Thank you.

21              MR. ANDRES:  Your Honor, could I have two questions?

22              THE COURT:  Don't you think you've had enough bites

23   at this apple?

24              MR. ANDRES:  Two more, Judge.  That's it, I promise.

25              THE COURT:  And it has to do with these questions?

Raico - Redirect/Kirimca - Direct                                          2116

1           MR. ANDRES:  Directly.

2           THE COURT:  All right.  Do so.

3                   FURTHER REDIRECT EXAMINATION

4    BY MR. ANDRES:

5    Q.   Mr. Raico, your job at the bank is a salesman?

6    A.   Yes.

7    Q.   Are you involved in approving loans, the final approval of

8    loans?

9    A.   No.

10          MR. ANDRES:  Thank you, Your Honor.

11          THE COURT:  I might point out to you that I think

12   that evidence was already admitted, but I could be wrong.  In

13   any event, you may step down.  You may be excused.

14                   (Witness excused.)

15          THE COURT:  Call your next witness.

16          MR. VAN GRACK:  The Government calls Irfan Kirimca.

17          THE COURT:  Would you spell that for the court

18   reporter, please?

19          MR. VAN GRACK:  Yes, Your Honor.  K-i-r-i-m-c-a,

20   Kirimca.

21          THE COURT:  Come forward and take the oath, please,

22   sir.

23          IRFAN KIRIMCA, GOVERNMENT'S WITNESS, SWORN

24          THE COURT:  All right.  You may proceed.

25                   DIRECT EXAMINATION

Kirimca - Direct                                                    2117

1   BY MR. VAN GRACK:

2   Q.   Could you please state and spell your name for the record?

3   A.   Irfan Kirimca, I-r-f-a-n K-i-r-i-m-c-a.

4   Q.   How old are you?

5   A.   Fifty.

6   Q.   Where do you live?

7   A.   River Rights, New Jersey.

8   Q.   And can you briefly describe your educational background?

9   A.   I received a BBA in Public Accounting.

10  Q.   Are you employed?

11  A.   Yes.

12  Q.   Where?

13  A.   New York Yankees.

14  Q.   And what are the New York Yankees?

15  A.   New York Yankees are a professional baseball team in Major

16  League Baseball.

17  Q.   How long have you worked for the New York Yankees?

18  A.   About 20 years.

19  Q.   And what is your current title?

20  A.   Senior director of ticket operations.

21  Q.   What are ticket operations?

22  A.   Ticket operations just encompasses all -- everything

23  that's related to ticketing for our organization, whether it be

24  baseball games, football games, concerts, so on, so forth.

25  Q.   And what are your directors -- your duties as senior

Kirimca - Direct                                                2118

1    director?

2    A.   Just to oversee all aspects of ticket operations for the

3    organization.

4    Q.   And what did you do with the Yankees before you were the

5    senior director?

6    A.   I was the internal auditor.

7    Q.   And based on your 20 years with the New York Yankees, are

8    you familiar with how records are created and maintained by the

9    Yankees?

10   A.   Yes.

11   Q.   I'd like to ask you some questions with respect to an

12   individual named Paul Manafort.  Were the Yankees asked to

13   search for records pertaining to Paul Manafort?

14   A.   Yes.

15   Q.   And did the Yankees identify these records pertaining to

16   Mr. Manafort?

17   A.   Yes.

18   Q.   Did you provide these records to the Government?

19   A.   Yes.

20   Q.   And have you reviewed those records prior to your

21   testimony today?

22   A.   Yes.

23   Q.   I'd like you to turn to Government Exhibit 113A.  Do you

24   recognize this document?

25   A.   Yes.

Kirimca - Direct                                                    2119

1    Q.    What is it?

2    A.    It's the financial records related to Mr. Manafort's

3    ticket account.

4    Q.    And is the information in Government Exhibit 113A, did it

5    come from a computer database?

6    A.    Yes.

7    Q.    And was the information from that database information

8    that was kept in the ordinary course of business for the New

9    York Yankees?

10   A.    Yes.

11            MR. VAN GRACK:  Your Honor, the Government would move

12   to admit and publish Government Exhibit 113A.

13            MR. WESTLING:  No objection.

14            THE COURT:  Admitted.

15            (Government Exhibit No. 113A was received in

16   evidence.)

17   BY MR. VAN GRACK:

18   Q.    Mr. Kirimca, if you could explain the information on the

19   left side of the -- left side of this chart, please?

20   A.    Could you blow it up a little more?  It's kind of tiny.

21   Q.    Absolutely.

22                              (Laughter.)

23            Just generally describe the information that's

24   contained on the left side of the chart

25   A.    The left side of the chart would be this -- the seasons

Kirimca - Direct                                                2120

1   that -- the regular and postseasons that Mr. Manafort purchased

2   tickets for.

3   Q.   And the right side, is that the financial information?

4   A.   The right side, yes, is all the detailed financial

5   information.

6   Q.   And according to this chart, what is the earlier year

7   showing that Mr. Manafort was a season ticket holder with the

8   New York Yankees?

9   A.   2010.

10  Q.   And do you know why this -- according to this chart,

11  that's the earliest year showing that Mr. Manafort was a season

12  ticket holder?

13  A.   I believe that's what the request for information asked us

14  for.

15  Q.   Are you aware of whether he was a season ticket holder

16  before 2010?

17  A.   Yes.

18  Q.   And was he?

19  A.   Yes.

20  Q.   According to this chart, for what years did Mr. Manafort

21  have season tickets with the New York Yankees?

22  A.   From 2010 to 2017.

23  Q.   And for each of those years, who paid for those season

24  tickets?

25  A.   Mr. Manafort.

Kirimca - Direct                                                        2121

1  Q.   Now, if I could direct your attention just to one year,

2  2016, we'll see if we can expand that.

3           How much did Mr. Manafort pay for season tickets in

4  2016?

5  A.   Approximately $210,600.

6  Q.   And when did he make those payments?

7  A.   February 15, 2016.

8  Q.   How did he pay for those tickets?

9  A.   With an American Express card ending in 3002.

10 Q.   Mr. Kirimca, if I can now direct your attention to what's

11 been marked as Government Exhibit 113.

12          Do you recognize this document?

13 A.   Yes.

14 Q.   What is it?

15 A.    It's the Legends Suite Ticket Agreement that Mr. Manafort

16 signed.

17          MR. VAN GRACK:  Your Honor, the Government would move

18 to admit and publish Government Exhibit 113.

19          MR. WESTLING:  No objection.

20          THE COURT:  Admitted.

21          (Government Exhibit No. 113 was received in

22 evidence.)

23 BY MR. VAN GRACK:

24 Q.   Mr. Kirimca, the top line says, "Legends Suite Ticket

25 Agreement."

1                What is a Legends Suite ticket agreement?

2     A.   It's the agreement that all licensees have to sign in

3     order to purchase tickets in our Legends Suite.

4     Q.   And what is the Legends Suite?

5     A.   They are the seats that are located from Sections 14A to

6     27A in Yankee Stadium.

7     Q.   Is it a type of season ticket option that a customer may

8     purchase?

9     A.   Yes.

10    Q.   There are other options?

11    A.   Yes.

12    Q.   Are there, just generally, benefits to being a member of

13    the Legends Suite beyond just sitting in particular seats?

14    A.   Yes.

15    Q.   For how many games is this ticket agreement for?

16    A.   Eighty-one games.

17    Q.   And for how many tickets?

18    A.   Four.

19    Q.   If I could direct your attention to the section entitled

20    "Term," how many years is this agreement for?

21    A.   Seven.

22    Q.   And does that include the 2016 baseball season?

23    A.   Yes.

24    Q.   And if I could direct your attention simply to Page 3.  No

25    need to publish that.

Kirimca - Direct                                                    2123

1           Who signed this agreement?

2   A.    Mr. Manafort.

3   Q.    Now, Mr. Kirimca, this concerns a ticket agreement.  Are

4   there other agreements associated with being a Legends Suite

5   ticket holder?

6   A.    Yes.

7   Q.    What are the other agreements?

8   A.    The other agreements are the license fee agreement and the

9   food and beverage agreement.

10  Q.    Are those agreements also in Government Exhibit 113?

11  A.    Yes.

12  Q.    And who signed those agreements?

13  A.    Mr. Manafort.

14  Q.    Mr. Kirimca, if I could now direct your attention to

15  Government Exhibit 115?

16          Do you recognize this document?

17  A.    Yes.

18  Q.    And what is it?

19  A.    It's an e-mail exchange between Mr. Manafort and Drew Fox

20  of the Yankees.

21  Q.    And what does it concern?

22  A.    Opening Day for the 2016 baseball season.

23          MR. VAN GRACK:  Your Honor, the Government would move

24  to admit and publish Government Exhibit 115.

25          MR. WESTLING:  No objection.

Kirimca - Direct                                                        2124

1              THE COURT:  Admitted.

2              (Government Exhibit No. 115 was received in

3     evidence.)

4     BY MR. VAN GRACK:

5     Q.   Mr. Kirimca, if I could direct your attention to the

6     bottom e-mail dated March 24, 2016, at 5:04 p.m., is this from

7     a Yankees employee to Mr. Manafort?

8     A.   Yes.

9     Q.   And what is the Yankees employee asking Mr. Manafort?

10    A.   He's, he's telling him that the season tickets have

11    been -- are being shipped.

12    Q.   Shipped to whom?

13    A.   To Mr. Manafort.

14    Q.   And could you please read Mr. Manafort's response?

15    A.   "Drew, please make certain that my tickets are sent to the

16    following address:  Paul Manafort, 721 5th Avenue,

17    Apartment 43G, New York, New York 10022."

18    Q.   And did the Yankees employee respond to Mr. Manafort's

19    e-mail?

20    A.   Yes.

21    Q.   Could you just read the first sentence of his response?

22    A.   "Paul, this is the only address I have on file for you.

23    You should be all set."

24    Q.   And if you could -- in the second paragraph, if you could,

25    again, read the first sentence of that paragraph?

Kirimca - Direct                                                        2125

1    A.    "Will you and Kathy be attending Opening Day or any other

2    games that week?"

3    Q.    Mr. Kirimca, what is opening day?

4    A.    Opening day is the first game of the regular season.

5    Q.    Is that a popular game?

6    A.    Yes.

7    Q.    And did Mr. Manafort respond to that e-mail?

8    A.    Yes.

9    Q.    Can you please read his response?

10   A.    "Perfect.  Yes, Kathy and I will be attending Opening

11   Day."

12   Q.    And which baseball season is this for?

13   A.    2016.

14   Q.    Mr. Kirimca, if I can now direct your attention to

15   Government Exhibit 114?

16          Do you recognize this document?

17   A.    Yes.

18   Q.    What is it?

19   A.    It's an e-mail exchange between employees of the New York

20   Yankees.

21   Q.    And is Mr. Manafort on these e-mails?

22   A.    Yes.

23          MR. VAN GRACK:  Your Honor, the Government would move

24   to admit and publish Government Exhibit 114.

25          MR. WESTLING:  No objection.

Kirimca - Direct                                                2126

1           THE COURT:  Admitted.

2           (Government Exhibit No. 114 was received in

3    evidence.)

4    BY MR. VAN GRACK:

5    Q.   Mr. Kirimca, if I could direct your attention to Page 3 of

6    Government Exhibit 114, in particular, the bottom e-mail dated

7    November 18, 2011?

8           Is this from a Yankees employee to Mr. Manafort?

9    A.   Yes.

10   Q.   And what is the employee asking Mr. Manafort?

11   A.   She is writing to confirm the financial details of the

12   renewal of his Legends Suite agreement.

13   Q.   For which baseball season?

14   A.   Starting with the 2012 season.

15   Q.   And what's the price of the season tickets for 2012?

16   A.   $700 per seat and $226,800 in total.

17   Q.   And can you please read Mr. Manafort's response?

18   A.   "Rose, full amount is in the Yankee account.  It was sent

19   from Global Highways LLC.  Please confirm receipt.  Paul."

20   Q.   And what is the date of Mr. Manafort's response?

21   A.   November 26, 2011.

22   Q.   Mr. Kirimca, if I could direct your attention now to the

23   first page of that document, and the e-mail second from the

24   bottom?

25          Is that an e-mail between two Yankees employees?

Kirimca - Direct                                                          2127

1    A.    I'm sorry, which e-mail is it?

2    Q.    Second from the bottom, dated November 28, 2011.

3    A.    Okay.

4    Q.    Is that an e-mail between two Yankees employees?

5    A.    Yes.

6    Q.    And could you please read that e-mail?

7    A.    (As read): "We got a wire on November 23 for $226,800 from

8    Global Highway Limited.  I am assuming this is yours based on

9    the information below, just please confirm and I will pay off

10   the account.  Thanks."

11   Q.    And did the Yankees, in fact, receive their payment from

12   Global Highways Limited on November 23?

13   A.    Yes.

14   Q.    Do you know what Global Highways Limited is?

15   A.    No.

16   Q.    Now, Mr. Kirimca, I'd like to ask you some questions with

17   respect to an individual named Richard Gates.

18           During your review of Mr. Manafort's season tickets,

19   did you identify any e-mails involving Richard Gates?

20   A.    Yes.

21   Q.    In any of those e-mails, did Mr. Gates indicate that he

22   would be paying for season tickets?

23   A.    No.

24   Q.    In any of those e-mails, did Mr. Gates indicate that

25   season tickets should be shipped to him?

Kirimca - Cross                                                          2128

1   A.   No.

2   Q.   Were the Yankees also asked to search for -- search its

3   season ticket database for records pertaining to Richard Gates?

4   A.   Yes.

5   Q.   And what was the result of that search?

6   A.   No records were found.

7   Q.   What does that mean?

8   A.   We didn't find any ticket accounts with Richard Gates'

9   name.

10  Q.   So does that mean -- was Richard Gates a season ticket

11  holder?

12  A.   No.

13            MR. VAN GRACK:  No further questions, Your Honor.

14            THE COURT:  Cross-examination?

15            MR. WESTLING:  Very briefly, Your Honor.

16                         CROSS-EXAMINATION

17  BY MR. WESTLING:

18  Q.   Mr. Kirimca, do I have that right?

19  A.   Yes.

20  Q.   All right.  My name is Richard Westling.  I represent Paul

21  Manafort.  If there's anything I say that's not clear, just let

22  me know, okay?

23            So generally, is it unusual for people to buy tickets

24  and to use them as part of their business operation to

25  entertain clients and customers?

Chojnowski - Direct                                                      2129

1    A.   No.

2    Q.   In fact, that's very typical when you're talking about the

3    kinds of tickets that you testified about here today, correct?

4    A.   That is correct.

5    Q.   In fact, I would suspect most of your ticket holders that

6    are at the Legend level are actually using them to further

7    their business entertainment expense needs; is that fair?

8    A.   That, I don't know.

9            MR. WESTLING:  All right.  I have no further

10   questions, Your Honor.

11           THE COURT:  All right.  Thank you.

12           You may step down.  You may be excused.

13                         (Witness excused.)

14           THE COURT:  Call your next witness, please.

15           MR. VAN GRACK:  The Government calls Andrew

16   Chojnowski.

17           THE COURT:  Come forward, take the oath, please, sir.

18        ANDREW CHOJNOWSKI, GOVERNMENT'S WITNESS, SWORN

19           THE COURT:  All right.  You may proceed.

20                       DIRECT EXAMINATION

21   BY MR. VAN GRACK:

22   Q.   Could you please state and spell your name for the record?

23   A.   Yes.  It's Andrew Chojnowski, A-n-d-r-e-w,

24   C-h-o-j-n-o-w-s-k-i.

25   Q.   How old are you?

Chojnowski - Direct                                                      2130

1    A.    Forty.

2    Q.    Where do you live?

3    A.    Park Ridge, Illinois.

4    Q.    And could you briefly describe your educational

5    background?

6    A.    I have an Undergraduate and a Master's in Business

7    Administration, and also an MBA from Cardinal Stritch.

8    Q.    And, Mr. Chojnowski, if I could ask you to move up just a

9    little bit to the microphone so the rest of us can hear you.

10             Thank you.   Are you employed?

11   A.    Yes, I am.

12   Q.    Where?

13   A.    The Federal Savings Bank.

14   Q.    How long have you worked for The Federal Savings Bank?

15   A.    Six-and-a half years.

16   Q.    What is your current title?

17   A.    I'm the chief operating officer of home lending.

18   Q.    And what is home lending?

19   A.    Home lending is the mortgage operations of the mortgage

20   division of the bank.

21   Q.    And what are your duties as the chief operating officer?

22   A.    I receive the processing, the underwriting, the closing,

23   post closing, funding of the residential home loans.

24   Q.    And how long have you been the chief operating officer?

25   A.    Five-and-a-half years.

1  Q.   What was your role at The Federal Savings Bank before you

2  became the chief operating officer?

3  A.   I was SBP of operations.

4  Q.   And what does that entail?

5  A.   Same responsibilities.

6  Q.   And, in total, for how many years have you worked in the

7  mortgage banking industry?

8  A.   Eighteen years.

9  Q.   And, Mr. Chojnowski, I apologize, but I'm going to ask you

10 if you can again move a little closer to the microphone?

11 A.   Is that better?

12 Q.   It is, thank you.

13        As the chief operating officer, are you familiar with

14 the documents required for a loan at The Federal Savings Bank?

15 A.   Yes, I am.

16 Q.   And as the chief operating officer, are you familiar with

17 the importance of those documents to The Federal Savings Bank

18 in the loan application process?

19 A.   Yes, I am.

20 Q.   I'd like to ask you some questions about an individual

21 named Paul Manafort.  Are you aware that Mr. Manafort obtained

22 two loans from The Federal Savings Bank?

23 A.   Yes, I am.

24 Q.   Were you involved in the processing or approval of those

25 loans?

Chojnowski - Direct                                                    2132

1   A.    I was not personally, no.

2   Q.    Are you familiar with some of the documents he signed as

3   part of the loan approval process?

4   A.    Yes, I am.

5   Q.    Have you reviewed some of the documents he signed?

6   A.    Yes, I have.

7   Q.    Mr. Chojnowski, I'd like to direct your attention to

8   what's been marked as Government Exhibit 288.

9   A.    Okay.

10  Q.    Do you recognize this document?

11  A.    Yes, I do.

12  Q.    Is it from The Federal Savings Bank?

13  A.    Yes, it is.

14  Q.    Is this document part of The Federal Savings Bank loan

15  application package?

16  A.    Yes, it is.

17  Q.    Whose loan did this particular document pertain to?

18  A.    Paul Manafort and Kathleen Manafort.

19          MR. VAN GRACK:  Your Honor, the Government would move

20  to admit and publish Government Exhibit 288.

21          MR. WESTLING:  No objection.

22          THE COURT:  Admitted.

23          (Government Exhibit No. 288 was received in

24  evidence.)

25          THE COURT:  You may do so.

Chojnowski - Direct                                                    2133

1   BY MR. VAN GRACK:

2   Q.   Can you please explain to the jury what this document is?

3   A.   This document is a disclosure sent to the loan applicants

4   during the application process, basically gives them

5   information or a warning to make sure that they fully disclose

6   all of their credit liabilities or outstanding debt to The

7   Federal Savings Bank.

8   Q.   Could you please -- I apologize.

9   A.   To The Federal Savings Bank.

10  Q.   Could you please read the first sentence in the document?

11  A.   (As read):  "It is extremely important that all loan

12  applicants disclose all outstanding debts, obligations and/or

13  liabilities at the time of loan application."

14  Q.   And the next paragraph?

15  A.   "The Lender relies on the outstanding debts, obligations,

16  and/or liabilities disclosed by applicants during the loan

17  application.  The information provided is used for loan program

18  qualification purposes."

19  Q.   And finally, the paragraph after that?

20  A.   "If new and/or additional debts or obligations are

21  identified prior to closing the mortgage loan, the Lender may

22  re-underwrite the application to assess loan program

23  qualification requirements are met.  The Lender reserves the

24  right to amend or rescind its loan approval based on the

25  re-underwriting results."

Chojnowski - Direct                                                    2134

1    Q.   Mr. Chojnowski, I may have had you skip a paragraph.  That

2    middle paragraph, could you read that one?

3    A.   Oh, I'm sorry.  (As read):  "It is the applicant's

4    responsibility to disclose to the Lender all outstanding debts,

5    obligations and/or liabilities, as well as any new or

6    additional liabilities the applicant will incur prior to the

7    mortgage loan closing."

8    Q.   Mr. Chojnowski, why is it extremely important to The

9    Federal Savings Bank that all loan applicants disclose all of

10   their outstanding debts, obligations, and liabilities?

11               THE COURT:  Is that your term, "extremely important"?

12               MR. VAN GRACK:  No, Your Honor, it came from the

13   document that Mr. Chojnowski just read.

14               THE COURT:  All right.  Go ahead.

15               THE WITNESS:  It's extremely important to The Federal

16   Savings Bank to know a loan applicant's debts so that we could

17   render an accurate loan decision.

18   BY MR. VAN GRACK:

19   Q.   And will The Federal Savings Bank approve a mortgage loan

20   if this acknowledgement is not signed?

21   A.   We will not.

22   Q.   Who signed this particular acknowledgement?

23   A.   Paul Manafort, Kathleen Manafort.

24   Q.   And did they submit this acknowledgement as part of one of

25   the loans they obtained from The Federal Savings Bank?

1    A.   Yes.

2    Q.   On what date?

3    A.   October 28, 2016.

4    Q.   Did Mr. Manafort sign another acknowledgement with respect

5    to the other loan he obtained with The Federal Savings Bank?

6    A.   Yes, he did.

7    Q.   Mr. Chojnowski, if I can now direct your attention to

8    Government Exhibit 273.

9         Do you recognize this document?

10   A.   Yes, I do.

11   Q.   Is this document from The Federal Savings Bank?

12   A.   Yes, it is.

13   Q.   Is this document part of The Federal Savings Bank loan

14   application package?

15   A.   Yes, it is.

16   Q.   And whose loan does this particular document pertain to?

17   A.   Paul Manafort.

18        MR. VAN GRACK:  Your Honor, the Government would move

19   to admit and publish Government Exhibit 273.

20        MR. WESTLING:  We object, Your Honor.  We don't think

21   it's relevant.

22        THE COURT:  All right.  Come to the podium -- or to

23   the bench.  What exhibit number is this?

24        MR. VAN GRACK:  273, Your Honor.

25        THE COURT:  All right.

Chojnowski - Direct                                                    2136

1              (Bench conference on the record.)

2              THE COURT:  All right, what's the objection?

3              MR. WESTLING:  Your Honor, that this is for a loan

4    that was never made, so it relates back to one of the loans

5    that in 8/11/2016, that was applied for, was never granted by

6    the bank.  It doesn't relate to either of the loans that are

7    charged in the indictment.

8              I also would argue that it's a prejudicial document.

9    It talks about legal standards, FBI seal, and all of that.

10             MR. VAN GRACK:  Your Honor, a number of points.

11   First, it goes to knowledge and intentionality.  Mr. Manafort

12   signed this document.

13             THE COURT:  I'm sorry, begin at the beginning.  Do

14   you contest his statement that this doesn't pertain to a loan

15   that was given in this case?

16             MR. VAN GRACK:  This is part of --

17             THE COURT:  Can you answer yes or no and then

18   explain, please?

19             MR. VAN GRACK:  No only in the sense that this was

20   part of the initial loan application package that Mr. Manafort

21   signed with The Federal Savings Bank.

22             THE COURT:  So why doesn't that make it relevant?

23             MR. WESTLING:  Because this is the first application

24   for a loan that wasn't granted, as compared to the applications

25   that were filed later in November and after that, which were,

Chojnowski - Direct                                              2137

1    in fact, given, which are the subject of the counts in the

2    indictment.

3            THE COURT:  Well, don't you have this document for

4    the other loans?

5            MR. VAN GRACK:  Your Honor --

6            THE COURT:  Can you say yes or no?

7            MR. VAN GRACK:  Yes, Your Honor.

8            THE COURT:  All right, use those.  Use this

9    document -- if you have this same document signed by

10   Mr. Manafort with respect to the loans that he got, that's

11   sufficient.

12           MR. VAN GRACK:  Your Honor, if I may, in part just so

13   that with respect to Mr. Chojnowski, we don't have to call him

14   back, could we simply publish the top half of this?  Because

15   Mr. Chojnowski will actually testify that Mr. Manafort signed

16   this document on multiple occasions, and so without identifying

17   the particular date, it would address the issue in terms of

18   prejudice.

19           MR. WESTLING:  Your Honor, I have no problem if they

20   can produce the proper document, having them put it into

21   evidence.

22           THE COURT:  He represents that he can.

23           MR. WESTLING:  But this witness has no personal

24   knowledge of this record at all.

25           MR. VAN GRACK:  Your Honor --

Chojnowski - Direct                                                2138

1            THE COURT:  It's a business --

2            MR. VAN GRACK:  Excuse me.

3            THE COURT:  Just be patient.

4            MR. VAN GRACK:  You're right, Your Honor.  My

5    apologies.

6            THE COURT:  One of these days, you're going to get to

7    be here and you'll see why it's irritating.  You've got to

8    relax.  I know you-all can't relax because of the stress on

9    you-all.

10           You want to introduce this document because you want

11   to show that the witness had notice that it was important that

12   the information that he provided to get the loan had to be

13   accurate.

14           MR. VAN GRACK:  Yes, Your Honor.

15           THE COURT:  And you also have told me that this very

16   document relates to loans that were not ultimately made but

17   that this same document was signed by Mr. Manafort on loans

18   that were made.  And you've represented to me, and I have no

19   doubt you're right, that you have those documents.

20           So I don't see why they're not -- why he can't offer

21   that and put into the record the right documents on Monday --

22           MR. VAN GRACK:  Your Honor --

23           THE COURT:  -- and elicit from the witness this time

24   that this same document would have been -- or was signed by

25   Mr. Manafort.

Chojnowski - Direct                                                2139

1            MR. VAN GRACK:  Your Honor, I just want to clarify

2     one point, which is that Mr. Chojnowski, I believe, would

3     testify that in reviewing the two loans that Mr. Manafort

4     applied for from The Federal Savings Bank, he identified as

5     part of the loan package two documents, both this document and

6     one signed on October 26.

7            I represent that because I have not personally gone

8     through the loan application documents to identify this

9     document signed on December (sic) 26.  I'm taking

10    Mr. Chojnowski's representation as the chief operating officer

11    of the lending division that he identified this document, which

12    is why we would seek solely to publish, we'll say, the top half

13    of the document based on his representation that he has seen

14    this document signed in the loan application packages.

15           MR. WESTLING:  Your Honor, based on the

16    representation, I think the document is admissible.  I'd ask

17    that it not be published until we've cleared this up because I

18    think it's very prejudicial in the event there is no such

19    document.

20           I don't believe I've seen it in discovery.  That

21    doesn't mean it's not there.  There's lots of discovery, so I

22    may well have missed it, but I know this one is not related to

23    those two loans.

24           THE COURT:  Let's do it that way.

25           MR. VAN GRACK:  If I may just?

1          THE COURT:  Yes, you may.

2          MR. VAN GRACK:  Your Honor, again, Mr. Chojnowski, as

3   I understand what he would testify to is what he reviewed, the

4   two loan applications that were in the Federal Savings Bank

5   record, he identified this signed document as part of one of

6   those loan applications, and he identified a separate signed

7   document as the other one.

8          THE COURT:  All right, enough.  This is what I'm

9   going to let you do:  You may inquire of this witness whether

10  Mr. Manafort with respect to the two loans that are in issue

11  signed a document that required him to -- because you don't

12  have any of the real documents for those two loans here today,

13  do you?

14         MR. VAN GRACK:  This is one of those two documents,

15  Your Honor.

16         THE COURT:  Oh, it is of the --

17         MR. VAN GRACK:  Mr. Chojnowski has represented that

18  when he looked at the two loans that The Federal Savings Bank

19  had with Mr. Manafort, this is what I think he would testify

20  to.  This is what he proffered to us:  There were two signed

21  documents in the loan application.  This pertained to one of

22  the loans, and there was another document dated December 26 --

23  October -- pertaining to the other one.  This is simply what

24  Mr. Chojnowski has represented to us.

25         THE COURT:  Well, he didn't participate in the loans,

Chojnowski - Direct                                                    2141

1    did he?

2              MR. VAN GRACK:  No.  He just has knowledge of the

3    import of the loans and which documents pertain to which, which

4    loan.

5              THE COURT:  Well, why don't you elicit from him

6    simply -- because these will be business records of the loans

7    that are in issue, and you may find those, and they would be

8    admissible --

9              MR. WESTLING:  They would, Your Honor.

10             THE COURT:  -- and they could display those.

11             If you want to elicit from this witness whether --

12   the significance of this document when signed, you may do so,

13   but don't display this yet.  You'll get to offer it and admit

14   it if you find them.  If you don't, you won't.  All you'll have

15   will be his testimony that it's routine for the bank to get

16   this and to have it signed and what it does.

17             MR. VAN GRACK:  Your Honor, would he be, as opposed

18   to publishing it, be able to read from the document?

19             THE COURT:  He can tell us what, what the document

20   does.

21             MR. VAN GRACK:  Okay.

22             THE COURT:  That's plenty.

23             MR. ANDRES:  Thank you, Your Honor.

24             MR. WESTLING:  Thank you, Your Honor.

25             THE COURT:  So, in essence, I have overruled and

Chojnowski - Direct                                                    2142

1   sustained in part.

2             MR. WESTLING:  Understood.  Thank you.

3             THE COURT:  All right.  Let's proceed.

4             MR. WESTLING:  Thank you.

5             (End of bench conference.)

6             THE COURT:  I still think we will make 5:30 for those

7   of you who need to make it.

8             All right.  Mr. Van Grack, you may proceed.

9   BY MR. VAN GRACK:

10  Q.   Mr. Chojnowski, again, pointing your attention to

11  Government Exhibit 273, do you recognize this document?

12  A.   Yes, I do.

13  Q.   And was this document part of Mr. Manafort's loan

14  applications?

15  A.   Yes, it was.

16  Q.   Which applications?

17  A.   The two applications in question.

18  Q.   And what is the import of this --

19            THE COURT:  What was that answer?

20            THE WITNESS:  The two -- the two loans that we closed

21  for the -- for the borrower.

22            THE COURT:  All right.  Proceed.

23  BY MR. VAN GRACK:

24  Q.   And, Mr. Chojnowski, what is the import of this document

25  to The Federal Savings Bank?

Chojnowski - Direct                                                    2143

1   A.   It's -- it gives the loan applicant information and a

2   warning that it's illegal to make false statements about

3   income, assets, themselves, debts, the collateral, during the

4   application process.

5   Q.   And does it make specific representations about what types

6   of crimes could be committed if an individual was to provide

7   false statements?

8   A.   Yes, it does.  It provides information that mortgage fraud

9   is punishable up to 30 years or a million dollars in fine or

10  both.

11  Q.   And, Mr. Chojnowski, based on your review of the records,

12  did Mr. Manafort sign these documents?

13  A.   Yes, he did.

14          MR. VAN GRACK:  No further questions, Your Honor.

15          THE COURT:  Cross-examination?

16          MR. WESTLING:  One moment.

17          THE COURT:  Yes, you can have a moment or two.

18          MR. WESTLING:  No questions, Your Honor.

19          THE COURT:  All right.  Thank you.  You may step

20  down.

21          All right, ladies and gentlemen, pass your books to

22  the right, and Mr. Flood, as always, will maintain their

23  security.

24          This witness may be excused.

25                          (Witness excused.)

2144

1          THE COURT:  Now, this evening, again, you must

2     refrain from discussing the matter with anyone, including

3     making general comments.  You cannot comment perhaps -- you can

4     say you're fascinated or bored, but nothing more.  Don't

5     discuss the matter at all.  Simply tell your family members,

6     your friends, your neighbors, that the judge has told you that

7     you may not discuss the matter at all.

8          And don't undertake any investigation on your own.

9     Don't look up anything on Google or anything else about any of

10    the participants, any of the witnesses, or anything else.  Put

11    it completely out of your mind until Monday.  I certainly plan

12    to do that.

13                         (Laughter.)

14          THE COURT:  All right.  You may follow Mr. Flood out.

15                         (Jury out.)

16          THE COURT:  All right.  You may be seated for a

17    moment.

18          I have -- in addition to consideration of the

19    instructions, which I'm working on and will be completed

20    Monday, I have that and I have the Government's continuing

21    motion, and -- or maybe it's the defendant's opposition, having

22    to do with the FinCEN witness.  I will consider that and

23    resolve it on Monday morning.

24          That's all that I plan to have done by Monday.  On

25    Monday, I expect in the afternoon we will have one, perhaps

2145

1   two, depending on my ruling, one more witness, which you

2   anticipate, Mr. Andres, will take about an hour on direct.

3           MR. ANDRES:  Yes.  May I speak from here, Your Honor?

4           THE COURT:  Yes, you may.

5           MR. ANDRES:  Yeah, that's exactly right, Judge.  One

6   witness for an hour, Mr. Brennan, and then the FinCEN, pursuant

7   to Your Honor's ruling, and then we'll just admit some business

8   records, some documents, e-mails that we had previously

9   expected to put in through a witness.  I will put them in and

10  use them for closing.  So that's the sum total of what's left

11  in the Government's case.

12          THE COURT:  All right.  Well, you need to be focused

13  about that because I'm not going to allow a full morning or a

14  full day for closing.

15          MR. ANDRES:  Understood, Your Honor.  Although, what

16  Your Honor has said repeatedly throughout is that the jury

17  doesn't need to see the exhibits because we'll get to use them

18  in closing.  So, I mean, there's a substantial number of

19  exhibits that we haven't displayed or published.

20          THE COURT:  All right.  Do you have an estimate right

21  now as to how long you think your closing would be?

22          MR. ANDRES:  Your Honor, between the closing and the

23  rebuttal, I would say two-and-a-half hours, if that's okay.

24          THE COURT:  Between the closing and the rebuttal, I'm

25  not sure I understand what you mean.  How long do you think it

2146

1    will take you to make a closing argument to the jury after all

2    the evidence is in?

3            MR. ANDRES:  Two hours.

4            THE COURT:  All right.  And how long do you think you

5    need to make a closing argument?

6            MR. WESTLING:  I think if we could have two hours,

7    that would be great, Your Honor.

8            THE COURT:  I think that's within the outer envelopes

9    of reasonable.  So I'll permit two hours, but I tell you, it's

10   no accident that TV programs are half an hour.

11                    (Laughter.)

12           THE COURT:  Not that I would expect you to take only

13   half an hour, but if you think you can hold a juror's attention

14   for two straight hours, then you live on a different planet

15   from the one I do.

16           But you're correct that there has been a lot of

17   evidence, and you're correct that some exhibits you will want

18   to call their attention to, and that's what your focus should

19   be.  I don't know that after really two weeks of evidence, that

20   you should be thinking that some very important evidence you

21   want to put in by reading it to the jury is going to be very

22   effective.

23           Now, what you can do is to say, ladies and gentlemen,

24   I want you to look especially at Exhibit 381.  We didn't --

25   that didn't come out in the course of the trial, but it's

2147

1  important for you to look at it for this reason.  You can do

2  that, but you can't do it for 1,000 documents or 800 documents.

3  It won't work.

4          Two hours is all I will allow.  It's really more than

5  I had in mind, but I think that you've made a good faith

6  estimate, Mr. Andres.

7          MR. ANDRES:  Thank you.

8          THE COURT:  Is that, "Yes, I have.  Thank you"?

9          MR. ANDRES:  Yes, I have, sir.  Thank you very much.

10          THE COURT:  Good.  Well, I hope you reconsider it

11  given what I've said because it's really a long time.

12          Now, it's my experience that jurors don't typically,

13  don't typically punish lawyers for being prolix unnecessary.

14  Most jurors try to do their duty, but they aren't happy about

15  it if you take more time than they think you ought to take.  In

16  any event, two hours is the most.

17          We'll review instructions, have an instructions

18  conference on Monday after all the evidence is in.  But taking

19  it one by one, the first thing that will happen is when they

20  rest, if I grant or deny that motion, whatever I do, and the

21  Government closes its case, I will be asking you, Mr. Westling,

22  or any one of you who wish to address it, whether you wish to

23  offer any evidence.

24          MR. WESTLING:  Understood, Your Honor.

25          THE COURT:  And, again, of course, you're not

2148

1    required to.

2            And then if you do, we will hear it, however long it

3    takes, and then following that, we will go to instructions and

4    final arguments.  The instructions conference first, then

5    closing arguments, then the instructions to the jury.  So

6    counsel will know in advance what instructions I intend to

7    give.

8            All right.  Anything else to be dealt with this

9    afternoon?

10           MR. ANDRES:  Judge, would we -- so Monday we rest our

11   case.  Put aside whether the defense is going to put on a case,

12   but just for the hypothetical they don't, we do a charge

13   conference, do we then start Tuesday morning with closings?

14           THE COURT:  I would assume so, but I can't guarantee

15   that.

16           MR. ANDRES:  Understood.

17           THE COURT:  I don't -- nobody -- neither side will be

18   required to divide their final -- or their closing arguments by

19   a day.  In other words, I won't require that you start at 3:00

20   and go to 5:00 and end the next day.  You're going to finish it

21   the same day.

22           Now, it could turn out that -- I prefer not to do

23   this, and I'll listen to counsel if you have a view -- I have

24   had situations where I've had one side close in the afternoon

25   and then the other side close in the morning.  I think there's

1   some force to the argument that it ought to be done on the same

2   day, and if you-all feel strongly about that, I will certainly

3   accommodate that.

4            Anything else today, Mr. Andres?

5            MR. ANDRES:  That would be our preference, Judge.

6            Very shortly, presumably the Government will be

7   allowed to use the, the video for their -- for our closing?

8            THE COURT:  Yes.

9            MR. ANDRES:  Okay.  And just lastly, I promise, I

10  just want to make sure I understand everything:  Are we

11  permitted to also read from the trial transcript in terms of

12  trial testimony?

13           THE COURT:  Typically not.  You have a trial

14  transcript.  I don't know if it's been fully vetted and all the

15  rest.

16           Do you plan to do that?

17           MR. WESTLING:  I think we do, Your Honor.

18           THE COURT:  I'll check with my court reporters, and

19  I'll give you an answer, but it's likely that if you both want

20  to do it, I'll permit it.

21           MR. ANDRES:  Okay.  And then just the one follow-up,

22  again, I want to understand everything before we get started,

23  what's the Court's procedures with respect to read-backs or

24  sending the transcripts back?

25           THE COURT:  I don't send transcripts back.

2150

1          MR. ANDRES:  So --

2          THE COURT:  Their recollection controls.

3          MR. ANDRES:  Okay.  Thank you, Your Honor.

4          THE COURT:  Anything from the defendant?

5          MR. WESTLING:  No, Your Honor.  Thank you.

6          THE COURT:  All right.  I thank counsel for your

7   cooperation.  We'll commence Monday at 1:00.  Thank you.

8          MR. WESTLING:  Thank you, Your Honor.

9      (Recess from 5:30 p.m., until 1:00 p.m., August 13, 2018.)

10

11              CERTIFICATE OF THE REPORTER

12      I certify that the foregoing is a correct transcript of

13   the record of proceedings in the above-entitled matter.

14              _____/s/_____

15                    Anneliese J. Thomson

16

17

18

19

20

21

22

23

24

25