2151

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------x
UNITED STATES OF AMERICA,      .  Criminal Action No.
                               .  1:18-CR-83
          versus               .
                               .
PAUL J. MANAFORT, JR.,         .
                               .  August 13, 2018
               Defendant.      .  Volume X-P.M.-1
------------------------------x

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE T. S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:               UZO ASONYE, AUSA
                                  United States Attorney's Office
                                  2100 Jamieson Avenue
                                  Alexandria, VA 22314
                                    and
                                  GREG D. ANDRES, SAUSA
                                  BRANDON L. VAN GRACK, SAUSA
                                  Special Counsel's Office
                                  U.S. Department of Justice
                                  950 Pennsylvania Avenue, N.W.
                                  Washington, D.C. 20530

FOR THE DEFENDANT:                THOMAS E. ZEHNLE, ESQ.
                                  Law Office of Thomas E. Zehnle
                                  601 New Jersey Avenue, N.W.
                                  Suite 620
                                  Washington, D.C. 20001
                                    and
                                  KEVIN M. DOWNING, ESQ.
                                  Law Office of Kevin M. Downing
                                  601 New Jersey Avenue, N.W.
                                  Suite 620
                                  Washington, D.C. 20001

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 2151 - 2279)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2152

1   APPEARANCES:  (Cont'd.)

2   FOR THE DEFENDANT:              RICHARD W. WESTLING, ESQ.
                                   Epstein, Becker & Green, P.C.
3                                  1227 25th Street, N.W.
                                   Washington, D.C. 20037
4
     OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
5                                  U.S. District Court, Fifth Floor
                                   401 Courthouse Square
6                                  Alexandria, VA 22314
                                   (703)299-8595
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2153

1                                    <u>INDEX</u>

2

<u>WITNESS</u>                            <u>EXAMINATION</u>        <u>PAGE</u>

3

4      JAMES BRENNAN

                                      DIRECT           2164
5                                     CROSS            2201
                                      REDIRECT         2245
6                                     RECROSS          2251
                                      FURTHER          2255
7                                     REDIRECT
                                      FURTHER          2260
8                                     RECROSS

9

10                         E X H I B I T S

11
       Government Exhibit Nos. 65E1, 65I1, 65J2, 65L1,    2163
12     142, 183, 197, 216, 231, 234, 244, 253, 269,
       339, 382, 401, 416, 419, 420, 426, 428, 429,
13     435, 440, 441, 442, 443, 452, 453, 460, 502, and
       503 were received
14     Government Exhibit No. 2B was received            2167
       Government Exhibit No. 294 was received           2177
15     Government Exhibit No. 275 was received           2187
       Government Exhibit No. 286 was received           2193
16

17     Defendant's Exhibit No. 40 was received           2208
       Defendant's Exhibit No. 41 was received           2228
18

19

20

21

22

23

24

25

2154

                    P R O C E E D I N G S

1

2                      (Defendant present, Jury out.)

3          THE COURT:  All right.  Good afternoon.

4          MR. WESTLING:  Good afternoon.

5          THE COURT:  I see the faithful are here.  We're going

6    to proceed as follows today, unless you have a suggestion to do

7    otherwise:  I have the evidence motion about which there have

8    been filings over the weekend.  I have those.  I'm going to

9    hear focused argument on those after the next witness, and I

10   will resolve that.  That involves the 404(b) intrinsic,

11   extrinsic, and so forth evidence.

12              I also have a sealed motion, which I will resolve

13   once the Government has an opportunity to respond, which you

14   can do either orally or in writing, as you wish.

15          MR. ANDRES:  And, Your Honor, I didn't mean to

16   interrupt, but we just filed something, so I'm sure you haven't

17   had a chance, but we did respond.

18          THE COURT:  All right.  Thank you.  That's helpful.

19              And then I'll attend to that, but, you see, in the

20   meantime, what we'll do is we'll finish this one additional

21   witness.  I'll deal with the evidence question.  That will

22   resolve whether the Government rests or puts on another

23   witness.

24              Do I have that right?

25          MR. ANDRES:  Yes, Your Honor.

2155

1          THE COURT:  All right.  Then if I decide that

2    question in favor of the Government, you'll have one more

3    witness.  If I don't, then I'll give you an opportunity to rest

4    before the jury, and then I'll hear anything under Rule 29, and

5    we will -- you will then have to answer the question that you

6    haven't had to answer, that is, whether you intend to offer

7    anything.

8          So we'll proceed in that fashion.  Any suggestions to

9    the contrary, Mr. Andres?

10          MR. ANDRES:  No, Your Honor.  That works for the

11    Government, just with one caveat:  Before we put on the first

12    witness, Mr. Van Grack is going to move in some documents that

13    have been stipulated to and which I understood --

14          THE COURT:  That's fine.

15          MR. ANDRES:  -- there's no objection from the

16    defense.

17          Then we'll start with Mr. Brennan.

18          THE COURT:  All right.  That's fine.  What are they,

19    Mr. Van Grack?

20          MR. VAN GRACK:  Your Honor, I believe we provided a

21    list to the Court, but here's another copy of it in case it's

22    not up there.

23          THE COURT:  Yes.  Hand it to the -- did you provide

24    it today?

25          MR. VAN GRACK:  Very late this afternoon, Your Honor.

2156

1          THE COURT:  All right.  It doesn't matter if there's

2     no objection.

3          All right.  355 is lined through, so that's not

4     offered?

5          MR. VAN GRACK:  That's correct, Your Honor.

6          THE COURT:  All right.  Why don't we shorten matters?

7     I will admit those that are listed.  Have you seen this, Mr. --

8          MR. WESTLING:  Your Honor, we have seen it.  We've

9     conferred with the Government.  We have no objection with the

10    exception of the one that has the line through it.

11         THE COURT:  All right.  I'm not going to recite all

12    of these.  I'll simply give it to the deputy clerk, but I will

13    admit all of those on this list beginning with 65E1 and going

14    to 503 and 244.  I'll have more to say about how these exhibits

15    must be organized so that they can be taken to the jury room,

16    but I think you've already gone down that road a good ways.

17         They will probably need an index, but the index

18    cannot be argumentative or of any sort, just describe it.  But

19    I'm sure you-all have already started that task.  Am I right,

20    Mr. Andres?

21         MR. ANDRES:  Yes, Your Honor.  We've started the

22    task, and we've started creating the binders that only have the

23    admitted exhibits in them.

24         THE COURT:  Good.  All right.  So we'll begin now.

25    We'll have the jury brought in, so we'll do our usual routine

2157

1    with the jury, then we'll proceed.

2              Who is your first witness?

3              MR. ANDRES:  James Brennan from The Federal Savings

4    Bank.

5              THE COURT:  All right.  And he'll take about an hour?

6              MR. ANDRES:  I hope so, Your Honor, or less.

7              THE COURT:  All right.  You may bring the jury in

8    now.

9              Oh, just a moment.  Let me deal with it now quickly

10   at the bench.  This is a very minor matter.  It has nothing to

11   do with the merits of the case.  And this bench conference will

12   be in the public record ultimately.

13             (Pages 2158 through 2160 filed under seal.)

14

15

16

17

18

19

20

21

22

23

24

25

2161

1          THE COURT:  Mr. Flood, bring the jury in, please.

2                    (Jury present.)

3          THE COURT:  Yes, I can see that claims have been laid

4   to particular seats, which is fine.

5          All right.  You may be seated.  Good afternoon,

6   ladies and gentlemen.  As always, we'll begin with the calling

7   of the roll by number.

8          THE CLERK:  Juror 0008.

9          THE JUROR:  Present.

10         THE CLERK:  Juror 0037.

11         THE JUROR:  Here.

12         THE CLERK:  Juror 0276.

13         THE JUROR:  Present.

14         THE CLERK:  Juror 0017.

15         THE JUROR:  Present.

16         THE CLERK:  Juror 0145.

17         THE JUROR:  Present.

18         THE CLERK:  Juror 0115.

19         THE JUROR:  Present.

20         THE CLERK:  Juror 0082.

21         THE JUROR:  Present.

22         THE CLERK:  Juror 0009.

23         THE JUROR:  Present.

24         THE CLERK:  Juror 0299.

25         THE JUROR:  Present.

2162

1           THE CLERK:  Juror 0091.

2           THE JUROR:  Present.

3           THE CLERK:  Juror 0302.

4           THE JUROR:  Present.

5           THE CLERK:  Juror 0060.

6           THE JUROR:  Present.

7           THE CLERK:  Juror 0296.

8           THE JUROR:  Present.

9           THE CLERK:  Juror 0054.

10           THE JUROR:  Present.

11           THE CLERK:  Juror 0127.

12           THE JUROR:  Present.

13           THE CLERK:  Juror 0133.

14           THE JUROR:  Here.

15           THE COURT:  All right.  Ladies and gentlemen, again,

16   good afternoon, and let me do as I've done throughout the

17   trial, ask that you confirm to me that you were able to refrain

18   from discussing this matter with anyone, as I instructed you.

19           THE JURORS:  Yes, Your Honor.

20           THE COURT:  Thank you.  That's a very important

21   factor.

22           All right.  We're going to proceed today with a

23   witness.  What we have is the Government has one more witness

24   for sure.  There's an issue I have to consider.  There may be

25   another Government witness, I don't know, but there will be one

2163

```
 1    more witness, and then we'll proceed.  I may have to take a

 2    recess after this.

 3            I forgot to tell you on Friday that your lunches

 4    would be here.  Did you get your lunches today at 12:00 or

 5    12:30?

 6            THE JURORS:  Yes, Your Honor.

 7            THE COURT:  Good.  I'm glad to hear that.

 8            Mr. Andres, you may call your next witness, sir.

 9            MR. ANDRES:  First, Your Honor, we wanted to admit

10    those exhibits that we referenced earlier.

11            THE COURT:  Yes.  Yes, thank you for reminding me.

12    The Government and the defendant have agreed to the admission

13    of -- may I see the list, please -- to the list of additional

14    exhibits, and I'm going to admit those now.

15            I thought I could use the list, but let me just run

16    down the list:  65E1, 65I1, 65J2, 65L1, 142, 183, 197, 216,

17    231, 234, 253, 269, 339, 382, 401, 416, 419, 420, 426, 428,

18    429, 435, 440, 441, 442, 443, 452, 453, 460, 502, 503, and 244.

19            And, Mr. Andres, do these cover the exhibits that

20    are -- you're going to ask the next witness about?

21            MR. ANDRES:  No, Your Honor.

22            THE COURT:  All right.  You may call your -- those

23    exhibits are all admitted without objection.

24            (Government Exhibit Nos. 65E1, 65I1, 65J2, 65L1, 142,

25    183, 197, 216, 231, 234, 244, 253, 269, 339, 382, 401, 416,
```

Brennan - Direct                                                    2164

1    419, 420, 426, 428, 429, 435, 440, 441, 442, 443, 452, 453,

2    460, 502, and 503 were received in evidence.)

3              MR. ANDRES:  Thank you, Your Honor.  The Government

4    calls James Brennan.

5              THE COURT:  All right.

6              Come forward and take the oath, please, sir.

7              JAMES BRENNAN, GOVERNMENT'S WITNESS, SWORN

8              THE COURT:  All right.  You may proceed.

9              MR. ANDRES:  Thank you, Your Honor.

10                        DIRECT EXAMINATION

11   BY MR. ANDRES:

12   Q.   Mr. Brennan, please state your name for the record and

13   spell your last name.

14   A.   James Brennan, B-r-e-n-n-a-n.

15   Q.   Can you summarize your educational background for the

16   jury?

17   A.   Bachelor's of Business Administration from Loyola

18   University Chicago, Master's of Business Administration from

19   DePaul University.

20   Q.   Are you currently employed?

21   A.   I am.

22   Q.   Where?

23   A.   The Federal Savings Bank.

24   Q.   When did you first start working at The Federal Savings

25   Bank?

Brennan - Direct                                                          2165

1   A.   May 2015.

2   Q.   What's your title there?

3   A.   Vice president.

4   Q.   And where is your office located?

5   A.   I split my time between Chicago and Lake Forest.

6   Q.   And where's Lake Forest?

7   A.   It's a North Shore suburb of Chicago.

8   Q.   And do you know if the bank, The Federal Savings Bank has

9   offices in New York?

10  A.   It does.

11  Q.   What are your responsibilities at The Federal Savings

12  Bank?

13  A.   I'm responsible for managing the portfolio loans,

14  especially construction loans.

15  Q.   Are you familiar with an individual named Paul Manafort?

16  A.   I am.

17  Q.   How?

18  A.   I worked on the approvals for his loans and also the

19  construction piece of one of his loans.

20  Q.   Can you summarize what the funded loans were that you

21  worked on for Mr. Manafort?

22  A.   The loan for Bridgehampton, $9.5 million, and the 377

23  Union Street, the two loans that total $6.5 million.

24  Q.   Prior to working at The --

25            THE COURT:  Mr. Brennan, could I ask you to speak up

Brennan - Direct                                                           2166

1    just a little bit so we can hear you?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Thank you.  Next question.

4    BY MR. ANDRES:

5    Q.   Prior to working at The Federal Savings Bank, did you work

6    in the banking industry?

7    A.   Yes, I did.

8    Q.   For how many years have you worked in the banking

9    industry?

10   A.   Just under 39.

11   Q.   And over your career, have you specialized in a particular

12   area of banking?

13   A.   Mainly in commercial real estate.

14   Q.   Prior to your testimony here today, did you meet with the

15   Government to prepare?

16   A.   I did.

17   Q.   Did you review documents?

18   A.   I did.

19   Q.   And are you testifying pursuant to a subpoena?

20   A.   I am.

21   Q.   Are you also testifying pursuant to an immunity order?

22   A.   Yes, I am.

23   Q.   Can I ask you to look at the document marked 2B in front

24   of you?

25              Can you tell me what that is?

```
     Brennan - Direct                                          2167
 1   A.   It's order use immunity for trial testimony in United
 2   States of America versus Paul J. Manafort, Jr.
 3            MR. ANDRES:  Your Honor, the Government moves to
 4   admit Government Exhibit 2B.
 5            MR. WESTLING:  No objection.
 6            THE COURT:  Admitted.
 7            (Government Exhibit No. 2B was received in evidence.)
 8   BY MR. ANDRES:
 9   Q.   Mr. Brennan, can you tell the jury what you understand
10   that immunity order to mean?
11   A.   That I cannot be prosecuted unless I commit perjury.
12   Q.   Let me direct your attention to June of 2017.  Were you
13   interviewed by the FBI?
14   A.   Yes, I was.
15   Q.   Where?
16   A.   In front of my house.
17   Q.   Were you asked questions?
18   A.   Yes, I was.
19   Q.   What questions were -- what was the subject matter of
20   those questions?
21   A.   Our -- the bank's loans to Mr. Manafort.
22   Q.   Did you later agree to meet with the Government pursuant
23   to a proffer agreement?
24   A.   I did.
25   Q.   You testified about your responsibility to review certain
```

Brennan - Direct                                                    2168

1    loans at The Federal Savings Bank.

2                Can you explain the review process?

3    A.    The review process consists of looking at documents the

4    borrower provides, along with documents that we order like

5    credit reports, appraisals, and seeing if we can underwrite the

6    loans to match up to the money that we're providing the

7    borrower.

8    Q.    Are you familiar with the function of the credit committee

9    at The Federal Savings Bank?

10   A.    I am.

11   Q.    What is it?

12   A.    It's the -- approve the overall structure to loans and

13   whether or not we're going to go forward with the loans.

14   Q.    Do you know who sits on the credit committee at The

15   Federal Savings Bank?

16   A.    I do.

17   Q.    Who?

18   A.    The chairman of the bank, Steve Calk; president of the

19   bank, Javier Ubarri; and the chief operating officer of the

20   bank, Jim Norini.

21   Q.    Do you have a role with respect to the credit committee?

22   A.    I'm the credit committee secretary.

23   Q.    Let me ask you some questions about the ownership of the

24   bank.  Do you have an understanding of the ownership structure

25   of The Federal Savings Bank?

Brennan - Direct                                                              2169

1   A.    I do.

2   Q.    Okay.  Is there a holding company?

3   A.    There is.

4   Q.    And who are the shareholders in the holding company?

5   A.    My understanding is the majority shareholder is Stephen

6   Calk, followed by his brother, John, and then small shares are

7   owned by three of the executive vice presidents.

8   Q.    You testified about the credit committee.  When the credit

9   committee approves the loan back in the time of Mr. Manafort's

10  loan, was it subject to some condition?

11  A.    It was subject to underwriting that would --

12  Q.    What is -- I'm sorry, excuse me.  Did you finish your

13  answer?

14  A.    It was subject to underwriting to match up to the

15  structure that the loan committee laid out.

16  Q.    And were you involved in that underwriting process?

17  A.    I am.

18  Q.    Can you explain what the underwriting process is?

19  A.    We would review financial statements provided by the

20  borrower, credit report of the borrower, appraisals.  If it was

21  a construction loan, we would review the construction budget,

22  construction contract.  Also, we would look at marketing data

23  to see if there was potential for the bank to get paid off

24  through the construction.

25  Q.    In evaluating a loan application, does the bank require

Brennan - Direct                                                          2170

1   information about real estate owned?

2   A.   We do.

3   Q.   Is that -- is that information important?

4   A.   It provides a basis for what other collateral the bank can

5   use as well as it gives us a flavor what other obligations the

6   borrower may have.

7   Q.   When you say what other obligations a borrower may have,

8   what do you mean by that?

9   A.   Well, if he has other loans, it affects his ability to

10  repay our loan potentially, because he may have a cash flow

11  drain or positive cash flow to help support the loan.

12  Q.   In the course of your work reviewing Mr. Manafort's loans,

13  did you speak or communicate with him directly?

14  A.   No.

15  Q.   What was the source of the information you relied on?

16  A.   It was provided to me through either a loan officer or his

17  assistant or my underwriting assistant would receive some of it

18  from associates of Mr. Manafort.

19  Q.   And who was the loan officer at The Federal Savings Bank?

20  A.   Dennis Raico.

21  Q.   And you mentioned another underwriter who assisted, who

22  was that?

23  A.   Tom Horn.

24  Q.   Who's Tom Horn?

25  A.   He's a vice president underwriter that reports to me.  He

Brennan - Direct                                                      2171

1    does commercial underwriting for the bank.

2    Q.   All right.  You mentioned there were several loans.  Did

3    one of those loans relate to Mr. Manafort's Bridgehampton

4    property?

5    A.   It did.

6    Q.   Okay.  What was the amount of that loan?

7    A.   9.5 million.

8    Q.   Do you know what the entity is that --

9    A.   Summerbreeze LLC.

10   Q.   And what did you understand Summerbreeze LLC to be?

11   A.   A sole -- single asset entity that's only holding was the

12   property in Bridgehampton.

13   Q.   With respect to the loan for Bridgehampton, do you know

14   what the purpose of the loan was?

15   A.   It was a cash-out refinance.

16   Q.   What does that mean?

17   A.   It means that the bank refinances the existing debts, so

18   it's in first lien position, and provides additional funds to

19   the borrower for their use.

20   Q.   Is there generally collateral for a cash-out refinance?

21   A.   There is.

22   Q.   What is it?

23   A.   In this case?

24   Q.   Yes.

25   A.   It was the property at Bridgehampton.  It was the

Brennan - Direct                                                    2172

1    borrower's -- or the guarantor's condominium in Alexandria,

2    Virginia, and approximately $615,000 cash account that the bank

3    held.

4    Q.   With respect to the Bridgehampton loan extended to

5    Mr. Manafort, do you know what the duration of that loan was?

6    A.   30 years.

7    Q.   You testified about the Bridgehampton loan.  What was the

8    second loan that was extended?

9    A.   There were actually a second and third loan on 377 Union

10   Street, and the total amount is $6.5 million.

11   Q.   Are you aware that prior to the approval of the

12   Bridgehampton and the Union Street loan, there were other loans

13   that were proposed?

14   A.   Yes, I am.

15   Q.   Can you explain that to the jury?

16   A.   We looked at a property -- a loan for a property in New

17   York that the chairman of the bank wasn't interested in

18   pursuing.  And then a couple months later, we looked at a

19   property in California, 2401 Nottingham, that we actively

20   pursued, obtained appraisals, copies of the general contract,

21   and were ready to close.

22   Q.   Okay.  And ultimately, that loan resulted in the

23   Bridgehampton loan being finalized?

24   A.   The Bridgehampton loan evolved out of the Nottingham loan,

25   yes.

Brennan - Direct                                                    2173

1    Q.   Are you familiar with the term over-collateralized?

2    A.   No, not really.

3    Q.   Do you know what it means if a -- if somebody claims their

4    property is -- or a loan is over-collateralized?

5    A.   It would mean different things to different people, but

6    it's not a term I'm familiar with.

7    Q.   Okay.  With respect to Mr. Manafort's Bridgehampton loan,

8    was that over-collateralized?

9    A.   No.

10   Q.   With respect to the terms of that loan that was extended

11   by The Federal Savings Bank to Mr. Manafort, who first proposed

12   those terms?

13   A.   The loan that closed were -- the terms were proposed by

14   the borrower, Mr. Manafort.

15   Q.   And were those terms ultimately agreed upon by the bank?

16   A.   Yes.

17   Q.   Can I ask you to look in the binder on the witness stand,

18   take a look at Government Exhibit 145?

19            MR. ANDRES:  This is already in evidence, Your Honor.

20            THE COURT:  All right.

21            MR. ANDRES:  May I publish it?

22            THE COURT:  You may.

23   BY MR. ANDRES:

24   Q.   Do you have that document in front of you, Mr. Brennan?

25   A.   I do.

Brennan - Direct                                                2174

1   Q.   Okay.  Can you explain to the jury what Government -- what

2   Government Exhibit 145 is?

3   A.   It's an e-mail from Anna Ivakhnik to Heather Washkuhn and

4   Cindy Laporta, carbon copying Mr. Manafort, dated August 10,

5   2016, with the attachments of 2015 P&L Manafort.pdf.

6   Q.   Can I ask you to take a look at that attachment and turn

7   to Page 2447?

8   A.   Yes.

9   Q.   Can you tell me what's reflected in -- on Page 2477?

10  A.   It's statement of revenue and expenses for DMP

11  International LLC as of December 31, 2015.

12  Q.   And what's listed as the net income?

13  A.   $4,450,744.

14  Q.   During the course of your review of Mr. Manafort's loans,

15  did you review this document?

16  A.   I did.

17  Q.   And was Mr. Manafort's income relevant to the underwriting

18  decision?

19  A.   Yes, it is.

20  Q.   Can you explain why?

21  A.   One of the sources of repayment for the loan is -- even

22  when it's a construction loan, we always look towards the

23  guarantor to make sure if there are collateral shortfalls, that

24  the borrower or guarantor has the means to repay a loan.

25  Q.   Did you ever learn during the course of your underwriting

Brennan - Direct                                                2175

1    that this document was false?

2    A.   We learned that this document was inconsistent.

3    Q.   Okay.  If a borrower submitted a profit and loss statement

4    that was false, how would that affect your decision with

5    respect to the loan and underwriting process?

6    A.   I would go to the character of the borrower, which should

7    mean that we would raise a red flag and potentially turn the

8    loan down.

9    Q.   When you say that goes to the character of the borrower,

10   can you explain how that's relevant to your decision?

11   A.   We -- as a lender, you want to know who you're lending to,

12   and you expect that the information that they provide, we can

13   rely on so that you can have a means to make your decision.

14   Q.   How about the amount of income?  Would the amount of

15   income be relevant to Mr. Manafort's Bridgehampton loan?

16   A.   It would, because the Bridgehampton loan, being a cash-out

17   refinance, the primary source of repayment was the borrower's

18   income.

19   Q.   Okay.  You testified earlier about something called a

20   construction loan.  Can you explain the difference with respect

21   to the risk profile of a construction loan and the type of loan

22   Mr. Manafort received for Bridgehampton?

23   A.   A construction loan is short-term in nature, usually a

24   year to two years and you're expecting the repayment of the

25   loan to come from the completion of the construction.  And if

Brennan - Direct                                                    2176

1    it's a property for sale, when that property is sold, the bank

2    gets repaid.  If it's a construction loan for somebody's house,

3    they would refinance it into a different loan.

4    Q.   And in terms of the role of -- are you familiar with

5    something called a hard money lender?

6    A.   I am.

7    Q.   What is that?

8    A.   Hard money lenders look only at the collateral value of

9    the property because their interest -- they don't care if the

10   borrower repays them or not.  They're fully well intentioned to

11   take the property back and manage and sell it for a profit.

12   Q.   And that would be in a foreclosure proceeding?

13   A.   That would be in a foreclosure proceeding, yes.

14   Q.   And is the practices of The Federal Savings Bank, are

15   those similar to a hard money lender?

16   A.   It is not.  We try to -- we do loans not to be foreclosed

17   upon.  We're not in business to own real estate, we're in the

18   business to make loans and get repaid.

19   Q.   Can I ask you to turn to Government Exhibit 294?

20        Can you tell me what that is?  What is Government

21   Exhibit 294?

22   A.   It's the uniform residential loan application, also known

23   as a 1003.

24   Q.   Okay.  And who is the borrower on this -- borrower or

25   borrowers on this application?

Brennan - Direct                                                    2177

1    A.   The borrower, under borrower's name, is Paul Manafort.

2    Q.   Okay.  Is Jeffrey Yohai also listed on this document?

3    A.   As the holding title.

4              MR. ANDRES:  The Government moves to admit Government

5    Exhibit 294.

6              MR. WESTLING:  No objection.

7              THE COURT:  Admitted.

8              (Government Exhibit No. 294 was received in

9    evidence.)

10   BY MR. ANDRES:

11   Q.   Have you reviewed this document before, Mr. Brennan?

12   A.   Yes, I have.

13   Q.   Okay.  And is it fair to say this is a loan application?

14   A.   That's what it's titled.

15   Q.   And what is the property at issue?

16   A.   I'm sorry.  I didn't hear the question.

17   Q.   What is the property that's being listed?

18   A.   This property was for 2401 Nottingham Avenue, Los Angeles,

19   California.

20   Q.   And do you know what type of loan this was?

21   A.   This would have been a refinance and construction loan.

22   Q.   How about the amount of the loan?

23   A.   5.7 million.

24   Q.   Can I ask you to turn to the third page?

25   A.   I'm on the third page.

Brennan - Direct                                                    2178

1  Q.    At the top, it says "Assets and Liabilities."  Do you see

2  that?

3  A.    Yes.

4  Q.    What is that -- what is -- what is that section of the

5  application called and what's its purpose?

6  A.    The purpose is for the borrower to tell us what assets

7  they own and also to list the liabilities that may be against

8  those assets or --

9  Q.    And is the -- when you look at that section at the top, is

10 there a property listed for Union Street?

11 A.    This also has a continuation page on Page 4.

12 Q.    Yes.  So if I could just -- thank you.  If you could start

13 at the top of Page 3, do you see Union Street there?

14 A.    No.

15 Q.    How about Howard Street?

16 A.    No.

17 Q.    Okay.  Could you now turn to the continuation page?

18 A.    Yes.

19          MR. ANDRES:  May I publish this, Your Honor?

20          THE COURT:  Yes, you may.

21          MR. ANDRES:  Just the last page.

22 BY MR. ANDRES:

23 Q.    Do you see the last page, the continuation page?

24 A.    I do.

25 Q.    And is there a listing there for Union Street?

Brennan - Direct                                                          2179

1    A.    Yes.

2    Q.    For -- where is the Union Street listing?

3    A.    It's the third one from the bottom of that.

4    Q.    Okay.  And is there a mortgage listed for that?

5    A.    There is not.

6    Q.    Did you later learn that there was, in fact, a mortgage on

7    Union Street?

8    A.    We did.

9    Q.    How did you learn that?

10   A.    When we were closing on Union Street, we received a payoff

11   letter to pay that loan off.

12   Q.    From who?

13   A.    I believe we received it directly from the company that

14   held the loan.

15   Q.    Do you know if Mr. Manafort disclosed that mortgage?

16   A.    At the time he did this in August, he did not.

17   Q.    Okay.  And do you see a reference for Howard Street?

18   A.    Yes, I do.

19   Q.    Okay.  And do you know what was listed as the mortgage for

20   Howard Street?

21   A.    Zero.

22   Q.    Did you later learn that there was a mortgage on Howard

23   Street?

24   A.    We did.

25   Q.    Okay.  How did you learn that?

Brennan - Direct                                                      2180

1   A.   Through discussions with Mr. Manafort's associates.

2   Q.   Okay.  Can I ask you to look at the bottom of the page?

3   Is it signed?

4   A.   There is a digital signature from Mr. Manafort.

5   Q.   And how about the date?

6   A.   August 11, 2016, with a time stamp of 5:21:27, Pacific

7   Daylight Time.

8   Q.   Can you read the language above his signature?

9   A.   "I/we fully understand that it is a federal crime

10  punishable by fine or imprisonment, or both, to knowingly make

11  any false statements concerning any of the above facts as

12  applicable under the provision of Title 18, United States Code,

13  Section 1001."

14  Q.   What's the purpose of that language?

15  A.   To put the borrower on notice that they are intended to

16  provide factual data.

17  Q.   In your role as an underwriter, would it be relevant to

18  you that a borrower proposed -- or provided false information

19  on the real estate owned section of the application?

20  A.   It would be.

21  Q.   Why?

22  A.   Because it goes to -- it's two prongs.  We aren't able to

23  ascertain their liabilities and their cash flow.

24  Q.   Was this loan on Nottingham, was it ever funded?

25  A.   No, it was not.

Brennan - Direct                                                    2181

1    Q.    Do you know why?

2    A.    Mr. Manafort decided at the closing -- basically at the

3    closing table that he no longer wanted the loan.

4    Q.    Did Mr. Manafort later propose an alternative loan

5    structure?

6    A.    Yes, he did.

7    Q.    And what properties did that include?

8    A.    I believe it included the Bridgehampton property and the

9    Alexandria, Virginia, condominium.

10   Q.    Were you notified about these new terms?

11   A.    I was.

12   Q.    Okay.  Do you know if others at the bank were?

13   A.    Yes, I do.

14   Q.    Does that include Javier Ubarri?

15   A.    Yes, it did.

16   Q.    Who is he?

17   A.    He's the president of the bank.

18   Q.    And when Mr. Manafort proposed these new terms, do you

19   know what position, if any, Javier Ubarri took with respect to

20   the new proposed loan?

21            MR. WESTLING:  Objection.  Hearsay.

22            THE COURT:  Do you have -- do you want to be heard on

23   that, Mr. Andres?  It does seem on the face of it to be

24   hearsay.

25            MR. ANDRES:  If I could try to just ask the question

Brennan - Direct                                                          2182

1    differently.

2              THE COURT:  All right.  You may do so.

3    BY MR. ANDRES:

4    Q.   Did you learn that somebody at the bank rejected those

5    terms?

6    A.   Mr. Ubarri did.

7    Q.   Okay.  How did you learn that?

8    A.   Both in conversations with him and in the e-mail chain.

9    Q.   And the application that he rejected was with respect to

10   what loan?

11   A.   It was in respect to the Bridgehampton property.

12   Q.   Okay.  Do you know if Mr. Ubarri was later overruled or

13   another official at the bank approved the loan?

14   A.   The loan closed, so, yes.

15   Q.   And do you know who approved the loan?

16   A.   The loan committee approved it.

17   Q.   Do you know what position Mr. Calk took with respect to

18   the loan?

19   A.   It closed because Mr. Calk wanted it to close.

20   Q.   Okay.  And, Mr. Ubarri, who you said rejected the offer,

21   he also sits on the credit committee?

22   A.   Yes.

23   Q.   Can I ask you to take a look at Government Exhibit 287?

24              MR. ANDRES:  This is already in evidence, Your Honor.

25   May I publish it?

Brennan - Direct                                                          2183

1          THE COURT:  You may.

2    BY MR. ANDRES:

3    Q.   Mr. Brennan, can I ask you to take a look at Government

4    Exhibit 287?

5    A.   I am.

6    Q.   Can you tell me what that is?

7    A.   This is a 1003 dated 10/28/2016, Mr. Manafort and

8    Mrs. Manafort.

9    Q.   Okay.  And this -- this is the application for

10   Bridgehampton?

11   A.   It is.

12   Q.   And the entity is Summerbreeze?

13   A.   No, it is not.

14   Q.   It's not.  Summerbreeze isn't on this loan?

15   A.   No.

16   Q.   Okay.  Is Mr. Yohai included?

17   A.   No.

18   Q.   Can I ask you again to turn to Page 3 of 4, look at the

19   real estate owned section?

20          Without going to the continuation page and just

21   focusing here, is the Union Street property listed?

22   A.   No.

23   Q.   How about the Howard Street?

24   A.   No.

25   Q.   Can you turn now to the last page, the continuation page?

Brennan - Direct                                                    2184

1              Is there any reference on Mr. Manafort's loan

2     application to the Union Street property?

3     A.    No, there is not.

4     Q.    Did you later learn that at this time he had a property on

5     Union Street?

6     A.    We knew, but, yes.

7     Q.    Okay.  And how about the Howard Street?

8              And with respect to the Union Street property, were

9     you aware that there was a mortgage on that property?

10    A.    Not at this point.

11    Q.    Okay.  Did you later learn that there was a mortgage on

12    the property from Genesis Capital?

13    A.    We did.

14    Q.    Okay.  And how about the Howard Street?

15             Can you tell me, is that listed here?

16    A.    Yes, it is.

17    Q.    And what's reflected?

18    A.    It's reflected with the loan amount of $687,000.

19    Q.    Is the document signed?

20    A.    It is.

21    Q.    On what date?

22    A.    October 28, 2018 (sic).

23    Q.    And without reading the language above the signature, is

24    it fair to say that that's the same language that you read from

25    the prior application?

Brennan - Direct                                               2185

1    A.   It is the same language.

2    Q.   If Mr. Manafort owned property at Union Street at the time

3    of the application, would that be material to your decision?

4    A.   Well, we already knew he did, so yes.

5    Q.   Okay.  And how about with respect to the Howard -- Howard

6    Street?  If there was a $3.4 million loan on Howard Street,

7    would that be relevant?

8    A.   Yes, it would be.

9    Q.   With respect to the loan at Bridgehampton, can you explain

10   to the jury what the factors are that you considered during the

11   underwriting process?

12   A.   With respect to Bridgehampton, we would have -- the reason

13   it was originally rejected by Mr. Ubarri is because I had sent

14   an e-mail stating that the income for the borrower was not

15   sufficient to pay the loan back, as we would be entitled to.

16        Because a cash-out refinance of that nature, the

17   primary source of repayment is the income or cash flow for the

18   borrower or guarantors.

19   Q.   Okay.  During the course of reviewing Mr. Manafort's

20   various applications, were issues with respect to his income

21   raised?

22   A.   Yes, it was.

23   Q.   Were these issues documented by the bank?

24   A.   They were.

25   Q.   Can you explain the process by which they were documented?

Brennan - Direct                                                        2186

1    A.    I instructed Mr. Horn to do an e-mail listing out some of

2    the concerns, and, also, we pointed out the inconsistencies in

3    the credit approval memo.

4    Q.    Did you review that memo?

5    A.    I did.

6    Q.    And did you direct Mr. Horn to send that to anyone at the

7    bank?

8    A.    The -- which memo are we referring to?

9    Q.    The memo that Mr. Horn wrote.

10   A.    I did.  I instructed him to send it to Mr. Ubarri and

11   Mr. Norini.

12   Q.    Can I ask you to take a look at Government Exhibit 275?

13   A.    I am.

14   Q.    Have you seen that document before?

15   A.    Yes, I have.

16   Q.    Does it relate to the loans extended to Mr. Manafort?

17   A.    It relates to the loan that we were doing for Nottingham

18   at the time.

19   Q.    Okay.  And those issues were also reviewed in the context

20   of Mr. Manafort's other loans?

21   A.    It would have been, yes.

22              MR. ANDRES:  The Government moves to admit Government

23   Exhibit 275.

24              MR. WESTLING:  No objection.

25              THE COURT:  Admitted.

Brennan - Direct                                                    2187

1              (Government Exhibit No. 275 was received in

2      evidence.)

3      BY MR. ANDRES:

4      Q.   Can you explain --

5              MR. ANDRES:  May I publish, Your Honor?

6              THE COURT:  You may.

7      BY MR. ANDRES:

8      Q.   Just with respect to the cover e-mail, can you describe

9      for the jury who it's to and from and summarize the e-mail?

10     A.   The e-mail is from Thomas Horn to Javier Ubarri and

11     Jim Norini, who are two members of the loan committee, carbon

12     copying myself.  It's dated September 13, 2016, and it's

13     basically with an attachment listing the issues that we were

14     having in trying to underwrite the Nottingham loan at that

15     time.

16     Q.   Okay.  Can I ask you to turn to the second page and tell

17     me what that is?

18     A.   This is the issue memo that Tom Horn wrote.

19     Q.   Okay.  And, again, you said that this related to the

20     Nottingham property.  Were similar issues relevant to the bank

21     during the Bridgehampton loan?

22     A.   Some of them, yes.

23     Q.   Okay.  How about the Union Street loan?

24     A.   Some of them also would have been, correct.

25     Q.   Can I ask you, under the heading "Manafort," to look at

Brennan - Direct                                                    2188

1    the first bullet?

2    A.   Okay.

3    Q.   Can you explain what's conveyed in that first bullet

4    without reading it?

5    A.   It's --

6    Q.   I don't mean you can't -- you can read it yourself.  I

7    meant just don't read it to the jury.

8            MR. ANDRES:  I'm sorry, Your Honor.

9            THE WITNESS:  That's fine.

10           THE COURT:  It's been admitted, hasn't it?

11           MR. ANDRES:  Yes.

12           THE COURT:  It can be read out loud if you want him

13   to, but it doesn't have to if you don't need him to.

14           MR. ANDRES:  I just wanted to move more

15   expeditiously, Your Honor.

16           THE COURT:  All right.  Proceed.

17           THE WITNESS:  Point 1 is basically telling the two

18   members of the loan committee that as of July 31, 2016, that

19   Mr. Manafort's consulting business had no revenue, just

20   $638,000 in expenses, and that the account indicated that there

21   were $2.4 million in fees earned, but we have not -- we're not

22   in possession of any backup to support that number.

23   Q.   And over the course of the loan process, did you ever

24   receive any backup information with respect to the 2.4 million?

25   A.   We did not.

Brennan - Direct                                                    2189

1    Q.   Okay.  And why would it be a problem if Mr. Manafort's

2    business wasn't making any money?

3    A.   Because our understanding of Mr. Manafort's finances at

4    that time was his primary source of income was his consulting

5    business.

6    Q.   With respect to the 2.4 million earned that's referenced

7    here, do you know if Mr. Manafort kept his books on a cash or

8    accrual basis?

9    A.   I believe they were kept on a cash basis.

10   Q.   And if that were true, would accrued income matter?

11   A.   It would only matter if we were able to verify the

12   existence, but from an accrual standpoint, accruals are one

13   thing, cash is another.  So it shouldn't have been -- wouldn't

14   have been taken into consideration.

15   Q.   Can I ask you now to look at the Bullet No. 2?

16        Certainly read it to yourself if necessary, but

17   explain to the jury the issue that's documented in Bullet

18   No. 2.

19   A.   Bullet No. 2 concerns a past due account on his American

20   Express account.  It was over 90 days past due.  It was a

21   recent past due issue.  It goes -- and the reason it was

22   important to the bank would be it affected his credit score and

23   it showed that there was an issue with him paying his debts.

24   Q.   Okay.  Do you know how long the delinquency was for?

25   A.   It was from earlier in the spring.  This was September, so

Brennan - Direct                                                          2190

1   it was at least four or five months at that point.

2   Q.   And did they relate that delinquency to a particular

3   credit card?

4   A.   It was his American Express card, yes.

5   Q.   And was there a specific item that was purchased that was

6   relevant to delinquency?

7   A.   It was ticket -- season tickets to New York Yankees.

8   Q.   Okay.  If there was a delinquency for more than 90 days,

9   would that be something the bank thought was important in its

10  decisionmaking on the loan?

11  A.   It's very important, especially if it's within 12 months

12  of the loan being made.  If it was something from six or seven

13  years ago, it's less important, depending on the explanation.

14  Q.   Did you later learn what Mr. Manafort's explanation was

15  with respect to --

16  A.   We were provided a letter or an e-mail explanation, yes.

17  Q.   And what was it?

18  A.   That he had lent the card to an associate to buy the

19  tickets and that associate hadn't paid him back.

20  Q.   At the time that Mr. Manafort provided that explanation,

21  did you have any reason to believe it wasn't true?

22  A.   No.

23  Q.   Who was the associate who Mr. Manafort claimed he lent his

24  credit card to?

25  A.   Mr. Gates.

Brennan - Direct                                                    2191

1    Q.    If you learned that Mr. Manafort had lied about lending

2    his credit card to Rick Gates, would that be important to you

3    or the bank in the process of deciding his loans?

4    A.    Once again, it goes to the matter of character and being

5    able to rely on the information provided by the borrower.

6    Q.    Can I ask you now to turn to Issue No. 4 on the second

7    page of the September 13 memo?

8          And certainly read it to yourself, but can you

9    explain what issue is identified in Bullet No. 4?

10   A.    Looking at the credit reports, we were able to identify

11   that Mr. Manafort had two loans, one to Citizens One and one to

12   Citizens Bank, one being in the amount of 2.7 million and

13   another being in the amount of 687.  We weren't able at that

14   point to identify which properties those loans matched up to.

15   Q.    And why was this a problem?

16   A.    Again, it goes to the ability to determine his cash flow.

17   Q.    Okay.  And if Mr. Manafort had failed to identify

18   properties and mortgages, would that have been material to your

19   decision about whether or not to extend the loan or loans?

20   A.    It would be a definite red flag that would go to the heart

21   of the matter, yes.

22   Q.    Why?

23   A.    Because it impacts our ability to do what's called a

24   global cash flow, to take all the borrower's properties and

25   both their positive income and their negative income and

Brennan - Direct                                                    2192

1    determine whether or not the borrower has sufficient income to

2    repay the loans, and the banks usually would like a cushion in

3    that amount in case there is a downturn in the income.

4    Q.    Can I ask you to turn to Government Exhibit 274?

5              MR. ANDRES:  This is in evidence, Your Honor.

6              THE COURT:  All right.

7    BY MR. ANDRES:

8    Q.    Do you see that, Mr. Brennan?

9    A.    Can I do.

10   Q.    If I could ask you to turn to the fourth page with the

11   Bates No. 1294.

12   A.    I'm there.

13             MR. ANDRES:  May I publish that, Your Honor?

14             THE COURT:  You may.

15   BY MR. ANDRES:

16   Q.    Can you tell me what this document is?

17   A.    It appears to be a memo from Rick Gates to Paul Manafort,

18   loan to purchase the season tickets for New York Yankees, dated

19   April 3, 2016.

20   Q.    And did you -- did you have this document for your review

21   as part of the loan process?

22   A.    We did.

23   Q.    Can I ask you now to turn to Government Exhibit 286?

24   A.    I'm there.

25   Q.    Okay.  Can you tell me what that is?

```
Brennan - Direct                                              2193
```

1  A.   It's an e-mail from Tom Horn to Dennis Raico, carbon

2  copying myself, and it's discussing -- it's dated October 26,

3  2016, discussing the 2015 P&L for Mr. Manafort, 2016

4  year-to-date P&L, and his personal tax returns for the year

5  2015 in draft form.

6           MR. ANDRES:   The Government moves to admit Government

7  Exhibit 286.

8           MR. WESTLING:   No objection.

9           THE COURT:   Admitted.

10          (Government Exhibit No. 286 was received in

11 evidence.)

12 BY MR. ANDRES:

13 Q.   Mr. Brennan, can I ask you to turn to the attachment?  I

14 believe it starts on the fourth page.  Can you tell me what

15 that is?

16 A.   DMP International LLC Schedule of Assets and Liabilities

17 on Income Tax Basis, dated December 31, 2015.

18 Q.   Okay.  Can I ask you to turn to the Page 6 -- 6255?

19 A.   Yes, sir.

20 Q.   Can you tell me what that is?

21 A.   DMP International LLC Statement of Revenue and Expenses,

22 Income Tax Basis, December 31, 2016.

23          MR. ANDRES:   May I publish that, Your Honor?

24          THE WITNESS:   Yes.

25 BY MR. ANDRES:

Brennan - Direct                                              2194

1   Q.   And can you tell me what's listed as the net income there?

2   A.   $4,450,744.

3   Q.   And was that relevant to your decision with respect to the

4   loan?

5   A.   Yes, it would.   It would be an indication of the

6   borrower's income.

7   Q.   You testified that there was a second loan extended to

8   Mr. Manafort related to the Union Street.

9        Can you explain the terms of that loan?

10  A.   It was a construction loan where we paid off the existing

11  debt, and then also advanced $1.2 million to complete the

12  renovation of 377 Union Street.

13       MR. ANDRES:   May I have a moment, Your Honor?

14       THE COURT:   You may.

15  BY MR. ANDRES:

16  Q.   Do you know the date when the Union Street loan closed?

17  A.   The exact date, no, but it was sometime in January 2017.

18  Q.   Can I ask you to take a look at Government Exhibit 289?

19       MR. ANDRES:   This is already admitted, Your Honor.

20  May I publish it?

21       THE COURT:   Yes, you may.

22  BY MR. ANDRES:

23  Q.   Can you tell me what Government Exhibit 289 is?

24  A.   It's a new construction - disclosure under TRID.   "Under

25  the TILA RESPA (TRID) rules, The Federal Savings Bank may issue

Brennan - Direct                                                    2195

1    a revised loan estimate at any time up until 60 calendar days

2    prior to closing," and it's digitally signed by Mr. Manafort

3    and Mrs. Manafort.

4    Q.   And can you turn to the second page?

5    A.   Yes.

6    Q.   Is that a loan application?

7    A.   It, again, is a 1003.

8    Q.   For what property?

9    A.   This prop -- 377 Union Street.

10   Q.   Is it signed?

11   A.   Digitally signed by Mr. and Mrs. Manafort.

12   Q.   And does it have the same notice with respect to false

13   statements and Title 18, United States Code, 1001?

14   A.   It does.

15   Q.   Can I ask you to -- in terms of the loan amount, how much

16   is listed?

17   A.   $3,900,000.

18   Q.   Was that the total amount of the loan?

19   A.   No.  Total amount of the loan was 6.5 million.

20   Q.   Okay.  And did each of those sums have different

21   specific -- was there a different purpose for each set of those

22   funds?

23   A.   The $5.3 million loan was to repay the existing debt, and

24   the $1.2 million loan was complete the construction on that

25   property.

Brennan - Direct                                                      2196

1    Q.    Okay.  Can I ask you to turn to page 3?

2              Do you see there's a section --

3              MR. ANDRES:  May I publish this, Your Honor?

4              THE COURT:  Yes, you may.

5              MR. ANDRES:  Okay.

6    BY MR. ANDRES:

7    Q.    Do you see there's a Section VIII?  It's in Roman

8    numerals.  It says "Declarations."

9    A.    Yes.

10   Q.    What's the purpose of that section?

11   A.    It tells us if the borrower is having any financial

12   difficulties or currently or in the past.

13   Q.    Okay.  Do you see there's a question f?

14   A.    Yes.

15   Q.    Can you read that?

16   A.    "Are you presently delinquent or in default on any federal

17   debt or any other loan, mortgage, financial obligation, bond,

18   or loan guarantee?  If 'Yes,' give details as described in the

19   preceding question."

20   Q.    And how is that indicated on Mr. Manafort's --

21   A.    "No."

22   Q.    No.  Do you know if that was accurate?

23   A.    It was not accurate.

24   Q.    Can you explain why?

25   A.    The Nottingham loan was in default at that time, and also

Brennan - Direct                                                2197

1    we were to later find out that the Union Street loan was also

2    in default.

3    Q.   Would that have been relevant information in your decision

4    with respect to Mr. Manafort's loans if he had been in default

5    with respect to other properties?

6    A.   Yes, it would be.

7    Q.   Why?

8    A.   Again, it goes to the ability of the borrower to service

9    his debt.

10   Q.   You mentioned that Mr. Gates' name was on a memo that you

11   reviewed.  Do you remember that?

12   A.   I do.

13   Q.   During the time that you worked on Mr. Manafort's loans,

14   did you ever communicate with Mr. Gates?

15   A.   I did not.

16   Q.   Do you know if he had any involvement negotiating with the

17   bank?

18   A.   None to my knowledge.

19   Q.   You testified that there were various red flags that were

20   identified during the loan process.

21          Can you tell the jury specifically what those red

22   flags were?

23   A.   The discrepancy between the income that was shown on DMP's

24   2015 financial statements and the draft 2015 personal tax

25   returns for the Manaforts in the form of the K-1 for DMP, the

Brennan - Direct                                                    2198

1    discrepancy concerning the inability to keep the American

2    Express current, and the loans not being properly disclosed as

3    to the status.

4    Q.   Notwithstanding those red flags, do you have an

5    understanding as to why the loans were approved?

6              MR. WESTLING:  Objection.  Hearsay.

7              THE COURT:  Well, if he has -- ask him for the basis

8    first, Mr. Andres.  If it's hearsay, he won't be able to tell

9    us.

10   BY MR. ANDRES:

11   Q.   Based on your work at the --

12             THE COURT:  Well, ask him if he knows about

13   something, what is his basis for knowing.

14   BY MR. ANDRES:

15   Q.   Do you know why the loans were ultimately approved?

16   A.   The loans were ultimately --

17             THE COURT:  Just say yes or no.

18             THE WITNESS:  Yes.  I'm sorry, Your Honor.  Yes.

19   BY MR. ANDRES:

20   Q.   Okay.  And --

21             THE COURT:  What is your basis for knowing that?

22             THE WITNESS:  There was an e-mail that Mr. Calk had

23   sent that he wanted the loans --

24             THE COURT:  Just a moment.  There was an e-mail from

25   Mr. Calk relating to the reason?

```
Brennan - Direct                                              2199
```

1              THE WITNESS:  No, that he wanted the loans to close.

2              THE COURT:  All right.  Next question.

3    BY MR. ANDRES:

4    Q.   And with respect to the total amount of the loans extended

5    to Mr. Manafort, what was the total amount?

6    A.   15 mill -- or just 16 million.

7              MR. ANDRES:  Just one moment, Your Honor.  I think

8    I'm done.

9              THE COURT:  Yes.

10             MR. ANDRES:  Your Honor, I have no further questions

11   for this witness.  Thank you.

12             THE COURT:  All right.  Mr. Westling, are you up?

13             MR. WESTLING:  I am, Your Honor.

14             THE COURT:  Let me have counsel quickly at the bench.

15             (Bench conference on the record.)

16             THE COURT:  First, it's a comment.  The witness -- I

17   asked the witness, "What was your basis?"  He not only gave the

18   basis; he gave the evidence.  If he had said the basis is a

19   memo from Mr. -- what's his name?

20             MR. ANDRES:  Calk.

21             THE COURT:  Calk, then your hearsay objection would

22   have been sound.  It came in.  You didn't move to strike.  It's

23   in.  But it was hearsay.  I don't think it's any lawyer's

24   fault.  It was just that the witness didn't answer the

25   question.  He answered more than the question.  He shouldn't

Brennan - Direct                                                    2200

1    have, but that's water over the dam.

2           The real reason I wanted you to come forward is I

3    don't ask questions typically except to clarify matters, not to

4    help one side or the other side.  In this case, however, it

5    would occur to me if I were a juror, why did this person need

6    the immunity?  What did he do wrong or what does he think he

7    did wrong, and why does he need immunity?

8           Now, I don't know how that figures into the

9    government's case or the defendant's case.  Do you have any

10   objection to my asking that?

11          MR. WESTLING:  I have no objection, Your Honor.

12          THE COURT:  Are you going to ask it?

13          MR. WESTLING:  I'm not sure.  It's going to depend on

14   some other answers.

15          THE COURT:  All right.  Let's wait and see if you do,

16   and if you do, then -- well, let me put it to you this way:

17   You decide whether you ask the question.  If you don't, I'll

18   leave it alone.

19          MR. WESTLING:  Thank you, Your Honor.

20          MR. ANDRES:  Thank you, Your Honor.

21          THE COURT:  But if I were a juror, I'd want to know.

22          MR. ANDRES:  I understand.

23          (End of bench conference.)

24          THE COURT:  All right.  Mr. Westling, you may

25   proceed, sir.

1            MR. WESTLING:  Thank you, Your Honor.

2                      CROSS-EXAMINATION

3    BY MR. WESTLING:

4    Q.   Mr. Brennan, my name is Richard Westling, and I represent

5    Paul Manafort.  How are you this afternoon?

6    A.   I'm doing fine.

7    Q.   Good.  If there's anything that I say that isn't clear in

8    any way, you don't understand what I'm saying, just let me

9    know, and I'll do my best to clear it up.

10   A.   Thank you.

11   Q.   So let's just, I guess, go back a bit.  You have been with

12   The Federal Savings Bank since 2015; is that correct?

13   A.   That is correct.

14   Q.   And your position is what again?

15   A.   I'm a vice president in charge of portfolio.

16   Q.   Okay.

17   A.   And construction lending.

18   Q.   All right.  And just so we're clear, when you say

19   "portfolio," what does that mean?

20   A.   It means loans that are held on the bank's books.

21   Q.   Okay.  And in this case, you said that three loans were

22   given, correct?

23   A.   That is correct.

24   Q.   All right.  There was one on the Bridgehampton property,

25   correct?

Brennan - Cross                                                    2202

1    A.    That is correct.

2    Q.    And then there was a combined two-loan package -- I'm not

3    sure I'm getting that right -- but on the Union Street property

4    that was a refinance and a construction loan; is that correct?

5    A.    That is correct.

6    Q.    All right.  Now, are either of those loans portfolio

7    loans?

8    A.    All of them.

9    Q.    Okay.  And, originally, was the Bridgehampton property

10   supposed to be a portfolio loan?

11   A.    We were looking to see if we could find an investor to

12   take it out and it was only supposed to be under portfolio a

13   short time.

14   Q.    Okay.  But it remained under portfolio?

15   A.    It is still under portfolio.

16   Q.    Now, you talked a little about the ownership of the bank,

17   and I want to talk a little more about that, if that's okay.

18          You said it's Mr. Calk is one of the shareholders,

19   correct?

20   A.    That is correct.

21   Q.    I guess there are actually two Mr. Calks, to be more

22   precise.

23   A.    There is.

24   Q.    And who are they?

25   A.    Stephen and John.

Brennan - Cross                                                          2203

1   Q.   And do you know how much of the bank they own together?

2   A.   I just know they own the majority.  I don't know the exact

3   amounts.

4   Q.   And then you said you thought there were three other

5   shareholders?

6   A.   That is correct.

7   Q.   And do you know who those are?

8   A.   One, first name is Mortie, he's an executive vice

9   president in our New York office; Bernie Miller, an executive

10  vice president in the Chicago office; and I believe Robert

11  Jones, who is an executive vice president in our Maryland

12  office.

13  Q.   Okay.  And so the Calk brothers own the majority of the

14  bank?

15  A.   Yes.

16  Q.   Mr. Calk, Stephen Calk, owns the most, I take it?

17  A.   I believe that is correct.

18  Q.   All right.  Now, I want to talk to you a little bit about

19  underwriting, because I want to make sure I understand how the

20  process works, but when someone applies for a loan at your

21  bank, I guess it starts by the need to gather some information;

22  is that correct?

23  A.   That is correct.

24  Q.   And you-all have a list of things that you generally need,

25  depending on the nature of the borrower, correct?

Brennan - Cross                                                    2204

1    A.    And the nature of the loan.

2    Q.    Okay.  Good point.

3              And so based on that, you are going to gather this

4    information, and all of that gets gathered up by who?

5    A.    It's a combination of getting gathered up by the loan

6    officer and his assistant or her assistant and the underwriter.

7    Q.    Okay.  And does eventually all of that material move to

8    the underwriter for review?

9    A.    Yes, it does.

10   Q.    And the job of the underwriter, if I understand it -- and

11   if I get this wrong, let me know -- but is really to go through

12   all of that, to look at it to verify it, correct?

13   A.    That is correct.

14   Q.    And then in the process, to follow up with additional

15   questions?

16   A.    That is correct.

17   Q.    Because there's a process in each loan of going through

18   the material and finding out more information, correct?

19   A.    That is correct.

20   Q.    And so the underwriter, when they have all that

21   information gathered, what do they do?

22   A.    It depends on what they find.  They either make a

23   recommendation to -- that the loan should be approved, or they

24   raise issues in why the loan should be declined.

25   Q.    Okay.  And as part of this gathering of information, I

Brennan - Cross                                                    2205

1    take it that at times, depending again on the borrower, you

2    need to get profit and loss statements or financial statements,

3    correct?

4    A.   That is correct.

5    Q.   And those -- a financial statement that's submitted to

6    your bank doesn't have to be prepared by anyone special, does

7    it?

8    A.   No, it does not.

9    Q.   So the borrower can prepare a financial statement

10   themselves?

11   A.   Depending on the loan, yes.

12   Q.   And the P&L as well?

13   A.   That is correct.

14   Q.   Because the reality is you're just trying to make sure you

15   gather the right information.  It doesn't matter who gives it

16   to you, correct?

17   A.   That is correct.

18   Q.   All right.  And so to the extent that there was an old P&L

19   someone had that needed to be updated, the borrower could do

20   that without breaking any rules, correct?

21   A.   That is correct.

22   Q.   All right.  But in the underwriting process, you-all go

23   through and then try to verify all kinds of things, correct?

24   A.   That is correct.

25   Q.   All right.  Now, as far as that underwriting process, what

Brennan - Cross                                                    2206

1    are the things that folks in the underwriting department do to

2    try to verify things?  Can you give me some examples?

3    A.   We run their credit, we will do litigation searches, we

4    will review their tax returns, compare them against any

5    documents that are provided, and we'll try to verify some of

6    their debts against their credit reports.

7    Q.   And, in fact, is it the underwriting department that

8    eventually generates the -- I think it's the 1003 form for the

9    borrower to sign?

10   A.   It is not.

11   Q.   Who does that?

12   A.   It's generated much earlier by the loan officer or his

13   assistant.

14   Q.   Because in each case, we've seen a couple of those

15   documents in evidence, and they're all typed out very

16   carefully.  I assume the borrower doesn't do that, correct?

17   A.   It is generated -- we have a loan processing system

18   encompassed that generates that form.

19   Q.   And where do the loan processors work in the bank?  Is

20   there a specific location?

21   A.   They are located in different parts of the country.

22   Q.   Okay.  Is Maryland one of those places?

23   A.   Maryland is one of those, yes.

24   Q.   All right.  And so the documents that the borrower gets

25   are reviewed, they go through this process, and eventually

Brennan - Cross                                                    2207

1   documents come back out which need to be signed, correct?

2   A.   That is correct.

3   Q.   And they're usually multipage documents, correct?

4   A.   They are.

5   Q.   Often many pages.  Fair statement?

6   A.   If you can clarify when you say many --

7   Q.   Sure.  Well, in the standard mortgage loan package or

8   construction loan package, how many pages would you say you

9   have to go through to sign in order to get all your signatures

10  on there?

11  A.   If you're talking about a 1003, normally it's four or five

12  pages.

13  Q.   But that's not usually signed alone, is it?  It's usually

14  on a stack of disclosures and other things?

15  A.   At various points, other disclosures are needed to be

16  signed, yes.

17  Q.   So do you have an estimate of how many pages?

18  A.   I do not, because you're talking on the residential side.

19  I'm not on the residential side.

20  Q.   Okay.  And just so we're clear, was the loan on the

21  Bridgehampton property a residential loan or not?

22  A.   It was a commercial loan.

23  Q.   Commercial loan.  Because it was a portfolio loan?

24  A.   No, because the cash-out refinance was defined as being

25  used for commercial purposes.

Brennan - Cross                                                        2208

1    Q.    Thank you for clearing that up.

2           And so I'd like you to look at Government Exhibit

3    No. 290, which I think is in evidence, but to be honest, I'm

4    not sure.

5           No, all right.

6           MR. WESTLING:  Give me one second, Your Honor.

7           THE COURT:  Yes, you can have it.

8           MR. WESTLING:  I'm going to just mark this as

9    Defendant's 40 by hand.  Unfortunately, I didn't come very

10   prepared, Your Honor.  I apologize.

11          THE COURT:  You don't need to apologize.  Give it to

12   the court security officer.  I'll have the deputy clerk mark

13   it.

14   BY MR. WESTLING:

15   Q.    And ask if you could take a look at that, Mr. Brennan.

16          THE COURT:  Give it to the deputy clerk first,

17   please.

18          Let me see it.

19          Are you going to offer this document?

20          MR. WESTLING:  I am going to offer it, Your Honor.

21          THE COURT:  Any objection?

22          MR. ANDRES:  No objection, Your Honor.

23          THE COURT:  It's admitted.  And Exhibit 40, Defense

24   Exhibit 40.  Clip it or staple it.

25          (Defendant's Exhibit No. 40 was received in

```
      Brennan - Cross                                        2209
 1    evidence.)
 2              THE COURT:  All right.  You may provide that to the
 3    witness.  Go ahead, Mr. Westling.
 4              MR. WESTLING:  Thank you, Your Honor.
 5    BY MR. WESTLING:
 6    Q.   Mr. Brennan, that's an e-mail written by some folks
 7    related to The Federal Savings Bank, correct?
 8    A.   It is.
 9    Q.   All right.  Could you just take a quick look at that, and
10    then I'll ask you some questions?
11    A.   Okay.
12              THE COURT:  As an estimate, Mr. Westling, how long do
13    you anticipate?
14              MR. WESTLING:  About 30 minutes, Your Honor.
15              THE COURT:  Would it assist the witness if I took a
16    recess to give you an opportunity to read it?
17              THE WITNESS:  I have read it.
18              THE COURT:  Proceed.
19              MR. WESTLING:  Thank you, Your Honor.
20    BY MR. WESTLING:
21    Q.   So, Mr. Brennan, first, let's talk about the e-mail.
22              What date is on that e-mail?
23    A.   November 8, 2016.
24    Q.   Okay.  And can you generally tell us what that e-mail is
25    about?  I mean, there's a couple of items in the chain, but
```

Brennan - Cross                                                    2210

1   what's going on there?

2   A.   It appears that the people that were working on the loan

3   were trying to clarify where different properties were not

4   showing up on the 1003 that was most recently sent.

5   Q.   Okay.  And, in fact, it indicates there that the folks

6   that are writing that e-mail -- and why don't we clarify, who's

7   that e-mail from?

8   A.   Vanessa Bartholomew.

9   Q.   Bartholomew?  Is that --

10  A.   Excuse me.  Yes.

11  Q.   Okay.  And she is whom?

12  A.   She's a senior vice president.

13  Q.   And she's in the Maryland office; is that right?

14  A.   It shows that she's in the Crofton, Maryland office, yes.

15  Q.   Okay.  Thank you.

16       And so she's writing an e-mail back and forth to

17  various people, talking about what property should be on the --

18  is it 10- --

19  A.   1003.

20  Q.   1003.  Thank you.

21       And what shouldn't be, correct?

22  A.   That is correct.

23  Q.   It indicates they've actually removed some properties from

24  that, doesn't it?

25  A.   Yes.

Brennan - Cross                                                        2211

1    Q.   And there would be a reason for that if those properties

2    were not held personally by Mr. Manafort, correct?

3    A.   That is correct.

4    Q.   Because you would only want -- if it's a personal loan,

5    only assets that are held by the person individually should be

6    listed on that schedule, correct?

7    A.   No.

8    Q.   Okay.  So the bank was getting it wrong there?

9    A.   No.  It would depend if the LLC or ownership of that

10   property had the borrower as a guarantor of that loan.

11   Q.   I see.  So real estate owned includes anything you

12   guarantee?

13   A.   It can, yes.

14   Q.   Okay.

15   A.   It should.

16   Q.   Even though it says "owned"?

17   A.   Yes.

18   Q.   Okay.  And so if you look a couple pages into that

19   document, it looks like there are some -- there's some computer

20   information, I guess it's from Encompass.  Is that where that

21   comes from?

22   A.   Yes.  That -- I'm sorry, I can't really testify to that.

23   I don't know.

24   Q.   Well, you have the document in front of you.  You don't

25   know where it comes from?

Brennan - Cross                                                    2212

1    A.    That's correct.

2    Q.    All right.  Looking at the information that's there, is

3    there a reference to the Howard Street property?

4              MR. ANDRES:  Objection, Your Honor.  The witness says

5    he's not able to testify about the document.

6              THE COURT:  Well, he didn't say that.  He answered

7    that he didn't know an answer to a specific question, so I'll

8    overrule the objection.

9              What's the question pending, Mr. Westling?

10             MR. WESTLING:  Whether there's any information there

11   about the Howard Street property.

12             THE COURT:  All right.

13             THE WITNESS:  Howard Street is listed on this, yes.

14   BY MR. WESTLING:

15   Q.    And does it indicate there's a mortgage on that property?

16   A.    It does.

17   Q.    And what does it say?

18   A.    "Lien Holders 1, Citizens Bank."

19   Q.    Okay.  So it shows there's a Citizens Bank mortgage on

20   Howard Street, correct?

21   A.    That is correct.

22   Q.    Is there other mortgage information on that document?

23   A.    Yes, there is.

24   Q.    Can you tell me what's there?

25   A.    Jobs Lane, it shows there's a lienholder, S3 Capital, I

Brennan - Cross                                                          2213

1    believe it is.

2    Q.   And so we're clear, the Jobs Lane property is the

3    Bridgehampton property; is that right?

4    A.   That is correct.

5    Q.   Okay.

6    A.   It is showing a -- the lien on Howard Street.  It is

7    showing a lien on a property, 721 Fifth Avenue to Citizens One.

8    It is showing a -- and that's all the liens that it's showing.

9    Q.   Okay.  And so this is a document that was being prepared

10   or worked on by folks at your bank, correct?

11   A.   That is correct.

12   Q.   And they were determining what properties had liens on

13   them, correct?

14   A.   That is correct.

15   Q.   And that's part of their normal process, correct?

16   A.   I can't speak to what their normal process is.

17   Q.   Okay.  But you've indicated it's important to know what

18   liens are on what properties before a loan closes?

19   A.   That is correct.

20   Q.   And in this case, the cash-out refinance, which is what

21   was being done on the Bridgehampton property, was to retire the

22   lien that was on that property?

23   A.   That is correct.

24   Q.   And also to provide cash out, correct?

25   A.   That is correct.

Brennan - Cross                                                         2214

1    Q.   All right.  You can put that aside.  Thank you.

2         So I want to go back quickly to the loan chronology

3    here, just because as I understand it, Mr. Manafort starts

4    dealing with your bank in the spring of 2015; is that right?

5    Or is it 2016?

6         2016, my correction.  I apologize.

7         Is that -- it's spring of 2016?

8    A.   That is correct.

9    Q.   And there's a project in New York, correct?

10   A.   Yes.

11   Q.   And Mr. Manafort and his son-in-law, Jeffrey Yohai, are

12   interested in working on a loan with your bank?

13   A.   That is correct.

14   Q.   And it doesn't go through, correct?

15   A.   That is correct.

16   Q.   And why does that happen, if you know?

17   A.   The chairman of the bank, Stephen Calk, visited the

18   property and determined that it was something he was not

19   interested in doing.

20   Q.   So Mr. Calk turned down the loan to Mr. Manafort?

21   A.   That is correct.

22   Q.   All right.  And so then I think you said there was another

23   loan after that that dealt with Nottingham in California,

24   correct?

25   A.   That is correct.

Brennan - Cross                                                      2215

1    Q.   Did you work on that loan?

2    A.   I did.

3    Q.   Okay.  And in that case, Mr. Manafort wasn't actually an

4    owner of the property involved at the time you began the loan

5    process, was he?

6    A.   It was owned by an LLC.

7    Q.   Okay.  And do you know whether or not he had an interest

8    in that LLC?

9    A.   I couldn't testify to that today.

10   Q.   Okay.  And so they were working on getting that loan that

11   was on that property refinanced, correct?

12   A.   That is true.

13   Q.   To provide more money for construction, correct?

14   A.   Correct.

15   Q.   And you can't tell us whether or not that was Mr. Yohai's

16   property?

17   A.   I can't state who the owner was.  I can state who the

18   guarantors were.

19   Q.   Okay.  Well, let's talk about who the guarantors were.

20   The property was owned by an LLC?

21   A.   Correct.

22   Q.   And the guarantors were Mr. Yohai and Mr. Manafort,

23   correct?

24   A.   That is correct.

25   Q.   All right.  And so with that loan, when you -- you

Brennan - Cross                                                          2216

1    indicated, I think, there was a problem at some point that led

2    to a default or a foreclosure; is that right?

3    A.   The construction had stopped on it, yes.

4    Q.   Okay.

5    A.   So it was in default.

6    Q.   When you are asking the question on the 1003 about whether

7    someone has been the subject of a foreclosure or has not paid a

8    loan, is that intended to get to any company they may be

9    involved in?

10   A.   If they are guarantee -- guarantor, yes.

11   Q.   Okay.  So -- and that's indicated somewhere on that form?

12   A.   I'd have to re-look at the form.

13   Q.   All right.  Why don't we put it up?  Let me see if I can

14   remember the number.

15           MR. WESTLING:  One moment, Your Honor.

16           THE COURT:  All right.

17   BY MR. WESTLING:

18   Q.   Let's see.  Yeah, so on Union Street, let's just look at

19   that one.

20           There -- the 1003s are the same, correct?

21   A.   That is correct.

22   Q.   All right.  Let's look at 289.  Do you have that in front

23   of you?

24   A.   I was actually looking at 284 -- or 294, but I'll look for

25   289.

Brennan - Cross                                                       2217

1              Yes, sir.

2    Q.   All right.  So I guess I'm just trying to figure out when

3    I fill out the declarations, how do I know whether you're

4    asking me about information that's personal versus some

5    interest I have in a company?

6    A.   Well, if you were to look at Number -- or letter e, small

7    e.

8    Q.   Uh-huh.

9    A.   This would include such loans as home mortgage loans, SBA

10   loans, home improvement loans, education loans, manufactured

11   (mobile) homes, any mortgages, financial obligations, or loan

12   guarantees.

13   Q.   Okay.  So could we put that document up on the screen?

14   It's Page 1196.  Number 289, I apologize.

15              And then you said it was No. e; is that right?

16   A.   E, letter e.

17   Q.   Letter e, correct.  Is there a way to just enlarge that

18   portion of it?  Thank you.

19              So we're looking at this small print here; is that

20   right?

21   A.   This is true.

22   Q.   And it's somewhere in there, it would include such loans,

23   et cetera; is that right?

24   A.   Yes.

25   Q.   And who checked the box there?

Brennan - Cross                                                          2218

1    A.    The borrower.  I don't -- I don't know who checked it.

2    Q.    Well, I mean, it comes in preprinted, doesn't it?

3    A.    I don't know.

4    Q.    Okay.  So you don't know whether or not that box was

5    checked by Mr. Manafort; is that correct?

6    A.    No, I don't.

7    Q.    And you don't know whether part of the normal electronic

8    processing of that form indicates the borrower checks those

9    boxes at all, do you?

10   A.    I do not.

11   Q.    All right.  Thank you.  I'm done with that exhibit.

12          And so we're going back over this Nottingham loan,

13   and I think you said the bank was prepared to lend, but

14   Mr. Manafort decided he didn't want to go through with it,

15   correct?

16   A.    That is correct.

17   Q.    And that led us to the Summerbreeze Hampton loan, correct?

18   A.    That is correct.

19   Q.    And on the Summerbreeze Hampton loan, I know you didn't

20   recognize the term "over-collateralized."  I'll try to put this

21   less technically:  There's a lot of collateral for this loan;

22   is that right?

23   A.    There is collateral for this loan.

24   Q.    Well, and I guess maybe I shouldn't quantify.  Do you know

25   what the collateral was for the loan?

Brennan - Cross                                                    2219

1    A.    The property in Bridgehampton, the condominium in

2    Alexandria, Virginia, and $615,000 in a cash account.

3    Q.    And so the Bridgehampton property, I think, had an

4    appraised value of $13.5 million.  Does that sound right?

5    A.    That was one of the appraised values.

6    Q.    But do you remember what the value was that you-all

7    assigned to it?

8    A.    I believe we assigned a value in the $12 million range.

9    Q.    Okay.  So 12 million on the Bridgehampton property and two

10   2.5 on the Virginia residence?

11   A.    2.7.

12   Q.    2.7.

13         And then 600,000 more?

14   A.    Correct.

15   Q.    So 15.3?  Do I have that right?

16   A.    Yes.

17   Q.    Million for a $9.5 million loan, correct?

18   A.    That is correct.

19   Q.    That's a pretty healthy loan to value?  Pretty standard?

20   You tell me.

21   A.    For that size loan, it's -- I consider it pretty standard.

22   Q.    Okay.  No real question that if the bank had to, if it

23   collected, it would get its money back, correct?

24   A.     If the bank had to foreclose on it, it is always a

25   question whether we'll get our money back.

Brennan - Cross                                                    2220

1    Q.    Even under these circumstances?

2    A.    Even under these circumstances.

3    Q.    All right.  And do you remember the terms of this loan?

4    A.    You'll have to be more specific with the question when you

5    use the word "terms."

6    Q.    Sure.  I guess I'm saying the rate that was being charged

7    by the bank?

8    A.    I believe it was 7.25.

9    Q.    And this -- is that because it was a commercial loan?

10   That's a high rate, isn't it?

11   A.    For our standard portfolio product, that is what we

12   charge.

13   Q.    Okay.  And that's a lot higher than a mortgage rate,

14   correct?

15   A.    For a mortgage rate that is soluble, yes.

16   Q.    Okay.  And what about points?  Did you require

17   Mr. Manafort to pay points on this loan?

18   A.    We did.

19   Q.    How many?

20   A.    Three.

21   Q.    So how much money was that?

22   A.    Approximately $285,000.

23   Q.    So that was his cost of borrowing, correct?

24   A.    That is correct.

25   Q.    All right.  And so eventually the Summerbreeze loan

Brennan - Cross                                                    2221

1    closes, correct?

2    A.    Correct.

3    Q.    And in its closing, by then you're already contemplating

4    making the loan on the Union Street property, correct?

5    A.    Looking at the dates on the 1003, that is correct.

6    Q.    All right.  And that's because, to some degree, these

7    were, although separate, again, kind of part of the an overall

8    deal, correct?

9    A.    They were part of an overall relationship.

10   Q.    Better put, thank you.

11              And so in terms of the Union Street property, let's

12   talk a little bit about what was going on there.

13              It was a construction refinance?

14   A.    Correct.

15   Q.    And the Union Street property was worth about

16   $6.3 million?

17   A.    That is correct.

18   Q.    Okay.  But you were going to make a $6.5 million loan,

19   correct?

20   A.    That is correct.

21   Q.    And so you did something to be sure you had enough

22   collateral, right?

23   A.    That is true.

24   Q.    What did you do?

25   A.    We required the borrower to put $2.5 million in the bank

Brennan - Cross                                                    2222

1   as -- and we put a -- what we consider a brick on it.  But it's

2   basically the borrower has no access to those funds.

3   Q.   All right.  So he has to put his money up to help secure

4   that loan?

5   A.   That is true.

6   Q.   And, again, similar terms on this loan?

7   A.   Yes.

8   Q.   All right.  So about 7.25?

9   A.   I believe that is correct.

10  Q.   Roughly.

11            And then 3 points?

12  A.   That is correct.

13  Q.   All right.  And so I would guess the loan cost a little

14  bit less.  What would it have been on this one?

15  A.   Roughly, if I'm doing the math right, 195,000.

16  Q.   Okay.  So the bank was going to make some money right up

17  front on these loans, correct?

18  A.   The bank earned money up front, yes, that we would

19  amortize over the life of the loan.

20  Q.   Got it.

21            Now, in this situation, there was concern about

22  Mr. Manafort's income, correct?

23  A.   That is true.

24  Q.   And that's because you knew he wasn't -- he didn't have an

25  income when you were making the loans to him, correct?

Brennan - Cross                                                    2223

1    A.    This is true.

2    Q.    Because he explained that he had a volunteer position and

3    he wasn't earning any money from clients in his consulting

4    business during that year, correct?

5    A.    That is correct.

6    Q.    All right.  And there was some issue about a receivable

7    that was out there, but that never came in, did it?

8    A.    To my understanding, that is true.

9    Q.    All right.  And as a result, you didn't factor that

10   receivable into your decision whether to extend credit,

11   correct?

12   A.    That is correct.

13   Q.    All right.  And so here what we have is the bank thinking

14   through the fact that you've got somebody that may have a

15   future potential income, but doesn't have it right now, right?

16   A.    This being a construction loan, the primary source of

17   repayment is -- we consider what we can -- the borrower can

18   sell that property for, and that would be the primary source of

19   the repayment.

20   Q.    All right.  And so that's with the Union Street loan,

21   correct?

22   A.    That is correct.

23   Q.    Now, let's go back to Bridgehampton.  There, you had some

24   concern because you knew he'd be paying it, correct?

25   A.    That was the anticipation.

Brennan - Cross                                                          2224

1    Q.    And so the bank set up a fund, that six hundred-some

2    thousand dollars in order to pay for the loan for a period of

3    time, correct?

4    A.    No.

5    Q.    No?

6    A.    That is incorrect.  That was additional security for the

7    loan.

8    Q.    Well, then tell me about the PITI account, which --

9    A.    It was called a PITI account.  It was --

10   Q.    What does that mean, just so we're all clear?

11   A.    Principal, interest, taxes, and insurance.

12   Q.    Okay.  So tell me about that part of the loan.

13   A.    That 615,000 represented one year's principal, taxes, and

14   insurance, but it was not to be used to make the payments.  It

15   was just additional collateral.

16   Q.    So it became additional security in the amount of the

17   first year's debt carrying for that property, correct?

18   A.    That is correct.

19   Q.    And so you kind of made sure you were going to be okay

20   there, correct?

21   A.    We did our best to make sure that the loan was properly

22   collateralized.

23   Q.    All right.  Now, you've talked about another issue with

24   regard to this and that is the AmEx card?

25   A.    Yes.

Brennan - Cross                                                    2225

1    Q.    And there was a debt on the AmEx card that went 90 days

2    delinquent, correct?

3    A.    Yes.

4    Q.    And by the time you closed any of these loans, that had

5    been repaid, correct?

6    A.    I believe that's true.

7    Q.    All right.  Because there was a credit memo at some point

8    later on where you indicate that you saw a statement showing it

9    had been repaid in October, correct?

10   A.    I believe that's true.

11   Q.    All right.  And so as a practical matter, your concern

12   about that item at the time was the delinquency period,

13   correct?

14   A.    Yes.

15   Q.    And the fact it was an outstanding debt when you started

16   this process, correct?

17   A.    That's true.

18   Q.    All right.  And so it was helpful, obviously, for the debt

19   to be paid back, correct?

20   A.    Yes.

21   Q.    But you still had a concern about the delinquency?

22   A.    Very much so.

23   Q.    And so you ran his credit again, correct?

24   A.    Correct.

25   Q.    And had it improved any after it was repaid?

Brennan - Cross                                                          2226

1   A.   Yes, it did.

2   Q.   All right.  In fact, I think in your memo, you indicated

3   he -- or someone indicated they had pretty good credit, fair

4   statement?

5   A.   They had acceptable credit.

6   Q.   Fine.  Now, I want to talk to you a little bit about the

7   loan committee.

8          MR. WESTLING:  And, Your Honor, I don't know if we're

9   going to take a break, but it would be a good time for me if

10  that's a possibility.

11         THE COURT:  All right.  Well, we've been at it a

12  little more than an hour and-a-half, so we'll do that.

13         Mr. Brennan, you may step down, sir.  I'm going to

14  take a recess.  During the recess, sir, you may not speak to

15  anybody about your testimony.  That includes lawyers.  You may

16  step down, and we will reconvene at five minutes after 3:00.

17         THE WITNESS:  Thank you, sir.

18         THE COURT:  You're welcome.

19         Pass your books to the right, ladies and gentlemen.

20  The court security officer will collect them, maintain their

21  security.  During the recess -- remember during the recess not

22  to discuss the matter among yourselves or with anyone or

23  undertaking any investigation on your own.

24         You may follow Mr. Flood out.

25                     (Jury out.)

Brennan - Cross                                                    2227

1              THE COURT:  All right.  Court stands in recess.

2              MR. WESTLING:  Thank you, Your Honor.

3              MR. ANDRES:  Thank you, Your Honor.

4                  (Recess from 2:40 p.m., until 3:12 p.m.)

5                          (Defendant present, Jury out.)

6              THE COURT:  All right.  Let's have Mr. Brennan return

7    to the stand, please.

8              Yes, we can do it either way.  Let's go ahead and

9    let's get the jury first.  We can do it either way.

10                         (Jury present.)

11             THE COURT:  All right.  You may be seated.

12             Let's have Mr. Brennan return, please.

13             Mr. Brennan, you'll recall, sir, you remain under

14   oath.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  And you may resume the stand.

17             All right.  Mr. Westling, you may complete your

18   cross-examination.

19             MR. WESTLING:  Thank you, Your Honor.

20   BY MR. WESTLING:

21   Q.   Mr. Brennan, I want to move on to the process of approving

22   the Union Street loan.  Well, actually, I should correct

23   myself -- yes, the Union Street loan.

24             You wrote a credit memo of some sort on that loan; is

25   that correct?

Brennan - Cross                                                      2228

1    A.    That is correct.

2    Q.    All right.  And if you look right in front of you up on

3    this ledge there, I think you'll find Defendant's Exhibit

4    No. 41.  Do you see that?

5    A.    Yes, I do.

6    Q.    And is that the memo that you prepared in connection with

7    the Union Street loan?

8    A.    No, it is not.

9    Q.    All right.  Did you look at the left?  It says, "Prepared

10   by J. Brennan."

11   A.    I'm sorry, my confusion --

12   Q.    I had the same confusion.  Go ahead and tell the jury what

13   it is.

14   A.    It says, "Summerbreeze LLC," and that's because of the

15   connection to -- we always -- if we have multiple loans, one

16   borrower, we have a connection, and -- so, yes, this is for

17   Union Street.

18   Q.    Okay.

19            MR. WESTLING:  Your Honor, I'd offer Defendant's 41.

20            MR. ANDRES:  No objection, Your Honor.

21            THE COURT:  Admitted.

22            (Defendant's Exhibit No. 41 was received in

23   evidence.)

24   BY MR. WESTLING:

25   Q.    Now, Mr. Brennan, can you tell us -- this is called a loan

Brennan - Cross                                                      2229

1    memorandum.  What is that?

2    A.   It's when we underwrite a loan, at the last stages, we put

3    together a loan memorandum summarizing the findings that we

4    have of the borrower's financials and other information

5    concerning the property.

6    Q.   Okay.  And so you prepared this document, correct?

7    A.   Yes, I did.

8    Q.   And are you the person who provides a risk rating for this

9    loan?

10   A.   I did.

11   Q.   And what did you rate this loan?

12   A.   Four.

13   Q.   Okay.  And what does a 4 mean in your world of --

14   A.   Average.

15   Q.   Sorry, one more --

16   A.   Average.

17   Q.   And what does that mean?

18   A.   It's anything -- if we rated it less -- or higher than a

19   4, it becomes a classified loan.  So you -- it was rated a 4,

20   just below where it starts to be a troubled loan.

21   Q.   Okay.  But it was rated an average, which is a loan to be

22   approved, correct?

23   A.   Correct.

24   Q.   All right.  And in looking over what you put together

25   here, you kind of collected a lot of information about

Brennan - Cross                                                        2230

1    Mr. Manafort, correct?

2    A.    That is true.

3    Q.    All right.  Information about his background, for example?

4    A.    Yes.

5    Q.    And you identify two key credit risk issues in -- in this

6    loan.  What do you identify as -- as those issues?

7    A.    Mr. Manafort's past lobbying efforts with foreign

8    governments might be investigated in the future.  High-end

9    housing, while currently hot in New York City, may cool at some

10   point.

11   Q.    And so your primary credit risk concern was Mr. Manafort's

12   Ukrainian consulting; is that right?

13   A.    Not necessarily just Ukraine.

14   Q.    Okay.  Just -- maybe I didn't understand your answer.

15   A.    Well, I said "foreign governments."  I didn't say Ukraine.

16   Q.    I see.  So any foreign governments, generally?

17   A.    Correct.

18   Q.    Okay.  And that was because you just didn't know what

19   would happen there?  There's unknown risk?

20   A.    Correct.

21   Q.    All right.  And the high-end housing in New York City

22   might not be as popular to buy; is that a fair statement?

23   A.    That is true.

24   Q.    And that would put the bank at risk because it would be

25   hard to sell the property, correct?

Brennan - Cross                                                    2231

1    A.    It would be at a lower value, yes.

2    Q.    All right.  And I think you indicated that the proposed

3    loan-to-value on this loan was favorable; is that right?

4              Under the mitigant section right there.

5    A.    Well, I don't use the word "favorable."

6    Q.    74 percent.

7    A.    Correct.

8    Q.    Okay.  And that you indicate Mr. Manafort has a solid net

9    worth?

10   A.    Correct.

11   Q.    All right.  Let's go to page that is marked 3404, if you

12   would, Bates number at the bottom corner.

13   A.    Okay.

14   Q.    And is that a personal financial statement from

15   Mr. Manafort?

16   A.    3404?

17   Q.    Yeah, the last four digits of that number in the bottom

18   corner of the --

19   A.    This is a summary of his personal financial statement,

20   yes.

21   Q.    Okay.  And you -- your bank pulled these numbers together;

22   is that right?

23   A.    That is true.

24   Q.    All right.  And so just so we have some idea, what amount

25   of cash --

Brennan - Cross                                                    2232

1               THE COURT:  Has this document already been admitted?

2               MR. WESTLING:  You know, I don't know if I've offered

3    it, Your Honor.  I apologize.  I think it was.

4               MR. ANDRES:  It was.

5               MR. WESTLING:  It was?  I think it was, Your Honor.

6               THE COURT:  All right.

7               MR. WESTLING:  I apologize.

8               THE COURT:  Then you may display any portions of it

9    you wish.

10              MR. WESTLING:  Sure.  I'm not sure how -- do you have

11   this?  Okay.  Let me work on the camera, but I'll continue.

12   BY MR. WESTLING:

13   Q.   So just so we understand the net worth statement, it's

14   basically a listing of assets and liabilities, correct?

15   A.   That is correct.

16   Q.   All right.  And so the kind of thing the bank is looking

17   for is cash in bank accounts and that sort of thing, correct?

18   A.   Yes.

19   Q.   And if you look now on the screen, Mr. Brennan, right

20   there, that's the document we've been talking about, correct?

21   A.   It is.

22   Q.   All right.  So he has $8,600,000 in the bank, correct?

23   A.   In other financial institutions.

24   Q.   Okay.  Not in your bank but in some financial

25   institutions?

Brennan - Cross                                                          2233

1    A.    Correct.

2    Q.    All right.  And then residential real estate worth

3    $20 million?

4    A.    Correct.

5    Q.    401(k) worth $1.2 million?

6    A.    Correct.

7    Q.    For total assets of $30,621,000, correct?

8    A.    Correct.

9    Q.    And then on the other side of the ledger, you use

10   liabilities, correct?

11   A.    Yes.

12   Q.    And the AmEx liability that I see there, do you know

13   whether that was still outstanding?  I thought that had been

14   paid off.

15   A.    At this point, I believe it was paid off.

16   Q.    Okay.  And so that would actually be a lower amount

17   probably?

18   A.    The liabilities would have been a lower amount, yes.

19   Q.    And so his adjusted net worth at the end of the day,

20   $21,297,000, correct?

21   A.    Right.

22   Q.    Now -- you can take that down.

23          We're going to look at some other information.  So

24   that was information you gathered in an effort to determine his

25   solvency in the event that you had to collect on your

Brennan - Cross                                                    2234

1    guarantee, correct?

2    A.    That is true.

3    Q.    All right.  In addition to the collateral that you had on

4    the loan, right?

5    A.    Yes.

6    Q.    Okay.  And if you could look at Page 3401 of that same

7    document.

8          Now, this loan was made in January of 2017, right?

9    A.    Correct.

10   Q.    And so you were looking at what Mr. Manafort's income was

11   expected to be to pay that loan, correct?

12   A.    Yes.

13   Q.    All right.  But I think you also indicated, to be fair to

14   your testimony, that with this loan, unlike the other one,

15   there was actually more of an expectation it would be paid when

16   the property was sold, correct?

17   A.    Yes.

18   Q.    All right.  Now, if we look at the numbers here, it shows

19   that your records show that he had lost $600,000 in 2016,

20   correct --

21   A.    That is correct.

22   Q.    -- from his business?

23         And then you also show based on draft information

24   that there was only $344,090 that came from his K-1s, correct?

25   A.    Yes.

Brennan - Cross                                                          2235

1    Q.    All right.  And the other numbers, the one from the

2    financial statement, correct?

3    A.    Yes.

4    Q.    And that's a discrepancy that you've talked about in your

5    prior testimony, is that right?

6    A.    Yes.

7    Q.    But as a practical matter, the bank understood at the time

8    it made the decision to lend this money, Mr. Manafort did not

9    have income in the current year?

10   A.    That is correct.

11   Q.    Right.  And so there was an understanding about that out

12   in the open, correct?

13   A.    Yes.

14   Q.    All right.  Now, if we look at the -- go back to Page 398,

15   if you would.

16          At the top of that page, there's a box that

17   indicates "Summerbreeze."  Do you see that?

18   A.    Yes.

19   Q.    Right.  And below it, it says "Net 577."  Do you know what

20   that refers to?

21   A.    I -- it would refer to Union Street, the loan on Union

22   Street was broken up between the bank and the holding company

23   to stay within legal lending limits.

24   Q.    And just so we're clear, though, I see below that 577

25   Union, but that's not the right property, right?

Brennan - Cross                                                    2236

1    A.    No.  I put the wrong address.

2    Q.    Okay.  So there's an error here, correct?

3    A.    Correct.

4    Q.    All right.  And that wasn't one that Mr. Manafort sent you

5    information on?

6    A.    Not at all.

7    Q.    That was your own?

8    A.    Yes.

9    Q.    Right.  And that wasn't the only error the bank had in

10   processing Mr. Manafort's loans, was it?

11   A.    This is true.

12   Q.    Right.  Wasn't there an issue with the Summerbreeze loan

13   regarding the way the bank computed income in its credit memo?

14         Do you recall that?

15   A.    There was a difference, yes.

16   Q.    All right.  And so the bank, within its own processes,

17   actually made an error that made Mr. Manafort's income look

18   better; is that fair?

19   A.    Yes.

20   Q.    All right.  And that was all part of what was viewed by

21   the bank in moving these loans forward, correct?

22   A.    To an extent, yes.

23   Q.    Okay.

24         THE COURT:  Mr. Brennan, have we been referring to

25   Summerbreeze by any other identity?

Brennan - Cross                                                    2237

1              THE WITNESS:  We also have called it Bridgehampton.

2              THE COURT:  Thank you.

3              MR. WESTLING:  Thank you, Your Honor.

4              THE COURT:  Next question.

5    BY MR. WESTLING:

6    Q.   And so just -- we see that -- I'm going back to the front

7    page of the document, which I don't think I have the benefit of

8    the projector, just so we can see your name in the top

9    right-hand corner.

10             You're the one who prepared it, correct?

11   A.   Yes.

12   Q.   You rated it a 4, average, correct?

13   A.   Yes.

14   Q.   And then you indicated you approved it as loan committee

15   secretary on 1/5/17, correct?

16   A.   Yes.

17   Q.   All right.  You can take it down.

18             Now, the loan committee, that's made up of five

19   individuals; is that correct?

20   A.   No.

21   Q.   Okay.  How many people?

22   A.   Three.

23   Q.   All right.  Are there any -- is there anyone on it that

24   participates but is not a member?

25   A.   Yes.

Brennan - Cross                                                     2238

1    Q.    Who is that?

2    A.    At various times, it could be a loan officer, it could be

3    myself, could be Mr. Horn, and then it would be the three

4    members of the loan committee.

5    Q.    Now, the loan on the Bridgehampton property was approved

6    by the loan committee, correct?

7    A.    Yes.

8    Q.    And the loan on the Union Street property was approved by

9    the loan committee, correct?

10   A.    Yes.

11   Q.    And they had the information that you had about all of

12   this?

13   A.    I can't speak to what information all members of the loan

14   committee had.

15   Q.    All right.  It's part of your job to ensure that they know

16   what they need to know, isn't it?

17   A.    It's part of my job to provide them the information, yes.

18   Q.    All right.  All right.  I want to touch on a couple of

19   other items.

20           Earlier, you testified about that you -- and, again,

21   if I get this wrong, please correct me -- but that the bank was

22   not aware of the Genesis loan on the Union Street property.

23           Was that your testimony?

24   A.    At a point in time, that was my testimony, yes.

25   Q.    Okay.  But that changed before the loan was made, correct?

Brennan - Cross                                                    2239

1    A.   Before the loan closed, that is correct.

2    Q.   Right.  And so you found out there was a payoff.  In fact,

3    you knew there was a payoff because it was a refinance, right?

4    A.   Yes.

5    Q.   And so it was just a question of who held the refinance?

6    A.   Yes.

7    Q.   All right.  Are you aware that other individuals at the

8    bank knew that the Genesis loan was in default as early as

9    October?

10   A.   I'm not aware of that.

11   Q.   Okay.  Thank you.  Now, going back to the Nottingham

12   property for a second, you were involved in that loan?

13   A.   Yes, I was.

14   Q.   All right.  And so were you the one that tracked down to

15   determine who had an ownership interest in each of the entities

16   in each property?

17   A.   I believe Mr. Horn would have done that.

18   Q.   All right.  So he'd be the better person to talk to about

19   that?

20   A.   Yes.

21   Q.   All right.  But the Nottingham loan was not made; is that

22   correct?

23   A.   The Nottingham loan was not made.

24   Q.   Okay.  And that was because Mr. Manafort chose to walk

25   away?

Brennan - Cross                                                    2240

1    A.    That is true.

2              MR. WESTLING:  One moment, Your Honor.

3              THE COURT:  All right.

4    BY MR. WESTLING:

5    Q.    So just to touch on a couple of more points, there was a

6    time that -- well, let me back up.

7              Do you deal with various regulators in your work for

8    the bank?

9    A.    Yes.

10   Q.    All right.  And who is the bank's regulator?

11   A.    The OCC, Office of Comptroller of Currency.

12   Q.    Okay.  So the Office of the Comptroller of the Currency?

13   A.    Yes.

14   Q.    And what is their function?

15   A.    They perform various reviews of the bank.

16   Q.    And at one point, they were involved in a review of The

17   Federal Savings Bank, correct?

18   A.    Yes.

19   Q.    In approximately -- well, they had several reviews, but

20   they looked at issues from approximately January 2014 through

21   January 2017 in reports of examination.

22             Does that sound familiar?

23   A.    They do annual examinations.

24   Q.    All right.  And during their review of your bank, they

25   looked at the loan related to the Bridgehampton property,

Brennan - Cross                                                          2241

1    correct?

2              MR. ANDRES:  Your Honor, objection, relevance.

3              MR. WESTLING:  Well, he was --

4              MR. ANDRES:  Can we approach, Your Honor?

5              THE COURT:  Come to the bench quickly.

6              (Bench conference on the record.)

7              THE COURT:  Mr. Westling, does your question have to

8    do with the Bridgehampton loan?

9              MR. WESTLING:  It does, Your Honor.

10             THE COURT:  Why isn't that relevant?

11             MR. ANDRES:  Because it's an investigation by the OCC

12   that's completely irrelevant as to whether Mr. Manafort was

13   involved in providing false information to the bank.

14             THE COURT:  What do you expect to --

15             MR. WESTLING:  I expect it's going to show that the

16   comptroller of the currency reviewed the loan and found errors

17   made by the bank but did not otherwise cite a problem in the

18   loan.

19             MR. ANDRES:  The OCC wasn't reviewing the loan.  They

20   were reviewing the bank's procedures and with respect to the

21   amount of capital that the bank could extend beyond its limit.

22   It had nothing to do with Mr. Manafort.

23             THE COURT:  Well, you can ask that on recross.  I'll

24   permit it.  Overruled.

25             (End of bench conference.)

Brennan - Cross                                                2242

1             THE COURT:  Proceed.

2    BY MR. WESTLING:

3    Q.   So, Mr. Brennan, was there a time when the OCC reviewed

4    the bank's work on the Manafort Bridgehampton loan?

5    A.   There was.

6    Q.   And were you interviewed at all during that process?

7    A.   I was -- the loan was discussed with me, yes.

8    Q.   I'm sorry, I didn't hear you.

9    A.   I said the loan was discussed with me.

10   Q.   Okay.  By the OCC?

11   A.   By a member -- yes.

12   Q.   Okay.  And during that review, what, if any, problems did

13   the OCC identify with the process the bank had used?

14   A.   They did not like the fact that we averaged the appraisal

15   for Bridgehampton instead of using the lower value as the

16   value.

17   Q.   Okay.

18   A.   They thought we gave the borrower too much credit for his

19   income by -- some distributions from his LLCs were counted as

20   income when, in fact, they were one-time events from

21   borrowings.

22   Q.   All right.  And so just so we're clear in what the OCC was

23   concerned about there, they didn't like the way you-all had

24   done your math; is that fair?

25   A.   They did not like the way the loan was analyzed; that is

Brennan - Cross                                                                    2243

1    correct.

2    Q.   And so, in essence, they thought that you had given

3    Mr. Manafort too much credit for income in your own processing,

4    correct?

5    A.   That is correct.

6    Q.   Their concern was not with the information Mr. Manafort

7    gave you, was it?

8    A.   You'd have to ask them.

9    Q.   All right.  But they never told you that?

10   A.   I don't recollect they did.

11   Q.   Okay.  And, again, they're the bank's primary regulator;

12   is that right?

13   A.   That is correct.

14   Q.   All right.  I want to touch back on something we talked

15   about a little while ago with regard to Encompass, which is the

16   computer system, I take it, you use to track?

17        Do I have that right?  Did I say that name right?

18   A.   You did.

19   Q.   Okay.  And so that's where the information borrowers send

20   you gets entered into, correct?

21   A.   For residential loans, yes, that is correct.

22   Q.   Okay.  And so Encompass was involved in this loan, though,

23   wasn't it?

24   A.   It was.

25   Q.   Okay.  And -- but I think you've told us these weren't

Brennan - Cross                                                      2244

1    residential loans.  I'm a little confused by that.

2    A.   The loan officers that generated the loan for us are

3    mainly residential loan officers, so they will start with

4    Encompass because that's how -- what they're familiar with.

5    Q.   And so it sounds like -- but, again, correct me if I'm

6    wrong -- but you don't typically use Encompass in the work you

7    do?

8    A.   I will only pull up information out of it.  I can't input

9    information into it.  It's strictly a review.

10   Q.   Okay.  And -- did you finish?  I'm sorry, I didn't mean to

11   cut you off.

12   A.   I did.

13   Q.   And so in this case, was there information in Encompass

14   that you -- were you familiar with everything that was in

15   Encompass?

16   A.   No.

17   Q.   Okay.  Because that, again, isn't where you sort of

18   normally store your information, correct?

19   A.   That is correct.

20   Q.   And so to the extent loan officers had received some

21   information that went into Encompass, you might not be aware of

22   that?

23   A.   That is true.

24           MR. WESTLING:  All right.  Your Honor, if I can have

25   one moment?

Brennan - Redirect                                                    2245

1             THE COURT:  You may.

2   BY MR. WESTLING:

3   Q.   Mr. Brennan -- you know what?  I'm going to -- the better

4   part of valor, Judge, is sometimes knowing when not to ask the

5   next question.  I'm concluding my examination.

6             THE COURT:  All right.  Any redirect?

7             MR. ANDRES:  Briefly, Your Honor.

8                         REDIRECT EXAMINATION

9   BY MR. ANDRES:

10  Q.   Mr. Brennan, Mr. Westling showed you Defense Exhibit 41.

11  Do you have that up there?

12  A.   I do.

13  Q.   And what is that?

14  A.   It's a loan memorandum.

15  Q.   And when is this loan memorandum created?

16  A.   This is created after loan committee approval.

17  Q.   And does this go to the loan committee?

18  A.   No.

19  Q.   Why not?

20  A.   That wasn't the process in place at the time.

21  Q.   Okay.  Has that process changed now?

22  A.   It has.

23  Q.   How has it changed?

24  A.   Now it goes to loan committee, and the members of the loan

25  committee have to sign a back page showing that they have

Brennan - Redirect                                                    2246

1    reviewed it and are approving it; and also, that back page

2    outlines any differences between the original structure the

3    loan committee approved or reviewed and how the loan is now

4    structured.

5    Q.    You testified that in response to a question from

6    Mr. Westling, that you rated this a 4.  Do you remember that?

7    A.    Yes, I do.

8    Q.    Can you explain the rating system to the jury?

9    A.    A "1" rated loan is the best rating you can give a loan.

10   It's usually cash secured, no loss to the bank.  As the number

11   gets higher, it means the loan has additional risk.  You will

12   not make a loan rated higher than a 4 because if you put a --

13   that would be telling the regulators and your board of

14   directors that you're making loans that you consider overly

15   risky.

16   Q.    And did you consider this loan to be a 4?

17   A.    I did not.

18   Q.    What did you consider it to be?

19   A.    I -- if I had my -- my recommendation was the loan not be

20   made.

21   Q.    And based on the information provided to -- by

22   Mr. Manafort, what would you have done if you rated this below

23   a 4?  Would you have taken some action?

24   A.    If I -- we would have had to do what are called watch list

25   reports thereafter.  It would have gone on our watch list.

Brennan - Redirect                                          2247

1   Q.   Okay.  And so why is it that you -- if you didn't agree

2   with the --

3            THE COURT:  I'm a little confused about something.

4   Look at 41.

5            THE WITNESS:  Yes.

6            THE COURT:  It says, "Prepared by J. Brennan."

7            THE WITNESS:  Correct.

8            THE COURT:  Who is J. Brennan?

9            THE WITNESS:  It is me.

10           THE COURT:  And you prepared it, and you gave it a 4.

11           THE WITNESS:  I did.

12           THE COURT:  But now you're telling us under oath that

13   you don't believe it was a 4?

14           THE WITNESS:  I didn't at the time.

15           THE COURT:  But you still wrote down a 4.

16           THE WITNESS:  Right.

17           THE COURT:  Next question.

18   BY MR. ANDRES:

19   Q.   Why did you write down 4?

20   A.   Because you wouldn't make a loan that would have a higher

21   number than a 4 and put it on your books.

22   Q.   And who decided that the loan was going to go through?

23   A.   Mr. Calk.

24   Q.   Did you have a choice to rate this other than a 4?

25   A.   No.

Brennan - Redirect                                                    2248

1    Q.    Because of Mr. Calk?

2    A.    Because the loan was going through.

3    Q.    Mr. Westling asked you some questions about the OCC.  Do

4    you remember that?

5    A.    Yes, he did.

6    Q.    What does the OCC do?

7    A.    They examine the bank for a number -- in a number of

8    different areas.

9    Q.    And bank officials, is that correct?

10   A.    Yes.

11   Q.    Do you know if political consultants are subject to the

12   regulations of the OCC?

13   A.    I don't know who is other than banks.

14   Q.    Do you know if Mr. Manafort was interviewed as part of the

15   investigation?

16   A.    I don't believe he was.

17   Q.    Do you know if the --

18   A.    I wouldn't know.

19   Q.    I'm sorry.  Do you know if the OCC knew that Mr. Manafort

20   provided false information to the bank?

21   A.    They never mentioned it to me.

22   Q.    Mr. Westling asked you some questions about the loans and

23   liabilities that had to be disclosed.  Do you remember that?

24   A.    Yes.

25   Q.    If Mr. Manafort's loans were in the name of other entities

Brennan - Redirect                                                  2249

1    or LLCs but he was the guarantor, would he have to disclose

2    that information on his 1003?

3    A.   Yes.

4    Q.   If the title to a property was known -- was in the name of

5    an entity or an LLC but the loan had Mr. Manafort's name on it,

6    would he have to disclose that?

7    A.   As the borrower, yes.

8    Q.   And these 1003 documents, Mr. Westling asked you if the

9    bank filled out those documents.  Do you remember that?

10   A.   Yes.

11   Q.   Who provides the information on those 1003 forms?

12   A.   The borrower.

13   Q.   Okay.  And who signs it?

14   A.   The borrower.

15   Q.   And when the borrower signs those forms, what do they

16   guarantee?

17   A.   That they're providing accurate information.

18   Q.   Do you remember that Mr. Westling asked you some questions

19   about the owners of The Federal Savings Bank, or the

20   shareholders?

21   A.   Yes.

22   Q.   And you said that there were a total of five?

23   A.   That is my belief, yes.

24   Q.   Was any of those -- were any of those five shareholders

25   involved in the Manafort loans?

Brennan - Redirect                                                                2250

1   A.    Yes.

2   Q.    Who?

3   A.    Mr. Calk.

4   Q.    Which one?

5   A.    Stephen.

6   Q.    Anyone else?

7   A.    In the ownership structure, none to my knowledge.

8   Q.    Did you ever approach John Calk about taking some action

9   with the Manafort loan?

10  A.    As part of the -- Mr. Calk was -- Stephen was not in the

11  office when we were getting to time to sign the participation

12  agreement between the bank and the holding company, so I went

13  to -- I gave the document to John Calk, and he refused to sign

14  it because he said he didn't have the knowledge --

15          THE COURT:  Just a moment.  That's hearsay.  You

16  didn't specifically call for it, but the witness was getting

17  into it.  So I'll strike that testimony.  You may re-ask the

18  question.

19          You may not, Mr. Brennan, testify as to what others

20  said to you because that person is not here to be

21  cross-examined.

22          Next question.

23  BY MR. ANDRES:

24  Q.    At some point, did you approach John Calk?

25  A.    I did.

Brennan - Recross                                                        2251

1    Q.    And did you approach him in relation to the Manafort

2    loans?

3    A.    I did.

4    Q.    Did you ask him to sign a document?

5    A.    I did.

6    Q.    And did he?

7    A.    No.

8    Q.    Mr. Westling asked you a question about whether or not

9    borrowers could submit their own P&L statements.  Do you

10   remember that?

11   A.    Yes.

12   Q.    If a borrower submits his own P&L statement and it's

13   false, how does that factor into your decision?

14   A.    If we know it's false, then it's a character issue and

15   should lead us to turn the loan down.

16   Q.    And what if the -- what if the P&L that the borrower makes

17   up on his own or that he creates on his own, what if it's off

18   by millions of dollars?  How does that affect your --

19   A.    It leads us to ask further questions.

20              MR. ANDRES:  I have no further questions, Your Honor.

21              THE COURT:  Recross based on that?

22              MR. WESTLING:  Yes, Your Honor.

23              THE COURT:  All right.

24                        RECROSS EXAMINATION

25   BY MR. WESTLING:

Brennan - Recross                                                      2252

1    Q.   Mr. Brennan, you rated the loan a 4, correct?

2    A.   That is correct.

3    Q.   You weren't told to rate the loan a 4, were you?

4    A.   That is correct.

5    Q.   So no one from the loan committee came and said:  Rate

6    this a 4?

7    A.   No.

8    Q.   And no one from the loan committee said:  We must give

9    this loan?

10            Did someone from the loan committee tell you to do

11   this loan?

12   A.   I would have to go back through my e-mails.  I can't say

13   with certainty that that was the case.

14   Q.   Do you think if it had happened, it's something you would

15   remember?

16   A.   I would remember the e-mails, yes.

17   Q.   All right.  You stated that the borrower fills out the

18   1003 on redirect?

19   A.   I don't believe that's what I stated.

20   Q.   Okay.  You said the information came from the borrower?

21   A.   That is what I said.

22   Q.   But that's only partly true, isn't it?

23   A.   I --

24            THE COURT:  What's only partly true?

25            MR. WESTLING:  That the --

Brennan - Recross                                                      2253

1            THE COURT:  Make your question clearer.

2            MR. WESTLING:  Thank you, Your Honor.

3   BY MR. WESTLING:

4   Q.   That the borrower is the source of the information on the

5   1003?

6   A.   Since I don't fill them out, I can't answer that.

7   Q.   So you don't know who the source of the information on

8   that 1003 is, do you?

9   A.   I don't.

10  Q.   You indicated you approached Mr. John Calk and he refused

11  to sign because he didn't know anything about what you were

12  asking him to sign, correct?

13  A.   I'll defer that to Your Honor, because he said that was

14  hearsay and struck it.

15                          (Laughter.)

16  BY MR. WESTLING:

17  Q.   Let me see if I can get at it a different way.

18                          (Laughter.)

19  BY MR. WESTLING:

20  Q.   You spoke to Mr. Calk?

21  A.   Yes.

22  Q.   Mr. John Calk?

23  A.   Correct.

24  Q.   He wouldn't sign?

25  A.   Correct.

Brennan - Recross                                                     2254

1   Q.   Did you have any reason to believe his problem was some

2   knowledge he had about that loan?

3   A.   No.

4   Q.   In fact, you don't know if he had any knowledge about the

5   loan, do you?

6   A.   I don't know what his knowledge was.

7   Q.   On direct, you -- or, I'm sorry, on cross, you indicated

8   the borrower can create their own P&L, correct?

9   A.   Yes.

10  Q.   We know the P&L needs to be accurate, right?

11  A.   Correct.

12  Q.   And you don't know when a borrower submits information to

13  you necessarily, whether it's been provided by them or by

14  someone else?

15  A.   That is correct.

16  Q.   In some cases, they use an accountant?

17  A.   Yes.

18  Q.   Bookkeeper?

19  A.   Yes.

20  Q.   Their business associates?

21  A.   I don't know who.

22  Q.   Okay.  In Mr. Andres' question, he asked if something was

23  false, would that affect you.

24  A.   Yes.

25  Q.   Do you remember that?

Brennan - Further Redirect                                    2255

1            And sitting here today -- go back.

2            1/5/2017, if there had been something you knew was

3     false, would you have granted the loan?

4     A.   I don't have the authority to grant loans.

5     Q.   Would you have indicated that you approved it as the loan

6     committee secretary?

7     A.   What I'm indicating, as loan committee secretary, is that

8     loan committee approved the loan.

9     Q.   All right.  Well, then I'm asking the wrong person, right?

10    A.   That, you are.

11    Q.   If I wanted to ask those questions, who should I ask?

12    A.   You should ask the members of the loan committee.

13    Q.   That's Mr. Calk?

14    A.   Mr. Calk.

15    Q.   Mr. Ubarri?

16    A.   Correct.

17    Q.   Mr. Norini, correct?

18    A.   Correct.

19    Q.   They're the ones that make the decision, right?

20    A.   That is correct.

21            MR. WESTLING:  No further questions, Your Honor.

22            MR. ANDRES:  Your Honor, very briefly?

23            THE COURT:  Yes.

24                  FURTHER REDIRECT EXAMINATION

25    BY MR. ANDRES:

Brennan - Further Redirect                                          2256

1    Q.   Mr. Brennan, Mr. Westling asked you some questions about

2    the P&L; is that correct?

3    A.   Yes, he did.

4    Q.   And that was considered with respect to the Bridgehampton

5    loan, the income that Mr. Manafort disclosed?

6    A.   He was asking that on Exhibit 41, which was the Union

7    Street.

8    Q.   I'm sorry, I'm asking about -- he asked you questions

9    about profit-and-loss statements.  Do you remember that?

10   A.   Correct.

11   Q.   I'm not referring to that document.

12        And you wanted to understand the profit-and-loss

13   statements relative to the Bridgehampton loan; is that correct?

14   A.   We would, yes.

15   Q.   And the Union Street loan?

16   A.   Yes.

17   Q.   With respect to the Bridgehampton loan, was that large?

18   A.   9.5 million is considered large, yes.

19   Q.   Okay.  Relative to the loans that are generally given in

20   the bank, how would you rate that?

21   A.   That was the largest loan that the bank gave.

22   Q.   How about this --

23        THE COURT:  Isn't this really beyond the scope of

24   cross?

25        MR. ANDRES:  It's not, Judge.  It --

Brennan - Further Redirect                                      2257

 1              THE COURT:  Redirect, I mean?

 2              MR. ANDRES:  It relates to the questions that were

 3    asked.

 4              THE COURT:  All right.  I'll permit it.

 5    BY MR. ANDRES:

 6    Q.   How about the $6.5 million loan, was that large?

 7    A.   That was -- would be the second largest loan that the bank

 8    did at the time.

 9    Q.   And together, the two loans, do you know what percentage

10    of the total amount of loans provided by the bank?

11    A.   Percentage of the total loans provided by the bank as of

12    January 31, we probably had approximately 200 -- I can't state

13    exactly, but it would be less than 10 percent.

14    Q.   My last question --

15              THE COURT:  Why are the size of these loans -- well,

16    is that your last question?

17              MR. ANDRES:  This is my last question, Judge.

18              THE COURT:  The scope of your cross, I don't think --

19    or direct and redirect didn't cover it, but go ahead.  You've

20    elicited it.  Ask your last question.

21    BY MR. ANDRES:

22    Q.   This is my last question:  Mr. Westling asked on his

23    questioning whether or not the bank made money off the loans.

24    Has the bank made money from the loans to Mr. Manafort?

25              MR. WESTLING:  Objection, Your Honor.

Brennan - Further Redirect                                          2258

1          THE COURT:  All right.  Did -- you want to tell me
2    you didn't ask that question?
3          MR. WESTLING:  Well, that's part of what I want to
4    tell you, but that's all I'll leave it at for now.
5          THE COURT:  All right.  Come to the bench.  Come to
6    the bench quickly.
7          (Bench conference on the record.)
8          THE COURT:  All right, Mr. Westling.
9          MR. WESTLING:  Your Honor, I think that Mr. Andres
10   wants to elicit the fact that these loans are now
11   nonperforming.  I simply wanted to approach to say that if that
12   question is asked --
13         THE COURT SECURITY OFFICER:  Quiet.
14         MR. WESTLING:  -- I think it's appropriate for me to
15   ask whether the nonperformance of these loans was triggered
16   when the Government seized the underlying collateral from the
17   bank.
18         MR. ANDRES:  I'm not sure that's accurate, but what I
19   was asking is Mr. Westling has said that the bank made money,
20   and the reality is the bank hasn't made money because both of
21   the loans have been -- gone into default.  The bank has lost a
22   substantial amount of money.
23         THE COURT:  Why wouldn't the seizure by the
24   Government play a role in that?
25         MR. ANDRES:  I don't -- for one, I don't think it's

Brennan - Further Redirect                                    2259

1   accurate, but --

2           THE COURT:  Well, then you can -- but you can ask

3   questions and you can put on evidence if you want, but I'm

4   going to permit that if you get into this.

5           MR. ANDRES:  Okay.

6           THE COURT:  Let's proceed.

7           MR. WESTLING:  Thank you, Your Honor.

8           (End of bench conference.)

9           THE COURT:  All right.  You may proceed.

10          MR. ANDRES:  May I have one moment, Your Honor?

11          THE COURT:  Yes, you may.

12          Ladies and gentlemen, let me cover with you where

13  we're going to proceed -- are you ready to proceed?

14          MR. ANDRES:  Yes, Your Honor.

15          THE COURT:  All right.  Well, go ahead and finish,

16  and then we'll proceed.

17  BY MR. ANDRES:

18  Q.   Mr. Brennan, did the bank make any money with respect to

19  Mr. Manafort's loans?

20  A.   No.

21  Q.   Why not?

22  A.   The bank had charged off both -- all three loans as of

23  12/31/2016 -- or '17, I'm sorry.

24  Q.   And what does that mean, charged off the loans?

25  A.   We wrote the loans off, took a hit to our loan loss

Brennan - Further Recross                                         2260

1    reserve, and reduced our capital level.

2    Q.   How much money did the bank lose?

3    A.   The bank's loss would have been 9.5 plus 2.3,

4    11.8 million, and the remaining money was lost on the holding

5    company level.

6              MR. ANDRES:  No further questions, Your Honor.

7              THE COURT:  All right.  Any recross based on that?

8              MR. WESTLING:  Yes, Your Honor.

9                    FURTHER RECROSS EXAMINATION

10   BY MR. WESTLING:

11   Q.   Did the bank go after the collateral?

12   A.   I'm not privy to those discussions.

13   Q.   So it's possible they're going after the collateral?

14   A.   Anything is possible.

15                      (Laughter.)

16   BY MR. WESTLING:

17   Q.   You work at a responsible bank?

18   A.   Yes.

19   Q.   And so I would assume it would look to protect any losses?

20   A.   One would make that assumption.

21   Q.   And part of that would be seeking to collect on the

22   security interest it has in property, wouldn't it?

23   A.   It would.

24   Q.   All right.  Now, you were interviewed for the first time

25   in this case in June of 2017, correct?

1    A.   That is correct.

2    Q.   And at the time, you gave answers to the FBI that the loan

3    was performing, correct?

4    A.   At the time, it was.

5    Q.   All right.  And so the event that took place between June

6    of 2017 and December of 2017 was the indictment in this case

7    and the seizure of some of the underlying collateral, correct?

8    A.   None of the collateral has been seized.

9    Q.   The money in the bank is not restrained?

10   A.   The money that was collateral for the loan is still in the

11   bank.

12   Q.   But it's been restrained by the federal government, has it

13   not?

14   A.   I don't believe so.

15             MR. WESTLING:  Well, we can ask for judicial notice

16   on that point since it's in the indictment.

17             Thank you very much, Mr. Brennan.

18             THE COURT:  Have you read the indictment in this

19   case?

20             THE WITNESS:  I have.

21             THE COURT:  Didn't you see what was seized and what

22   wasn't?

23             THE WITNESS:  There was another account in the bank

24   that I believe was seized and not the accounts that were

25   collateral for the loan.

2262

1            THE COURT:  Anything further based on my question?

2            MR. WESTLING:  No, Your Honor.

3            MR. ANDRES:  No, Your Honor.  Thank you.

4            THE COURT:  All right.  You may step down.

5            THE WITNESS:  Thank you.

6                        (Witness excused.)

7            THE COURT:  Ladies and gentlemen, I have -- there's

8    one potential witness we haven't heard from, and I need to hear

9    some argument about that.  So I'd ask that you pass your books

10   to the right, have another soft drink, and I will -- it will be

11   at least 15, maybe 20 minutes, and then we'll proceed.

12           Remember to refrain from discussing the matter among

13   yourselves or anyone or undertaking any investigation on your

14   own.

15                        (Jury out.)

16           THE COURT:  All right.  You may be seated.

17           Now, first thing, I just want to mention this,

18   Mr. Westling, if you want me to take judicial notice of

19   something, file it in writing, and I will consider it.

20           MR. WESTLING:  Thank you, Your Honor.

21           THE COURT:  Now, the issue that I want to hear

22   focused argument on really started some time ago when the

23   Government offered evidence from the financial center relating

24   to the failure to file FBARs.  At the time, I precluded the

25   Government from showing a lot of evidence about prior years, I

1    don't remember how long it was, but it was pretty long, and I

2    ruled at the time that, look, he's indicted for these four

3    years; that's what you're limited to.

4              Now we have an issue that's more sharply focused, I

5    think.  It really isn't a request for reconsideration of that

6    ruling in whole, but it is a request that I consider, as I

7    understand it, a request to present evidence -- the Government

8    wants to present evidence that FBARs, foreign bank account

9    reports, controlled by his business, namely, Davis Manafort

10   Partners and DMP International, were not filed, and I think

11   it's a request to show that evidence for the four years that

12   are alleged in the indictment; is that right?

13             MR. ASONYE:  Yes, Your Honor.

14             THE COURT:  So that I'm clear, Mr. Asonye, you want

15   to present evidence from the financial center that no FinBar

16   (sic) reports were filed during those four years for Davis

17   Manafort Partners or DMP International?

18             MR. ASONYE:  That's correct, Your Honor.

19             THE COURT:  And you want to show that because it is

20   relevant, you think, to showing intent; is that right?

21             MR. ASONYE:  It is.  And it also rebuts an argument

22   that the defense has raised during cross of the FinCEN witness,

23   but also subsequently through cross of Mr. Gates and the

24   stipulation that has been entered into evidence.

25             THE COURT:  All right.  Well, come to the podium,

1    Mr. Asonye, because I want to pursue that a little bit with

2    you.

3              What is the intent that is required by the

4    Government, that is, what -- that's the wrong way to put it.

5              What is the requirement of intent that the Government

6    must prove beyond a reasonable doubt in this case?

7              MR. ASONYE:  For the tax charges and the FBAR

8    charges, it's willfulness, Your Honor.

9              THE COURT:  So you have to show, as I recall the case

10   law, that he knew that it was against the law not to report

11   that, not to report those foreign bank accounts, and that

12   knowing that, he nonetheless went ahead and violated that law

13   by not reporting it.

14             MR. ASONYE:  That's correct, Your Honor.

15             THE COURT:  All right.  Now, you-all -- that's what

16   you say this goes to, and you give me really, I think, two

17   bases for doing it.  Correct me if I'm wrong.

18             First, you say it's relevant under 402 because it is

19   intrinsic to the offense charged.

20             MR. ASONYE:  Yes, Your Honor.

21             THE COURT:  The second argument you make in support

22   of it is that it's past bad acts or other bad acts under

23   404(b).

24             MR. ASONYE:  That's correct, Your Honor.

25             THE COURT:  And you do that only as an alternative,

2265

1    because if you persuade me that it's intrinsic, that's the end

2    of the matter.

3           MR. ASONYE:  Correct.  And I think there's a third

4    argument, Your Honor, as well, that they --

5           THE COURT:  The third argument about they're opening

6    the door.

7           MR. ASONYE:  Correct.

8           THE COURT:  All right.  We'll come -- and let me go

9    ahead and state that one so it's in front of you.  I think --

10   I've forgotten who did it, Mr. Westling or somebody.

11          MR. ZEHNLE:  Mr. Zehnle, Your Honor.

12          THE COURT:  Oh, Zehnle asked the question about

13   whether one had to file for a business if -- depending on what

14   percentage ownership they had.

15          MR. ASONYE:  Beyond that, Your Honor, he also

16   questioned whether -- he cross-examined Ms. Liss on whether

17   U.S. corporations have an obligation to file FBARs if they meet

18   the FBAR requirement, which -- and Ms. Liss answered yes.

19          And subsequent to that, on cross-examination of

20   Mr. Gates, defense counsel elicited that these were DMP's

21   accounts, not Mr. Manafort's accounts.  We're talking about the

22   Cypriot accounts.

23          So they have essentially laid the foundation to try

24   to argue in closing that it's not Mr. Manafort's responsibility

25   to file an FBAR; it was DMP and Davis Manafort Partners'

1    responsibility to file an FBAR report.  So they can't have it

2    both ways.  They cannot say it was the company's

3    responsibility --

4              THE COURT:  Well, let me stop you for a moment.  I

5    want you to come back to the -- I want you to finish they can't

6    have it both ways, but refresh my recollection:  The

7    obligation -- the legal obligation to file if you have an

8    interest in a company applies to someone who has more than

9    50 percent ownership, right?

10             MR. ASONYE:  That's correct, Your Honor.

11             THE COURT:  So if you have 50, you don't have an

12   obligation?

13             MR. ASONYE:  You could have it -- indirectly, you

14   could, Your Honor.

15             THE COURT:  Is there any evidence about that?

16             MR. ASONYE:  Well, his wife owns the other 50 percent

17   and they file a joint tax return.

18             THE COURT:  Yes, but that doesn't relate to him.

19             MR. ASONYE:  But there's one tax return, Your Honor,

20   and there's -- on the foreign bank account question, on the tax

21   return, the Schedule B, whether you have a foreign bank

22   account, so there is an argument that he could under the

23   financial interest rubric on 50 percent for DMP International.

24   But putting that aside, he had 100 percent of Davis Manafort

25   Partners for '10 and '11, so he would obviously have a

2267

1    financial --

2            THE COURT:  I'm sorry, say that again.

3            MR. ASONYE:  In 2011, Mr. Manafort owned 100 percent

4    of Davis Manafort Partners, so he automatically had a financial

5    interest and would have an FBAR -- a personal FBAR filing

6    requirement due to his interest in -- 100 percent interest in

7    Davis Manafort Partners.

8            THE COURT:  All right.  Go back to your argument

9    about the Government can't have it -- or the defendant can't

10   have it both ways and finish that for me.

11           MR. ASONYE:  Yes.  Your Honor, they've essentially

12   laid this -- the foundation to argue in closing that no harm,

13   no file -- foul.  The requirement to file the FBAR was not

14   Mr. Manafort's personally as charged, it was really DMP

15   International's or Davis Manafort Partners, his company,

16   because the company owned the money.  So he cannot be held

17   responsible for a requirement that was not his personally; it

18   was the company's responsibility.

19           And what -- our point is if they're going to argue

20   that, fine, but the jury should know that he didn't file for

21   Davis Manafort Partners or DMP International during the

22   relevant period.  If you're going to argue that the

23   responsibility belongs to the corporation, the jury must know

24   that the corporation didn't file.

25           THE COURT:  So what?  They're not indicted.  They're

2268

1    not a defendant.

2              MR. ASONYE:  But they're --

3              THE COURT:  They could have been.  You could have

4    indicted the company.

5              MR. ASONYE:  But he's using it as --

6              THE COURT:  I'm sorry.  You could have indicted the

7    company, couldn't you?

8              MR. ASONYE:  We could have.  We didn't.  But he's now

9    opened the door by arguing that the filing requirement belonged

10   to the corporation.  It becomes relevant to the defense

11   argument, which they've clearly laid.

12             THE COURT:  All right.  Defendant wish to be heard on

13   this?

14             MR. ASONYE:  Your Honor, may I -- if I can make one

15   other note just --

16             THE COURT:  Yes, you can.

17             MR. ASONYE:  The Government offered the -- and it's

18   unclear really what the defense position is on this, but we

19   offered the FARA filing that was filed in 2017.

20             THE COURT:  A what?

21             MR. ASONYE:  The Foreign Agents Registration Act

22   filing as evidence, Mr. Manafort filed in 2017.  And in that

23   filing, we have pointed out that Mr. Manafort indicated that he

24   owned 100 percent of DMP International, not 50 percent.  Now,

25   that conflicts with his own tax returns that indicate that he

2269

1   has 50 percent.

2           THE COURT:  That's not before me now.

3           MR. ASONYE:  It is, Your Honor.  It's --

4           THE COURT:  No, it isn't.  That isn't in evidence.

5           MR. ASONYE:  It is in evidence.  The FARA filing --

6           THE COURT:  This document?

7           MR. ASONYE:  Yes, the FARA --

8           THE COURT:  What exhibit number is it?

9           MR. ASONYE:  34, Your Honor.  It's in evidence, and

10  there's also --

11          THE COURT:  All right.  I'll look at it.

12          All right.  Now, Mr. Zehnle.

13          MR. ZEHNLE:  Yes, Your Honor.

14          THE COURT:  Do you wish to respond?

15          MR. ZEHNLE:  I do, Your Honor.

16          THE COURT:  All right.

17          MR. ZEHNLE:  I think Your Honor's questions went to

18  the heart of the matter, which is that the Special Counsel

19  keeps conflating the responsibilities here.  As we heard Agent

20  Liss testify, there is an individual responsibility for filing

21  an FBAR under certain circumstances, but there also may be a

22  corporate or a partnership or a trust, depending on the nature

23  of the entity.  It may have its own separate responsibility for

24  filing.  So it's actually under the law two separate persons as

25  defined under FBAR in its regulations.

1          And Mr. Asonye keeps saying in his papers and even

2   now that in terms of opening the door that the defense counsel

3   asked this question, and I went back to the transcript, Your

4   Honor, on Page 1084 of it, and my question on Line 17 was as

5   follows:  "How much ownership does a person have to have in a

6   corporation in order to be required to file an FBAR on behalf

7   of that corporation?"

8          And the answer, which Agent Liss gave, which he keeps

9   attributing to my question, was:  "The corporation may have its

10  own filing requirement, and then an individual may have their

11  own filing requirement if they own, directly or indirectly,

12  more than 50 percent of the company."

13         Now, that's on Page 1084 of the transcript.  And I'm

14  a little -- well, so I keep getting ascribed as like, oh, well,

15  they opened the door.  No, the agent -- their agent, their

16  witness answered that way.  So we have two separate

17  responsibilities here.

18         What they have charged, as the Court has pointed out,

19  is Mr. Manafort's failure to file FBARs personally for 2011,

20  '12, '13, and '14.

21         There is no evidence other than they say, well, he's

22  the owner of the company, that suggests that he had the

23  responsibility on behalf of that separate entity in order to

24  file it.  There are hundreds of thousands, if not millions, of

25  corporations, Your Honor, that have individuals who are

2271

1     ascribed responsibility for filing regulatory matters, such as

2     FBARs.  It could be a corporate secretary or a director or

3     something like that.  There's been no evidence adduced

4     whatsoever that Mr. Manafort had any responsibility on behalf

5     of the corporation to file on behalf of that corporation.

6              So what they're doing, they're inviting the jury to

7     potentially convict on a theory that was not charged by the

8     grand jury.  The grand jury said Mr. Manafort -- there's

9     probable cause to believe Mr. Manafort didn't file individually

10    for those four years and those four years alone.

11             As the Court pointed out, they could have charged it.

12    They knew all these other companies, but they didn't, and now

13    they're trying to get it in the back door.  They've already

14    thrown the kitchen sink at him.  Now, they're throwing the

15    plumbing and the pipes, too.

16             THE COURT:  Let me -- I have another matter with

17    Mr. Asonye, but before you finish -- well, I'll let you come

18    back.

19             Mr. Asonye, this is not like a normal case, drugs or

20    guns or whatever, where I decide whether something is intrinsic

21    or extrinsic in terms of its relevancy.  In those cases, a

22    defendant usually is either convicted or there's another event

23    that shows that he knows what drugs are, he knows what guns

24    are.

25             What concerns me about the basis of your argument is

2272

1      that all of this the Government wants to show because the

2      Government says, look, we have the burden to prove beyond a

3      reasonable doubt that he willfully violated the law that

4      required him to report these, which means you have to show that

5      he knew about it and that he deliberately decided not to obey

6      it.

7              And it's hard for me to see how failures to file for

8      various years shows that.  Now -- for other entities, for other

9      entities.

10             MR. ASONYE:  May I respond?

11             THE COURT:  You get to argue on the basis of the

12     record evidence that he did this willfully and the jury can

13     decide it.  That's their job.  But there's nothing about

14     repeatedly doing it for Davis Manafort Partners and DMP

15     International that shows he knew that there was an obligation

16     and that he deliberately did not comply with it.

17             MR. ASONYE:  Your Honor, a couple of things:

18     Mr. Zehnle indicated that it was the agent who opened the door

19     in the transcript, but he --

20             THE COURT:  I'm sorry, I know you have your speech on

21     that ready, but that's not what I just put to you.  Address

22     what I'm saying and what I'm thinking.  I'll give you a chance

23     to come back to that.

24             MR. ASONYE:  The issue, Your Honor, is that -- and,

25     fine, I can agree with Your Honor on that point.  However, they

2273

1    have now raised a defense argument that he -- that the

2    responsibility to file an FBAR on this was not a personal one;

3    it was a corporate responsibility, that essentially these

4    weren't Mr. Manafort's Cypriot accounts, these were DMP

5    International and Davis Manafort Partners accounts; and once

6    they've advanced that argument, if they want to say, "Judge,

7    we're not going to argue in closing that these were DMP

8    International's accounts and, therefore, the filing requirement

9    was the company's and not Mr. Manafort's," then most of our

10   argument, I agree, Your Honor, we're less worried about it.

11          But if they get up in closing, which is what they've

12   laid the foundation to do, and say, "Ladies and gentlemen, they

13   charged the wrong entity.  It should have charged the

14   corporation; therefore, the corporation had the filing

15   requirement, not Mr. Manafort," then the jury should know that

16   Mr. Manafort didn't file.

17          THE COURT:  You still haven't responded to the point

18   I raised.  I'm going to do it once more.  The point I'm raising

19   is simply this:  The Government has the obligation to prove

20   beyond a reasonable doubt that he willfully violated the FBAR

21   requirement.  That means that the Government has to prove that

22   he knew there was -- what the law was and that he deliberately

23   violated the law.

24          I don't see what showing these other events shows

25   about his knowledge.  Now, typically what happens in these

2274

1    cases is there's a conviction.  You know, if he had been

2    convicted in the past of violating this, then, of course, it

3    would be clear that he knew and that it would be relevant.  So

4    just explain to me why the -- never mind the open door.  We'll

5    come back to that, and I'll give you a chance to finish that

6    argument.

7         But tell me why the failure to file for DMP

8    International and the other entity, whatever it is, shows that

9    he knew he had an obligation to file and that he deliberately

10   did not comply with that legal obligation.

11        MR. ASONYE:  So, Your Honor, the defendant signed

12   five engagement letters where the FBAR requirement, including

13   for corporations, is spelled out in detail in the engagement

14   letter.  That goes to his knowledge.

15        Secondly, there's an e-mail from one of the KWC tax

16   preparers.  They literally cut and paste the regulation

17   spelling out the definition of financial interest and signature

18   authority, which would cover this -- the corporate interest.

19   That's enough for knowledge, Your Honor.  He receives that

20   e-mail.  It has --

21        THE COURT:  Give me that exhibit number so I can look

22   at it.

23        MR. ASONYE:  We'll pull it up, Your Honor.

24        THE COURT:  All right.  But what you now want to

25   offer through the financial center witness is that for which

2275

1    years?

2              MR. ASONYE:  2011 through 2014.

3              THE COURT:  That no, no FBAR was filed.

4              MR. ASONYE:  For -- correct, for DMP International

5    and Davis Manafort Partners.  And, again, our argument is --

6    is, again, if defense counsel wants to stipulate that they're

7    not going to argue that it was a DMP or Davis Manafort

8    requirement to file, we're less concerned.  But they have set

9    up this argument for closing, Your Honor, to be totally clear.

10             THE COURT:  All right.  Well, I'm not going to bother

11   with whether they asked the question to elicit that or whether

12   your witness volunteered that aspect.  I get your point.

13             MR. ASONYE:  May I raise that one issue, Your Honor,

14   just to be clear on the record of --

15             THE COURT:  No, I don't need it.  It's not going to

16   play a role.  I don't really care.

17             Are you going to argue that or not?

18             MR. ZEHNLE:  Well, when you put it that way, Your

19   Honor, no, we are not.  There is no evidence in the record, one

20   way or the other, and so that's why this whole argument by the

21   Government is specious.  There's absolutely no evidence about

22   who controlled these companies.

23             THE COURT:  All right.  One more time, Mr. Asonye,

24   what argument is it you're afraid of?

25             MR. ASONYE:  The argument --

2276

1              THE COURT:  Stay right there and tell me.  I can hear

2    you.

3              MR. ASONYE:  The argument, Your Honor, is that the

4    obligation to file an FBAR for the 32 Cypriot bank accounts was

5    not Mr. Manafort's; it was DMP International or Davis Manafort

6    Partners.  That's it, Your Honor.

7              THE COURT:  Do you intend to argue that?

8              MR. ZEHNLE:  It's not an issue, and we do not.  The

9    issue is his intent alone, his individual willfulness with

10   respect to the four years that they've charged, and all the

11   other things that they tried to put in, the 14 other

12   individuals and entities for 2001 to 2018 is totally irrelevant

13   and unfairly prejudicial, Your Honor.

14             THE COURT:  Well, the danger, of course, is that

15   he'll be convicted for things he wasn't charged with in the

16   indictment.  He could have been, but he wasn't.

17             Given that representation, and it is a

18   representation --

19             MR. ZEHNLE:  Yes, Your Honor.  Yes, I'm sorry.

20             THE COURT:  Mr. Westling is nervous.

21             MR. WESTLING:  Could we confer?

22             MR. ZEHNLE:  Yes.

23                      (Laughter.)

24             THE COURT:  If that representation is affirmed, then

25   we don't need this argument, and I don't need to decide it.  If

2277

1    it's not, then I do need to decide it.

2            MR. ZEHNLE:  Yes, Your Honor.  Yeah, Mr. Westling

3    just wanted to make sure that something was clear.  When we

4    were talking -- when we were having the examination of the

5    witness, the focus was on the 50 percent or more -- the more

6    than 50 percent ownership.  That is something that we certainly

7    will be arguing because if you do not have more than a

8    50 percent ownership --

9            THE COURT:  Why is that relevant if you're not going

10   to argue about DMP and --

11           MR. ZEHNLE:  We're not, Your Honor.  I'm just trying

12   to make sure that I'm clear, and I think -- thank you,

13   Mr. Westling, for bringing it up.

14           We're going to argue -- and it's very clear that if

15   you don't own more than 50 percent of the entity, as the agent

16   testified, then you do not have a responsibility.  You have to

17   own more than 50 percent of it.

18           THE COURT:  And in what context are you going to make

19   that argument?

20           MR. ZEHNLE:  With respect to the intent of our

21   client, Mr. Manafort, because it's an individual's

22   responsibility.  If I as an individual own more than 50 percent

23   of the entity, Your Honor, then I as an individual may have a

24   responsibility to file that FBAR.  That's -- that's apart from

25   this whole argument --

2278

1          THE COURT:  But does your -- the argument that you

2     intend to make relate in any way to DMP International or

3     Davis -- let me see -- Davis Manafort Partners or DMP

4     International?

5          MR. ZEHNLE:  It does relate to DMP International,

6     Your Honor, because as the Government has introduced evidence,

7     he is only a 50 percent shareholder of that company, and as we

8     talked about a number of days ago when the witness was on the

9     stand, that is clearly what we're entitled to argue.

10          The other things about the entity's responsibility is

11     something that we're not arguing.

12          THE COURT:  All right.  Do you want to say anything

13     else, Mr. Asonye?  It sounds to me like he's not going to argue

14     anything about he didn't have to file anything for DMP and he

15     didn't have to file anything for Davis Manafort Partners.

16          MR. ASONYE:  Yeah.  I don't know how he's going to

17     argue for the years when he owns 100 percent.  I'll put that

18     aside.  If the argument is -- I want to make sure I understand

19     this -- that nobody had a responsibility to file the FBAR when

20     Mr. Manafort --

21          THE COURT:  No, that's not the argument.  Look, I'm

22     going to take a recess.  You make clear among yourselves -- I'm

23     going to decide it, and I can predict, as many of my decisions

24     result in this, neither side is going to be happy.

25          MR. ZEHNLE:  Yes, Your Honor.

2279

1          THE COURT:  You know, half the people -- in some

2    cases, half the people think I'm dumber than a post, and the

3    other half think I'm brilliant.  But in many, they both think I

4    misspoke.

5          So, anyway, I'll give you an opportunity, but I don't

6    want to hear a witness if I don't have to.  If I decide that

7    it's relevant or admissible, I can see only one, two, or three

8    questions at the most.

9          Court stands in recess for 15 minutes.

10          MR. ANDRES:  Thank you, Your Honor.

11          MR. ZEHNLE:  Thank you, Your Honor.

12           (Recess from 4:14 p.m., until 4:30 p.m.)

13

14               CERTIFICATE OF THE REPORTER

15     I certify that the foregoing is a correct transcript of

16    the record of proceedings in the above-entitled matter.

17

18

19                         _____
                                    /s/
20                            Anneliese J. Thomson

21

22

23

24

25