IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| PAUL J. MANAFORT, JR., | Crim. No. 1:18-cr-83 (TSE) |
| Defendant. | |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Special Counsel Robert S. Mueller, III, files this submission to address the sentencing of defendant Paul J. Manafort, Jr.

As an initial matter, the government agrees with the guidelines analysis in the Presentence Investigation Report (PSR) and its calculation of the defendant's Total Offense Level as 38 with a corresponding range of imprisonment of 235 to 293 months, a fine range of $50,000 to $24,371,497.74, a term of supervised release of up to five years, restitution in the amount of $24,815,108.74, and forfeiture in the amount of $4,412,500.

Second, while the government does not take a position as to the specific sentence to be imposed here, the government sets forth below its assessment of the nature of the offenses and the characteristics of the defendant under Title 18, United States Code, Section 3553(a). The defendant stands convicted of the serious crimes of tax fraud, bank fraud, and failing to file a foreign bank account report. Manafort was the lead perpetrator and a direct beneficiary of each offense. And while some of these offenses are commonly prosecuted, there was nothing ordinary about the millions of dollars involved in the defendant's crimes, the duration of his

criminal conduct, or the sophistication of his schemes.[1]  Together with the relevant criminal

conduct, Manafort's misconduct involved more than $16 million in unreported income resulting

in more than $6 million in federal taxes owed, more than $55 million hidden in foreign bank

accounts, and more than $25 million secured from financial institutions through lies resulting in

a fraud loss of more than $6 million.  Manafort committed these crimes over an extended period

of time, from at least 2010 to 2016.  His criminal decisions were not momentary or limited in

time; they were routine.  And Manafort's repeated misrepresentations to financial institutions

were brazen, at least some of which were made at a time when he was the subject of significant

national attention.

Neither the Probation Department nor the government is aware of any mitigating factors.

Manafort did not commit these crimes out of necessity or hardship.  He was well educated,

professionally successful, and financially well off.  He nonetheless cheated the United States

Treasury and the public out of more than $6 million in taxes at a time when he had substantial

resources.  Manafort committed bank fraud to supplement his liquidity because his lavish

spending exhausted his substantial cash resources when his overseas income dwindled.

Finally, Manafort pled guilty in September 2018 in the United States District Court for

the District of Columbia to others crimes committed over an even longer period.   The

government references those crimes below principally as they pertain to the Section 3553(a)

factors and, in particular, because they demonstrate the defendant's concerted criminality,

including the conduct to which he pled guilty, from as early as 2005 and continuing up until the

---

[1]Manafort was being investigated prior to the May 2017 appointment of the Special Counsel by
prosecutors in this district and the Criminal Division of the Department of Justice.  See Motion Hearing
Tr., May 4, 2018, at 4.

defendant's involvement in an obstruction of justice conspiracy between February 23, 2018 and April 2018—a crime Manafort committed while under indictment in two jurisdictions and subject to court-ordered bail conditions in each. The District of Columbia offenses are also relevant to the application of § 2S1.3(b)(2) of the Sentencing Guidelines to the FBAR offenses and to the issue of acceptance of responsibility, as discussed below.

In the end, Manafort acted for more than a decade as if he were above the law, and deprived the federal government and various financial institutions of millions of dollars. The sentence here should reflect the seriousness of these crimes, and serve to both deter Manafort and others from engaging in such conduct.

## I.   <u>Procedural History</u>

On February 22, 2018, a grand jury sitting in the Eastern District of Virginia returned a 32-count Superseding Indictment charging Manafort and co-defendant Richard Gates with a series of crimes involving tax fraud, failure to file foreign bank account reports, and bank fraud. Superseding Indictment, Feb. 2, 2019, Doc. 9.

The defendant proceeded to trial on July 31, 2018 and, on August 21, the jury convicted the defendant on eight counts: Counts 1 through 5 (filing false income tax returns for the years 2010 to 2014); Count 12 (failing to file a report of foreign bank and financial accounts (FBAR) in 2012), and Counts 25 and 27 (bank fraud relating to a Citizens Bank loan for the Howard Street property in New York, and a Banc of California commercial loan, respectively). The jury did not reach a verdict on the remaining ten counts.[2]

---

[2]The Jury Verdict Form indicated that the jury voted eleven to one in favor of guilt on all ten counts for which it did not reach a verdict. <u>See</u> Jury Verdict Form, Aug. 21, 2018, Doc. 280.

## II.    **Trial Evidence**

Given the Court's familiarity with the trial evidence, the government only briefly outlines it below.

### A.    **Tax Charges**

Manafort's tax returns were false as to the stated income and the fact that in each year Manafort failed to report the existence of his overseas bank accounts.  The government proved Manafort's unreported income through a series of payments from his overseas accounts to vendors for various goods and services and for the purchase and improvement of real estate in New York and Virginia.[3]  FBI Forensic Accountant Morgan Magionos traced each wire transfer, detailing the banks and accounts over the period from 2010 to 2014, and calculated the total

---

[3]The evidence supporting the false returns included both testimony and documentary evidence.  Eight vendors testified about receiving payments from overseas accounts for goods, services, or real estate purchased by the defendant in the United States.  See Trial Tr. at 285-312 (Testimony of Maximillian Katzman from Alan Couture); id. at 312-29 (Testimony of Ronald Wall from House of Bijan); id. at 339-49 (Testimony of Daniel Opsut from American Service Center/Mercedes-Benz of Alexandria); id. at 349-59 (Testimony of Wayne Holland from McEnearney Associates); id. at 361-91 (Testimony of Stephen Jacobson from SP&C Home Improvement); id. at 393-410 (Testimony of Doug DeLuca from Federal Stone and Brick); id. at 435-461 (Testimony of Joel Maxwell from Big Picture Solutions); id. at 469-91 (Testimony of  Michael Regolizio from New Leaf Landscape).  This testimony was corroborated by invoices, banks statements, emails, and other documentary evidence.  See, e.g., Government Exhibit 94A (SP&C Home Improvement Invoices 2010-2014); Government Exhibit 95A (SP&C Home Improvement Bank Records); Government Exhibit 97A (Alan Couture Invoices 2010-2014); Government Exhibit 98 (Alan Couture Bank Records); Government Exhibit 99 (March 21, 2011 Email from Manafort to M. Katzman).  Evidence with respect to six additional vendors and three real estate purchases, and supporting documentation, was admitted by stipulation.  See e.g., Government Exhibit 327 (Stipulation Regarding Aegis Holdings, LLC); Government Exhibit 329 (Stipulation Regarding J&J Oriental Rug Gallery); Government Exhibit 332 (Stipulation Regarding Don Beyer Motors, Inc.); Government Exhibit 334 (Stipulation Regarding Sabatello Construction of Florida, Inc.); Government Exhibit 335 (Stipulation Regarding Scott L. Wilson Landscaping & Tree Specialists, Inc.); Government Exhibit 336 (Stipulation Regarding Sensoryphile, Inc.); Government Exhibit 328 (Stipulation Relating to the Purchase of 377 Union Street, Brooklyn, New York); Government Exhibit 330 (Stipulation Relating to the Purchase of 29 Howard Street #4, New York, New York); Government Exhibit 331 (Stipulation Relating to the Purchase of 1046 N. Edgewood Street, Arlington, Virginia).

amount to be $15,571,046, as reflected on Government Exhibit 72 (attached as Exhibit A).[4]

Additionally, the government proved that Manafort further misrepresented his income by falsely

characterizing certain income as loans.[5]

IRS Revenue Agent Michael Welch testified that Manafort failed to report more than $16

million in income on line 22 of his tax returns during tax years 2010 through 2014, as

documented in Government Exhibit 77 (attached as Exhibit B).[6]  Welch also testified that

Manafort failed to identify any of his foreign bank accounts on Schedule B, Line 7A for the

years from 2010 to 2014.[7]  The IRS has determined that Manafort owed $6,164,032 in taxes for

his unreported income.  See PSR, ¶ 36.

### B. FBAR Charges

Manafort was found guilty of the Count 12 FBAR charge relating to 2012.  Under the

Sentencing Guidelines the FBAR charges in Counts 11, 13 and 14, for the years 2011, 2013, and

2014, respectively, constitute relevant conduct.  See PSR, ¶ 75.  FBI Forensic Accountant

Magionos, using a series of charts, testified that Manafort maintained 31 overseas accounts in

three countries and listed the aggregate maximum value in those accounts in each year from

2011 to 2014 as reflected on the following exhibits:[8]

- Government Exhibit 73B documented the aggregate maximum value of foreign bank
  accounts controlled by Manafort in 2011 that totaled approximately $8.3 million;

---

[4]See Trial Tr. at 1617-20 (Testimony of Morgan Magionos).

[5]See Trial Tr. at 903-06 (Cindy LaPorta testified that Gates proposed changing the amount of Manafort's alleged loans to reduce his total taxable income); see id. at 1107-09 (Gates testified that at Manafort's direction he instructed Manafort's bookkeeper and tax preparers to treat certain income as loans to avoid paying taxes on the income).

[6]See Trial Tr. at 1679-82 (Testimony of Michael Welch).

[7]Id. at 1695-97.

[8]See Trial Tr. at 1620-24 (Testimony of Morgan Magionos).

- Government Exhibit 73C documented the aggregate maximum value of foreign bank accounts controlled by Manafort in 2012 that totaled approximately $25.7 million;

- Government Exhibit 73D documented the aggregate maximum value of foreign bank accounts controlled by Manafort in 2013 that totaled approximately $18.7 million;

- Government Exhibit 73E documented the aggregate maximum value of foreign bank accounts in 2014 that totaled approximately $2.7 million.[9]

Copies of Government Exhibits 73B, 73C, 73D and 73E are attached as Exhibit C.

### C. **Bank Frauds**

The jury convicted Manafort of the two bank fraud schemes charged in Counts 25 and 27. Manafort sought both loans at a time when he was no longer receiving income from Ukraine.

Count 25 charged Manafort with defrauding Citizens Bank of $3.4 million relating to a loan for property on Howard Street in New York, New York.  As part of that fraud, the government proved at trial that the defendant made, or caused to be made, the following three material false statements between December 2015 and March 2016: (1) that the Howard Street residence was his second home; (2) that a $1.5 million dollar loan from a Cyprus entity named Peranova had been forgiven in the prior year; and (3) that there was no mortgage on Manafort's Union Street property in Brooklyn, New York.[10]  Two bank witnesses, Manafort's tax preparer and bookkeeper, and Rick Gates testified to the details of the charged scheme.  Their testimony

---

[9]Special Agent Paula Liss from the Financial Crimes Enforcement Network testified that no FBAR reports were filed by Manafort or his related entities in the relevant time period.  See Trial Tr. at 1080-81; 2293-94.

[10]See Trial Tr. at 2409 (government summation identifying false statements relating to the Counts 24 and 25 Citizens Bank fraud/conspiracy charges involving the Howard Street property).

was corroborated by a series of emails, tax returns, and insurance documents, among other

documentary evidence.[11]

Manafort was also convicted, in Count 27, of defrauding the Banc of California with

respect to a $1 million dollar commercial loan. The government proved at trial that the

defendant made, or caused to be made, the following material false statements: (1) omitting to

report his Howard Street mortgage on his loan application; and (2) submitting a materially false

2015 DMP Profit and Loss Statement.[12] Among other evidence, Washkuhn and Gates testified

about the false DMP Profit and Loss Statements submitted to the bank, with Gates explaining the

various emails in which Manafort directed him to manipulate the relevant financial statement.[13]

---

[11]Melinda James (née Francis) from Citizens Bank testified that Manafort represented the Howard Street property to be a second home and that Manafort represented that there was no mortgage on the Union Street property. See Trial Tr. at 1747, 1755. Tax preparer Cindy LaPorta testified about her representations relating to the Peranova loan to Citizens Bank, nothwithstanding the fact that she had concerns it was never a loan at all, see Trial Tr. at 944-59, as did Gates, who also noted that money from Peranova was income and was never a loan, see Trial Tr. at 1297-1308. Bookkeeper Heather Washkuhn testified that at the time of the Howard Street loan, there was a mortgage on the Union Street property. See Trial Tr. at 596-601. The supporting documentary evidence included the following: Government Exhibit 227 (Manafort's bank application identifying the Howard Street property as a second residence); Government Exhibit 337L (2015 MC Soho Tax Return reporting $115,987 in rental income for Howard Street apartment); Government Exhibit 337M (2016 MC Soho Tax Return reporting $108,000 in rental income for Howard Street apartment); Government Exhibit 127 (February 5, 2015 email relating to rental income from the Howard Street apartment); Government Exhibit 503 (March 12, 2016 email relating to rental earnings generated from the Howard Street property); Government Exhibit 422 (January 26, 2016 email from Manafort to his son-in-law reminding him that the appraiser is coming to the Howard Street apartment, who believes that the son-in-law and his wife live in the apartment); Government Exhibit 118 (Airbnb records relating to the rental of the Howard Street apartment); Government Exhibit 500 (Stipulation regarding Genesis Capital mortgage on Union Street Property).

[12]See Trial Tr. at 2418-21 (government summation identifying false statements relating to the Counts 26 and 27 Banc of California commercial loan fraud/conspiracy).

[13]Gates testified that at Manafort's direction he altered the 2015 DMP Profit and Loss Statement that was ultimately sent to the Banc of California. See Trial Tr. at 1317-26. Washkuhn testified to the falsity of the submitted 2015 DMP Profit and Loss Statement. See Trial Tr. at 601-19. The supporting documentary evidence included among other evidence: Government Exhibit 140 (March 16, 2016 emails between Gates and Washkuhn involving the 2015 DMP Profit and Loss Statement); Government Exhibit 392 (March 16, 2016 email between Manafort and Gates involving the 2015 DMP Profit and Loss Statement); and Government Exhibit 298 (March 16, 2016 email from Manafort to Perris Kaufman

With respect to the three other bank frauds for which the jury failed to reach a verdict, one involving a $5.5 million loan from Citizens Bank (charged only as a conspiracy) and two involving loans from The Federal Savings Bank, one for $9.5 million and the other for $6.5 million, respectively, the defendant admitted to his involvement in each of these bank frauds as part of his guilty plea in the District of Columbia.[14]   The evidence at trial established those same facts through witness testimony and documentary evidence.[15]

With respect to the Union Street loan conspiracy involving Citizens Bank, charged in Count 28, Manafort pledged his property at 377 Union Street in Brooklyn, New York.  At the

---

attaching false 2015 DMP Profit and Loss Statement).  Gary Seferian, Senior Vice President of the Managed Assets Group at the Banc of California, testified about the loan process and the materiality of Manafort's false statements.  See Trial Tr. at 1958-88.

[14]Plea Agreement, United States v. Manafort, 1:17-cr-201 (ABJ) (D.D.C. Sept.14, 2018), Doc 422 ("D.C. Plea Agreement"); Statement of the Offenses and Other Acts, United States v. Manafort, 1:17-cr-201 (ABJ) (D.D.C. Sept.14, 2018), Doc 423 ("D.C. Statement of the Offense") (collectively attached as Exhibit D).

[15]With respect to the Citizens Bank Union Street loan, Manafort made, or caused to be made, the following misrepresentations: (a) he caused to be submitted a false 2016 DMP Profit and Loss Statement; and (b) he falsely claimed the Peranova loan was forgiven and made false statements about his income. See Trial Tr. at 2418-21 (government summation identifying false statements relating to Counts 28 Citizens Bank Union Street loan conspiracy).  Taryn Rodriguez from Citizens Bank testified about the loans process, see Trial Tr. at 1906-37, LaPorta testified about the Peranova loan issues, see id., at 947-59, as did Gates, see id. at 1326-30, and Washkuhn testified about the false DMP Profit and Loss Statement comparing it to the original she prepared, see id. at 631-32.  With respect to The Federal Savings Bank loans, Manafort made, or caused to be made, the following misrepresentations as to both loans: (a) he caused to be submitted a false 2015 DMP Profit and Loss Statement; (b) he caused to be submitted a false 2016 DMP Profit and Loss Statement; (c) he falsely claimed that the $300,000 delinquency on his American Express Card resulted from lending that credit card to Rick Gates to buy New York Yankees tickets; and (d) he made false statements about his mortgage on the Howard Street property.  See Trial Tr. at 2423-24 (government summation identifying false statements relating to the Counts 29, 30, 31 and 32 bank fraud/conspiracies relating to two loans from The Federal Savings Bank). Three bank witnesses testified about The Federal Savings Bank Loans: Dennis Raico, see Trial Tr. at 2008-77; James Brennan, id. at 2164-2199; and Andrew Chojnowski, see id. at 2129-43. Among other testimony, Washkuhn identified the various submitted DMP Profit and Loss Statements as false.  See Trial Tr. at 620-32.  Gates testified that he never sought to borrow Manafort's American Express card and that he did not incur the $300,000 delinquency for Yankees tickets, but rather that those tickets were for Manafort.  See Trial Tr. at 1352-54.

time of his application, the Union Street property was encumbered by a $5.3 million dollar loan from Genesis Capital.  Manafort failed to disclose this mortgage to Citizens Bank at the time of the Count 28 conspiracy, nor previously as part of the $3.4 million Citizens Howard Street loan application (charged in Counts 24 and 25).  Taryn Rodriguez from Citizens Bank testified to this fact, noting that she later found the loan on her own.[16]  At trial, Manafort never disputed the existence of the Genesis Capital loan and in fact agreed to the underlying details in Government Exhibit 500, a stipulation between the parties relating to the Genesis Capital loan on Union Street property.

### III.     Standards Governing Sentencing

The Fourth Circuit has held that a sentencing court must: "(1) properly calculate the [Sentencing] Guidelines range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentence[s] requested by the parties; and (3) explain its reasons for selecting a sentence."  United States v. Simmons, 269 Fed. Appx. 272, 273 (4th Cir. 2008) (citing United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007)).  Although the Sentencing Guidelines are advisory, United States v. Booker, 543 U.S. 220, 246 (2005), "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  Gall v. United States, 552 U.S. 38, 50 n. 6 (2007); see Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904 (2018) ("[E]ven in an advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the process of appellate review.'") (citation omitted).

---

[16] See Trial Tr. at 1911-1917.

### IV.     The Advisory Guidelines Range

The government agrees with the Probation Department's guidelines calculations in the

PSR and addresses that analysis below together with the defendant's challenges.  See Defense

Objections to the PSR (dated January 21, 2019).

#### A.   Tax and FBAR Guidelines (Group 1)

##### 1.   Section 2S1.3 is the Relevant Guideline Provision

As noted in the PSR, the base offense level for the Group 1 tax and FBAR counts is level

6, pursuant to § 2S1.3(b)(2), with 22 levels added based on the value of the funds held—here,

more than $55 million, pursuant to § 2B1.1(b)(1)(L).  See PSR ¶¶ 73-74.[17]

The defendant argues that the tax guidelines, and not § 2S1.3, is the appropriate starting

point for the Group 1 FBAR and tax offenses, citing United States v. Kim, 1:17-cr-00248

(TSE/LMB) (E.D. Va. 2018).  See Defense Objections to the PSR, at 1-2.  As detailed in the PSR

Addendum, the defendant's arguments lack merit.  See PSR Addendum, 52-53.

First, the Guidelines explicitly distinguish between the various reporting crimes at issue

here (covered by § 2S1.3) and tax offenses (covered by Part T).  For example, the commentary to

§ 2S1.3, under the title "Statutory Provisions," explicitly lists 31 U.S.C. § 5313—the statute of

which Manafort was convicted in Count 12.  Further, § 2S1.3(c)(1) addresses a reporting

violation committed for the purposes of evading taxes, and specifically calls for use of the tax

guidelines only if the resulting offense level is greater than the one determined under § 2S1.3.[18]

---

[17]The base offense level is 6 pursuant to § 2S1.3(b)(2) because the offense at issue is not enumerated in § 2S1.3(b)(1).

[18]Section 2S1.3(c)(1), entitled "Cross Reference," reading as follows: "If the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter

That criterion is not satisfied here:  "the resulting offense level" under Chapter 2T of the

guidelines is less than the Chapter 2S calculation.  See United States v. Hill, 171 Fed. Appx. 815,

821-22 (11th Cir. 2006) ("§ 2S1.3(c)(1) was not applicable because the offense level of 16 that

would have resulted from the court's application of U.S.S.G. § 2T1.1(a)(1), would have been less

than 17—the offense level that resulted from the court's application of § 2S1.3(a) & (b)(1)")

(footnote omitted).

Moreover, Manafort's FBAR offense was not committed solely for allowing him to

violate the tax laws.  Rather, his use of and access to unreported overseas accounts also

facilitated the money laundering and unregistered-foreign-agent (FARA) schemes to which he

pled guilty in Count One of a superseding information in the District of Columbia.[19]

Accordingly, the tax guidelines are not appropriate here, both because the tax guidelines are not

higher, as required by § 2S1.3(c)(1),  and because the gravamen of the crime here was not solely

tax avoidance.

As part of his plea in the District of Columbia, Manafort pleaded guilty to a conspiracy to

transfer funds from outside the United States to the United States with the intent to promote the

felony FARA violations.[20]  Manafort's scheme involved more than $6.5 million dollars in

transfers from the very overseas accounts that Manafort failed to report on his tax returns and

under the FBAR process.[21]

_____

Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above."

[19]See D.C. Plea Agreement; D.C. Statement of the Offense ¶ 36-37.

[20]Id.

[21]Notably, in his objections to the PSR, the defendant falsely characterized his guilty plea in the District of Columbia as involving only a "general conspiracy to violate the Foreign Agents Registration Act,"

Finally, Manafort argues that the Part T guidelines are appropriate because they were used in older cases, such as <u>United States v. Kim</u>, <u>supra</u>, and thus should continue to be used to avoid unwarranted sentencing disparities for similar defendants.  The government disagrees for two reasons.  First, in late 2017, the Department of Justice's Tax Division clarified its interpretation as to the appropriate guidelines applicable to FBAR violations, and its current position is consistent with that of the Probation Office in this matter; and second, the facts at issue here differ from those of the <u>Kim</u> prosecution.

The Tax Division changed its position on the appropriate guideline provision in FBAR cases sometime in late 2017.  Manafort was aware of the government's position prior to this trial, at the very least because the Special Counsel's Office made clear its view that the relevant guideline is § 2S1.3.  Further, in <u>Kim</u> itself, the Tax Division and Probation Office took the position that the appropriate guideline was § 2S1.3.  <u>See</u> Kim Plea Agreement, at 3-4 (attached as Government Exhibit E) ("The Government contends that the applicable Guideline in this matter should be U.S.S.G § 2S1.3(a)(2), § 2B1.1 and § 2S1.3(b)(2) because the defendant filed two false FBARs and a false U.S. Individual Income Tax Return, Form 1020, within a 12-month period.  However, at the time that the defendant agreed to plead guilty, the Government consistently took the position with similarly situated defendants that the applicable Guideline was U.S.S.G. § 2T1.1 and § 2T1.4 due to the cross reference in § 2S1.3(c)(1).  Therefore, in order to ensure that the defendant receives equitable treatment, and in accordance with Federal Rule of Criminal Procedure 11(c)(1)(B), the United States and the defendant will recommend to

---

Def. Obj. to PSR, at 3, without any mention to the fact that his plea also included a money laundering conspiracy, among other offenses.  <u>See</u> D.C. Plea Agreement; D.C. Statement of the Offense ¶ 36-37.

the Court that the following provisions of the Sentencing Guidelines apply: [the Tax

Guidelines].”); Government Sentencing Brief, at 6 (attached as Government Exhibit F) (“The

defendant pled guilty to the willful failure to file an FBAR, in violation of 31 U.S.C. Sections

5314 and 5322.  The offense of conviction in this case falls under U.S.S.G. § 2S1.3.  The

Probation Office calculated the Guidelines range under U.S.S.G. § 2S1.3(a)(2)”).

Further, as noted, the circumstances of the <u>Kim</u> and Manafort prosecutions and the

conduct at issue are easily distinguished.  In <u>Kim</u>, the defendant entered into a negotiated plea

agreement which involved his cooperation, and the plea was entered into pursuant to Rule

11(c)(1)(B).   Manafort’s FBAR offenses, in contrast, served to facilitate his tax offenses and his

FARA and money laundering offenses.  Further, the <u>Kim</u> prosecution was part of a series of

prosecutions involving the use of overseas accounts to hide tax offenses, and thus the concern

over parity with similarly situated defendants prosecuted at the same time was at its height.

Calculating Manafort’s advisory Guidelines range under § 2S1.3 for an FBAR offense, even if he

is one of the first defendants to be sentenced in that manner, would not constitute disparate

treatment because his conduct, and the circumstances at issue, were different than in <u>Kim</u>.

### 2.   A Role Enhancement is Appropriate

The PSR concluded that Manafort should receive a four-level role enhancement for the

Group 1 offenses, pursuant § 3B1.1(a), on the basis that “the defendant was an organizer or

leader of a criminal activity that was otherwise extensive.”  PSR, ¶ 78.  The relevant test is the

number of persons involved in the offenses, whether they were witting or unwitting.  <u>See United

States v. Harvey</u>, 532 F.3d 326, 338 (4th Cir. 2008) (“The Application Note to U.S.S.G. § 3B1.1

explains that, in determining if a criminal activity is ‘otherwise extensive,’ all persons involved

13

during the course of the entire offense are to be considered, including outsiders who provided

unwitting services and thus do not qualify as 'participants.'"); United States v. Ellis, 951 F.2d

580, 585 (4th Cir. 1991) (role enhancement based on "otherwise extensive" prong based on "'all

persons involved during the course of the entire offense,' even the 'unknowing services of many

outsiders'").

Manafort's criminal conduct meets this standard.  Manafort controlled the money at

issue, he recruited others to facilitate these crimes, and he claimed a larger share of the proceeds.

Further, Manafort was plainly the leader.  He involved numerous individuals who were both

knowing and unknowing participants in the criminal scheme.  These included Gates and

Konstantin Kilimnik, Manafort's tax preparers (Ayliff, LaPorta, Naji Lakkis, Dan Walters, and

Conor O'Brien) and bookkeepers (Hesham Ali and Washkuhn), and others in Cyprus who were

involved in originating and maintaining the defendant's overseas accounts.[22]  Under the factors

set forth in the Guidelines application notes and applied by the Fourth Circuit, application of the

leadership enhancement is warranted.  See United States v. Jones, 495 F. App'x 371, 373 (4th

Cir. 2012) ("In determining a defendant's leadership and organizational role, sentencing courts

must consider seven factors: [T]he exercise of decision making authority, the nature of

participation in the commission of the offense, the recruitment of accomplices, the claimed right

to a larger share of the fruits of the crime, the degree of participation in planning or organizing

the offense, the nature and scope of the illegal activity, and the degree of control and authority

---

[22]The corporate entity and bank account documents relating to the overseas accounts listed a variety of
individuals associated with Dr. Kypros Chrysostomides firm's, including Eleni Chrysostomides,
Chrystalla Pitsilli Dekatris, Myrianthi Christou, Evelina Georgiades, and Georgoula Mavrides.  See e.g.,
Government Exhibit 63 (chart of foreign entities); Government Exhibit 73B (chart listing bank accounts).

exercised over others. U.S.S.G. § 3B1.1, cmt. n.4.").[23]  Further, even to the extent that Gates profited from this scheme, including by stealing from Manafort, his profits from these crimes paled in comparison to Manafort's gain.

### B.  Bank Fraud Guidelines (Group 2)

#### 1.  The PSR Correctly Calculated the Fraud Loss

The Probation Department assessed the fraud loss to be approximately $6 million for the counts of conviction for bank fraud together with the relevant conduct.  See PSR, at ¶ 87. Manafort contends that the assessed fraud loss is overstated because the Citizens Bank loan conspiracy relating to Union Street property charged in Count 28 never closed and, had it closed, Manafort speculates that he would have fully collateralized the loan, resulting in no loss.  See Defense Objections to PSR, at 4.  That argument ignores the trial evidence that the defendant did not intend the property he pledged as collateral to be used as such since he lied to the bank about the collateral, hiding the fact that the Union Street property had a mortgage.  At trial, the government proved that the Union Street property Manafort now claims he would have pledged as part of the loan charged in Count 28 was encumbered by a $5.3 million loan from Genesis

---

[23]In arguing against the application of a role enhancement, Manafort relies principally on the Guidelines' use of the phrase "criminal organization" and contends that role enhancements in § 3B1.1 are meant to be applied only "to leaders or managers of organizations that have a primary purpose of engaging in crime, such as foreign cartels that smuggle narcotics into the United States, or motorcycle gangs that unlawfully transport and distribute firearms."  Def. Obj. to PSR, at 5.  Manafort cites no case law endorsing his "not-in-white-collar-cases" reading of § 3B1.1, which cannot be reconciled with Fourth Circuit decisions such as Ellis and Harvey, supra.  The dog-track owner who bribed state legislators in Ellis, for example, may have done it for "the primary purpose of" helping his business, not "engaging in crime," see Def. Obj. to PSR, at 5, yet the Fourth Circuit affirmed application of the leadership enhancement to his scheme.  Ellis, 951 F.2d at 585; accord Harvey, 532 F.3d at 338 (defendant sentenced for honest-services fraud involving bribery in awarding Army contracts was assessed a role enhancement).  The defendant's argument, in short, lacks merit.

Capital at the time.[24]  Previously, the defendant applied for a loan from Citizens Bank on the Howard Street property (Counts 24 & 25), and also failed to disclose the Genesis loan on the Union Street property, which was one of several misrepresentations charged in the indictment and proven at trial.[25]

Because Manafort concealed the Genesis loan and intended to continue to do so, he is not entitled to credit based on the happenstance that the bank, through its own due diligence, eventually discovered the Genesis loan.  See United States v. Staples, 410 F.3d 484, 490-91 (8th Cir. 2005) ("We do not mean that the value of the collateral necessarily must be deducted from the intended loss; the defendant's intent is the touchstone. For example, if a car were collateral in a fraudulent loan procurement case, and the defendant were to hide the car, then the court should not deduct the value of the collateral from the *intended loss* because under those circumstances the defendant intended the loss to encompass the value of the collateral.") (emphasis added).

## 2.  The Sophisticated Means Enhancement Is Appropriate

The Probation Department assessed a two-level enhancement on the Group 2 offenses for the use of sophisticated means pursuant to USSG § 2B1.1(b)(10)(c).  PSR ¶ 88.  The defendant

---

[24]See Government Exhibit 500 (Stipulation relating to Genesis Capital); Trial Tr, at 1911-17 (Taryn Rodriguez from Citizens Bank testified that Manafort did not list the mortgage from Genesis Capital for 377 Union Street, Brooklyn, New York on his application for the Union Street loan and that she later identified the mortgage during a records check); Government Exhibit 255 (377 Union Street Uniform Residential Loan Application).

[25]See Trial Tr. at 1743-44 (Melinda James (née Francis) from Citizens Bank testified that on Manafort's Howard Street loan application, it indicated that there was no mortgage on the property at 377 Union Street, Brooklyn, New York); Government Exhibit 224 (email attaching schedule of Manafort's real estate owned and reflecting there is no mortgage on Union Street property); Trial Tr. at 1284-85 (Rick Gates testified that he understood that Manafort had a mortgage on the property at 377 Union Street, Brooklyn, New York during the time of the loan application at Citizens Bank for the Howard Street property).

objects on the grounds that "there was nothing complex about simply lying to the banks," and that the falsified documents were "simple or ham-handed."  See Defense Objections to PSR, at 4. Manafort is wrong; even if some of Manafort's conduct may have been ham-handed not all of it was.

The Guidelines affords an enhancement when "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means," U.S.S.G. § 2B1.1(b)(10)(c).  Application Note 9 defines "sophisticated means" as:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

Id. § 2B1.1 cmt. n. 9.

Here, the defendant's conduct qualifies for the enhancement, as he routinely hid relevant transactions, falsified documentation, and made misrepresentations relating to an offshore transaction (and the existence of those assets).  For example, for the two Citizens Bank loans, Manafort hid the true nature of his foreign Peranova "loan".  Manafort had first claimed the $1.5 million from Peranova, an offshore entity that he controlled, as a "loan" on his tax returns (to avoid paying taxes on the money), and when the bank needed to see less debt and more income for 2015, Manafort claimed the loan was forgiven, created a back-dated letter purporting to document the forgiveness, and instructed his tax preparer to forward that letter to the bank.[26]

_____

[26]See Trial Tr. at 944-69 (Testimony of Cindy LaPorta).

Further, for four of the five loans, Manafort materially misstated the Profit and Loss Statement from his business for the years 2015 and 2016, hiding his true income, requested those documents from his bookkeeper, altered them, and then submitted them to the bank.[27]

With respect to the Citizens Bank loan charged in Count 24, Manafort hid the mortgage on the Union Street property, and went to great lengths to do so including having Gates contact the mortgage broker (Donna Duggan) and having her forward an older version of the mortgage binder for the property.[28]  On the Banc of California fraud charged in Counts 27 and 28, Manafort hid the Howard Street mortgage.  For The Federal Savings Bank loans charged in Counts 29 through 32, Manafort hid outstanding American Express debt and delinquency, falsely claiming that debt to be a loan to Gates and sending a letter to that effect to the bank.  See United States v. Davis, No. 18-4080, 2018 WL 5096070, at *1 (4th Cir. Oct. 18, 2018) (unpublished) (affirming application of the sophisticated means enhancement applies where the defendant created a "multilayered scheme" and "used numerous means to conceal the fraud, including forgery, altering documentation, transferring money between accounts, and omitting property from certain accountings").

---

[27]See Trial Tr. at 601-30 (Testimony of Heather Washkuhn).

[28]See Trial Tr. at 1284-86 (Gates testified that at Manafort's direction he contacted Manafort's insurance broker and requested an old copy of the insurance binder with respect to the Union Street property, which did not reflect the current mortgage, and that he was aware that the older version was then sent to the bank to hide the fact that there was currently a mortgage on the Union Street property).

### 3.  A Role Enhancement is Appropriate For the Group 2 Crimes

The Group 2 criminal conduct involved multiple parties, individuals who were both

knowing and unknowing with respect to the scheme, including co-conspirators Gates and Jeffrey

Yohai, and more than a dozen bankers, accountants, and Manafort's bookkeepers and tax

preparers.[29]  Manafort, moreover, was the primary beneficiary of the frauds.  Based on the

criteria in the application note and the case law cited above, the role enhancement is equally

appropriate for the Group 2 bank fraud offenses.

### C.  The Defendant Did Not Accept Responsibility

Finally, the PSR properly denied Manafort any reduction for acceptance of responsibility

pursuant to § 3E1.1.  PSR ¶ 96.  Manafort proceeded to trial and vigorously denied his guilt.

Although a trial alone does not necessarily preclude an acceptance reduction, it almost always

does in circumstances like those here.  Application Note 2 to § 3E1.1 suggests that the situations

where a defendant proceeds to trial and qualifies for an acceptance reduction are rare, and are

often limited to circumstances where the defendant proceeds to trial to challenge the

constitutionality of a statute, or some other legal issue, and not the facts.  See § 3E1.1,

Application Note 2.  That was not the case here.  See e.g., United States v. Redding, 422 F.

App'x 192, 195 (4th Cir. 2011) (unpublished) ("Because Redding put the government to its

burden of proof and went to trial challenging his factual guilt, the district court was correct in

finding the two-level reduction was inappropriate.").  Manafort cites no authority for the

---

[29]For example, from Citizens Bank at least the following individuals were involved: David Fallarino, Melinda James (née Francis), Taryn Rodriguez, and Peggy Miceli; from the Banc of California, Perris Kaufman and Gary Seferian; and from The Federal Savings Bank: Anna Ivakhnik, Dennis Raico, Thomas Horn, James Brennan, and Steve Calk; from Nigro Karlin (the bookkeeper): Heather Washkuhn; and from KWC: Cindy LaPorta and Philip Ayliff.

proposition that a later plea in another prosecution—even one involving some of the same facts—negates the fact that he put the government to its proof in the Eastern District of Virginia.

Further, the defendant has now conceded that he breached his plea agreement in the District of Columbia, and on February 13, 2019, in a ruling from the bench, Judge Jackson found by a preponderance of the evidence that Manafort intentionally lied to the government as to three subject areas, and had not with respect to two others.  The DC Court also issued an order documenting those findings.  United States v. Manafort, 1:17-cr-201 (ABJ) (D.D.C. February 13, 2019), Doc 509 (attached as Exhibit G).

Finally, the defendant's failure to file the required financial information with the Probation Department, in either district, is further evidence of his failure to accept responsibility, particularly here, where the defendant was convicted of financial crimes, including hiding his income and assets.

V.      **Statutory Sentencing Factors Pursuant
        To Title 18, United States Code, Section 3553(a)**

The government addresses the Section 3553(a) factors below.

A.  **The Nature and Circumstances of the Offense**

Manafort's criminal conduct was serious, longstanding, and bold.  He failed to pay taxes in five successive years involving more than $16 million in unreported income—and failed to identify his overseas accounts in those same returns—resulting in more than $6 million in unpaid taxes.  In four successive years from 2011 to 2014, Manafort failed to report his overseas accounts to the Treasury Department, and over that period he maintained 31 accounts in three

20

foreign countries collectively holding more than $55 million in multiple currencies.[30]  As for his

bank fraud offenses, Manafort defrauded not one financial institution but three, and sought five

loans from those banks, seeking more than $25 million.

Tax fraud is a serious crime and violates the most basic covenant between citizens and

the government.  See United States v. Zukerman, 897 F.3d 423, 428 (2d Cir. 2018) ("[t]ax crimes

represent an especially damaging category of criminal offense" which "strike[] at the foundation

of a functioning government'") (citation omitted), pet. for cert. filed, No. 18-642 (Nov. 19,

2018).  The defendant benefited from the protections and privileges of the law and the services

of his government, while cheating it and his fellow citizens.  See United State v. Trupin, 475

F.3d 71, 76 (2d Cir. 2007) (tax evader effectively "[steals] from his fellow taxpayers through his

deceptions.").

The defendant's failure to file foreign bank account reports is also significant.  FBAR

regulations facilitate the identification of "persons who may be using foreign financial accounts

to circumvent United States law," whether those funds are used for "illicit purposes or to identify

income maintained or generated abroad."  See IRS FBAR Reference Guide, at 2

(https://www.irs.gov/pub/irs-utl/irsfbarreferenceguide.pdf).  Here, Manafort's FBAR offenses

were more serious than that of a defendant who simply hides his income, like the defendant in

Kim.  Manafort used his foreign accounts not only to hide his income, but to launder funds,

including by engaging in transactions that promoted his FARA scheme.

---

[30]See Government Exhibit 73B (FBAR Chart for 2011), Government Exhibit 73C (FBAR Chart for 2012), Government Exhibit 73D (FBAR Chart for 2013), Government Exhibit 73E (FBAR Chart for 2014); Government Exhibit 74 ("Deposit Analysis – Foreign Source of Funds Received by Foreign Accounts," listing total as $65,860,502.50).

Finally, the defendant's bank fraud offenses are also serious, both for the number and amount of the loans and the conduct involved.  Bank fraud undermines the stability of our financial system and the federally insured financial institutions that citizens rely upon that those statutes seek to protect.  See United States v. Koh, 199 F.3d 632, 638 (2d Cir. 1999) (recognizing that Congress, in part through passage of the bank fraud statute,  "clearly intended to protect 'the financial integrity' of institutions in which it had a strong federal interest, including those that are 'federally created, controlled or insured'") (quoting S. Rep. No. 98–225, at 377 (1983)). Manafort sought five loans totaling more than $25 million and secured funding in the amount of more than $19 million.  Those facts set him far afield from the ordinary bank fraud defendant.

As noted, these were not short-lived schemes.  Manafort's crimes were the product of his planning and premeditation over many years, and a result of his direct and willful conduct. Manafort's tax crimes by any account were serious, and more serious than most given the amount of money at issue and the fact that his failure to pay the taxes owed was not caused by any necessity but simple greed.  Manafort had ample funds to cover these tax payments.  He simply chose not to comply with laws that would reduce his wealth.  And along the way, each year, in order to successfully implement the tax scheme the defendant involved numerous other people, including both witting and unwitting participants.  In every scheme, Manafort was always the principal, and almost always the exclusive beneficiary.

### B.  History and Characteristics of the Defendant

Manafort's history and characteristics are aggravating factors.  Manafort has had every opportunity to succeed.  He is well educated and a member of the legal profession, attending

Georgetown University for college and law school.  He was a successful political consultant both in the United States and abroad.[31]

Further, while the defendant is 69 years old and has suffered reputational harm as a result of his conviction, neither is a mitigating factor.   Part H of Chapter 5 of the Sentencing Guidelines addresses age, and in effect provides that age can be considered "individually or in combination with other offender characteristics," when "present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  U.S.S.G. § 5H1.1. Nothing about the defendant's age is unusual.  Tax offenders are often older and often, like the defendant, wealthy, but they nonetheless receive substantial terms of incarceration notwithstanding age and health issues.  See, e.g., United States v. Dibbi, 413 Fed. Appx 618, 620 (4th Cir. 2011) (affirming sentence of 30 months for tax fraud and decision not to grant a downward variance based on the defendant's health and age); United States v. Gilmartin, 12-cr-287 (MGC) (SDNY) (defendant, age 70, sentenced to 48 months imprisonment for evading taxes and failing to file federal and state tax returns for over 20 years, where the tax loss was approximately $1.7 million).[32]

---

[31]See Trial Tr. at 2436 (defense closing argument citing witness testimony of Tad Devine and Dan Rabin describing Manafort as a talented political consultant and citing documents detailing Manafort's work for the presidential campaigns of Gerald Ford, Ronald Reagan, George H. W. Bush, Bob Dole, and Donald Trump); see Trial Tr. at 1133-34 (Rick Gates testified that Manafort was "probably one of the most, you know, politically brilliant strategists I've ever worked with.").

[32]See also United States v. Jackson, 10-cr-298 (CM) (SDNY) (defendant, age 57, sentenced to 63 months imprisonment for his work as a tax preparer who used a variety of deceptive practices—including claiming deceased children as dependents—as part of a scheme to prepare false tax returns and where the tax loss was approximately $1 million); United States v. Catlett, 10-CR-101 (D. Md) (defendant, age 64, sentenced to 210 months imprisonment, related to filing 275 fraudulent tax returns reporting over $22 million in false Schedule E losses, resulting in a federal tax loss of $3.8 million).

Manafort's age does not eliminate the risk of recidivism he poses—particularly given that his pattern of criminal activity has occurred over more than a decade and that the most recent crimes he pled guilty to occurred from February to April 2018, when he conspired to tamper with witnesses at a time when he was under indictment in two separate districts.   Further as Judge Jackson found, Manafort's misconduct continued as recently as October 2018 when he repeatedly and intentionally lied to the government during proffer sessions and the grand jury.

Courts also have rejected the premise that the reputational harm incident to every criminal conviction is a valid basis for reducing the term of imprisonment imposed on a white-collar offender such as Manafort.  Nothing about that harm, or the collateral consequences that Manafort faces, was unforeseeable at the time that he chose to engage in the charged conduct. Manafort chose to commit multiple bank frauds, even when the subject of national attention in 2016.  See, e.g., United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible for a court to impose a lighter sentence on a white-collar defendant than on blue-collar defendants because it reasons that white-collar defendants suffer greater reputational harm or have more to lose by conviction.").

### C.  The Need to Promote Respect for the Law and to Afford Adequate Deterrence to Criminal Conduct

The sentence should serve to promote respect for the law and to afford both adequate specific and general deterrence as intended by Congress.  With respect to general deterrence, the sentence should send a clear message that repeated choices to commit serious economic crimes have serious consequences, particularly in a matter that received national attention.

The Fourth Circuit has stressed the heightened importance of general deterrence in tax cases, and in particular the need for incarceration, given the prevalence of tax offenses and the

comparatively few prosecutions.  See United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010)

("Given the nature and number of tax evasion offenses as compared to the relatively infrequent

prosecution of those offenses, we believe that the [Sentencing] Commission's focus on

incarceration as a means of third-party deterrence is wise.  The vast majority of such crimes go

unpunished, if not undetected.  Without a real possibility of imprisonment, there would be little

incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward

path.").  Courts have recognized that tax prosecutions are difficult and time consuming to

investigate and prosecute, and require substantial resources.  See Zukerman, 897 F.3d at 429

(general deterrence has an important role in tax cases "due to the significant resources required

to monitor and prosecute tax cases," which cost the government hundreds of billions of dollars

annually) (internal quotation marks omitted); see also U.S.S.G Ch. 2, Part T, intro. cmt.

(explaining that, in light of "the limited number of criminal tax prosecutions relative to the

estimated incidence of such violations, deterring others from violating the tax laws is a primary

consideration underlying these guidelines," and that "[r]ecognition that the sentence for a

criminal tax case will be commensurate with the gravity of the offense should act as a deterrent

to would-be violators").

Tax evasion through the use of offshore entities and bank accounts is among the most

lucrative offenses and often the most difficult to investigate, which increases the need for strong

deterrence and a meaningful sentence.  See United States v. Hefferman, 43 F.3d 1144, 1149 (7th

Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those

offenses that either are lucrative or are difficult to detect and punish, since both attributes go to

increase the expected benefits of a crime and hence the punishment required to deter it.").  Bank

fraud, while more common, is equally serious and the need for deterrence is also strong in light of the need to protect the integrity of the nation's banking system.

### D.   The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a) also requires a sentence that is generally consistent with others imposed on similar offenders for similar offenses; courts are instructed "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). First, in this case, there are no similarly situated charged defendants, as Manafort's co-defendant, Gates, was subservient to Manafort, and he accepted responsibility, pled guilty, and cooperated early in this investigation. The crimes at issue involved Manafort's taxes and overseas accounts, not Gates'. With respect to the bank loans, Manafort, not Gates, principally received the proceeds. Second, given the breadth of Manafort's criminal activity, the government has not located a comparable case with the unique array of crimes and aggravating factors.

## VI.   Conclusion

For a decade, Manafort repeatedly violated the law. Considering only the crimes charged in this district, they make plain that Manafort chose to engage in a sophisticated scheme to hide millions of dollars from United States authorities. And when his foreign income stream dissipated in 2015, he chose to engage in a series of bank frauds in the United States to maintain his extravagant lifestyle, at the expense of various financial institutions. Manafort chose to do this for no other reason than greed, evidencing his belief that the law does not apply to him. Manafort solicited numerous professionals and others to reap his ill-gotten gains. The sentence

in this case must take into account the gravity of this conduct, and serve to both specifically deter Manafort and those who would commit a similar series of crimes.


Dated: February 15, 2018                    /s/ _____
                                            Andrew Weissmann
Uzo Asonye                                  Greg D. Andres
Assistant United States Attorney            Brandon L. Van Grack
Eastern District of Virginia                Senior Assistant Special Counsels
                                            Special Counsel's Office
                                            U.S. Department of Justice
                                            950 Pennsylvania Avenue NW
                                            Washington, D.C. 20530
                                            Telephone: (202) 616-0800

                                            *Attorneys for United States of America*