# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 1:18-cr-00083-TSE |
| | ) | |
| v. | ) | Judge T.S. Ellis, III |
| | ) | |
| PAUL J. MANAFORT, JR., | ) | |
| | ) | Sentencing: March 7, 2019, 3:30 p.m. |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Paul J. Manafort, Jr. comes before the Court for sentencing after having been convicted at trial of five counts of subscribing false income tax returns, one count of failing to file a foreign bank account report ("FBAR"), and two counts of bank fraud.  Mr. Manafort acknowledges that he received a fair trial before this Court, he accepts the jury's verdict, and is truly remorseful for his conduct.  Mr. Manafort submits this sentencing memorandum to aid the Court in determining an appropriate sentence under 18 U.S.C. § 3553(a).

The U.S. Probation Office ("Probation") has calculated, under the U.S. Sentencing Guidelines ("Guidelines"), an advisory sentencing range of 235 to 293 months' imprisonment. This range—roughly 19.5 to 24 years—is clearly disproportionate to the offense conduct for which Mr. Manafort was convicted.  In its submission the Special Counsel's Office takes no specific sentencing position.  *See* Special Counsel Sentencing Submission (Doc. 314) ("SCO Memo.") at 1.  The defense submits that a sentence substantially below the range calculated by Probation is warranted in light of the fact that the defendant is a first-time offender and given the nature of the offenses for which Mr. Manafort was convicted.

## BACKGROUND

For nearly his entire career, Mr. Manafort worked for elected officials and operated businesses engaged in political consulting and public affairs work in the United States and around the globe. He worked hard and was proud of what he achieved. Mr. Manafort's career culminated in serving as an advisor and campaign chairman for then-candidate Donald J. Trump's successful presidential campaign in 2016.

Shortly after Mr. Trump's election, the Acting Attorney General appointed the Special Counsel to investigate allegations that Mr. Trump's campaign colluded with the Russian government to influence the 2016 election. In October 2017, unable to establish that Mr. Manafort engaged in any such collusion, the Special Counsel charged him in the District of Columbia with crimes unrelated to Mr. Manafort's work on the 2016 campaign.[1] Several months later, in February 2018, Mr. Manafort was charged in this District with tax fraud, failing to report foreign bank accounts, and bank fraud—allegations, again, that were unrelated to the 2016 campaign or any collusion with the Russian government.[2] On June 15, 2018, the Special Counsel brought new allegations in the District of Columbia that Mr. Manafort conspired with another individual to obstruct justice by contacting two potential witnesses which resulted in the revocation of Mr. Manafort's bail by the Court in the District of Columbia. He has since been incarcerated for almost nine months in protective solitary confinement.

---

[1] Mr. Manafort's subsequent guilty plea in the District of Columbia case includes no charges that he colluded with the Russian government to influence the 2016 election.

[2] The Special Counsel's strategy in bringing charges against Mr. Manafort had nothing to do with the Special Counsel's core mandate—Russian collusion—but was instead designed to "tighten the screws" in an effort to compel Mr. Manafort to cooperate and provide incriminating information about others. Tr. of May 4, 2018 Motions Hearing at 5.

As the Court is well aware, Mr. Manafort did not plead guilty in this case. Instead, he exercised his constitutional right to jury trial on July 31, 2018. On August 21, 2018, the jury found Mr. Manafort guilty on eight counts: subscribing to false income tax returns (Counts 1-5), failure to report his interest in foreign financial accounts (Count 12), and bank fraud (Count 25 and Count 27). The jury could not reach a unanimous verdict on the remaining charges and the Court declared a mistrial on the ten other counts (Counts 11, 13-14, 24, 26, and 28-32), which were subsequently dismissed without prejudice.

Shortly after his conviction in Virginia, Mr. Manafort entered a plea of guilty to a superseding information filed in the District of Columbia. In his plea agreement in that case, Mr. Manafort accepted responsibility for those charges, acceded to a substantial forfeiture order, *and admitted his guilt with respect to the conduct involved in the remaining charges in this case*. Mr. Manafort agreed to cooperate with the Special Counsel's Office and, as set forth below, met with attorneys and investigators from the government numerous times. He also testified before a grand jury in the District of Columbia on two occasions.[3]

---

[3] More specifically, his cooperation has included a dozen interviews by the Special Counsel's attorneys and investigators totaling more than 50 hours. Mr. Manafort has also provided the Special Counsel with access to requested electronic devices. Finally, the defendant has provided assistance to the Special Counsel's Office in transferring his assets pursuant to the forfeiture order filed in the District of Columbia.

It should be noted that the Special Counsel contends that Mr. Manafort made intentional misrepresentations regarding five areas of inquiry; the District of Columbia court, using a preponderance standard, determined that false statements occurred with respect to three of those topic areas. (Doc. 314 at 20). The defendant acknowledges the DC court's finding but continues to dispute that he made intentionally false statements. (*United States v. Manafort*, 17-201-ABJ (D.D.C.) Doc. 527 at 37). This is important because the Special Counsel now asks this Court to consider the alleged misrepresentations not only with respect to the advisory Guidelines calculation in the case at bar, but also concerning one of the mandatory sentencing factors. (Doc. 314 at 19-20; 22-24). The Special Counsel does so without providing all unredacted evidence or background materials so that this Court may *independently* assess and come to its own findings as it pertains to the sentencing in *this* case.

The Special Counsel's attempt to vilify Mr. Manafort as a lifelong and irredeemable felon is beyond the pale and grossly overstates the facts before this Court.  The Special Counsel's conduct comes as no surprise, and falls within the government's pattern of spreading misinformation about Mr. Manafort to impugn his character in a manner that this country has not experienced in decades.[4]  Indeed, the Department of Justice (DOJ) Inspector General reviewed the DOJ and the FBI's actions in advance of the 2016 presidential election and found a pattern of unauthorized leaks of non-public information by the FBI officials to media outlets.  *See generally* Office of the Inspector General, U.S. Department of Justice, *A Review of Various Actions by the Federal Bureau of Investigation and the Department of Justice in Advance of the 2016 Election* (Oversight and Review Div. 18-04) (June 2018).  More recently, a senior Treasury Department official was charged with leaking information concerning suspicious activity reports (SARs) related to Mr. Manafort (and others) to a reporter.  *See United States. Edwards*, 19-cr-00064-GHW (S.D.N.Y. (Complaint filed Oct. 16, 2018)).  Mr. Manafort's motion for an investigation regarding improper disclosures of confidential material remains pending in this case.  (*See* Doc. 43.)

The cases that Special Counsel have brought against Mr. Manafort have devastated him personally, professionally, and financially.  The charges and associated publicity have brought intense, negative media coverage and scrutiny, have destroyed his career, and have resulted in financial hardship for Mr. Manafort and his family.

## **ARGUMENT**

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second

---

[4] *See, e.g.*, Martin London, *Spiro Agnew's Lawyer: How the Russia Leaks Could Backfire in Court*, Time.com (June 7, 2017) (*available at*: http://time.com/4808890/donald-trump-russiainvestigation-leaks/).

paragraph of the statute.  *See United States v. Shortt*, 485 F.3d 243, 248 (4th Cir. 2007).  In undertaking its analysis, the Court must give consideration to the advisory sentencing range recommended by the Guidelines and any relevant Guideline policy statements, as well as other traditional sentencing factors, such as:

(1) the nature of the offense and history and characteristics of the defendant;

(2) the purpose of sentencing;

(3) the kinds of sentences available;

(4) the Sentencing Guidelines;

(5) pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted disparities among similar offenders; and

(7) the need to provide restitution to victims.

*See* 18 U.S.C. § 3553(a).

Nearly twenty years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).  The Guidelines are no longer "the only consideration" at sentencing.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations.  *Id.*; *accord Cunningham v. California*, 549 U.S. 270 (2007).  While a sentencing court must consider the Guidelines as a starting point, a court should not presume "that the Guidelines range is reasonable."  *Gall*, 552 U.S. at 50.  Instead the Court is to impose sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id.*  Moreover, the Court need *not* find "extraordinary circumstances to justify a sentence outside of the Guidelines range."  *Id.* at 47.

As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[5]  This is especially true in white collar and tax cases such as this case, where the sentencing range is largely determined by escalating loss enhancements pursuant to USSG §§ 2B1.1 and 2T1.1, an increasingly criticized approach that usually results in draconian advisory Guidelines.  *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also United States v. Parris*, 573 F. Supp. 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life."). The Supreme Court's decisions in *Gall*, *Cunningham*, and *Kimbrough v. United States*, 552 U.S. 85 (2007), significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines, and in this case the Court should exercise its broad discretion and impose a sentence substantially below the Guidelines calculated by Probation, especially since Mr. Manafort has been held in protective solitary confinement for almost nine months and has agreed to forfeit the vast majority of his assets accumulated over a lifetime of work per the plea agreement in the District of Columbia.

---

[5] Terry Carter, *Rakoff's stance on the SEC draws fire, praise—and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

1.  **The Nature and Circumstances of the Offense**

    a)  **Offense Conduct**

In this case, Mr. Manafort was convicted of subscribing false income tax returns, failing to file an FBAR, and engaging in bank fraud (although there is no evidence that he purposely sought to inflict financial harm as to any of the relevant banks). Having presided over Mr. Manafort's trial, the Court is familiar with the charges and evidence; therefore, a detailed recitation of the facts is not included in this memorandum. Mr. Manafort acknowledges that he established foreign bank accounts at the behest of his foreign clients for whom he performed consulting work in Ukraine, but thereafter transferred untaxed funds from those accounts to the United States to pay vendors for goods and services and to purchase and improve real estate. Mr. Manafort further admits that he intentionally failed to report his interest in the foreign accounts to the Treasury Department. He did not report this income or these foreign accounts to the Internal Revenue Service ("IRS"). Mr. Manafort also acknowledges that, in connection with bank loan applications, he provided false information to Citizens Bank, the Banc of California, and The Federal Savings Bank, although as discussed below, he did not specifically intend to cause losses to any of these banks. *See* USSG § 2B1.1(b)(1), App. Note 3(A)(ii) ("intended loss" defined, in relevant part, as "the pecuniary harm that the defendant *purposely sought* to inflict[.]") (emphasis added).

    b)  **Related Conduct**

As reflected in his plea agreement in the District of Columbia, Mr. Manafort has also admitted to other criminal conduct and agreed to cooperate with the Special Counsel's Office. Specifically, Mr. Manafort admitted to the offense conduct underlying the hung counts in this District.

## 2.    The History and Characteristics of the Defendant

### a)  Personal Life

Mr. Manafort comes from humble beginnings and he worked hard to succeed.  His grandfather arrived from Italy in the early twentieth century.  Mr. Manafort grew up in a blue-collar family with close ties to their community.  His grandfather established a small construction company in Connecticut that became successful.  Mr. Manafort's father also worked for the company, which continues to operate and is still managed by members of the Manafort family.

In 1971, Mr. Manafort became the first member of his family to graduate from college, earning degrees with honors from Georgetown University in business administration and economics.  In 1974, Mr. Manafort earned a law degree from the Georgetown University Law Center.  In 1978, he married his wife, Kathleen.  They have two daughters together, Jessica and Andrea, and two young grandchildren, with more on the way.

Many already assume they "know" Mr. Manafort from the numerous—and mostly negative—press reports about him and his work as a political consultant in Ukraine.  Others view him adversely solely because of his work during the 2016 campaign on behalf of President Trump.  Those who truly know him, however, paint a very different picture of the man.

Mr. Manafort's wife, Kathleen, writes to the Court about how her husband of 40 years has always put her and his children first and foremost despite a career filled with grueling travel schedules and high-pressure assignments.[6]  Mrs. Manafort describes her and Mr. Manafort as a "great team" and a "partnership of equals" that has shared many memories, challenges, and sacrifices.[7]  She also describes how Mr. Manafort "encouraged me to be my own person and follow

---

[6] *See* Lttr. of Kathleen Manafort, annexed hereto as Exhibit A.

[7] *Id.*

8

my own interests and have my own career" and never viewed her as a traditional housewife dependent on him.[8]

Kathleen recalls one particular instance where Mr. Manafort turned down an invitation to a private dinner with then-Vice President George H.W. Bush because the dinner conflicted with Andrea's graduation from the Brownies to the Girl Scouts. She recalls:

> I will never forget overhearing [Mr. Manafort's] response to a colleague that later asked him why he would miss such an important event, [Mr. Manafort stated] "[i]n 25 years no one will remember if I was at that dinner, but my daughter will remember that I was at her graduation." I can assure you that he wanted to be at that dinner very badly, but he didn't hesitate, he didn't complain, and most importantly, he was right.[9]

Mrs. Manafort goes on to detail how, in addition to his unwavering and empowering support for his daughters, Mr. Manafort provided the same support for her, in particular, as she worked through law school night classes, and, most significantly, when she suffered a very serious brain injury and faced a long, uncertain recovery.[10] Mrs. Manafort also details how her husband's support extended to family members such as her own parents as they got older, her sister-in-law, who suffers from spina bifida and needed a handicapped-accessible home, and nieces and nephews who needed help with their educations.[11] Mrs. Manafort describes her husband as "the rock the family has relied on for years."[12]

Mr. Manafort's daughter, Andrea Shand, has also written to the Court to provide insight into her father's true character. Her letter is filled with memories of her father from her childhood,

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

examples of his generosity with his time and resources for both his immediate and extended family, and the fortitude he displayed after he had been indicted but still stayed up late at night to help Andrea care for her newborn son.[13]   We urge the Court to review Andrea's entire letter, but highlight a particularly poignant section here:

> As a father, he has not just taught me the importance of being generous or selfless, but he has shown me what that really means and how to practice it. This is something that I hope to emulate with my own children.  I love my dad more than words can describe.  I am so blessed that he is my father and I wouldn't change that for anything in the world.  While I know that he is not perfect, I love him just as much as if he was.  Because he is truly a good man.  Something I wish more people would have the opportunity to see – and not just for his sake but for their own.  Because knowing him and learning from him has given me faith in humanity and shown me the goodness that people are capable of.  And I know he is more than worthy of forgiveness just like every person under God is.[14]

A long-time friend, David Bennett, recalls in his letter to the Court how he came to know Mr. Manafort when their daughters attended elementary school together.[15]   That turned into a life-long friendship.  Mr. Bennett describes Mr. Manafort as "a natural leader" and a "compassionate" and "loyal . . . family man."[16]   Another long-time friend and neighbor, Lt. Col. (Ret.) Wayne Holland—who testified as a witness for the Special Counsel in the trial before this Court—has written to describe that, despite his very busy work schedule, Mr. Manafort always made time for his friends and family during family milestones, both happy and sad, such as weddings, funerals, and their children's graduations and sporting events.[17]   It is rare for a government witness to write

---

[13] *See* Lttr. of Andrea Shand, annexed hereto as Exhibit B.

[14] *Id.*

[15] *See* Lttr. of David Bennett, annexed hereto as Exhibit C.

[16] *Id.*

[17] *See* Lttr. of Lt. Col. (Ret.) Wayne Holland, annexed hereto as Exhibit D.

a letter to the Court asking for leniency for a defendant at the time of sentencing. Mr. Holland hopes that he will see his old friend soon.

Mr. Manafort grew up with his first cousin, David Cimadon, who recalls how they spent time playing basketball at the Boys Club and how Mr. Manafort has been a steadfast member of his family; in more recent years, Mr. Manafort has provided him with emotional support and offered to help his family because Mr. Cimadon's wife suffers from Alzheimer's disease.[18]

Mr. Manafort's friend from elementary school, Bart Mazzarella, served as an altar boy with Mr. Manafort, played football with him, and recalls that in 9th grade Mr. Manafort became his school's class president due to "his likability and his leadership ability (that was evident even back then)."[19] Mr. Mazzarella describes Mr. Manafort as "a consummate gentleman, always a good sport and someone we all looked up to."[20]

In his letter to the Court, Kathy Manafort's cousin, Jeff Richards, shares many examples of Mr. Manafort's kindness and generosity over the years, but one particular example reflects how Mr. Manafort often used his political experience to help those in need. Mr. Richards writes:

> There were many times when [Mr. Manafort] was asked for favors. My youngest sister, studying in Italy, fell for a young Iraqi street painter who had run away after all three of his brothers had been killed in the Iran-Iraq war. Agents from Iraq found him, raided his room in Italy and took all his papers. In desperation, my sister asked Paul to help, though she and Paul hardly knew each other. Paul helped him obtain a Green Card, helped him out of that dangerous situation, and helped him find work here. This is just one example, as Paul would always make time to help others.[21]

---

[18] *See* Lttr. of David Cimadon, annexed hereto as Exhibit E.

[19] *See* Lttr. of Bart Mazzarella, annexed hereto as Exhibit F.

[20] *Id.*

[21] Lttr. of Jeff Richards, annexed hereto as Exhibit G.

The list goes on.  In his letter to the Court, Mr. Manafort's youngest brother, Dennis Manafort, recalls how his older brother helped pull him from the clutches of drug addiction and get back on his feet after a difficult period.  He writes:

> Paul has always been there for me, especially after I was divorced and he never gave up on me when I ended up being addicted to drugs myself. My brother was by my side at my darkest hour.  It was because of his support and love that helped me pull my life back together.  This was a very long battle, and he never gave up.  I have been sober for many years now, I have a home and a steady job, and my brother never forgets to remind me how proud he is.[22]

Thom Bond, Mr. Manafort's brother-in-law, writes about how Mr. Manafort stepped up to help when Mr. Bond was diagnosed with cancer, when Mr. Bond's parents needed medical care and adult housing, and how Mr. Manafort took an interest in and looked after his employees.[23] Stacy Bond recalls how when she first met Mr. Manafort she felt intimidated but quickly recognized that "[h]e is a man with a big heart" who formed a special bond with Mrs. Bond's daughter and he helped provide for her over the years.[24]  Rosann Garber Brodie, a long-time family friend, writes about how Mr. Manafort is the "glue" holding their circle of friends together and that Mr. Manafort's friends include "doctors, an electrician, a personal trainer, a receptionist, a UPS worker and housewives."[25]  She notes that they are all "lost without [Mr. Manafort] these days."[26]

---

[22] Lttr. of Dennis Manafort, annexed hereto as Exhibit H.

[23] *See* Lttr. of Thom Bond, annexed hereto as Exhibit I.

[24] *See* Lttr. of Stacy Bond, annexed hereto as Exhibit J.

[25] Lttr. of Rosann Garber Brodie, annexed hereto as Exhibit K.

[26] *Id.*

Probably one of the most poignant examples of the *true* Paul Manafort is reflected by how he stepped up after his middle brother Bob's death at a young age.  In her letter to the Court, Mr. Manafort's niece, Starr Manafort, recalls how, after her father passed away when she was just seven years old, Mr. Manafort stepped in as a loving and supporting father figure who cared for Starr as though she was his own daughter.[27]  Mr. Manafort supported Starr's development and education by paying her school expenses and mentoring her as she embarked on her career.[28]  She writes that Mr. Manafort:

> [H]as provided financial and emotional support in times when I have felt so stuck in my life that it has seemed impossible to move forward.  All it took is one phone call or email to my Uncle and my situation would be improve one way or another.  He is the rock upon which our family supported and the ground from which our success grows.  The hardest thing about these past two years has been not having him here to celebrate our joys, ease or sorrows and fix our problems.[29]

Mr. Manafort's friend, Nicholas Panuzio, who has known Mr. Manafort for almost 50 years, recalls how, following his brother's death, Mr. Manafort essentially adopted Starr "and treated her with the same love and devotion as his two biological daughters" and has "supported Starr in each developmental phase of her life with whatever resource was needed."[30]

These supportive letters from Mr. Manafort's family and friends dispel the mistaken impression of Mr. Manafort.  He is a loyal and compassionate man upon whom his immediate family, his extended family, and his friends have relied for decades for support and guidance.  The fact that these individuals are willing to submit letters of support for Mr. Manafort under the

---

[27] *See* Lttr. of Starr Manafort, annexed hereto as Exhibit L.

[28] *Id.*

[29] *Id.*

[30] Lttr. of Nicholas Panuzio, annexed hereto as Exhibit M.

circumstances of this high-profile case—which has received negative media attention beyond compare—is a testament to just how much Mr. Manafort is admired by those who *truly* know him.

There are many others who support Mr. Manafort and hope that his current situation will end soon; however, they were not comfortable publicly expressing their thoughts about and experiences with Mr. Manafort out of fear that they will be subjected to harassment and ridicule. In fact, Mr. Manafort himself has expressly asked that some individuals not include a letter of support out of concern for the potential impact a public filing may have on their personal and/or professional lives.

### b)  Business Life

#### *Government Service and Contributions to the U.S. Political Process*

Mr. Manafort has spent his life advancing American ideals and principles.  He has served as a trusted advisor to four United States Presidents.  Mr. Manafort began his career in the Ford Administration, where he served as Associate Director in the Office of Presidential Personnel and acted as liaison between the White House, international and national security, and energy-related departments for all Presidential appointments.  Next, President Ronald Reagan appointed Mr. Manafort as a Director of the Overseas Private Investment Corporation.  Thereafter, Mr. Manafort served in the Reagan Administration as a member of the Investment Policy Advisory Committee at the Office of the U.S. Trade Representative.  With strong organizational and leadership skills, Mr. Manafort was a consultant, strategist and coordinator for the campaigns of Presidents Gerald Ford, Ronald Reagan, George H.W. Bush, and Donald J. Trump, as well as for Senator Bob Dole in his 1996 campaign effort.  In all, Mr. Manafort has advised elected officials at the federal, state, and local levels for over 30 years.

### *International Consulting Work*

During his years outside of government service, Mr. Manafort worked with world leaders. Mr. Manafort has spent a lifetime promoting democratic values and assisting emerging democracies to adopt reforms necessary to become a part of Western society.  At times, he interacted with politicians and business people in emerging countries to assist in the development of beliefs of equal justice, human rights and free markets.  As an experienced strategist, Mr. Manafort often found ways to build bridges and create economic opportunities between those individuals, their countries and the United States.  As part of his work, Mr. Manafort created, organized, and conducted leadership and educational programs that helped establish functioning democratic processes to oversee elections.  He educated election officials in connection with election management techniques and procedures.  Mr. Manafort also created and managed international election observer programs in over 25 countries.  Mr. Manafort's efforts highlighted the opportunities and benefits of the American system and fostered substantial relationships between the United States and other countries.

One example of the impact that Mr. Manafort's work has had can be found in how he persuaded Kenya's former president in 1989 to send a message to the international community by publicly burning millions of dollars' worth of ivory obtained by illegal elephant poaching.  This event, which was featured on the cover of *Time*, together with Mr. Manafort's advocacy in the United States, led the government to declare elephants an endangered species and led Congress to pass the African Elephant Conservation Act.  Another example of Mr. Manafort's impact can be found in the Caribbean Basin Initiative, which Mr. Manafort helped implement during the Regan administration and which became a landmark program to spread democracy throughout the Caribbean and Central America.

It is Mr. Manafort's work in Ukraine, and the fees that he earned there, that bring him before this Court.  The Special Counsel's Office has repeatedly characterized this as work on behalf of a pro-Putin politician.[31]  This is not true.  Mr. Manafort was hired to spearhead efforts for Ukraine to become a member state of the European Union and he acted as one of the Ukrainian government's liaisons to the European Commission.  These efforts were clearly designed to distance Ukraine from Putin.[32]

### The 2016 Campaign

In 2016, Mr. Manafort served as campaign chairman for Donald J. Trump's successful campaign for the presidency of the United States.  Mr. Manafort served as an advisor and campaign chairman for approximately five months without compensation.  That work ultimately led to his investigation by the Special Counsel's Office, but the prosecution in this case (and the District of Columbia case) did not charge him with anything related to Russian collusion or to the 2016 presidential campaign.[33]

Mr. Manafort's work for then-candidate Donald J. Trump is perhaps best summarized by political strategist Doug Davenport:

> When I see/hear any of the negative reporting on Paul, I stop and shake my head and wonder how any of this could have gotten to this point.  [Mr. Manafort] was ALL-IN for this current President, and never once (at least

---

[31] The Special Counsel's Office also used terms, such as "oligarch," during the trial to describe the Ukrainian Party of Region's financial backers who paid for his services.  *See* Trial Tr. at 138-141.  These characterizations were undeniably effective as some onlookers stood outside the courthouse accusing the defendant of disloyalty—all in what this Court has correctly described as a "tax and bank fraud" case.  Tr. of Motions Hearing, June 29, 2018 at 69.

[32] What the Special Counsel also failed to acknowledge until only recently, when forced to do so in the matter pending in the District of Columbia, was that Mr. Manafort was in regular contact with U.S. officials at the American Embassy in Kiev to communicate details of his work in Ukraine.

[33] As the Court pointed out: "And so what is really going on … is that this indictment [was] used as a means of exerting pressure on the defendant to give you information that really is in [the Special Counsel's] appointment, but itself has nothing whatever to do with it."  Tr. of May 4, 2018 Motions Hearing at 8.

> to me) ever asked, offered, or suggested any shortcuts or other dirty political tactics – foreign or domestic – to try to further the candidacy of the man who now sits in the most powerful chair on earth.  It is easy to look at 40+ years of someone's accomplished career in DC and around the world and boil it down to a simple summary of short cuts and greased relationships – as opposed to looking at the whole of a man and his contributions to society and government service that was Paul Manafort.[34]

Though some may disagree with Mr. Manafort's politics and may not like some of the individuals he worked for, it cannot be said that Mr. Manafort had anything but an extraordinary and largely successful career.

### c)  Organizational and Charitable Work

Mr. Manafort has been involved with a number of organizations.  He has served as a member of the Board of Directors for the Center for Study of Democratic Institutions, which focused on public health, democracy, and human rights; the Center for Democracy, a think tank Mr. Manafort established to focus on democratic institution building, with particular emphasis on third-world countries and former republics of the Soviet Union; the U.S. Youth Council, an organization that sponsored educational, cultural, political, and business exchange trips and seminars for emerging young leaders in various countries; and as a Senior Fellow of the Center for Strategic and International Studies, a bipartisan think tank dedicated to helping lawmakers and policymakers chart a course for a better world.

Mr. Manafort has also been involved in charitable and community organizations closer to home.  Mr. Manafort's father served as the mayor of New Britain, CT, and encouraged his children to become involved in public service and give back to their community.  For example, before he relocated to Virginia to attend college, Mr. Manafort established a program with the local Boys Club that allowed low income children residing in public housing projects to participate in the

---

[34] Lttr. of Doug Davenport, annexed hereto as Ex. N.

Club's basketball, baseball, and football leagues, where the children learned skills, teamwork, and sportsmanship.  The program became very successful and continued even after Mr. Manafort left New Britain to attend college.  Mr. Manafort's interest in helping young people continued when he ran his public affairs company, where he established a successful intern program that taught recent college graduates both business and organizational skills; many graduates of the program went on to leadership positions in public relations, the media, and politics.

There are other examples of Mr. Manafort's genuine care for others and contributions to his community.  After his wife Kathy suffered a serious injury in 1998, Mr. Manafort became active in brain trauma research and fundraising, and he sat on the Brain Trauma Foundation's board of directors.  Mr. Manafort volunteered his time to coach basketball and soccer programs for girls; he served as President of the U.S. Youth Council, which adopted an exchange program to help implement programs for future leaders from foreign counties to promote democratic values and free market principles; and he helped create and manage annual political seminars for young men and women from the Young Republicans National Federation.  Mr. Manafort has also raised money for numerous community and societal causes, including non-profit Inova Alexandria Hospital, the Good Shepard Catholic Church, the National Diabetic Association, Georgetown University Law Center, and the Boy and Girl Scouts of America.  Mr. Manafort also created and funded an annual education scholarship program that allowed boy scouts from low income families located in this father-in-law's district to attend college.  At St. Ann's Church in New Britain, Connecticut, Mr. Manafort established a community resource program for elderly and low income members of his community that provided them with needed food, transportation to medical appointments and shopping trips, and daily in-door activities for senior citizens.

### d)  Age and Health Concerns

Mr. Manafort's age suggests that a lengthy sentence of imprisonment would be particularly detrimental.  A study commissioned by the DOJ's National Institute of Corrections concluded that imprisonment is especially problematic for older inmates like Mr. Manafort, finding that "several important factors seem to speed the aging process for those in prison" and identifying numerous management problems associated with older inmates.  *See* National Institute of Corrections, U.S. Department of Justice, *Correctional Health Care* (2004) at 8-9.[35]   This study noted that older inmates are uniquely vulnerable to abuse and predation, that they experience difficulty in establishing social relationships, that they often need special physical accommodations in a relatively inflexible physical environment, and that many need special programs in a setting where special privileges are disdained.  *Id.* at 11.  The study found that older first-time offenders "are frequently severely maladjusted and especially at risk for suicide, explosiveness, and other manifestations of mental disorder."  *Id.*  Moreover, "[s]ince their behaviors are not well tolerated by other inmates, their victimization potential is high."  *Id.*

Aside from high blood pressure, Mr. Manafort was a relatively healthy 69-year-old man before he was remanded to custody in June 2018, where has been held in protective solitary confinement.  As described in the PSR, since that time, his health has deteriorated.  *See* PSR ¶¶ 118-120.  In jail, he has developed severe gout, which causes significant pain and swelling in his right foot.  At one point, he needed to be transported to Alexandria Hospital for treatment.  *Id.* at ¶ 119.  Mr. Manafort requires a wheelchair to ambulate on bad days, or a cane on "good" days.  *Id.*

---

[35] *Available at*: (https://info.nicic.gov/nicrp/system/files/018735.pdf).

Since his incarceration, Mr. Manafort has been prescribed numerous prescription drugs to address various health challenges, including: Allopurinol and Colchicine to treat his gout symptoms; Amlodipine Besylate and Carvedilol to treat his high blood pressure; Atorvastatin to treat high cholesterol; Otezla and Lac-Hydrin to treat psoriasis; and Meloxicam to treat arthritis, among other prescription and over-the-counter treatments. Although Mr. Manafort downplays these challenges for his family and friends, the reality is he is not the relatively healthy man he was prior to his incarceration. Recently, doctors at the jail identified a potential thyroid problem and Mr. Manafort is currently undergoing diagnostic testing.

This is not to say that older defendants should not be held accountable simply because of their age and health issues, but outside observers have seen the impact of Mr. Manafort's incarceration. A prominent legal and political commentator, who will never be mistaken as someone kindly disposed to the defendant, recently observed him in the courtroom in the District of Columbia and stated the following in *The Hill*:

> I saw Paul Manafort in court the other day[.] This is a man who looks like he's dying. He is walking with a cane. He looks disoriented. He has declined so precipitously in prison that when you realize he has now lost his cooperation agreement and the chance for a lower sentence and he's facing an entirely separate prison sentence in the Virginia case, a 70-year-old man is looking like he may die in prison, and it is just a profound thing to think about. Apparently he's using a wheelchair a lot of the time[.] Prison is rough for anybody. Yes, he did wrong and he did wrong over and over again. But, I mean, this man is really, really in danger of losing his life.[36]

The conditions of Mr. Manafort's incarceration have taken an even greater toll on his mental and emotional health. *See* PSR ¶¶ 121-123. To ensure his safety, Mr. Manafort is confined to solitary confinement at the Alexandria Detention Center where he spends 21 hours a day locked

---

[36] Joe Concha, *CNN's Toobin: 'Almost unrecognizable' Manafort 'In danger of losing his life' in prison*, CNN (Feb. 14, 2019) (*available at:* https://thehill.com/homenews/media/430004-cnns-toobin-almost-unrecognizable-manafort-in-danger-of-losing-his-life-in).

in a cell alone.  Family visitation time is limited to just two 30-minute visits per week; as a result,

he meets more often with his legal team than his loved ones.  He suffers from severe anxiety, panic

attacks, and a constant feeling of claustrophobia while he is locked alone in his cell each day.

These conditions of confinement were designed for violent offenders who pose risks to the safety

of other inmates or jail personnel, or who are placed in solitary confinement as punishment for

disciplinary infractions; they were surely not intended for the long-term confinement of a first-

time white-collar offender of Mr. Manafort's age and health.[37]

Section 3553(a) recognizes that the Court should take into account any medical issues

facing the defendant and whether the sentence imposed will "provide the defendant . . .  with

needed medical care . . . in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  The advisory

Guidelines likewise provide that:

> Physical condition or appearance, including physique, may be relevant in
> determining whether a departure is warranted, if the condition or
> appearance, individually or in combination with other offender
> characteristics, is present to an unusual degree and distinguishes the cases
> from the typical cases covered by the Guidelines.  An extraordinary physical
> impairment may be a reason to depart downward; *e.g.*, in the case of a
> seriously infirm defendant, home detention may be as efficient as, and less
> costly than, imprisonment.

USSG §5H1.4.

Courts often impose non-custodial sentences in cases involving defendants who suffer from

serious medical conditions.  For example, following the defendant's conviction after trial for wire

fraud in *United States v. Burks*, 2010 WL 1221752 (E.D.N.Y. Mar. 29, 2010) , the sentencing court

imposed a sentence of one month incarceration and five years' probation despite a Guidelines

---

[37] The detrimental effects of solitary confinement have been well documented.  *See, e.g.*, Robert T. Muller, Phd., *Solitary Confinement is Torture: Research reveals numerous adverse effects of solitary confinement on inmates*, Psychology Today, May 10, 2018 (*available at*: https://www.psychologytoday.com/us/blog/talking-about-trauma/201805/solitary-confinement-is-torture).

range of 57-71 months where, *inter alia*, the defendant suffered from degenerative diabetes. *Id.* at

*2; *see also United States v. McFarlin*, 535 F.3d 808, 810-11 (8th Cir. 2008) (affirming variance

for 56-year old defendant with numerous health problems, including coronary disease and who

had undergone several operations); *United States v. Alatsas*, 2008 WL 238559 (E.D.N.Y. Jan. 16,

2008) (imposing a term of probation, despite Guidelines range of 24-30 months where, *inter alia*,

"[d]efendant has multiple complex medical problems, which will be better cared for outside of

prison.").

In *United States v. Barbato*, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002), a pre-*Booker*

decision, the defendant pled guilty to using extortionate means to collect extensions of credit. The

sentencing court granted a downward departure from a then-mandatory Guideline range of 24-30

months imprisonment based on the defendant's history of heart problems, and imposed a sentence

of home detention and two years of supervised release. Notably, the *Barbato* court imposed home

confinement even though the prosecution contended that the Bureau of Prisons would be able to

provide adequate treatment for the defendant's health conditions. The court noted that "[i]t is often

relevant, though not always controlling, whether the BOP can provide adequate care." *Id.* at *4.

For these reasons, Mr. Manafort's physical, mental, and emotional health, together with

his age and his almost nine-month stay in solitary confinement, weigh in favor of a sentence in

this case that does not include a lengthy period of incarceration.

### 3. The Purpose of Sentencing

Pursuant to the sentencing statute, a defendant's sentence should be designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2)

These factors do not warrant the lengthy period of incarceration that was calculated by Probation pursuant to the Guidelines.  To be clear, Mr. Manafort does not dispute that his crimes were serious.  He did not report a significant amount of the income deposited into the foreign bank accounts on his tax returns, he failed to disclose those financial accounts to the Treasury Department, and he submitted false information to lenders in the United States when his finances grew tight.

As a mitigating factor, however, it is worth noting that the foreign accounts at issue were established at the behest of Mr. Manafort's foreign clients, *not* because Mr. Manafort intended from the outset to use them to evade income tax or foreign account reporting obligations.  In fact, the evidence at trial was that, in 2014, prior to any indictments in Virginia or the District of Columbia, Mr. Manafort *voluntarily disclosed* his interest in foreign accounts to the FBI, which was engaged in an unrelated investigation of Ukraine-based assets.  *See* Trial Tr. at 1453-1457 (testimony from the government's primary cooperating witness, Rick Gates, that in 2014 he and Mr. Manafort met with attorneys from DOJ and special agents from the FBI and disclosed DMI's work in Ukraine and foreign accounts).

With regard to the bank fraud conduct in this case, Mr. Manafort admits his guilt and acknowledges that he knew the loan applications contained false information.  However, Mr. Manafort intended to repay each of the loans in questions and did not purposely seek to inflict pecuniary harm as to any of the banks.  All but one of the bank loans charged in this case were collateralized by valuable properties.  In fact, all of the loans at issue in this case were performing under the terms of the relevant loan agreements *until* the Special Counsel's Office initiated the

prosecutions of Mr. Manafort and brought forfeiture allegations, which resulted in over $2 million in cash being frozen.

There is no risk of recidivism in this case given the harsh lesson Mr. Manafort has already learned, especially in light of his age. *See, e.g.*, *United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (affirming 54 months downward variance in part because of low risk of recidivism). Statistical data from a study commissioned by the United States Sentencing Commission show that "[r]ecidivism rates decline relatively consistently as age increases." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12.[38] That study indicates that a defendant over the age of 50 in criminal history category I has a 6.2 percent likelihood of recidivating. *Id.* at Ex. 9.[39] Based on the government's own studies, then, the likelihood of recidivism for a 70-year-old man such as Mr. Manafort is likely far less than 6.2 percent.

Beyond his age, a number of other characteristics make recidivism by Mr. Manafort highly unlikely, including his advanced level of education and lack of illicit drug use. *See Measuring Recidivism*, at 12-13. Indeed, elderly tax and white-collar offenders generally are considered low risk by the Bureau of Prisons and pose very little risk of reoffending.[40]

---

[38] *Available at*: (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf).

[39] A related study of recidivism rates by "true" first offenders (*i.e.*, those with no prior involvement with the criminal justice system) showed that such first offenders had a "primary" recidivism rate (including supervised release/probation violations, re-arrest, and re-convicted) of 6.8 percent, and a re-conviction rate (involving an actual conviction for a subsequent offense) of only 2.5 percent. U.S.S.C., *Recidivism and the "First Offender,"* at Ex. 6 (*available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf).

[40] *See* Evan J. Davis, *Is the First Step Act Good New for Tax and Other White-Collar Defendants?* (Jan. 4, 2019) (*available at*: https://www.taxlitigator.com/is-the-first-step-act-good-news-for-tax-crime-and-other-white-collar-defendants-by-evan-j-davis/).

Here, Mr. Manafort has been personally and financially punished as a result of his illegal conduct and there is no reason to believe that a sentence of many years in prison is necessary to prevent him from committing further crimes.   Given the severe damage to his professional reputation and the enormous investigative efforts of the Special Counsel to examine every aspect of his life, he poses no future risk to the public of reoffending and specific deterrence for a soon-to-be septuagenarian is not necessary under these circumstances.

Lastly, a lengthy term of imprisonment is not required in this case to provide Mr. Manafort with necessary educational or vocational training, medical care, or other correctional treatment. Indeed, with regard to needed medical care, those needs could be far better addressed by Mr. Manafort's own physicians, at his own expense, outside of the federal prison system.

### 4.   The Kinds of Sentences Available

The Court has the authority and discretion to impose a wide range of alternatives to the lengthy term of incarceration contemplated by the Guidelines.  *See* 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1).  A sentence significantly below the Guidelines is appropriate in this case in light of: Mr. Manafort's remorse for his conduct; his acceptance of responsibility as reflected in the District of Columbia plea agreement—*where he also admitted his guilt as to the mistried counts in this case*; the fact that he (specifically) and the public (generally) have been deterred from engaging in similar conduct in light of the punishment already suffered and the widespread media attention this case has garnered; his age and health concerns; the financial penalty Mr. Manafort has experienced as a result of his prosecution and forfeiture agreement; the detrimental effect on his family; and, as explained below, the types of sentences imposed for similar conduct.  Although there are many types of sentences available, the defense respectfully asks that, in fashioning its

sentence, the Court to consider that Mr. Manafort has served significant time in solitary confinement and has agreed to forfeit substantial assets accumulated over his working life.

### 5.  The Sentencing Guidelines and The Commission's Policy Statements

Mr. Manafort objects to several of Probation's determinations as set out in the PSR.

### a)  The Tax – not FBAR – Guidelines Are Appropriate in this Case

Probation has calculated the "Group 1" Counts (False Income Tax Returns and Failure to File Reports of Foreign Bank and Financial Accounts ("FBAR")) using the Guidelines applicable to FBAR convictions.  *See* PSR ¶ 76; *see also* USSG § 2S1.3(c)(1) (directing offenses committed for the purpose of violating the tax laws to the most appropriate tax Guidelines, but only if doing so results in a higher offense level).  The defendant submits that the tax Guidelines are the appropriate barometer in this case, which the Court has previously described as a "bank fraud and tax" case.  *See, e.g.,* Tr. of Motions Hearing, June 29, 2018 at 69.

The defendant's position has a historical basis.  The government long advocated the use of the tax Guidelines in criminal tax cases involving FBAR violations.  For nearly ten years (*i.e.*, the time during which DOJ began to aggressively enforce the FBAR statute in connection with federal tax offenses involving foreign bank accounts), DOJ urged the application of the tax Guidelines when determining sentences in combined tax and FBAR cases.[41]  DOJ then gave notice that it might alter this practice in December 2017, stating that it may now argue that USSG § 2S1.3 is the correct Guideline for criminal tax cases involving offshore accounts.[42]  The Special Counsel's

---

[41] *See generally* Anton Janik, Jr., *DOJ Announces Major New Shift in Criminal Sentencing in Offshore Tax Matters*, Mitchell Williams (Dec. 8, 2017). (*Available at*: https://www.jdsupra.com/legalnews/doj-announces-major-new-shift-in-39945/).

[42] *See id.*

Office acknowledges this background.  *See* SCO Memo. at 12 ("The Tax Division changed its position on the appropriate guideline provision in FBAR cases sometime in late 2017.")

What the government glosses over is the fact that the Special Counsel's Office charged Mr. Manafort with a criminal tax conspiracy on October 27, 2017, *months before the purported change in DOJ's practice relating to the tax and FBAR Guidelines*.  Mr. Manafort was arraigned on October 30, 2017, and that indictment alleged that he wired substantial amounts of funds from foreign bank accounts located in Cyprus (and elsewhere) into the United States, and that "Manafort did not pay taxes on this income. . ."  *See* Indictment, No. 1:17-201 (ABJ) at ¶ 16.  The Special Counsel attempts to factually distinguish *United States v. Kim*, 1:17-cr-00248 (TSE/LMB) (E.D. Va. 2018), by arguing that "the *Kim* prosecution was part of a series of prosecutions involving the use of overseas accounts to hide tax offenses."  *See* SCO Memo. at 13.  But that is exactly the same argument that the Special Counsel made at Mr. Manafort's trial.  *See e.g.*, Trial Tr. at 2367 (government's statement during closing argument that "Mr. Manafort lied to his bookkeeper about these foreign accounts, about the income and the existence of the accounts, and he lied to his tax preparers.  That income never made it on to his books and was never reported on this tax returns.").  The real difference, it seems, is that the Special Counsel's Office is prosecuting someone caught up in its Russian collusion investigation, so to ratchet up the pressure, or to make an example of Mr. Manafort, DOJ's previous practice can be ignored.  At bottom, the use of the FBAR Guidelines in this case goes against the government's longstanding practice of advocating for the application of the tax Guidelines to tax and tax-related offenses.

Mr. Manafort is entitled to the same treatment as other defendants facing similar facts and circumstances.  Probation should re-calculate the Group 1 Counts under the more appropriate

provisions of USSG § 2T1.1 and, based on the tax loss amount computed, *see* ¶ 36,[43] determine

that the Base Offense Level is 24.  *See* USSG § 2T4.1(J) (tax loss exceeds $3,500,000 but under

$9,500,000); *see also* USSG § 2T4.1 (Base Offense Level determined by reference to the Tax

Table at USSG § 2T4.1).  Regarding the eight counts of conviction, more than half (five) related

to tax offenses (*i.e.,* Counts 1 – 5), and the lone FBAR conviction (Count 12) was fully

encompassed in the evidence presented by the government and the conviction returned for Count

3 (*i.e.,* subscribing to a false income tax return which, *inter alia*, failed to identify foreign bank

accounts).  To use the FBAR Guidelines as the lodestar for the calculation—when the jury reached

a unanimous verdict on only one of the four FBAR counts—is to allow the "tail to wag the dog."

The evidence adduced during trial demonstrates that there is no basis for such a rigid

approach.  Testimony from the government's own witnesses, and documentary evidence establish

that the foreign accounts were opened in order to receive payments for Mr. Manafort's legitimate

consulting services in Ukraine.  *See, e.g.*, Trial Tr. at 1185-86 (testimony from Rick Gates that

Cypriot entities and accounts were established at the request of Ukrainian businessmen who were

financing Mr. Manafort's work for the Party of Regions).  Additionally, substantial amounts were

ultimately paid out in fees to professionals that Mr. Manafort utilized, related business expenses,

or was reported as income on the books and records and tax returns of DMP and DMP

International.  *See, e.g.*, Trial Tr. at 79-80 (testimony from Thomas Devine regarding contracts

with Mr. Manafort and others to provide DMI with media services in connection with Ukraine

campaign);  Trial Tr. at 146-47 (testimony from Daniel Rabin regarding television productions

---

[43] Mr. Manafort was never audited in connection with his offshore assets.  The defense submits that the tax loss amount reflected in the PSR has been estimated and does not account for funds embezzled by the Special Counsel's primary cooperating witness at Mr. Manafort's trial, amounts for which Mr. Manafort would be entitled to claim theft loss deductions.  Therefore, the tax loss is likely less that the figure calculated by Probation.

services he performed for DMI related to Ukraine presidential election); Trial Tr. at 1023 (testimony from Mr. Manafort's CPA confirming that approximately $92.5 million in revenue was reported on DMP and DMI tax returns for the period 2005 through 2015. *See also* Defendant's Trial Ex. 2. Payments directed to personal vendors and utilized to purchase real estate that were not reported as income on U.S. income tax returns are clearly the crux of the loss suffered by the U.S. Treasury, and this is the appropriate amount under the tax Guidelines upon which to calculate loss in this case.[44]

If the Court concludes that the tax Guidelines are more appropriate, there are two potential Special Offense Characteristics under USSG § 2T1.1 that need to be addressed, but neither enhancement is warranted here. There was nothing illegal about Mr. Manafort's core business itself; *i.e.*, international political consulting. Indeed, at trial, the government called two individuals as witnesses who worked with Mr. Manafort on these international campaigns in Ukraine. *See supra.* Further, even if one considers the defendant's guilty plea in the District of Columbia (to a general conspiracy to violate the Foreign Agents Registration Act ("FARA")), legal research has not uncovered a single case where the "esoteric" FARA statute (as the Special Counsel has described that law) resulted in a sentencing enhancement under the Guidelines. A two-level enhancement under USSG § 2T1.1(b)(1) is not warranted.

Second, there was nothing "sophisticated" about the use of offshore vehicles in this case that warrants an enhancement.[45] Despite the presence of foreign entities and offshore bank

---

[44] Also at issue during the trial were various transactions between the Cypriot entities and entities that Mr. Manafort controlled in the United States that were initially recorded as loans. These "loans," however, were ultimately reported as income on Mr. Manafort's tax returns. *See* Defendant's Trial Exhibit 3.

[45] *See* USSG § 2T1.1, App. Note 5 (noting that hiding assets "through the use" of offshore vehicles "*ordinarily* indicates sophisticated means") (emphasis added).

accounts, the evidence presented by the government's main witness established that these were set up at the behest of Mr. Manafort's foreign clients for their own reasons, *see, e.g.*, Trial Tr. at 1185-86 (testimony from Rick Gates that Cypriot entities and accounts were established at the request of Ukrainian businessmen), not as a method for the defendant to hide his assets from the Internal Revenue Service.  In fact, Mr. Manafort disclosed various offshore structures to DOJ and FBI agents in 2014 in connection with the government's investigation of Ukraine-based assets—long before any indictments were returned; this fact alone is difficult to square with the application of this enhancement.  *See, e.g.*, Trial Tr. 1453-1457 (testimony from Rick Gates that in 2014 he and Mr. Manafort met with attorneys from DOJ and agents from the FBI and disclosed DMI's work in Ukraine and foreign accounts).  The two-level enhancement under USSG § 2T1.1(b)(2) is not warranted.

Lastly, Probation has characterized a series of loans from Cypriot entities controlled by Mr. Manafort to domestic entities that he controlled as "designed to fraudulently reduce [his] report[able] taxable income."  PSR ¶ 27.  However, all of these loans were ultimately reported as income on Mr. Manafort's income tax returns and Mr. Manafort paid the related tax due. *See* Defendant's Trial Exhibits 2 and 3.

For the above reasons, Mr. Manafort respectfully submits that the Court compute the advisory Guidelines in this case using the tax Guidelines,[46] which will result in a Total Offense Level of 24.  Mr. Manafort is in Criminal History Category I.  *See* PSR ¶¶ 106, 107.  The

---

[46] We submit that, even if the Guidelines are computed under USSG § 2S1.3, it should be noted that this provision contains a cross reference to USSG § 2B1.1 which, in turn, contains the rules regarding computing actual and intended loss.  Here, the actual loss and intended loss are the same; *i.e.*, the approximately $6 million in taxes that Mr. Manafort did not report, not the approximately $55 million that flowed through the relevant foreign accounts.

appropriate advisory sentencing range related to the Group 1 Counts should be 51-63 months' imprisonment.

### b) The Loss Attributed to the Bank Fraud Charges is Overstated

Probation has determined that Mr. Manafort should be held accountable for fraud losses totaling $6,021,716.71 in connection with the loans and loan applications associated with Citizens Bank, Banc of California, and The Federal Savings Bank. *See* PSR ¶ 64. Importantly, as to all of the loans at issue, there was no evidence introduced at trial that the defendant "*purposely* sought to inflict" any harm on the bank. *See* USSG § 2B1.1(3)(A)(ii). With the exception of one unsecured loan where no collateral was requested, all of the loans were *collateralized*. More importantly, all of the loans were performing up to the time that Mr. Manafort was indicted in this case.

Of the $6 million loss number, $5.5 million is "intended loss" to Citizens Bank in connection with a loan application for the Union Street property in Brooklyn, NY, which never closed. *See id.*; *see also* Trial Tr. at 1937-38. There is no evidence, however, that the defendant "*purposely* sought to inflict" any harm on the bank. First, the Citizens Bank loan was a construction loan based on the future value of the underlying collateral, which was sufficient to protect the bank from losses. Second, contrary to Probation's assertion alleging non-disclosure of an existing mortgage on the property, *see* PSR at pp. 53-54, at the time the loan was being considered, namely on July 11, 2016, the date on the initial loan application filled out by the bank (Gov. Ex. 255 and Trial Tr. at 1940), Citizens Bank had been aware for at least four months that there was a preexisting mortgage on the Union Street property. *See* Trial Tr. at 1941. There is simply no evidence to support the allegation that Mr. Manafort purposely sought to inflict any

harm on Citizens Bank in seeking to make a secured loan when the bank had full knowledge of the existing mortgage.  Accordingly, the analysis should exclude the $5.5 million amount.[47]

### c)   An Enhancement Under USSG § 2B1.1(b)(1)(C) Is Inapplicable

Probation has also increased the offense level by two under USSG § 2B1.1(b)(10)(C) based on the theory that the bank fraud offense conduct involved sophisticated means.  *See* PSR ¶ 88. Like the conduct related to the tax offenses in this case, however, nothing about the bank fraud was particularly sophisticated.  With regard to transfers from foreign accounts to purchase and improve property in the United States, there is nothing inherently complex about instructing a bank to execute a wire transfer order.  With regard to Mr. Manafort's and Mr. Gates' interactions with the mortgage lenders, there was nothing complex about lying to the banks.  Indeed, it was misstatements and falsified documents that formed the backbone of the government's bank fraud charges.  *See* PSR ¶ 38 (noting that the offense conduct included "lying about Manafort's and DMI's income, lying about their debt, and lying about Manafort's use of the property and loan proceeds.").  With regard to falsified documents, the offense conduct was far from sophisticated. In fact, the evidence at trial demonstrated that Mr. Manafort and Mr. Gates simply altered Microsoft Word documents to reflect incorrect income information, or they provided the banks with outdated or fabricated information.  *See* PSR ¶¶ 37-63.  An enhancement under USSG § 2B1.1(b)(10)(C) is therefore not warranted.

### d)   An Enhancement Under USSG § 3B1.1 Is Not Warranted

Probation has also applied aggravating role enhancements with respect to both the Group 1 and Group 2 Counts on the theory that Mr. Manafort "was an organizer or leader of criminal activity that was otherwise extensive."  *See* PSR ¶¶ 81 (tax/FBAR charges); 91 (bank fraud

---

[47]   Significantly, instead of moving forward with the Citizens Bank loan on the Union Street property, a loan on Union Street was obtained from The Federal Saving Bank, which has not resulted in a loss.

charges).   The PSR omits the specific language from USSG § 3B1.1(a) which refers to five or more participants being involved in the criminal activity.  *Id.*  A similar provision is found in USSG § 3B1.1(b) with regard to a "manager or supervisor" of schemes involving five or more participants or that is otherwise extensive.   USSG § 3B1.1(c) imposes a two-level enhancement for any "organizer, leader, manager, or supervisor" engaged in any criminal activity without regard for the number of participants or the extensiveness of the criminal conduct.

The background comments to these Guideline provisions provide that they should be considered with respect to "criminal organization[s]."  *See* USSG § 3B1.1, Background Note ("This section provides a range of adjustments to increase the offense level based upon the *size of a criminal organization* (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense.") (emphasis added); *see also id.*, App. Note 2 ("An upward departure may be warranted … in the case of a defendant …who … exercised management responsibility over the property, assets, or activities of *a criminal organization*.") (emphasis added); *id.*, App. Note 3 ("In assessing whether *an organization* is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.") (emphasis added).  *See also United States v. Slade*, F.3d 185, 190 n.1 (4th Cir. 2013) (to qualify for aggravating role enhancement, the government must establish that defendant oversaw "participants, as opposed to property, in the *criminal enterprise*.") (emphasis added); *United States v. Robinson*, 541 F. App'x 293, 295 (4th Cir. 2013) (aggravating role enhancement affirmed where defendant was leader of a group of drug dealers).

The commentary from the Sentencing Commission and Fourth Circuit precedent strongly suggest that these role enhancements are applicable to leaders or managers of organizations that have a primary purpose of engaging in crime, such as foreign cartels that smuggle narcotics into

33

the United States, or motorcycle gangs that unlawfully transport and distribute firearms. But neither consulting company associated with Mr. Manafort, DMP and/or DMI, operated as a criminal organization. DMP was a company formed in 2005 to engage in political consulting work, while DMI was a company formed in 2011 to engage in consulting, public affairs, and public relations work for foreign clients. *See* Doc. 9 (Superseding Indictment) ¶ 10. They were not "criminal organizations" as that phrase is ordinarily understood and, therefore, these enhancements are not applicable in this case.

Mr. Manafort cannot fairly be described as an organizer, leader, manager, or supervisor under USSG § 3B1.1. The government's star witness, Rick Gates, testified that he was the only DMP or DMI employee that engaged in any criminal activity with Mr. Manafort. *See* Trial Tr. at 1097. In fact, the evidence at trial established that Mr. Gates often acted alone, both when dealing with U.S. lenders in connection with the loan applications that underpin the bank fraud counts, and when handling transfers of funds held offshore. Mr. Gates operated with little or no management supervision by Mr. Manafort; indeed, at trial Mr. Gates testified that this lack of oversight enabled him to embezzle hundreds of thousands of dollars from Mr. Manafort. *See* Trial Tr. at 1419. This was not "extensive" criminal activity by any stretch of the imagination.

Because Mr. Manafort's public affairs and consulting companies were not criminal organizations, and because Mr. Manafort cannot be described as an organizer, leader, manager, or supervisor, the enhancements under USSG § 3B1.1(a) are inapplicable and should be omitted from the Guideline analysis.

### e) Mr. Manafort Should Receive Credit for Acceptance of Responsibility

Finally, Probation has declined to credit Mr. Manafort with accepting responsibility under USSG § 3E1.1. *See* PSR ¶¶ 72, 99. Although Mr. Manafort proceeded to trial in this case (after

the Special Counsel declined to extend a reasonable plea offer), Probation's determination in this regard ignores the fact that, shortly after trial, Mr. Manafort pleaded guilty in the District of Columbia and accepted responsibility for offense conduct in both that District *and the Eastern District of Virginia*, including the counts in this case for which a mistrial was declared. *See* PSR ¶ 8. In fact, Probation has included conduct that Mr. Manafort admitted in the District of Columbia plea as relevant conduct under the Guidelines in this case. *See* PSR ¶¶ 75 (FBAR counts), 85 (bank fraud counts). It is inequitable to increase Mr. Manafort's Guidelines based on offense conduct he has admitted in his District of Columbia plea, on the one hand, and then decline to give him any consideration for accepting responsibility on the other. Mr. Manafort should be credited for acceptance of responsibility under USSG § 3E1.1.

There are no pertinent U.S. Sentencing Commission policy statements.

### 4. The Need to Avoid Unwarranted Disparities

A critical sentencing factor in this case—and the one that the Special Counsel Office pointedly ignores in its papers—is the need to avoid disparity with the types of sentences imposed in similar cases. In similar cases, below-Guidelines variances are substantial and have reflected the belief of many courts, academics, and commentators that the Guidelines in tax and bank fraud cases—driven by a mechanical application of the Guidelines' loss provisions—result in astronomically high advisory sentencing ranges that bear little relation to the nature of the offense or the history and characteristics of a defendant.

### a) Offshore Tax and FBAR Cases

It has been rare that Guidelines sentences are imposed in cases involving tax evasion related to the use of offshore bank accounts, including sentences imposed in this District. For example, in *United States v. Silva*, Case No. 10-CR-00044 (E.D. Va. 2010), Judge Liam O'Grady

sentenced the defendant to two years' probation with special conditions of four months' home detention and 100 hours of community service in a case where the defendant repatriated funds from his unreported offshore account into the United States by mailing himself 26 packages of currency and carrying another two packages into the United States, always structured in amounts under $10,000 to avoid detection.  In *United States v. Cambata*, Case No. 15-CR-362 (E.D. Va. 2016), Judge Claude M. Hilton sentenced the defendant to one year of probation and a $15,000 fine where the defendant received $12 million from a Belizean company which was deposited into an undisclosed account at a Swiss bank in the name of Hong Kong Corporate entity.  Thereafter, the funds were later transferred to a Singapore and Monaco bank account and the defendant failed to file FBARs even after he was advised to do so by counsel.  In *United States v. Horsky*, Case No. 16-CR-224 (E.D.Va. 2017), this Court sentenced the defendant, a former business professor at the University of Rochester, convicted of hiding over $200 million in offshore accounts resulting in approximate tax loss of $18 million, to seven months' imprisonment followed by a period of supervised release with special conditions.  More recently, in *United States v. Kim*, Case No. 17-CR-248 (E.D.Va. 2018), Judge Leonie M. Brinkema sentenced the defendant to six months' imprisonment for failing to report $28 million in income hidden in a Swiss bank account, using coded messages to communicate with Swiss bankers, and ultimately repatriating his funds by conspiring with a Swiss jeweler to ship jewelry to the United States in an effort to disguise the transfer.

The types of sentences imposed in offshore tax cases beyond this District are similarly instructive and appropriately considered by the Court.  *See, e.g.*, *United States v. Doan*, 498 F. Supp. 2d 816, 820 (E.D.Va. 2007) ("This Court does not dispute the value in looking nationwide to similarly situated criminal defendants of similar culpability that have committed similar acts

resulting in similar convictions with similar backgrounds and with similar records under similar circumstances.").   Indeed, while offenders are being punished, variances in tax fraud cases involving the use of foreign accounts have been the rule—not the exception—around the country:

- Markus Hager, who maintained multiple offshore accounts in multiple countries held by a sham foreign entity, who used his own sister (a non-U.S. person) to open a secret bank account for him in Israel, and who established new offshore accounts even after he became aware that he was under federal investigation, was sentenced to 6 months' imprisonment.  (Case No. 16 Cr. 447 (PKC) (E.D.N.Y. May 31, 2017));

- Ashvin Desai, who was convicted at trial of hiding over $8 million in an Indian bank account.  The Guidelines called for a sentence of 78-96 months but the court sentenced the defendant to 6 months' imprisonment and 6 months' home detention.  (Case No. 11-CR-846 (EJD) (N.D. Ca. July 7, 2014));

- Ty Warner, who was prosecuted for an undisclosed offshore bank account that held a high balance of over $100,000,000, which resulted in a tax loss of over $5.5 million, but was sentenced to 2 years' probation. (Case No. 13 Cr. 731 (CPK) (N.D. Ill. Jan. 14, 2014));

- Mary Estelle Curran, who owned an undisclosed $47 million Swiss bank account which resulted in a $21 million FBAR penalty, was sentenced to *five (5) seconds* of probation. (Case No. 12 Cr. 80206 (KLR) (S.D. Fl. Apr. 25, 2013));

- Jacques Wajsfelner, who worked in real estate and advertising, held a Swiss bank account valued at over $5 million and owed more than $400,000 in back taxes, interest, and penalties, but was sentenced to three months home detention based in part on his PTSD stemming from his experiences during World War II (he fled the Nazis as a teenager). (Case No. 12 Cr. 641 (NRB) (S.D.N.Y. Mar. 8, 2013));

- Josephine Bhasin, who had an account at HSBC in India that held a high balance of $8.3 million, and filed a false FBAR after being contacted by the DOJ, was sentenced to 2 years' probation, the first 3 months to be served in home confinement, and 150 hours of community service.  (Case No. 11 Cr. 268 (ADS) (E.D.N.Y. Mar. 8, 2013));

- Arvind Ahuja, who was convicted in jury trial of willfully filing a false return and willfully failing to file an FBAR due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India.  At sentencing, the court varied from the Guidelines' range of 41-51 months to a sentence of 3 years' probation, 3 months home detention, a $350,000 fine, and 450 hours community service. (Case No. 11 Cr. 135 (CNC) (E.D. Wisc. Feb. 6, 2013));

- Lothar Hoess, the owner of a company that sold office supplies and equipment, had a tax loss of between $400,000 and $1,000,000, and faced a Guidelines' range of 30 to

37 months, but was sentenced to three years' probation. (Case No. 11 Cr. 154 (SM) (D.N.H. Mar. 30, 2012));

- Kenneth Heller, a disbarred attorney who had a secret $25 million account in Switzerland, faced a Guidelines' range of 30-37 months, but was sentenced to 6 weeks' imprisonment.  (Case No. 10 Cr. 388 (PKC) (S.D.N.Y. Jan. 23, 2012));

- Michael Reiss, who moved his offshore account to various institutions and countries, failed to participate in the IRS' offshore voluntary disclosure program, and filed false FBARs, faced a Guidelines' range of 30 to 37 months, but was sentenced to 3 years' probation, the first 8 months to be served in a community confinement center, and 30 hours of community service a week for 3 years. (Case No. 11 Cr. 668 (RMB) (S.D.N.Y. Jan. 1, 2011));

- Ernest Vogliano, who opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations, and actively used funds and transferred some after learning of the criminal investigation, was sentenced to 2 years' probation. (Case No. 10 Cr. 327 (TPG) (S.D.N.Y. Apr. 26, 2011));

- Jules Robbins, who created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts that held nearly $42 million.  The court took into consideration his "otherwise unblemished life" in imposing a sentence of 12 months' probation. (Case No. 10 Cr. 333 (RJH) (S.D.N.Y. Oct. 8, 2010));

- Paul Zabczuk, who instructed clients to make payments to him through undisclosed accounts in Switzerland and the Bahamas and who was sentenced to 3 years' probation, 12 months' home detention, and community service.  (Case No. 10-CR-60112 (WPD) (S.D. Fl. July 26, 2010));

- John McCarthy, who transferred over $1,000,000 to an unreported Swiss bank account and communicated with bank representatives to orchestrate various transactions and who was sentenced to 3 years' probation with 6 months of home detention and 300 hours of community service.  (Case No. 09-CR-784 (VBF) (C.D. Cal. Mar. 22, 2010));

- Juergen Homman, who failed to disclose a Swiss account holding approximately $5 million and who was sentenced to 5 years' probation and community service.  (Case No. 09-CR-724 (SRC) (D.N.J. Jan. 6, 2010));

- Steven Rubinstein, who hid approximately $7 million in unreported Swiss accounts that he used to invest in real estate was sentenced to 3 years' probation with 12 months of home detention.  (Case No. 09-CR60166 (MGC) (S.D. Fl. Oct. 28, 2009)); and

- Igor Olenicoff, a businessman and investor, held more than $200 million in undisclosed offshore bank accounts and owed $52 million in back taxes, interest, and penalties, but was sentenced to two years' probation. (Case No. 07 Cr. 227 (CJC) (C.D. Cal. Apr. 16,

2008)).

Even if there were not numerous other factors warranting a sentence substantially below the Guidelines in this case, sentencing Mr. Manafort to prison for many years would create an undeniable and unwarranted disparity in the sentencing treatment of other defendants in tax fraud and FBAR cases.  *See* 18 U.S.C. § 3553(a)(6).  This factor alone weighs heavily in favor of a sentence that does not include a substantial term of imprisonment, particularly in light of the time that Mr. Manafort has already served in solitary confinement and his agreement to forfeit a substantial portion of his assets.

### b) Bank Fraud

With respect to the bank fraud conduct, this case is unique because there is no evidence that Mr. Manafort ever "purposely sought to inflict" financial losses with respect to Citizens Bank, the Banc of California, and The Federal Savings Bank.  *See supra* p. 30; *see also* USSG § 2B1.1(b)(1), App. Note. 3(A)(ii).  Mr. Manafort makes no attempt here to re-litigate the question of whether he provided false information in connection with the relevant loan applications.  That said, it is important to recognize that all of the relevant loans—no matter how they were procured—were collateralized and/or performing prior to the commencement of this action (and the related action in the District of Columbia).  After the Special Counsel's Office brought charges, which included forfeiture allegations, Mr. Manafort's liquid assets were frozen, preventing him from continued performance and resulting in the defaults that Probation and the Special Counsel characterize as loss.  The Special Counsel's charging decisions undeniably played a role in these defaults.  While the government is certainly entitled to bring charges as it sees fit, it should also acknowledge that those decisions can have financial ramifications for defendants.  As stated above, there is no evidence that Mr. Manafort ever intended to purposely inflict financial losses as to any

of the relevant banks. USSG § 2B1.1(b)(1), App. Note 3(A)(ii). Simply put, Mr. Manafort should not be exposed to an increased loss amount under the Guidelines and additional punishment because the government froze substantial assets.

### 5. The Need to Provide Restitution to Any Victims of the Offense

Probation has determined that Mr. Manafort should be ordered to pay restitution in the amount of $24,815,108.74. *See* PSR ¶ 137. This amount was computed based on a tax loss amount of $6,164,032, *see* PSR ¶ 69, and on a purported fraud loss amount of $18,651,076,74, *see* PSR ¶ 68. With regard to the fraud loss amount, the government is in the process of forfeiting the collateral underlying the loans to Citizens Bank (restitution amount $2,577,724.80)[48] and The Federal Savings Bank (restitution amount $15,387,903.39).[49] As a result, any restitution order should include a provision that the restitution amount ordered by the Court will be offset and reduced by any amount paid to Citizens Bank and The Federal Savings Bank through the forfeiture process.

### CONCLUSION

For all of the foregoing reasons, we respectfully request that the Court impose a sentence significantly below the advisory Guidelines determined by Probation in this case.

---

[48] The government has agreed to pay $2,571,257.74 to Citizens Bank from the proceeds of the collateral sale. *See United States v. Paul J. Manafort, Jr.,* No. 1:18-mc-00167-ABJ (D.D.C) (the "Ancillary Litigation"), Stipulation and Order of Settlement Regarding Petition of Citizens Financial Group (Doc. 32-1).

[49] The ancillary petition filed by The Federal Savings Bank has not yet been resolved. *See* Ancillary Litigation, Petition of The Federal Savings Bank for Ancillary Hearing (Doc. 8).

Respectfully submitted,

s/ Kevin M. Downing
Kevin M. Downing (*pro hac vice*)
Law Office of Kevin M. Downing
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 754-1992
kevindowning@kdowninglaw.com

s/ Thomas E. Zehnle
Thomas E. Zehnle (VSB No. 27755)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 368-4668
tezehnle@gmail.com

s/ Richard W. Westling
Richard W. Westling (*pro hac vice*)
Epstein Becker & Green, P.C.
1227 25th Street, N.W.
Washington, DC 20037
(202) 861-1868
rwestling@ebglaw.com

s/ Jay R. Nanavati
Jay R. Nanavati (VSB No. 44391)
Brian P. Ketcham (*pro hac vice*)
Kostelanetz & Fink LLP
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 875-8000
bketcham@kflaw.com

*Counsel for Defendant Paul J. Manafort, Jr.*