IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PAUL J. MANAFORT, JR.,<br><br>Defendant. | Crim. No. 1:18-cr-83 (TSE) |

**THE GOVERNMENT'S SENTENCING REPLY MEMORANDUM**

The United States of America, by and through Special Counsel Robert S. Mueller, III, files this reply to defendant Paul J. Manafort, Jr.'s sentencing memorandum. Def. Sen. Mem., Doc. 317. The government principally addresses the following issues: (A) acceptance of responsibility; (B) alleged cooperation; (C) health and age; and (D) recidivism. In sections E and F, the government addresses the defendant's Sentencing Guidelines objections and arguments regarding a disparate sentence.

**A.  Acceptance of Responsibility**

As the Court is aware, the defendant exercised his constitutional right to trial in this matter and contested the facts and his guilt. That alone undermines any reduction for acceptance of responsibility. *See United States v. Redding*, 422 F. App'x 192, 195 (4th Cir. 2011) (unpublished). And, although Manafort subsequently pleaded guilty in the District of Columbia prosecution, he has since breached his plea agreement by making false statements to the government and the grand jury. *See* Order, *United States v. Manafort*, No. 17-cr-201 (ABJ) (D.D.C. Feb. 13, 2019), Doc. 509 ("D.C. February 13 Order") (finding by a preponderance that the defendant breached his cooperation agreement and that he lied intentionally as to three

subject areas and not two others). The Fourth Circuit has held that in assessing acceptance of responsibility, a court may consider the defendant's post-arrest or post-plea conduct. *See United States v. Dugger*, 485 F.3d 236, 240 (4th Cir. 2007) (defendant's involvement in additional criminal activity after his arrest and plea justified denial of reduction for acceptance of responsibility).

Additionally, the defendant's brief is replete with claims that are at odds with acceptance of responsibility. The defendant blames everyone from the Special Counsel's Office to his Ukrainian clients for his own criminal choices.[1] Manafort suggests, for example, that but for the appointment of the Special Counsel's Office, he would not have been charged in connection with hiding more than $55 million abroad, failing to pay more than $6 million in taxes, and defrauding three financial institutions of more than $25 million dollars. In addition to a lack of remorse, Manafort has his facts wrong: he was being investigated by prosecutors in this district and the Criminal Division of the Department of Justice prior to the May 2017 appointment of the Special Counsel. *See* May 4, 2018 Motion Hearing Transcript, at 4.[2] Manafort contends that as a "mitigating factor," the Court should consider that Manafort initially opened foreign accounts "at the behest of [his] foreign clients," (*see* Doc. 317 at 29-30), but there is no evidence that any foreign client told Manafort not to report those accounts on his tax returns, not to file FBARs with the U.S. Treasury Department, or not to pay millions of dollars in taxes. And even if a

---

[1] For example, Manafort notes: 'The cases that Special Counsel have brought against Mr. Manafort have devastated him personally, professionally, and financially. The charges and associated publicity have brought intense, negative media coverage and scrutiny, have destroyed his career, and have resulted in financial hardship for Mr. Manafort and his family." *See* Doc. 317 at 4. But it is Manafort's own criminal actions that have led to these consequences; it cannot be blamed on the government or a jury's holding him responsible for his crimes.

[2] Manafort also seems to contend that because he was not charged with additional offenses, that mitigates his crimes of tax fraud, bank fraud and failing to file FBARs involving millions of dollars. Doc. 317 at 15-16. It does not.

foreign client had made those requests that would not present any defense to, or mitigation of, his crimes. It is Manafort who, after opening accounts in Cyprus, opened numerous new foreign accounts, including in other foreign countries. Those choices were his own and his efforts at misdirection are further proof that he has not accepted responsibility for his criminal conduct.

Manafort's claim that he disclosed his foreign accounts to the FBI misrepresents the facts and is no substitute for failing to report timely these accounts to the Treasury Department as required by law. Manafort only belatedly disclosed some, not all, of these accounts at his 2014 FBI interview, and at a time after many of those accounts were closed. *See* Trial Tr., at 1246. At no point in that 2014 FBI interview did Manafort acknowledge the more than 30 overseas accounts that he controlled in three countries, or the more than $55 million that passed through those accounts. Prior to his interview, Manafort also sought to cover his tracks. As Rick Gates testified, before that interview with the FBI, Manafort directed Gates to alert one of the Ukrainians who paid Manafort of the FBI investigation and find out more about the accounts used to pay him. Trial Tr., at 1247.

Manafort also blames the government for his difficulties with the banks he defrauded, noting, "all of the loans at issue in this case were performing under the terms of the relevant loan agreements *until* the Special Counsel's Office initiated the prosecution of Mr. Manafort and brought forfeiture allegations, which resulted in over $2 million in cash being frozen." Doc. 317 at 23-24 (emphasis in original). Manafort presents only some of the relevant facts. He fails, for example, to acknowledge that he had ample assets to repay the banks (and chose not to), including property that he could have sold. Further, the defendant had issues with bank repayments, notwithstanding his available assets, long before he was indicted. Notably, Genesis Capital brought suit against Manafort in September 2016 to secure payment on a prior loan for

the Union Street property (the very loan Manafort hid from other banks). *See* Government Exhibit 500 (stipulation regarding Genesis Capital)("On or about September 20, 2016, Genesis Capital Master Fund II, LLC, filed a Summons and Verified Complaint in the Supreme Court of The State of New York, County of Kings, against MC Brooklyn Holdings, LLC, Paul Manafort….. Judicial proceedings were initiated as a result of a lack of payment on the $3,897,468.00 mortgage beginning on or about April 1, 2016").

Finally, Manafort seeks leniency for having to forfeit the vast majority of "his" assets earned over a lifetime, Doc. 317 at 6, without any recognition that he profited handsomely from those crimes over that same lifetime or that the property was not "his" if obtained through criminal activity. And neither the Court, nor the government, can be sure of the full extent of Manafort's assets because he has failed to submit a financial statement to either this Court or the Court in District of Columbia—yet another example that he has failed to accept responsibility in a prosecution where he was convicted of hiding assets. Further, unlike most defendants who appear in tax cases, Manafort has not paid any restitution to the Treasury Department and still owes more than $6 million.

Manafort's effort to shift the blame to others—as he did at trial—is not consistent with acceptance of responsibility or a mitigating factor. Manafort has failed to accept that he is responsible for the criminal choices that bring him to this Court for sentencing.

### B.  Alleged Cooperation

The defendant asserts on several occasions that he "cooperated" with the Special Counsel's Office and that he testified before the grand jury. *See* Doc. 317 at 3. Manafort, however, violated his cooperation agreement with the government by lying about several topics to the government and the grand jury, as has been found by the District of Columbia District

Court. And he has conceded that the government was within its rights to find him in breach. *See* D.C. February 13 Order. Accordingly, the government opposes any credit or mitigation for the alleged cooperation, and contends that consideration of his lies to the government and grand jury are aggravating factors and an additional basis for the denial of any reduction for acceptance of responsibility.

Any departure based on substantial assistance to authorities under § 5K requires a government motion. U.S.S.G. § 5K1.1; *see Melendez v. United States*, 518 U.S. 120, 131 (1996); *United States v. Hernandez*, 587 F. App'x 76, 77 (4th Cir. 2014) (per curiam) (unpublished); *United States v. Fernandez*, 127 F.3d 277, 286 (2d Cir. 1997) (where a cooperation agreement required the defendant to be truthful, his subsequent lying to the government constitutes a breach of the agreement, allowing the government to refrain from making a § 5K1.1 motion). Even where the government has so moved, the extent of any reduction by the district court depends in part on "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant," U.S.S.G. § 5K1.1(a)(2). And "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance." U.S.S.G. § 5K1.1, cmt. n. 3. Here, a court has already found Manafort lied to the government and the grand jury. That is not a basis for a lower sentence, but rather a more severe one. *See United States v. Swanson*, 284 F. App'x 365, 368 (7th Cir. 2008) (unpublished order) ("Swanson cooperated only partially at time 't,' and then promptly obstructed justice attempting to reduce his criminal liability at time 't+1.' The district court committed no clear error in deciding that Swanson's initial cooperation and timely guilty plea did not combine to overcome his intervening obstruction of justice."); *United States v. Perez-Mendez*, 162 F. App'x 207, 209 (4th Cir. 2006) (per curiam) (unpublished) ("the Government

declined to file the motion—and indeed declined to seek assistance from Perez-Mendez—after it discovered that Perez-Mendez had provided false information to the court and to the presentence investigator"); *cf. United States v. David*, 58 F.3d 113, 114 (4th Cir. 1995) (upholding government's refusal to make § 5K1.1 motion where defendant had provided substantial assistance and then jumped bail prior to sentencing).

    C.    **Recidivism**

The defendant argues that he presents "no risk of recidivism . . .given the harsh lesson [he] has already learned, especially in light of his age." Doc. 317 at 24. There is no reason to believe this is so, and Manafort cites no evidence. Nowhere does the defendant address the fact that after he was indicted in two districts for crimes spanning a decade, including crimes through 2017, he committed the additional crimes in 2018 of tampering with witnesses while on bail from both courts. *See* Plea Agreement, *United States v. Manafort*, No. 17-cr-201 (ABJ) (D.D.C. Sept. 14, 2018) Doc. 422 ("D.C. Plea Agreement"); Statement of the Offenses and Other Acts, *United States v. Manafort*, No. 17-cr-201 (ABJ) (D.D.C. Sept. 14, 2018) Doc. 423 ("D.C. Statement of the Offenses and Other Acts") (Attached as Exhibit D to initial filing). Manafort also lied to the government and the grand jury, in material ways, as recently as October 2018. Such actions are inconsistent with learning any positive lesson from his criminal conduct and proof that the defendant poses a serious risk of recidivism.

In support of his claim that the defendant poses no risk of recidivism, he cites to a series of studies unrelated to his own situation, as well as *United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008). That case is easily distinguished, in part because there was no evidence that the defendant engaged in criminal activity after his indictment. Further, in support of a downward departure, the district court in *Smith* noted a series of factors, including that the

defendant had "avoided violations of the law up until this point in his life." *Id.* at 186 (internal quotation marks omitted). Manafort cannot make that claim.

### D. The Defendant's Health and Age

Manafort argues that his health and age merit a departure or variance from the guidelines. Manafort notes that since his incarceration he suffers from gout and has been prescribed a number of prescription drugs. Section 5H1.4 of the Guidelines Manual states that "[a]n extraordinary physical impairment may be a reason to depart downward" from the advisory guidelines. Manafort can and should receive proper medical care while he is incarcerated. But none of Manafort's reported conditions warrants a variance or departure. First, where the Bureau of Prisons ("BOP") has the ability to provide medical treatment for the defendant's condition, departure under § 5H1.4 is generally not appropriate. *See United States v. Persico*, 164 F.3d 796, 806 (2d Cir. 1999) (a § 5H1.4 departure requires medical conditions that BOP is unable to accommodate); *United States v. Greenwood*, 928 F.2d 645 (4th Cir. 1991) (departure appropriate where incarceration would jeopardize treatment); *United States v. Carey*, 895 F.2d 318 (7th Cir. 1990) (cancer, without more, is not an extraordinary physical impairment).

Putting aside the defendant's request for this Court to rely on a news article for the proposition that Manafort is in "danger of losing his life," *see* Doc. 317 at 20, Manafort has not submitted a report from a medical practitioner or shown that the BOP is unable to treat his medical conditions. To the contrary, during his nine-month incarceration the Alexandria Detention Center has appropriately addressed the defendant's medical needs. *See* PSR ¶¶ 119-123. Manafort has failed to establish that he has not received proper medical care and attention, and none of his prescribed treatments or medications indicates that his life is in any danger from a long period of incarceration.

This Court's opinion in *United States. v. Depew*, 751 F. Supp. 1195 (E.D. Va. 1990) (Ellis, J.) is instructive. In *Depew*, the defendant argued his physical condition, AIDS, warranted a downward departure from his guidelines calculation. As this Court has correctly noted, even "terminally ill persons who commit serious crimes may not use their affliction to escape prison" because "otherwise, the law's deterrent effect would be unreasonably and unnecessarily diminished in the case of terminally ill persons." *Id*. at 1199. This Court explained that the "Bureau of Prisons, at FCI Butner and elsewhere, has the medical personnel and facilities required to furnish defendant with the care and treatment he needs." *Id*. The Court concluded, "defendant's physical condition, while lamentable, is no basis for a departure." *Id*. The same principle applies here.

Third, the government notes that Manafort raised health issues as relevant to the determination of whether he intentionally lied to the government and the grand jury. Judge Jackson rejected his argument and made the following finding:

> I also found the defendant's statements in his submission concerning his health to be particularly conclusory. In his response to the allegations, the defendant specifically asked me to consider the defendant's health issues exacerbated by the conditions of confinement, quote, in particular, solitary confinement, close quote, as a reason why I should find that the inaccuracies were not intentional. But the submission did not include any chronology, any medical or mental health information, any information about the details of his custodial situation, or any information concerning the state of his health on any of the dates in question. In short, it gave me no basis upon which I could find that it would be a mitigating factor. So I gave the defense an opportunity to elaborate at the hearing. And when I asked questions and at that point it all evaporated and counsel had little or nothing to say, other than, It's been shown, One sees an impact, and there really wasn't any specificity there. And it left the impression that the issue was left in the pleading for public consumption, but not mine.

Transcript, *United States v. Manafort*, No. 17-cr-201 (ABJ) (D.D.C. Feb. 13, 2019), at 10-11.[3]

### E. The Defendant's Guidelines Objections

Having addressed the defendant's principal objections to the Probation Office's guidelines calculations in its sentencing memorandum, the government responds briefly here to the guidelines arguments in the defendant's sentencing submission.

#### 1. Use of § 2S1.3 to Determine Offense Level

The defendant does not dispute that under the plain terms of the guidelines and the relevant application note to the guideline governing his FBAR conviction, § 2S1.3 should be used to calculate the offense level for his Group 1 convictions. Rather, he makes an "historical" argument contending that the tax guidelines should be used here because they were used in sentencing other defendants prior to the Department of Justice revising its position. *See* Doc. 317 at 26, He also contends that because tax charges were included in the initial District of Columbia indictment returned in October 2017, before the Tax Division changed its position, the government in essence should be estopped.

Those arguments lack merit. The defendant's reference to his October 2017 indictment in the District of Columbia overlooks that the operative indictment in this case (and this District) was returned in February 2018, after the Department had announced its position on sentencing calculations in tax and FBAR cases, and after Manafort declined to waive venue so that all charges could proceed in the District of Columbia. Moreover, in arguing for use of the tax guidelines, the defendant does not address the fact that he used the unreported overseas accounts

---

[3] The government submits that this finding is persuasive authority, but not binding on this Court.

9

not just to further tax offenses (as in the example that he cites, Doc. 317 at 27), but also to perpetrate the money laundering conspiracy to which he pled guilty in the District of Columbia—an offense that itself involved promoting a violation of FARA. For those reasons and those set forth in the government's sentencing submission, *see* Gov't Sent. Mem. at 10-13, the Probation Office correctly calculated the advisory guidelines range pursuant to § 2S1.3 *See* Doc. 317 at 29-30.[4]

Further, even if the tax guidelines were applied, the total offense level would be at least 30 (and not 24 as the defendant alleges). As an initial matter, the tax loss relating to the $15 million in income hidden in the overseas accounts would be greater than $3.5 million (for a base offense level of 24 pursuant to § 2T4.1(J)) with enhancements of two levels pursuant to § 2T1.1(b)(2) (sophisticated means) and a four level role enhancement pursuant to § 3B1.1(a).

The § 2T1.1(b)(2) enhancement for "sophisticated means" "does not require a brilliant scheme, just one that displays a greater level of planning or concealment than the usual tax evasion case." *United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir. 2011) (internal quotation marks omitted). The application note says it "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2T1.1, cmt. n. 5. Examples include "hiding assets or transactions, or both, through the use of fictitious entities,

---

[4] The defendant also complains about the "draconian advisory Guidelines," referencing *United States v. Adelson*, 441 F. Supp 2d 506, 512 (S.D.N.Y. 2006), in which Judge Rakoff criticized the Sentencing Guidelines as rigidly attached to certain facts—like fraud loss or the weight of drugs. Doc. 317 at 6. The facts before Judge Rakoff were far different than those here, even if the Court were to agree with Judge Rakoff. Adelson was charged with the full loss resulting from an accounting fraud, when he joined late in the conspiracy and the loss was based on the loss to shareholders as dictated by the market and which may have been caused by a variety of factors. The facts here are easily distinguished; the fraud guidelines at issue related to the particular amount of money that Manafort hid in foreign accounts, not someone else, and not affected in any way by the market.

corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." *Id.* But the enhancement "properly applies to conduct less sophisticated than the list articulated in the application note." *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013). The "essence" some courts have said, "is merely deliberate steps taken to make the offense difficult to detect." *O'Doherty*, 643 F.3d at 220 (ellipses and internal quotation marks omitted).

Manafort's tax scheme involved hidden assets in more than 30 overseas accounts, with more than a dozen related entities, in three countries. These entities had corporate structures that concealed the identity of the true owner, Manafort, and which existed only to open bank accounts. Manafort deceived both his bookkeepers and his tax preparers with respect to these accounts (and the banks to which he applied for loans). He not only took deliberate steps to make the offense difficult to detect, he succeeded in doing so over an extended period of time.

Finally, courts regularly apply role enhancements in tax cases. *See, e.g.*, *United States v. Thorson*, 633 F.3d 312, 317-318 (4th Cir. 2011); *United States v. Perrin*, 237 Fed. Appx. 899, 900-01 (4th Cir. 2007) (per curiam). As noted above, Manafort involved both witting and unwitting participants in the scheme, from his coconspirator Rick Gates, and in the Ukraine, Konstantin Kilimnik, to his bookkeepers and tax preparers as well those who managed his accounts abroad at Dr. Kyphos Chrysostomides' firm (as reflected in Government Exhibits 63 and 73B).

### 2. Role Enhancement

The defendant challenges the assessment of a four level enhancement under § 3B1.1 for his leadership role in the offenses. He argues principally that § 3B1.1(a) applies only "to leaders or managers of organizations that have a primary purpose of engaging in crime, such as foreign cartels that smuggle narcotics into the United States, or motorcycle gangs that unlawfully transport and distribute firearms." Doc. 317 at 33-34. The defendant bases that contention on

references in the guidelines' background note to "a criminal organization" or "criminal enterprise[,]" terms that are not found in the text of § 3B1.1 itself. On the contrary, § 3B1.1 applies "[i]f the defendant was an organizer or leader of a criminal *activity*," § 3B1.1(a) (emphasis added), and does not require that the defendant have headed an "organization" or "enterprise" designed solely or even "primar[ily]" to carry out crimes.

The defendant identifies no case that endorses his interpretation of § 3B1.1. *See* Gov't Sent. Mem. at 15 n.23. Rather, courts have long held "that the owner of a legitimate business who actively participates in criminal activity through the business may be eligible for an aggravating role adjustment." *United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003). Thus, courts have applied the enhancement to the owner of a car dealership whose salesman helped drug dealers launder money by selling them cars for cash, *United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997); a laboratory owner whose company performed "the integral final step [in a] Medicare fraud" scheme, *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004); and a hedge fund manager who supervised others in an insider-trading scheme, *United States v. Rajaratnam*, No. 09-cr-1184, 2012 WL 362031, at *17 (S.D.N.Y. Jan. 31, 2012). *See also United States v. Ellis*, 951 F.2d 580, 584-85 & n.4 (4th Cir. 1991) (applying enhancement to a partner in a dog track who led a fraudulent scheme to influence passage of legislation that would benefit the dog track). Under those precedents and the plain text of the guideline, the fact that Manafort's companies performed some legitimate "consulting, public affairs, and public relations work," Doc. 317 at 34, does not foreclose application of the enhancement based on the defendant's directing individuals inside and outside those companies in the performance of criminal activities.

Finally, a role enhancement would apply whether the Court used the § 2S1.3 guidelines or the tax guidelines (as would the sophisticated means enhancement).

### 3. Loss for Group 2 Offenses

The PSR correctly holds the defendant accountable for approximately $6 million in loss for his schemes to defraud Citizens Bank, Banc of California, and the Federal Savings Bank. *See* Gov't Sent. Mem. at 15-16; PSR at ¶ 87. In arguing to the contrary, the defendant emphasizes that the intended-loss provision in the guidelines focuses on loss that the defendant purposefully inflicted and points out that the amount principally at issue—$5.5 million relating to the Union Street loan sought from Citizens Bank—was secured by collateral. Doc. 317 at 31. The government recognizes that the value of disclosed collateral is often deducted from the gross amount of intended loss. But as the government explained in its sentencing submission, that general rule is inapplicable when the defendant seeks to use encumbered collateral and conceals the encumbrance from the lender. Gov't Sent. Mem. at 16 (citing *United States v. Staples*, 410 F.3d 484, 490-91 (8th Cir. 2006)). Here, Manafort hid from Citizens Bank the fact that the property to serve as collateral already had a mortgage, thus undermining its value as collateral in the first place. The defendant claims that Citizens Bank ultimately became aware of the "preexisting mortgage on the Union Street property" by the time he submitted his loan application, Doc. 317 at 31, but any such awareness was attributable not to defendant's disclosures but to the bank's own due diligence. The bank's independent knowledge does not alter the fact that the defendant pressed forward with a loan application predicated on his provision of misleading information about the value of the collateral underlying the transaction. He does not, in short, deserve a reduction on intended loss based on the value of the collateral.

F.  **Claim of Sentencing Disparity**

Manafort cites a smattering of offshore tax cases from across the country to argue that a lenient sentence is required to avoid unwarranted sentencing disparities among similarly-situated offenders. Doc. 317 at 35-39; *see* 18 U.S.C. § 3553(a)(6). The cited examples, however, are inapposite, as none involves the combination of tax, FBAR, and bank fraud offenses evident in the jury's guilty verdict here—much less a defendant who continued to engage in deceptive and criminal conduct following indictment and after a guilty verdict and later guilty plea.

The cases that Manafort references vary widely from each other and from that of this defendant. The overwhelming majority of these cases involved guilty pleas (and thus award reductions for acceptance of responsibility); others, including several in this district, involved defendants who provided full cooperation and received credit for that cooperation and/or involved significant fines that were paid at or around the time of sentencing. For example, the defendant Horsky, sentenced by this Court, pled guilty, cooperated, and paid a fine of $100 million.

Further, many if not most of these cases involved defendants who parked money overseas but were not actively involved in managing or using the accounts, and certainly were not using the accounts to commit additional crimes. At the time, under certain limited circumstances not relevant to Manafort, the government offered immunity from prosecution to individuals who disclosed their overseas accounts; it prosecuted others who failed to disclose their accounts (one of the cited defendants for example applied for the program but his name was disclosed to the government by a financial institution prior to the filing of his application and he was prosecuted accordingly). One defendant, Mary Estelle Curran, was charged with hiding $47 million in a Swiss bank account which held money that she inherited from her husband when he died (and

which he had previously inherited). She paid more than $20 million in penalties as part of the settlement in her case. Still others pled guilty prior to being charged or indicted, demonstrating an extraordinary acceptance of responsibility. Another cited case involved a defendant who voluntarily returned to the United States to be subject to prosecution.

These facts are far afield from this case. Manafort's conduct was markedly different—involving more than thirty foreign accounts in three countries that housed more than $55 million, which he managed and accessed routinely. And Manafort was hiding not just his assets to avoid taxes, but also used millions of dollars to promote his FARA crimes.[5] He neither pled promptly nor provided complete and honest cooperation. He also has not paid back any of the taxes owed—a factor featured in most of the cases cited. Accordingly, these cases provide little guidance and no reason not to impose a sentence commensurate with his criminal conduct.

## Conclusion

The government is available to address any of the defendant's additional arguments at sentencing.

---

[5] Manafort's criminal activity involving his violation of FARA is detailed in the Statement of Facts and Other Offense attached to his plea agreement in the District of Columbia. *See* D.C. Plea Agreement; D.C. Statement of the Offenses and Other Acts ¶¶ 1-35. The government does not raise this point to seek a sentencing enhancement, but to rebut the defendant's claim that he sought only to promote democratic principles here and abroad. *See* Doc. 317 at 15. Further, the defendant calls attention to his work for four U.S. Presidents, but fails to acknowledge that at least with respect to his more recent role in the 2016 election, he actively tried to use his position to secure substantial loans from The Federal Savings Bank.

Respectfully submitted,

ROBERT S. MUELLER III
Special Counsel

Dated: March 5, 2019

Uzo Asonye
Assistant United States Attorney
Eastern District of Virginia

/s/

Andrew Weissmann
Greg D. Andres
Brandon L. Van Grack
Senior Assistant Special Counsels
Special Counsel's Office
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-0800

*Attorneys for United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of March, 2019, I will cause to be filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Thomas E. Zehnle (VA Bar No. 27755)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue, N.W., Suite 620
Washington, D.C. 20001
tezehnle@gmail.com

Jay R. Nanavati (VA Bar No. 44391)
Kostelanetz & Fink LLP
601 New Jersey Avenue, N.W., Suite 620
Washington, D.C. 20001
jnanavati@kflaw.com

/s/ Uzo Asonye
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
uzo.asonye@usdoj.gov
Phone: (703) 299-3700
Fax: (703) 299-3981
*Attorney for the United States of America*